N3g2AceC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In re: Acetaminophen –
ASD–ADHD Products Liability          New York, N.Y.
Litigation,

                                     22 MD 3043 (DLC)

------------------------------x      Remote Conference

                                     March 16, 2023
                                     2:00 p.m.

Before:

                    HON. DENISE COTE,

                                     District Judge


                        APPEARANCES

WATTS GUERRA, LLC
     Attorneys for Plaintiffs
BY:  ALICIA O'NEILL
     MIKAL C. WATTS

KELLER POSTMAN, LLC
     Attorneys for Plaintiffs
BY:  ASHLEY KELLER
     ASHLEY BARRIERE

HOLWELL SHUSTER & GOLDBERG, LLP
     Attorneys for Plaintiffs
BY:  DANIEL M. SULLIVAN

BARNES & THORNBURG, LLP
     Attorneys for Defendants
BY:  KRISTEN L. RICHER
     SARAH E. JOHNSTON

KING & SPALDING, LLP
     Attorneys for Defendants
BY:  KRISTEN R. FOURNIER

N3g2AceC

THE COURT:  Good afternoon, counsel.  This is Judge Cote speaking.

Do we have a court reporter?

THE COURT REPORTER:  Good afternoon, Judge.  Kristen Carannante.

THE COURT:  Thank you.

I will call the case.  In re: Acetaminophen, 22 MD 3043.

I will call appearances first for the plaintiffs. Mr. Watts, are you present?

MR. WATTS:  Yes, ma'am, I am.  Thank you.

THE COURT:  Mr. Keller.

MR. KELLER:  Good afternoon, your Honor.

THE COURT:  Mr. Sullivan.

MR. SULLIVAN:  I am here, your Honor.  Good afternoon.

THE COURT:  Ms. O'Neill.

MS. O'NEILL:  Good afternoon, your Honor.

THE COURT:  Ms. Barriere.

MS. BARRIERE:  Yes.  Good afternoon, your Honor.

THE COURT:  And for defense counsel, Ms. Richer.

MS. RICHER:  Good afternoon, your Honor.

THE COURT:  Ms. Fournier.

MS. FOURNIER:  Yes, your Honor.

THE COURT:  Ms. Johnston.

MS. JOHNSTON:  Yes.  Good afternoon, your Honor.

N3g2AceC

THE COURT:  Welcome, everyone.

Is there anyone else who wishes to place their appearance on the record?

Not hearing anyone, thank you all for participating on short notice with this conference call.  I have the parties' submissions of March 14 with respect to the plaintiff fact sheet, or PFS, as the parties' letters refer to it.  There are essentially four disputes.  But before we get to that, I want to just congratulate everyone for working so carefully together to arrive to this point where we just have four disputes to resolve.  I want to thank, also, Special Master Ellis for working with the parties to help bring this about.

I will want to raise with the parties at the end of our discussion today references that appear in the PFS to privileges—nonprivileged documents, recognized privileges, privilege log.  I am concerned about a potential for misleading people about what might be considered privileged, since there are so many medical records being called for.  But we will come back to that at the end of the conference.

Let me dive right in.  The first issue that the parties want some guidance on is to what extent an individual's psychiatric history will be discoverable in this PFS.

What I am going to do is give you a sense of my

preliminary ruling and let that party who is perhaps not going to win this debate be heard first and foremost.  And so let me ask, who is going to be speaking on behalf of the plaintiffs today?

MS. O'NEILL:  I will, your Honor --

MR. WATTS:  Your Honor, Mikal --

MS. O'NEILL:  -- Alicia -- oh, I'm sorry.

MR. WATTS:  I was about to tell you Alicia O'Neill, your Honor.  This is Mikal Watts.  I apologize.

THE COURT:  Thank you.

Ms. O'Neill, do you --

MS. O'NEILL:  Yes, your Honor.

THE COURT:  -- wish to be heard on this topic?

MS. O'NEILL:  I do, your Honor, just very briefly because most of what we wanted to say about it really is set out in our letter.

I think that under the law in this jurisdiction that you are not allowed to ask outside of or about unrelated illnesses and treatments.  Allowing the defendants to ask every single plaintiff for every single psychologist and psychiatrist that's ever treated them for every unrelated and probably horrible thing that's ever happened to them is embarrassing, it's irrelevant, it's privileged, and it will make plaintiffs quit this litigation.

THE COURT:  Thank you very much.

N3g2AceC

Yes, you are right, that the letters that were submitted to me discuss this issue in some detail, and one of the things I would be deeply disappointed by is if plaintiffs quit this litigation because these plaintiff fact sheets call for this information, but I think it must call for this information and let me explain why.

