# EXHIBIT 2

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2

 3   IN RE: ACETAMINOPHEN -     ) MDL No. 3043
     ASD-ADHD PRODUCTS          )
 4   LIABILITY LITIGATION       ) Case No.
     _____    ) 1:22-md-03043-DLC
 5   THIS DOCUMENT RELATES TO: )
                                ) JUDGE DENISE
 6   All Cases, 1:22-md-03043  ) COTE

 7

 8            WEDNESDAY, AUGUST 30, 2023

     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
 9
                       - - -
10

11          Videotaped deposition of Wendy

12   Chung, MD, Ph.D., held at the offices of

13   Barnes & Thornburg, One Marina Park Drive,

14   Suite 1530, Boston, Massachusetts, commencing

15   at 8:42 a.m. Eastern, on the above date,

16   before Carrie A. Campbell, Registered

17   Diplomate Reporter, Certified Realtime

18   Reporter, Illinois, California & Texas

19   Certified Shorthand Reporter, Missouri,

20   Kansas, Louisiana & New Jersey Certified

21   Court Reporter.

22                     - - -
             GOLKOW LITIGATION SERVICES
23                 877.370.DEPS
               deps@golkow.com
24

25
```

```
 1        A P P E A R A N C E S :

 2

 3   TRACEY & FOX
     BY:  SEAN P. TRACEY
 4        stracey@traceylawfirm.com
          LAWRENCE TRACEY
 5        ltracey@traceylawfirm.com
     440 Louisiana Street, Suite 1901
 6   Houston, Texas  77002
     (713) 495-2333
 7

 8   and

 9

     THE LANIER LAW FIRM, PLLC
10   BY:  EVAN M. JANUSH       (VIA ZOOM)
          evan.janush@lanierlawfirm.com
11        CATHERINE HEACOX     (VIA ZOOM)
          catherine.heacox@lanierlawfirm.com
12   126 East 56th Street, 6th Floor
     New York, New York  11758
13   (212) 421-2800

14
     and
15

16
     KELLER POSTMAN LLC
17   BY:  REBECCA KING         (VIA ZOOM)
          rebecca.king@kellerpostman.com
18        ASHLEY C. KELLER     (VIA ZOOM)
          ashley.keller@kellerpostman.com
19        ASHLEY BARRIERE      (VIA ZOOM)
          ashley.barriere@kellerpostman.com
20        AMANDA HUNT          (VIA ZOOM)
          amanda.hunt@kellerpostman.com
21        ROSIE ROMANO         (VIA ZOOM)
          rosie.romano@kellerpostman.com
22        LAUREN SCHULTZ       (VIA ZOOM)
          lauren.schultz@kellerpostman.com
23        J.J. SNIDOW          (VIA ZOOM)
          jj.snidow@kellerpostman.com
24   150 North Riverside Plaza, Suite 4100
     Chicago, Illinois  60606
25   (312) 741-5220
```

Confidential - Subject to Protective Order

```
 1    and

 2
      WATTS GUERRA LLC
 3    BY:  MIKAL C. WATTS
             mcwatts@wattsguerra.com
 4           HAILEY WATTS
             hwatts@wattsguerra.com
 5           RUSS ABNEY            (VIA ZOOM)
             rabney@wattsguerra.com
 6           JOHN CRACKEN          (VIA ZOOM)
             jcracken@wattsguerra.com
 7    Millennium Park Plaza RFO
      Suite 410, C112
 8    Guaynabo, Puerto Rico  00966
      (210) 447-0500
 9

10    and

11
      HOLWELL SHUSTER & GOLDBERG LLP
12    BY:  EILEEN MONAGHAN DELUCIA  (VIA ZOOM)
             edelucia@hsgllp.com
13    425 Lexington Avenue
      New York, New York  10017
14    (646) 837-5151

15
      and
16

17    MOSKOW LAW GROUP LLC
      BY:  NEAL L. MOSKOW
18           neal@moskowlaw.com
      425 Kings Highway East
19    Fairfield, Connecticut  06825
      (475) 999-4177
20

21    and

22
      WAGSTAFF & CARTMELL
23    BY:  LINDSEY SCARCELLO     (VIA ZOOM)
             lscarcello@wcllp.com
24    4740 Grand Avenue, Suite 300
      Kansas City, Missouri  64112
25    (816) 701-1100
```

Confidential - Subject to Protective Order

```
 1   and

 2
     THE CARLSON LAW FIRM
 3   BY:  EMILY MARLOWE         (VIA ZOOM)
          emarlowe@carlsonattorneys.com
 4   1717 North Interstate Highway 35,
     Suite 305
 5   Round Rock, Texas   78664
     (512) 671-7277
 6

 7   and

 8
     KRAUSE & KINSMAN
 9   BY:  TRICIA CAMPBELL        (VIA ZOOM)
          tcampbell@krauseandkinsman.com
10   4717 Grand Avenue, Suite 300
     Kansas City, Missouri  64112
11   (816) 200-2900

12
     and
13

14   DOVEL & LUNER
     BY:  JULIEN ADAMS          (VIA ZOOM)
15        julien@dovel.com
          GREG DOVEL            (VIA ZOOM)
16        greg@dovel.com
     201 Santa Monica Boulevard, Suite 600
17   Santa Monica, California   90401
     (310) 656-7066
18

19   and

20
     TORHOERMAN LAW LLC
21   BY:  ERIC CRACKEN          (VIA ZOOM)
          ecracken@thlawyer.com
22   227 West Monroe Street, Suite 2650
     Chicago, Illinois 60606
23   (312) 372-4800

24
     and
25
```

```
 1   BEASLEY, ALLEN, CROW, METHVIN,
     PORTIS & MILES
 2   BY:  JASON SHORT           (VIA ZOOM)
          jason.short@beasleyallen.com
 3   218 Commerce Street
     Montgomery, Alabama  36104
 4   (800) 898-2034

 5
     and
 6

 7   KERSHAW TALLEY BARLOW
     BY:  WILLIAM J. LEE        (VIA ZOOM)
 8        VINH T. LE            (VIA ZOOM)
     401 Watt Avenue, Suite 1
 9   Sacramento, California  95864-7273
     (916) 520-6639
10
     and
11

12   COOPER LAW PARTNERS
     BY:  DAVIS COOPER          (VIA ZOOM)
13        davis@cooperlawpartners.com
     999 Vanderbilt Beach Road, Suite 200
14   Naples, Florida  34108
     (800) 872-3500
15

16   and

17
     COOPER & KIRK PLLC
18   BY:  JOSEPH O. MASTERMAN   (VIA ZOOM)
          jmasterman@cooperkirk.com
19   523 New Hampshire Avenue NW
     Washington, DC  20036
20   (202) 220-9600
     Counsel for Plaintiffs
21

22

23

24

25
```

Confidential - Subject to Protective Order

```
 1   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     BY:  ALLISON M. BROWN
 2        allison.brown@skadden.com
     One Manhattan West
 3   New York, New York  10001
     (212) 735-3000
 4

 5   and

 6

     BARNES & THORNBURG LLP
 7   BY:  JAMES F. MURDICA      (VIA ZOOM)
          jmurdica@btlaw.com
 8   2029 Century Park East, Suite 300
     Los Angeles, California  90067-2904
 9   (310) 284-3880

10
     and
11

12   BARNES & THORNBURG LLP
     BY:  DEANNA LEE            (VIA ZOOM)
13        dlee@btlaw.com
     555 12th Street N.W., Suite 1200
14   Washington, DC  20004-1275
     (202) 289-1313
15

16   and

17

     BARNES & THORNBURG LLP
18   BY:  JESSICA BRENNAN       (VIA ZOOM)
          jessica.brennan@btlaw.com
19   67 East Park Place, Suite 500
     Morristown, New Jersey  07960
20   (973) 775-6101

21
     and
22

23

24

25
```

Confidential - Subject to Protective Order

```
 1   BARNES & THORNBURG, LLP
     BY:  KARA KAPKE          (VIA ZOOM)
 2        kara.kapke@btlaw.com
     11 South Meridian Street
 3   Indianapolis, Indiana  46204
     (317) 236-1313
 4

 5   and

 6

     BUTLER SNOW
 7   BY:  DAVID M. COHEN      (VIA ZOOM)
          david.cohen@butlersnow.com
 8        RAQUEL LUCAS        (VIA ZOOM)
          raquel.lucas@butlersnow.com
 9   810 7th Avenue, Suite 1105
     New York, New York  10019
10   (646) 606-2996
     Counsel for Johnson & Johnson
11   Consumer, Inc.

12

13   BARNES & THORNBURG LLP
     BY:  SANDRA M. KO        (VIA ZOOM)
14        sko@btlaw.com
     555 12th Street N.W., Suite 1200
15   Washington, DC  20004-1275
     (202) 289-1313
16   Counsel for Costco Wholesale
     Corporation
17

18

     ARNOLD & PORTER, LLP
19   BY:  RAYNE ELLIS         (VIA ZOOM)
          rayne.ellis@arnoldporter.com
20   250 West 55th Street
     New York, New York  10019
21   (212) 836-8000
     Counsel for Dollar Tree Inc.,
22   7-Eleven, and Family Dollar, Inc.

23

24

25
```

```
 1    KING & SPALDING LLP
      BY:  EVA CANAAN            (VIA ZOOM)
 2         ecanaan@kslaw.com
      1185 Avenue of the Americas
 3    New York, New York  10036
      (212) 556-2100
 4
      and
 5
      KING & SPALDING LLP
 6    BY:  LUKE BOSSO            (VIA ZOOM)
           lbosso@kslaw.com
 7    1700 Pennsylvania Avenue NW
      Washington, DC  20006
 8    (202) 737-0500
      Counsel for Walmart Inc., and
 9    Wal-Mart Stores, Inc.

10

11    MORRISON & FOERSTER LLP
      BY:  LYNDSEY CAIN          (VIA ZOOM)
12         lcain@mofo.com
           ASHLEY E. QUINN       (VIA ZOOM)
13         aquinn@mofo.com
      250 West 55th Street
14    New York, New York  10019-9601
      (212) 468-8000
15    Counsel for Target Corporation

16

17    DUANE MORRIS LLP
      BY:  SEAN K. BURKE         (VIA ZOOM)
18         sburke@duanemorris.com
      901 New York Avenue N.W., Suite 700 East
19    Washington, DC 20001-4795
      (202) 776-5236
20    Counsel for Dollar General, Dollar
      General Corporation
21

22

23

24

25
```

Confidential - Subject to Protective Order

```
 1       SMITH SOVIK KENDRICK & SUGNET
         BY:  DAVID M. KATZ          (VIA ZOOM)
 2            dkatz@smithsovik.com
         250 South Clinton Street, Suite 600
 3       Syracuse, New York  13202
         (315) 474-2911
 4       Counsel for Rite Aid


 5


 6       STONE DEAN LLP
         BY:  JOSEPH A. LARA         (VIA ZOOM)
 7            jlara@stonedeanlaw.com
         21052 Oxnard Street
 8       Woodland Hills, California  91367
         (818) 999-2232
 9       Counsel for The Kroger Co.


10


11       HAIGHT BROWN & BONESTEEL LLP
         BY:  KEITH ROZANSKI         (VIA ZOOM)
12            krozanski@hbblaw.com
         555 South Flower Street, 55th Floor
13       Los Angeles, California  90071
         (213) 542-8000
14       Counsel for Big Lots Stores-PNS, LLC


15


16   ALSO PRESENT:
             DANIEL OLIVO, Tracey Fox & Walters
17
             MICHAEL KAUFFMANN, trial technician,
18   Precision Trial Solutions

19           LISA QIAN, firm unknown

20           NAO TAKADA, firm unknown


21


22   V I D E O G R A P H E R :
         ROBERT MARTIGNETTI,
23       Golkow Litigation Services
                         - - -
24


25
```

Confidential - Subject to Protective Order

```
 1                        INDEX

 2                                          PAGE

 3   APPEARANCES................................  2

 4   EXAMINATIONS

 5     BY MR. TRACEY............................  14

 6     BY MS. BROWN............................ 430

 7

 8                      EXHIBITS

 9     No.   Description                        Page

10    300    Video clip of Wendy Chung          300

11    301    Plaintiffs' Notice of Oral         430
             Videotaped Deposition of Wendy
12           Chung and Requests for Production
             of Documents
13
      303    Invoices of Wendy K. Chung, MD,    430
14           Ph.D.

15    305    Rule 26(a)(2) Expert Disclosure     46
             of Wendy K. Chung, MD, Ph.D.
16
      305A   "Meta-analysis and                 422
17           multidisciplinary consensus
             statement:exome sequencing is a
18           first-tier clinical diagnostic
             test for individuals with
19           neurodevelopmental disorders,"
             Srivastava, et al.
20
      309    Exploring Gene-Environment         271
21           Interactions in Autism Spectrum
             Disorder, March 21, 2023
22
      312    "Neurobehavioural effects of       108
23           developmental toxicity,"
             Grandjean, et al.
24

25
```

Confidential — Subject to Protective Order

| | | | |
|---|---|---|---|
| 1 | 313 | "Environmental exposures associated with elevated risk for autism spectrum disorder may augment the burden of deleterious de novo mutations among probands," Pugsley, et al. | 230 |
| 2 | 315 | SPARK and the Future of Autism Research, Wendy Chung, MD, Ph.D., April 25, 2023 | 311 |
| 3 | 318 | "Considering Toxic Chemicals in the Etiology of Autism," Volk, et al. | 136 |
| 4 | 319 | "Gene and Environment Interaction," NIEHS | 98 |
| 5 | 320 | "Study Spotlight: GEARS Study," Emily Singer | 289 |
| 6 | 322 | "The False Dawn of Polygenic Risk Scores for Human Disease Prediction," Herzig, et al. | 358 |
| 7 | 322B | "Addressing the challenges of polygenic scores in human genetic research," November, et al. | 383 |
| 8 | 326 | "Autism genes ares electively targeted by environmental pollutants including pesticides, heavy metals, bisphenol A, phthalates and many others in food, cosmetics or household products," Carter, et al. | 166 |
| 9 | 329 | Label for DEPAKOTE ER - divalproex sodium tablet, extended release, AbbVie Inc. | 197 |
| 10 | 333 | "Environmental carcinogens disproportionally mutate genes implicated in neurodevelopmental disorders," Baker, et al. | 217 |

Confidential - Subject to Protective Order

1   343B   "A framework for an                       346
           evidence-based gene list relevant
2          to autism spectrum disorder,"
           Schaaf, et al.
3
    348A   Deposition Transcript of Wendy           52
4          Chung, MD, Ph.D., April 23, 2019

5   391A   Intro to Craig Newschaffer video        334
           clip
6
    391B   Craig Newschaffer video clip            335
7
    398    "Heritability in the genomics era        85
8          - concepts and misconceptions,"
           Visscher, et al.
9

10     (Exhibits attached to the deposition.)

11

12   CERTIFICATE..................................437

13   ACKNOWLEDGMENT OF DEPONENT...................439

14   ERRATA......................................440

15   LAWYER'S NOTES..............................441

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Protective Order

```
 1              VIDEOGRAPHER:  We are now on

 2        the record.  My name is Robert

 3        Martignetti.  I'm a videographer for

 4        Golkow Litigation Services.

 5              Today's date is August 30,

 6        2023, and the time is 8:42 a.m.

 7              This video deposition is being

 8        held in Boston, Massachusetts, In Re:

 9        Acetaminophen/ASD-ADHD Products

10        Liability Litigation.

11              The deponent is Wendy Chung,

12        MD, Ph.D.

13              Counsels' appearances will be

14        noted on the stenographic record.

15              The court reporter is Carrie

16        Campbell and will now swear in the

17        witness.

18

19              WENDY CHUNG, MD, Ph.D.,

20   of lawful age, having been first duly sworn

21   to tell the truth, the whole truth and

22   nothing but the truth, deposes and says on

23   behalf of the Plaintiffs, as follows:

24   /

25   /
```

Confidential - Subject to Protective Order

```
 1                  DIRECT EXAMINATION

 2   QUESTIONS BY MR. TRACEY:

 3        Q.    Dr. Chung, could you please

 4   introduce yourself?

 5        A.    Sure.  I'm Wendy Chung.

 6        Q.    And where do you live?

 7        A.    20 Village Way, Brookline,

 8   Massachusetts.

 9        Q.    And, Dr. Chung, my name is Sean

10   Tracey.  You and I met before the deposition,

11   right?

12        A.    That's correct.

13        Q.    And do you understand I'm a

14   lawyer who's going to ask you questions in

15   this case?

16        A.    Yes.

17        Q.    One of the questions I want to

18   ask you is how you got hired in this case.

19              Can you tell me that?

20        A.    I was approached by Eva Canaan.

21        Q.    Who?

22        A.    Eva Canaan.

23        Q.    Who is Eva Canaan?

24        A.    She's a lawyer.

25        Q.    With what firm?
```

Confidential - Subject to Protective Order

```
1        A.    I don't recall.  You -- I'm
2   sure it's easy to look up.
3        Q.    How do you know her?
4        A.    I had worked with her
5   previously.
6        Q.    On what kind of case?
7        A.    Another legal case in terms of
8   trying to understand a product and whether or
9   not a product was responsible for an outcome.
10       Q.    What product was that?
11       A.    Zofran.
12       Q.    Zofran?
13       A.    Yes.
14       Q.    Was that a Zofran birth defect
15  case?
16       A.    It was.
17       Q.    And is that a GSK product,
18  Zofran?  I've forgotten.
19       A.    I don't recall who manufactures
20  Zofran.
21       Q.    Okay.  Did you give a
22  deposition in that case?
23       A.    Yes.
24       Q.    All right.  Did you testify at
25  trial?
```

Confidential - Subject to Protective Order

```
 1          A.      I did not.

 2          Q.      I've read some of your

 3   depositions.  I got ahold of three or four of

 4   them, and I know you've testified in other

 5   pharmaceutical litigation?

 6          A.      Yes, I have.

 7          Q.      You testified in, you told us,

 8   the Zofran litigation.  I think you

 9   testified --

10          A.      Let me --

11          Q.      Pardon me?

12          A.      I just want to clarify.  I gave

13   deposition.  I haven't testified.

14          Q.      Yeah.  Good point.

15                  So we lawyers call deposition

16   testimony.

17          A.      Ah, okay.

18          Q.      It's the same kind of testimony

19   if you were testifying live at trial.

20                  Do you understand that?

21          A.      Okay.

22          Q.      So they make you raise your

23   right hand.  You swear to tell the truth.

24                  This testimony is just as

25   binding as if you were to stare at a jury in
```

Confidential - Subject to Protective Order

1    the eye.

2              Okay?

3        A.    I understand.

4              MS. BROWN:  I object to that.

5    QUESTIONS BY MR. TRACEY:

6        Q.    So when we say "testimony,"

7    lawyers, we mean both.

8              Okay?

9        A.    Understood.

10       Q.    So you have given sworn

11   testimony in other drug cases as I understand

12   it?

13             MS. BROWN:  Objection to the

14        form.

15             You can answer.

16             THE WITNESS:  I had give a

17        dep -- given a deposition in the

18        Zofran litigation.

19   QUESTIONS BY MR. TRACEY:

20       Q.    And didn't you give a

21   deposition in an SSRI case?

22       A.    I did.

23       Q.    What other drug or device cases

24   have you testified in?

25       A.    Those are the only two.

Confidential - Subject to Protective Order

1     Q.      The only two.

2             Have you consulted before this

3     case for Johnson & Johnson or any of the

4     affiliated Johnson & Johnson companies?

5     A.      No, I have not.

6     Q.      Okay.  Do you consult for drug

7     companies outside of litigation?

8     A.      I am --

9             MS. BROWN:  Object to the form

10        of the question.

11            Go ahead.

12            THE WITNESS:  I am on

13        scientific advisory boards or boards

14        of directors.

15    QUESTIONS BY MR. TRACEY:

16    Q.      How many companies are you on

17    the scientific advisory boards or boards of

18    directors?

19    A.      I would have to look back.  I

20    don't recall off the top of my head.

21    Q.      Do you remember, is it 5 or 10

22    or 20?

23    A.      Oh, no.  It's a small number.

24    Q.      Is it less than five?

25    A.      I believe so.  Regeneron

Confidential — Subject to Protective Order

```
1    Genetics Center is the main one.
2         Q.    Regeneron?
3         A.    Genetics Center.
4         Q.    Genetics Center.
5               And what do they make?
6         A.    I don't know all the products
7    that Regeneron makes, but the -- it's
8    specifically the Genetics Center within
9    Regeneron.
10        Q.    Okay.  Do you have stock in
11   Regeneron?
12        A.    I do not.
13        Q.    Do you have options?
14        A.    I do not.
15        Q.    Do you get paid for sitting on
16   the board?
17        A.    I had in the past, but I don't
18   now, but I'm not -- again, a scientific
19   advisor, not on a board.
20        Q.    Okay.  What other companies are
21   you either on the board or a scientific
22   advisor for?
23        A.    Prime Medicine.
24        Q.    Prime?
25        A.    Prime Medicine.
```

Confidential - Subject to Protective Order

1   Q.      And what does Prime Medicine

2   do?

3   A.      They have a technology for gene

4   editing.

5   Q.      And are you on the scientific

6   advisory board?

7   A.      The board of directors.

8   Q.      You're on the board of

9   directors for Prime Medicine.

10          And is that a paid position?

11  A.      It is.

12  Q.      Do you own stock in Prime

13  Medicine?

14  A.      I have options, but I don't own

15  stock.

16  Q.      Okay.  Were the options issued

17  in exchange for you serving on the board?

18  A.      As part of being a member of

19  the board of director, I was given options.

20  Q.      Is that a publicly traded

21  company?

22  A.      It is.

23  Q.      Okay.  And how long have you

24  been on the board of Prime Medicine?

25  A.      I believe a little less than

Confidential - Subject to Protective Order

1    two years.

2         Q.    How did you get on -- how did

3    that come about?  How did you get approached

4    to be on the board of Prime Medicine?

5         A.    I was approached by a firm

6    that's -- places members of boards of

7    directors.

8         Q.    They approached you?

9         A.    They approached me.

10        Q.    Okay.  And what does Prime

11   Medicine -- what do they do?  What do they

12   make?  How do they make money?

13             MS. BROWN:  Objection to the

14        form.

15             You can answer, if you know.

16             THE WITNESS:  Right now they

17        don't have a product, but they are

18        trying to develop therapies for

19        genetic conditions and for diseases

20        using that prime editing technology.

21   QUESTIONS BY MR. TRACEY:

22        Q.    Okay.  And the hope is that one

23   day they will have that technology available

24   commercially?

25             MS. BROWN:  Objection to the

```
 1          form.

 2                    THE WITNESS:  The hope is that

 3          one day they will be able to apply

 4          that technology for diseases.

 5   QUESTIONS BY MR. TRACEY:

 6          Q.     And to be used commercially, to

 7   sell?

 8          A.     Yes, correct.

 9          Q.     Yeah.

10                 It's a for-profit company?

11          A.     It is a publicly traded,

12   for-profit company.

13          Q.     And do your options -- so do

14   you know when your options expire?

15          A.     I don't recall.

16          Q.     Okay.  Any other companies that

17   you are on the boards of?

18          A.     Rallybio.

19          Q.     Reilly?

20          A.     Rallybio, R-a-l-l-y, Bio.

21          Q.     And where is Rallybio?

22          A.     In Connecticut.

23          Q.     And what do they do or make?

24          A.     They don't have a commercial

25   product at this time, but, again, they focus
```

1   on rare diseases and have several things that

2   they're working on.

3        Q.     And are you on the board of

4   directors for that company?

5        A.     Correct.

6        Q.     And is that a paid position?

7        A.     Yes, it is compensated.

8        Q.     And so both Prime Medicine and

9   Rallybio are positions where you sit on the

10  boards of these companies and you're paid for

11  that?

12       A.     That is correct.

13       Q.     Now, you told me that with

14  Prime Medicine you also have options.

15              Do you have options with

16  Rallybio?

17       A.     I do.

18       Q.     Okay.  And have you exercised

19  any of those options?

20       A.     I have not.

21       Q.     Do you have any stock in the

22  company independent of the options?

23       A.     I do not.

24       Q.     Okay.  You told me that company

25  isn't selling a product yet, but it hopes to?

Confidential - Subject to Protective Order

```
 1          A.      That is correct.
 2          Q.      And what type of company is
 3   Rallybio?  What are they hoping to sell one
 4   day?
 5          A.      They're a pharmaceutical --
 6   they're developing treatments for human
 7   conditions.
 8          Q.      What human conditions, if you
 9   know?
10          A.      So they have things in early
11   stages, some of which are not publicly
12   disclosed.
13          Q.      Okay.  Are they a -- for
14   autism?
15          A.      No, they are not.
16          Q.      Are they for any
17   neurodevelopmental disorders?
18          A.      They are not.
19          Q.      How did you get to be on the
20   board of Rallybio?
21          A.      I was approached by someone who
22   tries to recruit boards of directors.
23          Q.      Okay.  You told me that, didn't
24   you?
25          A.      (Witness nods head.)
```

Confidential - Subject to Protective Order

1    Q.    Yeah.

2          And what about Prime Meridian

3    {sic}, how did you get on their board?

4    A.    Same process.

5    Q.    Oh, it was the same process.

6          Okay.  Okay.  Any other

7    companies?

8    A.    No.

9    Q.    So you are -- are you on the

10   scientific advisory board for Regeneron?

11   A.    For the Regeneron Genetics

12   Center.

13   Q.    But -- okay.  But you're not on

14   the board of directors for that company?

15   A.    I am not.

16   Q.    Okay.  Do you know anybody at

17   Johnson & Johnson?

18         MS. BROWN:  Objection to the

19   form.

20         You can answer, if you

21   understand.

22         THE WITNESS:  I'm sure there's

23   someone at Johnson & Johnson that I

24   know, just because it's a large

25   company with subsidiaries.

Confidential - Subject to Protective Order

```
 1                But off the top of my head,

 2        there's no one that I'm working with

 3        at Johnson & Johnson that comes to

 4        mind.

 5  QUESTIONS BY MR. TRACEY:

 6        Q.      Well, whether you're working

 7  with them or not, can you identify a Johnson

 8  & Johnson employee that you know?

 9        A.      No, because I'm not actively

10  working with Johnson & Johnson.

11        Q.      What does that mean?  What does

12  that have to do with my question?

13                Do you know anybody at Johnson

14  & Johnson?

15                MS. BROWN:  I object to the

16        form.  She answered the question.

17                THE WITNESS:  I can't think of

18        anyone that I know works at Johnson &

19        Johnson.  On the other hand, I have a

20        large circle of people that I know,

21        and they move in positions.

22                And I can't say for sure that

23        someone might not be at Johnson &

24        Johnson currently, and I wouldn't have

25        realized that they've moved to Johnson
```

Confidential - Subject to Protective Order

```
1          & Johnson.

2     QUESTIONS BY MR. TRACEY:

3          Q.     I see what you're saying.

4     Okay.  I understand now.  Thank you.

5               Do you know what the JAKE

6     program is at Johnson & Johnson, J-A-K-E?

7               MS. BROWN:  Objection to form.

8               THE WITNESS:  I believe there

9          is an app that's used at Janssen.

10    QUESTIONS BY MR. TRACEY:

11         Q.     Good point.  Janssen, not J&J.

12         A.     And I believe that's what

13    you're referring to in terms of JAKE.

14         Q.     Yes, that is.

15               Are you familiar with the app?

16         A.     I have looked at the app

17    several years ago.

18         Q.     Why did you look at the app

19    several years ago?

20         A.     To understand whether or not it

21    would be useful to look at behaviors with

22    autism and to use it for outcome measures to

23    be able to continuously assess those

24    behaviors.

25         Q.     How did you get access to the
```

1   app?

2        A.     I didn't have access, per se.

3   I saw a demonstration of the app.

4        Q.     Oh, where did you see a

5   demonstration?

6        A.     I believe I saw it in a

7   demonstration in New Jersey.

8        Q.     Where in New Jersey?

9        A.     At Janssen.

10       Q.     At the Janssen offices?

11       A.     Yes.

12       Q.     Do you remember who presented

13   the --

14       A.     It was a group of people.

15       Q.     From Janssen?

16       A.     Correct.

17       Q.     Do you remember any names?

18       A.     I don't.

19       Q.     Okay.  Is that the last time

20   you've had any interaction with anybody at

21   Janssen that you know of?

22       A.     So there is a collaborative

23   from Foundation NIH, or FNIH, that sponsors

24   something called ABC-CT, which is looking at

25   autism biomarkers, and I have been at

Confidential - Subject to Protective Order

1    meetings where Janssen has had

2    representatives there.

3         Q.    And do you remember any of

4    their names?

5         A.    I don't know off the top of my

6    head.

7         Q.    Okay.  How did you know they

8    were from Janssen?

9         A.    It said it in the materials,

10   that they were labeled as Janssen.

11        Q.    Okay.  Are you -- was the --

12   was the JAKE app something that you were

13   interested in using?

14        A.    We're always assessing

15   different ways of measuring behavior, so we

16   were assessing it.  We didn't -- I haven't

17   used it personally.

18        Q.    Why not?

19        A.    We haven't moved forward.  At

20   the time, this was when I was in a position

21   as director of clinical research at the

22   Simons Foundation, and we hadn't moved

23   forward with studies that would use JAKE app

24   or something like that in person.

25              We just didn't have reason to

Confidential - Subject to Protective Order

1    be able to use anything like that.

2         Q.      Do you remember if the JAKE app

3    assessed environmental exposures in pregnant

4    women?

5         A.      To my knowledge, I don't recall

6    that it did.

7         Q.      All right.  Do you have any

8    materials from that JAKE meeting that you

9    attended at Janssen?

10        A.      I do not.

11        Q.      Did they give you any

12   materials?

13        A.      I don't recall.

14        Q.      Was there a PowerPoint?

15        A.      I'm sure they showed a

16   PowerPoint on the screen.

17        Q.      Okay.  How long did that

18   meeting last?

19        A.      I'm guesstimating, two hours.

20        Q.      Okay.  Did you go by yourself?

21        A.      I don't recall.  I think it's

22   likely that someone else from the Simons

23   Foundation was with me, but I don't recall.

24        Q.      You mentioned the Simons

25   Foundation a few times.

Confidential - Subject to Protective Order

```
 1                    What is that?

 2        A.     The Simons Foundation is a

 3   non-profit based in New York City.

 4        Q.     You used to be in New York

 5   City, right?

 6        A.     That's correct.

 7        Q.     Were you at Columbia?

 8        A.     I was.

 9        Q.     How many years were you at

10   Columbia?

11        A.     I began in 1998 and went

12   through 2023.  So I guess 25 years.

13        Q.     Did you enjoy your time at

14   Columbia?

15        A.     I did.

16        Q.     Is that a fine institution?

17        A.     It is.

18        Q.     One of the best in the country?

19        A.     I do think Columbia is a very

20   good institution.

21        Q.     Great researchers?

22        A.     Many researchers at Columbia

23   are good.

24        Q.     Yeah.

25               Okay.  How did you end up at
```

Confidential - Subject to Protective Order

1    **Janssen for this two-hour presentation on**

2    **JAKE?**

3         A.     We were serving different ways

4    of being able to assess behaviors and

5    understand whether they would be useful for

6    clinical trials and being able to measure

7    changes in behavior over time.  So we were

8    investigating many technologies.

9         Q.     Okay.  So fair enough.

10             **I'm trying to figure out how**

11   **you got -- did you get an invitation?  Did**

12   **you call them?  How did that all come about**

13   **that you ended up at Janssen's offices for**

14   **two hours in New Jersey?**

15        A.     I don't recall exactly, but I'm

16   sure that we had heard about it at an autism

17   meeting.

18        Q.     **Okay.**

19        A.     And mutually had decided it

20   would be useful to have a demonstration of

21   the app.

22        Q.     **Okay.  Other than that**

23   **collaborative you told me about -- do you**

24   **participate in any groups or with any Johnson**

25   **& Johnson or Janssen or Kenvue employees, any**

Confidential – Subject to Protective Order

```
 1   professional organizations or groups?

 2        A.     Can you clarify what you mean

 3   by that?

 4        Q.     I'm not sure.

 5               Do you belong to any

 6   professional organizations that also have

 7   Johnson & Johnson or Kenvue or Janssen

 8   employees in it?

 9        A.     I'm a member of many

10   professional organizations, and I'm sure that

11   there must be some employees that are members

12   of the same organizations, but I don't know

13   who, and I don't know which ones.

14        Q.     Okay.  Do drug companies

15   sometimes show up at the professional

16   meetings that you attend?

17               MS. BROWN:  Objection to the

18          form.

19               THE WITNESS:  Many of the

20          scientific meetings that I attend have

21          good scientists and clinicians that

22          attend, and we have individuals from

23          all different parts of science who

24          attend.  So, yes, I believe there

25          probably are people from commercial
```

```
 1          entities.
 2   QUESTIONS BY MR. TRACEY:
 3          Q.      Well, you know there are,
 4   right, Doctor?
 5          A.      I believe there are.  They're
 6   part of our scientific community.
 7          Q.      Sure.
 8                  You've seen them and talked to
 9   them at these meetings, these scientists that
10   work for drug companies, right?
11                  MS. BROWN:  Objection to the
12          form.
13                  THE WITNESS:  Again, I talk to
14          scientists at scientific meetings, and
15          many of them are at academic
16          institutions, many of them are part of
17          the government, many of them are part
18          of commercial entities.
19   QUESTIONS BY MR. TRACEY:
20          Q.      Right.
21                  And the commercial entity part
22   are drug companies, pharmaceutical companies,
23   right?
24                  MS. BROWN:  Objection to the
25          form.
```

Confidential - Subject to Protective Order

```
 1              THE WITNESS:  In terms of

 2        commercial entities, there are many

 3        commercial entities in the space where

 4        I work in genetics, some of which

 5        represent pharmaceutical companies,

 6        but there are also other commercial

 7        entities that participate in science

 8        besides pharmaceutical companies.

 9   QUESTIONS BY MR. TRACEY:

10        Q.     So there's a whole host of

11   commercial entities, that is, companies, that

12   are trying to make a profit in your space

13   that come to these meetings?

14              MS. BROWN:  Objection to the

15        form.

16              THE WITNESS:  So in the

17        meetings that I attend, there are

18        scientists in many different parts of

19        the world represented in many sectors

20        of the -- of society.  And --

21   QUESTIONS BY MR. TRACEY:

22        Q.     Do you remember my question?

23              MS. BROWN:  Well, she wasn't

24        done answering it, so let's let her do

25        that.
```

1            THE WITNESS:  And within this,

2        many different scientists are able to

3        contribute in many different ways.

4        And in many cases, where we've made

5        progress in terms of public health,

6        has been through being able to have

7        collaborations and partnerships that

8        go across many of these different

9        sectors.

10   QUESTIONS BY MR. TRACEY:

11        **Q.      Collaborations and partnerships**

12   **with these many sectors including drug and**

13   **pharmaceutical companies?**

14            MS. BROWN:  Objection.  Vague.

15            THE WITNESS:  Again, what has

16        always been, at least in the way I

17        have collaborated, has been

18        collaborations between good

19        scientists, good doctors, people who

20        are qualified to do whatever the

21        objective is.  And in some cases, they

22        have been part of commercial

23        companies, in some cases they have

24        been part of pharmaceutical companies,

25        but they have always been good

Confidential - Subject to Protective Order

```
 1              scientists doing good science.

 2                   MR. TRACEY:  I'm going to

 3         object to nonresponsive.

 4    QUESTIONS BY MR. TRACEY:

 5         Q.    Ma'am, do you know what it is

 6    when a lawyer says an answer is

 7    nonresponsive?

 8                   MS. BROWN:  No.  Objection.

 9         Don't -- don't --

10    QUESTIONS BY MR. TRACEY:

11         Q.    I think you do.  Don't you?

12         A.    I apologize --

13                   MS. BROWN:  It's argumentative,

14         and it's irrelevant.

15                   THE WITNESS:  I apologize, I

16         thought I did answer the question.  If

17         you would like to ask the question

18         again, I will try again to be clearer

19         in my answer.

20    QUESTIONS BY MR. TRACEY:

21         Q.    You collaborate at these

22    meetings with employees from pharmaceutical

23    companies?

24                   MS. BROWN:  I object --

25                   MR. TRACEY:  That was my
```

Confidential - Subject to Protective Order

```
 1            question.

 2                   MS. BROWN:  It's been asked and

 3            answered.  I object.

 4                   THE WITNESS:  Again, as we have

 5            discussions, scientific discussions,

 6            there are scientists in many different

 7            sectors who can speak and who can work

 8            together.  In some cases, those

 9            include individuals who are in

10            pharmaceutical companies or other

11            commercial enterprises who will

12            collaborate with good scientists in

13            other locations, including academia.

14      QUESTIONS BY MR. TRACEY:

15            Q.    How often do these good

16      clinicians from commercial enterprises take

17      place with you during the year?

18                   MS. BROWN:  Objection.  Vague.

19                   THE WITNESS:  Can you rephrase

20            the question to understand how you

21            want the accounting to occur?  When

22            you say how many times, how should I

23            think about that?

24      QUESTIONS BY MR. TRACEY:

25            Q.    I'm not sure.  You said that
```

Confidential - Subject to Protective Order

1    many times you collaborate with these

2    commercial enterprises at these scientific

3    meetings.

4              Does that happen once a year?

5    Ten times a year?

6         A.    So if I understand your

7    question, I probably attend and/or present

8    at, say, ten scientific meetings per year.

9    And I haven't done an inventory of the entire

10   attendee list, but I wouldn't be surprised if

11   there's at least one person from a

12   pharmaceutical company at all of those

13   meetings.

14        Q.    Okay.  When's the last time --

15   what was the last meeting that you presented

16   at?

17        A.    Let me think about this.

18              There was a scientific meeting

19   in Taiwan on newborn screening.  I believe

20   that was the last one that I presented on.

21        Q.    And do you remember

22   approximately when that was?

23        A.    Over the summer.

24        Q.    Do you remember who sponsored

25   that meeting?

```
1        A.      I don't.

2        Q.      Is it your experience that many

3   times these meetings are sponsored by drug or

4   pharmaceutical companies?

5               MS. BROWN:  Objection to the

6        form.

7               THE WITNESS:  There can be at

8        some scientific meetings booths where

9        a pharmaceutical company will have a

10       booth, and in that way, they pay for

11       the booth.

12  QUESTIONS BY MR. TRACEY:

13       Q.      Yeah.

14               And at these -- I've been to

15  these meetings, some of these, and there will

16  be -- pharmaceutical companies will have

17  booths that are manned with materials and

18  people so that if at these meetings you want

19  to talk about whatever it is they're selling,

20  you can do that?

21               MS. BROWN:  I object.

22               Is that a question?

23               MR. TRACEY:  It is.  Most of my

24       statements are going to be in --

25       interrogative.
```

Confidential - Subject to Protective Order

```
 1              MS. BROWN:  Yeah, this looked

 2        like it was a declarative statement.

 3        So I'll object.

 4              MR. TRACEY:  Well, when my

 5        voice rises at the end, that's

 6        typically a cue that it's a question.

 7              MS. BROWN:  Okay.  It looks

 8        like a statement.  I object.

 9              THE WITNESS:  So at many

10        scientific meetings, there are booths

11        where individuals are there to be able

12        to ask questions that attendees at the

13        meetings may approach them about.

14   QUESTIONS BY MR. TRACEY:

15        Q.     And they'll have stacks of

16   material, oftentimes, that they hand out to

17   attendees at these meetings, right?

18              MS. BROWN:  Objection to the

19        form.

20              THE WITNESS:  For individuals

21        asking questions, they often have

22        materials to be able to answer their

23        questions.

24   QUESTIONS BY MR. TRACEY:

25        Q.     And then sometimes in these
```

Confidential - Subject to Protective Order

1    meetings, you'll see the literature or the

2    promotional materials will say, sponsored by

3    Johnson & Johnson or Prime Medicine, or it's

4    whoever it is, right?

5              MS. BROWN:  Same objection.

6              THE WITNESS:  Depending on how

7         the meeting is set up, there may be

8         sponsors that would be, for instance,

9         on a study web -- or rather, a meeting

10        website, yes, if they've sponsored the

11        meeting.

12   QUESTIONS BY MR. TRACEY:

13        Q.    Has a pharmaceutical company

14   ever sponsored any of your research or help

15   pay for it?

16        A.    Yes, they have.

17        Q.    How many times?

18        A.    Three times that they've

19   sponsored my research, and there have been

20   times where I've been part of a clinical

21   trial as an individual site amongst many

22   sites in the clinical trial.

23        Q.    How many times -- so three

24   times they've sponsored your research.

25              Do you recall the last time

Confidential - Subject to Protective Order

1    your research was sponsored by a drug

2    company?

3         A.      Currently, two of my studies

4    are sponsored.

5         Q.      Oh.

6                 What drug companies?

7         A.      Ovid and Sanofi.

8         Q.      Sanofi?

9         A.      Sanofi.

10        Q.      And -- sorry.

11        A.      Ovid.  O-v-i- --

12        Q.      I told you I'm hard of hearing.

13        A.      I'm sorry.  O-v-i-d.

14        Q.      Okay.  And then you said -- so

15   those are two current studies being sponsored

16   by drug companies?

17        A.      That is correct.

18        Q.      And how many in the past

19   have -- how many drug companies in the

20   past -- or how many studies of yours in the

21   past have been sponsored or paid for by drug

22   companies?

23        A.      I've had one additional sponsor

24   for one additional study.

25        Q.      Who was that?

Confidential - Subject to Protective Order

```
 1        A.      Biogen.

 2        Q.      Biogen.

 3                Okay.  And then you said you've

 4   been part of collaborations for clinical

 5   research that were sponsored or paid for by

 6   drug companies?

 7        A.      Let me clarify.

 8        Q.      Okay.

 9        A.      I've been part of clinical

10   trials, and the clinical trial has been

11   sponsored by the company testing a potential

12   therapy.

13        Q.      And how many clinical trials

14   have you been a part of?

15        A.      We've been part of one by

16   Rhythm.

17        Q.      Rhythm is the company?

18        A.      Rhythm is the company.

19        Q.      Okay.  Any others?

20        A.      No.

21        Q.      Pardon me?

22        A.      No.

23        Q.      No.

24                Okay.  When you were at

25   Columbia, would drug company employees come
```

Confidential - Subject to Protective Order

1    see you from time to time?

2                MS. BROWN:  Objection to the

3          form.

4                Go ahead.

5                THE WITNESS:  Drug companies

6          would not come to me at Columbia, no.

7    QUESTIONS BY MR. TRACEY:

8          Q.    Well, would they approach you

9    either by e-mail or phone from time to time?

10         A.    If people approached me, per

11   se, it was usually at a scientific meeting

12   where many of us were together and where they

13   would present to a large number of us as an

14   audience.

15         Q.    Did you ever have meetings that

16   were preplanned at these scientific

17   conferences with drug companies?

18         A.    Occasionally, there would be an

19   educational session, and you were free to

20   sign up and to be able to attend the session.

21         Q.    Okay.  You wrote a report in

22   this case, right?

23         A.    I did.

24         Q.    It's in front of you?

25         A.    It is.

Confidential - Subject to Protective Order

1          Q.     I've forgotten the exhibit

2    number.

3               Can you tell me what it is?

4    You're so far way.

5          A.     305.

6               (Chung Exhibit 305 marked for

7          identification.)

8    QUESTIONS BY MR. TRACEY:

9          Q.     305.

10               Well, let me ask you this

11   before I get into your report.

12               Have you ever had an occasion

13   outside of litigation to assess the

14   scientific literature on a subject and come

15   to conclusions about what the data says?

16         A.     Yes, I have.

17         Q.     That's something you do fairly

18   regularly?

19         A.     That's a routine part of what I

20   do as a scientist.

21         Q.     And are there methods or

22   frameworks that you employ or utilize to

23   assess the data so that you can come to

24   conclusions about what the data means to you?

25         A.     Yes.  As a scientist, I have

Confidential - Subject to Protective Order

```
 1   many criteria and ways of being able to

 2   approach a paper, a manuscript, a set of

 3   data, to assess the validity and how

 4   rigorously the study has been performed.

 5       Q.     Do those -- what do we call

 6   those?  Are those frameworks?  Are they --

 7   are they methodologies?  What do we call that

 8   when you do that in your

 9   outside-of-litigation work?

10       A.     I would say it's how I assess

11   the -- well, any dataset, how I assess the

12   scientific data.

13       Q.     One paper you published, I saw

14   recently, you actually suggested what was

15   called a framework for evaluating scientific

16   evidence.

17              Is that a term you're familiar

18   with?

19       A.     I'm familiar with the term.

20   I'm not sure which paper or which manuscript

21   you're referring to.

22       Q.     Okay.  Maybe we'll talk about

23   it later.

24              I'm just trying to understand,

25   is there a term or a methodology that you
```

Confidential - Subject to Protective Order

1    **employ outside of litigation when you're**

2    **assessing scientific literature?**

3         A.      Scientific literature is a

4    pretty broad term, and it refers to many

5    different data types in doing this.  So it's

6    hard to be able to say that there's one

7    single way that we do this.

8              But, in general, we try and use

9    the methods that are available at the time

10   when the data are available to assess the

11   validity, the rigor with which the study was

12   performed, the reproducibility, and I'd say

13   those are general things that we do

14   throughout science.

15        **Q.      Okay.  Are you aware that there**

16   **are methodologies that are employed by**

17   **scientists to assess scientific literature**

18   **and data and then reach conclusions that have**

19   **names?**

20              MS. BROWN:  Objection to the

21        form.

22              THE WITNESS:  Again, science is

23        a broad field, but, yes, I'm sure

24        fields of science have particular

25        methods that they employ.

Confidential - Subject to Protective Order

```
 1   QUESTIONS BY MR. TRACEY:

 2        Q.      For example, are you familiar

 3   with something called a weight of the

 4   evidence methodology to assess scientific

 5   evidence?

 6        A.      I'm not personally familiar

 7   with that method.

 8        Q.      Okay.  And I saw in another

 9   deposition somebody asked you if you employed

10   the Bradford Hill criteria in assessing

11   causation in a case, and you seemed

12   unfamiliar with that.

13                Is that true?

14                MS. BROWN:  Objection to the

15        form.

16                THE WITNESS:  I'm familiar with

17        the criteria.  It's not something that

18        as a geneticist applies to a lot of

19        the genetic research that I do, but

20        I'm familiar with the criteria and

21        familiar with others who use the

22        criteria.

23   QUESTIONS BY MR. TRACEY:

24        Q.      Have you ever employed the

25   Bradford Hill criteria in assessing
```

Confidential - Subject to Protective Order

1    **causation, ever?**

2        A.    I think there's some of the

3    Bradford criteria that are useful across

4    science in terms of looking at

5    reproducibility, looking at order of

6    magnitude in terms of the effect size that we

7    see, in terms of assessing plausibility.  I

8    think those are general sort of criteria that

9    are used scientifically across multiple

10   methods, my own field included.

11       **Q.    So you use some of the criteria**

12   **of Bradford Hill?**

13       A.    Let me try and rephrase that.

14            Some of the Bradford Hill

15   criteria are the same way that we approach

16   science in a more generic and general way.

17   And so I think those are, in terms of what I

18   use in my routine practice and my routine

19   research, things that I routinely use as I

20   assess scientific data.

21       **Q.    Have you ever used the Bradford**

22   **Hill criteria and employed it methodically to**

23   **assess scientific evidence?**

24       A.    I'm not an epidemiologist.  I'm

25   a geneticist.

Confidential - Subject to Protective Order

1    Q.      Good point.

2    A.      And as I do that, I tend to use

3  the methods that I personally use in my field

4  in terms of genetics.  And to the extent that

5  some of those criteria are overlapping, I'd

6  say that's routine in my practice in terms of

7  assessing the scientific literature.

8    Q.      I'm not sure what the answer

9  is.

10          MS. BROWN:  Objection.

11  QUESTIONS BY MR. TRACEY:

12    Q.      Do you use -- have you used the

13  Bradford Hill criteria -- have you employed

14  the criteria as set forth by Bradford Hill to

15  assess scientific -- to assess causation?

16          MS. BROWN:  Objection.  Asked

17       and answered.

18          THE WITNESS:  So from a formal

19       point of view, I have not

20       systematically gone through the

21       Bradford Hill criteria.

22  QUESTIONS BY MR. TRACEY:

23    Q.      Okay.

24    A.      But on the other hand, many of

25  the Bradford Hill criteria -- in fact, I

Confidential - Subject to Protective Order

1    would say that the main drivers in terms of

2    an order of priority and importance are the

3    same and overlapping features that we use to

4    assess scientific data in the fields in which

5    I am an expert.

6              (Chung Exhibit 348A marked for

7         identification.)

8    QUESTIONS BY MR. TRACEY:

9         Q.    Okay.  Let me hand you

10   Exhibit 348.  Is it A?  I should have looked.

11   348A.

12             It's an excerpt from a

13   deposition you gave a few years ago where you

14   were asked about the Bradford Hill criteria.

15             MS. BROWN:  Counsel, do you

16        have the entire deposition transcript

17        available?

18             MR. TRACEY:  No.

19             MS. BROWN:  If you have it, can

20        you e-mail it, at least?  Does

21        somebody have it?

22             MR. TRACEY:  Somebody probably

23        has it.

24             MS. BROWN:  Okay.

25             MR. TRACEY:  Sure.  Let me --

```
 1          yeah, I assume.  It's her testimony.
 2               MS. BROWN:  Okay.  I'm just
 3          going to object to the extent she
 4          needs to look at more of this half a
 5          page we have printed out.
 6               But if you have the whole thing
 7          available, it would be great if she
 8          could take a look at it.
 9               MR. TRACEY:  Okay.  Yeah.
10          Well, I think it's two pages, not half
11          a page.
12     QUESTIONS BY MR. TRACEY:
13          Q.    And so on page 221 -- oh,
14     sorry.  Let's see if it reduced it.
15               This is in the case we were
16     talking about earlier.  This is the case
17     Nichole Daniels-Feasel versus Forest
18     Pharmaceuticals.
19               You were an expert in that
20     case.
21          A.    That is correct.
22          Q.    And on page 221 of your
23     deposition, you were asked:
24               "Have you applied the Bradford
25          Hill criteria to your genetic theory of
```

Confidential - Subject to Protective Order

```
1              autism?"

2                   Do you see that?

3         A.      Yes, I do.

4         Q.      And your answer was:

5                   "Again, I'm not someone who

6         thinks about Bradford Hill in terms of

7         doing this.

8                   "I think about genetics as a

9         discipline, as a scientific area."

10                  Then you were asked:

11                  "So you did not apply Bradford

12        Hill, right?"

13                  And you say:

14                  "Again, I don't think in terms

15        of Bradford Hill."

16                  Is that -- was that your

17   testimony?

18        A.      That's what's in this printout,

19   yes.

20        Q.      Well, that was true, wasn't it?

21        A.      I believe that's consistent

22   with what I just stated in terms of the way I

23   approach things scientifically as a

24   geneticist.

25        Q.      Okay.  So you do not think in
```

Confidential - Subject to Protective Order

1    **terms of Bradford Hill?**

2         A.     Again, as I think -- I think --

3    I am a geneticist, and I think as a

4    geneticist.  That's my discipline.  That's my

5    field of expertise.

6              As we think about this, there

7    are many of the same scientific criteria that

8    overlap between Bradford Hill criteria and

9    how I think about science and how I think

10   about data.

11             And those are the criteria that

12   I tend to use, and those also happen to be

13   major drivers in terms of causation under

14   Bradford Hill as I understand those criteria.

15        **Q.     You don't -- in your report you**

16   **don't mention Bradford Hill one time, do you?**

17        A.     I could do a search, but I

18   don't recall that I did mention Bradford

19   Hill, per se.

20        **Q.     I don't remember seeing a**

21   **weight of the evidence methodology employed**

22   **in your report either.**

23             **Do you remember that?**

24        A.     I'm sure I did not state using

25   a weight of the evidence.

Confidential - Subject to Protective Order

```
 1         Q.      Did you tell us in your report
 2   what methodology you were employing to
 3   evaluate the scientific evidence and reach
 4   whatever conclusions you reached?
 5         A.      I used the -- I wouldn't say
 6   that it's got a name in terms of the way that
 7   we approach data, but we do think of
 8   geneticists as being able to look at the
 9   data.
10              And in particular because
11   autism and ADHD are so heavily genetically
12   determined, my opinion is largely in terms of
13   trying to understand the role of genetics and
14   as we think about how other things are
15   brought into play, whether those can be
16   explained by genetic factors.
17         Q.      Did you -- did you reference
18   for the Court or the jury or anybody to see
19   the methodology you were employing so that we
20   could go look it up ourselves?
21         A.      Again, as geneticists, there
22   are many, many different methods that we use.
23   I don't know that there's one handbook or one
24   name that we use because there's so many
25   types of analyses that are performed.
```

Confidential - Subject to Protective Order

```
 1              But as geneticists, we tend to

 2    be extremely data-driven, and with that, very

 3    rigorous in terms of what we will accept in

 4    terms of causation, and we -- I applied those

 5    same methods to the literature that I

 6    reviewed.

 7         Q.    What methods?

 8         A.    Being able to assess genetic

 9    contributions to conditions, being able to

10    understand the relative weight of the

11    contributions and how to design studies to

12    assess genetic contributions to conditions.

13         Q.    What weight did you assign the

14    evidence, and where in your report can I find

15    the assignment of the weight for the evidence

16    that you evaluated?

17         A.    As an example, when one looks

18    at heritability estimates for conditions, one

19    can get an assessment of the variance for

20    that phenotype, how much of that is genetic

21    and for both of the conditions of autism and

22    ADHD.

23              Those estimates are extremely

24    high, 80 to 90 percent; in other words --

25         Q.    Whoa, whoa, whoa, whoa.
```

Confidential - Subject to Protective Order

```
 1                    MS. BROWN:  She's got to finish
 2         that.  No, no, no, no.
 3                    MR. TRACEY:  I'm not asking
 4         about that yet.
 5                    MS. BROWN:  No, hold on.
 6    QUESTIONS BY MR. TRACEY:
 7         Q.    I'm trying to figure out,
 8    Dr. Chung --
 9                    MS. BROWN:  Sir?  Sir?  She's
10         not done with her answer.  She's got
11         to finish her answer, and then you can
12         follow up.
13                    Please finish your answer, and
14         then if you want to follow-up, that's
15         perfectly fine.
16                    Go ahead.
17                    THE WITNESS:  So for both of
18         those conditions, autism and ADHD,
19         being 80 to 90 percent of the variants
20         attributable to genetic factors, that
21         is the overwhelming contributor to
22         those conditions.
23                    And everything else has to be
24         looked at within the context of
25         genetics and understand whether
```

Confidential - Subject to Protective Order

```
1            genetics has been accounted for in

2            terms of compounds.

3    QUESTIONS BY MR. TRACEY:

4            Q.      Do you remember my question?

5            A.      If you don't mind repeating it,

6    I'd appreciate it.

7            Q.      Do you not remember it?

8            A.      Just to make sure I've got it

9    right, I would appreciate it if you'd repeat

10   it.

11           Q.      What do you think you were

12   answering?

13                   MS. BROWN:  Objection.

14           Argumentative.

15                   She's asked for clarification.

16           Our effort here is to get truthful and

17           accurate testimony.

18   QUESTIONS BY MR. TRACEY:

19           Q.      Where can I find a description

20   of the methodology you employed in your

21   report?

22                   MS. BROWN:  I object.  Asked

23           and answered.

24   QUESTIONS BY MR. TRACEY:

25           Q.      Just pull out your report and
```

Confidential - Subject to Protective Order

```
 1    point it out to me.  I don't want to have to

 2    guess.

 3        A.       As scientists, we don't have --

 4    because there are so many different methods

 5    that are applied, there is not one single

 6    method that we use to apply to all of the

 7    literature and all of the scientific methods

 8    that are so rapidly evolving.

 9        Q.       Let me ask you this.  Where do

10    I find the search terms that you employed to

11    actually identify the relevant literature?

12        A.       So can you repeat the question,

13    please?

14        Q.       Yes.

15             Where in your report can I turn

16    to and find the search terms that you

17    employed to identify the relevant literature

18    in this case?

19        A.       I don't believe in my report I

20    list search terms.

21        Q.       You certainly do that in your

22    academic life, don't you?

23        A.       I do scientific searches, that

24    is true, in my -- in my academic life.

25        Q.       And you identify what search
```

Confidential - Subject to Protective Order

```
 1   terms you're using to identify relevant

 2   literature, don't you?

 3        A.     Depending on the question,

 4   there may be a very simple question in which

 5   one can do a simple literature review in

 6   terms of being able to use search terms.

 7            The methods to understand a

 8   complex body of data is not simply a matter,

 9   however, of a literature search.

10        Q.     Well, you want to be

11   transparent, Dr. Chung, don't you?

12            We want the judge and the jury

13   to understand how you reached the conclusions

14   you reached.

15            Right?

16            MS. BROWN:  Objection to the

17       form of the question.

18            THE WITNESS:  I believe in

19       transparency.

20   QUESTIONS BY MR. TRACEY:

21        Q.     Transparency is fundamental to

22   the scientific method, isn't it?

23        A.     I believe in transparency.  I

24   believe in being able to, as a scientific

25   community, share, to be able to arrive at the
```

 1    most accurate information.

 2              And by sharing that, we evolve

 3    our thinking over time and continue to

 4    improve in the accuracy of that information.

 5         **Q.    And what you didn't share in**

 6    **this case is the search term strategy you**

 7    **employed to identify literature, right?**

 8         A.    I didn't --

 9              MS. BROWN:  Objection to the

10         form.

11              Go ahead.

12              THE WITNESS:  I did not

13         specifically list search terms, in

14         large part, because many of my

15         colleagues -- this would have been

16         intuitive.

17    QUESTIONS BY MR. TRACEY:

18         **Q.    It would have been intuitive to**

19    **who?**

20         A.    To colleagues such as myself.

21         **Q.    I see.**

22              **So you didn't feel the need to**

23    **share the search terms with the Court because**

24    **you think it would be intuitive to colleagues**

25    **like yourself?**

Confidential - Subject to Protective Order

```
 1              MS. BROWN:  Objection to the
 2         form.  Argumentative.  Misstates her
 3         testimony.
 4              THE WITNESS:  In terms of the
 5         review that I did, I do believe that I
 6         did a comprehensive analysis for the
 7         specific questions in terms of
 8         associations between acetaminophen,
 9         autism and ADHD.
10    QUESTIONS BY MR. TRACEY:
11         Q.    No doubt.  I don't doubt you
12    believe it, ma'am, but we were talking about
13    sharing data and transparency, right?
14         A.    I believe we were talking about
15    search terms.  There wasn't anything -- I
16    think anything cloaked in terms of any
17    secrecy for that.
18              I simply thought it was obvious
19    in terms of the question, that that's how I
20    would search, and that's how, even beyond
21    another scientist intuitively, one would have
22    searched on those terms.
23         Q.    Okay.  What was the question
24    you were answering?  That's actually not in
25    your report either, is it?
```

```
 1                  MS. BROWN:  Objection to the
 2          form.
 3   QUESTIONS BY MR. TRACEY:
 4          Q.      Is the question that you were
 5   answering in your report for -- that you
 6   identify that for the Court so we knew what
 7   question that you were answering in your
 8   report.
 9                  MS. BROWN:  Objection to the
10          form.
11                  THE WITNESS:  Give me one
12          second --
13   QUESTIONS BY MR. TRACEY:
14          Q.      Yeah, please, by all means.
15          A.      -- to see specifically how I
16   stated this in my report.
17                  So in my report, I have several
18   opinions that are listed, and within that,
19   most individuals would have thought to look
20   at the terms used within the opinions that I
21   stated and doing searches on those keywords.
22                  And that was, in fact, what I
23   have done.
24          Q.      Okay.  But what was the --
25   where is the question in your report that you
```

Confidential - Subject to Protective Order

1    were answering for the Court?

2         A.     I'm rendering several opinions

3    that are listed under point number 3 and that

4    go on for a couple of pages thereafter.

5         Q.     What page are you on?

6         A.     Page 2, 3 and into page 4.

7         Q.     And is there a question that

8    you're answering on 2, 3 and 4?

9         A.     I'm rendering --

10        Q.     Is there a question identified?

11   I should ask a better question.

12        A.     I'm rendering opinions in those

13   cases under points 2 and 3.

14        Q.     You say, "Genetic variants

15   account for most known causes of ASD and

16   ADHD"?

17        A.     I do say that.

18        Q.     Okay.  All right.  We're going

19   to come back to that.

20               But there is no question you've

21   identified in your report that you were

22   answering that I could find.

23               Is that a fair assessment?

24               MS. BROWN:  Objection to the

25        form.  Misstates testimony.

Confidential - Subject to Protective Order

1   QUESTIONS BY MR. TRACEY:

2        Q.      For example, there's no place

3   in your report where you say, I was asked by

4   Johnson & Johnson to answer the following

5   question?

6               MS. BROWN:  Objection to the

7        form.

8               THE WITNESS:  Well, number one,

9        I wasn't asked by Johnson & Johnson

10       within any of the report or any of the

11       work that I was thinking through.

12              Point number --

13  QUESTIONS BY MR. TRACEY:

14       Q.      Who asked you to do it, ma'am?

15              MS. BROWN:  Well, let her

16       finish, please.

17              THE WITNESS:  Point number two,

18       within my report on page 2 I believe

19       is what you're getting at in terms of

20       the scope of what I was addressing.

21  QUESTIONS BY MR. TRACEY:

22       Q.      Where is that?

23       A.      Page 2, number 2.

24       Q.      Yeah, I'm sorry.

25              Where it says, "This report

Confidential - Subject to Protective Order

1    identifies the robust and rigorously

2    replicated scientific evidence in the

3    published literature demonstrating known

4    genetic ideology about ASD and ADHD"?

5        A.    And the following sentence, "My

6    report also addresses the published

7    epidemiological studies on prenatal

8    acetaminophen exposure and outcomes

9    purportedly related to ASD and/or ADHD to

10   assess whether these studies have properly

11   accounted for genetic confounders."

12       Q.    In fact, in that last sentence,

13   you address the methodologies of the

14   plaintiffs' experts, don't you?

15       A.    I'm sorry, can you clarify?

16       Q.    Yeah.  That last sentence,

17   finally -- let's put that -- can we have that

18   up on the screen?

19             "Finally, my report addresses

20   the various methodologies and data used by

21   plaintiff experts in their expert reports."

22             That's what you claim to be

23   doing, right -- one of the things you claim

24   to be doing?

25       A.    One of the things my report

1    addresses, yes, are some of the plaintiff

2    experts.

3         **Q.    The plaintiffs' experts did**

4    **employ methodologies that they identified,**

5    **didn't they?**

6         A.    Can you repeat that?

7         **Q.    Yes.**

8              **The plaintiffs' expert in this**

9    **case did identify methodologies that they**

10   **employed?**

11             MS. BROWN:  Objection to the

12        form.

13             THE WITNESS:  Yes, the

14        plaintiffs did identify methods that

15        they employed.

16   QUESTIONS BY MR. TRACEY:

17        **Q.    And you critiqued those methods**

18   **in your report, didn't you, or those**

19   **methodologies or the conclusions reached**

20   **based on those methodologies, right?**

21        A.    I point out that some of the

22   methods need to be comprehensive in their

23   designs and in particular to be able to

24   include genetics, which accounts for the

25   major contributor to both A -- autism and

Confidential - Subject to Protective Order

```
 1    ADHD.

 2         Q.     Okay.  And I want to critique

 3    your methodology, Dr. Chung.

 4                Is that fair?

 5                MS. BROWN:  Objection to the

 6         form.

 7                THE WITNESS:  I'm always open

 8         to critique.

 9    QUESTIONS BY MR. TRACEY:

10         Q.     Where do I find your

11    methodology so that I can critique it in your

12    report?

13                MS. BROWN:  I object.  That's

14         been asked and answered four times.

15                THE WITNESS:  As I've said, the

16         field of genetics and genomics in

17         particular is extremely complex and

18         rapidly evolving.  I would argue one

19         of the most rapidly evolving in all of

20         science.

21                Because of that, we tend not to

22         have very rigid sort of rule books in

23         terms of how this is done, so as we do

24         this, I can only point to I use state

25         of the art methods that a geneticist
```

Confidential - Subject to Protective Order

1      or a genomicist would use in my field.

2   QUESTIONS BY MR. TRACEY:

3      Q.      There's no rigid set of methods

4   that are employed in genetics?

5      A.      Again, you've identified a very

6   large field of genetics and genomics.  For

7   some things in which we try to come to

8   consensus for a field, yes, there are

9   guidelines.

10             For instance, for ACMG variant

11  interpretation, there are guidelines so there

12  are -- there is consistency.  That's --

13     Q.      There sure are, aren't there?

14     A.      That is different --

15             MS. BROWN:  Let her finish,

16     Mr. Tracey.  You're cutting her off.

17  QUESTIONS BY MR. TRACEY:

18     Q.      I'm sorry, Doctor.  I thought

19  you were finished.

20     A.      That is --

21             MS. BROWN:  Go ahead.  Please

22     finish.

23             THE WITNESS:  That is

24     different, however, from what I

25     understood your question to be.

Confidential - Subject to Protective Order

```
 1    QUESTIONS BY MR. TRACEY:
 2         Q.     Okay.  But to get back to my
 3    original question, there is no, none -- no
 4    methodology identified in your report that
 5    anybody could critique because you didn't
 6    identify one?
 7              MS. BROWN:  I object.  That's
 8         been asked and answered and misstates
 9         her testimony.
10              THE WITNESS:  Again, there is
11         no specific method that I've referred
12         to in my report because in the field,
13         there is no single method to refer to.
14    QUESTIONS BY MR. TRACEY:
15         Q.     For example, I can find no
16    place in your report where you assess the
17    literature and you weigh the literature,
18    right?
19              MS. BROWN:  Objection to the
20         form.
21              THE WITNESS:  Again, I don't
22         reference, nor do I know there to be,
23         a particular weight or mathematical
24         formula that one uses.  Again, that is
25         not standard within my field of
```

Confidential - Subject to Protective Order

1           science.

2    QUESTIONS BY MR. TRACEY:

3           **Q.     Are you aware of generally**

4    **accepted scientific methodologies that employ**

5    **just that technique?**

6                MS. BROWN:  I object as vague.

7    QUESTIONS BY MR. TRACEY:

8           **Q.     Where they weigh literature and**

9    **assign a grade to it, a weight to it?**

10               MS. BROWN:  Same objection.

11               You can answer, if you

12          understand.

13               THE WITNESS:  I don't know all

14          of science.  I do know that when it

15          comes to some things with clinical

16          care guidelines, as an example, people

17          will have ratings based on how much

18          evidence there is to support certain

19          claims.

20   QUESTIONS BY MR. TRACEY:

21          **Q.     Much of the literature that you**

22   **evaluated in this case was epidemiology,**

23   **right?**

24          A.     Some of the literature that I

25   evaluated was epidemiology, in particular

Confidential - Subject to Protective Order

1  with an eye to study design and how genetics

2  was or was not included in the study design

3  and the conclusions that were drawn.

4      **Q.     And nowhere in your evaluation**

5  **of the epidemiological literature can I find**

6  **a weighing of the epidemiological evidence by**

7  **you, right?**

8          MS. BROWN:  Objection.  Vague.

9          THE WITNESS:  I have not

10         employed a weighting factor.

11  QUESTIONS BY MR. TRACEY:

12     **Q.     Okay.  And we've talked about**

13  **already, we don't know what your search terms**

14  **were because you didn't identify them, right?**

15         MS. BROWN:  Objection to the

16         form.

17         THE WITNESS:  I believe what I

18         stated is that the search terms were

19         obvious from how I had stated in my

20         report what my report was covering.

21  QUESTIONS BY MR. TRACEY:

22     **Q.     If I wanted to recreate your**

23  **search terms, where in your report would I**

24  **find them obviously?**

25         A.     Again, within my report on

Confidential - Subject to Protective Order

1    pages 2, 3 and 4, where I outline what my

2    opinions are.

3         Q.    But there's not one search term

4    on those pages, Doctor, is there?

5         A.    No, there would not be one

6    search term.  There would have been a number

7    of search terms.

8         Q.    I'm presuming that you actually

9    did research, right?

10        A.    I did.  The search terms, as an

11   example, were "autism," "ADHD,"

12   "acetaminophen," "prenatal" and "genetics."

13        Q.    Okay.  That's nowhere in your

14   report?

15        A.    It was something that was

16   intuitive and obvious to me based on the

17   scope of my report outlined in my opinions.

18        Q.    What if your research terms

19   missed some relevant literature?  Is that

20   possible?

21             MS. BROWN:  Objection to the

22        form.

23             THE WITNESS:  Anything is

24        possible, but I believe that I did a

25        comprehensive search as well as can be

1          done to the standard in my field.

2     QUESTIONS BY MR. TRACEY:

3          Q.     When you reviewed the expert

4     reports or the expert rebuttal reports, were

5     you struck that you missed some relevant

6     literature?

7               MS. BROWN:  I object to the

8          form of the question.

9               THE WITNESS:  I was not struck

10          that I missed relevant literature.

11     QUESTIONS BY MR. TRACEY:

12          Q.     Did you add any literature

13     since your report to -- to your report?  Did

14     you add any literature?

15               MS. BROWN:  I object as vague.

16               THE WITNESS:  Any work that I

17          do is an iterative process.  Science

18          is an iterative process, and there

19          were multiple revisions to the reports

20          as this evolved over time.

21     QUESTIONS BY MR. TRACEY:

22          Q.     So the answer is, yes, you did

23     add literature after your report was filed,

24     right?  Some of it I got last night.

25               MS. BROWN:  I object.

Confidential - Subject to Protective Order

1                    Add to what?

2    QUESTIONS BY MR. TRACEY:

3        Q.      Well, add to your materials

4    considered list.  The materials you

5    considered.

6                    MS. BROWN:  I object as vague.

7                    Is the question, did she serve

8        a supplemental reliance list?

9                    MR. TRACEY:  No.

10                   MS. BROWN:  I object.

11   QUESTIONS BY MR. TRACEY:

12       Q.      Let me ask you this.

13               You didn't weigh -- we talked

14   about the fact that you didn't weigh in a way

15   that's -- that I can find in your report the

16   epidemiological literature, right?

17                   MS. BROWN:  Objection.

18       Misstates testimony.

19                   THE WITNESS:  Again, we've

20       stated this.  I didn't use a weighting

21       factor.

22   QUESTIONS BY MR. TRACEY:

23       Q.      Yeah.

24               And you also evaluated

25   preclinical studies, animal studies, right?

Confidential - Subject to Protective Order

1       A.      I did not attempt to do a

2   comprehensive review of animal studies.

3   Animals don't have autism.  Animals, in terms

4   of their relevance, are not something that I

5   focus on.

6       **Q.      Okay.  That all may be true,**

7   **but you identified animal studies in your**

8   **report that you reviewed, correct?**

9       A.      Again, I did not attempt to do,

10  nor did I do, a comprehensive literature

11  review or assessment of all animal studies

12  that might have been relevant.

13      **Q.      Okay.  Fair enough.**

14          **So you didn't even attempt to**

15  **do a comprehensive analysis of the animal**

16  **literature?**

17              MS. BROWN:  She literally just

18          said that.

19              I object.  Asked and answered.

20              THE WITNESS:  Again, as I think

21          about a uniquely human condition of

22          autism and what informs causation for

23          autism, I start with the condition.  I

24          start with humans.  I start with

25          people.  And that's the most relevant

Confidential - Subject to Protective Order

```
 1        information.
 2   QUESTIONS BY MR. TRACEY:
 3        Q.    Okay.  Can you answer my
 4   question?
 5             MS. BROWN:  Objection.  She
 6        did.
 7   QUESTIONS BY MR. TRACEY:
 8        Q.    You did not attempt, Dr. Chung,
 9   to do a comprehensive search and evaluation
10   of the animal literature, correct?
11             MS. BROWN:  Asked and answered.
12             THE WITNESS:  I did not attempt
13        to do a comprehensive literature --
14   QUESTIONS BY MR. TRACEY:
15        Q.    Okay.
16        A.    -- review of the animal
17   studies.
18        Q.    And even what you did do,
19   contained in your report, there is no effort
20   made to weigh or grade the animal studies?
21        A.    Again, I did not use the term
22   nor a methodology of weighting, per se.  I'll
23   again try and explain, and I know this is
24   complicated, so --
25        Q.    You don't need to explain,
```

Confidential - Subject to Protective Order

 1    **Doctor.**

 2              MS. BROWN:  Wait, wait.  But

 3        she does need to finish.  Let her

 4        finish.

 5              MR. TRACEY:  But I just said

 6        you don't need to --

 7              MS. BROWN:  No, no, no.  She's

 8        not done.

 9              MR. TRACEY:  I don't need an

10        explanation.

11              MS. BROWN:  She's going to give

12        it because you asked a question.

13        Please let her finish, and then you

14        can follow up.

15              Go ahead, Doctor.

16              MR. TRACEY:  Okay.

17              THE WITNESS:  So what happens

18        in science, especially with rapidly

19        evolving fields, is we continue to

20        iterate in terms of being able to

21        design better and better methods to be

22        able to understand the fundamental

23        question that we're asking.

24              So as we approach this in my

25        field, that idea of weighting is

Confidential - Subject to Protective Order

1           really replaced by what I would call

2           an iterative process of refining both

3           methods to be able to assess the

4           comprehensive models that can be able

5           to understand issues of causation.  So

6           I think it's a different field.

7                And I apologize, but I just

8           think we apply different methodologies

9           as a different discipline.

10    QUESTIONS BY MR. TRACEY:

11           **Q.    The problem is, you didn't tell**

12    **me what your methodologies are in your report**

13    **for me to critique, right?**

14                MS. BROWN:  Objection.

15           Misstates testimony.

16                THE WITNESS:  Again, I don't

17           think that's a doable thing to do

18           because of our field.

19                On the other hand, there have

20           been experts who have looked at my

21           report and made comments.  And so I

22           think in terms of that, they have had

23           an understanding of the evidence that

24           I reviewed, of the literature, of the

25           data behind that, and they certainly

Confidential - Subject to Protective Order

1        have responded.  So I think there was

2        understanding.

3    QUESTIONS BY MR. TRACEY:

4        Q.      Do you know what a Navigation

5    Guide -- do you know what the Navigation

6    Guide is?

7        A.      I do not.

8        Q.      Do you know what the Cochrane

9    collaboration guide is?

10       A.      I do know about Cochrane

11   reports.

12       Q.      Okay.  Well, yeah, right.

13               But I'm asking a different

14   question.  I'm asking whether or not you know

15   about the Cochrane method for evaluating

16   scientific evidence?

17       A.      I have formally not performed a

18   Cochrane review.

19       Q.      Okay.  You have not used the

20   Navigation Guide either, correct?

21       A.      I have not used the Navigation

22   Guide.

23       Q.      You did not employ an adverse

24   outcome pathway in the -- in your report?

25       A.      I did not.

Confidential - Subject to Protective Order

```
 1          Q.      Do you know what that is?

 2          A.      I can guess, but, no, I don't

 3   formally know.

 4          Q.      Okay.  Let's -- you have said a

 5   number of times here today in your report,

 6   the last -- oh, second from the last sentence

 7   in the report.  Let me just read it because I

 8   think it's the punch line of your report.

 9                  You say in your report -- you

10   can just turn to the last page, page 77,

11   under Conclusion, Doctor.

12          A.      Okay.

13          Q.      You say, "For the reasons

14   described" -- can we put it on the screen?

15   Does that -- oh, okay.  Thanks.

16                  "For the reasons described in

17   this report, I conclude that genetics are the

18   predominant cause of ADH" -- "of ASD and

19   ADHD."

20                  Right?

21          A.      That is what I state.

22          Q.      And then, 2, "There is

23   insufficient scientific" -- "scientific

24   evidence to support the conclusion that

25   maternal intake of acetaminophen during
```

Confidential - Subject to Protective Order

1    pregnancy can cause the development of ASD

2    and ADHD in offspring."

3              Those are your -- that's your

4    one -- two-sentence -- or one-sentence

5    conclusion, right?

6         A.    That is correct.

7         Q.    What do you mean, Doctor, when

8    you say, "genetics are the predominant cause

9    of ASD and ADHD"?

10             I want to understand that,

11   please.

12        A.    So that when -- tries to

13   understand causation or contributors to both

14   of those phenotypes that the overwhelming,

15   underlying contributors are genetics.  And as

16   we estimate that, using estimates of

17   heritability, those numbers are extremely

18   high; 80 to 90 percent for both of those

19   conditions.

20        Q.    I noticed you use

21   "heritability" in your report quite often,

22   but you never defined it, did you?

23        A.    I believe I did.

24        Q.    Oh, where?  I didn't see it.

25   Please tell me where you define

Confidential - Subject to Protective Order

1    "heritability."

2         A.    This is easier to do

3    electronically.

4               MS. BROWN:  Yeah.

5    QUESTIONS BY MR. TRACEY:

6         Q.    And I looked, ma'am.  I looked

7    for a definition of heritability.  Now, I'm

8    not a techno geek or proficient with it, so I

9    could have missed it.

10        A.    On page 20.

11        Q.    Okay.

12        A.    Under Section 44.

13        Q.    "Heritability is the fraction

14   of the variability of the phenotype that is

15   due to inherited genetic factors."

16               Is that right?

17        A.    That's correct.

18        Q.    Are you implying to the Court

19   and everybody that heritability is

20   independent and divorced from environment?

21        A.    It is just what I said; that

22   heritability is inherited genetic factors.

23               I will also state that there

24   are other genetic factors that are not

25   inherited, but this is putting a point that

Confidential - Subject to Protective Order

1    the overwhelming majority of the probability

2    of an individual having autism or ADHD, 80 to

3    90 percent of that is due to heritable or

4    inherited genetic factors, in addition to

5    which there are de novo genetic factors,

6    which means that all told, genetics is the

7    overwhelming predominance in terms of

8    contributors.

9         **Q.    Doesn't heritability allow a**

10   **comparison of the relative importance of**

11   **genes and environment to the variation of**

12   **traits within and across populations?**

13        A.    I'm not sure exactly what you

14   mean by that, but heritability is an estimate

15   of the variance in the phenotype attributable

16   to inherited genetic factors.

17        **Q.    Okay.  Do you know who Peter**

18   **Visscher is?**

19        A.    I do not.

20        **Q.    What about Naomi Wray?**

21        A.    I do not.

22        **Q.    What about William Hill?**

23        A.    I do not.

24             (Chung Exhibit 398 marked for

25        identification.)

Confidential - Subject to Protective Order

```
1    QUESTIONS BY MR. TRACEY:
2         Q.     I'm going to hand you
3    exhibit --
4               MR. TRACEY:  What's the number,
5         Danny?  319 -- 398, sorry.
6    QUESTIONS BY MR. TRACEY:
7         Q.     This is something -- a paper
8    published in Nature Reviews Genetics.
9               You're familiar with this
10   publication, ma'am, are you not?
11        A.     I don't recall whether or not
12   I've read this particular paper.
13        Q.     No, ma'am.  But I was asking
14   you about the publication itself, Nature
15   Reviews Genetics.
16        A.     Yes, I know of the journal.
17        Q.     It's one of the highest impact
18   journals in the world in the discipline of
19   genetics, isn't it?
20        A.     I don't know the current impact
21   factor.
22        Q.     Okay.  But it's well-respected,
23   is it not?
24        A.     It's part of the Nature series
25   of journals.
```

CONFIDENTIAL - Subject to Protective Order

```
1       Q.     And that's one of the most
2  well-respected journals, Nature, in the
3  world, right?
4       A.     This is one of a series in
5  Nature.
6       Q.     But isn't Nature one of the
7  most well-respected journals in the world?
8       A.     The journal Nature is, but this
9  is not the journal Nature.
10      Q.     Yeah.  Okay.
11             The very first sentence in the
12 abstract, ma'am, says, "Heritability" --
13 well, let's read the title.
14             "Heritability in the genomics
15 era - concepts and misconceptions."
16             Do you see that?
17      A.     I see the title.
18      Q.     And the very first sentence in
19 the abstract says, "Heritability allows a
20 comparison of the relative importance of
21 genes and environment to the variation of
22 traits within and across populations."
23             Do you see that?
24      A.     Yes, I do see that.
25      Q.     Is that a true statement?
```

Confidential - Subject to Protective Order

```
 1        A.      Heritability -- I think the

 2   assumption is is that things are not

 3   inherited -- or heritable or environment.

 4   So, yes, if one thinks about this is

 5   heritable and nonheritable, yes, that's true.

 6        Q.      That's a true statement, yeah?

 7        A.      What I said I believe to be

 8   true.

 9        Q.      Well, is that statement on the

10   screen that's highlighted in yellow true?

11        A.      As I said, if one considers the

12   environment in a very broad way, everything

13   that's nonheritable, yes, that's true.

14        Q.      Okay.  And then if you flip

15   over -- this entire paper, you will see by

16   its title, is about misconceptions with

17   respect to heritability.  And if you turn

18   over to the page where at the top it says,

19   "Box 2," it's page 257, you see that box is

20   actually titled "Misconceptions regarding

21   heritability."

22              Do you see that?

23        A.      Yes, I see that.

24        Q.      And then the good doctors list

25   various misconceptions that people have about
```

Confidential - Subject to Protective Order

1    heritability.

2              Do you see that?

3         A.    I see that they have several

4    things in this box that they've listed.

5         Q.    And this -- yeah.

6              And the second thing I want

7    to -- the second misconception they identify

8    is "high heritability implies genetic

9    determination."

10             Do you see that?

11        A.    I see that title.

12        Q.    Do you agree with these doctors

13   that that is a misconception?

14             MS. BROWN:  And, Doctor, I --

15             THE WITNESS:  I haven't --

16             MS. BROWN:  -- you testified

17        you haven't read this paper, you don't

18        recall reading it.  So if you need a

19        moment to take a look, please do

20        before you answer.

21             THE WITNESS:  I'd really, to be

22        fair, need to have time to read the

23        entire -- this review to be able to

24        comment on this.

25

Confidential - Subject to Protective Order

1    QUESTIONS BY MR. TRACEY:

2         **Q.     Ma'am, you can't answer the**

3    **question as a geneticist whether it is a**

4    **misconception of genetics to claim that high**

5    **heritability implies genetic determination?**

6              MS. BROWN:  Well, that

7         misstates her testimony.  I object.

8              THE WITNESS:  I do not agree

9         that high heritability does not mean

10        that there is a high percent of the

11        variation that is due to underlying

12        genetic causes.

13   QUESTIONS BY MR. TRACEY:

14        **Q.     Okay.  Well, let's read on.**

15             **They go on to say, "A high**

16   **heritability means that most of the variation**

17   **that is observed in the present population is**

18   **caused by variation in genotypes."**

19             **Do you -- are you with them --**

20   **do you agree with that so far?**

21        A.     Again, within this, to have an

22   opinion on this, I'd really need to read

23   through the entire review to be able to

24   understand the entire context with which this

25   was written.

```
1            Q.     Okay.  Well, let's read on, see

2     if it becomes any more clear.

3                   It says, "It means that in the

4     current population, the phenotype of an

5     individual is a good predictor of the

6     genotype."

7                   How about that?

8                   MS. BROWN:  Well, I just have a

9          running objection to this --

10                  MR. TRACEY:  You can have it.

11                  MS. BROWN:  -- to this document

12         that she's not familiar with and is

13         not on --

14                  MR. TRACEY:  You can have a

15         running objection.

16                  MS. BROWN:  -- on her reliance

17         list, and she's asked for time to

18         review.

19                  THE WITNESS:  Again, I mean, if

20         we'd like to give me a couple hours to

21         read this and then to comment on it,

22         we can.

23                  I'd prefer not being able -- I

24         want to be accurate in my statements,

25         and I prefer not taking one sentence
```

1      out of context for the entire review.

2   QUESTIONS BY MR. TRACEY:

3      **Q.     You can't answer that question**

4   **without spending a couple of hours with the**

5   **paper?**

6              MS. BROWN:  Well, that's not

7         what she said.

8              THE WITNESS:  Again --

9              MR. TRACEY:  It is what she

10        said.

11             MS. BROWN:  No.

12             THE WITNESS:  Again, I've given

13        my opinion in terms of genetics and

14        heritability estimates and what that

15        tells us.

16             To be able to take a sentence

17        within this and to accurately

18        interpret what it means, I should read

19        the entirety of this.

20   QUESTIONS BY MR. TRACEY:

21      **Q.     Well, let's read on and see if**

22   **we can get some agreement.**

23             **It says, "However, it does not**

24   **mean that the phenotype is determined once we**

25   **know the genotype."**

 1            **Do you agree with that?**

 2            MS. BROWN:  Same objections.

 3            THE WITNESS:  What I agree in

 4        general is that it is impossible for

 5        us in this day of 2023 to understand

 6        the entirety of, quote/unquote, the

 7        genotype.

 8            Our incomplete understanding of

 9        that genotype leads us to imprecision

10        with predicting the genotype.  With

11        that statement, I agree.

12   QUESTIONS BY MR. TRACEY:

13        **Q.    So they go on to say, "The**

14   **reason it doesn't mean that is because the**

15   **environment can change or be manipulated to**

16   **alter the phenotype."**

17            **That's a true statement, isn't**

18   **it?**

19            MS. BROWN:  Same objections.

20            THE WITNESS:  Again, I believe

21        that the environment is different for

22        different people and over different

23        periods of time.  Being able to

24        correctly model the environmental

25        exposures, there's something that

Confidential - Subject to Protective Order

```
 1          we're currently imprecise at doing.
 2   QUESTIONS BY MR. TRACEY:
 3          Q.     Even if you're imprecise at
 4   doing it, there's no question in your field
 5   that heritability encompasses both genetics
 6   and the environment, correct?
 7                 MS. BROWN:  I object.
 8          Misstates testimony.
 9                 THE WITNESS:  Again, I've
10          stated the definition of heritability
11          is the variance -- the percentage of
12          the variance and the phenotype
13          accountable by inherited genetic
14          factors.
15   QUESTIONS BY MR. TRACEY:
16          Q.     I know you have, but can you
17   answer my question?
18          A.     Can you please restate the
19   question?
20          Q.     Yeah.
21                 There's no doubt in your field
22   of genetics that heritability includes the
23   environment?
24          A.     The phenotype includes the
25   environment.
```

Confidential - Subject to Protective Order

```
 1        Q.      And let's define phenotype.
 2   Maybe we ought to do that.
 3               What is -- is that the trait or
 4   the behavior associated that we're looking
 5   at?
 6        A.      Phenotype is within the context
 7   of a particular scientific question.
 8        Q.      Yeah.
 9               So autism spectrum disorder is
10   a phenotype?
11        A.      It can be.
12        Q.      ADHD is a phenotype?
13        A.      It can be.
14        Q.      Phenotypes are influenced by
15   the environment?
16               MS. BROWN:  Objection to the
17        form.
18               THE WITNESS:  Phenotypes, that
19        is a very broad statement.
20   QUESTIONS BY MR. TRACEY:
21        Q.      Yes, ma'am.
22        A.      And it depends on what the
23   phenotype is, whether that's influenced by
24   the environment or not.
25        Q.      Autism is a phenotype that is
```

1   **absolutely influenced by the environment?**

2       A.      I would say that our

3   understanding of autism in the present day is

4   that the overwhelming contributor to autism

5   is genetic, be that either inherited genetic

6   factors or de novo genetic factors, but the

7   overwhelming contribution is genetic.

8       **Q.      Okay.  Do you want to answer my**

9   **question?**

10          MS. BROWN:  Objection.

11      Argumentative.

12          She did her very best to answer

13      the question that you asked.

14          THE WITNESS:  At this point in

15      terms of understanding, quote/unquote,

16      the environment -- or I will take that

17      liberally to say nongenetic

18      environment, we do believe that there

19      is a small contribution of those

20      nongenetic factors because that

21      heritability is not one.  It is not

22      100 percent.

23          But on the other hand, being

24      that it is 80 to 90 percent, that

25      means that the overwhelming

Confidential - Subject to Protective Order

```
 1          contribution is genetic, and that to

 2          be able to implicate something that is

 3          environmental must contribute -- must

 4          consider those genetic confounds

 5          potentially in terms of understanding

 6          a nongenetic or environmental

 7          contributor.

 8     QUESTIONS BY MR. TRACEY:

 9          Q.     Does the environment contribute

10     to the cause of autism, Dr. Chung?

11          A.     I know this is complicated.

12          Q.     No, no, it's not.

13               MS. BROWN:  Let her --

14               MR. TRACEY:  It's not.

15               MS. BROWN:  Let her finish,

16          please, sir.  She's answering your

17          question.

18               THE WITNESS:  So the

19          overwhelming contributor to autism or

20          ADHD is genetic.

21     QUESTIONS BY MR. TRACEY:

22          Q.     Can you answer my question?

23          A.     Given that the overwhelming

24     contributor to both autism and ADHD is

25     genetic, we know that it is not 100 percent
```

Confidential - Subject to Protective Order

1    genetic, but it is overwhelmingly genetic.

2              And, therefore, to be able to

3    properly assess the evidence for anything

4    that's not genetic must consider genetic

5    contributors to ensure that there are not

6    genetic confounds in whatever nongenetic

7    factors are implicated.

8         Q.    We'll get there.  Can you bring

9    up Exhibit 319, please?

10             MS. BROWN:  And, Mr. Tracey,

11        after this exhibit, would it be a good

12        time for a break?

13             MR. TRACEY:  Sure.

14             (Chung Exhibit 319 marked for

15        identification.)

16   QUESTIONS BY MR. TRACEY:

17        Q.    You know what the National

18   Institutes of Environmental Health and

19   Sciences is, Dr. Chung?

20        A.    I do.

21        Q.    Have you been on their website

22   before?

23        A.    I don't recall.

24             MS. BROWN:  Can she have a hard

25        copy of this?

Confidential - Subject to Protective Order

```
 1                    MR. TRACEY:  Yeah.
 2                    MS. BROWN:  Thank you.
 3    QUESTIONS BY MR. TRACEY:
 4         Q.     I found this on the website.
 5    You see that -- the date is three days ago.
 6                    Do you see that, August 27,
 7    2023?
 8         A.     I see that date.
 9         Q.     The National Institute of
10    Environmental Health Sciences is a branch of
11    the federal government, right?
12                    MS. BROWN:  Hang on.  We're
13        just getting sorted with our exhibits.
14                    THE WITNESS:  I'm sorry, can
15        you repeat your question?
16    QUESTIONS BY MR. TRACEY:
17         Q.     Do you understand the National
18    Institute of Environmental Health Sciences to
19    be a branch of the federal government?
20         A.     It is one of the institutes
21    within NIH.
22         Q.     Yeah.
23                    Which is supported and funded
24    by the federal government.
25         A.     That is correct.
```

1          Q.     Now, what they say, if you go

2     to their website and you have a question

3     about gene and environment interaction, they

4     say, "Few diseases result from a change in a

5     single gene or even multiple genes.  Instead,

6     most diseases are complex and stem from an

7     interaction between your genes and your

8     environment."

9               Do you agree with the NI --

10    National Institutes of Environmental Health

11    Sciences?

12         A.     That's a very broad statement,

13    and I agree that when one thinks about many

14    conditions -- and, again, there are many,

15    many, hundreds, thousands, of different

16    conditions -- that is a very broad statement.

17         Q.     They go on -- it is, ma'am.

18    Trust me, we're going to get specific soon.

19               It says, "Factors in your

20    environment can range from chemicals in the

21    air or water pollution, mold, pesticides,

22    diet choices or grooming products."

23               Do you agree with that?

24         A.     I believe that it's a statement

25    that they've made.  I think one needs to get

Confidential - Subject to Protective Order

1    to specificity to understand particular

2    conditions.

3         Q.    Okay.  They go on to say,

4    **"Subtle differences in one person's genes can**

5    **cause them to respond differently to the same**

6    **environmental exposure as another person."**

7                   **Do you agree with that?**

8         A.    Again, realizing that this is a

9    very broad statement about many different

10   conditions and many different exposures,

11   there are some differences between

12   individuals.

13        Q.    **That's called, what, genetic**

14   **susceptibility?**

15        A.    Genetic susceptibility is a

16   portion of that statement.

17        Q.    **Okay.  They go on to say, "As a**

18   **result, some people may develop a disease**

19   **after being exposed to something in the**

20   **environment while others may not."**

21                   **And that's a true statement,**

22   **right?**

23        A.    Again, this is a very broad

24   statement, and it depends in terms of what

25   condition and what environmental exposure.

Confidential - Subject to Protective Order

1        Q.      Okay.  Scroll down there,

2    please, Mike.

3                Now, the next section I want to

4    point to is, "What is the NIEHS doing?"

5                It says, "NIEHS studies a wide

6    range of diseases and disorders with genetic

7    and environmental component."

8                Did you know that they did

9    that?

10       A.      Yes, I was aware.

11       Q.      It says, "In addition, new

12   technologies and computational approaches are

13   under development to tease out the gene and

14   environment interactions that underpin

15   disease."

16               Did you know that was going on?

17       A.      Yes, I was aware.

18       Q.      And then the very first disease

19   they flag for us is autism.

20               Do you see that?

21       A.      They do have a bullet under

22   autism.

23       Q.      Remember I said we were going

24   to get specific?

25       A.      Yes, I recall.

1      Q.      They say, "High levels of air

2   pollution increase the risk for autism in

3   children with a genetic variant called MET,

4   which is involved in brain development."

5              Do you know whether that's

6   true?

7      A.      I don't know about that

8   particular gene.

9      Q.      They say, "This genetic variant

10   did not increase the risk for the 75 percent

11   of the population exposed to lower levels of

12   air pollution, suggesting that autism may be

13   caused by an interaction of genetic and

14   environmental factors."

15              Did you know that?

16      A.      I believe they're referencing

17   one paper specifically about one genetic

18   variance and interaction with one particular

19   exposure of air pollution.

20      Q.      Okay.  Do you disagree with

21   them?  Are they just wrong?

22      A.      Can you be precise in what

23   you're asking if I disagree about?

24      Q.      Well, you're seeming to imply

25   that maybe they're incorrect.

1          **Am I wrong in getting that**

2   **impression?**

3               MS. BROWN:  Objection to the

4        form of the question.

5   QUESTIONS BY MR. TRACEY:

6        **Q.     If I'm wrong, just tell me I'm**

7   **wrong.**

8        A.     I just like to be precise in

9   what we're -- what statement specifically,

10  we -- we've listed several statements.

11       **Q.     Well, the statement that we**

12  **just read into the record that "This genetic**

13  **variant did not increase the risk for**

14  **75 percent of the population exposed to lower**

15  **levels of air pollution," suggesting that**

16  **autism may be caused by an interaction of**

17  **genetic and environmental factors, that**

18  **statement.**

19       A.     I'll timestamp when this

20  particular paper was published, which was in

21  2014, which is already almost a decade ago,

22  which in terms of genetic history is ancient.

23               And so within this, although

24  this may have at the time been something that

25  was believed, in many cases we're going back

1    and revisiting with much more complicated

2    methods, models, being able to consider

3    multiple contributors.

4            I don't know whether or not

5    these investigators have readdressed this

6    same question using currently available

7    technologies and methods.

8        Q.    **The date that I pulled this off**

9    **the Internet was three days ago, though, not**

10   **nine years ago, right?**

11       A.    That's correct, but I'm

12   referencing the primary literature that they

13   refer to, and I'm commenting on the primary

14   literature.  I'm not commenting on the

15   science communicator that wrote their

16   website.

17       Q.    **Well, you're not really**

18   **commenting on the primary literature.  What**

19   **you're doing is saying that it's nine years**

20   **old.**

21            **Are you testifying that that**

22   **statement is false based on new and improved**

23   **technologies?**

24            MS. BROWN:  I object.  That's

25        argumentative.

Confidential - Subject to Protective Order

1            THE WITNESS:  Again, what I'm

2       stating is that in terms of the

3       question, I'm not aware if these

4       investigators have done the most

5       up-to-date analysis that's possible to

6       do that considers the totality of the

7       evidence to understand the

8       contributors.

9  QUESTIONS BY MR. TRACEY:

10       **Q.    Okay.  All right.  You're**

11  **ignorant of whether they've done further**

12  **research?**

13            MS. BROWN:  Objection to the

14       form.

15            THE WITNESS:  I'm ignorant.  I

16       don't know of all research done in all

17       aspects.

18  QUESTIONS BY MR. TRACEY:

19       **Q.    Okay.  That's not my question.**

20            **My question is, are you**

21  **claiming that what's on this page is**

22  **scientifically false?**

23            MS. BROWN:  Objection to the

24       form of the question.

25            THE WITNESS:  Again, to be

Confidential - Subject to Protective Order

1        precise, can we talk about which

2        sentence specifically we're talking

3        about?

4    QUESTIONS BY MR. TRACEY:

5        **Q.      The same sentence I read in the**

6    **last time you asked me two minutes ago --**

7        A.      And I'm sorry --

8        **Q.      -- this genetic variant.**

9        A.      Again, I believe this website

10   is referencing this paper, this primary

11   literature, from 2014, and I believe this

12   website is accurately reflecting what is

13   written in this paper in 2014.

14              I am saying I have not

15   specifically gone back, and I don't know if

16   these authors have gone back, to check the

17   validity of this statement or this

18   information given current methods that we

19   have today.

20       **Q.      I understand you're ignorant,**

21   **Doctor, of what's been done since then, but I**

22   **want an answer to a different question.**

23       A.      So what I see --

24       **Q.      I want to know -- let me -- let**

25   **me ask it again.**

Confidential - Subject to Protective Order

1              I want to know whether Wendy

2    Chung today, August the 30th, 2023, is

3    testifying that that sentence that we've read

4    now twice into the record is false?

5              MS. BROWN:  I object.  She's

6         answered this question at least three

7         times now.

8              THE WITNESS:  I'm not saying

9         whether this sentence is either true

10        or false.

11   QUESTIONS BY MR. TRACEY:

12        Q.    Okay.  I'm going to hand you

13   Exhibit 312 --

14             MS. BROWN:  Can we do a break

15        before that?

16             MR. TRACEY:  Oh, yeah, sorry.

17        Yeah.  Yeah.

18             VIDEOGRAPHER:  The time is

19        10:00 a.m., and we're off the record.

20         (Off the record at 10:00 a.m.)

21             VIDEOGRAPHER:  The time is

22        10:11 a.m., and we're on the record.

23             (Chung Exhibit 312 marked for

24        identification.)

25

Confidential - Subject to Protective Order

```
 1    QUESTIONS BY MR. TRACEY:

 2         Q.     Dr. Chung, on the break, I

 3    walked down -- the next exhibit, it's -- what

 4    is the number?  Is it 312?

 5              Sorry, 312, it's an article

 6    called "Neurobehavioral Effects of

 7    Developmental Toxicity," published in Lancet

 8    Neurology, it says 2014 up there, but I think

 9    it was ultimately published in 2015.

10              Are you familiar with the

11    journal Lancet Neurology?

12         A.     I'm familiar with Lancet

13    Neurology.

14         Q.     Do you -- do you understand

15    that to be one of the premium journals,

16    scientific journals, in the world?

17         A.     I don't know the impact factor.

18    Lancet certainly -- Lancet properly is a

19    leading journal.

20         Q.     Okay.  Do you know who either

21    of the authors are, Philippe Grandjean or

22    Philip Landrigan?

23         A.     I personally don't know either

24    of them.

25         Q.     Well, have you heard of either
```

Confidential - Subject to Protective Order

1    one of the them?

2        A.    Off the top of my head, no.

3        Q.    Dr. Grandjean is, it says, with

4    the Department of Environmental Medicine,

5    University of Southern Denmark and also an

6    appointment at the Department of

7    Environmental Health at the Harvard School of

8    Public Health here in Boston.

9             Do you see that?

10       A.    I see that with his

11   affiliations.

12       Q.    And then Dr. Landrigan, at

13   least at the time, was at the Icahn School of

14   Medicine in Mount Sinai, New York, correct?

15       A.    That's what's listed, yes.

16       Q.    Those are two institutions of

17   impeccable scientific quality and integrity,

18   right?

19       A.    I think you have to not overly

20   generalize for institutions and talk about

21   individual investigators, but I don't know

22   either of them.

23       Q.    Okay.  What is Harvard's

24   reputation, the Department of Environmental

25   Health at Harvard?  Is it -- does it enjoy a

1   fine reputation worldwide?

2       A.     I assume it does have a fine

3   reputation.  Again, more importantly are the

4   individual investigators.

5       Q.     Okay.  Let's see what these two

6   individual investigators that published in

7   Lancet have to say about the subject of

8   neurobehavioral effects of developmental

9   toxicity, shall we?

10              If you -- if you scroll down,

11  the last sentence in the abstract, it says,

12  "To control the pandemic of developmental

13  neurotoxicity, we propose a global prevention

14  strategy.  Untested chemicals should not be

15  presumed to be safe to brain development, and

16  chemicals in existing use and all new

17  chemicals must therefore be tested for

18  developmental neurotoxicity."

19              Now, I have a couple questions

20  about that.

21              Do you see them describe a

22  pandemic of developmental neurotoxicity?

23              MS. BROWN:  Well, I -- same

24          objection as before.  She hasn't

25          reviewed this article, and so she

Confidential - Subject to Protective Order

```
 1        needs time to look at it to answer

 2        your question.

 3   QUESTIONS BY MR. TRACEY:

 4        Q.     Ma'am, do you agree that --

 5   with these authors, that there is a pandemic

 6   of developmental neurotoxicity that needs to

 7   be controlled?

 8             MS. BROWN:  Same objection.

 9             THE WITNESS:  Again, I haven't

10        read this particular paper.  As we're

11        thinking about the world around us, I

12        would not describe this as a pandemic.

13   QUESTIONS BY MR. TRACEY:

14        Q.     Okay.  Do you agree that

15   untested chemicals should not be presumed to

16   be safe to brain development?

17        A.     There are literally hundreds of

18   thousands of chemicals, so that's a very,

19   very broad statement.

20        Q.     It is, ma'am.

21             Do you agree with it?

22             MS. BROWN:  Object to the form.

23             THE WITNESS:  Again, I think it

24        would be impossible to test as

25        chemicals as exist -- the number of
```

```
 1            chemicals that exist on the face of

 2            the earth to be able to test for

 3            developmental neurotoxicity.

 4     QUESTIONS BY MR. TRACEY:

 5            Q.      It would be impossible?

 6            A.      I don't believe that people

 7     would put the resources necessary to be able

 8     to do this and to be able to do it in an

 9     ethical way.

10            Q.      Okay.  Have you yourself

11     studied or published on acetaminophen?

12            A.      I don't believe so.

13            Q.      You don't have any papers on

14     acetaminophen and neurotoxicity?

15            A.      I believe I may have a paper of

16     acetaminophen with breast cancer, if I have a

17     paper.

18            Q.      Okay.  But I was asking about

19     neurotoxicity.

20            A.      To the best of my recollection,

21     I do not.

22            Q.      Okay.  Do you know, or did you

23     run across in your research for this case,

24     the developmental neurotoxicity tests that

25     were done on acetaminophen before it was --
```

1  started getting sold to the public?

2          MS. BROWN:  Objection to the

3      form.

4          THE WITNESS:  I did not review

5      such literature.

6  QUESTIONS BY MR. TRACEY:

7      Q.    Did you ask anybody if such

8  literature existed before you rendered your

9  opinions in this case?

10     A.    I did not ask specifically for

11 that literature.

12     Q.    Do you know if it even exists?

13     A.    I did not do a comprehensive

14 literature review for that specific question.

15 I did a comprehensive literature review, as

16 we've talked about before, thinking about

17 prenatal acetaminophen, autism and ADHD.

18     Q.    But my question -- I understood

19 that.

20          But my question is, do you even

21 know if the literature on developmental

22 neurotoxicity and acetaminophen has been

23 done?

24          MS. BROWN:  Objection.  Asked

25      and answered.

1          THE WITNESS:  I did not do a

2     search specifically with the terms

3     that you just mentioned, so I can't

4     comment on what literature is

5     available using those terms

6     specifically.

7  QUESTIONS BY MR. TRACEY:

8     Q.     **So you don't have any idea, as**

9  **we sit here today, whether it exists or it**

10 **doesn't?**

11         MS. BROWN:  Asked and answered.

12     Objection.

13         THE WITNESS:  Again, I was

14     thinking about the data that we have

15     to support, from an epidemiological

16     and a genetic point of view, the role

17     of acetaminophen.

18 QUESTIONS BY MR. TRACEY:

19     Q.     **Can you answer my question?**

20     A.     Again, because I did not do the

21 literature review that you mentioned, I can't

22 comment on what the data are or are not.

23     Q.     **Okay.  Do you know whether**

24 **Tylenol was never tested for developmental**

25 **neurotoxicity before it began being marketed**

1   in the United States?

2           MS. BROWN:  Object to the form.

3       Lacks foundation.

4   QUESTIONS BY MR. TRACEY:

5       Q.      Has anybody ever told you that?

6           MS. BROWN:  I object.  That

7       lacks foundation.

8           THE WITNESS:  Again, for

9       acetaminophen, I'm not aware of

10      published or unpublished data using

11      the terms that you've just used of

12      neurotoxicity.

13  QUESTIONS BY MR. TRACEY:

14      Q.      Do you know whether or not

15  Tylenol, acetaminophen, is hepatotoxic in

16  humans?

17      A.      Certainly I do know of the

18  hepatotoxicity of acetaminophen.

19      Q.      Do you know how long

20  acetaminophen was being sold worldwide before

21  it was discovered that acetaminophen was

22  hepatotoxic?

23      A.      I do not know the answer to

24  that specific question.

25          MS. BROWN:  Object, I --

1          belated objection to that question.

2     QUESTIONS BY MR. TRACEY:

3          Q.     You don't know whether it'd

4     been -- it had been being sold for months,

5     years or decades before that was discovered?

6          A.     I don't know.

7          Q.     Okay.  Do you know how many

8     years it had been marketed worldwide to the

9     public as an over-the-counter medicine before

10    a warning was put on it regarding

11    hepatotoxicity?

12               MS. BROWN:  Objection to the

13         form.  Lacks foundation.

14               THE WITNESS:  I don't know.

15    QUESTIONS BY MR. TRACEY:

16         Q.     Do you know whether or not

17    Tylenol, acetaminophen, is the leading cause

18    of accidental liver overdose deaths in the

19    world?

20               MS. BROWN:  Objection to the

21         form.  Lacks foundation.

22               THE WITNESS:  I don't know.  I

23         haven't specifically investigated that

24         question.

25

Confidential - Subject to Protective Order

1    QUESTIONS BY MR. TRACEY:

2         Q.    All right.  Well, let's read on

3    Landrigan and Grandjean.

4              At the bottom of the

5    introduction, the sentence that says, "The

6    root causes of the present global pandemic of

7    neurodevelopmental disorders" -- oh, sorry.

8    I skipped something.  Sorry.

9              First sentence under

10   Introduction.  It says, "Disorders of

11   neurobehavioral development affect 10 to

12   15 percent of all births, and prevalence

13   rates of autism spectrum disorder and

14   attention-deficit/hyperactivity disorder seem

15   to be increasing worldwide."

16             Do you agree with that?

17             MS. BROWN:  Objection to the

18        form of the question.

19             THE WITNESS:  I think it

20        depends on where you are in the world

21        and where you are over time, but at

22        the time that this paper was published

23        in 2015, I believe those estimates

24        were approximately correct.

25

```
1    QUESTIONS BY MR. TRACEY:

2         Q.     All right.  Next paragraph.

3    "The root causes of the present global

4    pandemic of neurodevelopmental disorders are

5    only partly understood."

6              You certainly agree with that?

7         A.     That is true.

8         Q.     It says, "Although genetic

9    factors have a role, they cannot explain," on

10   the next page, "increases in reported

11   prevalence, and none of the genes discovered

12   so far seem to be responsible for more than a

13   small proportion of cases."

14             Do you see that?

15             MS. BROWN:  So same objection

16        to reading sentences out of this

17        article she hasn't had time to review.

18   QUESTIONS BY MR. TRACEY:

19        Q.     Do you agree with that?

20        A.     I don't agree with that.

21        Q.     Okay.

22        A.     I do see the sentence that

23   you've highlighted here.  I'll again say that

24   this is timestamped, published, 2015,

25   probably written in 2014, and our state of
```

Confidential - Subject to Protective Order

1    knowledge of genetics over that almost decade

2    has been remarkably different.

3              And specifically when it comes

4    to de novo genetic factors, those have

5    changed over time as reproductive patterns

6    have changed over time.

7         Q.    I assure you, Dr. Chung, we're

8    going to come forward in time up till and

9    including today.

10             All right?

11             MS. BROWN:  Let's just ask

12        questions.

13   QUESTIONS BY MR. TRACEY:

14        Q.    Is that okay with you, Doctor?

15        A.    I'm ready for the next

16   question.

17        Q.    All right.  These doctors say,

18   "Overall, genetic factors seem to account for

19   no more than perhaps 30 to 40 percent of all

20   cases of neurodevelopmental disorders.  Thus,

21   nongenetic, environmental exposures are

22   involved in causation, in some cases probably

23   by interacting with genetically inherited

24   predispositions."

25             Do you see that?

Confidential - Subject to Protective Order

```
 1              MS. BROWN:  Same objections.

 2              THE WITNESS:  I see that,

 3       although I haven't read this

 4       particular paper.

 5              I'll point out that what they

 6       reference in terms of this very broad

 7       group of neurodevelopmental disorders

 8       is not specific, and the statements

 9       that you've just read are not specific

10       either to autism or ADHD in what

11       you've read.

12  QUESTIONS BY MR. TRACEY:

13       Q.     You're absolutely right.  I

14  just read what I read.

15              Right?

16       A.     Correct, you read what they

17  wrote.

18       Q.     That sounds strikingly similar,

19  that last sentence, though, to what the

20  National Institutes of Environmental Health

21  Sciences has on their website as of three

22  days ago, doesn't it?

23              MS. BROWN:  Objection to the

24       form.

25              THE WITNESS:  Again, what the
```

```
1            National Institutes of Environmental

2            Health Sciences has written is quite

3            broad in their statements, and we need

4            to get down to the specificity of the

5            issues related to autism and ADHD.

6    QUESTIONS BY MR. TRACEY:

7         Q.     Okay.  And the next paragraph,

8    the second sentence, it says, "The developing

9    human brain is uniquely vulnerable" --

10        A.     I'm sorry, where are we?

11        Q.     Sorry.  The second sentence of

12   the next paragraph.  We're going to highlight

13   it for you.  It may be easier to follow along

14   on the screen.

15        A.     Okay.

16        Q.     "The developing human brain is

17   uniquely vulnerable to toxic chemical

18   exposures, and major windows of developmental

19   vulnerability occur in utero and during

20   infancy and childhood."

21               Do you agree with that?

22        A.     I agree with the statement

23   that's written here that, again, we're

24   talking about in a very general way --

25        Q.     Yes, ma'am.
```

1        A.       -- many conditions.

2        Q.       **They go on to say that, "During**

3    **these sensitive life stages, chemicals can**

4    **cause permanent brain injury at low levels of**

5    **exposure that would have little or no adverse**

6    **effect in an adult."**

7                 **Do you agree with that?**

8        A.       Again, these are very, very

9    general statements in terms of hundreds of

10   thousands of chemicals that could be at play

11   without any level of specificity.

12       Q.       **Okay.  But generally speaking,**

13   **you agree with that statement?**

14       A.       I believe that there are

15   different life stages and different things

16   happen at different life stages; fetal

17   development being different than newborn

18   development being different than adults.  But

19   that's a very -- again, the statements that

20   you've read so far are extremely broad.

21       Q.       **And if you skip down two**

22   **paragraphs, the one starting "We noted," it**

23   **says, "We noted that recognition of the risk**

24   **of industrial chemicals to brain development**

25   **has historically needed decades of research**

Confidential - Subject to Protective Order

```
 1   and scrutiny, as shown in the cases of lead
 2   and methylmercury."
 3              Are you familiar, Dr. Chung,
 4   with the history of methylmercury and lead in
 5   this country?
 6        A.    I'm more --
 7              MS. BROWN:  Objection.  Vague.
 8              THE WITNESS:  I'm more familiar
 9        with the lead and what we do in terms
10        of monitoring lead levels in children.
11   QUESTIONS BY MR. TRACEY:
12        Q.    Okay.  They go on to say, "In
13   most cases, discovery began with the clinical
14   diagnosis of poisoning in workers and
15   episodes of high-dose exposure.  More
16   sophisticated epidemiological studies
17   typically began only much later."
18              Let me ask you this.  Have you
19   ever asked anybody when Tylenol began being
20   sold in the United States?  What year?
21        A.    I have not.
22        Q.    Do you have even a vague idea
23   of how long it's been on the market?
24        A.    I have not, but at least for
25   decades.
```

```
 1          Q.     Okay.  Do you know why or if

 2   the sales of Tylenol increased in the 1980s;

 3   and if so, for what reason?

 4               MS. BROWN:  Objection.  Lacks

 5       foundation.

 6               THE WITNESS:  I do not.  I have

 7       not studied sales of acetaminophen.

 8   QUESTIONS BY MR. TRACEY:

 9          Q.     You're younger than me, but

10   when I was a kid, we used to get aspirin.

11               Do you remember that or have

12   any knowledge of that?

13          A.     I'm familiar --

14               MS. BROWN:  Wait.  Does she

15       have knowledge of what happened when

16       you were a kid?  That's the question?

17   QUESTIONS BY MR. TRACEY:

18          Q.     Yeah.  When I was a kid,

19   aspirin was given to children.

20               Do you have any knowledge of

21   that?

22               You and I were kids at

23   different times.

24               MS. BROWN:  I object.

25               THE WITNESS:  I am familiar
```

```
 1          with the former use of aspirin in

 2          children.

 3     QUESTIONS BY MR. TRACEY:

 4          Q.     And the reason we don't give it

 5     any more is because it was associated with

 6     Reye's syndrome in children, right?

 7               MS. BROWN:  Objection to the

 8          form.  This all lacks foundation.

 9               THE WITNESS:  Yes.

10          Prescription pattern -- or not

11          prescription.  Usage patterns have

12          changed over time to try and minimize

13          the impact of Reye's syndrome in

14          children.

15     QUESTIONS BY MR. TRACEY:

16          Q.     And how long was aspirin sold,

17     if you know, before we figured out it was

18     causing Reye's syndrome in children?

19          A.     I do not know.  I haven't

20     investigated that point in particular.

21          Q.     If I told you it was sold for

22     over a hundred years, would that surprise

23     you?

24               MS. BROWN:  Objection to the

25          form.  Lacks foundation.
```

1           THE WITNESS:  I don't know the

2      answer.

3  QUESTIONS BY MR. TRACEY:

4      Q.      Aspirin, of course, is -- has

5  been always, for the most part, an

6  over-the-counter product, right?

7      A.      Again, I don't have a comment.

8  I don't know.

9      Q.      Okay.  They go on to say,

10  "Thus, recognition of widespread subclinical

11  toxicity often did not occur until decades

12  after the initial evidence of neurotoxicity."

13           They say, "A recurring theme

14  was that the early warnings of subclinical

15  neurotoxicity were often ignored or even

16  dismissed."

17           Are you familiar, ma'am, with

18  the history of some of the most notorious

19  toxins in our country?

20           MS. BROWN:  Objection to the

21      form.

22           THE WITNESS:  That's a pretty

23      general statement.

24  QUESTIONS BY MR. TRACEY:

25      Q.      Let me give you some specifics.

1              Are you familiar with the

2    history of asbestos poisoning in this

3    country?

4              MS. BROWN:  Objection to the

5         form.

6              THE WITNESS:  In a very broad

7         sense.

8    QUESTIONS BY MR. TRACEY:

9         Q.    Okay.  Do you know who Irving

10   Selikoff was?

11        A.    I do not.

12        Q.    Do you know who Richard Doll

13   was?

14        A.    I do not.

15        Q.    Are you aware of the research

16   linking smoking to lung cancer performed by

17   Austin Bradford Hill and Richard Doll in

18   1950?

19        A.    I know generally of the

20   studies.

21        Q.    And you know that those were

22   observational studies, correct?

23        A.    I have not gone back and

24   reviewed that literature in detail.

25        Q.    Do you know what the regulators

Confidential - Subject to Protective Order

1    and the public -- what industry and the

2    regulators did to Richard Doll when he told

3    the industry and the regulators that smoking

4    caused lung cancer?

5                MS. BROWN:  How does this have

6          anything to do with the issues we're

7          here to discuss?

8                I object.  This is completely

9          irrelevant.  It completely lacks

10         foundation.  And it's a huge waste of

11         time.

12               THE WITNESS:  I'm not familiar

13         with all of the details.  It was

14         something that by the time I trained

15         in medicine and science was already a

16         well-established association.

17   QUESTIONS BY MR. TRACEY:

18         Q.    You're not aware that he was --

19   Richard Doll was viciously attacked by both

20   regulators and industry when his study was

21   published?

22               MS. BROWN:  This completely

23         lacks foundation.  I object.

24               THE WITNESS:  Again, I -- this

25         is not an area of focus for my

1          research, so I'm not familiar with the

2          details.

3     QUESTIONS BY MR. TRACEY:

4          Q.     Do you know how long after his

5     seminal study was published in 1950 that it

6     took to put a warning on cigarettes in the

7     United States?

8               MS. BROWN:  Same objections.

9          This is such a waste of time.

10         Irrelevant.  Lacks foundation.

11              THE WITNESS:  Again, I have not

12         reviewed the history of this

13         particular case study.

14    QUESTIONS BY MR. TRACEY:

15         Q.     Do you know what happened to

16    Irving Selikoff when he discovered that

17    asbestos causes cancer?

18              MS. BROWN:  Objection.

19              THE WITNESS:  I do not.

20    QUESTIONS BY MR. TRACEY:

21         Q.     Do you know whether he was

22    vilified, both by regulators and industry, in

23    the press?

24              MS. BROWN:  Objection.  False

25         and lacks foundation.

Confidential - Subject to Protective Order

1              THE WITNESS:  Again, I'm not

2         familiar with the details of this

3         particular case.

4    QUESTIONS BY MR. TRACEY:

5         Q.     Does anyone doubt today, ma'am,

6    that smoking causes lung cancer?

7         A.     I believe it's a commonly

8    accepted medical association and has resulted

9    in trying, from a public health point of

10   view, to minimize exposures.

11        Q.     Does anybody doubt in the

12   scientific community that asbestos causes

13   cancer?

14             MS. BROWN:  Objection to the

15        form.

16             THE WITNESS:  That's, again, a

17        very broad statement.  There are

18        associations between asbestos and

19        particular types of cancer.

20   QUESTIONS BY MR. TRACEY:

21        Q.     Let's say mesothelioma.

22        A.     I believe that association is

23   well-established.

24        Q.     Let's read on.

25             "The good doctors say that

Confidential - Subject To Protective Order

1    David P. Rall, former director of the US

2    National Institute of Environmental Health

3    Sciences" --

4              That's the outfit we were just

5    looking at, right?

6         A.    That is the NIEHS, correct.

7         Q.    "David Rall once noted that 'if

8    thalidomide had caused a ten-point loss of

9    intelligence quotient instead of obvious

10   birth defects of the limbs, it would probably

11   still be on the market.'"

12             Do you see that?

13        A.    I see that sentence.

14        Q.    Do you believe that thalidomide

15   causes neurodevelopmental disorders?

16             MS. BROWN:  Objection to the

17        form.

18             THE WITNESS:  Thalidomide is

19        not something taken during pregnancy

20        anymore, so I -- it's very difficult

21        to know exactly what the associations

22        are.

23   QUESTIONS BY MR. TRACEY:

24        Q.    Well, there's plenty -- there's

25   studies on thalidomide and birth defects,

Confidential - Subject to Protective Order

1    ma'am, are there not, in the historical work?

2                MS. BROWN:  Objection to the

3          form.

4                THE WITNESS:  There

5          are associate -- well-published

6          studies of thalidomide and structural

7          congenital anomalies.

8    QUESTIONS BY MR. TRACEY:

9          Q.     And not just phocomelia, which

10   is the missing limbs, right?

11         A.     Again, thalidomide was not the

12   focus of my investigation, but thalidomide is

13   not something commonly used by pregnant

14   women.

15         Q.     And the reason it's not

16   commonly used by pregnant women is because it

17   causes neurodevelopmental disorders and

18   structural birth defects?

19         A.     My understanding of the history

20   in reviewing this was because of the

21   association with the limb anomalies.

22         Q.     Okay.  Do you know whether or

23   not the data supports the fact that

24   thalidomide causes autism or

25   neurodevelopmental disorders?

1          MS. BROWN:  Objection to the

2     form.

3          THE WITNESS:  I did not

4     specifically do a comprehensive review

5     for thalidomide and neurodevelopmental

6     disorders.

7  QUESTIONS BY MR. TRACEY:

8     Q.    I'm going to get you to flip

9  back to something just to identify it, and

10 we're going to come back to it.

11         But I just want to flag for

12 your attention on page 19, it's Figure 1,

13 Grandjean and Landrigan have put together a

14 diagram.

15         Do you see that, ma'am --

16    A.    I do.

17    Q.    -- called "The effect of

18 neurotoxicants during early brain

19 development"?

20    A.    I see the figure.

21    Q.    And they've got arrows.  It

22 starts out "from early life exposures to

23 neurotoxic chemicals," on the left.  Got a

24 big arrow pointing to "development/

25 programming."

Confidential - Subject to Protective Order

1              Do you see that, ma'am?

2     A.      I see the figure.

3     Q.      And then an arrow going down to

4  functional maturation and then ending up at

5  neurological disease and degenerative

6  changes.

7              Do you see that?

8     A.      I see the figure, yes.

9     Q.      Does that make sense to you,

10 this diagram?  Is it understandable to you

11 scientifically?

12             MS. BROWN:  Objection to the

13        form.  Vague.

14             THE WITNESS:  I understand what

15        they're showing in the figure.

16             What they have not shown are

17        all of the other factors contributing

18        to this process, most importantly

19        genetics and genomics.

20             And that is the overwhelming

21        driver that also has a role through

22        what they have talked about in terms

23        of developmental programming,

24        functional maturation and ultimately

25        neurological disease and degenerative

```
 1              changes.

 2                   And again, as they have

 3              referred to this figure, this is a

 4              general figure that is not specific in

 5              my understanding, without reading the

 6              manuscripts, of autism or ADHD but to

 7              neurodevelopmental disorders

 8              generically.

 9    QUESTIONS BY MR. TRACEY:

10         Q.    Fair enough.

11               Who's Heather Volk?

12         A.    I don't know.

13         Q.    You don't know who Heather Volk

14    is at Johns Hopkins University, a researcher?

15         A.    I don't.

16              (Chung Exhibit 318 marked for

17              identification.)

18    QUESTIONS BY MR. TRACEY:

19         Q.    Interesting.  Pull up -- let me

20    have Exhibit 318.

21               I think you're contributing to

22    one of her investigations.  That's why I'm

23    surprised.  Okay.  Here's Exhibit 318.  Two

24    copies.

25               This Exhibit 318, as you can
```

1    see, Dr. Chung, is called "Considering toxic

2    chemicals in the etiology of autism,"

3    published in Pediatric Perspectives, not in

4    2014 or '15, but in January of 2022.

5              Do you see that, ma'am?

6        A.    I see the year of publication,

7    yes.

8        Q.    Now, Heather Volk, let's just

9    identify her over on the right.  It says she

10   is the Wendy Klag Center -- or with the

11   Wendy Klag Center for Autism and

12   Developmental Disabilities Research,

13   Department of Mental Health, Bloomberg School

14   of Public Health, at Johns Hopkins University

15   in Baltimore, Maryland.

16             Do you see that?

17       A.    I see the affiliation.

18       Q.    You've heard of Johns Hopkins?

19       A.    I have.

20       Q.    Is that an excellent academic

21   institution?

22       A.    The institution is a good

23   institution, and as we've reviewed before, we

24   should also consider the individual

25   investigators, not just the institution.

1      Q.     No question.  We'll get to that

2  soon enough.

3            I'll also highlight Dr. Beate

4  Ritz, MD, Ph.D., who's the chair of

5  epidemiology in environmental health and

6  neurological at the Fielding School of Public

7  Health at UCLA.

8            Are you familiar with Dr. Ritz

9  or her publications?

10     A.     She's not someone I'm

11  intimately familiar with her entire records

12  of publications, no.

13     Q.     In your review of the

14  epidemiology literature in this case, do you

15  remember running across her name as being a

16  coauthor on some of the seminal studies on

17  acetaminophen and neurodevelopmental

18  disorders?

19     A.     She may have been a coauthor.

20  I don't recall that she was either first or

21  senior author.

22     Q.     Okay.  They say -- these

23  authors -- this -- and then there's many

24  more, of course, right?

25     A.     There are certain many other

Confidential - Subject to Protective Order

```
 1   authors on this paper.
 2        Q.     Yeah.
 3               Looks like they're from all
 4   over the country, doesn't it?  Pennsylvania,
 5   another one from California, right?
 6        A.     Certainly as with many papers,
 7   they have affiliations with many
 8   institutions.
 9        Q.     And what these authors say --
10   the very first sentence, it says, "Diagnoses
11   of autism spectrum disorder, also referred
12   here as" -- oh, yeah -- "ASD also referred to
13   here as autism, a condition that arises
14   during early brain formation, have increased
15   to now 1 in 54 children in the United
16   States."
17               And I think she's citing the
18   CDC for that.
19               Does that sound like an
20   accurate statement to you?
21        A.     I believe those were based on
22   CDC prevalence numbers at the time of
23   publication, yes.
24        Q.     Now, the next paragraph says,
25   "Scientists long-recognize that genetic
```

Confidential - Subject to Protective Order

1    **factors contribute to autism etiology as**

2    **indicated in family, twin and genetic**

3    **studies."**

4              **You agree with that, right?**

5        A.      Yes, I believe that genetics

6    contribute to autism.

7              They go on to say, "Yet twin

8    studies, from which heritability estimates

9    are primarily derived, may inflate the role

10   of genetics as both gene-only and

11   gene-by-shared environment influences are

12   summarized as genetic."

13             Do you see what the good doctor

14   said there?

15             MS. BROWN:  Objection to the

16        form.

17             THE WITNESS:  I see what the

18        doctor said there.

19             I'll also restate that

20        heritability estimates don't include

21        all genetic contributors, and de novo

22        genetic variants are not included

23        within that.

24   QUESTIONS BY MR. TRACEY:

25        **Q.      I assure you we're going to get**

1    to de novo, Doctor.

2              But do you agree with that

3    statement as written?

4        A.    As I've stated before,

5    heritability estimates are a good estimate of

6    genetic contributions to the conditions.  The

7    genetics are complicated, but they are a good

8    overall estimate of the aggregate of

9    inherited genetic factors.

10       Q.    But you didn't mention

11   environment in your answer, Doctor, like she

12   did in her sentence.

13       A.    I will say broadly, again, that

14   there are genetic and I'll call environment

15   nongenetic factors, and because the

16   heritability is not 100 percent, there is

17   something in terms of nongenetic factors, at

18   least not -- not -- at least not heritable

19   genetic factors.

20       Q.    Okay.  I'm a little confused.

21             Do you agree with that sentence

22   as written?

23       A.    I do not agree with this

24   sentence as written.

25             I do agree with the first

1    sentence that you stated, which is that it is

2    long-recognized that genetic factors

3    contribute to autism etiology.

4         Q.    Right.

5               But I'm on the next sentence,

6    **"Yet twin studies from which heritability**

7    **estimates are primarily derived, may inflate**

8    **the role of genetics as both gene-only and**

9    **genetic-by-shared environment influences are**

10   **summarized as genetic."**

11              **That's the sentence I want to**

12   **know if you agree with.**

13        A.    I'll underscore that they use

14   the term "may inflate."  And within that, I

15   would say that I don't believe they do

16   inflate, but they are equivocating, I would

17   say, in their statement and in that sentence.

18        Q.    So agree?  Disagree?

19              MS. BROWN:  Asked and answered.

20              THE WITNESS:  Again, I would

21        say that heritability studies -- or

22        twin studies, rather, are a good

23        estimate of heritability.

24   QUESTIONS BY MR. TRACEY:

25        Q.    And environment?

Confidential - Subject to Protective Order

```
1        A.       Twin studies are a good
2   estimate of heritability.
3        Q.       And environment?
4        A.       Again, I will state what I
5   stated, my understanding and my opinion,
6   which is that twin studies are a good
7   estimate of heritability.
8        Q.       Well, the twins are in the same
9   environment, aren't they?
10            MS. BROWN:  Objection to the
11       form.  Lacks foundation.
12            THE WITNESS:  They may or may
13       not be.
14   QUESTIONS BY MR. TRACEY:
15       Q.       Well, the twins -- in utero
16   twins born vaginally are in the same in utero
17   environment?
18       A.       Again, you have just specified
19   something different, which is in utero
20   environment, but there's also a postnatal
21   environment.
22       Q.       Okay.  All right.  Let's move
23   on.
24            Dr. Volk and her coauthors say,
25   "This pervasive problem of identifying
```

1  genetic contributions and assuming their

2  effects cannot result from -- from genes

3  acting in concert with environmental agents

4  also applies to a recent analysis of twin

5  studies purporting to demonstrate that the

6  environmental component is an unlikely

7  explanation of both ASD risk and the increase

8  in ASD over time."

9           Now, I have a few questions

10  about that, ma'am.

11           Do you know what study they're

12  referring to?

13           If you want to flip over to

14  footnote 3, take a look at it.  I think it's

15  the Taylor study, the one that they call --

16  or they identify as being a pervasive

17  problem.

18           Do you see that?  That's

19  Taylor, isn't it?

20      A.    I see the reference to the

21  Taylor citation.

22      Q.    And you cited Taylor on page 24

23  of your report, paragraph 55, for just that

24  proposition, didn't you, the one that

25  Dr. Volk calls a problem?  Page 24,

1    paragraph 55.

2         A.      So I do cite the Taylor study

3    in my report.

4         Q.      Now, Dr. Volk, as far as you

5    know, is not -- has not been paid by Johnson

6    & Johnson in this case, right?

7              MS. BROWN:  Objection to the

8         form.

9              THE WITNESS:  Again, I know

10        nothing about what Dr. Volk does in

11        general and whether -- what her

12        relationship is with Johnson &

13        Johnson.

14   QUESTIONS BY MR. TRACEY:

15        Q.      Well, you haven't seen her

16   identified as an expert for any party in this

17   case, have you?

18        A.      I'll just say in general I have

19   no knowledge of what Heather Volk does.

20        Q.      Yeah.

21              Well, she says that doing what

22   you did, citing Taylor for the proposition

23   that assuming that genetic contributions

24   cannot act in concert with the environment is

25   problematic, doesn't she?

Confidential - Subject to Protective Order

```
 1              MS. BROWN:  Objection to the
 2         form.  Misstates the testimony.
 3              THE WITNESS:  Again, she has
 4         her opinion, and she's stated things,
 5         certain things, within this.  It is
 6         the overwhelming evidence is that
 7         genetics, they would agree, are an
 8         important contributor to autism.
 9              And I think, again, we are
10         agreeing that genetics is not
11         100 percent in terms of the risk of a
12         probability of autism.
13              Getting down into the specific
14         contributions, heritability estimates
15         from twins would still argue that the
16         overwhelming majority, however, is due
17         to genetic -- inherited genetic
18         factors.
19    QUESTIONS BY MR. TRACEY:
20         Q.    Okay.  Do you agree with her or
21    not?
22         A.    Which statement?
23         Q.    The statement we just read into
24    the record that's highlighted on the screen
25    where she identifies Taylor as a pervasive
```

1    **problem.**

2         A.      I do not agree with that

3    statement.

4         **Q.      Okay.  Now, Dr. Chung, it's not**

5    **unusual for scientists to disagree about**

6    **things, is it?**

7         A.      There can be disagreements

8    between scientists.

9         **Q.      I mean, two perfectly**

10   **competent, accomplished scientists can look**

11   **at the same set of data and draw different**

12   **conclusions, can't they?**

13            MS. BROWN:  Objection to the

14        form.

15            THE WITNESS:  Again, although

16        two individual scientists could look

17        at the same data and for reasons come

18        to different conclusions, but over

19        time the scientific community as a

20        whole tends to look at the whole of

21        the data and come to consensus.

22            And there is consensus in the

23        scientific community that the

24        overwhelming contributors to autism

25        and ADHD are genetic factors.

1    QUESTIONS BY MR. TRACEY:

2         Q.    You and I are going to explore

3    whether that's true for the rest of the day,

4    Dr. Chung.

5              But can you answer my question?

6         A.    Your question, if I understood

7    it, can any two scientists disagree?

8         Q.    No.  I said, can two competent,

9    qualified scientists look at the same set of

10   data and draw different conclusions?

11             MS. BROWN:  Objection.  Asked

12        and answered.

13             THE WITNESS:  Again, that's a

14        very general statement.

15   QUESTIONS BY MR. TRACEY:

16        Q.    Yes, ma'am, it is.

17        A.    But it is a very general

18   statement that two good scientists can have

19   different opinions about the same set of

20   data --

21        Q.    We want that, don't we?

22             MS. BROWN:  Wait, wait.  She's

23        not done.

24             MR. TRACEY:  Sorry, I thought

25        you were done.  Sorry.

```
 1              THE WITNESS:  Based in part on
 2       their background and their
 3       understanding of the complexities of
 4       the data and how one should design the
 5       experiments that are necessary to come
 6       to definitive conclusions.
 7  QUESTIONS BY MR. TRACEY:
 8       Q.     You brought up a good point.
 9              You ever heard the saying that
10  when you're a hammer, you think everything's
11  a nail?
12       A.     I have heard of that statement.
13       Q.     You're not an environmental
14  epidemiologist, are you, Dr. Chung?
15       A.     I am not an environmental
16  epidemiologist.
17       Q.     You've never designed an
18  environmental epidemiology study, have you?
19       A.     I have not designed an
20  environmental epidemiology study.
21       Q.     And you've told me before, a
22  couple times, you're not an epidemiologist?
23       A.     Not an epidemiologist, but I've
24  worked with many epidemiologists over my
25  career and --
```

```
1              Q.      No doubt.

2              A.      -- and in understanding the

3      complexities of epidemiology and genetic

4      epidemiology, these areas come together in

5      terms of trying to understand cause of

6      conditions.

7              Q.      Do you know what ipse dixit

8      means?

9              A.      I do not.

10             Q.      Ipse dixit is a Latin term we

11     lawyers use, and it means because I say so.

12                     When I was a kid --

13                     MS. BROWN:  Oh, come on.  Come

14             on.  Come on.  Come on.  Please ask a

15             question.

16                     MR. WATTS:  Let him ask his

17             questions.

18                     MS. BROWN:  Yeah, but come on.

19                     MR. WATTS:  Object to form.

20     QUESTIONS BY MR. TRACEY:

21             Q.      When I was a kid, Dr. Chung,

22     and if I asked my mother if I could do

23     something and she'd say no, and if I asked

24     her why, she'd say "Because I said so."

25                     Have you ever had that
```

1    experience?

2              MS. BROWN:  I object to the

3        form of the question.

4              THE WITNESS:  I've not, but I

5        had a different mother.

6    QUESTIONS BY MR. TRACEY:

7        Q.    Okay.  We don't allow that in

8    the law.  We don't allow witnesses to say,

9    "Believe me because I say so."

10             MS. BROWN:  Object to the form.

11   QUESTIONS BY MR. TRACEY:

12       Q.    We require them to defend their

13   methodology and how they reached their

14   conclusions.

15             Does that sound fair to you?

16             MS. BROWN:  I object.  It lacks

17       foundation.  It's an improper

18       question.

19             THE WITNESS:  I would say that

20       I use a scientific methodology in

21       which we do, as well as a scientific

22       community, strive for rigor and try to

23       understand the world around us.  And

24       as we do that, we hold each other

25       accountable and to a very high

1          standard.

2     QUESTIONS BY MR. TRACEY:

3          **Q.     Good point.**

4          A.     And the opinion that I'm

5     rendering today is not my opinion alone.  In

6     fact, it is, I would argue, the consensus of

7     the scientific community.

8          **Q.     Okay.  Next paragraph is**

9     **entitled "Evidence for environmental**

10    **influence on ASD risk."**

11              **Do you believe that there is**

12    **evidence for environmental influence on ASD**

13    **risk?**

14         A.     I believe, as we've spoken

15    about, the heritability for autism is not

16    100 percent.  Because of that, there is

17    something, if we wanted to call it

18    environment, nongenetic factors.  There is

19    room for a contribution of something that is

20    not genetic.

21         **Q.     They say "A large body of**

22    **evidence, including decades of research on**

23    **lead and child IQ, indicate a link between**

24    **toxic environmental exposures and poorer**

25    **developmental outcomes."**

1          **Are you familiar with the**
2    **literature she's referencing?**
3          A.     Again, I think the specific
4    literature that she's referencing is the
5    association between lead.
6          Q.     **Yes, ma'am.**
7          A.     And between lead and
8    neurodevelopmental outcomes, postnatally, is
9    the main concern that we have in terms of
10   lead exposures.
11         Q.     **They go on to say, "In animal**
12   **models and human studies, several toxic**
13   **chemicals have been implicated in ASD and**
14   **ASD-related traits and biological markers.**
15         **"Specifically, scientists have**
16   **found that air pollution exposures during**
17   **pregnancy and early infancy, at levels**
18   **typically found in large cities, are**
19   **associated with autism."**
20         **Do you agree with that, ma'am?**
21         A.     Again, as we think about some
22   of these things that have been implicated
23   previously, I'll again say that we go through
24   a process iteratively of being able to have
25   more complex modeling and considering

1    multiple factors in those studies.

2            If we wanted to go back through

3    those, to my knowledge, not all of the

4    studies that are referenced here have done

5    the state-of-the-art analyses to consider all

6    those particular confounds.

7        Q.    **What does that mean?**

8        A.    What that means is that autism,

9    in particular, is complicated.  There is not

10   one single condition that is autism.  There

11   is not one single genetic or nongenetic

12   factor that is autism.

13           In trying to understand this

14   very complex human behavior, it is necessary

15   to have very complex modeling that considers

16   many, many potential confounds.

17           In doing so, these study

18   designs are extremely difficult, and having

19   the perfect study that can accurately and

20   scientifically assess the contributions of

21   these are extremely hard to do, and are still

22   getting better in their ability to answer

23   that question.

24       Q.    **Do you think genetic**

25   **susceptibility contributes to smoking and**

1    lung cancer?

2              MS. BROWN:  Objection to the

3         form.  Beyond the scope.

4              THE WITNESS:  Can you please

5         break that down into two separate

6         questions?  Because I believe there

7         are two questions embedded within

8         that.

9    QUESTIONS BY MR. TRACEY:

10        Q.    Do you know whether there's

11   data that supports that people that have a

12   certain genetic makeup are at higher or

13   increased risk from smoking and lung cancer?

14             MS. BROWN:  Objection to the

15        form.

16             THE WITNESS:  I have not

17        investigated that particular

18        scientific question.

19   QUESTIONS BY MR. TRACEY:

20        Q.    Do you know whether or not

21   Richard Doll, in 1950, had any genetic

22   testing to exclude the contribution of

23   genetic susceptibility before reaching the

24   conclusion he did that smoking caused lung

25   cancer?

```
 1              MS. BROWN:  Objection to the
 2         form.
 3              THE WITNESS:  To my knowledge,
 4         he did not, but you bring up an
 5         important point, which is that if
 6         there is an exposure that has a very
 7         large effect size, it can overwhelm
 8         genetic factors if genetic factors are
 9         not a major contributing.
10              On the other hand, if there are
11         exposures which may have a very small
12         contributing factor, it is very easy
13         for there to appear to be an
14         association where there's actually a
15         confound due to genetic factors
16         driving the signal.
17    QUESTIONS BY MR. TRACEY:
18         Q.    Do you know how many diseases
19    smoking is thought to cause that are
20    generally accepted in the scientific
21    community that have effect sizes under 2?
22         A.    I have not done an inventory to
23    answer that question.
24         Q.    Okay.  You don't know if it's 2
25    or 50?
```

1    A.    I have not done a comprehensive

2    literature search to answer that question.

3    **Q.    Do you know and understand that**

4    **smoking causes more than one disease?**

5    A.    I do believe that smoking is

6    associated with more than one disease.

7    **Q.    Okay.  What did -- what did Sir**

8    **Bradford Hill, Austin Bradford Hill, say**

9    **about effect size in his seminal 1965 paper?**

10   **Do you know?**

11        MS. BROWN:  Objection to the

12        form.

13        THE WITNESS:  My understanding

14        is that the larger the effect size,

15        the more likely it is to be

16        causatively associated.

17   QUESTIONS BY MR. TRACEY:

18   **Q.    Did he say that if it doesn't**

19   **have a large effect size, we just throw it in**

20   **the trash and move on?**

21   A.    I believe what I said was what

22   he implied; was that if there is a large

23   effect size, it is less likely to be affected

24   by confounds.

25   **Q.    I understand.  That's half of**

1    what he said, ma'am.  I'm asking about the

2    other half.

3         A.    I would say that when there is

4    a smaller effect size, one needs to be quite

5    careful about confounding factors.

6         Q.    Fair enough.

7               Let's flip over to the next

8    page and see what these good doctors have to

9    say.

10              At the -- on the second

11   paragraph in the column on the left, it says,

12   "Some environmental factors may also reduce

13   the probability of autism.  For example,

14   folate, a vitamin involved in the manufacture

15   and methylation of DNA, plays a critical role

16   in neurodevelopment."

17              Do you see that, ma'am?

18        A.    I see the sentence.

19        Q.    Now, you believe that's true,

20   don't you?  You actually have that in your

21   PowerPoint presentations, don't you?

22        A.    I believe in terms of that

23   association, I have not seen a robust study

24   that has looked specifically at the effects

25   of folate in terms of autism that accounts

Confidential - Subject to Protective Order

1    for the factors that need to be accounted for

2    to be able to understand that linkage.

3         **Q.     Do you doubt that folate**

4    **supplementation reduces the risk of autism?**

5         A.     I have no opinion one way or

6    the other.  Folic, to my knowledge -- folic

7    acid, to my knowledge, is not a problem for

8    women to take during pregnancy.  It's quite

9    the opposite.  It protects against neural

10   tube defects.  And so it is with that

11   recommendation that we recommend folic acid

12   during pregnancy for women.

13        **Q.     Right.**

14             **But my question is different**

15   **than that.  I appreciate that.**

16             **My question is whether you**

17   **doubt that folic acid supplements reduce the**

18   **risk of autism?**

19        A.     I have no opinion.  I have not

20   specifically investigated that factor.

21             I also have not seen any

22   evidence that folic acid is harmful, which is

23   why we do recommend supplementation of folic

24   acid during pregnancy.

25        **Q.     Okay.  You haven't reviewed the**

Confidential - Subject to Protective Order

1    literature on folic acid and whether it --

2    whether it reduces the risk of autism?

3              MS. BROWN:  I object.  Asked

4         and answered.

5              THE WITNESS:  At the level of

6         rigor necessary to have a

7         comprehensive opinion, I have not

8         looked at folic acid specifically for

9         association with autism in the way

10        that should be to render an opinion.

11   QUESTIONS BY MR. TRACEY:

12        Q.    Okay.  Down below, they've got

13   studies of gene-environment interaction.

14              You know what GxE means, right?

15        A.    Yes, I do.

16        Q.    That means gene-environment

17   interaction, right?

18        A.    That is what scientists mean

19   when they use that term.

20        Q.    They say, "As with other

21   multifactorial conditions, it's highly likely

22   that the interplay of gene variants and

23   environmental factors contributes to a

24   substantial proportion of autism."

25              Do you agree with these

Confidential - Subject to Protective Order

```
 1    doctors, ma'am?

 2         A.    I would say that we don't have

 3    evidence in terms of specific cases to be

 4    able to validate that statement.

 5         Q.    Okay.  They say, "Highly likely

 6    that the interplay between genes and the

 7    environments contributes to a substantial

 8    proportion of autism," ma'am, don't they?

 9         A.    That is the statement that they

10    make.

11         Q.    Now, did you read this article

12    when it came out?

13         A.    I did not.

14         Q.    Okay.  Do you know if anybody

15    after it was published wrote in and said,

16    "Oh, my God, Dr. Volk and Ritz, you guys are

17    clowns.  That's not true"?

18         A.    I don't know.

19         Q.    Okay.  They go on to say,

20    "Although inherited genes are fixed at

21    conception, environmental factors vary over

22    time and place and can be modified."

23              That's a true statement, isn't

24    it?

25         A.    Genes can change over time and
```

1    that, in fact, is the underlying basis for

2    cancer in some people.

3         **Q.     Yes.**

4              **They go on to say, "Thus,**

5    **gene-environment interactions can provide**

6    **crucial biological insights and opportunities**

7    **for intervention at the individual, community**

8    **and policy levels."**

9              **Do you agree with that?**

10        A.     When it comes to autism, I

11   don't have evidence for this to be the case

12   yet.

13        **Q.     Okay.  But this whole paper is**

14   **about autism, right?**

15        A.     This paper is purported to be

16   about autism.  And, again, I don't have

17   evidence, nor do I believe they do, in terms

18   of making policy decisions that would change

19   policy in terms of the statements they make

20   in this paper.

21        **Q.     Okay.  They go on to say, "Only**

22   **a handful of epidemiological studies have**

23   **examined the role of environmental factors in**

24   **combination with genetic variations and**

25   **autism, Table 1."  We're going to look at**

1    that in a second.  "Early evidence is

2    striking.  For example, a meta-analysis

3    revealed that a variant of the MTHFR gene,

4    which reduces the ability" -- "the body's

5    ability to convert folate in its active form,

6    contributes to higher rates of autism."

7              Do you know whether that's

8    true?

9         A.    When I look in particular at

10   that manuscript, and I don't have it here

11   before me, but when I look at the date of

12   when that was published in 2012 and looking

13   at the title of this, I don't believe this

14   was a comprehensive genomic analysis.  And at

15   the time when this was known, most of the

16   genetic contributors to autism were not

17   known.

18              And with a very specific

19   hypothesis that is probably not genome-wide

20   corrected for anything, I don't know that

21   that same statement would hold up with the

22   evidence that we have today.

23        Q.    Well, she's making the

24   statement last year, in 2022, right?

25        A.    She is referencing a paper that

1    was written and where the data were collected

2    and analyzed a long time ago.

3        Q.    But she doesn't say, "But the

4    data doesn't hold up any longer," does she?

5        A.    I think she is referencing a

6    paper which supports her opinion.

7        Q.    Yeah.

8              She goes on to say, "Other

9    pieces of compelling evidence also underscore

10   the interaction of genetic susceptibility

11   with toxic chemicals as a major contributor

12   to autism.  Researchers analyzing 206 genes

13   from an established genomics database against

14   the database that records the activities of

15   more than 10,000 chemicals on genes and gene

16   pathways found that 4,428 chemicals

17   interacted with one or more of the genes

18   linked to autism."

19             Now, do you know the paper that

20   she and her coauthors conclude is "compelling

21   evidence to underscore the interaction of

22   genetic susceptibility with toxic chemicals

23   as a major contributor to autism"?

24             It's the Carter and Blizard

25   paper.

```
 1        A.     Yes.  I was just looking at the

 2   reference set.

 3               Yes, I am aware of this paper.

 4        Q.     Now, these authors, unpaid by

 5   Johnson & Johnson, as far as we know, call

 6   the Carter and Blizard paper "compelling

 7   evidence," don't they?

 8        A.     Those are these authors' words.

 9   I would argue about the use of the adjective

10   "compelling."

11        Q.     Okay.  They go on to say,

12   "Additionally, rare genetic variants that by

13   themselves have a strong influence on ASD

14   diagnosis have been shown to have greater

15   biological perturbations when considered in

16   the presence of toxic chemical exposures in

17   in vitro studies," and then they cite two

18   papers, don't they?

19        A.     They cite two papers.  I've not

20   read these two papers that they cite.

21        Q.     Okay.  And then if you'll flip

22   over, I just want to see -- if you look at

23   Table 1 that they put on their paper, Table 1

24   is actually entitled "Epidemiologic studies

25   on specific gene-by-environment interactions
```

Confidential - Subject to Protective Order

```
 1    in autism risk, etiologic mechanisms or

 2    severity."

 3               Do you see that table, ma'am?

 4        A.     I do see the table.

 5        Q.     And then just at the bottom,

 6    the last reference on that page, they

 7    reference Carter and Blizard, don't they?

 8        A.     Yes, they do.

 9               (Chung Exhibit 326 marked for

10        identification.)

11    QUESTIONS BY MR. TRACEY:

12        Q.     All right.  So let's turn to

13    Carter and Blizard, and let's see what they

14    had to say.

15               Carter and Blizard you have

16    reviewed and analyzed in your report, haven't

17    you?

18        A.     Yes, I have.

19        Q.     Do you know either one of those

20    researchers?

21        A.     I do not personally know them,

22    no.

23        Q.     Do you know their reputations

24    in the scientific community?

25        A.     No, I do not.
```

1    Q.    Have you ever talked to or

2    communicated with either one of them?

3    A.    I have not.

4    Q.    This is Exhibit 326.

5         Now, this was published in 2016

6    in Neurochemistry International.

7    A.    Do you know the impact factor

8    for Neurochemistry International?

9    Q.    I don't.

10        Does that make a difference to

11    you?

12    A.    To my knowledge, it's not a --

13    anyway, I would doubt it has a very high

14    impact factor.

15    Q.    Do you publish in journals

16    without high impact factors, Dr. Chung?

17    A.    I publish in a large number of

18    journals.

19    Q.    Yeah, but that wasn't my

20    question.

21        My question is, do you publish

22    in journals without high impact factors?

23    A.    With over 600 publications, I

24    publish in everything from the New England

25    Journal of Medicine, to Nature, to Science,

1    to other more specialized journals that don't

2    have as high an impact factor.

3         Q.    I saw some of your publications

4    recently in something called Frontiers.

5         A.    Yes.

6         Q.    You know what Frontiers is,

7    don't you?

8         A.    Yes.

9         Q.    Frontiers is sometimes referred

10   to as a predatory journal, isn't it?

11              MS. BROWN:  Objection to the

12        form of the question.

13              THE WITNESS:  I don't believe I

14        was the senior or first author for any

15        publication in Frontiers.

16   QUESTIONS BY MR. TRACEY:

17        Q.    Well, your name is on the

18   paper?

19        A.    My name is on many papers.

20        Q.    It is, many.

21              You know that Frontiers is

22   called a predatory journal, right?

23              MS. BROWN:  Asked and answered.

24        I object.

25              THE WITNESS:  I did not

1        know that -- I don't even know what a

2        predatory journal is, but, no, I did

3        not know that.

4   QUESTIONS BY MR. TRACEY:

5        Q.      Okay.  Well, you brought up the

6   subject of impact factor, right?

7        A.      Yes.

8        Q.      Are you trying to diminish the

9   journal Neurochemistry International?  Are

10  you trying to imply that we ought not pay

11  attention to anything published in that?

12              MS. BROWN:  Objection to the

13       form.  Assumes testimony.

14              THE WITNESS:  I asked a simple

15       question because you seemed to be

16       concerned about the impact of certain

17       journals as you've gone through your

18       line of questioning.

19  QUESTIONS BY MR. TRACEY:

20       Q.      Okay.  Should we assess the

21  science on the science or on the journal in

22  which it's contained?

23              MS. BROWN:  Objection to the

24       form.

25              THE WITNESS:  I think we should

1          assess the science on the science, but

2          many times you will see scientists who

3          will submit their manuscript to one

4          journal and not have it accepted

5          because of issues with the science

6          that they have submitted.

7     QUESTIONS BY MR. TRACEY:

8          Q.     **Certainly happened to you,**

9     **hasn't it?**

10         A.     It's happened to every good

11    researcher that's submitted.

12         Q.     **Yeah.  Nothing wrong with that,**

13    **is there?**

14         A.     There can be.

15         Q.     **Sure, there can be.**

16         A.     But there may not be.

17         Q.     **But by itself, that's not an**

18    **indication of science that ought not be paid**

19    **attention to, right?**

20         A.     I think one has to look at the

21    individual case, but in general, I will just

22    say that Neurochemistry International is not

23    a journal that many people commonly would

24    regard as a high impact factor journal.

25         Q.     **Well, it's got an impact --**

1    they -- somebody just handed me a note.  It's

2    got an impact factor of 4.3.

3         A.      Okay.

4         Q.      That's pretty good, isn't?

5         A.      It's not above 10.

6         Q.      It's not, but it's pretty good.

7                 Your average journal is what,

8    under 3, under 2 and a half?

9         A.      As we think about journals with

10   higher impact, we use a threshold of 10.

11        Q.      All right.  If you have

12   published in a journal, Dr. Chung, with an

13   impact factor of under 10, should we just

14   take all of that literature that you publish

15   and throw it in the trash?

16        A.      No.  We should judge it on its

17   merits.

18        Q.      Okay.  That's the right thing

19   to do, isn't it?

20        A.      It is always the right thing to

21   do, to judge the data and the science on its

22   merits.

23        Q.      So let's see what these doctors

24   that Dr. Volk referenced had to say.

25                The name of this study is

1  "Autism genes are selectively targeted by

2  environmental pollutants, including

3  pesticides, heavy metals, bisphenol A,

4  phthalates and many others in food, cosmetics

5  or household products."

6          And they say in the abstract,

7  "The increasing incidence of autism suggests

8  a major environmental influence."

9          You disagree with that, do you?

10      A.     I would say the next sentence

11  is critical.  "Epidemiology has implicated

12  many candidate genes and genetics -- in

13  genetics, many susceptibility genes."

14      Q.     Okay.  You want to take those

15  sentences together then?

16      A.     I'd focus on the second

17  sentence.

18      Q.     But I want to focus on the

19  first.

20          How come you don't want to

21  focus on the first that says "major

22  environmental influences"?  Is that because

23  that doesn't support your opinion?

24          MS. BROWN:  Objection.

25      Argumentative.

1          THE WITNESS:  Again, my opinion

2     is based on the data, and the

3     overwhelming data is reliable in terms

4     of genetic contributions.

5  QUESTIONS BY MR. TRACEY:

6     Q.     Well, this -- these authors

7  apparently disagree with you, correct?

8     A.     These authors are focusing on

9  environmental pollutants.

10    Q.     And genes?

11    A.     And I have -- and they do

12  consider genes.

13    Q.     And they also consider drugs,

14  including acetaminophen, in this paper, don't

15  they?

16    A.     Yes, and they consider

17  acetaminophen.

18    Q.     All right.  So they say -- they

19  go on to say, "Epidemiology has implicated

20  many candidates and genetics, many

21  susceptibility genes.  Genes/environmental

22  interactions in autism were analyzed using

23  206 autism susceptibility genes from the

24  Autworks database to interrogate about

25  1 million gene -- chemical/gene interactions

1   in the Comparative Toxicogenomics Database.

2           "Any bias towards autism

3   susceptibility genes, ASGs, was statistically

4   determined for each chemical.  Many major

5   compounds identified in epidemiology,

6   including," and then they list a whole list

7   of them, including acetaminophen.

8           Do you see that?

9   A.      I see that, but I don't want to

10  dismiss what you have correctly pointed out,

11  which is that they do a very, very large

12  number of tests statistically, when I think

13  about the statistical penalty.

14          So they're looking at millions

15  of different independent tests in terms of

16  doing this and --

17  Q.      Yes.

18  A.      -- to my understanding of what

19  they've done, they have not statistically

20  penalized themselves for those multiple

21  independent comparisons.

22  Q.      You think they didn't do that?

23  A.      I don't believe they have

24  rigorously done this to be able to take into

25  account by chance alone some possible

Confidential - Subject to Protective Order

```
 1   associations.
 2         Q.     Okay.  Well, flip over and
 3   let's see what they say about acetaminophen
 4   and other chemicals that are known causes of
 5   autism.  Okay?
 6                In the introduction, about
 7   two-thirds of the way down, it says, "Certain
 8   drugs used in pregnancy, including
 9   valproate" --
10         A.     Can you just hold on?  I just
11   want to --
12         Q.     Sorry.  "Certain drugs used in
13   pregnancy, including valproate."
14                Let's stop there.
15                MS. BROWN:  Hang on a second.
16         Can she just have a moment to find it
17         on her copy?
18                In think you're in the first
19         paragraph of the introduction; is that
20         right?
21                MR. TRACEY:  Yes, ma'am.
22                MS. BROWN:  Okay.
23                THE WITNESS:  Okay.
24                MS. BROWN:  Just take a -- take
25         as long as you need to be able to
```

1          answer the question.

2     QUESTIONS BY MR. TRACEY:

3          Q.     Doc, just -- that sentence

4     that's highlighted, "Certain drugs used in

5     pregnancy, including valproate."

6               You know what valproate is?

7          A.     Yes.

8          Q.     One of the brand names for

9     valproate is Depakote, right?

10         A.     Yes.

11         Q.     Does Depakote -- does Depakote

12    cause autism?

13         A.     To be able to explain the

14    detail, there are certain exposures that have

15    been -- I'm going to use the term --

16    associated with an outcome such as autism.

17               In terms of causation, looking

18    for potential confounds for those, have not

19    been completely and adequately done for each

20    of the different exposures that they list.

21         Q.     What's the label for Depakote

22    say about whether it causes autism?  Do you

23    know?

24         A.     I don't know the label.

25         Q.     We'll look at that in a few

Confidential - Subject to Protective Order

1    minutes and see what the manufacturer of the

2    drug says.

3         A.     Okay.

4         Q.     Would that be helpful to you?

5         A.     To my knowledge, valproic acid

6    is not what we're talking about, but...

7         Q.     Do you know what analogy is in

8    the context of the Bradford Hill criteria?

9         A.     I have a general understanding.

10        Q.     Okay.  After valproate, they

11   list SSRIs and some other drugs, and then

12   they reference acetaminophen again, right?

13        A.     They do reference

14   acetaminophen.

15        Q.     And what they do, is they say,

16   "These and other environmental risk factors

17   are referenced in Table 1."

18               Do you know what a risk factor

19   is?

20               MS. BROWN:  Objection to the

21        form.

22               THE WITNESS:  Again, these are

23        their words for what they're

24        considering risk factor, but it's

25        implied to be something that increases

```
1          the probability of the outcome.
2     QUESTIONS BY MR. TRACEY:
3          Q.     Yeah.  That's a generally
4     accepted and understood term in science,
5     isn't it?
6          A.     I believe so.
7          Q.     And what you want to do in
8     science is identify risk factors that are
9     modifiable; that is, risk factors that we
10    can -- we can intervene in and reduce the
11    risk, right?
12              MS. BROWN:  Objection to the
13         form.
14              THE WITNESS:  I think there are
15         different reasons that we do science,
16         but, yes, one is to be able to
17         minimize the burden of a condition.
18    QUESTIONS BY MR. TRACEY:
19         Q.     And then if we turn to Table 1,
20    they have this -- it's called "compounds that
21    have been implicated in autism and
22    epidemiological studies or where different
23    blood, hair or tissue levels have been
24    reported.  Where available, relevant animal
25    studies are noted."
```

1          That's the name of the table,

2   right?

3       A.    That is the title of the table.

4       Q.    And just flip down on the first

5   page, you've got chlorpyrifos.

6             Do you know what that is?

7       A.    Can you highlight where you're

8   showing that?

9       Q.    It's the second from the last

10   one.

11       A.    Yes, it's under --

12       Q.    Chlorpyrifos.

13       A.    Under the category of

14   pesticides.

15       Q.    Yes, ma'am.

16             Do you know what that is?

17       A.    I assume it's a pesticide.

18       Q.    Yes, ma'am.

19             Do you know whether or not it

20   causes autism?

21       A.    Within this -- as I said, I'll

22   go back to this, that many epidemiological

23   studies that have been done to be able to

24   look at compounds, but they have not all been

25   done with the level of rigor to look for all

1    the potential confounds.

2         Q.    Do you -- do you know, ma'am,

3    whether or not it's generally accepted that

4    chlorpyrifos causes autism or contributes to

5    cause autism?

6         A.    Again, when one looks at the

7    timestamp in terms of when these studies were

8    done, these studies did not include all the

9    potential confounds that can now be done to

10   rigorously assess any potential environmental

11   exposure or contributor to autism.

12        Q.    Can you answer my question?

13             MS. BROWN:  Objection to the

14        form.

15             THE WITNESS:  I'm sorry, can

16        you repeat the question?

17   QUESTIONS BY MR. TRACEY:

18        Q.    Yeah.

19             Do you know whether it's

20   generally understood in the medical and

21   scientific community that chlorpyrifos can

22   contribute to cause autism?

23        A.    I thought I answered that

24   question, which is -- but to be clearer --

25        Q.    You didn't, ma'am.

Confidential - Subject to Protective Order

```
 1              MS. BROWN:  Well, let's let
 2        her --
 3   QUESTIONS BY MR. TRACEY:
 4        Q.      What you did is you told me a
 5   lot of things that hasn't been done, that
 6   there's timestamps, and I don't know if a
 7   bunch of work's been done.
 8              I want to know whether you know
 9   here and now whether it's generally
10   understood in the medical and scientific
11   community that chlorpyrifos contributes to
12   cause autism.
13              MS. BROWN:  I object to the
14        speech, and she's asked and answered
15        that question.
16              And she was in the middle of
17        re-answering it when you interrupted
18        her, so I --
19              MR. TRACEY:  Yeah.  I don't
20        want another nonresponsive answer.
21              MS. BROWN:  Let -- no.  No.
22        You asked a question.  She gets to
23        answer it.  Let's give her a moment to
24        answer the question.
25
```

```
 1    QUESTIONS BY MR. TRACEY:

 2         Q.     Can you answer my question,

 3    Dr. Chung?

 4         A.     For simplicity, no, I don't

 5    believe it's generally accepted in terms of

 6    this being an exposure in terms of autism.

 7         Q.     Okay.

 8         A.     So the simple answer, no.

 9         Q.     That's all I'm looking for is

10    the simple answers.

11                If you flip over to page 87,

12    Table 1 continues -- oh, no, sorry, 86,

13    you'll see lead, manganese and mercury there

14    under heavy metals.

15                Do you know what -- ma'am,

16    whether lead, manganese and mercury are

17    associated with autism?

18         A.     I won't comment on each of

19    these, but certainly lead is something that

20    we're concerned about in terms of children

21    and exposure to lead.

22         Q.     Okay.  Under herbicide --

23    sorry.  On the next page, you'll see -- oh,

24    sorry.  I'm getting ahead of myself with

25    the -- sorry, Mike.
```

1              Yeah, there's lead, mercury and

2      manganese.

3              And if you go to the next page,

4      you'll see air pollution.

5              Do you remember looking at

6      air pollution on the national -- the

7      Environmental Health Science website where

8      they specifically talked about a specific

9      gene being associated with autism and

10     air pollution?

11         A.    I do remember where they pulled

12     out one specific gene.  Air pollution is

13     complex because it's often related to

14     particular location, and those locations can

15     be included or can include complex other

16     socioeconomic and social determinants of

17     health that are related to air pollution.

18              So it's a complex set of

19     questions that get rolled up into

20     air pollution.

21         Q.    Okay.  Let's keep flipping

22     until we get to 89 because there's one called

23     drugs used in pregnancy or to induce or delay

24     labor.

25              And the number one on the list

1    there is acetaminophen, isn't it?

2         A.      I see acetaminophen listed in

3    this table, among -- with many, many, many

4    other things.

5         Q.      Yeah, we do.

6                 But there it is, right?

7         A.      I see it listed amongst many

8    other things, yes.

9         Q.      Why do you feel the need to add

10   things all the time when I ask questions?

11               MS. BROWN:  I object.  That's

12        argumentative.

13               She's answering your questions

14        truthfully and accurately and

15        completely, and I would expect that's

16        what you want from her to do.

17   QUESTIONS BY MR. TRACEY:

18        Q.      Ma'am, why do you feel the need

19   to add things?

20               MS. BROWN:  No, I object.

21               Don't answer that question.

22        It's argumentative.

23   QUESTIONS BY MR. TRACEY:

24        Q.      Do you feel like you're an

25   advocate here, ma'am, or are you a witness?

1       A.      I feel like I need to represent

2  the scientific information as accurately as

3  possible.

4       **Q.      Okay.  And you think in order**

5  **to do that, you need to add things to my**

6  **questions?**

7              MS. BROWN:  Objection to the

8       form.  Argumentative.

9              THE WITNESS:  I think in terms

10      of representing this, I'm trying to

11      represent the entirety of the

12      scientific literature and community.

13 QUESTIONS BY MR. TRACEY:

14      **Q.      All right.  Flip over to the**

15 **next page, because on the next page, we have**

16 **thalidomide and valproate, don't we?  That's**

17 **also under Table 1.**

18      A.      Yes, those are both listed.

19      **Q.      Pardon me?**

20      A.      Yes, thalidomide, valproate are

21 both listed.

22      **Q.      And then they have other drugs,**

23 **and they have cannabis, don't we -- don't**

24 **they?  That's marijuana, right?**

25      A.      They do have that listed.

1    Q.    Is marijuana associated with

2    neurodevelopmental disorders, including

3    autism and ADHD?

4    A.    Again, this is a complicated

5    analysis that can be confounded by who would

6    use any of the medications that are on this

7    list, and I think that has to be considered

8    as one designs these studies to ask that

9    question.

10    Q.    Can you not answer the question

11    whether smoking pot during pregnancy is

12    harmful from a neurotoxic viewpoint to

13    children?

14    A.    I've not investigated that

15    particular question.

16    Q.    Do you know what the American

17    College of Obstetricians and Surgeons -- or

18    Gynecologists says about whether or not it's

19    okay to smoke pot while you're pregnant?

20    A.    I would assume that in general,

21    they would say that for anything, any

22    medication, that you should talk with your

23    doctor, and you should be able to discuss

24    that with them.

25    Q.    Well, let's just a general

1    comment about everything, isn't it?

2          A.     That is a general comment about

3    during pregnancy, one should talk to their

4    doctors, and one should be able to consider

5    the context of that individual person.

6          **Q.     But my question was whether**

7    **you're aware of what ACOG says about whether**

8    **smoking pot while you're pregnant leads to**

9    **neurodevelopmental -- poor neurodevelopmental**

10   **outcomes includes autism and ADHD.**

11         A.     I'm not aware of a specific

12   policy statement.

13         **Q.     Do you know whether or not**

14   **acetaminophen works on the endocannabinoid**

15   **system?**

16         A.     Exact -- explain what you mean

17   by your question.

18         **Q.     Do you know whether it has an**

19   **effect on the endocannabinoid system in**

20   **humans?**

21         A.     Can you define for me what you

22   mean by the "endocannabinoid system"?

23         **Q.     No.**

24                **Can you not answer it just**

25   **generally?**

1        A.      I can't answer your question

2   then, I'm sorry.

3        Q.      Okay.  Do you ever talk to

4   women about whether it's a good idea to smoke

5   pot during pregnancy?

6        A.      I'm not an obstetrician.

7        Q.      Okay.  Do you -- by the way,

8   when's the last time you diagnosed a child in

9   a clinic with autism?

10       A.      I am not a clinical

11  psychologist that performs an ADOS and an ADI

12  myself to make those diagnoses.  I'm a

13  geneticist who makes genetic diagnoses, often

14  which for conditions that are associated with

15  autism, but I use a team of behaviorists who

16  make a behavioral diagnosis of autism.

17       Q.      So the answer to my question

18  is, you don't make autism diagnoses, correct?

19            MS. BROWN:  Objection.  Asked

20       and answered.

21            THE WITNESS:  I make genetic

22       diagnoses.

23  QUESTIONS BY MR. TRACEY:

24       Q.      But autism is not a genetic

25  diagnosis, ma'am.  It's a behavioral,

1    clinical diagnosis, correct?

2              MS. BROWN:  Objection to the

3         form.

4              THE WITNESS:  That is correct.

5         And as I stated, there are individuals

6         who are reliable in performing

7         measures to make a diagnosis of

8         autism, things like the ADOS and the

9         ADI, and they are trained specifically

10        to do so.

11   QUESTIONS BY MR. TRACEY:

12        Q.     Right.

13             But if we're going to be clear

14   about what you do, you do not yourself

15   diagnose children with autism?

16        A.     I do not diagnose children with

17   autism, but I have decades of experience

18   caring for individuals with autism.  I'm very

19   familiar with the signs and symptoms and how

20   to support children.  But my formal part of a

21   multi-disciplinary team is not to make that

22   diagnosis but to be able to do many other

23   things to support those individuals.

24        Q.     Okay.  Have you ever diagnosed

25   a child with autism in your career?

Confidential - Subject to Protective Order

```
 1          A.     I certainly recognize the signs
 2   and symptoms.  I don't formally give that
 3   diagnosis.  Again, there is another member of
 4   our multi-disciplinary team who makes that
 5   formal diagnosis, but I'm able to recognize
 6   the signs and symptoms.
 7          Q.     Okay.  But the answer to my
 8   question is, you have never in your career
 9   formally diagnosed a child with autism?
10          A.     Again, that role is for someone
11   who is a behavioral psychologist, usually,
12   and to be able to make that diagnosis, and
13   that is not my official training.  But my
14   years of experience in clinical practice have
15   taught me, by experience, how to recognize
16   the signs and symptoms and how to support
17   those individuals.
18          Q.     Okay.  Let's flip over to
19   page 91 of Carter and Blizard.
20                 This is under the Results
21   section.
22                 And it's -- the 3.1 says,
23   "Genes affected by compounds implicated in
24   autism."
25                 And they start off, "Of the
```

```
 1   named pollutants implicated in autism, 45

 2   showed enrichment values, the p-value less

 3   than .05," right?

 4               Are you --

 5        A.    Sorry, I'm trying to find --

 6               MS. BROWN:  I think you --

 7        let's just find it on her hard copy.

 8        It looks like Section 3.1.

 9   QUESTIONS BY MR. TRACEY:

10        Q.    3.1, page 91 at the top under

11   Results.

12        A.    Okay.  Do you mind going back?

13   Sorry.

14        Q.    Yeah, sorry.

15               It says, "3.1.  Genes affected

16   by compounds implicated in autism, Figure 1."

17               And we'll get to Figure 1.

18               And then it talks about the

19   named pollutants first which showed

20   enrichment values at less than .05.

21               Do you see that?

22        A.    I see that statement.

23        Q.    Okay.  And then they list a

24   bunch of -- a bunch of compounds with the

25   most significant enrichment scores.
```

Confidential - Subject to Protective Order

```
 1                  And then two paragraphs down,
 2    they talk about drugs, they're switching
 3    topics, and they say, "Drugs with the most
 4    significant enrichment scores included," they
 5    got SSRI, antidepressants, thalidomide; drugs
 6    of abuse - cocaine, methamphetamine, ethanol,
 7    it's alcohol, et cetera, et cetera.  And then
 8    down there at the bottom, between -- or after
 9    thalidomide you see acetaminophen as being
10    one of the drugs with the most significant
11    enrichment score.
12                  Right?
13        A.    I see -- I see what you're
14    reading, yes.
15        Q.    And then if we flip over to --
16    and then they cite us to Figure 2,
17    somewhere -- there we go, Figure 2.  And then
18    let's flip over to Figure 2, and I want to
19    look at the drugs with the most significant
20    enrichment scores on Figure 2.
21                  Now, number 1, the highest
22    enrichment score, showing the highest
23    chemical autism susceptibility gene
24    interaction, was valproic acid at 130, wasn't
25    it?
```

Confidential - Subject to Protective Order

```
 1              MS. BROWN:  Object to form.
 2              THE WITNESS:  So, again, based
 3         on this, this is not based on human
 4         epidemiological data, just so that
 5         we're clear on this in terms of
 6         implicating any of these exposures and
 7         what we see in actual people.
 8    QUESTIONS BY MR. TRACEY:
 9         Q.     Okay.  But I didn't ask you any
10    of that.
11              Did I, ma'am?
12         A.     So I'm just saying what I'm
13    concerned about are these exposures in actual
14    people and the behaviors that we see in
15    actual people, and none of the data from this
16    paper are implicating exactly what I think
17    we're talking about today.
18         Q.     Okay.  Well, what we're talking
19    about is whether or not genes, autism
20    susceptibility genes, are enriched when
21    they're exposed to chemicals, right?
22              MS. BROWN:  Objection to the
23         form.  Vague.
24              THE WITNESS:  Again, these are
25         not experiments, for instance, that
```

1          were done in human people in looking

2          at gene expression in human brains and

3          being able to understand these

4          exposures and how that relates to the

5          behaviors associated with those

6          individuals.

7               So these are many steps removed

8          from the actual biological question.

9     QUESTIONS BY MR. TRACEY:

10         **Q.     We're going to get there.**

11    **We're going to get there.  Trust me.**

12              **But these are gene enrichment**

13    **scores.  Do you not use gene enrichment**

14    **scores in your own work?**

15         A.     Not in the way that these are

16    done, and I'm not clear that this biology

17    that they're trying to underscore is actually

18    relevant to the human biology that we see.

19         **Q.     Well, can you answer my**

20    **question, though?  Isn't number 1 on the list**

21    **valproic acid?  That's the number 1**

22    **enrichment score, isn't it?**

23              MS. BROWN:  Objection to the

24         form.  Misstates the document.

25              THE WITNESS:  For this

Confidential - Subject to Protective Order

```
 1          experiment that they have performed,

 2          yes, valproic acid is the one that has

 3          the strongest effect.

 4               Whether or not that's relevant

 5          to the human biology, that's what I'm

 6          saying there's a gap.

 7   QUESTIONS BY MR. TRACEY:

 8          Q.    Okay.  In a few minutes, ma'am,

 9   we're going to look at the epidemiology of

10   valproic acid and what it says about autism

11   to see if it's coherent with what Carter and

12   Blizard show here.

13               Is that fair?

14          A.    If you'd like to, we certainly

15   can.

16          Q.    That's a fair thing to do,

17   isn't it?

18          A.    We can certainly do that later

19   today.

20          Q.    Okay.  So I've got that

21   highlighted.

22               And then number 2 on the list,

23   the chemical compound, the drug that enriches

24   the second-most autism susceptibility genes

25   is acetaminophen, isn't it?
```

1      A.      I see within that figure, yes,

2   acetaminophen is the number 2.

3      **Q.      Number 1 and number 2, right?**

4      A.      Valproic acid being number 1

5   and acetaminophen being number 2.

6      **Q.      And thalidomide is a distant**

7   **third in that section of the graph, isn't it?**

8      A.      Again, I don't know how to

9   interpret these data to the human experience

10  of autism and the prenatal exposure.  I don't

11  believe these are a direct correlation or a

12  causation.

13     **Q.      Perhaps I can help you with**

14  **that later, but can you answer my question**

15  **about whether or not thalidomide is a distant**

16  **third after valproic acid and acetaminophen?**

17     A.      Within this particular cluster

18  that you're showing on the right, within that

19  quartet of those four exposures, yes, that is

20  number 3.

21     **Q.      Do you know whether or not, as**

22  **we sit here today, it is generally accepted**

23  **that thalidomide causes autism?**

24          MS. BROWN:  Objection.  Asked

25      and answered.

Confidential - Subject to Protective Order

```
 1                 THE WITNESS:  Again, I have not
 2        done a comprehensive review --
 3   QUESTIONS BY MR. TRACEY:
 4        Q.    Oh, I -- I'm sorry, you did
 5   answer that.  You're right.  Sustained.
 6                 MS. BROWN:  Thank you, Judge.
 7        I appreciate it.
 8                 MR. TRACEY:  Yeah.  Yeah, I
 9        forgot.  My apologies.  You did answer
10        that.  Okay.  All right.  We're going
11        to look at Depakote in just a few
12        minutes.
13                 MS. BROWN:  Should we take a
14        break?
15                 MR. TRACEY:  Yeah, yeah.  We're
16        going to do -- yeah, go ahead.  Sorry.
17                 VIDEOGRAPHER:  The time is
18        11:28 a.m., and we're off the record.
19          (Off the record at 11:28 a.m.)
20                 VIDEOGRAPHER:  The time is
21        11:41 a.m., and we're on the record.
22                 (Chung Exhibit 329 marked for
23        identification.)
24                 MR. TRACEY:  Do you have that,
25        Danny?
```

```
 1              DANIEL OLIVO:  Yeah.

 2    QUESTIONS BY MR. TRACEY:

 3         Q.      Doctor, I'm going to hand you

 4    the Exhibit 329 here in a second, and it's

 5    the Depakote label.

 6              Generic name of Depakote is

 7    valproic acid, right?

 8         A.      Yes.

 9         Q.      And just as sort of a threshold

10    matter, Depakote is an antiseizure medicine,

11    and it's also used for prevention of

12    migraines.

13              Is that your understanding?

14         A.      Yes, that's my understanding.

15         Q.      It's not indicated for minor

16    aches and pains, right?

17         A.      Not to my knowledge.

18         Q.      Okay.  It's got some black box

19    warnings up there on that first page.

20              The first one is

21    hepatotoxicity.

22              Do you see that?

23         A.      I see that.

24         Q.      And then, just the way these

25    new and improved labels work, if you flip
```

1    over to the fourth page, it's got Use in

2    Specific Populations, and Pregnancy is 8.1.

3    It's the same in every label, as you probably

4    know.  You always go to 8.1 in a label to

5    look at pregnancy.

6              And so we're going to do that.

7    We're going to flip over to page 30, just to

8    show you that we're in the pregnancy section.

9    And then on the next page, because it starts,

10   actually, on the next page, 31, they say

11   here -- under the -- it's the -- I don't

12   know, fourth or fifth paragraph from the

13   bottom under Risk Summary.  It says,

14   "Epidemiological studies have indicated that

15   children exposed to valproate in utero have

16   lower IQ scores and higher risk of

17   neurodevelopmental disorders compared to

18   children exposed to another AED," which is

19   antiepileptic drug, "in utero or to no AEDs,"

20   and then they say, "See warnings."

21             And then just below that it

22   says, "An observational study has suggested

23   that exposure to valproate products during

24   pregnancy increases the risk of autism

25   spectrum disorders."

Confidential - Subject to Protective Order

```
 1                    And then they go on to say, "In

 2    animal studies, valproate administration

 3    during pregnancy resulted in fetal structural

 4    malformations similar to those seen in humans

 5    and neurobehavioral deficits in the offspring

 6    at clinically relevant doses."

 7                    And so that is -- those are

 8    sort of the three things I want to talk about

 9    in this label, which is under the Risk

10    Summary.

11                    Okay?

12         A.     Okay.

13         Q.     Now, if you flip over two more

14    pages, we finally get to the data section.

15    And you'll see it's the paragraph that -- it

16    says -- it starts off, "Effect on IQ and

17    neurodevelopmental effects."

18                    And then the second paragraph

19    down is the neurodevelopmental effect

20    paragraph.

21                    Okay?  Are you oriented to

22    where we are?

23         A.     I see that.

24         Q.     So what this FDA -- you know

25    this is an FDA-approved label, right?
```

```
 1              MS. BROWN:  Objection.  Lacks
 2        foundation.
 3    QUESTIONS BY MR. TRACEY:
 4        Q.     Or do you know that?
 5        A.     I know this is an FDA-approved
 6    medication.
 7        Q.     Okay.  They say, "Although the
 8    available studies have methodological
 9    limitations, the weight of the evidence
10    supports a causal association between
11    valproate exposure in utero and subsequent
12    adverse effects on neurodevelopment,
13    including increases in autism spectrum
14    disorders and attention-deficit/hyperactivity
15    disorder.  An observational study has
16    suggested that exposure to valproate products
17    during pregnancy increases the risk of autism
18    spectrum disorders.  In this study, children
19    born to mothers who had used valproate
20    products during pregnancy had 2 point
21    times" -- "2.9 times the risk of developing
22    autism spectrum disorders compared to
23    children born to mothers not exposed to
24    valproate products during pregnancy."
25                I'm going to stop there for a
```

1    second because that's a big mouthful.

2              Were you aware, ma'am, that

3    this warning in the Depakote label about the

4    risk of autism and that the weight of the

5    evidence supporting a causal association was

6    based on one observational epidemiology

7    study?

8              MS. BROWN:  I object.  It lacks

9         foundation and assumes facts.

10             THE WITNESS:  I'm not an expert

11        in labeling, and I hadn't reviewed

12        this document prior to today.

13   QUESTIONS BY MR. TRACEY:

14        Q.    Okay.  You see that in this

15   label, this document, at least as far as I

16   can tell, they have only referenced one

17   study, and I believe the record is going to

18   reflect it's one of the Christensen studies.

19             Are you familiar with

20   Dr. Christensen and his work?

21             MS. BROWN:  Object to the first

22        part of the question as lacking

23        foundation.

24             THE WITNESS:  I haven't

25        comprehensively reviewed the valproic

Confidential - Subject to Protective Order

```
 1          acid data and relationships to autism

 2          or ADHD in preparation for today.

 3   QUESTIONS BY MR. TRACEY:

 4          Q.      Okay.  Have you ever

 5   comprehensively reviewed it?

 6          A.      Not in the modern era.

 7          Q.      What's the modern era for

 8   Dr. Chung?

 9          A.      Within the last five years.

10          Q.      Okay.  They say below that,

11   "Another observational study found that

12   children who were exposed to valproate in

13   utero had an increased risk of ADHD of 1.48

14   compared with the unexposed children.

15   Because these studies were observational in

16   nature, conclusions regarding a causal

17   association between in utero valproate

18   exposure and an increased risk of autism

19   spectrum disorder and ADHD cannot be

20   considered definitive."

21              Did I read that mostly correct?

22          A.      Yes, I believe you did.

23          Q.      Now, is it -- it is true,

24   because I've read it in your report, that you

25   believe that all observational studies have
```

1    methodological flaws, right?

2         A.    I believe that we're getting

3    better over time, but there are limitations

4    with epidemiological observational studies.

5         Q.    Do you know whether either one

6    of the observational studies that, candidly,

7    the label says have methodological flaws,

8    whether either one of them accounted for

9    confounding by genetics?

10              MS. BROWN:  I object.

11              Are you talking about the two

12         studies referenced in this label?

13              MR. TRACEY:  I am.

14              MS. BROWN:  Okay.  I object.

15         Lacking foundation.  Calls for

16         speculation.

17              THE WITNESS:  Again, I haven't

18         reviewed these papers in

19         preparation -- or in preparation of my

20         opinion or for today.

21    QUESTIONS BY MR. TRACEY:

22         Q.    Would it surprise you to know,

23    Dr. Chung, that neither one of the

24    observational studies referenced in this

25    label accounted for any genetic confounding?

1          MS. BROWN:  Objection.  Assumes

2      facts.  Lacks foundation.

3          THE WITNESS:  Again, I don't

4      know the studies, but it would not

5      surprise me if they were things that

6      were not done within the last year or

7      two.

8  QUESTIONS BY MR. TRACEY:

9      **Q.     You're not of the opinion,**

10 **Dr. Chung, are you, that until and unless**

11 **observational epidemiology studies account**

12 **for potential genetic confounders using the**

13 **latest and greatest technology that we can't**

14 **reach any conclusions about observational**

15 **studies, are you?**

16         MS. BROWN:  Objection.  Vague.

17         THE WITNESS:  Again, I think

18     one looks at the relative risk

19     associated with these, understanding

20     that is something that one considers

21     in terms of what that risk is.  If

22     something were associated with a

23     200-fold increased risk, I think it

24     would be more obvious that there were

25     unlikely to be confounds accounting

1          for that signal.

2                  When you see signals that are

3          associated with a relative risk that

4          are more modest, 1 to 2, for instance,

5          I think it gets more complicated and

6          one has to be able to consider the

7          confounds.

8                  Again, valproic acid was not

9          something that I was asked to comment

10          on, and I did not prepare an opinion

11          on valproic acid.

12   QUESTIONS BY MR. TRACEY:

13          **Q.     Well, the relative risk of**

14   **ADHD, according to this label, are modest by**

15   **your standards, 1.48, right?**

16                  MS. BROWN:  Objection.

17          Misstates the label.

18                  THE WITNESS:  Again, I was not

19          considering the literature for

20          valproic acid, and I don't have an

21          opinion to render on valproic acid.

22   QUESTIONS BY MR. TRACEY:

23          **Q.     I didn't ask you about that.  I**

24   **asked you about the number.**

25                  **You said modest numbers are**

1    between 1 and 2, which is exactly what we see

2    in this label, right, on ADHD?

3              MS. BROWN:  Objection.

4              THE WITNESS:  I will say that

5         what I see and on the screen before me

6         is a hazard ratio of 1.48.

7    QUESTIONS BY MR. TRACEY:

8         Q.    And then on autism, we see a

9    2.9 relative risk, right?

10        A.    Yes, that's what I see above,

11   is 2.9.

12        Q.    Now, is this label and the

13   language that they use -- scroll up a little

14   bit -- that the weight of the evidence --

15   "Although studies have methodological

16   limitations, the weight of the evidence

17   supports a causal association between

18   valproate exposure in utero and subsequent

19   adverse effects on neurodevelopment,

20   including ASD and ADHD," is that statement

21   consistent with the enrichment score that

22   Carter and Blizard found in their

23   gene-chemical interaction study?

24             MS. BROWN:  Objection.  Lacks

25        foundation.

Confidential - Subject to Protective Order

```
 1                  THE WITNESS:  Again, as we've

 2          talked about within the Carter study,

 3          that's not based on the actual biology

 4          in humans, and I think that needs to

 5          be looked at separately from anything

 6          that's being referenced here in terms

 7          of epidemiology studies in people.

 8   QUESTIONS BY MR. TRACEY:

 9          Q.    Okay.  But is it consistent

10   with what this epidemiology shows, which is a

11   human study, right?

12                  MS. BROWN:  Asked and answered.

13          I object.

14                  THE WITNESS:  Again, these are

15          two small data points, but it's not

16          taking into consideration the totality

17          of the data that Carter looked at.

18   QUESTIONS BY MR. TRACEY:

19          Q.    I'm not -- I'm not following

20   you.

21                  Carter did an enrichment score

22   for valproic acid, right?  And it had the

23   highest enrichment score when it interacted

24   with autism susceptibility genes, of drugs,

25   right?
```

```
 1        A.     So all I'm saying is that
 2   you've cherry-picked two data points from the
 3   Carter study.  They've looked at thousands of
 4   compounds in terms of doing that, and I
 5   haven't seen an association, in terms of what
 6   you're describing to me, looking at
 7   epidemiological data with all of the
 8   different things that they looked at, to know
 9   whether that's a consistent pattern to assess
10   the validity of the method that they used.
11        Q.     Okay.  But I'm not asking you
12   about any of that, Doctor.
13               What I'm asking is very simple.
14   Is the conclusions that they reached in this
15   label about the weight of the evidence
16   supporting a causal association consistent
17   with Carter and Blizard's high enrichment
18   score?
19               MS. BROWN:  Objection.  Asked
20        and answered.
21               You can answer it again.
22               THE WITNESS:  Again, these are
23        two of thousands of data points, and
24        by chance --
25
```

Confidential - Subject to Protective Order

1    QUESTIONS BY MR. TRACEY:

2         **Q.    But I'm only asking you about**

3    **one.**

4              MS. BROWN:  Let her finish,

5         please.

6    QUESTIONS BY MR. TRACEY:

7         **Q.    I'm only asking you about one.**

8              MS. BROWN:  She's answering

9         your question.

10             Go ahead.

11             MR. TRACEY:  No.  No, she's

12        not.  She's answering about a thousand

13        other things.

14             MS. BROWN:  That's the answer

15        to the question.

16             MR. TRACEY:  You know -- you

17        know what I'm asking, Doctor.

18             MS. BROWN:  She's giving you

19        the answer.

20             THE WITNESS:  What I'm saying

21        is that by chance alone, one could

22        have seen this same association that

23        you're seeing.  And scientifically and

24        rigorously to assess whether or not

25        that would be consistent, I've told

1          you the methodology that we would use

2          to be able to understand that within

3          the larger context of the studies that

4          were done.

5    QUESTIONS BY MR. TRACEY:

6          **Q.     But the confidence intervals in**

7    **these studies exclude chance, don't they?**

8          A.     That's a different issue that

9    you're raising so --

10         **Q.     Well, you raised the issue of**

11   **chance, I thought.**

12                **You were talking about Carter**

13   **and Blizard?**

14         A.     So talking about Carter and

15   Blizard, they have performed a massive number

16   of independent genetic tests, which

17   statistically need to be corrected for that

18   because you can see associations by chance

19   alone.

20                You have cherry-picked two of

21   the things that they looked at and to be able

22   to see that that is consistent with what

23   you're seeing here and that is possible that

24   it is only by chance alone.

25         **Q.     So you think --**

```
1              MS. BROWN:  Well, please let

2         her finish.  She was not finished.

3    QUESTIONS BY MR. TRACEY:

4         Q.     Oh, I thought you were done,

5    I'm sorry.

6         A.     I'm simply outlining that there

7    are ways to rigorously assess that, but I've

8    not seen that Carter has performed those

9    studies.

10        Q.     So what I'm asking, though,

11   Doctor, is if the label is correct, okay,

12   let's assume for our purposes that the weight

13   of the evidence supports a causal association

14   between Depakote and autism and ADHD.  Let's

15   pretend it's true for a second.

16             Are you with me?

17        A.     I understand your assumption.

18        Q.     Okay.  My question is, forget

19   about all of the -- maybe they did everything

20   wrong, everything -- Carter and Blizard did

21   everything wrong, but still, they had a very

22   high enrichment score.  And if they did

23   everything wrong, that would have to be a

24   coincidence based on this label, wouldn't it?

25             MS. BROWN:  Objection.  Vague.
```

1           THE WITNESS:  Given the number

2      of independent tests that they

3      performed, there is a high likelihood

4      of many things being coincidence.

5  QUESTIONS BY MR. TRACEY:

6      **Q.    So you think, then, the Carter**

7  **and Blizard 130 enrichment score, the highest**

8  **of any drug that they ran through the**

9  **database, and the label saying that Depakote**

10 **causes autism, is simply a coincidence?**

11     A.    I'm simply saying that I don't

12 have the data to independently answer the

13 question that I've {sic} asked, and so I

14 can't assess whether it's coincidence or

15 statistically meaningful.

16     **Q.    Okay.  Okay.  Who is Brandon**

17 **Pearson?**

18     A.    Brandon Pearson is -- I believe

19 at this time he's an assistant professor at

20 the School of Public Health at Columbia.

21     **Q.    Did you work with Dr. Pearson?**

22     A.    I did.

23     **Q.    Do you know him to be a**

24 **scientist of impeccable integrity?**

25     A.    I wouldn't say that I know one

Confidential - Subject To Protective Order

```
1    way or the other in terms of integrity.
2         Q.    Really?  How long did you work
3    with him?
4         A.    Approximately two years.
5         Q.    And in those two years of
6    working with Dr. Pearson, you were not able
7    to assess his integrity?
8         A.    No.
9         Q.    You published papers with
10   Dr. Pearson, right?
11        A.    I've published one paper with
12   Dr. Pearson.
13        Q.    You published a paper with him,
14   what was it, last month, two months ago?
15        A.    I believe that's when it came
16   out.
17        Q.    Dr. Pearson, in your
18   interaction with him in the two years at
19   Columbia, did he appear to be a competent
20   toxicologist?
21        A.    I can't comment on his
22   toxicology experience.
23        Q.    Can you comment about him at
24   all in any respect, or is he a stranger to
25   you?
```

1          A.      I've met with Dr. Pearson, to

2    my knowledge, on two occasions.

3          Q.      Really?

4                  How did you choose him, if you

5    did, to do the study?

6          A.      I did not choose him.  He chose

7    me.

8          Q.      Ah, he chose you.  I see.

9                  Do -- yeah, I will.

10                 What about Brennan Baker?  Do

11   you know Dr. Baker?

12         A.      I believe he's a graduate

13   student in Dr. Pearson's lab or was at the

14   time.

15         Q.      Okay.  Any opinion on his

16   scientific integrity?

17         A.      I don't really know.

18         Q.      What about your other coauthor,

19   Dr. Zhang?

20         A.      I don't know Dr. Zhang at all.

21         Q.      What about Jeremy Simon?

22         A.      I don't know Dr. -- or I assume

23   it's Dr. Simon.

24         Q.      Or Sarah McLarnan?

25         A.      I don't know.  I don't know

Confidential - Subject to Protective Order

1    that person personally.

2          Q.     You said you've only met with

3    Dr. Pearson one -- two times in your life?

4          A.     That's correct.

5          Q.     You guys were both at Columbia?

6          A.     That's correct.

7          Q.     Were you in the same

8    department?

9          A.     No.

10         Q.     What department were you in?

11         A.     Pediatrics.

12         Q.     Oh.

13         A.     He's in the School of Public

14   Health.

15         Q.     Have you exchanged e-mails with

16   Dr. Pearson?

17         A.     We have.

18         Q.     More than two?

19         A.     I don't know the number, but

20   more than two.

21         Q.     Since you left Columbia, have

22   you exchanged e-mails?

23         A.     No.

24         Q.     Okay.  Why did you exchange

25   e-mails?

```
1          A.      About this manuscript.

2          Q.      Is that the only communication

3    you've ever had with Dr. Pearson in your

4    life, was over the manuscript we're about to

5    discuss?

6          A.      I won't say it's an absolute

7    that I've never, ever discussed anything with

8    him, but the vast majority of our

9    communications were around this manuscript.

10         Q.      Dr. Pearson has done studies on

11   acetaminophen and neurotoxicology, hasn't he?

12         A.      I -- I'm not aware of his

13   studies.  Those -- I did not do any studies

14   with him with acetaminophen.

15         Q.      You're not aware of his

16   research on acetaminophen?

17         A.      I'm not.

18         Q.      I think it's in your report,

19   isn't it?

20         A.      I don't recall.  Maybe you can

21   point it out to me.

22         Q.      Okay.  We'll get to it.  We're

23   going to get to in just a second.

24               (Chung Exhibit 333 marked for

25         identification.)
```

Confidential - Subject to Protective Order

```
 1   QUESTIONS BY MR. TRACEY:

 2        Q.    All right.  Let's -- this -- my

 3   next exhibit is 333.  This is a study that

 4   you yourself are on, published in the journal

 5   Frontiers.

 6        A.    Okay.

 7        Q.    This was published less than a

 8   month ago, August 3, 2023.

 9              And there we see Wendy Chung,

10   don't we?

11        A.    Yes.

12        Q.    Now, at the time you were still

13   at Columbia, weren't you?

14        A.    Yes.

15        Q.    And the name of the paper is,

16   "Environmental carcinogens disproportionally

17   mutate genes implicated in neurodevelopmental

18   disorders."

19              That's the name of it?

20        A.    That's the title, that's

21   correct.

22        Q.    And the lead author is Brennan

23   Baker, and Brandon Pearson is the senior

24   author at the end, right?

25        A.    That's correct.
```

```
1        Q.      And you were there right before
2    Brandon, right?
3        A.      That's correct.
4        Q.      The Columbia University
5    actually has a mouse lab, doesn't it?
6        A.      Several investigators at
7    Columbia use rodent models, including mice.
8        Q.      Are you familiar with the lab
9    at Columbia that studies neurotoxicology in
10   mouse models?
11       A.      Not specifically.  Maybe you
12   can be more specific.
13       Q.      Okay.  No, I'll come back to
14   that.  I thought you might -- you might be
15   familiar with it.
16               In any event, this article was
17   published less than 30 days ago.  27 days
18   ago, right?
19       A.      Let's see.  It looks like
20   August 3, 2023.
21       Q.      Did you read this study before
22   it was published?
23       A.      Yes, I did.
24       Q.      Did you edit it?
25       A.      Yes, I did.
```

Confidential - Subject to Protective Order

```
 1          Q.      You redline it?

 2          A.      Track changes, but, yes.

 3          Q.      Yeah, that's track changes.

 4                  Do you believe what's written

 5    in this paper?

 6          A.      You know, there are always

 7    several rounds of edits that go through any

 8    manuscript.  Ultimately, Dr. Pearson was the

 9    one who decided the consensus and what to

10    submit in terms of the final manuscript.

11          Q.      But my question wasn't that.

12    It was whether you believed what's in the

13    paper that has your name on it that was

14    published less than 30 days ago with

15    Dr. Pearson.

16          A.      Dr. Pearson, Dr. Baker and the

17    team were the ones who performed the actual

18    experiments, so I was not involved in the

19    actual generation of the data.  I was

20    involved in terms of editing the manuscript.

21    And, again, the ultimate decision about what

22    changes, what suggestions were accepted, were

23    Dr. Pearson's decisions.

24          Q.      Can you not answer my question?

25                  MS. BROWN:  Objection.
```

Confidential - Subject to Protective Order

```
 1          Argumentative.

 2               She did.

 3               THE WITNESS:  So there could

 4          have been edits that I suggested as we

 5          were going through multiple rounds of

 6          revision.  And as the senior author,

 7          Dr. Pearson was the one who ultimately

 8          decided how the final manuscript is as

 9          you see it today.

10   QUESTIONS BY MR. TRACEY:

11          Q.    All of that may be true.  My

12   question to you, is the published work that,

13   after all the edits, after all the redlines

14   that was published for the world to see, is

15   it true, best you can tell?

16          A.    I think the major takehome

17   message, yes, I stand behind the major

18   conclusions of the manuscript.

19          Q.    Is there some part of it you

20   don't stand behind, Dr. Chung?

21          A.    Again, in terms of the major

22   takehome message and to the best of my

23   knowledge in terms of the data as they were

24   presented to me, I stand behind the

25   conclusions of this manuscript.
```

Confidential - Subject To Protective Order

1     Q.      When did you get hired by

2  Johnson & Johnson, Dr. Chung?

3             MS. BROWN:  Objection.

4             THE WITNESS:  I've not been

5       hired by Johnson & Johnson.

6  QUESTIONS BY MR. TRACEY:

7     Q.      Who hired you?

8     A.      I've been retained by the legal

9  team to be able to render a report and an

10  opinion.

11     Q.      When did you get hired by the

12  legal team in this case?

13     A.      Approximately one year ago was

14  when I was retained.

15     Q.      Okay.  And how much do you get

16  paid?  I should have asked that.  I'm sloppy.

17             How much do you get paid an

18  hour?

19     A.      $600 an hour.

20     Q.      And how many hours do you have

21  in this case?

22     A.      I don't know.  I've submitted

23  invoices, and we can add those up.

24     Q.      Okay.  Are you doing any other

25  work for law firms right now on other cases?

Confidential - Subject to Protective Order

```
1         A.      Yes.

2         Q.      How many?

3         A.      A total of five, at one stage

4    or another.

5         Q.      And those five cases, are they

6    all for drug companies?

7         A.      No, none of them are for drug

8    companies other than -- I shouldn't say drug

9    companies, but anything involving medication

10   or a product.

11        Q.      Are they medical malpractice

12   cases?

13        A.      Yes.

14        Q.      Where somebody is alleging that

15   some birth trauma or something else

16   contributed to cause a -- cause autism, and

17   you're stepping in to say it was all genetic?

18        A.      No.

19        Q.      Okay.

20        A.      But they are medical

21   malpractice cases.

22        Q.      In all of those cases, is it

23   your opinion that the cause of the autism was

24   genetic?

25                MS. BROWN:  And I would just be
```

1          careful if your opinion hasn't been

2          disclosed in those cases, please do

3          not provide --

4                    MR. TRACEY:  I'm not asking you

5          to identify the case.  I don't care.

6                    THE WITNESS:  So those cases do

7          not involve autism.

8     QUESTIONS BY MR. TRACEY:

9          Q.     **Oh, what do they involve?**

10         A.     Other medical problems.

11         Q.     **Like what?**

12         A.     I don't know what I'm allowed

13    to disclose.  I'll just say that in general.

14    But I'll just say they're, you know, problems

15    in terms of medical outcomes.

16         Q.     **Well, you can disclose anything**

17    **because I haven't asked you to identify**

18    **anyone.**

19         A.     Okay.

20         Q.     **So there's no privacy issues.**

21                    MS. BROWN:  Well, but I think

22         there might be a confidentiality issue

23         if you're able to reverse-engineer

24         what cases she's been disclosed in and

25         her opinion has not yet been given.

1          MR. TRACEY:  Fair enough.  I --

2          MS. BROWN:  So I would just be

3     careful --

4          MR. TRACEY:  I got it.

5          MS. BROWN:  Okay.

6  QUESTIONS BY MR. TRACEY:

7     Q.     None of those cases involve

8  autism?

9     A.     No.

10    Q.     Okay.  Okay.  $600 an hour, you

11  got hired a year ago by a law firm.

12           Who does the law firm

13  represent?

14    A.     Eva Canaan.  You can, I assume,

15  figure out which law firm she is.

16         MR. WATTS:  King & Spalding.

17         MR. TRACEY:  Oh, King &

18    Spalding.  Interesting.

19  QUESTIONS BY MR. TRACEY:

20    Q.     All right.  Let's look at your

21  paper.  And the Results section on the first

22  page say, "We demonstrate that several

23  mutagens, including radiation and polycyclic

24  aromatic hydrocarbons, disproportionally

25  mutate genes related to neurodevelopmental

1    disorders including autism spectrum

2    disorders, schizophrenia,

3    attention-deficit/hyperactivity disorder."

4                Did I read that correctly?

5        A.      Yes, that's the first sentence

6    under the Results.

7        Q.      Did you and your coauthors

8    demonstrate that in your study?

9        A.      Within -- with this system,

10   yes.

11       Q.      Okay.  So you demonstrated that

12   environmental factors disproportionally

13   mutated genes related to neurodevelopmental

14   disorders?

15       A.      Again, for mutagens, radiation

16   is obviously a very strong mutagen.  Genes

17   that are related to the conditions that they

18   describe are relatively large genes.  The

19   larger the gene is, the bigger the target it

20   is for something that alters DNA.

21               And so in that case, yes, those

22   were shown in this system to be associated

23   with an increased chance.

24       Q.      And polycyclic aromatic

25   hydrocarbons, that's pollution, isn't it?

Confidential - Subject to Protective Order

1          A.      That is part of what can be
2    found in pollutants.
3          Q.      Uh-huh.
4                  Flip over to the introduction,
5    because you begin your introduction citing
6    two other papers -- three other papers there.
7                  And the one -- I want to focus
8    on that Pugsley 2021 that you cited.
9                  Do you see that?
10         A.      Yes.
11         Q.      Now, you cited Pugsley in this
12   paper four or five times.
13                 Did you know that?
14         A.      We could go back and count, but
15   that wouldn't surprise me.
16         Q.      Do you know the Pugsley 2021
17   paper?
18         A.      Yes, I see the paper.
19         Q.      Pardon me?
20         A.      Yes, I see the paper in the
21   references.
22         Q.      Yeah.
23                 But are you familiar with the
24   paper that you cited -- I think the record is
25   going to reflect four or five times -- in

Confidential - Subject to Protective Order

1    this paper?

2         A.     I do see the paper.  I don't

3    recall all the details off the top of my

4    head, but I do see the paper.

5         Q.     And you-all cited Landrigan in

6    this paper, too?  Remember we talked about

7    Philip Landrigan?  That was the first article

8    we looked at, I think.

9         A.     Yes, I see --

10        Q.     Do you see Landrigan?

11        A.     I see the citation.

12        Q.     And you cited him for the

13   proposition, you did, "Similarly,

14   environmental exposures may be responsible

15   for a large proportion of neurodevelopmental

16   disorders."

17               That's what you said, right?

18        A.     Again, the team of authors had

19   this written here.

20        Q.     Okay.  Do you want to take that

21   back now?

22        A.     I'm not taking it back, but I

23   am saying that this manuscript was driven by

24   Drs. Baker and Pearson being the first and

25   the senior authors.

```
1        Q.     Okay.  That's fine.

2               But is it true what they wrote?

3        A.     I think they have referenced a

4   paper.

5        Q.     Okay.  You see Pugsley again

6   there.

7               You cite him again next to

8   Kinney?

9        A.     Yes, I see the second one.

10       Q.     "Environmentally induced

11  mutation remains a strong yet generally

12  untested candidate mechanism that may link

13  environmental exposures to neurodevelopment."

14              And there's Pugsley 2021 again,

15  isn't it?

16       A.     Yes.  Again, "untested," I

17  think, is a key word here.

18       Q.     Pardon me?

19       A.     I think "untested" is one of

20  the key words here.

21       Q.     Indeed.

22              You were doing the testing in

23  this study, weren't you?

24       A.     We were using a system to test,

25  yes.
```

1    Q.    Yes.

2          And the system you used to test

3    proved that the environment was creating de

4    novo mutations?

5    A.    That certain things could

6    create de novo mutations, certain exposures.

7    Q.    And you stand behind everything

8    in this paper, don't you, Dr. Chung?

9    A.    As I said --

10         MS. BROWN:  Object to the form.

11         THE WITNESS:  As I said

12    earlier, the major conclusions, yes, I

13    do stand behind.

14         (Chung Exhibit 313 marked for

15    identification.)

16   QUESTIONS BY MR. TRACEY:

17   Q.    Okay.  Good for you.

18         Let's pull up Pugsley.  This is

19   Exhibit 314.  We're going to talk about

20   Pugsley and see what these authors who you

21   cited four times have to say about the

22   subject that we're here to talk about.

23         MR. WATTS:  314?

24         MR. TRACEY:  314.

25         Pugsley.  I have 314.  Is that

```
 1        wrong?

 2               THE WITNESS:  This looks like

 3        something else.

 4               MR. TRACEY:  313?  My bad.  I

 5        gave you the wrong one.  Danny's bad.

 6        Mine says 314.  It's 313.

 7               Thank you, Senor Watts.

 8  QUESTIONS BY MR. TRACEY:

 9        Q.     By the way, were you Brandon

10  Pearson's postdoc advisor?

11        A.     No.

12        Q.     No?

13               Oh, Zylka, I see.

14               Do you know Dr. Zylka?

15        A.     I do know Dr. Zylka.

16        Q.     Were you her postdoc advisor?

17        A.     I believe it's Mark Zylka, if

18  it's the same Zylka I'm thinking of, and --

19        Q.     Did I say "her"?  Oh, I'm

20  sorry.

21        A.     And, no, I was -- I've not

22  directly worked with Mark Zylka.

23        Q.     Okay.  Let's turn to -- see

24  what the good doctors, Pugsley, et al., have

25  to say.
```

Confidential - Subject To Protective Order

```
 1               By the way, this was published
 2    in 2022, I think, in the fall -- October.
 3    There we go.  October of 2022.  This was
 4    published -- yeah, 20 -- yeah, it was
 5    published in 2022 in Molecular Psychiatry.
 6               Are you familiar with that
 7    journal?
 8        A.    I am familiar with the journal.
 9        Q.    Is that a high impact journal?
10        A.    We would have to look at the
11    impact score.
12        Q.    Okay.
13        A.    I don't believe it's greater
14    than 10, but I don't recall.
15        Q.    Well, in any event, this is the
16    paper you cited four times, right?
17        A.    The paper cited in the
18    manuscript, correct.
19        Q.    Okay.  The name of it is
20    "Environmental exposures associated with
21    elevated risk for autism spectrum disorder
22    may augment the burden of deleterious de novo
23    mutations among probands."
24               That's the name of the article,
25    right?
```

```
 1        A.      That's the title, correct.

 2        Q.      That's the title.

 3                Now, I notice with some

 4   interest that your report, you don't cite

 5   Pugsley in your expert report in this case

 6   even one time, do you?

 7        A.      No, I don't believe I did.

 8        Q.      How is it that you -- that this

 9   paper escaped your search criteria when you

10   were reviewing the relevant literature?

11        A.      I'm sorry, can you rephrase the

12   question?

13        Q.      How is it -- whatever search

14   criteria that you used, how is it that you

15   didn't capture Pugsley as a relevant piece of

16   literature?

17                MS. BROWN:  Objection to the

18        form.

19                THE WITNESS:  Well, for one

20        thing, I believe this is a review

21        article.

22   QUESTIONS BY MR. TRACEY:

23        Q.      Yes, ma'am, it is.

24        A.      So I --

25        Q.      Okay.
```

1    A.    In general, I'm trying to find

2  the primary source data to be able to

3  directly assess the source of the data.

4    **Q.    So if I look through your**

5  **report, you will only have referenced**

6  **original sources?  There will be no review**

7  **articles, there will be no commentaries,**

8  **there will be no reviews?**

9         MS. BROWN:  Objection.

10    Misstates testimony.

11         THE WITNESS:  No, I'm not

12         saying there isn't a review, but in

13         terms of the things that one is trying

14         to gather the evidence and assess the

15         evidence, one should directly look at

16         the evidence.

17  QUESTIONS BY MR. TRACEY:

18    **Q.    Well, how did one end up with**

19  **review articles in your paper and miss**

20  **Pugsley?**

21    A.    In certain cases, there were

22  reviews, for instance, of genetics.  I have a

23  very long report and a very long section on

24  genetics.  And so many of those have

25  references to reviews, more so than, for

```
 1   instance, looking at individual

 2   paper-by-paper, the direct epidemiological

 3   data.

 4       Q.    Well, let's see what they have

 5   to say.

 6             The very first sentence in the

 7   abstract says, "Although the full etiology of

 8   autism spectrum disorder is unknown, familial

 9   and twin studies demonstrate high

10   heritability of 60 to 90 percent, indicating

11   a predominant role of genetics in the

12   development of the disorder."

13             Do you agree with that?

14       A.    I agree about the predominance

15   of genetics and this developmental disorder,

16   autism.

17       Q.    In fact -- in fact, that's

18   almost word for word your conclusion, isn't

19   it?

20       A.    I don't know about word for

21   word, but --

22       Q.    Well, let me read it for you.

23             You say, "Genetics are the

24   predominant cause of ASD and ADHD."

25             They say "predominant role."
```

1     A.     In that sense, yes, we do both

2  use the word "predominant."

3     **Q.     So the authors, and at least**

4  **Dr. Chung on that issue, seem to be in**

5  **agreement?**

6     A.     I think we both have an opinion

7  that genetics are the predominant

8  contributing factor to autism.

9     **Q.     But I think you may have a**

10  **disagreement on what that means, Dr. Chung.**

11     **Don't you?**

12     A.     You'll have to be more

13  specific.

14     **Q.     Well, you've read this, ma'am,**

15  **haven't you, lately?**

16     A.     If you want to ask a specific

17  question, I'm glad to consider it.

18     **Q.     I just asked a specific**

19  **question.**

20     **You read this article recently,**

21  **didn't you?**

22     A.     Yes, I've read this article.

23     **Q.     When's the last time you read**

24  **it?**

25     A.     Within the last six months.

Confidential - Subject to Protective Order

```
 1        Q.      What about in the last six
 2   days?
 3        A.      I don't think I've read it
 4   cover to cover in the last six days, no.
 5        Q.      But you've read it in the last
 6   six days, didn't you, Dr. Chung?
 7              MS. BROWN:  Objection.
 8              THE WITNESS:  I don't
 9        understand the question.  I have not
10        read it start to finish in the last
11        six days.
12   QUESTIONS BY MR. TRACEY:
13        Q.      I didn't ask you about start to
14   finish, Doctor.
15              You have laid your eyes on this
16   paper in the last six days, haven't you?
17              MS. BROWN:  Objection.  Asked
18        and answered.
19              THE WITNESS:  I don't recall
20        looking at this in the last six days.
21        I'm not sure why the last six days is
22        coming up.
23   QUESTIONS BY MR. TRACEY:
24        Q.      Okay.  Well, let's see what
25   they say.  They say, "The genetic
```

Confidential - Subject to Protective Order

1    architecture of ASD consists of a complex

2    array of rare and common variants of all

3    classes of genetic variation usually acting

4    additively to augment individual risk."

5              And you certainly agree with

6    that, right?

7         A.    I agree that it's complex, and

8    they're both rare and common genetic

9    variants, yes.

10        Q.    And then they say there -- they

11   start off a sentence, "Notably."

12             Do you see that?  "Notably" --

13   oops.

14             "Notably, environmental

15   exposures attributed as salient risk factors

16   for ASD may play a causal role in the

17   emergence of deleterious de novo variations

18   with several ASD-associated agents having

19   significant mutagenic potential."

20             Do you remember reading that

21   when you reviewed this paper?

22        A.    Yes, and I would, again,

23   underscore the word "may" within this.  I

24   think if you were to ask these authors, they

25   would say the proven association is with

1    advanced paternal age with de novo genetic

2    variance.

3         Q.    I didn't hear the last part.

4         A.    I think if you ask these

5    authors, they would say that the one

6    established association is with advanced

7    paternal age with de novo genetic variance.

8         Q.    Okay.  Well, let's not guess

9    because they're not here.  Let's see what

10   they wrote in the paper.

11            Okay?

12        A.    Okay.

13        Q.    Salient means important,

14   doesn't it?

15        A.    I would say relevant.

16        Q.    Okay.  So environmental

17   exposures attributed as important risk

18   factors may play a causal role in the

19   emergence of deleterious de novo variations,

20   right?

21        A.    That's what they say.

22        Q.    And then they say, "Broadly,

23   these exposures were observed to elicit

24   genomic alterations through one or a

25   combination of, 1, direct interaction with

1    genetic material."

2              Would that be -- would that be

3    a mutagen?

4         A.    I think they are hypothesizing

5    that mutagens that alter DNA could have this

6    effect.

7         Q.    And then number 2, they have,

8    "Impaired DNA repair."

9              What do we call that?

10        A.    Impaired DNA repair.

11        Q.    Okay.  Not as complex as I

12   thought.

13             And 3 is, "Oxidative DNA

14   damage."

15             Right?

16        A.    Correct.

17        Q.    By the way, do you know what

18   the reputation of Monash University in

19   Australia is in the worldwide research

20   community?

21        A.    No, I don't.

22        Q.    Okay.  So down at the bottom of

23   the first paragraph to the right, they start

24   talking about the relative contributions of

25   mutations to the etiology of autism.

```
 1              Do you see where they say, "The

 2   relative contribution of these mutations to

 3   the etiology of the disorder is estimated at

 4   2.5 to 15 percent and 12 to 52 percent

 5   respectively, with more recent evidence

 6   supporting the role of tandem repeat

 7   variations as additional and incredible

 8   salient components of the ASD genotype"?

 9        A.    I see the sentence, yes.

10        Q.    Do you agree with their -- what

11   they're writing about what the data shows?

12        A.    Yes, I support -- or I believe

13   that these genetic contributions, that's

14   approximately the right percentages.

15        Q.    Yeah, and they're referring us

16   to the section on elevated genomic

17   sensitivity to exposure-induced mutagenesis,

18   aren't they?

19              Which we'll look at in a

20   minute.

21        A.    Yes, they do reference this

22   other section.

23        Q.    But up at the top of this

24   second page, I want you to look at the

25   diagram they put together for everybody.
```

1          And it's called "ASD etiology.

2    They've spelled it "aetiology"

3    because they're Australian, but etiology

4    means cause of, right?

5          A.    Yes.

6          Q.    So we're looking at ASD, the

7    cause, according to these researchers that

8    you cited in your most recent paper.

9          And under Figure 1, they tell

10   us what we're looking at.  It's a

11   diagrammatic representation of the interplay

12   between genetic and environmental risk

13   factors in the etiology of ASD.  That's all

14   bolded there.

15         Do you see that?

16         A.    Yes, I see that.

17         Q.    And then they say, "Both

18   heritability and nonheritable factors can

19   independently and reciprocally influence the

20   development of ASD symptomatology."

21         I'm going to stop there for a

22   second.  Do you agree with their statements

23   there?

24         A.    I agree that both heritable and

25   nonheritable factors can influence the

1    development of ASD.

2           Q.     Reciprocally?

3           A.     I'm not sure I understand

4    exactly without reading in detail, which we

5    can stop and I can do, but I need to look at

6    further what they mean by reciprocally.

7           Q.     Okay.  With that understanding,

8    let's move on.  "Up to 5 to 15 of ASD

9    probands possess risk-associated de novo

10   mutations, indicating the significance of

11   nonfamilial genetic variability in

12   disordering -- in determining disorder risk."

13               And you certainly agree with

14   that?

15          A.     Yes.

16          Q.     And then finally on this they

17   say, "The mutagenic genotoxic potential of

18   nonheritable factors associated with ASD

19   suggests that these toxicants may play a role

20   in the elicitation of spontaneous mutations."

21               Do you agree with that?

22          A.     I agree that they're saying --

23   and again, I'll underscore the word,

24   "suggests" and "may."

25          Q.     Yes.

1      A.      So I think they have hypotheses

2    that they would like to see tested.

3      Q.      I'm going to hold you to

4    "suggest" and "may," Dr. Chung, for later in

5    the day when we look at some literature you

6    relied on.

7              Would that be okay?

8              MS. BROWN:  Objection to the

9          form.

10              THE WITNESS:  We can look at

11          this -- other topics this afternoon,

12          sure.

13    QUESTIONS BY MR. TRACEY:

14      Q.      Okay.  In the middle of this

15    first paragraph there, starting in the middle

16    it says -- sorry.

17              At the beginning it says, "The

18    contribution of hereditary in ASD persists

19    despite strong selective pressures against

20    the deleterious genetic events associated

21    with disorder onset.

22              "Interestingly, the

23    reproductive challenges faced by individuals

24    with ASD are not physical but instead mostly

25    social.  Fecundity is consequently reduced

1    among affected individuals."

2              What's fecundity mean?

3         A.    Reproductive, reproducing.

4         Q.    Yeah.  What they're saying is

5    even though people that have autism spectrum

6    disorder don't reproduce, yet it's

7    persisting, right?

8         A.    For some individuals.

9         Q.    Yeah.

10             They say, "Despite this, the

11   prevalence of ASD is demonstrated stability

12   or increases over time with nonheritable

13   etiological factors insufficiently

14   compensating for the loss of high-risk

15   genetic variants from the reproductive gene

16   pool."

17             Do you know what they're saying

18   there?

19        A.    Yes.  They're saying that

20   individuals -- often those individuals with

21   intellectual disabilities and autism, are not

22   having children.

23             And to understand how those

24   individuals continue in a population genetic

25   point of view, there are de novo mutations

1    that largely account for those individuals.

2         Those de novo mutations

3    oftentimes, as I was saying before, are

4    associated with advanced paternal age.

5         And as we've seen, the

6    reproductive habits of humans change over

7    time, and as we've seen individuals

8    reproducing older, people have hypothesized

9    that that's where portions of the autism

10   population are coming from.

11   **Q.    But of course the name of this**

12   **paper is not paternal age; it's environmental**

13   **exposures, isn't it?**

14        A.    That is the title of this

15   paper, but I'm also explaining the very

16   well-established association of de novo

17   mutations with advanced parent age.

18   **Q.    I have no quibble with you**

19   **there, Dr. Chung.  None.**

20        **They go on to say,**

21   **"Preservation of the genetic liability of ASD**

22   **despite reduced transmission of risk variants**

23   **has been theorized to occur, in part, due to**

24   **spontaneous de novo mutations," and then they**

25   **cite us to Table 1, right?**

```
 1         A.     Yes.
 2         Q.     And then if we flip over to the
 3    next column -- not flip, just look over to
 4    the paragraph at the top that starts off
 5    "environmental exposures."
 6                Do you see that?
 7         A.     Yes, I see that.
 8         Q.     They say, "Environmental
 9    exposures that are classically attributed as
10    salient risk factors."
11                There's that "salient" again,
12    isn't it?
13         A.     Yes.
14         Q.     "For ASD and other
15    neurodevelopmental disorders could represent
16    a catalyst for deleterious de novo variation
17    with several disorder-associated agents
18    having significant mutagenic and genotoxic
19    potential.
20                "However, although the
21    neurotoxicity and teratogenicity conferred by
22    these toxicants is well-established, their
23    potential role in the genesis of the de novo
24    mutations of relevance to ASD has received
25    little attention."
```

Confidential - Subject to Protective Order

1    And then this is the part I

2  want you to concentrate on.

3    "Toxicogenomic analyses suggest

4  disorder-associated exposures may perturb ASD

5  susceptibility genes through mutagenic

6  chemical-gene interactions."

7    Do you see that, ma'am?

8    A.    I see that statement.

9    Q.    Who do you think Pugsley is

10  citing for that proposition?  I'll give you

11  two guesses.

12    A.    I don't know that we have to

13  guess.  We just have to look at the

14  reference.

15    Q.    The first name rhymes with

16  martyr.

17    A.    Carter.

18    Q.    Carter and Blizard, right?

19    A.    Yes, that's the reference.

20    Q.    In 2022, Pugsley, the group you

21  cited, cited to this very paper -- cite

22  Carter and Blizard for that proposition,

23  don't they?

24    A.    Notably.  What they don't cite,

25  though, are data -- epidemiological data

1    demonstrating an association in people of

2    known mutagens or carcinogens and associated

3    with an increased risk of autism.

4          Q.    Well, how do you know they

5    don't do that?

6                I thought you hadn't read the

7    paper recently.

8          A.    I'm pointing out that the

9    reference that you alluded to here was, in

10   fact, the Carter paper, was not a paper in

11   terms of looking at the epidemiological

12   studies.

13         Q.    Okay.  Let me ask you this.  Do

14   you disagree with Pugsley when they say,

15   "Toxicogenomic analysis suggests

16   disorder-associated exposure may perturb

17   known ASD susceptibility genes through

18   mutagenic chemical-gene interactions"?

19               MS. BROWN:  Well, I object to

20         the partial reading of that sentence.

21               THE WITNESS:  Again, what

22         they're -- what they have stated is

23         the toxicogenomic analyses, which are

24         the Carter analyses that were

25         performed.  What they are not citing

Confidential - Subject to Protective Order

1           and they, in fact, say that there's a

2           paucity of evidence in terms of being

3           able to look at this in people and

4           with epidemiological data.

5                  If this were a strong factor, I

6           would have expected that someone would

7           have observed clinically this

8           observation already and that it would

9           have been studied in epidemiological

10          studies.

11     QUESTIONS BY MR. TRACEY:

12          **Q.     How many epidemiology studies**

13     **have looked at acetaminophen exposure and**

14     **neurodevelopmental disorders?**

15          A.     I can't count the number, but

16     there are several.

17          **Q.     More than 20?**

18          A.     I believe so.

19          **Q.     All right.  Let's soldier on.**

20               **So on page 714 of Pugsley,**

21     **sorry, he referred us to Table 2 in that --**

22     **that sentence, which is why I'm -- let's**

23     **finish that sentence.  I should have read the**

24     **whole thing.  You guys are right.  Let me**

25     **read it.  Go back.  Sorry, Mike, to where we**

```
 1    were.
 2              So, "Toxicogenomic analyses
 3    suggest disorder-associated exposures may
 4    perturb known ASD susceptibility genes
 5    through mutagenic chemical-gene
 6    interactions."
 7              And that's Carter and Blizard.
 8              "However, a paucity of evidence
 9    limits the current conceptualization of this
10    relationship to a very few exposures," and
11    then they cite us to Table 2 for those
12    exposures.
13              Okay?  And so now I want to
14    look at Table 2 where they told us to go
15    look.
16              Okay?  Are you with me?
17       A.    I'm on Table 2.
18       Q.    And it's called "Environmental
19    exposures associated with elevated ASD risk
20    and evidence of their potential mode of
21    mutagenicity/genotoxicity in vivo and/or
22    in vitro."
23              That's what they call this
24    table?
25       A.    That's the title of the table.
```

1      Q.     And of course at the top, we

2  see pollution, which we talked about, right,

3  air pollutants?  Right?

4      A.     Yes, there are air pollutions

5  under the category Air Pollutants.

6      Q.     And then if we want to look at

7  parental health factors, which is down there,

8  we see that.

9             You want to talk about that,

10  and that's there, isn't it?

11     A.     Yes, increasing parental age is

12  there.

13     Q.     Yeah.

14             And they say, "Increasing

15  parental age at the time of conception is

16  associated with an increased risk of ASD.

17  Odds ratio 1.41, maternal; paternal, 1.55,"

18  right?

19     A.     Correct.

20     Q.     Those are modest in your world,

21  right?

22     A.     They are.

23     Q.     Okay.  And then, of course, we

24  see heavy metals, and then we see "Inference

25  of endogenous DNA repair responses," and you

1    see they've got oxidative DNA damage?

2        A.    Yes, they have oxidative DNA

3    damage.

4        Q.    And then they list the

5    pollutants under the oxidative DNA damage,

6    don't they?

7        A.    Correct.

8        Q.    All right.  And then if we go

9    to page 716, the table goes on for a few

10   pages, and we have pre and postconceptual

11   drug use.

12            And there, again, on another

13   table, with other researchers, we see

14   acetaminophen, don't we?

15       A.    Acetaminophen is listed.

16       Q.    And right underneath it is

17   thalidomide, right?  Side by side or

18   underneath.

19       A.    Yes, I do see thalidomide

20   underneath that.

21       Q.    And under the link to ASD, they

22   say, "Meta-analytical review indicates

23   maternal use of paracetamol during pregnancy

24   increases risk of ASD in offspring, relative

25   risk 1.19.  And elevated biomarkers of

1    **paracetamol metabolites in umbilical cord**

2    **plasma is associated with childhood ASD, an**

3    **odds ratio of 2.14."**

4              **Do you see that, ma'am?**

5         A.    I do see that.  I would say the

6    exposure, in particular with the umbilical

7    cord plasma samples, I have trouble in terms

8    of making a story that puts together that

9    timing of exposure and the risk that we're

10   talking about, given that the hypothesis here

11   is that it's invoking DNA damage.

12        **Q.    Okay.  Well, I might be able to**

13   **help you with that concept when we get to Ji.**

14             **But in any event, Pugsley**

15   **references those studies and says that**

16   **paracetamol has been -- the link to ASD for**

17   **paracetamol is the meta-analysis and then Ji,**

18   **right?**

19        A.    I'm sorry, can you ask that

20   again?

21        **Q.    Yeah.**

22             **Pugsley cites two studies in**

23   **human beings that they say links**

24   **acetaminophen to autism.**

25        A.    Correct.  References 29 and

Confidential - Subject to Protective Order

```
 1   115, is that what you mean?
 2          Q.     Yes, ma'am.
 3          A.     Yes.
 4          Q.     And then to the right under
 5   "Evidence of mutagenicity, genotoxicity,"
 6   they say, "Oral doses of therapeutic doses of
 7   paracetamol induces oxidative stress-related
 8   gene expression in peripheral blood in humans
 9   in vivo; and elevated concentrations of
10   urinary" -- "urinary paracetamol is
11   associated with increased DNA fragmentation
12   in human sperm in vivo."
13          A.     That is what they state, but
14   what I would say is notably absent is what
15   they don't state.  Given that acetaminophen
16   is used quite widely, there are ample
17   opportunities to directly demonstrate
18   evidence of accumulated DNA mutations in any
19   number of studies that have been performed,
20   and I don't see any evidence of that effect.
21          Q.     Has anybody looked for it?
22          A.     I don't know all the studies
23   that have been done.
24          Q.     Have you seen even one where
25   anybody even attempted to look for it?
```

1        A.      Again, I don't know all of the

2    studies that have been done, but notably the

3    fact that it hasn't been reported, I think,

4    is notable.

5        **Q.      Do you think Johnson & Johnson**

6    **should look for that?**

7                MS. BROWN:  Objection to the

8        form.  Lacks foundation.

9                THE WITNESS:  I'm not going to

10        make a comment about what Johnson &

11        Johnson shouldn't do.

12    QUESTIONS BY MR. TRACEY:

13        **Q.      Well, who should be looking for**

14    **it?**

15                MS. BROWN:  Objection to the

16        form.

17                THE WITNESS:  There are many

18        large epidemiological studies that

19        have the ability to look for this

20        association; and in particular, this

21        type of variation is often seen with

22        other conditions or would be seen with

23        cancer.

24                And I've not seen, given the

25        widespread use of acetaminophen, of an

```
 1        association, for instance, with cancer

 2        associated with exposures.

 3   QUESTIONS BY MR. TRACEY:

 4        Q.     Okay.  Have you seen a study

 5   that looked for and said it's not there?

 6        A.     I haven't done a comprehensive

 7   review to look for it.

 8        Q.     Okay.  Don't you think you

 9   should do that?

10        MS. BROWN:  Objection.

11        Argumentative.

12        THE WITNESS:  Again, I think

13        what's notable is given the widespread

14        use and given the number of conditions

15        that could be associated, that it

16        hasn't come up and it would have been,

17        I think, very visible to me and to the

18        general public.

19   QUESTIONS BY MR. TRACEY:

20        Q.     How long did it take to figure

21   out that -- how long did it take to figure

22   out that lead was poisoning children?

23        MS. BROWN:  Objection to the

24        form.

25        THE WITNESS:  I did not do a
```

Confidential - Subject to Protective Order

```
 1           literature review to get the history

 2           of lead exposures.

 3                 MS. BROWN:  Mr. Tracey, can we

 4           take a lunch break when you get to a

 5           good stopping point?

 6                 MR. TRACEY:  Yeah, let me just

 7           finish this paper.

 8     QUESTIONS BY MR. TRACEY:

 9           Q.    Just below acetaminophen again

10     we see thalidomide, right?

11           A.    Yes, I see thalidomide.

12           Q.    On another list with

13     paracetamol by another group of researchers,

14     right?

15           A.    There's a different reference,

16     correct.

17           Q.    Yeah.

18                 And of course we see mercury

19     down there.  Mercury is a well-known

20     neurotoxicant, isn't it, Doctor?

21           A.    I haven't explored mercury.

22           Q.    You don't know that?

23           A.    I haven't explored mercury.

24           Q.    Okay.  If we flip over on the

25     next page, we'll see pre and postconceptual
```

1    drug use.  We see, there we go, marijuana

2    again, right?

3          A.      I do see, yeah, TCH {sic}.

4          Q.      Yeah.  Opioids, right?

5          A.      I see opioids listed.

6          Q.      And there's valproate again.

7    That's the generic name for Depakote, right?

8          A.      Valproate is listed.

9          Q.      Yeah.

10               And there is the -- looks like

11    the same studies you and I looked at in the

12    label, the 2.9 relative risk there for ASD.

13               Do you see that?

14          A.      I see that.

15               Importantly, again, what this

16    paper points out is that this is

17    hypothesis-generating with some very simple

18    experiments to test the hypotheses given our

19    ability to do DNA sequencing and directly see

20    mutations as they accumulate in individuals

21    over time.

22          Q.      Yeah, but let's be clear.  The

23    hypothesis is whether it's a mutagen causing

24    de novo mutations.

25               They're not hypothesizing

1    whether there's an ASD link to acetaminophen?

2              MS. BROWN:  Objection to the

3         form.

4              THE WITNESS:  And what I'm

5         saying is that exact idea about

6         whether or not they're inducing DNA

7         mutations is very easy to test, given

8         the common population exposure to

9         acetaminophen and the number of

10        genomic studies that have been

11        performed.

12   QUESTIONS BY MR. TRACEY:

13        Q.    Why doesn't Pugsley say that in

14   his paper?  Why don't they say, "Wow, this is

15   real easy to figure out.  Surely somebody's

16   figured it out.  I've written a 20-page paper

17   about it, and I can't figure it out"?

18             Why isn't that in their paper?

19             MS. BROWN:  Object to the form

20        of the question.  Compound.

21             THE WITNESS:  I can't guess

22        what Pugsley is thinking.

23   QUESTIONS BY MR. TRACEY:

24        Q.    Well, can you think of a

25   scientific reason why Pugsley -- if it's so

1    obvious to you, why Pugsley wouldn't put that

2    in his paper?

3              MS. BROWN:  Objection to the

4         form.  Speculation.

5              THE WITNESS:  Again, I can't

6         speak for these authors in terms of

7         what they may even be doing or have

8         done in the past.  I don't know.

9    QUESTIONS BY MR. TRACEY:

10        Q.    Have you counseled the lawyers

11   that represent Johnson & Johnson or Kenvue

12   that it'd be a good idea to look for that

13   kind of literature to find out whether their

14   drug that's been on the market since 1955 was

15   contributing to de novo mutations in humans?

16             MS. BROWN:  Objection to the

17        form.

18             THE WITNESS:  Again, this is a

19        very common exposure that's included

20        within many epidemiological studies

21        completely unrelated to autism or

22        ADHD, and I've not seen any published

23        reports of an association of any

24        conditions, notably things like

25        cancer.

1    QUESTIONS BY MR. TRACEY:

2         Q.      Yeah, but my question wasn't

3    about what you saw in the literature.  My

4    question is about counseling the lawyers that

5    represent the defendants in this case.

6              Have you had that conversation?

7         A.      I have not had that -- the

8    scope of my work has been to assess the

9    association between genetic factors,

10   acetaminophen, prenatal exposures and autism.

11   That's the scope of what I was asked to

12   render an opinion upon.

13              MR. TRACEY:  Okay.  Let's take

14         a break.  That's a long paper.  I'm

15         not done, so let's go ahead and take a

16         lunch break.

17              MS. BROWN:  Sounds good.

18              VIDEOGRAPHER:  The time is

19         12:40 p.m., and we're off the record.

20          (Off the record at 12:40 p.m.)

21              VIDEOGRAPHER:  The time is

22         1:18 p.m., and we're on the record.

23   QUESTIONS BY MR. TRACEY:

24         Q.      Hi, Doctor, are you ready?

25         A.      I am.

1          Q.     We were -- oh, sorry,

2     apparently I'm not.

3               We were talking about the

4     Pugsley paper before lunch, and I just had a

5     few more questions about it.  It's -- I guess

6     I should identify it again for the record.

7     Exhibit 313, right?

8          A.     Yes.

9          Q.     313.

10              And if we can bring it up

11    again, to Figure 2, which is page 718.  The

12    next page that -- yeah, there we go.

13              The authors have another

14    diagram for us to look at, and they call it

15    "The diagrammatic representation of the

16    impact of environmental factors on genomes

17    within parental germlines and offspring."

18              And they say, "ASD-associated

19    toxicants, e.g.," -- for example --

20    "herbicides and heavy metals, can induce de

21    novo mutations in parental germline cells

22    which may be transmitted to offspring in the

23    subsequent generation."

24              And then they say, "For

25    example, induce double-stranded breaks and

Confidential - Subject to Protective Order

```
 1    impaired BRCA1-directed homologous
 2    recombination, HR, DNA damage response, DDR,
 3    can elicit de novo mutations and hamper their
 4    repair.  Offspring may also acquire
 5    agent-induced mutations at later stages of
 6    development, resulting in somatic mosaicism.
 7    Genes impacted by these processes can lead to
 8    aberrant neural development and functioning
 9    contributing to the onset of ASD."
10              What they -- what they say
11    there, is that accurate scientifically?
12              MS. BROWN:  Objection to the
13         form.  Compound.
14              THE WITNESS:  So I think they
15         have what I would describe as a life
16         course schematic with a hypothesis
17         about how DNA damage can lead to de
18         novo mutations in the offspring.  So
19         I'm -- you know, I think that's what
20         they're trying to illustrate in the
21         figure.
22    QUESTIONS BY MR. TRACEY:
23         Q.    Okay.  And then when we look at
24    the figure, at the top of the diagram, it
25    says, "Mutagenic ASD-associated environmental
```

1    exposures."

2              And then they've just,

3    generally speaking, listed the categories

4    that we've already looked at on the table.

5              Remember those?

6    A.    Those are the same categories

7    they had in the table.

8    Q.    Yeah, air pollutants, heavy

9    metals, herbicides, industrial chemicals,

10   parental health factors and pre and

11   postconceptual drug exposure, and we looked

12   at many of those together, didn't we?

13   A.    We did review those before the

14   break.

15   Q.    Yes.

16             And then the next sort of arrow

17   down or step in the process, they have three

18   potential -- is it mechanism?  Is that the

19   right word to use when we're talking about

20   direct interaction or an impaired DNA damage

21   response or oxidative DNA damage?  Are those

22   mechanisms through which de novo mutations

23   can take place?

24   A.    So I think there are different

25   ways that DNA damage can occur, and very

Confidential - Subject to Protective Order

1    specifically there are signatures of DNA

2    damage that occur via different mechanisms,

3    and I think that's what they're trying to

4    illustrate.

5              And one can, in fact, see

6    signatures in terms of cause and effect by

7    looking at the DNA readout and seeing what

8    type -- not just that there are mutations,

9    but actually seeing the types of mutations

10   one has.

11       **Q.    Okay.  But you're being sort of**

12   **granular.  I'm asking as a threshold matter,**

13   **no matter how it happens, are the three**

14   **types -- descriptions there, direct**

15   **intervention, impaired DDR or oxidative DNA**

16   **damage, do we refer to those as mechanisms or**

17   **processes?  What would we call those?**

18       A.    I would call those more

19   processes by which the DNA damage occurs and

20   specific types of DNA damage that occur.

21       **Q.    Okay.  So oxidative, I know**

22   **from my cancer cases, which you referenced**

23   **cancer earlier, a biomarker of oxidative DNA**

24   **damage is 8-OHdG.**

25            **Are you familiar with that?**

Confidential - Subject to Protective Order

```
1        A.      No.

2        Q.      Okay.  Do you do -- do you look

3  at cancer cases?

4        A.      Clinically I do germline cancer

5  genetics, yes.

6        Q.      Okay.  Do you know what

7  biomarkers exist that are used to determine

8  oxidative DNA damage?

9            MS. BROWN:  Objection to the

10           form.

11           THE WITNESS:  Those are

12        something, I think, that are more

13        common with somatic.  I think you're

14        referring to somatic cancer changes,

15        and that's not predominantly where I

16        spend my time.

17  QUESTIONS BY MR. TRACEY:

18        Q.      Okay.  Fair enough.

19              Okay.  So we have these three

20  processes that we talked about in the middle,

21  all leading to de novo mutations according to

22  this chart, right?

23        A.      Yes.

24        Q.      And then if we follow it down,

25  they've got, you know, three different
```

1    periods.  They actually call it genotypic

2    consequences in developing offspring and

3    children, and then we have preconceptual,

4    that's postfertilization, right?

5         A.    No, I think pre --

6         Q.    Oh, preconceptual.  Sorry.

7         A.    -- conception is actually prior

8    to fertilization.

9         Q.    Yeah, sorry.

10             That would be like the exposure

11   in the mother or father before conception?

12        A.    Correct.  So that would affect

13   gametes.

14        Q.    Yes.

15             Things like damage to the

16   father's sperm?

17        A.    Correct, on the paternal side,

18   that's what it would be.

19        Q.    Are you familiar with the Smarr

20   study with respect to acetaminophen

21   damaging -- causing DNA damage in the male

22   sperm?

23             MS. BROWN:  Objection to the

24        form.

25             THE WITNESS:  I don't believe

1          that particular study, no.

2     QUESTIONS BY MR. TRACEY:

3          Q.     Okay.  And then we have

4     gestational, which is of course, you know,

5     the in utero, postfertilization exposure,

6     right?

7          A.     Yes, that would be in utero.

8          Q.     And then of course when we

9     reach the what my OB/GYN friends call the

10     extra uterine environment, after you're

11     delivered, we have early development.  These

12     are all three places where these de novo

13     mutations can occur.  Three time frames,

14     sorry.

15         A.     Sure.

16         Q.     Okay.

17         A.     And, in fact, they occur

18     through the life course as well.

19         Q.     Yes.  Yes.

20                All right.  Now, if you flip

21     over to the references, reference 163 that

22     Pugsley cites to is a paper by Hill and

23     Cabrera.

24                163?  Do you see it there?

25         A.     Yes.

Confidential - Subject to Protective Order

1      Q.     Now, you know Dr. Cabrera.  You

2  know who he is.  He's an expert in this case?

3      A.     Yes, I'm familiar with

4  Dr. Cabrera.

5      Q.     And are you familiar with

6  Dr. Finnell from the Finnell-Cabrera lab in

7  Houston?

8      A.     I don't personally know

9  Finnell.

10      Q.     Are you familiar with him?  Do

11  you know his work?  Are you aware of him?

12      A.     Not intimately familiar.

13      Q.     Have you ever met him in a

14  meeting or talked to him?

15      A.     No.

16      Q.     Okay.  Do you have an

17  understanding of whether the Finnell-Cabrera

18  lab has a reputation in the scientific

19  community?

20      A.     I'm sure they have a

21  reputation.  I'm not -- I'm not particularly

22  familiar with it.

23      Q.     Okay.  You're not familiar with

24  their lab and historically what they've

25  accomplished?

```
 1        A.      No.

 2        Q.      Okay.  I'm assuming you've

 3   never written a paper with Rick Finnell?

 4        A.      Not to my knowledge.

 5        Q.      Okay.  The paper that Pugsley

 6   cites to written by Robert and Rick and

 7   others is, "Autism-like behavior and

 8   epigenetic changes associated with autism as

 9   consequences of in utero exposure to

10   environmental pollutants in a mouse model."

11             I'm assuming you're not

12   familiar with that study?

13        A.      I don't believe I've read it,

14   no.

15             (Chung Exhibit 309 marked for

16        identification.)

17   QUESTIONS BY MR. TRACEY:

18        Q.      Okay.  Let's -- 309, please.

19             I'm going to hand you what's

20   Exhibit 329 -- sorry, 309.

21             MS. BROWN:  We're not going

22        sequentially?

23             MR. TRACEY:  Pardon me?

24             MS. BROWN:  These numbers --

25             MR. TRACEY:  No, of course not.
```

```
 1              MS. BROWN:  Okay.

 2              MR. TRACEY:  That would be too

 3        easy and too normal.  But you'll be

 4        happy to know, that results in much

 5        fewer -- many fewer exhibits so --

 6              MS. BROWN:  I'll take it.

 7              MR. TRACEY:  Yeah, I knew you

 8        would.

 9              MS. BROWN:  Thank you.

10   QUESTIONS BY MR. TRACEY:

11        Q.     So, Dr. Chung, this is a

12   PowerPoint from this year by Heather Volk and

13   others called, "Exploring Gene-Environment

14   Interactions in Autism Spectrum Disorder."

15              And if you turn the page and

16   look at the collaborators for this, you'll

17   see Johns Hopkins, Penn State, Kaiser

18   Permanente, University of Miami, et cetera,

19   et cetera.

20              Do you see any recognize?

21        A.     Sure, there's several.

22        Q.     Who?

23        A.     Dani Fallin, Rebecca Landa, Joe

24   Piven.

25        Q.     Joe Piven at UNC?  I've
```

Confidential - Subject to Protective Order

1    forgotten.

2          A.     Yes.

3          Q.     **Okay.  Yeah, there he is.  All**

4    **right.**

5          A.     Bob Schultz.

6          Q.     **Okay.**

7          A.     Those are the people I know.

8          Q.     **Okay.  And as I said, I'll sort**

9    **of set this again, the title of this**

10   **presentation is "Exploring Gene-Environment;**

11   **Interactions in Autism Spectrum Disorder."**

12                MS. BROWN:  And, Counsel, just

13          for the record, was this from a

14          website, or how did you get it?

15                MR. TRACEY:  Man, I don't --

16          oh, that's a great -- that's a great

17          answer.  I'm glad you asked that

18          question.

19                MS. BROWN:  All right.

20   QUESTIONS BY MR. TRACEY:

21         Q.     **What is SPARK?**

22         A.     SPARK is Simons Foundation

23   Powering Autism Research for Knowledge.

24         Q.     **Do you have anything to do with**

25   **SPARK?**

Confidential - Subject to Protective Order

```
 1          A.      I'm the principal investigator.

 2          Q.      This is from the SPARK website.

 3          A.      Okay.

 4          Q.      So this is off the website that

 5   you're a principal investigator on, Doctor.

 6   That's why I pulled it, actually.  Glad you

 7   reminded me.

 8                  Joe Piven, how do you know who

 9   Joe Piven is, or how do you know Joe -- or

10   Dr. Piven, I should call him?

11          A.      He's a researcher in the autism

12   field.

13          Q.      Okay.  Were you aware that the

14   website that you're a principal investigator

15   for presented with all of these different

16   collaborators this exploring gene-environment

17   interactions in autism spectrum disorder?

18                  MS. BROWN:  I'll just object as

19          lacking foundation.

20                  THE WITNESS:  So to clarify,

21          this is not my study from SPARK.  We

22          have invited guests that we invite to

23          be able to discuss scientific topics,

24          and we post those topics for the

25          public to be able to see, and this is
```

1        one of those topics.  This is one of

2        these talks.

3   QUESTIONS BY MR. TRACEY:

4        Q.     I was just asking you, are

5   you -- were you aware of this, that it was on

6   your website?

7        A.     I don't recall listening to

8   this particular talk.

9        Q.     Okay.  I really just have a few

10  questions about it.  If we flip over to my

11  page 13, 13 of it, you'll see that Heather

12  Volk and the other collaborators --

13            MS. BROWN:  Sorry.  Ours is not

14       paginated.

15            MR. TRACEY:  Well, you're not

16       going -- these aren't complicated.

17       Trust me on this one.

18            MS. BROWN:  It's right after

19       this one.  Here, take mine.

20  QUESTIONS BY MR. TRACEY:

21       Q.     You see on my page 13 --

22       A.     I got it.

23       Q.     They use the Figure 1 from

24  Grandjean and Landrigan that you and I looked

25  at early in the deposition.

1      A.      Sure, I see it.

2      Q.      **And then on my 49, which I**

3   **apologize, yours isn't marked, there's a**

4   **slide called "Genes and environment in**

5   **SPARK."**

6              **Are you aware of the genes and**

7   **environment SPARK research that's going on?**

8   **GEARS?  I think it's called GEARS?**

9      A.      I'll explain it in just a

10  second.  I just want to make sure I've got

11  the page.

12             MS. BROWN:  How much farther do

13      we go in?

14             MR. TRACEY:  I don't know.

15      It's my page 49.  I thought everybody

16      had paginated.

17             MS. BROWN:  We'll get there.

18             THE WITNESS:  On this one.

19      Okay.

20             MR. TRACEY:  I'd say it's

21      three-quarters of the way through.

22      It's long.

23             THE WITNESS:  Yep.

24             MR. TRACEY:  Yeah, it's on the

25      screen.  I mean, I --

```
1               THE WITNESS:  So -- yeah.  So,
2         let me explain how SPARK works.
3               So we have sites throughout the
4         country, clinical-affiliated sites.
5               Within this, we open this up to
6         something called research match, where
7         we try and make it easier for
8         researchers to do research with the
9         SPARK community.
10              Through that process, these are
11        not SPARK-endorsed, but we try to
12        enable, as I said, people to do
13        research more effectually and
14        efficiently, and the GEARS study is
15        one of the groups that has used our
16        research match mechanism.
17              And we send invitations to our
18        research community about participation
19        within research-matched studies such
20        as GEARS.
21   QUESTIONS BY MR. TRACEY:
22        Q.    And this is -- so I found this
23   PowerPoint on the SPARK website, and you --
24   are you familiar with the Genes and
25   Environment Autism Research Study that's
```

Confidential - Subject to Protective Order

1    ongoing now?

2         A.     So this is not -- even though

3    we have it on the SPARK website, this is not

4    my study.  These are the investigators, and

5    you'll note that I'm not listed as one of

6    those investigators.

7         Q.     I actually don't think that's

8    true.

9                Can you turn to page 58,

10   please?  It's called the GEARS network.

11        A.     So the GEARS network, which is

12   different.

13        Q.     Oh, I see.  Okay.  Fair enough.

14               You're not one of the

15   investigators though?

16        A.     I'm not one of the GEARS

17   investigators.

18        Q.     But if we look at the GEARS

19   network, you're on there, aren't you?  You're

20   on there twice as being one of the GEARS --

21   two of the GEARS?

22        A.     So maybe you can show me what

23   you're pointing to.

24        Q.     Well, I'm assuming SPARK Chung

25   is you?

Confidential - Subject to Protective Order

```
 1        A.      SPARK Chung is me, representing

 2   the SPARK study.

 3        Q.      Okay.

 4        A.      And then I guess you're

 5   pointing to SSC, Simons Simplex Collection.

 6                Is that what you mean?

 7        Q.      Yes.

 8        A.      So in both of these, these are

 9   cohorts for autism.  SCC stands for Simons

10   Simplex Collection, and at the time that I

11   was at the Simons Foundation as the director

12   of clinical research, I was the

13   representative for both of those studies.

14                I'm no longer representing the

15   Simons Simplex Collection.

16        Q.      So -- but in March of this year

17   you were?

18        A.      As of March 2023, I was.

19        Q.      And what this PowerPoint says

20   the GEARS network is, it says "it's an

21   infrastructure for GxE."

22                That's genes and environment,

23   right?

24        A.      GxE stands for genes by

25   environment.
```

```
 1          Q.      And the GEARS network we see in

 2   the top, "Combining advances in genomics and

 3   environmental science to accelerate

 4   actionable research and practice in ASD."

 5          A.      That is the acronym for GEAR,

 6   yes.

 7          Q.      Okay.  And it says it's got

 8   18 network sites and plans to add more.

 9                  That's part of the

10   infrastructure, right?

11          A.      That's up to those

12   investigators, but I presume those are their

13   plans.

14          Q.      And then it says, "175,000

15   individuals."

16                  That's a large number, isn't

17   it?

18          A.      It is a large number.

19          Q.      "Translational laboratory

20   models."  That's part of their

21   infrastructure, right?

22          A.      Again, this is their research,

23   but...

24          Q.      Okay.  And "mini-brain models

25   and community advisory board and outreach."
```

Confidential - Subject to Protective Order

1              That's what their

2   infrastructure they say consists of?

3       A.    Again, this is -- this is their

4   research, so I presume if that's what they

5   said and these are their slides, then that's

6   what they intend to do.

7       Q.    And you told me earlier in the

8   deposition you've never heard of Heather

9   Volk; is that right?

10      A.    I don't know her personally,

11  no.

12      Q.    That's different than never

13  having heard of her.

14            My question earlier was, have

15  you ever heard of her before?

16      A.    No.  I mean, her name doesn't

17  ring bells for me.

18      Q.    Okay.  And yet here you are,

19  not once, but twice, in the GEARS network

20  where she's the principal investigator?

21      A.    Again, in doing this, you can

22  see many of these cogs here, given that we

23  give many, many people access to SPARK

24  through the research match mechanism, there

25  are many people that I don't know who are

1  using our resources, hundreds of

2  investigators around the world.

3     **Q.    Wait.  It's not just your**

4  **resources.  There's 18 different databases**

5  **that are being accessed here, right?**

6     A.    My point being -- and I'm

7  sorry, I wasn't clear on this -- is that we

8  try and make our data freely accessible, and

9  we may try and enable more research to be

10  done in autism.

11         I don't know most of the people

12  who use our resources, but we try and make

13  this, as I said, a learning environment and

14  make people as productive as possible.

15         So it's not surprising that I

16  don't know her as I don't know most of the

17  people who use our resources.

18     **Q.    Okay.  And they're mining your**

19  **resources researching for the GxE connection,**

20  **right?**

21         MS. BROWN:  Objection.

22     Speculation.

23         THE WITNESS:  Based on the

24     slides that you've shown here, that is

25     what GEARS -- it looks like.  I don't

1          see specific aims, per se, but it does

2          look like they're trying to look for

3          genomics and environmental

4          interactions.

5      QUESTIONS BY MR. TRACEY:

6          Q.      **Does SPARK keep track of**

7      **environmental exposures?**

8          A.      Can you define what you mean by

9      "keep track of"?

10         Q.      **I don't know how else to ask**

11     **that question.**

12         A.      Do we have sensors in people's

13     homes?  No.

14         Q.      **Those are the only two options,**

15     **sensors in people's homes versus --**

16         A.      I'm trying, and if you can be

17     more specific about your question, then I can

18     try and answer.

19         Q.      **Do you ask about exposures when**

20     **people register with SPARK?**

21         A.      It's not a systematic thing

22     that we do.  There are people who have used

23     SPARK participants to be able to do those

24     types of studies, and we encourage people to

25     use SPARK in those types of ways.

Confidential - Subject to Protective Order

1           So what I call SPARK central,

2    that has not been our focus, but many other

3    researchers have administered questionnaires

4    and surveys to understand those potential

5    exposures.

6           **Q.     So other people, other than you**

7    **as the principal investigator, would have to**

8    **ask the exposure questions because you're not**

9    **doing it yourself in SPARK central?**

10          A.     So we set this up as a learning

11   ecosystem --

12          **Q.     Okay.**

13          A.     -- in which other -- we invite

14   the community, the research community, to be

15   able to think of good questions to ask, and

16   we provide essentially the infrastructure to

17   efficiently ask and gather those data.

18          **Q.     No, I understand that.**

19          A.     But we allow the community to

20   scientifically drive the questions.

21          **Q.     No, I understand that.**

22          **My question, though, is, does**

23   **SPARK central -- is that you, SPARK central?**

24          A.     I am the principal

25   investigator, and, yes, I run SPARK

1    centrally.

2        Q.    Does SPARK central ask any

3    questions, interrogate or try to figure out

4    exposures?

5              MS. BROWN:  Objection to the

6         form.

7              THE WITNESS:  Again, the model

8         is that this is meant to be a

9         collaborative scientific model, and so

10        SPARK does the central recruitment to

11        be able to develop and retain and

12        engage the community --

13   QUESTIONS BY MR. TRACEY:

14        Q.    Okay.

15        A.    -- while we allow scientists

16   really to ask the questions.

17        Q.    I see.

18              So SPARK central isn't asking

19   any questions?

20        A.    SPARK central provides

21   infrastructure for scientists to be able to

22   ask questions.

23        Q.    Yes.

24        A.    We also provide infrastructure

25   to be able to disseminate the learnings from

Confidential - Subject to Protective Order

1  those scientists back to the community.

2       Q.    Sure.

3       A.    And within this, there are

4  central things that we will develop in terms

5  of genomic datasets that we will make freely

6  available to anyone in the community to be

7  able to analyze the data.

8       Q.    What I'm -- I appreciate that.

9  It's becoming more clear.

10            What I was wondering is when

11  somebody -- I think you call it enroll in

12  SPARK, right?  That's what I've seen.

13      A.    Uh-huh.

14      Q.    When a -- a child or parents

15  enroll, right, and even adults, but you don't

16  have very many of those, but when they

17  enroll, do they answer any questions when

18  they enroll that would include prenatal

19  exposure questions?

20      A.    For the most part, the

21  questions that we ask are questions related

22  to if the diagnosis was made, confirming the

23  diagnosis, being certain of the autism

24  diagnosis, asking questions about things like

25  medications that are used for the treatment

1   of autism and issues related to family

2   members so that we know who else within the

3   family to invite to be part of SPARK.

4          Q.      Okay.

5          A.      We focus on those types of

6   questions.

7                  And then we do have other

8   things that we can ask clinical sites to be

9   able to help provide data.

10                 So, as an example, if we have

11  imaging data like brain MRIs or EEGs that

12  family would not have directly access to

13  themselves but clinical sites would have,

14  then they help to enrich with the family's

15  permission those additional very granular

16  clinical data.

17         Q.      Okay.  So I didn't hear you say

18  that SPARK central asked any questions about

19  exposure.

20                 Is that accurate?

21         A.      For the most part, trying to

22  minimize the burden on families.  We are

23  allowing the scientific community to be able

24  to design how and what questions to ask, and

25  we were also letting families decide their

Confidential - Subject to Protective Order

1    level of engagement and the burden for the

2    participation.

3         Q.    No, fair.  I'm not being

4    critical.  I'm just trying to understand it.

5              Okay.  So the scientific

6    community then, depending on the willingness

7    of the families involved and their level of

8    engagement, as you said, can ask the

9    questions related to environmental prenatal

10   exposures?

11        A.    Correct.  And then --

12        Q.    Oh, sorry.

13        A.    And then those data, as they

14   are collected, become part of the central

15   resource where organically any researchers

16   can ask -- see the data and ask questions

17   themselves and analyze the data, so that

18   those organically can evolve into more and

19   more complex questions and study designs can

20   be addressed.

21        Q.    Okay.  And do you have -- and

22   then you get access -- you meaning SPARK

23   central.  You then have access to the

24   information that the other scientists in the

25   community are putting together when they

Confidential - Subject to Protective Order

1    engage the families and get the information?

2          A.      So there is a time when those

3    investigators have the data to publish, and

4    then when they publish the data, those data

5    are deposited back in SPARK central for other

6    researchers to be able to use.

7                (Chung Exhibit 320 marked for

8          identification.)

9    QUESTIONS BY MR. TRACEY:

10         Q.      Okay.  This is Exhibit 320,

11   please.

12                This is from your website.  You

13   can see it's SPARK.

14                Do you see that?  This is from

15   two weeks ago.  Yeah, two weeks ago almost

16   exactly.

17                There we go.  Oh, no, it's from

18   three days ago again.

19                SPARK for Autism.  That's you,

20   right?

21         A.      Yeah.

22                MS. BROWN:  Hang on one sec.

23         We're just getting our papers

24         together.  Do you have that?

25                Oh, is this just the title of

1          your folder?

2                    MR. TRACEY:  Yeah.

3                    MS. BROWN:  Okay.

4                    MR. TRACEY:  You can keep it.

5                    MS. BROWN:  Thanks.

6     QUESTIONS BY MR. TRACEY:

7          **Q.     All right.  So this is from**

8     **your website, SPARK, Simons Powering Autism**

9     **Research, right?**

10         A.     Correct, that's from the SPARK

11    website.

12         **Q.     And do you know who Emily**

13    **Singer is?**

14         A.     She's a writer.

15         **Q.     Okay.  For SPARK?**

16         A.     Science, communicator, writer,

17    yes.

18         **Q.     But I mean, for you, for SPARK.**

19         A.     She works for the Simons

20    Foundation, but...

21         **Q.     Okay.  You know her?**

22         A.     I do know her.

23         **Q.     Okay.  And she's put up this**

24    **web page, I guess, is the name of it, Study**

25    **Spotlight:  GEARS study.  And then she writes**

Confidential - Subject to Protective Order

1    that, "Research suggests that environmental

2    factors, such as a parent's age or the

3    mother's infection during pregnancy, can

4    contribute to autism risk, but identifying

5    those factors has been incredibly

6    challenging.  Studies often have conflicting

7    results.  One might find that exposure to

8    air pollution increases risk for autism,

9    while another finds no such link."

10                 By the way, have you ever seen

11   this before today?

12        A.    No.  I haven't seen this

13   particular blurb on the website, no.

14        Q.    Do you spend any time on the

15   website?

16        A.    I have a lot of things that I

17   do, so I have a large team that manages many

18   of the details like this.

19        Q.    Okay.  Who manages the website

20   for you?

21        A.    There's a woman by the name of

22   Beverly Robertson.

23        Q.    And what is her background?

24        A.    She's our communications

25   director.

Confidential - Subject to Protective Order

1          Q.      Okay.  Does anybody approve the

2    content for scientific accuracy?

3          A.      Well, Emily Singer is herself a

4    scientist.

5          Q.      Oh.  What kind of scientist?

6          A.      I don't recall her degree.

7          Q.      So she's a scientist.

8                  She goes on to say, Emily does,

9    the scientist, "One reason for this

10   discrepancy could be that that environmental

11   and genetic risk factors can interact.  In

12   other words, an environmental variable, such

13   as air pollution, might increase autism risk

14   only in people who are genetically

15   susceptible.  A classic example of this type

16   of interaction is phenylketonuria, a

17   metabolic condition linked to intellectual

18   disability.  Children with the disorder are

19   at risk of brain damage, but only if they eat

20   a high-protein diet.  An environmental

21   factor, diet, and a genetic factor, a faulty

22   metabolism gene, interact to cause

23   phenylketonuria.  Early screening and a

24   special diet drastically reduce symptoms.

25   All infants in the United States are tested

1    for this disorder."

2              Did Emily -- what she wrote

3    there, is all that correct?

4         A.    Yes, all of that's correct.

5    Phenylketonuria is a very specific use case,

6    but, yes.

7         Q.    But if you don't have -- you

8    can have the gene, but if you don't have the

9    right environment, you won't get sick, right?

10             MS. BROWN:  Objection to the

11        form.

12             THE WITNESS:  This is a

13        medical, metabolic diet that we give

14        these children, so just to -- for

15        people who may not realize this, this

16        is not just, like, not eating a steak

17        sandwich.  I mean, this is a metabolic

18        diet that is deprived in phenylalanine

19        to be able to avoid the inborn error

20        of metabolism associated with this.

21   QUESTIONS BY MR. TRACEY:

22        Q.    Okay.  I agree.

23             But what you're doing is

24   controlling the diet, right?

25        A.    I mean, there are multiple

1   examples medically where we, as part of our

2   treatment, will either have ways of being

3   able to deplete the body of something that

4   happens, being able to go around a metabolic

5   block, being able to do substrate inhibition.

6   If you want to call that environment because

7   it's anything that's not the genes, yes,

8   that's what we try and do in medicine, is we

9   try and treat people with these conditions.

10          **Q.     Well, I mean, it's not me**

11  **wanting to call it that.  It's Emily Singer**

12  **from SPARK calling it that.  She says it's an**

13  **environmental factor, diet.**

14          A.     Again, point of clarification,

15  Emily Singer from the Simons Foundation,

16  but --

17          **Q.     Oh.**

18          A.     -- yes, as she's written this,

19  she is writing an example that people may

20  have familiarity with because phenylketonuria

21  is something we include in newborn screening.

22  So something every baby in the United States

23  is screened for.

24          **Q.     And it's highly treatable,**

25  **isn't it?**

Confidential - Subject to Protective Order

```
 1        A.      It is, if recognized early.

 2        Q.      Yeah.

 3                They go on to say, Emily does,

 4   from the Simons Foundation, "Heather Volk and

 5   collaborators at Johns Hopkins University in

 6   Baltimore aim to explore whether this type of

 7   interaction also applies to autism," and then

 8   she starts a quote.  "'We think that autism

 9   can't be explained only by genes or

10   environmental factors alone,' Volk says.

11   "'It's likely a combination of these two

12   things working together.'"

13                Is Heather Volk correct?

14                MS. BROWN:  Objection to the

15        form.

16                THE WITNESS:  I think Heather

17        Volk is performing GEARS to answer

18        that question.  I don't think she has

19        data yet to know the answer.

20   QUESTIONS BY MR. TRACEY:

21        Q.      So when she says, "We think

22   that autism can't be explained only by genes

23   or environmental factors alone," you think

24   she's premature in making that statement on

25   your website?
```

1      A.      Well, I think we can go back to

2   data that we've talked about before with the

3   heritability of 80 to 90 percent, the

4   overwhelming majority of the probability is

5   associated with genetics.  That number is not

6   100 percent, so there clearly is something

7   nongenetic, but the overwhelming

8   preponderance of risk and the risk that we

9   have strong data to support with replication

10  are genetic factors.

11      Q.      **Doctor, heritability includes**

12  **the environment, doesn't it?**

13              MS. BROWN:  Objection to the

14      form.  Misstates her testimony.

15              THE WITNESS:  Not in the way we

16      define heritability, no.

17  QUESTIONS BY MR. TRACEY:

18      Q.      **Not in the way you define**

19  **heritability?**

20      A.      Not in the way that the genetic

21  scientific community defines heritability.

22      Q.      **Can you point me to a source, a**

23  **reference, that defines it your way; that is,**

24  **heritability by definition excludes any**

25  **environmental contribution?**

```
 1              MS. BROWN:  Objection to the

 2         form.

 3              THE WITNESS:  Again, as we

 4         think about heritability, these are

 5         based on twin studies.  The most

 6         robust of those twin studies include

 7         twins who are reared apart.  And so in

 8         terms of being able to control for the

 9         environment, that does the best that

10         we biologically can in terms of

11         keeping the genes constant and the

12         environments even different.

13    QUESTIONS BY MR. TRACEY:

14         Q.    Do you remember my question?

15         A.    Can you repeat your question?

16         Q.    Yeah.  I want to look up a

17    site, a source, that says what you said.  I

18    want somebody other than Wendy Chung saying

19    what you say.  The claim is, as I understand

20    it, that heritability means genes, genetics

21    and only genetics, and ignores the

22    environment.  There is no environmental

23    contribution to heritability in your world.

24              I want somebody other than you

25    who is somebody that knows what they're
```

1    talking about that will confirm that.

2              MS. BROWN:  Objection to the

3         form of the question.

4              THE WITNESS:  So most standard

5         genetic textbooks, human genetic

6         textbooks, will, in fact, say the same

7         thing that I've just said.

8    QUESTIONS BY MR. TRACEY:

9         Q.    Give me the name of one.

10   Because I'm going to go -- on a break, I'm

11   going to go look it up and I'm going to see

12   if it says what you say.

13        A.    So you can probably go to any

14   standard genetic textbooks that will define

15   heritability and will define heritability as

16   I just have.

17        Q.    Give me the name of one.

18        A.    Emery and Rimoin.

19        Q.    Emery and?

20        A.    Emery and Rimoin.

21        Q.    Okay.  Can somebody look that

22   up?  I want to see if it says that.

23              Because that's the first time

24   I -- I've read a lot of genetics in

25   preparation for your deposition, and every

1   definition of heritability is the one that I

2   read to you at the beginning, which is the --

3   which is the phenotype is the combination of

4   the gene -- of the genes and the environment.

5       A.      With all due respect, having

6   spent my career doing this, I think there may

7   be some misunderstanding.

8       Q.      Tell me -- so you -- why is

9   it -- I'll tell you what.  Let's do this.

10  Bring up her tape.  Her tape.

11              I've got a tape of you I want

12  to play for everybody.  And we're going to

13  see if we can untangle what it is you're

14  saying.

15              As I understand it, this is --

16  what you're about to see is you speaking

17  about genes and environment.

18              I guess we should give it an

19  exhibit number.

20              MS. BROWN:  Yeah, and can you

21      tell us where it's from and the date?

22              MR. TRACEY:  It's from her

23      website.

24              MS. BROWN:  Her website?

25              MR. TRACEY:  SPARK.

Confidential - Subject to Protective Order

```
1            MS. BROWN:  Okay.

2            (Chung Exhibit 300 marked for

3    identification.)

4            (Video played.)

5            MR. TRACEY:  All right.  That's

6    it.

7            MS. BROWN:  And just for the

8    record, would you guys mark the

9    entirety of this PowerPoint as an

10   exhibit?

11           MR. TRACEY:  Yeah, I'm going to

12   use it next.

13           MS. BROWN:  Okay, great.

14           MR. TRACEY:  I've got it

15   marked.

16           MS. BROWN:  Great.

17           MR. WATTS:  What was the number

18   for the video?  Get that on the

19   record.

20           MR. TRACEY:  What is the number

21   for the video, Danny?

22           What is it?

23           DANIEL OLIVO:  300.

24           MR. TRACEY:  300.  That's

25   Exhibit 300.
```

1          MS. BROWN:  Okay.  And do we

2      have a date of the video or just

3      accessible on --

4          MR. TRACEY:  I'm going to get

5      to that.  Give me a minute.  Give me a

6      minute.

7          MS. BROWN:  Okay.  I just want

8      to make --

9          MR. TRACEY:  I've just begun.

10         MS. BROWN:  -- a clear, clear

11     record.

12         MR. TRACEY:  Can you -- back up

13     to the -- to the actual -- to the last

14     slide on this.  Yeah, just back it up,

15     like, 30 seconds.

16 QUESTIONS BY MR. TRACEY:

17     **Q.    Now, here's my question to you.**

18 **That's you, isn't it, speaking?**

19     A.    That is me.

20     **Q.    Does Wendy Chung, this Wendy**

21 **Chung today, Dr. Wendy Chung, agree with what**

22 **that Wendy Chung said?**

23     A.    I'll state again, which is what

24 I was trying to say within this video, aimed

25 at a lay audience to be able to make things

1  simple, is that it's complicated.  And

2  genetics are a strong factor.  As I've shown

3  here and as I say in the video and throughout

4  the rest of the video, genetics are a very

5  strong factor in this, in fact, the

6  overwhelming contributor in terms of

7  probability, but it's not 100 percent.  That

8  heritability is not 100 percent; it's 80 to

9  90 percent.  And so there are nongenetic

10  factors, and I've demonstrated what people

11  have said were associated features in the

12  past.

13          At the end of the day, it will

14  require a complex analysis, which includes

15  being able to control for genetic factors to

16  understand which of these nongenetic factors

17  are at play.

18      Q.    **Can you answer my question?**

19      A.    Can you repeat your question?

20      Q.    **Yeah.**

21          **Are all of the things that we**

22  **just played for the jury of Wendy Chung on**

23  **this PowerPoint, this presentation, do you**

24  **agree with every word you said when you said**

25  **them?**

1          MS. BROWN:  Objection.  Asked

2     and answered.

3          THE WITNESS:  So, again, being

4     able --

5  QUESTIONS BY MR. TRACEY:

6     Q.    **There's no again.  You didn't**

7  **tell me.**

8          MS. BROWN:  No, no, no.  She --

9          MR. TRACEY:  You have to tell

10    me whether you agree with them.

11         MS. BROWN:  No, sir.  She has

12    to answer your question truthfully --

13         MR. TRACEY:  No, no, no.  No,

14    no.  We're not playing that game.

15         MS. BROWN:  I'm sorry, you

16    cannot cut her off.

17         MR. TRACEY:  We're not playing

18    that game.

19         MS. BROWN:  Okay.  She's --

20         MR. TRACEY:  I'm entitled to --

21         MS. BROWN:  -- going to answer

22    your question.

23         MR. TRACEY:  Look, I'm entitled

24    to an answer to the question.

25

1    QUESTIONS BY MR. TRACEY:

2         Q.    **Do you agree with what you said**

3    **or not?**

4              MS. BROWN:  And you can answer

5         that in any way you see fit.

6              MR. TRACEY:  Well, you've got

7         to answer it.

8              MS. BROWN:  You don't -- she is

9         going to.

10             MR. TRACEY:  No, you're --

11        you're --

12             MS. BROWN:  You're

13        interrupting.

14             Wait.  That's --

15             MR. TRACEY:  I'm entitled to an

16        answer.

17             MS. BROWN:  First of all,

18        that's not professional or

19        appropriate.

20             Second of all, please allow her

21        to answer the question and you can

22        follow up.

23             Go ahead, Dr. Chung.

24             MR. TRACEY:  I was trying to

25        follow up.  I just don't want the same

```
 1            answer all over again.  I heard ya.
 2                 MS. BROWN:  But you're going to
 3            get whatever answer she gives you.
 4                 MR. TRACEY:  Okay.
 5                 MS. BROWN:  Go ahead.
 6                 THE WITNESS:  Okay.  So, again,
 7            autism is complicated.
 8       QUESTIONS BY MR. TRACEY:
 9            Q.     I don't care about that.
10                 MS. BROWN:  No, no, no.
11                 MR. TRACEY:  I've heard that a
12            hundred times today.
13                 MS. BROWN:  No, no, no.  No,
14            sir.  You need to let her finish.
15       QUESTIONS BY MR. TRACEY:
16            Q.     Let's do it this way.
17                 I want to know whether any of
18       those words that we just played for the jury,
19       whether any of those words you want to take
20       back today, or do you stand by them?
21            A.     I stand by we have created and
22       I have created SPARK to address what are
23       extreme complexities for a very complex
24       condition.  To be able to get at the
25       underlying truth about what increases risk
```

1   for autism is going to take large numbers of

2   individuals where we have multiple streams of

3   data to be able to understand this complexity

4   of etiology.

5        **Q.    Let me ask you this.  Nowhere**

6   **in that four-minute talk section of this**

7   **PowerPoint, that presentation, did you claim**

8   **that genetics was overwhelmingly the cause of**

9   **autism, did you?**

10       A.    We would have to go through the

11  entirety of my presentation for me to recall

12  exactly what I stated about the genetics, but

13  my recollection is that I did refer

14  repeatedly to the fact that genes were a

15  very, very important component.  And I'm

16  guessing I say the predominant, although I

17  don't know if I gave specific numbers.

18       **Q.    Okay.  Did you prepare this**

19  **slide that's on the screen right now that's**

20  **called Causes of Autism?**

21       A.    Collectively, the SPARK team

22  put the slides --

23       **Q.    And what you have is you have**

24  **two circles, don't you?**

25       A.    Yes.

1      Q.      The circles are the same size,

2  aren't they?

3      A.      They happen to be the same

4  size, but that's not to represent the

5  contributions of the two.

6      Q.      Well, that's certainly what

7  somebody would get from it, isn't it?

8      A.      I don't know what they would

9  get from it.

10      Q.      Okay.  On the left, you have

11  genetic factors, and you have inherited and

12  de novo, right?

13      A.      Yes.

14      Q.      And on the right, you have

15  environmental factors, and those two circles

16  of equal size intersect, don't they?

17      A.      Yes.

18      Q.      What you're saying here is the

19  causes of autism, and what you said on the

20  part of the tape we just played, is that

21  autism is a complex interaction -- I wrote it

22  down -- "a complex interaction of genes and

23  environment."

24              That's what you said, right?

25      A.      Yes.

1      Q.      That's true, isn't it?

2      A.      It depends on the individual,

3 and it depends --

4      Q.      Of course.

5      A.      -- on the contributing factors

6 for each individual.

7      Q.      Of course it does.

8      A.      For instance, environmental

9 factors, nongenetic factors, can include

10 prematurity as an example.  And within this,

11 to show you the complexity, there are many

12 factors that can contribute to this.

13            You'll also note that I do not

14 have acetaminophen listed on this, nor do I

15 refer to acetaminophen in the talk that I

16 gave.

17      Q.      I did notice that.  I'm going

18 to come -- I'm going to get to that in a

19 second.

20            But you don't mention

21 prematurity under environmental factors.

22 That's not one of the factors you list for

23 this talk, is it?

24      A.      I did not attempt to go

25 exhaustively through every possible thing,

1    including prematurity.  I was trying to refer

2    to that when I was talking about the

3    different life stages and, again, for a lay

4    audience, trying to make this relatively

5    simple.

6         **Q.    Okay.  But what you did put**

7    **on -- and this is years before you were hired**

8    **by the lawyers for Johnson & Johnson, right?**

9         A.    Can you remind us what -- when

10   this talk was given?

11        **Q.    I think it was 2017, although I**

12   **have a PowerPoint I'm going to use with you**

13   **that has the exact same slide from this year.**

14        A.    Okay.  So if this was 2017,

15   this was while we were still evolving in

16   terms of some of our understanding of this

17   complexity.

18        **Q.    Okay.**

19             MS. BROWN:  And just for the

20        record, do we have a date of the video

21        that we can put on the record?

22             MR. TRACEY:  It's on her

23        website.  You can go look at it, I

24        mean.

25             MS. BROWN:  Okay.  But I --

1          just the people who read this

2          transcript aren't going to be

3          looking at the --

4              MR. TRACEY:  Somebody pull it

5      up.  I want to say it's 2017.

6              MS. WATTS:  It's going to be

7      March '17.

8              MR. TRACEY:  What is it?

9              MS. BROWN:  Thank you.

10             MS. WATTS:  I can confirm it's

11     2017.

12             MR. TRACEY:  Okay.  2017.

13             MS. BROWN:  Thank you.

14   QUESTIONS BY MR. TRACEY:

15       **Q.     All right.  What you do have on**

16   **your PowerPoint is on causes of autism on the**

17   **right, environmental factors, you do have**

18   **in utero exposure to valproic acid?**

19       A.     So those were associations that

20   were published as of the time of this talk.

21       **Q.     Yes.**

22          **Did you believe it?**

23       A.     At that point, specifically at

24   the time that we had that, those were the

25   best studies at the time.

1        Since then, there have been

2   improvements in terms of some of the

3   epidemiological studies that have been done

4   to do -- to go back and readdress the same

5   questions, oftentimes adding complexity to

6   the studies.

7        **Q.    Are you aware of evidence that**

8   **exonerates valproic acid as a teratogen now?**

9   **Is there something that's changed?  That's**

10  **what you're implying?**

11            MS. BROWN:  Objection to the

12       form of the question.

13            THE WITNESS:  Again, as we've

14       talked about, I haven't recently done

15       a deep dive in terms of reviewing all

16       of the evidence for valproic acid.

17            (Chung Exhibit 315 marked for

18       identification.)

19  QUESTIONS BY MR. TRACEY:

20       **Q.    I'll tell you what.  Let's do**

21  **this.  Give me Exhibit 315.**

22            **Here's a PowerPoint of yours,**

23  **Dr. Chung, from April 2015 --**

24            (Audio interference.)

25            Just so we don't get confused

Confidential - Subject to Protective Order

1    about dates, this is a PowerPoint of yours

2    with your name on it from April of this year,

3    and you're going to see the exact same

4    slides?

5              Okay?

6              MS. BROWN:  In fairness, we

7         don't know if it's the exact same

8         slides because we don't have those

9         slides.

10             MR. TRACEY:  Yeah.  I'm about

11        to hand them to you, and if I'm wrong,

12        I'm certain Dr. Chung will tell me I'm

13        wrong.

14   QUESTIONS BY MR. TRACEY:

15        Q.    So this is exhibit -- what did

16   I say, 315?  First page.

17             You recognize this as a

18   PowerPoint you gave, "SPARK and The Future of

19   Autism Research"?

20        A.    Yes, I do recognize the title

21   slide.

22        Q.    And that of course has your

23   name on it, MD, Ph.D., April 25, 2023, just a

24   few months ago?

25        A.    Yes.

1      Q.     And so if we flip over, there's

2   a slide -- I'm sorry, this is not numbered

3   either.  It's the one that says, "Autism is

4   complex.  It's not a single condition, and

5   many individuals have related challenges."

6            Oh, there we go.

7            Do you see that slide?

8      A.     I do.

9      Q.     Did you prepare that slide?

10     A.     I and my team did, yes.

11     Q.     And you've got "autism spectrum

12  disorder," and then you have a variety of

13  other conditions associated with autism

14  spectrum disorder.

15           Is that right?

16     A.     That's correct.

17     Q.     And of course we see ADHD up

18  there on the left-hand side at the top, don't

19  we?

20     A.     Yes.

21     Q.     All right.  And then if we go

22  to -- it may be the slide before, but it's

23  "There are many causes of autism."

24           It's actually a slightly

25  different slide in terms of the language, but

1    it's this slide, "There are many causes of

2    autism, but for most individuals we do not

3    yet know the cause."

4              MR. TRACEY:  Mike, do you got

5         this one?  It may be the one -- the

6         slide before.

7              MICHAEL KAUFFMANN:  I'm trying

8         to get to it.

9    QUESTIONS BY MR. TRACEY:

10        Q.    Okay.  Do you have it,

11   Dr. Chung?

12        A.    I do.

13        Q.    Oh, there we go.

14              So this is your slide from this

15   year, right?

16        A.    Yes.

17        Q.    You say, "There are many causes

18   of autism, but for most individuals, we do

19   not yet know the cause," right?

20        A.    That's correct.

21        Q.    You don't say the only cause is

22   genetics, do you?

23        A.    No, I do not.

24        Q.    You don't say the predominant,

25   overwhelming cause of autism is genetics, do

1    you?

2          A.      Again, without the audio, I

3    can't recall exactly what my words were.

4          **Q.      Well, your -- those words are**

5    **not on this page?**

6          A.      Again, you know, I said words

7    over this, and I don't recall what I actually

8    said when I gave the talk.

9          **Q.      Well, what you actually wrote**

10   **is, "There are many causes of autism."**

11          **Correct?**

12          A.      There are many causes of

13   autism.

14          **Q.      You didn't say there's only one**

15   **cause, and it's genes, right?**

16          A.      Again, I don't recall what I

17   actually said is the text over for this, but

18   what I traditionally say when I give public

19   talks is that genetics are the overwhelming

20   contributor to what we know of causes of

21   autism or contributors to autism.

22          **Q.      Well, if that's true, why not**

23   **put it in the slide so there's no confusion?**

24          MS. BROWN:  Objection to the

25          form.

```
 1              THE WITNESS:  You can't put
 2       everything in a slide, and so you
 3       speak as you're giving the talk with
 4       the slides.
 5   QUESTIONS BY MR. TRACEY:
 6       Q.      That seems like a nontrivial
 7   thing?
 8              MS. BROWN:  Objection to the
 9       form.
10              THE WITNESS:  I'm sorry, what
11       is nontrivial?
12   QUESTIONS BY MR. TRACEY:
13       Q.      It seems nontrivial to make the
14   claim as you do, that the overwhelming
15   majority of autism cases are caused by
16   genetics and genetics alone?
17              MS. BROWN:  Objection to the
18       form.
19              THE WITNESS:  I think it's
20       stated very clearly here in terms of
21       the genetic factors, and knowing the
22       different types of genetic factors, I
23       think that is clear.
24   QUESTIONS BY MR. TRACEY:
25       Q.      Okay.  Well, let's read it and
```

1    see how clear it is.

2              You wrote, "It's a mix of

3    genetic and environmental factors that are

4    unknown."

5              That's what you wrote, right?

6    A.    Yes.

7    Q.    Is that true?

8    A.    I think we've been through this

9    a few times today.  Again, 80 to 90 percent

10   in terms of heritability, with that not being

11   100 percent.

12             There are -- there are factors

13   that are not genetic, but the overwhelming

14   contributor is genetic in etiology.

15   Q.    And yet, those words are

16   nowhere to be found, are they?

17             MS. BROWN:  Objection.  Asked

18        and answered.

19             THE WITNESS:  Again, I don't

20        recall what I said exactly when I was

21        giving these slides, and if I quoted

22        numbers -- and it depends on the

23        audience where I say this and how much

24        I'm trying to overwhelm or not

25        overwhelm an audience with numbers and

Confidential - Subject to Protective Order

1          to make concepts simple.

2               And as I was trying to speak to

3          a lay audience with this, the concept

4          is that this is largely genetic, as

5          you can see here, and --

6     QUESTIONS BY MR. TRACEY:

7          Q.     How can I see that here?

8               MS. BROWN:  Wait, please let

9          her finish.

10    QUESTIONS BY MR. TRACEY:

11         Q.     How can I see with this slide

12    that this is largely genetic?

13         A.     I don't recall, again, the

14    words I used during the talk that I gave, but

15    with this being a genetic study, people came

16    into this understanding that genetics were an

17    important part of autism and that we were

18    exploring genetic factors.

19         Q.     Okay.  But where do I see on

20    this slide, point it out to the judge and the

21    jury, where it says, "This is really mostly

22    genetic"?

23              Where do I find that on the

24    slide?

25              MS. BROWN:  Do you have the

```
 1          audio because she's asked several
 2          times for the audio?
 3                  MR. TRACEY:  I don't have the
 4          audio.  I don't.  I don't think there
 5          is one.
 6                  MS. BROWN:  Well, she's already
 7          answered this question.
 8                  MR. TRACEY:  I don't think --
 9          no, she hasn't.
10   QUESTIONS BY MR. TRACEY:
11          Q.    Point the words on the page
12   that tell me that your claim -- that whenever
13   you did this, is that autism is mostly or
14   predominantly genetic?
15                  MS. BROWN:  I object.  It's
16          been asked and answered.
17                  Go ahead, Doctor.
18                  THE WITNESS:  Without having my
19          actual talk, I don't recall what I was
20          saying during the time that I gave
21          this --
22   QUESTIONS BY MR. TRACEY:
23          Q.    I didn't ask you about the
24   talk, Doctor.
25                  MS. BROWN:  Please let her
```

1        finish.

2    QUESTIONS BY MR. TRACEY:

3        **Q.    I'm asking about the words on**

4    **the page.**

5        A.    The simple answer to your very

6    specific question is I don't have numbers on

7    the page.  I don't recall at the time I gave

8    the talk whether I quoted numbers or not.

9             Whether or not I quoted

10   specific numbers for the purpose of this talk

11   does not change my opinion, however, which is

12   a very specific scientific opinion for a very

13   specific audience in terms of trying to

14   understand etiology of autism.

15            And for that, I need to be

16   quantifiable, and for that I will say, again,

17   that the genetics are 80, 90 percent of the

18   heritability.

19       **Q.    You're right, but we're going**

20   **to get back to heritability.**

21            **I just found a definition of**

22   **heritability, and let me read it to you and**

23   **see if you agree with it.  I don't think you**

24   **will.**

25            **It says, "Heritability does not**

Confidential - Subject to Protective Order

1    indicate what proportion of a trait is

2    determined by genes and what proportion is

3    determined by environment."

4         A.    Can you tell me what you're

5    reading from, please?

6         Q.    It's not.

7               Well, hold on.  I want to know

8    whether you agree with it first.

9               MS. BROWN:  Well, we object.

10        We don't know what you're reading

11        from.

12   QUESTIONS BY MR. TRACEY:

13        Q.    It doesn't matter.  Do you

14   agree with the words that I'm saying out

15   loud?

16        A.    I would like to understand the

17   source that you're reading from, please.

18        Q.    Does the truth of the matter

19   depend to you upon what the source is?

20        A.    I'd still like to hear the

21   source that you're reading from.

22        Q.    Okay.  Well, you don't get to

23   know the source.  I get to ask the questions;

24   you don't, Dr. Chung.

25               MS. BROWN:  Okay.  Let's keep

Confidential - Subject to Protective Order

```
 1        it professional.
 2   QUESTIONS BY MR. TRACEY:
 3        Q.    Here's my question, do you
 4   agree that heritability does not indicate
 5   what proportion of a trait is determined by
 6   genes and what proportion is determined by
 7   environment?
 8              MS. BROWN:  Objection to the
 9        form of the question.
10              You can answer, Dr. Chung.
11              THE WITNESS:  Again, the
12        heritability estimates are the
13        percentage of the variants of a
14        phenotypic trait that are due to
15        genetic factors, to heritable factors.
16   QUESTIONS BY MR. TRACEY:
17        Q.    So you disagree with this?
18        A.    Again, I've told you what my
19   definition of heritability is.
20        Q.    Okay.  But I'm asking you a
21   follow-up question because it means that you
22   disagree with this definition of
23   "heritable" --
24              MS. BROWN:  Objection.
25
```

```
1    QUESTIONS BY MR. TRACEY:

2         Q.      -- "heritability."

3              MS. BROWN:  To the form.  Asked

4         and answered.

5    QUESTIONS BY MR. TRACEY:

6         Q.      Is that right, Doctor?

7         A.      Again, in terms of

8    heritability, it's the fraction of the

9    phenotypic variance that are due to heritable

10   factors.

11        Q.      And it is -- there's no

12   equation that you're aware of that factors in

13   the environment -- environmental exposures?

14             MS. BROWN:  Objection.  Vague.

15   QUESTIONS BY MR. TRACEY:

16        Q.      That's what you're saying, the

17   pheno -- phenotype is only genetics and no E?

18   All G, no E?

19        A.      That is not what I said.

20        Q.      Okay.  Un-confuse me.  I

21   thought you just said that heritability

22   was the -- was a -- was the contribution of

23   genetics to a phenotype.

24        A.      What I believe I said, although

25   you can read back what I said to make sure,
```

Confidential - Subject to Protective Order

1    was the fraction of the variance of the

2    phenotype that was responsible or due to

3    heritable factors.

4          Q.     Okay.  But phenotype

5    **includes -- those are traits that would**

6    **include and subsume environmental exposures?**

7          A.     A phenotype doesn't care about

8    genes or environment --

9          Q.     **It's agnostic.**

10          A.     -- it is a phenotype.

11          Q.     **Yeah.  Yeah.**

12               **But it includes -- I mean,**

13    **Dr. Chung, we don't exist outside of our**

14    **environment, do we?**

15          A.     We live in an environment.

16          Q.     **Yes.**

17               **Genes don't exist by themselves**

18    **in a bubble.  They're always, always in the**

19    **confines of environment -- of an environment,**

20    **right?**

21          A.     Yes, we are living beings on

22    the earth.

23          Q.     **Yes.**

24               **And the environment that we**

25    **live in impacts us, right?**

Confidential - Subject to Protective Order

1        A.      It depends on what phenotype

2   one is looking at.

3        **Q.      Let me ask it this way.**

4             **Is it your opinion -- are you**

5   **going to testify -- are you testifying that**

6   **phenotypes only include genetic**

7   **contributions?**

8             MS. BROWN:  Objection.  Asked

9        and answered.

10            THE WITNESS:  It depends.

11       You've asked a very general question

12       about phenotypes --

13   QUESTIONS BY MR. TRACEY:

14       **Q.      Okay.  Let me be more specific.**

15            MS. BROWN:  Please let her

16       answer.  Please --

17            MR. TRACEY:  Hold on.  She

18       objected.  I'm sustaining her

19       objection.

20            MS. BROWN:  I'm sorry, you just

21       keep cutting her off.  Please let her

22       finish.

23   QUESTIONS BY MR. TRACEY:

24       **Q.      So let me ask a more specific**

25   **question.**

Confidential - Subject to Protective Order

1           Is it your testimony that the

2  phenotype of autism spectrum disorder, that

3  that by definition only includes genetic

4  contributions?

5       A.     I believe you've asked that

6  question several times today, and I'll say

7  the same answer again, which is, that I have

8  not said ever today that autism, as a

9  phenotype, is only and exclusively dependent

10  on genes.

11       Q.     Let me ask it this way --

12       A.     However --

13       Q.     I'm sorry.  I'll let you

14  finish.

15       A.     However, I have repeatedly said

16  that the major contributor is genetics, and I

17  will say that this has been reproducibly in

18  quite rigorous ways.

19       Q.     Do you think the heritability

20  definition is different depending on what

21  trait we're talking about?

22           MS. BROWN:  Objection to the

23       form of the question.  I don't

24       understand it.

25           If you understand it, you can

```
 1          answer.

 2                   THE WITNESS:  Can you define

 3          "trait" for me?

 4     QUESTIONS BY MR. TRACEY:

 5          Q.     No, I can't.  Trait -- I mean,

 6     if you don't know what a trait is, I don't

 7     know what to do.

 8          A.     If you can define "trait" for

 9     me, then I can answer the question.

10          Q.     Okay.  Do you have a different

11     definition of heritability depending on what

12     outcome you're looking at?

13                   MS. BROWN:  Objection to the

14          form.  Vague.

15                   THE WITNESS:  Again, if you can

16          tell me what it is we're talking

17          about, I feel like you're trying to

18          ask me about any phenotype of any

19          sort, and there's not one single

20          answer for your question.

21     QUESTIONS BY MR. TRACEY:

22          Q.     Yeah, but I don't understand

23     how the definition of heritability can be a

24     moving target --

25          A.     Can you rephrase --
```

Confidential - Subject to Protective Order

1          Q.      -- and that's what I'm hearing

2    you say.

3          A.      Can you rephrase your question?

4    I may not be understanding it.

5          Q.      Yeah, I'm not sure that I can.

6                  It's your position, as I

7    understand it, that heritability does not

8    include environmental exposures.

9          A.      Again, we may have some

10   misunderstandings.  A heritability, if it is

11   less than 1, necessarily says that there are

12   environmental exposures that contribute to

13   the phenotype.

14                 So the heritability is telling

15   us something about nongenetic factors.

16         Q.      Okay.  Okay.  Is PKU genetic

17   predominantly?

18         A.      Phenylketonuria is a monogenic

19   condition.

20         Q.      If you don't have the gene, you

21   don't get the disease, right?

22         A.      There are multiple monogenic

23   forms of phenylketonuria, but there is not a

24   way to have phenylketonuria without that

25   monogenic condition.

Confidential - Subject to Protective Order

```
 1        Q.      Right.

 2                And as we've discussed, though,

 3   if you're not exposed to the environment of a

 4   diet that will trigger the condition, you

 5   won't get sick, right?  That's what Emily

 6   Singer told us.

 7        A.      Again, we can pick this apart.

 8   One will still have phenylketonuria

 9   regardless of the diet, right.  One will

10   still --

11        Q.      That's almost a metaphysical --

12                MS. BROWN:  Wait.

13   QUESTIONS BY MR. TRACEY:

14        Q.      -- question.  I mean --

15        A.      But one will still have

16   phenylketonuria even if we use dietary

17   modification.

18        Q.      Which is why I said you

19   wouldn't get sick.

20                MS. BROWN:  Can you please let

21        her finish?

22   QUESTIONS BY MR. TRACEY:

23        Q.      I'm trying to help you out.  I

24   didn't say phenylketonuria, but --

25                MS. BROWN:  She doesn't need
```

Confidential - Subject to Protective Order

1          help answering your questions.

2                    MR. TRACEY:  I think she does.

3                    MS. BROWN:  She can do it all

4          by herself.

5                    MR. TRACEY:  I'm not sure about

6          that.

7                    MS. BROWN:  That's not nice or

8          fair or accurate.  Please let her

9          finish.

10                    THE WITNESS:  But we treat

11          people to try and mitigate the

12          symptoms.  We're not perfect in our

13          treatment, but we do this to improve

14          health.

15     QUESTIONS BY MR. TRACEY:

16          Q.     In 2023, you still have the

17     concentric circles, equal size, overlapping

18     with environmental factors and genetic

19     factors, right?

20          A.     For ease of reading this slide,

21     we have these two circles of equal size.

22          Q.     And then you have in 2023, just

23     like you did in 2017, you have pollution, mom

24     ill during pregnancy, insufficient folic acid

25     during pregnancy and in utero exposure to

Confidential - Subject to Protective Order

1    valproic acid.

2              **That has not changed, has it?**

3         A.      Notably, if you compare the two

4    slides from 2023 to, I believe it was 2017,

5    you'll see that I have added mix of genetic

6    and environmental factors are unknown.

7         Q.      Yeah.

8         A.      And that's because, in part,

9    many of those environmental factors on the

10   right we are now revisiting and trying to

11   reanalyze, and it is unknown.

12        **Q.      Well, but you could say the**

13   **same thing about genetics then; genetics is**

14   **unknown?**

15        A.      Absolutely.  We are very

16   rigorously assessing those genetic factors.

17        **Q.      Okay.  Why did you want to tell**

18   **me that?**

19        A.      Why did I want to tell you

20   that?

21        **Q.      Yeah.**

22        A.      I wanted to make sure you

23   understood that we are trying to apply the

24   most rigorous methods possible to

25   understanding the science and getting forth

1    valuable -- correct information.

2         Q.    How many of the patients in

3    SPARK have you identified a monogenic cause

4    of autism for?

5         A.    The number is approximately

6    10 percent.

7         Q.    And the other 90 percent, what

8    have you attributed their autism to in your

9    SPARK study?

10        A.    We're still learning.

11        Q.    The answer is you don't have

12   any idea, right?

13             MS. BROWN:  Objection to the

14        form.

15             THE WITNESS:  I would not say

16        that it's that we don't have any idea.

17        It is that we're still learning, and

18        to come up with the statistically

19        rigorous information we need for

20        genetics, in particular for genomewide

21        significance, which is a very high

22        bar, we're not willing to declare that

23        we have a known cause except for those

24        10 percent of cases that I referred

25        to.

```
1    QUESTIONS BY MR. TRACEY:

2         Q.    So as you sit here today, the

3    other 90 percent, according to SPARK, are

4    unknown?

5         A.    I would say to implicate for

6    any one person the totality of their

7    contributors to their autism, that 90 percent

8    is not yet fully understood.

9         Q.    Well, it's unknown, isn't it?

10        A.    Or not yet fully understood.

11        Q.    What is wrong with using

12   "unknown"?  I thought those were your words

13   on the site.

14        A.    Because in some cases we know

15   about statistically significant genetic

16   contributors, but we know -- may know that

17   they increase the relative risk by something

18   like tenfold, but that has not met our

19   threshold for things that we can say are

20   cause as a single cause, which I believe was

21   your question.

22        Q.    Yeah, we have another clip.

23             MR. TRACEY:  What exhibit

24        should we call it?

25             DANIEL OLIVO:  This will be
```

```
 1        391B.

 2               MR. TRACEY:  And do you have

 3        the slide that explains who the guy

 4        is?  It's another SPARK clip, by the

 5        way.

 6               DANIEL OLIVO:  391A.

 7               (Chung Exhibit 391A marked for

 8        identification.)

 9   QUESTIONS BY MR. TRACEY:

10        Q.     Exhibit 391A.  Maybe you can

11   just tell us who this guy is.

12               MS. BROWN:  Can we just

13        identify where this is coming from?

14               MR. TRACEY:  SPARK.

15               MS. BROWN:  And what the date

16        is?

17               DANIEL OLIVO:  March 7.

18               MR. TRACEY:  March 7.

19               DANIEL OLIVO:  2018.

20               MR. TRACEY:  2018.

21               MS. BROWN:  Okay.  And both

22        this and the prior video clip are from

23        the SPARK website?

24               MR. TRACEY:  Yes, ma'am.

25               (Video played.)
```

```
 1                  MR. TRACEY:  There's more.

 2                  DANIEL OLIVO:  391B.

 3                  (Chung Exhibit 391B marked for

 4        identification.)

 5                  (Video played.)

 6                  MR. TRACEY:  Stop right there.

 7   QUESTIONS BY MR. TRACEY:

 8        Q.     Did you hear what he just said?

 9        A.     I heard what he said.

10        Q.     Heritability -- they inflate

11   heritability, the twin studies.  That's what

12   he said, right?

13        A.     That's what Dr. Newschaffer

14   said.

15        Q.     Is he a competent scientist?

16        A.     I have never evaluated his

17   science to know that.

18        Q.     Do you know who he is?

19        A.     Broadly, but not in detail.

20        Q.     Okay.  He calls this a causal

21   pie.

22               Did you hear that?

23        A.     I don't recall if he used

24   exactly those terms, but he was talking about

25   gene-by-environment interactions.
```

1          Q.     And he says at the top,

2     "Environmental risk factors do contribute to

3     causing autism."

4                 And you agree with that, right?

5          A.     We've talked about this before.

6          Q.     Yeah.

7                 Do you believe that the

8     heritability in family studies is

9     overestimated like this good doctor said?

10         A.     At this point, I still think

11    that heritability estimates are 80 to

12    90 percent.  If you look at the science where

13    we have rigorous, reproducible data to

14    implicate many things, the most rigorous, the

15    most reproducible data are for genetic

16    contributions.

17         Q.     Did you -- do you remember my

18    question?

19         A.     I do, and I believe I answered

20    your question.

21         Q.     No, you didn't.  Let me ask it

22    again.

23                MS. BROWN:  She did.  She did.

24         She'll do it again.

25

```
 1   QUESTIONS BY MR. TRACEY:

 2        Q.    Do you believe that the

 3   heritability in family studies is

 4   overestimated?  That's the question.

 5             MS. BROWN:  Asked and answered.

 6             You can answer it again.

 7             THE WITNESS:  The questions

 8        are, I believe, in the heritability

 9        estimates of 80 to 90 percent that

10        have been calculated for autism, as

11        well as for ADHD, and those estimates

12        show that the overwhelming

13        contribution is genetic for both of

14        those conditions.

15             MR. TRACEY:  I'm going to

16        object to nonresponsive.

17   QUESTIONS BY MR. TRACEY:

18        Q.    Do you believe that those

19   studies you just cited are overestimating the

20   heritability?

21             MS. BROWN:  Objection.  Asked

22        and answered.

23   QUESTIONS BY MR. TRACEY:

24        Q.    That's my question.  I don't

25   need you to repeat what the studies say.  I'm
```

Confidential - Subject to Protective Order

1    asking you whether you agree with this doctor

2    who believes they're inflated or

3    overestimated.

4              MS. BROWN:  So she already

5         answered that.  Asked and answered.  I

6         object.

7              She can answer it again.

8              THE WITNESS:  Again, the

9         heritability estimates for both autism

10        and ADHD are 80 to 90 percent.

11   QUESTIONS BY MR. TRACEY:

12        Q.    I heard that three times.

13        A.    I believe in those estimates.

14        Q.    Are they or are they not?

15             MS. BROWN:  You're cutting her

16        off.  I'm going to object.

17   QUESTIONS BY MR. TRACEY:

18        Q.    Are they overestimating?

19             MS. BROWN:  No, no, no, no, no.

20        She's going to finish.

21             THE WITNESS:  I believe in

22        those estimates.

23   QUESTIONS BY MR. TRACEY:

24        Q.    So you -- okay.  Well, this is

25   real simple, Dr. Chung.  I'm not a

Confidential - Subject to Protective Order

```
 1   complicated person.  You either believe
 2   they're overestimated or you do not.  Tell me
 3   one way or the other.
 4              MS. BROWN:  Please don't raise
 5          your voice, and please don't
 6          interrupt.
 7              Go ahead, Dr. Chung.
 8              MR. TRACEY:  Oh, my God.
 9              THE WITNESS:  I'll try and say
10          it again.
11              That the heritability estimates
12          that have been published for autism
13          and ADHD of 80 to 90 percent I believe
14          in.
15   QUESTIONS BY MR. TRACEY:
16       Q.    Okay.  So you disagree with the
17   doctor who was speaking on your website that
18   the heritability in the family studies is
19   overestimated?
20              That's all I'm trying to get
21   you to say.  You disagree with him.
22       A.    So let me clarify because I
23   realize for understandable reasons that it's
24   confusing about what's on the SPARK website.
25              So SPARK is meant to be a
```

1   community resource to be able to share

2   information from multiple scientists.  It is

3   not endorsed by me in terms of individuals

4   who are speaking on SPARK.  We want to

5   encourage discussion so that we can apply

6   rigorous methods to come up with real

7   answers.  And to have those --

8        Q.     Yeah, I agree.  I heard you the

9   first time you told me that.

10       A.     -- rigorously validated.

11       Q.     I heard you the first time you

12   told me that.

13       A.     So within this, I just want it

14   to be clear that I have not personally

15   endorsed his estimates or what he has stated

16   here, and I have stated --

17       Q.     I understood that.

18       A.     -- what my opinions are.

19       Q.     Yeah, I understood that.

20              You disagree with this guy,

21   whoever he is.  That's the point I'm trying

22   to make, right?

23       A.     That is correct.

24       Q.     Okay.  I found a quote on

25   heritability in a textbook called Population

1   Genetics.

2           Are you familiar with that?

3       A.      Who are the editors or authors?

4       Q.      Human Population Genetics and

5   Genomics.

6           And here's the definition.

7           MS. BROWN:  She just asked who

8       the editors are.  Do we know?

9           MR. TRACEY:  I don't --

10      somebody will tell me in a second.  I

11      don't know right this second.

12          And I can't make it bigger.

13  QUESTIONS BY MR. TRACEY:

14      Q.      Charles Reb- -- Alan Templeton,

15  Charles Rebstock, Professor Emeritus,

16  Department of Biology and Division of

17  Statistical Genomics, Washington University,

18  St. Louis, Missouri.

19      A.      I'm not familiar with him.

20      Q.      Okay.  Well, let's see if he's

21  wrong, too.

22          He says in his book that

23  "Heritability has been misapplied to the

24  nature, nurture, genetic environmental

25  debate, and even high heritabilities do not

1  exclude strong environmental effects.  The

2  genomic age has allowed measured genotype

3  approaches to phenotypic inheritance."

4          Is he wrong?

5     A.    I agree with parts of his

6  statement, and I think one has to be very

7  specific about the parts of his statement.

8     Q.    Okay.  Let's see which ones

9  he's right on.  Let me read the first

10  sentence.

11          It says, "Heritability has been

12  misapplied to the nature, nurture, genetic,

13  environmental debate, and even high

14  heritabilities do not exclude strong

15  environmental effects."

16          Is he right or wrong there?

17     A.    So for conditions like autism

18  that have high heritability, in individual

19  cases there can be nongenetic factors.

20          And for those individual cases,

21  those nongenetic factors may be quite

22  important.

23     Q.    Okay.  So he's right?

24     A.    With the explanation -- I

25  believe in the explanation I gave.

1          Q.     Okay.  But --

2          A.     As an interpretation of what he

3     stated.

4          Q.     Let me read the words again

5     because I don't think what you and he are

6     saying are inconsistent.

7               "Heritability has been

8     misapplied to the nature, nurture, genetic,

9     environmental debate, and even high

10    heritabilities do not exclude strong

11    environmental effects."

12               You agree with that?

13               MS. BROWN:  Asked and answered.

14               THE WITNESS:  Again, when you

15          consider the large number of

16          individuals with autism, so the very

17          high prevalence, to say that there are

18          individual rare cases that could be

19          due to strong environmental or

20          exposure factors, I believe that is

21          likely the case.

22               But the overwhelming majority

23          for individuals are genetic

24          contributors.

25

Confidential - Subject to Protective Order

```
 1   QUESTIONS BY MR. TRACEY:

 2        Q.     What percentage today -- what

 3   percentage of autism today can we attribute

 4   to genetic variation -- variant to?

 5        A.     Can you repeat the question?

 6        Q.     Yeah.

 7               Let me ask you if you agree

 8   with this sentence.

 9               Well, this disorder, autism, is

10   defined behaviorally rather than genetically

11   or biologically.  "At present, a contributing

12   genetic variant can be identified in 5 to

13   30 percent of individuals with ASD depending

14   on the genetic tests used, the cohort

15   examined and the thresholds used for

16   significance."  So the range is 5 to

17   30 percent.

18        A.     I agree with that statement.

19   I'm not sure you're interpreting the way I

20   am, but I agree with the statement.

21        Q.     Okay.  You should, because you

22   wrote it.

23               What about this statement?

24   "The incomplete penetrance and variable

25   expressivity of ASD in the presence of a
```

1  **high-impact genetic variant may be under the**

2  **influence of additional genetic variation,**

3  **including common genetic variation and/or**

4  **epigenetic factors and possibly environmental**

5  **contributions."**

6      A.    Can you tell me what that was

7  taken from and when it was written?

8      **Q.    It was written this year by**

9  **you.**

10     A.    Okay.  What I was likely

11  referring to, although I don't have the

12  context of the publication, is that many of

13  the monogenic factors that we have that are

14  associated with autism are always associated

15  with an effect on the brain and behavior, but

16  whether or not an individual has autism, per

17  se, whether or not they meet diagnostic

18  criteria within ADOS and ADI, that's where

19  the incomplete penetrance comes.

20     **Q.    Okay.  I misspoke, it was 2020,**

21  **in a paper you published in Nature Review**

22  **Genetics.**

23     A.    My opinion is still the same as

24  I just stated.

25     **Q.    Yeah, I thought it might be.  I**

Confidential - Subject to Protective Order

1    just wanted to correct the record.

2              And you go on to say, "A

3    polygenic risk score, which expresses the

4    cumulative impact of thousands of common

5    variants on the probability of a phenotypic

6    outcome for ASD, explains approximately

7    2.5 percent of the observed variants and has,

8    therefore, no clinical use as a risk

9    predictor tool" -- "prediction tool in the

10   general population."

11             MS. BROWN:  Counsel, if we want

12        to talk in detail about this paper,

13        could she have a copy of it?

14             MR. TRACEY:  Yes.

15             MS. BROWN:  Thank you.

16             (Chung Exhibit 343B marked for

17        identification.)

18   QUESTIONS BY MR. TRACEY:

19        Q.    Do you agree with that

20   statement you made in 2020?

21             And this is Exhibit 343B.  Do

22   you agree with that statement, that --

23        A.    I'll take just a second so I

24   can see the context in which this was

25   written.

1      Q.      Yeah.

2              You're talking about polygenic

3   risk scores.

4      A.      And can you show me where we're

5   reading?

6      Q.      Yeah, top of page 7, the

7   incomplete penetrance sentence is the first

8   full sentence, and then the polygenic risk

9   score sentence is directly following.  So I

10  was on the -- I'll just read it again into

11  the record to orient us.

12              "A polygenic risk score, which

13  expresses the cumulative impact of thousands

14  of common variants on the probability of a

15  phenotypic outcome, for ASD explains

16  approximately 2.5 percent of the observed

17  variance and has, therefore, no clinical use

18  as a risk prediction tool in the general

19  population at this time."

20              MS. BROWN:  And, Dr. Chung,

21          take as long as you need to

22          refamiliarize yourself with this

23          before you answer.

24  QUESTIONS BY MR. TRACEY:

25      Q.      You recognize this as your

1    **paper, right?**

2              MS. BROWN:  Well, let's just

3         give her a minute.  She has hundreds

4         of papers.

5              MR. TRACEY:  Okay.  But she

6         might, but her name is on this one, so

7         I just want to set the record

8         straight, but --

9              MS. BROWN:  Her name is on 699

10        other ones, so let's just give her a

11        minute to take -- to refresh and

12        answer your question.

13             THE WITNESS:  So what I'm

14        referring to is that we are incomplete

15        in our understanding of the genetic

16        complexity of autism.  That's not to

17        state that there are not underlying

18        genetic factors, but that we have not

19        yet identified all of them or know

20        mathematically how to be able to put

21        them together in the appropriate way

22        to understand what that does to the

23        probability of autism.

24             We are very immature in our

25        understanding of the genetics, I will

1          admit, but we are -- have made great

2          strides from where we were 10 or

3          20 years ago.

4                  And in terms of progress that

5          has been made in autism research and

6          understanding etiology, we have made

7          infinitely more progress in

8          understanding the genetic factors,

9          validating and reproducing those

10         across multiple cohorts and across

11         multiple investigators.

12    QUESTIONS BY MR. TRACEY:

13         **Q.     What question are you**

14    **answering?**

15         A.     The statement --

16                MS. BROWN:  The one you asked.

17         Please let her finish.

18                MR. TRACEY:  Well, no.  I

19         didn't ask her --

20                MS. BROWN:  You have to stop

21         interrupting her.

22                MR. TRACEY:  I didn't ask her a

23         question.  She just started talking.

24                MS. BROWN:  But this is not how

25         it works.  She'll answer.  You can

```
 1          move to strike and ask a follow-up

 2          question --

 3                  MR. TRACEY:  What question is

 4          she answering?

 5                  MS. BROWN:  -- but interrupting

 6          her with these outbursts --

 7                  MR. TRACEY:  It's not on the

 8          record.

 9                  MS. BROWN:  -- are not fair,

10          appropriate or consistent with the

11          federal rules.

12     QUESTIONS BY MR. TRACEY:

13          Q.     Do you know what question

14     you're answering?

15                  MS. BROWN:  Please finish.

16                  It doesn't matter.  She's in

17          the middle of it.  Let her finish.

18                  If you can recall where you

19          were, Dr. Chung, please finish.

20                  THE WITNESS:  In response to

21          the sentence that you highlighted

22          here --

23     QUESTIONS BY MR. TRACEY:

24          Q.     Right.

25          A.     -- polygenic risk score is a
```

Confidential - Subject to Protective Order

1   portion of that genetic liability.  It is the

2   portion that we understand least well, in

3   part, because we have the least amount of

4   data and because it is the most complex.

5           At this point what we can

6   understand from those multiple genetic

7   factors put together with the appropriate

8   weights is a relatively small portion of the

9   genetic variants.

10          And we were responding as

11  authors to concerns that had been raised that

12  individuals would use preimplantation genetic

13  diagnosis and genetic testing on polygenic

14  risk scores to select embryos to try and

15  select against individuals with autism.

16          And we are pointing out that

17  this is something that cannot reliably be

18  done based on the current information.

19      Q.      **You were worried about**

20  **eugenics, weren't you?**

21      A.      There are reasons that I'm also

22  worried about eugenics.

23      Q.      **Yeah.**

24              **But my question wasn't this**

25  **broad, social construct that you answered.**

1   My question was very specific, and it was

2   about your very specific statement.

3            You state in this paper, "A

4   polygenic risk score which expresses the

5   cumulative impact of thousands of common

6   variants on the probability of a phenotypic

7   outcome, for ASD explains approximately

8   2.5 percent of the observed variance and has,

9   therefore, no clinical use as a risk

10  prediction tool in the general population at

11  this time."

12           So is that a true statement?

13       A.    At the time when this was

14  written, that was a true statement in terms

15  of the percentage of the observed variance

16  based on what we knew about the polygenic

17  risk scores for autism at that time.

18       Q.    And today, what is the

19  percentage?

20       A.    I would have to go back.  There

21  are unpublished data to be able to say that.

22  The number is higher, but we still do not

23  understand the vast majority of common or

24  inherited variants for autism.  Not to say

25  that they do not exist, but we have not been

1    able to put our finger on the genes or

2    variants yet.

3         **Q.      Is it true today that polygenic**

4    **risk scores are clinically useless as risk**

5    **predictors?**

6              MS. BROWN:  Objection to the

7         form.

8              THE WITNESS:  I think in our

9         research studies, we often use

10        polygenic risk score to account for

11        some fraction of genetic contribution.

12             In terms of clinical

13        application, I would not use a

14        polygenic risk score for autism

15        clinically at this point.

16   QUESTIONS BY MR. TRACEY:

17        **Q.      But my question was about**

18   **clinically.  I didn't -- that's what I -- I**

19   **didn't ask you about research.**

20             **I want to know whether -- and,**

21   **by the way, they're just pointing out -- I**

22   **was right the first time.  This is a 2023**

23   **paper, July of 2023, last month.**

24        A.      Okay.

25             MS. BROWN:  So it says 2020 up

```
1        top.
2               MR. TRACEY:  So that's what
3        it -- it's strange.
4               MS. BROWN:  It says June 2020.
5               MR. TRACEY:  I think that's
6        when it was --
7               MS. BROWN:  Ran.
8               MR. TRACEY:  Look at it, author
9        manuscript --
10              MS. BROWN:  It says "published
11       in final edited form, 2020."
12              MR. TRACEY:  Okay.  So I was
13       right then.
14              THE WITNESS:  I think --
15              MR. TRACEY:  What's the -- at
16       the bottom -- at the bottom of the
17       page, it says --
18              MS. BROWN:  Yeah.
19              THE WITNESS:  The time it was
20       released from PMC, which is a way of
21       public access.  It looks like it was
22       July '23.
23  QUESTIONS BY MR. TRACEY:
24       Q.    So the public got ahold of this
25  in 2023?
```

Confidential - Subject to Protective Order

1    A.    Anyone could have gotten it,

2 but we made sure it was freely available to

3 the public.

4    Q.    Okay.  Not a huge deal, but I

5 do want to be accurate, and that is

6 confusing.

7        So is it still true today that

8 polygenic risk scores are clinically of no

9 use as risk predictors?

10    A.    I would not use a polygenic

11 risk score for autism clinically today, no.

12    Q.    Okay.  Now, polygenic risk

13 scores, there's some confusion about what

14 those -- there's some confusion about what

15 those actually mean, aren't they?

16    A.    I'm sure someone could be

17 confused about almost anything.

18    Q.    There's confusion among the

19 genetic -- among geneticists about what it

20 means, isn't there?

21    A.    I don't know.  Amongst the

22 individuals I work with, I don't think

23 there's much confusion.

24    Q.    Well, let me ask this.  Do you

25 think that polygenic risk scores encompass

Confidential - Subject to Protective Order

1   environmental exposures?

2        A.      Polygenic risk scores are

3   literally genetic factors looked at in

4   isolation and their connection or their

5   association with a phenotype.

6        Q.      Really?

7        A.      There can be things that can be

8   modulators, mediators, other things in

9   between, but strictly the way that these are

10  calculated are to look at the genes and the

11  phenotype.

12       Q.      Well, the modulator and

13  mediator part of that sentence is important,

14  Doctor, isn't it?

15       A.      When we calculate polygenic

16  risk scores, we calculate literally the

17  beginning of the genes and the ends in terms

18  of the phenotype.

19       Q.      And that encompasses whatever

20  exposures that the person's been exposed to?

21       A.      We don't account for the

22  exposures.

23       Q.      You don't account for it, but

24  it's there?

25       A.      As you have pointed out, we all

1    are living beings that are exposed.

2         Q.    And so the assumption that some

3    people make that polygenic risk scores are

4    only accounting for genetic liability is

5    false?

6         A.    The calculation is very simple.

7    It takes genetic polymorphisms at the one end

8    and phenotypes at the other end and does not

9    worry about anything in between and does a

10   calculation between the beginning and the

11   end.

12        Q.    That's right.

13              But it's the -- between the

14   beginning and the end, that's the important

15   part, isn't it?

16              MS. BROWN:  Objection to the

17        form.

18              THE WITNESS:  We are agnostic

19        to the middle.  We look at the

20        beginning and the end for the purpose

21        of a calculation of a polygenic risk

22        score.

23   QUESTIONS BY MR. TRACEY:

24        Q.    You sure do, but the person's

25   not agnostic but they're living in an

1    environment?

2         A.     From my understanding of the

3    question you asked, you asked about polygenic

4    risk scores, and I'm explaining how a

5    polygenic risk score is calculated.

6               (Chung Exhibit 322 marked for

7         identification.)

8    QUESTIONS BY MR. TRACEY:

9         Q.     Let's look at Exhibit 322.  Did

10   we give it to her?

11              This is a paper called "The

12   False Dawn of Polygenic Risk Scores for Human

13   Disease Prediction."

14              Are you familiar with this --

15   this commentary?

16        A.     I've not read this paper.

17        Q.     Do you know what the history of

18   polygenic risk scores is?  Do you know how

19   they came about and how recent they are?

20        A.     They came out of genome-wide

21   association studies.

22        Q.     Do you know how -- where

23   genome-wide association studies came out of?

24   Do you recall agriculture being the first one

25   to attempt to use them for breeding purposes?

1    A.    They certainly have been used

2  in agriculture.

3    Q.    If you flip over to page 3 of

4  11, you'll see from GWAS to PRS, GWAS is

5  genomewide association studies, right?  And

6  that's how we calculate PRS, right?

7    A.    GWAS is genomewide association

8  studies.

9    Q.    It says, "The principle of

10  combining information at different genetic

11  markers to construct a genetic score was

12  first introduced by animal geneticists to

13  perform a marker-assisted selection."

14        Did you know that that?

15    A.    I'm not an animal breeder or a

16  horticulturist, so I'm not familiar with

17  animal genetics in large part.

18    Q.    They go on to say, "This score

19  was later called estimated breeding value and

20  is used to estimate offspring performance but

21  for quantitative traits of agricultural

22  interest.

23        "The principles of EBV are

24  built themselves on the assumption that it's

25  possible to separate the genetic and

1    environmental variance components of a trait.

2    Further -- furthermore, that there are

3    typically large number of genetic variants

4    that each capture a small -- capture a small

5    part of the genetic variance, and the

6    heritability of a trait, thus -- can thus be

7    recovered by summing across their

8    contributions; this being the polygenic model

9    of inheritance proposed by R.A. Fisher."

10            Do you understand that to be

11   how polygenic models were developed?

12            MS. BROWN:  And I'll just

13        object to the extent she said she's

14        not familiar with this paper, so if

15        you need time to evaluate it to answer

16        that question, you should do that.

17            THE WITNESS:  Within this,

18        again, I am not an animal breeder, and

19        so I'm not going to comment on any of

20        the things that are related to animal

21        breeding.

22   QUESTIONS BY MR. TRACEY:

23        Q.    All right.  I think we're going

24   to leave animals in the next sentence.

25            It says, "PRS was introduced in

Confidential - Subject to Protective Order

1    the human genetics by Wray, et al., 2007,

2    according to the same principle of summing

3    across the contribution of many different

4    SNPs, but serve a different purpose; that is,

5    predicting the individual risk to develop a

6    disease."

7              Now, do you remember one of the

8    very first articles I used with you with the

9    definition of heritability you didn't agree

10   with was by three authors, Visscher and Wray,

11   and the other one escapes me.

12             But do you remember me asking

13   if you had heard of Wray?

14        A.    Yes, I do.

15        Q.    You didn't know that Wray was

16   the actually geneticist that introduced PRS

17   into human genetics?

18        A.    I don't know whether Wray was

19   or not.

20        Q.    Okay.  If you flip over to

21   page 5, in the middle of the page, starting

22   with "underlying the PAL model" --

23        A.    I'm sorry, what is the PAL

24   model?

25        Q.    Oh, it's the polygenic additive

1    liability model, which is how PRS is

2    calculated.

3         A.     If you can give me just a

4    second to look at that.

5         Q.     Yep.

6                Are you there?

7         A.     I'm just going back a page.

8    Give me a second, please.

9         Q.     It tells you where the PAL

10   model is, the definition on erroneous

11   assumptions of PRS on page 4.

12               MS. BROWN:  She just needs a

13        minute.  She's not familiar with this

14        paper.

15               MR. TRACEY:  Oh.

16   QUESTIONS BY MR. TRACEY:

17        Q.     Are you ready?

18        A.     If you can go back to your

19   question.

20        Q.     Yeah.

21               So I was just going to -- we're

22   going to read a little bit of that sentence,

23   and then I'm going to ask you if you agree or

24   disagree.

25               It says, "Underlying the PAL

1    model is also the assumption that each

2    environmental factor has a small effect that

3    is independent from the effects of the

4    genetic factors.  For most traits, however,

5    this is clearly not true.

6            "The effect of the environment

7    can be important, and a given genotype can

8    react differently across different

9    environments.  This is well-known from

10   breeders.  Changes in the environment can

11   have a dramatic impact on the efficiency of

12   cattle breeding programs and the accuracy of

13   selection.

14           "This occurs, for example, in

15   the case for milk production, with a

16   significant impact of environmental factors

17   such as temperature and humidity and

18   gene-environment interactions.

19           "The environment cannot be

20   ignored, and as explained by Feldman and

21   Lewontin, 'Partitioning the causes of

22   variation is really illusory.  The genetic

23   variance depends on the distribution of

24   environments, and the environmental variance

25   depends on the distribution of genotypes.'"

Confidential - Subject to Protective Order

```
 1               Do you agree with that sentence

 2    in -- that I read in quotes?

 3               MS. BROWN:  Well, I object

 4        based on her prior testimony about

 5        animals, so...

 6               MR. TRACEY:  This is -- she's

 7        not referring to animals there.

 8               THE WITNESS:  So I --

 9               MS. BROWN:  It's milk

10        production.

11               MR. TRACEY:  All right.

12        Let's --

13    QUESTIONS BY MR. TRACEY:

14        Q.    All right.  Let's -- let me ask

15    you this.  Let's pretend for a second -- I'm

16    going to prove it in a minute.

17               Let's pretend for a second that

18    that quote applies to humans.

19               Would you agree or disagree

20    with that quote, "partitioning the causes of

21    variation is really illusory; the genetic

22    variance depends on the distribution of

23    environments, and the environmental variance

24    depends on the distribution of genotypes"?

25               MS. BROWN:  I object.  Lacks
```

1   foundation.

2        THE WITNESS:  So all of this

3   depends on the phenotype one is

4   talking about.  This can't be stated

5   in a monolithic way across everything

6   in human health or disease or

7   behavior.  So this depends on what

8   we're talking about.

9        When it comes to environment,

10  yes, for certain conditions.  The

11  environment can change.  It can have

12  effects in terms of the expression on

13  human's phenotypes, and that may be in

14  some conditions differential based on

15  genotype.

16       Notably, this is not referring

17  to autism specifically, and even if we

18  are talking about environmental

19  contributions, which I've already

20  talked about regarding autism and

21  ADHD, none of this is in reference to

22  that.

23       And animal breeding data are

24  not relevant to a complex human

25  behavior like autism.

Confidential - Subject to Protective Order

```
 1   QUESTIONS BY MR. TRACEY:

 2        Q.    Okay.  Let's read on and see

 3   what they say about humans, Doctor.

 4              "In their food steps, Burt

 5   claims that, 'the conceptual, biological,

 6   model in which heritability studies and thus

 7   also PRS depend, that of identifiable

 8   separate effects of genes versus the

 9   environment on phenotype variance, is

10   unsound.'"

11              Do you agree that it is

12   unsound?

13        A.    I will point out that these

14   investigators are commenting specifically on

15   polygenic risk scores, and as we've talked

16   about before when it comes to autism, autism

17   genetics are not solely polygenic risk

18   scores.

19        Q.    Well, do you agree with them

20   then?

21        A.    They're a complex combination

22   of inherited variants, both common and rare,

23   as well as de novo variants, and the

24   complexity of this, putting all of that

25   together, still argues very strongly that the
```

1    predominant susceptibility or increased risk

2    for autism and ADHD is genetic.

3              And this has been reproducibly,

4    reliably and statistically, significantly

5    shown multiple times by multiple

6    investigators in multiple cohorts.

7              MR. TRACEY:  I'm going to

8         object as nonresponsive.

9    QUESTIONS BY MR. TRACEY:

10        Q.    **Can you answer my question now?**

11             MS. BROWN:  She did.

12             THE WITNESS:  Again --

13   QUESTIONS BY MR. TRACEY:

14        Q.    **No, no, not again.  I want an**

15   **answer to my question.**

16             MS. BROWN:  She answered it.

17        It doesn't matter if you like it.

18   QUESTIONS BY MR. TRACEY:

19        Q.    **Do you agree or disagree with**

20   **the highlighted part of this paper?**

21             MS. BROWN:  Objection.  Asked

22        and answered.

23             THE WITNESS:  I believe that

24        people, human beings, are complex, and

25        that when one is talking about

Confidential - Subject to Protective Order

```
 1          conditions where there is strong

 2          heritability but environmental

 3          contributions, these things come

 4          together.  And within this, the

 5          heritability estimates, especially

 6          when they are as high as they are with

 7          autism -- and you have to understand

 8          within the landscape of human

 9          behaviors and human conditions, this

10          is at the extremely high end.  And

11          with that, it is still very likely the

12          case that genetics are the predominant

13          contributing factor.

14                  MR. TRACEY:  Objection.

15          Nonresponsive.

16   QUESTIONS BY MR. TRACEY:

17          Q.      Can you answer my question,

18   Doctor?

19                  MS. BROWN:  Asked and answered.

20          Twice.

21                  MR. TRACEY:  No.  No, ma'am.

22                  MS. BROWN:  Yes, sir.

23   QUESTIONS BY MR. TRACEY:

24          Q.      Can you answer my question?

25   You either agree with that statement or you
```

Confidential - Subject to Protective Order

```
 1   don't.

 2        A.     Again --

 3        Q.     No, not again.

 4               MS. BROWN:  Please let her

 5   answer.

 6   QUESTIONS BY MR. TRACEY:

 7        Q.     Agree or disagree?  Yes or no?

 8               MS. BROWN:  She doesn't have to

 9   answer yes or no.  She's going to

10   answer it truthfully and accurately as

11   she's done twice, and now she'll do a

12   third time.

13   QUESTIONS BY MR. TRACEY:

14        Q.     What's the answer to my

15   question, Doctor?

16               MS. BROWN:  She absolutely does

17   not have to answer it yes or no.

18   QUESTIONS BY MR. TRACEY:

19        Q.     Do you agree or disagree with

20   him?

21        A.     For the complexity of autism --

22        Q.     I'm not asking about autism.

23               MS. BROWN:  It doesn't matter.

24   You can't interrupt her.

25
```

```
1    QUESTIONS BY MR. TRACEY:
2         Q.    I didn't ask you about autism.
3              MS. BROWN:  It doesn't matter.
4         You can't interrupt her.
5              MR. TRACEY:  I didn't ask you
6         about autism.  You don't get to
7         reframe my questions.
8              MS. BROWN:  But you don't get
9         to interrupt.  It's rude, and it's not
10        consistent with the rules.
11             MR. TRACEY:  It's not rude.
12        This is rude --
13             MS. BROWN:  It is.
14             MR. TRACEY:  -- and this is
15        obstructive.
16             MS. BROWN:  You are
17        interrupting her repeatedly.  You may
18        not like her answer, but it is --
19   QUESTIONS BY MR. TRACEY:
20        Q.    Doctor, look at me.  Look at me
21   in the eye.
22             MS. BROWN:  No, we're not --
23        we're looking wherever she wants to
24        look.
25
```

```
 1   QUESTIONS BY MR. TRACEY:

 2        Q.    I am not asking you about

 3   autism.

 4        A.    Can you restate your question?

 5        Q.    I'm asking you about polygenic

 6   risk scores and a statement in this paper.

 7   Don't reask it a different way.

 8        A.    So one cannot generalize to all

 9   of phenotypes --

10        Q.    Okay.

11        A.    -- in this way.

12        Q.    All right.

13        A.    If you would like to increase

14   the specificity of your question, then I can

15   answer this in a way that is correct

16   scientifically.

17        Q.    Okay.  Do you know who Moore

18   and Shenk are?

19        A.    I don't know.

20        Q.    You've never heard of those

21   geneticists?

22        A.    I'm not sure who you're

23   referring to.

24        Q.    That's my question.  You don't

25   know who I'm referring to?
```

1        A.       I don't know who you're

2    referring to.

3        Q.       Okay.  They go on to say,

4    **"Gottlieb considers that genes are part of a**

5    **'developmental system,' and Moore and Shenk**

6    **explain that contemporary biology has**

7    **demonstrated that traits are the product of**

8    **interactions between genetic and nongenetic**

9    **factors at every point of the development."**

10               **Is that true or false?**

11        A.       Again, I think they are talking

12   in a very general way about biology.

13        Q.       **Do you think that autistic**

14   **patients are independent of human biology?**

15        A.       I think you have to get down to

16   the level of specificity of individual

17   conditions to be able to understand the

18   factors, genetic and environmental and

19   developmental, for any one condition.  You

20   can't generically speak about this

21   accurately.

22               MS. BROWN:  Can we take a break

23        when you get to a good spot?

24               MR. TRACEY:  Yeah, let me --

25        I've got a couple more things here.

Confidential - Subject to Protective Order

1    QUESTIONS BY MR. TRACEY:

2         Q.    It says GWAS and Causal

3    Inference.

4              Do you see that?

5         A.    I see that section.

6         Q.    It says, "Underneath PRS is the

7    idea that there are individuals with a

8    genetic makeup that predispose them to

9    developing disease, and it's possible to

10   identify such individuals based on their PRS

11   values."

12             That's the -- what's -- what

13   they want to do, right?

14        A.    I'm not sure who you mean

15   "they" and how I can tell if they want to do

16   what they want to do.

17        Q.    Well, underneath the PRS is the

18   idea that we can do risk predictions in

19   people, right?

20        A.    I believe there are people who

21   would like to be able to predict risk.

22        Q.    They say, "The SNPs used in PRS

23   identified by association tests on the basis

24   of different genotype distributions in cases

25   and controls.  It is thus assumed that these

1    **observed differences in genotype**

2    **distributions reflect the true genetic**

3    **effect.  However, this is not true."**

4              **That's what these authors say,**

5    **don't they?**

6         A.    They go on to explain that

7    there can be cases of population

8    stratification that can obscure those cases.

9              And so genomewide association

10   studies have to be very carefully designed

11   for population stratification to see the true

12   effect of a true biological variance to

13   calculate an accurate polygenic risk score.

14        **Q.    And the truth is to calculate a**

15   **accurate polygenic risk score, you need to**

16   **know the environmental influences?**

17        A.    Again, the way genomewide

18   association studies are done to then

19   calculate a polygenic risk scores are to take

20   the genotypes and the phenotypes and not

21   consider anything else in between.  And with

22   that, in that population, they can --

23   those -- if you draw from that same

24   population, that PRS should be able to

25   predict with the limitations of whatever

1    those polymorphisms are that are included.

2         Q.    All right.  Flip over to

3    page 6.  In the middle of the page it says,

4    "Matching cases and controls on all

5    environmental risk, however" -- "is, however,

6    not possible."

7         A.    I'm sorry, I can't see where

8    you are yet.

9         Q.    It's highlighted.  "Matching

10   cases and controls on all environmental risk

11   is, however, not possible.

12              "And controls used in GWAS are

13   usually less exposed to environmental risk

14   factors than the general population.  Even in

15   a population considered as genetically

16   homogeneous, environmental stratification may

17   well exist, and PRSs have been shown to be

18   sensitive to changes in variables such as

19   age, sex, economic" -- "socioeconomic status

20   as shown in recent studies of the UK Biobank.

21   Therefore, PRSs not only contain information

22   about genetic factors inherited from parents,

23   but also on clinical and environmental

24   factors.  As Janssens rightly pointed out,

25   PRSs do not measure what they are supposed to

Confidential - Subject to Protective Order

1   measure.  This fact is totally ignored by

2   those who integrate PRS values in risk models

3   as an observation, which is independent from

4   clinical and environmental factors."

5              Do you agree with that?

6      A.     So this is separate from other

7   things we have discussed.

8      Q.     It is.

9      A.     Polygenic risk scores, in

10  general, are taken, and I use my words

11  carefully, from a population and applied to

12  that same population.  Therefore, the

13  assumptions made in the original study will

14  apply to that same population when applied

15  again.

16     Q.     Well, only if they're exposed

17  to the same environmental factors?

18     A.     As I said, the same population.

19     Q.     Well, no.  The same population

20  can have different -- home to home can have

21  different environmental factors.  In one home

22  you might take valproate and another home,

23  you may take acetaminophen?

24     A.     Again, population is the key,

25  because these are applied to populations.

Confidential - Subject to Protective Order

```
 1          Q.      Oh, I see what you're saying.

 2                  So you should see -- okay.

 3                  If you flip over to the

 4     Discussion page, because I think you're going

 5     to -- you're going to recognize some of this

 6     language.

 7                  On the third paragraph down, it

 8     says, "The misinterpretation of PRS has

 9     dangerous clinical and eugenic consequences."

10                  The eugenic consequences are

11     some of the things you were writing about in

12     your paper.  That's what you were worried

13     about, one of the things.

14                  Right?

15          A.      I worry about eugenics in

16     general.

17          Q.      Yeah.

18                  Well, I mean -- but it came up

19     in the context of your paper we were reading

20     together, right?

21          A.      I will just say that I worry

22     about eugenics in general.

23          Q.      Okay.  Well, you brought it up

24     when we were reading your paper.

25                  What am I doing wrong?  What am
```

1    I saying it wrong?

2         A.     I'm just making it clear that I

3    have concern -- I try to be an ethical

4    person, in addition to a scientifically

5    accurate person, and so I try and keep that

6    in mind in terms of concerns about eugenics.

7         Q.     Okay.  Yeah, I wasn't

8    suggesting you were limiting your concerns

9    about eugenics to one paper.

10              Anyway, in the next sentence

11   down, it says, "Furthermore, after individual

12   medical future selling" -- "future selling by

13   direct-to-consumer companies, new companies

14   are now offering prenatal diagnoses, based on

15   PRS, for all the diseases that parents want

16   to avoid infecting their children.  Some

17   already protested from an ethical standpoint

18   against such eugenic drift.  However, in

19   addition to the ethical question, one must

20   also be aware that it is scientifically

21   wrong.  It is important to stop selling the

22   dream that it is possible to predict disease

23   risk with an oversimplistic model."

24              Do you agree with that?

25        A.     I agree with as we've spoken

Confidential - Subject to Protective Order

1    about today that the polygenic risk scores

2    that we have capture a small portion of the

3    genetic factors.  They are not in this paper

4    talking anything about rare genetic variants

5    and being able -- and for many individuals,

6    the predominance of the genetic risk or

7    liability is actually a rare variance rather

8    than common variance.

9              Furthermore, the polygenic risk

10   scores that have been calculated today are

11   not capturing all of the common variants

12   either.

13             So as I've said, we still have

14   further information to gather on the

15   genetics, but that doesn't deny the fact that

16   genetics are the strongest and most

17   reproducible contributor to autism

18   probability.

19        Q.    I don't know what your answer

20   was.

21             Did you agree with them or not?

22        A.    As I've said, currently, the

23   models that we have for the amount of

24   information that we know about common

25   variants is incomplete and inadequate to

1    accurately predict human behavior, including

2    autism.

3            However, this is a small

4    fraction of genetic liability and that does

5    not -- by not accounting for those other

6    portions of the genetic contribution, that

7    does not negate the genetics beyond PRS that

8    is currently understood is the major

9    contributor to behavior -- the behavior of

10   autism and ADHD.

11           MR. TRACEY:  Okay.  I'm going

12       to object to nonresponsive.

13   QUESTIONS BY MR. TRACEY:

14       Q.    **That question, this sentence is**

15   **only about PRS, right?**

16       A.    I'm clarifying that the current

17   understanding of PRS cannot accurately

18   predict human behavior.

19       Q.    **Stop.  I agree with you there.**

20           MS. BROWN:  Well, okay.  But

21       you can't -- you can't interrupt and

22       put your hand up and ask her to stop.

23           MR. TRACEY:  But I have to to

24       keep control of this deposition.

25           MS. BROWN:  No, no, no.  But

Confidential - Subject to Protective Order

```
1          that is not allowed.
2                  MR. TRACEY:  It is allowed.
3                  MS. BROWN:  You just put your
4          hand up and told the witness to stop.
5                  MR. TRACEY:  I did.
6                  MS. BROWN:  She was
7          mid-sentence, answering your question.
8          That's not acceptable.
9                  Please finish.
10                 MR. TRACEY:  She was not
11         mid-sentence.  If her history is
12         any --
13                 MS. BROWN:  You put her hand up
14         and told her to stop --
15                 MR. TRACEY:  -- example, she
16         was at the beginning of a sentence.
17                 MS. BROWN:  -- as if we're at a
18         traffic light.
19                 Please finish, Doctor.
20  QUESTIONS BY MR. TRACEY:
21      Q.      That part you just gave me is
22  consistent with what's on the screen, right?
23      A.      I want to explain beyond
24  that --
25      Q.      But I don't want to know about
```

1    beyond.  I didn't ask about beyond.

2         A.    But this is --

3         Q.    See, when I ask questions,

4    they're only about very discrete subjects.

5    This is not your time to give a lecture, give

6    a PowerPoint presentation.  This fine lady

7    right here, when I'm done, can ask you all of

8    those questions.

9              MS. BROWN:  Let's take a break.

10   QUESTIONS BY MR. TRACEY:

11        Q.    But I have a limited amount of

12   time, Dr. Chung.

13             You understand that?

14             MS. BROWN:  Let's take our --

15             THE WITNESS:  I understand.

16             MS. BROWN:  Can we take our

17       break now?  We've been going for an

18       hour.

19   QUESTIONS BY MR. TRACEY:

20        Q.    But I've got to finish this.

21             Did that part -- your last part

22   of that question, when I did say stop, that

23   part of your answer was consistent with what

24   we see on the screen, right?

25        A.    It is consistent with a very

1    narrow-focused question about the current

2    state of clinical utility of polygenic risk

3    scores.

4                    MR. TRACEY:  Yes.  All right.

5          Let's take a break.

6                    MS. BROWN:  Thank you.

7                    VIDEOGRAPHER:  The time is

8          3:09 p.m., and we're off the record.

9           (Off the record at 3:09 p.m.)

10                    VIDEOGRAPHER:  The time is

11          3:23 p.m., and we're on the record.

12                    (Chung Exhibit 322B marked for

13          identification.)

14    QUESTIONS BY MR. TRACEY:

15          Q.    Dr. Chung, I've handed you

16    Exhibit 322B, which is a paper, a guidance

17    paper, by the -- or the ASHG.  That's the

18    American Society of Human Genetics; is that

19    right?

20          A.    Yes, that is.

21          Q.    Do you belong to that society?

22          A.    Yes, I do.

23          Q.    And this is in their journal,

24    which is called the American Journal of Human

25    Genetics, and this was published in December

1    of 2022, eight months or so ago.

2        A.    Yes, I see that publication

3    date.

4        Q.    Did you read this guidance

5    document when it came out?

6        A.    I skimmed over it, yes.

7        Q.    Okay.  And it's called

8    "Addressing the challenges of polygenic

9    scores in human research."

10            Isn't it?

11       A.    That's the title of the

12   manuscript, yes.

13       Q.    Do you know or recognize any of

14   the authors that are listed there?

15       A.    Yes, I do.

16       Q.    Who do you know?

17       A.    Claudia Gonzalo {sic} and Sarah

18   Tishkoff.

19       Q.    Okay.

20       A.    Gonzaga, I should say.

21       Q.    Sorry?

22       A.    Claudia Gonzaga and Sarah

23   Tishkoff.

24       Q.    Okay.  This paper, at the top

25   you see, this is a guidance document, ASHG.

1    This is a guidance document.  And if we look

2    down at the introduction on the right-hand

3    column, they tell us that this "ASHG guidance

4    was developed by a writing group led by

5    members of the professional practice and

6    social implications committee to discuss and

7    provide recommendations on three major issues

8    related to the technical, ethical and social

9    considerations of PGS.  It was approved by

10   the ASHG board of directors for publication

11   in October of 2022."

12            Did you -- by the way, are you

13   on the board of directors for the ASHG?

14       A.    Yes, I am.

15       Q.    Did you vote and approve this

16   paper?

17       A.    Yes, we did at our board

18   meeting.

19       Q.    And so did you vote with

20   approval to publish this document for

21   everyone to see?

22       A.    By the rules of our board, I'm

23   not supposed to disclose anything about our

24   board meetings publicly.

25       Q.    Okay.  But you were on the

Confidential - Subject to Protective Order

1    board that voted to approve this.  Whether

2    you voted yay or nay is none of my business

3    is what you're saying?

4         A.    Respectfully, yes.

5               MS. BROWN:  Very politely.

6    QUESTIONS BY MR. TRACEY:

7         Q.    Yeah, okay.

8               In any event, you were on the

9    board that did vote?

10        A.    Yes.

11        Q.    All right.  Down below at

12   the -- beneath there it says, "Develop

13   diverse research cohorts and analyses."

14   Well, let me ask you this.  I should have

15   asked this.

16              Did you edit this document

17   before it was published?

18        A.    No, I did not.

19        Q.    Okay.  You didn't redline it or

20   offer any contributions?

21        A.    That was not our role as the

22   board.

23        Q.    Okay.  It says, "Develop

24   diverse research and cohorts and analyses.

25   Several limitations of PGSs arise from the

Confidential - Subject to Protective Order

1   lack of diverse cohort data in PGS

2   development.  The accuracy of a PGS might be

3   compromised when applied to a cohort that

4   differs in key demographic characteristics

5   from the discovery cohort used to develop the

6   PGS.  This is known as the PGS portability

7   problem, sometimes also called the

8   generalizability problem or transferability

9   problem."

10            Did I read all that correctly?

11       A.    Yes, you did.

12       Q.    Do you agree with all of that?

13       A.    Yes, I do.

14       Q.    Okay.  They say, "Several

15   factors contribute to the portability

16   problem, although the relative importance of

17   each is still an open topic of research.

18   First, they talk about linkage disequilibrium

19   varies across human populations.  And because

20   PGSs are based on marker loci that are an LD

21   with as yet unknown causal loci, inaccuracies

22   will be introduced if one assumes the GWAS

23   marker loci have the same LD with causal loci

24   in different populations."

25            What is LD?  That's the linkage

1    disequilibrium?

2        A.    Yes, that's what LD stands for.

3        Q.    Did everything I read -- did

4    you agree with everything I just read?

5        A.    Yes, I do.

6        Q.    Okay.  It says, "Fine-mapping

7    approaches that aim to identify causal loci

8    can help ameliorate this problem.

9            "Second, different causal

10   alleles will be at different frequencies or

11   even absent, in different populations.  At a

12   global scale, a variant common in one region

13   is more likely to be found in several others,

14   whereas rare variants are more likely to be

15   localized.

16           "Third, even causal variants

17   that are shared might have differing average

18   effect sizes in different populations.  One

19   potential cause is differing genetic

20   backgrounds between discovery and application

21   cohorts, which might give rise to different

22   average effect sizes as a result of gene-gene

23   interactions, i.e., epistasis, e.g., see

24   Patel, et al.  Another potential cause is a

25   different distribution of nongenetic

Confidential - Subject to Protective Order

1  individual risk factors between the discovery

2  and implementation cohorts when such factors

3  moderate the effect of a genotype.  Such

4  factors are varied and phenotype dependent;

5  such examples include age, sex, diet,

6  pollutant, exposure, access to health care

7  and gut microbiome composition.  In

8  quantitative and statistical genetics, these

9  factors are often collectively referred to as

10  environment, and they induce what are known

11  as genotype-by-environment interactions or

12  context-independent {sic} effects."

13          MR. WATTS:  Context-dependent.

14  QUESTIONS BY MR. TRACEY:

15      Q.    Do you agree with all of that?

16      A.    So within this, realizing that

17  they were trying to deal with a hard problem,

18  that is to, in a very general and a generic

19  way, to describe PRSs across a wide range of

20  human conditions, phenotypes being that

21  related to health and just normal genetic

22  variation.

23          And what they've written here

24  is quite generic in terms of trying to be

25  broad.  As you said, they were trying to

1    provide guidance in a nonspecific way, and

2    the generality with which they refer to this

3    is generally correct.

4            However, to be able to

5    understand how this applies to any one

6    condition, it is necessary to then drill

7    down.  The overwhelming concern that they had

8    and that our community continues to have were

9    the items that you addressed at the

10   beginning; and that is that most research

11   studies today are conducted on individuals of

12   European ancestry, and the genetic variation

13   that we understand is largely derived from

14   that genetic ancestry.

15           Some of the technical language

16   that you've read is related to the

17   portability issue that you referred to.  So

18   that if we try and port over the information

19   to individuals of African ancestry, Asian

20   ancestry, other parts of the world, the

21   ability to accurately port over that

22   information may be inadequate.  And so they

23   are trying to provide general guidance about

24   limitations of PRS, and in particular, some

25   of the pitfalls of why those common variants

1   may differ in their predictive ability across

2   populations around the world.

3        **Q.     One of the problems they**

4   **identify in PRS being accurate is the**

5   **different environmental effects in different**

6   **populations?**

7        A.     They do, but if you look by

8   rank order in terms of order in which they

9   list the issues, and I know this based on

10  being a member of the community, the much

11  greater concern is they're addressing are

12  differences across populations and

13  differences that may be attributable to

14  linkage disequilibrium structure and

15  differences that we see based on that genetic

16  structure, the relative weight and genetic

17  contributions.

18            And in particular, one of the

19  concerns that we've had that's very

20  significant is that if a gene is not

21  implicated in a European population and,

22  therefore, absent in other populations where

23  that gene is applicable, that discovery will

24  not replicate in those other populations.

25        **Q.     In the United States, we're**

1    called the melting pot.

2              **Are we the melting pot?**

3         A.    I would say some regions of the

4    United States more so than others.

5         **Q.    Some are more melted than**

6    **others?**

7         A.    Some are more admixed and some

8    are more heterogenous, shall we say.

9         **Q.    Okay.  And I read that**

10   **80 percent or so of the existing discovery**

11   **GWAS cohorts were European, and it would be**

12   **14 percent Asian and a few percent other**

13   **things.**

14             **Is that right?**

15        A.    I'm not sure where you read

16   that, but I agree that they are overwhelming

17   of European ancestry.

18        **Q.    Okay.  And so the portability**

19   **problem, I kind of like that term, it makes**

20   **sense, we can't export this to other**

21   **populations, right?**

22        A.    Right.

23        **Q.    Now, it would seem to me, if in**

24   **a population -- for example, if you had a**

25   **population that was exposed to something, a**

1  **compound, an environmental toxin, and this**

2  **population had either epigenetic changes or**

3  **de novo mutations as a result of these**

4  **exposures, or flipping it around, you're in a**

5  **population that it was exposed to something**

6  **that was reducing disease, better diet,**

7  **things like that, that would also affect the**

8  **GW -- the GRS {sic} scoring, wouldn't it?**

9       A.    So you've got several different

10  concepts wrapped within that.

11       **Q.    Yes.**

12       A.    So let's try and separate them.

13            I think the fundamental issue

14  in terms of that portability issue is, let's

15  confine ourselves to those common variants.

16  So within the space of genetics, there is a

17  space of common inherited variants, rare

18  inherited variants and de novo variants,

19  right.  For simplicity, we'll divide those

20  into three spaces.

21            The polygenic risk scores or

22  the genomewide association studies are only

23  those common genetic variants, and those

24  variants that we use are oftentimes not the

25  causative alleles that are actually causing

1    or attributable.  They may be close to.  They

2    may travel together and, hence, be in linkage

3    disequilibrium with what the true genetic

4    variance is.

5                Based on the architecture for

6    that population, A and B may travel together

7    if you're European, but A and C may travel

8    together if you're Asian.  And so, therefore,

9    by using the surrogate or the substitute, you

10   may get the wrong signal by using A, if it's

11   B or C that are actually causative.

12               So, again, the overwhelming

13   message that's coming through here is that

14   the concern is that people will use

15   discoveries from a population in, say, the

16   2000s, from over here in this part of the

17   world to over here in this part of the world.

18               If one were to take this over

19   here in this part of the world and just move

20   over to the next state, it should be

21   applicable in that other state.  Things are

22   common enough within this larger genetic

23   ancestral pool that those should be able to

24   port over.

25               So the large part of what

1  they're concerned about are these really

2  radical differences, but, again, remembering

3  that this is still only a portion of that

4  spectrum of genetic liability.

5      Q.    So let me ask you this.  This

6  is what I think about.  I'm -- I've seen the

7  North Korea, South Korea population mentioned

8  as an example of heritability being a product

9  of environment and genes.  And here was the

10  example that was given to me.

11          The South Vietnamese people are

12  of the same genetic architecture as the North

13  Vietnamese people and yet, they're 5 inches

14  taller on average.  And we know that height

15  is 80 percent-plus heritable, right?

16  Correct?

17      A.    I believe the estimate is very

18  high, as you said.

19      Q.    Very high.

20          And so in that environment, if

21  I were doing a PRS for height to see what the

22  risk was for shortness, if you want to say

23  shortness, I would see in the same genetic

24  cohort a stark difference in height that was

25  primarily or exclusively driven by nutrition,

1    right?

2              **This is sort of a classic**

3    **example that I've read in the genetics**

4    **literature.**

5              **Are you familiar with that**

6    **example?**

7         A.     Right.

8              So as I said earlier, it

9    depends, and the context is incredibly

10   relevant.  When it comes to issues of

11   nutrition, right, things that are driven and

12   inextricably correlated with nutrition and

13   access to calories, whether you're going to

14   talk about height or body mass index, but

15   things that are directly related to

16   nutrition, certainly you see differences in

17   terms of those environmental, if you will,

18   factors.

19             But it depends on the context.

20   And so you can't generalize what's true of

21   the condition over here to a condition over

22   here.  You always have to remember that

23   specific context.

24        Q.     Okay.  But I was just -- I

25   **agree with you.  I understand.**

1           **But generally speaking, the**

2    **concept, though, is one of in which in the**

3    **North Viet -- sorry, North Korea, South**

4    **Korea, you know, cohorts, where the**

5    **phenotype, shortness or tallness, I don't**

6    **know what we want -- which one we want to**

7    **pick, but there's stark differences related**

8    **not to genetics that a polygenic risk score**

9    **would imply were genetic, even though they**

10   **were nutritional?**

11           MS. BROWN:  Objection to the

12      form.

13           Go ahead.

14           THE WITNESS:  So I don't think

15      the polygenic risk score has that

16      implication.  Rather, what happens in

17      terms of the calculation of

18      heritability or in terms of polygenic

19      risk tends to be with one population

20      in one moment in time.

21           And so when there are changes

22      in terms of the environment, such as

23      you've described, what you see is you

24      see that same polygenic risk score

25      being able to predict, for instance,

1          the distribution of height and the

2          relative sort of rank order in height

3          that you see, but yet nutrition is

4          expanding for the entire cohort in

5          terms of increasing height.

6     QUESTIONS BY MR. TRACEY:

7          Q.    But if I didn't have access to

8     the nutrition information, right, I didn't

9     know, I didn't know what the environmental

10    differences were, and I just did polygenic

11    risk scores against everybody in North and

12    South Korea, right?  Are you with me?

13         A.    So you're going to put together

14    the entirety of North and South Korea?

15         Q.    All the common variants, I'm

16    going to put them all together.  And I'm not

17    going to have an explanation -- I'm not going

18    to have the explanation for the height

19    differences in my polygenic risk score, am I?

20         A.    So, again, that's not going to

21    be that driving a factor.  What you are

22    pointing out to is the complexity in terms of

23    understanding human phenotypes.  And what it

24    drills down to is being able to calculate all

25    the myriad factors that go into calculating

1    and predicting what can ultimately be complex

2    biology; where it's not a one-to-one mapping

3    in terms of one factor or one gene, but,

4    again, it differs depending on what the

5    phenotype is that's involved and how large

6    those environmental contributors are to that

7    factor.

8         Q.    Let me give you another

9    example.  I like examples.  I learn better

10   that way.

11            If we had a population of

12   mothers who did no folic acid

13   supplementation, no prenatal vitamins at all,

14   and we had another population of women that

15   did take them, and we didn't know this, we

16   didn't know that one population was

17   supplementing and the other wasn't

18   supplementing, and they were in the same

19   country, and they were the same -- they were

20   homogeneous, would the outcome differences in

21   autism in those groups be the result of

22   genetics or supplementation?

23        A.    So what you're pointing out,

24   though, actually works against you in terms

25   of the predictions of heritability and the

Confidential - Subject to Protective Order

1    role of genetics.

2              If, in fact, your hypothesis is

3    correct and there's a fair amount of

4    environmental influence that varies and is

5    unaccounted for, it will look like you have a

6    weaker genetic signal rather than a stronger

7    genetic signal.

8              So if anything, you've made the

9    argument that we've underestimated the

10   heritability and the genetic contributors.

11        Q.    **I'm not following that.**

12             **What I've just described is**

13   **effectively an epidemiology study, which we**

14   **use every day to assess populations.  I have**

15   **a control and an exposed group.**

16        A.    So taking that example and

17   helping to understand the complexity of these

18   epidemiological studies, many of them

19   heretofore have not included genetics and

20   genetic factors or even simple things like

21   family history.

22        Q.    **Yeah.**

23        A.    Or maternal factors that may be

24   influencing by transmission without

25   accounting directly for the genetics but

1    factors in terms of enrichment within that

2    family history from either mother or from

3    father.

4              Without accounting for that and

5    accounting in particular why some of those

6    genetic factors may influence directly the

7    exposure, because someone might be driven to

8    use a medication or to have a certain

9    exposure, then, in fact, without accounting

10   for genetics, one could falsely come to the

11   conclusion that it was whatever that

12   environmental exposure was that was driving

13   the cause, but, in fact, it is possible it is

14   the underlying genes.  And if one does not

15   account for that, at least indirectly, one

16   can falsely jump to the conclusion that it's

17   the exposure rather than an underlying

18   genetic susceptibility.

19        **Q.    So in my example, no folate**

20   **supplementation, none, lots of folate**

21   **supplementation, the one without folate**

22   **supplementation has more children with autism**

23   **in it than the one that had supplementation,**

24   **you think the conclusion to be drawn from**

25   **that is what?**

Confidential - Subject to Protective Order

1    A.    So I did not talk about the

2  specificity of folate and autism.

3    **Q.    Well, that was my question.**

4    A.    So I'm not --

5    **Q.    That was my whole example.**

6    A.    Okay.  So I have not looked

7  carefully at the literature, the

8  epidemiological literature, about folate and

9  autism.  So I'm not going to comment on that

10  specific question because I don't know that

11  there are reproducible or reliable studies

12  that have incorporated genetic factors either

13  directly or indirectly with folate and being

14  able to look at reliable outcomes of a

15  phenotype of autism.

16          You would need to have, in my

17  opinion, all of those to be able to come to

18  the most accurate conclusion about

19  understanding contributing factors.

20    **Q.    Do you know whether scientists**

21  **have looked at populations of women who don't**

22  **supplement and look at their rates of autism**

23  **compared to those that do?**

24    A.    Again, in terms of my opinion

25  today, I didn't prepare to be able to address

1  that question.

2      Q.    No, no, I wasn't asking you if

3  you knew the answers.  I was asking

4  whether -- if you know that work has been

5  done.

6      A.    As I said, I would need to do a

7  comprehensive review to be able to answer

8  knowledgeably about that question.

9      Q.    Let's get back to the guidance

10 paper just for a second here.

11          On the same page, next column

12 over, starting with "Given these problems,"

13 we start to see some recommendations.

14          It says, "Given these

15 problems," which -- some of which we've been

16 talking about, "we recommend that future

17 development of PGSs incorporate increased

18 cohort diversity."

19          That's good, right?  That's

20 what you were talking about, right?

21     A.    Yes.

22     Q.    "Along multiple dimensions,

23 ancestry, age, sex, health care access, and

24 other environmental variables relevant to

25 focal phenotypes."

Confidential - Subject to Protective Order

1          That's the recommendation,

2   right?

3       A.    Again, realizing that this is

4   for a general audience in terms of being

5   inclusive for all phenotypes, yes, that's the

6   recommendation.

7       Q.    Well, this isn't for a general

8   audience.  This is for geneticists.

9       A.    I'm sorry, let me rephrase.  An

10  audience that is nonspecific in terms of the

11  phenotypes under research of geneticists.

12      Q.    Okay.  And what the guidance

13  document says is we must -- or they recommend

14  that we need to take into account other

15  environmental problems relevant to the focal

16  phenotype.

17          A focal phenotype is like

18  autism, right?

19      A.    Again, they're being

20  nonspecific within this.  And as general

21  guidelines, they're trying to make sure that

22  they're covering all of the bases across

23  different conditions.

24      Q.    But a focal phenotype, an

25  example of a focal phenotype is autism?

1      A.      That is correct.  If one wanted

2  to study autism, then one could make and

3  tailor these recommendations to autism.

4      Q.      They say, "Over the year" --

5  "past few years, several such efforts,

6  including the All of Us, H3Africa and the

7  Trans-Omics for Precision Medicine programs

8  have been launched with the goal of

9  increasing the diversity and representation

10  of previously understudied groups in human

11  genomics research and better understanding

12  the contribution of genetic and environmental

13  factors on disease risks."

14          And you certainly know that to

15  be true, right?

16      A.      Yes.  And, in fact, the major

17  effort that they've utilized, as they've

18  outlined here, is to increase the diversity

19  of these cohorts to increase the ancestral

20  genetic diversity in particular.

21      Q.      And then if you flip over to

22  the next page, they give some more

23  guidelines.  They say, "Foster Robustness,

24  Application and Interpretation of PGSs."

25          And they -- they flag that

1    first, "the accuracy of the effect size

2    estimate used in PGS is dependent on the

3    sample size of the reference GWAS, the

4    genotyping or imputation of accuracy, the

5    provision of trait measurement and GWAS

6    modeling decisions such as those regarding

7    batch-correction and adjustment for

8    covariants.

9              "During estimation of effect

10   sizes in the reference GWAS, a correlation

11   between a variant genotype and unobserved

12   environmental factors," and they say, quote,

13   "Environmental confounding are between a

14   variant genotype and genetic background," and

15   they quote, "Genetic confounding, can lead to

16   inaccurate effect-size estimates."

17             Do you agree with that?

18        A.    Again, realizing that this is

19   written generically across all phenotypes,

20   what they're alluding to, again, across many

21   different phenotypes is that the effect size

22   can be misrepresented within a polygenic risk

23   score calculation.

24        Q.    Right.

25        A.    That's not --

1    Q.    Oh, sorry.

2    A.    That's not to say that genetics

3    as a contributor to the condition are changed

4    in terms of estimates of genetic risk.

5    Q.    Well, but what will be done is

6    the environment will be underrepresented?

7    A.    Again, with the complexities of

8    whether these are not moderators or

9    mediators, one may develop more complex

10   models in terms of being able to model this

11   to come up with risk -- accurate risk

12   assessments.

13          But, again, this all has to be

14   within the context of the particular

15   condition, and this manuscript is written

16   very generically in the guidance.

17   Q.    Is there a GWAS model for

18   autism that accounts for environmental

19   confounding right now that we can look at?

20   A.    Again, what we have tried to

21   do, knowing that this is complicated, and

22   there's so many different subtypes, if you

23   will, of autism, so many different ancestral

24   backgrounds, we have tried to collect as much

25   detailed information across as many

1    individuals as possible to be able to power

2    to have such studies done.

3                I would say it's still a work

4    in progress, both in terms of recruiting

5    enough individuals, having enough exposure

6    data, having enough genotypic data.

7                But so far, based on currently

8    powered studies, we do not see the robust

9    effect of those environmental exposures,

10   especially once accounting for the genetic

11   factors.

12       **Q.    Well, but you don't have the**

13   **power to see anything yet?**

14       A.    So, as I said, I have not seen

15   within the context of being able to control

16   for the genetics seeing robust, reliable

17   exposure data.

18       **Q.    Yeah.  I'm trying to understand**

19   **how you will ever accurately account for**

20   **environmental exposures in a population.**

21       A.    So I don't entirely know the

22   answer.  That is part of what is up to the

23   collective scientific community --

24       **Q.    Okay.**

25       A.    -- to understand from a study

1   design point of view with different

2   populations around the world who have access

3   to different ways of measuring things

4   throughout the life course and looking at

5   outcomes with the constraints of the fact

6   that research takes money and whether or not

7   individuals think this is a priority to fund

8   and what diseases they decide or conditions

9   they decide to fund this for.

10       **Q.    Okay.**

11       A.    So it may be scientifically

12   possible.  It will be a societal decision to

13   decide in terms of priorities.

14       **Q.    Okay.  The next thing they put**

15   **on their list under the heading of "Foster**

16   **Robustness and Scientific Development,**

17   **Validation and Application and Interpretation**

18   **of PGS," second on this list is the comment**

19   **that "most PGS calculations assume a lack of**

20   **interaction and correlation between genetic**

21   **and nongenetic factors.**

22       **"Such genotype-by-environment**

23   **interactions and correlations create two**

24   **major limitations for the use of PGSs; a**

25   **difference in environmental backgrounds**

Confidential - Subject to Protective Order

1   between the GWAS cohort and target

2   individuals can have unpredictable effects on

3   PGS accuracy and biases; and 2, the

4   interaction and correlation between a PGS and

5   environmental variables can induce a collider

6   bias that undermines the use of the PGS as a

7   covariant in modeling a variety."

8          You agree with that?

9      A.     Again, you have to get to the

10  specificity of what the trait is, and in this

11  manuscript, they have not listed the traits

12  that they believe are specifically at risk

13  for these types of concerns that they have.

14     Q.     Well, they say they all are.

15  They say "most," right?

16     A.     In fact, they say that as a

17  generic way, but they -- there are different

18  conditions that will have different relative

19  contributions of genes and environment.

20         And so there's certain

21  conditions that they're more concerned about

22  where that heritability and those risk

23  estimates of heritability are lower.

24     Q.     But as we sit here today, you

25  can't point me to any ASD PGS score that

Confidential - Subject to Protective Order

1    **accounts for the environment; it doesn't**

2    **exist?**

3         A.    So right now, as we've spoken

4    about before, we're still in very early

5    stages of the accuracy of any of the

6    polygenic risk scores for autism.  That's not

7    to say that genetics is not playing a key

8    role and that heritability is not extremely

9    high.

10             It's to say that our sample

11   size to be able to see those variants that

12   are statistically significant and

13   contributing is still limited.

14        Q.    **And the same is true of ADHD?**

15        A.    We are more advanced in our

16   understanding of the polygenic risk of ADHD

17   than we are for autism, but it suffers many

18   of the same limitations.

19        Q.    **And so any study that seeks to**

20   **rely on polygenic risk scores to account**

21   **for -- to claim confounding by genetics is**

22   **unsound scientifically?**

23             MS. BROWN:  Objection to the

24        form.

25             THE WITNESS:  You may be

```
 1              misunderstanding I think how people

 2              are using the PRSs in these studies.

 3                   I think if they're able to

 4              account for something, they truly have

 5              accounted for it, because all of these

 6              are always on the conservative side.

 7                   Rather, when you aren't able to

 8              account for this, it doesn't rule out

 9              the possibility that there might be

10              genetic confounds that are not

11              accounted for within those studies.

12     QUESTIONS BY MR. TRACEY:

13         Q.     No, Doctor.

14              If somebody claims that a

15     polygenic risk score for autism or ADHD is an

16     accurate reflection of the genetic risk

17     and ignores the environmental risk, that is

18     unsound scientifically, and we can't do that

19     yet; scientifically it's not possible to do

20     that yet?

21                   MS. BROWN:  Objection to the

22              form.

23                   THE WITNESS:  So I want to

24              clarify because I think there are two

25              different things that we're talking
```

1          about.

2                    Our estimates of polygenic risk

3          score currently are not accounting for

4          all the genetic factors that we see.

5          That results in some of the

6          imprecision, but it does account for

7          some of the genetic variables.

8                    So they will account for some

9          of the variation that we see in terms

10         of the behavior of the phenotype, in

11         this case autism or ADHD.

12                   When we see that contribution,

13         it is truly there, but there may be

14         other contributing factors as well.

15    QUESTIONS BY MR. TRACEY:

16         **Q.     Right.**

17                   **And if you don't know the other**

18    **contributing factors, right --**

19         A.     You are underestimating the

20    genetic factors.

21         **Q.     I don't think so, Doctor,**

22    **because what you're ignoring is the part**

23    **where they say most PGS calculations assume a**

24    **lack of interaction between the genes and the**

25    **environment.**

```
1        A.     So --
2        Q.     That's what's going on here in
3   these -- in these studies that presume to
4   give an accurate polygenic risk score.
5   That's why they're -- that's why you said
6   they're of no clinical use.
7        A.     They're of no clinical use
8   today.
9        Q.     Yes.
10       A.     And that's a very specific use
11  case.  That does not mean they're of no
12  scientific use.  They can be of scientific
13  use to be able to understand in complex
14  models with large numbers of people what
15  percent of the variation within that
16  population, for instance, is due to the
17  genetic factors or if we can understand in
18  particular cases whether an outcome is in
19  part due to genetics or whether it's due to
20  an exposure.
21            What I'm stating is that you
22  can't not account for the genetics.  Given
23  how high the heritability of the conditions
24  of autism and ADHD are, you will be
25  potentially confounded by other factors if
```

1    you don't include the genetics.

2            Especially if the exposure has

3    a relatively low risk associated with it, it

4    is even more susceptible to confounding, and

5    it is even more important to take into

6    account in whatever way possible those

7    confounding factors, some of which are

8    genetic, but others of which may not be

9    genetic.

10        Q.    **May be what?  Say it.**

11        A.    I don't know.

12        Q.    **Say "environment."  You can say**

13   **it.**

14        A.    I don't know.

15        Q.    **Well, environment, that's one**

16   **of them, right?**

17        A.    My point is --

18        Q.    **Say environment first.**

19            MS. BROWN:  Hold on.  Wait.

20        Wait.  Hold on.  Let her answer,

21        please.

22            THE WITNESS:  Again, for a

23        condition or conditions, ADHD and

24        autism, that are so strongly

25        heritable, one needs to account for

Confidential - Subject to Protective Order

```
 1          that in trying to account for the
 2          outcomes and any other associations
 3          with the outcomes.
 4   QUESTIONS BY MR. TRACEY:
 5          Q.      We're going round and round.
 6   The problem is your definition of heritable
 7   is not the definition any of my geneticists
 8   use because your definition of heritable
 9   assumes, as I understand it the way you keep
10   repeating it, no environmental contribution.
11               And that's inconsistent with
12   what I understand to be the definition of
13   heritable.
14               So every time you say "with the
15   heritability being so high," I hear you
16   presuming no environmental contribution?
17          MS. BROWN:  That totally
18      misstates her testimony for the past
19      seven hours.
20          MR. TRACEY:  Am I wrong in
21      doing that?
22          MS. BROWN:  Yes.  Yes.  Let her
23      explain it again carefully because I
24      think you'll get it.
25
```

Confidential - Subject to Protective Order

```
 1   QUESTIONS BY MR. TRACEY:

 2        Q.    Speak slowly.  I'm not very

 3   bright, Doctor.

 4             MS. BROWN:  Give -- give --

 5             THE WITNESS:  I'm sure you're

 6        very bright.

 7             MS. BROWN:  Give him the

 8        percentages so he understands.

 9   QUESTIONS BY MR. TRACEY:

10        Q.    Well, the percent -- I get the

11   percentages, but the percentages --

12        A.    So --

13        Q.    When you say heritable is 80 to

14   90 percent -- I mean, this -- we've been

15   reading this all day long.

16             That assumes -- this is the

17   overinflation of genetics.  It's the

18   overinflation of the genetic contribution,

19   which is why I asked the question about when

20   you're a hammer, everything looks like a

21   nail, right?

22        A.    So in multiple studies that

23   have looked at heritability for both

24   conditions, autism as well as ADHD, there is

25   a range in terms of that heritability, but it
```

1    is never 100 percent.

2              By that -- with those data, I

3    think I am stating and I have stated a few

4    times now today, that I don't believe it is

5    100 percent genetic.

6              As we think about the

7    contributions in a population of individuals,

8    a number of individuals, knowing that autism

9    is a spectrum, is quite heterogenous, for

10   autism or for ADHD, it is still

11   overwhelmingly genetic.

12             But --

13        Q.    What does that mean?

14        A.    That means that for -- if one

15   is to look at the variation in the phenotype

16   in a large population, the predominance of

17   the variation is attributable to genetic

18   factors.

19             Be they inherited or de novo

20   factors, it is still genetics that is

21   overwhelmingly driving the phenotype.

22        Q.    But this is where I think you

23   and I are driving past each other.

24             You proved in a paper that

25   de novo mutations can be caused by

Confidential - Subject to Protective Order

1    environmental exposures, right?

2        A.    In the paper?

3        Q.    Yes, ma'am.

4        A.    It is not looking at human

5    people and what exposures --

6        Q.    What kind of people is it

7    looking at?

8        A.    -- in human people, living

9    human people.  It is not showing in living

10   human people --

11       Q.    It's a cell study?

12       A.    -- what is -- what is driving

13   de novo mutations in living human people that

14   may be associated with autism.

15       Q.    Okay.  But my point is, the way

16   I think that we're passing each other is --

17   and maybe I'm mishearing you or

18   misunderstanding you, which I'm completely

19   capable of.

20            You seem to be assuming that

21   the environment has no direct effect or even

22   indirect effect on the genetics of human

23   beings living in an environment?

24       A.    I don't believe I've stated

25   that.

```
 1        Q.     Okay.

 2        A.     Right.

 3        Q.     Good.

 4               So, but if you don't know what

 5     environmental exposures are that are causing

 6     the different ways that genetics can be

 7     impacted, and you don't account for that, and

 8     you presume that everything is genetic and

 9     genetic only, you're reaching a foreordained

10     conclusion.

11               You're a priori deciding

12     without evidence that everything is genetic

13     when we know the environment influences a

14     common variance.  We know that.  We know that

15     it influences de novo mutations.

16        A.     What I'm stipulating --

17               MS. BROWN:  I object to the

18          question on a number of grounds,

19          including lacking foundation and

20          compound.

21               Go ahead.

22               THE WITNESS:  What I'm

23          saying -- and I realize that it's hard

24          to prove these things.  I admit, these

25          are hard questions.  Biology is hard.
```

Confidential - Subject to Protective Order

```
1          Human behavior is hard to understand.

2              And to be able to implicate any

3          of those environmental exposures, one

4          must account for the genetics in the

5          equations of those environmental

6          exposures because genetics is so

7          strong overall in a population of

8          individuals.

9              And what I have not seen in the

10         studies that implicate any of those

11         environmental exposures for autism or

12         ADHD is an appropriate study design

13         that can include genetics as part of

14         the equation.

15             So even if you are correct in

16         terms of those gene-by-environmental

17         exposures in your model, you would

18         still, I think, argue that one would

19         need to include the genetics in those

20         study designs to be able to account

21         for those interactions.

22     QUESTIONS BY MR. TRACEY:

23         Q.    Yes.  Okay.

24               Science is hard, isn't it?

25         A.    Science is hard, and people are
```

Confidential - Subject to Protective Order

1    hard.

2                    (Chung Exhibit 305A marked for

3          identification.)

4    QUESTIONS BY MR. TRACEY:

5          Q.    Oh, yes.  This will be my last

6    thing because I want to get out of here

7    quickly.  This is a real last thing, not a

8    lawyer last thing.

9                    On the break -- at the

10   beginning of the deposition -- I'm going to

11   sort of come back to where I began.

12                   You -- I asked you about

13   methodology, any methodology that you could

14   articulate in your paper, and we had that

15   discussion.

16                   Do you remember that?

17         A.    Yes, I do.

18         Q.    And then I asked you whether in

19   your professional life, outside of

20   litigation, you actually employed

21   methodologies when you were doing analyses of

22   data and scientific information.

23                   Do you remember that?

24         A.    Yes, I do.

25         Q.    And so on the break, somebody

1   found this paper where it seems that you've

2   done just that.  This was a paper published

3   in 2019 in Genetics in Medicine.  It's called

4   "A Systematic Review."  And you are one of

5   the authors.

6           Are you not?

7       A.   Yes, I was.

8       Q.   And then just flip over to the

9   next page, you have "Materials and Methods."

10          Do you see that?

11      A.   Yes, I see.

12      Q.   You said you conducted -- or

13  we, not you.  "We conducted a scoping review

14  as the basis for a consensus development

15  conference to summarize the molecular

16  diagnostic yield of ES for NDDs, specifically

17  compared with CMA.  For the conference, in

18  addition to the core group of experts who

19  authored this paper, we also invited outside

20  experts on the CNV analysis from ES data."

21          The details don't matter to me

22  much, but the next paragraph does.

23          In the scope -- you said, "For

24  this scoping review, we addressed the

25  following question."

Confidential - Subject to Protective Order

1           And then you -- you tell us the

2    question you're addressing, don't you?

3           You say, "Among individuals

4    with NDDs tested with ES, what is the

5    molecular diagnostic yield compared with

6    CMA?"

7           So you've identified and

8    articulated the question that you were

9    addressing in your paper, haven't you?

10       A.     Yes.

11       Q.     Then you say, "We selected

12   articles from PubMed focusing on ES and NDDs.

13   We included studies that involve sequencing

14   of protein-coding, regions of Mendelian genes

15   and excluded studies that were gene panels

16   sub-sampled from exome data.  We defined NDD

17   as GDD, ID and/or ASD.  We searched PubMed

18   with a combination of medical subject

19   headings, terms and keywords pertaining to

20   NDDs."

21          And then you give examples, and

22   then you give the date of your search,

23   January 2014 to June 2018.

24          Then you say, "A scoping review

25   differs from the systematic reviews in that

1    their focus is on more broadly defined

2    research questions, charting of themes and

3    development of inclusion/exclusion criteria

4    at the study selection stage."

5              Did I read all of that

6    correctly?

7         A.    Yes, you've read that

8    correctly.

9         Q.    And in this systematic review,

10   you identified for everybody the question

11   that was being asked, and then you

12   articulated the search terms and how you went

13   about identifying the literature that you did

14   identify that you were setting out to review.

15             Correct?

16        A.    Yes, that's correct.

17        Q.    None of that was done in your

18   report?

19             MS. BROWN:  Objection to the

20        form.

21             THE WITNESS:  This review that

22        was done was done for a very specific

23        reason and indication, which is that

24        as we're trying to assess clinical

25        guidelines in this case, diagnostic

1  yields for neurodevelopmental

2  disorders.  It was very clear how to

3  be able to look at the published data

4  for this and largely to be able to

5  help guide clinicians and payers in

6  what tests should be performed.

7       This is quite a different

8  process than what I was asked to do in

9  terms of developing the opinions for

10  today.

11       This was not dissimilar in

12  terms of doing a literature review

13  with key search terms and being able

14  to look at the evidence that was in

15  those manuscripts and summarizing that

16  data in one comprehensive source.

17       I did, when I was using the

18  methods after performing the

19  literature review, consider many

20  things, many things in terms of the

21  sample size of the papers that I

22  reviewed, the replicability across

23  studies, the effect size that was

24  seen, the rigor of testing and

25  penalizing for multiple statistical

```
1           tests.  So I did apply that method,

2           although it was different from this

3           method because this was a different,

4           focused clinical question than I was

5           asked to review for my opinion.

6    QUESTIONS BY MR. TRACEY:

7           Q.      The answer to my question is,

8    what we have on the page there that you did,

9    identifying a question and then all your

10   search terms, is absent from your report.

11               MS. BROWN:  Objection to the

12          form.  Misstates her testimony.

13   QUESTIONS BY MR. TRACEY:

14          Q.      Right?

15          A.      Again, we went through it

16   earlier this morning.  Within my report, I

17   did demonstrate the area which was the key

18   questions, the scope of what I was

19   addressing.

20          Q.      Can you show me in your report,

21   ma'am, where -- like you have on the page

22   here in this published paper, the question

23   that you were answering like we see it in

24   this paper?

25          A.      Again, we referenced this this
```

1   morning, but on pages 2, 3 and 4, we have the

2   questions and the opinions.  They're not

3   framed in the form of a question, but we do

4   have my opinions listed there.

5            I did not include the search

6   terms in my report, but I stated this

7   morning, as we were discussing it, how I

8   performed the PubMed literature search.

9       Q.    I just -- one more question.

10            **In your disclosures to us, you**

11   **did not identify a case where you gave a**

12   **deposition in July of 2022 in a case called**

13   **Hermiller {phonetic} versus Mary -- Mercy,**

14   **sorry.**

15            **Do you know why you didn't**

16   **disclose that as a deposition you've given in**

17   **the last four years?**

18       A.    It was an oversight if I didn't

19   put -- include it.

20       Q.    **Okay.  The other -- okay.**

21   **Okay.  So it should -- it says four cases**

22   **you've testified in as an expert witness in**

23   **the last four years, but it should be five.**

24            **You remember the Mercy case,**

25   **right?**

```
1       A.      I don't off the top of my head.

2       Q.      I read the deposition.  I think

3    it was a med-mal case.

4       A.      Okay.

5       Q.      In Philly.

6       A.      Okay.

7       Q.      Do you remember that now?

8       A.      I'm sure it was a med-mal case,

9    yes.

10       Q.      How many depositions have you

11   given in your lifetime?

12       A.      In my lifetime, if that was

13   five and today's six, then seven and eight

14   and nine.

15       Q.      Nine.

16               Okay.  Have you ever testified

17   at trial?

18       A.      Once.

19       Q.      And what kind of -- is that --

20   you were an expert in that case?

21       A.      Yes.

22       Q.      What kind of case was that?

23       A.      Medical malpractice.

24       Q.      Where was that?

25       A.      It was a very long time ago, in
```

Confidential - Subject to Protective Order

```
 1    New York.

 2              MR. TRACEY:  Okay.  Okay.

 3         What's that?  Oh, they want me to mark

 4         your bills as an exhibit and attach

 5         them.  And let's mark the depo notice,

 6         do the cleanup stuff.

 7              Doctor, thank you for your

 8         time.  I don't have any further

 9         questions.  I appreciate it.

10              Have I been reasonably nice to

11         you?

12              THE WITNESS:  It's been an

13         interesting day.

14              MR. TRACEY:  Yeah.  For me,

15         too, thanks.

16              I'll pass the witness.

17              (Chung Exhibits 301 and 303

18         marked for identification.)

19              MS. BROWN:  I have just a

20         couple of questions.

21              CROSS-EXAMINATION

22    QUESTIONS BY MS. BROWN:

23         Q.    Dr. Chung, are you ready just

24    to answer --

25         A.    Sure.
```

Confidential - Subject to Protective Order

1      Q.      -- a few questions.

2             Okay.  Counsel just showed you

3    an article titled "Meta-analysis and

4    multi-disciplinary consensus statement."

5             MS. BROWN:  Did we mark this as

6         an exhibit?

7             MR. TRACEY:  Oh, no.  We

8         should.

9             MS. BROWN:  Okay.  Do we have a

10        number?

11            Ah.  It's been marked as 305A.

12            MR. TRACEY:  Oh, okay.  So I

13        don't think I said that.

14   QUESTIONS BY MS. BROWN:

15        Q.      Okay.  And, Dr. Chung, I want

16   to direct your attention to the second page

17   of Exhibit 305A.  Look with me, if you would,

18   at the left-hand column, the very last

19   paragraph that begins "Therefore."

20            Do you see that?

21        A.      Yes.

22        Q.      And what your paper that we

23   marked as Exhibit 305A states is that

24   "Therefore, our primary objective was to

25   conduct an evidence-based consensus

1    conference to provide recommendations for the

2    use of ES in the diagnostic evaluation of

3    individuals with NDDs."

4              Do you see that, Doctor?

5        A.    Yes, I do.

6        Q.    Okay.  Was the primary

7    objective of your expert report that we've

8    marked as 305 the same?

9        A.    No, it was different.  This

10   was, as I said, designed to be able to inform

11   diagnostic evaluations.

12       Q.    And counsel pointed you to a

13   section of 305A that discussed something

14   called a "scoping review."

15             Do you remember looking at that

16   language?

17       A.    Yes.

18       Q.    And is that something that you

19   did as part of your report?

20       A.    I didn't call it a scoping

21   review, per se, but I considered them both

22   literature reviews that are comprehensive in

23   scope of defining the question and reviewing

24   all the relevant literature.

25       Q.    And counsel asked you, well,

Confidential - Subject to Protective Order

1    where can we find the question in your

2    report?  And you directed him to, in part,

3    pages 2, 3, 4 of your report, correct?

4         A.    Correct.

5         Q.    And I want to draw your

6    attention to paragraph number 2, Dr. Chung,

7    where you state, "This report identifies the

8    robust and rigorously replicated scientific

9    evidence in the published literature

10   demonstrating the known genetic etiologies of

11   ASD and ADHD."

12              Do you see that, Doctor?

13        A.    Yes, I do.

14        Q.    And what was the intent of that

15   sentence in your report at page 2,

16   paragraph 2?

17        A.    The intent was to identify what

18   the scope of this report was to include.

19        Q.    And is that the same

20   methodology that you apply when you were

21   publishing one of your 700 papers?

22        A.    The same in the sense of

23   being -- doing a comprehensive literature

24   review and summarizing all of that literature

25   and -- anyway, being able to represent it

1    accurately and concisely.

2        Q.    And the next sentence in

3    paragraph 2 says, "My report also addresses

4    the published epidemiological studies on

5    prenatal acetaminophen exposure and outcomes

6    purportedly relating to ASD and/or ADHD to

7    assess whether these studies have properly

8    accounted for genetic confounders."

9            Do you see that sentence?

10       A.    Yes.

11       Q.    And what was the intent of that

12   sentence in paragraph 2, page 2 of your

13   report?

14       A.    As we've been discussing today,

15   it was to be able to understand specifically

16   the context of acetaminophen and prenatal

17   exposures and to understand whether genetic

18   factors have been accounted for in those

19   epidemiological studies.

20       Q.    And did you apply the same

21   methodology that you apply in your published

22   papers to your efforts to do what you've --

23   what you've set forth in paragraph 2 of your

24   expert report?

25       A.    Yes, I tried to use the same

1    scientific methodology and literature review

2    that I would do in any of my other scientific

3    work.

4         Q.    So if someone were to take

5    **Exhibit 305A and line it up with your expert**

6    **report, which we've marked as 305, and**

7    **suggest that you somehow have employed a**

8    **different methodology outside of litigation**

9    **than you've employed as an expert witness in**

10   **litigation, would that be fair?**

11        A.    I would say I haven't

12   specifically spelled it out in the same way

13   that we do in a methods paper by calling it a

14   scoping review, per se, but it's the same

15   process and the same literally PubMed search

16   engine that's used for both of the literature

17   reviews and assessments.

18        Q.    **So have you done anything**

19   **different outside of litigation than what**

20   **you've done inside of litigation when it**

21   **comes to creating your expert report that**

22   **we've marked as 305?**

23        A.    No, I'm scientifically trained

24   to perform scientific analyses the most

25   rigorous way I know how.

Confidential - Subject to Protective Order

```
 1        Q.     And did you apply the same

 2  scientific rigor to your expert report that

 3  we've marked as Exhibit 305 that you've

 4  applied to your many publications that you

 5  have throughout the years?

 6        A.     I believe so.  I believe I've

 7  been very careful and very rigorous in my

 8  report.

 9             MS. BROWN:  Thanks, Dr. Chung.

10        I have no further questions.

11             THE WITNESS:  Thank you.

12             MR. TRACEY:  I don't have

13        anything else, Dr. Chung.  Thank you.

14             THE WITNESS:  Thanks.

15             MS. BROWN:  Okay.

16             VIDEOGRAPHER:  With that, the

17        time is 4:16 p.m.  This deposition has

18        concluded, and we're off the record.

19        (Deposition concluded at 4:16 p.m.)

20             - - - - - - -

21

22

23

24

25
```

Confidential - Subject to Protective Order

```
 1                      CERTIFICATE

 2           I, CARRIE A. CAMPBELL, Registered
      Diplomate Reporter, Certified Realtime
 3    Reporter and Certified Shorthand Reporter, do
      hereby certify that prior to the commencement
 4    of the examination, Wendy Chung, MD, Ph.D.,
      was duly sworn by me to testify to the truth,
 5    the whole truth and nothing but the truth.

 6           I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 7    testimony as taken stenographically by and
      before me at the time, place and on the date
 8    hereinbefore set forth, to the best of my
      ability.
 9
             I DO FURTHER CERTIFY that I am
10    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
11    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
12    that I am not financially interested in the
      action.
13


14

15    _____

16    CARRIE A. CAMPBELL,
      NCRA Registered Diplomate Reporter
17    Certified Realtime Reporter
      California Certified Shorthand
18    Reporter #13921
      Missouri Certified Court Reporter #859
19    Illinois Certified Shorthand Reporter
      #084-004229
20    Texas Certified Shorthand Reporter #9328
      Kansas Certified Court Reporter #1715
21    New Jersey Certified Court Reporter
      #30XI00242600
22    Louisiana Certified Court Reporter
      #2021012
23    Notary Public
      Dated:  August 31, 2023
24


25
```

Confidential - Subject to Protective Order

```
 1                INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8           After doing so, please sign the

 9   errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13           It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

Case 1:22-md-03043-DLC   Document 1139-4   Filed 09/19/23   Page 440 of 442
Confidential - Subject to Protective Order

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I,_____, do
    hereby certify that I have read the foregoing
 5  pages and that the same is a correct
    transcription of the answers given by me to
 6  the questions therein propounded, except for
    the corrections or changes in form or
 7  substance, if any, noted in the attached
    Errata Sheet.
 8

 9

10

11

12  _____
    Wendy Chung, MD, Ph.D.               DATE
13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

Confidential - Subject to Protective Order

```
1                 - - - - - - -
                       ERRATA
2                 - - - - - - -

3     PAGE    LINE    CHANGE

4     _____   _____   _____

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25
```

Confidential - Subject to Protective Order

```
 1                    _ _ _ _ _ _ _
                      LAWYER'S NOTES
 2                    _ _ _ _ _ _ _

 3      PAGE    LINE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```