# Exhibit 20

Confidential - Subject to Protective Order

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
 2

 3    IN RE: ACETAMINOPHEN -    ) MDL No. 3043
      ASD-ADHD PRODUCTS         )
 4    LIABILITY LITIGATION      ) Case No.
      _____  ) 1:22-md-03043-DLC
 5    THIS DOCUMENT RELATES TO: )
                                ) JUDGE DENISE
 6    All Cases, 1:22-md-03043  ) COTE

 7

 8              MONDAY, AUGUST 14, 2023

      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
 9
                        - - -
10

11          Videotaped deposition of Andrea

12    Baccarelli, MD, Ph.D., held at the offices of

13    Lanier Law Firm, 126 East 56th Street,

14    New York, New York, commencing at 8:32 a.m.

15    Eastern, on the above date, before Carrie A.

16    Campbell, Registered Diplomate Reporter,

17    Certified Realtime Reporter, Illinois,

18    California & Texas Certified Shorthand

19    Reporter, Missouri, Kansas, Louisiana & New

20    Jersey Certified Court Reporter.

21                      - - -

22

           GOLKOW LITIGATION SERVICES
23              877.370.DEPS
              deps@golkow.com
24

25
```

A P P E A R A N C E S :

KELLER POSTMAN LLC
BY: J.J. SNIDOW
jj.snidow@kellerpostman.com
ASHLEY C. KELLER
ashley.keller@kellerpostman.com
REBECCA KING          (VIA ZOOM)
rebecca.king@kellerpostman.com
ASHLEY BARRIERE       (VIA ZOOM)
ashley.barriere@kellerpostman.com
AMANDA HUNT           (VIA ZOOM)
amanda.hunt@kellerpostman.com
ROSIE ROMANO          (VIA ZOOM)
rosie.romano@kellerpostman.com
LAUREN SCHULTZ        (VIA ZOOM)
lauren.schultz@kellerpostman.com
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
(312) 741-5220

and

TRACEY & FOX
BY: SEAN P. TRACEY     (VIA ZOOM)
stracey@traceylawfirm.com
440 Louisiana Street, Suite 1901
Houston, Texas 77002
(713) 495-2333

and

THE LANIER LAW FIRM, PLLC
BY: EVAN M. JANUSH     (VIA ZOOM)
evan.janush@lanierlawfirm.com
CATHERINE HEACOX
catherine.heacox@lanierlawfirm.com
LEILA AYACHI          (VIA ZOOM)
leila.ayachi@lanierlawfirm.com
126 East 56th Street, 6th Floor
New York, New York 11758
(212) 421-2800

and

WATTS GUERRA LLC
BY: MIKAL C. WATTS      (VIA ZOOM)
mcwatts@wattsguerra.com
HAILEY WATTS
hwatts@wattsguerra.com
RUSS ABNEY
rabney@wattsguerra.com
Millennium Park Plaza RFO
Suite 410, C112
Guaynabo, Puerto Rico 00966
(210) 447-0500

and

HOLWELL SHUSTER & GOLDBERG LLP
BY: EILEEN MONAGHAN DELUCIA (VIA ZOOM)
edelucia@hsgllp.com
DANIEL M. SULLIVAN     (VIA ZOOM)
dsullivan@hsgllp.com
425 Lexington Avenue
New York, New York 10017
(646) 837-5151

and

WAGSTAFF & CARTMELL
BY: LINDSEY SCARCELLO     (VIA ZOOM)
lscarcello@wcllp.com
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 701-1100

and

THE CARLSON LAW FIRM
BY: EMILY MARLOWE      (VIA ZOOM)
emarlowe@carlsonattorneys.com
1717 North Interstate Highway 35, Suite 305
Round Rock, Texas 78664
(512) 671-7277

and

KRAUSE & KINSMAN
BY: TRICA CAMPBELL      (VIA ZOOM)
tcampbell@krauseandkinsman.com
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 200-2900

and

HOLLAND LAW FIRM
BY: MICHAEL DOWD       (VIA ZOOM)
mdowd@hollandtriallawyers.com
211 North Broadway, Suite 2625
St. Louis, Missouri 63102
(314) 241-8111

and

DOVEL & LUNER
BY: GREG DOVEL         (VIA ZOOM)
greg@dovel.com
JULIEN ADAMS           (VIA ZOOM)
julien@dovel.com
201 Santa Monica Boulevard, Suite 600
Santa Monica, California 90401
(310) 656-7066

and

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES
BY: W. ROGER SMITH III  (VIA ZOOM)
roger.smith@beasleyallen.com
218 Commerce Street
Montgomery, Alabama 36104
(800) 898-2034

and

KERSHAW TALLEY BARLOW
BY: WILLIAM J. LEE      (VIA ZOOM)
VINH T. LE             (VIA ZOOM)
401 Watt Avenue, Suite
Sacramento, California 95864-7273
(916) 520-6639

and

COOPER LAW PARTNERS
BY: DAVIS COOPER       (VIA ZOOM)
davis@cooperlawpartners.com
999 Vanderbilt Beach Road, Suite 200
Naples, Florida 34108
(800) 872-3500.
Counsel for Plaintiffs

BARNES & THORNBURG LLP
BY: JAMES F. MURDICA
jmurdica@btlaw.com
SARAH E. JOHNSTON
sjohnston@btlaw.com
MITCHELL HARCHALIS
mharchalis@btlaw.com
KRISTEN L. RICHER      (VIA ZOOM)
kricher@btlaw.com
2029 Century Park East, Suite 300
Los Angeles, California 90067-2904
(310) 284-3880

and

BARNES & THORNBURG LLP
BY: DEANNA LEE         (VIA ZOOM)
dllee@btlaw.com
555 12th Street N.W., Suite 1200
Washington, DC 20004-1275
(202) 289-1313

and

Page 6

```
 1  BARNES & THORNBURG LLP
 2  BY:  JESSICA BRENNAN        (VIA ZOOM)
        jessica.brennan@btlaw.com
 3  67 East Park Place, Suite 500
    Morristown, New Jersey  07960
 4  (973) 775-6101
    Counsel for Johnson & Johnson
 5  Consumer, Inc.

 6
 7  BARNES & THORNBURG LLP
    BY:  NADINE KOHANE          (VIA ZOOM)
 8      nkohane@btlaw.com
    390 Madison Avenue, 12th Floor
 9  New York, New York  10017
    (646) 746-2000
10  Counsel for CVS Pharmacy, Inc., CVS
    Health Corporation, Walgreen Co.,
11  Walgreens Co., and Walgreens Boots
    Alliance, Inc.
12
13  BARNES & THORNBURG LLP
14  BY:  SANDRA M. KO           (VIA ZOOM)
        sko@btlaw.com
15  555 12th Street, N.W., Suite 1200
    Washington, DC  20004-1275
16  (202) 289-1313
    Counsel for Costco Wholesale
17  Corporation

18
19  ARNOLD & PORTER, LLP
    BY:  RAYNE ELLIS            (VIA ZOOM)
20      rayne.ellis@arnoldporter.com
        MITCHELL STERN           (VIA ZOOM)
21      mitchell.stern@arnoldporter.com
    250 West 55th Street
22  New York, New York  10019
    (212) 836-8000
23  Counsel for Dollar Tree Inc.,
    7-Eleven, and Family Dollar, Inc.
24
25
```

Page 7

```
 1  KING & SPALDING LLP
    BY:  EVA CANAAN             (VIA ZOOM)
 2      ecanaan@kslaw.com
    1185 Avenue of the Americas
 3  New York, New York  10036
    (212) 556-2100
 4
 5  and

 6
 7  KING & SPALDING LLP
    BY:  LUKE BOSSO             (VIA ZOOM)
 8      lbosso@kslaw.com
    1700 Pennsylvania Avenue NW
 9  Washington, DC  20006
    (202) 737-0500
10  Counsel for Walmart Inc., and
    Wal-Mart Stores, Inc.
11
12  MORRISON & FOERSTER LLP
13  BY:  LYNDSEY CAIN           (VIA ZOOM)
        lcain@mofo.com
14      ASHLEY E. QUINN         (VIA ZOOM)
        aquinn@mofo.com
15  250 West 55th Street
    New York, New York  10019-9601
16  (212) 468-8000
    Counsel for Target Corporation
17
18  DUANE MORRIS LLP
19  BY:  ANNE A. GRUNER         (VIA ZOOM)
        agruner@duanemorris.com
20  30 South 17th Street
    Philadelphia, Pennsylvania  19103
21  (215) 979-1000
    Counsel for Dollar General, Dollar
22  General Corporation
23
24
25
```

Page 8

```
 1  SMITH SOVIK KENDRICK & SUGNET
    BY:  GARDAR OLAFSSON        (VIA ZOOM)
 2      golafsson@smithsovik.com
    250 South Clinton Street, Suite 600
 3  Syracuse, New York  13202
    (315) 474-2911
 4  Counsel for Rite Aid

 5
 6  STONE DEAN LLP
 7  BY:  JOSEPH A. LARA         (VIA ZOOM)
        jlara@stonedeanlaw.com
 8  21052 Oxnard Street
    Woodland Hills, California  91367
 9  (818) 999-2232
    Counsel for The Kroger Co.
10
11  HAIGHT BROWN & BONESTEEL LLP
12  BY:  KATIE M. TRINH         (VIA ZOOM)
        ktrinh@hbblaw.com
13  555 South Flower Street, 55th Floor
    Los Angeles, California  90071
14  (213) 542-8000
    Counsel for Big Lots Stores-PNS, LLC
15
16  ALSO PRESENT (VIA ZOOM):
17      JACKIE KOSTICK, King & Spalding
18      LAURA SHANNON, summer associate, Keller
    Postman LLC
19
20  V I D E O G R A P H E R :
21      DANNY ORTEGA,
        Golkow Litigation Services
22
            - - -
23
24
25
```

Page 9

```
 1              INDEX
 2                             PAGE
 3  APPEARANCES..................................  2
 4  EXAMINATIONS
 5  BY MR. MURDICA............................  14
 6  BY MR. SNIDOW.............................. 478
 7  BY MR. MURDICA............................. 483
 8
 9              EXHIBITS
10  No.   Description                    Page
11  89    E-mail(s)                      108
12        BACCARELLI_014239 -
        BACCARELLI_014242
13  90    "Association Between Meconium   169
        Acetaminophen and Childhood
14      Neurocognitive Development in
        GESTE, a Canadian Cohort Study,"
15      Laue, et al.
16  91    E-mail(s)                      174
17        BACCARELLI_000427 -
        BACCARELLI_000431
18  92    "Meconium:  A Novel Biomarker of 213
        In Utero Exposure to
19      Acetaminophen and Caffeine,"
        Laue, et al.
20
21  93    Draft of "Association of maternal 245
        acetaminophen usage during
22      pregnancy and childhood
        neurocognitive development in a
23      Canadian cohort study,"
        BACCARELLI_000298 -
24      BACCARELLI_000309
25  94    Printout of Andrea Baccarelli   283
        Twitter tweet
```

Page 10

95   Use of Acetaminophen              289
     (Paracetamol, Tylenol) During
     Pregnancy and Association to
     Infant Neurodevelopmental
     Outcomes chart of studies

96   Dr. Baccarelli invoices and       293
     privilege log

97   "Monitoring of prenatal exposure  296
     to organic and inorganic
     contaminants using meconium from
     an Eastern Canada cohort,"
     Cassoulet, et al.

98   Redline document of "Monitoring   297
     of prenatal exposure to organic
     and inorganic contaminants using
     meconium from an Eastern Canada
     cohort,"
     BACCARELLI-000464 -
     BACCARELLI-000482

99   "The Causal Relationship Between  347
     Prenatal Acetaminophen Use,
     Neurodevelopmental Disorders
     (NDD), Attention-Deficit
     Hyperactivity Disorder (ADHD),
     and Autism Spectrum Disorder
     (ASD)," Expert Report of Andrea
     Baccarelli, MD, Ph.D., MPH

100  "Association of Prenatal          348
     Acetaminophen Exposure Measured
     in Meconium With Risk Of
     Attention-Deficit/Hyperactivity
     Disorder Mediated by
     Frontoparietal Network Brain
     Connectivity," Baker, et al.

101  Online version of "Association of 354
     Prenatal Acetaminophen Exposure
     Measured in Meconium With Risk Of
     Attention-Deficit/Hyperactivity
     Disorder Mediated by
     Frontoparietal Network Brain
     Connectivity," Baker, et al.

Page 11

102  Supplementary Online Content     367

103  Draft analysis plan:  Association 374
     between meconium acetaminophen
     and attention deficit,
     BACCARELLI-000499 -
     BACCARELLI-000501

104  Draft of "Association of Prenatal 384
     Acetaminophen Measured in
     Meconium with Risk of
     Attention-Deficit Hyperactivity
     Disorder: Mediation by frontal
     Parietal Network Brain
     Connectivity,"
     BACCARELLI-001185 -
     BACCARELLI-001209

105  Report of Anne McTiernan, MD,     393
     Ph.D., to the House of
     Representatives Subcommittee on
     Economic and Consumer Policy,
     March 12, 2019

106  "Association of Cord Plasma       393
     Biomarkers of In Utero
     Acetaminophen Exposure With Risk
     of Attention-Deficit/
     Hyperactivity Disorder and Autism
     Spectrum Disorder in Childhood,"
     Ji, et al.

107  E-mail(s),                        405
     BACCARELLI-014576 -
     BACCARELLI-014580

108  "Association of Prenatal          420
     Acetaminophen Exposure Measured
     in Meconium With Adverse Birth
     Outcomes in a Canadian Birth
     Cohort," Baker, et al.

109  "Sex-specific neurobehavioral and 428
     prefrontal cortex gene expression
     alterations following
     developmental acetaminophen
     exposure in mice," Baker, et al.

Page 12

110  "Acetaminophen use in pregnancy:  438
     Examination prevalence, timing
     and indication of use in a
     prospective birth cohort,"
     Bandoli, et al.

111  E-mail(s),                        448
     BACCARELLI-001360 -
     BACCARELLI-001364

112  "Acetaminophen use in pregnancy   450
     and neurodevelopment:  Attention
     function and autism spectrum
     symptoms," Avella-Garcia, et al.

113  "Maternal Use of Acetaminophen    467
     during Pregnancy and Risk of
     Autism Spectrum Disorders in
     Childhood:  A Danish National
     Birth Cohort Study," Liew, et al.

114  Binders of materials brought to   487
     the deposition by Dr. Baccarelli

115  Laue PowerPoint presentation      487
     slides

(Exhibits attached to the deposition.)

(Exhibits 96 and 115 to be provided by

plaintiffs' counsel at a later date.)

CERTIFICATE................................488

ACKNOWLEDGMENT OF DEPONENT...................490

ERRATA.......................................491

LAWYER'S NOTES...............................492

Page 13

VIDEOGRAPHER:  We are now on the record.  My name is Danny Ortega, and I'm the legal videographer for Golkow Litigation Services.

Today's date is August 14, 2023, and the time is 8:32 a.m.

This video deposition is being held at 126 East 56th Street, New York, New York, in the matter of acetaminophen (Tylenol) ASD-ADHD Products Liability Litigation.

The deponent today is Andrea Baccarelli.

All counsel will be noted on the stenographic record.

The court reporter today is Carrie Campbell and will now swear in the witness.

ANDREA BACCARELLI, MD, Ph.D., of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Defendant Johnson & Johnson, as follows:

1    DIRECT EXAMINATION
2  QUESTIONS BY MR. MURDICA:
3      Q.    Good morning, Doctor.
4      A.    Good morning.
5      Q.    How do you prefer that I
6  address you?
7      A.    Dr. Baccarelli is good.
8      Q.    Thank you, Dr. Baccarelli.
9            Before we begin, I just want to
10 put on the record that late Friday, counsel
11 for the plaintiffs, Mr. Snidow --
12           MR. MURDICA:  Did I pronounce
13 that right, J.J..
14           MR. SNIDOW:  Snidow.
15 QUESTIONS BY MR. MURDICA:
16     Q.    Snidow.
17           -- filed a motion for pro hac
18 admission in this case.  I have not yet had a
19 chance to confer with the client or do any
20 research about this, but there may exist a
21 good faith basis to oppose the pro hac.
22           I'm comfortable with going
23 forward with Mr. Snidow defending you today,
24 provided we have an agreement that any such
25 opposition, if there is a credible basis for

1  it, would not be waived.
2            And if, on direct examination,
3  there's any examination with respect to my
4  client, we may have to take that question by
5  question.
6            MR. MURDICA:  Okay.  That's
7  fine.  Thanks, Jim.
8            Dr. Baccarelli, you can ignore
9  all that.
10           THE WITNESS:  Yes.
11           MR. MURDICA:  Yes, not relevant
12 to you, Dr. Baccarelli.
13           MR. SNIDOW:  Please do.
14           THE WITNESS:  Okay.
15 QUESTIONS BY MR. MURDICA:
16     Q.    Good morning, Dr. Baccarelli.
17 My name is Jim Murdica, and I represent the
18 defendants.
19           Dr. Baccarelli, as you sit here
20 today, you have offered a written opinion in
21 an initial report, correct?
22     A.    Yes.
23     Q.    You offered an amended report
24 that you said was substantively the same as
25 your initial report, right?

1      A.    Correct.  Didn't change the
2  substance of my conclusion.
3      Q.    Okay.  And then you also
4  submitted a rebuttal report about two weeks
5  ago, right?
6      A.    Yes, that is correct.
7      Q.    Okay.  Are there any opinions
8  you hold today that are not contained in
9  those reports?
10     A.    No, there is not -- no opinions
11 that I need to add.
12     Q.    Okay.  Before we begin, is
13 there anything you want to go on the record
14 to change right now in -- contained in those
15 reports?
16     A.    There are small things that I
17 found that I might need to correct, but I can
18 tell you what they are.
19     Q.    Sure.
20           Are any of them substantive?
21     A.    No.
22           A lot of small things, the way
23 you look at 100 pages, you find all the
24 times.
25           For instance, I realized that

1  in my tables I said that Alemany was
2  presenting new results for two out of six
3  cohorts instead -- sorry, for four out of six
4  cohorts.  Instead, there are three out of six
5  cohorts that are new.
6            There's a paper Alemany 2021.
7            And I said that Liew 2014 in my
8  table, page 8 of 21, was from Norway.
9  Instead, it is from Denmark.
10           These are some of the things I
11 have.  I -- all the rest is about right.  If
12 there is anything that I find different, I'll
13 make sure to tell you.
14     Q.    Okay.  Thank you,
15 Dr. Baccarelli.
16           Dr. Baccarelli, when did you
17 first begin investigating an association
18 between acetaminophen exposure in pregnancy
19 and neurodevelopmental outcomes?
20     A.    Acetaminophen and
21 neurodevelopmental outcomes, correct?
22           In -- we started to work on
23 this, my team and I, in around 2019.
24     Q.    And --
25     A.    2018, actually.  Yeah.

Page 18

1  Q.  2018 is the first time you
2  started investigating acetaminophen exposure
3  during pregnancy and neurodevelopmental
4  outcomes, correct?
5  A.  Correct.  Correct.
6  Q.  Do you remember when in 2018?
7  A.  No.
8  Q.  Okay.  By the way, are you a
9  neurologist?
10  A.  Oh, no.  I'm not a neurologist.
11  I'm an epidemiologist.  I publish about 300
12  papers on the effects of chemical intoxicants
13  on the child prenatally and during -- and
14  during childhood.
15  So I clearly -- I clearly --
16  I'm a physician, but I don't work as a
17  neurologist.
18  Q.  Neurodevelopmental outcomes are
19  not themselves your expertise; is that right?
20  MR. SNIDOW:  Objection to the
21  form.
22  Dr. Baccarelli, you can -- you
23  can answer.
24  THE WITNESS:  That is
25  completely incorrect.

Page 19

1  I work extensively on
2  neurodevelopmental outcomes.  I
3  published -- as an epidemiologist, I'm
4  very well qualified to look at
5  neurodevelopmental outcomes.
6  QUESTIONS BY MR. MURDICA:
7  Q.  Okay.  Was there ever a time
8  when you held the opinion that acetaminophen
9  exposure during pregnancy was not associated
10  with adverse neurodevelopmental outcomes?
11  A.  Oh, absolutely.  I was
12  completely convinced it was not.
13  Q.  Okay.
14  A.  I was taught like that in
15  medical school.  I was taught Tylenol is the
16  only drug you can give to women during
17  pregnancy.  So I grew up believing that as a
18  truth that no one can doubt.
19  Q.  And, Dr. Baccarelli, you just
20  testified you started looking into it as a --
21  as a scientist in 2018, correct?
22  A.  That is correct.
23  Q.  Okay.  And at the time that you
24  started looking into it as a scientist, did
25  you believe that acetaminophen exposure

Page 20

1  during pregnancy was associated with adverse
2  neurodevelopmental outcomes?
3  MR. SNIDOW:  Objection to the
4  form.
5  Dr. Baccarelli, you can answer.
6  THE WITNESS:  At that time, I
7  didn't believe that acetaminophen was
8  associated with the outcome.  I
9  believe it was worth investigating.
10  The way went -- my team went to
11  me, came to me, particularly Hannah
12  Laue and then Brennan Baker, and they
13  say there is some papers that show
14  that acetaminophen may be associated
15  with neurodevelopmental outcomes.  I
16  think should we we should look into it.
17  And I say, okay, let's look
18  into it.  But in my mind, it was no
19  way this -- we find everything.  I was
20  pretty sure we find absolutely
21  nothing.
22  I mean, as a physician, I
23  thought Tylenol is perfectly fine.
24  Everyone takes it.  Everyone
25  is that -- that is what I thought back

Page 21

1  then.  I was completely wrong.
2  QUESTIONS BY MR. MURDICA:
3  Q.  Okay.  And when Hannah came to
4  you, she was talking about ADD or ADHD
5  specifically, not just all neurodevelopmental
6  outcomes, correct?
7  A.  Hannah was talking about ADD,
8  ADHD and neurodevelopmental outcomes.  It
9  was -- at the time, we were -- when Hannah
10  Laue came to me, she approached me about
11  looking at the intelligence.  So we were
12  talking about the intelligence at that time.
13  Q.  Okay.  And you -- she did, in
14  fact, look at data from meconium and tried to
15  connect acetaminophen exposure to an
16  intelligence outcome, right?
17  MR. SNIDOW:  Objection to the
18  form.
19  And, Jim, if you're talking
20  about a particular study, I do ask
21  that you show it to him.
22  If you're talking about
23  conversations, that's fine, but it
24  seems like you're mentioning a study.
25  MR. MURDICA:  So we're not

Page 22

1  going to be doing that today. I'm
2  going to ask my questions. I will
3  conduct my examination however I want
4  within the rules, and I'm not going to
5  waste my time listening to you talk
6  about things that are unrelated to my
7  examination.
8      So, particularly given the
9  status of your pro hac, we're not
10  going to do this today.
11      MR. SNIDOW: That has nothing
12  to do with anything. If you want to
13  show him -- you're talking about data.
14  It seems like you're talking about a
15  study, and I ask you show him the
16  study.
17      MR. MURDICA: Mr. Snidow, I
18  will show whatever I want whenever I
19  what it, and this is going to be the
20  last time we have this conversation
21  today.
22  QUESTIONS BY MR. MURDICA:
23      Q. Can you answer my question,
24  Dr. Baccarelli?
25      A. Can you rephrase the question,

Page 23

1  please?
2      Q. Sure.
3      MR. MURDICA: Do you mind
4  reading it back?
5      (Court Reporter read back
6  question.)
7      THE WITNESS: So she didn't try
8  to connect. As we -- as scientists,
9  we always look objectively at the
10  evidence. We don't try to connect
11  anything.
12      So we are just studying the
13  association between -- in that case
14  between prenatal acetaminophen and a
15  measurement, one measurement, of
16  intelligence.
17  QUESTIONS BY MR. MURDICA:
18      Q. And at the time,
19  Dr. Baccarelli, like you just said, you
20  didn't know if there was an association or
21  not, right?
22      A. At the time, I had an opinion
23  that -- that I was completely agnostic to
24  the -- to the fact. Without -- my first
25  reaction to Hannah was, that is interesting

Page 24

1  to look at, but I -- I'm not sure we will
2  find anything.
3      So as a scientist, I'm driven
4  by data. The data that I was aware of at
5  that time was part of the literature, and I
6  was really driven by my bias as a physician
7  of thinking that Tylenol was great. Was
8  great. I just trust in my teachers in
9  medical school more than the evidence, and it
10  was a mistake.
11      Q. Do you think you answered my
12  question?
13      MR. SNIDOW: Objection to the
14  form.
15      Dr. Baccarelli --
16  Dr. Baccarelli, you can answer it, but
17  if you want him to rephrase, go ahead
18  and ask.
19      THE WITNESS: I do, but if --
20  if you think I didn't, please tell me
21  what part I didn't -- I didn't answer.
22  QUESTIONS BY MR. MURDICA:
23      Q. Dr. Baccarelli, do you recall
24  whether Ms. Laue --
25      Is it Dr. Laue?

Page 25

1      A. Dr. Laue.
2      Q. -- whether Dr. Laue found
3  anything with respect to acetaminophen and
4  neurodevelopmental outcomes in that -- when
5  she looked at meconium?
6      A. It --
7      MR. SNIDOW: Objection -- I'm
8  sorry, Dr. Baccarelli. Just pause for
9  a second.
10      Objection to form.
11      Again, it now sounds like you
12  really are talking about a study, and
13  I ask that if you're going to do that,
14  you show it to him.
15      MR. MURDICA: I'm going to stop
16  the deposition if you do that one more
17  time. I asked if he recalled
18  anything.
19      I'm serious. I'm very serious
20  about this. We're not doing this
21  again. You're interrupting my
22  examination. It actually is bothering
23  me, and it's not proper.
24      So are you going to tell me
25  you're going to stop or not?

Page 26

1  MR. SNIDOW:  I think, Jim,
2 frankly, anytime you want to ask him
3 about a study, I'm going to ask that
4 you do it.
5  MR. MURDICA:  Okay.  Let's off
6 the record.
7  VIDEOGRAPHER:  The time right
8 now is 8:43 a.m.  We are off the
9 record.
10  (Off the record at 8:43 a.m.)
11  VIDEOGRAPHER:  The time right
12 now is 8:47 a.m.  We are back on the
13 record.
14  MR. SNIDOW:  Okay.  Mr. Murdica
15 and I have discussed, and we decided
16 that I'm going to be entitled to a
17 standing objection that I won't make
18 every time that -- against the
19 opposing counsel asking the witness
20 questions about a particular study
21 without showing it to him.
22  Are you okay with that,
23 Mr. Murdica?
24  MR. MURDICA:  I said you could
25 state it on the record, and I'm going

Page 27

1 to state that Document Number 433 on
2 the MDL docket is the deposition
3 protocol for expert depositions.  And
4 paragraph 13 clearly shows that you
5 violated the protocol multiple times
6 this morning, which is why I said I
7 wouldn't continue if you continued
8 doing that.
9  So you can say whatever you
10 want right now.  From this point on,
11 the only thing you will say is that
12 you object to form, or we'll follow
13 paragraph 14, which is to call
14 Judge Cote.
15  MR. SNIDOW:  Okay.  So but
16 you're fine with my standing
17 objection?
18  MR. MURDICA:  Yes.
19  MR. SNIDOW:  Thank you.
20 QUESTIONS BY MR. MURDICA:
21  Q.   Dr. Baccarelli, are you ready
22 to proceed?
23  A.   Absolutely.
24  MR. SNIDOW:  And again, Doctor,
25 you can ignore all of that.

Page 28

1  THE WITNESS:  That's okay.
2 QUESTIONS BY MR. MURDICA:
3  Q.   Dr. Baccarelli, before the
4 interruption, we were discussing Dr. Hannah
5 Laue's investigation of acetaminophen
6 exposure in meconium --
7  A.   Uh-huh.
8  Q.   -- in 2019.
9  Do you recall that question?
10  A.   I do.
11  Q.   Okay.  And sitting here today,
12 do you recall whether or not Dr. Laue found
13 anything with respect to acetaminophen
14 exposure in that study?
15  A.   That paper is one of the very
16 few that shows no association between
17 acetaminophen and intelligence or any other
18 neurodevelopmental outcomes.  It's one of the
19 outliers in the literature.
20  And part of it is because it
21 looks at intelligence and -- one scale of
22 intelligence and doesn't look at the -- at
23 the other outcomes.
24  And also, it's a small study.
25 It's one -- 118 subjects, something that at

Page 29

1 the time perhaps I didn't appreciate, but now
2 when I look at the literature later on,
3 clearly we are comparing this study to others
4 that have hundreds of children, some have
5 thousands, some have 50,000, 60,000 children.
6  So this study is very possible
7 to be a false negative.
8  Q.   Dr. Baccarelli, did you say
9 there were 118 children in that?
10  A.   Correct.
11  Q.   Okay.  Now, you don't have that
12 study in front of you right now, right?
13  A.   I do.  It's here.
14  Q.   You do?
15  A.   Yes.
16  Q.   Okay.  What are you looking at?
17  A.   Laue.
18  Q.   Oh, you have the study in front
19 of you.
20  A.   And 118.
21  Q.   Okay.  What do you -- what do
22 you have in front of you right now?
23  A.   Is the study of Laue?
24  Q.   No, no, I mean --
25  A.   The abstract.

1    Q.    You have several binders
2  sitting in front of you, right?  Two binders?
3    A.    Yeah.  One is my report, and
4  one is some literature that is in my report.
5    Q.    Okay.  Can I take a look at the
6  literature binder?
7    A.    Absolutely.
8    Q.    That way I know what you have.
9  Thanks.
10         Now, I see one thing that you
11 have here is Masarwa, right?
12   A.    Uh-huh.
13   Q.    And is that in your report?
14   A.    Of course.
15   Q.    Okay.  And right before
16 Masarwa, is that a -- is that a summary that
17 you created?
18   A.    Yes.
19   Q.    Okay.
20   A.    Absolutely.
21   Q.    Is that -- is that summary in
22 your report or is that something new?
23   A.    It's a summary of a study by
24 Alemany, which is in my report.  It's nothing
25 that is -- it's just notes to remind me what

1  Alemany says.
2    Q.    Your notes?
3    A.    Correct.
4    Q.    Okay.  Dr. Baccarelli, did you
5  review any deposition transcripts of
6  plaintiffs' experts in this case?
7    A.    I reviewed Cabrera's.
8    Q.    Okay.  Did you review
9  Dr. Hollander's?
10   A.    No.
11   Q.    You say in your report and in
12 your rebuttal report that you rely on
13 Dr. Hollander, correct?
14   A.    I didn't say that.  I said that
15 I read Dr. Hollander's, and I'm also -- also
16 using their knowledge and also reporting his
17 knowledge.
18   Q.    Okay.  So you're not relying on
19 Dr. Hollander for anything here?
20   A.    If there is anything that I am
21 relying on, please let me know.
22   Q.    Well, you're saying right
23 now -- I mean, this is your chance.  You're
24 under oath right now, Dr. Baccarelli.
25   A.    Correct.

1    Q.    You're not relying on
2  Dr. Hollander, correct?
3         MR. SNIDOW:  Objection to the
4  form.
5         MR. MURDICA:  I just want to
6  get your testimony right.
7         MR. SNIDOW:  Objection to the
8  form again.
9         Do you mind repeating your
10 question, Jim?
11        MR. MURDICA:  Sure.
12 QUESTIONS BY MR. MURDICA:
13   Q.    Do you rely on Dr. Hollander's
14 neurodevelopmental opinions for your expert
15 opinions here?
16   A.    I read Dr. Hollander's
17 opinions.  They are generally consistent with
18 my own.
19        And I reported my view on
20 neurodevelopment in my own report, and my
21 report is generally consistent with
22 Dr. Hollander's.
23   Q.    But you didn't read his
24 testimony, correct?
25   A.    I didn't.

1    Q.    Okay.  And you're test -- and
2  you're testifying right now that you're not
3  relying on Dr. Hollander, right?
4    A.    I read Dr. Hollander's, so
5  Dr. Hollander's report is consistent with
6  mine.  So I -- if you want to discuss
7  anything that is in Dr. Hollander's report, I
8  would be happy to.
9    Q.    Yes.
10        And my question was whether
11 you're relying on him, and your answer is no,
12 correct?
13   A.    I didn't say that.
14   Q.    Okay.  Well, are you -- is
15 Dr. Baccarelli relying on Dr. Hollander here
16 or not?
17   A.    I'm relying on the scientific
18 literature that is made of hundreds of
19 papers, and I also considered Dr. Hollander's
20 report.
21   Q.    Okay.  But you don't need
22 Dr. Hollander's opinions for -- to have your
23 own that you're offering here, correct?
24   A.    I'm sure I need many of the
25 things Dr. Hollander said.  Dr. Hollander is

Page 34

¹ not the only one in the world to say those
² things.
³      Q.      Okay.  So do you need
⁴ Dr. Hollander's opinion here to support yours
⁵ or not?
⁶      A.      I can't answer the question as
⁷ you phrase it, as you can understand.
⁸      Q.      Okay.  Dr. Baccarelli, do you
⁹ believe you have opinions here that can stand
¹⁰ on their own without any of the other
¹¹ experts?
¹²      A.      The other experts that covered
¹³ hundreds of papers, and so there is a lot
¹⁴ there that is important to this case.
¹⁵      Q.      Okay.  You could look at those
¹⁶ papers, too, right?
¹⁷      A.      Of course I can.
¹⁸      Q.      Have you?
¹⁹      A.      Many of them.
²⁰      Q.      But not all of them?
²¹      A.      I'm sure I didn't read all of
²² them.
²³      Q.      All right.  And why did you
²⁴ look at Dr. Cabrera's deposition transcript?
²⁵      A.      It came early, and I thought it

Page 35

¹ was interesting to look at it.
²      Q.      Okay.  Did his testimony make
³ you want to change any of your opinions?
⁴      A.      No.  He really gave me a
⁵ glimpse on how this type of things work.
⁶ It's the first time I work in a case of this
⁷ type, so it was important to me to understand
⁸ the dynamics.
⁹      Q.      Okay.  So after you saw the
¹⁰ results of Dr. Laue's examination of meconium
¹¹ and acetaminophen exposure, at that point in
¹² time did you still believe that acetaminophen
¹³ was not associated with adverse
¹⁴ neurodevelopmental outcomes?
¹⁵      MR. SNIDOW:  Objection to the
¹⁶ form.
¹⁷      You can answer, Dr. Baccarelli.
¹⁸      THE WITNESS:  At that time,
¹⁹ again, I thought this was a study that
²⁰ I wanted to support, and clearly --
²¹ clearly I -- I was very sure that this
²² study was negative.
²³      All the other papers in the
²⁴ literature, I hadn't reviewed in the
²⁵ details of the letter.  I have

Page 36

¹      reviewed the letters clearly now, so I
²      was pretty sure that these -- we were
³      right to publish this paper.
⁴ QUESTIONS BY MR. MURDICA:
⁵      Q.      Right.
⁶           In other words, Dr. Baccarelli,
⁷ in -- as of the time of publication of
⁸ Dr. Hannah Laue's paper, you did not believe
⁹ that there was any relationship between
¹⁰ acetaminophen exposure during pregnancy and
¹¹ adverse neurodevelopmental outcomes, correct?
¹²      A.      I believed it was at least
¹³ uncertain.
¹⁴      Q.      Okay.  At that time, had you
¹⁵ reviewed any of the studies from the Danish
¹⁶ National Birth Cohort?
¹⁷      A.      I don't think I did at that
¹⁸ time.  I reviewed -- I read some of the
¹⁹ literature, especially the one related to
²⁰ intelligence.
²¹      Q.      Okay.  Now, Dr. Baccarelli, are
²² you an author on the -- Dr. Laue's paper that
²³ you have in front of you?
²⁴      A.      Of course.  I'm the last
²⁵ author.

Page 37

¹      Q.      Okay.  And did you review it
² prior to publication, if you remember?
³      A.      Of course I did.
⁴      Q.      Okay.  How do you know?
⁵      A.      How do I know what?
⁶      Q.      How do you know that you
⁷ reviewed it?
⁸      A.      I review all the papers I
⁹ publish.
¹⁰      Q.      Do you -- do you know if you
¹¹ revised it?
¹²      A.      Of course I did.
¹³      Q.      Okay.  Do you remember what you
¹⁴ revised?
¹⁵      A.      Absolutely not.
¹⁶      Q.      Okay.  Do you know how many
¹⁷ times you revised it?
¹⁸      A.      I typically do three or four
¹⁹ hours of revisions.  It might be two or
²⁰ three.
²¹      Q.      Okay.  Do you look at -- of the
²² papers that you review and revise, do you
²³ look at the citations in the papers?
²⁴      A.      I -- it's a teamwork, so I
²⁵ trust that I -- it's a teamwork, so I

Page 38

1  trust -- I need to trust my team members.  So
2  in this case, I review some of the -- I knew
3  some of the citations.  I didn't review all
4  of them.
5      Q.    Okay.  But you wouldn't let a
6  paper go out with your name on it unless you
7  reviewed it, right?
8      A.    Yes, but that doesn't mean I
9  read all the literature.  No, I never do
10  that, and I'm perfectly fine with that.
11      Q.    Okay.  Dr. Baccarelli, before a
12  paper goes out with your name on it, you've
13  read the words in the paper itself, even if
14  not the citations, correct?
15      A.    Oh, absolutely.
16      Q.    Okay.  And when you revise a
17  paper with your name on it, how do you do
18  that?  Is it in redline?  Do you offer
19  telephone comments?  Both?
20      A.    I mostly receive the paper in
21  my e-mail.  I set aside time.  I read it.  I
22  make comments.  Typically I ask lots of
23  questions.
24          I try to be pointed.  I try to
25  tell exactly what I think.  I make a lot of

Page 39

1  objections.  I put myself in the shoes of the
2  doubters, and I try to say exactly what any
3  possible objection will be.  And often I play
4  the devil's advocate.
5      Q.    And when you referred to
6  objection, do you mean a question by a peer
7  reviewer?
8      A.    A question a peer reviewer
9  might ask.
10      Q.    Okay.  Did there come a point
11  in time -- so Dr. Laue's paper was published
12  in 2019, right?
13      A.    That is correct.
14      Q.    Do you recall what -- whether
15  it was beginning of the year or end of the
16  year?
17      A.    It -- yeah, it came out at the
18  beginning, apparently.  I'm not sure.
19      Q.    Okay.  When -- if you remember,
20  to the extent you remember, when was the next
21  time after reviewing and revising Dr. Laue's
22  paper that you had any involvement in looking
23  at the relationship between acetaminophen
24  exposure in utero and neurodevelopmental
25  outcomes?

Page 40

1          MR. SNIDOW:  Objection to the
2  form.
3          You can answer.
4          THE WITNESS:  By the way, I
5  found here it was 20 -- this came out
6  at the -- in 2018.  The advanced
7  access publication date was
8  September 7, 2018.
9          After working on this, we
10  started to work on a larger study
11  looking at ADHD and looking at brain
12  MRIs, and that was published in 2020.
13  That was Baker, et al., 2020.
14          By the way, something I forgot
15  about my report.  I think I wrote
16  Baker 2022 a few times when I meant
17  Baker 2020 when you asked me before.
18          I think -- there are two
19  papers.  One is 2022 and one 2020.  I
20  think at some point I wrote 2022 while
21  it was 2020.
22  QUESTIONS BY MR. MURDICA:
23      Q.    Okay.  Baker 2020 was -- the
24  first author was a student of yours, correct?
25      A.    Yep.  Absolutely.

Page 41

1      Q.    Okay.
2      A.    He was a doctoral student.  One
3  of the smartest doctoral students I ever had.
4      Q.    And Mr. Baker was actually
5  doing this as part of his dissertation,
6  right?
7      A.    Correct.
8      Q.    Okay.  And the part of the
9  study was utilizing the same meconium samples
10  that Dr. Hannah Laue utilized for the paper
11  you and her did in 2018, right?
12      A.    They are not the same meconium
13  sample.  They -- the sample size is bigger,
14  so there are many more subjects in that
15  study, in Baker.
16          Another difference is that
17  these children were 6 to 7 -- 6 to 8 years
18  old in Laue.  In Baker, they had become 10 to
19  12 year old.  So we had longer follow-up,
20  more time to develop phenotypes, more time to
21  develop especially ADHD.
22          As you know, ADHD is -- they
23  are diagnosed usually between age 6 and
24  age 10, 11, so they -- the children by then
25  had gotten to be fully mature, if you may.

1    Q.   Dr. Baccarelli, do you know
2 what Dr. Hollander testified as to the
3 average age of diagnosis for a child with
4 ADHD?
5         MR. SNIDOW:  Objection to the
6    form.
7         THE WITNESS:  I'm happy to hear
8    it.
9 QUESTIONS BY MR. MURDICA:
10   Q.   Okay.  So Dr. Baccarelli's
11 testimony is that the diagnosis age for
12 children with ADHD is 10 to 12; is that
13 right?
14   A.   I didn't say that.
15        MR. SNIDOW:  Object -- sorry,
16   hold on.  Objection to the form.
17        Dr. Baccarelli, you can
18   clarify, if you like.
19 QUESTIONS BY MR. MURDICA:
20   Q.   Dr. Baccarelli, what is --
21 according to Dr. Baccarelli, what is the
22 average age of diagnosis of ADHD in the
23 United States?
24   A.   The cases of ADHD starts to be
25 diagnosed as early as five years.  Many cases

1 of ADHD gets diagnosed when children go to
2 school, so children go to school between 5
3 and 6, and they keep being diagnosed up to
4 age 10.
5    Q.   Okay.  Dr. Baccarelli, in
6 Canada, what is the average age of diagnosis
7 of ADHD?
8    A.   It's probably the same as
9 United States, around 6 or 7 years old.
10   Q.   Do you know?
11   A.   I'm happy to review it for you.
12   Q.   Okay.  Because what we're
13 talking about is subjects in Canada, not the
14 United States, correct?
15   A.   Absolutely.  And as I
16 mentioned, we did a study 10 ten years
17 because by then we were sure that all the
18 people would have gotten ADHD.  Because there
19 might be some stragglers who get diagnosed at
20 10, 11.  And that helps.  That helps us to
21 make sure that we classify all the children
22 with ADHD as having ADHD.
23        You can understand that if I do
24 a study at age 4, there might be some
25 diagnosis of ADHD even at age 4, perhaps,

1 though it's very early.
2    Q.   Dr. Baccarelli, you're not
3 sitting here telling us that Dr. Laue and
4 Dr. Baker studied different cohorts, right?
5         MR. SNIDOW:  Objection to the
6    form.
7         It's not what he testified.
8         THE WITNESS:  I'm here to tell
9    you that Dr. Baker is -- Baker's is a
10   larger study, and the Baker is a
11   little wave of -- it's a new follow-up
12   with the same people.
13        But again, at 6 to 8 years,
14   they -- we were able to call back,
15   because of funding limitations, only a
16   subset of the -- of the study.
17        So Laue is a much smaller study
18   than Baker.
19 QUESTIONS BY MR. MURDICA:
20   Q.   Dr. Baccarelli, the same 396
21 meconium samples from the GESTE cohort in
22 Sherbrooke is what has been studied in each
23 meconium study that you've been involved in,
24 correct?
25   A.   That is correct.

1    Q.   Okay.  When -- so back to my
2 original question.
3    A.   Yes.
4    Q.   Is the Baker 2020 results the
5 first time you thought there was an
6 association between acetaminophen exposure in
7 utero and neurodevelopmental outcomes?
8         MR. SNIDOW:  Objection to the
9    form.
10        You can answer, Dr. Baccarelli.
11        THE WITNESS:  It was the first
12   paper I published that shows an
13   association between acetaminophen
14   during pregnancy and ADHD.
15        At this time I had started to
16   look at the literature a little more
17   carefully, more carefully, and by --
18   by 2020, I was surprised.  So I did a
19   deep dive in the literature, and I
20   started to believe at the end of 2020
21   that there was a problem.  There was a
22   concern.
23        Over time, I started to believe
24   there was a concern and that -- to be
25   honest, when I reviewed the literature

Confidential - Subject to Protective Order

Page 46

1  for this case, I was blown away by the
2  consistency.  I couldn't believe my
3  eyes that there were so many studies
4  showing so much association, a level
5  of consistence I've never seen before
6  in my life --
7  QUESTIONS BY MR. MURDICA:
8      Q.    Okay.
9      A.    -- in studies that I work and I
10  create my own.
11     Q.    Okay.  Dr. Baccarelli, did I
12  just hear you say when you started looking at
13  it for this case, and then you said about
14  what a great connection it was?
15         MR. SNIDOW:  Objection to the
16     form.
17         THE WITNESS:  I -- I -- I --
18         MR. SNIDOW:  Hold -- sorry,
19     sorry.
20         THE WITNESS:  Yeah.
21         MR. SNIDOW:  You can answer.  I
22     just want to be allowed to object
23     before you start answering.
24         THE WITNESS:  I said that I
25     became gradually aware of the -- of

Page 47

1  the connection.  And before starting
2  to work on this case, I became pretty
3  convinced, or almost entirely
4  convinced, reasonably convinced, that
5  there was a causal association.
6      Of course, I'm a scientist, so
7  I wanted to leave no stones unturned.
8  And I worked on -- pretty diligently
9  on the case, and I review all the
10  possible papers that I could find.
11      And I hadn't done that before.
12  I hadn't reviewed as of 2023 all the
13  papers that were around there.  In
14  2020, 2021, perhaps I had reviewed 70,
15  80 percent of the papers.
16      As you understand, when we
17  publish a paper, we need to know
18  the -- when we work on a project, we
19  need to know the main -- the main
20  papers that are around.
21      I never -- I never was in the
22  business of also saying, especially
23  under oath, whether there is causal
24  association.  I was in the business of
25  doing research.

Page 48

1      To do research, you need to
2   know the main purpose.  You don't need
3   to know all the papers under the sun.
4      I think you appreciate the
5   difference.
6  QUESTIONS BY MR. MURDICA:
7      Q.    The Baker paper in 2020, you
8  were a signatory on that one, right?
9      A.    Correct.
10     Q.    Okay.  And did you look at the
11  references in that one before it was
12  published?
13     A.    I looked at what -- at the list
14  of references.  I did not read all the
15  references that are there.
16     Q.    When did you read all of the
17  references in Baker for -- you have now,
18  correct?
19     A.    I'm sure I haven't.  I'm sure
20  that there might be paper -- references in
21  Baker's that I haven't read today.
22     Q.    Do you believe that you've read
23  all of the papers today on acetaminophen
24  exposure during pregnancy and the outcome of
25  autism?

Page 49

1         MR. SNIDOW:  Objection to the
2     form.
3         You can answer, Dr. Baccarelli.
4         THE WITNESS:  You have the
5     entire list of papers.  I did a
6     systematic review.  Databases are not
7     perfect, so it's possible that one
8     paper might have dis -- might have --
9     might have not show up in my search or
10    even more.
11        But I -- if there is any paper
12    that you think should be included in
13    my review, I'm happy to discuss it
14    today.
15  QUESTIONS BY MR. MURDICA:
16     Q.    Dr. Baccarelli, you just
17  testified that you believe you left no stone
18  unturned, right?
19     A.    I left no stone unturned.
20     Q.    Okay.
21     A.    In fact, I did a systematic
22  search, and this what in the industry we do.
23  We do a systematic search.
24        And if there is a paper that I
25  didn't consider, I'd be happy to discuss it

1 anytime.  I -- you know, the evidence is so
2 strong that it will need a few papers to
3 change my opinion, not just one or two or
4 three.
5      Q.   Dr. Baccarelli, with respect to
6 the outcome of autism, you believe sitting
7 here today that you've reviewed the papers
8 describing any association or lack thereof
9 between acetaminophen exposure during
10 pregnancy and the outcome of autism, correct?
11           MR. SNIDOW:  Objection to form.
12      Asked and answered.
13           THE WITNESS:  Let me -- let me
14      tell you what I did.  If I can give to
15      my report.
16           So this -- on page 13.  On
17      March 19, 2023, I conducted a
18      systematic search of the literature on
19      PubMed to identify original papers on
20      the relationship between ADHD, ASD and
21      NNDs and prenatal exposure to
22      acetaminophen, including observational
23      studies and meta-analysis.
24           I went through all of them, I
25      triaged them, and I put in the report

1      if they looked at the association
2      between acetaminophen and ADHD,
3      prenatal acetaminophen and ADHD,
4      prenatal acetaminophen and ASD,
5      prenatal acetaminophen and other
6      neurodevelopmental disorders.
7 QUESTIONS BY MR. MURDICA:
8      Q.   Okay.  Doctor, I'd appreciate
9 it if you'd do your best -- I know you're
10 very smart.  If you could listen to my
11 questions, it will make this go a lot faster.
12           So my question is about --
13      MR. SNIDOW:  Hold on.
14 QUESTIONS BY MR. MURDICA:
15      Q.   -- ASD --
16           MR. MURDICA:  You will not
17      interrupt me.
18           MR. SNIDOW:  I thought you were
19      done.
20           MR. MURDICA:  You will not
21      interrupt me.
22           MR. SNIDOW:  I thought you were
23      done.
24 QUESTIONS BY MR. MURDICA:
25      Q.   Dr. Baccarelli, my question was

1 about the literature with ASD as an outcome,
2 and I said when did you first do that review.
3           And I think you just answered
4 that it was March for ASD, correct?
5           MR. SNIDOW:  Hold on.
6      Objection to the form, particularly
7      commentary about him answering.  He's
8      answering your questions.
9           You can answer.
10           THE WITNESS:  I searched the
11      literature on March 19, 2023, using --
12      using search terms.  And what I found
13      and what I got turned out is what you
14      see.
15 QUESTIONS BY MR. MURDICA:
16      Q.   Yes.
17           And you identified six studies
18 regarding the outcome of autism, correct?
19           MR. SNIDOW:  Objection to the
20      form.
21           THE WITNESS:  Let me -- let me
22      check.
23           I thought it was seven, but --
24      yeah, there are six.
25

1 QUESTIONS BY MR. MURDICA:
2      Q.   Now, which of those six had you
3 seen before March 18, 2023?
4      A.   I'm -- I can't remember.
5      Q.   Okay.  Do you think you had
6 seen any of them?
7      A.   Oh, yeah.  I certainly saw -- I
8 certainly saw Liew, Avella-Garcia, Ji and
9 Alemany.
10           MR. SNIDOW:  And just -- do you
11      mind saying the year on Liew for the
12      record?
13           THE WITNESS:  Liew 2016.
14      Avella-Garcia 2016.  Ji 2020.  Alemany
15      2021.
16 QUESTIONS BY MR. MURDICA:
17      Q.   Now, Dr. Baccarelli, when were
18 you hired in this matter?
19      A.   In January.  I believe it was
20 January.
21      Q.   January of 2023?
22      A.   Yeah.
23      Q.   Okay.  And was that after a
24 conversation with Dr. Pearson about this?
25      A.   No.

Page 54

1    Q.    Do you know how you came to be
2  hired?
3    A.    I was contacted by Amanda Hunt
4  and --
5    Q.    Dr. Baccarelli, do you know
6  when Dr. Pearson was hired to work --
7    A.    I have absolutely no idea.
8    Q.    Okay.  And are you being paid
9  for your work here?
10    A.    I am.
11    Q.    Is it by the hour?
12    A.    It is by the hour.
13    Q.    Okay.  And what is your hourly
14  rate?
15    A.    My hourly rate is 700 per hour.
16    Q.    Okay.  And does that money go
17  to Dr. Baccarelli or to the Mailman School or
18  to Columbia University?
19    A.    The money comes to
20  Dr. Baccarelli.
21    Q.    Okay.  And do you know
22  approximately how much money Dr. Baccarelli
23  has made of this litigation to date?
24          MR. SNIDOW:  Objection to the
25    form.

Page 55

1          THE WITNESS:  I'm -- I -- yes.
2    I work for more than 200 hours, so
3    it's about $150,000.
4  QUESTIONS BY MR. MURDICA:
5    Q.    Does the Mailman School know
6  that you've made that money from plaintiffs'
7  lawyers?
8          MR. SNIDOW:  Objection to the
9    form.
10          THE WITNESS:  Say that again?
11    Sorry.
12  QUESTIONS BY MR. MURDICA:
13    Q.    Does the Mailman School know
14  that you've made 140 or $150,000 from
15  plaintiffs' lawyers?
16          MR. SNIDOW:  Objection to the
17    form again.
18          Dr. Baccarelli, you can -- you
19    can answer to the extent you
20    understand it.
21          THE WITNESS:  They absolutely
22    do.  I disclosed that several times,
23    including two weeks ago when I -- at
24    this point I know what the Daubert is
25    going to be, so I disclosed the -- and

Page 56

1  filed a report to make sure that there
2  is no conflict of interest.
3          We have a reporting system for
4  conflict of interest, and we are asked
5  to report any extramural activity we
6  do that can represent a potential
7  conflict with our jobs.  So I made
8  sure to report it.
9          And I'm pretty sure there's not
10  a conflict of interest, but we are
11  requested to report any -- anytime
12  someone pays anything to us.
13  QUESTIONS BY MR. MURDICA:
14    Q.    And you did that two weeks ago?
15    A.    I did the first time in January
16  when I signed the contract.  I updated my
17  disclosure in March when money started to
18  accumulate.
19          If you want, I can tell you all
20  the breakdowns and the different thresholds
21  of money that Columbia has, but --
22    Q.    I'm aware, Doctor.
23    A.    Yeah.  And I decided two weeks
24  ago to update my disclosure because I
25  realized that I had exceeded another

Page 57

1  threshold that Columbia wants me to pay
2  attention to.
3    Q.    Dr. Baccarelli, have you
4  provided the school or the university
5  administration your reports in this matter?
6    A.    They don't want to see it, and
7  I'm not supposed to report it.  I'm happy to
8  report it -- to give it to them at any time
9  if they want it, but I -- I'm not required
10  to.  I haven't done it.
11    Q.    Okay.
12    A.    I'm not even encouraged to.
13    Q.    Dr. Baccarelli, between the
14  publication of the 2020 Baker paper and your
15  hiring by plaintiffs' lawyers in January
16  of 2023, did you conduct any other work
17  regarding acetaminophen and pregnancy
18  outcomes?
19          MR. SNIDOW:  Objection to the
20    form.
21          You can answer.
22          THE WITNESS:  We kept working
23    on a paper that eventually became
24    Baker 2022.
25

Page 58

1 QUESTIONS BY MR. MURDICA:
2      Q.    Okay.  And what was your role
3 with respect to that paper?
4      A.    I'm one of the authors.
5      Q.    Was Baker 20 -- was your work
6 on Baker 2022 the only other acetaminophen
7 exposure work that you had done prior to
8 being hired by plaintiffs here?
9           MR. SNIDOW:  Objection to the
10      form.
11           THE WITNESS:  I believe so.  If
12      I'm missing anything, please remind
13      me, but I can't remember other type of
14      works that was published or we are
15      planning to publish.
16 QUESTIONS BY MR. MURDICA:
17      Q.    Do you have any ongoing work
18 with respect to acetaminophen exposure and
19 pregnancy outcomes right now?
20      A.    Oh, right now we are not -- we
21 are -- I'm not working on that at the moment.
22      Q.    Have you submitted your expert
23 report or any version of your expert report
24 for publication anywhere?
25      A.    That is something I really want

Page 59

1 to do.  I think this is strong, and this is
2 something that would make a nice paper.
3           And of course, I mean, I
4 finished this three weeks ago.  I really want
5 to condense it in a paper and send it out.  I
6 think it will be something important for the
7 literature.
8      Q.    Assuming you can get it
9 published, right?
10           MR. SNIDOW:  Objection to the
11      form.
12           THE WITNESS:  I -- I'm very
13      sure it's going to get published.
14      Trust me.
15 QUESTIONS BY MR. MURDICA:
16      Q.    I am very sure there's zero
17 percent chance, but I appreciate your
18 optimism, Dr. Baccarelli.
19           MR. SNIDOW:  Okay, Jim.  Jim,
20      listen.  Listen, Jim.  Jim, I'm happy
21      to limit my objection to objection to
22      the form, but you can't go making
23      commentary like that.  And if you want
24      to take it to the judge, I'm happy to
25      show her, I'm sure there's zero

Page 60

1 percent chance that your paper will
2 get published.
3           Okay?
4 QUESTIONS BY MR. MURDICA:
5      Q.    Dr. Baccarelli, have you
6 started working on that yet?
7      A.    I'm going to start tomorrow,
8 really.  This is something I want to do as
9 soon as possible.  It's fresh.  I don't want
10 to become aged.
11           And it's going to become pretty
12 strong -- and by the way, I published 600
13 papers.  I know which papers get published
14 and which not.  I really know that very well.
15 So I appreciate your opinion.
16      Q.    Will you commit to do it,
17 Dr. Baccarelli?
18      A.    Oh, I'm going to do it,
19 absolutely.
20      Q.    How quickly can you do it?
21      A.    I hope to have it done --
22 published by early 2024.
23      Q.    Okay.  Will you commit to that
24 here on the record?
25      A.    I'm going to try my best.

Page 61

1      Q.    Okay.  So when I ask you at the
2 Daubert hearing, you'll be able to tell me
3 how much effort you've put into it, right?
4           MR. SNIDOW:  Objection to the
5      form.
6           Again, I think this is an
7      entirely improper question.
8           But you can answer.
9           THE WITNESS:  I'm very happy to
10      do that.  I have no problems.  I'm
11      really going to do it.  I'm serious.
12      This is strong.  It's nice.  It's
13      transparent.  If people have
14      objections, they can go into the
15      details and see where I'm wrong.
16           We do -- we do literature all
17      the time.  If there is anything wrong,
18      I stand by it.
19 QUESTIONS BY MR. MURDICA:
20      Q.    Okay.  Dr. Baccarelli, are you
21 an obstetrician?
22      A.    I'm not an obstetrician, but
23 you appreciate that I've done -- I published
24 300 papers looking at the epidemiology on
25 mothers that are pregnant and their children.

Page 62

¹ So as long as this case is concerned, I'm
² very well-qualified to understand the effect
³ of exposures during pregnancy.
⁴     Q.   You are not one of the doctors
⁵ that's board certified in obstetrics or
⁶ gynecology, correct?
⁷     A.   Definitely not.
⁸     Q.   Okay.  Have you talked to any
⁹ board certified obstetricians about your
¹⁰ opinions here?
¹¹     A.   Oh, yes.  Yes.  We have an
¹² obstetrician on the team at -- in Sherbrooke,
¹³ and I did speak with her about that.
¹⁴     Q.   Okay.  And have you talked to
¹⁵ anyone -- so Sherbrooke, that's an
¹⁶ obstetrician in Canada?
¹⁷     A.   Correct.
¹⁸     Q.   Okay.  Have you ever -- have
¹⁹ you talked to any board certified United
²⁰ States obstetricians about your opinions
²¹ here?
²²     A.   Let me think.  I spoke with a
²³ lot of people, so you might -- it might as
²⁴ well be.  I'm not able to tell you whether I
²⁵ spoke -- I don't usually ask for -- whether

Page 63

¹ people are certified or not.
²     Q.   Okay.  Well -- all right.
³ Let's go through the lot of people you talked
⁴ to.
⁵           Who have you talked to about
⁶ your opinions here?
⁷     A.   I'm terrible in names, but I
⁸ spoke with Larissa Takser.
⁹     Q.   Can you say that last name?
¹⁰     A.   Larissa Takser, my colleague
¹¹ who's a psychiatrist in Sherbrooke.
¹²     Q.   Okay.
¹³     A.   I spoke to colleagues at my
¹⁴ school, Ana Navas-Acien.
¹⁵           I spoke to colleagues --
¹⁶ Amisota {phonetic}, who is also my school.
¹⁷           I spoke with a lot people.
¹⁸     Q.   Okay.
¹⁹     A.   I speak with colleagues at
²⁰ conferences.  I was at the conference of
²¹ the -- of epidemiologists in Oregon a few
²² weeks ago, and I was working intensively on
²³ those and started to talk about it, and
²⁴ especially how impressive the literature is
²⁵ in supporting an association.

Page 64

¹     Q.   Okay.  Have you spoken to
² anyone from the American College of
³ Gynecology?
⁴     A.   No, I have not.
⁵     Q.   Okay.  Have you spoken to
⁶ any -- you reference in your report the
⁷ so-called consensus statement, correct?
⁸         MR. SNIDOW:  Objection.
⁹     Objection to the form.
¹⁰         THE WITNESS:  That is a
¹¹     consensus statement as good as any
¹²     consensus statement in the world.  If
¹³     you say so-called, I will -- I will
¹⁴     love for you to qualify why you think
¹⁵     it's so-called.
¹⁶ QUESTIONS BY MR. MURDICA:
¹⁷     Q.   Well, Dr. Baccarelli, you
¹⁸ may -- maybe you don't know this, but you
¹⁹ tell me if you do.  A consensus statement
²⁰ normally has a medical body or a regulatory
²¹ body behind it.
²²         You didn't know that?
²³     A.   That is not true.  A consensus
²⁴ statement is a group of people who come
²⁵ together and agree on a consensus.  That's

Page 65

¹ the name of the -- of the statement.  It's
² called consensus statement because there are
³ a group of people who write a consensus.
⁴     Q.   Okay.
⁵     A.   Whether they are -- we are
⁶ backed by an organization or not, that
⁷ doesn't make it less of a consensus
⁸ statement.
⁹     Q.   Have you ever been --
¹⁰     A.   I'm sor -- I'm sorry, you are
¹¹ wrong about that.
¹²     Q.   Okay, Dr. Baccarelli --
¹³         MR. SNIDOW:  Sorry.
¹⁴     Are you done finishing?
¹⁵     Because you do need to let him
¹⁶     answer.
¹⁷     Are you done with your answer?
¹⁸     THE WITNESS:  Yes.
¹⁹     MR. SNIDOW:  Okay.
²⁰     MR. MURDICA:  He was clearly
²¹     done.  Please stop that.
²² QUESTIONS BY MR. MURDICA:
²³     Q.   Dr. Baccarelli, have you ever
²⁴ been part of a consensus statement before?
²⁵     A.   I worked on several reports

Confidential - Subject to Protective Order

Page 66

1 with organizations. I don't think I've been
2 part of a consensus statement.
3     Q.    Okay. And you just said those
4 were with organizations, right?
5     A.    Yes.
6     Q.    Medical organizations, right?
7     A.    Yes. Yes. Absolutely.
8     Q.    Have you ever seen another
9 consensus statement that didn't involve a
10 medical or a regulatory organization prior to
11 this one?
12     A.    Oh, yes. There are many.
13     Q.    Give me an example.
14     A.    For instance, the -- there is a
15 consortium called CHARGE that typically
16 writes consensus statements.
17         I'm -- there is a consensus
18 statement that was just published by the
19 pregnancy in child epigenetics cohort that
20 presents child -- epigenetic consortium.
21 They came together and wrote a paper about
22 how to study pregnancy and child
23 environmental exposures. It's a consensus
24 statement.
25         If you believe that having ACOG

Page 67

1 or any other -- you're entitled to that
2 opinion.
3         At the same time, a consensus
4 statement is what it is. It's a statement of
5 people who reach a consensus about certain
6 topic.
7     Q.    I appreciate that's your
8 opinion, Dr. Baccarelli.
9         For the consensus statement
10 we're talking about here, there were 91
11 people, give or take, right?
12     A.    I think that is right.
13     Q.    Okay. Have you spoken to any
14 of those 91 people?
15     A.    I don't think so. I think
16 we might have had communications with some of
17 them, but now -- I mean, if you -- if there
18 is anyone on the 91 that I spoke with, I
19 think Zeyan Liew is part of that, and we -- I
20 know Zeyan very well, and we had recent
21 e-mail exchange about acetaminophen and
22 genetics.
23         If there are others, I'm --
24 please let me know.
25     Q.    Okay. You said --

Page 68

1     A.    Particularly I want to point
2 out, I didn't speak with them before they
3 publish the statement. I especially didn't
4 give them any information that could
5 contribute to the statement.
6     Q.    Okay. And to the best of your
7 recollection, they didn't contact you before
8 they issued the statement, right?
9     A.    Oh, they didn't contact me
10 formally.
11     Q.    Okay. And you just testified
12 that Zeyan Liew -- that's Dr. Liew, right?
13     A.    Correct.
14     Q.    That you and Dr. Liew are
15 friendly?
16     A.    Dr. Liew gave a presentation at
17 Columbia University. We are not friendly.
18 We have a professional relationship. He is a
19 very well-known epidemiologist in the field,
20 and I read his papers with attention.
21         And he -- I mean, I know that
22 he works at Yale. We have a professional
23 relationship. We are not friendly.
24     Q.    When -- Dr. Baccarelli, when is
25 the first time to your recollection that

Page 69

1 you -- well, let me ask it this way.
2         Have you ever spoken to
3 Dr. Liew? Not e-mail. Spoken with words.
4     A.    Dr. Liew came for a
5 presentation at Columbia University probably
6 in 2020. To be completely transparent, he
7 interviewed for a job at Columbia University,
8 I think in 2019, so I spoke with him as part
9 of the interview process. I was one of the
10 selectors.
11         So my conversation for him was
12 about whether he wanted to come and whether
13 we wanted to hire him.
14         And at the end, he told us he
15 was going to Yale and -- before we could
16 reach a decision on whether to hire him or
17 not. So timing was not right, and we -- I
18 respect his opinion and his choice, of
19 course.
20         And we had a lot of candidates,
21 and the committee hadn't yet told me what
22 was -- what were the top candidates. So I
23 don't know whether Dr. Liew was a top
24 candidate or not. Would have been a top
25 candidate or not. He told us he was going to

1 Yale before the committee could send me a
2 list of top candidates.
3     Q.    Understood, Dr. Baccarelli.
4        At the time when you
5 interviewed him in 2019, roughly, did you
6 discuss acetaminophen in any way?
7     A.    It was -- 2023.  It was 2017 or
8 2016.  Probably was five years ago at least.
9     Q.    So just to be clear, when you
10 interviewed Dr. Liew at Columbia, you -- it
11 was 20 --
12     A.    It was probably 20 -- 2017 or
13 2018.
14     Q.    Okay.  And at that time,
15 Dr. Baccarelli, when you interviewed him, did
16 you talk to him at all about acetaminophen?
17     A.    No.  No.  I talked about
18 Columbia, the job.  I talk about how great it
19 is to live in New York City, how amazing it
20 is, much better than the West Coast.  I think
21 he was there.
22        We discussed about housing.  We
23 discussed about how we support faculty
24 member.  How beautiful it is to work with a
25 chair like me and things like that.

1     Q.    Dr. Baccarelli, did there come
2 a time when you did speak to Dr. Liew about
3 acetaminophen?
4     A.    Speak verbally?  I don't think
5 I ever did.
6     Q.    Okay.  To date?
7     A.    I believe so.
8     Q.    Okay.
9     A.    I mean, I can't remember -- I
10 can't remember speaking -- or anything that
11 might have stuck to my memory.
12     Q.    Sure.
13     A.    So I really -- yeah.
14     Q.    So let's go beyond speaking.
15        Did there come a time when you
16 contacted or they -- either you contacted
17 Dr. Liew or Dr. Liew contacted you regarding
18 acetaminophen?
19     A.    Yes.  There was -- there is a
20 very weird case in this literature about
21 someone who published two papers that did the
22 same thing, about the same thing, and they're
23 pretty -- reaching different conclusions.
24 And these are things -- Stergiakouli and
25 Leppart.  And I was really puzzled why -- I

1 mean, why there were so -- discrepancies,
2 especially -- what is unusual about these two
3 papers is that the second one doesn't
4 acknowledge the first.
5        The first author, Stergiakouli,
6 is the last author in the second.  And the
7 first says A; the second says B.  And B
8 doesn't acknowledge the existence of A, as
9 far as I understand.  Well, at least it
10 doesn't explain why A -- why A came to one
11 conclusion, B.
12        So I actually got to --
13 Stergiakouli, who was a person in the UK, a
14 colleague in the UK, hoping she could help me
15 to understand why they really don't seem to
16 have their acts together, to be honest.
17        And she never replied, which is
18 unusual, I will say.  People usually reply to
19 inquiries about their papers, especially if
20 it comes from a university.
21        So I really thought I'm missing
22 something big here, that there's something
23 obvious I'm not seeing.  I really wanted like
24 someone to be -- a reality check.  I need
25 someone to really see whether I'm really --

1 there is an elephant in the room I can't see.
2        So I thought of all the people
3 that I could contact, I -- at that point I
4 read that Zeyan Liew was reading a lot of
5 papers, and I really see that his papers are
6 very well-crafted and very well-documented.
7 So I thought, well, let me write to Zeyan and
8 see whether there is anything I'm missing.
9     Q.    Okay.  Dr. Baccarelli, what you
10 just described, is that the first contact you
11 had with Dr. Liew?
12        MR. SNIDOW:  Objection to the
13     form.  Asked and answered.
14        THE WITNESS:  So I had other
15     contacts with Dr. Liew.  As I
16     mentioned, I interviewed him.  He
17     interviewed with us.
18 QUESTIONS BY MR. MURDICA:
19     Q.    Sorry.
20        My original question, and then
21 you gave a long explanation --
22     A.    Yeah.
23     Q.    -- that didn't answer my
24 question.
25        My original question was,

1  after -- from the time you interviewed
2  Dr. Liew, when -- was there a time that he
3  contacted you or you contacted him
4  thereafter?
5              MR. SNIDOW:  Hold on.
6  Objection to the form, particularly
7  the commentary.
8              Go ahead and answer.
9              MR. MURDICA:  Hang on.  I'm
10  being very patient.  He's not
11  answering the questions.  I'm being
12  very being patient and letting him say
13  whatever he wants.
14              MR. SNIDOW:  Perhaps you should
15  ask better questions.
16              But you can answer, if you
17  understand.
18              THE WITNESS:  I really don't
19  know.  I mean, I remember only that --
20  I remember only that interaction
21  about -- that e-mail exchange.
22              If there is anything else, I'm
23  happy to discuss and explain, but that
24  was --
25

1  QUESTIONS BY MR. MURDICA:
2      Q.    Okay.  Just for the sake of the
3  record, sitting here today, Baccarelli --
4  Dr. Baccarelli, as far as you know, the only
5  other interaction you had with Dr. Liew than
6  interviewing him was an e-mail exchange about
7  Stergiakouli?
8      A.    There is --
9              MR. SNIDOW:  I'm sorry.
10  Objection to the form.  Asked and
11  answered.
12              But you can answer.
13              THE WITNESS:  So that is the
14  one I remember.  If anything is, okay,
15  more recent, if there is anything that
16  perhaps I'm forgetting, I receive
17  about 300 to 400 e-mails a day, and I
18  speak every day with 30, 40 people.
19  If there is some -- if I forget an
20  interaction, you will forgive me.
21  QUESTIONS BY MR. MURDICA:
22      Q.    Okay.  Understood,
23  Dr. Baccarelli.
24              When was that e-mail exchange,
25  roughly?

1      A.    I can't remember.  It must have
2  been in April or May.
3      Q.    It was this year?
4      A.    Yeah, absolutely.
5      Q.    While you were working for the
6  plaintiffs' side?
7              MR. SNIDOW:  Objection to the
8  form.
9              You can answer.
10              THE WITNESS:  While I was --
11  yeah, while I was assessing the
12  literature to -- in preparation for
13  this case.
14  QUESTIONS BY MR. MURDICA:
15      Q.    Okay.  And when you
16  contacted -- did you -- you contacted
17  Dr. Liew or he contacted you?
18      A.    I did contact Dr. Liew.
19      Q.    Okay.  When you contacted
20  Dr. Liew, did you tell him the reason you
21  were asking him was because you were working
22  on litigation?
23      A.    No.  I didn't have to.  There
24  was no reason to tell him.
25              The reason why I told him that

1  I want -- I was reviewing the literature, I
2  told him exactly the truth.  I was reviewing
3  the literature, and I wanted to understand
4  why these two papers had different
5  conclusions with exactly the same cohort,
6  exactly the same methods.
7      Q.    Okay.  So Dr. Liew didn't
8  realize you were working for one side of a
9  litigation when you contacted him, right?
10              MR. SNIDOW:  Objection.
11  Objection to the form.
12              You can answer.
13              THE WITNESS:  I didn't disclose
14  to Dr. Liew that I was working on
15  litigation.  I'm pretty sure he
16  responded honestly and to the best of
17  his knowledge.
18              We had a very nice, open
19  discussion, and clearly I was not -- I
20  was not may -- putting him in a trap,
21  and that I'm not using his e-mail
22  exchange in my documentation, as you
23  can understand.
24              I just wanted to be sure that
25  what I understood myself was right,

Page 78

1  and I wanted to be sure that -- it was
2  really a sanity check. I wanted to be
3  sure that I'm -- I was not completely
4  out of my mind to think that two
5  people -- I really give a lot of
6  respect to people who write papers.
7  QUESTIONS BY MR. MURDICA:
8      Q.    Okay.
9      A.    I wanted to make sure that -- I
10  want to make sure that if two papers by the
11  same person say that this person doesn't
12  need -- since you mentioned neurology, that
13  this person doesn't need a neurologist. And
14  I didn't want to send them a neurologist
15  before understanding what was going on.
16      Q.    Dr. Baccarelli, did you -- did
17  you ask anyone else any questions in
18  formulating your opinions here for that type
19  of sanity check, to use your words, to make
20  sure you weren't off the deep end?
21          MR. SNIDOW: Objection to the
22      form.
23          I think he was talking about
24      the authors, not him.
25          But go ahead.

Page 79

1      MR. MURDICA: Okay. All right.
2  That -- hang on.
3          We're just not going to do
4  this. I said it again. You're saying
5  asked and answered. Now you're
6  telling him how to testify.
7          I don't know where you learned
8  to do this, but it's not something
9  we're going to do. I said that. This
10  is it. This is your last warning. I
11  will terminate the deposition and call
12  Judge Cote.
13          MR. SNIDOW: Okay. For the
14  record, I don't think that your
15  questions have been appropriate. As I
16  said, there were a couple of them,
17  happy to have Judge Cote review. She
18  can decide whether or not she thinks
19  they're appropriate questions.
20          I will limit it to asked and
21  answered. For the last one, Jim, and
22  I mean this, I thought that you
23  misunderstood his answer.
24          MR. MURDICA: Okay. Well, then
25  maybe I'm doing a bad job, but that's

Page 80

1  not for you to say. You sit there and
2  you say objection to form or you say
3  nothing. And if you say anything
4  other than that, we're stopping this.
5          MR. SNIDOW: Again,
6      Dr. Baccarelli, you can ignore all
7      that.
8          THE WITNESS: Absolutely.
9  QUESTIONS BY MR. MURDICA:
10      Q.    Dr. Baccarelli, are you aware
11  of anyone else working on acetaminophen
12  exposure, neurodevelopmental outcomes in
13  pregnancy, that has unpublished works?
14      A.    I -- I'm -- I don't think so.
15      Q.    Okay. Because you testified
16  that you -- other than trying to get your
17  expert report in this litigation published,
18  you don't have any ongoing studies on
19  acetaminophen, correct?
20      A.    That is correct. I don't think
21  we are writing other papers right now.
22      Q.    Okay. And you're not aware of
23  anybody else writing papers on acetaminophen
24  and pregnancy outcomes, correct?
25      A.    I think that is right.

Page 81

1      Q.    Okay. You haven't been asked
2  to review anybody else's work on
3  acetaminophen and pregnancy outcomes, have
4  you?
5      A.    What do you mean "anybody
6  else's"?
7      Q.    Other than the doctors and
8  students in your group, like Mr. -- Dr. Baker
9  and Dr. Pearson, you haven't been asked by
10  anyone outside the Mailman School of Public
11  Health to review their work on acetaminophen,
12  have you?
13      A.    So Dr. Pearson is not in my
14  group. Dr. Pearson was an independent
15  scientist and -- who works independently for
16  me. He's in my department, so I have -- he
17  reports to the school, so -- I mean, he's in
18  my unit, but he's independent from me.
19          And as far as I remember, no.
20  But, I mean, if there is any study I'm
21  forgetting, I'm happy to discuss. I really
22  have nothing to hide here.
23      Q.    Dr. Baccarelli, we went through
24  the people that you've talked to about your
25  opinions here, the doctors that you've talked

1  to about your opinions, right?

2      A.    Correct.

3      Q.    Are there any others that you

4  haven't mentioned?

5      A.    There might be.  If you want to

6  bring them up, I'm happy.  I mean, I don't

7  know.

8          I spoke openly about what I'm

9  doing here.  I spoke openly about my

10  opinions.  So I spoke to a few people.

11          And many times it happens over

12  coffee, over drinks.  So, you know, I'm

13  working on my own on this one, so I -- I'm

14  not -- I don't have team meetings like I do

15  for my papers where I speak to people.  I

16  don't keep a record to whom I speak to at

17  conferences or over coffee.

18      Q.    Dr. Baccarelli, does Dr. Baker

19  know you're doing this?

20      A.    Yes, he does.

21      Q.    And does anyone else in your

22  group know you're doing this?

23      A.    Yes, my assistant, my team

24  members, Dr. Laue.

25      Q.    Okay.  Have you spoken to

1  anyone else outside of Columbia that you

2  remember specifically?

3      A.    Dr. Takser.

4      Q.    What's the last name?

5      A.    Dr. Larissa Takser.

6      Q.    Does anyone else come to mind?

7      A.    I'm terrible at names.  I'm

8  sure I spoke with a colleague at the CDC that

9  I met at the Society of Toxicology last year.

10  I can't remember his name.

11      Q.    Okay.

12      A.    He's at the EPA, sorry, not

13  CDC.  I can draw a sketch of his face, but I

14  can't really remember his name.

15      Q.    Dr. Baccarelli, how about --

16  have you spoken with any epidemiologists

17  about your opinions here?

18      A.    Again, if you're asking whether

19  I spoke about how I formulated the opinions,

20  no.  This is the work I've done on my own.

21          I spoke with other

22  epidemiologists about my conclusions, for

23  instance, Dr. Ana Navas-Acien.

24      Q.    Any others?

25      A.    Not that I remember.

1      Q.    And where is -- where is Ana,

2  Dr. Ana?

3      A.    Dr. Ana Navas-Acien is at the

4  Mailman School of Public Health at Columbia.

5      Q.    At Mailman.  Okay.

6          Other than family and personal

7  friends, have you spoken with any other

8  non-doctors about your opinions here?

9          MR. SNIDOW:  Objection to the

10      form.

11          You can answer.

12          THE WITNESS:  I didn't speak

13      with family and personal friends, to

14      be honest.

15  QUESTIONS BY MR. MURDICA:

16      Q.    Okay.

17      A.    My mom doesn't know my opinion

18  on this.

19      Q.    I was trying to make the

20  question easier, Doctor.

21          Dr. Baccarelli, have you spoken

22  with anyone else you can think of, whether

23  they're doctors or not, about your

24  conclusions here?

25      A.    As I mentioned, I spoke with a

1  lot of people.  And, again, happy to -- if

2  you have any questions about who in

3  particular -- and I want to reiterate that

4  these are my conclusions based on my

5  opinions.  I check some details with other

6  people, but it's really checking other --

7  some details.

8          I didn't rely on anyone else's

9  opinion to formulate my opinion.  I relied on

10  my own, everything I can verify.

11          And of course science is based

12  on trust.  We want -- we want to make sure if

13  someone publish a paper, I'm not going to

14  redo the experiment.

15      Q.    If someone publishes a paper,

16  you're not going to do what?

17      A.    I'm not going to -- let's say

18  someone publishes a paper in the -- in the --

19  in the Danish cohort.  It's not my job to get

20  their data and redo that analysis.  Correct.

21      Q.    Okay.  Dr. Baccarelli, did

22  you -- do you recall speaking to any

23  financial analysts about your opinion -- your

24  conclusions here?

25      A.    I certainly didn't do that.

Page 86

1    Q.    Okay.
2    A.    Oh, one second.
3          I spoke -- I spoke to a
4  consulting firm who were interested in
5  hearing about the state of the art and the
6  science on acetaminophen and
7  neurodevelopment.  There is one consulting
8  firm who contacted me.  They wanted to --
9  they wanted to have -- to hear my opinion.
10    Q.    And when was that?
11    A.    Must have been like in
12  January 2023.
13    Q.    So this year?
14    A.    Yeah.
15    Q.    After you were working on the
16  litigation for the plaintiffs?
17    A.    About the same time.  I can't
18  remember whether it was before or after.
19    Q.    And what did you tell them?
20    A.    I tell them -- I tell them that
21  I was incredibly concerned that there was a
22  huge problem here, and that whatever they
23  wanted to do -- they didn't explain why --
24  they told me they were working with hedge
25  funds.  They were a consulting firm working

Page 87

1  with hedge funds, and they wanted to have
2  opinion from scientists about what was going
3  on.
4          And I told them I was
5  incredibly concerned and that I was
6  reasonably sure that there is a problem, that
7  acetaminophen during pregnancy causes ADHD
8  and autism.
9    Q.    Okay.  Did they tell you they
10  were working for investors?
11    A.    Yes, they did.
12    Q.    And did they tell you -- were
13  they asking you about acetaminophen or were
14  they asking you about Tylenol?
15        MR. SNIDOW:  Objection to the
16  form.
17        THE WITNESS:  They were asking
18  me about acetaminophen.
19  QUESTIONS BY MR. MURDICA:
20    Q.    So you don't -- sitting here
21  today, Dr. Baccarelli, you don't know what
22  their investment was in that they were -- you
23  don't know the investment for which they were
24  calling you, right?
25    A.    I was given no information

Page 88

1  except that they were working for a -- for a
2  financial analyst, for a group of financial
3  analysts, I believe.
4    Q.    I take it you didn't disclose
5  that you were being paid by plaintiffs'
6  lawyers at the time?
7        MR. SNIDOW:  Objection to the
8  form.
9        You can answer.
10        THE WITNESS:  I am unsure
11  whether -- I don't think I had been
12  paid at that point.  I don't think I
13  put hours into the -- into the work.
14  It might have been even before I was
15  retained.
16        At the same time, I was not
17  made aware that I had to disclose any
18  of these relationships.  They asked me
19  to be an expert, and I -- it was a
20  phone call of 40 minutes, and they
21  wanted my opinion as a scientist.
22  They didn't ask me anything about any
23  conflicts.
24  QUESTIONS BY MR. MURDICA:
25    Q.    And you don't -- because you

Page 89

1  don't know whether you were hired in this
2  litigation at that point, you don't know if
3  you told them, or you're sure that you did
4  not tell them?
5        MR. SNIDOW:  Objection to the
6  form.
7        THE WITNESS:  I can't remember
8  whether I told them.  And I'm -- I
9  certainly don't remember being an
10  issue.
11  QUESTIONS BY MR. MURDICA:
12    Q.    Okay.  Do you know if you had
13  signed the protective order in this matter at
14  the time?
15    A.    I don't know.
16    Q.    Okay.  Do you know what
17  material nonpublic information is?
18    A.    I'm not sure.  If you want
19  to...
20    Q.    You shared with them your
21  opinions you're sharing with us now, for
22  40 minutes, correct?
23    A.    I share about the same opinion.
24  Of course, I haven't -- I hadn't done at that
25  point in time literature review.

1 And again, I need to say, I was
2 blown away by the literature. The literature
3 is so clear that it literally spoke to me.
4 At the time I hadn't done this
5 work, so they -- my opinion certainly was
6 less well-informed than it is now.
7 Q. Dr. Baccarelli, did I ask you
8 that question?
9 MR. SNIDOW: Objection to the
10 form.
11 THE WITNESS: I --
12 MR. SNIDOW: Hold on.
13 You can answer.
14 THE WITNESS: I thought you
15 did. Perhaps I didn't hear you well.
16 QUESTIONS BY MR. MURDICA:
17 Q. I'm sorry?
18 A. Go ahead.
19 Q. Dr. Baccarelli, you're not a
20 teratologist by training, correct?
21 A. I didn't train specifically in
22 teratology, but I took plenty of teratology
23 classes during my doctorate and during my
24 medical school. And I -- again, I published
25 more than 300 papers on the effects of

1 toxicants on mothers and their children.
2 Q. Good. So you can help us then.
3 What is the -- what is the
4 exact time during pregnancy that a fetus is
5 most susceptible to a toxicant inducing ADHD
6 in the child?
7 MR. SNIDOW: Objection to the
8 form.
9 THE WITNESS: The -- as I wrote
10 in my report, pregnancy is a
11 susceptible window. As long as you
12 have an embryo, as long as you have a
13 neuron in -- in the womb of the
14 mother, the -- the fetus is
15 susceptible. So the entire pregnancy
16 is susceptible.
17 QUESTIONS BY MR. MURDICA:
18 Q. Okay. Is that the same for
19 autism as well, that your --
20 Dr. Baccarelli's, testimony is that an
21 exposure at any time during the pregnancy can
22 cause autism in the offspring?
23 MR. SNIDOW: Objection to the
24 form.
25 You can answer.

1 THE WITNESS: What I'm saying
2 is that -- as I said in my report, I
3 studied the entire pregnancy, and
4 there is evidence that entire
5 pregnancy can be susceptible. So that
6 is something that is really clear
7 happens, that exposure during
8 pregnancy -- that the brain -- the
9 brain of the fetus is susceptible to
10 Tylenol or to any other environmental
11 exposures and other toxicants
12 throughout the pregnancy.
13 QUESTIONS BY MR. MURDICA:
14 Q. Right. So I want to make sure
15 I'm clear, because I wasn't asking you about
16 Tylenol.
17 A. Okay. Thank you.
18 Q. Dr. Baccarelli, prior to being
19 paid for your opinions here, you've studied
20 other pregnancy exposures and
21 neurodevelopmental outcomes, right?
22 A. Correct.
23 Q. Okay. And is there any period,
24 particular period, during the pregnancy when
25 the fetus is most susceptible to adverse

1 neurodevelopmental outcomes?
2 A. In general, we believe that the
3 entire pregnancy -- during the entire
4 pregnancy, the fetus brain is susceptible.
5 And of course, I mean, depending on the type
6 of chemicals, there might be different types
7 of susceptibility. But in general, the
8 susceptibility is -- continues the entire
9 pregnancy.
10 So that is -- that is my
11 testimony.
12 Q. Okay. And that's the same for
13 autism or ADHD? There's no particular period
14 during the pregnancy that is more likely to
15 cause autism or ADHD, correct?
16 MR. SNIDOW: Objection to the
17 form.
18 You can answer.
19 THE WITNESS: Again, in my --
20 in my report I focus on pregnancy as a
21 whole. Whether there is a susceptible
22 window, that -- that is interesting,
23 but I don't think that the matter is
24 settled yet.
25

Page 94

1  QUESTIONS BY MR. MURDICA:
2      Q.    Okay.  So an exposure --
3  according to Dr. Baccarelli, an exposure two
4  days after conception can cause autism in a
5  child, correct?
6          MR. SNIDOW:  Objection to form.
7          THE WITNESS:  I didn't say
8      that.  As you read in my report, I
9      said that -- I wrote in my report that
10     there is more convincing evidence for
11     exposures that are 20-day -- 28 days
12     or longer.  So you can understand that
13     if it's 28 days or longer, it's not
14     even possible that your question
15     stands.
16  QUESTIONS BY MR. MURDICA:
17     Q.    Okay.  Dr. Baccarelli, though,
18  you're not -- you're not answering my
19  question, because you're now answering about
20  28 days of acetaminophen exposure, correct?
21         MR. SNIDOW:  Objection to the
22     form.
23         You can answer.
24         THE WITNESS:  I was making an
25     example how -- what you are trying to

Page 95

1      say I'm saying is completely different
2      from what I wrote.
3  QUESTIONS BY MR. MURDICA:
4      Q.    Okay.  And I am not asking you
5  about acetaminophen exposure.
6      A.    Okay.
7      Q.    You told me twice today that
8  you are -- you have expertise in toxicant
9  exposure during pregnancy that has nothing to
10  do with acetaminophen and neurodevelopmental
11  outcomes, correct?
12     A.    I have experience with many
13  different toxicants, including toxicants --
14  other toxicants that have a lot to do with
15  neurodevelopment.
16     Q.    Okay.  So my question for you
17  is, can a toxicant exposure on day 2
18  post-conception cause autism in a child?
19         MR. SNIDOW:  Objection to the
20     form.  Asked and answered.
21         THE WITNESS:  So in order
22     for -- in order for a toxicant to
23     cause exposure, we need certain
24     developmental stages.  So definitely
25     the exposure becomes toxicant when

Page 96

1  there are neurons.  And the exposure
2  becomes toxicants when there is
3  neurulation.
4          So it's a great question when
5  it starts, but it's not the question
6  that I set out to answer.
7          What I set out to answer was,
8  is there reasonable evidence if people
9  have prolonged use of a chemical, in
10  this case acetaminophen, during
11  pregnancy, whether that makes sense
12  that would -- that would cause --
13  would be reasonably associated with --
14  reasonably causally related to ADHD
15  and ASD and other neurodevelopmental
16  disorders during pregnancy.
17          So the pregnancy is a whole
18  lot -- by the way, we haven't yet
19  found a way to do X-rays of the -- of
20  a woman every hour and see when a
21  chemical starts to hit the embryo or
22  the -- or the fetus.  So I think your
23  question is interesting, but I --
24  I've -- it's not -- it's not -- it's
25  not a focus of my -- of my interests.

Page 97

1  QUESTIONS BY MR. MURDICA:
2      Q.    So here's my question then,
3  Dr. Baccarelli.
4          Can Dr. Baccarelli answer
5  whether an exposure on day 2 post-conception
6  can cause autism in a child?  Is it even
7  possible?
8          MR. SNIDOW:  Objection to the
9      form.
10  QUESTIONS BY MR. MURDICA:
11     Q.    According to Dr. Baccarelli.
12         MR. SNIDOW:  Objection to the
13     form.
14         You can answer.
15         THE WITNESS:  That is a
16  question I -- I'm not even interested
17  to answer.  I mean, it's a question
18  that scientifically makes no sense.
19  I'm so sorry, it's a question
20  scientifically we are -- we are not
21  doing a forensic on every minute of
22  someone's pregnancy.  I think you
23  appreciate that.
24  QUESTIONS BY MR. MURDICA:
25     Q.    Can you answer my question,

1 Dr. Baccarelli?

2        MR. SNIDOW:  Objection to the

3    form.

4        THE WITNESS:  Again, I don't

5    want to answer your question because I

6    don't think it makes sense nor has

7    relevance to our discussion today.

8 QUESTIONS BY MR. MURDICA:

9    Q.    Dr. Baccarelli, in the studies

10 that you are relying on, many of them were

11 observational studies, correct?

12    A.    All of them.

13    Q.    Okay.  And the exposure to

14 acetaminophen in most of them was recorded by

15 questionnaire, correct?

16    A.    That is correct.

17    Q.    Retrospective questionnaire,

18 correct?

19    A.    I want to -- I want to push

20 back on that.  They were not retrospective.

21 They were collected during pregnancy or just

22 at the end of pregnancy.  It's the best way

23 to collect information about acetaminophen

24 during pregnancy.  Most of the studies

25 measure -- asked the women during pregnancy.

1        For instance, I believe the

2 Danish cohort asked about acetaminophen at 18

3 weeks and 32 weeks.  So this is information

4 that usually not even physicians have.

5    Q.    Physicians don't normally have

6 that information on drug exposure.

7        Is that your testimony?

8    A.    No.  Go ahead.

9    Q.    Okay.  Dr. Baccarelli, can you

10 tell for any given patient -- let's just take

11 the DNBC.

12        You know what that is, right?

13    A.    Yeah.

14    Q.    What is it?

15    A.    It's the Danish birth cohort.

16    Q.    Danish National Birth Cohort?

17    A.    Correct.

18    Q.    Okay.  You don't know, and

19 there's no way for you to find out, when,

20 during the first 18 weeks or the second 16

21 weeks, a mother took a single pill of

22 acetaminophen, correct?

23    A.    And I'll be happy -- you know,

24 I reviewed hundreds of studies.  I'll be

25 happy to discuss this study if you can give

1 me the paper.

2    Q.    Dr. Baccarelli, you don't know,

3 sitting here, that none of those cohort

4 studies identified the day or even week

5 during pregnancy when the acetaminophen was

6 taken, correct?

7        MR. SNIDOW:  Objection to the

8    form.

9        Dr. Baccarelli, you can answer.

10        THE WITNESS:  There is a

11    multitude of approaches that are being

12    used to study -- to study the exposure

13    to acetaminophen, and many of them are

14    detailed.  Many of them are collecting

15    acetaminophen at 18 weeks, 32, end of

16    pregnancy.  Many of them have

17    information about the trimester.

18 QUESTIONS BY MR. MURDICA:

19    Q.    And, Dr. Baccarelli, I don't

20 think you answered my question.

21        Let's take DNBC, right?  There

22 was an interview at 18 weeks, correct?

23    A.    I'll be happy to review the

24 paper if you have it.

25    Q.    Whenever it was interviewed --

1 whenever the interview occurred, the

2 interview asked, among other things, if there

3 was exposure to acetaminophen, correct?

4        MR. SNIDOW:  Objection to the

5    form.

6        You can answer.

7        THE WITNESS:  The studies were

8    conducted to study acetaminophen, and

9    they exactly, precisely, asked

10    whether they measured -- whether the

11    women had taken acetaminophen.

12 QUESTIONS BY MR. MURDICA:

13    Q.    And that's all -- they don't

14 know -- you don't know and the scientists who

15 ran the cohorts don't know the days on which

16 the women took acetaminophen or for how long

17 a particular use of acetaminophen lasted,

18 correct?

19        MR. SNIDOW:  Objection to the

20    form.

21        Just hold on.  You can answer.

22        THE WITNESS:  There are many

23    studies in the literature that looked

24    at specific trimesters of pregnancy.

25    They asked whether acetaminophen was

Page 102

1 taken in the first trimester, the
2 second or the third.
3       And by the way, if you want to
4 confuse a woman, you're going to ask
5 them, please tell me in -- tell me
6 when you got -- you got acetaminophen
7 on that day.
8       So if you want low quality
9 data, you should follow the approach
10 you discussed.
11       I want to also note that --
12 also particularly point out that you
13 might be suggesting that there is
14 exposure misclassification.
15       So let's say there is only one
16 day in the entire pregnancy.  Let's
17 say really that these are women that
18 are vulnerable only one hour during
19 their pregnancy, which is what you're
20 suggesting.  And it's a suggestion
21 that is interesting, but let's say --
22 let's say it's just something --
23 something.
24       And there are like 10,000 hours
25 of pregnancy, and only one hour is

Page 103

1 susceptible.  There is only one window
2 the brain can be hit.  So even more
3 remarkable that we are finding
4 associations.
5       I'm particularly impressed by
6 the fact that, as you say, provided --
7 I mean, not granted, but assuming that
8 what you say is right, there is a
9 narrow window, which is not true, of
10 susceptibility, the fact that we are
11 finding such a strong effect is even
12 more remarkable.
13       So if you -- what you say is
14 true, perhaps the risk is not
15 30 percent but it's by 1,000 percent,
16 because we are classifying as an
17 exposed people who would be exposed.
18       And again, the window is not
19 that narrow, so, please --
20 QUESTIONS BY MR. MURDICA:
21       Q.    Dr. Baccarelli, I appreciate
22 you're being defensive about this, but I'm
23 the one asking you if you can identify the
24 window of exposure for acetaminophen in a
25 pregnancy that can result in the outcome of

Page 104

1 autism.
2             MR. SNIDOW:  Objection to the
3       form.
4       Dr. Baccarelli --
5             THE WITNESS:  Let me -- you
6       said --
7             MR. SNIDOW:  Sorry.  Sorry.
8       Objection to the form.
9       You can answer.
10            THE WITNESS:  You said two
11      things.  A, I'm not defensive.  I'm
12      just trying to explain how things
13      stand.
14            And I'm sorry.  If you say
15      things that scientifically make no
16      sense, I need to tell the truth.
17            Your question was?  I can't
18      remember.
19 QUESTIONS BY MR. MURDICA:
20       Q.    My question was,
21 Dr. Baccarelli, I'm the one asking you if you
22 can identify the window of exposure to a
23 pregnancy to acetaminophen that could trigger
24 the outcome of autism.
25       A.    As I mentioned in my -- in my

Page 105

1 report, there are many mechanisms.  I
2 reviewed -- I've reviewed several mechanisms
3 that are plausible.
4             The acetaminophen first crosses
5 the placental and enter the fetal brain.
6             Acetaminophen increases
7 oxidative stress.
8             Acetaminophen changes the
9 prostaglandin system.
10            Acetaminophen often alters the
11 endocannabinoid system, the BDNF.  Has
12 endocrine effects and epigenetic effects.
13            You started by talking about
14 teratology, so you might think that for
15 teratology the window is a certain window.
16 But for these other mechanisms, the windows
17 change.
18            So the entire pregnancy can be
19 vulnerable.  And that is incredibly
20 well-established.  We have lots of evidence
21 that any toxicant that affects the brain can
22 affect throughout the entire pregnancy.  That
23 is incontrovertible.
24       Q.    Okay.
25            MR. SNIDOW:  Hold on, Jim.

Page 106

1  Just -- we've been going for
2  90 minutes, minus however long our --
3      MR. MURDICA:  I do want to get
4  an answer to my question first, and
5  then I'll -- then we can take a break.
6      MR. SNIDOW:  Okay.
7      MR. MURDICA:  Okay.
8      MR. SNIDOW:  Well --
9      MR. MURDICA:  Because I didn't
10 get an answer to the question.  So I'm
11 going to reask the same question.
12     MR. SNIDOW:  All right.  So
13 hold on.
14     I think you did, just for the
15 record, but I'm happy to let you ask
16 one more time, and then we can take a
17 break.
18     MR. MURDICA:  Yeah.
19     MR. SNIDOW:  Thank you.
20 QUESTIONS BY MR. MURDICA:
21     Q.   I'm going to read back what I
22 just asked you.
23     A.   Okay.
24     Q.   Dr. Baccarelli, can you
25 identify the window of exposure to a

Page 107

1  pregnancy of acetaminophen that can trigger
2  the outcome of autism?
3      MR. SNIDOW:  Okay.  Objection
4  to the form.
5      You can answer, Dr. Baccarelli.
6      THE WITNESS:  So, again, your
7  question implies that such a window
8  exists and has been identified.
9      I replied to by saying that
10 pregnancy as a whole is a window --
11 QUESTIONS BY MR. MURDICA:
12     Q.   Okay.
13     A.   -- and is associated with this
14 very well-known.  And there may be parts of
15 the pregnancy that are more susceptible, but
16 the entire pregnancy is a target.
17     MR. MURDICA:  Okay.  Thank you,
18 Doctor.
19     MR. SNIDOW:  Thank you.
20     Can we go off the record?
21     MR. MURDICA:  Yep.
22     VIDEOGRAPHER:  The time right
23 now is 10:01 a.m.  We are off the
24 record.
25     (Off the record at 10:01 a.m.)

Page 108

1      VIDEOGRAPHER:  The time right
2  now is 10:17 a.m.  We are back on the
3  record.
4      THE WITNESS:  Thank you.
5  QUESTIONS BY MR. MURDICA:
6      Q.   Dr. Baccarelli, welcome back.
7  Are you ready to proceed?
8      A.   Absolutely.
9      (Baccarelli Exhibit 89 marked
10 for identification.)
11 QUESTIONS BY MR. MURDICA:
12     Q.   All right.  We are going to
13 mark an exhibit.  Our first one.
14     Dr. Baccarelli, you have in
15 front of you what's been marked as
16 Exhibit 89.  The reason for that is that
17 there were 88 exhibits in the other expert
18 depositions, so that's why it says that, in
19 case you're curious.
20     Do you recognize what's in
21 front of you?
22     A.   Yes.
23     Q.   And do you recall my questions
24 and your answers about contact with an
25 investment advisor?

Page 109

1      A.   Yes.
2      MR. SNIDOW:  Objection to the
3  form.
4  QUESTIONS BY MR. MURDICA:
5      Q.   All right.  And is this, what's
6  in Exhibit 89, what you were referring to?
7      A.   So this person is someone
8  who -- is someone -- is -- I think the person
9  who contacted me for that situation with --
10 emphasized they were looking for information
11 about the evidence available on acetaminophen
12 and ADHD and ASD and neurodevelopmental
13 disorders.
14     Q.   And had you ever -- you see the
15 name is AlphaSites, right?
16     A.   AlphaSites, that is correct.
17     Q.   Yeah.
18     Had you ever worked with them
19 before?
20     A.   No.
21     Q.   Did they pay you for your
22 interview?
23     A.   Yes, they -- I believe they
24 paid me $500.
25     Q.   Okay.  And this e-mail was from

Page 110

1  someone named Elsbeth Caulo, but you also
2  spoke with someone named Alvaro Garcia,
3  correct?
4      A.   Correct.
5      Q.   Was Alvaro Garcia the 40-minute
6  conversation that you had that you testified
7  about earlier?
8      A.   Alvaro Garcia was the person
9  who set it up, and I believe that he was in
10 the conversation.  I honestly cannot recall
11 the names of the people he set me up with.
12     Q.   Okay.  And if you look on the
13 bottom of the page that ends in 240, which is
14 the second page of the e-mail --
15     A.   Uh-huh.
16     Q.   -- you see it's actually asking
17 about Tylenol and autism, not acetaminophen
18 and autism, right?
19         MR. SNIDOW:  Objection to the
20     form.
21         THE WITNESS:  I -- if you can
22     explain to me what is the difference.
23 QUESTIONS BY MR. MURDICA:
24     Q.   Do you understand there's 600
25 different brands of acetaminophen?

Page 111

1      A.   Absolutely.  I also understand
2  that Tylenol and acetaminophen are terms that
3  are used inter-exchangeable.
4         So I also understand that along
5  the 600 formulations, acetaminophen is always
6  present.  Acetaminophen is always present in
7  all the 600 formulations that you mentioned.
8      Q.   Right.
9         But one of them in particular
10 is Tylenol, correct?
11     A.   That is correct.
12     Q.   Okay.
13     A.   It's the most common, so that
14 people often speaks about Tylenol when they
15 really mean acetaminophen.
16     Q.   Okay.  And you don't know
17 that -- okay.  Well, let's turn to the last
18 page -- to the page that ends in 241.
19     A.   Uh-huh.
20     Q.   What Elsbeth Caulo told you was
21 that she, or he, was working on behalf of an
22 institutional investor client.
23     A.   Uh-huh.
24     Q.   Do you see that?
25     A.   Yes, that I understand.

Page 112

1      Q.   That is the information that
2  you had when you chose to take the phone call
3  from Mr. Garcia, correct?
4      A.   Yes, absolutely.
5      Q.   Okay.  And you have no idea,
6  Dr. Baccarelli, what that's referring to
7  about an institutional investor client asking
8  about Tylenol?
9         MR. SNIDOW:  Objection to form.
10        THE WITNESS:  I don't have any
11     idea.
12 QUESTIONS BY MR. MURDICA:
13     Q.   Okay.  Do you know who makes
14 Tylenol?
15     A.   I guess that is Johnson &
16 Johnson.
17     Q.   Well, it's a former company of
18 the Johnson & Johnson family, but at the time
19 that this is being asked, it was a Johnson &
20 Johnson Company.
21     A.   Uh-huh.
22     Q.   So you don't --
23        MR. SNIDOW:  Objection.
24 QUESTIONS BY MR. MURDICA:
25     Q.   You don't -- sitting here

Page 113

1  today, you don't understand the
2  ramifications, the stock ramifications, that
3  they were asking you about?
4         MR. SNIDOW:  Objection to the
5     form.
6         THE WITNESS:  I -- if you want
7     to explain to me what are the
8     ramifications, I'm happy -- I said in
9     all honesty what I saw in the
10    literature, and I have no problem
11    doing that.
12        If you had contacted me, I
13    would have told you the same.
14 QUESTIONS BY MR. MURDICA:
15     Q.   Well, Doctor, can you tell us
16 exactly what day you were hired by the
17 plaintiffs' lawyers?
18     A.   No.  I don't remember that.
19     Q.   Can you tell us the day of your
20 first contact with the plaintiffs' lawyers?
21     A.   It was sometimes in January.
22     Q.   Okay.  Do you keep billing
23 records?
24     A.   Yes, I do.
25     Q.   Do you have them with you?

Page 114

1    A.    No.

2    Q.    Will the billing records
3 reflect the first contact you ever had with
4 plaintiffs' lawyers?

5    A.    I assume so.

6    Q.    You knew at this point in time
7 that Mr. Pearson -- Dr. Pearson, who you say
8 is not part of your group, was working for
9 the plaintiffs' lawyers, right?

10    A.    No, I didn't.

11    Q.    You didn't.

12        So when you referred these
13 investment advisors to Dr. Pearson, you
14 didn't know that he was working with the
15 plaintiffs' lawyers?

16    A.    I did not know he was working
17 with the plaintiffs' lawyers.

18    Q.    Okay.  Did you know anyone who
19 was working with the plaintiffs' lawyers in
20 January 2023?

21    A.    No.  Absolutely not.

22    Q.    So you thought you were the
23 only one helping them?

24        MR. SNIDOW:  Objection to the
25    form.

Page 115

1        THE WITNESS:  No.  I was told
2    by your colleagues here that there
3    were other experts.  I didn't know who
4    they were.

5        I learned from Dr. Pearson he
6    was working with the same firms at a
7    meeting we were both together, I
8    believe in April 2023.  He mentioned
9    that he had been retained, and he was
10   working with -- on this case.

11 QUESTIONS BY MR. MURDICA:

12    Q.    Was that April 2023 meeting in
13 person?

14    A.    Yes.

15    Q.    And where was that?

16    A.    Society of Toxicology.
17 Nashville, Tennessee.

18    Q.    Okay.  So it was a -- it was a
19 medical meeting that you went to where he
20 also happened to be there, correct?

21    A.    Correct.  It's a meeting with
22 8,000 participants, called the Society of
23 Toxicology.  And we were there, and we bumped
24 into each other during posters.

25    Q.    So this was a side -- unplanned

Page 116

1 side conversation with Dr. Pearson, correct?

2    A.    Correct.

3    Q.    Did you -- at that Society of
4 Toxicology meeting, did you attempt to
5 publicize your views on acetaminophen?

6        MR. SNIDOW:  Object to the
7    form.

8        THE WITNESS:  Can you please
9    explain what you mean by that?

10 QUESTIONS BY MR. MURDICA:

11    Q.    Did you -- did you try to go up
12 on stage and tell everyone what
13 Dr. Baccarelli believes?

14        MR. SNIDOW:  Objection.
15    Objection to the form.

16        You can answer.

17        THE WITNESS:  I don't -- you
18    know, if I tried to go on stage, they
19    will call the police.  No.  Really,
20    really, I was not an invited speaker
21    in that -- in the presentation.  I
22    didn't give presentations.

23        I was an attendant.  And so if
24    you -- I do what you suggested, they
25    would probably call public security.

Page 117

1 QUESTIONS BY MR. MURDICA:

2    Q.    Okay.  Dr. Baccarelli, did you
3 attempt to tell anyone about these new
4 opinions that you had on acetaminophen?

5        MR. SNIDOW:  Objection to the
6    form.

7        THE WITNESS:  Again, the
8    opinions were not new.  They existed
9    before I was retained, and they were
10   pretty solidified before I was
11   retained.

12        And I discussed with -- as I
13   mentioned, there was the conference
14   where I discussed with the colleague
15   at the EPA the problem about the issue
16   that I was researching.

17 QUESTIONS BY MR. MURDICA:

18    Q.    To the best you can describe
19 it, Dr. Baccarelli, when was the first time
20 that Dr. Baccarelli decided that the
21 relationship between acetaminophen exposure
22 during pregnancy and autism was causal?

23        MR. SNIDOW:  Objection to the
24    form.

25        You can answer, Dr. Baccarelli.

Page 118

1    THE WITNESS:  I wish -- I wish
2  I had that comment on me, but to be
3  honest, I -- it's very difficult to
4  have a record of what my brain thought
5  in the past two or three years.
6    And I was -- I was particularly
7  concerned about acetaminophen starting
8  in 2021, 2022, becoming concerned that
9  there was a problem.  Started to read
10  more and more literature, and
11  gradually I came to the realization
12  that this was a big issue.  I believed
13  this was real.  This was happening.
14  This was causal.
15    Of course, in order to do -- to
16  be reasonably convinced and to say
17  under oath that this -- the only
18  reasonable explanation for the
19  association is there have been seen 30
20  more times in the literature, I really
21  had to do a Bradford Hill analysis.  I
22  had to do a documentation of what --
23  of what I found.
24    And that I did it really in
25  April or May.  So that is when I

Page 119

1  became ready to file the report and to
2  come here to tell you what I found.
3  QUESTIONS BY MR. MURDICA:
4    Q.    Before April or May 2023, did
5  Dr. Baccarelli believe that the relationship
6  between in utero acetaminophen exposure and
7  autism was causal?
8    MR. SNIDOW:  Objection to the
9  form.
10    Dr. Baccarelli, you can answer.
11    THE WITNESS:  I think I already
12  said that multiple times.  I
13  believed -- I had a strong
14  understanding that this was a problem
15  at least one year before.  Maybe
16  earlier.  And there was
17  particularly -- particularly strong
18  understanding that this was a huge
19  issue.
20    I was completely baffled by,
21  for instance, reading, at least one
22  year before March 2023, the
23  statement -- reading again the
24  statement by the ACOG, the American
25  College of Obstetrics and Gynecology,

Page 120

1  that basically says in response to the
2  consensus statement, that can't be
3  true, offering no evidence.
4    And, again, my assessment is
5  based on evidence, and it's clear.
6  QUESTIONS BY MR. MURDICA:
7    Q.    Dr. -- are you done?
8    A.    Yes.
9    Q.    Dr. Baccarelli, if I understood
10  your testimony correctly, your best estimate
11  of when Dr. Baccarelli believed the
12  relationship between in utero acetaminophen
13  exposure and the outcome of autism was causal
14  was sometime in 2022.
15    Is that fair?
16    MR. SNIDOW:  Objection to the
17  form.
18    THE WITNESS:  Let me --
19    MR. SNIDOW:  Just -- only
20  reason I'm asking you to pause is so
21  that I can get the objection on and
22  really get it out entirely.
23    Objection to the form.
24    You can answer.
25    THE WITNESS:  Let me give you

Page 121

1  the entire response again.
2    I was educated in medical
3  school by OB/GYN doctors that -- and
4  pharmacologists that Tylenol is
5  perfectly fine and the only drug that
6  is safe in pregnant women, for them
7  and their children; that other
8  painkillers and fever-reducers have
9  teratology effects.
10    My reaction when we started to
11  work on this was, this is a fine idea.
12  Let's take a look.  If there is a
13  question, if there is something going
14  on in the literature, we can
15  contribute.
16    I honestly expected to find
17  nothing, and instead we did find
18  something.  So as a scientist, I'm
19  trained to believe in the data, not on
20  my own opinions or those of the
21  others.
22    So gradually, from the time we
23  published the Baker 2020 to the time I
24  came to -- in 2022, I started to be
25  more and more convinced and started to

Page 122

1   have time to read more literature,
2   started to be more convinced that this
3   was a problem.  And it is a problem.
4   QUESTIONS BY MR. MURDICA:
5   Q.   Okay.  Dr. Baccarelli, the
6   question I just asked you was related to
7   autism.
8        Did you give me your answer
9   with relation to autism?
10  A.   Yes, also autism.
11  Q.   Okay.
12  A.   Absolutely.
13  Q.   And so that same answer applies
14  to ADHD; is that correct?
15  A.   About the same answer, yeah.
16  Q.   Okay.  And if you believed --
17  you reviewed Baker 2020 before your name was
18  on it, correct?  Before it was published, you
19  reviewed it?
20  A.   Correct.
21  Q.   You offered commentary on it
22  and revisions, yes?
23  A.   Yes, I did.
24  Q.   Okay.  And Baker 2020 does not
25  say that the relationship between in utero

Page 123

1   acetaminophen exposure and autism or ADHD is
2   causal, correct?
3        MR. SNIDOW:  Objection to the
4   form.
5        You can answer.
6        THE WITNESS:  Let me unpack --
7   let me unpack the situation.
8        Baker 2020 doesn't -- is not on
9   autism.  It's on ADHD.  So as far as
10  I'm concerned, there is no
11  relationship within the paper and
12  autism.
13       That paper just doesn't deal
14  with autism.  It doesn't say that
15  autism is -- that autism is a problem
16  or not.  It just doesn't provide any
17  information.  And I might be wrong,
18  but I don't think there's any
19  commentary on autism.  If there is,
20  please let me know.
21       And I'm pretty sure we had
22  pretty strong language about
23  acetaminophen being associated with
24  autism -- with ADHD, and our -- the
25  results being consistent with having a

Page 124

1   problem there.
2        And I'm happy to review the
3   paper with you, if you like to.
4   QUESTIONS BY MR. MURDICA:
5   Q.   Okay.  You just testified that
6   Baker 2020 isn't about autism, and I just
7   want to make sure I understand.
8        Did Baker 2020 cause you to
9   have concern about the relationship between
10  acetaminophen exposure and autism, or did
11  that come later?
12       MR. SNIDOW:  Objection to the
13  form.
14       THE WITNESS:  So at the same
15  time I was working on this, this
16  triggered an alarm in my mind that all
17  my opinions, based on my own training,
18  that acetaminophen during pregnancy
19  was fine, it was not true.
20       So at the time I started to
21  also to be interested in the
22  literature, I started to review the
23  papers on autism.  And over time, as I
24  had time to read and to work on it, I
25  realized that there was a problem with

Page 125

1   ADHD and there was a problem with
2   autism.
3   QUESTIONS BY MR. MURDICA:
4   Q.   Okay.  And ADHD and autism are
5   different neurodevelopmental outcomes from
6   each other, correct?
7        MR. SNIDOW:  Objection to the
8   form.
9        THE WITNESS:  As you
10  understand, they have the very similar
11  genetic background, and they're
12  interrelated.  They're a comorbidity.
13  So they're interrelated --
14  interrelated diseases that get
15  diagnosed in two different DSM-5
16  categories.  But they clearly have
17  similar origins, including genetics,
18  and they're clearly similar also,
19  etiology and causes.
20  QUESTIONS BY MR. MURDICA:
21  Q.   They have different
22  symptomology and different presentations,
23  correct, between ADHD and autism?
24  A.   Absolutely.  For instance, let
25  me give you an example here.

Page 126

1    Smoking causes lung cancer and
2 causes cardiovascular disease.  So would you
3 say because cardiovascular disease and smoke
4 and cancer are different, they have different
5 symptoms?  It can't be possible that smoking
6 causes both?
7    Q.    Doctor, I'm not -- I'm not
8 asking you about smoking, and I'm not asking
9 you about causation in that question to one
10 or the other.  I was asking you about the
11 symptomology of autism and ADHD.  Okay?
12      So I appreciate that you're
13 trying to draw a comparison, but it wasn't
14 what I was -- it wasn't what I was asking
15 about.
16      MR. SNIDOW:  Okay.  Objection
17 to form.
18      You got a question, Jim?
19      THE WITNESS:  Sorry?
20      MR. SNIDOW:  I just -- I don't
21 think we have a question pending.
22      THE WITNESS:  You don't
23 think --
24      MR. SNIDOW:  I'm talking to
25 him.

Page 127

1      THE WITNESS:  Okay.  Sorry.
2 QUESTIONS BY MR. MURDICA:
3    Q.    He's breaking the rules again,
4 and so now he has himself confused.  And now
5 he has you confused.
6    A.    No, I'm not confused.  Don't
7 worry, I'm not confused.
8    Q.    It's okay, Doctor.
9      Doctor, at the time that Baker
10 2022 was signed off on by Dr. Baccarelli,
11 there was no statement in the publication
12 that said that you believed or your group
13 believes the relationship between
14 acetaminophen in utero exposure and ADHD was
15 causal, correct?
16      MR. SNIDOW:  Objection to the
17 form.
18      THE WITNESS:  I think you're
19 making my own mistake.  You're saying
20 Baker '22?
21 QUESTIONS BY MR. MURDICA:
22    Q.    Baker 2020.
23    A.    Yes, I feel better now, that
24 actually I'm not the only one doing that.
25 Really.

Page 128

1    No, there is a lot of
2 statements that are consistent with causality
3 in that paper.  I'm happy to review them with
4 you.  There is quite a bit of language that
5 is very strong.
6    Q.    Did you believe at the time of
7 publication of Baker 2020 that the
8 relationship between in utero acetaminophen
9 exposure and ADHD was causal, Doctor?
10      MR. SNIDOW:  Objection to the
11 form.
12      You may answer.
13      THE WITNESS:  I think you are
14 conflating two different things.  One
15 is one single paper and whether that
16 paper is consistent with causality,
17 which we said very clearly in that
18 paper.  We really said these are data
19 that are concerning.  There is an open
20 question about whether it's causal or
21 not.
22      Our paper shows that the
23 opinion of the evidence -- strength in
24 the evidence that there is a causal
25 association between ADHD and prenatal

Page 129

1 acetaminophen.
2    If you're asking me about my
3 opinion that all the literature as a
4 whole describes and shows clearly a
5 causal association, that requires not
6 one paper but entire literature.
7 QUESTIONS BY MR. MURDICA:
8    Q.    No individual paper, at least
9 in what you've seen so far, establishes
10 causation for in utero exposure of
11 acetaminophen with the outcomes of autism and
12 ADHD, correct?
13      MR. SNIDOW:  Objection to the
14 form.
15      THE WITNESS:  I didn't say
16 that.  I actually said the opposite.
17 QUESTIONS BY MR. MURDICA:
18    Q.    Okay.  Can you point to any
19 individual paper that you reviewed that comes
20 to the conclusion that the relationship
21 between acetaminophen and one of those
22 neurodevelopmental outcomes is causal?
23    A.    There are many that have those
24 statements.  For instance, I wrote in my
25 executive summary that is on page 7, I said

1 there are many other researchers who
2 acknowledge the -- sorry.
3          The authors of Olsen and Liew
4 say that their work increased the probability
5 that the association is causal.
6          Gou, I think this is 2019, says
7 that their findings lend weight to the
8 hypothesis that the association is causal.
9          The author of the Ystrom study
10 say that their results are consistent with a
11 causal link.
12          Stergiakouli says that their
13 findings were consistent with an intrauterine
14 effect, which is causation.
15          Alemany even did a Bradford
16 Hill analysis.  So they even had a full
17 Bradford Hill analysis that, as you know, is
18 done to establish causation, and they
19 concluded that association is causal.
20          And even there is a textbook,
21 which is the Briggs Drugs in Pregnancy and
22 Lactation, that is a reference guide to fetal
23 and neonatal risk that goes as far to provide
24 pregnancy recommendations.  And they say
25 that acetaminophen is a problem.

1    Q.    So --
2    A.    So I think your answer is all
3 of this -- there are many papers that
4 contribute to the evidence that this
5 association is causal.
6    Q.    Let the record reflect that the
7 doctor was just reading off of something he
8 put in front of himself, which is his report,
9 that he's reading into the record.
10    A.    Page 7.
11          MR. SNIDOW:  Objection to the
12 form.
13 QUESTIONS BY MR. MURDICA:
14    Q.    Did I ask you to read anything
15 to me, Doctor?
16          MR. SNIDOW:  Objection to the
17 form.
18          THE WITNESS:  I understand that
19          this is part of the proceedings and
20          that I'm allowed to read it.  So if
21          you have any objections to this, let
22          me know.
23 QUESTIONS BY MR. MURDICA:
24    Q.    Doctor, do you remember what my
25 question was?

1    A.    No, but if you want to --
2    Q.    Okay.
3    A.    -- tell me again.
4    Q.    Is it your testimony that each
5 of the studies you just referenced by reading
6 out of your report, it's your testimony that
7 each of those separately concludes causation
8 between acetaminophen exposure and the
9 outcome of ADHD?
10          MR. SNIDOW:  Objection to the
11 form.
12          You can answer.
13          THE WITNESS:  Again, your
14 question implies that one single study
15 is enough.
16          If one single study were
17 enough, we wouldn't be here today.  We
18 need the entirety of the study and
19 entirety of the evidence.  This is how
20 epidemiology work.
21          I understand you are not an
22 epidemiologist, but I also need to say
23 that when we do -- this was
24 well-delineated by Bradford Hill
25 himself.  This year, 1965, Bradford

1 Hill says you need to read the
2 entire -- entirety of the literature
3 and do an analysis of all the
4 literature.
5          So what you're asking me is not
6 consistent with the study of
7 epidemiology that has been established
8 for more than 50 years.
9 QUESTIONS BY MR. MURDICA:
10    Q.    Now we're understanding each
11 other, Doctor, because my question is, no
12 single study standing alone can establish
13 causation, correct?
14          MR. SNIDOW:  Objection to the
15 form.
16          THE WITNESS:  But many single
17 studies, about 30, are consistent with
18 causation.
19 QUESTIONS BY MR. MURDICA:
20    Q.    Okay.  So you agreed with my
21 statement, correct?
22          MR. SNIDOW:  Objection to the
23 form.
24          THE WITNESS:  I don't agree
25 with your statement.

1 QUESTIONS BY MR. MURDICA:
2    Q.   Okay.  So a single study
3 standing alone can establish causation,
4 according to Dr. Baccarelli, correct?
5         MR. SNIDOW:  Objection to the
6    form.
7         Dr. Baccarelli, you can answer.
8         THE WITNESS:  I didn't say
9    that.
10        I said single studies can
11    contribute to causation, and I said
12    that your question wouldn't be allowed
13    in any class of epidemiology.  If a
14    student asked your question, I would
15    be worried about whether they've been
16    listening to any epidemiology
17    questions.
18 QUESTIONS BY MR. MURDICA:
19    Q.   Okay.  So is your answer that
20 you can't answer my question, Dr. Baccarelli?
21    A.   My answer --
22        MR. SNIDOW:  Hold on.  Hold on.
23    Objection to the form.
24        Take a deep.  You can answer.
25        MR. MURDICA:  No other

1 commentary.  That's enough.  You're
2 interfering with my examination.
3         MR. SNIDOW:  I don't think I
4 was, but I'll -- object to the form.
5    You can answer.
6    I think we've agreed --
7         MR. MURDICA:  He knows he
8 can -- you don't need to tell him he
9 can answer.  Just say "object to form"
10 if you have a form objection.
11    Okay?
12        MR. SNIDOW:  I've said that one
13 many times.  I didn't know you had a
14 problem with it, but if you want --
15        MR. MURDICA:  Well, you're
16 interfering.
17        MR. SNIDOW:  If you want, I'll
18 say "object to form."
19        THE WITNESS:  My answer is that
20 if you were a student in an
21 epidemiology class or any course that
22 you asked the questions, would
23 probably take a C or a D or a bad
24 grade because this is not the way
25 epidemiology works.

1 QUESTIONS BY MR. MURDICA:
2    Q.   Yeah.
3         So let's try to get an answer
4 under oath on the record then.
5         According to Dr. Baccarelli,
6 can causation be established from a single
7 study?
8         MR. SNIDOW:  Objection to the
9    form.
10        THE WITNESS:  It depends on the
11    study.
12 QUESTIONS BY MR. MURDICA:
13    Q.   Did you see any in your review
14 of the literature here that, standing alone,
15 establishes a causal relationship between
16 acetaminophen and the neurodevelopmental
17 outcomes that are adverse?
18    A.   Again, I saw many.  The
19 overwhelming majority, 90 percent of the
20 studies here, 95 percent of the study, are
21 consistent and strongly supportive of
22 causation.  And overall, the evidence is
23 incredibly clear.
24        It's -- you don't even need to
25 read my report.  You can look at the tables

1 that show the studies, and you will see that
2 all the studies together show causation.
3    Q.   Okay.  Dr. Baccarelli, you're
4 not answering my question.
5         Is it a principle of
6 epidemiology, according to Dr. Baccarelli,
7 that a single study can establish causation
8 in and of itself for any exposure and effect?
9         MR. SNIDOW:  Objection to the
10    form.
11        THE WITNESS:  It is -- it is a
12    principle of epidemiology that a study
13    can be consistent with causation and
14    that you need more than one study to
15    have a complete Bradford Hill
16    analysis.
17        And we have them here.  We have
18    here many studies that are consistent
19    with causation, so it's incredibly
20    clear that it is more likely than not
21    that acetaminophen causes all the
22    outcomes that I mentioned in my
23    report.
24 QUESTIONS BY MR. MURDICA:
25    Q.   I know you believe that,

1 Dr. Baccarelli, and thank you for continuing
2 to repeat it. It's very helpful.
3         MR. SNIDOW: Objection --
4 objection -- objection to the form.
5 QUESTIONS BY MR. MURDICA:
6    Q.   And, Dr. Baccarelli, you're
7 going to repeat it -- you're going to attempt
8 to -- you promised me that you're going to
9 attempt to submit this into a medical
10 journal, correct?
11    A.   Yes, I will.
12    Q.   Okay. And when you do that,
13 what are you going to disclose as your
14 conflict?
15    A.   I'm going to disclose that I
16 worked in this litigation, and that's a
17 potential conflict of interest, of course.
18 Why wouldn't I?
19    Q.   Okay. Have you ever seen a
20 publication where an author disclosed that
21 they received over $100,000 from the
22 plaintiff -- from the United States
23 plaintiffs' Bar to do the work?
24         MR. SNIDOW: Objection.
25

1 QUESTIONS BY MR. MURDICA:
2    Q.   Have you ever seen that?
3         MR. SNIDOW: Objection to the
4 form.
5         THE WITNESS: I can -- I'm
6 happy to write one, if it has never
7 been done before.
8 QUESTIONS BY MR. MURDICA:
9    Q.   Okay.
10    A.   I have no problem with that. I
11 mean, honestly. Why would I be ashamed or
12 worried. I mean, I --
13    Q.   Well, I can give you a lot of
14 reasons, Doctor.
15         MR. SNIDOW: Objection.
16         And, Jim, Jim, Jim, look at me.
17 Look at me. I'm going to behave, but
18 you've got to stop that, too. You
19 know that. You know what this record
20 looks like right now.
21         MR. MURDICA: He asked me.
22         MR. SNIDOW: No.
23 QUESTIONS BY MR. MURDICA:
24    Q.   Dr. Baccarelli, do you know if
25 your colleagues -- well, first of all, you

1 agree that if somebody is taking money from
2 one side of a litigation, that that is a
3 conflict if it relates to a work they're
4 trying to publish, right?
5         MR. SNIDOW: Objection to the
6 form.
7         THE WITNESS: That is not true.
8 It is a potential conflict, and this
9 is why we disclose potential conflict.
10         We are not required to disclose
11 conflicts. We are required to
12 disclose potential conflict.
13         So this is an important
14 distinction that you're conflating.
15 QUESTIONS BY MR. MURDICA:
16    Q.   Okay. But you would agree,
17 Dr. Baccarelli, that it is a potential
18 conflict if a study author has received money
19 from a litigant in a way that relates to the
20 subject matter of their -- of their
21 publication, correct?
22    A.   And, again, it's a potential
23 conflict and, therefore, it's disclosed.
24 Once it's disclosed, people have their own
25 brains.

1    Q.   Right.
2    A.   They can dis -- they can dis --
3 they can evaluate the merit. Used to
4 evaluate the merit and the data and the
5 evidence, if they have any disagreement with
6 the way I present the evidence, they will --
7 they will disagree. And they would probably
8 be more critical because I worked with the --
9 with the lawyers.
10         So, I mean, that -- I'm ready
11 to get the fire. This is very solid.
12         And by the way, I'm planning to
13 publish all the tables that transparently
14 show how I've evaluated every paper.
15         So the reason why I'm very
16 confident is that I'm not going to say
17 Tylenol sucks or acetaminophen sucks,
18 correct? I'm going to say, here is the
19 evidence. It is classified meticulously and
20 with rigor. I'm going to present these
21 tables.
22         And the tables talk by
23 themselves. I mean, you don't even need my
24 opinion. You need -- just need the tables.
25 And the tables are in the literature.

Page 142

1 Everyone can redo exactly what I did.
2      Q.    Right.
3            And as it sits today, you know
4 that the medical organizations disagree with
5 you, correct?
6            MR. SNIDOW:  Objection to the
7      form.
8            THE WITNESS:  Which medical
9      organizations in particular?
10 QUESTIONS BY MR. MURDICA:
11     Q.    Well, you know ACOG disagrees
12 with you, right?
13           MR. SNIDOW:  Objection to the
14     form.
15           THE WITNESS:  ACOG has written
16     a statement three years ago.  I don't
17     know whether they disagree with me
18     now.
19           And I think the reason why we
20     are here is exactly because they --
21     the medical organizations haven't
22     taken a position yet.  I hope they
23     take it soon because they have a
24     problem in their hands.
25

Page 143

1 QUESTIONS BY MR. MURDICA:
2      Q.    You think that's what you're
3 doing with this litigation?  That's why
4 you're here?
5      A.    No.  The reason why I'm here is
6 because I'm asked.  The reason why I'm here,
7 because I can provide evidence.  The reason
8 why I'm here is because it's a way to bring
9 the evidence to the floor.
10           I'm a scientist.  I'm
11 interested in the evidence.  I'm not
12 interested in interfering with everyone's --
13 everyone's business.
14     Q.    Right.
15           And you're also employed,
16 correct, Dr. Baccarelli?
17     A.    Say that again?
18     Q.    You're also employed in this
19 litigation.  You're not doing it for free,
20 correct?
21     A.    I'm employed, and I'm under
22 oath.  I understand the repercussions of, A,
23 saying something that is under oath; and B,
24 particularly, not doing enough due diligence
25 to -- because, I mean, I can have my opinions

Page 144

1 and be wrong, but this is not my opinions.
2 This is the evidence.
3      Q.    But you're not doing this out
4 of the goodness of your heart.  You could,
5 but you chose to accept money for it,
6 correct?
7            MR. SNIDOW:  Objection to the
8      form.
9            THE WITNESS:  I -- and I really
10     appreciate that my time is valued.  I
11     do.
12 QUESTIONS BY MR. MURDICA:
13     Q.    Okay.  Back to Exhibit 89.
14     A.    89, yeah.
15     Q.    Okay.  At the time -- so,
16 Dr. Baccarelli, how are we going to figure
17 out when you were first hired in this
18 litigation?  Do you have an e-mail or a
19 telephone log?  What -- how were you first
20 contacted?  Was it by phone?  By e-mail?
21     A.    By e-mail.
22     Q.    Okay.  So you would be able to
23 tell the first date that you were first
24 contacted from your e-mail, correct?
25     A.    I guess probably the best way

Page 145

1 is to see when I started to work on it.  And
2 I understand that you have the logs of my
3 time, correct?
4      Q.    Actually, they weren't
5 produced.  So I'll just put on the record
6 that if counsel wants to tell me before the
7 end of this deposition when they first
8 contacted Dr. Baccarelli, that would be
9 appreciated.
10           I think there was an objection
11 to producing his bills, so we don't have
12 anything on that, which is why I'm asking all
13 these questions.
14     A.    Okay.  Thank you.
15     Q.    Okay.  So, Dr. Baccarelli, you
16 referred this investment advisor representing
17 an institutional investor who is interested
18 in Tylenol to, among -- Dr. Liew is one of
19 the people you referred them to, right?
20     A.    Yep.
21     Q.    You also referred them to
22 Dr. Pearson, who you say at the time you
23 didn't know was working for the plaintiffs'
24 lawyers on this, right?
25     A.    So, first of all, I didn't

Page 146

1  refer them.  I suggested names of people that
2  might have information, and if they wanted to
3  have an alternative opinion, they could.  And
4  these are the people who published on the
5  paper, on the subject.  So I give them these
6  name because of the people who published on
7  the subjects.
8      Q.   Well, they also told you that
9  they would pay you if the referral -- if the
10  people that you're recommending them to takes
11  their call, right?
12     A.   That is not true.  I never
13  received any money.
14     Q.   Oh, they didn't tell you that
15  in the next page?
16     A.   If they said, they didn't
17  probably contact, because I did not receive
18  any money.
19        Is it there?
20     Q.   It's there.
21     A.   I didn't get any money.  I'm
22  sorry.
23     Q.   Okay.
24     A.   I didn't even notice they were
25  willing me to pay -- to pay me.

Page 147

1      Q.   When you gave these names, they
2  were referrals, and they told you you would
3  be paid even if you weren't, right?
4      A.   I didn't notice that was the
5  case --
6      Q.   Okay.
7      A.   -- and I never got paid, and I
8  didn't do it because I wanted to be paid.
9      Q.   Another person --
10     A.   It's pretty typical, because
11  usually when people tell me I get money to
12  refer them to a shop or the -- to a barber, I
13  like to get the money.  But in this case, I
14  didn't even notice that.
15     Q.   One of the other people you
16  referred them to is Ann Bauer, right?
17     A.   Again, this is not -- I don't
18  know Dr. Bauer.  I know that she published a
19  few papers that were in the literature.
20     Q.   And do you -- do you know if
21  she was in the majority or minority as it
22  relates to acetaminophen and
23  neurodevelopmental outcomes?
24     A.   I -- I --
25        MR. SNIDOW:  Object --

Page 148

1  object -- object to form.
2        THE WITNESS:  I think you see
3  here that these people are people
4  who -- in the conversation with the --
5  with them, I realize they wanted to
6  hear whether this is a concern.  So it
7  gave me -- I gave them a list of
8  people that would probably speak to
9  the concern, and that they're experts
10 and they're people who publish the
11 associations.
12       Most of them, I believe, they
13 published associations on Tylenol and
14 neurodevelopmental disorders that were
15 positive.  So I just assumed that they
16 would love to hear from the people who
17 found the problems.
18       Because as you know, often the
19 people who find the problems are
20 closest to the problems, and they
21 might be right.
22 QUESTIONS BY MR. MURDICA:
23     Q.   So did you know Dr. Bauer
24 before 2003?
25     A.   I never met her.

Page 149

1      Q.   Okay.  So you don't know -- do
2  you know if Dr. Bauer is somebody you
3  consider an expert or not?
4      A.   You know, I -- Dr. Bauer was
5  the first author of our consensus statement
6  that was published in 2019, and probably I
7  remember the consensus statement with -- this
8  is why -- this is why I referred her, too.  I
9  know that she published quite a bit in the
10 literature, and I was aware of that.
11     Q.   Do you know she was -- were you
12 aware if she was retained by the plaintiffs'
13 lawyers at the time?
14       MR. SNIDOW:  Objection to the
15 form.
16       THE WITNESS:  I -- I'm not
17 aware even now.
18 QUESTIONS BY MR. MURDICA:
19     Q.   Okay.
20     A.   I don't think -- I'm not sure
21 whether she was retained.  I didn't know at
22 the time.  I don't know now.
23     Q.   How about Kriebel?
24     A.   I know David Kriebel because he
25 taught me epidemiologies 20 years ago.

Page 150

1      By the way, he speaks wonderful
2  Italian, and he's a great teacher.  And he
3  taught me epidemiology in Italian 25 years
4  ago.  I haven't talked with him in 20 years,
5  I think.
6      Q.    Do you know if he was retained
7  by the plaintiffs here?
8      A.    No, I don't know.
9      Q.    Okay.  Same question for Shanna
10  Swan.  Do you know if she was retained by the
11  plaintiffs here?
12      A.    I don't know.
13      Q.    Okay.  And this is on
14  January 18th that you send this e-mail,
15  right?
16      A.    Correct.
17      Q.    Okay.  And sitting here today,
18  right now, you don't know still if you were
19  retained by the plaintiffs, or contacted by
20  the plaintiffs, by January 18th of 2023,
21  correct?
22      A.    I believe this was before I
23  started to work, but I'm not 100 percent
24  sure.
25      Q.    Okay.  Is there a difference

Page 151

1  between when you started to work on it and
2  when you were first contacted?
3      A.    I'm not sure.  I know -- I
4  don't know the dates, really.
5      Q.    Okay.  Baker 2020 was a study
6  of meconium, the GESTE, G-E-S-T-E, cohort,
7  right?
8      A.    Sorry, G -- GESTE?
9      Q.    GESTE.
10      A.    GESTE.
11      Q.    Right?
12      A.    Baker 2020 was a study
13  reporting results from the GESTE cohort,
14  meconium, acetaminophen.
15      Q.    And was that the second
16  meconium study that you were ever involved
17  in, Dr. Baccarelli?
18      A.    It was the second on
19  acetaminophen, I believe, in meconium.
20      Q.    What other meconium studies
21  have you been involved in?
22      A.    We published a paper in 2019
23  reporting on some of the techniques we used.
24      Q.    The techniques used in -- by
25  Dr. Laue and yourself in that article?

Page 152

1      A.    Yeah, the techniques -- the
2  techniques used to measure meconium -- to
3  measure chemicals in meconium.
4      Q.    So is it correct that the Laue
5  2018 or 2019 meconium study was the first
6  study you've ever done with meconium?
7      A.    Sorry, can you say that again?
8      Q.    Sure.
9          Is it correct that the Laue
10  2018 or 2019 meconium study was the first
11  study you've ever done with meconium,
12  Dr. Baccarelli?
13      A.    Yeah, I think this was the
14  first study ever done with meconium.  We read
15  the literature about meconium, and one of our
16  colleagues who is the analyst here, who is
17  the biochemist, J.P. Bellenger, proposed to
18  use meconium in this cohort because he made
19  me aware of plenty of literature showing that
20  meconium reflects exposure to chemicals to
21  which the mothers are exposed during several
22  months of pregnancy.  At least five months of
23  pregnancy.  The five months before delivery.
24      Q.    And have you seen any
25  literature that quantifies how much meconium

Page 153

1  is made throughout those five months of
2  pregnancy?
3      A.    There are studies on
4  miscarriages and on abortions that have
5  measured the level of meconium in each of
6  the -- in each of the -- of the -- each of
7  the weeks of pregnancies.
8          And also, there is a huge
9  amount of literature on chemicals in meconium
10  that makes people -- that creates -- this is
11  a fact.  It's really a fact that meconium --
12  it's completely accepted in the literature
13  that meconium reflects exposure over five
14  months or even six months before pregnancy.
15          The reason is because meconium
16  gets to be accumulated six months before
17  delivery.  The gut of the baby becomes to
18  develop, and at that point meconium start to
19  be produced.  And meconium accumulates slowly
20  over time.  It accumulates slowly over time
21  until the end of the -- of the pregnancy.
22      Q.    And have you seen studies to
23  that effect, that show how much meconium
24  accumulates at -- over that course of time?
25  Have you seen those?

Page 154

1    A.    I understand there are studies
2 like this.  I haven't reviewed them directly.
3    Q.    You understand there are
4 from -- from what?
5    A.    Again, from miscarriages and --
6 studies on miscarriages, studies of aborted
7 fetuses.  People know how big is the bowel of
8 the -- of the -- of the baby over time.
9    Q.    Can you cite one study that
10 says that right now?
11    A.    I relied on them.  There are --
12 there are a lot of -- there's a lot of
13 literature -- if you want, I can produce --
14 about the use of meconium as a biomarker of
15 chemical exposure.  This has been -- it's
16 incredibly well-accepted in the literature.
17 It's not something we made up.  It's not
18 something -- it's something that we relied --
19 there are at least 20 years of toxicology
20 studies reporting on meconium.
21    Q.    Have you seen literature, or
22 can you point me to any, that quantifies the
23 maternal exposure at a given point in time in
24 the pregnancy and how -- the level at which
25 it appears in the meconium, given that time

Page 155

1 exposure in pregnancy?
2    A.    So there are many studies that
3 measured or assessed the exposure of the
4 mothers and looked at the correlation with
5 the same level of the same chemical in
6 meconium.  And they show a very strong
7 correlation, and they're very -- this makes
8 everyone -- made everyone believe that
9 meconium is a great way to measure maternal
10 exposure to chemicals.
11    Q.    Okay.  Is a maternal exposure
12 in the sixth month of pregnancy reflected
13 equally in the meconium as the same maternal
14 exposure in the eighth month of pregnancy?
15    A.    So we -- the production of
16 meconium is believed to increase -- to be
17 larger in the -- in the last few months of
18 pregnancy.  So we believe that there is more
19 exposure reflected in meconium in the last
20 trimester compared to the second trimester.
21    Q.    Okay.  So would a -- would a
22 drug exposure in the last month of pregnancy
23 show up in a greater presence in the meconium
24 than the same drug exposure two months
25 earlier?

Page 156

1    A.    It depends on the quantity of
2 exposure, of course.
3    Q.    Have you done that type of
4 study with respect to acetaminophen in
5 meconium?
6    A.    It has been done plenty of
7 times in different -- in different studies of
8 other chemicals, so we know this happens in
9 meconium.  Also, meconium is a gel that traps
10 chemicals.
11         So perhaps you are implying --
12 I don't want to say you're doing -- that if
13 someone takes a pill of meconium two days
14 before pregnancy, that would completely sway
15 the results.
16         That doesn't happen, because
17 meconium -- in order for a drug to end up in
18 meconium, it needs to work through the mom.
19 It needs to go into the amniotic fluid.  The
20 baby swallows it.  The fetus swallows it.
21 Sorry.  It goes into the -- into the guts,
22 and it gets there through the bile.
23         So -- and when it's there, it's
24 trapped.  So it really almost -- I don't know
25 whether you can relate to the old geological

Page 157

1 archives.  We can tell today that there was
2 climate change 2 million years ago because we
3 can go through the rocks and identify --
4 identify levels of exposure 2 million years
5 ago.
6         This is what happens in
7 meconium.  It gets all jumbled up, so we
8 cannot really do the -- the strata.  But
9 really what happens there is that each
10 contribution gets trapped and represented for
11 the entire five months.  It's gives us a nice
12 average of five months of exposure.  A little
13 more weighted toward the end, but it's a nice
14 average of five months of exposure.
15    Q.    Okay.  So Dr. Baccarelli's
16 testimony is that the exposure during
17 pregnancy in the meconium represents an
18 average and is slightly weighted to exposures
19 at the end of the pregnancy, correct?
20    A.    There is a little more
21 representation of exposures at the end of the
22 pregnancy.
23    Q.    Okay.
24    A.    I think that is correct.
25    Q.    And I take it based on your

Page 158

1 answer that according to Dr. Baccarelli,
2 acetaminophen administered during labor or
3 delivery would not be represented in the
4 child's meconium, correct?
5          MR. SNIDOW:  Objection to the
6 form.
7          THE WITNESS:  No, that is not
8 right.
9 QUESTIONS BY MR. MURDICA:
10     Q.    Oh, okay.
11     A.    That is not right.
12     Q.    So according to Dr. Baccarelli,
13 acetaminophen that the mother utilized during
14 labor and delivery would be -- would be
15 reflected in the child's meconium?
16     A.    Absolutely.  That was a concern
17 we had.  In fact, in Baker 2020, we took that
18 into account.  We did the results with
19 everyone included, and then we looked at the
20 medical records, the medical charts, and we
21 excluded those women who had delivered --
22 sorry, who had received acetaminophen during
23 labor and delivery.  And when we excluded
24 those women, the results were exactly the
25 same.

Page 159

1          So, clearly, if you are arguing
2 that our results are biased by having -- by
3 the women who took acetaminophen during their
4 labor and delivery, they're not.  We excluded
5 those women.  The results stood on their own,
6 only with the -- with the -- with the women
7 who took acetaminophen before.
8     Q.    And then the reason,
9 Dr. Baccarelli, that you looked at the
10 results excluding the women who took it
11 during labor and delivery is because you were
12 worried that that peripartum administration
13 of acetaminophen would skew the results,
14 correct?
15     A.    No.  We wanted -- I was not
16 worried.  We wanted to double-check that.
17 And that -- we have data to say -- yeah,
18 you're right.  I was worried.  I'm not
19 worried anymore.
20     Q.    Okay.  Have you conducted, or
21 have you seen any studies conducted, that
22 measure -- that correlate acetaminophen
23 exposure during pregnancy to the level of
24 acetaminophen in meconium?
25          MR. SNIDOW:  Objection to the

Page 160

1 form.
2          THE WITNESS:  Sorry, can you
3 say that again?
4 QUESTIONS BY MR. MURDICA:
5     Q.    Sure.
6          Separate and apart from the
7 outcomes of autism and ADHD --
8     A.    Uh-huh.
9     Q.    -- have you seen a study, or
10 any study, correlating acetaminophen exposure
11 during pregnancy at different times with the
12 quantity of acetaminophen in meconium?
13          MR. SNIDOW:  Objection to the
14 form.
15          THE WITNESS:  So we know that
16 that happens.  If we find
17 acetaminophen in meconium, it's
18 because -- it's because it gets there
19 unless you are having -- gets there in
20 other ways.  But especially at
21 deliveries we found.
22          By the way, in our study we
23 got, I think, 55 percent of women who
24 tested positive -- or, sorry, meconium
25 that tested positive for

Page 161

1 acetaminophen.  That is about the same
2 proportion of women who use
3 acetaminophen during pregnancy.  So
4 I'm pretty convinced that we are
5 picking up meconium -- sorry,
6 acetaminophen during pregnancy.
7          Also, from -- the reason why
8 this study is important is because it
9 asks the question, is acetaminophen in
10 the child the cause of -- contributes
11 to answering this question, is
12 acetaminophen in the child the cause
13 of ADHD in this case?
14          You can understand that, okay,
15 women take the Tylenol, might -- has
16 to get to the baby.  It needs to
17 get -- so the fact that we're
18 measuring the dose in the baby, it
19 gives even more information that in a
20 way is mechanistic; that is, the
21 meconium that is in the baby that is
22 associated and potentially causes
23 ADHD.
24          So I understand that you want
25 to know how many pills women are

Page 162

1  taking, but in this case the study is
2  important because we are measuring
3  acetaminophen in the baby. Because
4  it's acetaminophen in the baby that
5  causes the -- that causes the disease.
6  QUESTIONS BY MR. MURDICA:
7      Q.   Yeah, Dr. Baccarelli, I don't
8  think you're understanding my question, so
9  let me ask it not about acetaminophen.
10     A.   Uh-huh.
11     Q.   Have you seen meconium studies
12 that show an administration of a particular
13 agent to the mother at -- different mothers
14 at different times during pregnancy and
15 looking at the results of the concentration
16 in the meconium to see whether all
17 administration at different times of the
18 pregnancy ends up being the same in the
19 meconium?
20     A.   So there are many studies in
21 the past 20 years that have been done,
22 particularly about illicit drugs, and this is
23 why it is being used. This test has been
24 first brought about by -- with the interest
25 of understanding whether women use illicit

Page 163

1  drugs. And you can find cocaine in meconium.
2  You can find marijuana. You can find
3  alcohol. You can find products of tobacco.
4      And all the literature we have
5  today is consistent with the proposition that
6  this is a great biomarker of chemical
7  exposures.
8      Q.   Okay. You believe you answered
9  my question?
10     MR. SNIDOW: Objection to the
11 form.
12     THE WITNESS: I do.
13 QUESTIONS BY MR. MURDICA:
14     Q.   Okay. Have you seen
15 meconium -- I'm going to ask it one more
16 time, and if you can't improve on your
17 answer, just tell me you can't improve on
18 your answer. Okay?
19     Have you seen meconium studies
20 that show an administration of a particular
21 agent to the mother at different times during
22 pregnancy that look at the results of the
23 concentration in the meconium to see whether
24 all administration at different times of the
25 pregnancy ends up being the same in the

Page 164

1  meconium?
2      A.   So I --
3      MR. SNIDOW: Hold on.
4  Objection to the form.
5      THE WITNESS: I'm happy to
6  review any other study -- any study
7  you might have in that respect.
8      I'm pretty familiar with the
9  concept that meconium is a biomarker
10 of exposure during pregnancy, that
11 chemicals get trapped in meconium.
12     We might even have published an
13 abstract at some point looking at our
14 own data. So that -- where we looked
15 at -- in abstract where we looked at
16 some of the data we had with
17 acetaminophen during pregnancy and
18 delivery.
19 QUESTIONS BY MR. MURDICA:
20     Q.   Okay.
21     A.   And we found pretty consistent
22 results, as far as I was concerned, with --
23 with our own abstract.
24     Q.   Consistent how?
25     A.   That our data were consistent

Page 165

1  with the -- with the tenet that
2  acetaminophen -- that acetaminophen in
3  meconium reflects exposure both at the time
4  of delivery and during pregnancy.
5      Q.   Okay. And did you analyze
6  whether acetaminophen at the time of the
7  delivery has a greater presence in the
8  meconium than acetaminophen at, say, six
9  months during the pregnancy?
10     A.   We couldn't do that because the
11 data for -- during pregnancy were not
12 complete.
13     Q.   Okay. Have you seen anyone
14 else that has done that?
15     A.   I'd be happy to see any other
16 study.
17     Q.   So the answer, Dr. Baccarelli,
18 is, as you sit here today, you haven't seen
19 that other than in your own abstract,
20 correct?
21     MR. SNIDOW: Objection to the
22 form.
23     THE WITNESS: Again, there is
24 plenty of literature supporting
25 that meconium is a great biomarker.

Page 166

1   It's a great substrate to measure this
2   type of biomarkers.
3   QUESTIONS BY MR. MURDICA:
4       Q.   Was that my question?
5           MR. SNIDOW:  Objection to the
6   form.
7           THE WITNESS:  I think it was.
8   QUESTIONS BY MR. MURDICA:
9       Q.   Okay.  You just testified that
10  you studied whether exposure during pregnancy
11  or during labor and delivery is represented
12  in meconium.
13          You remember that?
14      A.   Say that again?
15      Q.   Okay.  Your testimony is that
16  you studied exposure during pregnancy and
17  then at labor and delivery to look at the
18  relationship of the compound in meconium,
19  correct?
20          MR. SNIDOW:  Objection to the
21  form.
22          THE WITNESS:  So I -- we did
23  publish an abstract, and the data we
24  had were incomplete.  They made us
25  feel confident that what has been

Page 167

1   reported countless times in the
2   literature, that meconium reflects
3   five months of exposure, was true also
4   in our study.
5   QUESTIONS BY MR. MURDICA:
6       Q.   Okay.  My question is, was
7   there a difference in your abstract between
8   acetaminophen exposure at delivery and
9   acetaminophen exposure during, let's say, the
10  second trimester?
11      A.   If you would like to discuss
12  that abstract, I'm happy to review it now.
13      Q.   Do you remember?
14      A.   I remember that the data were
15  consistent with our hypothesis --
16      Q.   Okay.
17      A.   -- that we didn't -- that
18  toxicant didn't cause any concern.
19          If you want to discuss it --
20  discuss it in detail, I'm happy to review it
21  with you, and I'll tell you why --
22      Q.   Sure.
23      A.   -- I have this opinion.
24      Q.   Sitting here, other than this
25  abstract you're talking about, have you seen

Page 168

1   any other study attempt to capture the amount
2   of acetaminophen in meconium based on
3   exposure either during the second trimester
4   or at labor and delivery?
5           MR. SNIDOW:  Objection to the
6   form.
7           THE WITNESS:  Again, it is very
8   consistent with biological
9   plausibility that the -- that meconium
10  reflects five, six months' worth of
11  exposure.  So this is how it has been
12  used in hundreds of papers.  So I
13  don't have any reasonable doubt that
14  there -- because this very
15  well-accepted in the toxicology
16  community.
17  QUESTIONS BY MR. MURDICA:
18      Q.   But you can't point me to
19  another paper, correct?
20      A.   I can point you to papers.
21      Q.   On acetaminophen.
22          Doctor, my question was very
23  specific.  It was as to acetaminophen and
24  exposure at the time of delivery versus in
25  the second trimester.

Page 169

1           Have you seen any other paper
2   that examined that specifically?
3       A.   So --
4           MR. SNIDOW:  Objection to the
5   form.
6           Go ahead.
7           THE WITNESS:  We published a
8   paper in 2019.  There is a lot of
9   literature reported here that shows
10  that acetaminophen -- sorry, that
11  meconium is great biomarkers that
12  reflects five to six months of
13  exposure.
14  QUESTIONS BY MR. MURDICA:
15      Q.   Okay.  And are you referring to
16  the Laue paper?
17      A.   No, I'm referring to the
18  Cassoulet paper, 2019.
19      Q.   Okay.
20      A.   It's in my -- in it's my
21  reference list.
22          (Baccarelli Exhibit 90 marked
23  for identification.)
24  QUESTIONS BY MR. MURDICA:
25      Q.   Okay.  Let's take a look at the

1  Laue paper, and we'll get that one here.
2         Dr. Baccarelli, you have in
3  front of you what's been marked as
4  Exhibit 90.
5         Do you recognize it?
6     A.    Yes.
7     Q.    Okay.  Where was this
8  published?
9     A.    It was published in
10 toxicology -- Toxicological Sciences in 2019.
11    Q.    Okay.  And you reviewed and
12 revised this before it was published,
13 correct?
14    A.    Of course.
15    Q.    Okay.  And the first attempt to
16 publish this was rejected, correct?
17    A.    Yes, as often happens.
18    Q.    Yeah.
19    A.    I -- we always shoot high so we
20 can be reject -- we don't like a paper if
21 it's not rejected.
22    Q.    Understood.
23         And you always shoot high, and
24 that's why you tried to put it in the Gray
25 journal, right?

1     A.    I can't remember that.
2     Q.    Okay.  Do you know what the
3  Gray journal is?
4     A.    I -- can you -- can you explain
5  what the Gray journal is to me?
6     Q.    Well, I think it's important
7  to -- so you don't know what the Gray journal
8  is, right?
9     A.    I don't call journals by
10 colors, usually.  I call them by their names.
11 So if you have a journal that other people
12 uses, I'm afraid I don't know it.
13    Q.    Do you know what the Green
14 journal is?
15    A.    No.  I don't know any of the
16 colors.  Perhaps I'm color blind.
17    Q.    Well, I think we established
18 you're not a board certified obstetrician,
19 right?
20    A.    I don't think you need an
21 obstetrician here.
22    Q.    Okay.  So you shot high by
23 trying to get the paper in the American
24 Journal of Obstetrics and Gynecology,
25 correct?

1     A.    Well, we haven't shoot that
2  high then.
3     Q.    That --
4     A.    That's -- we -- I don't think
5  we shot that high, if you tell me that.
6     Q.    Okay.  Because they rejected
7  you, you have a low opinion of them now?
8     A.    Oh, every journal rejected me.
9  I -- probably 600 papers, I probably sent
10 papers to 1,000 journals.  You can be sure
11 that every journal in the world has rejected
12 me at some time.
13         I hold no -- no -- I hold no --
14 not really no anger to anyone.
15    Q.    It sounds like sour grapes,
16 Doctor.  But if you want to criticize the
17 American Journal of Obstetrics and
18 Gynecology, feel free.
19         MR. SNIDOW:  Objection to form.
20         And again, Jim, look, I'm
21 behaving.  You need to behave.  It's
22 out of line.  You know it.  Ask him a
23 question if you want.
24         MR. MURDICA:  You are not
25 behaving.  Your witness is saying

1  plenty of things that are not in line,
2  and I'm fine with my conduct.  If you
3  have a problem with it, you can call
4  Judge Cote.
5         MR. SNIDOW:  Okay.
6         MR. MURDICA:  And you need to
7  stop interrupting.
8         MR. SNIDOW:  I wasn't.
9         But if you want to go to the
10 judge with "it sounds like sour
11 grapes, Doctor," I'm fine with that.
12 But I'm asking you --
13         MR. MURDICA:  Well, it would be
14 you going to the judge, okay?  And
15 you're interrupting my examination.
16         MR. SNIDOW:  Okay.
17         MR. MURDICA:  So would you like
18 to go to the judge?
19         MR. SNIDOW:  I would not.
20         MR. MURDICA:  Okay.  Then you
21 need to be quiet.
22         THE WITNESS:  In that year,
23 2019, I published about 70 papers.  I
24 don't keep a list of the -- of the
25 journals that rejected me.  And as you

Page 174

1  heard me say just before, I didn't
2  even remember that we sent it to the
3  journal you mentioned.  So it's really
4  impossible that I'm angry at any
5  OB/GYN journal.
6      Just -- and also, I'm an
7  epidemiologist.  I would rather have
8  this published in the American Journal
9  of Epidemiology than in a specialty
10  OB/GYN journal.  I really would have
11  preferred that, if you asked me.
12  QUESTIONS BY MR. MURDICA:
13      Q.   Well, do you recall,
14  Dr. Baccarelli, the decision process, since
15  this was about pregnancy outcomes, to go to
16  an obstetrics and gynecology journal?
17      A.   I don't remember.
18      Q.   Okay.  Do you remember why it
19  was rejected?
20      A.   I don't remember.
21      (Baccarelli Exhibit 91 marked
22  for identification.)
23  QUESTIONS BY MR. MURDICA:
24      Q.   Okay.  Doctor, you now have in
25  front of you what's been marked as

Page 175

1  Exhibit 91.
2      A.   Uh-huh.
3      Q.   Do you recognize this as one of
4  your e-mails?
5      A.   This looks like it.
6      Q.   Okay.  When's the last time you
7  looked at this e-mail?
8      A.   Probably on Monday, May 21,
9  2018.
10      Q.   Okay.  Do you need a second to
11  review it, or can I ask you questions about
12  it?
13      A.   Let me review it.
14      Okay.
15      Q.   Okay.  So do you agree, Doctor,
16  that this reflects the American Journal of
17  Obstetrics and Gynecology's critique and
18  rejection of the Hannah Laue paper?
19      A.   No, this reflect individual
20  opinion of three reviewers, one, two, three,
21  and an editor who is probably someone --
22  here, there's someone by the name of Sandra
23  Perrine.  So I don't know who -- who are the
24  editors here.  They don't disclose the
25  editors.

Page 176

1      There are three people who are
2  anonymous, and so one seems to be staff.  So
3  this doesn't say who did this.
4      Q.   Doctor, you still have in front
5  of you Exhibit 90, right, which is the Laue
6  article published in the Journal of
7  Toxicology?
8      A.   Yes.
9      Q.   Okay.  What you're holding in
10  your hand as Exhibit 91 occurred before that
11  publication, correct?
12      A.   That is correct.
13      Q.   Okay.  And this, what you're
14  holding in your hand, Exhibit 91, documents a
15  rejection by the journal of American -- by
16  the American Journal of Obstetrics and
17  Gynecology for the same article, correct?
18      A.   That is correct.
19      Q.   Okay.  And, in fact, they say
20  it is unlikely that the revision of such a
21  manuscript will alter its status, correct?
22      A.   That is what they say.
23      Q.   Okay.
24      A.   It's not -- I think that --
25  this is what they say.  It really means that

Page 177

1  they were not interested in the paper.
2      Q.   Right.
3      A.   When editors accept or reject a
4  journal {sic}, as you can see here, they say
5  also, we can only accept 20 percent of
6  submissions.  And they'll accept those work
7  which received the highest priority ratings
8  with respect to perceived reader -- reader
9  interest, scientific quality, and timeliness
10  of such a matter.
11      So the priority status is about
12  whether their readers are interested or not,
13  the quality of -- the scientific quality and
14  the timeliness.  And I don't think you can
15  tell which of the three they used.
16      Q.   And nevertheless, Doctor, they
17  did give you the comments from the three
18  reviewers, correct?
19      A.   Correct.
20      Q.   And what you told Dr. Laue is
21  to not worry about the comments, right?
22      A.   I told, don't worry -- this is
23  a student.  I want to tell her, don't get
24  upset.  Don't take it personal.  There is no
25  reason to take it personal.

Page 178

1    You are implying that I take it
2  personal.  My message here is, please,
3  Hannah, don't take it personal.  This will
4  happen over and over again over your career.
5  It's not about you.  Just work on it and take
6  everything seriously, and whatever is
7  addressable, we'll do it.
8    Q.    That's what -- let me see if I
9  read this correctly.
10    You're recommending another
11 journal.  You say, don't worry too much about
12 the comments.  If there's anything you feel
13 you should have done, that is okay;
14 otherwise, just resubmit it.
15    Right?
16    MR. SNIDOW:  Objection to form.
17    THE WITNESS:  So you understand
18  that worry is an emotion.
19 QUESTIONS BY MR. MURDICA:
20    Q.    I'm sorry.
21    A.    I say, do not worry too much
22 about the comments.  When someone worries,
23 they have an emotion.  So I say, don't -- do
24 not worry.  Don't be emotional about it.
25    And, okay, this is my e-mail,

Page 179

1  so I can explain what it means.  Because what
2  it really meant to say, Hannah, I know you
3  are new to the business, but never get it
4  personal.  Don't get upset.  Do not worry.
5    I didn't say, do not do work.
6    She -- as long as I know, she
7  did work.  If there is anything you feel you
8  should have done, now doing it.
9    Q.    Okay.  Some of the comments --
10 did you have a chance to look at the reviewer
11 comments?
12    A.    Not -- not all of them.
13    Q.    Okay.  Did you see that some of
14 them are about the same questions I was
15 asking you about meconium?  Right?
16    A.    No, I didn't.
17    Q.    Okay.  Take a look at the page
18 that ends in 429, reviewer number 2, second
19 half from the bottom.
20    A.    429?
21    Q.    Yep.
22    Reviewer number 2.
23    A.    Uh-huh.
24    Q.    Paragraph 1, introduction.
25    A.    Yeah.

Page 180

1    Q.    Let me know when you've had a
2  chance to look at that.
3    A.    Fantastic.  Yeah.
4    Q.    Okay.  This reviewer, whoever
5  they are, is asking the same questions I was
6  just asking you, correct?
7    MR. SNIDOW:  Objection to the
8  form.
9    THE WITNESS:  They're asking a
10 similar question, and they -- it's a
11 question that, again, we're interested
12 in the dose in the baby.
13    I think this reviewer is
14 missing the point, that this is a
15 study about the dose in the baby and
16 neurodevelopmental outcomes.  It's not
17 a study about the dose in the mother.
18 It's the dose -- the big advantage of
19 this study is that we are measuring
20 the dose in the baby.
21    If the reviewer is interested
22 in this, that's okay.
23    I wish we had the data to make
24 this reviewer happy.  Not that I think
25 it was important for the study, but --

Page 181

1  QUESTIONS BY MR. MURDICA:
2    Q.    Right.
3    A.    -- in this case the reviewer
4  asked the question.  They're entitled to ask
5  this question.  I'm entitled to decide to
6  move forward with the paper, nonetheless.
7    Q.    Right.
8    And you did move forward with
9  the paper without addressing this question,
10 correct?
11    A.    The question is addressed in
12 the paper.  We have references about the use
13 of meconium.  So the reviewer probably didn't
14 read the references.
15    Q.    Okay.  One of the questions
16 here is -- tell me if I've got this right --
17 is there any previously reported specific
18 data about acetaminophen use in pregnancy and
19 its presence in meconium.
20    You saw that, right?
21    A.    I see the question.
22    Q.    Right.
23    And there is no paper that
24 show -- that correlates a dose taken at a
25 particular time during pregnancy with a

Page 182

1 particular concentration in the meconium,
2 correct?
3          MR. SNIDOW:  Objection to form.
4          THE WITNESS:  Again, if the
5 question were important, I would have
6 not published this paper.
7          This paper is about meconium in
8 the baby, and that is a much better
9 measurement than asking a mother to
10 report their use.  It's about
11 toxicology.
12          This is called a biomarker of
13 internal dose.  The internal dose is
14 the strongest type of evidence.  It
15 means there is chemical in the baby's
16 tissues that in this case, by the way,
17 they were causing very little or
18 nothing.
19          But in the -- it turned out,
20 actually, in the later paper by Baker
21 to be a problem.
22 QUESTIONS BY MR. MURDICA:
23     Q.    I understand, Doctor, that you
24 don't think it's a relevant question, but I'm
25 going to ask it again --

Page 183

1     A.    Please do.
2     Q.    -- and see if you can -- see if
3 you can answer it.
4          There is no paper that
5 correlates a dose taken at a particular time
6 during pregnancy with a particular
7 concentration in the meconium, correct?
8          MR. SNIDOW:  Objection to form.
9          THE WITNESS:  I would like to
10 say that there is overwhelming
11 evidence that drugs and chemicals to
12 which women are exposed during
13 pregnancy result -- gets archived in
14 the meconium, and the meconium is a
15 valid guide of toxic exposure.
16          If you think there is a reason
17 why acetaminophen should be different
18 from any other chemicals -- I
19 understand we're talking about
20 acetaminophen, but is acetaminophen a
21 special chemical.
22 QUESTIONS BY MR. MURDICA:
23     Q.    Okay.  Please try to listen
24 very closely to the question, because you
25 didn't get it.

Page 184

1          There's no paper that
2 correlates a dose taken at a particular time
3 during pregnancy and a particular
4 concentration in the meconium.
5          Correct, Doctor?
6          MR. SNIDOW:  Objection.
7          THE WITNESS:  Same --
8          MR. SNIDOW:  Sorry.  Objection
9 to the form.
10 QUESTIONS BY MR. MURDICA:
11     Q.    There is no paper that
12 correlates a dose of acetaminophen taken at a
13 particular time during pregnancy with a
14 particular concentration in the meconium,
15 correct?
16     A.    Again, it is very well-known
17 that what you said is the case, that there is
18 an association between chemicals taken during
19 pregnancy and what gets stored in meconium.
20          In this case, we didn't need to
21 worry about this.  And, again, I didn't -- I
22 didn't use that -- I didn't make that link to
23 reach my conclusions.
24          This is one of the 30 papers
25 that is associated with the -- that shows

Page 185

1 associations.  And again, I didn't need to
2 have that data to reach my conclusions.
3     Q.    And, Doctor, I didn't ask you
4 if you needed it.  I didn't ask if it was
5 important.  I just asked if it exists.
6          And it does not exist, correct?
7          MR. SNIDOW:  Objection to the
8 form.
9          THE WITNESS:  So I want to say
10 that we have overwhelming evidence
11 that meconium is a good archive of
12 chemical exposures.  It's very
13 well-accepted in the literatures.
14 There are 30 years of research
15 studying the meconium's chronicles,
16 the level of exposures in the last
17 five, six months of pregnancy.  This
18 is very well-known.
19          This is -- our use of meconium
20 is not new.  It is something that has
21 been done many times.
22          So you might be right that
23 there is no paper specifically on
24 acetaminophen, but again, we then
25 needed it for the paper because the

Confidential - Subject to Protective Order

Page 186

1  dose is more in the meconium. And the
2  fetal tissue is more powerful that --
3  that in -- in the -- in the -- in the
4  reported questionnaires.
5      And also, again, I didn't use
6  this paper only in the literature.
7  This is one of 30 pieces of evidence
8  that I used. So that is particularly
9  important to know that -- whether
10  there is an association or not.
11  Whether it's a paper that reports an
12  association or not is not relevant to
13  my conclusions.
14  QUESTIONS BY MR. MURDICA:
15      Q.   Doctor, I understand you think
16  it's irrelevant, it's not important, but I am
17  entitled to get an answer.
18      So you agree with me that there
19  is no such paper that I --
20      A.   I gave you an answer in the
21  long answer. Don't let me restart again.
22      Q.   I really don't want you to
23  restart again.
24      Are you able to answer it yes
25  or no? Does such a paper exist, Doctor?

Page 187

1      A.   I answered already.
2      MR. SNIDOW: Okay. Hold on.
3  Hold on.
4      MR. MURDICA: There's no hold
5  on. You be quiet over there.
6      MR. SNIDOW: I get to object to
7  form, and I am.
8      Object to the form.
9      MR. MURDICA: Look, I would
10  have every ground in the world to go
11  get the judge here about the answers
12  to these questions.
13      MR. SNIDOW: Oh, not to my
14  objections?
15      MR. MURDICA: No.
16      MR. SNIDOW: Okay.
17      MR. MURDICA: Well, that's
18  different. That's a separate issue.
19      MR. SNIDOW: Thank you.
20      MR. MURDICA: One I'm not
21  dealing with right now.
22      MR. SNIDOW: Okay.
23  QUESTIONS BY MR. MURDICA:
24      Q.   Doctor, I understand all the
25  things you want to say, and you can say them

Page 188

1  when Mr. Snidow asks you questions.
2      All I'm asking you is, there is
3  no paper that exists today that correlates
4  acetaminophen dose given to a mother at some
5  particular time during pregnancy and the
6  concentration that results in the meconium,
7  correct?
8      MR. SNIDOW: Objection to form.
9      THE WITNESS: So I -- let me --
10  let me repeat what I said step by
11  step.
12  QUESTIONS BY MR. MURDICA:
13      Q.   Okay. Doctor, if you're going
14  to repeat what you said, we can just -- we
15  can just call the deposition now because --
16      A.   Okay. I'm okay. I'm okay with
17  that. I mean --
18      Q.   Okay.
19      A.   -- I need a bathroom break, so
20  soon.
21      MR. SNIDOW: Okay. Take a
22  break.
23      MR. MURDICA: Okay. We're not
24  going to continue unless you want to
25  talk to him about answering questions.

Page 189

1  Because in seven hours, we can't get
2  through this.
3      And I think if a court read
4  those last six questions where I asked
5  the same thing over and over, I think
6  we'd get relief.
7      MR. SNIDOW: Okay. So, first
8  of all, Jim, he is answering your
9  questions. You've asked him the
10  question and actually gotten the
11  answer that I thought you wanted,
12  which he said, you may be right,
13  there's no paper specific on
14  acetaminophen.
15      That's what you've been asking
16  him. He gave it to you. I know you
17  want some special clip, but he's given
18  you the answer.
19      So he's being fully responsive.
20  He thinks it's important --
21      MR. MURDICA: On the second
22  time --
23      MR. SNIDOW: Hold on. Hold on.
24  Okay. Hold on.
25      He thinks it's important to add

Page 190

¹ context, as he said.  But you have the
² specific answer that you've been
³ asking for.  So why don't you just
⁴ move on.
⁵        MR. MURDICA:  He's being
⁶ obstructionist.
⁷        MR. SNIDOW:  He's not.  He's
⁸ absolutely not.
⁹        MR. MURDICA:  Okay.  If you --
¹⁰ if you think that -- how much time
¹¹ have we used?  Okay.  Let's go to the
¹² Court.
¹³        VIDEOGRAPHER:  Want to go off
¹⁴ the record?
¹⁵        MR. MURDICA:  Yeah, let's off
¹⁶ the record.  We're going to call the
¹⁷ Court.
¹⁸        MR. SNIDOW:  Okay.
¹⁹        VIDEOGRAPHER:  The time right
²⁰ now is 11:29 a.m.  We are off the
²¹ record.
²²   (Off the record at 11:29 a.m.)
²³        VIDEOGRAPHER:  The time right
²⁴ now is 11:52 a.m.  We are back on the
²⁵ record.

Page 191

¹ QUESTIONS BY MR. MURDICA:
²        Q.    Dr. Baccarelli, are you ready
³ to proceed?
⁴        A.    Absolutely.
⁵        Q.    Okay.  Dr. Baccarelli, you had
⁶ in front of you Exhibit 91, and I was asking
⁷ you questions about if you recall some of the
⁸ reviewers' comments on the Laue article.
⁹        A.    Yes.
¹⁰        Q.    Okay.  And we were on the page
¹¹ marked 429 at the bottom, and we were talking
¹² about the use of meconium.
¹³        Let me know when you're there.
¹⁴        A.    Sorry, which page again?
¹⁵        Q.    It was 429 on the bottom --
¹⁶        A.    Yes.
¹⁷        Q.    -- reviewer number 2.
¹⁸        Do you remember that sentence I
¹⁹ was asking you about?
²⁰        The following sentence is the
²¹ last sentence is -- in number 1.  "How does
²² maternal frequency of use, duration of time
²³ from ingestion to delivery in weeks or days,
²⁴ or maternal dose affect the amount detected
²⁵ in the meconium?"

Page 192

¹        Do you see that reviewer's
² question?
³        A.    I do.
⁴        Q.    Okay.  And, Dr. Baccarelli,
⁵ with the information that you have, that's
⁶ not a question that can be answered, correct?
⁷        A.    As I said before, there is a
⁸ question that can be answered.  We know that
⁹ there is a correlation between chemicals in
¹⁰ general ingested by the mother, so the
¹¹ mothers are exposed to in any other form, and
¹² the levels in the baby.
¹³        What I said before is that
¹⁴ the -- we were interested in this study in
¹⁵ the levels in the baby.  So the meconium is a
¹⁶ fetal tissue, it's in the fetus, so it's more
¹⁷ relevant to the causation than it is what the
¹⁸ mothers might have ingested.
¹⁹        That said, I agree with you
²⁰ that as I sit here, I don't recall studies
²¹ that have done the type of analysis you
²² propose or that the reviewer is asking about.
²³        But again, that doesn't -- was
²⁴ not related to this study.  This study was
²⁵ about the dose in the baby and exposure of

Page 193

¹ the -- and the risk of ADHD and the -- sorry,
² in this case it was intelligence, I believe.
³ We are talking about Laue here.
⁴        And by the way, as I mentioned,
⁵ we have a small data set in our study where
⁶ we asked this question.  We published an
⁷ abstract where we defined differences.
⁸        We found studies that are -- we
⁹ found results that are consistent with the
¹⁰ idea that what I said is true, that this is a
¹¹ good biomarker.
¹²        Q.    Dr. Baccarelli, what -- in that
¹³ answer you just gave, what study are you
¹⁴ talking about?
¹⁵        You said you published
¹⁶ something in other studies.
¹⁷        A.    We published an abstract in
¹⁸ 2017, I believe.
¹⁹        Q.    Oh, okay.  You were talking
²⁰ about the abstract?
²¹        A.    Yeah.
²²        Q.    Got it.
²³        All right.  And if you turn to
²⁴ the next page.
²⁵        You see reviewer number 3?

Page 194

1    A.    Uh-huh.
2    Q.    And I want you to take a second
3  to review this.  If you look at reviewer
4  number 3's major concern number 2, I'm going
5  to ask you a question about the third
6  sentence.
7    A.    Uh-huh.
8    Q.    Let me know when you're ready.
9    A.    Okay.
10   Q.    So reviewer number 3 has a
11 concern that was similar to the one you had
12 when you were helping on Baker 2020, and that
13 is a -- is acetaminophen administration at
14 the time of delivery something that can
15 overrepresent acetaminophen in the meconium.
16      Is that fair?
17   A.    Can you rephrase the ques --
18   Q.    Sure.
19   A.    You said I had a concern?
20   Q.    I thought you testified earlier
21 that in Baker -- when you did Baker 2020,
22 which we're going to get to, you did an
23 analysis that removed the mothers who were
24 administered acetaminophen at the time of
25 childbirth, right?

Page 195

1    A.    We did -- we did that analysis.
2    Q.    Okay.  And the reason to do
3  that analysis was to see if the acetaminophen
4  burden at the time of delivery was
5  overrepresented in the meconium, right?
6    A.    The reason -- the analysis that
7  women get acetaminophen at birth, it can be
8  doses that are due to the delivery, and they
9  can be higher perhaps than before.  So let's
10 say -- let's look at it.  We have the data.
11 We can do a sensitivity analysis.
12      And, again, we had -- we had a
13 question about that.  We addressed the
14 question.  There was no concern after -- the
15 data showed that this concern is not valid.
16   Q.    Okay.  And reviewer number 3 is
17 expressing the same concern here, right?
18      In the sentence it says, "Is it
19 possible that the higher detectable levels
20 reflect closer-in-time administration of
21 acetaminophen to delivery rather than a
22 higher level of accumulative dose?"
23   A.    Absolutely.  But I think that
24 the reviewer doesn't understand that
25 acetaminophen -- sorry, that meconium traps

Page 196

1  the chemicals.  So they get into the bowel of
2  the baby and it gets there.  It becomes an
3  archival exposure, a cumulative archive.
4      I wish we could go in there and
5  dissect the meconium.  But really what
6  happens -- what happens there is that all of
7  the chemicals get trapped there from the --
8  from when meconium gets to start produced,
9  which is around six months before delivery.
10   Q.    And, Dr. Baccarelli, if you
11 look at reviewer concern number 4, it says,
12 "The categorization of acetaminophen levels
13 in meconium is hard to interpret.  How much
14 dose does a pregnant woman need to take to
15 reach the detectable level of 55 nanograms
16 per gram in meconium?"
17      Do you see that question?
18   A.    Uh-huh.
19   Q.    Can you answer that question?
20   A.    Oh, yeah.  So the question
21 is -- is -- based on our data is pretty
22 simple to believe, that because we found
23 about 55 percent of women who had detectable
24 level of meconium {sic}, that is
25 approximately the same proportion of women

Page 197

1  who gets -- who gets acetaminophen during
2  pregnancy, that it's about the same
3  situation; that the level of detection was
4  set on purpose, by the way, by our
5  biochemist.  It was set to a level that is
6  consistent with taking acetaminophen orally.
7      If the level of detection were
8  put lower -- and we have control on the level
9  of detection.  If the level of detection was
10 put lower, we would pick up also
11 acetaminophen in the environment.
12      For instance, you can go in the
13 public water in New York City or can take
14 analysis of the sewers, you will find
15 acetaminophen.
16   Q.    Okay.  So --
17   A.    And this was set with -- to be
18 consistent with a therapeutic dose.
19   Q.    So according -- what you're
20 saying, Dr. Baccarelli, is that if a woman
21 takes a single dose of oral acetaminophen at
22 any time in the second or third trimester of
23 pregnancy, it will be represented in meconium
24 at a level of 55 nanograms per gram or
25 higher, right?

Page 198

1    A.    What I'm saying is that the
2 detection limit was set to approximately --
3 what you are saying is too conclusive --
4 approximately to a level that can detect
5 therapeutic use of acetaminophen.
6         And also, I think you
7 appreciate that this analysis is not just a
8 yes or no.  We have the levels from 55 to
9 levels much higher, and we did a
10 dose-response analysis.
11        So clearly it is not about
12 whether I can pick out acetaminophen or not,
13 but whether I can measure it.
14        And again, this very important
15 because we are measuring acetaminophen in the
16 fetus.  So in the fetus, we have
17 acetaminophen that comes from the mother --
18 unless you object it might -- it might come
19 from somewhere else.  The fetus -- everything
20 that comes to the fetus comes from the
21 mother.
22        But the real important point of
23 this paper is that we are associating
24 acetaminophen in the fetus, the molecule,
25 with neurodevelopment.

Page 199

1         In this case, by the way, we
2 don't find an association, but in Baker we
3 do.
4         And that really is the -- that
5 really is the -- a great level of evidence
6 for a toxicologist, because a toxicologist
7 wants to measure in the tissue.  A
8 toxicologist not typically worried about
9 what the -- what is the level of exposure.
10 They're worried about can we get something
11 that's more proximal.
12         You can -- I think you
13 understand that once a mom takes
14 acetaminophen, it goes into the mom's body,
15 it goes into -- through the placenta, it goes
16 into the fetus.  So having it in the fetus is
17 more proximal to the effect.
18         So this is why this paper is
19 important.  This is why I was not worried
20 about this situation.
21         And again, if you want to me --
22 to answer, I mean, I don't have -- I don't
23 have absolute certainty that what I say is
24 true, but as I sit here today, I believe that
25 taking acetaminophen orally in the -- in the

Page 200

1 form is why this gets positive in meconium.
2    Q.    Okay.  Doctor, I'm going to try
3 this once more.
4         This reviewer's question was,
5 "How much dose does a pregnant woman need to
6 take to reach the detectable level of
7 55 nanograms per gram in meconium?"
8         Can you answer that question?
9    A.    I did already answer.
10    Q.    Okay.  How much dose?  What
11 dose?
12    A.    I did answer that -- I'm
13 reasonably comfortable to say that this --
14 the level of detection is consistent with
15 taking acetaminophen by the pregnant woman
16 orally.
17         At the same time, I also
18 answered that this is not important to this
19 paper.  This paper is about a different
20 question, which is, is acetaminophen in the
21 baby, in the fetus, in this case, associated
22 with neurodevelopmental outcome.
23         The question about how many --
24 the question about whether women takes it or
25 not and the association with acetaminophen is

Page 201

1 proven by at least another 29 papers.  So I
2 don't need this paper to talk about -- to
3 talk about the general causation of women
4 taking acetaminophen.
5    Q.    Okay.  The next line says, "How
6 much more does the pregnant woman need to
7 take to reach the median concentration of
8 59.9 nanograms per gram used in the study?"
9         Can you answer that question,
10 Dr. Baccarelli?
11    A.    I would answer the same way I
12 answered before.  It's exactly the same.
13 Again, this reviewer misses the idea that we
14 are looking at acetaminophen versus -- in the
15 fetus and neurodevelopment.
16    Q.    Okay.  Dr. Baccarelli, is it
17 your testimony that one pill taken in the
18 second or third -- 1,000-milligram
19 acetaminophen pill taken in the second or
20 third trimester by a pregnant woman will
21 result in a meconium concentration of
22 acetaminophen of more than 55 nanograms per
23 gram?
24    A.    No, it is not my testimony.
25    Q.    Okay.  How much -- if you

Page 202

1  take -- if a pregnant woman takes
2  acetaminophen in the second trimester, how
3  many pills does it take -- how many
4  thousand-milligram pills does it take to get
5  to 55 nanograms per gram of meconium? Do you
6  know?
7      A.   We know exactly what we need to
8  know, which is the more pills you take, the
9  higher the level in the fetus. This is what
10 I want to know.
11      If you want to know a different
12 answer, that is not something we can address
13 based on this paper or the data that I'm
14 aware of.
15      But we know, A, that there is a
16 dose-response relationship between any type
17 of chemicals women take and meconium. We
18 know that meconium is a very well-established
19 substrate for this type of analysis. We know
20 that there is a strong correlation between
21 what chemicals women are exposed to and
22 meconium.
23      In this case, we know that the
24 levels of meconium of acetaminophen are not
25 associated, by the way, in this paper with

Page 203

1  IQ, with a measure of IQ. And they're
2  associated in the larger study of Baker with
3  ADHD and other outcomes.
4      So, again, what I look as an
5  epidemiologist -- you can understand that
6  epidemiology is about associations, so it's
7  about correlations. And I have all the
8  correlations I need in this case to state
9  with certainty that this data are valid.
10      Q.   Okay. Is that the best you can
11 answer that question, Doctor?
12      A.   I can go on for another hour if
13 you want to, but it's already a pretty
14 comprehensive answer.
15      Q.   Dr. Baccarelli, when is
16 meconium collected from the baby?
17      A.   In -- usually within 24 hours
18 of delivery.
19      Q.   Okay. And when does meconium
20 stop collect -- stop representing maternal
21 ingestion?
22      A.   About the time the baby is
23 delivered.
24      Q.   Okay. And can meconium
25 represent the baby's acetaminophen usage?

Page 204

1      A.   You mean after delivery?
2      Q.   Yes.
3      A.   It's highly unlikely.
4      Q.   Are you familiar with
5  medications given for circumcisions?
6      A.   Yes.
7      Q.   Is acetaminophen given to male
8  babies being circumcised?
9      A.   It is possible.
10      Q.   Okay. Does it happen within
11 the first 24 hours of birth?
12      A.   It depends on the uses of -- it
13 depends on whether it's done at the hospital
14 or not.
15      Q.   If it's done at the hospital,
16 it's typically done within the first
17 24 hours, correct?
18      A.   I -- I really don't know
19 what -- how circumcision is done. I'm so
20 sorry.
21      If you want to tell me, I'll be
22 happy, but I don't think that is relevant,
23 really.
24      Again, most of these babies
25 pass meconium within 24 hours. You

Page 205

1  understand that acetaminophen needs to be
2  given to the baby. It needs to -- to get
3  absorbed, it takes a few hours. It needs to
4  work with circulation. It needs to pass into
5  the bile, into the liver. It needs to go --
6  that takes at least 12 or 14 hours. So there
7  might be some people.
8      At the same time, it's entirely
9  poss -- if you're asking whether this
10 reflects postnatal exposure, let's say that I
11 agree with that, which is honestly very
12 unlikely. But there is plenty of papers that
13 have asked these questions in the literature,
14 not this one, whether it's prenatal exposure
15 confounded by postnatal exposure. So the
16 culprit -- the culprit will be postnatal, not
17 prenatal.
18      The answer is a resounding no.
19 It is the preclinical exposure.
20      Perhaps the postnatal is a
21 problem, and you might have a problem in the
22 future about postnatal exposure. But
23 postnatal exposure doesn't artifactually
24 makes appear the prenatal exposure to be
25 associated with ADHD, ASD or

Page 206

1  neurodevelopmental disorder.
2       So even in the unlikely
3  circumstance that meconium reflects a tiny
4  bit, really, it needs to be very small, of
5  the exposure to Tylenol after pregnancy.
6  Again, it's not the postnatal exposure that
7  matters here; it's the prenatal.
8       There are other kinds of
9  studies that shows the prenatal.
10     Q.    So, Dr. Baccarelli, the most
11 recent exposure of the child prior to passing
12 the meconium is not reflected more strongly
13 than more distant exposures earlier in the
14 pregnancy, correct?
15     A.    As I mentioned, the meconium
16 is -- traps the chemicals over time, so
17 meconium reflects cumulative exposure over
18 five months.  It is well-established.
19          There is a slightly increase
20 over -- overrepresentation of chemicals that
21 come in the -- over time because the meconium
22 volume tends to grow a little more as the
23 baby because bigger.
24     Q.    Okay.  And Dr. Baccarelli, I
25 think, agrees with me that it's possible that

Page 207

1  meconium can reflect use of acetaminophen
2  directly by the baby for something like
3  circumcision in the first 24 hours?
4      A.    I just said it's very unlikely.
5      Q.    Okay.  And is that based on any
6  analysis that you did or just your own
7  opinion without being an expert on
8  circumcision and what medications are
9  administered?
10          MR. SNIDOW:  Objection to form.
11          THE WITNESS:  I don't claim to
12     be an expert on circumcision.  To be
13     honest, I don't have to be.
14          But the -- I think it's based
15     on logic.  It's based on fact.  It's
16     based on timing.  It's based on the
17     most reasonable assessment I can do.
18          And if you have any point in my
19     response that you don't agree with,
20     I'm happy to discuss any of the points
21     I guided you through.
22 QUESTIONS BY MR. MURDICA:
23     Q.    No, I just -- I'm helping -- I
24 just want the record to reflect, you know,
25 all of the reasons that you're dismissing

Page 208

1  that as a possible contributor to
2  acetaminophen burden in the meconium.
3       And you've given those to us,
4  right?
5      A.    I -- there are six months of
6  exposure through the mothers that is
7  reflected in.  There might be a few hours
8  that the babies are exposed to in the -- in
9  the -- in the -- postnatally.  There might be
10 some meconium that gets in, but I think it's
11 very unlikely that it gets in.
12     Q.    Are babies exposed to
13 acetaminophen through breastfeeding?
14     A.    If the mother is taking
15 acetaminophen, of course.
16     Q.    Okay.  Can that contribute to
17 meconium burden?
18     A.    Again, that is before.  As you
19 understand, breast milk is ingested orally.
20 Acetaminophen, the baby can get ingested
21 orally or IV.
22          That's exactly the same
23 response as before.  It's highly unlikely
24 that the results are driven by meconium -- by
25 acetaminophen administered after pregnancy.

Page 209

1       At the same time, I understand
2  that for you that it might look like there is
3  a before delivery and after delivery, but the
4  prenatal is the same.  So even if there
5  was a contribution after delivery, it's still
6  acetaminophen getting into the baby and
7  causing the outcomes we are discussing.
8      Q.    Okay.  So in Dr. Baccarelli's
9  opinion, exposure postnatal can also cause
10 autism?
11          MR. SNIDOW:  Objection to form.
12          THE WITNESS:  I didn't -- I
13     didn't say that.  I didn't do a
14     Bradford Hill analysis on this.  I
15     didn't do a literature review of this.
16          When I actually did my
17     literature review, as you certainly
18     read in my report, I excluded all
19     those studies about postnatal exposure
20     from my review.  Therefore, I didn't
21     look at that.
22          I did look, though, at whether
23     postnatal exposures are confounded,
24     which means when we look at the
25     association between prenatal exposure

1   and NDDs, is this real or maybe it's
2   caused by postnatal exposure.
3       It is not caused by postnatal
4   exposure. It has been assessed in
5   many studies, and postnatal exposure
6   is not a problem.
7   QUESTIONS BY MR. MURDICA:
8       Q.   Okay. Dr. Baccarelli, when you
9   did the sensitivity analysis in Baker 2020
10  and excluded the women who were administered
11  Tylenol during labor and delivery, how did
12  you choose which women to exclude?
13      A.   I'm -- I think -- I mean, can
14  we look at the paper now? It would be
15  important for me to --
16      Q.   You don't remember?
17      A.   I want to be sure 100 percent.
18  But I can look at the paper here. If you
19  want to give me the paper, I'll be happy to
20  discuss this.
21      Q.   I really don't want to take the
22  time to mark it right now because we're going
23  to do that after lunch.
24      I'll ask a different question
25  if you can't remember.

1       Let me ask you about your views
2   on statistical significance.
3       A.   Uh-huh.
4       Q.   When you did your analysis
5   here, did you focus on point estimates that
6   were positive with statistically significant
7   odds ratios?
8       A.   I focused on the entire
9   literature. I focused on all the papers I
10  reviewed, whether they're significant or not,
11  whether they had a positive association or
12  not, whether it was null, negative. So I
13  reviewed everything.
14      And I -- in my assessment I
15  used both the point estimates and the
16  statistical significance, as recommended by
17  any epidemiology textbook.
18      Q.   Okay. But you are not part of
19  a group of -- that thinks statistical
20  significance should be abandoned or anything
21  like that, right, Doctor?
22      MR. SNIDOW: Objection to the
23  form.
24      THE WITNESS: I don't think
25  anyone has ever said that. Not

1   really. No one ever said that.
2   QUESTIONS BY MR. MURDICA:
3       Q.   Okay. You mean nobody ever
4   said that about you, right?
5       A.   No. I mean that p-values
6   should be abandoned. As you understand,
7   confidence intervals and p-values are
8   interrelated with each other, so the moment
9   you present a confidence interval, you're
10  also giving me information about the p-value.
11      Q.   Okay.
12      A.   So I think people have said
13  that -- there are colleagues, typically
14  clinicians, that rely -- over-rely on
15  p-values. And there has been a movement in
16  epidemiology to -- not to publish p-values
17  because some people apparently are too eager
18  to jump to conclusions only based on
19  p-values.
20      Q.   Right.
21      And in fact, the New England
22  Journal of Medicine changed their standards
23  on p-values for that reason, right?
24      A.   If you want to tell me what
25  they did, let me know.

1       Q.   Okay. But it seemed like you
2   were familiar with it, which is why I asked.
3       A.   There are 2,000 journals in the
4   literature. What the New England Journal of
5   Medicine does today, I really -- if you have
6   an opinion on that that is important to the
7   discussion today, please let me know.
8       Q.   What p-value -- what range of
9   p-values are important to you, Doctor?
10      A.   All of them. The p-value is a
11  number that goes from zero to 1. I want to
12  look at all of it.
13      Of course, I mean, there is an
14  agreement in the general community that
15  p-values that are less than 0.05 may evaluate
16  one single study, makes a -- makes the study
17  so-called statistically significant.
18      Q.   And if you have multiple
19  endpoints you're looking at with p-values,
20  then 0.05 may not be as meaningful, right?
21      A.   That depends on the type of
22  study. It assumes the outcomes are not
23  correlated to each other and the exposures
24  aren't correlated with each other.
25      (Baccarelli Exhibit 92 marked

Page 214

1     for identification.)

2  QUESTIONS BY MR. MURDICA:

3     Q.   Let's mark this.

4        Okay.  Dr. Baccarelli, you now

5  have in front of you what's been marked as

6  Exhibit 92.

7        Do you recognize this?

8     A.   No.  I -- I'm sure it's

9  something I coauthored.  I am -- okay.

10    Q.   It has your name on it, right?

11    A.   Yes.

12    Q.   Is this the abstract you've

13 referred to a couple times regarding

14 meconium?

15    A.   I don't know.  Can I read it?

16    Q.   Go ahead.

17    A.   Oh, yes, this is the one.  Very

18 nice.

19        Yeah.

20    Q.   Are you ready?

21    A.   Yep.

22    Q.   Okay.  So, Dr. Baccarelli,

23 Exhibit 92 --

24    A.   Uh-huh.

25    Q.   -- is the abstract you

Page 215

1  published looking at exposure during

2  pregnancy and what exposures look like in

3  meconium, right?

4     A.   Correct.

5     Q.   Okay.  And what you found is

6  that acetaminophen administered during labor

7  showed a significant increase in the meconium

8  acetaminophen concentration, right?

9     A.   Sorry, say that again?

10    Q.   Acetaminophen administration

11 during labor was associated with a

12 significant increase in meconium

13 acetaminophen concentration, correct?

14    A.   Correct.  We found that, and we

15 found also an increase in -- during

16 pregnancy.

17    Q.   My question was,

18 acetaminophen --

19    A.   Yes, your question --

20    Q.   Did you find a significant

21 increase in meconium acetaminophen

22 concentration from acetaminophen

23 administration during labor?

24    A.   Yes, we did.

25    Q.   Okay.  And what was the p-value

Page 216

1  of that?

2     A.   0.002.

3     Q.   Okay.  So are you pretty

4  certain that that was a real finding?

5     A.   Yeah.  As expect, as I

6  mentioned before, I really -- it's clear, as

7  I said, that that can be reflected in

8  acetaminophen -- in the meconium.

9     Q.   The administration during the

10 time of childbirth has a strong association

11 with the presence of meconium, correct?

12    A.   Has an association, and you can

13 see the effect size is 2.30 to 2.15.  It is

14 statistically significant, but I wouldn't say

15 strong.  I mean, strong depends on compared

16 to what.  The intensity of association is not

17 measured by the p-value.

18    Q.   The p-value is less than .05,

19 correct?

20    A.   0.002.

21    Q.   So much, much less than 0.05,

22 right?

23    A.   Enough.

24    Q.   Okay.  And then acetaminophen

25 intake during pregnancy itself was marginally

Page 217

1  associated with meconium concentrations,

2  right?

3     A.   And I can tell you why.  That

4  analysis had a sample size of five.  There

5  were only five women that in our database had

6  reported to have taken acetaminophen during

7  pregnancy.  Because we never asked --

8  actually, the colleagues who worked on the

9  study -- I was not involved in the study back

10 then, but in -- when the study was started

11 15 years ago now, they just said one

12 question.  They said, have you taken any

13 medications during pregnancy.

14        If you want to study

15 acetaminophen, you need to ask about

16 acetaminophen.  You need to really say, have

17 you taken acetaminophen during pregnancy, and

18 they will say yes or no.

19        In this case, you -- we asked,

20 have you taken any medications.  And you can

21 understand, that a sentence -- it's a type of

22 formulation that is not valid for

23 acetaminophen.

24        Because as I said,

25 acetaminophen is often over the counter, and

Page 218

[1] women will not feel it's a, quote/unquote,
[2] medication.
[3]    Q.    And that --
[4]    A.    So this is why we never
[5] published these results, because we realized
[6] that the question is not valid.
[7]         So as far as I'm concerned --
[8] as I said before, this data didn't create any
[9] alarm in my group because as you can see, the
[10] level of acetaminophen goes up from 2.5 to
[11] 3.83. It's actually remarkable that with
[12] only five women reporting acetaminophen,
[13] it -- this 300 -- 238. So we would have
[14] expected, I don't know, 120 to have used
[15] acetaminophen, and only five actually -- they
[16] might have said, okay, I took an
[17] antihypertensive. I took -- I took drugs
[18] that were prescribed by my physician. But
[19] clearly it didn't occur to them and their --
[20] we might have liked them to tell us also
[21] about Tylenol.
[22]         So this instrument, we talk
[23] about validity of instrument. The question
[24] we used for acetaminophen clearly was not
[25] valid.

Page 219

[1]         So we only have five people.
[2] So you can imagine, we have five women
[3] reporting acetaminophen as being exposed, and
[4] then you have in the unexposed 233. Probably
[5] 120 of those actually took acetaminophen but
[6] didn't tell us.
[7]         So it's pretty remarkable,
[8] actually. I have to say, it's pretty
[9] remarkable with only five women we can see a
[10] difference that is not of statistical
[11] significance, but it's getting there.
[12]         So, I mean, again, I never
[13] published these results, but I don't think
[14] that they're valid. But at the same time, it
[15] gave me the peace of mind that acetaminophen
[16] really -- the meconium actually was.
[17]    Q.    Are you done?
[18]    A.    As always.
[19]    Q.    Dr. Baccarelli, that answer
[20] that you just gave applies to the entire
[21] GESTE cohort, right?
[22]    A.    No. The answer I just gave
[23] applies to the -- these 238 women.
[24]         But what do you mean in
[25] particular? Which part is --

Page 220

[1]    Q.    There's a lot of parts in your
[2] answer that I didn't ask for.
[3]    A.    Okay.
[4]    Q.    The 238 women are from the
[5] GESTE cohort, correct?
[6]    A.    Correct.
[7]    Q.    Okay. And your testimony,
[8] which is not reflected in the abstract, is
[9] that there were only five women who were
[10] administered acetaminophen out of those 238
[11] who were not also given it at labor?
[12]    A.    Absolutely not. I didn't say
[13] that.
[14]    Q.    Okay.
[15]    A.    I actually said the opposite.
[16]         I said that only -- in this
[17] questionnaire that asks in general, which
[18] drugs did you take. So you understand, when
[19] we ask about drugs, we give women usually a
[20] list of drugs.
[21]         In this case we asked, which
[22] medications are you taking, and women didn't
[23] realize that acetaminophen -- in our
[24] interpretation, women didn't realize that
[25] acetaminophen is a medication. So they

Page 221

[1] didn't report in the overwhelming majority of
[2] cases whether they reported acetaminophen --
[3] whether they were using acetaminophen.
[4]         So I have no reason to believe
[5] that in GESTE the prevalence of use of
[6] acetaminophen is different than the rest of
[7] Canada, which is about 55, 60 percent. So
[8] clearly there is a huge misclassification
[9] here that would drive the results toward the
[10] null.
[11]         So if any -- it's pretty
[12] impressive, actually. It's almost a
[13] 50 percent increase in acetaminophen with
[14] only five cases of women -- this actually is
[15] certainly a false -- false negative. It
[16] should be much higher, if I had all the data.
[17]    Q.    Dr. Baccarelli, which of those
[18] numbers reflects five women?
[19]    A.    Is the micro -- it's the -- how
[20] do you say, 2.51 to 3.83. The 3.83 are based
[21] on five women. The 2.51 is based on all the
[22] others, which is 233.
[23]         So let me get this from the
[24] beginning.
[25]         The 2.51 is based on three --

1 283 women, and the 3.83 is based on five
2 women.  And again, in the 3.83, there are
3 certainly 50 percent of them who did take
4 acetaminophen but didn't tell us.
5        So you can understand how we
6 are comparing five women who take
7 acetaminophen who thought it was important to
8 take it.  Perhaps even the women who took it
9 longer.  Perhaps they're reminded because
10 they took it longer.
11        But we're comparing them to a
12 group of people that is mixed, where it's
13 likely that 50 percent of the people in the
14 251 group actually did take acetaminophen but
15 didn't report it.
16    Q.    Dr. Baccarelli, the testimony
17 that there were only five people in the 3.83
18 group, that's -- you're doing that from
19 memory, right?  Because that's not reflected
20 in Exhibit 92?
21    A.    I actually called Hannah the
22 day before yesterday because I thought you
23 would ask me about this, and I -- Hannah Laue
24 is the person here, and I asked her what was
25 the number of people and why we had this

1 situation, and she confirmed that only five.
2        I don't remember she told me
3 how many there were in the other group.
4 Probably not.
5    Q.    Okay.  So it's your testimony
6 here today that you called Dr. Laue a couple
7 days ago to ask about how many -- the number
8 of women that were accounted for in each of
9 these numbers reported here?
10    A.    No, I called her in general
11 to discuss whether there was any weakness in
12 meconium, because she is the person who
13 worked a lot on meconium.
14        She says she didn't see any
15 weakness.  She didn't see any problem to be
16 concerned.
17        I really wanted to have a final
18 discussion with her, and I told her, you
19 know, I'm working on this litiga -- on this
20 litigation -- sorry, it's not litigation --
21 this case, and I wanted to really be sure
22 that my understanding was similar to her.
23 Because she definitely worked on meconium
24 data much more than I did.
25        And especially I wanted to be

1 absolutely sure -- what the question I really
2 had is that in reading Baker, it occurred to
3 me that we did have data of -- on
4 acetaminophen taken during -- at the time of
5 delivery.  So I thought, have we ever looked
6 at that.
7        So I called Hannah to say, have
8 you ever looked at whether acetaminophen at
9 time of delivery is associated with
10 acetaminophen in meconium.  And she pointed
11 me to this abstract where there are these
12 data that are not just about -- I was
13 surprised, actually, that we had looked -- I
14 didn't even remember we had data incomplete
15 but on acetaminophen during pregnancy.
16        And so she pointed out that we
17 had done this analysis, and then I remembered
18 that we decided not to publish because the
19 question that helped us collect the data
20 about pregnancy, about acetaminophen during
21 pregnancy, was not considered a valid
22 instrument.
23    Q.    Dr. Baccarelli, you published
24 this abstract, right?
25    A.    Correct.

1    Q.    Okay.  And the abstract
2 reported in the plain language, it didn't --
3 it doesn't contain anything that you just
4 said.  It reports that there's a significant
5 increase of an association when Tylenol --
6 when acetaminophen is administered during
7 labor, correct?
8    A.    What -- sorry, can I -- I'm not
9 sure I understand the question.
10    Q.    Okay.  All of the
11 qualifications that you just gave, everything
12 you said critical of this analysis, is not
13 present in the analysis itself, correct?
14    A.    It was present in the
15 presentation that Hannah gave.  It was a
16 well-presented representation that Hannah
17 gave at the conference.
18        You understand that the
19 abstracts for a conference are given to
20 indicate the topic, and the type of -- and
21 the type of presentation is going to give is
22 supposed to be an overview.
23    Q.    Okay.  You were there?
24    A.    I was there, yeah.
25    Q.    Okay.  So you remember six

1  years ago how she presented this abstract?

2     A.    No, she shared candidly with me

3  the slide deck that she used.

4     Q.    Okay.  And do you have that?

5     A.    Not here.

6     Q.    Okay.  We'll request that.

7           Okay.  Do you agree, Doctor,

8  with the conclusion in the abstract that

9  delivery administration of acetaminophen is

10  well-represented in meconium?

11     A.    Again, I agree that meconium

12  captures five months of pregnancy, including

13  that -- at the time of delivery, which,

14  anyhow, we have no reason to believe it

15  cannot be toxic to the fetus.

16     Q.    Okay.  So it's Dr. Baccarelli's

17  testimony that acetaminophen intake on the

18  day of delivery can cause autism in the

19  offspring, right?

20           MR. SNIDOW:  Objection to form.

21           THE WITNESS:  I didn't say

22     that.  It's my opinion that

23     acetaminophen taken during pregnancy

24     is a cause associated with autism,

25     ADHD and other neurodevelopmental

1     disorders.

2           I was not asked to -- I was not

3     asked to review the literature about

4     acetaminophen at delivery, so I

5     haven't done that.

6  QUESTIONS BY MR. MURDICA:

7     Q.    Okay.  So if I asked you right

8  now, can -- Dr. Baccarelli, can acetaminophen

9  taken during delivery induce autism, cause

10  autism, in the child, you would say you

11  hadn't done that analysis, correct?

12     A.    Delivery is a part of

13  pregnancy, so if pregnancy as a whole -- as a

14  whole causes autism, it stand to reason that

15  also -- you might have a damaging effect also

16  if given at delivery.

17           But, again, yeah, I want to

18  point that in our analysis we exclude also

19  the women who took acetaminophen at delivery,

20  and the results were the same.  So we don't

21  have a reason to think that acetaminophen

22  given at delivery is the only culprit here.

23  It might be one of the culprits, but we have

24  many culprits here, and certainly during

25  pregnancy is important.

1           MR. SNIDOW:  Okay.  Jim, it's

2     12:30.  Do you want to do lunch?

3           MR. MURDICA:  Let me just

4     finish this question --

5           MR. SNIDOW:  Go for it.

6           MR. MURDICA:  -- because I

7     don't think I got an answer.

8  QUESTIONS BY MR. MURDICA:

9     Q.    This is as to autism,

10  Dr. Baccarelli.

11     A.    Okay.

12     Q.    And so I actually have two more

13  questions because I'm going to ask it about

14  ADHD, too.

15     A.    Okay.

16     Q.    As to autism, according to

17  Dr. Baccarelli sitting here today in

18  August 2023, can acetaminophen taken by the

19  mother on the day of delivery cause autism in

20  the baby?

21     A.    Again, I reviewed the pregnancy

22  as a whole, and as a whole, pregnancy is

23  associated with autism and ADHD, if you want

24  to hear that.

25           And I haven't looked at the day

1  of delivery in isolation, so I can't answer

2  that.  It might be biologically likely or it

3  might -- it's likely it's a problem, but I

4  don't have the -- I haven't looked -- I

5  haven't looked at the literature only by

6  filtering the results that tell about the day

7  of delivery.

8     Q.    Okay.

9           MR. SNIDOW:  You got both in

10     one.

11           MR. MURDICA:  All right.

12           VIDEOGRAPHER:  The time right

13     now is 12:31 p.m.  We are off the

14     record.

15     (Off the record at 12:31 p.m.)

16           VIDEOGRAPHER:  The time right

17     now is 1:08 p.m.  We are back on the

18     record.

19  QUESTIONS BY MR. MURDICA:

20     Q.    Dr. Baccarelli, welcome back

21  from lunch.

22     A.    Thank you.

23     Q.    Are you ready to proceed?

24     A.    Absolutely.

25     Q.    Dr. Baccarelli, prior to your

1  work on this litigation, did you ever seek to
2  determine causes of autism in children?
3      A.    As you know, I worked
4  extensively in neurodevelopment, but I
5  haven't published on autism and causes of
6  autism in children.
7      Q.    Okay.  Do you -- beyond your
8  opinion that acetaminophen exposure during
9  pregnancy can cause autism here, do you have
10  opinions on other causes of autism?
11      A.    There is -- there is plenty of
12  literature about potential and established
13  causes of autism, and that is in the
14  literature.
15      Q.    Okay.  Sitting here today, what
16  established causes of autism do you
17  recognize?
18      A.    I mean, if we -- if you want me
19  to discuss that with same level that I am
20  talking about acetaminophen, there is very
21  little I can say with the same certainty
22  because I haven't done a Bradford Hill
23  analysis.  I haven't done an extensive review
24  of the literature.
25          So I'm ready to discuss them as

1  they come along, but what I want to assure
2  you is that I assessed all the measure and
3  primary causes -- potential causes of autism
4  in addition to the literature between ADHD --
5  sorry, acetaminophen and autism.
6          So I was able to exclude that
7  the results for the association between
8  acetaminophen and autism may be biased by
9  other confounders, which may be risk
10  factor -- other risk factors of autism.
11          VIDEOGRAPHER:  I'm sorry,
12      Doctor, your microphone came off.
13          THE WITNESS:  Oh, so sorry.
14      Sorry.  Good catch.  Thank you.
15  QUESTIONS BY MR. MURDICA:
16      Q.    Dr. Baccarelli, I'm now going
17  to you ask the same question about ADHD.
18          Prior to your determination
19  here that prenatal acetaminophen exposure can
20  cause ADHD in the child, had you done any
21  causation analyses on causes of ADHD in
22  children from exposures during pregnancy?
23      A.    I mean, I have -- and I have
24  the same answer.  I worked -- I had worked on
25  ADHD -- and the question is before the work

1  I've done here.
2      Q.    Correct.
3      A.    I've done -- I did informal
4  analysis of the same type.  I mean, not with
5  the same level of detail and transparency,
6  but I did work on ADHD and published several
7  papers on ADHD and causes of ADHD.  So in
8  that -- in that -- in those papers, there is
9  language about associations and potential
10  causation.
11      Q.    For example, a lack of
12  breastfeeding during early childhood is,
13  according to your work, a cause of ADHD,
14  correct?
15      A.    I didn't see that in my work.
16          You mean in my published work?
17      Q.    I thought so, but that's okay.
18  I'm just asking you.  If the answer is no,
19  that's fine.
20      A.    I wouldn't -- sorry, I didn't
21  understand the question.
22      Q.    Okay.  Sitting here today,
23  Dr. Baccarelli, do you believe that a lack of
24  breastfeeding the child causes ADHD in the
25  child?

1      A.    I wouldn't be able to answer
2  this question.  I mean --
3      Q.    Okay.
4      A.    -- I don't think there is
5  enough information I'm aware to answer this
6  question.
7          It might have been one of the
8  risk factors that have been studied -- in
9  studies, but I -- it's not one of the typical
10  risk factors that are usually considered for
11  ADHD.
12      Q.    Okay.  If I asked you the same
13  question for autism and the lack of
14  breastfeeding, would you give me the same
15  answer?
16      A.    Similar answer.  There are --
17  there might have been studies that looked at
18  lack of breastfeeding and autism.
19          If you look at the major
20  authorities like the CDC or other
21  associations that deal with autism directly,
22  they would not put breastfeeding as one of
23  the risk factors that's typically shown to be
24  associated with ASD.
25      Q.    Okay.  Dr. Baccarelli, do you

Page 234

1 agree that untreated fever during pregnancy
2 is a cause of autism in the child?
3     A.    Untreating fever during
4 pregnancy has been -- are you asking about
5 autism only or also ADHD?
6     Q.    Autism only.
7     A.    Untreated fever during
8 pregnancy, pregnancy, correct, it has been
9 associated with autism in many studies,
10 including the ones -- some of the ones I
11 reviewed.
12         At the same time, the way I
13 approached this question for my review was to
14 understand whether there were differences
15 between women who take Tylenol for any reason
16 as opposed to women who take Tylenol because
17 of fever.
18         And, first of all, women who
19 take Tylenol because of fever are only 8 to
20 20 percent of the women, pregnant women, who
21 take Tylenol.  So fever is a smaller
22 proportion.
23         Most of the Tylenol during
24 pregnancy is taken because of pain or
25 headaches.  And so the fever-reducing effect,

Page 235

1 the fever-reducing indication, happens only
2 in a small amount of women.
3         There are a lot of studies that
4 have looked at whether the effect of Tylenol
5 changes according to whether it's been
6 reported to be because of fever or not, and
7 there is not a lot of changes because of
8 that.
9         So the -- we are -- based on my
10 review, I concluded that there is no evidence
11 that fever is confounding the association
12 between Tylenol during pregnancy and ASD in
13 the children.
14     Q.    Do you remember my question,
15 Dr. Baccarelli?
16     A.    Yes.
17         MR. SNIDOW:  Objection.
18         THE WITNESS:  I did answer.
19 QUESTIONS BY MR. MURDICA:
20     Q.    Okay.  I'll ask it again.
21         Dr. Baccarelli, do you agree
22 that untreated fever during pregnancy is a
23 cause of autism in the child?
24     A.    Again, there are -- there
25 are -- there are several studies that show

Page 236

1 that.  I didn't do a formal analysis, so I
2 can't tell you with the same certainty as
3 for acetaminophen and ASD whether there is
4 the same level of certainty.  But, yes, there
5 is -- there are plenty of associations that
6 prompted me to consider fever as a potential
7 confounder.
8     Q.    Okay.  I'm still not sure that
9 you answered.
10         Are you agreeing with me or
11 disagreeing with me that fever, untreated,
12 during a pregnancy in a woman can be a cause
13 of autism in the child?
14     A.    So --
15         MR. SNIDOW:  Objection to the
16 form.
17         THE WITNESS:  So fever is one
18 of -- is -- has been suggested to be a
19 cause, and I can agree with that.
20         At the same time, it is not --
21 QUESTIONS BY MR. MURDICA:
22     Q.    Can or cannot?
23     A.    I can agree with that.
24         At the same time, it's not a
25 confounder, so it's not the reason why we see

Page 237

1 the associations between acetaminophen and
2 ASD or acetaminophen and ADHD in the
3 literature.
4     Q.    So are you also agreeing then,
5 Dr. Baccarelli, that untreated fever during
6 pregnancy can cause ADHD in the child?
7     A.    Again, we have -- there is
8 evidence that that is true.  At the same
9 time, I repeat that I've looked at the
10 literature, and while it may be a cause, it's
11 not a confounder.  So the association between
12 acetaminophen and ADHD is not due to fever.
13         Women who have fever and take
14 acetaminophen have a problem.  Women who
15 don't have fever and don't take
16 acetaminophen -- take acetaminophen have a
17 problem as well.
18     Q.    Dr. Baccarelli, because we only
19 have a limited amount of time, I would like
20 you to say on the record whether you think
21 that I asked you about acetaminophen in this
22 last series of four questions about untreated
23 fever.
24         Did I ask you about
25 acetaminophen?

Page 238

1  MR. SNIDOW:  Objection to the
2  form.
3  THE WITNESS:  I -- we are
4  talking about acetaminophen, so I made
5  sure I wanted to make clear why I
6  reviewed the literature.
7  MR. MURDICA:  Put this one
8  down.
9  MR. SNIDOW:  Just object to
10  form on that, too.
11  MR. MURDICA:  Well, per your
12  suggestion, we're making a list of
13  things in the event that we have to go
14  to the Court on this because this --
15  that was absurd.
16  MR. SNIDOW:  Objection to the
17  form.
18  MR. MURDICA:  Okay.
19  MR. SNIDOW:  We don't need the
20  commentary.
21  QUESTIONS BY MR. MURDICA:
22  Q.    Okay.  Dr. Baccarelli, what
23  else can cause autism according to
24  Dr. Baccarelli?
25  A.    You know, there are -- I can

Page 239

1  tell you what I wrote in my report.  There
2  are a few things that can cause autism.
3  Particularly if you look, for instance, at
4  the CDC for autism reports, older parents and
5  OB/GYN complication at birth.  And there is
6  some indication that genetics contributes to
7  autism.  And I wouldn't say cause, because
8  cause is a loaded question.  And genetics
9  cause almost nothing.  It contributes to a
10  lot of disease.
11  Q.    There are -- you're aware of
12  genetic syndromes, right, Doctor?
13  A.    Absolutely.
14  Q.    And genetic syndromes are
15  caused by a particular gene, correct?
16  A.    If -- I wanted -- I made that
17  point exactly, because let's say genetic
18  syndrome for autism.  There is a -- they're
19  all called by different mutations.  The most
20  common is p10.
21        p10 -- out of 100 people with
22  p10, only 20 get autism.  So there is an
23  increased risk if you have a p10, but it's
24  not a one-on-one correspondence.  So you
25  understand that I cannot say that p10 is the

Page 240

1  only cause of autism in this case.
2        In the kids who have p10 and
3  they have autism, it's entirely likely that
4  the reason are the environmental factor that
5  intervenes.  Because, again, out of five kids
6  with p10, only one gets autism.  Four do not.
7  Q.    Dr. Baccarelli, is maternal
8  stress associated with autism in the
9  offspring?
10  A.    I don't think there is a
11  consensus about that.
12  Q.    Okay.  Have you looked?
13  A.    Yes, I did.
14  Q.    Okay.  Have you seen evidence
15  that it is -- that maternal stress is
16  associated with autism in the offspring?
17  A.    I didn't -- I didn't do a
18  formal analysis.  So there are papers that
19  might have reported that, but whether stress
20  is associated with autism in the -- in the
21  child, I don't think there is conclusive
22  evidence.
23        So at the same time, I did
24  worry about stress.  I did worry about
25  anxiety.  I did worry about neuroticism.  And

Page 241

1  I can say with absolute certainty that it's
2  more reasonable than not that these have
3  nothing to do in association with prenatal
4  acetaminophen and the ADHD and ASD.
5  Q.    Dr. Baccarelli, if I asked you
6  the same question about maternal stress in
7  relation to ADHD, would you give me the same
8  answer?
9  A.    Uh-huh.
10  Q.    Okay.  Dr. Baccarelli, do you
11  believe that maternal depression is
12  associated with the outcome of autism?
13  A.    Again, I haven't looked at
14  maternal depression in general.  There is a
15  lot of literature about maternal depression.
16  There's a lot of literature about
17  antidepressant, including valproic acid and
18  ASD.
19        If you look at the measured
20  reference sources like the CDC website, it
21  wouldn't list depression or even an
22  antidepressant in that list.  So, again, I
23  think it's an interesting hypothesis that I
24  haven't reviewed in detail.
25        I did, though, look at the --

Page 242

1  at whether antidepression -- antidepressant
2  or depression might influence or bias the
3  association between acetaminophen prenatally
4  and the ASD in the child, and that is not the
5  case.
6      Q.    Okay.  So, Dr. Baccarelli, your
7  testimony is that taking antidepressants
8  doesn't cause autism, correct?
9      A.    No, I didn't say that.
10         I said that there are
11  antidepressant that have been associated with
12  autism and that, of course, as -- of course
13  there is a lot of literature, and I haven't
14  reviewed the same detail as here.
15         So what I said is that I
16  took -- I did my research and did the
17  worst-case scenario that antidepressants and
18  depression caused the autism.  So for the
19  job -- for the work I did today, I started
20  from the worst-case scenario, the idea that
21  that is true, as you say.  But I didn't worry
22  about doing a formal analysis to verify
23  whether it is true or not.
24         I just started from the
25  worst-case scenario and worked back and make

Page 243

1  sure that there was no evidence that the
2  results that we're discussing today between
3  acetaminophen and ASD or acetaminophen and
4  ADHD are biased in any way by mental health
5  in the mother, especially depression, and use
6  of antidepressant -- antidepressives.
7      Q.    Okay.  And you satisfied
8  yourself of that by considering studies that
9  controlled for those factors?
10         MR. SNIDOW:  Objection to form.
11         THE WITNESS:  Not only.  I
12      considered plenty of evidence from
13      different levels.  I consider studies
14      that controlled for these factors.  I
15      consider negative control exposures
16      that are interesting because they add
17      additional evidence to that, as I
18      wrote in my report.
19  QUESTIONS BY MR. MURDICA:
20      Q.    Did the negative control
21  exposures look at maternal depression?
22      A.    The negative control exposures
23  don't need to look at maternal depression.
24  They exclude any confounder based on the
25  negative control exposure.  So there is

Page 244

1  not -- that is not the way control exposures
2  work.
3         There is results of
4  sibling-control study that shows association
5  that is also very powerful, because
6  sibling-control studies are very likely to be
7  false negatives for the way that the siblings
8  are chosen, because they're too similar to
9  the other sibling.
10         So if you have a
11  sibling-control study that shows an
12  association, that is particularly powerful.
13      Q.    Okay.  Dr. Baccarelli, do you
14  know from your own work or from your study if
15  a woman, when pregnant, changes her behavior
16  as to taking or not taking medication?
17         MR. SNIDOW:  Object to form.
18         THE WITNESS:  They might.  I
19      have no doubt that there are changes
20      in behavior.
21  QUESTIONS BY MR. MURDICA:
22      Q.    In other words, when a woman
23  becomes pregnant, she might be less likely to
24  take medication because she's worried about
25  the baby, right?

Page 245

1         MR. SNIDOW:  Object to form.
2         THE WITNESS:  That is a
3      hypothesis that might be true.
4  QUESTIONS BY MR. MURDICA:
5      Q.    Okay.  And once she gives
6  birth, she might be more likely to take
7  medication than when she was pregnant,
8  correct?
9         MR. SNIDOW:  Object to form.
10         THE WITNESS:  Perhaps.
11  QUESTIONS BY MR. MURDICA:
12      Q.    Okay.  I want to go back to --
13  we were talking about the Laue article -- or
14  Laue.
15         How do you say Hannah's last
16  name?
17      A.    Laue.  I wish I could say
18  right.  Let's say Laue.
19      Q.    Laue.  The Laue article,
20  Exhibit 90.
21         And before it was published,
22  you reviewed and revised it, right?
23      A.    Uh-huh.
24         (Baccarelli Exhibit 93 marked
25      for identification.)

1 QUESTIONS BY MR. MURDICA:
2     Q.    And we're going to mark your
3 revisions as Exhibit 93.
4     A.    Okay.
5     Q.    Okay.  Dr. Baccarelli, you now
6 you have in front of you what's been marked
7 as Exhibit 93.
8         Do you recognize that?
9     A.    Yeah, it seems to be one of our
10 papers.
11     Q.    Okay.  And does it appear to be
12 a draft of the Laue article?
13     A.    I don't know.  The title is
14 different.
15     Q.    Okay.
16     A.    Let me check.
17         Yes, it's meconium, yes.  It
18 seems to be the same.
19     Q.    Okay.  And do you know if this
20 was revised before or after getting rejected
21 by the gynecol -- gynecology oncology --
22     A.    I wouldn't know.
23     Q.    Obstetrics and gynecology
24 journal?
25     A.    I wouldn't know.

1     Q.    Okay.  And if you look, this is
2 a redline, right?  Is it a redline format?
3     A.    Yeah.
4     Q.    Okay.  And do you see the
5 comments in the margin, BA?
6     A.    Yes, I can see that.
7     Q.    That's you, right?
8     A.    Probably, yes.  I think so.
9     Q.    Okay.  So if you look at what's
10 marked page 301 at the bottom --
11     A.    Uh-huh.
12     Q.    -- do you see your comment
13 there?
14     A.    Yeah.  Very consistent from
15 what I said before, I believe.
16     Q.    Your comment is you're asking
17 if meconium exposure represents the third or
18 second trimester, right?
19     A.    I am arguing here that -- as
20 you say, she said our study captured third
21 trimester exposure, and I thought that was
22 not completely accurate because it captures
23 both second and third.
24         So my question goes to the
25 direction of saying, please either specify it

1 captures third, because meconium captures
2 second or third, or just say it captures
3 both.
4         I felt this statement as
5 written by -- in the draft I received was not
6 completely accurate.
7     Q.    And the next sentence says,
8 "While meconium captures a wide window of
9 exposure, it's not possible to determine
10 precisely when during that window a fetus was
11 exposed to the tested substance."
12         Right?
13     A.    That is correct.  As I
14 mentioned before, it gives us a cumulative
15 dose over the five months or the six months.
16 We cannot understand exactly which are
17 the days during the six months that are --
18 that are important.
19         Now, at the same time, this
20 shows the cumulative dose.  So it shows the
21 dose over the entire six months.  This is
22 what matters here.
23         Again, this paper, not the
24 study, was done to address the question
25 you mentioned, whether -- when women took

1 Tylenol.
2         We're interested that women
3 took Tylenol over the six months window.
4 Tylenol gets trapped into the meconium.
5 Meconium is associated with -- well,
6 actually, in this case not associated with
7 anything.  In the other case, 2020 Baker,
8 associated with the ADHD.
9     Q.    And, Dr. Baccarelli, if you
10 disagreed with the words I just read, you
11 would have let Hannah know in the redline,
12 right?
13     A.    Say that again.  Sorry.
14     Q.    If you disagreed with the words
15 I just read about meconium, you would have
16 let her know?
17     A.    So this says exactly what I
18 said, which I agree with, which is, meconium
19 is an integrate of six months worth of
20 exposure only one time.  Meconium gives only
21 one number.
22         So if the level of exposure is
23 200, it's 200 over those six months.  Does it
24 make sense?
25         So I don't have -- as you can

Page 250

1 understand very well, I don't get six numbers
2 that reflect each six months of exposure. I
3 get only one number. We get to measure
4 meconium only once, so the number we get is
5 only one. So it's the cumulative dose of
6 exposure during pregnancy.
7        And I think it's clear in this
8 context that what we meant is that the data
9 gives us information only about the
10 cumulative dose over six months. The data
11 don't give information about which month the
12 exposure happened.
13     Q.    And if you turn to page 299 of
14 this --
15     A.    Uh-huh.
16     Q.    -- you corrected Dr. Laue to
17 say that if there's not an association, it
18 doesn't matter if -- the concentration
19 doesn't matter, right?
20     A.    Let me read this.
21     Q.    Okay.
22     A.    So say the question again?
23     Q.    Here you corrected Dr. Laue and
24 said that there's no -- if there's no
25 association, it doesn't matter whether the

Page 251

1 concentration is up or down.
2     A.    No, I didn't say that.
3     Q.    Okay. What did you say,
4 Doctor?
5     A.    I said -- I said that if there
6 is no association, we cannot -- the language
7 is not appropriate. We should say there is
8 no association. We shouldn't start with a
9 priori.
10        I think what Dr. Laue implies,
11 that increased Tylenol is bad, and that's
12 something I don't want to have as a priori.
13 A priori I want to say increased Tylenol is
14 maybe better or not.
15        So I wanted to be objective. I
16 wanted her to write something objectively. I
17 didn't want her to be biased to expect a
18 certain result.
19        So as a teacher and a mentor, I
20 want them to learn to be objective and
21 non-biased. So this was my training to her,
22 to always think than expected. Never to
23 start with a hypothesis and try to prove it,
24 but always start with an open slate and be
25 open to the data to tell you what is true.

Page 252

1     Q.    Dr. Baccarelli, wasn't she
2 trying to say that even increasing
3 concentrations in the meconium had no
4 association with the outcome measure?
5        MR. SNIDOW: Objection to the
6 form.
7        THE WITNESS: So if you -- as I
8 wrote in my report, this paper -- and
9 it discusses in length. This paper in
10 particular, which is Laue 20 -- what
11 is this, Laue 2019?
12        As you show in the result, they
13 show in the published paper, you then
14 need to use the preliminary draft.
15        I published a study that shows
16 no association. It's a study that did
17 a critique in my report, and it's not
18 prior. It's one of the very few
19 studies that shows no association.
20        So this is shown in my tables.
21 It's shown in my results. I
22 considered it in my analysis. It's a
23 point I completely carve out in my
24 report.
25

Page 253

1 QUESTIONS BY MR. MURDICA:
2     Q.    Okay. Exhibit 90 you were
3 holding, right?
4     A.    Yes.
5     Q.    That's the actual publication.
6        You're the last listed author
7 on it, right?
8     A.    Yeah.
9     Q.    Okay. The last sentence under
10 abstract says, "These results do not support
11 prior reports of adverse neurodevelopmental
12 effects in utero exposure to acetaminophen."
13        Correct?
14     A.    That is correct. This paper
15 shows no association between acetaminophen
16 and intelligence, so the results of this
17 paper are not consistent with the
18 explanation. But we are talking about one
19 paper, not the overall evidence.
20     Q.    Right.
21        We're talking about one paper
22 that you did in 2019, right?
23     A.    Correct. One paper that I did
24 that I realize is one of the few papers --
25 and this really also shows that I have no

Page 254

1  stakes here.  I published one paper that is
2  negative, one paper that is positive.
3           I'm happy to say that this
4  paper doesn't contribute a lot of evidence,
5  but taken together with all the other papers,
6  I'm -- there is no problem to think that
7  this paper doesn't contribute to the
8  evidence, but the overall evidence is
9  incredibly strong.
10          You have 45 papers.  I believe
11 35 show something that this paper does not
12 show.  So this is consistent as it gets in
13 epidemiology.  There is no example that I've
14 worked on where the evidence is so
15 consistent.
16     Q.    Dr. Baccarelli, in your 2020
17 paper, did you criticize the Laue paper?
18     A.    I cannot remember.  I'm happy
19 to look at the 2020 and see whether -- I
20 thought we did, but if we didn't, our bad.
21 But I thought we mentioned the paper.
22     Q.    Do you know, sitting here
23 today, if you criticized Exhibit 90, the 2019
24 paper, before you were paid for your opinions
25 here?

Page 255

1           MR. SNIDOW:  Hold on.
2      Objection to form.
3           THE WITNESS:  I would like to
4      see the paper and see whether I -- I
5      was pretty confident that we did, but,
6      I mean, I can't remember whether we
7      did and what we said.
8  QUESTIONS BY MR. MURDICA:
9      Q.    Okay.  Turn to -- on
10 Exhibit 90, if you turn to page -- it's 140
11 at the top.  It's the third page in.
12     A.    Uh-huh.
13     Q.    Under Discussion, bottom right,
14 it's the second to last sentence.  It says,
15 "In this population, subjects whose mothers
16 had recorded administration of acetaminophen
17 at delivery had significantly higher
18 concentrations of acetaminophen in their
19 meconium.  Data not shown."
20     A.    Uh-huh.
21     Q.    Okay.
22          MR. SNIDOW:  So sorry, Jim.
23 Where are you?
24          THE WITNESS:  At the end here.
25          MR. SNIDOW:  Okay.  Thank you.

Page 256

1  QUESTIONS BY MR. MURDICA:
2      Q.    Doctor, that was true, right?
3      A.    We discussed that before, is
4  the abstract we discussed, that there was an
5  association between taking acetaminophen at
6  delivery and acetaminophen in meconium.
7           As you saw, there was also an
8  association between taking acetaminophen
9  during pregnancy, before delivery, before the
10 time of delivery, before being admitted to
11 the hospital for delivery, and levels of
12 acetaminophen in meconium.
13          There were -- and as we
14 discussed, the data were not complete for the
15 second part, for acetaminophen during
16 pregnancy.
17          So -- but really, this doesn't
18 in any way says that meconium captures only
19 delivery.
20          In fact, as I mentioned, we did
21 sensitivity analysis in Baker 2020, which is
22 the only one that is positive -- this is
23 not -- where we excluded those women that you
24 mentioned here, and the results did not
25 change whatsoever.

Page 257

1           So because they did not change
2  whatsoever, it really means this association
3  is not influential.  It's not influencing the
4  association between acetaminophen and ADHD.
5      Q.    And those women that you --
6  when you did that sensitivity analysis, you
7  were able to exclude them because there was a
8  hospital administration record that they were
9  given acetaminophen at delivery, correct?
10     A.    I think that is correct.
11     Q.    Right.
12          And you know, do you not,
13 Dr. Baccarelli, that those records oftentimes
14 omit hospital administration during labor and
15 delivery --
16          MR. SNIDOW:  Object to form.
17 QUESTIONS BY MR. MURDICA:
18     Q.    -- right?
19     A.    Say that again?
20     Q.    The hospital administration
21 records for the GESTE cohort often omit
22 whether a mother had acetaminophen during
23 labor and delivery.
24     A.    That is something we reviewed
25 in -- we had a detailed discussion with this

Page 258

1  with the colleagues in OB/GYN and in the
2  delivery ward there and with Hannah and
3  Larissa Takser, and we realized there are two
4  sources of records that are kept in
5  Sherbrooke.
6        The delivery charts -- the
7  delivery charts is the information that --
8  there is a questionnaire.  When women come in
9  and they're rushing to the hospital, there is
10 someone there, a nurse or a doctor, that
11 tries to ask people what they took before
12 they came into the hospital.  So the delivery
13 charts are the ones -- one source of
14 information, which is the source we did not
15 use.
16        However, any drug given to a
17 woman in labor is recorded in the clinical
18 chart, and the clinical chart is accurate.
19 The delivery chart is not.  The clinical
20 chart is accurate.
21        So we didn't use the delivery
22 chart, which again is a type of -- I saw it
23 in -- when I went to Sherbrooke, I saw the --
24 I saw both the clinical charts and the
25 delivery chart.  The delivery chart is a

Page 259

1  questionnaire.  It's two pages.  And women
2  are asked while in labor, or while getting
3  prepped for anesthesia if they're doing a
4  C-section, to ask {sic} this question.
5        You can understand how they
6  might answer.  They might answer any -- I
7  mean, have you taken any drugs:  Yes; no; I
8  don't know.
9        But then what we used is not
10 that data.  What we used is the drugs
11 recorded given by the nurse or by the
12 physicians, and those are registered.  Any
13 drug that is given to anyone in a hospital is
14 recorded.
15        So there is a source of
16 information that we had in Sherbrooke that
17 wasn't reliable.  That's the delivery chart
18 that we didn't use.
19        We did use the clinical charts,
20 which is the drugs that are prescribed and
21 administered by the nurse and the physician.
22    Q.    And -- okay.  Are you done?
23    A.    Say that again?
24    Q.    Are you done with your answer?
25    A.    Yeah.

Page 260

1    Q.    Okay.  Dr. Baccarelli, when did
2  you realize that despite -- that the delivery
3  charts were inaccurate but there was another
4  source that was accurate, according to you?
5    A.    I can't remember, but it might
6  have been before this paper.
7    Q.    All right.  Because
8  you actually told Dr. Laue that the delivery
9  charts were unreliable, they didn't include
10 labor or delivery administration of
11 acetaminophen, and a maternal report would be
12 more reliable, correct?
13    A.    I didn't say that.  This was
14 done by -- Dr. Laue spoke directly with the
15 colleagues in Canada.
16    Q.    Okay.  And did you agree with
17 that, that the delivery chart was missing
18 data?
19    A.    Yeah.  And we didn't use it.
20    Q.    Okay.  If you -- we're back on
21 Exhibit 90, going through the Laue article,
22 on page 142.
23    A.    Uh-huh.
24    Q.    If you look at this section,
25 I'm going to ask you about this sentence, but

Page 261

1  there's a couple sentences before it.
2        What's published here by you
3  and Dr. Laue says, "Importantly, many of the
4  instruments previously used relied on
5  parental report of behavior, which may be
6  inaccurate or biased."
7        Do you see that?
8    A.    Where is it?
9        MR. SNIDOW:  Where are you?
10       MR. MURDICA:  Probably the
11 second sentence on the page.
12       MR. SNIDOW:  Thanks.
13       Do you mind reading it again
14 for him?
15 QUESTIONS BY MR. MURDICA:
16    Q.    Sure.
17       "Importantly, many of the
18 instruments previously use relied on parental
19 report of behavior, which may be inaccurate
20 or biased."
21       THE WITNESS:  What is it again?
22 What is that?
23       MR. SNIDOW:  Do you mind?
24       MR. MURDICA:  No.
25       MR. SNIDOW:  Okay.  Thank you.

Confidential - Subject to Protective Order

Page 262

1    THE WITNESS: Thank you.
2  QUESTIONS BY MR. MURDICA:
3    Q.  Okay.  That was -- first of
4  all, you signed off on those words, right?
5    A.  I did.
6    Q.  Okay.
7    A.  But at the same time, I mean, I
8  want to point out that, A, if they're
9  inaccurate, they probably take away the
10  signal, so they're going to create false
11  negatives, which is not what we see now.
12    So if this -- if this -- let's
13  say that I was -- I was here to say that
14  there is no association between ADHD -- we're
15  talking about ADHD, I think, here -- and
16  acetaminophen or ASD and acetaminophen.  This
17  would be a big concern because this is likely
18  to make the association go away.
19    I have to say, as worded, this
20  seems to be a strong statement, and I wish I
21  had attenuated because when you look at
22  thousands of people like studies have done,
23  if you do this in 50,000 people, that's
24  incredibly important information.
25    There is misclassification, but

Page 263

1  as I said in my report, the misclassification
2  is expected to be nondifferential.  That
3  means it's going to make any association, any
4  link, between acetaminophen and ASD or
5  acetaminophen and ADHD go away, not make it
6  appear.
7    So if you're looking for
8  reasons why the association exists, as shown
9  in the literature, this is not it.
10    Q.  Okay.  Doctor, do you
11  disagree -- and I want you to go ahead and
12  read the three sentences before this on the
13  prior page.
14    Do you disagree that what you
15  were saying here was that the other studies
16  might be biased, which is why they didn't
17  come to the conclusion that there was no
18  association with neurodevelopmental
19  disorders?
20    MR. SNIDOW:  On 141?
21    MR. MURDICA:  Yes.
22    THE WITNESS:  141?  What is it?
23  What --
24  QUESTIONS BY MR. MURDICA:
25    Q.  I'm still asking you about the

Page 264

1  statement on 142, but I'm suggesting politely
2  that you look back into that entire paragraph
3  and then see if you can answer my question.
4    MR. SNIDOW:  Okay.  Objection.
5    MR. MURDICA:  I'll ask it again
6  if you'd like me to.
7    MR. SNIDOW:  Yeah, please.  I
8  apologize.
9    MR. MURDICA:  I was trying to
10  help the doctor.
11    MR. SNIDOW:  I know.  I get it.
12  Just an objection.
13    THE WITNESS:  I just want to
14  point out that this paper is about
15  intelligence.  It's not about ASD and
16  ADHD.  So we're talking about
17  intelligence here.  And in general,
18  the discussion is about intelligence.
19  QUESTIONS BY MR. MURDICA:
20    Q.  Doctor, please turn to
21  page 141 --
22    A.  Uh-huh.
23    Q.  -- left side.
24    A.  Uh-huh.
25    Q.  Tell me if I read this

Page 265

1  correctly.
2    "Although the results of this
3  study seem discordant with previous studies,
4  Avella-Garcia, Brandlistuen, Liew,
5  Stergiakouli, Thompson, Vlenterie, Ystrom,
6  they are not necessarily in conflict.  In
7  addition to the improved exposure assessment
8  in our study, previous studies have primarily
9  used instruments that measured child
10  behavior, motor development, and symptoms of
11  specific behavioral disorders including ADHD
12  and autism.  This study subjects {sic} from
13  the WISC-IV battery, which is an objective,
14  validated metric that is commonly used to
15  measure components of child intelligence,
16  because behavior and intelligence are
17  different, our results cannot be directly
18  compared.  Importantly, many of the
19  instruments previously used relied on
20  parental report of behavior, which may be
21  inaccurate or biased."
22    Did I read that correctly?
23    A.  You read that correctly.
24    Q.  Do you stand by those words?
25    A.  I think -- no.  I told you in

Page 266

¹ the beginning that I had different opinion in
² 2019 --
³      Q.    Okay.
⁴      A.    -- than I have today.
⁵      Q.    Okay.
⁶      A.    And the reason why is that, I
⁷ was really sure that acetaminophen was fine
⁸ and our results were in line with that.  I
⁹ was probably overinfluenced by my opinions,
¹⁰ and I'm sorry I did.
¹¹      At the same time I want to
¹² point out, A, that the reason why they're
¹³ different is because we said -- we said a
¹⁴ completely different thing.  We said we had
¹⁵ one advantage.  We are measuring meconium.
¹⁶ Others haven't done it.
¹⁷      The other thing is that the
¹⁸ previous studies looked at ADHD -- methods
¹⁹ related to ASD and ADHD.  We are looking only
²⁰ at intelligence, so we are capturing only one
²¹ component.
²²      And I think you understand that
²³ ADHD, kids with ADHD, they don't have lower
²⁴ intelligence usually.  And children with ASD
²⁵ might even have higher -- with ASD can have

Page 267

¹ higher intelligence.
²      So what this statement needs to
³ be read is that we are studying intelligence;
⁴ we're not studying ADHD or ASD.  So at the
⁵ time I wrote this, I believe that part of the
⁶ reason was that we are -- we are studying
⁷ different type of phenotypes, different type
⁸ of diseases; that intelligence might not be a
⁹ target of Tylenol over acetaminophen while
¹⁰ the ADHD and ASD might have been.
¹¹      I have to say today, probably I
¹² was wrong also on the statement that is
¹³ written here.  The statement as written here
¹⁴ is, there is not -- we found no effect on
¹⁵ intelligence, and most like -- we found no
¹⁶ effect on intelligence, and most likely --
¹⁷ and most likely we are right.
¹⁸      We were not right.  What I
¹⁹ wrote here, I mean, after three years, I need
²⁰ to take it back.
²¹      Q.    Okay.  Dr. Baccarelli, if you
²² look back on page 142 -- are you on 142?
²³      A.    Yep.
²⁴      Q.    Okay.  At the very -- the last
²⁵ sentence of the second paragraph there, it

Page 268

¹ says, "Because of inconsistent
² epidemiological findings and without an
³ identified mechanism, causality of any
⁴ association observed in the other studies
⁵ cannot be established."
⁶      Do you see that?
⁷      Are you looking at the exhibit?
⁸      A.    Let me look, yeah.
⁹      Q.    We were on page 142.
¹⁰      Are you on page 142, Doctor?  I
¹¹ don't think you are.
¹²      MR. SNIDOW:  Jim, do you mind
¹³ if I --
¹⁴      MR. MURDICA:  Nope.
¹⁵      MR. SNIDOW:  Okay.  Thanks.
¹⁶      THE WITNESS:  Thank you.
¹⁷      MR. SNIDOW:  Yeah.
¹⁸      THE WITNESS:  Thank you.
¹⁹ QUESTIONS BY MR. MURDICA:
²⁰      Q.    Okay.  Did you see that?
²¹      A.    Yes.
²²      Q.    Okay.  And you signed off on
²³ that before it was published, right?
²⁴      A.    Yes.
²⁵      Q.    Okay.  And I take it you don't

Page 269

¹ stand by that now?
²      A.    I stand by the final sentence,
³ which I understand that usually at the end of
⁴ the -- of a manuscript we write the final
⁵ sentence that encompasses all the paper.  So
⁶ you are picking out -- you are really
⁷ cherry-picking on one sentence.
⁸      Q.    Well, they're your words,
⁹ right?
¹⁰      A.    The entire paper says, although
¹¹ our study provides some reassurance, its
¹² observational nature cannot definitely
¹³ determine, one study only, that women can
¹⁴ safely consume acetaminophen during
¹⁵ pregnancy, and ongoing surveillance and
¹⁶ long-term outcomes of fetal exposure remains
¹⁷ warranted.
¹⁸      So we didn't say acetaminophen
¹⁹ is no problem.  We didn't say everything that
²⁰ was published should be discarded.  We just
²¹ said our study does not support an
²² association.
²³      And unfortunately, after
²⁴ 2020 -- and you can understand -- 2029
²⁵ {sic} -- you can understand that this was

Page 270

1  published in 2018 -- there have been five
2  years' worth of data that are damning.  I
3  mean, really.
4        And, again, I wish I could see
5  the future, and I would have been much more
6  accurate in saying this is small study.  This
7  is something that we -- that we have done
8  that is not consistent with the causation.
9        But, again, it's only one of
10 the studies that are there in the universe of
11 studies.  And to say -- there were already a
12 few studies that were interesting, and there
13 are many more now that are even more
14 interesting to have my opinion.
15     Q.    Dr. Baccarelli, at the time
16 that this was published in 2019, you agreed
17 with the statement that because of
18 inconsistent epidemiologic findings and
19 without an identified mechanism, causality of
20 any association observed in the other studies
21 could not be established, right?
22     A.    I didn't say that.
23          MR. SNIDOW:  Objection.  Hold
24 on.  Hold on.  Objection to the form.
25

Page 271

1  QUESTIONS BY MR. MURDICA:
2     Q.    You didn't say that?
3     A.    I -- the conclusion -- that is
4  only one sentence --
5     Q.    Right.
6     A.    -- and it's theoretical.  It's
7  a theoretical sentence that in general
8  applies to the -- to the level of theory.
9        So here, what I said in the
10 beginning is that we did not find evidence of
11 neurodevelopmental harm.  And again,
12 everything here is read to intelligence.  It
13 is not ASD and ADHD.  We were studying
14 intelligence.
15        So don't get the sentence and
16 put it to ASD and ADHD.  Those sentences have
17 very little to do with ADHD and ASD.  We
18 mentioned ADHD and ASD to point out the
19 difference between our study and the previous
20 studies.
21     Q.    Doctor, please turn to
22 page 143.  You were reading from the last
23 sentence in the conclusion.
24        Right?
25     A.    Yes.

Page 272

1     Q.    What's the first sentence in
2  the final paragraph of your conclusion?
3     A.    It's what this paper -- again,
4  this is a paper of 138 people that shows no
5  association between intelligence.
6     Q.    Okay.  Are you able to read the
7  first sentence of your final --
8     A.    Yeah.
9     Q.    -- conclusion paragraph?
10 What's it say?
11     A.    In this paper, in this specific
12 paper, which, again, is in conflict with the
13 overwhelming majority of other papers in the
14 universe of literature -- and it happened to
15 be authored by me, but, I mean, I can be
16 severe and strict with this paper as with any
17 other -- we did not find evidence of
18 neurodevelopmental harm from prenatal
19 exposure to acetaminophen measurement in
20 meconium.  And, therefore, this is -- this is
21 something that is -- really applies to this
22 paper.  It does not apply to the -- to the
23 causation in general.
24     Q.    At the time, in this paper, you
25 did not find evidence of neurodevelopmental

Page 273

1  harm from prenatal exposure to acetaminophen,
2  correct?
3     A.    In this paper, I didn't find an
4  association in a small study between
5  acetaminophen during -- in meconium and
6  intelligence of the child.
7     Q.    This study -- and this study
8  did not support, at the time, causation of
9  acetaminophen with neurodevelopmental
10 disorders, correct?
11     A.    Not only at the time, but also
12 today.  Today doesn't support any
13 association.  And, therefore, this is one of
14 the few papers today that doesn't support
15 association.
16     Q.    Okay.
17     A.    I considered that in the
18 literature.  It's in my tables, so you can
19 understand how -- you can cherry-pick this
20 paper as much as you want, but it's already
21 in my tables.
22     Q.    Yeah.
23     A.    So I said in my tables that the
24 evidence supporting the association due to
25 this paper is zero.

Page 274

1    Q.    Dr. Baccarelli, you just used
2  the word "cherry-pick," but this is the first
3  paper that you published on this, so this is
4  the first paper I'm asking you about.
5         MR. SNIDOW:  Objection to the
6     form.
7         THE WITNESS:  No, no, you're
8     not cherry-picking on the paper;
9     you're cherry-picking on the sentences
10    in the paper.
11 QUESTIONS BY MR. MURDICA:
12    Q.    Okay.  You wrote every sentence
13 in the paper, right?  Or you revised it?
14    A.    No, I did not write --
15    Q.    You stand by -- you stood by
16 every sentence in the paper when you
17 submitted it to be published in a journal,
18 correct?
19        MR. SNIDOW:  Hold on.
20    Objection to the form.
21        THE WITNESS:  I used to read
22    the paper from -- as I -- as a whole,
23    and each sentence makes sense in the
24    context.  If you take it out of
25    context --

Page 275

1  QUESTIONS BY MR. MURDICA:
2     Q.    Right.
3     A.    -- and you told me about this
4  sentence that -- any sentence that -- if it
5  were written today and in the absence of the
6  entire paper, I cannot stand by those
7  sentences because they're not in context.
8     Q.    Dr. Baccarelli, when you went
9  out and told the world about this paper, you
10 didn't limit it to intelligence.  You talked
11 about neurodevelopment, right?
12    A.    In general.  I mean, as --
13 again, what I'm say -- this paper doesn't
14 support -- I didn't say this paper shows that
15 there is no toxicity whatsoever.
16    Q.    Okay.
17    A.    If you read the sentences, it
18 doesn't -- I use negative language.  We use
19 negative language.  We don't use affirmative
20 language.
21        So if you read this paper
22 carefully, it says this paper doesn't support
23 the association.  It doesn't say the
24 association doesn't exist.  They're very two
25 different concepts.

Page 276

1     Q.    And you criticize your own
2  paper now, Exhibit 90, because of sample
3  size, right?
4     A.    Today?  Yes.
5     Q.    Today.
6     A.    Because there many -- at the
7  time, I felt it was a perfectly okay sample
8  size because of some advantages like
9  measuring meconium and using a medical value
10 for intelligence.
11    Q.    And you don't stand by your
12 criticism of the cohort studies that were
13 included in Laue, correct?
14        MR. SNIDOW:  Objection to the
15    form.
16        THE WITNESS:  I'm not
17    understanding.  I don't understand the
18    question.
19 QUESTIONS BY MR. MURDICA:
20    Q.    We asked questions about the --
21 do you remember when I read to you citations
22 in your study that were to be discordant
23 from Avella-Garcia, Brandlistuen, Liew,
24 Stergiakouli, Thompson, Vlenterie and Ystrom?
25        MR. SNIDOW:  Objection.

Page 277

1     Objection to the form.
2  QUESTIONS BY MR. MURDICA:
3     Q.    Do you remember when I read
4  those to you?
5     A.    I remember.
6     Q.    Yeah.
7     A.    And I could say three years
8  ago, and I could say that four years ago and
9  now, that in those papers there is an
10 exposure misclassification, and especially
11 the measure -- the measurement in meconium.
12 So I'm positive that our study had an
13 advantage over those cohorts, measuring
14 acetaminophen in meconium, that those cohorts
15 didn't do.
16        And again, there can be a
17 problem in studies like this because if there
18 is misclassification of exposures, meaning
19 women cannot recall exactly what -- whether
20 they took Tylenol and how much they took over
21 pregnancy, that can bias the result, as I
22 wrote in my report.
23        The bias is likely to be toward
24 the null, meaning they're likely to cause a
25 false negative, not false positives.

Over here, we have a bunch of studies that are positive. So if there is a problem -- I'm really sorry, but if there is a problem, it's that these studies are all underestimating the true effect of Tylenol on neurodevelopment.

Q. Right.

And you didn't say what you just said now in Exhibit 90 at the time, correct?

A. I --

MR. SNIDOW: Objection to the form.

THE WITNESS: I want to point out that this paper is about intelligence. The other studies were about ADHD.

My -- I did not write this paper to criticize the literature. I write this paper to report on my results.

QUESTIONS BY MR. MURDICA:

Q. Okay. Did you think at the time that the -- those studies were weak?

A. I thought -- at the time, I

thought that we had an advantage on them. We measured -- we measured -- we measured acetaminophen in meconium, and they didn't.

Q. And you thought that the parental report aspect of those studies biased them, right?

A. Which parental report?

Q. In the data -- in the cohort studies, the fact that they were taking maternal report for use of acetaminophen.

A. Maternal report -- as I said before, parental report can hide the association.

Q. Okay.

A. So if they -- if you're asking, I mean, what I think now and probably what I would have thought back then is that if the parental report of acetaminophen, the association would be smaller or a false negative.

Q. Okay. And --

A. I understand those papers show the association, so that is not the problem with -- there's no dation, correct.

Q. Okay. So it's your testimony

that you weren't, in Laue 2019, criticizing the methodology of those papers and explaining why they found an association but you didn't?

MR. SNIDOW: Objection to form.

THE WITNESS: Again, I was just saying -- I didn't get that far. In Laue, we were just saying there are differences between my study and the past. And the reason why we don't see it -- they are many, including small sample size, I will say now. But sample size is not everything.

QUESTIONS BY MR. MURDICA:

Q. Okay.

A. As you understand, sample size is not everything. I wanted to point out particularly the strength of our study, which was particularly measuring acetaminophen in meconium that could turn out an association to be positive if there is one as opposed to other studies, the use of reports of using acetaminophen that could help to hide the association.

Q. Okay. And when you -- when you

published Laue 2019, you went on Twitter and you talked about it, right?

A. I think so.

Q. Yeah.

When is the last time you looked at those tweets?

MR. SNIDOW: Objection to the form.

Just, Dr. Baccarelli, you can answer, but not in the context of anything that you've discussed with any attorneys.

THE WITNESS: Of course.

I -- I looked at that probably one week ago.

QUESTIONS BY MR. MURDICA:

Q. Okay. So in preparation for the depon -- for your deposition, you saw this?

A. While I was doing -- while I was studying my materials, I type in to find stuff on Google that were about acetaminophen.

Q. Okay. I take it you don't stand by what you tweeted back then?

Page 282

1    A.    I think the -- if you look at
2  that tweet and you click on it, it was
3  tweeted at 6:20 a.m. in the morning.  I wake
4  up until 6:30, so I was probably not
5  completely woken up that morning.
6    Q.    Have you -- have you removed
7  that tweet now?
8    A.    I don't need to.  I -- I'm
9  happy to be wrong sometimes.  People know I'm
10 wrong many times.  If I was wrong, it's okay.
11   Q.    Okay.  At the time, at the 6:20
12 in the morning, you're not being paid to be
13 part of this litigation, correct?
14       MR. SNIDOW:  Objection to form.
15       THE WITNESS:  I think you
16   understand that I wrote many times
17   over and over again over time, as I
18   explained, that I believe that ADHD
19   and acetaminophen are linked and
20   causally linked.  I wrote it, for
21   instance, in Baker 2020 to -- for
22   extent {sic}.  So you have evidence
23   well before the litigation that
24   explained my opinion.
25       I disclosed that I was a

Page 283

1  nonbeliever, and I think I disclosed
2    that I was a nonbeliever at the time
3    of publication of 2019.  And so you
4    have a nonbeliever there that gets
5    upset because someone criticizes my
6    paper.
7  QUESTIONS BY MR. MURDICA:
8    Q.    Is there anywhere on Twitter
9  where you have put your current opinion?
10   A.    I put it everywhere.  I put it
11 here.  I told to colleagues.  I want to
12 publish these results.
13   Q.    Is it on Twitter?
14   A.    Twitter is not an official mean
15 of communication, as far as I know.
16   Q.    I'm just asking.
17   A.    I don't put on Twitter all my
18 opinions.  I put only a part of them, so --
19   Q.    Okay.  So the answer is no,
20 right, Doctor?
21   A.    If you want, I can -- I can
22 take a time machine and go one year ago and
23 tweet it.  I will do it easily and happily.
24       (Baccarelli Exhibit 94 marked
25       for identification.)

Page 284

1  QUESTIONS BY MR. MURDICA:
2    Q.    Okay.  Dr. Baccarelli, I've
3  marked as Exhibit 94 a printout from Twitter.
4    A.    Uh-huh.
5    Q.    You have that in front of you
6  now, right?
7    A.    Correct.
8    Q.    Okay.  Is this what you
9  reviewed in the last week in preparation for
10 your deposition?
11       MR. SNIDOW:  And actually, Jim,
12   I think we've got an agreement that
13   we're not going to ask questions like
14   that.
15       MR. MURDICA:  Not questions
16   like that.
17       MR. SNIDOW:  I'm looking at it
18   right here.  It says, "No questions on
19   activities undertaken by the expert to
20   prepare for his or her deposition."
21       So on that basis, I'm
22   instructing you not to answer.
23       MR. MURDICA:  Okay.  He
24   testified he found it on Google.
25       MR. SNIDOW:  Yeah.

Page 285

1  QUESTIONS BY MR. MURDICA:
2    Q.    Is this what you found on
3  Google, Doctor?
4    A.    Yes.
5    Q.    Okay.  So you saw this whole
6  exchange prior to today?
7    A.    Yeah, absolutely.
8    Q.    Okay.  Because it wasn't
9  just -- it wasn't just 6:20 a.m.  You sent --
10 you sent -- you made a tweet, right?  And
11 then the next day --
12   A.    The done at 6:20 a.m. -- sorry,
13 go ahead.
14   Q.    There's not just one tweet
15 here.  There's two, correct?  By you?
16   A.    There is one tweet that is sent
17 out by my communication officer who does the
18 tweets for me.  I have a communication person
19 who tweets out.  She tweets -- at the time,
20 she tweeted most of my papers, if not all.
21   Q.    Okay.
22   A.    Now, unfortunately, she's too
23 busy.  I need to tweet it -- tweet it on my
24 own.  But at the time, she used to tweet
25 everything that we published.  So she wrote

Page 286

¹ this for me, I approved it, and it seems
² okay.  This is the result of our paper.
³      Q.    Okay.
⁴      A.    Our paper is not consistent
⁵ with the hypothesis.
⁶      Q.    So on January 3, 2020, you,
⁷ through your assistant, tweeted about the
⁸ Laue study we just looked at, correct?
⁹      A.    Correct.  And that says it
¹⁰ finds no association between acetaminophen
¹¹ levels in meconium and child
¹² neurodevelopment.
¹³      Q.    Okay.
¹⁴      A.    So this is exactly the same
¹⁵ message in the paper, so I'm not surprised.
¹⁶      Q.    Yeah.  Well, it doesn't say
¹⁷ intelligence; it says neurodevelopment.
¹⁸ Correct?
¹⁹      A.    Again, found no associa --
²⁰ intelligence -- intelligence is a type of
²¹ neurodevelopmental outcome.  So if you're
²² saying this tweet is inaccurate, yes, it's
²³ inaccurate.
²⁴      Q.    And then Dr. Bauer replied,
²⁵ right?

Page 287

¹      A.    Yep.
²      Q.    And then you end up replying to
³ that a week later, right?
⁴      A.    Yep.
⁵      Q.    Okay.  And was this written by
⁶ your assistant?
⁷      A.    No, this was written by me at
⁸ 6:20 a.m. in the morning.
⁹      Q.    Okay.
¹⁰      A.    And to say it's unilateral and
¹¹ probably inaccurate now, probably inaccurate
¹² back then.
¹³           And it's -- perhaps it's not
¹⁴ the reason why I wrote this, but it's
¹⁵ definitely -- it's definitely something that
¹⁶ can be misread and misinterpreted.  And they
¹⁷ learned that on Twitter a hard way.  On
¹⁸ Twitter need to write things that can be read
¹⁹ different ways.
²⁰           What this tweet meant, it meant
²¹ only one thing.  We have an advantage.  You
²² cannot take down this study just because it's
²³ a sample size sample, because there are
²⁴ advantages.  One of the advantages is
²⁵ measuring acetaminophen in meconium.

Page 288

¹           I was just defending the right
² to publish this article.  I was not giving
³ any opinion on causation.
⁴      Q.    Okay.  Your words were, "Sample
⁵ size is not everything in research."
⁶           Correct?
⁷      A.    Oh, I think we all agree on
⁸ that.
⁹      Q.    Yeah.  You were defending the
¹⁰ sample size of the Laue study, right?
¹¹      A.    Correct.
¹²           And that because we have
¹³ acetaminophen, and therefore this -- as you
¹⁴ understand, power depends -- power depends
¹⁵ not only on sample size.  I think you can
¹⁶ read any biostatistic book or epidemiology
¹⁷ book.  Sample size is not the only
¹⁸ contributor to power.
¹⁹      Q.    Do you recall criticizing the
²⁰ sample size of Laue earlier today in your
²¹ testimony?
²²      A.    Yeah, absolutely.
²³      Q.    Okay.
²⁴      A.    And I'm not saying this --
²⁵ there is nowhere here or in the paper saying

Page 289

¹ this is a study with a great sample size.
² I'm just saying sample size is small, but
³ sample size is not the only one thing in
⁴ research.  I think we can agree that this is
⁵ acceptable as of today.
⁶      Q.    The next sentence you wrote
⁷ was -- and this is to Dr. Bauer.  "You may
⁸ want to elaborate on the weaknesses of those
⁹ studies."
¹⁰           Right?  Those were your words?
¹¹      A.    Exactly.  And I was referring
¹² about the lack of meconium measurement in
¹³ those studies.
¹⁴      Q.    All right.  We're going to mark
¹⁵ this.
¹⁶           MR. SNIDOW:  Jim, if you're
¹⁷ switching exhibits, do you want to do
¹⁸ a break now?  I think we've been going
¹⁹ for another hour.
²⁰           MR. MURDICA:  This is part of
²¹ this.  When I'm done with this, that's
²² fine.
²³           MR. SNIDOW:  Fair.
²⁴           (Baccarelli Exhibit 95 marked
²⁵ for identification.)

Page 290

¹ QUESTIONS BY MR. MURDICA:
²    Q.    Doctor, you now have in front
³ of you what's been marked as Exhibit 95.
⁴ Do you see that?
⁵    A.    Yeah. I need to point out,
⁶ though, that when it was in the tweet, it was
⁷ much smaller, and I never actually went back
⁸ after 6:20 a.m. to read the entire -- the
⁹ entire list of studies.
¹⁰    So I just -- my tweet was only
¹¹ based on my understanding we were talking
¹² about intelligence and there were studies
¹³ before. And it was just to say, this is a
¹⁴ study that has the right to be published.
¹⁵    Other than that, there is no
¹⁶ bearing to other opinions I had at the time
¹⁷ or now.
¹⁸    Q.    Dr. Baccarelli, you wrote, "You
¹⁹ may want to elaborate on the weaknesses of
²⁰ those studies," and those studies were in a
²¹ chart that's reflected on Exhibit 95,
²² correct?
²³    A.    Correct. And you understand in
²⁴ my report I also elaborate on the weaknesses
²⁵ of those studies. And again, most of the

Page 291

¹ weaknesses -- not all the weaknesses of those
² studies will make the association go away.
³    Q.    Okay. And the studies you were
⁴ referring to in Exhibit 94, your tweet, are
⁵ represented on Exhibit 95. And they are
⁶ Brandlistuen 2013, Vlenterie 2016; Ystrom
⁷ 2017; Liew 2014, 2015, 2016, another 2016;
⁸ Petersen 2018; Thompson 2014; Avella-Garcia
⁹ 2016; Ruish 2017; Stergiakouli 2016; Bornehag
¹⁰ 2017; Laue 2018; Ji 2018; Toro-Rodriguez --
¹¹ Toro-Rodriguez 2018; Liew 2019; Leppart 2019;
¹² Tronnes 2019; Chen 2019; Gervin 2019; Golding
¹³ 2019; Rifas-Shiman 2019; and Ji 2019.
¹⁴ Correct?
¹⁵    MR. SNIDOW: Objection. Form.
¹⁶    THE WITNESS: Now, I need to
¹⁷ reiterate that I never opened up this
¹⁸ table, never analyzed, never looked
¹⁹ at.
²⁰    I'm just replying by saying my
²¹ paper is science, it should be
²² published, and that it is what it is.
²³    My tweet cannot be taken as
²⁴ a -- as a criticism related to whether
²⁵ or not these studies are sufficient to

Page 292

¹ prove causation in this case because,
² again, the weaknesses of these studies
³ would hide the association. It would
⁴ not make the association to appear.
⁵ QUESTIONS BY MR. MURDICA:
⁶    Q.    Dr. Baccarelli, were you being
⁷ paid by anyone for the opinions you expressed
⁸ in the tweet at the time in 2019?
⁹    MR. SNIDOW: Objection to the
¹⁰ form.
¹¹    THE WITNESS: I'm not paid now
¹² either to express an opinion. I'm
¹³ sorry. I'm paid to do research, not
¹⁴ to express an opinion. And you
¹⁵ understand that very well.
¹⁶    MR. SNIDOW: Break?
¹⁷    MR. MURDICA: Sure.
¹⁸    MR. MURDICA: Thanks.
¹⁹    VIDEOGRAPHER: The time right
²⁰ now is 2:07 p.m. We are off the
²¹ record.
²²    (Off the record at 2:07 p.m.)
²³    VIDEOGRAPHER: The time right
²⁴ now is 2:20 p.m. We are back on the
²⁵ record.

Page 293

¹ QUESTIONS BY MR. MURDICA:
²    Q.    Welcome back, Dr. Baccarelli.
³ Are you ready to proceed?
⁴    A.    Yes, I am.
⁵    Q.    Okay. During the last session,
⁶ plaintiffs' counsel turned over your retainer
⁷ agreement --
⁸    A.    Uh-huh.
⁹    Q.    -- to work for them in this
¹⁰ litigation. I'm going to represent to you
¹¹ that that was signed on December 22, 2023.
¹² Do you disagree with that?
¹³    A.    You mean 2022?
¹⁴    Q.    2022.
¹⁵    A.    Okay. Yes, I think that might
¹⁶ be right, yeah.
¹⁷    Q.    Okay. We're going to print and
¹⁸ mark it as the next exhibit, so we'll just
¹⁹ leave a placeholder for Exhibit 96 for your
²⁰ retention agreement.
²¹    A.    Uh-huh.
²²    (Baccarelli Exhibit 96 marked
²³ for identification.)
²⁴ QUESTIONS BY MR. MURDICA:
²⁵    Q.    Okay. So if that's correct,

Page 294

1  Doctor, that you were retained in December of
2  2022, that means that when you spoke to that
3  financial firm, you were already working for
4  the plaintiffs, correct?
5      A.    I had signed an agreement, but
6  probably -- I don't think I had done much
7  work by then.
8      Q.    But you knew that one side of
9  the litigation had retained you at that
10 point, correct?
11     A.    That is correct.
12           And again, I spoke to this
13 firm, to the best of my knowledge, just to
14 report my opinion as a scientist, as I would
15 do and I did with many of my colleagues.
16           So I -- there is no
17 inconsistency between what I did in this case
18 and what I spoke to the firm, too, and what I
19 said to my colleagues.
20     Q.    And to the best of your
21 knowledge, you did not disclose to the
22 financial firm that you were working on the
23 litigation for one party, correct?
24     A.    They didn't ask me.  I didn't
25 disclose.

Page 295

1      Q.    Okay.  Earlier today you
2  mentioned a colleague of yours, Raphael
3  Cassoulet.
4           Do you remember that?
5      A.    Yes.
6      Q.    As somebody else in your group
7  that had worked on meconium, right?
8      A.    So there is a paper that he
9  published that is -- he's in my collaborative
10 group.  I believe he's one of the colleagues
11 in Montreal.
12     Q.    Yeah.
13           And you have that --
14     A.    Yeah.
15     Q.    I saw you turned to something.
16     A.    Yeah.
17     Q.    So --
18     A.    It's the paper, I think.
19     Q.    What is it called?
20     A.    It's called, "Monitoring of
21 prenatal exposure to organic and inorganic
22 contaminants using meconium from an Eastern
23 Canada cohort."
24     Q.    Let's just mark that since the
25 Doctor is looking at it.

Page 296

1      A.    It's in a different format.  I
2  would like to get yours.
3      Q.    Okay.
4      A.    So it's printed as PDF, and
5  yours is -- it's -- the pages are not going
6  to correspond.
7      Q.    I understand.  I'll give you
8  your own.  So we'll mark this as 97.
9           (Baccarelli Exhibit 97 marked
10      for identification.)
11 QUESTIONS BY MR. MURDICA:
12     Q.    Doctor, you have what's been
13 marked as Exhibit 97 in front of you.
14           Is that what you were looking
15 at?
16     A.    Yes.
17     Q.    In your binder?
18           Okay.  And this is your study,
19 right?
20     A.    I'm one of the coauthors.
21     Q.    Okay.  And you reviewed it
22 before it was published, just like the Laue
23 study, right?
24     A.    I did review it, of course.
25 Usually I read the papers I'm the last author

Page 297

1  or the first authors two or three times.  I
2  typically do it -- when I'm the coauthor in
3  our group, usually it's one or two times.  So
4  I can't say I reviewed it with the same
5  degree of attention, but definitely I read --
6  I read it through.
7      Q.    Do you recall if you edited it?
8      A.    Yes, of course --
9      Q.    Okay.
10     A.    -- I did provide comments and
11 any suggestions I had.
12           (Baccarelli Exhibit 98 marked
13      for identification.)
14 QUESTIONS BY MR. MURDICA:
15     Q.    Okay.  We'll mark a redline as
16 Exhibit 98.
17           Dr. Baccarelli, you now have in
18 front of you what's been marked as
19 Exhibit 98?
20     A.    Uh-huh.
21     Q.    Does that appear to be a draft
22 of the publication that's Exhibit 97?
23     A.    Yes, it is.
24     Q.    And in fact, if you look on the
25 first page, we see that your first edit was

Page 298

1 to include your middle initial in redline,
2 right?
3     A.   Uh-huh.
4     Q.   Okay.  And if you turn to
5 page 13 of the draft.
6          Let me know when you're there.
7     A.   Uh-huh.
8     Q.   Okay.  So you have some
9 redline -- redlines and comments in here --
10     A.   Sorry.
11     Q.   -- but not on page 13, right?
12     A.   Sorry, which page?
13     Q.   13 on the bottom.
14     A.   Okay.  Here are no
15 comments, no.
16     Q.   Okay.  There are no comments on
17 page 13, but if you look earlier, you have
18 some redlines beforehand, right?
19     A.   Uh-huh, yeah.
20     Q.   One of the things it says here
21 is that whether or not -- "The use of
22 acetaminophen during pregnancy has been
23 associated with abnormal fetal
24 neurodevelopment or disorders.  Whether or
25 not this association reflects direct effects

Page 299

1 of the molecule or confounded effects from
2 other unmeasured factors linked to the intake
3 of acetaminophen remains to be fully
4 studied."
5          Do you see that?
6     A.   That is what Stergiakouli
7 says --
8     Q.   Yes.
9     A.   -- as indicated in the --
10 there's a reference that says that's
11 Stergiakouli's opinion.
12     Q.   Okay.  And you reviewed this
13 and didn't change it, right?
14     A.   I mean, I agree that
15 Stergiakouli says that.
16     Q.   Okay.  And then it says,
17 "Concentration of acetaminophen in meconium
18 needs to be examined with caution since
19 newborns are sometimes treated with
20 acetaminophen before the release of
21 meconium."
22          Do you see that?
23     A.   Of course.
24     Q.   Okay.  And you didn't -- you
25 didn't delete that or make a comment about

Page 300

1 it, correct?
2     A.   I didn't make a comment about
3 that, absolutely.
4          But as I mentioned before,
5 that's theoretically a point, but it's very
6 uncommon or unlikely that represents a big
7 part of the acetaminophen we find in
8 meconium.  Because meconium accumulates over
9 five months.  One day, or less than one day,
10 can't be a big part of that.
11          Again, meconium gets produced a
12 few units every day, and on average takes a
13 half a day to produce meconium if treated
14 after -- after delivery.  So it's really a
15 small part of the entire meconium that is
16 produced after delivery.  So that's it.
17     Q.   Okay.  You chose not to comment
18 on it or remove it, and you reviewed it,
19 correct?
20     A.   I did -- evidently I didn't
21 comment.
22     Q.   Okay.  If you look on page 4,
23 the first sentence on page 4 is that
24 "Xenobiotics can be analyzed in cord blood,"
25 but that -- this only provides a snapshot of

Page 301

1 the fetus exposure.
2     A.   Uh-huh.
3     Q.   Right?
4     A.   Correct.
5     Q.   And you agree with that, right?
6 Cord blood provides a snapshot in time?
7     A.   Yeah, it's really -- first of
8 all, it's -- it measures only what is present
9 there.  Of course there is a big question as
10 to whether it reflects typical use of
11 acetaminophen over time, which some women
12 might.  Some women might have typical use
13 that also occurs that day.
14     Q.   And they might not, right?
15     A.   Agree.
16     Q.   Okay.  Was that a yes, for the
17 transcript?
18     A.   They may not.
19     Q.   Okay.  Then you have a -- it's
20 says, "Meconium can thus potentially record
21 fetus exposure to xenobiotics for up to six
22 to seven months."
23          And you have a comment, "Is
24 most meconium produced at the end of
25 pregnancy?  Or pretty constantly over those

Page 302

1  six to seven months?"
2      Do you see that?
3      A.    Absolutely.  And it's clear
4  that this was the first paper we ever
5  published about meconium.  I was a coauthor.
6  This was lead by Dr. J.P. Bellenger, who is a
7  biochemist, and this is how I learned about
8  meconium.  I learned about meconium because
9  J.P. Bellenger and Cassoulet explained to me.
10  As you can see, I was curious, and I wanted
11  to learn.
12      Q.    Right.  At the time they wrote
13  that -- oh, sorry.
14      A.    And they confirm that what they
15  wrote here is true.  And in fact, there are
16  references that support that.
17          For instance, one of the
18  references that are shown here says that it
19  reflects months' worth of exposure, so it is
20  the longer biomarker you can get in children.
21      Q.    Which reference is that?
22      A.    It's one of those.  I think
23  Ostrea or Gareri, one of the two.
24      Q.    Gareri?
25      A.    I think so.

Page 303

1      Q.    Okay.
2      A.    I wouldn't be completely sure.
3      Q.    So your testimony is that one
4  of those two says --
5      A.    There are references in the --
6  in the literature that say that.
7      Q.    Okay.  So at the time that you
8  wrote this comment, you didn't know what
9  meconium was reflective of in terms of the
10  exposure time during pregnancy, correct?
11      A.    I wanted to -- as I mentioned
12  before, I often play the devil's advocate,
13  and I want to bring up all the possible
14  theoretical arguments against our statement.
15  And I wanted to be sure that I understood
16  what meconium stand by.
17          So at the time, I was still
18  learning, and I was educated by my
19  colleagues, particularly J.P. Bellenger, who
20  is the mind between using meconium, that he
21  was in -- familiar with the literature, and
22  he was right, what is -- what we see here is
23  right.
24          So as always, I ask questions
25  because I want to learn.

Page 304

1      Q.    Doctor, one of the things that
2  you did in rendering your opinions here was
3  you utilized something called a navigation
4  guide --
5      A.    Uh-huh.
6      Q.    -- to analyze the different
7  literature, correct?
8      A.    Correct.
9      Q.    Okay.  And that -- this is not
10  the first time that you had used the
11  navigation guide, right?
12      A.    It's not the first time I used
13  the criteria in the navigation guide.
14          As you can see in the -- in my
15  report, there are criteria that I use every
16  day.  I use the -- I used it to -- because
17  they are pretty straightforward.  There is
18  a risk of bias analysis and a contribution to
19  evidence.  There are about eight criterion in
20  the risk of bias analysis.  There are about
21  eight criteria also in the evidence analysis.
22  And these are the usual one any
23  epidemiologist would use in using -- in
24  assessing an opinion.
25          And there to say the navigation

Page 305

1  guide, the name tells it all.  It's a guide
2  on -- especially about documenting and making
3  your analysis transparent to other.  It's not
4  a magic tool that gives answer.
5      Q.    Do you remember my question?
6      A.    I -- yeah.  And I say I use the
7  same criteria as in the navigation guide many
8  times, is my answer.
9      Q.    Okay.  The navigation guide was
10  first published in 2014, correct?
11      A.    I think you might be right,
12  yeah.
13      Q.    Okay.  Have you ever used a
14  navigation guide in litigation before now?
15          MR. SNIDOW:  Objection to form.
16          THE WITNESS:  I only worked in
17      one litigation, and I was not -- I
18      didn't use the navigation guide
19      because it was not about general
20      causation.
21  QUESTIONS BY MR. MURDICA:
22      Q.    All right.
23      A.    Because it was one single case,
24  and I didn't -- it was about a toxic exposure
25  that is known to be toxic, so I didn't have

Page 306

1 to do the navigation guide.
2     Q.    In your non-litigation work,
3 have you utilized the navigation guide to
4 render a causation analysis?
5     A.    Again, I used the same
6 criteria, but in coming up for this
7 deposition, I was made aware that I might --
8 my criteria might have been questioned.  My
9 analysis of the literature might have been
10 questioned.
11         So one of the ideas that came
12 to mind is to use a tool and find the tool
13 that will make my research completely
14 transparent to everyone who can read it,
15 including you.
16         So this tool is helpful for me
17 to -- it's a tool that helps me to document
18 my analysis.  It shows the paper is
19 categorized based on 20 criteria, as you can
20 see for each of the paper how I created each
21 of the criteria.
22         So, again, usually this is done
23 without disclosing all the criteria you have.
24         So I used the navigation guide
25 because I became aware that I needed to be

Page 307

1 particularly transparent and particularly
2 open about how I evaluated every paper and
3 how I -- I used it in my overall conclusion.
4     Q.    Okay.  So, Dr. Baccarelli, you
5 discovered the tool, the navigation guide,
6 after you were hired for this litigation,
7 right?
8         MR. SNIDOW:  Objection to the
9 form.
10         THE WITNESS:  No.  No, I know
11 one of the people who created the
12 navigation guide very well, Tracey
13 Woodruff.  She's a colleague who used
14 to work at the EPA, and she wrote the
15 navigation guide with many colleagues
16 at the EPA.
17         And I -- the tool is pretty
18 popular.  In the literature it's
19 pretty popular.  She has been
20 suggesting that we use it whenever we
21 need to document our criteria.
22         And at the same time, I want to
23 point out the navigation guide is not
24 that new, because it's essentially the
25 same as GRADE.  GRADE is a similar

Page 308

1 guide that has been in existence for
2 25 times, and there are very minor --
3 for 25 years.  And there are many
4 minor differences between GRADE and
5 the navigation guide.  If I use GRADE,
6 it would have been exactly the same.
7         The navigation guide is more --
8 it has been -- is GRADE tailored for
9 observational studies.  Because these
10 are all observational studies, the
11 navigation guide is more appropriate
12 than GRADE.
13 QUESTIONS BY MR. MURDICA:
14     Q.    Dr. Baccarelli --
15     A.    Uh-huh.
16     Q.    -- do you remember my question?
17         MR. SNIDOW:  Objection to form.
18         THE WITNESS:  Please, let me
19 know.
20 QUESTIONS BY MR. MURDICA:
21     Q.    Okay.  I don't think that you
22 do.  I'll ask another one, but please do your
23 best --
24     A.    I did answer, by the way, but
25 please go ahead.

Page 309

1     Q.    Please do your best.
2         Okay.  Have you utilized the
3 navigation guide in your work at Columbia
4 prior to this engagement?
5     A.    As I said, I -- I think I
6 replied.  If I didn't, I'm so sorry, because
7 I really thought I did.
8         It's the first time I need to
9 show to anyone exactly how I grade and how I
10 assign each of the papers.  I usually use all
11 the criteria in the navigation guide in my
12 daily job at Columbia or elsewhere, and when
13 I give opinion about causation, I have all
14 the criteria in mind.
15         The navigation guide is a tool
16 that gives additional transparency, and it's
17 really done to your benefit so that you can
18 see exactly whether you agree or disagree
19 with me.
20         So this is the first time I
21 work on a case on causation.  It's only my
22 second case, ever.  And I was made aware, and
23 I became aware while I was working on it,
24 that I had to be particularly transparent
25 about how I grade every paper.

Confidential - Subject to Protective Order

Page 310

1    So this is why I decided to use
2  for the first time the navigation guide,
3  because the navigation guide really gives me
4  added capacity to show exactly what I did at
5  each step of the way.
6         And you can see it in the
7  tables.  There are nine tables here, and each
8  of the paper is classified according to
9  criterion in three tables.  As you can see
10  exactly what I did.  So if you disagree with
11  any of the -- of the ways I classify the
12  paper in the navigation guide, we can
13  discuss.
14         But clearly this is not a
15  tool -- a magic box that spits an answer.
16  It's a way to document what I did and really
17  creates transparency for you, for the judge,
18  for the judge.
19         And also, I have to say this is
20  why I'm pretty proud of this.  Because for
21  the first time I will publish a paper with a
22  navigation guide, which will give me the
23  opportunity to provide transparency about the
24  studies to everyone who is going to read the
25  papers.

Page 311

1    Q.    So if we looked at all your
2  600-plus studies that have been published, we
3  wouldn't see any publications that utilized
4  and applied the navigation guide to reach a
5  conclusion, correct?
6         MR. SNIDOW:  Objection to form.
7         THE WITNESS:  I think I already
8  answered that before.
9  QUESTIONS BY MR. MURDICA:
10    Q.    The answer is no, right?
11    A.    I can go on and repeat all the
12  answer, or you can -- anyone can look back
13  about the answer I just gave.
14    Q.    Can you point to any of your
15  600 studies that utilized the navigation
16  guide that's utilized here?
17    A.    There are many studies where
18  expressed opinions about causation, and by
19  doing that, I used exactly the same criteria
20  I used in the navigation guide.
21    Q.    Oh.
22    A.    Again, the navigation guide --
23  the navigation guide provides transparency
24  that I don't need in my publications.
25    Q.    Okay.

Page 312

1    A.    So -- and in general, I'm
2  not -- I'm not publishing papers to say I
3  looked at entire literature and now here I
4  think that A causes B.
5         You can see my 600 papers.
6  There are few or none that worry
7  about that type of answer, whether in the
8  entire universe of literature there is
9  anything like that.
10         But when I publish papers and I
11  need to indicate whether there is an
12  association or not, I use exactly the same
13  criteria.
14    Q.    Okay.
15    A.    So I never published this
16  navigation guide before, as I mentioned to
17  you.  And again, this creates more
18  transparency; it doesn't create less.
19         So in a way, I give you much
20  more opportunities to look into my job that
21  if I didn't use this.  So you have an
22  opportunity.  So you are really complaining
23  about something that is to your advantage,
24  not to mine.
25    Q.    Dr. Baccarelli, I still don't

Page 313

1  think you answered my question.
2    A.    I did.
3    Q.    Have you published on the
4  navigation guide?
5    A.    I did answer before.  Thank
6  you.
7    Q.    Dr. Baccarelli, have you
8  published on the navigation guide?
9    A.    I did answer my question -- my
10  answer is in the -- is before.  If you want,
11  I can start again.
12    Q.    If we looked at any of your
13  publications, would we see the words
14  "navigation guide"?
15    A.    I did answer the question
16  before.
17         MR. SNIDOW:  Am I allowed to
18  speak?
19         MR. MURDICA:  Are you going to
20  have him answer or no?
21         MR. SNIDOW:  Yeah.
22         Dr. Baccarelli, can -- you can
23  tell him if you've ever used
24  navigation guide and then go on to
25  tell him if you've done GRADE.

Page 314

1    But I think you can tell him
2  if -- I think you have, by the way,
3  three times now if you --
4    MR. MURDICA:  Depending on the
5  question.
6    MR. SNIDOW:  -- if you've used
7  the navigation guide in prior
8  publications.
9    MR. MURDICA:  The pending
10 question is, "Do the words 'navigation
11 guide' appear in any of your 600
12 publications?"
13   And he refused to answer it.
14   THE WITNESS:  I did answer
15 before.  The navigation guide is not
16 used in the previous publication.
17 They used the word "navigation guide"
18 in the publication.
19   The reason is because I use the
20 same criteria, but I'm not expected or
21 required or even interested in provide
22 the same level of documentation,
23 transparency and accountability that
24 is needed in this setting.
25   So in preparing for this

Page 315

1  deposition, I thought I wanted to
2  enhance accountability, enhance
3  transparency, and enhance
4  documentation that the document --
5  that the navigation guide provides.
6    And I want to say, this is
7  something to your advantage because
8  you can look at all the way I classify
9  the paper.  If you disagree, I'm happy
10 to discuss.
11   This is about disclosing.  It's
12 a way of disclosing what I did, and I
13 disclosed it.  It's helpful to
14 everyone, I believe.
15   MR. MURDICA:  Okay.
16   MR. SNIDOW:  Definitely
17 answered that time, right?
18   He said the navigation guide is
19 not --
20   MR. MURDICA:  He's wasting so
21 much time by refusing to answer.
22   MR. SNIDOW:  He said the
23 navigation guide is not used in a
24 previous publication.  Okay?  You got
25 what you want.  I suggest you move on.

Page 316

1    MR. MURDICA:  I don't think his
2  answers are appropriate at all.  I'll
3  keep asking questions.
4    MR. SNIDOW:  Okay.
5  QUESTIONS BY MR. MURDICA:
6    Q.   Dr. Baccarelli, you mentioned
7  Woodruff, right?
8    A.   Uh-huh.
9    Q.   Okay.  Now, when did you meet
10 Dr. Woodruff?
11   A.   Dr. Woodruff, the first time I
12 might have met her 15 years ago.
13   Q.   Okay.
14   A.   I think we were together
15 working on a review of a position statement
16 or a -- let's say a monograph published by
17 the EPA.  And we were brought together by the
18 National Academy of Medicine in Washington,
19 DC, to review that -- the monograph.  And
20 that was perhaps the first time I spent time
21 with Dr. Woodruff.
22   Q.   Okay.  Dr. Baccarelli, did you
23 call Dr. Woodruff when you were attempting to
24 apply the navigation guide of Dr. Woodruff
25 for the first time?

Page 317

1    A.   No.  No.
2    Q.   Okay.
3    A.   I -- Dr. Woodruff, we never
4  talk about the navigation guide.
5    And Dr. Woodruff presented --
6  we invited Dr. Woodruff for -- at Columbia,
7  and this was during COVID, so it was a
8  virtual visit.  And Dr. Woodruff gave a
9  presentation probably three or four years ago
10 about the navigation -- about her work in
11 toxicology.  And that situation, probably was
12 four years ago.  She also presented about the
13 navigation guide.
14   And I thought it was
15 interesting that finally GRADE was -- made it
16 easier to work for people who work in
17 toxicology.
18   Q.   When she gave the presentation
19 about the navigation guide, do you recall
20 Dr. Woodruff saying that it is a team that
21 scores the articles under the criteria of the
22 navigation guide, not a single person?
23   A.   I know that it has been done by
24 teams at times, but I -- I'm not a team.  I
25 cannot clone myself.

Page 318

1  So you will understand that I
2  cannot do it on my own -- I cannot do three
3  times on my own.  I would probably get to the
4  same result.
5  Q.  Did you know, Dr. Baccarelli,
6  that Dr. Woodruff was invited to sign the
7  consensus statement we were talking about
8  earlier and she refused?
9  MR. SNIDOW:  Objection to the
10  form.
11  THE WITNESS:  No, I'm not aware
12  of it, and I'm not sure she ever
13  worked on acetaminophen.  Did she?
14  QUESTIONS BY MR. MURDICA:
15  Q.  I'm just asking if you're aware
16  if she was invited to sign and didn't.
17  MR. SNIDOW:  Objection to the
18  form.
19  THE WITNESS:  I'm not aware.
20  QUESTIONS BY MR. MURDICA:
21  Q.  Okay.  Have you -- one of
22  the -- one of the main principles of the
23  navigation guide is to avoid bias, right?
24  A.  No.  One of the main principles
25  in navigation guide is to assess bias.

Page 319

1  Q.  Okay.  To assess bias.
2  According to the principles of
3  the navigation guide, do any of them apply to
4  the bias of the reviewer?
5  A.  Sorry, can you explain that?
6  Q.  Sure.
7  The navigation guide is
8  typically applied by a team, and their scores
9  of the articles are averaged, correct?
10  A.  Correct.
11  Q.  Okay.  And are the team usually
12  paid by one side of a litigation or another?
13  MR. SNIDOW:  Objection to the
14  form.
15  QUESTIONS BY MR. MURDICA:
16  Q.  In application of the
17  navigation guide?
18  A.  Again, I prepared the
19  navigation guide.  I made it transparent to
20  you.  If you think there is a bias there, you
21  need to tell me where.
22  Q.  Well, you made your own scores,
23  right, Dr. Baccarelli?
24  A.  I predetermined the scores
25  before starting the navigation guide, and

Page 320

1  then I scored all the papers according to
2  the -- to the levels of evidence.  And I made
3  it clear how I did it, so I think it's very
4  objective.
5  Q.  Okay.  So according to
6  Dr. Baccarelli, there's no subjective
7  elements of your scoring for any of the
8  papers, right?
9  A.  I think you understand that
10  every expert has subjective opinions, so I'm
11  no different from other experts.  So I have
12  opinions.  And if I'm proven to be wrong in
13  any of my -- the way I scored the paper,
14  I'm happy to discuss, and I'm happy to change
15  any score even on the spot.
16  I have to say, the evidence is
17  so overwhelming that you can change the score
18  as much as you want.  You can give me 200
19  reviewers.  We'll all come back with the same
20  ideas.
21  I mean, if you can find a
22  reviewer who will use the navigation guide or
23  any other tool, Bradford Hill, and disagree
24  with it, you will have to ask for an entire
25  list of papers and show -- let's say someone

Page 321

1  who doesn't know the literature or
2  misinterpret the literature says there is no
3  consistency.  I would doubt the sanity of
4  that person because there is huge consistency
5  across the literature.
6  So, I mean, it's possible
7  someone might do that, but I will worry about
8  that.
9  Q.  Did I ask you that,
10  Dr. Baccarelli?
11  MR. SNIDOW:  Objection to the
12  form.
13  THE WITNESS:  I just thought I
14  would offer --
15  QUESTIONS BY MR. MURDICA:
16  Q.  Okay.
17  A.  -- if you wouldn't mind.
18  Q.  Well, I do, because I only have
19  a limited amount of time.  So I'd like to get
20  my questions in, please.
21  A.  We professors tend to speak a
22  lot.
23  Q.  Yeah.
24  One of the first things that
25  you reviewed in this litigation was a

1  production by the United States Food and Drug
2  Administration, correct?
3      A.    I reviewed those productions at
4  some point, yeah.
5      Q.    Yeah.
6            And you saw that they also
7  assessed the literature, correct?
8      A.    They definitely report on the
9  literature.
10     Q.    And their conclusion was more
11 along the lines of what you believed in 2019
12 when you published the Laue article, correct?
13           MR. SNIDOW:  Object to form.
14           THE WITNESS:  I don't recall
15     that.  I don't think there is anything
16     to that effect.
17           The -- the production was
18     redacted.  I really don't know what is
19     their conclusion.  They -- I was
20     really -- it was interesting to me
21     because they seem to worry.  And the
22     reason why they were looking at it is
23     because they're concerned.
24           I don't think there was a
25     conclusion on that.

1  QUESTIONS BY MR. MURDICA:
2      Q.    Okay.  Did you see anything in
3  that production that you remember where FDA
4  made the same determination you did, that the
5  relationship is causal?
6      A.    So I'm used to work on the
7  literature.  I worked on the primary
8  literature.  I don't want to be biased by any
9  other body one way or another.
10           I was asked to give an opinion
11 based on the literature.  I, as you say, say
12 in my report I haven't taken into account the
13 FDA production one way or another.
14     Q.    Okay.  And would the same thing
15 apply to any company documents, the
16 defendants' production?
17     A.    Correct.  I have to say, all
18 these materials were very important to me
19 because it help me to make sure I considered
20 any possible concern.  And I did.
21           So there were a lot of concerns
22 that were raised by the FDA, were raised by
23 Johnson & Johnson, and I was able to address
24 those concerns so they're no longer a
25 concern.  The literature is bulletproof.

1      Q.    So you're relying on the
2  literature, not on any of the FDA documents
3  or the defendants' own documents, correct?
4      A.    My opinion, as it stand, is not
5  used on some -- it's not based on someone
6  else's opinion.  So if you're asking me
7  whether I base my opinion on the opinion of
8  FDA, Johnson & Johnson, the opinion of the
9  lawyers, the opinion of my colleagues, I
10 based my assessment on exactly the
11 literature.
12           I reviewed the papers.  I --
13 it's much easier to rely on someone else's
14 opinion.  It's much harder to do what I did,
15 to look at all the papers one by one.
16     Q.    Dr. Baccarelli, when is the
17 last time that you looked at Dr. Woodruff's
18 original 2014 publication of the navigation
19 guide?
20     A.    Probably when I started to do
21 this work.  Let's say in April.
22     Q.    Okay.  And did you say April?
23     A.    April 2013 {sic}.
24     Q.    Did you do the navigation guide
25 analysis first before you did Bradford Hill?

1      A.    I -- so the way -- the way it
2  is, I started with doing both, so I sat down
3  all the criteria how I was going to grade
4  each of the papers a priori, as requested by
5  the navigation guide.  So I wrote down the
6  criteria about the navigation guide, all the
7  criteria for Bradford Hill, and then I
8  started to work this through.
9            Of course the navigation guide
10 requires that each paper -- you can see the
11 tables at the end of my report.  The
12 navigation guide that requires that -- let me
13 get this.
14           So the request that while I
15 read the papers, I put them in these tables.
16 So I need to ask questions about selection,
17 about exposure outcomes, confounding,
18 incomplete outcomes, selective outcome
19 reporting, et cetera.
20           Then we need to add a table
21 with all the information and then one about
22 the evidence, which is sample size, large
23 effect, dose response, internal consistency,
24 control of bias, et cetera, et cetera.
25           So the navigation guide is a

Page 326

1 process where I document all of the papers
2 and I put them down.  And then of course the
3 Bradford Hill analysis comes along.
4        Essentially the Bradford Hill
5 analysis and the navigation guides are the
6 same process.  They use the same criteria.
7 You would recognize many of the Bradford Hill
8 criteria here.  So I could have used either
9 or both.
10        I would be surprised if the --
11 someone doing the navigation guide analysis
12 would come with a different conclusion
13 because of Bradford Hill, because they are
14 similar -- they are similar processes.
15        The navigation guide, though,
16 allowed me to document.  Again, the
17 navigation guide is not -- is not a way to
18 get an answer.  It's a way to document the
19 process.
20    Q.   Dr. Baccarelli, your Bradford
21 Hill analysis relies on your navigation guide
22 scoring of the studies, correct?
23    A.   No, that is not true.
24    Q.   Okay.
25    A.   The Bradford Hill analysis

Page 327

1 relies on the nine criteria of Bradford Hill.
2 So I reviewed the nine criteria, and I -- and
3 I -- and I concluded that it -- that in
4 parallel to the navigation guide.
5    Q.   Okay.  So each one, the
6 navigation guide analysis and the Bradford
7 Hill analysis, are separate and apart from
8 each other, right, Dr. Baccarelli?
9    A.   That's -- you can understand
10 very well that that is not true because the
11 papers are the same, so they cannot be
12 separate from each other.  They are just two
13 processes that follow similar criteria, and I
14 will be surprised if you use one of the other
15 you would have different results.
16        Bradford Hill simply doesn't
17 require the same level of transparency and
18 accountability the navigation guide allows.
19 So the navigation guide essentially is a way
20 to make the Bradford Hill analysis
21 transparent.
22    Q.   Okay.  So I just want to be
23 clear, because I don't think you've answered
24 my question, Doctor.
25    A.   I said no.

Page 328

1    Q.   You did not use the navigation
2 guide scoring in your Bradford Hill analysis,
3 correct?
4        MR. SNIDOW:  Objection to form.
5        THE WITNESS:  In the Bradford
6    Hill analysis, of course the same --
7    the same components that are in the
8    navigation guide end up in the
9    Bradford Hill analysis.  So as I said,
10    they're essentially the same process.
11        One makes this -- the Bradford
12    Hill analysis clear and transparent,
13    the navigation guide.  They're
14    essentially the same process.  So the
15    navigation guide is like a more
16    documented, more expanded Bradford
17    Hill analysis.
18 QUESTIONS BY MR. MURDICA:
19    Q.   So, Doctor, if you got a study
20 wrong in your scoring in the navigation
21 guide, that would have affected your Bradford
22 Hill analysis, correct?
23        MR. SNIDOW:  Objection to form.
24        THE WITNESS:  No.  There is not
25    one single scoring that can change the

Page 329

1    navigation guide or the Bradford Hill.
2        In order to change my opinion
3    on the navigation guide, I would have
4    to get half of the scoring wrong.
5        To be honest, the evidence is
6    so overwhelming that it really takes a
7    lot of mistakes to really change my
8    opinion for Bradford Hill.
9        And if you can find one score
10    that is wrong, that's okay.  I mean,
11    I'm not perfect.  I know that I can
12    make mistakes.  Most of us do.
13 QUESTIONS BY MR. MURDICA:
14    Q.   So your testimony then is the
15 navigation guide analysis is separate, apart
16 and independent from your Bradford Hill
17 analysis, correct?
18        MR. SNIDOW:  Objection to form.
19        THE WITNESS:  They are two --
20    these two are running parallel.  They
21    are very similar.  Some of the
22    criterias of the Bradford Hill
23    analysis are also included in the
24    navigation guide and vice versa.
25        I ran the Bradford Hill

analysis first, if I remember correctly, and I reached -- I reached some -- I ran the Bradford Hill analysis, and I reached some conclusions. And then I ran the navigation guide at a -- I reached some conclusion.

I need to point out it's the same type of studies, and it's me doing both. So I think it's pretty -- it's pretty clear that the two processes are interrelated.

QUESTIONS BY MR. MURDICA:

Q. Okay. So, Dr. Baccarelli, you reached your Bradford Hill conclusion first, and then you reached your navigation guide conclusion second, correct?

A. At the same time -- yeah, about the same. I'm not sure at this point, really.

Q. And both of those conclusions came in April 2023?

A. They came along the process. I can't remember. I mean, I really did this in March or April, so I had -- I made this

conclusion in my mind the problem existed before. Like in 2022 and 2021, I was pretty sure there was a problem.

When I started to do these -- these tables are actually pretty helpful, because when you finish and you step back, you see, I didn't expect this to be so consistent. I was blown away by this table. This table really blew me away for how consistent they are.

There is really very little example in the epidemiology literature of studies that are so consistent with each other that they help understand and read out a situation so clearly.

You asked me whether this can be subjective. This cannot be subjective. And honestly, this is why I have the tables, because anyone who reads these tables can reach my own conclusion.

Q. Have you ever worked with prospective, double-blinded data, Doctor? In epidemiology?

A. In epidemiology, as you know, it's very unusual. In epidemiology,

observational studies.

Q. Did you see when you reviewed the navigation guide that it's -- it was intended to be done -- to be performed by government agencies, professional societies, health care organizations, to analyze relationships between environmental exposures and outcomes?

A. And me. Correct?

I don't want to say I'm an organization, but I would say that if government organization rely on this --

Q. Dr. Baccarelli --

A. -- it's actually -- it's actually -- it applies also to me, correct?

I think I can -- I'm rising to the standards of government organizations. It's pretty flattering, actually, you're saying that.

Q. Dr. Baccarelli, are you aware of anyone individually doing a navigation guide analysis per the guide before?

MR. SNIDOW: Objection. Form.

THE WITNESS: Say that again?

QUESTIONS BY MR. MURDICA:

Q. Are you aware of any individual like yourself performing and publishing a navigation guide analysis before?

A. Again, I'm -- this really makes me even more convinced your comment, that if it were true, and perhaps you're right, if I'm the first one to use it, I should get a gold medal because I did a lot of work to make it transparent to you and to help you to understand that what I'm saying is true. And the judge, of course.

So probably what you're saying, that this standard of rigor and transparency are used is unusual for the scientist. And I feel you're commending me for using a higher level of transparency.

Q. I'm sure that that's what you think I meant.

What I'm asking you, Doctor, is whether you're aware of an individual performing a navigation guide analysis before -- while you know that the navigation guide says that it is meant to be applied by a team and to average the scores so that you

Page 334

1 get multiple points of input and not one
2 person's analysis in case they're biased,
3 right?
4        MR. SNIDOW:  Objection.
5 Objection to the form.
6        THE WITNESS:  Again, I -- you
7    just said that usually individuals
8    don't do that because it's run by
9    organizations.
10        I'm saying by doing the
11    navigation analysis, I held myself to
12    the highest possible standard.  It is
13    usually done by a government or an
14    agency.
15        And again, I disclosed my
16    criteria, I disclosed my opinions,
17    something, by the way, that the
18    epidemiologists you used didn't.  And
19    so I make my opinion transparent,
20    which is not something I can say about
21    you.
22        So if you are saying I'm
23    biased, I eliminated a lot of space
24    where I can be biased because I gave
25    it to you, all my scoring.  So if

Page 335

1    there is a way to show that I'm not
2    biased, this is the way.
3        And the navigation guide is --
4    I used the navigation guide exactly to
5    show that is the data, not me.
6 QUESTIONS BY MR. MURDICA:
7    Q.    Okay.  Are you aware,
8 Dr. Baccarelli, that the drafters of the
9 navigation guide say that assessing the risk
10 of bias needs to be independently determined
11 by multiple investigators?
12        MR. SNIDOW:  Objection to form.
13        THE WITNESS:  And again, I did
14    the risk of bias, and I documented
15    this.  So again, I think you -- if you
16    have any reason to think my navigation
17    guide is biased or wrong, I'm happy to
18    discuss.
19        I'm disclosing you the data and
20    my reasoning.  I'm not hiding it.
21    It's exactly the opposite of what you
22    seem to discuss, to suggest.
23 QUESTIONS BY MR. MURDICA:
24    Q.    Don't worry, Doctor, we're
25 going to go through your -- through your

Page 336

1 scoring.
2    A.    Fantastic.
3    Q.    Doctor, I'm going to ask you
4 about -- you have a website for your group at
5 Columbia, right?
6    A.    I have a website for my lab.
7    Q.    Right.
8        And your lab's website talks
9 about some of the things that you're
10 investigating, right?
11    A.    Very, very generally.
12    Q.    Very generally.
13        But it does identify some
14 things, right?  Pollutants?
15    A.    Very little.
16    Q.    Okay.  It doesn't say
17 acetaminophen, right?
18    A.    Acetaminophen is one of the
19 chemicals we use.  I'm sure we say
20 "chemicals."
21    Q.    Okay.  But you know it doesn't
22 say acetaminophen, right?
23        MR. SNIDOW:  Objection to form.
24        THE WITNESS:  I publish 650
25    papers.  About four on acetaminophen,

Page 337

1    and you can see that in my CV.
2 QUESTIONS BY MR. MURDICA:
3    Q.    One of the things that you
4 assessed in your navigation guide analysis
5 was sample size, right?
6    A.    Correct.
7    Q.    And you're critical of some
8 studies over sample size, right?
9    A.    I'm not critical.  I'm
10 assessing them, and I explain the criteria in
11 my -- that are predetermined in my navigation
12 guide analysis.
13    Q.    What was the sample size of the
14 population in Baker 2020 that had
15 acetaminophen exposure and ADHD?
16        MR. SNIDOW:  Object to the
17    form.
18        THE WITNESS:  I'm happy to -- I
19    can't remember in the top of my mind.
20    If you have the paper, I'm happy to
21    discuss.
22 QUESTIONS BY MR. MURDICA:
23    Q.    Well, the GESTE cohort --
24    A.    GESTE.
25    Q.    GESTE cohort only had 394

Page 338

1  meconium samples, right?
2      A.   Correct.
3      Q.   So it had to be less than 394,
4  right?
5          MR. SNIDOW:  Object to form.
6          THE WITNESS:  Maybe about that.
7      If you have the paper, we can start to
8      discuss it.
9  QUESTIONS BY MR. MURDICA:
10      Q.   Yeah.  I'm going to ask you
11  generally about GESTE first, and then we'll
12  get into it.
13          MR. SNIDOW:  Object to the
14      form.
15  QUESTIONS BY MR. MURDICA:
16      Q.   GESTE originally had 400
17  samples, and six of them weren't returned,
18  right?
19          MR. SNIDOW:  Object to the
20      form.
21          THE WITNESS:  I'll be happy to
22      discuss the paper.
23  QUESTIONS BY MR. MURDICA:
24      Q.   It's not in the paper.  I'm
25  just asking if you -- you know that this

Page 339

1  cohort has been used for multiple papers by
2  you and your colleagues, right?
3          MR. SNIDOW:  Object to the
4      form.
5          THE WITNESS:  Can -- I'm not
6      sure I understand the question.
7  QUESTIONS BY MR. MURDICA:
8      Q.   Sure.
9          GESTE is one grouping of
10  samples collected in Sherbrooke, Canada,
11  right?
12      A.   No.  It's a prospective study
13  of women and their children, follow-up
14  longitudinally for 12 years.  It's not a
15  group of samples.
16      Q.   Well, the meconium samples were
17  collected from 394 of them, correct?
18          MR. SNIDOW:  Objection to form.
19          THE WITNESS:  I'd be happy to
20      review the paper if you're interested
21      in -- exactly in the Baker 2020.
22  QUESTIONS BY MR. MURDICA:
23      Q.   I don't know what paper you
24  want me to give you, Doctor.  I'm asking you
25  about GESTE, from which you've published

Page 340

1  multiple papers.
2      A.   You mentioned Baker, I didn't.
3      Q.   Right.
4      A.   Baker 2020.
5      Q.   I'm asking about GESTE.
6      A.   Uh-huh.
7      Q.   Okay.  You don't recall how
8  many meconium samples are in inventory from
9  the GESTE study?
10          MR. SNIDOW:  Objection to the
11      form.
12          THE WITNESS:  It seems to be --
13      I mean, I'm happy to review what --
14      the analysis specifically, but it
15      seems to be the right -- 394 seems to
16      be the right number.
17  QUESTIONS BY MR. MURDICA:
18      Q.   Okay.  And some portion over
19  50 percent, I think you testified earlier,
20  had acetaminophen exposure in the meconium,
21  right?
22          MR. SNIDOW:  Object to form.
23          THE WITNESS:  55 percent had
24      detectable levels.  Among those
25      55 percent, there is a range of

Page 341

1      exposure from very low to very high
2      and everything in between.  So it's
3      not just the exposure, but there's --
4      there's not just yes or no, but there
5      is also a level.
6  QUESTIONS BY MR. MURDICA:
7      Q.   Okay.  So 55 percent, roughly
8  200 of 394, maybe a little more, had exposure
9  to acetaminophen --
10          MR. SNIDOW:  Objection.
11  QUESTIONS BY MR. MURDICA:
12      Q.   -- according to meconium,
13  right?
14          MR. SNIDOW:  Objection to form.
15          THE WITNESS:  I really don't
16      understand the word -- what is this
17      question?  Can you repeat it?
18  QUESTIONS BY MR. MURDICA:
19      Q.   Okay.  What's 55 percent of
20  394?
21          MR. SNIDOW:  Objection to the
22      form.
23          THE WITNESS:  I'm sure that
24      it's in the paper.  If you want to
25      look at the paper, they're in the

Page 342

1  paper --
2  QUESTIONS BY MR. MURDICA:
3      Q.   I don't know which paper you
4  want me to give you, Doctor.
5      A.   I don't know what answer you
6  want to give me.
7          MR. SNIDOW:  Hold on.  Hold on.
8      I've been extremely
9      well-behaved.  The reason he's
10     confused is because you mentioned
11     Baker, and now he'd like to see Baker.
12         MR. MURDICA:  That was a long
13     time ago --
14         MR. SNIDOW:  Do you want to
15     show it to him?
16         MR. MURDICA:  -- and it's not
17     what I'm asking about.  I'm not asking
18     about Baker.
19         THE WITNESS:  You did.
20         MR. MURDICA:  I just told you
21     I'm not asking about Baker, Doctor.
22         Do you need a break?
23         THE WITNESS:  No, no, we can
24     go.
25         What time is it?

Page 343

1          MR. SNIDOW:  It's 3:04.
2      Are you going to show him
3  Baker?  Do you have Baker?
4          MR. MURDICA:  Eventually.
5          MR. SNIDOW:  Okay.
6          MR. MURDICA:  When I'm going to
7  ask questions about it.
8          MR. SNIDOW:  All right.  All
9  right.
10         MR. MURDICA:  But right now you
11     guys are wasting my time.
12         Why don't you take a break.  If
13     you want to look at Baker -- I'm not
14     asking about Baker.  But why don't you
15     guys take a break and look at Baker.
16         MR. SNIDOW:  Wait.  Sorry.  Do
17     you need a break?
18         THE WITNESS:  I'm okay.
19         MR. SNIDOW:  All right.  You
20     keep asking questions.
21         MR. MURDICA:  Okay.  Let's try
22     to answer them, though, because now
23     you've just wasted ten minutes of my
24     time.
25         MR. SNIDOW:  At most, a minute,

Page 344

1      10.
2  QUESTIONS BY MR. MURDICA:
3      Q.   Doctor, you've published
4  multiple things from the GESTE cohort, right?
5      A.   Uh-huh.
6      Q.   Okay.  55 percent of the
7  samples of meconium had acetaminophen in
8  them, right?
9          MR. SNIDOW:  Objection to the
10     form.
11         THE WITNESS:  So there was an
12     entirety of, let's say, 400 people
13     with meconium.  400 children had
14     meconium and also had follow-up at
15     12 years, 10, 12 years.
16         All of this did that
17     informally.  You understand the sample
18     size is the total people, not just the
19     ones that had meconium -- that have
20     acetaminophen in meconium.  All of
21     them are in the analysis, so we are
22     considering two things, whether there
23     are meconium -- acetaminophen in
24     meconium or not and the levels.
25         So the entire -- the entire

Page 345

1  sample size is everyone who has
2  meconium.  It's not just the people
3  who are positive.  The people who are
4  positive are compared to the ones that
5  are negative for meconium.
6      Does it make sense?
7  QUESTIONS BY MR. MURDICA:
8      Q.   I understand, Doctor.
9      A.   Okay.
10     Q.   My question that I was trying
11 to establish is that the meconium -- the
12 acetaminophen-positive meconium samples are
13 55 percent of approximately 394, right?
14     A.   Correct.
15         MR. SNIDOW:  Objection to the
16     form.
17 QUESTIONS BY MR. MURDICA:
18     Q.   And I asked you if you could
19 either do the math or agree with me that
20 that's a little over 200 samples.
21     A.   So there are a little over 200
22 samples that get compared to a little over --
23 a little less than 200 samples in the entire
24 study.  It's what is said in the paper, and
25 I'm happy to review the paper with you again.

Page 346

1    Q.    And a portion of those, both
2  with and without acetaminophen, have
3  diagnoses of different neurodevelopmental
4  outcomes, right?
5    A.    Sorry.  You are talking about
6  Baker.  It's the only paper where we
7  published these results.  So I would like to
8  discuss Baker.
9    Q.    Okay.  You can have a break,
10 Doctor.
11         MR. SNIDOW:  No, he wants you
12 to show him the paper.  He doesn't
13 want a break.
14         MR. MURDICA:  You've taken
15 whatever papers you wanted in front of
16 you -- yeah.
17         THE WITNESS:  No, if you want
18 to discuss Baker, we should discuss
19 Baker.
20         MR. MURDICA:  I'm discussing
21 the GESTE cohort.
22         I conduct this deposition, not
23 you, Doctor.
24         THE WITNESS:  I -- I --
25         MR. MURDICA:  We're going off

Page 347

1  the record.  I need to talk to your
2  counsel.
3         VIDEOGRAPHER:  The time right
4  is now 3:07 p.m.  We are off the
5  record.
6   (Off the record at 3:07 p.m.)
7         VIDEOGRAPHER:  The time right
8  now is 3:16 p.m.  We are back on the
9  record.
10        (Baccarelli Exhibit 99 marked
11        for identification.)
12 QUESTIONS BY MR. MURDICA:
13   Q.    Dr. Baccarelli, you have in
14 front of you what's been marked as
15 Exhibit 99.
16         Do you recognize that as your
17 amended report?
18   A.    Yeah, this seems to be it.
19   Q.    Will you please turn to
20 page 15?
21   A.    Yeah.
22   Q.    Sorry, Doctor, I'm trying to
23 find something here.
24         I understand on the break you
25 took a look at Baker 2020.

Page 348

1    A.    Just a little bit.
2    Q.    Okay.  And was that marked?
3    A.    No.  It's here though.
4         (Baccarelli Exhibit 100 marked
5         for identification.)
6  QUESTIONS BY MR. MURDICA:
7    Q.    Okay.  So we'll mark that as
8  Exhibit 100.
9         Doctor, part of Baker 2020 --
10 you were involved in it, right?
11   A.    That is correct.
12   Q.    Okay.  Part of it was an MRI
13 analysis, right?
14   A.    That is correct.
15   Q.    Do you recall how many MRIs
16 were conducted at the time?
17   A.    It was a small subset of the
18 population.
19   Q.    And those --
20   A.    45, 50.  I can't remember
21 exactly.
22   Q.    The MRIs were of the
23 children --
24   A.    Of the children.
25   Q.    -- who at this point were now

Page 349

1  10 or 12, right?
2    A.    Correct.
3    Q.    And --
4    A.    10 or 12 years old.
5    Q.    Yes.
6         And part of the protocol was
7  that the children had to be off their ADHD
8  medication that day when they had their MRI,
9  right?
10   A.    Correct.  That is something
11 that our neuropsychologist, Dr. Posner, who
12 is an expert on ADHD -- he does that for a
13 living -- suggested that we had the kids off
14 medication because that will make the MRI
15 more accurate.
16   Q.    Right.
17         Because the medication itself
18 could show that -- the brain connectivity,
19 right?
20   A.    That is what I understand.
21   Q.    Okay.  At the time Baker 2020
22 was published, you actually had a lot more
23 MRIs, right?
24   A.    It is possible that we had more
25 MRIs, but I'm not sure.  I'm not sure what

Page 350

1 was the situation there.
2    Q.   Okay.
3    A.   I'm sure we put all the MRIs
4 for which we had complete data.  This is not
5 a subset of MRI.  All the MRI that were
6 eligible for the study, meaning we had
7 complete data to do the analysis we did here,
8 we don't withhold any MRI.
9    Q.   You sure about that?
10   A.   I'm pretty sure.
11   Q.   Okay.  How many MRIs do you
12 have done today?
13   A.   I can't remember.
14   Q.   Okay.
15   A.   I think it's 100 in total
16 today.
17   Q.   Okay.  Do you --
18   A.   I can't remember exactly.
19   Q.   Do you know, Dr. Baccarelli, if
20 that continued?  The MR -- accumulating MRIs
21 continued following this publication?
22   A.   Unfortunately, the -- we had
23 problems during COVID because we couldn't do
24 any more MRIs.  And therefore, we are not
25 doing them anymore right now.  This study --

Page 351

1 this study is finished.  The MRI study is
2 finished.
3    Q.   Okay.  Did you -- have you done
4 a new analysis now that you have 100 or so
5 MRIs?
6    A.   This is the complete MRI
7 subset.  What we have now -- what is here is
8 what the MRIs we have.  It is what I
9 understand.
10   Q.   So if you have 100 MRIs now,
11 they're all represented in the Baker 2020
12 publication?
13   A.   These are the MRIs that have
14 complete data.  I understand that these are
15 all of it.  There is a -- yeah, these are all
16 the -- the follow-up was -- was almost
17 complete at this time, so it's almost every
18 one.
19   Q.   Okay.  Do you know anything --
20 back to MRIs and the cessation of the
21 medication for the day of the MRI.
22        Do you know what medication was
23 recorded about the child as to the medication
24 that they were normally on?
25   A.   I'm pretty sure we have all of

Page 352

1 it.
2    Q.   Okay.  And do you know if their
3 last use was the night before or the morning
4 before the MRI or otherwise?
5    A.   So you just said that we had
6 them all for one day?
7    Q.   The day of MRI.
8    A.   For the day of the MRI.
9        I'm pretty sure that what the
10 protocol said was that to be off for
11 24 hours.  We asked them to have not for
12 24 hours.
13        I might be wrong about that,
14 but at the same time, I mean, that is -- that
15 is what I remember.
16   Q.   Okay.  When you were just
17 reviewing Baker 2020, which has been marked
18 as Exhibit 100 --
19   A.   Yeah.
20   Q.   -- do you recall seeing a
21 protocol that the children had to be off
22 their medication for 24 hours?
23   A.   I don't remember.  If you can
24 point me out -- by the way, these are two
25 different formats again.  You have one

Page 353

1 format, I have another.  So if you want to
2 point out stuff -- yeah, thank you.
3        MR. SNIDOW:  You want to
4    re-mark it then or what?
5        MR. MURDICA:  No, he's --
6        THE WITNESS:  I have the PDF.
7    You have -- you are looking at the --
8 QUESTIONS BY MR. MURDICA:
9    Q.   Yeah.  That's okay.  I have
10 nowhere to point you.
11        I'm asking you if you -- you
12 know, if you see anywhere --
13   A.   I thought it was 24 hours, but
14 honestly, I -- it might be the same day.
15        And again, we could have done
16 it with the drugs, but we did without because
17 we thought that would make it more sensitive.
18   Q.   Do you know the half-life of
19 Adderall, for example?
20   A.   A few hours.
21   Q.   It's not 12 hours; it's few
22 hours?
23   A.   Yeah.  12 hours.
24   Q.   Okay.  So if it's 12 hours and
25 the child had their medication the night

Page 354

1 before the MRI, the medication could still be
2 present, right?  Half of it?
3      A.   Of course.  Of course.  But
4 that wouldn't worry me at all.
5      Q.   Okay.  So if you look at the
6 study itself now, this was -- you were listed
7 as a supervisor, right?
8      A.   I was listed as the last
9 author.
10     Q.   Okay.  Well, let me see if your
11 version says that.
12          (Baccarelli Exhibit 101 marked
13     for identification.)
14 QUESTIONS BY MR. MURDICA:
15     Q.   All right.  I'm going to mark
16 an online version.
17     A.   Thank you.
18     Q.   Okay, Doctor.  Now on
19 Exhibit 101, you see there's a few extra
20 things here about funding and drafting?
21     A.   Yeah, I see it.
22          MR. SNIDOW:  Jim, do you have
23 one for me?
24          MR. MURDICA:  Yes.
25          MR. SNIDOW:  If not, it's okay.

Page 355

1          MR. MURDICA:  Actually, I
2 don't.
3          MR. SNIDOW:  Yeah.  It's --
4          MR. MURDICA:  I believe it's
5 been previously marked as Exhibit 19
6 as well.
7          MR. SNIDOW:  Okay.  Thanks.
8 QUESTIONS BY MR. MURDICA:
9      Q.   And you're listed as a
10 supervisor?
11     A.   Exactly.  I can explain exactly
12 why.
13          There is a doctor -- there are
14 three supervisors: Dr. Bellenger, who was an
15 expert in meconium; Dr. Posner, who was a
16 neuropsychiatrist, and his expertise all of
17 his life, works on brain MRIs and ADHD; and
18 Dr. Baccarelli, the epidemiologist.
19          So I'm the supervisor of
20 epidemiology.  Dr. Posner is the supervisor
21 of brain MRIs.
22     Q.   And my question was just
23 whether you're listed as a supervisor, and
24 you are, correct?
25          Doctor, do you see the conflict

Page 356

1 of interest section?
2      A.   Okay.
3      Q.   Do you see Dr. Posner lists
4 receiving consultancy fees from Innovative
5 Science Corporation?
6      A.   Okay.
7      Q.   All right.  You see that,
8 right?
9      A.   It is there.
10     Q.   And you agree that's
11 appropriate, to list as potential conflicts
12 of interest any consultancy fees that the
13 scientists are receiving from a third party,
14 correct?
15     A.   Only if related to the work
16 that is being -- that is being discussed.
17 Not all -- not everything -- any money you
18 get in the world.  Only if it can represent a
19 potential conflict of interest.
20     Q.   Okay.  And this study is about
21 ADHD, right?
22     A.   Correct.
23     Q.   I'm sorry?
24     A.   Yes, that's correct.
25     Q.   Okay.  Not about autism, right?

Page 357

1      A.   The study is about ADHD,
2 absolutely.
3      Q.   Okay.  So if we look at
4 results, you see some numbers here.
5          Acetaminophen was detected in
6 199 meconium samples, right?
7      A.   Where are you looking?
8      Q.   Results, page 4.
9      A.   Results, page 4.  Okay.  So
10 there are 355 children, which is the entire
11 sample size, and 199 had meconium.  Okay.
12     Q.   199 had meconium with
13 acetaminophen --
14     A.   With acetaminophen, correct.
15     Q.   Okay.  But you're also looking
16 for a diagnosis of ADHD, right?
17     A.   Correct.
18     Q.   And only 33 children had both.
19 Only 33 children had an ADHD diagnosis,
20 whether there was acetaminophen or not in
21 their meconium, right?
22     A.   There are 33 children, which is
23 about 10 percent.  Very consistent with the
24 prevalence in -- so we have 33 children in
25 345.  All 345.

Page 358

1  I want to point out that
2  meconium, because it's a -- it's valuable,
3  this number, provides a higher power than
4  yes/no.  So it's really important to point
5  out this is a difference.
6      And also, you will understand
7  that power is not just a function of sample
8  size but also the expected relative risk.  So
9  that's really important to keep in mind.
10     Q.   And you're saying that, Doctor,
11  because 33 sounds like a small sample size,
12  right?
13          MR. SNIDOW:  Objection to form.
14          THE WITNESS:  No.  I use that
15      because that sample size is smaller
16      than some of the studies that are in
17      the literature.  But I want to point
18      out that we have an advantage here,
19      that we are measuring -- we are
20      measuring the exposure in meconium,
21      which is expected to be more proximal
22      to the outcome.  And those are
23      expected to be more accurate, reflects
24      the entire pregnancy and therefore we
25      would expect to have a higher relative

Page 359

1      risk than the previous studies.
2          So if you ever -- you expect a
3      higher relative risk, you can conduct
4      a study with a smaller sample size,
5      and that is going to be informative.
6  QUESTIONS BY MR. MURDICA:
7      Q.   And you were critical of Laue
8  for having 115 sample size, right?
9      A.   So it's four times smaller,
10  looking at intelligence.  It's four times
11  smaller.
12     Q.   If you turn to page 5.
13     A.   Uh-huh.
14     Q.   The paragraph that begins with
15  the word "despite."  If you look at the third
16  sentence, it says, "No single observational
17  study is sufficient for a causal inference."
18      Do you see those words?
19     A.   What is it?
20     Q.   Where is it, or what is it?
21     A.   Yeah.  "No single observational
22  study is sufficient for causal inference."
23     Q.   Right.
24      Do you remember fighting me on
25  that earlier?

Page 360

1          MR. SNIDOW:  Objection to the
2      form.
3  QUESTIONS BY MR. MURDICA:
4      Q.   These are your words, right?
5          MR. SNIDOW:  Objection to form.
6          THE WITNESS:  I don't remember
7      that.  I really -- I really -- I
8      believe I agree with the idea that you
9      need many studies to --
10 QUESTIONS BY MR. MURDICA:
11     Q.   Okay.
12     A.   -- to get causal inference.
13     Q.   So these are your words.  "No
14 single observational study is sufficient for
15 causal inference."
16      Correct?
17     A.   I think that is what every
18 epidemiologist will tell you, and I will
19 stand by those sentences.
20     Q.   Okay.  And more observational
21 studies using direct measurements of fetal
22 acetaminophen exposure are needed, correct?
23     A.   That is really a very nice
24 desire.  At the same time, I mean, we would
25 love to do that, but the literature at this

Page 361

1  point, three years after the fact, maybe
2  four years because this paper was probably
3  written in 2019, the evidence is so
4  overwhelming that if I had to write this
5  today, I probably would say it would be nice
6  to have another study like this.  But there
7  is enough, really, to prove causation.
8      Q.   At this point in 2020 when this
9  was published, you believed and stood by the
10 words in here, correct?
11     A.   I -- again, I believed that it
12 would be helpful to have another study like
13 this.  At the same time, I didn't say there
14 is no causal evidence unless this is done.
15      And by the way, at the time, I
16 didn't know the existence of Ji, et al.  Ji,
17 et al., is a study also that uses biomarkers.
18 So it's really important for me to see that
19 there is another biomarker study that shows
20 the results consistent with ours.
21      And at the time, I didn't
22 realize that they were studying maternal
23 plasma and cord blood, which is fetal tissue,
24 also.  And they reported an association also
25 supporting the association, the link, between

1 acetaminophen and ADHD.

2      Q.    That answer you just gave, that

3 was about Ji?

4      A.    Ji.

5      Q.    Okay.

6      A.    Ji, et al.

7      Q.    Did I ask you about Ji?

8      A.    Yes.

9      Q.    I did?

10          Okay.

11     A.    Oh, yeah.  No, sir, you didn't.

12 I'm getting confused.

13     Q.    Okay.  One of the things that

14 was done here is the level of acetaminophen

15 in the meconium was broken into three -- two

16 groups in the exposed population, right?

17     A.    Correct.

18     Q.    And the midpoint to divide the

19 two exposed groups was just the 50th

20 percentile of the concentration of the

21 acetaminophen in the meconium, right?

22     A.    It was the median.

23     Q.    Okay.  It wasn't any particular

24 amount that was chosen ahead of time.  It was

25 just the middle, the average?

1      A.    It was chosen ahead of time to

2 be the median.

3      Q.    Okay.

4      A.    It's something that we do

5 commonly in epidemiology.  The median

6 provides the sweet point, the sweet spot,

7 where to cut a group because it provides the

8 best power.  So it is something that many

9 epidemiologists do.

10     Q.    In Laue, you were looking at

11 55 nanograms per gram, right?  That was a

12 specific point that was not the median,

13 right?

14     A.    Which is the same as the

15 difference between no acetaminophen and low

16 acetaminophen, I would say.  Unless I'm

17 wrong.  But that was the detection limit of

18 no versus yes.  Here we're splitting the yes

19 in two groups because we have more people.

20     Q.    And if you look at the actual

21 subjects that had a diagnosis -- well, that

22 had ADHD symptomology and acetaminophen in

23 the meconium, it's 25, right?

24     A.    We reviewed the group.

25 Altogether there are 33, correct?  They're

1 splitting three groups.  No acetaminophen, 8;

2 low acetaminophen, 9; high acetaminophen, 16.

3          You see a nice trend of

4 proportions going up from 5.5 percent of

5 children having acetaminophen in the --

6 having no acetaminophen and ADHD; 8.5 percent

7 low acetaminophen; 17.2 percent with high

8 acetaminophen and ADHD.  This is what you see

9 when you have a dose-response relationship.

10          I also want to point out that

11 we have an analysis where we looked at all

12 the data together, with no categories, where

13 we used the actual numbers, not just the

14 categories.  That is on the right-hand side

15 of Table 2 where we used the data altogether,

16 and that showed significant results.

17          For each dabbling, I believe,

18 in acetaminophen level, we get a 10 percent

19 statistically significant increased risk.

20     Q.    And this is all based on 25

21 meconium samples --

22     A.    No.

23     Q.    -- correct?

24     A.    It's based on -- it's based on

25 345 meconium samples.  All of them.  All of

1 them contribute to the analysis.  All of them

2 give information to the analysis.

3      Q.    Okay.  Dr. Baccarelli, is it

4 true or not true that in this study, in Baker

5 2020, Exhibit 100, there are 25 subjects that

6 have ADHD symptoms and acetaminophen in the

7 meconium?

8      A.    I don't think it's my role here

9 to go into epidemiology 101, but the power of

10 a study is contributed both by the cases and

11 the controls, the exposed and the unexposed.

12 So the entire power is given by 345 subjects.

13          You understand that the power

14 is due not just to the cases but the

15 controls.  You are trying -- you are

16 getting -- you are getting down to a subset

17 of the fourth groups of people -- or the

18 sixth group of people, actually, but the

19 power is based on 345 subjects.  It's not

20 based on only the group you are mentioning.

21     Q.    Okay.  I didn't ask you about

22 power, Dr. Baccarelli.  I asked you about

23 data.

24          Can you confirm the data, that

25 my number of 25 is correct?

Page 366

1    A.    You are asking about numbers,
2  and we are talking about sample size.  So
3  sample size and power are the same thing in
4  epidemiology.
5    Q.    Can you answer or not?
6    A.    I can answer.
7    Q.    In that article, Baker 2020,
8  were there 25 subjects that both had
9  acetaminophen in their meconium and symptoms
10 of ADHD as a child?
11   A.    So that is true.  As part of a
12 larger sample size of 345 people, including
13 34 that had ADHD, and with es -- very
14 inaccurate measurements in meconium.
15        And again, what makes this
16 study particularly stand out is the meconium,
17 but other studies have other strengths that
18 are -- that are not in the study.
19   Q.    How many of those 25,
20 Dr. Baccarelli, had delivery or labor
21 administration of acetaminophen according to
22 the hospital record?
23        MR. SNIDOW:  Objection to form.
24        THE WITNESS:  So, again, we are
25 talking about 345 children, so that

Page 367

1  is -- and some of them had
2  administration of acetaminophen
3  during pregnancy -- sorry, during
4  pregnancy, some at delivery, according
5  to the hospital charts.
6        And, again, we are schooled to
7  the subjects in a sensitivity
8  analysis.  The results were exactly
9  the same, so it doesn't make a
10 difference really.  Just
11 administration, this later
12 administration you're referring to, is
13 not influencing the results.
14 QUESTIONS BY MR. MURDICA:
15   Q.    Can you answer my question,
16 Dr. Baccarelli?  How many of the 25 had
17 acetaminophen administered at delivery?
18   A.    So as I sit here today, I
19 cannot remember.
20   Q.    Okay.
21   A.    If it's written in the paper,
22 I'm happy to discuss.
23        (Baccarelli Exhibit 102 marked
24        for identification.)
25

Page 368

1  QUESTIONS BY MR. MURDICA:
2    Q.    Please mark this as
3  Exhibit 102, please.
4        Dr. Baccarelli, do you
5  recognize what's been marked as Exhibit 102?
6    A.    Yes, the supplementary
7  materials.
8    Q.    Okay.  I'd like you to turn to
9  the fourth page when you're ready for me.
10 It's e Table 2.
11   A.    e Table 2.  Okay.
12   Q.    Okay.  So my first question,
13 Doctor, is a simple one.  If you look at the
14 column no acetaminophen -- do you see that?
15   A.    Uh-huh.
16   Q.    Do you see N equals 146?
17   A.    Correct.
18   Q.    Okay.  That's 146 meconium
19 samples, right?
20   A.    146 people with meconium
21 sampled, children and their mothers.
22   Q.    Okay.  And when it says
23 "female" and "male," you see 166 female and
24 179 male, right?
25   A.    Correct.

Page 369

1    Q.    Okay.  That doesn't add to 146,
2  correct?
3    A.    That seems to be a mistake.
4  Thank you for pointing it out.
5    Q.    Okay.  How about look over to
6  the next column.
7        199.  You see the same numbers,
8  right?  166 and 179?
9    A.    It seems like someone copied
10 and pasted, and we didn't catch it.  Thank
11 you.
12   Q.    Go down to maternal education.
13 154 and 191 in both columns, right?
14   A.    Absolutely.  They're all wrong.
15   Q.    The columns 2 and 3 appear to
16 be entirely in error, correct?
17   A.    Absolutely.  Just -- I want to
18 make sure you understand that the reason why
19 we are showing these is because we considered
20 these variables in a different part of
21 analysis.  We created ways on these
22 variables, and we used the actual variables,
23 not the ones that are shown in this table, to
24 adjust for confounding.
25        So we adjusted these in the

¹ confounding. You can be sure that the
² variables are right. Just the reporting is
³ not right.
⁴      And I'm sorry this happened.
⁵ I'm honestly mortified by this, but sometimes
⁶ these type of copy-and-paste errors happen.
⁷      Q.   The fourth column, Doctor, has
⁸ a weighting --
⁹      A.   Yeah.
¹⁰      Q.   -- and a standardization in the
¹¹ fourth and fifth column, right?
¹²      A.   Correct.
¹³      Q.   And those -- where did those
¹⁴ numbers come from?
¹⁵      A.   From the database.
¹⁶      Q.   Okay.
¹⁷      A.   Maybe we can read how it was
¹⁸ done.
¹⁹      Q.   You can read it if you want,
²⁰ Doctor. I'm just asking if you know.
²¹      You gave me an answer, so I'm
²² ready to ask another question.
²³      MR. SNIDOW: Objection to the
²⁴ form.
²⁵      MR. MURDICA: Well, he --

¹      MR. SNIDOW: Objection to the
² form.
³ QUESTIONS BY MR. MURDICA:
⁴      Q.   I have a question on the next
⁵ table when you are ready for it.
⁶      A.   Yes, please.
⁷      MR. SNIDOW: Objection to the
⁸ form.
⁹      THE WITNESS: So you asked me
¹⁰ how they were used.
¹¹      They were -- my understanding
¹² as I sit here today is that this is
¹³ related to page 175 of the PDF, which
¹⁴ is somewhere in the statistical
¹⁵ analysis.
¹⁶      Page 7 out of 23 of the
¹⁷ Exhibit 101. Data were analyzed from
¹⁸ September, et cetera, et cetera. To
¹⁹ control for potential confounders, we
²⁰ used the inverse probability weighting
²¹ for propensity score in this -- our
²² package. And in fact, we weighed all
²³ the potential scores and the way it
²⁴ was done, and we used these variables
²⁵ to adjust for potential confounders.

¹      And I think these variables are
² the same in this Table e2 in the
³ supplement. Unfortunately, the
⁴ breakdown is not right, but the
⁵ weights were calculated directly from
⁶ the data set. It's not that we used
⁷ the table to calculate the weights.
⁸ The weights are calculated by the
⁹ package by feeding the data as they
¹⁰ are in the data set.
¹¹ QUESTIONS BY MR. MURDICA:
¹²      Q.   And you're getting that from
¹³ reading the article, right?
¹⁴      A.   I'm getting that by knowing how
¹⁵ things are done.
¹⁶      Q.   Okay.
¹⁷      A.   And we don't use tables to do
¹⁸ these calculations. We use software. I
¹⁹ think you understand that the software is --
²⁰ the student who does the table can get it
²¹ wrong, but the software doesn't.
²²      Q.   Okay. Now, this study was part
²³ of Mr. Baker's dissertation, correct?
²⁴      A.   Uh-huh.
²⁵      Q.   And you advised him on what

¹ studies should be done, right?
²      A.   He actually came up with his
³ own ideas. All of this was -- he started
⁴ with this. I directed him. We directed him
⁵ as a team, and he came up with this -- he's a
⁶ pretty remarkable young individual, very
⁷ smart and very bright. And he did a lot
⁸ of -- he had a lot of ideas that I approved
⁹ and I seconded, and I think he did a pretty
¹⁰ good job.
¹¹      Q.   And he -- his original idea was
¹² to have an animal study as well, right?
¹³      A.   He did do an animal study.
¹⁴      Q.   Well, he had two aims, two
¹⁵ thesis aims, right?
¹⁶      A.   Correct.
¹⁷      Q.   One was the meconium?
¹⁸      A.   Correct.
¹⁹      Q.   And another was a mouse study,
²⁰ right?
²¹      A.   Which he published, I think, in
²² Baker 2023. I think it's that one.
²³      He didn't do the animal study
²⁴ with me. He did it with Dr. Pearson.
²⁵      Q.   Yeah.

Confidential - Subject to Protective Order

Page 374

1  Do you remember that originally
2 they were supposed to be together and you
3 recommended he talk to Dr. Pearson, or no?
4  A.  Can you please remind me that?
5 I'm not sure -- I'm not sure I remember the
6 situation.
7  Q.  That's okay.
8  A.  I don't do animal studies, so
9 certainly he didn't do animal studies with
10 me.
11  Q.  All right.  Do you recall
12 getting a draft of the meconium portion of
13 the study?
14  A.  No.  I'm sure I did, but I
15 don't remember every draft.
16  (Baccarelli Exhibit 103 marked
17  for identification.)
18 QUESTIONS BY MR. MURDICA:
19  Q.  Have you seen this before,
20 Doctor, what's been marked as Exhibit 103?
21  A.  Yep.
22  Q.  Okay.  And do you see -- this
23 is by Mr. Baker, right?
24  A.  Yes, it is.
25  Q.  And he identifies in the first

Page 375

1 paragraph that one issue with the DNBC cohort
2 is that self-reported drug use may be
3 inaccurate, and metabolism of acetaminophen
4 may vary between individuals, right?
5  A.  Again, this is -- we are
6 highlighting the strengths of our study,
7 which is having meconium.  And I think I said
8 before on record that if that is the case,
9 it's probably biasing the results towards the
10 null in the Danish cohort, meaning the Danish
11 cohort is likely to underestimate the risk
12 posed by acetaminophen.
13  Q.  And that's what you think he
14 meant here when he wrote what I just said?
15  A.  What is the sentence exactly?
16  Q.  "One limitation of the study
17 was that it relied on self-reported
18 acetaminophen via telephone interviews.
19 Self-reported drug use may be inaccurate.
20 Metabolism of acetaminophen may vary between
21 individuals."
22  MR. SNIDOW:  Where are you,
23 Jim?
24  MR. MURDICA:  First paragraph.
25  MR. SNIDOW:  Oh, okay.  Thank

Page 376

1 you.
2  THE WITNESS:  Correct.  And we
3 follow by saying, "Thus, a biological
4 measure of acetaminophen would likely
5 provide a more reliable estimate of
6 exposure."
7  And I think the body of the
8 evidence shows that.  I don't think my
9 report.  We showed a relative risk
10 with having acetaminophen that was in
11 this paper that eventually came out
12 two or three years after.  We have an
13 odds ratio with high acetaminophen of
14 3.6.
15  So this 360 percent higher than
16 people are not exposed in this study,
17 while in Liew -- I can't remember
18 which Liew it is.  Liew has a lot of
19 papers.  But it might have been like
20 30 percent, 40 percent or 50 percent.
21  So clearly I stand by his
22 words, because the data show that
23 having a better -- a better method of
24 exposure makes easier to detect the
25 association.

Page 377

1  And if there is one thing
2 remarkable here is that even with
3 wisterniles {phonetic}, there are
4 10 -- 20-plus studies that showed an
5 association, even though you would
6 expect that the self-report would bias
7 everything toward the null or cleared
8 false negatives.  Instead, we have a
9 lot of true positives.
10 QUESTIONS BY MR. MURDICA:
11  Q.  Dr. Baccarelli, do you see that
12 Dr. Baker said the results of this pilot are
13 likely unreliable with such a small sample of
14 ADHD-positive children?
15  MR. SNIDOW:  Where is that?
16  THE WITNESS:  Where is that?
17 QUESTIONS BY MR. MURDICA:
18  Q.  It's the second paragraph,
19 third sentence.
20  A.  I really don't know what it is,
21 but if you can see the pilot analysis, there
22 is only one case of ADHD without
23 acetaminophen detected in meconium.
24  So I can't remember which
25 subset it is, but it's in another subset we

Page 378

1 published. It was a preliminary analysis,
2 and I'm happy we published an analysis with
3 many more samples.
4     Q.    Well, Doctor, if you look at
5 the chart right below the pilot analysis, you
6 see that there's 222 samples with
7 acetaminophen detected in meconium and 172
8 without, right?
9     A.    Correct.
10     Q.    Right.
11         And there's 11 ADHD diagnoses
12 with acetaminophen in meconium and one
13 without.
14     A.    Okay.
15     Q.    Do you see that?
16     A.    I see that.
17     Q.    This is the same cohort that
18 was ultimately published. This is the GESTE
19 cohort, right?
20         MR. SNIDOW: Objection to form.
21         THE WITNESS: It seems to be
22 the same. I don't know why these
23 results were different. I --
24 definitely we do a lot of iterations
25 of analyses, and you can understand

Page 379

1 that the odds ratio -- the risk ratio
2 here is 8.5.
3         So if we published this, the
4 results would be even stronger. And
5 we didn't do the regions. We
6 completed the data set. We waited for
7 all the samples. We -- and the
8 analysis show what we find here.
9         So I can stand by Baker 2020.
10 I cannot stand by the pilot analysis.
11 The pilot analysis is just for
12 internal use to guide our thinking.
13 QUESTIONS BY MR. MURDICA:
14     Q.    In the pilot analysis, when
15 there were 12 ADHD diagnoses with
16 acetaminophen -- or 11 with acetaminophen
17 detected in meconium, was enough for
18 Dr. Baker to say that it's likely unreliable
19 with such a small sample of ADHD-positive
20 children, right?
21     A.    That is what Dr. Baker said. I
22 mean, you will have to ask him, though.
23     Q.    And ultimately, you published
24 with 25. The 11 was unreliable, right?
25     A.    I didn't publish with 25. I

Page 380

1 published with 345 children, and 33 who had
2 ADHD.
3         And that is, in my opinion,
4 enough for this paper. This paper is a -- is
5 a good piece of literature, that put in the
6 context of all the other papers in the
7 universe of papers is very consistent with
8 the other 45 papers in the literature.
9         If this were an outlier, I
10 would be worried. This is not an outlier.
11     Q.    Doctor --
12     A.    This is one of the papers that
13 together with the other 30 confirms my
14 assessment of causality.
15     Q.    Dr. Baccarelli, where did the
16 extra 20 ADHD diagnoses come from between
17 this draft, Exhibit 103, this pilot analysis,
18 and the final publication?
19     A.    It comes from -- you need to
20 ask Baker. I don't know how -- how -- what
21 is the difference, really.
22     Q.    Okay. And you --
23     A.    As it stand today -- I can look
24 for it up for you, but as it stand today, I
25 don't know what is the difference.

Page 381

1     Q.    And you disagree with him that
2 with a total of 222 and 172, with 12 ADHD
3 diagnoses, that this is likely unreliable
4 with such a small sample of ADHD-positive
5 children, right?
6         MR. SNIDOW: Object to the
7 form.
8         THE WITNESS: I actually -- I'm
9 not sure I agree. I mean, he doesn't
10 show me a p-value. He doesn't show me
11 a confidence interval. It gives me a
12 risk ratio of 8.5, which is pretty
13 high.
14         And, I mean, I'm happy we
15 did -- we published with more samples,
16 but, you know, a risk ratio of 8.5 in
17 the literature probably is significant
18 from this data. Would have been an
19 interesting result.
20         And again, he said that, and
21 that's okay. I mean, you can
22 understand that this is an internal
23 document to prepare a data analysis
24 plan. And I reviewed it being worried
25 that what he was proposing was a

Page 382

1 different analysis. Had nothing to do
2 with Baker 2020. Was interesting and
3 reliable.
4     I didn't thoroughly review the
5 rest of the document as carefully as I
6 do when something goes out in the
7 press.
8     At the same time, you would
9 agree that these results here give
10 about the same conclusion as the
11 result here in the -- in the
12 meta-analysis plan, give about the
13 same conclusion as the one here in the
14 study.
15     The conclusion is that there is
16 a strong possible association between
17 meconium -- between acetaminophen
18 measured in meconium and a risk of
19 ADHD in children.
20     And if any, this is less -- is
21 weaker in terms of strength of
22 association in terms of effect size
23 than the one you see here in the
24 meta-analysis plan.
25

Page 383

1 QUESTIONS BY MR. MURDICA:
2     Q.    Exhibit 103, Dr. Baker said,
3 would be unreliable because of sample size --
4     MR. SNIDOW: Objection to the
5 form.
6 QUESTIONS BY MR. MURDICA:
7     Q.    -- correct?
8     A.    You need to ask him about that.
9     Q.    Okay. And if I wanted to know
10 where the extra 20 cases came from in that
11 cohort in order to get it published, I'd have
12 to ask him, right?
13     MR. SNIDOW: Objection to the
14 form.
15     THE WITNESS: So they came --
16 they came in from the data cleaning at
17 follow-up. We were completing the
18 database. The database were completed
19 over time.
20     Why he's -- he had only these
21 cases, I don't know. I don't know
22 what exclusions he used. They're not
23 written in this manuscript.
24     Perhaps he used only the ones
25 that had the -- not neuropsychological

Page 384

1 scores he had.
2     There are many ways you can --
3 you can create exclusionary and
4 inclusion criteria. This is not
5 documented here, so it's impossible
6 for me to tell you what -- to
7 reconstruct what happened.
8     (Baccarelli Exhibit 104 marked
9 for identification.)
10 QUESTIONS BY MR. MURDICA:
11     Q.    Okay. Doctor, we have marked
12 as number -- Exhibit 104 the Baker 2020 draft
13 which you reviewed.
14     Do you recognize that?
15     A.    Yes.
16     Would you be able to tell me
17 when this was circulated?
18     Q.    I would not, but my question is
19 simple, and I only have one for now, so you
20 may be able to get by without that.
21     MR. SNIDOW: Objection to the
22 form.
23 QUESTIONS BY MR. MURDICA:
24     Q.    If you turn to page 1191.
25     A.    1191.

Page 385

1     Q.    If you look at comment AB 19,
2 what the comment is, and correct me if I'm
3 wrong, is that though the manuscript says
4 there's 76 MRIs, you're saying, well, we
5 actually have 101. I know you want to
6 publish it, but there's more MRIs now.
7     MR. SNIDOW: Sorry, I'm
8 actually lost now.
9     On 10 -- 191?
10     MR. MURDICA: Yeah, 1191,
11 comment AB 19.
12     MR. SNIDOW: Do you see it?
13 Yeah.
14     THE WITNESS: Yeah, this is
15 about the MRI. Only specific about
16 the MRI.
17 QUESTIONS BY MR. MURDICA:
18     Q.    That's all I'm asking you
19 about.
20     MR. SNIDOW: What are you
21 asking?
22     Objection to the form.
23 QUESTIONS BY MR. MURDICA:
24     Q.    Okay. Do you remember I asked
25 you before about how many MRIs you had?

Page 386

1   A.   Correct.
2   Q.   Right.
3        So at the time that this --
4   prior to publication, while it was being
5   edited, AB pointed out in a comment that
6   there were actually 101 now, right?
7   A.   Okay.  I discussed this with
8   Baker.  I discussed with Posner.  We agreed
9   that the number that we had was enough.
10       As you understand, this was --
11  the MRI is not the main focus of this
12  manuscript.  The main focus of this
13  manuscript is the association between
14  meconium, acetaminophen and ADHD.  And this
15  uses the full study.
16       The MRI is supporting evidence
17  that also helps understand the circulus.  And
18  it was agreed between Dr. Posner and
19  Dr. Baker, who -- that -- that we -- that the
20  number we had was enough for the publication.
21  So it expanded the -- waiting for the data to
22  come in and being clean was not worth it, but
23  given that we were -- that we were ready to
24  publish this manuscript.
25  Q.   So you have a third more MRIs

Page 387

1   that weren't analyzed at the time you
2   published, correct?
3   A.   And I don't think we ever
4   analyzed it.
5   Q.   Okay.  You have a third more
6   that you did not analyze at the time of
7   publication and you have not analyzed to
8   date.
9        Is that your testimony?
10  A.   We haven't analyzed them to
11  date --
12  Q.   Okay.
13  A.   -- and I would be surprised if
14  it changes anything in the publication.
15       Usually when you increase the
16  sample size, you see more.  We saw already
17  enough.  So an increase in sample size would
18  have shown more effect than what we showed
19  there.
20  Q.   But you don't know what it
21  would have shown, because you didn't analyze
22  it, right, Doctor?
23       MR. SNIDOW: Objection to the
24  form.
25       THE WITNESS: Again, it's only

Page 388

1   one-third more, so I think it's okay.
2   QUESTIONS BY MR. MURDICA:
3   Q.   Okay.  You rely heavily on the
4   MRI analysis in your scoring of this paper,
5   correct?
6   A.   No, I relied a lot on the
7   meconium --
8   Q.   Okay.
9   A.   -- and I said the MRI is nice
10  to have.  Not a must have.  I wouldn't have
11  changed the score if the MRI was not there.
12  Q.   Okay.  One more question on
13  1198.
14  A.   1190 -- same --
15  Q.   Same document.
16  A.   Same draft.
17  Q.   There's a sentence, "Taken
18  together with the relatively small MRI sample
19  size, studies in larger and more diverse
20  cohorts are needed to replicate these novel
21  findings."
22  A.   What is it?
23       MR. SNIDOW: Yeah, where?
24       MR. MURDICA: 1198.  It's the
25  second sentence.

Page 389

1        MR. SNIDOW: Oh, I'm sorry.  I
2   was looking --
3        THE WITNESS: Yeah.
4        MR. SNIDOW: -- at comments.
5   QUESTIONS BY MR. MURDICA:
6   Q.   And then there's a comment on
7   it, right?
8   A.   Yeah.
9   Q.   Okay.  So my question for you
10  is, do you agree that the MRI sample size is
11  relatively small?
12  A.   Yeah, but it's enough to see an
13  effect.  So it's pretty interesting that we
14  see an effect.
15  Q.   Okay.  Move on to the next one.
16       Can you turn back to Exhibit
17  99?
18       MR. SNIDOW: Whenever you want.
19  You need to have a break?
20       THE WITNESS: Okay.  Bathroom.
21  Thank you.  Sorry.  I was more --
22       MR. SNIDOW: Are we off the
23  record?
24       MR. MURDICA: Yeah.
25       VIDEOGRAPHER: The time right

Page 390

1   now is 3:56 p.m.  We are off the
2   record.
3    (Off the record at 3:56 p.m.)
4       VIDEOGRAPHER:  The time right
5   now is 4:15 p.m.  We are back on the
6   record.
7   QUESTIONS BY MR. MURDICA:
8       Q.   Dr. Baccarelli, could you --
9   welcome back.
10      Are you ready to proceed?
11      A.   Yes, please.
12      Q.   Can you please put your amended
13  report, Exhibit 99, back in front of you?
14      A.   Yeah.
15      Q.   Would you turn to page 14,
16  please.
17      A.   Uh-huh.
18      Q.   Okay.  So one of the things you
19  say on page 14, the -- under extraction of
20  important study information is your last
21  sentence, "I did not perform a new
22  meta-analysis myself because excellent
23  meta-analyses have recently been published."
24      Do you see that?
25      A.   Yeah, there are meta-analysis

Page 391

1   that have been published.  I didn't do one
2   myself.
3       Q.   Okay.  And that was -- that was
4   your determination, and you put that there,
5   right?
6       A.   Correct.
7       Q.   Okay.  All right.  If we turn
8   to page -- I may be wrong here -- 63.
9       A.   5-3?
10      Q.   6-3.
11      A.   6-3?
12      Q.   Do you see at the bottom of the
13  page, paragraph, "Accurate and complete
14  ascertainment of cases"?
15      A.   Yep.
16      Q.   And case-control studies, et
17  cetera?
18      A.   Uh-huh.
19      Q.   And you can -- it goes on to
20  the next page and ends with, "For both types
21  of studies, cases should be confirmed with
22  reasonable certainty."
23      Right?
24      A.   I'm sorry, let me take a look.
25      Yeah.

Page 392

1       Q.   Now, does reasonable certainty
2   mean medical record confirmation?
3       A.   No, it doesn't mean medical
4   record confirmation.  It can be done in
5   multiple ways.  In this case of ADHD and ASD
6   has been done in multiple ways.
7       And different streams of
8   evidence give different information.  So I
9   found actually the variety of tools that been
10  used to be very interesting because they
11  provide complementary information.
12      Q.   Okay.  Dr. Baccarelli, do you
13  work with any other epidemiologists outside
14  of Columbia?
15      A.   Yes.  I worked with about 100
16  or 200 institutions all over my career.  Most
17  of them are epidemiologists.
18      Q.   Did you work with any other
19  epidemiologists on this report?
20      A.   No.
21      Q.   You didn't have any
22  epidemiologists write any parts of this
23  report?
24      A.   No.
25      Q.   Okay.

Page 393

1       A.   Only me.
2       Q.   Do you know someone named Anne
3   McTiernan?
4       A.   Sorry, what is the name?
5       Q.   Anne McTiernan?
6       A.   No.
7       Q.   Do you have any -- you don't --
8   you've never met her?
9       A.   I don't recognize the name.
10      Q.   Okay.  Could you explain why
11  this expert report is identical in over 60
12  places to an expert report that she's filed
13  in another case?
14      A.   No.
15      Q.   Okay.  It just -- it's pure
16  coincidence if that's the case?
17      A.   I don't know.  I mean, I don't
18  know that person.
19      Q.   Okay.  You chose the words in
20  here, right?
21      A.   Yes.
22      (Baccarelli Exhibits 105 and
23      106 marked for identification.)
24  QUESTIONS BY MR. MURDICA:
25      Q.   Okay.  You know what, I'm going

Page 394

1 to mark the McTiernan report as Exhibit 105.
2        I'm also going to mark the Ji
3 article as Exhibit 106.
4        Okay.  Doctor, you now have in
5 front of you an article by Ji that you
6 referenced earlier, which has been marked as
7 Exhibit 106.
8        Do you see that?
9     A.    Yes.
10     Q.    Okay.  You agreed with me
11 earlier that cord blood provides information
12 on one snapshot of time for acetaminophen
13 use, correct?
14     A.    So cord blood only captures the
15 level of acetaminophen a few hours before
16 pregnancy.  But at the same time you -- I
17 think Ji, et al., make the argument that it
18 can also be reflective of prolonged use in
19 the same women.
20     Q.    Ji, for example, said the cord
21 plasma measurement may at most reflect
22 maternal use of acetaminophen during the
23 peripartum period, correct?
24     A.    Correct.  That is pretty
25 impressive, because that means in the

Page 395

1 nonexposed there are a lot of women that
2 indeed use acetaminophen, but they're not
3 include -- including the exposed group.  So
4 this article is likely to be biased toward
5 the null, while instead it shows an
6 association.
7        So if this article were null, I
8 would be very worried about your statement
9 because I would be worried about this being a
10 false negative.
11        But because it is positive, it
12 cannot be a false positive.  It's even more
13 likely to be a true positive.
14     Q.    Because women are taking
15 acetaminophen for -- during labor and
16 delivery?
17     A.    Because misclassification --
18 because there is mis -- you are arguing there
19 is misclassification, that exposure doesn't
20 reflect the entire pregnancy.  So we are
21 mixing up.  In the group of people who are
22 nonexposed, there is a mix of people who
23 actually are exposed.  So we are diluting the
24 association.
25        There is a bunch of people that

Page 396

1 are in the reference that shouldn't be there.
2 So if they were not there, if we're able to
3 separate, the observation would be much
4 higher.
5     Q.    Doctor, that's -- are there
6 also not a bunch of -- bunch of people, to
7 use your terms, that are having acetaminophen
8 for the first time in their pregnancy due to
9 labor and delivery?
10     A.    It's entirely possible.
11     Q.    Wouldn't that bias it the other
12 way, Doctor?
13     A.    How would it bias the other way
14 around?  Sorry?
15     Q.    If many of these subjects
16 are -- only have acetaminophen in the cord
17 blood because of administration to their
18 mother during labor and delivery, otherwise
19 they were unexposed, that could bias it
20 towards a positive association, correct?
21     A.    So strictly speaking, labor or
22 delivery is still pregnancy, correct?  The
23 baby hasn't come out yet.
24     Q.    You testified earlier, Doctor,
25 that you don't have the information here

Page 397

1 today to say that exposure to acetaminophen
2 during labor and delivery is causal for the
3 outcomes of autism and ADHD.
4     A.    I did --
5        MR. SNIDOW:  Hold on.  Hold on.
6 Objection to the form.
7        THE WITNESS:  I definitely
8 didn't say that.  I said that labor
9 and delivery is part of pregnancy.
10 And my statement is that the whole of
11 pregnancy is a vulnerable period.  And
12 I even went on to say that the weeks,
13 days and even years after pregnancy
14 might be important.
15        Just I clarified that -- and I
16 wrote in my report there is an entire
17 chapter about this -- that there have
18 been plenty of studies adjusting
19 for -- adjusting the association of
20 acetaminophen during pregnancy with
21 ADHD, ASD and other neurodevelopmental
22 disorders for whether people have
23 taken or not, children have taken or
24 not, acetaminophen after delivery and
25 during childhood, and that is not a

Page 398

1  factor.
2       So I think you are
3  misrepresenting what I said.
4  QUESTIONS BY MR. MURDICA:
5       Q.   Okay.  The court -- let me try
6  again.
7            According to Dr. Baccarelli,
8  one exposure to acetaminophen, one time at
9  the time of delivery, is enough to induce
10 autism or ADHD in a child, correct?
11           MR. SNIDOW:  Objection to the
12 form.
13           THE WITNESS:  So I believe I
14 wrote in my report that I have
15 reasonable certainty to state that
16 there is an association between
17 acetaminophenal -- acetaminophenal --
18 acetaminophen and neurodevelopmental
19 disorders, particularly ADHD and ASD,
20 particularly when women have taken the
21 drug for 28 days and more, cumulative,
22 at any time during pregnancy.
23      So I stand with what I wrote.
24 QUESTIONS BY MR. MURDICA:
25      Q.   Okay.  So back to my original

Page 399

1  question.
2            If a woman takes acetaminophen
3  for the first time of her pregnancy at the
4  time of delivery, that was not an exposure
5  for 28 days or more during pregnancy,
6  correct?
7            MR. SNIDOW:  Objection to the
8  form.
9            THE WITNESS:  So, again, all --
10 my standing, that is based on the
11 epidemiology studies that have used
12 the medication reported by the women.
13 Now we are looking at one -- at one
14 single point where women are exposed
15 to acetaminophen.
16      It's really impressive that
17 this happens, because if you didn't
18 find anything, you could say, okay,
19 but they measured once.
20      But since they found it, it's
21 pretty impressive they found it.  It
22 can be that, as you say, one time is
23 okay, is enough to cause the effect,
24 but it might be that the women who
25 have taken acetaminophen around the

Page 400

1  time of delivery might have taken it
2  for six months, two years, might have
3  low back pain.  They might have
4  persistent headaches.
5            There are many reasons why
6  women take acetaminophen for long
7  time, and it might be those women who
8  take acetaminophen for long time who
9  are included in the exposed group,
10 including with others who have taken
11 just in the past few hours.
12 QUESTIONS BY MR. MURDICA:
13      Q.   And that data was not collected
14 by Ji, correct?
15      A.   I -- again, you have to ask
16 them for that.  I don't see it in the paper.
17      Q.   Yeah.
18           In fact, this -- the cord blood
19 wasn't collected to study acetaminophen,
20 right?
21      A.   That, I don't know.
22      Q.   Okay.
23      A.   You will have to tell me, or
24 you have to ask Ji.
25      Q.   Okay.  Have you ever seen any

Page 401

1  information about the acetaminophen use of
2  the mothers here, other than the
3  acetaminophen level in the cord blood at the
4  time of delivery?
5      A.   Again, a biomarker study don't
6  need that information.  When you do a
7  biomarker study, you are interested in
8  associating the biomarker with the outcome.
9  In this case, ADHD and ASD in this paper.
10     Q.   Dr. Baccarelli, do you know the
11 standard medication or medications given to a
12 woman to prepare for a cesarean section?
13     A.   I have some idea from my
14 medical education.
15     Q.   And what do you think that is?
16     A.   Probably -- I don't know.
17     Q.   Do you have any guesses?
18          MR. SNIDOW:  Objection to the
19 form.
20          You really want him to guess?
21          MR. MURDICA:  Well, he's the
22 expert.
23          MR. SNIDOW:  Not on -- not on
24 how to do a C-section.
25          THE WITNESS:  I've never done a

Page 402

1    C-section. I can -- I can tell you
2    that none --
3  QUESTIONS BY MR. MURDICA:
4    Q.   Okay.
5    A.   I'm not planning on doing any
6  in the near future.
7         I -- in addition to that, I
8  think we reviewed that the data by Baker
9  stand alone without the perinatal
10 administration.
11        There are also -- also, many
12 studies have been adjusted for the type of
13 delivery, so I think we are covered on that.
14        And, again, there are many
15 questions you can ask about issuing a study,
16 but when you look at the totality of studies,
17 there is no doubt.
18   Q.   Okay. Back to my question,
19 which was, do you know what medications are
20 administered to a woman in preparation for a
21 cesarean section?
22        And the answer is, you don't
23 know, right?
24   A.   People might take
25 acetaminophen, might take other drugs. But

Page 403

1  again, that doesn't change anything about the
2  conclusion of this study.
3    Q.   Okay. Ji says, "Because of our
4  observational study design, we were unable to
5  exclude the potential residual confounders
6  because of unmeasured genetic and
7  environmental factors."
8         Do you remember reading that?
9    A.   Yes.
10   Q.   And Ji believes that, right?
11   A.   Where is that?
12   Q.   That is in the last page,
13 second to last sentence before the
14 conclusion.
15   A.   Okay.
16   Q.   Starts with "fourth."
17   A.   Uh-huh.
18   Q.   You agree this is an
19 observational study design?
20   A.   We are using 50 papers that are
21 observational, as you understand. So all of
22 our discussion for seven, eight hours today
23 is about observational studies.
24   Q.   So you have no information --
25 you haven't talk to Ji, right?

Page 404

1    A.   I haven't talked to Ji.
2    Q.   You take Ji at his word that
3  they were unable to exclude the potential
4  residual confounders because of unmeasured
5  environmental factors, right?
6         MR. SNIDOW:  Objection to the
7    form.
8         THE WITNESS:  You'll have to
9    discuss this with Ji.
10        But what I can say is that I
11 take it very seriously, and I did an
12 analysis in my navigation guide, and
13 that the analysis that I did exclude
14 potential residual confounders,
15 particularly the genetics that have no
16 standing whatsoever.  Genetics has
17 absolutely nothing to do with this.
18        And the measured confounders
19 are incredibly unlikely to bias the
20 results and especially to affect my
21 conclusion.
22 QUESTIONS BY MR. MURDICA:
23   Q.   Okay. Dr. Baccarelli, when you
24 had that exchange with Dr. Liew, did he
25 tell -- did he agree with you that he has no

Page 405

1  concern about genetics?
2    A.   If you want to review the
3  e-mail with me, I'm happy to discuss that in
4  detail.
5    Q.   Okay. You today have no
6  concern about genetic confounding, correct?
7    A.   So both Zeyan Liew and I agreed
8  that the genetic has been -- a concern has
9  been raised. I was worried, he was worried,
10 and we both agreed together. He confirmed my
11 opinion that genetics was not the explanation
12 for what we are seeing here. The genetics
13 absolutely has nothing to do with this.
14        If you want to discuss
15 genetics, the matter of the subject, I'm
16 happy to discuss why I think that. I put in
17 my report, and I'm happy to give you any
18 information about that.
19        (Baccarelli Exhibit 107 marked
20    for identification.)
21 QUESTIONS BY MR. MURDICA:
22   Q.   Dr. Baccarelli, you have in
23 front of you what's been marked as
24 Exhibit 107.
25        Earlier you were telling us

Page 406

1 about an e-mail exchange that you had with
2 Dr. Liew, and I believe you said you had
3 reviewed it recently, right?
4     A.    Correct.
5     Q.    Okay.  And is this that e-mail
6 exchange?
7     A.    Yes.
8     Q.    Okay.
9     A.    From June 2nd, so it's not
10 very -- yeah.
11    Q.    This is very recent.  This is
12 June 2nd of this year, on the eve of you
13 providing your expert opinions here, right?
14    A.    Correct.  I was working on
15 these, and I wanted to make sure that I
16 didn't miss anything about Stergiakouli,
17 because they are two papers that both provide
18 very little evidence about the role of
19 genetics.  But one contradicts the other
20 without referencing each other, the
21 Stergiakouli 2016, I think, and Leppart 2019.
22    Q.    And if we look at this chain,
23 you can confirm for us that you never told
24 Dr. Liew that you were working for one side
25 of the litigation, correct?

Page 407

1     A.    Absolutely, I didn't.
2     Q.    Okay.
3     A.    But I'm planning to actually
4 discuss with him in the future my -- the
5 outcome of my work with this because I would
6 love to involve him in writing the paper I
7 mentioned before.
8     Q.    Okay.  Dr. Baccarelli, one of
9 the things you say is that the Baker paper
10 came under fire because we did not control
11 for genetics, right?
12    A.    I think I read that in the FDA
13 production and perhaps in the J&J production.
14 So there were a few -- and obviously there
15 were commentaries in the literature also
16 published about that.
17          And I wanted to make sure I was
18 covering all the bases, which, by the way, I
19 did.  I wrote in my report the genetics is
20 not an issue.  Genetics absolutely has
21 nothing to do with this causation.  It's --
22    Q.    What certifications do you have
23 in genetics, Doctor?
24    A.    I have a postdoc from the
25 Division of Cancer Epidemiology at the NIH.

Page 408

1 I worked for three years and a half in
2 genetic epidemiology at the NIH as a postdoc,
3 so I formally trained in genetic
4 epidemiology.
5     Q.    Okay.  And one of the things
6 that you saw that you didn't understand was
7 that the polygenic risk score analysis by
8 Stergiakouli seemed to explain that
9 acetaminophen was not the cause of ADHD in
10 that study, right?
11          MR. SNIDOW:  Objection to the
12    form.
13 QUESTIONS BY MR. MURDICA:
14    Q.    It was actually the mediator.
15          MR. SNIDOW:  Objection to form.
16          THE WITNESS:  Can you repeat
17    that again?
18 QUESTIONS BY MR. MURDICA:
19    Q.    Sure.
20    A.    I am very confused about all
21 these arrows that you are drawing, in my
22 mind.
23    Q.    Well, you decided you need --
24 you needed to ask Dr. Liew a question because
25 you didn't understand why one of the studies

Page 409

1 seem to suggest that acetaminophen was the
2 mediator, not the cause, of ADHD
3 relationship.
4          Right?
5     A.    Acetaminophen -- no, I don't
6 think I said that, that -- none -- I don't
7 think Stergiakouli talks about mediation.
8     Q.    He talks about polygenic risk
9 scores, right?
10    A.    Correct.  Stergiakouli talks
11 about polygenic risk scores, and it shows no
12 association between genetics for ADHD, I
13 believe, in Stergiakouli 2016, and taking
14 Tylenol.
15          So if the objection here is
16 that -- as I say, my paper came under fire on
17 the idea that women who have higher genetic
18 risk factors for ADHD, and it must meet the
19 risk factor to their children, they would
20 also take more Tylenol.
21          Stergiakouli 2016 shows that it
22 is not true.  There is no association
23 whatsoever between the ADHD genetics -- it
24 might be also ASD.  Now I don't remember
25 exactly what Stergiakouli does.

1 　　　　But I'm sure that applies also
2 to ASD, that there is -- there was no
3 association between having genes in the
4 mother that can be transmitted to the
5 children and taking Tylenol.
6 　　　　So if you have genes that
7 are risk factors for ASD, or supposed to be
8 risk factors for ASD, these women don't take
9 more Tylenol.
10 　　　　And particularly Leppart shows
11 that there is -- this association doesn't
12 exist for ASD.  So all this idea that
13 genetics is important is based on nothing.
14 　　　　Women who have high risk of ASD
15 due to being genetic -- having genes that are
16 a risk for ASD, they don't take more Tylenol.
17 And this is -- shows in Leppart.
18 　　　　So if they don't take more
19 Tylenol, genes are not a confounder.  Genes
20 have nothing to do with this, as I mentioned.
21 　　Q.　　Dr. Baccarelli, Leppart finds
22 that genetics is the issue, right?
23 　　A.　　No.
24 　　Q.　　And that's why -- that's why
25 you chose to write Dr. Liew?

1 　　　　MR. SNIDOW:  Objection.
2 　　　　THE WITNESS:  No.  No.  Leppart
3 　　writes something that is completely
4 　　different from Stergiakouli.
5 QUESTIONS BY MR. MURDICA:
6 　　Q.　　Okay.  Were there more or less
7 alleles identified in 2019 than there were in
8 2016 associated with ADHD or autism?
9 　　　　MR. SNIDOW:  Objection to the
10 　　form.
11 　　　　THE WITNESS:  The Leppart and
12 　　Stergiakouli used two different
13 　　reference materials.  One is based on
14 　　the additional UK studies, and one is
15 　　based on a more generalizable data
16 　　set, and they still have questions.
17 　　　　By the way, I wrote to
18 　　Stergiakouli asking whether they would
19 　　explain to me why they used two
20 　　reference materials and did not reply.
21 　　　　So at the point, I'm not even
22 　　sure whether Leppart is right or
23 　　Stergiakouli is right.
24 　　　　Stergiakouli has a point there,
25 　　that they use a reference for their

1 epigenetic score that these -- that is
2 based on UK and the Irish.  They seem
3 to be use a European database that
4 might even be less applicable in
5 Leppart.
6 　　　　By the way, Leppart, which is
7 the newer one that you say perhaps had
8 more genes, shows no association with
9 the ASD.  Genes for -- with
10 acetaminophen.
11 　　　　Genes for ASD, women who have
12 genes for ASD in their -- in their DNA
13 don't take more acetaminophen.  All
14 this argument that genetics --
15 genetics is important for ASD
16 causation due to acetaminophen is
17 based on zero data.  But it's zero,
18 meaning zero close to zero zero.
19 QUESTIONS BY MR. MURDICA:
20 　　Q.　　How about ADHD, Doctor?  Is
21 that what Leppart said with regard to ADHD?
22 　　A.　　What Leppart says is that there
23 is a very weak association between having
24 genes for ADHD and taking acetaminophen.
25 　　　　If you have the paper, I'm

1 happy to discuss it with you.
2 　　Q.　　Okay.  Later in the e-mail,
3 Dr. Liew replies.  First he had an error in
4 his reply, and he deleted some, and it looks
5 like he sent it again.
6 　　　　Right?
7 　　A.　　Yeah, I didn't even notice at
8 the time.  I read just the last one.
9 　　Q.　　And he says, "I also have been
10 worrying about genetic confounding because my
11 analyses of the Danish National Birth Cohort
12 did not have genetic data and that we did
13 observe a considerable drop in effect size
14 when adjusting for maternal mental illness."
15 　　　　You saw that, right, at the
16 time?
17 　　A.　　Correct.
18 　　Q.　　And I read that correctly now,
19 right?
20 　　A.　　Correct.
21 　　Q.　　Okay.  And so all of the Liew
22 studies --
23 　　　　MR. SNIDOW:  Sorry, Jim, I'm
24 　　lost.  Where are you?
25 　　　　MR. MURDICA:  I'm at the top of

Page 414

1    14578.
2         MR. SNIDOW:  Okay.  Thank you.
3    QUESTIONS BY MR. MURDICA:
4         Q.    The Liew studies, and any study
5    that analyzed the Danish National Birth
6    Cohort, couldn't control for genetic
7    confounding, and here Liew is telling you
8    they actually saw a drop when they adjusted
9    for maternal mental illness.
10        A.    I believe that's in their
11   paper, is it?
12        Q.    Right.
13            And remember I was asking you
14   before if you accounted for maternal mental
15   illness?
16        A.    This has been looked in tens of
17   papers.  There are tens of papers adjusted
18   for maternal mental illness.  Maternal mental
19   illness is not the problem.
20        Q.    And he says -- well, your
21   opinion that maternal mental illness is not
22   the problem, right?
23            MR. SNIDOW:  Object.  Objection
24   to form.
25            THE WITNESS:  Let me rephrase

Page 415

1    that.
2            Maternal mental illness is not
3        artificially causing the association
4        that we see between acetaminophen and
5        ADHD, ASD and other neurodevelopmental
6        disorders.
7    QUESTIONS BY MR. MURDICA:
8         Q.    Why didn't you tell Dr. Liew
9    that when you wrote back?
10        A.    Because we were discussing
11   genetics, and Dr. Liew seemed to be pretty
12   confident about his results.
13            We are talking about genetics,
14   and Dr. Liew concurred with me that genetics
15   is not a problem.  So he clearly leaves --
16   that derives, at least in my mind -- if I'm
17   wrong, I'm happy to be corrected -- that he
18   was also not that worried in the end about
19   mental illness.  Because, again, genes have
20   nothing to do with this.  There's really very
21   little you can say about genes.
22        Q.    He told you he was not that
23   worried about maternal mental illness?
24        A.    No.  He told me -- he concurred
25   with me that there is no -- there is very

Page 416

1    little evidence that genes have anything to
2    do with this.
3            So he said -- I was worried
4    because the illness.  I looked at the genetic
5    data.  The genetic data took my -- my
6    concerns addressed.  You can see that in that
7    e-mail.
8         Q.    Did you see that Dr. Liew is
9    saying they're now collecting some -- they
10   have some polygenic risk score data for ADHD
11   and ASD in the DNBC, but it's rather
12   challenging to use genetic data, and he's
13   trying to hopefully inform the debate?
14        A.    It would be wonderful if they
15   did.  At the same time, based on the evidence
16   that I reviewed with you, again, Stergiakouli
17   shows no association between genes for ADHD
18   and taking acetaminophen.  So women who have
19   higher genetic risk scores for ADHD takes no
20   more acetaminophen.
21            Leppart suddenly shows a weak
22   association.
23            And also I have to say, they
24   also adjust -- in Stergiakouli they also
25   adjust the association between acetaminophen

Page 417

1    and the hyperactivity for the genes.  So
2    really -- they really put the confounders in
3    the model and shows that their results are
4    still there.
5            So APAP cause hyperactivity,
6    actually ADHD with hyperactivity,
7    independently of the polygenic risk score and
8    depending on the genes.
9            Leppart shows a small
10   association within -- between polygenic risk
11   scores for ADHD and acetaminophen, and again
12   shows no association whatsoever with autism.
13            So all these genes of autism
14   that people say are so important for -- those
15   are genes for autism and not for ADHD.  I
16   think you would agree that the genetic
17   component of ADHD is somehow smaller than the
18   one for autism.
19            So the concern is much bigger
20   for autism.  And guess what, women who --
21   women who have higher risk scores, genetics,
22   for autism take the same acetaminophen as
23   women who don't.  So there is -- there is no
24   case with genetics.  I'm sorry.
25        Q.    Doctor, I asked you about

Page 418

1  Dr. Liew's additional data he's getting.
2         Have you talked to him since
3  this e-mail chain?
4     A.    No.
5     Q.    So you don't know if he's --
6  how the review of that data is coming out?
7     A.    If you like to talk to him, I
8  mean, you can.
9     Q.    In talking about Leppart, you
10  say, "It seems they use some arbitrary
11  cutoff, and I am still worried that if they
12  used it as a continuous numerical scale they
13  could have gotten stronger associations."
14    A.    Uh-huh.
15    Q.    Those were your words, right?
16    A.    Absolutely.
17    Q.    You were concerned that if
18  Leppart had used a different scale, they
19  would have found an even stronger association
20  with genetics, which would go against what
21  you had already determined at this point was
22  a causal relationship, right?
23         MR. SNIDOW:  Object to form.
24         THE WITNESS:  I hadn't finished
25    my analysis yet.  I was still

Page 419

1    considering all the objections.
2         So I did -- I got my final
3    analysis and my final determination
4    after this e-mail.  So this was part
5    of my final determination on how to
6    assess genetics.  I was trying to
7    figure out exactly how to assess
8    genetics, and this was really helpful
9    because it really helped me to
10    understand -- to shed light on genes.
11    And genes have nothing to do with the
12    causation between ADHD -- between
13    acetaminophen and disease.
14  QUESTIONS BY MR. MURDICA:
15    Q.    Okay.  So this Stergiakouli and
16  Leppart issue that you identified to Dr. Liew
17  starting on May 29th, at that point you
18  hadn't made your causal determination between
19  acetaminophen and the outcomes of ADHD and
20  ASD, correct?
21         MR. SNIDOW:  Objection to the
22    form.
23         THE WITNESS:  I hadn't still
24    finished my report, so I was still in
25    time to change my determination if I

Page 420

1    wanted to.
2  QUESTIONS BY MR. MURDICA:
3     Q.    Had you just found Leppart at
4  that time, when you e-mailed Dr. Liew?
5     A.    No.  I found Leppart much
6  before.  I found Leppart with the papers when
7  I did my PubMed search and the other searches
8  in March.
9     Q.    Dr. Baccarelli, your name was
10  on another paper with Dr. Baker in 2022
11  titled "Association of Prenatal Acetaminophen
12  Exposure Measured in Meconium With Adverse
13  Birth Outcomes."
14         Right?
15    A.    Yes.
16    Q.    And that was just looking at
17  non-neurological adverse outcomes, right?
18    A.    I think so.
19         (Baccarelli Exhibit 108 marked
20    for identification.)
21  QUESTIONS BY MR. MURDICA:
22    Q.    Doctor, you should now have in
23  front of you what's been marked as
24  Exhibit 108.
25         Do you recognize Exhibit 108?

Page 421

1     A.    Yes.
2     Q.    And this is another meconium
3  study, right?
4     A.    Yes.
5     Q.    Okay.  And this is something
6  with your name on it, right?
7     A.    Correct.
8     Q.    Okay.  If you turn to page 6.
9         Now this is in April of 2022,
10  right?
11    A.    Uh-huh.
12    Q.    Okay.  Page 6, if you look on
13  the right-hand column, the first full
14  paragraph, you wrote, "While the associations
15  of prenatal acetaminophen exposure with
16  adverse birth outcomes found here may be
17  concerning, more studies in a diverse range
18  of cohorts are needed before suggesting a
19  change in clinical practice."
20         Those are your words, right,
21  Doctor?
22    A.    Where is it?  Sorry, where is
23  it?
24         So we are talking about
25  something different here.  There is neonatal

1  development here, correct?  So we are talking
2  about birth weight, preterm weight,
3  gestational age, small and large for
4  gestational age, gestational diabetes,
5  preeclampsia and high blood pressure.  So
6  this is not related to the discussion today.
7      Q.    Okay.  So you're not -- you're
8  not considering autism or ADHD or
9  neurodevelopmental disorders as adverse birth
10 outcomes here?
11         MR. SNIDOW:  Objection to the
12 form.
13         THE WITNESS:  So this is
14 written in the -- so birth outcome is
15 an outcome typically that can be
16 measured at birth.  So I think we
17 agree that we cannot measure autism or
18 ADHD at birth or during pregnancy.
19         It seems like that we also have
20 here -- we put under the umbrellas a
21 few outcomes that are not just birth
22 outcomes but also pregnancy
23 complications.  So the title should
24 have been pregnancy complications and
25 birth outcomes.

1      And the birth outcomes here are
2  birth weight, preterm birth, and small
3  and large for gestational age.
4  QUESTIONS BY MR. MURDICA:
5      Q.    Okay.  In April 2022,
6  Dr. Baccarelli would not suggest a change in
7  clinical practice as it relates to prenatal
8  acetaminophen exposure, correct?
9      A.    I didn't say that.  The paper
10 doesn't say that.
11         It just says there is -- that
12 we published the result on something that has
13 nothing to do with neurodevelopment, and this
14 data are not enough to tell people that all
15 the kids are both small or large, and all the
16 kids are -- and that acetaminophen is causing
17 gestational diabetes, it's causing eclampsia,
18 it's causing preterm birth, it's causing high
19 blood pressure in the mother.
20     Q.    Okay.
21     A.    So this paper has very
22 little -- very little to do with what we are
23 discussing today.
24     Q.    I just want to understand your
25 testimony, for the world that reads this, is

1  that in April 2022 -- well, let's do some
2  foundation.
3         In April of 2022, did you
4  believe that acetaminophen caused adverse
5  neurological outcomes when there was in utero
6  exposure?
7      A.    In April 2022, I was pretty
8  convinced that there was a problem.
9      Q.    Okay.  Notwithstanding that you
10 were convinced there was a problem, you put
11 words in a published paper in April 2022 that
12 more data was needed before there was a
13 change in clinical practice with respect to
14 acetaminophen, but only with respect to other
15 birth outcomes.
16         That's your testimony, right?
17         MR. SNIDOW:  Objection to form.
18         THE WITNESS:  So as you see at
19 the end of this paper, we say that we
20 want more work for this about -- but
21 it's not related to NDDs.
22         If I had written a paper on
23 neurodevelop -- on NDDs at the time, I
24 would have used a different statement.
25         This statement can be read only

1  in relation to the birth outcomes,
2  which again are at birth.  So
3  everything I say in this paper applies
4  to birth outcomes.
5         I mean, I agree with you that
6  this statement, perhaps, would have
7  been to be qualified more, so probably
8  if I -- if after you made this
9  objection I would have the opportunity
10 to rewrite this paper, I would
11 probably rewrite it in a way that is
12 more qualified related to high blood
13 pressure of the mother, related to low
14 birth weight, related to high birth
15 weight, related to gestational age.
16         So that is what I will say
17 there.  I would be happy to write this
18 statement if I had the opportunity to
19 do it now.  Perhaps it's not the most
20 accurate statement I've ever written.
21 QUESTIONS BY MR. MURDICA:
22     Q.    Dr. Baccarelli, you don't --
23     A.    But I think you understand in
24 the context of the paper what this means.  I
25 mean, I get --

1    Q.   You want the people reading
2  this transcript to believe that you thought
3  acetaminophen caused autism and ADHD, but you
4  still weren't changing clinical practice in
5  2022 with respect to other adverse birth
6  outcomes, right?
7         MR. SNIDOW:  Objection to the
8  form.
9         THE WITNESS:  Again, you can
10  pick out a sentence out of a paper,
11  but the paper is pretty clear we are
12  talking only about certain outcomes.
13  And what I -- what this statement is
14  meant to be is to say that the
15  evidence we are providing in this
16  single paper about something that has
17  nothing to do with neurodevelopment is
18  not enough to influence practice.
19         Other types of evidence can.
20  QUESTIONS BY MR. MURDICA:
21    Q.   Okay.  Doctor, there was a
22  Baker 2023 article as well that you
23  referenced earlier, right?
24    A.   Yes, I believe so.
25    Q.   That was the second part of the

1  dissertation proposal that you helped Brennan
2  Baker, right?
3    A.   No.  They -- Brennan was
4  supervised by two scientists.  One is me, and
5  one is Brandon Pearson.  So for that part of
6  the dissertation, it was under Brandon
7  Pearson's supervision.
8         And you had an opportunity to
9  speak with Brandon, so I'm sure he would --
10  if you asked him, he would have told you all
11  about the paper.
12    Q.   Okay.  It was part of the
13  proposal that Baker made to you for --
14  prior to him getting his degree, correct?
15    A.   He didn't make it to me.  He
16  make it to the -- to the school.
17    Q.   Okay.
18    A.   And he made it to the two PIs,
19  two principal investigators, who supervised
20  him.
21         So for that part of the study,
22  I completely deferred to Brandon.  I don't do
23  animal studies, so --
24    Q.   You don't recall reviewing
25  his targeted outcomes for his dissertation

1  and one of them being an animal study?
2    A.   Oh, I did review the outcome,
3  but, again, we are a team, and that was under
4  Brandon Pearson's supervision, not mine.
5         (Baccarelli Exhibit 109 marked
6  for identification.)
7  QUESTIONS BY MR. MURDICA:
8    Q.   Okay.  I'm marking Baker 2023.
9         Okay.  Now, Doctor, you now
10  have in front of you what's been marked as
11  Exhibit 109?
12    A.   Uh-huh.
13    Q.   Do you recognize this as
14  Baker's animal study from 2023?
15    A.   Yes.
16    Q.   Okay.  And you see up top it
17  says 2023?
18    A.   It does.
19    Q.   Now, if you look at the
20  introduction, the second paragraph -- by the
21  way, it's -- Pearson is also on this.
22         You said that, right?
23  Dr. Pearson?
24    A.   Yes, Pearson is the senior
25  author and the supervisor of Baker for this

1  paper.
2    Q.   Okay.  So he reviewed this --
3  in your lab, in your group, you expect other
4  doctors and scientists to review their papers
5  before they go out to the publication, right?
6    A.   I do review papers.  I hope
7  Brandon does as well.
8    Q.   Okay.
9    A.   I'm not in his lab.  As I said,
10  he's in a different lab.  He's the director
11  of his own lab.  I'm the director of my own
12  lab.
13    Q.   Did you look at this one before
14  it went for publication?  Do you know?
15    A.   I don't think so.
16    Q.   Okay.  Do you see the second
17  paragraph?  It says, "Despite such widespread
18  use, evidence from human observational
19  studies suggests that prenatal APAP exposure
20  may be associated with ADHD."
21    A.   Yes.
22    Q.   Okay.  That doesn't say cause,
23  right?
24         MR. SNIDOW:  Object to form.
25         THE WITNESS:  I think it's

Page 430

1  pretty similar.  Maybe associated
2  doesn't say.  It is 50 percent.  Is it
3  more?
4        It doesn't say we are
5  100 percent sure this is absolutely
6  causal, but it says there is a lot
7  of -- there is a lot of papers that
8  are consistent with causality,
9  correct?
10 QUESTIONS BY MR. MURDICA:
11     Q.    Well, you're sitting here today
12 saying it's causal, right, Doctor?
13     A.    Absolutely.
14     Q.    Okay.
15     A.    And again, I did not write this
16 paper, so I cannot --
17     Q.    Right.
18        You're not on this paper.
19     A.    I cannot be responsible for
20 whatever Brandon and Brennan wrote here.
21        At the same time, I have to
22 say, as I read it today, this is -- evidence
23 from human observational studies suggest that
24 APAP exposure prenatally may be associated
25 with attention-deficit/hyperactivity

Page 431

1  disorder.  So I leave it up --
2     Q.    You would disagree with them,
3  right?  You would say, actually it's causal,
4  right?
5        MR. SNIDOW:  Objection to the
6  form.
7        THE WITNESS:  What I -- what I
8  would say today, as I sit here after
9  having been done the navigation guide
10 analysis and looking at -- that it's
11 more likely than not, and it's
12 reasonable that -- the only reasonable
13 explanation to all the associations,
14 including dose, explained here is that
15 the association is causal.
16 QUESTIONS BY MR. MURDICA:
17     Q.    Okay.  And if you look in the
18 next column, the last sentence, it says, "For
19 instance, maternal polygenic risk scores for
20 ADHD are associated with use of APAP during
21 late pregnancy," citing Leppart, "indicating
22 a strong potential for genetic confounding."
23        Do you see that?
24     A.    I would disagree with that.
25     Q.    Yeah.  That was going to be my

Page 432

1  question.  So you disagree with them on that
2  one.
3        And then it says, "Furthermore,
4  a sibling study that examined unmeasured
5  familial confounding in the Norwegian
6  national cohort found a substantial family
7  effect, suggesting that unmeasured familial
8  factors, including genetics, may partially
9  explain the association between APAP use with
10 child ADHD."
11        And it cites Gustavson, right?
12     A.    Yeah.  And that is really wrong
13 because there are two studies only with
14 sibling-control designs.  And again, sibling
15 controls are really -- are really difficult
16 to do because siblings are very similar to
17 each other.  So when you use siblings as
18 control, you run the risk of any association
19 going away.
20        So first of all, Gustavson is
21 the smallest study in the literature.  You
22 argued about my study.  That's a study with
23 only 34, perhaps, informative units.  34 in
24 total, I mean, and using a yes/no
25 classification of acetaminophen,

Page 433

1  self-reported.  So much less power than any
2  study I ever did, including the one with 120
3  that we agreed is a small study.
4        Plus, the association is weak.
5        Plus, I have to say, it's
6  really impressive that another study from the
7  same group as Gustavson, the data by
8  Brandlistuen, all do expect the sibling
9  studies to make every association within
10 acetaminophen and neurodevelopment go away,
11 the sibling-control study actually did show
12 an association.
13        So you have a design that is
14 likely to produce false negatives, and
15 everyone would expect it to produce false
16 negatives, and instead it produces a true
17 positive.
18        So you can understand that
19 sibling-control studies are actually pretty
20 strong.  I would differ with what they wrote
21 here.  And this is something, honestly, I
22 started to understand only recently by
23 looking at the papers and reading them.
24     Q.    You disagree with your
25 colleagues, right?

Page 434

1    That was my question, and you
2  just gave a long answer.
3        MR. SNIDOW:  Objection to the
4    form.
5        THE WITNESS:  The answer -- the
6    answer is that I disagree that the
7    genetic confounding is an issue here.
8  QUESTIONS BY MR. MURDICA:
9    Q.    Okay.
10   A.    There is no evidence in the
11  literature that genetic confounding is
12  causing the problem here.  Acetaminophen is.
13   Q.    Would you look at page 11,
14  please?
15   A.    (Witness complies.)
16   Q.    Now, when did you find out that
17  Dr. Pearson was working with the plaintiffs'
18  lawyers on this case?
19   A.    I think in March when we met at
20  the Society of Toxicology, he mentioned that
21  he was working with the lawyers.
22   Q.    Okay.  Do you see the
23  declaration of competing interests here on
24  the left-hand column?
25   A.    Okay.

Page 435

1    Q.    There's no disclosures, right?
2    A.    Okay.
3    Q.    Okay.  If Dr. Pearson was
4  working for the plaintiffs' lawyers at this
5  point in this litigation when this was
6  published in 2023, would you expect him, when
7  performing studies on acetaminophen, to
8  disclose that he was being paid in a
9  litigation over acetaminophen?
10        MR. SNIDOW:  Objection to the
11    form.
12        THE WITNESS:  I have to say, do
13    you know when this paper came out?
14        The paper was received in
15    August 2022, was accepted 18
16    December 2022.  So the disclosure was
17    probably filed 18 December 2022.  Or
18    usually it's filed at the time the
19    paper is submitted.
20        So you will have to ask the
21    lawyers here whether in August 18,
22    2022, that Dr. Pearson had already
23    been retained.
24  QUESTIONS BY MR. MURDICA:
25   Q.    If he had been retained, you'd

Page 436

1  expect him to disclose that, right?
2        MR. SNIDOW:  Objection to the
3    form.
4        THE WITNESS:  I -- that is
5    something to ask him.  It's up to
6    individual scientists to decide what
7    represents a conflict of interest.
8        Anyone has their own judgment,
9    and I trust Dr. Pearson to have good
10    judgment.
11        By the way, Dr. Pearson is one
12    of the most conscientious people I've
13    ever met in my life.  You can be sure
14    that he would -- he has done due
15    diligence.
16  QUESTIONS BY MR. MURDICA:
17   Q.    You don't -- in your position
18  in Mailman, you don't have any views on
19  whether the other -- your other colleagues
20  need to follow the financial disclosure
21  requirements or not.
22        Is that your testimony?
23        MR. SNIDOW:  Objection to the
24    form.
25

Page 437

1  QUESTIONS BY MR. MURDICA:
2    Q.    That it's up to them?
3    A.    I have a view that Columbia
4  requires a finance -- disclose whenever we
5  get by anyone else than Columbia.  That
6  doesn't get reported to me.
7        So I hope Dr. Pearson did
8    disclose it, but I'm not supervising
9  Dr. Pearson for that aspect nor whether he
10  writes this or not in the report.  So, I
11  mean, that is something that has very little
12  to do with me and my opinions.  Has very
13  little bearing on the situation.
14   Q.    Okay.  Doctor, have you ever
15  looked at the Bandoli study?
16   A.    I read it.  I think so.
17   Q.    Okay.  Well, let me see if I
18  need to mark it.
19        You saw that Bandoli found that
20  women who had long-term use of acetaminophen
21  had almost three times the prevalence of
22  depression, four times prevalence of anxiety,
23  three times the prevalence of other mental
24  health disorders.
25        Do you remember anything like

Page 438

1 that?
2          MR. SNIDOW:  Objection to the
3 form.
4          THE WITNESS:  I'd like to
5 review that paper, if you don't mind.
6 QUESTIONS BY MR. MURDICA:
7     Q.    Okay.  Do you have it with you?
8     A.    No, I don't think so.
9          (Baccarelli Exhibit 110 marked
10 for identification.)
11 QUESTIONS BY MR. MURDICA:
12     Q.    Okay.  I'll mark it.
13     A.    Okay.
14          MR. SNIDOW: I'm sorry.  This
15 is 110?
16          THE WITNESS:  110.
17          MR. SNIDOW: Okay.  Thank you.
18 QUESTIONS BY MR. MURDICA:
19     Q.    Doctor, do you remember
20 reviewing this now?
21     A.    Yes.
22     Q.    Okay.  Did you see that the
23 women who used acetaminophen are quite
24 different?
25     A.    Where is that?

Page 439

1          MR. SNIDOW:  Objection to the
2 form.
3 QUESTIONS BY MR. MURDICA:
4     Q.    Well, you -- your testimony is
5 that the cutoff of 28 days of use in
6 pregnancy is -- it's meaningful, right?
7          People who use it for more than
8 28 days in pregnancy have a stronger
9 relationship with the outcomes, right?
10     A.    That is reported on many
11 papers.
12     Q.    Okay.
13     A.    Many papers use 28 as a cutoff,
14 and you see a dose-response relationship.  So
15 when you get more acetaminophen, more days,
16 you get stronger effects.
17     Q.    And those 20 --
18     A.    I wouldn't say that less than
19 28 is perfectly safe.  I mean, of course
20 with -- 28 is not a magic number.
21     Q.    Okay.  And the 28, you -- when
22 you look at those studies, you don't know in
23 general if it was 28 days in a row at some
24 point or spaced out.  There's not exact
25 dates --

Page 440

1     A.    There is a lot of different
2 analysis.  So 28 is the total number of --
3     Q.    Right.
4     A.    -- the days during pregnancy.
5 But studies have looked at individual
6 trimesters, and there is no difference across
7 trimesters.  They're precise, exactly the
8 same and so on.
9          So there's a wealth of data.
10 The data have been sliced every way you can.
11 So if you have a specific question, I can
12 perhaps help you to find the answer.
13     Q.    Well, they've been sliced every
14 way you can without actually having the dates
15 of use, right?
16          No study had the exact dates
17 and lengths of using during pregnancy?
18          MR. SNIDOW:  Objection to form.
19          THE WITNESS:  That is not true.
20 There are --
21          MR. SNIDOW: I'm sorry.  I'm
22 sorry.  Objection to form.
23          THE WITNESS:  That is not true.
24 There are -- there is many studies
25 that have rich information about the

Page 441

1 exposure to acetaminophen over time,
2 and the number of days is the most
3 reliable way to ask the question.
4          So if you ask number of days,
5 women are likely to report that more
6 accurately than asking other type of
7 information.
8 QUESTIONS BY MR. MURDICA:
9     Q.    Okay.  So it's your testimony
10 that you can point to a study that has the
11 exact day during pregnancy that acetaminophen
12 was taken?
13     A.    I don't need that
14 information --
15     Q.    That was my question.
16     A.    -- so I wouldn't look for it,
17 and no one does it.
18     Q.    Okay.  It doesn't exist, right?
19     A.    That information is not needed
20 in this situation.
21     Q.    Okay.
22     A.    So I wouldn't be able to tell
23 you whether that did exist or not because I
24 didn't look for it.
25     Q.    You didn't see it?

Page 442

1    A.    I was not interested, and it
2  didn't matter for my opinion.
3    Q.    Okay.  I understand that.
4    You didn't see -- you didn't
5  see that data, though, right?
6        MR. SNIDOW:  Objection to form.
7        THE WITNESS:  As I stand here
8  today, I cannot recall that data.
9  QUESTIONS BY MR. MURDICA:
10    Q.    Okay.
11    A.    But at the same time, it's not
12  relevant to my -- to my opinion.
13    Q.    I understand you feel that way,
14  Doctor.
15        If you look at Exhibit 110 --
16        MR. SNIDOW:  Objection to the
17  form.
18  QUESTIONS BY MR. MURDICA:
19    Q.    -- which is in front of you,
20  did you see that the women who were high
21  users of acetaminophen had a much different
22  mental health --
23        MR. SNIDOW:  Where are you
24  looking, Jim?
25        THE WITNESS:  Where is that?

Page 443

1  QUESTIONS BY MR. MURDICA:
2    Q.    This is Exhibit 110.
3        MR. SNIDOW:  Where?
4        MR. MURDICA:  Well, it's all
5  throughout.
6        MR. SNIDOW:  Well, what are you
7  reading?
8        MR. MURDICA:  I'm reading
9  page 8.
10        MR. SNIDOW:  Okay.
11        THE WITNESS:  Page 8?
12  Okay.  What is it?
13  QUESTIONS BY MR. MURDICA:
14    Q.    Well, there's a statement here
15  based on their study that says compared with
16  women who did not use acetaminophen, women
17  who used acetaminophen were more than 40 --
18  for more than 44 days had almost three times
19  the prevalence of self-reported depression,
20  four times --
21    A.    Where is it?
22    Q.    It's the middle of the page.
23    A.    Sorry.
24    Q.    Sorry, Doctor, I thought you
25  had reviewed this.

Page 444

1        MR. SNIDOW:  Objection to form.
2        THE WITNESS:  I really said I
3  read it.  I didn't memorize it by
4  heart.
5        Can you tell me what they're
6  talking about here?  Is it data?  Is
7  it -- I really -- I really don't --
8  don't remember this paper that well.
9  QUESTIONS BY MR. MURDICA:
10    Q.    Okay.  It's okay, Doctor.
11    A.    I want to say on that -- that
12  if you're arguing that there is a genetic
13  confounding here because of mental illness,
14  there is not.  This has been shown over and
15  over again.
16        MR. MURDICA:  That's okay.
17  Let's take a break.  I'll organize my
18  last questions and last exhibits.
19        MR. SNIDOW:  So off the record.
20        VIDEOGRAPHER:  The time right
21  now is 5:04 p.m.  We are off the
22  record.
23      (Off the record at 5:04 p.m.)
24        VIDEOGRAPHER:  The time right
25  now is 5:19 p.m.  We are back on the

Page 445

1  record.
2        MR. MURDICA:  Are we good now?
3        MR. SNIDOW:  (Nods head.)
4        MR. MURDICA:  Okay.
5  QUESTIONS BY MR. MURDICA:
6    Q.    Dr. Baccarelli, welcome back.
7        Are you ready to proceed?
8    A.    Yes, please.
9    Q.    Okay.  I asked you earlier if
10  you considered yourself an expert in
11  neurodevelopment, and you said yes.
12        Do you recall that?
13    A.    I'm an expert on the
14  epidemiology on neurodevelopment, so I
15  definitely -- I am qualified to publish
16  papers first on neurodevelopment.  I
17  published, I think, 15 papers that have to do
18  with neurodevelopment.
19        And of course I'm not a
20  neuropsychiatrist, so I don't -- I don't have
21  expertise in making clinical diagnosis.  I
22  have -- I haven't done clinical diagnosis
23  myself.
24    Q.    When you're not in litigation,
25  what you tell people is that you're an expert

Page 446

¹ in molecular epi, correct?
²     A.    Say that again?
³     Q.    When you're not being paid in a
⁴ litigation, you tell people that you are an
⁵ expert in molecular epi, correct?
⁶       MR. SNIDOW:  Objection to the
⁷     form.
⁸       THE WITNESS:  You know, I have
⁹     a lot of expertise.  I can -- as
¹⁰     you -- as you understand, I trained in
¹¹     multiple disciplines.  The strength of
¹²     my training is really that I've done a
¹³     lot of different work in different
¹⁴     areas.
¹⁵ QUESTIONS BY MR. MURDICA:
¹⁶     Q.    Okay.  So can you answer my
¹⁷ question?
¹⁸       MR. SNIDOW:  Objection to the
¹⁹     form.
²⁰       THE WITNESS:  So I trained as a
²¹     physician.  I'm a medical doctor.
²²     I -- so I'm a physician.
²³     I trained in internal medicine.
²⁴     I trained in toxicology.  I trained in
²⁵     genetic epidemiology.  And I've done

Page 447

¹ extensive work on the part of
² different type of chemicals and
³ toxicants on the fetus.
⁴ QUESTIONS BY MR. MURDICA:
⁵     Q.    Okay.
⁶     A.    And of course some part of this
⁷ work is on genes, epigenetics, and how
⁸ chemicals impact the fetus, including the
⁹ brain.
¹⁰     Q.    Dr. Baccarelli, my question
¹¹ was, when you're not in litigation, you tell
¹² people that your expertise is in molecular
¹³ epi, right?
¹⁴       MR. SNIDOW:  Objection to the
¹⁵     form.
¹⁶       THE WITNESS:  When I'm not
¹⁷     in -- if I were not -- if I were not
¹⁸     here under oath and -- even more or
¹⁹     less tell the truth under oath.
²⁰       But if I were with a colleague
²¹     at the bar and say -- the people will
²²     tell -- will tell me, do you have
²³     expertise in neuroepidemiology, I
²⁴     would say yes --
²⁵

Page 448

¹ QUESTIONS BY MR. MURDICA:
²     Q.    Okay.
³     A.    -- because I published several
⁴ papers on that.  So, I mean, there is
⁵ something that I could do.
⁶       At the same time, I defer to
⁷ colleagues who are more experienced than me.
⁸     (Baccarelli Exhibit 111 marked
⁹     for identification.)
¹⁰ QUESTIONS BY MR. MURDICA:
¹¹     Q.    Oh, okay.  Well, let's mark
¹² this as Exhibit 111.
¹³     Dr. Baccarelli, I'm marking one
¹⁴ of your e-mails as Exhibit 111.  And if you
¹⁵ turn to page 3, which has 362 on the
¹⁶ bottom --
¹⁷     A.    Uh-huh.
¹⁸     Q.    -- you say, "One question."
¹⁹     Do you see that up top, the
²⁰ second paragraph?
²¹     A.    Absolutely.
²²     Q.    Do you see you say -- this
²³ is -- you're telling Brennan Baker this,
²⁴ right, when he's going for his dissertation?
²⁵     A.    No, this is about the grant.

Page 449

¹     Q.    Right.
²     A.    He's writing a grant to support
³ his studies.  So we are going to -- we are
⁴ deciding where to go with this grant.
⁵       He's writing a grant
⁶ application.  It was just called an F51.
⁷     Q.    And that's for his disser --
⁸ that's for his dissertation, right?
⁹     A.    To support his work in his
¹⁰ dissertation.
¹¹     Q.    Yeah, okay.
¹²       And what you say is, "Brennan,
¹³ my expertise is in molecular epi, and aim 1
¹⁴ and 2 are more into neurodevelopment.  I'm
¹⁵ wondering whether you need a mentor such as,"
¹⁶ and you list two other doctors.
¹⁷     A.    Exactly, who are colleagues who
¹⁸ are --
¹⁹     Q.    Okay.
²⁰     A.    -- part of my papers that I
²¹ rely to.  And therefore what I'm saying is
²² that please make sure that when you go to
²³ submit the grant, because reviewers can be
²⁴ inquisitive and nasty, be sure you have
²⁵ someone who's a card-carrying

Page 450

¹ neurodevelopmental person who is a
² neuropsychiatrist.  Because if they don't see
³ any neuropsychiatrists in your grant, they
⁴ are going to kill you.
⁵     Q.    Okay.
⁶     A.    So it's not about whether I'm
⁷ experienced or not enough to publish a paper
⁸ or to review the literature.  It's whether
⁹ the study section will think that -- that I
¹⁰ can be -- I can be enough for Brennan to get
¹¹ the grant.
¹²         Because if they don't have a
¹³ neuropsychiatrist who can vouch for the rest
¹⁴ of the study how clinical diagnosis is done,
¹⁵ how brains MRIs, I have no problem to say
¹⁶ that I cannot analyze brain MRI data.  I
¹⁷ cannot read them.
¹⁸         And the grant was about brain
¹⁹ MRI.  He needs a brain MRI person there.
²⁰ It's not me.
²¹         (Baccarelli Exhibit 112 marked
²²     for identification.)
²³ QUESTIONS BY MR. MURDICA:
²⁴     Q.    Okay.  Doctor, we're going to
²⁵ mark another exhibit.

Page 451

¹         Doctor, you now have in front
² of you what's been marked as Exhibit 111?
³         MR. SNIDOW:  I think 112.
⁴ QUESTIONS BY MR. MURDICA:
⁵     Q.    112?
⁶     A.    112, yes.
⁷     Q.    Do you recognize that?
⁸     A.    Yeah, it's one of the papers
⁹ that are in my material list.
¹⁰     Q.    In fact, it's one of the six
¹¹ studies that you have under your autism
¹² category, right?
¹³     A.    Yes, it's one of those.
¹⁴     Q.    Okay.  When did you last review
¹⁵ this?
¹⁶     A.    A few weeks ago, I guess.
¹⁷     Q.    Okay.  And when you reviewed
¹⁸ this, did you see that as for autism -- when
¹⁹ is -- take a look at Table 3, because that's
²⁰ what I'm going to ask you about.
²¹         MR. SNIDOW:  What page?
²²         MR. MURDICA:  1992.
²³ QUESTIONS BY MR. MURDICA:
²⁴     Q.    All right.  Doctor, do you
²⁵ recall when you were assessing this study --

Page 452

¹ this is one of the ones you assessed on the
² navigation guide, right?
³     A.    I think so, you're right.
⁴     Q.    Okay.  Do you recall that the
⁵ three levels of exposure to acetaminophen
⁶ were rated as never --
⁷         That one's easy, right?
⁸     A.    Uh-huh.
⁹     Q.    Sporadic?
¹⁰     A.    Uh-huh.
¹¹     Q.    And persistent?
¹²     A.    Uh-huh.
¹³     Q.    All right.  Now, I asked you
¹⁴ questions earlier about the notation of
¹⁵ exactly when people took -- mothers took
¹⁶ acetaminophen during pregnancy, and here it
¹⁷ was sporadic if there was some exposure in
¹⁸ one or two trimesters but not all three,
¹⁹ right?
²⁰     A.    Uh-huh.
²¹     Q.    And it was persistent if there
²² was some exposure, even one pill, in all
²³ three, right?
²⁴     A.    I'm not sure it's even one
²⁵ pill, but you might be right.

Page 453

¹     Q.    Okay.  Did you -- did you
² analyze the exposure here as part of your
³ opinion?
⁴     A.    Of course.  Of course.  Three
⁵ months ago.  So you're not expecting me to
⁶ recall exactly what this papers says.
⁷         I -- part of the advantage of
⁸ the navigation guide is that you note down
⁹ all the details as you read it.  So that's
¹⁰ how I did it.
¹¹     Q.    Okay.  You know what CAST is,
¹² right?
¹³     A.    It's the Childhood Autism
¹⁴ Spectrum Test.
¹⁵     Q.    So if you look at Table 3,
¹⁶ those are the outcome results for autism in
¹⁷ this study, correct?
¹⁸     A.    These are the results for CAST,
¹⁹ I believe, correct?  What is it, Table 3?
²⁰     Q.    They're for CAST --
²¹     A.    That is all for CAST and CPT,
²² that are both related to autism.
²³     Q.    CPT is an autism outcome as
²⁴ well?
²⁵     A.    Let me see.  No, the CAST is

Page 454

1 about -- is about autism, yeah.

2    Q.   Right.

3         And if you look, in reporting,
4 Avella-Garcia broke it down into -- by sex,
5 right?

6    A.   Correct.

7    Q.   Okay.  And if you look at
8 females and the CAST score for sporadic use,
9 do you see the number?  There were 287 --

10    A.   Uh-huh.

11    Q.   -- in that?

12    A.   Yeah.

13    Q.   Now, 287 is more than any of
14 your meconium studies in terms of a -- in
15 terms of a number that actually had the
16 outcome you were looking at, right?

17    A.   So you're comparing pears with
18 apples.  My meconium study had a measurement
19 of meconium.  That gives more power because
20 there is less exposure assessment.

21         Here is just about whether
22 people had taken any pill, as you mentioned,
23 during pregnancy.

24    Q.   Okay.

25    A.   So if you want to compare this

Page 455

1 to something else, you might want to compare
2 it with studies done by Liew that are
3 50,000 -- 50,000 subjects.

4         This compare -- when you look
5 at studies that only rely on reports of
6 acetaminophen from mothers, this is a
7 relatively small study, correct?  It's 2,600
8 compared to 50,000.  So it stands to reason,
9 especially when you start to break them down
10 in subgroups, the results start to become
11 less stable.

12    Q.   Okay.

13    A.   And you can see things that you
14 wouldn't expect.

15    Q.   So, for example, if we look at
16 females with sporadic use under the autism
17 measure, the CAST score, we see that for
18 those 287, acetaminophen use in two
19 trimesters was actually protective against
20 autism, right?

21         MR. SNIDOW:  Object to the
22 form.

23         THE WITNESS:  There is a
24 negative association here that is not
25 shown when all participants are seen

Page 456

1 together.  And all participants is the
2 strongest -- is the strongest
3 association, is the strongest
4 analysis.  It is where you have more
5 power.  So if you start to break them
6 down by sex, there might be some
7 difference.

8         At the same time, the way I
9 evaluated this, this is not the only
10 paper that shows analysis certified
11 by gender, by sex, actually, in this
12 case.

13         And if you look at the entire
14 of the study, there is no evidence
15 altogether that there is an effect
16 modification by sex.

17         One study, again, is not enough
18 to create a concern that results might
19 be different in girls as opposed to
20 boys.

21 QUESTIONS BY MR. MURDICA:

22    Q.   Avella-Garcia broke it down
23 into sex because they were worried about that
24 at the time that they did this analysis,
25 right?

Page 457

1    A.   And I was worried as well.

2    Q.   Okay.

3    A.   So I reviewed the literature
4 exactly also with this in mind.

5         It's not hard to understand
6 that there are many studies that break them
7 down by sex, and there are plenty of studies.
8 This is one of the few that shows -- that
9 shows differences, but it doesn't mean that
10 this is true across the literature.

11    Q.   And when --

12    A.   So if you want to look at
13 entire literature, you will see very little
14 difference between boys and girls.

15    Q.   Okay.  And, Doctor, when you
16 look at all participants, when you don't
17 break it down by sex, for their CAST score,
18 none of the results were significant, right,
19 whether it be sporadic or persistent use?

20    A.   CAST scores were increased in
21 ever-exposed males in this study, and so
22 they found an association in males and not in
23 females, and that is one study.

24    Q.   But you just -- you just told
25 us not to look by sex, right?

Page 458

1   MR. SNIDOW:  Objection to the
2   form.
3   QUESTIONS BY MR. MURDICA:
4   Q.    Doctor, my question was, in all
5   participants, which you said is better, there
6   was no statistically significant association
7   for autism by CAST score --
8   MR. SNIDOW:  Objection.
9   QUESTIONS BY MR. MURDICA:
10   Q.    -- for any amount of use of
11   acetaminophen, correct?
12   MR. SNIDOW:  Objection to form.
13   THE WITNESS:  In this study,
14   it's mostly males, not in females.
15   When you look at all children, there
16   is an 8 percent increased risk.  And
17   it's not statistically significant,
18   but it's still 8 percent.
19   So the interaction is
20   consistent with the rest of the
21   literature when you put everything
22   together.
23   QUESTIONS BY MR. MURDICA:
24   Q.    Yeah, my question, if you
25   recall, was whether in all participants in

Page 459

1   Avella-Garcia, Exhibit 112, whether there was
2   a statistically significant association with
3   autism as an outcome.
4   And the answer is no, correct?
5   A.    Correct.  There is not a
6   significant association when you put all of
7   them together, but there is some suggestive
8   association in males which is not shown in
9   females.
10   So, yeah, I -- overall, this
11   paper doesn't provide a lot of evidence in
12   support of the autism association --
13   Q.    Okay.
14   A.    -- though it was included in a
15   meta-analysis.  That is Alemany, that
16   included also other five studies.  And when
17   you put all of them together, there is an
18   association.
19   Q.    On page 1994, Doctor, what
20   Avella-Garcia says in the first sentence is,
21   "We were unable to evaluate the effects of
22   dosage because of mothers' difficulties in
23   recalling the dose taken."
24   Did you see that when you were
25   doing your analysis?

Page 460

1   A.    What is it again?  What is it?
2   Q.    1994, first sentence.
3   A.    Okay.
4   Q.    Did you see that they couldn't
5   study the effective dose?
6   A.    I think that is something also
7   generally I pointed out in my report without
8   even reading Garcia, that recall of use of
9   acetaminophen can be inaccurate, and that
10   will make the results -- will wash away the
11   results.  It will make the results to
12   disappear rather than show up, as they show
13   up consistently throughout the entire
14   literature here.
15   Q.    That's assume -- well, you're
16   assuming that people have a mis-memory in one
17   direction, right?
18   A.    No.  I'm assuming that
19   misclassification is nondifferential,
20   especially because the studies are
21   prospective and therefore are -- when the
22   women were assessed, the children were not
23   born yet, or they were just born.  So they
24   don't know whether the children will have
25   ADHD, ASD or not.

Page 461

1   So there is no way they can
2   predict the future.  There is no way they can
3   tell their dosage of acetaminophen based on
4   what will happen three, four, five, ten years
5   from now.
6   So in all good faith, we
7   believe that the -- that the
8   misclassification is nondifferential.
9   Q.    And the women who get lost to
10   follow-up in years three, four, five, seven,
11   you know that there's a -- there's a bias
12   there that women with healthy children have
13   less of an interest in participating, right?
14   A.    I didn't write that.  I mean,
15   I'm not sure I can -- I can agree with that
16   statement.
17   There is lots of the -- of the
18   study here used the clinical that counters
19   the argument, which is called inverse
20   probability weighting, which is exactly a
21   technique to address the issue you say.
22   You get the study, you get
23   the -- you understand why women are lost to
24   follow-up, and you can adjust for these
25   variables and make sure that loss to

Page 462

1 follow-up is not a problem.
2          There are several studies that
3 use inverse probability weights, and inverse
4 probability weights is the technique to
5 address your concern.  This has been done
6 multiple time in the literature, so I'm
7 pretty confident there is not a problem.
8      Q.    The prospective aspect of the
9 studies you're talking about, Doctor, is that
10 the women are enrolled prior to -- prior to
11 seeing the pregnancy outcome, correct?
12      A.    They are enrolled during
13 pregnancy or at delivery.
14      Q.    Right.
15      A.    And we are talking about
16 outcomes that happen when children are 3, 4,
17 5, 2, 3, 4, 5, 10 year old --
18      Q.    Right.
19      A.    -- correct?
20      Q.    But the recall of what was used
21 and when during pregnancy itself is
22 retrospective, because they're being asked at
23 some point in time what they did some prior
24 point in time, right?
25      A.    They are typically asked during

Page 463

1 pregnancy -- I mean, every use -- every
2 record is retrospect.  If asked you whether
3 you took Tylenol today, like, it would be
4 retrospective, correct?
5      Q.    Right.
6      A.    If you asked whether took --
7 you took Tylenol yesterday or two months ago,
8 it would be retrospective.
9          I mean, the recall is of course
10 a recall.  Every memory is in our brain is
11 about things we have done unless you are
12 arguing we can predict the future when we
13 ask -- if you ask me whether we'll take
14 Tylenol or acetaminophen the next year, I
15 might say yes, but that's about the future.
16          I don't think you can argue
17 that these people should have asked women
18 about their future use, correct?  Any use you
19 have is about what happened in the past few
20 months.
21          And these studies are
22 incredible because most of the -- most of
23 the -- most of the recall is about recent
24 exposure, recent use.  Some of the studies
25 asked multiple times during pregnancy, the

Page 464

1 bigger ones typically.  They ask at 18 weeks,
2 32 weeks and at pregnancy.  So they're asking
3 every trimester.  And every trimester we now
4 reporting their use at the time their
5 pregnant, not after.
6          So, again, this -- and I have
7 to say, 43 of the 45 studies I reviewed I
8 believe are prospective.  So they used this
9 design, which is incredibly rigorous.
10      Q.    Dr. Baccarelli, do you see one
11 paragraph down, middle of the left column, it
12 says, "Other limitations include unmeasured
13 genetic confounding, as ADHD and ASC may have
14 genetic components"?
15          That's what the authors of the
16 study said, right?
17      A.    And we -- that is what the
18 authors of the study say.  We already
19 reviewed that this was really helpful to me
20 because I had to take this as a valid
21 concern.  I did an analysis of the
22 literature.  It's in my report.
23          Genetics is not a problem.
24 There is no evidence whatsoever that genetics
25 plays a role here.

Page 465

1      Q.    Okay.  And if you look on the
2 last page, there's a commentary.  If you flip
3 it over to the very last page.  Let me see.
4          You see a commentary there?
5      A.    Yeah.
6      Q.    And this is by your friend
7 Dr. Liew, right?
8      A.    It is not a friend.  It's a
9 colleague, please.
10      Q.    Okay.  This is by your
11 colleague --
12      A.    Don't make me too friendly with
13 my colleagues.  I don't get -- I never get a
14 drink with Dr. Liew.
15      Q.    Okay.
16      A.    And also didn't hire him in my
17 department, so he really might be upset for
18 me not hiring him.
19      Q.    Dr. Baccarelli, you see that
20 Dr. Liew -- the commentary is with respect to
21 this Avella-Garcia article, right?
22      A.    I think so.
23      Q.    And what Dr. Liew says is the
24 main concern in Avella-Garcia's study perhaps
25 is not confounding by indication but

Page 466

1  confounding by genetic factors. And then he
2  goes on to explain why he thinks that could
3  be a problem.
4       And I take it you just
5  disagree, correct?
6       MR. SNIDOW: Object -- sorry,
7  objection to the form.
8       THE WITNESS: I think we --
9  there is a change that you showed
10 before that clarifies what Dr. Liew's
11 opinion is, and I think he said that
12 he is not worried anymore about
13 genetics because he reviewed the
14 literature. And he agreed with me
15 that genetics is not at play here.
16      And again, there is no data
17 whatsoever. You can claim genetics
18 all the way, and perhaps it's easy to
19 say because, you know, genes sound
20 very important. But genes are just
21 one of the confounders that needed to
22 be addressed. It has been addressed.
23      MR. MURDICA: Okay.
24      MR. SNIDOW: Jim, is this cut
25 off, this commentary?

Page 467

1       THE WITNESS: Yeah, I think
2  it's not complete.
3       MR. MURDICA: Okay. We can --
4       THE WITNESS: It's not
5  complete, but --
6       MR. MURDICA: We'll get to
7  that.
8       THE WITNESS: No, it's in --
9  yeah, it's cut off.
10 QUESTIONS BY MR. MURDICA:
11   Q.   Okay. Do you --
12      MR. SNIDOW: Okay.
13 QUESTIONS BY MR. MURDICA:
14   Q.   Dr. Liew also, around the same
15 time as this commentary, had a paper that
16 evaluated autism with acetaminophen as well,
17 right?
18   A.   It's possible. If you can tell
19 me which one.
20      (Baccarelli Exhibit 113 marked
21      for identification.)
22 QUESTIONS BY MR. MURDICA:
23   Q.   Okay. I'll just mark it.
24      You do recall one of your six
25 autism studies was Liew 2016, right?

Page 468

1    A.   I'm sure it is. He perhaps
2  published -- published a lot of papers.
3    Q.   You now have in front of you
4  what's been marked 113 -- Exhibit 113.
5       That is Liew in 2016, right?
6    A.   Yes.
7    Q.   This is one of your six autism
8  papers you evaluated, correct?
9    A.   Yes.
10   Q.   Okay. And so this was about
11 the same time that Liew had his commentary on
12 Avella-Garcia saying that he thought then, at
13 least, that genetic was an issue, right?
14   A.   Correct. And I want to point
15 out, though, this is before we -- either he
16 or Oscar read the Stergiakouli or Leppart,
17 which are the papers that really show that
18 genetics is not a problem.
19      So in 2016, it might have been
20 more of a problem because there were not a
21 lot of data about whether women who have
22 genes, so they may pose them and their
23 children at risk of ASD or ADHD, had higher
24 intake of Tylenol.
25      Now, we have a paper, Leppart,

Page 469

1  that show no higher intake of Tylenol or
2  acetaminophen during pregnancy in women
3  who have this higher risk for ASD.
4       So, I mean, in order for
5  something to be a problem, it needs to be
6  associated with Tylenol, and Tylenol is not
7  associated with the genetic risk score for
8  ASD. So there is no way that genes had
9  nothing to do -- anything to do with ASD.
10   Q.   You saw that Dr. Liew is still
11 looking at the polygenic risk scores in this
12 exact cohort that's in Exhibit 113, right?
13      MR. SNIDOW: Object to the
14      form.
15 QUESTIONS BY MR. MURDICA:
16   Q.   That's what he told you.
17      MR. SNIDOW: Object to form.
18 QUESTIONS BY MR. MURDICA:
19   Q.   Right, Doctor?
20   A.   If you want to ask him, I --
21   Q.   Okay.
22   A.   -- you are welcome to contact
23 him. I mean, as far as I'm concerned,
24 he's -- he seemed pretty confident that it's
25 not a problem.

Page 470

1  I understand he's a very
2  thorough individual, and he might want to
3  follow up and do work -- all the research --
4      Q.    Doctor, that's your -- your
5  only communication was that e-mail, so that's
6  your interpretation of his e-mail, correct?
7          MR. SNIDOW:  Objection to the
8      form.
9          THE WITNESS:  My interpretation
10     of that e-mail, corroborated by my
11     evidence.  And I'm using his e-mail,
12     but I'm particularly using --
13 QUESTIONS BY MR. MURDICA:
14     Q.    Okay.
15     A.    You know, science is not based
16 in authority.  I have all the respect for
17 Dr. Liew that is in the world.  I think he
18 does good science.  But I am basing my
19 opinion on the data that I publish, not on
20 the authority of Dr. Liew.
21     Q.    Okay.
22     A.    And data and the science is
23 that there is no -- women at higher genetic
24 risk for autism, and for their children can
25 be a higher genetic risk for autism, takes no

Page 471

1  more Tylenol than all the other women.
2          So there is no one in the world
3  that based on the evidence that can tell that
4  genes are a problem, especially for ASD.
5      Q.    I appreciate that's your view,
6  Dr. Baccarelli.  I have another question for
7  you, if you turn to page 955 on Exhibit 113.
8      A.    Uh-huh.
9      Q.    If you look at Table 2, you see
10 it's broken down into autism spectrum
11 disorders and infantile autism, right?
12     A.    Uh-huh.
13     Q.    And he measures the number of
14 cases but also includes person years.  And
15 that's by age, right?
16     A.    Sorry, what did you say?
17     Q.    Do you see the measure is by
18 number of cases and person years?
19     A.    And what do you say about
20 person years?
21     Q.    I'm saying that's by age,
22 right?  That's adding up the ages?
23     A.    No, it's the years of
24 follow-up.
25     Q.    The years of follow-up?

Page 472

1      A.    Right.
2      Q.    Of the child, right?
3      A.    Which probably might be similar
4  to the age.
5      Q.    Yeah.  Okay.
6          And you see for-ever used
7  acetaminophen during pregnancy, there's a
8  positive point estimate and a slightly
9  significant confidence interval, right?  For
10 ever used?
11         MR. SNIDOW:  Objection to the
12     form.
13         But, actually, where are you
14     looking?
15         MR. MURDICA:  Can you let the
16     doctor answer?  Because I'm running of
17     out of time.
18         MR. SNIDOW:  I see it now.  I'm
19     sorry.
20         Go ahead.
21         THE WITNESS:  Sorry.  You are
22     looking at the line where it says the
23     1.22 includes odds ratio 1.19 --
24 QUESTIONS BY MR. MURDICA:
25     Q.    Yes, correct.

Page 473

1      A.    -- adjusted odds ratio?
2      Q.    Yeah, that's --
3      A.    Yeah.
4      Q.    You see that?
5      A.    So there is a 19 percent
6  increased risk in ever used, which is very
7  similar to the 16 percent you'll see on the
8  right-hand column.
9      Q.    And then if you look, Doctor --
10 well, the 16 percent on the right-hand column
11 is not statistically significant, right?
12     A.    Again, I'm not looking at each
13 of the study individually for statistical
14 significance.  Using overall.  And you can
15 understand clearly why it might not be
16 statistically significant, because the power
17 in a study like this is determined by the
18 number of cases.
19         So the analysis on the right is
20 a subset, and this 286 number of cases as
21 opposed to 626.  So the analysis on the left
22 is three times -- has three times as much
23 power as the analysis on the right, and
24 they're essentially the same.
25         Any epidemiologist who has

Page 474

1 trained in epidemiology will tell you that
2 the two column, 1.22 and 1.16, have
3 essentially -- sorry.  1.19 and 1.16 have
4 essentially the same results.
5      Q.    Okay.
6      A.    There is no noticeable
7 difference between the two, unless you really
8 want to say that we need to -- in one study
9 we need to worry about epi value.
10      Q.    The lack of statistical
11 significance on the right doesn't matter to
12 you when you have the number on the left.
13 Right, Doctor?
14           MR. SNIDOW:  Objection.
15 Objection to the form.
16           THE WITNESS:  What I -- what I
17      said is that the -- is that the two
18      risk estimates are very similar, and
19      you can see also that the confidence
20      interval are pretty similar.  The
21      confidence interval on the right
22      include the confidence interval on the
23      left.
24           So as far as I'm concerned,
25      these are two estimates of hazard

Page 475

1      ratio that are very similar.
2 QUESTIONS BY MR. MURDICA:
3      Q.    Okay.  And if you look down on
4 the left side and you look at the different
5 trimester analysis, you see that it's not
6 significant -- it's not statistically
7 significant for autism for exposure in the
8 first trimester only, the second trimester
9 only, the third trimester only, the second
10 and third trimester together, the first and
11 third trimester together.
12           Right?
13      A.    I'm very confused about all
14 these trimesters you mentioned.
15      Q.    Okay.
16      A.    What are you -- what do you
17 want me to focus on?
18      Q.    Table 2.
19           Did you do an analysis of all
20 the different outcomes here?
21           MR. SNIDOW:  Objection to the
22 form.
23           THE WITNESS:  I reviewed this
24      very carefully, and of course, I mean,
25      my question was -- the question I

Page 476

1 assessed is stated in my -- in my
2 report.
3           I wanted to answer this
4 question.  Does acetaminophen during
5 pregnancy -- is acetaminophen during
6 pregnancy causally associated with
7 ADHD, ASD and neurodevelopmental
8 disorders.
9           So I looked at the process as a
10 whole, and I made sure there was no
11 heterogeneity that made me worry about
12 one window being more important than
13 another.  And I think this paper shows
14 that.
15           But if you disagree, let me
16 know where this paper shows --
17           MR. MURDICA:  Well, I asked you
18 a question, and I haven't gotten an
19 answer to it.
20           MR. SNIDOW:  Hold on.  I think
21 we're out of time.
22           Can we do a time check?
23           VIDEOGRAPHER:  We're at seven
24 hours, one minute.
25           MR. MURDICA:  He didn't answer

Page 477

1 my question, though.
2           MR. SNIDOW:  Well --
3           MR. MURDICA:  Okay.  That's
4 fine.
5           MR. SNIDOW:  -- he did answer
6 your question.
7           MR. MURDICA:  He didn't.  He
8 said, I don't know what -- where
9 you're talking about, and I --
10           MR. SNIDOW:  Do you want one
11 more question?  I'll give you one
12 more.
13           MR. MURDICA:  I'm not asking
14 for your charity.  If you want to
15 stand on him not answering that
16 question, that's fine.  I asked a
17 question.  I didn't get an answer.
18           MR. SNIDOW:  Let me look at it.
19           You said table -- did you do an
20 analysis of all the different outcomes
21 here?  That one?
22           MR. MURDICA:  Well --
23           MR. SNIDOW:  Yeah.  All right.
24 I'm going to stand on that.
25           MR. MURDICA:  It was before,

Page 478

1  when he said he didn't understand what
2  I was asking about the table.
3      THE WITNESS:  My eyes are
4  crossing here.  I can't see anything.
5  Okay.
6      MR. SNIDOW:  No.  I'm fine with
7  that.  You're out of time.  You're a
8  minute over.
9      VIDEOGRAPHER:  Want to go off
10  the record?
11      The time right now is
12  5:48 p.m., and we are off the record.
13  (Off the record at 5:48 p.m.)
14      VIDEOGRAPHER:  The time right
15  now is 6 p.m.  We are back on the
16  record.
17      CROSS-EXAMINATION
18  QUESTIONS BY MR. SNIDOW:
19  Q.    Dr. Baccarelli, when
20  Mr. Murdica was asking you questions, he
21  asked you a lot of questions about sample
22  size.
23      Do you remember that?
24  A.    Correct.
25  Q.    And one of the things you were

Page 479

1  talking about is the difference between the
2  likelihood of a false negative in a study and
3  a false positive.
4      Do you remember that?
5  A.    Correct.
6  Q.    So let's say I had a study that
7  had six people in it or something.
8      Is that a pretty well-powered
9  study?
10  A.    No, that would be low power.
11  Q.    And is a study that has low
12  power, is that likely to lead to a false
13  negative or a false positive?
14  A.    A false negative.
15  Q.    If you had a study with six
16  people or just an unpower -- an underpowered
17  study generally and you got a null result,
18  would that be surprising?
19  A.    That would be completely
20  expected, even if the association were
21  absolutely true.
22  Q.    And why is that?
23  A.    Because the study is
24  underpowered; therefore, it cannot show an
25  association when it exists.

Page 480

1      Q.    If a small study, on the other
2  hand, shows a statistically significant
3  result, is that a surprising result?
4      MR. MURDICA:  Objection to
5  form.
6      THE WITNESS:  Not as much,
7  because if an association shows up but
8  the study has very little power to
9  show an association -- but if an
10  association shows up, that is likely
11  to be a true positive.  Particularly
12  if there are larger studies like in
13  this case of thousands or tens of
14  thousands of people, they show the
15  same thing.
16      So there is not surprise.  It's
17  more studies and large studies all
18  show associations.  So everything is
19  pretty consistent.
20  QUESTIONS BY MR. SNIDOW:
21  Q.    Mr. Murdica asked you about
22  some small studies that showed results that
23  were not statistically significant.
24  A.    Uh-huh.
25  Q.    Does that provide a lot of

Page 481

1  information about whether there's a real link
2  between APAP exposure and ADHD and autism?
3      MR. MURDICA:  Objection to
4  form.
5      THE WITNESS:  No, because as
6  I -- I did also grading of evidence
7  for these.  Sample size was part of
8  it.
9      If a small study doesn't
10  provide evidence, that's suspected.
11  It's a small study, very low power.
12  The study doesn't have the power to
13  show the association if there is one.
14  QUESTIONS BY MR. SNIDOW:
15  Q.    Mr. Murdica asked you about
16  some studies that had small sample sizes but
17  nevertheless showed statistically significant
18  results.
19      Do those studies hurt
20  Mr. Murdica's position or help him?
21      MR. MURDICA:  Objection to
22  form.
23      THE WITNESS:  They hurt him a
24  lot because the really -- even with
25  small power, the result comes out, so

Page 482

1    it means the results is strong.
2  QUESTIONS BY MR. SNIDOW:
3       Q.    So when you were considering
4  the results between small studies that were
5  null, small studies that were statistically
6  significant, did you place greater weight on
7  some or the other?
8       A.    Of course.  I placed better
9  weight on the ones that are bigger because
10 there is more power.  And I documented that
11 in the navigation guide as well as my -- in
12 my writing.
13      Q.    And did you consider all the
14 results of those studies, big or small,
15 statistically significant or not, in your
16 analysis?
17          MR. MURDICA:  Objection.  Form.
18          THE WITNESS:  Oh, absolutely.
19      I considered all the results, the ones
20      that are positive and the ones that
21      are negative.  And that to say --
22      there are very few that are negative.
23      They happen to be small, and this is
24      expected.  95 percent of the studies
25      are -- show a signal.  So they are

Page 483

1  really -- they are really there.
2          MR. SNIDOW:  Thank you,
3  Dr. Baccarelli.  I have nothing
4  further.
5          REDIRECT EXAMINATION
6  QUESTIONS BY MR. MURDICA:
7       Q.    Dr. Baccarelli, earlier today
8  we looked at a proposal that Dr. Baker made
9  to you to conduct what became Baker 2020.
10         Do you remember that?
11         MR. SNIDOW:  Sorry.  Objection.
12     Can we go off the record for a
13     moment, actually?  Can we go off the
14     record?
15         VIDEOGRAPHER:  The time right
16     now is 6:04 p.m.  We are off the
17     record.
18      (Off the record at 6:04 p.m.)
19         VIDEOGRAPHER:  The time right
20     now is 6:04 p.m.  We're back on the
21     record.
22 QUESTIONS BY MR. MURDICA:
23      Q.    Dr. Baccarelli, I was asking
24 you before I was interrupted about
25 Dr. Baker's original proposal in 2018 for

Page 484

1  what became Baker 2020.
2          Do you remember that question?
3       A.    I think I do.
4       Q.    Okay.
5       A.    So there was the analysis plan.
6       Q.    Yeah.
7          And originally there -- the
8  sample size of the outcome with the exposure
9  was only 13, if you remember.  And then by
10 the time of publication, it was 33, right?
11      A.    I think you are only referring
12 to a subset of the study.  The study overall
13 had, as we reviewed, 385 people when the --
14 when the -- when it was published.
15          Then in the e-mail you show me,
16 or in the proposal you show me, it was
17 smaller, with like 200 and some.
18          So the entire study is not what
19 you said.  In test -- in this study, all the
20 units provide power, correct?  So the power
21 is calculated on 385.
22      Q.    The outcome on the sample size
23 on the pilot that Dr. Baker did in 2018 had a
24 relative risk of somewhere around 8 and a
25 half.

Page 485

1          Do you remember that?
2       A.    Right.  I remember that,
3  absolutely.
4       Q.    And when it went to
5  publication, when the extra 20 cases were
6  found, it ended up being something much lower
7  than that, right?
8       A.    The cases were not found.  We
9  completed the data set, and we -- obviously
10 we didn't publish the results based on nine
11 because we wanted the study to be as complete
12 as possible.
13          Again, the two results are
14 comparable.  There's the one subset, and
15 whether it's 9 or 2.5, they're in the same
16 direction and give the same signal.
17      Q.    In that case, though, making
18 the sample larger made the effect decrease,
19 right?
20      A.    The results are pretty similar.
21 As you understand -- as you understand, a
22 sample size that's smaller can give bias in
23 both directions.  It can be smaller or
24 bigger.  The results don't decrease because
25 you increase the sample size.  This is just

Page 486

1  poor statistics.

2      Q.    You're testifying that 9 and

3  2.5 are similar?

4      A.    I'm testifying that in this

5  case, there was a smaller odds ratio when it

6  became -- when we went to publication with a

7  larger sample size.

8          But your assertion that a

9  larger sample size decreases the odds ratio

10  of the risk, it's completely wrong.  The risk

11  is whatever it is.  A larger sample size may

12  suggest a -- find it better.

13      Q.    Adding more cases to Baker 2020

14  decreased the effect, correct?

15      A.    We didn't add more cases.  We

16  added more subjects.  There were more cases.

17  There were more controls.  There were more

18  people exposed, less people -- more people

19  nonexposed.  Altogether, the results -- the

20  results became more robust.

21          And if you had the confidence

22  interval, so the 8.5 or 9, whatever it was,

23  and you compared to the confidence interval

24  at 2.5 that we published, probably this

25  confidence interval would be overlapping.

Page 487

1          Unfortunately, we didn't have

2  the confidence interval, so I cannot really

3  tell you what they would have been.

4      Q.    Yeah.

5      A.    Clearly you can understand that

6  there was a preliminary analysis.  It

7  happened to be that way.  It could have been

8  the other way around.  It could have become

9  20.  I wouldn't have been surprised.

10      Q.    You have -- we only have the

11  point estimate, which went down when you had

12  more information, correct?

13      A.    That is not typically happens.

14  It can go either way.

15          MR. MURDICA:  Yeah.  That was

16  my point.

17          Okay.  No further questions.

18          MR. SNIDOW:  Off the record?

19          VIDEOGRAPHER:  The time right

20  now is 6:08 p.m.  We are off the

21  record.

22  (Deposition concluded at 6:08 p.m.)

23      (Baccarelli Exhibits 114 and

24  115 marked for identification.)

25      ━ ━ ━ ━ ━ ━ ━

Page 488

1          CERTIFICATE

2      I, CARRIE A. CAMPBELL, Registered

3  Diplomate Reporter, Certified Realtime

Reporter and Certified Shorthand Reporter, do

4  hereby certify that prior to the commencement

of the examination, Andrea Baccarelli, MD,

5  Ph.D., was duly sworn by me to testify to the

truth, the whole truth and nothing but the

6  truth.

7      I DO FURTHER CERTIFY that the

foregoing is a verbatim transcript of the

8  testimony as taken stenographically by and

before me at the time, place and on the date

9  hereinbefore set forth, to the best of my

ability.

10      I DO FURTHER CERTIFY that I am

11  neither a relative nor employee nor attorney

nor counsel of any of the parties to this

12  action, and that I am neither a relative nor

employee of such attorney or counsel, and

13  that I am not financially interested in the

action.

14

15

16

17  CARRIE A. CAMPBELL,
    NCRA Registered Diplomate Reporter

18  Certified Realtime Reporter
    California Certified Shorthand

19  Reporter #13921
    Missouri Certified Court Reporter #859

20  Illinois Certified Shorthand Reporter
    #084-004270

21  Texas Certified Shorthand Reporter #9328
    Kansas Certified Court Reporter #1715

22  New Jersey Certified Court Reporter
    #30XI00242600

23  Louisiana Certified Court Reporter
    #2021012

24  Notary Public
    Dated:  August 15, 2023

25

Page 489

1      INSTRUCTIONS TO WITNESS

2

3          Please read your deposition over

4  carefully and make any necessary corrections.

5  You should state the reason in the

6  appropriate space on the errata sheet for any

7  corrections that are made.

8          After doing so, please sign the

9  errata sheet and date it.  You are signing

10  same subject to the changes you have noted on

11  the errata sheet, which will be attached to

12  your deposition.

13          It is imperative that you return

14  the original errata sheet to the deposing

15  attorney within thirty (30) days of receipt

16  of the deposition transcript by you.  If you

17  fail to do so, the deposition transcript may

18  be deemed to be accurate and may be used in

19  court.

20

21

22

23

24

25

Page 490

# ACKNOWLEDGMENT OF DEPONENT

I _____, do
hereby certify that I have read the foregoing
pages and that the same is a correct
transcription of the answers given by me to
the questions therein propounded, except for
the corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____
Andrea Baccarelli, MD, Ph.D.      DATE

Subscribed and sworn to before me this

_____ day of _____, 20 _____.

My commission expires: _____

Notary Public

---

Page 492

# _ _ _ _ _ _ _
# LAWYER'S NOTES
_ _ _ _ _ _ _

PAGE  LINE

_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

---

Page 491

# _ _ _ _ _ _ _
# ERRATA
_ _ _ _ _ _ _

PAGE  LINE  CHANGE

_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

Confidential - Subject to Protective Order

**WORD INDEX**

< $ >
**$100,000**
138:*21*
**$150,000**
55:*3, 14*
**$500** 109:*24*

< 0 >
**0.002** 216:2,
*20*
**0.05** 213:*15,
20* 216:*21*
**00966** 3:*7*
**05** 216:*18*
**07960** 6:*3*
**084-004229**
488:*20*

< 1 >
**1** 5:*2*
179:*24*
191:*21*
213:*11*
449:*13*
**1,000**
103:*15*
172:*10*
**1,000-**
**milligram**
201:*18*
**1.16** 474:*2, 3*
**1.19** 472:*23*
474:*3*
**1.22** 472:*23*
474:2
**1:08** 229:*17*
**1:22-md-**
**03043** 1:*6*
**1:22-md-**
**03043-DLC**
1:*4*

**10** 41:*18, 24*
42:*12* 43:*4,
16, 20* 344:*1,
15* 349:*1, 4*
357:*23*
364:*18*
377:*4*
385:*9*
462:*17*
**10,000**
102:*24*
**10:01**
107:*23, 25*
**10:17** 108:2
16:*23*
**100** 10:*17*
16:*23*
150:*23*
210:*17*
239:*21*
348:*4, 8*
350:*15*
351:*4, 10*
352:*18*
365:*5*
392:*15*
430:*5*
**10017** 3:*13*
6:*8*
**10019** 6:*21*
**10019-9601**
7:*15*
**10036** 7:*3*
**101** 10:*21*
354:*12, 19*
365:*9*
371:*17*
385:*5* 386:*6*
**102** 11:*1*
367:*23*
368:*3, 5*
**103** 11:*2*
374:*16, 20*
380:*17*
383:2

**104** 11:*5*
384:*8, 12*
**105** 11:*10*
393:*22*
394:*1*
**106** 11:*13*
393:*23*
394:*3, 7*
**107** 11:*17*
405:*19, 24*
**108** 9:*11*
11:*19*
420:*19, 24,
25*
**109** 11:*22*
428:*5, 11*
**11** 41:*24*
43:*20*
378:*11*
379:*16, 24*
434:*13*
**11:29**
190:*20, 22*
**11:52**
190:*24*
**110** 12:*1*
438:*9, 15, 16*
442:*15*
443:2
**111** 12:*4*
448:*8, 12, 14*
451:2
**112** 12:*6*
450:*21*
451:*3, 5, 6*
459:*1*
**113** 12:*7*
467:*20*
468:*4*
469:*12*
471:*7*
**114** 12:*10*
487:*23*

**115** 12:*13,
16* 359:*8*
487:*24*
**11758** 2:*24*
**118** 28:*25*
29:*9, 20*
**1185** 7:2
**1190** 388:*14*
**1191** 384:*24,
25* 385:*10*
**1198** 388:*13,
24*
**12** 11:*12*
41:*19*
42:*12*
205:6
339:*14*
344:*15*
349:*1, 4*
353:*21, 23,
24* 379:*15*
381:2
**12:30** 228:2
**12:31**
229:*13, 15*
**120** 218:*14*
219:*5* 433:2
**1200** 5:*21*
6:*14*
**126** 1:*13*
2:*23* 13:*8*
**12th** 5:*21*
6:*8, 14*
**13** 27:*4*
50:*16*
298:*5, 11, 13,
17* 484:*9*
**13202** 8:*3*
**138** 272:*4*
**13921**
488:*18*
**14** 1:*6* 9:*5*
13:*5* 27:*13*

205:6
390:*15, 19*
**140** 55:*14*
255:*10*
**141** 263:*20,
22* 264:*21*
**142** 260:*22*
264:*1*
267:*22*
268:*9, 10*
**143** 271:*22*
**14578** 414:*1*
**146** 368:*16,
18, 20* 369:*1*
**15** 217:*11*
316:*12*
347:*20*
445:*17*
488:*24*
**150** 2:*10*
**154** 369:*13*
**16** 99:*20*
364:2
473:*7, 10*
**166** 368:*23*
369:8
**169** 9:*13*
**17.2** 364:*7*
**1700** 7:*8*
**1715** 488:*21*
**1717** 3:*24*
**172** 378:*7*
381:2
**174** 9:*16*
**175** 371:*13*
**179** 368:*24*
369:8
**17th** 7:*19*
**18** 53:*3*
99:*2, 20*
100:*15, 22*
435:*15, 17,
21* 464:*1*

Confidential - Subject to Protective Order

**18th** 150:*14, 20*

**19** 50:*17* 52:*11* 355:*5* 385:*1, 11* 473:*5*

**1901** 2:*16*

**191** 369:*13* 385:*9*

**19103** 7:*20*

**1965** 132:*25*

**199** 357:*6, 11, 12* 369:*7*

**1992** 451:*22*

**1994** 459:*19* 460:*2*

**< 2 >**

**2** 9:*3* 95:*17* 97:*5* 157:*2, 4* 179:*18, 22* 191:*17* 194:*4* 364:*15* 368:*10, 11* 369:*15* 449:*14* 462:*17* 471:*9* 475:*18*

**2,000** 213:*3*

**2,600** 455:*7*

**2.15** 216:*13*

**2.30** 216:*13*

**2.5** 218:*10* 485:*15* 486:*3, 24*

**2.51** 221:*20, 21, 25*

**2:07** 292:*20, 22*

**2:20** 292:*24*

**20** 40:*5* 58:*5* 70:*11, 12* 149:*25* 150:*4* 154:*19* 162:*21* 177:*5* 234:*20* 239:*22* 252:*10* 306:*19* 380:*16* 383:*10* 439:*17* 485:*5* 487:*9* 490:*16*

**200** 5:*8* 55:*2* 249:*23* 320:*18* 341:*8* 345:*20, 21, 23* 392:*16* 484:*17*

**20004-1275** 5:*22* 6:*15*

**20006** 7:*8*

**200-2900** 4:*5*

**2003** 148:*24*

**201** 4:*16*

**2013** 291:*6* 324:*23*

**2014** 17:*7* 291:*7, 8* 305:*10* 324:*18*

**2015** 291:*7*

**2016** 53:*13, 14* 70:*8* 291:*6, 7, 9* 406:*21* 409:*13, 21*

411:*8* 467:*25* 468:*5, 19*

**2017** 70:*7, 12* 193:*18* 291:*7, 9, 10*

**2018** 17:*25* 18:*1, 6* 19:*21* 40:*6, 8* 41:*11* 70:*13* 152:*5, 10* 175:*9* 270:*1* 291:*8, 10, 11* 483:*25* 484:*23*

**2019** 11:*12* 17:*23* 28:*8* 39:*12* 69:*8* 70:*5* 130:*6* 149:*6* 151:*22* 152:*5, 10* 169:*8, 18* 170:*10* 173:*23* 252:*11* 253:*22* 254:*23* 266:*2* 270:*16* 280:*1* 281:*1* 283:*3* 291:*11, 12, 13* 292:*8* 322:*11* 361:*3* 406:*21* 411:*7*

**202** 5:*22* 6:*15* 7:*9*

**2020** 40:*12, 13, 17, 19, 21, 23* 45:*4, 18, 20* 47:*14* 48:*7* 53:*14* 57:*14* 69:*6* 121:*23* 122:*17, 24* 123:*8* 124:*6, 8* 127:*22* 128:*7* 151:*5, 12* 158:*17* 194:*12, 21* 210:*9* 249:*7* 254:*16, 19* 256:*21* 269:*24* 282:*21* 286:*6* 337:*14* 339:*21* 340:*4* 347:*25* 348:*9* 349:*21* 351:*11* 352:*17* 361:*8* 365:*5* 366:*7* 379:*9* 382:*2* 384:*12* 483:*9* 484:*1* 486:*13*

**2021** 17:*6* 47:*14* 53:*15* 118:*8* 331:*2*

**2021012** 488:*23*

**2022** 40:*16, 19, 20* 57:*24* 58:*6* 118:*8* 120:*14* 121:*24* 127:*10* 293:*13, 14* 294:*2* 331:*2* 420:*10* 421:*9* 423:*5* 424:*1, 3, 7, 11* 426:*5* 435:*15, 16, 17, 22*

**2023** 1:*6* 13:*6* 47:*12* 50:*17* 52:*11* 53:*3, 21* 57:*16* 70:*7* 86:*12* 114:*20* 115:*8, 12* 119:*4, 22* 150:*20* 228:*18* 293:*11* 330:*22* 373:*22* 426:*22* 428:*8, 14, 17* 435:*6* 488:*24*

**2024** 60:*22*

**2029** 5:*16* 269:*24*

**20-day** 94:*11*

**20-plus** 377:*4*

**21**  17:8
175:8
**210**  3:7
**21052**  8:7
**211**  4:9
**212**  2:24
6:22  7:3, 15
**213**  8:13
9:18
**215**  7:20
**218**  4:22
**22**  127:20
293:11
**222**  378:6
381:2
**23**  371:16
**233**  219:4
221:22
**238**  218:13
219:23
220:4, 10
**24**  203:17
204:11, 17,
25  207:3
352:11, 12,
22  353:13
**240**  110:13
**241**  111:18
**241-8111**
4:10
**245**  9:19
**25**  150:3
308:2, 3
363:23
364:20
365:5, 25
366:8, 19
367:16
379:24, 25
**250**  6:21
7:14  8:2
**251**  222:14
**2625**  4:9

**28**  94:11, 13,
20  398:21
399:5
439:5, 8, 13,
19, 20, 21, 23
440:2
**283**  9:23
222:1
**284-3880**
5:17
**286**  473:20
**287**  454:9,
13  455:18
**289**  10:1
**289-1313**
5:22  6:15
**29**  201:1
**293**  10:4
**296**  10:4
**297**  10:7
**299**  250:13
**29th**  419:17
**2nd**  406:9,
12

< 3 >

**3**  193:25
194:10
195:16
286:6
369:15
448:15
451:19
453:15, 19
462:16, 17
**3.6**  376:14
**3.83**  218:11
221:20
222:1, 2, 17
**3:04**  343:1
**3:07**  347:4,
6
**3:16**  347:8

**3:56**  390:1,
3
**30**  7:19
75:18
103:15
118:19
133:17
184:24
185:14
186:7
376:20
380:13
489:15
**300**  3:18
4:4  5:16
18:11
61:24
75:17
90:25
218:13
**301**  247:10
**3043**  1:3
**305**  3:24
**30XI0024260
0**  488:22
**310**  4:17
5:17
**312**  2:11
**314**  4:10
**315**  8:3
**32**  99:3
100:15
464:2
**33**  357:18,
19, 22, 24
358:11
363:25
380:1
484:10
**34**  366:13
432:23
**34108**  5:8
**345**  357:25
364:25

**365**:12, 19
366:12, 25
380:1
**347**  10:11
**348**  10:17
**35**  3:24
254:11
**354**  10:21
**355**  357:10
**360**  376:15
**36104**  4:22
**362**  448:15
**367**  11:1
**374**  11:2
**384**  11:5
**385**  484:13,
21
**390**  6:8
**393**  11:10,
13
**394**  337:25
338:3
339:17
340:15
341:8, 20
345:13
**396**  44:20
**3's**  194:4

< 4 >

**4**  43:24, 25
196:11
300:22, 23
357:8, 9
462:16, 17
**4:15**  390:5
**40**  75:18
88:20
89:22
376:20
443:17
**400**  75:17
338:16

**344**:12, 13
**401**  5:2
**405**  11:17
**40-minute**
110:5
**410**  3:6
**4100**  2:10
**420**  11:19
**421-2800**
2:24
**425**  3:13
**428**  11:22
**429**  179:18,
20  191:11,
15
**43**  464:7
**433**  27:1
**438**  12:1
**44**  443:18
**440**  2:16
**447-0500**
3:7
**448**  12:4
**45**  254:10
348:20
380:8  464:7
**450**  12:6
**467**  12:7
**468-8000**
7:15
**4717**  4:4
**4740**  3:18
**474-2911**
8:3
**478**  9:6
**483**  9:7
**487**  12:10,
13
**495-2333**
2:17

< 5 >

**5**  43:2
359:*12*
462:*17*
**5.5**  364:*4*
**5:04**  444:*21,
23*
**5:19**  444:*25*
**5:48**  478:*12,
13*
**50**  133:*8*
221:*13*
222:*3, 13*
340:*19*
348:*20*
376:*20*
403:*20*
430:*2*
**50,000**  29:*5*
262:*23*
455:*3, 8*
**500**  6:*2*
**50th**  362:*19*
**512**  3:*25*
**520-6639**
5:*3*
**5-3**  391:*9*
**542-8000**
8:*13*
**55**  160:*23*
196:*15, 23*
197:*24*
198:*8*
200:*7*
201:*22*
202:*5*
221:*7*
340:*23, 25*
341:*7, 19*
344:*6*
345:*13*
363:*11*
**555**  5:*21*
6:*14*  8:*12*

**556-2100**
7:*3*
**55th**  6:*21*
7:*14*  8:*12*
**56th**  1:*13*
2:*23*  13:*8*
**59.9**  201:*8*

**< 6 >**
**6**  41:*17, 23*
43:*3, 9*
44:*13*
421:*8, 12*
478:*15*
**6:04**  483:*16,
18, 20*
**6:08**  487:*20,
22*
**6:20**  282:*3,
11*  285:*9, 12*
287:*8*  290:*8*
**6:30**  282:*4*
**60**  221:*7*
393:*11*
**60,000**  29:*5*
**600**  4:*16*
8:*2*  60:*12*
110:*24*
111:*5, 7*
172:*9*
311:*15*
312:*5*
314:*11*
**600-plus**
311:*2*
**60606**  2:*11*
**626**  473:*21*
**63**  391:*8*
**6-3**  391:*10,
11*
**63102**  4:*10*
**64112**  3:*19*
4:*4*

**646**  3:*14*
6:*9*
**650**  336:*24*
**656-7066**
4:*17*
**67**  6:*2*
**671-7277**
3:*25*
**6th**  2:*23*

**< 7 >**
**7**  40:*8*
41:*17*  43:*9*
129:*25*
131:*10*
371:*16*
**70**  47:*14*
173:*23*
**700**  54:*15*
**701-1100**
3:*19*
**713**  2:*17*
**737-0500**
7:*9*
**741-5220**
2:*11*
**746-2000**
6:*9*
**76**  385:*4*
**77002**  2:*16*
**775-6101**
6:*3*
**78664**  3:*24*
**7-Eleven**
6:*23*

**< 8 >**
**8**  17:*8*
41:*17*
44:*13*
234:*19*
364:*1*
443:*9, 11*

**458:***16, 18*
484:*24*
**8,000**  115:*22*
**8.5**  364:*6*
379:*2*
381:*12, 16*
486:*22*
**8:32**  1:*14*
13:*6*
**8:43**  26:*8,
10*
**8:47**  26:*12*
**80**  47:*15*
**800**  4:*23*
5:*9*
**816**  3:*19*
4:*5*
**818**  8:*8*
**836-8000**
6:*22*
**837-5151**
3:*14*
**859**  488:*19*
**872-3500**
5:*9*
**877.370.DEP
S**  1:*23*
**88**  108:*17*
**89**  9:*11*
108:*9, 16*
109:*6*
144:*13, 14*
**898-2034**
4:*23*

**< 9 >**
**9**  364:*2*
485:*15*
486:*2, 22*
**90**  9:*13*
106:*2*
136:*19*
169:*22*
170:*4*

**176:***5*
245:*20*
253:*2*
254:*23*
255:*10*
260:*21*
276:*2*  278:*9*
**90067-2904**
5:*16*
**90071**  8:*13*
**90401**  4:*16*
**91**  9:*16*
67:*10, 14, 18*
174:*21*
175:*1*
176:*10, 14*
191:*6*
**91367**  8:*8*
**916**  5:*3*
**92**  9:*18*
213:*25*
214:*6, 23*
222:*20*
**93**  9:*19*
245:*24*
246:*3, 7*
**9328**  488:*20*
**94**  9:*23*
283:*24*
284:*3*  291:*4*
**95**  10:*1*
136:*20*
289:*24*
290:*3, 21*
291:*5*
482:*24*
**955**  471:*7*
**95864-7273**
5:*3*
**96**  10:*4*
12:*16*
293:*19, 22*

**97** 10:*4*
296:*8, 9, 13*
297:22
**973** 6:*3*
**979-1000**
*7:20*
**98** 10:*7*
297:*12, 16,*
*19*
**99** 10:*11*
347:*10, 15*
389:*17*
390:*13*
**999** 5:*8*
**999-2232**
*8:8*

**< A >**
**a.m** 1:*14*
13:6 26:*8,*
*10, 12*
107:*23, 25*
108:2
190:*20, 22,*
*24* 282:*3*
285:*9, 12*
287:8 290:*8*
**AB** 385:*1,*
*11* 386:5
**abandoned**
211:*20*
212:6
**ability** 488:*9*
**able** 44:*14*
61:2 62:*24*
144:22
186:*24*
231:6
233:*1*
257:7
272:6
323:*23*
384:*16, 20*

396:2
441:22
**ABNEY** 3:*5*
**abnormal**
298:*23*
**aborted**
154:6
**abortions**
153:*4*
**absence**
275:5
**absolute**
199:*23*
241:*1*
**absolutely**
19:*11*
20:*20*
27:23 30:*7,*
*20* 37:*15*
38:*15*
40:25
43:15 54:7
55:21
60:*19* 66:7
76:4 80:8
108:*8*
111:*1*
112:4
114:*21*
122:12
125:*24*
158:*16*
190:8
191:4
195:*23*
220:*12*
224:*1*
229:*24*
239:*13*
285:7
288:22
300:*3*
302:*3*
357:2

369:*14, 17*
404:*17*
405:*13*
407:*1, 20*
418:*16*
430:5, *13*
448:*21*
479:*21*
482:*18*
485:*3*
**absorbed**
205:*3*
**abstract**
29:*25*
164:*13, 15,*
*23* 165:*19*
166:*23*
167:*7, 12, 25*
193:*7, 17, 20*
214:*12, 25*
220:8
224:*11, 24*
225:*1*
226:*1, 8*
253:*10*
256:*4*
**abstracts**
225:*19*
**absurd**
238:*15*
**Academy**
316:*18*
**accept**
144:5
177:*3, 5, 6*
**acceptable**
289:5
**accepted**
153:*12*
435:*15*
**access** 40:7
**account**
158:*18*
323:*12*

**accountabilit**
**y** 314:*23*
315:2
327:*18*
**accounted**
223:8
414:*14*
**accumulate**
56:*18*
**accumulated**
153:*16*
**accumulates**
153:*19, 20,*
*24* 300:8
**accumulating**
350:*20*
**accumulative**
195:22
**accurate**
247:22
248:6
258:*18, 20*
260:4
270:6
349:*15*
358:*23*
391:*13*
425:*20*
489:*18*
**accurately**
441:6
**ACETAMIN**
**OPHEN**
1:*3* 9:*13,*
*19, 21* 10:*1,*
*13, 17, 21*
11:2, *5, 14,*
*19, 23* 12:*1,*
*6, 7* 13:*10*
17:*18, 20*
18:2 19:*8,*
*25* 20:7, *14*

21:*15*
23:*14* 25:*3*
28:5, *13, 17*
35:*11, 12*
36:*10*
39:*23* 45:*6,*
*13* 48:*23*
50:9, *22*
51:2, *3, 4, 5*
57:*17* 58:*6,*
*18* 67:*21*
70:6, *16*
71:*3, 18*
80:*11, 19, 23*
81:*3, 11*
86:6 87:*7,*
*13, 18* 94:*20*
95:5, *10*
96:*10*
98:*14, 23*
99:2, *22*
100:5, *13, 15*
101:*3, 8, 11,*
*16, 17, 25*
102:6
103:*24*
104:*23*
105:*4, 6, 8,*
*10* 107:*1*
109:*11*
110:*17, 25*
111:2, *5, 6,*
*15* 116:5
117:*4, 21*
118:7
119:6
120:*12*
123:*1, 23*
124:*10, 18*
127:*14*
128:8
129:*1, 11, 21*
130:25
132:8

136:*16*
137:*21*
141:*17*
147:22
151:*14, 19*
156:*4*
158:2, *13, 22*
159:*3, 7, 13, 22, 24*
160:*10, 12, 17* 161:*1, 3, 6, 9, 12*
162:*3, 4, 9*
164:*17*
165:2, *6, 8*
167:*8, 9*
168:2, *21, 23*
169:*10*
181:*18*
183:*17, 20*
184:*12*
185:24
188:*4*
189:*14*
194:*13, 15, 24* 195:*3, 7, 21, 25*
196:*12*
197:*1, 6, 11, 15, 21* 198:*5, 12, 15, 17, 24*
199:*14, 25*
200:*15, 20, 25* 201:*4, 14, 19, 22* 202:2, *24* 203:25
204:*7*
205:*1*
207:*1*
208:2, *13, 15, 20, 25* 209:6
215:*6, 8, 10, 13, 18, 21, 22*
216:8, *24*

217:*6, 15, 16, 17, 23, 25*
218:*10, 12, 15, 24* 219:*3, 5, 15* 220:*10, 23, 25* 221:*2, 3, 6, 13*
222:*4, 7, 14*
224:*4, 8, 10, 15, 20* 225:6
226:*9, 17, 23*
227:*4, 8, 19, 21* 228:*18*
230:8, *20*
231:*5, 8, 19*
236:*3*
237:*1, 2, 12, 14, 16, 21, 25*
238:*4*
241:*4*
242:*3*
243:*3*
253:*12, 15*
255:*16, 18*
256:*5, 6, 8, 12, 15* 257:*4, 9, 22* 260:*11*
262:*16*
263:*4, 5*
266:*7*
267:9
269:*14, 18*
272:*19*
273:*1, 5, 9*
277:*14*
279:*3, 10, 18*
280:*19, 23*
281:23
282:*19*
286:*10*
287:25
288:*13*
298:22
299:*3, 17, 20*

300:*7*
301:*11*
318:*13*
336:*17, 18, 22, 25*
337:*15*
340:*20*
341:9
344:*7, 20, 23*
346:2
357:*5, 13, 14, 20* 360:22
362:*1, 14, 21*
363:*15, 16, 22* 364:*1, 2, 5, 6, 7, 8, 18*
365:6
366:*9, 21*
367:*2, 17*
368:*14*
375:*3, 12, 18, 20* 376:*4, 10, 13* 377:23
378:*7, 12*
379:*16*
382:*17*
386:*14*
394:*12, 15, 22* 395:*2, 15*
396:*7, 16*
397:*1, 20, 24*
398:8, *18*
399:2, *15, 25*
400:*6, 8, 19*
401:*1, 3*
402:25
408:9
409:*1, 5*
412:*10, 13, 16, 24* 415:4
416:*18, 20, 25* 417:*11, 22* 419:*13, 19* 420:*11*

421:*15*
423:8, *16*
424:*4, 14*
426:*3*
432:25
433:*10*
434:*12*
435:*7, 9*
437:*20*
438:23
439:*15*
441:*1, 11*
442:*21*
443:*16, 17*
452:*5, 16*
455:*6, 18*
458:*11*
460:9
461:*3*
463:*14*
467:*16*
469:2
472:*7*
476:*4, 5*
**acetaminoph
enal** 398:*17*
**acetaminoph
en-positive**
345:*12*
**acid** 241:*17*
**acknowledge**
72:*4, 8*
130:2
**ACKNOWL
EDGMENT**
12:20 490:*1*
**ACOG**
66:25
119:24
142:*11, 15*
**action**
488:*11, 13*
**activities**

284:*19*
**activity** 56:*5*
**acts** 72:*16*
**actual**
253:*5*
363:*20*
364:*13*
369:22
**ADAMS**
4:*15*
**add** 16:*11*
21:*4, 7*
189:25
243:*16*
325:*20*
369:*1*
486:*15*
**added**
310:*4*
486:*16*
**Adderall**
353:*19*
**adding**
471:22
486:*13*
**addition**
231:*4*
265:*7* 402:*7*
**additional**
243:*17*
309:*16*
411:*14*
418:*1*
**address**
14:*6*
202:*12*
248:24
323:23
461:*21*
462:*5*
**addressable**
178:*7*
**addressed**
181:*11*

Confidential - Subject to Protective Order

195:*13*
416:*6*
466:*22*
**addressing**
181:*9*
**ADHD**
10:*14*  21:*4,
8*  40:*11*
41:*21, 22*
42:*4, 12, 22,
24*  43:*1, 7,
18, 22, 25*
45:*14*
50:*20*  51:*2,
3*  87:*7*
91:*5*  93:*13,
15*  96:*14*
109:*12*
122:*14*
123:*1, 9, 24*
125:*1, 4, 23*
126:*11*
127:*14*
128:*9, 25*
129:*12*
132:*9*
160:*7*
161:*13, 23*
193:*1*
203:*3*
205:*25*
226:*25*
228:*14, 23*
231:*4, 17, 20,
21, 25*  232:*6,
7, 13, 24*
233:*11*
234:*5*
237:*2, 6, 12*
241:*4, 7*
243:*4*
249:*8*
257:*4*
262:*14, 15*

263:*5*
264:*16*
265:*11*
266:*18, 19,
23*  267:*4, 10*
271:*13, 16,
17, 18*
278:*17*
282:*18*
337:*15*
349:*7, 12*
355:*17*
356:*21*
357:*1, 16, 19*
362:*1*
363:*22*
364:*6, 8*
365:*6*
366:*10, 13*
377:*22*
378:*11*
379:*15*
380:*2, 16*
381:*2*
382:*19*
386:*14*
392:*5*
397:*3, 21*
398:*10, 19*
401:*9*
408:*9*
409:*2, 12, 18,
23*  411:*8*
412:*20, 21,
24*  415:*5*
416:*10, 17,
19*  417:*6, 11,
15, 17*
419:*12, 19*
422:*8, 18*
426:*3*
429:*20*
431:*20*
432:*10*

460:*25*
464:*13*
468:*23*
476:*7*  481:*2*
**ADHD-
positive**
377:*14*
379:*19*
381:*4*
**adjust**
369:*24*
371:*25*
416:*24, 25*
461:*24*
**adjusted**
369:*25*
402:*12*
414:*8, 17*
473:*1*
**adjusting**
397:*18, 19*
413:*14*

**administered**
158:*2*
194:*24*
207:*9*
208:*25*
210:*10*
215:*6*
220:*10*
225:*6*
259:*21*
367:*17*
402:*20*
**administratio
n**  57:*5*
159:*12*
162:*12, 17*
163:*20, 24*
194:*13*
195:*20*
215:*10, 23*
216:*9*

226:*9*
255:*16*
257:*8, 14, 20*
260:*10*
322:*2*
366:*21*
367:*2, 11, 12*
396:*17*
402:*10*
**admission**
14:*18*
**admitted**
256:*10*
**advanced**
40:*6*
**advantage**
180:*18*
266:*15*
277:*13*
279:*1*
287:*21*
312:*23*
315:*7*
358:*18*
453:*7*
**advantages**
276:*8*
287:*24*
**Adverse**
11:*20*
19:*10*  20:*1*
35:*13*
36:*11*
92:*25*
136:*17*
253:*11*
420:*12, 17*
421:*16*
422:*9*
424:*4*  426:*5*
**advised**
372:*25*

**advisor**
108:*25*
145:*16*
**advisors**
114:*13*
**advocate**
39:*4*  303:*12*
**affect**
105:*22*
191:*24*
404:*20*
**affirmative**
275:*19*
**afraid**
171:*12*
**age**  13:*21*
41:*23, 24*
42:*3, 11, 22*
43:*4, 6, 24,
25*  422:*3, 4*
423:*3*
425:*15*
471:*15, 21*
472:*4*
**aged**  60:*10*
**agencies**
332:*5*
**agency**
334:*14*
**agent**
162:*13*
163:*21*
**ages**  471:*22*
**agnostic**
23:*23*
**ago**  16:*5*
55:*23*
56:*14, 24*
59:*4*  63:*22*
70:*8*
142:*16*
149:*25*
150:*4*
157:*2, 5*

217:*11*
223:*7*
226:*1*
277:*8*
281:*15*
283:*22*
316:*12*
317:*9, 12*
342:*13*
451:*16*
453:*5* 463:*7*
**agree** 64:*25*
133:*24*
140:*1, 16*
175:*15*
186:*18*
192:*19*
205:*11*
207:*19*
226:*7, 11*
234:*1*
235:*21*
236:*19, 23*
249:*18*
260:*16*
288:*7*
289:*4*
299:*14*
301:*5, 15*
309:*18*
345:*19*
356:*10*
360:*8*
381:*9*
382:*9*
389:*10*
403:*18*
404:*25*
417:*16*
422:*17*
425:*5*
461:*15*
**agreed**
133:*20*

135:*6*
270:*16*
386:*8, 18*
394:*10*
405:*7, 10*
433:*3*
466:*14*
**agreeing**
236:*10*
237:*4*
**agreement**
14:*24*
213:*14*
284:*12*
293:*7, 20*
294:*5*
**agrees**
206:*25*
**agruner@du
anemorris.co
m** 7:*19*
**ahead**
24:*17* 74:*8*
78:*25*
90:*18* 99:*8*
169:*6*
214:*16*
263:*11*
285:*13*
308:*25*
362:*24*
363:*1*
472:*20*
**Aid** 8:*4*
**aim** 449:*13*
**aims** 373:*14,
15*
**al** 9:*15, 19*
10:*7, 20, 24*
11:*16, 21, 24*
12:*3, 7, 10*
40:*13*
361:*16, 17*

362:*6*
394:*17*
**Alabama**
4:*22*
**alarm**
124:*16*
218:*9*
**alcohol**
163:*3*
**Alemany**
17:*1, 6*
30:*24* 31:*1*
53:*9, 14*
130:*15*
459:*15*
**alleles** 411:*7*
**ALLEN**
4:*20*
**Alliance**
6:*11*
**allowed**
46:*22*
131:*20*
134:*12*
313:*17*
326:*16*
**allows**
327:*18*
**AlphaSites**
109:*15, 16*
**alter** 176:*21*
**alterations**
11:*23*
**alternative**
146:*3*
**alters**
105:*10*
**Altogether**
363:*25*
364:*15*
456:*15*
486:*19*
**Alvaro**
110:*2, 5, 8*

**AMANDA**
2:*7* 54:*3*
**amanda.hunt
@kellerpost
man.com**
2:*8*
**amazing**
70:*19*
**amended**
15:*23*
347:*17*
390:*12*
**American**
64:*2*
119:*24*
171:*23*
172:*17*
174:*8*
175:*16*
176:*15, 16*
**Americas**
7:*2*
**Amisota**
63:*16*
**amniotic**
156:*19*
**amount**
153:*9*
168:*1*
191:*24*
235:*2*
237:*19*
321:*19*
362:*24*
458:*10*
**Ana** 63:*14*
83:*23* 84:*1,
2, 3*
**analyses**
231:*21*
378:*25*
413:*11*
**analysis**
11:*2* 85:*20*

118:*21*
130:*16, 17*
133:*3*
137:*16*
192:*21*
194:*23*
195:*1, 3, 6,
11* 197:*14*
198:*7, 10*
202:*19*
207:*6*
209:*14*
210:*9*
211:*4*
217:*4*
224:*17*
225:*12, 13*
227:*11, 18*
230:*23*
232:*4*
236:*1*
240:*18*
242:*22*
252:*22*
256:*21*
257:*6*
304:*18, 20,
21* 305:*3*
306:*4, 9, 18*
324:*25*
326:*3, 5, 11,
21, 25* 327:*6,
7, 20* 328:*2,
6, 9, 12, 17,
22* 329:*15,
17, 23* 330:*1,
4* 332:*22*
333:*4, 22*
334:*2, 11*
337:*4, 12*
340:*14*
344:*21*
348:*13*
350:*7*

351:*4*
364:*11*
365:*1, 2*
367:8
369:*21*
371:*15*
377:*21*
378:*1, 2, 5*
379:*8, 10, 11, 14* 380:*17*
381:*23*
382:*1*
388:*4*
404:*12, 13*
408:7
418:*25*
419:*3*
431:*10*
440:2
456:*4, 10, 24*
459:*25*
464:*21*
473:*19, 21, 23* 475:*5, 19*
477:*20*
482:*16*
484:*5* 487:6

**analyst**
88:2 152:*16*

**analysts**
85:*23* 88:*3*

**analyze**
165:*5*
304:6
332:6
387:*6, 21*
450:*16*
453:2

**analyzed**
291:*18*
300:*24*
371:*17*
387:*1, 4, 7, 10* 414:*5*

**Andrea**
1:*11* 9:*23*
10:*15*
13:*12, 20*
488:*4*
490:*12*

**anesthesia**
259:*3*

**Angeles**
5:*16* 8:*13*

**anger**
172:*14*

**angry** 174:*4*

**animal**
373:*12, 13, 23* 374:*8, 9*
427:*23*
428:*1, 14*

**Ann** 147:*16*

**ANNE** 7:*18*
11:*10*
393:2, 5

**anonymous**
176:2

**answer**
18:*23* 20:5
22:*23*
24:*16, 21*
33:*11* 34:6
35:*17* 40:*3*
45:*10*
46:*21* 49:*3*
52:9 55:*19*
57:*21* 61:8
65:*16, 17*
73:*23* 74:8, *16* 75:*12*
76:9 77:*12*
79:*23*
84:*11* 88:9
90:*13*
91:*25*
93:*18*
94:*23* 96:6,

7 97:*4, 14, 17, 25* 98:5
100:9
101:*6, 21*
104:9
106:*4, 10*
107:5
116:*16*
117:*25*
119:*10*
120:*24*
122:*8, 13, 15*
123:5
128:*12*
131:2
132:*12*
134:*7, 19, 20, 21, 24* 135:5, *9, 19* 136:*3*
158:*1*
163:*17, 18*
165:*17*
183:*3*
186:*17, 20, 21, 24*
189:*11, 18*
190:2
193:*13*
196:*19*
199:*22*
200:8, *9, 12*
201:*9, 11*
202:*12*
203:*11, 14*
205:*18*
219:*19, 22*
220:2
228:7
229:*1*
231:*24*
232:*18*
233:*1, 5, 15, 16* 235:*18*
241:8

259:*6, 24*
264:*3*
281:*10*
283:*19*
284:22
305:*4, 8*
308:*24*
310:*15*
311:*10, 12, 13* 312:7
313:*5, 9, 10, 15, 20*
314:*13, 14*
315:*21*
326:*18*
342:*5*
343:22
362:2
366:*5, 6*
367:*15*
370:*21*
402:22
434:*2, 5, 6*
440:*12*
446:*16*
459:*4*
472:*16*
476:*3, 19, 25*
477:*5, 17*

**answered**
24:*11*
50:*12* 52:*3*
73:*13*
75:*11* 79:*5, 21* 95:*20*
100:*20*
163:*8*
187:*1*
192:*6, 8*
200:*18*
201:*12*
236:9
311:*8*
313:*1*

315:*17*
327:*23*

**answering**
46:*23* 52:7, *8* 74:*11*
94:*18, 19*
137:*4*
161:*11*
188:*25*
189:*8*
477:*15*

**answers**
108:*24*
187:*11*
316:2 490:*5*

**antidepressa nt** 241:*17, 22* 242:*1, 11*
243:*6*

**antidepressa nts** 242:*7, 17*

**antidepressio n** 242:*1*

**antidepressiv es** 243:*6*

**antihyperten sive** 218:*17*

**anxiety**
240:*25*
437:22

**anybody**
80:*23* 81:2, *5*

**anymore**
159:*19*
350:*25*
466:*12*

**anytime**
26:2 50:*1*
56:*11*

**APAP**
417:*5*
429:*19*

430:*24*
431:*20*
432:*9* 481:*2*
**apart** 160:*6*
327:*7*
329:*15*
**apologize**
264:*8*
**apparently**
39:*18*
212:*17*
**appear**
205:*24*
246:*11*
263:*6*
276:*22*
292:*4*
297:*21*
314:*11*
369:*15*
**APPEARAN
CES** 9:*3*
**appears**
154:*25*
**apples**
454:*18*
**applicable**
412:*4*
**application**
319:*16*
449:*6*
**applied**
311:*4*
319:*8*
333:*24*
**applies**
122:*13*
219:*20, 23*
271:*8*
272:*21*
332:*15*
410:*1* 425:*3*
**apply**
272:*22*

316:*24*
319:*3*
323:*15*
**appreciate**
29:*1* 48:*4*
51:*8* 59:*17*
60:*15*
61:*23* 67:*7*
97:*23*
103:*21*
126:*12*
144:*10*
198:*7* 471:*5*
**appreciated**
145:*9*
**approach**
102:*9*
**approached**
21:*10*
234:*13*
**approaches**
100:*11*
**appropriate**
79:*15, 19*
251:*7*
308:*11*
316:*2*
356:*11*
489:*6*
**approved**
286:*1* 373:*8*
**approximatel
y** 54:*22*
196:*25*
198:*2, 4*
345:*13*
**April** 76:*2*
115:*8, 12*
118:*25*
119:*4*
324:*21, 22,
23* 330:*22,
25* 421:*9*
423:*5*

424:*1, 3, 7,
11*
**aquinn@mof
o.com** 7:*14*
**arbitrary**
418:*10*
**archival**
196:*3*
**archive**
185:*11*
196:*3*
**archived**
183:*13*
**archives**
157:*1*
**areas**
446:*14*
**argue**
463:*16*
**argued**
432:*22*
**arguing**
159:*1*
247:*19*
395:*18*
444:*12*
463:*12*
**argument**
394:*17*
412:*14*
461:*19*
**arguments**
303:*14*
**ARNOLD**
6:*16*
**arrows**
408:*21*
**art** 86:*5*
**article**
151:*25*
176:*6, 17*
191:*8*
245:*13, 19*
246:*12*

260:*21*
288:*2*
322:*12*
366:*7*
372:*13*
394:*3, 5*
395:*4, 7*
426:*22*
465:*21*
**articles**
317:*21*
319:*9*
**artifactually**
205:*23*
**artificially**
415:*3*
**ASC** 464:*13*
**ascertainmen
t** 391:*14*
**ASD** 10:*15*
50:*20* 51:*4,
15* 52:*1, 4*
96:*15*
109:*12*
205:*25*
233:*24*
235:*12*
236:*3*
237:*2*
241:*4, 18*
242:*4*
243:*3*
262:*16*
263:*4*
264:*15*
266:*19, 24,
25* 267:*4, 10*
271:*13, 16,
17, 18* 392:*5*
397:*21*
398:*19*
401:*9*
409:*24*
410:*2, 7, 8,*

*12, 14, 16*
412:*9, 11, 12,
15* 415:*5*
416:*11*
419:*20*
460:*25*
468:*23*
469:*3, 8, 9*
471:*4* 476:*7*
**ASD-ADHD**
1:*3* 13:*10*
**ashamed**
139:*11*
**ASHLEY**
2:*4, 6* 7:*13*
**ashley.barrie
re@kellerpos
tman.com**
2:*7*
**ashley.keller
@kellerpost
man.com**
2:*5*
**aside** 38:*21*
**asked** 25:*17*
40:*17*
50:*12* 56:*4*
73:*13*
75:*10* 79:*5,
20* 81:*1, 9*
88:*18*
95:*20*
98:*25* 99:*2*
101:*2, 9, 25*
106:*22*
112:*19*
122:*6*
134:*14*
135:*22*
139:*21*
143:*6*
174:*11*
181:*4*
185:*5*

189:*4*, *9*
193:*6*
205:*13*
213:2
217:*7*, *19*
220:*21*
222:*24*
227:*2*, *3*, *7*
233:*12*
237:*21*
241:*5*
259:2
276:*20*
323:*10*
331:*16*
345:*18*
352:*11*
365:*22*
371:*9*
385:*24*
417:*25*
427:*10*
445:*9*
452:*13*
462:*22*, *25*
463:*2*, *6*, *17*, *25*  476:*17*
477:*16*
478:*21*
480:*21*
481:*15*

**asking**
26:*19*
76:*21*
83:*18*
87:*13*, *14*, *17*
92:*15*  95:*4*
103:*23*
104:*21*
110:*16*
112:7
113:*3*
120:*20*
126:*8*, *10*, *14*

129:2
133:*5*
145:*12*
173:*12*
179:*15*
180:*5*, *6*, *9*
182:*9*
188:2
189:*15*
190:*3*
191:*6*, *19*
192:*22*
205:*9*
232:*18*
234:*4*
247:*16*
263:*25*
274:*4*
279:*15*
283:*16*
316:*3*
318:*15*
324:6
333:*20*
338:*25*
339:*24*
340:*5*
342:*17*, *21*
343:*14*, *20*
353:*11*
366:*1*
370:*20*
385:*18*, *21*
411:*18*
414:*13*
441:6
464:2
477:*13*
478:*2*, *20*
483:*23*

**asks**  161:*9*
188:*1*
220:*17*

**aspect**
279:*5*
437:*9*  462:*8*
**assertion**
486:*8*
**assess**
318:*25*
319:*1*
419:*6*, *7*
**assessed**
155:*3*
210:*4*
231:2
322:7
337:*4*
452:*1*
460:*22*
476:*1*
**assessing**
76:*11*
304:*24*
335:*9*
337:*10*
451:*25*
**assessment**
120:*4*
207:*17*
211:*14*
265:7
324:*10*
380:*14*
454:*20*
**assign**
309:*10*
**assistant**
82:*23*
286:7  287:6
**associa**
286:*19*
**associate**
8:*16*
**associated**
19:*9*  20:*1*, *8*, *14*  35:*13*

96:*13*
107:*13*
123:*23*
161:*22*
184:*25*
200:*21*
202:*25*
203:2
205:*25*
215:*11*
217:*1*
224:*9*
226:*24*
228:*23*
233:*24*
234:*9*
240:*8*, *16*, *20*
241:*12*
242:*11*
249:*5*, *6*, *8*
298:*23*
411:*8*
429:*20*
430:*1*, *24*
431:*20*
469:*6*, *7*
476:*6*
**associating**
198:*23*
401:*8*
**Association**
9:*13*, *19*
10:2, *17*, *21*
11:2, *5*, *13*, *19*  17:*17*
23:*13*, *20*
28:*16*  45:*6*, *13*  46:*4*
47:*5*, *24*
50:*8*  51:*1*
63:*25*
118:*19*
128:*25*
129:*5*

130:*5*, *8*, *19*
131:*5*
184:*18*
186:*10*, *12*
199:2
200:*25*
209:*25*
211:*11*
216:*10*, *12*, *16*  225:*5*
231:7
235:*11*
237:*11*
241:*3*
242:*3*
244:*4*, *12*
250:*17*, *25*
251:*6*, *8*
252:*4*, *16*, *19*
253:*15*
256:*5*, *8*
257:*2*, *4*
262:*14*, *18*
263:*3*, *8*, *18*
268:*4*
269:*22*
270:*20*
272:*5*
273:*4*, *13*, *15*, *24*  275:*23*, *24*  279:*13*, *19*, *23*  280:*3*, *20*, *24*
286:*10*
291:2
292:*3*, *4*
298:*25*
312:*12*
361:*24*, *25*
376:*25*
377:*5*
382:*16*, *22*
386:*13*
395:*6*, *24*

396:*20*
397:*19*
398:*16*
409:*12*, *22*
410:*3*, *11*
412:*8*, *23*
415:*3*
416:*17*, *22*,
*25* 417:*10*,
*12* 418:*19*
420:*11*
431:*15*
432:*9*, *18*
433:*4*, *9*, *12*
455:*24*
456:*1*
457:*22*
458:*6*
459:*2*, *6*, *8*,
*12*, *18*
479:*20*, *25*
480:*7*, *9*, *10*
481:*13*
**associations**
103:*4*
148:*11*, *13*
185:*1*
203:*6*
232:*9*
233:*21*
236:*5*
237:*1*
418:*13*
421:*14*
431:*13*
480:*18*
**assume**
114:*5*
460:*15*
**assumed**
148:*15*
**assumes**
213:*22*

**Assuming**
59:*8* 103:*7*
460:*16*, *18*
**assure** 231:*1*
**attached**
12:*15*
489:*11*
490:*7*
**attempt**
116:*4*
117:*3*
138:*7*, *9*
168:*1*
170:*15*
**attempting**
316:*23*
**attendant**
116:*23*
**attention**
11:*3* 12:*6*
57:*2* 68:*20*
297:*5*
**Attention-
Deficit**
10:*14* 11:*6*,
*14*
**Attention-
Deficit/Hype
ractivity**
10:*18*, *22*
430:*25*
**attenuated**
262:*21*
**attorney**
488:*10*, *12*
489:*15*
**attorneys**
281:*12*
**AUGUST**
1:*6* 13:*5*
228:*18*
435:*15*, *21*
488:*24*

**author**
36:*22*, *25*
40:*24* 72:*5*,
*6* 130:*9*
138:*20*
140:*18*
149:*5*
253:*6*
296:*25*
354:*9*
428:*25*
**authored**
272:*15*
**authorities**
233:*20*
**authority**
470:*16*, *20*
**authors**
58:*4* 78:*24*
130:*3*
297:*1*
464:*15*, *18*
**Autism**
10:*15*
11:*15* 12:*7*,
*9* 48:*25*
50:*6*, *10*
52:*18* 87:*8*
91:*19*, *22*
93:*13*, *15*
94:*4* 95:*18*
97:*6* 104:*1*,
*24* 107:*2*
110:*17*, *18*
117:*22*
119:*7*
120:*13*
122:*7*, *9*, *10*
123:*1*, *9*, *12*,
*14*, *15*, *19*, *24*
124:*6*, *10*, *23*
125:*2*, *4*, *23*
126:*11*
129:*11*

160:*7*
209:*10*
226:*18*, *24*
227:*9*, *10*, *14*
228:*9*, *16*, *19*,
*23* 230:*2*, *5*,
*6*, *9*, *10*, *13*,
*16* 231:*3*, *5*,
*8*, *10* 233:*13*,
*18*, *21* 234:*2*,
*5*, *6*, *9*
235:*23*
236:*13*
238:*23*
239:*2*, *4*, *7*,
*18*, *22* 240:*1*,
*3*, *6*, *8*, *16*, *20*
241:*12*
242:*8*, *12*, *18*
265:*12*
356:*25*
397:*3*
398:*10*
411:*8*
417:*12*, *13*,
*15*, *18*, *20*, *22*
422:*8*, *17*
426:*3*
451:*11*, *18*
453:*13*, *16*,
*22*, *23* 454:*1*
455:*16*, *20*
458:*7*
459:*3*, *12*
467:*16*, *25*
468:*7*
470:*24*, *25*
471:*10*, *11*
475:*7* 481:*2*
**available**
109:*11*
**Avella-
Garcia** 12:*7*
53:*8*, *14*

265:*4*
276:*23*
291:*8*
454:*4*
456:*22*
459:*1*, *20*
465:*21*
468:*12*
**Avella-
Garcia's**
465:*24*
**Avenue**
3:*13*, *18*
4:*4* 5:*2*
6:*8* 7:*2*, *8*
**average**
42:*3*, *22*
43:*6*
157:*12*, *14*,
*18* 300:*12*
333:*25*
362:*25*
**averaged**
319:*9*
**avoid**
318:*23*
**aware** 24:*4*
46:*25*
56:*22*
80:*10*, *22*
88:*17*
149:*10*, *12*,
*17* 152:*19*
202:*14*
233:*5*
239:*11*
306:*7*, *25*
309:*22*, *23*
318:*11*, *15*,
*19* 332:*20*
333:*2*, *21*
335:*7*
**AYACHI**

2:22

**< B >**
**BA** 247:5
**babies**
204:8, 24
208:8, 12
**baby**
153:17
154:8
156:20
161:16, 18,
21  162:3, 4
180:12, 15,
20  182:8
192:12, 15,
25  196:2
200:21
203:16, 22
205:2
206:23
207:2
208:20
209:4, 6
228:20
244:25
396:23
**baby's**
182:15
203:25
**Baccarelli**
1:12  9:23
10:4, 16
12:12
13:13, 20
14:7, 8
15:8, 12, 16,
19  17:15, 16
18:22
19:19  20:5
22:24
23:19
24:15, 16, 23
25:8  27:21

28:3  29:8
31:4, 24
33:15  34:8
35:17  36:6,
21  38:11
42:1, 17, 20,
21  43:5
44:2, 20
45:10
46:11  49:3,
16  50:5
51:25
53:17  54:5,
17, 20, 22
55:18  57:3,
13  59:18
60:5, 17
61:20
64:17
65:12, 23
67:8  68:24
70:3, 15
71:1  73:9
75:3, 4, 23
78:16  80:6,
10  81:23
82:18
83:15
84:21
85:21
87:21  90:7,
19  92:18
94:3, 17
97:3, 4, 11
98:1, 9
99:9  100:2,
9, 19  103:21
104:4, 21
106:24
107:5
108:6, 9, 14
112:6
116:13
117:2, 19, 20,

25  119:5, 10
120:9, 11
122:5
127:10
134:4, 7, 20
136:5
137:3, 6
138:1, 6
139:24
140:17
143:16
144:16
145:8, 15
151:17
152:12
158:1, 12
159:9
162:7
165:17
169:22
170:2
174:14, 21
191:2, 5
192:4
193:12
196:10
197:20
201:10, 16
203:15
206:10, 24
210:8
213:25
214:4, 22
219:19
221:17
222:16
224:23
227:8
228:10, 17
229:20, 25
231:16
232:23
233:25
235:15, 21

237:5, 18
238:22, 24
240:7
241:5, 10
242:6
244:13
245:24
246:5
249:9
252:1
254:16
257:13
260:1
267:21
270:15
274:1
275:8
281:9
283:24
284:2
289:24
290:18
292:6
293:2, 22
296:9
297:12, 17
307:4
308:14
312:25
313:7, 22
316:6, 22
318:5
319:23
320:6
321:10
324:16
326:20
327:8
330:14
332:13, 20
335:8
347:10, 13
348:4
350:19

354:12
355:18
365:3, 22
366:20
367:16, 23
368:4
374:16
377:11
380:15
384:8
390:8
392:12
393:22
398:7
401:10
404:23
405:19, 22
407:8
410:21
420:9, 19
423:6
425:22
428:5
438:9
445:6
447:10
448:8, 13
450:21
464:10
465:19
467:20
471:6
478:19
483:3, 7, 23
487:23
488:4
490:12
**BACCAREL
LI_000298**
9:23
**BACCAREL
LI_000309**
9:23

**BACCAREL LI_000427**
9:16
**BACCAREL LI_000431**
9:17
**BACCAREL LI_000464**
10:11
**BACCAREL LI_000482**
10:11
**BACCAREL LI_000499**
11:3
**BACCAREL LI_000501**
11:4
**BACCAREL LI_001185**
11:8
**BACCAREL LI_001209**
11:9
**BACCAREL LI_001360**
12:4
**BACCAREL LI_001364**
12:5
**BACCAREL LI_014239**
9:11
**BACCAREL LI_014242**
9:12
**BACCAREL LI_014576**
11:17
**BACCAREL LI_014580**
11:18
**Baccarelli's**
42:10

91:20
157:15
209:8
226:16
**back** 20:25
23:4, 5
26:12
44:14  45:1
98:20
106:21
108:2, 6
144:13
190:24
217:9
229:17, 20
242:25
245:12
260:20
264:2
267:20, 22
279:17
281:25
287:12
290:7
292:24
293:2
311:12
320:19
331:6
347:8
351:20
389:16
390:5, 9, 13
398:25
400:3
402:18
415:9
444:25
445:6
478:15
483:20
**backed** 65:6
**background**
125:11

**bad** 79:25
135:23
251:11
254:20
**baffled**
119:20
**Baker**
10:20, 24
11:21, 24
20:12
40:13, 16, 17, 23  41:4, 15, 18  44:4, 9, 10, 18  45:4
48:7, 17
57:14, 24
58:5, 6
81:8  82:18
121:23
122:17, 24
123:8
124:6, 8
127:9, 20, 22
128:7
151:5, 12
158:17
182:20
194:12, 21
199:2
203:2
210:9
224:2
249:7
256:21
282:21
337:14
339:21
340:2, 4
342:11, 18, 21  343:3, 13, 14, 15  346:6, 8, 18, 19
347:25
348:9

349:21
351:11
352:17
365:4
366:7
373:22
374:23
377:12
379:9, 18, 21
380:20
382:2
383:2
384:12
386:8, 19
402:8
407:9
420:10
426:22
427:2, 13
428:8, 25
448:23
483:8, 9
484:1, 23
486:13
**Baker's**
44:9  48:21
372:23
428:14
483:25
**Bandoli**
12:3
437:15, 19
**Bar** 138:23
447:21
**barber**
147:12
**BARLOW**
5:1
**BARNES**
5:9, 20  6:1, 4, 13
**BARRIERE**
2:6
**base** 324:7

**based** 85:4, 11  120:5
124:17
157:25
168:2
196:21
202:13
207:5, 14, 15, 16  212:18
221:20, 21, 25  222:1
235:9
243:24
290:11
306:19
323:11
324:5, 10
364:20, 24
365:19, 20
399:10
410:13
411:13, 15
412:2, 17
416:15
443:15
461:3
470:15
471:3
485:10
**bases**
407:18
**basically**
120:1
**basing**
470:18
**basis** 14:21, 25  284:21
**bathroom**
188:19
389:20
**battery**
265:13
**Bauer**
147:16, 18

148:*23*
149:*2, 4*
286:*24*
289:*7*
**BDNF**
105:*11*
**Beach** 5:*8*
**bearing**
290:*16*
437:*13*
**BEASLEY**
4:*20*
**beautiful**
70:*24*
**becoming**
118:*8*
**beginning**
39:*15, 18*
221:*24*
266:*1*
271:*10*
**begins**
359:*14*
**behalf**
13:*24*
111:*21*
**behave**
139:*17*
172:*21*
**behaving**
172:*21, 25*
**behavior**
244:*15, 20*
261:*5, 19*
265:*10, 16,*
*20*
**behavioral**
265:*11*
**believe**
19:*25* 20:*7,*
*9* 34:*9*
35:*12* 36:*8*
45:*20, 23*
46:2 48:22

49:*17* 50:6
53:*19*
58:*11*
66:*25* 71:7
88:*3* 93:2
99:*1*
109:*23*
110:*9*
115:*8*
119:*5*
121:*19*
128:*6*
137:*25*
148:*12*
150:*22*
151:*19*
155:*8, 18*
163:*8*
193:*2, 18*
196:*22*
199:*24*
221:*4*
226:*14*
232:*23*
241:*11*
247:*15*
254:*10*
267:*5*
282:*18*
295:*10*
315:*14*
355:*4*
360:*8*
364:*17*
398:*13*
406:2
409:*13*
414:*10*
424:4
426:*2, 24*
453:*19*
461:7 464:8
**believed**
36:*12*

118:*12*
119:*13*
120:*11*
122:*16*
127:*12*
155:*16*
322:*11*
361:*9, 11*
**believes**
116:*13*
127:*13*
403:*10*
**believing**
19:*17*
**Bellenger**
152:*17*
302:*6, 9*
303:*19*
355:*14*
**benefit**
309:*17*
**best** 51:*9*
60:*25* 68:*6*
77:*16*
98:22
117:*18*
120:*10*
144:*25*
203:*10*
294:*13, 20*
308:*23*
309:*1*
363:8 488:8
**better**
70:*20*
74:*15*
127:*23*
182:*8*
251:*14*
376:*23*
458:5
482:8
486:*12*

**beyond**
71:*14* 230:7
**bias** 24:*6*
242:2
277:*21, 23*
304:*18, 20*
318:*23, 25*
319:*1, 4, 20*
325:*24*
335:*10, 14*
377:6
396:*11, 13,*
*19* 404:*19*
461:*11*
485:*22*
**biased**
159:2
231:*8*
243:*4*
251:*17*
261:*6, 20*
263:*16*
265:*21*
279:*6*
323:*8*
334:*2, 23, 24*
335:*2, 17*
395:*4*
**biasing**
375:*9*
**Big** 8:*14*
72:22
118:*12*
154:7
180:*18*
262:*17*
300:*6, 10*
301:*9*
482:*14*
**bigger**
41:*13*
206:*23*
417:*19*
464:*1*

482:*9*
485:*24*
**bile** 156:*22*
205:5
**billing**
113:*22*
114:2
**bills** 145:*11*
**binder** 30:*6*
296:*17*
**Binders**
12:*10* 30:*1,*
*2*
**biochemist**
152:*17*
197:5 302:7
**biological**
168:8 376:*3*
**biologically**
229:2
**Biomarker**
9:*18*
154:*14*
163:*6*
164:*9*
165:*25*
182:*12*
193:*11*
302:*20*
361:*19*
401:*5, 7, 8*
**Biomarkers**
11:*13*
166:2
169:*11*
361:*17*
**biostatistic**
288:*16*
**Birth** 11:*20*
12:2, *10*
36:*16*
99:*15, 16*
195:7
204:*11*

239:*5*
245:*6*
413:*11*
414:*5*
420:*13*
421:*16*
422:*2, 9, 14,*
*16, 18, 21, 25*
423:*1, 2, 18*
424:*15*
425:*1, 2, 4,*
*14*  426:*5*
**bit**  128:*4*
149:*9*
206:*4*  348:*1*
**blew**  331:*9*
**blind**  171:*16*
**blood**
300:*24*
301:*6*
361:*23*
394:*11, 14*
396:*17*
400:*18*
401:*3*
422:*5*
423:*19*
425:*12*
**blown**  46:*1*
90:*2*  331:*8*
**board**  62:*5,*
*9, 19*  171:*18*
**body**  64:*20,*
*21*  199:*14*
323:*9*  376:*7*
**BONESTEE**
**L**  8:*11*
**book**
288:*16, 17*
**Boots**  6:*10*
**born**  460:*23*
**Bornehag**
291:*9*
**BOSSO**  7:*7*

**bothering**
25:22
**bottom**
110:*13*
179:*19*
191:*11, 15*
247:*10*
255:*13*
298:*13*
391:*12*
448:*16*
**Boulevard**
4:*16*
**bowel**  154:*7*
196:*1*
**box**  310:*15*
**boys**  456:*20*
457:*14*
**Bradford**
118:*21*
130:*15, 17*
132:*24, 25*
137:*15*
209:*14*
230:22
320:*23*
324:*25*
325:*7*
326:*3, 4, 7,*
*13, 20, 25*
327:*1, 6, 16,*
*20*  328:*2, 5,*
*9, 11, 16, 21*
329:*1, 8, 16,*
*22, 25*  330:*3,*
*15*
**Brain**  10:*19,*
*23*  11:*7*
*40:11*  92:*8,*
*9*  93:*4*
103:*2*
105:*5, 21*
118:*4*
349:*18*

355:*17, 21*
447:*9*
450:*16, 18,*
*19*  463:*10*
**brains**
140:*25*
450:*15*

**Brandlistuen**
265:*4*
276:*23*
291:*6*  433:*8*
**Brandon**
427:*5, 6, 9,*
*22*  428:*4*
429:*7*
430:*20*
**brands**
110:*25*
**break**  106:*5,*
*17*  188:*19,*
*22*  289:*18*
292:*16*
342:22
343:*12, 15,*
*17*  346:*9, 13*
347:*24*
389:*19*
444:*17*
455:*9*
456:*5*
457:*6, 17*
**breakdown**
372:*4*
**breakdowns**
56:*20*
**breaking**
127:*3*
**breast**
208:*19*

**breastfeeding**
208:*13*
232:*12, 24*

233:*14, 18,*
*22*
**BRENNAN**
6:*1*  20:*12*
427:*1, 3*
430:*20*
448:*23*
449:*12*
450:*10*
**Briggs**
130:*21*
**bright**  373:*7*
**bring**  82:*6*
143:*8*
303:*13*
**Broadway**
4:*9*
**broke**  454:*4*
456:22
**broken**
362:*15*
471:*10*
**brought**
12:*10*
162:*24*
316:*17*
**BROWN**
8:*11*
**bulletproof**
323:*25*
**bumped**
115:*23*
**bunch**
278:*1*
395:*25*
396:*6*
**burden**
195:*4*
208:*2, 17*
**business**
47:*22, 24*
143:*13*
179:*3*

**busy**  285:*23*

**< C >**
**C112**  3:*6*
**Cabrera's**
31:*7*  34:*24*
**Caffeine**
9:*19*
**CAIN**  7:*12*
**calculate**
372:*7*
**calculated**
372:*5, 8*
484:*21*
**calculations**
372:*18*
**California**
1:*18*  4:*16*
5:*3, 16*  8:*8,*
*13*  488:*18*
**call**  27:*13*
44:*14*
79:*11*
88:*20*
112:*2*
116:*19, 25*
146:*11*
171:*9, 10*
173:*3*
188:*15*
190:*16*
316:*23*
**called**  65:*2*
66:*15*
115:22
182:*12*
222:*21*
223:*6, 10*
224:*7*
239:*19*
295:*19, 20*
304:*3*
449:*6*
461:*19*

**calling**
87:*24*
**Campbell**
1:*16* 4:*3*
13:*17*
488:*2, 16*
**CANAAN**
7:*1*
**Canada**
10:*7, 10*
43:*6, 13*
62:*16*
221:*7*
260:*15*
295:*23*
339:*10*
**Canadian**
9:*14, 22*
11:*20*
**cancer**
126:*1, 4*
407:*25*
**candidate**
69:*24, 25*
**candidates**
69:*20, 22*
70:*2*
**candidly**
226:*2*
**capacity**
310:*4*
**capture**
168:*1*
**captured**
247:*20*
**captures**
226:*12*
247:*22*
248:*1, 2, 8*
256:*18*
394:*14*
**capturing**
266:*20*

**card-carrying**
449:*25*
**cardiovascular** 126:*2, 3*
**care** 332:*6*
**career**
178:*4*
392:*16*
**carefully**
45:*17*
275:*22*
382:*5*
475:*24*
489:*4*
**CARLSON**
3:*21*
**Carrie** 1:*15*
13:*17*
488:*2, 16*

**CARTMELL**
3:*17*
**carve**
252:*23*
**Case** 1:*4*
14:*18*
23:*13* 31:*6*
34:*14* 35:*6*
38:*2* 46:*1,
13* 47:*2, 9*
62:*1* 71:*20*
76:*13*
96:*10*
108:*19*
115:*10*
147:*5, 13*
161:*13*
162:*1*
181:*3*
182:*16*
184:*17, 20*
193:*2*
199:*1*

200:*21*
202:*23*
203:*8*
217:*19*
220:*21*
223:*21*
240:*1*
242:*5*
249:*6, 7*
292:*1*
294:*17*
305:*23*
309:*21, 22*
334:*2*
375:*8*
377:*22*
392:*5*
393:*13, 16*
401:*9*
417:*24*
434:*18*
456:*12*
480:*13*
485:*17*
486:*5*
**case-control**
391:*16*
**Cases** 1:*6*
42:*24, 25*
221:*2, 14*
365:*10, 14*
383:*10, 21*
391:*14, 21*
471:*14, 18*
473:*18, 20*
485:*5, 8*
486:*13, 15,
16*
**Cassoulet**
10:*7*
169:*18*
295:*3* 302:*9*
**CAST**
453:*11, 18,*

20, 21, 25
454:*8*
455:*17*
457:*17, 20*
458:*7*
**catch**
231:*14*
369:*10*
**categories**
125:*16*
364:*12, 14*
**categorization** 196:*12*
**categorized**
306:*19*
**category**
451:*12*
**CATHERINE** 2:*21*
**catherine.hea
cox@lanierla
wfirm.com**
2:*22*
**Caulo**
110:*1*
111:*20*
**Causal**
10:*11* 47:*5,
23* 117:*22*
118:*14*
119:*7*
120:*13*
123:*2*
127:*15*
128:*9, 20, 24*
129:*5, 22*
130:*5, 8, 11,
19* 131:*5*
136:*15*
323:*5*
359:*17, 22*
360:*12, 15*
361:*14*
397:*2*

418:*22*
419:*18*
430:*6, 12*
431:*3, 15*
**causality**
128:*2, 16*
268:*3*
270:*19*
380:*14*
430:*8*
**causally**
96:*14*
282:*20*
476:*6*
**causation**
126:*9*
129:*10*
130:*14, 18*
132:*7*
133:*13, 18*
134:*3, 11*
136:*6, 22*
137:*2, 7, 13,
19* 192:*17*
201:*3*
231:*21*
232:*10*
270:*8*
272:*23*
273:*8*
288:*3*
292:*1*
305:*20*
306:*4*
309:*13, 21*
311:*18*
361:*7*
407:*21*
412:*16*
419:*12*
**cause** 91:*22*
93:*15* 94:*4*
95:*18, 23*
96:*12* 97:*6*

Confidential - Subject to Protective Order

124:*8*
161:*10*, *12*
167:*18*
209:*9*
226:*18*, *24*
227:*9*
228:*19*
230:*9*
231:*20*
232:*13*
234:*2*
235:*23*
236:*12*, *19*
237:*6*, *10*
238:*23*
239:*2*, *7*, *8*, *9*
240:*1*
242:*8*
277:*24*
399:*23*
408:*9*
409:*2*
417:*5*
429:*22*
**caused**
210:*2*, *3*
239:*15*
242:*18*
424:*4*  426:*3*
**causes** 87:*7*
125:*19*
126:*1*, *2*, *6*
137:*21*
161:*22*
162:*5*
227:*14*
230:*2*, *5*, *10*,
*13*, *16*  231:*3*,
*21*  232:*7*, *24*
312:*4*
**causing**
182:*17*
209:*7*
415:*3*

423:*16*, *17*,
*18*  434:*12*
**caution**
299:*18*
**CDC**  83:*8*,
*13*  233:*20*
239:*4*
241:*20*
**Century**
5:*16*
**certain**  67:*5*
95:*23*
105:*15*
216:*4*
251:*18*
426:*12*
**certainly**
53:*7*, *8*
85:*25*  89:*9*
90:*5*
209:*17*
221:*15*
222:*3*
227:*24*
374:*9*
**certainty**
199:*23*
203:*9*
230:*21*
236:*2*, *4*
241:*1*
391:*22*
392:*1*
398:*15*
**CERTIFICA
TE** 488:*1*
**CERTIFICA
TE.................
.................488**
12:*19*

**certifications**
407:*22*

**Certified**
1:*17*, *18*, *20*
62:*5*, *9*, *19*
63:*1*
171:*18*
456:*10*
488:*2*, *3*, *17*,
*18*, *19*, *20*, *21*,
*22*
**certify**
488:*3*, *5*, *10*
490:*4*
**cesarean**
401:*12*
402:*21*
**cessation**
351:*20*
**cetera**
325:*19*, *24*
371:*18*
391:*17*
**chain**
406:*22*
418:*3*
**chair** 70:*25*
**challenging**
416:*12*
**chance**
14:*19*
31:*23*
59:*17*  60:*1*
179:*10*
180:*2*
**change**  16:*1*,
*14*  35:*3*
50:*3*
105:*17*
157:*2*
256:*25*
257:*1*
299:*13*
320:*14*, *17*
328:*25*
329:*2*, *7*

403:*1*
419:*25*
421:*19*
423:*6*
424:*13*
466:*9* 491:*3*
**changed**
212:*22*
388:*11*
**changes**
105:*8*
235:*5*, *7*
244:*15*, *19*
387:*14*
489:*10*
490:*6*
**changing**
426:*4*
**chapter**
397:*17*
**CHARCHA
LIS**  5:*14*
**CHARGE**
66:*15*
**charity**
477:*14*
**chart**  10:*3*
258:*18*, *19*,
*20*, *22*, *25*
259:*17*
260:*17*
290:*21*
378:*5*
**charts**
158:*20*
258:*6*, *7*, *13*,
*24*  259:*19*
260:*3*, *9*
367:*5*
**check**  52:*22*
72:*24*  78:*2*,
*19*  85:*5*
246:*16*
476:*22*

**checking**
85:*6*
**chemical**
18:*12*  96:*9*,
*21*  154:*15*
155:*5*
163:*6*
182:*15*
183:*21*
185:*12*
**chemicals**
93:*6*  152:*3*,
*20*  153:*9*
155:*10*
156:*8*, *10*
164:*11*
183:*11*, *18*
184:*18*
192:*9*
196:*1*, *7*
202:*17*, *21*
206:*16*, *20*
336:*19*, *20*
447:2, *8*
**Chen**
291:*12*
**cherry-pick**
273:*19*
274:2
**cherry-
picking**
269:*7*
274:*8*, *9*
**Chicago**
2:*11*
**child**  18:*13*
42:*3*  66:*19*,
*20*, 22  91:*6*
94:*5*  95:*18*
97:*6*
161:*10*, *12*
206:*11*
227:*10*
231:*20*

232:*24, 25*
234:*2*
235:*23*
236:*13*
237:*6*
240:*21*
242:*4*
265:*9, 15*
273:*6*
286:*11*
351:*23*
353:*25*
366:*10*
398:*10*
432:*10*
472:*2*
**childbirth**
194:*25*
216:*10*
**Childhood**
9:*13, 21*
11:*15*
12:*10*
18:*14*
232:*12*
397:*25*
453:*13*
**children**
29:*4, 5, 9*
41:*17, 24*
42:*12* 43:*1,*
*2, 21* 61:*25*
91:*1* 121:*7*
230:2, *6*
231:*22*
235:*13*
266:*24*
302:*20*
339:*13*
344:*13*
348:*23, 24*
349:*7*
352:*21*
357:*10, 18,*

*19, 22, 24*
364:*5*
366:*25*
368:*21*
377:*14*
379:*20*
380:*1*
381:*5*
382:*19*
397:*23*
409:*19*
410:*5*
458:*15*
460:*22, 24*
461:*12*
462:*16*
468:*23*
470:*24*
**child's**
158:*4, 15*
**choice** 69:*18*
**choose**
210:*12*
**chose** 112:2
144:*5*
300:*17*
393:*19*
410:*25*
**chosen**
244:*8*
362:*24*
363:*1*
**chronicles**
185:*15*
**circulated**
384:*17*
**circulation**
205:*4*
**circulus**
386:*17*
**circumcised**
204:*8*

**circumcision**
204:*19*
207:*3, 8, 12*
**circumcision
s** 204:*5*

**circumstance**
206:*3*
**citations**
37:*23* 38:*3,*
*14* 276:*21*
**cite** 154:*9*
**cites** 432:*11*
**citing**
431:*21*
**City** 3:*19*
4:*4* 70:*19*
197:*13*
**claim**
207:*11*
466:*17*
**clarified**
397:*15*
**clarifies**
466:*10*
**clarify**
42:*18*
**class** 134:*13*
135:*21*
**classes**
90:*23*
**classification**
432:*25*
**classified**
141:*19*
310:*8*
**classify**
43:*21*
310:*11*
315:*8*
**classifying**
103:*16*
**clean** 386:*22*

**cleaning**
383:*16*
**clear** 70:*9*
90:*3* 92:*6,*
*15* 120:*5*
136:*23*
137:*20*
216:*6*
238:*5*
250:*7*
302:*3*
320:*3*
327:*23*
328:*12*
330:*11*
426:*11*
**cleared**
377:*7*
**clearly**
18:*15* 27:*4*
29:*3* 35:*20,*
*21* 36:*1*
65:*20*
77:*19*
125:*16, 18*
128:*17*
129:*4*
159:*1*
198:*11*
218:*19, 24*
221:*8*
310:*14*
331:*15*
376:*21*
415:*15*
473:*15*
487:*5*
**click** 282:*2*
**client** 14:*19*
15:*4*
111:*22*
112:*7*
**climate**
157:*2*

**clinical**
258:*17, 18,*
*19, 24*
259:*19*
421:*19*
423:*7*
424:*13*
426:*4*
445:*21, 22*
450:*14*
461:*18*
**clinicians**
212:*14*
**Clinton** 8:*2*
**clip** 189:*17*
**clone** 317:*25*
**close** 412:*18*
**closely**
183:*24*
**closer-in-
time** 195:*20*
**closest**
148:*20*
**Coast** 70:*20*
**coauthor**
297:2 302:*5*
**coauthored**
214:*9*
**coauthors**
296:*20*
**cocaine**
163:*1*
**coffee** 82:*12,*
*17*
**Cohort**
9:*14, 22*
10:7, *10*
11:*21* 12:2,
*10* 36:*16*
44:*21*
66:*19* 77:*5*
85:*19* 99:2,
*15, 16* 100:*3*
151:*6, 13*

Confidential - Subject to Protective Order

152:*18*
219:*21*
220:*5*
257:*21*
276:*12*
279:*8*
295:*23*
337:*23, 25*
339:*1*
344:*4*
346:*21*
375:*1, 10, 11*
378:*17, 19*
383:*11*
413:*11*
414:*6*
432:*6*
469:*12*
**cohorts**
17:*3, 4, 5*
44:*4*
101:*15*
277:*13, 14*
388:*20*
421:*18*
**coincidence**
393:*16*

**collaborative**
295:*9*
**colleague**
63:*10*
72:*14* 83:*8*
117:*14*
295:*2*
307:*13*
447:*20*
465:*9, 11*
**colleagues**
63:*13, 15, 19*
115:*2*
139:*25*
152:*16*
212:*13*

217:*8*
258:*1*
260:*15*
283:*11*
294:*15, 19*
295:*10*
303:*19*
307:*15*
324:*9*
339:*2*
433:*25*
436:*19*
448:*7*
449:*17*
465:*13*
**collect**
98:*23*
203:*20*
224:*19*
**collected**
98:*21*
203:*16*
339:*10, 17*
400:*13, 19*
**collecting**
100:*14*
416:*9*
**College**
64:*2* 119:*25*
**color** 171:*16*
**colors**
171:*10, 16*
**Columbia**
54:*18*
56:*21* 57:*1*
68:*17* 69:*5,
7* 70:*10, 18*
83:*1* 84:*4*
309:*3, 12*
317:*6*
336:*5*
392:*14*
437:*3, 5*

**column**
368:*14*
369:*6*
370:*7, 11*
421:*13*
431:*18*
434:*24*
464:*11*
473:*8, 10*
474:*2*
**columns**
369:*13, 15*
**come** 39:*10*
64:*24*
69:*12* 71:*1,
15* 83:*6*
119:*2*
124:*11*
198:*18*
206:*21*
231:*1*
258:*8*
263:*17*
320:*19*
326:*12*
370:*14*
380:*16*
386:*22*
396:*23*
**comes**
54:*19*
72:*20*
129:*19*
198:*17, 20*
326:*3*
380:*19*
481:*25*
**comfortable**
14:*22*
200:*13*
**coming**
306:*6* 418:*6*
**commencement** 488:*3*

**commencing**
1:*14*
**commending**
333:*16*
**comment**
118:*2*
247:*12, 16*
299:*25*
300:*2, 17, 21*
301:*23*
303:*8*
333:*6*
385:*1, 2, 11*
386:*5* 389:*6*
**commentaries** 407:*15*
**commentary**
52:*7* 59:*23*
74:*7*
122:*21*
123:*19*
135:*1*
238:*20*
465:*2, 4, 20*
466:*25*
467:*15*
468:*11*
**comments**
38:*19, 22*
177:*17, 21*
178:*12, 22*
179:*9, 11*
191:*8*
247:*5*
297:*10*
298:*9, 15, 16*
389:*4*
**Commerce**
4:*22*
**commission**
490:*17*
**commit**
60:*16, 23*

**committee**
69:*21* 70:*1*
**common**
111:*13*
239:*20*
**commonly**
265:*14*
363:*5*
**communication** 283:*15*
285:*17, 18*
470:*5*
**communications** 67:*16*
**community**
168:*16*
213:*14*
**comorbidity**
125:*12*
**company**
112:*17, 20*
323:*15*
**comparable**
485:*14*
**compare**
454:*25*
455:*1, 4*
**compared**
155:*20*
216:*15*
265:*18*
345:*4, 22*
443:*15*
455:*8*
486:*23*
**comparing**
29:*3* 222:*6,
11* 454:*17*
**comparison**
126:*13*
**competing**
434:*23*
**complaining**
312:*22*

Confidential - Subject to Protective Order

complementary 392:*11*
complete 137:*15*
165:*12*
256:*14*
350:*4, 7*
351:*6, 14, 17*
391:*13*
467:*2, 5*
485:*11*
completed 379:*6*
383:*18*
485:*9*
completely 18:*25*
19:*12* 21:*1*
23:*23* 69:*6*
78:*3* 95:*1*
119:*20*
153:*12*
156:*14*
247:*22*
248:*6*
252:*23*
266:*14*
282:*5*
303:*2*
306:*13*
411:*3*
427:*22*
479:*19*
486:*10*
completing 383:*17*
complication 239:*5*
complications 422:*23, 24*
complies 434:*15*

component 266:*21*
417:*17*
components 265:*15*
328:*7*
464:*14*
compound 166:*18*
comprehensive 203:*14*
concentration 162:*15*
163:*23*
182:*1*
183:*7*
184:*4, 14*
188:*6*
201:*7, 21*
215:*8, 13, 22*
250:*18*
251:*1*
299:*17*
362:*20*
concentrations 217:*1*
252:*3*
255:*18*
concept 164:*9*
conception 94:*4*
concepts 275:*25*
concern 45:*22, 24*
124:*9*
148:*6, 9*
158:*16*
167:*18*
194:*4, 11, 19*
195:*14, 15, 17* 196:*11*
262:*17*

323:*20, 25*
405:*1, 6, 8*
417:*19*
456:*18*
462:*5*
464:*21*
465:*24*
concerned 62:*1* 86:*21*
87:*5* 118:*7, 8* 123:*10*
164:*22*
218:*7*
223:*16*
322:*23*
418:*17*
469:*23*
474:*24*
concerning 128:*19*
421:*17*
concerns 323:*21, 24*
416:*6*
concluded 130:*19*
235:*10*
327:*3*
487:*22*
concludes 132:*7*
conclusion 16:*2* 72:*11*
129:*20*
226:*8*
263:*17*
271:*3, 23*
272:*2, 9*
307:*3*
311:*5*
322:*10, 19, 25* 326:*12*
330:*7, 15, 17*
331:*1, 20*

382:*10, 13, 15* 403:*2, 14*
404:*21*
conclusions 71:*23* 77:*5*
83:*22*
84:*24* 85:*4, 24* 184:*23*
185:*2*
186:*13*
212:*18*
330:*5, 21*
conclusive 198:*3*
240:*21*
concurred 415:*14, 24*
condense 59:*5*
conduct 22:*3* 57:*16*
173:*2*
346:*22*
359:*3* 483:*9*
conducted 50:*17*
101:*8*
159:*20, 21*
348:*16*
confer 14:*19*
conference 63:*20*
117:*13*
225:*17, 19*
conferences 63:*20* 82:*17*
confidence 212:*7, 9*
381:*11*
472:*9*
474:*19, 21, 22* 486:*21, 23, 25* 487:*2*

confident 141:*16*
166:*25*
255:*5*
415:*12*
462:*7*
469:*24*
CONFIDENTIAL 1:*6*
confirm 302:*14*
365:*24*
406:*23*

confirmation 392:2, *4*
confirmed 223:*1*
391:*21*
405:*10*
confirms 380:*13*
conflating 128:*14*
140:*14*
conflict 56:*2, 4, 7, 10*
138:*14, 17*
140:*3, 8, 9, 12, 18, 23*
265:*6*
272:*12*
355:*25*
356:*19*
436:*7*
conflicts 88:*23*
140:*11*
356:*11*
confounded 205:*15*
209:*23*
299:*1*

Confidential - Subject to Protective Order

confounder
236:7, *25*
237:*11*
243:*24*
410:*19*
confounders
231:*9*
371:*19, 25*
403:*5*
404:*4, 14, 18*
417:*2*
466:*21*
confounding
235:*11*
325:*17*
369:*24*
370:*1*
405:*6*
413:*10*
414:*7*
431:*22*
432:*5*
434:*7, 11*
444:*13*
464:*13*
465:*25*
466:*1*
confuse
102:*4*
confused
127:*4, 5, 6, 7*
342:*10*
362:*12*
408:*20*
475:*13*
connect
21:*15* 23:*8,*
*10*
connection
46:*14* 47:*1*
Connectivity
10:*20, 24*
11:*8* 349:*18*

conscientious
436:*12*
consensus
64:7, *11, 12,*
*19, 23, 25*
65:*2, 3, 7, 24*
66:*2, 9, 16,*
*17, 23* 67:*3,*
*5, 9* 120:*2*
149:*5, 7*
240:*11*
318:*7*
consider
49:*25*
149:*3*
236:*6*
243:*13, 15*
482:*13*
considerable
413:*13*
considered
33:*19*
224:*21*
233:*10*
243:*12*
252:*22*
273:*17*
323:*19*
369:*19*
445:*10*
482:*19*
considering
243:*8*
344:*22*
419:*1*
422:*8* 482:*3*
consistence
46:*5*
consistency
46:*2* 321:*3,*
*4* 325:*23*
consistent
32:*17, 21*

33:*5*
123:*25*
128:*2, 16*
130:*10, 13*
133:*6, 17*
136:*21*
137:*13, 18*
163:*5*
164:*21, 24,*
*25* 167:*15*
168:*8*
193:*9*
197:*6, 18*
200:*14*
247:*14*
253:*17*
254:*12, 15*
270:*8*
286:*4*
331:*8, 10, 13*
357:*23*
361:*20*
380:*7*
430:*8*
458:*20*
480:*19*
consistently
460:*13*
consortium
66:*15, 20*
constantly
301:*25*
consultancy
356:*4, 12*
consulting
86:*4, 7, 25*
consume
269:*14*
Consumer
6:*4* 11:*11*
contact
68:*7, 9*
73:*3, 10*
76:*18*

108:*24*
113:*20*
114:*3*
146:*17*
469:*22*
contacted
54:*3* 71:*16,*
*17* 74:*3*
76:*16, 17, 19*
77:*9* 86:*8*
109:*9*
113:*12*
144:*20, 24*
145:*8*
150:*19*
151:*2*
contacts
73:*15*
contain
225:*3*
contained
16:*8, 14*

contaminants
10:*6, 9*
295:*22*
Content
11:*1*
context
190:*1*
250:*8*
274:*24, 25*
275:*7*
281:*10*
380:*6*
425:*24*
continue
27:*7* 188:*24*
continued
27:*7*
350:*20, 21*
continues
93:*8*

continuing
138:*1*
continuous
418:*12*
contract
56:*16*
contradicts
406:*19*
contribute
68:*5*
121:*15*
131:*4*
134:*11*
208:*16*
254:*4, 7*
365:*1*
contributed
365:*10*
contributes
161:*10*
239:*6, 9*
contribution
157:*10*
209:*5*
304:*18*
contributor
208:*1*
288:*18*
control
197:*8*
243:*15, 20,*
*22, 25* 244:*1*
325:*24*
371:*19*
407:*10*
414:*6*
432:*18*
controlled
243:*9, 14*
controls
365:*11, 15*
432:*15*
486:*17*

**conversation**
22:*20*
53:*24*
69:*11*
110:6, *10*
116:*1* 148:*4*
**conversation**
**s** 21:*23*
**convinced**
19:*12* 47:*3,*
*4* 118:*16*
121:*25*
122:2
161:*4*
333:6
424:*8, 10*
**convincing**
94:*10*
**COOPER**
5:5, *7*
**copied**
369:*9*
**copy-and-**
**paste** 370:*6*
**Cord** 11:*13*
300:*24*
301:*6*
361:*23*
394:*11, 14,*
*20* 396:16
400:*18*
401:*3*
**Corporation**
6:*10, 16*
7:*16, 21*
356:5
**correct**
15:*21* 16:*1,*
*6, 17* 17:*21*
18:*4, 5*
19:*21, 22*
21:6 29:*10*
31:*3, 13, 25*
32:2, *24*

33:*12, 23*
36:*11*
38:*14*
39:*13*
40:*24* 41:*7*
43:*14*
44:*24, 25*
48:*9, 18*
50:*10* 52:*4,*
*18* 62:6, *17*
64:7 68:*13*
80:*19, 20, 24*
82:2 85:*20*
89:*22*
90:*20*
92:*22*
93:*15* 94:*5,*
*20* 95:*11*
98:*11, 15, 16,*
*18* 99:*17, 22*
100:*6, 22*
101:*3, 18*
109:*16*
110:*3, 4*
111:*10, 11*
112:*3*
115:*20, 21*
116:*1, 2*
122:*14, 18,*
*20* 123:*2*
125:*6, 23*
127:*15*
129:*12*
133:*13, 21*
134:*4*
138:*10*
140:*21*
141:*18*
142:*5*
143:*16, 20*
144:*6, 24*
145:*3*
150:*16, 21*
152:*4, 9*

157:*19, 24*
158:*4*
159:*14*
165:*20*
166:*19*
168:*19*
170:*13, 16*
171:*25*
176:*11, 12,*
*17, 18, 21*
177:*18, 19*
180:*6*
181:*10*
182:*2*
183:*7*
184:*5, 15*
185:*6*
188:*7*
192:*6*
204:*17*
206:*14*
215:*4, 13, 14*
216:*11, 19*
220:*5, 6*
224:*25*
225:*7, 13*
227:*11*
232:*2, 14*
234:*8*
239:*15*
242:*8*
245:*8*
248:*13*
253:*13, 14,*
*23* 257:*9, 10*
260:*12*
273:*2, 10*
274:*18*
276:*13*
278:*10*
279:*24*
282:*13*
284:*7*
285:*15*

286:*8, 9, 18*
288:6, *11*
290:*22, 23*
291:*14*
293:*25*
294:*4, 10, 11,*
*23* 300:*1, 19*
301:*4*
303:*10*
304:*7, 8*
305:*10*
311:*5*
319:*9, 10*
322:*2, 7, 12*
323:*17*
324:*3*
326:*22*
328:*3, 22*
329:*17*
330:*17*
332:*9, 15*
337:*6*
338:*2*
339:*17*
345:*14*
348:*11, 14*
349:*2, 10*
355:*24*
356:*14, 22,*
*24* 357:*14,*
*17* 360:*16,*
*22* 361:*10*
362:*17*
363:*25*
364:*23*
365:*25*
368:*17, 25*
369:*2, 16*
370:*12*
372:*23*
373:*16, 18*
376:*2*
378:*9*
383:*7*

385:*2*
386:*1*
387:*2*
388:*5*
391:*6*
394:*13, 23,*
*24* 396:*20,*
*22* 398:*10*
399:*6*
400:*14*
405:*6*
406:*4, 14, 25*
409:*10*
413:*17, 20*
419:*20*
421:*7*
422:*1*
423:*8*
427:*14*
430:*9*
446:*1, 5*
453:*17, 19*
454:*6*
455:*7*
458:*11*
459:*4, 5*
462:*11, 19*
463:*4, 18*
466:*5*
468:*8, 14*
470:*6*
472:*25*
478:*24*
479:*5*
484:*20*
486:*14*
487:*12*
490:*5*
**corrected**
250:*16, 23*
415:*17*
**corrections**
489:*4, 7*
490:*6*

Confidential - Subject to Protective Order

correctly
120:*10*
178:*9*
265:*1, 22, 23*
330:*2*
413:*18*
correlate
159:*22*
correlated
213:*23, 24*
correlates
181:*24*
183:*5*
184:*2, 12*
188:*3*
correlating
160:*10*
correlation
155:*4, 7*
192:*9*
202:*20*
correlations
203:*7, 8*
correspond
296:*6*
corresponde
nce 239:*24*

corroborated
470:*10*
cortex  11:*22*
**Costco**  6:*16*
**COTE**  1:*6*
27:*14*
79:*12, 17*
173:*4*
**Counsel**  5:*9*
6:*4, 9, 16, 22*
7:*9, 16, 21*
8:*4, 9, 14*
12:*17*
13:*14*
14:*10*
26:*19*

145:*6*
293:*6*
347:*2*
488:*11, 12*
**counter**
217:*25*
**counters**
461:*18*
**countless**
167:*1*
**couple**
79:*16*
214:*13*
223:*6*  261:*1*
**course**
30:*14*
34:*17*
36:*24*  37:*3,*
*12*  47:*6*
59:*3*  69:*19*
85:*11*
89:*24*  93:*5*
118:*15*
135:*21*
138:*17*
153:*24*
156:*2*
170:*14*
208:*15*
213:*13*
242:*12*
281:*13*
296:*24*
297:*8*
299:*23*
301:*9*
325:*9*
326:*2*
328:*6*
333:*12*
354:*3*
439:*19*
445:*19*
447:*6*

453:*4*
463:*9*
475:*24*
482:*8*
**COURT**
1:*1, 20*
13:*16*  23:*5*
189:*3*
190:*12, 17*
238:*14*
398:*5*
488:*19, 21,*
*22*  489:*19*
**covered**
34:*12*
402:*13*
**covering**
407:*18*
**COVID**
317:*7*
350:*23*
**CPT**  453:*21,*
*23*
**create**
46:*10*
218:*8*
262:*10*
312:*18*
384:*3*
456:*18*
**created**
30:*17*
306:*20*
307:*11*
369:*21*
**creates**
153:*10*
310:*17*
312:*17*
**credible**
14:*25*
**criteria**
304:*13, 15,*
*21*  305:*7*

306:*6, 8, 19,*
*21, 23*
307:*21*
309:*11, 14*
311:*19*
312:*13*
314:*20*
317:*21*
325:*3, 6, 7*
326:*6, 8*
327:*1, 2, 13*
334:*16*
337:*10*
384:*4*
**criterias**
329:*22*
**criterion**
304:*19*
310:*9*
**critical**
141:*8*
225:*12*
337:*7, 9*
359:*7*
**criticism**
276:*12*
291:*24*
**criticize**
172:*16*
254:*17*
276:*1*
278:*19*
**criticized**
254:*23*
**criticizes**
283:*5*
**criticizing**
280:*1*
288:*19*
**critique**
175:*17*
252:*17*
**crosses**
105:*4*

**CROSS-**
**EXAMINAT**
**ION**  478:*17*
**crossing**
478:*4*
**CROW**  4:*20*
**C-section**
259:*4*
401:*24*
402:*1*
**culprit**
205:*16*
227:*22*
**culprits**
227:*23, 24*
**cumulative**
196:*3*
206:*17*
248:*14, 20*
250:*5, 10*
398:*21*
**curious**
108:*19*
302:*10*
**current**
283:*9*
**cut**  363:*7*
466:*24*
467:*9*
**cutoff**
418:*11*
439:*5, 13*
**CV**  337:*1*
**CVS**  6:*9*

**< D >**
**dabbling**
364:*17*
**daily**  309:*12*
**damaging**
227:*15*
**damning**
270:*2*

**DANIEL**
3:12
**Danish**
12:10
36:15
85:19  99:2,
15, 16
375:10
413:11
414:5
**DANNY**
8:20  13:2
**data**  21:14
22:13  24:4
85:20
102:9
121:19
128:18
141:4
159:17
164:14, 16,
25  165:11
166:23
167:14
180:23
181:18
185:2
193:5
195:10, 15
196:21
202:13
203:9
218:8
221:16
223:24
224:3, 12, 14,
19  250:8, 10
251:25
255:19
256:14
259:10
260:18
270:2
279:8

331:22
335:5, 19
350:4, 7
351:14
364:12, 15
365:23, 24
371:17
372:6, 9, 10
376:22
379:6
381:18, 23
383:16
386:21
400:13
402:8
411:15
412:17
413:12
416:5, 10, 12
418:1, 6
423:14
424:12
433:7
440:9, 10
442:5, 8
444:6
450:16
466:16
468:21
470:19, 22
485:9
**database**
217:5
370:15
383:18
412:3
**Databases**
49:6
**date**  1:15
12:17  13:5
40:7  54:23
71:6
144:23
387:8, 11

488:8
489:9
490:12
**Dated**
488:24
**dates**  151:4
439:25
440:14, 16
**dation**
279:24
**Daubert**
55:24  61:2
**David**
149:24
**DAVIS**  5:7
**davis@coope
rlawpartners
.com**  5:7
**day**  75:17,
18  95:17
97:5  100:4
102:7, 16
113:16, 19
222:22
226:18
228:19, 25
229:6
285:11
300:9, 12, 13
301:13
304:16
349:8
351:21
352:6, 7, 8
353:14
441:11
490:16
**days**  94:4,
11, 13, 20
101:15
156:13
191:23
223:7
248:17

397:13
398:21
399:5
439:5, 8, 15,
23  440:4
441:2, 4
443:18
489:15
**DC**  5:22
6:15  7:8
316:19
**deal**  123:13
233:21
**dealing**
187:21
**DEAN**  8:6
**DEANNA**
5:20
**debate**
416:13
**December**
293:11
294:1
435:16, 17
**decide**
79:18
181:5  436:6
**decided**
26:15
56:23
117:20
224:18
310:1
408:23
**deciding**
449:4
**decision**
69:16
174:14
**deck**  226:3
**declaration**
434:23
**decrease**
485:18, 24

**decreased**
486:14
**decreases**
486:9
**deemed**
489:18
**deep**  45:19
78:20
134:24
**Defendant**
13:24
**defendants**
15:18
323:16
324:3
**defending**
14:23
288:1, 9
**defense**
310:18
**defensive**
103:22
104:11
**defer**  448:6
**deferred**
427:22
**deficit**  11:3
**defined**
193:7
**Definitely**
62:7  95:24
223:23
269:12
287:15
297:5
315:16
322:8
378:24
397:7
445:15
**degree**
297:5
427:14

delete
299:25
deleted
413:4
delivered
158:21
203:23
deliveries
160:21
delivery
152:23
153:17
158:3, 14, 23
159:4, 11
164:18
165:4, 7
166:11, 17
167:8
168:4, 24
191:23
194:14
195:4, 8, 21
196:9
203:18
204:1
209:3, 5
210:11
224:5, 9
226:9, 13, 18
227:4, 9, 12,
16, 19, 22
228:19
229:1, 7
255:17
256:6, 9, 10,
11, 19 257:9,
15, 23 258:2,
6, 7, 12, 19,
21, 25
259:17
260:2, 8, 10,
17 300:14,
16 366:20
367:4, 17

395:16
396:9, 18, 22
397:2, 9, 24
398:9
399:4
400:1
401:4
402:13
462:13
DELUCIA
3:11
DENISE 1:5
Denmark
17:9
department
81:16
465:17
depending
93:5 314:4
417:8
depends
136:10
156:1
204:12, 13
213:21
216:15
288:14
depon
281:18
deponent
13:12 490:1
DEPONENT
....................49
0 12:20
deposes
13:23
deposing
489:14
deposition
1:11 12:12,
15 13:7
25:16 27:2
31:5 34:24
79:11

145:7
188:15
281:18
284:10, 20
306:7
315:1
346:22
487:22
489:3, 12, 16,
17
depositions
27:3 108:18
depression
241:11, 14,
15, 21 242:2,
18 243:5, 21,
23 437:22
443:19
deps@golko
w.com 1:23
derives
415:16
describe
117:18
described
73:10
describes
129:4
describing
50:8
Description
9:10
design
403:4, 19
433:13
464:9
designs
432:14
desire
360:24
despite
260:2
359:15
429:17

detail
167:20
232:5
241:24
242:14
405:4
detailed
100:14
257:25
details
35:25
61:15 85:5,
7 453:9
detect
198:4
376:24
detectable
195:19
196:15, 23
200:6
340:24
detected
191:24
357:5
377:23
378:7
379:17
detection
197:3, 7, 9
198:2
200:14
363:17
determinatio
n 231:18
323:4
391:4
419:3, 5, 18,
25
determine
230:2
248:9
269:13
determined
335:10

418:21
473:17
develop
41:20, 21
153:18

Development
9:14, 22
265:10
422:1
developament
al 11:23
95:24
devil's 39:4
303:12
diabetes
422:4
423:17
diagnosed
41:23
42:25 43:1,
3, 19 125:15
diagnoses
346:3
378:11
379:15
380:16
381:3
diagnosis
42:3, 11, 22
43:6, 25
357:16, 19
363:21
445:21, 22
450:14
differ
433:20
difference
41:16 48:5
110:22
150:25
167:7
219:10
271:19

358:5
363:*15*
367:*10*
380:*21, 25*
440:6
456:7
457:*14*
474:7  479:*1*
**differences**
193:7
234:*14*
280:9
308:*4*  457:9
**different**
17:*12*  44:4
56:*20*
71:*23*  77:4
93:*6*  95:*1,
13*  110:*25*
125:*5, 15, 21,
22*  126:4
128:*14*
156:7
160:*11*
162:*13, 14,
17*  163:*21,
24*  183:*17*
187:*18*
200:*19*
202:*11*
210:*24*
221:6
239:*19*
243:*13*
246:*14*
265:*17*
266:*1, 13, 14*
267:7
275:*25*
287:*19*
296:*1*
304:6
320:*11*
326:*12*

327:*15*
346:*3*
352:*25*
369:*20*
378:*23*
382:*1*
392:*7, 8*
411:*4, 12*
418:*18*
421:*25*
424:*24*
429:*10*
438:*24*
440:*1*
442:*21*
446:*13*
447:*2*
456:*19*
475:*4, 20*
477:*20*
**difficult**
118:*3*
432:*15*
**difficulties**
459:*22*
**diligence**
143:*24*
436:*15*
**diligently**
47:*8*
**diluting**
395:*23*
**Diplomate**
1:*16*  488:*2,
17*
**DIRECT**
14:*1*  15:*2*
298:*25*
360:*21*
**directed**
373:*4*
**direction**
247:*25*

460:*17*
485:*16*
**directions**
485:*23*
**directly**
154:*2*
207:*2*
233:*21*
260:*14*
265:*17*
372:*5*
**director**
429:*10, 11*
**dis**  49:*8*
141:*2*
**disagree**
141:*7*
142:*4, 17*
263:*11, 14*
293:*12*
309:*18*
310:*10*
315:*9*
320:*23*
381:*1*
431:*2, 24*
432:*1*
433:*24*
434:*6*
466:*5*
476:*15*
**disagreed**
249:*10, 14*
**disagreeing**
236:*11*

**disagreement**
141:*5*
**disagrees**
142:*11*
**disappear**
460:*12*
**discarded**
269:*20*

**disciplines**
446:*11*
**disclose**
77:*13*  88:*4,
17*  138:*13,
15*  140:*9, 10,
12*  175:*24*
294:*21, 25*
435:*8*
436:*1*
437:*4, 8*
**disclosed**
55:*22, 25*
138:*20*
140:*23, 24*
282:*25*
283:*1*
315:*13*
334:*15, 16*
**disclosing**
306:*23*
315:*11, 12*
335:*19*
**disclosure**
56:*17, 24*
435:*16*
436:*20*
**disclosures**
435:*1*
**discordant**
265:*3*
276:*22*
**discovered**
307:*5*

**discrepancies**
72:*1*
**discuss**  33:*6*
49:*13, 25*
70:*6*  74:*23*
81:*21*
99:*25*
167:*11, 19,
20*  207:*20*

210:*20*
223:*11*
230:*19, 25*
310:*13*
315:*10*
320:*14*
335:*18, 22*
337:*21*
338:*8, 22*
346:*8, 18*
367:*22*
404:*9*
405:*3, 14, 16*
407:*4*  413:*1*
**discussed**
26:*15*
70:*22, 23*
102:*10*
117:*12, 14*
256:*3, 4, 14*
281:*11*
356:*16*
386:*7, 8*
**discusses**
252:*9*
**discussing**
28:*4*  209:7
243:*2*
346:*20*
415:*10*
423:*23*
**discussion**
77:*19*  98:7
213:7
223:*18*
255:*13*
257:*25*
264:*18*
403:*22*
422:6
**disease**
126:*2, 3*
162:*5*

239:*10*
419:*13*
**diseases**
125:*14*
267:*8*
**dismissing**
207:*25*
**Disorder**
10:*14, 15, 19,*
*23*  11:*7, 15*
206:*1*  431:*1*
**Disorders**
10:*13*  12:*9*
51:*6*  96:*16*
109:*13*
148:*14*
227:*1*
263:*19*
265:*11*
273:*10*
298:*24*
397:*22*
398:*19*
415:*6*
422:*9*
437:*24*
471:*11*
476:*8*
**dissect**
196:*5*
**disser**  449:*7*
**dissertation**
41:*5*
372:*23*
427:*1, 6, 25*
448:*24*
449:*8, 10*
**distant**
206:*13*
**distinction**
140:*14*
**DISTRICT**
1:*1*
**dive**  45:*19*

**diverse**
388:*19*
421:*17*
**divide**
362:*18*
**Division**
407:*25*
**dlee@btlaw.c**
**om**  5:*21*
**DNA**   412:*12*
**DNBC**
99:*11*
100:*21*
375:*1*
416:*11*
**docket**   27:*2*
**Doctor**   14:*3*
27:*24*   51:*8*
56:*22*
84:*20*
107:*18*
113:*15*
126:*7*
127:*8, 9*
128:*9*
131:*7, 15, 24*
133:*11*
139:*14*
168:*22*
172:*16*
173:*11*
174:*24*
175:*15*
176:*4*
177:*16*
182:*23*
184:*5*
185:*3*
186:*15, 25*
187:*24*
188:*13*
200:*2*
203:*11*
211:*21*

213:*9*
226:*7*
231:*12*
239:*12*
251:*4*
256:*2*
258:*10*
263:*10*
264:*10, 20*
268:*10*
271:*21*
283:*20*
285:*3*
290:*2*
294:*1*
295:*25*
296:*12*
304:*1*
327:*24*
328:*19*
331:*22*
333:*20*
335:*24*
336:*3*
339:*24*
342:*4, 21*
344:*3*
345:*8*
346:*10, 23*
347:*22*
348:*9*
354:*18*
355:*13, 25*
358:*10*
368:*13*
370:*7, 20*
374:*20*
378:*4*
380:*11*
384:*11*
387:*22*
394:*4*
396:*5, 12, 24*
407:*23*

412:*20*
417:*25*
420:*22*
421:*21*
426:*21*
428:*9*
430:*12*
437:*14*
438:*19*
442:*14*
443:*24*
444:*10*
446:*21*
450:*24*
451:*1, 24*
457:*15*
458:*4*
459:*19*
462:*9*
469:*19*
470:*4*
472:*16*
473:*9*
474:*13*
**doctoral**
41:*2, 3*
**doctorate**
90:*23*
**doctors**
62:*4*  81:*7,*
*25*  84:*23*
121:*3*
429:*4*
449:*16*
**DOCUMEN**
**T**  1:*5*  10:*7*
27:*1*
306:*17*
307:*21*
310:*16*
315:*4*
326:*1, 16, 18*
381:*23*

382:*5*
388:*15*
**documentati**
**on**  77:*22*
118:*22*
314:*22*
315:*4*
**documented**
328:*16*
335:*14*
384:*5*
482:*10*

**documenting**
305:*2*
**documents**
176:*14*
323:*15*
324:*2, 3*
**doing**  22:*1*
25:*20*  27:*8*
41:*5*  47:*25*
79:*25*  82:*9,*
*19, 22*  97:*21*
113:*11*
127:*24*
143:*3, 19, 24*
144:*3*
156:*12*
179:*8*
222:*18*
242:*22*
259:*3*
281:*20*
311:*19*
325:*2*
326:*11*
330:*10*
332:*21*
334:*10*
350:*25*
402:*5*
459:*25*
489:*8*

**Dollar** 6:*22*, *23* 7:*21*

**dosage**
459:*22*
461:*3*

**dose** 161:*18*
180:*12, 15,*
*17, 18, 20*
181:*24*
182:*13*
183:*5*
184:*2, 12*
186:*1*
188:*4*
191:*24*
192:*25*
195:*22*
196:*14*
197:*18, 21*
200:*5, 10, 11*
248:*15, 20,*
*21* 250:*5, 10*
325:*23*
431:*14*
459:*23*
460:*5*

**dose-**
**response**
198:*10*
202:*16*
364:*9*
439:*14*

**doses** 195:*8*

**double-**
**blinded**
331:*22*

**double-**
**check**
159:*16*

**doubt** 19:*18*
168:*13*
244:*19*
321:*3*
402:*17*

**doubters**
39:*2*

**DOVEL**
4:*12, 14*

**DOWD** 4:*8*

**Dr** 10:*4*
12:*12* 14:*7,*
*8* 15:*8, 12,*
*16, 19* 17:*15,*
*16* 18:*22*
19:*19* 20:*5*
22:*24*
23:*19*
24:*15, 16, 23,*
*25* 25:*1, 2, 8*
27:*21* 28:*3,*
*4, 12* 29:*8*
31:*4, 9, 13,*
*15, 19, 24*
32:*2, 13, 16,*
*22* 33:*3, 4, 5,*
*7, 15, 19, 22,*
*25* 34:*4, 8,*
*24* 35:*10, 17*
36:*6, 8, 21,*
*22* 38:*11*
39:*11, 21*
41:*10* 42:*1,*
*2, 10, 17, 20,*
*21* 43:*5*
44:*2, 3, 4, 9,*
*20* 45:*10*
46:*11* 49:*3,*
*16* 50:*5*
51:*25*
53:*17, 24*
54:*5, 6, 17,*
*20, 22* 55:*18*
57:*3, 13*
59:*18* 60:*5,*
*17* 61:*20*
64:*17*
65:*12, 23*
67:*8* 68:*12,*

*14, 16, 24*
69:*3, 4, 23*
70:*3, 10, 15*
71:*1, 2, 17*
73:*9, 11, 15*
74:*2* 75:*4,*
*5, 23* 76:*17,*
*18, 20* 77:*7,*
*14* 78:*16*
80:*6, 10*
81:*8, 9, 13,*
*14, 23* 82:*18,*
*24* 83:*3, 5,*
*15, 23* 84:*2,*
*3, 21* 85:*21*
87:*21* 90:*7,*
*19* 91:*20*
92:*18* 94:*3,*
*17* 97:*3, 4,*
*11* 98:*1, 9*
99:*9* 100:*2,*
*9, 19* 103:*21*
104:*4, 21*
106:*24*
107:*5*
108:*6, 14*
112:*6*
114:*7, 13*
115:*5*
116:*1, 13*
117:*2, 19, 20,*
*25* 119:*5, 10*
120:*7, 9, 11*
122:*5*
127:*10*
134:*4, 7, 20*
136:*5*
137:*3, 6*
138:*1, 6*
139:*24*
140:*17*
143:*16*
144:*16*
145:*8, 15, 18,*

*22* 147:*18*
148:*23*
149:*2, 4*
151:*17, 25*
152:*12*
157:*15*
158:*1, 12*
159:*9*
162:*7*
165:*17*
170:*2*
174:*14*
177:*20*
191:*2, 5*
192:*4*
193:*12*
196:*10*
197:*20*
201:*10, 16*
203:*15*
206:*10, 24*
209:*8*
210:*8*
214:*4, 22*
219:*19*
221:*17*
222:*16*
223:*6*
224:*23*
226:*16*
227:*8*
228:*10, 17*
229:*20, 25*
231:*16*
232:*23*
233:*25*
235:*15, 21*
237:*5, 18*
238:*22, 24*
240:*7*
241:*5, 10*
242:*6*
244:*13*
246:*5*

249:*9*
250:*16, 23*
251:*10*
252:*1*
254:*16*
257:*13*
260:*1, 8, 14*
261:*3*
267:*21*
270:*15*
274:*1*
275:*8*
281:*9*
284:*2*
286:*24*
289:*7*
290:*18*
292:*6*
293:*2*
297:*17*
302:*6*
307:*4*
308:*14*
312:*25*
313:*7, 22*
316:*6, 10, 11,*
*21, 22, 23, 24*
317:*3, 5, 6, 8,*
*20* 318:*5, 6*
319:*23*
320:*6*
321:*10*
324:*16, 17*
326:*20*
327:*8*
330:*14*
332:*13, 20*
335:*8*
347:*13*
349:*11*
350:*19*
355:*14, 15,*
*18, 20* 356:*3*
365:*3, 22*

366:*20*
367:*16*
368:*4*
373:*24*
374:*3*
377:*11, 12*
379:*18, 21*
380:*15*
383:2
386:*18, 19*
390:*8*
392:*12*
398:7
401:*10*
404:*23, 24*
405:*22*
406:*2, 24*
407:*8*
408:*24*
410:*21, 25*
413:*3*
415:*8, 11, 14*
416:*8*
418:*1*
419:*16*
420:*4, 9, 10*
423:*6*
425:*22*
428:*23*
434:*17*
435:*3, 22*
436:*9, 11*
437:*7, 9*
445:*6*
447:*10*
448:*13*
464:*10*
465:*7, 14, 19, 20, 23*
466:*10*
467:*14*
469:*10*
470:*17, 20*
471:*6*

478:*19*
483:*3, 7, 8, 23, 25*
484:*23*
**Draft**  9:*19*
11:*2, 5*
246:*12*
248:*5*
252:*14*
297:*21*
298:*5*
374:*12, 15*
380:*17*
384:*12*
388:*16*
**drafters**
335:*8*
**drafting**
354:*20*
**draw**  83:*13*
126:*13*
**drawing**
408:*21*
**drink**
465:*14*
**drinks**
82:*12*
**drive**  221:*9*
**driven**  24:*3, 6*  208:*24*
**drop**
413:*13*
414:*8*
**drug**  19:*16*
99:*6*  121:*5*
155:*22, 24*
156:*17*
258:*16*
259:*13*
322:*1*
375:2, *19*
398:*21*
**Drugs**
130:*21*

162:*22*
163:*1*
183:*11*
218:*17*
220:*18, 19, 20*  259:*7, 10, 20*  353:*16*
402:*25*
**DSM-5**
125:*15*
**dsullivan@hs**
**gllp.com**
3:*12*
**DUANE**
7:*18*
**due**  143:*24*
195:*8*
237:*12*
273:*24*
365:*14*
396:*8*
410:*15*
412:*16*
436:*14*
**duly**  13:*21*
488:*4*
**duration**
191:*22*
**dynamics**
35:*8*

**< E >**
**e2**  372:2
**eager**
212:*17*
**earlier**
110:*7*
119:*16*
155:*25*
194:*20*
206:*13*
288:*20*
295:*1*
298:*17*

318:*8*
340:*19*
359:*25*
394:*6, 11*
396:*24*
405:*25*
426:*23*
445:*9*
452:*14*
483:*7*
**early**  34:*25*
42:*25*  44:*1*
60:*22*
232:*12*
**easier**  84:*20*
317:*16*
324:*13*
376:*24*
**easily**
283:*23*
**East**  1:*13*
2:*23*  5:*16*
6:2  13:*8*
**Eastern**
1:*15*  10:*7, 10*  295:*22*
**easy**  452:*7*
466:*18*
**ecanaan@ksl**
**aw.com**  7:2
**eclampsia**
423:*17*
**Economic**
11:*11*
**edelucia@hs**
**gllp.com**
3:*11*
**edit**  297:*25*
**edited**
297:*7*  386:*5*
**editor**
175:*21*

**editors**
175:*24, 25*
177:*3*
**educated**
121:*2*
303:*18*
**education**
369:*12*
401:*14*
**effect**  62:2
103:*11*
130:*14*
137:*8*
153:*23*
199:*17*
216:*13*
227:*15*
234:*25*
235:*4*
267:*14, 16*
278:*5*
322:*16*
325:*23*
382:*22*
387:*18*
389:*13, 14*
399:*23*
413:*13*
432:*7*
456:*15*
485:*18*
486:*14*
**effective**
460:*5*
**effects**
18:*12*
90:*25*
105:*12*
121:*9*
253:*12*
298:*25*
299:*1*
439:*16*

459:*21*
**effort** 61:*3*
**eight**
304:*19, 21*
403:*22*
**eighth**
155:*14*
**EILEEN**
3:*11*
**either** 71:*16*
168:*3*
247:*25*
292:*12*
326:*8*
345:*19*
468:*15*
487:*14*
**elaborate**
289:*8*
290:*19, 24*
**elements**
320:*7*
**elephant**
73:*1*
**eligible**
350:*6*
**eliminated**
334:*23*
**ELLIS** 6:*19*
**Elsbeth**
110:*1*
111:*20*
**else's** 81:*2,*
*6* 85:*8*
324:*6, 13*
**e-mail**
38:*21*
67:*21* 69:*3*
74:*21* 75:*6,*
*24* 77:*21*
109:*25*
110:*14*
144:*18, 20,*
*21, 24*

150:*14*
175:*7*
178:*25*
405:*3*
406:*1, 5*
413:*2*
416:*7*
418:*3*
419:*4*
470:*5, 6, 10,*
*11* 484:*15*
**E-mail(s**
9:*11, 16*
11:*17* 12:*4*
**e-mailed**
420:*4*
**e-mails**
75:*17*
175:*4*
448:*14*
**emarlowe@c**
**arlsonattorne**
**ys.com** 3:*23*
**embryo**
91:*12* 96:*21*
**EMILY**
3:*23*
**emotion**
178:*18, 23*
**emotional**
178:*24*
**emphasized**
109:*10*
**employed**
143:*15, 18,*
*21*
**employee**
488:*10, 12*
**encompasses**
269:*5*
**encouraged**
57:*12*
**ended** 485:*6*

**endocannabi**
**noid** 105:*11*
**endocrine**
105:*12*
**endpoints**
213:*19*
**ends** 110:*13*
111:*18*
162:*18*
163:*25*
179:*18*
391:*20*
**engagement**
309:*4*
**England**
212:*21*
213:*4*
**enhance**
315:*2, 3*
**enrolled**
462:*10, 12*
**enter** 105:*5*
**entire** 49:*5*
91:*15* 92:*3,*
*4* 93:*3, 8*
102:*16*
105:*18, 22*
107:*16*
121:*1*
129:*6*
133:*2*
157:*11*
211:*8*
219:*20*
248:*21*
264:*2*
269:*10*
275:*6*
290:*8, 9*
300:*15*
312:*3, 8*
320:*24*
344:*25*
345:*23*

357:*10*
358:*24*
365:*12*
395:*20*
397:*16*
456:*13*
457:*13*
460:*13*
484:*18*
**entirely**
47:*3* 61:*7*
120:*22*
205:*8*
240:*3*
369:*16*
396:*10*
**entirety**
132:*18, 19*
133:*2*
344:*12*
**entitled**
26:*16* 67:*1*
181:*4, 5*
186:*17*
**environment**
197:*11*
**environment**
**al** 66:*23*
92:*10*
240:*4*
332:*7*
403:*7* 404:*5*
**EPA** 83:*12*
117:*15*
307:*14, 16*
316:*17*
**epi** 446:*1, 5*
447:*13*
449:*13*
474:*9*
**epidemiologi**
**c** 270:*18*
**epidemiologi**
**cal** 268:*2*

**epidemiologi**
**es** 149:*25*
**epidemiologi**
**st** 18:*11*
19:*3* 68:*19*
132:*22*
174:*7*
203:*5*
304:*23*
355:*18*
360:*18*
473:*25*
**epidemiologi**
**sts** 63:*21*
83:*16, 22*
334:*18*
363:*9*
392:*13, 17,*
*19, 22*
**epidemiology**
61:*24*
132:*20*
133:*7*
134:*13, 16*
135:*21, 25*
137:*6, 12*
150:*3*
174:*9*
203:*6*
211:*17*
212:*16*
254:*13*
288:*16*
331:*12, 23,*
*24, 25*
355:*20*
363:*5*
365:*9*
366:*4*
399:*11*
407:*25*
408:*2, 4*
445:*14*

Confidential - Subject to Protective Order

446:*25*
474:*1*
**epigenetic**
66:*20*
105:*12*
412:*1*
**epigenetics**
66:*19* 447:*7*
**equally**
155:*13*
**equals**
368:*16*
**errata**
489:*6, 9, 11,*
*14* 490:*7*
491:*1*
**ERRATA......**
**...................**
**..........491**
12:*21*
**error**
369:*16*
413:*3*
**errors** 370:*6*
**es** 366:*13*
**especially**
36:*19*
41:*21*
47:22
63:*24* 68:*3*
72:2, *19*
160:*20*
223:*25*
243:*5*
277:*10*
305:2
404:*20*
455:9
460:*20*
471:*4*
**essentially**
307:*24*
326:*4*
327:*19*

328:*10, 14*
473:*24*
474:*3, 4*
**establish**
130:*18*
133:*12*
134:*3*
137:*7*
345:*11*
**established**
133:*7*
136:6
171:*17*
230:*12, 16*
268:*5*
270:*21*
**establishes**
129:*9*
136:*15*
**estimate**
120:*10*
376:*5*
472:8
487:*11*
**estimates**
211:*5, 15*
474:*18, 25*
**et** 9:*15, 19*
10:*7, 20, 24*
11:*16, 21, 24*
12:*3, 7, 10*
40:*13*
325:*19, 24*
361:*16, 17*
362:6
371:*18*
391:*16*
394:*17*
**etiology**
125:*19*
**European**
412:*3*
**EVA** 7:*1*

**evaluate**
141:*3, 4*
213:*15*
459:*21*
**evaluated**
141:*14*
307:2
456:9
467:*16*
468:8
**EVAN** 2:*20*
**evan.janush**
**@lanierlawfi**
**rm.com**
2:*21*
**eve** 406:*12*
**event**
238:*13*
**eventually**
57:*23*
343:*4*
376:*11*
**ever-**
**exposed**
457:*21*
**everyone's**
143:*12, 13*
**evidence**
23:*10* 24:9
50:*1* 92:*4*
94:*10* 96:8
105:*20*
109:*11*
120:*3, 5*
128:*23, 24*
131:*4*
132:*19*
136:22
141:*5, 6, 19*
143:*7, 9, 11*
144:2
182:*14*
183:*11*
185:*10*

186:*7*
199:*5*
235:*10*
237:8
240:*14, 22*
243:*1, 12, 17*
253:*19*
254:*4, 8, 14*
271:*10*
272:*17, 25*
273:*24*
282:22
304:*19, 21*
320:2, *16*
325:22
329:*5*
361:*3, 14*
376:8
386:*16*
392:8
406:*18*
416:*1, 15*
426:*15, 19*
429:*18*
430:22
434:*10*
456:*14*
459:*11*
464:*24*
470:*11*
471:*3*
481:*6, 10*
**evidently**
300:*20*
**exact** 91:*4*
439:*24*
440:*16*
441:*11*
469:*12*
**exactly**
38:*25* 39:2
77:2, *5, 6*
101:*9*
113:*16*

142:*1, 20*
158:*24*
201:*12*
202:*7*
208:22
239:*17*
248:*16*
249:*17*
277:*19*
286:*14*
289:*11*
308:6
309:*9, 18*
310:*4, 10*
311:*19*
312:*12*
324:*10*
335:*4, 21*
339:*21*
348:*21*
350:*18*
355:*11*
367:8
375:*15*
409:*25*
419:*7*
440:*7*
449:*17*
452:*15*
453:6
457:*4*
461:*20*
**Examination**
12:*1* 14:*1*
15:2, *3*
22:*3, 7*
25:22
35:*10*
135:2
173:*15*
483:*5* 488:*4*
**EXAMINAT**
**IONS** 9:*4*

**examined**
169:*2*
299:*18*
432:*4*
**example**
66:*13*
94:*25*
125:*25*
232:*11*
254:*13*
331:*12*
353:*19*
394:*20*
455:*15*
**exceeded**
56:*25*
**excellent**
390:*22*
**exchange**
67:*21*
74:*21*  75:*6,*
*24*  77:*22*
285:*6*
404:*24*
406:*1, 6*
**exclude**
210:*12*
227:*18*
231:*6*
243:*24*
257:*7*
403:*5*
404:*3, 13*
**excluded**
158:*21, 23*
159:*4*
209:*18*
210:*10*
256:*23*
**excluding**
159:*10*
**exclusionary**
384:*3*

**exclusions**
383:*22*
**executive**
129:*25*
**Exhibit**
108:*9, 13, 16*
109:*6*
144:*13*
169:*22*
170:*4*
174:*21*
175:*1*
176:*5, 10, 14*
191:*6*
213:*25*
214:*6, 23*
222:*20*
245:*20, 24*
246:*3, 7*
253:*2*
254:*23*
255:*10*
260:*21*
268:*7*
276:*2*
278:*9*
283:*24*
284:*3*
289:*24*
290:*3, 21*
291:*4, 5*
293:*18, 19,*
*22*  296:*9, 13*
297:*12, 16,*
*19, 22*
347:*10, 15*
348:*4, 8*
352:*18*
354:*12, 19*
355:*5*
365:*5*
367:*23*
368:*3, 5*
371:*17*

374:*16, 20*
380:*17*
383:*2*
384:*8, 12*
389:*16*
390:*13*
394:*1, 3, 7*
405:*19, 24*
420:*19, 24,*
*25*  428:*5, 11*
438:*9*
442:*15*
443:*2*
448:*8, 12, 14*
450:*21, 25*
451:*2*
459:*1*
467:*20*
468:*4*
469:*12*
471:*7*
**EXHIBITS**
9:*9*  12:*15,*
*16*  108:*17*
289:*17*
393:*22*
444:*18*
487:*23*
**exist**  14:*20*
185:*6*
186:*25*
275:*24*
410:*12*
441:*18, 23*
**existed**
117:*8*  331:*1*
**existence**
72:*8*  308:*1*
361:*16*
**exists**  107:*8*
185:*5*
188:*3*
263:*8*
479:*25*

**expanded**
328:*16*
386:*21*
**expect**
216:*5*
251:*17*
331:*7*
358:*25*
359:*2*
377:*6*
429:*3*
433:*8, 15*
435:*6*
436:*1*
455:*14*
**expected**
121:*16*
218:*14*
251:*22*
263:*2*
314:*20*
358:*8, 21, 23*
479:*20*
482:*24*
**expecting**
453:*5*
**experience**
95:*12*
**experienced**
448:*7*  450:*7*
**experiment**
85:*14*
**Expert**
10:*15*  27:*3*
32:*14*
58:*22, 23*
80:*17*
88:*19*
108:*17*
149:*3*
207:*7, 12*
284:*19*
320:*10*
349:*12*

355:*15*
393:*11, 12*
401:*22*
406:*13*
445:*10, 13,*
*25*  446:*5*
**expertise**
18:*19*  95:*8*
355:*16*
445:*21*
446:*9*
447:*12, 23*
449:*13*
**experts**
31:*6*  34:*11,*
*12*  115:*3*
148:*9*
320:*11*
**expires**
490:*17*
**explain**
72:*10*
74:*23*
86:*23*
104:*12*
110:*22*
113:*7*
116:*9*
171:*4*
179:*1*
319:*5*
337:*10*
355:*11*
393:*10*
408:*8*
411:*19*
432:*9*  466:*2*
**explained**
282:*18, 24*
302:*9*
431:*14*
**explaining**
280:*3*

**explanation**
73:21
118:18
253:18
405:11
431:13
**exposed**
103:17
152:21
183:12
192:11
202:21
208:8, 12
219:3
248:11
362:16, 19
365:11
376:16
395:3, 23
399:14
400:9
486:18
**Exposure**
9:18   10:4,
9, 17, 21
11:14, 19, 24
17:18   18:2
19:9, 25
21:15   28:6,
14   35:11
36:10
39:24   45:6
48:24   50:9,
21   58:7, 18
80:12
91:21   92:7
94:2, 3, 20
95:5, 9, 17,
23, 25   96:1
97:5   98:13
99:6
100:12
101:3
102:14

103:24
104:22
106:25
117:21
119:6
120:13
123:1
124:10
127:14
128:9
129:10
132:8
137:8
152:20
153:13
154:15, 23
155:1, 3, 10,
11, 14, 19, 22,
24   156:2
157:4, 12, 14,
16   159:23
160:10
164:10
165:3
166:10, 16
167:3, 8, 9
168:3, 11, 24
169:13
183:15
192:25
196:3
199:9
205:10, 14,
15, 19, 22, 23,
24   206:5, 6,
11, 17   208:6
209:9, 19, 25
210:2, 4, 5
215:1
230:8
231:19
243:25
247:17, 21
248:9

249:20, 22
250:2, 6, 12
253:12
265:7
269:16
272:19
273:1
277:10
295:21
301:1, 21
302:19
303:10
305:24
325:17
337:15
340:20
341:1, 3, 8
358:20
360:22
376:6, 24
395:19
397:1
398:8
399:4
420:12
421:15
423:8
424:6
429:19
430:24
441:1
452:5, 17, 22
453:2
454:20
463:24
475:7
481:2   484:8
**exposures**
62:3   66:23
92:11, 20
94:11
157:18, 21
163:7
185:12, 16

206:13
209:23
213:23
215:2
231:22
243:15, 21,
22   244:1
277:18
332:7
**express**
292:12, 14
**expressed**
292:7
311:18
**expressing**
195:17
**expression**
11:22
**extensive**
230:23
447:1
**extensively**
19:1   230:4
**extent**
39:20
55:19
282:22
**extra**
354:19
380:16
383:10
485:5
**extraction**
390:19
**extramural**
56:5
**extremely**
342:8
**eyes**   46:3
478:3

**< F >**
**F51**   449:6
**face**   83:13

**fact**   21:14
23:24
49:21
103:6, 10
153:11
158:17
161:17
176:19
207:15
212:21
256:20
279:9
297:24
302:15
361:1
371:22
400:18
451:10
**factor**
231:10
240:4
398:1
409:19
**factors**
231:10
233:8, 10, 23
243:9, 14
299:2
403:7
404:5
409:18
410:7, 8
432:8   466:1
**faculty**
70:23
**fail**   489:17
**fair**   120:15
194:16
289:23
**faith**   14:21
461:6
**false**   29:7
221:15
244:7

262:*10*
277:25
279:*19*
377:8
395:*10, 12*
433:*14, 15*
479:2, *3, 12,*
*13, 14*
**familial**
432:5, 7
**familiar**
164:8
204:4
213:2
303:*21*
**Family**  6:*23*
84:6, *13*
112:*18*
432:6
**Fantastic**
180:*3*  336:2
**far**  72:9
75:4  81:*19*
123:9
129:9
130:*23*
164:22
218:7
280:7
283:*15*
469:23
474:*24*
**faster**  51:*11*
**FDA**  323:*3,*
*13, 22*  324:2,
8  407:*12*
**feeding**
372:9
**feel**  127:*23*
166:25
172:*18*
178:*12*
179:7
218:*1*

333:*16*
442:*13*
**fees**  356:*4,*
*12*
**felt**  248:*4*
276:7
**female**
368:*23*
**females**
454:8
455:*16*
457:23
458:*14*
459:9
**fetal**  105:5
130:22
186:2
192:*16*
269:*16*
298:23
360:*21*
361:*23*
**fetus**  91:*4,*
*14*  92:9, *25*
93:4  96:22
156:*20*
192:*16*
198:*16, 19,*
*20, 24*
199:*16*
200:*21*
201:*15*
202:9
226:*15*
248:*10*
301:*1, 21*
447:*3, 8*
**fetuses**
154:7
**fever**  234:*1,*
*3, 7, 17, 19,*
*21*  235:6, *11,*
*22*  236:6, *11,*

*17*  237:*5, 12,*
*13, 15, 23*
**fever-**
**reducers**
121:*8*
**fever-**
**reducing**
234:*25*
235:*1*
**field**  68:*19*
**fifth**  370:*11*
**fighting**
359:*24*
**figure**
144:*16*
419:7
**file**  119:*1*
**filed**  14:*17*
56:*1*
393:*12*
435:*17, 18*
**filtering**
229:6
**final**  223:*17*
269:2, *4*
272:2, *7*
380:*18*
419:2, *3, 5*
**finally**
317:*15*
**finance**
437:*4*
**financial**
85:*23*  88:2
294:*3, 22*
436:*20*
**financially**
488:*12*
**find**  16:*23*
17:*12*
20:*19, 20*
24:2  47:*10*
99:*19*
121:*16, 17*

148:*19*
160:*16*
163:*1, 2, 3*
197:*14*
199:2
215:*20*
271:*10*
272:*17, 25*
273:3
281:*21*
300:7
306:*12*
320:*21*
329:9
347:*23*
379:8
399:*18*
434:*16*
440:*12*
486:*12*
**finding**
103:*3, 11*
216:4
**findings**
130:*7, 13*
268:2
270:*18*
388:*21*
**finds**
286:*10*
410:*21*
**fine**  15:7
20:*23*
21:*23*
27:*16*
38:*10*
121:*5, 11*
124:*19*
173:2, *11*
232:*19*
266:7
289:22
477:*4, 16*
478:6

**finish**  228:*4*
331:6
**finished**
59:4  351:*1,*
*2*  418:*24*
419:*24*
**finishing**
65:*14*
**fire**  141:*11*
407:*10*
409:*16*
**Firm**  1:*13*
2:*20*  3:*21*
4:8  86:4, *8,*
*25*  294:*3, 13,*
*18, 22*
**firms**  115:6
**first**  13:*21*
17:*17*  18:*1*
23:*24*  35:6
40:*24*  45:*5,*
*11*  52:2
56:*15*
68:*25*  72:*4,*
*5, 7*  73:*10*
99:*20*
102:*1*
105:*4*
106:*4*
108:*13*
113:*20*
114:*3*
117:*19*
139:*25*
144:*17, 19,*
*23*  145:*7, 25*
149:5
151:2
152:*5, 10, 14*
162:*24*
170:*15*
189:7
204:*11, 16*
207:3

Confidential - Subject to Protective Order

234:*18*
262:*3*
272:*1, 7*
274:*2, 4*
297:*1, 25*
300:*23*
301:*7*
302:*4*
304:*10, 12*
305:*10*
309:*8, 20*
310:*2, 21*
316:*11, 20,*
*25* 321:*24*
324:*25*
330:*1, 15*
333:*8*
338:*11*
368:*12*
374:*25*
375:*24*
396:*8*
399:*3*
413:*3*
421:*13*
432:*20*
445:*16*
459:*20*
460:*2*
475:*8, 10*
**five** 42:*25*
70:*8*
152:*22, 23*
153:*1, 13*
157:*11, 12,*
*14* 167:*3*
168:*10*
169:*12*
185:*17*
206:*18*
217:*4, 5*
218:*12, 15*
219:*1, 2, 9*
220:*9*

221:*14, 18,*
*21* 222:*1, 6,*
*17* 223:*1*
226:*12*
240:*5*
248:*15*
270:*1*
300:*9*
459:*16*
461:*4, 10*
**flattering**
332:*18*
**flip** 465:*2*
**Floor** 2:*23*
6:*8* 8:*12*
143:*9*
**Florida** 5:*8*
**Flower** 8:*12*
**fluid** 156:*19*
**focus** 93:*20*
96:*25*
211:*5*
386:*11, 12*
475:*17*
**focused**
211:*8, 9*
**FOERSTER**
*7:12*
**follow**
27:*12*
102:*9*
327:*13*
376:*3*
436:*20*
470:*3*
**following**
11:*23*
191:*20*
350:*21*
**follows**
13:*25*
**follow-up**
41:*19*
44:*11*

339:*13*
344:*14*
351:*16*
383:*17*
461:*10, 24*
462:*1*
471:*24, 25*
**Food** 322:*1*
**foregoing**
488:*7* 490:*4*
**forensic**
97:*21*
**for-ever**
472:*6*
**forget** 75:*19*
**forgetting**
75:*16* 81:*21*
**forgive**
75:*20*
**forgot** 40:*14*
**form** 18:*21*
20:*4* 21:*18*
24:*14*
25:*10*
27:*12* 32:*4,*
*8* 35:*16*
40:2 42:*6,*
*16* 44:*6*
45:*9* 46:*16*
49:*2* 50:*11*
52:*6, 20*
54:*25* 55:*9,*
*17* 57:*20*
58:*10*
59:*11, 22*
61:*5* 64:*9*
73:*13* 74:*6*
75:*10* 76:*8*
77:*11*
78:*22* 80:*2*
84:*10*
87:*16* 88:*8*
89:*6* 90:*10*
91:*8, 24*

93:*17* 94:*6,*
*22* 95:*20*
97:*9, 13*
98:*3* 100:*8*
101:*5, 20*
104:*3, 8*
107:*4*
109:*3*
110:*20*
112:*9*
113:*5*
114:*25*
116:*7, 15*
117:*6, 24*
119:*9*
120:*17, 23*
123:*4*
124:*13*
125:*8*
126:*17*
127:*17*
128:*11*
129:*14*
131:*12, 17*
132:*11*
133:*15, 23*
134:*6, 23*
135:*4, 9, 10,*
*18* 136:*9*
137:*10*
138:*4*
139:*4*
140:*6*
142:*7, 14*
144:*8*
148:*1*
149:*15*
158:*6*
160:*1, 14*
163:*11*
164:*4*
165:*22*
166:*6, 21*
168:*6*

169:*5*
172:*19*
178:*16*
180:*8*
182:*3*
183:*8*
184:*9*
185:*8*
187:*7, 8*
188:*8*
192:*11*
200:*1*
207:*10*
209:*11*
211:*23*
226:*20*
236:*16*
238:2, *10, 17*
243:*10*
244:*17*
245:*1, 9*
252:*6*
255:*2*
257:*16*
270:*24*
274:*6, 20*
276:*15*
277:*1*
278:*13*
280:*5*
281:*8*
282:*14*
291:*15*
292:*10*
305:*15*
307:*9*
308:*17*
311:*6*
318:*10, 18*
319:*14*
321:*12*
322:*13*
328:*4, 23*
329:*18*

332:*23*
334:*5*
335:*12*
336:*23*
337:*17*
338:*5, 14, 20*
339:*4, 18*
340:*11, 22*
341:*14, 22*
344:*10*
345:*16*
358:*13*
360:*2, 5*
366:*23*
370:*24*
371:*2, 8*
378:*20*
381:*7*
383:*5, 14*
384:*22*
385:*22*
387:*24*
397:*6*
398:*12*
399:*8*
401:*19*
404:*7*
408:*12, 15*
411:*10*
414:*24*
418:*23*
419:*22*
422:*12*
424:*17*
426:*8*
429:*24*
431:*6*
434:*4*
435:*11*
436:*3, 24*
438:*3*
439:*2*
440:*18, 22*
442:*6, 17*

444:*1*
446:*7, 19*
447:*15*
455:*22*
458:*2, 12*
466:*7*
469:*14, 17*
470:*8*
472:*12*
474:*15*
475:*22*
480:*5*
481:*4, 22*
482:*17*
490:*6*
**formal**
236:*1*
240:*18*
242:*22*
**formally**
68:*10*   408:*3*
**format**
247:*2*
296:*1*   353:*1*
**formats**
352:*25*
**former**
112:*17*
**formulate**
85:*9*
**formulated**
83:*19*
**formulating**
78:*18*
**formulation**
217:*22*
**formulations**
111:*5, 7*
**forth**   488:*8*
**forward**
14:*23*
181:*6, 8*
**found**   16:*17*
25:*2*   28:*12*

40:*5*   52:*12*
96:*19*
118:*23*
119:*2*
148:*17*
160:*21*
164:*21*
193:*8, 9*
196:*22*
215:*5, 14, 15*
267:*14, 15*
280:*3*
284:*24*
285:*2*
286:*19*
392:*9*
399:*20, 21*
418:*19*
420:*3, 5, 6*
421:*16*
432:*6*
437:*19*
457:*22*
485:*6, 8*
**foundation**
424:*2*
**four**   17:*3*
37:*18*
237:*22*
240:*6*
277:*8*
317:*9, 12*
336:*25*
359:*9, 10*
361:*2*
437:*22*
443:*20*
461:*4, 10*
**fourth**
365:*17*
368:*9*
370:*7, 11*
403:*16*

**FOX**   2:*13*
**frankly**   26:2
**free**   143:*19*
172:*18*
**frequency**
191:22
**fresh**   60:9
**Friday**
14:*10*
**friend**
465:6, 8
**friendly**
68:*15, 17, 23*
465:*12*
**friends**   84:7,
13
**front**   29:*12,
18, 22*   30:2
36:23
108:*15, 21*
131:8
170:3
174:25
176:4
191:6
214:5
246:6
284:5
290:2
296:*13*
297:18
346:15
347:14
390:13
394:5
405:*23*
420:23
428:10
442:19
451:*1*   468:3
**frontal**   11:7
**Frontopariet
al**   10:*19, 23*

**full**   130:*16*
**full** 130:*16*
386:*15*
421:*13*
**fully**   41:*25*
189:*19*
299:*3*
**function**
12:7   358:7
**funding**
44:*15*
354:*20*
**funds**   86:*25*
87:*1*
**further**
483:*4*
487:*17*
488:*5, 10*

**Furthermore**
432:*3*
**future**
205:22
270:5
402:6
407:*4*
461:2
463:*12, 15,
18*

**< G >**
**Garcia**
110:2, *5, 8*
112:*3*   460:8
**GARDAR**
8:*1*
**Gareri**
302:*23, 24*
**gel**   156:9
**gender**
456:11
**gene**   11:22
239:*15*
**General**
7:*21*   93:2,

Confidential - Subject to Protective Order

7  192:*10*
201:*3*
213:*14*
220:*17*
223:*10*
241:*14*
264:*17*
271:*7*
272:*23*
275:*12*
305:*19*
312:*1*
439:*23*

**generalizable**
411:*15*
**generally**
32:*17, 21*
336:*11, 12*
338:*11*
460:*7*
479:*17*
**genes**  410:*3,*
*6, 15, 19*
412:*8, 9, 11,*
*12, 24*
415:*19, 21*
416:*1, 17*
417:*1, 8, 13,*
*15*  419:*10,*
*11*  447:*7*
466:*19, 20*
468:*22*
469:*8*  471:*4*
**genetic**
125:*11*
239:*12, 14,*
*17*  403:*6*
405:*6, 8*
408:*2, 3*
409:*17*
410:*15*
413:*10, 12*
414:*6*

416:*4, 5, 12,*
*19*  417:*16*
431:*22*
434:*7, 11*
444:*12*
446:*25*
464:*13, 14*
466:*1*
468:*13*
469:*7*
470:*23, 25*
**genetics**
67:*22*
125:*17*
239:*6, 8*
404:*15, 16*
405:*1, 11, 12,*
*15*  406:*19*
407:*11, 19,*
*20, 23*
409:*12, 23*
410:*13, 22*
412:*14, 15*
415:*11, 13,*
*14*  417:*21,*
*24*  418:*20*
419:*6, 8*
432:*8*
464:*23, 24*
466:*13, 15,*
*17*  468:*18*
**geological**
156:*25*
**Gervin**
291:*12*
**gestational**
422:*3, 4*
423:*3, 17*
425:*15*
**GESTE**
9:*14*  44:*21*
151:*6, 8, 9,*
*10, 13*
219:*21*

220:*5*
221:*5*
257:*21*
337:*23, 24,*
*25*  338:*11,*
*16*  339:*9, 25*
340:*5, 9*
344:*4*
346:*21*
378:*18*
**G-E-S-T-E**
151:*6*
**getting**
209:*6*
219:*11*
246:*20*
259:*2*
362:*12*
365:*16*
372:*12, 14*
374:*12*
418:*1*
427:*14*
**girls**  456:*19*
457:*14*
**give**  19:*16*
50:*14*  57:*8*
66:*13*
67:*11*  68:*4*
78:*5*  99:*25*
116:*22*
120:*25*
122:*8*
125:*25*
139:*13*
146:*5*
177:*17*
210:*19*
220:*19*
225:*21*
233:*14*
241:*7*
250:*11*
296:*7*

309:*13*
310:*22*
312:*19*
320:*18*
323:*10*
339:*24*
342:*4, 6*
365:*2*
382:*9, 12*
392:*8*
405:*17*
477:*11*
485:*16, 22*
**given**  22:*8*
87:*25*
99:*10*
154:*23, 25*
188:*4*
189:*17*
204:*5, 7*
205:*2*
208:*3*
220:*11*
225:*19*
227:*16, 22*
257:*9*
258:*16*
259:*11, 13*
365:*12*
386:*23*
401:*11*
490:*5*
**gives**
157:*11*
161:*19*
245:*5*
248:*14*
249:*20*
250:*9*
305:*4*
309:*16*
310:*3*
381:*11*
454:*19*

**giving**
212:*10*
288:*2*
**glimpse**
35:*5*
**go**  16:*13*
24:*17*  38:*6*
43:*1, 2*
51:*11*
54:*16*
59:*22*
61:*14*  63:*3*
71:*14*  74:*8*
78:*25*
90:*18*  99:*8*
107:*20*
116:*11, 18*
156:*19*
157:*3*
169:*6*
173:*9, 18*
174:*15*
187:*10*
190:*11, 13*
196:*4*
197:*12*
203:*12*
205:*5*
214:*16*
228:*5*
238:*13*
245:*12*
262:*18*
263:*5, 11*
283:*22*
285:*13*
291:*2*
308:*25*
311:*11*
313:*24*
335:*25*
342:*24*
365:*9*
369:*12*

418:*20*
429:*5*
433:*10*
449:*4, 22*
472:*20*
478:*9*
483:*12, 13*
487:*14*
**goes** 38:*12*
130:*23*
156:*21*
199:*14, 15*
213:*11*
218:*10*
247:*24*
382:*6*
391:*19*
466:*2*
**going** 14:*22*
22:*1, 2, 4, 10,*
*19* 25:*13, 15,*
*24, 25* 26:*3,*
*16, 25* 55:*25*
59:*13* 60:*7,*
*11, 18, 25*
61:*11*
69:*15, 25*
78:*15* 79:*3,*
*9* 85:*13, 16,*
*17* 87:*2*
102:*4*
106:*1, 11, 21*
108:*12*
121:*13*
138:*7, 8, 13,*
*15* 139:*17*
141:*16, 18,*
*20* 144:*16*
163:*15*
173:*14*
182:*25*
188:*13, 24*
190:*16*
194:*4, 22*

200:*2*
210:*22*
225:*21*
228:*13*
231:*16*
246:*2*
260:*21, 25*
262:*10*
263:*3*
284:*13*
289:*14, 18*
293:*10, 17*
296:*5*
310:*24*
313:*19*
325:*3*
335:*25*
336:*3*
338:*10*
343:*2, 6*
346:*25*
354:*15*
359:*5*
364:*4*
393:*25*
394:*2*
431:*25*
432:*19*
448:*24*
449:*3*
450:*4, 24*
451:*20*
477:*24*
**golafsson@s**
**mithsovik.co**
**m** 8:*2*
**gold** 333:*9*

**GOLDBERG**
3:*9*
**Golding**
291:*12*

**GOLKOW**
1:*21* 8:*21*
13:*4*
**Good** 14:*3,*
*4, 7, 21*
15:*16*
64:*11* 91:*2*
185:*11*
193:*11*
231:*14*
373:*10*
380:*5*
436:*9*
445:*2*
461:*6*
470:*18*
**goodness**
144:*4*
**Google**
281:*22*
284:*24*
285:*3*
**gotten**
41:*25*
43:*18*
189:*10*
418:*13*
476:*18*
**Gou** 130:*6*
**government**
332:*5, 12, 17*
334:*13*
**grade**
135:*24*
307:*25*
308:*4, 5, 8,*
*12* 309:*9, 25*
313:*25*
317:*15*
325:*3*
**grading**
481:*6*
**gradually**
46:*25*

118:*11*
121:*22*
**gram**
196:*16*
197:*24*
200:*7*
201:*8, 23*
202:*5*
363:*11*
**Grand** 3:*18*
4:*4*
**grant**
448:*25*
449:*2, 4, 5,*
*23* 450:*3, 11,*
*18*
**granted**
103:*7*
**grapes**
172:*15*
173:*11*
**Gray**
170:*24*
171:*3, 5, 7*
**great** 24:*7,*
*8* 46:*14*
70:*18* 96:*4*
150:*2*
155:*9*
163:*6*
165:*25*
166:*1*
169:*11*
199:*5* 289:*1*
**greater**
155:*23*
165:*7* 482:*6*
**Green**
171:*13*
**GREG** 4:*14*
**greg@dovel.c**
**om** 4:*14*
**grew** 19:*17*

**ground**
187:*10*
**group**
64:*24* 65:*3*
81:*8, 14*
82:*22* 88:*2*
114:*8*
127:*12*
211:*19*
218:*9*
222:*12, 14,*
*18* 223:*3*
295:*6, 10*
297:*3*
336:*4*
339:*15*
363:*7, 24*
365:*18, 20*
395:*3, 21*
400:*9*
429:*3* 433:*7*
**grouping**
339:*9*
**groups**
362:*16, 19*
363:*19*
364:*1*
365:*17*
**grow** 206:*22*
**GRUNER**
7:*18*
**Guaynabo**
3:*7*
**GUERRA**
3:*1*
**guess**
112:*15*
144:*25*
401:*20*
417:*20*
451:*16*
**guesses**
401:*17*

Confidential - Subject to Protective Order

**guide**
130:22
183:15
304:4, 11, 13
305:1, 7, 9,
14, 18   306:1,
3, 24   307:5,
12, 15, 23
308:1, 5, 7,
11   309:3, 11,
15   310:2, 3,
12, 22   311:4,
16, 20, 22, 23
312:16
313:4, 8, 14,
24   314:7, 11,
15, 17   315:5,
18, 23
316:24
317:4, 13, 19,
22   318:23,
25   319:3, 7,
17, 19, 25
320:22
324:19, 24
325:5, 6, 9,
12, 25
326:11, 15,
17, 21   327:4,
6, 18, 19
328:2, 8, 13,
15, 21   329:1,
3, 15, 24
330:6, 16
332:3, 22
333:4, 22, 24
335:3, 4, 9,
17   337:4, 12
379:12
404:12
431:9
452:2
453:8
482:11

**guided**
207:21
**guides**   326:5
**Gustavson**
432:11, 20
433:7
**gut**   153:17
**guts**   156:21
**guys**   343:11,
15
**gynecol**
246:21
**gynecology**
62:6   64:3
119:25
171:24
172:18
174:16
176:17
246:21, 23

**Gynecology's**
175:17

**< H >**
**hac**   14:17,
21   22:9
**HAIGHT**
8:11
**HAILEY**
3:4
**half**   179:19
300:13
329:4
354:2
408:1
484:25
**half-life**
353:18
**hand**
176:10, 14
480:2
**hands**
142:24

**Hang**   74:9
79:2
**Hannah**
20:11   21:3,
7, 9   23:25
28:4   36:8
41:10
175:18
178:3
179:2
222:21, 23
224:7
225:15, 16
249:11
258:2
**Hannah's**
245:15
**happen**
156:16
178:4
204:10
370:6
461:4
462:16
482:23
**happened**
115:20
250:12
272:14
370:4
384:7
463:19
487:7
**happening**
118:13
**happens**
82:11   92:7
156:8
157:6, 9
160:16
170:17
196:6
235:1

399:17
487:13
**happily**
283:23
**happy**   33:8
42:7   43:11
49:13, 25
57:7   59:20,
24   61:9
74:23
79:17
81:21   82:6
85:1   99:23,
25   100:23
106:15
113:8
124:2
128:3
139:6
164:5
165:15
167:12, 20
180:24
204:22
207:20
210:19
254:3, 18
282:9
315:9
320:14
335:17
337:18, 20
338:21
339:19
340:13
345:25
367:22
378:2
381:14
405:3, 16, 17
413:1
415:17
425:17

**hard**
196:13
287:17
457:5
**harder**
324:14
**harm**
271:11
272:18
273:1
**hazard**
474:25
**HEACOX**
2:21
**head**   445:3
**headaches**
234:25
400:4
**Health**   6:10
81:11   84:4
243:4
332:6
437:24
442:22
**healthy**
461:12
**hear**   42:7
46:12   86:9
90:15
148:6, 16
228:24
**heard**   174:1
**hearing**
61:2   86:5
**heart**   144:4
444:4
**heavily**
388:3
**he'd**   342:11
**hedge**   86:24
87:1
**held**   1:12
13:8   19:8
334:11

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| **help** 72:*14* | 381:*13* | 324:*25* | **holding** | 256:*11* |
| 91:*2* | 410:*14* | 325:*7* | 176:*9*, *14* | 257:*8*, *14*, *20* |
| 264:*10* | 422:*5* | 326:*3*, *4*, *7*, | 253:*3* | 258:*9*, *12* |
| 280:*23* | 423:*18* | *13*, *21*, *25* | **HOLLAND** | 259:*13* |
| 323:*19* | 425:*12*, *14* | 327:*1*, *7*, *16*, | 4:*8* | 366:*22* |
| 331:*14* | 442:*20* | *20* 328:*2*, *6*, | **Hollander** | 367:*5* |
| 333:*10* | **higher** | *9*, *12*, *17*, *22* | 31:*13*, *19* | **hour** 54:*11*, |
| 440:*12* | 195:*9*, *19*, *22* | 329:*1*, *8*, *16*, | 32:*2* 33:*3*, | *12*, *15* 96:*20* |
| 481:*20* | 197:*25* | *22*, *25* 330:*3*, | *15*, *25* 42:*2* | 102:*18*, *25* |
| **helped** | 198:*9* | *15* | **Hollander's** | 203:*12* |
| 224:*19* | 202:*9* | **Hills** 8:*8* | 31:*9*, *15* | 289:*19* |
| 419:*9* 427:*1* | 221:*16* | **hire** 69:*13*, | 32:*13*, *16*, *22* | **hourly** |
| **helpful** | 255:*17* | *16* 465:*16* | 33:*4*, *5*, *7*, *19*, | 54:*13*, *15* |
| 138:*2* | 266:*25* | **hired** 53:*18* | *22* 34:*4* | **hours** 37:*19* |
| 306:*16* | 267:*1* | 54:*2*, *6* | **HOLWELL** | 55:*2* 88:*13* |
| 315:*13* | 333:*16* | 58:*8* 89:*1* | 3:*9* | 102:*24* |
| 331:*5* | 358:*3*, *25* | 113:*16* | **honest** | 189:*1* |
| 361:*12* | 359:*3* | 144:*17* | 45:*25* | 203:*17* |
| 419:*8* | 376:*15* | 307:*6* | 72:*16* | 204:*11*, *17*, |
| 464:*19* | 396:*4* | **hiring** | 84:*14* | *25* 205:*3*, *6* |
| **helping** | 409:*17* | 57:*15* | 118:*3* | 207:*3* |
| 114:*23* | 416:*19* | 465:*18* | 207:*13* | 208:*7* |
| 194:*12* | 417:*21* | **hit** 96:*21* | 329:*5* | 352:*11*, *12*, |
| 207:*23* | 468:*23* | 103:*2* | **honestly** | *22* 353:*13*, |
| **helps** 43:*20* | 469:*1*, *3* | **hold** 16:*8* | 77:*16* | *20*, *21*, *22*, *23*, |
| 306:*17* | 470:*23*, *25* | 42:*16* | 110:*10* | *24* 394:*15* |
| 386:*17* | **highest** | 46:*18* | 121:*16* | 400:*11* |
| **hereinbefore** | 177:*7* | 51:*13* 52:*5* | 139:*11* | 403:*22* |
| 488:*8* | 334:*12* | 74:*5* 90:*12* | 205:*11* | 476:*24* |
| | **highlighting** | 101:*21* | 331:*18* | **House** 11:*10* |
| **heterogeneity** | 375:*6* | 105:*25* | 353:*14* | **housing** |
| 476:*11* | **highly** | 106:*13* | 370:*5* | 70:*22* |
| **hide** 81:*22* | 204:*3* | 134:*22* | 433:*21* | **Houston** |
| 279:*12* | 208:*23* | 164:*3* | **honesty** | 2:*16* |
| 280:*23* | **Highway** | 172:*13* | 113:*9* | **huge** 86:*22* |
| 292:*3* | 3:*24* | 187:*2*, *3*, *4* | **hope** 60:*21* | 119:*18* |
| **hiding** | **Hill** 118:*21* | 189:*23*, *24* | 142:*22* | 153:*8* |
| 335:*20* | 130:*16*, *17* | 255:*1* | 429:*6* 437:*7* | 221:*8* 321:*4* |
| **high** 170:*19*, | 132:*24* | 270:*23*, *24* | **hopefully** | **human** |
| *23* 171:*22* | 133:*1* | 274:*19* | 416:*13* | 429:*18* |
| 172:*2*, *5* | 137:*15* | 342:*7* | **hoping** | 430:*23* |
| 341:*1* | 209:*14* | 397:*5* | 72:*14* | **hundreds** |
| 364:*2*, *7* | 230:*22* | 476:*20* | **hospital** | 29:*4* 33:*18* |
| 376:*13* | 320:*23* | | 204:*13*, *15* | 34:*13* |

99:*24*
168:*12*
**HUNT** 2:*7*
54:*3*
**hurt** 481:*19, 23*
**hwatts@watt sguerra.com** 3:*4*
**Hyperactivit y** 10:*14*
11:*6, 15*
417:*1, 5, 6*
**hypothesis**
130:*8*
167:*15*
241:*23*
245:*3*
251:*23*
286:*5*

**< I >**
**idea** 54:7
112:*5, 11*
121:*11*
193:*10*
201:*13*
242:*20*
360:*8*
373:*11*
401:*13*
409:*17*
410:*12*
**ideas**
306:*11*
320:*20*
373:*3, 8*
**identical**
393:*11*

**identification**
108:*10*
169:*23*
174:*22*

214:*1*
245:*25*
283:*25*
289:*25*
293:*23*
296:*10*
297:*13*
347:*11*
348:*5*
354:*13*
367:*24*
374:*17*
384:*9*
393:*23*
405:*20*
420:*20*
428:*6*
438:*10*
448:*9*
450:*22*
467:*21*
487:*24*
**identified**
52:*17*
100:*4*
107:*8*
268:*3*
270:*19*
411:7
419:*16*
**identifies**
374:*25*
**identify**
50:*19*
103:*23*
104:*22*
106:*25*
157:*3, 4*
336:*13*
**ignore** 15:*8*
27:*25* 80:*6*
**III** 4:*21*
**illicit**
162:*22, 25*

**Illinois** 1:*17*
2:*11* 488:*19*
**illness**
413:*14*
414:*9, 15, 18, 19, 21* 415:*2, 19, 23* 416:*4*
444:*13*
**imagine**
219:*2*
**impact**
447:*8*
**imperative**
489:*13*
**implies**
107:*7*
132:*14*
251:*10*
**implying**
156:*11*
178:*1*
**important**
34:*14* 35:7
59:*6*
140:*13*
161:*8*
162:*2*
171:*6*
180:*25*
182:*5*
185:*5*
186:*9, 16*
189:*20, 25*
198:*14, 22*
199:*19*
200:*18*
210:*15*
213:*6, 9*
222:*7*
227:*25*
248:*18*
262:*24*
323:*18*
358:*4, 9*

361:*18*
390:*20*
397:*14*
410:*13*
412:*15*
417:*14*
466:*20*
476:*12*
**Importantly**
261:*3, 17*
265:*18*
**impossible**
174:*4* 384:*5*
**impressed**
103:*5*
**impressive**
63:*24*
221:*12*
394:*25*
399:*16, 21*
433:*6*
**improper**
61:7
**improve**
163:*16, 17*
**improved**
265:7
**inaccurate**
260:*3*
261:*6, 19*
262:*9*
265:*21*
286:*22, 23*
287:*11*
366:*14*
375:*3, 19*
460:*9*
**include**
260:*9*
298:*1*
395:*3*
464:*12*
474:*22*

**included**
49:*12*
158:*19*
276:*13*
329:*23*
400:*9*
459:*14, 16*
**includes**
471:*14*
472:*23*
**including**
50:*22*
55:*23*
95:*13*
125:*17*
226:*12*
234:*10*
241:*17*
265:*11*
280:*11*
306:*15*
366:*12*
395:*3*
400:*10*
431:*14*
432:*8*
433:2 447:*8*
**inclusion**
384:*4*
**incomplete**
166:*24*
224:*14*
325:*18*

**inconsistency**
294:*17*
**inconsistent**
268:*1*
270:*18*
**incontroverti ble** 105:*23*
**incorrect**
18:*25*

increase
155:*16*
206:*19*
215:*7, 12, 15,
21* 221:*13*
225:*5*
387:*15, 17*
485:*25*
**increased**
130:*4*
239:*23*
251:*11, 13*
364:*19*
457:*20*
458:*16*
473:*6*
**increases**
105:*6*
**increasing**
252:*2*
**incredible**
463:*22*
**incredibly**
86:*21* 87:*5*
105:*19*
136:*23*
137:*19*
154:*16*
254:*9*
262:*24*
404:*19*
464:*9*
**independent**
81:*14, 18*
329:*16*
**independentl**
**y** 81:*15*
335:*10*
417:*7*
**INDEX** 9:*1*
**indicate**
225:*20*
312:*11*

indicated
299:*9*
**indicating**
431:*21*
**indication**
12:*2* 235:*1*
239:*6*
465:*25*
**individual**
129:*8, 19*
175:*19*
333:*2, 21*
373:*6*
436:*6*
440:*5* 470:*2*
**individually**
332:*21*
473:*13*
**individuals**
334:*7*
375:*4, 21*
**induce**
227:*9* 398:*9*
**inducing**
91:*5*
**industry**
49:*22*
**Infant** 10:*2*
**infantile**
471:*11*
**inference**
359:*17, 22*
360:*12, 15*
**influence**
242:*2*
426:*18*
**influencing**
257:*3*
367:*13*
**influential**
257:*3*
**inform**
416:*13*

informal
232:*3*
**informally**
344:*17*
**information**
68:*4* 87:*25*
89:*17*
98:*23* 99:*3,
6* 100:*17*
109:*10*
112:*1*
123:*17*
146:*2*
161:*19*
192:*5*
212:*10*
233:*5*
250:*9, 11*
258:*7, 14*
259:*16*
262:*24*
325:*21*
365:*2*
390:*20*
392:*8, 11*
394:*11*
396:*25*
401:*1, 6*
403:*24*
405:*18*
440:*25*
441:*7, 14, 19*
481:*1*
487:*12*
**informative**
359:*5*
432:*23*
**ingested**
192:*10, 18*
208:*19, 20*
**ingestion**
191:*23*
203:*21*

initial 15:*21,
25* 298:*1*
**Innovative**
356:*4*
**inorganic**
10:*6, 9*
295:*21*
**input** 334:*1*
**inquiries**
72:*19*
**inquisitive**
449:*24*
**instance**
16:*25*
66:*14*
83:*23* 99:*1*
119:*21*
125:*24*
129:*24*
197:*12*
239:*3*
282:*21*
302:*17*
431:*19*
**institutional**
111:*22*
112:*7*
145:*17*
**institutions**
392:*16*
**instructing**
284:*22*
**INSTRUCTI**
**ONS** 489:*1*
**instrument**
218:*22, 23*
224:*22*
**instruments**
261:*4, 18*
265:*9, 19*
**intake**
216:*25*
226:*17*
299:*2*

468:*24*
469:*1*
**integrate**
249:*19*
**intelligence**
21:*11, 12, 16*
23:*16*
28:*17, 21, 22*
36:*20*
193:*2*
253:*16*
264:*15, 17,
18* 265:*15,
16* 266:*20,
24* 267:*1, 3,
8, 15, 16*
271:*12, 14*
272:*5*
273:*6*
275:*10*
276:*10*
278:*16*
286:*17, 20*
290:*12*
359:*10*
**intended**
332:*4*
**intensity**
216:*16*
**intensively**
63:*22*
**interaction**
74:*20* 75:*5,
20* 458:*19*
**interest**
56:*2, 4, 10*
138:*17*
162:*24*
177:*9*
356:*1, 12, 19*
436:*7*
461:*13*
**interested**
86:*4* 97:*16*

124:*21*
143:*11, 12*
145:*17*
177:*1, 12*
180:*11, 21*
192:*14*
249:*2*
314:*21*
339:*20*
401:*7*
442:*1*
488:*12*
**interesting**
23:25  35:*1*
93:*22*
96:*23*
102:*21*
241:*23*
243:*16*
270:*12, 14*
317:*15*
322:*20*
381:*19*
382:*2*
389:*13*
392:*10*
**interests**
96:*25*
434:*23*
**inter-
exchangeable**
111:*3*
**interfering**
135:2, *16*
143:*12*
**internal**
182:*13*
325:*23*
379:*12*
381:*22*
446:*23*
**interpret**
196:*13*

**interpretatio
n** 220:*24*
470:6, *9*
**interrelated**
125:*12, 13,
14* 212:*8*
330:*12*
**interrupt**
51:*17, 21*
**interrupted**
483:*24*
**interrupting**
25:*21*
173:7, *15*
**interruption**
28:*4*
**Interstate**
3:*24*
**interval**
212:*9*
381:*11*
472:*9*
474:*20, 21,
22* 486:*22,
23, 25* 487:*2*
**intervals**
212:*7*
**intervenes**
240:*5*
**interview**
69:*9*
100:*22*
101:*1, 2*
109:*22*
**interviewed**
69:7  70:*5,
10, 15* 73:*16,
17* 74:*1*
100:*25*
**interviewing**
75:*6*
**interviews**
375:*18*

**intoxicants**
18:*12*
**intrauterine**
130:*13*
**introduction**
179:*24*
428:*20*
**inventory**
340:*8*
**inverse**
371:*20*
461:*19*
462:*3*
**investigating**
17:*17*  18:*2*
20:9  336:*10*
**investigation**
28:*5*
**investigators**
335:*11*
427:*19*
**investment**
87:*22, 23*
108:*25*
114:*13*
145:*16*
**investor**
111:*22*
112:*7*
145:*17*
**investors**
87:*10*
**invited**
116:*20*
317:*6*
318:*6, 16*
**invoices**
10:*4*
**involve**
66:*9*  407:*6*
**involved**
44:*23*
151:*16, 21*

217:*9*
348:*10*
**involvement**
39:*22*
**IQ** 203:*1*
**Irish** 412:*2*
**irrelevant**
186:*16*
**isolation**
229:*1*
**issue**  89:*10*
117:*15*
118:*12*
119:*19*
187:*18*
375:*1*
407:*20*
410:*22*
419:*16*
434:*7*
461:*21*
468:*13*
**issued**  68:*8*
**issuing**
402:*15*
**Italian**
150:*2, 3*
**iterations**
378:*24*
**its**  176:*21*
181:*19*
269:*11*
**IV**  208:*21*

**< J >**
**J&J**  407:*13*
**J.J**  2:*3*
14:*13*
**J.P**  152:*17*
302:6, *9*
303:*19*
**JACKIE**
8:*16*

**JAMES**
5:*12*
**January**
53:*19, 20, 21*
56:*15*
57:*15*
86:*12*
113:*21*
114:*20*
150:*14, 20*
286:*6*
**JANUSH**
2:*20*
**Jersey**  1:*20*
6:*3*  488:*21*
**JESSICA**
6:*1*
**jessica.brenn
an@btlaw.co
m**  6:*2*
**Ji**  11:*16*
53:8, *14*
291:*10, 13*
361:*16*
362:*3, 4, 6, 7*
394:*2, 5, 17,
20*  400:*14,
24*  403:*3, 10,
25*  404:*1, 2,
9*
**Jim**  15:*7,
17*  21:*19*
26:*1*  32:*10*
59:*19, 20*
79:*21*
105:*25*
126:*18*
139:*16*
172:*20*
189:*8*
228:*1*
255:*22*
268:*12*
284:*11*

Confidential - Subject to Protective Order

289:*16*
354:*22*
375:*23*
413:*23*
442:*24*
466:*24*
**jj.snidow@k**
**ellerpostman**
**.com**  2:*4*
**jlara@stoned**
**eanlaw.com**
8:*7*
**jmurdica@bt**
**law.com**
5:*12*
**job**  69:*7*
70:*18*
79:*25*
85:*19*
242:*19*
309:*12*
312:*20*
373:*10*
**jobs**  56:*7*
**Johnson**
6:*4*  13:*24*
112:*15, 16,*
*18, 19, 20*
323:*23*
324:*8*
**JOHNSTON**
5:*13*
**JOSEPH**
8:*6*
**journal**
138:*10*
170:*25*
171:*3, 5, 7,*
*11, 14, 24*
172:*8, 11, 17*
174:*3, 5, 8,*
*10, 16*
175:*16*
176:*6, 15, 16*

177:*4*
178:*11*
212:*22*
213:*4*
246:*24*
274:*17*
**journals**
171:*9*
172:*10*
173:*25*
213:*3*
**JUDGE**  1:*5*
27:*14*
59:*24*
79:*12, 17*
173:*4, 10, 14,*
*18*  187:*11*
310:*17*
333:*12*
**judgment**
436:*8, 10*
**JULIEN**
4:*15*
**julien@dovel**
**.com**  4:*15*
**jumbled**
157:*7*
**jump**
212:*18*
**June**  406:*9,*
*12*

**< K >**
**Kansas**
1:*19*  3:*19*
4:*4*  488:*21*
**KATIE**  8:*11*
**keep**  43:*3*
82:*16*
113:*22*
173:*24*
316:*3*
343:*20*
358:*9*

**KELLER**
2:*3, 4*  8:*16*
**KENDRICK**
8:*1*
**kept**  57:*22*
258:*4*
**KERSHAW**
5:*1*
**kids**  240:*2,*
*5*  266:*23*
349:*13*
423:*15, 16*
**kill**  450:*4*
**kinds**  206:*8*
**KING**  2:*5*
7:*1, 5*  8:*16*
**KINSMAN**
4:*1*
**knew**  38:*2*
114:*6*  294:*8*
**know**  23:*20*
30:*8*  31:*21*
37:*4, 5, 6, 10,*
*16*  41:*22*
42:*1*  43:*10*
47:*17, 19*
48:*2, 3*
50:*1*  51:*9*
54:*1, 5, 21*
55:*5, 13, 24*
60:*13, 14*
64:*18, 22*
67:*20, 24*
68:*21*
69:*23*
74:*19*  75:*4*
79:*7*  82:*7,*
*12, 19, 22*
84:*17*
87:*21, 23*
89:*1, 2, 12,*
*15, 16*  99:*12,*
*18, 23*  100:*2*
101:*14, 15*

111:*16*
112:*13*
114:*14, 16,*
*18*  115:*3*
116:*18*
123:*20*
130:*17*
131:*22*
135:*13*
137:*25*
139:*19, 24*
142:*3, 11, 17*
145:*23*
147:*18, 20*
148:*18, 23*
149:*1, 2, 4, 9,*
*11, 21, 22, 24*
150:*6, 8, 10,*
*12, 18*  151:*3,*
*4*  154:*7*
156:*8, 24*
160:*15*
161:*25*
171:*2, 7, 12,*
*13, 15*
172:*22*
175:*23*
179:*2, 6*
180:*1*
186:*9*
189:*16*
191:*13*
192:*8*
194:*8*
202:*6, 7, 8,*
*10, 11, 15, 18,*
*19, 23*
204:*18*
207:*24*
212:*25*
213:*7*
214:*15*
218:*14*
223:*19*

230:*3*
238:*25*
244:*14*
246:*13, 19,*
*22, 25*
249:*11, 16*
254:*22*
257:*12*
259:*8*
264:*11*
282:*9*
283:*15*
298:*6*
303:*8*
307:*10*
308:*19*
317:*23*
318:*5*
321:*1*
322:*18*
329:*11*
331:*24*
333:*23*
336:*21*
338:*25*
339:*23*
342:*3, 5*
350:*19*
351:*19, 22*
352:*2*
353:*12, 18*
361:*16*
370:*20*
377:*20*
378:*22*
380:*20, 25*
381:*16*
383:*9, 21*
385:*5*
387:*20*
393:*2, 17, 18,*
*25*  400:*21*
401:*10, 16*
402:*19, 23*

418:*5*
429:*14*
435:*13*
439:*22*
446:*8*
453:*11*
460:*24*
461:*11*
466:*19*
470:*15*
476:*16*
477:*8*
**knowing**
372:*14*
**knowledge**
31:*16, 17*
77:*17*
294:*13, 21*
**known**
305:*25*
**knows** 135:*7*
**KO** 6:*13*
**KOHANE**
6:*7*
**KOSTICK**
8:*16*
**KRAUSE**
4:*1*
**kricher@btla**
**w.com** 5:*15*
**Kriebel**
149:*23, 24*
**KRISTEN**
5:*15*
**Kroger** 8:*9*
**ktrinh@hbbl**
**aw.com** 8:*12*

**< L >**
**lab** 336:*6*
429:*3, 9, 10,*
*11, 12*
**labor** 158:*2,*
*14, 23* 159:*4,*

*11* 166:*11,*
*17* 168:*4*
210:*11*
215:*6, 11, 23*
220:*11*
225:*7*
257:*14, 23*
258:*17*
259:*2*
260:*10*
366:*20*
395:*15*
396:*9, 18, 21*
397:*2, 8*
**lab's** 336:*8*
**lack** 50:*8*
232:*11, 23*
233:*13, 18*
289:*12*
474:*10*
**Lactation**
130:*22*
**language**
123:*22*
128:*4*
225:*2*
232:*9*
251:*6*
275:*18, 19,*
*20*
**Lanier** 1:*13*
2:*20*
**LARA** 8:*6*
**large**
325:*22*
422:*3*
423:*3, 15*
480:*17*
**larger**
40:*10*
44:*10*
155:*17*
203:*2*
366:*12*

388:*19*
480:*12*
485:*18*
486:*7, 9, 11*
**Larissa**
63:*8, 10*
83:*5* 258:*3*
**lasted**
101:*17*
**late** 14:*10*
431:*21*
**Laue** 9:*15,*
*19* 12:*13*
20:*12*
21:*10*
24:*24, 25*
25:*1, 2*
28:*12*
29:*17, 23*
41:*10, 18*
44:*3, 17*
82:*24*
151:*25*
152:*4, 9*
169:*16*
170:*1*
175:*18*
176:*5*
177:*20*
191:*8*
193:*3*
222:*23*
223:*6*
245:*13, 14,*
*17, 18, 19*
246:*12*
250:*16, 23*
251:*10*
252:*10, 11*
254:*17*
260:*8, 14, 21*
261:*3*
276:*13*
280:*1, 8*

281:*1*
286:*8*
288:*10, 20*
291:*10*
296:*22*
322:*12*
359:*7*
363:*10*
**Laue's** 28:*5*
35:*10* 36:*8,*
*22* 39:*11, 21*
**LAURA**
8:*16*
**LAUREN**
2:*9*
**lauren.schult**
**z@kellerpost**
**man.com**
2:*10*
**Law** 1:*13*
2:*20* 3:*21*
4:*8* 5:*5*
**lawful** 13:*21*
**lawyers**
55:*7, 15*
57:*15* 88:*6*
113:*17, 20*
114:*4, 9, 15,*
*17, 19* 141:*9*
145:*24*
149:*13*
324:*9*
434:*18, 21*
435:*4, 21*
**LAWYER'S**
12:*22* 492:*1*
**lbosso@ksla**
**w.com** 7:*7*
**lcain@mofo.**
**com** 7:*13*
**LE** 5:*2*
**lead** 302:*6*
479:*12*

**learn**
251:*20*
302:*11*
303:*25*
**learned**
79:*7* 115:*5*
287:*17*
302:*7, 8*
**learning**
303:*18*
**leave** 47:*7*
293:*19*
431:*1*
**leaves**
415:*15*
**LEE** 5:*1, 20*
**left** 49:*17,*
*19* 264:*23*
464:*11*
473:*21*
474:*12, 23*
475:*4*
**left-hand**
434:*24*
**legal** 13:*3*
**LEILA** 2:*22*
**leila.ayachi@**
**lanierlawfir**
**m.com** 2:*23*
**lend** 130:*7*
**length** 252:*9*
**lengths**
440:*17*
**Leppart**
71:*25*
291:*11*
406:*21*
410:*10, 17,*
*21* 411:*2, 11,*
*22* 412:*5, 6,*
*21, 22*
416:*21*
417:*9*
418:*9, 18*

Confidential - Subject to Protective Order

419:*16*
420:*3, 5, 6*
431:*21*
468:*16, 25*
**letter** 35:*25*
**letters** 36:*1*
**letting** 74:*12*
**level** 46:*4*
153:*5*
154:*24*
155:*5*
159:*23*
185:*16*
195:*22*
196:*15, 24*
197:*3, 5, 7, 8,*
*9, 24* 198:*4*
199:*5, 9*
200:*6, 14*
202:*9*
218:*10*
230:*19*
232:*5*
236:*4*
249:*22*
271:*8*
314:*22*
327:*17*
333:*17*
341:*5*
362:*14*
364:*18*
394:*15*
401:*3*
**levels** 157:*4*
192:*12, 15*
195:*19*
196:*12*
198:*8, 9*
202:*24*
243:*13*
256:*11*
286:*11*
320:*2*

340:*24*
344:*24*
452:*5*
**Lexington**
3:*13*
**LIABILITY**
1:*4* 13:*11*
**Liew** 12:*10*
17:*7* 53:*8,*
*11, 13* 67:*19*
68:*12, 14, 16*
69:*3, 4, 23*
70:*10* 71:*2,*
*17* 73:*4, 11,*
*15* 74:*2*
75:*5* 76:*17,*
*18, 20* 77:*7,*
*14* 130:*3*
145:*18*
265:*4*
276:*23*
291:*7, 11*
376:*17, 18*
404:*24*
405:*7*
406:*2, 24*
408:*24*
410:*25*
413:*3, 21*
414:*4, 7*
415:*8, 11, 14*
416:*8*
419:*16*
420:*4*
455:*2*
465:*7, 14, 20,*
*23* 467:*14,*
*25* 468:*5, 11*
469:*10*
470:*17, 20*
**Liew's**
418:*1*
466:*10*

**life** 46:*6*
355:*17*
436:*13*
**light** 419:*10*
**liked** 218:*20*
**likelihood**
479:*2*
**limit** 59:*21*
79:*20*
198:*2*
275:*10*
363:*17*
**limitation**
375:*16*
**limitations**
44:*15*
464:*12*
**limited**
237:*19*
321:*19*
**LINDSEY**
3:*17*
**line** 172:*22*
173:*1*
201:*5*
266:*8*
472:*22*
491:*3* 492:*3*
**lines** 322:*11*
**link** 130:*11*
184:*22*
263:*4*
361:*25*
481:*1*
**linked**
282:*19, 20*
299:*2*
**list** 48:*13*
49:*5* 70:*2*
148:*7*
169:*21*
173:*24*
220:*20*
238:*12*

241:*21, 22*
290:*9*
320:*25*
356:*11*
449:*16*
451:*9*
**listed** 253:*6*
354:*6, 8*
355:*9, 23*
**listen** 51:*10*
59:*20*
183:*23*
**listening**
22:*5* 134:*16*
**lists** 356:*3*
**literally**
90:*3*
**literature**
24:*5* 28:*19*
29:*2* 30:*4,*
*6* 33:*18*
35:*24*
36:*19* 38:*9*
45:*16, 19, 25*
50:*18* 52:*1,*
*11* 59:*7*
61:*16*
63:*24*
71:*20*
76:*12* 77:*1,*
*3* 89:*25*
90:*2*
101:*23*
113:*10*
118:*10, 20*
121:*14*
122:*1*
124:*22*
129:*3, 6*
133:*2, 4*
136:*14*
141:*25*
147:*19*
149:*10*

152:*15, 19,*
*25* 153:*9, 12*
154:*13, 16,*
*21* 163:*4*
165:*24*
167:*2*
169:*9*
186:*6*
205:*13*
209:*15, 17*
211:*9*
213:*4*
227:*3*
229:*5*
230:*12, 14,*
*24* 231:*4*
237:*3, 10*
238:*6*
241:*15, 16*
242:*13*
263:*9*
272:*14*
273:*18*
278:*19*
303:*6, 21*
304:*7*
306:*9*
307:*18*
312:*3, 8*
321:*1, 2, 5*
322:*7, 9*
323:*7, 8, 11,*
*25* 324:*2, 11*
331:*12*
358:*17*
360:*25*
380:*5, 8*
381:*17*
407:*15*
432:*21*
434:*11*
450:*8*
457:*3, 10, 13*
458:*21*

| | | | | |
|---|---|---|---|---|
| 460:*14* | 345:*20, 21,* | **long-term** | 297:*24* | 101:*23* |
| 462:*6* | *22, 23* 348:*1* | 269:*16* | 298:*17* | 155:*4* |
| 464:*22* | 406:*18* | 437:*20* | 300:*22* | 158:*19* |
| 466:*14* | 415:*21* | **look** 16:*23* | 311:*12* | 159:*9* |
| **literatures** | 416:*1* | 19:*4* 20:*16,* | 312:*20* | 164:*14, 15* |
| 185:*13* | 423:*22* | *17* 21:*14* | 315:*8* | 175:*7* |
| **litiga** 223:*19* | 437:*11, 13* | 23:*9* 24:*1* | 324:*15* | 224:*5, 8, 13* |
| **litigant** | 457:*13* | 28:*22* 29:*2* | 341:*25* | 228:*25* |
| 140:*19* | 480:*8* | 30:*5* 34:*15,* | 343:*13, 15* | 229:*4, 5* |
| **LITIGATIO** | **live** 70:*19* | *24* 35:*1* | 347:*25* | 233:*17* |
| **N** 1:*4, 21* | **liver** 205:*5* | 37:*21, 23* | 354:*5* | 235:*4* |
| 8:*21* 13:*4,* | **living** | 45:*16* | 357:*3* | 237:*9* |
| *11* 54:*23* | 349:*13* | 48:*10* | 359:*15* | 240:*12* |
| 76:*22* 77:*9,* | **LLC** 2:*3* | 110:*12* | 363:*20* | 241:*13* |
| *15* 80:*17* | 3:*1* 8:*14, 18* | 121:*12* | 368:*13* | 266:*18* |
| 86:*16* 89:*2* | **LLP** 3:*9* | 136:*25* | 369:*5* | 281:*6, 14* |
| 138:*16* | 5:*9, 20* 6:*1,* | 139:*16, 17* | 378:*4* | 286:*8* |
| 140:*2* | *4, 13, 16* 7:*1,* | 163:*22* | 380:*23* | 291:*18* |
| 143:*3, 19* | *5, 12, 18* 8:*6,* | 166:*17* | 385:*1* | 311:*1* |
| 144:*18* | *11* | 169:*25* | 391:*24* | 312:*3* |
| 223:*20* | **loaded** | 172:*20* | 402:*16* | 313:*12* |
| 230:*1* | 239:*8* | 179:*10, 17* | 406:*22* | 324:*17* |
| 282:*13, 23* | **log** 10:*4* | 180:*2* | 421:*12* | 364:*11* |
| 293:*10* | 144:*19* | 187:*9* | 428:*19* | 414:*16* |
| 294:*9, 23* | **logic** 207:*15* | 194:*3* | 429:*13* | 416:*4* |
| 305:*14, 17* | **logs** 145:*2* | 195:*10* | 431:*17* | 437:*15* |
| 307:*6* | **long** 62:*1* | 196:*11* | 434:*13* | 440:*5* |
| 319:*12* | 73:*21* | 203:*4* | 439:*22* | 476:9 483:8 |
| 321:*25* | 91:*11, 12* | 209:*2, 21, 22,* | 441:*16, 24* | **looking** |
| 406:*25* | 101:*16* | *24* 210:*14,* | 442:*15* | 19:*20, 24* |
| 435:*5, 9* | 106:*2* | *18* 213:*12* | 451:*19* | 21:*11* |
| 445:*24* | 179:*6* | 215:*2* | 453:*15* | 29:*16* |
| 446:*4* | 186:*21* | 233:*19* | 454:*3, 7* | 39:*22* |
| 447:*11* | 342:*12* | 239:*3* | 455:*4, 15* | 40:*11* |
| **little** 44:*11* | 400:*6, 8* | 241:*19, 25* | 456:*13* | 46:*12* |
| 45:*16* | 434:*2* | 243:*21, 23* | 457:*12, 16,* | 61:*24* |
| 157:*12, 20* | **longer** | 247:*1, 9* | *25* 458:*15* | 109:*10* |
| 182:*17* | 41:*19* | 254:*19* | 465:*1* | 162:*15* |
| 206:*22* | 94:*12, 13* | 260:*24* | 471:*9* | 164:*13* |
| 230:*21* | 222:*9, 10* | 262:*21* | 473:*9* | 201:*14* |
| 271:*17* | 302:*20* | 264:*2* | 475:*3, 4* | 213:*19* |
| 331:*11* | 323:*24* | 267:*22* | 477:*18* | 215:*1* |
| 336:*15* | **longitudinall** | 268:*8* | **looked** 25:*5* | 263:*7* |
| 341:*8* | **y** 339:*14* | 282:*1* | 48:*13* 51:*1* | 266:*19* |

268:7
284:17
295:25
296:14
322:22
353:7
357:7, 15
359:10
363:10
389:2
399:13
420:16
431:10
433:23
442:24
454:16
469:11
472:14, 22
473:12
**looks** 28:21
139:20
175:5  413:4
**Los** 5:16
8:13
**loss** 461:25
**lost** 385:8
413:24
461:9, 23
**lot** 16:22
34:13
38:25
51:11
62:23  63:3,
17  69:20
73:4  78:5
85:1  95:14
96:18
128:1
139:13
154:12
169:8
220:1
223:13
235:3, 7

239:10
241:15, 16
242:13
254:4
321:22
323:21
329:7
333:9
334:23
349:22
373:7, 8
376:18
377:9
378:24
388:6
395:1
430:6, 7
440:1
446:9, 13
459:11
468:2, 21
478:21
480:25
481:24
**Lots** 8:14
38:22
105:20
461:17
**Louis** 4:10
**Louisiana**
1:19  2:16
488:22
**love** 64:14
148:16
360:25
407:6
**low** 102:8
172:7
341:1
363:15
364:2, 7
400:3
425:13

479:10, 11
481:11
**lower** 197:8,
10  266:23
485:6
**lscarcello@w**
**cllp.com**
3:18
**LUKE** 7:7
**lunch**
210:23
228:2
229:21
**LUNER**
4:12
**lung** 126:1
**LYNDSEY**
7:12

**< M >**
**machine**
283:22
**Madison** 6:8
**magic**
305:4
310:15
439:20
**Mailman**
54:17  55:5,
13  81:10
84:4, 5
436:18
**main** 47:19
48:2
318:22, 24
386:11, 12
465:24
**major**
194:4
233:19
**majority**
136:19
147:21

221:1
272:13
**making**
59:22
94:24
127:19
238:12
305:2
445:21
485:17
**male** 204:7
368:23, 24
**males**
457:21, 22
458:14
459:8
**manuscript**
176:21
269:4
383:23
385:3
386:12, 13,
24
**March**
11:12
50:17  52:4,
11  53:3
56:17
119:22
330:25
420:8
434:19
**margin**
247:5
**marginally**
216:25
**marijuana**
163:2
**mark**
108:13
210:22
214:3
246:2
289:14

293:18
295:24
296:8
297:15
348:7
354:15
368:2
394:1, 2
437:18
438:12
448:11
450:25
467:23
**marked**
108:9, 15
169:22
170:3
174:21, 25
191:11
213:25
214:5
245:24
246:6
247:10
283:24
284:3
289:24
290:3
293:22
296:9, 13
297:12, 18
347:10, 14
348:2, 4
352:17
354:12
355:5
367:23
368:5
374:16, 20
384:8, 11
393:23
394:6
405:19, 23
420:19, 23

428:*5, 10*
438:*9*
448:*8*
450:*21*
451:*2*
467:*20*
468:*4*
487:*24*
**marking**
428:*8*
448:*13*
**MARLOWE**
3:*23*
**Masarwa**
30:*11, 16*
**material**
89:*17*  451:*9*
**materials**
12:*10*
281:*21*
323:*18*
368:*7*
411:*13, 20*
**maternal**
9:*19*  12:7
154:*23*
155:*9, 11, 13*
191:*22, 24*
203:*20*
240:*7, 15*
241:*6, 11, 14,
15*  243:*21,
23*  260:*11*
279:*10, 11*
361:*22*
369:*12*
394:*22*
413:*14*
414:*9, 14, 18,
21*  415:*2, 23*
431:*19*
**math**  345:*19*
**matter**  13:9
53:*18*  57:5

89:*13*
93:*23*
140:*20*
177:*10*
250:*18, 19,
25*  405:*15*
442:*2*
474:*11*
**matters**
206:*7*
248:*22*
**mature**
41:*25*
**mcharchalis
@btlaw.com**
5:*14*
**McTiernan**
11:*10*
393:*3, 5*
394:*1*
**mcwatts@wa
ttsguerra.co
m**  3:*3*
**MD**  1:*12*
10:*16*
11:*10*
13:*20*
488:*4*
490:*12*
**MDL**  1:*3*
27:*2*
**mdowd@holl
andtriallawy
ers.com**  4:*9*
**mean**  20:*22*
29:*24*
31:*23*  38:*8*
39:6  59:*3*
67:*17*
68:*21*  71:9
72:*1*  74:*19*
79:*22*  81:*5,
17, 20*  82:*6*
93:*5*  97:*17*

103:*7*
111:*15*
116:*9*
139:*11, 12*
141:*10, 23*
143:*25*
188:*17*
199:*22*
204:*1*
210:*13*
212:*3, 5*
213:*13*
216:*15*
219:*12, 24*
230:*18*
231:*23*
232:*4, 16*
233:*2*
255:*6*
259:*7*
262:*7*
267:*19*
270:*3*
272:*15*
275:*12*
279:*16*
283:*14*
293:*13*
299:*14*
320:*21*
321:*6*
329:*10*
330:*24*
340:*13*
352:*14*
360:*24*
379:*22*
381:*9, 14, 21*
392:*2, 3*
393:*17*
418:*8*
425:*5, 25*
432:*24*
437:*11*

439:*19*
448:*4*
457:*9*
461:*14*
463:*1, 9*
469:*4, 23*
475:*24*
**meaning**
277:*18, 24*
350:*6*
375:*10*
412:*18*
**meaningful**
213:*20*
439:*6*
**means**
176:*25*
179:*1*
182:*15*
209:*24*
257:*2*
263:*3*
294:*2*
394:*25*
425:*24*
482:*1*
**meant**
40:*16*
179:*2*
250:*8*
287:*20*
333:*19, 24*
375:*14*
426:*14*
**measure**
98:*25*
152:*2, 3*
155:*9*
159:*22*
166:*1*
198:*13*
199:*7*
203:*1*
231:*2*

250:*3*
252:*4*
265:*15*
277:*11*
376:*4*
422:*17*
455:*17*
471:*17*
**Measured**
10:*17, 22*
11:*5, 19*
101:*10*
153:*5*
155:*3*
216:*17*
241:*19*
265:*9*
279:*2*
382:*18*
399:*19*
404:*18*
420:*12*
422:*16*

**measurement**
23:*15*
182:*9*
272:*19*
277:*11*
289:*12*
394:*21*
454:*18*
**measurement
s**  360:*21*
366:*14*
**measures**
301:*8*
471:*13*
**measuring**
161:*18*
162:*2*
180:*19*
198:*15*
266:*15*

276:9
277:13
280:19
287:25
358:19, 20
**mechanism**
268:3
270:19
**mechanisms**
105:1, 2, 16
**mechanistic**
161:20
**Meconium**
9:13, 18
10:6, 10, 18,
22  11:2, 6,
20  21:14
25:5  28:6
35:10  41:9,
12  44:21, 23
151:6, 14, 16,
19, 20  152:2,
3, 5, 6, 10, 11,
14, 15, 18, 20,
25  153:5, 9,
11, 13, 15, 18,
19, 23
154:14, 20,
25  155:6, 9,
13, 16, 19, 23
156:5, 9, 13,
17, 18  157:7,
17  158:4, 15
159:24
160:12, 17,
24  161:5, 21
162:11, 16,
19  163:1, 15,
19, 23  164:1,
9, 11  165:3,
8, 25  166:12,
18  167:2
168:2, 9
169:11

179:15
181:13, 19
182:1, 7
183:7, 14
184:4, 14, 19
185:11, 19
186:1
188:6
191:12, 25
192:15
194:15
195:5, 25
196:5, 8, 13,
16, 24
197:23
200:1, 7
201:21
202:5, 17, 18,
22, 24
203:16, 19,
24  204:25
206:3, 12, 15,
17, 21  207:1
208:2, 10, 17,
24  214:14
215:3, 7, 12,
21  216:8, 11
217:1
219:16
223:12, 13,
23  224:10
226:10, 11
246:17
247:17
248:1, 8
249:4, 5, 15,
18, 20  250:4
252:3
255:19
256:6, 12, 18
266:15
272:20
273:5
276:9

277:11, 14
279:3
280:20
286:11
287:25
289:12
295:7, 22
299:17, 21
300:8, 11, 13,
15  301:20,
24  302:5, 8
303:9, 16, 20
338:1
339:16
340:8, 20
341:12
344:7, 13, 14,
19, 20, 23, 24
345:2, 5, 11,
12  355:15
357:6, 11, 12,
21  358:2, 20
362:15, 21
363:23
364:21, 25
365:7
366:9, 14, 16
368:18, 20
373:17
374:12
375:7
377:23
378:7, 12
379:17
382:17, 18
386:14
388:7
420:12
421:2
454:14, 18,
19
**meconium's**
185:15
**medal**  333:9

**median**
201:7
362:22
363:2, 5, 12
**Mediated**
10:19, 23
**Mediation**
11:7  409:7
**mediator**
408:14
409:2
**medical**
19:15  24:9
64:20  66:6,
10  90:24
115:19
121:2
138:7
142:4, 8, 21
158:20
276:9
392:2, 3
401:14
446:21
**medication**
218:2
220:25
244:16, 24
245:7
349:8, 14, 17
351:21, 22,
23  352:22
353:25
354:1
399:12
401:11
**medications**
204:5
207:8
217:13, 20
220:22
401:11
402:19

**Medicine**
212:22
213:5
316:18
446:23
**meet**  316:9
409:18
**meeting**
115:7, 12, 19,
21  116:4
**meetings**
82:14
**member**
70:24
**members**
38:1  82:24
**memorize**
444:3
**memory**
71:11
222:19
463:10
**mental**
243:4
413:14
414:9, 14, 18,
21  415:2, 19,
23  437:23
442:22
444:13
**mentioned**
43:16
73:16
78:12  82:4
84:25
104:25
111:7
115:8
117:13
137:22
174:3
193:4
206:15
216:6

248:*14*, *25*
254:*21*
256:*20*, *24*
271:*18*
295:*2*
300:*4*
303:*11*
312:*16*
316:*6*
340:*2*
342:*10*
407:*7*
410:*20*
434:*20*
454:*22*
475:*14*
**mentioning** 21:*24* 365:*20*
**mentor** 251:*19* 449:*15*
**merit** 141:*3*, *4*
**message** 178:*2* 286:*15*
**met** 83:*9* 148:*25* 316:*12* 393:*8* 434:*19* 436:*13*
**meta-analyses** 390:*23*
**meta-analysis** 50:*23* 382:*12*, *24* 390:*22*, *25* 459:*15*
**metabolism** 375:*3*, *20*
**method** 376:*23*
**methodology** 280:*2*
**methods** 77:*6* 266:*18*
**METHVIN** 4:*20*
**meticulously** 141:*19*
**metric** 265:*14*
**mice** 11:*24*
**MICHAEL** 4:*8*
**micro** 221:*19*
**microphone** 231:*12*
**middle** 298:*1* 362:*25* 443:*22* 464:*11*
**midpoint** 362:*18*
**MIKAL** 3:*3*
**MILES** 4:*20*
**milk** 208:*19*
**Millennium** 3:*6*
**million** 157:*2*, *4*
**mind** 20:*18* 23:*3* 32:*9* 53:*11* 78:*4* 83:*6* 124:*16* 219:*15* 261:*13*, *23* 268:*12* 303:*20* 306:*12* 309:*14* 321:*17* 331:*1* 337:*19* 358:*9* 408:*22* 415:*16* 438:*5* 457:*4*
**mine** 33:*6* 312:*24* 428:*4*
**minor** 308:*2*, *4*
**minority** 147:*21*
**minus** 106:*2*
**minute** 97:*21* 343:*25* 476:*24* 478:*8*
**minutes** 88:*20* 89:*22* 106:*2* 343:*23*
**mis** 395:*18*
**miscarriages** 153:*4* 154:*5*, *6*
**misclassification** 102:*14* 221:*8* 262:*25* 263:*1* 277:*10*, *18* 395:*17*, *19* 460:*19* 461:*8*
**misinterpret** 321:*2*
**misinterpreted** 287:*16*
**mis-memory** 460:*16*
**misread** 287:*16*
**misrepresenting** 398:*3*
**misses** 201:*13*
**missing** 58:*12* 72:*21* 73:*8* 180:*14* 260:*17*
**Missouri** 1:*19* 3:*19* 4:*4*, *10* 488:*19*
**mistake** 24:*10* 127:*19* 369:*3*
**mistakes** 329:*7*, *12*
**misunderstood** 79:*23*
**MITCHELL** 5:*14* 6:*20*
**mitchell.stern@arnoldporter.com** 6:*20*
**mix** 395:*22*
**mixed** 222:*12*
**mixing** 395:*21*
**model** 417:*3*
**modification** 456:*16*
**molecular** 446:*1*, *5* 447:*12* 449:*13*
**molecule** 198:*24* 299:*1*
**mom** 84:*17* 156:*18* 199:*13*
**moment** 58:*21* 212:*8* 483:*13*
**mom's** 199:*14*
**MONAGHAN** 3:*11*
**MONDAY** 1:*6* 175:*8*
**money** 54:*16*, *19*, *22* 55:*6* 56:*17*, *21* 140:*1*, *18* 144:*5* 146:*13*, *18*, *21* 147:*11*, *13* 356:*17*
**Monica** 4:*16*
**Monitoring** 10:*4*, *7* 295:*20*
**monograph** 316:*16*, *19*
**Montgomery** 4:*22*
**month** 155:*12*, *14*, *22* 250:*11*
**months** 152:*22*, *23* 153:*1*, *14*, *16* 155:*17*, *24* 157:*11*, *12*, *14* 165:*9* 167:*3* 168:*10* 169:*12* 185:*17* 196:*9*

Confidential - Subject to Protective Order

206:*18*
208:*5*
226:*12*
248:*15, 17, 21*  249:*3, 19, 23*  250:2, *10*
300:*9*
301:*22*
302:*1, 19*
400:*2*
453:*5*
463:*7, 20*
**Montreal**
295:*11*
**morning**
14:*3, 4*
15:*16*  27:*6*
282:*3, 5, 12*
287:*8*  352:*3*
**MORRIS**
7:*18*

**MORRISON**
7:*12*
**Morristown**
6:*3*
**mortified**
370:*5*
**mother**
91:*14*
99:*21*
158:*13*
162:*13*
163:*21*
180:*17*
182:*9*
188:*4*
192:*10*
198:*17, 21*
208:*14*
228:*19*
243:*5*
257:*22*
396:*18*

410:*4*
423:*19*
425:*13*
**mothers**
61:*25*  91:*1*
152:*21*
155:*4*
162:*13*
192:*11, 18*
194:*23*
208:*6*
255:*15*
368:*21*
401:*2*
452:*15*
455:*6*
459:*22*
**motion**
14:*17*
**motor**
265:*10*
**mouse**
373:*19*
**move**  181:*6, 8*  190:*4*
315:*25*
389:*15*
**movement**
212:*15*
**MPH**  10:*16*
**MRI**
348:*12*
349:8, *14*
350:*5, 8*
351:*1, 6, 21*
352:*4, 7, 8*
354:*1*
385:*15, 16*
386:*11, 16*
388:*4, 9, 11, 18*  389:*10*
450:*16, 19*
**MRIs**  40:*12*
348:*15, 22*

349:*23, 25*
350:*3, 11, 20, 24*  351:*5, 8, 10, 13, 20*
355:*17, 21*
385:*4, 6, 25*
386:*25*
450:*15*
**multiple**
27:*5*
119:*12*
213:*18*
334:*1*
335:*11*
339:*1*
340:*1*
344:*4*
392:*5, 6*
446:*11*
462:*6*
463:*25*
**multitude**
100:*11*
**MURDICA**
5:*12*  9:*5, 7*
14:*2, 12, 15*
15:*6, 11, 15, 17*  19:*6*
21:*2, 25*
22:*17, 22*
23:*3, 17*
24:*22*
25:*15*  26:*5, 14, 23, 24*
27:*18, 20*
28:*2*  32:*5, 11, 12*  36:*4*
40:*22*  42:*9, 19*  44:*19*
46:*7*  48:*6*
49:*15*  51:*7, 14, 16, 20, 24*
52:*15*  53:*1, 16*  55:*4, 12*

56:*13*  58:*1, 16*  59:*15*
60:*4*  61:*19*
64:*16*
65:*20, 22*
73:*18*  74:*9*
75:*1, 21*
76:*14*  78:*7*
79:*1, 24*
80:*9*  84:*15*
87:*19*
88:*24*
89:*11*
90:*16*
91:*17*
92:*13*  94:*1, 16*  95:*3*
97:*1, 10, 24*
98:*8*
100:*18*
101:*12*
103:*20*
104:*19*
106:*3, 7, 9, 18, 20*
107:*11, 17, 21*  108:*5, 11*
109:*4*
110:*23*
112:*12, 24*
113:*14*
115:*11*
116:*10*
117:*1, 17*
119:*3*
120:*6*
122:*4*
124:*4*
125:*3, 20*
127:*2, 21*
129:*7, 17*
131:*13, 23*
133:*9, 19*
134:*1, 18, 25*

135:*7, 15*
136:*1, 12*
137:*24*
138:*5*
139:*1, 8, 21, 23*  140:*15*
142:*10*
143:*1*
144:*12*
148:*22*
149:*18*
158:*9*
160:*4*
162:*6*
163:*13*
164:*19*
166:*3, 8*
167:*5*
168:*17*
169:*14, 24*
172:*24*
173:*6, 13, 17, 20*  174:*12, 23*  178:*19*
181:*1*
182:*22*
183:*22*
184:*10*
186:*14*
187:*4, 9, 15, 17, 20, 23*
188:*12, 23*
189:*21*
190:*5, 9, 15*
191:*1*
207:*22*
210:*7*
212:*2*
214:*2*
227:*6*
228:*3, 6, 8*
229:*11, 19*
231:*15*
235:*19*

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 236:21 | 329:13 | 411:5 | 482:17 | **narrow** |
| 238:7, 11, 18, | 330:13 | 412:19 | 483:6, 22 | 103:9, 19 |
| 21  243:19 | 333:1 | 413:25 | 487:15 | **Nashville** |
| 244:21 | 335:6, 23 | 414:3 | **Murdica's** | 115:17 |
| 245:4, 11 | 337:2, 22 | 415:7 | 481:20 | **nasty** |
| 246:1 | 338:9, 15, 23 | 419:14 | **mutations** | 449:24 |
| 253:1 | 339:7, 21 | 420:2, 21 | 239:19 | **National** |
| 255:8 | 340:17 | 423:4 | | 12:10 |
| 256:1 | 341:6, 11, 18 | 425:21 | **< N >** | 36:16 |
| 257:17 | 342:2, 12, 16, | 426:20 | **N.W** 5:21 | 99:16 |
| 261:10, 15, | 20  343:4, 6, | 428:7 | 6:14 | 316:18 |
| 24  262:2 | 10, 21  344:2 | 430:10 | **NADINE** | 413:11 |
| 263:21, 24 | 345:7, 17 | 431:16 | 6:7 | 414:5  432:6 |
| 264:5, 9, 19 | 346:14, 20, | 434:8 | **name**  13:2 | **nature** |
| 268:14, 19 | 25  347:12 | 435:24 | 15:17  38:6, | 269:12 |
| 271:1 | 348:6 | 436:16 | 12, 17  63:9 | **Navas-Acien** |
| 274:11 | 353:5, 8 | 437:1 | 65:1  83:4, | 63:14 |
| 275:1 | 354:14, 24 | 438:6, 11, 18 | 10, 14 | 83:23  84:3 |
| 276:19 | 355:1, 4, 8 | 439:3 | 109:15 | **navigation** |
| 277:2 | 359:6 | 441:8 | 122:17 | 304:3, 11, 13, |
| 278:22 | 360:3, 10 | 442:9, 18 | 146:6 | 25  305:7, 9, |
| 280:14 | 367:14 | 443:1, 4, 8, | 175:22 | 14, 18  306:1, |
| 281:16 | 368:1 | 13  444:9, 16 | 214:10 | 3, 24  307:5, |
| 283:7 | 370:25 | 445:2, 4, 5 | 245:16 | 12, 15, 23 |
| 284:1, 15, 23 | 371:3 | 446:15 | 305:4, 9 | 308:5, 7, 11 |
| 285:1 | 372:11 | 447:4 | 393:4, 9 | 309:3, 11, 15 |
| 289:20 | 374:18 | 448:1, 10 | 420:9  421:6 | 310:2, 3, 12, |
| 290:1 | 375:24 | 450:23 | **named** | 22  311:4, 15, |
| 292:5, 17 | 377:10, 17 | 451:4, 22, 23 | 110:1, 2 | 20, 22, 23 |
| 293:1, 24 | 379:13 | 456:21 | 393:2 | 312:16 |
| 296:11 | 383:1, 6 | 458:3, 9, 23 | **names**  63:7 | 313:4, 8, 14, |
| 297:14 | 384:10, 23 | 466:23 | 83:7 | 24  314:7, 10, |
| 305:21 | 385:10, 17, | 467:3, 6, 10, | 110:11 | 15, 17  315:5, |
| 308:13, 20 | 23  388:2, 24 | 13, 22 | 146:1 | 18, 23 |
| 311:9 | 389:5, 24 | 469:15, 18 | 147:1 | 316:24 |
| 313:19 | 390:7 | 470:13 | 171:10 | 317:4, 10, 13, |
| 314:4, 9 | 393:24 | 472:15, 24 | | 19, 22 |
| 315:15, 20 | 398:4, 24 | 475:2 | **nanograms** | 318:23, 25 |
| 316:1, 5 | 400:12 | 476:17, 25 | 196:15 | 319:3, 7, 17, |
| 318:14, 20 | 401:21 | 477:3, 7, 13, | 197:24 | 19, 25 |
| 319:15 | 402:3 | 22, 25 | 200:7 | 320:22 |
| 321:15 | 404:22 | 478:20 | 201:8, 22 | 324:18, 24 |
| 323:1 | 405:21 | 480:4, 21 | 202:5 | 325:5, 6, 9, |
| 328:18 | 408:13, 18 | 481:3, 15, 21 | 363:11 | 12, 25  326:5, |
| | | | **Naples**  5:8 | |

*11, 15, 17, 21*
327:*4, 6, 18,*
*19*  328:*1, 8,*
*13, 15, 20*
329:*1, 3, 15,*
*24*  330:*6, 16*
332:*3, 21*
333:*4, 22, 23*
334:*11*
335:*3, 4, 9,*
*16*  337:*4, 11*
404:*12*
431:*9*
452:*2*
453:*8*
482:*11*
**NCRA**
488:*17*
**NDD**  10:*14*
**NDDs**
210:*1*
424:*21, 23*
**near**  402:*6*
**necessarily**
265:*6*
**necessary**
489:*4*
**need**  16:*11,*
*17*  33:*21, 24*
34:*3*  38:*1*
47:*17, 19*
48:*1, 2*
50:2   65:*15*
72:*24*
78:*12, 13*
90:*1*  95:*23*
104:*16*
132:*18, 22*
133:*1*
135:*8*
136:*24*
137:*14*
141:*23, 24*
171:*20*

172:*21*
173:*6, 21*
175:*10*
184:*20*
185:*1*
188:*19*
196:*14*
200:*5*
201:2, *6*
202:*7*
203:*8*
217:*15, 16*
238:*19*
243:*23*
252:*14*
267:*19*
282:*8*
285:*23*
287:*18*
290:*5*
291:*16*
307:*21*
309:*8*
311:*24*
312:*11*
319:*21*
325:*16, 20*
330:*8*
342:*22*
343:*17*
347:*1*
360:*9*
380:*19*
383:*8*
389:*19*
401:*6*
408:*23*
436:*20*
437:*18*
441:*13*
449:*15*
474:*8, 9*
**needed**
185:*4, 25*

306:*25*
314:*24*
360:*22*
388:*20*
408:*24*
421:*18*
424:*12*
441:*19*
466:*21*
**needs**
156:*18, 19*
161:*16*
205:*1, 2, 3, 4,*
*5*  206:*4*
267:*2*
299:*18*
335:*10*
450:*19*
469:*5*
**negative**
29:7   35:22
211:*12*
221:*15*
243:*15, 20,*
*22, 25*  254:2
275:*18, 19*
277:*25*
279:*20*
345:*5*
395:*10*
455:*24*
479:*2, 13, 14*
482:*21, 22*
**negatives**
244:*7*
262:*11*
377:*8*
433:*14, 16*
**neither**
488:*10, 11*
**neonatal**
130:*23*
421:*25*

**Network**
10:*19, 23*
11:*7*
**neurobehavi**
**oral**  11:*22*
**Neurocogniti**
**ve**  9:*14, 22*

**neurodevelop**
424:*23*
**neurodevelop**
**ment**  12:*6*
32:*20*  86:*7*
95:*15*
198:*25*
201:*15*
230:*4*
275:*11*
278:*6*
286:*12, 17*
298:*24*
423:*13*
426:*17*
433:*10*
445:*11, 14,*
*16, 18*
449:*14*
**Neurodevelo**
**pmental**
10:*2, 13*
17:*19, 21*
18:*3, 18*
19:*2, 5, 10*
20:*2, 15*
21:*5, 8*
25:*4*  28:*18*
32:*14*
35:*14*
36:*11*
39:*24*  45:*7*
51:*6*  80:*12*
92:*21*  93:*1*
95:*10*
96:*15*

109:*12*
125:*5*
129:*22*
136:*16*
147:*23*
148:*14*
180:*16*
200:*22*
206:*1*
226:*25*
253:*11*
263:*18*
271:*11*
272:*18, 25*
273:*9*
286:*21*
346:*3*
397:*21*
398:*18*
415:*5*
422:*9*
450:*1*   476:*7*
**neuroepidem**
**iology**
447:*23*
**neurological**
424:*5*
**neurologist**
18:*9, 10, 17*
78:*13, 14*
**neurology**
78:*12*
**neuron**
91:*13*
**neurons**
96:*1*
**neuropsychia**
**trist**  355:*16*
445:*20*
450:2, *13*
**neuropsychia**
**trists**  450:*3*

neuropsychol
ogical
383:*25*
neuropsychol
ogist 349:*11*
neuroticism
240:*25*
neurulation
96:*3*
never 38:*9*
46:*5* 47:*21*
72:*17*
139:*6*
146:*12*
147:*7*
148:*25*
179:*3*
217:*7*
218:*4*
219:*12*
251:*22*
290:*7*
291:*17, 18*
312:*15*
317:*3*
393:*8*
401:*25*
406:*23*
452:*6*
465:*13*
nevertheless
177:*16*
481:*17*
NEW 1:*1,
14, 19* 2:*24*
3:*13* 6:*3, 8,
21* 7:*3, 15*
8:*3* 13:*9*
17:*2, 5*
30:*22*
44:*11*
70:*19*
117:*3, 8*
179:*3*

185:*20*
197:*13*
212:*21*
213:*4*
307:*24*
351:*4*
390:*21*
488:*21*
newborns
299:*19*
newer 412:*7*
nice 59:*2*
61:*12*
77:*18*
157:*11, 13*
214:*18*
360:*23*
361:*5*
364:*3* 388:*9*
night 352:*3*
353:*25*
NIH 407:*25*
408:*2*
nine 310:*7*
327:*1, 2*
485:*10*
nkohane@btl
aw.com 6:*7*
NNDs 50:*21*
Nods 445:*3*
nonbeliever
283:*1, 2, 4*
non-biased
251:*21*
nondifferenti
al 263:*2*
460:*19*
461:*8*
non-doctors
84:*8*
nonexposed
395:*1, 22*
486:*19*

non-
litigation
306:*2*
non-
neurological
420:*17*
nonpublic
89:*17*
Nope 268:*14*
normally
64:*20* 99:*5*
351:*24*
North 2:*10*
3:*24* 4:*9*
Norway
17:*8*
Norwegian
432:*5*
Notary
488:*23*
490:*19*
notation
452:*14*
note 102:*11*
453:*8*
noted 13:*14*
489:*10*
490:*7*
notes 30:*25*
31:*2* 492:*1*
NOTES.........
.......................
492 12:*22*
notice
146:*24*
147:*4, 14*
413:*7*
noticeable
474:*6*
Notwithstand
ing 424:*9*
Novel 9:*18*
388:*20*

null 211:*12*
221:*10*
277:*24*
375:*10*
377:*7*
395:*5, 7*
479:*17*
482:*5*
Number
27:*1*
179:*18, 22*
191:*17, 21*
193:*25*
194:*4, 10*
195:*16*
196:*11*
213:*11*
222:*25*
223:*7*
249:*21*
250:*3, 4*
340:*16*
358:*3*
365:*25*
384:*12*
386:*9, 20*
439:*20*
440:*2*
441:*2, 4*
454:*9, 15*
471:*13, 18*
473:*18, 20*
474:*12*
numbers
221:*18*
223:*9*
250:*1*
357:*4*
364:*13*
366:*1*
369:*7*
370:*14*
numerical
418:*12*

nurse
258:*10*
259:*11, 21*
NW 7:*8*

< O >
oath 31:*24*
47:*23*
118:*17*
136:*4*
143:*22, 23*
447:*18, 19*
OB/GYN
121:*3*
174:*5, 10*
239:*5* 258:*1*
object
27:*12*
42:*15*
46:*22*
116:*6*
135:*4, 9, 18*
147:*25*
148:*1*
187:*6, 8*
198:*18*
238:*9*
244:*17*
245:*1, 9*
257:*16*
322:*13*
337:*16*
338:*5, 13, 19*
339:*3*
340:*22*
381:*6*
414:*23*
418:*23*
429:*24*
455:*21*
466:*6*
469:*13, 17*
Objection
18:*20* 20:*3*

| | | | | |
|---|---|---|---|---|
| 21:*17* | 127:*16* | 264:*4, 12* | 408:*11, 15* | |
| 24:*13* 25:*7, 10* 26:*17* | 128:*10* | 270:*23, 24* | 409:*15* | **observational** |
| | 129:*13* | 274:*5, 20* | 411:*1, 9* | 50:*22* |
| 27:*17* 32:*3, 7* 35:*15* | 131:*11, 16* | 276:*14, 25* | 414:*23* | 98:*11* |
| | 132:*10* | 277:*1* | 419:*21* | 269:*12* |
| 39:*3, 6* | 133:*14, 22* | 278:*12* | 422:*11* | 308:*9, 10* |
| 40:*1* 42:*5, 16* 44:*5* | 134:*5, 23* | 280:*5* | 424:*17* | 332:*1* |
| | 135:*10* | 281:*7* | 425:*9* | 359:*16, 21* |
| 45:*8* 46:*15* | 136:*8* | 282:*14* | 426:*7* | 360:*14, 20* |
| 49:*1* 50:*11* | 137:*9* | 291:*15* | 431:*5* | 403:*4, 19, 21, 23* 429:*18* |
| 52:*6, 19* | 138:*3, 4, 24* | 292:*9* | 434:*3* | |
| 54:*24* 55:*8, 16* 57:*19* | 139:*3, 15* | 305:*15* | 435:*10* | 430:*23* |
| | 140:*5* | 307:*8* | 436:*2, 23* | **observe** |
| 58:*9* 59:*10, 21* 61:*4* | 142:*6, 13* | 308:*17* | 438:*2* | 413:*13* |
| | 144:*7* | 311:*6* | 439:*1* | **observed** |
| 64:*8, 9* | 145:*10* | 318:*9, 17* | 440:*18, 22* | 268:*4* |
| 73:*12* 74:*6* | 149:*14* | 319:*13* | 442:*6, 16* | 270:*20* |
| 75:*10* 76:*7* | 158:*5* | 321:*11* | 444:*1* | **obstetrician** |
| 77:*10, 11* | 159:*25* | 328:*4, 23* | 446:*6, 18* | 61:*21, 22* |
| 78:*21* 80:*2* | 160:*13* | 329:*18* | 447:*14* | 62:*12, 16* |
| 84:*9* 87:*15* | 163:*10* | 332:*23* | 458:*1, 8, 12* | 171:*18, 21* |
| 88:*7* 89:*5* | 164:*4* | 334:*4, 5* | 466:*7* | **obstetricians** |
| 90:*9* 91:*7, 23* 93:*16* | 165:*21* | 335:*12* | 470:*7* | 62:*9, 20* |
| | 166:*5, 20* | 336:*23* | 472:*11* | **obstetrics** |
| 94:*6, 21* | 168:*5* | 339:*18* | 474:*14, 15* | 62:*5* |
| 95:*19* 97:*8, 12* 98:*2* | 169:*4* | 340:*10* | 475:*21* | 119:*25* |
| | 172:*19* | 341:*10, 14, 21* 344:*9* | 480:*4* | 171:*24* |
| 100:*7* | 178:*16* | | 481:*3, 21* | 172:*17* |
| 101:*4, 19* | 180:*7* | 345:*15* | 482:*17* | 174:*16* |
| 104:*2, 8* | 182:*3* | 358:*13* | 483:*11* | 175:*17* |
| 107:*3* | 183:*8* | 360:*1, 5* | **objections** | 176:*16* |
| 109:*2* | 184:*6, 8* | 366:*23* | 39:*1* 61:*14* | 246:*23* |
| 110:*19* | 185:*7* | 370:*23* | 131:*21* | **obstructionis** |
| 112:*9, 23* | 188:*8* | 371:*1, 7* | 187:*14* | **t** 190:*6* |
| 113:*4* | 207:*10* | 378:*20* | 419:*1* | **obvious** |
| 114:*24* | 209:*11* | 383:*4, 13* | **objective** | 72:*23* |
| 116:*14, 15* | 211:*22* | 384:*21* | 251:*15, 20* | **obviously** |
| 117:*5, 23* | 226:*20* | 385:*22* | 265:*13* | 407:*14* |
| 119:*8* | 235:*17* | 387:*23* | 320:*4* | 485:*9* |
| 120:*16, 21, 23* 123:*3* | 236:*15* | 397:*6* | **objectively** | **occur** |
| | 238:*1, 16* | 398:*11* | 23:*9* 251:*16* | 218:*19* |
| 124:*12* | 243:*10* | 399:*7* | **observation** | **occurred** |
| 125:*7* | 252:*5* | 401:*18* | 396:*3* | 101:*1* |
| 126:*16* | 255:*2* | 404:*6* | | |

Confidential - Subject to Protective Order

176:*10*
224:2
**occurs**
301:*13*
**odds**  211:7
376:*13*
379:*1*
472:23
473:*1*
486:5, 9
**offer**  38:*18*
321:*14*
**offered**
15:*20, 23*
122:*21*
**offering**
33:23  120:*3*
**officer**
285:*17*
**offices**  1:*12*
**official**
283:*14*
**offspring**
91:22
226:*19*
240:*9, 16*
**oftentimes**
257:*13*
**Oh**  18:*10*
19:*11*
29:*18*
38:*15*  53:7
58:20
60:*18*
62:*11*
66:*12*  68:9
86:2
146:*14*
158:*10*
172:8
187:*13*
193:*19*
196:20
214:*17*

231:*13*
288:7
302:*13*
311:*21*
362:*11*
375:25
389:*1*
428:2
448:*11*
482:*18*
**Okay**  15:*6,*
*14*  16:*3, 7,*
*12*  17:*14*
18:8  19:*7,*
*13, 23*  20:*17*
21:*3, 13*
26:*5, 14, 22*
27:*15*  28:*1,*
*11*  29:*11, 16,*
*21*  30:*5, 15,*
*19*  31:*4, 8,*
*18*  33:*1, 14,*
*21*  34:*3, 8,*
*15*  35:*2, 9*
36:*14, 21*
37:*1, 4, 13,*
*16, 21*  38:*5,*
*11, 16*  39:*10,*
*19*  40:*23*
41:*1, 8*
42:*10*  43:*5,*
*12*  45:*1*
46:*8, 11*
48:*10*
49:*20*  51:8
53:*5, 23*
54:*8, 13, 16,*
*21*  57:*11*
58:2  59:*19*
60:*3, 23*
61:*1, 20*
62:*8, 14, 18*
63:*2, 12, 18*
64:*1, 5*

65:*4, 12, 19*
66:*3*  67:*13,*
*25*  68:*6, 11*
70:*14*  71:*6,*
*8*  73:9
75:*2, 14, 22*
76:*15, 19*
77:7  78:8
79:*1, 13, 24*
80:*15, 22*
81:*1*  82:25
83:*11*  84:*5,*
*16*  85:*21*
86:*1*  87:9
89:*12, 16*
91:*18*
92:*17, 23*
93:*12*  94:*2,*
*17*  95:*4, 6,*
*16*  98:*13*
99:*9, 18*
105:*24*
106:*6, 7, 23*
107:*3, 12, 17*
109:*25*
110:*12*
111:*12, 16,*
*17*  112:*5, 13*
113:*22*
114:*18*
115:*18*
117:2
122:*5, 11, 16,*
*24*  124:*5*
125:*4*
126:*11, 16*
127:*1, 8*
129:*18*
132:2
133:*20*
134:*2, 19*
135:*11*
137:*3*
138:*12, 19*

139:9
140:*16*
144:*13, 15,*
*22*  145:*14,*
*15*  146:*23*
147:*6*
149:*1, 19*
150:*9, 13, 17,*
*25*  151:*5*
155:*11, 21*
157:*15, 23*
158:*10*
159:*20*
161:*14*
163:*8, 14, 18*
164:*20*
165:*5, 13*
166:*9, 15*
167:*6, 16*
169:*15, 19,*
*25*  170:*7, 11,*
*15*  171:*2, 22*
172:*6*
173:*5, 14, 16,*
*20*  174:*18,*
*24*  175:*6, 10,*
*14, 15*  176:*9,*
*13, 19, 23*
178:*13, 25*
179:*9, 13, 17*
180:*4, 22*
181:*15*
183:*23*
187:*2, 16, 22*
188:*13, 16,*
*18, 21, 23*
189:*7, 24*
190:*9, 11, 18*
191:*5, 10*
192:*4*
193:*19*
194:9
195:*2, 16*
197:*16*

200:*2, 10*
201:*5, 16, 25*
203:*10, 19,*
*24*  204:*10*
206:*24*
207:*5*
208:*16*
209:*8*
210:*8*
211:*18*
212:*3, 11*
213:*1*
214:*4, 9, 22*
215:*5, 25*
216:*3, 24*
218:*16*
220:*3, 7, 14*
223:*5*
225:*1, 10, 23,*
*25*  226:*4, 6,*
*7, 16*  227:*7*
228:*1, 11, 15*
229:*8*
230:*7, 15*
232:*17, 22*
233:*3, 12, 25*
235:*20*
236:*8*
238:*18, 22*
240:*12, 14*
241:*10*
242:*6*
243:*7*
244:*13*
245:*5, 12*
246:*4, 5, 11,*
*15, 19*  247:*1,*
*4, 9*  250:*21*
251:*3*
253:*2, 9*
255:*9, 21, 25*
259:22
260:*1, 16, 20*
261:25

262:*3, 6*
263:*10*
264:*4*
266:*3, 5*
267:*21, 24*
268:*15, 20, 22, 25*  272:*6*
273:*16*
274:*12*
275:*16*
276:*7*
278:*23*
279:*14, 21, 25*  280:*15, 25*  281:*17, 24*  282:*10, 11*  283:*19*
284:*2, 8, 23*
285:*5, 8, 21*
286:*2, 3, 13*
287:*5, 9*
288:*4, 23*
291:*3*
293:*5, 15, 17, 25*  295:*1*
296:*3, 18, 21*
297:*9, 15*
298:*4, 8, 14, 16*  299:*12, 16, 24*
300:*17, 22*
301:*16, 19*
303:*1, 7*
304:*9*
305:*9, 13*
307:*4*
308:*21*
309:*2*
311:*25*
312:*14*
315:*15, 24*
316:*4, 9, 13, 22*  317:*2*
318:*21*

319:*1, 11*
320:*5*
321:*16*
323:2, *14*
324:22
326:24
327:*5, 22*
329:*10*
330:*14*
335:7
336:*16, 21*
340:7, *18*
341:7, *19*
343:*5, 18, 21*
344:*6*
345:9
346:9
348:2, *7, 12*
349:*21*
350:2, *11, 14, 17*  351:*3, 19*
352:2, *16*
353:9, *24*
354:*5, 10, 18, 25*  355:*7*
356:2, *6, 20, 25*  357:*3, 9, 11, 15*
360:*11, 20*
362:*5, 10, 13, 23*  363:*3*
365:*3, 21*
367:20
368:8, *11, 12, 18, 22*  369:*1, 5*  370:*16*
372:*16, 22*
374:*7, 22*
375:25
378:*14*
380:22
381:*21*
383:9
384:*11*

385:*24*
386:7
387:*5, 12*
388:*1, 3, 8, 12*  389:*9, 15, 20*  390:*18*
391:*3, 7*
392:*12, 25*
393:*10, 15, 19, 25*  394:*4, 10*  398:*5, 25*
399:*18, 23*
400:*22, 25*
402:*4, 18*
403:*3, 15*
404:*23*
405:*5*
406:*5, 8*
407:*2, 8*
408:*5*
411:*6*
413:*2, 21*
414:*2*
419:*15*
421:*5, 8, 12*
422:*7*
423:*5, 20*
424:*9*
426:*21*
427:*12, 17*
428:*8, 9, 16*
429:*2, 8, 16, 22*  430:*14*
431:*17*
434:*9, 22, 25*
435:*2, 3*
437:*14, 17*
438:*7, 12, 13, 17, 22*
439:*12, 21*
441:*9, 18, 21*
442:*3, 10*
443:*10, 12*
444:*10, 16*

445:*4, 9*
446:*16*
447:*5*
448:*2, 11*
449:*11, 19*
450:*5, 24*
451:*14, 17*
452:*4*
453:*1, 11*
454:*7, 24*
455:*12*
457:*2, 15*
459:*13*
460:*3*
465:*1, 10, 15*
466:*23*
467:*3, 11, 12, 23*  468:*10*
469:*21*
470:*14, 21*
472:*5*
474:*5*
475:*3, 15*
477:*3*
478:*5*
484:*4*
487:*17*
**OLAFSSON**
8:*1*
**old**  41:*18, 19*  43:*9*
156:*25*
349:*4*
462:*17*
**older**  239:*4*
**Olsen**  130:*3*
**omit**  257:*14, 21*
**Once**
140:*24*
199:*13*
200:*3*
245:*5*

250:*4*
399:*19*
**oncology**
246:*21*
**one-on-one**
239:*24*
**ones**  234:*10*
258:*13*
344:*19*
345:*4*
369:*23*
383:*24*
452:*1*
464:*1*
482:*9, 19, 20*
**one's**  452:*7*
**one-third**
388:*1*
**ongoing**
58:*17*
80:*18*
269:*15*
**Online**
10:*21*  11:*1*
354:*16*
**open**  77:*18*
128:*19*
251:*24, 25*
307:*2*
**opened**
291:*17*
**openly**  82:*8, 9*
**opinion**
15:*20*  19:*8*
23:*22*  34:*4*
50:*3*  60:*15*
67:*2, 8*
69:*18*
84:*17*  85:*9, 23*  86:*9*
87:*2*  88:*21*
89:*23*  90:*5*
128:*23*

129:*3*
141:*24*
146:*3*
167:*23*
172:7
175:*20*
207:7
209:9
213:6
226:22
230:*8*
266:*1*
270:*14*
282:*24*
283:9
288:*3*
292:*12, 14*
294:*14*
299:*11*
304:*24*
309:*13*
323:*10*
324:*4, 6, 7, 8,
9, 14*  329:*2,
8*  334:*19*
380:*3*
405:*11*
414:*21*
442:*2, 12*
453:*3*
466:*11*
470:*19*
**opinions**
16:*7, 10*
32:*14, 15, 17*
33:22  34:9
35:3  62:*10,
20*  63:6
78:*18*
81:25  82:*1,
10*  83:*17, 19*
84:8  85:5
89:*21*
92:*19*

117:*4, 8*
121:*20*
124:*17*
143:25
144:*1*
230:*10*
254:*24*
266:9
283:*18*
290:*16*
292:7
304:2
311:*18*
320:*10, 12*
334:*16*
406:*13*
437:*12*

**opportunities**
312:*20*
**opportunity**
310:*23*
312:22
425:*9, 18*
427:8
**oppose**
14:*21*
**opposed**
234:*16*
280:*21*
456:*19*
473:*21*
**opposing**
26:*19*
**opposite**
129:*16*
220:*15*
335:*21*
**opposition**
14:25
**optimism**
59:*18*
**oral**  197:*21*

**orally**  197:6
199:25
200:*16*
208:*19, 21*
**ORDER**
1:*6*  89:*13*
95:*21, 22*
118:*15*
156:*17*
329:2
383:*11*
469:*4*
**Oregon**
63:*21*
**organic**
10:*6, 9*
295:*21*
**organization**
65:6  66:*10*
332:*11, 12*

**organizations**
66:*1, 4, 6*
142:*4, 9, 21*
332:6, 17
334:9
**organize**
444:*17*
**original**
45:2  50:*19*
73:*20, 25*
324:*18*
373:*11*
398:25
483:25
489:*14*
**originally**
338:*16*
374:*1*  484:7
**origins**
125:*17*
**ORTEGA**
8:*20*  13:2

**Oscar**
468:*16*
**Ostrea**
302:*23*
**outcome**
20:*8*  21:*16*
48:*24*  50:*6,
10*  52:*1, 18*
103:25
104:*24*
107:2
120:*13*
132:9
200:22
241:*12*
252:4
286:*21*
325:*18*
358:22
401:*8*
407:*5*
422:*14, 15*
428:2
453:*16, 23*
454:*16*
459:*3*
462:*11*
484:8, 22
**Outcomes**
10:*3*  11:*20*
17:*19, 21*
18:*4, 18*
19:2, 5, 10
20:2, 15
21:6, 8
25:*4*  28:*18,
23*  35:*14*
36:*11*
39:25  45:7
57:*18*
58:*19*
80:*12, 24*
81:*3*  92:*21*
93:*1*  95:*11*

125:5
129:*11, 22*
136:*17*
137:22
147:*23*
160:7
174:*15*
180:*16*
203:*3*
209:7
213:22
269:*16*
325:*17, 18*
332:8
346:*4*
397:*3*
419:*19*
420:*13, 17*
421:*16*
422:*10, 21,
22, 25*  423:*1*
424:*5, 15*
425:*1, 4*
426:*6, 12*
427:25
439:9
462:*16*
475:*20*
477:*20*
**outlier**
380:9, *10*
**outliers**
28:*19*
**outside**
81:*10*  83:*1*
392:*13*
**overall**
136:22
253:*19*
254:8
307:*3*
459:*10*
473:*14*
484:*12*

Confidential - Subject to Protective Order

overinfluenced 266:9
overlapping 486:25
over-rely 212:14
overrepresent 194:15
overrepresentation 206:20
overrepresented 195:5
overview 225:22
overwhelming 136:19 183:10 185:10 221:1 272:13 320:17 329:6 361:4
oxidative 105:7
Oxnard 8:7

< P >
p.m 229:13, 15, 17 292:20, 22, 24 347:4, 6, 8 390:1, 3, 5 444:21, 23, 25 478:12, 13, 15 483:16, 18, 20 487:20, 22
p10 239:20, 21, 22, 23, 25 240:2, 6

package 371:22 372:9
PAGE 9:2, 10 17:8 50:16 110:13, 14 111:18 129:25 131:10 146:15 179:17 191:10, 14 193:24 247:10 250:13 255:10, 11 260:22 261:11 263:13 264:21 267:22 268:9, 10 271:22 297:25 298:5, 11, 12, 17 300:22, 23 347:20 357:8, 9 359:12 368:9 371:13, 16 384:24 390:15, 19 391:8, 13, 20 403:12 421:8, 12 434:13 443:9, 11, 22 448:15 451:21 459:19 465:2, 3

471:7 491:3 492:3
pages 16:23 259:1 296:5 490:5
paid 54:8 88:5, 12 92:19 109:24 147:3, 7, 8 254:24 282:12 292:7, 11, 13 319:12 435:8 446:3
pain 234:24 400:3
painkillers 121:8
paper 17:6 28:15 36:3, 8, 22 38:6, 12, 13, 17, 20 39:11, 22 41:10 45:12 47:17 48:7, 20 49:8, 11, 24 57:14, 23 58:3 59:2, 5 60:1 66:21 85:13, 15, 18 100:1, 24 123:11, 13 124:3 128:3, 15, 16, 18, 22 129:6, 8, 19 141:14 146:5 151:22 168:19 169:1, 8, 16, 18 170:1, 20

171:23 175:18 177:1 181:6, 9, 12, 23 182:6, 7, 20 183:4 184:1, 11 185:23, 25 186:6, 11, 19, 25 188:3 189:13 198:23 199:18 200:19 201:2 202:13, 25 210:14, 18, 19 248:23 252:8, 9, 13 253:14, 17, 19, 21, 23 254:1, 2, 4, 7, 11, 17, 21, 24 255:4 260:6 264:14 269:5, 10 272:3, 4, 11, 12, 16, 22, 24 273:3, 20, 25 274:3, 4, 8, 10, 13, 16, 22 275:6, 9, 13, 14, 21, 22 276:2 278:15, 19, 20 283:6 286:2, 4, 15 288:25 291:21 295:8, 18 302:4 306:18, 20 307:2

309:25 310:8, 12, 21 315:9 320:13 325:10 337:20 338:7, 22, 24 339:20, 23 341:24, 25 342:1, 3 345:24, 25 346:6, 12 361:2 367:21 376:11 380:4 388:4 400:16 401:9 407:6, 9 409:16 412:25 414:11 420:10 423:9, 21 424:11, 19, 22 425:3, 10, 24 426:10, 11, 16 427:11 429:1 430:16, 18 435:13, 14, 19 438:5 444:8 450:7 456:10 459:11 467:15 468:25 476:13, 16
papers 18:12 20:13

33:*19*
34:*13, 16*
35:*23*  37:*8, 22, 23*  40:*19*
47:*10, 13, 15, 20*  48:*3, 23*
49:*5*  50:*2, 7, 19*  60:*13*
61:*24*
68:*20*
71:*21*  72:*3, 19*  73:*5*
77:*4*  78:*6, 10*  80:*21, 23*
82:*15*
90:*25*
124:*23*
131:*3*
147:*19*
168:*12, 20*
172:*9, 10*
173:*23*
184:*24*
201:*1*
205:*12*
211:*9*
232:*7, 8*
240:*18*
246:*10*
253:*24*
254:*5, 10*
272:*13*
273:*14*
277:*9*
279:*22*
280:*2*
285:*20*
296:*25*
309:*10*
310:*25*
312:*2, 5, 10*
320:*1, 8, 25*
324:*12, 15*
325:*4, 15*

326:*1*
327:*11*
336:*25*
339:*1*
340:*1*
346:*15*
376:*19*
380:*6, 7, 8, 12*  403:*20*
406:*17*
414:*17*
420:*6*
429:*4, 6*
430:*7*
433:*23*
439:*11, 13*
445:*16, 17*
448:*4*
449:*20*
451:*8*
453:*6*
468:*2, 8, 17*
**Paracetamol**
10:*1*
**paragraph**
27:*4, 13*
179:*24*
264:*2*
267:*25*
272:*2, 9*
359:*14*
375:*1, 24*
377:*18*
391:*13*
421:*14*
428:*20*
429:*17*
448:*20*
464:*11*
**parallel**
327:*4*
329:*20*
**parental**
261:*5, 18*

265:*20*
279:*5, 7, 12, 18*
**parents**
239:*4*
**Parietal**
11:*7*
**Park**  3:*6*
5:*16*  6:*2*
**part**  24:*5, 21*  28:*20*
41:*5, 8*
65:*24*  66:*2*
67:*19*  69:*8*
114:*8*
131:*19*
211:*18*
219:*25*
227:*12*
256:*15*
267:*5*
282:*13*
283:*18*
289:*20*
300:*7, 10, 15*
348:*9, 12*
349:*6*
366:*11*
369:*20*
372:*22*
397:*9*
419:*4*
426:*25*
427:*5, 12, 21*
447:*1, 6*
449:*20*
453:*2, 7*
481:*7*
**partially**
432:*8*
**participants**
115:*22*
455:*25*
456:*1*

457:*16*
458:*5, 25*
**participating**
461:*13*
**particular**
21:*20*
26:*20*  85:*3*
92:*24*
93:*13*
101:*17*
111:*9*
142:*9*
162:*12*
163:*20*
181:*25*
182:*1*
183:*5, 6*
184:*2, 3, 13, 14*  188:*5*
219:*25*
239:*15*
252:*10*
362:*23*
**particularly**
20:*11*  22:*8*
52:*6*  68:*1*
74:*6*
102:*12*
103:*5*
118:*6*
119:*17*
143:*24*
162:*22*
186:*8*
239:*3*
244:*12*
280:*18, 19*
303:*19*
307:*1*
309:*24*
366:*16*
398:*19, 20*
404:*15*

410:*10*
470:*12*
480:*11*
**parties**
488:*11*
**PARTNERS**
5:*5*
**parts**
107:*14*
220:*1*
392:*22*
**party**
294:*23*
356:*13*
**pass**  204:*25*
205:*4*
**passing**
206:*11*
**pasted**
369:*10*
**patient**
74:*10, 12*
99:*10*
**pause**  25:*8*
120:*20*
**pay**  57:*1*
109:*21*
146:*9, 25*
**pays**  56:*12*
**PDF**  296:*4*
353:*6*
371:*13*
**peace**
219:*15*
**pears**
454:*17*
**Pearson**
53:*24*  54:*6*
81:*9, 13, 14*
114:*7, 13*
115:*5*
116:*1*
145:*22*
373:*24*

Confidential - Subject to Protective Order

374:*3*
427:*5*
428:*21, 23, 24* 434:*17*
435:*3, 22*
436:*9, 11*
437:*7, 9*
**Pearson's**
427:*7* 428:*4*
**peer** 39:*6, 8*
**pending**
126:*21*
314:*9*

**Pennsylvania**
7:*8, 20*
**people**
43:*18*
44:*12*
61:*13*
62:*23* 63:*1, 3, 17* 64:*24*
65:*3* 67:*5, 11, 14* 72:*18*
73:2 75:*18*
78:*5, 6*
81:*24*
82:*10, 15*
85:*1, 6*
96:*8*
103:*17*
110:*11*
111:*14*
140:*24*
145:*19*
146:*1, 4, 6, 10* 147:*11, 15* 148:*3, 8, 10, 16, 19*
153:*10*
154:*7*
171:*11*
176:*1*
205:*7*

212:*12, 17*
219:*1*
222:*12, 13, 17, 25*
239:*21*
258:*11*
262:*22, 23*
272:*4*
282:*9*
307:*11*
317:*16*
344:*12, 18*
345:2, *3*
363:*19*
365:*17, 18*
366:*12*
368:*20*
376:*16*
395:*21, 22, 25* 396:*6*
397:*22*
402:*24*
417:*14*
423:*14*
426:*1*
436:*12*
439:*7*
445:*25*
446:*4*
447:*12, 21*
452:*15*
454:*22*
460:*16*
463:*17*
479:7, *16*
480:*14*
484:*13*
486:*18*
**perceived**
177:*8*
**percent**
47:*15*
59:*17* 60:*1*
103:*15*

136:*19, 20*
150:*23*
160:*23*
177:*5*
196:*23*
210:*17*
221:*7, 13*
222:*3, 13*
234:*20*
340:*19, 23, 25* 341:*7, 19*
344:*6*
345:*13*
357:*23*
364:*4, 6, 7, 18* 376:*15, 20* 430:*2, 5*
458:*16, 18*
473:*5, 7, 10*
482:*24*
**percentile**
362:*20*
**perfect** 49:*7*
329:*11*
**perfectly**
20:*23*
38:*10*
121:*5*
276:*7*
439:*19*
**perform**
390:*21*
**performed**
332:*4*
**performing**
333:*3, 22*
435:*7*
**perinatal**
402:*9*
**period**
92:*23, 24*
93:*13*
394:*23*
397:*11*

**peripartum**
159:*12*
394:*23*
**Perrine**
175:*23*
**persistent**
400:*4*
452:*11, 21*
457:*19*
**person**
72:*13*
78:*11, 13*
109:*7, 8*
110:*8*
115:*13*
147:*9*
222:*24*
223:*12*
285:*18*
317:*22*
321:*4*
393:*18*
450:*1, 19*
471:*14, 18, 20*
**personal**
84:*6, 13*
177:*24, 25*
178:*2, 3*
179:*4*
**person's**
334:*2*
**Petersen**
291:*8*
**Ph.D** 1:*12*
10:*16*
11:*10*
13:*20*
488:*4*
490:*12*
**pharmacolog ists** 121:*4*
**Pharmacy**
6:*9*

**phenotypes**
41:*20* 267:*7*
**Philadelphia**
7:*20*
**phone**
88:*20*
112:2
144:*20*
**phonetic**
63:*16* 377:*3*
**phrase** 34:*7*
**physician**
18:*16*
20:22 24:*6*
218:*18*
259:*21*
446:*21, 22*
**physicians**
99:*4, 5*
259:*12*
**pick** 197:*10*
198:*12*
426:*10*
**picking**
161:*5* 269:*6*
**piece** 380:*5*
**pieces** 186:*7*
**pill** 99:*21*
156:*13*
201:*17, 19*
452:*22, 25*
454:*22*
**pills** 161:*25*
202:*3, 4, 8*
**pilot** 377:*12, 21* 378:*5*
379:*10, 11, 14* 380:*17*
484:*23*
**PIs** 427:*18*
**Place** 6:*2*
482:*6* 488:*8*
**placed**
482:*8*

placeholder 293:19
placenta 199:15
placental 105:5
places 393:12
plain 225:2
plaintiff 138:22
Plaintiffs 5:9 12:17 14:11 31:6 55:6, 15 57:15 58:8 76:6 86:16 88:5 113:17, 20 114:4, 9, 15, 17, 19 138:23 145:23 149:12 150:7, 11, 19, 20 293:6 294:4 434:17 435:4
plan 11:2 381:24 382:12, 24 484:5
planning 58:15 141:12 402:5 407:3
Plasma 11:13 361:23 394:21
plausibility 168:9

plausible 105:3
play 39:3 303:12 466:15
plays 464:25
Plaza 2:10 3:6
Please 15:13 23:1 24:20 31:21 58:12 65:21 67:24 102:5 103:19 116:8 123:20 178:2 183:1, 23 213:7 247:25 264:7, 20 271:21 308:18, 22, 25 309:1 321:20 347:19 368:2, 3 371:6 374:4 390:11, 12, 16 434:14 445:8 449:22 465:9 489:3, 8
plenty 90:22 152:19 156:6 165:24 173:1

205:12
230:11
236:5
243:12
397:18
457:7
PLLC 2:20
Plus 433:4, 5
point 27:10 35:11 39:10 40:20 55:24 68:1 73:3 88:12 89:2, 25 102:12 114:6 129:18 153:18 154:22, 23 164:13 168:18, 20 180:14 198:22 207:18 211:5, 15 227:18 239:17 252:23 262:8 264:14 266:12 271:18 278:14 280:17 290:5 294:10 300:5 307:23 311:14 322:4 330:8, 19 348:25

352:24
353:2, 10
358:1, 4, 17
361:1, 8
363:6, 12
364:10
399:14
411:21, 24
418:21
419:17
435:5
439:24
441:10
462:23, 24
468:14
472:8
487:11, 16
pointed 38:24 224:10, 16 386:5 460:7
pointing 369:4
points 207:20 334:1
police 116:19
Policy 11:11
politely 264:1
Pollutants 336:14
polygenic 408:7 409:8, 11 416:10 417:7, 10 431:19 469:11
poor 486:1
popular 307:18, 19

population 255:15
337:14
348:18
362:16
PORTER 6:16
portion 340:18
346:1
374:12
PORTIS 4:20
pose 468:22
posed 375:12
position 142:22
316:15
436:17
481:20
positive 148:15
160:24, 25
200:1
211:6, 11
254:2
256:22
277:12
278:2
280:21
345:3, 4
395:11, 12, 13 396:20
433:17
472:8
479:3, 13
480:11
482:20
positives 277:25
377:9
Posner 349:11

355:*15*, *20*
356:*3*
386:*8*, *18*
**poss**  205:*9*
**possible**
29:*6*  39:*3*
47:*10*  49:*7*
60:*9*  94:*14*
97:*7*  126:*5*
195:*19*
204:*9*
206:*25*
208:*1*
248:*9*
303:*13*
321:*6*
323:*20*
334:*12*
349:*24*
382:*16*
396:*10*
467:*18*
485:*12*
**post-**
**conception**
95:*18*  97:*5*
**postdoc**
407:*24*
408:*2*
**posters**
115:*24*
**POSTMAN**
2:*3*  8:*18*
**postnatal**
205:*10*, *15*,
*16*, *20*, *22*, *23*
206:*6*
209:*9*, *19*, *23*
210:*2*, *3*, *5*
**postnatally**
208:*9*
**potential**
56:*6*
138:*17*

140:*8*, *9*, *12*,
*17*, *22*
230:*12*
231:*3*
232:*9*
236:*6*
356:*11*, *19*
371:*19*, *23*,
*25*  403:*5*
404:*3*, *14*
431:*22*
**potentially**
161:*22*
301:*20*
**power**
288:*14*, *18*
358:*3*, *7*
363:*8*
365:*9*, *12*, *13*,
*19*, *22*  366:*3*
433:*1*
454:*19*
456:*5*
473:*16*, *23*
479:*10*, *12*
480:*8*
481:*11*, *12*,
*25*  482:*10*
484:*20*
**powerful**
186:*2*
244:*5*, *12*
**PowerPoint**
12:*13*
**practice**
421:*19*
423:*7*
424:*13*
426:*4*, *18*
**precise**
440:*7*
**precisely**
101:*9*
248:*10*

**preclinical**
205:*19*
**predetermine**
**d**  319:*24*
337:*11*
**predict**
461:*2*
463:*12*

**preeclampsia**
422:*5*
**prefer**  14:*5*
**preferred**
174:*11*
**prefrontal**
11:*22*
**pregnancies**
153:*7*
**pregnancy**
9:*21*  10:*2*
12:*1*, *6*, *9*
17:*18*  18:*3*
19:*9*, *17*
20:*1*  36:*10*
45:*14*
48:*24*
50:*10*
57:*17*
58:*19*  62:*3*
66:*19*, *22*
80:*13*, *24*
81:*3*  87:*7*
91:*4*, *10*, *15*,
*21*  92:*3*, *5*, *8*,
*12*, *20*, *24*
93:*3*, *4*, *9*, *14*,
*20*  95:*9*
96:*11*, *16*, *17*
97:*22*
98:*21*, *22*, *24*,
*25*  100:*5*, *16*
101:*24*
102:*16*, *19*,
*25*  103:*25*

104:*23*
105:*18*, *22*
107:*1*, *10*, *15*,
*16*  117:*22*
124:*18*
130:*21*, *24*
152:*22*, *23*
153:*2*, *14*, *21*
154:*24*
155:*1*, *12*, *14*,
*18*, *22*
156:*14*
157:*17*, *19*,
*22*  159:*23*
160:*11*
161:*3*, *6*
162:*14*, *18*
163:*22*, *25*
164:*10*, *17*
165:*4*, *9*, *11*
166:*10*, *16*
174:*15*
181:*18*, *25*
183:*6*, *13*
184:*3*, *13*, *19*
185:*17*
188:*5*
197:*2*, *23*
206:*5*, *14*
208:*25*
215:*2*, *16*
216:*25*
217:*7*, *13*, *17*
224:*15*, *20*,
*21*  226:*12*,
*23*  227:*13*,
*25*  228:*21*,
*22*  230:*9*
231:*22*
234:*1*, *4*, *8*,
*24*  235:*12*,
*22*  236:*12*
237:*6*
250:*6*

256:*9*, *16*
269:*15*
277:*21*
298:*22*
301:*25*
303:*10*
358:*24*
367:*3*, *4*
394:*16*
395:*20*
396:*8*, *22*
397:*9*, *11*, *13*,
*20*  398:*22*
399:*3*, *5*
422:*18*, *22*,
*24*  431:*21*
439:*6*, *8*
440:*4*, *17*
441:*11*
452:*16*
454:*23*
462:*11*, *13*,
*21*  463:*1*, *25*
464:*2*
469:*2*
472:*7*
476:*5*, *6*
**pregnant**
61:*25*
121:*6*
196:*14*
200:*5*, *15*
201:*6*, *20*
202:*1*
234:*20*
244:*15*, *23*
245:*7*  464:*5*
**preliminary**
252:*14*
378:*1*  487:*6*
**prenatal**
10:*4*, *9*, *13*,
*17*, *21*  11:*5*,
*19*  23:*14*

50:*21*  51:*3,*
*4, 5*  128:*25*
205:*14, 17,*
*24*  206:*7, 9*
209:*4, 25*
231:*19*
241:*3*
272:*18*
273:*1*
295:*21*
420:*11*
421:*15*
423:*7*
429:*19*
**prenatally**
18:*13*
242:*3*
430:*24*
**preparation**
76:*12*
281:*17*
284:*9*
402:*20*
**prepare**
284:*20*
381:*23*
401:*12*
**prepared**
319:*18*
**preparing**
314:*25*
**prepped**
259:*3*
**prescribed**
218:*18*
259:*20*
**presence**
155:*23*
165:*7*
181:*19*
216:*11*
**PRESENT**
8:*16*  111:*6*
141:*6, 20*

212:*9*
225:*13, 14*
301:*8*  354:*2*
**presentation**
12:*13*
68:*16*  69:*5*
116:*21*
225:*15, 21*
317:*9, 18*

**presentations**
116:*22*
125:*22*
**presented**
226:*1*
317:*5, 12*
**presenting**
17:*2*
**presents**
66:*20*
**press**  382:*7*
**pressure**
422:*5*
423:*19*
425:*13*
**preterm**
422:*2*
423:*2, 18*
**pretty**
20:*20*  36:*2*
47:*2, 8*
56:*9*  60:*11*
71:*23*
77:*15*
117:*10*
123:*21, 22*
147:*10*
161:*4*
164:*8, 21*
196:*21*
203:*13*
216:*3*
219:*7, 8*
221:*11*

255:*5*
301:*25*
304:*17*
307:*17, 19*
310:*20*
330:*10, 11*
331:*2, 5*
332:*18*
350:*10*
351:*25*
352:*9*
373:*6, 9*
381:*12*
389:*13*
394:*24*
399:*21*
415:*11*
424:*7*
426:*11*
430:*1*
433:*19*
462:*7*
469:*24*
474:*20*
479:*8*
480:*19*
485:*20*
**prevalence**
12:*1*  221:*5*
357:*24*
437:*21, 22,*
*23*  443:*19*
**previous**
265:*3, 8*
266:*18*
271:*19*
314:*16*
315:*24*
359:*1*
**previously**
181:*17*
261:*4, 18*
265:*19*
355:*5*

**primarily**
265:*8*
**primary**
231:*3*  323:*7*
**principal**
427:*19*
**principle**
137:*5, 12*
**principles**
318:*22, 24*
319:*2*
**print**  293:*17*
**printed**
296:*4*
**Printout**
9:*23*  284:*3*
**prior**  37:*2*
58:*7*  66:*10*
92:*18*
206:*11*
229:*25*
231:*18*
252:*18*
253:*11*
263:*13*
285:*6*
309:*4*
314:*7*
386:*4*
427:*14*
462:*10, 23*
488:*3*
**priori**  251:*9,*
*12, 13*  325:*4*
**priority**
177:*7, 11*
**privilege**
10:*4*
**pro**  14:*17,*
*21*  22:*9*
**probability**
130:*4*
371:*20*

461:*20*
462:*3, 4*
**probably**
43:*8*  69:*5*
70:*8, 12*
116:*25*
135:*23*
141:*7*
144:*25*
146:*17*
148:*8*
149:*6*
172:*9*
175:*8, 21*
181:*13*
219:*4*
223:*4*
247:*8*
261:*10*
262:*9*
266:*9*
267:*11*
279:*16*
281:*14*
282:*4*
287:*11*
294:*6*
317:*9, 11*
318:*3*
324:*20*
333:*13*
361:*2, 5*
375:*9*
381:*17*
401:*16*
425:*7, 11*
435:*17*
472:*3*
486:*24*
**problem**
45:*21*
86:*22*  87:*6*
113:*10*
117:*15*

Confidential - Subject to Protective Order

118:*9*
119:*14*
122:*3*
123:*15*
124:*1, 25*
125:*1*
130:*25*
135:*14*
139:*10*
142:*24*
173:*3*
182:*21*
205:*21*
210:*6*
223:*15*
229:*3*
237:*14, 17*
254:*6*
269:*19*
277:*17*
278:*3, 4*
279:*24*
331:*1, 3*
414:*19, 22*
415:*15*
424:*8, 10*
434:*12*
450:*15*
462:*1, 7*
464:*23*
466:*3*
468:*18, 20*
469:*5, 25*
471:*4*
**problems**
61:*10*
148:*17, 19,*
*20*  350:*23*
**proceed**
27:*22*
108:*7*
191:*3*
229:*23*
293:*3*

390:*10*
445:*7*
**proceedings**
131:*19*
**process**
69:*9*
174:*14*
326:*1, 6, 19*
328:*10, 14*
330:*23*
476:*9*
**processes**
326:*14*
327:*13*
330:*12*
**produce**
154:*13*
300:*13*
433:*14, 15*
**produced**
145:*5*
153:*19*
196:*8*
300:*11, 16*
301:*24*
**produces**
433:*16*
**producing**
145:*11*
**production**
155:*15*
322:*1, 17*
323:*3, 13, 16*
407:*13*
**productions**
322:*3*
**PRODUCTS**
1:*3*  13:*11*
163:*3*
**professional**
68:*18, 22*
332:*5*
**professors**
321:*21*

**project**
47:*18*
**prolonged**
96:*9*  394:*18*
**promised**
138:*8*
**prompted**
236:*6*
**pronounce**
14:*12*
**propensity**
371:*21*
**proper**
25:*23*
**proportion**
161:*2*
196:*25*
234:*22*
**proportions**
364:*4*
**proposal**
427:*1, 13*
483:*8, 25*
484:*16*
**propose**
192:*22*
**proposed**
152:*17*
**proposing**
381:*25*
**proposition**
163:*5*
**propounded**
490:*6*
**prospective**
12:*2*
331:*22*
339:*12*
460:*21*
462:*8*  464:*8*
**prostaglandi**
**n**  105:*9*
**PROTECTI**
**VE**  1:*6*

89:*13*
455:*19*
**protocol**
27:*3, 5*
349:*6*
352:*10, 21*
**proud**
310:*20*
**prove**
251:*23*
292:*1*  361:*7*
**proven**
201:*1*
320:*12*
**provide**
123:*16*
130:*23*
143:*7*
297:*10*
310:*23*
314:*21*
376:*5*
392:*11*
406:*17*
459:*11*
480:*25*
481:*10*
484:*20*
**provided**
12:*16*
14:*24*  57:*4*
103:*6*
**provides**
269:*11*
300:*25*
301:*6*
311:*23*
315:*5*
358:*3*
363:*6, 7*
394:*11*
**providing**
406:*13*
426:*15*

**proximal**
199:*11, 17*
358:*21*
**psychiatrist**
63:*11*
**Public**
81:*10*  84:*4*
116:*25*
197:*13*
488:*23*
490:*19*
**publication**
36:*7*  37:*2*
40:*7*  57:*14*
58:*24*
127:*11*
128:*7*
138:*20*
140:*21*
176:*11*
253:*5*
283:*3*
297:*22*
314:*16, 18*
315:*24*
324:*18*
350:*21*
351:*12*
380:*18*
386:*4, 20*
387:*7, 14*
429:*5, 14*
484:*10*
485:*5*  486:*6*
**publications**
311:*3, 24*
313:*13*
314:*8, 12*
**publicize**
116:*5*
**publish**
18:*11*  36:*3*
37:*9*  47:*17*
58:*15*  68:*3*

Confidential - Subject to Protective Order

85:*13*
140:*4*
141:*13*
148:*10*
166:*23*
170:*16*
212:*16*
224:*18*
283:*12*
288:2
310:*21*
312:*10*
336:*24*
379:*25*
385:6
386:*24*
445:*15*
450:7
470:*19*
485:*10*
**published**
19:*3*  39:*11*
40:*12*
45:*12*
48:*12*
58:*14*  59:*9,*
*13*  60:*2, 12,*
*13, 22*  61:*23*
66:*18*
71:*21*
80:*17*
90:*24*
121:*23*
122:*18*
146:*4, 6*
147:*18*
148:*13*
149:*6, 9*
151:*22*
164:*12*
169:7
170:*8, 9, 12*
173:*23*
174:*8*

176:6
182:6
193:*6, 15, 17*
215:*1*
218:5
219:*13*
224:*23*
230:5
232:6, *16*
245:*21*
252:*13, 15*
254:*1*
261:2
268:*23*
269:*20*
270:*1, 16*
274:*3, 17*
281:*1*
285:*25*
290:*14*
291:*22*
295:9
296:*22*
302:5
305:*10*
311:2
312:*15*
313:*3,* 8
316:*16*
322:*12*
339:*25*
344:*3*
346:7
349:*22*
361:9
373:*21*
378:*1, 2, 18*
379:*3, 23*
380:*1*
381:*15*
383:*11*
387:2
390:*23*
391:*1*

407:*16*
423:*12*
424:*11*
435:6
445:*17*
448:*3*
468:2
484:*14*
486:*24*
**publishes**
85:*15,* 18
**publishing**
312:2  333:*3*
**PubMed**
50:*19*  420:7
**Puerto**  3:7
**pure**  393:*15*
**purpose**
48:2  197:*4*
**PURSUANT**
1:*6*
**push**  98:*19*
**put**  14:*10*
39:*1*  50:25
61:*3*  88:*13*
131:8
145:5
170:*24*
197:*8, 10*
233:*22*
238:7
271:*16*
283:*9, 10, 17,*
*18*  325:*15*
326:2
350:*3*
380:5
390:*12*
391:*4*
405:*16*
417:2
422:*20*
424:*10*

458:*21*
459:6, *17*
**putting**
77:*20*
**puzzled**
71:*25*
**p-value**
212:*10*
213:*8, 10*
215:*25*
216:*17, 18*
381:*10*
**p-values**
212:*5, 7, 15,*
*16, 19, 23*
213:*9, 15, 19*

**< Q >**

**qualifications**
225:*11*
**qualified**
19:*4*  425:*7,*
*12*  445:*15*
**qualify**
64:*14*
**quality**
102:8
177:*9, 13*
**quantifies**
152:*25*
154:*22*
**quantity**
156:*1*
160:*12*
**ques**  194:*17*
**question**
15:*4, 5*
22:*23, 25*
23:6  24:*12*
28:9  32:*10*
33:*10*  34:6
39:*6,* 8
45:2  51:*12,*

25  61:7
73:*20, 24,* 25
84:*20*  90:*8*
94:*14, 19*
95:*16*  96:*4,*
*5, 23*  97:*2,*
*16, 17, 19, 25*
98:*5*
100:*20*
104:*17, 20*
106:*4, 10, 11*
107:7
121:*13*
122:6
126:*9, 18, 21*
128:*20*
131:*25*
132:*14*
133:*11*
134:*12, 14,*
*20*  137:*4*
150:9
161:*9, 11*
162:8
163:9
166:*4*
167:6
168:22
172:*23*
180:*10, 11*
181:*4, 5, 9,*
*11, 21*  182:*5,*
*24*  183:*24*
189:*10*
192:2, *6,* 8
193:6
194:*5*
195:*13, 14*
196:*17, 19,*
*20*  200:*4, 8,*
*20, 23, 24*
201:9
203:*11*
210:*24*

Confidential - Subject to Protective Order

215:*17, 19*
217:*12*
218:*6, 23*
224:*1, 19*
225:*9*
228:*4*
231:*17, 25*
232:*21*
233:*2, 6, 13*
234:*13*
235:*14*
239:*8*
241:*6*
247:*24*
248:*24*
250:*22*
259:*4*
264:*3*
276:*18*
301:*9*
305:*5*
308:*16*
313:*1, 9, 15*
314:*5, 10*
327:*24*
339:*6*
341:*17*
345:*10*
355:*22*
367:*15*
368:*12*
370:*22*
371:*4*
384:*18*
388:*12*
389:*9*
399:*1*
402:*18*
408:*24*
432:*1*
434:*1*
440:*11*
441:*3, 15*
446:*17*

447:*10*
448:*18*
458:*4, 24*
471:*6*
475:*25*
476:*4, 18*
477:*1, 6, 11,
16, 17*  484:*2*
**questioned**
306:*8, 10*
**questionnair
e**  98:*15, 17*
220:*17*
258:*8*  259:*1*
**questionnair
es**  186:*4*
**QUESTION
S**  14:*2, 15*
15:*15*  19:*6*
21:*2*  22:*2,
22*  23:*17*
24:*22*
26:*20*
27:*20*  28:*2*
32:*12*  36:*4*
38:*23*
40:*22*  42:*9,
19*  44:*19*
46:*7*  48:*6*
49:*15*  51:*7,
11, 14, 24*
52:*8, 15*
53:*1, 16*
55:*4, 12*
56:*13*  58:*1,
16*  59:*15*
60:*4*  61:*19*
64:*16*
65:*22*
73:*18*
74:*11, 15*
75:*1, 21*
76:*14*  78:*7,
17*  79:*15, 19*

80:*9*  84:*15*
85:*2*  87:*19*
88:*24*
89:*11*
90:*16*
91:*17*
92:*13*  94:*1,
16*  95:*3*
97:*1, 10, 24*
98:*8*
100:*18*
101:*12*
103:*20*
104:*19*
106:*20*
107:*11*
108:*5, 11, 23*
109:*4*
110:*23*
112:*12, 24*
113:*14*
115:*11*
116:*10*
117:*1, 17*
119:*3*
120:*6*
122:*4*
124:*4*
125:*3, 20*
127:*2, 21*
129:*7, 17*
131:*13, 23*
133:*9, 19*
134:*1, 17, 18*
135:*22*
136:*1, 12*
137:*24*
138:*5*
139:*1, 8, 23*
140:*15*
142:*10*
143:*1*
144:*12*
145:*13*

148:*22*
149:*18*
158:*9*
160:*4*
162:*6*
163:*13*
164:*19*
166:*3, 8*
167:*5*
168:*17*
169:*14, 24*
174:*12, 23*
175:*11*
178:*19*
179:*14*
180:*5*
181:*1, 15*
182:*22*
183:*22*
184:*10*
186:*14*
187:*12, 23*
188:*1, 12, 25*
189:*4, 9*
191:*1, 7*
205:*13*
207:*22*
210:*7*
212:*2*
214:*2*
227:*6*
228:*8, 13*
229:*19*
231:*15*
235:*19*
236:*21*
237:*22*
238:*21*
243:*19*
244:*21*
245:*4, 11*
246:*1*
253:*1*
255:*8*

256:*1*
257:*17*
261:*15*
262:*2*
263:*24*
264:*19*
268:*19*
271:*1*
274:*11*
275:*1*
276:*19, 20*
277:*2*
278:*22*
280:*14*
281:*16*
283:*7*
284:*1, 13, 15,
18*  285:*1*
290:*1*
292:*5*
293:*1, 24*
296:*11*
297:*14*
303:*24*
305:*21*
308:*13, 20*
311:*9*
316:*3, 5*
318:*14, 20*
319:*15*
321:*15, 20*
323:*1*
325:*16*
328:*18*
329:*13*
330:*13*
333:*1*
335:*6, 23*
337:*2, 22*
338:*9, 15, 23*
339:*7, 22*
340:*17*
341:*6, 11, 18*
342:*2*

343:7, *20*
344:*2*
345:7, *17*
347:*12*
348:*6*
353:*8*
354:*14*
355:*8*
359:*6*
360:*3, 10*
367:*14*
368:*1*
371:*3*
372:*11*
374:*18*
377:*10, 17*
379:*13*
383:*1, 6*
384:*10, 23*
385:*17, 23*
388:*2*
389:*5*
390:*7*
393:*24*
398:*4, 24*
400:*12*
402:*3, 15*
404:*22*
405:*21*
408:*13, 18*
411:*5, 16*
412:*19*
414:*3*
415:*7*
419:*14*
420:2, *21*
423:*4*
425:*21*
426:*20*
428:*7*
430:*10*
431:*16*
434:*8*
435:*24*

436:*16*
437:*1*
438:6, *11, 18*
439:*3*
441:*8*
442:9, *18*
443:*1, 13*
444:9, *18*
445:*5*
446:*15*
447:*4*
448:*1, 10*
450:*23*
451:*4, 23*
452:*14*
456:*21*
458:*3, 9, 23*
467:*10, 13,*
*22*  469:*15,*
*18*  470:*13*
472:*24*
475:*2*
478:*18, 20,*
*21*  480:*20*
481:*14*
482:*2*
483:6, *22*
487:*17*
490:*6*
**quickly**
60:*20*
**quiet**
173:*21*
187:*5*
**QUINN**
7:*13*
**quite**  128:*4*
149:*9*
438:*23*
**quote/unquot**
**e**  218:*1*

**< R >**

**rabney@wat**
**tsguerra.com**
3:*5*
**raised**
323:*22*
405:*9*
**ramifications**
113:*2, 8*
**ran**  101:*15*
329:*25*
330:*3, 5*
**range**  213:*8*
340:*25*
421:*17*
**Raphael**
295:*2*
**rate**  54:*14,*
*15*
**rated**  452:*6*
**ratings**
177:*7*
**ratio**
376:*13*
379:*1*
381:*12, 16*
472:*23*
473:*1*
475:*1*
486:5, *9*
**ratios**  211:*7*
**RAYNE**
6:*19*
**rayne.ellis@a**
**rnoldporter.c**
**om**  6:*19*
**reach**  67:*5*
69:*16*
184:*23*
185:*2*
196:*15*
200:*6*
201:*7*

311:*4*
331:*20*
**reached**
330:2, *4, 6,*
*15, 16*
**reaching**
71:*23*
**reaction**
23:*25*
121:*10*
**read**  23:*5*
31:*15*
32:*16, 23*
33:*4*  34:*21*
36:*18*  38:*9,*
*13, 21*  48:*14,*
*16, 21, 22*
68:*20*  73:*4*
94:*8*
106:*21*
118:*9*
122:*1*
124:*24*
131:*14, 20*
133:*1*
136:*25*
152:*14*
178:*9*
181:*14*
189:*3*
209:*18*
214:*15*
249:*10, 15*
250:*20*
263:*12*
264:*25*
265:22, *23*
267:*3*
271:*12*
272:*6*
274:*21*
275:*17, 21*
276:*21*
277:*3*

287:*18*
288:*16*
290:*8*
296:*25*
297:5, *6*
306:*14*
310:*24*
325:*15*
331:*14*
370:*17, 19*
407:*12*
413:8, *18*
424:*25*
430:*22*
437:*16*
444:*3*
450:*17*
453:*9*
468:*16*
489:*3*  490:*4*
**reader**
177:*8*
**readers**
177:*12*
**reading**
23:*4*  73:*4*
119:*21, 23*
131:7, *9*
132:*5*
224:*2*
261:*13*
271:*22*
372:*13*
403:*8*
426:*1*
433:*23*
443:7, *8*
460:*8*
**reads**
331:*19*
423:*25*
**ready**  27:*21*
108:*7*
119:*1*

141:*10*
191:*2*
194:*8*
214:*20*
229:*23*
230:*25*
293:*3*
368:*9*
370:*22*
371:*5*
386:*23*
390:*10*
445:*7*
**real**  118:*13*
198:*22*
210:*1*
216:*4*  481:*1*
**reality**
72:*24*
**realization**
118:*11*
**realize**  77:*8*
148:*5*
220:*23, 24*
253:*24*
260:*2*
361:*22*
**realized**
16:*25*
56:*25*
124:*25*
218:*5*  258:*3*
**really**  24:*6*
25:*12*  35:*4*
58:*25*  59:*4*
60:*8, 14*
61:*11*
71:*13, 25*
72:*15, 21, 23,*
*25*  73:*5*
74:*18*  78:*2,*
*5*  81:*21*
83:*14*  85:*6*
92:*6*

102:*17*
111:*15*
116:*19, 20*
118:*20, 24*
120:*22*
127:*25*
128:*18*
144:*9*
151:*4*
153:*11*
156:*24*
157:*8, 9*
172:*14*
174:*3, 10*
176:*25*
179:*2*
186:*22*
196:*5*
199:*4, 5*
204:*18, 23*
206:*4*
210:*21*
212:*1*
213:*5*
216:*6*
217:*16*
219:*16*
223:*17, 21*
224:*1*
253:*25*
256:*17*
257:*2*
266:*7*
269:*6*
270:*3*
272:*21*
278:*3*
300:*14*
301:*7*
309:*7, 17*
310:*3, 16*
312:*22*
322:*18, 20*
329:*6, 7*

330:*20, 24*
331:*9, 11*
333:*5*
341:*15*
358:*4, 9*
360:*7, 23*
361:*7, 18*
367:*10*
377:*20*
380:*21*
399:*16*
401:*20*
415:*20*
417:*2*
419:*8, 9*
432:*12, 15*
433:*6*
444:*2, 7*
446:*12*
464:*19*
465:*17*
468:*17*
474:*7*
481:*24*
483:*1*  487:*2*
**Realtime**
1:*17*  488:*2,*
*17*
**reask**
106:*11*
**reason**
76:*20, 24, 25*
108:*16*
120:*20*
141:*15*
142:*19*
143:*5, 6, 7*
153:*15*
159:*8*
161:*7*
177:*25*
183:*16*
195:*2, 6*
212:*23*

221:*4*
226:*14*
227:*14, 21*
234:*15*
236:*25*
240:*4*
266:*6, 12*
267:*6*
280:*10*
287:*14*
314:*19*
322:*22*
335:*16*
342:*9*
369:*18*
455:*8*  489:*5*
**reasonable**
96:*8*
118:*18*
168:*13*
207:*17*
241:*2*
391:*22*
392:*1*
398:*15*
431:*12*
**reasonably**
47:*4*  87:*6*
96:*13, 14*
118:*16*
200:*13*
**reasoning**
335:*20*
**reasons**
139:*14*
207:*25*
263:*8*  400:*5*
**reassurance**
269:*11*
**REBECCA**
2:*5*
**rebecca.king**
**@kellerpost**

**man.com**
2:*6*
**rebuttal**
16:*4*  31:*12*
**recall**  24:*23*
28:*9, 12*
39:*14*
85:*22*
108:*23*
110:*10*
174:*13*
191:*7*
192:*20*
277:*19*
288:*19*
297:*7*
317:*19*
322:*14*
340:*7*
348:*15*
352:*20*
374:*11*
427:*24*
442:*8*
445:*12*
451:*25*
452:*4*
453:*6*
458:*25*
460:*8*
462:*20*
463:*9, 10, 23*
467:*24*
**recalled**
25:*17*
**recalling**
459:*23*
**receipt**
489:*15*
**receive**
38:*20*
75:*16*
146:*17*

Confidential - Subject to Protective Order

received 138:21 140:18 146:13 158:22 177:7 248:5 435:14
receiving 356:4, 13
recognize 108:20 170:5 175:3 214:7 230:17 246:8 326:7 347:16 368:5 384:14 393:9 420:25 428:13 451:7
recollection 68:7, 25
recommendations 130:24
recommended 211:16 374:3
recommending 146:10 178:10
reconstruct 384:7
record 13:2, 15 14:10 16:13 26:6, 9, 10, 13, 25 53:12 60:24 75:3 79:14

82:16 106:15 107:20, 24, 25 108:3 118:4 131:6, 9 136:4 139:19 145:5 190:14, 16, 21, 22, 25 207:24 229:14, 15, 18 237:20 257:8 292:21, 22, 25 301:20 347:1, 5, 6, 9 366:22 375:8 389:23 390:2, 3, 6 392:2, 4 444:19, 22, 23 445:1 463:2 478:10, 12, 13, 16 483:12, 14, 17, 18, 21 487:18, 21
recorded 98:14 255:16 258:17 259:11, 14 351:23
records 113:23 114:2 158:20 257:13, 21 258:4

redacted 322:18
REDIRECT 483:5
Redline 10:7 38:18 247:2 249:11 297:15 298:1, 9
redlines 298:9, 18
redo 85:14, 20 142:1
refer 146:1 147:12
reference 64:6 130:22 169:21 241:20 299:10 302:21 396:1 411:13, 20, 25
referenced 132:5 394:6 426:23
references 48:11, 14, 15, 17, 20 181:12, 14 302:16, 18 303:5
referencing 406:20
referral 146:9
referrals 147:2
referred 39:5

114:12 145:16, 19, 21 147:16 149:8 214:13
referring 109:6 112:6 169:15, 17 289:11 291:4 367:12 484:11
reflect 114:3 131:6 175:19 195:20 207:1, 24 250:2 394:21 395:20
reflected 155:12, 19 158:15 206:12 208:7 216:7 220:8 222:19 290:21
reflective 303:9 394:18
reflects 152:20 153:13 165:3 167:2 168:10 169:12 175:16 205:10 206:3, 17

221:18 298:25 301:10 302:19 358:23
refused 314:13 318:8
refusing 315:21
regard 412:21
regarding 52:18 57:17 71:17 214:13
regions 379:5
Registered 1:16 259:12 488:2, 17
regulatory 64:20 66:10
reiterate 85:3 291:17
reject 170:20 177:3
rejected 170:16, 21 172:6, 8, 11 173:25 174:19 246:20
rejection 175:18 176:15
relate 156:25
related 36:19 96:14

Confidential - Subject to Protective Order

122:6
192:*24*
266:*19*
291:*24*
356:*15*
371:*13*
422:6
424:*21*
425:*12, 13,*
*14, 15*
453:22
**RELATES**
1:*5* 140:*3,*
*19* 147:22
423:7
**relation**
122:9
241:*7* 425:*1*
**Relationship**
10:*11* 36:9
39:*23*
50:*20*
68:*18, 23*
117:*21*
119:*5*
120:*12*
122:*25*
123:*11*
124:9
127:*13*
128:8
129:*20*
136:*15*
166:*18*
202:*16*
323:*5*
364:9
409:*3*
418:22
439:*9, 14*
**relationships**
88:*18* 332:7
**relative**
358:8, 25

359:*3*
376:9
484:*24*
488:*10, 11*
**relatively**
388:*18*
389:*11*
455:7
**release**
299:*20*
**relevance**
98:7
**relevant**
15:*11*
182:*24*
186:*12*
192:*17*
204:22
442:*12*
**reliable**
259:*17*
260:*12*
376:5
382:*3* 441:*3*
**relied** 85:9
154:*11, 18*
261:*4, 18*
265:*19*
375:*17*
388:6
**relief** 189:6
**relies**
326:*21*
327:*1*
**rely** 31:*12*
32:*13* 85:8
212:*14*
324:*13*
332:*12*
388:*3*
449:*21*
455:5
**relying**
31:*18, 21*

32:*1* 33:*3,*
*11, 15, 17*
98:*10* 324:*1*
**remains**
269:*16*
299:*3*
**re-mark**
353:*4*
**remarkable**
103:*3, 12*
218:*11*
219:*7, 9*
373:*6* 377:*2*
**remember**
18:*6* 37:*2,*
*13* 39:*19, 20*
53:*4* 58:*13*
71:*9, 10*
74:*19, 20*
75:*14* 76:*1*
81:*19* 83:*2,*
*10, 14, 25*
86:*18* 89:*7,*
*9* 104:*18*
113:*18*
131:*24*
149:*7*
166:*13*
167:*13, 14*
171:*1*
174:*2, 17, 18,*
*20* 191:*18*
210:*16, 25*
223:*2*
224:*14*
225:*25*
235:*14*
254:*18*
255:*6*
260:*5*
276:*21*
277:*3, 5*
295:*4*
305:*5*

308:*16*
323:*3*
330:*1, 24*
337:*19*
348:*20*
350:*13, 18*
352:*15, 23*
359:*24*
360:*6*
367:*19*
374:*1, 5, 15*
376:*17*
377:*24*
385:*24*
403:*8*
409:*24*
414:*13*
437:*25*
438:*19*
444:*8*
478:*23*
479:*4*
483:*10*
484:*2, 9*
485:*1, 2*
**remembered**
224:*17*
**remind**
30:*25*
58:*12* 374:*4*
**reminded**
222:*9*
**remove**
300:*18*
**removed**
194:*23*
282:*6*
**render**
306:*4*
**rendering**
304:*2*
**repeat**
138:*2, 7*
188:*10, 14*

237:*9*
311:*11*
341:*17*
408:*16*
**repeating**
32:9
**repercussions** 143:22
**rephrase**
22:*25*
24:*17*
194:*17*
414:*25*
**replicate**
388:*20*
**replied**
72:*17*
107:9
286:*24*
309:*6*
**replies**
413:*3*
**reply** 72:*18*
411:*20*
413:*4*
**replying**
287:*2*
291:*20*
**Report**
10:*15*
11:*10*
15:*21, 23, 25*
16:*4* 30:*3,*
*4, 13, 22, 24*
31:*11, 12*
32:*20, 21*
33:*5, 7, 20*
40:*15*
50:*15, 25*
56:*1, 5, 8, 11*
57:*7, 8*
58:*23* 64:*6*
80:*17*
91:*10* 92:*2*

| | | | | |
|---|---|---|---|---|
| 93:*20*  94:*8,* | **reported** | 293:*10* | 288:*5* | **restart** |
| *9*  105:*1* | 32:*19* | 356:*18* | 289:*4* | 186:*21, 23* |
| 119:*1* | 167:*1* | **representatio** | 292:*13* | **resubmit** |
| 131:*8* | 169:*9* | **n**  157:*21* | 306:*13* | 178:*14* |
| 132:*6* | 181:*17* | 225:*16* | 470:*3* | **result** |
| 136:*25* | 186:*4* | **Representati** | **researchers** | 103:*25* |
| 137:*23* | 217:*6* | **ves**  11:*11* | 130:*1* | 183:*13* |
| 182:*10* | 221:*2* | **represented** | **researching** | 201:*21* |
| 209:*18* | 223:*9* | 157:*10* | 117:*16* | 251:*18* |
| 221:*1* | 225:*2* | 158:*3* | **residual** | 252:*12* |
| 222:*15* | 235:*6* | 166:*11* | 403:*5* | 277:*21* |
| 239:*1* | 240:*19* | 197:*23* | 404:*4, 14* | 286:*2* |
| 243:*18* | 361:*24* | 291:*5* | **resounding** | 318:*4* |
| 252:*8, 17, 24* | 399:*12* | 351:*11* | 205:*18* | 381:*19* |
| 260:*11* | 437:*6* | **representing** | **respect** | 382:*11* |
| 261:*5, 19* | 439:*10* | 145:*16* | 15:*3*  25:*3* | 423:*12* |
| 263:*1* | **Reporter** | 203:*20* | 28:*13*  50:*5* | 479:*17* |
| 265:*20* | 1:*16, 17, 19,* | **represents** | 58:*3, 18* | 480:*3* |
| 277:22 | *20*  13:*16* | 157:*17* | 69:*18*  78:*6* | 481:*25* |
| 278:*20* | 23:*5*  488:*2,* | 247:*17* | 156:*4* | **results**  17:*2* |
| 279:*5, 7, 10,* | *3, 17, 18, 19,* | 300:*6*  436:*7* | 164:*7* | 35:*10*  45:*4* |
| *11, 12, 18* | *20, 21, 22* | **request** | 177:*8* | 123:*25* |
| 290:*24* | **reporting** | 226:*6* | 424:*13, 14* | 130:*10* |
| 294:*14* | 31:*16*  56:*3* | 325:*14* | 426:*5* | 151:*13* |
| 304:*15* | 151:*13, 23* | **requested** | 465:*20* | 156:*15* |
| 322:*8* | 154:*20* | 56:*11*  325:*4* | 470:*16* | 158:*18, 24* |
| 323:*12* | 218:*12* | **require** | **responded** | 159:*2, 5, 10,* |
| 325:*11* | 219:*3* | 327:*17* | 77:*16* | *13*  162:*15* |
| 347:*17* | 325:*19* | **required** | **response** | 163:*22* |
| 376:*9* | 370:*2* | 57:*9* | 120:*1* | 164:*22* |
| 390:*13* | 454:*3*  464:*4* | 140:*10, 11* | 121:*1* | 188:*6* |
| 392:*19, 23* | **reports** | 314:*21* | 207:*19* | 193:*9* |
| 393:*11, 12* | 16:*9, 15* | | 208:*23* | 208:*24* |
| 394:*1* | 57:*5*  65:*25* | **requirements** | 325:*23* | 218:*5* |
| 397:*16* | 81:*17* | 436:*21* | **responsible** | 219:*13* |
| 398:*14* | 186:*11* | **requires** | 430:*19* | 221:*9* |
| 405:*17* | 225:*4* | 129:*5* | **responsive** | 227:*20* |
| 407:*19* | 239:*4* | 325:*10, 12* | 189:*19* | 229:*6* |
| 419:*24* | 253:*11* | 437:*4* | **rest**  17:*11* | 231:*7* |
| 437:*10* | 280:*22* | **research** | 221:*6* | 243:*2* |
| 441:*5* | 455:*5* | 14:*20* | 382:*5* | 244:*3* |
| 460:*7* | **represent** | 47:*25*  48:*1* | 450:*13* | 252:*21* |
| 464:*22* | 15:*17*  56:*6* | 185:*14* | 458:*20* | 253:*10, 16* |
| 476:*2* | 203:*25* | 242:*16* | | 256:*24* |

Confidential - Subject to Protective Order

| | | | |
|---|---|---|---|
| 265:2, *17* | **Retrospectiv** | 36:*1*, *15*, *18* | **RFO**  3:6 |
| 266:8 | **e**  98:*17*, *20* | 37:7  38:7 | **rich**  440:*25* |
| 278:*21* | 462:22 | 45:25 | **RICHER** |
| 283:*12* | 463:*4*, *8* | 47:*12*, *14* | *5:15* |
| 327:*15* | **return** | 50:7  99:*24* | **Rico**  3:7 |
| 346:7 | 489:*13* | 105:2 | **Rifas-** |
| 357:*4*, *8*, *9* | **returned** | 122:*17*, *19* | **Shiman** |
| 361:*20* | 338:*17* | 129:*19* | 291:*13* |
| 364:*16* | **review**  31:*5*, | 154:2 | **right**  14:*13* |
| 367:8, *13* | *8*  37:*1*, *8*, *22* | 170:*11* | 15:25  16:*5*, |
| 375:9 | 38:2, *3* | 211:*10*, *13* | *14*  17:*11* |
| 377:*12* | 43:*11*  47:9 | 228:*21* | 18:*19* |
| 378:*23* | 49:*6*, *13* | 234:*11* | 21:*16* |
| 379:*4* | 52:2  79:*17* | 238:6 | 23:*21*  26:*7*, |
| 382:9 | 81:2, *11* | 241:*24* | *11*  27:*10* |
| 404:*20* | 89:25 | 242:*14* | 29:*12*, *22* |
| 415:*12* | 100:*23* | 245:22 | 30:*2*, *11*, *15* |
| 417:*3* | 124:2, *22* | 257:*24* | 31:22, *24* |
| 453:*16*, *18* | 128:*3* | 284:9 | 32:6  33:*2*, |
| 455:*10* | 136:*13* | 296:*21* | *3*  34:*16*, *23* |
| 456:*18* | 164:6 | 297:*4* | 36:*3*, *5* |
| 457:*18* | 167:*12*, *20* | 299:*12* | 38:7  39:*12* |
| 460:*10*, *11* | 175:*11*, *13* | 300:*18* | 41:*6*, *11* |
| 474:*4* | 194:*3* | 321:25 | 42:*13*  44:4 |
| 480:22 | 209:*15*, *17*, | 322:*3* | 48:8  49:*18* |
| 481:*18* | *20*  227:*3* | 324:*12* | 58:*19*, *20* |
| 482:*1*, *4*, *14*, | 230:*23* | 327:2 | 59:9  61:*3* |
| *19*  485:*10*, | 234:*13* | 332:2 | 63:2  66:*4*, |
| *13*, *20*, *24* | 235:*10* | 363:*24* | *6*  67:*11*, *12* |
| 486:*19*, *20* | 296:*24* | 381:*24* | 68:8, *12* |
| **retained** | 316:*15*, *19* | 384:*13* | 69:*17*  77:*9*, |
| 88:*15* | 339:*20* | 402:8 | *25*  79:*1* |
| 115:9 | 340:*13* | 406:*3* | 80:*21*, 25 |
| 117:9, *11* | 345:25 | 416:*16* | 82:*1*  87:*24* |
| 149:*12*, *21* | 382:*4* | 429:2 | 92:*14*, *21* |
| 150:*6*, *10*, *19* | 405:2 | 443:*25* | 99:*12* |
| 294:*1*, *9* | 418:6 | 451:*17* | 100:*21* |
| 435:*23*, 25 | 428:2 | 457:*3* | 103:8 |
| **retainer** | 429:*4*, *6* | 464:*7*, *19* | 106:*12* |
| 293:6 | 438:*5* | 466:*13* | 107:22 |
| **retention** | 450:8 | 475:*23* | 108:*1*, *12* |
| 293:*20* | 451:*14* | 484:*13* | 109:*5*, *15* |
| **retrospect** | **reviewed** | **reviewer** | 110:*18* |
| 463:2 | 31:7  35:*24* | 39:*7*, *8* | 111:8 |

114:9
139:20
140:4
141:1
142:2, 12
143:14
145:19, 24
146:11
147:3, 16
148:21
150:15, 18
151:7, 11
154:10
158:8, 11
159:18
170:25
171:8, 19
176:5
177:2, 21
178:15
179:15
181:2, 7, 16,
20, 22
185:22
187:21
189:12
190:19, 23
193:23
194:25
195:5, 17
197:25
208:4
210:22
211:21
212:4, 20, 23
213:20
214:10
215:3, 8
216:22
217:2
219:21
222:19
224:24
226:19

227:7
229:11, 12,
16  239:12
244:25
245:18, 22
247:2, 7, 18
248:12
249:12
250:19
253:3, 7, 20,
22  255:13
256:2
257:11, 18
260:7
262:4
267:17, 18
268:23
269:9
270:21
271:5, 24
274:13
275:2, 11
276:3
278:7
279:6
281:2
283:20
284:6, 18
285:10
286:25
287:3
288:1, 10
289:10, 14
290:14
292:19, 23
293:16
295:7
296:19, 23
298:2, 11, 18
299:13
301:3, 5, 14
302:12
303:22, 23
304:11

305:11, 22
307:7
311:10
315:17
316:7
318:23
319:23
320:8
327:8
333:7
334:3
336:5, 7, 10,
14, 17, 22
337:5, 8
338:1, 4, 18
339:2, 11
340:3, 15, 16,
21  341:13
343:8, 9, 10,
19  344:4, 8
345:13
346:4
347:3, 7
348:10, 13
349:1, 9, 16,
19, 23
350:25
354:2, 7, 15
356:7, 8, 21,
25  357:6, 16,
21  358:12
359:8, 23
360:4
362:16, 21
363:11, 13,
23  368:19,
24  369:8, 13
370:2, 3, 11
372:4, 13
373:1, 12, 15,
20  374:11,
23  375:4
378:5, 8, 10,
19  379:20,

24  381:5
383:12
386:2, 6
387:22
389:7, 25
390:4
391:5, 7, 23
393:20
400:20
402:23
403:10, 25
404:5
406:3, 13
407:11
408:10
409:4, 9
410:22
411:22, 23
413:6, 15, 19
414:12, 22
418:15, 22
420:14, 17
421:3, 6, 10,
20  424:16
426:6, 23
427:2
428:22
429:5, 23
430:12, 17
431:3, 4
432:11
433:25
435:1
436:1
439:6, 9
440:3, 15
441:18
442:5
444:20, 24
447:13
448:24
449:1, 8
451:12, 24
452:2, 3, 7,

13, 19, 23, 25
453:12
454:2, 5, 16
455:20
456:25
457:18, 25
460:17
461:13
462:14, 18,
24  463:5
464:16
465:7, 21
467:17, 25
468:5, 13
469:12, 19
471:11, 15,
22  472:1, 2,
9  473:11, 19,
23  474:11,
13, 21
475:12
477:23
478:11, 14
483:15, 19
484:10
485:2, 7, 19
487:19
**right-hand**
364:14
421:13
473:8, 10
**rigor**
141:20
333:14
**rigorous**
464:9
**rising**
332:16
**Risk**  10:18,
22  11:6, 14
12:9
103:14
130:23
193:1

231:9, 10
233:8, 10, 23
239:23
304:18, 20
335:9, 14
358:8
359:1, 3
364:19
375:11
376:9
379:1
381:12, 16
382:18
408:7
409:8, 11, 18, 19   410:7, 8, 14, 16
416:10, 19
417:7, 10, 21
431:19
432:18
458:16
468:23
469:3, 7, 11
470:24, 25
473:6
474:18
484:24
486:10
**Rite** 8:4
**Riverside**
2:10
**Road** 5:8
**robust**
486:20
**Rock** 3:24
**rocks** 157:3
**ROGER**
4:21
**roger.smith**
**@beasleyalle**
**n.com** 4:21
**role** 58:2
365:8

406:18
464:25
**ROMANO**
2:8
**room** 73:1
**ROSIE** 2:8
**rosie.romano**
**@kellerpost**
**man.com**
2:9
**roughly**
70:5  75:25
341:7
**Round** 3:24
**row** 439:23
**Ruish** 291:9
**rules** 22:4
127:3
**run** 334:8
432:18
**running**
329:20
472:16
**rushing**
258:9
**RUSS** 3:5

< S >
**Sacramento**
5:3
**safe** 121:6
439:19
**safely**
269:14
**sake** 75:2
**sample**
41:13
217:4
276:2, 7
280:12, 13, 16  287:23
288:4, 10, 15, 17, 20  289:1, 2, 3  325:22

337:5, 8, 13
344:17
345:1
357:11
358:7, 11, 15
359:4, 8
366:2, 3, 12
377:13
379:19
381:4
383:3
387:16, 17
388:18
389:10
478:21
481:7, 16
484:8, 22
485:18, 22, 25  486:7, 9, 11
**sampled**
368:21
**samples**
41:9  44:21
338:1, 17
339:10, 15, 16  340:8
344:7
345:12, 20, 22, 23  357:6
364:21, 25
368:19
378:3, 6
379:7
381:15
**SANDRA**
6:13  175:22
**sanity** 78:2, 19  321:3
**Santa** 4:16
**SARAH**
5:13
**sat** 325:2

**satisfied**
243:7
**saw** 35:9
53:7, 8
113:9
136:18
181:20
256:7
258:22, 23, 24  281:18
285:5
295:15
322:6
387:16
408:6
413:15
414:8
437:19
469:10
**saying**
31:22
47:22
53:11  79:4
92:1  95:1
107:9
127:19
143:23
172:25
197:20
198:1, 3
247:25
263:15
270:6
280:7, 8
286:22
288:24, 25
289:2
291:20
317:20
332:19
333:11, 13
334:10, 22
358:10
376:3

385:4
416:9
430:12
449:21
468:12
471:21
**says** 13:23
31:1  72:7
108:18
120:1
130:6, 12
133:1
154:10
195:18
196:11
201:5
223:14
248:7
249:17
253:10
255:14
256:18
261:3
268:1
269:10
275:22
284:18
286:9, 17
298:20
299:7, 10, 15, 16  301:20
302:18
303:4
321:2
333:24
354:11
359:16
368:22
385:3
403:3
412:22
413:9
414:20
423:11

428:*17*
429:*17*
430:*6*
431:*18*
432:*3*
443:*15*
453:*6*
459:*20*
464:*12*
465:*23*
472:*22*
**scale** 28:*21*
418:*12, 18*
**SCARCELL**
**O** 3:*17*
**scenario**
242:*17, 20,*
*25*
**school**
19:*15* 24:*9*
43:*2* 54:*17*
55:*5, 13*
57:*4* 63:*14,*
*16* 81:*10, 17*
84:*4* 90:*24*
121:*3*
427:*16*
**schooled**
367:*6*
**SCHULTZ**
2:*9*
**science**
85:*11* 86:*6*
291:*21*
356:*5*
470:*15, 18,*
*22*
**Sciences**
170:*10*
**scientific**
33:*17*
177:*9, 13*

**scientifically**
97:*18, 20*
104:*15*
**scientist**
19:*21, 24*
24:*3* 47:*6*
81:*15*
88:*21*
121:*18*
143:*10*
294:*14*
333:*15*
**scientists**
23:*8* 87:*2*
101:*14*
356:*13*
427:*4*
429:*4* 436:*6*
**score**
320:*15, 17*
329:*9*
371:*21*
388:*11*
408:*7*
412:*1*
416:*10*
417:*7*
454:*8*
455:*17*
457:*17*
458:*7* 469:*7*
**scored**
320:*1, 13*
**scores**
317:*21*
319:*8, 22, 24*
333:*25*
371:*23*
384:*1*
409:*9, 11*
416:*19*
417:*11, 21*
431:*19*

457:*20*
469:*11*
**scoring**
320:*7*
326:*22*
328:*2, 20, 25*
329:*4*
334:*25*
336:*1* 388:*4*
**SEAN** 2:*15*
**search** 49:*9,*
*22, 23* 50:*18*
52:*12* 420:*7*
**searched**
52:*10*
**searches**
420:*7*
**second** 25:*9*
72:*3, 6, 7*
86:*2* 99:*20*
102:*2*
110:*14*
151:*15, 18*
155:*20*
167:*10*
168:*3, 25*
175:*10*
179:*18*
189:*21*
194:*2*
197:*22*
201:*18, 19*
202:*2*
247:*18, 23*
248:*2*
255:*14*
256:*15*
261:*11*
267:*25*
309:*22*
330:*17*
377:*18*
388:*25*
403:*13*

426:*25*
428:*20*
429:*16*
448:*20*
475:*8, 9*
**seconded**
373:*9*
**section**
260:*24*
356:*1*
401:*12*
402:*21*
450:*9*
**security**
116:*25*
**see** 30:*10*
52:*14* 57:*6*
61:*15*
72:*25* 73:*1,*
*5, 8* 96:*20*
109:*14*
110:*16*
111:*24*
136:*13*
137:*1*
145:*1*
148:*2*
162:*16*
163:*23*
165:*15*
177:*4*
178:*8*
179:*13*
181:*21*
183:*2*
192:*1*
193:*25*
195:*3*
196:*17*
216:*13*
218:*9*
219:*9*
223:*14, 15*
232:*15*

236:*25*
247:*4, 6, 12*
254:*19*
255:*4*
261:*7*
262:*11*
264:*3*
268:*6, 20*
270:*4*
280:*10*
290:*4*
297:*25*
299:*5, 22*
302:*2, 10*
303:*22*
304:*14*
306:*20*
309:*18*
310:*6, 9*
311:*3*
312:*5*
313:*13*
323:*2*
325:*10*
331:*7*
332:*2*
337:*1*
342:*11*
353:*12*
354:*10, 19,*
*21* 355:*25*
356:*3, 7*
357:*4*
359:*18*
361:*18*
364:*3, 8*
368:*14, 16,*
*23* 369:*7*
374:*22*
377:*11, 21*
378:*6, 15, 16*
382:*23*
385:*12*
387:*16*

389:*12, 14*
390:*24*
391:*12*
394:*8*
400:*16*
415:*4*
416:*6, 8*
424:*18*
428:*16*
429:*16*
431:*23*
434:*22*
437:*17*
438:*22*
439:*14*
441:*25*
442:*4, 5, 20*
448:*19, 22*
450:*2*
451:*18*
453:*25*
454:*9*
455:*13, 17*
457:*13*
459:*24*
460:*4*
464:*10*
465:*3, 4, 19*
471:*9, 17*
472:*6, 18*
473:*4, 7*
474:*19*
475:*5* 478:*4*
**seeing**
72:*23*
352:*20*
405:*12*
462:*11*
**seek** 230:*1*
**seen** 46:*5*
53:*3, 6*
66:*8*
118:*19*
129:*9*

138:*19*
139:*2*
152:*24*
153:*22, 25*
154:*21*
159:*21*
160:*9*
162:*11*
163:*14, 19*
165:*13, 18*
167:*25*
169:*1*
240:*14*
374:*19*
400:*25*
455:*25*
**selection**
325:*16*
**selective**
325:*18*
**selectors**
69:*10*
**self-report**
377:*6*
**self-reported**
375:*2, 17, 19*
433:*1*
443:*19*
**send** 59:*5*
70:*1* 78:*14*
150:*14*
**senior**
428:*24*
**sense** 96:*11*
97:*18* 98:*6*
104:*16*
249:*24*
274:*23*
345:*6*
**sensitive**
353:*17*
**sensitivity**
195:*11*
210:*9*

256:*21*
257:*6* 367:*7*
**sent** 172:*9*
174:*2*
285:*9, 10, 16*
413:*5*
**sentence**
191:*18, 20,*
*21* 194:*6*
195:*18*
217:*21*
248:*7*
253:*9*
255:*14*
260:*25*
261:*11*
267:*25*
269:*2, 5, 7*
271:*4, 7, 15,*
*23* 272:*1, 7*
274:*12, 16,*
*23* 275:*4*
289:*6*
300:*23*
359:*16*
375:*15*
377:*19*
388:*17, 25*
390:*21*
403:*13*
426:*10*
431:*18*
459:*20*
460:*2*
**sentences**
189:*1*
261:*1*
263:*12*
271:*16*
274:*9*
275:*7, 17*
360:*19*
**Separate**
160:*6*
187:*18*

327:*7, 12*
329:*15*
396:*3*
**separately**
132:*7*
**September**
40:*8* 371:*18*
**series**
237:*22*
**serious**
25:*19* 61:*11*
**seriously**
178:*6*
404:*11*
**SERVICES**
1:*21* 8:*21*
13:*4*
**session**
293:*5*
**set** 38:*21*
96:*6, 7*
110:*9, 11*
193:*5*
197:*4, 5, 17*
198:*2*
372:*6, 10*
379:*6*
411:*16*
485:*9* 488:*8*
**setting**
314:*24*
**settled**
93:*24*
**seven** 52:*23*
189:*1*
301:*22*
302:*1*
403:*22*
461:*10*
476:*23*
**severe**
272:*16*
**sewers**
197:*14*

**sex** 454:*4*
456:*6, 11, 16,*
*23* 457:*7, 17,*
*25*
**Sex-specific**
11:*22*
**Shanna**
150:*9*
**SHANNON**
8:*16*
**share** 89:*23*
**shared**
89:*20* 226:*2*
**sharing**
89:*21*
**shed** 419:*10*
**sheet** 489:*6,*
*9, 11, 14*
490:*7*
**Sherbrooke**
44:*22*
62:*12, 15*
63:*11*
258:5, *23*
259:*16*
339:*10*
**shoes** 39:*1*
**shoot**
170:*19, 23*
172:*1*
**shop** 147:*12*
**Shorthand**
1:*18* 488:*3,*
*18, 19, 20*
**shot** 171:*22*
172:*5*
**show** 20:*13*
21:*21*
22:*13, 15, 18*
25:*14* 49:*9*
59:*25*
137:*1, 2*
141:*14*
153:*23*

155:6, *23*
162:*12*
163:*20*
181:*24*
235:25
252:*12, 13*
254:*11, 12*
279:22
309:9
310:*4*
320:25
335:*1, 5*
342:*15*
343:2
346:*12*
349:*18*
376:22
379:8
381:*10*
433:*11*
460:*12*
468:*17*
469:*1*
479:24
480:*9, 14, 18*
481:*13*
482:25
484:*15, 16*
**showed**
195:*15*
215:7
364:*16*
376:9
377:*4*
387:*18*
466:9
480:22
481:*17*
**showing**
26:*21*   46:4
152:*19*
369:*19*
**shown**
233:*23*

252:*20, 21*
255:*19*
263:8
302:*18*
369:*23*
387:*18, 21*
444:*14*
455:25
459:8
**shows**   27:*4*
28:*16*
45:*12*
128:22
129:*4*
169:9
184:25
206:9
244:*4, 11*
248:20
252:*15, 19*
253:*15, 25*
272:*4*
275:*14*
306:*18*
361:*19*
376:8
395:5
409:*11, 21*
410:*10, 17*
412:8
416:*17, 21*
417:*3, 9, 12*
456:*10*
457:8, 9
476:*13, 16*
480:*2, 7, 10*
**SHUSTER**
3:9
**sibling**
244:9
432:*4, 14*
433:8
**sibling-
control**

244:*4, 6, 11*
432:*14*
433:*11, 19*
**siblings**
244:7
432:*16, 17*
**sic**   177:*4*
196:*24*
259:4
265:*12*
269:25
282:22
324:*23*
**side**   76:*6*
77:8
115:25
116:*1*
140:2
264:*23*
294:8
319:*12*
364:*14*
406:*24*
475:*4*
**sign**   318:*6,
16*   489:8
**signal**
262:*10*
482:25
485:*16*
**signatory**
48:8
**signed**
56:*16*
89:*13*
127:*10*
262:*4*
268:22
293:*11*
294:5
**significance**
211:*2, 16, 20*
219:*11*

473:*14*
474:*11*
**significant**
211:6, *10*
213:*17*
215:7, *12, 20*
216:*14*
225:*4*
364:*16, 19*
381:*17*
457:*18*
458:6, *17*
459:*2, 6*
472:9
473:*11, 16*
475:6, 7
480:2, *23*
481:*17*
482:6, *15*
**significantly**
255:*17*
**signing**
489:9
**similar**
125:*10, 17,
18*   180:*10*
194:*11*
223:22
233:*16*
244:8
307:25
326:*14*
327:*13*
329:21
430:*1*
432:*16*
472:*3*
473:7
474:*18, 20*
475:*1*
485:*20*
486:*3*
**simple**
196:22

368:*13*
384:*19*
**simply**
327:*16*
**single**   99:*21*
128:*15*
132:*14, 16*
133:*12, 16*
134:2, *10*
136:6
137:7
197:*21*
213:*16*
305:*23*
317:22
328:25
359:*16, 21*
360:*14*
399:*14*
426:*16*
**sir**   362:*11*
**sit**   15:*19*
80:*1*
165:*18*
192:20
199:24
367:*18*
371:*12*
431:8
**sits**   142:*3*
**sitting**
28:*11*   30:2
44:*3*   50:6
75:*3*   87:20
100:*3*
112:25
150:*17*
167:24
228:*17*
230:*15*
232:22
254:22
430:*11*

**situation**
109:*9*
123:*7*
197:*3*
199:*20*
223:*1*
317:*11*
331:*15*
350:*1*
374:*6*
437:*13*
441:*20*
**six**  17:*2, 3,
4*  52:*17, 24*
53:*2*
153:*14, 16*
165:*8*
168:*10*
169:*12*
185:*17*
189:*4*
196:*9*
208:*5*
225:*25*
248:*15, 17,
21*  249:*3, 19,
23*  250:*1, 2,
10*  301:*21*
302:*1*
338:*17*
400:*2*
451:*10*
467:*24*
468:*7*
479:*7, 15*
**sixth**
155:*12*
365:*18*
**size**  41:*13*
216:*13*
217:*4*
276:*3, 8*
280:*12, 13,
16*  287:*23*

288:*5, 10, 15,
17, 20*  289:*1,
2, 3*  325:*22*
337:*5, 8, 13*
344:*18*
345:*1*
357:*11*
358:*8, 11, 15*
359:*4, 8*
366:*2, 3, 12*
382:*22*
383:*3*
387:*16, 17*
388:*19*
389:*10*
413:*13*
478:*22*
481:*7*
484:*8, 22*
485:*22, 25*
486:*7, 9, 11*
**sizes**  481:*16*
**sjohnston@b
tlaw.com**
5:*13*
**sketch**  83:*13*
**skew**  159:*13*
**sko@btlaw.c
om**  6:*14*
**slate**  251:*24*
**sliced**
440:*10, 13*
**slide**  226:*3*
**slides**  12:*13*
**slightly**
157:*18*
206:*19*
472:*8*
**slowly**
153:*19, 20*
**small**  16:*16,
22*  28:*24*
193:*5*
206:*4*

235:*2*
270:*6*
273:*4*
280:*11*
289:*2*
300:*15*
348:*17*
358:*11*
377:*13*
379:*19*
381:*4*
388:*18*
389:*11*
417:*9*
422:*3*
423:*2, 15*
433:*3*
455:*7*
480:*1, 22*
481:*9, 11, 16,
25*  482:*4, 5,
14, 23*
**smaller**
44:*17*
234:*21*
279:*19*
290:*7*
358:*15*
359:*4, 9, 11*
417:*17*
484:*17*
485:*22, 23*
486:*5*
**smallest**
432:*21*
**smart**  51:*10*
373:*7*
**smartest**
41:*3*
**SMITH**
4:*21*  8:*1*
**smoke**  126:*3*
**Smoking**
126:*1, 5, 8*

**snapshot**
300:*25*
301:*6*
394:*12*
**SNIDOW**
2:*3*  9:*6*
14:*11, 14, 16,
23*  15:*13*
18:*20*  20:*3*
21:*17*
22:*11, 17*
24:*13*  25:*7*
26:*1, 14*
27:*15, 19, 24*
32:*3, 7*
35:*15*  40:*1*
42:*5, 15*
44:*5*  45:*8*
46:*15, 18, 21*
49:*1*  50:*11*
51:*13, 18, 22*
52:*5, 19*
53:*10*
54:*24*  55:*8,
16*  57:*19*
58:*9*  59:*10,
19*  61:*4*
64:*8*  65:*13,
19*  73:*12*
74:*5, 14*
75:*9*  76:*7*
77:*10*
78:*21*
79:*13*  80:*5*
84:*9*  87:*15*
88:*7*  89:*5*
90:*9, 12*
91:*7, 23*
93:*16*  94:*6,
21*  95:*19*
97:*8, 12*
98:*2*  100:*7*
101:*4, 19*
104:*2, 7*

105:*25*
106:*6, 8, 12,
19*  107:*3, 19*
109:*2*
110:*19*
112:*9, 23*
113:*4*
114:*24*
116:*6, 14*
117:*5, 23*
119:*8*
120:*16, 19*
123:*3*
124:*12*
125:*7*
126:*16, 20,
24*  127:*16*
128:*10*
129:*13*
131:*11, 16*
132:*10*
133:*14, 22*
134:*5, 22*
135:*3, 12, 17*
136:*8*
137:*9*
138:*3, 24*
139:*3, 15, 22*
140:*5*
142:*6, 13*
144:*7*
147:*25*
149:*14*
158:*5*
159:*25*
160:*13*
163:*10*
164:*3*
165:*21*
166:*5, 20*
168:*5*
169:*4*
172:*19*
173:*5, 8, 16,*

Confidential - Subject to Protective Order

*19* 178:*16*
180:7
182:*3*
183:8
184:*6, 8*
185:7
187:*2, 6, 13, 16, 19, 22*
188:*1, 8, 21*
189:7, *23*
190:7, *18*
207:*10*
209:*11*
211:22
226:20
228:*1, 5*
229:9
235:*17*
236:*15*
238:*1, 9, 16, 19* 243:*10*
244:*17*
245:*1, 9*
252:5
255:*1, 22, 25*
257:*16*
261:*9, 12, 23, 25* 263:20
264:*4, 7, 11*
268:*12, 15, 17* 270:*23*
274:*5, 19*
276:*14, 25*
278:*12*
280:*5*
281:7
282:*14*
284:*11, 17, 25* 289:*16, 23* 291:*15*
292:*9, 16, 18*
305:*15*
307:8
308:*17*

311:*6*
313:*17, 21*
314:6
315:*16, 22*
316:*4*
318:*9, 17*
319:*13*
321:*11*
322:*13*
328:*4, 23*
329:*18*
332:23
334:*4*
335:*12*
336:23
337:*16*
338:*5, 13, 19*
339:*3, 18*
340:*10, 22*
341:*10, 14, 21* 342:*7, 14*
343:*1, 5, 8, 16, 19, 25*
344:9
345:*15*
346:*11*
353:*3*
354:22, *25*
355:*3, 7*
358:*13*
360:*1, 5*
366:*23*
370:*23*
371:*1, 7*
375:*22, 25*
377:*15*
378:*20*
381:6
383:*4, 13*
384:*21*
385:*7, 12, 20*
387:*23*
388:*23*
389:*1, 4, 18,*

*22* 397:*5*
398:*11*
399:7
401:*18, 23*
404:6
408:*11, 15*
411:*1, 9*
413:*23*
414:*2, 23*
418:*23*
419:*21*
422:*11*
424:*17*
426:7
429:*24*
431:*5*
434:*3*
435:*10*
436:*2, 23*
438:*2, 14, 17*
439:*1*
440:*18, 21*
442:*6, 16, 23*
443:*3, 6, 10*
444:*1, 19*
445:*3*
446:*6, 18*
447:*14*
451:*3, 21*
455:*21*
458:*1, 8, 12*
466:*6, 24*
467:*12*
469:*13, 17*
470:7
472:*11, 18*
474:*14*
475:*21*
476:*20*
477:*2, 5, 10, 18, 23* 478:*6, 18* 480:*20*
481:*14*
482:2

483:*2, 11*
487:*18*
**so-called**
64:*7, 13, 15*
213:*17*
**societies**
332:*5*
**Society**
83:9
115:*16, 22*
116:*3*
434:*20*
**software**
372:*18, 19, 21*
**solid** 141:*11*
**solidified**
117:*10*
**somebody**
140:*1*
149:2 295:*6*
**someone's**
97:22
**soon** 60:*9*
142:*23*
188:*20*
**sor** 65:*10*
**sorry** 17:*3*
25:8 42:*15*
46:*18, 19*
55:*11*
65:*10, 13*
73:*19* 75:9
83:*12*
90:*17*
97:*19*
104:7, *14*
126:*19*
127:*1*
130:2
146:22
151:8
152:7
156:*21*

158:22
160:2, *24*
161:*5*
169:*10*
178:*20*
184:8
191:*14*
193:*1*
195:*25*
204:*20*
215:9
223:*20*
225:8
231:*5, 11, 13, 14* 232:*20*
249:*13*
255:*22*
266:*10*
278:*3*
285:*12*
292:*13*
298:*10, 12*
302:*13*
309:*6*
319:*5*
343:*16*
346:*5*
347:22
356:*23*
367:*3*
370:*4*
385:7
389:*1, 21*
391:*24*
393:*4*
396:*14*
413:*23*
417:*24*
421:22
438:*14*
440:*21, 22*
443:*23, 24*
466:*6*
471:*16*

472:*19, 21*
474:*3*
483:*11*
**sound**
466:*19*
**sounds**
25:*11*
172:*15*
173:*10*
358:*11*
**sour**  172:*15*
173:*10*
**source**
258:*13, 14*
259:*15*
260:*4*
**sources**
241:*20*
258:*4*
**South**  7:*19*
8:*2, 12*

**SOUTHERN**
1:*1*
**SOVIK**  8:*1*
**space**
334:*23*
489:*6*
**spaced**
439:*24*
**SPALDING**
7:*1, 5*  8:*16*
**speak**  62:*13*
63:*19*  68:*2*
71:*2, 4*
75:*18*
82:*15, 16*
84:*12*
148:*8*
313:*18*
321:*21*
427:*9*
**speaker**
116:*20*

**speaking**
71:*10, 14*
85:*22*
396:*21*
**speaks**
111:*14*
150:*1*
**special**
183:*21*
189:*17*
**specialty**
174:*9*
**specific**
101:*24*
168:*23*
181:*17*
189:*13*
190:*2*
265:*11*
272:*11*
363:*12*
385:*15*
440:*11*
**specifically**
21:*5*  83:*2*
90:*21*
169:*2*
185:*23*
340:*14*
**specify**
247:*25*
**Spectrum**
10:*15*
11:*15*  12:*7,*
*9*  453:*14*
471:*10*
**spent**
316:*20*
**spits**  310:*15*
**splitting**
363:*18*
364:*1*
**spoke**  62:*22,*
*25*  63:*8, 13,*

*15, 17*  67:*18*
69:*8*  82:*8,*
*9, 10*  83:*8,*
*19, 21*  84:*25*
86:*3*  90:*3*
110:*2*
260:*14*
294:*2, 12, 18*
**spoken**  64:*1,*
*5*  67:*13*
69:*2, 3*
82:*25*
83:*16*  84:*7,*
*21*
**Sporadic**
452:*9, 17*
454:*8*
455:*16*
457:*19*
**spot**  320:*15*
363:*6*
**St**  4:*10*
**stable**
455:*11*
**staff**  176:*2*
**stage**
116:*12, 18*
**stages**  95:*24*
**stakes**  254:*1*
**stand**  34:*9*
61:*18*
104:*13*
227:*14*
265:*24*
269:*1, 2*
274:*15*
275:*6*
276:*11*
281:*25*
303:*16*
324:*4*
360:*19*
366:*16*
376:*21*

379:*9, 10*
380:*23, 24*
398:*23*
402:*9*
442:*7*
477:*15, 24*
**standard**
333:*14*
334:*12*
401:*11*
**standardizati
on**  370:*10*
**standards**
212:*22*
332:*17*
**standing**
26:*17*
27:*16*
133:*12*
134:*3*
136:*14*
399:*10*
404:*16*
**stands**
94:*15*  455:*8*
**start**  46:*23*
60:*7*
153:*18*
196:*8*
251:*8, 23, 24*
313:*11*
338:*7*
455:*9, 10*
456:*5*
**started**
17:*22*  18:*2*
19:*20, 24*
40:*10*
45:*15, 20, 23*
46:*12*
56:*17*  60:*6*
63:*23*
105:*13*
118:*9*

121:*10, 24,*
*25*  122:*2*
124:*20, 22*
145:*1*
150:*23*
151:*1*
217:*10*
242:*19, 24*
324:*20*
325:*2, 8*
331:*4*
373:*3*
433:*22*
**starting**
47:*1*  118:*7*
319:*25*
419:*17*
**starts**  42:*24*
96:*5, 21*
403:*16*
**state**  26:*25*
27:*1*  86:*5*
203:*8*
398:*15*
489:*5*
**stated**  476:*1*
**statement**
64:*7, 11, 12,*
*19, 24*  65:*1,*
*2, 8, 24*  66:*2,*
*9, 18, 24*
67:*4, 9*
68:*3, 5, 8*
119:*23, 24*
120:*2*
127:*11*
133:*21, 25*
142:*16*
149:*5, 7*
248:*4*
262:*20*
264:*1*
267:*2, 12, 13*
270:*17*

Confidential - Subject to Protective Order

303:*14*
316:*15*
318:7
395:8
397:*10*
424:24, *25*
425:6, *18, 20*
426:*13*
443:*14*
461:*16*
**statements**
66:*16*
128:2
129:*24*
**STATES**
1:*1*   42:*23*
43:9, *14*
62:*20*
138:*22*
322:*1*
**statistical**
211:2, *16, 19*
219:*10*
371:*14*
473:*13*
474:*10*
**statistically**
211:6
213:*17*
216:*14*
364:*19*
458:6, *17*
459:2
473:*11, 16*
475:6
480:2, *23*
481:*17*
482:5, *15*
**statistics**
486:*1*
**status**   22:*9*
176:*21*
177:*11*

**stenographic**
13:*15*
**stenographic**
**ally**   488:7
**step**   188:*10*,
*11*   310:5
331:6
**Stergiakouli**
71:*24*   72:5,
*13*   75:7
130:*12*
265:5
276:*24*
291:9
299:6, *15*
406:*16, 21*
408:8
409:7, *10, 13,*
*21, 25*   411:*4,*
*12, 18, 23, 24*
416:*16, 24*
419:*15*
468:*16*
**Stergiakouli'**
**s**   299:*11*
**STERN**
6:*20*
**stock**   113:2
**STONE**   8:6
49:*17, 19*
**stones**   47:7
**stood**   159:5
274:*15*
361:9
**stop**   25:*15*,
*25*   65:*21*
139:*18*
173:7
203:*20*
**stopping**
80:*4*
**stored**
184:*19*
**Stores**   7:*10*

**Stores-PNS**
8:*14*
**stracey@trac**
**eylawfirm.co**
**m**   2:*15*
**stragglers**
43:*19*
**straightforw**
**ard**   304:*17*
**strata**   157:8
**streams**
392:7
**Street**   1:*13*
2:*16, 23*
4:*22*   5:*21*
6:*14, 21*
7:*14, 19*
8:2, *7, 12*
13:8
**strength**
128:*23*
280:*18*
382:*21*
446:*11*
**strengths**
366:*17*
375:6
**stress**   105:7
240:8, *15, 19,*
*24*   241:6
**strict**   272:*16*
**strictly**
396:*21*
**strong**   50:2
59:*1*   60:*12*
61:*12*
103:*11*
119:*13, 17*
123:*22*
128:5
155:6
202:*20*
216:*10, 15*
254:9

262:*20*
382:*16*
431:*22*
433:*20*
482:*1*
**stronger**
379:*4*
418:*13, 19*
439:8, *16*
**strongest**
182:*14*
456:2, *3*
**strongly**
136:*21*
206:*12*
**stuck**   71:*11*
**student**
40:*24*   41:2
134:*14*
135:*20*
177:*23*
372:*20*
**students**
41:*3*   81:8
**studied**
44:4, *22*
92:3, *19*
166:*10, 16*
233:8   299:*4*
**studies**   10:*3*
36:*15*   46:*3,*
*9*   50:*23*
52:*17*
80:*18*   98:9,
*11, 24*   99:*24*
100:*4*
101:7, *23*
132:5
133:*17*
134:*10*
136:*20*
137:*1, 2, 18*
151:*20*
153:3, *22*

154:*1, 6, 20*
155:2
156:7
159:*21*
162:*11, 20*
163:*19*
192:*20*
193:8, *16*
206:9
209:*19*
210:5
233:9, *17*
234:9
235:3, *25*
243:8, *13*
244:6
252:*19*
262:*22*
263:*15*
265:3, *8*
266:*18*
268:4
270:*10, 11,*
*12, 20*
271:*20*
276:*12*
277:*17*
278:2, *4, 16,*
*24*   279:5, *9*
280:*22*
289:9, *13*
290:9, *12, 20,*
*25*   291:2, *3,*
*25*   292:2
308:9, *10*
310:*24*
311:2, *15, 17*
326:*22*
330:9
331:*13*
332:*1*
337:8
358:*16*
359:*1*

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 360:9, 21 | 20  28:14, 24 | 21  270:6 | 432:4, 21, 22 | **subjective** |
| 366:17 | 29:3, 6, 12, | 271:19 | 433:2, 3, 6, | 320:6, 10 |
| 373:1 | 18, 23  30:23 | 273:4, 7 | 11  437:15 | 331:17 |
| 374:8, 9 | 35:19, 22 | 276:22 | 440:16 | **subjects** |
| 377:4 | 40:10  41:9, | 277:12 | 441:10 | 28:25 |
| 388:19 | 15  43:16, 24 | 280:9, 18 | 443:15 | 41:14 |
| 391:16, 21 | 44:10, 16, 17, | 286:8 | 450:9, 14 | 43:13 |
| 397:18 | 23  66:22 | 287:22 | 451:25 | 146:7 |
| 399:11 | 81:20 | 288:10 | 453:17 | 255:15 |
| 402:12, 16 | 99:25 | 289:1 | 454:18 | 265:12 |
| 403:23 | 100:12 | 290:14 | 455:7 | 363:21 |
| 408:25 | 101:8 | 296:18, 23 | 456:14, 17 | 365:5, 12, 19 |
| 411:14 | 130:9 | 328:19 | 457:21, 23 | 366:8 |
| 413:22 | 132:14, 16, | 339:12 | 458:13 | 367:7 |
| 414:4 | 18  133:6, 12 | 340:9 | 460:5 | 396:15 |
| 421:17 | 134:2 | 345:24 | 461:18, 22 | 455:3 |
| 427:23 | 136:7, 11, 20 | 350:6, 25 | 464:16, 18 | 486:16 |
| 429:19 | 137:7, 12, 14 | 351:1 | 465:24 | **submissions** |
| 430:23 | 140:18 | 354:6 | 473:13, 17 | 177:6 |
| 432:13 | 151:5, 12, 16 | 356:20 | 474:8 | **submit** |
| 433:9, 19 | 152:5, 6, 10, | 357:1 | 479:2, 6, 9, | 138:9 |
| 435:7 | 11, 14  154:9 | 359:4, 17, 22 | 11, 15, 17, 23 | 449:23 |
| 439:22 | 156:4 | 360:14 | 480:1, 8 | **submitted** |
| 440:5, 24 | 160:9, 10, 22 | 361:6, 12, 17, | 481:9, 11, 12 | 16:4  58:22 |
| 449:3 | 161:8 | 19  365:4, 10 | 484:12, 18, | 274:17 |
| 451:11 | 162:1 | 366:16, 18 | 19  485:11 | 435:19 |
| 454:14 | 164:6 | 372:22 | **studying** | **Subscribed** |
| 455:2, 5 | 165:16 | 373:12, 13, | 23:12 | 490:15 |
| 457:6, 7 | 167:4 | 19, 23 | 185:15 | **subset** |
| 459:16 | 168:1 | 374:13 | 267:3, 4, 6 | 44:16 |
| 460:20 | 180:15, 17, | 375:6, 16 | 271:13 | 348:17 |
| 462:2, 9 | 19, 25 | 376:16 | 281:21 | 350:5 |
| 463:21, 24 | 192:14, 24 | 382:14 | 361:22 | 351:7 |
| 464:7 | 193:5, 13 | 386:15 | **stuff**  281:22 | 365:16 |
| 467:25 | 201:8 | 390:20 | 353:2 | 377:25 |
| 480:12, 17, | 203:2 | 400:19 | **Subcommitte** | 473:20 |
| 22  481:16, | 213:16, 22 | 401:5, 7 | **e**  11:11 | 484:12 |
| 19  482:4, 5, | 217:9, 10, 14 | 402:15 | **subgroups** | 485:14 |
| 14, 24 | 244:4, 11, 14 | 403:2, 4, 19 | 455:10 | **substance** |
| **Study**  9:14, | 247:20 | 408:10 | **subject** | 16:2 |
| 22  12:10 | 248:24 | 414:4 | 140:20 | 248:11 |
| 21:20, 24 | 252:15, 16 | 421:3 | 146:5 | 490:7 |
| 22:15, 16 | 265:3, 8, 12 | 427:21 | 405:15 | **substantial** |
| 25:12  26:3, | 269:11, 13, | 428:1, 14 | 489:10 | 432:6 |

Confidential - Subject to Protective Order

**substantive**
16:*20*

**substantively**
15:*24*
**substrate**
166:*1*
202:*19*
**sucks**
141:*17*
**suddenly**
416:*21*
**sufficient**
291:*25*
359:*17, 22*
360:*14*
**suggest**
315:*25*
335:*22*
409:*1*
423:*6*
430:*23*
486:*12*
**suggested**
116:*24*
146:*1*
236:*18*
349:*13*
**suggesting**
102:*13, 20*
264:*1*
307:*20*
421:*18*
432:*7*
**suggestion**
102:*20*
238:*12*
**suggestions**
297:*11*
**suggestive**
459:*7*
**suggests**
429:*19*

**SUGNET**
8:*1*
**Suite** 2:*10,
16* 3:*6, 18,
24* 4:*4, 9, 16*
5:*2, 8, 16, 21*
6:*2, 14* 8:*2*
**SULLIVAN**
3:*12*
**summary**
30:*16, 21, 23*
129:*25*
**summer**
8:*16*
**sun** 48:*3*
**supervised**
427:*4, 19*
**supervising**
437:*8*
**supervision**
427:*7* 428:*4*
**supervisor**
354:*7*
355:*10, 19,
20, 23*
428:*25*
**supervisors**
355:*14*
**supplement**
372:*3*
**Supplementa
ry** 11:*1*
368:*6*
**support**
34:*4* 35:*20*
70:*23*
253:*10*
269:*21*
273:*8, 12, 14*
275:*14, 22*
302:*16*
449:*2, 9*
459:*12*

**supporting**
63:*25*
165:*24*
273:*24*
361:*25*
386:*16*
**supportive**
136:*21*
**supposed**
57:*7*
225:*22*
374:*2* 410:*7*
**Sure** 16:*19*
17:*13*
20:*20* 23:*2*
24:*1* 32:*11*
33:*24*
34:*21*
35:*21* 36:*2*
39:*18*
43:*17, 21*
48:*19* 56:*1,
8, 9* 59:*13,
16, 25* 71:*12*
77:*15, 24*
78:*1, 3, 9, 10,
20* 83:*8*
85:*12* 87:*6*
89:*3, 18*
92:*14*
123:*21*
124:*7*
149:*20*
150:*24*
151:*3*
152:*8*
160:*5*
167:*22*
172:*10*
194:*18*
210:*17*
214:*8*
223:*21*
224:*1*

225:*9*
236:*8*
238:*5*
243:*1*
261:*16*
266:*7*
292:*17*
303:*2, 15*
318:*12*
319:*6*
323:*19*
330:*19*
331:*3*
333:*18*
336:*19*
339:*6, 8*
341:*23*
349:*25*
350:*3, 9, 10*
351:*25*
352:*9*
369:*18*
370:*1*
374:*5, 14*
381:*9*
406:*15*
407:*17*
408:*19*
410:*1*
411:*22*
427:*9*
430:*5*
436:*13*
449:*22, 24*
452:*24*
461:*15, 25*
468:*1*
476:*10*
**surprise**
480:*16*
**surprised**
45:*18*
224:*13*
286:*15*

326:*10*
327:*14*
387:*13*
487:*9*
**surprising**
479:*18*
480:*3*
**surveillance**
269:*15*

**susceptibility**
93:*7, 8*
103:*10*
**susceptible**
91:*5, 11, 15,
16* 92:*5, 9,
25* 93:*4, 21*
103:*1*
107:*15*
**suspected**
481:*10*
**swallows**
156:*20*
**Swan**
150:*10*
**sway** 156:*14*
**swear** 13:*17*
**sweet** 363:*6*
**switching**
289:*17*
**sworn**
13:*21*
488:*4*
490:*15*
**symptomolog
y** 125:*22*
126:*11*
363:*22*
**symptoms**
12:*7* 126:*5*
265:*10*
365:*6* 366:*9*
**syndrome**
239:*18*

syndromes
239:*12*, *14*
**Syracuse**
8:*3*
**system** 56:*3*
105:*9*, *11*
**systematic**
49:*6*, *21*, *23*
50:*18*

< T >
**table** 17:*8*
291:*18*
325:*20*
331:*8*, *9*
364:*15*
368:*10*, *11*
369:*23*
371:*5*
372:*2*, *7*, *20*
451:*19*
453:*15*, *19*
471:*9*
475:*18*
477:*19*
478:*2*
**tables** 17:*1*
136:*25*
141:*13*, *21*,
*22*, *24*, *25*
252:*20*
273:*18*, *21*,
*23* 310:*7*, *9*
325:*11*, *15*
331:*5*, *18*, *19*
372:*17*
**tailored**
308:*8*
**take** 15:*4*
30:*5* 59:*24*
67:*11* 88:*4*
99:*10*
100:*21*
106:*5*, *16*

112:*2*
121:*12*
134:*24*
135:*23*
142:*23*
157:*25*
161:*15*
169:*25*
177:*24*, *25*
178:*1*, *3*, *5*
179:*17*
188:*21*
194:*2*
196:*14*
197:*13*
200:*6*
201:*7*
202:*1*, *3*, *4*, *8*,
*17* 210:*21*
220:*18*
222:*3*, *6*, *8*,
*14* 234:*15*,
*16*, *19*, *21*
237:*13*, *15*,
*16* 244:*24*
245:*6*
262:*9*
267:*20*
268:*25*
274:*24*
281:*24*
283:*22*
287:*22*
343:*12*, *15*
391:*24*
400:*6*, *8*
402:*24*, *25*
404:*2*, *11*
409:*20*
410:*8*, *16*, *18*
412:*13*
417:*22*
444:*17*
451:*19*

463:*13*
464:*20*
466:*4*
**taken** 100:*6*
101:*11*
102:*1*
142:*22*
181:*24*
183:*5*
184:*2*, *12*, *18*
201:*17*, *19*
217:*6*, *12*, *17*,
*20* 224:*4*
226:*23*
227:*9*
228:*18*
234:*24*
254:*5*
259:*7*
291:*23*
323:*12*
346:*14*
388:*17*
397:*23*
398:*20*
399:*25*
400:*1*, *10*
441:*12*
454:*22*
459:*23*
488:*7*
**takes** 20:*24*
146:*10*
156:*13*
197:*21*
199:*13*
200:*24*
202:*1*
205:*3*, *6*
300:*12*
329:*6*
399:*2*
416:*19*
470:*25*

**Takser** 63:*8*,
*10* 83:*3*, *5*
258:*3*
**talk** 22:*5*
63:*23*
70:*16*, *18*
141:*22*
188:*25*
201:*2*, *3*
218:*22*
317:*4*
347:*1*
374:*3*
403:*25*
418:*7*
**talked** 62:*8*,
*14*, *19* 63:*3*,
*5* 70:*17*
81:*24*, *25*
150:*4*
275:*10*
281:*2*
404:*1* 418:*2*
**talking** 21:*4*,
*7*, *12*, *19*, *22*
22:*13*, *14*
25:*12*
43:*13*
67:*10*
78:*23*
105:*13*
126:*24*
167:*25*
183:*19*
191:*11*
193:*3*, *14*, *19*
230:*20*
238:*4*
245:*13*
253:*18*, *21*
262:*15*
264:*16*
290:*11*
318:*7*

346:*5*
366:*2*, *25*
415:*13*
418:*9*
421:*24*
422:*1*
426:*12*
444:*6*
462:*9*, *15*
477:*9* 479:*1*
**talks** 336:*8*
409:*7*, *8*, *10*
**TALLEY**
5:*1*
**Target** 7:*16*
107:*16*
267:*9*
**targeted**
427:*25*
**taught**
19:*14*, *15*
149:*25*
150:*3*
tcampbell@k
rauseandkins
man.com
4:*3*
**teacher**
150:*2*
251:*19*
**teachers**
24:*8*
**team** 17:*23*
20:*10* 38:*1*
62:*12*
82:*14*, *23*
317:*20*, *24*
319:*8*, *11*
333:*25*
373:*5* 428:*3*
**teams**
317:*24*
**teamwork**
37:*24*, *25*

**technique**
461:*21*
462:*4*
**techniques**
151:*23, 24*
152:*1, 2*
**telephone**
38:*19*
144:*19*
375:*18*
**tell** 13:*22*
16:*18*
17:*13*
24:*20*
25:*24*
38:*25* 44:*8*
50:*14*
56:*19* 61:*2*
62:*24*
64:*19*
76:*20, 24*
86:*19, 20*
87:*9, 12*
89:*4* 99:*10*
102:*5*
104:*16*
113:*15, 19*
116:*12*
117:*3*
119:*2*
132:*3*
135:*8*
144:*23*
145:*6*
146:*14*
147:*11*
157:*1*
163:*17*
167:*21*
172:*5*
177:*15, 23*
181:*16*
204:*21*
212:*24*

217:*3*
218:*20*
219:*6*
222:*4*
229:*6*
236:*2*
239:*1*
251:*25*
264:*25*
313:*23, 25*
314:*1*
319:*21*
360:*18*
384:*6, 16*
400:*23*
402:*1*
404:*25*
415:*8*
423:*14*
441:*22*
444:*5*
445:*25*
446:*4*
447:*11, 19,
22* 461:*3*
467:*18*
471:*3*
474:*1* 487:*3*
**telling** 44:*3*
79:*6*
405:*25*
414:*7*
448:*23*
**tells** 305:*1*
**ten** 43:*16*
343:*23*
461:*4*
**tend** 321:*21*
**tends**
206:*22*
**tenet** 165:*1*
**Tennessee**
115:*17*

**tens** 414:*16,
17* 480:*13*
**teratologist**
90:*20*
**teratology**
90:*22*
105:*14, 15*
121:*9*
**terminate**
79:*11*
**terms** 52:*12*
111:*2*
303:*9*
382:*21, 22*
396:*7*
454:*14, 15*
**terrible**
63:*7* 83:*7*
**test** 33:*1*
162:*23*
453:*14*
484:*19*
**tested**
160:*24, 25*
248:*11*
**testified**
19:*20* 42:*2*
44:*7* 49:*17*
68:*11*
80:*15*
110:*6*
124:*5*
166:*9*
194:*20*
284:*24*
340:*19*
396:*24*
**testify** 79:*6*
488:*4*
**testifying**
33:*2* 486:*2,
4*
**testimony**
32:*6, 24*

35:*2* 42:*11*
91:*20*
93:*11* 99:*7*
120:*10*
132:*4, 6*
157:*16*
166:*15*
201:*17, 24*
220:*7*
222:*16*
223:*5*
226:*17*
242:*7*
279:*25*
288:*21*
303:*3*
329:*14*
387:*9*
423:*25*
424:*16*
436:*22*
439:*4*
441:*9* 488:*7*
**Texas** 1:*18*
2:*16* 3:*24*
488:*20*
**textbook**
130:*20*
211:*17*
**Thank** 14:*8*
17:*14*
27:*19*
92:*17*
106:*19*
107:*17, 19*
108:*4*
138:*1*
145:*14*
187:*19*
229:*22*
231:*14*
255:*25*
261:*25*
262:*1*

268:*16, 18*
313:*5*
353:*2*
354:*17*
369:*4, 10*
375:*25*
389:*21*
414:*2*
438:*17*
483:*2*
**Thanks**
15:*7* 30:*9*
261:*12*
268:*15*
292:*18*
355:*7*
**theoretical**
271:*6, 7*
303:*14*
**theoretically**
300:*5*
**theory**
271:*8*
**therapeutic**
197:*18*
198:*5*
**thereof** 50:*8*
**thesis**
373:*15*
**thing** 27:*11*
30:*10*
71:*22*
189:*5*
266:*14, 17*
287:*21*
289:*3*
323:*14*
366:*3*
377:*1*
480:*15*
**things**
16:*16, 22*
17:*10* 22:*6*
33:*25* 34:*2*

Confidential - Subject to Protective Order

35:5  70:25
71:24
101:2
104:11, 12,
15  128:14
173:1
187:25
238:13
239:2
287:18
298:20
304:1
321:24
336:9, 14
337:3
344:4, 22
354:20
362:13
372:15
390:18
407:9
408:5
455:13
463:11
478:25
**think**  20:16
24:11, 20
26:1  36:17
38:25
40:15, 18, 20
48:4  49:12
52:3  53:5
59:1, 6
61:6  62:22
64:14  66:1
67:12, 15, 19
69:8  70:20
71:4  78:4,
23  79:14
80:14, 20, 25
84:22
88:11, 12
93:23
96:22

97:22  98:6
100:20
105:14
106:14
109:8
119:11
123:18
126:21, 23
127:18
128:13
130:6
131:2
135:3, 6
142:19
143:2
145:10
148:2
149:20
150:5
152:13
157:24
160:23
162:8
166:7
171:6, 17, 20
172:4
176:24
177:14
180:13, 24
182:24
183:16
186:15
189:3, 5
190:10
195:23
198:6
199:12
204:22
206:25
207:14
208:10
210:13
211:24
212:12

219:13
227:21
228:7
233:4
237:20
240:10, 21
241:23
247:8
250:7
251:10, 22
254:6
257:10
262:15
265:25
266:22
268:11
278:23
279:16
281:3
282:1, 15
283:1
284:12
288:7, 15
289:4, 18
293:15
294:6
295:18
302:22, 25
305:11
308:21
309:5
311:7
312:4
313:1
314:1, 2
316:1, 14
319:20
320:3, 9
322:15, 24
327:23
330:10
332:16
333:19
335:15, 16

340:19
350:15
360:17
365:8
372:1, 19
373:9, 21, 22
375:7, 13
376:7, 8
387:3
388:1
394:17
398:2
401:15
402:8, 13
405:16
406:21
407:12
409:6, 7
417:16
420:18
422:16
425:23
429:15, 25
434:19
437:16
438:8
445:17
450:9
451:3
452:3
460:6
463:16
465:22
466:8, 11
467:1
470:17
476:13, 20
484:3, 11
**thinking**
24:7  379:12
**thinks**
79:18
189:20, 25

211:19
466:2
**third**  102:2
194:5
197:22
201:18, 20
247:17, 20,
23  248:1, 2
255:11
356:13
359:15
377:19
386:25
387:5
475:9, 10, 11
**thirty**
489:15
**Thompson**
265:5
276:24
291:8
**THORNBUR
G**  5:9, 20
6:1, 4, 13
**thorough**
470:2
**thoroughly**
382:4
**thought**
20:23, 25
34:25
35:19  45:5
51:18, 22
52:23
72:21  73:2,
7  79:22
90:14
114:22
118:4
189:11
194:20
222:7, 22
224:5
232:17

Confidential - Subject to Protective Order

247:*21*
254:*20, 21*
278:*25*
279:*1, 4, 17*
309:*7*
315:*1*
317:*14*
321:*13*
353:*13, 17*
426:*2*
443:*24*
468:*12*
**thousand-**
**milligram**
202:*4*
**thousands**
29:*5*
262:*22*
480:*13, 14*
**three**   17:*4*
37:*18, 20*
50:*4*  59:*4*
118:*5*
142:*16*
175:*20*
176:*1*
177:*15, 17*
221:*25*
263:*12*
267:*19*
277:*7*
297:*1*
310:*9*
314:*3*
317:*9*
318:*2*
355:*14*
361:*1*
362:*15*
364:*1*
376:*12*
408:*1*
437:*21, 23*
443:*18*

452:*5, 18, 23*
453:*4*
461:*4, 10*
473:*22*
**threshold**
57:*1*
**thresholds**
56:*20*
**time**   13:*6*
18:*1*   19:*7,*
*23*   20:*6*
21:*9, 12*
22:*5, 20*
23:*18, 22*
24:*5*   25:*17*
26:*7, 11, 18*
29:*1*   35:*6,*
*12, 18*   36:*7,*
*14, 18*   38:*21*
39:*11, 21*
41:*20*   45:*5,*
*15, 23*   56:*15*
57:*8*   61:*17*
67:*3*   68:*25*
70:*4, 14*
71:*2, 15*
74:*1, 2*
86:*17*   88:*6,*
*16*   89:*14, 25*
90:*4*   91:*4,*
*21*   106:*16*
107:*22*
108:*1*
112:*18*
114:*6*
117:*19*
121:*22, 23*
122:*1*
124:*15, 20,*
*23, 24*   127:*9*
128:*6*
144:*10, 15*
145:*3, 22*
149:*13, 22*

153:*20, 24*
154:*8, 23, 25*
163:*16*
165:*3, 6*
168:*24*
172:*12*
175:*6*
181:*25*
183:*5*
184:*2, 13*
188:*5*
189:*22*
190:*10, 19,*
*23*   191:*22*
194:*14, 24*
195:*4*
197:*22*
200:*17*
203:*22*
205:*8*
206:*16, 21*
209:*1*
210:*22*
216:*10*
219:*14*
224:*4, 9*
226:*13*
229:*12, 16*
234:*12*
236:*20, 24*
237:*9, 19*
240:*23*
248:*19*
249:*20*
256:*10*
262:*7*
266:*11*
267:*5*
270:*15*
272:*24*
273:*8, 11*
276:*7*
278:*9, 24, 25*
281:*5*

282:*11, 17*
283:*2, 22*
285:*19, 24*
290:*16*
292:*8, 19, 23*
301:*6, 11*
302:*12*
303:*7, 10, 17*
304:*10, 12*
307:*22*
309:*8, 20*
310:*2, 21*
315:*17, 21*
316:*11, 20,*
*25*   321:*19*
324:*17*
330:*18*
342:*13, 25*
343:*11, 24*
347:*3, 7*
348:*16*
349:*21*
351:*17*
352:*14*
360:*24*
361:*13, 15,*
*21*   362:*24*
363:*1*
382:*8*
383:*19*
386:*3*
387:*1, 6*
389:*25*
390:*4*
394:*12, 16*
396:*8*
398:*8, 9, 22*
399:*3, 4, 22*
400:*1, 7, 8*
401:*4*
413:*8, 16*
416:*15*
419:*25*
420:*4*

424:*23*
430:*21*
435:*18*
441:*1*
442:*11*
444:*20, 24*
448:*6*
456:*8, 24*
462:*6, 23, 24*
464:*4*
467:*15*
468:*11*
472:*17*
476:*21, 22*
478:*7, 11, 14*
483:*15, 19*
484:*10*
487:*19*
488:*8*
**timeliness**
177:*9, 14*
**times**   16:*24*
27:*5*   37:*17*
40:*16*
55:*22*
82:*11*
118:*20*
119:*12*
135:*13*
156:*7*
160:*11*
162:*14, 17*
163:*21, 24*
167:*1*
185:*21*
214:*13*
282:*10, 16*
297:*1, 3*
305:*8*
308:*2*
314:*3*
317:*24*
318:*3*
359:*9, 10*

437:*21, 22, 23*  443:*18, 20*  463:*25*
473:*22*
**timing**  12:*1*
69:*17*
207:*16*
**tiny**  206:*3*
**tissue**  186:2
192:*16*
199:7
361:*23*
**tissues**
182:*16*
**title**  246:*13*
422:*23*
**titled**  420:*11*
**tobacco**
163:*3*
**today**  13:*12, 16*  14:*23*
15:*20*  16:*8*
22:*1, 10, 21*
28:*11*
48:*21, 23*
49:*14*  50:7
75:*3*  87:*21*
95:7  98:7
113:*1*
132:*17*
142:*3*
150:*17*
157:*1*
163:5
165:*18*
188:*3*
199:*24*
213:*5, 7*
223:6
228:*17*
230:*15*
232:*22*
242:*19*
243:*2*

254:*23*
266:*4*
267:*11*
273:*12, 14*
275:*5*
276:*4, 5*
285:6
288:*20*
289:*5*
295:*1*
350:*12, 16*
361:*5*
367:*18*
371:*12*
380:*23, 24*
397:*1*
403:*22*
405:*5*
422:*6*
423:*23*
430:*11, 22*
431:*8*
442:*8*
463:*3*  483:*7*
**Today's**
13:*5*
**told**  69:*14, 21, 25*  76:*25*
77:2  86:*24*
87:*4*  89:*3, 8*  95:7
111:*20*
113:*13*
115:*1*
146:*8*
147:2
177:*20, 22*
223:2, *18*
260:*8*
265:*25*
275:*3, 9*
283:*11*
342:*20*
406:*23*

415:*22, 24*
427:*10*
457:*24*
469:*16*
**tomorrow**
60:7
**tool**  305:*4*
306:*12, 16, 17*  307:*5, 17*
309:*15*
310:*15*
320:*23*
**tools**  392:9
**top**  69:*22, 23, 24*  70:2
255:*11*
337:*19*
413:*25*
428:*16*
448:*19*
**topic**  67:6
225:*20*
**Toro-Rodriguez**
291:*10, 11*
**total**  344:*18*
350:*15*
381:2
432:*24*
440:2
**totality**
402:*16*
**toxic**
183:*15*
226:*15*
305:*24, 25*
**toxicant**
91:5  95:*8, 17, 22, 25*
105:*21*
167:*18*
**toxicants**
91:*1*  92:*11*

95:*13, 14*
96:2  447:*3*
**toxicity**
275:*15*

**Toxicological**
170:*10*
**toxicologist**
199:*6, 8*
**Toxicology**
83:9
115:*16, 23*
116:*4*
154:*19*
168:*15*
170:*10*
176:7
182:*11*
317:*11, 17*
434:*20*
446:*24*
**TRACEY**
2:*13, 15*
307:*12*
**train**  90:*21*
**trained**
121:*19*
408:*3*
446:*10, 20, 23, 24*  474:*1*
**training**
90:*20*
124:*17*
251:*21*
446:*12*
**transcript**
34:*24*
301:*17*
426:2
488:7
489:*16, 17*

**transcription**
490:*5*

**transcripts**
31:5
**transmitted**
410:*4*

**transparency**
232:*5*
309:*16*
310:*17, 23*
311:*23*
312:*18*
314:*23*
315:*3*
327:*17*
333:*14, 17*
**transparent**
61:*13*  69:6
305:*3*
306:*14*
307:*1*
309:*24*
319:*19*
327:*21*
328:*12*
333:*10*
334:*19*
**transparently**  141:*13*
**trap**  77:*20*
**trapped**
156:*24*
157:*10*
164:*11*
196:7  249:*4*
**traps**  156:9
195:*25*
206:*16*
**treated**
299:*19*
300:*13*
**Tree**  6:*22*
**trend**  364:*3*
**triaged**

Confidential - Subject to Protective Order

50:25
**TRICIA** 4:3
**tried** 21:14
116:18
170:24
**tries** 258:11
**trigger**
104:23
107:1
**triggered**
124:16
**trimester**
100:17
102:1
155:20
167:10
168:3, 25
197:22
201:20
202:2
247:18, 21
464:3
475:5, 8, 9,
10, 11
**trimesters**
101:24
440:6, 7
452:18
455:19
475:14
**TRINH**
8:11
**Tronnes**
291:12
**true** 64:23
103:9, 14
120:3
124:19
140:7
146:12
167:3
193:10
199:24
237:8

242:21, 23
245:3
251:25
256:2
278:5
302:15
326:23
327:10
333:7, 11
365:4
366:11
377:9
395:13
409:22
433:16
440:19, 23
457:10
479:21
480:11
**trust** 24:8
37:25 38:1
59:14
85:12 436:9
**truth** 13:22,
23 19:18
77:2
104:16
447:19
488:5
**try** 23:7, 10
38:24 39:2
60:25
116:11
136:3
183:23
200:2
251:23
343:21
398:5
**trying**
80:16
84:19
94:25
104:12

126:13
140:4
171:23
252:2
264:9
345:10
347:22
365:15
416:13
419:6
**turn** 111:17
193:23
250:13
255:9, 10
264:20
271:21
280:20
298:4
347:19
359:12
368:8
384:24
389:16
390:15
391:7
421:8
448:15
471:7
**turned**
52:13
182:19
293:6
295:15
**tweet** 9:25
282:2, 7
283:23
285:10, 14,
16, 23, 24
286:22
287:20
290:6, 10
291:4, 23
292:8

**tweeted**
281:25
282:3
285:20
286:7
**tweets**
281:6
285:18, 19
**twice** 95:7
**Twitter**
9:25 281:1
283:8, 13, 14,
17 284:3
287:17, 18
**two** 16:4
17:2 30:2
37:19
40:18 50:3
55:23
56:14, 23
71:21 72:2
77:4 78:4,
10 94:3
104:10
118:5
125:15
128:14
155:24
156:13
175:20
228:12
258:3
259:1
275:24
285:15
297:1, 3
302:23
303:4
327:12
329:19, 20
330:11
344:22
352:24
362:15, 19

363:19
373:14
376:12
400:2
406:17
411:12, 19
427:4, 18, 19
432:13
449:16
452:18
455:18
463:7
474:2, 7, 17,
25 485:13
**Tylenol**
10:1 13:10
19:15
20:23 24:7
87:14
92:10, 16
110:17
111:2, 10, 14
112:8, 14
121:4
141:17
145:18
148:13
161:15
206:5
210:11
218:21
225:5
234:15, 16,
19, 21, 23
235:4, 12
249:1, 3, 4
251:11, 13
267:9
277:20
278:5
409:14, 20
410:5, 9, 16,
19 463:3, 7,
14 468:24

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 469:*1, 6* | 487:*13* | 20  454:*10* | 178:*17* | 351:*9, 14* |
| 471:*1* | | 471:*8, 12* | 182:*23* | 358:*6* |
| **type**  35:*5, 7* | **< U >** | 480:*24* | 183:*19* | 365:*13* |
| 58:*13* | **Uh-huh** | **UK**  72:*13,* | 186:*15* | 369:*18* |
| 78:*18*  93:*5* | 28:*7*  30:*12* | *14*  411:*14* | 187:*24* | 372:*19* |
| 156:*3* | 110:*15* | 412:*2* | 195:*24* | 378:*25* |
| 166:*2* | 111:*19, 23* | **ultimately** | 199:*13* | 381:*22* |
| 182:*14* | 112:*21* | 378:*18* | 203:*5* | 386:*10, 17* |
| 192:*21* | 160:*8* | 379:*23* | 205:*1* | 403:*21* |
| 202:*16, 19* | 162:*10* | **umbrellas** | 208:*19* | 408:*6, 25* |
| 213:*21* | 175:*2* | 422:*20* | 209:*1* | 419:*10* |
| 217:*21* | 179:*23* | **unable** | 212:*6* | 423:*24* |
| 225:*20, 21* | 194:*1, 7* | 403:*4* | 217:*21* | 425:*23* |
| 232:*4* | 196:*18* | 404:*3* | 220:*18* | 433:*18, 22* |
| 258:22 | 211:*3* | 459:*21* | 222:*5* | 442:*3, 13* |
| 267:*7* | 214:*24* | **uncertain** | 225:*9, 18* | 446:*10* |
| 281:*21* | 241:*9* | 36:*13* | 232:*21* | 457:*5* |
| 286:*20* | 245:*23* | **uncommon** | 234:*14* | 461:*23* |
| 312:*7* | 247:*11* | 300:*6* | 239:*25* | 470:*1* |
| 330:*9* | 250:*15* | **underestimat** | 248:*16* | 473:*15* |
| 370:*6* | 255:*12, 20* | **e**  375:*11* | 250:*1* | 478:*1* |
| 402:*12* | 260:*23* | **underestimat** | 259:*5* | 485:*21* |
| 441:*6*  447:*2* | 264:*22, 24* | **ing**  278:*5* | 266:*22* | 487:*5* |
| **types**  93:*6* | 284:*4* | **underpowere** | 269:*3, 24, 25* | **understandin** |
| 391:*20* | 293:*8, 21* | **d**  479:*16, 24* | 273:*19* | **g**  78:*15* |
| 426:*19* | 297:*20* | **understand** | 276:*17* | 119:*14, 18* |
| **typical** | 298:*3, 7, 19* | 34:*7*  35:*7* | 279:*22* | 133:*10* |
| 147:*10* | 301:*2* | 43:*23* | 280:*16* | 162:*8, 25* |
| 233:*9* | 304:*5* | 47:*16* | 282:*16* | 223:*22* |
| 301:*10, 12* | 308:*15* | 55:*20*  62:*2* | 288:*14* | 276:*17* |
| **typically** | 316:*8* | 72:*9, 15* | 290:*23* | 290:*11* |
| 37:*18* | 340:*6* | 74:*17*  77:*3,* | 292:*15* | 371:*11* |
| 38:*22* | 344:*5* | *23*  94:*12* | 296:*7* | **Understood** |
| 66:*15* | 359:*13* | 110:*24* | 318:*1* | 70:*3*  75:*22* |
| 199:*8* | 368:*15* | 111:*1, 4, 25* | 320:*9* | 77:*25* |
| 204:*16* | 372:*24* | 113:*1* | 327:*9* | 120:*9* |
| 212:*13* | 390:*17* | 124:*7* | 331:*14* | 170:*22* |
| 233:*23* | 391:*18* | 125:*10* | 333:*11* | 303:*15* |
| 297:*2* | 403:*17* | 131:*18* | 339:*6* | **undertaken** |
| 319:*8* | 418:*14* | 132:*21* | 341:*16* | 284:*19* |
| 422:*15* | 421:*11* | 143:*22* | 344:*17* | **unexposed** |
| 462:*25* | 428:*12* | 145:*2* | 345:*8* | 219:*4* |
| 464:*1* | 448:*17* | 154:*1, 3* | 347:*24* | 365:*11* |
| | 452:*8, 10, 12,* | 161:*14, 24* | 349:*20* | 396:*19* |

Confidential - Subject to Protective Order

unfortunatel
y  269:23
285:22
350:22
372:3  487:1
unilateral
287:10
unit  81:18
UNITED
1:1  42:23
43:9, 14
62:19
138:22
322:1
units
300:12
432:23
484:20
universe
270:10
272:14
312:8  380:7
University
54:18  57:4
68:17  69:5,
7  72:20
unmeasured
299:2
403:6
404:4
432:4, 7
464:12
unpack
123:6, 7
unplanned
115:25
unpower
479:16
unpublished
80:13
unrelated
22:6
unreliable
260:9

377:13
379:18, 24
381:3  383:3
unsure
88:10
untreated
234:1, 7
235:22
236:11
237:5, 22
Untreating
234:3
unturned
47:7  49:18,
19
unusual
72:2, 18
331:25
333:15
update
56:24
updated
56:16
upset
177:24
179:4
283:5
465:17
usage  9:21
203:25
Use  10:1,
13  12:1, 2, 6,
7  78:19
96:9
101:17
152:18
154:14
161:2
162:25
181:12, 18
182:10
184:22
185:19
186:5

191:12, 22
198:5
207:1
221:5
243:5
252:14
258:15, 21
259:18, 19
260:19
261:18
275:18, 19
279:10
280:22
298:21
301:10, 12
304:15, 16,
23  305:6, 18
306:12
307:20
308:5
309:10
310:1
312:12, 21
314:19
320:22
326:6
327:14
328:1
333:8
336:19
352:3
358:14
372:17, 18
375:2, 19
379:12
394:13, 18,
22  395:2
396:7
401:1
411:25
412:3
416:12
418:10
429:18

431:20
432:9, 17
437:20
439:5, 7, 13
440:15
443:16
454:8
455:16, 18
457:19
458:10
460:8
462:3
463:1, 18, 24
464:4
users  442:21
uses  171:12
204:12
361:17
386:15
usual
304:22
usually
41:23
62:25
72:18  99:4
147:11
171:10
203:17
220:19
233:10
266:24
269:3
296:25
297:3
306:22
309:10
319:11
334:7, 13
387:15
435:18
Utero  9:18
11:13
39:24  45:7
119:6

120:12
122:25
127:14
128:8
129:10
253:12
424:5
utilized
41:10
158:13
304:3
306:3
309:2
311:3, 15, 16
utilizing
41:9

< V >
valid
183:15
195:15
203:9
217:22
218:6, 25
219:14
224:21
464:20
validated
265:14
validity
218:23
valproic
241:17
valuable
358:2
value  276:9
474:9
valued
144:10
Vanderbilt
5:8
variables
369:20, 22
370:2

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 371:*24* | **view** 32:*19* | **want** 14:*9* | 227:*17* | 468:*14* |
| 372:*1* | 437:*3* 471:*5* | 16:*13* 22:*3,* | 228:2, *23* | 469:*20* |
| 461:*25* | **views** 116:*5* | *12, 18* 24:*17* | 230:*18* | 470:2 |
| **variety** | 211:*1* | 26:2 27:*10* | 231:*1* | 474:8 |
| 392:*9* | 436:*18* | 32:5 33:6 | 245:*12* | 475:*17* |
| **vary** 375:*4,* | **VINH** 5:2 | 35:*3* 46:22 | 251:*12, 13,* | 477:*10, 14* |
| *20* | **violated** | 56:*19* 57:*6,* | *17, 20* 262:8 | 478:*9* |
| **verbally** | 27:5 | *9* 58:25 | 263:*11* | **wanted** |
| 71:*4* | **virtual** | 59:*4, 23* | 264:*13* | 35:*20* 47:7 |
| **verbatim** | 317:8 | 60:8, *9* | 266:*11* | 69:*12, 13* |
| 488:7 | **visit** 317:8 | 68:*1* 77:*1* | 273:20 | 72:23 77:*3,* |
| **verify** 85:*10* | **Vlenterie** | 78:*10, 14* | 278:*14* | *24* 78:*1, 2, 9* |
| 242:22 | 265:5 | 82:5 85:*3,* | 283:*11, 21* | 86:8, *9, 23* |
| **versa** | 276:*24* | *12* 89:*18* | 289:8, *17* | 87:*1* 88:*21* |
| 329:*24* | 291:6 | 92:*14* 98:*5,* | 290:*19* | 146:2 |
| **version** | **volume** | *19* 102:*3, 8,* | 303:*13, 25* | 147:8 |
| 10:*21* | 206:22 | *11* 106:*3* | 307:22 | 148:5 |
| 58:23 | **vouch** | 113:6 | 313:*10* | 159:*15, 16* |
| 354:*11, 16* | 450:*13* | 124:7 | 315:6, *25* | 189:*11* |
| **versus** | **vulnerable** | 132:*1* | 320:*18* | 223:*17, 21,* |
| 168:*24* | 102:*18* | 135:*14, 17* | 323:8 | *25* 238:5 |
| 201:*14* | 105:*19* | 154:*13* | 327:22 | 239:*16* |
| 363:*18* | 397:*11* | 156:*12* | 332:*10* | 251:*15, 16* |
| **vice** 329:*24* | | 161:*24* | 339:*24* | 280:*17* |
| **video** 13:7 | **< W >** | 167:*19* | 341:*24* | 302:*10* |
| **VIDEOGRA** | | 172:*16, 23* | 342:*4, 6, 14* | 303:*11, 15* |
| **PHER** 13:*1,* | **WAGSTAFF** | 173:*9* | 343:*13* | 315:*1* |
| *3* 26:7, *11* | 3:*17* | 177:23 | 346:*13, 17* | 346:*15* |
| 107:22 | **Wait** 343:*16* | 185:*9* | 353:*1, 3* | 383:9 |
| 108:*1* | **waited** | 186:22 | 358:*1, 17* | 406:*15* |
| 190:*13, 19,* | 379:6 | 187:*25* | 364:*10* | 407:*17* |
| *23* 229:*12,* | **waiting** | 188:*24* | 369:*17* | 420:*1* |
| *16* 231:*11* | 386:*21* | 189:*17* | 370:*19* | 476:*3* |
| 292:*19, 23* | **waived** 15:*1* | 190:*13* | 385:5 | 485:*11* |
| 347:*3, 7* | **wake** 282:*3* | 194:2 | 389:*18* | **wants** 57:*1* |
| 389:*25* | **Walgreen** | 199:*21* | 401:*20* | 74:*13* |
| 390:*4* | 6:*10* | 202:*10, 11* | 405:2, *14* | 145:6 |
| 444:*20, 24* | **Walgreens** | 203:*13* | 423:*24* | 199:7 |
| 476:23 | 6:*10* | 204:*21* | 424:*20* | 346:*11* |
| 478:*9, 14* | **Walmart** | 207:*13, 24* | 426:*1* | **ward** 258:2 |
| 483:*15, 19* | 7:9 | 210:*17, 19,* | 444:*11* | **warning** |
| 487:*19* | **Wal-Mart** | *21* 212:*24* | 454:*25* | 79:*10* |
| **Videotaped** | 7:*10* | 213:*11* | 455:*1* | **warranted** |
| 1:*11* | | 217:*14* | 457:*12* | |

269:*17*
wash 460:*10*
Washington
  5:*22* 6:*15*
  7:*8* 316:*18*
waste 22:*5*
wasted
  343:*23*
wasting
  315:*20*
  343:*11*
water
  197:*13*
Watt 5:*2*
WATTS
  3:*1, 3, 4*
wave 44:*11*
way 16:*22*
  18:*8* 20:*10,*
  *19* 30:*8*
  40:*4, 14*
  60:*12* 69:*1*
  70:*6* 96:*18,*
  *19* 98:*22*
  99:*19*
  102:*3*
  135:*24*
  140:*19*
  141:*6, 12*
  143:*8*
  144:*25*
  150:*1*
  155:*9*
  160:*22*
  161:*20*
  182:*16*
  193:*4*
  197:*4*
  199:*1*
  201:*11*
  202:*25*
  234:*12*
  243:*4*
  244:*1, 7*

256:*18*
287:*17*
308:*24*
310:*5, 16*
312:*19*
314:*2*
315:*8, 12*
320:*13*
323:*9, 13*
325:*1*
326:*17, 18*
327:*19*
334:*17*
335:*1, 2*
352:*24*
361:*15*
371:*23*
396:*12, 13*
407:*18*
411:*17*
412:*6*
425:*11*
428:*21*
436:*11*
440:*10, 14*
441:*3*
442:*13*
456:*8*
461:*1, 2*
466:*18*
469:*8*
487:*7, 8, 14*
ways
  160:*20*
  287:*19*
  310:*11*
  369:*21*
  384:*2*
  392:*5, 6*
weak
  278:*24*
  412:*23*
  416:*21*
  433:*4*

weaker
382:*21*
weakness
  223:*11, 15*
weaknesses
  289:*8*
  290:*19, 24*
  291:*1* 292:*2*
wealth
  440:*9*
website
  241:*20*
  336:*4, 6, 8*
week 100:*4*
  281:*15*
  284:*9* 287:*3*
weeks 16:*4*
  55:*23*
  56:*14, 23*
  59:*4* 63:*22*
  99:*3, 20, 21*
  100:*15, 22*
  153:*7*
  191:*23*
  397:*12*
  451:*16*
  464:*1, 2*
weighed
  371:*22*
weight
  130:*7*
  422:*2*
  423:*2*
  425:*14, 15*
  482:*6, 9*
weighted
  157:*13, 18*
weighting
  370:*8*
  371:*20*
  461:*20*
weights
  372:*5, 7, 8*

462:*3, 4*
weird 71:*20*
welcome
  108:*6*
  229:*20*
  293:*2*
  390:*9*
  445:*6*
  469:*22*
well 19:*4*
  31:*22*
  33:*14*
  60:*14*
  62:*24* 63:*2*
  64:*17*
  67:*20* 69:*1*
  72:*9* 73:*7*
  79:*24*
  90:*15*
  91:*19*
  106:*8*
  111:*17*
  112:*17*
  113:*15*
  135:*15*
  139:*13, 25*
  142:*11*
  146:*8*
  171:*6, 17*
  172:*1*
  173:*13*
  174:*13*
  187:*17*
  237:*17*
  238:*11*
  249:*5*
  250:*1*
  269:*8*
  282:*23*
  286:*16*
  292:*15*
  307:*12*
  319:*22*
  321:*18*

327:*10*
337:*23*
339:*16*
354:*10*
355:*6*
363:*21*
370:*25*
373:*12, 14*
378:*4*
385:*4*
401:*21*
408:*23*
414:*20*
424:*1*
426:*22*
429:*7*
430:*11*
437:*17*
439:*4*
440:*13*
443:*4, 6, 14*
444:*8*
448:*11*
453:*24*
457:*1*
460:*15*
467:*16*
473:*10*
476:*17*
477:*2, 22*
482:*11*
well-
accepted
  154:*16*
  168:*15*
  185:*13*
well-
behaved
  342:*9*
well-crafted
  73:*6*
well-
delineated
  132:*24*

Confidential - Subject to Protective Order

**well-documented**
73:6
**well-established**
105:20
202:18
206:18
**well-informed**
90:6
**well-known**
68:19
107:14
184:16
185:18
**well-powered**
479:8
**well-presented**
225:16
**well-qualified**
62:2
**well-represented**
226:10
**went**  20:10
50:24
81:23
115:19
258:23
275:8
281:1
290:7
397:12
429:14
485:4
486:6
487:11
**we're**  21:25
22:9  25:20
43:12

67:10  79:3,
9  80:4
133:10
161:17
180:11
183:19
188:23
190:16
194:22
210:22
222:11
238:12
243:2
246:2
249:2
253:21
260:20
262:14
264:16
267:4
284:13
289:14
293:17
335:24
346:25
363:18
396:2
450:24
476:21, 23
483:20
**West**  6:21
7:14  70:20
**we've**  106:1
135:6
284:12
289:18
**whatsoever**
256:25
257:2
275:15
404:16
409:23
417:12

464:24
466:17
**When's**
175:6
**Wholesale**
6:16
**wide**  248:8
**widespread**
429:17
**WILLIAM**
5:1
**willing**
146:25
**window**
91:11
93:22
103:1, 9, 18,
24  104:22
105:15
106:25
107:7, 10
248:8, 10
249:3
476:12
**windows**
105:16
**WISC-IV**
265:13
**wish**  118:1
180:23
196:4
245:17
262:20
270:4
**wisterniles**
377:3
**withhold**
350:8
**witness**
13:18
15:10, 14
18:24  20:6
23:7  24:19
26:19  28:1

35:18  40:4
42:7  44:8
45:11
46:17, 20, 24
49:4  50:13
52:10, 21
53:13  55:1,
10, 21  57:22
58:11
59:12  61:9
64:10
65:18
73:14
74:18
75:13
76:10
77:13  80:8
84:12
87:17
88:10  89:7
90:11, 14
91:9  92:1
93:19  94:7,
24  95:21
97:15  98:4
100:10
101:7, 22
104:5, 10
107:6
108:4
110:21
112:10
113:6
115:1
116:8, 17
117:7
118:1
119:11
120:18, 25
123:6
124:14
125:9
126:19, 22
127:1, 18

128:13
129:15
131:18
132:13
133:16, 24
134:8
135:19
136:10
137:11
139:5
140:7
142:8, 15
144:9
148:2
149:16
158:7
160:2, 15
163:12
164:5
165:23
166:7, 22
168:7
169:7
172:25
173:22
178:17
180:9
182:4
183:9
184:7
185:9
188:9
207:11
209:12
211:24
226:21
231:13
235:18
236:17
238:3
243:11
244:18
245:2, 10
252:7

Confidential - Subject to Protective Order

255:*3, 24*
261:*21*
262:*1*
263:22
264:*13*
268:*16, 18*
274:*7, 21*
276:*16*
278:*14*
280:6
281:*13*
282:*15*
291:*16*
292:*11*
305:*16*
307:*10*
308:*18*
311:7
314:*14*
318:*11, 19*
321:*13*
322:*14*
328:*5, 24*
329:*19*
332:*24*
334:6
335:*13*
336:*24*
337:*18*
338:*6, 21*
339:*5, 19*
340:*12, 23*
341:*15, 23*
342:*19, 23*
343:*18*
344:*11*
346:*17, 24*
353:6
358:*14*
360:6
366:*24*
371:9
376:2
377:*16*

378:*21*
381:8
383:*15*
385:*14*
387:25
389:*3, 20*
397:7
398:*13*
399:9
401:25
404:8
408:*16*
411:*2, 11*
414:25
418:*24*
419:*23*
422:*13*
424:*18*
426:9
429:25
431:7
434:*5, 15*
435:*12*
436:4
438:*4, 16*
440:*19, 23*
442:*7, 25*
443:*11*
444:2
446:*8, 20*
447:*16*
455:*23*
458:*13*
466:8
467:*1, 4, 8*
470:9
472:*21*
474:*16*
475:*23*
478:*3*
480:6
481:*5, 23*
482:*18*
489:*1*

**woken**
282:5
**woman**
96:*20*
102:*4*
196:*14*
197:*20*
200:*5, 15*
201:*6, 20*
202:*1*
236:*12*
244:*15, 22*
258:*17*
399:2
401:*12*
402:*20*
**womb**  91:*13*
**women**
19:*16*
98:25
101:*11, 16*
102:*17*
121:6
158:*21, 24*
159:*3, 5, 6, 10*  160:*23*
161:*2, 15, 25*
162:25
183:*12*
195:7
196:*23, 25*
200:*24*
201:*3*
202:*17, 21*
210:*10, 12*
217:5
218:*1, 12*
219:*2, 9, 23*
220:*4, 9, 19, 22, 24*
221:*14, 18, 21*  222:*1, 2, 6, 8*  223:8
227:*19*

234:*15, 16, 18, 20*  235:2
237:*13, 14*
248:25
249:2
256:*23*
257:5
258:8
259:*1*
269:*13*
277:*19*
301:*11, 12*
339:*13*
394:*19*
395:*1, 14*
398:*20*
399:*12, 14, 24*  400:*6, 7*
409:*17*
410:*8, 14*
412:*11*
416:*18*
417:*20, 21, 23*  437:*20*
438:*23*
441:5
442:*20*
443:*16*
460:*22*
461:*9, 12, 23*
462:*10*
463:*17*
468:*21*
469:2
470:*23*
471:*1*
**wonderful**
150:*1*
416:*14*
**wondering**
449:*15*
**Woodland**
8:8

**Woodruff**
307:*13*
316:*7, 10, 11, 21, 23, 24*
317:*3, 5, 6, 8, 20*  318:6
**Woodruff's**
324:*17*
**word**  274:2
314:*17*
341:*16*
359:*15*
404:2
**worded**
262:*19*
**words**  36:6
38:*13*  69:3
78:*19*
244:22
249:*10, 14*
262:*4*
265:24
269:8
288:*4*
289:*10*
313:*13*
314:*10*
359:*18*
360:*4, 13*
361:*10*
376:22
393:*19*
418:*15*
421:*20*
424:*11*
**work**  17:22
18:*16*  19:*1*
35:*5, 6*
40:*10*  46:9
47:*2, 18*
54:*6, 9*
55:2  57:16
58:*5, 7, 17*
70:*24*  81:*2,*

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| *11* 83:*20* | 223:*13, 23* | 275:*9* | **worth** 20:*9* | 65:*11* |
| 88:*13* 90:*5* | 230:*3* | 356:*18* | 168:*10* | 123:*17* |
| 121:*11* | 231:*24* | 423:*25* | 249:*19* | 144:*1* |
| 124:*24* | 242:*25* | 470:*17* | 270:*2* | 267:*12* |
| 130:*4* | 254:*14* | 471:*2* | 302:*19* | 282:*9, 10* |
| 132:*20* | 295:*7* | **worried** | 386:*22* | 320:*12* |
| 138:*23* | 305:*16* | 134:*15* | **write** 65:*3* | 328:*20* |
| 140:*3* | 318:*13* | 139:*12* | 73:*7* 78:*6* | 329:*4, 10* |
| 145:*1* | 323:*7* | 159:*12, 16,* | 139:*6* | 335:*17* |
| 150:*23* | 331:*21* | *18, 19* 199:*8,* | 251:*16* | 352:*13* |
| 151:*1* | 392:*15* | *10, 19* | 269:*4* | 363:*17* |
| 156:*18* | 408:*1* | 244:*24* | 274:*14* | 369:*14* |
| 177:*6* | **working** | 380:*10* | 278:*18, 20* | 372:*21* |
| 178:*5* | 40:*9* 57:*22* | 381:*24* | 287:*18* | 385:*3* |
| 179:*5, 7* | 58:*21* 60:*6* | 395:*8, 9* | 361:*4* | 391:*8* |
| 205:*4* | 63:*22* 76:*5,* | 405:*9* | 392:*22* | 415:*17* |
| 230:*1* | *21* 77:*8, 14* | 415:*18, 23* | 410:*25* | 432:*12* |
| 231:*25* | 80:*11* | 416:*3* | 425:*17* | 486:*10* |
| 232:*6, 13, 15,* | 82:*13* | 418:*11* | 430:*15* | **wrote** 40:*15,* |
| *16* 242:*19* | 86:*15, 24, 25* | 456:*23* | 461:*14* | *20* 66:*21* |
| 244:*2, 14* | 87:*10* 88:*1* | 457:*1* | **writes** | 91:*9* 94:*9* |
| 293:*9* | 111:*21* | 466:*12* | 66:*16* | 95:*2* |
| 294:*7* | 114:*8, 14, 16,* | **worries** | 411:*3* | 129:*24* |
| 306:*2* | *19* 115:*6, 10* | 178:*22* | 437:*10* | 239:*1* |
| 307:*14* | 124:*15* | **worry** | **writing** | 243:*18* |
| 309:*3, 21* | 145:*23* | 127:*7* | 80:*21, 23* | 252:*8* |
| 317:*10, 16* | 223:*19* | 177:*21, 22* | 407:*6* | 267:*5, 19* |
| 323:*6* | 294:*3, 22* | 178:*11, 18,* | 449:*2, 5* | 274:*12* |
| 324:*21* | 309:*23* | *21, 24* 179:*4* | 482:*12* | 277:*22* |
| 325:*8* | 316:*15* | 184:*21* | **written** | 282:*16, 20* |
| 333:*9* | 406:*14, 24* | 240:*24, 25* | 15:*20* | 285:*25* |
| 356:*15* | 434:*17, 21* | 242:*21* | 142:*15* | 287:*14* |
| 392:*13, 18* | 435:*4* | 312:*6* | 248:*5* | 289:*6* |
| 407:*5* | **works** | 321:*7* | 267:*13* | 290:*18* |
| 424:*20* | 58:*14* | 322:*21* | 275:*5* | 302:*12, 15* |
| 446:*13* | 68:*22* | 335:*24* | 287:*5, 7* | 303:*8* |
| 447:*1, 7* | 80:*13* | 354:*4* | 361:*3* | 307:*14* |
| 449:*9* 470:*3* | 81:*15* | 474:*9* | 367:*21* | 325:*5* |
| **worked** | 135:*25* | 476:*11* | 383:*23* | 375:*14* |
| 47:*8* 65:*25* | 355:*17* | **worrying** | 422:*14* | 397:*16* |
| 109:*18* | **world** 34:*1* | 413:*10* | 424:*22* | 398:*14, 23* |
| 138:*16* | 64:*12* | **worst-case** | 425:*20* | 407:*19* |
| 141:*8* | 172:*11* | 242:*17, 20,* | **wrong** 21:*1* | 411:*17* |
| 217:*8* | 187:*10* | *25* | 61:*15, 17* | 415:*9* |

Confidential - Subject to Protective Order

421:*14*
430:*20*
433:*20*

**< X >**
**Xenobiotics**
300:*24*
301:*21*
**X-rays**
96:*19*

**< Y >**
**Yale**  68:*22*
69:*15*  70:*1*
**Yeah**  17:*25*
30:*3*  39:*17*
46:*20*
52:*24*  53:*7,
22*  56:*23*
71:*13*
73:*22*  76:*4,
11*  86:*14*
99:*13*
106:*18*
109:*17*
122:*15*
136:*2*
144:*14*
152:*1, 13*
159:*17*
162:*7*
170:*18*
179:*25*
180:*3*
190:*15*
193:*21*
196:*20*
214:*19*
216:*5*
225:*24*
227:*17*
246:*9*
247:*3, 14*
253:*8*

259:*25*
260:*19*
264:*7*
268:*8, 17*
272:*8*
273:*22*
277:*6*
281:*4*
284:*25*
285:*7*
286:*16*
288:*9, 22*
290:*5*
293:*16*
295:*12, 14,
16*  298:*19*
301:*7*
305:*6, 12*
313:*21*
321:*23*
322:*4, 5*
330:*18*
338:*10*
346:*16*
347:*18, 21*
351:*15*
352:*19*
353:*2, 9, 23*
354:*21*
355:*3*
359:*21*
362:*11*
370:*9*
373:*25*
385:*10, 13,
14*  388:*23*
389:*3, 8, 12,
24*  390:*14,
25*  391:*25*
400:*17*
406:*10*
413:*7*
431:*25*
432:*12*

449:*11*
451:*8*
454:*1, 12*
458:*24*
459:*10*
465:*5*
467:*1, 9*
472:*5*
473:*2, 3*
477:*23*
484:*6*
487:*4, 15*
**year**  39:*15,
16*  41:*19*
53:*11*  76:*3*
83:*9*  86:*13*
119:*15, 22*
132:*25*
173:*22*
283:*22*
406:*12*
462:*17*
463:*14*
**years**  41:*17*
42:*25*  43:*9,
16*  44:*13*
70:*8*  118:*5*
133:*8*
142:*16*
149:*25*
150:*3, 4*
154:*19*
157:*2, 4*
162:*21*
185:*14*
217:*11*
226:*1*
267:*19*
270:*2*
277:*7, 8*
308:*3*
316:*12*
317:*9, 12*
339:*14*

344:*15*
349:*4*
361:*1, 2*
376:*12*
397:*13*
400:*2*
408:*1*
461:*4, 10*
471:*14, 18,
20, 23, 25*
**Yep**  40:*25*
107:*21*
145:*20*
179:*21*
214:*21*
267:*23*
287:*1, 4*
374:*21*
391:*15*
**yes/no**
358:*4*
432:*24*
**yesterday**
222:*22*
463:*7*
**YORK**  1:*1,
14*  2:*24*
3:*13*  6:*8,
21*  7:*3, 15*
8:*3*  13:*9*
70:*19*
197:*13*
**young**  373:*6*
**Ystrom**
130:*9*
265:*5*
276:*24*
291:*6*

**< Z >**
**zero**  59:*16,
25*  213:*11*
273:*25*
412:*17, 18*

**Zeyan**
67:*19, 20*
68:*12*  73:*4,
7*  405:*7*
**ZOOM**  2:*5,
6, 7, 8, 9, 15,
20, 22*  3:*3,
11, 12, 17, 23*
4:*3, 8, 14, 15,
21*  5:*1, 2, 7,
15, 20*  6:*1, 7,
13, 19, 20*
7:*1, 7, 12, 13,
18*  8:*1, 6, 11,
16*