# Exhibit 25

Confidential - Subject to Protective Order

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2

 3     IN RE: ACETAMINOPHEN -     ) MDL No. 3043
       ASD-ADHD PRODUCTS          )
 4     LIABILITY LITIGATION       ) Case No.
       _____   ) 1:22-md-03043-DLC
 5     THIS DOCUMENT RELATES TO: )
                                  ) JUDGE DENISE
 6     All Cases, 1:22-md-03043   ) COTE

 7

               WEDNESDAY, SEPTEMBER 6, 2023
 8
       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
 9
                         - - -
10

11           Videotaped deposition of Jennifer

12     Pinto-Martin, Ph.D., MPH, held at the offices

13     of Barnes & Thornburg, 1717 Arch Street,

14     Suite 4900, Philadelphia, Pennsylvania,

15     commencing at 8:42 a.m. Eastern, on the above

16     date, before Carrie A. Campbell, Registered

17     Diplomate Reporter, Certified Realtime

18     Reporter, Illinois, California & Texas

19     Certified Shorthand Reporter, Missouri,

20     Kansas, Louisiana & New Jersey Certified

21     Court Reporter.

22                       - - -
               GOLKOW LITIGATION SERVICES
23                  877.370.DEPS
                 deps@golkow.com
24

25
```

Page 2

```
 1      A P P E A R A N C E S :
 2
 3   KELLER POSTMAN LLC
     BY:  JJ SNIDOW
 4       jj.snidow@kellerpostman.com
         ASHLEY BARRIERE
 5       ashley.barriere@kellerpostman.com
         REBECCA C. KING       (VIA ZOOM)
 6       rebecca.king@kellerpostman.com
         ASHLEY C. KELLER      (VIA ZOOM)
 7       ashley.keller@kellerpostman.com
         AMANDA HUNT           (VIA ZOOM)
 8       amanda.hunt@kellerpostman.com
         ROSIE ROMANO          (VIA ZOOM)
 9       rosie.romano@kellerpostman.com
         LAUREN SCHULTZ        (VIA ZOOM)
10       lauren.schultz@kellerpostman.com
     150 North Riverside Plaza, Suite 4100
11   Chicago, Illinois  60606
     (312) 741-5220
12
13   and
14
     THE LANIER LAW FIRM, PLLC
15   BY:  EVAN M. JANUSH       (VIA ZOOM)
         evan.janush@lanierlawfirm.com
16       CATHERINE HEACOX
         catherine.heacox@lanierlawfirm.com
17   126 East 56th Street, 6th Floor
     New York, New York  11758
18   (212) 421-2800
19
20   and
21   TRACEY & FOX
     BY:  SEAN P. TRACEY       (VIA ZOOM)
22       stracey@traceylawfirm.com
         LAWRENCE TRACEY       (VIA ZOOM)
23       ltracey@traceylawfirm.com
     440 Louisiana Street, Suite 1901
24   Houston, Texas  77002
     (713) 495-2333
25
```

Page 3

```
 1   and
 2
 3   WATTS GUERRA LLC
     BY:  MIKAL C. WATTS
 4       mcwatts@wattsguerra.com
         HAILEY WATTS
 5       hwatts@wattsguerra.com
         RUSS ABNEY
 6       rabney@wattsguerra.com
         JOHN CRACKEN          (VIA ZOOM)
 7       jcracken@wattsguerra.com
         SHELLY SANFORD        (VIA ZOOM)
 8       ssanford@wattsguerra.com
     Millennium Park Plaza RFO
 9   Suite 410, C112
     Guaynabo, Puerto Rico  00966
10   (210) 447-0500
11
12
     HOLWELL SHUSTER & GOLDBERG LLP
13   BY:  DANIEL M. SULLIVAN    (VIA ZOOM)
         dsullivan@hsgllp.com
14       EILEEN MONAGHAN DELUCIA  (VIA ZOOM)
         edelucia@hsgllp.com
15   425 Lexington Avenue
     New York, New York  10017
16   (646) 837-5151
17
18   and
19   WAGSTAFF & CARTMELL
     BY:  LINDSEY SCARCELLO     (VIA ZOOM)
20       lscarcello@wcllp.com
     4740 Grand Avenue, Suite 300
21   Kansas City, Missouri  64112
     (816) 701-1100
22
23   and
24
25
```

Page 4

```
 1   KRAUSE & KINSMAN
     BY:  TRICIA CAMPBELL       (VIA ZOOM)
 2       tcampbell@krauseandkinsman.com
     4717 Grand Avenue, Suite 300
 3   Kansas City, Missouri  64112
     (816) 200-2900
 4
 5   and
 6
 7   BEASLEY, ALLEN, CROW, METHVIN,
     PORTIS & MILES
 8   BY:  W. ROGER SMITH III   (VIA ZOOM)
         roger.smith@beasleyallen.com
 9       RYAN DUPLECHIN        (VIA ZOOM)
         ryann.duplechin@beasleyallen.com
10       MARY RAYBON           (VIA ZOOM)
         mary.raybon@beasleyallen.com
11   218 Commerce Street
     Montgomery, Alabama  36104
12   (800) 898-2034
13
14   and
15   KERSHAW TALLEY BARLOW
     BY:  WILLIAM J. LEE        (VIA ZOOM)
16       VINH T. LE            (VIA ZOOM)
     401 Watt Avenue, Suite
17   Sacramento, California  95864-7273
     (916) 520-6639
18
19   and
20   COOPER LAW PARTNERS
     BY:  J. DAVIS COOPER       (VIA ZOOM)
21       davis@cooperlawpartners.com
     999 Vanderbilt Beach Road, Suite 200
22   Naples, Florida  34108
     (800) 872-3500
23
24   and
25
```

Page 5

```
 1   TORHOERMAN LAW LLC
     BY:  ERIC CRACKEN         (VIA ZOOM)
 2       ecracken@thlawyer.com
     227 West Monroe Street, Suite 2650
 3   Chicago, Illinois 60606
     (312) 372-4800
 4
 5   and
 6
 7   LUFF LAW FIRM PLLC
     BY:  PATRICK LUFF          (VIA ZOOM)
 8       patrick@lufflaw.com
     10440 N. Central Expressway, Suite 950
 9   Dallas, Texas  75231
     (844) 636-7459
10
11   and
12   COOPER & KIRK PLLC
13   BY:  JOSEPH O. MASTERMAN   (VIA ZOOM)
         jmasterman@cooperkirk.com
14   523 New Hampshire Avenue NW
     Washington, DC  20036
15   (202) 270-9600
16   Counsel for Plaintiffs
17   BARNES & THORNBURG LLP
18   BY:  JAMES F. MURDICA
         jmurdica@btlaw.com
19       SARAH E. JOHNSTON     (VIA ZOOM)
         sjohnston@btlaw.com
20       MITCHELL CHARCHALIS
         mcharchalis@btlaw.com
21       KRISTEN RICHER        (VIA ZOOM)
         kricher@btlaw.com
22   2029 Century Park East, Suite 300
     Los Angeles, California  90067-2904
23   (310) 284-3880
24
25   and
```

Confidential - Subject to Protective Order

Page 6

```
 1  BARNES & THORNBURG LLP
 2  BY: DEANNA LEE          (VIA ZOOM)
       dlee@btlaw.com
 3     PAUL QUINCY          (VIA ZOOM)
       pquincy@btlaw.com
 4  555 12th Street N.W., Suite 1200
    Washington, DC 20004-1275
 5  (202) 289-1313

 6  and

 7  BARNES & THORNBURG LLP
 8  BY: JESSICA BRENNAN      (VIA ZOOM)
       jessica.brennan@btlaw.com
 9  67 East Park Place, Suite 500
    Morristown, New Jersey 07960
10  (973) 775-6101

11  and

12
13  BARNES & THORNBURG LLP
14  BY: WILLIAM E. PADGETT   (VIA ZOOM)
       william.padgett@btlaw.com
15  11 South Meridian Street
    Indianapolis, Indiana 46204
16  (317) 236-1313

17  and

18
19  BUTLER SNOW
    BY: DAVID M. COHEN       (VIA ZOOM)
20     david.cohen@butlersnow.com
       RAQUEL LUCAS          (VIA ZOOM)
21     raquel.lucas@butlersnow.com
    810 7th Avenue, Suite 1105
22  New York, New York 10019
    (646) 606-2996
23  Counsel for Johnson & Johnson
    Consumer, Inc.
24
25
```

Page 7

```
 1  BARNES & THORNBURG LLP
 2  BY: NADINE KOHANE        (VIA ZOOM)
       nkohane@btlaw.com
 3  390 Madison Avenue, 12th Floor
    New York, New York 10017
 4  (646) 746-2000
    Counsel for CVS Pharmacy, Inc., CVS
 5  Health Corporation, Walgreen Co.,
    Walgreens Co., and Walgreens Boots
 6  Alliance, Inc.

 7
 8  BARNES & THORNBURG LLP
    BY: SANDRA M. KO
 9     sko@btlaw.com
    555 12th Street N.W., Suite 1200
10  Washington, DC 20004-1275
    (202) 289-1313
11  Counsel for Costco Wholesale
    Corporation
12
13  KING & SPALDING LLP
14  BY: EVA CANAAN           (VIA ZOOM)
       ecanaan@kslaw.com
15  1185 Avenue of the Americas
    New York, New York 10036
16  (212) 556-2100

17  and

18
19  KING & SPALDING LLP
    BY: JENNIFER STEWART     (VIA ZOOM)
20     jstewart@kslaw.com
    50 California Street, Suite 3300
21  San Francisco, California 94111
    (415) 318-1200
22  Counsel for Walmart Inc., and
    Wal-Mart Stores, Inc.
23
24
25
```

Page 8

```
 1  MORRISON & FOERSTER LLP
 2  BY: LYNDSEY CAIN         (VIA ZOOM)
       lcain@mofo.com
 3  250 West 55th Street
    New York, New York 10019-9601
 4  (212) 468-8000
    Counsel for Target Corporation
 5
 6  DUANE MORRIS LLP
 7  BY: ANNE A. GRUNER       (VIA ZOOM)
       agruner@duanemorris.com
 8  30 South 17th Street
    Philadelphia, Pennsylvania 19103
 9  (215) 979-1000
    Counsel for Dollar General, Dollar
10  General Corporation

11
12  SMITH SOVIK KENDRICK & SUGNET
    BY: DAVID M. KATZ        (VIA ZOOM)
13     dkatz@smithsovik.com
    250 South Clinton Street, Suite 600
14  Syracuse, New York 13202
    (315) 474-2911
15  Counsel for Rite Aid

16
17  STONE DEAN LLP
    BY: JOSEPH A. LARA       (VIA ZOOM)
18     jlara@stonedeanlaw.com
    21052 Oxnard Street
19  Woodland Hills, California 91367
    (818) 999-2232
20  Counsel for The Kroger Co.

21
22  HAIGHT BROWN & BONESTEEL LLP
    BY: KATIE M. TRINH       (VIA ZOOM)
23     ktrinh@hbblaw.com
    555 South Flower Street, 55th Floor
24  Los Angeles, California 90071
    (213) 542-8000
25  Counsel for Big Lots Stores-PNS, LLC
```

Page 9

```
 1  ALSO PRESENT:
 2     MICHAEL KAUFFMANN, trial technician,
 3  Precision Trial Solutions

 4
 5  V I D E O G R A P H E R :
       BRIAN MCGEE,
 6     Golkow Litigation Services
             - - -
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 10

INDEX

PAGE

APPEARANCES.................................  2

EXAMINATIONS

BY MR. SNIDOW..............................  16

BY MR. MURDICA............................ 554

BY MR. SNIDOW............................. 563


EXHIBITS

No.   Description                    Page

600   Rule 26(a)(2) Expert Disclosure    16
      of Jennifer A. Pinto-Martin,
      Ph.D., MPH

601   NOT MARKED

602   "Autism Spectrum Disorders,"       85
      Levy, et al.

603   Medline Plus, "What is             96
      heritability?"

604   NOT MARKED

605   Reference Manual on Scientific    102
      Evidence," Third Edition

606   "Priorities for autism spectrum   107
      disorder risk communication and
      ethics," Yudell

607   "Association of Maternal          157
      Neurodevelopmental Risk Alleles
      with Early-Life Exposures,"
      Leppart, et al.

608   Past Winners - Rising Star, SPER  186
      Awards

Page 11

609   "Fetal programming of mental      215
      health by acetaminophen: Response
      to the SMFM statement: Prenatal
      acetaminophen use and ADHD,"
      Olsen & Liew

610   "Association of maternal prenatal  228
      acetaminophen use with the risk
      of attention-
      deficit/hyperactivity disorder in
      offspring: A meta-analysis," Gou,
      et al.

611   "Association of Acetaminophen Use  233
      During Pregnancy With Behavioral
      Problems in Childhood Evidence
      Against Confounding,"
      Stergiakouli, et al.

612   "Prenatal and postnatal exposure   236
      to acetaminophen in relation to
      autism spectrum and
      attention-deficit and
      hyperactivity symptoms in
      childhood: Meta-analysis in six
      European population-based
      cohorts," Alemany, et al.

613   Briggs Drugs in Pregnancy and     247
      Lactation, Twelfth Edition

614   Nature, August 30, 1958, Letters  297
      to the Editor

615   "In utero acetaminophen exposure   319
      and child neurodevelopmental
      outcomes: Systematic review and
      meta-analysis," Ricci, et al.

617   "Smoking and Health, Report of    273
      the Advisory Committee to the
      Surgeon General of the Public
      Health Service

618   "Prenatal paracetamol exposure    330
      and child neurodevelopment: A
      review," Bauer, et al.

Page 12

619   Depakote ER- divalproex sodium    344
      tablet, extended release, AbbVie,
      Inc., label

620   "Antiseizure medication use       360
      during pregnancy and risk of ASD
      and ADHD in children," Wiggs, et
      al.

621   "Association of Prenatal Exposure  372
      to Valproate and Other
      Antiepileptic Drugs With Risk for
      Attention-Deficit/Hyperactivity
      Disorder in Offspring,"
      Christensen, et al.

622   National Center for Toxicology    376
      Research, Science Advisory Board
      Meeting, May 19, 2022

623   Modern Epidemiology, Fourth       389
      Edition

624   "Maternal Prenatal Smoking and    407
      Autism Spectrum Disorder in
      Offspring: A California
      Statewide Cohort and Sibling
      Study," von Ehrenstein, et al.

625   "Invited Commentary:              415
      Sibling-Comparison Designs, Are
      They Worth the Effort?," Frisell

626   "Prenatal paracetamol exposure    422
      and child neurodevelopment: A
      sibling-controlled cohort study,"
      Brandlistuen, et al.

627   "Acetaminophen use during         444
      pregnancy and offspring attention
      deficit hyperactivity disorder -
      a longitudinal sibling control
      study," Gustavson, et al.

Page 13

628   Supporting information for:       449
      Acetaminophen use during
      pregnancy and offspring attention
      deficit hyperactivity disorder -
      a longitudinal sibling control
      study

629   "Association of Cord Plasma       477
      Biomarkers of In Utero
      Acetaminophen Exposure With Risk
      of Attention-Deficit/
      Hyperactivity Disorder and Autism
      Spectrum Disorder in Childhood,"
      Ji, et al.

630   "Association of Prenatal          495
      Acetaminophen Exposure Measured
      in Meconium With Risk of
      Attention-Deficit/Hyperactivity
      Disorder Mediated by
      Frontoparietal Network Brain
      Connectivity," Baker, et al.

631   "The Environment and Disease:     525
      Association or Causation?" Sir
      Bradford Hill

632   Prenatal APAP Use, Autism,        554
      Confounding Variable
      demonstrative

633   ADHD forest plot demonstrative    554

634   ASD forest plot demonstrative     554

635   Nonsmokers, maternal smokers      554
      forest plot demonstrative

636   No secondhand smoke/secondhand    554
      smoke demonstrative

637   No acetaminophen/Yes              554
      acetaminophen demonstrative

638   First, second and third tertile   554
      Cord APAP demonstrative

639   Entire video of Jennifer          554
      Pinto-Martin

Confidential - Subject to Protective Order

Page 14

1   639.1  Things happening in utero video        554
         clip

2

3   639.2  Twins video clip                        554

4   639.3  Environmental factors we have           554
         control over video clip

5   639.4  No gene for autism video clip           554

6   639.5  We don't know whether it's an           554
         epidemic video clip

7

8   639.6  Valproic acid video 1 clip             554

9   639.7  Valproic acid video 2 clip             554

10  (Exhibits attached to the deposition.)

11

12  CERTIFICATE..................................567

13  ACKNOWLEDGMENT OF DEPONENT...................569

14  ERRATA.......................................570

15  LAWYER'S NOTES...............................571

16

17

18

19

20

21

22

23

24

25

Page 15

1          VIDEOGRAPHER:  We are now on

2   the record.  My name is Brian McGee.

3   I'm a videographer for Golkow

4   Litigation Services.

5          Today's date is September 6,

6   2023, and the time is 8:42 a.m.

7          This video deposition is being

8   held in Philadelphia, PA, in the

9   matter of Acetaminophen (Tylenol)

10  ASD/ADHD Products Liability

11  Litigation, MDL Number 3043.

12         The deponent is Jennifer

13  Pinto-Martin.

14         Counsels' appearances will be

15  noted on the stenographic record.

16         The court reporter is Carrie

17  Campbell and will now swear in the

18  witness.

19

20      JENNIFER PINTO-MARTIN, Ph.D., MPH,

21  of lawful age, having been first duly sworn

22  to tell the truth, the whole truth and

23  nothing but the truth, deposes and says on

24  behalf of the Plaintiffs, as follows:

25  /

Page 16

1          DIRECT EXAMINATION

2   QUESTIONS BY MR. SNIDOW:

3       Q.    Good morning, Dr. Pinto-Martin.

4       A.    Good morning.

5       Q.    My name is J.J. Snidow, and I

6   think you understand I represent the

7   plaintiffs in today's case?

8       A.    I do.

9          (Pinto-Martin Exhibit 600

10         marked for identification.)

11  QUESTIONS BY MR. SNIDOW:

12      Q.    Okay.  I'm going to show you a

13  document that I've marked as Exhibit 600 of

14  your deposition.  We'll be going in that

15  order, from 600 on.

16         Do you recognize this as your

17  report in this case?

18         MR. SNIDOW:  Do you need those,

19      Jim?  Yeah, you do.

20         THE WITNESS:  It does look to

21      be my report with the appendices and

22      the references and my CV, yes.

23  QUESTIONS BY MR. SNIDOW:

24      Q.    Any changes that you need to

25  make in that report that you've noticed in

Page 17

1   preparing?

2       A.    So, yeah.  In the last week or

3   so I just was reading through it and found a

4   few things that I would like to change.

5          THE WITNESS:  Do I give him

6      this?

7          MR. MURDICA:  They already have

8      it.

9   QUESTIONS BY MR. SNIDOW:

10      Q.    Is it that handwritten note

11  that you produced?

12      A.    Yes.  Yeah.  Yeah.

13      Q.    Anything else?

14      A.    No.

15      Q.    So other than those marks that

16  you made on the handwritten note, everything

17  else in your report you believe is accurate

18  as you sit here today?

19      A.    I do.

20      Q.    I'd like you to turn to page 5

21  of Exhibit 600, which is your report.

22      A.    Uh-huh.

23      Q.    And do you see a paragraph

24  that's marked 7 there?

25      A.    Yes.

Page 18

1    Q.    Do you see the sentence that
2  begins "because"?
3    A.    Uh-huh.
4    Q.    It says, "Because the better
5  designed studies do not report an
6  association, the inconsistency in the studies
7  is an important factor that weighs against a
8  causal conclusion."
9        Did I read that correctly?
10    A.    You did.
11    Q.    Does that sentence apply both
12  to the ADHD and the ASD literature?
13    A.    I believe so.
14    Q.    Okay.  And that was important
15  to you as you say here?
16    A.    Uh-huh.
17    Q.    So it was important to you that
18  the better-designed studies don't report an
19  association either for ASD or ADHD?
20        MR. MURDICA:  Objection to
21    form.
22        Go ahead.
23        THE WITNESS:  Correct.
24  QUESTIONS BY MR. SNIDOW:
25    Q.    Correct, all right.

Page 19

1        All right.  Marking another
2  document as Exhibit 601.  This is just my
3  handwriting, and I'll give it to you when
4  we're done in second.
5        So tell me what the
6  better-designed studies on ASD are.  What are
7  their names?
8        MR. MURDICA:  J.J., I object to
9    the use of this kind of thing.  I
10    don't think you can mark it as an
11    exhibit.  We're not going to create
12    plaintiff lawyer-created exhibits
13    here.
14        MR. SNIDOW:  Jim, objection to
15    form.
16        MR. MURDICA:  No -- well, hang
17    on.  This is different.  This is about
18    whether you can create something as an
19    exhibit, and I'm not going to let that
20    happen.
21        MR. SNIDOW:  Okay.  I'll take
22    the marker off if that's what you
23    want.
24        MR. MURDICA:  You're not going
25    to be able to mark this as an exhibit

Page 20

1  at the deposition, period, unless you
2  want to call the Court.
3        MR. SNIDOW:  Okay.  That's
4    fine.  I'm going to use this though.
5        MR. MURDICA:  Okay.  Take the
6  marker off.  We're not going to mark
7    it, and I'm letting the court reporter
8    know that we won't be marking it as an
9    exhibit.
10        If you intend to, let's just
11    call the Court now because it's not
12    happening.
13        MR. SNIDOW:  Okay.
14  QUESTIONS BY MR. SNIDOW:
15    Q.    Dr. Pinto-Martin, do you see
16  this document?
17    A.    I do.
18    Q.    All right.  Can you tell me
19  what are the better-designed studies for ASD?
20  What are their names?
21        MR. MURDICA:  J.J., are you
22    going to take that marker off?
23        MR. SNIDOW:  I'm going to, I
24    promise.
25        MR. MURDICA:  Okay.

Page 21

1        MR. SNIDOW:  Trust me.  I
2    promise.
3        MR. MURDICA:  Okay.
4  QUESTIONS BY MR. SNIDOW:
5    Q.    Dr. Pinto-Martin, what are the
6  names of the better-designed studies for ASD?
7        MR. MURDICA:  Object to form.
8        If you can answer it, go ahead.
9        THE WITNESS:  So the
10    best-designed study that uses ASD as a
11    diagnostic outcome of the five that I
12    include in my report that look at
13    prenatal acetaminophen exposure and
14    ASD in the child is the Danish
15    National Birth Cohort study, the Liew
16    2016 C study.
17  QUESTIONS BY MR. SNIDOW:
18    Q.    Okay.
19    A.    And I can go into the
20  reasons --
21    Q.    Nope.  Nope.
22    A.    -- why I think the others are
23  not as well-designed, if you like, but...
24    Q.    Yeah.
25        Is Liew 2016 the only study

Confidential - Subject to Protective Order

Page 22

1  that you're referring to in your report when
2  you are referring to the better-designed
3  studies?
4      A.   With respect to ASD, yes.
5      Q.   All right.  So just Liew 2016?
6      A.   Yes.
7      Q.   For ADHD, when you referred to
8  the better-designed studies, which studies
9  did you mean?
10         MR. MURDICA:  Object to the
11     form.
12         THE WITNESS:  So the
13     best-designed study that looks at
14     maternal acetaminophen exposure during
15     pregnancy and ADHD as a diagnostic
16     outcome is the Gustavson 2021 study,
17     which is based on the mother and baby
18     cohort from Norway.
19  QUESTIONS BY MR. SNIDOW:
20     Q.   Okay.  Any other
21  better-designed studies that you're referring
22  to there for ADHD?
23     A.   That's the best.
24         MR. MURDICA:  Objection to
25     form.

Page 23

1         You can answer.
2  QUESTIONS BY MR. SNIDOW:
3      Q.   So just one for each?
4      A.   (Witness nods head.)
5      Q.   So you used the plural there,
6  but there's just one for each of them?
7         MR. MURDICA:  Objection to
8     form.
9         THE WITNESS:  There's one for
10     each them.
11  QUESTIONS BY MR. SNIDOW:
12     Q.   Okay.  And --
13     A.   Two studies in total.
14     Q.   Yeah.  And, Dr. Pinto-Martin,
15  you mentioned Liew 2016.  It's your testimony
16  that Liew 2016 does not report an association
17  between acetaminophen and ASD?
18         MR. MURDICA:  Objection to
19     form.
20         THE WITNESS:  Liew 2016 has a
21     series of outcome measures that they
22     use that include ASD alone, infantile
23     autism, ASD with hyperkinetic
24     disorder, and the positive association
25     was found for a subset of those

Page 24

1      outcomes, so...
2  QUESTIONS BY MR. SNIDOW:
3      Q.   Okay.  So let's look at your
4  report again.  You said, "The better-designed
5  studies do not report an association."
6         Right?
7         MR. MURDICA:  Objection to
8     form.
9  QUESTIONS BY MR. SNIDOW:
10     Q.   I asked you, which
11  better-designed studies.  You said Liew 2016,
12  right?
13         MR. MURDICA:  Objection to
14     form.
15         THE WITNESS:  Uh-huh.
16  QUESTIONS BY MR. SNIDOW:
17     Q.   And my question for you is very
18  simple, does Liew 2016 report an association
19  between acetaminophen use and ASD?
20         MR. MURDICA:  Objection to
21     form.
22  QUESTIONS BY MR. SNIDOW:
23     Q.   Yes or no.
24         MR. MURDICA:  Asked and
25     answered.

Page 25

1  QUESTIONS BY MR. SNIDOW:
2      Q.   Does it do that?
3      A.   It does.
4      Q.   Okay.  So I'm going to cross
5  this one off because it does.
6         What better-designed --
7      A.   So --
8         MR. MURDICA:  Objection to
9     form.  Hang on.  First of all, I have
10     to object to form.  I object to form.  There's
11     no need to raise your voice.
12         MR. SNIDOW:  Okay.
13         MR. MURDICA:  Okay?  We can
14     stay calm and professional all day
15     long.
16         MR. SNIDOW:  Yeah, that's fine.
17         MR. MURDICA:  Let's try it.
18         THE WITNESS:  May I --
19  QUESTIONS BY MR. SNIDOW:
20     Q.   Hold on.  Hold on.  Hold on.
21  Let me ask the question.
22         The question is, besides
23  Liew 2016, are there any better-designed
24  studies on ASD that you know of that do not
25  report an association between acetaminophen

Page 26

1  use and ADHD?
2       MR. MURDICA: Objection to
3  form.
4       THE WITNESS: The current
5  literature does not include any
6  better-designed studies.
7  QUESTIONS BY MR. SNIDOW:
8    Q.   Okay.
9    A.   Better-designed is -- we could
10 talk about what that means.
11   Q.   Okay. For Gustavson 2021, is
12 it your testimony that Gustavson 2021 does
13 not report an association between prenatal
14 acetaminophen use and ADHD?
15   A.   It is.
16   Q.   Okay. In that entire study?
17       MR. MURDICA: Wait. Objection
18 to form.
19       You can answer.
20       THE WITNESS: The authors
21 report the previously reported
22 association from the same cohort and
23 the same set of authors and then apply
24 a sibling-control analysis that
25 reduces the prior reported association

Page 27

1  to the null.
2  QUESTIONS BY MR. SNIDOW:
3    Q.   Okay. But if I just -- if I
4  open up Gustavson 2021, and we will, am I
5  going to find an association between
6  acetaminophen and ADHD in there?
7    A.   At the end of the day, the
8  association that was reported was confounded
9  by genetics, and the final outcome there is a
10 null finding.
11   Q.   Okay. Do you remember my
12 question, though?
13   A.   I do.
14   Q.   Okay. If I open
15 Gustavson 2021, am I going to find an
16 association between prenatal acetaminophen
17 use and ADHD?
18       MR. MURDICA: Objection to
19 form.
20       She already answered it.
21       THE WITNESS: Go ahead?
22       MR. MURDICA: If you want to do
23 it again, go ahead.
24       MR. SNIDOW: Hey, Jim,
25 "objection to form." You know we did

Page 28

1  this last time.
2       MR. MURDICA: Don't ask the
3  same question twice in a row.
4       MR. SNIDOW: Okay. Let's go
5  off the record.
6       VIDEOGRAPHER: The time is
7  8:51 a.m. We're off the record.
8       (Off the record at 8:51 a.m.)
9       VIDEOGRAPHER: The time is
10 8:53 a.m., and we're on the record.
11 QUESTIONS BY MR. SNIDOW:
12   Q.   Okay. Dr. Pinto-Martin, do you
13 remember the question I asked you?
14   A.   I don't. I'm sorry.
15   Q.   Okay. If I look in Gustavson
16 2021, am I going to find an association
17 between prenatal APAP use and ADHD, yes or
18 no?
19       MR. MURDICA: Objection to
20 form.
21       THE WITNESS: Gustavson 2021
22 will summarize the results from the
23 whole cohort, and in that entire
24 cohort, as was reported in the prior
25 study by Ystrom and Gustavson and

Page 29

1  others, there was an elevated risk.
2       He will then go on to apply a
3  sibling-control analysis, which is a
4  technique to control for genetic
5  confounding, a very important
6  confounder in this literature, and
7  will report that that prior result is
8  reduced to the null.
9  QUESTIONS BY MR. SNIDOW:
10   Q.   Okay. So it's a "yes" --
11       MR. MURDICA: Object- --
12 QUESTIONS BY MR. SNIDOW:
13   Q.   -- there's going to be an
14 association reported in Gustavson 2021?
15       MR. MURDICA: Objection to
16 form.
17       THE WITNESS: I would say it's
18 a yes and a no. It's a yes, and then
19 it goes on to refute that finding.
20 QUESTIONS BY MR. SNIDOW:
21   Q.   That's fine. And we'll talk
22 about this the sibling control.
23       Okay. Dr. Pinto-Martin, this
24 is not your first deposition, right?
25   A.   That's correct.

Confidential - Subject to Protective Order

Page 30

1    Q.    And it looks like you've
2 testified on behalf of Pfizer and Ely Lilly
3 related to SSRIs?
4    A.    I've never test -- well, do you
5 call a deposition a test --
6    Q.    I do.
7    A.    Okay.  So, yes, I have.
8    Q.    Okay.  The Nexium litigation,
9 gave a dep?  It's a PPI.
10    A.    Yes.
11    Q.    Okay.  I believe you testified
12 in a case about twins with autism who were
13 exposed to tocolytic agents?
14    A.    That's correct.
15    Q.    And then a case where parents
16 were occupationally opposed {sic} to a
17 pesticide; is that right?
18    A.    Occupationally exposed, yes.
19    Q.    Is that it?
20    A.    In terms of deposition, I
21 believe so.  I -- you know, it's -- I've been
22 doing it for more than ten years, but I
23 believe you've captured all the depositions
24 I've done, yes.
25    Q.    How about trial testimony?

Page 31

1    A.    I've gone to court once.  That
2 was in the twin case that you described where
3 they were exposed to a tocolytic, which is an
4 agent to prevent preterm labor.
5       And we went to a court in
6 Maryland, and it was in front of a judge, I
7 believe it's what's called a Daubert hearing.
8 There was not a jury there, but I was
9 examined, cross-examined, in front of the
10 judge.
11    Q.    Okay.
12    A.    That's my only court
13 appearance.
14    Q.    All right.  So as far as you
15 can remember four -- sorry, five:  Four
16 depositions and one trial testimony?
17    A.    That's sounds about right,
18 yeah.
19    Q.    Have you ever testified on
20 behalf of a plaintiff?
21    A.    I've never been deposed.  I
22 have been engaged on behalf of plaintiffs and
23 done consultation, but I've -- that -- those
24 consultations have never proceeded to a
25 deposition.

Page 32

1    Q.    What cases were those?
2    A.    I would have to go back and
3 look at my records to remember the specifics.
4    Q.    Okay.
5    A.    And I believe that they're
6 protected, so I don't know that I can
7 disclose the specifics of the -- of the
8 cases.
9    Q.    All right.  But for testimony,
10 depositions or trial, it's been only on
11 behalf of defendants?
12       MR. MURDICA:  Objection to
13       form.
14       THE WITNESS:  For depositions
15       and the one time I appeared in court,
16       it was -- those were all on behalf of
17       defendants, correct.
18 QUESTIONS BY MR. SNIDOW:
19    Q.    And in any of those depositions
20 or trial testimony, did you give the opinion
21 that the substance caused whatever the injury
22 was?
23    A.    In the depositions and the
24 trial testimony that I gave, my opinion was
25 that the agent, whatever it was that we were

Page 33

1 considering, was not causally related to
2 autism spectrum disorder, which was the
3 outcome we were looking at.
4    Q.    In the PPI case, you testified
5 that PPIs don't cause fractures?
6    A.    I don't remember the specifics
7 of the PPI case, but I do recall that the --
8 that the opinion that I gave was not in --
9 did not implicate the agent.
10    Q.    Do you know whether that label
11 now warns about bone fractures?
12       MR. MURDICA:  Objection to
13       form.
14       THE WITNESS:  I do not.
15 QUESTIONS BY MR. SNIDOW:
16    Q.    Okay.  Have you done any
17 consulting for pharmaceutical companies?
18    A.    I have not.
19    Q.    Do you sit on any boards,
20 advisory boards, anything like that, of
21 pharmaceutical companies?
22    A.    I do not.
23    Q.    Any other work for pharma
24 companies I've forgotten?
25    A.    No.

Page 34

1    Q.    Have they ever sponsored your
2 research?
3    A.    They have not.
4    Q.    Have you ever done any media
5 training?
6    A.    I have not.
7    Q.    Do you know anyone who works at
8 Johnson & Johnson?
9    A.    Not to my knowledge.
10    Q.    Do you know -- before this
11 litigation, did you know any of the other
12 experts involved in this case on either side?
13    A.    I had certainly heard of some
14 of them.  I don't know any of them
15 personally.
16    Q.    Never met them at academic
17 conferences?
18    A.    No.
19    Q.    And that's true both for the
20 defense experts and the plaintiff experts?
21    A.    Correct.
22    Q.    So what, that's ten or so?
23    A.    I think so, yeah.
24    Q.    And never met any of them in
25 your work as an epidemiologist?

Page 35

1    A.    No.
2    Q.    Your billing rate is $750 per
3 hour?
4    A.    That's correct.
5    Q.    And if I'm reading your time
6 entries right, you've spent more than
7 200 hours on this case so far?
8    A.    That's correct.
9    Q.    So more than $150,000 so far?
10    A.    That's correct.
11    Q.    Does that money go to you or to
12 Penn?
13    A.    That money goes to me.
14    Q.    Do they know you're doing this
15 work?
16    A.    I do not have to disclose this
17 work by the rules of Penn.
18    Q.    Sorry.  So that's a "no," they
19 do not --
20    A.    They do not know.
21    Q.    And you've reviewed the Penn HR
22 policies before deciding not to disclose to
23 them that you're doing this work?
24    A.    Of course I have.
25    Q.    And you're aware there's a

Page 36

1 policy that all extramural and intramural
2 activities should be cleared through the
3 individual's immediate supervisor when these
4 activities constitute a possible conflict of
5 interest; is that right?
6    A.    I do sign a conflict of
7 interest statement.  I have no conflict of
8 interest, and so there's nothing to report.
9    Q.    You're an autism researcher
10 professionally, right?
11    A.    I'm a professor professionally.
12    Q.    Well, but you focus on autism
13 research?
14    A.    I do.
15    Q.    I didn't think you were going
16 to fight me on that.
17        And it's your testimony that
18 giving testimony on behalf of J&J about what
19 does and doesn't cause autism doesn't
20 constitute a conflict of interest?
21        MR. MURDICA:  Objection to
22 form.
23        THE WITNESS:  I'm not giving
24 testimony on behalf of anyone.  I'm
25 giving testimony based on my expert

Page 37

1 review of the epidemiologic
2 literature.  That's what I was asked
3 to do, and that's what I've done.
4 QUESTIONS BY MR. SNIDOW:
5    Q.    You spent a significant part of
6 your career working to identify modifiable
7 risk factors for ASD; is that right?
8    A.    I continue to work on that.
9    Q.    What's a modifiable risk
10 factor?
11    A.    Modifiable risk factor is
12 something that we -- is a risk factor we can
13 do something about.  So it's a risk factor
14 that we can intervene on and thereby reduce
15 the risk of an outcome.
16    Q.    And I think I know, but just to
17 clarify.  When you're using "risk factor," at
18 least in the way you just did, you're
19 referring to something that's actually
20 causal, right?
21    A.    I'm glad you asked that
22 question.
23    Q.    Yeah.
24    A.    And the answer is no.  So we
25 have risk factors in epidemiology that get

Page 38

1 evaluated with respect to their impact on an
2 outcome.  So a risk factor can be null; in
3 other words, there is no association.  It can
4 be -- it can show evidence of an association,
5 which then puts it in the category of
6 potentially causal, but it's not -- a risk
7 factor does not equate with a causal agent.
8    Q.    Well, how about modifiable risk
9 factor?
10         MR. MURDICA:  Objection to
11    form.
12 QUESTIONS BY MR. SNIDOW:
13    Q.    I mean, if you're going to
14 modify it and expect a lower risk, it seems
15 like it's got to be causal, right?
16         MR. MURDICA:  Objection to
17    form.
18         You can answer.
19         THE WITNESS:  So there's
20    association and there's causality.
21    And in observational epidemiology,
22    which is what we're talking about
23    here, we are establishing an
24    association.  We are looking at the
25    body of evidence to see if the --

Page 39

1    there is a credible association
2    between the factor that we're studying
3    and the outcome that we're studying.
4    We cannot establish causality
5    in an observational study because it
6    is not an experiment.
7 QUESTIONS BY MR. SNIDOW:
8    Q.    So it's your testimony you
9 can't ever establish causality without doing
10 an RCT?
11    A.    That's not what I said.
12    Q.    Okay.  Well, you said "without
13 doing an experiment."
14         MR. MURDICA:  Objection to
15    form.
16         There's no question.
17 QUESTIONS BY MR. SNIDOW:
18    Q.    Well, let me ask it again.
19         What did you mean when you said
20 we can't ever establish causality with an
21 observational study because it's not an
22 experiment?
23         MR. MURDICA:  Objection to
24    form.
25         Answer it, if you can.

Page 40

1         THE WITNESS:  So observational
2    studies are fraught with methodologic
3    challenges, as I'm sure you are aware,
4    and those challenges render any kind
5    of conclusive results about causality
6    challenging.
7         There are instances where a set
8    of observational studies are powerful
9    enough to overcome those challenges,
10    and we are able to say they're -- that
11    the evidence supports a causal
12    association.
13         But that's rare.
14 QUESTIONS BY MR. SNIDOW:
15    Q.    Right.
16         Can you give me an example of a
17 modifiable risk factor for anything that's
18 not causal?
19         MR. MURDICA:  Objection to
20    form.
21         THE WITNESS:  An example of a
22    modifiable risk factor?
23         So --
24 QUESTIONS BY MR. SNIDOW:
25    Q.    Well, let me ask -- let me try

Page 41

1 some examples first.
2         What's a modifiable risk factor
3 for lung cancer?
4    A.    Smoking would be a modifiable
5 risk factor for lung cancer.
6    Q.    That one's definitely causal,
7 right?
8    A.    I believe that we have strong
9 enough evidence to support there's a causal
10 association between smoking and lung cancer,
11 yes.
12    Q.    All right.  That's good.
13         Can you think of another
14 modifiable risk factor off the top of your
15 head?
16    A.    For lung cancer?
17    Q.    Sure.
18    A.    So I could imagine that air
19 pollution, you know, you know, cities that
20 have high levels of particulate matter, may
21 have higher rates of lung cancer.
22         The data to determine whether
23 that's causal is going to be very, very
24 challenging because it's an ecological
25 measure.  We don't have individual-level

Page 42

¹ exposure, so I would describe that as
² modifiable risk factor for which causal data
³ is not established.
⁴     Q.    Okay.  You're a member of the
⁵ American College of Epidemiology?
⁶     A.    Uh-huh.
⁷     Q.    That's a pretty well-respected
⁸ organization?
⁹         MR. MURDICA:  Objection to
¹⁰ form.
¹¹         THE WITNESS:  It is.
¹² QUESTIONS BY MR. SNIDOW:
¹³     Q.    How about the Society For
¹⁴ Pediatric Epidemiologic Research?
¹⁵     A.    I am a member and -- yes.
¹⁶     Q.    And you used to be president.
¹⁷     A.    I used to be president.
¹⁸     Q.    And that was in '93, '94?
¹⁹     A.    Sounds about right.
²⁰     Q.    Is that a pretty good
²¹ organization?
²²     A.    I think it's a reputable
²³ organization, yes.
²⁴     Q.    Promotes good science, in your
²⁵ experience?

Page 43

¹         MR. MURDICA:  Objection to
² form.
³         THE WITNESS:  In my experience,
⁴ yes.
⁵ QUESTIONS BY MR. SNIDOW:
⁶     Q.    Doesn't promote bad science in
⁷ your experience, does it?
⁸     A.    That's not been my experience.
⁹     Q.    Okay.  You're familiar with the
¹⁰ National Academy of Medicine?
¹¹     A.    I am.
¹²     Q.    Fair to say it's pretty hard to
¹³ get elected to that?
¹⁴     A.    I would agree.
¹⁵     Q.    Extremely impressive
¹⁶ credential?
¹⁷     A.    It's a hard appointment to get,
¹⁸ yes.
¹⁹     Q.    It's been described as the
²⁰ country's most esteemed and authoritative
²¹ advisor on issues of health and medicine,
²² right?
²³         MR. MURDICA:  Objection to
²⁴ form.
²⁵         THE WITNESS:  I don't know

Page 44

¹ where that comes from.  I don't know
² who says that.
³ QUESTIONS BY MR. SNIDOW:
⁴     Q.    Are you a member of the
⁵ National Academy of Medicine?
⁶     A.    I am not.
⁷     Q.    Are you familiar with the
⁸ International Society of Environmental
⁹ Epidemiology?
¹⁰     A.    I've heard of it.
¹¹     Q.    A pretty good organization?
¹²     A.    I really know nothing about it.
¹³ It's just that I've heard that name.
¹⁴     Q.    How about the Mailman School of
¹⁵ Public Health?
¹⁶     A.    I certainly know the Mailman
¹⁷ School of Public Health, yes.
¹⁸     Q.    Is that at Columbia?
¹⁹     A.    It is.
²⁰     Q.    Outstanding public health
²¹ school?
²²         MR. MURDICA:  Objection to
²³ form.
²⁴         THE WITNESS:  It is.
²⁵

Page 45

¹ QUESTIONS BY MR. SNIDOW:
²     Q.    Do you know anyone there?
³     A.    I do.  I did my postdoc at
⁴ Columbia, so I do know people there.
⁵     Q.    Who do you know who?
⁶     A.    I know Ezra Susser who was the
⁷ chair of epidemiology for many years.  I know
⁸ his father, Mervyn Susser, with whom I
⁹ worked, and his mother is Zena Stein, with
¹⁰ whom I worked.
¹¹         I did my postdoc with a
¹² physician named Nigel Paneth, who is no
¹³ longer there.  Various other folks.  I was
¹⁴ there for four or five years, so...
¹⁵     Q.    And Irwin {sic} Susser,
¹⁶ outstanding epidemiologist?
¹⁷     A.    So Mervyn Susser is no longer
¹⁸ alive.  That's the father.
¹⁹     Q.    But he was.
²⁰     A.    He was -- he was a very, very
²¹ good epidemiologist, yes.
²²     Q.    And he was chair of the
²³ epidemiology department at Columbia?
²⁴     A.    No, I'm sorry.  I think you're
²⁵ getting them confused.

Confidential - Subject to Protective Order

Page 46

1 So Ezra Susser was his son, and
2 Ezra was the chair.
3 Q. And was he a pretty good
4 epidemiologist?
5 MR. MURDICA: Objection to
6 form.
7 THE WITNESS: Ezra has a very
8 good reputation.
9 QUESTIONS BY MR. SNIDOW:
10 Q. Okay. How big does a risk
11 ratio need to be before you would say it was
12 strong?
13 MR. MURDICA: Objection to
14 form.
15 THE WITNESS: So that's a
16 difficult question to answer simply
17 because it so depends on the exposure
18 that you're looking at, the outcome
19 that you're looking at, the quality of
20 the data that underlies that exposure,
21 but what we do know is that the
22 stronger a measure of association is
23 the less likely it is to be due purely
24 to confounding or bias.
25 So I would say, you know,

Page 47

1 there's not a precise number there.
2 I'm not willing to give you a precise
3 number because it depends so much on
4 the context.
5 QUESTIONS BY MR. SNIDOW:
6 Q. That's what I was asking.
7 It's not 2.0, 3.0. You can't
8 do it like that?
9 A. That's not how I do it.
10 Q. You think it would be wrong to
11 just set a cutoff, right? Because you have
12 to consider all of the data, right?
13 MR. MURDICA: Objection to
14 form.
15 THE WITNESS: I think different
16 epidemiologists and biostatisticians
17 approach the question differently.
18 The way I approach it is that there's
19 not a right number that you need to
20 exceed.
21 QUESTIONS BY MR. SNIDOW:
22 Q. Okay. How many statistically
23 significant results do you need before you
24 think there's an association that's been
25 demonstrated?

Page 48

1 MR. MURDICA: Objection to
2 form.
3 THE WITNESS: Again --
4 MR. MURDICA: Go ahead and
5 answer.
6 THE WITNESS: Sorry. I think I
7 answer too quickly.
8 Again, that's an impossible
9 question to answer in that sort of
10 theoretical framework. It is very
11 dependent upon the literature that
12 you're reviewing, the specifics of the
13 studies. Statistically significant
14 results can be due to all kinds of
15 bias and confounding, obviously, and
16 they can also relate to a whole range
17 of outcomes, which is important to
18 consider when you're looking at the
19 number of statistically significant
20 associations.
21 So I can't answer that
22 question.
23 QUESTIONS BY MR. SNIDOW:
24 Q. So I think maybe you
25 misunderstood. I'm not asking about

Page 49

1 causation.
2 I'm just saying, how many
3 results before you would say there's an
4 association? Maybe it's confounding, maybe
5 it's bias, but I think there's an
6 association.
7 A. Again, I can't give you a
8 number. It's dependent upon the underlying
9 data.
10 Q. So if I had 500 studies showing
11 a statistically significant link between an
12 exposure and an outcome, you'd say, "I don't
13 know if there's an association"?
14 MR. MURDICA: Objection to
15 form.
16 THE WITNESS: Again --
17 MR. MURDICA: Go ahead.
18 THE WITNESS: I can't answer
19 that in this theoretical context. I
20 would want to look at the studies. I
21 would understand -- I want to
22 understand how the data was derived.
23 You could have 500 statistically
24 significant studies that were wrong
25 because they were all confounded.

QUESTIONS BY MR. SNIDOW:

Q.   I agree.  That's not what I'm asking.  So put aside confounding.

Can you do that for me?

MR. MURDICA:  Objection to form.

QUESTIONS BY MR. SNIDOW:

Q.   Can you put aside confounding?

MR. MURDICA:  Objection to form.

Answer the --

THE WITNESS:  I will -- I will ignore the idea of confounding to answer your question.

QUESTIONS BY MR. SNIDOW:

Q.   And bias, okay, ignore that.

All I'm asking is, for an association, if I had 500 studies showing a statistically significant link, that would be an association, right?

It doesn't mean it's causal, but that would be an association, right?

MR. MURDICA:  Objection to form.

THE WITNESS:  So you've asked

me to ignore two things that are absolutely central to observational studies.  So you're asking me something that's theoretically impossible.  There's no such thing as an observational study that is free of bias and confounding, so I can't answer the question.

QUESTIONS BY MR. SNIDOW:

Q.   Okay.  How do you define a causal agent?

MR. MURDICA:  Objection to form.

THE WITNESS:  A causal agent is something for which there is consistent, reliable, valid evidence that the dose of that agent, if you will, increases the risk of the outcome that you're studying.

QUESTIONS BY MR. SNIDOW:

Q.   You know what a forest plot is, right?

A.   I do.

Q.   All right.  I'm going to do one as an example.  I would mark it, but, you

know.

All right.  So I made up these numbers.  But can you tell me on this forest plot what study 1 is showing?

MR. MURDICA:  I object to the use of this, but you can answer it, if you can.

THE WITNESS:  It says a 1.5 something.  I don't know.  There's no --

QUESTIONS BY MR. SNIDOW:

Q.   And that is a relative risk.

A.   Okay.  So you're telling me those top numbers are relative risk?

Q.   Yes.

A.   So it shows you that there's a 1 point -- something like 1.5, 1.6 relative risk with a confidence interval that goes from something like 1.25 to 1 point -- to almost 2.0.

Q.   Okay.  Is that result statistically significant?

A.   This -- I have no idea what this -- what this means in statistical terms.  If you had this in a textbook, it would show

that this is evidence of a statistically significant effect, but it's completely without context here, so...

Q.   I know.  I'm just -- I promise, I made these up.  I'm truly just trying to talk about concepts.

For study 2, essentially same thing, except the point estimate is somewhere around 2.3; is that right?

A.   That looks about right.

Q.   Right.

And it is statistically significant, right?

A.   Again, the confidence intervals do not include 1.

Q.   Study 3, the point estimate looks like maybe 1.2?

A.   Maybe 1.1.

Q.   Yeah, maybe 1.1.

And that one is not statistically significant, right?

A.   Confidence intervals include 1, which would indicate that you cannot rule out chance as an explanation for that --

Q.   Okay.

Confidential - Subject to Protective Order

Page 54

1    A.    -- whatever it is.
2    Q.    Yeah.
3          All right.  And then the last
4  one there, study 8, similar point estimate,
5  but the confidence intervals are wider,
6  right?
7    A.    Correct.
8    Q.    Okay.  And it's not
9  statistically significant, right?
10   A.    Confidence intervals include 1.
11   Q.    Would you -- would you
12  characterize this as a strong association?
13         MR. MURDICA:  Objection to
14   form.
15         THE WITNESS:  I cannot answer
16   that question.
17  QUESTIONS BY MR. SNIDOW:
18   Q.    Okay.
19   A.    Because without the context of
20  the underlying data, I have no way of judging
21  whether it's strong or not.
22   Q.    How about a consistent
23  association?  Would you say this is
24  consistent?
25   A.    I would say the same thing for

Page 55

1  consistency.  Without understanding how these
2  results were derived --
3    Q.    Yeah.
4    A.    -- I cannot determine whether
5  there's consistency.
6    Q.    The only reason I ask is
7  because in your report, if I read it
8  correctly, you suggest that the presence of
9  statistically nonsignificant findings means
10  that the results can't be consistent; is that
11  right?
12         MR. MURDICA:  Objection to
13   form.
14         THE WITNESS:  In my report, I
15   state that statistical significance is
16   relevant to my consideration for
17   consistency.  It is not the only
18   criterion by which I judge
19   consistency.
20         But I certainly take that into
21   account when I'm looking to see
22   whether a body of literature has
23   consistent results.
24  QUESTIONS BY MR. SNIDOW:
25   Q.    Let me ask it a different way.

Page 56

1          Can a set of results ever be
2  consistent if some of the confidence
3  intervals overlap with 1?
4          MR. MURDICA:  Objection to
5   form.
6          THE WITNESS:  It depends on
7   your definition of consistency.  The
8   way I derive consistency, it includes
9   an evaluation of the statistical
10   significance of the results and a
11   whole host of other things, which I'm
12   happy to talk to you about.
13  QUESTIONS BY MR. SNIDOW:
14   Q.    But can you answer my question?
15  Can a set of results ever be statistically
16  significant if -- sorry, strike it.
17         Can a set of results ever be
18  consistent if some of the results are not
19  statistically significant?
20         MR. MURDICA:  Same objection.
21         THE WITNESS:  I cannot answer
22   that question in a theoretical context
23   like that.  I would need to know
24   exactly what you're talking about.  I
25   would need to understand the

Page 57

1    underlying data.  I can't do it --
2  QUESTIONS BY MR. SNIDOW:
3    Q.    Okay.
4    A.    -- in isolation.
5    Q.    All right.  But on this one, I
6  want to talk about this result, study 7.
7          This is showing a point
8  estimate below 1?
9    A.    Correct.
10   Q.    What's that indicate?
11   A.    Well, in most cases, depending
12  on what these data mean, that is a protective
13  effect of the exposure on the outcome.
14   Q.    And that one is statistically
15  significant as well, right?
16   A.    It shows a statistically
17  significant protective effect for whatever it
18  is.  Again, without any knowledge of the
19  underlying data, that's, you know, hard to
20  say.
21   Q.    Okay.  All right.  You know
22  what a prospective cohort study is?
23   A.    I do.
24   Q.    And so the way those work is
25  you identify a group of unexposed and exposed

Page 58

1 groups, right?
2     A.    Typically that's the way you
3 enroll individuals into a prospective cohort
4 study.
5     Q.    And then you follow them over
6 time to see which ones develop the outcome of
7 interest?
8     A.    That's right.
9     Q.    And if the same percentage
10 develop the outcome of interest, that's
11 equivalent to a risk ratio of 1.0?
12          MR. MURDICA:  Note my objection
13     to the use of the demonstrative.
14          MR. SNIDOW:  Got it.  Got it.
15          MR. MURDICA:  And object to the
16     form of the question.
17 QUESTIONS BY MR. SNIDOW:
18     Q.    If the same percentage develop
19 the outcome, it's equivalent to a risk of
20 1.0?
21     A.    Again, you know, this is --
22 these are such sort of theoretical concepts.
23     Q.    Okay.
24     A.    But, yes, theoretically, that's
25 the way it works.

Page 59

1     Q.    Okay.  And so if you see
2 something like this, that doesn't give you a
3 signal one way or another, does it?
4          MR. MURDICA:  Objection to
5     form.
6          THE WITNESS:  I would say
7     that's a null finding.
8 QUESTIONS BY MR. SNIDOW:
9     Q.    Right.
10          Exactly a null finding.  It's
11 1.0 on the dot.
12     A.    Perfect.
13     Q.    Yeah, perfect.
14     A.    A perfect finding.
15     Q.    And even if there are, you
16 know, tiny differences between the groups
17 like this, still probably a null finding.
18 You'd have to do the math, but probably a
19 null finding, right?
20          MR. MURDICA:  Objection to
21     form.
22          THE WITNESS:  Again, really
23     hard to say just based on a chart like
24     this, but I don't see a big difference
25     between those two groups.

Page 60

1 QUESTIONS BY MR. SNIDOW:
2     Q.    Right.
3          There's only one more person
4 that got the outcome of interest in the
5 exposed, right?
6     A.    Right.
7     Q.    All right.  So null finding
8 again.
9          So but you would agree if -- I
10 did 100 kids here, but if these actually
11 represented a million kids in each arm, that
12 could still be a statistically significant
13 result, right?
14          MR. MURDICA:  Objection to
15     form.
16          THE WITNESS:  I would want to
17     do the numbers and understand what we
18     were talking about in terms of
19     exposure.  I would want to know how
20     that exposure was ascertained.  I
21     would want to know the reliability and
22     the validity of that exposure.
23          I cannot answer a question, you
24     know, like whether it would be
25     significant or important without the

Page 61

1 context.
2 QUESTIONS BY MR. SNIDOW:
3     Q.    Well, you can for the
4 statistical significance, right?  You can
5 just run the math.
6          MR. MURDICA:  Objection to
7     form.
8          THE WITNESS:  Again,
9     statistical significance depends on
10     the quality of the data underlying it.
11     You can have a statistically
12     significant result that is flawed
13     because the underlying data is biased.
14 QUESTIONS BY MR. SNIDOW:
15     Q.    I totally agree.  And that's
16 why I say, please set that aside.  I'm just
17 saying --
18     A.    It's very hard to do.
19     Q.    No, I know, but for the numbers
20 it's not, right?
21          You could run the math and see
22 whether these are statistically significant
23 differences, right?
24          MR. MURDICA:  Object to form.
25

¹ QUESTIONS BY MR. SNIDOW:
²     Q.    Is that right?
³         MR. MURDICA:  Note my
⁴ objection.
⁵         MR. SNIDOW:  Yeah.  I got -- I
⁶ got the objection --
⁷         MR. MURDICA:  I can't --
⁸         MR. SNIDOW:  Ah-ah-ah, you
⁹ promised.  You promised.
¹⁰         MR. MURDICA:  I can't sit here
¹¹ forever with you asking the same
¹² question with the -- with this made-up
¹³ thing.
¹⁴         MR. SNIDOW:  Jim?  Jim, we
¹⁵ talked in the hallway.  You promised.
¹⁶         MR. MURDICA:  Okay.  But you
¹⁷ still have to conduct yourself in
¹⁸ accordance with the rules.
¹⁹         MR. SNIDOW:  Okay.
²⁰ QUESTIONS BY MR. SNIDOW:
²¹     Q.    Ma'am, is that right, you can
²² run the math and determine whether or not
²³ these are statistically significant?
²⁴     A.    I would say you could run a
²⁵ mathematical equation to determine the

¹ relative risk in this, you know, artificial
² example, but it's meaningless in my mind
³ without the underlying context.
⁴     Q.    Sure.
⁵         This is equivalent to a
⁶ relative risk of 1.5?
⁷         MR. MURDICA:  Objection to
⁸ form.
⁹         THE WITNESS:  Do you want me to
¹⁰ count them?
¹¹ QUESTIONS BY MR. SNIDOW:
¹²     Q.    Yeah.  I promise, it's -- it's
¹³ 25 in the exposed and 20 in the unexposed.
¹⁴ Oh, sorry.  It's 30 in the exposed and 20 in
¹⁵ the unexposed.
¹⁶     A.    I'm sorry, so what's the
¹⁷ question?
¹⁸     Q.    Risk ratio is 1.5.
¹⁹         MR. MURDICA:  Objection to
²⁰ form.
²¹ QUESTIONS BY MR. SNIDOW:
²²     Q.    Is that right?
²³     A.    Are you asking me or telling
²⁴ me?  You just told me.
²⁵     Q.    I'm --

¹     A.    Are you asking me whether I
² agree with you?
³     Q.    I'm asking, yeah.  Is that
⁴ right?
⁵     A.    So again, I --
⁶ mathematically that is a correct analysis.
⁷ It is meaningless without the context of the
⁸ underlying data.
⁹     Q.    Okay.  And this is a risk ratio
¹⁰ of 1.2, right -- or sorry, 2.0?
¹¹         MR. MURDICA:  Objection to
¹² form.
¹³ QUESTIONS BY MR. SNIDOW:
¹⁴     Q.    Is that right?
¹⁵     A.    Again, mathematically if you
¹⁶ were to run these numbers, I believe you
¹⁷ would come up with a risk ratio of 2.0.  It
¹⁸ is meaningless without the underlying
¹⁹ context.
²⁰     Q.    That's a doubling of the risk?
²¹     A.    2.0 is equivalent of the
²² doubling of the risk.
²³     Q.    Also known as 100 percent
²⁴ increase in the risk, right?
²⁵     A.    That is also referred to as

¹ 100 percent increase in the risk.
²     Q.    And as you said before, as the
³ risk ratio increases, the likelihood of a
⁴ chance finding goes down?
⁵         MR. MURDICA:  Objection to
⁶ form.
⁷         THE WITNESS:  So in general,
⁸ that is the way we think about it.
⁹ The larger the risk, the less likely
¹⁰ it is to be explained away by bias and
¹¹ confounding.
¹²         It does not mean it's
¹³ impossible to explain it away by bias
¹⁴ and confounding.  I think that's very
¹⁵ important to consider here.
¹⁶ QUESTIONS BY MR. SNIDOW:
¹⁷     Q.    That actually wasn't my
¹⁸ question.  That was going to be my next one.
¹⁹         My question was, as the risk
²⁰ ratio increases, the likelihood of a chance
²¹ finding goes down?
²²         MR. MURDICA:  Objection to
²³ form.
²⁴         THE WITNESS:  So chance is one
²⁵ of the things that we worry about in

Page 66

1  terms of statistical significance, and
2  we can never absolutely determine
3  whether we can rule out chance as an
4  explanation because we have typically
5  one study that we're relying on.
6        And we're saying, does the
7  evidence from this study overwhelm
8  the possibility that chance explains
9  the finding.  We could be wrong.
10 QUESTIONS BY MR. SNIDOW:
11     Q.    Okay.  Do you remember my
12 question, though?
13        MR. MURDICA:  Objection to
14 form.
15 QUESTIONS BY MR. SNIDOW:
16     Q.    Do you remember it?
17     A.    I thought I answered it.  I'm
18 sorry.
19     Q.    My question was, as the risk
20 ratio increases, the likelihood of a chance
21 finding goes down?
22        I know it's not zero, but the
23 likelihood goes down, right?
24        MR. MURDICA:  Objection to
25 form.

Page 67

1        THE WITNESS:  I think that
2  that, again, is very hard to state,
3  you know, a definitive answer to in
4  the absence of context.
5  QUESTIONS BY MR. SNIDOW:
6     Q.    Okay.  All right.  If you had a
7  study like this, this doubling of the risk in
8  the exposed group, you would agree and you
9  said, the options are it could be -- it could
10 be chance, right?  Is that right?
11     A.    Yeah.
12     Q.    It could be bias?
13     A.    Uh-huh.
14     Q.    And do some epidemiologists say
15 that confounding's a type of bias?
16     A.    That's fine.  I can -- I can
17 accept that.
18     Q.    But I'll say it, it can be
19 confounding.
20     A.    It can be confounding.
21     Q.    And the remaining option is
22 causation, right?
23        MR. MURDICA:  Objection to
24 form.
25        THE WITNESS:  If you rule out

Page 68

1  all of the others, then you have
2  evidence in support of a causal
3  association.
4        I wouldn't say you've
5  established causation.  I think
6  there's a difference in the way I
7  phrased that that's an important one.
8  QUESTIONS BY MR. SNIDOW:
9     Q.    Helpful.
10        My question, though, is, are
11 there other theoretical possibilities for
12 what's going on here besides chance, bias,
13 confounding and causation?
14        MR. MURDICA:  Objection to the
15 form and the continued use of this
16 hypothetical demonstrative.
17        THE WITNESS:  In standard
18 epidemiologic textbook explanation,
19 no.
20 QUESTIONS BY MR. SNIDOW:
21     Q.    All right.  That's where I got
22 it from, so thank you.
23        Oh, and actually, I'll just say
24 it.  This is basically how the link between
25 tobacco and lung cancer was detected, right?

Page 69

1  They noticed that people exposed to tobacco
2  had much higher risks of lung cancer?
3        MR. MURDICA:  Objection to
4  form.
5        THE WITNESS:  So the history of
6  the association between tobacco and
7  lung cancer goes way back.  There are
8  hundreds, possibly thousands, of
9  studies that involve all different
10 kinds of study design.  A prospective
11 cohort study would certainly be one of
12 those.
13        There are case-control studies.
14 There are ecological studies.  There
15 are all kinds of pieces of evidence
16 that support the notion of a causal
17 link.
18 QUESTIONS BY MR. SNIDOW:
19     Q.    Right.
20        But -- I totally agree.  But
21 I'm just asking, they originally detected the
22 link, originally in the '20s through the
23 '60s, by looking at people who were exposed
24 to tobacco versus people who weren't, right?
25     A.    That's correct.

Page 70

1   Q.    And they noticed the people who
2   were had a much higher rate?
3   A.    That's correct.
4   Q.    And then they ruled out bias
5   and confounding and chance, right?
6       MR. MURDICA:  Objection to
7   form.
8       THE WITNESS:  Over time those
9   were ruled out.
10  QUESTIONS BY MR. SNIDOW:
11  Q.    Over time.
12      And that's how they made the
13  causal inference, right?
14  A.    I agree.
15  Q.    That's what the Surgeon General
16  did?
17  A.    I agree.
18  Q.    Okay.  In your report you state
19  your belief that ASD is primarily caused by
20  genetics; is that right?
21  A.    That's right.
22  Q.    And you think genetics are a
23  primary cause of ADHD as well?
24  A.    I do.
25  Q.    Do you agree that the

Page 71

1   heritability for ASD and ADHD is not
2   100 percent?
3   A.    I do.
4   Q.    And that means that
5   environmental factors play a role, right?
6   A.    That means that factors other
7   than those that are passed down from the
8   mother and father to the fetus could have an
9   influence.  We don't know, but that's
10  possible.
11  Q.    Okay.  Including environmental
12  factors?
13  A.    So, yes.  Environmental factors
14  I would describe as anything other than
15  genetic factors.
16      And so that would include
17  lifestyle factors.  That would include
18  de novo mutations that are not passed down
19  from the mother and father but that are
20  genetic in origin.  And it would include
21  things in the environment.
22  Q.    You agree there are some
23  diseases that are entirely genetic, right?
24      MR. MURDICA:  Objection to
25  form.

Page 72

1       THE WITNESS:  Some diseases,
2   certainly.
3   QUESTIONS BY MR. SNIDOW:
4   Q.    Down syndrome is a good
5   example?
6   A.    Yes.
7   Q.    Identical twins will either
8   both have Down syndrome or neither have Down
9   syndrome, excluding some rare mosaic cases,
10  right?
11  A.    I don't know the genetics of
12  Down syndrome, but that would make sense to
13  me if it's a single gene disorder and they're
14  identical twins that have the same set of
15  genes.
16  Q.    Well, you know it's a
17  replication of the 23rd chromosome?
18  A.    Uh-huh.
19  Q.    And that's something that
20  happens at conception?
21  A.    Uh-huh.
22  Q.    Immediately, right?
23      MR. MURDICA:  Objection to
24  form.
25      THE WITNESS:  Again, I'm not an

Page 73

1   embryologist, but...
2   QUESTIONS BY MR. SNIDOW:
3   Q.    Okay.  Well, you don't -- I
4   mean, do you not know that Down syndrome
5   is -- occurs initially when the egg is
6   fertilized?
7   A.    I do know that.
8   Q.    And that -- that's the
9   monozygotic egg, right?
10  A.    Yes.
11  Q.    So when it splits, they're
12  either both going to have Down's or neither
13  is, right?
14  A.    A single gene disorder, that's
15  how it works.
16  Q.    And autism is not like that, is
17  it?
18  A.    No.
19  Q.    No.
20      You agree that autism is not
21  caused entirely by genetics, true?
22      MR. MURDICA:  Objection to
23  form.
24      THE WITNESS:  As we said,
25  heritability is not 1 or 100 percent,

Page 74

1 however you prefer to speak of it, so
2 there are other factors.
3 QUESTIONS BY MR. SNIDOW:
4     Q.    Okay.  The reason you know
5 that, in part, is because the concordance for
6 monozygotic twins for autism, it's not
7 100 percent, is it?
8     A.    Correct.
9     Q.    And what's the -- I know the
10 estimates keep changing.
11         What do you think the best
12 estimate for that is now?
13     A.    Heritability?
14     Q.    No, for the concordance of
15 monozygotic twins.
16     A.    I would say around 90 percent,
17 but, again, it varies depending on who's
18 doing the study.
19     Q.    So it's -- basically, that
20 estimate has stayed the same for the last ten
21 years or so?
22     A.    It's bounced around a little
23 bit, but yes.
24     Q.    And outside of some rare cases,
25 like Fragile X, you agree there's no single

Page 75

1 gene for autism?
2     A.    There's no single gene for
3 autism, right.
4     Q.    You've never counseled someone
5 to get genetic counseling if they had a child
6 with autism?
7         MR. MURDICA:  Objection to
8     form.
9         THE WITNESS:  So I'm not a
10     geneticist, and I don't counsel
11     patients.  So I'm not going to opine
12     on that.
13 QUESTIONS BY MR. SNIDOW:
14     Q.    Oh, you wouldn't take a
15 position on that?
16     A.    I'm not -- it's not my area of
17 expertise.
18     Q.    So if someone asked you whether
19 you'd counsel someone to get genetic testing,
20 you'd say, "I can't take a position on that"?
21         MR. MURDICA:  Objection to
22     form.
23         THE WITNESS:  I would say I'm
24     not a geneticist, and I don't counsel
25     patients, so I wouldn't try to do

Page 76

1 that.
2         MR. SNIDOW:  Can we play tab
3 NN?  And I've still got the ELMO.
4         Do you want to go off the
5 record, Michael?
6         MICHAEL KAUFFMANN:  Yeah.
7         MR. SNIDOW:  Okay.  Go off the
8 record.
9         VIDEOGRAPHER:  The time is
10 9:28 a.m.  We're off the record.
11 (Off the record at 9:28 a.m.)
12         VIDEOGRAPHER:  The time is
13 9:32 a.m., and we're on the record.
14         MR. MURDICA:  Okay.  I would
15 just like to ask that this is twice
16 now that plaintiff's counsel has
17 unilaterally gone off the record.  I
18 asked off the record respectfully that
19 there be consent to do that or at
20 least a discussion in the future.
21         So this is my notation on the
22 record that that's my request.
23         Thank you.
24         MR. SNIDOW:  That's fine.  All
25 right.  Can you play NN?

Page 77

1         (Video played.)
2 QUESTIONS BY MR. SNIDOW:
3     Q.    All right.  Dr. Pinto-Martin,
4 is that you?
5     A.    That is.
6     Q.    All right.  And that was in
7 about 2014, I think?
8         MR. MURDICA:  Objection to
9     form.
10         THE WITNESS:  That's probably
11     about right.
12 QUESTIONS BY MR. SNIDOW:
13     Q.    And she asked you whether you'd
14 counsel someone to get genetic testing,
15 right?
16     A.    I can't remember precisely what
17 her question is, but that's what we were
18 talking about.
19     Q.    Do you want to play it again?
20     A.    No, I mean --
21     Q.    Okay.
22     A.    Yeah.
23     Q.    And you didn't say, "Oh, I
24 can't say anything about that," right?  You
25 just said no; is that right?

1       MR. MURDICA:  Objection to
2   form.
3       THE WITNESS:  I didn't just say
4   no.  I described what I think about in
5   terms of the value of genetic testing.
6   QUESTIONS BY MR. SNIDOW:
7       Q.    In that clip, did you ever say,
8   "Oh, I can't talk about that"?
9       MR. MURDICA:  Objection to
10  form.
11      THE WITNESS:  Again, this was a
12  discussion about the value of genetic
13  testing.  I would still -- had she
14  asked me, "Do you individually counsel
15  patients," I would have said no.  The
16  situation does not change.
17      MR. MURDICA:  Do you have the
18  entire video?  Sorry.
19      MR. SNIDOW:  Yeah.
20      MR. MURDICA:  I don't want to
21  interrupt the question.
22      MR. SNIDOW:  We'll send it to
23  you.
24      MR. MURDICA:  Well, look, if
25  you're going to ask her about the

1   whole thing, if you're going to say
2   "you never said this," I think she's
3   got to see the whole thing.
4       MR. SNIDOW:  That's fair.
5   That's fair.  That's fair.
6       MR. MURDICA:  So don't ask any
7   more questions like that.
8   QUESTIONS BY MR. SNIDOW:
9       Q.    Do you agree that you need an
10  environmental trigger in addition to genetics
11  to actually trigger the autism?
12      A.    I don't believe we know the
13  answer to that.  So we know that it's highly
14  heritable, and we know that there are some
15  other factors that matter, but those other
16  factors might also be related to genetics.
17      Q.    But you don't -- you wouldn't
18  agree that you need an environmental trigger
19  in addition to genetics?
20      A.    I think that was the thought --
21      Q.    Uh-huh.
22      A.    -- in the past, and I think
23  that I have -- my thinking has evolved since
24  then, and I don't know that we need an
25  environmental, quote/unquote, trigger.

1   Q.    Okay.
2       MR. SNIDOW:  Let's look at tab
3   LL.
4       (Video played.)
5       MR. MURDICA:  Okay.  Before you
6   ask a question, if this were -- if you
7   were cross-examining via prior sworn
8   testimony, like a deposition
9   transcript, you'd have to show the
10  entire transcript when you were
11  cross-examining.
12      Instead, you're taking little
13  video clips without the whole context,
14  which I don't think is proper
15  examination, and so I object.
16      I don't actually think you can
17  do this, J.J.
18      MR. SNIDOW:  Okay.  Are you
19  done?
20      MR. MURDICA:  I'm trying to
21  decide if --
22      MR. SNIDOW:  Yeah.  We can go
23  off the record and call the judge.
24      MR. MURDICA:  All right.  Is
25  this your last one, or do you have a

1   lot of these?
2       MR. SNIDOW:  It's on YouTube.
3   Go YouTube it.  Okay?  Are you done?
4       MR. MURDICA:  But you would
5   need to examine with the entire thing.
6       MR. SNIDOW:  All I'm asking is
7   whether we're calling -- I'm not going
8   to play a 40-minute video in the
9   deposition, obviously.  We'll send you
10  the YouTube link if you don't have it,
11  although I suspect you do.
12      MR. MURDICA:  I don't have it.
13      MR. SNIDOW:  Okay.  Well, are
14  we going to call the judge, or are we
15  going to go on?
16      MR. MURDICA:  Are you to going
17  ask a question about the entire
18  conversation?
19      MR. SNIDOW:  I'm going to ask
20  her a question.
21      MR. MURDICA:  All right.  Let's
22  hear it.
23  QUESTIONS BY MR. SNIDOW:
24      Q.    My question is, is that you,
25  Dr. Pinto-Martin?

Confidential - Subject to Protective Order

Page 82

1    A.    That's still me.
2    Q.    Okay.  And I noticed in there
3  that it said that the concordance for twins
4  was 65 or 70.
5          Is that dated data?
6    A.    So you yourself pointed out
7  this was in about 2014.
8    Q.    Yeah.
9    A.    So, yes, our knowledge has
10  evolved.
11    Q.    That's all I was asking.
12          It's still not 100 percent,
13  though, right?
14    A.    Correct.
15    Q.    And you did say in there that
16  you need an environmental trigger in addition
17  to the genetics to actually trigger the
18  autism, right?
19          MR. MURDICA:  Object to form.
20          THE WITNESS:  I said that in
21      2014 based on our best evidence at
22      that time.
23  QUESTIONS BY MR. SNIDOW:
24    Q.    And since 2014, has the
25  concordance for identical twins gone to

Page 83

1  100 percent?
2    A.    As we have already discussed,
3  it's not 100 percent.  It's closer to
4  90 percent.
5    Q.    Do you agree that there are
6  things that happen to the fetus in utero that
7  predispose a child to autism?
8    A.    I don't think we know the
9  specifics of intrauterine effects on the
10  fetus that might cause autism.  We are very
11  interested in studying what those effects
12  might be, but I would say we're still in the
13  early stages of understanding what those
14  factors might be.
15    Q.    Do you think the most important
16  place to look when searching for causes of
17  autism is the gestational period?
18          MR. MURDICA:  Objection to
19      form.
20          THE WITNESS:  I believe that
21      autism is a congenital disorder so
22      that the effect happens in utero.  We
23      can't detect it right away, but a
24      child is born with or without autism.
25

Page 84

1  QUESTIONS BY MR. SNIDOW:
2    Q.    Do you think that the things
3  that happen in utero is where you should look
4  to find causes of autism?
5    A.    I think genetics is where you
6  should look to find causes of autism.  I
7  think 90 percent of autism is explainable by
8  heritable factors.  That's a huge proportion.
9    Q.    And the other 10 percent?
10          MR. MURDICA:  Objection to
11      form.
12          THE WITNESS:  The other
13      10 percent we don't know.
14  QUESTIONS BY MR. SNIDOW:
15    Q.    Okay.
16    A.    And the other 10 percent could,
17  in fact, be tied to genetic factors.  So
18  we're, as I said, exploring very intensely to
19  understand what the risk factors are and we
20  don't have the answers yet.
21          MR. SNIDOW:  Let's play tab KK.
22          (Video played.)
23  QUESTIONS BY MR. SNIDOW:
24    Q.    You said that, right?
25    A.    I said that.

Page 85

1    Q.    And you referred to causal
2  agents in that video, right?
3          MR. MURDICA:  Objection to
4      form.
5          THE WITNESS:  I think I used
6      that terminology, yes.
7  QUESTIONS BY MR. SNIDOW:
8    Q.    In utero causal agents, right?
9    A.    And this was in 2014.
10    Q.    Do you agree that prenatal
11  environmental exposures can alter the brain?
12          MR. MURDICA:  Objection to
13      form.
14          THE WITNESS:  I'd like you to
15      cite something specific.  That's a
16      very general statement.  I think
17      there -- there can be evidence, but I
18      would like you to be specific.
19          (Pinto-Martin Exhibit 602
20      marked for identification.)
21  QUESTIONS BY MR. SNIDOW:
22    Q.    Okay.  Can I have tab AAA also?
23  Yeah.  And also that second book.
24          All right.  You've seen this
25  before?

Page 86

1    A.    Uh-huh.
2    Q.    Okay.  Did you write a chapter
3 in this book?
4    A.    I was part of a team that wrote
5 a chapter for that book.
6    Q.    Okay.  So here's what I'm going
7 to do.  I excerpted the entire chapter here.
8    A.    Okay.
9        MR. SNIDOW:  Jim, if you'd like
10 the whole book, be my guest.
11       MR. MURDICA:  Thank you.
12       MR. SNIDOW:  And I'm going to
13 mark this one as 602.
14 QUESTIONS BY MR. SNIDOW:
15    Q.    All right.  And on the first
16 page, that's your name, Jennifer
17 Pinto-Martin?
18    A.    Correct.
19    Q.    And you wrote or co-authored
20 this chapter?
21    A.    I did.
22    Q.    And on 499 at the bottom, do
23 you see where it says "Ongoing research"?
24    A.    At the very bottom, yeah.
25    Q.    It says, "Ongoing research is

Page 87

1 examining the role of hormones, infection,
2 autoimmune response, exogenous toxic
3 exposures, and other potential environmental
4 influences that might alter pre or postnatal
5 brain development alone or by altering gene
6 action."
7        Is that right?
8    A.    I think my --
9    Q.    It skips over to 501.
10    A.    Yeah, I can't read the top of
11 501 because it's highlighted and then
12 highlighted again.
13       MR. MURDICA:  It's highlighted
14 and copied and blacked out.
15       THE WITNESS:  Yeah, it's like
16 really dark.  I can't -- I mean, I
17 believe you if you say that's what it
18 says, but it would be better to have a
19 clean copy.
20       MR. MURDICA:  I'll give you
21 mine.
22       THE WITNESS:  That's also
23 pretty hard to see, but --
24       MR. SNIDOW:  You can't read
25 that?

Page 88

1        THE WITNESS:  It does alter pre
2 or postnatal brain development alone
3 or by altering gene actions, yeah.
4 QUESTIONS BY MR. SNIDOW:
5    Q.    Okay.  And what that's saying
6 is prenatal environmental exposures can alter
7 the brain.
8        MR. MURDICA:  Objection to
9 form.
10 QUESTIONS BY MR. SNIDOW:
11    Q.    Is that right?
12    A.    As I said, I think that's a
13 hypothesis that we are putting forth in this
14 chapter.
15        By the way, can you tell me the
16 date of this?  I don't remember when we
17 authored this, but it was a while ago.
18    Q.    I don't --
19        MR. MURDICA:  I can.
20        MR. SNIDOW:  Jim took the book.
21        MR. MURDICA:  It looks like
22 15 years ago.
23        MR. SNIDOW:  Can you just give
24 the date, Jim?
25        MR. MURDICA:  '08.

Page 89

1        MR. SNIDOW:  Thank you.
2 QUESTIONS BY MR. SNIDOW:
3    Q.    All right.  You can put that
4 aside.
5        Do you agree that there are
6 environmental factors that can cause autism?
7        MR. MURDICA:  Object to form.
8        THE WITNESS:  I think we are in
9 a very rich time for investigating the
10 role of nongenetic factors for autism.
11 I don't think we have specific
12 environmental factors with --
13 describing that broadly, right.  So
14 all the things that we talked about
15 already:  The lifestyle factors and
16 the actual agents in the environment
17 and the potential other genetic
18 factors.
19        We don't have strong evidence
20 to support a causal association with
21 any of those environmental factors
22 with perhaps the exception of parental
23 age, which, of course, is linked to
24 genetics in ways that we can talk
25 about, if you want.

Page 90

1    So I think that we are in an
2  exploration phase.  We have
3  interesting data.  We have data that's
4  continuing to evolve, but there is
5  still a lot of questions.
6    MR. SNIDOW:  Okay.  Can you
7  play tab MM?
8    (Video played.)
9  QUESTIONS BY MR. SNIDOW:
10   Q.   All right.  And that's what --
11 that's what you've tried to do in your work,
12 right?
13   A.   That's right.
14    MR. MURDICA:  Objection to
15  form.
16 QUESTIONS BY MR. SNIDOW:
17   Q.   And I'm not asking about
18 conclusively, but do you think that there are
19 any environmental factors where it's more
20 likely than not that it causes autism?
21    MR. MURDICA:  Objection to
22  form.
23    THE WITNESS:  So, again, I'm
24  never going to say that I think an
25  environmental factor causes autism.

Page 91

1  QUESTIONS BY MR. SNIDOW:
2   Q.   Oh, okay.
3   A.   But I could say that, you know,
4  is there evidence in support of a causal
5  association.  And as I said with parental
6  age, I think there is strong and consistent
7  evidence from all over the world that the
8  older mother and older father both contribute
9  to an increased risk of autism.
10   Q.   But that's it; nothing else?
11    MR. MURDICA:  Objection to
12  form.
13    THE WITNESS:  I think there is
14  interesting evidence in other areas,
15  but nothing that I think is as strong
16  as the parental age finding.
17 QUESTIONS BY MR. SNIDOW:
18   Q.   And you wouldn't deem any of
19 the other ones causal?
20   A.   Correct.
21   Q.   Do you agree it's possible that
22 there is currently an epidemic of autism?
23    MR. MURDICA:  Objection to
24  form.
25    THE WITNESS:  So I think to

Page 92

1  answer that question -- first of all,
2  no.
3  QUESTIONS BY MR. SNIDOW:
4   Q.   Okay.
5   A.   And to answer that question, we
6  need to understand what the definition of an
7  epidemic is.
8   Q.   Right.
9   A.   And I'm happy to go into that,
10 if you'd like.
11   Q.   Well, I think you think an
12 epidemic, you need to know the cause, right?
13   A.   It's --
14    MR. MURDICA:  Objection to
15  form.
16    THE WITNESS:  An epidemic is
17  showing an increase in the actual risk
18  of acquiring the disease, not being
19  labeled with the disease, but an
20  increase in the actual risk of
21  acquiring the disease.
22    We do not have evidence to
23  show -- that would be the incidence,
24  right?  We do not have evidence to
25  show that the incidence of autism

Page 93

1  spectrum disorders is increasing, yes,
2  and information to show that the
3  prevalence is increasing, but those
4  are very different things.
5  QUESTIONS BY MR. SNIDOW:
6   Q.   Yeah.
7    But do you think you need to
8  know the cause of a disease to say whether
9  it's an epidemic?
10    MR. MURDICA:  Objection to
11  form.
12    THE WITNESS:  So I think that
13  understanding the incidence of disease
14  requires knowing what's driving the
15  increase in incidences.
16    So I believe we cannot
17  establish that there's an increased
18  incidence in autism spectrum disorder
19  because we don't know entirely what
20  the causal pathway for autism is.
21 QUESTIONS BY MR. SNIDOW:
22   Q.   But would you agree we don't
23 currently know whether there's an autism
24 epidemic?
25    MR. MURDICA:  Objection to

Page 94

```
1    form.
2         THE WITNESS:  I would say I
3    believe, based on the data that I've
4    been involved in collecting and
5    publishing, it -- the epidemic is not
6    a function of an increase in
7    incidence; it's a function of a whole
8    host of factors, including increased
9    awareness, change in diagnostic
10   criteria, early age of diagnosis.
11        So I do not count that as an
12   epidemic because it's not an increase
13   in the risk of acquiring the disease.
14   It's an increase in the number of
15   individuals who are labeled with the
16   disease.
17   QUESTIONS BY MR. SNIDOW:
18        Q.    Yeah.
19             So you don't think there's an
20   epidemic?
21        A.    I do not.
22             MR. SNIDOW:  Can we play tab
23   OO?
24             (Video played.)
25
```

Page 95

```
1    QUESTIONS BY MR. SNIDOW:
2         Q.    Is that you again?
3         A.    That's me.
4              MR. MURDICA:  Objection to form
5    and to the continued use of these
6    short little video clips from a large
7    video.
8              MR. SNIDOW:  Yeah, that's fine.
9    QUESTIONS BY MR. SNIDOW:
10        Q.    And there you said we don't
11   know whether there's an epidemic, right?
12        A.    So this was in 2014.
13        Q.    Yeah.
14        A.    And I think that that's what I
15   said in 2014.
16        Q.    Okay.  Do you agree
17   heritability does not actually tell you what
18   proportion of a trait is determined by the
19   environment?
20        A.    Heritability does not determine
21   what proportion of the trait is determined by
22   the environment.  Yes, I agree with that.
23        Q.    A disease can be heritable and
24   still determined by environmental factors?
25        A.    A disease can be heritable, and
```

Page 96

```
1    environmental factors can still influence the
2    phenotype, yes.
3         Q.    So if a her -- we had
4    heritability of -- what do you think autism
5    is, 90 percent?
6         A.    80 to 90 percent.
7         Q.    80?
8              That doesn't mean that autism
9    is 80 percent caused by genetic factors, does
10   it?
11             MR. MURDICA:  Objection to
12   form.
13             THE WITNESS:  Again, we
14   understand autism to be a genetic
15   disorder.  We understand heritability
16   to describe the proportion of the
17   phenotype that is explained by genes.
18             We know that that's not
19   100 percent.  We know that there are
20   other factors as we've -- as we've
21   said already that include lifestyle,
22   environment, other genetic factors.
23             (Pinto-Martin Exhibit 603
24   marked for identification.)
25
```

Page 97

```
1    QUESTIONS BY MR. SNIDOW:
2         Q.    All right.  I'm going to mark a
3    document as Pinto-Martin 603.
4              You see at the top there,
5    National Institutes of Health?
6         A.    Barely.
7         Q.    Yeah.  Not great printing.
8              Do you see the bullet at the
9    bottom that says, "Heritability does not
10   indicate"?
11        A.    I do.
12        Q.    It says, "Heritability does not
13   indicate what proportion of a trait is
14   determined by genes and what proportion is
15   determined by environment."
16             Did I read that correctly?
17        A.    That's what it says.
18        Q.    Do you agree?
19        A.    I think I just said something
20   similar to that.
21        Q.    Okay.  It says, "So a
22   heritability of .7 does not mean that a trait
23   is 70 percent caused by genetic factors."
24             Did I read that correctly?
25        A.    That's what that says.
```

Page 98

1    Q.   Do you agree?
2    A.   I agree with that statement.
3    Q.   So if someone said that 70 to
4  90 percent of ASD cases are caused by
5  genetics because of the heritability rate
6  that you described, that's inconsistent with
7  this, right?
8        MR. MURDICA:  Objection to
9    form.
10       THE WITNESS:  I don't know
11   where this came from.  I don't know
12   what this is used for.  So it's a
13   little hard for me to re -- respond
14   sort of off the cuff on statements
15   like this.
16 QUESTIONS BY MR. SNIDOW:
17   Q.   Well, you told me you agreed
18 with that, right?
19   A.   So I understand that
20 heritability is not deterministic, but I
21 believe that 80 to 90 percent of autism is
22 described --
23       (Audio interruption.)
24       MR. MURDICA:  All right.
25

Page 99

1  QUESTIONS BY MR. SNIDOW:
2    Q.   All right.  Ma'am, let's focus
3  on this.  You said you agreed with the
4  sentence, "A heritability of .7 does not mean
5  that a trait is 70 percent caused by genetic
6  factors," right?
7    A.   Again, this --
8    Q.   Wait, sorry.  I'm just saying,
9  do -- are you changing your testimony about
10 whether you agree?
11       MR. MURDICA:  Objection to
12   form.
13       THE WITNESS:  I'm not changing
14   my testimony.  I'm trying to
15   contextualize it by saying I don't
16   know where this came from, and I don't
17   know exactly who the audience is.  I
18   don't know what it's based on.
19       So it's hard for me respond
20   to it.
21 QUESTIONS BY MR. SNIDOW:
22   Q.   Right.
23       But you said you agreed with
24 the sentence, right?
25       MR. MURDICA:  Objection to

Page 100

1  form.
2        THE WITNESS:  I can agree with
3    something and still have a --
4  QUESTIONS BY MR. SNIDOW:
5    Q.   Yeah.
6    A.   -- contextualized response, and
7  that's what I'm saying with that.
8    Q.   All I'm saying is -- what this
9  is saying is the heritability of -- for
10 autism of 80 to 90 percent does not mean that
11 autism is 80 to 90 percent caused by genetic
12 factors, right?
13       MR. MURDICA:  Objection to
14   form.
15       THE WITNESS:  I'm not sure I
16   agree with that.
17 QUESTIONS BY MR. SNIDOW:
18   Q.   Okay.  That's fine.
19       Do you agree that applying
20 Bradford Hill is more like a clinical
21 judgment than experimental science?
22       MR. MURDICA:  Objection to
23   form.
24       THE WITNESS:  So that's not the
25   way I would describe it because I'm

Page 101

1    not a clinician, so I don't apply
2    clinical judgment.  I apply
3    epidemiologic judgment.
4        I would agree that it's
5    applying epidemiologic judgment to a
6    body of literature.
7  QUESTIONS BY MR. SNIDOW:
8    Q.   When you're doing Bradford
9  Hill, there's no hard-and-fast rules; it is a
10 matter of judgment, right?
11   A.   I believe that it's a matter of
12 expert judgment, yes.
13   Q.   And when researchers are
14 writing their papers, do you agree they're
15 conservative when assessing causal
16 relationships?
17       MR. MURDICA:  Objection to
18   form.
19       THE WITNESS:  It's a very broad
20   statement.  I can't answer.
21 QUESTIONS BY MR. SNIDOW:
22   Q.   All right.  PPP.
23       All I am asking is when
24 they're -- when they're publishing, they're
25 reluctant to say causation, aren't they?

Page 102

1          MR. MURDICA:  Objection to
2    form.
3          THE WITNESS:  I can't say that
4    in general.  Some people are very
5    willing to say causation.  I myself am
6    I think perhaps more conservative than
7    others.
8          (Pinto-Martin Exhibit 605
9    marked for identification.)
10   QUESTIONS BY MR. SNIDOW:
11   Q.    All right.  I'm going to mark a
12   document as Pinto-Martin 605.  This is the
13   Reference Manual on Scientific Evidence.
14         MR. MURDICA:  Do you have a
15   copy for me?
16         MR. SNIDOW:  I do.  I do.
17   QUESTIONS BY MR. SNIDOW:
18   Q.    This document, just so you
19   know, is about a thousand pages long, so I've
20   excerpted a couple of chapters.
21         MR. SNIDOW:  Jim, this one is
22   widely available, and I think you're
23   familiar with it, too.
24         MR. MURDICA:  I am.
25

Page 103

1    QUESTIONS BY MR. SNIDOW:
2    Q.    So this is the Reference Manual
3    on Scientific Evidence.
4          Do you see that?
5    A.    I see that.  I don't really
6    know what that -- how it's used or where it's
7    from or any- --
8    Q.    Yeah.
9    A.    I've never seen it before.
10   Q.    All right.
11   A.    But, yes, that's what it says.
12   Q.    You see it's published by the
13   Federal Judicial Center?
14   A.    I see that on the front page.
15   Q.    And if you could turn to the
16   page that's marked 62.
17   A.    262?  I'm sorry.
18   Q.    I'm sorry.
19   A.    It's marked 62?  I don't see
20   that.
21   Q.    262.
22   A.    Marked 262.  I don't have a
23   262.  I have a 253, a 254.
24         MR. MURDICA:  I think he put
25   two parts --

Page 104

1          THE WITNESS:  I know, but I
2    still don't have a 262.
3          MR. MURDICA:  Hold on.  Hold
4    on.  Hold on.  Hold on.  Hold on.
5    Hold on.
6          THE WITNESS:  It goes from 252
7    to 500 something -- 255.
8    QUESTIONS BY MR. SNIDOW:
9    Q.    599, I'm sorry.
10   A.    590 -- I don't have 599 either.
11   I have 597.
12   Q.    Look at that one.
13         MR. MURDICA:  I don't have 599
14   either.
15         THE WITNESS:  You want to
16   share?
17         Okay.  I have page 599.  I'm
18   going to get my reading glasses out if
19   you don't mind, because that's pretty
20   small.
21   QUESTIONS BY MR. SNIDOW:
22   Q.    Please.
23   A.    Okay.
24   Q.    And do you see the sentence
25   that begins -- three lines down that begins

Page 105

1    "generally"?
2    A.    Uh-huh.
3    Q.    It says, "Generally researchers
4    are conservative when it comes to assessing
5    causal relationships, often calling for
6    stronger evidence and more research before
7    conclusion of causation is drawn."
8          Do you see that?
9    A.    That's what it says.
10   Q.    All right.  You can put that
11   one aside for now, but hold on to it.
12         Do you agree that it's
13   ultimately a value judgment about whether the
14   evidence is strong enough to warrant a causal
15   inference?
16         MR. MURDICA:  Objection to
17   form.
18         THE WITNESS:  So I think I
19   would want you to define a value --
20   what did you say, a value --
21   QUESTIONS BY MR. SNIDOW:
22   Q.    A value judgment.
23   A.    -- judgment?
24   Q.    Uh-huh.
25   A.    Because I'm not sure exactly

Confidential - Subject to Protective Order

Page 106

1  what you mean by that. There are -- there
2  are a set of criteria, and I try to apply
3  those criteria with rigor and consistency,
4  and I don't consider that a value judgment.
5         I think that's an expert
6  opinion judgment.
7      Q.   Okay. Do you think that
8  whether evidence is strong enough to warrant
9  the causal inference is open to reasonable
10 debate?
11        MR. MURDICA: Objection to
12 form.
13        THE WITNESS: I think that
14 entirely depends on the evidence, so
15 reasonable debate is -- it happens in
16 science, but I can't in -- sort of out
17 of context say "yes" because sometimes
18 the answer would be "no."
19 QUESTIONS BY MR. SNIDOW:
20     Q.   Do you think people can
21 disagree with one another in good faith about
22 whether the evidence is strong enough to
23 warrant a causal inference?
24        MR. MURDICA: Objection. Form.
25        THE WITNESS: Again, I think it

Page 107

1  depends on the body of evidence.
2        MR. SNIDOW: Can I have X,
3  please?
4        (Pinto-Martin Exhibit 606
5  marked for identification.)
6  QUESTIONS BY MR. SNIDOW:
7      Q.   All right. Marking a document
8  as Pinto-Martin 606.
9      A.   Put this aside?
10        MR. MURDICA: Uh-huh.
11 QUESTIONS BY MR. SNIDOW:
12     Q.   All right. Now --
13        MR. MURDICA: Can I have my
14 copy, please?
15        MR. SNIDOW: Yeah.
16        MR. MURDICA: Thank you.
17        MR. SNIDOW: Yeah.
18 QUESTIONS BY MR. SNIDOW:
19     Q.   All right. This is a
20 publication Yudell 2013.
21        Do you see that at the top
22 there?
23     A.   I do.
24     Q.   And if you look down at the
25 bottom, you'll see your name. It's about

Page 108

1  four lines down in the corresponding author
2  box.
3      A.   I haven't found me, but I
4  believe that I'm in there.
5        MR. MURDICA: I saw it. Right
6  there.
7        THE WITNESS: Okay. Yeah. Got
8  it.
9  QUESTIONS BY MR. SNIDOW:
10     Q.   All right. It's defining you
11 as member -- as a member of the working group
12 in autism risk communication ethics, right?
13     A.   That's correct.
14     Q.   And you served on -- in that
15 working group?
16     A.   I did.
17     Q.   And then it looks like you guys
18 published this paper?
19     A.   Well, I wasn't part of the
20 paper itself, but I'm part of the working
21 group.
22     Q.   Do you think you reviewed it
23 before it went out?
24     A.   I don't recall.
25     Q.   Okay. Let's see if you agree.

Page 109

1        On page 10, at the bottom
2  there, do you see a sentence -- sorry, the
3  bottom of the second full paragraph, there's
4  a sentence that begins "finally"?
5      A.   Uh-huh.
6      Q.   It says, "Finally, the notion
7  of sufficient or appropriate evidential
8  support involves value judgments."
9        Did I read that correctly?
10     A.   That's what it says.
11     Q.   And that's what this working
12 group that you served on said?
13     A.   Again, I don't know who wrote
14 that particular sentence. It looks like it's
15 citing to two other references, and that may
16 have been their language.
17     Q.   Uh-huh.
18     A.   So I don't know who said that.
19     Q.   Do you agree with it?
20     A.   As I just said, it depends on
21 the definition of value judgment. It's not
22 the way I would describe application of the
23 Bradford Hill criteria, which was your
24 original question.
25     Q.   Well, this isn't about Bradford

Page 110

1  Hill, is it?
2      A.    But that was your original
3  question about the --
4      Q.    No, actually --
5      A.    -- an actual value judgment.
6      Q.    No.  I actually said whether
7  the evidence is enough to warrant a causal
8  inference?
9          MR. MURDICA:  Object -- that's
10  not a question.
11  QUESTIONS BY MR. SNIDOW:
12      Q.    Right?
13          And so look at it again.  It
14  says, "Finally, the notion of sufficient or
15  appropriate evidential support involves value
16  judgments."
17          Right?
18          MR. MURDICA:  Objection to
19  form.
20          THE WITNESS:  That's what it
21  says.
22  QUESTIONS BY MR. SNIDOW:
23      Q.    Okay.  And if you turn to the
24  next page, page 11, at the top of the first
25  paragraph, the one that begins with the next

Page 111

1  page, there's a sentence that says,
2  "Furthermore"?
3      A.    I see that sentence.
4      Q.    It says, "Furthermore, since
5  judgements of sufficient evidence are value
6  laden, there's no good reason to exclude the
7  voices of the broader autism community when
8  considering them."
9          Right?
10      A.    That's what that says.
11      Q.    Do you agree?
12      A.    I'm not sure exactly what they
13  mean there.
14      Q.    Okay.  So you think that even
15  though your name is on the front, you didn't
16  read this before it went out?
17          MR. MURDICA:  Objection to
18  form.
19          THE WITNESS:  I'm not an author
20  on this paper.  We had multiple
21  meetings as a group, and this was a
22  publication that was written without
23  my involvement.  So I am not
24  responsible for what's --
25          (Audio interruption.)

Page 112

1          MR. MURDICA:  Do you want to go
2  off the record?
3          MR. SNIDOW:  Yes, please.
4          VIDEOGRAPHER:  The time is
5  9:59 a.m., and we're off the record.
6      (Off the record at 9:59 a.m.)
7          VIDEOGRAPHER:  The time is
8  10:10 a.m., and we're on the record.
9  QUESTIONS BY MR. SNIDOW:
10      Q.    Okay.  Dr. Pinto-Martin, I'm
11  going to go through some associations that
12  have been demonstrated in the autism
13  literature, and what I want you to do is tell
14  me whether you think the most likely
15  explanation is chance, bias, confounding or
16  causation.
17          Okay?
18          MR. MURDICA:  Object to form.
19  QUESTIONS BY MR. SNIDOW:
20      Q.    Ready?
21      A.    I understand what you're
22  proposing to do.
23      Q.    Okay.
24      A.    It may be that I'm going to
25  want to look at specific studies to inform

Page 113

1  myself about whether one of those is the most
2  likely explanation.  I'm not sure I can do
3  it --
4      Q.    That's fine.
5      A.    -- in a vacuum.
6      Q.    If there's one you aren't sure
7  about, you just let me know.
8          Okay?
9          MR. MURDICA:  Object to form.
10  QUESTIONS BY MR. SNIDOW:
11      Q.    All right.  Thalidomide?
12      A.    So thalidomide, to my
13  knowledge, there is one study that used data
14  and looked retrospectively at whether
15  thalidomide increased the risk of autism
16  spectrum disorder.
17          There are many problems with a
18  retrospective design like that.  We could
19  talk about the problems inherent in recall
20  bias and -- so I would say that the jury is
21  still out on that one, if you will.  One
22  study does not establish or disprove the
23  hypothesis of a causal association.
24      Q.    All right.  So you don't think
25  it's -- the most likely explanation is

¹ causation; is that right?
²      MR. MURDICA: Object to form.
³      THE WITNESS: Again, I'm
⁴ willing to give an opinion when we
⁵ have one study.
⁶ QUESTIONS BY MR. SNIDOW:
⁷      Q. All right. You wouldn't say
⁸ that it's established that thalidomide causes
⁹ autism?
¹⁰      MR. MURDICA: Objection to
¹¹ form.
¹²      THE WITNESS: It's -- I would
¹³ say there is very significant
¹⁴ interesting evidence from one study.
¹⁵ I would never make an opinion based on
¹⁶ a single study.
¹⁷      I think it's interesting. I
¹⁸ think it's compelling. We will never
¹⁹ be able to do another study because
²⁰ thalidomide is now off the market.
²¹ QUESTIONS BY MR. SNIDOW:
²²      Q. Yeah.
²³      A. And, again, with one study and
²⁴ the inherent problems, I can't establish that
²⁵ something is causal.

¹      Q. Okay. But what do you think
² the most likely explanation is? Is it
³ chance, confounding, bias or causation?
⁴      MR. MURDICA: Objection to
⁵ form.
⁶      THE WITNESS: I would want to
⁷ look at the study, look at the sample
⁸ size, look at the exposure, look at
⁹ the assessment of outcome.
¹⁰ QUESTIONS BY MR. SNIDOW:
¹¹      Q. All right. That's fine.
¹² Misoprostol?
¹³      A. So that's an abortifacient.
¹⁴ And so women who wanted to end their
¹⁵ pregnancy took that medication. And then
¹⁶ those who didn't lose their baby were then
¹⁷ followed and autism was assessed in those
¹⁸ babies.
¹⁹      Again, I think that there's
²⁰ interesting evidence to suggest that there
²¹ may be an association with an increased risk
²² of autism among those women, but it's a very
²³ complicated study to assess, given the
²⁴ selection bias going into a study like that,
²⁵ and I would want to review the study -- the

¹ studies very carefully before I answered a
² question like the one you're addressing.
³      Q. All right. Air pollution?
⁴      A. So, again, there is some data
⁵ that suggests that particulate matter in the
⁶ environment, in the air, is associated with
⁷ an increased risk. There are many problems
⁸ with the studies.
⁹      I referred to this earlier in
¹⁰ the answer to one of your questions because
¹¹ air pollution is an ecological exposure. We
¹² don't have individual level of air pollution
¹³ in a pregnant woman. So I believe that there
¹⁴ are very interesting data that are very
¹⁵ challenging to interpret with respect to any
¹⁶ kind of causal connection.
¹⁷      Q. Mother's psychiatric
¹⁸ conditions, do you think that's chance,
¹⁹ confounding, bias or causation?
²⁰      MR. MURDICA: Objection to
²¹ form.
²²      THE WITNESS: So I think
²³ maternal psychiatric condition,
²⁴ because it is linked to genetics, has
²⁵ strong and very consistent evidence

¹ with respect to both ASD and ADHD.
²      We don't understand the causal
³ pathway from maternal genetics through
⁴ psychiatric history of the mother to
⁵ increased risk of autism in the
⁶ offspring because we don't know how
⁷ the genes operate.
⁸      So, again, I think the evidence
⁹ there is very strong and consistent
¹⁰ and compelling. If you -- if you
¹¹ wanted me to review that body of
¹² literature and give you my best
¹³ estimate, I'd be happy to do that,
¹⁴ but --
¹⁵ QUESTIONS BY MR. SNIDOW:
¹⁶      Q. But sitting here right now, can
¹⁷ you tell me that mother's psychiatric
¹⁸ conditions causes autism? Can you tell me
¹⁹ that?
²⁰      MR. MURDICA: Objection to
²¹ form.
²²      THE WITNESS: So, again, as I
²³ mentioned before, based on
²⁴ observational studies, I will never
²⁵ say that something causes autism.

1 QUESTIONS BY MR. SNIDOW:
2      Q.    Okay.
3      A.    I would say that the strength
4 of the evidence on psychiatric history is
5 substantial, and that it looks to be a risk
6 factor that elevates the outcome of autism in
7 offspring.
8      Q.    Okay.  Valproic acid?
9      A.    Again, very interesting data.
10 We know a lot about valproic acid because
11 it's a prescription medication, so we know
12 very specific information about the timing
13 and the dose and the duration of valproic
14 acid with respect to a mother's pregnancy.
15           We also know the indication for
16 use because it's given for very specific
17 reasons:  Seizure disorder, migraine.  So the
18 evidence is, again, interesting and
19 compelling and I think strong in many cases,
20 and we are still continuing to evaluate it.
21      Q.    Do you think that the evidence
22 for valproic acid right now is strong enough
23 to say it's most likely causal?
24           MR. MURDICA:  Objection to
25      form.

1           THE WITNESS:  I would want to
2      review the valproic acid studies.  I
3      haven't done that in a while, and I
4      think they are still ongoing.  I think
5      people are still producing evidence,
6      but I think that, again, the data is
7      interesting, compelling, worthy of
8      further consideration, could well be
9      confounded by genetics.
10          There could be other
11     explanations for it, so I'm unwilling
12     to say that anything is causal without
13     a thorough evaluation of that
14     literature.
15 QUESTIONS BY MR. SNIDOW:
16      Q.    Well, you've got two sections
17 on valproic acid in your report, right?
18      A.    I believe that's true, both in
19 the autism and ADHD section.
20      Q.    And you reviewed the literature
21 before writing those sections, I assume.
22      A.    The literature that existed to
23 date, yeah.
24      Q.    Okay.  So can you tell me, does
25 that literature make the most likely

1 explanation for the valproic acid association
2 causation?
3      A.    Again, from an observational
4 study, I cannot establish causation.  I would
5 say that the evidence on valproic acid is
6 suggestive of an increased risk of autism
7 spectrum disorder among women who took it.
8 That doesn't necessarily establish causality.
9      Q.    I agree.
10      A.    Okay.
11      Q.    But you say in your report you
12 don't think that the evidence for Tylenol is
13 enough to establish causation, right?
14           MR. MURDICA:  Object --
15      objection to form.
16           THE WITNESS:  That's correct.
17 QUESTIONS BY MR. SNIDOW:
18      Q.    Okay.  And I assume that
19 there's some level of evidence where you
20 would have a different opinion, right?
21      A.    So as I said, the things that I
22 think about when I'm trying to evaluate
23 whether there is evidence in support of a
24 causal association -- not cause, but a causal
25 association -- I look at the information on

1 the exposure, what is the precision with
2 respect to timing, dose, duration; what is
3 the precision with respect to assessment of
4 outcome.
5           And in the acetaminophen
6 literature, we have problems in both of those
7 domains, and so it renders my opinion --
8 supports my opinion, which is that there is
9 not evidence of a causal association.
10      Q.    Right.
11           I was asking about valproic
12 acid, right?  And does the literature for
13 valproic acid support the statement that the
14 most likely explanation is causation?
15           Does it or no?
16           MR. MURDICA:  Objection to
17      form.
18 QUESTIONS BY MR. SNIDOW:
19      Q.    Let me ask it a different way.
20           If we had had a report saying,
21 "We think valproic acid causes autism," and
22 you were writing a report like yours now,
23 would you write, "I do or I don't think that
24 the evidence for valproic acid supports a
25 causal association"?

Confidential - Subject to Protective Order

---

Page 122

1    MR. MURDICA:  Objection to
2 form.
3    THE WITNESS:  So I tried to
4 answer this question a couple of
5 times.
6 QUESTIONS BY MR. SNIDOW:
7    Q.    Right.
8        But can you answer it?
9    A.    I'll try again.
10    Q.    Okay.  Would you write that
11 sentence?  Would you write, "I think the
12 evidence for valproic acid does support a
13 causal association," or would you write, "I
14 think the evidence for valproic acid does not
15 report a causal association"?
16        MR. MURDICA:  Objection to
17 form.
18 QUESTIONS BY MR. SNIDOW:
19    Q.    Can you answer that question?
20        If you can't answer it, we'll
21 move on.  But can you answer that?
22        MR. MURDICA:  Objection to
23 form.
24        THE WITNESS:  I believe in my
25 report I agree that the evidence

---

Page 123

1 supports a causal link.  That doesn't
2 mean it establishes it --
3 QUESTIONS BY MR. SNIDOW:
4    Q.    That's fine.
5    A.    -- but it supports it.
6    Q.    That's all I wanted.
7        The most likely explanation is
8 causation, it's not just certain.
9        Is that right?
10        MR. MURDICA:  Object to form.
11        THE WITNESS:  I'll agree with
12 that statement.
13 QUESTIONS BY MR. SNIDOW:
14    Q.    Okay.  And maybe I should have
15 clarified this before, but any of these other
16 risk factors we talked about, would you give
17 the same answer that you did for valproic
18 acid?
19        Like, would you say
20 thalidomide, misoprostol, air pollution,
21 mother's psychiatric conditions, not
22 definitive, but would you say the most likely
23 explanation is causation?
24        MR. MURDICA:  Object to form.
25        THE WITNESS:  We just went

---

Page 124

1 through them one at a time, and I
2 think I answered them one at a time.
3 I can't answer them as a group because
4 I differ in the -- with respect to the
5 individual agent, and we talked about
6 it.
7 QUESTIONS BY MR. SNIDOW:
8    Q.    Right.
9        But are there any of them where
10 you'd say, "I think causation is the most
11 likely, it's just not definitive"?
12    A.    No.
13    Q.    No.  Okay.
14        Same question for fever:  Do
15 you think causation is the most likely, even
16 if not definitive, or do you think not enough
17 evidence?
18        MR. MURDICA:  Objection to
19 form.
20        THE WITNESS:  I think fever is
21 a very interesting finding that we've
22 seen replicated over and over again,
23 and we also have some evidence to
24 suggest that it might be confounded by
25 genetics.

---

Page 125

1        So, again, you cannot cause --
2 say that something is causally
3 associated if there's a clear -- a
4 confounder, and that's true across the
5 board.
6 QUESTIONS BY MR. SNIDOW:
7    Q.    So not enough evidence for
8 fever; is that right?
9    A.    Again, I don't want to be black
10 and white like that.  The evidence on fever
11 is very compelling.  But if fever is a marker
12 for something else, right, for some
13 underlying immune disorder or some genetic
14 factor in the mother, fever itself is not the
15 causal agent, if you will.
16        So I have to -- I have to
17 always contextualize like that.
18    Q.    But if I said, "I think fever
19 does cause autism," I read a report, and you
20 were writing your report, and you had to
21 write the sentence, "I think there's enough
22 evidence about fever to say it is causal," or
23 the sentence, "I think there isn't enough
24 evidence to say it's causal," which one of
25 those would you pick?

---

Page 126

1    MR. MURDICA:  Objection to
2 form.
3    THE WITNESS:  So I find it
4 frustrating that you're asking me to
5 come down, you know, on a black -- in
6 a black and white way.
7 QUESTIONS BY MR. SNIDOW:
8    Q.   You came down on one side in
9 this report, right?  You said there's not
10 enough evidence on acetaminophen, didn't you?
11    MR. MURDICA:  Objection to
12 form.
13    THE WITNESS:  I did.
14 QUESTIONS BY MR. SNIDOW:
15    Q.   Okay.  Is there enough evidence
16 for fever?
17    MR. MURDICA:  I need to make my
18 objections.
19    Object to form.
20    And you need to ask questions.
21 Not, like, dialogue.
22    MR. SNIDOW:  That's fine.
23 QUESTIONS BY MR. SNIDOW:
24    Q.   Do you think there's enough
25 evidence for fever or no?

Page 127

1    A.   I think the evidence on fever
2 is compelling and interesting, and we don't
3 understand the causal pathway --
4    Q.   Okay.
5    A.   -- that would lead from a fever
6 in the mother to an increased risk of autism
7 in the child.  And so we need to keep
8 studying it and keep working on it, which is
9 what we're doing.
10    Q.   Smoking?
11    A.   The evidence on smoking is --
12 are we talking about any outcome, or can you
13 be specific about --
14    Q.   Autism, ASD.  If you had to
15 write the sentence, "I think there's
16 sufficient evidence for smoking," or "I think
17 there's not sufficient evidence for smoking,"
18 which one would you write?
19    MR. MURDICA:  Object to form.
20    THE WITNESS:  I would --
21 similar to some of the prior
22 responses, I would say there is
23 interesting evidence.  My review of
24 the literature does not suggest that
25 that's a causal association but that

Page 128

1 there may be confounding, and it may
2 represent some other factor
3 unmeasured.
4    MR. SNIDOW:  All right.  Can I
5 play tab RR, Michael?
6    MICHAEL KAUFFMANN:  Yeah.
7    MR. SNIDOW:  Thank you.
8    (Video played.)
9 QUESTIONS BY MR. SNIDOW:
10    Q.   Is that your voice on there?
11    A.   That is my voice.
12    Can you tell me when this
13 was --
14    Q.   I believe that one's either
15 July 2011 or January 2012.  Both dates are on
16 there.
17    A.   It was a very long time ago.
18    Q.   Well, right.
19    But in the interim, the
20 evidence on valproic acid has become
21 stronger, right?
22    MR. MURDICA:  Objection to
23 form.
24    THE WITNESS:  So I just want to
25 point out that the things that you're

Page 129

1 pulling up that reflect my opinions
2 are from many years ago, and my
3 thinking about the etiology of autism
4 spectrum disorder and ADHD and other
5 neurodevelopmental disorders has
6 evolved along with the science.  So I
7 think that that's what I believed
8 then, and perhaps my opinion would
9 change over time.
10 QUESTIONS BY MR. SNIDOW:
11    Q.   Okay.  Do you think that SSRIs
12 cause autism?
13    A.   I do not.
14    Q.   All right.  So you think not
15 enough evidence on SSRIs, right?
16    MR. MURDICA:  Objection to
17 form.
18    THE WITNESS:  So, actually,
19 there's a lot of evidence on SSRIs.
20 QUESTIONS BY MR. SNIDOW:
21    Q.   No, no, sorry.  Not enough
22 evidence to say causation, right?
23    A.   Again --
24    MR. MURDICA:  Objection.
25    THE WITNESS:  This is -- this

Page 130

1 is the problem that I have here.
2 You're asking me to opine on an
3 exposure which we have since learned,
4 including data from our own research,
5 is confounded by psychiatric history
6 of the mother.
7        So it is a marker for an
8 increased risk but in and of itself
9 does not cause an increased risk.  So
10 I can't just say yes or no.
11        It has been demonstrated that
12 there's an increased association with
13 SSRI, but that is not a causal
14 association because it was confounded
15 by the underlying maternal psychiatric
16 history.
17        Once you control for that, the
18 association diminishes to the null.
19 QUESTIONS BY MR. SNIDOW:
20    Q.    That's what I'm trying to get.
21 For SSRIs you think the most likely
22 explanation is confounding; is that right?
23        MR. MURDICA:  Objection to
24    form.
25        THE WITNESS:  I know it's

Page 131

1 confounding.
2 QUESTIONS BY MR. SNIDOW:
3    Q.    You know it's confounding.
4 Okay.
5        For thalidomide, here you
6 present it as an environmental risk factor,
7 right?
8        MR. MURDICA:  Object --
9    objection to form.
10       THE WITNESS:  In 2011, that's
11    how I presented it.
12 QUESTIONS BY MR. SNIDOW:
13    Q.    Has there been another study on
14 thalidomide since then?
15    A.    No.  And as I said, we will
16 never have another study.  We had one study.
17 So in 2011 I was willing to characterize it
18 that way.
19    Q.    Yeah.
20    A.    I think I'm a little more
21 careful now because one study does not
22 establish that something is causal.
23    Q.    I'm sorry.  I just want on the
24 record:  There hasn't been a thalidomide
25 study between 2011 and now, has there?

Page 132

1    A.    Not to my knowledge.
2    Q.    All right.
3    A.    I haven't searched the
4 literature, but I can't imagine how one --
5 someone would do one.
6    Q.    I couldn't either.  That's why
7 I was asking.
8        Do you think any of the ones we
9 went through - the thalidomide, misoprostol,
10 fever, valproic acid, smoking - do you think
11 there are ones that are -- where there's room
12 for disagreement among epidemiologists about
13 whether they're causal or not?
14        MR. MURDICA:  Objection to the
15    form.
16        THE WITNESS:  So you asked me
17    about a whole host of questions.  I
18    think you need to go through them one
19    at a time.
20 QUESTIONS BY MR. SNIDOW:
21    Q.    Okay.  That's fine.
22    A.    And we could really then
23 determine.
24    Q.    Do you think there's room for
25 disagreement on whether thalidomide is

Page 133

1 causal?
2    A.    I think there's room for
3 disagreement on whether someone would
4 characterize it as causal --
5    Q.    Okay.
6    A.    -- based on a single study.
7    Q.    Great.
8        Misoprostol, do you think
9 there's room for disagreement on whether
10 misoprostol is causal?
11        MR. MURDICA:  Objection to
12    form.
13        THE WITNESS:  Again, it's --
14    it depends on how you define causal,
15    right, and how you interpret that
16    statement.  Personally, I would not be
17    willing to assign causality on the
18    basis of observational studies.
19        Other epidemiologists may be
20    more willing to do that, so we may
21    have different opinions based on our
22    willingness to assign causality on the
23    basis of observational data.
24 QUESTIONS BY MR. SNIDOW:
25    Q.    And nothing wrong with that,

Page 134

1  right?  It's just disagreements --
2      A.    It's the way it works.
3          MR. MURDICA:  Objection to
4      form.
5  QUESTIONS BY MR. SNIDOW:
6      Q.    It's the way it works in
7  science generally, right?
8          MR. MURDICA:  Objection to
9      form.
10         THE WITNESS:  It's a broad
11     statement.  It's the way it works in
12     my world of epidemiology -- perinatal
13     epidemiology.
14 QUESTIONS BY MR. SNIDOW:
15     Q.    That's right.
16         For fever, do you think there's
17 room for disagreement about whether it's
18 causal?
19     A.    So I would say for fever, it's
20 not really about disagreement as much as
21 nuanced understanding of what fever
22 represents and a sense of we need to know
23 more.  You know, is it confounded by
24 genetics?  Is it -- is it immune dysfunction?
25         I think fever has interesting

Page 135

1  data that deserves further exploration.
2      Q.    But let me ask it this way.  If
3  someone said, I think fever does cause
4  autism, do you think that's a reasonable
5  position or no?
6          MR. MURDICA:  Objection to
7      form.
8          THE WITNESS:  I think it
9      depends on the person and the context
10     in which they're saying that.
11 QUESTIONS BY MR. SNIDOW:
12     Q.    If an epidemiologist, one of
13 your colleagues, came to you and said, hey, I
14 actually think fever is causal, I know you
15 disagree, do you think that's a reasonable
16 thing for them to say or not?
17     A.    I think it's perhaps a naïve
18 thing because it's a not a very nuanced
19 understanding of how fever might relate to an
20 increased risk of autism.
21     Q.    Okay.
22     A.    Is it wrong?  It depends on how
23 you define "causal."
24     Q.    For ADHD, besides genetics, are
25 there any risk factors that you think there

Page 136

1  is enough evidence to say, this is causal?
2          MR. MURDICA:  Objection to
3      form.
4          THE WITNESS:  Not to my
5      knowledge.  I think there's some ones
6      that are interesting markers, but not
7      in and of themselves supportive of a
8      causal link.
9  QUESTIONS BY MR. SNIDOW:
10     Q.    How about valproic acid?
11         MR. MURDICA:  Objection to
12     form.
13         THE WITNESS:  We've talked
14     about valproic acid.  I think there
15     is, you know, interesting and
16     compelling data that we need to
17     continue to evaluate.
18 QUESTIONS BY MR. SNIDOW:
19     Q.    Do you think the most likely
20 explanation for the valproic acid association
21 with ADHD is causation?
22         MR. MURDICA:  Objection to
23     form.
24         THE WITNESS:  I don't know that
25     I can answer that yet.  I think I

Page 137

1      would want to see more studies before
2      I was able to really --
3  QUESTIONS BY MR. SNIDOW:
4      Q.    Well, you have a section of
5  your report on valproic acid and ADHD, right?
6      A.    Uh-huh.
7      Q.    Is that right?
8      A.    I do.
9      Q.    So you read those studies?
10     A.    I did.
11     Q.    All right.  And based on those
12 studies that you read, do you think that
13 there's enough evidence to say that valproic
14 acid causes ADHD?
15         MR. MURDICA:  Objection to
16     form.
17         THE WITNESS:  So, again, I
18     would never say an individual agent
19     causes ASD or ADHD.
20 QUESTIONS BY MR. SNIDOW:
21     Q.    Oh, never?
22         MR. MURDICA:  Objection to
23     form.
24         THE WITNESS:  I would not say
25     on the basis of the data on valproic

Page 138

1  acid that there is a causal
2  association because it's observational
3  data, and we have to always take into
4  account the potential for bias, the
5  potential for genetic confounding, the
6  potential for confounding by
7  indication, all of the things that
8  we've talked about.
9  QUESTIONS BY MR. SNIDOW:
10  Q.  Okay.  You think that
11  scientists should keep studying the
12  association between prenatal APAP exposure
13  and ADHD?
14  A.  So I imagine that there are
15  people that have data that might be relevant
16  to the question at hand.  I would never say,
17  don't analyze data that exists that might
18  help to resolve what appears to be an ongoing
19  debate about whether there is any causal
20  association.
21       And the value of additional
22  publications and data, in my mind, would be
23  the public health value, the benefit to
24  pregnant women who experience pain or
25  difficulty sleeping or whatever the case may

Page 139

1  be for whom APAP is an effective and safe
2  medication.
3       And so it would be very nice
4  for women not to have to worry about that
5  during pregnancy.
6  Q.  Yeah.
7  A.  That would be the value of
8  additional studies, in my mind.
9  Q.  You mentioned the ongoing
10  debate about whether it's causal or not.
11       Do you know any of the
12  epidemiologists on the other side of that
13  debate that think it is causal?
14  A.  Not personally.
15  Q.  Okay.  Do you have any reason
16  to think that the people on the other side of
17  the debate, about whether it's causal or not,
18  are bad epidemiologists?
19       MR. MURDICA:  Objection to
20  form.
21       THE WITNESS:  Again, if you
22  asked me about a specific person, I --
23  you know, I don't know everyone's
24  record.  I don't know enough about
25  those individuals to opine about their

Page 140

1  integrity or their career.
2  QUESTIONS BY MR. SNIDOW:
3  Q.  Sure.
4       When you -- when you saw their
5  names, did any of them jump out to you and
6  say, oh, that's a -- he's a known quack
7  who works in this field?
8       MR. MURDICA:  Objection to
9  form.
10       THE WITNESS:  I don't typically
11  think of people as quacks or
12  non-quacks.
13  QUESTIONS BY MR. SNIDOW:
14  Q.  Yeah.
15  A.  And so I look at their career,
16  and I can make a judgment based on that, but
17  I don't have any specific response to the
18  individuals who are involved in this
19  litigation.
20  Q.  In this debate.  I meant in the
21  broader literature.
22       MR. MURDICA:  Objection to the
23  form.
24       THE WITNESS:  Again, I don't
25  have an opinion.

Page 141

1  QUESTIONS BY MR. SNIDOW:
2  Q.  When you saw the names of the
3  epidemiologists on the other side of the
4  debate about whether acetaminophen causes
5  autism, did you -- did you see any of them
6  and say, ah, I've actually noticed they
7  published bad studies in the past?
8       MR. MURDICA:  Objection to the
9  form.
10       THE WITNESS:  I didn't evaluate
11  them with that eye, but it didn't --
12  it didn't strike me that way.
13  QUESTIONS BY MR. SNIDOW:
14  Q.  Okay.  Do you think as of now
15  we can say with certainty that there's no
16  causal relationship between prenatal APAP
17  exposure and ASD?
18  A.  I do.
19  Q.  You can say it with certainty?
20  A.  I think that based on the body
21  of evidence that exists today, there is no
22  peer-reviewed, published epidemiologic
23  evidence to support a causal association
24  between acetaminophen and ADHD or A -- or ASD
25  in the offspring.

Page 142

1    Q.    That's a little different.  I'm
2   not actually asking about the body of
3   literature.
4         I'm saying, are you certain
5   that there is no causal relationship between
6   prenatal APAP exposure and ASD?
7    A.    I understand that that's what
8   you're asking me.
9    Q.    Okay.
10    A.    My only way to evaluate and
11   answer that question is based on the existing
12   body of literature.  I'm an epidemiologist.
13   That's what I was asked to do in this
14   litigation, and that's what I've done.  And
15   that's what my opinion is based on.
16    Q.    Right.
17         But I'm saying -- let me ask it
18   a different way.
19         Did any of the papers that you
20   reviewed have the conclusion, based on our
21   study, we now know for sure that APAP does
22   not cause ASD?  Any of them say that?
23         MR. MURDICA:  Objection to the
24   form.
25         THE WITNESS:  I don't think

Page 143

1    that any epidemiologist would make a
2    conclusion like that based on a single
3    study, which is what they've authored.
4   QUESTIONS BY MR. SNIDOW:
5    Q.    Well, how about the ones who
6   did like meta-analysis or literature reviews,
7   you read those too, right?
8    A.    I did read those.
9    Q.    And did any of them say, I've
10   read the literature and I can say with
11   100 percent certainty that prenatal APAP
12   exposure doesn't cause autism?
13    A.    Again, I don't believe a
14   credible epidemiologist would ever state an
15   opinion like that.
16         I will tell you what the
17   meta-analyses' authors did say which is, we
18   can't determine because there is so many
19   potential confounders and biases in this
20   literature.
21    Q.    Okay.  Did any of the papers
22   you reviewed say, based on the data in this
23   study, we're sure that this association is
24   entirely spurious?
25    A.    Again, I don't think a credible

Page 144

1   epidemiologist would ever make a statement
2   like that in a paper.  When you are writing a
3   manuscript, you're using the body of data
4   that you have for that paper, for that
5   analysis.  It's a single analysis or a set of
6   analyses, and we don't determine yes or no.
7         Epidemiology is an iterative
8   science, as I've said in my report, and we
9   build evidence over time, and that is why we
10   need to use a set of criteria to evaluate
11   that body of evidence at the end.
12    Q.    Did any of the papers that you
13   reviewed state an opinion that there is no
14   risk to the developing fetus from prenatal
15   APAP exposure?  Any of them say that?
16    A.    I would have to review the
17   articles to see if that was a statement that
18   any of them made.  I -- I can't just recall
19   that off the top of my head.
20    Q.    None of them come to mind,
21   though, right?
22         MR. MURDICA:  Objection to
23   form.
24         THE WITNESS:  Again, I would
25   want to review the studies and

Page 145

1    evaluate the statements they made in
2    the context of their assessment of
3    their data and their discussion of
4    that data and the limitations of that
5    data and the interpretation of that
6    data.
7   QUESTIONS BY MR. SNIDOW:
8    Q.    Yeah.
9         Any studies in the literature
10   say that the consistency factor of Bradford
11   Hill is not satisfied when looking at the
12   overall literature?
13    A.    Again, I --
14         MR. MURDICA:  Objection to
15   form.
16         THE WITNESS:  I -- so that
17   would be a meta-analysis I would -- I
18   would imagine.  You wouldn't do that
19   in an individual study because we
20   apply Bradford Hill to a set of
21   studies.
22         And again, I don't recall from
23   the meta-analyses what the specific
24   findings with respect to the Bradford
25   Hill criteria were, but I'd be happy

Page 146

1    to look through them, if you want me
2    to.
3    QUESTIONS BY MR. SNIDOW:
4        Q.    No, that's fine.  If you don't
5    remember.
6            And the same question for any
7    of the other Bradford Hill criteria, did any
8    of the studies they reviewed say, this factor
9    of Bradford Hill is not satisfied for this
10   literature?
11           MR. MURDICA:  Objection.  Form.
12           THE WITNESS:  I would review
13   the meta-analyses for those specific
14   statements.  I don't recall offhand
15   whether any of them were willing to
16   say that, but -- able to say that.
17   QUESTIONS BY MR. SNIDOW:
18       Q.    I assume you think that the
19   APAP label should not warn about the risk of
20   autism or ADHD?
21           MR. MURDICA:  Objection to the
22   form.
23           THE WITNESS:  I have no opinion
24   about the label.  That's not what I
25   was asked to review, and I have never

Page 147

1    seen it.
2            I mean, maybe I've seen it, but
3    it's not something that I reviewed as
4    part of this engagement.
5    QUESTIONS BY MR. SNIDOW:
6        Q.    Well, do you think it would be
7    a truthful statement to put on the label that
8    some studies have shown that prenatal APAP
9    exposure causes autism?
10           MR. MURDICA:  Objection to
11   form.
12   QUESTIONS BY MR. SNIDOW:
13       Q.    I'm sorry, is associated with
14   autism?
15           MR. MURDICA:  Objection to the
16   form.
17           THE WITNESS:  Again, that's not
18   my area of expertise.  I was not asked
19   to opine on the label, and I don't
20   have an opinion based on my expert
21   evaluation of the literature.
22   QUESTIONS BY MR. SNIDOW:
23       Q.    Would that be a true statement,
24   though, some studies have shown that prenatal
25   APAP exposure increases the risk of autism?

Page 148

1            MR. MURDICA:  Same objection.
2            THE WITNESS:  Again, we're
3    talking about the label, and it's not
4    something that I'm willing to opine
5    on.
6    QUESTIONS BY MR. SNIDOW:
7        Q.    Put the label aside.
8            If I said some studies have
9    shown an association between prenatal APAP
10   exposure and autism, is that true or false?
11           MR. MURDICA:  Objection to the
12   form.
13           THE WITNESS:  So that's a very
14   general statement that comes out of
15   nowhere, and I don't know who the
16   audience is.  I don't know what
17   studies you're considering.  I can't
18   agree or disagree to a statement like
19   that.
20   QUESTIONS BY MR. SNIDOW:
21       Q.    You can't agree or disagree
22   whether some studies have shown an
23   association between prenatal APAP exposure
24   and autism?
25           MR. MURDICA:  Objection to the

Page 149

1    form.
2            THE WITNESS:  I would want to
3    know what the "some studies" are.
4    QUESTIONS BY MR. SNIDOW:
5        Q.    I know, but that's all I'm
6    saying.  They exist, don't they?
7            MR. MURDICA:  Objection to
8    form.
9            THE WITNESS:  Again, I would
10   want to be specific in my response.
11   I'm not willing to make a general
12   statement like that.
13           MR. SNIDOW:  Can I have the
14   ELMO, please?
15           Jim, you can have an objection
16   to my demonstrative.
17           Okay?
18   QUESTIONS BY MR. SNIDOW:
19       Q.    I pulled this from page 17 of
20   your report.
21           Look familiar?
22           And I'll tell you what I did to
23   it in a second.  But do you see on page 17 --
24       A.    It looks a little different
25   than what I'm -- yeah.

Page 150

1 Q. So you've made it general.
2 I've just made it specific to this case.
3 But you agree this is -- this
4 accurately describes what you're suggesting
5 when you're talking about confounding?
6 A. Yes.
7 Q. Okay. And I made one for
8 autism, and I made one for ADHD.
9 A. Okay.
10 Q. Okay. And you think that this
11 is what's going on here. You think there's a
12 confounder that's associated with prenatal
13 APAP use and autism?
14 A. Correct.
15 MR. MURDICA: Objection to
16 form.
17 QUESTIONS BY MR. SNIDOW:
18 Q. Now, for this to be a
19 confounder, you agree the confounder has to
20 cause autism, right?
21 MR. MURDICA: Objection to
22 form.
23 THE WITNESS: The confounder
24 has to be associated with autism.
25

Page 151

1 QUESTIONS BY MR. SNIDOW:
2 Q. All right. We'll get to
3 that to -- in a second. But for now,
4 confounder has to be associated with autism,
5 right?
6 A. Uh-huh.
7 Q. And the confounder has to be
8 associated with prenatal APAP use.
9 A. That's the definition of a
10 confounding variable.
11 Q. All right. So for this
12 association, tell me, what should I write
13 here for confounding variables? I know
14 genetics is one of them, right?
15 MR. MURDICA: Objection to
16 form.
17 THE WITNESS: Genetics.
18 QUESTIONS BY MR. SNIDOW:
19 Q. All right. Any other ones?
20 A. Indication for use.
21 Q. Okay. Uh-huh.
22 Any other ones?
23 A. I'm going to leave it at that
24 for confounding variable.
25 Q. Okay. And for ADHD, should I

Page 152

1 write genetics again?
2 A. You should.
3 Q. And indication?
4 A. Uh-huh.
5 Q. And indication is whether the
6 mother's using it for fever or pain and so
7 on?
8 A. It's the indication for the use
9 of acetaminophen, correct.
10 Q. All right. So for autism, what
11 evidence -- what paper suggests that the
12 genes of the mother that cause autism or
13 associated with autism are associated with
14 prenatal APAP use?
15 MR. MURDICA: Objection to the
16 form.
17 THE WITNESS: So because we
18 don't understand all of the genetic
19 contribution, the specific genes that
20 cause autism, no one has been able to
21 directly study that.
22 QUESTIONS BY MR. SNIDOW:
23 Q. Okay. All right. That's fine.
24 So --
25 MR. MURDICA: She was going to

Page 153

1 continue answering, and you
2 interrupted her. Please don't do
3 that.
4 THE WITNESS: So because we
5 don't know the specifics of the genes
6 that cause autism and we, therefore,
7 can't test for them to see if they are
8 a specific confounder, what we have
9 done is used statistical techniques to
10 assess whether genes might play a
11 role.
12 QUESTIONS BY MR. SNIDOW:
13 Q. Right.
14 What paper is that?
15 A. In the -- in the autism
16 literature, there is not a study that has
17 done what I would consider the best control
18 for genetics, which would be a sibling
19 control, and so we don't have sufficient
20 evidence to really support that as a -- as a
21 confounding variable and yet, because of what
22 we know about autism and its genetic
23 components, we can be sure that it is a
24 potential confounder.
25 And, you know, we talk about

Page 154

1 potential confounder, and then we test to see
2 if it's there.
3     Q.    All right.  So you said we
4 don't have sufficient evidence.
5         Okay?
6         MR. MURDICA:  I don't hear a
7 question.
8         MR. SNIDOW:  No, no, no.  Nope.
9 You can have the objection.
10        MR. MURDICA:  Well, there is no
11 question.
12        MR. SNIDOW:  I'm going to turn
13 to the next one.
14        That's fine.  I'll ask one.
15        So here's one --
16        MR. MURDICA:  You can't just
17 write stuff down that she didn't say.
18        MR. SNIDOW:  She absolutely
19 said it.
20        MR. MURDICA:  You can't take it
21 out of context.
22        MR. SNIDOW:  There's a
23 transcript.  There's a transcript.
24 QUESTIONS BY MR. SNIDOW:
25     Q.    This is the one for ADHD.

Page 155

1         So you agree for it to be a
2 confounder, the confounder has to be
3 associated with prenatal APAP use, right?
4     A.    Correct.
5     Q.    What evidence is there that
6 genetics that determine ADHD are associated
7 with prenatal APAP use?
8     A.    So we have studies that have
9 evaluated both the polygenic risk score and
10 maternal psychiatric issues and their
11 propensity to ingest acetaminophen during
12 pregnancy.
13        And they support the
14 association that the women who have that
15 propensity for autism, whether it be through
16 PRS or through report of their own
17 psychiatric history --
18     Q.    Yeah.
19     A.    -- are more likely to use APAP
20 during pregnancy than women who do not.
21     Q.    And that study is called
22 Leppart, right?
23     A.    Right.
24     Q.    So I'm going to write Leppart
25 here, and that's 2019, right?

Page 156

1     A.    Uh-huh.
2     Q.    And that was a PRS study,
3 right?
4     A.    Correct.
5     Q.    And it looked at a polygenic
6 risk score, which ones were associated with
7 ADHD, and then looked at whether it was
8 associated with acetaminophen, right?
9     A.    Uh-huh.
10    Q.    Okay.  What did the Leppart
11 study show for autism?
12    A.    So the Leppart study for
13 autism, I would want to review specifically.
14    Q.    Okay.  Yeah.  That's fine.
15    A.    So I am sure to state the
16 correct numbers.  Okay?
17        MR. MURDICA:  Are you providing
18    it to her?  Is that what you're doing?
19        MR. SNIDOW:  No, she's showing
20    me.  She's got it.
21        THE WITNESS:  I'm sorry?
22 QUESTIONS BY MR. SNIDOW:
23    Q.    Are you looking at your report?
24 What are you looking at?
25    A.    I was going to look at my

Page 157

1 report, but I can also look at the study
2 itself, and that's probably what I'll do.
3    Q.    Yeah.  All right.
4    A.    I just want to make sure I cite
5 the numbers correctly.
6        (Pinto-Martin Exhibit 607
7        marked for identification.)
8 QUESTIONS BY MR. SNIDOW:
9    Q.    So this will be 607, which is
10 tab JJ for me.
11        MR. SNIDOW:  There you go.  Are
12    you going to want this?
13        MR. MURDICA:  Yes.  Thank you.
14 QUESTIONS BY MR. SNIDOW:
15    Q.    All right.  And if you turn to
16 838.
17        Do you see that?
18    A.    Uh-huh.
19    Q.    No association, right, for
20 autism?
21    A.    So we're looking at Table 3?
22    Q.    Uh-huh.  No, 2.
23    A.    Okay.  We're looking at
24 Table 2.  ASD, PRS and acetaminophen.  They
25 report -- they do not report a statistically

Page 158

1  significant association, that's correct.
2      Q.    Almost -- I mean, almost
3  exactly null, right?
4      A.    I would say the first one is --
5  yeah, is null and the second one is very
6  close to null.
7      Q.    Okay.  So I'm going to write
8  Leppart, no association.
9      A.    And I would like to point out
10 that a polygenic risk score does not capture
11 the entire universe of genetic risk because
12 we, as I said before, don't understand all of
13 the genes that cause or interact to cause
14 autism.
15     Q.    Right.
16          But if I asked, is there --
17 what affirmative evidence is there that
18 prenatal APAP use is associated with the
19 genes that cause autism, the answer is, all
20 we have is Leppart, and there's no
21 association, right?
22          MR. MURDICA:  Objection to
23     form.
24          THE WITNESS:  Again, I think
25     it's -- when you have imperfect

Page 159

1      information and you don't find an
2      association, it doesn't mean that the
3      association doesn't exist.  It means
4      you were not able to find it on the
5      basis of the data that you have.
6  QUESTIONS BY MR. SNIDOW:
7      Q.    Okay.  For -- you still have
8  Leppart up?
9      A.    I will.
10     Q.    Yeah.
11     A.    Yeah.
12     Q.    Okay.  For autism -- ADHD.
13 Sorry, for ADHD.  You see in Table 2 where it
14 reports an association?
15     A.    Yes.
16     Q.    In Leppart here, this is what
17 you told me was the evidence that the genes
18 associated with ADHD are associated with
19 prenatal APAP use, right?
20          MR. MURDICA:  Objection to
21     form.
22          THE WITNESS:  This is one piece
23     of evidence in support of that
24     confounder, yes.
25

Page 160

1  QUESTIONS BY MR. SNIDOW:
2      Q.    All right.  What else is there?
3      A.    Well, I'm just saying there is
4  one piece of evidence.  I'm not -- I'm not
5  saying there's another one.  I'm saying this
6  is one piece of evidence.
7      Q.    I know.
8          But you're not aware of
9  anything else other than Leppart, right?
10          MR. MURDICA:  Objection to
11     form.
12          THE WITNESS:  I believe that
13     the ALSPAC cohort also had some data,
14     but I would want to remind myself of
15     the specifics of that.
16 QUESTIONS BY MR. SNIDOW:
17     Q.    All right.  We'll do that in a
18 second.
19          So for Leppart, would you --
20 the results they showed was there was a
21 risks -- odds ratio of 1.09?
22     A.    Right.
23     Q.    And then 1.11?
24     A.    Right.
25     Q.    And the confidence intervals

Page 161

1  are really close to 1, right?
2      A.    What do you mean by that?
3      Q.    They're 1.02 --
4      A.    The lower band of the
5  confidence interval?
6      Q.    Yeah.  Yeah.
7      A.    Yeah.
8      Q.    And you would characterize that
9  as barely statistically significant?
10     A.    I have characterized it as that
11 in the past.
12     Q.    Yeah.
13          And you would characterize
14 those odds ratios as weak, right?
15     A.    I don't know that I would ever
16 call an odds ratio weak, but they are not,
17 you know, incredibly powerful.
18          Again, remembering that what
19 the PRS captures is just a fraction of the
20 overall genetic risk.  So the fact that they
21 found anything is actually quite compelling.
22     Q.    Okay.  All right.
23          Do you have -- do you see any
24 evidence that a mother's use of acetaminophen
25 before she gets pregnant causes autism?

Page 162

1    A.    So there have been some
2 attempts to do what we call a negative
3 control exposure analysis to look at that
4 very question, does prenatal use --
5    Q.    Pre-prenatal use.
6    A.    Pre-prenatal use.  I'm sorry.
7    Q.    Yeah.
8    A.    Prepregnancy use.
9    Q.    Yeah.
10    A.    -- increase the risk of autism
11 or post-pregnancy use increase the risk of
12 autism.
13    Q.    Yeah.
14    A.    And several authors have used
15 that design to -- in an attempt to show that
16 it's an intrauterine effect.
17    Q.    Yeah.
18    A.    However, there are instances in
19 this literature where the opposite was found.
20 In fact, they showed that prepregnancy use
21 and post-pregnancy use did have an
22 association, which would argue for an
23 underlying genetic or familial risk.
24    Q.    With autism diagnosis?
25    A.    Yes.

Page 163

1    Q.    And what study is that?
2    A.    I'll have to go to my report to
3 remind myself.
4    Q.    Sorry.  Just to be clear, I'm
5 asking you, you're telling me there's a study
6 that looked at prepregnancy use and found an
7 association with autism diagnosis?
8    A.    I need to go to my report to
9 remind myself.
10    Q.    All right.
11    A.    There's so many studies --
12    Q.    Let's move on.  At a break, I'd
13 like you to do that.
14    A.    Okay.
15    Q.    And the same question for ADHD.
16 Do you think that there are studies that
17 looked at prepregnancy use?  Yeah, you do.
18        And I'm talking about ADHD
19 diagnosis.
20    A.    Correct.
21    Q.    Okay.  Not any of the screening
22 tools.
23    A.    Well, again, I would want to
24 review my report to make sure those are the
25 studies that I'm talking about.

Page 164

1    Q.    Yeah.
2    A.    There's five studies that used
3 ASD diagnosis as an outcome, and eight or
4 nine, depending on how you count, and then
5 there are many, many others that used other
6 outcomes.
7        So I would want to look
8 specifically at the studies before I answered
9 the question.
10    Q.    All right.  Why don't you do
11 that on a break, and we'll come back to it.
12        Put that aside for now.
13        Okay.  On page 74 of your
14 report, you have a table of results in the
15 literature looking at ADHD diagnosis, right?
16    A.    Correct.
17    Q.    And you chose which results to
18 put in this table, I think?
19    A.    I did.
20    Q.    And did you make a forest plot
21 of those results?
22    A.    No.
23    Q.    No.
24        Well, I did.  Let me show you
25 what it looks like.  All right.

Page 165

1        MR. MURDICA:  Note my objection
2 to the use of the demonstrative
3 created by the plaintiff's lawyer.
4        MR. SNIDOW:  That's fine.
5 That's fine.
6        MR. MURDICA:  You don't need to
7 tell me it's fine.  I'm making my
8 objection.
9        MR. WATTS:  Overruled.
10 QUESTIONS BY MR. SNIDOW:
11    Q.    Dr. Pinto-Martin, I'm not
12 asking you to check every one, but take a
13 look at the table 70 -- on 74 and 75, and let
14 me know if you see any obvious errors in what
15 I've done here.
16        And I'll tell you one.
17 Obviously, the Ystrom, the upper bound
18 confidence interval, needs to go way, way up.
19 I just did that so the paper wouldn't be so
20 long.
21    A.    Sorry, I'm just checking to
22 make sure these are accurate.
23    Q.    Yeah.
24    A.    So I haven't checked every
25 single one, but the ones I've looked at so

Page 166

1  far --
2      Q.    Looks pretty good?
3      A.    Yeah.
4      Q.    Okay.  And you chose these
5  results, right, to include in your table?
6      A.    I did.
7      Q.    Yeah.  If you turn -- I'm going
8  to turn to the next page, which all I've done
9  is, do you see how there's one to seven days
10  and less than eight days in Ystrom and
11  Gustavson?
12      A.    Uh-huh.
13      Q.    I've taken those off just to
14  show the longer-term results because --
15  otherwise, it's the same chart.
16          All right?
17      A.    Okay.
18      Q.    All right.  So looking at this
19  study, do you agree that 100 percent of the
20  results here for long-term use of prenatal
21  APAP show a positive point estimate for the
22  risk of ADHD diagnosis?
23          MR. MURDICA:  Objection to the
24      form and use of the demonstrative.
25          THE WITNESS:  So when you say

Page 167

1      "looking at the study," I think you
2      mean looking at this chart that you
3      created?
4  QUESTIONS BY MR. SNIDOW:
5      Q.    Yep.  Sorry.  Yes.
6      A.    So I disagree because there are
7  two or three that show a nonsignificant
8  association.
9      Q.    You know what a point estimate
10  is, right?
11      A.    Right.  Oh, I'm sorry, is that
12  what you asked about?
13      Q.    Yeah.  Can I ask it again?
14      A.    So I -- yeah.
15      Q.    Do you agree that 100 percent
16  of these studies had a point estimate showing
17  a positive association between prenatal APAP
18  exposure and the risk of ADHD diagnosis?
19      A.    So --
20          MR. MURDICA:  Objection to
21      form.
22          THE WITNESS:  -- I will say
23      that I agree with that statement, and
24      I would immediately qualify it by
25      saying that a point estimate taken in

Page 168

1      isolation is meaningless in my mind.
2          First of all, we need to look
3      at the statistical significance and
4      the confidence interval associated
5      with that point estimate, and we have
6      to think about the data upon which
7      that point estimate is based.
8  QUESTIONS BY MR. SNIDOW:
9      Q.    Sure.
10          So let's do the first one
11  first.
12          This one is statistically
13  significant, right?
14          MR. MURDICA:  Objection.  Form.
15          THE WITNESS:  I'm sorry,
16      which --
17  QUESTIONS BY MR. SNIDOW:
18      Q.    This one.
19      A.    You're pointing to greater than
20  29 days?
21      Q.    Yep.
22      A.    That study reported a
23  statistically significant result for greater
24  than 29 days --
25      Q.    Okay.

Page 169

1      A.    -- which they then demonstrated
2  was confounded by genetics, and when they did
3  the sibling control, it was null.
4      Q.    Okay.  We'll get there.  And I
5  included it.  I included the sibling control
6  for you, right?
7      A.    I see it, but you were about to
8  jump over it.
9      Q.    No.  No.
10      A.    I wanted to point that out.
11      Q.    I just wanted to say which one
12  was statistically significant.  This one is?
13      A.    That report of two trimesters
14  of use in the Gustavson 2021 has a
15  significant point estimate.
16      Q.    Okay.
17      A.    However, I think we need to
18  really characterize the data that drives
19  that.  They are talking about trimesters of
20  use here based on maternal recall, and it is
21  recall, of use of APAP in the prior trimester
22  of their pregnancy.  And they are then using
23  that to derive trimester-specific estimates.
24          So I would say that these data
25  are very fragile and not particularly

Page 170

1  compelling with respect to exposure.
2      Q.   Okay.  That's fine.  But I'm
3  actually just asking about statistical
4  significance, and there's one, two, three,
5  four, five, six, seven, eight, nine -- ten
6  more, right?
7           MR. MURDICA:  Objection to
8      form.
9           THE WITNESS:  There are ten
10     point estimates there that are
11     statistically significant, and each
12     one of them needs to be evaluated in
13     the context of the study from which it
14     was derived and the data that supports
15     that purported statistically
16     significant association.
17  QUESTIONS BY MR. SNIDOW:
18     Q.   Yeah.
19          And just to get the record
20  clear, there's actually one, two, three --
21  sorry.  1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,
22  12 -- 13, right?
23          MR. MURDICA:  Objection to
24     form.
25          THE WITNESS:  Again, there are

Page 171

1      13 point estimates that are
2      statistically significant according to
3      the evaluation done by the authors in
4      those studies.
5           Those authors themselves often
6      contextualize that result to indicate
7      that there are potential confounders
8      and biases that could be driving the
9      result.
10  QUESTIONS BY MR. SNIDOW:
11     Q.   So my question is, you say in
12  your report that you think that these results
13  could be due to chance.
14          Is that right?
15          MR. MURDICA:  Objection to the
16     form.
17          THE WITNESS:  I don't recall in
18     my report where I might have said
19     that.  It's certainly possible that
20     that is one explanation for some of
21     these findings --
22  QUESTIONS BY MR. SNIDOW:
23     Q.   Okay.
24     A.   -- because many of them
25  analyzed a multitude of specific outcomes,

Page 172

1  for example, on a screening questionnaire,
2  individual items, sub-scales.
3           So they are looking at many,
4  many, many outcomes and at times not
5  adjusting for the multiple testing, which
6  could result in a type 1 error.
7      Q.   Right.
8      A.   So when I talk about chance,
9  that's what I'm referring to.
10     Q.   And that's actually helpful.
11          I wanted to clarify, though,
12  you're not suggesting that you can get 13
13  statistically significant results in a row
14  due to chance, are you?
15          MR. MURDICA:  Objection to the
16     form.
17          THE WITNESS:  I don't believe I
18     said that anywhere in my report.
19  QUESTIONS BY MR. SNIDOW:
20     Q.   And you don't think that --
21          MR. MURDICA:  Objection to
22     form.
23          THE WITNESS:  I can't answer
24     that without looking specifically at
25     each individual study and saying, is

Page 173

1      there a chance that chance explains
2      this finding in this study, in this
3      study.  I can't do it as a whole.
4  QUESTIONS BY MR. SNIDOW:
5      Q.   Well, you know that the chance
6  is going to be less than .05 for all the ones
7  that are statistically significant, right?
8      A.   That's right.
9      Q.   Okay.  So the chance of a
10  chance finding -- sorry, there's no way
11  around chancing?
12     A.   I know.
13     Q.   Yeah.  The chance of a chance
14  finding for this result is .05?
15     A.   Correct.  But look what
16  happened once they did the sibling control,
17  sir.
18     Q.   No, we're talking about chance
19  right now.
20          MR. MURDICA:  It -- well, hang
21     on.  You can't do that.
22          MR. SNIDOW:  Okay.
23          MR. MURDICA:  You can't -- you
24     can't wave her off.  You can't
25     interrupt her.  That is not

Page 174

1  appropriate deposition conduct.
2       You can't wave me off either,
3  J.J.  You just did what you did, and
4  you can't do that.  That is improper
5  deposition conduct.  Please conduct
6  yourself appropriately.
7  QUESTIONS BY MR. SNIDOW:
8      Q.    The chance of a chance finding
9  for this result is less than .5, .05?
10     A.    Less than .05, correct, as
11 reported in that study with the caveat that
12 we need to understand exactly where these
13 data were derived and what they --
14     Q.    But the odds of that happening
15 twice, .05, .05 -- it's what, .0025?
16         MR. MURDICA:  Objection to the
17     form.
18         THE WITNESS:  I'm not sure that
19     you can take the chance estimate from
20     one study and apply it to another
21     study and say that, you know, there's
22     a doubling of -- a decrease by
23     100 percent of that chance.
24         I don't -- I -- we do chance
25     finding within an individual study,

Page 175

1  within an individual analysis.  That's
2  the way it's done.
3  QUESTIONS BY MR. SNIDOW:
4      Q.    All right.  What's the odds of
5  flipping a head when you flip a coin?
6      A.    50/50.
7      Q.    And what's the odds of doing
8  that twice?
9      A.    50/50.
10     Q.    Right.
11         And what's the -- no.  What's
12 the odds of it happening twice, heads, heads?
13     A.    Oh.
14     Q.    Yeah, okay.  Well, I'll tell
15 you, it's .25, because you multiply the
16 probabilities together, right?
17         MR. MURDICA:  Objection to
18     the --
19         THE WITNESS:  You're talking
20     about flipping a coin.  I'm talking
21     about an epidemiologic study that has,
22     you know, all other kinds of things
23     that we need to address when we're
24     looking at the result.
25

Page 176

1  QUESTIONS BY MR. SNIDOW:
2      Q.    Did you do a calculation,
3  though, to see what the likelihood of all of
4  these being due to chance was?
5         MR. MURDICA:  Objection to the
6     form.
7         THE WITNESS:  Again, that is
8     not my primary objection with these
9     studies that have ASD as -- ASD or
10    ADHD in this case as an outcome.
11         The bias -- I mean, the chance
12    finding was primarily directed at the
13    studies that used screening tools as
14    an outcome because of what we talked
15    about before and the multiple testing
16    and the likelihood of chance finding
17    there.
18 QUESTIONS BY MR. SNIDOW:
19     Q.    All right.  So the chance was
20 not your primary objection?
21         MR. MURDICA:  Objection to the
22     form.
23         THE WITNESS:  With respect to
24     the studies that had ADHD as an
25     outcome --

Page 177

1  QUESTIONS BY MR. SNIDOW:
2      Q.    Yeah.
3      A.    -- diagnostic outcome, chance
4  was not my primary objection to the
5  credibility of the results where there was a
6  reported increased risk.
7         Rather, it was based on the
8  imprecision of the exposure, which is
9  extremely important when we're talking about
10 fetal brain development, and we need to think
11 about the timing and the dose and the
12 duration of exposure in order to be able to
13 assess whether that exposure actually had an
14 increased risk on the likelihood of autism in
15 the offspring.
16     Q.    All right.  Could you turn to
17 page 93 in your report?
18     A.    (Witness complies.)
19     Q.    All right.  And do you see
20 where you say, "A Bradford Hill analysis is
21 only called for when the epidemiological
22 literature establishes an association that is
23 perfectly clearcut"?
24     A.    I do.
25     Q.    And then you say that you don't

Page 178

1 actually think that you should be doing a
2 Bradford Hill analysis of the ADHD literature
3 at all, right?
4     A.    This is ASD, but, yes.
5     Q.    Yeah.
6           And the reason why you say that
7 is because you don't think that there's an
8 association in the literature at all between
9 prenatal APAP use and ADHD, right?
10    A.    I don't believe there's a
11 cred -- there's credible evidence of an
12 association between prenatal APAP use and
13 ASD.
14    Q.    Well, how many studies -- how
15 many studies have to go on the forest plot
16 before you at least concede there's an
17 association?
18          I mean, look, confounding I
19 get, but how many do you need before you get
20 an association?
21          MR. MURDICA:  Objection to the
22    commentary.
23          THE WITNESS:  Well, I would say
24    confounding you don't get because
25    that's exactly the point here.  We

Page 179

1    could have thousands of estimates of
2    an elevated risk, and if they're all
3    confounded, then in my mind that does
4    not equate with strength of an
5    association.
6          It's not about a number.  It's
7    not about counting.  It's about
8    evaluating each individual study and
9    the strength of the data that drives
10    the point estimate that they report.
11          I don't believe we have that
12    here.
13 QUESTIONS BY MR. SNIDOW:
14    Q.    Well, I agree.  It's just not
15 what you said in your report, right?
16          You said you don't think
17 there's an association because it's not,
18 quote, "Perfectly clearcut and beyond what we
19 would care to attribute to the play of
20 chance."
21          Is that what you said?
22          MR. MURDICA:  Objection to the
23    form of the question.
24          THE WITNESS:  I didn't say
25    that.  Bradford -- Dr. Hill said that.

Page 180

1 QUESTIONS BY MR. SNIDOW:
2    Q.    No, no, no.  You said, "In my
3 opinion, the literature has not identified an
4 association that's perfectly clearcut and
5 beyond what we would care to attribute to the
6 play of chance."
7          Right?  You said that?
8          MR. MURDICA:  Objection to form
9    to the form of the question.
10          You can answer it.
11          THE WITNESS:  So I put
12    "perfectly clearcut" in quotes because
13    that is a direct quote from Hill, who
14    established the Bradford Hill
15    criteria, and said in the absence of a
16    perfectly clearcut association between
17    an exposure and an outcome, Bradford
18    Hill is not warranted.
19 QUESTIONS BY MR. SNIDOW:
20    Q.    Uh-huh.
21          And so my question is this, do
22 you think that these results are beyond what
23 you would care to attribute to the play of
24 chance?
25          MR. MURDICA:  Objection to the

Page 181

1    form.
2          THE WITNESS:  So, again, we're
3    not talking just about chance here.
4    We're talking about the criteria of
5    Bradford Hill, and what goes into that
6    evaluation includes all of the things
7    that I mentioned before:  The context
8    of the studies, the sample size, the
9    selection bias, the assessment of
10    exposure.
11          All of those things matter when
12    we're trying to establish a,
13    quote/unquote, clearcut association.
14          Because of the problems in
15    these studies, the methodologic
16    problems, I do not believe we've
17    established a clearcut association.
18 QUESTIONS BY MR. SNIDOW:
19    Q.    My question is, do you think
20 these could all be due to chance?  That's my
21 only question.
22          MR. MURDICA:  Objection to the
23    form.
24          THE WITNESS:  Again, we would
25    have to look at each study

Page 182

1    individually to say whether chance
2    might be an explanation for the
3    finding.  I can't do them as a whole.
4  QUESTIONS BY MR. SNIDOW:
5      Q.   Okay.  You've read the
6  consensus statement, right?
7      A.   Uh-huh.
8      Q.   And did you know any of the
9  authors?
10     A.   Not personally.
11     Q.   Any professionally?
12     A.   So Dr. Swan was a
13 biostatistician professor when I did my
14 doctorate at Penn -- I mean, not at Penn, I'm
15 sorry -- at the University of
16 California-Berkeley.
17     Q.   Did you work with her?
18     A.   She wouldn't remember me, I'm
19 sure.
20     Q.   She wouldn't remember you?
21     A.   No.  I was one student in a
22 class.
23     Q.   But you took her class?
24     A.   I did.
25     Q.   Do you think she's an

Page 183

1  unreasonable epidemiologist?
2      A.   She's a biostatistician.  I
3  think she's, you know, a solid
4  biostatistician from my experience with her
5  in class.
6      Q.   And she's one of the lead
7  authors on that consensus statement?
8         MR. MURDICA:  Objection to the
9      form.
10        THE WITNESS:  I believe so.
11     I'm not sure exactly where she is in
12     the authorship, but...
13 QUESTIONS BY MR. SNIDOW:
14     Q.   What is -- are you aware that
15 society for Pediatric and Perinatal
16 Epidemiological Research, SPER, gives out an
17 award each year?
18        MR. MURDICA:  Objection to the
19     form.
20        THE WITNESS:  I recall that,
21     yeah.  Well, they give out several
22     awards.  They give out a student
23     award.  They give out a best paper
24     award.
25

Page 184

1  QUESTIONS BY MR. SNIDOW:
2      Q.   Yep.
3      A.   Oh, yeah.
4      Q.   Rising star award?
5      A.   Yeah.
6      Q.   Do you remember that one?
7      A.   I've heard of it, yeah.
8      Q.   And do they typically give that
9  one to good epidemiologists?
10        MR. MURDICA:  Objection to
11     form.
12        THE WITNESS:  I have no
13     knowledge of, you know, who evaluates
14     that rising star, but I would imagine
15     that they look at the individual
16     carefully.
17 QUESTIONS BY MR. SNIDOW:
18     Q.   Yeah.
19        And again, you were present at
20 SPER, right?
21     A.   I was, back when it was first
22 formed.
23     Q.   Outstanding organization of
24 epidemiologists, correct?
25     A.   It's a good organization.

Page 185

1        MR. SNIDOW:  Can I have YYY?
2     Thanks.
3  QUESTIONS BY MR. SNIDOW:
4      Q.   While she's getting that, do
5  you know who Zeyan Liew is?
6      A.   I do not, except from reviewing
7  the literature.  I've never --
8      Q.   But you see his name in the
9  literature?
10     A.   I've seen his name, yes.
11     Q.   He's in a lot of it, right?
12        MR. MURDICA:  Objection to
13     form.
14        THE WITNESS:  He's written a
15     lot of studies, yes.
16 QUESTIONS BY MR. SNIDOW:
17     Q.   There's Liew 2014.
18     A.   16, ABC.
19     Q.   Exactly.
20     A.   19, yes.
21     Q.   Yep.
22        And Olsen and Liew 2017?
23     A.   I guess I think of '16 as ABC.
24 Maybe you're thinking C is '17.
25     Q.   Olsen and Liew, 2017?

Page 186

1       A.      Oh, Olsen and Liew, yeah,
2   different paper, yeah.
3       Q.      All right.  So half a dozen
4   studies directly on this question, right?
5           MR. MURDICA:  Objection to the
6       form.
7           THE WITNESS:  He's written many
8       studies on this, yes.  He's written
9       many papers.  He hasn't done a study
10      himself, but he's used data.
11          (Pinto-Martin Exhibit 608
12          marked for identification.)
13  QUESTIONS BY MR. SNIDOW:
14      Q.      All right.  So I'm going to
15  show you a printout of the SPER website.
16  We'll mark it 608.
17          And if you look down --
18          MR. MURDICA:  Do you have mine?
19          MR. SNIDOW:  I do not.
20          MR. MURDICA:  Thank you.
21  QUESTIONS BY MR. SNIDOW:
22      Q.      If you look down under 2020, do
23  you see that in 2020 they gave an honorable
24  mention for the rising star award to
25  Zeyan Liew?

Page 187

1       A.      I do see that.
2       Q.      In 2020, that was after he had
3   published all of the studies that we just
4   talked through?
5       A.      That's correct.
6       Q.      And you know that he studies
7   acetaminophen fetal development pretty much
8   full-time, right?
9           MR. MURDICA:  Objection to
10      form.
11          THE WITNESS:  I know nothing
12      about what Zeyan Liew does.
13  QUESTIONS BY MR. SNIDOW:
14      Q.      Okay.
15      A.      But I know that he publishes
16  studies.
17      Q.      You know he's a primary author
18  on the consensus statement?
19          MR. MURDICA:  Objection to the
20      form.
21          THE WITNESS:  I know he was an
22      author.  I don't know where he is in
23      the author list.
24  QUESTIONS BY MR. SNIDOW:
25      Q.      And then after he wrote all of

Page 188

1   those papers in 2020, SPER gave him honorable
2   mention for the Rising Star Award?
3       A.      That looks to be the case.
4       Q.      You mentioned Dr. Swan?
5       A.      Swan, Shanna Swan.
6       Q.      Shanna Swan.
7       A.      Uh-huh.
8       Q.      Yeah.  Do you think that
9   reasonable scientists could sign on to the
10  consensus statement?
11      A.      I do think reasonable
12  scientists could sign on to the consensus
13  statement because it's not -- it's not a
14  study.  It's an interpretation of the
15  literature that some people feel one way
16  about and others will feel another way about.
17          So reasonable scientists could
18  disagree.  Some could agree to sign on.  Some
19  could say no thank you.
20      Q.      Sure.
21          The consensus statement
22  recommends that women be warned about
23  prenatal acetaminophen use?
24      A.      They believe that the
25  precautionary principle should be applied

Page 189

1   here.  Although they admit that the data is
2   still quite flawed and needs to be further
3   evaluated, they believe that the
4   precautionary principle should be applied.
5   That is what they said.
6       Q.      And do you think that's a
7   reasonable view?
8           MR. MURDICA:  Objection to the
9       form.
10          THE WITNESS:  I actually
11      disagree with that view.
12  QUESTIONS BY MR. SNIDOW:
13      Q.      Okay.
14      A.      Because I think that the risk
15  of denying women a pain medication during
16  pregnancy is a significant one from a public
17  health perspective, and I think that they
18  overstepped the bounds of the literature that
19  they reviewed.
20          Remember, they did not do any
21  of their own study or analysis.  They just
22  summarized some of the literature that
23  existed at the time.
24      Q.      I get that you disagree, and
25  it's kind of uncertain, but do you think it's

1 reasonable for them to have recommended that?
2        MR. MURDICA:  Objection to the
3    form.
4        THE WITNESS:  I believe I
5    answered that already, and I don't
6    agree with that.  I would not have
7    signed on to that statement.  I think
8    that --
9 QUESTIONS BY MR. SNIDOW:
10   Q.   Not asking you -- sorry.  Not
11 asking you for your personal opinion.
12       What I'm saying -- let me put
13 it a different way.
14       Do you think that they were
15 being unscientific when they made that
16 recommendation?
17       MR. MURDICA:  Objection to the
18    form.
19       THE WITNESS:  I'm not sure what
20    you mean by "unscientific."  They are
21    not evaluating primary data and
22    saying, "This is what these data
23    show."  They're interpreting the
24    literature that existed at the time
25    and saying, "We think we should have

1    applied a precautionary principle
2    here," which is their language --
3 QUESTIONS BY MR. SNIDOW:
4    Q.   Yeah.
5    A.   -- which really means going
6 beyond what the data shows and taking a stand
7 based on what we believe the interpretation
8 of that data should be.
9    Q.   Yeah.
10       MR. MURDICA:  And when you're
11    done with this area and there's not a
12    question pending, J.J., we've been
13    going an hour.  It's up to you.
14       MR. SNIDOW:  Okay.
15       Go off the record?
16       MR. MURDICA:  Yeah.
17       MR. SNIDOW:  Okay.
18       THE WITNESS:  Break?  Okay.
19       VIDEOGRAPHER:  The time is
20    11:11 a.m., and we're off the record.
21    (Off the record at 11:11 a.m.)
22       VIDEOGRAPHER:  The time is
23    11:23 a.m., and we're on the record.
24 QUESTIONS BY MR. SNIDOW:
25    Q.   Okay.  Dr. Pinto-Martin, during

1 the break, were you ever able to tell me what
2 studies showed that prepregnancy use of
3 acetaminophen is associated with autism
4 diagnoses?
5    A.   I'm sorry, I didn't look at
6 that.
7    Q.   Okay.  Will you do that next?
8    A.   I'm happy to do it when we have
9 a longer break.
10       MR. MURDICA:  Object to form.
11       No, you don't have to do
12    anything during the break.  Nobody
13    tells you what to do.
14       You can ask your questions.
15 QUESTIONS BY MR. SNIDOW:
16    Q.   If you would, I would
17 appreciate it.
18       MR. MURDICA:  No.  Objection.
19    That is not how depositions work.
20       J.J., you can ask questions if
21    you want.  Don't tell anybody what you
22    appreciate or what you wouldn't
23    appreciate.
24       If you want to use your time
25    that way, use it.

1 QUESTIONS BY MR. SNIDOW:
2    Q.   Have you ever published your
3 view of the evidence between prenatal
4 acetaminophen exposure and autism?
5    A.   I have not published on this
6 question, no.
7    Q.   So you -- have you given a
8 lecture on it?
9    A.   No.
10   Q.   Letter to the editor?
11   A.   No.
12   Q.   You can do that when you
13 disagree with a study, right?
14   A.   You can do that when you
15 disagree with a study, yes.
16   Q.   An editorial in a journal?
17   A.   I've not done anything, no.
18   Q.   Asked to speak at a conference?
19   A.   No.
20   Q.   Told any professional peers?
21   A.   No.
22   Q.   Written to any authors of these
23 journals?
24   A.   I have not.
25   Q.   Written to anyone on the

Page 194

1 consensus statement telling them that they're
2 wrong?
3      A.   I have not.
4      Q.   And why have you decided not to
5 get into this debate about whether it's
6 causal?
7           MR. MURDICA:  Objection to the
8      form.
9           THE WITNESS:  So I've been very
10      occupied reviewing this literature and
11      writing my expert report.  I am not
12      ruling out the possibility that I
13      might write something at some point or
14      give a lecture on it at some point.
15           It's not been a focus of the
16      last, you know, six months of my life.
17 QUESTIONS BY MR. SNIDOW:
18      Q.   Okay.  Have you done anything
19 to make your view -- make clear your view
20 that APAP does not cause autism besides
21 serving as an expert in this case?
22      A.   I have not.  And, again, I'm
23 not ruling out the possibility that I would
24 do that at some point in time, but it has not
25 been the focus of my life --

Page 195

1      Q.   Okay.
2      A.   -- for the past.
3      Q.   You're not a regulatory expert?
4      A.   I am not.
5      Q.   Not an expert on animal
6 studies?
7      A.   I am not.
8      Q.   Not an expert on reviewing the
9 literature on biological mechanisms?
10      A.   So biological mechanisms are
11 typically based on animal studies, and so the
12 same answer applies.  I'm not an expert in
13 animal studies.
14      Q.   Not an expert on biological
15 plausibility?
16           MR. MURDICA:  Objection to
17      form.
18           THE WITNESS:  So I understand
19      the criterion of biological
20      plausibility, and when I believe it's
21      important to explore the literature
22      associated with biological
23      plausibility, I do so.  But that's
24      a -- I don't know who an expert on
25      biological plausibility would be.

Page 196

1 QUESTIONS BY MR. SNIDOW:
2      Q.   It's just something you said
3 before, so I thought I would ask you again.
4           You're not a neurologist,
5 right?
6      A.   I am not.
7      Q.   Not a neonatologist?
8      A.   I am not.
9      Q.   Not a toxicologist?
10      A.   I am not.
11      Q.   Not a teratologist?
12      A.   I am not.
13      Q.   Not a medical doctor?
14      A.   I am not.
15      Q.   Not a geneticist?
16      A.   I am not.
17      Q.   You don't do basic lab work?
18      A.   I do not.
19      Q.   You don't diagnose people with
20 autism?
21      A.   I certainly am not a clinician
22 diagnosing people with autism, but as part of
23 our -- the studies that I've done, I have
24 observed probably thousands of evaluations of
25 individuals to see if they had autism.

Page 197

1      Q.   So, no, you don't diagnose it?
2           MR. MURDICA:  Objection.
3           THE WITNESS:  I do not make the
4      diagnosis, no.
5 QUESTIONS BY MR. SNIDOW:
6      Q.   And same for ADHD, you don't
7 not diagnose them?
8      A.   I am not a clinician.  I do not
9 make diagnoses.
10      Q.   You also don't treat people
11 with autism or ADHD?
12      A.   I'm not a clinician, so I do
13 not treat.
14      Q.   But you're definitely an expert
15 in autism, right?
16      A.   I'm an epidemiologist, a
17 peri-epidemiologist specifically, and I have
18 spent my career studying the etiology of
19 autism spectrum disorder.
20      Q.   How about ADHD?
21      A.   So ADHD is another
22 neurodevelopmental disorder, and I have
23 studied it in its relation to autism because
24 the differentiation between those two and the
25 etiology differences between those two is

Page 198

1  important to my work.
2      Q.    Have you published on it?
3      A.    There's certainly publications
4  of mine that have ADHD in them, but it's
5  not -- again, not my primary focus.  My
6  research has been funded to specifically look
7  at autism spectrum disorders in the study to
8  explore early development, which is the
9  CDC-funded study that I've been involved in
10  for many years.  The -- one of the comparison
11  groups is other developmental disabilities,
12  not autism, and in that comparison group, are
13  children with ADHD.
14      Q.    Okay.  Let's talk about
15  confounders again for a moment.
16          In your report you say that the
17  confounding variable to be a confounder needs
18  to be independently associated with the
19  outcome, right?
20      A.    Correct.
21      Q.    And you defined that as a risk
22  factor.
23      A.    Define what as a risk factor,
24  I'm sorry.
25      Q.    Whether it's independently

Page 199

1  associated with the outcome, you say it's a
2  risk factor.
3      A.    It's a potential risk factor if
4  it's independently associated with the
5  outcome.  That's what we're exploring in an
6  assessment of confounding.
7      Q.    Okay.  And you say that the
8  confounder must not lie on the causal pathway
9  between exposure and disease?
10      A.    Correct.  Correct.
11      Q.    And do you agree it's
12  theoretically possible that genetics
13  predispose a woman to take acetaminophen and
14  that the acetaminophen causes the autism?
15          MR. MURDICA:  Objection to the
16      form.
17          THE WITNESS:  So I'm not sure I
18      understand your question.
19  QUESTIONS BY MR. SNIDOW:
20      Q.    All right.  Hold on.  Let me --
21      A.    I think you're talking about a
22  causal pathway.
23      Q.    If you don't understand, let me
24  ask again.
25      A.    Yeah.

Page 200

1      Q.    You say, "Must not lie on the
2  causal pathway between exposure and disease."
3  Right?
4          MR. MURDICA:  Objection to the
5      form.
6          And I'd appreciate it if you
7      didn't do this hand waving thing while
8      she's in the middle of speaking again.
9      Thank you.
10          MR. SNIDOW:  Okay.  I'll put my
11      hands down.
12  QUESTIONS BY MR. SNIDOW:
13      Q.    You say, "Must not lie on the
14  causal pathway between exposure and disease,"
15  right?
16      A.    In order for a variable to be a
17  confounder, it cannot lie on the causal
18  pathway between exposure and disease.
19      Q.    And I'll give you an example.
20          So secondhand smoke, right?
21      A.    Right.
22      Q.    You know that's causally
23  associated with lung cancer, right?
24      A.    That has been established, yes.
25      Q.    And there was, I think, some

Page 201

1  question about whether that was confounded by
2  socioeconomic status; is that right?
3      A.    I'm not familiar with that
4  literature, but --
5      Q.    Well, you talk about it in your
6  report, don't you?
7      A.    Yeah.  I mean, I just don't
8  know the study that you're referring to and
9  so --
10      Q.    Well, in your report you say
11  it's stronger than the Tylenol literature,
12  right?
13          MR. MURDICA:  Objection.  You
14      cut her off again.
15          THE WITNESS:  Can you point to
16      me to exactly what you're talking
17      about?  Smoking and lung cancer is a
18      stronger --
19  QUESTIONS BY MR. SNIDOW:
20      Q.    Secondhand smoke.  You reviewed
21  that literature?
22          MR. MURDICA:  Objection to the
23      form.
24          Is that a question?
25

Page 202

1 QUESTIONS BY MR. SNIDOW:
2     Q.    Yeah.
3           Did you review that literature?
4     A.    I have certainly reviewed that
5 literature in the course of my work as an
6 epidemiologist, and I don't remember if I
7 referred -- reviewed it specifically for this
8 report.
9     Q.    Okay.
10    A.    If I referred to something, it
11 was based on my general knowledge.
12    Q.    Well, let me refresh your
13 memory because you have some footnotes on it.
14          Can you go to page 55?
15          At the top there, you see you
16 talk about secondhand smoke?
17    A.    Uh-huh.
18    Q.    And do you see there you say
19 that the literature is stronger than it is
20 for Tylenol, right?
21          MR. MURDICA:  Objection to the
22    form.
23          THE WITNESS:  So I say that
24    there were 50 consistent epidemiologic
25    studies, and I'm now recalling that

Page 203

1    I -- that I looked at that in response
2    to Dr. Baccarelli who said that, you
3    know, a weak association can
4    ultimately prove causal, something
5    that I don't disagree with.
6 QUESTIONS BY MR. SNIDOW:
7     Q.    Yeah.
8           But you do think it's stronger,
9 don't you?
10          MR. MURDICA:  Objection.
11          THE WITNESS:  Stronger than
12    what?
13 QUESTIONS BY MR. SNIDOW:
14    Q.    Than the association between
15 prenatal APAP exposure and autism, Doctor.
16    A.    Yes, I do.
17    Q.    Okay.  And I just want to ask
18 because I'm -- I wasn't real sure.  You did
19 look at that literature before writing this
20 report?
21    A.    I certainly -- when I saw that
22 in Dr. Baccarelli's report, I went and
23 reminded myself what was there, and I looked
24 up a reference and cited that reference.
25    Q.    Okay.  And the reference that

Page 204

1 you cite is the Surgeon General, right?
2     A.    That's correct.
3           MR. SNIDOW:  Can I have BBBB,
4     four Bs?  It's in the back there.
5 QUESTIONS BY MR. SNIDOW:
6     Q.    Okay.  All right.  I'm showing
7 you an excerpt from the Surgeon General's
8 report on secondhand smoke.  It is, again, in
9 its full version, more than -- at least 700
10 pages, so I've got an excerpt for you.
11          MR. SNIDOW:  But, Jim, this one
12    is Googleable.  You can use the Google
13    machine, as my colleague put it
14    recently.
15 QUESTIONS BY MR. SNIDOW:
16    Q.    All right.  Before we look into
17 this, Dr. Pinto-Martin, do you know what the
18 Surgeon General's estimate for the risk ratio
19 for secondhand smoke and lung cancer was?
20    A.    I do not off the top of my
21 head, but I imagine I could find it in here.
22    Q.    Yeah, you can.
23          So if you go to page 434.
24          All right.  Do you see that?
25    A.    I see page 434, yeah.

Page 205

1     Q.    It says, "Secondhand smoke
2 exposure from spouses, an update in the
3 literature, reports Hackshaw obtains a RR of
4 1.24."
5           Right?
6     A.    I'm sorry, where are you
7 looking?  Oh, Hackshaw and colleagues pooled
8 1997?
9     Q.    Yeah.
10    A.    '97 published studies.  Yep.
11    Q.    1.24?
12    A.    I see that.
13    Q.    And then they quote Zhong,
14 1.20?
15    A.    Correct.
16    Q.    Then if you turn to 436, they
17 actually show a lot of studies.
18    A.    Uh-huh.
19    Q.    Do you see them there?
20    A.    I see a whole list of studies,
21 yeah.
22    Q.    All right.  And any of those
23 studies show a risk ratio above 2.0?
24    A.    Do you want me to look at them
25 one at a time?

Page 206

1    Q.    It should be pretty easy.
2    A.    Not -- not that I see, no.
3    Q.    Okay.  All -- if you look down
4 at childhood exposure?
5    A.    I'm sorry, where is that?
6    Q.    Childhood exposure at the
7 bottom.
8    A.    Oh, now we're -- oh, we're at
9 the next page, sorry.  You jumped -- got it.
10 Oh, yeah, you're showing me here.  Okay.
11        MR. MURDICA:  No, you can
12    look --
13        THE WITNESS:  Okay.
14 QUESTIONS BY MR. SNIDOW:
15    Q.    Do you see that?
16    A.    Yeah.
17    Q.    For childhood exposure, none of
18 them are above 2.0?
19    A.    Correct.
20    Q.    The ones I've highlighted are
21 statistically nonsignificant?
22    A.    Correct.
23    Q.    There's one of the results that
24 shows a statistically significant protective
25 effect, right, that Europe, six studies?

Page 207

1    A.    Yeah.
2    Q.    Okay.  Do you still think that
3 the relationship between secondhand smoke and
4 lung cancer is causal?
5        MR. MURDICA:  Objection to the
6    form.
7        THE WITNESS:  The data here in
8    some instances, you've cited a bunch
9    of different numbers and relative
10    risks and odds ratios here.
11        But in general, it looks to me
12    like the secondhand smoke exposure
13    from spouses is consistent, and the
14    childhood smoke exposure is less
15    consistent.
16 QUESTIONS BY MR. SNIDOW:
17    Q.    Okay.  Would you say
18 inconsistent if you looked at that?
19    A.    So, again, as I've -- as I've
20 described to you, my evaluation and
21 consistency is very importantly informed by
22 the underlying data.
23        And I have no idea in this set
24 of studies here -- this is a meta-analysis,
25 which includes many studies -- how they

Page 208

1 derived the exposure information, and so it's
2 really hard for me to comment on that.
3    Q.    But you wouldn't say that just
4 because they had these statistically
5 nonsignificant results, that means no
6 causation, would you?
7        MR. MURDICA:  Object to the
8    form.
9        THE WITNESS:  Again, without
10    knowing the specifics of the study,
11    I think we need to look carefully at
12    what might have an impact on that,
13    what was the sample size, how did they
14    measure exposure.
15 QUESTIONS BY MR. SNIDOW:
16    Q.    Yeah, sorry.  Let me just take
17 a step back.
18        You think that secondhand smoke
19 causes lung cancer, do you not?
20    A.    I think that there is good
21 evidence to support a causal association
22 between secondhand smoke and lung cancer.
23    Q.    And you agree that many of
24 these studies are statistically
25 insignificant, right?

Page 209

1    A.    Many of these studies looking
2 at childhood exposure are statistically
3 insignificant, yes.
4    Q.    Well, here's the one for
5 workplace exposure.  We get two statistically
6 insignificant results there, right?
7        MR. MURDICA:  Object to the
8    form, and if that's intended to be a
9    demonstrative, to the use of the
10    demonstrative.
11 QUESTIONS BY MR. SNIDOW:
12    Q.    Is that right?
13    A.    I see two statistically
14 insignificant results, yes.
15    Q.    And you still think this is a
16 causal association, right?
17        MR. MURDICA:  Object --
18    objection to the form.
19        THE WITNESS:  I still think the
20    weight of the evidence supports a
21    causal association between secondhand
22    smoke and lung cancer.
23 QUESTIONS BY MR. SNIDOW:
24    Q.    Okay.
25    A.    I think that the situation with

1 secondhand smoke is a very different
2 situation from what we have with respect to
3 APAP in terms of the precision of the
4 exposure.
5     Q.   Yeah. Sure.
6        Let's look at the childhood
7 one. I guess I should ask, do you think that
8 childhood secondhand smoke exposure causes
9 lung cancer?
10     A.   I've never --
11        MR. MURDICA: Objection to the
12 form.
13        THE WITNESS: Yeah. I've never
14 reviewed that literature specifically,
15 so I'm not willing to offer an opinion
16 without looking at the individual
17 studies and evaluating --
18 QUESTIONS BY MR. SNIDOW:
19     Q.   Let's look at page 445 of what
20 you've got in front of you.
21        Do you see the Surgeon General
22 there, Conclusions, 1?
23     A.   Yes.
24     Q.   It says, "The evidence is
25 sufficient to infer a causal relationship

1 between secondhand smoke exposure and lung
2 cancer among lifetime smokers. This
3 conclusion extends to all secondhand smoke
4 exposure regardless of location."
5     A.   I see that.
6     Q.   Okay. You can put that aside
7 for now.
8        So let me ask you this. This
9 childhood exposure forest plot, do you think
10 that's stronger or weaker than this one?
11        MR. MURDICA: Objection to the
12 form.
13        THE WITNESS: Again, I think
14 just comparing point estimates across
15 two entirely different exposures and
16 outcomes is a misguided exercise.
17 QUESTIONS BY MR. SNIDOW:
18     Q.   That's fine.
19        It's not just point estimates,
20 though, right? It's confidence intervals,
21 too?
22     A.   Same point.
23     Q.   Yeah, okay.
24        But can you tell me for the --
25 for the consistency of the findings, would

1 you say this one is the more positive
2 association or this one is the more
3 consistent positive association?
4        MR. MURDICA: Objection to the
5 form.
6        THE WITNESS: Again, you're
7 asking me to look at two forest plots
8 and make an evaluation that requires
9 much more information in order to be
10 precise about my response.
11 QUESTIONS BY MR. SNIDOW:
12     Q.   Even to tell me if there's a
13 consistent association? I'm not asking about
14 causation.
15        MR. MURDICA: Same objection.
16        THE WITNESS: You're asking me
17 to compare different bodies of
18 evidence, one on smoking and one on
19 acetaminophen. They are entirely
20 different in the underlying data.
21        And I can't evaluate them with
22 respect to their relevant consistency.
23 I'm just not willing to do that.
24 QUESTIONS BY MR. SNIDOW:
25     Q.   Right.

1        But the presence of this no
2 result here, or actually statistically
3 significant protective effect, doesn't
4 preclude you from making a causal inference,
5 does it?
6        MR. MURDICA: Objection to the
7 form.
8        THE WITNESS: I'm sorry, can
9 you -- can you --
10 QUESTIONS BY MR. SNIDOW:
11     Q.   Yeah.
12     A.   -- rephrase that?
13     Q.   This is the literature on
14 childhood exposure and lung cancer, right?
15     A.   That's what you are presenting,
16 yes.
17     Q.   You think it's causal, right?
18     A.   I believe there is evidence in
19 support of a causal association between
20 prenatal smoking -- I mean, I'm sorry,
21 secondhand smoking and --
22     Q.   Yeah.
23     A.   -- and cancer.
24     Q.   And yet, one of the results
25 they got was statistically significant in the

Confidential - Subject to Protective Order

Page 214

1  wrong direction, right?
2       A.    So one result from Europe, I
3  don't know what's included there, appears to
4  have a protective effect.
5       Q.    And that's all I'm asking.
6  That happens sometimes, right?  Even with
7  true causal exposure, sometimes you get a
8  blip result, don't you?
9            MR. MURDICA:  Objection to the
10           form.
11           THE WITNESS:  I don't know if
12           it's a blip result.  I don't know what
13           the data is based on, but that is a
14           different result from the others, I
15           will grant you that.
16  QUESTIONS BY MR. SNIDOW:
17       Q.    That's what I'm asking.  Thank
18  you.
19            All right.  You agree that a
20  number of people on the other side of the
21  debate from you in this literature have said
22  that causation is the most likely
23  explanation?
24       A.    So when you say "people on the
25  other side of the debate," I'm not quite sure

Page 215

1  who you mean.
2       Q.    Okay.
3       A.    If you can give me an example
4  of a specific person that disagrees with my
5  conclusion, I'd be happy to --
6       Q.    Yeah.
7       A.    -- to think about that, but
8  that's a broad statement, and I don't have a
9  response.
10           (Pinto-Martin Exhibit 609
11           marked for identification.)
12  QUESTIONS BY MR. SNIDOW:
13       Q.    Can I just have tab H?
14           Oh, gosh.  All right.  This,
15  I'm going to mark, as Exhibit 609, which is
16  Olsen and Liew 2017.
17           And you read this paper when
18  writing your report, right?
19       A.    I did.
20       Q.    All right.  If you turn to
21  page 1395, do you see there's a paragraph
22  that says, "The existing evidence"?
23       A.    1395.
24       Q.    It's just the first page.
25       A.    Okay.

Page 216

1       Q.    The first --
2       A.    Existing evidence, yeah.
3       Q.    And it says -- and I've got the
4  monitor if you want.
5            It says, "The existing evidence
6  is based on observational data from several
7  cohorts."
8            Do you agree with that?
9       A.    I do.
10       Q.    It says, "Different analytical
11  options have been used."
12           Agree with that?
13       A.    Uh-huh.
14       Q.    It says, "These research
15  findings have increased the probability that
16  the association is causal."
17           Do you see that?
18       A.    I see that.
19       Q.    Do you agree with that one?
20       A.    Not necessarily.
21       Q.    Do you think it's a possibly
22  correct thing to say?
23       A.    It's certainly not something
24  that I would say, again, because I'm not
25  willing to say that something is causal based

Page 217

1  on observational studies --
2       Q.    I see.
3       A.    -- observational data.
4       Q.    And these guys have, it sounds
5  like, a lower threshold for causation than
6  you do, right?
7       A.    I would say that, yeah, or they
8  interpret that concept differently.
9       Q.    And do you agree that it was
10  reasonable to say that "the findings
11  increased the probability that the
12  association is causal"?
13           MR. MURDICA:  Objection to the
14           form.
15           THE WITNESS:  Again, I think
16           that is their interpretation.
17           My assessment based on the
18           methodology problems with the study
19           is not consistent with that.
20  QUESTIONS BY MR. SNIDOW:
21       Q.    But would you -- would you say
22  that they're being quacks for saying that?
23           MR. MURDICA:  Objection to the
24           form.
25           THE WITNESS:  Again, I don't

Page 218

1  know what a quack is, and I don't use
2  that term.  I find it somewhat
3  derogatory.
4        I think that every
5  epidemiologist is doing their best to
6  interpret the evidence on a very
7  important issue to the best of their
8  ability using the training that they'd
9  received and the way that they think
10 about establishing causality.
11 QUESTIONS BY MR. SNIDOW:
12     Q.    Right.
13        And you applied that analysis
14 to this statement here when they say,
15 "Increase the probability that the
16 association was causal"?
17        MR. MURDICA:  Objection to the
18     form.
19        THE WITNESS:  I believe that
20     they were using their own training and
21     their own interpretation to come up
22     with that statement.
23 QUESTIONS BY MR. SNIDOW:
24     Q.    Okay.
25     A.    It's not something that I would

Page 219

1  say.
2     Q.    Yeah.  No, I get it.
3        And that's exactly what I mean.
4  I know you disagree, but I'm asking if that's
5  within the realm of reasonable debate?
6        MR. MURDICA:  Objection to the
7     form.
8        THE WITNESS:  Yeah.  I wouldn't
9     call it debate, but I think it's
10     interpretation, and people -- I would
11     say that trained epidemiologists can
12     interpret evidence differently.
13 QUESTIONS BY MR. SNIDOW:
14     Q.    Including the evidence that
15 they're describing here?
16     A.    Including the evidence that
17 they're describing here.
18        MR. MURDICA:  Object to form.
19 QUESTIONS BY MR. SNIDOW:
20     Q.    And then he goes on to say,
21 "It's too simple and not justified to explain
22 away the possibility of confounding" --
23 excuse me, I'll say it again.  I screwed it
24 up totally.
25        He goes on to say, "It is too

Page 220

1  simple and not justified to explain away the
2  possibility of causality by mentioning
3  confounding."
4        Do you see that?
5     A.    I see that he says that, yes.
6     Q.    And do you agree?
7     A.    I do not.
8     Q.    Okay.  So you think it's fine
9  to just mention confounding?
10     A.    I'm not sure I understand your
11 question.  I think we must consider the
12 possibility of confounding and look carefully
13 at the possibility that confounding explains
14 some or all of the association.
15     Q.    Okay.  But you need actual
16 evidence of confounding before explaining
17 away the possibility of causality, don't you?
18     A.    You need evidence on the
19 confounder that you're testing, and you need
20 to be able to assess its impact on the
21 results that you have reported, yes.
22     Q.    And you need evidence both that
23 it's associated with the outcome and that
24 it's associated with the exposure, right?
25     A.    Correct.

Page 221

1     Q.    Correct.
2        Okay.  Let's look at -- ah,
3  same one.  1396, which is the next page.
4        All right.  Do you see where it
5  says, "The studies we are aware of covering
6  the topic of fetal programming all find
7  statistically significant results"?
8     A.    I do.
9     Q.    Okay.  It says, "But that plays
10 a limited role in our reading and
11 interpretation of the data."
12        Right?
13     A.    That's what they say.
14     Q.    And you'd agree with that,
15 right?  That's what you've been telling me
16 all morning?
17        MR. MURDICA:  Objection to the
18     form.
19        THE WITNESS:  Not exactly sure
20     what they're referring to there, if
21     they're talking about mechanisms of
22     action.  I think -- I agree that I
23     give it limited weight in my
24     evaluation.
25

Page 222

1 QUESTIONS BY MR. SNIDOW:
2    Q.    Yeah.
3        They go on to say, "More
4 important is the methods and bias analyses
5 that have been applied trying to make the
6 association go away."
7        Right?  They say that?
8    A.    They say that, yes.
9    Q.    And do you agree that
10 researchers in this field have tried to make
11 the association go away?
12    A.    I think that's perhaps
13 mischaracterizing it.  I don't think we try
14 to make an association go away.  When we are
15 doing an epidemiologic study, we evaluate the
16 impact of potential confounders and biases on
17 that measure of association to see whether
18 it's credible.
19    Q.    And do you see it says,
20 "Comparison of exposure periods during and
21 after" -- next page -- "pregnancy makes the
22 case" -- "makes the case her own control
23 could also help eliminate bias"?
24    A.    So I know they're referring
25 there to a negative control as we talked

Page 223

1 about before --
2    Q.    Yeah.
3    A.    -- using women prepregnancy
4 and after pregnancy.
5    Q.    Yeah.
6    A.    And I would argue that that --
7 using that as a negative control has
8 problems.
9    Q.    Uh-huh.
10    A.    Because we know that pregnancy
11 changes a woman in all kinds of way, right,
12 physical ways and her -- and perhaps could
13 influence the pain that she's experiencing,
14 her willingness to take a pain medication,
15 and her necessity of taking acetaminophen as
16 opposed to another medication that perhaps is
17 no longer indicated during pregnancy.
18    Q.    Yeah.
19    A.    So using the woman as her own
20 negative control I think has some problems.
21    Q.    Okay.  But I'm just asking,
22 it's been done, right?  They've done that.
23        8 refers to the Stergiakouli
24 study.  You know they did it in that one?
25    A.    They did that in the

Page 224

1 Stergiakouli study.  However, can I just
2 point out that the Stergiakouli results that
3 are reported in the main paper are the
4 unadjusted results?
5        And when you look at the
6 adjusted results in the supplementary table,
7 they actually support the notion of
8 unmeasured confounding.
9    Q.    Okay.  Did you write to Olsen
10 and Liew to tell them that, that they got
11 Stergiakouli wrong here?
12        MR. MURDICA:  Objection to the
13 form.
14        THE WITNESS:  Again, as I've
15 said before, that has not been the
16 focus of the past six months of my
17 life, but I am not ruling out the
18 possibility that I would write a
19 letter to the editor or to express my
20 opinions about it at some point in
21 time.
22 QUESTIONS BY MR. SNIDOW:
23    Q.    Okay.  I hope you do.
24        Do you see where it says
25 "triangulation" here?

Page 225

1    A.    I'm sorry, I lost the spot
2 where you are.
3    Q.    Do you see where it says "it's
4 a term used to address a bias problem as
5 approached from different angles"?
6    A.    Yes, I see that.
7    Q.    And you agree that's been
8 employed here?
9    A.    So I think what they're
10 referring to here is looking at the cohort
11 results and comparing it to the negative
12 control exposure results, yes.
13    Q.    Right.
14        So they've done that here?
15    A.    They have done that.
16    Q.    Okay.
17    A.    Well, I guess that's what
18 they're saying here.
19    Q.    Yeah.
20        And then it says -- it quotes
21 Arthur Conan Doyle.  It says, "Once you
22 eliminate the impossible, whatever remains,
23 no matter how improbable, must be the truth."
24    A.    I've seen that quote before.
25    Q.    Yeah.  It's in Bradford Hill,

Page 226

1  right?
2      A.    It's in Bradford Hill, and it's
3  in Baccarelli's report, yes.
4      Q.    Yeah.  Well, it's in Bradford
5  Hill.
6          And then it says, "Such
7  attempts have so far been unsuccessful."
8      Right?
9      A.    That's what it says.
10     Q.    And that's saying that they've
11 tried to find evidence for other explanations
12 other than causation and at least as of 2017,
13 no luck, right?
14     A.    I disagree with that statement.
15 As I just pointed out in the Stergiakouli,
16 for example, when they used a negative
17 control exposure, both paternal and maternal
18 prepregnancy use showed an increased risk of
19 autism in the offspring, which supports the
20 notion of familial or genetic confounding.
21     Q.    Yeah, I know you disagree.  I
22 was actually just trying to get an
23 interpretation of the sentence.
24          They're saying they've tried to
25 eliminate other explanations, and those

Page 227

1  attempts have been unsuccessful, right?
2          MR. MURDICA:  Objection to the
3      form.
4          THE WITNESS:  I see the
5      sentence as it's written, and I'm
6      saying I disagree with that statement.
7  QUESTIONS BY MR. SNIDOW:
8      Q.    Okay.
9      A.    Because I think that the
10 attempts actually have demonstrated residual
11 confounding.
12     Q.    Okay.  And that's Stergiakouli?
13     A.    That's one example, yes.
14     Q.    All right.  Why don't you just
15 give them all to me right now.
16          What else?
17          MR. MURDICA:  Objection to the
18     form.
19          THE WITNESS:  I can't just
20     rattle them off.  I can look through
21     the studies and describe where the
22     negative control exposures or the
23     maternal pre and post-pregnancy use
24     have resulted in an increased risk in
25     spite of the proposition that that

Page 228

1  would show no confounding, it shows
2  there is confounding, and the same
3  with paternity use.
4  QUESTIONS BY MR. SNIDOW:
5      Q.    Could you do that on a break
6  for me on as well?
7          MR. MURDICA:  Objection to the
8      form.
9          If you want her to do
10     something --
11          THE WITNESS:  I'm happy to look
12     through my report and come up with
13     them.  I'm not going to try and do it
14     from memory.
15          MR. SNIDOW:  Thank you.  That's
16     all I'm asking.
17          THE WITNESS:  And I can do it
18     right now.
19          (Pinto-Martin Exhibit 610
20     marked for identification.)
21 QUESTIONS BY MR. SNIDOW:
22     Q.    I'm going to -- I'm going to
23 show you another study that I'm going to mark
24 as Exhibit 610, which is the Gou paper.
25          All right.  And you've read

Page 229

1  this one, right?
2      A.    Yes, this is a meta-analysis.
3      Q.    It is a meta-analysis.
4          If we turn to page 204.
5          Are you there?
6      A.    I am there.
7      Q.    It says, "These are validated,
8  large prospective cohort studies and includes
9  some analytical methods such as
10 sibling-controlled analyses."
11         Right?
12     A.    Correct.
13     Q.    And this is before Gustavson,
14 to be fair, right?  So they don't cite it.
15     A.    Right.
16     Q.    But they do cite Brandlistuen,
17 right?
18     A.    Right.
19     Q.    And that's a sibling-control
20 study that showed a result even after doing
21 the sibling controls?
22     A.    That's correct, although
23 Brandlistuen was based on a nondiagnostic
24 outcome --
25     Q.    Right.

Confidential - Subject to Protective Order

Page 230

1    A.    -- so...
2    Q.    And you don't like those,
3 right?
4    A.    It's not that I don't like
5 them.
6         MR. MURDICA:  Objection.
7         THE WITNESS:  I just don't
8    think they are contributory to my
9    opinion about the association between
10   prenatal APAP exposure and the
11   diagnosis of autism or ADHD.
12 QUESTIONS BY MR. SNIDOW:
13   Q.    Yeah, and that's fair.
14        Then the Gou authors go on to
15 say, "The most recent set of studies have
16 consistently suggested a moderately increased
17 risk from in utero acetaminophen exposure."
18 Right?
19   A.    That's what they say.
20   Q.    And they say, "These research
21 findings lend weight to the hypothesis that
22 the association is causal."
23 Right?
24   A.    That's right.  They're saying
25 there's a hypothesis and the evidence is

Page 231

1 supporting the hypothesis of causality, but
2 it's still a hypothesis.
3    Q.    Right.  No, I get it.
4         And I'm not asking you on the
5 overall causation question, but do you think
6 that's a reasonable thing for them to have
7 said here?
8         MR. MURDICA:  Objection to the
9    form.
10        THE WITNESS:  So, again, a
11   meta-analysis is taking, you know,
12   data that already exists.  They
13   don't -- they can't control how the
14   data was collected and what the
15   reliability of that information is.
16   So given that caveat, that they're
17   basing it on studies of that
18   methodologic flaws and acknowledging
19   that caveat, I think it's a reasonable
20   statement.
21 QUESTIONS BY MR. SNIDOW:
22   Q.    Okay.  And then they say, "It's
23 overly simplistic and not justifiable to
24 explain away the possibilities of causality
25 through confounding factors alone."

Page 232

1    Right?
2         MR. MURDICA:  Objection to
3    form.
4         THE WITNESS:  I'm not sure I
5    agree with that statement.
6 QUESTIONS BY MR. SNIDOW:
7    Q.    Okay.  Do you think it's
8 reasonable for them to say it?
9         MR. MURDICA:  Objection to the
10   form.
11        THE WITNESS:  I think if I
12   wanted to answer that, I would want to
13   read, you know, a couple of pages of
14   this to really see where that's coming
15   from.  You're sort of pulling it out
16   of context.  I'm not sure exactly what
17   they're trying to say there.  So it's
18   a little hard to react to a single
19   statement like that.
20 QUESTIONS BY MR. SNIDOW:
21   Q.    Okay.  And then they call out
22 confounding by indication in particular,
23 right?
24   A.    They do.
25        (Pinto-Martin Exhibit 611

Page 233

1    marked for identification.)
2 QUESTIONS BY MR. SNIDOW:
3    Q.    All right.  Let's look at J,
4 which I'm going to mark as 611.
5         All right.  And this one is
6 Stergiakouli 2016?
7    A.    It is.
8    Q.    If you turn to page 967.
9         All right.  And do you see at
10 the bottom there it says, "These findings,
11 when coupled with those from the previous
12 discordant sibling-design study, suggests
13 that the association between prenatal
14 acetaminophen exposure and childhood
15 behavioral problems is not explained by
16 unmeasured familial factors linked to both
17 acetaminophen use and childhood behavioral
18 problems"?
19   A.    I see that statement.
20   Q.    Yeah.
21   A.    And I think that that statement
22 is actually a mischaracterization of the
23 data.  Because as I stated, if you pull the
24 supplementary tables --
25   Q.    Yeah.

Page 234

1    A.    -- the effect in paternal use
2  is actually greater than the effect in
3  maternal prenatal use.
4        And this study had a whole set
5  of commentaries that came following it
6  because people actually accused her of
7  mischaracterizing the data.
8        So I --
9    Q.    Yeah.
10   A.    -- I see that statement, but I
11 think that it's not a fair summary of the
12 data that she evaluated.
13       MR. MURDICA:  Let me just add
14     before you ask another question.
15       You have this tendency to
16     comment while she's giving answers and
17     to say, yeah, yeah, or other things,
18     and I'm sure it's unintentional, but
19     it's distracting, and I don't think
20     it's the right thing to do.
21       So if you could try to stop it,
22     I'd appreciate it.
23       MR. SNIDOW:  Okay.  It wasn't
24     intentional.
25       MR. MURDICA:  I said I don't

Page 235

1  think it's intentional.  I think it's
2  just a tick that you have.
3        MR. SNIDOW:  Uh-huh, all right.
4        MR. MURDICA:  Just try not to
5      do it.
6  QUESTIONS BY MR. SNIDOW:
7    Q.    All right.  Are you ready,
8  Doctor?
9    A.    I am.
10   Q.    Okay.  What you're suggesting
11 is that the authors of this study
12 mischaracterized their own data?
13   A.    I am.
14   Q.    Okay.  You see here where it
15 says, "The findings are consistent with an
16 intrauterine effect"?
17   A.    I'm sorry, what page are you
18 on?
19   Q.    On 967, right at the bottom.
20   A.    Right-hand column.  Okay.
21   Q.    You see it says, "The findings
22 are consistent with an intrauterine effect"?
23   A.    Yes, I see that.
24   Q.    Do you think that's a
25 reasonable thing to say?

Page 236

1    A.    I do not think it's a
2  reasonable thing to say because a negative
3  control analysis is designed to address that
4  question specifically:  Is the effect an
5  intrauterine effect?  If so, you should not
6  see an effect prepregnancy or post-pregnancy.
7  You should not see an effect by paternal use.
8        And in her supplementary
9  tables, she reports both.
10       (Pinto-Martin Exhibit 612
11     marked for identification.)
12 QUESTIONS BY MR. SNIDOW:
13   Q.    Uh-huh.  D is going to be
14 marked as --
15       (Off the record discussion.)
16       MR. SNIDOW:  And will you make
17     sure that one is not highlighted.
18       THE WITNESS:  It's highlighted.
19       MR. SNIDOW:  It is?  Trade me.
20       MR. MURDICA:  He wants to
21     trade.
22       THE WITNESS:  Well, now I don't
23     have one.
24       MR. SNIDOW:  I know.  I want
25     you to have the real one.

Page 237

1  There you go.
2        THE WITNESS:  Thank you.
3        MS. KO:  J.J., do you happen to
4      have an extra copy for me?
5        MR. SNIDOW:  I do.
6        MS. KO:  Thank you.
7  QUESTIONS BY MR. SNIDOW:
8    Q.    All right.  You reviewed this
9  study when writing your report?
10   A.    I did.  This is a meta-analysis
11 that I reviewed, yeah.
12   Q.    If we could turn to page 1000.
13       Okay.  Do you see it says, "The
14 most consistent pattern of results was
15 observed for the association between prenatal
16 acetaminophen exposure and ADHD symptoms."
17   A.    Yes, and I note the symptoms
18 there.
19   Q.    Yep.
20       And then it says, "Our findings
21 are consistent with previous single-cohort
22 studies conducted in the ALSPAC, DNBC and
23 INMA cohorts."
24   A.    And those also were studies
25 that used ADHD symptoms, yes.

Page 238

1    Q.    Yeah.
2          You see it says, "The
3  association between prenatal acetaminophen
4  use and ASC symptoms was consistently
5  positive"?
6    A.    I do see that.
7    Q.    Okay.  It says, "Associations
8  between prenatal acetaminophen, ASC and ADHD
9  symptoms were consistently positive for both
10  boys and girls, albeit slightly stronger
11  among boys."
12          Right?
13    A.    I see that statement.
14    Q.    And so these authors use the
15  term "consistent" one, two, three, four --
16  four times in about three paragraphs?
17    A.    That looks to be the case.
18    Q.    And you disagree what the
19  author is actually writing this paper, right?
20    A.    I disagree with their overall
21  evaluation of the body of evidence because,
22  to my recollection, there's only one study in
23  this meta-analysis that actually had ADHD as
24  a diagnosis.  And I think it's very important
25  to think about the difference between results

Page 239

1  on a screening instrument, which are not
2  diagnostic for ADHD, and the ADHD diagnosis
3  itself.
4          There are many, many
5  instruments that were used in this literature
6  that have little to no bearing on the
7  diagnosis of ADHD.  And so I disagree with it
8  because of that.
9    Q.    Do you think that they're being
10  bad epidemiologists for characterizing the
11  literature as being consistent?
12          MR. MURDICA:  Objection to the
13          form.
14          THE WITNESS:  I would never
15          call someone a bad epidemiologist.
16  QUESTIONS BY MR. SNIDOW:
17    Q.    Okay.
18    A.    And I don't -- it's not the
19  point of my disagreeing with their overall
20  results.  They can use consistent, if that's
21  how they evaluate their results.  That is not
22  informative to my opinion about whether APAP
23  exposure during pregnancy increases the risk
24  of ADHD diagnosis.
25    Q.    Well, let me ask you this.

Page 240

1  Let's say a series of results showed ten
2  statistically significant negative results in
3  a row.  Okay?
4          .7, all the way down,
5  statistically significant, right?
6    A.    Insignificant or significant?
7    Q.    Statistically significant.
8    A.    .7?
9    Q.    Yeah.
10    A.    So a protective effect down
11  the -- down the board.
12    Q.    Yeah.
13    A.    Okay.
14    Q.    Do you think it would be
15  unreasonable to characterize that -- those
16  results as consistent in the positive
17  direction?
18          MR. MURDICA:  Objection --
19          objection to the form.
20  QUESTIONS BY MR. SNIDOW:
21    Q.    Do you want me to draw?
22    A.    So in the positive direction,
23  so the result is .7, but you're claiming an
24  increased risk?
25          You don't have to draw it.

Page 241

1    Q.    Yeah.  That's what I'm saying.
2    A.    I think that would be a
3  mischaracterization of the results.
4    Q.    I agree.
5          And that's what I'm asking.  Is
6  that -- do you think that this is what
7  they're doing here when they say consistent,
8  or is it just a disagreement among
9  epidemiologists about what counts?
10    A.    As I said, I don't -- I don't
11  disagree that they are interpreting their
12  results as consistent.  It does not inform my
13  opinion as to whether there is a causal
14  association between acetaminophen exposure
15  and ADHD diagnosis because the results that
16  they used in their meta-analysis were based
17  primarily on screening instruments, which are
18  not the same thing as a diagnosis.
19          As you know, screening
20  instruments are designed to cast a wide net.
21  So the sensitivity of those instruments is
22  high in order to capture the risk pool, and
23  that group of individuals is then
24  further evaluated for diagnosis where we
25  establish a more specific outcome.

Page 242

1    Q.   Okay.
2    A.   So the two are very different
3  in form.
4    Q.   Do you see here they say, "The
5  above-mentioned findings provide biological
6  plausibility"?
7    A.   I see that's what they say.
8    Q.   Do you think that's a
9  reasonable characterization of the evidence?
10    A.   So I want to read the whole
11  sentence.  I don't believe that it
12  establishes biological plausibility for a
13  diagnosis of ADHD, which is what I was tasked
14  with doing and what my review consists of.
15    Q.   Yeah.
16    A.   So, no.  Again, picking one
17  sentence out is -- sort of mischaracterizes
18  their overall point.  Because if you look at
19  the beginning of the next paragraph, they say
20  we need to interpret these results with
21  caution --
22    Q.   Sure.
23    A.   -- because these are symptoms
24  and not diagnoses.
25    Q.   Okay.

Page 243

1        MR. MURDICA:  Objection to the
2    form.
3  QUESTIONS BY MR. SNIDOW:
4    Q.   Do you agree that the results
5  they describe above provide biological
6  plausibility?
7    A.   Not to a diagnosis of ADHD.
8    Q.   So you disagree with the study
9  authors again?
10    A.   I do.
11    Q.   How about coherence?  Agree or
12  disagree with the study authors?
13    A.   Again, I am looking at this
14  with respect to its influence on my opinion
15  about prenatal APAP exposure and ADHD as an
16  outcome, and I disagree with their
17  characterization of their findings, and it
18  does not inform my opinion.
19    Q.   Okay.  How about temporality?
20  They say the temporality criterion has been
21  satisfied.
22        Do you agree?
23    A.   With respect to their analysis
24  or in general?
25    Q.   Uh-huh.  With respect to their

Page 244

1  analysis.
2    A.   Again, I think they're
3  mischaracterizing the impact of APAP on these
4  screening outcomes and inferring that because
5  they found these effects in screening
6  instruments, it establishes a risk for ADHD
7  as a diagnosis.
8    Q.   Well, it's not all screening
9  instruments in this meta-analysis, right?
10    A.   There's, I believe, one study.
11    Q.   Yeah.  Okay.
12        That uses diagnoses, right?
13    A.   Yeah.
14    Q.   All right.  So just to be
15  clear.  And then they go on to say
16  dose-response here.
17        And they think that the
18  dose-response criteria in Bradford Hill has
19  been satisfied?
20    A.   And I disagree.
21    Q.   All right.  So you disagree
22  with them -- the study authors themselves
23  on --
24    A.   Uh-huh.
25    Q.   -- one, two, three, four, five,

Page 245

1  what, six of the Bradford Hill criteria?
2    A.   I disagree with the summary of
3  the data that these authors have presented --
4    Q.   But do you --
5    A.   -- in this form, and I think
6  the supplementary tables inform my review and
7  interpretation of this study.
8    Q.   But you agree they are doing a
9  Bradford Hill criteria -- Bradford Hill
10  analysis here, right?
11    A.   I never --
12        MR. MURDICA:  Objection to the
13    form.
14        THE WITNESS:  They never state
15    that, but those are the Bradford Hill
16    criteria.
17  QUESTIONS BY MR. SNIDOW:
18    Q.   Oh, really?  What's footnote
19  42, do you think?
20    A.   I'm just saying they don't
21  state it in their paragraph.
22    Q.   Well, but they cite to
23  footnote 42.
24    A.   Okay.  So fine.
25    Q.   Do you want to know what that

Page 246

1 is?
2     A.    I mean, I said it's Bradford
3 Hill criteria.
4     Q.    Yeah.  That's the Bradford Hill
5 address?  Yeah.
6          So in that paragraph, they're
7 doing the Bradford Hill analysis, right?
8     A.    They're doing a Bradford Hill
9 analysis on data that is not complete --
10    Q.    Okay.
11    A.    -- because they have not
12 included what the supplementary tables
13 include.
14    Q.    Okay.
15    A.    And they are coming up with a
16 summary of the findings based on incomplete
17 presentation of the data.
18    Q.    And that's fine.
19          MR. MURDICA:  J.J., I'm going
20    to ask you again nicely.  I'm sure
21    it's unintentional, but you keep doing
22    it.  You can't help yourself, and just
23    please try.
24 QUESTIONS BY MR. SNIDOW:
25    Q.    They say one, two, three, four,

Page 247

1 five -- six of the Bradford Hill criteria are
2 satisfied?
3     A.    I thought we just went through
4 this, but that's what they say.
5     Q.    Yeah.  Okay.  Thank you.  You
6 can put that one aside.
7          (Pinto-Martin Exhibit 613
8    marked for identification.)
9 QUESTIONS BY MR. SNIDOW:
10    Q.    All right.  Can I have L?
11          Are you familiar with the
12 Briggs textbook?
13    A.    I've seen it referred to in
14 some of the expert reports.  It's not a
15 textbook I've ever looked at.  It's not -- I
16 would have no reason to.  I'm not an
17 obstetrician.
18    Q.    Oh, is that what it's for?
19 It's for obstetricians?
20    A.    I believe so.
21    Q.    All right.  It says, "A
22 Reference Guide to Fetal and Neonatal Risk."
23 Right?
24    A.    My understanding is it's for
25 clinicians, but, again, I've never seen it,

Page 248

1 so...
2     Q.    All right.  So this is designed
3 for doctors who are dealing with pregnant
4 women?
5          MR. MURDICA:  Objection to the
6    form.
7          THE WITNESS:  I don't know what
8    it was designed for.  I wasn't part of
9    its publication, but my understanding
10   is that it's a reference for
11   clinicians.
12 QUESTIONS BY MR. SNIDOW:
13    Q.    And you see it's in its 12th
14 edition?
15    A.    I see that.
16    Q.    So, yes, it's been around for a
17 bit; is that right?
18    A.    I would imagine.  I don't know
19 when the first publication was, but, yes, I
20 would imagine it's been around for at least
21 12 years.
22    Q.    All right.  I'm going to mark
23 it as 613.
24    A.    Oh, boy, this one I really need
25 my --

Page 249

1     Q.    Yeah.
2     A.    These give me a headache,
3 that's the problem.
4          Yeah.  That's really hard to
5 read.
6     Q.    You see here you've got a
7 section on acetaminophen, right?
8     A.    Uh-huh.  Can this -- can this
9 enlarge this little thing?
10    Q.    Yeah.
11    A.    That would be great, because
12 this is really hard to read.
13    Q.    Yeah, yeah, yeah.
14          MR. MURDICA:  It's blurry on
15    here too.  I'm not sure that it's
16    going to help it.
17          THE WITNESS:  I think his copy
18    is -- well --
19 QUESTIONS BY MR. SNIDOW:
20    Q.    Is that better?
21    A.    Did I mess it up?
22    Q.    Good?
23    A.    Does anyone know how this
24 works?  Oh, it's got to go -- we've got it.
25 Thank you.

Page 250

1    Yeah, that's better.  It's
2 easier to read.
3    Do you want to look at this
4 one, too?  If you want --
5    Q.   Are you ready?
6    A.   Yeah.
7    Q.   It says, "Acetaminophen is
8 commonly used in all stages of pregnancy."
9 Right?
10    A.   That's what it says.
11    Q.   It says, "Although originally
12 thought not to cause embryo-fetal harm, this
13 assessment must change because of recent
14 data."
15    Correct?
16    MR. MURDICA:  Objection to the
17 form.
18    THE WITNESS:  There's what it
19 says.
20 QUESTIONS BY MR. SNIDOW:
21    Q.    And then it calls out ADHD in
22 particular?
23    A.    Although the risk is very low,
24 use of the drug for seven -- several weeks or
25 longer has been associated with -- (reading

Page 251

1 sotto voce).
2    It does.  It does.
3    Q.    And do you agree with the study
4 authors?
5    A.    As I've said, I do not believe
6 there's credible epidemiologic evidence to
7 support an increased risk of ADHD from
8 prenatal APAP use.
9    Q.    So you think that the Briggs
10 textbook authors are wrong to be telling
11 obstetricians that the assessment of APAP
12 must change because of recent data?
13    A.    I don't think anything about the
14 Briggs textbook.  I don't know who the
15 authors are.  I don't really know who the
16 audience is, although I think it is
17 clinicians, and I don't know what data they
18 evaluated.
19    I don't know when this was
20 written and why they decided to put this in
21 there, so I really can't comment.  It's not
22 my area of expertise.  I'm not willing to
23 opine on why that's in there.
24    Q.    Okay.  You say you don't -- you
25 don't make causal determinations on the basis

Page 252

1 of observational data; is that right?
2    A.    That's right.
3    Q.    All right.  Do you make causal
4 determinations on the basis of randomized
5 controlled trials?
6    A.    I don't know that I've ever
7 made a causal determination on the basis of
8 an RCT.  I have been involved with some RCTs.
9 They certainly rule out many of the problems
10 of confounding and bias that a observational
11 study contains.
12    So I would say I would be more
13 likely to accept evidence from an RCT than I
14 would from an observational study with
15 respect to establishing a causal association.
16    Q.    Well, isn't that how the FDA
17 determined whether drugs work, because they
18 do RCT?
19    MR. MURDICA:  Objection to the
20 form.
21    THE WITNESS:  I'm have no idea
22 hat the FDA does.  I'm not an FDA
23 employee.  I don't know what kinds of
24 studies they do or how they evaluate
25 their evidence.

Page 253

1 QUESTIONS BY MR. SNIDOW:
2    Q.    You really don't know before
3 approving a drug the FDA requires a
4 randomized control trial?
5    MR. MURDICA:  Objection to
6 form.
7    THE WITNESS:  I know that there
8 are a series of steps you have to go
9 through to approve a drug, but it's
10 not something that I've ever studied
11 or know about.
12 QUESTIONS BY MR. SNIDOW:
13    Q.    Okay.  Do you think that an RCT
14 would pretty definitively answer the question
15 of whether acetaminophen use in utero causes
16 autism?
17    A.    Well, it's a hypothetical
18 that's impossible to do, so I've never really
19 given it consideration.  You can't randomly
20 assign women to receive a medication that at
21 this point has some suggestion of harm.
22    Q.    Right.
23    A.    Yeah.  So that's kind of what I
24 was getting at.  You think it would be
25 unethical, right?

Page 254

1    MR. MURDICA:  Objection to the
2  form.
3    THE WITNESS:  We do not allow
4  randomized clinical trials, except at
5  the moment of what we call equipoise,
6  where there is not sufficient evidence
7  on one side or the other.
8    It's very hard to establish
9  that point in time, and I think we're
10  past that now because there are
11  studies suggesting a risk.
12    And so, first of all, which --
13  what women would enroll in a study
14  like that?  And it would be unethical.
15  QUESTIONS BY MR. SNIDOW:
16    Q.    And suggesting the risk of
17  what?
18    MR. MURDICA:  Objection to the
19  form.
20    THE WITNESS:  I'm sorry?  I
21  just lost you there.
22  QUESTIONS BY MR. SNIDOW:
23    Q.    You said there are -- you can't
24  do it at this point because there's studies
25  suggesting the risk.  Suggesting the risk of

Page 255

1  what?
2    A.    So there's studies that report
3  an elevated risk of ASD, ADHD and some
4  findings on screening instruments that are
5  very flawed but nonetheless have been
6  published and have been picked up by the
7  media.
8    And so that information is out
9  there, and the public has digested it and --
10    Q.    And because of that, you can't
11  do a clinical trial anymore, right?
12    MR. MURDICA:  Objection to the
13  form.
14    THE WITNESS:  Because of that
15  and because in general we don't allow
16  pregnant women to enroll in clinical
17  trials because of the vulnerability of
18  the fetus.
19  QUESTIONS BY MR. SNIDOW:
20    Q.    Right.
21    But put just the general
22  pregnancy point aside.  You actually don't
23  think that there's a causal association
24  between APAP and autism or ADHD, right?
25    A.    That's correct.

Page 256

1    Q.    And you're 100 percent certain
2  of that, right?
3    A.    As I said, I am certain based
4  on the body of literature that I've reviewed
5  that no evidence for a causal association
6  exists for ASD or ADHD.
7    Q.    That's a little different,
8  though.
9    Are you certain that it doesn't
10  cause it?
11    A.    As I said, all I can be certain
12  on is what I've reviewed and evaluated, and
13  I've reviewed and evaluated the studies, and
14  my conclusion on the basis of that review and
15  evaluation is that there's not credible
16  evidence of a causal association for either
17  of those outcomes.
18    Q.    So why would it be unethical to
19  do the RCT?
20    MR. MURDICA:  Objection to the
21  form.
22    THE WITNESS:  It's unethical to
23  do RCTs in pregnant women.
24  QUESTIONS BY MR. SNIDOW:
25    Q.    Put that one aside.

Page 257

1    A.    I can't put that one aside.
2  It's --
3    Q.    It's not the one you told me
4  first.  You said it would be unethical
5  because of what we know now on risk.
6    MR. MURDICA:  And objection to
7  the form.  And you -- please stop.
8  You really got to stop interrupting
9  the witness.
10  QUESTIONS BY MR. SNIDOW:
11    Q.    Go ahead.
12    Why -- why would the risk of
13  APAP, which you think is entirely the result
14  of confounding and bias -- why would that
15  preclude you from doing an RCT on ethical
16  grounds?
17    MR. MURDICA:  Objection to the
18  form.
19    THE WITNESS:  So I think it
20  would be unethical to ask a woman to
21  enroll in a study where she has heard
22  on media or law websites that this
23  substance might put her baby at risk.
24    I think just the suggestion of
25  an association is enough to make a

Page 258

1  woman worry, and I think it would be
2  unethical to subject a woman to that
3  kind of -- of worry and anxiety. So
4  it's unethical from that reason.
5  QUESTIONS BY MR. SNIDOW:
6      Q.   Can you point me to any
7  publication or authority that says it's
8  unethical to do a clinical trial based on
9  what's been reported in the press rather than
10 the science?
11         MR. MURDICA: Objection to the
12     form.
13         THE WITNESS: I can point to a
14     textbook definition of equipoise,
15     which I think speaks to this exact
16     issue, that a clinical trial can be
17     launched when we are at a point where
18     nobody really knows anything about the
19     risk, and you can legitimately enroll
20     people and expose them to something
21     because we have no evidence to suggest
22     that that exposure might increase the
23     risk.
24         And as I've said, there are
25     reported elevated risk estimates from

Page 259

1  these studies that have been captured
2  and publicized, and so we are not at
3  the moment of equipoise.
4  QUESTIONS BY MR. SNIDOW:
5      Q.   We're not at the moment of
6  equipoise?
7      A.   We are not at the moment of
8  equipoise.
9         MR. SNIDOW: Okay. Jim, can we
10     take a quick break?
11         MR. MURDICA: We're taking
12     lunch in eight minutes.
13         MR. SNIDOW: Okay. Perfect.
14 QUESTIONS BY MR. SNIDOW:
15     Q.   All right. Can you go to
16 page 36 of your report?
17     A.   Yes.
18     Q.   And there you report a set of
19 results for autism and prenatal APAP use?
20     A.   Correct.
21     Q.   You chose these again?
22     A.   I did.
23     Q.   And you report, I think you
24 say, five of them?
25     A.   That's right.

Page 260

1      Q.   All right.
2      A.   Yeah.
3      Q.   Yeah.
4      A.   Liew, Ji, Ji, Hornig and
5  Saunders.
6      Q.   Okay. And you told me before
7  that Liew 2016 is the strongest, the best?
8      A.   So Liew 2016 is based on the
9  largest sample with, I would say, the most
10 accurate, although very imperfect, measure of
11 exposure. So among this group, I would
12 describe it as the methodologically
13 strongest.
14     Q.   Yeah. Remember you said -- I
15 asked what are the better-designed studies,
16 you said Liew 2016, right?
17     A.   As I said, among the five
18 studies, I think this one has strengths over
19 the others. It still has many problems, but
20 it has strengths over the others.
21     Q.   Okay. So the result for ASD
22 there was 1.19?
23     A.   That's correct. The overall
24 result for ASD was 1.19.
25     Q.   And that's statistically

Page 261

1  significant?
2      A.   It is in the report, yes.
3      Q.   All right. And you said in
4  your report the better-designed studies don't
5  show an association, right?
6         MR. MURDICA: Objection to the
7     form.
8  QUESTIONS BY MR. SNIDOW:
9      Q.   On page 5. Remember that?
10     A.   I'm reminding myself of my
11 exact phrase, but, yes, that does sound
12 familiar.
13     Q.   Okay. And Liew, that's the
14 better-designed study you're referring to?
15     A.   Among the five that report on
16 ASD outcome, this one is based on the
17 best-designed study, yes.
18     Q.   Okay. And would you mind
19 looking at the table real quick and just
20 telling me if my forest plot here -- if you
21 see any obvious errors?
22         MR. MURDICA: Objection to the
23     form and the use of this
24     demonstrative.
25         MR. SNIDOW: In most

Page 262

1  litigations, you guys like the forest
2  plot.
3        THE WITNESS:  It looks to be an
4  accurate representation of what I had
5  in the table.
6  QUESTIONS BY MR. SNIDOW:
7     Q.   Okay.  All right.  Do you agree
8  that all the results except for this one here
9  have a point estimate above 1.0?
10    A.   That is what is reported by the
11 authors.  That is what is reflected in your
12 forest plot here.  And again, it is one
13 measure of -- one aspect of my interpretation
14 of these data, and I have to always
15 characterize it in the context of the
16 underlying data on exposure, which is
17 exceedingly weak.
18       So a point estimate that's
19 above 1 based on data that I think is highly
20 flawed is not the same thing as a point
21 estimate of above 1 on data that is solid and
22 reliable and valid.
23    Q.   Yeah, and I get it.  I just --
24 just to be clear, though, for what that
25 means, the point estimate above 1 means in

Page 263

1  all these studies except for this subgroup,
2  the woman who was exposed to APAP, or in this
3  case more APAP, had a higher rate of having a
4  child with ASD, right?
5        MR. MURDICA:  Objection to the
6  form.
7        THE WITNESS:  That is what the
8  study authors have reported.  However,
9  I don't think that that's a fair
10 characterization of the data because
11 the underlying exposure information is
12 so flimsy that it doesn't hold up in
13 my mind in terms of characterizing an
14 increased risk.
15 QUESTIONS BY MR. SNIDOW:
16    Q.   Okay.  But it's an accurate
17 representation of the results, right?
18    A.   The point results -- the point
19 estimates are above 1 and statistically
20 significant, and those have to be evaluated
21 in the context of the -- of the quality of
22 the underlying data.
23       MR. MURDICA:  Objection to the
24 form.
25       MR. SNIDOW:  All right.

Page 264

1  Lunchtime?
2        MR. MURDICA:  Sure.
3        VIDEOGRAPHER:  The time is
4  12:19 p.m., and we are off the record.
5     (Off the record at 12:19 p.m.)
6        VIDEOGRAPHER:  The time is
7  12:54 p.m., and we're on the record.
8  QUESTIONS BY MR. SNIDOW:
9     Q.   Okay.  Dr. Pinto-Martin, when
10 you were on break, did you -- did you find
11 that study you were telling me about where it
12 showed that pre or post-pregnancy use was
13 associated with an autism diagnosis in the
14 child?
15       MR. MURDICA:  Objection to
16 form.
17       You know we just had a break
18 for lunch.  That's what
19 Dr. Pinto-Martin did, was she ate
20 lunch.
21 QUESTIONS BY MR. SNIDOW:
22    Q.   Okay.  So sorry, did you find
23 that article?
24    A.   I didn't have time.  I barely
25 had time -- I didn't even time to finish my

Page 265

1  lunch.
2        So I'm sorry, I did not have
3  time to do that.
4     Q.   Would you mind looking on the
5  next break?
6        MR. MURDICA:  Objection to
7  form.
8        Just stop asking.  Okay?  You
9  don't get to tell the witness what to
10 do.
11       MR. SNIDOW:  Well, here's the
12 thing.  Here's the thing.  I don't
13 think it exists, and I really want to
14 be sure of that.
15       MR. MURDICA:  We don't care
16 about your opinion.  Just ask
17 questions.
18 QUESTIONS BY MR. SNIDOW:
19    Q.   So will you next time -- I'm
20 going to ask you every break, because it's
21 not fair.  Okay?
22       You've got to tell me if these
23 exist or don't exist, so I want you to
24 look --
25       MR. MURDICA:  Please conduct

Page 266

1  yourself appropriately, Mr. Snidow.
2  That's not --
3  QUESTIONS BY MR. SNIDOW:
4      Q.    Okay.  Could -- I'm going to
5  show you this demonstrative.
6          Do you remember the secondhand
7  smoke data we were looking at?
8      A.    I remember that, yes.
9      Q.    And you remember the risk
10 ratios were all between about -- well, a
11 little bit negative and a maximum of 1.3 or
12 so?
13     A.    Are we talking about the
14 sibling -- I mean, the spouse or child?
15     Q.    Actually, all of them.
16     A.    Okay.
17     Q.    Sure.
18     A.    Yeah, I would like to refresh,
19 but, yes, that sounds about right.
20     Q.    All right.  And I'm not saying
21 exactly, but this is approximately what that
22 association looks like; that you get a third
23 more than in the no secondhand smoke one?
24         MR. MURDICA:  Object to the
25 form and the use of the demonstrative

Page 267

1  you created.
2          THE WITNESS:  I mean, I think
3  we have the point estimates in the
4  report, so I don't know why we need to
5  see a graphic demonstration of it.  I
6  don't -- I don't really feel like that
7  adds anything, but --
8  QUESTIONS BY MR. SNIDOW:
9      Q.    Yeah.  I'm just -- is it an
10 accurate graphic demonstration, though?
11         This is what a risk ratio of
12 1.3 in the secondhand smoke literature,
13 that's what it looks like.
14     A.    I mean, if you were -- yeah --
15         MR. MURDICA:  Objection to the
16 form.
17         THE WITNESS:  Again, it just
18 seems a strange way to take an actual,
19 established risk.  This is more of a
20 teaching method to show how we might
21 derive it, but it's not wrong.
22 QUESTIONS BY MR. SNIDOW:
23     Q.    Okay.  Thank you.
24         Has there ever been a
25 randomized controlled trial on the

Page 268

1  relationship between active smoking and lung
2  cancer?
3      A.    I do not believe that a
4  randomized controlled trial would have ever
5  been authorized because of ethical
6  considerations.
7      Q.    So it wasn't an equipoise,
8  right?  At least after the '50s or so?
9      A.    Right.  As soon as we had
10 established that there was potential for
11 increased risk, we are beyond the point of
12 equipoise.
13     Q.    Yeah.
14         Do you agree that in the middle
15 of the 20th century, '50s or so, there were
16 many epidemiologists who argued that the
17 relationship between smoking and lung cancer
18 was due to confounding?
19     A.    I was not reviewing
20 epidemiology studies on smoking and lung
21 cancer in the '50s.
22     Q.    Uh-huh.
23     A.    I was a child.  So I can't
24 really respond to that.
25     Q.    Okay.  Do you agree, though,

Page 269

1  it's always theoretically possible to say
2  that a result might be due to unmeasured
3  confounding?
4          MR. MURDICA:  Objection to
5  form.
6          THE WITNESS:  Do I agree that
7  it's always theoretically possible?
8          I mean, unmeasured confounding
9  is a fact of life in observational
10 studies, and we always assess for the
11 risk of that in our analytic
12 strategies.  Or at least I do, and I
13 think most reasonable epidemiologists
14 do.
15         So I think that's how I would
16 describe it, is when you're doing your
17 analysis, you look at the putative
18 confounders and assess for them if you
19 have data on them.
20 QUESTIONS BY MR. SNIDOW:
21     Q.    Right.
22         That's what I'm saying.  It's
23 always possible that you missed something.
24         MR. MURDICA:  Objection to
25 form.

1  QUESTIONS BY MR. SNIDOW:
2      Q.    Right?
3      A.    It's always possible that you
4  missed something.  I mean, that's a very
5  general statement.
6      Q.    Okay.  Do you remember this?
7      A.    I remember this, yeah.
8      Q.    No matter how good your study
9  is, it's always possible that there's some
10 confounder out there that's actually driving
11 the results.
12          Is that true?
13          MR. MURDICA:  Objection to
14 form.
15          THE WITNESS:  Absolutely true.
16 QUESTIONS BY MR. SNIDOW:
17     Q.    Absolutely true.  Okay.
18          And same thing for residual
19 confounding, right?  Even if you've
20 controlled for something explicitly, it's
21 possible that your data sucked, right?
22          MR. MURDICA:  Objection to
23 form.
24          THE WITNESS:  That's one
25 interpretation.

1  QUESTIONS BY MR. SNIDOW:
2      Q.    And in that situation, it's
3  theoretically possible that there's residual
4  confounding?
5      A.    Residual confounding is always
6  a possibility.
7      Q.    And that's my question.
8          No matter how good your study
9  is, best study in the world, outside of the
10 RCT context, there's always going to be the
11 possibility for residual and unmeasured
12 confounding, right?
13     A.    Which is why I talk about the
14 challenges of observational studies.
15     Q.    No, I agree.
16     A.    Epidemiology.
17     Q.    Do you agree with me, though,
18 always possible, every study, no matter how
19 good?
20          MR. MURDICA:  Objection to
21 form.
22          THE WITNESS:  That's a very
23 firm, broad statement.  I don't know.
24 Maybe there's -- maybe there is a
25 perfect observational study that could

1  be designed that was free of bias and
2  confounding.  I haven't seen it, but I
3  couldn't say that it would never be
4  possible.
5  QUESTIONS BY MR. SNIDOW:
6      Q.    Have you ever seen one like
7  that?
8      A.    I've never seen one.
9      Q.    No.
10          Is that a no, you've never seen
11 one like that?
12          MR. MURDICA:  Objection to
13 form.
14          THE WITNESS:  I've never seen a
15 study like that, but I'm saying --
16 QUESTIONS BY MR. SNIDOW:
17     Q.    Sure.
18     A.    Maybe someone could do it.
19          MR. MURDICA:  You're doing it
20 again.  You just did "okay" and "sure"
21 there, and I know you're saying it's
22 not intentional, I don't think it is,
23 but if there's any way to stop it,
24 it's very distracting, and it
25 interrupts the witness.

1          (Pinto-Martin Exhibit 617
2  marked for identification.)
3  QUESTIONS BY MR. SNIDOW:
4      Q.    I'm going to show you a
5  document that I'm marking 617.
6          MR. MURDICA:  Well, are you
7  going to acknowledge that you're going
8  to try to fix that or not?
9          MR. SNIDOW:  No, I'm not.
10         MR. WATTS:  Don't talk to him.
11 Keep asking questions.  Come on.
12         MR. SNIDOW:  Here's one for
13 you.
14         Let's just move on.  Let's just
15 move on.
16         MR. MURDICA:  You keep talking
17 in the middle of her answers.
18         MR. SNIDOW:  Ladies, please,
19 you're both pretty.  Let's move on.
20 Okay?
21         MR. MURDICA:  I don't even know
22 what that means.  That seems wildly
23 inappropriate to say to a female
24 witness.  I don't know --
25         MR. SNIDOW:  I wasn't --

Page 274

1    MR. MURDICA: -- what your
2 problem is --
3    THE WITNESS: I'm really
4 offended by that.
5    MR. SNIDOW: I wasn't talking
6 to the witness.
7    THE WITNESS: I'm sure you
8 weren't, but it's still an offensive
9 comment, so --
10    MR. SNIDOW: I was talking to
11 Mr. Watts.
12    MR. MURDICA: You need --
13    THE WITNESS: It's still an
14 offensive comment, so --
15    MR. MURDICA: You need to get
16 it under control real quick.
17    MR. SNIDOW: Okay.
18    THE WITNESS: I find that
19 offensive.
20 QUESTIONS BY MR. SNIDOW:
21    Q.    You see this Smoking and Health
22 from the Surgeon General?
23    A.    I do.
24    Q.    This is the report that was
25 used to establish likelihood of causation for

Page 275

1 tobacco?
2    MR. MURDICA: Objection to the
3 form.
4    THE WITNESS: I don't know how
5 this report was used, but if I have a
6 chance to read it, I can look to see
7 who called for it and to whom it went
8 and what was done with the data.
9    But I don't know looking at it
10 right now.
11 QUESTIONS BY MR. SNIDOW:
12    Q.    You really haven't seen the
13 Surgeon General report on smoking and health?
14    MR. MURDICA: Objection to the
15 form.
16    THE WITNESS: I have not read
17 this report.
18 QUESTIONS BY MR. SNIDOW:
19    Q.    Okay. Well, let's look at
20 page 593.
21    Oh, I'm sorry, 190.
22    A.    Okay.
23    Q.    All right. Do you see where it
24 says "Constitutional hypothesis"?
25    A.    I do.

Page 276

1    Q.    And it says, "Thus far in the
2 evaluation, the committee has considered
3 whether the available data are consistent
4 with the hypothesis that smoking causes
5 cancer of the lung."
6    Do you see that?
7    A.    That is the first sentence of
8 that paragraph.
9    Q.    Then it says, "The analysis
10 must consider with equal attention the
11 alternative hypothesis that both the smoking
12 of cigarettes and cancer of the lung have a
13 common cause which determines both that an
14 individual shall become a smoker and also
15 that he shall be predisposed to lung cancer."
16    Right?
17    A.    That's correct.
18    Q.    And that's describing
19 confounding, right?
20    A.    That's describing confounding.
21    Q.    And what that's suggesting is,
22 oh, well, maybe there's something out there
23 that's associated both with smoking and with
24 lung cancer, and we just haven't found it
25 yet.

Page 277

1    Right?
2    A.    That is what that's suggesting,
3 I would agree.
4    Q.    And that argument is, though,
5 the one you're making here, right; that
6 there's a confounder, mainly genetics and
7 indication, that's associated both with
8 prenatal APAP use and autism.
9    True?
10    MR. MURDICA: Objection to the
11 form.
12    THE WITNESS: So the
13 difference, I would say, is that I
14 think we have evidence that both
15 genetics and indication of use act as
16 potential confounders in that
17 relationship.
18 QUESTIONS BY MR. SNIDOW:
19    Q.    Yeah. I'm obviously not saying
20 they were right. I'm just saying the form of
21 the argument is the same one that you're
22 making, right?
23    A.    Uh-huh.
24    Q.    Yeah.
25    And, actually, it's a little

Page 278

[1] more specific, because if you look down a
[2] little bit farther down the page, it says,
[3] "Fisher has been foremost in calling
[4] attention to the possibility that cancer of
[5] the lung and the habit of smoking may be due
[6] to a common genotype."
[7]          Is that right?
[8]      A.    I see that sentence.
[9]      Q.    Do you know who Ronald Fisher
[10] was?
[11]      A.    I imagine --
[12]          MR. MURDICA:  Objection to the
[13]      form.
[14]          THE WITNESS:  -- it's Fisher,
[15]      the statistician, but I have no idea
[16]      based on this.
[17] QUESTIONS BY MR. SNIDOW:
[18]      Q.    It is.
[19]          And who is Fisher, the
[20] statistician?
[21]      A.    He is a famous statistician who
[22] developed the Fisher's exact test.
[23]      Q.    Yes.
[24]          And the F-test is named for
[25] him?

Page 279

[1]      A.    I believe that's correct.
[2]      Q.    The Student t-test that he
[3] was -- he developed it or helped to?
[4]      A.    I don't know exactly what he
[5] did or didn't do, but I know that he's a
[6] statistician that is often cited.
[7]      Q.    But possibly the most important
[8] statistician of the 20th century; is that
[9] right?
[10]          MR. MURDICA:  Objection to
[11]      form.
[12]          THE WITNESS:  I can't
[13]      characterize him that way.  I know
[14]      that I studied his textbook when I was
[15]      in graduate school.
[16] QUESTIONS BY MR. SNIDOW:
[17]      Q.    He came up with the concept of
[18] the null hypothesis?
[19]          MR. MURDICA:  Objection.  Form.
[20]          THE WITNESS:  I believe that's
[21]      true.
[22] QUESTIONS BY MR. SNIDOW:
[23]      Q.    You said you believe that's
[24] true?
[25]      A.    Uh-huh.

Page 280

[1]      Q.    Okay.  That's a pretty good
[2] contribution to the literature, don't you
[3] think?
[4]          MR. MURDICA:  Objection to
[5]      form.
[6]          THE WITNESS:  I agree.  He's an
[7]      important statistician.
[8] QUESTIONS BY MR. SNIDOW:
[9]      Q.    And he said that "The habit of
[10] smoking may be due to a common genotype with
[11] lung cancer," right?
[12]      A.    That's what that says.
[13]      Q.    "Selection of smokers then
[14] would automatically provide a population in
[15] which pulmonary cancer would appear on the
[16] basic of" -- "basis of genetic
[17] susceptibility."
[18]          Right?
[19]      A.    That's a hypothesis that he's
[20] putting forth, if that confounder is there.
[21]      Q.    And that is, if I understand
[22] correctly, exactly the same argument that
[23] you're making with respect to prenatal APAP
[24] use, autism and ADHD, right?
[25]          MR. MURDICA:  Objection to

Page 281

[1]      form.
[2]          THE WITNESS:  Again, I'm trying
[3]      to get a sense, you know, of the
[4]      whole -- of the whole argument here
[5]      because just pulling the one line out
[6]      is a little hard for me to react to.
[7] QUESTIONS BY MR. SNIDOW:
[8]      Q.    Yeah, go ahead and read.
[9]      A.    Okay.  I think I -- I think
[10] that his illustration of the potential role
[11] of genetic confounding is similar to what I'm
[12] arguing in my example here.
[13]      Q.    Yeah.
[14]      A.    Well, your example here because
[15] I made it generic, and you've now made it
[16] specific to APAP and autism.
[17]      Q.    Yeah, that was okay.
[18]          Right?
[19]          MR. MURDICA:  Objection to
[20]      form.
[21] QUESTIONS BY MR. SNIDOW:
[22]      Q.    Did you mind that I made the
[23] confounding diagram?
[24]          MR. MURDICA:  Objection to
[25]      form.

1       THE WITNESS:  I think it's
2   irrelevant whether I find it --
3   QUESTIONS BY MR. SNIDOW:
4       Q.    Well, sorry.  It does describe
5   what you think is going on here, right?
6           MR. MURDICA:  Objection to
7       form.
8           THE WITNESS:  It does describe
9       what I have proposed.
10  QUESTIONS BY MR. SNIDOW:
11      Q.    All right.  And let's look at
12  what evidence Fisher relied on for his
13  genetic confounding theory.
14          He points to studies on
15  monozygotic pairs of twins; is that right?
16          MR. MURDICA:  Objection to
17      form.
18          THE WITNESS:  He does point to
19      the difference between monozygotic
20      twin pairs and dizygotic twin pairs in
21      terms of smoking.
22  QUESTIONS BY MR. SNIDOW:
23      Q.    And that is exactly the same
24  kind of evidence that you point to to show
25  that autism is genetic, right?

1           MR. MURDICA:  Objection to the
2       form.
3           THE WITNESS:  The basis of the
4       heritability estimate for autism is
5       the concordance rate for monozygotic
6       twins and dizygotic twins, yes.
7   QUESTIONS BY MR. SNIDOW:
8       Q.    And that's Fisher's statement
9   for saying that it might be genetic
10  confounding in smoking and lung cancer; is
11  that true?
12          MR. MURDICA:  Objection to
13      form.
14          THE WITNESS:  I believe that
15      that's what he's saying in this
16      paragraph, not having read the entire
17      report, pulling that out.
18  QUESTIONS BY MR. SNIDOW:
19      Q.    He goes on to say that "The
20  data on smoking habits of identical and
21  fraternal twins raised apart are compatible
22  with that hypothesis."
23          Do you see that?
24      A.    Again, this is very hard for me
25  to do, to be reading sentence by sentence and

1   not understanding the whole context.  I'd
2   sort of like to take a minute and read the
3   whole couple of paragraphs and maybe a couple
4   of pages to understand exactly what his
5   argument is and what the flow of his argument
6   might be.
7       Q.    Okay.
8       A.    Because you're taking one
9   sentence at a time, and it's hard to react to
10  them --
11          MR. MURDICA:  You can.  You're
12      allowed --
13          THE WITNESS:  -- in isolation.
14          MR. MURDICA:  You're allowed
15      to.
16          THE WITNESS:  Yeah.
17  QUESTIONS BY MR. SNIDOW:
18      Q.    Yeah.  You can look.
19      A.    I'll do it this way.
20          Okay.
21      Q.    All right.  Are you ready?
22      A.    Well, I can stop --
23          MR. MURDICA:  You let him --
24      you can tell him when you're ready.
25      You take as much time as you need.

1           THE WITNESS:  I mean, I can
2       read -- read on.
3   QUESTIONS BY MR. SNIDOW:
4       Q.    No.
5           MR. MURDICA:  Well --
6           THE WITNESS:  Because it's
7       all -- I don't know what you're going
8       to ask me about.
9   QUESTIONS BY MR. SNIDOW:
10      Q.    Right.  So let me --
11      A.    But I'd like to understand the
12  whole --
13      Q.    So let me -- let me try to walk
14  you through it.
15          Richard {sic} Fisher also
16  pointed out that cigarette smokers were
17  different in certain ways than people who
18  didn't smoke cigarettes.
19          Right?  Did you see that there?
20      A.    He does talk about the
21  differences, yes.
22      Q.    And you think that women who
23  take APAP while pregnant are different than
24  women who do not take APAP in certain ways,
25  right?

Page 286

1    MR. MURDICA:  Objection.  Form.
2    THE WITNESS:  I think there's
3    evidence to suggest that women who
4    take APAP during pregnancy are
5    prone to depression and to anxiety and
6    to comorbid symptomatology that means
7    that they're willing to continue to
8    take medication during pregnancy or
9    they need to continue to take
10   medication during pregnancy.
11   QUESTIONS BY MR. SNIDOW:
12   Q.    Including neuroticism.
13   Is that right?
14   MR. MURDICA:  Objection.  Form.
15   THE WITNESS:  What do you mean
16   "including neuroticism"?
17   QUESTIONS BY MR. SNIDOW:
18   Q.    Do you think that women who
19   take APAP are more likely to be neurotic than
20   women who don't?
21   A.    So there is a study that
22   evaluated the trait of neuroticism and
23   supports the idea that women who have more
24   neurotic traits are more likely to take APAP
25   during pregnancy.

Page 287

1    Q.    If we look up here, it says,
2    "Cigarette smokers have been described as
3    consuming more alcohol, drinking more, being
4    more neurotic, engaging more often in
5    athletics and being more likely to have at
6    least one parent with hypertension or
7    coronary diease."
8    Right?
9    A.    Okay.  So now you're jumping up
10   to a paragraph that I haven't even looked at
11   yet, so --
12   Q.    Right.  Take a look.  Take a
13   look.
14   A.    Can -- can I just --
15   Q.    I had said you can have as long
16   as you like.  So take a look.
17   A.    Okay.  I want to read the whole
18   thing.  Genetic considerations.
19        When was this written?  It's
20   sort of making me laugh because some of the
21   terms that are used.
22   Q.    Yeah, no.  It is -- it is
23   dated.
24   A.    Masculinity.
25   Q.    Yeah.  That's -- they thought

Page 288

1    that might have been one of the confounders,
2    too.
3    A.    Uh-huh.
4    Q.    Hold on, and I'll tell you.
5    1964.
6    A.    Okay.  Okay.  I mean, I think
7    I've got the flavor of it.
8    Q.    Okay.  You got -- you got the
9    gist of it?
10   A.    Yeah.
11   Q.    All right.  He's suggesting
12   that there's confounding because cigarette
13   smokers are different in certain ways than
14   non-cigarette smokers, right?
15   A.    Uh-huh.
16   Q.    And some of the ways are the
17   same ones that you point to here, right,
18   alcohol?
19   A.    Uh-huh.
20   Q.    Neuroticism?
21   A.    Again, there's a study that
22   suggests that, yeah.
23   Q.    And family history, right?
24   A.    Right, which would be, I guess,
25   genetics --

Page 289

1    Q.    Yeah.
2    A.    -- as explained through family
3    history, yeah.
4    Q.    Okay.  And just to be clear,
5    you think that this was very wrong for him to
6    suggest at the time, right?
7    MR. MURDICA:  Objection.  Form.
8    THE WITNESS:  I never said that
9    I thought it was very wrong for him to
10   suggest at the time.  I didn't know he
11   suggested it at the time.  I'm reading
12   this for the first time.
13   QUESTIONS BY MR. SNIDOW:
14   Q.    Okay.  Do you think that was
15   wrong of him to suggest at the time?
16   A.    No.  I don't think it was wrong
17   of him to suggest at the time.  It was a
18   hypothesis that was put forth to test with
19   data.
20   Q.    Yeah.
21        So you think it was fine for
22   Fisher in 1964 to suggest that maybe the
23   relationship between smoking and lung cancer
24   was the result of confounding?
25   MR. MURDICA:  Objection to

Page 290

1    form.
2         THE WITNESS:  I'm sorry, can
3    you repeat the question?
4    QUESTIONS BY MR. SNIDOW:
5         Q.    Yeah.
6         You think it was fine for
7    Fisher in 1964 to suggest that the
8    relationship between smoking and lung cancer
9    was possibly due to confounding?
10        MR. MURDICA:  Objection to
11   form.
12        THE WITNESS:  I think it was a
13   reasonable hypothesis that he was
14   putting forth to see if it could be
15   tested.
16   QUESTIONS BY MR. SNIDOW:
17        Q.    Okay.  Do you know what the
18   risk ratios for smoking and lung cancer are?
19        MR. MURDICA:  Objection to
20   form.
21        THE WITNESS:  Not off the top
22   of my head, but I imagine they're
23   quite high.
24   QUESTIONS BY MR. SNIDOW:
25        Q.    Double digits?

Page 291

1         MR. MURDICA:  Objection to
2    form.
3         THE WITNESS:  Again, I don't
4    know without looking at a specific
5    study.
6    QUESTIONS BY MR. SNIDOW:
7         Q.    Okay.  Do you think it's --
8    well, never mind.  That's fine.
9         Are you aware that one of the
10   pieces of evidence that the Surgeon General
11   considered pretty compelling was the fact
12   that lung cancer and cigarettes had gone up
13   in the same fashion over the decades
14   preceding the 1960s?
15        MR. MURDICA:  Objection to
16   form.
17        You can answer.
18        THE WITNESS:  I have no idea
19   what the Surgeon General considered in
20   terms of the overall evidence.  That
21   is ecological evidence.
22        And as we know, ecological
23   evidence is very easily explained by
24   other factors, and that's certainly
25   true in the acetaminophen and

Page 292

1    neurodevelopmental disorder story as
2    well.
3    QUESTIONS BY MR. SNIDOW:
4         Q.    Can you look at page 179 of
5    this?
6         You see direct measure of the
7    association?
8         A.    Uh-huh.
9         Q.    Do you see that there were
10   seven prospective studies at this time on
11   smoking and lung cancer?
12        A.    "Seven prospective studies
13   consider the occurrence or lack of occurrence
14   of lung cancer among smokers and nonsmokers."
15        Yes, I see that.
16        Q.    Do you think that's a
17   consistent association?
18        MR. MURDICA:  Objection to
19   form.
20        THE WITNESS:  Again, I don't
21   have the studies in front of me.  If I
22   had time to review them and look at
23   the data behind those -- behind that
24   statement, I'd be happy to give an
25   opinion.

Page 293

1    QUESTIONS BY MR. SNIDOW:
2         Q.    Okay.  Do you see here it says,
3    "Others believe that the lung cancer rise is
4    spurious and can be attributed either to
5    improvements in diagnosis and reporting"?
6         A.    I do see that statement.
7         Q.    Okay.  And --
8         MR. MURDICA:  You didn't read
9    it all in there.
10        MR. SNIDOW:  Oh, I'm sorry.
11        MR. MURDICA:  You didn't
12   complete the sentence.
13   QUESTIONS BY MR. SNIDOW:
14        Q.    "Or to the aging of the
15   population."
16        Do you see that?
17        A.    I see that statement, yes.
18        Q.    And so what the -- what the
19   smoker skeptics here are suggesting is that
20   there's a difference between the prevalence
21   and the incidence rate for lung cancer,
22   right?
23        MR. MURDICA:  Objection to
24   form.
25        THE WITNESS:  Again, I think

Page 294

1  you're inferring something that they
2  are not stating here, but I understand
3  why you say that.  You know,
4  prevalence and incidence are
5  different, as we talked about before.
6  QUESTIONS BY MR. SNIDOW:
7      Q.    Well, they're saying the lung
8  cancer rise is spurious, true?
9          MR. MURDICA:  Objection to
10  form.
11         THE WITNESS:  They're saying
12  that some believe that the lung cancer
13  rise is spurious and might be a
14  diagnostic reporting issue,
15  ascertainment issue.
16  QUESTIONS BY MR. SNIDOW:
17      Q.    Yeah.
18          And that's what you think is
19  going on here with autism?
20          MR. MURDICA:  Objection to
21  form.
22          THE WITNESS:  So I think that
23  the data supporting the increased
24  prevalence of autism, which I am very
25  familiar with because I was part of

Page 295

1  the team that has been collecting that
2  data for the CDC, uses a methodology
3  that relies on medical records alone.
4  There's no in-person evaluation of
5  children.
6          We've been doing it now for
7  about ten years or more.  And the
8  methodology is, I would say now,
9  somewhat biased by the fact that we
10  continue to do it.
11          And I'd be happy to talk about
12  the specifics of that bias, but I
13  believe there is some perhaps
14  overascertainment or overcalling of
15  the presence.
16          That being said, that's only
17  one reason why the prevalence might be
18  increasing over time.  We know that
19  the diagnostic criteria has changed,
20  and at least prior to the most recent
21  change to DSM-5, the umbrella was
22  larger, and it was easier to be
23  labeled with autism spectrum disorder
24  than it had been in the past.
25          Furthermore, the awareness of

Page 296

1  autism and the likelihood of early
2  detection has been dramatically
3  changed over the past 10 to 15 years
4  because of public awareness.
5          So all of those things are
6  going to contribute to an inflated
7  prevalence estimate, and none of them
8  address the issue of whether there's
9  actually an increased incidence.
10  QUESTIONS BY MR. SNIDOW:
11      Q.    So is that a, yeah, you think
12  that the rise in autism is a spurious -- a
13  spurious one?
14          MR. MURDICA:  Objection to
15  form.
16          THE WITNESS:  I'm not saying
17  that the -- I'm saying that there are
18  methodologic reasons that contribute
19  to the increased prevalence, and we
20  need to acknowledge those and not
21  assume that it's due to an actual
22  increase in the risk of acquiring the
23  disease --
24  QUESTIONS BY MR. SNIDOW:
25      Q.    Okay.

Page 297

1      A.    -- which would be the
2  incidence.
3      Q.    Can you go to 27 for a second?
4      A.    (Witness complies.)
5      Q.    Actually, I'll do it with a
6  different statement.  Okay.
7          (Pinto-Martin Exhibit 614
8      marked for identification.)
9  QUESTIONS BY MR. SNIDOW:
10      Q.    I'm going to show you an
11  exhibit I'm going to mark as GGG, and that
12  will be -- thanks -- mark as 614.
13      A.    Thank you.
14      Q.    Okay.  Do you see this is a
15  letter to the editor in Nature in 1958?
16      A.    I do.
17      Q.    Nature is a pretty good
18  journal, right?
19          MR. MURDICA:  Objection to the
20  form.
21          THE WITNESS:  I have no idea
22  what Nature in 1958 was like.
23  QUESTIONS BY MR. SNIDOW:
24      Q.    Okay.  Pretty good journal
25  today?

Page 298

1    A.    Nature -- Nature today has a
2  good reputation.
3    Q.    And do you see this is from
4  Ronald Fisher?
5    A.    Sure enough.
6    Q.    Part of genetics at Cambridge,
7  right?
8    A.    Uh-huh.
9    Q.    And he's talking about cancer
10 and smoking, right?
11   A.    Uh-huh.
12   Q.    And he says, "Such results
13 suggest that an error has been made of an old
14 kind in arguing from correlation to
15 causation," right?
16   A.    I'm sorry, I've lost where you
17 are.
18        MR. MURDICA:  Where are you?
19 QUESTIONS BY MR. SNIDOW:
20   Q.    Second paragraph.
21   A.    Such results -- okay.  Again,
22 I'd like to read this whole thing.  I'm
23 fascinated by this actually, being a historic
24 epidemiologist.
25        But can I read the whole thing?

Page 299

1    Q.    Uh-huh.
2    A.    Okay.
3        MR. MURDICA:  I think I showed
4    up to the wrong deposition.  I was
5    planning to do one on acetaminophen,
6    and we're --
7        THE WITNESS:  Curious relation.
8        MR. MURDICA:  -- it's on
9    smoking.
10       THE WITNESS:  This is great.
11   I'm going to use it in my teaching.
12   It's good.
13       He was a good writer.  You got
14   to give him that.
15 QUESTIONS BY MR. SNIDOW:
16   Q.    Uh-huh.
17   A.    This is great.
18   Okay.
19   Q.    I'm glad you think so.
20       Okay.  You see where it says,
21 "Such results suggest that an error has been
22 made of an old kind arguing from correlation
23 to causation"?
24   A.    I do.
25   Q.    And that's the error that you

Page 300

1  think -- you think the plaintiff experts are
2  making here, right?
3        MR. MURDICA:  Objection to the
4    form.
5        THE WITNESS:  So I would say
6    that's an oversimplification of the
7    error that I believe has been made.  I
8    think it's certainly part of it,
9    but...
10 QUESTIONS BY MR. SNIDOW:
11   Q.    Okay.  Then he repeats his
12 genetic confounding argument, right?
13   A.    Uh-huh.
14   Q.    Then he goes on to say,
15 "Unfortunately, considerable propaganda is
16 now being developed to convince the public
17 that cigarette smoking is dangerous."
18       Right?
19   A.    That's what he says.
20   Q.    And you agree that that
21 propaganda which he said was dangerous to the
22 public ultimately turned out to be
23 100 percent correct, right?
24       MR. MURDICA:  Objection to the
25    form.

Page 301

1        THE WITNESS:  So I believe that
2    that was a statement that he made at
3    the time that he believed was true,
4    and I believe later the evidence
5    was counter -- ran counter to that.
6  QUESTIONS BY MR. SNIDOW:
7    Q.    And do you think that the
8  people who were promoting evidence in favor
9  of the link between tobacco and cigarette
10 smoking were wrong to promote it, even before
11 the link was 100 percent definitive?
12       MR. MURDICA:  Objection to
13   form.
14       THE WITNESS:  That's a hard
15   question to answer because I don't
16   know what the weight of the evidence
17   back was when people were putting
18   forth their belief that it was
19   dangerous.
20       So it's really sort of
21   impossible for me to say whether it
22   was right or wrong.  I imagine they
23   were doing it with the best intention,
24   but I really have no way of knowing.
25   It was a long time ago.

Page 302

1  QUESTIONS BY MR. SNIDOW:
2      Q.    Well, I'm talking about the
3  ones who are saying that tobacco does cause
4  lung cancer.  Those guys were definitely
5  right to promote that view, right?
6          MR. MURDICA:  Objection to
7      form.
8          THE WITNESS:  Again, without
9      knowledge of what the state of the
10      evidence was at the time that they
11      were promote -- promoting that view, I
12      would not be willing to comment.
13  QUESTIONS BY MR. SNIDOW:
14      Q.    Okay.  So you can't give me a
15  clean answer on whether the people in the
16  1950s and early 1960s who said, "Yes, tobacco
17  does cause lung cancer," whether they were
18  right to promote that view?
19          MR. MURDICA:  Objection to
20      form.
21          THE WITNESS:  Again, I was not
22      around to see the data that was being
23      relied upon to make statements about
24      that, so I would not be willing to
25      give an opinion on whether they were

Page 303

1      right or wrong.
2  QUESTIONS BY MR. SNIDOW:
3      Q.    Isn't it generally considered
4  the biggest achievement in epidemiology what
5  they did?
6          MR. MURDICA:  Objection to
7      form.
8          THE WITNESS:  I don't have an
9      opinion on that.  I've never --
10  QUESTIONS BY MR. SNIDOW:
11      Q.    You don't -- well --
12          MR. MURDICA:  Well, she was
13      talking and you interrupted her again.
14          MR. SNIDOW:  I didn't mean to.
15  QUESTIONS BY MR. SNIDOW:
16      Q.    You said you don't have an
17  opinion on that.
18          Go ahead.
19      A.    I don't think in terms of the
20  greatest achievement.  I think in terms of
21  careful science and diligent search for the
22  truth, which I think was done in this
23  instance and has been done in other
24  instances.
25      Q.    Okay.  You can put that aside

Page 304

1  now.
2          Do you agree that for a
3  variable to be a confounder, it needs to be a
4  true cause of the outcome of interest?
5      A.    I think I've -- I think that
6  the true cause is what's giving me hesitation
7  here.
8      Q.    Yeah.
9      A.    Because something can confound
10  an association by a -- an overall association
11  by, I would say, reducing the overall impact
12  of the measure of association.
13          So I think it can have an
14  impact without being the cause.
15      Q.    And are you saying that there
16  can be partial confounding?
17      A.    Correct.
18      Q.    That's what you're saying.
19  Okay.
20          But even the partial
21  confounding, the confounding agent needs to
22  actually cause the outcome, right?
23      A.    It needs to have an
24  established, reliable, valid association with
25  the outcome.  Again, the cause concern -- the

Page 305

1  word "cause" concerns me because we will
2  evaluate a confounder without knowing whether
3  it's causal -- causally related.  But if we
4  see a reduction, we say it's a confounder.
5      Q.    But isn't that just in an
6  abundance of caution?
7          Like, in other words, you cast
8  your net a little broader than the ones you
9  think are actual cause just in case, right?
10      A.    We cast a wide net if we have
11  data on the potential confounders, we examine
12  them, and we look to see what that does to
13  the measure of association.
14      Q.    Do you have Exhibit 605 in
15  front of you?
16      A.    If I can find it.
17      Q.    And while you're doing that,
18  let me give you an example I think will clear
19  it up.
20          MR. MURDICA:  Well, hang on.
21      You can ask her to do one thing.  You
22      can't ask her a question while she's
23      trying to --
24          MR. SNIDOW:  She's just getting
25      it.

Confidential - Subject to Protective Order

Page 306

1    THE WITNESS:  Okay.  This is
2  the --
3    MR. SNIDOW:  605?
4    THE WITNESS:  -- Federal
5  Judicial Center thing?
6  QUESTIONS BY MR. SNIDOW:
7    Q.    Yeah.  Just hold on for a
8  second.
9    So I don't know what your
10  favorite example of confounding is.  Mine is
11  gray hair color and mortality.
12    Is that a good one?
13    A.    That's a pretty basic one,
14  yeah.
15    MR. WATTS:  I object.
16  QUESTIONS BY MR. SNIDOW:
17    Q.    And the -- no hair.
18    And the confounder is, of
19  course, age, right?
20    A.    Correct.
21    Q.    Right.
22    And so if you were doing a
23  study on, let's say, smoking and mortality,
24  you wouldn't need to control for gray hair,
25  right?

Page 307

1    MR. MURDICA:  Objection.  Form.
2    THE WITNESS:  Gray hair is a
3  proxy for age, so --
4  QUESTIONS BY MR. SNIDOW:
5    Q.    Right.
6    A.    -- you would need to control
7  for it in its true form.
8    Q.    You need to control for age,
9  right?
10    A.    Right.
11    Q.    If you control for age, you
12  wouldn't also need to control for gray hair?
13    A.    But should you control for gray
14  hair, you would see a difference in the
15  effect estimate, and then you would need to
16  identify what that meant.
17    And that was my earlier point,
18  that something can be suspected to be a
19  confounder and can later be revealed that
20  it's not that, it's associated with something
21  else that the -- that is the actual
22  confounder.
23    Q.    Yeah.  I was actually going to
24  ask you that, too.
25    If you can't control for

Page 308

1  something directly, you can control for a
2  correlate.
3    A.    If you know what the correlate
4  is, and you have data on that correlate --
5    Q.    Yeah.
6    A.    -- that's reliable and valid,
7  you can enter that into the model to see if
8  it makes a difference.
9    Q.    So in other words, let's say I
10  couldn't control for age in my study.
11    A.    Yep.
12    Q.    They just lost the data.  But I
13  had data on hair gray, it's not going to be a
14  perfect measure of age, but it's still better
15  than nothing, right?
16    MR. MURDICA:  Objection to
17    form.
18    THE WITNESS:  It's a proxy for
19    age, so...
20  QUESTIONS BY MR. SNIDOW:
21    Q.    And that's one way of
22  controlling for confounders that you can't
23  see, is by controlling for proxies?
24    MR. MURDICA:  Objection to
25    form.

Page 309

1    THE WITNESS:  I would agree
2    that there are times when we don't
3    have the exact data that we would like
4    to enter into the model to see if it
5    makes a difference, and we may use a
6    proxy for that.
7    I think we need to understand
8    how it might be approximately
9    associated with the confounder we're
10    thinking about, but, yes, I will grant
11    you that.
12  QUESTIONS BY MR. SNIDOW:
13    Q.    And one way you can control for
14  confounders is using multiple regression
15  models?
16    A.    Correct.
17    Q.    Another way you can control for
18  confounders is by doing stratifications?
19    A.    Correct.
20    Q.    And just to walk through with
21  our example, if I did -- if I did gray
22  hair -- if I did, let's say, smoking and
23  mortality and, you know, there was some age
24  confounder, I could control for age, and then
25  whether the association went away or not

Page 310

1 would determine whether there was actual
2 confounding effect, right?
3          MR. MURDICA:  Objection to
4     form.
5          THE WITNESS:  So I believe
6     you're saying you would stratify on
7     age and see if the effect estimate was
8     the same in those two strata?
9 QUESTIONS BY MR. SNIDOW:
10    Q.    Yeah.
11    A.    That is one approach, yes.
12    Q.    Okay.  And then for
13 multivariate regression, let's say -- what
14 did I say, gray hair, mortality.  And
15 obviously we think the confounder is age.
16         The other thing I could do is I
17 could just make a very long multivariate
18 model that included age and see whether the
19 association between gray hair and mortality
20 stayed the same, right?
21         MR. MURDICA:  Objection to
22    form.
23         THE WITNESS:  I'm not really
24    following you because you told me that
25    gray hair -- you didn't have

Page 311

1    information on age.
2 QUESTIONS BY MR. SNIDOW:
3    Q.    No.  No.  Forget that one.
4    A.    You said you'd use gray hair as
5 a proxy.
6         MR. MURDICA:  You can't wave
7    your hand and talk in the middle of
8    her answer.  You keep doing it.
9    Please, please.  I'm asking you very
10   kindly to stop.
11 QUESTIONS BY MR. SNIDOW:
12    Q.    Let's say I did a regression of
13 gray hair and mortality.
14         All right?
15    A.    Okay.
16    Q.    I would get an association.
17    A.    Okay.
18    Q.    Definitely spurious, right?
19    A.    Okay.
20    Q.    The way to test that, one way,
21 would be to do a multivariate analysis and
22 include age in my model.
23    A.    Okay.  I'm following you in
24 that.
25    Q.    Is that right?

Page 312

1    A.    But you would -- before you did
2 that, you would first look at the correlation
3 between gray hair and age and see that they
4 were very strongly correlated, and you might
5 not enter them both into your model because
6 that's not the way we do it.
7         But fair enough.
8    Q.    Yep.
9         And my question was if we had
10 my model and including age made the
11 association go away, that would be good
12 evidence that the association between gray
13 hair and mortality was confounded, right?
14         MR. MURDICA:  Objection to
15    form.
16         THE WITNESS:  If you added age
17    to the model and your association with
18    gray hair went away, you -- if you
19    knew the correlation between gray hair
20    and age, you could say that is serving
21    as a proxy for age and it's no longer
22    significant in the face of age, which
23    is actually the variable that's
24    driving the association.
25

Page 313

1 QUESTIONS BY MR. SNIDOW:
2    Q.    Yep.
3         And similarly, if you control
4 for something and the association doesn't
5 change, that's good evidence that it's not
6 confounding, right?
7         MR. MURDICA:  Object to form.
8         THE WITNESS:  I think that's a
9    little trickier because it depends on
10   the reliability and validity of the
11   data for that confounder.
12 QUESTIONS BY MR. SNIDOW:
13    Q.    Yeah.
14    A.    So it could be that it doesn't
15 change because it's an imperfect measure of
16 the confounder.  It could be that it doesn't
17 change because the confounder is actually
18 tied to something else that you haven't
19 measured.
20         So I think it's a little easier
21 to agree with the first and a little harder
22 to agree with the second.
23    Q.    But assume I had measured
24 perfectly, perfect measurement of everything,
25 I know it's not --

Page 314

1    A.    I mean, theoretically.
2    Q.    Yeah.  Theoretically, a perfect
3  measure for everything, if you control for
4  something and the association doesn't change,
5  that's evidence that whatever you're putting
6  in the model is not a confounder?
7         MR. MURDICA:  Objection to
8     form.
9         THE WITNESS:  Yeah.  And, you
10    know, this is -- this is so
11    theoretical, and it's so unlikely,
12    that it's hard to -- you know, it's
13    hard to disagree with you, but it's
14    also hard to agree with you because
15    it's not -- it's not reality based.
16  QUESTIONS BY MR. SNIDOW:
17    Q.    Well, that is why you do
18  multivariate regression, right?
19         MR. MURDICA:  Objection to
20    form.
21         THE WITNESS:  Again, it's why
22    you do multivariate regression --
23    regression with good data.  And here,
24    you're talking about something that's
25    completely hypothetical and

Page 315

1  impossible.
2  QUESTIONS BY MR. SNIDOW:
3    Q.    Okay.  Let's put genetics aside
4  for a moment.
5         What causal risk factors do you
6  think have not been controlled for in any of
7  the studies looking at the relationship
8  between prenatal APAP exposure and ASD?
9         MR. MURDICA:  Objection to
10    form.
11         THE WITNESS:  So I'd have to go
12    through the studies and look at the
13    specific list of confounders.  You
14    know, each cohort study included a
15    different set.  I would tell you that
16    none of them included all of the most
17    important confounders that I would
18    consider.
19         So I can't, off the top of my
20    head, say MoBa didn't control for
21    this, DNBC did, you know.  I think I
22    would have to look at it.
23         But I would say that none of
24    them controlled for everything that
25    might be relevant in that association.

Page 316

1  QUESTIONS BY MR. SNIDOW:
2    Q.    Can you tell me any particular
3  one?  What specifically did they fail to
4  control for across all of the studies, or
5  any, if you want?
6         MR. MURDICA:  Same objection.
7         THE WITNESS:  I can't answer
8    across all because, as I said, there
9    are differences among the studies.
10    I'll give you an example.
11         The Ji study, which used the --
12    Ji studies, which used the Boston
13    Birth Cohort as a basis for their
14    analysis, did not control for genetic
15    confounding.  And that's a very
16    significant confounder and a very
17    significant limitation, among others,
18    of the results that they present.
19  QUESTIONS BY MR. SNIDOW:
20    Q.    All right.  Besides genetics,
21  anything else?
22    A.    So there are studies that,
23  although they attempted to control for
24  confounding by indication, based that control
25  on very imprecise and imperfect maternal

Page 317

1  report of indications, and often that
2  indication is not tied to the actual exposure
3  of acetaminophen.
4         So an imperfect control for
5  something that is a very important,
6  underlying, methodologic challenge.
7    Q.    All right.  Anything else?
8    A.    Those are the two big ones in
9  my mind.  As I've said before, genetics and
10  confounding by indication are the two that I
11  would say are front of mind when I'm
12  reviewing these studies.
13    Q.    So aside from those two,
14  sitting here right now, you can't think of
15  any causal confounder that was not controlled
16  for across the studies?
17         MR. MURDICA:  Object to the
18    form.
19         THE WITNESS:  Again, I would
20    want to review the studies, review the
21    confounders they considered, and give
22    it the proper consideration before I
23    answered that, you know,
24    categorically.
25         But as I said, the two most

Page 318

1  important confounders were not
2  thoroughly controlled in many of the
3  studies.
4  QUESTIONS BY MR. SNIDOW:
5      Q.    And sitting here right now, you
6  can't think of any others?
7          MR. MURDICA:  Object to form.
8          THE WITNESS:  I've tried to
9  answer that question.  I said I'm
10  unwilling to, you know, use memory and
11  try to recall which ones were included
12  and not included.  I would want to
13  review the studies and review the
14  specifics of the confounders they
15  collected, and the -- and the
16  integrity of that data.
17  QUESTIONS BY MR. SNIDOW:
18      Q.    Okay.  You know that many of
19  the study authors have said that confounding
20  by indication is unlikely, right?
21          MR. MURDICA:  Objection to
22  form.
23          THE WITNESS:  I would like to
24  have you point to a specific citation.
25  I've certainly seen that, but I

Page 319

1  don't -- are we done with this one, by
2  the way?  Because I pulled it out and
3  we don't need it.
4      I don't necessarily agree with
5  that characterization.
6  QUESTIONS BY MR. SNIDOW:
7      Q.    Well, I'm pulling out a study
8  now, but while they're doing that, I'm not
9  asking whether you agree.
10      You know that a lot of the
11  study authors have said, we've looked at the
12  data; we don't think confounding by
13  indication is very likely?
14          MR. MURDICA:  Objection to
15  form.
16          THE WITNESS:  Again, I know
17  that study authors have said that.
18  And as I've just explained, the data
19  on confounding by indication in many
20  cases is imperfect at best.  And so in
21  my mind, it's overstepping the data to
22  make a conclusion like that.
23      (Pinto-Martin Exhibit 615
24  marked for identification.)
25

Page 320

1  QUESTIONS BY MR. SNIDOW:
2      Q.    Okay.  So here's Ricci 2023,
3  which I'll mark as 615.
4      A.    Another meta-analysis?
5      Q.    Yeah.  Yes.
6          All right.  And it sounds like
7  you're familiar with this because you knew it
8  was a meta-analysis, right?
9      A.    I did.
10      Q.    All right.  And they say that
11  "The objective of the study was to assess the
12  extent to which the association is due to
13  confounding by indication."
14          Right?
15      A.    Correct.
16      Q.    And that is one of the two
17  things that you think is confounding this
18  relationship; the other being genetics,
19  right?
20      A.    Uh-huh.
21          MR. MURDICA:  Objection to
22  form.
23          THE WITNESS:  I agree.
24  QUESTIONS BY MR. SNIDOW:
25      Q.    You agree.

Page 321

1          All right.  So that's the
2  objective of their study.
3          And then if we go to the
4  conclusion of their study, they say,
5  "Confounding by indication did not explain
6  the association between in utero
7  acetaminophen exposure and child ADHD."
8          Right?
9      A.    So that is the box that's been
10  pulled out on the second page of the article.
11  And as often is the case, it's an
12  oversimplified view of their final results.
13      Q.    Okay.  Hold on.  Let's look at
14  the final results then.
15          Let's go -- let's go to 9,
16  Principal Findings.
17          And this isn't in the abstract
18  anymore, right?
19      A.    Correct.
20      Q.    Okay.  So it says here,
21  "Principal findings are findings indicating a
22  small to moderate association between in
23  utero acetaminophen exposure and risk of
24  child ADHD, which did not appear to be
25  explained by confounding by indication."

Page 322

1     Did I read that correctly?
2     A.    You did, and I think their
3 language is important which did not appear to
4 be explained by confounding by indication.
5     Q.    Well, let's --
6     A.    Can we turn to their
7 conclusions?
8     Q.    Let's first look at their
9 chart.
10     So at the top, they actually do
11 a forest plot, right?
12     A.    They do.
13     Q.    And they say that this forest
14 plot is adjusted for maternal and infant
15 characteristics and confounding by
16 indication.
17     Right?
18     A.    So they are relying on a set of
19 studies that attempted to control for
20 confounding by indication, and as I've said
21 before, the data that they're relying on is
22 imperfect.
23     We do not have a direct -- a
24 direct piece of evidence on the indication
25 for acetaminophen use and the timing of

Page 323

1 exposure relevant to that indication.
2     Q.    Yeah.
3     A.    And so they are using a set of
4 data that's imperfect with respect to this
5 potential confounder.  They analyzed it
6 anyway, and they were unable to demonstrate
7 that it had an impact.
8     And in their conclusions, they
9 state as much.  So in their conclusions, I
10 just want to point out --
11     Q.    Yeah.
12     A.    -- that they say, "However, the
13 certainty of the evidence on this topic is
14 low, and findings should be interpreted in
15 light of the limitations of the existing
16 studies," -- what I was just referring to --
17 "as well as the limited number of
18 sufficiently comparable studies available to
19 meta analyze.  These findings strongly
20 suggest the need for high-quality studies
21 with adequate control for both measured and
22 unmeasured maternal indications for
23 acetaminophen use."
24     So they're saying we didn't
25 have that, and that's what we need.

Page 324

1     MR. MURDICA:  You talked three
2 times during her answer there.  You've
3 got to try to stop.  You did.
4 QUESTIONS BY MR. SNIDOW:
5     Q.    Would you mind going to page 9?
6     MR. MURDICA:  You're on video
7 doing it.  I'm trying to help you
8 here.
9 QUESTIONS BY MR. SNIDOW:
10     Q.    Do you mind going to page 9
11 that we were just looking at?
12     A.    Yeah, I see it.
13     Q.    My question was just going to
14 be -- what I asked was, in their -- I know
15 you think it was imperfectly done, but what
16 they're saying is they produced this
17 meta-analysis adjusting for confounding by
18 indication, right?
19     That's what they say.  I know
20 you disagree, but that's what they say?
21     MR. MURDICA:  Object to form.
22     THE WITNESS:  Again, you're
23 taking one line here, and they say
24 that, and then they qualify it in
25 their conclusions, which I would argue

Page 325

1 is one of the most important sections
2 of any epidemiologic study.
3     Why?  Because an honest
4 epidemiologist will acknowledge, I did
5 my best, and there are these problems
6 that must be considered in order to
7 evaluate the credibility of this
8 evidence with respect to a causal --
9 hypothesized causal association.
10 QUESTIONS BY MR. SNIDOW:
11     Q.    All right.  Let me ask it a
12 different way.
13     Did the Ricci meta-analysis
14 conclude that there was confounding by
15 indication that could explain this
16 association?
17     A.    Again, their pooled estimate
18 does not support confounding by indication.
19     Q.    Okay.
20     A.    And yet they state that that
21 data is imperfect and needs to be followed up
22 with more precise and accurate data.
23     Q.    That's all I wanted.
24     All right.  Do you have the
25 Alemany study in front of you?

Page 326

1    A.    Remind me what number it was,
2  if you remember.  I can find it, I'm sure.
3  Did you give it to me?
4        MS. BARRIERE:  Try 612.
5        THE WITNESS:  So mine goes from
6    611 to 613, so something happened to
7    Alemany along the way.  Let's see if
8    it got misfiled.
9        Oh, here we go.  I got it.  It
10   was just out of order.
11  QUESTIONS BY MR. SNIDOW:
12   Q.    All right.  Can you turn to
13  page 1001?
14   A.    (Witness complies.)
15   Q.    Are you there?
16   A.    1001.
17   Q.    You see where it says
18  "however"?
19   A.    Uh-huh.
20   Q.    It says, "However, the
21  consistent associations found across
22  different sensitivity analysis, including
23  examining ASC and ADHD diagnosis in the
24  largest cohort, makes unlikely that the
25  observed relationship between prenatal

Page 327

1  acetaminophen and ASC and ADHD symptoms is
2  entirely explained by unmeasured
3  confounding."
4        Did I read that correctly?
5    A.    That is their statement.
6    Q.    And do you disagree with these
7  study authors too?
8    A.    I do.
9    Q.    You do?
10   A.    I do.
11   Q.    Okay.  Have you -- have you
12  written to them to tell them that they're
13  very wrong on that?
14       MR. MURDICA:  Objection to
15   form.
16       THE WITNESS:  I have not
17   written any letters directly to
18   authors, which I actually have never
19   done, and I've not written a letter to
20   the editor, which I have done in the
21   past, because as I said, the past
22   period of time, that has not been my
23   focus.
24  QUESTIONS BY MR. SNIDOW:
25   Q.    But you do -- you do disagree

Page 328

1  with these authors?
2    A.    I do.
3    Q.    Can I have H, which we've done?
4        Do you have Olsen and Liew in
5  front of you?  609?
6        Do you have it?
7    A.    I have it.
8    Q.    All right.  Turn to page 1395.
9    A.    What is it -- oh, it's the
10  first page.  Okay.
11   Q.    Uh-huh.
12       Do you see where it says
13  "Several analytical methods"?
14   A.    Uh-huh.
15   Q.    It says, "Several analytical
16  methods that aim to minimize confounding bias
17  have been utilized in these studies."
18       Right?
19   A.    That's what it says.
20   Q.    And then it describes a
21  propensity score match method?
22   A.    Uh-huh.
23   Q.    Sibling-controlled analysis?
24   A.    Uh-huh.
25   Q.    And negative control

Page 329

1  comparison?
2    A.    Uh-huh.
3    Q.    And it says they've all given
4  consistent results, right?
5    A.    That's what it says.  I
6  disagree with that statement.
7    Q.    All right.  Hold on.
8        And it says, "Providing
9  additional evidence against confounding as
10  the primary reason to explain away the
11  possible fetal programming of acetaminophen
12  on brain function in childhood."
13       Did I read that correctly?
14   A.    You read it correctly, but I --
15   Q.    Do you disagree with these
16  study authors, too?
17   A.    I do.
18   Q.    Have you written to them?
19       MR. MURDICA:  Objection to
20   form.
21       You asked these same questions
22   before the break.
23       THE WITNESS:  As I said, I --
24   I've never written to a study author,
25   and I have not written to the editor

Page 330

1  to describe my feelings about the
2  study.
3      Again, I'm not ruling out that
4  it's something that I might not do in
5  the future.  I have not done it to
6  date.
7      MR. SNIDOW:  And you're right,
8  Jim.  I forgot I did.
9      (Pinto-Martin Exhibit 618
10  marked for identification.)
11  QUESTIONS BY MR. SNIDOW:
12      Q.    All right.  I'm going to show
13  you Bauer and Kriebel, which I will mark --
14      MR. SNIDOW:  What are we up to,
15  Christy {sic}?
16      COURT REPORTER:  I don't know
17  because I think one of them got marked
18  out of order.
19      MR. SNIDOW:  Okay.
20      COURT REPORTER:  So I don't
21  want to tell you one --
22      THE WITNESS:  I have 617 as my
23  last one.
24      MR. CHARCHALIS:  You marked
25  Surgeon General report as 617, and

Page 331

1  then you went back and you marked --
2  you marked the Nature in 1958 as 14 --
3      MR. SNIDOW:  Uh-huh.  Can I
4  do --
5      MR. CHARCHALIS:  -- and then
6  you marked Ricci as 15, and you didn't
7  do 16.
8  QUESTIONS BY MR. SNIDOW:
9      Q.    Okay.  This one is going to be
10  18.
11      A.    Okay.  So we're missing 16?
12      Q.    Yeah.
13      A.    That's why I was confused.
14      Q.    All right.  Do you see the
15  Bauer and Kriebel article?
16      A.    I do.
17      Q.    If we go to page 134, do you
18  see where it says "Together these nine
19  studies"?
20      A.    Ah, sorry, I'm not there yet.
21  Okay.  "Together these nine studies."
22      Q.    Okay.  "Together these nine
23  studies and five cohorts provide a strong
24  body of evidence suggesting
25  neurodevelopmental effects of prenatal APAP

Page 332

1  exposure."
2      Did I read that correctly?
3      A.    You did.
4      Q.    And then two sentences later it
5  says, "Several lines of reasoning suggest
6  that bias, confounding and chance are not
7  solely responsible for the observed
8  relationships."
9      Did I read that correctly?
10      A.    You did.
11      Q.    And I know you -- you probably
12  disagree with the study authors on that
13  point, right?
14      MR. MURDICA:  Objection to
15  form.
16      THE WITNESS:  So I agree -- I
17      disagree with the study authors'
18      review of the evidence with respect to
19      its support of a causal association
20      between acetaminophen and ASD or ADHD.
21  QUESTIONS BY MR. SNIDOW:
22      Q.    Do you think this sentence is
23  unreasonable, "several lines of reasoning
24  suggest that bias, confounding and chance are
25  not solely responsible"?

Page 333

1      A.    Again, I'm not going to comment
2  on the reasonableness or unreasonableness of
3  a statement that is made in the middle of a
4  review article.  You know my opinion on the
5  evidence and its support of a causal
6  association.
7      And so I, therefore, agree
8  with -- I disagree, sorry, with the
9  authors --
10      Q.    Okay.
11      A.    -- and the conclusions.
12      Q.    All right.  Then they say
13  there's evidence of a dose-response gradient,
14  right?
15      A.    I see that.
16      Q.    And do you agree that there's
17  evidence of dose-response in this literature?
18      A.    I do not agree there's evidence
19  of a dose-response.  As I've mentioned
20  before, I think the fragility of the dosing
21  information where we have no information on
22  actual dose, on actual timing of dose and
23  duration of dose, renders it really virtually
24  impossible to conduct a valid dose-response
25  relationship.

Confidential - Subject to Protective Order

Page 334

1    Nevertheless, many authors have
2 tried to do it.
3    Q.   Yeah.
4    You see where it says, "No
5 associations were found with ibuprofen or
6 other analgesic medications suggested
7 specificity of the association with APAP"?
8    A.   I do see that.
9    Q.   And you know that there were
10 studies that looked for a link between
11 ibuprofen and neurodevelopmental outcomes?
12    A.   I do know that, and
13 importantly, we have to recognize that women
14 are advised against taking ibuprofen during
15 pregnancy, so they will substitute ibuprofen
16 with, for example, another analgesic like
17 acetaminophen.
18    And, therefore, the numbers who
19 report ibuprofen use are very small, so we
20 might have the problem of inadequate power to
21 test the association.
22    In addition, the -- the dose of
23 ibuprofen is even weaker than the dose and
24 duration information that we have on
25 acetaminophen.  It's often characterized as a

Page 335

1 dichotomous yes or no.
2    Q.   All right.  Any studies that do
3 show a link between ibuprofen use and autism?
4    A.   Again --
5    MR. MURDICA:  Objection to
6 form.
7    THE WITNESS:  -- as I said, the
8 data is very thin and weak because
9 women are just -- are advised not to
10 take it, and so we have very few
11 studies that even asked about it, and
12 where they did, it was a yes/no.
13    So in my mind, that's not
14 adequate to rule that out as a
15 potential.
16    MR. MURDICA:  When you're --
17 QUESTIONS BY MR. SNIDOW:
18    Q.   I'm just asking, is there a
19 study that showed a link between ibuprofen
20 and autism?  Can you name me that study?
21    MR. MURDICA:  Objection to
22 form.
23    THE WITNESS:  There is not a
24 study.  That was not my point.
25

Page 336

1 QUESTIONS BY MR. SNIDOW:
2    Q.   Sorry.  That's all I wanted.
3    And same answer for ADHD?
4    MR. MURDICA:  Objection to
5 form.
6    THE WITNESS:  The same issue
7 arises with respect to ADHD, which is
8 that women are advised not to take
9 ibuprofen during pregnancy.  Very few
10 of them do, and we still have the
11 problem with recall bias, and we have
12 the problem with a yes/no measurement
13 of exposure.
14    MR. MURDICA:  We've been going
15 an hour.  When you're done --
16    MR. SNIDOW:  Yep.
17    MR. MURDICA:  -- with the line
18 of questioning, if you want to take a
19 break, we'd be good with that.
20 QUESTIONS BY MR. SNIDOW:
21    Q.   So can you name me a study that
22 showed a link between prenatal APAP use and
23 ADHD?
24    MR. MURDICA:  Objection to
25 form.

Page 337

1    THE WITNESS:  As I just said,
2 that data is weak, and we do not have
3 a study showing that.
4    MR. SNIDOW:  Okay.  Yeah.  We
5 can go off the record.
6    VIDEOGRAPHER:  The time is
7 1:54 p.m., and we are off the record.
8    (Off the record at 1:54 p.m.)
9    VIDEOGRAPHER:  The time is
10 2:07 p.m., and we are on the record.
11 QUESTIONS BY MR. SNIDOW:
12    Q.   Okay.  Dr. Pinto-Martin, have
13 you found the studies showing a pre or
14 post-pregnancy use of APAP is associated with
15 the autism diagnosis?
16    MR. MURDICA:  Objection to
17 form.
18    You know she hasn't because she
19 hasn't had a chance.  If you want her
20 to look on record, just tell her to
21 look now.
22 QUESTIONS BY MR. SNIDOW:
23    Q.   Have you -- were you able to
24 look?
25    A.   I believe that the question was

Page 338

¹ just answered. I have not had time to look.
²    Q.   Okay.  You know, we're going to
³ do this right now.  Will you please look for
⁴ me?
⁵         And I'll -- you know, you can
⁶ take the time you like, but realize what I'm
⁷ asking is prenatal APAP use, pre-prenatal
⁸ APAP use and autism diagnosis, post-pregnancy
⁹ use and autism diagnosis.  Take a look at
¹⁰ your report.
¹¹    A.   So you're asking me about a
¹² negative control exposure analysis that had
¹³ autism as the outcome?
¹⁴    Q.   Correct.
¹⁵    A.   Okay.  I will look in my
¹⁶ report.
¹⁷    Q.   Yeah.
¹⁸    A.   So in reviewing my report,
¹⁹ there is not a study that looks specifically
²⁰ at pre or post-pregnancy use and --
²¹    Q.   For autism?
²²    A.   Autism.  The studies that do
²³ that analysis have both autism and ADHD as an
²⁴ outcome, but their analysis was restricted to
²⁵ pre or post-pregnancy use and ADHD.

Page 339

¹    Q.   Okay.  So no evidence that pre
² or post-pregnancy use of acetaminophen is
³ associated with autism?
⁴       MR. MURDICA:  Objection to
⁵    form.
⁶       THE WITNESS:  As I said,
⁷    there's no data on prepregnancy or
⁸    post-pregnancy use of acetaminophen
⁹    and the impact of autism, only on
¹⁰    ADHD.
¹¹ QUESTIONS BY MR. SNIDOW:
¹²    Q.   All right.  And then for ADHD,
¹³ it sounds like you just saw the Ystrom study
¹⁴ or Liew 2019?
¹⁵       MR. MURDICA:  Objection to
¹⁶    form.
¹⁷       THE WITNESS:  Yeah.  There's
¹⁸    Liew 2019.  There's Ystrom.  There's
¹⁹    Stergiakouli.  There's Trønnes, and
²⁰    there's Chen.  I think those are --
²¹ QUESTIONS BY MR. SNIDOW:
²²    Q.   But the only two that have ADHD
²³ clinical diagnosis as the endpoint are Liew
²⁴ 2019 and --
²⁵    A.   And Ystrom.

Page 340

¹    Q.   -- and Ystrom; is that right?
²    A.   Uh-huh.
³    Q.   And both of those did not find
⁴ an association between prepregnancy use or
⁵ post-pregnancy use and ADHD?
⁶    A.   Let me remind myself
⁷ specifically what they found.
⁸    Q.   Yeah.
⁹    A.   Because there's also
¹⁰ supplemental materials that need to be
¹¹ considered.
¹²       Where am I in my report?  Okay.
¹³ So...
¹⁴       Actually, I'd rather just look
¹⁵ at the actual papers rather than try and find
¹⁶ it in my report because I don't remember
¹⁷ where it is.
¹⁸    Q.   Well, I actually don't want you
¹⁹ to read the entire Ystrom and Liew paper
²⁰ right now.
²¹       If you don't know off the top
²² of my head, we'll do it a little bit later,
²³ okay?
²⁴    A.   Okay.
²⁵    Q.   All right.  But am I correct,

Page 341

¹ sitting here right now, you can't think of a
² study that showed that pre or post-pregnancy
³ use was associated with ADHD as a clinical
⁴ outcome?
⁵       MR. MURDICA:  Object to the
⁶    form.
⁷       She was looking at the study
⁸    because there was something else she
⁹    wanted to say about it.  So if you
¹⁰    stop her -- you can't have it both
¹¹    ways.
¹²       THE WITNESS:  Yeah.  I didn't
¹³    say that.  I said I'd like to look at
¹⁴    the studies to refresh my memory about
¹⁵    the specific findings.
¹⁶       So I'm happy to do that, but
¹⁷    I'm not going to try and guess.
¹⁸ QUESTIONS BY MR. SNIDOW:
¹⁹    Q.   All right.  Can you go back to
²⁰ Bauer and Kriebel that we were just looking
²¹ at before the break?
²²    A.   Okay.  I have it.
²³    Q.   Can you turn to page 137?
²⁴    A.   Okay.
²⁵    Q.   It says, "There were consistent

Page 342

¹ findings in the nine prospective cohort
² studies within five cohorts suggesting
³ adverse neurodevelopmental outcomes in
⁴ children following APAP use in pregnancy."
⁵         Do you agree or disagree?
⁶     A.    I disagree.
⁷     Q.    Okay.  Then later in the
⁸ paragraph it says, "The relatively modest
⁹ risks may be the result of residual
¹⁰ confounding, but the identification of
¹¹ dose-response gradients, trimester effects,
¹² specificity to APAP, biological plausibility,
¹³ as well as the findings that show
¹⁴ associations are not confounded by indication
¹⁵ for use, argue against a spurious
¹⁶ association."
¹⁷         Did I read that correctly?
¹⁸     A.    You read that correctly, and
¹⁹ I'd be happy to talk about each one of those
²⁰ and my disagreement with each one of those.
²¹         We've talked about already the
²² problems with the dose-response gradient
²³ being based on very imperfect and flimsy
²⁴ information.
²⁵         The same applies for the

Page 343

¹ trimester-specific effects.  Although it is
² couched as prospective in many cases, we're
³ still asking women to recall their exposure
⁴ for the prior, at least, trimester, if not
⁵ further.
⁶         With respect to specificity to
⁷ APAP, I think we talked about the lack of
⁸ data on ibuprofen because women are advised
⁹ not to take ibuprofen during pregnancy.
¹⁰         With respect to biological
¹¹ plausibility, I have not said, but I will say
¹² now, that I use biological plausibility to
¹³ support the evidence in epidemiologic studies
¹⁴ when I'm conducting a Bradford Hill analysis.
¹⁵ And in the absence of strong and solid
¹⁶ epidemiologic evidence, I am not willing or
¹⁷ need to consider biological plausibility.
¹⁸     Q.    Okay.
¹⁹     A.    And --
²⁰     Q.    My question was just going to
²¹ be, do you agree or disagree?
²²         MR. MURDICA:  Did you finish
²³     your answer?
²⁴         THE WITNESS:  I think I
²⁵     finished.

Page 344

¹ QUESTIONS BY MR. SNIDOW:
²     Q.    Okay.
³     A.    And I disagree.
⁴     Q.    You disagree.
⁵     A.    Which I said.
⁶     Q.    With these authors here.  All
⁷ right.
⁸     A.    Are we done with this one?  I'm
⁹ just trying to keep things in order.
¹⁰     Q.    Yep.  You can put it right
¹¹ there.  Yep.  Yep.
¹²         (Pinto-Martin Exhibit 619
¹³     marked for identification.)
¹⁴ QUESTIONS BY MR. SNIDOW:
¹⁵     Q.    Showing you the label for
¹⁶ valproic acid, which I will mark as 619.
¹⁷         There you go.  Jim.
¹⁸         And have you read this?
¹⁹     A.    I have not read the label for
²⁰ valproic acid.  I'm not an expert in
²¹ labeling, and it's not part of what I was
²² asked to do in my review of the epidemiologic
²³ literature.  So the answer is no.
²⁴     Q.    So before giving an opinion on
²⁵ valproic acid in your report, you didn't read

Page 345

¹ the label?
²         MR. MURDICA:  Objection to
³     form.
⁴         THE WITNESS:  There would be no
⁵     reason for me to read the label when
⁶     I'm reviewing epidemiologic studies.
⁷     It's not what I do.
⁸ QUESTIONS BY MR. SNIDOW:
⁹     Q.    Okay.
¹⁰     A.    I'm not an expert in labeling.
¹¹     Q.    I just thought you might have
¹² been curious.
¹³         MR. MURDICA:  Objection to the
¹⁴     form and the commentary.
¹⁵ QUESTIONS BY MR. SNIDOW:
¹⁶     Q.    Could you -- could you go to
¹⁷ page -- so this one is hard to get to because
¹⁸ the FDA did not put page numbers on here.
¹⁹     A.    Of course not.
²⁰     Q.    But it's before -- if you
²¹ find -- flip through and find Section 8.2,
²² which is called Lactation.
²³     A.    6.4.
²⁴         MR. MURDICA:  Here, if you want
²⁵     to use this one.

Page 346

1    MR. SNIDOW:  Yeah, you can use
2  Jim's.
3    THE WITNESS:  If I can find the
4  beginning.  You did such a quick job
5  of that.
6  QUESTIONS BY MR. SNIDOW:
7    Q.    And then flip just to the
8  previous page.
9    A.    Okay.
10    Q.    Do you see the paragraph that
11  begins "Although"?
12    A.    I do.
13    Q.    It says, "Although the
14  available studies have methodological
15  limitations, the weight of the evidence
16  supports a causal association between
17  valproate exposure in utero and subsequent
18  adverse effects on neurodevelopment."
19    Did I read that correctly?
20    A.    That's what it says.
21    Q.    Do you agree?
22    A.    Again, this is a label.  I have
23  absolutely no idea how a label is created.  I
24  have no idea what data they are relying on
25  when they make this statement, and so I --

Page 347

1  it's not part of my review of published
2  epidemiologic literature, peer-reviewed
3  literature, so I don't -- I'm not going to
4  opine on whether I agree or disagree with
5  something that is not something I've -- I
6  typically review as part of my practice.
7    Q.    Well, do you see where it says
8  "ADHD" here?
9    A.    I see that it says "ADHD."
10    Q.    And "Autism Spectrum
11  Disorders"?
12    A.    I do.
13    Q.    Do you agree -- I'm not asking
14  about the label, just do you agree with the
15  sentence, "The weight of the evidence
16  supports a causal association between
17  valproate exposure in utero and subsequent
18  adverse effects on neurodevelopment,
19  including ASD and ADHD"?
20    MR. MURDICA:  Objection to
21  form.
22    THE WITNESS:  Again, we've
23  talked about my opinion with respect
24  to valproic acid with respect to ASD
25  and ADHD, and that there's interesting

Page 348

1  evidence that supports the causal
2  hypothesis, but I still think there is
3  work to be done because of
4  methodological limitations of the study.
5    And, in fact, these authors,
6  whoever they may be, acknowledged
7  those methodologic limitations right
8  at the outset of their statement.
9  QUESTIONS BY MR. SNIDOW:
10    Q.    Well, the authors are the
11  makers of valproic acid, right?
12    A.    I have no idea.  Again, I don't
13  know how labels are created.
14    Q.    You don't know that they're
15  approved by the FDA?
16    MR. MURDICA:  Objection to
17  form.
18    THE WITNESS:  I don't know how
19  labels are created.  It's not an area
20  that I've learned anything about.
21  It's not an area I care to learn
22  anything about.  It's not part of what
23  I do as an epidemiologist.  It's not
24  part of my review of the
25  peer-reviewed, published literature.

Page 349

1  QUESTIONS BY MR. SNIDOW:
2    Q.    Okay.  I think, when we were
3  talking before, you told me you've -- you
4  weren't sure but you thought cause was most
5  likely for valproic acid.
6    Are you changing your
7  testimony?
8    MR. MURDICA:  Objection to the
9  form.
10    THE WITNESS:  I believe what I
11  said before, is that there is
12  interesting suggestive evidence of a
13  potential causal link and that the
14  methodologic flaws in the study, in my
15  mind, mean that we still have work to
16  do, both for -- with respect to ASD
17  and ADHD.
18  QUESTIONS BY MR. SNIDOW:
19    Q.    Oh, I know there's more work to
20  do, but do you think the weight of the
21  evidence supports a causal association or
22  not?
23    MR. MURDICA:  Objection to the
24  form.
25    THE WITNESS:  Again, I'm --

Page 350

1 that was not part of my assignment,
2 was to -- you know, I was not asked to
3 review the evidence on valproic acid.
4 I was asked to review the evidence on
5 acetaminophen and ASD and ADHD. I'd
6 be happy to talk to you about my
7 assessment of the body of evidence
8 with respect to that.
9 Valproic acid was in my
10 introduction to the epidemiology of
11 autism and my introduction to the
12 epidemiology of ADHD as a medication
13 that has been studied, and I think I
14 was clear on my feeling about the body
15 of evidence that I reviewed with
16 respect to that.
17 QUESTIONS BY MR. SNIDOW:
18 Q. You don't remember telling me
19 it was most likely causal?
20 MR. MURDICA: Objection to the
21 form.
22 THE WITNESS: I remember a
23 series of questions that you asked
24 about trying to rule out confounding
25 and bias, and I don't remember

Page 351

1 precisely what I said, but I will
2 state again that I think that there is
3 interesting evidence and it needs
4 to -- and it's certainly stronger than
5 the evidence for acetaminophen and
6 prenatal exposure to acetaminophen and
7 ASD or ADHD because of the important
8 issue of certainty of timing and dose
9 and exposure because we have medical
10 records confirming that.
11 And also certainty about the
12 indication for use because we have
13 medical records confirming that as
14 well.
15 QUESTIONS BY MR. SNIDOW:
16 Q. For ADHD, the evidence
17 consisted of five small studies and a
18 meta-analysis; is that right?
19 MR. MURDICA: Objection to
20 form.
21 THE WITNESS: For valproate?
22 QUESTIONS BY MR. SNIDOW:
23 Q. Uh-huh.
24 A. I would want to go back and
25 remind myself exactly what the body of

Page 352

1 evidence was. Again, that was not the
2 primary focus of my review.
3 Q. You just got -- you've got two
4 sections on valproic acid in your report,
5 don't you?
6 MR. MURDICA: Objection to the
7 form.
8 THE WITNESS: I have two
9 sections. One in the background on
10 ASD, and one in the background on
11 ADHD.
12 QUESTIONS BY MR. SNIDOW:
13 Q. What's valproic acid indicated
14 for?
15 A. My understanding -- again, I am
16 not a clinical doctor, but my understanding
17 is that valproic acid is used to control
18 seizures in a woman who has seizure disorder.
19 It's used as a prophylactic, I believe, for
20 someone who has migraine headaches, and there
21 may be a couple other indications for use.
22 Interestingly, seizure
23 disorders are also implicated in autism
24 spectrum disorder. And so there may be --
25 one of the reasons that we need to continue

Page 353

1 to study it is that there may be a genetic
2 confounder in there that both increases the
3 risk of seizures and increases the risk of
4 autism in the offspring, and I think we need
5 to continue to look at that.
6 Q. Well, Depakote indicated for
7 acute treatment of manic or mixed episodes?
8 A. Again, I'm not an expert on
9 valproate. I don't know how it's used. You
10 read that sentence correctly. I have -- I
11 don't know. What are you asking?
12 Q. I'm asking, do you think to
13 know whether confounding by indication has
14 been controlled for you need to know what the
15 indication is?
16 A. I think that I understand the
17 primary indications for use of valproate, and
18 the studies that I've looked at looked at it
19 in relation to seizure disorder and migraine.
20 Q. Okay. But do you see here the
21 FDA is saying it's indicated for acute
22 treatment of manic or mixed episodes?
23 A. I see that that's on this
24 paper. Again, it's not something I reviewed,
25 and it's not something that the literature

Page 354

1  that I reviewed discusses.
2      So it's not relevant to my
3  opinion because I didn't see any evidence for
4  or against that as an indication.
5      Q.   Well, that's kind of my point,
6  though.
7      Don't you think that a drug
8  that's -- that's indicated for manic episodes
9  and bipolar disorder or psychotic features,
10  that raises some pretty serious confounding
11  by indications concerns, right?
12      MR. MURDICA:  Objection to
13  form.
14      THE WITNESS:  Again, I do not
15  have knowledge of the specific
16  indications -- for all of the specific
17  indications for use for valproic acid.
18  The literature I reviewed did not
19  address manic or mixed episodes in
20  their analysis, so I don't -- I can't
21  comment on it.  I'm an epidemiologist.
22  I rely -- I rely on published
23  epidemiologic literature.
24  QUESTIONS BY MR. SNIDOW:
25      Q.   All right.  Can you look at

Page 355

1  your report, please?
2      A.   Uh-huh.
3      Q.   And can you go to page 35?
4      A.   I'm there.
5      Q.   Okay.  You see "valproic acid"?
6      A.   I do.
7      Q.   Do you see that you report the
8  indication there?
9      A.   Epilepsy, manic episodes,
10  prophylactic -- yes.
11      Q.   So you did note that manic
12  episodes is an indication for valproic acid,
13  right?
14      MR. MURDICA:  Objection to the
15  form.
16      THE WITNESS:  I -- yeah.  I --
17  I'm -- forgot that that was one of the
18  indications, but it does say that,
19  yes.
20  QUESTIONS BY MR. SNIDOW:
21      Q.   Do you agree that raises grave
22  confounding by indication concerns?
23      MR. MURDICA:  Objection to the
24  form.
25      THE WITNESS:  I would agree

Page 356

1      that all of them do, in fact.
2  QUESTIONS BY MR. SNIDOW:
3      Q.   Yes.
4      A.   Epilepsy and seizure disorder,
5  which I guess is equivalent to epilepsy, and
6  migraine headaches, because they all have an
7  independent association with an increased
8  risk of autism spectrum disorder, which is
9  precisely why I'm not willing to say, ah-ha,
10  we found something that is definitely
11  causally associated.  I think there may be
12  confounding that we still need to address,
13  which is -- and I -- and I think I've said
14  that; that there's methodologic challenges
15  that need to be continued to -- we need to
16  continue to study.
17      Q.   And did you say that in your
18  report, what you just told me?
19      MR. MURDICA:  Objection to
20  form.
21      THE WITNESS:  With respect to
22  valproic acid?
23  QUESTIONS BY MR. SNIDOW:
24      Q.   Yeah.
25      Can you just take a look at

Page 357

1  that paragraph?  Because you're giving me a
2  lot of, I don't know how strong this is,
3  confounding.
4      Is that in your report?
5      MR. MURDICA:  Objection to the
6  form of the question.
7      THE WITNESS:  Again, that was
8  not the purpose of my report.
9      The purpose of my report to --
10  was to evaluate the epidemiologic
11  evidence with respect to APAP exposure
12  and ASD and ADHD.  This section of my
13  report is background information on
14  the etiology of autism spectrum
15  disorder.  I did a similar section,
16  background on the etiology of ADHD,
17  and I'm reflecting on published
18  literature that has interesting and
19  worthy of consideration findings,
20  valproic acid being one of them.
21  QUESTIONS BY MR. SNIDOW:
22      Q.   Well, you say it's stronger
23  than the association here, right?  You say
24  that in the paragraph?
25      A.   It's stronger than the

1  association we have with APAP.

2      Q.    And do you ever, in this

3  paragraph, mention that you have concerns

4  about genetic confounding or confounding by

5  indication for valproic acid?

6          MR. MURDICA:  Objection to the

7      form.

8          THE WITNESS:  I tried to answer

9      that question already by describing

10     that this was not the primary focus of

11     my report.  This was background

12     information about ASD in this case,

13     ADHD in the other case.  And the

14     primary literature that I reviewed was

15     the focus of my discussion of

16     confounding by indication and

17     confounding by genetics.

18 QUESTIONS BY MR. SNIDOW:

19     Q.    Are you aware of any paper that

20 was able to conclusively rule out confounding

21 by indication for valproic acid?

22         MR. MURDICA:  Objection to

23     form.

24         THE WITNESS:  I am not aware of

25     a paper that was able to do that.

1  QUESTIONS BY MR. SNIDOW:

2      Q.    Were you able -- sorry.

3          Can you tell me a paper that

4  was able to conclusively rule out confounding

5  by genetics for valproic acid?

6      A.    I cannot tell you a paper that

7  was able to conclusively rule that out

8  because we don't understand the total picture

9  of genetics, and that is precisely why I'm

10 saying we need to do additional studies.

11     Q.    Need to do additional studies

12 before making a causal inference?

13     A.    Need to do additional studies

14 to understand the causal pathway that exists,

15 if it does, linking valproic acid to ASD or

16 ADHD.  We need to understand the way that

17 the causal pathway operates.

18     Q.    Well, I know.  Here's what I'm

19 asking.

20         Given that you couldn't rule --

21 there's no study ruling out confounding by

22 genetics or confounding by indication.  Do

23 you think that the makers of valproic acid

24 were right to say, the weight of the evidence

25 supports a causal association?

1          Do you think that was right or

2  wrong?

3      A.    Again, I'm not willing to

4  comment on a label.  A label is not something

5  that I review typically.  I don't know what's

6  expected in a label.  I don't know what

7  literature they reviewed here.  You're

8  pulling out one sentence from a long

9  document, and I'm just not willing to comment

10 on it.

11         It's not my area of expertise.

12 It's not what I was asked to do in this

13 engagement.

14     Q.    What if I put the sentence in a

15 document that's not the label?  Can you tell

16 me if you agree or disagree with the

17 sentence?

18     A.    Again, I think context matters,

19 and I'm not going to give you a "yes" or "no"

20 on something that is completely acontextual.

21         (Pinto-Martin Exhibit 620

22     marked for identification.)

23         MR. SNIDOW:  Okay.  Can I have

24     AA?

25         THE WITNESS:  I didn't get this

1  one marked.  Does that matter?  We

2  didn't mark this one.

3          MR. SNIDOW:  I did.  Someone

4      else has got the marked one.

5          MR. MURDICA:  Oh, remember, I

6      turned you to the right page.

7          THE WITNESS:  Oh, right.

8      Sorry.

9  QUESTIONS BY MR. SNIDOW:

10     Q.    All right.  I'm going to show

11 you Wiggs, which is valproic acid paper that

12 you cite in your report.  620.

13         Do you see this paper?

14     A.    I see this paper.

15     Q.    And is that footnote 66 in your

16 report?

17     A.    It is, Wiggs, yes.

18     Q.    And this was published in, it

19 looks like, 2020?

20     A.    That's correct.

21     Q.    So pretty recently?

22     A.    That's pretty recently, yes.

23     Q.    And if you go to E 233.

24     A.    Uh-huh.

25     Q.    You say, "The majority of

Page 362

¹ research does not adjust for many, if any,
² confounding factors."
³         Correct?
⁴     A.    That's correct.
⁵     Q.    It looks like severity of
⁶ maternal epilepsy.  It seems like a good one
⁷ to adjust for, right?
⁸         MR. MURDICA:  Objection to
⁹     form.
¹⁰        THE WITNESS:  I think epilepsy
¹¹    is an important potential confounder.
¹²    I think severity would be also a
¹³    relevant --
¹⁴ BY MR. SNIDOW:
¹⁵    Q.    Yeah.
¹⁶    A.    -- addition.
¹⁷    Q.    If you go to E 3238, you see
¹⁸ where it says, "We were not able to adjust
¹⁹ for parental diagnosis of ASD and ADHD"?
²⁰    A.    Sorry.  I just -- third, we
²¹ were not able -- yes, I see that.
²²    Q.    That's a pretty important thing
²³ to adjust for, right?
²⁴    A.    I believe that parental
²⁵ diagnosis, which would reflect a heritability

Page 363

¹ estimate, is important, yes.
²     Q.    But they didn't have it here
³ for valproic acid, right?
⁴     A.    They did not, I guess.
⁵     Q.    And it says, "Given these
⁶ disorders are heritable, this is a likely
⁷ source of confounding in the present study."
⁸     Right?
⁹     A.    That's what they say.
¹⁰    Q.    So more than just saying they
¹¹ weren't able to rule it out; they're saying
¹² that confounding by genetics is actually
¹³ likely for valproic acid, right?
¹⁴    A.    Well, that's not -- I mean,
¹⁵ they're not saying that.  They're saying that
¹⁶ they think that they should control for it,
¹⁷ but they don't say likely.  They don't use
¹⁸ that term, so they think it's important.
¹⁹    Q.    Okay.  Any sibling studies for
²⁰ valproic acid that you're aware of?
²¹    A.    I have not seen a sibling study
²² on valproic acid.
²³        Can I just point out that
²⁴ sibling studies are actually very challenging
²⁵ to do?  You need a very large cohort --

Page 364

¹     Q.    Yep.
²     A.    -- and able -- in order to be
³ able to pull out the relevant sibling pairs,
⁴ which have to be discordant for both exposure
⁵ and outcome.
⁶         So I don't know how common
⁷ valproic acid is prescribed, but my guess is
⁸ it would take an enormous cohort with a long
⁹ follow-up period of multiple family members
¹⁰ to be able to actually do a
¹¹ sibling-controlled analysis.
¹²    Q.    And why do you need such a big
¹³ cohort for sibling-controlled studies?
¹⁴    A.    I just described that the
¹⁵ relevant data for a sibling-controlled study
¹⁶ is those individuals who are divergent on
¹⁷ both exposure and outcome.
¹⁸        So you can imagine how the
¹⁹ numbers drop down once you are restricting to
²⁰ that.  It's -- that's basically a matched
²¹ analysis, and only two cells of that 2 by 2
²² table are relevant to the question at hand.
²³    Q.    And what happens when that
²⁴ number of discordant pairs gets too low?
²⁵    A.    Well, I will say that in the

Page 365

¹ one sibling-control study that we have for
² ADHD, Gustavson, the numbers went from, you
³ know, over 100,000 women down to something
⁴ like 3 -- 300-plus who were discordant on
⁵ exposure.  However, they were able to
⁶ demonstrate an attenuation of the risk to the
⁷ null.
⁸         The problem we worry about with
⁹ small numbers is the probability of a type 2
¹⁰ error of missing an association, right?  But
¹¹ if we were able to demonstrate an attenuation
¹² to the null, it wasn't a problem in that
¹³ study.
¹⁴    Q.    Well, let's say that I tried to
¹⁵ do a sibling-controlled study with five
¹⁶ discordant pairs.
¹⁷        Okay?  Do you understand the
¹⁸ hypothetical?
¹⁹    A.    Five discordant pairs --
²⁰        MR. MURDICA:  Objection to the
²¹    form.
²² BY MR. SNIDOW:
²³    Q.    Yeah.
²⁴    A.    -- on outcome?
²⁵    Q.    Yeah.

Page 366

1    A.    On exposure and outcome?
2    Q.    Exposure on outcome -- and
3 outcome, the relevant data.
4    A.    Okay.
5    Q.    Almost certainly going to get a
6 null result, right?
7    A.    I have no idea.  It totally
8 depends on what exposure you're talking
9 about, what outcome you're talking about.
10    Q.    On five?  If it's five
11 siblings, you think I'm going to get a
12 statistically significant result?
13    A.    Again, I'm not going to try and
14 guess what the statistical result would be
15 based on an entirely hypothetical result.  We
16 have a real result here --
17    Q.    Yep.
18    A.    -- with 34 discordant pairs,
19 which is at least equal to 68, probably more,
20 because there's more than one sibling in some
21 cases, and we were able to see an attenuation
22 to the null.
23        So that study had the
24 statistical power to demonstrate confounding
25 by genetics.

Page 367

1    Q.    Well, you said the only concern
2 is type 2 indication, but if the study gets
3 small enough, there's going to be a type 1
4 problem, too, right?
5    A.    Theoretically, I -- again, we
6 don't have data on that, and there's no point
7 in talking about it without having data on
8 that.
9    Q.    But theoretically, what I said
10 is true?
11    A.    I mean, we don't -- that's not
12 the situation.  We have -- we have --
13    Q.    We'll talk about Gustavson.  I
14 just want to know, theoretically you get too
15 small of a sibling control, you're going to
16 get a type 1 error, right?
17        MR. MURDICA:  Objection to
18    form.
19        THE WITNESS:  I guess I would
20    ask a statistician that question.
21    I've never done a sibling-control with
22    five.
23 QUESTIONS BY MR. SNIDOW:
24    Q.    Yeah.
25    A.    Nor would I.

Page 368

1    Q.    You wouldn't.
2        All right.  For ADHD and
3 valproic acid, are you aware of any studies
4 that showed a risk ratio of more than 2.0?
5    A.    Not in my recollection.  Again,
6 this was not the main focus of my report, so
7 I don't have a strong recollection of a study
8 that I reviewed, but I don't remember a risk
9 ratio that high.
10    Q.    Are you aware of any studies
11 for valproic acid that were able to rule out
12 confounding by indication?
13    A.    I would want to look at the
14 studies that I cited to to see if any of them
15 attempted to do that.  I don't recall
16 specifically.
17    Q.    All right.  Give me CC.
18        If you look at your report, you
19 cite one study.  It's Christensen 2019.
20    A.    We're talking about --
21    Q.    ADHD.
22    A.    -- valproic acid and ADHD now?
23    Q.    Yeah.
24    A.    Okay.  So we're off of Wiggs?
25    Q.    That's right.

Page 369

1        It's on page -- it looks like
2 73.
3        Do you see a footnote 185?
4    A.    I do.
5    Q.    All right.  And that's
6 Christensen?
7    A.    And then I cite again to Wiggs.
8    Q.    Yeah.
9        You say, "Regarding valproic
10 acid exposure, a 50 percent increased risk of
11 ADHD was reported"?
12    A.    Yes.
13    Q.    That's a risk ratio of 1.5?
14    A.    Correct.
15    Q.    And then it looks like there's
16 a meta-analysis --
17    A.    Uh-huh.
18    Q.    -- that had a null finding?
19    A.    That was -- yeah.  That was a
20 meta-analysis, similar to these meta-analyses
21 in the APAP literature, that had a range
22 of neurodevelopmental outcomes, not just
23 ADHD.
24    Q.    Well, it's not similar because
25 they had a null finding, right?

Page 370

1          MR. MURDICA:  Objection to the
2    form.
3          THE WITNESS:  Well, some of
4    these studies had a null finding as
5    well.
6    QUESTIONS BY MR. SNIDOW:
7       Q.    You've got a meta-analysis for
8    me that had a null finding in this
9    literature?
10         MR. MURDICA:  Objection to the
11   form.
12         THE WITNESS:  We've discussed
13   some of the meta-analyses, and
14   although they report a small
15   statistically significant elevated
16   risk, they are quick to point out that
17   they -- the result could be confounded
18   due to the heterogeneity of the
19   outcome, due to the misclassification
20   of exposure.
21         So a null finding is one
22   outcome that we need to be concerned
23   about, but a positive finding with a
24   qualification of the authors
25   themselves about the reliability of

Page 371

1    that finding is something that I take
2    into consideration.
3    QUESTIONS BY MR. SNIDOW:
4       Q.    I know, but you said, well,
5    some of these meta-analyses here had a null
6    finding as well.  That's what you said,
7    right?
8       A.    I'm talking about the --
9       Q.    Sorry.  Can you focus on my
10   question?
11         MR. MURDICA:  Whoa, whoa.
12         MR. SNIDOW:  Yeah, she's not
13   answering this one.
14         MR. MURDICA:  You're
15   interrupting her again.
16         MR. SNIDOW:  I know, but she's
17   not being responsive, and you know it.
18         THE WITNESS:  I'm sorry.  I'm
19   not understanding your question.
20   QUESTIONS BY MR. SNIDOW:
21      Q.    You said --
22      A.    I'm not trying to be
23   nonresponsive.
24      Q.    -- well, some of the
25   meta-analyses here had a null finding as

Page 372

1    well.  That's not true.  You don't have any
2    meta-analysis in this literature that had a
3    null finding.
4          MR. MURDICA:  Objection to the
5    form.
6          THE WITNESS:  I tried to answer
7    the question by pointing out that
8    although the meta-analyses report an
9    elevated association, they are based
10   on studies that are heterogenous with
11   regard to outcome, that are based on
12   studies with imperfect measure of
13   exposure.
14         So in my mind a meta-analysis
15   is only as good as the underlying
16   data, and as I pointed out repeatedly
17   here, the underlying data is
18   exceedingly weak.
19   QUESTIONS BY MR. SNIDOW:
20      Q.    Okay.
21      A.    I have to respond to one text.
22   I apologize.  It's important.
23         (Pinto-Martin Exhibit 621
24   marked for identification.)
25

Page 373

1    QUESTIONS BY MR. SNIDOW:
2       Q.    Okay.  I'm going to show you
3    Christensen 2013, which is 621.  2019, sorry.
4    I said it wrong.  That's the one I want.
5    Yep.
6          Could you turn to page 9?
7       A.    I'm sorry, I have different
8    paging I think than you do.  Limitations --
9          MR. MURDICA:  It's 9 of 13.
10   There's a slash there.  There.
11         THE WITNESS:  Oh, I see.  I
12   thought it was 913.  Got it.  Okay.
13   QUESTIONS BY MR. SNIDOW:
14      Q.    Do you see limitations at the
15   top?
16      A.    I do.
17      Q.    Do you see where it says, "Due
18   to the observational nature of this study, we
19   cannot rule out that the observed risk
20   increase for ADHD is at least in part
21   explained by the mother's health condition
22   that triggered the prescription of valproate
23   during pregnancy"?
24      A.    I do see that.
25      Q.    Fair to say they're describing

1 confounding by indication there?
2    A.   Or perhaps comorbid conditions,
3 yes.
4    Q.   Yeah.  Some kind of
5 confounding?
6    A.   Uh-huh.
7    Q.   And they're saying they can't
8 rule that out?
9    A.   That's correct.
10   Q.   All right.  Do you see here it
11 said for their dose data that they estimated
12 the average daily dose?
13   A.   I do see that.
14   Q.   And that's how they did their
15 dose-response?
16   A.   And I've never quibbled with
17 the dose-response with respect to valproic
18 acid, if that's where you're going, because
19 as I've stated, they have data because it's a
20 medication that requires prescription.
21        They have data on dose and
22 timing and duration, which we do not have in
23 the acetaminophen literature.
24   Q.   Oh, I actually didn't under --
25 I misunderstood your report.

1        You think it's actually okay to
2 use average daily dose to do a dose-response
3 so long as you have really good data on
4 average daily dose?
5        MR. MURDICA:  Objection to
6    form.
7        THE WITNESS:  If you can
8    actually quantify dose, then I think
9    there is nothing wrong with creating a
10   measure of that actual data on dose
11   that equates with estimated average
12   daily dose.
13       To do that on the basis of
14   self-report that is retrospective, I
15   have a problem with.
16 QUESTIONS BY MR. SNIDOW:
17   Q.   Okay.  The conclusion here,
18 they note that "a randomized clinical trial
19 is neither feasible or ethical."
20   A.   I see that, and I agree.
21   Q.   And you agree?
22   A.   I do.
23   A.   Yep.  It says, "Replication of
24 our findings in large-scale observational
25 studies is warranted."

1    A.   And I said that right from the
2 start, that we need more data on this.  We
3 need more studies.  We need continued
4 examination.
5    Q.   More data before what?  Before
6 warning women about the risk of valproic
7 acid?
8    A.   More data to understand what
9 the causal pathway is, so I wouldn't even go
10 to the next step.  We need to understand the
11 causal pathway.
12        That's what epidemiology does.
13 That's why it evolves over time.  That's why
14 the studies become more sophisticated.
15        As we identify confounders and
16 we're able to gather data to control for
17 those confounders, we have a more effective
18 assessment of the link between exposure and
19 outcome.
20        (Pinto-Martin Exhibit 622
21    marked for identification.)
22 QUESTIONS BY MR. SNIDOW:
23   Q.   All right.  I'm going to mark a
24 document as 622, which is a transcript.
25 Thank you.

1        All right.  Do you know what
2 the National Center for Toxic --
3 Toxicological Research is?
4    A.   I don't.  It's a national
5 center that must study toxicology, but I have
6 no knowledge of it.
7    Q.   You don't even know what that
8 is?
9    A.   I -- as I said, I have no
10 knowledge of it.
11   Q.   All right.  Do you know what a
12 science advisory board is?
13   A.   I do know what a science
14 advisory board is.
15   Q.   What's that?
16   A.   It's a group of individuals
17 that are either volunteered or paid to serve
18 on -- as a review for a company, an
19 organization, an institute, any number of
20 those.
21   Q.   If you turn the page, it's got
22 a list of attendees, and one of them is
23 division of neurotoxicology, John Talpos.
24   A.   I see that.
25   Q.   Do you know that guy by any

Page 378

1 chance?
2    A.    I have not ever met
3 John Talpos.
4    Q.    If you turn to page 36.
5          And do you see here where it
6 says, "So there's a growing concern about the
7 potential toxicity of in utero exposure to
8 acetaminophen"?
9    A.    I see that.
10    Q.    And then it goes on to talk
11 about the 2021 consensus statement.
12    A.    I see that.
13    Q.    And you know what that is, of
14 course, the Bauer --
15    A.    I know that that's -- they --
16 it's called a consensus statement.  I have
17 some quibble with that title, but, yes, I
18 know what it is.
19    Q.    And then it says, "The concerns
20 over APAP are being driven by a series of
21 high-quality epidemiological studies."
22    A.    I see that's what these authors
23 stated.
24    Q.    Would you agree?
25    A.    So I think that the cohort

Page 379

1 studies that were designed, not for the
2 purposes of looking at APAP exposure and
3 neurodevelopmental outcome, were thoughtfully
4 constructed and did a good job trying to
5 collect data that they thought might be
6 relevant to some potential hypothesis that
7 they had not yet identified.
8          So they are strong
9 epidemiologic studies for a very general
10 purpose.  They are not strong, high-quality
11 epidemiologic studies for the purpose of
12 evaluating exposure to APAP during pregnancy
13 and ASD or ADHD.
14    Q.    Do you see here he's saying the
15 concerns over APAP?
16    A.    I see that's what they say.
17    Q.    And do you disagree?
18    A.    I disagree that these are
19 high-quality studies with respect to the
20 question at hand of prenatal exposure to APAP
21 and neurodevelopmental disabilities.  They
22 were not designed for that purpose, and so
23 they are not high-quality for that purpose.
24          I'm not disagreeing that
25 they're high quality for other purposes.

Page 380

1 They're not high quality for this purpose.
2    Q.    Okay.  So you disagree with
3 John Talpos here?
4    A.    I do.
5    Q.    Okay.  Then it goes down to
6 say -- it talks about the cumulative sample
7 size in the study.
8    A.    Uh-huh, I see that.
9    Q.    And it says, "It's an
10 impressive dataset highlighting this
11 potential concern."
12          Right?
13    A.    It says they're really very
14 big.
15    Q.    That's what I was going to say.
16 There's no dispute that they are monster
17 datasets, right?
18          MR. MURDICA:  Objection to
19 form.
20          THE WITNESS:  The size of these
21 cohort studies is substantial, partly,
22 I might point out, because they did
23 not have a hypothesis to start.  So
24 they were casting a wide net and they
25 were saying, let's collect a lot of

Page 381

1 information, and we will mine that
2 information later with specific
3 hypotheses, which is what they're
4 doing now.
5          So the size of the study
6 doesn't really matter if the data that
7 they're trying to extract from those
8 studies is imperfect to address the
9 question at hand.  And that's what I'm
10 arguing.
11 QUESTIONS BY MR. SNIDOW:
12    Q.    But in terms of cohort size, I
13 think the Liew cohorts are about 60,000?
14    A.    Again, I'm not disputing that
15 they're large studies.  It's -- the size of
16 the cohort, frankly, doesn't matter if the
17 data that they're using to derive the
18 estimate of APAP exposure and
19 neurodevelopmental outcome are weak or flawed.
20    Q.    All right.  Let's go to page 52
21 of this.  Sorry, it's 51.
22          Do you see where he says,
23 "Based on what we know, it crosses the
24 placenta and blood-brain barrier quite
25 readily"?

Page 382

1   A.   I see that.
2   Q.   Do you agree that APAP does
3 cross the placenta and blood-brain barrier
4 quite readily?
5   A.   I've certainly read evidence to
6 that effect.  So I'm not a toxicologist so
7 that's not my area of expertise, so I can't
8 really comment.  I don't know what "readily"
9 means, but...
10   Q.   Fair enough.  You can put that
11 one aside.
12         In your report you say that the
13 association between ADHD and APAP exposure is
14 highly inconsistent, right?
15   A.   That's correct.
16   Q.   In fact, you say it's hard to
17 imagine any greater level of inconsistency?
18   A.   I think those are my words.
19 I'd like to --
20   Q.   Page 59 of your report.
21   A.   Yeah, that sounds like me.
22   Q.   Yeah.
23   A.   Yes.
24   Q.   And do you stand by that?
25   A.   I do.

Page 383

1   Q.   And the reason that you say
2 that -- they're inconsistent, if you turn to
3 page 101 of your report, you do a comparison
4 of some of the results in the literature.
5         Do you see that?
6   A.   Yeah, this is a comparising --
7 comparing Liew 2014 and Ystrom 2017 with
8 respect to their trimester of exposure data.
9 Yeah.
10   Q.   And the comparison you're doing
11 with the red and the black is you're
12 highlighting the ones that are statistically
13 significant in black and the ones that are
14 not in red?
15   A.   That's correct.
16   Q.   And that's why you say the
17 results are inconsistent?
18   A.   It's part of the reason I say
19 the results are inconsistent.
20   Q.   Yeah.
21         If you look above, it says, "A
22 comparison of the adjusted results
23 demonstrates that the results are
24 inconsistent with statistically insignificant
25 results in bold red."

Page 384

1   A.   That is what I say.
2   Q.   Let's look at -- you see it
3 says, "Under any two trimesters for Ystrom,"
4 there's a 1.21 and a 1.20?
5   A.   1.21 -- I see 1.2 -- oh, yes.
6 Okay.  Got it.
7   Q.   And you're suggesting that
8 those two results are inconsistent with one
9 another?
10   A.   So when I'm evaluating
11 consistency, I'm looking at a number of
12 things.  So, first of all, I'm looking at the
13 pattern across trimesters, between two
14 studies that relied on different datasets
15 and, frankly, slightly different outcomes
16 because one is looking at hyperkinetic
17 disorder and one is looking at
18 attention-deficit/hyperactivity disorder.
19         The pattern is somewhat
20 variable.  The statistical significance of
21 the reported associations is somewhat
22 variable and most importantly, the data that
23 underlies those evaluations is inconsistent
24 across the two cohorts and also potentially
25 flawed.

Page 385

1         So inconsistency, in my mind,
2 encompasses an understanding of the
3 underlying data and the quality of that data.
4 It's not just about a number.  In this
5 example I'm citing numbers, but my overall
6 evaluation includes all of those things.
7   Q.   I get it.
8         But in this example, you're
9 citing the difference in significance between
10 those two numbers, right?
11   A.   I'm citing the difference
12 across the two studies with respect to their
13 findings by trimester.
14   Q.   Well, no, I'm actually
15 focused -- look at Ystrom.  One study,
16 Ystrom.
17         Do you see there's a 1.21?
18   A.   Which is not statistically
19 significant.  I'm sorry, which is, and then
20 a -- and then a 1.20, which is not.  Sorry.
21   Q.   Yeah.
22   A.   Yeah.
23   Q.   Yeah.
24   A.   That's, again, one piece of the
25 overall inconsistency.  I'm talking about the

Page 386

1 pattern of associations that I see across
2 trimesters.
3      Q.   I know you're trying to say
4 that you're not saying those are inconsistent
5 now, but that's why you highlighted them in
6 red and black, right?
7           MR. MURDICA:  Objection to
8      form.
9           THE WITNESS:  So the point of
10      this illustration --
11 QUESTIONS BY MR. SNIDOW:
12      Q.   Go ahead.  I'm just looking for
13 my tabs.  I'm sorry.
14           MR. MURDICA:  She can't answer
15      while you're talking to somebody else.
16 QUESTIONS BY MR. SNIDOW:
17      Q.   Okay.  Go ahead.  The point of
18 the illustration?
19      A.   The point of the illustration
20 is to look at the patterns of association by
21 trimester derived from two different cohort
22 studies.
23           That one -- the two lines that
24 you pulled out are from within a single
25 cohort, and I would argue one is significant

Page 387

1 and one is not, but that is not the basis for
2 my statement that the results are
3 inconsistent across the two cohorts.
4      Q.   Let's look at page 5 of your
5 report.  Go back to page 5.
6           And do you see where you say,
7 "Even ignoring issues of confounding and bias
8 that most studies fail to address, the
9 results across the studies of ASD and ADHD
10 are inconsistent"?
11      A.   I do.
12      Q.   All right.  So here you're
13 ignoring issues of confounding and bias,
14 right?
15           MR. MURDICA:  Objection to
16      form.
17           THE WITNESS:  So for the
18      purpose of describing statistically
19      significant inconsistency, yes, but
20      never in overall analysis would I
21      ignore those issues.
22 QUESTIONS BY MR. SNIDOW:
23      Q.   No, of course.
24           And then you say, "Some report
25 statistically significant associations,

Page 388

1 others do not."
2           Right?
3      A.   Correct.
4      Q.   And that's why here, at least,
5 you're saying that the results are
6 inconsistent?
7      A.   That's one factor that I
8 consider when I'm looking at the criterion of
9 consistency.
10      Q.   All right.  Can I have the book
11 for a second?
12           Have you seen this?  Rothman?
13      A.   Rothman, yes.
14      Q.   Fair to say this is one of, if
15 not the, most authoritative texts in your
16 field?
17           MR. MURDICA:  Objection to
18      form.
19           THE WITNESS:  It's a good
20      textbook on epidemiology.
21 QUESTIONS BY MR. SNIDOW:
22      Q.   And described as the Bible by
23 some?
24           MR. MURDICA:  Objection to
25      form.

Page 389

1 QUESTIONS BY MR. SNIDOW:
2      Q.   Is that right?
3      A.   I have no idea.  I've never
4 heard it described as the Bible.
5           (Pinto-Martin Exhibit 623
6      marked for identification.)
7 QUESTIONS BY MR. SNIDOW:
8      Q.   Okay.  I'm going to mark 623.
9           And this is a printout of,
10 obviously, not the whole book for obvious
11 reasons, but a couple of pages I want to talk
12 about.
13           If you could please turn to --
14      A.   Nice big paper on this one.
15      Q.   Yeah, it's a PDF printout.
16           -- page 66.
17      A.   Yes.
18      Q.   And you see here Rothman says,
19 "One mistake in evaluating consistency is so
20 common and yet wrong that it deserves special
21 mention."
22           Do you see that?
23      A.   I do.
24      Q.   "It is sometimes claimed that a
25 literature or a set of results is

Confidential - Subject to Protective Order

Page 390

¹ inconsistent simply because some results are
² statistically significant and some are not."
³        Right?
⁴    A.   Uh-huh.
⁵    Q.   It says, "This sort of
⁶ evaluation is completely fallacious."
⁷        Do you see that?
⁸    A.   I do.
⁹    Q.   Do you agree with that?
¹⁰   A.   I think it's a bit strong, and
¹¹ I think that there are counterarguments to
¹² the value of using statistical significance
¹³ as a way to evaluate the literature.  I have
¹⁴ a citation in my report to a recent JAMA
¹⁵ article that describes the importance of
¹⁶ holding to the standard when we're evaluating
¹⁷ evidence, and I would say that in the case of
¹⁸ imperfect data, it's even more important to
¹⁹ consider the role of statistical
²⁰ significance.  It will never be the only
²¹ criterion by which I evaluate consistency,
²² but I think given that we're looking at a
²³ multitude of different outcomes in this
²⁴ literature and different ways of assessing
²⁵ and combining exposure to determine dose, the

Page 391

¹ likelihood of error is high.
²        And so I think that completely
³ fallacious is a strong statement.  And if we
⁴ were talking about a very robust and
⁵ carefully measured exposure and outcome, it
⁶ would be a different story.
⁷    Q.   And the reason you're saying
⁸ you think completely fallacious is strong is
⁹ because this is what you have done in your
¹⁰ report.  You've said the results are
¹¹ inconsistent because some are statistically
¹² significant and some are not?
¹³        MR. MURDICA:  Objection to the
¹⁴ form.
¹⁵        THE WITNESS:  I made that
¹⁶ statement, and I also made a -- I
¹⁷ contextualize it to say that that is
¹⁸ part of my criterion for evaluating
¹⁹ consistency in a body of literature.
²⁰ I don't ever evaluate a single study
²¹ in its -- on its own.  That's not the
²² way epidemiology proceeds, and so to
²³ look at the arc of evidence over time
²⁴ and the inconsistency of findings over
²⁵ time is very important.

Page 392

¹        So, for example, the fact that
² one of the more robust designs to
³ address the issue of confounding by
⁴ genetics, the sibling-control design,
⁵ which is one of the last studies we
⁶ have published on this topic, was able
⁷ to attenuate the result to the null,
⁸ is very important in my consideration
⁹ of the overall weight of evidence, if
¹⁰ you will, with respect to APAP
¹¹ exposure and neurodevelopmental
¹² outcome.
¹³ QUESTIONS BY MR. SNIDOW:
¹⁴    Q.   I promise I will talk about
¹⁵ Gustavson with you.
¹⁶        My question was just, in part,
¹⁷ your analysis of consistency is doing exactly
¹⁸ what Rothman says is completely fallacious,
¹⁹ right?
²⁰        MR. MURDICA:  Objection to
²¹ form.
²²        THE WITNESS:  Again, this is a
²³ textbook.  This is a teaching
²⁴ instrument that we use to describe to
²⁵ students how a -- an analysis with

Page 393

¹ integrity should proceed.  And the
² nuance of the underlying data is
³ completely absent here.
⁴        So I would agree overall if all
⁵ you're doing is looking at statistical
⁶ significance out of context, then this
⁷ statement is -- could be interpreted
⁸ differently.
⁹        I'm saying that I do not
¹⁰ believe that the way I conducted my
¹¹ analysis was completely fallacious
¹² because it was contextualized in the
¹³ literature itself.
¹⁴ QUESTIONS BY MR. SNIDOW:
¹⁵    Q.   Let me just ask it this way.
¹⁶        You did this in your report?
¹⁷        MR. MURDICA:  Objection to
¹⁸ form.
¹⁹ QUESTIONS BY MR. SNIDOW:
²⁰    Q.   You did that?
²¹        MR. MURDICA:  Asked and
²² answered.
²³        THE WITNESS:  I believe I tried
²⁴ to answer this.  If I didn't answer
²⁵ it, I will try again.

Page 394

1 QUESTIONS BY MR. SNIDOW:
2    Q.    Okay.  Yeah, tell me.
3          Did you do this in your report?
4    A.    Again, I'm not going to answer
5 that question.
6    Q.    Okay.
7    A.    I'm going to describe to you
8 what I did because you're asking me to
9 respond to a single statement and it's taken
10 out of context.
11         So I don't just look at a set
12 of results and say, I don't believe there's
13 consistency in this body of literature
14 because there are differences in statistical
15 significance.  I say that weighs into my
16 consideration, the Bradford Hill
17 consideration, of overall consistency because
18 the underlying data is inconsistent, in and
19 of itself, in terms of how they're measuring
20 things and what they're measuring.
21         And so you can't -- I can't --
22 maybe some people can.  I can't isolate
23 myself from the reality of the data and make
24 a statement like that.  I was pointing out
25 the data in its own context.

Page 395

1    Q.    Can you go to page 101 of your
2 report?
3    A.    I'm there.
4    Q.    Can you find there where you
5 told -- where you said what you just told me;
6 that you've got to look at the underlying
7 data when doing a consistency analysis?
8          MR. MURDICA:  Objection to
9    form.
10         THE WITNESS:  So, again, this
11   report --
12 QUESTIONS BY MR. SNIDOW:
13   Q.    Just take a moment and tell me
14 if it's there.
15   A.    I can tell you that that's not
16 in this section of the report.
17   Q.    Okay.
18   A.    This report was a review of the
19 literature and an attempt to apply Bradford
20 Hill where I didn't think it was necessary.
21 And I'm using this chart as an example of one
22 of the flaws in the underlying data, and that
23 is part of my evaluation of inconsistency.
24   Q.    All right.  Okay.  Let's go
25 back to this chart.

Page 396

1          So here's the genetic
2 confounding diagram.  I want to walk through
3 any evidence you have in support here.
4          There's no sibling-control
5 study for autism, is there?
6    A.    Not in this literature, there's
7 not.  There are many other sibling controls
8 for autism, and I point them out in my
9 literature because they're powerful ways to
10 demonstrate and measure confounding.
11   Q.    And Leppart showed no
12 association here?
13   A.    Leppart did not report an
14 association for autism.
15   Q.    And your theory is that there's
16 a gene that's associated with autism and
17 prenatal APAP use, right?
18         MR. MURDICA:  Objection to
19   form.
20         THE WITNESS:  My theory is not
21   that there's a gene.  There is not a
22   gene that causes autism.  My theory is
23   that there is a genetic predisposition
24   that would increase a woman's
25   willingness and need to use APAP

Page 397

1 during pregnancy.
2          It might be that she has
3 depression or anxiety or can't sleep,
4 and that is tied to her genes and, in
5 turn, that genetic profile of the
6 woman increases the risk of her having
7 a child on the autism spectrum.
8 QUESTIONS BY MR. SNIDOW:
9    Q.    That genetic profile has not
10 been demonstrated to lead to increased use of
11 ibuprofen; is that right?
12         MR. MURDICA:  Objection to
13   form.
14         THE WITNESS:  So we know that
15   women who are more anxious and who
16   have more comorbid symptoms and who
17   have more depression use more
18   ibuprofen during pregnancy.
19 QUESTIONS BY MR. SNIDOW:
20   Q.    Not my question.
21         Genetics.  You have not been
22 able to show the genetics association --
23 genetics associated with autism lead to
24 increased use of ibuprofen; is that right?
25   A.    So we don't know what the

1 genetics are precisely that are associated
2 with autism, and so we can't test that
3 hypothesis.
4         What we can say is that because
5 we know that autism is heritable, and we know
6 that mothers are likely to have similar
7 behaviors and characteristics, that that
8 propensity to use more APAP is tied to their
9 underlying anxiety, depression, neuroticism
10 from the one study, et cetera.
11     Q.    The genetics associated with
12 autism have not been demonstrated to be
13 associated with prepregnancy use of APAP; is
14 that right?
15         MR. MURDICA:  Objection to the
16     form.
17         THE WITNESS:  So there are some
18     negative control studies that have
19     attempted to look at prepregnancy use
20     and post-pregnancy use, but, again,
21     they are restricted to ADHD.
22 QUESTIONS BY MR. SNIDOW:
23     Q.    So that's a no, right?
24         There's no study that shows
25 that the genetics associated with autism lead

1 to prepregnancy use?
2     A.    We don't have a study to
3 address that.
4     Q.    And the same answer for
5 post-pregnancy use; there's no study that
6 shows the genetics associated with autism are
7 associated with post-pregnancy use?
8     A.    We don't have data to support
9 that.  It doesn't mean that it doesn't exist,
10 but we don't have data to support it.
11     Q.    Right.
12         Well, for ADHD we do have data,
13 right?
14     A.    Uh-huh.
15     Q.    And so let's ask these
16 questions here.
17         Genetics associated with ADHD,
18 we have data suggesting that those are not
19 associated with prepregnancy use, right?
20     A.    I think we have data on both
21 sides.  We have some studies -- and I would
22 need to pull them up and look at the exact
23 citations, and some of it is in the
24 supplementary material, but I'm happy to do
25 that -- that actually shows an increased risk

1 of ADHD among offspring for prepregnancy use
2 and also for paternal use.
3     Q.    Uh-huh.  I know for paternal
4 use.
5         Actually, can you walk me
6 through that?  You think that the paternal
7 negative control is very instructive, right?
8     A.    I think it's certainly
9 important to try to use paternal use as a
10 negative control in this --
11     Q.    And you think it indicates
12 confounding by genetics, don't you?
13     A.    So if the paternal use
14 prepregnancy confers an increased risk of
15 autism, it's not an intrauterine effect.  It
16 means there's something else going on.
17         What that exactly is, I
18 couldn't tell you because we don't understand
19 all the genetics of autism.  It could be a
20 familial factor.  It could be both familial
21 and genetic, but it does point to residual
22 confounding.
23     Q.    But of genetics in particular
24 is my question.  Is that evidence of
25 confounding by genetics or just something

1 weird's going on?
2         MR. MURDICA:  Objection to
3     form.
4         THE WITNESS:  Well, we don't
5     know the genetics of autism.  We don't
6     know whether there is a paternal
7     contribution and a maternal
8     contribution.  So we don't have the
9     data to be able to test that
10     specifically.
11         What we do have data on is to
12     show that when you do that negative
13     exposure control, the risk is there,
14     which argues for confounding
15     because --
16         MR. MURDICA:  When you -- go
17     ahead.
18         THE WITNESS:  Sorry.
19         MR. MURDICA:  No, I interrupted
20     you.  Continue.
21         THE WITNESS:  You lost me.
22         MR. SNIDOW:  Jim, were you
23     going to ask me for a break?
24         MR. MURDICA:  I was going to
25     say it's been an hour, when it's a

Page 402

1  good point for you.
2      MR. SNIDOW: Now is good.
3      VIDEOGRAPHER: The time is
4  3:04 p.m., and we are off the record.
5  (Off the record at 3:04 p.m.)
6      VIDEOGRAPHER: The time is
7  3:18 p.m., and we're on the record.
8  QUESTIONS BY MR. SNIDOW:
9      Q.   Could you turn to page -- to
10 Exhibit 623, and it's going to be the
11 page that's marked 426 maybe.
12     A.   I'm sorry, what's -- so I have
13 page --
14     MR. MURDICA: I think what they
15 did is they appended a bunch of
16 different excerpts together.
17     THE WITNESS: Oh, so it's way
18 farther along? Got it. So I'm sorry,
19 what number?
20 QUESTIONS BY MR. SNIDOW:
21     Q.   426.
22     A.   Got it.
23     Q.   And Jim is exactly right.
24     A.   All right.
25     Q.   Do you see where it says --

Page 403

1      MR. MURDICA: Can you read that
2  back?
3  QUESTIONS BY MR. SNIDOW:
4      Q.   Do you see where it says
5  sibling-controls?
6      A.   I do.
7      Q.   It says, "Matching study
8  subjects with siblings may be used in both
9  cohort and case-control studies to control
10 for shared genetic and environmental
11 factors"?
12     A.   I see that.
13     Q.   And do you agree that it --
14 sibling controls do control both for genetic
15 factors and for shared environmental factors?
16     A.   So, yes. And I think the
17 emphasis on shared environmental factors is
18 important because it's critical that those
19 environmental factors don't change from
20 pregnancy to pregnancy, and there's times
21 when they do.
22     Q.   Yep.
23          If a sibling-controlled study
24 did show statistically significant results,
25 do you agree that would be compelling

Page 404

1  evidence that confounding by genetics is not
2  the explanation?
3      MR. MURDICA: Objection to
4  form.
5      THE WITNESS: If a
6  sibling-control showed an effect, so
7  even though it was not an intrauterine
8  effect, you still saw effect -- an
9  effect, that would point to genetics
10 as a confounder.
11 QUESTIONS BY MR. SNIDOW:
12     Q.   No, no, no.
13     A.   I'm sorry, I didn't understand
14 your --
15     Q.   Yeah, that's okay.
16     A.   -- hypothetical.
17     Q.   All right. Here's the mom,
18 right? She's got whatever genetics she has,
19 right?
20     A.   Okay.
21     Q.   And then she's got two kids?
22     A.   Right.
23     Q.   And they can be boys, they can
24 be girls, in the sibling studies. It doesn't
25 matter, but she's got two kids. And one is

Page 405

1  exposed, and the other is not exposed.
2          This is how you do a
3  sibling-control trial, right?
4      A.   This is correct, right.
5      Q.   And my question is, if the
6  exposed child has an increased risk of the
7  disease --
8      A.   Uh-huh.
9      Q.   -- that is compelling evidence
10 that the mom's genetics is not confounding
11 the association?
12     MR. MURDICA: Objection to
13 form.
14     THE WITNESS: So the exposed
15 child has an increased risk, and the
16 unexposed child does not.
17 QUESTIONS BY MR. SNIDOW:
18     Q.   Okay.
19     A.   So that's your discordant pair
20 right there.
21     Q.   Yep.
22     A.   So they're discordant on
23 outcome, and they're discordant on exposure.
24     Q.   Right.
25     A.   And I would say that is

Page 406

1 evidence that genetics does not entirely
2 explain the association, and that -- and yet,
3 as we know, genetics is not everything.
4 It's, you know -- heritability is not one.
5         And so it then has us look at
6 what factors might explain the association.
7     Q.    All I'm asking is, this would
8 be strong evidence against genetic
9 confounding?
10         MR. MURDICA:  Objection to
11     form.
12         THE WITNESS:  Strong?  I mean,
13     I think it depends on the study, but
14     it's evidence against genetic
15     confounding, I'll give you that.
16 QUESTIONS BY MR. SNIDOW:
17     Q.    Thank you.
18         In your report you cite
19 von Ehrenstein as an example of a
20 sibling-controlled study that I think you
21 thought was done pretty well.  It's on
22 smoking.
23         MR. MURDICA:  Objection to
24     form.
25         THE WITNESS:  Correct.

Page 407

1         (Pinto-Martin Exhibit 624
2     marked for identification.)
3 QUESTIONS BY MR. SNIDOW:
4     Q.    And I'm going to show it to
5 you.  I'm going to mark this as 624, and it's
6 tab R in case anyone cares.  There you go.
7         All right.  And this is
8 von Ehrenstein, and they used a
9 sibling-controlled study as a risk factor?
10     A.    Uh-huh.
11     Q.    And what they did was they
12 found that heavy prenatal smoking was related
13 to an odds ratio of, it looks like, 1.55 for
14 autism?
15     A.    Uh-huh.
16     Q.    And that's their main analysis,
17 right?
18     A.    Again, I would want to look
19 through and see, but that sounds right.
20 That's usually what you quote in your
21 abstracts, yeah.
22     Q.    And that's going to be
23 analogous when we look at it to the main
24 Gustavson analysis?
25     A.    Uh-huh.

Page 408

1     Q.    Yeah.
2         Then it says, "In the sibling
3 comparison, the odds ratio for heavy smoking
4 was similarly elevated, but the confidence
5 interval was wide"?
6     A.    Uh-huh.
7     Q.    And do you interpret that to
8 mean was not statistically significant?
9     A.    I don't know.
10     Q.    We can look.  Look at 733.
11         Do you see that there where
12 they report the sibling controls?
13     A.    I'm just studying it.  Yep.
14     Q.    Yeah.
15         And my question, so you know,
16 is going to be no results across the board?
17     A.    First -- within the sibling --
18 I'm sorry, I'm not understanding your
19 question.  Within the sibling cohort, there's
20 no results across the board is what your
21 statement is?
22     Q.    Null results?
23     A.    Oh, null results across the
24 board.
25         Okay.  I would say -- let's

Page 409

1 see.  Null results throughout.
2     Q.    All right.  If you turn to
3 page 731, the authors of this study say,
4 "While the sibling comparison should adjust
5 for shared familial factors by design, the
6 approach has several limitations."
7         Do you agree with that?
8         MR. MURDICA:  Object to the
9     form.
10         THE WITNESS:  I think there
11     are -- again, this is a general
12     statement, but I think there are
13     problems with sibling controls.  It's
14     not a perfect measure of genetics.
15         It's probably as good as it
16     gets, but, again, because we don't
17     know all of the risk factors for
18     something like autism spectrum
19     disorders or ADHD, it's hard to know
20     whether we are full -- fully
21     controlling for everything.
22 QUESTIONS BY MR. SNIDOW:
23     Q.    It says that they're prone to
24 exposure misclassification?
25     A.    Again, I'd want to understand

Page 410

1  why they're saying that, but that is a
2  possibility in sibling controls.
3      Q.    And exposure misclassifications
4  when they're nondifferential bias results
5  toward the null, right?
6      A.    So in --
7      Q.    That's just textbook, right?
8      A.    In general, exposure
9  misclassification, when it's not
10  differential, reduces the measure of
11  association.
12      Q.    And that can lead to false
13  negatives?
14      A.    It can, and -- but I think it's
15  important to understand the evidence that is
16  behind that.  Again, as I always say, it's
17  not -- you can't -- that's a textbook
18  definition, right?  And then the context of
19  the study and the measurement of exposure
20  matters.
21      Q.    Then it says,
22  "Sibling-controlled studies usually have less
23  power and generalizability."
24          Right?
25      A.    Well, the less power is a

Page 411

1  function of what we talked about before,
2  right?  You are reducing down to siblings who
3  are discordant on exposure and outcome.  So
4  that is going to reduce the study power by
5  virtue of the sample size.
6          And less generalizability, I'd
7  want to think about that.  I'm sure exactly
8  why they're saying that.
9      Q.    Yeah, don't worry about that
10  one.  I just want to know about the power.
11          Sibling-controlled studies
12  usually have less power, right?
13      A.    Sibling-control studies usually
14  have less power.  I think that's --
15      Q.    732 on Ehren -- von Ehrenstein,
16  at the top right -- top of the right-hand
17  column, it says, "The sibling-comparison
18  design are usually consistent with the
19  findings from the full cohort.  The small
20  number of discordant siblings resulted in
21  imprecise estimations, thus limiting our
22  abilities to evaluate family-based
23  confounding."
24          Right?
25      A.    So what they're saying there is

Page 412

1  we're comparing the full cohort with the
2  sibling discordant group and seeing if
3  there's a difference.
4          And they're saying they're
5  generally consistent with the full cohort,
6  but where they're not, we're showing an
7  intrauterine effect, and we're implicating
8  genetics.
9          We have already talked about
10  the limited sample size available to us, and
11  of course the smaller the sample size, the
12  less imprecise the estimates.
13          But, again, I will point out
14  that even with a relatively limited sample
15  size, Gustavson was able to demonstrate
16  genetic confounding and to attenuate the
17  association to the null.
18      Q.    Okay.  We'll get there.
19          You actually -- just you
20  said -- you said of course the smaller the
21  sample size, the less imprecise the
22  estimates?  I think you meant --
23      A.    I'm sorry, I misspoke.
24      Q.    Do you mind just saying it for
25  me?

Page 413

1      A.    So the smaller the sample size,
2  the more likely we have imprecision in the
3  estimate of the measure of association.
4      Q.    And that can lead to false
5  negatives?
6          MR. MURDICA:  Objection to
7  form.
8          THE WITNESS:  It can lead to
9  false negatives.  It doesn't always
10  lead to false negatives, right?  And I
11  think where we have a finding, we are
12  showing that even a small sample can
13  demonstrate a significant impact.
14  QUESTIONS BY MR. SNIDOW:
15      Q.    Let's turn to 735.  The
16  von Ehrenstein authors say, "Sibling design
17  has less statistical power and requires a
18  relatively large number of discordant pairs."
19      A.    I think I just said that.
20      Q.    Yeah, I agree.
21          Then it says, "Thus sample size
22  limitations did not allow us to assess the
23  role of familial confounding as intended."
24          Right?
25      A.    Uh-huh.

Page 414

1    Q.    So what they're saying there is
2  even though they got null results for the
3  sibling-controlled studies, they're not sure
4  whether that indicates genetic confounding or
5  not, right?
6    A.    So, again, that's a type 2
7  error, right?  They're saying we don't have
8  the power to really rule in or rule out, and
9  that is different from saying we found an
10  association that attenuated the full cohort.
11    Q.    I don't know.  Look at the
12  table again.  Look at Table 1.
13    A.    I saw Table 1, but what --
14    Q.    All right.  So they got no
15  results?
16    A.    Right.  But what they're
17  saying -- read their sentence again.
18    Q.    Uh-huh.
19    A.    "The sibling design has less
20  statistical power, requires a relatively
21  large number of discordant pairs."
22         So they're saying we got a null
23  result, but we're not sure that that wouldn't
24  be different in if -- were we to have a large
25  sample size.

Page 415

1         Right.
2    Q.    Right.  Yep.
3         And the sample size in
4  von Ehrenstein, the number of discordant
5  pairs was -- and you're going to have to help
6  me here.  It looks like discordant on --
7    A.    Yeah, this is hard to do.
8    Q.    Yeah.  But I think discordant
9  on both is 64.
10    A.    I can spend some time, but I
11  think so.  Smoking during pregnancy.
12         Yeah, the maximum is 64.  Yeah.
13         (Pinto-Martin Exhibit 625
14  marked for identification.)
15  QUESTIONS BY MR. SNIDOW:
16    Q.    That's what I thought, too.
17  Okay.
18         Then let's look at Frisell,
19  which I think you cite as well, and I think
20  you recently added it to your reliance list.
21  I'm going to mark as 625.  There you go.
22         You've seen this one before?
23    A.    Uh-huh.
24    Q.    And the title is "Invited
25  commentary: Sibling-comparison designs, are

Page 416

1  they worth the effort?"
2         Right?
3    A.    I have seen this.
4    Q.    And you cite this in your
5  paper?
6    A.    I did.
7    Q.    And if you turn to page 740,
8  they start talking about von Ehrenstein.
9    A.    Uh-huh.
10    Q.    And they say, "If, on the other
11  hand, an association remains, we have not
12  shown that it's causal, but we have known
13  that it is not entirely explained by
14  confounding shared by the siblings."
15         I assume you fully agree?
16    A.    Yes.
17    Q.    It says, "It is thus imperative
18  that we have sufficient power to demonstrate
19  such a null finding."
20    A.    Uh-huh.
21    Q.    All right.  They say that was
22  the weakness in von Ehrenstein, right?
23         They say, "Only 58 of those
24  were exposed to prenatal smoking, and many of
25  them were likely from uninformative pairs."

Page 417

1         Correct?
2         MR. MURDICA:  Object to the
3  form.
4         THE WITNESS:  So it's 58 who
5  are discordant on exposure, so I think
6  that our 64 guesstimate is incorrect.
7  QUESTIONS BY MR. SNIDOW:
8    Q.    Yeah, I didn't get that either.
9  But it's -- I didn't understand it.
10    A.    It's less.  It's --
11    Q.    But they're saying it's 58,
12  which is less.
13    A.    58 is dis -- discordant on
14  exposure.  Then you also have to say how many
15  were discordant on outcome.
16    Q.    Yeah.
17    A.    So it's going to be much
18  smaller, so it's -- you know, I don't know
19  what it would be.  Anyway, it's small.
20    Q.    Yeah.
21         It says, "The results and broad
22  confidence limits were consistent with both
23  increased and decreased association compared
24  with the full cohort."
25         Right?

Page 418

1    A.    That's a hard sentence to
2 understand, but that is what it says.  In
3 other words, they couldn't -- they couldn't
4 rule out or rule in, yeah.
5    Q.    All right.  So they're saying
6 based on the sample --
7    A.    No association was possible,
8 yeah.
9    Q.    Based on the sample size in von
10 Ehrenstein, they weren't able to say whether
11 there was an actual increased or decreased
12 association in the sibling-control part of
13 the study.
14    A.    Right.
15    Q.    Is that right?
16    A.    That's what they said, correct.
17    Q.    Then it says, "Concluding
18 remarks, sibling comparisons do indeed add
19 unique value but only when the power is
20 moderate to high."
21    A.    Right.
22          Can we look at what they also
23 say, which is, "Could we have foreseen this
24 lack of power"?  And they say, you know, "For
25 binary exposure and outcome, it will be

Page 419

1 decided by the number of doubly discordant
2 pairs," which is what we just talked about.
3 "This, in turn, depends on the prevalence of
4 exposure and outcome."
5          So they, too, are stating what
6 I've been stating over and over again; that
7 just relying on a statistical assessment of
8 the ability to prove or disprove the null
9 hypothesis is an imperfect way to do it, and
10 you have to consider what you're measuring,
11 how reliable that measure is, how prevalent
12 that exposure is, et cetera.
13    Q.    Okay.  My question, though, do
14 you see where they say "only when the power
15 is moderate to high"?
16    A.    I see that.
17    Q.    And that's true; you need
18 moderate to high power for sibling
19 comparisons to have value?
20    A.    And, again, you can't know that
21 in advance, and it depends, as they just
22 said, on the prevalence of the exposure.  So
23 that's one of the reasons they're so
24 challenging, because you can't do a power
25 analysis in advance, really.

Page 420

1    Q.    Okay.  Let's look at -- all
2 right.  Do you see the diagram?
3    A.    Mom --
4    Q.    Yeah.
5    A.    -- discordant on exposure --
6    Q.    Yeah.
7    A.    -- and one child has autism, I
8 think we're talking about here.
9          Is that right?
10    Q.    Yeah.
11    A.    Or ADHD?
12    Q.    Yeah.
13          Brandlistuen found this for
14 communication scores, externalizing behavior,
15 internalizing behavior and higher activity
16 levels, right?
17    A.    Among the sibling control,
18 Brandlistuen was able to show that the
19 significant elevated effect remained.  So
20 arguing against an intrauterine effect.
21          However, I will point out that
22 the screening tools that they used are not
23 directly relevant to a diagnosis of ASD or
24 ADHD, and they themselves in the paper call
25 for a more refined analysis that's based on

Page 421

1 diagnostic outcome.
2    Q.    And sorry, I think you misspoke
3 again.
4          You said that argues against
5 intrauterine effect.  Did you mean argues
6 against genetic confounding?
7    A.    I'm sorry, yes.
8    Q.    Is that right?
9          Just say it again.  They found
10 a result that argued against a genetic
11 confounding?
12    A.    They found a consistent effect
13 among exposed and unexposed, which argues
14 against the genetic effect.
15    Q.    Thank you.
16          And --
17    A.    However --
18    Q.    Yeah, I get that it's not a --
19 it doesn't -- your point is it doesn't use
20 ASD and ADHD clinical diagnoses of outcomes,
21 right?
22    A.    Right.  These are -- these are
23 screening outcomes that are not directly
24 relevant to a diagnosis.  And as I stated
25 before, when we use a screening tool, it's to

1  identify children in this case who might be
2  at risk for a diagnosis.  And so we set a
3  very high sensitivity in order to get anyone
4  who might be at risk, and we then subject
5  them to further evaluation to determine the
6  specific diagnosis.
7          I think it's really important
8  to understand that in this literature.
9      Q.   Okay.  So this -- what I've
10 drawn here, this is what Brandlistuen found?
11     A.   Yeah.  I'd like to pull it up
12 and look specifically at the betas that they
13 described, if we want to get into
14 Brandlistuen, because the clinical
15 significance of those findings is very
16 questionable in my mind.
17     Q.   That's all right.
18     A.   You don't want to look at it?
19     Q.   Not right now.  I might later.
20         MR. SNIDOW:  Actually, we'll
21     you pull it out?  Actually, can I see
22     Brandlistuen?  I'm not sure if we
23     marked this one.  You might be on a
24     wild goose chase.
25         (Pinto-Martin Exhibit 626

1      marked for identification.)
2  QUESTIONS BY MR. SNIDOW:
3      Q.   All right.  I'm going to mark
4  it as 626.  If we end up with two
5  Brandlistuens, it's not the end of the world.
6          All right.  This is what we
7  were just talking about?
8          MR. MURDICA:  Objection to
9      form.
10         THE WITNESS:  This is the
11     Brandlistuen study.
12 QUESTIONS BY MR. SNIDOW:
13     Q.   Turn to page 1711.
14         Do you see where it says, "A
15 major strength in the study was the large
16 sample size, enabling sibling-control
17 design"?
18     A.   I do see that.
19     Q.   And if you look over here,
20 since you wanted to talk about clinical
21 terms, it says, "In clinical terms, these
22 results suggest that exposure to paracetamol
23 for more than 28 days during fetal time
24 increases the risk of adverse psychomotor and
25 behavioral outcomes by almost 70 percent and

1  doubles the risk of language problems in
2  3-year-old children."
3          Did I read that correctly?
4      A.   You read that correctly.  That
5  does not speak to the clinical significance
6  of those findings with respect to a
7  diagnostic outcome of ASD or ADHD.
8      Q.   Well, then it does a comparison
9  with smoking.  It says, "For comparison, the
10 effect of a well-established association
11 between prenatal smoking and externalizing
12 behavior problems has been reported to be as
13 small as .07 in a recent study using sibling
14 design."
15         Right?
16     A.   Again, it does not speak to the
17 clinical significance of this finding with
18 respect to a diagnostic outcome, which is
19 what I was evaluating in this literature.
20     Q.   Again, what it's saying --
21     A.   We see it in smoking, we see it
22 in this, but it doesn't speak to the clinical
23 significance, what is the construct validity
24 of a communication problem with respect to
25 ADHD or an externalizing behavior problem.

1          Again, I would like to look at
2  the size of those effects with respect to a
3  diagnosis.  We don't know.
4      Q.   All right.  While we're here,
5  under the Discussion section on 1710, you see
6  it says, "We found no association between
7  ibuprofen on the same neurodevelopmental
8  outcomes"?
9      A.   I did -- I do see that.
10     Q.   It says, "Which suggests a
11 specific effect of paracetamol less likely to
12 be confounded by indication"?
13     A.   I do see that.  Again, my
14 earlier point about the paucity of ibuprofen
15 consumption by pregnant women, because
16 they're told not to take it, I think renders
17 the comparison less than informative.  And
18 they had a yes/no measure of that exposure.
19 It's just not compelling evidence in my mind.
20     Q.   Brandlistuen had almost a
21 thousand discordant pairs?  If you look at
22 1704.
23     A.   So they had 700 -- no, they
24 had -- sorry, 805 who were discordant on
25 exposure 1 to 27 days, and they had 134 who

1 were discordant on greater than and equal to
2 28 days, which is what we're talking about.
3          But that does not address
4 the -- the discordant on -- discordance on
5 outcome, which, as we've said, are the only
6 relevant pairs when you do the analysis.  It
7 doesn't tell us here how many were discordant
8 on outcome, and it's because it's a
9 regression analysis.  It's not as easy to
10 figure it out as when it's a matched, you
11 know, sort of 2-by-2 table where you can look
12 at the cells that actually contribute.
13          So --
14     Q.    Based on this, can you say
15 whether this was a large enough
16 sibling-control study to give accurate
17 results?
18     A.    I can't, because I don't know
19 the number of sibling discordant on these
20 outcomes that they reported, and I couldn't
21 find it anywhere in the paper.
22          Furthermore, as I've said
23 repeatedly, the outcome is not relevant to my
24 opinion about whether prenatal APAP is
25 associated with ASD or ADHD.

1          And so I think -- you know, I
2 can't -- I can't make a judgment.
3          I will say one more thing that
4 they also mention in their discussion of the
5 results, which is that the MoBa cohort had a
6 very high loss to follow-up.  So the
7 participant -- the participation rate was
8 only about 40 percent, and what we know about
9 participation in longitudinal cohort studies
10 is that women with higher levels of anxiety
11 are more likely to be retained in
12 longitudinal studies, and we have a lot of
13 good data supporting that.
14          Why?  Because they're anxious,
15 and they want to see what's happening with
16 their child, and they want to bring their
17 child back in for a checkup.
18          And so we have, at the end of
19 the day, a highly selected population that
20 have completed this series of long-term
21 evaluations over time.  Again, I think that's
22 relevant to interpretation of the data.
23     Q.    All right.  Could you turn to
24 page 7 of your report?
25     A.    Hold on.

1          7. Okay.
2     Q.    Do you see in your report the
3 sample size for Brandlistuen?
4     A.    On page 7?
5     Q.    Yep.  I think so.
6     A.    I'm not seeing it.
7     Q.    No?
8     A.    Here I'm talking about
9 ecological studies on page 7.  I start to
10 talk about retrospective --
11     Q.    Oh, sorry.  You know what it
12 is?  It's page 7 of your appendix.
13     A.    Okay.  The appendix discussion?
14 Okay.
15          Okay.  So I have them -- so
16 it's the first page of my appendix.  Is that
17 what we're looking at?
18     Q.    Well, it's page 7 of your --
19     A.    Well, it's page 27 in mine, so
20 the numbering is different.  Are you looking
21 at the chart, or are you looking at the
22 actual narrative?
23     Q.    It says, "Appendices to Expert
24 Report of Jennifer Pinto-Martin," and it
25 should be page 7.  It's a chart.

1     A.    Okay.  So it's a chart.  I'm
2 sorry.  I have both.  I have a chart and a
3 narrative.
4          Page 7, I'm there.
5     Q.    All right.  Do you see
6 Brandlistuen?
7     A.    I do.
8     Q.    You report the sample size as
9 the discordant pairs, right?
10     A.    So that's what they reported,
11 so that was all I was able to pull out of
12 their paper --
13     Q.    I'm not criticizing that.
14     A.    -- that's 800-and-something
15 discordant pairs.
16     Q.    If you go to page 74 of your
17 report.
18     A.    Yep.
19     Q.    You talk about Gustavson?
20     A.    Gustavson 2021, yes.
21     Q.    You report the population is
22 21,448?
23     A.    Correct.
24     Q.    You report the sibling-control
25 result and the results?

Page 430

1    A.    Uh-huh.
2    Q.    But you never report the
3  discordant pair numbers in your table here?
4    A.    Not in the table, but in my
5  overview of Gustavson in the narrative, I do.
6    Q.    But you don't think you
7  should -- I mean, I read this, and I said,
8  wow, Gustavson had 21,000 people in the
9  sibling control.
10        That's not accurate, right?
11   A.    No, that's not accurate.
12   Q.    Okay.  Do you report any
13  limitations for the Gustavson paper?
14   A.    Well, certainly, because the
15  Gustavson paper is based on the MoBa cohort,
16  and that's not -- you know, as I said from
17  the very beginning, that study was not
18  designed to assess the relationship between
19  APAP and neurodevelopmental outcome.
20   Q.    Let's look at page 76 of your
21  report.
22        MR. MURDICA:  You interrupted
23  her again.
24        MR. SNIDOW:  I didn't mean to.
25  I thought she was done.

Page 431

1  QUESTIONS BY MR. SNIDOW:
2    Q.    All right.  Can you go to 76 of
3  your report?
4    A.    I see, yeah.
5    Q.    This is Gustavson?
6    A.    Uh-huh.
7    Q.    And where -- you just told me
8  you reported the number of discordant pairs?
9        MR. MURDICA:  Is that a
10  question?
11  QUESTIONS BY MR. SNIDOW:
12   Q.    Uh-huh.
13        Didn't you just tell me that
14  your reported --
15   A.    I did, and I thought I had
16  reported it in my narrative.  I do not see
17  it, but I could cite it to you.
18   Q.    That's a pretty important
19  omission, right?  Because that's the sample
20  size that determines the power of that
21  analysis, right?
22        MR. MURDICA:  Objection to
23  form.
24        THE WITNESS:  That is the
25  sample size that determines the power

Page 432

1  of that analysis.  And as I've stated
2  repeatedly, although there were only
3  34 discordant on both, the sibling
4  then doubles that to 68, and at least
5  68 because there were additional
6  siblings included in the analysis, and
7  they found an attenuation of risk.
8        So when you find that a
9  confounding estimate reduces the
10  association to the null, the study
11  power is not what you're worried about
12  anymore.  You've shown the
13  association, and that's what we're
14  after.
15  QUESTIONS BY MR. SNIDOW:
16   Q.    Yeah.
17        But my question is this.  For
18  Brandlistuen, you noted the number of
19  discordant pairs, right?  Because that's what
20  determines the power of the study, right?
21        Is that true?
22   A.    I am surprised that I don't
23  have the number for Gustavson in here because
24  I truly thought I did.  So if it was omitted,
25  it was omitted in error.  It was not an

Page 433

1  intentional omission.
2    Q.    Okay.  Well, do you report any
3  limitations for Gustavson?
4    A.    Again, when I describe the
5  cohort in general, I do admit that the --
6  because the cohorts were not designed to
7  measure this association, the possibility of
8  recall bias with respect to exposure is
9  always there.
10   Q.    No, but there -- they're on
11  that page.  When you're describing Gustavson,
12  do you ever say limitations of this study
13  include, blah-blah-blah-blah-blah, like you
14  do for everything else?
15        MR. MURDICA:  Objection to
16  form.
17        THE WITNESS:  So Gustavson is
18  the pinnacle of a series of studies
19  that were done on the MoBa cohort, and
20  when you understand how epidemiology
21  involved -- evolved, you understand
22  that, you know, irrespective of the
23  methodologic challenges, investigators
24  are trying to do a better and better
25  job to demonstrate an association, and

Page 434

1    that's what's going on here.
2    QUESTIONS BY MR. SNIDOW:
3        Q.    My question was, do you ever
4    describe any limitations of the Gustavson
5    study?
6            MR. MURDICA:  Objection to
7        form.
8    QUESTIONS BY MR. SNIDOW:
9        Q.    Here, on page -- on page 76?
10       A.    On page 76, I do not see any
11   direct critique of the Gustavson paper.
12       Q.    Do you agree that for many of
13   the other studies, you provided extensive
14   critiques of the studies?
15           MR. MURDICA:  Objection to
16       form.
17           THE WITNESS:  So, again, I do
18       agree with that, but can I just point
19       out that because I describe many other
20       studies from the MoBa cohort, I am
21       stating the --
22   QUESTIONS BY MR. SNIDOW:
23       Q.    And, ma'am, I'm not trying to
24   be disrespectful.  I just am trying to get an
25   exhibit number.

Page 435

1            MR. MURDICA:  Let the record
2        reflect that Dr. Pinto-Martin is doing
3        her best to answer the question and
4        you're not paying attention, and
5        you're having conversations and it's
6        making it -- it's making it hard for
7        me to defend it, it's making her --
8        hard for her to testify, and she just
9        expressed that.
10   QUESTIONS BY MR. SNIDOW:
11       Q.    Okay.  I apologize.  That
12   wasn't my intention.
13           Could you look at --
14       A.    Could I finish what I was
15   saying?
16       Q.    Well, sure.  I didn't stop you.
17       A.    What I do when I review a body
18   of literature is discuss the study design for
19   the cohort from which the data is derived,
20   and I do that in many places in this report.
21   It does not happen to appear on my discussion
22   of Gustavson, which, as I said, is the latest
23   study from a whole series that emerged from
24   the MoBa cohort.
25       Q.    Gustavson adds sibling controls

Page 436

1    to that body of literature, right?
2        A.    It does.
3        Q.    You don't report any
4    limitations resulting from sibling-controlled
5    analysis, right?
6            MR. MURDICA:  Object to form.
7    QUESTIONS BY MR. SNIDOW:
8        Q.    Any?
9            MR. MURDICA:  Objection to the
10       form.
11           THE WITNESS:  To Gustavson
12       sibling control?
13   QUESTIONS BY MR. SNIDOW:
14       Q.    Correct.
15       A.    I -- in this -- in this section
16   right here, I do not critique Gustavson.  I
17   think it's a very important study.  I
18   obviously rely on it heavily because, as I
19   pointed out repeatedly, the way epidemiology
20   evolves is over time, with increased
21   attention to detail and to addressing
22   confounding.  And only because the MoBa
23   cohort continued to recruit siblings and had
24   data on outcome was Gustavson able --
25   Gustavson and his coauthors, who prior had

Page 437

1    reported had an increased risk, were able to
2    show that it was confounded by genetics
3    because the cohort evolved and they had data
4    on siblings.
5        Q.    Can you look at Exhibit 605 for
6    me?
7        A.    605 is what?
8        Q.    It's the reference manual.
9        A.    Okay.  Hold on.  Okay.
10       Q.    Do you see where it says,
11   "What's the power of the test?"
12       A.    I'm sorry, what page are we
13   looking at?
14       Q.    253.
15       A.    Will you give me a page?
16       Q.    Yes, that would have been a
17   good -- that would've been a good thing to
18   tell you.  I agree.
19       A.    253.  "What is the power of the
20   test?"
21       Q.    It says, "When a p-value is
22   high, the findings are not significant, and
23   the null hypothesis is not rejected."
24           True?
25       A.    That's what it says.

Page 438

1    Q.    And it says, "This could happen
2  for at least two reasons," and let's turn the
3  page.
4          The first is the null
5  hypothesis is true, right?
6    A.    Uh-huh.
7    Q.    And that's what you think is
8  going on in Gustavson, right?
9    A.    I think it supports the notion
10 of genetic confounding.
11   Q.    And that's the null hypothesis
12 that they're testing there essentially?
13   A.    Well, they're testing
14 confounding.
15   Q.    Yeah.
16   A.    So they're testing the impact
17 of confounding on the prior association in
18 the full cohort.
19   Q.    But the second possibility is
20 "the null is false, but by chance, the data
21 happened to be of the kind expected under the
22 null."
23         Did I read that correctly?
24   A.    You did.
25   Q.    And do you agree that is a

Page 439

1  possibility when study power is low?
2    A.    I agree that it's a possibility
3  when study power is low.
4          I think it's unlikely when you
5  demonstrate such a significant decrease in
6  the prior reported measure of association and
7  it attenuates to the null with a small sample
8  size that that possibility is likely.
9    Q.    Then it says, "When a study
10 with low power fails to show a significant
11 effect," that's what happened in Gustavson,
12 right?
13         MR. MURDICA:  Object to the
14   form.
15         THE WITNESS:  So, again, the
16   sibling analysis is embedded within
17   the overall analysis.  The sibling --
18   the study itself does not have low
19   power.
20         It's like you're stratifying.
21   If you think about it as stratifying,
22   you're stratifying on the basis of
23   genetics.
24         So the overall power of the
25   study is the overall power of the

Page 440

1    study, and the sibling design is the
2    stratification within that analysis.
3  QUESTIONS BY MR. SNIDOW:
4    Q.    Do you see where it says, "The
5  results may, therefore, be more fairly
6  described as inconclusive than negative"?
7    A.    I see that.
8    Q.    All right.  Do you agree with
9  the statement that I've underlined here from
10 the reference manual?
11         MR. MURDICA:  Objection --
12   objection to form.
13         THE WITNESS:  So, first of all,
14   I don't know what this reference
15   manual is.  I don't know who wrote it.
16   I don't know how it's used, and so I'm
17   not going to agree or disagree with
18   the statement that you've pulled out
19   of it because I have no knowledge of
20   its derivation.
21 QUESTIONS BY MR. SNIDOW:
22   Q.    Okay.  Do you agree when a
23 study with low power fails to show a
24 significant effect, the results may be more
25 fairly described as inconclusive than

Page 441

1  negative?
2          Do you agree with that?
3    A.    Again, you're asking me to
4  agree with a statement that I have no
5  knowledge of its purpose, its origin, who
6  wrote it.  I'm not willing to opine about
7  random statements from manuals that I know
8  nothing about.
9    Q.    Okay.  Can I ask you, you're a
10 professor of epidemiology, right?
11   A.    I am.
12   Q.    And you all the time give your
13 opinion about the basics of epidemiological
14 technique, right?
15   A.    I do, but that's not what I was
16 asked --
17   Q.    No, I know.  I know.
18   A.    -- to do here.
19   Q.    I know.
20   A.    And I'm not going to do it
21 here.  I think that textbooks can differ,
22 manuals can differ, and I was here to -- I
23 was asked here to evaluate the published
24 epidemiologic literature, and I'm going to
25 stay in that lane.

Page 442

¹ Q. And you're telling me that in
² order to tell me whether this basic principle
³ of epidemiology is true or false, you need to
⁴ know who wrote it?
⁵ MR. MURDICA: Objection to the
⁶ form.
⁷ THE WITNESS: I'm saying that
⁸ my assignment here, if you will, was
⁹ not to opine on statements about
¹⁰ statistical significance and study
¹¹ power.
¹² My assignment was to review the
¹³ published epidemiologic literature,
¹⁴ and I'm just going to stay there.
¹⁵ This is not something I've ever seen
¹⁶ before.
¹⁷ It's not -- I'm not opining as
¹⁸ Jennifer Pinto-Martin, professor of
¹⁹ epidemiology. I'm opining as an
²⁰ expert witness based on my review of
²¹ the published literature, and that's
²² what I am -- I'm here to talk about.
²³ QUESTIONS BY MR. SNIDOW:
²⁴ Q. Well, this isn't -- this isn't
²⁵ about APAP, right? This is -- this is about

Page 443

¹ epidemiology. Can --
² A. I recognize that.
³ Q. Can you answer the question?
⁴ Is this -- is this true, or is this not true?
⁵ Do you know?
⁶ A. I --
⁷ Q. Do you know if it's true or
⁸ not?
⁹ MR. MURDICA: Objection.
¹⁰ Objection to the form. Same
¹¹ objection.
¹² THE WITNESS: Again, I'm not
¹³ going to offer an opinion on a
¹⁴ statement that was pulled randomly
¹⁵ from a manual that I've never seen
¹⁶ before, and it's not my assignment.
¹⁷ QUESTIONS BY MR. SNIDOW:
¹⁸ Q. Why does it matter who wrote
¹⁹ it, like, truly? Why does it matter who
²⁰ wrote that?
²¹ What if a student came up to
²² you and said, Dr. Pinto-Martin, when a study
²³ with low power fails to show a significant
²⁴ effect, the results may therefore be more
²⁵ fairly described as inclusive than negative,

Page 444

¹ am I right or wrong, what would you tell
² them?
³ MR. MURDICA: Objection to
⁴ form.
⁵ THE WITNESS: Again,
⁶ hypothetical, I'm not going to respond
⁷ to what I might say to a student in a
⁸ different situation. That is not my
⁹ role here.
¹⁰ QUESTIONS BY MR. SNIDOW:
¹¹ Q. Right.
¹² A. I'm not here as a professor of
¹³ epidemiology. I'm here as an expert witness
¹⁴ to review the published literature.
¹⁵ Q. Well, you're here as an expert
¹⁶ in epidemiology, right?
¹⁷ A. I'm here as an expert
¹⁸ epidemiologist who was asked to review the
¹⁹ published literature.
²⁰ (Pinto-Martin Exhibit 627
²¹ marked for identification.)
²² MR. SNIDOW: Could I have --
²³ oh, yeah.
²⁴ QUESTIONS BY MR. SNIDOW:
²⁵ Q. Okay. All right. Doctor, this

Page 445

¹ is what you've been wanting to do all day.
² We're going to look at Gustavson together.
³ MR. MURDICA: Objection to the
⁴ commentary.
⁵ MR. SNIDOW: Harmless.
⁶ QUESTIONS BY MR. SNIDOW:
⁷ Q. 627.
⁸ All right. How would you
⁹ characterize the statistical power of the
¹⁰ main analysis, the non-sibling one, in
¹¹ Gustavson?
¹² A. It's a very large cohort, and I
¹³ think that statistical power is one important
¹⁴ consideration in evaluating the integrity of
¹⁵ the result that they present.
¹⁶ Q. High? Medium? Low?
¹⁷ MR. MURDICA: Objection. Form.
¹⁸ THE WITNESS: It's not a way
¹⁹ that I typically evaluate statistical
²⁰ power, but it's a large study, as I
²¹ said, and I think they had sufficient
²² power to test the association that
²³ they were testing.
²⁴ QUESTIONS BY MR. SNIDOW:
²⁵ Q. Let's go to page 7.

Page 446

1    It looks like in the main
2  analysis, the number of children not exposed
3  to acetaminophen was 12,080?
4    A.    Uh-huh.
5    Q.    And you see that's what they're
6  using as their control?
7    A.    Yeah.  It has the reference.
8  Yeah.
9    Q.    Yeah, the reference.
10    And then for acetaminophen,
11  29 days or more, it's 469?
12    A.    Correct.
13    Q.    So lower, but still pretty big,
14  right?
15    A.    It's 469.
16    Q.    Yeah.
17    And they report an unadjusted
18  and adjusted result.  The unadjusted is 2.47;
19  the adjusted is 2.02?
20    A.    That's correct, that's what
21  they state in this table.
22    Q.    That corresponds to a doubling
23  of the risk?
24    A.    That is correct.
25    Q.    Or 100 percent increase in

Page 447

1  risk?
2    A.    That's what a twofold increase
3  means, yes.
4    Q.    And so I made a little diagram
5  that I hope will illustrate this.
6    So this is the Gustavson
7  primary analysis, right?
8    They looked at children not
9  exposed to APAP.  There were about 12,000 of
10  them.
11    A.    Uh-huh.
12    Q.    Is that true?  You gave me an
13  "uh-huh."
14    Is that true?
15    A.    That's true, uh-huh, so --
16    Q.    Sorry, have to do that.
17    And then they looked at kids
18  who were exposed to APAP for more than
19  29 days?
20    A.    That's correct.
21    Q.    And there were 469.  And if you
22  see here, I -- each one of these is going to
23  represent 25 children.
24    A.    Oh, I see.  Okay.
25    Q.    Okay?

Page 448

1    A.    Got it.
2    Q.    That's the setup for the
3  Gustavson paper.  It's a cohort study --
4    A.    Uh-huh.
5    Q.    -- prospective?
6    A.    Prospective, although as I
7  pointed out repeatedly, the assessment of
8  exposure was actually retrospective because
9  they were asking women during their pregnancy
10  to recall exposure from the prior at least
11  three months.
12    Q.    Right.
13    But it wasn't retrospective
14  after they learned whether or not they were
15  going to experience the outcome, right?
16    A.    They did not know the child's
17  outcome at the time of assessment of
18  exposure, correct.
19    Q.    And for recall bias, that's
20  typically what you're concerned about?
21    MR. MURDICA:  Objection to
22  form.
23    THE WITNESS:  It's one reason
24  that recall bias can be introduced.
25  There are many other reasons,

Page 449

1  including, as I pointed out, the
2  underlying psychological profile of
3  the mother because we know that women
4  with anxiety are more likely to
5  remember negative events and report
6  negative events.
7  QUESTIONS BY MR. SNIDOW:
8    Q.    Yeah.
9    Well, let me ask you and --
10  while she's getting it.  For the Gustavson
11  paper, you agree only discordant siblings
12  contribute with information in the sibling
13  design?
14    A.    That's correct.
15    Discordant on both.
16    Q.    On both.
17    A.    Doubly discordant, as we say.
18    Q.    What did you say?
19    A.    Doubly discordant.
20    (Pinto-Martin Exhibit 628
21  marked for identification.)
22  QUESTIONS BY MR. SNIDOW:
23    Q.    Okay.  I'm going to mark this
24  as the Gustavson appendix.  My tabs have
25  disappeared yet again.

Confidential - Subject to Protective Order

1    MR. SNIDOW:  What are we up to?
2    MS. BARRIERE:  I'm checking.
3    628.
4    MR. SNIDOW:  Okay.  Thanks.
5  QUESTIONS BY MR. SNIDOW:
6    Q.    This is the Gustavson
7  supporting information.  You've read this,
8  right?
9    A.    I have.
10    Q.    And if you look at page 7, it
11  says, "Only discordant siblings contribute
12  with information in the sibling design."
13    True?
14    A.    Correct.
15    Q.    It says, "380 mothers
16  participated with children discordant on the
17  exposure for 29 days or more."
18    Right?
19    A.    Sorry, you must have jumped.
20  300 -- okay.
21    Q.    Yeah, I did.  "380 mothers
22  participated with children discordant on the
23  exposure for 29 days or more."
24    A.    Uh-huh.
25    Q.    "34 of them have children

1  discordant on the outcome."
2    A.    Right.
3    Q.    And then it looks like some of
4  them have two, and then some of them have
5  three?
6    A.    Uh-huh.  I think we end up with
7  38 or 39 by my calculation.
8    Q.    Okay.
9    A.    But then, of course, you need
10  to double that.
11    Q.    Right.  Exactly.
12    A.    Right?
13    Q.    I was going to say, I went
14  through this myself.  I think -- I'm not
15  100 percent sure, but I think you'll agree
16  with me that this is what the sample size
17  looks like for the Gustavson sibling control
18  because discordant on exposure was around
19  800 kids because 380 mothers.
20    MR. MURDICA:  Objection to
21  form.
22  QUESTIONS BY MR. SNIDOW:
23    Q.    And discordant on ADHD
24  diagnosis, I said about 72 because it looks
25  like 36 times 2?

1    MR. MURDICA:  Objection to form
2  and use of demonstrative.
3    THE WITNESS:  So I'm sorry, but
4  I believe that the 380 captures the
5  discordance, so I don't think you need
6  to double it.
7  QUESTIONS BY MR. SNIDOW:
8    Q.    So you think actually --
9    A.    See, they've already captured
10  the discordance in that statement, so it's --
11  380 are discordant on exposure.
12    Q.    Well, it's mothers, isn't it?
13    A.    Right.
14    Q.    And they have kids.  I --
15  that's why I said about --
16    A.    No, but you measure it from the
17  mother, right?
18    Q.    Oh, okay.
19    A.    Because the mom is the one
20  who's exposed.  So it's 380.
21    Q.    Okay.
22    A.    Or I think that's what it is,
23  yeah.
24    Q.    So it's smaller, smaller --
25    A.    Greater than 29, and then

1  you're right about sort of doubling the
2  estimate of the discordant outcome.
3    Q.    All right.  So you think this
4  is -- this is accurate on sample size for the
5  Gustavson?
6    A.    Close enough, yes.
7    Q.    Yeah.
8    Agree, this is much smaller
9  than this?
10    A.    I agree that the sample size is
11  small.  Again, I will say the fact that a
12  small sample was able to so effectively
13  attenuate a prior reported association by the
14  same authors -- so they're disagreeing with
15  their prior finding.
16    They're actually debunking
17  their prior finding, which is a very brave
18  thing to do, but it happens in epidemiology
19  because we want to get it right.  We want to
20  get to the truth, so we continue to analyze.
21    That's what they did here, and
22  they were able to show genetics matters.
23  They certainly point out that we want this
24  replicated, but it is a very important
25  finding in this -- in this arc of literature,

Page 454

1 it is a very important finding.
2     Q.    Well, they said low sample size
3 was a problem, didn't they?
4         MR. MURDICA:  Objection to
5 form.
6         THE WITNESS:  They said that --
7 QUESTIONS BY MR. SNIDOW:
8     Q.    Didn't they say that?
9     A.    Let me quote what they said.
10 "The results highlight the importance of
11 using designs that allow for accounting for
12 unmeasured confounding.  As only discordant
13 siblings contribute to information in
14 sibling-control models, even the current very
15 large birth cohort provided limit -- limited
16 statistical power.  Hence, the results need
17 to be replicated."
18         So they acknowledged that it
19 was limited statistical power, but they still
20 found an association or an attenuation.
21     Q.    Is your testimony they didn't
22 say that the low power was a problem for
23 those sibling controls?
24         MR. MURDICA:  Objection to
25 form.

Page 455

1         THE WITNESS:  I just read you
2     what they said.
3 QUESTIONS BY MR. SNIDOW.
4     Q.    Well, let's look at the
5 appendix.
6     A.    I'm reading -- I'm -- okay.
7     Q.    Yeah.  Let's look at the
8 appendix.
9     A.    This is exactly what they say
10 in their results.
11     Q.    No.  No.  Hold on.  Hold on.
12         Do you see this?
13     A.    These numbers show that
14 statistical power to detect within effects
15 was relatively low.
16     Q.    You agree?
17     A.    But they found an effect.
18     Q.    I -- I --
19     A.    They're acknowledging that it
20 was low, but they found an effect.  And then
21 they're saying, let's replicate this.  How
22 interesting.
23         They are calling for exactly
24 what we do in epidemiology.  Let's replicate
25 this finding.

Page 456

1     Q.    Hold on.
2         First of all, they found a null
3 finding for the sibling controls, right?  So
4 I don't know what you mean by they found --
5 they found a null finding for the sibling
6 controls.
7     A.    So the purpose of the sibling
8 control is to compare it to the main cohort
9 analysis.
10     Q.    Yep.
11     A.    And they found an attenuation
12 of the effect.  That is an effect in my mind.
13 It shows that there is confounding, which is
14 the purpose of doing the sibling-control
15 analysis.
16     Q.    But you see here, "The numbers
17 shows the statistical power to detect within
18 effects was relatively low."
19         Did I read that correctly?
20     A.    You did.
21     Q.    All right.  And then they say,
22 "Hence, these results should be interpreted
23 with caution."
24         Right?
25     A.    A very -- a very wise thing to

Page 457

1 say.
2     Q.    You are not interpreting these
3 results with caution, are you?
4     A.    I am.
5         MR. MURDICA:  Objection to
6 form.
7         THE WITNESS:  I'm saying they
8 are incredibly interesting.  They
9 needed to be replicated.
10         Again, think about where they
11 come in the arc of evidence, and this
12 is very important to consider.  This
13 is the way epidemiology works.
14         I would love to see these
15 results replicated, and I'm sure if
16 anyone has the cohort to do it, they
17 will do so.
18 QUESTIONS BY MR. SNIDOW:
19     Q.    Yep.
20         This is -- when I asked you
21 about ADHD -- I'm sorry.  When I asked you
22 about autism and ADHD, you said the
23 sibling-control analysis were powerful
24 evidence for you?
25         MR. MURDICA:  Objection to

Page 458

1    form.
2        THE WITNESS:  I'm sorry, I
3    was --
4    QUESTIONS BY MR. SNIDOW:
5        Q.    Yeah, you were -- when I asked
6    you -- do remember about this?
7        A.    Yes.
8        Q.    Yeah.
9        A.    Well, I said genetics is a
10   powerful --
11       Q.    And you said Gustavson --
12       A.    -- factor.
13       Q.    -- was your -- was your main
14   basis; is that right?
15       A.    For ADHD.
16       Q.    For ADHD?
17       A.    Right.  I mean, that's the one
18   that has a sibling control, so that's the
19   only one you can look at.
20       Q.    And they said, "Interpret our
21   sibling control results with caution."
22   Right?
23       A.    They didn't say ignore them.
24   They said interpret them with caution.  This
25   is the first -- "We are the first group to do

Page 459

1    this" --
2        Q.    Yes.
3        A.    -- and they're putting it out
4    there as a call for others to replicate,
5    which is exactly what they should do.
6        Q.    Yeah.
7            So let's look at page 8 of
8    Gustavson.
9        A.    Page 8 of Gustavson.  Yeah,
10   okay.
11       Q.    Do you see, "This may lead to
12   false conclusions that observed associations
13   are due to familial confounding factors"?
14           Did I read that correctly?
15           MR. MURDICA:  Objection to
16   form.
17           THE WITNESS:  So this -- let's
18   go back and see what "this" is.
19   QUESTIONS BY MR. SNIDOW:
20       Q.    Yeah, it's nondifferential
21   misclassification error.
22           MR. MURDICA:  Objection to
23   form.
24           It's not a question.
25           THE WITNESS:  It says,

Page 460

1    "Measurement error," which could mean
2    lots of things, right?  It could mean
3    misclassification by exposure.  It
4    could mean imprecision in that
5    exposure estimate.
6            "Measurement error" is a broad
7    term.  It's not -- they're not saying
8    misclassification here.  They're
9    saying measurement error, and that's
10   something that I pointed out
11   repeatedly.  We don't have solid
12   exposure information from any of these
13   data.
14   QUESTIONS BY MR. SNIDOW:
15       Q.    But what they're saying here is
16   that could lead to a false conclusion that
17   the observed results are due to familial
18   confounding factors.
19       A.    That is what they're saying.
20       Q.    Do you agree with that?
21       A.    I think it's always a
22   possibility in sibling control, but
23   they're saying -- they have to be honest
24   about what the results might mean.  They're
25   not dismissing their results on the basis of

Page 461

1    this.  They're acknowledging that it -- that
2    a sibling-control analysis has limitations,
3    which I think is a very honest and
4    straightforward way to do it.
5            And, by the way, did you notice
6    one of the coauthors was the person that you
7    were talking about earlier as a very renowned
8    epidemiologist, the former department chair
9    at Columbia, Ezra Susser, who I have great
10   respect for.
11           I just point that out.
12       Q.    So where in the Gustavson paper
13   does it ever say, we have proven that these
14   associations are the result of residual
15   confounding?
16           MR. MURDICA:  Objection to
17   form.
18           THE WITNESS:  So no credible
19   epidemiologist would say they had
20   proven anything on the basis of a
21   single study.
22           What we do is analyze the data,
23   put the data forth as evidence in
24   support of the null hypothesis or in
25   support of a research hypothesis and

Page 462

1    then call for confirmation of the
2    finding.
3        And I think they were, again --
4    they showed a lot of integrity in the
5    way that they presented their results.
6  QUESTIONS BY MR. SNIDOW:
7    Q.    So that's a, no, they didn't
8  say that.
9        MR. MURDICA:  Objection to
10    form.
11        THE WITNESS:  I think I
12    answered the question.
13  QUESTIONS BY MR. SNIDOW:
14    Q.    Okay.  Did they ever say, now
15  that we have our sibling-control results, we
16  know that the association between APAP and
17  ADHD is a spurious one?  Did they say that?
18    A.    What they said was it points to
19  evidence of confounding by genetics, and they
20  called out for replication of the finding.
21        Again, that's precisely what I
22  would expect an epidemiologist with integrity
23  to do based on a single study.
24    Q.    Let's look at the actual
25  results of Gustavson and see how compelling

Page 463

1  they actually are.
2        So this is the table that they
3  report?
4    A.    Uh-huh.
5    Q.    And this is the main result,
6  right?
7    A.    That is the result from the
8  entire cohort.
9    Q.    Yeah.
10    A.    The model that was presented in
11  Ystrom.
12    Q.    And this is the sibling-control
13  result that you like?
14        MR. MURDICA:  Objection to
15    form.
16        THE WITNESS:  This is the
17    result of the sibling-control analysis
18    showing that the prior result is
19    attenuated towards the null.  You can
20    see that the point estimate is down at
21    1, and it has a confidence interval
22    that goes way below 1 and way above 1.
23  QUESTIONS BY MR. SNIDOW:
24    Q.    It's actually 1.06, right?
25    A.    I don't recall precisely, but

Page 464

1  that sounds right.
2    Q.    So even in Gustavson, the child
3  that was exposed to APAP in utero had a 6 --
4  the point estimate was a 6 percent higher
5  risk of getting ADHD than his nonexposed --
6  his or her nonexposed sibling, right?
7        MR. MURDICA:  Objection to
8    form.
9        THE WITNESS:  I don't think
10    that's the way to interpret a sibling
11    analysis.  Because what a sibling
12    analysis is designed to do is
13    demonstrate the effect of genetic
14    confounding.  And so the result is the
15    attenuation, the extent of
16    attenuation, towards the null, which
17    is very substantial, and the lack of
18    statistical significance is also
19    relevant here.
20  QUESTIONS BY MR. SNIDOW:
21    Q.    Yeah.  But I'm going to need an
22  answer on this.
23        The actual results of the
24  sibling control, the actual point estimate
25  they got, showed that the exposed child had a

Page 465

1  6 percent higher likelihood of developing
2  ADHD than the nonexposed sibling.  That's
3  what happened.
4        MR. MURDICA:  Objection to
5    form.
6        THE WITNESS:  It's a not --
7    it's a nonsignificant finding, so I
8    would never be willing to say that it
9    illustrates a 6 percent increased
10    risk.
11        It's -- it could have
12    illustrated a result that is
13    protective.  It could have illustrated
14    a result that was higher than that.
15    So the point estimate is meaningless
16    when you have wide confidence
17    intervals and it's not significant.
18  QUESTIONS BY MR. SNIDOW:
19    Q.    Exactly.
20        So it goes all the way up to,
21  like, 2, right?
22        MR. MURDICA:  Which one are you
23    talking about now?
24        MR. SNIDOW:  This one.  It goes
25  all the way up to 2.

Page 466

1    THE WITNESS:  He's talking
2  about more than 29 days, sibling
3  control.
4    So the attenuation is towards
5  the null, and the confidence intervals
6  are wide, granted.  But as I said, the
7  interpretation is how does the
8  sibling-controlled analysis -- this
9  is -- this is the way you run the
10  analysis, right.  How does the
11  sibling-control analysis compare to
12  the full cohort analysis.  And if we
13  see that reduction in risk, and it
14  identifies genetics as a confounder.
15    Does it prove that this is all
16  about genetics?  No.  And that's why
17  they're saying, this is a really
18  interesting finding, it shows the
19  impact of genetics on that prior
20  result, and we need more studies to do
21  the same kind of thing.
22  QUESTIONS BY MR. SNIDOW:
23    Q.    You think that when there are
24  overlapping confidence intervals that raises
25  the question of whether the values are

Page 467

1  meaningful different, right?
2    A.    Sometimes.  I -- I've said
3  that, and I do think that sometimes, not
4  always, but there are instances where it's
5  pretty obvious that there's not a difference
6  and someone is trying to describe it as
7  different.
8    Q.    This one, though, it's not that
9  obvious, right?  These confidence intervals
10  are halfway overlapping, right?
11    A.    Again, we're talking about two
12  different analyses, and this is a subset of
13  the prior analysis.  So I don't think it's
14  fair to talk about overlapping confidence
15  intervals because we are doing basically a
16  subanalysis, a stratified analysis from the
17  overall cohort.
18    Q.    I get that you don't think it's
19  fair, but are these overlapping confidence
20  intervals or not?
21    MR. MURDICA:  Objection to
22  form.
23  QUESTIONS BY MR. SNIDOW:
24    Q.    Do they overlap?
25    MR. MURDICA:  Objection to

Page 468

1  form.
2    THE WITNESS:  You've already
3  pointed out that they overlap --
4  QUESTIONS BY MR. SNIDOW:
5    Q.    All right.
6    A.    -- and I've tried to describe
7  that I think when you're doing a
8  sibling-control analysis, it's a subanalysis
9  of your overall cohort.  And comparing the
10  width of the confidence intervals or the
11  overlapping nature of the confidence
12  intervals is not as relevant as it might be
13  in a situation where you weren't doing a
14  subanalysis within your overall cohort.
15    Q.    Well, here's maybe why it could
16  be relevant.
17    You can't statistically exclude
18  the possibility that the main result was down
19  here and the sibling-control result was up
20  here, right?
21    MR. MURDICA:  Objection to
22  form.
23  QUESTIONS BY MR. SNIDOW:
24    Q.    Can you exclude that
25  statistically?

Page 469

1    A.    So we know that the farther
2  away you get from the point estimate on the
3  confidence interval, the less likely that
4  result is.  I can't determine that looking at
5  it right now, and they didn't try to
6  determine that.
7    What they said was, our
8  sibling-control analysis revealed evidence of
9  confounding by genetics.  We think that's
10  important.  There are many other people who
11  have talked about the importance of genetic
12  confounding.  I would say almost every study
13  that I reviewed said that in their
14  conclusions and limitations, even if they
15  found an effect, well, we need to be cautious
16  in our interpretation because of the
17  possibility of residual confounding by
18  genetics.
19    So here we have a study that's
20  actually able to demonstrate that it does
21  have an impact.
22    Q.    It says here, "Third, the
23  sibling-comparison model adjusts not only for
24  stable confounding factors but also for
25  potential mediating factors"?

Page 470

1    A.    That affect all siblings,
2  that's correct.
3    Q.    Yeah.  You agree?
4    A.    That is something that has been
5  pointed out about sibling control, and it is
6  an issue.  In order to test for a mediation
7  effect, you need to have what the mediator
8  is, a definition of the mediator, and data on
9  the mediator.
10        And I have -- I've seen nothing
11 to support that the sibling-control analysis
12 in this, or any other study that I've looked
13 at, can demonstrate the impact of a mediating
14 effect.  It's theoretically possible.  It's
15 not what's happening here.
16    Q.    But the authors call it out
17 here, right?
18    A.    Again, being honest, they say
19 they have to note that this is -- you know,
20 sibling-control analysis is a statistical
21 technique.  It's not perfect, but it has
22 power in demonstrating the role of unmeasured
23 confounding.
24    Q.    Do you see here where they do
25 their conclusions?  You see where it says,

Page 471

1  "The results suggest that may be at least
2  partly due to familial confounding"?
3    A.    I do.
4    Q.    Do you think it's all of it?
5    A.    I don't think we can say on the
6  basis of one study whether it's all of it or
7  part of it.  Again, without knowing what the
8  components of familial confounding are, what
9  we see is this has an impact, and we don't
10 have the underlying data to really parse
11 that.
12    Q.    So you can't say for sure that
13 genetic confounding explains the entire
14 association between prenatal APAP exposure
15 and autism?
16        MR. MURDICA:  Objection to
17    form.
18        THE WITNESS:  I don't think
19    anybody can.  Because, again, autism
20    is not completely heritable, and here
21    we have a demonstration of a profound
22    impact when we try to control for that
23    heritability.  But there's -- it's not
24    a perfect measure, and it's one study.
25

Page 472

1  QUESTIONS BY MR. SNIDOW:
2    Q.    And same question for ADHD.
3  You can't say for sure that genetic
4  confounding explains the entire association
5  between prenatal APAP exposure and ADHD?
6        MR. MURDICA:  Objection to
7    form.
8        THE WITNESS:  I cannot say that
9    because we don't have evidence to
10    support that.  I think without, you
11    know, designing a new study, there
12    will always be the possibility of
13    other confounders.
14 QUESTIONS BY MR. SNIDOW:
15    Q.    And that's -- and that's a
16 possibility, right?
17        Genetic confounding could be
18 partially an explanation for the association,
19 but there could remain some that's truly
20 causal?
21        MR. MURDICA:  Objection to
22    form.
23        THE WITNESS:  In my opinion,
24    there is no evidence in the published
25    literature, epidemiologic literature,

Page 473

1  to suggest a causal relationship.
2        There are many reasons for
3  that.  Genetic confounding is one of
4  them, and all the other reasons we
5  talked about all day long, which I can
6  go through again, if you like, are the
7  other reasons.
8        MR. SNIDOW:  All right.  Want
9  to take a break?
10       THE WITNESS:  Yes.
11       MR. MURDICA:  Sure.
12       VIDEOGRAPHER:  The time is
13 4:14 p.m., and we're off the record.
14  (Off the record at 4:14 p.m.)
15       VIDEOGRAPHER:  The time is
16 4:26 p.m., and we're on the record.
17       MR. SNIDOW:  Just for the
18 record, based on Dr. Pinto's-Martin --
19 Pinto-Martin's refusal to answer my
20 questions about whether statements
21 about epidemiology in the reference
22 manual were true or not, we are
23 reserving the right to reopen the
24 deposition.
25       MR. MURDICA:  Regarding the

Page 474

1   one -- the one sentence you asked
2   about?
3        MR. SNIDOW:  That she told me
4   she would not answer because it was
5   not what she was called here to
6   testify about.
7        MR. MURDICA:  Okay.  Why don't
8   you just call the judge now?
9        MR. WATTS:  Come on, guys.
10  Let's go.
11  QUESTIONS BY MR. SNIDOW:
12       Q.   All right.  Dr. Pinto-Martin,
13  do you agree that the work you do in the
14  field of autism epidemiology relates to
15  possible environmental causes?
16       A.   I do.
17       Q.   And that's work you do at
18  UPenn?
19       A.   That's correct.
20       Q.   Part of your job duties at
21  UPenn?
22       A.   So it's a grant --
23       Q.   Yeah.
24       A.   -- right.  So it's external
25  funding to support research that is looking

Page 475

1   into the etiology of autism spectrum
2   disorders.
3        Q.   And on the Penn website you say
4   that you're a researcher who looks into
5   possible environmental causes of autism?
6        A.   That's correct.
7        Q.   And you agree that you were
8   retained in this case in part because of your
9   professional standing or expertise in the
10  field of autism research?
11       MR. MURDICA:  Objection to
12  form.
13       THE WITNESS:  I believe that's
14  true.
15  QUESTIONS BY MR. SNIDOW:
16       Q.   In particular, because of your
17  professional standing or expertise in
18  relation to potential environmental causes of
19  autism?
20       MR. MURDICA:  Objection to
21  form.
22       THE WITNESS:  I don't actually
23  know.  I mean, no one said to me, this
24  is why we want to retain you.
25       I think that what you can see

Page 476

1   from my life's work, actually, is that
2   I have devoted myself to understanding
3   the etiology of autism spectrum
4   disorders, and that includes potential
5   environmental factors.
6        And, in fact, the SEED study
7   that -- that the CDC has supported for
8   many, many years now is looking at the
9   genetic causes and the causes beyond
10  genetics, I would say.  Whatever --
11  however you want to characterize them.
12  QUESTIONS BY MR. SNIDOW:
13       Q.   Okay.  Do you agree that some
14  of the associations in this literature are
15  strong ones?
16       MR. MURDICA:  Objection to the
17  form.
18       THE WITNESS:  So "strong" is a
19  word that people use in epidemiology
20  typically to describe the size of the
21  measure of association.  And so I ask
22  you what you mean by "strong."
23  QUESTIONS BY MR. SNIDOW:
24       Q.   You have a section in your
25  report on strength.  Okay?

Page 477

1        So you have some idea of what
2   you mean by strong or weak associations,
3   right?
4        A.   I do.
5        Q.   Okay.  So use that one, and
6   tell me if some of the associations in the
7   literature are strong.
8        A.   So I would say that none of the
9   associations in the literature are strong.
10       Q.   All right.
11       A.   Because although some of them
12  report a measure of association that is some
13  might say substantially above 1, the data
14  supporting that measure of association is
15  flawed and, therefore, I can't describe it as
16  a strong association.
17       (Pinto-Martin Exhibit 629
18  marked for identification.)
19  QUESTIONS BY MR. SNIDOW:
20       Q.   I'm going to show you a
21  document that I'm going to mark as --
22       COURT REPORTER:  629.
23       MR. SNIDOW:  Thank you.
24  QUESTIONS BY MR. SNIDOW:
25       Q.   629.  It's the Ji 2020 paper.

Page 478

1   A.   This one?  Okay.
2   Q.   Have you seen this one?
3   A.   I have.
4   Q.   And if you turn to page 186.
5   A.   Uh-huh.
6   Q.   They report the results, right?
7   A.   They do.
8   Q.   And you see for cord
9  acetaminophen burden -- and that's their
10 composite dataset?
11  A.   Uh-huh.
12  Q.   They report the results for
13 ADHD?
14  A.   They do.
15  Q.   And for ASD?
16  A.   Correct.
17  Q.   The results for ADHD in the
18 first -- excuse me, the second tertile is
19 2.26?
20  A.   That's what they report.
21  Q.   As compared to the first?
22  A.   That's correct.
23  Q.   2.86 for the third?
24  A.   That's correct.
25  Q.   And those results are

Page 479

1  statistically significant?
2   A.   They are significant, correct.
3   Q.   That means less than 5 percent
4  likelihood of being a chance finding there,
5  right?
6        MR. MURDICA:  Objection to
7     form.
8        THE WITNESS:  That's the
9     definition of statistical
10    significance, yes.
11 QUESTIONS BY MR. SNIDOW:
12  Q.   For ASD, they report the odds
13 ratio at 2.14?
14  A.   For the second tertile, the
15 odds ratio is 2.14, not statistically
16 significant.
17  Q.   3.62 for the third?
18  A.   Correct.
19  Q.   And that one is?
20  A.   And that one is statistically
21 significant, yes.
22  Q.   All right.  Let's look at what
23 that looks like.
24        So here is the results for Ji,
25 right?

Page 480

1        MR. MURDICA:  Objection to form
2     and demonstrative.
3        THE WITNESS:  So we have the
4     first tertile.  Clue me into your
5     little diagram here.
6        So we have -- how many people
7     do each -- does each little person
8     represent on this one?
9  QUESTIONS BY MR. SNIDOW:
10  Q.   It's in percent.  So I've got
11 100 them.
12  A.   Okay.
13  Q.   And I've done percent.  If you
14 want to look --
15  A.   No, it's okay.
16  Q.   Yeah.
17  A.   I just wanted to understand it.
18  Q.   Yeah.
19  A.   Okay.  This is for ADHD, okay.
20  Q.   And can you look at the cord
21 acetaminophen burden table and tell me if I
22 got this right?
23  A.   We just went over the numbers,
24 so, yes, you --
25        MR. MURDICA:  Objection to the

Page 481

1     form and to the demonstrative that he
2     created.
3  QUESTIONS BY MR. SNIDOW:
4   Q.   It's -- did you say, Yeah, I
5  got it right?
6   A.   We just looked at those
7  numbers, and these are consistent with what
8  we just looked at.
9   Q.   Yes.
10        MR. MURDICA:  The doctor -- let
11    the record reflect the doctor is
12    looking at Exhibit 629, not whatever
13    plaintiff's counsel created.
14 QUESTIONS BY MR. SNIDOW:
15  Q.   Are you -- are you looking at
16 this?
17  A.   I'm looking at both.
18  Q.   Okay.  Good.  I just wanted to
19 make sure.  Mr. Murdica suggested otherwise.
20        But -- so the second tertile
21 here, a lot more kids got ADHD, would you
22 agree?
23        MR. MURDICA:  Objection to
24    form.
25        THE WITNESS:  A lot more kids

1    is a pretty imprecise statement.
2    QUESTIONS BY MR. SNIDOW:
3        Q.    All right.  Well --
4        A.    We can look at the exact number
5    if we wanted to do that.
6        Q.    More than a doubling of the
7    risk?
8        A.    It's more than a doubling of
9    the risk, correct.
10        Q.    And third tertile, 2.86?
11        A.    Correct.
12        Q.    That's more than doubling of
13    the risk?
14        A.    That's correct.
15        Q.    All right.  And the results
16    here I'm reporting, those are adjusted
17    results, true?
18            MR. MURDICA:  Objection to
19    form.
20            THE WITNESS:  Those are
21    adjusted by a set of potential
22    confounders that include maternal age,
23    race, ethnicity, education, marital
24    status, stress during pregnancy,
25    smoking before or during, alcohol

1    before or during, maternal body mass
2    index, parity, child sex, delivery
3    type, preterm birth and low birth
4    weight.  Notably not genetics.
5    QUESTIONS BY MR. SNIDOW:
6        Q.    Well, it's -- you can't just
7    adjust for genetics, right?  It's hard to
8    measure.
9        A.    Well, you could do a stratified
10    analysis on --
11        Q.    You can do things that are
12    correlated with genetics, right?
13        A.    That's what we've talked about.
14        Q.    And sex is highly correlated
15    with genetics?
16        A.    It's determined by genetics.
17        Q.    I agree.
18            Same thing with race, although
19    obviously less than sex?
20        A.    (Witness nods head.)
21        Q.    Is that right?
22            MR. MURDICA:  Objection to
23    form.
24            THE WITNESS:  I'm not sure the
25    point of your question.

1    QUESTIONS BY MR. SNIDOW:
2        Q.    No, I'm just --
3        A.    But, yes, that's true.
4        Q.    My point is just that race
5    is obviously correlated with genetics, right?
6        A.    I would agree with that
7    statement.
8        Q.    And those were controlled in
9    this study?
10        A.    Those were controlled in that
11    study.
12        Q.    And did you notice in my -- in
13    my diagram, I'm reporting essentially the
14    crude risk ratios, right?  Because I'm just
15    showing the percentage of kids?
16            MR. MURDICA:  Objection.  Form.
17            THE WITNESS:  You just told me
18    you reported the adjusted, and that's
19    what we are seeing here in this table.
20    QUESTIONS BY MR. SNIDOW:
21        Q.    Well --
22        A.    Cord acetaminophen --
23        Q.    Well, I was actually trying to
24    have you look at the percentages.
25            So you see the percentages.

1    Remember I said I'm reporting percentages?
2        A.    Well, you're showing the
3    percentages with your little people.
4        Q.    Uh-huh.
5        A.    And you're reporting the
6    relative risk that they report in their
7    paper, which is what we do, right?  We
8    calculate the incidence in the exposed
9    compared to the incidence in the unexposed,
10    and that is how we get relative risk.
11        Q.    Absolutely.
12            And so if I wanted to do the
13    crude relative risk, I divide incidence here
14    divided by here, right?
15        A.    So --
16            MR. MURDICA:  Objection to
17    form.
18            THE WITNESS:  So I wouldn't
19    call it incidence because we don't
20    know that these are incident cases.
21    These are prevalent cases.
22            So we would look at the number
23    of individuals with autism in one
24    tertile compared to the reference
25    tertile.

Confidential - Subject to Protective Order

1  QUESTIONS BY MR. SNIDOW:
2      Q.    Yep.
3            Okay.  What's it mean when you
4  adjust for confounders and the association
5  goes up versus the crude?
6      A.    Very good question and very
7  hard to interpret.  We don't really know what
8  that means.  I mean, I think that it shows
9  that there is something that we don't
10  understand about the causal pathway is --
11  would be my first interpretation.
12            But it's a -- it's a
13  challenging question that a lot of people
14  have thought about, and I don't think there's
15  a perfect answer for it.
16      Q.    Okay.  If we look at the chart
17  for autism, you agree this is -- these are
18  the results?
19            MR. MURDICA:  Objection to
20      form.
21            THE WITNESS:  These are the
22      results they report in Table 2,
23      "adjusted associations between cord
24      plasma acetaminophen biomarkers and
25      the risk of physician-diagnosed

1  conditions."
2            In this case, we're looking at
3  ASD, and we looked before at ADHD.
4            I will say that the exposure
5  information they're relying on here,
6  cord acetaminophen burden and then
7  various markers within that cord
8  acetaminophen, is a point in time
9  measurement that really only reflects
10  exposure right around the time of
11  delivery, and actually, perhaps,
12  post-delivery for women who may have
13  pain from a C-section or something
14  like that.
15            So I think that it's important
16  to point out what the tertiles
17  reflect.
18  QUESTIONS BY MR. SNIDOW:
19      Q.    All right.  But these are the
20  actual results?
21      A.    These are the results reported
22  in Table 2.
23      Q.    All right.  So kids who had
24  more acetaminophen in their cord blood got
25  more ASD than the ones who had less, right?

1      A.    The results indicate an
2  increased risk among those who have cord
3  acetaminophen measured right at the time of
4  delivery, which is not relevant to fetal
5  brain development throughout the trimesters.
6            So I question the value, I
7  would say, of the results --
8      Q.    Well --
9      A.    -- with respect to informing my
10  opinion about prenatal acetaminophen exposure
11  and risk of ASD or ADHD.
12      Q.    Well, the study authors didn't
13  say it was worthless, right?
14            They said, "Our findings
15  support previous studies regarding the
16  association between prenatal and perinatal
17  acetaminophen exposures and childhood
18  neurodevelopmental risk"?
19      A.    I mean, study authors rarely
20  say that their findings are inconsequential.
21      Q.    Right.  I know.
22      A.    I think they elsewhere talk
23  about the notion that this is a point in time
24  measurement and may not reflect anything
25  other than perinatal exposure.

1      Q.    And that's a limitation, just
2  like we saw in the Gustavson paper, right?
3            MR. MURDICA:  Objection to
4      form.
5            THE WITNESS:  It's a rather --
6      it's a rather huge limitation in my
7      mind when you're talking about fetal
8      brain development, which starts very
9      early on and continues throughout
10      pregnancy.
11            And here we have an exposure
12      that happened right at the end, and
13      we're trying to link that to a
14      diagnostic outcome.
15  QUESTIONS BY MR. SNIDOW:
16      Q.    All right.  They say, "The
17  dose-response associations found for the
18  current study also addressed the methodologic
19  issues identified by the Society for
20  Maternal -- Maternal-Fetal Medicine, FDA and
21  American Association of Pediatrics regarding
22  the reliance on maternal self-reported
23  acetaminophen exposures in previous cohort
24  studies."
25            Right?

1    A.    That's what they say.
2    Q.    Right.
3    A.    And I'm not sure I agree with
4 that because the fact that they are relying
5 on a biological marker may at first blush
6 seem like a better approach to measuring
7 exposure.
8        But if you think carefully
9 about how fetal brain development works and
10 how exposure in terms of dose and timing and
11 duration might impact that, we have almost no
12 information from this study on that.
13    Q.    You see here they say,
14 "Reliance on maternal self-reported"?
15    A.    I see that.
16    Q.    That's what you've been telling
17 me about for a good amount of the day, right?
18    A.    That is --
19        MR. MURDICA:  Objection to
20 form.
21        THE WITNESS:  So maternal
22 self-report is not a perfect
23 measurement either.
24 QUESTIONS BY MR. SNIDOW:
25    Q.    Yeah.

1    A.    What I'm saying is that these
2 results, you pointed them out as the
3 strongest results or big numbers.
4        And I just saying that they
5 don't inform my opinion about prenatal use
6 because I would say this is peripartum
7 exposure and not prenatal.
8    Q.    So you disagree with the
9 authors' interpretation of their study,
10 right?
11    A.    I do.
12    Q.    Or -- is that a "yes"?
13    A.    I do.
14    Q.    All right.  They say they were
15 dose-response patterns.
16        You disagree?
17        MR. MURDICA:  Objection to
18 form.
19        THE WITNESS:  So I think that
20 they have established that there's a
21 dose-response by the biomarkers that
22 they measure.
23        However, I don't know how those
24 biomarkers related to fetal brain
25 development, much less to the ultimate

1 diagnosis of ASD or ADHD.
2 QUESTIONS BY MR. SNIDOW:
3    Q.    Right.
4        Because no question, this is a
5 dose-response, right?
6        MR. MURDICA:  Objection to
7 form.
8        THE WITNESS:  Again, the
9 biomarkers show an increased risk as
10 the level of that biomarker goes up,
11 but it was taken at the time of
12 delivery and does not relate to fetal
13 brain development, in my opinion.
14 QUESTIONS BY MR. SNIDOW:
15    Q.    And, yeah.  If you disagree,
16 we'll just put it -- can I have Baker?  Yep.
17 Nope.  Yeah.
18        All right.  Did you review the
19 Baker study?
20    A.    I did.
21    Q.    That one's about meconium?
22    A.    Correct.
23    Q.    And do you agree that the
24 results in that were fairly strong?
25        MR. MURDICA:  Objection to

1 form.
2        THE WITNESS:  I do not.
3 QUESTIONS BY MR. SNIDOW:
4    Q.    All right.  Well, while she's
5 getting that, let me do one more thing.
6        Here's the secondhand smoke
7 result.  Do you remember that one?
8    A.    I do.
9    Q.    And here's the Baker result.
10        Do you see that?
11    A.    I see that you've made a
12 graphic of probably what comes from one of
13 the tables.
14    Q.    Yes.
15    A.    So...
16    Q.    So can you tell me which is a
17 stronger association, this or this?
18        MR. MURDICA:  Objection to form
19 and the use of these graphics you
20 created.
21 QUESTIONS BY MR. SNIDOW:
22    Q.    Can you tell me that?
23    A.    I can't tell you that because
24 context matters.
25    Q.    Yeah.  That's fine.

Page 494

1    The number's a lot smaller,
2  though, right?  This one is 1.3, and this one
3  is 3?
4        MR. MURDICA:  Objection to
5    form.
6        THE WITNESS:  As I've said
7    repeatedly, it's not just about the
8    numbers.
9  QUESTIONS BY MR. SNIDOW:
10   Q.    And can you give me a citation
11 for that, that when you're looking for
12 strength in Bradford Hill, you need to look
13 at the underlying data and not just the
14 magnitude of the association?
15   A.    I can't cite you something
16 specific to that, but I think it's a common
17 belief among thoughtful epidemiologists that
18 context is incredibly important.
19   Q.    I know context is important,
20 but we're doing strength.
21        Can you cite anything that
22 says, you know, don't just look at the
23 magnitude of the point estimate, you need to
24 actually go and look at all of the data
25 underlying all the studies?

Page 495

1    A.    Again, I just think it's common
2  sense.  I don't look at things in isolation,
3  so it's the way I approach things, and I'm
4  not alone in that.
5        (Pinto-Martin Exhibit 630
6    marked for identification.)
7  QUESTIONS BY MR. SNIDOW:
8    Q.    All right.  Here is Baker,
9  which Christy {sic} is going to tell me what
10 to mark as.
11   A.    630, I think, right?
12   Q.    Great.  Here's Baker.
13        And do you see here they say,
14 "A dose-response association was detected.
15 Each doubling of exposure increased the odds
16 of ADHD by 10 percent."
17        Do you see that?
18   A.    I do see that.
19   Q.    Do you agree that they detected
20 a dose-response association here?
21        MR. MURDICA:  Objection to
22    form.
23        THE WITNESS:  So the analytes
24    from the meconium appear to increase
25    the risk of the odds of ADHD.

Page 496

1        However, similar to the Ji
2  study, I take exception to using a
3  biomarker that is collected after
4  delivery to reflect exposure
5  throughout pregnancy.
6        Although we know that meconium
7  does develop throughout pregnancy, we
8  also know that babies don't poop, to
9  be straightforward about it, until
10 several days, sometimes, after
11 delivery, and we know -- I'll just
12 tell you because my mother -- my
13 mother -- my daughter just had a baby,
14 and she had a C-section, and so she
15 was taking a lot of Tylenol after
16 birth, and she was also nursing her
17 baby.
18        And so I am quite sure that any
19 acetaminophen that might have been
20 detected in Teddy's poop could have
21 been a function of the exposure she
22 had during delivery, after delivery
23 and through the breast milk.
24 QUESTIONS BY MR. SNIDOW:
25   Q.    Right.

Page 497

1        Do you -- are you an expert in
2  how exposures get into meconium at which
3  points in pregnancy?
4        MR. MURDICA:  Objection to
5    form.
6        THE WITNESS:  I'm not an expert
7    in how exposures get into meconium
8    during pregnancy, but I have read that
9    exposures accumulate in meconium
10   throughout pregnancy.
11       We have no information from
12   Baker about how the exposure measured
13   in the meconium relates to maternal
14   usage throughout pregnancy.
15 QUESTIONS BY MR. SNIDOW:
16   Q.    You see here, though, the
17 conclusions they said, "By using a direct
18 measurement of prenatal acetaminophen
19 exposure that's unbiased by maternal recall."
20       Do you see that?
21   A.    I do see that.  And that's --
22   Q.    Do you agree the measure was
23 unbiased by maternal recall?
24   A.    The measure is unbiased by
25 maternal recall.  That does not equate with

Page 498

1 demonstration of an increased risk of APAP in
2 the meconium and ADHD or ASD.
3     Q.    They seem to disagree.  Because
4 they said, "These results add evidence in
5 support of the association between prenatal
6 acetaminophen use and child ADHD."
7         Right?
8         MR. MURDICA:  Objection to
9 form.
10        THE WITNESS:  That is their
11    statement.
12 QUESTIONS BY MR. SNIDOW:
13    Q.    Do you disagree with the study
14 authors again?
15    A.    I disagree with the study
16 authors again.
17    Q.    How many do you think you've
18 disagreed with today?  Do you think it's more
19 than five?
20        MR. MURDICA:  Objection to the
21    form.
22        THE WITNESS:  I didn't count.
23 QUESTIONS BY MR. SNIDOW:
24    Q.    Well, what do you think is
25 going on here?  Why are all these

Page 499

1 researchers, who are doing this in their day
2 job, getting all of this stuff wrong?  Do you
3 have an explanation for that?
4        MR. MURDICA:  Objection to the
5    form.
6        THE WITNESS:  So I don't think
7    it's a question of getting things
8    wrong.  I think these are people who
9    are trying their best to understand
10    whether there is a true causal
11    association between prenatal APAP use
12    and higher risk of an adverse
13    neurodevelopmental outcome in the
14    offspring.
15        Most epidemiologists, and I
16    would put myself among them, care
17    deeply about finding the truth.  And
18    so these are people who are doing
19    their best with, as we've discussed,
20    flawed data --
21        MS. BARRIERE:  He's reading
22    what you're saying at the same time.
23        MR. SNIDOW:  Oh, yeah.  Sorry
24    about that.  I got your transcript
25    here.

Page 500

1     MS. BARRIERE:  He's not
2 ignoring you.
3     MR. SNIDOW:  I've got to read
4 what you're saying.
5     THE WITNESS:  Okay.  It's just
6 very distracting to have you poking
7 her and --
8     MR. SNIDOW:  I couldn't -- I
9 couldn't -- I couldn't see.
10     MS. BARRIERE:  Sorry.
11     THE WITNESS:  Okay.  It's
12 just -- I'm sorry.  It's just
13 distracting.
14     MR. SNIDOW:  It's okay.
15     THE WITNESS:  It feels
16 disrespectful.
17     MS. BARRIERE:  It wasn't
18 intended.
19     MR. SNIDOW:  It's really not.
20 This is -- this is your transcript.  I
21 obviously have to read it.  I can't
22 look you in the eye and do that at the
23 same time.  I think you understand.
24     THE WITNESS:  I didn't know
25 that that's what you were doing.

Page 501

1     Thank you for explaining it.
2 QUESTIONS BY MR. SNIDOW:
3     Q.    Yes.  All right.
4         You want me to ask you the
5 question again?
6     A.    Yes, please.
7     Q.    The people who keep saying, you
8 know, we think this is -- this is causation,
9 we don't think this is confounding and so on,
10 what do you think is going on there?
11     MR. MURDICA:  Objection to the
12 form.
13     THE WITNESS:  So what I think
14 is going on is that epidemiologists
15 who have data that might be relevant
16 to the very important question of
17 whether prenatal APAP exposure
18 increases the risk of diagnostic ASD
19 or ADHD are analyzing that data to the
20 best of their ability and putting that
21 information forth in the published
22 literature.
23     And that has been going on for
24 about ten years now pretty steadily,
25 and the data is in toto not convincing

Page 502

1  because there are so many flaws.
2      It's a very, very difficult
3  study to perform, in large part,
4  because the exposure, which has to be
5  precise with respect to timing and
6  dose and duration, if we really want
7  to know what its impact is on fetal
8  brain development, is simply not
9  there.
10      And these are two authors
11  who've attempted to use a biological
12  marker, but the biological marker
13  itself has flaws with respect to
14  interpreting timing, dose and
15  duration.
16  QUESTIONS BY MR. SNIDOW:
17      Q.    But you're not saying those
18  authors are acting in bad faith?
19      A.    Not at all.
20      Q.    And you're not saying they're
21  doing unreasonable science?
22      A.    Not at all.
23      Q.    And you're not saying that the
24  methods that they've used to reach those
25  conclusions are scientifically invalid ones,

Page 503

1  right?
2      A.    No, I think -- as I said, I
3  think everyone is doing their best job with
4  all the data they have available, and all of
5  these articles have gone through peer review,
6  which means there are other scientists that
7  agree, this is important information to put
8  out there.  But that's not the same thing as
9  establishing a causal association.
10      Q.    But including the papers that
11  say, we think this strengthens the causal
12  inference and so on, those went through peer
13  review, right?
14      MR. MURDICA:  Objection to
15  form.
16      THE WITNESS:  They did.
17  QUESTIONS BY MR. SNIDOW:
18      Q.    And so you don't think that's
19  an unreasonable thing to say, right?
20      A.    I think --
21      MR. MURDICA:  Objection to
22  form.
23      Go ahead.
24      THE WITNESS:  I think everybody
25  is, again, trying to provide evidence

Page 504

1  that addresses the question of whether
2  there is a true causal association,
3  and I -- that's all I can say, is that
4  people are doing the best with the
5  data they have.
6  QUESTIONS BY MR. SNIDOW:
7      Q.    And analyzing that data using
8  scientifically reasonable means, right?
9      MR. MURDICA:  Objection to
10  form.
11      THE WITNESS:  I think that
12  these are scientifically reasonable
13  means to address the question using
14  the data that they have available.
15  The data isn't perfect.
16  QUESTIONS BY MR. SNIDOW:
17      Q.    Including the authors that you
18  disagree with, right?
19      MR. MURDICA:  Objection to
20  form.
21      THE WITNESS:  I'm not
22  understanding that question.
23  QUESTIONS BY MR. SNIDOW:
24      Q.    Yeah.  The authors -- including
25  the authors you disagree with on the

Page 505

1  causation question, confounding and so on,
2  they're using scientifically reasonable means
3  to address the data using imperfect data?
4      MR. MURDICA:  Objection to
5  form.
6      THE WITNESS:  So they're using
7  scientific means to address the
8  question using imperfect data, and
9  almost universally they're
10  acknowledging the potential problems
11  with drawing any causal conclusion
12  from their data.  Saying that
13  something adds evidence or support is
14  not the same as saying it causes.
15  QUESTIONS BY MR. SNIDOW:
16      Q.    Do you see in Baker that they
17  adjusted for hospital-administered
18  acetaminophen?
19      A.    I did see that.
20      Q.    All right.  And we were talking
21  earlier about how when you're looking for a
22  confounder and you adjust for it and the
23  results don't change, that's evidence against
24  the confounding?
25      MR. MURDICA:  Objection to

Page 506

1  form.
2      THE WITNESS:  Well, it suggests
3  that the results are not confounded by
4  that specific factor.  It's not
5  evidence against all confounding.
6  QUESTIONS BY MR. SNIDOW:
7      Q.    And the specific factor was
8  hospital-administered meconium?
9  Hospital-administered --
10     A.   I hope not.
11     Q.   Yeah.
12         Hospital-administered APAP?
13     A.   Sorry.  Correct.
14     Q.   Correct.
15         And that was the example you're
16 giving about -- did you say your sis --
17     A.   To my daughter.
18     Q.   Your daughter.  Okay.
19         That was the example you were
20 giving, right?
21     A.   Well, it was one example.  She
22 also took oral Tylenol or oral acetaminophen,
23 whatever we -- I don't know exactly what the
24 brand was, but she took it in the hospital in
25 front of me and then proceeded to nurse her

Page 507

1  babies for several days before he had his
2  first poop.
3      Q.    And they adjusted for that in
4  Baker?
5          MR. MURDICA:  Objection to
6  form.
7          THE WITNESS:  Well, that's not
8  injection.  That's oral.
9  QUESTIONS BY MR. SNIDOW:
10     Q.   No, but they adjusted for
11 hospital-administered acetaminophen?
12         MR. MURDICA:  Objection to
13 form.
14 QUESTIONS BY MR. SNIDOW:
15     Q.   And the results didn't change?
16     A.   I need to look.  I don't
17 recall.
18     Q.   Okay.
19     A.   But irrespective of that, it
20 doesn't change my evaluation of the
21 contribution of this to the overall question
22 of causation because of the issue of timing,
23 dose and duration, which is just absent.  We
24 don't know throughout pregnancy how the --
25 women's use of acetaminophen correlates with

Page 508

1  the measure of meconium.
2      Q.    Are you looking for that still?
3          MR. MURDICA:  Objection to
4  form.
5          THE WITNESS:  I'm just seeing
6  if I can find it, yeah.
7          I think it's probably in the
8  supplements because I don't see it.
9  QUESTIONS BY MR. SNIDOW:
10     Q.   All right.  Don't worry about
11 it.
12         Let me ask you this, though.
13 If that's true, if they did adjust for
14 hospital-administered acetaminophen, that
15 would suggest that they're reporting results
16 for acetaminophen that was taken during
17 pregnancy, right?
18         MR. MURDICA:  Objection to
19 form.
20         THE WITNESS:  I would like to
21 see the exact numbers and how they
22 adjusted for it.  So it's hard for me
23 to -- without seeing the numbers, it's
24 hard for me to determine.
25

Page 509

1  QUESTIONS BY MR. SNIDOW:
2      Q.    Okay.  While we're looking for
3  that, so you can see it, would you agree that
4  results in Baker --
5          MR. MURDICA:  He's asking you a
6  question.
7          THE WITNESS:  I'm sorry.  I'm
8  just trying to see if I could look in
9  the supplementary materials in order
10 to answer that question.
11 QUESTIONS BY MR. SNIDOW:
12     Q.   It's all right.  We'll dig it
13 up.  It will be faster.
14         Do you agree these --
15     A.   I mean, I have it right in my
16 binder.  I can just look at it.
17     Q.   Let me just find where it is in
18 the table.  I'm not -- I'll let you read it,
19 I promise.
20         Do you see where it says "No
21 acetaminophen" and "Yes acetaminophen"?
22     A.   I see that, yes.
23     Q.   And this is the first result in
24 Baker.  They did a yes/no comparison?
25     A.   No acetaminophen and

Confidential - Subject to Protective Order

Page 510

1 acetaminophen, yes.
2    Q.   Did I accurately capture the
3 results of Table 2?
4    A.   You did, the adjusted analysis,
5 the weighted -- the weighted analysis, I will
6 say.  That's what they call it.
7    Q.   So in this study, the kids who
8 had acetaminophen in their meconium had twice
9 the likelihood of developing ADHD however
10 many years later, right?
11       MR. MURDICA:  Objection to the
12    form.
13       THE WITNESS:  The results
14    support an increased risk of ADHD
15    among children in whom meconium -- in
16    whom APAP was detected in their
17    meconium.
18       I'm really getting tired.
19 QUESTIONS BY MR. SNIDOW:
20    Q.   Yeah.
21       And not just an increased risk,
22 a doubling of the risk, right?
23    A.   That's what they report in
24 their study.
25    Q.   And similarly here, they did a

Page 511

1 dose-response analysis, right?
2       MR. MURDICA:  Objection to
3    form.  Use of the demonstrative.
4       Answer it, if you can.
5       THE WITNESS:  So they used the
6    levels in the meconium and
7    characterized that as no, low or high.
8    It's unclear to me exactly what that
9    means.  And then they looked to see
10    whether the risk varied across those
11    levels.
12       And in the low APAP, it
13    appeared that there was not a
14    significant risk.  In the high APAP,
15    it appeared that there was, with quite
16    a substantially wide confidence
17    interval.
18 QUESTIONS BY MR. SNIDOW:
19    Q.   The risk ratio for high APAP
20 use was 4.1?
21    A.   That's what they report.
22    Q.   That is a statistically
23 significant result?
24    A.   It is.
25    Q.   The minimum they report in the

Page 512

1 confidence interval is 2.4?
2    A.   Uh-huh.
3    Q.   The point estimate suggests a
4 310 percent increase in the risk of ADHD?
5    A.   That's correct.
6    Q.   The high end of the confidence
7 interval suggests a 609 -- sorry, a 595
8 percent increase in the risk of ADHD?
9       MR. MURDICA:  Objection to
10    form.
11       THE WITNESS:  That's how we can
12    interpret a confidence interval, yes.
13 QUESTIONS BY MR. SNIDOW:
14    Q.   All right.  And I imagine if I
15 show you these again, you think that's
16 stronger or weaker than the secondhand smoke
17 result?
18       MR. MURDICA:  Objection to
19    form.
20       THE WITNESS:  Again, I'm not
21    going to compare across a completely
22    different question and completely
23    different exposure and a completely
24    different outcome.  It's not a fair
25    comparison.

Page 513

1 QUESTIONS BY MR. SNIDOW:
2    Q.   Well, this had a risk ratio of
3 1.3, I think we saw?
4    A.   Again, we need to consider what
5 the exposure is, how the exposure was
6 measured, how reliable that is, what the
7 outcome is.  All of those things go into my
8 evaluation.  So just looking at the numbers
9 is not a sufficient way to compare those two,
10 in my mind.
11    Q.   This risk ratio is 4?
12    A.   We've said that this -- we've
13 already established that, yes.
14    Q.   And that's, what, hundreds of
15 percent higher than the secondhand smoke one?
16       MR. MURDICA:  Objection to
17    form.
18 QUESTIONS BY MR. SNIDOW:
19    Q.   Is that right?
20    A.   Again, I'm not going to compare
21 the results from a secondhand smoke study
22 with very different exposure classification,
23 measurement, precision, et cetera, to a study
24 of meconium.  It just doesn't -- it's not the
25 way I would -- the way I do things.

Page 514

1  MR. SNIDOW:  Jim, do you want
2  to take a break and see what I can do
3  to wrap up?
4  MR. MURDICA:  Okay.
5  MR. SNIDOW:  Thanks.
6  VIDEOGRAPHER:  The time is
7  4:57 p.m., and we're off the record.
8  (Off the record at 4:57 p.m.)
9  VIDEOGRAPHER:  The time is
10  5:11 p.m., and we're on the record.
11  QUESTIONS BY MR. SNIDOW:
12  Q.  All right.  Dr. Pinto-Martin,
13  when assessing whether results in studies
14  that report multiple results are
15  statistically significant, are you familiar
16  with a concept of a Bonferroni correction?
17  A.  I am.  I refer to it in my
18  report.
19  Q.  Yeah.
20  And what you do there is when
21  you're reporting lots of results, that
22  increases the likelihood of a chance finding,
23  right?
24  A.  That's correct.
25  Q.  And I think the classic example

Page 515

1  is -- are you familiar with the study where
2  they regress the zodiac signs on cardiac
3  outcomes?  No?
4  A.  No, I'm not.
5  Q.  Okay.  You'll like this one.
6  You should teach this one, too.
7  They found that two of the
8  signs had statistically significant results
9  as a matter of chance, and so you use it to
10  illustrate why you got a Bonferroni
11  correction.
12  Did you do a Bonferroni
13  correction on any of the studies in the
14  literature?
15  A.  I did not.  That was not part
16  of what I was assigned to do.  I was assigned
17  to review the studies as they were published.
18  And so I certainly noted when I
19  thought they should have done one and didn't,
20  but I didn't conduct my own.
21  Q.  Could you have done that?
22  A.  Perhaps, if I'd had access to
23  the data.  It's hard to know whether you
24  actually have access to the raw data in order
25  to conduct something like that.

Page 516

1  Q.  But that would have given you
2  more information that -- as to whether or not
3  there was a multiplicity issue, right?
4  A.  Certainly.  Doing the
5  Bonferroni will tell you whether there's an
6  issue there or not, but, again, without the
7  raw data, that's just a hypothetical.
8  Q.  Right.
9  But you didn't -- you didn't do
10  one, did you?
11  A.  I had no desire to do one,
12  frankly.  As I said, I reviewed the reported
13  results from the authors and commented on
14  those.
15  Q.  Okay.  Will you look at Baker
16  again for me?  It's the last one we were
17  doing.
18  A.  Yeah.
19  Q.  Do you see here on page 1075 --
20  hold on a second.
21  A.  Where are we?  Yeah.  1075,
22  yeah.
23  Q.  You see above, "To explore
24  potential dose-response association."  It
25  says, "In a sensitivity analysis, we excluded

Page 517

1  all mothers who were administered
2  acetaminophen during delivery," right?
3  A.  Uh-huh.
4  Q.  It says, "To account for
5  potential confounding by indication for use
6  during labor"?
7  A.  Uh-huh.
8  Q.  All right.  So they did a
9  sensitivity analysis there, right?
10  A.  Right.  So a sensitivity
11  analysis is a -- an attempt to control for
12  something but not necessarily based on data.
13  And again, this is during
14  labor.  So I think we were talking about the
15  hospital administration.  That was your --
16  the term you used, and so I'm talking about
17  oral administration post C-section.  That's
18  not during labor; it's post-labor.
19  So, you know, a woman can be
20  given acetaminophen, and of course she will
21  ask for it after a C-section because she's in
22  pain, and then continue to take it during her
23  stay in the hospital and before her baby's
24  meconium is collected.
25  Q.  But the baby at that point is

Confidential - Subject to Protective Order

Page 518

1  out of the body?
2      A.    The baby at that point is out
3  of the body.
4      Q.    And it's going into the baby
5  via, in your theory, breast milk?
6      A.    It's not a theory.  It's -- we
7  know that --
8      Q.    Do they say that in Baker?  I'm
9  sorry, I didn't mean to interrupt you.
10         Do they say that in Baker?
11         MR. MURDICA:  Hang on a second.
12  You just -- you said you were sorry to
13  interrupt her, and then you actually
14  interrupted her.
15         You have let her answer the
16  question before you ask a new one.
17  QUESTIONS BY MR. SNIDOW:
18      Q.    Go ahead.
19      A.    That's not something Baker
20  addresses at all, which is why I think it's
21  important to consider.  He does not address
22  the potential exposure through breastfeeding
23  that would then result in an elevated level
24  of acetaminophen in the meconium of the baby.
25

Page 519

1  QUESTIONS BY MR. SNIDOW:
2      Q.    Do you have a paper or really
3  any authority suggesting that a mother taking
4  acetaminophen who is breastfeeding can end up
5  in the meconium of the baby who's out of the
6  body?
7         MR. MURDICA:  Objection to
8  form.
9  QUESTIONS BY MR. SNIDOW:
10      Q.    Do you have a paper for that?
11      A.    I don't have a paper for that.
12      Q.    Okay.
13      A.    I just know that that is a
14  fact.
15      Q.    Oh, you know it's a fact?
16      A.    I know that I've heard it.
17  I've read it.  I don't know exactly where the
18  information comes from, but meconium
19  continues to accumulate exposures until it's
20  released from the baby's body.
21      Q.    And in your write-up of Baker
22  in your report, did you say any of that?
23         MR. MURDICA:  Objection to
24  form.
25         THE WITNESS:  Interestingly, I

Page 520

1  did not.  My daughter hadn't had her
2  baby yet, and I was struck by the fact
3  that I was witnessing exactly what he
4  was talking about because she was
5  taking acetaminophen after pregnancy,
6  she was nursing her baby.
7         And the meconium -- I wished I
8  could have collected his meconium, in
9  fact.
10  QUESTIONS BY MR. SNIDOW:
11      Q.    Well, right.
12         But you weren't witnessing the
13  acetaminophen go through the breast milk into
14  the baby's meconium, right?
15      A.    No, and --
16         MR. MURDICA:  Objection to
17  form.
18  QUESTIONS BY MR. SNIDOW:
19      Q.    And you didn't talk about that
20  at all in your report?
21         MR. MURDICA:  Objection to
22  form.
23         Which question do you want her
24  to -- come on.
25

Page 521

1  QUESTIONS BY MR. SNIDOW:
2      Q.    In your report --
3         MR. MURDICA:  Ask a question.
4  QUESTIONS BY MR. SNIDOW:
5      Q.    In your report, did you ever
6  flag the possibility that a mother might
7  introduce acetaminophen into the baby's
8  meconium while breastfeeding and then that
9  could have somehow messed up the Baker
10  results?
11         MR. MURDICA:  Asked and
12  answered.
13  QUESTIONS BY MR. SNIDOW:
14      Q.    Did you say that?
15      A.    Again --
16         MR. MURDICA:  Objection.
17         THE WITNESS:  -- I said it was
18  not a concept that I had thought about
19  while -- when I was writing my report.
20  It was something that occurred to me
21  afterwards, so...
22  QUESTIONS BY MR. SNIDOW:
23      Q.    When did your daughter have her
24  baby?
25      A.    The end of July.

Confidential - Subject to Protective Order

Page 522

1    Q.   All right.  So in the past
2  month, you could have updated your report,
3  right?
4         MR. MURDICA:  Objection to
5     form.
6         THE WITNESS:  I could have
7     updated my report.  I did not update
8     my report.  It's an anecdotal piece of
9     evidence that I thought was worth
10    pointing out.
11 QUESTIONS BY MR. SNIDOW:
12    Q.   Yeah.  It's -- it is anecdotal,
13 true?  Right?
14        MR. MURDICA:  Objection to
15    form.
16 QUESTIONS BY MR. SNIDOW:
17    Q.   And do you typically rely on
18 anecdotal evidence in your field?
19        MR. MURDICA:  Objection to
20    form.
21        THE WITNESS:  I do not.  I rely
22    on published epidemiologic literature.
23 QUESTIONS BY MR. SNIDOW:
24    Q.   Have you heard --
25    A.   I just thought it was an

Page 523

1  interesting story.
2    Q.   Well, I did, too, but now --
3  you're using it to undermine the published
4  peer-reviewed study, so I've got to explore
5  that.
6    A.   I'm suggesting that it might
7  have an impact.  I think there are other
8  reasons to -- and I've already stated them,
9  to question the results of this study with
10 respect to contributing to the evidence on
11 causal association between acetaminophen and
12 ADHD or ASD.
13    Q.   Okay.  Are you familiar with
14 the max in your field, the plural of anecdote
15 is not data?
16        MR. MURDICA:  Objection to
17    form.
18        THE WITNESS:  I am.
19 QUESTIONS BY MR. SNIDOW:
20    Q.   Do you agree with that one, by
21 the way?  I mean, isn't the plural of
22 anecdote data?
23        MR. MURDICA:  Objection to
24    form.
25        THE WITNESS:  I do not agree

Page 524

1     with that.
2  QUESTIONS BY MR. SNIDOW:
3    Q.   Okay.  All right.  If the FDA
4  said that the literature linking
5  acetaminophen exposure to ADHD was
6  consistent, would you disagree?
7         MR. MURDICA:  Objection to
8     form.
9         THE WITNESS:  I'm sorry, I
10    don't know what's happening.
11        MS. BARRIERE:  I think we asked
12    her a question.
13 QUESTIONS BY MR. SNIDOW:
14    Q.   Oh, you said, I'm sorry, I
15 don't know.  I did not -- I did not hear you.
16        MR. MURDICA:  No.  I think this
17    is all confused because you're looking
18    over there and --
19        THE WITNESS:  I don't know
20    what's happening.  Yeah.
21        MR. MURDICA:  Why don't -- why
22    don't you ask a new question.
23 QUESTIONS BY MR. SNIDOW:
24    Q.   If the FDA said that literature
25 linking acetaminophen exposure to ADHD was

Page 525

1  consistent, would you disagree?
2    A.   So I would want to know where
3  that statement was made and in what context
4  and for what purpose.  And again, I've
5  described my definition of consistency, which
6  I think incorporates things that others may
7  not, including the FDA.
8         I don't -- I don't know, you
9  know, the purpose of that -- of that
10 statement by the FDA.
11    Q.   Do you think you might agree?
12        MR. MURDICA:  Objection to
13    form.
14        THE WITNESS:  I don't believe
15    that this literature establishes a
16    consistent association, so...
17 QUESTIONS BY MR. SNIDOW:
18    Q.   Okay.
19    A.   That's my finding.
20        (Pinto-Martin Exhibit 631
21    marked for identification.)
22 QUESTIONS BY MR. SNIDOW:
23    Q.   All right.  I'm going to mark
24 631, which is the Bradford Hill address.
25        Can you see if there's

1 highlighting on that, Doctor?
2      A.    It doesn't appear to have
3 highlighting.
4      Q.    Great.
5           Okay.  Would you agree that the
6 method laid out in the Bradford Hill address
7 is considered the classic way to do causation
8 analysis in your field?
9           MR. MURDICA:  Objection.  Form.
10          THE WITNESS:  I think that the
11      majority of epidemiologists use the
12      Bradford Hill as a method of assessing
13      a body of literature with respect to a
14      causal association.
15 QUESTIONS BY MR. SNIDOW:
16      Q.    You agree that's the right way
17 to assess causation?
18          MR. MURDICA:  Objection to
19      form.
20          THE WITNESS:  I don't know if I
21      think it's right or wrong.  It is what
22      we use.  It's -- it -- it's the
23      established method.  I don't know what
24      you mean by "right," but it's the
25      established method.

1 QUESTIONS BY MR. SNIDOW:
2      Q.    I don't know what the
3 difference between that is either, but if you
4 think it's the established, that's fine.
5           If you look here under
6 Strength?
7      A.    Uh-huh.
8      Q.    Now, today you -- you've told
9 me a few times that for strength, you need to
10 look at the underlying data before you can
11 determine whether a -- an association is
12 strong or not, right?
13      A.    So what I've tried to explain
14 is that a strong association can still be
15 flawed, and so you could have an odds ratio
16 of 5, for example, or a relative risk of 5,
17 that was either completely biased or
18 confounded and, therefore, not representative
19 of a strong association.
20          So taking the point estimate in
21 isolation, in my mind, is an incomplete
22 evaluation of strength.
23      Q.    Okay.  But can you tell me
24 where in the Bradford Hill address it says
25 you need to look at, like, how the exposure

1 was gathered and some of the other stuff that
2 you've mentioned today when deciding whether
3 association is strong?
4          MR. MURDICA:  Objection to
5      form.
6          You can answer.
7 QUESTIONS BY MR. SNIDOW:
8      Q.    Does it say to do that?
9          MR. MURDICA:  Objection to
10      form.
11          You answer it, you if you can.
12          THE WITNESS:  The Bradford Hill
13      criteria are a set of very simple
14      statements about those criterion, and
15      he does not tell us, you know, how to
16      apply those to real world data that we
17      are evaluating, much less a body of
18      evidence that we are evaluating.
19          So that's my own expertise
20      coming into play after years of
21      reading studies, evaluating studies,
22      understanding whether a purported
23      association is strong just by virtue
24      of its size or strong because it is
25      meaningful in terms of the association

1 that it represents.
2 QUESTIONS BY MR. SNIDOW:
3      Q.    So that's a no.  Bradford Hill
4 doesn't say to go look at the underlying
5 data?
6          MR. MURDICA:  Objection to
7      form.
8 QUESTIONS BY MR. SNIDOW:
9      Q.    You can -- you can look.
10      A.    Bradford Hill does not address
11 how to apply the criteria.  He describes the
12 criteria and does not give us specific
13 instructions about how to prioritize them or
14 use them in an evaluation.
15          And I think that is the way
16 that he wanted to put them out there, and
17 then the utility of them has evolved over
18 time.
19      Q.    All right.  So for consistency,
20 he says, "Has it been repeatedly observed by
21 different persons, in different places,
22 circumstances and times"?
23      A.    That's correct.
24      Q.    And you'd agree that the
25 association between APAP and ADHD and ASD has

Confidential - Subject to Protective Order

Page 530

¹ been observed by different persons, in
² different places, circumstances and times,
³ right?
⁴        MR. MURDICA:  Objection to
⁵    form.
⁶        THE WITNESS:  So observed is
⁷    the relevant point here.  I think
⁸    there are studies that demonstrate
⁹    that they have support for a causal
¹⁰    association and studies that don't.
¹¹        The consistency in terms of
¹²    timing is all over the place, and the
¹³    term -- the consistency in terms of
¹⁴    dose is not there.
¹⁵        And so consistency, again, is
¹⁶    considered in the context of the
¹⁷    overall body of evidence, and in my
¹⁸    mind, the consistency criteria is not
¹⁹    met.
²⁰ QUESTIONS BY MR. SNIDOW:
²¹    Q.    Where does Bradford Hill say to
²² consider really any of that?  Dose?  What
²³ else did you say?  Time?
²⁴        Does he say to do any of that?
²⁵        MR. MURDICA:  Objection to the

Page 531

¹    form of the question.
²        THE WITNESS:  As I said, he was
³    laying out a set of criteria to be
⁴    applied in the real world to a body of
⁵    evidence, and I believe that the
⁶    approach that I use is the correct
⁷    approach for evaluating consistency
⁸    and the other criteria.
⁹ QUESTIONS BY MR. SNIDOW:
¹⁰    Q.    Well, I know you think it's
¹¹ right, but is that what Bradford Hill says?
¹² Can you find it here?
¹³        MR. MURDICA:  Objection.
¹⁴    You've now done this five times.  I
¹⁵    think that's enough, J.J.
¹⁶        MR. SNIDOW:  Okay.
¹⁷        THE WITNESS:  As I said, that
¹⁸    was not what he did in this report.
¹⁹    He was laying out the criteria for us
²⁰    to use in our evaluation in the real
²¹    world.
²² QUESTIONS BY MR. SNIDOW:
²³    Q.    All right.  Specificity is
²⁴ next.  Agree that one is just very rarely
²⁵ satisfied, true?

Page 532

¹    A.    Depends on the body of
² evidence.  Sometimes it's very nicely
³ satisfied.  It's certainly not satisfied in
⁴ the APAP and neurodevelopmental outcome.
⁵    Q.    It's certainly not satisfied in
⁶ tobacco and lung cancer, right?
⁷        MR. MURDICA:  Objection to
⁸    form.
⁹        THE WITNESS:  Again, there's
¹⁰    examples where it's satisfied and
¹¹    examples where it's not.
¹²        I'm saying in this literature,
¹³    it is clearly not satisfied.
¹⁴ QUESTIONS BY MR. SNIDOW:
¹⁵    Q.    Right.
¹⁶        And Bradford Hill says that's
¹⁷ okay, right?
¹⁸        He says, "If specificity
¹⁹ exists, we may be able to draw conclusions
²⁰ without hesitation.  If it's not apparent,
²¹ we're not thereby necessarily left sitting
²² irresolutely on the fence."
²³        Right?
²⁴    A.    That's what it says.
²⁵    Q.    All right.  Temporality, he

Page 533

¹ says, that's about which is the cart and
² which is the horse, right?
³    A.    Uh-huh.
⁴    Q.    That's a statement about
⁵ reverse causation?
⁶        MR. MURDICA:  Objection to
⁷    form.
⁸        THE WITNESS:  That's --
⁹ QUESTIONS BY MR. SNIDOW:
¹⁰    Q.    Yes?
¹¹    A.    -- part of what he's
¹² considering there, yes --
¹³    Q.    Well --
¹⁴    A.    -- in the criterion.
¹⁵    Q.    That is what he's saying here,
¹⁶ which is the cart, which is the horse; that's
¹⁷ about reverse causation?
¹⁸        MR. MURDICA:  Objection to
¹⁹    form.
²⁰        THE WITNESS:  Well, it's about
²¹    whether the exposure precedes the
²²    outcome, yeah.
²³ QUESTIONS BY MR. SNIDOW:
²⁴    Q.    Does a particular diet lead to
²⁵ disease, or do the early stages of the

Confidential - Subject to Protective Order

Page 534

1 disease lead to those particular diet
2 particular habits.  That's about reverse
3 causation?
4        A.    So it's about both, right.
5 It's about, is there a causal pathway towards
6 disease, or is the effect of the disease on
7 the exposure what we're measuring here.
8              So he's saying both.  He's
9 saying it could be we see exposure to
10 outcome, or it could be that the outcome is
11 affecting the exposure.  I think he's
12 describing both.
13        Q.    And in this literature here,
14 you know, the way it kind of worked, was for
15 the cohort study, take Liew 2016 as an
16 example, they followed women, you know, kind
17 of a time -- they followed them at time A,
18 asked them about APAP use, waited ten years
19 or so, and then looked at ADHD diagnoses?
20        A.    So I'd like to know what
21 specific study you're referring to.  I'm
22 pretty tired right now and just to throw
23 something out like that, I'm not quite sure
24 exactly what you're referring to.
25              But I can tell you about the

Page 535

1 methods of the study, if that's what you're
2 asking about.
3        Q.    Let me ask it a different way.
4              Do you think reverse causation
5 is a possibility in this literature?
6              MR. MURDICA:  Object to the
7 form.
8              THE WITNESS:  Can you describe
9 what that reverse causation hypothesis
10 would be?
11 QUESTIONS BY MR. SNIDOW:
12        Q.    Sure.
13              Do you think that the child's
14 diagnosis of ADHD could have caused the
15 mother to take acetaminophen ten years
16 earlier?
17              MR. MURDICA:  Objection to
18 form.
19              THE WITNESS:  I think that
20 that, as you presented it, is a highly
21 unlikely scenario, but I do believe
22 that maternal genetics can have an
23 impact on the risk of a future child
24 having autism.
25              So we know that autism is

Page 536

1 heritable, and we know that women who
2 have one child with autism are more
3 likely to have another child with
4 autism.  So her result in one
5 pregnancy could affect her
6 acetaminophen use and lots of other
7 things in subsequent pregnancies.
8 QUESTIONS BY MR. SNIDOW:
9        Q.    The strongest you'll give me on
10 that is that it's highly unlikely that
11 there's reverse causation?
12              MR. MURDICA:  Objection to
13 the -- to the form in which you're
14 asking the question.
15              THE WITNESS:  I'm not really
16 understanding your question, quite
17 frankly.
18 QUESTIONS BY MR. SNIDOW:
19        Q.    All right.  Here's how the
20 studies work, right?  The mother takes APAP,
21 they wait a long time, they see whether the
22 kid gets ADHD, right?
23              MR. MURDICA:  Object to the
24 form.
25

Page 537

1 QUESTIONS BY MR. SNIDOW:
2        Q.    Is that basically right?
3        A.    In some of those cohort
4 studies, that's -- yeah.
5        Q.    I'm asking you, is there any
6 possibility that this caused that ten years
7 earlier?
8              MR. MURDICA:  Object to the
9 form.
10              THE WITNESS:  And I think I
11 answered it.  I don't think that
12 that's likely.  I think that the
13 maternal genetic predisposition to
14 having a child without -- with autism
15 could affect a subsequent pregnancy.
16 QUESTIONS BY MR. SNIDOW:
17        Q.    When you say it's not likely, I
18 mean, is it possible?  Does she have a time
19 machine?
20              MR. MURDICA:  Object to the
21 form.
22              THE WITNESS:  I think I've
23 answered the question.
24 QUESTIONS BY MR. SNIDOW:
25        Q.    Okay.  But you're leaving open

Page 538

1 the possibility that this causes that, right?
2     A.    No, I said --
3         MR. MURDICA:  Object --
4         THE WITNESS:  I mean, if you
5     want me to say it in a more strong
6     term, I will.
7 QUESTIONS BY MR. SNIDOW:
8     Q.    Yes, please.
9     A.    I don't think it's possible.
10     Q.    All right.  There you go.
11         All right.
12     A.    Can I just point out that
13 that's not the only thing that Bradford Hill
14 was pointing out in that -- in that
15 criterion?
16     Q.    Okay.  Biological gradient.
17 That's dose-response?
18     A.    That's correct.
19     Q.    Okay.  And what he says was,
20 "For instance, the fact that the death rate
21 from cancer of the lung rises linearly with
22 the number of cigarettes smoked daily, adds a
23 very great deal to the simpler evidence that
24 cigarette smokers have a higher death rate
25 than nonsmokers."

Page 539

1         Right?
2     A.    That's correct.
3     Q.    And you think that you need
4 really good exposure data in order to be able
5 to do that kind of analysis?
6     A.    I certainly believe we need
7 exposure data that is better than what we
8 have in the APAP literature.
9     Q.    And you think in 19 -- you
10 think in 1965, they had, what, prescription
11 databases for tobacco use?
12     A.    I don't --
13         MR. MURDICA:  Object to the
14     form.
15         THE WITNESS:  I don't believe
16     they had prescription databases for
17     tobacco use.  It's, I would say, an
18     easier proposition to describe the
19     number of cigarettes you smoked per
20     day, most people can -- back in the
21     day would smoke a pack or more.  So
22     they often characterized it by packs
23     and not just single cigarettes.  So I
24     just --
25

Page 540

1 QUESTIONS BY MR. SNIDOW:
2     Q.    My point is this is
3 self-reported data.
4     A.    Perhaps.  Perhaps.  Perhaps it
5 was counting cigarette butts.  Perhaps it was
6 partner exposure.  I have no idea.
7     Q.    You think -- you think that in
8 the '50s and '60s that they had studies where
9 they were counting cigarette butts to measure
10 tobacco exposure?
11         MR. MURDICA:  Object- --
12     objection to the form of the question.
13         THE WITNESS:  I think it's
14     possible.
15 QUESTIONS BY MR. SNIDOW:
16     Q.    Now, where in Bradford Hill's
17 analysis does he say to consider any of that?
18 That you need tight exposure data
19 before you can do a dose-response analysis?
20         MR. MURDICA:  Objection to
21     form.
22         THE WITNESS:  I think an
23     epidemiologist with integrity would
24     think very carefully about the basis
25     for any purported association, and

Page 541

1     part of that would be looking at the
2     integrity of the exposure information.
3         So he doesn't say it, as you --
4     as you've repeatedly pointed out, he
5     doesn't contextualize, but I do.  And
6     I think contextualizing is absolutely
7     essential when you're evaluating a
8     body of literature.
9 QUESTIONS BY MR. SNIDOW:
10     Q.    All right.  Biological
11 plausibility, right?  You're not an expert in
12 biological plausibility, are you?
13         MR. MURDICA:  Objection to
14     form.
15         We're really retreading ground
16     here.
17         THE WITNESS:  I am not.
18 QUESTIONS BY MR. SNIDOW:
19     Q.    Okay.  And then in your report
20 you say that it's not -- that this
21 association is not biologically plausible
22 because they don't know for sure what the
23 mechanism is, right?
24     A.    The mechanism that they
25 proposed -- the mechanisms that are proposed

Page 542

1 are all hypotheses, and we have no human data
2 to support those hypotheses.
3        So, yes, we don't have that
4 biological plausibility.
5    Q.   Is there ever going to be human
6 data on biological plausibility?
7        MR. MURDICA:  Object to the
8    form of the question.
9        THE WITNESS:  I can't answer
10    that question.  I don't know.  I don't
11    know what the future will bring.
12 QUESTIONS BY MR. SNIDOW:
13    Q.   Well, this is about how to go
14 from observational studies to causation,
15 right?
16        MR. MURDICA:  Objection to
17    form.
18        THE WITNESS:  These are a set
19    of criteria that we use to evaluate a
20    body of evidence, which is what I did.
21 QUESTIONS BY MR. SNIDOW:
22    Q.   And what does the word
23 "plausible" mean?
24    A.   Possible.  I don't know what a
25 synonym would be.  Possible.

Page 543

1    Q.   Possible.
2    A.   Likely, maybe.  Possibly
3 likely.  It's a little more than possible.
4    Q.   You've read the literature that
5 identified several potential causal pathways,
6 right?
7        MR. MURDICA:  Objection to
8    form.
9        THE WITNESS:  I have read the
10    literature that hypothesizes causal
11    mechanisms.
12        Again, I will repeat that there
13    is no epidemiologic data to support
14    any of those biological pathways.
15 QUESTIONS BY MR. SNIDOW:
16    Q.   Coherence.  And this is about
17 having the epidemiologic data not seriously
18 conflict with other known facts about the
19 history of the disease, right?
20    A.   That's what he says there, yes.
21    Q.   And he says for tobacco, it's
22 the fact that cigarette smoking was coherent
23 with the temporal rise that has taken place
24 over the -- in the two variables over the
25 last generation, right?

Page 544

1    A.   Right.  And I think that that's
2 an ecological assessment of using data that
3 was much easier to acquire than what we are
4 looking at here.  Because of the changes in
5 diagnostic criteria and awareness, as we
6 know, that have had a profound impact on the
7 prevalence of autism, it's very difficult for
8 us to make the same kind of ecological
9 argument.
10    Q.   Well, but the skeptics said the
11 same thing about tobacco, right?  They said
12 it was because of the development of X-rays
13 and so on?
14    A.   I don't know.  I wasn't reading
15 that literature back in the day.
16    Q.   We looked at it just, like, two
17 hours ago, right?
18        MR. MURDICA:  Object to the
19    form.
20 QUESTIONS BY MR. SNIDOW:
21    Q.   Do you not remember?
22        MR. MURDICA:  Objection.
23        THE WITNESS:  Again, it's not
24    something that I used to look at the
25    evidence at APAP and

Page 545

1    neurodevelopmental outcome.
2 QUESTIONS BY MR. SNIDOW:
3    Q.   Experiment.  This one can be
4 done with animal studies, right?
5    A.   So there are experimental
6 studies that attempt to characterize autism
7 and ADHD in mice and rats.  I don't believe
8 that that's really a fair comparison because
9 it's a bio -- it's a behaviorally based
10 diagnosis.
11    Q.   And then analogy.  And that's
12 when you look at other drugs that have been
13 accepted as causal and see whether the
14 mechanism is similar?
15    A.   Correct.
16    Q.   And you don't think that
17 valproic acid is a good analogy?
18        MR. MURDICA:  Object to the
19    form.
20        And I think you're out of time.
21    When you took an early break after
22    only 25 minutes, I thought it was
23    because you were going to end early;
24    otherwise, I wouldn't have agreed to
25    it.  But I think we're done now.

Page 546

1    MR. SNIDOW:  Okay.  Can we do a
2 time check?
3    VIDEOGRAPHER:  6 hours,
4 56 minutes.
5    MR. MURDICA:  Okay.
6    MR. SNIDOW:  Four minutes?
7    MR. MURDICA:  Yeah.  It's still
8 amateur hour that you took an early
9 break and then didn't end early.
10    But go ahead.
11    MR. SNIDOW:  You did the exact
12 same thing.
13    MR. MURDICA:  I did not.
14    MR. SNIDOW:  With Baccarelli.
15 You took a break, like, ten minutes
16 before you were done.
17    MR. MURDICA:  Ten minutes
18 before I was done.  You took a break
19 half an hour before you were done.
20    MR. SNIDOW:  Oh.  So that's how
21 the pros do it.
22    MR. MURDICA:  It was amateurish
23 to take that break.
24    MR. SNIDOW:  The pros do it --
25 the pros do it ten minutes before and

Page 547

1 not 30?
2    MR. MURDICA:  That was
3 amateurish.
4    Go ahead.
5    MR. SNIDOW:  Okay.
6    THE WITNESS:  So I do not
7 believe that valproic acid is a
8 legitimate analogy for all the reasons
9 that I've described before, which
10 include the fact that we have precise
11 data on timing, dose and duration,
12 precise data on indication of use.
13 QUESTIONS BY MR. SNIDOW:
14    Q.    Okay.  And then he says here,
15 "None of my nine viewpoints can bring
16 indisputable evidence for or against the
17 cause-and-effect hypothesis."
18    Right?
19    A.    He does say that.
20    Q.    And you agree with that, right?
21    A.    I do.
22    Q.    And then he says, ultimately,
23 that it's a matter of judgment, right?  That
24 there's no hard-and-fast rules for making the
25 causation determination?

Page 548

1    A.    That's correct.  And that's
2 what I believe, and that's what I've done in
3 my application of the Bradford Hill.
4    Q.    And he says, "The ultimate
5 answer, though, is whether there's any other
6 answer equally or more likely than cause and
7 effect."
8    True?
9    A.    That's correct.
10    Q.    Okay.
11    A.    And in my opinion, there is.
12    MR. SNIDOW:  Okay.  I'm going
13 to, I think, pass the witness, Jim,
14 but I've got some exhibits to mark.
15    And what number am I up to?
16    THE WITNESS:  631 is Baker,
17 which I think is the last one you gave
18 me.  Or Bradford Hill, sorry.
19    MR. MURDICA:  You're not
20 marking the things you agreed not to
21 mark, are you?
22    MR. SNIDOW:  I am marking
23 these.  And you can talk to the judge
24 or file a motion or whatever you want
25 to do.

Page 549

1    MR. MURDICA:  Well, you agreed
2 not to mark them; otherwise, I said we
3 would have talked to the judge then.
4 And that's on the record.
5    So now that you're not marking
6 these, they're not going to be part of
7 the record, and the court reporter was
8 here, and she knows what was said, and
9 I'm going to ask the court reporter
10 not to mark them.
11    MR. SNIDOW:  Okay.  Do you want
12 to call the judge now to resolve this
13 dispute?
14    MR. MURDICA:  It's your -- it's
15 your problem.  You agreed not to do
16 it.  It's not my problem.  It's your
17 problem.
18    MR. SNIDOW:  I'm not calling
19 the judge.  I'm just marking my
20 exhibits.
21    MR. MURDICA:  We are not going
22 to have exhibits that were created by
23 you.  I made that very clear.  And I
24 said if there was any dispute over it,
25 go to the judge then.  I never would

Page 550

¹ have allowed it to proceed if I knew
² you were going to walk back your
³ agreement.
⁴       MR. SNIDOW:  All right.  Let's
⁵ call the judge then.
⁶       MR. MURDICA:  Yeah, call the
⁷ judge.
⁸       MR. SNIDOW:  No, I don't want
⁹ to call the judge.  I want to mark my
¹⁰ exhibits.
¹¹       MR. MURDICA:  Well, it's your
¹² problem.  They're not -- you agreed
¹³ not to have them be exhibits.  They're
¹⁴ not going on the transcript.
¹⁵       MR. SNIDOW:  Yeah.  And I have
¹⁶ some videos to mark, which I assume
¹⁷ you'll object to.
¹⁸       MR. MURDICA:  I think you
¹⁹ should mark the entire thing, if
²⁰ you're going to mark a video.
²¹       MR. SNIDOW:  That, I'm actually
²² fine with, but it's going to take some
²³ time.
²⁴       MR. MURDICA:  Okay.
²⁵       MR. SNIDOW:  Do you want me to

Page 551

¹ mark the whole thing?
²       MR. MURDICA:  The videos?
³       MR. SNIDOW:  Yeah.
⁴       MR. MURDICA:  Yeah.
⁵       MR. SNIDOW:  That, I can do.
⁶       MR. MURDICA:  That would be the
⁷ reasonable thing to do.
⁸       MR. SNIDOW:  Okay.
⁹       MR. MURDICA:  Just like not
¹⁰ going back on an agreement.
¹¹       MR. SNIDOW:  And what I'm going
¹² to do is, I'll mark the snips, and
¹³ then I'll mark the whole thing.  So
¹⁴ you'll have -- you can call them .1,
¹⁵ .2, whatever.  They're part of the
¹⁶ full exhibit, but you'll have them.
¹⁷       All right?
¹⁸       MR. MURDICA:  Sure.
¹⁹       Okay.  So are we going to
²⁰ proceed now?  You're not marking them,
²¹ so --
²²       MR. SNIDOW:  I marked them.
²³       MR. MURDICA:  No, you didn't.
²⁴ You didn't.
²⁵       MR. SNIDOW:  Look, see.

Page 552

¹       MR. MURDICA:  You agreed not
² to.  It's not -- it's not happening.
³ That's totally unprofessional.
⁴       MR. SNIDOW:  You can call the
⁵ judge.
⁶       MR. MURDICA:  They won't be
⁷ part of the transcript because there
⁸ was already an agreement in front of
⁹ an officer of the court.
¹⁰       MR. SNIDOW:  Yeah.  You told me
¹¹ there was some rule against it; we
¹² looked into it, there's not, so...
¹³       MR. MURDICA:  Look at what you
¹⁴ said on the transcript and what I
¹⁵ said.
¹⁶       MR. SNIDOW:  You said that was
¹⁷ against the rules --
¹⁸       MR. MURDICA:  Okay.  It doesn't
¹⁹ matter.  You agreed to it.  It's not
²⁰ part of the record.
²¹       Okay.  Let's continue.
²²       MR. SNIDOW:  Are you scared of
²³ them?  Are you frightened of them?
²⁴ Why don't -- yeah.  Why don't want
²⁵ them be part of the record?  They were

Page 553

¹ exhibits that we used with the
² witness.
³       MR. MURDICA:  They're things
⁴ that you created.  They're things that
⁵ you created.  They're not accurate,
⁶ and they're not appropriate exhibits.
⁷ And that's why you agreed to not call
⁸ the judge then when I told you you
⁹ could have called the judge.
¹⁰       I'm not going to argue with you
¹¹ anymore.  They're not exhibits.  You
¹² agreed for them to not be exhibits,
¹³ and you're not walking back an
¹⁴ agreement.  That's -- I mean, that's
¹⁵ just pathetic.
¹⁶       All right.
¹⁷       MR. SNIDOW:  You think that was
¹⁸ respectful?
¹⁹       MR. MURDICA:  I don't think
²⁰ it's respectful in the context of this
²¹ litigation for you to make an
²² agreement in the first hour of a
²³ deposition and then walk it back at
²⁴ the end of the deposition.
²⁵       MR. SNIDOW:  I really don't

1   think I made an exhibit {sic}.  I
2   said -- all I said is I'll take it
3   off.  That's all I said.  I didn't say
4   I'm never marking these.  I didn't
5   say, oh, yeah, you're totally right.
6   I said, I'll take it off.
7          MR. MURDICA:  You can go read
8   it and see if you -- see if that was a
9   mootable of character.
10          (Pinto-Martin Exhibits 632,
11   633, 634, 635, 636, 637, 638, 639,
12   639.1, 639.2, 639.3, 639.4, 639.5,
13   639.6 and 639.7 marked for
14   identification.)
15          CROSS-EXAMINATION
16   QUESTIONS BY MR. MURDICA:
17   Q.    All right.  Are you ready to
18   proceed, Doctor?
19   A.    Sure.
20   Q.    All right.  So let's make a
21   note of when we're starting.
22       I'm just going to ask you a
23   couple of questions about your examination
24   today.
25   A.    Okay.

1   Q.    Counsel for plaintiffs asked
2   you about different confounding issues across
3   the body of literature.
4       Do you remember that?
5   A.    I do.
6   Q.    Okay.  And did the individual
7   studies each have elements of confounding
8   that were or were not accounted for?
9   A.    Yes, and I tried to describe
10   that.  The set of confounders that the
11   various cohort studies included vary, but
12   they -- there are things that are included in
13   some and not others, including, for example,
14   maternal alcohol use and smoking, comorbid
15   medical conditions, body mass index of the
16   mother, stress during pregnancy, such things
17   like that.
18       But, again, they vary in terms
19   of which ones controlled for which, so I
20   didn't want to try to make a general
21   statement about it.
22   Q.    You were asked questions about
23   Exhibit 605, which is a Judicial Reference
24   Manual?
25   A.    Right, which I had never seen

1   before, right.
2   Q.    And my question was going to
3   be, have you ever seen that before?
4   A.    No.  I didn't -- I didn't know
5   what it was for or where it came from.  I
6   tried to make that clear.
7   Q.    Do you use that in your
8   practice in any way?
9   A.    No.  As I said, I've never seen
10   it before, and I don't know how it's used.
11   Q.    Okay.  And you were asked a
12   bunch of questions on a particular sentence,
13   I think it was from there, about whether a
14   small sample size renders something
15   inconclusive or actually negative.
16   A.    Uh-huh.
17   Q.    Do you remember those
18   questions?
19   A.    I do.
20   Q.    And my question for you is
21   this:  Whether a study in the acetaminophen
22   body of literature that you reviewed is
23   inconclusive or negative, does it matter to
24   your analysis -- your conclusion on causation
25   here?

1   A.    It does not have an impact on
2   my conclusion on cause -- causation.
3   Q.    Why not?
4   A.    Because my conclusion on
5   causation is based on the body of evidence
6   and all of the factors that we've described
7   to date that are relevant to the methodologic
8   issues within the literature.
9   Q.    You were asked --
10   A.    I think it's here.  Are you
11   looking for it?
12   Q.    No.  I'm looking for the next
13   one, trying to save time here.
14       You were asked a question about
15   Exhibit 615, the Ricci study.
16       Do you remember --
17   A.    I do.
18   Q.    -- seeing that earlier?
19   A.    I do, yeah.
20   Q.    And do you remember counsel
21   asked you questions about negative
22   meta-analyses?  Remember that question?
23   A.    Uh-huh.
24   Q.    Okay.  Was Ricci even able to
25   do a meta-analysis on the autism data?

Confidential - Subject to Protective Order

1   A.    No, and stated as much because
2  of the heterogeneity of the studies.
3   Q.    Okay.  Do you recall being
4  asked about Exhibit 609, which I'm putting in
5  front of you, that is an Olsen and Liew
6  study?
7   A.    I do.
8   Q.    And counsel went back to that a
9  few times today if you recall.
10       Do you remember that?
11  A.    Yes, I recall.
12  Q.    Okay.  And what was the year of
13  that?
14  A.    I believe it was 2016.
15  Q.    And --
16  A.    Yeah.  2017 it says here.
17  Yeah.
18  Q.    And counsel showed you that for
19  his proposition that the confounders had --
20  that Liew allegedly thought the confounders
21  had been accounted for.
22       Do you remember that?
23  A.    That is what this opinion seems
24  to indicate, yes.
25  Q.    Okay.  Have you seen, since you

1  wrote your report, e-mails containing
2  Dr. Liew's views on confounders that he wrote
3  only three months ago?
4  A.    I have.
5  Q.    And what did you see Dr. Liew
6  say about confounders?
7  A.    That he was worried about
8  genetic confounding.  I don't know that he
9  used the word "worry," concerned maybe, and
10  that he noted that there had been a
11  significant drop in the reported association
12  once genetics were controlled for, and that
13  he himself now had data, PRS data, that he
14  was going to use to address the question of
15  confounding by genetics.
16  Q.    Okay.  And have you seen that
17  data published by Dr. Liew yet?
18  A.    No, and as I've said, I would
19  be anxious to see it.
20  Q.    Okay.  And did the DN -- did
21  the Danish National Birth Cohort that he
22  published his studies from have genetic data?
23  A.    No, they did not control for
24  genetic confounding.
25  Q.    Okay.  You were shown

1  Exhibit 610 as well, which is the Gou study.
2  A.    Uh-huh.
3  Q.    Do you recall counsel showing
4  you that as well earlier today?
5  A.    I do.
6  Q.    All right.  And you were -- you
7  were asked some questions about it, but I
8  want to point you to something that counsel
9  didn't show you or ask you about --
10  A.    Okay.
11  Q.    -- which is the second sentence
12  of the conclusion, on page 205.
13  A.    "Nevertheless, caution is
14  advised when considering whether the
15  association is causal because potentially
16  unidentified or inadequately -- inadequately
17  controlled confounding factors in the
18  included studies may have unpredictable
19  effects on the overall association."
20       And I have said that
21  repeatedly.  Like a meta-analysis is only as
22  good as the data on which it relies, and we
23  know that those data have potential
24  confounders and biases.
25  Q.    And that was right in

1  Exhibit 610 that counsel asked you other
2  questions about, right?
3  A.    That's correct.
4  Q.    Okay.  You were asked a lot of
5  questions about, you know, were the
6  science -- you were asked a lot of questions
7  about whether you disagreed with certain
8  publication authors.
9       Do you remember those
10  questions?
11  A.    I do.
12  Q.    And you were asked about
13  whether, you know, they were trying hard,
14  doing a good job, was it reasonable for them
15  to publish their results.
16       Do you remember questions like
17  that?
18  A.    I do.
19  Q.    Okay.  For the conclusion that
20  you made that the body of literature that you
21  reviewed that was addressed here today does
22  not support a causal relationship between
23  in utero acetaminophen exposure and the
24  outcomes of ADHD and/or autism, can
25  reasonable epidemiologists disagree on that

Page 562

1  conclusion?
2      A.   I don't think a reasonable
3  epidemiologist could disagree with my
4  conclusion based on this body of evidence
5  that there is no cred -- credible support for
6  a causal association between prenatal
7  acetaminophen use and ASD or APAP -- ASD or
8  ADHD.
9          And so the answer is no.
10     Q.   Dr. Pinto-Martin, you issued a
11 report, maybe at this point it's almost two
12 months ago, right?
13     A.   Yeah, end of June, I believe.
14     Q.   Okay.
15     A.   End of July.
16     Q.   Since then, there's been
17 numerous expert depositions of plaintiffs'
18 experts and the defendants' experts, and the
19 ones that have happened to date, have you
20 reviewed their transcripts?
21     A.   I have.
22     Q.   Okay.  Is there anything you've
23 seen since you've issued your report, either
24 in those deposition transcripts or from
25 counsel today, that has changed your views

Page 563

1  and your conclusions in your report in any
2  way?
3      A.    Absolutely not.
4          MR. MURDICA:  Okay.  I don't
5  have anything further.
6          MR. SNIDOW:  Okay.
7          REDIRECT EXAMINATION
8  QUESTIONS BY MR. SNIDOW:
9      Q.    Very briefly.
10         You mentioned some e-mails
11 with Dr. Liew.
12         When did you look at those?
13     A.    In the last two weeks, I would
14 say.
15     Q.    And it's your testimony that he
16 said that genetic confounding was likely?
17         MR. MURDICA:  Objection to the
18 form.
19         THE WITNESS:  I don't recall
20 the specifics of the e-mail, but the
21 gist of the message was that he had
22 seen results where genetic confounding
23 was illustrated, was imagining it was
24 the Gustavson study, and was concerned
25 about that as a potential confounder

Page 564

1  in this purported association, and
2  that he himself was going to look at
3  it in data that he now had that had
4  PRS scores.
5  QUESTIONS BY MR. SNIDOW:
6      Q.    But did he say that genetic
7  confounding was likely in those e-mails?
8          MR. MURDICA:  Objection.
9  Objection to the form.
10         THE WITNESS:  I don't believe I
11 said that, and I don't believe -- I
12 don't remember the specifics of the
13 e-mail.  I just looked at it and --
14 QUESTIONS BY MR. SNIDOW:
15     Q.    Well, you talked about it with
16 Mr. Murdica just now, right?  You talked
17 about those e-mails?
18     A.    Not just now.  I saw the
19 e-mails back whenever they showed -- when the
20 lawyers showed them to me.  I read them.  I
21 don't -- I didn't retain that.  I don't
22 remember precisely what he said.
23         What I can say is that his --
24 the message that he was putting forth is a
25 very different message from the opinion piece

Page 565

1  that you showed me, the Olsen and Liew piece.
2          And in addition, he's written
3  another opinion piece, another commentary,
4  that is also -- talks about the noncausal
5  back door that can be opened if there's a
6  genetic factor that both increases the use of
7  APAP and increases the risk of ASD or ADHD.
8          So I just point it out because
9  I think a thoughtful epidemiologist should
10 consider that, and he is, and I hope he
11 publishes on it.
12     Q.    You said "and he is"?
13         MR. MURDICA:  Objection.
14         THE WITNESS:  Well, he says
15 he's going to --
16 QUESTIONS BY MR. SNIDOW:
17     Q.    No, he is a thoughtful
18 epidemiologist?
19     A.    If he -- if he proceeds with
20 what he said he was going to do, which is to
21 use new evidence to address prior
22 associations that he's reported to see if
23 there's confounding, I think that is a --
24 that shows integrity.
25         MR. SNIDOW:  Okay.  I have no

Confidential - Subject to Protective Order

Page 566

1 further questions.

2      MR. MURDICA:  All right.  Thank

3 you.

4      VIDEOGRAPHER:  The time is

5 5:48 p.m., and we are off the record.

6 (Deposition concluded at 5:48 p.m.)

7      − − − − − − −

Page 568

INSTRUCTIONS TO WITNESS

2 DATE: September 11, 2023

3      Please read your deposition over

4 carefully and make any necessary corrections.

5 You should state the reason in the

6 appropriate space on the errata sheet for any

7 corrections that are made.

8      After doing so, please sign the

9 errata sheet and date it.  You are signing

10 same subject to the changes you have noted on

11 the errata sheet, which will be attached to

12 your deposition.

13      It is imperative that you return

14 the original errata sheet to the deposing

15 attorney within thirty (30) days of receipt

16 of the deposition transcript by you.  If you

17 fail to do so, the deposition transcript may

18 be deemed to be accurate and may be used in

19 court.

Page 567

CERTIFICATE

2      I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
3 Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
4 of the examination, Jennifer Pinto-Martin,
Ph.D., MPH, was duly sworn by me to testify
5 to the truth, the whole truth and nothing but
the truth.
6
     I DO FURTHER CERTIFY that the
7 foregoing is a verbatim transcript of the
testimony as taken stenographically by and
8 before me at the time, place and on the date
hereinbefore set forth, to the best of my
9 ability.

10      I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
11 nor counsel of any of the parties to this
action, and that I am neither a relative nor
12 employee of such attorney or counsel, and
that I am not financially interested in the
13 action.

14

16      CARRIE A. CAMPBELL,
17      NCRA Registered Diplomate Reporter
Certified Realtime Reporter
18 California Certified Shorthand
Reporter #13921
19 Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
20 #084-004229
Texas Certified Shorthand Reporter #9328
21 Kansas Certified Court Reporter #1715
New Jersey Certified Court Reporter
22 #30XI00242600
Louisiana Certified Court Reporter
23 #2021012
Notary Public
24 Dated:  September 11, 2023

25

Page 569

ACKNOWLEDGMENT OF DEPONENT

2

3

4      I_____, do
5 hereby certify that I have read the foregoing
pages and that the same is a correct
6 transcription of the answers given by me to
the questions therein propounded, except for
7 the corrections or changes in form or
substance, if any, noted in the attached
8 Errata Sheet.

10

11

12 _____

13 Jennifer Pinto-Martin, Ph.D., MPH   DATE

15 Subscribed and sworn to before me this

16 _____ day of _____, 20 _____.

17 My commission expires: _____

18

19 Notary Public

Confidential - Subject to Protective Order

Page 570

1

  _ _ _ _ _ _ _
  ERRATA
  _ _ _ _ _ _ _

2

3  PAGE  LINE CHANGE

4  _____  _____  _____

5  _____  _____  _____

6  _____  _____  _____

7  _____  _____  _____

8  _____  _____  _____

9  _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24

25

Page 571

1

  _ _ _ _ _ _ _
  LAWYER'S NOTES
  _ _ _ _ _ _ _

2

3  PAGE  LINE

4  _____  _____  _____

5  _____  _____  _____

6  _____  _____  _____

7  _____  _____  _____

8  _____  _____  _____

9  _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24

25

**WORD INDEX**

**< $ >**
**$150,000** 35:9
**$750** 35:2

**< 0 >**
**0025** 174:15
**00966** 3:9
**05** 173:6, 14 174:9, 10, 15
**07** 424:13
**07960** 6:9
**08** 88:25
**084-004229** 567:20

**< 1 >**
**1** 4:16 14:6 52:4, 17, 19 53:15, 22 54:10 56:3 57:8 73:25 161:1 170:21 172:6 210:22 262:19, 21, 25 263:19 367:3, 16 414:12, 13 425:25 463:21, 22 477:13 551:14
**1.0** 58:11, 20 59:11 262:9
**1.02** 161:3
**1.06** 463:24

**1.09** 160:21
**1.1** 53:18, 19
**1.11** 160:23
**1.19** 260:22, 24
**1.2** 53:17 64:10 384:5
**1.20** 205:14 384:4 385:20
**1.21** 384:4, 5 385:17
**1.24** 205:4, 11
**1.25** 52:19
**1.3** 266:11 267:12 494:2 513:3
**1.5** 52:8, 17 63:6, 18 369:13
**1.55** 407:13
**1.6** 52:17
**1:22-md-03043** 1:6
**1:22-md-03043-DLC** 1:4
**1:54** 337:7, 8
**10** 84:9, 13, 16 109:1 170:21 296:3 495:16
**10:10** 112:8
**100** 60:10 64:23 65:1 71:2 73:25 74:7 82:12 83:1, 3 96:19 143:11 166:19

**167**:15
**174**:23
**256**:1
**300**:23
**301**:11
**446**:25
**451**:15
**480**:11
**100,000** 365:3
**1000** 237:12
**1001** 326:13, 16
**10017** 3:15 7:3
**10019** 6:21
**10019-9601** 8:3
**10036** 7:15
**101** 383:3 395:1
**102** 10:18
**10440** 5:8
**107** 10:18
**1075** 516:19, 23
**11** 6:14 110:24 170:21 567:24 568:2
**11:11** 191:20, 21
**11:23** 191:23
**1105** 6:21
**11758** 2:17
**1185** 7:14
**12** 170:22 248:21
**12,000** 447:9
**12,080** 446:3
**12:19** 264:4,

**5**
**12:54** 264:7
**1200** 6:3 7:9
**126** 2:16
**12th** 6:3 7:2, 9 248:13
**13** 170:22 171:1 172:12 373:9
**13202** 8:13
**134** 331:17 425:25
**137** 341:23
**13921** 567:18
**1395** 215:21, 23 328:8
**1396** 221:3
**14** 331:2
**15** 88:22 296:3 331:6
**150** 2:10
**157** 10:20
**16** 10:5, 11 185:18, 23 331:7, 11
**17** 149:19, 23 185:24
**1704** 425:22
**1710** 425:5
**1711** 423:13
**1715** 567:21
**1717** 1:13
**179** 292:4
**17th** 8:7
**18** 331:10
**185** 369:3
**186** 10:24 478:4

**19** 12:10 185:20 539:9
**190** 275:21
**1901** 2:23
**19103** 8:8
**1950s** 302:16
**1958** 11:15 297:15, 22 331:2
**1960s** 291:14 302:16
**1964** 288:5 289:22 290:7
**1965** 539:10
**1997** 205:8

**< 2 >**
**2** 10:3 14:6 53:7 157:22, 24 159:13 170:21 364:21 365:9 367:2 414:6 451:25 465:21, 25 486:22 487:22 510:3 551:15
**2.0** 47:7 52:20 64:10, 17, 21 205:23 206:18 368:4
**2.02** 446:19

Confidential - Subject to Protective Order

**2.14** 479:*13, 15*
**2.26** 478:*19*
**2.3** 53:9
**2.4** 512:*1*
**2.47** 446:*18*
**2.86** 478:*23* 482:*10*
**2:07** 337:*10*
**20** 63:*13, 14* 569:*16*
**200** 4:*21* 35:7
**20004-1275** 6:*4* 7:9
**200-2900** 4:*3*
**20036** 5:*14*
**2011** 128:*15* 131:*10, 17, 25*
**2012** 128:*15*
**2013** 107:*20* 373:*3*
**2014** 77:7 82:7, *21, 24* 85:9 95:*12, 15* 185:*17* 383:7
**2016** 21:*16, 25* 22:5 23:*15, 16, 20* 24:*11, 18* 25:*23* 233:6 260:7, *8, 16* 534:*15* 558:*14*
**2017** 185:*22, 25* 215:*16* 226:*12* 383:7 558:*16*

**2019** 155:*25* 339:*14, 18, 24* 368:*19* 373:*3*
**202** 5:*14* 6:*4* 7:*10*
**2020** 186:*22, 23* 187:*2* 188:*1* 361:*19* 477:*25*
**2021** 22:*16* 26:*11, 12* 27:*4, 15* 28:*16, 21* 29:*14* 169:*14* 378:*11* 429:*20*
**2021012** 567:*23*
**2022** 12:*10*
**2023** 1:*6* 15:6 320:2 567:*24* 568:2
**2029** 5:*21*
**204** 229:*4*
**205** 560:*12*
**20s** 69:*22*
**20th** 268:*15* 279:*8*
**21,000** 430:8
**21,448** 429:*22*
**210** 3:*9*
**21052** 8:*18*
**212** 2:*17* 7:*15* 8:*3*
**213** 8:*24*
**215** 8:*8* 11:*1*
**218** 4:*10*

**220-9600** 5:*14*
**227** 5:2
**228** 11:*4*
**233** 11:6 361:*23*
**236** 11:9
**236-1313** 6:*15*
**23rd** 72:*17*
**247** 11:*15*
**25** 63:*13* 175:*15* 447:*23* 545:*22*
**250** 8:2, *13*
**252** 104:6
**253** 103:*23* 437:*14, 19*
**254** 103:*23*
**255** 104:7
**26(a)(2** 10:*11*
**262** 103:*17, 21, 22, 23* 104:2
**2650** 5:2
**27** 297:*3* 425:*25* 428:*19*
**273** 11:*19*
**28** 423:*23* 426:2
**284-3880** 5:*22*
**289-1313** 6:*4* 7:*10*
**29** 168:*20, 24* 446:*11* 447:*19* 450:*17, 23* 452:*25* 466:2
**297** 11:*15*

**2-by-2** 426:*11*

**< 3 >**
**3** 53:*16* 157:*21* 170:*21* 365:4 494:*3*
**3.0** 47:7
**3.62** 479:*17*
**3:04** 402:4, 5
**3:18** 402:7
**30** 8:7 11:*15* 63:*14* 547:*1* 568:*15*
**300** 3:*20* 4:2 5:*21* 450:*20*
**300-plus** 365:4
**3043** 1:*3* 15:*11*
**30XI00242600** 567:*22*
**310** 5:*22* 512:4
**312** 2:*11* 5:3
**315** 8:*14*
**317** 6:*15*
**318-1200** 7:*21*
**319** 11:*18*
**3238** 362:*17*
**330** 11:*23*
**3300** 7:*20*
**34** 366:*18* 432:*3* 450:*25*
**34108** 4:*22*

**344** 12:*1*
**35** 355:*3*
**36** 259:*16* 378:4 451:*25*
**360** 12:*3*
**36104** 4:*11*
**372** 12:4
**372-4800** 5:*3*
**376** 12:*9*
**38** 451:7
**380** 450:*15, 21* 451:*19* 452:4, *11, 20*
**389** 12:*11*
**39** 451:7
**390** 7:2
**3-year-old** 424:2

**< 4 >**
**4** 170:*21* 513:*11*
**4.1** 511:*20*
**4:14** 473:*13, 14*
**4:26** 473:*16*
**4:57** 514:7, *8*
**40** 427:*8*
**401** 4:*16*
**407** 12:*11*
**40-minute** 81:*8*
**410** 3:*8*
**4100** 2:*10*
**415** 7:*21* 12:*14*
**42** 245:*19, 23*
**421-2800** 2:*17*

**422** 12:*16*
**425** 3:*15*
**426** 402:*11,
21*
**434** 204:*23,
25*
**436** 205:*16*
**440** 2:*23*
**444** 12:*20*
**445** 210:*19*
**447-0500**
3:*9*
**449** 13:*1*
**46204** 6:*15*
**468-8000**
8:*3*
**469** 446:*11,
15* 447:*21*
**4717** 4:*2*
**4740** 3:*20*
**474-2911**
8:*14*
**477** 13:*3*
**4900** 1:*14*
**495** 13:*7*
**495-2333**
2:*24*
**499** 86:*22*

**< 5 >**
**5** 17:*20*
170:*21*
174:*9*
261:*9*
387:*4, 5*
479:*3*
527:*16*
**5:11** 514:*10*
**5:48** 566:*5,
6*
**50** 7:*20*
202:*24*
369:*10*

**50/50** 175:*6,
9*
**500** 6:*9*
49:*10, 23*
50:*18* 104:*7*
**501** 87:*9, 11*
**50s** 268:*8,
15, 21* 540:*8*
**51** 381:*21*
**52** 381:*20*
**520-6639**
4:*17*
**523** 5:*13*
**525** 13:*11*
**542-8000**
8:*24*
**55** 202:*14*
**554** 10:*6*
13:*13, 15, 20,
23* 14:*1, 5, 6*
**555** 6:*3*
7:*9* 8:*23*
**556-2100**
7:*15*
**55th** 8:*2, 23*
**56** 546:*4*
**563** 10:*7*
**56th** 2:*16*
**58** 416:*23*
417:*4, 11, 13*
**59** 382:*20*
**590** 104:*10*
**593** 275:*20*
**595** 512:*7*
**597** 104:*11*
**599** 104:*9,
10, 13, 17*

**< 6 >**
**6** 1:*6* 15:*5*
170:*21*
464:*3, 4*
465:*1, 9*

**546:*3*
**6.4** 345:*23*
**60,000**
381:*13*
**600** 8:*13*
10:*11* 16:*9,
13, 15* 17:*21*
**601** 10:*13*
19:*2*
**602** 10:*14*
85:*19* 86:*13*
**603** 10:*14*
96:*23* 97:*3*
**604** 10:*17*
**605** 10:*18*
102:*8, 12*
305:*14*
306:*3*
437:*5, 7*
555:*23*
**606** 10:*18*
107:*4, 8*
**60606** 2:*10*
5:*3*
**606-2996**
6:*22*
**607** 10:*20*
157:*6, 9*
**608** 10:*24*
186:*11, 16*
**609** 11:*1*
215:*10, 15*
328:*5*
512:*7* 558:*4*
**60s** 69:*23*
540:*8*
**610** 11:*4*
228:*19, 24*
560:*1* 561:*1*
**611** 11:*6*
232:*25*
233:*4* 326:*6*

**612** 11:*9*
236:*10*
326:*4*
**613** 11:*15*
247:*7*
248:*23*
326:*6*
**614** 11:*15*
297:*7, 12*
**615** 11:*18*
319:*23*
320:*3*
557:*15*
**617** 11:*19*
273:*1, 5*
330:*22, 25*
**618** 11:*23*
330:*9*
**619** 12:*1*
344:*12, 16*
**62** 103:*16,
19*
**620** 12:*3*
360:*21*
361:*12*
**621** 12:*4*
372:*23*
373:*3*
**622** 12:*9*
376:*20, 24*
**623** 12:*11*
389:*5, 8*
402:*10*
**624** 12:*11*
407:*1, 5*
**625** 12:*14*
415:*13, 21*
**626** 12:*16*
422:*25*
423:*4*
**627** 12:*20*
444:*20*
445:*7*

**628** 13:*1*
449:*20*
450:*3*
**629** 13:*3*
477:*17, 22,
25* 481:*12*
**630** 13:*7*
495:*5, 11*
**631** 13:*11*
525:*20, 24*
548:*16*
**632** 13:*13*
554:*10*
**633** 13:*15*
554:*11*
**634** 13:*15*
554:*11*
**635** 13:*15*
554:*11*
**636** 13:*20*
554:*11*
**636-7459**
5:*9*
**637** 13:*20*
554:*11*
**638** 13:*23*
554:*11*
**639** 13:*23*
554:*11*
**639.1** 14:*1*
554:*12*
**639.2** 14:*1*
554:*12*
**639.3** 14:*1*
554:*12*
**639.4** 14:*5*
554:*12*
**639.5** 14:*6*
554:*12*
**639.6** 14:*6*
554:*13*
**639.7** 14:*6*
554:*13*

Confidential - Subject to Protective Order

**64** 415:*9, 12*
417:*6*
**64112** 3:*21*
4:*3*
**646** 3:*16*
6:*22* 7:*3*
**65** 82:*4*
**66** 361:*15*
389:*16*
**67** 6:*9*
**68** 366:*19*
432:*4, 5*
**6th** 2:*16*

**< 7 >**
**7** 17:*24*
57:*6* 97:*22*
99:*4*
170:*21*
240:*4, 8, 23*
427:*24*
428:*1, 4, 9,*
*12, 18, 25*
429:*4*
445:*25*
450:*10*
**70** 82:*4*
97:*23* 98:*3*
99:*5*
165:*13*
423:*25*
**700** 204:*9*
425:*23*
**701-1100**
3:*21*
**713** 2:*24*
**72** 451:*24*
**73** 369:*2*
**731** 409:*3*
**732** 411:*15*
**733** 408:*10*
**735** 413:*15*

**74** 164:*13*
165:*13*
429:*16*
**740** 416:*7*
**741-5220**
2:*11*
**746-2000**
7:*3*
**75** 165:*13*
**75231** 5:*8*
**76** 430:*20*
431:*2*
434:*9, 10*
**77002** 2:*23*
**775-6101**
6:*10*
**7th** 6:*21*

**< 8 >**
**8** 54:*4*
170:*21*
223:*23*
459:*7, 9*
**8.2** 345:*21*
**8:42** 1:*15*
15:*6*
**8:51** 28:*7, 8*
**8:53** 28:*10*
**80** 96:*6, 7, 9*
98:*21*
100:*10, 11*
**800** 4:*11, 22*
451:*19*
**800-and-**
**something**
429:*14*
**805** 425:*24*
**810** 6:*21*
**816** 3:*21*
4:*3*
**818** 8:*19*
**837-5151**
3:*16*

**838** 157:*16*
**844** 5:*9*
**85** 10:*14*
**859** 567:*19*
**872-3500**
4:*22*
**877.370.DEP**
**S** 1:*23*
**898-2034**
4:*11*

**< 9 >**
**9** 170:*21*
321:*15*
324:*5, 10*
373:*6, 9*
**9:28** 76:*10,*
*11*
**9:32** 76:*13*
**9:59** 112:*5,*
*6*
**90** 74:*16*
83:*4* 84:*7*
96:*5, 6*
98:*4, 21*
100:*10, 11*
**90067-2904**
5:*22*
**90071** 8:*23*
**913** 373:*12*
**91367** 8:*18*
**916** 4:*17*
**93** 42:*18*
177:*17*
**9328** 567:*20*
**94** 42:*18*
**94111** 7:*20*
**950** 5:*8*
**95864-7273**
4:*16*
**96** 10:*14*
**967** 233:*8*
235:*19*

**97** 205:*10*
**973** 6:*10*
**979-1000**
8:*8*
**999** 4:*21*
**999-2232**
8:*19*

**< A >**
**a.m** 1:*15*
15:*6* 28:*7,*
*8, 10* 76:*10,*
*11, 13* 112:*5,*
*6, 8* 191:*20,*
*21, 23*
**AA** 360:*24*
**AAA** 85:*22*
**AbbVie**
12:*1*
**ABC**
185:*18, 23*
**abilities**
411:*22*
**ability**
218:*8*
419:*8*
501:*20*
567:*9*
**able** 19:*25*
40:*10*
114:*19*
137:*2*
146:*16*
152:*20*
159:*4*
177:*12*
192:*1*
220:*20*
337:*23*
358:*20, 25*
359:*2, 4, 7*
362:*18, 21*
363:*11*
364:*2, 3, 10*

365:*5, 11*
366:*21*
368:*11*
376:*16*
392:*6*
397:*22*
401:*9*
412:*15*
418:*10*
420:*18*
429:*11*
436:*24*
437:*1*
453:*12, 22*
469:*20*
532:*19*
539:*4*
557:*24*
**ABNEY** 3:*5*
**abortifacient**
115:*13*
**above-**
**mentioned**
242:*5*
**absence**
67:*4*
180:*15*
343:*15*
**absent**
393:*3*
507:*23*
**absolutely**
51:*2* 66:*2*
154:*18*
270:*15, 17*
346:*23*
485:*11*
541:*6* 563:*3*
**abstract**
321:*17*
**abstracts**
407:*21*
**abundance**
305:*6*

**academic**
34:*16*
**Academy**
43:*10*  44:*5*
**accept**
67:*17*
252:*13*
**accepted**
545:*13*
**access**
515:*22, 24*
**account**
55:*21*
138:*4*  517:*4*
**accounted**
555:*8*
558:*21*
**accounting**
454:*11*
**accumulate**
497:*9*
519:*19*
**accurate**
17:*17*
165:*22*
260:*10*
262:*4*
263:*16*
267:*10*
325:*22*
426:*16*
430:*10, 11*
453:*4*
553:*5*
568:*18*
**accurately**
150:*4*  510:*2*
**accused**
234:*6*
**ACETAMIN**
**OPHEN**
1:*3*  11:*1, 2,*
*4, 6, 11, 18*
12:*20*  13:*1,*

*5, 9, 22*  15:*9*
21:*13*
22:*14*
23:*17*
24:*19*
25:*25*
26:*14*  27:*6,*
*16*  121:*5*
126:*10*
141:*4, 24*
152:*9*
155:*11*
156:*8*
157:*24*
161:*24*
187:*7*
188:*23*
192:*3*
193:*4*
199:*13, 14*
212:*19*
223:*15*
230:*17*
233:*14, 17*
237:*16*
238:*3, 8*
241:*14*
249:*7*
250:*7*
253:*15*
291:*25*
299:*5*
317:*3*
321:*7, 23*
322:*25*
323:*23*
327:*1*
329:*11*
332:*20*
334:*17, 25*
339:*2, 8*
350:*5*
351:*5, 6*
374:*23*

378:*8*
446:*3, 10*
478:*9*
480:*21*
484:*22*
486:*24*
487:*6, 8, 24*
488:*3, 10, 17*
489:*23*
496:*19*
497:*18*
498:*6*
505:*18*
506:*22*
507:*11, 25*
508:*14, 16*
509:*21, 25*
510:*1, 8*
517:*2, 20*
518:*24*
519:*4*
520:*5, 13*
521:*7*
523:*11*
524:*5, 25*
535:*15*
536:*6*
556:*21*
561:*23*
562:*7*
**acetaminoph**
**en/Yes**
13:*20*
**achievement**
303:*4, 20*
**acid**  14:*6*
118:*8, 10, 14,*
*22*  119:*2, 17*
120:*1, 5*
121:*12, 13,*
*21, 24*
122:*12, 14*
123:*18*
128:*20*

132:*10*
136:*10, 14,*
*20*  137:*5, 14*
138:*1*
344:*16, 20,*
*25*  347:*24*
348:*11*
349:*5*
350:*3, 9*
352:*4, 13, 17*
354:*17*
355:*5, 12*
356:*22*
357:*20*
358:*5, 21*
359:*5, 15, 23*
361:*11*
363:*3, 13, 20,*
*22*  364:*7*
368:*3, 11, 22*
369:*10*
374:*18*
376:*7*
545:*17*
547:*7*
**acknowledge**
273:*7*
296:*20*
325:*4*
**acknowledge**
**d**  348:*6*
454:*18*
**acknowledgi**
**ng**  231:*18*
455:*19*
461:*1*
505:*10*
**ACKNOWL**
**EDGMENT**
14:*13*  569:*1*
**acontextual**
360:*20*
**acquire**
544:*3*

**acquiring**
92:*18, 21*
94:*13*
296:*22*
**act**  277:*15*
**acting**
502:*18*
**action**  87:*6*
221:*22*
567:*11, 13*
**actions**  88:*3*
**active**  268:*1*
**activities**
36:*2, 4*
**activity**
420:*15*
**actual**
89:*16*
92:*17, 20*
110:*5*
220:*15*
267:*18*
296:*21*
305:*9*
307:*21*
310:*1*
317:*2*
333:*22*
340:*15*
375:*10*
418:*11*
428:*22*
462:*24*
464:*23, 24*
487:*20*
**acute**  353:*7,*
*21*
**add**  234:*13*
418:*18*
498:*4*
**added**
312:*16*
415:*20*

| | | | | |
|---|---|---|---|---|
| **addition** | **adds** 267:7 | 243:7, 15 | 464:5 | **adjusting** |
| 79:10, 19 | 435:25 | 244:6 | 465:2 | 172:5 |
| 82:16 | 505:13 | 250:21 | 472:2, 5 | 324:17 |
| 334:22 | 538:22 | 251:7 | 478:13, 17 | **adjusts** |
| 362:16 | **adequate** | 255:3, 24 | 480:19 | 469:23 |
| 565:2 | 323:21 | 256:6 | 481:21 | |
| **additional** | 335:14 | 280:24 | 487:3 | **administered** |
| 138:21 | **ADHD** 11:2 | 321:7, 24 | 488:11 | 517:1 |
| 139:8 | 12:4 13:15 | 326:23 | 492:1 | **administratio** |
| 329:9 | 18:12, 19 | 327:1 | 495:16, 25 | **n** 517:15, 17 |
| 359:10, 11, | 22:7, 15, 22 | 332:20 | 498:2, 6 | **admit** 189:1 |
| 13 432:5 | 26:1, 14 | 336:3, 7, 23 | 501:19 | 433:5 |
| **address** | 27:6, 17 | 338:23, 25 | 510:9, 14 | **advance** |
| 175:23 | 28:17 | 339:10, 12, | 512:4, 8 | 419:21, 25 |
| 225:4 | 70:23 71:1 | 22 340:5 | 523:12 | **adverse** |
| 236:3 | 117:1 | 341:3 | 524:5, 25 | 342:3 |
| 246:5 | 119:19 | 347:8, 9, 19, | 529:25 | 346:18 |
| 296:8 | 129:4 | 25 349:17 | 534:19 | 347:18 |
| 354:19 | 135:24 | 350:5, 12 | 535:14 | 423:24 |
| 356:12 | 136:21 | 351:7, 16 | 536:22 | 499:12 |
| 381:8 | 137:5, 14, 19 | 352:11 | 545:7 | **advised** |
| 387:8 | 138:13 | 357:12, 16 | 561:24 | 334:14 |
| 392:3 | 141:24 | 358:13 | 562:8 565:7 | 335:9 |
| 399:3 | 146:20 | 359:16 | **adjust** | 336:8 |
| 426:3 | 150:8 | 362:19 | 362:1, 7, 18, | 343:8 |
| 504:13 | 151:25 | 365:2 | 23 409:4 | 560:14 |
| 505:3, 7 | 154:25 | 368:2, 21, 22 | 483:7 | **advisor** |
| 518:21 | 155:6 | 369:11, 23 | 486:4 | 43:21 |
| 525:24 | 156:7 | 373:20 | 505:22 | **Advisory** |
| 526:6 | 159:12, 13, | 379:13 | 508:13 | 11:21 12:9 |
| 527:24 | 18 163:15, | 382:13 | **adjusted** | 33:20 |
| 529:10 | 18 164:15 | 387:9 | 224:6 | 377:12, 14 |
| 559:14 | 166:22 | 398:21 | 322:14 | **affect** 470:1 |
| 565:21 | 167:18 | 399:12, 17 | 383:22 | 536:5 |
| **addressed** | 176:10, 24 | 400:1 | 446:18, 19 | 537:15 |
| 489:18 | 178:2, 9 | 409:19 | 482:16, 21 | **affirmative** |
| 561:21 | 197:6, 11, 20, | 420:11, 24 | 484:18 | 158:17 |
| **addresses** | 21 198:4, 13 | 421:20 | 486:23 | **age** 15:21 |
| 504:1 | 230:11 | 424:7, 25 | 505:17 | 89:23 91:6, |
| 518:20 | 237:16, 25 | 426:25 | 507:3, 10 | 16 94:10 |
| **addressing** | 238:8, 23 | 451:23 | 508:22 | 306:19 |
| 116:2 | 239:2, 7, 24 | 457:21, 22 | 510:4 | 307:3, 8, 11 |
| 436:21 | 241:15 | 458:15, 16 | | 308:10, 14, |
| | 242:13 | 462:17 | | 19 309:23, |

Confidential - Subject to Protective Order

*24*  310:*7, 15,*
*18*  311:*1, 22*
312:*3, 10, 16,*
*20, 21, 22*
482:*22*
**agent**  31:*4*
32:*25*  33:*9*
38:*7*  51:*11,*
*14, 17*  124:*5*
125:*15*
137:*18*
304:*21*
**agents**
30:*13*  85:*2,*
*8*  89:*16*
**aging**
293:*14*
**ago**  88:*17,*
*22*  128:*17*
129:*2*
301:*25*
544:*17*
559:*3*
562:*12*
**agree**  43:*14*
50:*2*  60:*9*
61:*15*  64:*2*
67:*8*  69:*20*
70:*14, 17, 25*
71:*22*
73:*20*
74:*25*  79:*9,*
*18*  83:*5*
85:*10*  89:*5*
91:*21*
93:*22*
95:*16, 22*
97:*18*  98:*1,*
*2*  99:*10*
100:*2, 16, 19*
101:*4, 14*
105:*12*
108:*25*
109:*19*

111:*11*
120:*9*
122:*25*
123:*11*
148:*18, 21*
150:*3, 19*
155:*1*
166:*19*
167:*15, 23*
179:*14*
188:*18*
190:*6*
199:*11*
208:*23*
214:*19*
216:*8, 12, 19*
217:*9*
220:*6*
221:*14, 22*
222:*9*
225:*7*
232:*5*
241:*4*
243:*4, 11, 22*
245:*8*
251:*3*
262:*7*
268:*14, 25*
269:*6*
271:*15, 17*
277:*3*
280:*6*
300:*20*
304:*2*
309:*1*
313:*21, 22*
314:*14*
319:*4, 9*
320:*23, 25*
332:*16*
333:*7, 16, 18*
342:*5*
343:*21*
346:*21*

347:*4, 13, 14*
355:*21, 25*
360:*16*
375:*20, 21*
378:*24*
382:*2*
390:*9*
393:*4*
403:*13, 25*
409:*7*
413:*20*
416:*15*
434:*12, 18*
437:*18*
438:*25*
439:*2*
440:*8, 17, 22*
441:*2, 4*
449:*11*
451:*15*
453:*8, 10*
455:*16*
460:*20*
470:*3*
474:*13*
475:*7*
476:*13*
481:*22*
483:*17*
484:*6*
486:*17*
490:*3*
492:*23*
495:*19*
497:*22*
503:*7*
509:*3, 14*
523:*20, 25*
525:*11*
526:*5, 16*
529:*24*
531:*24*
547:*20*

**agreed**
98:*17*  99:*3,*
*23*  545:*24*
548:*20*
549:*1, 15*
550:*12*
552:*1, 19*
553:*7, 12*
**agreement**
550:*3*
551:*10*
552:*8*
553:*14, 22*
**agruner@du**
**anemorris.co**
**m**  8:*7*
**ah**  141:*6*
221:*2*
331:*20*
**Ah-ah-ah**
62:*8*
**ahead**
18:*22*  21:*8*
27:*21, 23*
48:*4*  49:*17*
257:*11*
281:*8*
303:*18*
386:*12, 17*
401:*17*
503:*23*
518:*18*
546:*10*
547:*4*
**ah-ha**  356:*9*
**Aid**  8:*14*
**aim**  328:*16*
**air**  41:*18*
116:*3, 6, 11,*
*12*  123:*20*
**al**  10:*14, 23*
11:*6, 9, 14,*
*19, 24*  12:*4,*

*8, 14, 19, 22*
13:*7, 11*
**Alabama**
4:*11*
**albeit**
238:*10*
**alcohol**
287:*3*
288:*18*
482:*25*
555:*14*
**Alemany**
11:*14*
325:*25*
326:*7*
**alive**  45:*18*
**allegedly**
558:*20*
**Alleles**
10:*22*
**ALLEN**  4:*5*
**Alliance**  7:*5*
**allow**  254:*3*
255:*15*
413:*22*
454:*11*
**allowed**
284:*12, 14*
550:*1*
**ALSPAC**
160:*13*
237:*22*
**alter**  85:*11*
87:*4*  88:*1, 6*
**altering**
87:*5*  88:*3*
**alternative**
276:*11*
**AMANDA**
2:*7*
**amanda.hunt**
**@kellerpost**
**man.com**
2:*7*

amateur
546:8
amateurish
546:22
547:3
American
42:5  489:21
Americas
7:14
amount
490:17
analgesic
334:6, 16
analogous
407:23
analogy
545:11, 17
547:8
analyses
144:6
222:4
229:10
467:12
analysis
26:24  29:3
64:6  144:5
162:3
175:1
177:20
178:2
189:21
218:13
236:3
243:23
244:1
245:10
246:7, 9
269:17
276:9
311:21
316:14
326:22
328:23
338:12, 23,

24  343:14
354:20
364:11, 21
387:20
392:17, 25
393:11
395:7
407:16, 24
419:25
420:25
426:6, 9
431:21
432:1, 6
436:5
439:16, 17
440:2
445:10
446:2
447:7
456:9, 15
457:23
461:2
463:17
464:11, 12
466:8, 10, 11,
12  467:13,
16  468:8
469:8
470:11, 20
483:10
510:4, 5
511:1
516:25
517:9, 11
526:8
539:5
540:17, 19
556:24
analytes
495:23
analytic
269:11
analytical
216:10

229:9
328:13, 15
analyze
138:17
323:19
453:20
461:22
analyzed
171:25
323:5
analyzing
501:19
504:7
and/or
561:24
anecdotal
522:8, 12, 18
anecdote
523:14, 22
Angeles
5:22  8:23
angles  225:5
animal
195:5, 11, 13
545:4
ANNE  8:6
answer
21:8  23:1
26:19
37:24
38:18
39:25
46:16  48:5,
7, 9, 21
49:18
50:11, 14
51:8  52:6
54:15
56:14, 21
60:23  67:3
79:13  92:1,
5  101:20
106:18
116:10

122:4, 8, 19,
20, 21
123:17
124:3
136:25
142:11
158:19
172:23
180:10
195:12
232:12
253:14
291:17
301:15
302:15
311:8
316:7
318:9
324:2
336:3
343:23
344:23
358:8
372:6
386:14
393:24
394:4
399:4
435:3
443:3
464:22
473:19
474:4
486:15
509:10
511:4
518:15
528:6, 11
542:9
548:5, 6
562:9
answered
24:25
27:20

66:17
116:1
124:2
164:8
190:5
317:23
338:1
393:22
462:12
521:12
537:11, 23
answering
153:1
371:13
answers
84:20
234:16
273:17
569:5
Antiepileptic
12:6
Antiseizure
12:3
anxiety
258:3
286:5
397:3
398:9
427:10
449:4
anxious
397:15
427:14
559:19
anybody
192:21
471:19
anymore
255:11
321:18
432:12
553:11

**anyway**
323:6
417:19
**APAP**
13:13, 23
28:17
138:12
139:1
141:16
142:6, 21
143:11
144:15
146:19
147:8, 25
148:9, 23
150:13
151:8
152:14
155:3, 7, 19
158:18
159:19
166:21
167:17
169:21
178:9, 12
194:20
203:15
210:3
230:10
239:22
243:15
244:3
251:8, 11
255:24
257:13
259:19
263:2, 3
277:8
280:23
281:16
285:23, 24
286:4, 19, 24
315:8
331:25

334:7
336:22
337:14
338:7, 8
342:4, 12
343:7
357:11
358:1
369:21
378:20
379:2, 12, 15,
20  381:18
382:2, 13
392:10
396:17, 25
398:8, 13
426:24
430:19
442:25
447:9, 18
462:16
464:3
471:14
472:5
498:1
499:11
501:17
506:12
510:16
511:12, 14,
19  529:25
532:4
534:18
536:20
539:8
544:25
562:7  565:7
**apart**
283:21
**apologize**
372:22
435:11
**apparent**
532:20

**appear**
280:15
321:24
322:3
435:21
495:24
526:2
**appearance**
31:13
**APPEARAN
CES**  10:3
15:14
**appeared**
32:15
511:13, 15
**appears**
138:18
214:3
**appended**
402:15
**appendices**
16:21
428:23
**appendix**
428:12, 13,
16  449:24
455:5, 8
**application**
109:22
548:3
**applied**
188:25
189:4
191:1
218:13
222:5  531:4
**applies**
195:12
342:25
**apply**  18:11
26:23  29:2
101:1, 2
106:2
145:20

174:20
395:19
528:16
529:11
**applying**
100:19
101:5
**appointment**
43:17
**appreciate**
192:17, 22,
23  200:6
234:22
**approach**
47:17, 18
310:11
409:6
490:6
495:3
531:6, 7
**approached**
225:5
**appropriate**
109:7
110:15
174:1
553:6  568:6
**appropriatel
y**  174:6
266:1
**approve**
253:9
**approved**
348:15
**approving**
253:3
**approximatel
y**  266:21
309:8
**arc**  391:23
453:25
457:11
**Arch**  1:13

**area**  75:16
147:18
191:11
251:22
348:19, 21
360:11
382:7
**areas**  91:14
**argue**
162:22
223:6
324:25
342:15
386:25
553:10
**argued**
268:16
421:10
**argues**
401:14
421:4, 5, 13
**arguing**
281:12
298:14
299:22
381:10
420:20
**argument**
277:4, 21
280:22
281:4
284:5
300:12
544:9
**arises**  336:7
**arm**  60:11
**Arthur**
225:21
**article**
264:23
321:10
331:15
333:4
390:15

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| articles | 359:*15* | 303:*25* | asking 47:*6* | aspect |
| 144:*17* | 362:*19* | 315:*3* | 48:*25* 50:*3,* | 262:*13* |
| 503:*5* | 379:*13* | 317:*13* | *17* 51:*3* | assess |
| artificial | 387:*9* | 382:*11* | 62:*11* | 115:*23* |
| 63:*1* | 420:*23* | asked 24:*10,* | 63:*23* 64:*1,* | 153:*10* |
| ASC 238:*4,* | 421:*20* | *24* 28:*13* | *3* 69:*21* | 177:*13* |
| *8* 326:*23* | 424:*7* | 37:*2, 21* | 81:*6* 82:*11* | 220:*20* |
| 327:*1* | 426:*25* | 50:*25* | 90:*17* | 269:*10, 18* |
| ascertained | 478:*15* | 75:*18* | 101:*23* | 320:*11* |
| 60:*20* | 479:*12* | 76:*18* | 121:*11* | 413:22 |
| ascertainmen | 487:*3, 25* | 77:*13* | 126:*4* | 430:*18* |
| t 294:*15* | 488:*11* | 78:*14* | 130:2 | 526:*17* |
| ASD 12:*3* | 492:*1* | 132:*16,* | 132:7 | assessed |
| 13:*15* | 498:2 | 139:22 | 142:*2, 8* | 115:*17* |
| 18:*12, 19* | 501:*18* | 142:*13* | 163:*5* | assessing |
| 19:*6* 20:*19* | 523:*12* | 146:*25* | 165:*12* | 101:*15* |
| 21:*6, 10, 14* | 529:25 | 147:*18* | 170:*3* | 105:*4* |
| 22:*4* 23:*17,* | 562:7 565:7 | 158:*16* | 190:*10, 11* | 390:*24* |
| *22, 23* 24:*19* | ASD/ADHD | 167:*12* | 212:*7, 13, 16* | 514:*13* |
| 25:*24* 37:*7* | 15:*10* | 193:*18* | 214:*5, 17* | 526:*12* |
| 70:*19* 71:*1* | ASD-ADHD | 260:*15* | 219:*4* | assessment |
| 98:*4* 117:*1* | 1:*3* | 324:*14* | 223:*21* | 115:*9* |
| 127:*14* | ASHLEY | 329:*21* | 228:*16* | 121:*3* |
| 137:*19* | 2:*4, 6* | 335:*11* | 231:*4* | 145:2 |
| 141:*17, 24* | ashley.barrie | 344:22 | 241:*5* | 181:*9* |
| 142:*6, 22* | re@kellerpos | 350:*2, 4, 23* | 265:*8* | 199:*6* |
| 157:*24* | tman.com | 360:*12* | 273:*11* | 217:*17* |
| 164:*3* | 2:*4* | 393:*21* | 311:*9* | 250:*13* |
| 176:*9* | ashley.keller | 441:*16, 23* | 319:*9* | 251:*11* |
| 178:*4, 13* | @kellerpost | 444:*18* | 335:*18* | 350:*7* |
| 255:*3* | man.com | 457:*20, 21* | 338:*7, 11* | 376:*18* |
| 256:*6* | 2:*6* | 458:*5* | 343:*3* | 419:*7* |
| 260:*21, 24* | aside 50:*3,* | 474:*1* | 347:*13* | 448:*7, 17* |
| 261:*16* | *8* 61:*16* | 521:*11* | 353:*11, 12* | 544:2 |
| 263:*4* | 89:*4* | 524:*11* | 359:*19* | assign |
| 315:*8* | 105:*11* | 534:*18* | 394:*8* | 133:*17, 22* |
| 332:*20* | 107:*9* | 555:*1, 22* | 406:*7* | 253:*20* |
| 347:*19, 24* | 148:*7* | 556:*11* | 441:*3* | assigned |
| 349:*16* | 164:*12* | 557:*9, 14, 21* | 448:*9* | 515:*16* |
| 350:*5* | 211:*6* | 558:*4* | 509:*5* | assignment |
| 351:*7* | 247:*6* | 560:*7* | 535:2 | 350:*1* |
| 352:*10* | 255:22 | 561:*1, 4, 6,* | 536:*14* | 442:*8, 12* |
| 357:*12* | 256:*25* | *12* | 537:*5* | 443:*16* |
| 358:*12* | 257:*1* | | | |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| **associated** | 28:*16* | 217:*12* | 396:*12, 14* | 541:*21* |
| 116:*6* | 29:*14* 38:*3,* | 218:*16* | 397:*22* | 559:*11* |
| 125:*3* | *4, 20, 24* | 220:*14* | 405:*11* | 560:*15, 19* |
| 147:*13* | 39:*1* 40:*12* | 222:*6, 11, 14,* | 406:*2, 6* | 562:*6* 564:*1* |
| 150:*12, 24* | 41:*10* | *17* 230:*9, 22* | 410:*11* | **associations** |
| 151:*4, 8* | 46:*22* | 233:*13* | 412:*17* | 48:*20* |
| 152:*13* | 47:*24* 49:*4,* | 237:*15* | 413:*3* | 112:*11* |
| 155:*3, 6* | *6, 13* 50:*18,* | 238:*3* | 414:*10* | 238:*7* |
| 156:*6, 8* | *20, 22* 54:*12,* | 241:*14* | 416:*11* | 326:*21* |
| 158:*18* | *23* 68:*3* | 252:*15* | 417:*23* | 334:*5* |
| 159:*18* | 69:*6* 89:*20* | 255:*23* | 418:*7, 12* | 342:*14* |
| 168:*4* | 91:*5* | 256:*5, 16* | 424:*10* | 384:*21* |
| 192:*3* | 113:*23* | 257:*25* | 425:*6* | 386:*1* |
| 195:*22* | 115:*21* | 261:*5* | 432:*10, 13* | 387:*25* |
| 198:*18* | 120:*1, 24, 25* | 266:*22* | 433:*7, 25* | 459:*12* |
| 199:*1, 4* | 121:*9, 25* | 292:*7, 17* | 438:*17* | 461:*14* |
| 200:*23* | 122:*13, 15* | 304:*10, 12,* | 439:*6* | 476:*14* |
| 220:*23, 24* | 127:*25* | *24* 305:*13* | 445:*22* | 477:*2, 6, 9* |
| 250:*25* | 130:*12, 14,* | 309:*25* | 453:*13* | 486:*23* |
| 264:*13* | *18* 136:*20* | 310:*19* | 454:*20* | 489:*17* |
| 276:*23* | 138:*2, 12, 20* | 311:*16* | 462:*16* | 565:*22* |
| 277:*7* | 141:*23* | 312:*11, 12,* | 471:*14* | **assume** |
| 307:*20* | 143:*23* | *17, 24* 313:*4* | 472:*4, 18* | 119:*21* |
| 309:*9* | 148:*9, 23* | 314:*4* | 476:*21* | 120:*18* |
| 337:*14* | 151:*12* | 315:*25* | 477:*12, 14,* | 146:*18* |
| 339:*3* | 155:*14* | 320:*12* | *16* 486:*4* | 296:*21* |
| 341:*3* | 157:*19* | 321:*6, 22* | 488:*16* | 313:*23* |
| 356:*11* | 158:*1, 8, 21* | 325:*9, 16* | 489:*21* | 416:*15* |
| 396:*16* | 159:*2, 3, 14* | 332:*19* | 493:*17* | 550:*16* |
| 397:*23* | 162:*22* | 333:*6* | 494:*14* | **ate** 264:*19* |
| 398:*1, 11, 13,* | 163:*7* | 334:*7, 21* | 495:*14, 20* | **athletics** |
| *25* 399:*6, 7,* | 167:*8, 17* | 340:*4* | 498:*5* | 287:*5* |
| *17, 19* | 170:*16* | 342:*16* | 499:*11* | **attached** |
| 426:*25* | 177:*22* | 346:*16* | 503:*9* | 14:*10* |
| **Association** | 178:*8, 12, 17,* | 347:*16* | 504:*2* | 568:*11* |
| 10:*20* 11:*4,* | *20* 179:*5, 17* | 349:*21* | 516:*24* | 569:*7* |
| *6* 12:*4* | 180:*4, 16* | 356:*7* | 523:*11* | **attempt** |
| 13:*3, 7, 13* | 181:*13, 17* | 357:*23* | 525:*16* | 162:*15* |
| 18:*6, 19* | 203:*3, 14* | 358:*1* | 526:*14* | 395:*19* |
| 23:*16, 24* | 208:*21* | 359:*25* | 527:*11, 14,* | 517:*11* |
| 24:*5, 18* | 209:*16, 21* | 365:*10* | *19* 528:*3, 23,* | 545:*6* |
| 25:*25* | 212:*2, 3, 13* | 372:*9* | *25* 529:*25* | **attempted** |
| 26:*13, 22, 25* | 213:*19* | 382:*13* | 530:*10* | 316:*23* |
| 27:*5, 8, 16* | 216:*18* | 386:*20* | 540:*25* | 322:*19* |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 368:*15* | **attribute** | 251:*4, 10, 15* | 91:*9, 22* | *25*  197:*11,* |
| 398:*19* | 179:*19* | 262:*11* | 92:*25* | *15, 19, 23* |
| 502:*11* | 180:*5, 23* | 263:*8* | 93:*18, 20, 23* | 198:*7, 12* |
| **attempts** | **attributed** | 318:*19* | 96:*4, 8, 14* | 199:*14* |
| 162:2 | 293:*4* | 319:*11, 17* | 98:*21* | 203:*15* |
| 226:7 | **audience** | 327:*7, 18* | 100:*10, 11* | 226:*19* |
| 227:*1, 10* | 99:*17* | 328:*1* | 108:*12* | 230:*11* |
| **attendees** | 148:*16* | 329:*16* | 111:*7* | 253:*16* |
| 377:22 | 251:*16* | 332:*12, 17* | 112:*12* | 255:*24* |
| **attention** | **Audio** | 333:*9* | 113:*15* | 259:*19* |
| 11:5  12:*20* | 98:*23* | 334:*1* | 114:*9* | 264:*13* |
| 13:2 | 111:*25* | 344:*6* | 115:*17, 22* | 277:*8* |
| 276:*10* | **August** | 348:*5, 10* | 117:*5, 18, 25* | 280:*24* |
| 278:*4* | 11:*15* | 370:*24* | 118:*6* | 281:*16* |
| 435:*4* | **author** | 378:22 | 119:*19* | 282:*25* |
| 436:*21* | 108:*1* | 409:*3* | 120:*6* | 283:*4* |
| **attention-** | 111:*19* | 413:*16* | 121:*21* | 294:*19, 24* |
| **deficit** | 187:*17, 22,* | 453:*14* | 125:*19* | 295:*23* |
| 11:*12*  13:6 | *23*  238:*19* | 470:*16* | 127:6, *14* | 296:*1, 12* |
| **Attention-** | 329:*24* | 488:*12, 19* | 129:*3, 12* | 335:*3, 20* |
| **Deficit/Hype** | **authored** | 491:*9* | 135:*4, 20* | 337:*15* |
| **ractivity** | 88:*17*  143:*3* | 498:*14, 16* | 141:*5* | 338:8, *9, 13,* |
| 12:7  13:*10* | | 502:*10, 18* | 143:*12* | *21, 22, 23* |
| 384:*18* | **authoritative** | 504:*17, 24,* | 146:*20* | 339:*3, 9* |
| **attenuate** | 43:*20* | *25*  516:*13* | 147:9, *14, 25* | 347:*10* |
| 392:7 | 388:*15* | 561:*8* | 148:*10, 24* | 350:*11* |
| 412:*16* | **authority** | **authorship** | 150:8, *13, 20,* | 352:*23* |
| 453:*13* | 258:7  519:*3* | 183:*12* | *24*  151:*4* | 353:*4* |
| **attenuated** | **authorized** | **Autism** | 152:*10, 12,* | 356:*8* |
| 414:*10* | 268:*5* | 10:*14, 18* | *13, 20*  153:*6,* | 357:*14* |
| 463:*19* | **authors** | 11:*11* | *15, 22* | 396:5, *8, 14,* |
| **attenuates** | 26:*20, 23* | 12:*13*  13:*6,* | 155:*15* | *16, 22*  397:7, |
| 439:7 | 143:*17* | *13*  14:*5* | 156:*11, 13* | *23*  398:*2, 5,* |
| **attenuation** | 162:*14* | 23:*23* | 157:*20* | *12, 25*  399:*6* |
| 365:6, *11* | 171:*3, 5* | 30:*12*  33:2 | 158:*14, 19* | 400:*15, 19* |
| 366:*21* | 182:*9* | 36:9, *12, 19* | 159:*12* | 401:*5* |
| 432:7 | 183:*7* | 73:*16, 20* | 161:*25* | 407:*14* |
| 454:*20* | 193:22 | 74:6  75:*1,* | 162:*10, 12,* | 409:*18* |
| 456:*11* | 230:*14* | *3, 6*  79:*11* | *24*  163:*7* | 420:*7* |
| 464:*15, 16* | 235:*11* | 82:*18*  83:*7,* | 177:*14* | 457:22 |
| 466:*4* | 238:*14* | *10, 17, 21, 24* | 192:*3* | 471:*15, 19* |
| **attorney** | 243:9, *12* | 84:*4, 6, 7* | 193:*4* | 474:*14* |
| 567:*10, 12* | 244:22 | 89:6, *10* | 194:*20* | 475:*1, 5, 10,* |
| 568:*15* | 245:*3* | 90:*20, 25* | 196:*20, 22,* | *19*  476:*3* |

Confidential - Subject to Protective Order

485:*23*
486:*17*
535:*24, 25*
536:*2, 4*
537:*14*
544:7
545:6
557:*25*
561:*24*
**autoimmune**
87:*2*
**automaticall**
**y**  280:*14*
**available**
102:*22*
276:*3*
323:*18*
346:*14*
412:*10*
503:*4*
504:*14*
**Avenue**
3:*15, 20*
4:*2, 16*
5:*13*  6:*21*
7:*2, 14*
**average**
374:*12*
375:*2, 4, 11*
**award**
183:*17, 23,*
*24*  184:*4*
186:*24*
188:*2*
**Awards**
10:*24*
183:*22*
**aware**
35:*25*  40:*3*
160:*8*
183:*14*
221:*5*
291:*9*
358:*19, 24*

363:*20*
368:*3, 10*
**awareness**
94:*9*
295:*25*
296:*4*  544:*5*

**< B >**
**babies**
115:*18*
496:*8*  507:*1*
**baby**  22:*17*
115:*16*
257:*23*
496:*13, 17*
517:*25*
518:*2, 4, 24*
519:*5*
520:*2, 6*
521:*24*
**baby's**
517:*23*
519:*20*
520:*14*
521:*7*
**Baccarelli**
203:*2*
546:*14*
**Baccarelli's**
203:*22*
226:*3*
**back**  32:*2*
69:*7*
164:*11*
184:*21*
204:*4*
208:*17*
301:*17*
331:*1*
341:*19*
351:*24*
387:*5*
395:*25*
403:*2*

427:*17*
459:*18*
539:*20*
544:*15*
550:*2*
551:*10*
553:*13, 23*
558:*8*
564:*19*
565:*5*
**background**
352:*9, 10*
357:*13, 16*
358:*11*
**bad**  43:*6*
139:*18*
141:*7*
239:*10, 15*
502:*18*
**Baker**
13:*11*
492:*16, 19*
493:*9*
495:*8, 12*
497:*12*
505:*16*
507:*4*
509:*4, 24*
516:*15*
518:*8, 10, 19*
519:*21*
521:*9*
548:*16*
**band**  161:*4*
**Barely**  97:*6*
161:*9*
264:*24*
**BARLOW**
4:*13*
**Barnes**  1:*13*
5:*17*  6:*1, 6,*
*13*  7:*1, 5*

**barrier**
381:*24*
382:*3*
**BARRIERE**
2:*4*  326:*4*
450:*2*
499:*21*
500:*1, 10, 17*
524:*11*
**based**  22:*17*
36:*25*
59:*23*
82:*21*  94:*3*
99:*18*
114:*15*
117:*23*
133:*6, 21*
137:*11*
140:*16*
141:*20*
142:*11, 15,*
*20*  143:*2, 22*
147:*20*
168:*7*
169:*20*
177:*7*
191:*7*
195:*11*
202:*11*
214:*13*
216:*6, 25*
217:*17*
229:*23*
241:*16*
246:*16*
256:*3*
258:*8*
260:*8*
261:*16*
262:*19*
278:*16*
314:*15*
316:*24*
342:*23*

366:*15*
372:*9, 11*
381:*23*
418:*6, 9*
420:*25*
426:*14*
430:*15*
442:*20*
462:*23*
473:*18*
517:*12*
545:*9*
557:*5*  562:*4*
**basic**
196:*17*
280:*16*
306:*13*
442:*2*
**basically**
68:*24*
74:*19*
364:*20*
467:*15*
537:*2*
**basics**
441:*13*
**basing**
231:*17*
**basis**
133:*18, 23*
137:*25*
159:*5*
251:*25*
252:*4, 7*
256:*14*
280:*16*
283:*3*
316:*13*
375:*13*
387:*1*
439:*22*
458:*14*
460:*25*
461:*20*

471:*6*
540:*24*
**Bauer**
11:*24*
330:*13*
331:*15*
341:*20*
378:*14*
**BBBB** 204:*3*
**Beach** 4:*21*
**bearing**
239:*6*
**BEASLEY**
4:*5*
**beginning**
242:*19*
346:*4*
430:*17*
**begins** 18:*2*
104:*25*
109:*4*
110:*25*
346:*11*
**behalf**
15:*24* 30:2
31:*20*, 22
32:*11*, *16*
36:*18*, *24*
**behavior**
420:*14*, *15*
424:*12*, *25*
**Behavioral**
11:*8*
233:*15*, *17*
423:*25*
**behaviorally**
545:*9*
**behaviors**
398:*7*
**belief** 70:*19*
301:*18*
494:*17*
**believe**
17:*17*

18:*13*
30:*11*, *21*, *23*
31:7 32:*5*
41:*8* 64:*16*
79:*12*
83:*20*
87:*17*
93:*16* 94:*3*
98:*21*
101:*11*
108:*4*
116:*13*
119:*18*
122:*24*
128:*14*
143:*13*
160:*12*
172:*17*
178:*10*
179:*11*
181:*16*
183:*10*
188:*24*
189:*3*
190:*4*
191:*7*
195:*20*
213:*18*
218:*19*
242:*11*
244:*10*
247:*20*
251:*5*
268:*3*
279:*1*, *20*, *23*
283:*14*
293:*3*
294:*12*
295:*13*
300:*7*
301:*1*, *4*
310:*5*
337:*25*
349:*10*

352:*19*
362:*24*
393:*10*, *23*
394:*12*
452:*4*
475:*13*
525:*14*
531:*5*
535:*21*
539:*6*, *15*
545:*7*
547:*7*
548:*2*
558:*14*
562:*13*
564:*10*, *11*
**believed**
129:*7* 301:*3*
**benefit**
138:*23*
**best** 22:*23*
74:*11*
82:*21*
117:*12*
153:*17*
183:*23*
218:*5*, *7*
260:*7*
271:*9*
301:*23*
319:*20*
325:*5*
435:*3*
499:*9*, *19*
501:*20*
503:*3*
504:*4* 567:*8*
**best-
designed**
21:*10*
22:*13*
261:*17*
**betas** 422:*12*

**better** 18:*4*
87:*18*
249:*20*
250:*1*
308:*14*
433:*24*
490:*6* 539:*7*
**better-
designed**
18:*18* 19:6
20:*19* 21:*6*
22:2, *8*, *21*
24:*4*, *11*
25:*6*, *23*
26:*6*, *9*
260:*15*
261:*4*, *14*
**beyond**
179:*18*
180:*5*, *22*
191:*6*
268:*11*
476:*9*
**bias** 46:*24*
48:*15* 49:*5*
50:*16* 51:*7*
65:*10*, *13*
67:*12*, *15*
68:*12* 70:*4*
112:*15*
113:*20*
115:*3*, *24*
116:*19*
138:*4*
176:*11*
181:*9*
222:*4*, *23*
225:*4*
252:*10*
257:*14*
272:*1*
295:*12*
328:*16*
332:*6*, *24*

336:*11*
350:*25*
387:7, *13*
410:*4*
433:*8*
448:*19*, *24*
**biased**
61:*13*
295:*9*
527:*17*
**biases**
143:*19*
171:*8*
222:*16*
560:*24*
**Bible**
388:*22*
389:*4*
**Big** 8:*24*
46:*10*
59:*24*
317:*8*
364:*12*
380:*14*
389:*14*
446:*13*
491:*3*
**biggest**
303:*4*
**billing** 35:*2*
**binary**
418:*25*
**binder**
509:*16*
**bio** 545:*9*
**biological**
195:*9*, *10*, *14*,
*19*, *22*, *25*
242:*5*, *12*
243:*5*
342:*12*
343:*10*, *12*,
*17* 490:*5*
502:*11*, *12*

538:*16*
541:*10*, *12*
542:*4*, *6*
543:*14*
**biologically**
541:*21*
**biomarker**
492:*10*
496:*3*
**Biomarkers**
13:*5*
486:*24*
491:*21*, *24*
492:*9*
**biostatisticia
n** 182:*13*
183:*2*, *4*
**biostatisticia
ns** 47:*16*
**bipolar**
354:*9*
**Birth** 21:*15*
316:*13*
454:*15*
483:*3*
496:*16*
559:*21*
**bit** 74:*23*
248:*17*
266:*11*
278:*2*
340:*22*
390:*10*
**black** 125:*9*
126:*5*, *6*
383:*11*, *13*
386:*6*
**blacked**
87:*14*
**blah-blah-
blah-blah-
blah** 433:*13*
**blip** 214:*8*,
*12*

**blood**
487:*24*
**blood-brain**
381:*24*
382:*3*
**blurry**
249:*14*
**blush** 490:*5*
**Board** 12:*9*
125:*5*
240:*11*
377:*12*, *14*
408:*16*, *20*,
*24*
**boards**
33:*19*, *20*
**bodies**
212:*17*
**body** 38:*25*
55:*22*
101:*6*
107:*1*
117:*11*
141:*20*
142:*2*, *12*
144:*3*, *11*
238:*21*
256:*4*
331:*24*
350:*7*, *14*
351:*25*
391:*19*
394:*13*
435:*17*
436:*1*
483:*1*
518:*1*, *3*
519:*6*, *20*
526:*13*
528:*17*
530:*17*
531:*4*
532:*1*
541:*8*

542:*20*
555:*3*, *15*
556:*22*
557:*5*
561:*20*
562:*4*
**bold** 383:*25*
**bone** 33:*11*
**BONESTEE
L** 8:*19*
**Bonferroni**
514:*16*
515:*10*, *12*
516:*5*
**book** 85:*23*
86:*3*, *5*, *10*
88:*20*
388:*10*
389:*10*
**Boots** 7:*5*
**born** 83:*24*
**Boston**
316:*12*
**bottom**
86:*22*, *24*
97:*9*
107:*25*
109:*1*, *3*
206:*7*
233:*10*
235:*19*
**bounced**
74:*22*
**bound**
165:*17*
**bounds**
189:*18*
**box** 108:*2*
321:*9*
**boy** 248:*24*
**boys** 238:*10*,
*11* 404:*23*
**Bradford**
13:*13*

100:*20*
101:*8*
109:*23*, *25*
145:*10*, *20*,
*24* 146:*7*, *9*
177:*20*
178:*2*
179:*25*
180:*14*, *17*
181:*5*
225:*25*
226:*2*, *4*
244:*18*
245:*1*, *9*, *15*
246:*2*, *4*, *7*, *8*
247:*1*
343:*14*
394:*16*
395:*19*
494:*12*
525:*24*
526:*6*, *12*
527:*24*
528:*12*
529:*3*, *10*
530:*21*
531:*11*
532:*16*
538:*13*
540:*16*
548:*3*, *18*
**Brain** 13:*11*
85:*11* 87:*5*
88:*2*, *7*
177:*10*
329:*12*
488:*5*
489:*8*
490:*9*
491:*24*
492:*13*
502:*8*
**brand**
506:*24*

**Brandlistuen**
12:*19*
229:*16*, *23*
420:*13*, *18*
422:*10*, *14*,
*22* 423:*11*
425:*20*
428:*3*
429:*6*
432:*18*
**Brandlistuen
s** 423:*5*
**brave**
453:*17*
**break**
163:*12*
164:*11*
191:*18*
192:*1*, *9*, *12*
228:*5*
259:*10*
264:*10*, *17*
265:*5*, *20*
329:*22*
336:*19*
341:*21*
401:*23*
473:*9*
514:*2*
545:*21*
546:*9*, *15*, *18*,
*23*
**breast**
496:*23*
518:*5*
520:*13*

**breastfeeding**
518:*22*
519:*4* 521:*8*
**BRENNAN**
6:*8*

Confidential - Subject to Protective Order

BRIAN 9:5
15:2
briefly
563:9
Briggs
11:15
247:12
251:9, 14
bring
427:16
542:11
547:15
broad
101:19
134:10
215:8
271:23
417:21
460:6
broader
111:7
140:21
305:8
broadly
89:13
BROWN
8:19
Bs 204:4
build 144:9
bullet 97:8
bunch
207:8
402:15
556:12
burden
478:9
480:21
487:6
BUTLER
6:17
butts 540:5, 9

< C >
C112 3:8
CAIN 8:1
calculate
485:8
calculation
176:2 451:7
California
1:18 4:16
5:22 7:20
8:18, 23
12:13
567:18
California-
Berkeley
182:16
call 20:2, 11
30:5 80:23
81:14
161:16
162:2
219:9
232:21
239:15
254:5
420:24
459:4
462:1
470:16
474:8
485:19
510:6
549:12
550:5, 6, 9
551:14
552:4 553:7
called 31:7
155:21
177:21
275:7
345:22
378:16
462:20
474:5 553:9

calling 81:7
105:5
278:3
455:23
549:18
calls 250:21
calm 25:14
Cambridge
298:6
Campbell
1:16 4:1
15:17
567:2, 16
CANAAN
7:13
cancer 41:3,
5, 10, 16, 21
68:25 69:2,
7 200:23
201:17
204:19
207:4
208:19, 22
209:22
210:9
211:2
213:14, 23
268:2, 17, 21
276:5, 12, 15,
24 278:4
280:11, 15
283:10
289:23
290:8, 18
291:12
292:11, 14
293:3, 21
294:8, 12
298:9
302:4, 17
532:6
538:21
capture
158:10

241:22
510:2
captured
30:23
259:1 452:9
captures
161:19
452:4
cardiac
515:2
care 179:19
180:5, 23
265:15
348:21
499:16
career 37:6
140:1, 15
197:18
careful
131:21
303:21
carefully
116:1
184:16
208:11
220:12
391:5
490:8
540:24
568:4
cares 407:6
Carrie 1:16
15:16
567:2, 16
cart 533:1,
16

CARTMELL
3:19
Case 1:4
16:7, 17
30:12, 15
31:2 33:4,
7 34:12

35:7
138:25
150:2
176:10
188:3
194:21
222:22
238:17
263:3
305:9
321:11
358:12, 13
390:17
407:6
422:1
475:8 487:2
case-control
69:13 403:9
Cases 1:6
32:1, 8
57:11 72:9
74:24 98:4
118:19
319:20
343:2
366:21
485:20, 21
cast 241:20
305:7, 10
casting
380:24
categorically
317:24
category
38:5
CATHERIN
E 2:15
catherine.hea
cox@lanierla
wfirm.com
2:16
causal 18:8
37:20 38:6,
7, 15 40:11,

Confidential - Subject to Protective Order

18 41:6, 9,
23 42:2
50:21
51:11, 14
68:2 69:16
70:13 85:1,
8 89:20
91:4, 19
93:20
101:15
105:5, 14
106:9, 23
110:7
113:23
114:25
116:16
117:2
118:23
119:12
120:24
121:9, 25
122:13, 15
123:1
125:15, 22,
24 127:3, 25
130:13
131:22
132:13
133:1, 4, 10,
14 134:18
135:14, 23
136:1, 8
138:1, 19
139:10, 13,
17 141:16,
23 142:5
194:6
199:8, 22
200:2, 14, 17
203:4
207:4
208:21
209:16, 21
210:25

213:4, 17, 19
214:7
216:16, 25
217:12
218:16
230:22
241:13
251:25
252:3, 7, 15
255:23
256:5, 16
305:3
315:5
317:15
325:8, 9
332:19
333:5
346:16
347:16
348:1
349:13, 21
350:19
359:12, 14,
17, 25 376:9,
11 416:12
472:20
473:1
486:10
499:10
503:9, 11
504:2
505:11
523:11
526:14
530:9
534:5
543:5, 10
545:13
560:15
561:22
562:6
**causality**
38:20 39:4,
9, 20 40:5

120:8
133:17, 22
218:10
220:2, 17
231:1, 24
**causally**
33:1 125:2
200:22
305:3
356:11
**Causation**
13:13 49:1
67:22 68:5,
13 101:25
102:5
105:7
112:16
114:1
115:3
116:19
120:2, 4, 13
121:14
123:8, 23
124:10, 15
129:22
136:21
208:6
212:14
214:22
217:5
226:12
231:5
274:25
298:15
299:23
501:8
505:1
507:22
526:7, 17
533:5, 17
534:3
535:4, 9
536:11
542:14

547:25
556:24
557:2, 5
**cause** 33:5
36:19
70:23
83:10 89:6
92:12 93:8
120:24
125:1, 19
129:12
130:9
135:3
142:22
143:12
150:20
152:12, 20
153:6
158:13, 19
194:20
250:12
256:10
276:13
302:3, 17
304:4, 6, 14,
22, 25 305:1,
9 349:4
548:6 557:2
**cause-and-
effect**
547:17
**caused**
32:21
70:19
73:21 96:9
97:23 98:4
99:5
100:11
535:14
537:6
**causes**
83:16 84:4,
6 90:20, 25
114:8

117:18, 25
121:21
137:14, 19
141:4
147:9
161:25
199:14
208:19
210:8
253:15
276:4
396:22
474:15
475:5, 18
476:9
505:14
538:1
**caution**
242:21
305:6
456:23
457:3
458:21, 24
560:13
**cautious**
469:15
**caveat**
174:11
231:16, 19
**CC** 368:17
**CDC** 295:2
476:7
**CDC-funded**
198:9
**cells** 364:21
426:12
**Center** 12:9
103:13
306:5
377:2, 5
**Central** 5:8
51:2
**Century**
5:21

268:*15*
279:8
**certain**
123:8
142:*4*
256:*1, 3, 9,*
*11* 285:*17,*
*24* 288:*13*
561:7
**certainly**
34:*13*
44:*16*
55:*20*
69:*11* 72:2
171:*19*
196:*21*
198:*3*
202:4
203:*21*
216:*23*
252:9
291:*24*
300:8
318:*25*
351:*4*
366:5
382:5
400:8
430:*14*
453:*23*
515:*18*
516:*4*
532:*3, 5*
539:6
**certainty**
141:*15, 19*
143:*11*
323:*13*
351:*8, 11*
**CERTIFICA**
**TE** 567:*1*
**CERTIFICA**
**TE**..................

..................**567**
14:*12*
**Certified**
1:*17, 19, 20*
567:*2, 3, 17,*
*18, 19, 20, 21,*
*22*
**certify**
567:*3, 5, 10*
569:*4*
**cetera**
398:*10*
419:*12*
513:*23*
**chair** 45:*7,*
*22* 46:2
461:*8*
**challenge**
317:6
**challenges**
40:*3, 4, 9*
271:*14*
356:*14*
433:*23*
**challenging**
40:6 41:*24*
116:*15*
363:*24*
419:*24*
486:*13*
**chance**
53:*24* 65:*4,*
*20, 24* 66:*3,*
*8, 20* 67:*10*
68:*12* 70:5
112:*15*
115:*3*
116:*18*
171:*13*
172:8, *14*
173:*1, 5, 9,*
*10, 13, 18*
174:8, *19, 23,*
*24* 176:*4, 11,*

*16, 19* 177:*3*
179:*20*
180:*6, 24*
181:*3, 20*
182:*1*
275:6
332:*6, 24*
337:*19*
378:*1*
438:*20*
479:*4*
514:*22*
515:9
**chancing**
173:*11*
**change** 17:*4*
78:*16* 94:9
129:9
250:*13*
251:*12*
295:*21*
313:*5, 15, 17*
314:*4*
403:*19*
505:*23*
507:*15, 20*
570:*3*
**changed**
295:*19*
296:*3*
562:*25*
**changes**
16:*24*
223:*11*
544:*4*
568:*10*
569:6
**changing**
74:*10* 99:*9,*
*13* 349:6
**chapter**
86:*2, 5, 7, 20*
88:*14*

**chapters**
102:*20*
**character**
554:9
**characteristi**
**cs** 322:*15*
398:7
**characterizat**
**ion** 242:*9*
243:*17*
263:*10*
319:5
**characterize**
54:*12*
131:*17*
133:*4*
161:*8, 13*
169:*18*
240:*15*
262:*15*
279:*13*
445:9
476:*11*
545:6
**characterize**
**d** 161:*10*
334:*25*
511:7
539:*22*
**characterizin**
**g** 239:*10*
263:*13*
**CHARCHA**
**LIS** 5:*19*
330:*24*
331:5
**chart** 59:*23*
166:*15*
167:2
322:9
395:*21, 25*
428:*21, 25*
429:*1, 2*
486:*16*

**chase**
422:*24*
**check**
165:*12*
546:2
**checked**
165:*24*
**checking**
165:*21*
450:2
**checkup**
427:*17*
**Chen**
339:*20*
**Chicago**
2:*10* 5:*3*
**child** 11:*18,*
*23* 12:*18*
21:*14* 75:5
83:*7, 24*
127:*7*
263:*4*
264:*14*
266:*14*
268:*23*
321:7, *24*
397:*7*
405:*6, 15, 16*
420:*7*
427:*16, 17*
464:*2, 25*
483:*2*
498:6
535:*23*
536:*2, 3*
537:*14*
**Childhood**
11:*8, 13*
13:*7* 206:*4,*
*6, 17* 207:*14*
209:*2*
210:*6, 8*
211:*9*
213:*14*

233:*14*, *17*
329:*12*
488:*17*
**children**
12:*4*
198:*13*
295:*5*
342:*4*
422:*1*
424:*2*
446:*2*
447:*8*, *23*
450:*16*, *22*, *25* 510:*15*
**child's**
448:*16*
535:*13*
**chose**
164:*17*
166:*4*
259:*21*
**Christensen**
12:*8*
368:*19*
369:*6* 373:*3*
**Christy**
330:*15*
495:*9*
**chromosome**
72:*17*
**cigarette**
285:*16*
287:2
288:*12*
300:*17*
301:*9*
538:*24*
540:*5*, *9*
543:22
**cigarettes**
276:*12*
285:*18*
291:*12*

538:22
539:*19*, *23*
**circumstance
s** 529:22
530:2
**citation**
318:*24*
390:*14*
494:*10*
**citations**
399:*23*
**cite** 85:*15*
157:*4*
204:*1*
229:*14*, *16*
245:22
361:*12*
368:*19*
369:7
406:*18*
415:*19*
416:*4*
431:*17*
494:*15*, *21*
**cited**
203:*24*
207:*8*
279:*6*
368:*14*
**cities** 41:*19*
**citing**
109:*15*
385:*5*, *9*, *11*
**City** 3:*21*
4:*3*
**claimed**
389:*24*
**claiming**
240:*23*
**clarified**
123:*15*
**clarify**
37:*17*
172:*11*

**class** 182:*22*,
*23* 183:*5*
**classic**
514:*25*
526:7
**classification**
513:22
**clean** 87:*19*
302:*15*
**clear** 125:*3*
163:*4*
170:*20*
194:*19*
244:*15*
262:*24*
289:*4*
305:*18*
350:*14*
549:*23*
556:*6*
**clearcut**
177:*23*
179:*18*
180:*4*, *12*, *16*
181:*13*, *17*
**cleared** 36:2
**clearly**
532:*13*
**clinical**
100:*20*
101:2
254:*4*
255:*11*, *16*
258:8, *16*
339:*23*
341:*3*
352:*16*
375:*18*
421:*20*
422:*14*
423:*20*, *21*
424:*5*, *17*, *22*
**clinician**
101:*1*

196:*21*
197:*8*, *12*
**clinicians**
247:*25*
248:*11*
251:*17*
**Clinton** 8:*13*
**clip** 14:*1*, *4*,
*5*, *6* 78:7
**clips** 80:*13*
95:*6*
**close** 158:*6*
161:*1* 453:*6*
**closer** 83:*3*
**Clue** 480:*4*
**co-authored**
86:*19*
**coauthors**
436:*25*
461:*6*
**COHEN**
6:*19*
**coherence**
243:*11*
543:*16*
**coherent**
543:*22*
**Cohort**
12:*14*, *18*
21:*15*
22:*18*
26:22
28:*23*, *24*
57:22 58:*3*
69:*11*
160:*13*
225:*10*
229:8
315:*14*
316:*13*
326:*24*
342:*1*
363:*25*
364:8, *13*

378:*25*
380:*21*
381:*12*, *16*
386:*21*, *25*
403:*9*
408:*19*
411:*19*
412:*1*, *5*
414:*10*
417:*24*
427:5, *9*
430:*15*
433:*5*, *19*
434:*20*
435:*19*, *24*
436:*23*
437:*3*
438:*18*
445:*12*
448:*3*
454:*15*
456:8
457:*16*
463:8
466:*12*
467:*17*
468:*9*, *14*
489:*23*
534:*15*
537:*3*
555:*11*
559:*21*
**cohorts**
11:*14*
216:7
237:*23*
331:*23*
342:2
381:*13*
384:*24*
387:*3* 433:*6*
**coin** 175:*5*,
*20*

colleague 204:13
colleagues 135:13 205:7
collect 379:5 380:25
collected 231:14 318:15 496:3 517:24 520:8
collecting 94:4 295:1
College 42:5
color 306:11
Columbia 44:18 45:4, 23 461:9
column 235:20 411:17
combining 390:25
come 64:17 126:5 144:20 164:11 218:21 228:12 273:11 457:11 474:9 520:24
comes 44:1 105:4 148:14 493:12 519:18
coming 232:14

246:15 528:20
commencement 567:3
commencing 1:15
comment 208:2 234:16 251:21 274:9, 14 302:12 333:1 354:21 360:4, 9 382:8
commentaries 234:5
Commentary 12:14 178:22 345:14 415:25 445:4 565:3
commented 516:13
Commerce 4:10
commission 569:17
Committee 11:21 276:2
common 276:13 278:6 280:10 364:6 389:20 494:16 495:1
commonly 250:8

communication 10:20 108:12 420:14 424:24
community 111:7
comorbid 286:6 374:2 397:16 555:14
companies 33:17, 21, 24
company 377:18
comparable 323:18
compare 212:17 456:8 466:11 512:21 513:9, 20
compared 417:23 478:21 485:9, 24
comparing 211:14 225:11 383:7 412:1 468:9
comparising 383:6
comparison 198:10, 12 222:20 329:1 383:3, 10, 22 408:3 409:4 424:8, 9 425:17

509:24 512:25 545:8
comparisons 418:18 419:19
compatible 283:21
compelling 114:18 117:10 118:19 119:7 125:11 127:2 136:16 161:21 170:1 291:11 403:25 405:9 425:19 462:25
complete 246:9 293:12
completed 427:20
completely 53:2 314:25 360:20 390:6 391:2, 8 392:18 393:3, 11 471:20 512:21, 22, 23 527:17
complicated 115:23
complies 177:18

297:4 326:14
components 153:23 471:8
composite 478:10
Conan 225:21
concede 178:16
concept 217:8 279:17 514:16 521:18
conception 72:20
concepts 53:6 58:22
concern 304:25 367:1 378:6 380:11
concerned 370:22 448:20 559:9 563:24
concerns 305:1 354:11 355:22 358:3 378:19 379:15
conclude 325:14
concluded 566:6
Concluding 418:17

**conclusion**
18:8 105:7
142:20
143:2
211:3
215:5
256:14
319:22
321:4
375:17
460:16
505:11
556:24
557:2, 4
560:12
561:19
562:1, 4
**Conclusions**
210:22
322:7
323:8, 9
324:25
333:11
459:12
469:14
470:25
497:17
502:25
532:19
563:1
**conclusive**
40:5
**conclusively**
90:18
358:20
359:4, 7
**concordance**
74:5, 14
82:3, 25
283:5
**condition**
116:23
373:21

**conditions**
116:18
117:18
123:21
374:2
487:1
555:15
**conduct**
62:17
174:1, 5
265:25
333:24
515:20, 25
**conducted**
237:22
393:10
**conducting**
343:14
**conference**
193:18
**conferences**
34:17
**confers**
400:14
**confidence**
52:18
53:14, 22
54:5, 10
56:2
160:25
161:5
165:18
168:4
211:20
408:4
417:22
463:21
465:16
466:5, 24
467:9, 14, 19
468:10, 11
469:3
511:16
512:1, 6, 12

**CONFIDEN
TIAL** 1:6

**confirmation**
462:1
**confirming**
351:10, 13
**conflict**
36:4, 6, 7, 20
543:18
**confound**
304:9
**confounded**
27:8 49:25
119:9
124:24
130:5, 14
134:23
169:2
179:3
201:1
312:13
342:14
370:17
425:12
437:2
506:3
527:18
**confounder**
29:6 125:4
150:12, 19,
23 151:4, 7
153:8, 24
154:1
155:2
159:24
198:17
199:8
200:17
220:19
270:10
277:6
280:20
304:3

305:2, 4
306:18
307:19, 22
309:9, 24
310:15
313:11, 16,
17 314:6
316:16
317:15
323:5
353:2
362:11
404:10
466:14
505:22
563:25
**confounders**
143:19
171:7
198:15
222:16
269:18
277:16
288:1
305:11
308:22
309:14, 18
315:13, 17
317:21
318:1, 14
376:15, 17
472:13
482:22
486:4
555:10
558:19, 20
559:2, 6
560:24

**Confounding**
11:9 13:15
29:5 46:24
48:15 49:4
50:3, 8, 13

51:7 65:11,
14 67:19, 20
68:13 70:5
112:15
115:3
116:19
128:1
130:22
131:1, 3
138:5, 6
150:5
151:10, 13,
24 153:21
178:18, 24
198:17
199:6
219:22
220:3, 9, 12,
13, 16 224:8
226:20
227:11
228:1, 2
231:25
232:22
252:10
257:14
268:18
269:3, 8
270:19
271:4, 5, 12
272:2
276:19, 20
281:11, 23
282:13
283:10
288:12
289:24
290:9
300:12
304:16, 21
306:10
310:2
313:6
316:15, 24

317:*10*
318:*19*
319:*12, 19*
320:*13, 17*
321:*5, 25*
322:*4, 15, 20*
324:*17*
325:*14, 18*
327:*3*
328:*16*
329:*9*
332:*6, 24*
342:*10*
350:*24*
353:*13*
354:*10*
355:*22*
356:*12*
357:*3*
358:*4, 16, 17, 20*  359:*4, 21, 22*  362:*2*
363:*7, 12*
366:*24*
368:*12*
374:*1, 5*
387:*7, 13*
392:*3*
396:*2, 10*
400:*12, 22, 25*  401:*14*
404:*1*
405:*10*
406:*9, 15*
411:*23*
412:*16*
413:*23*
414:*4*
416:*14*
421:*6, 11*
432:*9*
436:*22*
438:*10, 14, 17*  454:*12*

456:*13*
459:*13*
460:*18*
461:*15*
462:*19*
464:*14*
469:*9, 12, 17, 24*  470:*23*
471:*2, 8, 13*
472:*4, 17*
473:*3*
501:*9*
505:*1, 24*
506:*5*
517:*5*
555:*2, 7*
559:*8, 15, 24*
560:*17*
563:*16, 22*
564:*7*
565:*23*
**confounding's**  67:*15*
**confused**
45:*25*
331:*13*
524:*17*
**congenital**
83:*21*
**connection**
116:*16*
**Connectivity**
13:*11*
**consensus**
182:*6*
183:*7*
187:*18*
188:*10, 12, 21*  194:*1*
378:*11, 16*
**consent**
76:*19*

**conservative**
101:*15*
102:*6*  105:*4*
**consider**
47:*12*
48:*18*
65:*15*
106:*4*
153:*17*
220:*11*
276:*10*
292:*13*
315:*18*
343:*17*
388:*8*
390:*19*
419:*10*
457:*12*
513:*4*
518:*21*
530:*22*
540:*17*
565:*10*
**considerable**
300:*15*

**consideration**
55:*16*
119:*8*
253:*19*
317:*22*
357:*19*
371:*2*
392:*8*
394:*16, 17*
445:*14*
**considerations**  268:*6*
287:*18*
**considered**
276:*2*
291:*11, 19*
303:*3*
317:*21*

325:6
340:*11*
526:7
530:16
**considering**
33:*1*  111:*8*
148:*17*
533:*12*
560:*14*
**consisted**
351:*17*
**consistency**
55:*1, 5, 17, 19*  56:*7, 8*
106:*3*
145:*10*
207:*21*
211:*25*
212:*22*
384:*11*
388:*9*
389:*19*
390:*21*
391:*19*
392:*17*
394:*13, 17*
395:*7*
525:*5*
529:*19*
530:*11, 13, 15, 18*  531:7
**consistent**
51:*16*
54:*22, 24*
55:*10, 23*
56:*2, 18*
91:*6*
116:*25*
117:*9*
202:*24*
207:*13, 15*
212:*3, 13*
217:*19*
235:*15, 22*

237:*14, 21*
238:*15*
239:*11, 20*
240:*16*
241:*7, 12*
276:*3*
292:*17*
326:*21*
329:*4*
341:*25*
411:*18*
412:*5*
417:*22*
421:*12*
481:7
524:6
525:*1, 16*
**consistently**
230:*16*
238:*4, 9*
**consists**
242:*14*
**constitute**
36:*4, 20*
**Constitutional**  275:*24*
**construct**
424:*23*
**constructed**
379:*4*
**consultation**
31:*23*

**consultations**
31:*24*
**consulting**
33:*17*
**Consumer**
6:*23*
**consuming**
287:*3*
**consumption**
425:*15*

**containing**
559:*1*
**contains**
252:*11*
**context**
47:4  49:*19*
53:*3*  54:*19*
56:22  61:*1*
63:3  64:7,
*19*  67:4
80:*13*
106:*17*
135:9
145:2
154:*21*
170:*13*
181:7
232:*16*
262:*15*
263:*21*
271:*10*
284:*1*
360:*18*
393:6
394:*10, 25*
410:*18*
493:*24*
494:*18, 19*
525:*3*
530:*16*
553:20

**contextualize**
99:*15*
125:*17*
171:6
391:*17*
541:5
**contextualize
d**  100:*6*
393:*12*
**contextualizi
ng**  541:*6*

**continue**
37:8
136:*17*
153:*1*
286:7, *9*
295:*10*
352:*25*
353:5
356:*16*
401:*20*
453:20
517:22
552:*21*
**continued**
68:*15*  95:5
356:*15*
376:*3*
436:*23*
**continues**
489:9
519:*19*
**continuing**
90:*4*  118:*20*
**contribute**
91:*8*  296:*6,
18*  426:*12*
449:*12*
450:*11*
454:*13*
**contributing**
523:*10*
**contribution**
152:*19*
280:2
401:*7, 8*
507:*21*
**contributory**
230:8
**control**
12:*21*  13:*3*
14:4  29:*4,
22*  130:*17*
153:*17, 19*
162:*3*

169:*3, 5*
173:*16*
222:22, *25*
223:7, *20*
225:*12*
226:*17*
227:22
231:*13*
236:*3*
253:*4*
274:*16*
306:*24*
307:*6, 8, 11,
12, 13, 25*
308:*1, 10*
309:*13, 17,
24*  313:*3*
314:*3*
315:*20*
316:*4, 14, 23,
24*  317:4
322:*19*
323:*21*
328:*25*
338:*12*
352:*17*
363:*16*
367:*15*
376:*16*
398:*18*
400:7, *10*
401:*13*
403:9, *14*
420:*17*
430:9
436:*12*
446:6
451:*17*
456:8
458:*18, 21*
460:22
464:*24*
466:*3*
470:5

471:22
517:*11*
559:*23*
**controlled**
252:5
267:*25*
268:*4*
270:*20*
315:6, *24*
317:*15*
318:2
353:*14*
484:8, *10*
555:*19*
559:*12*
560:*17*
**controlling**
308:22, *23*
409:*21*
**controls**
229:*21*
396:7
403:*14*
408:*12*
409:*13*
410:2
435:*25*
454:*23*
456:3, *6*
**conversation**
81:*18*
**conversation
s**  435:5
**convince**
300:*16*
**convincing**
501:*25*
**COOPER**
4:*20*  5:*12*
**copied**
87:*14*
**copy**  87:*19*
102:*15*
107:*14*

237:*4*
249:*17*
**Cord**  13:*3,
23*  478:8
480:*20*
484:22
486:*23*
487:6, 7, *24*
488:2
**coronary**
287:7
**Corporation**
7:4, *11*  8:*4,
9*
**Correct**
18:*23, 25*
29:*25*
30:*14*
32:*17*
34:*21*  35:*4,
8, 10*  54:7
57:9  64:*6*
69:*25*  70:*3*
74:8  82:*14*
86:*18*
91:*20*
108:*13*
120:*16*
150:*14*
152:9
155:4
156:*4, 16*
158:*1*
163:*20*
164:*16*
173:*15*
174:*10*
184:*24*
187:5
198:*20*
199:*10*
204:2
205:*15*
206:*19, 22*

Confidential - Subject to Protective Order

216:22
220:25
221:1
229:12, 22
250:15
255:25
259:20
260:23
276:17
279:1
300:23
304:17
306:20
309:16, 19
320:15
321:19
338:14
340:25
361:20
362:3, 4
369:14
374:9
382:15
383:15
388:3
405:4
406:25
417:1
418:16
429:23
436:14
446:12, 20, 24  447:20
448:18
449:14
450:14
470:2
474:19
475:6
478:16, 22, 24  479:2, 18
482:9, 11, 14
492:22
506:13, 14

512:5
514:24
529:23
531:6
538:18
539:2
545:15
548:1, 9
561:3  569:5
**correction**
514:16
515:11, 13
**corrections**
568:4, 7
569:6
**correctly**
18:9  55:8
97:16, 24
109:9
157:5
280:22
322:1
327:4
329:13, 14
332:2, 9
342:17, 18
346:19
353:10
424:3, 4
438:23
456:19
459:14
**correlate**
308:2, 3, 4
**correlated**
312:4
483:12, 14
484:5
**correlates**
507:25
**correlation**
298:14
299:22
312:2, 19

**corresponding**  108:1
**corresponds**
446:22
**Costco**  7:10
**COTE**  1:6
**couched**
343:2
**Counsel**
5:15  6:22
7:4, 10, 21
8:4, 9, 14, 19, 24  75:10, 19, 24  76:16
77:14
78:14
481:13
555:1
557:20
558:8, 18
560:3, 8
561:1
562:25
567:11, 12
**counseled**
75:4
**counseling**
75:5
**Counsels**
15:14
**count**  63:10
94:11
164:4
498:22
**counter**
301:5
**counterarguments**
390:11
**counting**
179:7
540:5, 9
**country's**
43:20

**counts**
241:9
**couple**
102:20
122:4
232:13
284:3
352:21
389:11
554:23
**coupled**
233:11
**course**
35:24
89:23
202:5
306:19
345:19
378:14
387:23
412:11, 20
451:9
517:20
**COURT**
1:1, 21
15:16  20:2, 7, 11  31:1, 5, 12  32:15
330:16, 20
477:22
549:7, 9
552:9
567:19, 21, 22  568:19
**covering**
221:5
**CRACKEN**
3:6  5:1
**create**
19:11, 18
**created**
165:3
167:3
267:1

346:23
348:13, 19
481:2, 13
493:20
549:22
553:4, 5
**creating**
375:9
**cred**  178:11
562:5
**credential**
43:16
**credibility**
177:5  325:7
**credible**
39:1
143:14, 25
178:11
222:18
251:6
256:15
461:18
562:5
**criteria**
94:10
106:2, 3
109:23
144:10
145:25
146:7
180:15
181:4
244:18
245:1, 9, 16
246:3
247:1
295:19
528:13
529:11, 12
530:18
531:3, 8, 19
542:19
544:5

Confidential - Subject to Protective Order

**criterion**
55:*18*
195:*19*
243:*20*
388:*8*
390:*21*
391:*18*
528:*14*
533:*14*
538:*15*
**critical**
403:*18*
**criticizing**
429:*13*
**critique**
434:*11*
436:*16*
**critiques**
434:*14*
**cross** 25:*4*
382:*3*
**crosses**
381:*23*
**CROSS-
EXAMINAT
ION** 554:*15*
**cross-
examined**
31:*9*
**cross-
examining**
80:*7, 11*
**CROW** 4:*5*
**crude**
484:*14*
485:*13*
486:*5*
**C-section**
487:*13*
496:*14*
517:*17, 21*
**cuff** 98:*14*
**cumulative**
380:*6*

**Curious**
299:*7*
345:*12*
**current**
26:*4*
454:*14*
489:*18*
**currently**
91:*22* 93:*23*
**cut** 201:*14*
**cutoff** 47:*11*
**CV** 16:*22*
**CVS** 7:*4*

**< D >**
**daily**
374:*12*
375:*2, 4, 12*
538:*22*
**Dallas** 5:*8*
**dangerous**
300:*17, 21*
301:*19*
**DANIEL**
3:*13*
**Danish**
21:*14*
559:*21*
**dark** 87:*16*
**data** 41:*22*
42:*2* 46:*20*
47:*12* 49:*9,
22* 54:*20*
57:*1, 12, 19*
61:*10, 13*
64:*8* 82:*5*
90:*3* 94:*3*
113:*13*
116:*4, 14*
118:*9*
119:*6*
130:*4*
133:*23*
135:*1*

136:*16*
137:*25*
138:*3, 15, 17,
22* 143:*22*
144:*3*
145:*3, 4, 5, 6*
159:*5*
160:*13*
168:*6*
169:*18, 24*
170:*14*
174:*13*
179:*9*
186:*10*
189:*1*
190:*21, 22*
191:*6, 8*
207:*7, 22*
212:*20*
214:*13*
216:*6*
217:*3*
221:*11*
231:*12, 14*
233:*23*
234:*7, 12*
235:*12*
245:*3*
246:*9, 17*
250:*14*
251:*12, 17*
252:*1*
262:*14, 16,
19, 21*
263:*10, 22*
266:*7*
269:*19*
270:*21*
275:*8*
276:*3*
283:*20*
289:*19*
292:*23*
294:*23*

295:*2*
302:*22*
305:*11*
308:*4, 12, 13*
309:*3*
313:*11*
314:*23*
318:*16*
319:*12, 18,
21* 322:*21*
323:*4*
325:*21, 22*
335:*8*
337:*2*
339:*7*
343:*8*
346:*24*
364:*15*
366:*3*
367:*6, 7*
372:*16, 17*
374:*11, 19,
21* 375:*3, 10*
376:*2, 5, 8,
16* 379:*5*
381:*6, 17*
383:*8*
384:*22*
385:*3*
390:*18*
393:*2*
394:*18, 23,
25* 395:*7, 22*
399:*8, 10, 12,
18, 20* 401:*9,
11* 427:*13,
22* 435:*19*
436:*24*
437:*3*
438:*20*
460:*13*
461:*22, 23*
470:*8*
471:*10*

477:*13*
494:*13, 24*
499:*20*
501:*15, 19,
25* 503:*4*
504:*5, 7, 14,
15* 505:*3, 8,
12* 515:*23,
24* 516:*7*
517:*12*
523:*15, 22*
527:*10*
528:*16*
529:*5*
539:*4, 7*
540:*3, 18*
542:*1, 6*
543:*13, 17*
544:*2*
547:*11, 12*
557:*25*
559:*13, 17,
22* 560:*22,
23* 564:*3*
**databases**
539:*11, 16*
**dataset**
380:*10*
478:*10*
**datasets**
380:*17*
384:*14*
**date** 1:*16*
15:*5* 88:*16,
24* 119:*23*
330:*6*
557:*7*
562:*19*
567:*8*
568:*2, 9*
569:*12*
**dated** 82:*5*
287:*23*

567:24
dates 128:15
**Daubert**
31:7
**daughter**
496:13
506:17, 18
520:1
521:23
**DAVID**
6:19 8:12
**david.cohen**
**@butlersnow**
**.com** 6:19
**DAVIS** 4:20
**davis@coope**
**rlawpartners**
**.com** 4:21
**day** 25:14
27:7
427:19
445:1
473:5
490:17
499:1
539:20, 21
544:15
569:16
**days** 166:9,
10 168:20,
24 423:23
425:25
426:2
446:11
447:19
450:17, 23
466:2
496:10
507:1
568:15
**DC** 5:14
6:4 7:9
**de** 71:18
**deal** 538:23

**dealing**
248:3
**DEAN** 8:14
**DEANNA**
6:1
**death**
538:20, 24
**debate**
106:10, 15
138:19
139:10, 13,
17 140:20
141:4
194:5
214:21, 25
219:5, 9
**debunking**
453:16
**decades**
291:13
**decide** 80:21
**decided**
194:4
251:20
419:1
**deciding**
35:22 528:2
**decrease**
174:22
439:5
**decreased**
417:23
418:11
**deem** 91:18
**deemed**
568:18
**deeply**
499:17
**defend**
435:7
**defendants**
32:11, 17
562:18

**defense**
34:20
**deficit**
12:21 13:2
**deficit/hyper**
**activity** 11:5
**define**
51:10
105:19
133:14
135:23
198:23
**defined**
198:21
**defining**
108:10
**definitely**
41:6
197:14
302:4
311:18
356:10
**definition**
56:7 92:6
109:21
151:9
258:14
410:18
470:8
479:9 525:5
**definitive**
67:3
123:22
124:11, 16
301:11
**definitively**
253:14
**delivery**
483:2
487:11
488:4
492:12
496:4, 11, 22
517:2

**DELUCIA**
3:14
**demonstrate**
323:6
365:6, 11
366:24
396:10
412:15
413:13
416:18
433:25
439:5
464:13
469:20
470:13
530:8
**demonstrate**
**d** 47:25
112:12
130:11
169:1
227:10
397:10
398:12

**demonstrates**
383:23
**demonstratin**
**g** 470:22
**demonstratio**
**n** 267:5, 10
471:21
498:1
**demonstrativ**
**e** 13:15, 19,
20, 22, 23
58:13
68:16
149:16
165:2
166:24
209:9, 10
261:24
266:5, 25

452:2
480:2
481:1 511:3
**DENISE** 1:5
**denying**
189:15
**dep** 30:9
**Depakote**
12:1 353:6
**department**
45:23 461:8
**dependent**
48:11 49:8
**depending**
57:11
74:17 164:4
**depends**
46:17 47:3
56:6 61:9
106:14
107:1
109:20
133:14
135:9, 22
313:9
366:8
406:13
419:3, 21
532:1
**deponent**
15:12 569:1
**DEPONENT**
...................56
**9** 14:13
**deposed**
31:21
**deposes**
15:23
**deposing**
568:14
**deposition**
1:11 14:10
15:7 16:14
20:1 29:24

30:5, *20*
31:*25*  80:*8*
81:*9*  174:*1,
5*  299:*4*
473:*24*
553:*23, 24*
562:*24*
566:*6*
568:*3, 12, 16,
17*
**depositions**
30:*23*
31:*16*
32:*10, 14, 19,
23*  192:*19*
562:*17*
**depression**
286:*5*
397:*3, 17*
398:*9*
**deps@golko
w.com**  1:*23*
**derivation**
440:*20*
**derive**  56:*8*
169:*23*
267:*21*
381:*17*
**derived**
49:*22*  55:*2*
170:*14*
174:*13*
208:*1*
386:*21*
435:*19*
**derogatory**
218:*3*
**describe**
42:*1*  71:*14*
96:*16*
100:*25*
109:*22*
227:*21*
243:*5*

260:*12*
269:*16*
282:*4, 8*
330:*1*
392:*24*
394:7
433:*4*
434:*4, 19*
467:*6*
468:*6*
476:*20*
477:*15*
535:*8*
539:*18*
555:*9*
**described**
31:*2*  43:*19*
78:*4*  98:*6,
22*  207:*20*
287:*2*
364:*14*
388:*22*
389:*4*
422:*13*
440:*6, 25*
443:*25*
525:*5*
547:*9*  557:*6*
**describes**
150:*4*
328:*20*
390:*15*
529:*11*
**describing**
89:*13*
219:*15, 17*
276:*18, 20*
358:*9*
373:*25*
387:*18*
433:*11*
534:*12*
**Description**
10:*10*

**deserves**
135:*1*
389:*20*
**design**
69:*10*
113:*18*
162:*15*
392:*4*
409:*5*
411:*18*
413:*16*
414:*19*
423:*17*
424:*14*
435:*18*
440:*1*
449:*13*
450:*12*
**designed**
18:*5*  236:*3*
241:*20*
248:*2, 8*
272:*1*
379:*1, 22*
430:*18*
433:*6*
464:*12*
**designing**
472:*11*
**Designs**
12:*16*
392:*2*
415:*25*
454:*11*
**desire**
516:*11*
**detail**
436:*21*
**detect**
83:*23*
455:*14*
456:*17*
**detected**
68:*25*

69:*21*
495:*14, 19*
496:*20*
510:*16*
**detection**
296:*2*
**determinatio
n** 252:*7*
547:*25*
**determinatio
ns** 251:*25*
252:*4*
**determine**
41:*22*  55:*4*
62:*22, 25*
66:*2*  95:*20*
132:*23*
143:*18*
144:*6*
155:*6*
310:*1*
390:*25*
422:*5*
469:*4, 6*
508:*24*
527:*11*
**determined**
95:*18, 21, 24*
97:*14, 15*
252:*17*
483:*16*
**determines**
276:*13*
431:*20, 25*
432:*20*

**deterministic**
98:*20*
**develop**
58:*6, 10, 18*
496:*7*
**developed**
278:*22*

279:*3*
300:*16*
**developing**
144:*14*
465:*1*  510:*9*
**development**
87:*5*  88:*2*
177:*10*
187:*7*
198:*8*
488:*5*
489:*8*
490:*9*
491:*25*
492:*13*
502:*8*
544:*12*
**development
al**  198:*11*
**devoted**
476:*2*
**diagnose**
196:*19*
197:*1, 7*
**diagnoses**
192:*4*
197:*9*
242:*24*
244:*12*
421:*20*
534:*19*
**diagnosing**
196:*22*
**diagnosis**
94:*10*
162:*24*
163:*7, 19*
164:*3, 15*
166:*22*
167:*18*
197:*4*
230:*11*
238:*24*
239:2, *7, 24*

Confidential - Subject to Protective Order

241:*15, 18, 24* 242:*13*
243:*7*
244:*7*
264:*13*
293:*5*
326:*23*
337:*15*
338:*8, 9*
339:*23*
362:*19, 25*
420:*23*
421:*24*
422:*2, 6*
425:*3*
451:*24*
492:*1*
535:*14*
545:*10*
**diagnostic**
21:*11*
22:*15* 94:*9*
177:*3*
239:*2*
294:*14*
295:*19*
421:*1*
424:*7, 18*
489:*14*
501:*18*
544:*5*
**diagram**
281:*23*
396:*2*
420:*2*
447:*4*
480:*5*
484:*13*
**dialogue**
126:*21*
**dichotomous**
335:*1*
**diease** 287:*7*

**diet** 533:*24*
534:*1*
**differ** 124:*4*
441:*21, 22*
**difference**
59:*24* 68:*6*
238:*25*
277:*13*
282:*19*
293:*20*
307:*14*
308:*8*
309:*5*
385:*9, 11*
412:*3*
467:*5* 527:*3*
**differences**
59:*16*
61:*23*
197:*25*
285:*21*
316:*9*
394:*14*
**different**
19:*17*
47:*15*
55:*25* 69:*9*
93:*4*
120:*20*
121:*19*
133:*21*
142:*1, 18*
149:*24*
186:*2*
190:*13*
207:*9*
210:*1*
211:*15*
212:*17, 20*
214:*14*
216:*10*
225:*5*
242:*2*
256:*7*

285:*17, 23*
288:*13*
294:*5*
297:*6*
315:*15*
325:*12*
326:*22*
373:*7*
384:*14, 15*
386:*21*
390:*23, 24*
391:*6*
402:*16*
414:*9, 24*
428:*20*
444:*8*
467:*1, 7, 12*
512:*22, 23, 24* 513:*22*
529:*21*
530:*1, 2*
535:*3*
555:*2*
564:*25*
**differential**
410:*10*
**differentiation** 197:*24*
**differently**
47:*17*
217:*8*
219:*12*
393:*8*
**difficult**
46:*16*
502:*2* 544:*7*
**difficulty**
138:*25*
**dig** 509:*12*
**digested**
255:*9*
**digits**
290:*25*

**diligent**
303:*21*
**diminishes**
130:*18*
**Diplomate**
1:*17* 567:*2, 17*
**DIRECT**
16:*1*
180:*13*
292:*6*
322:*23, 24*
434:*11*
497:*17*
**directed**
176:*12*
**direction**
214:*1*
240:*17, 22*
**directly**
152:*21*
186:*4*
308:*1*
327:*17*
420:*23*
421:*23*
**dis** 417:*13*
**disabilities**
198:*11*
379:*21*
**disagree**
106:*21*
135:*15*
148:*18, 21*
167:*6*
188:*18*
189:*11, 24*
193:*13, 15*
203:*5*
219:*4*
226:*14, 21*
227:*6*
238:*18, 20*
239:*7*

241:*11*
243:*8, 12, 16*
244:*20, 21*
245:*2*
314:*13*
324:*20*
327:*6, 25*
329:*6, 15*
332:*12, 17*
333:*8*
342:*5, 6*
343:*21*
344:*3, 4*
347:*4*
360:*16*
379:*17, 18*
380:*2*
440:*17*
491:*8, 16*
492:*15*
498:*3, 13, 15*
504:*18, 25*
524:*6*
525:*1*
561:*25*
562:*3*
**disagreed**
498:*18*
561:*7*
**disagreeing**
239:*19*
379:*24*
453:*14*

**disagreement**
132:*12, 25*
133:*3, 9*
134:*17, 20*
241:*8*
342:*20*
**disagreements** 134:*1*
**disagrees**
215:*4*

Confidential - Subject to Protective Order

disappeared
449:*25*
disclose
32:7 35:*16,*
*22*
Disclosure
10:*11*
discordance
426:*4*
452:5, *10*
discordant
233:*12*
364:*4, 24*
365:*4, 16, 19*
366:*18*
405:*19, 22,*
*23* 411:*3, 20*
412:*2*
413:*18*
414:*21*
415:*4, 6, 8*
417:5, *13, 15*
419:*1*
420:*5*
425:*21, 24*
426:*1, 4, 7,*
*19* 429:9, *15*
430:*3*
431:*8*
432:3, *19*
449:*11, 15,*
*17, 19*
450:*11, 16,*
*22* 451:*1, 18,*
*23* 452:*11*
453:*2*
454:*12*
discuss
435:*18*
discussed
83:*2*
370:*12*
499:*19*

discusses
354:*1*
discussion
76:*20*
78:*12*
145:*3*
236:*15*
358:*15*
425:*5*
427:*4*
428:*13*
435:*21*
Disease
13:*11*
92:*18, 19, 21*
93:8, *13*
94:*13, 16*
95:23, *25*
199:*9*
200:2, *14, 18*
296:*23*
405:*7*
533:*25*
534:*1, 6*
543:*19*
diseases
71:*23* 72:*1*
dismissing
460:*25*
disorder
10:*20* 11:*5*
12:7, *13, 21*
13:2, 6, 7, *10*
23:*24* 33:*2*
72:*13*
73:*14*
83:*21*
93:*18*
96:*15*
113:*16*
118:*17*
120:7
125:*13*
129:*4*

197:*19, 22*
292:*1*
295:*23*
352:18, *24*
353:*19*
354:9
356:4, *8*
357:*15*
384:*17, 18*
Disorders
10:*14* 93:*1*
129:5
198:7
347:*11*
352:*23*
363:*6*
409:*19*
475:2 476:*4*
disprove
113:*22*
419:*8*
dispute
380:*16*
549:*13, 24*
disputing
381:*1*
disrespectful
434:*24*
500:*16*
distracting
234:*19*
272:*24*
500:6, *13*
DISTRICT
1:*1*
divalproex
12:*1*
divergent
364:*16*
divide
485:*13*
divided
485:*14*

division
377:*23*
dizygotic
282:*20*
283:*6*
dkatz@smith
sovik.com
8:*12*
dlee@btlaw.c
om 6:*2*
DN 559:*20*
DNBC
237:*22*
315:*21*
doctor
196:*13*
203:*15*
235:*8*
352:*16*
444:*25*
481:*10, 11*
526:*1*
554:*18*
doctorate
182:*14*
doctors
248:*3*
DOCUMEN
T 1:*5*
16:*13* 19:2
20:*16* 97:*3*
102:*12, 18*
107:7
273:5
360:9, *15*
376:*24*
477:*21*
doing 30:*22*
35:*14, 23*
39:9, *13*
74:*18*
101:8
127:9
156:*18*

175:7
178:*1*
218:5
222:*15*
229:*20*
241:7
242:*14*
245:8
246:7, *8, 21*
257:*15*
269:*16*
272:*19*
295:6
301:*23*
305:*17*
306:22
309:*18*
311:8
319:8
324:7
381:*4*
383:*10*
392:*17*
393:5
395:7
435:*2*
456:*14*
467:*15*
468:7, *13*
494:*20*
499:*1, 18*
500:*25*
502:*21*
503:*3*
504:*4*
516:4, *17*
561:*14*
568:8
Dollar 8:9
domains
121:7
door 565:*5*
dose 51:*17*
118:*13*

121:2
177:*11*
333:*22, 23*
334:*22, 23*
351:*8*
374:*11, 12,*
*21*  375:*2, 4,*
*8, 10, 12*
390:*25*
490:*10*
502:6, *14*
507:*23*
530:*14, 22*
547:*11*
**dose-**
**response**
244:*16, 18*
333:*13, 17,*
*19, 24*
342:*11, 22*
374:*15, 17*
375:*2*
489:*17*
491:*15, 21*
492:*5*
495:*14, 20*
511:*1*
516:*24*
538:*17*
540:*19*
**dosing**
333:*20*
**dot** 59:*11*
**Double**
290:*25*
451:*10*
452:6
**doubles**
424:*1* 432:*4*
**doubling**
64:*20, 22*
67:*7*
174:*22*
446:22

453:*1*
482:*6, 8, 12*
495:*15*
510:22
**doubly**
419:*1*
449:*17, 19*
**Down's**
73:*12*
**Doyle**
225:*21*
**dozen** 186:*3*
**Dr** 16:*3*
20:*15* 21:*5*
23:*14*
28:*12*
29:*23* 77:*3*
81:*25*
112:*10*
165:*11*
179:*25*
182:*12*
188:*4*
191:*25*
203:2, *22*
204:*17*
264:*9, 19*
337:*12*
435:*2*
443:*22*
473:*18*
474:*12*
514:*12*
559:*2, 5, 17*
562:*10*
563:*11*
**dramatically**
296:*2*
**draw**
240:*21, 25*
532:*19*
**drawing**
505:*11*

**drawn**
105:7
422:*10*
**drinking**
287:*3*
**driven**
378:*20*
**drives**
169:*18*
179:9
**driving**
93:*14*
171:8
270:*10*
312:*24*
**drop**
364:*19*
559:*11*
**drug**
250:*24*
253:*3, 9*
354:7
**Drugs**
11:*15* 12:6
252:*17*
545:*12*
**DSM-5**
295:*21*
**dsullivan@hs**
**gllp.com**
*3:13*
**DUANE** 8:6
**due** 46:*23*
48:*14*
171:*13*
172:*14*
176:*4*
181:*20*
268:*18*
269:*2*
278:*5*
280:*10*
290:9
296:*21*

320:*12*
370:*18, 19*
373:*17*
459:*13*
460:*17*
471:*2*
**duly** 15:*21*
567:*4*
**DUPLECHI**
**N** 4:*8*
**duration**
118:*13*
121:2
177:*12*
333:*23*
334:*24*
374:*22*
490:*11*
502:6, *15*
507:*23*
547:*11*
**duties**
474:*20*
**dysfunction**
134:*24*

< E >
**earlier**
116:9
307:*17*
425:*14*
461:7
505:*21*
535:*16*
537:7
557:*18*
560:*4*
**early** 83:*13*
94:*10*
198:8
296:*1*
302:*16*
489:9
533:*25*

545:*21, 23*
546:8, 9
**Early-Life**
10:*22*
**easier** 250:*2*
295:22
313:*20*
539:*18*
544:*3*
**easily**
291:*23*
**East** 2:*16*
5:*21* 6:9
**Eastern**
1:*15*
**easy** 206:*1*
426:9
**ecanaan@ksl**
**aw.com** 7:*14*
**ecological**
41:*24*
69:*14*
116:*11*
291:*21, 22*
428:9
544:2, 8
**ecracken@th**
**lawyer.com**
5:2
**edelucia@hs**
**gllp.com**
*3:14*
**Edition**
10:*18*
11:*15*
12:*11*
248:*14*
**Editor**
11:*17*
193:*10*
224:*19*
297:*15*
327:*20*
329:*25*

Confidential - Subject to Protective Order

editorial
193:*16*
education
482:*23*
effect  53:*2*
57:*13, 17*
83:*22*
162:*16*
206:*25*
213:*3*
214:*4*
234:*1, 2*
235:*16, 22*
236:*4, 5, 6, 7*
240:*10*
307:*15*
310:*2, 7*
382:*6*
400:*15*
404:*6, 8, 9*
412:*7*
420:*19, 20*
421:*5, 12, 14*
424:*10*
425:*11*
439:*11*
440:*24*
443:*24*
455:*17, 20*
456:*12*
464:*13*
469:*15*
470:*7, 14*
534:*6* 548:*7*
effective
139:*1*
376:*17*
effectively
453:*12*
effects  83:*9,*
*11* 244:*5*
331:*25*
342:*11*
343:*1*

346:*18*
347:*18*
425:*2*
455:*14*
456:*18*
560:*19*
Effort
12:*16*  416:*1*
egg  73:*5, 9*
Ehren
411:*15*
Ehrenstein
12:*14*
406:*19*
407:*8*
411:*15*
413:*16*
415:*4*
416:*8, 22*
418:*10*
eight  164:*3*
166:*10*
170:*5*
259:*12*
EILEEN
3:*14*
either  18:*19*
34:*12*  72:*7*
73:*12*
104:*10, 14*
128:*14*
132:*6*
174:*2*
256:*16*
293:*4*
377:*17*
417:*8*
490:*23*
527:*3, 17*
562:*23*
elected
43:*13*
elements
555:*7*

elevated
29:*1*  179:*2*
255:*3*
258:*25*
370:*15*
372:*9*
408:*4*
420:*19*
518:*23*
elevates
118:*6*
eliminate
222:*23*
225:*22*
226:*25*
ELMO
76:*3*  149:*14*
Ely  30:*2*
e-mail
563:*20*
564:*13*
e-mails
559:*1*
563:*10*
564:*7, 17, 19*
embedded
439:*16*
embryo-fetal
250:*12*

embryologist
73:*1*
emerged
435:*23*
emphasis
403:*17*
employed
225:*8*
employee
252:*23*
567:*10, 12*
enabling
423:*16*

encompasses
385:*2*
endpoint
339:*23*
engaged
31:*22*
engagement
147:*4*
360:*13*
engaging
287:*4*
enlarge
249:*9*
enormous
364:*8*
enroll  58:*3*
254:*13*
255:*16*
257:*21*
258:*19*
enter  308:*7*
309:*4* 312:*5*
Entire
13:*23*
26:*16*
28:*23*
78:*18*
80:*10*  81:*5,*
*17* 86:*7*
158:*11*
283:*16*
340:*19*
463:*8*
471:*13*
472:*4*
550:*19*
entirely
71:*23*
73:*21*
93:*19*
106:*14*
143:*24*
211:*15*
212:*19*

257:*13*
327:*2*
366:*15*
406:*1*
416:*13*
entries  35:*6*

Environment
13:*11*
71:*21*
89:*16*
95:*19, 22*
96:*22*
97:*15*  116:*6*
Environment
al  14:*1*
44:*8*  71:*5,*
*11, 13*  79:*10,*
*18, 25*  82:*16*
85:*11*  87:*3*
88:*6*  89:*6,*
*12, 21*  90:*19,*
*25*  95:*24*
96:*1*  131:*6*
403:*10, 15,*
*17, 19*
474:*15*
475:*5, 18*
476:*5*
epidemic
14:*6*  91:*22*
92:*7, 12, 16*
93:*9, 24*
94:*5, 12, 20*
95:*11*
epidemiologi
c  37:*1*
42:*14*
68:*18*
101:*3, 5*
141:*22*
175:*21*
202:*24*
222:*15*

Confidential - Subject to Protective Order

251:6
325:2
343:13, 16
344:22
345:6
347:2
354:23
357:10
379:9, 11
441:24
442:13
472:25
522:22
543:13, 17
**epidemiologi
cal** 177:21
183:16
378:21
441:13
**epidemiologi
st** 34:25
45:16, 21
46:4
135:12
142:12
143:1, 14
144:1
183:1
197:16
202:6
218:5
239:15
298:24
325:4
348:23
354:21
444:18
461:8, 19
462:22
540:23
562:3
565:9, 18
**epidemiologi
sts** 47:16

67:14
132:12
133:19
139:12, 18
141:3
184:9, 24
219:11
239:10
241:9
268:16
269:13
494:17
499:15
501:14
526:11
561:25
**Epidemiolog
y** 12:11
37:25
38:21   42:5
44:9   45:7,
23   134:12,
13   144:7
268:20
271:16
303:4
350:10, 12
376:12
388:20
391:22
433:20
436:19
441:10
442:3, 19
443:1
444:13, 16
453:18
455:24
457:13
473:21
474:14
476:19
**Epilepsy**
355:9

356:4, 5
362:6, 10
**episodes**
353:7, 22
354:8, 19
355:9, 12
**equal**
276:10
366:19
426:1
**equally**
548:6
**equate**   38:7
179:4
497:25
**equates**
375:11
**equation**
62:25
**equipoise**
254:5
258:14
259:3, 6, 8
268:7, 12
**equivalent**
58:11, 19
63:5   64:21
356:5
**ER**   12:1
**ERIC**   5:1
**errata**
568:6, 9, 11,
14   569:7
570:1
**ERRATA......
.......................**
**..........570**
14:14
**error**   172:6
298:13
299:21, 25
300:7
365:10
367:16

391:1
414:7
432:25
459:21
460:1, 6, 9
**errors**
165:14
261:21
**essential**
541:7
**essentially**
53:7
438:12
484:13
**establish**
39:4, 9, 20
93:17
113:22
114:24
120:4, 8, 13
131:22
181:12
241:25
254:8
274:25
**established**
42:3   68:5
114:8
180:14
181:17
200:24
267:19
268:10
304:24
491:20
513:13
526:23, 25
527:4
**establishes**
123:2
177:22
242:12
244:6
525:15

**establishing**
38:23
218:10
252:15
503:9
**esteemed**
43:20
**estimate**
53:8, 16
54:4   57:8
74:12, 20
117:13
166:21
167:9, 16, 25
168:5, 7
169:15
174:19
179:10
204:18
262:9, 18, 21,
25   283:4
296:7
307:15
310:7
325:17
363:1
381:18
413:3
432:9
453:2
460:5
463:20
464:4, 24
465:15
469:2
494:23
512:3
527:20
**estimated**
374:11
375:11
**estimates**
74:10
169:23

| | | | | |
|---|---|---|---|---|
| 170:*10* | 145:*1* | 171:*3* | *24* 102:*13* | 216:2, *5* |
| 171:*1* | 212:*21* | 181:*6* | 103:*3* | 218:*6* |
| 179:*1* | 222:*15* | 207:*20* | 105:6, *14* | 219:*12, 14,* |
| 211:*14, 19* | 239:*21* | 212:*8* | 106:8, *14, 22* | *16* 220:*16,* |
| 258:*25* | 252:*24* | 221:*24* | 107:*1* | *18, 22* |
| 263:*19* | 305:2 | 238:*21* | 110:7 | 226:*11* |
| 267:*3* | 325:7 | 256:*15* | 111:5 | 230:25 |
| 412:*12, 22* | 357:*10* | 276:2 | 114:*14* | 238:*21* |
| **estimations** | 390:*13, 21* | 295:*4* | 115:*20* | 242:9 |
| 411:*21* | 391:*20* | 385:*6* | 116:*25* | 251:*6* |
| **et** 10:*14, 23* | 411:*22* | 390:*6* | 117:*8* | 252:*13, 25* |
| 11:*6, 9, 14,* | 441:*23* | 395:*23* | 118:*4, 18, 21* | 254:*6* |
| *19, 24* 12:*4,* | 445:*19* | 422:*5* | 119:*5* | 256:5, *16* |
| *8, 14, 19, 22* | 542:*19* | 507:*20* | 120:*5, 12, 19,* | 258:*21* |
| 13:*7, 11* | **evaluated** | 513:*8* | *23* 121:*9, 24* | 277:*14* |
| 398:*10* | 38:*1* 155:*9* | 527:*22* | 122:*12, 14,* | 282:*12, 24* |
| 419:*12* | 170:*12* | 529:*14* | *25* 124:*17,* | 286:*3* |
| 513:*23* | 189:*3* | 531:*20* | *23* 125:*7, 10,* | 291:*10, 20,* |
| **ethical** | 234:*12* | **evaluations** | *22, 24* | *21, 23* 301:*4,* |
| 257:*15* | 241:*24* | 196:*24* | 126:*10, 15,* | *8, 16* 302:*10* |
| 268:*5* | 251:*18* | 384:*23* | *25* 127:*1, 11,* | 312:*12* |
| 375:*19* | 256:*12, 13* | 427:*21* | *16, 17, 23* | 313:*5* |
| **ethics** 10:*20* | 263:*20* | **EVAN** 2:*14* | 128:*20* | 314:*5* |
| 108:*12* | 286:22 | **evan.janush** | 129:*15, 19,* | 322:*24* |
| **ethnicity** | **evaluates** | **@lanierlawfi** | *22* 136:*1* | 323:*13* |
| 482:*23* | 184:*13* | **rm.com** | 137:*13* | 325:*8* |
| **etiology** | **evaluating** | 2:*15* | 141:*21, 23* | 329:*9* |
| 129:*3* | 179:*8* | **events** | 144:9, *11* | 331:*24* |
| 197:*18, 25* | 190:*21* | 449:*5, 6* | 152:*11* | 332:*18* |
| 357:*14, 16* | 210:*17* | **everybody** | 153:*20* | 333:5, *13, 17,* |
| 475:*1* 476:*3* | 379:*12* | 503:*24* | 154:*4* | *18* 339:*1* |
| **Europe** | 384:*10* | **everyone's** | 155:*5* | 343:*13, 16* |
| 206:*25* | 389:*19* | 139:*23* | 158:*17* | 346:*15* |
| 214:2 | 390:*16* | **Evidence** | 159:*17, 23* | 347:*15* |
| **European** | 391:*18* | 10:*18* 11:*8* | 160:*4, 6* | 348:*1* |
| 11:*13* | 424:*19* | 38:*4, 25* | 161:*24* | 349:*12, 21* |
| **EVA** 7:*13* | 445:*14* | 40:*11* 41:*9* | 178:*11* | 350:*3, 4, 7,* |
| **evaluate** | 528:*17, 18,* | 51:*16* 53:*1* | 193:*3* | *15* 351:*3, 5,* |
| 118:*20* | *21* 531:*7* | 66:7 68:*2* | 208:*21* | *16* 352:*1* |
| 120:22 | 541:*7* | 69:*15* | 209:*20* | 354:*3* |
| 136:*17* | **evaluation** | 82:*21* | 210:*24* | 357:*11* |
| 141:*10* | 56:*9* | 85:*17* | 212:*18* | 359:*24* |
| 142:*10* | 119:*13* | 89:*19* 91:*4,* | 213:*18* | 382:*5* |
| 144:*10* | 147:*21* | *7, 14* 92:*22,* | 215:*22* | 390:*17* |

391:*23*
392:*9*
396:*3*
400:*24*
404:*1*
405:*9*
406:*1, 8, 14*
410:*15*
425:*19*
457:*11, 24*
461:*23*
462:*19*
469:*8*
472:*9, 24*
498:*4*
503:*25*
505:*13, 23*
506:*5*
522:*9, 18*
523:*10*
528:*18*
530:*17*
531:*5*
532:*2*
538:*23*
542:*20*
544:*25*
547:*16*
557:*5*
562:*4*
565:*21*
**evidential**
109:*7*
110:*15*
**evolve** 90:*4*
**evolved**
79:*23*
82:*10*
129:*6*
433:*21*
437:*3*
529:*17*

**evolves**
376:*13*
436:*20*
**exact**
258:*15*
261:*11*
278:22
309:*3*
399:*22*
482:*4*
508:*21*
546:*11*
**exactly**
56:*24*
59:*10*
99:*17*
105:*25*
111:*12*
158:*3*
174:*12*
178:*25*
183:*11*
185:*19*
201:*16*
219:*3*
221:*19*
232:*16*
266:*21*
279:*4*
280:*22*
282:*23*
284:*4*
351:*25*
392:*17*
400:*17*
402:*23*
411:*7*
451:*11*
455:*9, 23*
459:*5*
465:*19*
506:*23*
511:*8*
519:*17*

520:*3*
534:*24*
**EXAMINAT
ION** 16:*1*
80:*15*
376:*4*
554:*23*
563:*7* 567:*4*
**EXAMINAT
IONS** 10:*4*
**examine**
81:*5* 305:*11*
**examined**
31:*9*
**examining**
87:*1* 326:*23*
**example**
40:*16, 21*
51:*25* 63:*2*
72:*5* 172:*1*
200:*19*
215:*3*
226:*16*
227:*13*
281:*12, 14*
305:*18*
306:*10*
309:*21*
316:*10*
334:*16*
385:*5, 8*
392:*1*
395:*21*
406:*19*
506:*15, 19,
21* 514:*25*
527:*16*
534:*16*
555:*13*
**examples**
41:*1*
532:*10, 11*
**exceed**
47:*20*

**exceedingly**
262:*17*
372:*18*
**exception**
89:22  496:2
**excerpt**
204:*7, 10*
**excerpted**
86:*7* 102:*20*
**excerpts**
402:*16*
**exclude**
111:*6*
468:*17, 24*
**excluded**
516:*25*
**excluding**
72:*9*
**excuse**
219:*23*
478:*18*
**exercise**
211:*16*
**Exhibit**
16:*9, 13*
17:*21* 19:*2,
11, 19, 25*
20:*9* 85:*19*
96:*23*
102:*8*
107:*4*
157:*6*
186:*11*
215:*10, 15*
228:*19, 24*
232:*25*
236:*10*
247:*7*
273:*1*
297:*7, 11*
305:*14*
319:*23*
330:*9*
344:*12*

360:*21*
372:*23*
376:*20*
389:*5*
402:*10*
407:*1*
415:*13*
422:*25*
434:*25*
437:*5*
444:*20*
449:*20*
477:*17*
481:*12*
495:*5*
525:*20*
551:*16*
554:*1*
555:*23*
557:*15*
558:*4*
560:*1* 561:*1*
**EXHIBITS**
10:*9* 14:*10*
19:*12*
548:*14*
549:*20, 22*
550:*10, 13*
553:*1, 6, 11,
12* 554:*10*
**exist** 149:*6*
159:*3*
265:*23*
399:*9*
**existed**
119:22
189:*23*
190:*24*
**existing**
142:*11*
215:22
216:*2, 5*
323:*15*

exists
138:*17*
141:*21*
231:*12*
256:*6*
265:*13*
359:*14*
532:*19*
exogenous
87:*2*
expect
38:*14*
462:*22*
expected
360:*6*
438:*21*
experience
42:*25* 43:*3,*
*7, 8* 138:*24*
183:*4*
448:*15*
experiencing
223:*13*
experiment
39:*6, 13, 22*
545:*3*

experimental
100:*21*
545:*5*
Expert
10:*11*
36:*25*
101:*12*
106:*5*
147:*20*
194:*11, 21*
195:*3, 5, 8,*
*12, 14, 24*
197:*14*
247:*14*
344:*20*
345:*10*
353:*8*

428:*23*
442:*20*
444:*13, 15,*
*17* 497:*1, 6*
541:*11*
562:*17*
expertise
75:*17*
147:*18*
251:*22*
360:*11*
382:*7*
475:*9, 17*
528:*19*
experts
34:*12, 20*
300:*1*
562:*18*
expires
569:*17*
explain
65:*13*
219:*21*
220:*1*
231:*24*
321:*5*
325:*15*
329:*10*
406:*2, 6*
527:*13*
explainable
84:*7*
explained
65:*10*
96:*17*
233:*15*
289:*2*
291:*23*
319:*18*
321:*25*
322:*4*
327:*2*
373:*21*
416:*13*

explaining
220:*16*
501:*1*
explains
66:*8* 173:*1*
220:*13*
471:*13*
472:*4*
explanation
53:*24* 66:*4*
68:*18*
112:*15*
113:*2, 25*
115:*2*
120:*1*
121:*14*
123:*7, 23*
130:*22*
136:*20*
171:*20*
182:*2*
214:*23*
404:*2*
472:*18*
499:*3*
explanations
119:*11*
226:*11, 25*
explicitly
270:*20*
exploration
90:*2* 135:*1*
explore
195:*21*
198:*8*
516:*23*
523:*4*
exploring
84:*18* 199:*5*
expose
258:*20*
exposed
30:*13, 18*
31:*3* 57:*25*

60:*5* 63:*13,*
*14* 67:*8*
69:*1, 23*
263:*2*
405:*1, 6, 14*
416:*24*
421:*13*
446:*2*
447:*9, 18*
452:*20*
464:*3, 25*
485:*8*
exposure
11:*9, 18, 23*
12:*4, 16*
13:*5, 9*
21:*13*
22:*14* 42:*1*
46:*17, 20*
49:*12*
57:*13*
60:*19, 20, 22*
115:*8*
116:*11*
121:*1*
130:*3*
138:*12*
141:*17*
142:*6*
143:*12*
144:*15*
147:*9, 25*
148:*10, 23*
162:*3*
167:*18*
170:*1*
177:*8, 12, 13*
180:*17*
181:*10*
193:*4*
199:*9*
200:*2, 14, 18*
203:*15*
205:*2*

206:*4, 6, 17*
207:*12, 14*
208:*1, 14*
209:*2, 5*
210:*4, 8*
211:*1, 4, 9*
213:*14*
214:*7*
220:*24*
222:*20*
225:*12*
226:*17*
230:*10, 17*
233:*14*
237:*16*
239:*23*
241:*14*
243:*15*
258:*22*
260:*11*
262:*16*
263:*11*
315:*8*
317:*2*
321:*7, 23*
323:*1*
332:*1*
336:*13*
338:*12*
343:*3*
346:*17*
347:*17*
351:*6, 9*
357:*11*
364:*4, 17*
365:*5*
366:*1, 2, 8*
369:*10*
370:*20*
372:*13*
376:*18*
378:*7*
379:*2, 12, 20*
381:*18*

Confidential - Subject to Protective Order

382:*13*
383:*8*
390:*25*
391:*5*
392:*11*
401:*13*
405:*23*
409:*24*
410:*3, 8, 19*
411:*3*
417:*5, 14*
418:*25*
419:*4, 12, 22*
420:*5*
423:*22*
425:*18, 25*
433:*8*
448:*8, 10, 18*
450:*17, 23*
451:*18*
452:*11*
460:*3, 5, 12*
471:*14*
472:*5*
487:*4, 10*
488:*10, 25*
489:*11*
490:*7, 10*
491:*7*
495:*15*
496:*4, 21*
497:*12, 19*
501:*17*
502:*4*
512:*23*
513:*5, 22*
518:*22*
524:*5, 25*
527:*25*
533:*21*
534:*7, 9, 11*
539:*4, 7*
540:*6, 10, 18*

541:*2*
561:*23*
**Exposures**
10:*22*
85:*11* 87:*3*
88:*6*
211:*15*
227:*22*
488:*17*
489:*23*
497:*2, 7, 9*
519:*19*
**express**
224:*19*
**expressed**
435:*9*
**Expressway**
5:*8*
**extended**
12:*1*
**extends**
211:*3*
**extensive**
434:*13*
**extent**
320:*12*
464:*15*
**external**
474:*24*

**externalizing**
420:*14*
424:*11, 25*
**extra** 237:*4*
**extract**
381:*7*
**extramural**
36:*1*
**Extremely**
43:*15* 177:*9*
**eye** 141:*11*
500:*22*

**Ezra** 45:*6*
46:*1, 2, 7*
461:*9*

**< F >**
**face** 312:*22*
**fact** 84:*17*
161:*20*
162:*20*
269:*9*
291:*11*
295:*9*
348:*5*
356:*1*
382:*16*
392:*1*
453:*11*
476:*6*
490:*4*
519:*14, 15*
520:*2, 9*
538:*20*
543:*22*
547:*10*
**factor** 18:*7*
37:*10, 11, 12,*
*13, 17* 38:*2,*
*7, 9* 39:*2*
40:*17, 22*
41:2, *5, 14*
42:*2* 90:*25*
118:*6*
125:*14*
128:*2*
131:*6*
145:*10*
146:*8*
198:*22, 23*
199:*2, 3*
388:*7*
400:*20*
407:*9*
458:*12*

506:*4, 7*
565:*6*
**factors** 14:*1*
37:*7, 25*
71:*5, 6, 12,*
*13, 15, 17*
74:2 79:*15,*
*16* 83:*14*
84:*8, 17, 19*
89:*6, 10, 12,*
*15, 18, 21*
90:*19* 94:*8*
95:*24* 96:*1,*
*9, 20, 22*
97:*23* 99:*6*
100:*12*
123:*16*
135:*25*
231:*25*
233:*16*
291:*24*
315:*5*
362:*2*
403:*11, 15,*
*17, 19* 406:*6*
409:*5, 17*
459:*13*
460:*18*
469:*24, 25*
476:*5*
557:*6*
560:*17*
**facts** 543:*18*
**fail** 316:*3*
387:*8*
568:*17*
**fails** 439:*10*
440:*23*
443:*23*
**Fair** 43:*12*
79:*4, 5*
229:*14*
230:*13*
234:*11*

263:*9*
265:*21*
312:*7*
373:*25*
382:*10*
388:*14*
467:*14, 19*
512:*24*
545:*8*
**fairly** 440:*5,*
*25* 443:*25*
492:*24*
**faith** 106:*21*
502:*18*
**fallacious**
390:*6*
391:*3, 8*
392:*18*
393:*11*
**false** 148:*10*
410:*12*
413:*4, 9, 10*
438:*20*
442:*3*
459:*12*
460:*16*
**familial**
162:*23*
226:*20*
233:*16*
400:*20*
409:*5*
413:*23*
459:*13*
460:*17*
471:*2, 8*
**familiar**
43:*9* 44:*7*
102:*23*
149:*21*
201:*3*
247:*11*
261:*12*
294:*25*

Confidential - Subject to Protective Order

320:7
514:*15*
515:*1*
523:*13*
**family**
288:*23*
289:*2* 364:*9*
**family-based**
411:*22*
**famous**
278:*21*
**far** 31:*14*
35:*7, 9*
166:*1*
226:*7* 276:*1*
**farther**
278:*2*
402:*18*
469:*1*
**fascinated**
298:*23*
**fashion**
291:*13*
**faster**
509:*13*
**father** 45:*8,*
*18* 71:*8, 19*
91:*8*
**favor** 301:*8*
**favorite**
306:*10*
**FDA**
252:*16, 22*
253:*3*
345:*18*
348:*15*
353:*21*
489:*20*
524:*3, 24*
525:*7, 10*
**feasible**
375:*19*
**features**
354:*9*

**Federal**
103:*13*
306:*4*
**feel** 188:*15,*
*16* 267:*6*
**feeling**
350:*14*
**feelings**
330:*1*
**feels** 500:*15*
**female**
273:*23*
**fence** 532:*22*
**fertilized**
73:*6*
**Fetal** 11:*1*
177:*10*
187:*7*
221:*6*
247:*22*
329:*11*
423:*23*
488:*4*
489:*7*
490:*9*
491:*24*
492:*12*
502:*7*
**fetus** 71:*8*
83:*6, 10*
144:*14*
255:*18*
**fever**
124:*14, 20*
125:*8, 10, 11,*
*14, 18, 22*
126:*16, 25*
127:*1, 5*
132:*10*
134:*16, 19,*
*21, 25* 135:*3,*
*14, 19* 152:*6*
**field** 140:*7*
222:*10*

388:*16*
474:*14*
475:*10*
522:*18*
523:*14*
526:*8*
**fight** 36:*16*
**figure**
426:*10*
**file** 548:*24*
**final** 27:*9*
321:*12, 14*
**finally**
109:*4, 6*
110:*14*
**financially**
567:*12*
**find** 27:*5,*
*15* 28:*16*
84:*4, 6*
126:*3*
159:*1, 4*
204:*21*
218:*2*
221:*6*
226:*11*
264:*10, 22*
274:*18*
282:*2*
305:*16*
326:*2*
340:*3, 15*
345:*21*
346:*3*
395:*4*
426:*21*
432:*8*
508:*6*
509:*17*
531:*12*
**finding**
27:*10*
29:*19* 59:*7,*
*10, 14, 17, 19*

60:*7* 65:*4,*
*21* 66:*9, 21*
91:*16*
124:*21*
173:*2, 10, 14*
174:*8, 25*
176:*12, 16*
182:*3*
369:*18, 25*
370:*4, 8, 21,*
*23* 371:*1, 6,*
*25* 372:*3*
413:*11*
416:*19*
424:*17*
453:*15, 17,*
*25* 454:*1*
455:*25*
456:*3, 5*
462:*2, 20*
465:*7*
466:*18*
479:*4*
499:*17*
514:*22*
525:*19*
**findings**
55:*9*
145:*24*
171:*21*
211:*25*
216:*15*
217:*10*
230:*21*
233:*10*
235:*15, 21*
237:*20*
242:*5*
243:*17*
246:*16*
255:*4*
321:*16, 21*
323:*14, 19*
341:*15*

342:*1, 13*
357:*19*
375:*24*
385:*13*
391:*24*
411:*19*
422:*15*
424:*6*
437:*22*
488:*14, 20*
**fine** 20:*4*
25:*16*
29:*21*
67:*16*
76:*24* 95:*8*
100:*18*
113:*4*
115:*11*
123:*4*
126:*22*
132:*21*
146:*4*
152:*23*
154:*14*
156:*14*
165:*4, 5, 7*
170:*2*
211:*18*
220:*8*
245:*24*
246:*18*
289:*21*
290:*6*
291:*8*
493:*25*
527:*4*
550:*22*
**finish**
264:*25*
343:*22*
435:*14*
**finished**
343:*25*

Confidential - Subject to Protective Order

**FIRM** 2:*14*
5:*5* 271:*23*
**First** 13:*23*
15:*21* 25:9
29:*24* 41:*1*
86:*15* 92:*1*
110:*24*
158:*4*
168:*2, 10, 11*
184:*21*
215:*24*
216:*1*
248:*19*
254:*12*
257:*4*
276:*7*
289:*12*
312:*2*
313:*21*
322:*8*
328:*10*
384:*12*
408:*17*
428:*16*
438:*4*
440:*13*
456:*2*
458:*25*
478:*18, 21*
480:*4*
486:*11*
490:*5*
507:*2*
509:*23*
553:*22*
**Fisher**
278:*3, 9, 14,*
*19* 282:*12*
285:*15*
289:*22*
290:*7* 298:*4*
**Fisher's**
278:*22*
283:*8*

**five** 21:*11*
31:*15*
45:*14*
164:*2*
170:*5*
244:*25*
247:*1*
259:*24*
260:*17*
261:*15*
331:*23*
342:*2*
351:*17*
365:*15, 19*
366:*10*
367:*22*
498:*19*
531:*14*
**fix** 273:*8*
**flag** 521:*6*
**flavor** 288:*7*
**flawed**
61:*12*
189:*2*
255:*5*
262:*20*
381:*19*
384:*25*
477:*15*
499:*20*
527:*15*
**flaws**
231:*18*
349:*14*
395:*22*
502:*1, 13*
**flimsy**
263:*12*
342:*23*
**flip** 175:*5*
345:*21*
346:*7*
**flipping**
175:*5, 20*

**Floor** 2:*16*
7:*2* 8:*23*
**Florida** 4:*22*
**flow** 284:*5*
**Flower** 8:*23*
**focus** 36:*12*
99:*2*
194:*15, 25*
198:*5*
224:*16*
327:*23*
352:*2*
358:*10, 15*
368:*6* 371:*9*
**focused**
385:*15*
**FOERSTER**
8:*1*
**folks** 45:*13*
**follow** 58:*5*
**followed**
115:*17*
325:*21*
534:*16, 17*
**following**
234:*5*
310:*24*
311:*23*
342:*4*
**follows**
15:*24*
**follow-up**
364:*9* 427:*6*
**footnote**
245:*18, 23*
361:*15*
369:*3*
**footnotes**
202:*13*
**foregoing**
567:*7* 569:*4*
**foremost**
278:*3*

**foreseen**
418:*23*
**forest** 13:*15,*
*19* 51:*21*
52:*3*
164:*20*
178:*15*
211:*9*
212:*7*
261:*20*
262:*1, 12*
322:*11, 13*
**forever**
62:*11*
**Forget**
311:*3*
**forgot**
330:*8*
355:*17*
**forgotten**
33:*24*
**form** 18:*21*
19:*15* 21:*7*
22:*11, 25*
23:*8, 19*
24:*8, 14, 21*
25:*9, 10*
26:*3, 18*
27:*19, 25*
28:*20*
29:*16*
32:*13*
33:*13*
36:*22*
38:*11, 17*
39:*15, 24*
40:*20*
42:*10* 43:*2,*
*24* 44:*23*
46:*6, 14*
47:*14* 48:*2*
49:*15* 50:*6,*
*10, 24* 51:*13*
54:*14*

55:*13* 56:*5*
58:*16* 59:*5,*
*21* 60:*15*
61:*7, 24*
63:*8, 20*
64:*12* 65:*6,*
*23* 66:*14, 25*
67:*24*
68:*15* 69:*4*
70:*7* 71:*25*
72:*24*
73:*23* 75:*8,*
*22* 77:*9*
78:*2, 10*
82:*19*
83:*19*
84:*11* 85:*4,*
*13* 88:*9*
89:*7* 90:*15,*
*22* 91:*12, 24*
92:*15*
93:*11* 94:*1*
95:*4* 96:*12*
98:*9* 99:*12*
100:*1, 14, 23*
101:*18*
102:*2*
105:*17*
106:*12, 24*
110:*19*
111:*18*
112:*18*
113:*9*
114:*2, 11*
115:*5*
116:*21*
117:*21*
118:*25*
120:*15*
121:*17*
122:*2, 17, 23*
123:*10, 24*
124:*19*
126:*2, 12, 19*

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 127:*19* | 190:*3, 18* | 267:*16* | 339:*5, 16* | 440:*12* |
| 128:*23* | 192:*10* | 269:*5, 25* | 341:*6* | 442:*6* |
| 129:*17* | 194:*8* | 270:*14, 23* | 345:*3, 14* | 443:*10* |
| 130:*24* | 195:*17* | 271:*21* | 347:*21* | 444:*4* |
| 131:*9* | 199:*16* | 272:*13* | 348:*17* | 445:*17* |
| 132:*15* | 200:*5* | 275:*3, 15* | 349:*9, 24* | 448:*22* |
| 133:*12* | 201:*23* | 277:*11, 20* | 350:*21* | 451:*21* |
| 134:*4, 9* | 202:*22* | 278:*13* | 351:*20* | 452:*1* |
| 135:*7* | 207:*6* | 279:*11, 19* | 352:*7* | 454:*5, 25* |
| 136:*3, 12, 23* | 208:*8* | 280:*5* | 354:*13* | 457:*6* |
| 137:*16, 23* | 209:*8, 18* | 281:*1, 20, 25* | 355:*15, 24* | 458:*1* |
| 139:*20* | 210:*12* | 282:*7, 17* | 356:*20* | 459:*16, 23* |
| 140:*9, 23* | 211:*12* | 283:*2, 13* | 357:*6* | 461:*17* |
| 141:*9* | 212:*5* | 286:*1, 14* | 358:*7, 23* | 462:*10* |
| 142:*24* | 213:*7* | 289:*7* | 362:*9* | 463:*15* |
| 144:*23* | 214:*10* | 290:*1, 11, 20* | 365:*21* | 464:*8* |
| 145:*15* | 217:*14, 24* | 291:*2, 16* | 367:*18* | 465:*5* |
| 146:*11, 22* | 218:*18* | 292:*19* | 370:*2, 11* | 467:*22* |
| 147:*11, 16* | 219:*7, 18* | 293:*24* | 372:*5* | 468:*1, 22* |
| 148:*12* | 221:*18* | 294:*10, 21* | 375:*6* | 471:*17* |
| 149:*1, 8* | 224:*13* | 296:*15* | 380:*19* | 472:*7, 22* |
| 150:*16, 22* | 227:*3, 18* | 297:*20* | 386:*8* | 475:*12, 21* |
| 151:*16* | 228:*8* | 300:*4, 25* | 387:*16* | 476:*17* |
| 152:*16* | 231:*9* | 301:*13* | 388:*18, 25* | 479:*7* |
| 158:*23* | 232:*3, 10* | 302:*7, 20* | 391:*14* | 480:*1* |
| 159:*21* | 239:*13* | 303:*7* | 392:*21* | 481:*1, 24* |
| 160:*11* | 240:*19* | 307:*1, 7* | 393:*18* | 482:*19* |
| 166:*24* | 242:*3* | 308:*17, 25* | 395:*9* | 483:*23* |
| 167:*21* | 243:*2* | 310:*4, 22* | 396:*19* | 484:*16* |
| 168:*14* | 245:*5, 13* | 312:*15* | 397:*13* | 485:*17* |
| 170:*8, 24* | 248:*6* | 313:*7* | 398:*16* | 486:*20* |
| 171:*16* | 250:*17* | 314:*8, 20* | 401:*3* | 489:*4* |
| 172:*16, 22* | 252:*20* | 315:*10* | 404:*4* | 490:*20* |
| 174:*17* | 253:*6* | 317:*18* | 405:*13* | 491:*18* |
| 176:*6, 22* | 254:*2, 19* | 318:*7, 22* | 406:*11, 24* | 492:*7* |
| 179:*23* | 255:*13* | 319:*15* | 409:*9* | 493:*1, 18* |
| 180:*8, 9* | 256:*21* | 320:*22* | 413:*7* | 494:*5* |
| 181:*1, 23* | 257:*7, 18* | 324:*21* | 417:*3* | 495:*22* |
| 183:*9, 19* | 258:*12* | 327:*15* | 423:*9* | 497:*5* |
| 184:*11* | 261:*7, 23* | 329:*20* | 431:*23* | 498:*9, 21* |
| 185:*13* | 263:*6, 24* | 332:*15* | 433:*16* | 499:*5* |
| 186:*6* | 264:*16* | 335:*6, 22* | 434:*7, 16* | 501:*12* |
| 187:*10, 20* | 265:*7* | 336:*5, 25* | 436:*6, 10* | 503:*15, 22* |
| 189:*9* | 266:*25* | 337:*17* | 439:*14* | 504:*10, 20* |

505:*5*
506:*1*
507:*6, 13*
508:*4, 19*
510:*12*
511:*3*
512:*10, 19*
513:*17*
519:*8, 24*
520:*17, 22*
522:*5, 15, 20*
523:*17, 24*
524:*8*
525:*13*
526:*9, 19*
528:*5, 10*
529:*7*
530:*5*
531:*1*
532:*8*
533:*7, 19*
535:*7, 18*
536:*13, 24*
537:*9, 21*
539:*14*
540:*12, 21*
541:*14*
542:*8, 17*
543:*8*
544:*19*
545:*19*
563:*18*
564:*9* 569:*6*
**formed**
184:*22*
**former**
461:*8*
**forth** 88:*13*
280:*20*
289:*18*
290:*14*
301:*18*
461:*23*
501:*21*

564:*24*
567:*8*
**found** 17:*3*
23:*25*
108:*3*
161:*21*
162:*19*
163:*6*
244:*5*
276:*24*
326:*21*
334:*5*
337:*13*
340:*7*
356:*10*
407:*12*
414:*9*
420:*13*
421:*9, 12*
422:*10*
425:*6*
432:*7*
454:*20*
455:*17, 20*
456:*2, 4, 5,*
*11* 469:*15*
489:*17*
515:*7*
**four** 31:*15*
45:*14*
108:*1*
170:*5*
204:*4*
238:*15, 16*
244:*25*
246:*25*
546:*6*
**Fourth**
12:*11*
**FOX** 2:*19*
**fraction**
161:*19*
**fractures**
33:*5, 11*

**Fragile**
74:*25*
169:*25*
**fragility**
333:*20*
**framework**
48:*10*
**Francisco**
7:*20*
**frankly**
381:*16*
384:*15*
516:*12*
536:*17*
**fraternal**
283:*21*
**fraught** 40:*2*
**free** 51:*6*
272:*1*
**frightened**
552:*23*
**Frisell**
12:*16*
415:*18*
**front** 31:*6,*
*9* 103:*14*
111:*15*
210:*20*
292:*21*
305:*15*
317:*11*
325:*25*
328:*5*
506:*25*
552:*8* 558:*5*
**Frontopariet**
**al** 13:*11*
**frustrating**
126:*4*
**F-test**
278:*24*
**full** 109:*3*
204:*9*
409:*20*

411:*19*
412:*1, 5*
414:*10*
417:*24*
438:*18*
466:*12*
551:*16*
**full-time**
187:*8*
**fully** 409:*20*
416:*15*
**function**
94:*6, 7*
329:*12*
411:*1*
496:*21*
**funded**
198:*6*
**funding**
474:*25*
**further**
119:*8*
135:*1*
189:*2*
241:*24*
343:*5*
422:*5*
563:*5*
566:*1*
567:*5, 10*

**Furthermore**
111:*2, 4*
295:*25*
426:*22*
**future**
76:*20*
330:*5*
535:*23*
542:*11*

**< G >**
**gather**
376:*16*

**gathered**
528:*1*
**gene** 14:*5*
72:*13*
73:*14* 75:*1,*
*2* 87:*5*
88:*3*
396:*16, 21,*
*22*
**General** 8:*9*
11:*21* 65:*7*
70:*15*
85:*16*
102:*4*
148:*14*
149:*11*
150:*1*
202:*11*
204:*1*
207:*11*
210:*21*
243:*24*
255:*15, 21*
270:*5*
274:*22*
275:*13*
291:*10, 19*
330:*25*
379:*9*
409:*11*
410:*8*
433:*5*
555:*20*
**generalizabili**
**ty** 410:*23*
411:*6*
**generally**
105:*1, 3*
134:*7*
303:*3* 412:*5*
**General's**
204:*7, 18*
**generation**
543:*25*

generic
281:*15*
genes 72:*15*
96:*17*
97:*14*
117:7
152:*12, 19*
153:*5, 10*
158:*13, 19*
159:*17*
397:4
genetic 29:*4*
71:*15, 20, 23*
75:5, *19*
77:*14* 78:5,
*12* 84:*17*
89:*17* 96:*9,
14, 22* 97:*23*
99:5
100:*11*
125:*13*
138:5
152:*18*
153:22
158:*11*
161:*20*
162:*23*
226:*20*
280:*16*
281:*11*
282:*13, 25*
283:9
287:*18*
300:*12*
316:*14*
353:*1*
358:*4*
396:*1, 23*
397:5, 9
400:*21*
403:*10, 14*
406:*8, 14*
412:*16*
414:*4*

421:*6, 10, 14*
438:*10*
464:*13*
469:*11*
471:*13*
472:3, *17*
473:*3*
476:9
537:*13*
559:*8, 22, 24*
563:*16, 22*
564:6 565:6
geneticist
75:*10, 24*
196:*15*
genetics
27:9 70:*20,
22* 72:*11*
73:*21*
79:*10, 16, 19*
82:*17* 84:5
89:*24* 98:5
116:*24*
117:3
119:9
124:*25*
134:*24*
135:*24*
151:*14, 17*
152:*1*
153:*18*
155:6
169:2
199:*12*
277:*6, 15*
288:*25*
298:6
315:3
316:*20*
317:9
320:*18*
358:*17*
359:5, *9, 22*
363:*12*

366:*25*
392:*4*
397:*21, 22,
23* 398:*1, 11,
25* 399:*6, 17*
400:*12, 19,
23, 25* 401:5
404:*1, 9, 18*
405:*10*
406:*1, 3*
409:*14*
412:8
437:*2*
439:*23*
453:22
458:9
462:*19*
466:*14, 16,
19* 469:*9, 18*
476:*10*
483:*4, 7, 12,
15, 16* 484:5
535:22
559:*12, 15*
genotype
278:*6*
280:*10*
gestational
83:*17*
getting
45:*25*
185:*4*
253:*24*
305:*24*
449:*10*
464:5
493:5
499:*2, 7*
510:*18*
GGG
297:*11*
girls 238:*10*
404:*24*

gist 288:*9*
563:*21*
give 17:5
19:3 32:*20*
40:*16* 47:2
49:7 59:2
87:*20*
88:*23*
114:*4*
117:*12*
123:*16*
183:*21, 22,
23* 184:8
194:*14*
200:*19*
215:3
221:*23*
227:*15*
249:2
292:*24*
299:*14*
302:*14, 25*
305:*18*
316:*10*
317:*21*
326:*3*
360:*19*
368:*17*
406:*15*
426:*16*
437:*15*
441:*12*
494:*10*
529:*12*
536:9
given
115:*23*
118:*16*
193:7
231:*16*
253:*19*
329:*3*
359:*20*
363:5

390:22
516:*1*
517:*20*
569:5
gives 183:*16*
giving
36:*18, 23, 25*
234:*16*
304:*6*
344:*24*
357:*1*
506:*16, 20*
glad 37:*21*
299:*19*
glasses
104:*18*
Go 18:*22*
21:8, *19*
27:*21, 23*
28:4 29:2
32:2 35:*11*
48:4 49:*17*
76:4, 7
80:22 81:*3,
15* 92:9
112:*1, 11*
132:*18*
157:*11*
163:2, *8*
165:*18*
178:*15*
191:*15*
202:*14*
204:*23*
222:*3, 6, 11,
14* 230:*14*
237:*1*
244:*15*
249:*24*
253:8
257:*11*
259:*15*
281:8
297:*3*

Confidential - Subject to Protective Order

303:*18*
312:*11*
315:*11*
321:*3, 15*
326:*9*
331:*17*
337:*5*
341:*19*
344:*17*
345:*16*
351:*24*
355:*3*
361:*23*
362:*17*
376:*9*
381:*20*
386:*12, 17*
387:*5*
395:*1, 24*
401:*16*
407:*6*
415:*21*
429:*16*
431:*2*
445:*25*
459:*18*
473:*6*
474:*10*
494:*24*
503:*23*
513:*7*
518:*18*
520:*13*
529:*4*
538:*10*
542:*13*
546:*10*
547:*4*
549:*25*
554:*7*
**goes** 29:*19*
35:*13*
52:*18* 65:*4,*
*21* 66:*21, 23*

69:*7* 104:*6*
181:*5*
219:*20, 25*
283:*19*
300:*14*
326:*5*
378:*10*
380:*5*
463:*22*
465:*20, 24*
486:*5*
492:*10*
**going** 16:*12,*
*14* 19:*11, 19,*
*24* 20:*4, 6,*
*22, 23* 25:*4*
27:*5, 15*
28:*16*
29:*13*
36:*15*
38:*13*
41:*23*
51:*24*
65:*18*
68:*12*
73:*12*
75:*11*
78:*25* 79:*1*
81:*7, 14, 15,*
*16, 19* 86:*6,*
*12* 90:*24*
97:*2*
102:*11*
104:*18*
112:*11, 24*
115:*24*
150:*11*
151:*23*
152:*25*
154:*12*
155:*24*
156:*25*
157:*12*
158:*7*

166:*7*
173:*6*
186:*14*
191:*5, 13*
215:*15*
228:*13, 22,*
*23* 233:*4*
236:*13*
246:*19*
248:*22*
249:*16*
265:*20*
266:*4*
271:*10*
273:*4, 7*
282:*5*
285:*7*
294:*19*
296:*6*
297:*10, 11*
299:*11*
307:*23*
308:*13*
324:*5, 10, 13*
330:*12*
331:*9*
333:*1*
336:*14*
338:*2*
341:*17*
343:*20*
347:*3*
360:*19*
361:*10*
366:*5, 11, 13*
367:*3, 15*
373:*2*
374:*18*
376:*23*
380:*15*
389:*8*
394:*4, 7*
400:*16*
401:*1, 23, 24*

402:*10*
407:*4, 5, 22*
408:*16*
411:*4*
415:*5, 21*
417:*17*
423:*3*
434:*1*
438:*8*
440:*17*
441:*20, 24*
442:*14*
443:*13*
444:*6*
445:*2*
447:*22*
448:*15*
449:*23*
451:*13*
464:*21*
477:*20, 21*
495:*9*
498:*25*
501:*10, 14,*
*23* 512:*21*
513:*20*
518:*4*
525:*23*
542:*5*
545:*23*
548:*12*
549:*6, 9, 21*
550:*2, 14, 20,*
*22* 551:*10,*
*11, 19*
553:*10*
554:*22*
556:*2*
559:*14*
564:*2*
565:*15, 20*

**GOLDBERG**
3:*11*

**GOLKOW**
1:*22* 9:*5*
15:*3*
**Good** 16:*3,*
*4* 41:*12*
42:*20, 24*
44:*11*
45:*21* 46:*3,*
*8* 72:*4*
106:*21*
111:*6*
166:*2*
184:*9, 25*
208:*20*
249:*22*
270:*8*
271:*8, 19*
280:*1*
297:*17, 24*
298:*2*
299:*12, 13*
306:*12*
312:*11*
313:*5*
314:*23*
336:*19*
362:*6*
372:*15*
375:*3*
379:*4*
388:*19*
402:*1, 2*
409:*15*
427:*13*
437:*17*
481:*18*
486:*6*
490:*17*
539:*4*
545:*17*
560:*22*
561:*14*
**Google**
204:*12*

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| **Googleable** | 461:*9* | 341:*17* | 459:*8, 9* | 311:*7* |
| 204:*12* | 495:*12* | 356:5 | 461:*12* | 364:*22* |
| **goose** | 526:*4* | 363:*4* | 462:*25* | 379:*20* |
| 422:*24* | 538:*23* | 364:*7* | 464:*2* | 381:*9* |
| **gosh**  215:*14* | **greater** | 366:*14* | 489:*2* | 416:*11* |
| **Gou**  11:*6* | 168:*19, 23* | 367:*19* | 563:*24* | **hands** |
| 228:*24* | 234:*2* | **guesstimate** | **guy**  377:*25* | 200:*11* |
| 230:*14* | 382:*17* | 417:*6* | **guys**  108:*17* | **handwriting** |
| 560:*1* | 426:*1* | **guest**  86:*10* | 217:*4* | 19:*3* |
| **gradient** | 452:*25* | **Guide** | 262:*1* | **handwritten** |
| 333:*13* | **greatest** | 247:*22* | 302:*4*  474:*9* | 17:*10, 16* |
| 342:*22* | 303:*20* | **Gustavson** | | **hang**  19:*16* |
| 538:*16* | **ground** | 12:*22* | **< H >** | 25:*9* |
| **gradients** | 541:*15* | 22:*16* | **habit**  278:*5* | 173:*20* |
| 342:*11* | **grounds** | 26:*11, 12* | 280:*9* | 305:*20* |
| **graduate** | 257:*16* | 27:*4, 15* | **habits** | 518:*11* |
| 279:*15* | **group** | 28:*15, 21, 25* | 283:*20* | **happen** |
| **Grand**  3:*20* | 57:*25*  67:*8* | 29:*14* | 534:*2* | 19:*20*  83:*6* |
| 4:*2* | 108:*11, 15,* | 166:*11* | **Hackshaw** | 84:*3*  237:*3* |
| **grant** | *21*  109:*12* | 169:*14* | 205:*3, 7* | 435:*21* |
| 214:*15* | 111:*21* | 229:*13* | **HAIGHT** | 438:*1* |
| 309:*10* | 124:*3* | 365:*2* | 8:*19* | **happened** |
| 474:*22* | 198:*12* | 367:*13* | **HAILEY** | 173:*16* |
| **granted** | 241:*23* | 392:*15* | 3:*4* | 326:*6* |
| 466:*6* | 260:*11* | 407:*24* | **hair**  306:*11,* | 438:*21* |
| **graphic** | 377:*16* | 412:*15* | *17, 24*  307:*2,* | 439:*11* |
| 267:*5, 10* | 412:*2* | 429:*19, 20* | *12, 14* | 465:*3* |
| 493:*12* | 458:*25* | 430:*5, 8, 13,* | 308:*13* | 489:*12* |
| **graphics** | **groups**  58:*1* | *15*  431:*5* | 309:*22* | 562:*19* |
| 493:*19* | 59:*16, 25* | 432:*23* | 310:*14, 19,* | **happening** |
| **grave** | 198:*11* | 433:*3, 11, 17* | *25*  311:*4, 13* | 14:*1*  20:*12* |
| 355:*21* | **growing** | 434:*4, 11* | 312:*3, 13, 18,* | 174:*14* |
| **gray**  306:*11,* | 378:*6* | 435:*22, 25* | *19* | 175:*12* |
| *24*  307:*2, 12,* | **GRUNER** | 436:*11, 16,* | **half**  186:*3* | 427:*15* |
| *13*  308:*13* | 8:*6* | *24, 25*  438:*8* | 546:*19* | 470:*15* |
| 309:*21* | **Guaynabo** | 439:*11* | **halfway** | 524:*10, 20* |
| 310:*14, 19,* | 3:*9* | 445:*2, 11* | 467:*10* | 552:*2* |
| *25*  311:*4, 13* | **GUERRA** | 447:*6* | **hallway** | **happens** |
| 312:*3, 12, 18,* | 3:*1* | 448:*3* | 62:*15* | 72:*20* |
| *19* | **guess** | 449:*10, 24* | **Hampshire** | 83:*22* |
| **great**  97:*7* | 185:*23* | 450:*6* | 5:*13* | 106:*15* |
| 133:*7* | 210:*7* | 451:*17* | **hand** | 214:*6* |
| 249:*11* | 225:*17* | 453:*5* | 138:*16* | 364:*23* |
| 299:*10, 17* | 288:*24* | 458:*11* | 200:*7* | 453:*18* |

Confidential - Subject to Protective Order

**happy**
56:*12*  92:*9*
117:*13*
145:*25*
192:*8*
215:*5*
228:*11*
292:*24*
295:*11*
341:*16*
342:*19*
350:*6*
399:*24*
**hard**  43:*12,*
*17*  57:*19*
59:*23*
61:*18*  67:*2*
87:*23*
98:*13*
99:*19*
208:*2*
232:*18*
249:*4, 12*
254:*8*
281:*6*
283:*24*
284:*9*
301:*14*
314:*12, 13,*
*14*  345:*17*
382:*16*
409:*19*
415:*7*
418:*1*
435:*6, 8*
483:*7*
486:*7*
508:*22, 24*
515:*23*
561:*13*
**hard-and-**
**fast**  101:*9*
547:*24*

**harder**
313:*21*
**harm**
250:*12*
253:*21*
**Harmless**
445:*5*
**hat**  252:*22*
**HEACOX**
2:*15*
**head**  23:*4*
41:*15*
144:*19*
175:*5*
204:*21*
290:*22*
315:*20*
340:*22*
483:*20*
**headache**
249:*2*
**headaches**
352:*20*
356:*6*
**heads**
175:*12*
**Health**  7:*4*
11:*1, 19, 22*
43:*21*
44:*15, 17, 20*
97:*5*
138:*23*
189:*17*
274:*21*
275:*13*
373:*21*
**hear**  81:*22*
154:*6*
524:*15*
**heard**  34:*13*
44:*10, 13*
184:*7*
257:*21*
389:*4*

519:*16*
522:*24*
**hearing**
31:*7*
**heavily**
436:*18*
**heavy**
407:*12*
408:*3*
**held**  1:*12*
15:*8*
**help**  138:*18*
222:*23*
246:*22*
249:*16*
324:*7*  415:*5*
**helped**
279:*3*
**Helpful**
68:*9*  172:*10*
**hereinbefore**
567:*8*
**heritability**
10:*16*  71:*1*
73:*25*
74:*13*
95:*17, 20*
96:*4, 15*
97:*9, 12, 22*
98:*5, 20*
99:*4*  100:*9*
283:*4*
362:*25*
406:*4*
471:*23*
**heritable**
79:*14*  84:*8*
95:*23, 25*
363:*6*
398:*5*
471:*20*
536:*1*

**hesitation**
304:*6*
532:*20*

**heterogeneity**
370:*18*
558:*2*

**heterogenous**
372:*10*
**Hey**  27:*24*
135:*13*
**high**  41:*20*
241:*22*
290:*23*
368:*9*
379:*25*
380:*1*
391:*1*
418:*20*
419:*15, 18*
422:*3*
427:*6*
437:*22*
445:*16*
511:*7, 14, 19*
512:*6*
**higher**
41:*21*  69:*2*
70:*2*  263:*3*
420:*15*
427:*10*
464:*4*
465:*1, 14*
499:*12*
513:*15*
538:*24*
**highlight**
454:*10*
**highlighted**
87:*11, 12, 13*
206:*20*
236:*17, 18*
386:*5*

**highlighting**
380:*10*
383:*12*
526:*1, 3*
**highly**
79:*13*
262:*19*
382:*14*
427:*19*
483:*14*
535:*20*
536:*10*
**high-quality**
323:*20*
378:*21*
379:*10, 19,*
*23*
**Hill**  13:*13*
100:*20*
101:*9*
109:*23*
110:*1*
145:*11, 20,*
*25*  146:*7, 9*
177:*20*
178:*2*
179:*25*
180:*13, 14,*
*18*  181:*5*
225:*25*
226:*2, 5*
244:*18*
245:*1, 9, 15*
246:*3, 4, 7, 8*
247:*1*
343:*14*
394:*16*
395:*20*
494:*12*
525:*24*
526:*6, 12*
527:*24*
528:*12*
529:*3, 10*

Confidential - Subject to Protective Order

530:*21*
531:*11*
532:*16*
538:*13*
548:*3, 18*
**Hills** 8:*18*
**Hill's**
540:*16*
**historic**
298:*23*
**history** 69:*5*
117:*4*
118:*4*
130:*5, 16*
155:*17*
288:*23*
289:*3*
543:*19*
**Hold** 25:*20*
104:*3, 4, 5*
105:*11*
199:*20*
263:*12*
288:*4*
306:*7*
321:*13*
329:*7*
427:*25*
437:*9*
455:*11*
456:*1*
516:*20*
**holding**
390:*16*
**HOLWELL**
3:*11*
**honest**
325:*3*
460:*23*
461:*3*
470:*18*
**honorable**
186:*23*
188:*1*

**hope**
224:*23*
447:*5*
506:*10*
565:*10*
**hormones**
87:*1*
**Hornig**
260:*4*
**horse** 533:*2, 16*
**hospital**
506:*24*
517:*15, 23*
**hospital-administered**
505:*17*
506:*8, 9, 12*
507:*11*
508:*14*
**host** 56:*11*
94:*8* 132:*17*
**hour** 35:*3*
191:*13*
336:*15*
401:*25*
546:*8, 19*
553:*22*
**hours** 35:*7*
544:*17*
546:*3*
**Houston**
2:*23*
**HR** 35:*21*
**huge** 84:*8*
489:*6*
**human**
542:*1, 5*
**hundreds**
69:*8* 513:*14*
**HUNT** 2:*7*
**hwatts@wattsguerra.com**
3:*4*

**hyperactivity**
11:*12*
12:*21* 13:*2, 6*
**hyperkinetic**
23:*23*
384:*16*
**hypertension**
287:*6*
**hypotheses**
381:*3*
542:*1, 2*
**hypothesis**
88:*13*
113:*23*
230:*21, 25*
231:*1, 2*
275:*24*
276:*4, 11*
279:*18*
280:*19*
283:*22*
289:*18*
290:*13*
348:*2*
379:*6*
380:*23*
398:*3*
419:*9*
437:*23*
438:*5, 11*
461:*24, 25*
535:*9*
547:*17*
**hypothesized**
325:*9*
**hypothesizes**
543:*10*
**hypothetical**
68:*16*
253:*17*

314:*25*
365:*18*
366:*15*
404:*16*
444:*6* 516:*7*

**< I >**
**ibuprofen**
334:*5, 11, 14, 15, 19, 23*
335:*3, 19*
336:*9*
343:*8, 9*
397:*11, 18, 24* 425:*7, 14*
**idea** 50:*13*
52:*23*
207:*23*
252:*21*
278:*15*
286:*23*
291:*18*
297:*21*
346:*23, 24*
348:*12*
366:*7*
389:*3*
477:*1* 540:*6*
**Identical**
72:*7, 14*
82:*25*
283:*20*

**identification**
16:*10*
85:*20*
96:*24*
102:*9*
107:*5*
157:*7*
186:*12*
215:*11*
228:*20*
233:*1*

236:*11*
247:*8*
273:*2*
297:*8*
319:*24*
330:*10*
342:*10*
344:*13*
360:22
372:*24*
376:*21*
389:*6*
407:*2*
415:*14*
423:*1*
444:*21*
449:*21*
477:*18*
495:*6*
525:*21*
554:*14*
**identified**
180:*3*
379:*7*
489:*19*
543:*5*
**identifies**
466:*14*
**identify**
37:*6* 57:*25*
307:*16*
376:*15*
422:*1*
**ignore**
50:*13, 16*
51:*1*
387:*21*
458:*23*
**ignoring**
387:*7, 13*
500:*2*
**III** 4:*7*

**Illinois** 1:*18*
2:*10*  5:*3*
567:*19*
**illustrate**
447:*5*
515:*10*
**illustrated**
465:*12, 13*
563:*23*
**illustrates**
465:*9*
**illustration**
281:*10*
386:*10, 18,
19*
**imagine**
41:*18*
132:*4*
138:*14*
145:*18*
184:*14*
204:*21*
248:*18, 20*
278:*11*
290:*22*
301:*22*
364:*18*
382:*17*
512:*14*
**imagining**
563:*23*
**immediate**
36:*3*
**Immediately**
72:*22*
167:*24*
**immune**
125:*13*
134:*24*
**impact**  38:*1*
208:*12*
220:*20*
222:*16*
244:*3*

304:*11, 14*
323:*7*
339:*9*
413:*13*
438:*16*
466:*19*
469:*21*
470:*13*
471:*9, 22*
490:*11*
502:*7*
523:*7*
535:*23*
544:6  557:*1*
**imperative**
416:*17*
568:*13*
**imperfect**
158:*25*
260:*10*
313:*15*
316:*25*
317:*4*
319:*20*
322:*22*
323:*4*
325:*21*
342:*23*
372:*12*
381:*8*
390:*18*
419:*9*
505:*3, 8*
**imperfectly**
324:*15*
**implicate**
33:*9*
**implicated**
352:*23*
**implicating**
412:*7*
**importance**
390:*15*

454:*10*
469:*11*
**important**
18:*7, 14, 17*
29:*5*  48:*17*
60:*25*
65:*15*  68:*7*
83:*15*
177:*9*
195:*21*
198:*1*
218:*7*
222:*4*
238:*24*
279:*7*
280:*7*
315:*17*
317:*5*
318:*1*
322:*3*
325:*1*
351:*7*
362:*11, 22*
363:*1, 18*
372:*22*
390:*18*
391:*25*
392:*8*
400:*9*
403:*18*
410:*15*
422:*7*
431:*18*
436:*17*
445:*13*
453:*24*
454:*1*
457:*12*
469:*10*
487:*15*
494:*18, 19*
501:*16*
503:*7*
518:*21*

**importantly**
207:*21*
334:*13*
384:22
**impossible**
48:*8*  51:*5*
65:*13*
225:22
253:*18*
301:*21*
315:*1*
333:*24*
**imprecise**
316:*25*
411:*21*
412:*12, 21*
482:*1*
**imprecision**
177:*8*
413:2  460:*4*
**impressive**
43:*15*
380:*10*
**improbable**
225:*23*
**improper**
174:*4*
**improvement
s**  293:*5*
**inadequate**
334:*20*
**inadequately**
560:*16*
**inappropriat
e**  273:*23*
**incidence**
92:*23, 25*
93:*13, 18*
94:*7*
293:*21*
294:*4*
296:*9*
297:*2*

485:*8, 9, 13,
19*
**incidences**
93:*15*
**incident**
485:*20*
**include**
21:*12*
23:22  26:*5*
53:*15, 22*
54:*10*
71:*16, 17, 20*
96:*21*
166:*5*
246:*13*
311:22
433:*13*
482:22
547:*10*
**included**
169:*5*
214:*3*
246:*12*
310:*18*
315:*14, 16*
318:*11, 12*
432:*6*
555:*11, 12*
560:*18*
**includes**
56:*8*  181:*6*
207:*25*
229:*8*
385:*6*  476:*4*
**Including**
71:*11*  94:*8*
130:*4*
219:*14, 16*
286:*12, 16*
312:*10*
326:22
347:*19*
449:*1*
503:*10*

504:*17*, *24*
525:7
555:*13*
**inclusive**
443:*25*
**incomplete**
246:*16*
527:*21*
**inconclusive**
440:6, *25*
556:*15*, *23*
**inconsequent**
**ial** 488:*20*

**inconsistency**
18:6
382:*17*
385:*1*, *25*
387:*19*
391:*24*
395:*23*
**inconsistent**
98:6
207:*18*
382:*14*
383:*2*, *17*, *19*,
*24* 384:*8*, *23*
386:*4*
387:*3*, *10*
388:6
390:*1*
391:*11*
394:*18*
**incorporates**
525:6
**incorrect**
417:6
**increase**
64:*24* 65:*1*
92:*17*, *20*
93:*15* 94:6,
*12*, *14*
162:*10*, *11*
218:*15*

258:*22*
296:*22*
373:*20*
396:*24*
446:*25*
447:2
495:*24*
512:*4*, *8*
**increased**
91:*9* 93:*17*
94:8
113:*15*
115:*21*
116:7
117:5
120:6
127:6
130:*8*, *9*, *12*
135:*20*
177:*6*, *14*
216:*15*
217:*11*
226:*18*
227:*24*
230:*16*
240:*24*
251:7
263:*14*
268:*11*
294:*23*
296:*9*, *19*
356:7
369:*10*
397:*10*, *24*
399:*25*
400:*14*
405:*6*, *15*
417:*23*
418:*11*
436:*20*
437:*1*
465:*9*
488:2
492:*9*

495:*15*
498:*1*
510:*14*, *21*
**increases**
51:*18* 65:*3*,
*20* 66:*20*
147:*25*
239:*23*
353:*2*, *3*
397:6
423:*24*
501:*18*
514:*22*
565:*6*, 7
**increasing**
93:*1*, *3*
295:*18*
**incredibly**
161:*17*
457:*8*
494:*18*
**independent**
356:7
**independentl**
**y** 198:*18*, *25*
199:*4*
**INDEX**
10:*1* 483:*2*
555:*15*
**Indiana**
6:*15*
**Indianapolis**
6:*15*
**indicate**
53:*23*
57:*10*
97:*10*, *13*
171:6
488:*1*
558:*24*
**indicated**
223:*17*
352:*13*

353:*6*, *21*
354:8
**indicates**
400:*11*
414:4
**indicating**
321:*21*
**indication**
118:*15*
138:7
151:*20*
152:*3*, *5*, *8*
232:*22*
277:*7*, *15*
316:*24*
317:*2*, *10*
318:*20*
319:*13*, *19*
320:*13*
321:*5*, *25*
322:*4*, *16*, *20*,
*24* 323:*1*
324:*18*
325:*15*, *18*
342:*14*
351:*12*
353:*13*, *15*
354:4
355:*8*, *12*, *22*
358:*5*, *16*, *21*
359:*22*
367:2
368:*12*
374:*1*
425:*12*
517:5
547:*12*
**indications**
317:*1*
323:*22*
352:*21*
353:*17*
354:*11*, *16*,
*17* 355:*18*

**indisputable**
547:*16*
**individual**
116:*12*
124:5
137:*18*
145:*19*
172:*2*, *25*
174:*25*
175:*1*
179:8
184:*15*
210:*16*
276:*14*
555:6
**individual-**
**level** 41:*25*
**individually**
78:*14* 182:*1*
**individuals**
58:*3* 94:*15*
139:*25*
140:*18*
196:*25*
241:*23*
364:*16*
377:*16*
485:*23*
**individual's**
36:*3*
**infant**
322:*14*
**infantile**
23:*22*
**infection**
87:*1*
**infer** 210:*25*
**inference**
70:*13*
105:*15*
106:*9*, *23*
110:*8*
213:*4*

359:*12*
503:*12*
**inferring**
244:*4* 294:*1*
**inflated**
296:*6*
**influence**
71:*9* 96:*1*
223:*13*
243:*14*
**influences**
87:*4*
**inform**
112:*25*
241:*12*
243:*18*
245:*6* 491:*5*
**information**
13:*1* 93:*2*
118:*12*
120:*25*
159:*1*
208:*1*
212:*9*
231:*15*
255:*8*
263:*11*
311:*1*
333:*21*
334:*24*
342:*24*
357:*13*
358:*12*
381:*1, 2*
449:*12*
450:*7, 12*
454:*13*
460:*12*
487:*5*
490:*12*
497:*11*
501:*21*
503:*7*
516:*2*

519:*18*
541:*2*
**informative**
239:*22*
425:*17*
**informed**
207:*21*
**informing**
488:*9*
**ingest**
155:*11*
**inherent**
113:*19*
114:*24*
**initially**
73:*5*
**injection**
507:*8*
**injury** 32:*21*
**INMA**
237:*23*
**in-person**
295:*4*
**insignificant**
208:*25*
209:*3, 6, 14*
240:*6*
383:*24*
**instance**
303:*23*
538:*20*
**instances**
40:*7*
162:*18*
207:*8*
303:*24*
467:*4*
**institute**
377:*19*
**Institutes**
97:*5*
**instructions**
529:*13*
568:*1*

**instructive**
400:*7*
**instrument**
239:*1*
392:*24*
**instruments**
239:*5*
241:*17, 20,
21* 244:*6, 9*
255:*4*
**integrity**
140:*1*
318:*16*
393:*1*
445:*14*
462:*4, 22*
540:*23*
541:*2*
565:*24*
**intend** 20:*10*
**intended**
209:*8*
413:*23*
500:*18*
**intensely**
84:*18*
**intention**
301:*23*
435:*12*
**intentional**
234:*24*
235:*1*
272:*22*
433:*1*
**interact**
158:*13*
**interest**
36:*5, 7, 8, 20*
58:*7, 10*
60:*4* 304:*4*
**interested**
83:*11*
567:*12*

**interesting**
90:*3* 91:*14*
114:*14, 17*
115:*20*
116:*14*
118:*9, 18*
119:*7*
124:*21*
127:*2, 23*
134:*25*
136:*6, 15*
347:*25*
349:*12*
351:*3*
357:*18*
455:*22*
457:*8*
466:*18*
523:*1*
**Interestingly**
352:*22*
519:*25*
**interim**
128:*19*
**internalizing**
420:*15*
**International**
44:*8*
**interpret**
116:*15*
133:*15*
217:*8*
218:*6*
219:*12*
242:*20*
408:*7*
458:*20, 24*
464:*10*
486:*7*
512:*12*
**interpretatio
n** 145:*5*
188:*14*

191:*7*
217:*16*
218:*21*
219:*10*
221:*11*
226:*23*
245:*7*
262:*13*
270:*25*
427:*22*
466:*7*
469:*16*
486:*11*
491:*9*
**interpreted**
323:*14*
393:*7*
456:*22*
**interpreting**
190:*23*
241:*11*
457:*2*
502:*14*
**interrupt**
78:*21*
173:*25*
518:*9, 13*
**interrupted**
153:*2*
303:*13*
401:*19*
430:*22*
518:*14*
**interrupting**
257:*8*
371:*15*
**interruption**
98:*23*
111:*25*
**interrupts**
272:*25*
**interval**
52:*18*
161:*5*

165:*18*
168:*4*
408:*5*
463:*21*
469:*3*
511:*17*
512:*1, 7, 12*
**intervals**
53:*14, 22*
54:*5, 10*
56:*3*
160:*25*
211:*20*
465:*17*
466:*5, 24*
467:*9, 15, 20*
468:*10, 12*
**intervene**
37:*14*
**intramural**
36:*1*
**intrauterine**
83:*9*
162:*16*
235:*16, 22*
236:*5*
400:*15*
404:*7*
412:*7*
420:*20*
421:*5*
**introduce**
521:*7*
**introduced**
448:*24*
**introduction**
350:*10, 11*
**invalid**
502:*25*
**investigating**
89:*9*
**investigators**
433:*23*

**Invited**
12:*14*
415:*24*
**involve** 69:*9*
**involved**
34:*12* 94:*4*
140:*18*
198:*9*
252:*8*
433:*21*
**involvement**
111:*23*
**involves**
109:*8*
110:*15*
**irrelevant**
282:*2*
**irresolutely**
532:*22*
**irrespective**
433:*22*
507:*19*
**Irwin** 45:*15*
**isolate**
394:*22*
**isolation**
57:*4* 168:*1*
284:*13*
495:*2*
527:*21*
**issue** 218:*7*
258:*16*
294:*14, 15*
296:*8*
336:*6*
351:*8*
392:*3*
470:*6*
507:*22*
516:*3, 6*
**issued**
562:*10, 23*
**issues** 43:*21*
155:*10*

387:*7, 13, 21*
489:*19*
555:*2* 557:*8*
**items** 172:*2*
**iterative**
144:*7*
**its** 153:*22*
197:*23*
204:*9*
220:*20*
243:*14*
248:*9, 13*
307:*7*
332:*19*
333:*5*
391:*21*
394:*25*
440:*20*
441:*5*
502:*7*
528:*24*

**< J >**
**J&J** 36:*18*
**J.J** 2:*3*
16:*5* 19:*8*
20:*21*
80:*17*
174:*3*
191:*12*
192:*20*
237:*3*
246:*19*
531:*15*
**JAMA**
390:*14*
**JAMES**
5:*17*
**January**
128:*15*
**JANUSH**
2:*14*

**jcracken@w**
**attsguerra.co**
**m** 3:*6*
**Jennifer**
1:*11* 7:*19*
10:*11*
13:*23*
15:*12, 20*
86:*16*
428:*24*
442:*18*
567:*4*
569:*12*
**Jersey** 1:*20*
6:*9* 567:*21*
**JESSICA**
6:*8*
**jessica.brenn**
**an@btlaw.co**
**m** 6:*8*
**Ji** 13:*7*
260:*4*
316:*11, 12*
477:*25*
479:*24*
496:*1*
**Jim** 16:*19*
19:*14*
27:*24*
62:*14* 86:*9*
88:*20, 24*
102:*21*
149:*15*
204:*11*
259:*9*
330:*8*
344:*17*
401:*22*
402:*23*
514:*1*
548:*13*
**Jim's** 346:*2*
**JJ** 157:*10*

**jj.snidow@k**
**ellerpostman**
**.com** 2:*3*
**jlara@stoned**
**eanlaw.com**
8:*17*
**jmasterman**
**@cooperkirk**
**.com** 5:*13*
**jmurdica@bt**
**law.com**
5:*18*
**job** 346:*4*
379:*4*
433:*25*
474:*20*
499:*2*
503:*3*
561:*14*
**JOHN** 3:*6*
377:*23*
378:*3* 380:*3*
**Johnson**
6:*22* 34:*8*
**JOHNSTON**
5:*18*
**JOSEPH**
5:*12* 8:*17*
**journal**
193:*16*
297:*18, 24*
**journals**
193:*23*
**jstewart@ksl**
**aw.com** 7:*19*
**JUDGE** 1:*5*
31:*6, 10*
55:*18*
80:*23*
81:*14*
474:*8*
548:*23*
549:*3, 12, 19,*
*25* 550:*5, 7,*

**9** 552:*5*
553:*8, 9*
**judgements**
111:*5*
**judging**
54:*20*
**judgment**
100:*21*
101:*2, 3, 5,*
*10, 12*
105:*13, 22,*
*23*   106:*4, 6*
109:*21*
110:*5*
140:*16*
427:*2*
547:*23*
**judgments**
109:*8*
110:*16*
**Judicial**
103:*13*
306:*5*
555:*23*
**July**   128:*15*
521:*25*
562:*15*
**jump**   140:*5*
169:*8*
**jumped**
206:*9*
450:*19*
**jumping**
287:*9*
**June**   562:*13*
**jury**   31:*8*
113:*20*
**justifiable**
231:*23*
**justified**
219:*21*
220:*1*

**Kansas**
1:*20*   3:*21*
4:*3*   567:*21*
**KATIE**   8:*22*
**KATZ**   8:*12*
**KAUFFMA
NN**   9:*2*
76:*6*   128:*6*
**keep**   74:*10*
127:*7, 8*
138:*11*
246:*21*
273:*11, 16*
311:*8*
344:*9*   501:*7*
**KELLER**
2:*1, 6*
**KENDRICK**
8:*9*
**KERSHAW**
4:*13*
**kid**   536:*22*
**kids**   60:*10,*
*11*   404:*21,*
*25*   447:*17*
451:*19*
452:*14*
481:*21, 25*
484:*15*
487:*23*
510:*7*
**kind**   19:*9*
40:*4*
116:*16*
189:*25*
253:*23*
258:*3*
282:*24*
298:*14*
299:*22*
354:*5*
374:*4*
438:*21*
466:*21*

**< K >**

534:*14, 16*
539:*5*   544:*8*
**kindly**
311:*10*
**kinds**   48:*14*
69:*10, 15*
175:*22*
223:*11*
252:*23*
**KING**   2:*5*
7:*13, 17*
**KINSMAN**
4:*1*
**KIRK**   5:*12*
**KK**   84:*21*
**knew**
312:*19*
320:*7*   550:*1*
**know**   14:*6*
20:*8*   25:*24*
27:*25*
30:*21*   32:*6*
33:*10*   34:*7,*
*10, 11, 14*
35:*14, 20*
37:*16*
41:*19*
43:*25*   44:*1,*
*12, 16*   45:*2,*
*4, 5, 6, 7*
46:*21, 25*
49:*13*
51:*21*   52:*1,*
*9*   53:*4*
56:*23*
57:*19, 21*
58:*21*
59:*16*
60:*19, 21, 24*
61:*19*   63:*1*
66:*22*   67:*3*
71:*9*   72:*11,*
*16*   73:*4, 7*
74:*4, 9*

79:*12, 13, 14,*
*24*   83:*8*
84:*13*   91:*3*
92:*12*   93:*8,*
*19, 23*   95:*11*
96:*18, 19*
98:*10, 11*
99:*16, 17, 18*
102:*19*
103:*6*
104:*1*
109:*13, 18*
113:*7*
117:*6*
118:*10, 11,*
*15*   126:*5*
130:*25*
131:*3*
134:*22, 23*
135:*14*
136:*15, 24*
139:*11, 23,*
*24*   142:*21*
148:*15, 16*
149:*3, 5*
151:*13*
153:*5, 22, 25*
160:*7*
161:*15, 17*
165:*14*
167:*9*
173:*5, 12*
174:*21*
175:*22*
182:*8*
183:*3*
184:*13*
185:*5*
187:*6, 11, 15,*
*17, 21, 22*
194:*16*
195:*24*
200:*22*
201:*8*

203:*3*
204:*17*
214:*3, 11, 12*
218:*1*
219:*4*
222:*24*
223:*10, 24*
226:*21*
231:*11*
232:*13*
236:*24*
241:*19*
245:*25*
248:*7, 18*
249:*23*
251:*13, 14,*
*15, 17, 19*
252:*6, 23*
253:*2, 7, 11*
257:*5*
264:*17*
267:*4*
271:*23*
272:*21*
273:*21, 24*
275:*4, 9*
278:*9*
279:*4, 5, 13*
281:*3*
285:*7*
289:*10*
290:*17*
291:*4, 22*
294:*3*
295:*18*
301:*16*
306:*9*
308:*3*
309:*23*
313:*25*
314:*10, 12*
315:*14, 21*
317:*23*
318:*10, 18*

Confidential - Subject to Protective Order

319:*10, 16*
324:*14, 19*
330:*16*
332:*11*
333:*4*
334:*9, 12*
337:*18*
338:*2, 5*
340:*21*
348:*13, 14, 18* 349:*19*
350:*2*
353:*9, 11, 13, 14* 357:*2*
359:*18*
360:*5, 6*
364:*6*
365:*3*
367:*14*
371:*4, 16, 17*
377:*1, 7, 11, 13, 25*
378:*13, 15, 18* 381:*23*
382:*8*
386:*3*
397:*14, 25*
398:*5*
400:*3*
401:*5, 6*
406:*3, 4*
408:*9, 15*
409:*17, 19*
411:*10*
414:*11*
417:*18*
418:*24*
419:*20*
425:*3*
426:*11, 18*
427:*1, 8*
428:*11*
430:*16*
433:*22*

440:*14, 15, 16* 441:*7, 17, 19* 442:*4*
443:*5, 7*
448:*16*
449:*3*
456:*4*
462:*16*
469:*1*
470:*19*
472:*11*
475:*23*
485:*20*
486:*7*
488:*21*
491:*23*
494:*19, 22*
496:*6, 8, 11*
500:*24*
501:*8*
502:*7*
506:*23*
507:*24*
515:*23*
517:*19*
518:*7*
519:*13, 15, 16, 17*
524:*10, 15, 19* 525:*2, 8, 9* 526:*20, 23*
527:*2*
528:*15*
531:*10*
534:*14, 16, 20* 535:*25*
536:*1*
541:*22*
542:*10, 11, 24* 544:*6, 14*
556:*4, 10*
559:*8*
560:*23*
561:*5, 13*

**knowing**
93:*14*
208:*10*
301:*24*
305:*2* 471:*7*
**knowledge**
34:*9* 57:*18*
82:*9*
113:*13*
132:*1*
136:*5*
184:*13*
202:*11*
302:*9*
354:*15*
377:*6, 10*
440:*19*
441:*5*
**known**
64:*23*
140:*6*
416:*12*
543:*18*
**knows**
258:*18*
549:*8*
**KO**  7:*8*
237:*3, 6*
**KOHANE**
7:*1*
**KRAUSE**
4:*1*
**kricher@btlaw.com**  5:*21*
**Kriebel**
330:*13*
331:*15*
341:*20*
**KRISTEN**
5:*20*
**Kroger**  8:*19*
**ktrinh@hbblaw.com**  8:*22*

**< L >**
**lab**  196:*17*
**label**  12:*2*
33:*10*
146:*19, 24*
147:*7, 19*
148:*3, 7*
344:*15, 19*
345:*1, 5*
346:*22, 23*
347:*14*
360:*4, 6, 15*
**labeled**
92:*19*
94:*15*
295:*23*
**labeling**
344:*21*
345:*10*
**labels**
348:*13, 19*
**labor**  31:*4*
517:*6, 14, 18*
**lack**  292:*13*
343:*7*
418:*24*
464:*17*
**Lactation**
11:*15*
345:*22*
**laden**  111:*6*
**Ladies**
273:*18*
**laid**  526:*6*
**lane**  441:*25*
**language**
109:*16*
191:*2*
322:*3*  424:*1*
**LANIER**
2:*14*
**LARA**  8:*17*

**large**  95:*6*
229:*8*
363:*25*
381:*15*
413:*18*
414:*21, 24*
423:*15*
426:*15*
445:*12, 20*
454:*15*
502:*3*
**larger**  65:*9*
295:*22*
**large-scale**
375:*24*
**largest**
260:*9*
326:*24*
**latest**
435:*22*
**laugh**
287:*20*
**launched**
258:*17*
**LAUREN**
2:*9*
**lauren.schultz@kellerpostman.com**
2:*9*
**LAW**  2:*14*
4:*20*  5:*1, 5*
257:*22*
**lawful**  15:*21*
**LAWRENCE**  2:*22*
**lawyer**
165:*3*
**lawyer-created**
19:*12*
**lawyers**
564:*20*

**LAWYER'S**
14:*15* 571:*1*
**laying**
531:*3, 19*
**lcain@mofo.**
**com** 8:2
**LE** 4:*15*
**lead** 127:*5*
183:6
397:*10, 23*
398:*25*
410:*12*
413:*4, 8, 10*
459:*11*
460:*16*
533:*24*
534:*1*
**learn** 348:*21*
**learned**
130:*3*
348:*20*
448:*14*
**leave** 151:*23*
**leaving**
537:*25*
**lecture**
193:*8*
194:*14*
**LEE** 4:*15*
6:*1*
**left** 532:*21*
**legitimate**
547:*8*
**legitimately**
258:*19*
**lend** 230:*21*
**Leppart**
10:*23*
155:22, *24*
156:*10, 12*
158:8, *20*
159:8, *16*
160:9, *19*
396:*11, 13*

**Letter**
193:*10*
224:*19*
297:*15*
327:*19*
**Letters**
11:*15*
327:*17*
**letting** 20:7
**level** 116:*12*
120:*19*
382:*17*
492:*10*
518:*23*
**levels** 41:*20*
420:*16*
427:*10*
511:6, *11*
**Levy** 10:*14*
**Lexington**
3:*15*
**LIABILITY**
1:*4* 15:*10*
**lie** 199:*8*
200:*1, 13, 17*
**Liew** 11:*3*
21:*15, 25*
22:5 23:*15,*
*16, 20* 24:*11,*
*18* 25:*23*
185:5, *17, 22,*
*25* 186:*1, 25*
187:*12*
215:*16*
224:*10*
260:*4, 7, 8,*
*16* 261:*13*
328:*4*
339:*14, 18,*
*23* 340:*19*
381:*13*
383:7
534:*15*
558:5, *20*

559:*5, 17*
563:*11*
565:*1*
**Liew's**
559:*2*
**life** 194:*16,*
*25* 224:*17*
269:*9*
423:*23*
**life's** 476:*1*
**lifestyle**
71:*17*
89:*15* 96:*21*
**lifetime**
211:*2*
**light** 323:*15*
**likelihood**
65:*3, 20*
66:*20, 23*
176:*3, 16*
177:*14*
274:*25*
296:*1*
391:*1*
465:*1*
479:*4*
510:*9*
514:*22*
**Lilly** 30:2
**limit** 454:*15*
**limitation**
316:*17*
489:*1, 6*
**limitations**
145:*4*
323:*15*
346:*15*
348:*4, 7*
373:8, *14*
409:6
413:*22*
430:*13*
433:3, *12*
434:*4*

436:*4*
461:2
469:*14*
**limited**
221:*10, 23*
323:*17*
412:*10, 14*
454:*15, 19*
**limiting**
411:*21*
**limits**
417:*22*
**LINDSEY**
3:*19*
**line** 281:*5*
324:*23*
336:*17*
570:*3* 571:*3*
**linearly**
538:*21*
**lines** 104:*25*
108:*1*
332:5, *23*
386:*23*
**link** 49:*11*
50:*19*
68:*24*
69:*17, 22*
81:*10*
123:*1*
136:8
301:9, *11*
334:*10*
335:3, *19*
336:*22*
349:*13*
376:*18*
489:*13*
**linked**
89:*23*
116:*24*
233:*16*

**linking**
359:*15*
524:4, *25*
**list** 187:*23*
205:*20*
315:*13*
377:*22*
415:*20*
**literature**
18:*12* 26:*5*
29:6 37:*2*
48:*11*
55:*22*
101:*6*
112:*13*
117:*12*
119:*14, 20,*
*22, 25* 121:6,
*12* 127:*24*
132:*4*
140:*21*
142:3, *12*
143:6, *10, 20*
145:9, *12*
146:*10*
147:*21*
153:*16*
162:*19*
164:*15*
177:*22*
178:2, *8*
180:*3*
185:7, *9*
188:*15*
189:*18, 22*
190:*24*
194:*10*
195:9, *21*
201:4, *11, 21*
202:3, *5, 19*
203:*19*
205:*3*
210:*14*
213:*13*

Confidential - Subject to Protective Order

214:*21*
239:*5, 11*
256:*4*
267:*12*
280:*2*
333:*17*
344:*23*
347:2, *3*
348:*25*
353:*25*
354:*18, 23*
357:*18*
358:*14*
360:*7*
369:*21*
370:*9*
372:*2*
374:*23*
383:*4*
389:*25*
390:*13, 24*
391:*19*
393:*13*
394:*13*
395:*19*
396:*6, 9*
422:*8*
424:*19*
435:*18*
436:*1*
441:*24*
442:*13, 21*
444:*14, 19*
453:*25*
472:*25*
476:*14*
477:*7, 9*
501:*22*
515:*14*
522:*22*
524:*4, 24*
525:*15*
526:*13*
532:*12*

534:*13*
535:*5*
539:*8*
541:*8*
543:*4, 10*
544:*15*
555:*3*
556:*22*
557:*8*
561:*20*
**LITIGATIO N**  1:*4, 22*
9:*5*  15:*4, 11*  30:*8*
34:*11*
140:*19*
142:*14*
553:*21*
**litigations**
262:*1*
**little**  74:*22*
80:*12*  95:*6*
98:*13*
131:*20*
142:*1*
149:*24*
232:*18*
239:*6*
249:*9*
256:*7*
266:*11*
277:*25*
278:*2*
281:*6*
305:*8*
313:*9, 20, 21*
340:*22*
447:*4*
480:*5, 7*
485:*3*  543:*3*
**LLC**  2:*1*
3:*1*  5:*1*
8:*24*

**LLP**  3:*11*
5:*17*  6:*1, 6, 13*  7:*1, 5, 13, 17*  8:*1, 6, 14, 19*
**location**
211:*4*
**long**  25:*15*
102:*19*
128:*17*
165:*20*
287:*15*
301:*25*
310:*17*
360:*8*
364:*8*
375:*3*
473:*5*
536:*21*
**longer**
45:*13, 17*
192:*9*
223:*17*
250:*25*
312:*21*
**longer-term**
166:*14*
**longitudinal**
12:*21*  13:*3*
427:*9, 12*
**long-term**
166:*20*
427:*20*
**look**  16:*20*
21:*12*  24:*3*
28:*15*  32:*3*
49:*20*
78:*24*  80:*2*
83:*16*  84:*3, 6*  104:*12*
107:*24*
110:*13*
112:*25*
115:*7, 8*

120:*25*
140:*15*
146:*1*
149:*21*
156:*25*
157:*1*
162:*3*
164:*7*
165:*13*
168:*2*
173:*15*
178:*18*
181:*25*
184:*15*
186:*17, 22*
192:*5*
198:*6*
203:*19*
204:*16*
205:*24*
206:*3, 12*
208:*11*
210:*6, 19*
212:*7*
220:*12*
221:*2*
224:*5*
227:*20*
228:*11*
233:*3*
242:*18*
250:*3*
265:*24*
269:*17*
275:*6, 19*
278:*1*
282:*11*
284:*18*
287:*1, 12, 13, 16*  292:*4, 22*
305:*12*
312:*2*
315:*12, 22*
321:*13*

322:*8*
337:*20, 21, 24*  338:*1, 3, 9, 15*  340:*14*
341:*13*
353:*5*
354:*25*
356:*25*
368:*13, 18*
383:*21*
384:*2*
385:*15*
386:*20*
387:*4*
391:*23*
394:*11*
395:*6*
398:*19*
399:*22*
406:*5*
407:*18, 23*
408:*10*
414:*11, 12*
415:*18*
418:22
420:*1*
422:*12, 18*
423:*19*
425:*1, 21*
426:*11*
430:*20*
435:*13*
437:*5*
445:*2*
450:*10*
455:*4, 7*
458:*19*
459:*7*
462:*24*
479:*22*
480:*14, 20*
482:*4*
484:*24*
485:*22*

Confidential - Subject to Protective Order

486:*16*
494:*12, 22,
24* 495:*2*
500:*22*
507:*16*
509:*8, 16*
516:*15*
527:*5, 10, 25*
529:*4, 9*
544:*24*
545:*12*
551:*25*
552:*13*
563:*12*
564:*2*
**looked**
113:*14*
156:*5, 7*
163:*6, 17*
165:*25*
203:*1, 23*
207:*18*
247:*15*
287:*10*
319:*11*
334:*10*
353:*18*
447:*8, 17*
470:*12*
481:*6, 8*
487:*3*
511:*9*
534:*19*
544:*16*
552:*12*
564:*13*
**looking**
33:*3* 38:*24*
46:*18, 19*
48:*18*
55:*21*
69:*23*
145:*11*
156:*23, 24*

157:*21, 23*
164:*15*
166:*18*
167:*1, 2*
172:*3, 24*
175:*24*
205:*7*
209:*1*
210:*16*
225:*10*
243:*13*
261:*19*
265:*4*
266:*7*
275:*9*
291:*4*
315:*7*
324:*11*
341:*7, 20*
379:*2*
384:*11, 12,
16, 17*
386:*12*
388:*8*
390:*22*
393:*5*
428:*17, 20,
21* 437:*13*
469:*4*
474:*25*
476:*8*
481:*12, 15,
17* 487:*2*
494:*11*
505:*21*
508:*2*
509:*2*
513:*8*
524:*17*
541:*1*
544:*4*
557:*11, 12*
**looks** 22:*13*
30:*1* 53:*10,*

17  88:*21*
108:*17*
109:*14*
118:*5*
149:*24*
164:*25*
166:*2*
188:*3*
207:*11*
238:*17*
262:*3*
266:*22*
267:*13*
338:*19*
361:*19*
362:*5*
369:*1, 15*
407:*13*
415:*6*
446:*1*
451:*3, 17, 24*
475:*4*
479:*23*
**Los** 5:*22*
8:*23*
**lose** 115:*16*
**loss** 427:*6*
**lost** 225:*1*
254:*21*
298:*16*
308:*12*
401:*21*
**lot** 81:*1*
90:*5*
118:*10*
129:*19*
185:*11, 15*
205:*17*
319:*10*
357:*2*
380:*25*
427:*12*
462:*4*
481:*21, 25*

486:*13*
494:*1*
496:*15*
561:*4, 6*
**Lots** 8:*24*
460:*2*
514:*21*
536:*6*
**Louisiana**
1:*20* 2:*23*
567:*22*
**love** 457:*14*
**low** 250:*23*
323:*14*
364:*24*
439:*1, 3, 10,
18* 440:*23*
443:*23*
445:*16*
454:*2, 22*
455:*15, 20*
456:*18*
483:*3*
511:*7, 12*
**lower** 38:*14*
161:*4*
217:*5*
446:*13*
**lscarcello@w
cllp.com**
3:*20*
**ltracey@trac
eylawfirm.co
m** 2:*22*
**LUCAS**
6:*20*
**luck** 226:*13*
**LUFF** 5:*5, 7*
**lunch**
259:*12*
264:*18, 20*
265:*1*
**Lunchtime**
264:*1*

**lung** 41:*3, 5,
10, 16, 21*
68:*25* 69:*2,
7* 200:*23*
201:*17*
204:*19*
207:*4*
208:*19, 22*
209:*22*
210:*9*
211:*1*
213:*14*
268:*1, 17, 20*
276:*5, 12, 15,
24* 278:*5*
280:*11*
283:*10*
289:*23*
290:*8, 18*
291:*12*
292:*11, 14*
293:*3, 21*
294:*7, 12*
302:*4, 17*
532:*6*
538:*21*
**LYNDSEY**
8:*1*

**< M >**
**Ma'am**
62:*21* 99:*2*
434:*23*
**machine**
204:*13*
537:*19*
**made-up**
62:*12*
**Madison** 7:*2*
**magnitude**
494:*14, 23*
**Mailman**
44:*14, 16*

Confidential - Subject to Protective Order

main 224:*3*
368:*6*
407:*16, 23*
445:*10*
446:*1*
456:*8*
458:*13*
463:*5*
468:*18*
major
423:*15*
majority
361:*25*
526:*11*
makers
348:*11*
359:*23*
making
165:*7*
213:*4*
277:*5, 22*
280:*23*
287:*20*
300:*2*
359:*12*
435:*6, 7*
547:*24*
manic
353:*7, 22*
354:*8, 19*
355:*9, 11*
Manual
10:*18*
102:*13*
103:*2*
437:*8*
440:*10, 15*
443:*15*
473:*22*
555:*24*
manuals
441:*7, 22*
manuscript
144:*3*

marital
482:*23*
mark 19:*10, 25* 20:*6*
51:*25*
86:*13* 97:*2*
102:*11*
186:*16*
215:*15*
228:*23*
233:*4*
248:*22*
297:*11, 12*
320:*3*
330:*13*
344:*16*
361:*2*
376:*23*
389:*8*
407:*5*
415:*21*
423:*3*
449:*23*
477:*21*
495:*10*
525:*23*
548:*14, 21*
549:*2, 10*
550:*9, 16, 19, 20* 551:*1, 12, 13*
MARKED
10:*13, 17*
16:*10, 13*
17:*24*
85:*20*
96:*24*
102:*9*
103:*16, 19, 22* 107:*5*
157:*7*
186:*12*
215:*11*
228:*23*

233:*1*
236:*11, 14*
247:*8*
273:*2*
297:*8*
319:*24*
330:*10, 17, 24* 331:*1, 2, 6* 344:*13*
360:*22*
361:*1, 4*
372:*24*
376:*21*
389:*6*
402:*11*
407:*2*
415:*14*
422:*23*
423:*1*
444:*21*
449:*21*
477:*18*
495:*6*
525:*21*
551:*22*
554:*13*
marker
19:*22* 20:*6, 22* 125:*11*
130:*7*
490:*5*
502:*12*
markers
136:*6* 487:*7*
market
114:*20*
Marking
19:*1* 20:*8*
107:*7*
273:*5*
548:*20, 22*
549:*5, 19*
551:*20*

554:*4*
marks 17:*15*
MARY 4:*9*
mary.raybon
@beasleyalle
n.com 4:*10*
Maryland
31:*6*
Masculinity
287:*24*
mass 483:*1*
555:*15*
MASTERM
AN 5:*12*
match
328:*21*
matched
364:*10*
426:*10*
Matching
403:*7*
material
399:*24*
materials
340:*10*
509:*9*
Maternal
10:*20* 11:*4*
12:*11*
13:*15*
22:*14*
116:*23*
117:*3*
130:*15*
155:*10*
169:*20*
226:*17*
227:*23*
234:*3*
316:*25*
322:*14*
323:*22*
362:*6*
401:*7*

482:*22*
483:*1*
489:*20, 22*
490:*14, 21*
497:*13, 19, 23, 25*
535:*22*
537:*13*
555:*14*
Maternal-
Fetal 489:*20*
math 59:*18*
61:*5, 21*
62:*22*
mathematica
l 62:*25*
mathematica
lly 64:*6, 15*
matter 15:*9*
41:*20*
79:*15*
101:*10, 11*
116:*5*
181:*11*
225:*23*
270:*8*
271:*8, 18*
361:*1*
381:*6, 16*
404:*25*
443:*18, 19*
515:*9*
547:*23*
552:*19*
556:*23*
matters
360:*18*
410:*20*
453:*22*
493:*24*
max 523:*14*
maximum
266:*11*
415:*12*

**MCGEE**
9:5   15:2
**mcharchalis**
**@btlaw.com**
5:20
**mcwatts@wa**
**ttsguerra.co**
**m**  3:3
**MDL**   1:3
15:11
**mean**   22:9
38:13
39:19
50:21
57:12
65:12   73:4
77:20
87:16   96:8
97:22   99:4
100:10
106:1
111:13
123:2
147:2
158:2
159:2
161:2
167:2
176:11
178:18
182:14
190:20
201:7
213:20
215:1
219:3
246:2
266:14
267:2, 14
269:8
270:4
285:1
286:15
288:6

303:14
314:1
349:15
363:14
367:11
399:9
406:12
408:8
421:5
430:7, 24
456:4
458:17
460:1, 2, 4,
24   475:23
476:22
477:2
486:3, 8
488:19
509:15
518:9
523:21
526:24
537:18
538:4
542:23
553:14
**meaningful**
467:1
528:25
**meaningless**
63:2   64:7,
18   168:1
465:15
**means**
26:10
52:24   55:9
71:4, 6
159:3
191:5
208:5
262:25
273:22
286:6
382:9

400:16
447:3
479:3
486:8
503:6
504:8, 13
505:2, 7
511:9
**meant**
140:20
307:16
412:22
**measure**
41:25
46:22
208:14
222:17
260:10
262:13
292:6
304:12
305:13
308:14
313:15
314:3
372:12
375:10
396:10
409:14
410:10
413:3
419:11
425:18
433:7
439:6
452:16
471:24
476:21
477:12, 14
483:8
491:22
497:22, 24
508:1   540:9

**Measured**
13:9
313:19, 23
323:21
391:5
488:3
497:12
513:6
**measurement**
313:24
336:12
410:19
460:1, 6, 9
487:9
488:24
490:23
497:18
513:23
**measures**
23:21
**measuring**
394:19, 20
419:10
490:6   534:7
**mechanism**
541:23, 24
545:14
**mechanisms**
195:9, 10
221:21
541:25
543:11
**Meconium**
13:9
492:21
495:24
496:6
497:2, 7, 9,
13   498:2
506:8
508:1
510:8, 15, 17
511:6

513:24
517:24
518:24
519:5, 18
520:7, 8, 14
521:8
**media**   34:4
255:7
257:22
**Mediated**
13:10
**mediating**
469:25
470:13
**mediation**
470:6
**mediator**
470:7, 8, 9
**medical**
196:13
295:3
351:9, 13
555:15
**medication**
12:3
115:15
118:11
139:2
189:15
223:14, 16
253:20
286:8, 10
350:12
374:20
**medications**
334:6
**Medicine**
43:10, 21
44:5   489:20
**Medium**
445:16
**Medline**
10:14

Meeting 12:*10*
meetings 111:*21*
member 42:*4*, *15* 44:*4* 108:*11*
members 364:*9*
memory 202:*13* 228:*14* 318:*10* 341:*14*
mental 11:*1*
mention 186:*24* 188:*2* 220:*9* 358:*3* 389:*21* 427:*4*
mentioned 23:*15* 117:*23* 139:*9* 181:*7* 188:*4* 333:*19* 528:*2* 563:*10*
mentioning 220:*2*
Meridian 6:*14*
Mervyn 45:*8*, *17*
mess 249:*21*
message 563:*21* 564:*24*, *25*
messed 521:*9*

met 34:*16*, *24* 378:2 530:*19*
meta 323:*19*
meta-analyses 143:*17* 145:*23* 146:*13* 369:*20* 370:*13* 371:5, *25* 372:8 557:*22*
meta-analysis 11:*6*, *13*, *19* 143:*6* 145:*17* 207:*24* 229:2, *3* 231:*11* 237:*10* 238:*23* 241:*16* 244:*9* 320:*4*, *8* 324:*17* 325:*13* 351:*18* 369:*16*, *20* 370:*7* 372:2, *14* 557:*25* 560:*21*
method 267:*20* 328:*21* 526:*6*, *12*, *23*, *25*
methodologic 40:*2* 181:*15*

217:*18*
231:*18*
296:*18*
317:6
348:*4*, *7*
349:*14*
356:*14*
433:*23*
489:*18*
557:*7*
methodological 346:*14*
methodologically 260:*12*
methodology 295:2, *8*
methods 222:*4* 229:*9* 328:*13*, *16* 502:*24* 535:*1*
METHVIN 4:*5*
mice 545:*7*
MICHAEL 9:2 76:*5*, *6* 128:*5*, *6*
middle 200:*8* 268:*14* 273:*17* 311:7 333:*3*
migraine 118:*17* 352:*20* 353:*19* 356:6
MIKAL 3:*3*
MILES 4:*7*
milk 496:*23* 518:*5* 520:*13*

Millennium 3:*8*
million 60:*11*
mind 63:2 104:*19* 138:*22* 139:*8* 144:*20* 168:*1* 179:*3* 261:*18* 263:*13* 265:*4* 281:*22* 291:*8* 317:9, *11* 319:*21* 324:5, *10* 335:*13* 349:*15* 372:*14* 385:*1* 412:*24* 422:*16* 425:*19* 456:*12* 489:*7* 513:*10* 527:*21* 530:*18*
mine 87:*21* 186:*18* 198:*4* 306:*10* 326:*5* 381:*1* 428:*19*
minimize 328:*16*
minimum 511:*25*
minute 284:2

minutes 259:*12* 545:*22* 546:*4*, *6*, *15*, *17*, *25*
mischaracterization 233:*22* 241:*3*
mischaracterized 235:*12*
mischaracterizes 242:*17*
mischaracterizing 222:*13* 234:7 244:*3*
misclassification 370:*19* 409:*24* 410:*9* 459:*21* 460:*3*, *8*
misclassifications 410:*3*
misfiled 326:*8*
misguided 211:*16*
Misoprostol 115:*12* 123:*20* 132:*9* 133:*8*, *10*
missed 269:*23* 270:*4*
missing 331:*11* 365:*10*
Missouri 1:*19* 3:*21* 4:*3* 567:*19*

misspoke
412:23
421:2
mistake
389:19
misunderstoo
d 48:25
374:25
MITCHELL
5:19
mixed
353:7, 22
354:19
MM 90:7
MoBa
315:20
427:5
430:15
433:19
434:20
435:24
436:22
model
308:7
309:4
310:18
311:22
312:5, 10, 17
314:6
463:10
469:23
models
309:15
454:14
moderate
321:22
418:20
419:15, 18
moderately
230:16
Modern
12:11
modest
342:8

modifiable
37:6, 9, 11
38:8  40:17,
22  41:2, 4,
14  42:2
modify
38:14
mom
404:17
420:3
452:19
moment
198:15
254:5
259:3, 5, 7
315:4
395:13
mom's
405:10
MONAGHA
N  3:14
money
35:11, 13
monitor
216:4
monozygotic
73:9  74:6,
15  282:15,
19  283:5
Monroe  5:2
monster
380:16

Montgomery
4:11
month
522:2
months
194:16
224:16
448:11
559:3
562:12

mootable
554:9
morning
16:3, 4
221:16
MORRIS
8:6

MORRISON
8:1
Morristown
6:9
mortality
306:11, 23
309:23
310:14, 19
311:13
312:13
mosaic  72:9
mother
22:17  45:9
71:8, 19
91:8  117:4
125:14
127:6
130:6
152:12
449:3
452:17
496:12, 13
519:3
521:6
535:15
536:20
555:16
mothers
398:6
450:15, 21
451:19
452:12
517:1
Mother's
116:17
117:17

118:14
123:21
152:6
161:24
373:21
motion
548:24
move
122:21
163:12
273:14, 15,
19
MPH  1:12
10:12
15:20
567:4
569:12
multiple
111:20
172:5
176:15
309:14
364:9
514:14
multiplicity
516:3
multiply
175:15
multitude
171:25
multivariate
310:13, 17
311:21
314:18, 22
MURDICA
5:17  10:6
17:7  18:20
19:8, 16, 24
20:5, 21, 25
21:3, 7
22:10, 24
23:7, 18
24:7, 13, 20,

24  25:8, 13,
17  26:2, 17
27:18, 22
28:2, 19
29:11, 15
32:12
33:12
36:21
38:10, 16
39:14, 23
40:19  42:9
43:1, 23
44:22  46:5,
13  47:13
48:1, 4
49:14, 17
50:5, 9, 23
51:12  52:5
54:13
55:12  56:4,
20  58:12, 15
59:4, 20
60:14  61:6,
24  62:3, 7,
10, 16  63:7,
19  64:11
65:5, 22
66:13, 24
67:23
68:14  69:3
70:6  71:24
72:23
73:22  75:7,
21  76:14
77:8  78:1,
9, 17, 20, 24
79:6  80:5,
20, 24  81:4,
12, 16, 21
82:19
83:18
84:10  85:3,
12  86:11
87:13, 20

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 88:*8, 19, 21, 25*  89:*7* | 139:*19* | 195:*16* | 259:*11* | 313:*7* |
| 90:*14, 21* | 140:*8, 22* | 197:*2* | 261:*6, 22* | 314:*7, 19* |
| 91:*11, 23* | 141:*8* | 199:*15* | 263:*5, 23* | 315:*9* |
| 92:*14* | 142:*23* | 200:*4* | 264:*2, 15* | 316:*6* |
| 93:*10, 25* | 144:*22* | 201:*13, 22* | 265:*6, 15, 25* | 317:*17* |
| 95:*4*  96:*11* | 145:*14* | 202:*21* | 266:*24* | 318:*7, 21* |
| 98:*8, 24* | 146:*11, 21* | 203:*10* | 267:*15* | 319:*14* |
| 99:*11, 25* | 147:*10, 15* | 206:*11* | 269:*4, 24* | 320:*21* |
| 100:*13, 22* | 148:*1, 11, 25* | 207:*5* | 270:*13, 22* | 324:*1, 6, 21* |
| 101:*17* | 149:*7* | 208:*7* | 271:*20* | 327:*14* |
| 102:*1, 14, 24* | 150:*15, 21* | 209:*7, 17* | 272:*12, 19* | 329:*19* |
| 103:*24* | 151:*15* | 210:*11* | 273:*6, 16, 21* | 332:*14* |
| 104:*3, 13* | 152:*15, 25* | 211:*11* | 274:*1, 12, 15* | 335:*5, 16, 21* |
| 105:*16* | 154:*6, 10, 16, 20*  156:*17* | 212:*4, 15* | 275:*2, 14* | 336:*4, 14, 17, 24*  337:*16* |
| 106:*11, 24* | 157:*13* | 213:*6* | 277:*10* | 339:*4, 15* |
| 107:*10, 13, 16*  108:*5* | 158:*22* | 214:*9* | 278:*12* | 341:*5* |
| 110:*9, 18* | 159:*20* | 217:*13, 23* | 279:*10, 19* | 343:*22* |
| 111:*17* | 160:*10* | 218:*17* | 280:*4, 25* | 345:*2, 13, 24* |
| 112:*1, 18* | 165:*1, 6* | 219:*6, 18* | 281:*19, 24* | 347:*20* |
| 113:*9* | 166:*23* | 221:*17* | 282:*6, 16* | 348:*16* |
| 114:*2, 10* | 167:*20* | 224:*12* | 283:*1, 12* | 349:*8, 23* |
| 115:*4* | 168:*14* | 227:*2, 17* | 284:*11, 14, 23*  285:*5* | 350:*20* |
| 116:*20* | 170:*7, 23* | 228:*7* | 286:*1, 14* | 351:*19* |
| 117:*20* | 171:*15* | 230:*6* | 289:*7, 25* | 352:*6* |
| 118:*24* | 172:*15, 21* | 231:*8* | 290:*10, 19* | 354:*12* |
| 120:*14* | 173:*20, 23* | 232:*2, 9* | 291:*1, 15* | 355:*14, 23* |
| 121:*16* | 174:*16* | 234:*13, 25* | 292:*18* | 356:*19* |
| 122:*1, 16, 22* | 175:*17* | 235:*4* | 293:*8, 11, 23* | 357:*5* |
| 123:*10, 24* | 176:*5, 21* | 236:*20* | 294:*9, 20* | 358:*6, 22* |
| 124:*18* | 178:*21* | 239:*12* | 296:*14* | 361:*5* |
| 126:*1, 11, 17* | 179:*22* | 240:*18* | 297:*19* | 362:*8* |
| 127:*19* | 180:*8, 25* | 243:*1* | 298:*18* | 365:*20* |
| 128:*22* | 181:*22* | 245:*12* | 299:*3, 8* | 367:*17* |
| 129:*16, 24* | 183:*8, 18* | 246:*19* | 300:*3, 24* | 370:*1, 10* |
| 130:*23* | 184:*10* | 248:*5* | 301:*12* | 371:*11, 14* |
| 131:*8* | 185:*12* | 249:*14* | 302:*6, 19* | 372:*4* |
| 132:*14* | 186:*5, 18, 20* | 250:*16* | 303:*6, 12* | 373:*9* |
| 133:*11* | 187:*9, 19* | 252:*19* | 305:*20* | 375:*5* |
| 134:*3, 8* | 189:*8* | 253:*5* | 307:*1* | 380:*18* |
| 135:*6* | 190:*2, 17* | 254:*1, 18* | 308:*16, 24* | 386:*7, 14* |
| 136:*2, 11, 22* | 191:*10, 16* | 255:*12* | 310:*3, 21* | 387:*15* |
| 137:*15, 22* | 192:*10, 18* | 256:*20* | 311:*6* | 388:*17, 24* |
| | 194:*7* | 257:*6, 17* | 312:*14* | 391:*13* |
| | | 258:*11* | | |

Confidential - Subject to Protective Order

392:*20*
393:*17, 21*
395:*8*
396:*18*
397:*12*
398:*15*
401:*2, 16, 19, 24*  402:*14*
403:*1*
404:*3*
405:*12*
406:*10, 23*
409:*8*
413:*6*
417:*2*
423:*8*
430:*22*
431:*9, 22*
433:*15*
434:*6, 15*
435:*1*
436:*6, 9*
439:*13*
440:*11*
442:*5*
443:*9*
444:*3*
445:*3, 17*
448:*21*
451:*20*
452:*1*
454:*4, 24*
457:*5, 25*
459:*15, 22*
461:*16*
462:*9*
463:*14*
464:*7*
465:*4, 22*
467:*21, 25*
468:*21*
471:*16*
472:*6, 21*
473:*11, 25*

474:*7*
475:*11, 20*
476:*16*
479:*6*
480:*1, 25*
481:*10, 19, 23*  482:*18*
483:*22*
484:*16*
485:*16*
486:*19*
489:*3*
490:*19*
491:*17*
492:*6, 25*
493:*18*
494:*4*
495:*21*
497:*4*
498:*8, 20*
499:*4*
501:*11*
503:*14, 21*
504:*9, 19*
505:*4, 25*
507:*5, 12*
508:*3, 18*
509:*5*
510:*11*
511:*2*
512:*9, 18*
513:*16*
514:*4*
518:*11*
519:*7, 23*
520:*16, 21*
521:*3, 11, 16*
522:*4, 14, 19*
523:*16, 23*
524:*7, 16, 21*
525:*12*
526:*9, 18*
528:*4, 9*
529:*6*

530:*4, 25*
531:*13*
532:*7*
533:*6, 18*
535:*6, 17*
536:*12, 23*
537:*8, 20*
538:*3*
539:*13*
540:*11, 20*
541:*13*
542:*7, 16*
543:*7*
544:*18, 22*
545:*18*
546:*5, 7, 13, 17, 22*  547:*2*
548:*19*
549:*1, 14, 21*
550:*6, 11, 18, 24*  551:*2, 4, 6, 9, 18, 23*
552:*1, 6, 13, 18*  553:*3, 19*
554:*7, 16*
563:*4, 17*
564:*8, 16*
565:*13*
566:*2*
**mutations**
71:*18*

**< N >**
**N.W**  6:*3*
7:*9*
**NADINE**
7:*1*
**naïve**
135:*17*
**name**  15:2
16:*5*  44:*13*
86:*16*
107:*25*
111:*15*

185:*8, 10*
335:*20*
336:*21*
**named**
45:*12*
278:*24*
**names**  19:*7*
20:*20*  21:*6*
140:*5*  141:*2*
**Naples**  4:*22*
**narrative**
428:*22*
429:*3*
430:*5*
431:*16*
**National**
12:*9*  21:*15*
43:*10*  44:*5*
97:*5*  377:*2, 4*  559:*21*
**Nature**
11:*15*
297:*15, 17, 22*  298:*1*
331:*2*
373:*18*
468:*11*
**NCRA**
567:*17*
**necessarily**
120:*8*
216:*20*
319:*4*
517:*12*
532:*21*
**necessary**
395:*20*
568:*4*
**necessity**
223:*15*
**need**  16:*18, 24*  25:*11*
46:*11*
47:*19, 23*

56:*23, 25*
79:*9, 18, 24*
81:*5*  82:*16*
92:*6, 12*
93:*7*
126:*17, 20*
127:*7*
132:*18*
134:*22*
136:*16*
144:*10*
163:*8*
165:*6*
168:*2*
169:*17*
174:*12*
175:*23*
177:*10*
178:*19*
208:*11*
220:*15, 18, 19, 22*
242:*20*
248:*24*
267:*4*
274:*12, 15*
284:*25*
286:*9*
296:*20*
306:*24*
307:*6, 8, 12, 15*  309:*7*
319:*3*
323:*20, 25*
340:*10*
343:*17*
352:*25*
353:*4, 14*
356:*12, 15*
359:*10, 11, 13, 16*
363:*25*
364:*12*
370:*22*

Confidential - Subject to Protective Order

376:2, *3*, *10*
396:*25*
399:*22*
419:*17*
442:*3*
451:*9*
452:*5*
454:*16*
464:*21*
466:*20*
469:*15*
470:*7*
494:*12*, *23*
507:*16*
513:*4*
527:*9*, *25*
539:*3*, *6*
540:*18*
**needed**
457:*9*
**needs**
165:*18*
170:*12*
189:*2*
198:*17*
304:*3*, *21*, *23*
325:*21*
351:*3*
**negative**
162:*2*
222:*25*
223:*7*, *20*
225:*11*
226:*16*
227:*22*
236:*2*
240:*2*
266:*11*
328:*25*
338:*12*
398:*18*
400:*7*, *10*
401:*12*
440:*6*

441:*1*
443:*25*
449:*5*, *6*
556:*15*, *23*
557:*21*
**negatives**
410:*13*
413:*5*, *9*, *10*
**neither**
72:*8*  73:*12*
375:*19*
567:*10*, *11*
**Neonatal**
247:*22*

**neonatologist**
196:*7*
**net**  241:*20*
305:*8*, *10*
380:*24*
**Network**
13:*11*
**neurodevelop
ment**  11:*23*
12:*18*
346:*18*
347:*18*
**Neurodevelo
pmental**
10:*22*
11:*18*
129:*5*
197:*22*
292:*1*
331:*25*
334:*11*
342:*3*
369:*22*
379:*3*, *21*
381:*19*
392:*11*
425:*7*
430:*19*
488:*18*

499:*13*
532:*4*  545:*1*
**neurologist**
196:*4*
**neurotic**
286:*19*, *24*
287:*4*
**neuroticism**
286:*12*, *16*,
*22*  288:*20*
398:*9*
**neurotoxicol
ogy**  377:*23*
**never**  30:*4*
31:*21*, *24*
34:*16*, *24*
66:*2*  75:*4*
79:*2*  90:*24*
103:*9*
114:*15*, *18*
117:*24*
131:*16*
137:*18*, *21*
138:*16*
146:*25*
185:*7*
210:*10*, *13*
239:*14*
245:*11*, *14*
247:*25*
253:*18*
272:*3*, *8*, *10*,
*14*  289:*8*
291:*8*
303:*9*
327:*18*
329:*24*
367:*21*
374:*16*
387:*20*
389:*3*
390:*20*
430:*2*
443:*15*

465:*8*
549:*25*
554:*4*
555:*25*
556:*9*
**Nevertheless**
334:*1*
560:*13*
**NEW**  1:*1*,
*20*  2:*17*
3:*15*  5:*13*
6:*9*, *21*  7:*3*,
*15*  8:*3*, *13*
472:*11*
518:*16*
524:*22*
565:*21*
567:*21*
**Nexium**
30:*8*
**nice**  139:*3*
389:*14*
**nicely**
246:*20*
532:*2*
**Nigel**  45:*12*
**nine**  164:*4*
170:*5*
331:*18*, *21*,
*22*  342:*1*
547:*15*
**nkohane@btl
aw.com**  7:*2*
**NN**  76:*3*, *25*
**nods**  23:*4*
483:*20*
**noncausal**
565:*4*
**non-
cigarette**
288:*14*
**nondiagnosti
c**  229:*23*

**nondifferenti
al**  410:*4*
459:*20*
**nonexposed**
464:*5*, *6*
465:*2*
**nongenetic**
89:*10*
**non-quacks**
140:*12*
**nonresponsiv
e**  371:*23*
**non-sibling**
445:*10*
**nonsignifican
t**  55:*9*
167:*7*
206:*21*
208:*5*  465:*7*
**Nonsmokers**
13:*15*
292:*14*
538:*25*
**Nope**  21:*21*
154:*8*
492:*17*
**North**  2:*10*
**Norway**
22:*18*
**Notably**
483:*4*
**Notary**
567:*23*
569:*19*
**notation**
76:*21*
**note**  17:*10*,
*16*  58:*12*
62:*3*  165:*1*
237:*17*
355:*11*
375:*18*
470:*19*
554:*21*

noted 15:15
432:18
515:18
559:10
568:10
569:7
NOTES
571:1
NOTES.........
.....................
571 14:15
notice
461:5
484:12
noticed
16:25 69:1
70:1 82:2
141:6
notion
69:16
109:6
110:14
224:7
226:20
438:9
488:23
novo 71:18
nuance
393:2
nuanced
134:21
135:18
null 27:1,
10 29:8
38:2 59:7,
10, 17, 19
60:7
130:18
158:3, 5, 6
169:3
279:18
365:7, 12
366:6, 22
369:18, 25

370:4, 8, 21
371:5, 25
372:3
392:7
408:22, 23
409:1
410:5
412:17
414:2, 22
416:19
419:8
432:10
437:23
438:4, 11, 20,
22 439:7
456:2, 5
461:24
463:19
464:16
466:5
Number
15:11 47:1,
3, 19 48:19
49:8 94:14
179:6
214:20
323:17
326:1
364:24
377:19
384:11
385:4
402:19
411:20
413:18
414:21
415:4
419:1
426:19
431:8
432:18, 23
434:25
446:2
482:4

485:22
538:22
539:19
548:15
numbering
428:20
numbers
52:3, 14
60:17
61:19
64:16
156:16
157:5
207:9
334:18
345:18
364:19
365:2, 9
385:5, 10
430:3
455:13
456:16
480:23
481:7
491:3
494:8
508:21, 23
513:8
number's
494:1
numerous
562:17
nurse
506:25
nursing
496:16
520:6
NW 5:13

< O >
object 19:8
21:7 22:10
25:10
29:11 52:5

58:15
61:24
80:15
82:19 89:7
110:9
112:18
113:9
114:2
120:14
123:10, 24
126:19
127:19
131:8
192:10
208:7
209:7, 17
219:18
266:24
306:15
313:7
317:17
318:7
324:21
341:5
409:8
417:2
436:6
439:13
535:6
536:23
537:8, 20
538:3
539:13
540:11
542:7
544:18
545:18
550:17
Objection
18:20
19:14
22:24 23:7,
18 24:7, 13,
20 25:8

26:2, 17
27:18, 25
28:19
29:15
32:12
33:12
36:21
38:10, 16
39:14, 23
40:19 42:9
43:1, 23
44:22 46:5,
13 47:13
48:1 49:14
50:5, 9, 23
51:12
54:13
55:12 56:4,
20 58:12
59:4, 20
60:14 61:6
62:4, 6
63:7, 19
64:11 65:5,
22 66:13, 24
67:23
68:14 69:3
70:6 71:24
72:23
73:22 75:7,
21 77:8
78:1, 9
83:18
84:10 85:3,
12 88:8
90:14, 21
91:11, 23
92:14
93:10, 25
95:4 96:11
98:8 99:11,
25 100:13,
22 101:17
102:1

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 105:*16* | 168:*14* | 232:*2, 9* | 307:*1* | 397:*12* |
| 106:*11, 24* | 170:*7, 23* | 239:*12* | 308:*16, 24* | 398:*15* |
| 110:*18* | 171:*15* | 240:*18, 19* | 310:*3, 21* | 401:*2* |
| 111:*17* | 172:*15, 21* | 243:*1* | 312:*14* | 404:*3* |
| 114:*10* | 174:*16* | 245:*12* | 314:*7, 19* | 405:*12* |
| 115:*4* | 175:*17* | 248:*5* | 315:*9* | 406:*10, 23* |
| 116:*20* | 176:*5, 8, 20,* | 250:*16* | 316:*6* | 413:*6* |
| 117:*20* | *21*  177:*4* | 252:*19* | 318:*21* | 423:*8* |
| 118:*24* | 178:*21* | 253:*5* | 319:*14* | 431:*22* |
| 120:*15* | 179:*22* | 254:*1, 18* | 320:*21* | 433:*15* |
| 121:*16* | 180:*8, 25* | 255:*12* | 327:*14* | 434:*6, 15* |
| 122:*1, 16, 22* | 181:*22* | 256:*20* | 329:*19* | 436:*9* |
| 124:*18* | 183:*8, 18* | 257:*6, 17* | 332:*14* | 440:*11, 12* |
| 126:*1, 11* | 184:*10* | 258:*11* | 335:*5, 21* | 442:*5* |
| 128:*22* | 185:*12* | 261:*6, 22* | 336:*4, 24* | 443:*9, 10, 11* |
| 129:*16, 24* | 186:*5* | 263:*5, 23* | 337:*16* | 444:*3* |
| 130:*23* | 187:*9, 19* | 264:*15* | 339:*4, 15* | 445:*3, 17* |
| 131:*9* | 189:*8* | 265:*6* | 345:*2, 13* | 448:*21* |
| 132:*14* | 190:*2, 17* | 267:*15* | 347:*20* | 451:*20* |
| 133:*11* | 192:*18* | 269:*4, 24* | 348:*16* | 452:*1* |
| 134:*3, 8* | 194:*7* | 270:*13, 22* | 349:*8, 23* | 454:*4, 24* |
| 135:*6* | 195:*16* | 271:*20* | 350:*20* | 457:*5, 25* |
| 136:*2, 11, 22* | 197:*2* | 272:*12* | 351:*19* | 459:*15, 22* |
| 137:*15, 22* | 199:*15* | 275:*2, 14* | 352:*6* | 461:*16* |
| 139:*19* | 200:*4* | 277:*10* | 354:*12* | 462:*9* |
| 140:*8, 22* | 201:*13, 22* | 278:*12* | 355:*14, 23* | 463:*14* |
| 141:*8* | 202:*21* | 279:*10, 19* | 356:*19* | 464:*7* |
| 142:*23* | 203:*10* | 280:*4, 25* | 357:*5* | 465:*4* |
| 144:*22* | 207:*5* | 281:*19, 24* | 358:*6, 22* | 467:*21, 25* |
| 145:*14* | 209:*18* | 282:*6, 16* | 362:*8* | 468:*21* |
| 146:*11, 21* | 210:*11* | 283:*1, 12* | 365:*20* | 471:*16* |
| 147:*10, 15* | 211:*11* | 286:*1, 14* | 367:*17* | 472:*6, 21* |
| 148:*1, 11, 25* | 212:*4, 15* | 289:*7, 25* | 370:*1, 10* | 475:*11, 20* |
| 149:*7, 15* | 213:*6* | 290:*10, 19* | 372:*4* | 476:*16* |
| 150:*15, 21* | 214:*9* | 291:*1, 15* | 375:*5* | 479:*6* |
| 151:*15* | 217:*13, 23* | 292:*18* | 380:*18* | 480:*1, 25* |
| 152:*15* | 218:*17* | 293:*23* | 386:*7* | 481:*23* |
| 154:*9* | 219:*6* | 294:*9, 20* | 387:*15* | 482:*18* |
| 158:*22* | 221:*17* | 296:*14* | 388:*17, 24* | 483:*22* |
| 159:*20* | 224:*12* | 297:*19* | 391:*13* | 484:*16* |
| 160:*10* | 227:*2, 17* | 300:*3, 24* | 392:*20* | 485:*16* |
| 165:*1, 8* | 228:*7* | 301:*12* | 393:*17* | 486:*19* |
| 166:*23* | 230:*6* | 302:*6, 19* | 395:*8* | 489:*3* |
| 167:*20* | 231:*8* | 303:*6* | 396:*18* | 490:*19* |

| | | | | |
|---|---|---|---|---|
| 491:*17* | **objective** | 165:*17* | 141:*25* | 546:*20* |
| 492:6, *25* | 320:*11* | 277:*19* | 177:*15* | 554:5 |
| 493:*18* | 321:*2* | 310:*15* | 226:*19* | **Okay** 16:*12* |
| 494:*4* | | 389:*10* | 353:*4* | 18:*14* |
| 495:*21* | **observational** | 436:*18* | 400:*1* | 19:*21* 20:*3,* |
| 497:*4* | 38:*21* 39:*5,* | 483:*19* | 499:*14* | *5, 13, 25* |
| 498:*8, 20* | *21* 40:*1, 8* | 484:5 | **Oh** 63:*14* | 21:*3, 18* |
| 499:*4* | 51:2, *6* | 500:*21* | 68:*23* | 22:*20* |
| 501:*11* | 117:*24* | **occupationall** | 75:*14* | 23:*12* 24:*3* |
| 503:*14, 21* | 120:*3* | **y** 30:*16, 18* | 77:*23* 78:8 | 25:*4, 12, 13* |
| 504:*9, 19* | 133:*18, 23* | **occupied** | 91:*2* | 26:*8, 11, 16* |
| 505:*4, 25* | 138:*2* | 194:*10* | 137:*21* | 27:*3, 11, 14* |
| 507:*5, 12* | 216:*6* | **occurred** | 140:*6* | 28:*4, 12, 15* |
| 508:*3, 18* | 217:*1, 3* | 521:*20* | 167:*11* | 29:*10, 23* |
| 510:*11* | 252:*1, 10, 14* | **occurrence** | 175:*13* | 30:*7, 8, 11* |
| 511:*2* | 269:*9* | 292:*13* | 184:*3* | 31:*11* 32:*4* |
| 512:*9, 18* | 271:*14, 25* | **occurs** 73:*5* | 186:*1* | 33:*16* |
| 513:*16* | 373:*18* | **odds** 160:*21* | 205:*7* | 39:*12* 42:*4* |
| 519:7, *23* | 375:*24* | 161:*14, 16* | 206:*8, 10* | 43:*9* 46:*10* |
| 520:*16, 21* | 542:*14* | 174:*14* | 215:*14* | 47:*22* |
| 521:*16* | **observed** | 175:*4, 7, 12* | 245:*18* | 50:*16* |
| 522:*4, 14, 19* | 196:*24* | 207:*10* | 247:*18* | 51:*10* |
| 523:*16, 23* | 237:*15* | 407:*13* | 248:*24* | 52:*13, 21* |
| 524:7 | 326:*25* | 408:*3* | 249:*24* | 53:*25* 54:*8,* |
| 525:*12* | 332:7 | 479:*12, 15* | 275:*21* | *18* 57:*3, 21* |
| 526:*9, 18* | 373:*19* | 495:*15, 25* | 276:*22* | 58:*23* 59:*1* |
| 528:*4, 9* | 459:*12* | 527:*15* | 293:*10* | 62:*16, 19* |
| 529:*6* | 460:*17* | **offended** | 326:*9* | 64:*9* 66:*11* |
| 530:*4, 25* | 529:*20* | 274:*4* | 328:*9* | 67:6 70:*18* |
| 531:*13* | 530:*1, 6* | **offensive** | 349:*19* | 71:*11* 73:*3* |
| 532:7 | **obstetrician** | 274:*8, 14, 19* | 361:*5, 7* | 74:*4* 76:*7,* |
| 533:*6, 18* | 247:*17* | **offer** | 373:*11* | *14* 77:*21* |
| 535:*17* | **obstetricians** | 210:*15* | 374:*24* | 80:*1, 5, 18* |
| 536:*12* | 247:*19* | 443:*13* | 384:*5* | 81:*3, 13* |
| 540:*12, 20* | 251:*11* | **offhand** | 402:*17* | 82:*4* 84:*15* |
| 541:*13* | **obtains** | 146:*14* | 408:*23* | 85:*22* 86:*2,* |
| 542:*16* | 205:*3* | **officer** | 428:*11* | *6, 8* 88:*5* |
| 543:7 | **obvious** | 552:*9* | 444:*23* | 90:*6* 91:*2* |
| 544:*22* | 165:*14* | **offices** 1:*12* | 447:*24* | 92:*4* 95:*16* |
| 563:*17* | 261:*21* | **offspring** | 452:*18* | 97:*21* |
| 564:*8, 9* | 389:*10* | 11:*6* 12:*7,* | 499:*23* | 100:*18* |
| 565:*13* | 467:*5, 9* | *13, 20* 13:*2* | 519:*15* | 104:*17, 23* |
| **objections** | **obviously** | 117:*6* | 524:*14* | 106:7 |
| 126:*18* | 48:*15* 81:*9* | 118:*7* | | 108:*7, 25* |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 110:*23* | 189:*13* | 264:9, 22 | *24* 341:22, | 452:*18, 21* |
| 111:*14* | 191:*14, 17,* | 265:8, 21 | *24* 342:7 | 455:6 |
| 112:*10, 17,* | *18, 25* 192:7 | 266:*4, 16* | 343:*18* | 459:*10* |
| *23* 113:8 | 194:*18* | 267:23 | 344:2 | 462:*14* |
| 115:*1* | 195:*1* | 268:25 | 345:9 | 474:7 |
| 118:2, 8 | 198:*14* | 270:6, *17* | 346:9 | 476:*13, 25* |
| 119:*24* | 199:7 | 272:*20* | 349:2 | 477:*5* |
| 120:*10, 18* | 200:*10* | 273:*20* | 353:*20* | 478:*1* |
| 122:*10* | 202:9 | 274:*17* | 355:5 | 480:*12, 15,* |
| 123:*14* | 203:*17, 25* | 275:*19, 22* | 360:*23* | *19* 481:*18* |
| 124:*13* | 204:6 | 280:*1* | 363:*19* | 486:*3, 16* |
| 126:*15* | 206:*3, 10, 13* | 281:9, *17* | 365:*17* | 500:*5, 11, 14* |
| 127:4 | 207:2, *17* | 284:7, *20* | 366:*4* | 506:*18* |
| 129:*11* | 209:*24* | 287:9, *17* | 368:*24* | 507:*18* |
| 131:*4* | 211:*6, 23* | 288:6, *8* | 372:*20* | 509:2 |
| 132:*21* | 215:2, *25* | 289:*4, 14* | 373:2, *12* | 514:*4* |
| 133:5 | 218:*24* | 290:*17* | 375:*1, 17* | 515:*5* |
| 135:*21* | 220:8, *15* | 291:7 | 380:*2, 5* | 516:*15* |
| 138:*10* | 221:2, 9 | 293:2, 7 | 384:6 | 519:*12* |
| 139:*15* | 223:*21* | 296:25 | 386:*17* | 523:*13* |
| 141:*14* | 224:9, *23* | 297:*6, 14, 24* | 389:8 | 524:*3* |
| 142:9 | 225:*16* | 298:*21* | 394:2, *6* | 525:*18* |
| 143:*21* | 227:8, *12* | 299:2, *18, 20* | 395:*17, 24* | 526:5 |
| 149:*17* | 231:*22* | 300:*11* | 404:*15, 20* | 527:*23* |
| 150:7, *9, 10* | 232:7, *21* | 302:*14* | 405:*18* | 531:*16* |
| 151:*21, 25* | 234:*23* | 303:*25* | 408:*25* | 532:*17* |
| 152:*23* | 235:*10, 14,* | 304:*19* | 412:*18* | 537:*25* |
| 154:5 | *20* 237:*13* | 306:*1* | 415:*17* | 538:*16, 19* |
| 156:*10, 14,* | 238:7 | 310:*12* | 419:*13* | 541:*19* |
| *16* 157:*23* | 239:*17* | 311:*15, 17,* | 420:*1* | 546:*1, 5* |
| 158:7 | 240:*3, 13* | *19, 23* 315:*3* | 422:9 | 547:*5, 14* |
| 159:7, *12* | 242:*1, 25* | 318:*18* | 428:*1, 13, 14,* | 548:*10, 12* |
| 161:*22* | 243:*19* | 320:2 | *15* 429:*1* | 549:*11* |
| 163:*14, 21* | 244:*11* | 321:*13, 20* | 430:*12* | 550:*24* |
| 164:*13* | 245:*24* | 325:*19* | 433:2 | 551:8, *19* |
| 166:*4, 17* | 246:*10, 14* | 327:*11* | 435:*11* | 552:*18, 21* |
| 168:*25* | 247:5 | 328:*10* | 437:9 | 554:*25* |
| 169:*4, 16* | 251:*24* | 330:*19* | 440:*22* | 555:6 |
| 170:2 | 253:*13* | 331:*9, 11, 21,* | 441:9 | 556:*11* |
| 171:*23* | 259:*9, 13* | *22* 333:*10* | 444:*25* | 557:*24* |
| 173:*9, 22* | 260:6, *21* | 337:*4, 12* | 447:*24, 25* | 558:*3, 12, 25* |
| 175:*14* | 261:*13, 18* | 338:2, *15* | 449:*23* | 559:*16, 20,* |
| 182:5 | 262:7 | 339:*1* | 450:*4, 20* | *25* 560:*10* |
| 187:*14* | 263:*16* | 340:*12, 23,* | 451:8 | 561:*4, 19* |

Confidential - Subject to Protective Order

562:*14, 22*
563:*4, 6*
565:*25*
**old** 298:*13*
299:*22*
**older** 91:*8*
**Olsen** 11:*3*
185:*22, 25*
186:*1*
215:*16*
224:*9*
328:*4*
558:*5* 565:*1*
**omission**
431:*19*
433:*1*
**omitted**
432:*24, 25*
**once** 31:*1*
130:*17*
173:*16*
225:*21*
364:*19*
559:*12*
**ones** 58:*6*
91:*19*
132:*8, 11*
136:*5*
143:*5*
151:*19, 22*
156:*6*
165:*25*
173:*6*
206:*20*
288:*17*
302:*3*
305:*8*
317:*8*
318:*11*
383:*12, 13*
476:*15*
487:*25*
502:*25*

555:*19*
562:*19*
**one's** 41:*6*
128:*14*
492:*21*
**Ongoing**
86:*23, 25*
119:*4*
138:*18*
139:*9*
**OO** 94:*23*
**open** 27:*4,*
*14* 106:*9*
537:*25*
**opened**
565:*5*
**operate**
117:*7*
**operates**
359:*17*
**opine** 75:*11*
130:*2*
139:*25*
147:*19*
148:*4*
251:*23*
347:*4*
441:*6* 442:*9*
**opining**
442:*17, 19*
**opinion**
32:*20, 24*
33:*8* 106:*6*
114:*4, 15*
120:*20*
121:*7, 8*
129:*8*
140:*25*
142:*15*
143:*15*
144:*13*
146:*23*
147:*20*
180:*3*

190:*11*
210:*15*
230:*9*
239:*22*
241:*13*
243:*14, 18*
265:*16*
292:*25*
302:*25*
303:*9, 17*
333:*4*
344:*24*
347:*23*
354:*3*
426:*24*
441:*13*
443:*13*
472:*23*
488:*10*
491:*5*
492:*13*
548:*11*
558:*23*
564:*25*
565:*3*
**opinions**
129:*1*
133:*21*
224:*20*
**opposed**
30:*16*
223:*16*
**opposite**
162:*19*
**option** 67:*21*
**options**
67:*9* 216:*11*
**oral** 506:*22*
507:*8*
517:*17*
**ORDER**
1:*6* 16:*15*
177:*12*
200:*16*

212:*9*
241:*22*
325:*6*
326:*10*
330:*18*
344:*9*
364:*2*
422:*3*
442:*2*
470:*6*
509:*9*
515:*24*
539:*4*
**organization**
42:*8, 21, 23*
44:*11*
184:*23, 25*
377:*19*
**origin**
71:*20* 441:*5*
**original**
109:*24*
110:*2*
568:*14*
**originally**
69:*21, 22*
250:*11*
**outcome**
21:*11*
22:*16*
23:*21* 27:*9*
33:*3* 37:*15*
38:*2* 39:*3*
46:*18*
49:*12*
51:*19*
57:*13* 58:*6,*
*10, 19* 60:*4*
115:*9*
118:*6*
121:*4*
127:*12*
164:*3*
176:*10, 14,*

*25* 177:*3*
180:*17*
198:*19*
199:*1, 5*
220:*23*
229:*24*
241:*25*
243:*16*
261:*16*
304:*4, 22, 25*
338:*13, 24*
341:*4*
364:*5, 17*
365:*24*
366:*1, 2, 3, 9*
370:*19, 22*
372:*11*
376:*19*
379:*3*
381:*19*
391:*5*
392:*12*
405:*23*
411:*3*
417:*15*
418:*25*
419:*4*
421:*1*
424:*7, 18*
426:*5, 8, 23*
430:*19*
436:*24*
448:*15, 17*
451:*1*
453:*2*
489:*14*
499:*13*
512:*24*
513:*7*
532:*4*
533:*22*
534:*10*
545:*1*

**outcomes**
11:*19*   24:*1*
48:*17*
164:*6*
171:*25*
172:*4*
211:*16*
244:*4*
256:*17*
334:*11*
342:*3*
369:22
384:*15*
390:*23*
421:*20, 23*
423:25
425:*8*
426:*20*
515:*3*
561:*24*
**outset**  348:*8*
**outside**
74:*24*  271:*9*
**Outstanding**
44:*20*
45:*16*
184:*23*
**overall**
145:*12*
161:*20*
231:*5*
238:*20*
239:*19*
242:*18*
260:*23*
291:*20*
304:*10, 11*
385:*5, 25*
387:*20*
392:*9*
393:*4*
394:*17*
439:*17, 24,*
*25*  467:*17*

468:*9, 14*
507:*21*
530:*17*
560:*19*
**overascertain**
**ment**  295:*14*
**overcalling**
295:*14*
**overcome**
40:*9*
**overlap**
56:*3*
467:*24*
468:*3*
**overlapping**
466:*24*
467:*10, 14,*
*19*  468:*11*
**overly**
231:*23*
**Overruled**
165:*9*
**oversimplific**
**ation**  300:*6*
**oversimplifie**
**d**  321:*12*
**overstepped**
189:*18*
**overstepping**
319:*21*
**overview**
430:*5*
**overwhelm**
66:*7*
**Oxnard**
8:*18*

**< P >**
**p.m**  264:*4,*
*5, 7*  337:*7, 8,*
*10*  402:*4, 5,*
*7*  473:*13, 14,*
*16*  514:*7, 8,*

*10*  566:*5, 6*
**PA**  15:*8*
**pack**  539:*21*
**packs**
539:*22*
**PADGETT**
6:*13*
**PAGE**  10:*2,*
*10*  17:*20*
86:*16*
103:*14, 16*
104:*17*
109:*1*
110:*24*
111:*1*
149:*19, 23*
164:*13*
166:*8*
177:*17*
202:*14*
204:*23, 25*
206:*9*
210:*19*
215:*21, 24*
221:*3*
222:*21*
229:*4*
233:*8*
235:*17*
237:*12*
259:*16*
261:*9*
275:*20*
278:*2*
292:*4*
321:*10*
324:*5, 10*
326:*13*
328:*8, 10*
331:*17*
341:*23*
345:*17, 18*
346:*8*
355:*3*

361:*6*
369:*1*
373:*6*
377:*21*
378:*4*
381:*20*
382:*20*
383:*3*
387:*4, 5*
389:*16*
395:*1*
402:*9, 11, 13*
409:*3*
416:*7*
423:*13*
427:*24*
428:*4, 9, 12,*
*16, 18, 19, 25*
429:*4, 16*
430:*20*
433:*11*
434:*9, 10*
437:*12, 15*
438:*3*
445:*25*
450:*10*
459:*7, 9*
478:*4*
516:*19*
560:*12*
570:*3*  571:*3*
**pages**
102:*19*
204:*10*
232:*13*
284:*4*
389:*11*
569:*5*
**paging**
373:*8*
**paid**  377:*17*
**pain**  138:*24*
152:*6*
189:*15*

223:*13, 14*
487:*13*
517:22
**pair**  405:*19*
430:*3*
**pairs**
282:*15, 20*
364:*3, 24*
365:*16, 19*
366:*18*
413:*18*
414:*21*
415:*5*
416:*25*
419:*2*
425:*21*
426:*6*
429:*9, 15*
431:*8*
432:*19*
**Paneth**
45:*12*
**paper**
108:*18, 20*
111:*20*
144:2, *4*
152:*11*
153:*14*
165:*19*
183:*23*
186:2
215:*17*
224:*3*
228:*24*
238:*19*
340:*19*
353:*24*
358:*19, 25*
359:*3, 6*
361:*11, 13,*
*14*  389:*14*
416:*5*
420:*24*
426:*21*

429:*12*
430:*13, 15*
434:*11*
448:*3*
449:*11*
461:*12*
477:*25*
485:*7*
489:*2*
519:*2, 10, 11*
**papers**
101:*14*
142:*19*
143:*21*
144:*12*
186:*9*
188:*1*
340:*15*
503:*10*
**paracetamol**
11:*23*
12:*16*
423:*22*
425:*11*
**paragraph**
17:*23*
109:*3*
110:*25*
215:*21*
242:*19*
245:*21*
246:*6*
276:*8*
283:*16*
287:*10*
298:*20*
342:*8*
346:*10*
357:*1, 24*
358:*3*
**paragraphs**
238:*16*
284:*3*

**parent**
287:*6*
**parental**
89:*22* 91:*5,*
*16* 362:*19,*
*24*
**parents**
30:*15*
**parity** 483:*2*
**Park** 3:*8*
5:*21* 6:*9*
**parse**
471:*10*
**part** 37:*5*
74:*5* 86:*4*
108:*19, 20*
147:*4*
196:*22*
248:*8*
294:*25*
298:*6*
300:*8*
344:*21*
347:*1, 6*
348:*22, 24*
350:*1*
373:*20*
383:*18*
391:*18*
392:*16*
395:*23*
418:*12*
471:*7*
474:*20*
475:*8*
502:*3*
515:*15*
533:*11*
541:*1*
549:*6*
551:*15*
552:*7, 20, 25*
**partial**
304:*16, 20*

**partially**
472:*18*
**participant**
427:*7*
**participated**
450:*16, 22*
**participation**
427:*7, 9*
**particular**
109:*14*
232:*22*
250:*22*
316:*2*
400:*23*
475:*16*
533:*24*
534:*1, 2*
556:*12*
**particularly**
169:*25*
**particulate**
41:*20* 116:*5*
**parties**
567:*11*
**partly**
380:*21*
471:*2*
**partner**
540:*6*
**PARTNERS**
4:*20*
**parts** 103:*25*
**pass** 548:*13*
**passed** 71:*7,*
*18*
**paternal**
226:*17*
234:*1*
236:*7*
400:*2, 3, 6, 9,*
*13* 401:*6*
**paternity**
228:*3*

**pathetic**
553:*15*
**pathway**
93:*20*
117:*3*
127:*3*
199:*8, 22*
200:*2, 14, 18*
359:*14, 17*
376:*9, 11*
486:*10*
534:*5*
**pathways**
543:*5, 14*
**patients**
75:*11, 25*
78:*15*
**PATRICK**
5:*7*
**patrick@luff**
**law.com** 5:*7*
**pattern**
237:*14*
384:*13, 19*
386:*1*
**patterns**
386:*20*
491:*15*
**paucity**
425:*14*
**PAUL** 6:*2*
**paying**
435:*4*
**PDF** 389:*15*
**Pediatric**
42:*14*
183:*15*
**Pediatrics**
489:*21*
**peer** 503:*5,*
*12*
**peer-**
**reviewed**
141:*22*

347:*2*
348:*25*
523:*4*
**peers**
193:*20*
**pending**
191:*12*
**Penn** 35:*12,*
*17, 21*
182:*14*
475:*3*

**Pennsylvania**
1:*14* 8:*8*
**people** 45:*4*
69:*1, 23, 24*
70:*1* 102:*4*
106:*20*
119:*5*
138:*15*
139:*16*
140:*11*
188:*15*
196:*19, 22*
197:*10*
214:*20, 24*
219:*10*
234:*6*
258:*20*
285:*17*
301:*8, 17*
302:*15*
394:*22*
430:*8*
469:*10*
476:*19*
480:*6*
485:*3*
486:*13*
499:*8, 18*
501:*7*
504:*4*
539:*20*

**percent**
64:*23*  65:*1*
71:*2*  73:*25*
74:*7, 16*
82:*12*  83:*1,
3, 4*  84:*7, 9,
13, 16*  96:*5,
6, 9, 19*
97:*23*  98:*4,
21*  99:*5*
100:*10, 11*
143:*11*
166:*19*
167:*15*
174:*23*
256:*1*
300:*23*
301:*11*
369:*10*
423:*25*
427:*8*
446:*25*
451:*15*
464:*4*
465:*1, 9*
479:*3*
480:*10, 13*
495:*16*
512:*4, 8*
513:*15*
**percentage**
58:*9, 18*
484:*15*
**percentages**
484:*24, 25*
485:*1, 3*
**Perfect**
59:*12, 13, 14*
259:*13*
271:*25*
308:*14*
313:*24*
314:*2*
409:*14*

470:*21*
471:*24*
486:*15*
490:*22*
504:*15*
**perfectly**
177:*23*
179:*18*
180:*4, 12, 16*
313:*24*
**perform**
502:*3*
**peri-
epidemiologi
st**  197:*17*
**perinatal**
134:*12*
183:*15*
488:*16, 25*
**period**  20:*1*
83:*17*
327:*22*
364:*9*
**periods**
222:*20*
**peripartum**
491:*6*
**person**  60:*3*
135:*9*
139:*22*
215:*4*
461:*6*  480:*7*
**personal**
190:*11*
**personally**
34:*15*
133:*16*
139:*14*
182:*10*
**persons**
529:*21*
530:*1*
**perspective**
189:*17*

**pesticide**
30:*17*
**Pfizer**  30:*2*
**Ph.D**  1:*12*
10:*12*
15:*20*
567:*4*
569:*12*
**pharma**
33:*23*
**pharmaceuti
cal**  33:*17, 21*
**Pharmacy**
7:*4*
**phase**  90:*2*
**phenotype**
96:*2, 17*
**Philadelphia**
1:*14*  8:*8*
15:*8*
**phrase**
261:*11*
**phrased**
68:*7*
**physical**
223:*12*
**physician**
45:*12*
**physician-
diagnosed**
486:*25*
**pick**  125:*25*
**picked**
255:*6*
**picking**
242:*16*
**picture**
359:*8*
**piece**
159:*22*
160:*4, 6*
322:*24*
385:*24*
522:*8*

564:*25*
565:*1, 3*
**pieces**
69:*15*
291:*10*
**pinnacle**
433:*18*
**Pinto-
Martin**
1:*12*  10:*11*
13:*25*
15:*13, 20*
16:*3, 9*
20:*15*  21:*5*
23:*14*
28:*12*
29:*23*  77:*3*
81:*25*
85:*19*
86:*17*
96:*23*  97:*3*
102:*8, 12*
107:*4, 8*
112:*10*
157:*6*
165:*11*
186:*11*
191:*25*
204:*17*
215:*10*
228:*19*
232:*25*
236:*10*
247:*7*
264:*9, 19*
273:*1*
297:*7*
319:*23*
330:*9*
337:*12*
344:*12*
360:*21*
372:*23*
376:*20*

389:*5*
407:*1*
415:*13*
422:*25*
428:*24*
435:*2*
442:*18*
443:*22*
444:*20*
449:*20*
474:*12*
477:*17*
495:*5*
514:*12*
525:*20*
554:*10*
562:*10*
567:*4*
569:*12*
**Pinto-
Martin's**
473:*19*
**Pinto's-
Martin**
473:*18*
**Place**  6:*9*
83:*16*
530:*12*
543:*23*
567:*8*
**placenta**
381:*24*
382:*3*
**places**
435:*20*
529:*21*
530:*2*
**plaintiff**
19:*12*
31:*20*
34:*20*  300:*1*
**Plaintiffs**
5:*15*  15:*24*
16:*7*  31:*22*

555:*1*
562:*17*
**plaintiff's**
76:*16*
165:*3*
481:*13*
**planning**
299:*5*
**Plasma**
13:*3*  486:*24*
**plausibility**
195:*15, 20,*
*23, 25*  242:*6,*
*12*  243:*6*
342:*12*
343:*11, 12,*
*17*  541:*11,*
*12*  542:*4, 6*
**plausible**
541:*21*
542:*23*
**play**  71:*5*
76:*2, 25*
77:*19*  81:*8*
84:*21*  90:*7*
94:*22*
128:*5*
153:*10*
179:*19*
180:*6, 23*
528:*20*
**played**  77:*1*
80:*4*  84:*22*
90:*8*  94:*24*
128:*8*
**plays**  221:*9*
**Plaza**  2:*10*
3:*8*
**please**
61:*16*
104:*22*
107:*3, 14*
112:*3*
149:*14*

153:*2*
174:*5*
246:*23*
257:*7*
265:*25*
273:*18*
311:*9*
338:*3*
355:*1*
389:*13*
501:*6*
538:*8*
568:*3, 8*
**PLLC**  2:*14*
5:*5, 12*
**plot**  13:*15,*
*19*  51:*21*
52:*4*
164:*20*
178:*15*
211:*9*
261:*20*
262:*2, 12*
322:*11, 14*
**plots**  212:*7*
**plural**  23:*5*
523:*14, 21*
**Plus**  10:*14*
**point**  52:*17,*
*19*  53:*8, 16*
54:*4*  57:*7*
128:*25*
158:*9*
166:*21*
167:*9, 16, 25*
168:*5, 7*
169:*10, 15*
170:*10*
171:*1*
178:*25*
179:*10*
194:*13, 14,*
*24*  201:*15*
211:*14, 19,*

*22*  224:*2, 20*
239:*19*
242:*18*
253:*21*
254:*9, 24*
255:*22*
258:*6, 13, 17*
262:*9, 18, 20,*
*25*  263:*18*
267:*3*
268:*11*
282:*18, 24*
288:*17*
307:*17*
318:*24*
323:*10*
332:*13*
335:*24*
354:*5*
363:*23*
367:*6*
370:*16*
380:*22*
386:*9, 17, 19*
396:*8*
400:*21*
402:*1*
404:*9*
412:*13*
420:*21*
421:*19*
425:*14*
434:*18*
453:*23*
461:*11*
463:*20*
464:*4, 24*
465:*15*
469:*2*
483:*25*
484:*4*
487:*8, 16*
488:*23*
494:*23*

512:*3*
517:*25*
518:*2*
527:*20*
530:*7*
538:*12*
540:*2*
560:*8*
562:*11*
565:*8*
**pointed**
82:*6*
226:*15*
285:*16*
372:*16*
436:*19*
448:*7*
449:*1*
460:*10*
468:*3*
470:*5*
491:*2*  541:*4*
**pointing**
168:*19*
372:*7*
394:*24*
522:*10*
538:*14*
**points**
282:*14*
462:*18*
497:*3*
**poking**
500:*6*
**policies**
35:*22*
**policy**  36:*1*
**pollution**
41:*19*
116:*3, 11, 12*
123:*20*
**polygenic**
155:*9*

156:*5*
158:*10*
**pool**  241:*22*
**pooled**
205:*7*
325:*17*
**poop**  496:*8,*
*20*  507:*2*
**population**
280:*14*
293:*15*
427:*19*
429:*21*
**population-
based**  11:*13*
**PORTIS**  4:*7*
**position**
75:*15, 20*
135:*5*
**positive**
23:*24*
166:*21*
167:*17*
212:*1, 3*
238:*5, 9*
240:*16, 22*
370:*23*
**possibilities**
68:*11*
231:*24*
**possibility**
66:*8*
194:*12, 23*
219:*22*
220:*2, 12, 13,*
*17*  224:*18*
271:*6, 11*
278:*4*
410:*2*
433:*7*
438:*19*
439:*1, 2, 8*
460:*22*
468:*18*

469:*17*
472:*12*, *16*
521:*6*
535:*5*
537:*6*  538:*1*
**possible**
36:*4*  71:*10*
91:*21*
171:*19*
199:*12*
269:*1, 7, 23*
270:*3, 9, 21*
271:*3, 18*
272:*4*
329:*11*
418:*7*
470:*14*
474:*15*
475:*5*
537:*18*
538:*9*
540:*14*
542:*24, 25*
543:*1, 3*
**possibly**
69:*8*
216:*21*
279:*7*
290:*9*  543:*2*
**post**  517:*17*
**post-**
**delivery**
487:*12*
**postdoc**
45:*3, 11*
**post-labor**
517:*18*
**POSTMAN**
2:*1*
**postnatal**
11:*9*  87:*4*
88:*2*
**post-**
**pregnancy**

162:*11, 21*
227:*23*
236:*6*
264:*12*
337:*14*
338:*8, 20, 25*
339:*2, 8*
340:*5*
341:*2*
398:*20*
399:*5, 7*
**potential**
87:*3*  89:*17*
138:*4, 5, 6*
143:*19*
153:*24*
154:*1*
171:*7*
199:*3*
222:*16*
268:*10*
277:*16*
281:*10*
305:*11*
323:*5*
335:*15*
349:*13*
362:*11*
378:*7*
379:*6*
380:*11*
469:*25*
475:*18*
476:*4*
482:*21*
505:*10*
516:*24*
517:*5*
518:*22*
543:*5*
560:*23*
563:*25*
**potentially**
38:*6*

384:*24*
560:*15*
**power**
334:*20*
366:*24*
410:*23, 25*
411:*4, 10, 12,
14*  413:*17*
414:*8, 20*
416:*18*
418:*19, 24*
419:*14, 18,
24*  431:*20,
25*  432:*11,
20*  437:*11,
19*  439:*1, 3,
10, 19, 24, 25*
440:*23*
442:*11*
443:*23*
445:*9, 13, 20,
22*  454:*16,
19, 22*
455:*14*
456:*17*
470:*22*
**powerful**
40:*8*
161:*17*
396:*9*
457:*23*
458:*10*
**PPI**  30:*9*
33:*4, 7*
**PPIs**  33:*5*
**PPP**  101:*22*
**pquincy@btl
aw.com**  6:*3*
**practice**
347:*6*  556:*8*
**pre**  87:*4*
88:*1*
227:*23*
264:*12*

337:*13*
338:*20, 25*
339:*1*  341:*2*
**precautionar
y**  188:*25*
189:*4*  191:*1*
**precedes**
533:*21*
**preceding**
291:*14*
**precise**  47:*1,
2*  212:*10*
325:*22*
502:*5*
547:*10, 12*
**precisely**
77:*16*
351:*1*
356:*9*
359:*9*
398:*1*
462:*21*
463:*25*
564:*22*
**Precision**
9:*2*  121:*1,
3*  210:*3*
513:*23*
**preclude**
213:*4*
257:*15*
**predispose**
83:*7*  199:*13*
**predisposed**
276:*15*
**predispositio
n**  396:*23*
537:*13*
**prefer**  74:*1*
**pregnancies**
536:*7*
**Pregnancy**
11:*8, 15*
12:*3, 20*

13:*2*  22:*15*
115:*15*
118:*14*
139:*5*
155:*12, 20*
169:*22*
189:*16*
222:*21*
223:*4, 10, 17*
239:*23*
250:*8*
255:*22*
286:*4, 8, 10,
25*  334:*15*
336:*9*
342:*4*
343:*9*
373:*23*
379:*12*
397:*1, 18*
403:*20*
415:*11*
448:*9*
482:*24*
489:*10*
496:*5, 7*
497:*3, 8, 10,
14*  507:*24*
508:*17*
520:*5*
536:*5*
537:*15*
555:*16*
**pregnant**
116:*13*
138:*24*
161:*25*
248:*3*
255:*16*
256:*23*
285:*23*
425:*15*
**Prenatal**
11:*2, 4, 9, 23*

Confidential - Subject to Protective Order

12:*4, 11, 16*
13:*7, 13*
21:*13*
26:*13*
27:*16*
28:*17*
85:*10*  88:*6*
138:*12*
141:*16*
142:6
143:*11*
144:*14*
147:*8, 24*
148:*9, 23*
150:*12*
151:*8*
152:*14*
155:*3, 7*
158:*18*
159:*19*
162:*4*
166:*20*
167:*17*
178:*9, 12*
188:*23*
193:*3*
203:*15*
213:*20*
230:*10*
233:*13*
234:*3*
237:*15*
238:*3, 8*
243:*15*
251:*8*
259:*19*
277:*8*
280:*23*
315:*8*
326:*25*
331:*25*
336:*22*
338:*7*
351:*6*

379:*20*
396:*17*
407:*12*
416:*24*
424:*11*
426:*24*
471:*14*
472:*5*
488:*10, 16*
491:*5, 7*
497:*18*
498:*5*
499:*11*
501:*17*
562:*6*
**preparing**
  17:*1*
**Prepregnanc**
**y**  162:*8, 20*
  163:*6, 17*
  192:*2*
  223:*3*
  226:*18*
  236:6
  339:7
  340:*4*
  398:*13, 19*
  399:*1, 19*
  400:*1, 14*
**Pre-prenatal**
  162:*5, 6*
  338:7
**prescribed**
  364:7
**prescription**
  118:*11*
  373:22
  374:*20*
  539:*10, 16*
**presence**
  55:*8*  213:*1*
  295:*15*
**PRESENT**
  9:*1*  131:*6*

184:*19*
316:*18*
363:7
445:*15*
**presentation**
  246:*17*
**presented**
  131:*11*
  245:*3*
  462:*5*
  463:*10*
  535:*20*
**presenting**
  213:*15*
**president**
  42:*16, 17*
**press**  258:*9*
**preterm**
  31:*4*  483:*3*
**pretty**  42:*7,*
  *20*  43:*12*
  44:*11*  46:*3*
  87:*23*
  104:*19*
  166:*2*
  187:*7*
  206:*1*
  253:*14*
  273:*19*
  280:*1*
  291:*11*
  297:*17, 24*
  306:*13*
  354:*10*
  361:*21, 22*
  362:22
  406:*21*
  431:*18*
  446:*13*
  467:*5*
  482:*1*
  501:*24*
  534:22

**prevalence**
  93:*3*
  293:*20*
  294:*4, 24*
  295:*17*
  296:*7, 19*
  419:*3, 22*
  544:*7*
**prevalent**
  419:*11*
  485:*21*
**prevent**
  31:*4*
**previous**
  233:*11*
  237:*21*
  346:*8*
  488:*15*
  489:*23*
**previously**
  26:*21*
**primarily**
  70:*19*
  176:*12*
  241:*17*
**primary**
  70:*23*
  176:*8, 20*
  177:*4*
  187:*17*
  190:*21*
  198:*5*
  329:*10*
  352:*2*
  353:*17*
  358:*10, 14*
  447:*7*
**Principal**
  321:*16, 21*
**principle**
  188:*25*
  189:*4*
  191:*1*  442:*2*

**printing**
  97:*7*
**printout**
  186:*15*
  389:*9, 15*
**prior**  26:*25*
  28:*24*  29:*7*
  80:*7*
  127:*21*
  169:*21*
  295:*20*
  343:*4*
  436:*25*
  438:*17*
  439:*6*
  448:*10*
  453:*13, 15,*
  *17*  463:*18*
  466:*19*
  467:*13*
  565:*21*
  567:*3*
**Priorities**
  10:*18*
**prioritize**
  529:*13*
**probabilities**
  175:*16*
**probability**
  216:*15*
  217:*11*
  218:*15*
  365:*9*
**probably**
  59:*17, 18*
  77:*10*
  157:*2*
  196:*24*
  332:*11*
  366:*19*
  409:*15*
  493:*12*
  508:*7*

Confidential - Subject to Protective Order

**problem**
130:*1*
225:*4*
249:*3*
274:*2*
334:*20*
336:*11, 12*
365:*8, 12*
367:*4*
375:*15*
424:*24, 25*
454:*3, 22*
549:*15, 16,*
*17* 550:*12*
**Problems**
11:*8*
113:*17, 19*
114:*24*
116:*7*
121:*6*
181:*14, 16*
217:*18*
223:*8, 20*
233:*15, 18*
252:*9*
260:*19*
325:*5*
342:*22*
409:*13*
424:*1, 12*
505:*10*
**proceed**
393:*1*
550:*1*
551:*20*
554:*18*
**proceeded**
31:*24*
506:*25*
**proceeds**
391:*22*
565:*19*

**produced**
17:*11*
324:*16*
**producing**
119:*5*
**PRODUCTS**
1:*3* 15:*10*
**professional**
25:*14*
193:*20*
475:*9, 17*
**professionall**
y 36:*10, 11*
182:*11*
**professor**
36:*11*
182:*13*
441:*10*
442:*18*
444:*12*
**profile**
397:*5, 9*
449:*2*
**profound**
471:*21*
544:*6*
**programmin**
g 11:*1*
221:*6*
329:*11*
**promise**
20:*24* 21:*2*
53:*4* 63:*12*
392:*14*
509:*19*
**promised**
62:*9, 15*
**promote**
43:*6*
301:*10*
302:*5, 11, 18*
**Promotes**
42:*24*

**promoting**
301:*8*
302:*11*
**prone** 286:*5*
409:*23*
**propaganda**
300:*15, 21*
**propensity**
155:*11, 15*
328:*21*
398:*8*
**proper**
80:*14*
317:*22*
**prophylactic**
352:*19*
355:*10*
**proportion**
84:*8* 95:*18,*
*21* 96:*16*
97:*13, 14*
**proposed**
282:*9*
541:*25*
**proposing**
112:*22*
**proposition**
227:*25*
539:*18*
558:*19*
**propounded**
569:*6*
**pros** 546:*21,*
*24, 25*
**prospective**
57:*22* 58:*3*
69:*10*
229:*8*
292:*10, 12*
342:*1*
343:*2*
448:*5, 6*
**protected**
32:*6*

**PROTECTI**
**VE** 1:*6*
57:*12, 17*
206:*24*
213:*3*
214:*4*
240:*10*
465:*13*
**prove** 203:*4*
419:*8*
466:*15*
**proven**
461:*13, 20*
**provide**
242:*5*
243:*5*
280:*14*
331:*23*
503:*25*
**provided**
434:*13*
454:*15*
**providing**
156:*17*
329:*8*
**proxies**
308:*23*
**proxy** 307:*3*
308:*18*
309:*6*
311:*5*
312:*21*
**PRS** 155:*16*
156:*2*
157:*24*
161:*19*
559:*13*
564:*4*
**psychiatric**
116:*17, 23*
117:*4, 17*
118:*4*
123:*21*

130:*5, 15*
155:*10, 17*

**psychological**
449:*2*

**psychomotor**
423:*24*
**psychotic**
354:*9*
**Public**
11:*21*
44:*15, 17, 20*
138:*23*
189:*16*
255:*9*
296:*4*
300:*16, 22*
567:*23*
569:*19*
**publication**
107:*20*
111:*22*
248:*9, 19*
258:7 561:*8*
**publications**
138:*22*
198:*3*
**publicized**
259:*2*
**publish**
561:*15*
**published**
103:*12*
108:*18*
141:*7, 22*
187:*3*
193:*2, 5*
198:*2*
205:*10*
255:*6*
347:*1*
348:*25*
354:*22*

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 357:*17* | 540:*25* | **putative** | 51:*8* 54:*16* | 318:*9* |
| 361:*18* | 564:*1* | 269:*17* | 56:*14, 22* | 324:*13* |
| 392:*6* | **purpose** | **puts** 38:*5* | 58:*16* | 337:*25* |
| 441:*23* | 357:*8, 9* | **putting** | 60:*23* | 343:*20* |
| 442:*13, 21* | 379:*10, 11,* | 88:*13* | 62:*12* | 357:*6* |
| 444:*14, 19* | *22, 23* 380:*1* | 280:*20* | 63:*17* | 358:*9* |
| 472:*24* | 387:*18* | 290:*14* | 65:*18, 19* | 364:*22* |
| 501:*21* | 441:*5* | 301:*17* | 66:*12, 19* | 367:*20* |
| 515:*17* | 456:*7, 14* | 314:*5* | 68:*10* | 371:*10, 19* |
| 522:*22* | 525:*4, 9* | 459:*3* | 77:*17* | 372:*7* |
| 523:*3* | **purposes** | 501:*20* | 78:*21* 80:*6* | 379:*20* |
| 559:*17, 22* | 379:*2, 25* | 558:*4* | 81:*17, 20, 24* | 381:*9* |
| **publishes** | **PURSUANT** | 564:*24* | 92:*1, 5* | 392:*16* |
| 187:*15* | 1:*6* | **p-value** | 109:*24* | 394:*5* |
| 565:*11* | **put** 50:*3, 8* | 437:*21* | 110:*3, 10* | 397:*20* |
| **publishing** | 89:*3* | | 116:*2* | 400:*24* |
| 94:*5* 101:*24* | 103:*24* | **< Q >** | 122:*4, 19* | 405:*5* |
| **Puerto** 3:*9* | 105:*10* | **quack** | 124:*14* | 408:*15, 19* |
| **pull** 233:*23* | 107:*9* | 140:*6* 218:*1* | 138:*16* | 419:*13* |
| 364:*3* | 147:*7* | **quacks** | 142:*11* | 431:*10* |
| 399:*22* | 148:*7* | 140:*11* | 146:*6* | 432:*17* |
| 422:*11, 21* | 164:*12, 18* | 217:*22* | 154:*7, 11* | 434:*3* |
| 429:*11* | 180:*11* | **qualification** | 162:*4* | 435:*3* |
| **pulled** | 190:*12* | 370:*24* | 163:*15* | 443:*3* |
| 149:*19* | 200:*10* | **qualify** | 164:*9* | 459:*24* |
| 319:*2* | 204:*13* | 167:*24* | 171:*11* | 462:*12* |
| 321:*10* | 211:*6* | 324:*24* | 179:*23* | 466:*25* |
| 386:*24* | 247:*6* | **quality** | 180:*9, 21* | 472:*2* |
| 440:*18* | 251:*20* | 46:*19* | 181:*19, 21* | 483:*25* |
| 443:*14* | 255:*21* | 61:*10* | 186:*4* | 486:*6, 13* |
| **pulling** | 256:*25* | 263:*21* | 191:*12* | 488:*6* |
| 129:*1* | 257:*1, 23* | 379:*25* | 193:*6* | 492:*4* |
| 232:*15* | 289:*18* | 380:*1* 385:*3* | 199:*18* | 499:*7* |
| 281:*5* | 303:*25* | **quantify** | 201:*1, 24* | 501:*5, 16* |
| 283:*17* | 315:*3* | 375:*8* | 220:*11* | 504:*1, 13, 22* |
| 319:*7* 360:*8* | 344:*10* | **question** | 231:*5* | 505:*1, 8* |
| **pulmonary** | 345:*18* | 24:*17* | 234:*14* | 507:*21* |
| 280:*15* | 360:*14* | 25:*21, 22* | 236:*4* | 509:*6, 10* |
| **purely** | 382:*10* | 27:*12* 28:*3,* | 253:*14* | 512:*22* |
| 46:*23* | 461:*23* | *13* 37:*22* | 271:*7* | 518:*16* |
| **purported** | 492:*16* | 39:*16* | 290:*3* | 520:*23* |
| 170:*15* | 499:*16* | 46:*16* | 301:*15* | 521:*3* |
| 528:*22* | 503:*7* | 47:*17* 48:*9,* | 305:*22* | 523:*9* |
| | 529:*16* | *22* 50:*14* | 312:*9* | 524:*12, 22* |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 531:*1* | 65:*16* | 125:*6* | 182:*4* | 239:*16* |
| 536:*14*, *16* | 66:*10*, *15* | 126:*7*, *14*, *20*, | 183:*13* | 240:*20* |
| 537:*23* | 67:*5*  68:*8*, | *23*  128:*9* | 184:*1*, *17* | 243:*3* |
| 540:*12* | *20*  69:*18* | 129:*10*, *20* | 185:*3*, *16* | 245:*17* |
| 542:*8*, *10* | 70:*10*  72:*3* | 130:*19* | 186:*13*, *21* | 246:*24* |
| 556:*2*, *20* | 73:*2*  74:*3* | 131:*2*, *12* | 187:*13*, *24* | 247:*9* |
| 557:*14*, *22* | 75:*13*  77:*2*, | 132:*17*, *20* | 189:*12* | 248:*12* |
| 559:*14* | *12*  78:*6* | 133:*24* | 190:*9* | 249:*19* |
| **questionable** | 79:*7*, *8* | 134:*5*, *14* | 191:*3*, *24* | 250:*20* |
| 422:*16* | 81:*23* | 135:*11* | 192:*14*, *15*, | 253:*1*, *12* |
| **questioning** | 82:*23*  84:*1*, | 136:*9*, *18* | *20*  193:*1* | 254:*15*, *22* |
| 336:*18* | *14*, *23*  85:*7*, | 137:*3*, *20* | 194:*17* | 255:*19* |
| **questionnair** | *21*  86:*14* | 138:*9* | 196:*1* | 256:*24* |
| **e**  172:*1* | 88:*4*, *10* | 140:*2*, *13* | 197:*5* | 257:*10* |
| **QUESTION** | 89:*2*  90:*5*, | 141:*1*, *13* | 199:*19* | 258:*5* |
| **S**  16:*2*, *11*, | *9*, *16*  91:*1*, | 143:*4* | 200:*12* | 259:*4*, *14* |
| *23*  17:*9* | *17*  92:*3* | 145:*7* | 201:*19* | 261:*8* |
| 18:*24* | 93:*5*, *21* | 146:*3*, *17* | 202:*1* | 262:*6* |
| 20:*14*  21:*4*, | 94:*17*  95:*1*, | 147:*5*, *12*, *22* | 203:*6*, *13* | 263:*15* |
| *17*  22:*19* | *9*  97:*1* | 148:*6*, *20* | 204:*5*, *15* | 264:*8*, *21* |
| 23:*2*, *11* | 98:*16*  99:*1*, | 149:*4*, *18* | 206:*14* | 265:*17*, *18* |
| 24:*2*, *9*, *16*, | *21*  100:*4*, *17* | 150:*17* | 207:*16* | 266:*3* |
| *22*  25:*1*, *19* | 101:*7*, *21* | 151:*1*, *18* | 208:*15* | 267:*8*, *22* |
| 26:*7*  27:*2* | 102:*10*, *17* | 152:*22* | 209:*11*, *23* | 269:*20* |
| 28:*11*  29:*9*, | 103:*1* | 153:*12* | 210:*18* | 270:*1*, *16* |
| *12*, *20*  32:*18* | 104:*8*, *21* | 154:*24* | 211:*17* | 271:*1* |
| 33:*15*  37:*4* | 105:*21* | 156:*22* | 212:*11*, *24* | 272:*5*, *16* |
| 38:*12*  39:*7*, | 106:*19* | 157:*8*, *14* | 213:*10* | 273:*3*, *11* |
| *17*  40:*14*, *24* | 107:*6*, *11*, *18* | 159:*6* | 214:*16* | 274:*20* |
| 42:*12*  43:*5* | 108:*9* | 160:*1*, *16* | 215:*12* | 275:*11*, *18* |
| 44:*3*  45:*1* | 110:*11*, *22* | 165:*10* | 217:*20* | 277:*18* |
| 46:*9*  47:*5*, | 112:*9*, *19* | 167:*4* | 218:*11*, *23* | 278:*17* |
| *21*  48:*23* | 113:*10* | 168:*8*, *17* | 219:*13*, *19* | 279:*16*, *22* |
| 50:*1*, *7*, *15* | 114:*6*, *21* | 170:*17* | 222:*1* | 280:*8* |
| 51:*9*, *20* | 115:*10* | 171:*10*, *22* | 224:*22* | 281:*7*, *21* |
| 52:*11* | 116:*10* | 172:*19* | 227:*7* | 282:*3*, *10*, *22* |
| 54:*17* | 117:*15* | 173:*4* | 228:*4*, *21* | 283:*7*, *18* |
| 55:*24* | 118:*1* | 174:*7* | 230:*12* | 284:*17* |
| 56:*13*  57:*2* | 119:*15* | 175:*3* | 231:*21* | 285:*3*, *9* |
| 58:*17*  59:*8* | 120:*17* | 176:*1*, *18* | 232:*6*, *20* | 286:*11*, *17* |
| 60:*1*  61:*2*, | 121:*18* | 177:*1* | 233:*2* | 289:*13* |
| *14*  62:*1*, *20* | 122:*6*, *18* | 179:*13* | 235:*6* | 290:*4*, *16*, *24* |
| 63:*11*, *21* | 123:*3*, *13* | 180:*1*, *19* | 236:*12* | 291:*6* |
| 64:*13* | 124:*7* | 181:*18* | 237:*7* | 292:*3* |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 293:*1, 13* | 354:*24* | 443:*17* | 502:*16* | 557:*21* |
| 294:*6, 16* | 355:*20* | 444:*10, 24* | 503:*17* | 560:7 |
| 296:*10, 24* | 356:2, *23* | 445:*6, 24* | 504:*6, 16, 23* | 561:2, 5, 6, |
| 297:*9, 23* | 357:*21* | 449:*7, 22* | 505:*15* | *10, 16*   563:8 |
| 298:*19* | 358:*18* | 450:5 | 506:6 | 564:5, *14* |
| 299:*15* | 359:*1* | 451:*22* | 507:*9, 14* | 565:*16* |
| 300:*10* | 361:9 | 452:7 | 508:9 | 566:*1*   569:6 |
| 301:6 | 367:*23* | 454:7 | 509:*1, 11* | **quibble** |
| 302:*1, 13* | 370:6 | 455:3 | 510:*19* | 378:*17* |
| 303:2, *10, 15* | 371:*3, 20* | 457:*18* | 511:*18* | **quibbled** |
| 306:*6, 16* | 372:*19* | 458:4 | 512:*13* | 374:*16* |
| 307:4 | 373:*1, 13* | 459:*19* | 513:*1, 18* | **quick** |
| 308:*20* | 375:*16* | 460:*14* | 514:*11* | 259:*10* |
| 309:*12* | 376:*22* | 462:*6, 13* | 518:*17* | 261:*19* |
| 310:9 | 381:*11* | 463:*23* | 519:*1, 9* | 274:*16* |
| 311:*2, 11* | 386:*11, 16* | 464:*20* | 520:*10, 18* | 346:4 |
| 313:*1, 12* | 387:*22* | 465:*18* | 521:*1, 4, 13,* | 370:*16* |
| 314:*16* | 388:*21* | 466:*22* | *22*   522:*11,* | **quickly** 48:7 |
| 315:2 | 389:*1, 7* | 467:*23* | *16, 23* | **QUINCY** |
| 316:*1, 19* | 392:*13* | 468:*4, 23* | 523:*19* | *6:2* |
| 318:*4, 17* | 393:*14, 19* | 472:*1, 14* | 524:*2, 13, 23* | **quite** |
| 319:6 | 394:*1* | 473:*20* | 525:*17, 22* | 161:*21* |
| 320:*1, 24* | 395:*12* | 474:*11* | 526:*15* | 189:2 |
| 324:*4, 9* | 397:*8, 19* | 475:*15* | 527:*1* | 214:*25* |
| 325:*10* | 398:*22* | 476:*12, 23* | 528:7 | 290:*23* |
| 326:*11* | 399:*16* | 477:*19, 24* | 529:2, 8 | 381:*24* |
| 327:*24* | 402:*8, 20* | 479:*11* | 530:*20* | 382:4 |
| 329:*21* | 403:3 | 480:9 | 531:*9, 22* | 496:*18* |
| 330:*11* | 404:*11* | 481:*3, 14* | 532:*14* | 511:*15* |
| 331:8 | 405:*17* | 482:2 | 533:*9, 23* | 534:*23* |
| 332:*21* | 406:*16* | 483:5 | 535:*11* | 536:*16* |
| 335:*17* | 407:3 | 484:*1, 20* | 536:8, *18* | **quote** |
| 336:*1, 20* | 409:*22* | 486:*1* | 537:*1, 16, 24* | 179:*18* |
| 337:*11, 22* | 413:*14* | 487:*18* | 538:7 | 180:*13* |
| 339:*11, 21* | 415:*15* | 489:*15* | 540:*1, 15* | 205:*13* |
| 341:*18* | 417:7 | 490:*24* | 541:*9, 18* | 225:*24* |
| 344:*1, 14* | 423:*2, 12* | 492:*2, 14* | 542:*12, 21* | 407:*20* |
| 345:*8, 15* | 431:*1, 11* | 493:*3, 21* | 543:*15* | 454:9 |
| 346:6 | 432:*15* | 494:9 | 544:*20* | **quote/unquot** |
| 348:9 | 434:*2, 8, 22* | 495:7 | 545:2 | **e** 79:*25* |
| 349:*1, 18* | 435:*10* | 496:*24* | 547:*13* | 181:*13* |
| 350:*17, 23* | 436:*7, 13* | 497:*15* | 554:*16, 23* | **quotes** |
| 351:*15, 22* | 440:*3, 21* | 498:*12, 23* | 555:*22* | 180:*12* |
| 352:*12* | 442:*23* | 501:2 | 556:*12, 18* | |

225:*20*

**< R >**
**rabney@wat**

**tsguerra.com**
3:*5*
**race** 482:*23*
483:*18*
484:*4*
**raise** 25:*11*
**raised**
283:*21*
**raises**
354:*10*
355:*21*
466:*24*
**ran** 301:*5*
**random**
441:*7*
**randomized**
252:*4*
253:*4*
254:*4*
267:*25*
268:*4*
375:*18*
**randomly**
253:*19*
443:*14*
**range** 48:*16*
369:*21*
**RAQUEL**
6:*20*
**raquel.lucas**
**@butlersnow**
**.com** 6:*20*
**rare** 40:*13*
72:9 74:*24*
**rarely**
488:*19*
531:*24*
**rate** 35:2
70:2 98:*5*

263:*3*
283:*5*
293:*21*
427:*7*
538:*20, 24*
**rates** 41:*21*
**ratio** 46:*11*
58:*11*
63:*18* 64:*9,*
*17* 65:*3, 20*
66:*20*
160:*21*
161:*16*
204:*18*
205:*23*
267:*11*
368:*4, 9*
369:*13*
407:*13*
408:*3*
479:*13, 15*
511:*19*
513:2, *11*
527:*15*
**ratios**
161:*14*
207:*10*
266:*10*
290:*18*
484:*14*
**rats** 545:*7*
**rattle**
227:*20*
**raw** 515:*24*
516:*7*
**RAYBON**
4:*9*
**RCT** 39:*10*
252:*8, 13, 18*
253:*13*
256:*19*
257:*15*
271:*10*

**RCTs** 252:*8*
256:*23*
**reach**
502:*24*
**react**
232:*18*
281:6 284:*9*
**read** 18:*9*
55:7 87:*10,*
*24* 97:*16, 24*
109:*9*
111:*16*
125:*19*
137:*9, 12*
143:*7, 8, 10*
182:*5*
215:*17*
228:*25*
232:*13*
242:*10*
249:*5, 12*
250:2
275:*6, 16*
281:*8*
283:*16*
284:2
285:2
287:*17*
293:*8*
298:*22, 25*
322:*1*
327:*4*
329:*13, 14*
332:2, *9*
340:*19*
342:*17, 18*
344:*18, 19,*
*25* 345:*5*
346:*19*
353:*10*
382:*5*
403:*1*
414:*17*
424:*3, 4*

430:*7*
438:*23*
450:*7*
455:*1*
456:*19*
459:*14*
497:*8*
500:*3, 21*
509:*18*
519:*17*
543:*4, 9*
554:*7*
564:*20*
568:3 569:*4*
**readily**
381:*25*
382:*4, 8*
**reading**
17:*3* 35:*5*
104:*18*
221:*10*
250:*25*
283:*25*
289:*11*
455:6
499:*21*
528:*21*
544:*14*
**Ready**
112:*20*
235:*7*
250:*5*
284:*21, 24*
554:*17*
**real** 203:*18*
236:*25*
261:*19*
274:*16*
366:*16*
528:*16*
531:*4, 20*
**reality**
314:*15*
394:*23*

**realize**
338:*6*
**really** 44:*12*
59:22
87:*16*
103:*5*
132:*22*
134:*20*
137:2
153:*20*
161:*1*
169:*18*
191:*5*
208:2
232:*14*
245:*18*
248:*24*
249:*4, 12*
251:*15, 21*
253:2, *18*
257:*8*
258:*18*
265:*13*
267:6
268:*24*
274:*3*
275:*12*
301:*20, 24*
310:*23*
333:*23*
375:*3*
380:*13*
381:6
382:*8*
414:*8*
419:*25*
422:*7*
466:*17*
471:*10*
486:*7*
487:*9*
500:*19*
502:6
510:*18*

519:2
530:22
536:*15*
539:*4*
540:*18*
541:*15*
545:*8*
553:*25*
**realm** 219:*5*
**Realtime**
1:*17* 567:2,
17
**reason** 55:*6*
74:*4* 111:*6*
139:*15*
178:*6*
247:*16*
258:*4*
295:*17*
329:*10*
345:*5*
383:*1, 18*
391:*7*
448:*23*
568:*5*
**reasonable**
106:*9, 15*
135:*4, 15*
188:*9, 11, 17*
189:*7*
190:*1*
217:*10*
219:*5*
231:6, *19*
232:*8*
235:*25*
236:2
242:*9*
269:*13*
290:*13*
504:*8, 12*
505:2
551:7

561:*14, 25*
562:2
**reasonablene**
**ss** 333:2
**reasoning**
332:5, *23*
**reasons**
21:*20*
118:*17*
296:*18*
352:25
389:*11*
419:*23*
438:2
448:25
473:2, *4, 7*
523:*8* 547:*8*
**REBECCA**
2:*5*
**rebecca.king**
**@kellerpost**
**man.com**
2:*5*
**recall** 33:*7*
108:*24*
113:*19*
144:*18*
145:22
146:*14*
169:*20, 21*
171:*17*
183:*20*
318:*11*
336:*11*
343:*3*
368:*15*
433:*8*
448:*10, 19,*
*24* 463:*25*
497:*19, 23,*
*25* 507:*17*
558:*3, 9, 11*
560:*3*
563:*19*

**recalling**
202:*25*
**receipt**
568:*15*
**receive**
253:*20*
**received**
218:*9*
**recognize**
16:*16*
334:*13*
443:2
**recollection**
238:*22*
368:*5, 7*
**recommenda**
**tion** 190:*16*
**recommende**
**d** 190:*1*
**recommends**
188:*22*
**record** 15:2,
*15* 28:5, *7, 8,*
*10* 76:5, *8,*
*10, 11, 13, 17,*
*18, 22* 80:*23*
112:*2, 5, 6, 8*
131:*24*
139:*24*
170:*19*
191:*15, 20,*
*21, 23*
236:*15*
264:*4, 5, 7*
337:*5, 7, 8,*
*10, 20* 402:*4,*
*5, 7* 435:*1*
473:*13, 14,*
*16, 18*
481:*11*
514:*7, 8, 10*
549:*4, 7*
552:*20, 25*
566:*5*

**records**
32:*3* 295:*3*
351:*10, 13*
**recruit**
436:*23*
**red** 383:*11,*
*14, 25* 386:*6*
**REDIRECT**
563:*7*
**reduce**
37:*14* 411:*4*
**reduced**
29:*8*
**reduces**
26:*25*
410:*10*
432:*9*
**reducing**
304:*11*
411:2
**reduction**
305:*4*
466:*13*
**refer** 514:*17*
**Reference**
10:*18*
102:*13*
103:2
203:*24, 25*
247:*22*
248:*10*
437:*8*
440:*10, 14*
446:7, *9*
473:*21*
485:*24*
555:*23*
**references**
16:*22*
109:*15*
**referred**
22:*7* 64:*25*
85:*1* 116:*9*

202:7, *10*
247:*13*
**referring**
22:*1, 2, 21*
37:*19*
172:*9*
201:*8*
221:*20*
222:*24*
225:*10*
261:*14*
323:*16*
534:*21, 24*
**refers**
223:*23*
**refined**
420:*25*
**reflect**
129:*1*
362:*25*
435:2
481:*11*
487:*17*
488:*24*
496:*4*
**reflected**
262:*11*
**reflecting**
357:*17*
**reflects**
487:*9*
**refresh**
202:*12*
266:*18*
341:*14*
**refusal**
473:*19*
**refute** 29:*19*
**regard**
372:*11*
**Regarding**
369:*9*
473:*25*

Confidential — Subject to Protective Order

488:*15*
489:*21*
**regardless**
211:*4*
**Registered**
1:*16* 567:*2,*
*17*
**regress**
515:*2*
**regression**
309:*14*
310:*13*
311:*12*
314:*18, 22,*
*23* 426:*9*
**regulatory**
195:*3*
**rejected**
437:*23*
**relate** 48:*16*
135:*19*
492:*12*
**related** 30:*3*
33:*1* 79:*16*
305:*3*
407:*12*
491:*24*
**RELATES**
1:*5* 474:*14*
497:*13*
**relation**
11:*11*
197:*23*
299:*7*
353:*19*
475:*18*
**relationship**
141:*16*
142:*5*
207:*3*
210:*25*
268:*1, 17*
277:*17*
289:*23*

290:*8*
315:*7*
320:*18*
326:*25*
333:*25*
430:*18*
473:*1*
561:*22*
**relationships**
101:*16*
105:*5* 332:*8*
**relative**
52:*12, 14, 17*
63:*1, 6*
207:*9*
485:*6, 10, 13*
527:*16*
567:*10, 11*
**relatively**
342:*8*
412:*14*
413:*18*
414:*20*
455:*15*
456:*18*
**release** 12:*1*
**released**
519:*20*
**relevant**
55:*16*
138:*15*
212:*22*
315:*25*
323:*1*
354:*2*
362:*13*
364:*3, 15, 22*
366:*3*
379:*6*
420:*23*
421:*24*
426:*6, 23*
427:*22*
464:*19*

468:*12, 16*
488:*4*
501:*15*
530:*7* 557:*7*
**reliability**
60:*21*
231:*15*
313:*10*
370:*25*
**reliable**
51:*16*
262:*22*
304:*24*
308:*6*
419:*11*
513:*6*
**reliance**
415:*20*
489:*22*
490:*14*
**relied**
282:*12*
302:*23*
384:*14*
**relies** 295:*3*
560:*22*
**reluctant**
101:*25*
**rely** 354:*22*
436:*18*
522:*17, 21*
**relying** 66:*5*
322:*18, 21*
346:*24*
419:*7*
487:*5* 490:*4*
**remain**
472:*19*
**remained**
420:*19*
**remaining**
67:*21*

**remains**
225:*22*
416:*11*
**remarks**
418:*18*
**remember**
27:*11*
28:*13*
31:*15* 32:*3*
33:*6* 66:*11,*
*16* 77:*16*
88:*16*
146:*5*
182:*18, 20*
184:*6*
189:*20*
202:*6*
260:*14*
261:*9*
266:*6, 8, 9*
270:*6, 7*
326:*2*
340:*16*
350:*18, 22,*
*25* 361:*5*
368:*8*
449:*5*
458:*6*
485:*1*
493:*7*
544:*21*
555:*4*
556:*17*
557:*16, 20,*
*22* 558:*10,*
*22* 561:*9, 16*
564:*12, 22*

**remembering**
161:*18*
**remind**
160:*14*
163:*3, 9*
326:*1*

340:*6*
351:*25*
**reminded**
203:*23*
**reminding**
261:*10*
**render** 40:*4*
**renders**
121:*7*
333:*23*
425:*16*
556:*14*
**renowned**
461:*7*
**reopen**
473:*23*
**repeat**
290:*3*
543:*12*
**repeatedly**
372:*16*
426:*23*
432:*2*
436:*19*
448:*7*
460:*11*
494:*7*
529:*20*
541:*4*
560:*21*
**repeats**
300:*11*
**rephrase**
213:*12*
**replicate**
455:*21, 24*
459:*4*
**replicated**
124:*22*
453:*24*
454:*17*
457:*9, 15*
**replication**
72:*17*

Confidential - Subject to Protective Order

375:*23*
462:*20*
**Report**
11:*19*
16:*17, 21, 25*
17:*17, 21*
18:*5, 18*
21:*12* 22:*1*
23:*16* 24:*4,*
*5, 18* 25:*25*
26:*13, 21*
29:*7* 36:*8*
55:*7, 14*
70:*18*
119:*17*
120:*11*
121:*20, 22*
122:*15, 25*
125:*19, 20*
126:*9*
137:*5*
144:*8*
149:*20*
155:*16*
156:*23*
157:*1, 25*
163:*2, 8, 24*
164:*14*
169:*13*
171:*12, 18*
172:*18*
177:*17*
179:*10, 15*
194:*11*
198:*16*
201:*6, 10*
202:*8*
203:*20, 22*
204:*8*
215:*18*
226:*3*
228:*12*
237:*9*
255:*2*

259:*16, 18,*
*23* 261:*2, 4,*
*15* 267:*4*
274:*24*
275:*5, 13, 17*
283:*17*
317:*1*
330:*25*
334:*19*
338:*10, 16,*
*18* 340:*12,*
*16* 344:*25*
352:*4*
355:*1, 7*
356:*18*
357:*4, 8, 9,*
*13* 358:*11*
361:*12, 16*
368:*6, 18*
370:*14*
372:*8*
374:*25*
382:*12, 20*
383:*3*
387:*5, 24*
390:*14*
391:*10*
393:*16*
394:*3*
395:*2, 11, 16,*
*18* 396:*13*
406:*18*
408:*12*
427:*24*
428:*2, 24*
429:*8, 17, 21,*
*24* 430:*2, 12,*
*21* 431:*3*
433:*2*
435:*20*
436:*3*
446:*17*
449:*5*
463:*3*

476:*25*
477:*12*
478:*6, 12, 20*
479:*12*
485:*6*
486:*22*
510:*23*
511:*21, 25*
514:*14, 18*
519:*22*
520:*20*
521:*2, 5, 19*
522:*2, 7, 8*
531:*18*
541:*19*
559:*1*
562:*11, 23*
563:*1*
**reported**
26:*21, 25*
27:*8* 28:*24*
29:*14*
168:*22*
174:*11*
177:*6*
220:*21*
224:*3*
258:*9, 25*
262:*10*
263:*8*
369:*11*
384:*21*
424:*12*
426:*20*
429:*10*
431:*8, 14, 16*
437:*1*
439:*6*
453:*13*
484:*18*
487:*21*
516:*12*
559:*11*
565:*22*

**Reporter**
1:*17, 18, 19,*
*21* 15:*16*
20:*7*
330:*16, 20*
477:*22*
549:*7, 9*
567:*2, 3, 17,*
*18, 19, 20, 21,*
*22*
**reporting**
293:*5*
294:*14*
482:*16*
484:*13*
485:*1, 5*
508:*15*
514:*21*
**reports**
159:*14*
205:*3*
236:*9*
247:*14*
**represent**
16:*6* 128:*2*
447:*23*
480:*8*
**representatio**
**n** 262:*4*
263:*17*
**representativ**
**e** 527:*18*
**represented**
60:*11*
**represents**
134:*22*
529:*1*
**reputable**
42:*22*
**reputation**
46:*8* 298:*2*
**request**
76:*22*

**requires**
93:*14*
212:*8*
253:*3*
374:*20*
413:*17*
414:*20*
**Research**
12:*9* 34:*2*
36:*13*
42:*14*
86:*23, 25*
105:*6*
130:*4*
183:*16*
198:*6*
216:*14*
230:*20*
362:*1*
377:*3*
461:*25*
474:*25*
475:*10*
**researcher**
36:*9* 475:*4*
**researchers**
101:*13*
105:*3*
222:*10*
499:*1*
**reserving**
473:*23*
**residual**
227:*10*
270:*18*
271:*3, 5, 11*
342:*9*
400:*21*
461:*14*
469:*17*
**resolve**
138:*18*
549:*12*

**respect**
22:*4*  38:*1*
116:*15*
117:*1*
118:*14*
121:*2, 3*
124:*4*
145:*24*
170:*1*
176:*23*
210:2
212:22
243:*14, 23,*
*25*  252:*15*
280:*23*
323:*4*
325:8
332:*18*
336:7
343:*6, 10*
347:*23, 24*
349:*16*
350:*8, 16*
356:*21*
357:*11*
374:*17*
379:*19*
383:8
385:*12*
392:*10*
424:*6, 18, 24*
425:2
433:8
461:*10*
488:*9*
502:*5, 13*
523:*10*
526:*13*
**respectful**
553:*18, 20*
**respectfully**
76:*18*
**respond**
98:*13*

99:*19*
268:*24*
372:*21*
394:*9*  444:*6*
**Response**
11:*1*  87:2
100:*6*
140:*17*
149:*10*
203:*1*
212:*10*
215:*9*
**responses**
127:22
**responsible**
111:*24*
332:7, *25*
**responsive**
371:*17*
**restricted**
338:*24*
398:*21*
**restricting**
364:*19*
**result**  29:7
52:*21*  57:6
60:*13*
61:*12*
168:*23*
171:*6, 9*
172:6
173:*14*
174:9
175:*24*
213:2
214:*2, 8, 12,*
*14*  229:*20*
240:*23*
257:*13*
260:*21, 24*
269:2
289:*24*
342:9
366:*6, 12, 14,*

*15, 16*
370:*17*
392:7
414:*23*
421:*10*
429:25
445:*15*
446:*18*
461:*14*
463:*5, 7, 13,*
*17, 18*
464:*14*
465:*12, 14*
466:*20*
468:*18, 19*
469:*4*
493:7, *9*
509:*23*
511:*23*
512:*17*
518:*23*
536:*4*
**resulted**
227:*24*
411:*20*
**resulting**
436:*4*
**results**
28:22  40:*5*
47:*23*
48:*14*  49:*3*
55:2, *10, 23*
56:*1, 10, 15,*
*17, 18*
160:*20*
164:*14, 17,*
*21*  166:*5, 14,*
*20*  171:*12*
172:*13*
177:5
180:22
206:*23*
208:5
209:*6, 14*

213:*24*
220:*21*
221:7
224:2, *4, 6*
225:*11, 12*
237:*14*
238:*25*
239:*20, 21*
240:*1, 2, 16*
241:*3, 12, 15*
242:*20*
243:*4*
259:*19*
262:8
263:*17, 18*
270:*11*
298:*12, 21*
299:*21*
316:*18*
321:*12, 14*
329:*4*
383:*4, 17, 19,*
*22, 23, 25*
384:8
387:*2, 9*
388:*5*
389:*25*
390:*1*
391:*10*
394:*12*
403:*24*
408:*16, 20,*
*22, 23*  409:*1*
410:*4*
414:*2, 15*
417:*21*
423:*22*
426:*17*
427:5
429:*25*
440:*5, 24*
443:*24*
454:*10, 16*
455:*10*

456:*22*
457:*3, 15*
458:*21*
460:*17, 24,*
*25*  462:*5, 15,*
*25*  464:*23*
471:*1*
478:*6, 12, 17,*
*25*  479:*24*
482:*15, 17*
486:*18, 22*
487:*20, 21*
488:*1, 7*
491:*2, 3*
492:*24*
498:*4*
505:*23*
506:*3*
507:*15*
508:*15*
509:*4*
510:*3, 13*
513:*21*
514:*13, 14,*
*21*  515:*8*
516:*13*
521:*10*
523:*9*
561:*15*
563:*22*
**retain**
475:*24*
564:*21*
**retained**
427:*11*
475:*8*
**retreading**
541:*15*

**retrospective**
113:*18*
375:*14*
428:*10*
448:*8, 13*

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| **retrospective** | 503:*5, 13* | 331:*6* | *15, 24, 25* | 137:*5, 7, 11* |
| **ly** 113:*14* | 515:*17* | 557:*15, 24* | 80:*24* | 142:*16* |
| **return** | **reviewed** | **rich** 89:*9* | 81:*21* | 143:*7* |
| 568:*13* | 35:*21* | **Richard** | 82:*13, 18* | 144:*21* |
| **revealed** | 108:*22* | 285:*15* | 83:*23* | 150:*20* |
| 307:*19* | 119:*20* | **RICHER** | 84:*24* 85:*2,* | 151:*2, 5, 11,* |
| 469:*8* | 142:*20* | 5:*20* | *8, 24* 86:*15* | *14, 19* |
| **reverse** | 143:*22* | **Rico** 3:*9* | 87:*7* 88:*11* | 152:*10, 23* |
| 533:*5, 17* | 144:*13* | **right** 18:*25* | 89:*3, 13* | 153:*13* |
| 534:*2* | 146:*8* | 19:*1* 20:*18* | 90:*10, 12, 13* | 154:*3* |
| 535:*4, 9* | 147:*3* | 22:*5* 24:*6,* | 92:*8, 12, 24* | 155:*3, 22, 23,* |
| 536:*11* | 189:*19* | *12* 29:*24* | 95:*11* 97:*2* | *25* 156:*3, 8* |
| **review** | 201:*20* | 30:*17* | 98:*7, 18, 24* | 157:*3, 15, 19* |
| 11:*19, 24* | 202:*4, 7* | 31:*14, 17* | 99:*2, 6, 22,* | 158:*3, 15, 21* |
| 37:*1* | 210:*14* | 32:*9* 35:*6* | *24* 100:*12* | 159:*19* |
| 115:*25* | 237:*8, 11* | 36:*5, 10* | 101:*10, 22* | 160:*2, 9, 17,* |
| 117:*11* | 256:*4, 12, 13* | 37:*7, 20* | 102:*11* | *22, 24* 161:*1,* |
| 119:*2* | 350:*15* | 38:*15* | 103:*10* | *14, 22* |
| 127:*23* | 353:*24* | 40:*15* 41:*7,* | 105:*10* | 163:*10* |
| 144:*16, 25* | 354:*1, 18* | *12* 42:*19* | 107:*7, 12, 19* | 164:*10, 15,* |
| 146:*12, 25* | 358:*14* | 43:*22* | 108:*5, 10, 12* | *25* 166:*5, 16,* |
| 156:*13* | 360:*7* | 47:*11, 12, 19* | 110:*12, 17* | *18* 167:*10,* |
| 163:*24* | 368:*8* | 50:*20, 22* | 111:*9* | *11* 168:*13* |
| 202:*3* | 469:*13* | 51:*22, 24* | 113:*11, 24* | 169:*6* |
| 242:*14* | 516:*12* | 52:*2* 53:*9,* | 114:*1, 7* | 170:*6, 22* |
| 245:*6* | 556:*22* | *10, 11, 13, 21* | 115:*11* | 171:*14* |
| 256:*14* | 561:*21* | 54:*3, 6, 9* | 116:*3* | 172:*7* |
| 292:*22* | 562:*20* | 55:*11* 57:*5,* | 117:*16* | 173:*7, 8, 19* |
| 317:*20* | **reviewing** | *15, 21* 58:*1,* | 118:*22* | 175:*4, 10, 16* |
| 318:*13* | 48:*12* | *8* 59:*9, 19* | 119:*17* | 176:*19* |
| 332:*18* | 185:*6* | 60:*2, 5, 6, 7,* | 120:*13, 20* | 177:*16, 19* |
| 333:*4* | 194:*10* | *13* 61:*4, 20,* | 121:*10, 12* | 178:*3, 9* |
| 344:*22* | 195:*8* | *23* 62:*2, 21* | 122:*7* | 179:*15* |
| 347:*1, 6* | 268:*19* | 63:*22* 64:*4,* | 123:*9* | 180:*7* |
| 348:*24* | 317:*12* | *10, 14, 24* | 124:*8* | 182:*6* |
| 350:*3, 4* | 338:*18* | 66:*23* 67:*6,* | 125:*8, 12* | 184:*20* |
| 352:*2* | 345:*6* | *10, 22* 68:*21,* | 126:*9* | 185:*11* |
| 360:*5* | **reviews** | *25* 69:*19, 24* | 128:*4, 18, 21* | 186:*3, 4, 14* |
| 377:*18* | 143:*6* | 70:*5, 13, 20,* | 129:*14, 15,* | 187:*8* |
| 395:*18* | **RFO** 3:*8* | *21* 71:*5, 23* | *22* 130:*22* | 193:*13* |
| 435:*17* | **Ricci** 11:*19* | 72:*10, 22* | 131:*7* | 196:*5* |
| 442:*12, 20* | 320:*2* | 73:*9, 13* | 132:*2* | 197:*15* |
| 444:*14, 18* | 325:*13* | 75:*3* 76:*25* | 133:*15* | 198:*19* |
| 492:*18* | | 77:*3, 6, 11,* | 134:*1, 7, 15* | 199:*20* |

Confidential - Subject to Protective Order

200:*3, 15, 20, 21, 23* 201:*2, 12* 202:*20*
204:*1, 6, 16, 24* 205:*5, 22*
206:*25*
208:*25*
209:*6, 12, 16*
211:*20*
212:*25*
213:*14, 17*
214:*1, 6, 19*
215:*14, 18, 20* 217:*6*
218:*12*
220:*24*
221:*4, 12, 15*
222:*7*
223:*11, 22*
225:*13*
226:*1, 8, 13*
227:*1, 14, 15*
228:*18, 25*
229:*1, 11, 14, 15, 17, 18, 25*
230:*3, 18, 23, 24* 231:*3*
232:*1, 23*
233:*3, 5, 9*
234:*20*
235:*3, 7, 19*
237:*8*
238:*12, 19*
240:*5*
244:*9, 12, 14, 21* 245:*10*
246:*7*
247:*10, 21, 23* 248:*2, 17, 22* 249:*7*
250:*9*
252:*1, 2, 3*
253:*22, 25*
255:*11, 20,*

*24* 256:*2*
259:*15, 25*
260:*1, 16*
261:*3, 5*
262:*7*
263:*4, 17, 25*
266:*19, 20*
268:*8, 9*
269:*21*
270:*2, 19, 21*
271:*12*
275:*10, 23*
276:*16, 19*
277:*1, 5, 20, 22* 278:*7*
279:*9*
280:*11, 18, 24* 281:*18*
282:*5, 11, 15, 25* 284:*21*
285:*10, 19, 25* 286:*13*
287:*8, 12*
288:*11, 14, 17, 23, 24*
289:*6*
293:*22*
297:*18*
298:*7, 10, 15*
300:*2, 12, 18, 23* 301:*22*
302:*5, 18*
303:*1*
304:*22*
305:*9*
306:*19, 21, 25* 307:*5, 9, 10* 308:*15*
310:*2, 20*
311:*14, 18, 25* 312:*13*
313:*6*
314:*18*
316:*20*

317:*7, 14*
318:*5, 20*
320:*6, 8, 10, 14, 19* 321:*1, 8, 18* 322:*11, 17* 324:*18*
325:*11, 24*
326:*12*
328:*8, 18*
329:*4, 7*
330:*7, 12*
331:*14*
332:*13*
333:*12, 14*
335:*2*
338:*3*
339:*12*
340:*1, 20, 25*
341:*1, 19*
344:*7, 10*
348:*7, 11*
351:*18*
354:*11, 25*
355:*13*
357:*23*
359:*24*
360:*1*
361:*6, 7, 10*
362:*7, 23*
363:*3, 8, 13*
365:*10*
366:*6*
367:*4, 16*
368:*2, 17, 25*
369:*5, 25*
371:*7*
374:*10*
376:*1, 23*
377:*1, 11*
380:*12, 17*
381:*20*
382:*14*
385:*10*
386:*6*

387:*12, 14*
388:*2, 10*
389:*2*
390:*3*
392:*19*
395:*24*
396:*17*
397:*11, 24*
398:*14, 23*
399:*11, 13, 19* 400:*7*
402:*23, 24*
404:*17, 18, 19, 22* 405:*3, 4, 20, 24*
407:*7, 17, 19*
409:*2*
410:*5, 7, 18, 24* 411:*2, 12, 16, 24*
413:*10, 24*
414:*5, 7, 14, 16* 415:*1, 2*
416:*2, 21, 22*
417:*25*
418:*5, 14, 15, 21* 420:*2, 9, 16* 421:*8, 21, 22* 422:*17, 19* 423:*3, 6*
424:*15*
425:*4*
427:*23*
429:*5, 9*
430:*10*
431:*2, 19, 21*
432:*19, 20*
436:*1, 5, 16*
438:*5, 8*
439:*12*
440:*8*
441:*10, 14*
442:*25*
444:*1, 11, 16,*

*25* 445:*8*
446:*14*
447:*7*
448:*12, 15*
450:*8, 18*
451:*2, 11, 12*
452:*13, 17*
453:*1, 3, 19*
456:*3, 21, 24*
458:*14, 17, 22* 460:*2*
463:*6, 24*
464:*1, 6*
465:*21*
466:*10*
467:*1, 9, 10*
468:*5, 20*
469:*5*
470:*17*
472:*16*
473:*8, 23*
474:*12, 24*
477:*3, 10*
478:*6*
479:*5, 22, 25*
480:*22*
481:*5*
482:*3, 15*
483:*7, 12, 21*
484:*5, 14*
485:*7, 14*
487:*10, 19, 23, 25* 488:*3, 13, 21* 489:*2, 12, 16, 25*
490:*2, 17*
491:*10, 14*
492:*3, 5, 18*
493:*4*
494:*2*
495:*8, 11*
496:*25*
498:*7*
501:*3*

503:*1, 13, 19*
504:*8, 18*
505:*20*
506:*20*
508:*10, 17*
509:*12, 15*
510:*10, 22*
511:*1*
512:*14*
513:*19*
514:*12, 23*
516:*3, 8*
517:*2, 8, 9, 10*  520:*11, 14*  522:*1, 3, 13*  524:*3*
525:*23*
526:*16, 21, 24*  527:*12*
529:*19*
530:*3*
531:*11, 23*
532:*6, 15, 17, 23, 25*  533:*2*
534:*4, 22*
536:*19, 20, 22*  537:*2*
538:*1, 10, 11*
539:*1*
541:*10, 11, 23*  542:*15*
543:*6, 19, 25*
544:*1, 11, 17*
545:*4*
547:*18, 20, 23*  550:*4*
551:*17*
553:*16*
554:*5, 17, 20*
555:*25*
556:*1*
560:*6, 25*
561:*2*
562:*12*

564:*16*
566:*2*
**Right-hand**
  235:*20*
  411:*16*
**rigor**  106:*3*
**rise**  293:*3*
  294:*8, 13*
  296:*12*
  543:*23*
**rises**  538:*21*
**Rising**
  10:*24*
  184:*4, 14*
  186:*24*
  188:*2*
**risk**  10:*20, 22*  11:*4*
  12:*3, 6*
  13:*5, 9*
  29:*1*  37:*7, 9, 11, 12, 13, 15, 17, 25*
  38:*2, 6, 8, 14*
  40:*17, 22*
  41:*2, 5, 14*
  42:*2*  46:*10*
  51:*18*
  52:*12, 14, 18*
  58:*11, 19*
  63:*1, 6, 18*
  64:*9, 17, 20, 22, 24*  65:*1, 3, 9, 19*
  66:*19*  67:*7*
  84:*19*  91:*9*
  92:*17, 20*
  94:*13*
  108:*12*
  113:*15*
  115:*21*
  116:*7*
  117:*5*
  118:*5*

120:*6*
123:*16*
127:*6*
130:*8, 9*
131:*6*
135:*20, 25*
144:*14*
146:*19*
147:*25*
155:*9*
156:*6*
158:*10, 11*
161:*20*
162:*10, 11, 23*  166:*22*
167:*18*
177:*6, 14*
179:*2*
189:*14*
198:*21, 23*
199:*2, 3*
204:*18*
205:*23*
226:*18*
227:*24*
230:*17*
239:*23*
240:*24*
241:*22*
244:*6*
247:*22*
250:*23*
251:*7*
254:*11, 16, 25*  255:*3*
257:*5, 12, 23*
258:*19, 23, 25*  263:*14*
266:*9*
267:*11, 19*
268:*11*
269:*11*
290:*18*
296:*22*

315:*5*
321:*23*
353:*3*
356:*8*
365:*6*
368:*4, 8*
369:*10, 13*
370:*16*
373:*19*
376:*6*
397:*6*
399:*25*
400:*14*
401:*13*
405:*6, 15*
407:*9*
409:*17*
422:*2, 4*
423:*24*
424:*1*
432:*7*
437:*1*
446:*23*
447:*1*
464:*5*
465:*10*
466:*13*
482:*7, 9, 13*
484:*14*
485:*6, 10, 13*
486:*25*
488:*2, 11, 18*
492:*9*
495:*25*
498:*1*
499:*12*
501:*18*
510:*14, 21, 22*  511:*10, 14, 19*  512:*4, 8*  513:*2, 11*
527:*16*
535:*23*
565:*7*

**risks**  69:*2*
  160:*21*
  207:*10*
  342:*9*
**Rite**  8:*14*
**Riverside**
  2:*10*
**Road**  4:*21*
**robust**
  391:*4*  392:*2*
**ROGER**  4:*7*
**roger.smith
@beasleyalle
n.com**  4:*8*
**role**  71:*5*
  87:*1*  89:*10*
  153:*11*
  221:*10*
  281:*10*
  390:*19*
  413:*23*
  444:*9*
  470:*22*
**ROMANO**
  2:*8*
**Ronald**
  278:*9*  298:*4*
**room**
  132:*11, 24*
  133:*2, 9*
  134:*17*
**ROSIE**  2:*8*
**rosie.romano
@kellerpost
man.com**
  2:*8*
**Rothman**
  388:*12, 13*
  389:*18*
  392:*18*
**row**  28:*3*
  172:*13*
  240:*3*

Confidential - Subject to Protective Order

**RR** 128:*5*
205:*3*
**Rule** 10:*11*
53:*23* 66:*3*
67:*25*
252:*9*
335:*14*
350:*24*
358:*20*
359:*4, 7, 20*
363:*11*
368:*11*
373:*19*
374:*8*
414:*8*
418:*4*
552:*11*
**ruled** 70:*4,*
*9*
**rules** 35:*17*
62:*18*
101:*9*
547:*24*
552:*17*
**ruling**
194:*12, 23*
224:*17*
330:*3*
359:*21*
**run** 61:*5,*
*21* 62:*22, 24*
*64:16* 466:*9*
**RUSS** 3:*5*
**RYAN** 4:*8*
**ryann.duplec**
**hin@beasley**
**allen.com**
*4:9*

**< S >**
**Sacramento**
*4:16*
**safe** 139:*1*

**sample**
115:*7*
181:*8*
208:*13*
260:*9*
380:*6*
411:*5*
412:*10, 11,*
*14, 21* 413:*1,*
*12, 21*
414:*25*
415:*3*
418:*6, 9*
423:*16*
428:*3*
429:*8*
431:*19, 25*
439:*7*
451:*16*
453:*4, 10, 12*
454:*2*
556:*14*
**San** 7:*20*
**SANDRA**
7:*8*
**SANFORD**
3:*7*
**SARAH**
5:*18*
**satisfied**
145:*11*
146:*9*
243:*21*
244:*19*
247:*2*
531:*25*
532:*3, 5, 10,*
*13*
**Saunders**
260:*5*
**save** 557:*13*
**saw** 108:*5*
140:*4*
141:*2*

203:*21*
339:*13*
404:*8*
414:*13*
489:*2*
513:*3*
564:*18*
**saying** 49:*2*
61:*17* 66:*6*
88:*5* 99:*8,*
*15* 100:*7, 8,*
*9* 121:*20*
135:*10*
142:*4, 17*
149:*6*
160:*3, 5*
167:*25*
172:*25*
190:*12, 22,*
*25* 217:*22*
225:*18*
226:*10, 24*
227:*6*
230:*24*
241:*1*
245:*20*
266:*20*
269:*22*
272:*15, 21*
277:*19, 20*
283:*9, 15*
294:*7, 11*
296:*16, 17*
302:*3*
304:*15, 18*
310:*6*
323:*24*
324:*16*
353:*21*
359:*10*
363:*10, 11,*
*15* 374:*7*
379:*14*
380:*25*

386:*4*
388:*5*
391:*7*
393:*9*
410:*1*
411:*8, 25*
412:*4, 24*
414:*1, 7, 9,*
*17, 22*
417:*11*
418:*5*
424:*20*
435:*15*
442:*7*
455:*21*
457:*7*
460:*7, 9, 15,*
*19, 23*
466:*17*
491:*1, 4*
499:*22*
500:*4*
501:*7*
502:*17, 20,*
*23* 505:*12,*
*14* 532:*12*
533:*15*
534:*8, 9*
**says** 15:*23*
18:*4* 44:*2*
52:*8* 86:*23,*
*25* 87:*18*
97:*9, 12, 17,*
*21, 25*
103:*11*
105:*3, 9*
109:*6, 10*
110:*14, 21*
111:*1, 4, 10*
205:*1*
210:*24*
215:*22*
216:*3, 5, 10,*
*14* 220:*5*

221:*5, 9*
222:*19*
224:*24*
225:*3, 20, 21*
226:*6, 9*
229:*7*
233:*10*
235:*15, 21*
237:*13, 20*
238:*2, 7*
247:*21*
250:*7, 10, 11,*
*19* 258:*7*
275:*24*
276:*1, 9*
278:*2*
280:*12*
287:*1*
293:*2*
298:*12*
299:*20*
300:*19*
321:*20*
326:*17, 20*
328:*12, 15,*
*19* 329:*3, 5,*
*8* 331:*18*
332:*5*
334:*4*
341:*25*
342:*8*
346:*13, 20*
347:*7, 9*
362:*18*
363:*5*
373:*17*
375:*23*
378:*6, 19*
380:*9, 13*
381:*22*
383:*21*
384:*3*
389:*18*
390:*5*

392:*18*
402:*25*
403:*4, 7*
408:2
409:*23*
410:*21*
411:*17*
413:*21*
416:*17*
417:*21*
418:2, *17*
423:*14, 21*
424:*9*
425:6, *10*
428:*23*
437:*10, 21,*
*25*  438:*1*
439:*9*
440:*4*
450:*11, 15*
459:*25*
469:*22*
470:*25*
494:*22*
509:*20*
516:*25*
517:*4*
527:*24*
529:*20*
531:*11*
532:*16, 18,*
*24*  533:*1*
538:*19*
543:*20, 21*
547:*14, 22*
548:*4*
558:*16*
565:*14*
**SCARCELL**
**O**  3:*19*
**scared**
552:*22*
**scenario**
535:*21*

**School**
44:*14, 17, 21*
279:*15*
**SCHULTZ**
2:*9*
**Science**
12:*9*  42:*24*
43:*6*
100:*21*
106:*16*
129:*6*
134:*7*
144:*8*
258:*10*
303:*21*
377:*12, 13*
502:*21*
561:*6*
**Scientific**
10:*18*
102:*13*
103:*3*  505:*7*
**scientifically**
502:*25*
504:*8, 12*
505:*2*
**scientists**
138:*11*
188:*9, 12, 17*
503:*6*
**score**  155:*9*
156:*6*
158:*10*
328:*21*
**scores**
420:*14*
564:*4*
**screening**
163:*21*
172:*1*
176:*13*
239:*1*
241:*17, 19*
244:*4, 5, 8*

255:*4*
420:*22*
421:*23, 25*
**screwed**
219:*23*
**SEAN**  2:*21*
**search**
303:*21*
**searched**
132:*3*
**searching**
83:*16*
**second**
13:*23*  19:*4*
85:*23*
109:*3*
149:*23*
151:*3*
158:*5*
160:*18*
297:*3*
298:*20*
306:*8*
313:*22*
321:*10*
388:*11*
438:*19*
478:*18*
479:*14*
481:*20*
516:*20*
518:*11*
560:*11*
**secondhand**
13:*20*
200:*20*
201:*20*
202:*16*
204:8, *19*
205:*1*
207:*3, 12*
208:*18, 22*
209:*21*
210:*1, 8*

211:*1, 3*
213:*21*
266:6, *23*
267:*12*
493:*6*
512:*16*
513:*15, 21*
**section**
119:*19*
137:*4*
249:*7*
345:*21*
357:*12, 15*
395:*16*
425:*5*
436:*15*
476:*24*
**sections**
119:*16, 21*
325:*1*
352:*4, 9*
**see**  17:*23*
18:*1*  20:*15*
38:*25*
55:*21*  58:*6*
59:*1, 24*
61:*21*  79:*3*
86:*23*
87:*23*  97:*4,*
*8*  103:*4, 5,*
*12, 14, 19*
104:*24*
105:*8*
107:*21, 25*
108:*25*
109:*2*
111:*3*
137:*1*
141:*5*
144:*17*
149:*23*
153:*7*
154:*1*
157:*17*

159:*13*
161:*23*
165:*14*
166:*9*
169:*7*
176:*3*
177:*19*
185:*8*
186:*23*
187:*1*
196:*25*
202:*15, 18*
204:*24, 25*
205:*12, 19,*
*20*  206:2, *15*
209:*13*
210:*21*
211:*5*
215:*21*
216:*17, 18*
217:*2*
220:*4, 5*
221:*4*
222:*17, 19*
224:*24*
225:*3, 6*
227:*4*
232:*14*
233:9, *19*
234:*10*
235:*14, 21,*
*23*  236:6, *7*
237:*13*
238:2, 6, *13*
242:*4, 7*
248:*13, 15*
249:*6*
261:*21*
267:*5*
274:*21*
275:6, *23*
276:*6*
278:*8*
283:*23*

285:*19*
290:*14*
292:6, 9, 15
293:*2, 6, 16,*
*17* 297:*14*
298:*3*
299:*20*
302:22
305:*4, 12*
307:*14*
308:7, *23*
309:*4*
310:7, *18*
312:*3*
324:*12*
326:7, *17*
328:*12*
331:*14, 18*
333:*15*
334:*4, 8*
346:*10*
347:7, *9*
353:*20, 23*
354:*3*
355:5, 7
361:*13, 14*
362:*17, 21*
366:21
368:*14*
369:*3*
373:*11, 14,*
*17, 24*
374:*10, 13*
375:*20*
377:24
378:*5, 9, 12,*
*22* 379:*14,*
*16* 380:*8*
381:22
382:*1*
383:*5*
384:*2, 5*
385:*17*
386:*1*

387:6
389:*18, 22*
390:7
402:25
403:*4, 12*
407:*19*
408:*11*
409:*1*
419:*14, 16*
420:2
422:21
423:*14, 18*
424:*21*
425:*5, 9, 13*
427:*15*
428:2
429:*5*
431:*4, 16*
434:*10*
437:*10*
440:*4, 7*
446:5
447:*22, 24*
452:9
455:*12*
456:*16*
457:*14*
459:*11, 18*
462:25
463:*20*
466:*13*
470:*24, 25*
471:9
475:25
478:*8*
484:25
490:*13, 15*
493:*10, 11*
495:*13, 17,*
*18* 497:*16,*
*20, 21* 500:*9*
505:*16, 19*
508:*8, 21*
509:*3, 8, 20,*

*22* 511:*9*
514:*2*
516:*19, 23*
525:*25*
534:*9*
536:*21*
545:*13*
551:*25*
554:*8*
559:*5, 19*
565:*22*
**SEED** 476:*6*
**seeing**
412:*2*
428:*6*
484:*19*
508:*5, 23*
557:*18*
**seen** 85:*24*
103:*9*
124:*22*
147:*1, 2*
185:*10*
225:*24*
247:*13, 25*
272:*2, 6, 8,*
*10, 14*
275:*12*
318:*25*
363:*21*
388:*12*
415:*22*
416:*3*
442:*15*
443:*15*
470:*10*
478:*2*
555:*25*
556:*3, 9*
558:*25*
559:*16*
562:*23*
563:*22*

**Seizure**
118:*17*
352:*18, 22*
353:*19*
356:*4*
**seizures**
352:*18*
353:*3*
**selected**
427:*19*
**selection**
115:*24*
181:*9*
280:*13*
**self-report**
375:*14*
490:*22*
**self-reported**
489:*22*
490:*14*
540:*3*
**send** 78:*22*
81:*9*
**sense** 72:*12*
134:*22*
281:*3* 495:*2*
**sensitivity**
241:*21*
326:*22*
422:*3*
516:*25*
517:*9, 10*
**sentence**
18:*1, 11*
99:*4, 24*
104:*24*
109:*2, 4, 14*
111:*1, 3*
122:*11*
125:*21, 23*
127:*15*
226:*23*
227:*5*
242:*11, 17*

276:7
278:*8*
283:25
284:*9*
293:*12*
332:22
347:*15*
353:*10*
360:*8, 14, 17*
414:*17*
418:*1*
474:*1*
556:*12*
560:*11*
**sentences**
332:*4*
**SEPTEMBE**
**R** 1:*6* 15:*5*
567:*24*
568:*2*
**series** 23:*21*
240:*1*
253:*8*
350:*23*
378:*20*
427:*20*
433:*18*
435:*23*
**serious**
354:*10*
**seriously**
543:*17*
**serve** 377:*17*
**served**
108:*14*
109:*12*
**Service**
11:*22*
**SERVICES**
1:*22* 9:*5*
15:*4*
**serving**
194:*21*
312:*20*

| | | | | |
|---|---|---|---|---|
| set 26:23 | SHELLY | 512:15 | shows | 439:16, 17 |
| 40:7 47:11 | 3:7 | 560:9 | 52:16 | 440:1 |
| 56:1, 15, 17 | short 95:6 | showed | 57:16 | 449:12 |
| 61:16 | Shorthand | 160:20 | 191:6 | 450:12 |
| 72:14 | 1:19 567:3, | 162:20 | 206:24 | 451:17 |
| 106:2 | 18, 19, 20 | 192:2 | 228:1 | 454:23 |
| 144:5, 10 | show 16:12 | 226:18 | 398:24 | 456:3, 5, 7 |
| 145:20 | 38:4 52:25 | 229:20 | 399:6, 25 | 458:18, 21 |
| 207:23 | 80:9 92:23, | 240:1 | 456:13, 17 | 460:22 |
| 230:15 | 25 93:2 | 264:12 | 466:18 | 464:6, 10, 11, |
| 234:4 | 156:11 | 299:3 | 486:8 | 24 465:2 |
| 259:18 | 162:15 | 335:19 | 565:24 | 466:2 470:5 |
| 315:15 | 164:24 | 336:22 | SHUSTER | Sibling- |
| 322:18 | 166:14, 21 | 341:2 | 3:11 | Comparison |
| 323:3 | 167:7 | 368:4 | Sibling | 12:16 |
| 389:25 | 186:15 | 396:11 | 12:14, 21 | 411:17 |
| 394:11 | 190:23 | 404:6 | 13:3 29:22 | 415:25 |
| 422:2 | 205:17, 23 | 462:4 | 153:18 | 469:23 |
| 482:21 | 228:1, 23 | 464:25 | 169:3, 5 | sibling- |
| 528:13 | 261:5 | 558:18 | 173:16 | control |
| 531:3 | 266:5 | 564:19, 20 | 229:21 | 26:24 29:3 |
| 542:18 | 267:20 | 565:1 | 266:14 | 229:19 |
| 555:10 | 273:4 | showing | 363:19, 21, | 365:1 |
| 567:8 | 282:24 | 49:10 | 24 364:3 | 367:21 |
| setup 448:2 | 297:10 | 50:18 52:4 | 366:20 | 392:4 |
| seven 166:9 | 330:12 | 57:7 92:17 | 367:15 | 396:4 |
| 170:5 | 335:3 | 156:19 | 396:7 | 404:6 |
| 250:24 | 342:13 | 167:16 | 403:14 | 405:3 |
| 292:10, 12 | 361:10 | 204:6 | 404:24 | 411:13 |
| severity | 373:2 | 206:10 | 408:2, 12, 17, | 418:12 |
| 362:5, 12 | 397:22 | 337:3, 13 | 19 409:4, 13 | 423:16 |
| sex 483:2, | 401:12 | 344:15 | 410:2 | 426:16 |
| 14, 19 | 403:24 | 412:6 | 412:2 | 429:24 |
| Shanna | 407:4 | 413:12 | 413:16 | 454:14 |
| 188:5, 6 | 420:18 | 463:18 | 414:19 | 456:14 |
| share | 437:2 | 484:15 | 418:18 | 457:23 |
| 104:16 | 439:10 | 485:2 560:3 | 419:18 | 461:2 |
| shared | 440:23 | shown | 420:17 | 462:15 |
| 403:10, 15, | 443:23 | 147:8, 24 | 424:13 | 463:12, 17 |
| 17 409:5 | 453:22 | 148:9, 22 | 426:19 | 466:11 |
| 416:14 | 455:13 | 416:12 | 430:9 | 468:8, 19 |
| sheet 568:6, | 477:20 | 432:12 | 432:3 | 469:8 |
| 9, 11, 14 | 492:9 | 559:25 | 435:25 | 470:11, 20 |
| 569:7 | | | 436:12 | |

Confidential - Subject to Protective Order

sibling-
controlled
  12:*18*
  229:*10*
  328:23
  364:*11, 13,
  15*  365:15
  403:*23*
  406:*20*
  407:*9*
  410:22
  411:*11*
  414:*3*
  436:*4*  466:8
sibling-
controls
  403:*5*
sibling-
design
  233:*12*
siblings
  366:*11*
  403:8
  411:2, *20*
  416:*14*
  432:6
  436:*23*
  437:*4*
  449:*11*
  450:*11*
  454:*13*
  470:*1*
sic  30:*16*
  45:*15*
  285:*15*
  330:*15*
  495:9  554:*1*
side  34:*12*
  126:8
  139:*12, 16*
  141:*3*
  214:*20, 25*
  254:7
sides  399:*21*

sign  36:*6*
  188:9, *12, 18*
  568:8
signal  59:*3*
signed  190:7
significance
  55:*15*
  56:*10*  61:*4,
  9*  66:*1*
  168:*3*
  170:*4*
  384:*20*
  385:9
  390:*12, 20*
  393:6
  394:*15*
  422:*15*
  424:5, *17, 23*
  442:*10*
  464:*18*
  479:*10*
significant
  37:*5*  47:*23*
  48:*13, 19*
  49:*11, 24*
  50:*19*
  52:22  53:*2,
  13, 21*  54:9
  56:*16, 19*
  57:*15, 17*
  60:*12, 25*
  61:*12, 22*
  62:*23*
  114:*13*
  158:*1*
  161:9
  168:*13, 23*
  169:*12, 15*
  170:*11, 16*
  171:2
  172:*13*
  173:7
  189:*16*
  206:*24*

213:*3, 25*
221:7
240:*2, 5, 6, 7*
261:*1*
263:*20*
312:22
316:*16, 17*
366:*12*
370:*15*
383:*13*
385:*19*
386:*25*
387:*19, 25*
390:2
391:*12*
403:*24*
408:8
413:*13*
420:*19*
437:22
439:*5, 10*
440:*24*
443:*23*
465:*17*
479:*1, 2, 16,
21*  511:*14,
23*  514:*15*
515:8
559:*11*
signing
  568:9
signs  515:*2,
8*
similar  54:*4*
  97:*20*
  127:*21*
  281:*11*
  357:*15*
  369:*20, 24*
  398:6
  496:*1*
  545:*14*
similarly
  313:*3*

408:*4*
510:*25*
simple
  24:*18*
  219:*21*
  220:*1*
  528:*13*
simpler
  538:*23*
simplistic
  231:*23*
simply
  46:*16*
  390:*1*  502:8
single  72:*13*
  73:*14*
  74:*25*  75:*2*
  114:*16*
  133:6
  143:2
  144:5
  165:*25*
  232:*18*
  386:*24*
  391:*20*
  394:9
  461:*21*
  462:*23*
  539:*23*
single-
cohort
  237:*21*
Sir  13:*13*
  173:*17*
sis  506:*16*
sit  17:*18*
  33:*19*  62:*10*
sitting
  117:*16*
  317:*14*
  318:5
  341:*1*
  532:*21*

situation
  78:*16*
  209:*25*
  210:2
  271:2
  367:*12*
  444:8
  468:*13*
six  11:*13*
  170:5
  194:*16*
  206:*25*
  224:*16*
  245:*1*  247:*1*
size  115:8
  181:8
  208:*13*
  380:7, *20*
  381:5, *12, 15*
  411:5
  412:*10, 11,
  15, 21*  413:*1,
  21*  414:25
  415:3
  418:9
  423:*16*
  425:2
  428:*3*
  429:8
  431:*20, 25*
  439:8
  451:*16*
  453:*4, 10*
  454:2
  476:*20*
  528:*24*
  556:*14*
sjohnston@b
tlaw.com
  5:*19*
skeptics
  293:*19*
  544:*10*
skips  87:*9*

sko@btlaw.c
om  7:8
slash  373:10
sleep  397:3
sleeping
 138:25
slightly
 238:10
 384:15
small
 104:20
 321:22
 334:19
 351:17
 365:9
 367:3, 15
 370:14
 411:19
 413:12
 417:19
 424:13
 439:7
 453:11, 12
 556:14
smaller
 412:11, 20
 413:1
 417:18
 452:24
 453:8  494:1
SMFM  11:2
SMITH  4:7
 8:9
smoke
 13:20
 200:20
 201:20
 202:16
 204:8, 19
 205:1
 207:3, 12, 14
 208:18, 22
 209:22
 210:1, 8

211:1, 3
266:7, 23
267:12
285:18
493:6
512:16
513:15, 21
539:21
smoke/secon
dhand  13:20
smoked
538:22
539:19
smoker
276:14
293:19
smokers
13:15
211:2
280:13
285:16
287:2
288:13, 14
292:14
538:24
Smoking
11:19
12:11  41:4,
10  127:10,
11, 16, 17
132:10
201:17
212:18
213:20, 21
268:1, 17, 20
274:21
275:13
276:4, 11, 23
278:5
280:10
282:21
283:10, 20
289:23
290:8, 18

292:11
298:10
299:9
300:17
301:10
306:23
309:22
406:22
407:12
408:3
415:11
416:24
424:9, 11, 21
482:25
543:22
555:14
SNIDOW
2:3  10:5, 7
16:2, 5, 11,
18, 23  17:9
18:24
19:14, 21
20:3, 13, 14,
23  21:1, 4,
17  22:19
23:2, 11
24:2, 9, 16,
22  25:1, 12,
16, 19  26:7
27:2, 24
28:4, 11
29:9, 12, 20
32:18
33:15  37:4
38:12  39:7,
17  40:14, 24
42:12  43:5
44:3  45:1
46:9  47:5,
21  48:23
50:1, 7, 15
51:9, 20
52:11
54:17

55:24
56:13  57:2
58:14, 17
59:8  60:1
61:2, 14
62:1, 5, 8, 14,
19, 20  63:11,
21  64:13
65:16
66:10, 15
67:5  68:8,
20  69:18
70:10  72:3
73:2  74:3
75:13  76:2,
7, 24  77:2,
12  78:6, 19,
22  79:4, 8
80:2, 18, 22
81:2, 6, 13,
19, 23  82:23
84:1, 14, 21,
23  85:7, 21
86:9, 12, 14
87:24  88:4,
10, 20, 23
89:1, 2
90:6, 9, 16
91:1, 17
92:3  93:5,
21  94:17, 22
95:1, 8, 9
97:1  98:16
99:1, 21
100:4, 17
101:7, 21
102:10, 16,
17, 21  103:1
104:8, 21
105:21
106:19
107:2, 6, 11,
15, 17, 18
108:9

110:11, 22
112:3, 9, 19
113:10
114:6, 21
115:10
117:15
118:1
119:15
120:17
121:18
122:6, 18
123:3, 13
124:7
125:6
126:7, 14, 22,
23  128:4, 7,
9  129:10, 20
130:19
131:2, 12
132:20
133:24
134:5, 14
135:11
136:9, 18
137:3, 20
138:9
140:2, 13
141:1, 13
143:4
145:7
146:3, 17
147:5, 12, 22
148:6, 20
149:4, 13, 18
150:17
151:1, 18
152:22
153:12
154:8, 12, 18,
22, 24
156:19, 22
157:8, 11, 14
159:6
160:1, 16

165:*4, 10*
167:*4*
168:*8, 17*
170:*17*
171:*10, 22*
172:*19*
173:*4, 22*
174:*7*
175:*3*
176:*1, 18*
177:*1*
179:*13*
180:*1, 19*
181:*18*
182:*4*
183:*13*
184:*1, 17*
185:*1, 3, 16*
186:*13, 19, 21*  187:*13, 24*  189:*12*
190:*9*
191:*3, 14, 17, 24*  192:*15*
193:*1*
194:*17*
196:*1*
197:*5*
199:*19*
200:*10, 12*
201:*19*
202:*1*
203:*6, 13*
204:*3, 5, 11, 15*  206:*14*
207:*16*
208:*15*
209:*11, 23*
210:*18*
211:*17*
212:*11, 24*
213:*10*
214:*16*
215:*12*

217:*20*
218:*11, 23*
219:*13, 19*
222:*1*
224:*22*
227:*7*
228:*4, 15, 21*
230:*12*
231:*21*
232:*6, 20*
233:*2*
234:*23*
235:*3, 6*
236:*12, 16, 19, 24*  237:*5, 7*  239:*16*
240:*20*
243:*3*
245:*17*
246:*24*
247:*9*
248:*12*
249:*19*
250:*20*
253:*1, 12*
254:*15, 22*
255:*19*
256:*24*
257:*10*
258:*5*
259:*4, 9, 13, 14*  261:*8, 25*
262:*6*
263:*15, 25*
264:*8, 21*
265:*11, 18*
266:*1, 3*
267:*8, 22*
269:*20*
270:*1, 16*
271:*1*
272:*5, 16*
273:*3, 9, 12, 18, 25*  274:*5,*

*10, 17, 20*
275:*11, 18*
277:*18*
278:*17*
279:*16, 22*
280:*8*
281:*7, 21*
282:*3, 10, 22*
283:*7, 18*
284:*17*
285:*3, 9*
286:*11, 17*
289:*13*
290:*4, 16, 24*
291:*6*
292:*3*
293:*1, 10, 13*
294:*6, 16*
296:*10, 24*
297:*9, 23*
298:*19*
299:*15*
300:*10*
301:*6*
302:*1, 13*
303:*2, 10, 14, 15*  305:*24*
306:*3, 6, 16*
307:*4*
308:*20*
309:*12*
310:*9*
311:*2, 11*
313:*1, 12*
314:*16*
315:*2*
316:*1, 19*
318:*4, 17*
319:*6*
320:*1, 24*
324:*4, 9*
325:*10*
326:*11*
327:*24*

330:*7, 11, 14, 19*  331:*3, 8*
332:*21*
335:*17*
336:*1, 16, 20*
337:*4, 11, 22*
339:*11, 21*
341:*18*
344:*1, 14*
345:*8, 15*
346:*1, 6*
348:*9*
349:*1, 18*
350:*17*
351:*15, 22*
352:*12*
354:*24*
355:*20*
356:*2, 23*
357:*21*
358:*18*
359:*1*
360:*23*
361:*3, 9*
362:*14*
365:*22*
367:*23*
370:*6*
371:*3, 12, 16, 20*  372:*19*
373:*1, 13*
375:*16*
376:*22*
381:*11*
386:*11, 16*
387:*22*
388:*21*
389:*1, 7*
392:*13*
393:*14, 19*
394:*1*
395:*12*
397:*8, 19*
398:*22*

401:*22*
402:*2, 8, 20*
403:*3*
404:*11*
405:*17*
406:*16*
407:*3*
409:*22*
413:*14*
415:*15*
417:*7*
422:*20*
423:*2, 12*
430:*24*
431:*1, 11*
432:*15*
434:*2, 8, 22*
435:*10*
436:*7, 13*
440:*3, 21*
442:*23*
443:*17*
444:*10, 22, 24*  445:*5, 6, 24*  449:*7, 22*
450:*1, 4, 5*
451:*22*
452:*7*
454:*7*
455:*3*
457:*18*
458:*4*
459:*19*
460:*14*
462:*6, 13*
463:*23*
464:*20*
465:*18, 24*
466:*22*
467:*23*
468:*4, 23*
472:*1, 14*
473:*8, 17*
474:*3, 11*

475:*15*
476:*12, 23*
477:*19, 23, 24*  479:*11*
480:*9*
481:*3, 14*
482:*2*
483:*5*
484:*1, 20*
486:*1*
487:*18*
489:*15*
490:*24*
492:*2, 14*
493:*3, 21*
494:*9*
495:*7*
496:*24*
497:*15*
498:*12, 23*
499:*23*
500:*3, 8, 14, 19*  501:*2*
502:*16*
503:*17*
504:*6, 16, 23*
505:*15*
506:*6*
507:*9, 14*
508:*9*
509:*1, 11*
510:*19*
511:*18*
512:*13*
513:*1, 18*
514:*1, 5, 11*
518:*17*
519:*1, 9*
520:*10, 18*
521:*1, 4, 13, 22*  522:*11, 16, 23*
523:*19*
524:*2, 13, 23*

525:*17, 22*
526:*15*
527:*1*
528:*7*
529:*2, 8*
530:*20*
531:*9, 16, 22*
532:*14*
533:*9, 23*
535:*11*
536:*8, 18*
537:*1, 16, 24*
538:*7*
540:*1, 15*
541:*9, 18*
542:*12, 21*
543:*15*
544:*20*
545:*2*
546:*1, 6, 11, 14, 20, 24*
547:*5, 13*
548:*12, 22*
549:*11, 18*
550:*4, 8, 15, 21, 25*  551:*3, 5, 8, 11, 22, 25*  552:*4, 10, 16, 22*
553:*17, 25*
563:*6, 8*
564:*5, 14*
565:*16, 25*
**snips**  551:*12*
**SNOW**  6:*17*
**Society**
42:*13*  44:*8*
183:*15*
489:*19*
**socioeconomi
c** 201:*2*
**sodium** 12:*1*
**solely** 332:*7, 25*

**solid** 183:*3*
262:*21*
343:*15*
460:*11*
**Solutions**
9:*2*
**somebody**
386:*15*
**somewhat**
218:*2*
295:*9*
384:*19, 21*
**son** 46:*1*
**soon** 268:*9*

**sophisticated**
376:*14*
**sorry** 28:*14*
31:*15*
35:*18*
45:*24*  48:*6*
56:*16*
63:*14, 16*
64:*10*
66:*18*
78:*18* 99:*8*
103:*17, 18*
104:*9*
109:*2*
129:*21*
131:*23*
147:*13*
156:*21*
159:*13*
162:*6*
163:*4*
165:*21*
167:*5, 11*
168:*15*
170:*21*
173:*10*
182:*15*
190:*10*
192:*5*

198:*24*
205:*6*
206:*5, 9*
208:*16*
213:*8, 20*
225:*1*
235:*17*
254:*20*
264:*22*
265:*2*
275:*21*
282:*4*
290:*2*
293:*10*
298:*16*
331:*20*
333:*8*
336:*2*
359:*2*
361:*8*
362:*20*
371:*9, 18*
373:*3, 7*
381:*21*
385:*19, 20*
386:*13*
401:*18*
402:*12, 18*
404:*13*
408:*18*
412:*23*
421:*2, 7*
425:*24*
428:*11*
429:*2*
437:*12*
447:*16*
450:*19*
452:*3*
457:*21*
458:*2*
499:*23*
500:*10, 12*
506:*13*

509:*7*
512:*7*
518:*9, 12*
524:*9, 14*
548:*18*
**sort** 48:*9*
58:*22*
98:*14*
106:*16*
232:*15*
242:*17*
284:*2*
287:*20*
301:*20*
390:*5*
426:*11*
453:*1*
**sotto** 251:*1*
**sound**
261:*11*
**sounds**
31:*17*
42:*19*
217:*4*
266:*19*
320:*6*
339:*13*
382:*21*
407:*19*
464:*1*
**source**
363:*7*
**South** 6:*14*
8:*7, 13, 23*

**SOUTHERN**
1:*1*
**SOVIK** 8:*9*
**space** 568:*6*
**SPALDING**
7:*13, 17*
**speak** 74:*1*
193:*18*
424:*5, 16, 22*

Confidential - Subject to Protective Order

**speaking**
200:*8*
**speaks**
258:*15*
**special**
389:*20*
**specific**
85:*15, 18*
89:*11*
112:*25*
118:*12, 16*
127:*13*
139:*22*
140:*17*
145:*23*
146:*13*
149:*10*
150:*2*
152:*19*
153:*8*
171:*25*
215:*4*
241:*25*
278:*1*
281:*16*
291:*4*
315:*13*
318:*24*
341:*15*
354:*15, 16*
381:*2*
422:*6*
425:*11*
494:*16*
506:*4, 7*
529:*12*
534:*21*
**specifically**
156:*13*
164:*8*
172:*24*
197:*17*
198:*6*
202:*7*

210:*14*
236:*4*
316:*3*
338:*19*
340:*7*
368:*16*
401:*10*
422:*12*
**specificity**
334:*7*
342:*12*
343:*6*
531:*23*
532:*18*
**specifics**
32:*3, 7*
33:*6*   48:*12*
83:*9*   153:*5*
160:*15*
208:*10*
295:*12*
318:*14*
563:*20*
564:*12*
**Spectrum**
10:*14, 18*
11:*11*
12:*13*   13:*7*
33:*2*   93:*1,*
*18*   113:*16*
120:*7*
129:*4*
197:*19*
198:*7*
295:*23*
347:*10*
352:*24*
356:*8*
357:*14*
397:*7*
409:*18*
475:*1*   476:*3*
**spend**
415:*10*

**spent**   35:*6*
37:*5*   197:*18*
**SPER**
10:*24*
183:*16*
184:*20*
186:*15*
188:*1*
**spite**   227:*25*
**splits**   73:*11*
**sponsored**
34:*1*
**spot**   225:*1*
**spouse**
266:*14*
**spouses**
205:*2*
207:*13*
**spurious**
143:*24*
293:*4*
294:*8, 13*
296:*12, 13*
311:*18*
342:*15*
462:*17*
**ssanford@w**
**attsguerra.co**
**m**   3:*7*
**SSRI**   130:*13*
**SSRIs**   30:*3*
129:*11, 15,*
*19*   130:*21*
**stable**
469:*24*
**stages**
83:*13*
250:*8*
533:*25*
**stand**   191:*6*
382:*24*
**standard**
68:*17*
390:*16*

**standing**
475:*9, 17*
**Star**   10:*24*
184:*4, 14*
186:*24*
188:*2*
**start**   376:*2*
380:*23*
416:*8*   428:*9*
**starting**
554:*21*
**starts**   489:*8*
**state**   55:*15*
67:*2*   70:*18*
143:*14*
144:*13*
156:*15*
245:*14, 21*
302:*9*
323:*9*
325:*20*
351:*2*
446:*21*
568:*5*
**stated**
233:*23*
374:*19*
378:*23*
421:*24*
432:*1*
523:*8*   558:*1*
**statement**
11:*2*   36:*7*
85:*16*   98:*2*
101:*20*
121:*13*
123:*12*
133:*16*
134:*11*
144:*1, 17*
147:*7, 23*
148:*14, 18*
149:*12*
167:*23*

182:*6*
183:*7*
187:*18*
188:*10, 13,*
*21*   190:*7*
194:*1*
215:*8*
218:*14, 22*
226:*14*
227:*6*
231:*20*
232:*5, 19*
233:*19, 21*
234:*10*
238:*13*
270:*5*
271:*23*
283:*8*
292:*24*
293:*6, 17*
297:*6*
301:*2*
327:*5*
329:*6*
333:*3*
346:*25*
348:*8*
378:*11, 16*
387:*2*
391:*3, 16*
393:*7*
394:*9, 24*
408:*21*
409:*12*
440:*9, 18*
441:*4*
443:*14*
452:*10*
482:*1*
484:*7*
498:*11*
525:*3, 10*
533:*4*
555:*21*

statements
98:*14*
145:*1*
146:*14*
302:*23*
441:*7*
442:*9*
473:*20*
528:*14*
**STATES**
1:*1*
**Statewide**
12:*14*
**stating**
294:*2*
419:*5, 6*
434:*21*
**statistical**
52:*24*
55:*15* 56:*9*
61:*4, 9*
66:*1* 153:*9*
168:*3*
170:*3*
366:*14, 24*
384:*20*
390:*12, 19*
393:*5*
394:*14*
413:*17*
414:*20*
419:*7*
442:*10*
445:*9, 13, 19*
454:*16, 19*
455:*14*
456:*17*
464:*18*
470:*20*
479:*9*
**statistically**
47:*22*
48:*13, 19*
49:*11, 23*

50:*19*
52:*22* 53:*1,*
*12, 21* 54:*9*
55:*9* 56:*15,*
*19* 57:*14, 16*
60:*12*
61:*11, 22*
62:*23*
157:*25*
161:*9*
168:*12, 23*
169:*12*
170:*11, 15*
171:*2*
172:*13*
173:*7*
206:*21, 24*
208:*4, 24*
209:*2, 5, 13*
213:*2, 25*
221:*7*
240:*2, 5, 7*
260:*25*
263:*19*
366:*12*
370:*15*
383:*12, 24*
385:*18*
387:*18, 25*
390:*2*
391:*11*
403:*24*
408:*8*
468:*17, 25*
479:*1, 15, 20*
511:*22*
514:*15*
515:*8*
**statistician**
278:*15, 20,*
*21* 279:*6, 8*
280:*7*
367:*20*

**status** 201:*2*
482:*24*
**stay** 25:*14*
441:*25*
442:*14*
517:*23*
**stayed**
74:*20*
310:*20*
**steadily**
501:*24*
**Stein** 45:*9*
**stenographic**
15:*15*
**stenographic
ally** 567:*7*
**step** 208:*17*
376:*10*
**steps** 253:*8*
**Stergiakouli**
11:*9*
223:*23*
224:*1, 2, 11*
226:*15*
227:*12*
233:*6*
339:*19*
**STEWART**
7:*19*
**STONE**
8:*14*
**stop** 234:*21*
257:*7, 8*
265:*8*
272:*23*
284:*22*
311:*10*
324:*3*
341:*10*
435:*16*
**Stores** 7:*22*
**Stores-PNS**
8:*24*

**story** 292:*1*
391:*6* 523:*1*
**stracey@trac
eylawfirm.co
m** 2:*21*
**straightforw
ard** 461:*4*
496:*9*
**strange**
267:*18*
**strata** 310:*8*
**strategies**
269:*12*
**stratification**
440:*2*
**stratification
s** 309:*18*
**stratified**
467:*16*
483:*9*
**stratify**
310:*6*
**stratifying**
439:*20, 21,*
*22*
**Street** 1:*13*
2:*16, 23*
4:*10* 5:*2*
6:*3, 14* 7:*9,*
*20* 8:*2, 7, 13,*
*18, 23*
**strength**
118:*3*
179:*4, 9*
423:*15*
476:*25*
494:*12, 20*
527:*6, 9, 22*
**strengthens**
503:*11*
**strengths**
260:*18, 20*

**stress**
482:*24*
555:*16*
**strike** 56:*16*
141:*12*
**strong** 41:*8*
46:*12*
54:*12, 21*
89:*19* 91:*6,*
*15* 105:*14*
106:*8, 22*
116:*25*
117:*9*
118:*19, 22*
331:*23*
343:*15*
357:*2*
368:*7*
379:*8, 10*
390:*10*
391:*3, 8*
406:*8, 12*
476:*15, 18,*
*22* 477:*2, 7,*
*9, 16* 492:*24*
527:*12, 14,*
*19* 528:*3, 23,*
*24* 538:*5*
**stronger**
46:*22*
105:*6*
128:*21*
201:*11, 18*
202:*19*
203:*8, 11*
211:*10*
238:*10*
351:*4*
357:*22, 25*
493:*17*
512:*16*
**strongest**
260:*7, 13*
491:*3* 536:*9*

**strongly**
312:*4*
323:*19*
**struck** 520:*2*
**student**
182:*21*
183:22
279:2
443:*21*
444:7
**students**
392:25
**studied**
197:*23*
253:*10*
279:*14*
350:*13*
**studies** 18:*5,*
*6, 18* 19:*6*
20:*19* 21:*6*
22:*3, 8, 21*
23:*13* 24:*5,*
*11* 25:24
26:*6* 40:*2,*
*8* 48:*13*
49:*10, 20, 24*
50:*18* 51:*3*
69:*9, 13, 14*
112:25
116:*1, 8*
117:*24*
119:2
133:*18*
137:*1, 9, 12*
139:*8*
141:7
144:25
145:*9, 21*
146:*8*
147:*8, 24*
148:*8, 17, 22*
149:*3*
155:8
163:*11, 16,*

*25* 164:*2, 8*
167:*16*
171:*4*
176:*9, 13, 24*
178:*14, 15*
181:*8, 15*
185:*15*
186:*4, 8*
187:*3, 6, 16*
192:2
195:*6, 11, 13*
196:*23*
202:25
205:*10, 17,*
*20, 23*
206:25
207:*24, 25*
208:*24*
209:*1*
210:*17*
217:*1*
221:*5*
227:*21*
229:*8*
230:*15*
231:*17*
237:*22, 24*
252:*24*
254:*11, 24*
255:*2*
256:*13*
259:*1*
260:*15, 18*
261:*4*
263:*1*
268:*20*
269:*10*
271:*14*
282:*14*
292:*10, 12,*
*21* 315:*7, 12*
316:*4, 9, 12,*
*22* 317:*12,*
*16, 20* 318:*3,*

*13* 322:*19*
323:*16, 18,*
*20* 328:*17*
331:*19, 21,*
*23* 334:*10*
335:*2, 11*
337:*13*
338:22
341:*14*
342:2
343:*13*
345:*6*
346:*14*
351:*17*
353:*18*
359:*10, 11,*
*13* 363:*19,*
*24* 364:*13*
368:*3, 10, 14*
370:*4*
372:*10, 12*
375:25
376:*3, 14*
378:*21*
379:*1, 9, 11,*
*19* 380:*21*
381:*8, 15*
384:*14*
385:*12*
386:22
387:*8, 9*
392:*5*
398:*18*
399:*21*
403:*9*
404:*24*
410:22
411:*11, 13*
414:*3*
427:*9, 12*
428:*9*
433:*18*
434:*13, 14,*
*20* 466:*20*

488:*15*
489:*24*
494:25
514:*13*
515:*13, 17*
528:*21*
530:*8, 10*
536:*20*
537:*4*
540:*8*
542:*14*
545:*4, 6*
555:*7, 11*
558:*2*
559:22
560:*18*
**Study** 12:*14,*
*18, 22* 13:*3*
*21:10, 15, 16,*
*25* 22:*13, 16*
*26:16*
*28:25* 39:*5,*
*21* 51:*6*
*52:4* 53:*7,*
*16* 54:*4*
*57:6, 22*
*58:4* 66:*5,*
*7* 67:*7*
*69:10, 11*
*74:18*
*113:13, 22*
*114:5, 14, 16,*
*19, 23* 115:*7,*
*23, 24, 25*
*120:4*
*131:13, 16,*
*21, 25* 133:*6*
*142:21*
*143:3, 23*
*145:19*
*152:21*
*153:16*
*155:21*
*156:2, 11, 12*

157:*1*
163:*1, 5*
166:*19*
167:*1*
168:22
170:*13*
172:25
173:*2, 3*
174:*11, 20,*
*21, 25*
175:*21*
179:*8*
181:*25*
186:*9*
188:*14*
189:*21*
193:*13, 15*
198:*7, 9*
201:*8*
208:*10*
217:*18*
222:*15*
223:*24*
224:*1*
228:*23*
229:*20*
233:*12*
234:*4*
235:*11*
237:*9*
238:22
243:*8, 12*
244:*10, 22*
245:*7*
251:*3*
252:*11, 14*
254:*13*
257:*21*
261:*14, 17*
263:*8*
264:*11*
270:*8*
271:*8, 9, 18,*
*25* 272:*15*

Confidential - Subject to Protective Order

286:*21*
288:*21*
291:*5*
306:*23*
308:*10*
315:*14*
316:*11*
318:*19*
319:*7, 11, 17*
320:*11*
321:*2, 4*
325:*2, 25*
327:*7*
329:*16, 24*
330:*2*
332:*12, 17*
335:*19, 20, 24  336:21*
337:*3*
338:*19*
339:*13*
341:*2, 7*
348:*4*
349:*14*
353:*1*
356:*16*
359:*21*
363:*7, 21*
364:*15*
365:*1, 13, 15*
366:*23*
367:*2*
368:*7, 19*
373:*18*
377:*5*
380:*7*
381:*5*
385:*15*
391:*20*
396:*5*
398:*10, 24*
399:*2, 5*
403:*7, 23*
406:*13, 20*

407:*9*
409:*3*
410:*19*
411:*4*
418:*13*
423:*11, 15*
424:*13*
426:*16*
430:*17*
432:*10, 20*
433:*12*
434:*5*
435:*18, 23*
436:*17*
439:*1, 3, 9, 18, 25  440:1, 23  442:10*
443:*22*
445:*20*
448:*3*
461:*21*
462:*23*
469:*12, 19*
470:*12*
471:*6, 24*
472:*11*
476:*6*
484:*9, 11*
488:*12, 19*
489:*18*
490:*12*
491:*9*
492:*19*
496:*2*
498:*13, 15*
502:*3*
510:*7, 24*
513:*21, 23*
515:*1*
523:*4, 9*
534:*15, 21*
535:*1*
556:*21*
557:*15*

558:*6*
560:*1*
563:*24*
**studying**
  39:*2, 3*
  51:*19*
  83:*11*
  127:*8*
  138:*11*
  197:*18*
  408:*13*
**stuff**  154:*17*
  499:*2  528:1*
**subanalysis**
  467:*16*
  468:*8, 14*
**subgroup**
  263:*1*
**subject**
  258:*2*
  422:*4*
  568:*10*
**subjects**
  403:*8*
**sub-scales**
  172:*2*
**Subscribed**
  569:*15*
**subsequent**
  346:*17*
  347:*17*
  536:*7*
  537:*15*
**subset**
  23:*25*
  467:*12*
**substance**
  32:*21*
  257:*23*
  569:*7*
**substantial**
  118:*5*
  380:*21*
  464:*17*

**substantially**
  477:*13*
  511:*16*
**substitute**
  334:*15*
**sucked**
  270:*21*
**sufficient**
  109:*7*
  110:*14*
  111:*5*
  127:*16, 17*
  153:*19*
  154:*4*
  210:*25*
  254:*6*
  416:*18*
  445:*21*
  513:*9*
**sufficiently**
  323:*18*
**suggest**
  55:*8*
  115:*20*
  124:*24*
  127:*24*
  258:*21*
  286:*3*
  289:*6, 10, 15, 17, 22  290:7*
  298:*13*
  299:*21*
  323:*20*
  332:*5, 24*
  423:*22*
  471:*1*
  473:*1*
  508:*15*
**suggested**
  230:*16*
  289:*11*
  334:*6*
  481:*19*

**suggesting**
  150:*4*
  172:*12*
  235:*10*
  254:*11, 16, 25  276:21*
  277:*2*
  288:*11*
  293:*19*
  331:*24*
  342:*2*
  384:*7*
  399:*18*
  519:*3  523:6*
**suggestion**
  253:*21*
  257:*24*
**suggestive**
  120:*6*
  349:*12*
**suggests**
  116:*5*
  152:*11*
  233:*12*
  288:*22*
  425:*10*
  506:*2*
  512:*3, 7*
**SUGNET**
  8:*9*
**Suite**  1:*14*
  2:*10, 23*
  3:*8, 20  4:2, 16, 21  5:2, 8, 21  6:3, 9, 21*
  7:*9, 20  8:13*
**SULLIVAN**
  3:*13*
**summarize**
  28:*22*
**summarized**
  189:*22*
**summary**
  234:*11*

Confidential – Subject to Protective Order

245:2
246:16
**supervisor**
36:3

**supplemental**
340:10
**supplementa
ry** 224:6
233:24
236:8
245:6
246:12
399:24
509:9
**supplements**
508:8
**support**
41:9 68:2
69:16
89:20 91:4
109:8
110:15
120:23
121:13
122:12
141:23
153:20
155:13
159:23
208:21
213:19
224:7
251:7
325:18
332:19
333:5
343:13
396:3
399:8, 10
461:24, 25
470:11
472:10
474:25

488:15
498:5
505:13
510:14
530:9
542:2
543:13
561:22
562:5
**supported**
476:7
**Supporting**
13:1 231:1
294:23
427:13
450:7
477:14
**supportive**
136:7
**supports**
40:11
121:8, 24
123:1, 5
170:14
209:20
226:19
286:23
346:16
347:16
348:1
349:21
359:25
438:9
**sure** 40:3
41:17 63:4
100:15
105:25
111:12
113:2, 6
140:3
142:21
143:23
153:23
156:15

157:4
163:24
165:22
168:9
174:18
182:19
183:11
188:20
190:19
199:17
203:18
210:5
214:25
220:10
221:19
232:4, 16
234:18
236:17
242:22
246:20
249:15
264:2
265:14
266:17
272:17, 20
274:7
298:5
326:2
349:4
411:7
414:3, 23
422:22
435:16
451:15
457:15
471:12
472:3
473:11
481:19
483:24
490:3
496:18
534:23
535:12

541:22
551:18
554:19
**Surgeon**
11:21
70:15
204:1, 7, 18
210:21
274:22
275:13
291:10, 19
330:25
**surprised**
432:22

**susceptibility**
280:17
**suspect**
81:11
**suspected**
307:18
**Susser** 45:6,
8, 15, 17
46:1 461:9
**Swan**
182:12
188:4, 5, 6
**swear** 15:17
**sworn**
15:21 80:7
567:4
569:15
**symptomatol
ogy** 286:6
**symptoms**
11:12
237:16, 17,
25 238:4, 9
242:23
327:1
397:16
**syndrome**
72:4, 8, 9, 12
73:4

**synonym**
542:25
**Syracuse**
8:13
**Systematic**
11:19

< T >
**tab** 76:2
80:2 84:21
85:22 90:7
94:22
128:5
157:10
215:13
407:6
**Table**
157:21, 24
159:13
164:14, 18
165:13
166:5
224:6
261:19
262:5
364:22
414:12, 13
426:11
430:3, 4
446:21
463:2
480:21
484:19
486:22
487:22
509:18
510:3
**tables**
233:24
236:9
245:6
246:12
493:13
**tablet** 12:1

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| **tabs** 386:*13* | 543:*23* | 342:*21* | 420:*8* | **tell** 15:*22* |
| 449:*24* | 567:*7* | 343:*7* | 423:*7* | 19:*5* 20:*18* |
| **take** 19:*21* | **takes** 536:*20* | 347:*23* | 426:*2* | 52:*3* 88:*15* |
| 20:*5*, *22* | **talk** 26:*10* | 411:*1* | 428:*8* | 95:*17* |
| 55:*20* | 29:*21* 53:*6* | 412:*9* | 461:*7* | 112:*13* |
| 75:*14*, *20* | 56:*12* 57:*6* | 419:*2* | 465:*23* | 117:*17*, *18* |
| 138:*3* | 78:*8* 89:*24* | 469:*11* | 466:*1* | 119:*24* |
| 154:*20* | 113:*19* | 473:*5* | 467:*11* | 128:*12* |
| 165:*12* | 153:*25* | 483:*13* | 489:*7* | 143:*16* |
| 174:*19* | 172:*8* | 549:*3* | 505:*20* | 149:22 |
| 199:*13* | 198:*14* | 564:*15*, *16* | 517:*14*, *16* | 151:*12* |
| 208:*16* | 201:*5* | **talking** | 520:*4* | 165:*7*, *16* |
| 223:*14* | 202:*16* | 38:*22* | **talks** 380:*6* | 175:*14* |
| 259:*10* | 271:*13* | 56:*24* | 565:*4* | 192:*1*, *21* |
| 267:*18* | 273:*10* | 60:*18* | **TALLEY** | 211:*24* |
| 284:*2*, *25* | 285:*20* | 77:*18* | 4:*13* | 212:*12* |
| 285:*23*, *24* | 295:*11* | 127:*12* | **Talpos** | 224:*10* |
| 286:*4*, *8*, *9*, | 311:*7* | 148:*3* | 377:*23* | 265:*9*, *22* |
| *19*, *24* | 342:*19* | 150:*5* | 378:*3* 380:*3* | 284:*24* |
| 287:*12*, *16* | 350:*6* | 163:*18*, *25* | **Target** 8:*4* | 288:*4* |
| 335:*10* | 367:*13* | 169:*19* | **tasked** | 315:*15* |
| 336:*8*, *18* | 378:*10* | 173:*18* | 242:*13* | 316:*2* |
| 338:*6*, *9* | 389:*11* | 175:*19*, *20* | **tcampbell@k** | 327:*12* |
| 343:*9* | 392:*14* | 177:*9* | **rauseandkins** | 330:*21* |
| 356:*25* | 423:*20* | 181:*3*, *4* | **man.com** | 337:*20* |
| 364:*8* | 428:*10* | 199:*21* | 4:*2* | 359:*3*, *6* |
| 371:*1* | 429:*19* | 201:*16* | **teach** 515:*6* | 360:*15* |
| 395:*13* | 442:22 | 221:*21* | **teaching** | 394:*2* |
| 425:*16* | 467:*14* | 266:*13* | 267:*20* | 395:*13*, *15* |
| 473:*9* | 488:*22* | 273:*16* | 299:*11* | 400:*18* |
| 496:*2* | 520:*19* | 274:*5*, *10* | 392:*23* | 426:*7* |
| 514:*2* | 548:*23* | 298:*9* | **team** 86:*4* | 431:*13* |
| 517:22 | **talked** | 302:*2* | 295:*1* | 437:*18* |
| 534:*15* | 62:*15* | 303:*13* | **technician** | 442:*2* |
| 535:*15* | 89:*14* | 314:*24* | 9:*2* | 444:*1* |
| 546:*23* | 123:*16* | 349:*3* | **technique** | 477:*6* |
| 550:22 | 124:*5* | 366:*8*, *9* | 29:*4* | 480:*21* |
| 554:*2*, *6* | 136:*13* | 367:*7* | 441:*14* | 493:*16*, *22*, |
| **taken** | 138:*8* | 368:*20* | 470:*21* | *23* 495:*9* |
| 166:*13* | 176:*14* | 371:*8* | **techniques** | 496:*12* |
| 167:*25* | 187:*4* | 385:*25* | 153:*9* | 516:*5* |
| 394:*9* | 222:*25* | 386:*15* | **Teddy's** | 527:*23* |
| 492:*11* | 294:*5* | 391:*4* | 496:*20* | 528:*15* |
| 508:*16* | 324:*1* | 416:*8* | | 534:25 |

| | | | | |
|---|---|---|---|---|
| **telling** | **terms** 30:*20* | **testify** | 123:*20* | **theory** |
| 52:*13* | 52:*24* | 435:*8* | 131:5, *14, 24* | 282:*13* |
| 63:*23* | 60:*18*  66:*1* | 474:*6*  567:*4* | 132:9, *25* | 396:*15, 20,* |
| 163:*5* | 78:*5* 210:*3* | **testimony** | **thank** 68:*22* | *22* 518:*5, 6* |
| 194:*1* | 263:*13* | 23:*15* | 76:*23* | **thin** 335:*8* |
| 221:*15* | 282:*21* | 26:*12* | 86:*11*  89:*1* | **thing** 19:*9* |
| 251:*10* | 287:*21* | 30:*25* | 107:*16* | 51:*5*  53:*8* |
| 261:*20* | 291:*20* | 31:*16*  32:9, | 128:*7* | 54:*25* |
| 264:*11* | 303:*19, 20* | *20, 24*  36:*17,* | 157:*13* | 62:*13*  79:*1,* |
| 350:*18* | 381:*12* | *18, 24, 25* | 186:*20* | *3*  81:*5* |
| 442:*1* | 394:*19* | 39:*8*  80:*8* | 188:*19* | 135:*16, 18* |
| 490:*16* | 423:*21* | 99:9, *14* | 200:9 | 200:*7* |
| **tells** 192:*13* | 490:*10* | 349:*7* | 214:*17* | 216:*22* |
| **temporal** | 528:*25* | 454:*21* | 228:*15* | 231:*6* |
| 543:*23* | 530:*11, 13* | 563:*15* | 237:*2, 6* | 234:*20* |
| **temporality** | 555:*18* | 567:*7* | 247:*5* | 235:*25* |
| 243:*19, 20* | **tertile** | **testing** | 249:*25* | 236:*2* |
| 532:*25* | 13:*23* | 75:*19* | 267:*23* | 241:*18* |
| **ten** 30:*22* | 478:*18* | 77:*14*  78:5, | 297:*13* | 249:*9* |
| 34:*22* | 479:*14* | *13*  172:*5* | 376:*25* | 262:*20* |
| 74:*20* | 480:*4* | 176:*15* | 406:*17* | 265:*12* |
| 170:*5, 9* | 481:*20* | 220:*19* | 421:*15* | 270:*18* |
| 240:*1* | 482:*10* | 438:*12, 13,* | 477:*23* | 287:*18* |
| 295:*7* | 485:*24, 25* | *16*  445:*23* | 501:*1*  566:*2* | 298:22, *25* |
| 501:*24* | **tertiles** | **Texas** 1:*18* | **Thanks** | 305:*21* |
| 534:*18* | 487:*16* | 2:*23*  5:*8* | 185:*2* | 306:*5* |
| 535:*15* | **test** 30:*4, 5* | 567:*20* | 297:*12* | 310:*16* |
| 537:*6* | 153:*7* | **text** 372:*21* | 450:*4*  514:*5* | 362:*22* |
| 546:*15, 17,* | 154:*1* | **textbook** | **theoretical** | 427:*3* |
| *25* | 278:*22* | 52:*25* | 48:*10* | 437:*17* |
| **tendency** | 289:*18* | 68:*18* | 49:*19* | 453:*18* |
| 234:*15* | 311:*20* | 247:*12, 15* | 56:*22* | 456:*25* |
| **teratologist** | 334:*21* | 251:*10, 14* | 58:*22* | 466:*21* |
| 196:*11* | 398:*2* | 258:*14* | 68:*11* | 483:*18* |
| **term** 218:*2* | 401:*9* | 279:*14* | 314:*11* | 493:*5* |
| 225:*4* | 437:*11, 20* | 388:*20* | **theoretically** | 503:*8, 19* |
| 238:*15* | 445:*22* | 392:*23* | 51:*4*  58:*24* | 538:*13* |
| 363:*18* | 470:*6* | 410:*7, 17* | 199:*12* | 544:*11* |
| 460:*7* | **tested** | **textbooks** | 269:*1, 7* | 546:*12* |
| 517:*16* | 290:*15* | 441:*21* | 271:*3* | 550:*19* |
| 530:*13* | **testified** | **texts** 388:*15* | 314:*1, 2* | 551:*1, 7, 13* |
| 538:*6* | 30:*2, 11* | **Thalidomide** | 367:*5, 9, 14* | **Things** 14:*1* |
| **terminology** | 31:*19*  33:*4* | 113:*11, 12,* | 470:*14* | 17:*4*  51:*1* |
| 85:*6* | | *15*  114:*8, 20* | | 56:*11* |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 65:25 | 84:2, 5, 7 | 138:10 | 222:12, 13 | 293:25 |
| 71:21  83:6 | 85:5, 16 | 139:13, 16 | 223:20 | 294:18, 22 |
| 84:2  89:14 | 87:8  88:12 | 140:11 | 225:9 | 296:11 |
| 93:4 | 89:8, 11 | 141:14, 20 | 227:9 | 299:3, 19 |
| 120:21 | 90:1, 18, 24 | 142:25 | 230:8 | 300:1, 8 |
| 128:25 | 91:6, 13, 15, | 143:25 | 231:5, 19 | 301:7 |
| 138:7 | 25  92:11 | 146:18 | 232:7, 11 | 303:19, 20, |
| 175:22 | 93:7, 12 | 147:6 | 233:21 | 22  304:5, 13 |
| 181:6, 11 | 94:19 | 150:10, 11 | 234:11, 19 | 305:9, 18 |
| 234:17 | 95:14  96:4 | 158:24 | 235:1, 24 | 309:7 |
| 296:5 | 97:19 | 163:16 | 236:1 | 310:15 |
| 320:17 | 102:6, 22 | 164:18 | 238:24, 25 | 313:8, 20 |
| 344:9 | 103:24 | 167:1 | 239:9 | 315:6, 21 |
| 384:12 | 105:18 | 168:6 | 240:14 | 317:14 |
| 385:6 | 106:5, 7, 13, | 169:17 | 241:2, 6 | 318:6 |
| 394:20 | 20, 25 | 171:12 | 242:8 | 319:12 |
| 460:2 | 108:22 | 172:20 | 244:2, 17 | 320:17 |
| 483:11 | 111:14 | 177:10 | 245:5, 19 | 322:2 |
| 495:2, 3 | 112:14 | 178:1, 7 | 249:17 | 324:15 |
| 499:7 | 113:24 | 179:16 | 251:9, 16 | 330:17 |
| 513:7, 25 | 114:17, 18 | 180:22 | 253:13, 24 | 332:22 |
| 525:6 | 115:1, 19 | 181:19 | 254:9 | 333:20 |
| 536:7 | 116:18, 22 | 182:25 | 255:23 | 339:20 |
| 548:20 | 117:8 | 183:3 | 257:13, 19, | 341:1 |
| 553:3, 4 | 118:19, 21 | 185:23 | 24  258:1, 15 | 343:7, 24 |
| 555:12, 16 | 119:4, 6 | 188:8, 11 | 259:23 | 348:2 |
| **think**  16:6 | 120:12, 22 | 189:6, 14, 17, | 260:18 | 349:2, 20 |
| 19:10 | 121:21, 23 | 25  190:7, 14, | 262:19 | 350:13 |
| 21:22 | 122:11, 14 | 25  199:21 | 263:9 | 351:2 |
| 34:23 | 124:2, 10, 15, | 200:25 | 265:13 | 353:4, 12, 16 |
| 36:15 | 16, 20 | 203:8 | 267:2 | 354:7 |
| 37:16 | 125:18, 21, | 207:2 | 269:13, 15 | 356:11, 13 |
| 41:13 | 23  126:24 | 208:11, 18, | 272:22 | 359:23 |
| 42:22 | 127:1, 15, 16 | 20  209:15, | 277:14 | 360:1, 18 |
| 45:24 | 129:7, 11, 14 | 19, 25  210:7 | 280:3 | 362:10, 12 |
| 47:10, 15, 24 | 130:21 | 211:9, 13 | 281:9 | 363:16, 18 |
| 48:6, 24 | 131:20 | 213:17 | 282:1, 5 | 366:11 |
| 49:5  65:8, | 132:8, 10, 18, | 215:7 | 285:22 | 373:8 |
| 14  67:1 | 24  133:2, 8 | 216:21 | 286:2, 18 | 375:1, 8 |
| 68:5  70:22 | 134:16, 25 | 217:15 | 288:6 | 378:25 |
| 74:11  77:7 | 135:3, 4, 8, | 218:4, 9 | 289:5, 14, 16, | 381:13 |
| 78:4  79:2, | 14, 15, 17, 25 | 219:9 | 21  290:6, 12 | 382:18 |
| 20, 22  80:14, | 136:5, 14, 19, | 220:8, 11 | 291:7 | 390:10, 11, |
| 16  83:8, 15 | 25  137:12 | 221:22 | 292:16 | 22  391:2, 8 |

395:*20*
399:*20*
400:6, *8, 11*
402:*14*
403:*16*
406:*13, 20*
409:*10, 12*
410:*14*
411:7, *14*
412:22
413:*11, 19*
415:8, *11, 19*
417:5
420:8
421:2
422:7
425:*16*
427:*1, 21*
428:5
430:6
436:*17*
438:7, *9*
439:*4, 21*
441:*21*
445:*13, 21*
451:6, *14, 15*
452:5, *8, 22*
453:*3*
457:*10*
460:*21*
461:*3*
462:3, *11*
464:9
466:23
467:3, *13, 18*
468:7
469:9
471:*4, 5, 18*
472:*10*
475:25
486:8, *14*
487:*15*
488:22
490:8

491:*19*
494:*16*
495:1, *11*
498:17, *18,*
*24*  499:6, *8*
500:*23*
501:8, *9, 10,*
*13*  503:2, *3,*
*11, 18, 20, 24*
504:*11*
508:7
512:15
513:*3*
514:25
517:*14*
518:*20*
523:7
524:11, *16*
525:6, *11*
526:*10, 21*
527:4
529:15
530:7
531:*10, 15*
534:*11*
535:4, *13, 19*
537:*10, 11,*
*12, 22*  538:9
539:*3, 9, 10*
540:7, *13, 22,*
*24*  541:6
544:*1*
545:*16, 20,*
*25*  548:*13,*
*17*  550:*18*
553:*17, 19*
554:*1*
556:*13*
557:*10*
562:2
565:9, *23*
**thinking**
79:*23*
129:*3*

185:*24*
309:*10*
**Third**  10:*18*
13:*23*
266:22
362:*20*
469:22
478:*23*
479:*17*
482:*10*
**thirty**
568:*15*
**Thornburg**
1:*13*  5:*17*
6:*1, 6, 13*
7:*1, 5*
**thorough**
119:*13*
**thoroughly**
318:2
**thought**
66:*17*
79:*20*
196:*3*
247:*3*
250:*12*
287:*25*
289:9
345:*11*
349:*4*
373:*12*
379:*5*
406:*21*
415:*16*
430:*25*
431:*15*
432:*24*
486:*14*
515:*19*
521:*18*
522:9, *25*
545:*22*
558:*20*

**thoughtful**
494:*17*
565:9, *17*
**thoughtfully**
379:*3*
**thousand**
102:*19*
425:*21*
**thousands**
69:8  *179:1*
196:*24*
**three**
104:*25*
167:7
170:*4, 20*
238:*15, 16*
244:25
246:25
324:*1*
448:*11*
451:5  559:*3*
**threshold**
217:5
**throw**
534:22
**tick**  235:2
**tied**  84:*17*
313:*18*
317:2
397:*4*  398:8
**tight**  540:*18*
**time**  15:6
28:*1, 6, 9*
32:15  35:5
58:6  70:8,
*11*  76:9, *12*
82:22  89:9
112:*4, 7*
124:*1, 2*
128:*17*
129:9
132:*19*
144:9
189:*23*

190:*24*
191:*19, 22*
192:*24*
194:*24*
205:25
224:*21*
254:9
264:*3, 6, 24,*
*25*  265:*3, 19*
284:9, *25*
289:*6, 10, 11,*
*12, 15, 17*
292:*10, 22*
295:18
301:*3, 25*
302:*10*
327:22
337:6, *9*
338:*1, 6*
376:*13*
391:*23, 25*
402:*3, 6*
415:*10*
427:*21*
436:*20*
441:*12*
448:*17*
473:*12, 15*
487:8, *10*
488:*3, 23*
492:*11*
499:22
500:*23*
514:6, *9*
529:*18*
530:*23*
534:*17*
536:*21*
537:*18*
545:*20*
546:2
550:*23*
557:*13*
566:4  567:8

Confidential - Subject to Protective Order

times 122:5
172:4
238:16
309:2
324:2
403:20
451:25
527:9
529:22
530:2
531:14
558:9
timing
118:12
121:2
177:11
322:25
333:22
351:8
374:22
490:10
502:5, 14
507:22
530:12
547:11
tiny 59:16
tired
510:18
534:22
title 378:17
415:24
tobacco
68:25 69:1,
6, 24 275:1
301:9
302:3, 16
532:6
539:11, 17
540:10
543:21
544:11
tocolytic
30:13 31:3

today 17:18
141:21
297:25
298:1
498:18
527:8
528:2
554:24
558:9
560:4
561:21
562:25
Today's
15:5 16:7
told 63:24
98:17
159:17
193:20
257:3
260:6
310:24
349:3
356:18
395:5
425:16
431:7
474:3
484:17
527:8
552:10
553:8
tool 421:25
tools 163:22
176:13
420:22
top 41:14
52:14
87:10 97:4
107:21
110:24
144:19
202:15
204:20
290:18

315:19
322:10
340:21
373:15
411:16
topic 221:6
323:13
392:6
TORHOER
MAN 5:1
total 23:13
359:8
totally
61:15
69:20
219:24
366:7
552:3 554:5
toto 501:25
toxic 87:2
377:2
toxicity
378:7

Toxicological
377:3
toxicologist
196:9 382:6
Toxicology
12:9 377:5
TRACEY
2:19, 21, 22
Trade
236:19, 21
trained
219:11
training
34:5 218:8,
20
trait 95:18,
21 97:13, 22
99:5 286:22
traits
286:24

transcript
80:9, 10
154:23
376:24
499:24
500:20
550:14
552:7, 14
567:7
568:16, 17

transcription
569:5
transcripts
562:20, 24
treat
197:10, 13
treatment
353:7, 22
trial 9:2
30:25
31:16
32:10, 20, 24
253:4
255:11
258:8, 16
267:25
268:4
375:18
405:3
trials 252:5
254:4
255:17

triangulation
224:25
TRICIA 4:1
trickier
313:9
tried 90:11
122:3
222:10
226:11, 24
318:8

334:2
358:8
365:14
372:6
393:23
468:6
527:13
555:9 556:6
trigger
79:10, 11, 18,
25 82:16, 17
triggered
373:22
trimester
169:21
342:11
343:4
383:8
385:13
386:21
trimesters
169:13, 19
384:3, 13
386:2 488:5
trimester-
specific
169:23
343:1
TRINH
8:22
Trønnes
339:19
true 34:19
73:21
119:18
125:4
147:23
148:10
214:7
270:12, 15,
17 277:9
279:21, 24
283:11
291:25

294:*8*
301:*3*
304:*4, 6*
307:*7*
367:*10*
372:*1*
419:*17*
432:*21*
437:*24*
438:*5*
442:*3*
443:*4, 7*
447:*12, 14, 15*  450:*13*
473:*22*
475:*14*
482:*17*
484:*3*
499:*10*
504:*2*
508:*13*
522:*13*
531:*25*
548:*8*
**truly**  53:*5*
432:*24*
443:*19*
472:*19*
**Trust**  21:*1*
**truth**  15:*22, 23*  225:*23*
303:*22*
453:*20*
499:*17*
567:*5*
**truthful**
147:*7*
**try**  25:*17*
40:*25*
75:*25*
106:*2*
122:*9*
222:*13*
228:*13*

234:*21*
235:*4*
246:*23*
273:*8*
285:*13*
318:*11*
324:*3*
326:*4*
340:*15*
341:*17*
366:*13*
393:*25*
400:*9*
469:*5*
471:*22*
555:*20*
**trying**  53:*5*
80:*20*
99:*14*
120:*22*
130:*20*
181:*12*
222:*5*
226:*22*
232:*17*
281:*2*
305:*23*
324:*7*
344:*9*
350:*24*
371:*22*
379:*4*
381:*7*
386:*3*
433:*24*
434:*23, 24*
467:*6*
484:*23*
489:*13*
499:*9*
503:*25*
509:*8*
557:*13*

561:*13*
**t-test**  279:*2*
**turn**  17:*20*
103:*15*
110:*23*
154:*12*
157:*15*
166:*7, 8*
177:*16*
205:*16*
215:*20*
229:*4*
233:*8*
237:*12*
322:*6*
326:*12*
328:*8*
341:*23*
373:*6*
377:*21*
378:*4*
383:*2*
389:*13*
397:*5*
402:*9*
409:*2*
413:*15*
416:*7*
419:*3*
423:*13*
427:*23*
438:*2*  478:*4*
**turned**
300:*22*
361:*6*
**Twelfth**
11:*15*
**twice**  28:*3*
76:*15*
174:*15*
175:*8, 12*
510:*8*
**twin**  31:*2*
282:*20*

**Twins**  14:*1*
30:*12*  72:*7, 14*  74:*6, 15*
82:*3, 25*
282:*15*
283:*6, 21*
**Two**  23:*13*
51:*1*  59:*25*
103:*25*
109:*15*
119:*16*
167:*7*
169:*13*
170:*4, 20*
197:*24, 25*
209:*5, 13*
211:*15*
212:*7*
238:*15*
242:*2*
244:*25*
246:*25*
310:*8*
317:*8, 10, 13, 25*  320:*16*
332:*4*
339:*22*
352:*3, 8*
364:*21*
384:*3, 8, 13, 24*  385:*10, 12*  386:*21, 23*  387:*3*
404:*21, 25*
423:*4*
438:*2*
451:*4*
467:*11*
502:*10*
513:*9*
515:*7*
543:*24*
544:*16*

562:*11*
563:*13*
**twofold**
447:*2*
**Tylenol**
15:*9*
120:*12*
201:*11*
202:*20*
496:*15*
506:22
**type**  67:*15*
172:*6*
365:*9*
367:*2, 3, 16*
414:*6*  483:*3*
**Typically**
58:*2*  66:*4*
140:*10*
184:*8*
195:*11*
347:*6*
360:*5*
445:*19*
448:*20*
476:*20*
522:*17*

< U >
**Uh-huh**
17:*22*  18:*3, 16*  24:*15*
42:*6*  67:*13*
72:*18, 21*
79:*21*  86:*1*
105:*2, 24*
107:*10*
109:*5, 17*
137:*6*
151:*6, 21*
152:*4*
156:*1, 9*
157:*18, 22*
166:*12*

180:*20*
182:*7*
188:*7*
202:*17*
205:*18*
216:*13*
223:*9*
235:*3*
236:*13*
243:*25*
244:*24*
249:*8*
268:*22*
277:*23*
279:*25*
288:*3, 15, 19*
292:*8*
298:*8, 11*
299:*1, 16*
300:*13*
320:*20*
326:*19*
328:*11, 14, 22, 24* 329:*2*
331:*3*
340:*2*
351:*23*
355:*2*
361:*24*
369:*17*
374:*6*
380:*8*
390:*4*
399:*14*
400:*3*
405:*8*
407:*10, 15, 25* 408:*6*
413:*25*
414:*18*
415:*23*
416:*9, 20*
430:*1*
431:*6, 12*

438:*6*
446:*4*
447:*11, 13, 15* 448:*4*
450:*24*
451:*6*
463:*4*
478:*5, 11*
485:*4*
512:*2*
517:*3, 7*
527:*7*
533:*3*
556:*16*
557:*23*
560:*2*
**ultimate**
491:*25*
548:*4*
**ultimately**
105:*13*
203:*4*
300:*22*
547:*22*
**umbrella**
295:*12*
**unable**
323:*6*
**unadjusted**
224:*4*
446:*17, 18*
**unbiased**
497:*19, 23, 24*
**uncertain**
189:*25*
**unclear**
511:*8*
**underlies**
46:*20*
384:*23*
**underlined**
440:*9*

**underlying**
49:*8* 54:*20*
57:*1, 19*
61:*10, 13*
63:*3* 64:*8, 18* 125:*13*
130:*15*
162:*23*
207:*22*
212:*20*
262:*16*
263:*11, 22*
317:*6*
372:*15, 17*
385:*3*
393:*2*
394:*18*
395:*6, 22*
398:*9*
449:*2*
471:*10*
494:*13, 25*
527:*10*
529:*4*
**undermine**
523:*3*
**understand**
16:*6* 49:*21, 22* 56:*25*
60:*17*
84:*19* 92:*6*
96:*14, 15*
98:*19*
112:*21*
117:*2*
127:*3*
142:*7*
152:*18*
158:*12*
174:*12*
195:*18*
199:*18, 23*
220:*10*
280:*21*

284:*4*
285:*11*
294:*2*
309:*7*
353:*16*
359:*8, 14, 16*
365:*17*
376:*8, 10*
400:*18*
404:*13*
409:*25*
410:*15*
417:*9*
418:*2*
422:*8*
433:*20, 21*
480:*17*
486:*10*
499:*9*
500:*23*
**understandin**
**g** 55:*1*
83:*13*
93:*13*
134:*21*
135:*19*
247:*24*
248:*9*
284:*1*
352:*15, 16*
371:*19*
385:*2*
408:*18*
476:*2*
504:*22*
528:*22*
536:*16*
**unethical**
253:*25*
254:*14*
256:*18, 22*
257:*4, 20*
258:*2, 4, 8*

**unexposed**
57:*25*
63:*13, 15*
405:*16*
421:*13*
485:*9*
**Unfortunatel**
**y** 300:*15*
**unidentified**
560:*16*
**unilaterally**
76:*17*
**uninformativ**
**e** 416:*25*

**unintentional**
234:*18*
246:*21*
**unique**
418:*19*
**UNITED**
1:*1*
**universally**
505:*9*
**universe**
158:*11*
**University**
182:*15*
**unmeasured**
128:*3*
224:*8*
233:*16*
269:*2, 8*
271:*11*
323:*22*
327:*2*
454:*12*
470:*22*
**unpredictabl**
**e** 560:*18*
**unprofession**
**al** 552:*3*

**unreasonable**

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 183:*1* | *11, 20, 21* | 345:25 | **usually** | **Valproic** |
| 240:*15* | 163:*6, 17* | 346:*1* | 407:*20* | 14:*6*  118:*8,* |
| 332:*23* | 165:*2* | 351:*12* | 410:*22* | *10, 13*, 22 |
| 502:*21* | 166:*20, 24* | 352:*21* | 411:*12, 13,* | 119:*2, 17* |
| 503:*19* | 169:*14, 20,* | 353:*17* | *18* | 120:*1, 5* |
| **unreasonable** | *21*  178:*9, 12* | 354:*17* | **utero**  11:*18* | 121:*11, 13,* |
| **ness**  333:*2* | 188:*23* | 363:*17* | 13:*5*  14:*1* | *21, 24* |
| **unscientific** | 192:*2, 24, 25* | 375:*2* | 83:*6, 22* | 122:*12, 14* |
| 190:*15, 20* | 204:*12* | 392:*24* | 84:*3*  85:*8* | 123:*17* |
| **unsuccessful** | 209:*9* | 396:*17, 25* | 230:*17* | 128:*20* |
| 226:*7*  227:*1* | 218:*1* | 397:*10, 17,* | 253:*15* | 132:*10* |
| **unwilling** | 226:*18* | *24*  398:*8, 13,* | 321:*6, 23* | 136:*10, 14,* |
| 119:*11* | 227:*23* | *19, 20*  399:*1,* | 346:*17* | *20*  137:*5, 13,* |
| 318:*10* | 228:*3* | *5, 7, 19* | 347:*17* | *25*  344:*16,* |
| **update** | 233:*17* | 400:*1, 2, 4, 9,* | 378:*7* | *20, 25* |
| 205:*2*  522:*7* | 234:*1, 3* | *13*  421:*19,* | 464:*3* | 347:*24* |
| **updated** | 236:*7* | *25*  452:*2* | 561:*23* | 348:*11* |
| 522:*2, 7* | 238:*4, 14* | 476:*19* | **utility** | 349:*5* |
| **UPenn** | 239:*20* | 477:*5* | 529:*17* | 350:*3, 9* |
| 474:*18, 21* | 250:*24* | 491:*5* | **utilized** | 352:*4, 13, 17* |
| **upper** | 251:*8* | 493:*19* | 328:*17* | 354:*17* |
| 165:*17* | 253:*15* | 498:*6* | | 355:*5, 12* |
| **usage** | 259:*19* | 499:*11* | **< V >** | 356:*22* |
| 497:*14* | 261:*23* | 502:*11* | **vacuum** | 357:*20* |
| **use**  11:*2, 4,* | 264:*12* | 507:*25* | 113:*5* | 358:*5, 21* |
| *6*  12:*3, 20* | 266:*25* | 511:*3, 20* | **valid**  51:*16* | 359:*5, 15, 23* |
| 13:*1, 13* | 277:*8, 15* | 515:*9* | 262:*22* | 361:*11* |
| 19:*9*  20:*4* | 280:*24* | 517:*5* | 304:*24* | 363:*3, 13, 20,* |
| 23:*22* | 299:*11* | 526:*11, 22* | 308:*6* | *22*  364:*7* |
| 24:*19*  26:*1,* | 309:*5* | 529:*14* | 333:*24* | 368:*3, 11, 22* |
| *14*  27:*17* | 311:*4* | 531:*6, 20* | **validated** | 369:*9* |
| 28:*17*  52:*6* | 318:*10* | 534:*18* | 229:*7* | 374:*17* |
| 58:*13* | 322:*25* | 536:*6* | **validity** | 376:*6* |
| 68:*15*  95:*5* | 323:*23* | 539:*11, 17* | 60:*22* | 545:*17* |
| 118:*16* | 334:*19* | 542:*19* | 313:*10* | 547:*7* |
| 144:*10* | 335:*3* | 547:*12* | 424:*23* | **value**  78:*5,* |
| 150:*13* | 336:*22* | 555:*14* | **Valproate** | *12*  105:*13,* |
| 151:*8, 20* | 337:*14* | 556:*7* | 12:*6* | *19, 20, 22* |
| 152:*8, 14* | 338:*7, 8, 9,* | 559:*14* | 346:*17* | 106:*4* |
| 155:*3, 7, 19* | *20, 25*  339:*2,* | 562:*7* | 347:*17* | 109:*8, 21* |
| 158:*18* | *8*  340:*4, 5* | 565:*6, 21* | 351:*21* | 110:*5, 15* |
| 159:*19* | 341:*3* | **uses**  21:*10* | 353:*9, 17* | 111:*5* |
| 161:*24* | 342:*4, 15* | 244:*12* | 373:*22* | 138:*21, 23* |
| 162:*4, 5, 6, 8,* | 343:*12* | 295:*2* | | 139:*7* |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 390:*12* | 324:*6* | 413:*16* | 119:*1* | 422:*13*, *18* |
| 418:*19* | 550:*20* | 415:*4* | 125:*9* | 427:*15*, *16* |
| 419:*19* | **VIDEOGRA** | 416:*8*, *22* | 128:*24* | 453:*19*, *23* |
| 488:*6* | **PHER**  15:*1*, | 418:*9* | 131:*23* | 473:*8* |
| **values** | *3*  28:*6*, *9* | **vulnerability** | 137:*1* | 475:*24* |
| 466:*25* | 76:*9*, *12* | 255:*17* | 144:*25* | 476:*11* |
| **Vanderbilt** | 112:*4*, *7* | | 146:*1* | 480:*14* |
| 4:*21* | 191:*19*, *22* | **< W >** | 149:*2*, *10* | 501:*4* |
| **Variable** | 264:*3*, *6* | | 156:*13* | 502:*6* |
| 13:*15* | 337:*6*, *9* | **WAGSTAFF** | 157:*4*, *12* | 514:*1* |
| 151:*10*, *24* | 402:*3*, *6* | 3:*19* | 160:*14* | 520:*23* |
| 153:*21* | 473:*12*, *15* | **Wait**   26:*17* | 163:*23* | 525:*2* |
| 198:*17* | 514:*6*, *9* | 99:*8*  536:*21* | 164:*7* | 538:*5* |
| 200:*16* | 546:*3*  566:*4* | **waited** | 192:*21*, *24* | 548:*24* |
| 304:*3* | **videos** | 534:*18* | 203:*17* | 549:*11* |
| 312:*23* | 550:*16* | **Walgreen** | 205:*24* | 550:*8*, *9*, *25* |
| 384:*20*, *22* | 551:*2* | 7:*4* | 216:*4* | 552:*24* |
| **variables** | **Videotaped** | **Walgreens** | 228:*9* | 555:*20* |
| 151:*13* | 1:*11* | 7:*5* | 232:*12* | 560:*8* |
| 543:*24* | **view**   189:*7*, | **walk** | 236:*24* | **wanted** |
| **varied** | *11*  193:*3* | 285:*13* | 240:*21* | 115:*14* |
| 511:*10* | 194:*19* | 309:*20* | 242:*10* | 117:*11* |
| **varies**  74:*17* | 302:*5*, *11*, *18* | 396:*2* | 245:*25* | 123:*6* |
| **Various** | 321:*12* | 400:*5* | 250:*3*, *4* | 169:*10*, *11* |
| 45:*13* | **viewpoints** | 550:*2* | 265:*13*, *23* | 172:*11* |
| 487:*7* | 547:*15* | 553:*23* | 287:*17* | 232:*12* |
| 555:*11* | **views**  559:*2* | **walking** | 316:*5* | 325:*23* |
| **vary**  555:*11*, | 562:*25* | 553:*13* | 317:*20* | 336:*2* |
| *18* | **VINH**   4:*15* | **Walmart** | 318:*12* | 341:*9* |
| **verbatim** | **virtually** | 7:*21* | 323:*10* | 423:*20* |
| 567:*7* | 333:*23* | **Wal-Mart** | 330:*21* | 480:*17* |
| **version** | **virtue** | 7:*22* | 336:*18* | 481:*18* |
| 204:*9* | 411:*5* | **want**   19:*23* | 337:*19* | 482:*5* |
| **versus** | 528:*23* | 20:*2*  27:*22* | 340:*18* | 485:*12* |
| 69:*24*  486:*5* | **voce**  251:*1* | 49:*20*, *21* | 345:*24* | 529:*16* |
| **video**  13:*23* | **voice**  25:*11* | 57:*6*  60:*16*, | 351:*24* | **wanting** |
| 14:*1*, *4*, *5*, *6* | 128:*10*, *11* | *19*, *21*  63:*9* | 367:*14* | 445:*1* |
| 15:*7*  77:*1* | **voices**  111:*7* | 76:*4*  77:*19* | 368:*13* | **wants** |
| 78:*18*  80:*4*, | **volunteered** | 78:*20* | 373:*4* | 236:*20* |
| *13*  81:*8* | 377:*17* | 89:*25* | 389:*11* | **warn**   146:*19* |
| 84:*22*  85:*2* | **von**   12:*14* | 104:*15* | 396:*2* | **warned** |
| 90:*8*  94:*24* | 406:*19* | 105:*19* | 407:*18* | 188:*22* |
| 95:*6*, *7* | 407:*8* | 112:*1*, *13*, *25* | 409:*25* | **warning** |
| 128:*8* | 411:*15* | 115:*6*, *25* | 411:*7*, *10* | |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 376:6 | 175:2 | 285:17, 24 | **weighted** | 265:11 |
| **warns** 33:11 | 188:15, 16 | 288:13, 16 | 510:5 | 266:10 |
| **warrant** | 190:13 | 341:11 | **weird's** | 273:6 |
| 105:14 | 192:25 | 390:24 | 401:1 | 275:19 |
| 106:8, 23 | 218:9 | 396:9 | **well** 19:16 | 276:22 |
| 110:7 | 223:11 | **weak** | 30:4 36:12 | 281:14 |
| **warranted** | 240:4 | 161:14, 16 | 38:8 39:12, | 282:4 |
| 180:18 | 267:18 | 203:3 | 18 40:25 | 284:22 |
| 375:25 | 272:23 | 262:17 | 57:11, 15 | 285:5 |
| **Washington** | 279:13 | 335:8 | 61:3 70:23 | 291:8 |
| 5:14 6:4 | 284:19 | 337:2 | 72:16 73:3 | 292:2 |
| 7:9 | 301:24 | 372:18 | 78:24 | 294:7 |
| **Watt** 4:16 | 308:21 | 381:19 | 81:13 | 302:2 |
| **WATTS** | 309:13, 17 | 477:2 | 92:11 | 303:11, 12 |
| 3:1, 3, 4 | 311:20 | **weaker** | 98:17 | 305:20 |
| 165:9 | 312:6 | 211:10 | 108:19 | 314:17 |
| 273:10 | 319:2 | 334:23 | 109:25 | 319:7 |
| 274:11 | 325:12 | 512:16 | 119:8, 16 | 322:5 |
| 306:15 | 326:7 | **weakness** | 128:18 | 323:17 |
| 474:9 | 359:16 | 416:22 | 137:4 | 340:18 |
| **wave** | 390:13 | **website** | 143:5 | 342:13 |
| 173:24 | 391:22 | 186:15 | 147:6 | 347:7 |
| 174:2 311:6 | 393:10, 15 | 475:3 | 154:10 | 348:10 |
| **waving** | 402:17 | **websites** | 160:3 | 351:14 |
| 200:7 | 419:9 | 257:22 | 163:23 | 353:6 |
| **way** 37:18 | 436:19 | **WEDNESDA** | 164:24 | 354:5 |
| 47:18 | 445:18 | **Y** 1:6 | 173:5, 20 | 357:22 |
| 54:20 | 457:13 | **week** 17:2 | 175:14 | 359:18 |
| 55:25 56:8 | 461:4, 5 | **weeks** | 178:14, 23 | 363:14 |
| 57:24 58:2, | 462:5 | 250:24 | 179:14 | 364:25 |
| 25 59:3 | 463:22 | 563:13 | 183:21 | 365:14 |
| 65:8 68:6 | 464:10 | **weighs** 18:7 | 201:5, 10 | 367:1 |
| 69:7 88:15 | 465:20, 25 | 394:15 | 202:12 | 369:24 |
| 100:25 | 466:9 | **weight** | 209:4 | 370:3, 5 |
| 109:22 | 495:3 | 209:20 | 225:17 | 371:4, 6, 24 |
| 121:19 | 513:9, 25 | 221:23 | 226:4 | 372:1 |
| 126:6 | 523:21 | 230:21 | 228:6 | 385:14 |
| 131:18 | 526:7, 16 | 301:16 | 236:22 | 399:12 |
| 134:2, 6, 11 | 529:15 | 346:15 | 239:25 | 401:4 |
| 135:2 | 534:14 | 347:15 | 244:8 | 406:21 |
| 141:12 | 535:3 | 349:20 | 245:22 | 410:25 |
| 142:10, 18 | 556:8 563:2 | 359:24 | 249:18 | 415:19 |
| 165:18 | **ways** 89:24 | 392:9 483:4 | 252:16 | 424:8 |
| 173:10 | 223:12 | | 253:17 | 428:18, 19 |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 430:*14* | **went** 31:*5* | 368:*20, 24* | 513:*12* | 212:*23* |
| 433:*2* | 108:*23* | 376:*16* | 557:*6* | 216:*25* |
| 435:*16* | 111:*16* | 390:*16, 22* | **white** | 251:*22* |
| 438:*13* | 123:*25* | 402:*7* | 125:*10* | 286:*7* |
| 442:*24* | 132:*9* | 412:*1, 6, 7* | 126:*6* | 302:*12, 24* |
| 444:*15* | 203:*22* | 414:*23* | **Whoa** | 343:*16* |
| 449:*9* | 247:*3* | 420:*8* | 371:*11* | 356:*9* |
| 452:*12* | 275:*7* | 425:*4* | **Wholesale** | 360:*3, 9* |
| 454:*2* | 309:*25* | 426:*2* | 7:*10* | 441:*6* 465:*8* |
| 455:*4* | 312:*18* | 428:*17* | **who've** | **willingness** |
| 458:*9* | 331:*1* | 432:*13* | 502:*11* | 133:*22* |
| 468:*15* | 365:*2* | 445:*2* | **wide** 241:*20* | 223:*14* |
| 469:*15* | 451:*13* | 467:*11* | 305:*10* | 396:*25* |
| 482:*3* | 480:*23* | 473:*13, 16* | 380:*24* | **Winners** |
| 483:*6, 9* | 503:*12* | 487:*2* | 408:*5* | 10:*24* |
| 484:*21, 23* | 558:*8* | 489:*13* | 465:*16* | **wise** 456:*25* |
| 485:*2* | **we're** 19:*4,* | 494:*20* | 466:*6* | **wished** |
| 488:*8, 12* | *11* 20:*6* | 509:*2* | 511:*16* | 520:*7* |
| 493:*4* | 28:*7, 10* | 514:*7, 10* | **widely** | **witness** |
| 498:*24* | 38:*22* 39:*2,* | 532:*21* | 102:*22* | 15:*18* |
| 506:*2, 21* | *3* 66:*5, 6* | 534:*7* | **wider** 54:*5* | 16:*20* 17:*5* |
| 507:*7* | 76:*10, 13* | 541:*15* | **width** | 18:*23* 21:*9* |
| 513:*2* | 81:*7* 83:*12* | 545:*25* | 468:*10* | 22:*12* 23:*4,* |
| 520:*11* | 84:*18* | 554:*21* | **Wiggs** 12:*4* | *9, 20* 24:*15* |
| 523:*2* | 112:*5, 8* | **West** 5:*2* | 361:*11, 17* | 25:*18* 26:*4,* |
| 531:*10* | 127:*9* | 8:*2* | 368:*24* | *20* 27:*21* |
| 533:*13, 20* | 143:*23* | **we've** 96:*20* | 369:*7* | 28:*21* |
| 542:*13* | 148:*2* | 124:*21* | **wild** 422:*24* | 29:*17* |
| 544:*10* | 157:*21, 23* | 136:*13* | **wildly** | 32:*14* |
| 549:*1* | 173:*18* | 138:*8* | 273:*22* | 33:*14* |
| 550:*11* | 175:*23* | 181:*16* | **WILLIAM** | 36:*23* |
| 560:*1, 4* | 177:*9* | 191:*12* | 4:*15* 6:*13* | 38:*19* 40:*1,* |
| 564:*15* | 181:*2, 4, 12* | 249:*24* | **william.padg** | *21* 42:*11* |
| 565:*14* | 191:*20, 23* | 295:*6* | **ett@btlaw.co** | 43:*3, 25* |
| **well-** | 199:*5* | 319:*11* | **m** 6:*14* | 44:*24* 46:*7,* |
| **designed** | 206:*8* | 328:*3* | **willing** 47:*2* | *15* 47:*15* |
| 21:*23* | 254:*9* | 336:*14* | 102:*5* | 48:*3, 6* |
| **well-** | 259:*5, 11* | 342:*21* | 114:*4* | 49:*16, 18* |
| **established** | 264:*7* | 347:*22* | 131:*17* | 50:*12, 25* |
| 424:*10* | 299:*6* | 370:*12* | 133:*17, 20* | 51:*14* 52:*8* |
| **well-** | 309:*9* | 426:*5* | 146:*15* | 54:*15* |
| **respected** | 331:*11* | 483:*13* | 148:*4* | 55:*14* 56:*6,* |
| 42:*7* | 338:*2* | 499:*19* | 149:*11* | *21* 59:*6, 22* |
| | 343:*2* | | 210:*15* | 60:*16* 61:*8* |

Confidential - Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 63:9  65:7, 24  67:1, 25 | 133:13 | 191:18 | 267:2, 17 | 320:23 |
| 68:17  69:5 | 134:10 | 194:9 | 269:6 | 324:22 |
| 70:8  72:1, 25  73:24 | 135:8 | 195:18 | 270:15, 24 | 326:5, 14 |
| 75:9, 23 | 136:4, 13, 24 | 197:3 | 271:22 | 327:16 |
| 77:10  78:3, 11  82:20 | 137:17, 24 | 199:17 | 272:14, 25 | 329:23 |
| 83:20 | 139:21 | 201:15 | 273:24 | 330:22 |
| 84:12  85:5, 14  87:15, 22 | 140:10, 24 | 202:23 | 274:3, 6, 7, 13, 18  275:4, 16  277:12 | 332:16 |
| 88:1  89:8 | 141:10 | 203:11 | | 335:7, 23 |
| 90:23 | 142:25 | 206:13 | 278:14 | 336:6 |
| 91:13, 25 | 144:24 | 207:7 | 279:12, 20 | 337:1 |
| 92:16 | 145:16 | 208:9 | 280:6 | 339:6, 17 |
| 93:12  94:2 | 146:12, 23 | 209:19 | 281:2 | 341:12 |
| 96:13 | 147:17 | 210:13 | 282:1, 8, 18 | 343:24 |
| 98:10 | 148:2, 13 | 211:13 | 283:3, 14 | 345:4 |
| 99:13 | 149:2, 9 | 212:6, 16 | 284:13, 16 | 346:3 |
| 100:2, 15, 24 | 150:23 | 213:8 | 285:1, 6 | 347:22 |
| 101:19 | 151:17 | 214:11 | 286:2, 15 | 348:18 |
| 102:3 | 152:17 | 217:15, 25 | 289:8 | 349:10, 25 |
| 104:1, 6, 15 | 153:4 | 218:19 | 290:2, 12, 21 | 350:22 |
| 105:18 | 156:21 | 219:8 | 291:3, 18 | 351:21 |
| 106:13, 25 | 158:24 | 221:19 | 292:20 | 352:8 |
| 108:7 | 159:22 | 224:14 | 293:25 | 354:14 |
| 110:20 | 160:12 | 227:4, 19 | 294:11, 22 | 355:16, 25 |
| 111:19 | 166:25 | 228:11, 17 | 296:16 | 356:21 |
| 114:3, 12 | 167:22 | 230:7 | 297:4, 21 | 357:7 |
| 115:6 | 168:15 | 231:10 | 299:7, 10 | 358:8, 24 |
| 116:22 | 170:9, 25 | 232:4, 11 | 300:5 | 360:25 |
| 117:22 | 171:17 | 236:18, 22 | 301:1, 14 | 361:7 |
| 119:1 | 172:17, 23 | 237:2 | 302:8, 21 | 362:10 |
| 120:16 | 174:18 | 239:14 | 303:8 | 367:19 |
| 122:3, 24 | 175:19 | 245:14 | 306:1, 4 | 370:3, 12 |
| 123:11, 25 | 176:7, 23 | 248:7 | 307:2 | 371:18 |
| 124:20 | 177:18 | 249:17 | 308:18 | 372:6 |
| 126:3, 13 | 178:23 | 250:18 | 309:1 | 373:11 |
| 127:20 | 179:24 | 252:21 | 310:5, 23 | 375:7 |
| 128:24 | 180:11 | 253:7 | 312:16 | 380:20 |
| 129:18, 25 | 181:2, 24 | 254:3, 20 | 313:8 | 386:9 |
| 130:25 | 183:10, 20 | 255:14 | 314:9, 21 | 387:17 |
| 131:10 | 184:12 | 256:22 | 315:11 | 388:19 |
| 132:16 | 185:14 | 257:9, 19 | 316:7 | 391:15 |
| | 186:7 | 258:13 | 317:19 | 392:22 |
| | 187:11, 21 | 262:3 | 318:8, 23 | 393:23 |
| | 189:10 | 263:7 | 319:16 | 395:10 |
| | 190:4, 19 | 265:9 | | 396:20 |

397:*14*
398:*17*
401:*4, 18, 21*
402:*17*
404:*5*
405:*14*
406:*12, 25*
409:*10*
413:*8*
417:*4*
423:*10*
431:*24*
433:*17*
434:*17*
436:*11*
439:*15*
440:*13*
442:*7, 20*
443:*12*
444:*5, 13*
445:*18*
448:*23*
452:*3*
454:*6*
455:*1*
457:*7*
458:*2*
459:*17, 25*
461:*18*
462:*11*
463:*16*
464:*9*
465:*6*
466:*1*
468:*2*
471:*18*
472:*8, 23*
473:*10*
475:*13, 22*
476:*18*
479:*8*
480:*3*
481:*25*
482:*20*

483:*20, 24*
484:*17*
485:*18*
486:*21*
489:*5*
490:*21*
491:*19*
492:*8*
493:*2*
494:*6*
495:*23*
497:*6*
498:*10, 22*
499:*6*
500:*5, 11, 15, 24*  501:*13*
503:*16, 24*
504:*11, 21*
505:*6*
506:*2*
507:*7*
508:*5, 20*
509:*7*
510:*13*
511:*5*
512:*11, 20*
519:*25*
521:*17*
522:*6, 21*
523:*18, 25*
524:*9, 19*
525:*14*
526:*10, 20*
528:*12*
530:*6*
531:*2, 17*
532:*9*
533:*8, 20*
535:*8, 19*
536:*15*
537:*10, 22*
538:*4*
539:*15*
540:*13, 22*

541:*17*
542:*9, 18*
543:*9*
544:*23*
547:*6*
548:*13, 16*
553:*2*
563:*19*
564:*10*
565:*14*
568:*1*
**witnessing**
520:*3, 12*
**woman**
116:*13*
199:*13*
223:*11, 19*
257:*20*
258:*1, 2*
263:*2*
352:*18*
397:*6*
517:*19*
**woman's**
396:*24*
**women**
115:*14, 22*
120:*7*
138:*24*
139:*4*
155:*14, 20*
188:*22*
189:*15*
223:*3*
248:*4*
253:*20*
254:*13*
255:*16*
256:*23*
285:*22, 24*
286:*3, 18, 20, 23*  334:*13*
335:*9*
336:*8*

343:*3, 8*
365:*3*
376:*6*
397:*15*
425:*15*
427:*10*
448:*9*
449:*3*
487:*12*
534:*16*
536:*1*
**women's**
507:*25*
**Woodland**
8:*18*
**word**  305:*1*
476:*19*
542:*22*
559:*9*
**words**  38:*3*
305:*7*
308:*9*
382:*18*
418:*3*
**work**  33:*23*
34:*25*
35:*15, 17, 23*
37:*8*  57:*24*
90:*11*
182:*17*
192:*19*
196:*17*
198:*1*
202:*5*
252:*17*
348:*3*
349:*15, 19*
474:*13, 17*
476:*1*
536:*20*
**worked**
45:*9, 10*
534:*14*

**working**
37:*6*
108:*11, 15, 20*  109:*11*
127:*8*
**workplace**
209:*5*
**works**  34:*7*
58:*25*
73:*15*
134:*2, 6, 11*
140:*7*
249:*24*
457:*13*
490:*9*
**world**  91:*7*
134:*12*
271:*9*
423:*5*
528:*16*
531:*4, 21*
**worried**
432:*11*
559:*7*
**worry**
65:*25*
139:*4*
258:*1, 3*
365:*8*
411:*9*
508:*10*
559:*9*
**Worth**
12:*16*
416:*1*  522:*9*
**worthless**
488:*13*
**worthy**
119:*7*
357:*19*
**would've**
437:*17*
**wow**  430:*8*
**wrap**  514:*3*

**write** 86:*2*
121:*23*
122:*10, 11,*
*13* 125:*21*
127:*15, 18*
151:*12*
152:*1*
154:*17*
155:*24*
158:*7*
194:*13*
224:*9, 18*
**writer**
299:*13*
**write-up**
519:*21*
**writing**
101:*14*
119:*21*
121:*22*
125:*20*
144:*2*
194:*11*
203:*19*
215:*18*
237:*9*
238:*19*
521:*19*
**written**
111:*22*
185:*14*
186:*7, 8*
193:*22, 25*
227:*5*
251:*20*
287:*19*
327:*12, 17,*
*19* 329:*18,*
*24, 25* 565:*2*
**wrong**
47:*10*
49:*24* 66:*9*
133:*25*
135:*22*

194:*2*
214:*1*
224:*11*
251:*10*
267:*21*
289:*5, 9, 15,*
*16* 299:*4*
301:*10, 22*
303:*1*
327:*13*
360:*2*
373:*4*
375:*9*
389:*20*
444:*1*
499:*2, 8*
526:*21*
**wrote** 86:*4,*
*19* 109:*13*
187:*25*
440:*15*
441:*6*
442:*4*
443:*18, 20*
559:*1, 2*

**< X >**
**X-rays**
544:*12*

**< Y >**
**Yeah** 16:*19*
17:*2, 12*
21:*24*
23:*14*
25:*16*
31:*18*
34:*23*
37:*23*
53:*19* 54:*2*
55:*3* 59:*13*
62:*5* 63:*12*
64:*3* 67:*11*
76:*6* 77:*22*

78:*19*
80:*22* 82:*8*
85:*23*
86:*24*
87:*10, 15*
88:*3* 93:*6*
94:*18* 95:*8,*
*13* 97:*7*
100:*5*
103:*8*
107:*15, 17*
108:*7*
114:*22*
119:*23*
128:*6*
131:*19*
139:*6*
140:*14*
145:*8*
149:*25*
155:*18*
156:*14*
157:*3*
158:*5*
159:*10, 11*
161:*6, 7, 12*
162:*7, 9, 13,*
*17* 163:*17*
164:*1*
165:*23*
166:*3, 7*
167:*13, 14*
170:*18*
173:*13*
175:*14*
177:*2*
178:*5*
183:*21*
184:*3, 5, 7,*
*18* 186:*1, 2*
188:*8*
191:*4, 9, 16*
199:*25*
201:*7*

202:*2*
203:*7*
204:*22, 25*
205:*9, 21*
206:*10, 16*
207:*1*
208:*16*
210:*5, 13*
211:*23*
213:*11, 22*
215:*6*
216:*2*
217:*7*
219:*2, 8*
222:*2*
223:*2, 5, 18*
225:*19, 25*
226:*4, 21*
230:*13*
233:*20, 25*
234:*9, 17*
237:*11*
238:*1*
240:*9, 12*
241:*1*
242:*15*
244:*11, 13*
246:*4, 5*
247:*5*
249:*1, 4, 10,*
*13* 250:*1, 6*
253:*23*
260:*2, 3, 14*
262:*23*
266:*18*
267:*9, 14*
268:*13*
270:*7*
277:*19, 24*
281:*8, 13, 17*
284:*16, 18*
287:*22, 25*
288:*10, 22*
289:*1, 3, 20*

290:*5*
294:*17*
296:*11*
304:*8*
306:*7, 14*
307:*23*
308:*5*
310:*10*
313:*13*
314:*2, 9*
320:*5*
323:*2, 11*
324:*12*
331:*12*
334:*3*
337:*4*
338:*17*
339:*17*
340:*8*
341:*12*
346:*1*
355:*16*
356:*24*
362:*15*
365:*23, 25*
367:*24*
368:*23*
369:*8, 19*
371:*12*
374:*4*
382:*21, 22*
383:*6, 9, 20*
385:*21, 22,*
*23* 389:*15*
394:*2*
404:*15*
407:*21*
408:*1, 14*
411:*9*
413:*20*
415:*7, 8, 12*
417:*8, 16, 20*
418:*4, 8*
420:*4, 6, 10,*

Confidential - Subject to Protective Order

| | | | |
|---|---|---|---|
| *12* 421:*18* | **years** 30:*22* | 425:*18* | *12, 17, 22* |
| 422:*11* | 45:*7, 14* | 509:*24* | |
| 431:*4* | 74:*21* | **YORK** 1:*1* | |
| 432:*16* | 88:*22* | 2:*17* 3:*15* | |
| 438:*15* | 129:*2* | 6:*21* 7:*3,* | |
| 444:*23* | 198:*10* | *15* 8:*3, 13* | |
| 446:*7, 8, 9,* | 248:*21* | **YouTube** | |
| *16* 449:*8* | 295:*7* | 81:*2, 3, 10* | |
| 450:*21* | 296:*3* | **Ystrom** | |
| 452:*23* | 476:*8* | 28:*25* | |
| 453:*7* | 501:*24* | 165:*17* | |
| 455:*7* | 510:*10* | 166:*10* | |
| 458:*5, 8* | 528:*20* | 339:*13, 18,* | |
| 459:*6, 9, 20* | 534:*18* | *25* 340:*1, 19* | |
| 463:*9* | 535:*15* | 383:*7* | |
| 464:*21* | 537:*6* | 384:*3* | |
| 470:*3* | **Yep** 167:*5* | 385:*15, 16* | |
| 474:*23* | 168:*21* | 463:*11* | |
| 480:*16, 18* | 184:*2* | **Yudell** | |
| 481:*4* | 185:*21* | 10:*20* | |
| 490:*25* | 205:*10* | 107:*20* | |
| 492:*15, 17* | 237:*19* | **YYY** 185:*1* | |
| 493:*25* | 308:*11* | | |
| 499:*23* | 312:*8* | **< Z >** | |
| 504:*24* | 313:*2* | **Zena** 45:*9* | |
| 506:*11* | 336:*16* | **zero** 66:*22* | |
| 508:*6* | 344:*10, 11* | **Zeyan** | |
| 510:*20* | 364:*1* | 185:*5* | |
| 514:*19* | 366:*17* | 186:*25* | |
| 516:*18, 21,* | 373:*5* | 187:*12* | |
| *22* 522:*12* | 375:*23* | **Zhong** | |
| 524:*20* | 403:*22* | 205:*13* | |
| 533:*22* | 405:*21* | **zodiac** 515:*2* | |
| 537:*4* | 408:*13* | **ZOOM** 2:*5,* | |
| 546:*7* | 415:*2* | *6, 7, 8, 9, 14,* | |
| 550:*6, 15* | 428:*5* | *21, 22* 3:*6, 7,* | |
| 551:*3, 4* | 429:*18* | *13, 14, 19* | |
| 552:*10, 24* | 456:*10* | 4:*1, 7, 8, 9,* | |
| 554:*5* | 457:*19* | *15, 20* 5:*1, 7,* | |
| 557:*19* | 486:*2* | *12, 18, 20* | |
| 558:*16, 17* | 492:*16* | 6:*1, 2, 8, 13,* | |
| 562:*13* | **yes/no** | *19, 20* 7:*1,* | |
| **year** 183:*17* | 335:*12* | *13, 19* 8:*1, 6,* | |
| 558:*12* | 336:*12* | | |