# Exhibit 30

```
 1                 UNITED STATES DISTRICT COURT

                 SOUTHERN DISTRICT OF NEW YORK

 2

 3

 4    IN RE:  ACETAMINOPHEN      )  MDL No.  3043

      ASD-ADHD PRODUCTS          )

 5    LIABILITY LITIGATION       )  Case No.

                                 )  1:22-md-03043-DLC

 6    _____)

      THIS DOCUMENT RELATES TO:   )

 7                                )  JUDGE DENISE COTE

      All Cases, 1:22-MD-03043    )

 8    _____

 9

10              MONDAY, AUGUST 28, 2023

11        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

12                     —  —  —

13

14       Videotaped Deposition of CRAIG POWELL, M.D. Ph.D.,

15    taken pursuant to notice and conducted at the offices of

16    Butler Snow, 1819 5th Avenue N., Suite 1000, Birmingham,

17    Alabama, commencing at 8:31 a.m., Central Time, on the above

18    date, before Jennifer A. Dunn, Registered Merit Reporter,

19    Certified Realtime Reporter; California, Illinois & Texas

20    Certified Shorthand Reporter, and Missouri Certified Court

21    Reporter.

22                     —  —  —

23

24              GOLKOW LITIGATION SERVICES

                     877.370.DEPS

25                  deps@golkow.com
```

```
 1                    A P P E A R A N C E S
 2
        KELLER POSTMAN
 3          BY:  AMANDA HUNT
            amanda.hunt@kellerpostman.com
 4          BY:  ASHLEY BARRIERE    (via Zoom)
            ashley.barriere@kellerpostman.com
 5          BY:  ASHLEY C. KELLER   (via Zoom)
            ashley.keller@kellerpostman.com
 6          BY:  REBECCA KING       (via Zoom)
            rebecca.king@kellerpostman.com
 7          BY:  ROSIE ROMANO       (via Zoom)
            rosie.romano@kellerpostman.com
 8          BY:  J.J. SNIDOW        (via Zoom)
            jj.snidow@kellerpostman.com
 9          150 North Riverside Plaza, Suite 4100
            Chicago, Illinois  60606
10          Tel:  (312) 741-5220
11      and
12      WATTS GUERRA LLC
            BY:  MIKAL C. WATTS
13          mcwatts@wattsguerra.com
            BY:  JOHN CRACKEN
14          jcracken@wattsguerra.com
            Millennium Park Plaza RFO
15          Suite 410, C112
            Guaynabo, Puerto Rico  00966
16          Tel:  (210) 447-0500
17      and
18      THE LANIER LAW FIRM
            BY:  EVAN M. JANUSH  (via Zoom)
19          evan.janush@lanierlawfirm.com
            BY:  CATHERINE HEACOX (via Zoom)
20          catherine.heacox@lanierlawfirm.com
            126 East 56th Street, 6th Floor
21          New York, New York  11758
            Tel:  (212) 421-2800
22
        and
23
24
25
```

```
 1                A P P E A R A N C E S  (Cont.)

 2

        TRACEY FOX & WALTERS
 3         BY:  LAWRENCE TRACEY (via Zoom)
           ltracey@traceylawfirm.com
 4         440 Louisiana Street, Suite 1901
           Houston, Texas  77002
 5         Tel:  (713) 495-2333

 6      and

 7      HOLWELL SHUSTER & GOLDBERG LLP
           BY:  EILEEN MONAGHAN DELUCIA (via Zoom)
 8         edelucia@hsgllp.com
           BY:  DANIEL M. SULLIVAN (via Zoom)
 9         dsullivan@hsgllp.com
           425 Lexington Avenue
10         New York, New York  10017
           Tel:  (646) 837-5151

11

        and

12

        WAGSTAFF & CARTMELL
13         BY:  LINDSEY SCARCELLO
           lscarcello@wcllp.com
14         BY:  DARYL DOUGLAS      (via Zoom)
           ddouglas@wcllp.com
15         4740 Grand Avenue, Suite 300
           Kansas City, Missouri  64112
16         Tel:  (816) 701-1100

17      and

18      KRAUSE & KINSMAN
           BY:  TRICIA CAMPBELL
19         tcampbell@krauseandkinsman.com
           4717 Grand Avenue, Suite 300
20         Kansas City, Missouri  64112
           Tel:  (816) 200-2900

21

        and

22

        HOLLAND LAW FIRM
23         BY:  MICHAEL DOWD      (via Zoom)
           mdowd@hollandtriallawyers.com
24         211 North Broadway, Suite 2625
           St. Louis, Missouri  63102
25         Tel:  (314) 241-8111
```

```
 1              A P P E A R A N C E S  (Cont.)
 2
       and
 3
       DOVEL & LUNER
 4        BY:  GREG DOVEL        (via Zoom)
          greg@dovel.com
 5        BY:  JULIEN ADAMS      (via Zoom)
          julien@dovel.com
 6        201 Santa Monica Boulevard, Suite 600
          Santa Monica, California  90401
 7        Tel:  (310) 656-7066
 8     and
 9     KERSHAW TALLEY BARLOW
          BY:  WILLIAM J. LEE    (via Zoom)
10        BY:  VINH T. LE        (via Zoom)
          401 Watt Avenue, Suite 1
11        Sacramento, California  95864-7273
          Tel:  (916) 520-6639
12           Counsel for Plaintiffs
13
       BARNES & THORNBURG LLP
14        BY:  WILLIAM E. PADGETT
          william.padgett@btlaw.com
15        BY:  KARA KAPKE
          kara.kapke@btlaw.com
16        11 S. Meridian Street
          Indianapolis, Indiana  46204-3535
17        Tel:  (317) 236-1313
18     and
19     BARNES & THORNBURG LLP
          BY:  JAMES F. MURDICA (via Zoom)
20        jmurdica@btlaw.com
          2029 Century Park East, Suite 300
21        Los Angeles, California  90067-2904
          Tel:  (310) 284-3880
22
       and
23
24
25
```

Craig Powell

```
 1                A P P E A R A N C E S  (Cont.)
 2
 3      BARNES & THORNBURG LLP
            BY:  PRIYA SUNKARA      (via Zoom)
 4          priya.sunkara@btlaw.com
            One N. Wacker Drive
 5          Suite 4400
            Chicago, Illinois  60606-2833
 6          Tel:  (312) 338-5906
                Counsel for Johnson & Johnson Consumer, Inc.
 7
        and
 8
        BARNES & THORNBURG LLP
 9          BY:  NADINE KOHANE      (via Zoom)
            nkohane@btlaw.com
10          390 Madison Avenue, 12th Floor
            New York, New York  10017
11          Tel:  (646) 746-2000
                Counsel for CVS Pharmacy, Inc., CVS Health
12              Corporation, Walgreen Co., Walgreens Co., and
                Walgreens Boots Alliance, Inc.
13      and
14      BARNES & THORNBURG LLP
            BY:  DEANNA LEE         (via Zoom)
15          dlee@btlaw.com
            555 12th Street, N.W., Suite 1200
16          Washington, D.C.  20004-1275
            Tel:  (202) 289-1313
17              Counsel for Costco Wholesale Corporation
18
        BUTLER SNOW
19          BY:  DAVID M. COHEN     (via Zoom)
            david.cohen@butlersnow.com
20          BY:  RAQUEL LUCAS       (via Zoom)
            raquel.lucas@butlersnow.com
21          810 Seventh Avenue, Suite 1105
            New York, New York  10019
22          Tel:  (646) 606-2996
                Counsel for Johnson & Johnson Consumer, Inc.
23
24
25
```

Craig Powell

```
 1                A P P E A R A N C E S (Cont.)
 2
 3      ARNOLD & PORTER, LLP
            BY:  RAYNE ELLIS        (via Zoom)
 4          rayne.ellis@arnoldporter.com
            250 West 55th Street
 5          New York, New York  10019
            Tel:  (212) 836-8000
 6              Counsel for Dollar Tree Inc., 7-Eleven, and
                Family Dollar, Inc.
 7
 8      KING & SPALDING LLP
            BY:  AUSTIN EVANS       (via Zoom)
 9          aevans@kslaw.com
            500 West 2nd Street
10          Suite 1800
            Austin, Texas  78701
11          Tel:  (512) 457-2069
                Counsel for Walmart Inc., and Wal-Mart Stores,
12              Inc.
13
        MORRISON & FOERSTER LLP
14          BY:  LYNDSEY CAIN       (via Zoom)
            lcain@mofo.com
15          Republic Plaza, 370 17th Street
            Unit 4200
16          Denver, Colorado  80202
            Tel:  (303) 592-2276
17              Counsel for Target Corporation
18
        DUANE MORRIS LLP
19          BY:  SEAN K. BURKE      (via Zoom)
            sburke@duanemorris.com
20          901 New York Avenue, N.W., Suite 700 East
            Washington, DC  20001-4795
21          Tel:  (202) 776-5236
                Counsel for Dollar General, Dollar General
22              Corporation
23
24
25
```

Craig Powell

```
1                A P P E A R A N C E S (Cont.)
2
       SMITH SOVIK KENDRICK & SUGNET
3          BY:  DAVID M. KATZ      (via Zoom)
           dkatz@smithsovik.com
4          250 South Clinton Street, Suite 600
           Syracuse, New York  13202
5          Tel:  (315) 474-2911
               Counsel for Rite Aid
6
7      STONE DEAN LLP
           BY:  JOSEPH A. LARA     (via  Zoom)
8          jlara@stonedeanlaw.com
           21052 Oxnard Street
9          Woodland Hills, California  91367
           Tel:  (818) 999-2232
10             Counsel for The Kroger Co.
11
       HAIGHT BROWN & BONESTEEL LLP
12         BY:  KATIE M. TRINH     (via Zoom)
           ktrinh@hbblaw.com
13         555 South Flower Street, 55th Floor
           Los Angeles, California  90071
14         Tel:  (213) 542-8000
               Counsel for Big Lots Stores-PNS, LLC
15
16
17
18  ALSO PRESENT:
19  Jeff Fleming - Videographer
20  Ray Moore - Exhibit Technician
21  Daniel Olivo, Paralegal - Tracey Fox & Walters
22  Joe Masterman, for the Plaintiffs
23  Lisa Qian
24
25
```

Craig Powell

```
 1                    I N D E X
 2                                              PAGE
 3  CRAIG POWELL, M.D., Ph.D.
 4        Examination by Ms. Hunt              11
 5  Certificate of Court Reporter             289
 6  Letter for Signature                      290
 7  Witness Signature Page                    291
 8  Errata Sheet                              292
 9
10                  E X H I B I T S
11
    NUMBER    DESCRIPTION                      PAGE
12
    200       Notice of Deposition             13
13
    201       Expert Report of Craig Powell    22
14
    203       Curriculum Vitae of Dr. Powell   19
15
    ████      █████████████████████            51
16            ███████████
17  213       E-Mail Chain between John Talpos and   167
              Brandon Pearson
18            Subject:  APAP paper
19  ████      █████████████████████████████    62
              ███████████████████████████████
20            ████████████████████
21  217       Center for Drug Evaluation and Research  216
22  221       "Is There a Causal Relation between Maternal  170
              Acetaminophen Administration and ADHD?"
23
    223       "Enhancing Reproducibility through Rigor  118
24            and Transparency"
25
```

```
 1                  E X H I B I T S  (Cont.)
 2
       NUMBER     DESCRIPTION                         PAGE
 3
       225        Science Advisory Board (SAB) Meeting    178
 4                May 1, 2022
 5     226        Korean Journal of Anesthesiology        157
                  "What is the proper way to apply the
 6                multiple comparison test?"
 7     229        Neurotoxicology and Teratology          140
                  "Identification and interpretation of
 8                developmental neurotoxicity effects
                  A report from the ILSI Research Foundation/
 9                Risk Science Institute expert working group
                  on neurodevelopmental endpoints"
10
       234        Journal of Public Health Policy         273
11                "The disinformation playbook:  how industry
                  manipulates the science-policy process and
12                how to restore scientific integrity"
13     ████       ███████████████████████████████         279
                  ████████████
14                ██████████████████████████████████████
                  █████████████████████████████████
15                █████████████████
                  █████████████████████████████
16                ███████████████████
17     244        Neurobiology of Disease                 243
                  "Sex-specific neurobehavioral and prefrontal
18                cortex gene expression alterations following
                  developmental acetaminophen exposure in mice"
19
       251        HHS Public Access                       244
20                "Altered Striatal Synaptic Function and
                  Abnormal Behavior in Shank3 Exon4-9
21                Deletion Mouse Model of Autism
22     254        Clinician's Corner                      197
                  "Aminotransferase Elevations in Healthy Adults
23                Received 4 Grams of Acetaminophen Daily"
24     257        Rule 26 Expert Report of Brandon Pearson    208
25
```

```
 1                E X H I B I T S (Cont.)
 2
      NUMBER     DESCRIPTION                          PAGE
 3
      259        PLOS Biology                         126
 4               "The ARRIVE guidelines 2.0:  Updated
                 guidelines for reporting animal research"
 5
      261        Genes, Brain and Behavior            103
 6               "Reconsidering animal models used to study
                 autism spectrum disorder:  Current state
 7               and optimizing future"
 8    266        Studies Excluded from Consideration for   87
                 "Excessive" Dose
 9
      267        Studies Excluded from Consideration for   92
10               Failing to Correct for Multiple Comparisons
11    269        Reasons studies were excluded from   102
                 consideration as "irrelevant"
12
      270        PeerJ                                151
13               "Clinical relevance assessment of animal
                 preclinical research (RAA) tool:  development
14               and explanation"
15
16
17
18
19
20
21
22
23
24
25
```

Craig Powell

```
 1                    P R O C E E D I N G S

 2      (Monday, August 28, 2023 at 8:31 a.m., Central Time.)

 3                 THE VIDEOGRAPHER:  We are now on the record.

 4       My name is Jeff Fleming.  I'm a videographer for Golkow

 5       Litigation Services.

 6                 Today's date is August 28th, 2023.  The time

 7       is 8:31 a.m.

 8                 This video deposition is being held in

 9       Birmingham, Alabama, in the matter of

10       Acetaminophen/Tylenol, ASD-ADHD, Products Liability

11       Litigation.

12                 The deponent is Dr. Craig Powell.

13                 Appearances will be noted on the stenographic

14       record.

15                 Our court reporter is Jennifer Dunn and will

16       now swear in the witness.

17                 CRAIG POWELL, M.D., Ph.D.,

18      of lawful age, having been first duly sworn to tell the

19      truth, the whole truth and nothing but the truth, deposes

20      and says on behalf of the Plaintiffs, as follows:

21                              EXAMINATION

22      BY MS. HUNT:

23          Q    Good morning, Dr. Powell.

24          A    Good morning, Ms. Hunt.

25          Q    I understand you've been deposed previously; is
```

Craig Powell

```
 1    that right?

 2         A    Yes, a few times.

 3         Q    Okay.

 4         A    A handful.

 5         Q    I'm sorry, go ahead.

 6         A    I said a handful.  I don't know.

 7         Q    Okay.  So I won't bore you with all the rules for

 8    a deposition.  I know you're assisted by able counsel, but

 9    there are a few things I want to emphasize before we get

10    started.

11              It's not an endurance test.  So if you need a

12    break, please let us know.  I would just ask that you answer

13    any question pending and then I'm happy to take a break any

14    time.

15              Your counsel is going to object, I'm sure,

16    probably more than once during this deposition.  Unless he

17    instructs you not to answer, you still have to answer the

18    question.

19              If you don't understand the question I'm asking,

20    please ask me to clarify and I'll be happy to do it.  I

21    don't want you to answer something and then tell me later

22    you didn't understand; is that fair?

23         A    Yes, ma'am.

24         Q    Okay.  And do you understand the oath that you

25    just swore is the same oath that would be administered in a
```

Craig Powell

```
 1   courtroom?

 2       A    Yes, I do.

 3       Q    And you're under oath exactly like you would be in

 4   a court of law?

 5       A    Yes, I understand.

 6       Q    Okay.  Did you bring anything with you today?

 7       A    I brought some snacks, some water, and a

 8   TopoChico, but I have the -- some of the papers that are --

 9   I referenced, and a copy of my report and a few other

10   things, but nothing that you don't have a copy of.

11       Q    Okay.  Are there any notes or other types of

12   annotations anywhere in those documents?

13       A    Not to my knowledge.

14       Q    Okay.  I want to look at what's been marked as

15   Exhibit 200.

16            (Powell Deposition Exhibit 200 marked for

17            identification.)

18   BY MS. HUNT:

19       Q    Dr. Powell, this is your Notice of Deposition.

20            Have you seen this document before?

21       A    I have.

22       Q    And are you aware that there were document

23   requests attached at the back as Schedule A?

24       A    I'm aware that there were document requests, yes.

25       Q    Okay.  I only want to talk about a few of them,
```

Craig Powell

```
 1   specifically requests 6 and 7, which are on page -- if you

 2   look in the top right-hand corner, it should say "200.7."

 3        A    Mm-hmm.  Got it.

 4        Q    Okay.  So these requests both relate to

 5   communications with specific third parties about the topics

 6   that you address in your report.

 7             And I'd like to understand a little bit about your

 8   efforts to respond to these requests.

 9             Did you do an e-mail search for all these names?

10        A    No.  Because I haven't communicated with any of

11   the names in part 6.

12        Q    Do you know any of them?

13        A    I've heard of Eric Fombonne.  I've heard of Terrie

14   Inder.  I don't know if I know who Anthony Scialli is.

15             I'm probably confusing him with Anthony someone

16   else.  And that's all.

17        Q    Okay.

18             MR. PADGETT:  Amanda, just real quickly.

19             Will you have copies of the hard copies?

20             MS. HUNT:  Of the exhibits?

21             MR. PADGETT:  Yeah.

22             MS. HUNT:  I thought we gave you a copy.

23             MR. PADGETT:  Oh, never mind.  Got it.

24   BY MS. HUNT:

25        Q    Okay.  And as part of your -- forming your
```

```
 1   opinions in this case, did you contact the authors or any of

 2   the researchers involved in the studies you reviewed?

 3        A    I don't believe so, no.

 4        Q    Okay.  And for request number 7, do you know any

 5   of the people listed in that request?

 6        A    Not that I'm aware of, no.

 7        Q    Okay.  All right.

 8             I'd like to move to the next page.  So that's

 9   200.8, and I want to take a look at request 11, 12 and 13.

10             Let me ask you this:  You've never conducted any

11   experiments using acetaminophen; is that fair?

12        A    I don't think I've ever administered acetaminophen

13   and done an experimental condition.

14        Q    Okay.

15        A    That I can recall.

16        Q    Could you have done a preclinical experiment using

17   acetaminophen as part of your work in this case?

18                  MR. PADGETT:  Object to form.

19                  THE WITNESS:  As part of my work in this

20        case, I would say no.

21                  Could I have done such an experiment?  Yes.

22   BY MS. HUNT:

23        Q    Okay.  So you have the equipment that you would

24   need?

25        A    I have access to it, yes.
```

Craig Powell

```
 1         Q    Okay.  And do you have any plans to conduct a

 2   preclinical experiment with acetaminophen?

 3         A    Not as we sit here today, no, ma'am.

 4         Q    And the lawyers for the manufacturers of

 5   acetaminophen haven't asked you to do that?

 6                   MR. PADGETT:  Object to form.

 7                   THE WITNESS:  No one has asked me to do that.

 8   BY MS. HUNT:

 9         Q    Okay.  And in putting together your expert report,

10   were you given access to any unpublished neurotoxicology

11   data from Johnson & Johnson or any other acetaminophen

12   manufacturer?

13         A    Not to my knowledge.

14         Q    To your knowledge, has Johnson & Johnson ever

15   conducted a neurotoxicology study on acetaminophen?

16         A    I don't know.

17         Q    Okay.  Would you want to know that?

18         A    Not to form the opinions I put in my report, no,

19   ma'am.

20         Q    Okay.  Do you think that preclinical testing for

21   endpoints like neurotoxicity should be required before a

22   drug is given to pregnant women?

23         A    I'm not sure I have an opinion on that.

24         Q    Okay.  So you'd be fine with it either way?

25         A    With what either way?  I'm sorry.
```

Craig Powell

```
 1        Q    With administering a drug to pregnant women

 2   whether it had undergone that preclinical evaluation or not?

 3               MR. PADGETT:  Object to form.

 4               THE WITNESS:  Sorry.  I think that would

 5        depend on the drug and the context.

 6   BY MS. HUNT:

 7        Q    Okay.  And I know that you take issue with the

 8   statistical methods employed by some of the researchers in

 9   this case, and we're going to talk about that, but as part

10   of your analysis, did you rerun any of their data?

11        A    I did not.

12        Q    Okay.  And as you were going through the expert

13   reports of Dr. Pearson and Dr. Cabrera, are you familiar

14   with the fact that they scored or otherwise weighted the

15   studies that they reviewed?

16        A    I'm aware that Dr. Pearson made up a scoring

17   system and applied it without defining how to apply it.  And

18   I'm aware that Dr. Cabrera talked about it, weight of the

19   evidence, and I don't think he scored it with a number.

20        Q    Okay.

21        A    To the best of my recollection.

22        Q    You didn't try to go through and rescore the

23   studies yourself?

24        A    I did a weight of -- I did a systematic review of

25   the evidence and in doing so I considered many factors and
```

Craig Powell

```
 1   as -- at least two of the experts on the plaintiffs' side,

 2   for the plaintiffs, noted that putting a score is not

 3   necessary for -- even for a weight of the evidence

 4   evaluation.

 5           So, no, I didn't add a number.

 6      Q   Okay.  And I'm not criticizing you.

 7      A   I understand.

 8      Q   I'm just trying to figure out the universe of

 9   information that might exist.

10      A   Understood.

11      Q   That's why we're talking about this notice.

12      A   Mm-hmm.

13      Q   So is it fair to say that you -- I know you

14   disagree with it, but you understood the weighting or the

15   scoring in Dr. Pearson and Dr. Cabrera's reports, you just

16   chose a different approach?

17      A   I have to say no to that.

18      Q   Okay.  We'll talk about that more later today.

19           Going back to the notice.  Request number 16

20   concerns your invoices and time records.

21           And I noticed in looking at your invoices that

22   they only cover time up until June.

23           Is that because you haven't invoiced since June?

24      A   I don't have an invoice since June that I've

25   submitted.
```

Craig Powell

```
 1        Q    Okay.  Have you been paid for your time since

 2   June?

 3        A    Some of it.  The time that I spent on this case,

 4   yes.

 5        Q    Okay.  How did you get paid without the invoice?

 6        A    Oh, I'm sorry.  I haven't been -- I may have

 7   misspoke.

 8             I have not been paid anything in this case

 9   actually to date.

10        Q    Okay.

11        A    Sorry.

12        Q    Okay.  So there -- there is no invoice floating

13   around for the time between June and now?

14        A    I have not finalized an invoice and submitted it

15   for the time between June, no.

16        Q    Okay.  Do you have a rough idea of how many hours

17   you've put in in that time?

18        A    I don't -- I don't.  I can tell you that total

19   time I've spent is probably about 40 to 45 eight-hour days'

20   worth of time, my vacations, nights and weekends.

21        Q    40 to 45 eight-hour days.  Okay.  All right.

22             I'd like to turn now to what has been marked as

23   Exhibit 203.

24             (Powell Deposition Exhibit 203 marked for

25             identification.)
```

Craig Powell

```
 1   BY MS. HUNT:

 2        Q    Dr. Powell, this is a copy of the CV you provided

 3   when you served your initial report, and I just want to

 4   check and see that it's up to date.

 5             Is there anything that you would need to add?

 6        A    There's maybe a couple papers that I haven't added

 7   to my academic CV, and I -- I am named as a coinvestigator

 8   on a Neuren Pharmaceuticals, or Neuren Incorporated funded

 9   human participant study in the Civitan International

10   Research Center which I direct.

11             Those funds are supporting a clinical -- a phase,

12   I guess it's Phase II or I, clinical trial, of a novel --

13   new investigational drug for a specific genetic form of

14   autism and intellectual disability.

15             I don't receive any part of my salary from that

16   grant, and my understanding of my role is I'm there as a

17   neurologist who can, if need be, if there's something that

18   comes up on any of the scans or any medical issues, then I

19   can help the patients get to where they need to go.

20        Q    Okay.  And I think we found three additional

21   studies from 2022 and 2023 that were not on your CV.

22             Does that sound about right to you?  I think you

23   said --

24        A    I don't know.

25        Q    -- maybe a handful.  Okay.
```

Craig Powell

```
 1        A     That sounds like a little more than what I would
 2   have guessed.
 3        Q     I've got one where the lead author is Breen.  Are
 4   you familiar with that study?
 5        A     Who's the last author, or do you know the title of
 6   that study?
 7        Q     I would be happy to pull it.
 8        A     Thanks.
 9        Q     And I think actually Dr. Cullison is a co-author
10   on this paper.
11              Dr. Powell, are you aware that he is also a
12   testifying expert in this case?
13        A     I've been made aware of that, yes.
14        Q     And have you ever talked to him about this case?
15        A     No, I haven't.
16        Q     Okay.
17        A     I'm glad you pointed this out.  I don't --
18        Q     Can you confirm that this is, in fact, you?
19        A     This is I.  And, yes.  I am on this paper --
20        Q     Okay.
21        A     -- as part of the Developmental Synaptopathies
22   Consortium, yes.
23        Q     Okay.  Great.
24              All right.  Moving on to the exhibit that's been
25   marked as 201.
```

```
 1                   (Powell Deposition Exhibit 201 marked for

 2              identification.)

 3   BY MS. HUNT:

 4        Q    Dr. Powell, does this appear to you to be a

 5   redline of the amended expert report you submitted against

 6   the original expert report you submitted?

 7        A    Yes.

 8        Q    Okay.  And under the Federal Rules of Civil

 9   Procedure, you understand that your expert report has to

10   have a complete statement of all your opinions?

11                   MR. PADGETT:  Object to form.

12                   THE WITNESS:  I am not aware of any of the

13         statutes regarding the -- what my report needs to

14         contain or not contain, to be perfectly honest.

15   BY MS. HUNT:

16        Q    Okay.  Well, are all your opinions in this expert

17   report related to this case?

18        A    I would say that --

19                   MR. PADGETT:  Object to form.

20                   THE WITNESS:  I would say that my opinions on

21         the tasks put before me are in this report, and I have

22         additional opinions that weren't part of my task.

23   BY MS. HUNT:

24        Q    Okay.  So I'm talking specifically about your

25   opinions as they relate to this lawsuit.
```

Craig Powell

```
 1              Are all of those opinions in this expert report?

 2                   MR. PADGETT:  Object to form.

 3                   THE WITNESS:  Again, all of the opinions that

 4         I was asked to provide on the rodent animal literature,

 5         where -- about acetaminophen and potential nervous

 6         system consequences are in this report.

 7                   And, you know, as a scientist and a

 8         physician, I have my own opinions from additional

 9         literature that I've read that aren't in this report,

10         that weren't part of my task.

11    BY MS. HUNT:

12         Q    What are the opinions that you have that aren't in

13    this report about acetaminophen and neurodevelopment?

14                   MR. PADGETT:  Object to form.

15                   THE WITNESS:  I'm not sure I can answer that

16         question.  It's too broad.

17                   If you can narrow it down, I'd be happy to

18         answer.

19    BY MS. HUNT:

20         Q    What about that question do you not understand,

21    Dr. Powell?

22         A    I understood the question.  It's too broad for me

23    to give an answer.

24         Q    Okay.  So you can't say, sitting here today, how

25    many other opinions you have about acetaminophen in
```

Craig Powell

1  neurodevelopment?

2      A    I haven't enumerated in my mind how many different

3  opinions I have about acetaminophen, but I'm happy to answer

4  any questions about specific opinions --

5      Q    Okay.

6      A    -- that I might or might not have.

7      Q    I'm talking about acetaminophen in

8  neurodevelopment specifically.

9      A    Me too.

10     Q    Okay.  And so do you understand that we're

11 entitled under the -- under the Rules of Civil Procedure to

12 know the full scope of your opinion that you're going to

13 offer at trial?

14              MR. PADGETT:  Object to form.

15              THE WITNESS:  I don't, but I understand that

16       this deposition is meant to uncover any and all

17       opinions that I have.

18              MS. HUNT:  Okay.  I'll just say that to the

19       extent that Dr. Powell's going to offer opinions

20       outside of what's included in his Rule 26 report, we're

21       going to reserve our right to re-depose him at that

22       time.

23 BY MS. HUNT:

24     Q    Do you understand that your report is also --

25              MR. PADGETT:  I'll -- I'll -- I'll object to

Craig Powell

1        that.

2                The opinions that he's setting forth for this

3        case are in the report.  Just to make that crystal

4        clear.

5   BY MS. HUNT:

6        Q    Okay.  And you may not understand this, but under

7   the Federal Rules, your report also has to include the facts

8   and data considered by you in forming your opinion.

9                Did you list all of those facts and all that data

10  in your Materials Considered List?

11       A    I listed --

12               MR. PADGETT:  Object to form.

13               THE WITNESS:  I listed everything that I used

14       to form my opinion based on the specific task that I

15       was given, which was to review the rodent literature on

16       acetaminophen and potential downstream consequences.

17  BY MS. HUNT:

18       Q    Okay.  Is there anything you've considered in

19  forming your opinion that's not on your Materials Considered

20  List?

21       A    All I will say is that I've read additional

22  literature that's not in this, so that I understood the

23  context of what I -- the job that I was doing.

24               So -- but the basis of my opinion in the report,

25  I've cited everything that I used.  I think there may be --

Craig Powell

```
 1    I produced one more paper, Tyl 2009, that I haven't

 2    referenced in my report.

 3         Q    Okay.  So I'm trying to understand your answer.

 4              There's additional literature that you considered

 5    in order to understand the job you were doing; is that fair?

 6         A    To understand the context, yes.

 7         Q    Okay.  And that -- that literature is not on your

 8    Materials Considered List?

 9         A    Correct.  Because it wasn't part of my task in

10    this case.

11         Q    Does your counsel have access to the list of what

12    that literature might be?

13         A    I don't know, probably, but it's -- I don't

14    have -- I don't list it.  I mean, I looked at some of the

15    epidemiologic studies, for example, just to get an idea of

16    what was out there.

17         Q    Okay.  Okay.  We can talk about that more in a

18    little bit.

19              Do you understand that this case concerns claims

20    brought on behalf of women and their children who claim

21    injuries as a result of exposure to acetaminophen?

22         A    I know it's a class action suit and there are

23    people involved as plaintiffs.

24         Q    Okay.  What do you understand the claims in this

25    case to be?
```

```
 1        A    My understanding is there's a claim that

 2   acetaminophen, or acetaminophen-containing products are

 3   alleged to increase the risk for autism spectrum disorder

 4   and/or attention deficit hyperactivity disorder.

 5        Q    Okay.  Do you feel like you had enough time to

 6   come to the opinions you expressed in the expert report you

 7   tendered?

 8                  MR. PADGETT:  Object to form.

 9                  THE WITNESS:  I would say that I would

10        have -- I always would love to have more time to review

11        the literature because that's what I do for a living,

12        but I'm pretty comfortable with my opinions in my

13        report.

14   BY MS. HUNT:

15        Q    Okay.  And do you understand that we're also

16   entitled to know, in addition to knowing your opinions, the

17   bases for your opinions in this case?

18                  MR. PADGETT:  Object to form.

19                  THE WITNESS:  Again, I -- you've mentioned

20        that, and as I said, all of the things that I relied

21        upon primarily to come to these opinions in my report

22        are listed in the reference section.

23                  MS. HUNT:  Okay.

24                  THE WITNESS:  With one exception, which is

25        after those opinions were made, I have reproduced the
```

Craig Powell

```
 1        Tyl 2009 paper.

 2                  MS. HUNT:  Okay.

 3                  MR. PADGETT:  It's on there.

 4                  MS. HUNT:  Yeah, I saw it.

 5   BY MS. HUNT:

 6        Q    Do you hold any opinions about the conduct of

 7   Johnson & Johnson or any other manufacturer of acetaminophen

 8   in whether their conduct was proper or not?

 9        A    I do not.

10                  MR. PADGETT:  Object to form.

11   BY MS. HUNT:

12        Q    Okay.  All right.  Turning to your report.

13             I want to talk to you a little bit about your work

14   outside of the context of litigation.

15             So you say on page 1 of your expert report:  "I've

16   spent more than 20 years working with genetically-modified

17   laboratory animals to study their developmental disorders."

18             Did I read that reasonably correct?

19                  MR. PADGETT:  I'll object to form.  Just

20        recurring objection that this is not -- this is the

21        redline, that's at 201, as opposed to the actual

22        amended report.

23                  MS. HUNT:  Okay.  You can have a standing

24        objection.

25
```

BY MS. HUNT:

    Q    So, Dr. Powell, is it fair to say that most of
your career has been focused on creating and manipulating
genetic mass models of autism?

    A    I would say more than half of my research in the
last 20-plus years has been in some way related to that.
Certainly not all.

    Q    Right.  Right.  I understand that, and we'll talk
about some of your other work in just a little bit.

         But is the goal of that work to study potential
interventions for people with autism?

    A    In part.  The goal of that work is to take known
causes of autism, most of the time, in humans, and
recapitulate those, to some degree, in an animal model,
genetic animal model, and then we try to understand, using a
variety of techniques, what might be changed about the
brain's function and whether or not those changes have any
relevance or any behavioral change in the animal model,
which we hope might some day be demonstrated to be relevant
to the human disorder in a specific genetic cause or across
ASD at large.

    Q    Okay.  And I'd like to talk a little bit about why
it might be helpful to do that in an animal model.

         Is it fair to say that animals can have a lot of
the same biological processes and systems that humans do?

Craig Powell

```
 1                    MR. PADGETT:  I think I would say it's fair
 2         to say that some of the systems overlap with humans and
 3         it's mostly unknown to what extent that happens and
 4         that the vast majority of findings in animal models
 5         don't translate to humans in neuropsychiatric
 6         disorders, particularly uniquely human disorders, that
 7         are behaviorally defined, such as autism spectrum
 8         disorder and ADHD.
 9    BY MS. HUNT:
10         Q    So do you feel that most of your own work in mice
11    is never going to translate to humans?
12                    MR. PADGETT:  Object to form.
13                    THE WITNESS:  I would say that my hope is
14         that anything that we find in mice will translate to
15         humans.  And we've made attempts to do so.
16    BY MS. HUNT:
17         Q    And obviously mice are different than humans and
18    obviously rats are different than humans, but both of those
19    species have, for example, an endocannabinoid system, right?
20         A    That's my understanding, yes.
21         Q    Okay.  And they both have endocrine systems,
22    correct?
23         A    Yes.
24         Q    Okay.  Can rodents experience oxidative stress?
25                    MR. PADGETT:  Object to form.
```

Craig Powell

```
 1                    THE WITNESS:  You'd have to define oxidative

 2         stress.  I agree with Dr. Pearson's statement that it's

 3         a very, very diffuse and vague concept, oxidative

 4         stress.  Depends on what you mean.

 5  BY MS. HUNT:

 6         Q    So sitting here today, you don't know if rodents

 7  can experience oxidative stress?

 8         A    That's not my answer.  My answer is:  I don't know

 9  what you mean when you say "oxidative stress."

10         Q    Okay.  I'm talking about --

11         A    It's a vague and -- I'm sorry.

12              It's a vague --

13         Q    No.  Go ahead.

14         A    -- and diffuse term, as I said, so it's overly

15  broad and ambiguous.  So it's hard for me to answer.

16              If you can define it, I'm happy to answer.

17         Q    Okay.  So do you think that rodents can experience

18  an imbalance of reactive oxygen species in their bodies.

19         A    Yes, I do.

20         Q    Okay.  Do rodents have the same neurotransmitters

21  that humans might have in their brains?

22         A    Many of them.

23         Q    And is it fair to say that you can control a lot

24  of the variables in animal experiments?

25                    MR. PADGETT:  Object to form.
```

Craig Powell

```
 1                    THE WITNESS:  I would say that you can

 2        control some, but not all.

 3   BY MS. HUNT:

 4        Q    Can you control more variables in animal

 5   experiments than you can in, for example, an observational

 6   human study?

 7        A    I would say that's --

 8                    MR. PADGETT:  Object to form.

 9                    THE WITNESS:  Generally speaking, that's

10        true.

11   BY MS. HUNT:

12        Q    So there would be, for example, a lower risk of

13   confounding in an animal experiment?

14                    MR. PADGETT:  Object to form.

15                    THE WITNESS:  Than in -- I'm not sure what

16        your -- lower than what?  I'm sorry.

17   BY MS. HUNT:

18        Q    A lower risk of confounding than you might see in

19   a human observational experiment?

20                    MR. PADGETT:  Same objection.

21                    THE WITNESS:  I would say, generally

22        speaking, that's my understanding, yes.

23   BY MS. HUNT:

24        Q    Would there be a lower risk of misclassification

25   bias in an animal experiment as opposed to a human
```

Craig Powell

```
 1    observational experiment?

 2         A    I would agree with that.

 3         Q    Okay.  And you can control individual variables in

 4    an animal experiment with a lot more precision than you

 5    could in a human observational experiment, fair?

 6         A    Fair.

 7                   MR. PADGETT:  Object to form.

 8                   THE WITNESS:  I would agree.

 9    BY MS. HUNT:

10         Q    And so my understanding is a lot of your work in

11    mice has been related to the Shank3 mutation; is that a fair

12    statement?

13         A    Some of it, but I would -- I mean, some portion of

14    it, but less than half.

15         Q    Okay.  A significant amount of your work?

16         A    I mean, I spent 10 years studying Shank3 mouse

17    mutants and published a handful of papers on it, yes.

18         Q    Okay.  10 years is a long time to me.

19         A    Well, I was also looking at other things.  I've

20    studied multiple genetic models of autism.  More than most.

21         Q    Would you agree with me that in humans autism has

22    a pretty heterogenous presentation?

23         A    Autism spectrum disorder is a spectrum and it has

24    a wide -- a fairly broad range of, I guess, severity of

25    general symptoms and comorbidities.
```

Craig Powell

```
 1       Q    And I think you say -- if we want to turn to

 2   page 22 of your report that's been marked as Exhibit 201.

 3            I think you say at the end of that page:  "Among

 4   ASD researchers, the same goes.  If you've seen one child

 5   with autism you've seen one child with autism.  Meaning that

 6   each individual is unique and may, in fact, have unique

 7   underlying biology contributing to their ASD."

 8            Do you still agree with that statement?

 9       A    The statement -- with the caveat that the term

10   "may" is in there, yes.

11       Q    Okay.

12       A    It's in the realm of possibility, so I have to

13   agree.

14       Q    Okay.  And even when there's a known etiology for

15   a particular form of autism, you can still see a lot of

16   variation in the ultimate phenotype, right?

17                MR. PADGETT:  Object to form.  Go ahead.

18                THE WITNESS:  What I can tell you is, you

19       know, generally speaking, I can't answer that question,

20       but with respect to specific genetic causes, I know

21       that in two brothers, for example, with the exact same

22       mutation can have a slightly different -- somewhat

23       different presentation, yes.

24   BY MS. HUNT:

25       Q    Okay.  And is it fair to say that the science
```

Craig Powell

1    around the etiology of autism is still evolving?

