# EXHIBIT 1

# UNITED STATES JUDICIAL PANEL ON
# MULTIDISTRICT LITIGATION

## HEARING IN RE: ACETAMINOPHEN – ASD/ADHD PRODUCTS LIABILITY LITIGATION
## MDL NO. 3043

### TRANSCRIPT OF ORAL ARGUMENT
### HEARD ON SEPTEMBER 29, 2022
### ST. LOUIS, MISSOURI

Chairman:                Honorable Karen K. Caldwell
                         United States District Court
                         Eastern District of Kentucky

Members:                 Honorable Dale A. Kimball
                         United States District Court
                         District of Utah

                         Honorable Matthew F. Kennelly
                         United States District Court
                         Northern District of Illinois

                         Honorable Madeline Cox Arleo
                         United States District Court
                         District of New Jersey

Reported By:             REAGAN A. FIORINO, RMR, CRR, CSR, CCR
                         Official Court Reporter
                         United States District Court
                         111 South 10th Street
                         St. Louis, MO 63102 | (314)244-7989

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

INDEX

ORAL ARGUMENT

Mikal Watts, Esq. . . . . . . . . . . . . . . . . . . . 3

Ashley Barriere, Esq. . . . . . . . . . . . . . . . . . 8

Amanda M. Williams, Esq. . . . . . . . . . . . . . . .13

Robert L. Kinsman, Esq. . . . . . . . . . . . . . . . .14

James F. Murdica, Esq. . . . . . . . . . . . . . . . .17

Donald F. Zimmer, Jr., Esq. . . . . . . . . . . . . . .26

Amanda L. Groves, Esq. . . . . . . . . . . . . . . . .30

REBUTTAL

Mikal Watts, Esq. . . . . . . . . . . . . . . . . . . .33

*   *   *

```
 1                        SEPTEMBER 29, 2022
 2            (The proceedings commenced at 9:33 a.m.)
 3            JUDGE CALDWELL:  Good morning.  Welcome to
 4   St. Louis.  I would like to begin by thanking all of the
 5   people here in the United States District Court for the
 6   Eastern District of Missouri for hosting this hearing.  In
 7   particular, I would like to thank Judge Catherine Perry, a
 8   former JPML member, and also Chief Judge Rod Sippel for
 9   welcoming us.  I would like to thank the clerk's office for
10   all of the work that they have done to assist us in making
11   this hearing possible.
12            So, again, welcome.  And we will begin by hearing
13   our first case, MDL No. 3043.  I see that counsel are already
14   lined up.
15            Is this Mr. Watts for the moving plaintiff in the
16   Aujenai Thomas action?
17            MR. WATTS:  Good morning.
18            JUDGE CALDWELL:  Before you begin, let me just say
19   to each counsel:  If you would please make your appearance,
20   state the party that you're representing and the position you
21   take on the motion.  We won't hold that time against you.
22            Please proceed, sir.
23            MR. WATTS:  I'm Mikal Watts.  I represent the
24   Thompson plaintiffs who move for the Northern District of
25   California.
```

1          Some updates, statistics.  I believe last month a

2    certain judge got the Abbott infant formula case when there

3    were 18 actions in seven districts.  When we filed this on

4    June 10, there were 19 actions in seven districts.  But the

5    updated information is, as of yesterday, there's now 87

6    actions in nine different districts; 51 out of California, 18

7    in Minnesota, six apiece in the Western District of Missouri

8    and Nevada, two apiece in Washington and the Western District

9    of Arkansas, and one apiece in Arizona and the Eastern

10   District of Louisiana.

11          So we think that that data puts us more into the

12   In Re: Gardasil consolidate pile as opposed to consumer data

13   or the Supplemental Nutrition case you all decided last month

14   when there were seven and five actions respectively.

15          The other update I would give you is that some of

16   the papers talk about a proceeding in front of Judge Jon Tigar

17   in Oakland that involves some of the same preemption

18   arguments.  This is a class proceeding dealing with

19   acetaminophen.  It's been on file for a while.  Pleadings were

20   filed, motions to dismiss under preemptions were filed, a

21   repleading.  Those same motions in Morgan v. Albertsons is set

22   for a hearing on November 17th of 2022.

23          So that's really the updated data.  We believe that

24   this meets all of the requirements of Section 1407.  Same

25   operative facts, basically the same products, during prenatal

1   exposure, failure to warn with respect to autism, long use of

2   product while pregnant and then there's a causation claim.

3          So with respect to the product, this Court's ruling

4   last month in In Re: Taasera Licensing talked about different

5   products that come together in the same field of technology.

6   We believe that acetaminophen-based products all come together

7   as something bearing consolidation.

8          And then lastly, with respect to common issues of

9   causation, we think this fits the Court's ruling in In Re:

10  Gardasil where you have a particular medication provided, an

11  allegation of causation that's consistent.  There is some

12  argument in the papers with respect to autism spectrum

13  disorder and ADHD.  I won't make that argument because I'm

14  only bringing the autism cases.

15          **JUDGE CALDWELL:**  Thank you.  You have two minutes

16  reserved for rebuttal.

17          Ms. Barriere.

18          Excuse me.  I have just moved right into the second

19  argument.  We have some questions from the panel for

20  Mr. Watts.

21          Thank you, Ms. Barriere.  I apologize.  I was trying

22  to cut my colleague off here.

23          **JUDGE KENNELLY:**  I actually have a boatload of

24  questions.

25          **JUDGE CALDWELL:**  We could be here for a long time.

1    **JUDGE KENNELLY:**  One kind of group of questions has

2    to do with how big is this likely to get.  Does anybody know

3    what the percentage is of kids that get diagnosed with -- and

4    I know you don't have the ADHD cases, but isn't it a pretty

5    significant percentage of kids that get diagnosed with

6    something along the lines of ADHD?

