NC7DACEO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In re:  Acetaminophen

ASD-ADHD Products Liability

       v.                          22 MD 03043   (DLC)

------------------------------x

Oral Argument

New York, N.Y.
December 7, 2023
10:00 a.m.

Before:

HON. DENISE COTE,

District Judge

APPEARANCES

WATTS GUERRA, LLP
    Attorney for Plaintiffs
BY:  MIKAL C. WATTS
    JOHN R. W. CRACKEN

KELLER POSTMAN, LLC
    Attorneys for Plaintiffs
BY:  ASHLEY C. KELLER
    ASHLEY BARRIERE
    AMANDA HUNT
    JOHN JAMES SNIDOW

HOLWELL SHUSTER & GOLDBERG, LLP
    Attorney for Plaintiffs
BY:  DANIEL M. SULLIVAN

THE LANIER LAW FIRM
    Attorney for Plaintiffs
BY:  EVAN JANUSH

COOPER LAW PARTNERS, PLLC
    Attorney for Plaintiffs
BY:  CHARLES J. COOPER

NC7DACEO

MOSKOW LAW GROUP, LLC
     Attorney for Plaintiffs
BY:  NEAL MOSKOW

KRAUSE & KINSMAN
     Attorney for Plaintiffs
BY:  TRICIA L. CAMPBELL

LUFF LAW FIRM, PLLC
     Attorney for Plaintiffs
BY:  PATRICK LUFF

PAUL, LLP
     Attorney for Plaintiffs
BY:  ASHLEA SCHWARZ

BEASLEY ALLEN
     Attorney for Plaintiffs
BY:  W. ROGER SMITH, III

TRACEY, FOX, KING & WALTERS
     Attorney for Plaintiffs
BY:  SEAN P. TRACEY
     LAWRENCE TRACEY

TORHOERMAN LAW
     Attorney for Plaintiffs
BY:  ERIC CRACKEN

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
     Attorney for Defendants
BY:  ALLISON M. BROWN

BARNES & THORNBURG, LLP
     Attorneys for Defendants
BY:  JAMES F. MURDICA
     KRISTEN L. RICHER
     SARAH E. JOHNSTON

ARNOLD & PORTER KAYE SCHOLER, LLP
     Attorney for Defendants
BY:  LORI B. LESKIN

KING & SPALDING, LLP
     Attorney for Defendants
BY:  KRISTEN R. FOURNIER

Also Present:  John Morales

NC7DACEO

(Case called; appearances noted)

THE DEPUTY CLERK:  Who's appearing for the plaintiffs?

MR. WATTS:  I'll start on the left side.  Mikal Watts for the plaintiffs, your Honor.

MR. TRACEY:  Sean Tracey for the plaintiffs, your Honor.

MR. KELLER:  Ashley Keller for the plaintiffs, your Honor.

MS. HUNT:  Amanda Hunt for the plaintiffs, your Honor.

MR. SNIDOW:  J.J. Snidow for the plaintiffs, your Honor.

MS. BARRIERE:  Ashley Barrier for the plaintiffs, your Honor.

MR. SULLIVAN:  Daniel Sullivan for the plaintiffs, your Honor.

THE DEPUTY CLERK:  For the defendants?

MS. BROWN:  Good morning, your Honor.  Allie Brown for the defendants.

MR. MURDICA:  Good morning, your Honor.  Jim Murdica for the defendants.

MS. RICHER:  Good morning, your Honor.  Kristin Richer for the defendants.

MS. STADLER:  Good morning, your Honor.  Kristen Fournier for the defendants.

MS. LESKIN:  Good morning, your Honor.  Lori Leskin

NC7DACEO

for the defendants.

MR. MORALES:  I'm just --

THE COURT:  Mr. Morales, you're there to assist with technological matters.  Am I right?

MR. MORALES:  Yes, your Honor.

THE COURT:  Thank you for your help.

Is there anyone representing the plaintiffs who wishes to add their appearance to today's record?

I see the courtroom is filled with people.  I don't want to deprive anyone of putting their appearance on the record if they need to do so.  Otherwise, I think the plaintiffs are well represented in the front table.

Is there anyone on behalf of the defendant who wishes to place their appearance on the record who have not already done so?

Okay.  Good.  Thank you.

I'm going to ask everyone to use their mics, please, when speaking, because we have an overflow courtroom, and I want to make sure everyone there is also able to hear what is being said.

So I'm going to start with a statement, and it begins with my thanks.  I appreciate how hard each of the attorneys here and the teams back in the office have worked to tee up the issues of general causation for me.  I want to acknowledge that there are so many people, your support staff, and associates

NC7DACEO

that contributed to the materials that I have reviewed.

As we agreed when we first met, resolution of this MDL one way or the other, has profound consequences for the health and safety of pregnant women and their offspring. Fevers and pain during pregnancy have identified negative impacts on mothers and the development of their children. Many medications have known risks, and cannot be used to treat these conditions.

Currently, women are advised to consult with their doctors before using Acetaminophen while pregnant. The issue here is whether the Acetaminophen label must also warn them of a risk of ASD and ADHD, as plaintiffs argue those labels should already have done. The parties disagree strongly whether the evidence shows, that is, the science shows, to the degree required by law that the risks to health identified by plaintiffs exist or can be shown to exist.

The parties' experts have relied on studies conducted by scientists that have attempted to determine the degree to which there is an association, if any, between use of Acetaminophen and ASD or ADHD, among other things. The work done by the scientists, as reflected in their published studies, has been creative and impressive. It has been illuminating for me to read those studies.

As the parties acknowledge, the FDA has been looking at this literature since 2014, and the publication of Liew

NC7DACEO

2014, and has determined that the state of the science prevents causal interpretations, and each medical association that has responsibility for this area of medicine has also found the science too inconclusive to find that there is a causal relationship.

I look forward to hearing oral argument today on the defendant's motions to dismiss the plaintiffs' expert reports for failing to meet the standards of admissibility set out in Rule 702 and *Daubert*.  As you know, Rule 702 has been revised recently to underscore the importance of the Court's gatekeeping role.

One generally accepted methodology for determining causation among epidemiologists is the consideration of the Bradford Hill criteria.  ASD and ADHD are separate disorders, but the plaintiffs' experts did not conduct a separate Bradford Hill examination for the two disorders.  The parties' briefing discusses the reasons for the absence of such an analysis and the ramifications of that choice.  I look forward to hearing from the parties today anything further that they wish to say about that issue, and, of course, anything else they believe it is important for them to emphasize from their briefing and the reports produced by the plaintiffs' experts.

We have a time limit on today's oral argument.  We're going to start with defense counsel's argument.

Will you be handling that, Ms. Brown?

NC7DACEO

MS. BROWN:  I will, your Honor.

THE COURT:  Ms. Brown, how much time do you wish to reserve for rebuttal?

MS. BROWN:  Your Honor, if I may, I'd like to reserve 15 minutes for rebuttal.

THE COURT:  Great.  That means that we'll start with an hour and 15 minute oral argument by defense counsel.  We'll take a break then for ten minutes, and then we'll move directly to plaintiffs' counsels' statement to the Court, followed by the rebuttal, the 15-minute rebuttal.

Thank you so much.

MS. BROWN:  Your Honor, with your permission, can I hand up a copy of the slides I'll use?

THE COURT:  Please.

MS. BROWN:  Thank you.

May I proceed, your Honor?

THE COURT:  Please.

MS. BROWN:  Thank you, your Honor.

Your Honor, we are here before you today with critical questions about the sufficiency of the plaintiffs' experts' basis for their opinions, as well as the application of their experts' methodology.  And as your Honor well knows, and the committee notes to the Amended Rule 702 make clear, these are not questions of weight for a jury, but, rather, questions of admissibility that are reserved for this Court as gatekeeper.

Plaintiffs have put before the Court a lineup of experts who reject the views of the medical, scientific, and regulatory communities, and advance opinions that are based on a paucity of scientific evidence.  To do so, your Honor, these experts rely heavily on studies that have not properly controlled for the known major cause of ASD and ADHD genetics.  They cherry-pick findings, dismiss or ignore unfavorable studies, and repeatedly exceed the limitations of the various studies on which they rely.  And, your Honor, Amended 702 requires the exclusion of those unreliable opinions.

Acetaminophen, as the Court well knows, has been used safely during pregnancy for almost 70 years now.  Women have very limited options, as the Court pointed out this morning, of medicines that they can take during pregnancy.  Well, one thing that has been true for decades, your Honor, is that doctors consistently, strongly recommend Acetaminophen during pregnancy to treat a number of different conditions.  In fact, your Honor, the studies show that Acetaminophen has nearly 100 different indications for use, and therein lies one of the issues with this body of science, your Honor, because no study has been able to effectively control for potential confounding by indication.

And of course many of the reasons folks use Acetaminophen are themselves associated with an increased risk of ASD and ADHD, and that's why the FDA has been particularly

concerned about confounding by indication when examining repeatedly this body of literature.  But the other major confounder that limits a reliable interpretation of this data and a reliable application of this data is confounding by genetics.

Autism spectrum disorder has one major known cause your Honor, and it's genetics.  Scientists believe that anywhere from 80 to 90 percent of ASD diagnoses have a genetic etiology, and that's why authors like Taylor 2020 concluded environmental factors are unlikely to explain the increase in the prevalence of autism.  The same, of course, is true for ADHD, where scientists like Larsson 2014 similarly estimate heritability to be nearly 90 percent, and conclude that environmental effects are of minimal importance when investigating the cause of this disorder.

Plaintiffs' experts don't disagree, your Honor.  While plaintiffs in their briefing try to muddy the waters by arguing that heritability is not the same as inheritability, and does not mean that genetics alone causes these diseases, their own expert, Dr. Cabrera, admits that when you look at twin studies, there are estimates that the heritability -- the inheritability of ASD and ADHD is as high as 80 to 90 percent.

Your Honor, on this record, and on these scientific facts, there can be no dispute that the main known cause of both of these disorders is unquestionably genetics, and because

NC7DACEO

of the enormous role genetics play in the development of both of these disorders, it is critical to adjust for potential genetic confounding when investigating suspected environmental associations.  The very best way to do that is a sibling control analysis that isolates and attempts to control for potential genetic confounding.

Of course, Acetaminophen is not the first suspected environmental factor that may have a link to these two disorders.  We have seen studies time and time again, your Honor, report potential associations between an environmental factor, for example, smoking, or having a c-section, or having your labor induced, a potential association in the literature. Time and time again, your Honor, when sibling control analyses have been performed on this data, the association goes away. It becomes insignificant.

There is no sibling control study for the small number of studies plaintiffs rely on for their autism opinions in this case.  Because we know that all of these previous associations, every single one of them attenuated and became non-statistically significant, we cannot make causal conclusions about this body of evidence with no study that has attempted to control in this same sibling control analysis.

The same is true, your Honor, for ADHD, where, similarly, a number of different environmental factors, like smoking, and maternal obesity have been posited in the medical

NC7DACEO

literature as potentially being associated with ADHD, only to be debunked once a sibling control analysis was done.  Each and every one of these cases, the association became insignificant.  Here we do, your Honor, have a sibling control analysis, Gustavson 2020.  As your Honor is I'm sure very familiar with, there was a reported relative risk of 2.02 that dropped all the way to 1.06 and became statistically insignificant.  That is the gold standard way that epidemiologists evaluate this potential genetic confounding, and it's only been done once, and only on the ADHD side of this literature.

There is a Brandlistuen sibling control analysis, your Honor, that I'm sure we will talk about, and that sibling control analysis, no. 1, didn't deal with diagnoses, and, no. 2, has been heavily criticized in the literature, because it didn't involve discordant siblings, it didn't involve siblings who have different outcomes, which is what you have to have if you're trying to test it in this fashion.  Instead, they included concordant siblings, and it resulted in enormous criticism about that methodology.

Your Honor, no public health authority concludes what plaintiffs have put experts before this Court to say, which is that Acetaminophen causes autism and causes ADHD.  And, your Honor, it's not because these public health authorities have not been looking at this issue carefully for a very, very long time.  The FDA has repeatedly reviewed the literature from a

NC7DACEO

number of different departments, maternal fetal health areas of the FDA, epidemiology areas of the FDA.  They have repeatedly, painstakingly reviewed these studies, the very same studies that plaintiffs' experts rely on.  And what's important is that they have analyzed all of the same data.  It's not a situation where the FDA didn't take a look at some of the studies that plaintiffs' experts are relying on.  They've looked at every single one of the studies that plaintiffs' experts base their opinions on.

And critically, for this Court's gatekeeping analysis, the FDA has raised significant methodological limitations about interpreting this data.  What the FDA, as recently as July of 2022, raised, your Honor, are two very important issues with this data.  One is exposure.  Almost all of the studies on which plaintiffs rely, rely on moms in the middle of their pregnancy estimating when and how much they used in over-the-counter medicine like Acetaminophen.

We don't have prescription medicines, like a drug like Valproic Acid.  We are relying on moms to remember when they took this over-the-counter medicine.  And as we'll talk about later on, your Honor, there are a lot of very good reasons why moms may remember that differently:  If you have a difficult pregnancy, versus if you have an easy pregnancy.  There is enormous difficulty in the reliability and the bias of how the exposure data in this body of literature is collected.

NC7DACEO

Moreover, the FDA notes confounding by indication other medications and genetic factors, extremely limit the interpretation of this body of literature, and certainly prevent a causal conclusion.  As recently as March of 2023, the FDA concluded that the limitations and inconsistent findings of current observational studies are unable to support causality.

As the Court referenced this morning, the FDA is not alone.  Every medical association that has looked at this issue has reached a similar conclusion.  The Organization of Teratology Information Specialists, your Honor, they issued a statement in response to Dr. Bauer's "consensus statement," and what I think is important about this one for the Court, they're not just taking issue with the conclusion, your Honor.  They're taking issue with the methodology, which is the crux of the issue before this Court:  Have plaintiffs properly employed a methodology that is reliable, and that satisfies 702 and *Daubert*.  And the Organization of Teratology Information Specialists says that the studies are limited by serious methodological problems, including the very one we've been discussing, failure to account for confounding, and elements of bias that make the interpretation of data challenging.

So, too, your Honor, does the Society for Maternal Fetal Medicine raise methodological and design limitations in this body of evidence in informing their belief that the weight of the evidence is inconclusive and prevents a causal

NC7DACEO

conclusion.  More than 60,000 obstetricians and gynecologists have reviewed this literature carefully.  They note that gynecologists and obstetricians across the country have always identified Acetaminophen as one of the only safe pain relievers for pregnant individuals during pregnancy.  And based on their review of the data -- these are doctors, your Honor, who are devoting their lives to taking the very best care they can of pregnant women, and they conclude there is no clear evidence that would prove a causal relationship between --

THE COURT:  Well, the organization made the statement, not the 60,000 members.

MS. BROWN:  Yes, your Honor.  The organization, made up of -- that's fair, your Honor.  The organization made up of 60,000 doctors, whose mission in life of course is to take care of pregnant women, has this conclusion, your Honor, as a statement by their organization.

Moreover, your Honor, this conclusion of organizations, professional medical organizations goes beyond those just in our country.  The O'Sullivan article from 2022, 16 global organizations and 63 scientists who themselves, your Honor, did individually sign on to this statement about no causal association.

In fact, when Dr. Bauer's statement came out and there were so many responses, your Honor, from individual physicians, as well as organizations, she and her fellow authors issued a

NC7DACEO

response, and the reply specifically stated that they avoided any inference of causality in their statement, and recognized the limitations in the existing literature.  The very same limitations that we've pointed out to the Court in our briefing.

Your Honor, even plaintiffs' own experts did not have the opinion that they have now in this litigation.  These are individuals who have been practicing in their respective fields collectively for over 80 years, your Honor, but it wasn't until they were hired in the litigation that they formed the opinion that Acetaminophen used during pregnancy causes autism and ADHD.

And, your Honor, perhaps very tellingly is Dr. Baccarelli who published a paper in 2019 investigating potential neurodevelopment harm from Acetaminophen, and concluded that prenatal exposure to Acetaminophen, there was no evidence of neurodevelopment harm.  But that's his conclusion. Right, your Honor?

I think what's more telling about this Liew 2019 paper is that Dr. Baccarelli raised significant issues with the methodology of some of the very same studies he's now before the Court relying on.  And so, for example, in his published paper well before litigation, he pointed out the limitations and the bias in studies that use only maternal self report of Acetaminophen, and he explained that creates an issue of recall

NC7DACEO

bias. And it's differential, because he, Dr. Baccarelli, said, this results in recall bias due to higher levels of reporting and greater reporting precision among parents of children with impaired neurocognition.