Even though this is highly sensitive, this is a case in which the plaintiffs are seeking damages from the defendants, and in the normal course, even if this were just a single case instead of a whole host of individual actions, this I believe would be discoverable material.

The claim here is that there was *in utero* damage caused by the mother taking acetaminophen during the pregnancy and the kind of damages is of a very serious kind, that the infant developed autism or ADHD.  These are conditions that would affect an individual's functioning in a serious way.

It is hard for me to envision a situation in which a treating physician or psychiatrist wouldn't be impacted in their treatment decisions by understanding that the individual they were treating was also autistic or had ADHD, and if that wasn't reflected in the records and affecting treatment, that would be powerful evidence that those conditions didn't exist or didn't exist in a dramatic fashion in that individual's life.

The hypotheticals that the plaintiffs have posed here

N3g2AceC

are receiving psychological treatment because you have been sexually abused or been bullied at school or have suffered the death of a parent or have an eating disorder.  All of these conditions can be experienced by people with or without these two conditions——autism or ADHD——but the existence, for instance, of autism might make you far more vulnerable and more likely a target for this kind of experience or would affect how you would react in a very significant way to this mistreatment or difficulty in your life.

So I think the information in psychiatric records can't honestly be called unrelated to the kinds of claims that are at issue here.  If the psychiatric records could be called unrelated and we could carve it out, I'd absolutely be willing to consider that.

Now, the fact that this might contain highly embarrassing information, well, we have confidentiality provisions in place, and I know if anybody thought they weren't being followed, they would bring those circumstances quickly to my attention.

So I know this poses a difficulty for plaintiffs' counsel in advising their clients about why this information is important to their claim and must be discoverable when you are bringing this kind of serious case, but I have thought about this at some length because I know it is distressing or is likely to be distressing if people sought psychological

N3g2AceC

counseling for experiences in their life that on their face weren't caused by these two conditions, but you have my ruling with respect to that.  This is going to be highly important not just to the defendants but to plaintiffs' counsel to understand; and indeed, there may be important issues with respect to damages that plaintiffs are going to want to think seriously about in terms of the impact on any request for damages in an individual's case.

So let me go to the next issue, smoking. Ms. O'Neill, I will hear you with respect to that.

MS. O'NEILL:  Thank you, your Honor.

This one we have a very simple argument, which is, we want this question to be more narrowly tailored.  What the defendants are worried about is a mom having been exposed to smoke; and so if that's the concern and the increase in risk of a condition, then we would like for the question to be tailored to that and to ask whether they resided with a smoker who they were exposed to, who actually smoked in their presence instead of just whether they lived with a smoker, and then obviously all of the information for that witness.

THE COURT:  So I am going to reject the request that the question be modified to narrow it to a question that is addressed to whether or not the person you were living with who was a smoker actually smoked in your presence.  I think the question is narrow enough when it asks about whether you

resided with a smoker.  All of us, I expect, know smokers and some of us perhaps have lived with smokers in our apartments or homes.  If someone is smoking in the home, you can't avoid it.  It penetrates the curtains, the carpets, the clothing——everything.  So I am not going to narrow the question.

So who is going to speak on behalf of the defendants today?

MS. RICHER:  Good afternoon, your Honor.  That will be me, Kristen Richer.

THE COURT:  Thank you, Ms. Richer.

So with respect to the two nonguided questions, and I am looking now at pages 15 and 16 of the PFS.  I want to direct your attention to let's start with page 15 (vi) and (vii)  I want to make sure I understand how to read the PFS. As I understand it, the dispute is not over (vi) and (vii) but, instead, it is addressed to the question at the top of page 16.  Do I understand that correctly?

MS. RICHER:  That's right, your Honor.  And your Honor's noticing (vi) is helpful, frankly, because I do think that we are already asking for an identification of symptoms or behaviors, (vii) -- pardon.  The disputed provision, which asks to describe what was observed or learned, is really intended to capture more information that was conveyed to parents.  So you might imagine that in response to question

N3g2AceC

(vi) it might say communication delays, inability to make eye contact.  But some of that information may have been observed by someone other than the parent and called to the parent's attention.  So part of what we were trying to capture in that disputed question was what exactly was reported to the parent at that time.  And for the reasons explained in our brief, we think some open question here is warranted and that this is not something that fits neatly into, you know, four options that the plaintiff can select by clicking on radio buttons, for example.

THE COURT:  So are the radio buttons visible to me on this sheet or are you just throwing that out as argument?