2         A    All of science is always evolving and is still

3    evolving, and I would say that there's little controversy

4    over the fact that genetics are the -- the main majority

5    known cause of both disorders to the tune of over 75 to

6    80 percent at the current -- is the current thinking.

7         Q    Okay.  Meaning that at least 20 to 25 percent of

8    autism cases have environmental inputs?

9                   MR. PADGETT:  Object to form.

10   BY MS. HUNT:

11        Q    In other words -- does that make sense?

12        A    No.

13                  MR. PADGETT:  Same objection.

14   BY MS. HUNT:

15        Q    Okay.  So I think the statement you made is that

16   75 to 80 percent of the -- of the known causes of autism are

17   genetic.

18             Does that mean the remainder are environmental?

19                  MR. PADGETT:  Object to form.

20                  THE WITNESS:  It does not.

21   BY MS. HUNT:

22        Q    Okay.  What's going on with the other 20 to

23   25 percent?

24        A    Well, first of all, I would say that one of the

25   foremost experts on genetics of autism, Dr. Wendy Chung,

Craig Powell

```
 1   feels that, you know, that is the number for inheritance and
 2   inheritability in twin studies, and what's not accounted for
 3   in those numbers, and the same is true, to some extent, for
 4   ADHD, are the rare de novo mutations that may account for on
 5   the order of 10 to 15 percent of ASD.
 6            And I don't think we really have a good handle on
 7   what causes the rest of autism.
 8       Q    Are you aware that Dr. Chung published an article
 9   a couple months ago with Dr. Pearson?
10       A    I haven't seen that paper, if that's what you're
11   asking.
12       Q    Okay.  But are you aware that they co-published
13   it?
14       A    I think there was a reference to it in one of the
15   depositions.
16       Q    Do you know Dr. Chung personally?
17       A    Not really, no.
18       Q    Okay.
19       A    I mean, she's famous, so I know of her.
20       Q    Yes.
21       A    I've spoken to her at meetings, briefly.
22       Q    She's a big deal, I hear you.
23            Are you aware that the paper that she co-published
24   with Dr. Pearson is actually about how environmental factors
25   disproportionately impact genes related to
```

```
 1    neurodevelopmental disorders?

 2                    MR. PADGETT:  Object to form.

 3                    THE WITNESS:  Well, I'm sorry.

 4                    Can you clarify what tissue we're talking

 5         about?  Blood, brain, fetal brain, liver, kidney, skin.

 6    BY MS. HUNT:

 7         Q    I'm happy to show you the paper if you'd like to

 8    take a look at it later.  I'm just asking if you're aware of

 9    the subject matter of the paper?

10         A    I have a vague conceptual understanding of what

11    that paper might or might not be about, but again, I've

12    never seen the paper, and the only reference I'm aware of in

13    the -- that I've read in the literature about that is the

14    reference that -- very cryptic and tangential references to

15    that paper in, I think it was Dr. Pearson's deposition.

16         Q    Okay.  And you made some pretty serious

17    accusations about Dr. Pearson in your expert report.

18                    I think you said that his report raises concerns

19    about the misuse of science; is that right?

20                    MR. PADGETT:  Object to form.

21                    THE WITNESS:  First of all, I did not make

22         any ad hominem attacks that I'm aware of in my report.

23         I was talking about the things, ad hoc.

24    BY MS. HUNT:

25         Q    Okay.  We can come back to that later.
```

Craig Powell

```
1                Okay.  So going back to the question of the state

2      of the science on autism in general.

3                Would you agree with me that we're not at the

4      stage yet where we can do a blood draw and determine if an

5      individual has autism?

6      A     We are not at -- we cannot do that currently.

7      Q     And same for ADHD, right?

8      A     Yes.

9      Q     Okay.  And is that because we don't have specific

10     biomarkers yet that can definitively tell us that a person

11     has autism?

12     A     I think that's a little broad.  I would narrow

13     that and say we have behavioral biomarkers to diagnose

14     autism and ADHD, and we don't have a single test -- well,

15     that's not true.

16               We don't have a blood test or a biopsy or an

17     imaging finding that would diagnose someone with autism or

18     ADHD, that I'm aware of.

19     Q     Okay.  And this may seem obvious, so just bear

20     with me, but there's no way to look at what's going on in

21     the fetal brain and then follow that child out six or seven

22     years to see if they have ASD or ADHD, right?

23     A     No.  Incorrect.

24     Q     You can look at what's going on in the fetal brain

25     and then track that child out to six or seven years of age?
```

Craig Powell

```
 1       A    Well, yes.  You can see a fetal MRI and watch the

 2    growth trajectory over time of the fetal brain, and then

 3    look later to see if they have a diagnosis of autism

 4    spectrum disorder or ADHD.

 5       Q    Can you do a neurochemical analysis of what's

 6    going on in the baby's brain?

 7       A    I don't believe so, no.

 8       Q    Could you do a histology analysis of what's going

 9    on in the baby's brain?

10       A    Not in a human.

11       Q    Okay.

12       A    Well, not in a human.  In the way that you stated

13    where you later can know whether they had autism or not, or

14    ADHD.

15       Q    And that's part of why the animal models can be

16    helpful, right, because we can do that more invasive

17    testing; is that fair?

18       A    To look at potential mechanisms, I think that's a

19    reasonable --

20       Q    Okay.

21       A    -- way to think about it.

22            I can tell you that if you find a mechanism in a

23    rodent model, it may or may not be relevant to the human.

24       Q    Okay.  And when you're doing behavioral

25    neuroscience work in animals, do you feel like it's
```

 1    important to take into account how those conditions present

 2    in the real world in humans?

 3         A    That's an interesting question.  That's very

 4    broad, but let me see if I can try to answer it.

 5              In my experience --

 6              MR. PADGETT:  Object to form.

 7              THE WITNESS:  -- we study, for the most part,

 8         causes of autism, and we're trying to understand how

 9         that cause of autism changes brain function.

10              We may find hundreds of thousands of things

11         wrong with the brain if we look at it hard enough.  And

12         then one of the endpoints we look at is rodent

13         behavior.

14              In my view, every -- many people who aren't

15         in the field look for changes that have face validity

16         for autism spectrum disorder, for example.  And we do

17         too, and sometimes we find that and it lines up very

18         well in terms of the loose face validity insofar as you

19         can have any connection to a human being's behavior in

20         a rodent.

21              In my work, if there's a behavioral

22         difference, I look to see if the changes in the brain

23         might correct that behavior, and that may or may not be

24         relevant to a human.

25

Craig Powell

```
 1    BY MS. HUNT:

 2        Q    Is it important to understand, for example, the

 3    background rate of autism when you're designing these

 4    experiments?

 5                    MR. PADGETT:  Object to form.

 6                    THE WITNESS:  I'm not sure what you mean.

 7        The background rate of autism in rodents is zero.

 8                    MS. HUNT:  No, I mean in humans, Dr. Powell.

 9                    MR. PADGETT:  Same objection.

10                    THE WITNESS:  So, again, I don't -- could you

11        explain it?  I don't really understand.

12                    MS. HUNT:  Yeah.  So I can rephrase the

13        question.

14    BY MS. HUNT:

15        Q    So when you're working with these mouse models,

16    let's just use the Shank3 mice as an example.

17            Is it important for you to understand how the

18    syndromic form of autism caused by Shank3 mutations presents

19    in humans, or do you not care about the human context when

20    you're working with the mice?

21                    MR. PADGETT:  Object to form.

22                    THE WITNESS:  Well, a two-part question.

23            I do care about the human context to some

24        degree when I'm working with the mice, and I sort of

25        lost the first part of your question.
```

```
 1   BY MS. HUNT:

 2      Q    That's okay.

 3           Do you -- do you ever look at epidemiological

 4   studies as part of your work in rodent models?

 5      A    Yes, I do.

 6      Q    Okay.

 7      A    And I have periodically looked at the literature

 8   of these epidemiology studies, and I always have -- since I

 9   started working on autism, since I opened my lab, every time

10   I see an epidemiologist, I ask him, what's new, and, you

11   know, is there something that I can hang my hat on that's

12   causal that people aren't really working on.

13           You know, and then I would love to have a very

14   clear cause that's environmental that I could study in the

15   way that we do genes.

16      Q    Mm-hmm.  And the question of acetaminophen causing

17   neurodevelopmental issues could be potentially resolved with

18   a double blind randomized-controlled trial; is that fair,

19   assuming that we're ethical?

20           MR. PADGETT:  Object to form.

21           THE WITNESS:  If you're speaking about

22      randomizing pregnant women to receive doses of Tylenol

23      without a clinical indication, I would say, no, that

24      study would not be possible.

25
```

Craig Powell

```
 1   BY MS. HUNT:

 2       Q    Right.  It wouldn't be ethical, right?

 3       A    I would agree with that.

 4       Q    Okay.  But if it were -- if we didn't have to

 5   worry about the ethical considerations, would that give you

 6   a definitive answer about acetaminophen as a potential cause

 7   for neurodevelopmental disorders?

 8       A    It could if it was well done and reproducible by,

 9   independently, another group.

10       Q    Okay.  Because randomized control trials are most

11   definitive evidence that you can typically get about a

12   compound's effect on a human being, right?

13       A    In a human being, yes.

14       Q    Okay.  And if we were able to do that study in

15   humans, would you revisit your opinions in this case?

16       A    At all times I am willing to revisit my opinion in

17   this case based on peer-reviewed scientific literature.

18       Q    Okay.  Dr. Powell, do you describe yourself

19   professionally as a neurobiologist?

20       A    In part, yes.

21       Q    Tell me about the other part.

22       A    Well, I'm an M.D. neurologist.  I practice in the

23   hospital.  I direct a center.  I have some -- I direct a --

24   I'm a chair of a department.

25            I run an institutional behavioral core on -- for
```

Craig Powell

```
 1   rodents.  I run my lab.  And I direct now this year,

 2   starting in July 31st, a 10-week second year medical school

 3   course on all of neuroscience, including psychiatry and

 4   neurology.

 5        Q    Okay.

 6        A    And other things, but that's the gist.

 7        Q    Anything else?

 8        A    I reserve the right to say something else, but I

 9   think that sums it up in a broad stroke.

10        Q    Okay.  Do you consider yourself to be a

11   toxicologist?

12        A    I do not have a Ph.D. in toxicology, per se,

13   although I have done studies that are relevant to

14   toxicology.  I've published in the toxicology journal and

15   reviewed papers for a toxicology journal in the past.

16        Q    Are you a member of any professional organizations

17   for toxicologists?

18        A    I am not.

19        Q    Okay.  And you're aware that people who specialize

20   in toxicology or neurotoxicology undergo specialized

21   training, right?

22        A    I would say they do.  Not every -- well, wait a

23   minute.

24             Could you rephrase the question, or repeat the

25   question?  I might have missed something there.
```

Craig Powell

1      Q    Sure.

2           Are you aware that people who specialize in

3    neurotoxicology undergo specialized training related to that

4    discipline?

5      A    I'm aware that some people do toxicology

6    experiments without a Ph.D. in toxicology, and I'm aware

7    that toxicology Ph.D.s undergo special training for

8    toxicology research, yes.

9      Q    Is it your understanding that you have to have a

10   toxicology Ph.D. in order to perform a toxicology

11   experiment?

12     A    No.

13     Q    Okay.

14     A    Many people have a master's of public health

15   perform epidemiologic studies which is relevant to

16   toxicology and there are other examples.

17     Q    Have you ever done any specialized training in

18   neurotoxicology?

19     A    Specialized training in neurotoxicology?

20           MR. PADGETT:  Object to form.

21           THE WITNESS:  If you mean a core or sort of

22       post-doctoral fellowship or Ph.D.?  No.

23           If you mean learning about it in the

24       literature which I was trained to do, yes.

25

Craig Powell

```
 1   BY MS. HUNT:

 2       Q    Okay.  So is it fair to say that your experience

 3   in neurotoxicology is learning about it by reading papers?

 4       A    Papers, books --

 5               MR. PADGETT:  Object to form.

 6               THE WITNESS:  Papers, books, conversations

 7       with toxicologists, epidemiologists, public health

 8       professionals, and reading the literature and attending

 9       autism and neuroscience meetings, among other things.

10   BY MS. HUNT:

11       Q    Have you ever done a study evaluating the impact

12   of a compound on the developing brain?

13       A    Not on the developing brain, no.

14       Q    Okay.  Have you ever published on ADHD?

15       A    I would say that I've published on genetic animal

16   models that have hyperactivity and tried to relate them to a

17   neurodevelopmental disorder.

18       Q    Was that neurodevelopmental disorder ADHD?

19       A    In part, yes, but not the only one.

20       Q    Okay.  Which study was that?  If we can take a

21   look at your CV.

22       A    There's a study titled -- oh, gosh.

23       Q    You know what --

24       A    It has schizophrenia in the title, and it's about

25   RIM1 --
```

Craig Powell

```
1        Q    Oh, I'm familiar with that one.

2        A    -- alpha.  The mice are hyperactive, and I gave

3   them drugs that would treat ADHD with the idea that if it

4   decreased their activity, then that might be some predictive

5   validity for treatments for ADHD.  It did not.

6             It actually gave them -- they actually had a

7   bigger response to amphetamines and MK-801, which are

8   psychoneurotics and enhance the potential connection with

9   some face validity to schizophrenia.

10       Q    So was that study about animal models of

11  schizophrenia or animal models of ADHD?

12       A    The study was about a genetic mutant that had

13  hyperactivity.

14       Q    Okay.

15       A    And I studied it with the idea of seeing whether

16  it might be relevant to ADHD or other neuropsychiatric

17  disorders.

18       Q    Okay.  Other than that study, have you published

19  anything else on ADHD?

20       A    Not that I recall, no.

21       Q    Okay.  And outside of litigation, other than that

22  one study, have you ever worked on or interpreted mouse

23  models of ADHD?

24            MR. PADGETT:  Object to form.

25            THE WITNESS:  I don't believe that I've
```

Craig Powell

```
 1          personally worked on one of the touted animal models of
 2          ADHD, no.
 3    BY MS. HUNT:
 4       Q    Okay.  I would like to go back to your report for
 5    a second.  Still in the first page.
 6            You say in paragraph 2 that you were asked to
 7    perform a systematic review of all the published animal
 8    studies reporting neurodevelopmental outcomes following
 9    prenatal administration of acetaminophen to determine
10    whether these data provide sufficient scientific evidence of
11    a biological mechanism by which maternal use of
12    acetaminophen during pregnancy might cause
13    neurodevelopmental disorders in children.
14            Did I read that reasonably correct?
15       A    You read that sentence in an introductory
16    paragraph correctly.  If you want more specifics, you should
17    look at paragraph 4.
18       Q    Don't worry, Doctor.  We'll -- we will get there.
19       A    I'm not worried.  Thank you.
20       Q    So was it your decision to do a systematic review
21    or is that what you were asked to do?
22       A    I was asked.
23                 MR. PADGETT:  I'll object to form.
24                 THE WITNESS:  Are you -- I just want to make
25          sure.  You're asking me what the attorneys in this case
```

1      for the defendant asked me to do?

2   BY MS. HUNT:

3      Q    No.  I'm not asking you anything about what the

4   attorneys asked you to do.

5           I'm wondering if it was your decision to perform a

6   systematic review rather than a weight of evidence analysis?

7      A    Oh, I see what you're saying.

8           It was my decision to review the literature with

9   respect to the quality of the evidence and the character of

10  the evidence and the potential relevance to these questions

11  of causality and biologically plausible mechanisms, if there

12  are any.

13     Q    So why did you frame it as a systematic review

14  rather than a weight of evidence analysis?

15     A    Because they're essentially, in my mind, very

16  similar.  I mean --

17     Q    Okay.

18     A    -- you systematically go -- in a weight of the

19  evidence review, my understanding is you systematically go

20  through the evidence and you look for any potential flaws,

21  or, you know, how they did the science, and you make

22  comments on that and come to your opinion.

23     Q    I'd like to show you another exhibit, Dr. Powell.

24          So what I'm hearing you say is you don't have a

25  problem with a weight of evidence approach; is that fair?

Craig Powell

```
 1                    MR. PADGETT:  Object to form.

 2                    THE WITNESS:  Generally speaking, I have some

 3          issues with some applications of the weight of the

 4          evidence approach.

 5   BY MS. HUNT:

 6      Q    That's fair.  But reasonable scientists can

 7   disagree, right?  I'm talking about, do you have an issue

 8   with the methodology itself?

 9                    MR. PADGETT:  Object to form.

10                    THE WITNESS:  I would say that that's a very

11          general question, I'll try to answer as best I can.

12                    I think that the weight of the evidence

13          and/or a systematic review is a reasonable way to

14          analyze the body of literature, and if it's applied

15          consistently and in a reproducible manner, I think that

16          it's a reasonable way to go.

17   BY MS. HUNT:

18      Q    Okay.  All right.  So I'd like to take a look at

19   this exhibit together.

20                    And if you see the first page, I think you'll see

21   a Johnson & Johnson Consumer, Inc., logo in the top right

22   corner, and then it says:  "Our Approach."

23                    Is that right?

24      A    That's what it says, yes, ma'am.

25                    MR. PADGETT:  Do you have a number?
```

Craig Powell



Craig Powell



Craig Powell





Craig Powell

```
 1                 If we go to page 44 of your report, which is

 2    marked as Exhibit 201.

 3                 In subsection H -- so, first of all, I should say

 4    this heading says:  "Some of the studies I reviewed cannot

 5    inform the question at hand for various reasons.  Such

 6    reasons include the following."

 7                 And then if we go down to H, it says:  "Cultured

 8    cells not living organisms."

 9                 So, Dr. Powell, my question is:  Did you take, for

10    example, in vitro or ex utero data into account in your

11    systematic review?

12        A    I did.  What I will say is in my initial analysis

13    of the literature, I focused largely on in vivo studies,

14    which I believe to be the most relevant.

15                 And I did look at the culture studies and most of

16    the culture studies that I looked at used what most of the

17    experts in this case that opined on it on both sides would

18    consider higher than the typical concentration in humans.

19        Q    Okay.  But, Dr. Powell, your report, if I'm just

20    reading what's black and white on the page here, it says:

21    "Some of the studies I reviewed cannot inform the question

22    at hand."  And those reasons include that they were in

23    cultured cells, not living organisms.

24                 So I guess I'm still stuck on the same question,

25    and that's:  Did you deem ex utero and in vitro studies as
```

 1    irrelevant in your systematic review?

 2        A     Insofar as I was asking the question in my initial

 3    review, if the in vivo rodent studies provided evidence of

 4    causality in humans for ASD and ADHD, or biologically

 5    plausible mechanisms whereby that might -- if that outcome

 6    happens, that might occur.  I deem them irrelevant to that

 7    initial question.

 8              Later in my report, you'll see that I commented on

 9    the -- the cultured cells, among other studies.

10        Q     Okay.  So how is somebody reading your report

11    supposed to know whether you considered them or didn't

12    consider them?

13        A     They would read my report and they would see the

14    section where I considered them.

15              If you would log me in real quick?  I don't

16    remember the -- I mean, I thought I remembered.

17                    MR. PADGETT:  Just for the record, he --

18          there's an electronic version of his amended report on

19          here and he has access to nothing else.

20                    MS. HUNT:  Why don't we do that on a break,

21          and I can come back to this.

22                    And actually, we're at about an hour, if this

23          is a good breaking point.

24                    THE WITNESS:  I'm fine.  Whatever you want to

25          do.

```
 1                    MS. HUNT:  If he needs time to look, I'd

 2        rather just do it off the record and take a break since

 3        we're an hour in.

 4                    THE VIDEOGRAPHER:  Off record.  9:27 a.m.

 5                    (Off the record at 9:27 a.m.)

 6                    THE VIDEOGRAPHER:  On record, 9:42 a.m.

 7   BY MS. HUNT:

 8        Q    All right.  Dr. Powell, I would like to see where

 9   we can find some agreement, perhaps, on the way

10   acetaminophen affects the body.

11             So, first, do you dispute that acetaminophen can

12   form NAPQI in the body?

13        A    And by -- when you say "body," do you mean to

14   include the nervous system, including the central nervous

15   system or not?

16        Q    Okay.  So how about we start with the whole body.

17             Can it form NAPQI in the body in general anywhere?

18                    MR. PADGETT:  Object to form.

19                    THE WITNESS:  I believe that it can.  That's

20        part of the known metabolic -- metabolism of

21        acetaminophen in the liver.

22   BY MS. HUNT:

23        Q    Okay.  Do you believe that NAPQI can form anywhere

24   besides the liver?

25        A    That's an interesting question.  I'm not sure I
```

Craig Powell

1    know the answer to that.

2         Q    Okay.

3         A    Based on the information that I reviewed.

4         Q    Okay.  And NAPQI is formed through CYP2E1 enzymes,

5    right?

6         A    My understanding is that that is the, in large

7    part, that's the major enzyme that does that, yes.

8         Q    Okay.  So if a tissue or an area in the body has

9    acetaminophen and it has CYP2E1, would your assumption be

10   that NAPQI can form there?

11                  MR. PADGETT:  Object to form.

12                  THE WITNESS:  No.

13   BY MS. HUNT:

14        Q    Explain why not.

15        A    Well, it depends on what you mean by "there,"

16   right?

17             So it would depend on how much was there, what

18   other metabolic pathways were active.  And I would need to

19   see data that suggests that, you know, like in the liver,

20   that there's multiple pathways for detoxifying or de -- I'm

21   sorry, metabolizing in rendering safe acetaminophen in

22   whatever organ you're referring to.

23        Q    Okay.  So are you aware that NAPQI can form in the

24   kidneys?

25        A    I didn't -- I don't have -- I didn't review that

```
 1   information for this, my report or this deposition, so I'm

 2   not aware.

 3       Q   Okay.  Are you aware that NAPQI can form in the

 4   lungs?

 5       A   I didn't study the lungs, CYPE enzyme or NAPQI

 6   formation in the lungs.

 7       Q   Okay.  Do you know if NAPQI can form in the brain?

 8       A   I don't recall seeing any literature measuring

 9   NAPQI formation in the brain.

10       Q   Okay.  But it's hard, if not impossible, to

11   measure NAPQI, right?

12       A   Well, it's incredibly short lived, isn't it, yes.

13       Q   And so isn't one of the ways that scientists

14   determine whether NAPQI was there, examining oxidative

15   stress?

16       A   I would say examining oxidative stress is a way

17   that scientists would look to see if there had been any

18   oxidating -- oxidating -- any oxidation going on in the

19   brain.

20       Q   Okay.  And is it your understanding that NAPQI

21   causes oxidative stress?

22             MR. PADGETT:  Object to form.

23             THE WITNESS:  Sorry.  It's my understanding

24       that NAPQI is an oxidizer.

25
```

Craig Powell

```
 1    BY MS. HUNT:

 2         Q    Okay.  There's a part of your expert report which

 3    we've marked as Exhibit 201, it's on page 83, and it is in

 4    the middle of paragraph 184.

 5              You say that "glutathione is the antioxidant

 6    supposedly depleted by acetaminophen exposure."

 7              And I know that's in the context of a longer

 8    sentence, but do you dispute that NAPQI can deplete

 9    glutathione?

10                   MR. PADGETT:  Object to form.

11                   THE WITNESS:  In high doses, NAPQI may be

12         able to deplete glutathione.  I'm not aware of any

13         evidence that suggests that GSH is depleted, as I

14         understand the word, by typical doses of acetaminophen

15         in the liver, or anywhere else in the body.

16    BY MS. HUNT:

17         Q    Are the levels of glutathione in the body affected

18    by acetaminophen intake?

19         A    I believe that's been demonstrated, yes, in the

20    liver for sure.

21         Q    How about in other organ systems in the body?

22         A    I think I read some literature regarding decreases

23    in the adult brain of GSH on the order of about 10 percent

24    or so.

25         Q    Okay.
```

Craig Powell

```
 1        A    If I'm remembering correctly.

 2        Q    And do you agree with me that oxidative stress can

 3   be dangerous to the developing brain?

 4                  MR. PADGETT:  Object to form.

 5                  THE WITNESS:  Again, it depends on what you

 6        mean by oxidative stress.

 7                  To explain, I would say that insofar -- if

 8        there were oxidizing agents in the brain that were not

 9        reduced by GSH, they could potentially oxidize things

10        in the brain.

11   BY MS. HUNT:

12        Q    And if there were not enough GSH to act as an

13   effective antioxidant in the brain, that could be a problem,

14   right?

15                  MR. PADGETT:  Object to form.

16                  THE WITNESS:  Well, first of all, I've seen

17        no evidence that that's the case and --

18   BY MS. HUNT:

19        Q    I'm not talking about acetaminophen, let me be

20   clear.  I'm sorry to interrupt you.

21                  I'm saying in general, if there is not enough

22   glutathione in the brain to act as an effective antioxidant,

23   could that be a problem for neurodevelopment?

24                  MR. PADGETT:  Object to form.

25                  THE WITNESS:  It's possible.
```


Craig Powell

```
 1   BY MS. HUNT:

 2       Q    Okay.  Do you agree with me that acetaminophen can

 3   interact with the endocannabinoid system?

 4                 MR. PADGETT:  Object to form.

 5                 THE WITNESS:  I know of no data that suggests

 6        that acetaminophen in vivo has increased levels of

 7        anandamide or AM404 in the literature that I've

 8        reviewed.

 9   BY MS. HUNT:

10        ███   ██████   ████████████████████████████

 █   ███████████████████████████

 █                   ██████████████████████████████

 █                 ████████████████████

 █   █████████████

 █       █   ████████████   █████████████████████████████

 █   █████████████████████████████████████

 █   ████████████████████████████████████

 █   ███████████████████████████

 █                 ████████████████████

 █       █   ███████████

 █       █   ████████   █████████████████████████

 █   █████████

 █                   ██████████   ████████   █████████████

 █       ██████

 █                   ████████████   ███████
```

Craig Powell



Craig Powell



Craig Powell



Craig Powell



█   ████████████████████

█     █   █████████████████████████

█   ██████████████████████

4          Did you list that on your Materials Considered

5   List anywhere?

6                    MR. PADGETT:  Object to form.

7                    THE WITNESS:  I don't believe I put that

8        specific paper, no.

9   BY MS. HUNT:

10      Q    Did you take it into account when forming your

11   opinion in this case?

12      A    What I would say is, I was -- I looked for

13   evidence that acetaminophen acted on endocannabinoid

14   pathways, and I read data that showed that there was -- that

15   blocking or antagonizing CB1 receptors was postulated as a

16   potential possible mechanism of acetaminophen's analgesic

17   actions, and I've explained to you the two possible

18   interpretations of those data, and I considered that

19   literature in forming my opinions in this case, to some

20   degree, but -- and I don't remember whether I've cited any

21   of those studies or not.

22          Again, I believe in my report I have mentioned

23   AM404 as a possibility in various places, and, again, stated

24   whether or not there was literature that it forms in the

25   brain, I think maybe, but I'm not 100 percent sure.

```
1        Q    Okay.

2        A    Acetaminophen -- okay.  I did address this on

3   paragraph 98 in reference to the Bauer, et al., summary

4   review of the sum of the literature on acetaminophen.

5        Q    Okay.  And, Doctor --

6        A    And it suggested that acetaminophen might act

7   through the endocannabinoid system.

8             Acetaminophen inhibits cyclooxygenase enzymes that

9   degrade endocannabinoids.  Meaning that acetaminophen would

10  be predicted to increase endocannabinoids in their actions

11  along with conjugation into AM404.

12            It's clear that any role for altered

13  endocannabinoids in ASD remains understudied and uncertain.

14  And I have a reference there.

15            If anything --

16       Q    Doctor, I'm sorry.  I'm going to have to stop you.

17  I asked if you had considered this specific article.

18       A    And, ma'am, I'm going to interrupt you, and I'm

19  sorry, but I am explaining to you exactly where and how I

20  considered it as an answer to your question.  I'll continue.

21            If anything, cannabinoids are reduced in patients

22  with ASD and cannabinoids may actually alleviate some of the

23  symptoms associated with ASD.

24            And I go on.

25       Q    Okay.  And do you cite Hogestatt anywhere in that
```

1    long section?

2              MR. PADGETT:  Object to form.

3              THE WITNESS:  In paragraph 98, I do not.

4              MS. HUNT:  Okay.

5              THE WITNESS:  And I do not have Hogestatt as

6         a reference.  And as I told you, I read other papers

7         that had similar findings.

8              MS. HUNT:  Thank you for answering my

9         question, Doctor.

10   BY MS. HUNT:

11        Q    Do you agree with me that endocrine disruptions

12   can be dangerous to the developing brain?

13              MR. PADGETT:  Object to form.

14              THE WITNESS:  I'm not sure I can answer that

15         question because, you know, dangerous is -- can be a

16         relative term.

17   BY MS. HUNT:

18        Q    Okay.  So sitting here today, you can't tell me if

19   endocrine disruptions during neurodevelopment are a good or

20   bad thing?

21              MR. PADGETT:  Object to form.

22              THE WITNESS:  What I can tell you is:  I'm

23         not aware of any data that endocrine disruption

24         contributes to autism spectrum disorders or ADHD, which

25         is what I reviewed and certainly not in the rodent

```
 1          literature, that I understand that there are some

 2          studies looking at potential reproductive effects of

 3          acetaminophen on endocrine pathways.

 4                    And I also have stated in my report that the

 5          types of endocrine disruptions would actually be, you

 6          know, based on a conceptual understanding.  They might

 7          be lowering testosterone, for example, perhaps, and

 8          that would tend to -- if you look at the -- I think I

 9          stated in my report that if you think about the extreme

10          male brain hypothesis of autism, or theory of autism,

11          if you will, having decreased testosterone would

12          potentially be protected, but that's all I have to say

13          about that.

14   BY MS. HUNT:

15      Q    Could a reasonable scientist believe that

16   endocrine disruptions during pregnancy are dangerous to the

17   developing brain?

18                    MR. PADGETT:  Object to form.

19                    THE WITNESS:  I would say a reasonable

20          scientist could believe a lot of things.

21                    I believe a reasonable scientist could be

22          aware that some neuroendocrine effects on the brain may

23          affect the body in terms of development of genitalia,

24          for example.

25
```

Craig Powell

```
 1   BY MS. HUNT:

 2        Q    Okay.  I think I asked specifically about the

 3   brain, so I'm going to ask that question again.

 4             Could a reasonable scientist believe that

 5   endocrine disruption during pregnancy is dangerous to the

 6   developing brain?

 7             MR. PADGETT:  Same objection.

 8             THE WITNESS:  It's just too broad of a

 9        question.  I don't know what you mean by "dangerous."

10             I don't know what --

11             MS. HUNT:  Harmful.

12             THE WITNESS:  -- you mean by -- hurtful in

13        what way?

14             MS. HUNT:  Perturbing neurodevelopment.

15             THE WITNESS:  Perturbing neurodevelopment.

16             MR. PADGETT:  Object to form.

17             THE DEFENDANT:  It's possible that endocrine

18        disrupters may affect some of the hormonal system --

19        regulation systems in, say, the hypothalamus that might

20        lead to subtle or not -- or depending on the dose, not

21        so subtle changes in genitalia, among other things, is

22        a possibility, yes.

23   BY MS. HUNT:

24        Q    Are you aware that ACOG and other organizations

25   encourage women to avoid endocrine disrupting substances
```

Craig Powell

```
 1    during pregnancy?

 2                    MR. PADGETT:  Object to form.

 3                    THE WITNESS:  That's not a topic that I've

 4          looked at in depth.  I'm aware that they -- what are

 5          you talking about, the ACOG?

 6                    MS. HUNT:  That's okay.  We can move on.

 7    BY MS. HUNT:

 8        Q    Is it your understanding that acetaminophen can

 9    affect serotonergic signaling in the brain?

10        A    I would say that it's possible, and I have not --

11    I don't recall seeing specific data that's consistent and

12    reputable, that's relevant to the question under

13    consideration in my report, that suggest that that supports

14    that possibility in the brain of a fetus.

15        Q    Okay.  So, again, I'm going to repeat my question

16    because I'm afraid we're talking past each other here.

17                    What I'm asking is:  Is it your understanding that

18    acetaminophen can affect serotonergic signaling in the

19    brain?

20                    MR. PADGETT:  Object to form.

21                    THE WITNESS:  It's my understanding that it's

22          a possibility.  And it's my understanding that -- I

23          haven't seen the literature that's consistent and

24          reputable that suggests that there's an alteration of

25          serotonin signaling in the fetal brain with
```

Craig Powell

```
 1        acetaminophen at doses recommended equivalent -- doses

 2        that we would consider equivalent to human recommended

 3        doses.

 4   BY MS. HUNT:

 5        Q    Okay.  Can disruptions to neurotransmitters like

 6   serotonin be harmful to the developing brain?

 7                  MR. PADGETT:  Object to form.

 8                  THE WITNESS:  If they're dramatic and severe,

 9        it's possible, yes.

10   BY MS. HUNT:

11        Q    Okay.  And would you agree with me that it's not

12   just genes, but gene expression that is important for

13   neurodevelopment?

14                  MR. PADGETT:  Object to form.

15                  THE WITNESS:  Gene expression patterns are

16        happening in all -- changes in gene expression are

17        happening daily, every moment -- virtually every moment

18        of our existence in our brains.

19                  When we learn something new, gene expression

20        changes.  Certain gene expression changes with

21        circadian rhythm, the time of day, can change

22        expression in the brain.

23                  So I think gene expression is a fundamental

24        process that can change in the brain and the body,

25        period.
```

1    BY MS. HUNT:

2         Q    Okay.  And can changes in gene expression

3    sometimes result in pathologies?

4                   MR. PADGETT:  Object to form.

5                   THE WITNESS:  Absolutely, yes.

6    BY MS. HUNT:

7         Q    Okay.  Do you agree with me that, in general, when

8    you're evaluating a set of data, it's important to

9    understand your initial hypothesis in science?

10                   MR. PADGETT:  Object to form.

11                   THE WITNESS:  It's important to understand --

12         well, there's two kinds of science; discovery science

13         and hypothesis-driven science.

14                   So it's not a requirement to have a

15         hypothesis, but, generally speaking, we generate and

16         formulate a hypothesis when we do research.

17    BY MS. HUNT:

18         Q    And for purposes of forming your opinion in this

19    case, did you start with a null hypothesis?

20         A    I started with the hypothesis that -- well,

21    actually, no.

22              I mean, I -- I -- the -- the question at hand was

23    whether or not acetaminophen, during the human equivalent of

24    gestation in rodents, has supported or provides any support

25    for causality or a plausible biological mechanism whereby

Craig Powell

1    acetaminophen may or may not.

2           The null hypothesis in that case would be that it

3    does not cause -- that the acetaminophen does not cause

4    autism spectrum disorder or ADHD, and that there would not

5    be a plausible biological mechanism, so that would be the

6    null hypothesis.

7           But again, when I did my report, I'm doing a

8    systematic review, not an experiment, just to be clear.

9      Q    So is it your opinion that it's not important to

10   form a research question or a hypothesis before starting a

11   systematic review?  Or I'm sorry, a systematic review?

12              MR. PADGETT:  Object to form.

13              THE WITNESS:  That's not what I said.  And

14      that's not my opinion.

15   BY MS. HUNT:

16     Q    Okay.  Do you think that it's important to have a

17   hypothesis of some kind when you're undertaking a systematic

18   review?