7              **MR. WATTS:**  I think that's a fair statement.

8              **JUDGE KENNELLY:**  So this can get really gigantic?

9         **MR. WATTS:**  Really, autism cases alone, I'll tell

10   you right now we are ordering medical records --

11             (Court reporter clarification.)

12        **MR. WATTS:**  -- on 20,600 cases right now, so it's a

13   significant sum.

14        **JUDGE KENNELLY:**  Why are no manufacturers being

15   sued?

16        **MR. WATTS:**  The same answer.  Lots of MDL panels

17   about early vetting.  My experience in Zantac is people know

18   when they go and where they bought the drug from.  And so the

19   store-branded acetaminophen is something that is -- at least

20   with Zantac data -- verifiable at a much higher rate than

21   whether Mom bought something that was branded versus a

22   generic, which as you know have different preemption

23   implications.

24        **JUDGE KENNELLY:**  So that sounds like it's likely

25   that the manufacturers are going to get added at some point?

1          **MR. WATTS:**  Absolutely.

2          **JUDGE KENNELLY:**  So then that leads to my follow-up

3    question then.  So where -- on the assumption that the

4    manufacturers are eventually going to get added, where are

5    they located?

6          **MR. WATTS:**  So Johnson & Johnson is the maker of

7    Tylenol.  They stand in New Jersey.  The second largest brand

8    manufacturer -- which is an ever decreasing percentage of the

9    overall acetaminophen market -- is GlaxoSmithKline.  There's

10   an argument about where they are based.  We say Pennsylvania;

11   they say North Carolina.  But I think they would take the

12   position it's North Carolina.

13         **JUDGE KENNELLY:**  I thought I saw there's -- I'm

14   blanking on the name.  There was something with an acronym

15   that was the manufacturer for some of the generics.

16         **MR. WATTS:**  Yeah, LNK.

17         **JUDGE KENNELLY:**  Where are they?

18         **MR. WATTS:**  Hold on just a second.  I believe in New

19   York.

20         **JUDGE KENNELLY:**  New York.  Okay.

21         **MR. WATTS:**  And our response to that basic argument

22   is unlike Zantac, which deals with how it is manufacturing,

23   there are no allegations with respect to the manufacturer.

24         **JUDGE KENNELLY:**  This is all about disclosure?

25         **MR. WATTS:**  That's right.

IN RE: Acetaminophen – ASD/ADHD | MDL No. 3043

```
1              JUDGE KENNELLY:  Okay.
2              JUDGE KIMBALL:  Well, the good news is Judge
3    Kennelly asked all the questions I was going to ask.
4              JUDGE KENNELLY:  That's why I wanted you to go
5    first.
6              (Indiscernible comments and laughter.)
7              JUDGE ARLEO:  I had the same questions.
8              MR. WATTS:  Thank you, Your Honor.
9              JUDGE CALDWELL:  Thank you.
10             Now Ms. Barriere.  Thank you.
11             MS. BARRIERE:  Good morning.  May it please the
12   panel.  My name is Ashley Barriere.
13             JUDGE KENNELLY:  With these microphones -- we have
14   these rotten microphones in my court, too.  They have to be
15   pointing right at your mouth, like directly --
16             MS. BARRIERE:  Is this better?
17             JUDGE KENNELLY:  If they are pointing to the side,
18   they don't work.  Even more.
19             MS. BARRIERE:  This way?
20             JUDGE KENNELLY:  It's literally the axis has to be
21   coming straight through your throat almost.
22             (Laughter)
23             JUDGE ARLEO:  These may be defective microphones.
24   It's in every courtroom across the country.  Just some
25   thoughts.
```

1      **JUDGE KENNELLY:**  I renounce on that case.

2      (Laughter)

3      **MS. BARRIERE:**  I will try it again.  Does this work?

4      Okay.  May it please the panel.  My name is Ashley

5      Barriere of Keller Postman and I represent Michelle Maguire

6      and others.  We support consolidation in the Northern District

7      of California.

8      Given the scope of the litigation, which Mr. Watts

9      also touched on, the national scope of the litigation is since

10     that plaintiffs will be scattered all over, no one focal point

11     stands out as to where to consolidate the case.

12     Here we believe the Northern District of California

13     makes the most sense, as there are currently 21 cases pending

14     there and is also a district with a deep bench of judges with

15     MDL as well as general complex litigation experience.  That

16     experience we believe will be critical here, given the

17     potential large number of plaintiffs as well as defendants, as

18     management will be critical, I think, to the MDL success.

19     In particular, and as we stated in our papers, we

20     believe Judge Tigar would be the optimal choice to preside

21     over the MDL.  He has had an MDL before.  Actually, he

22     currently has an MDL, but currently only has 56 actions

23     pending.  And as Mr. Watts mentioned, he's currently presiding

24     over a proposed class action involving the rapid release of

25     Tylenol that implicates the same preemption issues that will

IN RE: Acetaminophen – ASD/ADHD | MDL No. 3043

 1   arise here and is set for hearing on November 17th.

 2            We also believe the Northern District of California

 3   is better suited for these cases than the defendants'

 4   proposals of the District of New Jersey and the Western

 5   District of Arkansas.  The Western District of New Jersey is

 6   currently experiencing a backlog.  Average time to trial is

 7   50.2 times [sic] from filing to trial.  And, frankly, the

 8   Western District of Arkansas is just simply not a convenient

 9   location for air travel, given that the closest non-regional

10   airport is 100 miles away.

11            So in closing, Judge Tigar and the Northern District

12   of California we believe are uniquely suited to handle the

13   anticipated docket in these consolidated actions.  And I will

14   reserve my time for any questions.