He also pointed out that there is a potential unreliability or a biased report when you are relying on parents to report behaviors, as opposed to properly -- proper diagnoses from clinicians. And of course he concluded that the inconsistent epidemiological findings, without an identified mechanism, means that causality could not be established. And this is troubling, your Honor, from a 702 perspective, because these are the very same studies on which Dr. Baccarelli now relies. And, even more, these very same methodological issues that Dr. Baccarelli raised outside of the courtroom pervade the entirety of the studies on which he relies before this Court as gatekeeper consistent with his opinion that Acetaminophen causes ASD and ADHD.

Your Honor well knows that plaintiffs and plaintiffs alone have the burden of proof here. They must prove to you as gatekeeper that their experts' opinions are based on sufficient facts or data. They are the product of reliable principles and methods, and, importantly, they have been reliably applied to the facts of the case.

Plaintiffs, your Honor, fail to meet the traditional *Daubert* criteria. As your Honor knows, there are four

NC7DACEO

traditional criteria outlined in *Daubert*, and none of these experts meet those criteria. They have not published their opinions in peer review. Their opinions are not generally accepted. Medical organizations and government authorities do not agree that Acetaminophen causes ASD and ADHD. There is no known error rate or a way to calculate an error rate when doing a Bradford Hill analysis, and the case law says that's because it's a multi-factorial, subjective analysis. And, certainly, plaintiffs' experts have not tested their theories.

And what the case law tells us, your Honor, is that because these experts fail to meet the traditional four *Daubert* criteria, this Court must take a hard look at their methodology to make sure that it survives Rule 702. And plaintiffs in their briefing, your Honor, repeatedly argue that, well, because these folks have done a Bradford Hill analysis, that any results really go to weight and not admissibility. But the case law says otherwise, your Honor. The case law says that Bradford Hill itself must be carefully analyzed, because otherwise it's subjective -- it could be subject to bias in terms of the way that it's been carried out.

*Daniels-Feasel* says, your Honor, if there is not a hard look and methodology like Bradford Hill, it would be virtually standardless, and can be unacceptably manipulable. And so, your Honor, because these experts have not met these four criteria, the Court has to take a hard look at the way

NC7DACEO

they have applied Bradford Hill.  And simply, your Honor, this methodology put forth by the plaintiffs' experts cannot survive a hard look.

To begin with, Bradford Hill requires a gating analysis, whether you call it the strength factor, the clear-cut factor, before you even get to Bradford Hill, you have to establish that there is a clear-cut association, your Honor, and that has not been done on this body of literature, particularly as it relates to ASD, which we'll talk about shortly.  There's just a lack of studies on that side that would prevent a proper application of Bradford Hill.

But beyond that, your Honor, plaintiffs ignore limitations of the few studies that exist, and extrapolate far beyond the limitations that the authors of these studies carefully point out in their publications.  As we mentioned multiple times in our briefing, plaintiffs' experts' opinions are based on selected findings from these studies, findings that met statistical significance, or showed a dose response when the rest of the findings did not.  They have selectively picked findings in order to support their opinion, and the case law says that cannot survive 702 and *Daubert*.

Your Honor, what I had planned to do this morning was to walk through with the Court why the evidence is not reliable for the ASD and for ADHD, but before I do that, I just want to make sure the Court didn't have specific questions that I could

NC7DACEO

help by addressing.

THE COURT:  No.  You may proceed.

One issue for me is whether Bradford -- but I've already, you know, pointed that out, whether Bradford Hill analysis can be applied here, survive admissibility review, when it's not focused separately on autism and ADHD.

MS. BROWN:  Yes, your Honor.

And I appreciate the question, and I'm going to talk about that.  That is a critical flaw.  What your Honor knows has been done here is that all of the studies have been lumped together, and the plaintiffs' experts have run a Bradford Hill analysis not on two separate disorders, but on a bunch of different studies that are combined.  And that is inherently unreliable, your Honor.

The trans-diagnostic approach that has been put before the Court is entirely inappropriate when we are trying to determine the causation of a particular disease.  These are two completely separate diseases.  They have different diagnostic criteria under DSM-5.  Autism is a disorder of communication and interaction.  And ADHD is a disorder of hyperreactivity and inattention to detail, your Honor.

The fact that they are both neurological disorders, that they may have some overlapping symptoms, has no relevance to a causation inquiry on what could be causing these two entirely separate disorders.  We don't have biomarkers for

NC7DACEO

these disorders.  They are diagnosed based on symptoms, your Honor, and they must -- in terms of doing a proper and reliable causation analysis, they must be analyzed differently.  And plaintiffs have the burden of proof to show this Court why that's not true, and they haven't presented anything more than speculation as to why it would be reliable not to look at these individually.  They are individual, unique disorders, and in order to determine what is causing each of them, an independent analysis must be done.

THE COURT:  Well, I think that Dr. Baccarelli principally relies on Dr. Hollander to suggest that a single Bradford Hill analysis can be done for all NDDs together.

MS. BROWN:  I think that's right, your Honor, and I think the failings come in Dr. Hollander's explanation for why that should survive this Court's 702 inquiry, because just because they point to a number of federal guidelines that talk about overlapping symptoms for treatment, for clinical treatment, how -- you know, if the focus of a doctor is just how can we help this child, it's a very different inquiry than the focus of the Court's inquiry in terms of what is causing the disease -- the disorder, and what independent, reliable methodology have you employed to meet Bradford Hill, if that's the appropriate methodology being done.

But I think the failing, your Honor, is that Dr. Hollander does not provide the Court with anything more than

his clinical practice or speculation, which is being done for a totally different purpose.  It's one thing to look at overlapping symptoms when you're trying to treat and help a child.  It is a very different thing when you are trying to analyze the literature according to an accepted methodology to determine causation.

And so, your Honor, I'll start with autism spectrum disorder, because I do believe plaintiffs have not met their burden of proving to the Court why it would be appropriate to lump all of these together in terms of their analysis, and as an initial matter, plaintiffs' experts fail to satisfy a threshold inquiry about whether or not a Bradford Hill analysis is even appropriate.  Some courts refer to it as the need for a clear-cut association.  Others talk about a gating inquiry before you even are able to do a Bradford Hill analysis.

When it comes to autism spectrum disorder, your Honor, plaintiffs have five diagnostic studies, just five.

THE COURT:  Thank you for listing these.  Dr. Baccarelli identifies six.  I think he says original studies with respect to autism.  I did not find his list of six identified anywhere in either of his two reports or in his navigation guide.  I contextually have tried to figure out which six he's pointing to.

Do you know which six?  You have five listed here.

MS. BROWN:  Yes, your Honor.  I do have five, because

NC7DACEO

these are the five diagnostic studies.  I will say, and perhaps this is how Dr. Baccarelli gets to six, Avella-Garcia is a symptom study that also looked into symptoms of autism, and certainly plaintiffs do cite and rely on that.  And that, perhaps, could be how Dr. Baccarelli gets to six.

We'll also talk about in a second, your Honor, two meta analyses that were done that could also perhaps be what Dr. Baccarelli is relying on, your Honor.  But certainly when it comes to the hard facts on diagnosis studies, it's just these five.

And as your Honor well knows, it sounds like you're very familiar with the literature, three of them do not support plaintiffs' causation theory before this Court.  Two of them have no significant association, and the third was actually a study of women with fevers, and to see if there was an association with ASD, which, importantly, there was, but it was attenuated by taking Acetaminophen, which shows, if anything, a protective effect.  So no question these three studies do not support the causation theory that is before the Court.

And troubling, your Honor, plaintiffs' experts don't grapple with that.  In fact, many of them, Dr. Louie and Dr. Hollander, don't even address these three studies in their report.  They simply dismiss them, without reconciling these inconsistent findings.  And it's even more troubling, your Honor, because each of these experts relies on Ji 2020.  So Ji

NC7DACEO

2018, as the Court knows, is a cord blood study, maternal plasma study, and then there's a follow-up study in 2020, and yet the experts on this page, your Honor, look only to Ji 2020, and don't provide the Court with a methodological explanation for why they have just ignored these unfavorable studies.

And, of course, that was part of the problem in *Daniels-Feasel*, your Honor, that Dr. Moille simply did not reconcile studies with inconsistent findings, which is the case with these experts here. Dr. Cabrera, too, completely omits Hornig 2018 from his report.

The two studies then, your Honor, two studies that we are left with on autism spectrum disorder are limited and contradictory. To begin with, your Honor, Ji 2020 is a cord blood study. There is no question from the study itself, and from the admissions of plaintiffs' experts, that it tells you nothing about exposure during pregnancy. Because of the half life of Acetaminophen by the time you're collecting this cord blood, you only have exposure data for a couple of hours before delivery. And it will surprise no one that labor is painful, and that many people are taking Acetaminophen as they are headed to the hospital. It tells you nothing about the issue that we are here to discuss.

And plaintiffs' experts, of course, admit that. Dr. Cabrera, we don't know anything about Acetaminophen use prior to labor and delivery from Ji 2020. Dr. Baccarelli and

Dr. Hollander similarly agree.  And that's one of the two studies that forms the basis -- one of the two diagnostic studies that forms the basis of a causal opinion before the Court, and it doesn't tell us anything about exposure during pregnancy.  That is not reliable, your Honor.

And what's more, and what is potentially the most troubling about Ji 2020, one, it doesn't tell you anything about exposure during pregnancy; but, two, even though the authors did not conduct a siblings control analysis, did not sort of employ rigorous methodology to control for confounding, they did a sensitivity analysis, and it's included in the supplemental table.  And what they did, your Honor, is in the sensitivity analysis, they controlled for maternal psychiatric illness.  And, surprising to no one, when they did that, the association became non-significant.

But what's troubling from a *Daubert* perspective, your Honor, is that plaintiffs' experts don't address this supplemental data at all, not in their reports, not in their depositions, not in their amended and supplemental reports. There is no explanation for how they can rely on one of two autism diagnosis studies that, no. 1, has no information about exposure during pregnancy; and, no. 2, the association completely attenuates to non-statistically significant when they run this sensitivity analysis.  That is not reliable, your Honor, and we have no -- nothing in the record that tells us

how plaintiffs' experts reconcile these findings with their causation opinion, which, by the way, relies very heavily on Ji 2020.

Further problematic, your Honor, is when now we're left with these two ASD studies, Liew 2016 and Ji 2020 -- and they have completely inconsistent studies.  So Liew 2016 only finds a statistically significant association for ASD with ADHD, as the Court knows.  Ji 2020 finds no association for ASD with ADHD.  And now that's the conclusion and that's the finding.

The methodological issue is plaintiffs don't put before the Court a reason to reconcile these entirely inconsistent findings, and *Daubert* and 702 require that they do that.  It is not enough to say, I employed a Bradford Hill analysis, your Honor, and everything else goes to weight.  They have to be able to reconcile findings like this.  They have to be able to explain inconsistent findings or unfavorable findings.  And just when we walk through these five ASD studies, we see that they have not.  In many cases, they appear to not even be aware of the additional analyses that were not being done.

Additionally troubling, your Honor, Liew itself says that there's a possibility of residual confounding by indication, and that genetic factors could be an alternative explanation, that those explanations cannot be dismissed.  This

NC7DACEO

is one of the two studies, your Honor, on which their entire ASD opinion is based. But also very troubling, your Honor, is the dose response information from Liew 2016. And perhaps what's even more troubling is that when this information is reported by Dr. Baccarelli, he leaves out most of these insignificant findings.

So this is a study, your Honor, where, first of all, 80 percent of the women could not recall dose, and 28 percent of the women could not recall what weeks they took Acetaminophen. This is not surprising with an over-the-counter medicine. But, in any event, because they couldn't recall the weeks, what the authors of the study did is they just took the information from the date of the interview, and assigned a trimester based on the date of the interview.

When you look at the trimester data, though, it makes no sense if this was truly a causal association. First trimester, second trimester, third trimester, non-significant; but the first and the second trimester is significant, but the second and the third and the first and the third also not significant. And that doesn't make sense if you consider Dr. Liu's 28-day exposure opinion, if you consider the opinion that plaintiffs have put before the Court, which is that more use during pregnancy leads to an increased risk. This data doesn't support it, your Honor, and problematic for them, they haven't explained to the Court how they reconcile that.

NC7DACEO

In short, your Honor, when it comes to the ASD literature, and it is enormously sparse, plaintiffs fail to specify a threshold inquiry that a Bradford Hill analysis could even be done on this meager set of data.  Protective effect in one study, Hornig.  No significant association in Ji 2018 and Saunders 2019.  Ji 2020, no information on exposure during pregnancy, and an association that becomes insignificant on a sensitivity analysis that controls for maternal psychiatric condition.

That leaves us with Liew 2016, your Honor, which has inconsistent results with Ji, and which the authors themselves say confounding itself may explain the entire association.  Plainly, your Honor, this isn't even enough to get them to Bradford Hill.  And certainly, your Honor, it is -- the evidence in *Daniels-Feasel*, which was found to be unreliable, was greater than the evidence that they have on ASD.

In *Daniels-Feasel*, the Court of course was critical about cherry-picked findings, issues of confounding.  The issue there, your Honor knows, was whether SSRIs are associated with autism spectrum disorder, and all of the very same things that we briefed here, your Honor, that plaintiffs' experts are doing, were issues there.  The difference in *Daniels-Feasel* is they had a lot more studies, they had a lot more diagnostic studies than we do here.  Same methodological flaws, but more studies, and the Court found it is not enough.

NC7DACEO

And that's why, your Honor, we saw a lot of forest plots in the briefing and at the deposition, and this slide compares for the Court what a forest plot on the studies and the findings on which plaintiffs experts rely up top in the blue, and then down here in the yellow, a forest plot of what the plaintiffs' experts in *Daniels-Feasel* relied on, your Honor. And you can see, there's more, the relative risks are a little higher, most of them are statistically significant, and what it shows, your Honor, is just having statistical findings on a forest plot does not inform the core question of a reliable application of methodology. That is the issue for the Court, and, unquestionably, particularly on autism spectrum disorder, your Honor.

Plaintiffs' experts have come up very short. Even if the Court said, well, they get past clear-cut association, and they could do a Bradford Hill analysis, they can't get very far, your Honor, because one of the gating factors that *Daniels-Feasel* tells us is strength of association. The strength of association factor is a gating factor that requires the statistical or strong association between the cause under review and it's asserted effects. And there is no question, even when you look at the meager studies that they have, the limited number of studies that they have here, there's no question the association is not strong.

Liew 2016 finds a relative risk of 1.19, which is the

NC7DACEO

same relative risk in two meta analyses that plaintiffs point to, and perhaps Dr. Baccarelli was referring to Alemany and Masarwa.  But 1.19 is so low, your Honor, that it is absolutely subject to potential bias and confounding.  It is almost 1, 1.19.  And, in fact, Ricci 2023, another meta analysis, determined there wasn't even enough data to do a meta analysis, your Honor.  When you compare a 1.19 to environmental or genetic factors that we know are causal, it pales in comparison.  Relative risk of more than 100 for HPV and cervical cancer, 25 for lung cancer and smoking.

So how do plaintiffs respond, your Honor, to this? Certainly, your Honor, the Court knows they point to Valproic Acid.  Valproic Acid is a heavily controlled prescription medicine that has been known to be a teratogen for decades. The data we have on women using Valproic Acid is incredibly precise.  We have pregnancy registries that carefully monitor and track women who use that.  And so the whole problem that we have in the Acetaminophen body of literature about maternal reports, that doesn't exist in Valproic Acid.  The relative risk is much stronger, 4.4.  And critically, your Honor, the Valproic Acid studies attempted to control for confounding, and that is a huge issue with the Acetaminophen literature, as we've seen already this morning.

So the Valproic Acid literature is far more precise. It involved a known teratogen.  It doesn't have the issue of

NC7DACEO

recall bias that we do, and the relative risks are simply higher, your Honor.  It's not a fair analogy at all.  And Dr. Cabrera admits that the very best evidence we have are these prospective pregnancy registries.  He puts that above meta analyses.  And that's, of course, the data we have for Valproic Acid, and we do not for Acetaminophen.

This is certainly a key issue that the Court has raised, the trans-diagnostic theory that plaintiffs attempt to use to, frankly, save not only the ASD opinions, but the ADHD opinions as well.  And, simply put, your Honor, it is not proper for purposes of causation.  And they have the burden of proving to the Court that it is, and they've come up short.

Pointing to clinical treatment guidelines that have overlapping symptoms of these disorders tells us nothing about causation, and, in fact, the guidelines or the treatises that they point the Court to, your Honor, they include a whole bunch of neurodevelopment issues, eating disorders, substance abuse, all sorts of problems.  And no one would say that analyzing data related to eating disorders would inform the causation of autism.  Simply because neurodevelopment outcomes share symptoms in some instances, or are grouped together in a treatment mandate, does not inform causation, and they have the burden of proving to the Court that it does.