MS. RICHER:  They are not for this question, although for other questions -- for example, if your Honor goes to the bottom of page 16, you will see that there is a note there in blue for a drop-down menu that plaintiffs can select.  For certain questions where we thought information could readily be categorized, we put that in the draft so that plaintiffs could select those options.

The challenge is the way this information may have come to parents or to the person reporting in this PFS varies quite a bit and, frankly, the behaviors or things that were observed or learned we anticipate may vary quite a bit, and so we didn't think that was appropriate to include here.  And I say that, your Honor, because at one point plaintiff's counsel

N3g2AceC

suggested that, you know, their objection was to the open form of the question and could we just give the plaintiffs a few options to choose from, and I think that that would be unfairly limiting to defendants in this case.

THE COURT:  Well, I am going to deny your request for the open question.  It seems to me that question (vi) and (vii) at the bottom of page 15 are sufficient.  They identify or require the person answering the question to identify the symptoms or behaviors, and question (vii) specifically elicits the date information, so I don't think we need more.

Let's go to the last issue about the special master and the order to show cause procedure.

In mapping this out, it seems to me that if we can get this plaintiffs' fact sheet finalized, let's say, early next week and an order issued early next week, we are looking at any difficulties ripening for the review of the Court sometime next September or October.  There are 60 days to fill out the questionnaire and then review periods and deficiency periods and periods for curing deficiencies, all of which the parties have agreed to.

So you are asking whether or not, once that process between the parties has concluded and there is still a complaint by the defendants with respect to deficiencies in the PFS, whether those should go to the special master—who we are fortunate enough here to have a wonderful special

N3g2AceC

master——or to me.

This isn't a difficult decision for me because my practice is to manage discovery myself in all cases——simple or complex.  I don't use magistrate judges.  I don't use special masters.  So I don't actually think there is a need or a role for a special master here except perhaps, once I have given you a couple of rulings, if there are -- if there is a need for any ruling whatsoever, I expect counsel will choose some good exemplars, I will give you a few rulings, and thereafter it may be that the special master can help you mediate if you need that additional help.  But I am going to just take this task on as I customarily do and work with counsel to make it as efficient as possible.  And if down the road I am not giving you a quick enough response or there is some inefficiency that I don't foresee right now, we can revisit this issue about a more appropriate process that can help the parties finalize the PFSs.

So before I turn to the questions I had about the references to privileges, I want to make sure that counsel had an opportunity to be heard with respect to these issues or any other issues about the PFS.

So Ms. O'Neill, is there anything else you wanted to add?

MS. O'NEILL:  No, your Honor.  I would just like to say that we were able to work really well with defense counsel

N3g2AceC

in getting this all together, and I was really happy to see the very few number of disagreements we had.

THE COURT:  I agree.  So thank you very much.

Ms. Richer, anything you want to add?

MS. RICHER:  I would just echo that, your Honor.  I think counsel in this litigation all know that this is not normally so streamlined a process, so it was truly a pleasure to work with Ms. O'Neill and Ms. Schwartz on this, who is not here today.

I also just wanted to call back to something that came up earlier on the call regarding the sensitivity of the psychiatric information, and that's just to say, your Honor, we appreciate that you understand that we are not asking for this information to be harassing in any way.  That's certainly not the case.  And we take our confidentiality obligations here very seriously and understand that this may be sensitive information for some plaintiffs.  And so we will act accordingly, and we appreciate your Honor recognizing that here.

THE COURT:  Thank you.

So let's talk about the references to privileged material.  I am just confused about how a plaintiff is going to understand the reference to privileged material and what privileges might require withholding of documents and entries on a privilege log.  Other than attorney-client privilege, I

N3g2AceC

am hard pressed to understand what additional privilege might exist.

Ms. O'Neill, do you have any idea of what the parties were contemplating on that score?

MS. O'NEILL:  I think, your Honor, that we probably could easily by the beginning of next week make it more clear so that a plaintiff could understand exactly what we were talking about.  I believe that -- and defense can join in if they thought of something different, but I believe what we were contemplating was attorney-client privilege.

THE COURT:  Okay.  Great.

MS. RICHER:  Yes, I think that's right, your Honor.

THE COURT:  Great.  So you can just say attorney-client privilege.

MS. O'NEILL:  Yes, your Honor.

THE COURT:  Great.  Wonderful.

So Ms. O'Neill, when do you think you will get me a turnaround?  Next week?  Early next week sound doable?

MS. O'NEILL:  Oh, absolutely, your Honor.

THE COURT:  Wonderful.

Anything else that anyone would like to raise?

Have a great weekend, everyone.  Thank you very much.

COUNSEL:  Thank you, your Honor.

oOo