19     A    I think it's important to define the question at

20   hand that you're addressing, which again, I told you what

21   the question was, and I've told you what the null hypothesis

22   would be.

23     Q    But --

24     A    Based on that question.

25     Q    But did you begin with a null hypothesis?

```
 1        A    I began --

 2                  MR. PADGETT:  Object to form.

 3                  THE WITNESS:  Sorry.

 4                  I began with a question, and then the

 5        question implies what the null hypothesis is, and I've

 6        stated it.

 7    BY MS. HUNT:

 8        Q    So is that a yes, you did begin with a null

 9    hypothesis?  I promise you, I'm not --

10        A    Actually, I began with a question, which implies

11    the obvious, in my opinion, null hypothesis.

12        Q    Okay.

13        A    And I don't recall -- never mind.

14        Q    Can you point to me where in your expert report,

15    which again, we've marked as 201, where you say that you

16    started with a null hypothesis?

17                  MR. PADGETT:  Object to form.

18                  THE WITNESS:  I can point you to paragraph 4,

19        where it defines the question, but not a null

20        hypothesis.

21                  MS. HUNT:  Okay.

22                  THE WITNESS:  I'm not aware of anybody who

23        stated a null hypothesis before they did that bear

24        systematic review by any of the expert witnesses in the

25        case, but my memory may not be serving me at the
```

Craig Powell

```
 1        moment.
 2   BY MS. HUNT:
 3        Q    And if you're starting with a null hypothesis and
 4   if there's no relationship between acetaminophen and these
 5   neurodevelopmental outcomes, you'd expect to see no effects
 6   across the studies, right?
 7                   MR. PADGETT:  Object to form.
 8                   THE WITNESS:  No.  I think that's incorrect.
 9                   I would explain further by saying that,
10        number one, the question regards a uniquely human
11        disorder that cannot be diagnosed in rodents.
12                   And it also -- my reading of the
13        epidemiologic literature suggests that there's no
14        evidence that acetaminophen causes ASD or ADHD in
15        humans.
16                   And I don't -- it's my opinion that when you
17        start with a noncausal manipulation in a rodent model,
18        that it lends any credence to causality for a human
19        disorder, such as autism spectrum disorder or ADHD.
20   BY MS. HUNT:
21        Q    So did you start with the assumption that
22   administering acetaminophen was a noncausal manipulation in
23   a rodent model?
24        A    No.
25        Q    Okay.
```

1      A    I'm sorry.  If you're speaking of -- well, I'm

2   sorry.

3           If you're speaking of noncausal in a rodent model

4   for the cause of a human disease that's defined by uniquely

5   human behavioral changes, then I would say that I didn't --

6   that's not the case.

7           But if you're asking me if it causes effects in

8   mice, I did not start with the hypothesis that -- or assume

9   that it didn't cause effects in mice.

10     Q    Okay.

11     A    I looked at the literature to see what effects it

12  did cause, how consistent they were, what the potential

13  concerns are with each of the experimental approaches,

14  consistency, and many other factors listed in my report.

15     Q    And separate and apart from the question of

16  whether it causes ultimate neurodevelopmental disorders as

17  endpoints, did you see that acetaminophen caused changes in

18  rodents in some of these studies?

19                MR. PADGETT:  Object to form.

20                THE WITNESS:  That's pretty broad.

21                I think my report makes it clear that the

22           data on changes in substances or -- of inside the brain

23           of the fetus, of rodents after acetaminophen

24           administration, there were few -- few or -- there

25           were -- I don't recall, as I sit here today, a

1        replicated finding of a change in molecular signals in

2        the brain.

3               And if you're like any scientist, I looked

4        for reproducibility and replication of behavioral

5        findings, and I've noted, for the most part, that these

6        behavioral findings are inconsistent across studies.

7               MS. HUNT:  Okay.

8               THE WITNESS:  Or unreplicated, or both.

9    BY MS. HUNT:

10       Q    Okay.  Are you done?

11       A    I am.

12       Q    Okay.  All right.

13            I'd like to turn back to your report which, again,

14   we've marked as Exhibit 201, and I'd like to look at

15   page 33.

16            And I want to -- I want to understand your

17   methodology a little bit better.

18            First off, are there any guidance documents that

19   you used to inform your systematic review?

20       A    Yes.

21       Q    Okay.  Can you tell me what those are?

22       A    First of all, what I did was I made my own list of

23   criteria that I would use.  Then I looked in the literature

24   at, for example, Gurusamy, et al., which is -- it was

25   reference 36, I'm not sure what it is now.

```
 1            I also looked at the Silverman paper on

 2  translation of autism animal models, the review that's cited

 3  by myself and some of your experts.

 4            And I also looked at multiple iterations of the

 5  ARRIVE 2.0 guidelines, and all those things lined up pretty

 6  well.

 7       Q    Okay.

 8       A    So that resulted in the list of the criteria

 9  that's in my report.

10       Q    Have you ever published another systematic review?

11       A    I've published summative reviews, but not

12  systematic reviews.

13       Q    Okay.

14       A    But I have systematically reviewed the literature

15  many times in my daily research career.

16       Q    But I'm talking about a formal published document.

17  You've never done that previously?

18       A    I've never published such a document, no.

19       Q    Okay.  And is the goal of a systematic review to

20  be objective?

21            MR. PADGETT:  Object to form.

22            THE WITNESS:  The goal of a systematic

23       review, in my understanding, is to shed light on the

24       question at hand in an objective manner.

25
```

Craig Powell

```
1    BY MS. HUNT:

2        Q    Okay.  And why is that objectivity important?

3                   MR. PADGETT:  Object to form.

4                   THE WITNESS:  Because what I would say is,

5             objectivity's important because oftentimes review

6             articles, I think summative reviews especially, can

7             have an agenda pre-existing before they write it and

8             that is not the case for my report, or my analysis in

9             this case.

10   BY MS. HUNT:

11       Q    Okay.  And it would be -- it would be

12   unscientific, right, to publish a review that had a

13   preconceived conclusion; is that right?

14                  MR. PADGETT:  I'll object to form.

15                  THE WITNESS:  Did you say "systematic

16            review"?

17   BY MS. HUNT:

18       Q    I would say any kind of review article.

19       A    I would say review articles are written all the

20   time to try to support a particular person's or scientist's

21   favored hypothesis.  I think that happens quite a bit in the

22   literature, even the peer-reviewed literature.

23       Q    How about a systematic review, is it important to

24   be objective and not have a specific endpoint in mind when

25   you start?
```

Craig Powell

```
 1        A    I think I've answered that.

 2        Q    Okay.  How about in a weight of evidence analysis?

 3        A    Same.

 4        Q    Okay.  How about in a review article about

 5   epidemiology?

 6        A    You're asking me if it's important to be objective

 7   in a review article about epidemiology, that's a summative

 8   review and not a systematic or weight of evidence review,

 9   correct?

10        Q    Yeah.  Well, I think in epidemiology they use a

11   weight of evidence methodology called Bradford Hill, right?

12                  MR. PADGETT:  Object to form.

13                  THE WITNESS:  I'm aware of multiple reviews

14        that don't use those criteria in the field of

15        epidemiology.  Bauer, et al., is one of them.

16   BY MS. HUNT:

17        Q    Okay.  But do you agree that, in general, when

18   you're reviewing -- excuse me, a body of literature, it's

19   good to be objective?

20        A    It's always good to be objective, in my opinion.

21        Q    Okay.  And it's good to be transparent, right?

22        A    I would agree with that.

23        Q    And it's good to be transparent so someone can go

24   behind you and reproduce your analysis if they need to,

25   right?
```

1     A    Well, insofar that there is an analysis done, I

2    think that would be important, yes.

3     Q    Okay.  Okay.  So going back to the spot I talked

4    about in your report.

5          You say shortly before this that two studies

6    passed all of your criteria, and you decided those two are

7    relevant, and I believe those two are Saad and Baker 2023,

8    right?

9     A    So, I want to make clear that there were two parts

10   to my systematic review.

11         One, the first one that we're speaking of was

12   looking at the articles, and I've enumerated all the

13   considerations and how those studies fall into different

14   categories of that consideration.

15         And then if you look at paragraph 93, I ignored

16   all the potential scientific flaws -- I think it's 93, or

17   it's around 93.  I ignored all the potential scientific

18   flaws and took all the results at face value to determine,

19   in a most conservative manner, what's left that replicates

20   and that's believable.

21    Q    Okay.

22    A    There were two steps to my review.

23    Q    Doctor, do you feel like you just answered my

24   question?

25    A    100 percent.

```
1                     MR. PADGETT:  Object to form.

2                     MS. HUNT:  Court Reporter, can you read it

3          back?

4                     (Requested portion of the record was read

5               back by the court reporter.)

6                     THE WITNESS:  Incorrect.  What I -- what I

7          actually did was I considered all the potential flaws,

8          and if one looks at all those potential flaws and then

9          looks at what's remaining after all those issues are --

10         papers with all those issues are set aside for the

11         purposes of drawing the firmest possible conclusions, I

12         told the reader what was left that met all of those

13         criteria.

14              I never excluded any article in my analysis --

15    BY MS. HUNT:

16         Q    Okay.  So --

17         A    -- for any reason.

18         Q    Okay.  So I think we're going to just need to take

19    this one step at a time.

20              So let's go to page 29 of your expert report

21    marked as Exhibit 201.

22              At the very bottom, there is a heading that says:

23    "B.  Results of Systematic Review."

24              Are you with me?

25         A    I'm with you.
```

Craig Powell

```
1        Q    And then you say:  "Of the 99 peer-reviewed

2   original research publications evaluated in detail, only two

3   publications passed criteria for relevance to the condition

4   of concern and appropriateness of experimental design and

5   statistical analysis."

6             Did I read that reasonably correct?

7        A    You did.

8        Q    Okay.  And are those two studies Saad 2016 and

9   Baker 2023?

10       A    I'm just looking for the Saad paper.  Yes, that is

11  correct.

12       Q    Okay.

13       A    In that initial part of my analysis.

14       Q    Okay.  And then if we go to page 33.

15            You have a section at the top, it's subsection C.

16  And it says:  "Explanation of Critical Flaws in and/or Lack

17  of Relevance of Remaining Publications Systematically

18  Reviewed."

19            Did I read that reasonably correctly?

20       A    Yes.  You read it correctly.

21       Q    And when you say "remaining publications," are you

22  talking about all the papers besides Baker and Saad?

23       A    When I talk about the remaining publications,

24  explanation of critical flaws in and/or lack of relevance of

25  remaining publications systematically reviewed.
```

```
 1              Oh, yeah, that's a good point that you point out.

 2    Remaining may -- is probably the incorrect term that I would

 3    have used.

 4              What I would say is this is the section where I

 5    outline which papers have which flaws --

 6         Q    Okay.

 7         A    -- in detail in reference to that initial portion

 8    of my analysis --

 9         Q    Okay.  And --

10         A    -- which we previously referenced.

11         Q    Okay.  And for someone to figure out why you found

12    a study non-relevant or what flaws that study had, they need

13    to look at the string of citations at the end of some of

14    these sentences; is that fair?

15         A    Among other things in the list format in

16    subsequent pages, yes.

17         Q    Okay.  So, for example, if I turn to page 34 and I

18    look at the subsection entitled:  "Use of Excessive Drug

19    Doses," right above paragraph 74.

20              Do you see that string of citations after the

21    second sentence?

22         A    I do.

23         Q    Okay.  And then if we turn to page 44 of your

24    report, under the heading that says:  "Non-Relevant

25    Published Studies."
```

Craig Powell

```
 1              And we look at 91A, which says:  "Findings

 2    confined largely to hepatotoxic, higher doses."

 3              Do you see there's another string of citations

 4    there?

 5         A    I do.

 6         Q    Okay.  I'd like to take a look at what we've

 7    marked as Exhibit 266.

 8                   (Powell Deposition Exhibit 266 marked for

 9                   identification.)

10    BY MS. HUNT:

11         Q    All right.  And, Dr. Powell, we actually had to

12    create this chart to try to understand which studies you

13    excluded as non-relevant based on dose.

14              Were you aware, in writing this report, that you

15    were only consistent about two studies in terms of their

16    dose being overly high across these three sets of string

17    cites?

18                   MR. PADGETT:  Object to the use of this

19         counsel-created document, and its accuracy.

20                   You can answer.

21                   THE WITNESS:  So --

22                   MR. PADGETT:  And to form.

23                   THE WITNESS:  -- in one of the previous

24         paragraphs you cited, I clearly say that a dose in

25         rodents above -- greater than 200 milligrams per
```

1        kilogram is -- it's -- first of all, it's a very

2        conservative point.

3               So using allometric scaling, the dose in

4        rats, max dose recommended for humans, corresponds to

5        about 90 milligrams per kilogram.  And so I've been

6        overly conservative for rat studies by putting the

7        cutoff at 200 milligrams per kilogram.

8               Similarly, for mice, I put it -- it would

9        lead to an allometric scaling dose of around

10       150 milligrams per kilogram.

11              Again, my cutoff is higher.

12              And then as I went through these, I

13       referenced studies that were confined to higher dose,

14       spatic doses, higher than my cutoff, in two places.

15              And if you're saying that they don't line up

16       perfectly, then that may be the case.

17   BY MS. HUNT:

18       Q    Okay.  I'm actually -- I'm saying they only line

19   up in two places.

20              So I guess what I'm wondering is --

21       A    Well, let's look at each of the places --

22       Q    Yeah.

23       A    -- so that we can better understand.

24       Q    Yeah, I would be happy to.

25       A    Sure.

Craig Powell

```
 1        Q    So I think we already looked at 74 and 91A.

 2        A    74.  I don't think 74 speaks to dosing at all.

 3             Oh, page 74 or paragraph 74?

 4        Q    Paragraph 74, Dr. Powell.

 5        A    My bad.  I gotcha.  Okay.

 6        Q    Okay.  And then again --

 7        A    Paragraph 91A.

 8        Q    Yep.  And that's page 44.

 9        A    So this is where I talk about non-relevant

10   published studies that can't inform the question at hand for

11   the following reasons.

12             And I've listed multiple citations.

13        Q    Right.  And I'm talking specifically about A,

14   the --

15        A    I understand.

16        Q    Yeah.

17        A    I see that.

18        Q    About dose.

19        A    Got it.

20        Q    Okay.  All right.

21             And then let's look at the third place, which is

22   paragraph 116, and that's on page 55.

23        A    I believe that's in the -- what page?

24        Q    55.

25        A    55.  Thank you.  In paragraph which?
```

Craig Powell

```
 1        Q    Paragraph 116.

 2        A    Right.  So --

 3        Q    I think it's the second sentence.

 4        A    Sure.  I would say -- yeah, go ahead.  What's your

 5    question?  Sorry.

 6        Q    Well, and so I guess my question is:  Is there a

 7    reason that you didn't just list in one place all the

 8    studies where you felt the dose was too high?

 9        A    Well, yes.  For example, in 116, I only -- it was

10    a rebuttal, I believe, to the -- I always get this wrong,

11    plaintiffs' experts; Pearson, Cabrera, Louie, and maybe some

12    of Hollander's, wherein they considered, in Pearson's case,

13    approximately 24 or 25 in vivo rodent studies.

14             And Dr. Cabrera's, which brings the total to about

15    34 or so.  And so I focused my rebuttal statements in

16    paragraph 116 on those studies, and so that's the first

17    explanation of why those might be different.

18        Q    Okay.

19        A    Secondly, what I would say is that in paragraph

20    74, I talked about studies that had high doses, and then

21    there was a host of other studies referred to in paragraph

22    91A, which I consider sort of other reasons for excluding

23    things.

24             And so I think that when I did paragraph 74, I was

25    looking at a side of the literature, and in 91A, it's -- I
```

Craig Powell

```
 1    may have been thinking about things that hadn't already been

 2    excluded for other reasons or -- I didn't exclude any papers

 3    ultimately, but what I would say is the paragraph 91 was

 4    largely things that I -- that didn't exclude for other

 5    reasons, as best I can recall, but I agree with you that

 6    they aren't perfectly in alignment.

 7        Q    Okay.  And would you agree with me that it might

 8    make it challenging for someone seeking to reproduce your

 9    systematic review to figure out which studies you had a dose

10    problem with?

11        A    No.  Because I state exactly the criteria for

12    having a problem with the dose.

13        Q    Okay.  And so --

14        A    And so anybody could look at all those papers and

15    replicate exactly what I've done.

16        Q    So which list is it of these three?  Is it -- is

17    it all of them, is it paragraph 91A, paragraph 74, paragraph

18    116, or all three?

19        A    Yes.

20             MR. PADGETT:  Object to form.

21             THE WITNESS:  It's all three.

22             I mean, the bottom line is that the goal that

23        you're speaking of is to have someone be able to look

24        at what I did and reproduce it.

25             That doesn't mean that they're going to
```

Craig Powell

```
 1          reproduce it by taking my word for it.  They're going

 2          to do the systematic analysis exactly as I've done and

 3          they'll come up with their list of papers, and I

 4          believe it will overlap with these references.

 5                   Now, there may be a case in this initial part

 6          of my analysis where -- let me get this right.

 7                   There may be a part in my initial analysis

 8          where I said that there were papers that had -- that

 9          involved largely a higher dose than the cutoff that I

10          made.

11                   It's possible that some of those studies also

12          included a lower dose as well.  And so it's very hard

13          to put those studies into a box because they do two

14          things.

15                   And so I may have referenced them in two or

16          three different places.

17     BY MS. HUNT:

18          Q    Okay.  I'd like to look at what's been marked as

19     Exhibit 267.

20                   (Powell Deposition Exhibit 267 marked for

21                   identification.)

22     BY MS. HUNT:

23          Q    And, Dr. Powell, you amended your report in this

24     case, right?

25          A    I did.
```

1      Q    And would you say that the corrections you made

2    were substantive?

3                MR. PADGETT:  Object to form.

4                THE WITNESS:  I don't know what you mean by

5          "substantive," but I think they were important to make

6          or I wouldn't have made them.

7    BY MS. HUNT:

8      Q    Okay.  And just to orient us in terms of the

9    report with -- with apologies to Ray, just so I'm tracking

10   where we are.  This is page 33 of your report, which is

11   marked as Exhibit 201.

12               And you say the majority of potentially relevant

13   studies examined multiple outcome measures without

14   corrections for multiple comparisons or accounting for false

15   discovery rate, and then you have a string of citations; is

16   that fair?

17     A    Yes.

18     Q    Okay.  And we are going to talk a lot about

19   multiple comparisons later today.  I just want to focus on

20   understanding your methodology for this piece.

21               Are you aware that there's another place in your

22   expert report where you list a string of citations saying

23   that the authors failed to correct for multiple comparisons?

24     A    I am.

25     Q    Okay.  And that's in paragraph 91C, which is on

```
 1   page 44 of your report.

 2       A    Say it again.  I was looking at page 91.

 3       Q    Sorry.  It's page 44 of your report.

 4       A    Got it.

 5       Q    Paragraph 91.

 6       A    Yes.

 7       Q    D.  "Lack of correction for multiple comparisons."

 8            So, same question:  Beyond the changes, which

 9   we'll talk about in a moment, why were the citations

10   different in paragraph 72 compared to paragraph 91D?

11       A    I don't recall exactly.  I mean, this is a section

12   on some of the studies that had other reasons other than

13   what I've stated before, and I may have duplicated that

14   somehow and not included all the studies in the second

15   version.

16       Q    Okay.

17       A    Possibly.  I'm not sure how that happened.

18       Q    And is a -- how is a reader going through your

19   expert report supposed to know which studies you dinged for

20   failing to correct for multiple comparisons?

21       A    Well, any --

22            MR. PADGETT:  Object to form.

23            You can answer.

24            THE WITNESS:  What I would say is, again, if

25       the goal was to have someone be able to do the same
```

Craig Powell

1          analysis and come up with the same conclusions, or

2          similar conclusions, or potentially a different

3          conclusion, I would expect that they would do an

4          analysis of all the papers that I've cited, and

5          determine, in their minds, which one corrected or

6          didn't correct for multiple comparisons adequately.

7                    So I think that's how one would do that.

8     BY MS. HUNT:

9          Q    Okay.  And then I want to talk a little bit about

10    the amendments that you made.

11                   Is it fair to say that you removed a significant

12    number of studies that you had initially said failed to

13    correct for multiple comparisons from that list?

14                   MR. PADGETT:  Object to form.

15                   THE WITNESS:  Yes.  Because when I looked at

16         the initial 100 or 99 papers, I looked for -- I went

17         through -- each time as I came across these different

18         sections or bullet points, if you will, or lettered

19         points, and I looked at those 100 papers to -- for

20         multiple comparisons, comparisons, multiple FDR, false

21         discovery rate, corrections, and used that as my

22         initial criteria.

23                   The reason I changed was because, at some

24         point as I was reading the literature, it dawned on me

25         that there are two ANOVA post hoc tests that actually

```
 1        correct for multiple comparisons, even if it doesn't

 2        say in the article that they did that, and those are

 3        Bonferroni and Tukey's post hoc comparisons.

 4             So out of an abundance of caution, I went

 5        back to correct the record objectively to ensure that I

 6        didn't include those -- I didn't want to include those

 7        in a correction for multiple comparisons.

 8             What it is not -- what I didn't really ding a

 9        paper, if you use your terms for, is the fact that many

10        papers do multiple ANOVAs across multiple types of

11        studies, and just using the post hoc Bonferroni or

12        Tukey test within each of those ANOVAs does not correct

13        for comparisons across those ANOVAs, and in a

14        conservative fashion, I decided that it would be better

15        not to ding them for that because there is, as I

16        understand it in a statistical world, some controversy

17        or indecisiveness, I would say, about whether or not

18        one needs to correct for that across ANOVA multiple

19        comparisons or not.

20   BY MS. HUNT:

21        Q    Okay.  And if I'm understanding it right, when you

22   did your initial review, you looked for words like multiple

23   comparisons, comparisons, false discovery rate, in those

24   studies; is that fair?

25        A    Yes.  And my expectation was that if you did the
```

1    corrections for multiple corrections, you would actually say

2    that in your methods, and I realized at some point that that

3    wasn't always the case.

4        Q    Okay.  Because really, the way you can tell if

5    someone employed a statistical correction is by taking a

6    look at the statistics, right?  Like their p-value, their

7    alpha value?

8                    MR. PADGETT:  Object to form.

9                    THE WITNESS:  Incorrect.

10   BY MS. HUNT:

11       Q    Okay.  Explain to me why I'm wrong.

12       A    You can't look at their p-value and determine

13   whether they corrected for multiple corrections.  You just

14   can't.  There's no explanation.

15            You just -- it's not possible to look at a p-value

16   and know whether or not they corrected for multiple

17   comparisons.

18            You have to look at the methodologies they used to

19   come up with that p-value, which is what I've done, and

20   that's the result.

21       Q    So if they --

22       A    And I amended the report.

23       Q    If they didn't use the word "multiple

24   comparisons," did you assume that they just adjusted their

25   p-value for some other reason?

Craig Powell

1                    MR. PADGETT:  Object to form.

2                    THE WITNESS:  Adjusted their p-value.  I'm

3        not sure what you mean by "adjusted their p-value."

4                    Sometimes when you do correction for multiple

5        comparisons, or a so-called false discovery rate and

6        you make multiple comparisons, then you do use a

7        different cutoff p-value.

8                    My recollection of these studies, many of

9        these rodent studies, is that they did not change the

10       p-value.

11                   However, what they did do was use a

12       Bonferroni post hoc test their ANOVA to draw

13       comparisons among the multiple outcomes within a

14       single, for example, behavioral domain, or within

15       neurotransmitter measurements, or within amino acid

16       measurements.

17                   And so that's the way that one would look for

18       that, and that's the way I ultimately did so.

19       BY MS. HUNT:

20       Q    Okay.  And so can you explain to me why -- let me

21       make sure I have the name of this study.  Give me one

22       moment.

23                   Okay.

24                   Can you explain to me why Blecharz-Klin 2013 was

25       removed -- I'm sorry, scratch that.  This is what happens

Craig Powell

```
 1    when lawyers mess with statistics.

 2        A    What's the date on that Blecharz-Klin?  I'm sorry.

 3        Q    It was 2013, but you don't need to look at it.

 4             Dr. Powell, would you agree with me that there are

 5    over 40 changes in terms of individual studies taken out

 6    from that footnote?

 7        A    I couldn't agree to that because I don't know

 8    whether it's true or not.

 9        Q    Okay.  If I represented to you that it's over 40,

10    do you have any reason to believe that's incorrect?

11        A    I believe that --

12             MR. PADGETT:  Object to form.

13             THE WITNESS:  I believe that I did not remove

14        over 40 references from the -- any portion of the lack

15        of correction for multiple comparisons in my document.

16             MS. HUNT:  Okay.

17             THE WITNESS:  So I'm not sure we're talking

18        about the same thing.

19    BY MS. HUNT:

20        Q    And all the changes that you made across -- across

21    these amendments, none of them made you rethink your

22    opinions in this case?

23        A    Oh, I did re-evaluate my opinion in this case, but

24    they didn't change the result of my opinion.

25        Q    Okay.  Do you explain anywhere in your amended
```

1    report how you re-evaluated your opinions?

2         A    Do I explain how I re-evaluated my opinions?

3         Q    In other words, after you found out that these

4    scientists actually did correct for multiple comparisons,

5    did you discuss anywhere why your opinion was still the

6    same?

7         A    I didn't explicitly say what -- the words that

8    you're speaking of.

9              However, if you'll look carefully at paragraph 92,

10   I analyzed, in the second iteration of my analysis, all the

11   publications, leaving aside any of the experimental

12   concerns, to see what was left in terms of consistently

13   replicated believable results, and reached my opinion based

14   on that, in large part, but also keeping in mind the

15   concerns raised in the post hoc.

16        Q    Okay.

17        A    And so the basis of my opinions are there, and if

18   it had changed my opinion, I would explain why, but since it

19   did not, I didn't feel the need to explain why it didn't

20   change my opinion because I didn't eliminate any of those

21   articles in the second half of my analysis --

22        Q    Okay.

23        A    -- for any reason.  Any experimental flaw,

24   including multiple comparisons or false discovery rate

25   corrections.

Craig Powell

```
1          Q    Okay.  All right.

2               So moving a little bit deeper into your

3  methodology, and I know you referenced this earlier, but it

4  sounds like you went through sort of a long process, and I'm

5  trying to understand that better.

6               So if we go to page 33 of your report.

7               Again, which I know we've spent some time here

8  previously.  You -- this begins a list of certain criteria

9  that it looks like you had.

10              And I believe there are five of them.  You know,

11  the first is no correction for multiple comparisons.  That's

12  right in the middle of page 33.

13              And then you go on to say at the top of page 34:

14  "Use of excessive drug doses."

15              And then slightly further down the page:  "Use of

16  adult animals," and then even further down the page:  "Low

17  number of animals."

18              And then finally on page 35, at the top, you say:

19  "Absence of experimental replication."

20              Did I read that correctly?

21         A    Yes.

22         Q    Okay.  And then if we go back to page 44, again,

23  that section where you talk about non-relevant published

24  studies.

25              Is it fair to say that there are more than five
```

1    criteria, starting on page 44, in terms of reasons you found

2    a published study to be non-relevant?

3          A    Yes.  There are more than five that are listed.

4          Q    Okay.  I'd like to take a look at what I've marked

5    as Exhibit 269.

6                    (Powell Deposition Exhibit 269 marked for

7                    identification.)

8    BY MS. HUNT:

9          Q    And so, Dr. Powell, just humor me here for my own

10   benefit.

11               I took the liberty of listing out each basis you

12   had for excluding a study as non-relevant.

13               And my question is:  Which one is it, is it the

14   list on page 33, or is it the list on page 44?

15               MR. PADGETT:  Object to form.  And I object

16        to use of Exhibit 269 and 267 --

17               THE WITNESS:  So on page 33 --

18               MR. PADGETT:  -- to the extent, sorry.

19               Any suggestion they're accurate.

20               THE WITNESS:  So on page 33, I'm

21        generalizing.  And in the following pages, I'm being

22        excessively -- exceedingly specific.

23   BY MS. HUNT:

24         Q    Okay.  So is the list on page 44, the more

25   specific list, is that the list that governs?

Craig Powell

```
 1                    MR. PADGETT:  Object to form.

 2                    THE WITNESS:  Governs what?

 3   BY MS. HUNT:

 4        Q    Why you excluded studies as non-relevant?

 5                    MR. PADGETT:  Object to form.

 6                    THE WITNESS:  I'll take a moment and just

 7        review the list to make sure I answer correctly.

 8                    MS. HUNT:  I always like it when people check

 9        my homework, so please feel free.

10                    THE WITNESS:  It's not about checking you,

11        it's just making sure that I understand every point

12        before I answer.

13                    So that is -- I mean, the list is in my

14        report and those were things that I felt made them not

15        relevant to the question at hand, which is, do relevant

16        doses in rodent models lead to any evidence that's --

17        weighs in on causation or plausible biologic

18        mechanisms.

19   BY MS. HUNT:

20        Q    Okay.  And I want to ask about some of the

21   language in the criteria beginning on page 44, which is that

22   second column on Exhibit 261.

23                    (Powell Deposition Exhibit 261 marked for

24         identification.)

25   BY MS. HUNT:
```

Craig Powell

```
 1        Q     So criteria number 1, for example.  "Findings

 2   confined largely to hepatotoxic higher doses."

 3              Did I read that right?

 4        A     Yes.

 5        Q     Why did you use the word "largely" in that

 6   sentence?

 7        A     For the same reason I mentioned earlier, that some

 8   of the studies use both a larger dose and a potentially

 9   relevant dose, if memory serves.  So I listed all those to

10   point out the issue that with respect to those higher doses,

11   that would make the -- it not relevant to the question at

12   hand, which focuses, in my understanding, on typical

13   recommended human doses, or the correlate of those in

14   rodents.

15        Q     Okay.  And so if --

16        A     So let me just back up a step, and say I'm listing

17   parts of -- all the papers that had parts of them that are

18   irrelevant.  Some of them it's all of them, and in a list

19   like this, it can be difficult to explain that.

20              And I've explained it here, and I've answered your

21   question as best I can.  Insofar as I put anything on this

22   list that also uses a non -- that uses a dose that's

23   relevant to the question, those papers were all considered

24   in my analysis.

25        Q     Okay.  And --
```

Craig Powell

```
 1        A    I want to be clear about that.

 2        Q    Thank you.  Because that gets to my next question,

 3   and that is:  If you had a study where you found that some

 4   of the doses were too high for you, but some of them

 5   administered what you would consider to be a therapeutic

 6   dose, you still considered the study or did you not consider

 7   it?

 8        A    I considered the portion of the study that --

 9        Q    That included the lower dose.

10        A    That included the lower dose.

11        Q    Okay.

12        A    To my recollection, yes.

13        Q    Okay.  That's what was not clear to me.

14             So on -- on Exhibit 269, moving down.

15             I have the same question about the other

16   highlighted language.

17             So, for example, number 9.  "Less relevant outcome

18   measures, no APAP alone group."

19             In that case, were the outcome measures somewhat

20   relevant, just not as relevant as others?

21        A    No.

22        Q    Is there a reason you said less irrelevant instead

23   of irrelevant?

24        A    Yes.  You know, I was being as conservative as I

25   could be.  And I guess a good example, I'm not sure if it's
```

Craig Powell

```
 1    even one -- if it's in that -- this part or another part,

 2    but there were some studies that looked at, for example,

 3    that I read.  Anogenital distance as an outcome.  And I

 4    don't consider that relevant to autism spectrum disorder or

 5    ADHD, per se, especially autism spectrum disorders, or ASD,

 6    because there's not a correlate.  There's studies that don't

 7    show a correlation between anogenital distance and the

 8    diagnosis of autism spectrum disorder.

 9         Q    Okay.

10         A    That's one example.  Less relevant outcome measure

11    of findings.

12              Why did I say less relevant?  Because I was trying

13    to be exceedingly cautious.  And I'm aware of some of the

14    potential hypotheses of mechanisms of action, and so I

15    wanted to make it clear that, you know, I'm willing to

16    consider those if they are relevant in anybody's mind.

17         Q    And when you say "the potential hypotheses" there,

18    are you talking about hypotheses that involve endocrine

19    disruption and its effect on the developing brain?

20         A    Among other things -- no.  Actually, no.

21              I'm talking about studies that -- not studies that

22    looked at effects on the developing brain, but studies that

23    look at apex measures, such as anogenital distance, or

24    perhaps a behavioral finding that, you know, is less

25    relevant than the core behavioral findings that might be
```

Craig Powell

1    relevant to ADHD or ASD.

2         Q    Okay.  But we wouldn't know necessarily why you

3    found them less relevant unless we, I guess, entered control

4    F and tried to search for those studies elsewhere in your

5    report?

6                    MR. PADGETT:  Object to form.

7                    THE WITNESS:  I'm not sure because I don't

8         remember exactly which of these references I've

9         discussed in detail.

10                   I can tell you that in my rebuttal report I

11        focused on the 35 papers combined that were cited by

12        Pearson and Cabrera.  Yeah, Pearson and Cabrera, for

13        the most part, although I looked at other studies that

14        were referenced by other -- them and others.

15                   MS. HUNT:  Okay.

16                   THE WITNESS:  But I expect someone who is

17        replicating what I've done to read the papers and

18        decide for themselves what they feel is relevant.

19   BY MS. HUNT:

20        Q    Okay.  And number 10 on this list is "study of

21   humans, not rodents."

22                   And just so I understand, your systematic review

23   was focused on the rodent in vivo literature, right?

24        A    That's correct.

25        Q    Okay.

Craig Powell

```
 1        A    And I came up with, in my search, some studies in
 2   humans for some reason, and I tried to make it clear why
 3   those were not part of my rodent portion of my analysis.
 4        Q    You say in your Materials Considered List that you
 5   read Dr. Baccarelli's expert report and references.
 6        A    I'm sorry.  Go ahead.
 7        Q    Does that mean that you read all of the
 8   epidemiological literature he cited?
 9        A    First of all, I don't think you accurately
10   characterized the first statement, but I'd love to look at
11   it because I'm not sure if I've -- could you point me to
12   where I said that?
13        Q    Yeah, absolutely.  So if we go to page 125.
14        A    Of my report?
15        Q    Of your report, which is marked as Exhibit 201.
16   You'll see it's item 250.
17             It says:  "Report of Andrea Baccarelli, M.D.,
18   Ph.D., MPH, including references and exhibits."
19        A    And what that means is I read through her
20   reference list and I read the exhibits associated with her
21   report.
22        Q    Got it.
23        A    Now, the answer to your question, though, is:  I
24   read multiple epidemiologic studies in preparation to
25   understand the context of the entire review of the
```

Craig Powell

1    literature and the report that I generated.

2        Q    Okay.  But the epidemiologic literature you read

3    was not part of your systematic review, fair?

4        A    Correct.  It only provided context for my

5    systematic review of the rodent/acetaminophen literature,

6    and the question of rodent studies and their impact on

7    potential biologically plausible mechanisms and/or cause.

8        Q    Okay.  And are you aware that there is an

9    epidemiologist who is going to testify on behalf of the

10   manufacturers of acetaminophen in this case?

11       A    I think so, yes, but I don't remember which one is

12   which, but I'm aware that there are epidemiology experts on

13   both sides.

14       Q    Okay.

15       A    To the best of my knowledge, yes.

16       Q    Have you read that report?

17       A    Which report?

18       Q    I believe the expert --

19       A    Whose report, how's that?

20       Q    Okay.  I'll back way up.

21            Are you aware that Dr. Pinto Martin is an

22   epidemiologist who's going to be a testifier on behalf of

23   the manufacturers of acetaminophen in this case?

24       A    I'm aware that he is an expert witness on the

25   defense side of this case.  And I have read that person's

Craig Powell

```
 1    report.

 2         Q    Okay.  And is there a reason you didn't rely on it

 3    in forming your conclusions?

 4         A    Of the rodent literature?  Yes.

 5              MR. PADGETT:  Object to form.

 6    BY MS. HUNT:

 7         Q    Okay.  And that's because your -- your expert

 8    report is focused on the animal and the rodent literature,

 9    right?

10         A    It is.

11         Q    So that's why you didn't rely on Dr. Pinto Martin?

12         A    Well, everything that I relied on is referenced,

13    including, I hope, Dr. Pinto Martin's report.

14              And if it's not on there, then it's an oversight

15    on my part, but I did read all the reports of all of our and

16    your experts.

17         Q    Okay.

18         A    If that's your question.

19         Q    But did you rely upon it in forming your ultimate

20    conclusions in this case?

21         A    For context to some degree.

22         Q    Okay.

23         A    But not -- it doesn't -- it's not part and parcel

24    of reviewing the rodent literature to look at the human

25    literature.
```

Craig Powell

```
 1       Q    Do you say anywhere in your -- either your expert
 2  report or your amended expert report that you read or that
 3  you relied on Dr. Pinto Martin's report?
 4                 MR. PADGETT:  Object to form.
 5                 THE WITNESS:  I don't recall.
 6  BY MS. HUNT:
 7       Q    Okay.  Going back to your expert report.  On
 8  page 97, you start a section 2 that says:  "Dr. Hollander's
 9  and Dr. Baccarelli's opinions regarding the purported
10  biological mechanisms identified by other plaintiffs'
11  experts are not supported by the specific literature they
12  cite."
13            Did I read that reasonably correct?
14       A    I'm trying to catch up to where you are.
15       Q    Sorry.
16       A    This is paragraph 223?
17       Q    Yes.
18       A    Where it starts:  Dr. Hollander's and Dr.
19  Baccarelli's --
20       Q    I just read heading 2, that's right above --
21       A    Oh, sorry.
22       Q    Right above 223.
23       A    Yes.  You read that correctly.
24       Q    Okay.  And is it fair to say that the studies that
25  you discuss in paragraphs 223 through 227 are human studies?
```

Craig Powell

1       A    Some of them, I guess, yes.

2       Q    Can you point to any that are animal studies?

3       A    I could -- I don't know if I can or not, but if

4   you want me to go through each one, which I don't think is

5   worth our time, as we sit here today, I'll say that I have

6   no knowledge that what you said isn't true, that they're.