15            **JUDGE CALDWELL:**  Yes.

16            **JUDGE KIMBALL:**  What do you think about the Southern

17   District of New York as a possible venue for this?

18            **MS. BARRIERE:**  I think we would also say it's not as

19   congested as the District of New Jersey, but it also is not --

20   there are no cases currently pending there.  So I think we

21   would think, given kind of the landscape, the Northern

22   District of California would be preferable.

23            **JUDGE KENNELLY:**  Right.  But, I mean, the reason

24   there are no cases pending there is because people have chosen

25   not to file them there.

*IN RE: Acetaminophen – ASD/ADHD | MDL No. 3043*

1      **MS. BARRIERE:**  That's true, Your Honor.

2      **JUDGE KENNELLY:**  I think it's this case where

3  somebody on the other side makes the arguments, wait a second,

4  Northern District of California has got proportionately more

5  MDLs per judge than in any other district, the two are

6  overloaded, so why send them there?  So what do you have to

7  say about that?

8      **MS. BARRIERE:**  Right.  I think there are more MDLs.

9  But I think even our papers state this.  The actual numbers in

10  each -- I believe there are 18 MDLs pending there, but the

11  actual numbers, I think there are only four upwards of three

12  digits.  So they are not these kind of massive MDLs that are

13  clogging other districts.  And I do note, Your Honor, there

14  are some --

15      **JUDGE KENNELLY:**  So the ten-case MDLs are

16  no-brainers; they're easy?

17      (Laughter)

18      **MS. BARRIERE:**  No.  And I didn't mean to suggest

19  that.  It may not be as overwhelming for the clerk's office,

20  in particular.

21      **JUDGE ARLEO:**  I take it, too, that you expect that

22  the manufacturers will be added?

23      **MS. BARRIERE:**  Yes.

24      **JUDGE ARLEO:**  Given the breadth of this MDL, aren't

25  there going to be plaintiffs in every state in the country?

IN RE: Acetaminophen – ASD/ADHD | MDL No. 3043

1    **MS. BARRIERE:**  Yes, Your Honor, I do believe that's

2    true.  And that's why I think kind of the convenience of the

3    parties here isn't as important because it's going -- there

4    are going to be plaintiffs parties everywhere, so I do

5    understand that some of the manufacturers may be clustered in

6    that Northeastern District.  But it is going to be truly

7    national MDL in scope, and that's why I think the Northern

8    District of California is so well suited because they are such

9    a deep bench of jurists with complex litigation experience.

10   **JUDGE ARLEO:**  Any objection to New Jersey?

11   **MS. BARRIERE:**  Yes.  I think just given the backlog

12   of cases there, it wouldn't be the ideal location for an MDL.

13   **JUDGE KENNELLY:**  So is there a reason to think that

14   this is a case that might attract state attorney general

15   lawsuits?  Like obviously opiates did.  Here is the theory.

16   And I'm not a plaintiff's lawyer, obviously.  But the theory

17   would be the state or localities are spending all of this

18   extra money on education for kids who have one or both of

19   these disorders.  There's an interest.  I mean, I would think

20   that there's at least some chance that some state attorney

21   general, state attorney general somewhere might jump in.

22   **MS. BARRIERE:**  Sure, Judge.  To be frank, I haven't

23   given that particular theory much thought as to the state

24   attorney generals.  I think there's a likelihood that may

25   arise.  I'm not aware of any discussions of such filings, but

1    I don't think at this point there's any reason to think --

2              **JUDGE KENNELLY:**  When folks do that, do they tend to

3    represent themselves or do they tend to hire outside counsel

4    or some of both?

5              **MS. BARRIERE:**  The state attorney generals?

6              **JUDGE KENNELLY:**  Yeah.

7              **MS. BARRIERE:**  I think there's usually a mixture.

8              **JUDGE CALDWELL:**  Anyone else?

9              Thank you very much.

10             **MS. BARRIERE:**  Thank you.

11             **JUDGE CALDWELL:**  Ms. Williams.

12             **MS. WILLIAMS:**  Now I am nervous about the

13   microphone.  Am I in the right spot?

14             **JUDGE KENNELLY:**  Perfect actually.

15             **MS. WILLIAMS:**  All right.  Good morning, Your

16   Honors.  May it please the Court.  Amanda Williams from

17   Gustafson Gluek on behalf of the Funk plaintiffs.  We are

18   requesting that the Court consolidate the cases under 1407 and

19   send them to the District of Minnesota.

20             As Mr. Watts mentioned earlier in his rundown of the

21   statistics, the District of Minnesota now has 18 cases.  That

22   is the second highest outside of California.  There are

23   several factors that you consider in these things.

24             Target, who is a retailer who has been brought in on

25   several cases, is headquartered in Minneapolis.  The district

IN RE: Acetaminophen – ASD/ADHD | MDL No. 3043

1  has regularly handled large MDLs, complex cases involving

2  pharmaceuticals and medical devices.  They are well versed in

3  preemption among other issues.  But I think most importantly

4  is that the district is well resourced and has the bandwidth

5  right now to take on a case that could be very large.

6        Now, there are always the usual arguments, right?

7  Minneapolis is in the middle of the country.  It's easy to get

8  to.  We have a Delta hub at our airport.  All fun things like

9  that.  But overall, I think the depth of the bench at the

10  District of Minnesota is extraordinarily deep and willing to

11  take on such a big case.

12        **JUDGE CALDWELL:**  Questions?

13        Thank you very much.  We have none.

14        **MS. WILLIAMS:**  Thank you.

15        **JUDGE CALDWELL:**  Mr. Kinsman.