Finally, your Honor, and this goes to the question the Court had about additional studies Dr. Baccarelli relies on.

Non-diagnostic studies are inherently unreliable, and one of the things plaintiffs try to do with their experts is sort of validate them, you know, point the Court to, well, this screening tool has been validated. But when you look at what the plaintiffs' experts actually rely on, they prove the point that these tools are not proper replacements for diagnosis. These are screening tools, your Honor, that are meant to do just that, screen, and cast a very wide net of kids who might have potential issues that clinicians want to follow up on.

It is purposefully done to capture more than the people who actually have the disorder, and even though plaintiffs pointed us to these studies on the right, they show that these are not predictive tools for figuring out who actually has the disorders that we're before the Court with. Perhaps the most striking one, your Honor, is this first one, because the strengths and difficulties questionnaire is used in a number of studies that plaintiffs rely on. And they point us to Russell 2013 as a way to sort of shore up the reliance on this screening tool, but when you look at the data, they say the predictive value for ADHD was 12 percent. So of all the people this screening tool caught, of all the people it cast the net for, only 12 percent of them actually had the disorder. That's remarkable, your Honor, 88 percent false positives with this tool. The same is true with ASD. You see there again, low at 18 percent. And that was the same for the CBCL, which

many of these studies employed.

The cite that the plaintiffs gave us, note the false high -- the higher false positive rate that this tool has.  And then for the ages and stages questionnaire, the cite that they provided us has no mention of either of these diagnoses.  I mean, simply no support at all, your Honor.  And it's not just our interpretation of these studies that show what a weak proxy these tools are.  The FDA raised the same concern.

The use of the SDQ screening tool to, quote, diagnose study outcome is problematic, says the FDA, because the positive predictive value is only 35 percent.  That's an enormous problem, your Honor, in trying to interpret these studies, where only a very few number of the children that are caught by the screening tool actually have the disorder that we are trying to analyze causation on.

This, your Honor, is perhaps that screening tool study that Dr. Baccarelli was referring to, and even when you look at the data here, it doesn't say they're ASD opinions.  This uses a screening tool called a CAST score, your Honor.  It has 50 percent predictability.  Fifty percent of the people caught up by this CAST score do not have autism.  And what's remarkable is that the findings of this study do not support plaintiffs' opinions.  There was no significant change in CAST scores for kids overall, not at all.  In fact, there was a significant decrease in the CAST score of girls.

NC7DACEO

So when you look at this, if it was actually protective for girls and actually helped girls, and then there was a finding for boys, what's troubling from a methodological perspective, your Honor, is that Dr. Baccarelli cites to the boys' finding, rather than grapple with the fact that the girls' finding was not statistically significant, that the overall finding was not statistically significant, and that the symptoms, this CAST score, only has a 50 percent predictability, your Honor.  And so this -- they put before this Court no explanation from a biological or logical explanation as to why this should be being protective for girls, but somehow causative in boys.  And that is another methodological failing, your Honor.

In short, your Honor, plaintiffs simply cannot meet their burden of proving to this Court that they have reliably applied technologies in interpreting ASD data.  There is not even enough data to run a Bradford Hill analysis.  When you do that, you fail almost immediately on strength of association. They have two diagnostic studies.  One says nothing about exposure during pregnancy.  One has a risk that attenuates when it controls for maternal illnesses, and the other says maybe it was caused by genetic confounding and we weren't able to control for it.  And the dose response in that Liu 2016 is completely inconsistent with the opinions of these experts, that the more you take, the greater your risk.

NC7DACEO

So, your Honor, there is simply no way based on this body of evidence and based on the opinions the experts have put before you that they have met their burden, that they have reliably applied methodology to support their causation opinion on ASD.

Unless your Honor has any questions, I will move on to ADHD.  Thank you.

So, your Honor, these studies, because ADHD also has such a high heritability, high inheritability, these studies, too, are confounded by genetics, and here's how we know.  We actually, in the ADHD side of things, have proven data that shows this is confounding by genetics.  Leppert 2019 is one, your Honor.  This study found a statistically significant association between polygenic risk scores, or a measure of the genetic risk of passing ADHD to children, and the likelihood of using Acetaminophen during children.  There is something about women who use -- and this study proves it -- Acetaminophen during pregnancy that is linked to a genetic predisposition to have a child with ADHD, and that's what Leppert 2019 shows, demonstrably shows.

Moreover, your Honor, Masarwa 2020 -- so Masarwa 2018 was a meta analysis that looked into this potential association for both ASD and ADHD, but the authors were troubled.  The authors were troubled by the very same concerns we have raised to this Court, bias confounding explaining these low relative

risks.  And so what they did is they went back in 2020 and they did a whole study that used statistical tools to analyze whether or not the small relative risk they had found back in 2018 could be explained by confounding or by bias.  And incredibly, your Honor, this is just on the ADHD side, what they found is it was explained by bias.  The observed association between Acetaminophen use during pregnancy and the increased risk for ADHD in the offspring is likely the result of bias.

What they talk about in Masarwa 2020, your Honor, is that parental ADHD, if not controlled for in these studies, is enough to account for the small relative risks that they saw in 2018 and that we see throughout this body of literature.  And, again, from a methodological standpoint, your Honor, what is enormously troubling is that Dr. Hollander points to Masarwa 2018, the first study, as one of the lynchpin studies of his expert report.  He grades it high.  He says it's a very strong study for his opinion.  And then at his deposition, your Honor, he was confronted with 2020 that takes all of that back once they do a proper analysis of potential bias, and he didn't even know about the study, your Honor.  Forget come before the Court with a way to reconcile its findings.  He was wholly unaware of this additional analysis that was done that substantively and demonstrably gets to the heart of the issue, which is that these small relative risks, even when a little bit of adjusting

is done, they go away.  They're explained by confounding.  And we know that for sure, your Honor, in the sibling control analysis that we've spoken about, Gustavson 2021.

Here the Court knows there was a purported association of 2.02, kind of on the higher side of some that we see in this body of literature, and once the sibling control analysis was performed, the relative risk went to down to almost null, 1.06, and was not statistically significant.  And Dr. Louie, of course, admits that the sibling control analysis is a very strong study design, but then he neglects to include the results of Gustavson's sibling control analysis --

THE COURT:  I'm sorry.  Did you say Dr. Louie?

MS. BROWN:  I did, yes, your Honor.

And his critique of it is, you know, he had heard that maybe it had low power, and that's why he didn't include it.  Dr. Baccarelli said, you know, this is sort of the one -- one of the smallest studies in the literature.  It's only got two to three siblings with ADHD.  He of course was mistaken, and plaintiffs admitted in their later briefing he had his math wrong.  This study had a significant number of participants.  We're talking about more than 612 children who contribute to this analysis, 68 of them in the more than 29-day analysis discordant, on an uncommon exposure, but perhaps what's most important, your Honor, to the methodological flaws of these experts -- Dr. Baccarelli relies heavily on Baker 2020, and

NC7DACEO

Baker 2020 actually has less cases of ADHD then those in Gustavson's sibling control analysis.  How can we reconcile that?  If there is a legitimate power technique, how could you turn around and rely on Baker '22 with less cases of ADHD?

Dr. Baccarelli speculates that perhaps there's some mediator effect, that the sibling control analysis is causing problems with that type of analysis.  It is entirely speculative, your Honor.  What it would mean is there would have to be something about a mom who takes Acetaminophen in pregnancy number one that somehow affects pregnancy number two three years, four years down the line.  There is no evidence that that is true.  They have come to the Court with an entirely speculative critique of the sibling control analysis, and given the Court no substantive support of why or how taking Acetaminophen in 2000 results in, has any affect on the child you have three years later in 2003.  It's absolutely unsupported, your Honor, and, in fact, these sibling control analyses are widely respected and viewed as the gold standard in the epidemiology literature.

The studies themselves, of course, admit, your Honor, that they're unable to exclude genetic confounding. Gustavson's the only one that does a proper sibling control analysis, and, of course, the effect goes away.  But Ji 2020, Liew 2014, Baker does nothing to control for confounding by indication, or confounding by genetics.  The studies themselves

NC7DACEO

address these limitations.

And *Daniels-Feasel*, and 702, and *Daubert* tell us these experts can't go beyond what the study authors themselves say, and, yet, they do it time and time again, rely on studies that say, hey, we haven't controlled for genetic confounding, and we can't exclude it for a possible reason for exclusion.  They can't come to you, your Honor, and say, well, we can.  That doesn't survive 702.

There's also the issue, as we spoke about at the beginning, in this body of literature, your Honor, for confounding by indication.  The very reason women take this medication during pregnancy could be masking underlying risk factors for these disorders or could be associated with these disorders themselves, like maternal fever.  The FDA has been concerned about this.  Potential confounding by indication is the major criticism of studies examining outcomes of prenatal Acetaminophen exposure.  And of course authors themselves have been concerned about it.  Same issue with the genetic confounding.  These authors tell you, hey, we might have an issue with genetic confounding.  It could completely explain the results.  Caution should be used when interpreting the results.  But these experts run with these studies as if it wasn't in there.  That's what happened in *Daniels-Feasel*, and that's what led to the exclusion there, your Honor, and mandates an exclusion here.

When the Court's taking a hard look at the methodological work of these experts, the Court will find numerous instances of experts cherry-picking from the studies the findings they like. Dr. Baccarelli has a number of those that we highlighted in our briefing. But here is sort of the issue your Honor, so this is the Chen study, 2019. Chen, honestly, if you're talking about dose, Chen probably has the most reliable data, because they're using insurance records, and so they actually have documented exposure. They find no dose response. The one study that has real data on this, no dose response.

But what does Dr. Baccarelli do? Well, he looks at this data, not statistically significant in the first trimester, barely statistically significant in the second trimester, and again not statistically significant in the third trimester, and he only puts in his report the middle findings. That is intellectually dishonest, and not a reliable application of methodology, your Honor, because their theory is the more you take, the greater your risk. So this finding is contrary to that. And *Daniels-Feasel*, and *Daubert*, and 702 says, you have to reconcile that for us, you can't simply ignore it, which is what they do, your Honor.

Same issue with Dr. Cabrera, he too employs this same selective interpretation of study results. We talked about this one, your Honor. The Avella-Garcia findings, where

there's only finding in boys, not in girls, not overall, and yet, remarkably, he puts in his report the finding of boys.  No explanation for these other findings.  No attempt to reconcile.  It's simply not allowed under 702, your Honor.

Another example of Dr. Cabrera.  This is remarkable.  Eight out of ten non-statistically significant findings, and Dr. Cabrera picks out the one statistically significant finding in this study.  And some of the non-statistically significant findings go to activities, social ability, you know, characteristics that could be linked to the very disorder he's investigating, but he completely ignores them, and picks out one finding.

Plaintiffs' experts, your Honor, misapply Bradford Hill.  And there's another gating issue of whether you should even get to Bradford Hill on the ADHD side.  On the autism side, we're talking about two studies, your Honor.  I mean, to argue there's a clear-cut association is an up-hill battle for sure, but we acknowledge there are far more studies on the ADHD side.  Whether that establishes a clear-cut association that would allow you to get to *Daubert*, I would argue no, but even if you do get to *Daubert*, your Honor, even if it was proper -- excuse me, Bradford Hill, if you do get to Bradford Hill on the ADHD side, the application of Bradford Hill actually disproves a causal conclusion, a proper application.  And again, your Honor, an application of just ADHD.  Not a bunch of other

NC7DACEO

studies, a bunch of neurodevelopment outcomes. This inquiry must be on this disorder.

THE COURT:  Well, I'm not sure I can take a Bradford Hill analysis that's not been offered to me. I don't have a Bradford Hill analysis on ADHD.

MS. BROWN:  Exactly, your Honor. I 100 percent agree. And what's been offered to you is unreliable without justification, without a reliable justification for why, when investigating ADHD, it's appropriate to include in your analysis other neurodevelopment outcomes. There has been no re -- they have the burden of proof, and there's been no reliable explanation for that.

And so, your Honor, absolutely, what is before the Court is simply not enough. It is not reliable, and it is not a rigorous, reliable analysis of these disorders separately. If you were to do it, though, your Honor, even the way the plaintiffs' experts do it, they don't meet strength --

THE COURT:  But they don't do it.

MS. BROWN:  I understand.

THE COURT:  I'm sorry. Am I supposed to create an expert report running a Bradford Hill analysis on ADHD?

MS. BROWN:  You can't, right? I mean, you are the gatekeeper. This Court is the gatekeeper and what is before the Court is the analysis the plaintiffs' experts did. And it is unreliable from the start.

The Court has no independent Bradford Hill analysis for each of these disorders, which it could give a hard look at, and determine whether or not it satisfies 702 and *Daubert*. It is not in this record, your Honor. Absolutely, the Court can't create it. We don't know what the basis is. We don't know what it would be if they did it the proper way. We know even what they did doesn't satisfy Bradford Hill, but it's wrong from the start, because it's not looking at the disorders that are before the Court.

So absolutely, your Honor, there are gating issues in this record that make a decision here very easy, your Honor. They have not put before -- the proper Bradford Hill application before this Court. What they did put before the Court, your Honor, even in their own analysis, even in the lumped-together analysis, which I agree does not pass 702 for the Court to consider here, it doesn't show strength. The plaintiffs' experts themselves agree that these risk ratios are low or moderate. Risk ratios between one and two, both of these experts agree that does not establish strength.

Here's the same issue, your Honor, on ADHD, where the forest plot compared to *Daniels-Feasel* -- yes, there are a lot of studies, and these are multiple findings from some of the very same studies. That doesn't establish reliability. That doesn't establish a reliable application of Bradford Hill. It just shows some studies that have a statistically significant

NC7DACEO

finding.

Your Honor, even in the way that they did this analysis, they don't satisfy dose response.  Even though they didn't look just at ADHD, what they looked at and what they point to, these studies do not establish what's needed for a proper and reliable applicable of Bradford Hill, which is the more you're exposed to the environmental factors, the more your risk increases.

We've already talked about Ji 2020.  No data on exposure beyond three months before delivery.  That doesn't tell us anything, and there's been no reliable method put before the Court as to why we could extrapolate anything for that.

Baker 2020 is a meconium study, your Honor, and there are ways to validate exposure if you're doing a meconium study. You could take blood tests during that time period.  You could do interviews with the mom to try and reconcile alleged usage with what you see in the meconium.  The authors themselves acknowledge there's a way to do it.  They couldn't do it here, your Honor.  There's no information about a validated exposure metric in Baker 2020 that would allow you to reach a dose response conclusion.

We spoke a little bit about what we saw in the Liew tables, your Honor, where the dose response is all over the place.  You know, increased risk in trimester one, but not in

two, again in three.  These do not support, even on the way these experts did their analysis, they do not support dose response.  Best evidence of dose in Chen clearly states no dose response found.

Temporality is incredibly important here, your Honor, because plaintiffs' experts don't know when the exposure occurs and when the critical time period for development is.  So, your Honor, it's not enough to say temporality is established because a woman took Acetaminophen before she had a baby.  What we need to know is what is the critical window for the development of these disorders, and did her ingestion of Acetaminophen come before that.  And we can't do that on these facts and on this data, because plaintiffs' experts agree they don't know.  They don't know when each of these disorders develops such that we can reliably try to interpret the data to see if there has been exposure before that part.

And here's -- here's how it is, your Honor.

THE COURT:  Excuse me, counsel.  I just want to say you have about five minutes left.

MS. BROWN:  Thank you, your Honor.  I appreciate it.

I'll fly through the end here.  They admit they don't know the critical window.  Dr. Hollander says second and third.  Dr. Cabrera says second.  Dr. Baccarelli says it's the whole pregnancy.  We need to understand temporality, your Honor.  We would need to know when these disorders actually -- what is the

NC7DACEO

critical window for these disorders to actually occur.

I want to make sure I quickly talk before the end of my time, your Honor, about biological plausibility.  What happened here is plaintiff sort of threw it all into the kitchen sink at the beginning of this litigation.  They had up to eight or ten postulated mechanisms.  But then, when we got through discovery, when we got through the depositions, it's clear they're sticking by only two of them, your Honor.  This NAT theory of oxidative stress, and the endocannabinoid system disruption.

Both are highly, highly speculative, your Honor.  For example, this NAT theory, there's little evidence that oxidative stress and glutathione depletion even occur in the fetal brain.  Dr. Pearson couldn't cite any study about whether or not glutathione had ever been measured in the fetal brain.  This is entirely speculative at every part of this chain, and there is no reliable data that these experts point to that would support this.