7   all -- they may all be human studies.

8       Q    Okay.  And so to the extent that you evaluated

9   these human studies in those paragraphs of your report, is

10  that outside of your systematic review?

11               MR. PADGETT:  Object to form.

12               THE WITNESS:  That's an interesting question.

13               I performed a systematic review, and then in

14        rebuttal to the plaintiffs' experts, I read, in detail,

15        each of these papers for evidence that they supported

16        the conclusions for which they were referenced.

17               And I didn't find that those same papers led

18        me to the same conclusions.

19  BY MS. HUNT:

20      Q    Did you --

21      A    So I don't know if that's -- is that a systematic

22  review?  I systematically read the papers but, you know, I

23  didn't do a -- the same thing that I did in the beginning of

24  my report.

25      Q    Okay.  And you said that you didn't find those

Craig Powell

```
1    same papers led you to the same conclusions.

2              In your work, is it common for scientists to

3    interpret data differently?

4                    MR. PADGETT:  Object to form.

5                    THE WITNESS:  Is it common for scientists to

6         interpret data differently?

7                    I would say that different people --

8         different scientists can reach different conclusions

9         looking at the same literature.

10                   However, what I would say is that oftentimes

11        many of the discussion points and conclusions are

12        qualified by "may" or "suggest" or "might" or "not

13        inconsistent with," and to the extent that those are

14        speculative discussion points, or, if you will,

15        conclusions, I would say that there's often not a major

16        disagreement among them when you take into account

17        those qualifiers.

18   BY MS. HUNT:

19        Q    Could you have done a separate literature search

20   on acetaminophen and biomarkers in human studies?

21                   MR. PADGETT:  Object to form.

22                   THE WITNESS:  I have access to literature

23        searches, and I could do lots of them.

24                   MS. HUNT:  Okay.

25                   THE WITNESS:  I can tell you that I reviewed
```

Craig Powell

```
 1        and read, again, which I've said before, many, if not

 2        all, of the epidemiologic studies in humans.

 3                And I'm certain that I didn't read every

 4        biomarker study of acetaminophen's effects, especially

 5        with respect to the liver and non-brain organs.

 6   BY MS. HUNT:

 7        Q    Did you do a Bradford Hill analysis, or any other

 8   weight of evidence analysis, to review these human studies?

 9        A    I reviewed the human studies and took into

10   consideration many of the concerns and flaws that I noted

11   independently -- before -- when I read those papers, before

12   reading any of the reports, before I had any of the reports,

13   and I had many of the same concerns about those

14   epidemiologic studies.

15                For example, many of them don't use ASD diagnosis

16   or ADHD diagnosis as an outcome measure, which struck me as

17   odd and concerning.

18                And then, second, they -- most, if not -- most of

19   the studies don't do anything to account for what I call the

20   elephant in the room, which is that 75, 80 percent or more

21   of both ASD and ADHD, are caused -- known to be or thought

22   to be, by consensus, caused by genetic changes.  And so that

23   struck me as odd.

24                And so I didn't feel -- and I didn't feel like

25   there was evidence to suggest causality in humans.
```

Craig Powell

```
 1              Now, in the end of the day, I looked and read the

 2    expert reports and found that my thinking was in line with a

 3    portion of the epidemiologists that reviewed those same

 4    studies.

 5              MR. PADGETT:  We've been going for an hour

 6        and 20.

 7              MS. HUNT:  Yeah.  Two more minutes, and then

 8        I'll be done.

 9    BY MS. HUNT:

10        Q    Dr. Powell, do you agree with me that the

11    epidemiology in this case is high quality?

12              MR. PADGETT:  Object to form.

13              THE WITNESS:  Which epidemiology?

14    BY MS. HUNT:

15        Q    Well, you said you reviewed nearly all the

16    epidemiological literature on this issue.

17              So I'm just wondering, do you feel like the

18    literature you reviewed was of high quality?

19              MR. PADGETT:  Same objection.

20              THE WITNESS:  All told, I don't believe that

21        they all accounted for or controlled for the most

22        important potential confound, which is the fact that

23        genetic changes caused the vast majority -- or thought

24        to cause the vast majority and agreed upon to cause the

25        vast majority of autism spectrum disorders and ADHD.
```

Craig Powell

1              As to the quality of the studies, it

2        didn't -- it didn't escape my notice that in some of

3        the studies, there were multiple, multiple measures in

4        multiple -- and different checklists and screening,

5        nondiagnostic measures, and that some of the studies

6        didn't correct for multiple comparisons, as far as I

7        could tell.

8              And that has been borne out by, I think the

9        reports of at least some of the epidemiologists.

10   BY MS. HUNT:

11       Q   So, so to go back to my question.  You would not

12   agree that they are high-quality studies?

13              MR. PADGETT:  Object to form.

14              THE WITNESS:  It depends on how you view

15        them.  If you're -- if you're viewing them as a study

16        that's going to lead to a conclusion of causality, and

17        as far as the diagnosis of ASD and ADHD, I would say

18        that many of them were not high quality for that

19        outcome measure.

20   BY MS. HUNT:

21       Q   Would you say that they came from large and

22   impressive datasets?

23              MR. PADGETT:  Object to form.

24              THE WITNESS:  Some of them came from large

25        datasets, and all the incumbent issues, problems and

Craig Powell

```
 1          concerns with such datasets and limitations, were

 2          inherent to those studies, so, yes.

 3                    MS. HUNT:  We can take a break.

 4                    THE VIDEOGRAPHER:  Off record.  11:04 a.m.

 5                    (Off the record at 11:04 a.m.)

 6                    THE VIDEOGRAPHER:  On record, 11:23 a.m.

 7  BY MS. HUNT:

 8     Q    Okay.  Dr. Powell, I want to go to page 35 of your

 9  report, which has been marked as Exhibit 201.

10          And there is a header that says:  "Absence of

11  Experimental Replication."

12          Did I read that correctly?

13     A    That's what it says, yes.

14     Q    Okay.  And you say right beneath that:

15  "Experimental replication is the foundation of scientific

16  truth.  In fact, no scientific finding makes it into the

17  textbook as a fact without replication by others."

18          Did I read that correctly?

19     A    You read that introductory sentence to this

20  section correctly, yes.

21     Q    Okay.  And as you were preparing your expert

22  report, did you check to see if findings by scientists about

23  acetaminophen and neurodevelopmental disorders had made it

24  into any textbooks?

25     A    No.  I'm not aware of actual textbooks on autism
```

Craig Powell

1    and ADHD textbooks, like you would use to teach

2    undergraduates or graduate students, but I did not.

3        Q    Okay.  So you're not aware that several major

4    textbooks on pharmacology, for example, have included data

5    on the link between acetaminophen and neurodevelopmental

6    disorders?

7                    MR. PADGETT:  Object to form.

8                    THE WITNESS:  I wouldn't doubt that there are

9         text -- there are books that have been published that

10        review literature and make speculative comments about

11        what a certain study may or may not mean, what's in the

12        realm of possibility, just like any discussion part of

13        a paper.

14                    (Powell Deposition Exhibit 223 marked for

15             identification.)

16   BY MS. HUNT:

17        Q    Okay.  I'd like to give you what I've marked as

18   Exhibit 223.

19             And, Dr. Powell, this is what you cite in your --

20   in your expert report for the premise that a study has to be

21   replicated in order to be relevant.  Fair?

22        A    No.  I don't think it is.

23             Let me look.

24        Q    Okay.  Well, let's go back to your expert report.

25        A    For example, the first paragraph starts the same

1    as what I've quoted, but it doesn't end the same way as I've

2    quoted.  Just to name one --

3         Q    Okay.  So --

4         A    -- difference.

5         Q    If we go to your expert report on page 35, where

6    you have that block quote, are you saying that that block

7    quote is altered from the quote that's on this website?

8         A    No.

9         Q    Okay.  Can you explain to me what you mean?

10        A    This was copied and pasted from the website at the

11   link credited -- it's credited to underneath it.

12             I don't know what you're looking at, but that's

13   what I'm looking at.

14        Q    Okay.

15        A    In fact, your link is different than mine.  The

16   link at the top of your page of your exhibit, 223, is it?

17        Q    Yes.  Okay.  So your --

18        A    It's different than mine.

19        Q    Your -- your position is that this is not what you

20   cited?

21        A    My position is that I copied and pasted this from

22   the NIH website listed here, and our two links are

23   different.

24        Q    Okay.  And so you think I -- I have the wrong

25   link; is that fair?

Craig Powell

1       A    I don't know whether you have the right or the

2  wrong link, but this was the information that I copied and

3  pasted from the website verbatim at the time that I wrote

4  my -- put this -- wrote this part of my report.

5       Q    Okay.  And is there a reason that you cited to

6  this website as opposed to like a peer-reviewed academic

7  article?

8       A    Yes.

9       Q    Can you explain what that reason is?

10       A    Sure.  As I point out in the report, this is a

11  fundamental tenet of interpreting science.

12            Many publications report striking,

13  earth-shattering results, that don't stand up under further

14  scrutiny, and that's how science works.  It's an iterative

15  process.  So it's absolutely critical.

16            And NIH requires that we teach these things to

17  graduate students, we teach it to undergraduate students,

18  and so I take it as a broadly, well-known fact, that

19  reproducibility, in independent labs especially, is a

20  critical part of the scientific process when one is

21  interpreting the literature.

22       Q    Okay.

23       A    And so I don't think it bears the need for -- I

24  mean, all of your experts on your side and ours talk about

25  consistency of the findings as critically important, period.

Craig Powell

```
 1        Q    Okay.  And so you don't recognize the exhibit that

 2   I have marked as 223?

 3        A    I didn't cite any -- what -- all of -- I didn't --

 4   I only cited -- I cited one sentence in common with this

 5   report, and it's the first sentence under "Enhancing

 6   reproducibility through rigor and transparency," and it has

 7   a sentence that starts:  "Two of the cornerstones of

 8   scientific advancement for rigor in designing and performing

 9   scientific research and the ability to reproduce biomedical

10   research findings."

11        Q    So is it your position that if I typed in the URL

12   at the bottom of that block quote, I would not end up at the

13   website marked as Exhibit 223?

14        A    No, I have no idea what you would come up with if

15   you did that now because they may have changed their website

16   since I took this off of there.

17        Q    Okay.

18        A    But I didn't make it up.  I can assure you of

19   that.

20        Q    Oh, I'm -- I might accuse you of many things but

21   that's not one of them, Doctor, so don't worry.

22        A    And, just likewise, I'm not accusing you of having

23   somehow engineered a difference of documents.

24        Q    Assuming for purposes of the deposition that this

25   is the resource that you cited to, would you agree with me
```

Craig Powell

```
 1    that the -- the website in Exhibit 223 is largely about

 2    transparency?

 3                    MR. PADGETT:  Object to form.

 4                    THE WITNESS:  I'm sorry, which -- you're

 5        referring to my report or this website?  I'm confused.

 6    BY MS. HUNT:

 7        Q    This website, Exhibit 223.

 8        A    Would I agree that this is largely about that?

 9        Q    About transparency.

10             In other words, the point of this website, as I

11    understand it, and I want to know if this is inconsistent

12    with the way you understand it.

13             The point of this is to make research more

14    transparent so that others can reproduce it, right?

15                    MR. PADGETT:  Same objection.

16                    THE WITNESS:  That is one of many purposes of

17        what I haven't read, which is this entire document.

18    BY MS. HUNT:

19        Q    Okay.  Take your time and take a look at it.  I

20    can wait.

21        A    Oh, there is.  "When a result can be reproduced by

22    multiple scientists, it validates the original results and

23    readiness to progress to the next phase of research."

24             This is -- well, and that's one of the sentences,

25    I think, that I quoted.
```

Craig Powell

```
 1              And I didn't engineer this with selective

 2    sentences from here and there.  This was, I think, verbatim

 3    from that website, as far as I recall.

 4         Q    Okay.  So this is --

 5         A    Or a website.

 6         Q    So this is the website you cited?

 7         A    No, I didn't say that.  I cited the website that I

 8    cited underneath the block quote, period.

 9         Q    Okay.

10         A    So -- and to the extent that this doesn't have a

11    paragraph that matches mine, this is not the website that I

12    quoted.

13         Q    Okay.  Is there anything on this website that's

14    specific to toxicology?

15         A    This is about science and toxicology is science.

16         Q    And --

17         A    So, yes.  It's specific to toxicology, which is a

18    part of the subset -- it's a subset of all science.

19         Q    So this website that you printed off from the NIH,

20    your opinion is that that applies equally to every area

21    of science -- every area of science, even if it's not

22    specifically discussed?

23         A    Well, I disagree that I printed this off, but to

24    the extent that I copied and pasted from the NIH website

25    what I've cited, reproducibility is important in every
```

Craig Powell

1    branch of science.

2        Q    Okay.

3        A    Period.

4        Q    Is reproducibility the same as whether a study has

5    been reproduced?

6               MR. PADGETT:  Object to form.

7               THE WITNESS:  So there are many types of

8         reproducibility and replication.

9               One is, there's independent replication under

10        different circumstances in a non-overlapping

11        laboratory, and then there's replication within a

12        laboratory.

13   BY MS. HUNT:

14       Q    But isn't reproducibility just the ability to

15   reproduce a study?

16       A    No.

17       Q    In other words -- it's not?

18       A    Not just that, no.  It isn't.

19            For example, if I studied nuclear fusion or

20   superconducting activity of a metal under room temperature

21   conditions and I did it twice and I published it twice, that

22   would be replicated and not independently replicated, and if

23   no one else could reproduce that result, it would be

24   problematic, and you wouldn't reach the conclusion that it

25   could be done at this point in time.

Craig Powell

1     Q    Okay.

2     A    That's been all over the press lately, among other

3     examples.

4     Q    But part of reproducibility is just transparency,

5     right, so that another scientist can go behind you and try

6     to do the same experiment?

7                    MR. PADGETT:  Object to form.

8                    THE WITNESS:  I wouldn't say that.  I

9          wouldn't agree with that fully.

10                   I would say that if one is complete and

11         transparent in their reporting of their methodologies,

12         then the research should be replicated and replicable,

13         and until it is, it's just oneoff finding.

14    BY MS. HUNT:

15    Q    Okay.  I'd like to move back to page 14 of your

16    report, which we've marked as Exhibit 201.

17              And in paragraph 36, in the bottom half of that

18    page, you talk about the ARRIVE 2.0 guidelines, and you say:

19    "Scientists have generated a set of accepted guidelines for

20    performing and reporting scientific experiments known as

21    ARRIVE 2.0."

22              Did I read that reasonably correct?

23    A    Yes.

24    Q    Okay.  And I'd like to give you a copy of those

25    guidelines, which we've marked as 259.

Craig Powell

```
 1                    (Powell Deposition Exhibit 259 marked for

 2               identification.)

 3   BY MS. HUNT:

 4        Q    Do you use the ARRIVE guidelines in your own work?

 5        A    To a degree.

 6        Q    Explain that a little bit more.

 7        A    Well, I would say that I try my best to provide

 8   the methods in all of my publications in a way that they can

 9   be reproduced by others.

10               I do exploratory research, and I would say that

11   we're looking for potential end roads into findings that

12   might be relevant to a genetic -- a gene's changes in the

13   brain and subsequently a mouse's behavior.

14               So we don't necessarily, in every paper that I've

15   ever published, do every single thing that's in this

16   July 2020 report in every paper in our exploratory research

17   in animals.

18        Q    And so is it possible for a study to still be

19   relevant to a field of research, even if it doesn't meet

20   every single ARRIVE 2.0 guideline?

21               MR. PADGETT:  Object to form.

22               THE WITNESS:  I would say that in my

23          analysis, I have considered every finding of every

24          paper, regardless of any of the scientific flaws or

25          criticisms, and regardless of their compliance with the
```

Craig Powell

```
1            ARRIVE guidelines, or any other guidelines in reaching

2       my opinions.

3                    And so that's what I do.

4    BY MS. HUNT:

5       Q    Okay.  So I think you may be answering a different

6    question than what I'm actually asking, but I'm asking -- we

7    were talking not about this case, but about your work out --

8    outside of being a paid expert, and what I asked was:  Is it

9    possible for a study to still be relevant to a field of

10   research, even if it doesn't meet every single metric in the

11   ARRIVE 2.0 guidelines?

12      A    Possible, yes.

13      Q    Okay.  And, in fact, some of your own work has not

14   met every single ARRIVE 2.0 guideline, correct?

15                   MR. PADGETT:  Object to form.

16                   THE WITNESS:  I don't believe they all have,

17      correct.

18   BY MS. HUNT:

19      Q    Okay.  And is it your understanding that the

20   ARRIVE 2.0 guidelines are meant to be a methodology to

21   evaluate causation in the context of the safety of a

22   compound?

23      A    That's not how I've applied those guidelines, and,

24   no.

25      Q    Okay.
```

1       A    It's not specifically for that purpose, especially

2  with regard to rodent studies and their impact on causality,

3  which is how -- where I've specifically applied Gurusamy's

4  guidelines on translatability of rodent findings to humans

5  and these reporting guidelines.

6       Q    Okay.  So if we go to your expert report at --

7  which is marked as Exhibit 201, at page 30 -- I'm sorry

8  page 29, we'll start there.

9            So it says:  "Results of systematic review," and I

10  think we mentioned this language earlier:  "Of the 99

11  peer-reviewed original research publications evaluated a

12  detail, only two publications passed criteria for relevance

13  to the condition of concern and appropriateness of

14  experimental design and statistical analysis.  These

15  guidelines included whether studies used animals, a relevant

16  dose, the relevant timing of drug administration,

17  appropriate statistical methods, a relevant outcome

18  measure."

19            Did I summarize that reasonably accurately?

20       A    For the most part.  And I would just point out

21  that if you want to read the summary of my finding in this

22  systematic review, I would point you to paragraph 93.

23       Q    Don't worry, I'll get there.

24       A    Good.

25       Q    But thank you.

Craig Powell

1        So then you continue on in the next paragraph to

2   say:  "Two papers passed criteria for relevance to the

3   condition of concern and appropriateness of experimental

4   design and statistical analysis."

5        And then -- when you said:  "Experimental design

6   and statistical analysis," you refer us back to paragraphs

7   37 and 38 of your report.  And those are, again, back at

8   page 14 and -- 14 through 16, where you talk about the

9   ARRIVE guidelines?

10              MR. PADGETT:  Object to form.

11              THE WITNESS:  I'm not sure that's an accurate

12        statement.

13              I would say that I listed some of the ARRIVE

14        guidelines.  If you're curious to know where -- what my

15        criteria were in this systematic review, I would point

16        you to the detailed issues in the pages that I'm trying

17        to find.

18              The initial ones you quoted, right, so --

19   BY MS. HUNT:

20        Q    So the ones on page 44 --

21        A    34.

22        Q    Oh.

23        A    It starts on page 33 and goes to paragraph 93 on

24   page 46.

25        Q    Okay.  And so --

Craig Powell

```
1        A    I believe, I think.  Well, maybe it goes a little

2   bit to 92, but before 92.

3        Q    So we can agree that you didn't use the ARRIVE

4   guidelines really as part of your systematic review.  It's

5   more something you mention in terms of a study design

6   quality?

7        A    I believe I've explained --

8                  MR. PADGETT:  Object to form.

9                  THE WITNESS:  I believe I've explained in

10            detail the methodology that I used and I went through,

11            and I explained that I didn't include all of the ARRIVE

12            guidelines because in some cases I thought the papers

13            generally did a good job of them, for example, blinding

14            investigators of the treatment group of the animals

15            while performing and analyzing the experiment.

16                  So I didn't find it necessary to include that

17            as a factor because most of the studies did that.  So

18            it wasn't a problem.  Communicating he was aware of

19            group allocation at different stages of the

20            experiments.

21                  You know, were they all perfect at that?  No,

22            but I don't consider that as important as other things

23            I looked at and listed in detail.

24   BY MS. HUNT:

25        Q    Okay.  So it's fair to say that your systematic
```

Craig Powell

1    review departs from the ARRIVE guidelines where you felt it

2    was appropriate?

3                    MR. PADGETT:  Object to form.

4                    THE WITNESS:  I would say that it is an

5           amalgam of Gurusamy, et al., and the ARRIVE guidelines,

6           and my own list of what I think was most important and

7           critical in terms of scientific experimentation.

8

9    BY MS. HUNT:

10       Q    And so would you say that that amalgamation, as

11   you described it, is that methodology published anywhere?

12       A    Gurusamy and all over the ARRIVE guidelines.

13       Q    I'm talking about the Dr. Powell methodology.  The

14   amalgamation that you talked about.

15       A    I could say that every single factor that I've

16   considered is published in the literature independently many

17   times over.

18       Q    Okay.  But in terms of these are the criteria to

19   evaluate a neurotoxicological endpoint, there's no study

20   that says these are the criteria you look at?

21                   MR. PADGETT:  Object to form.

22   BY MS. HUNT:

23       Q    That match yours?

24                   MR. PADGETT:  Same objection.

25                   THE WITNESS:  Again, Gurusamy overlaps with

Craig Powell

```
 1        my criteria, and I've conservatively conceded, if you

 2        will, that these papers have met some of these

 3        guidelines, of the ARRIVE guidelines, but not all of

 4        them.

 5                THE WITNESS:  Okay.

 6                THE WITNESS:  But I don't find them to be

 7        particularly important for critical flaws like the

 8        others that I've listed.

 9   BY MS. HUNT:

10   Q    Okay.  I want to talk to you a little bit about

11   numbers of animals in these studies.

12           Is it fair to say that you dinged a number of

13   studies for having low numbers of animals?

14                MR. PADGETT:  Object to form.

15                THE WITNESS:  First of all, I want to say

16        that you keep using the word "dinged."  I never

17        eliminated or excluded any study in my overall

18        analysis, period.

19                And that's stated explicitly on paragraph 90

20        some odd -- 93, I believe it is, or somewhere in the

21        low 90s.

22                And I considered every single study

23        irrespective of any of their potential flaws, but I

24        felt it was important to detail those flaws for the

25        reader.
```

Craig Powell

```
 1                   And I would say that -- I've forgotten the

 2        second part of your question.

 3   BY MS. HUNT:

 4        Q    That's okay.  I'm not -- I'm not sure you were

 5   working off my question.

 6        A    Oh, I was working off the first statement of your

 7   question.  If you can repeat it or have it read back, I'd be

 8   happy to address that.

 9        Q    Okay.  Is it --

10        A    That testimony, excuse me.

11        Q    Is it fair to say that you criticized a fair

12   number of studies for having low numbers of animals?

13        A    Oh, I pointed out that some studies had lower

14   animal numbers than is specified in Tyl 2008, by

15   Dr. Rochelle Tyl, which is relied upon by at least two or

16   more of your witnesses in detail, where it says that one

17   needs to have an in of 10 animals per sex, at least, in

18   every dose in both behavioral and pathologic studies.

19        Q    And --

20        A    I think that's almost a direct quote, but it's a

21   paraphrase.

22        Q    Did you rely on Tyl 2008 in your methodology

23   otherwise?

24        A    I relied on my experience as someone who has been

25   studying animal models for over 30 years in neuroscience and
```

```
 1    over two decades in the field of neurodevelopmental

 2    disorders, such as autism spectrum disorder, intellectual

 3    disability, among others.

 4            And so what I will say is, I've done these power

 5    analyses myself, and for behavioral experiments in

 6    particular, an in of less than 10 is unacceptable.

 7            I also relied on Silverman, et al., which states

 8    that you need to have an adequate power and adequate ins.

 9            And, for the record, in my studies, we use ins of

10    20 routinely for our behavior.

11    Q    Okay.

12    A    But, no, I didn't rely on Tyl 2008, but your

13    experts do.

14    Q    And is there a reason that you decided that Tyl

15    2008 was not a helpful guidance document in terms of

16    evaluating neurotox endpoints?

17    A    Well, I never said that.

18    Q    Well, then why didn't you use it?

19    A    Because I hadn't read it and it didn't come up in

20    my literature search.  It came up in my report after I read

21    the toxicology experts on the plaintiffs' side.

22    Q    Okay.

23    A    And so I read it carefully because I wanted to

24    know what it said and why they thought it was so important

25    as to reference it multiple, multiple times, to defend
```

Craig Powell

```
 1    things that I feel are less -- virtually indefensible.

 2        Q    Okay.  You mentioned Silverman 2022.

 3             I'd like to take a look at that.  I've marked it

 4    as Exhibit 258.

 5                  (Powell Deposition Exhibit 258 marked for

 6                  identification.)

 7             THE WITNESS:  I don't think that's it.

 8        Whoever's pulling this up, I don't think you have the

 9        right document.

10             MS. HUNT:  Okay.  Thanks for your patience.

11             Here's your copy.

12             THE WITNESS:  Thank you.

13    BY MS. HUNT:

14        Q    Okay.  So this is one of the studies or papers

15    that you relied upon in forming your opinions, right --

16        A    Myself --

17        Q    -- Dr. Powell?

18        A    I'm sorry.  Myself as well as your experts,

19    correct.

20        Q    That's right.

21             MS. KAPKE:  What's the exhibit number?

22             MS. HUNT:  It's 261, I apologize.

23    BY MS. HUNT:

24        Q    And Dr. Powell, was this paper the result of a

25    round table that took place?
```

Craig Powell

```
 1       A    I would say it was the result of multiple meetings

 2   among the authors --

 3       Q    Okay.  And were you --

 4       A    -- my understanding.

 5       Q    Were you involved in those meetings?

 6       A    I was.

 7       Q    And is there a reason you chose not to sign your

 8   name to this paper?

 9       A    Yes.

10       Q    Can you tell me what it is?

11       A    No.

12       Q    Why?

13       A    Because I'd rather not.

14       Q    Okay.  Well, this is my deposition and --

15       A    I understand.

16       Q    -- I'm entitled to an answer, and you're under

17   oath, so I'd like to know the reason.

18       A    With the caveat that this is -- this should be

19   marked as highly confidential information because it's very

20   personal.

21            I thought that the writing style was not

22   appropriate.  And I don't think it was -- I don't think that

23   every single thing in this paper was under my control

24   personally, because there were issues that I had, you know,

25   group think was going to trump, and so the stated reason is
```

Craig Powell

 1    because I have plans to write my own similar review.

 2         Q     And so is it safe to say you relied on a paper

 3    which has an inappropriate writing style and the contents

 4    you don't agree with in order to attack the opinions of the

 5    plaintiffs' experts in this case?

 6                    MR. PADGETT:  Object to form.

 7                    THE WITNESS:  I don't think I attacked

 8         anyone's opinions, I rebutted them, number one.

 9                    And number two, I read this paper, I agree

10         with many of their suggestions, but not all of them.

11    BY MS. HUNT:

12         Q    Are you aware that this paper is specifically

13    about genetic models of ASD?

14         A    That's an interesting question.

15                    MR. PADGETT:  Object to form.

16                    THE WITNESS:  I don't know that it's -- I

17         can't remember, to be honest.

18    BY MS. HUNT:

19         Q    Okay.  Well, why don't we look at the page that's

20    marked as 261.4.  It's page 4 of the document, and under

21    1.2, on the left-hand side, you can see some highlighted

22    language there.

23                    "We focused on genetic rather than environmental

24    factors because of their higher potential for

25    inter-laboratory reproducibility and their known construct

Craig Powell

1   validity."

2            Did I read that reasonably correctly?

3       A    You read a sentence correctly that describes what

4   articles were used to reach these conclusions and the

5   suggestions are what they learned.

6       Q    Okay.  And is it fair to say that in --

7       A    But I would dis -- I'm sorry.  I would disagree

8   with the idea that these sorts of suggestions wouldn't apply

9   to animal models of other -- of other types.

10      Q    Okay.

11      A    They relied on the most inter-laboratory

12  reproducible and construct valid studies is what they say

13  here.

14      Q    And you've already testified under oath to this

15  jury that you've never performed an experiment involving

16  determining if a substance causes a change in

17  neurodevelopment, right?

18      A    That is true.

19      Q    And -- okay.

20            Moving back more broadly to the number of rodents

21  in a particular study.

22            Is it your opinion that the number must be the

23  same regardless of the endpoint that's being studied?

24      A    No.  One has to -- should do a power analysis to

25  determine the number of animals, especially if you're going

Craig Powell

1    to use this study to make major decisions about humans,

2    number one.

3           And, number two.  I don't think it's necessary to

4    have a high in if you're doing an exploratory study that

5    you're going to follow-up on in detail to actually decide

6    whether it's true or not, or scientifically accurate or not.

7      Q    Okay.  And there are certain endpoints, like, for

8    example, evaluation of histology or neurochemical analysis

9    where you might be adequately powered with a much lower

10   number of animals, right?

11     A    It's possible --

12          MR. PADGETT:  Object to form.

13          THE WITNESS:  It's possible, although I'll

14      point out that Tyl 2008 states very clearly that an in

15      end of 10 of each sex for each dose in a toxicology

16      study is important for both behavioral outcomes and

17      pathologic outcomes.

18          MS. HUNT:  Okay.  I'm at a good stopping

19      point for a break, and I think lunch is here.

20          THE WITNESS:  Lunch?

21          THE VIDEOGRAPHER:  Off record.  11:54 a.m.

22          (Off the record at 11:54 a.m.)

23          THE VIDEOGRAPHER:  On record.  12:44 p.m.

24          MS. HUNT:  Okay.  All right, Dr. Powell.  We

25      were talking about this a little bit earlier.

Craig Powell

```
 1                    This is Exhibit 229.  And let's just take a

 2          look at the title.

 3                    (Powell Deposition Exhibit 229 marked for

 4             identification.)

 5  BY MS. HUNT:

 6      Q    It says:  "Identification and interpretation of

 7  developmental neurotoxicity effects."

 8                    Did I read that reasonably correct?

 9      A    You did.

10      Q    Okay.  And does it appear to you that this article

11  is specifically about developmental neurotoxicity?

12      A    It's related to that.  I can't remember if it's in

13  humans exclusively or rodents as well, I'm not sure.

14                    It looks like there's a selection of animal models

15  so, yes, it is, you're correct.

16      Q    Okay.  And I think you said earlier that this

17  article didn't come up in your search of the literature,

18  right?

19      A    The way I searched the literature, I didn't -- I

20  don't recall seeing it, no.

21      Q    Okay.  And that you read this article for the

22  first time after you saw plaintiffs' expert reports?

23      A    I believe that's correct.

24      Q    Okay.  And I think you pointed out some comments

25  that Dr. Tyl makes in this article about the number of
```

Craig Powell

```
 1    animal subjects that are appropriate for a given experiment.

 2            Do you recall that testimony?

 3        A    I do, yes.

 4        Q    Okay.  So I'd just like to spend a moment looking

 5    at that in more detail to make sure we have the full

 6    context.

 7            If you turn to the page that's been marked as

 8    229.3, and then go to the lower left-hand corner of that

 9    page, there's a heading that says:  "Gender and number of

10    animals."

11            And it says:  "Ideally, the number of animals

12    within each experimental group used in a developmental

13    neurotoxicity study should be guided by the known

14    variability of the test methods and procedures used to

15    measure the various study endpoints.  However, a test to

16    establish a single number of animals as the group size for

17    all tests and procedures carried out throughout the study,

18    based strictly on the variability of the test method or

19    procedure, becomes very complicated, if not virtually

20    impractical."

21            Did I read that correctly?

22        A    That's what it says here, yes.

23        Q    Okay.  And then she goes on to say:  "EPA

24    guidelines recommend that there would be a number of 10 per

25    sex or 20 pups per dose for the behavioral and pathological
```

1    endpoints."

2           Did I read that correctly?

3      A    You did.

4      Q    Okay.  And that was the part you were talking

5    about earlier, right?

6      A    Yes.

7      Q    Okay.  And then I'd like to look just a little

8    more deeply at this article.

9           If we could go to the page marked 229.22.  If

10   you're following the page numbers from the journal, it's

11   page 370.

12          And there's a section header on the left-hand side

13   of the page called:  "Weight of evidence approach to

14   interpretational study data."

15          Are you with me?

16     A    Yes.

17     Q    Okay.  And in the second paragraph of that

18   section, it says:  "This paper and its authors are not the

19   first to struggle with how to interpret developmental

20   neurotoxicity data."

21          And I want to stop for a moment and ask you, is it

22   fair, in your opinion, to say that developmental

23   neurotoxicity data is pretty complicated?

24              MR. PADGETT:  Object to form.

25              THE WITNESS:  That's too broad and vague for

Craig Powell

```
 1        me to answer, but what I can say is that we're talking

 2        about a couple of different things, and I want to make

 3        sure I understand the subtext here.

 4              Developmental neurotoxicity is a separate

 5        issue from the question at hand, which is, does

 6        acetaminophen, given during the rodent equivalent of

 7        human gestation, cause autism spectrum disorders or --

 8        and/or ADHD, and is there a plausible biological

 9        mechanism.  That's important.

10              And so I want -- I can't answer unless we

11        clarify what we're talking -- which of those two things

12        we're speaking about.

13   BY MS. HUNT:

14     Q    So, do you not understand that evaluating the

15   rodent literature on the effects of acetaminophen on

16   neurodevelopment inherently involves interpreting

17   developmental neurotoxicity data?

18              MR. PADGETT:  Object to form.

19              THE WITNESS:  Again, I would need to know if

20        you're referring to -- as relevant to this case, or

21        simply a screen for a developmental neurotoxicant,

22        which is a different matter altogether.

23   BY MS. HUNT:

24     Q    I'm asking you in general.  Do you agree that data

25   around developmental neurotoxicants is complicated?
```

Craig Powell

```
 1                    MR. PADGETT:  Same objection.

 2                    THE WITNESS:  I don't know what that means,

 3          developmental neurotoxicants, with respect to its

 4          application to this case.

 5                    I would say that science is complicated and

 6          insofar as neurotoxicological studies, or developmental

 7          neurotox studies, as they talked about here, is a

 8          subset of that science, that is complicated.

 9   BY MS. HUNT:

10        Q    So do you think all areas of science are equally

11   complicated?

12        A    I would say that all -- all science are equally

13   complicated.  Well, it depends on who the person is, right?

14                    So I'm not a physicist.  So I find physics

15   research incredibly complicated, and I find genetic animal

16   model and neurotoxicological and epidemiologic studies of

17   mice to be much less difficult than physics research, for

18   example.

19        Q    So sitting here today, you're not willing to agree

20   that developmental neurotoxicology is a complex field of

21   science?

22        A    I would say science is complex for any lay person,

23   and it's hard to explain, but I don't think it's rocket

24   science to analyze neurotoxic data or data on models of

25   epidemiological exposures, as a scientist, who's been
```

1   trained to work with animal models of neurodevelopmental

2   disorders.

3       Q    Right.  And that's why you feel comfortable doing

4   it, even though you've never undertaken a developmental

5   neurotoxicity study?

6               MR. PADGETT:  Object to form.

7               THE WITNESS:  I feel comfortable evaluating

8       this literature and many other types of literature.

9               MS. HUNT:  Okay.

10              THE WITNESS:  All of which are complex.

11              Some of which aren't directly related to

12      exactly what science I do in my lab on a day-to-day

13      basis.

14  BY MS. HUNT:

15      Q    Okay.  So when --

16      A    I've never done a stroke study, for example, but I

17  routinely look at the literature on stroke and many other

18  neurologic topics and evaluate those studies.

19      Q    So when Dr. Tyl says at the beginning of that

20  paragraph:  "This paper and its authors were not the first

21  to struggle with how to interpret developmental

22  neurotoxicity data," they just don't understand it as well

23  as you?