16        **MR. KINSMAN:**  May it please the panel.  Good

17  morning.  Robert Kinsman on behalf of Krause and Kinsman and

18  multiple plaintiffs in the Western District of Missouri,

19  including the Gaddis family.

20        I first want to start that when we first started

21  Krause and Kinsman out of law school eight years ago, it was

22  our ten-year goal to argue in front of the JPML.  It's now

23  multiple times we have argued in front of you so it's an honor

24  to be here today.

25        It's not lost on me that the Western District of

1  Missouri has asked for a lot and they have received a few

2  MDLs, but I think it's important to note that there's a reason

3  for that; and that's because of the respect that our peers and

4  the bar has for the judges in the district there, specifically

5  the MDL judges.

6          They are creating a complex litigation hub that

7  could be future home to MDLs for years to come.  They are the

8  fastest of any of the districts being argued from time to

9  filing to trial.  There's no vacancies.  The first cases were

10  filed by our firm.  The judges are a cohesive unit.  They

11  promote collaboration between the parties, including

12  meet-and-confers before any motion practice.  They are also

13  not overwhelmed with MDLs.  I think Judge Bough has the least

14  amount of cases within his MDL, and I think it's ripe for him

15  to get another one.

16          Judge Wimes is newer to the bench, has a recent MDL.

17  Judge Phillips also has an MDL and is chief judge there.  But

18  Judge Bough's medical background, I think, is perfect for this

19  case.  He has product liability background.  You are going to

20  hear argument for Western District of Missouri later for an

21  addiction case.  I think that Judge Wimes and Judge Phillips,

22  their experience as prosecutors are perfect for an addiction

23  case.

24          And I think -- I also want to note that Walmart had

25  filed in August a motion to transfer in the District of

1  Minnesota to send the APAP cases there to the Western District

2  of Missouri as their primary preference, not the Western

3  District of Arkansas.  Western District of Arkansas was the

4  alternative preference to Walmart.

5          I'm happy to answer any questions.

6          The one thing I would like to add, too, I know I'm

7  running out of time, but there may be argument and there was

8  some briefing that we potentially may want to send each

9  retailer MDL to a different district.  I think that certainly

10  doesn't avoid disrupting the functions of the federal court.

11  These cases need to be in front of one judge, specifically and

12  most importantly if we are bringing manufacturers in and how

13  we end up doing that and the discovery behind it.

14          **JUDGE CALDWELL:**  Your time is up.  Judge Kennelly.

15          **JUDGE KENNELLY:**  I should have asked this to

16  somebody earlier, so I will stick you with it.

17          The papers talk about these studies that show an

18  association.  Has anybody come up with a study yet that shows

19  a mechanism?

20          **MR. KINSMAN:**  A mechanism?  Well, there is -- I

21  don't even think the retailers and the manufacturers know the

22  mechanism of how acetaminophen actually relieves pain.

23          **JUDGE KENNELLY:**  That's not what your lawsuit is

24  about.  I'm asking what your lawsuit is about.

25          **MR. KINSMAN:**  There's no argument that there's not a

1    strong correlation between APAP and autism when exposed in

2    utero.  The causation is currently being built by a bunch of

3    lawyers working on the case and the experts that are

4    currently --

5              **JUDGE KENNELLY:**  I will take that as kind of a long

6    no.

7              (Laughter)

8              **MR. KINSMAN:**  I don't ever like to say no or yes, if

9    you can tell.  But there is a causation component being

10   developed, as Mr. Watts indicated as well.

11             **JUDGE CALDWELL:**  Anyone else?  Thank you very much.

12             **MR. KINSMAN:**  Thank you.

13             **JUDGE CALDWELL:**  Now we will hear from the defense

14   side.  Mr. Murdica.

15             **MR. MURDICA:**  Good morning, Your Honors.  May it

16   please the panel.  I'm Jim Murdica.  I represent CVS, Costco

17   and Walgreens.

18             Here today you have before you for the defendants

19   zero percent of 600-plus manufacturers of over 700 U.S.

20   marketed acetaminophen products.  Zero.  What you do have

21   before you is less than one percent, less than one percent of

22   all the sellers of acetaminophen.  That's the market share,

23   less than one percent of manufacturers.

24             We just heard for the first time that -- they didn't

25   say it in a reply to our opposition.  It was heard for the

IN RE: Acetaminophen – ASD/ADHD | MDL No. 3043

1    first time this morning that they are going to bring in

2    manufacturers.  So, you know, we don't even know what this

3    case is going to look like.  This is how they built it.

4              (Court reporter clarification.)

5              **MR. MURDICA:**  This is how plaintiffs chose to build

6    this litigation.  They put in page 12 of their petition that

7    they had a meeting that they think this is going to be the

8    largest MDL of all time in U.S. history.  If that's true, I

9    urge the panel to wait and let's see what happens.  Let's see

10   if they name the manufacturers.  Let's see if there's cases

11   all around the country.

12             On behalf of my clients, we just went through this

13   in Zantac.  I represent Costco, CVS, Walgreens and 11 other

14   retailers in Zantac.  Now, we got dismissed on the basis of

15   preemption.  Rosenberg did a great job.  But it took almost

16   three years, three rounds of motion to dismiss briefing, and

17   we spent millions and millions and millions of dollars.

18             This litigation is ultimately not going to be about

19   the clients that I represent.  It would be manifestly unfair

20   to MDL this now and put the retailers, the only ones they have

21   chosen to sue so far, through this.

22             For that reason, where the cases are filed now, who

23   they are filed against, I mean none of them --

24             **JUDGE ARLEO:**  You need to use the microphone a

25   little more.

1    **MR. MURDICA:**  Sorry.

2    **JUDGE ARLEO:**  That's okay.