In fact, the data that they point to, like Klein 2020, Rikabello 2021, overwhelmingly show no change in glutathione, and that's the key part of their theory.  The endocannabinoid system proposal doesn't fare any better, your Honor, because here, too, no study has ever identified this AM404 metabolite in the fetal brain.  We don't even know if it's there.  The same with the glutathione theory with the NAT depleting

NC7DACEO

glutathione.  We don't have reliable evidence that this actually occurs.  It is entirely speculative.  Plaintiffs have not brought before the Court any evidence that it is reliable.

Very quickly, your Honor, in my final moments, I will just say there are strong internal controls in some of these studies, like Ystrom, for example, your Honor, that show actually a greater association with dad's use during pregnancy than with the mom's use during pregnancy.  And that is such a strong indication that something other than maternal use of Acetaminophen is driving this association, so much so that the authors of Ystrom said that, we cannot draw any meaning from this data, because this paternal control data is so strong and suggests that there could be something else going on here.

Dr. Baccarelli says, well, there's nothing inconsistent with these findings, but again, your Honor, the authors themselves say there's something inconsistent.  And Dr. Baccarelli is required to grapple with that before the Court.

Finally, your Honor, these animal studies simply cannot plug the hole that they have in this opinion.  Dr. Pearson's 2023 study says that it's possible that ADHD is too complex a disorder to translate into animal behavior.  Animals do not get these social communication, attention deficit disorders.  These are human communication and behavior disorders.  And *Daniels-Feasel* cautions us against any causation opinion that would rely heavily on these types of

NC7DACEO

studies.

Your Honor knows that the courtroom is not the place for scientific guesswork. Your Honor is well aware of the heightened responsibility of the Court, based on the amended rules, to act as gatekeeper. Plaintiffs' experts have come before the Court with improper analyses to start. They have not properly analyzed two different disorders that are part of this litigation. They have not done it in a reliable method. Their views are contrary to the public health community. And, your Honor, Rule 702 mandates the exclusion of these experts.

Thank you very much for your time and attention, your Honor.

THE COURT:  Thank you, counsel.

So we'll take a ten-minute recess, and then resume with plaintiffs' counsel.

THE DEPUTY CLERK:  All rise.

(Recess taken)

THE DEPUTY CLERK:  All rise.

THE COURT:  Please be seated.

So, Ms. Brown, I cut you short. I cut you short by eight minutes.

MS. BROWN:  Would it be okay if I save those for rebuttal?

THE COURT:  Probably not.

MS. BROWN:  Okay.

NC7DACEO

THE COURT:  Because you had an agreement with plaintiffs' counsel I think.

MS. BROWN:  That's okay.

THE COURT:  So if you wanted to take a few more minutes to add anything that I rushed you through --

MS. BROWN:  Your Honor, I think it's okay.  I thank you very much for the eight minutes, but I'll just take care of it in rebuttal.

THE COURT:  Okay.  Yes.

MS. BROWN:  I appreciate it, Judge.

THE COURT:  Plaintiffs' counsel.

MR. KELLER:  Thank you, your Honor.

THE COURT:  It's Mr. Keller?

MR. KELLER:  Yes.

THE COURT:  Thank you.

MR. KELLER:  Good morning, your Honor.  And may it please the Court --

THE COURT:  Good morning.

MR. KELLER:  -- Ashley Keller, on behalf of the plaintiffs.

I'd like to start by taking a quick road map of where I plan to take our conversation today, of course subject to your Honor interrupting me and re-purposing me any way you see fit.  But I'd like to begin by briefly introducing our experts, and explain, more importantly, why it is they're here offering

the opinions they do.

I'd like to then quickly transition to Rule 702, and the relevant standard, particularly with the new rule that's been in effect for a few days.  And then my plan is to hit every point of disagreement between the parties that comes through in the briefing, and when I do that, I'm going to make two commitments to the Court.  First, I'm going to show the Court exactly what our experts say on that point of disagreement, because you heard in the presentation just a few moments ago, and see a lot of this in the briefing, the accusation that our experts kind of whistle past the graveyard and don't adequately address points of disagreement they say support their side.  And so I've brought the receipts to show that isn't correct.

The second thing I'm going to commit to the Court is I'm going to cite independent sources of scientific authority from outside of this courtroom, peer-reviewed publications, reference manuals, guidance documents that are going to demonstrate to the Court that what our expert said on that particular point of disagreement are accepted in the scientific community.  In many instances, I'm going to be able to point the Court to specific independent sources of authority that agreed with our experts on the exact same point that they're analyzing.  In other words, about Acetaminophen.

In a few instances, I'll point the Court to specific

NC7DACEO

sources of independent authority that agree with our expert on the general principle that they're applying, but either way I think that's going to help the Court understand what our experts did here is the same sort of thing that experts do out of the courtroom.  And so in keeping that commitment to the Court, I'm going to start with association, whether there actually is association between prenatal exposure to Acetaminophen and autism and ADHD.

Within that topic area, I'm going to address statistical significance, which we just heard from my friend on the other side is relevant to whether there's an association, and I'm also going to address the relevant body of literature that reasonable scientists could consider when addressing these questions.  And I think on your Honor's statement earlier on some of the questions you had with my friend from the other side, that's an important area that I want to spend some time on.

I'm then going to address what I think is the lead argument for the alternative explanation we're seeing here, which is confounding by genetics.  From there, we'll turn to Valproic Acid, and its significance to this case, followed by confounding by indication.  And then we'll come to the Bradford Hill criteria, and when we get to that, I'm going to start a little out of order from what Sir Austin Bradford Hill said in his seminal address, and I will address biological plausibility

NC7DACEO

first. The reason I'm going to do that, of course, is because the other side spent an entire set of briefs on that one Bradford Hill factor. And so it's their motion, and I want to make sure I give it the attention it deserves.

I'll then run through the remaining eight Bradford Hill criteria. And I'll close with some comments about the Food and Drug Administration, the Society for Fetal Medicine, and the other organizations that have expressed some opinions and conclusions with respect to the question that's before the Court.

So turning back to the quick introduction of who our experts are, your Honor obviously has the qualifications. I won't do them justice by just offering a sentence or two for each one, but you are Dr. Robert Cabrera, one of the most respected teratologists in the world, who teaches at the Baylor College of Medicine; a deeply experienced pharmacologist at USC in Dr. Louie. Dr. Hollander is such a well-regarded psychiatrist that he helped write the diagnostic criteria for autism and ADHD that both sides cite extensively in their papers, the DSM criteria. You have Dr. Brandon Pearson, the only neuro toxicologist offering testimony in this case on either side. He's been studying Acetaminophen outside of the courtroom for a decade, and his day job at the Mailman School of Public Health at Columbia University is to run their prestigious lab that exists to focus on the impact of

environmental exposures on children.  Then of course you have Andre Baccarelli, he's a medical doctor.  He's an epigeneticist, and he's a epidemiologist par excellence.  He's one of the most cited scientists in the world in any discipline, not just epidemiology, and he's the outgoing chair of the epidemiology department at Columbia, because he's the incoming dean of the Harvard School of Public Health, our nation's number one institution dedicated to that important field.

Now, the other side doesn't even challenge the first Rule 702 factor, which is whether these experts are credentialed.  Of course they are.  I would dare say these are the five most credentialed, respected, well-regarded scientists perhaps ever to offer testimony in an American pharmaceutical MDL.  The reason I bring up their credentials and experience, however, is to answer a different question, which is:  Why are they here.

They're actually here for the reasons your Honor flagged in your opening statement.  This is a deeply important case that concerns matters of public health.  These experts are not here because they're professional testifiers.  They're certainly not here to parrot whatever lawyers tell them to so they can make consulting revenue on the side.  They have serious reputations in the scientific community.  They obviously care about those representations, and put them on the

line to be here, because they care deeply about public health, and because they sincerely believe that they see red flashing alarm lights emanating from scientific literature.  And pregnant women need to be warned, so they can take into account those scientific alarm bells, and modify their behavior to better protect their children.

Of course the other side doesn't have to agree with that.  This is civil litigation.  They've hired their own experts, who have reached their own conclusions.  But I want to assure the Court, I've worked with each one of these scientists.  They have integrity.  They don't just do whatever Ashley Keller, or Mark Lanier, or Mikal Watts tells them to. They're here for exactly the right reasons.

Let me turn to the *Daubert* standard, and Rule 702. And I think you can see the parties' diverging approaches from the very first line of our respective briefs, and you can see this as well in the presentation that was just given by the other side.

We begin our brief defending Dr. Baccarelli by quoting the Second Circuit:  "The focus of Rule 702 has to be on principles and methodologies, and of course their application, not the conclusions that they generate."  The very first line of their brief on autism spectrum disorder essentially asks you to embrace a scientific conclusion:  "There's only one known cause of autism, and that is genetics."

NC7DACEO

Now, I think I understand why they're asking your Honor to put on your white lab coat and play amateur scientist under Rule 702, which is exactly what Judge Cabranes said not to do, and that is because their experts have agreed that our experts are deploying reliable methods. And so you have Dr. Pinto-Martin agreeing that the Bradford Hill criteria is the right criteria for epidemiologists. Dr. Faraone says the exact same thing, and so does their brief.

So let me pause here, your Honor, because I want to be particularly responsive to your point about Dr. Baccarelli, and although you didn't say it, it would also apply to Dr. Cabrera as well, which is the way that these experts applied their Bradford Hill criteria. I think it's important to note two things. First, there's a difference between the relevant body of literature that scientists should consider, which is something that we're going to tackle separately. Is it appropriate for scientists to consider Acetaminophen's link to poor question scores on the CAST grading scale, Acetaminophen's link to poor motor developmental outcomes or locomotive outcomes. I'm definitely going to tackle that, and I'm going to keep my promise to your Honor that I will show you independent sources of scientific authority that back our experts up on that approach. But that's a different question from how to do the Bradford Hill criteria, and I want to be very clear that Dr. Baccarelli considered the literature

NC7DACEO

associated with autism and ADHD separately.  You can see this in his report at pages 79 through 97.

THE COURT:  Excuse me one second.

Okay.  This section is not the Bradford Hill analysis.

MR. KELLER:  It is the literature review that powers the Bradford Hill analysis.  So it's considering the relevant body of literature.  The way any epidemiologist would start a Bradford Hill analysis is to consider all of the evidence associated or linked with the outcome of interest.

So Dr. Baccarelli does that with respect to ADHD at pages 79 through 97.  He separately looks at the relevant body of literature for Acetaminophen's link to autism at pages 97 through 104.  He then looks at other neurodevelopmental connections with autism, which is, again, the trans-diagnostic approach that we are going to talk about, and I'll explain why our experts have good grounds to do that.  And then I'll note this as well, your Honor.  You didn't hear this from my friend on the other side.  Dr. Baccarelli does a separate navigation guide analysis for autism and ADHD.

Now, your Honor is correct that when analyzing the Bradford Hill criteria, the nine Bradford Hill factors, he considers both autism and ADHD together.

THE COURT:  And other NDDs.

MR. KELLER:  He does reference other NDDs in his analysis to support his conclusion with respect to each one of

NC7DACEO

those criteria.  That is correct.

I would note that Sylvia Alemany,  a peer-reviewed epigeneticist, who conducted a separate Bradford Hill analysis and their meta analysis did it exactly the same way as Dr. Baccarelli.  And so this is an accepted way of conducting a Bradford Hill analysis.  When you're looking through the different Bradford Hill criteria -- let me give your Honor an example.  Temporality, does the cart come first, or is it the horse?  Which is the cart?  Which is the horse?  Does the exposure precede the outcome?

There's no need for Dr. Baccarelli to have two separate Bradford Hill analyses to say mom's taking the Acetaminophen first, and then her child is being diagnosed with a neurodevelopmental outcome like ADHD or autism.  And so the Alemany meta analysis is a peer-reviewed publication that I would point your Honor to, to show that independent scientists conduct a Bradford Hill analysis in exactly the way that our experts do.

Dr. Cabrera does the same thing.  He separately does a weight of the evidence analysis for autism and ADHD by looking at the different bodies of literature.  And then you can see at pages 136 through 149 of his report where he does that for ADHD.  So, page 134 -- I didn't give your Honor the page.  Page 128 through 134 is where he does that for autism.

It is not required for scientists who are looking at

the totality of the literature that's available to then separately set forth Bradford Hill criteria where they cannot treat those conditions together.  And so I think that our experts were on perfectly acceptable ground when they did the Bradford Hill analysis in that fashion.

Let's go on as well to discuss what the other side has said about the weight of the evidence methodology.  So Dr. Powell, the chief medical officer for Johnson & Johnson -- Johnson & Johnson's own internal documents say the weight of the evidence methodology is the correct methodology to employ.  And it's of course not just intoning the words, Bradford Hill, or weight of the evidence, we absolutely agree with that.  You can't just say Bradford Hill and get past the Rule 702 gate.

But let's also look at what their own experts have said about what independent scientists who agree with our scientists are doing.  Dr. Pinto-Martin, their epidemiologist, agrees that there's an ongoing debate going on in the scientific community about what's going on here.  Debate between scientists of course means that reasonable scientists can come out on our side.

So if you're focused on methods and principles, as opposed to conclusions, the fact there are scientists on our side of the line means you can't use Rule 702 to shut down the debate, and that's exactly what Dr. Pinto-Martin says.  She says that the scientists that agree with us, who think that

NC7DACEO

causation is the most likely, they're not acting in bad faith, they're not bad scientists, they're not employing junk science or the sorts of unreasonable methodological approaches to this sort of question that could bar them at the *Daubert* gate.

Dr. Faraone used to be on our side of the debate. This is their expert on ADHD.  He gave a talk last year to a medical audience, not lay people, so a group of scientists. The very first slide in his presentation was the following: The causes of ADHD.  The very next slide:  Prenatal exposure to Acetaminophen, is on the list.

And so previously, when he wasn't testifying in court, Dr. Faraone was on our side of the debate.  Now, it's true, Dr. Baccarelli used to disagree with the position he takes here. He was extremely candid about that under oath.  And I want to tackle that as well.  He should be commended for doing exactly what a good scientist is supposed to do.

He's a medical doctor.  He's heard the exact same things you've heard from the other side.  For years he'd been told, the only thing pregnant women are supposed to take for fever and pain is Acetaminophen; it must be safe.  That was his logical prior.  He did a study that wasn't directly on point. It was small, but it didn't find any IQ deficits associated with Acetaminophen.  And so it fortified his position, and he moved on.  But then he did Baker, which directly measured the exposure in meconium, saw the incredible dose response variant,

and started to change his mind.  And when he did a totality of the evidence review as an epidemiologist does when you do a Bradford Hill analysis, he was blown away by the results he saw.  He was candid under oath, and said, I wish I could go back in time, and change my position, and not have said what I did.  I can't do that.  The only thing I can do is step forward now, and give you my best scientific judgment based on all of the evidence that I've considered.

That's a good scientist.  That's what a skeptical scientist with humility is supposed to do.  That's what Dr. Baccarelli did.

Compare that, for example, with Dr. Faraone.  Dr. Faraone's testimony under oath was, "I always believed it was only an association.  I was never saying it was causal."  It's just flatly inconsistent with the things he was saying just last year.  And so if there's a reasonable debate between scientists, your Honor, I think that shows -- or goes a lot of the way towards showing that we meet all of the 702 criteria.

We've covered the credentials of our experts.  That hasn't been challenged.  So the first 702 factor is met by preponderance of the evidence by default.

Let's talk about whether their opinions are supported by sufficient facts.  This is one of the most voluminous bodies of human epidemiology and pre-clinical trials you will find.  I would say, compare this to any other case where a Court has

NC7DACEO

allowed plaintiff experts to testify, and you won't find a greater body of literature. So they definitely considered enough evidence to support their opinions. That's satisfied by a preponderance of the evidence, and it's not really contested.

Which gets us to the last two 702 factors, which I think is where the action is. So with respect to methods and principles, you heard from their own experts that Bradford Hill and weight of the evidence are the accepted scientific methods and principles that epidemiologists and neuro toxicologists and teratologists apply.

And so we picked the right methodologies in order to reach our conclusions, which leaves only, were they reliably applied, were they reliably applied in this case by these experts. And I don't think any of the independent sources of scientific authority they've pointed to, none of the authoritative agencies, none of those bodies would say that our experts did an unreliable application of their methods. Their quibble is with the conclusions. Their quibble is, we don't agree with that, we think the science points in a different direction. We'll get into all of that with respect to these contested points, but we have independent sources of authority that back us up on each and every one.

And so let's go back to whether there's an association at work here. That's a threshold inquiry. We actually agree with the other side about this. What this factor is doing,

NC7DACEO

it's a pre-factor before you run the Bradford Hill analysis. It's essentially saying, should we do more work, he should we be inquisitive, should we decide whether to continue investing research effort in order to figure out the truth as to what's going on here, or is there nothing to see here, we can put our pencils down and go home, because it's just random noise?