24              MR. PADGETT:  Object to form.

25              THE WITNESS:  That's not at all what I said.

Craig Powell

```
 1   BY MS. HUNT:

 2       Q    Okay.  So why do you think it would be a struggle

 3   to interpret that data?

 4       A    Well, that's an interesting question.  I would say

 5   that it would be a struggle for many reasons.

 6            One being that, you know, when you're -- you want

 7   to have consistency.  You want to have reproducibility.  You

 8   want to have rigor, statistical rigor, and you want to do a

 9   dose-response curve and you want to use the appropriate

10   statistics and, you know, it's -- then at some point you may

11   want to actually consider what the implications of those

12   findings are for human beings and that can be a struggle for

13   sure.

14       Q    Okay.  And she continues later in that paragraph

15   to say:  "There are a number of papers that specifically

16   discussed interpretation of developmental neurotoxicity

17   data.  All of these previous papers, and this paper, have

18   used a weight of evidence approach."

19            Did I read that reasonably correct?

20       A    No, not at all.  It says:  "There are a number of

21   previous papers that involved interpretation of adult

22   neurotoxicity data.  And involve" -- and I'm going to say

23   that -- that also -- the next part, is:  "And involved also

24   the weight of evidence approach."

25            So there are one, two, three, four, five, six
```

Craig Powell

```
1    studies referenced, and those are six studies that involve

2    interpretation of adult neurotoxicity data using a weight of

3    the evidence approach.

4            That's what it says.

5    Q    Okay.  Sir, I think we're talking about two --

6    A    And that's what I think it means.  No.

7    Q    Two different -- I'm asking you, please, to be

8    respectful and not interrupt me, and I'll do the same and be

9    respectful and not interrupt you.

10   A    I appreciate that.

11   Q    If you need to take a deep breath, that's totally

12   fine, but I'm talking about the last sentence of that

13   paragraph.  Okay?

14           So let me know when you're with me.

15           In addition -- and this is the piece talking about

16   developmental neurotoxicology, okay?

17           "In addition, there are a number of papers that

18   specifically discussed interpretation of developmental

19   neurotoxicity data.  All of these previous papers and this

20   paper have used a weight of evidence approach."

21           Did I read that reasonably correct?

22   A    Yes.  It -- and to interpret that, it describes

23   six papers, and that's the approach they used.

24   Q    Okay.  And did you take that into account when you

25   were deciding on which methodology you were going to use?
```

Craig Powell

```
 1        A    I took into account my own understanding of -- my

 2   30-plus years of training and evaluating the literature of

 3   rodent behavior, electrophysiology, protein data, RNA data,

 4   and behavioral data.

 5             And my understanding of autism spectrum disorders

 6   and other neuropsychiatric, neurodevelopmental disorders

 7   wrote in the literature, and I came up with my own list of

 8   important things, and I compared that to Gurusamy, et al.,

 9   and I compared that to the ARRIVE 2 guidelines.

10             I was lenient in deciding that some of these were

11   not so important, and I eliminated them.

12        Q    Okay.  So I'm going to ask my question again.

13             Did you take into account this fact pointed out by

14   Dr. Tyl that all of the papers -- let me go back, because I

15   want to make sure I get the language right.

16             That all of the papers she reviewed specifically

17   discussing interpretation of developmental neurotoxicity

18   data, all used a weight of evidence approach.

19             Did you take that into account?

20                  MR. PADGETT:  Object to form.

21                  THE WITNESS:  I did not take into account

22        that there are six papers cited, that all six of them

23        used the weight of the evidence approach.

24                  And not all papers that review these findings

25        use a weight of evidence approach, and that's implied
```

```
 1        by the sentence in my opinion.

 2   BY MS. HUNT:

 3        Q    Okay.  And I'd like to move now to the page that's

 4   marked as 229.24.  If you're following the journal numbers,

 5   it's page 372.

 6        A    I think I'm there.

 7        Q    Okay.  And it's in the bottom left corner under

 8   "Consistency."

 9             And, Dr. Powell, you'd agree with me that this is

10   the section in which Dr. Tyl is talking about the

11   consistency of effects between studies, correct?

12             Take your time.

13        A    Okay.  Yes.  This has something to do with

14   consistency.

15        Q    Okay.  And at the end of that paragraph, Dr. Tyl

16   says:  "Lack of information about a biologically relevant

17   pattern should be considered as an uncertainty and not a

18   negative in a weight of evidence evaluation.  Lack of a

19   known underlying biological explanation or mechanism is not

20   a reason to discount the findings."

21             Did I read that correctly?

22        A    You did.

23        Q    Okay.  And do you agree with that?

24        A    First, I'll have to interpret what I believe that

25   it means.
```

Craig Powell

```
1        Q    Feel free.

2        A    Lack of information about a biologically relevant

3   pattern.

4             So what I believe -- I'm assuming that refers to

5   is above in the first part of the -- this section, they're

6   talking about if changes in an endpoint are observed only at

7   one age, they might be considered of limited significance or

8   biologically relevant and the pattern is consistent with the

9   ontogeny of the endpoint, especially if the changes are

10  associated with a similar pattern in other endpoints like,

11  e.g., if there were also developmental delays and a number

12  of other developmental endpoints indicating likely overall

13  delays in development.

14            So I believe the first sentence is referring to

15  that.  And it's an uncertainty and not a negative in the

16  weight of evidence evaluation.  I don't know what she means

17  by negative in the weight of evidence evaluation.

18            I don't think she means Dr. Pearson's approach, or

19  saying a study is either causative or negative in support of

20  a conclusion.

21            "Lack of a known" -- and then the sentence:  "Lack

22  of a known underlying biological explanation or mechanism is

23  not a reason to discount the finding," and remember, we're

24  talking about a finding, not being discounted.

25            We're not talking about anything more than that.
```

Craig Powell

```
 1        Q    Okay.  I would like to show you what has been

 2   marked as Exhibit 270, Dr. Powell.

 3                 (Powell Deposition Exhibit 270 marked for

 4                 identification.)

 5   BY MS. HUNT:

 6        Q    Dr. Powell, and is this the Gurusamy article that

 7   you, I think, had referenced a few times, as part of the

 8   amalgamation of information you used for your methodology?

 9        A    That's correct.

10        Q    Okay.  And so it's safe to say you're familiar

11   with this article?

12        A    Somewhat.  I haven't read it in a long time.

13        Q    Okay.

14        A    I read this early on in my process.

15        Q    Would you say that it was important in designing

16   your methodology when you first started working on this

17   case?

18        A    I would say I took it under consideration.

19        Q    Okay.  I'd like to go to what has been marked as

20   270.9, the very bottom of that page.

21             Do you see a heading that says:  "Scope and

22   applicability of the tool"?

23        A    Yeah, I do.

24        Q    Okay.  And if you read here, it says:  "The scope

25   of the tool is only for assessment of the clinical relevance
```

Craig Powell

```
 1    of a preclinical research study in terms of the likelihood

 2    that therapeutic preclinical findings can be translated into

 3    improvement in the management of human diseases and not for

 4    assessment of the quality of the study that is how well the

 5    study was conducted, although we refer to tools that assess

 6    how well the study was conducted.

 7              Did I read that reasonably correctly?

 8       A    You did.

 9       Q    Okay.  And so is it your understanding that the

10    variables within this study were meant for use in assessing

11    the safety of an existing pharmaceutical compound?

12                   MR. PADGETT:  Object to form.

13                   THE WITNESS:  First of all, I don't think

14         anything in my report talks about the safety of an

15         existing pharmaceutical compound.

16    BY MS. HUNT:

17       Q    You don't think --

18       A    Number one.  I know it doesn't.

19              Number two, and I'm not quite finished.  If you

20    can just take a breath for just one second.

21       Q    Okay.

22       A    So I looked at this article because it's about how

23    well the animal preclinical research tools are translating

24    into the human condition, which is what we're talking about

25    in this case.
```

Craig Powell

```
 1        Q    So I need to unpack, I guess, what you said.

 2             You just testified that you don't think anything

 3   in your report talks about the safety of an existing

 4   pharmaceutical compound; is that right?

 5        A    In humans, yes.

 6        Q    In humans.  Okay.

 7        A    I don't think I mentioned the word "safety" in my

 8   report.  I'm not sure.

 9        Q    So sitting here today, you don't have an opinion

10   on whether Tylenol is safe for use in pregnancy?

11                  MR. PADGETT:  Object to form.

12                  THE WITNESS:  Oh, I have an opinion on that,

13        but it's not in my report, and the purpose of my

14        report, as I've stated multiple times so far, was to

15        review the rodent literature with respect to the

16        question of whether acetaminophen, given to the rodent

17        equivalent of human gestation, is evidence to support

18        cause, it has any bearing on causality of ASD and ADHD

19        in humans that are exposed to acetaminophen, and

20        whether there are biologically plausible mechanisms.

21             That was the scope of my report and my

22        systematic review before the rebuttal section.

23   BY MS. HUNT:

24        Q    So are you planning to come to trial and tell this

25   jury that you believe acetaminophen is safe for use in
```

Craig Powell

```
1    pregnancy?

2              MR. PADGETT:  Object to form.

3              THE WITNESS:  It's -- I don't have any plans

4         whatsoever regarding this case beyond this deposition

5         today.

6    BY MS. HUNT:

7    Q    Okay.  Well, Dr. Powell, you -- you may not know

8    this, but under the federal rules, we're entitled to know

9    the full scope of your opinions, so I'm trying to

10   understand.

11             You're telling me you have an opinion that Tylenol

12   is safe for use in pregnancy, it's just not in the report,

13   right?

14   A    What I'm telling you is that my report and the

15   systematic review largely focused on the rodent literature,

16   and I do have an opinion on the matter you spoke of as a

17   physician, but that was -- that's outside of the scope of my

18   systematic review.

19             However, I do have an opinion, and I'd be happy

20   to, you know, talk about it if you ask me about it.

21             MS. HUNT:  Okay.  I just would say for the

22        record that to the extent that Dr. Powell plans to

23        offer any additional opinions, we would reserve our

24        right to come back and depose him again once we get

25        those reports.
```

Craig Powell

```
 1                    MR. PADGETT:  If asked by you or as part of

 2         what the defense has put forth in his report as his

 3         opinions to be offered at trial?

 4                    MS. HUNT:  I'm just trying to understand what

 5         his opinions are.

 6                    So if -- if Dr. Powell is telling me that he

 7         has other opinions about the safety of acetaminophen,

 8         I'm letting you know that we will depose him on those

 9         when and if he offers a report explaining them.

10                    MR. PADGETT:  Beyond the scope of his current

11         report?

12                    MS. HUNT:  Yeah.  Well, he says it's not in

13         his current report, so, okay.

14    BY MS. HUNT:

15         Q    I'd like to move back to the exhibit, if we could.

16    There's another spot here on the page marked 270.3.

17                    It's about three sections down, it says:  "Who is

18    this intended for?"

19                    And underneath that heading, it says:  "This tool

20    is intended for all preclinical researchers and clinical

21    researchers considering translation of preclinical findings

22    to first-in-human clinical trials, the funders of such

23    studies, and regulatory agencies that approve first-in-human

24    studies."

25                    Did I read that reasonably correctly?
```

```
1        A    You did.

2        Q    Okay.  And is it your understanding that the

3   situation we're in now is something related to

4   first-in-human studies or first-in-human clinical trials?

5        A    Not first-in-human, no.  But drugs that are used

6   in humans, and it's about the effects on rodents.

7             And the reason I looked at this article and

8   imported to create my process of systematic review is

9   because it was what I could find that talks about the actual

10  analyzing whether a mouse model finding is applicable to

11  humans.

12            That's why I felt it was relevant.

13       Q    Okay.  Okay.

14            All right.  I'd like to go back to talking a

15  little bit more about multiple comparisons, if we could.

16            Tell me a little bit about your understanding of

17  the purpose of correcting for multiple comparisons.

18       A    I've explained it in my report, and it's

19  basically -- if you're measuring multiple things and you're

20  analyzing each thing with statistical measures that don't

21  correct for multiple comparisons, that increases the

22  likelihood that you're going to have a false positive

23  finding for the most part.  That's a simple explanation.

24       Q    And would a more abbreviated version of that be to

25  say it's to avoid type I errors?
```

Craig Powell

```
 1        A    That's one way of putting it.

 2        Q    Okay.  What are type II errors?

 3        A    The idea that you want to avoid making a false

 4   negative.

 5        Q    Okay.  And in a situation where there might be a

 6   threat to human health, a type II error can be a problem

 7   also, right?

 8                   MR. PADGETT:  Object to form.

 9                   THE WITNESS:  If there were a situation where

10        there might be a threat to human health, then it might

11        be an issue, yes.

12   BY MS. HUNT:

13        Q    Okay.  And if you correct for multiple

14   comparisons, that makes type I errors less likely, right?

15        A    Yes, that's my understanding.

16        Q    Okay.  But it can make type II errors more likely?

17        A    Yeah.  I don't have enough information to answer

18   that --

19        Q    Okay.

20        A    -- question.  Sorry.

21        Q    Can I have 226?  All right.  Let's take a look at

22   this article.  This is the exhibit I've marked as 226.

23                   (Powell Deposition Exhibit 226 marked for

24             identification.)

25   BY MS. HUNT:
```

```
 1      Q    And Dr. Powell, the title is:  "What is the proper

 2   way to apply the multiple comparison test?"

 3           Are you with me?

 4      A    Yes.

 5      Q    Okay.  And I'd like to look at the abstract first.

 6           Okay.  So a few lines down within the abstract it

 7   says:  "In this paper, we discuss how to test multiple

 8   hypotheses simultaneously while limiting type I error rate,

 9   which is caused by alpha inflation."

10      A    I know I'm interrupting, but I don't see where you

11   are.

12      Q    Oh, okay.

13      A    I would like to.

14      Q    Yeah, take your time.  So if you're at the top of

15   the abstract.

16      A    Is it "a problem occurs," is that where you're

17   starting?  Or "in this paper."

18      Q    "In this paper."

19      A    Let me find it.

20      Q    Two lines down from "a problem occurs," and I'm

21   sorry, I --

22      A    That's okay.  You didn't do anything wrong.  I'm

23   just trying to figure this out.

24           So it's to choose the appropriate test?

25      Q    "Consequently, in an MCT, it is necessary to
```

Craig Powell

```
1    control the error rate to an appropriate level.  In this
2    paper, we discuss how to test multiple hypotheses
3    simultaneously, while limiting type I error rate, which is
4    caused by alpha inflation.  To choose the appropriate test,
5    we must maintain the balance between statistical power and
6    type I error rate."
7             Do you agree with that?
8        A    Sure, that seems reasonable.
9        Q    "If the test is too conservative, a type I error
10   is not likely to occur.  However, concurrently, the test may
11   have insufficient power" -- I think this is a typo --
12   "resulting in increased probability of type II error
13   occurrence."
14            Did I read that reasonably correctly?
15       A    I don't believe that has anything to do with
16   multiple comparisons, per se, but it's true enough.
17       Q    So it's your testimony that type II errors don't
18   have a relationship to multiple -- to correcting for
19   multiple comparisons?
20       A    That is not what I said.
21       Q    Okay.  Can you explain what you mean?
22       A    Well, I -- having -- looking at this article, that
23   sentence doesn't say the words "multiple comparison test."
24   It just talks generally about which test one is using
25   statistically to evaluate one's data.
```

Craig Powell

```
 1        Q    Okay.  But zooming out, when you are talking about
 2   correcting for multiple comparisons, you're talking about
 3   using a statistical test in order to limit type I errors or
 4   spurious findings, right?
 5        A    What I'm talking about is -- what I believe
 6   they're talking about here is choosing the proper
 7   statistical test to begin with.
 8        Q    Right.
 9        A    Because some are a little bit more lenient and
10   some are a little bit strict.
11        Q    Right.
12        A    That's what I believe they're referring to.
13        Q    We are on the same page.
14        A    Good.
15        Q    Okay.  Let's turn to what's been marked as 226.5.
16             And do you see the section that says:  "Bonferroni
17   method"?
18        A    Mm-hmm.
19        Q    Okay.  And in the second paragraph of that
20   section, the authors have a discussion about the Bonferroni
21   method where they say:  "It has disadvantages as well, since
22   it is unnecessarily conservative with weak statistical
23   power.  The adjusted alpha is often smaller than required,
24   particularly if there are many tests and/or the test
25   statistics are positively correlated.  Therefore, this
```

Craig Powell

```
 1   method often fails to detect real differences.  If the

 2   proposed study requires that type II error should be avoided

 3   and possible effects should not be missed, we should not use

 4   a Bonferroni correction."

 5           Did I read that reasonably correctly?

 6   A    I believe you did.

 7   Q    Do you disagree with any of that?

 8           MR. PADGETT:  Object to form.

 9           THE WITNESS:  I'm not sure I agree with

10   Bonferroni being -- well, hang on.  Let me just read

11   the first paragraph so I understand the context real

12   quick.

13           MS. HUNT:  Yeah.  Take your time.

14           THE WITNESS:  Thank you.

15           So, first of all, I want to point out in

16   answer to your question that the first paragraph, first

17   sentence, speaks of clinical trials.

18           Second of all, I would point out that there's

19   a -- they've made a distinction between using the

20   Bonferroni method as a post hoc test after ANOVA, and I

21   wouldn't necessarily agree that the Bonferroni

22   statistical method is unnecessarily conservative --

23           MS. HUNT:  Okay.

24           THE WITNESS:  -- with weak statistical power.

25           Now, I would agree that it's unnecessarily
```

Craig Powell

1          conservative when you have weak statistical power.

2                    I think that -- to take a step back.

3                    None of the articles that I've reviewed, that

4          I recall, reported any sort of power analysis to

5          determine the number of animals that they decided to

6          use.

7                    And so in the specific case of having weak

8          statistical power, I would agree that it's

9          unnecessarily conservative.

10                   MS. HUNT:  Okay.

11                   THE WITNESS:  Because weak statistical power

12         results in -- in itself a confound for a study.

13    BY MS. HUNT:

14         Q    Right.  And it's important, if you're going to

15    employ a conservative statistical correction, that you have

16    adequate power, right, to find something statistically

17    significant?

18         A    I wouldn't qualify it like you did.  I would say

19    it's important to have sufficient statistical power to

20    detect a change that is somehow determined to be meaningful.

21         Q    Okay.  Should you also take into account the

22    statistical tools you might use in your analysis?

23                   MR. PADGETT:  Object to form.

24                   THE WITNESS:  Well, yes.  Especially if one's

25         testing multiple, multiple different things within an

```
 1        experiment.

 2   BY MS. HUNT:

 3        Q    Okay.  So I know we've talked about this a few

 4   times, but Saad 2016, is one of the two papers that you

 5   determined were most relevant for purposes of your analysis;

 6   is that fair?

 7        A    No, that's not correct.  As I keep stating, I

 8   considered every single result and every single paper

 9   regardless of quality, regardless of criticisms, regardless

10   of flaws in the second half my analysis, that's number one.

11             Number two.  With respect to the first part of my

12   analysis, I'm simply listing all the potential flaws and

13   concerns that I have about every single one of those papers.

14             And then I take a step back in the second part,

15   and I do say, you know, if we were going to -- I mean, I

16   don't eliminate any papers, I just say:  Here's a couple of

17   papers that survived that and are without -- essentially

18   without those criticisms, in particular.

19             And then I considered all the papers' results and

20   all the experiments' results independently of putting them

21   all in a bucket of this paper or that paper, and I drew my

22   conclusions.

23        Q    All right.  Let's go to Exhibit 201, which is your

24   report, page 30, paragraph 67.  At the very beginning of it.

25             "Two papers passed criteria for relevance to the
```

Craig Powell

```
 1    condition of concern and appropriateness of experimental

 2    design and statistical analysis."

 3            Did I read that reasonably correctly?

 4       A    In the first portion of my analysis, that's what I

 5    did, as I've told you.  And in the later half of my

 6    analysis, which you are dying to ignore, apparently, I -- it

 7    discounted all of those potential flaws that are listed, and

 8    I took the data at face value and came to the same

 9    conclusion.

10       Q    Okay.  Dr. Powell, I can assure you I'm not dying

11    to ignore any part of your -- any part of your report.

12            I'm, in fact, excited to talk about all of it.

13            So I'm just trying to understand if Saad is one of

14    two papers that you felt, I think in your words, passed

15    criteria for relevance.

16       A    And appropriateness of experimental design and

17    statistical analysis.

18       Q    Okay.  So that's correct.  That language in your

19    expert report is correct?

20       A    The language is correct, and it does not capture

21    how I did my full analysis of the literature.

22       Q    That's totally fine.

23       A    Thanks for your testimony.

24       Q    Is it your opinion that Saad has been replicated?

25       A    In total?
```

Craig Powell

```
1        Q    In any part.

2        A    It would take a lot of looking to figure that out,

3   but I can, in part, let me see, where did I go.  Let me read

4   that paragraph where I talk about Saad.

5             I seem to have lost my place.

6        Q    I believe you talk about it at paragraph 67.

7        A    Thank you.

8        Q    On page 30.

9        A    So with respect to open field total activity, open

10  field rearing.  Open field -- hang on.  Let me see.

11            Hang on.  Yeah, I can't answer that question

12  because I'd have to go back and look at it and look at all

13  the other papers to make sure.

14            I can't recall, as I sit here today, so I -- I

15  don't remember if it's been replicated or not.

16            I think that it's part of the inconsistent

17  findings, and so what I would say is here I'm talking about

18  appropriate doses and experimental design and statistical

19  analysis.

20       Q    Okay.

21       A    So I think it passed those criteria, is my

22  understanding, to the best of my recollection, without

23  looking at this paper and having to compare it to every

24  other paper.

25       Q    And the other paper that you mentioned at the
```

Craig Powell

1    beginning of that paragraph is Baker 2023, correct?

2         A    Yes.

3         Q    And it's a coincidence that that happens to be a

4    paper where Dr. Pearson is the primary investigator?

5                   MR. PADGETT:  Object to form.

6                   THE WITNESS:  What's your question?

7    BY MS. HUNT:

8         Q    Is it a coincidence that that happens to be a

9    paper where Dr. Pearson's the primary investigator?

10        A    I don't know what you -- I mean, it's a fact.

11        Q    Okay.

12        A    I don't think it's a coincidence.

13        Q    The fact that he's an expert testifying on behalf

14   of plaintiffs in this litigation didn't have anything to do

15   with the reason that you selected it?

16        A    Not at all.

17        Q    Okay.

18        A    He uses multiple corrections, for example, in his

19   statistical analysis.  He uses an excessively large number

20   of animals in his open field task.  Among other things.

21        Q    So you think it's a good study?

22        A    It passed the directory of the relevance.

23                   MR. PADGETT:  Object to form.  Mm-hmm.

24                   THE WITNESS:  Experimental design and

25           statistical analysis.

Craig Powell

```
 1   BY MS. HUNT:

 2       Q    Are you familiar with Mu Yang, one of the

 3   co-authors on Baker 2023?

 4       A    I sort of know who she is.  I've seen her at

 5   meetings and such.

 6       Q    She's a behavioral neuroscientist, right?

 7       A    Yes.

 8       Q    Do you think that it is wise for researchers

 9   undertaking behavioral work with animals to have experienced

10   behavioral neuroscientists on their -- on their research

11   teams?

12       A    It certainly doesn't hurt.  There's one on all my

13   papers.

14       Q    I'd like to look at what I've marked as Exhibit

15   213.

16            (Powell Deposition Exhibit 213 marked for

17            identification.)

18   BY MS. HUNT:

19       Q    Dr. Powell, are you aware that Dr. Pearson was

20   served with discovery requests in connection with his work

21   on this litigation?

22       A    I have no idea what you're talking about.

23       Q    Okay.

24       A    I don't think -- I mean, I think -- I guess I have

25   seen in a deposition, allusions to e-mail conversations that
```

1    I presume may be what you're referring to.

2        Q    Okay.  Are you aware that he produced about 2,000

3    pages of documents as part of his work in this litigation?

4        A    I have no reason to know that or -- no.

5        Q    All right.  Do you know that those documents

6    include information about the analyses performed in Baker

7    2023?

8        A    I don't recall that.

9        Q    Okay.

10       A    In the deposition, but may have.

11       Q    Would it have been useful or interesting for you

12   to know what went on behind the scenes in terms of how that

13   paper was drafted and how the experiments were performed?

14            MR. PADGETT:  Object to form.

15            THE WITNESS:  In -- as a scientist, I review

16       the literature and that's not something that I

17       routinely have access to, and I don't think it's -- I

18       don't know whether it's relevant or not.

19   BY MS. HUNT:

20       Q    So you wouldn't have been interested to see it

21   either way?

22       A    It would depend on what it contained, of course,

23   but that's not generally an accepted procedure in systematic

24   reviews of the literature as a scientist to go through the

25   e-mail conversations leading up to the publication or drafts

Craig Powell

```
1    of a paper, so I don't think it's necessary for this type of

2    analysis.  And so you must rely on what's in the paper

3    before you in the supplemental information would be my

4    opinion.

5        Q    Okay.  All right.  Well, I'll represent to you

6    that Exhibit 213 is part of what was produced by Dr. Pearson

7    in this litigation.

8             Dr. Powell, do you know who John Talpos is?

9        A    I do not.

10       Q    Okay.  I'll represent to you that he's the

11   director of neurotoxicology at the National Center for

12   Toxicological Research.

13            Are you aware of what the NCTR is?

14       A    I understand the concept.

15       Q    Okay.  Do you know that it's part of the FDA?

16       A    I was not aware of that.

17       Q    Okay.  And if you look about halfway down this

18   page, where it says:  "March 20th, 2023."

19       A    Which page?  The first page?

20       Q    First page.

21       A    All right.  Thank you.

22       Q    At 1705, Talpos, John.  And then it has an e-mail

23   address.

24            Does it appear to you that he's an FDA employee?

25       A    It appears that he has an FDA in Health and Human
```

Craig Powell

1  Services, a governmental e-mail address.  I don't know if

2  he's employed there or not.

3      Q    Okay.  Let's go all the way to the back of this

4  exhibit, the page marked 213.3.

5          Does this appear to you to be an e-mail from

6  Dr. Pearson to Dr. Talpos?

7      A    Dr. Pearson to Dr. Talpos.  I'm going to have to

8  look at the previous page.

9          It looks like it's from Dr. Pearson to John

10  Talpos.

11      Q    Okay.  And it says:  "Hi John, this is that mouse

12  paper.  Do you see effects in their behavioral and histopath

13  results?"

14          Did I read that correctly?

15      A    You did.

16      Q    Okay.  And I took the liberty of pulling up that

17  URL, and I've marked that as Exhibit 221.

18              (Powell Deposition Exhibit 221 marked for

19              identification.)

20  BY MS. HUNT:

21      Q    And Dr. Powell, does this appear to you to be the

22  Saad 2016 paper?

23      A    It doesn't look like my copy, but it may be.

24  Okay.  I'm not -- let me double-check, because I'm not --

25      Q    Take your time.

Craig Powell

```
1        A    I just want to make sure, because I have it

2   printed out a different way and that doesn't mean it's not

3   the same.  Saad 20 --

4        Q    Saad 2016.

5        A    Thank you.  Ah, yes, same title.

6             Yes.  This looks more familiar to me.  I'll just

7   go off this, if you don't mind.

8        Q    Okay.  That is no problem.

9             And moving back to Exhibit 213.

10            I'd like to look at the page marked 213.2.  About

11  halfway down the page, there's an e-mail from John Talpos on

12  March 20th, 2023, at 2:43 p.m.

13            Just let me know when you're there.

14       A    I'm there.

15       Q    Okay.

16       A    At 2:43 p.m?

17       Q    Yes.

18       A    Where it says -- yeah.

19       Q    And does this appear to be an e-mail from John

20  Talpos?

21                 MR. PADGETT:  Object to form.

22                 THE WITNESS:  It does.

23  BY MS. HUNT:

24       Q    Okay.  And I'm going to read what it says.

25            And I guess I should ask, does this appear to be a
```

Craig Powell

1    reply to Dr. Pearson's e-mail, which includes the Saad

2    study?

3         A    Given the way this is put together, I'm not sure I

4    could read it, but it could be.

5         Q    Okay.  All right.  Well, I'm going to read

6    Dr. Talpos' e-mail.

7              He says:  "This paper is really weak.  I admire

8    them for correcting for multiple comparisons.  I think we

9    should do more of this in behavior.  However, they are way

10   underpowered for their requirement for significance.  I have

11   a feeling this group does not publish much behavioral work."

12             Did I read that reasonably correctly?

13        A    You did.

14        Q    Do you agree that the Saad authors were

15   underpowered for their requirement for significance?

16        A    Let me take a quick look.

17        Q    Take your time.

18        A    What I'm trying to do is figure out what the end

19   use in their experiments was, and if I remember correctly,

20   they used two males -- what I just read was two males and

21   two females from each litter, and now I'm trying to go

22   through the paper, and I remember doing this previously,

23   because when I initially read this paper, I thought, wow,

24   that's an incredibly low end, four total.

25             But then you have to dig to figure out how many

1    litters there were, and to find out what their end was for

2    each experiment.

3            So I'm going to -- that's what's taking long and

4    it's because it's not readily apparent, but I may have it in

5    a table, but let me just -- let me see if I have it in a

6    table in my report.  It's possible.

7            A table.  And that might be a faster way to do it.

8            Otherwise, I'll have to read the whole article and

9    recapitulate some work that I've already done.

10           Let's see.  Saad 2016.  Okay.  There it is.

11           Ooh, I don't have the in in there either, okay.

12   So I'm trying to figure out how many litters there are.

13           Ah, here it is.

14           So for the behavioral experiments, the in was 16

15   per group, which I do not believe is -- I mean, it may be

16   underpowered, but I can't do -- I have not done a power

17   analysis on this specifically, but an in of 16 is within the

18   realm of acceptability per Silverman, per Dr. Rochelle Tyl,

19   and others in the field.

20           So I don't have issue with that being

21   underpowered.

22           I believe it's quite likely that what Dr. --

23       Q   Talpos.

24       A   -- Talpos is referring to is Figure 3, which I

25   basically don't think is -- shows much of anything and is

Craig Powell

1    definitely underpowered, in my opinion.

2            However, I was focusing more on the behavioral

3    findings.

4        Q    The --

5        A    I see that it has no findings, and the thing, I

6    would agree that for that particular experiment, it's

7    underpowered.

8        Q    And do you acknowledge that anywhere in your

9    expert report?

10       A    I don't know, that's a good question.

11       Q    Do you agree with Dr. Talpos that the Saad paper

12   is, I think he called it, really weak?

13       A    With respect to --

14               MR. PADGETT:  Object to form.

15               THE WITNESS:  With respect to the fact that

16           they met multiple of my criteria for the behavioral

17           studies, I don't agree.

18               But in terms of the initial staining, which I

19           don't think is particularly that revealing or relevant,

20           I think it's underpowered, and I would say that's a

21           reasonable characteristic of Figure 3, but not of the

22           behavioral outcome measure.

23   BY MS. HUNT:

24       Q    Okay.  And he says:  "I have a feeling this group

25   does not publish much behavioral work."

Craig Powell

```
 1            Did you look into the backgrounds of any of the
 2  people who worked on the Saad study?
 3      A    I did not.  And I don't know the basis of Talpos,
 4  what this guy's -- who's being -- communicating with Brandon
 5  Pearson's judgment on that was.
 6            The open field is -- is a task where you literally
 7  put the mice in a box and see what they do and how much they
 8  move, and it's either recorded by a video tracking
 9  instrument or beam brakes, or something like that, so it's a
10  behavioral task, it's probably the most straightforward and
11  I -- it would be something that virtually any laboratory who
12  can read the literature can do, anything related to
13  neuroscience.
14            So I disagree with the idea that to put an animal
15  into an open field and measure beam breaks and whether
16  they're the center of the periphery requires a behavioral
17  expert like Dr. My Yang, and I think she -- well, I don't
18  know, I shouldn't say.
19      Q    Okay.  But in your own work, you testified that
20  you liked to have a behavioral neuroscientist on all your
21  papers involving behavior, or did I hear that wrong?
22      A    Yeah.  I think you are misquoting me.
23            I think I said I think it's a good idea to have
24  someone and all my papers have one, myself.  So --
25      Q    Got it.
```

Craig Powell

```
 1        A      -- there you have it.

 2        Q      And I think we talked about this a little bit

 3   earlier, but is it -- let me back up.

 4               It sounds like you read the deposition of

 5   Dr. Pearson?

 6        A      At one point, yes.

 7        Q      Okay.  And in his deposition, do you recall if

 8   Dr. Pearson talked about how important the epidemiology is

 9   to his work as a neurotoxicologist?

10        A      The human --

11                    MR. PADGETT:  Object to form.

12                    THE WITNESS:  Yes.

13                    MR. PADGETT:  Same objection.

14                    THE WITNESS:  I don't, and I'm not sure

15        what -- I'm not sure what you're really asking about.

16                    Do I remember the fact that he thinks it's

17        important to understand epi as a toxicologist?

18   BY MS. HUNT:

19        Q      Yeah, in other words --

20        A      I don't disagree with that.  I have to understand

21   the epi in my work.

22        Q      Okay.  Would you say that --

23        A      As a non-neurotoxicology Ph.D.

24        Q      Okay.  So more broadly, in behavioral

25   neuroscience, it's important to understand the epi; is that
```

Craig Powell

```
 1    fair?

 2        A    Okay.  Well, if you're going to do experiments, is

 3    it important to understand the epi.

 4             You can do an experiment on a compound and look at

 5    its effects in mice and rodents and be completely agnostic

 6    of the epidemiological literature, that is possible to do.

 7             In many cases, there are studies where compounds

 8    are given to animals, where there's little or no epi, as far

 9    as I'm aware.

10             So I don't know what you mean by "important," so I

11    think it's kind of an ambiguous question.

12        Q    Well, do you think these neurotoxicologists doing

13    preclinical research are taking epidemiology into account

14    when they decide what compounds to expose rodents to?

15                   MR. PADGETT:  Object to form.

16                   THE WITNESS:  Oh, just -- I think that they

17        sometimes think about that.

18                   Other times they're agnostic to the human epi

19        and test compounds that are in the environment.  From

20        time to time.  Without -- with the absence of any human

21        epi data, but I don't -- I can't cite studies or

22        anything off the top of my head right now.

23                   I would say that as a person who studies

24        genetic animal models, I use the human genetics data to

25        inform the choice of some of my animal models, not all
```

Craig Powell

```
 1        of them though, there are cases where I've -- there's
 2        zero human connection to any disease.
 3             And I've looked at the effects of those genes
 4        and how they affect synaptic transmission, plasticity
 5        and behavior, so, you know, it's very a context
 6        opinion, I would say.
 7   BY MS. HUNT:
 8        Q    Okay.  But in the context of neurotoxicology,
 9   there would be no reason to dose these animals with a
10   compound if you didn't think that compound was having an
11   effect on human health, right?
12             MR. PADGETT:  Object to form.
13             THE WITNESS:  I think that there are
14        toxicology studies that give -- that I believe, I can't
15        say with 100 percent certainty, but I'm pretty sure
16        there are studies where they give rodents chemicals
17        that haven't shown any effect in humans in
18        epidemiologic studies, but I can't say that's
19        100 percent true.
20             (Powell Deposition Exhibit 225 marked for
21             identification.)
22   BY MS. HUNT:
23        Q    Okay.  I'd like to show you what I've marked as
24   Exhibit 225.
25             And, Dr. Powell, just looking at the first page,
```

Craig Powell

1    it says at the top:  "National Center for Toxicological

2    Research;" is that right?

3         A    Right.

4         Q    And beneath that it says:  "Science Advisory Board

5    Meeting, May 19th, 2022."

6              Did I read all that correctly?

7         A    Yes.

8         Q    And so let's take a look at this document, and I

9    will represent to you that this is a transcript of a science

10   advisory board meeting.  And I'd like to turn to what's been

11   marked as 225.28.

12             And do you see the bolded text there that says:

13   "Agenda Item, Division of Neurotoxicology."

14             Are you with me?

15        A    Yes, I do.  I see that.

16        Q    Okay.  And then it says right beneath that from

17   Dr. Talpos.

18             "Thank you for your time.  I am John Talpos, the

19   Director of the Division of Neurotoxicology, and I am going

20   to provide an update on activities within the division and

21   we would love your input on current, as well as our future

22   activities, because a lot of the current work I'm presenting

23   today is still very much in progress."

24             Did I read all of that reasonably correctly?

25        A    Sure.  Yes.

Craig Powell

```
 1        Q    Okay.  All right.

 2             Now, let's go -- so does it appear to you that

 3   this is testimony from Dr. Talpos?

 4        A    It is not.

 5        Q    It's not Dr. Talpos?

 6        A    It's not -- it is Dr. Talpos.

 7        Q    Okay.

 8        A    But it's not testimony, as I define it.

 9        Q    Okay.

10        A    As I understand it's defined generally.

11        Q    Okay.

12        A    When I'm at a deposition under oath testifying as

13   if I were in front of a jury and a judge, this is not

14   testimony of that sort --

15        Q    Touche.

16        A    -- in my understanding.

17             No, it's not a dig.  It's just a explanation.

18        Q    All right.  Let's go to what has been marked as

19   225.38, and I'm just going to start right at the top, and

20   I'll represent to you that this is still Dr. Talpos talking.

21             He says:  "Moving to future projects, I want to

22   talk about a project that we're putting together to look at

23   the developmental neurotoxicity of acetaminophen in a vitro

24   setting.  Our ongoing efforts to establish the regulatory

25   impact of damage to barriers of the CNS and our plans to
```

Craig Powell

1   develop the mini swine as a model for developmental

2   neurotoxicity testing and other studies."

3          Did I read that correctly?

4     A    You did.  Barriers to -- of the CNS damage, yes.

5     Q    Okay.  So Dr. Talpos continues on here, and he

6   says:  "So there's a growing concern about the potential

7   toxicity of in utero exposure to acetaminophen as

8   highlighted by this 2021 consensus statement.  The concerns

9   over APAP" -- and you understand that to be acetaminophen,

10  right, Dr. Powell?