3    **MR. MURDICA:**  Where the cases are filed now

4  shouldn't really matter if you are going to make a decision to

5  MDL the case.  It's going to be defendants that aren't

6  involved yet and, you know, and where the evidence is.  And

7  that, as I think you guys have correctly pointed out in your

8  questions, is probably going to be in New Jersey, in New York.

9  And that's why our clients said in the alternative, that's

10  where we want to be.

11        But, again, my last point, back to where I started,

12  rather than think about consolidation, let's take a pause.  I

13  urge the panel to deny consolidation at this time.  Let's see

14  what this looks like.  My clients are prepared to litigate the

15  cases that exist.

16        And we don't know what will actually happen.  People

17  stand before you all the time and say, "If you build it, they

18  will come."  I'm going to tell you something a little bit

19  similar to that, but if you don't build it, they may not come.

20  All the cases are filed in the Eighth and Ninth Circuit.  I

21  believe there's a reason for that.  This might be one big

22  trial balloon.

23    **JUDGE KENNELLY:**  You said one big trial balloon?

24    **MR. MURDICA:**  I'm sorry.

25    **JUDGE KENNELLY:**  You said this may be one big what?

1          **MR. MURDICA:**  Trial balloon.

2          That's all.  Thank you very much, Your Honors.

3          **JUDGE CALDWELL:**  Yes.  Judge Kimball.

4          **JUDGE KIMBALL:**  How many cases are there right now

5  against your clients?

6          **MR. MURDICA:**  More than 40.  About half.

7          **JUDGE CALDWELL:**  Yes, Judge Kennelly.

8          **JUDGE KENNELLY:**  I think I heard you say that right

9  now less than one percent of the sellers are sued.  Did you

10  mean retail sellers?

11          **MR. MURDICA:**  I should have said the sales, Your

12  Honor.

13          **JUDGE KENNELLY:**  Okay.

14          **MR. MURDICA:**  When you factor in the market share of

15  the store-branded products, it's less than one percent.

16          **JUDGE KENNELLY:**  Okay.  So the store-branded

17  products are less than one percent of the overall sales?

18          **MR. MURDICA:**  The ones that are before the Court,

19  yes.  And generally I think that's true as well.

20          **JUDGE KENNELLY:**  Okay.  So you said your client is

21  named in -- you just answered Judge Kimball's question -- how

22  many lawsuits now?

23          **MR. MURDICA:**  Forty to 43.  I'm not sure.

24          **JUDGE KENNELLY:**  You think it is done right there?

25  I mean, let's say we do what you say.  You think it's done

1    right there?  You are not going to get to 45, in other words?

2           **MR. MURDICA:**  For the retail clients, yes.  For the

3    clients I represent, I believe that is true.

4           **JUDGE KENNELLY:**  So you are then going to have to

5    litigate 45 preemption motions in front of 45 judges.  And

6    then in three months, when they sue the manufacturers and come

7    back here, then people are going to be talking about -- you

8    are going to be lining up the ones that said yes and the ones

9    that said no, and one side is going to say send to it these

10   folks and one side is going to say send it to these folks.

11   That doesn't make any sense to me.

12          **MR. MURDICA:**  If that's what happened, I would agree

13   with Your Honor, but I'm not sure that's right.

14          **JUDGE KENNELLY:**  So nobody is going to rule on the

15   preemption motions that you're going to file?

16          **MR. MURDICA:**  Plaintiffs may choose not to pursue

17   the retail defendants.

18          **JUDGE KENNELLY:**  Oh, I see.

19          **MR. MURDICA:**  I believe they will go after the

20   manufacturers, which is -- you know, retail defendants have a

21   lot of defenses in addition to preemption.  There are seller

22   statutes in most states.  All they do is sell sealed packages.

23   They didn't make any of this.  So the case against retailers

24   is really tough, which is why the retailers were dismissed

25   from Zantac.

1          **JUDGE KIMBALL:**  You really do not anticipate very

2    many more cases against the retailer?

3          **MR. MURDICA:**  I take the plaintiffs at their word.

4    They have 20,000-plus claims.  I don't believe the retailers

5    will be the target of this.  They didn't manufacture the

6    acetaminophen.  They didn't provide whatever warnings are on

7    the package.

8          And it's going to be a hard enough case.  There were

9    some questions about merits a minute ago and how it would

10   work.  And, you know, one thing that hasn't been said and

11   isn't in the papers is the prospect of success here.  It's

12   very difficult.  FDA said in July of this year:  We evaluated

13   research studies on acetaminophen published in the medical

14   literature and determined that they are too limited to make

15   any recommendations based on the studies at this time.

16         That is daunting.  We all know that.  That is going

17   to be very difficult to overcome.

18         **JUDGE ARLEO:**  So isn't this all just guesswork on

19   one level?  Isn't it equally plausible that if we deny it

20   there will be more lawsuits in different districts and have

21   the plaintiffs come back here and say, now, look, we have more

22   retailers and we are going to have to make -- some judges in

23   20, 30 different districts are now going to have to rule on

24   motions to dismiss.

25         In other words, there are already 40.  And you are

1   just assuming that no more will be filed.  And you are

2   assuming that wait and see if the manufacturers come in.

3   Either way, there's going to be a lot of cases and a lot of

4   motions spread across this country.  Isn't that inefficient?

5          **MR. MURDICA:**  If they choose to bring them, Judge

6   Arleo.

7          **JUDGE ARLEO:**  But even if they -- how do you know

8   that they won't, at a minimum, bring in additional retailers

9   throughout the country?

10         **MR. MURDICA:**  You mean --

11         **JUDGE ARLEO:**  They have suggested that they will.