We agree that association is not the same as causation. You have to go through the remainder of the criteria. But association is the important first step. And so this is the forest plot depicting the association between prenatal exposure to Acetaminophen and ADHD. The results are striking. Your eyes confirm what our experts say.

Of course there's an association here. Every single one of these point estimates is to the right of one, which means it's detecting a positive risk. A dozen of these results are statistically significant, which means you can be 95 percent confident that that individual result is not due to chance. When you see a dozen statistically significant results that each one says they're not due to chance, the probability that this is all just noise, and that it's chance goes down to close to zero.

So on the question just of association between prenatal exposure to Acetaminophen and ADHD, I think we win by default. The other side doesn't even contest it. So it's a rare point of common ground.

NC7DACEO

Now let's look at the same forest plot for autism spectrum disorder.  You can see here there are fewer data points on the plot, but the visual is just as striking.

THE COURT:  So is this the list of six on which Dr. Baccarelli is relying?

MR. KELLER:  In part --

THE COURT:  I've had to infer what six he was referring to.

MR. KELLER:  I apologize for that, your Honor.  I think it's on page 12, or the 12th table of his report, the list of six.  And so this is part of the list.  It's Liew, Ji, Suanders, Leppert, Avella-Garcia, and Ji.

THE COURT:  Let me just see if I have the 12th table accessible here.

MR. KELLER:  Oh, forgive me, your Honor.  I misspoke.  It's Liew, Saunders, Ji, Alemany, which is on here -- I apologize – and Avella-Garcia --

THE COURT:  So, I'm just going to ask you to list the six.

MR. KELLER:  Of course.  Avella-Garcia, Liew 2016, Leppert 2019, Saunders 2019 --

THE COURT:  Slow down.

MR. KELLER:  Forgive me, your Honor.

THE COURT:  Sorry.

MR. KELLER:  Saunders 2019.  Did you get Alemany?

NC7DACEO

THE COURT:  No.

MR. KELLER:  Alemany 2021.

THE COURT:  So that's five.

MR. KELLER:  Ji 2020.

THE COURT:  That's six.

MR. KELLER:  That should be the six, your Honor.

THE COURT:  Thank you.

MR. KELLER:  So when you look at the visual depiction for autism, our experts had no trouble concluding that there was, in fact, an association at work here.  Every single point estimate is to the right of one except for one, which means it's depicting a positive risk.  And if you include the four meta analyses at the bottom, Alemany and Masarwa, the results, four of them, are statistically significant.

Now, it's notable the previous forest plot and this forest plot, with the exception of the meta analysis are using only the studies they say you can consider, only the studies that look at a confirmed diagnosis of autism or ADHD as their end point.  And, again, we're going to explore that further, but this is their accepted list of the studies.  So we're not even in that contested ground yet, what the relevant body of evidence that a reasonable scientist could consider would be.

So how do they get to the argument that you should put your pencils down here, we shouldn't even investigate further? This depiction that you have published before you is just

random noise.  There's nothing to see here.  You shouldn't even start the Bradford Hill analysis.  Their answer to that is statistical significance.  They say that you should ignore all of the statistically insignificant results on that plot.  And our experts don't ignore this point.  They take it head on, and they flatly disagree with it.

So Dr. Baccarelli disagrees with it, page 56 through 57 of his report.  Dr. Cabrera says on page 84 of his report, statistical significance does not equal human significance.  Dr. Pearson testified similarly at page 176 of his deposition.  And that result just comports with common sense, your Honor.  Statistical significance is not a natural law.  It's not like gravity, or the speed of light in a vacuum.  It's a human convention.  It's a definition.  We've defined the result of statistically significant if we can be 95 percent confident that it's not due to chance.  There's no magic to 95 over 94 or 96.  And so when you're trying to figure out through the totality of the available evidence what the right answer is and you're looking at a visual depiction, a reasonable scientist can say, I'm not going to ignore a result just because it's only 94 percent, not due to chance.  I'm not going to ignore that result particularly where it's consistent with the other 90 plus percent probability end points that are also pointing at a positive association.

And so if the common sense doesn't do the job, let me

NC7DACEO

point to the independent sources of scientific authority.  You see here the Rothman Modern Epidemiology textbook, the seminal textbook that's given to every epidemiology student, says it's completely fallacious to engage in the reasoning that they're suggesting, which is you should ignore the statistically insignificant results.

And then coming back to the Alemany meta analysis that we talked about before, your Honor, they conclude that there is an association between prenatal exposure to Acetaminophen and autism spectrum disorder.  So independent, peer-reviewed scientists, one of the world's leading epigeneticists, as the lead author of that meta analysis study, agree with us.  So do their own experts, when they're outside of court.

This is Dr. Kalison in his book on autism spectrum disorders, a chapter that he authored, he says, "it's been demonstrated that prenatal exposure to Acetaminophen is associated with autism spectrum disorder and ADHD."

And so our experts can't be deploying an unreliable method, just on the question of association, they're just trying to say, we want to go further and continue to investigate when independent sources of scientific authority, including their own expert, agree with us on that question. The best they could possibly say is there's a difference of opinion about whether to throw out statistically insignificant results, but I think the overwhelming consensus of the

NC7DACEO

scientific community is not to do that at the threshold phase. And I would also point your Honor to case law, to the Zoloft case from the Third Circuit said the exact same thing.

So let's transition from there, your Honor, to the relevant body of evidence that you ought to consider.  This is an important point of disagreement, particularly in light of your Honor's questions that I think we need to consider.

And so what our experts say is, yes, these studies that have confirmed diagnosis of autism and ADHD are important, but other studies are also relevant.  If you have a study that links prenatal exposure of Acetaminophen to poor motor skills, inattention, hyperactivity, to poor scores on a diagnostic questionnaire that's used as the screening test by diagnosticians for autism or ADHD, that's relevant literature that ought to be considered.  It doesn't mean that it gets all of the weight, but it's definitely literature that ought to be considered when you're doing your analysis.

And so Dr. Hollander, of course, talks about this extensively in his report.  You can look at page 62, his rebuttal reports at pages 32 and 37.  He notes, hyperreactivity is a symptom domain, it's a core feature of ADHD, and an associated symptom of autism.  So of course when it goes into the analysis that the diagnostician would use to diagnose both conditions, you would want to consider studies that link Acetaminophen to hyperreactivity.

NC7DACEO

Dr. Baccarelli says, at page 36 and page 158 of his report, something similar.  In his rebuttal report at page 18, he says, surely a researcher would want to at least consider the fact that a study showed that women who took APAP while pregnant, were more likely to have children displaying the signs of autism.  Dr. Cabrera says something similar at pages 2 and 3 of his report.

And are these statements by our scientists outliers? Are they offering this opinion which they expressly address in their reports only inside of the courthouse?  No.  They are backed up by scores of independent sources of scientific authority.

Let's start again with Dr. Faraone, their own expert on ADHD.  He notes in his study from just this year, peer-reviewed publication, that autism and ADHD share an etiology, common environmental and genetic risk factors, that they are significantly overlapping, up to half of the people who present with autism are also codiagnosed, presenting with the systems of ADHD.  So of course it's the case that when these have overlapping domains like that, you would want to consider a wider body of literature than just the literature considering ADHD as a diagnosis, or autism alone.

As my friend on the other side says, we don't diagnose ADHD or autism with a blood test.  We don't do an MRI and say, I fingered the point in your brain that shows you have the

NC7DACEO

patches of the disorder associated with autism, so you have that condition.  These diagnosticians are looking at symptom domains to see if you have those conditions, and whether a severe enough, overlapping enough, and current enough context in order to make a diagnosis.

So it makes sense what Dr. Faraone is saying here, but we can go further than that on the specific question under review of the studies that all scientists consider.  You can look at the Masarwa meta analysis from 2018.  Again, we're just talking about association here.  The meta analysis found a 30 percent statistically significant increased risk of ADHD, and a 20 percent statistically significant increased risk of autism spectrum disorder.  The studies that powered that 30 percent statistic, five of the six of them were our type of studies, the studies that didn't look only at a confirmed diagnosis, the types of studies that they say it's unscientific, unreliable to consider, no reasonable scientist could consider them, it would be junk science.

Peer-reviewed publication on the exact question under review, is there an association here, goes the other way.  The same thing for the 20 percent statistic for autism spectrum disorder.  Four of the five studies that powered that statistic in the Masarwa meta analysis were all types of studies, the studies that didn't have a confirmed diagnosis of autism.  And so it cannot be unscientific junk science and unreliable

NC7DACEO

application of methods and principles for our scientists to do what Dr. Faraone says to do, and what meta analysts discussing the question of association are doing.

And I would note as well for your Honor, once again, the Alemany meta analysis did the exact same thing, so Masarwa is not alone.  It also won't surprise your Honor to hear that the authors of the studies that didn't just look at a confirmed diagnosis of autism or ADHD agree with our scientists.  They don't think that their studies have nothing to contribute to the question under review.  And so you can look to those study authors, Starkey, Akrili, Thompson, Valanteri, Anui, all of their conclusions point to the same thing, our scientists are ably justified by independent sources of authority in their methodological approach.

And that sort of begs the question, why is the other side asking you to ignore all of these neurodevelopmental problem studies that aren't necessarily a confirmed diagnosis?  Why are they telling you to avert your gaze?

It's because the already damning portrait depicted by the forest plots becomes all the more damning when you consider that wider body of evidence.  This is what that wider body of evidence looks like.  This is how the scales tilt.  This is why Dr. Baccarelli testified under oath as a world class epidemiologist he's never seen such consistency in his life. When you don't have randomized, controlled clinical trials,

NC7DACEO

which are not available with respect to Acetaminophen -- and we'll talk about that.  It would be unethical to conduct them on human beings given what we know -- this is about as damning a portrait as you will see in the literature.  All of these studies are pointing in one direction, that Acetaminophen can call neurodevelopmental fetal harm, and there's only a sliver of studies on the other side.  There's always studies on both sides of the scale, but this is how the scales look with that wider body of literature.  So it's no wonder that they want to say it's unscientific, you couldn't possibly consider all of this evidence, because the evidence is powerful and it's extremely bad for Tylenol.

So once you have an association between an exposure and an outcome, and I hope we've established that at the least reasonable scientists could conclude there's an association, and you want to keep going, you don't want to put your pencils down and stop investigating the issue.  We agree with Dr. Pinto-Martin, their epidemiologist, in classic epidemiology there are only four possibilities:  There's chance; there's bias; there's confounding; and then there's causation.

And the way it typically works in epidemiology is you use a process of elimination.  You eliminate chance, you eliminate bias, you eliminate confounding as the most likely explanations, and you're left with causation as the outcome.

And I think we should level set to see what lots of

independent researchers are saying is most likely going on here, and we should do at first by keeping in mind the reference manual's admonition, if this is a lower case C conservative bunch of epidemiologists, they are very reluctant to say causation, they are very reluctant to say anything other than our study results are interesting, more work needs to be done, this could be an issue, but we have to investigate further.  That is completely commonplace in epidemiology.  You see it all the time.  And, nonetheless, experts reasonably can draw a causal inference.

So what are independent scientists saying is going on here, despite that dispositional conservatism?  Well, you have the Bauer and Krebal paper.  This is an important systematic literature review.  It systematically evaluated all of the evidence of pre-natal exposure to Acetaminophen and autism and ADHD, and this is what the author said.  The author said, "we cannot attribute these results solely to bias, confounding, and chance."  Peer-reviewed publication from highly respective scientists saying that it's causation.

We just saw from Dr. Pinto-Martin, if it's not bias, if it's not confounding, if it's not chance, the only thing left is causation.  That's what these authors are saying.  What did Johnson & Johnson say when they saw Bauer and Krebal?  What was the response of their one internal epidemiologist, Rachel Weinstein, who focuses on this question?

NC7DACEO

She's the only person that they've deputized to look at this body of evidence.  When she finally got the full article from Bauer and Krebal, when she got the text, she wrote to her colleagues, "the weight of the evidence is starting to feel heavy to me."  Not that it was junk science, not that no reasonable expert could come to the conclusion of causation, those scientists, Bauer and Krebal, are barking up the wrong tree, there's not even an association here, what are they talking about.  That's not what they said.  What they said is that the weight of the evidence is starting to feel heavy, a very different line than what you heard in the presentation 40 minutes ago.

Many independent sources of scientific authority are echoing those concerns.  It is of course true that they have the caveat that you would expect, that the reference manual indicated, but all of these independent studies authors from very different disciplines, looking at very different cohorts, designing their studies in different ways to try and figure out the truth are pointing to causation consistent with an inter-uterine effect, further corroborate a causal relationship, may explain the increasing incidents in ASD and ADHD.  The list goes on.

These are not scientists testifying in the courtroom for plaintiffs' lawyers.  These are independent sources of scientific authority that can fortify your Honor's confidence

that what our experts did here was reliable.  Our experts are not out on a limb.  They have the support of many other independent scientists who are looking at the exact same things and coming to the same conclusion, and the best way that I can show your Honor that what you see here is extremely powerful, it's unusual in the epidemiological literature to have so many scientists pointing our way and actually uttering the word "causation" or writing the word "causation" in their peer-reviewed reports is to compare this to other litigation.

And I'll pick the *Roundup* litigation, because I know my friend, Ms. Brown, is familiar with it.  She just came from a Roundup trial.  Your colleague, Judge Chhabria, found that plaintiffs' experts could offer causation testimony in that case in the Northern District of California saying that glycoside, which is the active ingredient in Roundup, causes cancer.  There were four or five epidemiological studies total in that body of literature.  None of the independent scientists were sounding the alarm and uttering causation so repeatedly as you see here, and there were some animal studies.  That is all that they had.  The experts stitched together a causal inference from those different strands of evidence, but here you have a large body of independent scientific experts who are backing our experts up.  There are many other examples like the Roundup example, your Honor, where you can see a completely different landscape from the epidemiology literature.

NC7DACEO

So that's the sort of high level as to what the scientific community has been saying about the association that we've observed.  Let's turn to their leading theory for what's really going on.  Their alternative theory, confounding by genetics.

So let me make sure that we are level set on terminology.  When an epidemiologist refers to a confounder, a confounding variable, that's just a synonym for the true cause.  There's this true cause lurking in the background that you're not studying that's really causing the outcome of interest, and that true cause is also linked or is causing the exposure that you're focused upon, and so it's making it seem like the exposure is linked to the outcome when it's really not.  It's the confounder doing the work.

And it will probably be clearer to just be specific with respect to Tylenol.  The theory would be something like this.  Mom has a certain set of genes, and those genes are causing mom to have more fevers, more aches and pains, more muscle cramps, the indications of use for Tylenol.  So mom is treating those conditions disproportionately compared to other women with Tylenol.  But it's those genes, those genes that are causing the fever, and the aches and pains, and what have you, that are also causing the autism, that are also causing the ADHD.  And so it seems like women who take Tylenol are linking that exposure to autism and ADHD, but that's just the

association.  The real causal work is being done by the genes. That would be the theory.

To be very clear, that's a serious theory.  It's not one that a reasonable scientist could dismiss out of hand. It's not the sort of theory that you would say, that can't be right.  It's extremely plausible.  It makes sense that genes like that exist.  So you would want to test for it.  You would want to take that objection seriously.  You would want to design studies to find out if genetic confounding is really at work.  And scores of conscientious epidemiologist have done precisely that, and that is what our experts rely on to say that confounding by genetics is very likely not at work here.

And there are two strands of evidence our experts rely on.  It's these powerful, negative control studies that have been done in the epidemiology literature, and it's the pre-clinical lines of evidence.

So let's start with the human epidemiology, the strong, negative control studies.  Our experts say that it's very unlikely confounded by genetics because of these studies. You can see that in Dr. Baccarelli's report at page 113 through 34, his rebuttal report at pages 1 and 2; and then Dr. Cabrera as well at page 175 and 186 of his report.

Let's look at one of these negative control studies done by Olson Liew.  Olson Liew, by the way, is one of the most respected epidemiologists in the world.  He's at Yale

NC7DACEO

University, and his entire research is dedicated to innovative study designs to try to control for bias.  That's what he does.

And the way these negative control studies worked is they looked at women who took Tylenol before pregnancy, during pregnancy, and after pregnancy, different cohorts of women. And the reason these studies are so powerful is if you have the genes that we were talking about before that are the potential confounders, you have those genes at all phases of your life. You're born with them.  So you have those genes before pregnancy, you have those genes during pregnancy, and you have those genes after pregnancy.