11    A    Yes, I do.

12    Q    -- "are being driven by a series of high-quality

13  epidemiological studies."

14          And I think we already discussed you disagree with

15  Dr. Talpos about the quality of the epidemiological studies,

16  right?

17              MR. PADGETT:  Object to form.

18              THE WITNESS:  Well, I don't know which

19          studies he's referring to.  He talks about a,

20          quote-unquote, series of high-quality epidemiological

21          studies.

22              I didn't never once said that there aren't

23          any high quality or decent quality epidemiologic

24          studies.

25              I had concerns about several of the studies

1          in terms of their quality and their use and utility

2          with respect to the question in this case, whether

3          acetaminophen during human gestation leads to an

4          increased risk or causes an increased risk of autism

5          spectrum disorders or attention deficit hyperactivity

6          disorders.

7     BY MS. HUNT:

8          Q    Which epidemiological studies in this case would

9     you call high quality?

10         A    I don't have enough information to answer that

11    question because I read these a long time ago, and I don't

12    have them all memorized.

13         Q    Okay.  So there aren't any that stick out in your

14    mind as, wow, that was a pretty good study?

15         A    Well, I would say that the studies, to the --

16    losing my words, call the ambulance.  No.

17              With respect to the question of causality in

18    humans, or even association in humans of acetaminophen to

19    ASD and ADHD diagnoses, I would consider that the other

20    studies that don't use that as their endpoint are of lower

21    quality to answer that question for that very reason alone,

22    but that's my opinion.

23         Q    Okay.  So is it your opinion that the studies that

24    did use a formal clinical diagnosis of ASD or ADHD are high

25    quality?

Craig Powell

```
1      A    I would say that's too vague a term that I can't

2  define, and I don't know what he means so I can't really

3  answer that question.  I'm sorry.

4      Q    All right.  We will continue.

5           Dr. Talpos says:  "A recent meta-analysis of these

6  studies showed a 20 to 30 percent increased risk of autism

7  spectrum disorder and ADHD in boys exposed to acetaminophen

8  in utero.  The risk isn't" -- and I think it's supposed to

9  say "limited to boys alone, however, it is notably higher in

10 boys than in girls."

11          And I want to stop there for a moment.

12          Dr. Powell, are you familiar with the

13 meta-analysis that Dr. Talpos is referencing here?

14               MR. PADGETT:  Object to form.

15               THE WITNESS:  No one could possibly be

16      familiar with the meta-analysis because he doesn't say

17      which one it is.  So I don't think anyone could

18      possibly know what meta-analysis this is.

19 BY MS. HUNT:

20      Q    Okay.  And would you agree with me that

21 sex-specific differences in general are a hallmark of

22 neurodevelopmental disorders?

23               MR. PADGETT:  Object to form.

24               THE WITNESS:  I would say that autism

25      spectrum disorder is more prevalent in males than
```

Craig Powell

```
 1            females of a ratio of three or four to one, favoring

 2            boys getting the diagnosis.

 3                    And in ADHD, I think it's on the order of

 4            1.9, give or take, to 1, males over females.

 5   BY MS. HUNT:

 6       Q    Okay.  And boys and girls with neurodevelopmental

 7   disorders can also present differently; is that right?

 8                    MR. PADGETT:  Object to form.

 9                    THE WITNESS:  Any patient with an autism

10            spectrum disorder or ADHD can have differences in their

11            presentation as long as they meet the DSM-V criteria

12            for the disorder.

13                    And especially that they've ruled out that

14            that it's caused by other disorders, like anxiety

15            disorders and other neuropsychiatric or

16            neurodevelopmental disorders, depression and all that.

17            That's in the DSM-V.

18   BY MS. HUNT:

19       Q    Are there commonalities in the literature seen in

20   the differences between boys and girls with ASD or ADHD?

21       A    Well --

22                    MR. PADGETT:  Object to form.

23                    THE WITNESS:  My understanding in the ADHD

24            world is that it's a little more likely in a girl that

25            they're going to have ADD, attention deficit disorder
```

Craig Powell

```
1        without hyperactivity, and in boys a little more higher

2        incidence of ADHD, but that's really the only -- that's

3        only at a conceptual level, and I'm not prepared to

4        really speak more to that in detail.

5   BY MS. HUNT:

6        Q    When -- when you're --

7        A    Also I would add -- sorry.  That in the case of

8   ASD, the male to female ratio has not been fully explained,

9   and there are many people who feel like there are cultural

10  reasons why girls are less likely be diagnosed with autism

11  spectrum disorder than boys.

12            Third, I would say that if you have a known cause

13  like a rare de novo mutation, many of those do not have sex

14  differences in their incidence.

15       Q    But many of them do, right?

16       A    I wouldn't say many.

17            MR. PADGETT:  Object to form.

18            THE WITNESS:  If you're asking me about

19       genetic causes of autism, I would not agree with the

20       statement that many rare de novo genetic mutations that

21       are highly penetrant for autism spectrum disorder, I

22       wouldn't say that many of them are more prevalent in

23       boys than girls.

24            Some of them have been shown to be, but

25       that's not -- I think that's the exception in my
```

Craig Powell

```
 1        understanding of that literature rather than the norm.

 2   BY MS. HUNT:

 3        Q    All right.  Let's continue on with this document.

 4             So he goes on to say:  "And I'd also like to draw

 5   your attention to the cumulative sample size in these

 6   studies.  They're really very big and it's an impressive

 7   dataset highlighting this potential concern."

 8             Did I read that correctly?

 9        A    You did.

10        Q    And do you agree that the cumulative sample size

11   in the epidemiologic body of literature is impressive and

12   very big?

13                  MR. PADGETT:  Object to form.

14                  THE WITNESS:  Well, I would say that sample

15        size is virtually irrelevant if you consider the fact

16        that most, if not -- most of the studies that I read in

17        the epidemiologic literature had -- many of them had

18        large sample sizes and they did not control for the

19        most important cause, known cause of autism, which is

20        genetics.

21   BY MS. HUNT:

22        Q    Okay.  So is the answer to that yes or no?

23                  MR. PADGETT:  Object to form.

24                  THE WITNESS:  I answered your question, and

25        if you want to read it back, that's my answer to the
```

Craig Powell

```
 1      question.

 2  BY MS. HUNT:

 3      Q    Okay.  Do you agree that the cumulative sample

 4  size in the epidemiological literature is impressive and

 5  very big?

 6              MR. PADGETT:  Object to form.

 7              THE WITNESS:  I would agree that it's very

 8      big.

 9  BY MS. HUNT:

10      Q    Okay.  But --

11      A    I think -- and as we've spoken about, I think the

12  papers have serious lack of control for important elephant

13  in the room, majority of autism, vast majority of autism

14  cause is genetics.

15      Q    Okay.  And so you disagree with the director of

16  neurotoxicology for the National Center for Toxicological

17  Research within the FDA in terms of the impressiveness of

18  the dataset --

19              MR. PADGETT:  Object to form.

20  BY MS. HUNT:

21      Q    -- in the epi?

22      A    Impressiveness of the dataset?

23      Q    Yeah.

24      A    I don't disagree with him about the impressiveness

25  of the dataset in terms of its size.
```

Craig Powell

```
 1        Q    Okay.

 2        A    But to the extent that most of these studies did

 3   not even concern themselves with the most important

 4   confound, which is that 75 to 80 or more percent of ADHD and

 5   ASD are caused by genetic changes.

 6        Q    Dr. Powell, if all of those ASD cases are genetic,

 7   would that same -- wouldn't that same gene also have to

 8   cause the mother to take more acetaminophen in order to be a

 9   confounder in the epi?

10             MR. PADGETT:  Object to form.

11             THE WITNESS:  Well, I think you're asking a

12        very complex question, I'll try to address it.

13             There are many reasons why a person may or

14        may not take more or less acetaminophen during

15        pregnancy.

16             There are studies that relate certain genetic

17        tendencies or risks with a tendency to take more

18        acetaminophen in general, and I think during pregnancy,

19        but I won't put my life on that, and so that is one

20        possible explanation.

21             MR. PADGETT:  We've been going for an hour

22        and 10, so whenever you're ready for a break.

23             MS. HUNT:  Okay.  As soon as I'm done with

24        this document, we'll take a break.

25
```

Craig Powell

```
 1   BY MS. HUNT:

 2       Q    Do you know of a gene that's been discovered that

 3   encourages women to take more Tylenol during pregnancy?

 4       A    A single gene, no.

 5       Q    Okay.

 6       A    I just -- I feel remiss not pointing out that your

 7   famous and respected Dr. Talpos, is it?

 8       Q    Mm-hmm.

 9       A    Speaks, in two sentences below, where we just --

10   we just quoted that "our lack of knowledge about the

11   mechanism behind potential, potential APAP mediated nerve

12   toxicity makes it a little bit difficult to design

13   assessments."

14       Q    Oh, you got ahead of me, but don't worry, I was --

15   I was getting there, so we can talk about that now.

16            And you're right.  He says:  "Within the division,

17   we're starting to research APAP-related neurotoxicity with

18   in vivo models.  However, our lack of knowledge about the

19   mechanism behind potential APAP mediated neurotoxicity makes

20   it a little bit difficult to assign assessments, and there

21   are multiple mechanisms by which APAP may cause

22   neurotoxicity, as you can see here.  However, one potential

23   mechanism popped out as lending itself to evaluation in an

24   in vitro setting, and that's CYP2E1 mediated metabolism, and

25   that's a project that's being led by Dr. Shuliang Liu."
```

1          Did I read that reasonably correctly?

2      A    Yes.  Especially the part that says "may and

3  potential."

4      Q    Right.  That's -- those are the parts you like,

5  right?

6      A    And project -- no.  And there's a project that's

7  being done to test that potential mechanism whereby APAP may

8  cause neurotoxicity.

9          So, you know, you definitely read it right, but I

10  just want to make sure it's clear what it says for the

11  jury's sake.

12     Q    All right.

13     A    And what it doesn't say.

14     Q    All right.  So he continues on to say:

15  "CYP2E1" -- which, Dr. Powell, we talked a little bit about

16  CYP2E1 earlier, right?

17     A    Yes.

18     Q    "CYP2E1, a lot of you probably know a lot about

19  it, is highly expressed in the liver.  APAP metabolized by

20  CYP2E1 will eventually deplete levels of glutathione

21  resulting in free radical formation and hepatotoxicity."

22          Did I read that correctly?

23     A    Yes.  And I'll just note that doesn't talk about

24  dose, duration, et cetera.  And I'll reiterate what I've

25  answered before was I have never seen any literature saying

 1   that glutathione is depleted in the fetal brain, in humans,

 2   rice or rats.

 3        Q    He continues on to say:  "While CYP2E1 is

 4   expressed in neurons in the human brain, it is at lower

 5   levels than in the liver, but it's very much still there."

 6             Do you disagree with Dr. Talpos about that?

 7             MR. PADGETT:  Object to form.

 8             THE WITNESS:  Thank you.  It depends.  Sorry.

 9             It depends on whether -- what he means by the

10        word "expressed" on neurons, and he doesn't state that.

11             I would agree that there are detectable MRNAs

12        that are very low compared to the liver and the human

13        brain, I think, or maybe it's mouse -- I can't remember

14        if it's human or mouse, to be perfectly honest with

15        you, and the protein levels are, if at all detectable,

16        barely detectable, and I've seen no repetitive,

17        qualitative -- quantitative western blots done on the

18        fetal brain of rodents or humans that I can recall that

19        demonstrates, in a statistical manner, with multiple

20        iterations of testing, you know, where you test

21        multiple brains and have a high in and you measure

22        western blots and you quantify them and you relate that

23        to some known control, protein expression.

24             So I think this sentence is -- says what it

25        says but it's ambiguous, and it's impossible to know

Craig Powell

```
 1        exactly what he means, and I think that's a very

 2        important point in this case.

 3   BY MS. HUNT:

 4        Q    He continues on:  "This raises the question if

 5   CYP2E1 mediated toxicity could occur at the brain.  If so,

 6   this is potentially really problematic as alcohol" -- you're

 7   going to have to help me with this word, Dr. Powell.

 8        A    Halogenated anesthetics.

 9        Q    "Halogenated anesthetics, and even a metabolite of

10   caffeine are all metabolized by CYP2E1.  So there is very

11   real potential to push this system too far."

12             Did I read that correctly?

13        A    You read what that says.

14        Q    Okay.

15        A    And I would say that --

16        Q    Sorry.  Go ahead.

17        A    -- it needs to be clarified what it does and

18   doesn't mean because the majority of alcohol, as I

19   understand it, halogenated anesthetics, and even metabolites

20   of caffeine, are metabolized in the liver and not the brain,

21   as I understand it from my medical training and my limited

22   knowledge of this subject in terms of metabolism of alcohol,

23   halogenated anesthetics and metabolites of caffeine.

24        Q    Okay.  And then he --

25        A    So I would also state that --
```

Craig Powell

```
 1        Q    Oh, sorry.  Go ahead.

 2        A    So I would also state that -- so there's a real

 3   potential to push this system too far is -- it's not clear

 4   what he means, which organ he's talking about, what doses

 5   he's talking about, what duration he's talking about.

 6             And so, I mean, it says what it says, and it's

 7   difficult to ascertain what it means specifically.

 8        Q    And then he continues on to say:  "And, of course,

 9   the developing brain is very vulnerable to all types of

10   different abnormal energetic demands."

11             Do you agree with that?

12        A    Well, so --

13             MR. PADGETT:  Object to form.

14             THE WITNESS:  -- the brain makes up about 5

15        percent ever the weight of the human body and it

16        consumes about 20 percent of the energy in the human

17        body, and it relies largely on glycolysis.

18             So I think that's a reasonable explanation of

19        what he's trying to say in a scientific term.

20   BY MS. HUNT:

21        Q    And while we're talking about organ systems -- and

22   this is the last set of things I'll ask you before we take a

23   break, but when we're thinking about different organ

24   systems, like, for example, the brain versus the liver,

25   isn't one of the things that distinguishes the brain as an
```

Craig Powell

1    organ the fact that it can't regenerate?

2         A    That was classically the thought and, generally

3    speaking, that's true.  However, for the accuracy of my

4    answer, I have to say that there are new neurons born in the

5    intake gyrus of the hippocampus throughout life and that

6    there're continually newborn neurons migrating to replace

7    olfactory neurons of the brain.

8              But, generally speaking, the neurons in the brain

9    don't regenerate.

10        Q    Okay.

11        A    Generally speaking.

12        Q    But the liver can regenerate, right?

13        A    Yes.

14        Q    Okay.

15             MS. HUNT:  I'm good to take a break now,

16        Bill.

17             MR. PADGETT:  10 minutes.

18             THE VIDEOGRAPHER:  Off record, 2:02 p.m.

19             (Off the record at 2:02 p.m.)

20             THE VIDEOGRAPHER:  On record, 2:20 p.m.

21   BY MS. HUNT:

22        Q    Okay.  Dr. Powell, I'd like to go back to your

23   expert report, which has been marked as Exhibit 201.  And

24   I'd like to go to the bottom of page 24, we'll start there.

25             And I guess I should preface this by backing up

Craig Powell

1    and saying this section of your report, as I understand it,

2    is about translationally relevant dosing in preclinical

3    studies; is that fair, Dr. Powell?

4        A    Yes.  It's about -- it's musings on the -- what

5    the doses ought to be and what models, I think.

6        Q    Okay.  And so you say at the bottom, the very

7    bottom of page 24, you say:  "For example, extensive human

8    studies demonstrate that acetaminophen does not typically

9    result in toxicity at maximum labeled doses of up to 4,000

10   milligrams per day in adults.  While potential

11   hepatotoxicity in humans may occur at doses above the

12   maximum label dose of 57 mgs per kg per day at approximately

13   150 to 200 mgs per kg per day and following acute overdose."

14            Other than the citations, the strings of

15   citations, have I read that reasonably correctly?

16       A    Yes.

17       Q    Okay.  In your research and as a clinician, how do

18   you determine if hepatotoxicity is occurring in a human

19   subject?

20       A    You need to define hepatotoxicity.  If you mean

21   some minimal damage to some subset of cells in the liver, we

22   could look at spillage, literally spilling of AST and ALT

23   into the bloodstream.

24            If you mean through hepatotoxicity to the point

25   that there's decreased function of the liver then we

Craig Powell

1   typically look at coagulation factor, levels of albumin and

2   development of protein.

3        Q   Okay.  And --

4        A   Oh, sorry.  And we look at bilirubin and other

5   functions.

6        Q   Yeah, no, you're fine.

7            And in a human, is it possible to be experiencing

8   signs of liver damage and not know it?

9                MR. PADGETT:  Object to form.

10               THE WITNESS:  That's a little bit too broad

11          and ambiguous for me to answer.

12               What I would say is your -- it depends on the

13          extent of the liver damage and whether you have

14          functional liver damage that causes symptoms or not,

15          and so you have a range of hepatotoxicity, and I don't

16          know where you're talking about.

17               Certainly, you can have spillage of AST and

18          ALT in the bloodstream without knowing it.

19   BY MS. HUNT:

20        Q   Okay.  And you cite in your report a series of

21   studies in this section.

22            Do you know if any of the studies that you cited

23   in this section are double blind randomized control trials?

24        A   I have no idea.  I don't recall.

25        Q   Okay.

Craig Powell

```
 1        A    I just know what they taught us in medical school

 2   that we don't want to give more than -- I mean not just, but

 3   I know that we don't want to give more than the maximum

 4   amount per day, particularly if there are other

 5   comorbidities.

 6        Q    I'd like to look at what's been marked as

 7   Exhibit 254.

 8               (Powell Deposition Exhibit 254 marked for

 9               identification.)

10   BY MS. HUNT:

11        Q    And Dr. Powell, would you agree with me this

12   appears to be a randomized-controlled trial related to ALT

13   elevations in healthy adults?

14        A    I see that's all represented in the title, yes.

15        Q    Right.  It says:  "Aminotransferase Elevations in

16   Healthy Adults Receiving 4 Grams of Acetaminophen Daily."

17               Right?

18        A    That's what it says.

19        Q    And 4 grams is the recommended daily dose that you

20   talked about in your expert report, right?

21               MR. PADGETT:  Object to form.

22               THE WITNESS:  It's the maximum human amount

23        of acetaminophen that one is -- what one could take and

24        be following the label, Extra Strength Tylenol in

25        humans, yes.
```

```
 1    BY MS. HUNT:

 2        Q    Okay.  And if we look on that first page under:

 3    "Results," a few lines down, do you see where it says -- the

 4    sentence starts:  "Compared with placebo."

 5             "Compared with placebo, treatment with

 6    acetaminophen was associated with a markedly higher median

 7    maximum ALT.  Trough acetaminophen concentrations did not

 8    exceed therapeutic limits in any participant and after

 9    active treatment was discontinued, often decreased to

10    undetectable levels before ALT elevations resolved."

11             Did I read that reasonably correctly?

12        A    I believe you read the sentence correctly, and

13    we're speaking about minimal cellular damage.

14        Q    Okay.

15        A    And they talk about ALT elevations of this

16    magnitude that are recoverable.

17        Q    Okay.  And when you looked at the animal

18    literature, did you consider it a weakness of the study if

19    the animals showed signs of hepatotoxicity like increased

20    ALTs?

21        A    I didn't really comment on that.  If the dose was

22    rational or relevant, as far as I remember.

23             What I can tell you is that a cutoff of

24    200 milligrams per kilogram per day is, as I spoke about

25    before, a very conservative in terms of the recommended
```

1    single human dosage, and it's even with allometric scaling

2    or any other method in mice.

3         Q    Okay.  Do you think it's unreasonable for the

4    scientists who were studying neurotoxicity of acetaminophen

5    to use allometric scaling in their experiments?

6                   MR. PADGETT:  Object to form.

7                   THE WITNESS:  I would say that insofar as --

8         I'm sorry.  What did you ask me, is it what?

9    BY MS. HUNT:

10        Q    Is it unreasonable?

11        A    Unreasonable.

12                  MR. PADGETT:  Same objection.

13                  THE WITNESS:  The truth is, I went into this

14        fairly agnostic, read the literature on doses and, you

15        know, I think in -- in -- in a situation where we know

16        all about the peak doses and the area under the curve

17        and toxicity in a drug that's often used in humans, I

18        believe that the allometric scaling, as -- in the

19        document referenced by the expert reports that I read,

20        is intended for first-in-human use, and was not

21        intended for going back and forth between animals to

22        humans.

23                  At the end of the day, though, my cutoff is a

24        higher dose than liver toxic doses in mice and higher

25        than -- or liver toxic meaning these minor changes in

Craig Powell

```
 1        AST or  ALT, and higher than what the allometric

 2        scaling comes.

 3                So I put in a safety factor on my dose cutoff

 4        level of 200 milligrams per kilograms in both rats and

 5        mice.

 6   BY MS. HUNT:

 7        Q    Why did you choose to use a single dosing cutoff

 8   for all rodents?

 9        A    Because that is how humans take it, one dose at a

10   time, if they're following the label.  And then they wait an

11   appropriate period of time before they take another dose.

12             And --

13        Q    Oh --

14        A    That's what I used.

15        Q    I'm sorry.  I think we're -- I think we're -- I

16   think we're having a miscommunication.

17             How did you decide that you would use the same

18   number in terms of a dose, 200 mgs per kg, right?

19             How did you decide to use the same numbers for

20   rats and for mice?

21        A    Oh, again, these were conservative estimates and

22   they're higher than allometric scaling.

23        Q    Okay.

24        A    And so I was being as lenient and conservative as

25   I could because I wanted to know what -- if there was
```

Craig Powell

```
 1    really -- what was there in the literature that, you know,

 2    might lead one to conclude or support causality in humans,

 3    if anything, or a plausible biologic mechanism.

 4         Q    Are you aware that the majority of the in vivo

 5    experiments on acetaminophen's developmental neurotoxicity

 6    are in rats?

 7         A    I didn't calculate the ratio of rats to mice.

 8         Q    Okay.

 9         A    No.

10         Q    But you'd agree with me, in general, that it's

11    pretty important to get the dose analysis right in examining

12    this body of literature?

13                   MR. PADGETT:  Object to form.

14                   THE WITNESS:  I would say that it's important

15         not to exceed a dose level of -- that pushes things

16         into levels that don't correspond to human dosing.

17    BY MS. HUNT:

18         Q    Okay.

19         A    And my cutoff is higher than that.

20         Q    And when you came to that number of 200 mgs per

21    kgs, were you looking at data on hepatotoxicity in order to

22    come to that number?

23         A    I would say that I looked at multiple things,

24    multiple dosings, multiple sources, to kind of come to a

25    gestalt, because remember, this was before anything -- any
```

 1    other experts or anything else.

 2            So, you know, I looked in the literature to try to

 3    be as conservative as possible to come up with a dosing

 4    regimen, and so I looked at liver toxicity in mice and I

 5    looked at allometric scaling and certainly dismissed the

 6    idea of a safety factor of tenfold in the conversion from

 7    humans back to mice because we're not in that sort of

 8    situation.

 9            And then, you know, I settled on 200 milligrams

10    per kilogram because it was generous in rats and it was

11    generous in mice, period.

12        Q    Okay.  I'd like to go back to your expert report

13    for a moment.  So on page 25, again, this is in that top

14    paragraph.

15            You say:  "Similarly, going back decades, the

16    hepatotoxicity of acetaminophen in rodents has been

17    documented in dozens of studies employing a wide variety of

18    experimental conditions that demonstrate liver toxicity

19    after a single day exposure to acetaminophen at doses

20    ranging from 500 to a 1,000 mgs per kg and higher in rats,

21    and from 150 mgs per kg and higher in mice, with mice

22    clearly tracking human toxicity response dose wise."

23            Did I read that correctly?

24        A    I believe you did.

25        Q    Okay.  And is it safe to say, based on that

Craig Powell

```
 1    language, that rats and mice have different vulnerabilities

 2    to acetaminophen?

 3                 MR. PADGETT:  Object to form.

 4                 THE WITNESS:  It's safe to say that rats and

 5         mice have different vulnerabilities to hepatotoxicity

 6         than mice, and that's very well documented in the

 7         literature that I'm aware of, and that's -- well,

 8         that's all I have to say.

 9    BY MS. HUNT:

10        Q    And I realize this might be a silly question, but

11    rats and mice are entirely different species, right?

12        A    They are.

13                 MR. PADGETT:  Object to form.

14                 THE WITNESS:  They're a different species.

15    BY MS. HUNT:

16        Q    And they're different sizes, right?

17                 MR. PADGETT:  Object to form.

18                 THE WITNESS:  Mice and rats, on average, are

19         different sizes, correct.

20    BY MS. HUNT:

21        Q    Okay.  And there's other differences between them,

22    right, in terms of how they metabolize acetaminophen, for

23    example?

24        A    What's your question?  I'm sorry.

25        Q    Is it your understanding that rats and mice
```

Craig Powell

1    metabolize acetaminophen in different manners?

2        A    Yes.

3        Q    Okay.  And so despite the fact that there are

4    different species, they are different sizes and they

5    metabolize the drug differently, your opinion is still that

6    there should be a single dose that's appropriate for both?

7                    MR. PADGETT:  Object to form.

8                    THE WITNESS:  I believe that I could have

9             been much more stringent in my dosing criteria.

10                   However, I was agnostic to what people were

11            going to say about what the most appropriate doses

12            were.  There were many studies that had clearly higher

13            than appropriate doses.  And studies that were on the

14            border line.

15                   And so what I did was I added a safety factor

16            to be as conservative as possible, which is also why I

17            did my best in my initial analysis to include all the

18            studies.

19                   And then when I rebutted the expert witnesses

20            on -- excuse me, for the plaintiffs, I looked at mostly

21            the papers that they cited and noted that our dosing

22            cutoffs were, in many ways, very similar.

23                   We can look at -- if you'd like, we can look

24            at Dr. Pearson's deposition and what levels of dosing

25            he used for some of the studies to virtually eliminate

Craig Powell

1        the potential consideration.

2               So I was being conservative to try and give

3        the literature the widest benefit of the doubt.

4    BY MS. HUNT:

5        Q    So are you saying that the plaintiffs' expert

6    used -- experts used a single dose number as a cutoff for

7    both rats and mice?

8        A    Oh, I don't think I said that.  I think what I

9    said was their dosing regimens that Dr. Pearson included in

10   his report and Dr. Cabrera included in his report that I

11   believe are higher than the typical single dose in humans

12   and memory -- and I don't remember exactly what the doses

13   were, the cutoffs for Dr. Pearson to eliminate the studies

14   that he eliminated, but we can look at that if you'd like.

15       Q    Did you notice, in looking at the literature, that

16   the studies involving rats typically involved a higher dose

17   than the studies involving mice?

18       A    It depends on which studies you're talking about.

19   If you're talking about hepatotoxic in liver literature, I

20   don't recall.

21              And if you're talking about the other, I've

22   already said I don't remember whether there were more rats

23   than mice, so I don't recall.

24       Q    But sitting here today, you can't recall either

25   way whether the researchers studying acetaminophen's

Craig Powell

```
1    developmental neurotoxicity in rats used higher doses than

2    the researchers studying acetaminophen's developmental

3    neurotoxicity in mice?

4        A    Let's see.  I'll just go through some rat studies.

5             50 milligrams per kilogram.  Rat study,

6    35 milligrams per kilogram.  Rat study, 50 milligrams per

7    kilogram.  Rat study, 51.97 milligrams per kilogram.

8             Now let's look at mice.  Mice, 150 milligrams per

9    kilogram.  Mice, 150 milligrams per kilogram.  Mice,

10   103.9 milligrams per kilogram.  Mice, 150 milligrams per

11   kilogram.

12            And then there's -- let's see.  And then there's

13   some mouse studies that give 30 milligrams per kilogram or

14   30 milligrams per kilogram four hours apart.

15            So I didn't -- with that particular table, where I

16   looked at people who have -- the studies that passed the

17   hyperactivity or measures thereof, I didn't -- don't see a

18   trend that you're speaking of.

19       Q    Okay.

20       A    If we look at repetitive restrictive behaviors.

21   Rat, 5 milligrams per kilogram and 15 milligrams per

22   kilogram in the drinking water.

23            There's a rat with 350 milligrams per kilogram.

24   There's a rat -- it may be the same one, so it's the same

25   one with 5 and 15 milligram per kilogram.
```

Craig Powell

```
1        Q    And are those --

2        A    So there's a lot of variation in the doses used,

3    and I believe that, you know, even using allometric scaling,

4    the individual maximum dose in humans using rat allometric

5    scaling gives you a number on the order of 90 or so

6    milligrams per kilogram, as equivalent to a single human

7    maximum dose of a thousand milligrams.

8             Not the regular strength Tylenol, which is

9    650 grams per dose --

10       Q    Dr. Powell --

11       A    Which would be even a lower number.

12       Q    I'm so sorry to interrupt you, but if you could

13   give me a page number.

14       A    Oh, I'm sorry.  I'm looking at a couple of

15   pages --

16       Q    I'm just trying to track --

17       A    76, 77 --

18       Q    -- what's you're doing here.

19       A    76, 77, 72.  Those are the ones that I've gone

20   through so far.

21            And there are rat studies that use 350 milligrams

22   per kilogram.

23            I think when there were high doses that were

24   intended to cause liver toxicity, which typically aren't

25   presented in my table, then those are completely eliminated,
```

Craig Powell

```
 1   so I didn't look at those for a pattern.

 2        Q    Okay.

 3        A    And all those studies that I rejected for too high

 4   a dose correspond quite well, I think, for the most part,

 5   with about four or five exceptions with plaintiff experts.

 6        Q    Okay.  So I'd like to give you what's been marked

 7   as Exhibit 257.  I think you'll recognize this.

 8                  (Powell Deposition Exhibit 257 marked for

 9                  identification.)

10   BY MS. HUNT:

11        Q    This is Dr. Pearson's expert report, and I'd like

12   to look at what's been marked as 257.83.

13                  And, Ray, can we pull up another page right next

14   to this?

15                  TRIAL TECHNICIAN:  Sure.

16   BY MS. HUNT:

17        Q    I'd like to pull up right next to it, 257.100.

18                  And, Dr. Powell, I'll represent to you that on the

19   screen in front of you, we've got a chart that shows rat

20   studies involving developmental neurotoxicity.

21                  And on the right-hand side, we have mouse studies.

22   So I guess if we could revisit -- first of all, would you

23   agree with me that there are more rat studies than there are

24   mouse studies on acetaminophen's developmental

25   neurotoxicity?
```

```
1                    MR. PADGETT:  Object to form.

2                    THE WITNESS:  I would say of these papers

3        that are listed, yes.

4    BY MS. HUNT:

5        Q    Okay.  And will you agree with me that several of

6    these studies incorporate multiple dosing regimens; is that

7    fair?

8        A    Two or three different doses, yes.

9        Q    Yes.  Okay.

10            And looking at --

11       A    Oh, were we talking about rats or both, mice and

12   both?

13       Q    Both.  You can look at the screen in front of you.

14       A    I got it.  Thank you, though.

15            In the case of mice they used, at most, two doses

16   in this list.  Not including zero, of course.

17       Q    Okay.  And you're telling this jury that you don't

18   see a trend in higher dose ranges in the rat studies as

19   compared to the mouse studies?

20                   MR. PADGETT:  Object to form.

21                   THE WITNESS:  I would say that of these

22       studies that have been included in these tables, the

23       maximum mouse dose that is used is 150 milligrams per

24       kilograms per day, and the maximum dose used in rats is

25       as high as 500 milligrams per kilogram, though I think
```

Craig Powell

```
 1          that's too high, and the majority of the others don't

 2          go above 350 milligrams per kilogram.

 3                  There's only two that do at that level.

 4   BY MS. HUNT:

 5      Q    So can we agree that, in general, many of the rat

 6   studies use a higher dosing regimen than the mouse studies?

 7                  MR. PADGETT:  Object to form.

 8                  THE WITNESS:  We can agree that four rat

 9          studies do.

10                  MS. HUNT:  Okay.

11                  THE WITNESS:  In these lists, which are

12          selected after eliminating studies with higher -- with

13          doses that Dr. Pearson deems too high, I think.

14                  MS. HUNT:  Right.

15                  THE WITNESS:  If I'm not mistaken.

16   BY MS. HUNT:

17      Q    And, okay.  And so it sounds like we agree that

18   mice and rats have different vulnerabilities to

19   acetaminophen, right?

20                  MR. PADGETT:  Object to form.

21                  THE WITNESS:  With respect to liver toxicity,

22          I believe that's well-known.

23                  MS. HUNT:  Okay.

24                  THE WITNESS:  With respect to any other form

25          of toxicity, I don't believe that's been demonstrated
```

Craig Powell

1         for the brain, and I don't know about other organs.

2    BY MS. HUNT:

3         Q    Okay.  And it's still your opinion that allometric

4    scaling is inappropriate in this case?

5         A    Well, I think it's --

6              MR. PADGETT:  Object to form.

7              THE WITNESS:  I would say that I don't think

8         allometric scaling with a 10X safety factor in humans

9         would be appropriate to use to go down to mice or rats.

10             And I think that it's important to think

11        about what the maximum concentration is after some of

12        these doses in mice and rats and ensure that they don't

13        go higher than 132 micromolar, or micromols per liter,

14        which is within the range of what happens after you get

15        a peak dose, or Cmax, as it were, when you give to

16        mice.

17             And that's according to this particular

18        document I'm looking at.

19             MS. HUNT:  Okay.

20             THE WITNESS:  Yeah.  And I'll just note that,

21        you know, there's a mouse study where Dr. Pearson has

22        eliminated it because he didn't think the dose was

23        relevant.

24             And the highest dose in mice was

25        302 milligrams per kilogram.  And I'm looking at some

Craig Powell

```
 1        of the others.

 2               Some of these don't necessarily -- oh, here

 3        we go.

 4               Rats.  He eliminated Saad, et al. 2017, for

 5        the same reason and they gave 250 to 500 milligrams per

 6        kilogram.  I believe that's to rats.

 7               And then he eliminated another study.  Let's

 8        see if it's rats or mice.

 9   BY MS. HUNT:

10   Q    Okay.  Dr. Powell, I've been really patient with

11   your answers, but I just have to instruct you, if you can

12   please focus on the question that I'm asking, that would be

13   really helpful in getting us out of here at a reasonable

14   time.

15        So you -- are you saying you don't have a problem

16   with allometric scaling, but you do have a problem with the

17   10X safety factor?

18   A    Well --

19               MR. PADGETT:  Object to form.

20               THE WITNESS:  It's not a matter of having a

21        problem.  I mean, I told you I picked a conservative

22        cutoff that's relevant to human dosing in rodents and

23        with a safety factor.

24               So I was conservative in my estimation, and I

25        find it striking, again, that, you know, there's -- I
```

Craig Powell

```
 1          don't even -- I can't even ascertain what the cutoff

 2          was for Dr. Pearson in this study, so insofar as he's

 3          eliminated high dose mouse studies, then it's hard to

 4          answer your question about whether the studies

 5          altogether gave higher doses to rats than to mice when

 6          you've eliminated the high-dose mouse studies.

 7   BY MS. HUNT:

 8          Q    Do you understand that I'm not asking you about

 9   Dr. Pearson's opinion right now, I'm asking you about your

10   opinion?

11          A    Well, you're asking me my opinion about his --

12   about rats and mice and the studies, and you're excluding

13   multiple studies in mice that use higher doses, so it's hard

14   for me to answer your question when I'm looking at a

15   document that doesn't include all the studies.

16          Q    Okay.  So we're going to look at the transcript

17   together.

18               The question that I asked you is:  Are you saying

19   you don't have a problem with allometric scaling but you do

20   have a problem with the 10X safety factor.

21               That's the question we're currently on, Dr.

22   Powell.

23                    MR. PADGETT:  Same objection.

24   BY MS. HUNT:

25          Q    So if could you -- if you could answer that
```

Craig Powell

1    question.

2         A    I thought I did.

3         Q    Well, you started talking about Dr. Pearson.  I'm

4    not asking about Dr. Pearson.  I'm asking you, Dr. Powell.

5    And you know what, I think I can make this easier by going

6    back to the text of your expert report.

7              Why don't we look at what's been marked Exhibit as

8    201, page 24, top of the page, paragraph 54.

9              Okay.  For purposes -- and this is the very top of

10   the page, beginning at that paragraph.

11             "For purposes of nonclinical rodent study dosing,

12   the 2005 FDA allometric scaling guidance document used by

13   plaintiffs' experts to calculate a general human equivalency

14   dose of 6.2X for rats and 12.3X for mice is not appropriate

15   or accurate for acetaminophen."

16             Did I read that correctly?

17        A    You did.  And the reason that's written there is

18   because that particular document wasn't designed for that.

19   It had nonbinding recommendations for translation from

20   rodents to first-in-human studies.

21        Q    Okay.  But what I'm asking about is not the

22   document itself, but the underlying principle of allometric

23   scaling, and what I'm trying to figure out is, to the extent

24   that researchers studying the developmental neurotoxicity of

25   acetaminophen used allometric scaling to figure out a

1    translationally relevant dose.

2         Do you have a problem with that approach, or is it

3    the use of this FDA document that you have a problem with?