12  In other words, there could be more filed as a reason to come

13  back here and say, now, look, it's all over the country, we

14  now have 100, we now have 75.  No one has assured you that

15  there will not be more retailer cases filed imminently.

16         **MR. MURDICA:**  No, not at all.  I wouldn't know that.

17         **JUDGE ARLEO:**  Right.  So you are asking us to make

18  an assumption that could be wrong.  It could be if we deny it,

19  you can turn around and get 50 more cases filed in the next

20  two months.

21         **MR. MURDICA:**  That's entirely possible, Judge Arleo,

22  but look at the facts of what has happened so far.  The first

23  case was filed June 1.  There is a petition June 9.  It's all

24  the same plaintiffs working together.  And it seems like they

25  have intentionally not named a manufacturer until we just

1    heard that today.  And if you look at where the cases are

2    filed, the Eighth and Ninth Circuit, and you look at what

3    happened in Zantac with respect to preemption for all

4    generic --

5                   (Court reporter clarification)

6          **MR. MURDICA:**  Preemption for all generic

7    manufacturers and for all retailers, they are gone out of the

8    MDL now.  And as the panel is probably aware now, everyone is

9    running to state court.

10               I believe there's a reason why they chose only to

11   file in the Eighth and Ninth Circuit to shop for, you know, a

12   potentially favorable preemption ruling.  If they don't have

13   all of the cases in one place where they can possibly survive,

14   this is a very daunting case on regulatory and causation.

15         **JUDGE KENNELLY:**  I will bite on that.  So is it like

16   really good luck for plaintiffs in the Eighth Circuit on

17   preemption?

18               (Laughter)

19         **MR. MURDICA:**  No, but we know the Eleventh Circuit

20   is out.

21               (Laughter)

22         **JUDGE KENNELLY:**  Then you just cut your own

23   argument.

24         **MR. MURDICA:**  Well, Judge Kennelly, it is more

25   feasible that they have a shot in the Eighth Circuit.  And

1   certainly in the Ninth Circuit there is better law on that,

2   particularly --

3          **JUDGE KENNELLY:**  And that's why I didn't ask about

4   the Ninth.

5          (Laughter)

6          **JUDGE KENNELLY:**  You said the Eighth and the Ninth.

7   That's why I was asking you about the Eighth.  You think

8   Bentonville, for example, it's either Minneapolis or

9   Bentonville, I guess, right?

10         **MR. MURDICA:**  In the Eighth Circuit?

11         **JUDGE KENNELLY:**  Yeah.

12         **MR. MURDICA:**  Judge Kennelly, I didn't study

13  preemption law in the Eighth Circuit, but I can tell you that

14  there isn't --

15         **JUDGE KENNELLY:**  Well, I would just suggest that

16  before you say that the Eighth Circuit is part of this shot to

17  get good preemption law, you might want to do that.  Just a

18  suggestion.

19         **MR. MURDICA:**  There are no very positive

20  defense-oriented decisions on preemption in this context to my

21  knowledge in the Eighth Circuit.  There are in other -- in

22  other circuits there are decisions that make it very clear

23  what would happen for a case like this.

24         **JUDGE CALDWELL:**  Any other questions?

25         **JUDGE ARLEO:**  That's it.

1        **JUDGE CALDWELL:**  Thank you very much.

2        **MR. MURDICA:**  Thank you very much, Your Honors.

3        **JUDGE CALDWELL:**  Mr. Zimmer.

4        **MR. ZIMMER, JR.:**  Good morning, Your Honors.  Fritz

5   Zimmer of King & Spalding for Walmart, Inc.  I will confirm,

6   as Your Honor requested, that our position is that impaneling

7   an MDL is premature at this point.  It's unnecessary.  But if

8   you do so, we would suggest it be a Walmart-only MDL in the

9   Western District of Arkansas.

10        So a quick update.  On a number of cases that have

11   been filed against my client, we are aware now, as of late

12   last night, of 45.  Thirty-five of those involve Walmart only.

13   Just part of the suggestion we are making to the court.

14        **JUDGE ARLEO:**  Just please use the microphone.

15        **JUDGE KENNELLY:**  What you have to do -- and this is

16   for everybody.  Imagine this thing is an arrow.  It has to be

17   pointing straight into your throat.  I'm telling you, I've

18   been working with these things for ten years.

19        (Laughter)

20        **MR. ZIMMER, JR.:**  Thank you, Your Honor.  I'm doing

21   my best.  Is this better?

22        **JUDGE KENNELLY:**  Yes.

23        **MR. ZIMMER, JR.:**  All right.  Thank you.  I will

24   stay as close as I can to it.

25        Like all the defendants, we don't think that the

1   panel should speculate, of course, about what might be coming,

2   although of course it was instructive to hear today that the

3   manufacturers are to be named.  But I honestly don't believe,

4   nor can I imagine any of you do, that this case is about

5   retailers.

6          Sorry.  I just have to pause there for a moment.

7   Everybody before you is a retailer.  That just does not make

8   sense in this context.

9          So the reason we think this is premature, based on

10  what is before you, is that all of the lesser steps that the

11  panel has previously encouraged, we've been trying to employ.

12  Motions to transfer per the first filed rule, 1404 motions.

13  And, in fact, because the Northern District has been

14  mentioned, we filed notices of related cases, and all of the

15  cases in the Northern District are now being transferred to

16  Judge Chesney who had the lower numbered rule case there.  So

17  those efforts are underway.

18          I have already mentioned the elephant in the room.

19  I think that it's inappropriate for the panel to let the tail

20  wag the dog with retailers dictating where this might be

21  impaneled and that manufacturers to be brought in later to

22  follow.  I would think that they would want input.