And so Liew looked at cohorts of women who took Acetaminophen at those different phases.  The women who took Acetaminophen before pregnancy, no statistically significant increased risk of neurodevelopmental problems.  The women who took Acetaminophen after pregnancy, no statistically significant increased risk.  The women who took Tylenol during pregnancy, yes, statistically significant increased risk.

Starkey and Akruli did a study that was similar, looked at women took Acetaminophen during pregnancy and after pregnancy.  The during pregnant cohort, yes, statistically significant increased risk.  The after pregnancy cohort, no statistically significant increased risk.

Ystrom did the same thing.  No statistically significant increased risk for the before cohort.  Yes,

NC7DACEO

statistically significant increased risk for the after cohort.

Brandlistuen, this is a particularly cogent study design.  It looked at two cohorts of pregnant women.  The first one took Ibuprofen, Motrin, and Advil; and the second one took Tylenol.  No statistically significant increased risk for the Motrin and Advil cohort.  Yes, statistically significant increased risk for the Tylenol cohort.

The reason that that study is so cogent, your Honor, is because if you hypothesize these genes that we were talking about, and it makes mom have more fevers, more headaches, more muscles cramps, the indications of use for Motrin and Advil would be the same as Tylenol.  So she could treat it with Motrin and Advil, but when she did that, when these supposed culprit genes caused her to have a headache so she treated it with Advil, there was no statistically significant increased risk of problems with the offspring.  It was only the Tylenol that did that.

So when you see these negative control studies, study after study after study showing a statistically significant increased risk only for Tylenol cohort of women and only while pregnant, you have to ask yourself what type of genes could really be doing this work?  You would have to hypothesize a Tylenol-hungry gene.  It only wants Tylenol.  It doesn't like Advil and Motrin.  And these genes only active while mom is pregnant.  Before she's pregnant or after her pregnancy, these

NC7DACEO

genes are not in effect, are not causing her to take the Tylenol. Only causing her to do while pregnant. Never say never. Our experts agree it's possible that there's still genetic confounding, but that's a very strange set of genes that you would be hypothesizing and those negative control studies give them confidence that that is not the most likely explanation for what we're seeing here.

You can see the same sort of conclusion that comes from Dr. Kalison. He agrees that after adjusting for confounding variables, there's still a considerably robust and statistically significant association. The association doesn't go away when you control for confounding by genetics, and the independent study authors that we just spoke about agree with that conclusion as well. Liew, Starkey and Akruli, Brandlistuen, and Ystrom say that those studies help fortify their confidence, and study authors that confounding by genetics can't explain what we're seeing here.

Dr. Faraone agrees that he has no data to support the Tylenol hungry gene that they have to hypothesize. He has an opinion that moms who take Acetaminophen disproportionately during pregnancy might be doing it because of genetics, but it's just an opinion. There's no independent support for it anywhere in the scientific literature.

Our experts' opinions are not just based on the strong negative control studies we see from the human epidemiology.

NC7DACEO

They're also based on the pre-clinical lines of evidence.  And to be very clear, your Honor, we are not extrapolating from animals to people.  A lot of the case law that you see that they cite is, you rely exclusively on animal studies to make your argument.  Not at all.  What we're doing here is saying, do the animal studies help us fill in the picture that we're already seeing from the observational human epidemiology studies.

And it is true enough, animals are not people.  We agree with that proposition.  And thank God animals are not people, because one of the great benefits of animal models, of pre-clinical lines of evidence is that you can control for all of the things that they say are the real causes.  You can control for the genetics of rats and mice.  You can control for the mother's condition.  You can control for temperature and fever.  You can control for diet.  You can control for environment.  You can control for anything that a researcher thinks might actually be impacting the outcome of interest, and you can ethically do so in of course a way that we cannot do with respect to human beings.

And when you have those type of controls, the pre-clinical lines of evidence are showing the exact same thing.  These animals experiments are showing fetal toxicity from Acetaminophen, and neurodevelopmental problems in the offspring of these rats and these mice.  The rats and mice are

NC7DACEO

not diagnosed with autism and ADHD.  Of course they're not. They're rats.  They're mice.  They can't be diagnosed with those conditions.

But when you have the negative control studies from the human epidemiology, and you have the pre-clinical lines of evidence saying there's a neurodevelopmental problem in this rat, in this mouse, when we've controlled perfectly, or as perfectly as human beings can for genetic factors, reasonable experts can certainly conclude that congenetic confounding was not at work.

And so what's their response to this?  Your Honor, you heard it just a few moments ago.  Their response is, sibling control studies are the only game in town; those are the only studies that are well-designed to test for these issues; and so if you don't have that in your favor, you can't draw a causal inference.  They don't point you to any independent source of scientific authority that says that.  They don't have a single citation, a single scientist, a single expert, a single anybody that will say that is true, and sibling control studies are the only game in town, because it's not true.

And there are serious problems with the sibling control study argument for the other side.  Let's start with Dr. Pinto-Martin agreeing that there isn't a single sibling control study for autism.  And so if that's the only thing that counts, they don't have it with respect to that condition.  You

NC7DACEO

can also look to the Leppert paper --

THE COURT:  Well, autism or autism spectrum disorder, there are very few studies.  You gave me Dr. Baccarelli's list of six, so I'm not sure -- and most of those you would agree don't find a statistically significant causal connection or association -- most of those six.

MR. KELLER:  I would agree, your Honor, that there are only four statistically significant autism findings when you include the meta analyses.  You of course heard my argument that I would not throw out, and our experts would not throw out, and they have reliably opined that you should not throw out the 94 percent or the 93 percent confidence studies, but yes, I would agree that there are fewer studies on autism, but there's no sibling control study.  So when these experts say that confounding by genetics is not at work, and their rejoinder is, well, you have to have a sibling control study, they don't have it.

They also have the Leppert paper, which they selectively quoted for you, which does show a very statistically significant increased genetic component to ADHD that might be explaining things, but the Leppert paper, and Dr. Pinto-Martin testified to this as well, does not say that with respect to autism.  It says the opposite, that there's no link between the genetic confounding argument that they're making.

So they don't have the type of study they say is

NC7DACEO

important to refute our experts' point, and the one study they do have, which they've quoted to you for ADHD, runs in our direction, affirmatively finds in our direction with respect to autism.

Another problem that they have with respect to siblings control studies is that there's only one sibling control study that produced significantly significant results, and that's the Brandlistuen study.  And so what Brandlistuen did is it looked at this for sibling pairs, and asked mom -- to make sure that we're on the same page, your Honor -- these sibling control studies, they're looking at a mother who had at least two kids, and she said that she took a lot of Tylenol in one pregnancy, 28 days or more in Brandlistuen, as well as Gustavson, and comparatively less in the other pregnancy, and then it compares the siblings to see how the kids do who had the higher exposure versus how the kids do who had the lower exposure.  And what Brandlistuen finds is that the kids who had the higher exposure, that higher exposure pregnancy, had a statistically significant increased risk of neurodevelopmental problems.  And it was a significant statistically significant increased risk:  70 percent increase in adverse psychomotor and behavioral outcomes, and a doubling of the risk of language problems.

So if statistical significance is the only thing that counts for sibling control studies, Brandlistuen is it.  That's

NC7DACEO

the only game in town.

I think I heard my friend on the other side say these weren't discordant pairs, but that's not true.  They were discordant on the exposure, and they were all discordant on the outcome of their scores on these tests.  And so this was an extremely well designed study, and it also didn't have follow-up problems, because of when the study was conducted.  The results were obtained much sooner after the initial questionnaire was given to the mother.

And Gustavson notes this.  Gustavson 2021, which we're going to get into, said, we had significant follow-up problems, because they're checking in on these moms to see how their kids are doing much, much later in the analysis from when they were originally contacted.  So, of course, moving past Brandlistuen, which they don't want to consider, they have one study.  They have Gustavson 2021.  And these are the results of Gustavson 2021.  It does not record a statistically significant finding.  The results go to 1.06, a six percent increased risk for the higher exposure child for an ADHD diagnosis.  And note the confidence interval there.  It runs all the way up to a doubling of the risk, 2.05 is included in that confidence interval.

Our experts address Gustavson, your Honor.  We don't ignore this issue.  Once again, we don't just whistle past the graveyard.  Our experts address this expressly, and they say

that this study doesn't undermine their confidence in their overall findings.  They're not going to look at this one table from one sibling control study, and throw out all of the rest of our results.

So you can see Dr. Baccarelli addressing this in his rebuttal report, pages 6 through 7.  Dr. Cabrera addresses it at page 140 through 41.  There are three problems primarily with this study that our experts note.  The first is it's dramatically underpowered.  Thirty-four doubly discordant sibling pairs are driving that underpower.

And you heard my friend on the other side say, how can Dr. Baccarelli rely on Baker, which also had few subjects that were looked at compared to Gustavson 2021, which had these 34 doubly discordant pairs.  Very respectfully, your Honor, without getting too in the weeds on statistical significance, that's not what drives the power of a study.  The power of a study is determined by the overall cohort that you're looking at, which was tens of thousands of women in Gustavson 2021, versus the sample size you've picked out of that large group to determine what the power of the study is.

That's completely apples and oranges from Baker.  If you're only looking at a cohort of 100 people to start your study, you can have much higher confidence that the results are statistically significant.  So that's an important point --

THE COURT:  I'm sorry.  You have more confidence which

NC7DACEO

way?

MR. KELLER:  Dr. Baccarelli's use of a relatively small sample size in Baker does not involve him cherry-picking or engaging in conflicting testimony when he says that Gustavson is underpowered, because the underpowering that's driving Gustavson is based on the fact that you have 34 doubly discordant sibling pairs out of tens of thousands of people that were observed in the larger cohort.

Baker, which Dr. Baccarelli also tested meconium on a relatively small number of women, that was the only cohort that he was considering.  He wasn't pulling them from a larger cohort.  So this is an issue of statistical power that's important, and it drives the results of Gustavson towards the null.  And so you see the Gustavson authors essentially say exactly what our experts do, that their study is dramatically underpowered.

Dr. Pinto-Martin, by the way, didn't note this in her report.  She only agreed at deposition that the study was underpowered, and said she should have noted it, to her great credit.

Dr. Baccarelli and Dr. Cabrera also point out what the Rothman epidemiology textbook points out, that these sort of sibling control study designs have a risk of differential classification bias.  If you ask a mom, have you taken Acetaminophen during pregnancy, they're right, sometimes mom is

NC7DACEO

going to misremember, sometimes mom is going to misreport, and that risk can run in both directions.  And so it's a tolerable risk that scientists take, even though it can attenuate the results toward the null.

But here what Rothman points out, and our experts point out, is this creates a risk of differential classification bias.  If you ask a mom, have you taken 28 days of Acetaminophen in a pregnancy and she says yes, but then she says she took zero, no Acetaminophen in the other pregnancy, and that's the pregnancy that's operating as your control, there's a significant risk that mom is misreporting that in one direction, and that biases the results away from finding an effect when there really is one.

And that problem is particularly acute with the first problem we talked about, which is Gustavson is underpowered.  And, again, the Gustavson authors note the limitation.  They say the same thing that our experts do about it.

The third point that Dr. Baccarelli and Dr. Cabrera raise is a mathematical point.  They quote the Solander article from 2017 that talks about how sibling control studies control for common confounders, and that's a good thing compared to other studies, but all studies involve tradeoffs.  And another thing that is does is it controls for common mediators, colliders, and modifiers.  And what that essentially means is it's also controlling for common things that could be along the

NC7DACEO

causal pathway in that family, and it could be also contributing to the cause of the condition. And that is worse from a study design perspective than just comparing the siblings to the broader cohort.

It's explained with much more mathematical detail than I have the aptitude to present to the Court, but Dr. Baccarelli understood it and explained it. Dr. Pinto-Martin's response was, well, you only have one study saying this. It's notable, though, once again, the Gustavson article cites the exact same study as Dr. Baccarelli did to say that this is a problem with sibling control.

Now, at the end of the day, your Honor, I am not suggesting that anybody should have ignored Gustavson 2021. We've said, as part of the totality of the evidence analysis, even with significantly inconsistent results, you don't ignore things. But it's not unreasonable junk science for our experts to say, we've looked at this study; it says what it says; it has three serious limitations that do not outweigh all of the other evidence that we have. It doesn't touch autism spectrum disorder. And with respect to ADHD, it's not enough to overcome the pre-clinical lines of evidence, and the scores of negative control studies that were done by very well respected epidemiologists to control for confounding by genetics.

And so what does that leave of their confounding argument? And you've heard this again from the other side. It

NC7DACEO

leaves the heritability fallacy.  It leaves the notion that because we all agree that genes contribute to autism and ADHD, that's a point of common ground, but when people say things like a trait is 60, 70, 80, 90 percent heritable, that does not mean that genes are 60, 70, 80, or 90 percent of the cause of the expression of the phenotype.

The National Institutes for Health could not have said this more clearly.  They just said it on the screen exactly what I said.  The Moore and Shenk article talks about how this is the one of the most confusing terms in all of science.  It's a fallacy to say that you have a 70 percent heritable trait, and, therefore, it is 70 percent due to genetics.  That is exactly what our expert said in addressing the heritability fallacy.  And, once again, I hope I'm pointing your Honor to respectable sources of scientific authority that back them up on this discrete issue.  Dr. Wendy Chung talked about this in the specific context of what's causing autism, and she talks about these environmental factors that overlap with the genetic factors.

You can see the date on this presentation is from 2017, but she gave essentially the same talk with the same chart from just April of this year.  And so environmental factors of course are contributing, genes by environment interactions are what cause the expression of a phenotype. That is a point of common ground outside of the courtroom.  It

NC7DACEO

is the overwhelming scientific consensus.

And you can also see that Dr. Chung pointed to prenatal exposure to Valproic Acid as one of the environmental causes of autism.  It's not of course genetic.  It's an environmental exposure.  The other side's experts, Dr. Kalison and Dr. Faraone agree with us on this point as well.  They say that it's not all genetics, and that environmental vulnerabilities are increasing the risk of autism.  It is the international consensus that environmental risk factors are causing ADHD.

And finally, Johnson & Johnson, through Project Cocoon, when they're not in this courtroom, agree that it's not all about genetics.  The first line of their brief is on the left-hand side.  This is what they're saying internally:  There are environmental exposures at work here.  They say that prenatal drug use is one of those environmental exposures.  And so this notion that genes do everything is not supported by the independent sources of scientific authority, and, at a minimum, again, your Honor, I'm thoroughly convinced that we are right about this, but under the 702 standard, where we're not supposed to be focusing on conclusions, we're looking at methods, principles, and their application, reasonable scientists reliably applying their scientific disciplines of course can come to the conclusion that all of these independent sources of authorities have come to.

NC7DACEO

Let me talk about Valproic Acid, because this is another important point that I think helps establish many of the things that I've already articulated to your Honor.  And so the first point to make is that the biologically plausible mechanism of action for Valproic Acid is oxidative stress.  So there's an analogy between prenatal exposure to Acetaminophen and Valproic Acid.

But of course we recognize that Valproic Acid is not Acetaminophen.  We're not pointing to Valproic Acid to affirmatively make our case.  We're pointing to Valproic Acid to undermine some of the key arguments that you have heard from the other side, and see in their briefing.  And so hopefully we can all agree that what's in front of you is the label for Valproic Acid.

There was some dispute about this before, but I think we're now on the same page.  The label says that the weight of the evidence supports a causal association between Valproic Acid and autism and ADHD.  So that's what the manufacturer is telling medical doctors who are prescribing this, there is a causal association with Valproic Acid.

And so their experts also agree with this point by the way.  They don't think that the label's wrong.  They don't think that the manufacturers were incorrect.  They agree with the point that prenatal exposure to Valproic Acid most likely is causing autism and ADHD.

NC7DACEO

So what does that show?  What I think it shows first and foremost is it can't all be genetics.  There's agreement from the other side's experts.  There's agreement from the manufacturer of this important drug, that genes alone are not causing these conditions, that environmental exposures play an important role.  Prenatal drug use can play an important role.

What's another thing that Valproic Acid shows?  It shows that the argument that you can't draw a causal inference when the authors of the studies have used what the reference manual said is conservative language, that can't rule out every possible alternative explanation, that is not correct.

So look at the indications of use for Valproic Acid. I'm sorry that the slides have been bumping around a little bit.  That's my fault.

THE COURT:  Do you have a set of these for me?

MR. KELLER:  Of course, your Honor.  I'm sorry I didn't offer them up to you before.

THE COURT:  That's fine.

MR. KELLER:  Can my colleague approach?

THE COURT:  Yes.

MR. KELLER:  This is Ms. Amanda Hunt.

THE COURT:  Thank you.  I'm sorry to interrupt.

MR. KELLER:  If it's helpful to your Honor, we're on slide 62, which you can see published at the bottom.