4              MR. PADGETT:  Object to form.

5              THE WITNESS:  Good question.

6              This particular sentence refers to the 2005

7         FDA allometric scaling guidance document is not

8         appropriate.

9              The truth is, you know, allometric scaling is

10        a first pass for a drug when you don't know what's

11        going on in humans.  But in this drug, we know what the

12        doses and what the levels are and what the areas under

13        the curve were, so the most appropriate way to do it

14        would be to look at the doses that, when given to mice

15        or rats, reach a concentration in their bloodstream

16        that is a peak of around a maximum of 132 micromolar,

17        and a steady state of around 50 to 60 micromolar, if my

18        memory serves.

19             So it's not that I have a particular problem

20        with allometric scaling.  In fact, if you're using a

21        single dose, I think it, you know, it's a reasonable

22        approximation, and I've used the higher cutoff in my

23        report.

24   BY MS. HUNT:

25        Q    Okay.  I'd like to show you what I've marked as

Craig Powell

```
 1    Exhibit 217.

 2              (Powell Deposition Exhibit 217 marked for

 3         identification.)

 4    BY MS. HUNT:

 5         Q    Dr. Powell, do you know what Ofirmev is?

 6         A    Ofirmev?

 7         Q    Mm-hmm.

 8         A    It sounds like an abbreviation they're using.  Can

 9    you spell it out?

10         Q    So if we want to go to what's been marked as

11    217.3.  First paragraph.  I'll just read it to you.

12              "This review provides comments from the Division

13    of Medication Error Prevention and analysis regarding

14    potential medication error issues identified with the

15    proposed container label, carton and insert labeling for

16    Ofirmev, acetaminophen, injection."

17              Does that refresh your recollection as to what

18    Ofirmev is?

19         A    It's a brand name --

20         Q    Yes.

21         A    -- for an injectable form of acetaminophen.

22         Q    Okay.  And --

23         A    Can I clarify one point?

24         Q    I'm sorry, but no.  You can if it's responsive to

25    a question.
```

Craig Powell

```
 1      A    It is.  I just want to make it clear that there's

 2    more than acetaminophen in Ofirmev.  There are additional, I

 3    believe antioxidants, if I'm not mistaken, but I'm not

 4    100 percent sure.

 5      Q    And why do you think that they believed

 6    antioxidants in the IV preparation of acetaminophen?

 7      A    Presumably to protect the liver from damage.

 8      Q    And is that, in part, because acetaminophen causes

 9    oxidative stress?

10      A    I would say that it's -- well, first of all, I

11    don't like the term "oxidative stress."

12           Second of all, in normal dosing, I'm not aware

13    that there's depletion of glutathione in the liver, and

14    complete depletion of glutathione in the liver, and it would

15    be because one of the mechanisms that is thought to underlie

16    hepatic insults is due to oxidative stress, especially given

17    that the liver makes a lot of the enzyme CYP21E compared to

18    the brain.

19      Q    But the liver can regenerate, right, and the brain

20    can't?

21      A    We've already discussed that, yes.

22      Q    Okay.

23      A    To some degree, that's true.

24      Q    And certainly they're not including an antioxidant

25    preparation in this IV formulation of acetaminophen for
```

Craig Powell

```
 1    recreational purposes, right, there's a reason for it?
 2                    MR. PADGETT:  Object to form.
 3                    THE WITNESS:  I have no idea what they're
 4         thinking was behind that.
 5    BY MS. HUNT:
 6         Q    Okay.  So you think they may have just randomly
 7    included an antioxidant in this preparation of
 8    acetaminophen?
 9         A    No.  I don't why you're asking me that because I
10    didn't say that, but no.
11         Q    Okay.  But you don't know why?
12         A    Well, I think it's to protect the liver.
13         Q    Okay.  From -- and I know it's a term you don't
14    like, to protect it from oxidative stress?
15         A    To protect it from the possibility that it could,
16    in theory, decrease the level glutathione, and so out of an
17    abundance of caution they added it, would be my presumption,
18    but it's just that presumption.
19         Q    Okay.  And does this appear to you to be part of
20    the FDA's review process for approval of the Ofirmev label?
21         A    Honestly, I don't know.  I've never seen any of
22    those documents until today.  As far as I remember, but I
23    don't dispute that if that's the case.
24                    If you're representing it accurately, I don't
25    dispute it.  I just don't know.
```

Craig Powell

```
 1        Q    Okay.  Let's go to -- just a second.

 2             Let's go to what's been marked as 217.35.

 3             And do you see the highlighted language on this

 4  page, Dr. Powell?

 5        A    I do.

 6        Q    Does this appear to be describing a reproductive

 7  toxicity study of acetaminophen?

 8        A    I'm just going to read it for a second.

 9        Q    Take your time.

10        A    In part, yes.

11        Q    Okay.  And do you see here where it discusses --

12  it's the second sentence.

13             "These doses are approximately .42, .85 and 1.7

14  times the MHDD respectively based on body surface area."

15             Did I read that reasonably correctly?

16        A    You read it correctly.  And I don't know what MHDD

17  stands for in this context.

18        Q    Okay.

19        A    It may say -- maximum daily human dose.

20        Q    Correct.

21        A    So, yes, they are giving all of -- giving a

22  maximum dose in the food to these animals.

23        Q    And when you calculate a dose based on an animal's

24  body surface area, would you agree with me that that's a

25  form of velometry?
```

Craig Powell

```
1       A    I think so.  But I'm not an expert in velometry,

2  but that sounds like one of the criteria they use in

3  velometry, yes.

4       Q    Okay.  I'd like to go back to page -- what's

5  marked as page 217.2, and that's just the cover page, I

6  think, for this document.

7            Do you see the date, it looks to be September 13th

8  of 2010?

9       A    Yes.

10      Q    Okay.  And so does -- does it appear to you, based

11  on this document, that the FDA was using allometric scaling

12  to determine the human safety of acetaminophen as of 2010?

13      A    Well, first of all, I can't speak to that because

14  it doesn't say anything about who did this study in the

15  paragraph that you highlighted that I read on page 217.35.

16           Second of all, I mean, yeah.  I don't even know if

17  they -- I mean, they don't have a reference either to that,

18  so I don't know where it comes from.

19      Q    Okay.  Do you agree with me that mice and rats

20  have different body surface areas?

21      A    I do.

22      Q    And did you take that into account anywhere in

23  your expert report when you were determining the 200 mgs per

24  kg dose, which you applied to both rat and mouse studies?

25      A    I would say, yes.  Because the first thing I did
```

1    was use the allometric scaling without the correction factor

2    to figure out what the dosing should be.

3            And again, in rats, it was around, for a human

4    dose, the maximum would be around 90 milligrams per kilogram

5    to a rat.

6            And it would be around 100, I think around --

7    close to 150 milligrams per kilogram, maybe a little more or

8    less, but that's roughly what I determined for a mouse.

9            And again, I increased my cutoff above both of

10   those maximum single doses on allometric.  And for mice it's

11   above the liver toxicity dose and, of course, as we

12   mentioned, for rats, I didn't think the toxicity dose was

13   relevant because they're particularly resistant, as far as I

14   read in the literature.

15       Q    And so -- I'm sorry.  You're saying you did the

16   math and the allometric scaling for a rat dictated 90 mgs

17   per kg, but for a mouse it dictated 150 mgs per kg?

18       A    That's what I said.

19       Q    Okay.

20       A    But I'm happy to calculate it out.  So if the

21   maximum dose for a normal human is a thousand milligrams and

22   you divide that by a standard human being of 70 milligram --

23   70 kilograms, not pregnant human beings, but average human

24   being, you get a single dose of 14.3 milligrams per kilogram

25   and at two Extra Strength Tylenol dose in a human.

1          If you multiply that by 6.2 or 3, let's do 3 just

2    to be conservative, because I never can remember which is

3    which, you get 90 milligrams per kilogram for a rat.

4          And if you do the same thing, let's just say

5    14 milligrams per kilogram times 12. -- I'll do 3, it gives

6    you 172.2.  And my cutoff is 200 for both.  So I think

7    that's a very conservative, lenient interpretation, based on

8    allometric scaling and my understanding of the dose that

9    causes -- that can begin to cause liver toxicity in mice, is

10   150, so I think I was quite conservative.

11   Q    So you did use allometric scaling in coming to

12   your ultimate dose opinion?

13   A    I used allometric scaling at first, and I used

14   liver toxicity in mice, and I came up with a number that I

15   thought was particularly conservative.

16         I mean, I'll point out that when I started this

17   process, I included 99-plus studies, some of which used, you

18   know, way, way, way, really high doses, and I had no a

19   priori knowledge of what the consensus or what the Court

20   would rule is the cutoff or whatever it is.

21         So I was as conservative as I thought was

22   reasonable, and I think the idea that, you know, the four or

23   five studies that both Cabrera and Pearson included where

24   the rats gets 350 milligrams per kilogram per day is

25   high  --

Craig Powell

```
 1        Q    Do you --

 2        A    -- for a human dose.

 3        Q    Do you explain anywhere in your report where you

 4   made those calculations?

 5        A    Let's see.  I explained something about

 6   allometric.

 7             I see my -- where I note that other people failed

 8   to provide any details quantifying their dose levels.

 9             I'm too far down in my report to do this.  I

10   should go backwards.  There it is.  There's part of it.  Let

11   me see if I do --

12        Q    I guess I'm just confused because you said that

13   those conversion factors were inappropriate and inaccurate

14   for acetaminophen, but now it sounds like you used them, in

15   part, to come up with your opinion, which, of course, is

16   fine with me because that's what our experts used, in part,

17   but I just want to see where that is in your report, I

18   guess.

19        A    Yeah.  So I think I -- I mean, as we already

20   talked about, that FDA document I think is inappropriately

21   used because of what it says at its face.

22             And remember, it was cited by plaintiffs' experts,

23   and so I looked at it and read what it was for, I read the

24   whole thing, but I read what it was for, and it clearly says

25   what it's for.
```

Craig Powell

```
 1        Q    So --

 2        A    And what it -- and then I noticed that, in the

 3   end, there was a lot of talk about that this is done all the

 4   time and everything, but I didn't find a reference to that

 5   in plaintiff's experts' reports.

 6             But again, what I did was -- and I don't explain

 7   exactly how I came up with that number, but I think I do

 8   explain that it is a conservative estimate.

 9        Q    Okay.  But the math --

10        A    And I state -- I'm sorry.

11        Q    No, no.  Go ahead.

12        A    And I said what the value is.

13        Q    And -- but the math that you did here today,

14   that's how you came up with those numbers.

15             In other words, we should go off what you're

16   telling us now rather than -- because I don't see it in the

17   report, so I'm just trying to understand.

18        A    Well, you've seen my --

19             MR. PADGETT:  Object to form.

20             THE WITNESS:  -- cutoff, so I think it's

21        reasonable to include less than 200 milligrams per

22        kilogram.  I think it's conservative to do so in both

23        rats and mice.

24             I'm not sure how else to say it than that.

25   BY MS. HUNT:
```

1      Q    Okay.  And you -- you said that you felt it was

2  inappropriate for them to cite to that FDA document because

3  it's for first-in-human trials.

4          But you don't have a problem citing to Gurusamy,

5  which is also for first-in-human trials?

6                    MR. PADGETT:  Object to form.

7                    THE WITNESS:  What I would say is that was

8         one of multiple resources that I used, and so I have no

9         problem citing it because it's for translating from

10        mice data into humans.

11                    And in this case, this is a dose translating

12        from mice into humans with a tenfold corrective factor.

13        So I think we're comparing apples to oranges.

14                    But in any case, I used a conservative

15        number, and I say exactly what that number is.

16  BY MS. HUNT:

17      Q    Okay.  And where do you take into account in your

18  report the differences in APAP metabolism across species?

19      A    In my determination of a conservative threshold of

20  200 milligrams per kilogram, which is higher than the liver

21  toxic dose in mice and higher than the allometric scaling

22  dose in mice for a maximum human dose and higher than an

23  allometric rat dose.

24      Q    Okay.  So your testimony is that using the same

25  dose for rats and mice is how you took the species'

Craig Powell



1   differences into account?

2        A    No.

3                  MR. PADGETT:  Object to form.

4                  THE WITNESS:  That wasn't my answer.

5   BY MS. HUNT:

Craig Powell



Craig Powell



15   BY MS. HUNT:

16        Q    Okay.  Yeah, I'm just doing my best here, Doctor.

17        A    I'm not complaining.

18        Q    And is it -- is it -- is it a fair summary to say

19   that it's not just that species are different sizes, but

20   they actually metabolize the chemicals differently?

21                   MR. PADGETT:  Object to form.

22                   THE WITNESS:  Well --

23   BY MS. HUNT:

24        Q    They metabolize acetaminophen differently?

25        A    With respect to the liver, I would say that they

Craig Powell

1    probably do metabolize these differently and -- yeah, sure.

2        Q    So is it your belief that although the liver

3    metabolizes acetaminophen differently across these different

4    species, other tissues and organ systems metabolize it the

5    same?

6        A    I'm sorry --

7                MR. PADGETT:  Object to form.

8                THE WITNESS:  I didn't catch the whole thing.

9                MS. HUNT:  Oh, no, it's okay.

10               THE WITNESS:  I think because of the AC.

11   BY MS. HUNT:

12       Q    So is it your belief that although the liver in

13   these two different species metabolizes acetaminophen

14   differently, other tissues or organ systems in rats and mice

15   would metabolize acetaminophen the same way?

16       A    Well, I --

17               MR. PADGETT:  Object to form.

18               THE WITNESS:  It was a little ambiguous, but

19          I would say this.

20               I don't really have any a priori knowledge of

21          how the rodents are metabolizing acetaminophen in other

22          organs, other than the liver.

23               And I have some understanding of what I think

24          might be going on in the brains, but there's much less

25          data about that in the rodents and in the humans.

1    BY MS. HUNT:

2        Q    Are rat brains and mouse brains different sizes?

3        A    They are.

4        Q    Okay.  And are they otherwise anatomically

5    different at all?

6        A    In some --

7                MR. PADGETT:  Object to form.

8                THE WITNESS:  In some ways, yes.  In many

9        ways, no, but they're different.

10               MS. HUNT:  All right.  I'm happy to take a

11       break now.

12               THE WITNESS:  Thanks.

13               THE VIDEOGRAPHER:  Off record.  3:12 p.m.

14               (Off the record at 3:12 p.m.)

15               THE VIDEOGRAPHER:  On record.  3:35 p.m.

16   BY MS. HUNT:

17       Q    All right.  Dr. Powell, I want to go back to your

18   expert report again.

19            And I'd like to turn to page 27, and at the bottom

20   of page 27, under "Methodology," you describe your search

21   terms, and I think it continues onto the top of page 28; is

22   that fair?

23       A    Yes.

24       Q    Okay.  And is there a reason that your search

25   terms didn't include anything about gestation or pregnancy?

Craig Powell

```
1        A    Yes.

2        Q    Okay.  Tell me about that.

3        A    Well, my first literature search I wanted to be as

4   inclusive as I possibly could be and then exclude papers on

5   my own manually.

6        Q    Okay.

7        A    So that I didn't end up with too few or too many

8   articles.

9        Q    Okay.  And do you have a complete list somewhere

10  of what articles came back as a result of your literature

11  search?

12       A    I do not.

13       Q    Did you, at some point, have a complete list of

14  articles that came back as a result of your literature

15  search?

16       A    Well, I had the result of my search on the

17  computer, and then I went through all the papers.

18       Q    Okay.  And so you deleted the list, or it got

19  merged into a draft or what?

20       A    I didn't delete the list.  I didn't print out the

21  list.  I went through the list and looked at the papers.

22       Q    Okay.

23       A    And then I closed my window and I kept the papers

24  that I thought were relevant and melded them with some

25  papers that I was provided in -- at the outset of this case
```

Craig Powell

1   by defense attorneys, as I say, at the last sentence of the

2   paragraph 28.  And then I began reading them.

3        Q    Okay.  So as usual, Dr. Powell, you're 10 steps

4   ahead of me.

5             In that next paragraph, paragraph 61, which is on

6   page 28 of your report, you say at the end of that paragraph

7   that some articles were also separately provided to you by

8   the defense attorneys in this case; is that accurate?

9        A    Yes.

10       Q    And do you know sitting here today which studies

11  came from your search and which studies were provided by

12  lawyers?

13       A    No, I think there's a lot of overlap, let's just

14  say, between what I did and what I got from --

15       Q    Okay.

16       A    But not 100 percent, I don't think.

17            And then, of course -- well, I found other

18  articles as I read the literature -- citations in some of

19  the articles led me to additional articles.

20       Q    Okay.  And you say in paragraph 63 that you

21  reviewed each study and you noted several categories of

22  data, which I think continues onto page 29; is that right?

23       A    Yeah.

24       Q    So did you have a chart or something similar that

25  had these annotations about each study?

Craig Powell

```
 1        A    A chart or something that did annotation of these

 2   studies.

 3             Oh, so I noted all these things in draft versions

 4   of my report and then turned them into paragraphs.

 5        Q    Got it.  Okay.

 6             I think we can turn away from the report for a

 7   second.

 8             When were you first contacted about being an

 9   expert in this case?

10        A    I believe it was on or about February the 22nd,

11   2023.

12        Q    Okay.  So all of your opinions in this case you

13   came to in the last six months; is that fair?

14        A    Six months and roughly a week, yeah.

15        Q    Okay.  And who initially contacted you?

16        A    I think it was David Cohen at Butler Snow.

17        Q    Okay.  And how did you decide on an hourly rate?

18        A    I have a -- well, I have a colleague that does

19   this quite a bit, and I used his hourly rate.

20        Q    Who's that colleague?

21        A    I'd rather not say if I can avoid it, but I don't

22   know if I can or not, to be truthful.

23        Q    Is it someone involved in this case?

24        A    Oh, no.  Not at all.

25        Q    And I think as of June, you had billed about 123
```

Craig Powell

```
 1    hours.  Does that sound approximately correct to you?

 2         A    I don't know.  It was about $98,400 worth of hours

 3    at $800 an hour.

 4         Q    Okay.  And of those hours, how many would you

 5    estimate you've spent reviewing the studies?

 6         A    Countless.  I mean, I really have no earthly idea.

 7              It takes a long time to read -- the amount -- the

 8    number of articles that are in these two binders carefully.

 9    And I want to point out I read them once and that gave me a

10    good feel, and then I read them for, you know, several -- I

11    went through them several times for various reasons while

12    preparing my report.

13         Q    You're preaching to the choir, Dr. Powell.

14         A    I'm certain of it.

15         Q    And how many hours did you spend reading about

16    acetaminophen and its effect on neurodevelopment before you

17    decided to be an expert for the defendants in this case?

18         A    Ooh, interesting question.  About, I mean, I think

19    what -- if memory serves, I looked at it -- an e-mail, and

20    then I may -- I can't remember.

21              I think I responded to that e-mail, and then I

22    think I agreed, you know, said, you know, agreed to a call.

23    And then while I was talking on the phone and learned more

24    about what the case was about, I did a quick Google search

25    to see, you know, so maybe 5 minutes, 10 minutes.
```

Craig Powell

```
1        Q    Okay.

2        A    But I don't know.  I don't recall the exact date

3   when I -- well, I agreed on the date of the call, and then I

4   don't know what you consider the formal agreement agreement,

5   but that's -- I just don't recall when that formal formal, I

6   don't know when it becomes formal, to be honest with you.

7        Q    And did you have to submit an external activity

8   form to UAB in connection with your work on this case?

9        A    Yes.

10       Q    And did you get formal approval from UAB to work

11  on this case?

12       A    I did.

13       Q    And I know in the past when you've testified as an

14  expert witness, a portion of your income from that work has

15  gone back to your lab.

16            Is that the case here?

17       A    So, first of all, none of that money went to my

18  lab, I wish it would have.

19            25 percent of those monies at University of Texas

20  Southwestern Medical Center in Dallas -- actually all of the

21  money that I received went to UT Southwestern Medical Center

22  in Dallas, every penny of it.  I signed the check over.

23  They took it.

24            And then I got 75 percent back in paychecks, I

25  think, twice a year, or once or twice a year.
```

Craig Powell

```
 1        Q    Okay.  And are you in a similar arrangement now at

 2   UAB or no?

 3        A    No.

 4             MR. PADGETT:  Can I just object that this

 5        relates to an agreement, and I've got the e-mails, back

 6        and forth between Jim Murdica and Mikal Watts that as

 7        far as compensation, there's an agreement that the only

 8        two questions to be asked about expert compensation

 9        were hourly rate and total -- total amount.

10             MS. HUNT:  Uh-huh.

11             MR. PADGETT:  And so that --

12             MS. HUNT:  Okay.  I'm happy to move on.

13   BY MS. HUNT:

14        Q    Okay.  Dr. Powell, going back to your report.

15             Is it fair to say that one of the -- one of the

16   issues that you critiqued with the studies you analyze is

17   failure to perform an a priori power analysis?

18        A    Yes.

19        Q    Okay.

20        A    No.  I change my answer.

21             One of them was failure to include in the paper a

22   report of a power analysis which, in my view, is interpreted

23   as it either wasn't done or it was done and not followed or

24   it wasn't done.

25             And again, I eliminated no papers on that basis of
```

Craig Powell

1    my analysis and is the basis of my opinions.

2         Q    Did you review any publicly available grant or

3    funding information about those studies that might have

4    included a power calculation?

5         A    I'm not aware that any public database would

6    include those sections of any grant.  So -- but I did not do

7    that.

8         Q    Okay.

9         A    Because I wouldn't have come up with the answer.

10        Q    Is it fair to say that every time you didn't see

11   an a priori power analysis included in the paper's methods,

12   that was part of your critique?

13             In other words, even if you suspected they may

14   have done one, you critiqued the study if they didn't

15   explicitly describe it?

16             MR. PADGETT:  Object to form.

17             THE WITNESS:  I don't remember.  I don't

18        remember where I put my report.

19             I don't know that I even have a list of

20        papers that don't do a power analysis, who don't report

21        a power analysis.  I can't recall.

22             But what I do remember is that I don't recall

23        any of the studies mentioning a power analysis of the

24        ones that I reviewed, the 99 papers of in vivo rodent

25        studies, I may be wrong about that, but I can't recall

Craig Powell

```
1          that any of them contained that and, you know, I think

2          that's totally fine for an exploratory study.

3                  I think the reason I criticize it is because

4          I was concerned that we're not using these to -- you

5          know, in that -- in this arena, you know, those types

6          of exploratory studies can generate hypotheses that

7          require them to be tested and proven in a way that's

8          rigorous.

9                  So I don't -- I didn't eliminate any papers

10         on that basis.

11  BY MS. HUNT:

12      Q    Okay.  And you don't always include an a priori

13  power analysis in your own work, right?

14      A    I don't.  I typically do that for the exploratory

15  studies where we're characterizing mouse models.

16          I would say that -- for when we do things like

17  proteomics or genomix, where there's like thousands of

18  things to test, we typically do correct for multiple

19  comparisons, and we -- oh, you asked power analysis.  I'm

20  sorry.  I'm answering the wrong question.  You're right.

21          So power analysis.  I often don't in our

22  exploratory research.

23      Q    Okay.  And then I want to turn to page 47 of your

24  report which, again, is marked as 201.

25          You have a section starting at the top of page 47,
```

1    and it continues through the middle of page 49, where you

2    talk about proposed mechanisms in the Bauer, et al.,

3    reviews; is that right?

4         A    That is correct.

5         Q    Sorry, give me one second.

6              And when you say the "Bauer, et al. reviews," are

7    you talking primarily about the consensus statement?

8         A    In air quotes, that's what I put in the first

9    sentence of that section, yes.

10        Q    Okay.  And your opinions in this section of the

11   report, are they part of your systematic review that you

12   described earlier with the search terms and the criteria, or

13   is this a supplementary part of your expert report?

14             MR. PADGETT:  Object to form.

15             THE WITNESS:  Yeah, I wouldn't call it

16        supplementary.

17             So I guess I would say that I read a lot of,

18        you know, it's difficult to go through all the

19        literature about all the ever-proposed mechanisms that

20        might possibly be related to a drug.

21             So when I saw the Bauer, et al. reviews, I

22        thought that was a reasonable place to start and say,

23        okay, these are obviously things that are hypothesized

24        to be potential mechanisms, and so I looked into them

25        at the references in the Bauer, et al., and other

Craig Powell

```
 1        references, I think, and just wanted to go through them

 2        systematically, if you will, but it's not a weight of

 3        evidence or systematic review, per se, and review the

 4        literature and learn -- try to understand if there was

 5        valid, consistent, literature that supported these

 6        potential hypothetical mechanisms.

 7   BY MS. HUNT:

 8        Q    Okay.  Because you talk quite a bit in this

 9   section about, for example, anogenital distance, and that

10   was not part of the list of search terms that we discussed

11   earlier, right?

12        A    That is correct.  And this is in direct response

13   to the question of plausible biological mechanisms, and I

14   wanted to look at what they potentially were.  And this was

15   one that was highlighted by Bauer, et al., and has since

16   been highlighted by some of the experts on the plaintiffs --

17   some of the plaintiffs' experts.

18        Q    Could you have conducted a full literature search

19   about the endocrine effects of acetaminophen, including

20   issues like, for example, anogenital distance?

21                  MR. PADGETT:  Object to form.

22                  THE WITNESS:  I'm sure I could have.

23                  However, it wasn't necessary because there

24        have been tests of anogenital distance in autism, and

25        they're not associated.
```

1          And I cite to it, or to review, I'm not sure

2      which -- what articles they are, as I look at the

3      numbers.

4          Go ahead.

5  BY MS. HUNT:

6      Q    But in this section of your expert report, you

7  didn't undertake a full review of all of the literature that

8  might be out there.

9          You just read the consensus statement and then

10 wrote your response to it; is that fair?

11     A    To some of those mechanisms, yes.  And then later,

12 of course, I responded to some of those mechanisms that were

13 raised by plaintiff experts.

14     Q    Okay.

15     A    I wouldn't call it supplemental, though, because I

16 think it was not part of my amended report with rebuttal.

17 Or it wasn't -- how do I put this?

18         Oh, I think you got a copy of my initial report,

19 and then you got a copy of my initial report with the

20 rebuttal.  And I think the section was in the initial

21 report, but I'm not -- I can't --

22     Q    Okay.

23     A    -- know 100 percent for sure, but I'm pretty sure

24 it was.

25     Q    Okay.  But you didn't do, you know, for example, a

Craig Powell

1    Bradford Hill analysis on acetaminophen and endocrine

2    disruption as part of this analysis?

3         A    In humans, no.

4         Q    Okay.  How about a full weight of evidence

5    analysis on acetaminophen and endocrine disruption in in

6    vivo animals?

7                   MR. PADGETT:  Object to form.

8                   THE WITNESS:  I know I did literature

9         searches on that to find all the articles that I cite,

10        which are multiple.

11                   So I definitely read many articles on the

12        subject and evaluated them.

13   BY MS. HUNT:

14        Q    On endocrine disruption?

15        A    Well, I cited 147, 151, 148 through 150, 153, 168

16   through 74.

17                   So I read a lot of papers to ascertain the

18   plausibility of this mechanism for causing autism spectrum

19   disorder or -- and/or ADHD in humans.

20        Q    Do you have those search terms?

21        A    I do not.

22        Q    Okay.  So there's no way for me to go back and

23   reproduce the search again if I wanted to?

24        A    No.  But you could look at the references I cite.

25        Q    Okay.  I want to talk a little bit about Baker

Craig Powell

1    2023.  I've marked that as Exhibit 244.

2                    (Powell Deposition Exhibit 244 marked for

3             identification.)

4    BY MS. HUNT:

5        Q    Dr. Powell, I'm sure you've seen it a time or two.

6             So, I believe you say in your expert report that

7    they saw a decrease in locomotor activity and that that's an

8    unexpected result for a rodent model of ADHD; is that fair?

9        A    That wouldn't be the hypothesis and nor is it the

10   hypothesis that Dr. Pearson outlaid when he discussed those

11   types of tests in relation to ASD and ADHD.

12                   MR. PADGETT:  For the record, I'll object to

13            Exhibit 244 because of the last paragraph appears to

14            have been probably inadvertently completely covered up

15            by highlighting, at least on my version.

16                   MS. HUNT:  Oh, did I get too excited

17            highlighting?  Sorry, Bill.

18                   THE WITNESS:  Let me get a clean copy.

19                   MS. HUNT:  Your objection is noted.

20                   MR. PADGETT:  I'm sure I have a clean copy.

21   BY MS. HUNT:

22       Q    All right.  And actually, we can turn back to your

23   expert report for a moment.  That's probably easier.

24            If we go to page 30 of Exhibit 201.  I want to

25   talk a little bit about what's at the very end of that page.

Craig Powell

1          You say:  "Of note, the lack of changes in pup

2     ultrasonic vocalization is not consistent with expectations

3     of a proposed ASD model.  Decreased social communication is

4     a core feature of ASD and a decrease in social communication

5     in mice is hypothesized to be manifest as decreased USVs."

6          Did I read that correctly?

7     A    Yes.  And I -- you pointed out, without pointing

8     it out, that when I said the lack of changes, I must have

9     meant lack of decreases.  But go ahead.

10    Q    Okay.

11    A    It's an error.

12    Q    And have you ever published on USVs?

13    A    Maybe once or twice, yes.  We haven't done any

14    recently for various reasons.

15    Q    I'd like to look at what's been marked as

16    Exhibit 251.

17               (Powell Deposition Exhibit 251 marked for

18               identification.)

19    BY MS. HUNT:

20    Q    And before we fully dive in here.  Is it your

21    opinion that pup ultrasonic vocalizations in mice are

22    analogous to social communication in humans?

23    A    I would say that --

24               MR. PADGETT:  Object to form.

25               THE WITNESS:  -- my opinion has evolved on

Craig Powell

1      this.

2              Many people -- some people, excuse me, not

3      many.  Some people have argued that ultrasonic

4      vocalizations in rodent pups or rodent adults during

5      mating have some relevance for autism spectrum

6      disorders in that they may be, in some way, have some

7      tiny bit of face validity with human language

8      communication.

9              And what I would say is, I sort of believe

10      that that might be reasonable as an argument in the

11      past, and my thinking has evolved over time on that.

12              MS. HUNT:  Okay.

13              THE WITNESS:  I think it's controversial,

14      whether it has any relevance whatsoever, but insofar as

15      it does have any inkling of face validity, it is

16      hypothesized would be -- hypothesis would be decreased

17      or altered in the character.

18  BY MS. HUNT:

19      Q    Okay.  And I want to also pause for a second on --

20  you say here "decreased social communication is a core

21  feature of ASD."

22          Does the DSM require somebody with ASD to have

23  decreased social interaction?

24      A    The DSM-IV main criteria are, number one, deficits

25  in social communication and related social parameters and

1  deficits or -- I don't remember what it says about that

2  actually.

3        But in terms of communication, I believe the word

4  is "deficits," and then -- yeah.

5     Q    And --

6     A    That would imply a decrease.

7     Q    And clinically -- okay.

8        So your position is that deficits implies a

9  decrease and not just abnormal social communication?

10     A    Well, deficits would be abnormal.

11     Q    Okay.  So --

12     A    But that's -- I'm just telling you the word in the

13  DSM-V -- excuse me.  I keep saying -- to the extent that I

14  say "DSM-IV," let me just tell you that I grew up on DSM-IV

15  when I was in training, at certain times in my life, I think

16  we were DSM-III for a while, then DSM-IV, now we're in

17  DSM-V.

18        If I ever have said DSM-IV instead of DSM-V, I

19  mean DSM-V.  I apologize.

20     Q    I totally understand.

21        But -- so is it your position that the DSM

22  requires decreased social behavior or just abnormal social

23  behavior?

24           MR. PADGETT:  Object to form.

25           THE WITNESS:  It's my testimony that the

```
 1         first word for that criteria and others in ASD is

 2         deficits.

 3  BY MS. HUNT:

 4     Q    And aren't there clinical presentations of ASD

 5  where a patient might actually be very social but just in an

 6  inappropriate way?

 7     A    In autism spectrum disorders.  I don't know how to

 8  describe it in a way that makes it easily understood, but I

 9  would say that there are patients who have deficits in

10  social communication who may talk about subjects that are

11  tangential to the topic and that's a manifestation of their

12  restricted interests.

13     Q    And they might not pick up on social cues, for

14  example, that the other person --

15     A    They have deficits in understanding social cues,

16  yes.

17     Q    Right.  So they might not pick up that the other

18  person in the conversation would like to move on and they're

19  still talking about mice, for example?

20     A    What's the question?  Sorry.

21     Q    Just -- that's okay.  We can keep -- we can keep

22  it moving.

23         Okay.  So I'd like to talk to you a little bit

24  about this paper that I marked as Exhibit 251.

25              (Powell Deposition Exhibit 251 marked for
```

Craig Powell

 1              identification.)

 2   BY MS. HUNT:

 3        Q    Do you recognize this as a paper that you're the

 4   last author on?

 5        A    Yes.

 6        Q    Okay.  And is this paper about a Shank3 mouse

 7   model of autism?

 8        A    It is.

 9        Q    Okay.

10        A    Oh, no, it's not.  It's a model -- it's a mouse

11   model for autism caused by a Shank3 loss of function

12   mutation.

13              To the extent that I ever have said model of

14   autism or agreed that you -- to you calling it a model of

15   autism, I have to correct the record and say that we now no

16   longer talk about models of autism, although that's the

17   title of this paper.

18              We talk about animal models for studying aspects

19   of autism.  And that's sort of an edict from the National

20   Institutes of Mental Health Director, Josh Gordon.

21              So when I first started this, I said mouse model

22   of autism because it's a short term for mouse model of a

23   genetic cause of autism, where we can learn something about

24   potential negatives.

25              But go ahead.

```
 1        Q    Okay.  So I'd like to move to what is marked as

 2   251.24.

 3             And do you see the chart, I think it's labeled as

 4   D in the top right corner of that page.

 5        A    24, the chart?  251.24 is where you're on?

 6        Q    Yep.

 7        A    And you're asking me if I see a chart?  I see --

 8   the graph.  Yes, sorry.

 9        Q    Yes.

10        A    I'm not trying to be --

11        Q    No, it's okay.

12        A    -- picky.

13        Q    That' okay.  Okay.

14             And is the chart labeled as D, a chart that

15   describes pup ultrasonic vocalizations?

16        A    I believe it is.

17        Q    Okay.  And what does WT stand for?

18        A    Wild type.  Typical.

19        Q    Yeah.  Right.

20             So a wild type mouse is a typical mouse that

21   hasn't been genetically --

22        A    Altered.

23        Q    -- modified, right?

24        A    Correct.

25        Q    What does HET stand for?
```

```
 1        A    It means heterozygous, which means that one copy

 2   is, in this case, mutated.

 3        Q    Okay.  And how about KO?

 4        A    KO means two copies are mutated.

 5        Q    Okay.  And if we look at that chart, the y-axis is

 6   the number of calls every five minutes?

 7        A    It is.

 8        Q    Is that fair?

 9        A    Yes.

10        Q    And the x-axis is the postnatal day?

11        A    It is.

12        Q    Okay.  And so it looks like the mice that were

13   genetically modeled to have some features of autism, I'm

14   sure I'm disappointing Dr. Gordon, whoever he is.

15             Those mice, it looks like, had increases in the

16   number of calls on postnatal day 4, 6, and 8, as compared to

17   the wild type mice; is that right?

18        A    That's correct.

19        Q    Okay.  And then you say -- below Figure 6, in the

20   highlighted text, both heterozygous -- and KO stands for

21   knockout?

22        A    Yeah.

23        Q    "Both heterozygous and knockout mice display

24   abnormalities in the number of ultrasonic calls following

25   separation from their mother early in life.  At age
```

Craig Powell

1   postnatal day 4 and postnatal day 6, knockout mice display

2   an increase in number of calls compared to wild type mice,

3   while heterozygous mice display increased calls at postnatal

4   day 4 and postnatal day 12."

5          Did I read that correctly?

6      A    That's correct.  They would have had increased

7   ultrasonic vocalizations in this case and we reported it.

8      Q    And this study is from 2016; is that fair?

9      A    It is.

10     Q    And this study was performed outside the context

11  of litigation, right?

12     A    I hope so.

13     Q    And so is there a reason why in that study you

14  don't say what you said about Dr. Pearson's paper that the

15  decreased social communication is a core feature of ASD and

16  a decrease in communication in mice is hypothesized to be

17  manifested as a decrease in ultrasonic vocalizations?

18     A    Well, I'm not sure I didn't say that.

19          MR. PADGETT:  Object to form.

20          THE WITNESS:  I'd have to re-read the papers.

21     Is there a place that you can point to where I said

22     otherwise?

23  BY MS. HUNT:

24     Q    Well, Dr. Powell, it's your paper.  I'm not sure I

25  can help you with that.