23          Finally, forcing retailers into an MDL is not going

24  to encourage efficiency because, as the panel has seen before,

25  each retailer is going to have different suppliers,

1   manufacturers, products, development processes, labels,

2   marketing and sales data, QC procedures, pricing -- you name

3   it.  This is going to create an unwieldy mess for whoever you

4   hand this to if it is impaneled because of the need for an

5   incredibly complex array of protective orders and conceivably

6   even separate tranches of discovery and the like because of

7   the number of products that all the different retailers will

8   have sold.

9           So hence Western District of Arkansas.  Second in

10  line for us was, indeed, Missouri, if you feel compelled to do

11  it.  And, once again, we are doing this by the rules.  First

12  filed cases were in Missouri.  Next, closest to where our

13  client is based, convenience of parties and witnesses would be

14  Arkansas.

15          Last point, Your Honor, though I know Ms. Groves is

16  going to address this, is if you have any questions and would

17  like me to comment on the Northern District, that's where I'm

18  based but, of course, it's in my client's interest that we are

19  advocating these other places.

20          **JUDGE CALDWELL:**  Your time is up.  Questions?  Judge

21  Kennelly.

22          **JUDGE KENNELLY:**  So speaking only for myself, let me

23  just tell you what I think.  At least part of the dilemma is

24  on this "too early" thing.  I mean, I get what you're saying.

25  They haven't sued the manufacturers.  Let's wait for the

IN RE: Acetaminophen – ASD/ADHD | MDL No. 3043

1   manufacturers.  Let's see what happens.

2          Here is the flip side of that.  So the flip side of

3   that is we wait.  And lawsuits keep getting filed as they are

4   filed now and eventually manufacturers start getting added in.

5   By then, you know, maybe a dozen or a couple of dozen, three

6   dozen judges have ruled on preemption motions and various

7   other things.  I guarantee you somebody is going to come in

8   here and say they waited too long to do it.  I guarantee

9   that's going to happen.

10          Or that, well, you are trying to pick the judge that

11  ruled favorably on the preemption or the defense is trying to

12  pick the judge that ruled favorably on the preemption.

13  Because everybody is going to have a preemption argument at

14  some level.  Right?  Even the manufacturers from the FDA.

15          So that's the dilemma.  I don't think there's a --

16  there's no good resolution to it, but can you react to that?

17          **MR. ZIMMER, JR.:**  I will, Your Honor, and only very

18  briefly and say this:  We are not trying to engineer where

19  that's done.  We are literally playing it by the book.  And I

20  will tell you that within two weeks of today, there will be

21  two fully briefed motions to dismiss in the Western District

22  of Arkansas ready for Judge Brooks to rule on them.  There are

23  three others that will follow that and are close behind.

24          **JUDGE KENNELLY:**  Also in Western Arkansas?

25          **MR. ZIMMER, JR.:**  No, those are in the Western -- in

IN RE: Acetaminophen – ASD/ADHD | MDL No. 3043

1    Missouri.  Those are before, I believe, Judge Kays.

2              So what I'm getting at is, I don't see any reason

3    why those judges can't lead this process.  There's a lot more

4    deference than people might imagine, once the first judge to

5    rule on motions of that type does so.

6              **JUDGE KENNELLY:**  Thank you very much.

7              **MR. ZIMMER, JR.:**  You bet.

8              **JUDGE CALDWELL:**  Anything else?

9              Thank you very much.

10             **MR. ZIMMER, JR.:**  Thank you, Your Honors.

11             **JUDGE CALDWELL:**  Ms. Groves.

12             **MS. GROVES:**  Good morning, Your Honors.  Amanda

13   Groves for Defendant Safeway.  And, Your Honors, I'm just

14   addressing the Northern District of California as a potential

15   location, as I represent Safeway, who happens to be the only

16   defendant in the Northern District of California.

17             And we are actually the only defendant in all of

18   California, for that matter, and we have one case filed

19   against us to date, and it's by a plaintiff who isn't from the

20   Northern District of California or from California, for that

21   matter, either.  She lives in Washington.

22             The Northern District of California is not the

23   center of gravity for these lawsuits.  As has already been

24   discussed, the manufacturers are not located in the Northern

25   District.  And plaintiffs have never disputed that they are

1  the ones who are likely to have the bulk of the evidence in

2  this litigation.

3           If you picture a map of the United States, you have

4  Safeway in California, Costco in Washington, and you have to

5  go all the way out east to Minnesota to find another

6  retailer -- or Arkansas -- and then everybody else, including

7  the manufacturers that we are aware of, are farther east than

8  that.  So the center of gravity really tilts towards either

9  the upper midwest or to the Tri-State area.

10          Particularly, now that courts are returning to

11  in-person hearings, the California forum would be costly and

12  inefficient if an MDL, in fact, is granted.

13          Also, Your Honors, judicial efficiency does not

14  favor transfer to the Northern District of California.  It

15  still has the most active MDLs in the country and it still has

16  three judicial vacancies.  Multiple districts are closer to

17  the facts and have lighter MDL dockets.

18          And of the venues that have most frequently come up

19  in the papers, the Northern District of California has the

20  longest median time to dispose of civil cases and nearly

21  900 cases per judge, which puts it among the highest of the

22  courts suggested.

23          I did want to address very briefly plaintiffs'

24  argument for Judge Tigar which is curious because Judge Tigar

25  doesn't have a single one of the dozens of cases that have now

1   been filed in the Northern District of California.  And under

2   the local rules there, notice of related cases are supposed to

3   be filed and the cases get assigned to the first filed judge,

4   which in the Northern District is Judge Chesney.