So when you look at the indications of use for

NC7DACEO

Valproic Acid, what's it say?  The drug is taken for manic or mixed episodes, bipolar disorder, psychotic features.  It would not be an unreasonable conclusion for someone to say that someone who has those conditions, a mother who is taking a drug for psychotic features, has neurodevelopmental problems that could be genetically causing her offspring to have autism or ADHD.  And that's exactly what the Christensen authors say, Christensen 2013.

This is one of the two studies that's on the Valproic Acid label.  It says, we can't be sure that it's not confounded.  Nevertheless, the label says that the weight of the evidence supports a causal link.  The exact same thing was said by the Christensen authors in 2019 when they said, we can't rule out confounding by application.  Nonetheless, the label says that there is a causal link.

And so the idea that because the study authors are using precautionary language and saying, we can't be sure, we can't be certain, that of course is not the standard.  It's not the standard in science, and it's not the standard in a court of law.  We're trying to figure out what's true by a preponderance of the evidence, and the answer to that question is deeply important and profoundly important, as your Honor is no doubt aware and as you indicated in the beginning of your remarks.

The final point that I think that Valproic Acid can

NC7DACEO

effectively rule out is this notion that you need a more voluminous body of literature in order to draw a causal link. You heard my friend on the other side say, we just have so much better data with respect to Valproic Acid, because it's prescription. But the prescription data is actually a negative point for them, because when you're relying on observational studies as we are, the results are almost always biased towards the null. So the effect that you're seeing is not going to be as pronounced as opposed to prescription data, where it is going to be more pronounced.

And you saw the other side, again, selectively show you the relative risk ratios for autism. It didn't show you the risk rations for ADHD, because they're almost identical to what we see for Acetaminophen. And so the same sort of strength associated with this drug and ADHD is enough for the label to say that you can draw a causal inference.

And these are also the totality of the studies that we have available for Valproic Acid. You remember of course the scales that we looked at before. This is the scientific body of evidence for Valproic Acid. You have the Christensen studies from '13 and '19 that are listed on the label. Not listed on the label, but a study that is in favor of drawing a causal link is Wiggs from 2020. And then in 2017 a meta analysis was done, which is high on the hierarchy of available evidence. It's usually considered a superior type of study.

And in 2017, that study found no effect.

So that's the state of the evidence with respect to Valproic Acid. If reasonable scientists could conclude that that is enough to say that the weight of the evidence supports a causal link, we should be on very solid ground given the much greater weight of evidence that we have in this record.

Let me turn more quickly to confounding by indication, your Honor, and the reason it's more quickly is not because it's unimportant, but because I think a lot of what we already covered for confounding by genetics will be applicable here. So the same types of negative control studies, the same pre-clinical lines of evidence where you can tightly control for indications like fever, which is obviously important. When you apply those controls, you get the exact same answers that we talked about before. So unless your Honor has additional questions about that, I can move past confounding by indication, only to note, as I do so, that, once again, independent sources of scientific authority who are conducting these negative control studies are saying that confounding by indication doesn't explain the association.

And so to the extent that their argument is our scientists are wrong to not pin the blame on confounding by indication, we have lots of independent sources of authority that come our way. That should, again, help your Honor have confidence that what our experts did is reliable, is an

appropriate methodology.  It's an appropriate methodological approach to this question.

Let me turn to biological plausibility, which is one of the nine Bradford Hill criteria.  And, again, the other side spent an entire set of briefs on this, so I want to give this the attention that they say it deserves.  Before I turn to what is plausible, let me offer your Honor some things that are already established, things that are legally or scientifically just accepted.  They have nothing to do with Acetaminophen and its plausible connection to autism or ADHD.

The first thing that's established is that the defendants' mechanism brief is simply incorrect when it says that biological plausibility is necessary but not sufficient to establish general causation.  That's just flatly inconsistent with what Bradford Hill said.  You can see his quote here. It's a feature that I'm convinced we cannot demand.

There's no authority to say that plausibility is required, as opposed to being useful in helping us understand biologically what's happening.  Is there a coherent story for what's going on here?

The next point that I would make isn't scientific. It's a definitional point. We agree with Dr. Pinto-Martin, because she's correct from an epidemiological perspective, plausible means possible.  It doesn't mean established.  It doesn't mean certain.  It just means possible.  It means

NC7DACEO

sensible.  It means consistent with what we know about human biology.

And the reason for that is if we had an established biological mechanism, if we were observing the exposure causing the outcome, we wouldn't need Bradford Hill at all.  Bradford Hill is about drawing inferences from the scientific body of evidence.  You don't need Bradford Hill once you've already observed an association leading to an outcome.

Let's turn to science, oxidative stress and endocannabinoid disruption.  You're still talking about things that are already the scientific consensus.  These are not the biological plausible mechanisms of action that our experts reliably opine on.

Oxidative stress has been linked to autism and ADHD going back to the 1980's.  The reason for that is autism is caused by patches of disorder in the brain.  You have areas of neuron overgrowth and areas of neuronal disorganization, disorder.  And oxidative stress is extremely important as neurons are forming and moving into the places that they're permanently going to reside in a fetus' brain.

You can ask any scientist.  Again, this is the established consensus, when neurons are proliferating, oxidative stress impacts that proliferation, that creation of the neuronal cells.  Those neurons then have to migrate to where they're going to be in the brain.  The endocannabinoid

system is linked to that migration.  The endocannabinoid system is designed to ensure that those neurons migrate to where they eventually are going to be.  And then those neurons differentiate, they become the specific types of neuron cells they're going to be with that person for the most part for the rest of their life.  Neuron cells, with some rare exceptions, can't be replicated.  When they die, they die.

So oxidative stress is also linked to the differentiation phase of neuronal cells.  So of course if you have something like oxidative stress, it interferes with the proliferation, the number of neuronal cells that are being formed, and where, the types of cells that they are going to be.  That's going to be deeply problematic, and can lead to autism.  The literature is replete with scientists saying that oxidative stress is linked to autism.

Same thing with endocannabinoid disruption.  It's not going back to the 1980's.  That's more like around 2000.  But you have decades of literature talking about endocannabinoid disruption, the cascading sequence of things that occur with endocannabinoid disruption, impacting neuronal migration, and the consequences that form from that, as well as dopamine disruption.  So all of that is established.

Something else that's established, your Honor, Tylenol causes oxidative stress.  We're going to turn to plausibility and whether it causes it in the brain, but there's no doubt

NC7DACEO

that Tylenol causes oxidative stress.  But it took us a long time to finally tell people about this.

So the way this started was back in the 1950s, we did animal studies to see what was going on with Acetaminophen, and we detected a problem.  And so these study authors sounded the alarm, and said, this could be leading to liver problems.  We're observing liver problems in the animals.  We learned more, and in the 1970s the Lancet, which is a high impact, peer-reviewed publication.  It's one of the most respected scientific journals in the world.  It's very similar to Nature.

They sounded the alarm, and said, we have a problem here.  We started to figure out that what happens with Acetaminophen is that it interacts with CYP2E1, to metabolize into NAT, which is a free radical.  And if that free radical isn't neutralized through glutathione, which is an antioxidant, that free radical starts to cause oxidative stress.  And if it happens sufficiently, it causes your liver to fail.

Acetaminophen is still the number one cause of acute liver failure in the United States.  It takes lives every year.  But in the 1970s, the Lancet fingered this as a problem.  We then waited decades for more action to occur.  And as more people researched this problem, they continued to beat the drum, and sound the alarm, and say that this is something that we need to warn people about.

Eventually, the FDA Advisory Committee was

NC7DACEO

commissioned and proposed a liver warning.  Nothing happened for a decade.  And then after pressure from folks like Senator Grassley, eventually the exact same liver warning that the FDA Advisory Committee initially proposed was put on the label in 2009.  And so starting in the 1950s, we detected the problem. It took four decades before people were finally warned about this.

We are past the point of where the Lancet was in the 1970s with respect to our understanding of this science.  And when we see Judge Posner quoted to say that law lags science, I promise your Honor that is not what he meant.  This illustration, this timeline is not what he was referring to. He was saying that law lags science in the sense you can't just march into court with nothing where the scientific community has not come up with anything and get past the *Daubert* gate. He was not saying that we need to wait four decades before we take action to warn people about things that will have serious health ramifications.

And it's notable, too, that liver failure is a serious problem.  It takes lives.  When your liver fails, it can be fatal.  But the magnitude of that problem is much smaller than the problem that we are facing here.  There are a million people who are going to be born with autism or ADHD, and more than half of pregnant women say that they take Tylenol when they're pregnant.  And so life-altering, permanent

NC7DACEO

neurodevelopmental harm could be falling to scores of children if we do not heed the warnings coming from the science.  We do not have the luxury of waiting all the way through until the point that we can be certain.

And it's notable, too, your Honor, what was Johnson & Johnson saying during this entire period up until the moment that the liver warning was ordered to be put on the label?  They were saying the same thing that you're hearing:  We're going to scare people, frighten them into not responsibly using Acetaminophen.  But the responsible thing to do is to give people information, so they can make those sorts of choices for themselves.  Pregnant women deserve to be empowered.

We believe, by the way, that pregnant women should judiciously take Acetaminophen for fever.  It's an important thing to treat fever.  You take it for three or four or five days.  You don't take it every day for minor aches and pains.  That's the precaution that we want to tell women.

The long-term exposure, the injudicious use of this product is what's relevant.  Everybody says it's a point of common ground that fever should still be treated, because fever can have serious problems.  We acknowledge that, too.  But it's not frightening women to empower them with the truth, and the truth is the scientific evidence here is damning.

And so now let's turn to biological plausibility.  Everything I've already told you established that's the

NC7DACEO

scientific consensus.  There is nothing that we have to worry about with respect to plausibility.  Dr. Pearson goes through extensively in his report and analyzes the pre-clinical lines of evidence.  His entire report is obviously relevant to this. Dr. Cabrera also talks about oxidative stress extensively in his report, and establishes through the pre-clinical lines of evidence that we are observing oxidative stress, oxidative damage in the brains of these rats and mice.

And, by the way, those materials, most of the pre-clinical studies are not in front of the FDA.  They haven't even considered them.  And so this is the only opportunity to present this line of evidence, the totality of the evidence. That's why your Honor is the relevant gatekeeper.

Let's look at endocannabinoid disruption.  You can see that the study authors are saying the exact same thing as our scientists, that there is, in fact, endocannabinoid disruption and the cascading sequence of consequences that occur as a result of that.  And the study authors' conclusions are similar to our conclusions, that we need to take precautionary action. You have one study author saying that Acetaminophen wouldn't have been approved today if it had to go through the normal bevy of trials, because of the fetal toxicity that it's potentially causing.

And so scores of independent, peer-reviewed publications looking at the same lines of evidence, the study

NC7DACEO

authors themselves of these pre-clinical lines of evidence are embracing our experts' position, and so it can't be an unreasonable application of principles and methods for us to get to the same conclusions as these scientists.

And it's notable as well, your Honor, that on this specific Bradford Hill factor, let's remember that the Alemany meta analysis, they conducted a Bradford Hill analysis and came out our way.  They agree that biologic plausibility is satisfied.  So this is not us throwing in the kitchen sink to see what sticks.  These are all biologically plausible lines of evidence that has been established in the animal studies.

And so the only question is are the animals studies good proxies for what we expect to see in human beings.  They haven't cited a single study, a single source of authority to say NAT works differently in a rat versus a human, that CYP2E1 is different in a mouse compared to a human being.  There is no such study.  They want to disregard the animal literature, but this is what -- and we're going to come back to the authors in a moment.

This is what Hoberman said about the predictive power of animal studies.  Every single drug since the thalidomide incident that's been found to be teratogenic in humans has caused similar or related teratogenic effects in animals, also. And so these studies have a perfect track record of helping us understand fetal toxicity of teratogenic effects.

NC7DACEO

Who's Hoberman?  Hoberman is the J&J inhouse toxicologist.  He used to be there.  He's the one saying that these animal studies are relevant.  And they're particularly relevant with respect to Acetaminophen, because this is a little known fact, Acetaminophen has never been tested in humans through randomized controlled clinical trials.  You can see here the quote.  It is grandfathered in.

We don't even know how Acetaminophen works to treat fever and pain.  That mechanism hasn't been established.  It's only biologically plausible.  And so we're never going to have the kind of clarity that they're insisting upon to satisfy this Bradford Hill factor, because, once again, we can't ethically do randomized controlled trials on women.

And you see this from Dr. Pinto-Martin.  She agreed that we're past the point and so we couldn't do a study like that to actually test the safety of that drug because what woman would enroll in that study?  It would be unethical.

I want to pause on that for a moment, because at least to me, this is expressing a very twisted form of logic.  What we're saying here is, we can't do randomized controlled trials, which are the best way to uncover the truth.  The reason we can't do that is because all of the other evidence is so damning; and we would have to tell women about that evidence to enroll them in the randomized controlled trial; and if we told them about it, they would never enroll; what woman would enroll

NC7DACEO

in that kind of study; and so what we should do instead is not tell them anything, keep them in the dark, let millions of women who are pregnant in the United States continue to take Acetaminophen indiscriminately, because we would only warn them if we were trying to uncover the truth, but we can't ethically try to uncover the truth, so let's not warn them.  I think that's through the looking glass, Alice in Wonderland crazy.

THE COURT:  So I don't hear the defendants saying that.  The issue is whether or not, under the standards that I must follow with respect to Rule 702 and *Daubert*, that the plaintiffs have carried their burden to show that the expert testimony with respect to causation is reliable enough to be received.

MR. KELLER:  I agree with your Honor on that.  That is our burden.  We embrace that burden.  I hope I've demonstrated to you --

THE COURT:  Just to put a fine point on this, but maybe an important one, given what you just said, the defendants -- I do not hear them saying they want to keep women ignorant, or harm women, or have any negative impact whatsoever on the health and safety with respect to mothers and children.  That's not the issue here.

MR. KELLER:  Of course, your Honor.  I want to be very clear.  We're all human beings here, and we care about the safety and welfare of women and children.  And so I'm not

NC7DACEO

ascribing improper motives to the defendants.  I'm hoping to point out the consequences of their position, though, because I do think they do not want to tell pregnant women about the body of evidence that we've been discussing.

THE COURT:  Well, disinformation in this day and age is a big issue for our society.

MR. KELLER:  I agree with that.

THE COURT:  I take it that both the plaintiffs and the defendants are in agreement that whatever is said should be accurate and helpful, and not disinformation.

MR. KELLER:  I completely agree with that, your Honor. And I would point to what their testifying expert, Dr. Dalton, said, that women should be told to take the lowest effective dose for the shortest period of time when they're pregnant. That's not on the label.  It's on our proposed label, but it's not on the label.  It's on the European Medicine Association label, and so why shouldn't an American company selling an American product --

THE COURT:  Does the European label instruct pregnant women to consult with a physician?

MR. KELLER:  I believe it does, your Honor, but I want to be sure.

THE COURT:  I believe it does not, but, in any event --

MR. KELLER:  It is true in the United States the label

NC7DACEO

says, "consult a physician."  That's required on every over-the-counter drug in the United States.  But of course --

THE COURT:  Well, that's systemically absorbed.

MR. KELLER:  Correct.  Correct.  I'm sorry.  Yes, that is correct.

So Advil, Motrin, the alternatives to something like Acetaminophen would have that.  So I agree with all of that, your Honor, but I think the additional warnings that we are proposing here, even though that's not strictly relevant to the question of causation, they are intertwined.

The warning that we have proposed to pregnant women is unassailably accurate.  Every word of that I think is true, and so I stand behind the idea that, in this age of disinformation, where I agree with you, we need to be particularly cautious, because there are a lot of things out there that are not true and harmful to health, our label does not fit that depiction at all.  It is unassailably accurate.  And I believe going to the actual Rule 702 standard that is before your Honor, it is backed up by all sorts of peer-reviewed sources of scientific authority.  Our experts are not out on a limb.  They're not saying things that are only true inside of this courtroom, or they're the only ones to utter these opinions.  You have lots of different scientists backing them up, and saying that there's an ongoing debate coming out on our scientists' side of the line.  So in view of that, under the 702 standard, we've

NC7DACEO

met all of the factors.

The fourth factor that I think is the one your Honor is focused on, reliable application -- I think I have three minutes left, your Honor.

THE COURT:  Well, I was going to try to give you a five-minutes warning, but I think -- take five minutes.

MR. KELLER:  I appreciate that, your Honor.

I would like to take this in the place that's most important to you.  I could run through the remaining Bradford Hill factors, but in light of your opening statement, I would probably, if I had my druthers, go to the Food and Drug Administration, Society of Fetal Medicine, some of the other organizations that your Honor mentioned, because I think it's important to talk about that.