Craig Powell

```
 1        A    I'm not asking for help.  I'm happy to read the

 2   whole paper and see if I said anything to that effect.  If

 3   you think it's not in there or is in there in a different

 4   form, I'm happy to look at it and tell you the answer.

 5        Q    Let's go back to your expert report for just a

 6   second.

 7             On page 31 of your expert report, which again, is

 8   201, you continue talking about the Pearson study.

 9             You say:  "Male pups actually demonstrated

10   increased USVs at one point compared to controls.  Another

11   finding that is opposite of what would be hypothesized in an

12   animal model for ASD."

13             Did I read that correctly?

14        A    Yes.  And that's exactly right.

15             I'm happy to explain.  What we did in this study

16   was take a known cause or try to replicate, reproduce, a

17   known cause, a genetic cause of autism spectrum disorder,

18   and when we do that and we learn that there's any behavioral

19   abnormality of any face validity or change that's related to

20   autism, we've learned absolutely nothing.

21             And I say this in every talk that I give.  That we

22   didn't already know.  Because we already know in this case

23   that mutations in the Shank3 gene cause autism spectrum

24   disorder in humans.

25             And so in our studies, we look at behaviors, and
```

Craig Powell

1    the general naive people expect them to look exactly like an

2    autism person, and you cannot diagnose autism spectrum

3    disorder in a mouse model.

4            So the purposes of our studies are to use the

5    known cause and try and understand what's wrong with the

6    brain and then if that might have some relevance and we can

7    reverse it, then we'll look at that reversing that

8    dysfunction in the brain and then see if that affects any of

9    the behaviors.

10           And so in terms of behavior and what we're

11   studying for mechanisms, I am -- and our lab remains

12   agnostic as to what the expectations are, and let me tell

13   you why.

14           It's because we already know what the cause is and

15   that it is a cause in humans.

16           When you don't know a cause and you're talking

17   about causality using rodents.  Well, first of all, let me

18   just say, if I tried to take a gene and pull it out of the

19   genome and it had no relevance to humans and no causal

20   relevance to ASD, and I put it in a mouse model and it

21   looked exactly like that mouse study, it had all the face

22   valid features of ASD, I would never be able to publish a

23   conclusion that says this supports the concept that a

24   mutation or loss of this gene in humans is a cause of autism

25   spectrum disorder, period.

Craig Powell

```
 1        Q    Right.  So now we're back to it's important to

 2    know what the causes are of autism in humans, right, as you

 3    interpret the data in animals?

 4        A    In my work, we know it's a cause most of the time,

 5    and we don't necessarily look for face validity to support a

 6    cause.  We don't look for face validity or any behavioral

 7    abnormality to support a cause, if it's a known cause.

 8             We try to ask the question, if you model that

 9    cause, what happens to brain function and how might we fix

10    it.

11        Q    But you believe that neurotoxicologists like

12    Dr. Pearson have to achieve face validity even though you

13    don't?

14        A    Well, you can --

15             MR. PADGETT:  Object to form.

16             THE WITNESS:  Well, no, that's incorrect.

17        That's an incorrect characterization of my belief.

18             Insofar as the mouse studies, where

19        acetaminophen is given to pregnant dams, and outcomes

20        are tested in terms of behavior, if one wanted to even

21        attempt to demonstrate that that supports causality in

22        any way, shape, or form, which I don't believe it ever

23        would, then the only thing that some people might

24        actually believe indicated that it has any relevance at

25        all to causality of autism spectrum disorders in a
```

Craig Powell

```
1          human, would be face validity.

2                  And I don't think that would -- and

3          basically, I don't think that supports causality

4          because mice can't have -- they don't have human

5          behaviors, they don't have human interactions, they

6          don't have almost -- they can't lose their cell phone

7          or their keys.  They don't have deadlines to miss.

8          They don't have homework.

9                  So you can't have a mouse that has autism,

10         and that's the director of the National Institutes of

11         Mental Health's position, Dr. Josh Gordon.

12         Q    So it would be --

13         A    We've agreed for a long time about that.  And

14    you'll never -- in any of the papers that come out of my

15    lab, my laboratory, where I'm the last author, I'm not sure

16    you'll find that we argue causality based on behavioral

17    findings.

18         Q    So you're saying it would be impossible?

19         A    To do what?

20         Q    To find causation in animal behavior studies

21    related to acetaminophen as a developmental neurotoxicant?

22         A    That's not what I said.

23                  MR. PADGETT:  Object to form.

24                  THE WITNESS:  I'll say it again.

25                  What I mean -- what I said was very clear.
```

```
1          With respect to acetaminophen being -- being allegedly
2          causal of autism spectrum disorder, or ADHD, as a
3          diagnosis in humans, the mouse model behavioral does
4          not help with supporting the causality in human because
5          mice cannot exhibit those human behaviors and they
6          cannot be diagnosed with autism.
7                   I think every expert on this case has written
8          words -- most experts in this case who think about
9          animal studies have written that in some way, shape, or
10         form, that mouse can't be diagnosed with autism
11         spectrum disorder or ADHD.
12   BY MS. HUNT:
13   Q     Is there a reason, in describing Baker 2023, that
14   you didn't talk about the RNA sequencing data?
15   A     Yes.
16   Q     Can you explain why you didn't talk about it or
17   evaluate it in your report?
18   A     Well, I read about it, and I didn't find it
19   particularly relevant in providing any evidence of causality
20   or biological -- plausible biological mechanism in a human.
21            And so what we're talking about is a paper in
22   which the word "neurotoxicant" and the conclusion that
23   acetaminophen is a neurotoxicant, cannot be found in this
24   paper, and yet Dr. Pearson's perfectly willing to testify
25   that it's a neurointoxicant, but he won't put it in his
```

1    peer-reviewed paper.

2            Second of all, he states clearly in his paper, in

3    his conclusion somewhere, that these are

4    hypothesis-generating experiments and they do not -- and he

5    never in this paper says that this concludes that this paper

6    demonstrates that there's increased oxidative stress or DNA

7    damage in a rodent model.

8        Q    Did you say anything about RNA sequencing in that

9    last answer?

10       A    I did.

11       Q    Okay.  Can you explain to me why the RNA

12   sequencing data, gathered in Baker 2023, is irrelevant to

13   causality and biologic plausibility?

14       A    I'd be happy to.  None of the genes that change on

15   the list of eight actual genes that increased in the brains

16   of the fetuses, none of them are known to be causal of

17   autism spectrum disorder, or ADHD.

18           And if -- if you'd like me to, I can explain

19   the -- all the shortcomings of the subsequent analysis which

20   generates multiple pathways based on some primary literature

21   that's hard to find, but the bottom line is, when you have

22   eight genes that change in a statistically significant

23   manner, the next step conceptually is to -- in this type of

24   a genome wide gene set enrichment analysis, you take all of

25   the changes with a certain cutoff that none of which -- only

Craig Powell

```
 1    eight of which are statistically significant, and then you

 2    feed them into a program that has bio -- it spits out

 3    biological pathways, and -- that are overrepresented in

 4    those changes that aren't statistically significant to begin

 5    with.

 6            And so all that does is generate a hypothesis that

 7    hasn't been tested, to my knowledge.

 8       Q    And do you explain any of that in your expert

 9    report?

10       A    I do not.

11       Q    Okay.  Since we're talking about experts using

12    different language in and outside of the context of

13    litigation, I notice that you use the phrase "cherrypicked"

14    a lot in your expert report.

15            If I told you that you used it five times in your

16    expert report, would that sound about right to you?

17       A    I don't know, but it wouldn't surprise me.

18       Q    Okay.  Is that a phrase you've ever used in your

19    academic publications?

20       A    No.

21       Q    Have you ever used that phrase in any of your

22    social media posts?

23       A    I don't think so, but I'll point out that that's

24    not a conclusion about this case.  It's a characterization

25    of ignoring one set of data and using only the data
```

1    selectively that supports your opinion, and that's something

2    that I've used in conversations with other scientists, yes,

3    but, no, I don't -- it's not reaching a conclusion that I'm

4    stating.  It's just characterizing that concept of picking

5    data that supports but ignore data that doesn't support your

6    conclusion.

7        Q    As you sit here, can you point to a single written

8    document where you've used that phrase outside the context

9    of litigation?

10       A    No.  And again, it's not a scientific term or a

11   scientific conclusion, which is in contradistinction to the

12   answer you're referring to that I gave earlier.

13       Q    You also -- if we can look at page 86 of your

14   report.  There's some other language I wanted to ask you

15   about.

16            You were talking about -- this is at the top of

17   page 86, you were talking about Beck 2001, and the controls,

18   and you describe a process called gavage.

19            And your definition for gavage is grabbing the

20   animal roughly by the nape of the neck and forcing a tube

21   down the throat and into the esophagus, slash, stomach.

22            Did I read that reasonably correctly?

23       A    You did.  And if you've ever done it, that's

24   exactly the only way you can do it without getting bitten by

25   the mouse.

```
 1            Go ahead.

 2       Q    Okay.  Is grabbing the animal roughly a

 3   requirement of performing gavage?

 4                 MR. PADGETT:  Object to form.

 5                 THE WITNESS:  I would say that if you don't

 6            grab -- I've taught many people how to scruff a mouse,

 7            which is grabbing the animal roughly by the nape of the

 8            neck in a way so that it cannot turn its head and bite

 9            you and causing you to then fling the mouse across the

10            room, curse loudly, and hurt the mouse worse than you

11            otherwise would have.

12                 So it's unethical not to grab the animal

13            roughly the nape of the neck because it will bite you

14            and you will respond reflexively.

15   BY MS. HUNT:

16       Q    Okay.  And another piece of language I want to ask

17   you about, moving back earlier in your report to page 4,

18   paragraph 7.

19            You say:  "Overall, plaintiffs' experts' opinions

20   are based upon flawed methodologies and unscientific

21   speculation."

22            And I know you disagree with the ultimate

23   conclusion of the experts who testify for plaintiffs, but

24   are you opining that Bradford Hill, for example, is a flawed

25   methodology?
```

Craig Powell

```
 1        A    What I was referring to -- no.

 2             What I was referring to here is that weight of the

 3   evidence scoring system of Dr. Pearson, which is in no way

 4   explained and which was, in my opinion, misapplied, and

 5   that's what I mean -- that's part of the things that I've

 6   outlined later in my report about flawed application of the

 7   methodologies.

 8        Q    Okay.  So you don't -- you don't have an issue

 9   with Bradford Hill or weight of evidence.

10             You have an issue with how they were applied or

11   interpreted by the experts on the other side of this

12   litigation?

13        A    How they were --

14                  MR. PADGETT:  Object to form.

15                  THE WITNESS:  How they were applied in

16        practice.

17                  For example, consistency, which was talked

18        about in most of these experts' reports on the

19        plaintiffs' side for sure, talked about consistency,

20        which refers to reproducibility, replication, and no --

21        aside from speaking of it, they don't give a lot of

22        weight or credence to the fact that many of these

23        findings are either unreplicated or contradictory in

24        nature.

25
```

Craig Powell

```
1    BY MS. HUNT:

2        Q    Okay.  Does your expert report have a causation

3    opinion in it?

4                 MR. PADGETT:  Object to form.

5    BY MS. HUNT:

6        Q    In other words --

7        A    It has a causation opinion with respect to the

8    rodent literature, and -- well, that's -- it's in here.  Let

9    me see if I can search it real quick.

10               93.  Paragraph 93.  "In sum, after a thorough and

11   systematic review of the existing literature on effects of

12   acetaminophen on the rodent developing fetus, I can find no

13   scientifically valid study that support a biological

14   mechanism whereby acetaminophen might cause ADHD."

15       Q    Okay.

16       A    "Taken together, the behavioral and unbehavioral

17   outcomes assessed in the systematic review of the

18   acetaminophen animal scientific literature do not provide

19   evidence of consistent, independently reproduced findings to

20   suggest that the" -- "that maternal use of acetaminophen can

21   cause ADHD or ASD in offspring."

22               And in this case, I'm referring to humans, which

23   is the question of record.

24       Q    And I think you actually say this again later in

25   the report.
```

Craig Powell

```
 1       A    It could be.

 2       Q    Let me make sure I find the page number.

 3            Okay.  So this is page 81, paragraph 177.

 4            You say the -- at the end of that paragraph.

 5       A    Hang on.  I can't listen to the question and find

 6   the place.  Paragraph what?

 7       Q    Sorry.

 8       A    That's okay.

 9       Q    Page 81, paragraph 177.

10       A    Page 81.  177.  I'm at 81, almost.  177, got it.

11       Q    At the end of that paragraph, you say:  "The

12   relevant question is whether appropriate doses of

13   acetaminophen led to lasting changes in the developing brain

14   that are consistent with the known causal pathologies of ASD

15   or ADHD.  Someone suggesting causation needs to demonstrate

16   such a mechanism."

17            Did I read that correctly?

18       A    You did.  That's what it says.

19       Q    So is your opinion that to determine general

20   causation, when you see an association in human literature,

21   human epidemiological literature, is it your opinion that

22   you have to demonstrate biologic plausibility?

23       A    No.  What I meant was --

24            MR. PADGETT:  Object to form.  Go ahead.

25            THE WITNESS:  What I meant in this particular
```

Craig Powell

```
1          instance, and it's probably poorly worded, is that --

2          my understanding is that causation is a question by

3          itself.

4                   And I've stated, as you read, or I read, that

5          earlier in their report, my conclusion from my

6          analysis, which is that there's no evidence in the

7          rodent literature that supports causality of ASD or

8          ADHD in humans.

9                   On the other hand, there's some sort of --

10         somewhere one has -- there's the idea that there must

11         also be a plausible biological mechanism and there

12         isn't, that I could find in the literature.

13                  MS. HUNT:  Okay.

14                  THE WITNESS:  That's what I meant to say.

15                  MR. PADGETT:  Can we take a short break soon?

16                  MS. HUNT:  Yep.  Sure.  In just a minute.

17   BY MS. HUNT:

18        Q    Okay.  And so I'm sorry if I'm being dense.  I

19   just want to understand.

20                  Is your opinion that there should be biologic

21   plausibility before someone can say this environmental

22   cause -- this environmental --

23        A    Exposure.

24        Q    -- exposure, thank you.  Leads to this outcome?

25        A    That is not my opinion.
```

Craig Powell

1            It's my opinion that -- I was given the task of

2    reviewing whether the mouse models suggested causality or

3    supported causality, and it's my opinion that they do not.

4            Separately, I was asked to comment on whether

5    there's a biological plausible mechanism in this rodent

6    literature whereby that might happen, and I did not find

7    that.

8        Q    Are you familiar with the Bradford Hill factors?

9        A    After the last six months, I'm very familiar.

10           But no.  I'm not 100 percent familiar with them,

11   but I have a working passing knowledge of them, yes.

12       Q    Did you ever have to learn them in school?

13       A    I can't recall.  I don't recall if I did.

14           I'm sure I might have, but I don't remember, to be

15   honest.

16       Q    Okay.  As -- you know what, how about we take a

17   break?

18               THE WITNESS:  Okay.

19               MS. HUNT:  I'm at a good stopping point.

20               THE VIDEOGRAPHER:  Off record.  4:25.

21               (Off the record at 4:25 p.m.)

22               THE VIDEOGRAPHER:  On record.  4:47 p.m.

23   BY MS. HUNT:

24       Q    Okay.  Dr. Powell, one of the things you point out

25   in your expert report is that changes detected in

1   neurotransmitters might be transient and not permanent; is

2   that fair?

3        A    What I recall about my comments on

4   neurotransmitter levels was that it doesn't -- it's not a

5   marker of neurotransmission at all, or the function of

6   synapses, or how neurons communicate with each other.  It's

7   the whole tissue level.

8            I don't remember saying that, but if you can point

9   me, I'm happy to agree to it, if that's what I said.

10       Q    Okay.  And if a study like, for example, the

11  Blecharz-Klin study measured neurotransmission, you don't

12  have an opinion one way or another about whether those

13  changes in neurotransmitters are transient or not?

14               MR. PADGETT:  Object to form.

15               THE WITNESS:  First of all, I would have to

16       say that the -- but none of the Blecharz-Klin, in fact,

17       none of the studies that I remember reviewing, as I sit

18       like here today, measured neurotransmission, period.

19               And second of all, when you're talking about

20       levels of whole tissue neurotransmitters, at one time

21       point, I would say that would be an accurate statement

22       if I said it.

23  BY MS. HUNT:

24       Q    Okay.  Did you use any methodology to determine

25  that those changes were transient as opposed to permanent,

Craig Powell

1    or is the assumption that because they were measured at one

2    point in time they're transient?

3                    MR. PADGETT:  Object to form.

4                    THE WITNESS:  The way I came to that

5           conclusion was I read the paper, and they were measured

6           at one point in time.  And so we don't know whether

7           they are transient or not.

8                    MS. HUNT:  Okay.

9                    THE WITNESS:  That's what I can say.

10   BY MS. HUNT:

11        Q    Switching gears a little bit, Dr. Powell.

12             Do you agree with me that, in general, the

13   manufacturer of a drug should be concerned with determining

14   any issues with its safety?

15                   MR. PADGETT:  Object to form.

16                   THE WITNESS:  Well, first of all, I think

17          that all pharmaceutical companies should follow the

18          appropriate laws and FDA guidelines, and I think

19          that -- I think -- I don't know -- I mean, I know

20          there's a lot of post-marketing surveillance that goes

21          on in drug companies.  In some cases it's mandated,

22          they call it phase IV clinical trials.

23   BY MS. HUNT:

24        Q    And is it particularly important if it's a drug

25   that's being administered to pregnant women?

```
 1        A    Is what particularly important?  Sorry.

 2        Q    The manufacturers acting responsibly over the drug

 3   safety.

 4              MR. PADGETT:  Object to form.

 5              THE WITNESS:  Yeah.  I mean, acting

 6        responsibly is broad and vague, and so I'm not sure I

 7        can answer that question accurately.

 8              What I think you're asking is:  Should drug

 9        companies follow the laws and FDA regulations and

10        processes, and I believe that they should, and I

11        believe that that is our mechanism as a country for

12        ensuring that drugs are as safe as they possibly can be

13        and, of course, every drug has risks and benefits.

14              You can die tomorrow from an aspirin, from an

15        anaphylactic reaction and, you know, when I read the

16        list of possible side effects in patients, they often

17        don't want to take a drug, and when I go back and I

18        read them an aspirin side effects, or something like

19        that, they -- they feel reassured because many of --

20        many of those issues can overlap with things that they

21        feel very safe.

22   BY MS. HUNT:

23        Q    Okay.  And so that information that pharmaceutical

24   companies provide to doctors and consumers, it's important

25   that it be accurate?
```

Craig Powell

```
 1                    MR. PADGETT:  Object to form.

 2                    THE WITNESS:  It's important that it be

 3           compliant with the FDA guidance and laws.

 4    BY MS. HUNT:

 5        Q    Okay.  But you don't care if it's accurate?

 6                    MR. PADGETT:  Object to form.

 7                    THE WITNESS:  I assume it's accurate.

 8    BY MS. HUNT:

 9        Q    Okay.  When you treat pregnant patients, do you

10    ever have occasion to reference the FDA's pregnancy

11    categories?

12        A    Reference the FDA categories.  I -- I have -- I

13    look at them.  I don't know what you mean by "reference,"

14    but I definitely look at them.  So I'm familiar with it, at

15    least the way they used to be.

16             I don't know if it's been changed from A, B, C, X,

17    or whatever, but.

18        Q    Would you agree with me that those categories have

19    meaning in terms of what you might recommend to a pregnant

20    patient or what a pregnant patient might ultimately choose

21    to take?

22                    MR. PADGETT:  Object to form.

23                    THE WITNESS:  You know, I -- in my practice,

24           I'm trying to remember if I've ever prescribed a drug

25           to a pregnant woman without consulting an OB-GYN, and I
```

Craig Powell

```
 1        don't think that I have.

 2              So I always make that decision, especially

 3        when I'm doing consults in the hospital.  They're

 4        usually on the OB-GYN service, and I consult with them

 5        on the safety and pregnancy issue.

 6              And, of course, I look it up myself and have

 7        some idea, so I don't, you know, so I can speak

 8        intelligently with the OB-GYN about the question and

 9        what I think should happen.

10   BY MS. HUNT:

11        Q    Would it be okay with you if a pharmaceutical

12   company misrepresented what pregnancy category a drug was in

13   to a doctor?

14              MR. PADGETT:  Object to form.

15              THE WITNESS:  What was the word you used,

16        would I be?

17   BY MS. HUNT:

18        Q    Would it be okay with you if a company

19   misrepresented the pregnancy category a drug was in to

20   doctors?

21              MR. PADGETT:  Object to form.

22              THE WITNESS:  Well, I don't know the laws,

23        but I don't think that's okay within the guidelines.

24   BY MS. HUNT:

25        Q    Because you would want accurate information,
```

Craig Powell

```
 1   right, if you were going to recommend a drug to a pregnant
 2   woman?
 3        A    I would -- well, first of all, I would check with
 4   the OB-GYNs first, which is my routine practice, especially
 5   since I mostly work in the hospital setting.
 6             But I would say that the pregnancy categories I
 7   hope would follow the laws and the regulations of the FDA
 8   and other authorities.
 9        Q    And it would behoove the manufacturer to know
10   which category their drug fell into, right?
11             MR. PADGETT:  Object to form.
12             THE WITNESS:  I'm an academic neurologist, a
13        neuroscientist.  I've never worked in a pharmaceutical
14        company in my life, so I don't have a lot of
15        information on what they should or shouldn't do.
16             But insofar as would it behoove them, I think
17        it would be in their interest to have accurate
18        information, sure.
19   BY MS. HUNT:
20        Q    Okay.  Do you think that pharmaceutical companies
21   can sometimes create bias around the safety of their
22   products?
23             MR. PADGETT:  Object to form.
24             THE WITNESS:  I don't know.
25
```

Craig Powell

```
 1    BY MS. HUNT:

 2        Q     Are you aware that that phenomenon has been

 3    studied?

 4                   MR. PADGETT:  Same objection.

 5                   THE WITNESS:  I don't think I've read that

 6         literature.

 7    BY MS. HUNT:

 8        Q     Are you aware of sponsorship bias?

 9        A     Sponsorship bias.

10                   MR. PADGETT:  Same objection.

11                   THE WITNESS:  I think if you're -- I'm not

12         really aware of that term, but what I am aware of is,

13         you know, we used to get a lot of pens and little books

14         and they used to have stickers on them.

15                   And I could never figure out the point of

16         that, because I don't -- I never thought that it was

17         affecting my prescribing practices.  However, now we

18         don't do that anymore, and so we don't have sponsorship

19         bias these days.

20                   If you mean by sponsorship bias, tchotchkes

21         and swag and trips that, you know, to exotic places

22         that I've never been on.

23    BY MS. HUNT:

24        Q     Are you aware that there is a body of literature

25    analyzing how replicated studies can be different depending
```

```
 1   on who the financial sponsor is?

 2       A    I don't know that --

 3             MR. PADGETT:  Object to form.

 4             THE WITNESS:  -- literature, no.  But I'm not

 5       aware of the concept of, you know, there could be

 6       conflicts if the study is directly relevant to a drug

 7       that that company is selling and it's a human clinical

 8       trial.

 9   BY MS. HUNT:

10       Q    Okay.  I'd like to look at what has been marked as

11   Exhibit 234.

12             Sorry for making you reach, Dr. Powell.

13             THE WITNESS:  Oh, please, I wasn't

14       complaining.

15             MR. PADGETT:  But not me.

16             MS. HUNT:  Bill, you're used to it.

17             (Powell Deposition Exhibit 234 marked for

18       identification.)

19   BY MS. HUNT:

20       Q    Okay.  So does it appear to you that the title of

21   this article is:  "The disinformation playbook:  How

22   industry manipulates the science-policy process and how to

23   restore scientific integrity."

24             Did I read that correctly?

25       A    You did.  That's the title of this article that
```

Craig Powell

```
 1    I've never read.

 2         Q    Moving down to footnote 1.

 3              Do you know who the Union of Concerned Scientists

 4    are?

 5         A    No, I could guess, but no.

 6         Q    Okay.

 7         A    Never heard of them.

 8         Q    All right.  I'd like to take a look at the

 9    abstract.

10              It says:  "For decades, corporate undermining of

11    scientific consensus has eroded the scientific process

12    worldwide.  Guardrails for protecting science-informed

13    processes from peer-reviewed to regulatory decision-making

14    have suffered sustained attacks, damaging public trust in

15    the scientific enterprise and its aim to serve the public

16    good.  Government efforts to address corporate attacks have

17    been inadequate.  Researchers have cataloged corporate

18    malfeasance that harmed people's health across diverse

19    industries.  Well-known cases like the tobacco industry's

20    efforts to downplay the dangers of smoking are

21    representative of transnational industries rather than

22    unique.  This contribution schematizes" -- I don't know, you

23    might have to help me out with that, Dr. Powell -- "industry

24    tactics to distort, delay, or distract the public from

25    instituting measures that improve health.  Tactics that
```

```
 1    compromise the disinformation playbook."

 2              Did I read that reasonably correctly?

 3       A    I would say that you read the words correctly, and

 4    I would ask to make sure that you didn't represent this

 5    paper as scientific research because if I said something

 6    about, yes, this is a scientific research study, it doesn't

 7    appear to me to be a research study.  It appears to me to be

 8    either an opinion piece and/or an overview or review, just

 9    to be clear.

10              I don't remember what you asked me about this

11    paper before, but I just wanted to make sure I didn't answer

12    it incorrectly.

13       Q    All right.  I'd like to move to 234.3.  And I want

14    to take a look at Figure 1 up at the top here.

15              And it says here that the first step in the

16    disinformation playbook is to fake the science.  Do you see

17    that in the second column?

18              And I know it's a little bit small and hard to

19    read, so I'll read it for you.

20       A    I can read it.

21       Q    Okay.  It says:  "Conduct or fund counterfeit

22    science and disguise it as legitimate research.  Example,

23    the maker of asbestos-containing baby powder, Johnson &

24    Johnson, knowingly failed to use a testing method with

25    adequate sensitivity to find asbestos levels and hid
```

Craig Powell

```
1   unfavorable test results from the FDA."

2           Did I read that correctly?

3               MR. PADGETT:  Object to form.

4               THE WITNESS:  That's what it says.

5   BY MS. HUNT:

6       Q   Okay.  And then as we continue, it says:  "Spread

7   baseless or false doubt about the harm."

8           Then it says -- under step 2:  "The scientific

9   community speaks out."

10          It says:  "Retaliate against scientists whose

11  views, statements, or research is inconvenient for industry

12  interests."

13          Let me ask you this:  If Johnson & Johnson were to

14  retaliate against scientists who have studied the link

15  between acetaminophen and neurodevelopmental disorders; is

16  that something that you would have a problem with?

17              MR. PADGETT:  Object to form.

18              THE WITNESS:  I think the -- I probably

19      wouldn't have an opinion on that personally, but I'm

20      sure other people might have a problem with it,

21      other -- you know, federal government agencies, that

22      sort of thing, FDA.

23              So I don't know the answer.  I mean, it's --

24      me personally, I wouldn't pay much attention to it,

25      frankly, unless it had to do with my practice.
```

Craig Powell

```
 1               I don't prescribe anything -- I don't
 2        prescribe baby powder and/or tanning, and I would have
 3        to say I'm aware of the Monsanto issues around, what is
 4        it, Roundup?  Yeah, I've used Roundup.
 5               So that -- that would bother me.  That one
 6        bothers me, but the other stuff, I don't know.
 7  BY MS. HUNT:
 8        Q    So as long as it doesn't affect you personally,
 9  you don't have an opinion on it one way or another?
10               MR. PADGETT:  Object to form.
11               THE WITNESS:  Well, that's not what I said.
12               But what I'm saying is, I don't prescribe
13        baby powder or indoor tanning, and I said I use
14        Monsanto.
15               So insofar as I use Roundup and other
16        products in my daily life, it would concern me more
17        than something that is outside of my realm of
18        experience, which is prescribing baby powder, indoor
19        tanning.  I don't do that.
20               I mean, that's all I have to say.
21  BY MS. HUNT:
22        Q    Are you aware that Johnson & Johnson has
23  personally sued researchers in federal court for defamation
24  over their findings that there's asbestos in baby powder?
25        A    No.
```

Craig Powell

```
 1                    MR. PADGETT:  Object to form.

 2   BY MS. HUNT:

 3       Q    Does that concern you at all?

 4       A    Does what concern me?  The fact that --

 5                    MR. PADGETT:  Same objection.

 6                    THE WITNESS:  What's the concern?  Does what

 7       concern me?  Sorry.

 8   BY MS. HUNT:

 9       Q    Does it concern you that this company, who you're

10   serving as a paid expert for, would retaliate against

11   scientists who found unfavorable results in their studies on

12   Johnson & Johnson products?

13                    MR. PADGETT:  Object to form.

14                    THE WITNESS:  I can't be concerned about

15       something that I'm unaware of.

16   BY MS. HUNT:

17       Q    Okay.  If it were true, is that something that

18   would concern you?

19                    MR. PADGETT:  Same objection.

20                    THE WITNESS:  Concern me, I mean, yeah.  It's

21       concerning if it were true, and I don't know the basis

22       of that and, you know, or the literature, so I really

23       don't think it's valid for me to answer that question.

24   BY MS. HUNT:

25       Q    Okay.  And if you look below the figure, there's
```

Craig Powell

```
 1    this -- there's a section header that says:  "Faking

 2    Science.  Conducting or paying others to conduct flawed or

 3    bias scientific studies or hiding research with unfavorable

 4    conclusions."

 5              And then it continues:  "Industry-sponsored

 6    research is more likely to have favorable outcomes for the

 7    target product or process than research funded by other

 8    sources, a phenomenon known as the funding effect."

 9              And then it continues:  "Companies can publish

10    studies with flawed methodologies, hire firms from the

11    product defense industry, and publish ghostwritten

12    articles."  Those are just some examples from that list.

13              Are you aware of Johnson & Johnson doing any of

14    those things related to acetaminophen in this case?

15                   MR. PADGETT:  Object to form.

16                   THE WITNESS:  I don't -- no.

17    BY MS. HUNT:
```

Craig Powell



Craig Powell



Craig Powell



Craig Powell



Craig Powell



Craig Powell

█ ████████████████████████████

█           ████████   ██████████

█           ████████   █████████████

█    ██████████

5   BY MS. HUNT:

6        Q     Okay.  Are you aware that experts contacted by the

7   plaintiffs in this case have been told by their institutions

8   that they can't testify for fear of financial repercussions

9   in terms of Johnson & Johnson pulling funding from their

10  universities?

11               MR. PADGETT:  Object to form.

12               THE WITNESS:  I have no knowledge of that.

13  BY MS. HUNT:

14       Q     Did you read the deposition of Dr. Cabrera?

15       A     I believe I did, yes.

16       Q     Do you know who Dr. Finnell is?

17       A     No.

18       Q     Dr. Rick Finnell at Baylor?

19       A     No.

20       Q     Doesn't ring a bell?

21       A     I don't -- I don't think so.  Rick Finnell at

22  Baylor College of Medicine.

23             And what does he do here?

24       Q     He's the reason we have fully interbred.  He runs

25  the lab there.

```
 1        A    Yeah, I don't know him.

 2        Q    Okay.  So you're not aware of the testimony that

 3   he was not permitted to testify as an expert in this case

 4   for fear that Johnson & Johnson would seek retribution with

 5   Baylor?

 6                   MR. PADGETT:  Object to form.

 7                   THE WITNESS:  I don't recall that in a

 8        deposition, and so I'm not aware and wasn't aware.

 9   BY MS. HUNT:

10        Q    Are you aware of the testimony from Rachel

11   Weinstein, the director of consumer epidemiology at Johnson

12   Consumer, Inc., that she is part of an effort to publish

13   pharmaceutical industry funded studies on acetaminophen?

14                   MR. PADGETT:  Object to form.

15                   THE WITNESS:  I have no knowledge of any of

16        that.

17   BY MS. HUNT:

18        Q    Okay.  Did you ask to see any of the corporate

19   depositions in this case?

20        A    No.

21        Q    Were you interested to see them?

22                   MR. PADGETT:  Object to form.

23                   THE WITNESS:  I'm not sure I had any idea

24        they even existed when I was writing this report, and

25        in preparing for the deposition, I guess I saw
```

Craig Powell

```
 1          references to the depositions and the other experts'

 2          reports, so to the extent that I -- not reports, but --

 3          well, maybe the reports and/or the depositions, I

 4          think, I was aware that maybe that had happened based

 5          on that, but it was not primary information that I was

 6          aware of, other than through depositions and, you know,

 7          there's never a complete explanation of what's happened

 8          before in those depositions, so I don't really know

 9          what's happened.

10   BY MS. HUNT:

11       Q    Okay.  Do you think that the studies and the

12   review papers that Johnson & Johnson Consumer, Inc., is

13   funding are going to be objective?

14               MR. PADGETT:  Object to form.

15               THE WITNESS:  I would hope so.

16   BY MS. HUNT:

17       Q    Are you aware that Johnson & Johnson Consumer,

18   Inc., and other retailers who sell acetaminophen, sent

19   process servers to the homes of scientists who have

20   published on acetaminophen?

21       A    No.

22               MR. PADGETT:  Object to form.

23   BY MS. HUNT:

24       Q    Are you aware that they were subpoenaed in federal

25   court because of their publications about acetaminophen?
```

Craig Powell

```
 1                    MR. PADGETT:  Same objection.

 2                    THE WITNESS:  Because of their what?

 3    BY MS. HUNT:

 4        Q    Because of their published -- publications on

 5    acetaminophen?

 6        A    I have no knowledge of that.

 7        Q    Okay.  And is it fair to say that none of this

 8    troubles you as a scientist?

 9        A    Well --

10                    MR. PADGETT:  Object to form.

11                    THE WITNESS:  What I don't know hasn't

12         troubled me.

13                    MS. HUNT:  Can I take a quick break?

14                    THE VIDEOGRAPHER:  Off record, 5:14.

15                    (Off the record at 5:14 p.m.)

16                    THE VIDEOGRAPHER:  On record, 5:27 p.m.

17                    MS. HUNT:  Dr. Powell, I have no more

18         questions at this time.  I'd like to reserve the

19         remainder of my time for recross, if any.

20                    MR. PADGETT:  No questions.

21                    THE VIDEOGRAPHER:  Off record.  5:27 p.m.

22                    (Deposition concluded at 5:27 p.m.)

                            —  —  —

23

24

25
```

Craig Powell

```
 1                         CERTIFICATE
 2              I, Jennifer A. Dunn, Registered Merit
 3    Reporter, Certified Realtime Reporter, Certified Shorthand
 4    Reporter, and Certified Court Reporter, do hereby certify
 5    that prior to the commencement of the examination, CRAIG
 6    POWELL, M.D., Ph.D., was duly remotely sworn by me to
 7    testify to the truth, the whole truth and nothing but the
 8    truth.
 9              I DO FURTHER CERTIFY that the foregoing is a
10    verbatim transcript of the testimony as taken
11    stenographically by me at the time, place and on the date
12    hereinbefore set forth.
13              I DO FURTHER CERTIFY that I am neither a
14    relative nor employee nor attorney nor counsel of any of the
15    parties to this action, and that I am neither a relative nor
16    employee of such attorney or counsel, and that I am not
17    financially interested in the action.
18
19             "/s/JENNIFER A. DUNN"
20                  Registered Merit Reporter
21                 Certified Realtime Reporter
22
23
24             Dated:  August 31, 2023
25
```

Craig Powell

```
 1                    INSTRUCTIONS TO WITNESS

 2                    Please read your deposition over carefully

 3     and make any necessary corrections.  You should state the

 4     reason in the appropriate space on the errata sheet for any

 5     corrections that are made.

 6                    After doing so, please sign the errata sheet

 7     and date it.  You are signing same subject to the changes

 8     you have noted on the errata sheet, which will be attached

 9     to your deposition.

10                    It is imperative that you return the original

11     errata sheet to the deposing attorney within thirty (30)

12     days of receipt of the deposition transcript by you.

13                    If you fail to do so, the deposition

14     transcript may be deemed to be accurate and may be used in

15     court.

16

17

18

19

20

21

22

23

24

25
```

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2                I, CRAIG POWELL, M.D., Ph.D., do hereby

 3    certify that I have read the foregoing pages and that the

 4    same is a correct transcription of the answers given by me

 5    to the questions therein propounded, except for the

 6    corrections or changes in form or substance, if any, noted

 7    in the attached Errata Sheet.

 8                _____

                 CRAIG POWELL, M.D., Ph.D.          DATE

 9

10

11    (Reported by:  Jennifer A. Dunn, RMR, CRR, CCR & CSR)

12

13

14    Subscribed and sworn to before me this

15     _____ day of _____, 20 _____.

16

17    My commission expires: _____

18    _____

19                  Notary Public

20

21

22

23

24

25
```

Craig Powell

```
 1                       ERRATA SHEET

 2    WITNESS:  Craig Powell, M.D., Ph.D.

 3    IN RE:    Acetaminophen (Tylenol) ASD-ADHD Products

                Liability Litigation MDL No. 3043

 4

      Upon reading the deposition and before subscribing thereto,

 5

      the deponent indicated the following changes should be made:

 6

 7    PAGE  LINE   CHANGE/REASON

 8    _____ _____  _____

 9    _____ _____  _____

10    _____ _____  _____

11    _____ _____  _____

12    _____ _____  _____

13    _____ _____  _____

14    _____ _____  _____

15    _____ _____  _____

16    _____ _____  _____

17    _____ _____  _____

18    _____ _____  _____

19    _____ _____  _____

20    _____ _____  _____

21    _____ _____  _____

22    _____ _____  _____

23    _____ _____  _____

24

25    _____
```