5          And at least one of the plaintiffs have used this

6   "earliest filed" cases to suggest that Judge Menendez in the

7   Northern District -- District of Minnesota, rather, would be

8   an appropriate judge.  But no one has -- they are not using

9   that same argument for Judge Tigar.  He doesn't have a single

10  case.

11         And the case that he does have before him is very

12  different than these product liability failure-to-warn cases.

13  He has a case about false advertising and whether rapid

14  release, which has been defined in a monograph that was

15  adopted by the CARES Act, should control.  It's not the same

16  preemption issue and a review of the briefing would

17  demonstrate that.

18         Thank you.

19         **JUDGE CALDWELL:**  Thank you.  Questions?  Judge

20  Kennelly.

21         **JUDGE KENNELLY:**  You use the phase "Tri-State area."

22  Where I come from that means Wisconsin, Illinois and Indiana.

23  So what did you mean by Tri-State area?

24         (Laughter)

25         **MS. GROVES:**  I meant New York, New Jersey -- I'm

1    from California, so I may have messed that up.  Apologies to

2    those --

3            (Laughter)

4            **JUDGE KIMBALL:**  You said New York, New Jersey.  What

5    is the other one?

6            **MS. GROVES:**  I was hoping no one was going to ask me

7    that.

8            (Laughter)

9            **JUDGE ARLEO:**  Pennsylvania.

10           **MS. GROVES:**  I was going to guess Pennsylvania.

11           **JUDGE CALDWELL:**  Any other questions?

12           **JUDGE ARLEO:**  Any preference of New York over New

13   Jersey?

14           **MS. GROVES:**  No, Your Honor.  I mean, we are pretty

15   agnostic.  It just needs to be convenient for the parties and

16   part of the center of gravity.  I think that's the most

17   important.

18           **JUDGE ARLEO:**  Thank you.

19           **MS. GROVES:**  Thank you.

20           **JUDGE CALDWELL:**  We have your argument.  Thank you.

21           Mr. Watts.

22           **MR. WATTS:**  Let me start off by answering Judge

23   Kennelly's question about state AGs.  As you know in the

24   opioid litigation --

25           (Court reporter clarification)

1          **MR. WATTS:**  In the opioid litigation there were a

2    lot of state AG that did participate.  A small -- less than

3    half hired individual plaintiff's attorneys to do the AGs and

4    then others like Texas did it themselves with coordination

5    with our group.  So that's number one.

6          Number two, with respect to mechanism of action,

7    there are two different theories.  But putting it

8    simplistically, it deals with oxidative stress on developing

9    neurological system of a baby.  We go into a lot more detail

10   than that, but the bottom line is that's what it deals with.

11         Mr. Murdica's argument about 600 different

12   manufacturers and one percent.  These cases are about prenatal

13   use of acetaminophen.  Not somebody swigging cough medicine

14   when they're not pregnant.  That's not what it's about.

15   That's not what we are asking the MDL to be defined about.

16   This grand conspiracy argument about "where are the

17   manufacturers," I explained why we did it.

18         With respect to all of these store-branded

19   acetaminophen, they all have indemnification agreements with

20   the manufacturers.  I've been in personal communication with

21   lawyers from Johnson & Johnson.  They know this is coming.

22   This is no surprise.  But I've also been, you know, at

23   seminars where people are talking about early vetting.  So we

24   are ordering these records to make sure that we have that.

25   But it's coming.

1    With respect to what we learned in Zantac -- number

2  one, I never sued the retailers, but I did take all of their

3  depositions.  And that had to do with the conditions under

4  which Zantac was being stored, and the retailers and

5  distributors in this country did a good job as opposed to the

6  manufacturers who did not, leading to the arrisal of in the

7  NDMA.

8    Lastly, with respect to the Northern District.  If

9  you notice my first papers, we threw a footnote in because the

10 panel rules say you have to select somewhere.  What I want to

11 avoid is 45 different preemption rulings.  And what

12 Judge Kennelly said, we are going to come back here and have a

13 bunch of these rulings that are going to be all over the

14 place.

15    I found out about Judge Tigar's case.  I saw the

16 pleadings with respect to the motion to dismiss.  And I said

17 we have a potential and I have a duty to present it to this

18 Court.  So we did.  There's plenty of good judges out there.

19 I think the judge in Minnesota is fine.  I think the judge in

20 Missouri is fine.  But we need one person deciding all of

21 these rulings.

22    **JUDGE KIMBALL:**  What about the workload in the

23 Northern District of California?

24    **MR. WATTS:**  I have never been too impressed with the

25 argument that districts have workloads.  I think you have to

1    go down to the judge level.  And, you know, we presented to

2    you -- I mean, frankly, there's lots of good judges out there.

3    You know, with respect to His Honor Judge Tigar, we presented

4    because of the proceedings in front of him and the preemption

5    arguments that are being made, but there are certainly other

6    judges in San Francisco and Oakland that are, you know,

7    excellent judges that I know from the PGE fire litigation and

8    others.  But there are good judges everywhere.  You have an

9    abundance of choices.

10              **JUDGE CALDWELL:**  Other questions?

11              **MR. WATTS:**  Thank you.  I appreciate it.

12              **JUDGE CALDWELL:**  That concludes the matter in MDL

13   No. 3043.

14              (The proceedings concluded at 10:15 a.m.)

15

16

17

18

19

20

21

22

23

24

25

*IN RE: Acetaminophen – ASD/ADHD | MDL No. 3043*

CERTIFICATE


        I, Reagan A. Fiorino, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

        I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

        I further certify that this transcript contains pages 1 through 36 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

        Dated at St. Louis, Missouri, this 7th day of October, 2022.


                     /s/ Reagan A. Fiorino
                     Reagan A. Fiorino, RDR, CRR, CRC, CCR
                     Official Court Reporter