I want to make two points.  The first is a technical, legal point, and the second is a more practical point, a point that's based on what these organizations are actually saying.  So the technical, legal point is the one that's familiar to your Honor.  These organizations don't control the *Daubert* inquiry.  That's for you.  Reasonable scientists can disagree even with the professionals, the hard-working men and women of the Food and Drug Administration, Society for Fetal Medicine, and so reasoning from authority is not a legal basis to exclude or admit our experts.  That should be the standard.  So that's the technical point.

The more practical point is in many instances I don't think you can point to these independent sources of authority as criticizing our experts' method.  They never do that.  There's no statement that I saw from the Food and Drug Administration, or the United States that says our experts did it wrong, they ran the temporality prong of Bradford Hill incorrectly, they didn't properly consider dose response.  You don't see that at all.

In fact, there's disagreement even within the Food and Drug Administration.  Andrew Mosholder, and epidemiologist who's been with the agency for quite some time, and he's got a good track record, he's the epidemiology who noted a suicide link between adolescents taking anti-depressants and that unfortunate outcome.  And the FDA overruled him back in the early 2000s, and he was vindicated two years later.  There was even testimony in front of Congress about that.  And he is saying that pregnant women should be getting the warnings that we say are unassailably accurate and necessary.  And this was a signal that he was detecting back in 2016.

There is a lot more information that's come out.  But look at the Society of Fetal Medicine, look at ACOG.  ACOG is a really good example of this.  They have a methodology that they usually deploy called the grade system.  The grade system looks a lot like the Bradford Hill criteria.  It's a systematic literature review.  They go through all of these criteria to

NC7DACEO

determine whether to draw a causal inference.

The statements that were referenced don't do that. They don't say they did a grade analysis. They don't purport to. They never show their work, and say here's why we're reiterating our position. They're just reiterating their conclusion. And that's fine. As your Honor said, they don't speak for everyone in the organization. But they're a respected organization, and they made that conclusion. That can't undermine what our experts have said and reliably done, because they don't purport to disagree with our experts on their methods and their principles.

The same is true with the Society of Fetal Medicine. Point to something that Dr. Baccarelli, or Dr. Cabrera, or Dr. Pearson did that the Society of Fetal Medicine says, that's not good science, that's junk science, no reliable scientist would engage in that kind of scientific discipline or methodology. I don't think there's independent -- sources, which are respectable, and of course entitled -- entitled to our respect, weigh in on that question.

I don't think that they've actually done the totality of the evidence review. They harbor real concerns, and your Honor is right to share them. But there are consequences of providing this information to women, and nobody wants pregnant women not to treat fever, nobody, not us, of course not the other side, not an OB/GYN. Nobody wants that outcome. But

NC7DACEO

these societies are not doing the analysis to show where our experts went awry.  They're not even weighing in on methods and principles.  And so I think that that shows, going back to the first point, that they can't be relevant to the 702 inquiry. They don't tell you anything about what our experts actually did.

So the only methodological issue that I've heard really brought up is the Bradford Hill issue that your Honor and I exchanged remarks on before, and so I hope your Honor will look at the Alemany analysis that actually did a Bradford Hill -- there are scores of our examples like that where scientists, epidemiologists will run through the Bradford Hill factors if they're considering two exposures or two outcomes of interest.  They will analyze the factors together.  But that doesn't mean they didn't do a separate literature review.

And the final point that I'll leave you with that I also started with, Dr. Baccarelli does a separate navigation guide analysis for each one of these conditions, and so even if that was somehow a requirement in the academic and scientific community, he's met his burden.

THE COURT:  Thank you.

MR. KELLER:  Thank you, your Honor.

MS. BROWN:  May I proceed, your Honor?

THE COURT:  Yes.

MS. BROWN:  Thank you very much, your Honor.

NC7DACEO

With all due respect, this is not a public health hearing.  This is not a hearing on warnings.  We are here today on the issue of whether or not plaintiffs have satisfied their burden under 702 and *Daubert*.  And, your Honor, one of the key questions that I do believe went unanswered during plaintiffs' counsel's presentation is how is a Bradford Hill analysis that lumps these two distinct disorders together and includes other neurological deficit disorders, how is that reliable?  How does that satisfy their burden and their burden alone under 702 and *Daubert*?

Counsel pointed the Court -- and I didn't hear anything.  I didn't hear any source.  I didn't hear any expert testimony.  I didn't hear any authority that would support that taking two different and distinct disorders, and putting them together in a Bradford Hill analysis, is reliable.

THE COURT:  Well, I think Mr. Keller addressed the trans-diagnostic issue by citing Alemany 2021.  I think that was his response.

MS. BROWN:  Indeed, your Honor, and that's what I'd like to go to next, because I think it falls short of meeting the standard here, your Honor.

First of all, Alemany did not do a full Bradford Hill analysis.  That's just incorrect, on the record of Alemany.  There is a cursory run through some of the factors that's contained in about a paragraph and a half at the end of this

NC7DACEO

article.  So to point to that as a cite for how this was done, I don't think is quite fair, your Honor.

Additionally, your Honor, as to the idea of putting together these two distinct disorders --

THE COURT:  Other NDDs.

MS. BROWN:  Exactly, your Honor.  To the point of doing that, I think Alemany itself tells us that that's not proper, your Honor, because in the section of their paper, page 1,000, where they're talking about potential hypothesized mechanisms, they talk about some that, quote, may be particularly interesting for ADHD.  And they go on to say they're talking about a dopamine pathway.

THE COURT:  Excuse me one second.

MS. BROWN:  Yes.

THE COURT:  Please continue.

MS. BROWN:  Thank you, your Honor.

And they talk about a potential mechanism, and indicate specifically in this paragraph on 1,000 that these may play pivotal roles in ADHD, not ASD.  Your Honor, they're making a separate inquiry as to mechanism, and so certainly, even by their own analysis, your Honor, to properly do a Bradford Hill analysis, including on biological plausibility, we have to look at these disorders separately, and they do that themselves where they postulate potential hypothesized mechanisms that could perhaps deal with ADHD.

NC7DACEO

There are a number of other points of Alemany I know that I wanted to call to the Court's attention.  We spoke a lot today about the unreliability of screening tools and symptom studies, and how they had very low predictive rates.  And what's critical is Alemany shows us that demonstrably, your Honor, because what they do, they have data from Liew that's corrected according to the screening questionnaire, and when they have that data in their analysis, they show a statistically significant association.  When they take out the screening tool data and replace it with hospital diagnoses, the association goes away.  The association becomes statistically insignificant.

And so, your Honor, that speaks to the importance of looking at studies that have, in fact, collected diagnoses, and not screening for data.  And to that same point, because Brandlistuen came up today, your Honor, Brandlistuen 2013, those authors themselves talk about how they cannot even interpret their findings in terms of clinical significance, because they have no way of understanding the meaning of data collected from screening tools.

So, your Honor, if the sole source -- and I understood it as well to support a Bradford Hill analysis, that combines these two disorders and adds a bunch of other disorders is Alemany, I think even just a quick look at Alemany shows us that's not right, shows us a Bradford Hill analysis was not run

NC7DACEO

here.  And even a cursory discussion of proposed hypothetical mechanisms are disorder specific, as of course they would have to be.

Bradford Hill asks us things like specificity.  How does one conduct specificity if you have two diseases?  It has to be a separate analysis.  Is this proposed environmental factor capable of causing this specific disorder?  If we have two or three or ten lumped together, how do we even answer that question?

And the same is true on temporality.  There's no evidence on this record that we know the critical window of exposure for these two distinct exposures, but to answer that question under Bradford Hill, you'd have to know them separately, and you'd have to analyze them separately. Plaintiffs have not come before the Court with reliable data that would allow for a Bradford Hill inquiry that would be done together and with a bunch of additional other disorders in there as well.

Your Honor, I want to run through quickly some of the specific slides, and just make a couple of points on some things that were pointed out to the Court.  The first one is slide 14, where counsel has a subset I guess of the studies that Dr. Baccarelli looked at for ASD.  And I will point out just a couple things for the Court for completeness.

The Saunders relative risk that's on here does not

NC7DACEO

have the confidence interval which crosses one.  This is not a statistically significant or supported finding.  Ji 2018, not a statistically significant or supported finding.  Hornig 2018, not included on this chart, your Honor, but not a significantly -- not a supported finding.

They have Ji 2020 on this chart, but we know, your Honor, two things about that:  One, it only measures exposure three hours before delivery, and, two, when the authors controlled for maternal psychiatric illness, that association went away.

They have Alemany on here, your Honor, 2021, but we know, as I just mentioned, when the symptoms data was taken out and the diagnosis data was put in, this is no longer statistically significant.

They talked about Leppert, and how Leppert 2019 was one of the ASD studies on which Dr. Baccarelli relies, but they didn't mention that it has no significant findings of ASD.  It does not find an association between Acetaminophen use and the symptoms of ASD.  Another negative study.

They talked about Avella-Garcia, symptom study for ASD, but they didn't say that the overall finding was not statistically significant, that the finding as to girls was protected, and that it was only the finding as to boys inexplicably that showed an association.

And so, your Honor, this picture that was represented

NC7DACEO

to you on slide 14 informing Dr. Baccarelli's opinions, I would suggest it leaves off some very significant facts that are important when we're trying to understand, do we even have a clear-cut association in the body of ASD literature to do a proper Bradford Hill analysis of the autism spectrum disorder data.

On slide 23, your Honor, they had sort of a seesaw, and put a bunch of studies on the right-hand side, suggesting in their title, the literature on NDDs is overwhelmingly consistent, but, your Honor, this is belied by findings of actual studies, and, frankly, speaks to the cherry-picking that their experts do to be able to support the conclusions they've given to the Court.  And it is unquestionably improper under 702 and *Daubert*.

For example, they have on here Masarwa 2018, but what they don't tell in the chart and didn't tell the Court and what, frankly, Dr. Hollander didn't even know is that Masarwa 2020, when it did an analysis to try and understand if the low relative risk could be due to bias, it concluded it entirely was, that if we had just adjusted for indications of use like migraines or parental ADHD diagnoses, it would explain the association in its entirety.

They have Ji 2020 here, but what they didn't tell the Court is this association went away when we adjusted for maternal psychiatric illness.

NC7DACEO

Gustavson 2021, but we know when sibling control analysis was performed, that association also went away.

Avella-Garcia is listed on here as boys only. How can we explain the overall finding, no association of children generally, and a protective effect in girls?

I would suggest to the Court what slide 23 suggests, this seesaw that is overwhelmingly filled in their favor, what it shows is the cherry-picking and the conclusions that go beyond those that the authors make that have to be done by their experts to get to the conclusion that they've put before the Court in this case.

And of course what is no doubt not lost on your Honor, the title of the slides talks about NDDs. It is not even an inquiry into autism separately or ADHD separately. They have combined them here, your Honor, in a way that they have not supported to the Court is proper.

Perhaps most concerning, your Honor, was slide 28, where the title says, "many independent scientists have suggested causation." And I thought I heard counsel say, well, they have this throwaway caveat language. Your Honor, the conclusions of the studies' authors are not throwaway caveat language. And *Daubert*, and *Daniel-Feasel*, and 702 require that their expert not exceed the conclusions the authors themselves make.

And so, for example, they have Ystrom 2017 listed on

NC7DACEO

this slide with a quote that says, "the result is consistent with a causal link."  That's belied by the conclusions of the authors, because what happened in Ystrom, your Honor, is the authors did a paternal control to test to see if there was an association with dads, and they found not only was there, but it was stronger than the association that they found in moms taking Acetaminophen during pregnancy.  And that's why they said, however, given paternal use of Acetaminophen is also associated with ADHD, the causal role of Acetaminophen in the etiology of ADHD can be questioned.  We do not provide definitive evidence for or against a causal relation between maternal use of Acetaminophen and ADD.  And yet it appears here, your Honor, as many independent scientists have suggested causation, that's just not true.

And one more on that slide, your Honor.  They cite Gau, the research findings lend weight to the association that the association is causal.  But what the authors conclude is that caution is advised when considering whether this association is causal, because potentially unidentified or inadequately controlled confounding factors in the included studies may have unpredictable affects on the observed association.

What's more, your Honor, in this study they cited to the Court these authors included the mechanism underlying this association is not clear.  There is no evidence in these

articles that they cite that scientists have concluded that they understand a potential mechanism.

And what's also instructive about that, your Honor, is that they tell us there is considerable controversy about the validity of questionnaires for recording ADHD diagnoses without a certified expert review.  These are the very same limitations, your Honor, that before he was hired as an expert witness, Dr. Baccarelli made in Liew 2019.

Briefly, your Honor, on the maternal control slides that you were shown at slide 30 and 31, we have data, your Honor, that maternal controls are not as reliable as paternal controls, and the reason is because there are differences in women who take Tylenol during pregnancy, or take Acetaminophen during pregnancy, as opposed to women who take it before or after pregnancy.  We have a whole set of data that shows the underlying conditions of those women differ, the co-morbidities differ, the socioeconomic status differs, the smoking status differs, and the percentage of women who take Tylenol differ.

So we know that there are differences in moms taking Tylenol during pregnancy, or before, or after, and that's why they're not proper controls, because to be a proper control, we should only be changing one thing.  And because these women are so different, we're changing multiple things, and they are not reliable.  The reliable negative controls are paternal controls, your Honor.  And as Ystrom says, those findings are

so significant that they cause those authors to question whether or not they could draw any conclusion about the results of their study.

There was some discussion, your Honor, about Gustavson and Brandlistuen. Those are two studies that did a sibling control analysis. The Brandlistuen sibling control analysis has been heavily critiqued in the literature, and I would point the Court to Damacur 2015. And the reason for the critique, your Honor, is that the analysis did not include siblings -- it included siblings who were not concordant, but what we're supposed to be doing here -- excuse me, they included siblings that concordant, that were the same. What we're supposed to be doing is having siblings that have different exposures and different outcomes.

And what these authors did is they included concordant siblings, and they were critiqued for that. And what's interesting is it's many of the same authors on Brandlistuen 2013 who authored Gustavson 2021. And it's the same cohort of individuals who are being studied. And when they did the Gustavson 2021, they were careful to make sure they had discordant information, as opposed to concordant information.

Additionally, as I mentioned, your Honor, the Brandlistuen authors themselves are critical about the value of using screening questionnaires. They themselves say this data can't be interpreted with any clinical significance. We don't

NC7DACEO

know the meaning of it.  And so I think the discussion that we had on Brandlistuen didn't quite give the full details of what these scientific -- how the scientific community critiqued that particular analysis.

THE COURT:  I'm going to have to ask you to just bring your remarks to a close.

MS. BROWN:  Yes.  Absolutely, your Honor.

Just a few final points on Valproic Acid and the FDA. These are two totally different exposures, your Honor, and clearly the FDA agrees, because the FDA has looked at the Acetaminophen data, and concluded a causal inference, a causal conclusion cannot be determined.

The same is not true for Valproic Acid, where we have precise data on who's taking it, where we have higher relative risk, and where we have an effort to actually control for confounding.

And so, finally, your Honor, in conclusion, we are not here to debate labels.  We are not here to debate public health.  At another time, we will happily stand up and express our concern for moms during pregnancy as well, but what we are here for today is to determine whether or not plaintiffs met their burden.  They did not.

They have put forward experts who buck the consensus of the scientific medical and regulatory communities.  They have had to absolutely go beyond the findings of their own

NC7DACEO

studies' authors.  They cherry-pick findings that support their opinions, while ignoring those that don't, and don't, importantly, offer the Court a conclusion why they can't reconcile those.

And so, your Honor, the amendments to Rule 702 make clear, these are gatekeeping issues for the Court.  Plaintiffs have not met their burden.  They have not done independent Bradford Hill analysis.  They failed the four gating criteria. And so this Court is going to take a hard look at their Bradford Hill analysis, and before you can go even further, it fails.  It has combined too many different disorders.

And so with that, your Honor, we believe 702 mandates an exclusion here.  Thank you for your time, your Honor.

THE COURT:  Thank you.

So obviously you've given me a lot to chew on with your briefing and your excerpt reports.  I want to acknowledge again the magnificent work done by the scientists who have been studying these issues and trying to understand, among other things, the issue of causation from observations of association.

So I've read those underlying scientific studies that the parties have -- well, the parties' experts have relied on, at least most of them.  If there's any that I've missed that you've stressed today, I'll make sure that I circle back around and read those, too, but clearly the plaintiffs and the

NC7DACEO

defendants are well represented.

You've worked hard.  You've tried to bring to my attention the most important aspects of the legal issues here, and the factual disputes, and I appreciate that.  I made a commitment to you early on, about a year ago, and I'm going to do my best to fulfill that commitment.

Thank you.

(Adjourned)