Page 1

1       IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF NEW YORK
2                   -  -  -
    IN RE:  ACETAMINOPHEN   :
3   - ASD-ADHD PRODUCTS     :   MDL NO. 3043
    LIABILITY LITIGATION    :
4                           :   CASE NO.
                            :   1:22-md-03043
5                           :   -DLC
                            :
6                           :   Judge Denise
                            :   Cote
7   _____   :   _____
                            :
8                           :   Case No.
    Mota, et al., vs.       :   1:23-cv-11074
9   Johnson & Johnson       :
    Consumer, Inc.          :
10                          :
11            - CONFIDENTIAL -
        - PURSUANT TO PROTECTIVE ORDER -
12
                    -  -  -
13
               April 9, 2024
14
                    -  -  -
15
               Videotaped deposition of
16  ROBERTA B. NESS, M.D., M.P.H., taken
    pursuant to notice, was held at the
17  Lanier Law Firm, 535 Madison Avenue,
    New York, New York, beginning at
18  9:13 a.m., on the above date, before
    Michelle L. Gray, a Certified Shorthand
19  Reporter, Registered Professional
    Reporter, Certified Court Reporter,
20  Certified Realtime Reporter, and Notary
    Public.
21
                    -  -  -
22        GOLKOW, a Veritext Company
        877.370.3377 ph| 917.591.5672
23
24

Page 2

```
1  APPEARANCES:
2
   KELLER POSTMAN LLC
3  BY:  J.J. SNIDOW, ESQ.
   (In person)
4  1101 Connecticut Ave, N.W.
   Suite 1100
5  Washington, D.C. 20036
   202.918.1123
6  jj.snidow@kellerpostman.com
7     - and -
8  KELLER POSTMAN LLC
   BY:  ASHLEY KELLER, ESQ.
9  (Zoom)
   BY:  ASHLEY BARRIERE, ESQ.
10  (Zoom)
   BY:  AMANDA HUNT, ESQ.
11  (Zoom)
   BY:  REBECCA KING, ESQ.
12  (Zoom)
   150 North Riverside Plaza
13  Suite 4100
   Chicago, Illinois 60606
14  312.741.5220
   ack@kellerpostman.com
15  ashley.barriere@kellerpostman.com
   amanda.hunt@kellerpostman.com
16  rebecca.king@kellerpostman.com
   Representing the Plaintiffs
17
18  THE LANIER FIRM
   BY:  CATHERINE HEACOX, ESQ.
19  (In person)
   BY:  ANDREA JOHNSTONE, ESQ.
20  (In person)
   535 Madison Avenue, 12th Floor
21  New York, New York 10022
   (212) 421-2800
22  catherine.heacox@lanierlawfirm.com
   andrea.johnstone@lanierlawfirm.com
23  Representing the Plaintiffs
24
```

Page 3

```
1  APPEARANCES:  (Cont'd.)
2
3  WATTS LAW FIRM, LLP
   BY:  RUSS ABNEY, ESQ.
4  (Zoom)
   811 Barton Springs Road
5  # 725
   Austin, Texas 78704
6  855.969.2887
   Representing the Plaintiffs
7
8  KERSHAW TALLEY BARLOW
   BY:  VINH LE, ESQ.
9  (Zoom)
   BY:  WILLIAM J. LEE, ESQ.
10  (Zoom)
   401 Watt Avenue, Suite 1
11  Sacramento, California 95864
   916.520.6639
12  vinh@ktblegal.com
   Representing the Plaintiffs
13
14  WAGSTAFF & CARTMELL, ESQ.
   BY:  LINDSEY SCARCELLO, ESQ.
15  (Zoom)
   4740 Grand Avenue
16  Suite 300
   Kansas City, Missouri 64112
17  816.701.1112
   lscarcello@wcllp.com
18  Representing the Plaintiffs
19
   COOPER & KIRK, PLLC
20  BY:  JOSEPH O. MASTERMAN, ESQ.
   (Zoom)
21  1523 New Hampshire Avenue, N.W.
   Washington, DC 20036
22  202.220.9600
   jmasterman@cooperkirk.com
23  Representing the Plaintiffs
24
```

Page 4

```
1  APPEARANCES:  (Cont'd.)
2
   SKADDEN, ARPS, SLATE, MEAGHER
3  & FLOM LLP
   BY:  ALLISON M. BROWN, ESQ.
4  (In person)
   BY:  ASHER S. TRANGLE, ESQ.
5  (In person)
   One Manhattan West
6  New York, New York 10001
   212.735.3000
7  allison.brown@skadden.com
   asher.trangle@skadden.com
8  Representing Johnson & Johnson Consumer
   Inc. (JJCI)
9
10  BARNES & THORNBURG LLP
   BY:  JESSICA L. BRENNAN, ESQ.
11  (Zoom)
   67 E. Park Place
12  Suite 1000
   Morristown, New Jersey 07960
13  973.775.6101
   jessica.brennan@btlaw.com
14  Representing Johnson & Johnson Consumer
   Inc. (JJCI)
15
16  BARNES & THORNBURG, LLP
   BY:  MITCHELL CHARCHALIS, ESQ.
17  (In person)
   390 Madison Avenue
18  12th Floor
   New York, New York 10017
19  646.746.2000
   mcharchalis@btlaw.com
20  Representing Johnson & Johnson Consumer
   Inc. (JJCI)
21
22
23
24
```

Page 5

```
1  APPEARANCES:  (Cont'd.)
2
   BARNES & THORNBURG LLP
3  BY:  DEANNA LEE, ESQ.
   (In person)
4  555 12th Street N.W.
   Suite 1200
5  Washington, D.C.  20004
   202.289.1313
6  deanna.lee@btlaw.com
   Representing the Defendant, Walgreens
7
8  KING & SPALDING LLP
   BY:  LUKE BOSSO, ESQ.
9  (Zoom)
   1700 Pennsylvania Avenue, NW
10  Suite 900
   Washington, D.C. 20006
11  202.737.0500
   lbosso@kslaw.com
12  Representing the Defendant, Walmart,
   Inc., and Wal-Mart Stores, Inc.
13
14
   ALSO PRESENT:
15
   VIDEOTAPE TECHNICIAN:
16
      Danny Ortega - Golkow
17    (In person)
18
19
20
21
22
23
24
```

2 (Pages 2 - 5)

Page 6

1          - - -
2          I N D E X
3          - - -
4
Testimony of:
5
        ROBERTA B. NESS, M.D., M.P.H.
6
  By Ms. Brown              13, 465
7
  By Mr. Snidow             450
8
9
10
11          - - -
12          E X H I B I T S
13          - - -
14
15 NO.       DESCRIPTION        PAGE
16 Ness
   Exhibit 1   Is Tylenol Safe      13
17          During Pregnancy
            Expert Raises Alarm
18          About Possible Link
            To Autism, ADHD
19          (Weintraub)
20 Ness
   Exhibit 2   E-mail Thread      33
21          12/16/22
            Subject, Questions/Edits
22          For Autism Justice
            Website and Fact Sheet
23          NESS_0029-57
24

Page 8

1          - - -
2          E X H I B I T S  (Cont'd.)
3          - - -
4
5 NO.       DESCRIPTION        PAGE
6 Ness
   Exhibit 9   Report, 2/2018      280
7          Robert B. Ness
            Report on the Question
8          Of Whether Genital Talc
            Use Causes Ovarian Cancer
9
   Ness
10 Exhibit 10  Compilation of     308
            Invoices for Dr. Ness
11          NESS_0001-03
12 Ness
   Exhibit 11  Prenatal      352
13          Paracetamol
            Exposure and
14          Neurodevelopmental
            Outcomes in Preschool-Aged
15          Children
            (Tronnes)
16
   Ness
17 Exhibit 12  Low       369
            Neurodevelopmental
18          Performance and
            Behavioral Emotional
19          Problems)
            (Tovo-Rodrigues)
20
   Ness
21 Exhibit 13  Prenatal Paracetamol 378
            Exposure and Child
22          Neurodevelopment:
            A Sibling-Controlled
23          Cohort Study
            (Brandlistuen)
24

Page 7

1          - - -
2          E X H I B I T S  (Cont'd.)
3          - - -
4
5 NO.       DESCRIPTION        PAGE
6 Ness
   Exhibit 3   Declaration of     70
7          Roberta Ness
            7/28/23
8
   Ness
9 Exhibit 4   Letter, 4/5/24     80
            In Re:  Acetaminophen
10          ASD-ADHD Products
            Liability Litigation
11
   Ness
12 Exhibit 5   Compilation of     97
            Handwritten Notes
13          Of Dr. Ness
            NESS_0004-28
14
   Ness
15 Exhibit 6   Our Team       113
            Autism Justice
16          3/27/24
17 Ness
   Exhibit 7   Plaintiffs'     194
18          Disclosure of Rule 26
            Expert Witness
19
   Ness
20 Exhibit 8   Perinatal      260
            Acetaminophen
21          Exposure and Childhood
            Attention-Deficit/
22          Hyperactivity Disorder
            (ADHD)
23          (Anand)
24

Page 9

1          - - -
2          E X H I B I T S  (Cont'd.)
3          - - -
4
5 NO.       DESCRIPTION        PAGE
6 Ness
   Exhibit 14A  Acetaminophen Use    385
7          During Pregnancy and
            Children's Risk of
8          Autism, ADHD and
            Intellectual Disability
9          (JAMA)
            (Ahlqvist)
10
   Ness
11 Exhibit 14B  Supplemental      385
            Online Content
12          Acetaminophen Use
            During Pregnancy and
13          Children's Risk of Autism
            ADHD and Intellectual
14          Disability
            (Ahlqvist)
15
   Ness
16 Exhibit 15  Association of      399
            Prenatal Acetaminophen
17          Exposure Measured
            In Meconium
18          (Baker)
19
   Ness
20 Exhibit 16  Meconium:  A Novel    406
            Biomarker of In Utero
21          Exposure to Acetaminophen
            And Caffeine
22          (Laue)
23
24

Page 10

```
 1              - - -
 2        E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5 NO.        DESCRIPTION         PAGE
 6 Ness
   Exhibit 17  Is Taking Tylenol   429
 7          During Pregnancy
            Safe?  Experts Weigh
 8          In On Research,
            Pending Lawsuits
 9
10              - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

```
 1              - - -
 2        DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5 Direction to Witness Not to Answer
 6 PAGE  LINE  PAGE LINE    PAGE LINE
   None.
 7
 8 Request for Production of Documents
 9 PAGE  LINE  PAGE LINE    PAGE LINE
   None.
10
11 Stipulations
12 PAGE  LINE  PAGE LINE    PAGE LINE
   None.
13
14 Questions Marked
15 PAGE  LINE  PAGE LINE    PAGE LINE
   None.
16
17
18
19
20
21
22
23
24
```

Page 12

```
 1        THE VIDEOGRAPHER:  We are
 2 now on the record.
 3        My name is Danny Ortega.
 4 I'm the legal videographer for
 5 Golkow Litigation Services.
 6        Today's date is April 9,
 7 2024, and the time is 9:13 a.m.
 8        This video deposition is
 9 being held at 535 Madison Avenue,
10 New York, New York, in the matter
11 of Acetaminophen (Tylenol) -
12 ASD-ADHD Liability Products
13 litigation.
14        The deponent today is Dr.
15 Roberta B. Ness.
16        All counsel will be noted
17 on the stenographic record.
18        The court reporter today is
19 Michelle Gray and will now swear
20 in the witness.
21              - - -
22        ... ROBERTA B. NESS, M.D., M.P.H.,
23 having been first duly sworn, was
24 examined and testified as follows:
```

Page 13

```
 1              - - -
 2        EXAMINATION
 3              - - -
 4 BY MS. BROWN:
 5    Q.   Good morning, Dr. Ness.
 6        (Document marked for
 7 identification as Ness
 8 Exhibit 1.)
 9 BY MS. BROWN:
10    Q.   I'm handing you what we've
11 marked as Ness Exhibit 1.
12        And, Dr. Ness, you gave an
13 interview to USA Today back in the fall
14 of 2022, correct?
15    A.   Yes.
16    Q.   And what we've marked as
17 Ness-1 is a copy of that interview and
18 article, correct?
19    A.   Yes.
20    Q.   One of the things you told
21 the public in this interview is that you
22 were on a mission to warn pregnant people
23 to use less acetaminophen, correct?
24    A.   Correct.
```

4 (Pages 10 - 13)

Page 14

1    Q.   And you said that you had
2 formed the opinion that you believe
3 acetaminophen is a cause of autism and
4 ADHD, right?
5         MR. SNIDOW:  Sorry.  Just
6    where are you looking?
7         MS. BROWN:  Second
8    paragraph.
9         MR. SNIDOW:  Okay.  Thanks.
10        THE WITNESS:  Actually, I
11    see full text, second paragraph:
12    "I believe that acetaminophen is
13    a cause of autism and ADHD."
14 BY MS. BROWN:
15    Q.   Correct.
16    A.   Correct.
17    Q.   And that was an opinion you
18 held in the fall of 2022, correct?
19    A.   That's correct.
20    Q.   And you said, in this
21 interview, that that is a very big thing
22 for an epidemiologist to say, correct?
23    A.   That's correct.
24    Q.   And what did you mean by

Page 15

1 that?
2    A.   I mean that an
3 epidemiologist does not reach that
4 conclusion unless they've done a full
5 analysis by means of the Bradford Hill
6 criterion.
7    Q.   And as an epidemiologist,
8 Dr. Ness, you would never state that
9 something is the cause of a disease
10 without having first done a Bradford Hill
11 analysis; is that fair?
12    A.   I would -- that -- that is
13 the standard, yes.
14    Q.   And before you stated, as
15 you did in this article, that you
16 believed acetaminophen is a cause of
17 autism and a cause of ADHD, you had done
18 a full Bradford Hill analysis; is that
19 correct?
20    A.   I said -- I said autism and
21 ADHD.  That was a phrase, of autism and
22 ADHD.
23    Q.   Mm-hmm.  And are you
24 distinguishing that between them

Page 16

1 individually?
2    A.   Yes.
3    Q.   Okay.  When you stated that
4 you believe autism is a cause of autism
5 and ADHD, you considered autism and ADHD
6 to be one disease; is that right?
7         MR. SNIDOW:  Ali, just, you
8    said autism is a cause of autism
9    and ADHD.  Do you want to clean
10    it up?
11         MS. BROWN:  Autism and
12    ADHD.
13         MR. SNIDOW:  Yeah, you just
14    said you believe autism is a
15    cause of --
16         MS. BROWN:  Oh, I
17    apologize.  Thank you.
18         MR. SNIDOW:  Yeah, yeah,
19    you're good.  Just want it clean.
20         MS. BROWN:  Thanks.  I
21    appreciate it.
22         MR. SNIDOW:  Yeah.
23 BY MS. BROWN:
24    Q.   So when you stated that you

Page 17

1 believe acetaminophen is a cause of
2 autism and ADHD, you were considering
3 autism and ADHD to be one disease or
4 disorder?
5    A.   Neurodevelopmental disorders
6 as a category.
7    Q.   Neurodevelopment disorders.
8    A.   With autism and ADHD being
9 those distinct entities within
10 neurodevelopmental disorders.  Correct.
11    Q.   And when you said you had
12 done a full analysis by Bradford Hill,
13 had you done an analysis of acetaminophen
14 and neurodevelopment disorders?
15    A.   I had -- I have done a full
16 analysis of ADHD, and I had done an
17 analysis, in general, of
18 neurodevelopmental disorders.  I have not
19 done a Bradford Hill analysis specific to
20 autism, but I have done a full Bradford
21 Hill analysis specific to ADHD.
22    Q.   At the time that you said
23 you believed acetaminophen is a cause of
24 autism and ADHD, had you done a Bradford

5 (Pages 14 - 17)

Page 18

1 Hill analysis for ADHD?
2     A.    At that time I had -- I had
3 actually looked at it very, very
4 carefully.  I have subsequently written
5 the full analysis.  But I had looked at
6 it very carefully prior to making this
7 statement.
8     Q.    Sure.  And I understand that
9 testimony, but it wasn't quite my
10 question.
11         At the time you stated, "I
12 believe acetaminophen is a cause of
13 autism and ADHD," had you done a Bradford
14 Hill analysis for ADHD?
15     A.    I had -- I had -- I would
16 say I had looked at the literature
17 carefully enough to be able to say that
18 it met the criteria that I subsequently
19 wrote that it met, yes.
20     Q.    Does that mean you had done
21 a Bradford Hill analysis?
22     A.    I think I just answered that
23 question.
24     Q.    I don't think so.

Page 19

1     A.    I had not written it, but in
2 my mind, I had fully considered all of
3 the tenets.
4     Q.    You had done a Bradford Hill
5 analysis for ADHD in your mind?
6     A.    Yes.
7     Q.    And had you done a Bradford
8 Hill analysis for acetaminophen and
9 autism?
10     A.    Not separately, no.
11     Q.    Had you done a Bradford Hill
12 analysis for acetaminophen and
13 neurodevelopment disorders, of which I
14 think you stated autism and ADHD are two?
15     A.    I had done a Bradford Hill
16 analysis in my mind of neurodevelopmental
17 disorders but, dominantly, dominated by
18 ADHD.  ADHD is by far the more common of
19 the two.
20     Q.    And when did you first
21 conduct -- so you have done two separate
22 Bradford Hill analyses?
23     A.    I did not say that.  I said
24 that I had considered neurodevelopmental

Page 20

1 disorders as a category.  I had done the
2 Bradford Hill in my mind of ADHD and had
3 looked at the autism as well and feel --
4 felt that the most likely explanation for
5 autism and ADHD was causal.
6     Q.    You state -- the article
7 states that more than two dozen studies
8 have linked a pregnant person's frequent
9 use of acetaminophen, brand-name Tylenol,
10 to autism and attention deficit
11 hyperactivity disorder in their child.
12         Do you see that?
13     A.    Yes.
14     Q.    Did you discuss those
15 studies in this interview?
16     A.    I don't understand the
17 question.
18     Q.    Sure.
19         Did you provide that
20 information in the interview, the dozen
21 studies?
22     A.    Are you asking did I provide
23 references?
24     Q.    Yeah.  Did the -- did the

Page 21

1 interviewer ask you about what studies
2 you were relying on?
3     A.    No.
4     Q.    Okay.  You say in the next
5 paragraph, "I'm not saying that
6 acetaminophen is now the cause of autism
7 and ADHD.  I'm saying that it's a cause."
8         Do you see that?
9     A.    Yes.
10     Q.    And what did you mean by
11 that?
12     A.    I mean there are multiple
13 causes for these very complex
14 neurodevelopmental disorders, of which I
15 believe acetaminophen is one of those
16 causes.
17     Q.    And what are the causes that
18 you have identified for autism?
19     A.    You mean other than
20 acetaminophen?
21     Q.    Do you believe acetaminophen
22 causes autism?
23     A.    We just went through that.
24 I -- I'm just asking you to clarify,

6 (Pages 18 - 21)

Page 22

1 please -- please restate the question.
2     Q.   Okay.  And the reason I'm
3 asking it is because I understood you to
4 have said you never did a Bradford Hill
5 for acetaminophen and autism.
6        Is that not true?
7        MR. SNIDOW:  Objection to
8     the form.
9        THE WITNESS:  I said I had
10    done one dominated by ADHD but
11    not separately for autism.  But I
12    -- I have not done the full
13    analysis.
14       But in looking at all of
15    the tenets, my belief is that the
16    most likely explanation for the
17    studies that link acetaminophen
18    and autism is causal.
19 BY MS. BROWN:
20    Q.   You just said you had done a
21 Bradford Hill analysis dominated by ADHD.
22       Did I understand that
23 correctly?
24    A.   That's correct.  ADHD is the

Page 23

1 more common disease of those two.
2     Q.   Okay.  When you say a
3 Bradford Hill analysis dominated by ADHD,
4 what do you mean by that?
5     A.   I mean that I've done the
6 full Bradford Hill analysis for ADHD.
7     Q.   I guess I just wasn't clear,
8 in my mind, what you meant by dominate.
9        Were there -- were there
10 other neurodevelopmental disorders
11 included in the Bradford Hill analysis?
12    A.   No --
13       MR. SNIDOW:  Objection to
14    form.  Asked and answered.
15       THE WITNESS:  I mean, yeah.
16    I answered that question.
17 BY MS. BROWN:
18    Q.   But I'm confused, so that's
19 why I'm following up.
20       What did you mean by the
21 word "dominated"?
22       MR. SNIDOW:  Objection to
23    form again.
24       THE WITNESS:  There were

Page 24

1     more studies in ADHD.
2 BY MS. BROWN:
3     Q.   Okay.  What are the other
4 causes of autism that you've identified?
5     A.   Causes of autism.  Genetics.
6 Potentially behavioral factors during
7 childhood.
8     Q.   Any other?
9     A.   Those would be two.
10    Q.   Okay.  And for ADHD, have
11 you identified any causes other than your
12 belief that acetaminophen causes ADHD?
13    A.   In terms of modifiable risk
14 factors, I cannot think of any other than
15 acetaminophen.
16    Q.   Okay.  What about
17 non-modifiable risk factors?
18    A.   Again, genetics.
19    Q.   Have you formed an opinion
20 about the percentage of ADHD that is
21 caused by genetics?
22    A.   I have not.
23    Q.   What about for autism?  Have
24 you formed that opinion for autism?

Page 25

1     A.   I have not.
2     Q.   Have you formed an opinion
3 about the percentage of ADHD that you
4 believe is caused by acetaminophen?
5        MR. SNIDOW:  Objection to
6     form.
7        THE WITNESS:  I have not.
8 BY MS. BROWN:
9     Q.   Okay.
10    A.   I have -- I have opinions
11 with regard to the elevated risk.  You're
12 asking, epidemiologically, a different
13 question --
14    Q.   I am --
15    A.   Are you asking -- I just --
16 actually, I want to clarify the question.
17       Are you asking about
18 attributable risk?  Is that what you're
19 asking?
20    Q.   I'm asking if you have done
21 an analysis of the causal factors that
22 you've identified and you've weighted
23 percentages to what you believe each
24 factor is responsible for in the overall

Page 26

1 development of the disease.
2          MR. SNIDOW:  Objection to
3    form.
4          THE WITNESS:  I have
5    definitely looked at what I
6    believe is the elevation of risk
7    as a result of acetaminophen.
8 BY MS. BROWN:
9    Q.   Okay.  And what's that?
10    A.   It's a complicated answer.
11 Do you -- I mean --
12    Q.   Is it in your report?
13    A.   Yes.
14    Q.   Okay.  What you say -- let's
15 go back to the article we're looking at.
16          I want to turn to Page 2,
17 Dr. Ness, of the -- of Ness-1.
18          And just let me know, if
19 you're referring to something on your
20 computer, would you just let me know what
21 it is so we can put it on --
22    A.   Just the report.
23    Q.   Okay.
24    A.   My report.

Page 27

1    Q.   In the middle of the page --
2    A.   Yes.
3    Q.   -- there's a paragraph that
4 starts, "If recent studies are right."
5          Do you see that?
6    A.   Yes.
7    Q.   And they're referring to
8 you.  You're mentioned in the sentence
9 above.  "Ness reads the data
10 differently."
11          Do you see that?
12    A.   Yes.
13    Q.   "'If recent studies are
14 right,' she said, 'roughly 20 percent of
15 children diagnosed with autism or ADHD
16 were exposed to high levels of the
17 painkiller while in utero.'"
18          Do you see that?
19    A.   Yes.
20    Q.   And what's that based on?
21    A.   Let me see if I can pull up
22 the reference for you.  Trying to think
23 where that reference comes from.
24          Can we come back to that

Page 28

1 question?
2    Q.   Yep.
3    A.   Because I would need to look
4 fairly carefully through the report to
5 find the reference.
6    Q.   Okay.
7    A.   But, yes, there's a
8 reference for it.
9    Q.   Why don't -- why don't, at a
10 break, maybe if you're able to do that,
11 that would be great.
12    A.   Yeah.  I will do that.
13    Q.   The next sentence of the
14 article says, "'Genetic vulnerability is
15 also a factor, which is why acetaminophen
16 use doesn't always lead to neurological
17 differences,' she said."
18          Do you see that?
19    A.   I'm sorry.  I do not.  Let's
20 see.  Where --
21    Q.   It's the very next sentence
22 after the one we were talking about.
23    A.   Oh, I see.  Yes.  Thank
24 you --

Page 29

1    Q.   Okay.  And did you say
2 that --
3    A.   Oh, I see.
4          "Doesn't always lead to
5 neurologic differences."
6          I -- I was -- yes.  I did --
7 I did say that, yes.
8    Q.   Okay.  And what did you mean
9 by that statement?
10    A.   I meant to say that,
11 literally, if one takes long duration of
12 acetaminophen, we cannot say
13 unequivocally that a child will develop
14 autism or ADHD.
15    Q.   We can't say that, but for a
16 mother's use of acetaminophen in utero,
17 her child would not have developed ADHD
18 or autism; is that right?
19    A.   I'm not --
20          MR. SNIDOW:  Sorry.
21    Objection to the form.
22    Mischaracterizes the testimony.
23          THE WITNESS:  Yeah.  I'm
24    not saying that at all.  Not at

8 (Pages 26 - 29)

Page 30

1    all.
2 BY MS. BROWN:
3        Q.    Are you able to offer the
4    opinion that if a woman does not use
5    acetaminophen during pregnancy, she will
6    not have a child with ADHD or autism?
7        A.    So that's a double negative.
8    So if she does not use, she will not
9    have -- no one can say unequivocally,
10    this child will get autism or ADHD, this
11    child will not get autism or ADHD.
12        Q.    You say in this sentence,
13    "Genetic vulnerability also is a factor."
14            What did you mean by that?
15        A.    I believe I just answered
16    that question.
17            You asked me, are there
18    other factors other than acetaminophen
19    that I believe cause autism and ADHD.  I
20    mean, specific to this case, let's talk
21    about ADHD, because that's what we're
22    here to talk about today.
23            And I said, yes, genetics is
24    a factor.

Page 31

1        Q.    And have you -- do you have
2    an opinion on whether genetics -- the
3    percentage of increased risk from
4    genetics versus acetaminophen, do you
5    have an opinion on that?
6            MR. SNIDOW:  Objection to
7        form.
8            THE WITNESS:  I -- I am not
9        offering that opinion.  I think I
10        just answered that question.
11 BY MS. BROWN:
12        Q.    Okay.  If we go to the last
13    page, Dr. Ness.
14            The para -- the third
15    paragraph says, "Ness is concerned that
16    the consensus statement released during
17    the pandemic didn't receive a lot of
18    public attention."
19            Do you see that?
20        A.    Yes.
21        Q.    And then it says, "So now
22    she's taking it upon herself to warn
23    people."
24            Do you see that?

Page 32

1        A.    Yes.
2        Q.    Okay.  But you didn't take
3    it upon yourself to set up this
4    interview, correct?
5            MR. SNIDOW:  Objection to
6        form.
7            THE WITNESS:  Did I not --
8        I'm sorry.  I -- what's the
9        question?
10 BY MS. BROWN:
11        Q.    Sure.
12            You said in this article
13    that you were taking it upon yourself to
14    warn people, correct?
15        A.    I was taking any opportunity
16    offered to -- that asked me questions
17    about acetaminophen and ADHD, to opine as
18    I did in this interview.
19        Q.    And this interview was
20    actually set up by a public relations
21    firm, correct?
22        A.    That is correct.
23        Q.    Okay.  Let's take a look at
24    some of those.

Page 33

1            (Document marked for
2            identification as Ness
3            Exhibit 2.)
4 BY MS. BROWN:
5        Q.    And, Dr. Ness, I'm handing
6    you some e-mails that were produced to us
7    that we've marked as Ness-2.
8        A.    Yes.
9        Q.    And when you have a moment,
10    I'll direct you to Ness 51 to 52 in this
11    packet that we've marked as Exhibit 2.
12        A.    Pages 51 and 52?
13        Q.    Yes.
14        A.    Yes.
15        Q.    All right.  And if we look
16    at the bottom of Ness 51, we see an
17    e-mail to you on Thursday, October 27,
18    2022.
19            Do you see that?
20        A.    Yes.
21        Q.    And it's from Ashley
22    Thompson at Scott Circle.
23            Do you see that?
24        A.    Yes.

9 (Pages 30 - 33)

Page 34

1    Q.   And she writes to you with
2  the opportunity to give the USA Today
3  interview about your assessment of the
4  research.
5        Do you see that?
6    A.   Yes.
7    Q.   And if we turn to the next
8  page, she says, "I think what will
9  resonate with her" -- that is the person
10 interviewing you -- "is your point that
11 there has never been an environmental
12 cause found until now."
13       Do you see that?
14   A.   Yes.
15   Q.   And are you talking about
16 ADHD or autism here?
17   A.   I was talking -- we were
18 talking about, again, the kind of
19 combination of autism and ADHD as this
20 category of neurodevelopmental disorders.
21   Q.   When you were corresponding
22 with Ashley Thompson at Scott Circle, the
23 research that she was referring to was
24 your assessment of whether acetaminophen

Page 35

1  causes neurodevelopment disorders; is
2  that right?
3    A.   That's correct.
4    Q.   And your point was that
5  there had never been an environmental
6  cause of neurodevelopment disorders
7  discovered until now, correct?
8    A.   Correct.
9    Q.   Okay.  Do you believe
10 valproic acid is a cause of autism?
11   A.   I -- my understanding is
12 that is a designation that has been made.
13 Thank you for reminding me of that.
14       Yes, that is correct.
15   Q.   So you do think that
16 valproic acid causes autism?
17   A.   I have not done a full
18 Bradford Hill on valproic acid, but I'm
19 aware that it's labeled as such.  I'm not
20 opining about that particular topic
21 today.
22   Q.   Okay.  This Ashley Thompson
23 from Scott Circle Communications is not
24 the only person on this e-mail, correct?

Page 36

1    A.   Correct.
2    Q.   And you know that Scott
3  Circle Communications was working with
4  plaintiffs' lawyers, filing lawsuits
5  about acetaminophen, correct?
6    A.   I was --
7        MR. SNIDOW:  Objection to
8    the form.
9        THE WITNESS:  I was aware
10   of what -- what Scott Circle was
11   doing, yes.
12 BY MS. BROWN:
13   Q.   What was your understanding
14 of what they were doing?
15   A.   Well, I was asked -- let me
16 go back to the beginning of this.
17       I was asked by an attorney
18 named Russ Abney, who I've known for
19 quite some period of time, to look at the
20 literature on acetaminophen and this
21 topic.  And I agreed to look at that
22 literature and to fully assess it with
23 respect to, you know, looking at the
24 various Bradford Hill components of it.

Page 37

1        And upon fully doing that, I
2  was impressed by the strength and
3  consistency of the data in this regard,
4  as well as the other tenets, and agreed
5  to help this group on their website, the
6  scientific aspects of their website, and
7  also to help to make women aware, to
8  inform women, about what I had learned.
9    Q.   Was Russ Abney a lawyer
10 working with Autism Justice?
11   A.   I do not know, actually, to
12 this day, Russ's exact relationship with
13 them.
14       I simply know that he asked
15 me to take a look at it, and then
16 referred me to Doug Boxer.
17   Q.   Okay.  And Doug Boxer, who
18 is listed on this e-mail, correct?
19   A.   That's correct.
20   Q.   All right.  Your declaration
21 states that you first were approached in
22 a consulting capacity in August of 2022.
23 Is that the time Mr. Abney approached
24 you?

10 (Pages 34 - 37)

Page 38

1    A.   He -- he clearly must have
2 approached me before that, because I took
3 some time to look at the literature very
4 carefully.
5    Q.   Were you compensated for
6 your time in looking at the literature?
7    A.   I was compensated to some
8 degree.  Some of it I did on my own.
9    Q.   Okay.  Well, what portion of
10 it did you do on your own versus what
11 portion did you charge the lawyers for?
12    A.   I'd say I probably did half
13 of it on my own.
14    Q.   Why did you do half of it on
15 your own and charge them for half?
16    A.   Because they indicated that
17 there were a certain number of hours that
18 they were willing to compensate me for,
19 for looking at this literature, and I
20 felt that it was necessary to spend quite
21 a number more hours to fully convince
22 myself and become fully, you know,
23 literate on this topic.
24    Q.   Do you recall what the cap

Page 39

1 on your hours was?
2    A.   I do not.
3    Q.   Okay.  How many hours would
4 you estimate you spent reviewing the
5 literature -- strike that.
6       Before Mr. Abney reached out
7 to you in connection with this
8 litigation, had you reviewed the
9 literature that we're here to discuss
10 today?
11    A.   No, I had not.  In fact, I
12 was distressed at the fact that I was
13 unaware of this link, this very, very
14 consistent, and I -- I want to say
15 incredibly clear link between
16 acetaminophen and ADHD.  And I was --
17 this was really bringing it to my
18 awareness.  And then I was really
19 impressed with the data.
20    Q.   The first time you reviewed
21 the literature regarding acetaminophen
22 and neurodevelopment disorders was when
23 Mr. Abney requested you do that, correct?
24    A.   That is correct.

Page 40

1    Q.   Okay.  So the first time you
2 looked at this literature was in
3 connection with litigation, correct?
4    A.   It was in connection with
5 Russ asking me to take a look at it as a
6 scientist.
7    Q.   And one of the things you
8 told the media, Dr. Ness, is that your
9 initial thought was, this is going to be
10 something like vaccines and autism,
11 correct?
12    A.   I was skeptical when he
13 first approached me, yes.
14    Q.   Why were you skeptical?
15    A.   Because I was unaware of it.
16 I -- I mean, as an expert in women's
17 health, I was not aware of the strength
18 and consistency of the association, and I
19 felt it -- I was disturbed that I, as an
20 expert, had been unaware of it and then
21 realized that women were simply not
22 generally aware of this link.
23    Q.   And twice now you've
24 referenced strength and consistency,

Page 41

1 correct?
2    A.   I -- those are -- I'm only
3 using those as kind of examples of some
4 of Hill's tenets.
5    Q.   Right.  But of course in
6 your report, you find that the strength
7 factor is only partially met here.
8    A.   Is partially met.
9    Q.   Okay.  So you were impressed
10 by the partial meeting of the strength
11 factor?
12       MR. SNIDOW:  Objection to
13       form.  That's not what she
14       testified.
15       THE WITNESS:  In my report,
16       I'm clear about the fact that I
17       am being very conservative in my
18       assessment of strength of
19       association.
20       The strength of association
21       is -- has been called by Ricci,
22       who did a meta-analysis, really
23       the only meta-analysis that I
24       reference here under Hill's

11 (Pages 38 - 41)

Page 42

1　　tenets.  He called it something
2　　like mild to moderate or
3　　something.  And so on the basis
4　　of that, I am -- I deemed it to
5　　be only partially met.
6　　　　But -- or and -- if you
7　　look at other aspects of
8　　strength, for instance, longer
9　　duration use, higher dose of use,
10　　or more trimesters of use, one
11　　finds it to be, I would say,
12　　moderate to on the stronger side
13　　because, using those quantitative
14　　estimates, it then becomes in the
15　　range that -- of two or more, in
16　　many cases.
17　BY MS. BROWN:
18　　Q.　Your report says strength is
19　partially met.
20　　A.　I did.
21　　Q.　You -- you actually think it
22　is, the strength is met?
23　　A.　I'm saying --
24　　　　MR. SNIDOW:  Objection to

Page 43

1　　form -- hold on.  Hold on,
2　　Dr. Ness.  I have to object.
3　　　　Objection to form.
4　　　　THE WITNESS:  I'm saying
5　　it's partially met using very
6　　conservative judgment.
7　BY MS. BROWN:
8　　Q.　The other folks who are on
9　this e-mail are from something called
10　Perfected Claims.
11　　　　Do you know what that is?
12　　A.　I do not.
13　　Q.　There are two individuals
14　from a company called
15　Perfectedclaims.com.  Do you have any
16　idea why they would be copied on an
17　e-mail with you and the PR folks?
18　　A.　I had not looked carefully
19　at who was copied on that e-mail.  I
20　don't know who those people are.
21　　Q.　Okay.  When you responded to
22　the PR employee Ashley Thompson, you said
23　you'd be delighted to do the USA Today
24　interview, correct?

Page 44

1　　A.　Correct.
2　　Q.　Okay.  And you responded not
3　just to Ashley but also to the lawyer
4　Douglas Boxer, correct?
5　　A.　I'm sorry.  Where are you
6　looking, please?
7　　Q.　That same e-mail, right
8　above that e-mail we had been looking at,
9　is your response, on Ness 51.
10　　A.　You're looking on Page 51.
11　Oh, I would be -- yeah.  I just -- you
12　know, I hit respond to all.
13　　Q.　Did you ever come to learn
14　who the individuals you were responding
15　to at something called Perfected Claims
16　were?
17　　A.　I don't know who those -- I
18　just said that I don't know who those
19　folks are.
20　　Q.　Right.  But my question was
21　did you ever come to learn who they were?
22　　A.　No.
23　　Q.　One of the -- what Scott
24　Circle and what you were working together

Page 45

1　to do was to help acquire plaintiffs in
2　this lawsuit, correct?
3　　　　MR. SNIDOW:  Objection to
4　　form.
5　　　　THE WITNESS:  I was helping
6　　them to ensure that the
7　　scientific quality of their
8　　website was high and that I
9　　brought accurate scientific
10　　information to the public.
11　　That's what I was doing.
12　BY MS. BROWN:
13　　Q.　Let's look at Page 38,
14　please, Dr. Ness.  And it actually starts
15　on the very bottom of 37.  It's an e-mail
16　from Douglas Boxer on October 11, 2022.
17　　　　Do you see that?
18　　A.　Yes.
19　　Q.　All right.  And he was the
20　lawyer who Russ Abney put you in touch
21　with; is that right?
22　　A.　That is correct.
23　　Q.　All right.  And had you ever
24　met him before?

12 (Pages 42 - 45)

1     A.   Prior to Russ's introduction
2 to me?
3     Q.   Yes.
4     A.   No.
5     Q.   Okay.  Who did you submit
6 your invoices to for the work that you
7 did reviewing the literature?
8     A.   Douglas Boxer.
9     Q.   Okay.  Did you, after
10 Mr. Abney made the request of to you look
11 at the literature, did you have any more
12 dealings with him?
13     A.   No.
14     Q.   What was his instruction,
15 other than look at the literature?  Did
16 he give you any other instructions?
17        MR. SNIDOW:  Are you
18    talking about Russ Abney?
19        MS. BROWN:  Yes.
20        THE WITNESS:  Not that I
21    recall at this time, no.
22 BY MS. BROWN:
23     Q.   Okay.  And when you then
24 contacted -- did you contact the lawyer

1 Douglas Boxer?
2     A.   I really don't recall who
3 contacted who, when.  No, I don't.
4     Q.   Did you discuss what your
5 rate would be with Douglas Boxer?
6     A.   Yes.
7     Q.   Okay.  And we can take a
8 look at some of the summaries we've seen
9 of that work.  It looked to me like it
10 was $500 an hour.
11        Does that sound right?
12     A.   I -- I don't recall at that
13 time.
14     Q.   Did Mr. Boxer have a similar
15 cap on the number of hours you were to
16 spend looking at the literature that
17 Mr. Abney had?
18     A.   No.  I think you're
19 misunderstanding.  Russ was not paying me
20 initially to look at the literature.
21        I -- he asked me to look at
22 the literature, and there was some
23 interaction with Douglas Boxer around my
24 compensation.

1        I really don't recall all of
2 the details of this.  I mean, you're
3 asking about very specific things that I
4 just don't recall exactly.
5     Q.   Did you sign an engagement
6 letter with Mr. Abney or Mr. Boxer?
7     A.   At some point I did.
8     Q.   Okay.  Do you have that
9 engagement letter?
10     A.   I don't.
11     Q.   Okay.  Why not?
12     A.   I don't keep any of this.  I
13 mean, other than -- I guess I kept the
14 e-mails, but that was even a surprise to
15 me.  I usually delete everything.
16     Q.   Let's take a look at this
17 e-mail from Douglas Boxer to you and
18 Ashley Thompson.
19        This is cc'ing Michael
20 Meadows and Christian Archer.
21        Do you know who those people
22 are?
23     A.   I -- generally.
24     Q.   Who are they?

1     A.   Good question.
2        MR. SNIDOW:  Don't guess,
3    Dr. Ness.  She does not want you
4    to, either.  If you don't know --
5        THE WITNESS:  Yeah, I
6    really don't.
7 BY MS. BROWN:
8     Q.   Are they lawyers?
9     A.   I don't recall.
10     Q.   Okay.  Douglas Boxer, the
11 lawyer, says, "Ashley Thompson, please
12 meet Dr. Roberta Ness, and vice versa."
13        Do you see that?  It's the
14 very first sentence in that e-mail we're
15 looking at, at the top of the page.
16     A.   Oh, okay.  And I'm sorry.
17 Who wrote the e-mail?
18     Q.   This is the e-mail we're
19 looking at from Douglas Boxer, right?
20     A.   Oh, yes.  Mm-hmm.  Right.
21     Q.   All right.  And Douglas
22 Boxer, he is the lawyer who is paying you
23 to look at the studies, right?
24     A.   In part, yes.

1    Q.   Okay.  "Ashley, we've
2  discussed Roberta many times, and I'm
3  glad to finally be able to make this
4  introduction."
5         Do you see that?
6    A.   Yes.
7    Q.   "Roberta has joined our team
8  to help with our acquisition strategy.
9  She has a limited and concise scope of
10 work in this aspect of the litigation."
11        Do you see that?
12   A.   Yes.
13   Q.   And you understood that part
14 of your role was to help lawyers suing
15 companies like ours, acquire plaintiffs
16 to bring lawsuits, right?
17        MR. SNIDOW:  Objection --
18 objection to the form.
19        That's not what she
20 testified.
21        THE WITNESS:  I would
22 underline, "Roberta has joined
23 our team to help with our
24 acquisition strategy.  She has a

1     limited and concise scope of
2     work."
3         The limited and concise
4     scope of work that I just
5     delineated several times was a
6     scientific one, to ensure the
7     accuracy of the information
8     brought to the public.
9  BY MS. BROWN:
10   Q.   But this e-mail doesn't say
11 that at all.
12        MR. SNIDOW:  Objection to
13 the form.
14        THE WITNESS:  I don't
15 understand your question.
16 BY MS. BROWN:
17   Q.   What this e-mail says is
18 that you "had joined the team to help
19 with our acquisition strategy," correct?
20   A.   I --
21        MR. SNIDOW:  Objection --
22 Roberta, hold on.
23        Objection to form.  Asked
24 and answered.

1         THE WITNESS:  It's -- I
2     just answered it.  "She has a
3     limited and concise scope of
4     work."
5  BY MS. BROWN:
6    Q.   And the rest of that
7  sentence says, "She has a limited and
8  concise scope of work in this aspect of
9  the litigation."
10        Do you see that?
11        MR. SNIDOW:  Objection to
12 the form.
13        THE WITNESS:  I see what
14 you're asking --
15        MR. SNIDOW:  Hold on.  Hold
16 on.  Hold on, Dr. Ness.
17        Objection to form.  Asked
18 and answered now a few times.
19        Ali, the document speaks for
20 itself.
21 BY MS. BROWN:
22   Q.   The rest of that sentence
23 says, "She has limited and concise scope
24 of work in this aspect of the

1  litigation," correct?
2         MR. SNIDOW:  Objection to
3     the form.  Asked and answered now
4     four times.
5         You can answer again.
6         THE WITNESS:  I have
7     answered that question.
8  BY MS. BROWN:
9    Q.   But I don't think you have.
10        That was the rest of the
11 sentence, correct?
12   A.   I have answered your
13 question.
14   Q.   Ma'am, I need you to answer
15 yes or no.
16        MR. SNIDOW:  Objection to
17 form.
18        Dr. Ness, you don't have to
19 answer yes or no --
20        THE WITNESS:  I am not
21 answering yes or no --
22        MR. SNIDOW:  Hold on.  Hold
23 on.  Hold on.
24        Just for the record,

Page 54

1    Dr. Ness, if you need to give a
2    full answer, you're entitled to.
3        Ali, if you want to ask it
4    again, go for it, but this has
5    been asked and answered a few
6    times.
7        MS. BROWN:  Well, it
8    hasn't.
9 BY MS. BROWN:
10    Q.   And here is what we're
11 talking about, Dr. Ness.  This e-mail
12 describes your limited and concise scope
13 of work, correct?
14    A.   That is what the e-mail
15 says, yes.
16    Q.   And the e-mail says that you
17 had joined the team to help acquire
18 plaintiffs in litigation, correct?
19        MR. SNIDOW:  Objection to
20    the form.  It's not what it says.
21        THE WITNESS:  That is not
22    what it says.
23 BY MS. BROWN:
24    Q.   That's part of what you were

Page 55

1 hired to do, correct, Dr. Ness?
2        MR. SNIDOW:  Objection to
3    the form.  Asked and answered now
4    up to six times, Ali.
5        I mean, at some point
6    you've got to move on.
7        THE WITNESS:  I've answered
8    your question.
9 BY MS. BROWN:
10    Q.   You have not.
11        Part of what Douglas Boxer
12 hired you to do was to help him and other
13 lawyers acquire plaintiffs in litigation,
14 correct?
15        MR. SNIDOW:  Objection to
16    form.  She's told you that's not
17    true.  She's explained what her
18    role is --
19        MS. BROWN:  Well, then she
20    should say that's not true.
21        MR. SNIDOW:  She has.
22        MS. BROWN:  She hasn't
23    answered it.  So it's -- we need
24    an answer, and then I'll

Page 56

1    follow up.
2        MR. SNIDOW:  She absolutely
3    has answered.
4        Dr. Ness, if you'd like to
5    repeat your answer, go for it.
6        THE WITNESS:  I have
7    answered.  I have said I have a
8    limited and concise scope of
9    work, and I defined that for you.
10 BY MS. BROWN:
11    Q.   Is it your testimony that
12 despite the fact that Douglas Boxer said
13 you had joined the team to help with
14 their acquisition strategy, part of your
15 role was not to help lawyers acquire
16 plaintiffs in litigation?
17        MR. SNIDOW:  Objection to
18    form.  Asked and answered.
19    She's --
20        THE WITNESS:  My --
21        MR. SNIDOW:  Hold on,
22    Dr. Ness.  I've got to get the
23    objection.
24        THE WITNESS:  Sorry.

Page 57

1        MR. SNIDOW:  Objection to
2    form.  Asked and answered.
3        She's explained exactly
4    what her role was; now I don't
5    know if we're up to seven or
6    eight times.
7        You can answer, Dr. Ness.
8        THE WITNESS:  I've answered
9    the question.
10 BY MS. BROWN:
11    Q.   Okay.  But you haven't.
12        MS. BROWN:  And the
13    objections, truthfully, are
14    improper.  You know, per the
15    court order, that it's objection
16    to form --
17        MR. SNIDOW:  And I've done
18    that --
19        MS. BROWN:  No, no.  Hold
20    on.  Hold on.  Please.  You're
21    interrupting me.  You're
22    interrupting me.
23        MR. SNIDOW:  Well, I --
24        MS. BROWN:  Dr. Ness has

15 (Pages 54 - 57)

Page 58

1  not answered the question. I'm
2  being very patient. If her
3  testimony is the words on the
4  page do not reflect what I did,
5  then that should be the answer.
6  But a witness cannot decide not
7  to answer the question. And we
8  -- none of us want to come back
9  here and do this again.
10      So we need to get a simple
11  answer to the question that I can
12  follow up on, and then we can
13  continue moving through the
14  e-mails.
15      MR. SNIDOW: Hold on. You
16  give a speech, I have to now too.
17  You know how it works.
18      Dr. Ness has answered the
19  question. You asked her whether
20  she helped with acquisition
21  strategy. She explained what
22  that meant, namely that her
23  limited role was to make sure the
24  science was accurate. She's

Page 59

1  given you that answer a few
2  times.
3      If you'd like to ask her
4  again, though, Ali, it's your
5  dep. Go for it.
6      MS. BROWN: Well, I would
7  like an answer, okay? Because
8  "I've already answered the
9  question" is not an answer.
10 BY MS. BROWN:
11    Q.  Dr. Ness, is it your
12  testimony that despite Douglas Boxer's
13  e-mail, that you had joined the team to
14  help with their acquisition strategy, you
15  were not involved in helping the lawyers
16  to acquire plaintiffs in litigation?
17      MR. SNIDOW: Objection.
18  Asked and answered.
19      You can answer, Dr. Ness.
20      THE WITNESS: I was
21  involved very specifically in the
22  limited and concise scope of work
23  of bringing science to their
24  website and to the public.

Page 60

1 BY MS. BROWN:
2    Q.  What you say in that
3  New York -- USA Today article, on the
4  last page we had been looking at, was,
5  "She said it wasn't easy to decide" --
6      MR. SNIDOW: Sorry. Are
7  you back on Exhibit 1?
8      MS. BROWN: Mm-hmm.
9      MR. SNIDOW: Where?
10      MS. BROWN: Last page.
11 BY MS. BROWN:
12    Q.  "She said it wasn't easy to
13  decide as a scientist to come out as an
14  advocate."
15      Do you see that?
16    A.  Yes.
17    Q.  Okay. And you were
18  advocating in this article for the
19  plaintiffs' lawyer who was paying you to
20  look at this literature, correct?
21      MR. SNIDOW: Objection to
22  form.
23      That's not what she
24  testified to.

Page 61

1      THE WITNESS: I'm sorry.
2  What was the question?
3 BY MS. BROWN:
4    Q.  Sure.
5      You wrote -- and as you said
6  in this article, that you were an
7  advocate, correct?
8    A.  I said -- I indicated that I
9  was bringing the information to the
10  public, which many people define as being
11  an advocate.
12      I don't personally define
13  bringing information to the public as
14  being an advocate. I personally define
15  that as being a public health expert, but
16  I know that others use that terminology.
17    Q.  And what the article said is
18  "she" -- that's you, right, Dr. Ness?
19    A.  Correct.
20    Q.  -- "said it wasn't easy to
21  decide as a scientist to come out as an
22  advocate."
23      That's what the article
24  says, correct?

16 (Pages 58 - 61)

1        MR. SNIDOW:  Objection to
2    form.  Asked and answered.
3        THE WITNESS:  I would note
4    that this was not a quote from
5    me.  This was the reporter's
6    assessment of the situation.
7        And as I said, I personally
8    do not consider bringing
9    information to the public to be
10    anything other than my role as a
11    public health expert.
12        I believe that part of the
13    role of a public health expert is
14    to bring information,
15    scientifically sound information,
16    to the public.
17  BY MS. BROWN:
18    Q.   What did you mean, "It
19  wasn't easy to decide as a scientist to
20  come out as an advocate"?
21    A.   It was not easy to decide to
22  make this information -- let me -- let
23  me -- let me see how to phrase this.
24        As a scientist, we typically

1  talk to other scientists.  In this
2  particular case, I was aware that I was
3  talking to the public.  And for me to
4  make that decision to bring this
5  information to the public, I needed to be
6  convinced that it met the causal --
7  Bradford Hill's causal tenets.
8    Q.   And at this point when you
9  made these statements in the fall of
10  2022, you had done, in your head, a
11  Bradford Hill analysis regarding
12  acetaminophen and neurodevelopment
13  disorders, correct?
14        MR. SNIDOW:  Objection to
15    form.
16        You already asked her this.
17    She said yes.
18        You can say it again.
19        THE WITNESS:  I said yes.
20    Yes.
21  BY MS. BROWN:
22    Q.   And you had not done a
23  Bradford Hill analysis in the fall of
24  2022 regarding acetaminophen and autism,

1  correct?
2    A.   Not --
3        MR. SNIDOW:  Objection to
4    form.  Asked and answered -- give
5    me a second, Dr. Ness.
6        Asked and answered.
7        THE WITNESS:  Not
8    separately.
9  BY MS. BROWN:
10    Q.   And you had not done a
11  Bradford Hill analysis for autism and
12  ADHD in the fall of 2022?
13    A.   I don't understand this
14  question.
15    Q.   All right.  You hadn't
16  done -- your Bradford Hill analysis that
17  informed the statements that you made in
18  this USA Today article was a Bradford
19  Hill analysis of acetaminophen and
20  neurodevelopment disorders, correct?
21    A.   You know, the -- the report
22  that we're talking about today -- let's
23  stick to the report we are talking about
24  today.  And the report that we are

1  talking about today is about
2  acetaminophen and ADHD, and that's what
3  I'm prepared to discuss today.
4        Acetaminophen and ADHD as a
5    causal --
6    Q.   Right.  But I get to ask the
7  questions today, and I get to ask you
8  questions about public statements you've
9  made about these issues.
10        And so my question is not
11  yet about the report, which I promise you
12  we're going to get to.  It is about the
13  causation statements you made to the
14  world in the fall of 2022.
15        And the causation statements
16  you made to the world in the fall of 2022
17  were informed by a Bradford Hill analysis
18  of acetaminophen and neurodevelopment
19  disorders, correct?
20        MR. SNIDOW:  Objection to
21    the form.  Object to the
22    preamble.
23        Dr. Ness, if you understand
24    the question, you can answer it.

17 (Pages 62 - 65)

Page 66

1      THE WITNESS: I -- I
2  answered that question. You've
3  asked me that question so many
4  different ways, and I have
5  answered it again and again.
6  BY MS. BROWN:
7      Q.   Right. And the answer is
8  yes?
9          MR. SNIDOW: Objection to
10     form.
11         You're going to have to
12     restate it if you want "yes" on
13     that, Ali.
14  BY MS. BROWN:
15     Q.   In the fall of 2022 you had
16  not done a Bradford Hill analysis looking
17  specifically at acetaminophen and ADHD,
18  correct?
19     A.   I said I had done a Bradford
20  Hill analysis looking at acetaminophen
21  and ADHD.
22     Q.   In the fall of 2022?
23     A.   I said I had done a Bradford
24  Hill analysis looking at the combination

Page 67

1  of ADHD and autism dominated by ADHD,
2  which is where most of the studies are.
3      Q.   Those are two --
4      A.   I had -- I had done, in my
5  head, a full Bradford Hill analysis of
6  acetaminophen and ADHD.
7      Q.   And that analysis involved
8  other neurodevelopment disorders,
9  correct?
10     A.   Informed -- informed, yes.
11     Q.   Okay. You understand what
12  I'm asking you about. Maybe --
13         MR. SNIDOW: Objection to
14     the preamble.
15         MS. BROWN: Strike -- let
16     me -- let me rephrase.
17  BY MS. BROWN:
18     Q.   In the fall of 2022, you had
19  not done a Bradford Hill analysis that
20  was limited to ADHD and acetaminophen,
21  correct?
22         MR. SNIDOW: Objection to
23     form. This has been asked and
24     answered so many times.

Page 68

1          MS. BROWN: Please stop.
2  Please stop.
3          MR. SNIDOW: So many.
4          MS. BROWN: It's my seven
5  hours, and all you get to do is
6  say form.
7          MR. SNIDOW: Fair point.
8  If you want to spend time on
9  this, go for it.
10         THE WITNESS: Can you ask
11     again, please.
12  BY MS. BROWN:
13     Q.   Yes.
14         In the fall of 2022, you had
15  not done a Bradford Hill analysis that
16  looked only at acetaminophen and ADHD,
17  correct?
18     A.   I said I had done a Bradford
19  Hill analysis that had looked at the
20  combination of the two dominated by ADHD.
21     Q.   And you were paid by Douglas
22  Boxer to do that analysis, correct?
23         MR. SNIDOW: Objection to
24     form. Asked and answered.

Page 69

1          THE WITNESS: I started to
2  do that on the basis of Russ
3  Abney's query, and I -- and
4  ultimately -- and I don't recall,
5  as I said, the timeline, you
6  know, who did what when; but,
7  ultimately, I was compensated for
8  part of the time that I was
9  looking at that literature.
10  BY MS. BROWN:
11     Q.   And you were also
12  compensated for the time that you gave
13  interviews, like the USA Today interview,
14  correct?
15     A.   I was compensated for that
16  time, yes.
17     Q.   And were you compensated by
18  Douglas Boxer or by Autism Justice?
19     A.   All of my invoices went to
20  Douglas Boxer.
21     Q.   Okay. And that would have
22  included work for media appearances as
23  well as a review of the literature?
24     A.   Those were different

Page 70

1 invoice -- or, yeah. I mean different
2 invoices, but I was compensated for
3 both -- both things.
4      Q.   So in your declaration,
5 Dr. Ness, you tell us that you were
6 originally contacted by plaintiffs in
7 litigation for a consulting role in
8 approximately August of 2022.
9          Do you recall that?
10     A.   As I said, I -- what I told
11 you is I do not recall the exact timing.
12     Q.   Okay. Let's just look at
13 your declaration then.
14         MS. BROWN: Do you know
15     what number the declaration is?
16 BY MS. BROWN:
17     Q.   Just one second while we get
18 the exhibit.
19         (Document marked for
20     identification as Ness
21     Exhibit 3.)
22 BY MS. BROWN:
23     Q.   Dr. Ness, I'm handing you
24 what we've marked as exhibit -- Ness

Page 71

1 Exhibit 3.
2          And this is a declaration
3 that you signed in July of 2023.
4          Do you see that?
5     A.   Yes.
6     Q.   And what you say in
7 Paragraph 3 is that you were first
8 contacted by plaintiff's counsel
9 regarding acetaminophen and
10 neurodevelopment disorders in August of
11 2022.
12         Do you see that?
13    A.   Yes.
14    Q.   And that was the original
15 contact you described from Mr. Abney,
16 correct?
17        MR. SNIDOW: Dr. Ness,
18    don't guess.
19        THE WITNESS: I don't
20    recall. I don't recall.
21 BY MS. BROWN:
22    Q.   Okay. You don't know who
23 the plaintiff's counsel was that you're
24 describing in Paragraph 3?

Page 72

1     A.   I do not.
2     Q.   How were you able to swear
3 that you were contacted in August of 2022
4 if you don't know who contacted you?
5         MR. SNIDOW: That was a
6     year ago.
7         THE WITNESS: I -- as I
8     said several times, I just don't
9     recall who did what when.
10 BY MS. BROWN:
11    Q.   Are you certain you were
12 contacted in August of 2022?
13        MR. SNIDOW: Objection to
14    form.
15        Dr. Ness, this isn't a
16    memory test. So, you know, if
17    you do remember, obviously, tell
18    her, but please don't guess. She
19    doesn't want you to guess --
20        MS. BROWN: Counsel,
21    please.
22        THE WITNESS: I don't.
23    I -- as I said, I just don't
24    remember the exact timeline at

Page 73

1     this time.
2 BY MS. BROWN:
3     Q.   Okay.
4     A.   I don't remember the exact
5 timeline at this time.
6     Q.   When you put together this
7 declaration, did you refer to any
8 documents that would have allowed you to
9 swear that what you said in Paragraph 3
10 was accurate?
11        MR. SNIDOW: Object to the
12    form.
13        THE WITNESS: I cannot
14    opine about a document that I
15    signed in July of 2023, as that
16    is almost a year ago.
17        I just don't recall.
18 BY MS. BROWN:
19    Q.   And what you say in
20 Paragraph 3, in addition to being
21 contacted by plaintiffs' counsel
22 regarding acetaminophen and
23 neurodevelopment disorders, you had also
24 been retained by an individual law firm

19 (Pages 70 - 73)

Page 74

1 working on the acetaminophen litigation.
2        Do you see that?
3        MR. SNIDOW: Where are you?
4        MS. BROWN: It's the next
5 sentence in Paragraph 3.
6        MR. SNIDOW: Okay.
7        THE WITNESS: I see that.
8 BY MS. BROWN:
9    Q.   Okay. "But I have not been
10 disclosed as a testifying witness, and
11 the law firm has instructed me to
12 maintain confidentiality."
13       Do you see that?
14   A.   Yes.
15   Q.   What's the law firm?
16   A.   Again, I -- I'm apologetic,
17 but I don't remember exactly who did what
18 when. I don't even remember this
19 delineation that I'm making. I don't
20 recall who was involved in which aspects
21 of what.
22       I -- as I told you, what I
23 do recall is that Russ contacted me and
24 put me into contact with Douglas Boxer.

Page 75

1    Q.   What other lawyers do you
2 recall working with during this time
3 period?
4        MR. SNIDOW: Objection to
5        form.
6        And, Ali, I'm going to
7        assert our privilege objection
8        that we had some
9        correspondence --
10       MS. BROWN: Oh, I can
11       rephrase.
12       MR. SNIDOW: Yeah.
13 BY MS. BROWN:
14   Q.   Here is what I'm interested
15 in understanding, Dr. Ness, is who were
16 you submitting your invoices to at this
17 time.
18       And so in Paragraph 3, you
19 have identified two different plaintiffs'
20 lawyers, and I understand you don't
21 remember who they are, but are you with
22 me so far?
23   A.   Yes.
24   Q.   Okay. Did you submit

Page 76

1 separate invoices during this consulting
2 period?
3    A.   No. All my invoices went to
4 Douglas Boxer.
5    Q.   Okay. And to the extent you
6 had a retainer agreement, that would have
7 been with Mr. Boxer?
8    A.   I don't recall who signed
9 the retainer agreement, but it was
10 negotiated with Mr. Boxer.
11   Q.   Okay. And is that -- is the
12 retainer agreement different than the
13 engagement letter or do you consider that
14 to be the same?
15       MR. SNIDOW: Objection to
16       form.
17       THE WITNESS: I don't even
18       understand the distinction.
19 BY MS. BROWN:
20   Q.   So some experts require a
21 retainer, money upfront, before they
22 start doing work.
23   A.   Oh.
24   Q.   Did you do that?

Page 77

1    A.   No.
2    Q.   Okay. But you do recall
3 signing some kind of a document with
4 Mr. Boxer?
5        MR. SNIDOW: Do you want to
6        clarify when, Ali? I'm lost.
7        MS. BROWN: Sure.
8 BY MS. BROWN:
9    Q.   You do recall signing some
10 kind of an engagement letter with
11 Mr. Boxer in the fall or summer of 2022?
12   A.   I signed -- as I said, I
13 don't recall who countersigned it, but I
14 know that my contact was Mr. Boxer.
15   Q.   Okay. Does Mr. -- is
16 Mr. Boxer affiliated with Autism Justice?
17   A.   He introduced me, as you
18 saw, to Ashley Thompson -- or Thomas,
19 Thompson.
20   Q.   Okay.
21   A.   Is it Thomas or Thompson?
22   Q.   And do you understand Ashley
23 Thompson --
24   A.   Thompson.

20 (Pages 74 - 77)

1    Q.    -- to be working for a
2 public relations law firm -- or public
3 relations firm?
4    A.    I was aware of that.
5    Q.    Okay.  And what
6 connection -- and the public relations
7 law firm was working for Autism Justice;
8 is that right?
9    A.    That was -- I believe that's
10 true, yes.
11    Q.    What is Autism Justice?
12    A.    It's -- as I understand
13 it -- I mean, as I understood it, it's a
14 website bringing information to -- to
15 women.
16    Q.    Did you review the website
17 before agreeing to work with Autism
18 Justice?
19    A.    I did not.
20    Q.    What was your understanding
21 of who was responsible for the
22 information on the website?
23    A.    I mean, again, my contact
24 was Douglas Boxer.

1        Douglas Boxer ultimately --
2 after I had reviewed the literature and
3 come to my own conclusion, I was asked to
4 look at the website, at the scientific
5 accuracy of the website.
6    Q.    Okay.
7    A.    But, yes, I had not seen it
8 prior to that.
9    Q.    Did -- did you have a
10 separate engagement with Autism Justice?
11    A.    I am telling you, my contact
12 was Douglas Boxer.
13    Q.    Okay.  Because if you look
14 at Paragraph 4 of your declaration, it
15 says, "I was separately retained by
16 Autism Justice to provide limited
17 editorial assistance regarding the
18 contents of its website, to ensure it was
19 scientifically accurate."
20        Do you see that?
21    A.    Yes.  Correct.
22    Q.    Okay.  So is it correct that
23 there was a separate retention with
24 Autism Justice?

1    A.    No.  I'm telling you,
2 Douglas Boxer was my contact, period.
3    Q.    So --
4    A.    And I was aware that he was
5 working with Autism Justice.
6    Q.    Okay.  Did you know that
7 Autism Justice had a way for people to
8 fill out information to join a lawsuit
9 involving acetaminophen?
10    A.    I did not.  I was not
11 involved in that.
12    Q.    Yeah.  I understand you
13 weren't involved in it.
14        Were you aware that this was
15 a feature of the Autism Justice website?
16    A.    I was paying attention to
17 the science, and I don't recall -- I
18 actually don't recall that.  I just was
19 paying attention to the science.
20        So I looked at the
21 literature and looked at what they were
22 posting with regard to literature.
23        (Document marked for
24        identification as Ness

1    Exhibit 4.)
2 BY MS. BROWN:
3    Q.    This is -- I'm marking as
4 Exhibit 4 a letter that we received
5 regarding your -- a summary of your
6 consulting invoices.
7        And if you just turn to the
8 second page, Dr. Ness, I want to talk to
9 you about the chart that's contained
10 there.
11    A.    Yes.
12    Q.    The representations that
13 were made to us by Keller -- folks at
14 Keller Postman were that you billed
15 73 hours from September to October of
16 2022.
17        Do you see that?
18    A.    I see that.
19    Q.    Okay.  And so that would
20 have included the time you spent
21 reviewing the literature you described,
22 correct?
23    A.    That's correct.
24    Q.    And that would have included

21 (Pages 78 - 81)

Page 82

1 the Bradford Hill analysis that you did
2 in your head, correct?
3     A.   Correct.
4     Q.   Okay.  And that would have
5 been the work that you did that informed
6 statements like you made to the public
7 that we looked at in the USA Today
8 article, correct?
9     A.   That's correct.
10    Q.   And then in December, you
11 billed seven hours, correct?
12    A.   I see that.
13    Q.   And then you had much more
14 to do between February and March; you
15 billed 322 hours, correct?
16    A.   Correct.
17    Q.   Okay.  And then 55 in April,
18 10 in June, and 28 in July, correct?
19    A.   I see that.
20    Q.   Okay.  And if you do the
21 math, it works out to $500 an hour.
22        Is that your normal rate?
23    A.   Actually, my normal rate is
24 $600 an hour.

Page 83

1     Q.   Do you know why you were
2 charging $500 an hour in this work?
3     A.   I really don't recall.  As I
4 recall, that was the compensation that
5 was negotiated.
6     Q.   When you say negotiated, did
7 you negotiate it?
8     A.   I believe -- yeah, I
9 negotiated it with -- with Douglas Boxer,
10 yes.
11    Q.   Did you propose a higher
12 rate to begin with?
13    A.   I really don't recall.  I do
14 recall that after I had started reviewing
15 the evidence, I was very impressed with
16 the causal hypothesis, with the evidence
17 of cause, and I was very impressed.
18        And I was, as a -- as a
19 public health person, I was wanting to
20 make others aware of this newfound
21 information that I had -- that I had
22 learned and studied.
23    Q.   And the way you did that was
24 through your work with the plaintiffs'

Page 84

1 lawyers, correct?
2     A.   Through my work through
3 Douglas Boxer.
4     Q.   Who is a plaintiffs' lawyer,
5 right?
6     A.   My understanding was that he
7 was involved with Autism Justice and
8 involved -- I -- I really don't know his
9 scope.  That's for him to tell you.
10    Q.   You said there came a time
11 when you became impressed with the
12 literature, correct?
13    A.   Correct.
14    Q.   When you became impressed
15 with the literature, did you reach out to
16 the FDA to share your analysis?
17    A.   I did not.
18    Q.   When you became impressed
19 with the literature, did you reach out to
20 any public health authority to share your
21 analysis?
22    A.   I reached out to the public,
23 and the public is who needs to be aware.
24    Q.   That wasn't my question.

Page 85

1        When you became impressed
2 with the literature, did you reach out to
3 any public health authority to share your
4 assessment of the literature?
5        MR. SNIDOW:  Objection to
6     form.  Object to the preamble,
7     "when you became impressed."
8     Asked and answered.
9        THE WITNESS:  I became
10    impressed.  And my role, I
11    believe, as a public health
12    representative, is to allow women
13    to make an informed choice for
14    themselves.
15 BY MS. BROWN:
16    Q.   And the way you did that was
17 by working with the folks running Autism
18 Justice, correct?
19        MR. SNIDOW:  Objection to
20    form.  Asked and answered many,
21    many, many times now.
22        THE WITNESS:  I did that by
23    my willingness to speak out to
24    the media.

22 (Pages 82 - 85)

1 BY MS. BROWN:
2    Q.   When you spoke out to the
3 media in the USA Today article, you did
4 not disclose that you were being paid for
5 this interview, correct?
6         MR. SNIDOW:  Objection to
7    form.
8         THE WITNESS:  I -- I
9    actually specifically asked that
10   that be disclosed.  I am not
11   responsible for how they reported
12   the story, but I did ask for that
13   to be disclosed.
14 BY MS. BROWN:
15   Q.   And who'd you ask?
16   A.   Douglas Boxer.
17   Q.   And how come we don't have
18 that e-mail?
19        MR. SNIDOW:  Objection to
20   form.  Calls for speculation.
21        THE WITNESS:  I believe it
22   was a phone call.
23 BY MS. BROWN:
24   Q.   Okay.  Well, when the USA

1 article came out and you saw that your
2 payment by plaintiffs' lawyers was not
3 disclosed, did you take any action to
4 correct it?
5    A.   Actually, I did.  I asked
6 Douglas Boxer to please -- you know, to
7 please be in touch with the interviewer
8 and make absolutely sure that they knew
9 that.  Because I had disclosed it and it
10 was not reported.
11        And I was -- I -- I was
12 aware of it, and I wished that it had
13 been disclosed at the time that she wrote
14 it.  I don't know why she didn't include
15 it.
16   Q.   And other than reaching out
17 to Douglas Boxer, did you reach out to
18 USA Today regarding your concern that
19 they had published an article that did
20 not include your conflict?
21        MR. SNIDOW:  Objection to
22   form.
23        She doesn't have a
24   conflict.  She already told you

1    -- she's -- she's explained
2    this --
3         MS. BROWN:  Okay.  It's
4    objection to form.  Thank you.
5         MR. SNIDOW:  Okay.
6    Objection to form.
7         THE WITNESS:  I told you
8    what I did.  I reached out to
9    Douglas Boxer, who was in
10   contact, I guess, with USA Today,
11   whoever set up the interview, and
12   let them know that this
13   information had not been in the
14   article.
15 BY MS. BROWN:
16   Q.   Okay.  And did any of these
17 reach-outs to Mr. Boxer take place over
18 e-mail?
19   A.   We'd have to go through all
20 the e-mails.  I mean, you've seen them.
21 I can't answer that question without
22 looking through all the e-mails.
23   Q.   Okay.  And I'll represent to
24 you I looked through all of them, and

1 there's no reference to what you're
2 testifying to.
3         MR. SNIDOW:  Objection.
4    This is not a question.
5 BY MS. BROWN:
6    Q.   So do you have a
7 recollection of e-mailing about this?
8         MR. SNIDOW:  Objection to
9    form.
10        She already told you --
11        THE WITNESS:  I would have
12   to look through --
13        MS. BROWN:  You have to
14   stop.
15        THE WITNESS:  Can we read
16   through -- do you want to read
17   through all the e-mails --
18 BY MS. BROWN:
19   Q.   No, I don't.
20   A.   -- that's how we can spend
21 our time.
22   Q.   We're not going to do that.
23        Do you have a recollection
24 of e-mailing, is the question.

23 (Pages 86 - 89)

Page 90

1  MR. SNIDOW: If you're not
2  going to -- if you're not going
3  to do that --
4  MS. BROWN: Counsel,
5  Counsel, Counsel --
6  MR. SNIDOW: -- then I'm
7  not going to let you make
8  representations to her and then
9  not ask the question --
10  MS. BROWN: Counsel, I will
11  make a representation to you and
12  to anybody else and to the court
13  that there is not an e-mail that
14  was produced to us that documents
15  what Dr. Ness testified to.
16  My question is if she has a
17  recollection of an e-mail. If
18  you don't like that question,
19  your objection is to form.
20  That's it.
21  MR. SNIDOW: That's my
22  objection.
23 BY MS. BROWN:
24  Q. Do you have a recollection

Page 91

1 of e-mailing about USA Today?
2  A. My answer is, since we have
3 all the e-mails here, I'd be very happy
4 to read through all of them and see if I
5 come to the same conclusion that you did.
6  Q. Okay. And we can do that at
7 lunch.
8  Let's turn --
9  MR. SNIDOW: We're not
10  going to do it at lunch.
11  MS. BROWN: Well, we're not
12  going to do it now.
13  MR. SNIDOW: That's fine.
14 BY MS. BROWN:
15  Q. Let's turn to Page 40,
16 please, Dr. Ness.
17  A. Yes, ma'am.
18  Q. All right. So this is an
19 e-mail from you to Mr. Boxer, from
20 December 13, 2022.
21  Do you see that?
22  A. December 13th -- yes.
23  Q. Mm-hmm. And one of the
24 things you say is that you find working

Page 92

1 with Ashley from the PR firm to be
2 invaluable in terms of crafting the
3 messages.
4  Do you see that?
5  A. Correct.
6  Q. Okay. You found the work of
7 the public relations firm to be
8 invaluable to you in the interviews you
9 were doing, correct?
10  MR. SNIDOW: Objection to
11  form.
12  THE WITNESS: I am used
13  to -- as I said, I'm used to
14  talking to other scientists. I'm
15  not used to talking to the
16  public. And Ashley helped me to
17  -- helped me to put my words into
18  publicly understandable language.
19 BY MS. BROWN:
20  Q. And what you say here is
21 the -- you found it to be invaluable in
22 terms of crafting the messages. This
23 evolves as we see each interview and with
24 the focus of the journalists, correct?

Page 93

1  A. That's correct.
2  Q. And you say, "E.g., NYT is
3 focused on FDA, which requires a
4 different strategy."
5  Do you see that?
6  A. Yes.
7  Q. What did you mean by that?
8  A. The New York Times, I think,
9 had indicated some interest in this
10 story.
11  As I recall, they had done
12 previous stories on the FDA, not so much
13 on the question of acetaminophen and
14 ADHD, and so we were going to have to
15 take that into consideration.
16  It wasn't -- I wanted to
17 bring to public attention the causal link
18 between acetaminophen and ADHD.
19  I think that, if I recall,
20 they were interested in something related
21 to the FDA, but I wanted to bring the
22 information to the public about
23 acetaminophen and ADHD.
24  Q. And, Dr. Ness, if you wanted

Page 94

1 to bring to the public information about
2 acetaminophen and ADHD, why were you
3 working with an organization called
4 Autism Justice?
5         MR. SNIDOW: Objection to
6     form. Asked and answered.
7         She's told you why she's
8     worked with them several times.
9         THE WITNESS: I don't
10     understand your question at all.
11     I just don't understand.
12     What are you asking me?
13 BY MS. BROWN:
14     Q.   If you wanted to bring
15 information about ADHD to the public, why
16 was your work being done with an autism
17 organization?
18         MR. SNIDOW: Objection to
19     form.
20         THE WITNESS: I can't say
21     why they named themselves Autism
22     Justice. I wasn't involved in
23     the naming process.
24 BY MS. BROWN:

Page 95

1     Q.   Well, don't you think it's
2 because they are focused on autism?
3         MR. SNIDOW: Objection to
4     form.
5         THE WITNESS: I have no
6     opinion.
7         MR. SNIDOW: Do you really
8     want her to give testimony
9     on Autism Justice's name?
10 BY MS. BROWN:
11     Q.   You have no opinion about
12 whether or not Autism Justice is focused
13 on autism?
14     A.   I don't have an opinion
15 about that.
16     Q.   Okay. Do you know what the
17 focus of Autism Justice is?
18         MR. SNIDOW: Objection to
19     form.
20         THE WITNESS: I do not.
21 BY MS. BROWN:
22     Q.   Okay.
23     A.   I am not -- I am not part of
24 Autism Justice.

Page 96

1     Q.   You were --
2     A.   I was consulting for them.
3     Q.   Okay. You were paid by
4 Autism Justice, correct?
5     A.   I was.
6         MR. SNIDOW: Objection to
7     form -- hold on.
8         Objection to form. Asked
9     and answered so many times.
10         MS. BROWN: You have to
11     stop, please. It's form, and
12     that's it.
13         MR. SNIDOW: You've got to
14     stop asking her if she's been
15     paid by Autism Justice. You know
16     she has. I mean, it's your time.
17 BY MS. BROWN:
18     Q.   Your counsel just said that
19 you have been paid by Autism Justice.
20     Is that true?
21     A.   I was -- I invoiced Douglas
22 Boxer. Douglas Boxer -- the check came
23 after Douglas Boxer told me there would
24 be a check. That's what I know.

Page 97

1     Q.   Okay.
2         (Document marked for
3         identification as Ness Exhibit
4         5.)
5 BY MS. BROWN:
6     Q.   We are going to mark as
7 Exhibit 5, Dr. Ness, some notes that
8 you've produced -- your counsel produced
9 to us in advance of today.
10     A.   Correct.
11     Q.   And did you collect these
12 notes to provide to counsel?
13     A.   I'm sorry. What is the
14 question?
15     Q.   These notes were produced to
16 us by counsel, by lawyers representing
17 plaintiffs.
18         Did you collect these pages
19 of your notebook and give them to the
20 lawyers?
21     A.   This was my notebook, and
22 they asked me for my -- to see my
23 notebook.
24         Is that what you are asking?

25 (Pages 94 - 97)

1    Q.   Yeah.  Exactly.
2         Can you turn to Ness 24.
3         Is this a notebook,
4  Dr. Ness, that is devoted specifically to
5  your work in this litigation?
6    A.   These pages are -- are
7  specific to my assessment of the Bradford
8  Hill analyses.
9    Q.   Is the entirety of the
10 notebook devoted to your work in this
11 litigation?
12   A.   I keep a notebook with
13 all -- I don't recall, I mean, what else
14 is in that notebook.
15        As I recall, this is what
16 was in the notebook.  I mean, I produced
17 all the pages related to this litigation
18 for counsel.
19   Q.   Did you produce all the
20 pages or did you produce the notebook
21 itself?
22   A.   No, I gave them the
23 notebook.
24   Q.   Okay.  And that's just what

1  I'm trying to understand.
2         Is there other stuff in the
3  notebook?
4    A.   I don't recall that there
5  is.  I mean, I recall that this is what
6  was in the notebook.
7    Q.   Okay.  And so it looks like
8  the Bates-labeled numbers go up to 28.
9         Does that comport with your
10 recollection, that your notebook on your
11 work in this litigation is 28 pages?
12   A.   I mean, there are more empty
13 pages in the notebook.  But, yeah,
14 that -- this is the work in this case,
15 yes.  All of them.
16   Q.   Okay.  And I don't mean
17 empty pages.  But the substantive pages,
18 does it comport with your recollection
19 that that would be approximately
20 28 pages?
21   A.   Yes.
22   Q.   Okay.  Do you have any other
23 source of notes or documents that
24 evidence your review of the literature in

1  this case?
2    A.   Other than the report, I do
3  not.
4    Q.   Okay.  So if we look at --
5  excuse me -- Page 24.
6    A.   Yes.
7    Q.   This is a page titled "FDA
8  Warnings Re Pregnancy."
9         Do you see that?
10   A.   That's correct.
11   Q.   Okay.  And one of the things
12 that I noticed as you move down this page
13 is there are a couple of sentences in
14 quotes.  Do you see that, where it says,
15 "For example, warning letter is a must"?
16   A.   Yes.
17   Q.   Okay.  Who -- who said that?
18 Who are you quoting?
19   A.   I actually don't recall this
20 particular page, what it's relating to.
21   Q.   Was -- were these your notes
22 from a conference call?
23        MR. SNIDOW:  Objection to
24   form.

1         THE WITNESS:  I -- I don't
2    recall the source.  I don't
3    recall the source of what those
4    quotes were from.  I don't
5    recall.
6  BY MS. BROWN:
7    Q.   Okay.  In the section right
8  above the quoted language, there's a
9  sentence that's crossed out, and it says,
10 "Putting a black box label on
11 acetaminophen for autism/ADHD is not
12 outrageous."
13        And it looks like that's
14 been crossed out, and there's the word
15 "no" next to it.
16        What did you mean by this?
17   A.   I don't remember.  I really
18 don't remember this particular small
19 aspect of my work.
20        I mean, I would point out
21 that I reviewed in great detail a
22 multitude of studies, all of which have
23 data attached to them, and then I have
24 this page about FDA warnings.  And I

26 (Pages 98 - 101)

Page 102

1  really just don't recall very much about
2  the FDA's -- my thinking about the FDA in
3  this regard.
4      Q.   Okay.  In the -- and moving
5  up the page again, it says, "FDA warning
6  letter, yes, black box?"
7          Do you recall what you were
8  talking about there?
9      A.   I don't.
10     Q.   The very last sentence on
11 this page -- well, if we go back to the
12 quoted language.  Do you see that?
13         MR. SNIDOW:  Which -- which
14     quoted language?
15         MS. BROWN:  The only quoted
16     language on the page.
17         "Warning letter is a must.
18     Question of black box label is
19     one that FDA should raise now."
20 BY MS. BROWN:
21     Q.   Do you see those two
22 sentences?
23         MR. SNIDOW:  I'm sorry.  I
24     wasn't trying to be annoying.

Page 103

1          MS. BROWN:  No, no.  I
2      know.
3  BY MS. BROWN:
4      Q.   Do you see those --
5      A.   Yes, I see --
6      Q.   Okay.  Right underneath that
7  it says, "FDA has been slow in response."
8          What did you mean by that?
9      A.   I don't recall.  I know that
10 the FDA has stated publicly that they
11 find a consistent association between
12 acetaminophen and ADHD.  That's -- that's
13 what I do recall.
14     Q.   Mm-hmm.  Did you review all
15 of the FDA's analyses related to whether
16 or not acetaminophen is related to or
17 associated with ADHD or autism?
18         MR. SNIDOW:  Objection to
19     form.
20         THE WITNESS:  I have looked
21     at their public statements -- I
22     mean, their -- you know, their
23     public information releases.
24         I have not looked at their

Page 104

1      entire -- you know, how --
2      whether they've even done a
3      Hill's analysis.
4          My understanding is they
5      have not done a Hill's analysis,
6      but I can't even be sure of that.
7  BY MS. BROWN:
8      Q.   Did you ask the lawyers for
9  whom you were working to give you access
10 to the documents produced by the FDA?
11         MR. SNIDOW:  Objection to
12     form.
13         She's got some in her
14     report, so...
15         THE WITNESS:  I -- I mean,
16     I say that I have reviewed the
17     FDA's public statements, and I
18     say that in my report.  And I say
19     specifically -- actually, let me
20     look at my report with regard to
21     the FDA.  Give me one second,
22     please.  Let's just pull that up
23     so I'm not trying to remember
24     something that I wrote.

Page 105

1          MS. BROWN:  Why don't we go
2      off the record for a second.
3          MR. SNIDOW:  No.
4          MS. BROWN:  Well, we're not
5      going to waste time doing this.
6          MR. SNIDOW:  No, there's
7      no -- it requires an agreement of
8      both counsel.  No way.
9          MS. BROWN:  Okay.  Well,
10     then let's just keep going then.
11         MR. SNIDOW:  Okay.  That's
12     fine.
13 BY MS. BROWN:
14     Q.   Dr. Ness, I don't want to
15 waste time having you spend the time
16 looking at that.
17         I want to ask you about the
18 next sentence under "FDA has been slow in
19 response."
20         It says, "Litigation may be
21 only way to push FDA."
22     A.   Yes.
23     Q.   What did you mean by that?
24     A.   I can't tell you.  I don't

27 (Pages 102 - 105)

Page 106

1 recall.
2    Q.   Okay.  Is this all your
3 writing on this page?
4    A.   Yes.
5    Q.   Okay.  Do you have any
6 memory of what anything on this page
7 means?
8        MR. SNIDOW:  Objection to
9 form.
10       You really want to answer
11 that one?
12 BY MS. BROWN:
13    Q.   I don't mean to be --
14    A.   Can you ask me in a way that
15 is a question?
16    Q.   Yeah, and I don't -- I don't
17 mean to be cute about it.
18       I'm asking you, does
19 anything on this page jog a memory for
20 you about what these sentences mean?
21       MR. SNIDOW:  Take a look.
22 See if you can identify anything,
23 Dr. Ness.
24       THE WITNESS:  I do recall,

Page 107

1 because I've held this opinion
2 for a long time, the sentence
3 that reads "Lack of funding for
4 women's health.  Need more
5 research on" -- what does that
6 even say?  Oh, analgesics.
7    Oh, yeah, yeah, yeah.  I
8 definitely remember this.
9    And I do definitely
10 remember where it says women --
11 "Warn women with long duration."
12    That's what I was trying to
13 do.
14    And I do remember the part
15 about not advocating walking
16 around with pain.  I was pretty
17 clear in my interviews that I
18 wasn't saying you should not take
19 a single pill of acetaminophen
20 during pregnancy.
21    What I was saying to women
22 is they should be cautious about
23 the duration of their use.
24    So I remember this very

Page 108

1 well.
2 BY MS. BROWN:
3    Q.   Okay.  Do you remember the
4 statement above it about litigation?
5    A.   I do not.
6    Q.   Okay.  Let's go back to the
7 e-mail exhibit that we marked.
8       And I want to direct you to
9 Page 55.
10       MR. SNIDOW:  For the
11 record, is this Exhibit 2?
12       MS. BROWN:  Yeah.
13       THE WITNESS:  Yes.
14 BY MS. BROWN:
15    Q.   Okay.  And this is an e-mail
16 to -- from you, it looks like, to Ashley
17 Thompson, and then she responds to you.
18       Do you see that?
19    A.   Yes.
20    Q.   All right.  It's
21 December 2022, and you wrote that you had
22 spoken to Sinclair Syndicate and inside
23 sources.
24       Do you see that?

Page 109

1    A.   Yes.
2    Q.   And the end of that
3 paragraph says, "In both cases, I
4 referred them to the Autism Justice
5 website."
6       Do you see that?
7    A.   Yes.
8    Q.   Okay.  And why did you do
9 that?
10    A.   As I said, because my role
11 was to ensure that the Autism Justice
12 website had accurate research and
13 accurate scientific information.  I
14 wanted to make sure that everybody was on
15 the same page with accurate scientific
16 information.
17    Q.   And you believed the
18 information that was contained on the
19 Autism Justice website was accurate and
20 complete and reflected your analysis of
21 the data, correct?
22       MR. SNIDOW:  Objection to
23 form.
24       THE WITNESS:  Actually, I

28 (Pages 106 - 109)

Page 110

1  say earlier in this e-mail, "My
2  last review of the website from
3  about a week ago was that it was
4  not," underscored, "consistent
5  with what I am saying. This is a
6  situation that will confuse
7  reporters and dilute our
8  message."
9       In other words, I had
10  offered them consulting advice on
11  ensuring that the information was
12  accurate. And they had not, at
13  least at that time, reflected my
14  advice. The website had not
15  fully reflected my advice.
16  BY MS. BROWN:
17       Q.   And your critique had to do
18  with comparing Tylenol and autism to
19  vaccines and autism, correct?
20       MR. SNIDOW: Objection to
21  form.
22       THE WITNESS: That is not
23  -- is that what it says here? I
24  don't see that.

Page 111

1  BY MS. BROWN:
2       Q.   "I asked that my figures
3  comparing the research on Tylenol versus
4  vaccines be added."
5       MR. SNIDOW: She's skipping
6  down to the next paragraph.
7       THE WITNESS: I did prepare
8  figures comparing Tylenol and
9  vaccines. I did find -- I did
10  look at the literature on both
11  issues. And, as I recall, the
12  acetaminophen data were much more
13  replete than the vaccine data.
14  BY MS. BROWN:
15       Q.   I don't understand.
16       Do you recall suggesting a
17  part to the website that says,
18  "Acetaminophen is not like vaccines and
19  autism"?
20       Do you recall that?
21       MR. SNIDOW: Objection.
22  Asked and answered.
23       She just explained what she
24  did.

Page 112

1       THE WITNESS: I just told
2  you the information that I
3  conveyed to them.
4       I made a figure that
5  basically showed -- it was -- I
6  think it was a forest plot that
7  showed the acetaminophen data.
8       And I believe I also made a
9  forest plot that showed -- or I
10  found a forest plot that showed
11  the vaccine data, and I compared
12  the two.
13  BY MS. BROWN:
14       Q.   And when you did that,
15  Dr. Ness, your forest plot did not look
16  exclusively at acetaminophen and autism,
17  correct?
18       A.   I do not recall the very,
19  very specifics of that.
20       Q.   Okay. We'll look at some
21  documents.
22       Did you know your picture
23  was on the Autism Justice website?
24       A.   I actually did not know

Page 113

1  that.
2       Q.   Do you have any idea why it
3  was recently removed?
4       A.   I didn't know it was on
5  there, so I don't know why it was
6  removed.
7       Q.   Okay. Let's take a look
8  at --
9       (Document marked for
10       identification as Ness
11       Exhibit 6.)
12  BY MS. BROWN:
13       Q.   Okay. Let's mark as
14  Exhibit 6 a page from the Autism Justice
15  website, prior to about a week and a half
16  ago, which had your picture under Our
17  Team.
18       When you were reviewing the
19  Autism Justice website for accuracy and
20  scientific completeness, did you ever see
21  your picture listed under Our Team?
22       MR. SNIDOW: Objection to
23  the preamble.
24       THE WITNESS: I was -- I

29 (Pages 110 - 113)

Page 114

1  was doing it in the preparatory
2  phases of them developing the
3  content of the website.
4      I -- frankly, I don't
5  recall looking -- I don't think I
6  ever saw the final website.  I
7  just -- it was not my job.
8      My job wasn't to look at
9  all the graphics on the website.
10  My job was to make sure that they
11  were posting accurate information
12  during the process of the
13  development of the website.
14 BY MS. BROWN:
15     Q.   But to check their work on
16 that, did you ever look at the website?
17     A.   I don't recall that I ever
18 looked at the final website, because,
19 frankly, I had done my work.  I had given
20 them my best opinion at that point.
21     Q.   But the e-mail that we just
22 looked at said, "My last review of the
23 website."
24     A.   Yes.

Page 115

1      Q.   So at some point you looked
2  at the website, right?
3      A.   As it was in -- as it was in
4  preparation, yes, before it was, you
5  know, fully posted.
6      Q.   Let's look at -- you didn't
7  ask anybody to take your picture down; is
8  that right?
9      A.   I did not.  I didn't know it
10 was there.
11     MR. SNIDOW:  It's a nice
12     picture.
13     THE WITNESS:  Actually, I
14     look much, much younger than I
15     am.  Yeah.
16 BY MS. BROWN:
17     Q.   Let's go to tab -- Page 38
18 of Exhibit 2, the e-mails we were looking
19 at.
20     A.   Yes.
21     Q.   Okay.  We had -- we had
22 looked at this e-mail earlier regarding
23 the acquisition strategy.
24     Do you recall that?

Page 116

1      A.   Yes.
2      Q.   All right.  And if you move
3  down the e-mail, Mr. Boxer is talking
4  about the work you're going to do for
5  Scott Circle.
6      Do you see that?
7      A.   That was Ashley Thompson's
8  employer, yes.
9      Q.   Okay.  And it says "she."
10 That's you, Dr. Ness, right?
11     MR. SNIDOW:  What are you
12     asking her?
13 BY MS. BROWN:
14     Q.   Dr. Ness, do you agree the
15 three tasks where it says "she," that's
16 referring to what you're going to do?
17     A.   Oh, I see.  Let me just read
18 this.
19     I see that, yes.
20     Q.   Okay.  So it says,
21 "Number 1, she's going to prepare some
22 talking points for Erin B. and Bernie
23 Harlow that are consistent with her
24 findings after having spent many, many

Page 117

1  hours reviewing all of the studies on the
2  association between acetaminophen and
3  autism."
4      Do you see that?
5      A.   I see where he said that,
6  yes.
7      Q.   Okay.  Who is Erin B.?
8      A.   Erin Brockovich.
9      Q.   Okay.  Did you review
10 talking points for Erin Brockovich?
11     A.   I reviewed bullet points
12 making sure that she had accurate
13 information, based on the references.
14     Q.   Did you review those over
15 e-mail?
16     A.   I did not.
17     Q.   Someone verbally gave you
18 the bullet points?
19     A.   Didn't give me.  I gave
20 them.
21     I mean, I summarized the
22 data as I reviewed it into, you know,
23 very concise pieces of information.
24     Q.   And this, Task Number 1

30 (Pages 114 - 117)

1 here, refers only to studies on the
2 association between acetaminophen and
3 autism, right?
4      A.   That was his wording.  It's
5 not accurate.
6      Q.   Well, did you respond and
7 say, I'm going to be talking about ADHD?
8      MR. SNIDOW:  Objection to
9      form.
10      THE WITNESS:  I don't
11      recall that I responded at all,
12      did I?
13 BY MS. BROWN:
14      Q.   And then Number 3 says,
15 "She'll be available for the
16 October 27" -- "26-27 national media
17 launch."
18      Do you see that?
19      A.   I see that.
20      Q.   And what was the national
21 media launch?
22      A.   All I recall was that they
23 were -- that may have -- I don't recall
24 specifically.  Actually, I should just

1 say I don't recall specifically -- know
2 what -- that was not my thing.  That was
3 his thing.  I don't know what it was.
4      Q.   But it's listed as one of
5 your discrete tasks.
6      Do you see that?
7      A.   I said I --
8      MR. SNIDOW:  She told you
9      she doesn't remember.
10      THE WITNESS:  My discrete
11      task was to be available to speak
12      to the public.
13 BY MS. BROWN:
14      Q.   But what were they
15 launching?  Who was launching?
16      A.   I don't recall.
17      Q.   Why would -- why would --
18      A.   That was their thing.  I was
19 available at that time.  He was telling
20 Ashley I was available to speak to the
21 media.
22      Q.   On what topic?
23      A.   On the topic of
24 acetaminophen and neurodevelopmental

1 disorders.
2      MR. SNIDOW:  We've been
3      going about 90 minutes.  Do you
4      want to take a break, Ali?
5      MS. BROWN:  Sure.
6      THE VIDEOGRAPHER:  The time
7      right now is 10:47 a.m.  We are
8      off the record.
9      (Short break.)
10      THE VIDEOGRAPHER:  The time
11      right now is 11:01 a.m.  We're
12      back on the record.
13 BY MS. BROWN:
14      Q.   Dr. Ness, we're going to go
15 back to Exhibit 2, which are the e-mails,
16 and I want to talk to you about Pages 30
17 and 31.
18      A.   Actually, can I ask you a
19 question?  Do you want to go back to --
20 you had asked me a prior question, which
21 I was not able to answer, and --
22      Q.   Yes, ma'am.  20 --
23 20 percent?
24      A.   Exactly.

1      Q.   Yep.  So --
2      A.   I'd be happy to find it for
3 you now.
4      Q.   Well, we're not going to
5 look for it on the record.  So you can
6 put that down.  If you don't know it,
7 that's fine.
8      We're going to keep asking
9 questions and giving answers --
10      A.   It's okay.
11      Q.   -- and if it's not something
12 you have off the top of your head.
13      A.   I do.  And then I just
14 have to -- just give me one, please --
15      Q.   One minute is fine, but I
16 don't want to waste any more than one
17 minute.  So if you can't get it in one
18 minute, we're going to keep moving --
19      THE VIDEOGRAPHER:  Counsel,
20      do you have your microphone on?
21      MS. BROWN:  Ooh, I
22      apologize.  I don't.  Sorry.
23      THE WITNESS:  Okay.  Here
24      we go.  So this is Report Page

31 (Pages 118 - 121)

1     33.
2  BY MS. BROWN:
3     Q.   And what's the cite?
4     A.   I'm sorry?
5     Q.   The cite for that statistic
6  is in your report at Page 33?
7     A.   What -- if you please give
8  me the opportunity, it says, "A final
9  potential risk factor that may result in
10  confounding" -- okay.
11        "Long-term APAP use."
12     Q.   Do you have my report there?
13     A.   Mm-hmm.
14     A.   It's on Page 33.  At least
15  my copy is 33.  I don't -- I don't know
16  if that's the final format.
17     Q.   Okay.  Why don't you just
18  read it and let's keep moving.
19     A.   Okay.  "APAP use is most" --
20  "mostly used for pain and not as often
21  for fever.  Vlenterie" --
22  V-L-E-N-T-R-I-E -- "(2016) showed that
23  indications for greater than 28 days of
24  use in MoBa" -- which is the Norwegian

1  study -- "were headache or migraine (80.2
2  percent), back pain and pelvic girdle
3  pain (66 percent and 49.9 percent,
4  respectively), fever (24.9 percent).
5        "Based on acetaminophen
6  diaries, Bandolini [sic] in 2022 [sic]
7  found that women using APAP for more than
8  20 days reported that they had used it
9  for headache in 52 percent, pain or
10  injury in 27 percent, cold or flu in
11  13 percent, and fever, only 4 percent."
12        Pain is not a confounder,
13  however, in that there is essentially no
14  evidence that pain during pregnancy,
15  headache, back pain, et cetera, increases
16  the risk.  So it's either Vlenterie or
17  Bandolini that has the data about the
18  prevalence of long-term use.
19     Q.   So, ma'am, the sentence that
20  I asked for a citation for was roughly
21  20 percent of children diagnosed with
22  autism or ADHD were exposed to high
23  levels of Tylenol in utero.
24     A.   Yeah.

1     Q.   And you've pointed to
2  Bandolini and Vlenterie?
3     A.   Vlenterie.
4     Q.   Okay.  Those are your two
5  cites for that statement?
6     A.   One of the two of them, if
7  not both, have that statement -- I mean
8  have information about the prevalence,
9  yes, of long-term use.
10     Q.   Okay.  Thanks.  Let's keep
11  going.
12        So we are on 30 of your
13  e-mails, and this is an e-mail from you
14  to Ashley Thompson, cc'ing a bunch of
15  folks.
16        And just let me know when
17  you get there.
18     A.   Yes, ma'am.
19     Q.   All right.  And, again, we
20  see the folks from Perfectedclaims.com.
21        Do you know these folks,
22  Allison O'Boyle, Michael Meadows.
23     A.   I don't -- oh, I'm sorry.
24  I'm on the wrong page.  Ha.  Oh.  30.  I

1  see.
2        I'm sorry.  Where are you
3  looking?
4     Q.   So the only e-mail we have
5  on 30 starts with an e-mail from you on
6  Friday, December 16, 2022, to Ashley
7  Thompson.  She works for the PR firm
8  Scott Circle, correct?
9     A.   Yes.
10     Q.   And then there are a bunch
11  of folks cc'd.  And, again, we see the
12  Perfected Claims people.
13        Do you see that?
14     A.   I do.
15     Q.   And do you know who these
16  individuals are who work at something
17  called Perfected Claims?
18     A.   I -- I told you previously,
19  I don't know what Perfected Claims is.
20     Q.   And this e-mail includes
21  Russ Abney, correct?
22     A.   Oh, yes, I see that.
23  Mm-hmm.
24     Q.   Okay.  Had you worked with

1 Russ Abney before he approached you about
2 this litigation?
3     A.   I had -- worked with him.
4 I -- I've known Russ for some time.
5 Have we worked on a case together?  I
6 don't -- oh, actually, we had done -- in
7 the past we had some interaction related
8 to the talc cases.  I don't recall
9 exactly what it was, but we did have some
10 interaction related to the talc cases,
11 which is how I met him.
12     Q.   Had you ever met Mr. Boxer
13 in connection with talc cases?
14     A.   No.
15     Q.   Okay.  Russ Abney is at
16 Watts Guerra.
17         Do you see that?
18     A.   Yes.
19     Q.   Do you know that law firm?
20     A.   Not specifically.
21     Q.   Okay.  Has Mr. Abney worked
22 at that law firm the whole time you've
23 known him?
24     A.   I really don't know the

1 answer to that.
2     Q.   What about Alicia O'Neill
3 from the same firm.  Do you know her?
4     A.   I really don't.  I mean --
5     Q.   All right.
6     A.   -- I interacted with her at
7 this time, or I -- yeah.  I mean, I was
8 aware that -- I was aware that she was
9 involved in this at this time.
10     Q.   Involved in what?
11     A.   In the acetaminophen
12 question.
13     Q.   The acetaminophen
14 litigation?
15     A.   Yes.
16     Q.   Okay.  The subject of the
17 e-mail is "Questions/edits for Autism
18 Justice website and fact sheet."
19         Do you see that?
20     A.   Yes.
21     Q.   Okay.  And if we turn the
22 page, you say, "Ashley, you are correct."
23         And to orient us, the
24 original e-mail comes from Ashley,

1 "Questions/edits for Autism Justice
2 website."  That's on Page 32.
3         Do you see that, Dr. Ness?
4     A.   Yes.
5     Q.   Okay.  And so you ultimately
6 get added to this e-mail chain, and you
7 are responding to what Ashley has said
8 below.
9         Do you see that?
10     A.   Can you please read me
11 what -- I just -- I mean, it's very
12 difficult to follow these e-mail chains.
13 Please.
14     Q.   I know, and they were
15 produced to us like this, and they are in
16 a weird format.  But let's just work
17 through it together.
18         The e-mail begins on
19 Page 32.
20     A.   Okay.
21     Q.   So this is an e-mail that
22 you are not on.  It's from Ashley to
23 Douglas.
24         Do you see that?

1     A.   Yes.
2     Q.   And there are questions
3 regarding something called a scientific
4 fact sheet.
5         Do you see that?
6     A.   Yes.
7     Q.   Okay.  And if you scroll
8 through this whole e-mail, there appear
9 to be various pages from the website, and
10 there are, in some instances, proposed
11 edits.
12         Do you see that?
13     A.   I'm sorry.  In some
14 instances -- say again.
15     Q.   There are proposed edits.
16     A.   Yes.
17     Q.   Okay.  And then on
18 Page 31 --
19     A.   Yes.
20     Q.   -- you get brought into this
21 chain that Ashley Thompson is on.
22     A.   Yes.
23     Q.   And it says, "Dr. Ness,
24 there are some questions we never

33 (Pages 126 - 129)

1 received answers to."
2         Do you see that?  That's on
3 Page 32, up at the top.
4     A.   Yes.
5     Q.   Okay.  And she references an
6 attached spreadsheet.
7         Do you see that?
8     A.   Yes.
9     Q.   Do you recall reviewing
10 studies in a spreadsheet format from
11 Ashley Thompson?
12     A.   I don't recall.  I mean, I
13 do recall my notes, which are kind of a
14 spreadsheet.
15     Q.   Okay.
16     A.   I'm not clear here whether
17 she's saying that she's referencing my
18 notes or that she prepared a spreadsheet.
19 It's very unclear -- even reading it now,
20 it's unclear to me.
21     Q.   What --
22     A.   I don't recall.
23     Q.   One of the things she says
24 to you is, "Dr. Ness, there are some

1 questions we never received answers to,
2 specifically the larger number of
3 mother-child pairs."
4         Do you see that?
5     A.   Yes, I see that.
6     Q.   And then if we go to where
7 we started, Dr. Ness, you're responding
8 to Ashley on Page 31, correct?
9         You're going up the chain.
10 Now we have your response.
11         Do you see it?
12     A.   Oh, I see.  "You are
13 correct.  The numbers" --
14     Q.   Right.
15     A.   -- "in the overview of the
16 website do not match what I'm telling
17 you" -- yeah.
18     Q.   Okay.  So you ultimately get
19 looped into a chain where you were
20 providing advice on information that's
21 going to go on the website, correct?
22     A.   That's correct.  Yes.
23     Q.   And that's what you
24 described, in part, your role to be,

1 correct?
2     A.   That's correct.
3     Q.   All right.  And what you say
4 is, "There should be 29 publications:
5 26 show a positive association based on
6 220,000 pairs," correct?
7     A.   That's correct.
8     Q.   You say, "This includes
9 autism/ADHD," correct?
10     A.   Yes.
11     Q.   "We combine the two, for the
12 reasons you show below."
13     A.   Yes.
14     Q.   Okay.  And, Dr. Ness, what
15 you are referring to here is that the
16 scientific information that was being
17 made available on this website included
18 studies that investigated both autism and
19 ADHD and other neurodevelopment
20 disorders, correct?
21     A.   Where do you see "other
22 neurodevelopmental disorders"?
23     Q.   Well, you know these
24 29 publications, right, Dr. Ness?

1     A.   I don't understand why
2 you're characterizing.  That's not in the
3 e-mail.
4         What are you trying to say?
5 I don't understand.
6     Q.   I'm asking you a question
7 about these 29 studies, okay?
8     A.   Yes.  Mm-hmm.
9     Q.   And you've reviewed them,
10 right, and they are detailed in your
11 notes, correct?
12     A.   Yes.
13     Q.   Okay.  And they are studies
14 that do not exclusively look at autism,
15 correct?
16         MR. SNIDOW:  Objection to
17     form.
18         I mean, are you talking
19     about all of them?
20         THE WITNESS:  It says,
21     "Also some of the studies cited
22     on the website are not about
23     autism but about ADHD."
24         I don't understand where

Page 134

1    you're bringing in other
2    neurodevelopmental disorders.
3 BY MS. BROWN:
4    Q.   Let's walk through this
5 together, okay?  We're starting with
6 29 publications.
7        Do you see that?
8    A.   Yes.
9    Q.   These are studies that are
10 going to go on then to the Autism Justice
11 website, correct?
12    A.   Correct.
13    Q.   These are studies that you
14 reviewed in your Bradford Hill analysis
15 for acetaminophen and neurodevelopment
16 disorders, correct?
17        MR. SNIDOW:  Are we talking
18    about the report?  Talking about
19    the notes?
20        MS. BROWN:  Okay.  We're
21    not asking questions, Counsel.
22    If you have an objection to form,
23    that's the objection.
24        MR. SNIDOW:  Sorry.

Page 135

1    Objection to form.
2        MS. BROWN:  Okay.
3        MR. SNIDOW:  I just was
4    trying to clarify the record.  I
5    don't think you want a bad
6    record.
7 BY MS. BROWN:
8    Q.   Okay.  Let's just focus on
9 the 29 studies, okay?
10    A.   Yes.
11    Q.   Okay.  These are the studies
12 that you reviewed in forming your
13 opinions that you were speaking to the
14 media with; for example, USA Today,
15 correct?
16    A.   Correct.
17    Q.   Okay.  Those studies, you
18 say here, include autism/ADHD, correct?
19    A.   That's correct.
20    Q.   And then you say, "We
21 combine the two for the reasons you show
22 below."
23        Do you see that?
24    A.   Yes.

Page 136

1    Q.   Okay.  And one of the -- if
2 you go to "below," right, the reasons
3 below, and you go to Number 2 on Page 32.
4    A.   Okay.  Okay.  Oh, I see.
5 Mm-hmm.
6    Q.   No, you want to go to
7 Page 32.
8    A.   Oh, that's 30.  I'm sorry.
9        Yes.
10    Q.   We get some details on the
11 29 studies.
12        Do you see that?
13    A.   Can you please read me what
14 you're referring to?
15    Q.   Sure.
16        Section 2 on 32.  Are you
17 there?
18    A.   Where it says, "Please
19 provide a list of all 29 studies
20 reviewed"?
21    Q.   Right.
22        Do you see that?
23    A.   Yes.
24    Q.   Okay.  "Of the 29 studies,

Page 137

1 26 showed a positive association to ADHD
2 or autism spectrum diagnosis or
3 symptoms," correct?
4    A.   Yes.
5    Q.   Okay.  And then Number 3
6 says, "is the new copy regarding ADHD-ASD
7 correct?"
8        Do you see that?
9    A.   Yes.
10    Q.   And if you go to 33, you see
11 what they are talking about?
12    A.   Yes.
13    Q.   It says, "While many factors
14 can impact neurodevelopment of children,
15 based on the scientific consensus of the
16 studies reviewed below, acetaminophen use
17 during pregnancy may be a meaningful
18 contributor to the development of
19 autism."
20        Do you see that?
21    A.   Yes.
22    Q.   "Some of the studies
23 evaluated in this review used measures of
24 ADHD, but researchers have found that

35 (Pages 134 - 137)

1  some of the traits, causes, and
2  development of ADHD is highly similar to
3  that of autism."
4      Do you see that?
5      A.   Yes.
6      Q.   Okay.  And is that what you
7  were referring to when you said in your
8  e-mail, "We combine the two for the
9  reasons you show below"?
10     A.   Yes.
11     Q.   Okay.  Your analysis of the
12 studies combined studies on ADHD and
13 ASD because, in your view, researchers
14 have found that ADHD has similar traits
15 to that of autism?
16     A.   There -- there is -- I said,
17 in fact, over half of autistic people are
18 diagnosed with ADHD.  There's a fair bit
19 of overlap in the diagnostic --
20 there's -- yeah, there's a fair bit of
21 overlap in the diagnosis of the two
22 disorders.  They are concomitant in a
23 number of cases, and there are
24 similarities with regard to causes in

1  development, yes.
2      Q.   And that's why, Dr. Ness, in
3  reviewing this website for scientific
4  accuracy, you believed it was appropriate
5  to reference ADHD studies when looking at
6  whether or not acetaminophen causes
7  autism, right?
8      MR. SNIDOW:  Objection.
9      Objection to the preamble.
10     Objection to form.
11     THE WITNESS:  That's not
12     what I'm saying.
13 BY MS. BROWN:
14     Q.   Well, what you say here is
15 that "some of the studies cited on the
16 website are not about autism but are
17 about ADHD."
18     Do you see that?
19     A.   That's correct.
20     Q.   "It is internally
21 inconsistent to count only the autism
22 studies in the overview."
23     Do you see that?
24     A.   Yes.

1      Q.   Okay.  And that's because
2  your analysis, Dr. Ness, included an
3  analysis of both studies looking at
4  autism and studies looking at ADHD --
5      MR. SNIDOW:  What analysis
6      are you --
7  BY MS. BROWN:
8      Q.   -- correct?
9      MR. SNIDOW:  Are you
10     talking about the report?
11     MS. BROWN:  We're talking
12     about the analysis in the e-mail
13     we're discussing.
14     MR. SNIDOW:  Well --
15     MS. BROWN:  Counsel --
16     form --
17     MR. SNIDOW:  Objection to
18     form.
19     MS. BROWN:  Perfect.
20     MR. SNIDOW:  Thank you --
21     or you're welcome.  Sorry.
22 BY MS. BROWN:
23     Q.   Dr. Ness, the analysis that
24 you're discussing in this e-mail of 2022

1  is an analysis of the scientific
2  literature that combined studies looking
3  at acetaminophen and autism with studies
4  looking at acetaminophen and ADHD,
5  correct?
6      A.   I looked at the whole genre.
7      Q.   And one of the things that
8  you said was that it would be
9  inconsistent to look at only studies
10 evaluating acetaminophen and autism,
11 correct?
12     MR. SNIDOW:  Objection to
13     form.  It's not -- not what she
14     testified.
15     THE WITNESS:  I can't say
16     right at the moment what I --
17     what was inconsistent with what.
18     I don't recall what the internal
19     inconsistency was.
20     What I do recall was -- was
21     advising them that they
22     include -- as I said, ADHD was a
23     really major part of my thinking,
24     but that they make sure that they

Page 142

1      include studies of ADHD.
2 BY MS. BROWN:
3      Q.   ADHD was a major part of
4 your thinking, because you looked at both
5 the autism and the ADHD studies together,
6 correct?
7      A.   I think we've established
8 that.  Yes.
9      Q.   In the last paragraph you
10 say, "Moreover" -- and I'm on Page 31,
11 Dr. Ness.  This is your e-mail on the
12 website?
13     A.   Yes.
14     Q.   "Moreover, I have been
15 emphasizing that it's particularly the
16 women with longer duration exposure who
17 are at greatest risk, a month or more of
18 use."
19         Do you see that?
20     A.   That's correct.
21     Q.   And is that your opinion,
22 Dr. Ness, that women who use
23 acetaminophen for more than a month are
24 at greater risk?

Page 143

1      A.   A number of the studies have
2 looked at 28 days or more, and they have
3 shown higher elevations in risk.  That's
4 correct.
5      Q.   And that's your opinion,
6 correct?
7      A.   That's correct.
8          MR. SNIDOW:  Objection.
9 BY MS. BROWN:
10     Q.   In accruing -- you said --
11 you say here in this e-mail to the PR
12 consultant Ashley Thompson, "In accruing
13 plaintiffs, I think this is important to
14 emphasize on the website as a higher
15 concentration of such will strengthen
16 your case."
17         Do you see that?
18     A.   Yes.
19         MR. SNIDOW:  Objection to
20 the preamble.
21         MS. BROWN:  Well, there's
22 no preamble.  It was a question.
23         MR. SNIDOW:  No.  Sorry.
24 Just the constant talk about the

Page 144

1      PR consultant Ashley Thompson.
2          MS. BROWN:  That's who she
3 is.
4          MR. SNIDOW:  I know.  You
5 know what I mean.  You can ask
6 the question without repeating
7 the phrase every time.  That's
8 why I said objection to the
9 preamble.
10 BY MS. BROWN:
11     Q.   And what you were advising
12 on here, Dr. Ness, was a strategy you
13 thought would be helpful in accruing
14 plaintiffs, correct?
15         MR. SNIDOW:  Objection to
16 form.  Misstates the document.
17         THE WITNESS:  No, I -- no.
18 I think that's a real
19 mischaracterization, big time.
20         And I don't think that I
21 was carefully crafting the
22 language here.
23         My view, my opinion, as I
24 sit here today, is that studies

Page 145

1      that have looked at
2 longer duration use have found
3 higher degrees of risk.
4          And that advising a woman
5 they can't take a single pill of
6 acetaminophen during pregnancy is
7 not what I'm advising.
8          What I'm advising is that
9 they be cautious about longer
10 duration use as a result of the
11 research.
12         That is what I am saying
13 today.
14 BY MS. BROWN:
15     Q.   And what you said in 2022
16 was that if you emphasized women with
17 longer duration of exposure and got more
18 of those women, it would strengthen the
19 case, correct?
20         MR. SNIDOW:  Objection to
21 form.
22         THE WITNESS:  I believe
23 that that is a bad use of
24 language -- I -- my -- my use of

37 (Pages 142 - 145)

Page 146

1 language. I was not parsing it
2 terribly carefully.
3         And I think that the use of
4 language mischaracterizes my use
5 of language, mischaracterizes my
6 thinking even at that time.
7 BY MS. BROWN:
8     Q.   Do you know if Autism
9 Justice endeavored to take your advice as
10 it related to emphasizing on the website
11 a higher concentration of women with
12 longer exposure?
13         MR. SNIDOW: Objection to
14 form.
15         THE WITNESS: As I say, I
16 gave them my best advice. I
17 clearly gave them my best advice,
18 and I ultimately did not look at
19 what they posted.
20         All I could do was give
21 them my best advice. That's all
22 I could do.
23 BY MS. BROWN:
24     Q.   Dr. Ness, what we had marked

Page 147

1 as -- what we marked as Exhibit 5 were
2 the notes of your review of the
3 scientific studies that are discussed in
4 the e-mail that we were just looking at,
5 correct?
6     A.   Correct.
7     Q.   Okay. And these are your
8 notes that document your review of the
9 scientific studies that allowed you to
10 conclude that Tylenol, or acetaminophen,
11 causes "autism and ADHD," correct?
12         MR. SNIDOW: Objection.
13         THE WITNESS: Some of the
14 studies have autism endpoints,
15 other ones have ADHD endpoints,
16 and some have both.
17 BY MS. BROWN:
18     Q.   And these notes reflect your
19 work analyzing that body of literature,
20 correct?
21     A.   That's my -- that's the
22 written part of my work, yes.
23     Q.   And this work is the work
24 that we discussed earlier, Mr. Abney and

Page 148

1 Mr. Boxer commissioned you to review,
2 correct?
3     A.   Correct.
4     Q.   And this is the work that
5 would have informed your statements to
6 the press, including USA Today, correct?
7     A.   That's correct.
8     Q.   Okay. And these notes were
9 not created after you were retained as a
10 consulting -- as a -- strike that.
11         These notes were created
12 long before you were retained as a
13 testifying expert, correct?
14     A.   That's correct.
15     Q.   These notes reflect your
16 scientific analysis before you were hired
17 to write the report that we're here to
18 discuss today, correct?
19     A.   That's correct.
20     Q.   These notes reflect your
21 analysis of the scientific literature
22 before you had ever read Judge Cote's
23 Daubert opinion, correct?
24     A.   That's correct.

Page 149

1     Q.   And if we look at Page 27 of
2 the notes, Dr. Ness?
3     A.   Yes, ma'am.
4     Q.   You have a summary of your
5 review of the literature, correct?
6     A.   Yes.
7     Q.   And you would agree that
8 this summary includes both ADHD and ASD
9 studies, correct?
10     A.   That's correct.
11         MR. SNIDOW: Objection.
12 BY MS. BROWN:
13     Q.   And you agree that this
14 summary includes both diagnostic and
15 nondiagnostic studies, correct?
16     A.   That is correct.
17     Q.   And you have not -- your
18 notebook does not contain an analysis of
19 studies only looking at the diagnosis of
20 ADHD, correct?
21     A.   It includes both -- both of
22 those.
23     Q.   When you say both, you mean
24 both autism --

38 (Pages 146 - 149)

Page 150

1    A.   For ASD and, yes, ADHD.
2  Yes.
3    Q.   And the reason your note
4  does not contain -- excuse me -- a
5  reflection of an analysis focused
6  exclusively on ADHD is because you didn't
7  perform that analysis until after you
8  were hired as a testifying expert in this
9  case, correct?
10        MR. SNIDOW:  Objection to
11    form.
12        THE WITNESS:  I did the
13    full report with all the Bradford
14    Hill analyses as a result of
15    working on this litigation, yes,
16    on ADHD.
17  BY MS. BROWN:
18    Q.   Right.  I'm not sure I
19  understood.  It might be my fault.
20        The reason your notes from
21  2022 do not evidence an ADHD-specific
22  analysis of the literature is because you
23  didn't do that until recently, correct?
24    A.   That's correct.

Page 151

1    Q.   Okay.  The first time you
2  looked specifically at the literature
3  regarding acetaminophen and ADHD was when
4  you were hired as a testifying expert to
5  write the report we're here to talk
6  about, correct?
7        MR. SNIDOW:  Objection to
8    form.  Misstates testimony.
9        THE WITNESS:  I -- I wrote
10    the ADHD component after having
11    more fully reviewed ADHD with
12    respect to -- and writing it
13    up -- with respect to the Hill's
14    analysis.
15  BY MS. BROWN:
16    Q.   Right.  My question is
17  really just one of timing.
18        So the first time you
19  conducted a Bradford Hill analysis
20  looking only at acetaminophen and ADHD
21  was after Judge Cote's Daubert ruling,
22  correct?
23    A.   I -- as I said, I had done
24  it in my head, and I had all the

Page 152

1  underlying data laid out.  And then I
2  wrote it up for this litigation.
3    Q.   The first time you performed
4  a Bradford Hill analysis looking not at a
5  combined autism and ADHD or
6  neurodevelopment disorders, but looking
7  only at acetaminophen and ADHD, was after
8  you were hired as a testifying expert,
9  correct?
10        MR. SNIDOW:  Objection to
11    form.  Asked and answered.
12        That's the exact same
13    question you just asked.
14        THE WITNESS:  I answered
15    that question -- I just answered
16    that question.
17  BY MS. BROWN:
18    Q.   What I'm not under --
19    A.   I'm sorry.  Can we just get
20  a rereading of the transcript?
21    Q.   No, I'm afraid you can't ask
22  for that, Dr. Ness.
23        So the issue is I'm not
24  clear on it, and so I need to follow up

Page 153

1  on a question if I misunderstood it.  And
2  that could be my fault.  And that's my
3  bad, because it's my seven hours.  But I
4  didn't understand your answer, so I'm
5  going to ask it again.
6        The first time you conducted
7  a Bradford Hill analysis looking only at
8  ADHD was after you were hired as a
9  testifying expert in this case?
10        MR. SNIDOW:  Objection to
11    form.  Asked and answered.
12        This is the same question.
13        THE WITNESS:  I -- I've
14    said throughout all of your
15    questioning the exact same thing,
16    which is, in my head, I looked at
17    the combination with a dominance
18    on ADHD.
19        I had already thought about
20    it.  I had written the background
21    information in all these notes.
22    And I put it to paper after
23    having been retained -- or I
24    don't -- I don't know how you're

1    using the terminology.
2        After having told these
3    counselors, J.J. Snidow et al.
4    that I would write up the report.
5    So at that point I wrote up the
6    report.
7    BY MS. BROWN:
8        Q.   And you used a term, "a
9    combination analysis"?
10       A.   Yes.
11       Q.   What did you mean by that?
12       A.   That's what you see here.
13       Q.   Okay.  The combination
14   Bradford Hill analysis that you're
15   referencing is the one that we see
16   documented in your notes that are
17   Exhibit 5, correct?
18       A.   That's correct.
19       Q.   Okay.  And it was the
20   combination Bradford Hill analysis that
21   allowed you to state in multiple
22   interviews, "I believe that acetaminophen
23   is a cause of autism and ADHD," correct?
24       A.   That's correct.

1        Q.   As a scientist and an
2    epidemiologist, Dr. Ness, you felt
3    comfortable and confident in your
4    combination Bradford Hill analysis that
5    you believed it supported your public
6    statements that acetaminophen is a cause
7    of autism and ADHD, correct?
8        A.   That's correct.
9        Q.   And it was not your idea to
10   conduct an ADHD-specific Bradford Hill
11   analysis, correct?
12           MR. SNIDOW:  Objection to
13   form.
14           THE WITNESS:  I had -- as I
15   say, I had reviewed the data.
16   You see all the data here in
17   these multiple pages.
18           And I'm sorry.  What is the
19   question?
20   BY MS. BROWN:
21       Q.   It was not your idea to
22   conduct an ADHD-only Bradford Hill
23   analysis, correct?
24           MR. SNIDOW:  Objection to

1    form.  Asked and answered.
2        THE WITNESS:  I had already
3    done it.  I'm not sure I
4    understand.
5    BY MS. BROWN:
6        Q.   Sure.
7        We talked about your
8    combination Bradford Hill analysis as
9    evidenced in Exhibit 5, correct?
10       A.   Yes.  Mm-hmm.
11       Q.   And we talked about how that
12   scientifically was sufficient for you to
13   speak publicly about ADHD and autism
14   being caused by acetaminophen, correct?
15       A.   That's correct.
16       Q.   And, in fact, you thought it
17   was an important public health issue to
18   speak about, correct?
19       A.   That's correct.
20       Q.   And you thought that you had
21   done a sufficient combination Bradford
22   Hill analysis that allowed you to make
23   those statements to the public, correct?
24       A.   Dominated by ADHD, that's

1    correct.
2        Q.   And when you say "dominated
3    by ADHD," you're referring to the fact
4    that there are more studies on ADHD and
5    acetaminophen than there are on autism
6    and acetaminophen, correct?
7        A.   Yes.  You just referred to
8    my summary notes on Pages 27 and 28, and
9    that is -- that is what they show.
10   That's correct.
11       Q.   And what they show is your
12   analysis of all of the data of ADHD and
13   ASD, correct?
14       A.   All of it that I had at that
15   time, yes.
16       Q.   Okay.  And since that time,
17   what you have performed and documented in
18   your report is a look at the data that
19   excludes the autism data, correct?
20       A.   That's correct.
21       Q.   Since the time of your notes
22   and your public statements and your
23   retention as a testifying expert, you
24   have focused a Bradford Hill analysis

1 looking only at studies that looked at
2 ADHD, correct?
3     A.   That's what I wrote up, yes.
4     Q.   Dr. Ness, I want to talk a
5 little bit about your expertise and
6 qualifications.  Okay?
7     A.   Yes, ma'am.
8     Q.   All right.  You -- your
9 expertise broadly is in epidemiology,
10 correct?
11     A.   That is correct.
12     Q.   All right.  And you are not
13 currently licensed to practice medicine
14 anywhere, correct?
15     A.   That is correct.
16     Q.   And that has been the case
17 since the late 1990s?
18     A.   That's correct.
19     Q.   Okay.  So it's been
20 approximately 25 years or more since you
21 treated a patient, correct?
22     A.   That's correct.
23     Q.   And that would include a
24 pregnant woman, for example, correct?

1     A.   That's correct.
2     Q.   You are not a psychiatrist,
3 correct?
4     A.   That's correct.
5     Q.   You are not a member of the
6 American Psychiatric Association,
7 correct?
8     A.   I am not.
9     Q.   Okay.  You don't hold
10 yourself out to colleagues or other
11 professionals as a practicing
12 psychiatrist, correct?
13     A.   I do not.
14     Q.   Have you ever diagnosed a
15 patient with ADHD?
16     A.   Not -- not formally.
17     Q.   Have you ever treated a
18 patient for ADHD?
19     A.   Not as part of my
20 professional work.
21     Q.   Have you ever written a
22 prescription for an ADHD medicine?
23     A.   I have not.
24     Q.   Fair to say that the bulk of

1 your practice, when you were treating
2 patients, did not involve care for
3 individuals with ADHD?
4     A.   That would be accurate.
5     Q.   Okay.  And fair to say the
6 bulk of your, no doubt, impressive
7 research has not been focused on ADHD?
8     A.   My research has been focused
9 on risk factors for various outcomes,
10 including toxicologic risk factors for
11 various outcomes.
12         I have done some work on
13 conduct disorders, lead and conduct
14 disorders, and so I have done that.
15     Q.   And that lead and conduct
16 disorder paper is from the late 1990s,
17 correct?
18     A.   I believe it was from my
19 work with Herbert Needleman in Pittsburgh
20 after that time.
21     Q.   And that work did not
22 involve ADHD, correct?
23     A.   It included -- it did
24 include individuals who had -- had the

1 same kinds of difficulties that patients
2 with ADHD have.  Yes, it did actually
3 include that.
4     Q.   And other than this
5 publication, have you ever authored a
6 paper regarding ADHD?
7     A.   I have authored many, many,
8 many publications, many publications,
9 related to in utero exposures and adverse
10 outcomes.  Many, many.
11     Q.   That wasn't my question.
12         Had -- other than the 1990s
13 bone lead level paper you were referring
14 to, have you ever authored a paper
15 regarding ADHD?
16     A.   As I said, I did work with
17 Herbert Needleman well after the 1990s.
18 It was in -- let me think.  I left
19 Pittsburgh in 2008.  So it was in the
20 2000s, looking at conduct disorders, lead
21 and conduct disorders.
22     Q.   Lead -- bone lead levels and
23 delinquency.  Is that the paper you're
24 referring to?

41 (Pages 158 - 161)

1     A.   And we did some other work,
2 which I do not recall -- I do not believe
3 was published.
4     Q.   Okay.
5     A.   But we did a number of
6 analyses in that regard.
7     Q.   Okay.  And I'm talking about
8 publications.
9         Would it be fair to say that
10 the focus of your professional
11 publications has not been in the area of
12 ADHD?
13     A.   That has not been my focus,
14 no.
15     Q.   And the focus of your
16 research has not been in the area of
17 ADHD?
18     A.   The focus of much of my
19 research has been on in utero exposures
20 to toxicants.
21     Q.   But that wasn't my question.
22        The focus -- the bulk of
23 your research has not been investigating
24 ADHD and the causes of ADHD.

1     A.   That particular outcome, no.
2     Q.   Okay.  Have you ever
3 questioned a patient using a screening
4 tool for ADHD?
5     A.   No.
6     Q.   Have you ever published on
7 ADHD diagnoses as an endpoint or an
8 outcome of a study?
9     A.   As I said, conduct disorders
10 is part of -- or is -- kind of overlaps
11 with ADHD.  So I have, yes.
12     Q.   And that's the work on the
13 bone lead levels?
14     A.   That was done in the late
15 1990s and early 2000s.  Correct.
16     Q.   Okay.  And other than that
17 bone lead level research, have you ever
18 published on ADHD diagnoses as an
19 endpoint or an outcome?
20     A.   The specific ADHD outcome,
21 as I said, conduct disorders, which is
22 part of it.
23     Q.   I understand the bone lead
24 level research.

1         Putting that publication
2 aside, have you ever published on ADHD
3 diagnoses as an endpoint or an outcome in
4 one of your papers?
5     A.   Putting that aside, all that
6 work aside, no.
7     Q.   And how many published
8 papers came out of the bone lead level
9 research?
10     A.   Can I look on my --
11     Q.   No.  If you don't know off
12 the top of your head, that's fine.
13        You don't know?
14     A.   I don't know the answer.
15     Q.   Have you ever published
16 studies validating screening tools or
17 questionnaires for ADHD?
18     A.   I have not.
19     Q.   Are you familiar with
20 screening tools for ADHD?
21     A.   Yes.
22     Q.   What -- which ones are you
23 familiar with?
24     A.   Just give me one minute.

1     Q.   And, Dr. Ness, what are you
2 looking at?
3     A.   My report.
4     Q.   Okay.  Off of the top of
5 your head --
6         MR. SNIDOW:  No.  Object.
7 BY MS. BROWN:
8     Q.   -- it's fine --
9         MS. BROWN:  First of all, I
10     need to be able to ask the
11     question.
12         MR. SNIDOW:  I know, but
13     there's a question pending.
14         You asked her.  She said
15     she needs to look at her report.
16     She is going to look at her
17     report.
18 BY MS. BROWN:
19     Q.   Dr. Ness --
20         MS. BROWN:  No, no, no, no.
21     The question --
22         MR. SNIDOW:  Yeah.  Then
23     withdraw the question --
24         MS. BROWN:  Hold on.  Hold

42 (Pages 162 - 165)

1    on. Hold on. You have to let me
2    say something before you
3    interrupt me and object.
4        MR. SNIDOW: Well, I did.
5 BY MS. BROWN:
6    Q.  Dr. Ness, without looking at
7 your report, are you familiar with any of
8 the screening tools for ADHD?
9    A.  That was not your question.
10 I'm -- I'm trying to answer your
11 question.
12    Q.  Okay. But you --
13    A.  So --
14    Q.  Ma'am, I'm withdrawing the
15 question.
16    A.  -- the ADHD --
17        MR. SNIDOW: Hold on.
18 BY MS. BROWN:
19    Q.  Hold on, everybody. There
20 is a professional way to do this, and
21 there's a way to do this with not
22 purposely wasting time or violating the
23 court's ruling.
24        MR. SNIDOW: I'm not.

1 BY MS. BROWN:
2    Q.  What I want to know,
3 Dr. Ness -- and we can certainly do the
4 exercise of reviewing your report and
5 burning seven minutes -- off the top of
6 your head, are you familiar with any of
7 the screening tools for ADHD?
8    A.  Yes.
9    Q.  And what -- which ones are
10 you familiar with?
11    A.  I'm -- I'm trying to tell
12 you.
13    Q.  Okay. You're looking at
14 your report, and my question is focused
15 on off the top of your head. And if
16 you're not, that's fine.
17        MR. SNIDOW: Objection to
18    form.
19        This is -- Ali, even you
20    don't want this record. You
21    know --
22        MS. BROWN: Counsel,
23    please, it's objection to form.
24        MR. SNIDOW: -- the

1    screening tools -- hold on.
2        You know the screening
3    tools are in her report. This
4    isn't a memory test --
5        MS. BROWN: This is not
6    even a major question. The
7    objection is form.
8 BY MS. BROWN:
9    Q.  If you don't know them off
10 the top of your head, we're moving on.
11        This is not an exercise in
12 wasting 12 minutes.
13    A.  I -- I have my report in
14 front of me.
15    Q.  Yes, ma'am.
16    A.  I'm reviewing my report.
17 I'd like to answer your question, please.
18    Q.  Okay. Well, my question
19 is --
20    A.  Respectfully --
21    Q.  -- respectfully --
22    A.  -- you asked me,
23 respectfully, the question. I'd like to,
24 respectfully, answer your question,

1 please.
2    Q.  Okay. Then I'd like you to
3 answer my question.
4    A.  Okay. If you asked me just
5 as a hypothetical --
6    Q.  No. No, no, no.
7    A.  -- what exact relative risk,
8 I would have to look it up.
9        I don't have --
10    Q.  That's fine. That's the
11 answer. Off the top of your head, are
12 you --
13    A.  No, that is not the answer.
14    Q.  -- familiar -- ma'am,
15 respectfully --
16    A.  The answer is --
17        MR. SNIDOW: You have to
18    let her answer, though. You do
19    have to let her answer.
20        THE WITNESS: The answer is
21    I would like to tell you
22    definitively, based on what I
23    wrote.
24 BY MS. BROWN:

Page 170

1    Q.   I understand, ma'am.  I've
2 withdrawn that question.  So there is no
3 pending question that requires you to
4 look at your report.
5         My question is, independent
6 of looking at your report, off the top of
7 your head, are you familiar with any of
8 the screening tools for ADHD?
9         MR. SNIDOW:  Objection to
10    form.  This isn't a memory test.
11        THE WITNESS:  My answer is,
12    yes, I am familiar.
13 BY MS. BROWN:
14    Q.   Okay.  And which ones are
15 you familiar with, off the top of your
16 head?
17    A.   So I will show you from my
18 report.
19    Q.   Okay.  We'll come back to
20 that.  We do not need to waste time with
21 the report.
22        MR. SNIDOW:  She's not --
23    she's not -- just for the record,
24    she's not wasting time, Ali.

Page 171

1    She's trying to give you an
2    answer about what screening tools
3    she's familiar with.  Obviously,
4    those are in her report.  She
5    wants to give you a complete
6    list.
7         If you want to withdraw --
8         MS. BROWN:  No.  Counsel,
9    please.  You've made your record.
10        MR. SNIDOW:  Hold on --
11    just let me -- if you want to
12    withdraw the question, I
13    understand.
14        MS. BROWN:  No.
15 BY MS. BROWN:
16    Q.   Have you published a paper
17 on the genes associated with ADHD?
18    A.   No.
19    Q.   Okay.  Are you familiar with
20 particular genes that have been
21 associated with ADHD?
22    A.   I cannot cite for you the
23 specific genes, no.
24    Q.   Have you ever published

Page 172

1 about acetaminophen and its effect on the
2 brain?
3    A.   Acetaminophen?
4    Q.   Acetaminophen and its effect
5 on the brain.
6    A.   No.
7    Q.   Have you ever taught a
8 course involving ADHD?
9    A.   I have taught a course
10 involving exposures during pregnancy and
11 adverse outcomes, and I am reasonably
12 sure that included neurodevelopmental --
13 some neurodevelopmental outcomes.
14        I did that when I was in
15 Pittsburgh and again when I was at Texas.
16    Q.   Were the adverse outcomes
17 you discussed in the course related to
18 neurodevelopment disorders?
19    A.   I -- as I just said, we --
20 I'm sure that we had some lecturing on
21 that question, yes.
22    Q.   And what exposures did you
23 identify during pregnancy that are
24 associated with ADHD?

Page 173

1    A.   I really can't tell you the
2 very specifics of what was taught in that
3 course.
4    Q.   Have you, today, identified
5 any exposure other than acetaminophen
6 that you believe is associated with ADHD?
7         MR. SNIDOW:  Objection to
8    form.  I believe asked and
9    answered.
10        THE WITNESS:  Personally,
11    no.
12 BY MS. BROWN:
13    Q.   Dr. Ness, if you go back to
14 your notes, which -- excuse me -- which
15 we've marked as Exhibit 5.  I want to
16 direct your attention to Page 16, please.
17    A.   Oh.  Okay.  On Page 16.
18 Yes.
19    Q.   All right.  The -- excuse
20 me.  The title of this page is
21 "Autism/ADHD Epi."
22        Do you see that?
23    A.   Yes.
24    Q.   And there is a section right

44 (Pages 170 - 173)

Page 174

1 below that says "Per CDC."
2      Do you see that?
3      A.   Yes.
4      Q.   And then it has some
5 statistics on ADHD.
6      Do you see that?
7      A.   Yes.
8      Q.   When you say per CDC, is
9 this from the CDC website?
10     A.   It's from either the website
11 or publications sponsored by CDC, yes.
12     Q.   Okay.  And why were you
13 noting this information from the CDC's
14 website about ADHD?
15     A.   I was reviewing general
16 background about ADHD.
17     Q.   Do you consider the CDC to
18 be a reliable authority for information
19 about ASD and ADHD?
20     MR. SNIDOW:  Objection to
21     form.
22     THE WITNESS:  They collect
23     data, so I was citing their data.
24 BY MS. BROWN:

Page 175

1      Q.   Okay.  What about DSM-5
2 diagnostic criteria?  Did this
3 information come from the CDC as well?
4      A.   I'm sorry.  Where are you
5 reading, please?
6      Q.   Just under per CDC --
7      A.   Oh, I see.
8      Q.   -- it says DSM-5 diagnostic
9 criteria?
10     A.   No.  That came from the DSM.
11     Q.   Okay.  And how did you
12 access that?
13     A.   My husband is a
14 psychiatrist.  He has DSM-5 on our
15 bookshelf.
16     Q.   Okay.  You had a hardcopy at
17 your house?
18     A.   We sure do.  Every one of
19 them.
20     Q.   Okay.  And then down at the
21 bottom -- well, you have DSM-5 diagnostic
22 criteria.  The first thing is
23 inattention; is that right?
24     A.   Yes.

Page 176

1      Q.   Okay.  And then what are all
2 of the sub-bullets under inattention?
3      A.   It says, "Inattention
4 greater to or equal to six of the
5 following symptoms."
6      Q.   Are these the totality of
7 the inattention symptoms in the DSM-5
8 criteria?
9      MR. SNIDOW:  Objection to
10     form.
11 BY MS. BROWN:
12     Q.   If you know.
13     A.   I mean, that's certainly
14 what I recorded, so I presume that those
15 are -- those are the ones, yes.  I mean,
16 I -- that's what I recorded, yeah.
17     Q.   Do you recall how DSM-5
18 diagnoses or -- the criteria for ADHD?
19     MR. SNIDOW:  Hold on.
20     Objection to form.
21     Are you asking her her
22     memory of the DSM?
23     MS. BROWN:  Yeah.  Yeah.
24     MR. SNIDOW:  Okay.

Page 177

1 BY MS. BROWN:
2      Q.   What is the DSM-5 diagnostic
3 criteria for ADHD?
4      A.   It says, "Inattention
5 greater than or equal to six symptoms --
6 hyperactivity/impulsivity, greater than
7 or equal to six symptoms.  Must also have
8 symptoms of less than age 12, symptoms in
9 more than one setting, interference with
10 normal social work, not better explained
11 by other mood or personality disorder."
12     Q.   Any other criteria?
13     MR. SNIDOW:  Sorry.
14     Objection to form.
15     Ali, are you asking -- do
16     you mind clarifying so we have a
17     good record?  Any other criteria?
18     Are you asking her the abstract,
19     what's in the notes, what's in
20     the DSM?
21 BY MS. BROWN:
22     Q.   I'm asking about your
23 understanding of the DSM-5 diagnostic
24 criteria for ADHD.  And I was asking you,

45 (Pages 174 - 177)

Page 178

1  what is that criteria?
2      A.   The criteria I wrote down
3  here, I just read for you.  I'm not sure
4  I --
5      Q.   Is that complete, based on
6  your understanding of the DSM-5
7  diagnostic criteria?
8          MR. SNIDOW:  Objection to
9      form.
10          If you want to ask about
11      the DSM, let's whip it out.
12          THE WITNESS:  All I recall
13      is what I wrote in my notes at
14      this time.
15  BY MS. BROWN:
16      Q.   And you have not used the
17  DSM-5 diagnostic criteria for ADHD in
18  your medical practice, correct?
19      A.   That's correct.
20          MR. SNIDOW:  Objection to
21      form.  Asked and answered.
22          MS. BROWN:  Let's just --
23      you got the answer.
24          MR. SNIDOW:  You got the

Page 179

1      objection too, right?  Thank you.
2  BY MS. BROWN:
3      Q.   Dr. Ness, you are also not
4  an obstetrician, correct?
5      A.   I am not trained as an
6  obstetrician.
7      Q.   Okay.  You are also not
8  trained as a gynecologist, correct?
9      A.   That is correct.
10      Q.   You are not a maternal-fetal
11  clinical specialist, correct?
12      A.   That is correct.
13      Q.   You are not a member of
14  SMFM, or the Society of Maternal-Fetal
15  Medicine, correct?
16      A.   That's correct.
17      Q.   Have you -- during the time
18  period that you were treating patients,
19  did you ever advise a pregnant woman not
20  to take acetaminophen during pregnancy?
21      A.   I think we've established
22  that I didn't advise pregnant women as
23  part of my professional work.
24          However, I have done a great

Page 180

1  deal of epidemiology, as I said, on
2  exposures during pregnancy, including
3  aspirin.  So other analgesics.
4          Actually, let me -- let me
5  correct that.  Let me correct that.
6          I have done -- those are two
7  separate issues.  I have done a great
8  deal of work looking at exposures during
9  pregnancy, and I have also looked at
10  aspirin as an adverse exposure.
11      Q.   Have -- you've also done
12  research looking at aspirin and
13  acetaminophen in terms of ovarian cancer
14  risk; is that correct?
15      A.   That is correct.
16      Q.   Okay.  But you have not done
17  research looking at in utero exposure to
18  acetaminophen and potential
19  neurodevelopment disorders, correct?
20      A.   I have -- I have not
21  personally in my research, no.
22      Q.   You do not consider yourself
23  an expert in animal studies, correct?
24      A.   I do not.

Page 181

1      Q.   Okay.  And you are not a
2  toxicologist, correct?
3      A.   As part of my epidemiology
4  experience, I have reviewed, extensively,
5  both animal research, toxicologic
6  research, and have the expertise to be
7  able to read those papers and interpret
8  them.
9      Q.   My question was, you are not
10  a toxicologist, correct?
11      A.   I am not certified as a
12  toxicologist, and I -- yes.  I am not
13  certified as a toxicologist.
14      Q.   Well, when you were treating
15  patients, Dr. Ness, what was your board
16  certification?
17      A.   Internal medicine.
18      Q.   You have never designed a
19  study on the potential toxicological
20  effects of acetaminophen, correct?
21          MR. SNIDOW:  Objection to
22      form.
23          THE WITNESS:  Not
24      specifically on acetaminophen.

46 (Pages 178 - 181)

1    But I have designed many, many
2    studies looking at adverse
3    reproductive outcome -- you know,
4    looking at women, following them
5    through pregnancy and looking at
6    adverse outcomes.
7  BY MS. BROWN:
8    Q.   But that adverse outcome has
9  never been ADHD, correct?
10    A.   I have not focused on ADHD.
11  That's correct.
12    Q.   Have you ever conducted a
13  study using meconium as a biomarker?
14    A.   I'm sorry.  Meconium?
15    Q.   Meconium.
16    MR. SNIDOW:  Is there
17    something you need to look at,
18    Dr. Ness, or?
19    THE WITNESS:  I'm trying to
20    recall -- just give me a minute.
21    I know we have definitely used
22    meconium, and I'm just not
23    recalling off the top of my head
24    exactly what the exposures and

1    outcomes were.
2    Oh.  Hmm.  It may have
3    been -- I don't want to guess.
4    But, yeah, I think I -- I may
5    recall.  But I can look it up for
6    you and...
7  BY MS. BROWN:
8    Q.   Have you ever --
9    MR. SNIDOW:  Do you want
10    her to look it up?
11    MS. BROWN:  No.
12  BY MS. BROWN:
13    Q.   Have you ever used --
14  conducted a study using meconium to
15  investigate potential neurodevelopment
16  disorders?
17    A.   No.
18    Q.   Have you ever conducted
19  studies assessing the fetal blood-brain
20  barrier?
21    A.   I'm not sure I understand
22  what you're asking.
23    Q.   It's probably a bad
24  question.

1    Have you ever looked into
2  the fetal blood-brain barrier?
3    A.   I've certainly read a great
4  deal about it and thought about it a
5  great deal, as it impacts my own work.
6    Q.   Have you published on it?
7    A.   I have not published --
8  well, let -- I'm not -- I mean, in my
9  discussions, yeah.
10    Q.   What do you mean in your
11  discussions?
12    A.   Well, so I have discussed
13  in -- in discussions of my research
14  papers, you know, so in the discussion
15  section, I have referenced the
16  blood-brain barrier.
17    Q.   Sure.
18    Have you ever done any
19  research into medicines and whether they
20  cross the blood-brain barrier?
21    A.   So can you please clarify.
22    Q.   Have you ever done any
23  research investigating whether the
24  ability of a medicine to cross the

1  blood-brain barrier impacts
2  neurodevelopment disorders?
3    A.   Are you asking me from a
4  toxicologic perspective?
5    Q.   Any research, published
6  research.
7    A.   So I'm just -- I want to
8  clarify what you're asking, and I'm not
9  trying to be difficult.
10    Q.   Okay.
11    A.   I just want to understand
12  the question.
13    So are you asking me whether
14  I have done animal studies, human
15  studies, in which we have watched a drug
16  cross the blood-brain barrier or
17  determined what percentage of it is in --
18  is in spinal fluid as compared to
19  placenta?  I'm not sure.
20    Q.   Any kind of research
21  evaluating the ability of a medicine
22  taken during pregnancy to reach a fetus's
23  brain.  Have you done any research in
24  that area?

47 (Pages 182 - 185)

Page 186

1     A.   Are you asking whether I
2 myself have conducted research showing
3 that a drug crosses the brain and what --
4 to what degree?
5     Q.   Yes, ma'am.
6     A.   That's what you're asking?
7     Q.   Yes, ma'am.
8     A.   I have not.
9     Q.   Have you done any -- have
10 you published any research on MRI imaging
11 studies of brains?
12     A.   I have not published,
13 however, I have conducted such research,
14 yes.
15     Q.   Okay.  None of it has been
16 published?
17     A.   Not in a -- no.  Not --
18 nope.
19     Q.   When does ADHD develop in
20 the fetal brain?
21     A.   I wrote a whole section on
22 that.  I'd be really happy to discuss
23 that with you and read it to you.
24     Q.   And I'm looking for a time

Page 187

1 period.  Do you have a time period of
2 when ADHD develops?
3         And, Dr. Ness, you're going
4 to take a look at your report on your
5 computer that you have open in the
6 deposition?
7     A.   That's correct.
8         So in animal studies on
9 Page 155, I say, "Acetaminophen exposure
10 during periods equivalent to the third
11 trimester of pregnancy in humans, but not
12 later, induced behavioral and cognitive
13 alterations in both male and female mice.
14 Other animal studies report findings that
15 may be particularly interesting for
16 ADHD."
17         Actually, that is not
18 relevant.
19         I go on then to say -- so
20 under "Temporality," I say, "For APAP, as
21 noted above, the greatest risk" -- and
22 I'm referring to the epidemiology
23 studies -- "appears to be in the third
24 and possibly second trimester of

Page 188

1 gestation.  For the effect to precede the
2 cause, we would have to posit that the
3 sensitive period of neurodevelopment
4 occurs in the first or second trimester.
5 In fact, in the case of teratogens, the
6 exposure must be present during the time
7 the developmental process of interest is
8 taking place."
9         And I go on then to say,
10 "The questions are then three-fold.
11 First, what is the anatomy and physiology
12 of brain impairments seen in ADHD?
13 Second, when during gestation are these
14 areas and functions in the brain
15 developing?  Third, given the timing of
16 neurodevelopment of the parts of the
17 brain relevant to ADHD, is there any
18 possibility that disruption prior to the
19 third trimester could cause ADHD - that
20 is, is it plausible that the cart came
21 before the horse?"
22         And then I go on, then, to
23 describe the whole -- the whole process
24 of brain development, particularly with

Page 189

1 respect to executive functions, which is
2 what we believe is happening during the
3 disruption that ultimately causes ADHD.
4         It's -- I say it elegantly
5 manifest in a neuroimaging study in the
6 prefrontal lobe, so it's in the
7 prefrontal lobe.
8         So, "Central nervous system
9 formation begins shortly after
10 implantation with the rapid expansion of
11 cell layers and their formation into a
12 crude, embryonic notochord.  At the
13 cranial," or head, "end, the number of
14 neurons increase rapidly and their number
15 peaks in the early second trimester...
16 After assuming their final position,
17 neurons begin to differentiate to form
18 synaptic connections.
19         "Throughout the mid-second
20 and third trimesters and in the few weeks
21 after birth, pyramidal neurons and
22 interneurons within white and grey matter
23 mature and differentiate.  Dendritic
24 length increases and spines will develop,

Page 190

1 reaching out to other cortical and
2 subcortical targets."
3         And that's the case for both
4 excitatory and inhibitory networks.
5     Q.   And, Dr. Ness, I understand
6 you're reading us portions of your
7 report.
8         But my question was, do you
9 have an opinion on when ADHD develops in
10 the human fetal brain?
11         MR. SNIDOW:  Objection to
12     form.  Asked and answered.
13         THE WITNESS:  "During the
14     third trimester, from weeks 26
15     and beyond, the various layers of
16     the brain continue to mature, as
17     spines develop, basal dendritic
18     length increases, and
19     interneurons differentiate.  This
20     rapid phase of synaptogenesis
21     involves..."  refinement of
22     connections, removal of synaptic
23     contacts.
24         "Thus, the most sensitive

Page 191

1     period of prefrontal development
2     is in the mid-second and third
3     trimesters when neurons and
4     synapses are growing and
5     differentiating into a functional
6     organ."
7 BY MS. BROWN:
8     Q.   And I understand you just
9 read portions of your report, but --
10     A.   That was the answer.
11     Q.   Let me -- ma'am, I've got to
12 ask the question.
13     A.   I'm sorry.
14     Q.   I understand you just read
15 portions of your report about a sensitive
16 time period, but my question was, do you
17 have an opinion on when ADHD develops in
18 the human brain.
19     A.   I was just answering your
20 question in some detail, yes.
21     Q.   Is your opinion that ADHD
22 develops in the late second, third
23 trimester?
24     A.   At the time -- my opinion is

Page 192

1 that ADHD is a disruption of prefrontal
2 neurodevelopment and prefrontal -- the
3 most sensitive period during pregnancy
4 for prefrontal neurodevelopment is, as I
5 say, in the mid-second and third
6 trimesters, when neurons and synapses are
7 growing and differentiating into a
8 functional organ.
9     Q.   And what -- what page of
10 your report are you on?
11     A.   That would be -- that
12 particular part is Page 176 of the report
13 that I have here in front of me.
14     Q.   In the Temporality section?
15     A.   That would be correct.
16         Can I ask a question,
17 logistical question?
18         MS. BROWN:  Let's go off
19     the record for that.
20         THE WITNESS:  Okay.
21         THE VIDEOGRAPHER:  The time
22     right now is 12:10 p.m.  We are
23     off the record.
24         (Short break.)

Page 193

1         THE VIDEOGRAPHER:  The time
2     right now is 12:11 p.m.  We're
3     back on the record.
4 BY MS. BROWN:
5     Q.   Dr. Ness, you have just
6 pointed us to what I believe is Page 178
7 of your report regarding the mid-second
8 and third trimester; is that correct?
9         Is that the paragraph you're
10 reading from?
11     A.   Yeah.  There's a bit of a
12 problem here, insofar as my report on my
13 computer has slightly different
14 pagination than yours.
15     Q.   Yeah.  Let's just mark your
16 report so we can get on the same page.
17     A.   Yeah, that would be great.
18         MR. SNIDOW:  Let her get --
19     to avoid confusion, let her give
20     you the marked one.
21         THE WITNESS:  Sure.
22         MR. SNIDOW:  I'll take this
23     one back.
24         MS. BROWN:  J.J., do you

49 (Pages 190 - 193)

Page 194

1  need a copy?
2         MR. SNIDOW:  No, I'm okay.
3  Thank you, though.  Save some
4  trees.
5         MS. BROWN:  Okay.
6         (Document marked for
7  identification as Ness
8  Exhibit 7.)
9         THE WITNESS:  Thank you.
10 BY MS. BROWN:
11     Q.   Yes.  Thank you.
12     Dr. Ness, we'll mark as
13 Exhibit 7 your report, and in that copy,
14 if you go to Page 178.
15         Is this the page that you
16 have identified in answering the question
17 when ADHD develops in the brain?
18     A.   This is actually Page 179.
19     Q.   179.
20         And the paragraph that you
21 read about the critical
22 neurodevelopmental window is the one that
23 you're pointing me to on Page 179?
24     A.   This would be -- I think

Page 195

1  there are one, two -- four paragraphs
2  here, and this would be Paragraph 3.
3      Q.   Okay.  And do any of the
4  studies that you cite on Page 179, do
5  you --
6      A.   Oh, I'm sorry.  I'm sorry.
7  Can I just -- it's actually the second
8  paragraph.
9      Q.   Okay.  The second paragraph
10 on Page 179 of your report that we've
11 marked as Exhibit 7 says, "The most
12 sensitive period of prefrontal
13 neurodevelopment is the mid-second and
14 third trimesters," correct?
15     A.   That's correct.
16     Q.   All right.  And you have one
17 study cited here, Kolk 2022.
18         Do you see that?
19     A.   Yes.
20     Q.   Okay.  Do you have any
21 other -- this -- this paragraph doesn't
22 talk about ADHD at all, correct?
23     A.   Well, I just read for you
24 all of the previous thinking.

Page 196

1  Do you want me to read it
2  again?
3      Q.   No.
4      A.   So on Page 177, for
5  instance, just as one example -- but I
6  did read to you a -- you know, a whole
7  part of this.
8         It's on paragraph -- okay.
9  So there's kind of a partial paragraph at
10 the top, and then there's one, two, three
11 paragraphs, and -- there are three
12 paragraphs.
13        And the third full paragraph
14 says, "ADHD involves operations termed
15 'executive functions' coordinated by the
16 prefrontal cortex."
17        And then we're now talking
18 about, on Page 179, "Thus, the most
19 sensitive period of prefrontal
20 development" -- "neurodevelopment is in
21 the mid-second and third trimesters when
22 neurons and synapses are growing and
23 differentiating into a functional organ."
24     Q.   Do you believe ADHD develops

Page 197

1  in the prefrontal cortex?
2      A.   It is partially a disruption
3  of the prefrontal cortex, but it does
4  involve other parts of the brain, for
5  sure.  It is very complicated.
6      Q.   Well, where does it start?
7  Does it start in the prefrontal cortex?
8      A.   It -- this is a question
9  I -- starting is not a terminology that
10 one would use.
11     Q.   Well, my question to you
12 was, when does ADHD develop in a human
13 fetal brain, and you pointed me to a
14 section of your report that talks about
15 executive functions coordinated by the
16 prefrontal cortex --
17     A.   That's correct.
18     Q.   -- as well as a sensitive
19 period for the prefrontal
20 neurodevelopment, correct?
21     A.   That's correct.
22        MR. SNIDOW:  Objection to
23 form.
24        Just to clarify.  You asked

50 (Pages 194 - 197)

1    her does it start in the
2    prefrontal cortex.
3        MS. BROWN:  Correct.
4        MR. SNIDOW:  Not when.
5        MS. BROWN:  We're getting
6    there.
7        MR. SNIDOW:  Okay.
8    BY MS. BROWN:
9        Q.   And so my question to you,
10   the information you provided here has to
11   do with the prefrontal neurodevelopment,
12   correct?
13       A.   That's correct.
14       Q.   Okay.  Does ADHD develop in
15   the prefrontal area of the brain?
16       MR. SNIDOW:  Objection to
17   form.  Asked and answered.
18       THE WITNESS:  ADHD is a
19   disruption that involves multiple
20   parts of the brain and multiple
21   connections.
22   BY MS. BROWN:
23       Q.   So how do you know, then,
24   that it starts or develops in the second

1    and third trimester?
2        A.   It's not a matter of
3    starting.  It's the brain is developed --
4    it's not just the prefrontal cortex.  You
5    know, it's not like a baby comes out and
6    all they have is a prefrontal cortex.
7        So multiple brain regions
8    are developing, are getting more
9    sophisticated at that time,
10   differentiating, growing, being reduced,
11   "pruned," as we say.
12       You -- I don't think anyone
13   would say something starts in one place
14   or another.  There are multiple brain
15   regions that this is all happening at the
16   same time.
17       Q.   What are the other brain
18   regions where ADHD develops?
19       A.   I think one of the better
20   studies in this regard is the Baker
21   study.
22       Q.   Why is that?
23       A.   I'm sorry?
24       Q.   Why is that?

1        A.   Oh, I'm just about to tell
2    you.
3        Okay.  So Baker, who I'm
4    sure you know, used meconium to measure
5    acetaminophen burden.  So I write in my
6    report -- now, this is on Page 176 of my
7    report.  We have to look at where it is
8    on your printed copy.
9        But in any case -- let's
10   see.  The "authors employed causal
11   mediation analysis to test for the
12   mediation of the association between
13   prenatal acetaminophen exposure and
14   hyperactivity by resting-state brain
15   connectivity."
16       So they used MRI imaging,
17   and -- "This approach uses a
18   quasi-Bayesian Monte Carlo method with
19   1000 simulations, to test whether
20   connectivity mediated the association
21   between prenatal APAP exposure and
22   hyperactivity.  The average direct effect
23   and average causal mediation effect are
24   computed, reflecting direct and indirect

1    (mediated by connectivity) effects of
2    prenatal APAP exposure on hyperactivity.
3    Information from two models... (1),
4    connectivity as an outcome... and (2),
5    hyperactivity as an outcome."
6        And let's see.  So they
7    found quite a bit higher concentrations
8    of -- or higher proportions of ADHD
9    diagnosis amongst the children who had
10   APAP detection in the meconium.
11       "Children with APAP detected
12   in meconium showed increased negative
13   connectivity between prefrontal" --
14   protofontal, prefrontal -- "and default
15   mode network... clusters in the
16   sensorimotor cortices."
17       They were more hyperactive.
18   So this is also related to the right
19   prefrontal -- I mean -- sorry --
20   precentral/frontal gyrus.
21       Q.   You think Baker's MRI
22   imaging is a good study to support your
23   opinion as it relates to when ADHD
24   develops in the brain?

51 (Pages 198 - 201)

Page 202

1      A.   This is specifically how
2  they are showing that hyperactivity, the
3  connectivity between these various
4  regions, are disrupted in the situation
5  of hyperactivity; which, of course, is
6  part of the criteria for ADHD.
7      Q.   Okay.  Do you know that in
8  Baker, the authors didn't find any
9  relationship between brain connectivity
10  and diagnosis of ADHD?
11      MR. SNIDOW:  Objection to
12  form.
13      Ali, I'll ask for a
14  standing objection.  If you're
15  going to ask her about specific
16  studies, I ask that you show
17  them.
18  BY MS. BROWN:
19      Q.   Do you know that?
20      MR. SNIDOW:  Objection to
21  form.
22      THE WITNESS:  Can you show
23  me that, please.
24  BY MS. BROWN:

Page 203

1      Q.   Do you know that to be true?
2      MR. SNIDOW:  Objection to
3  form.  This isn't -- this is not
4  a memory test --
5      MS. BROWN:  Counsel, your
6  objection is form.  That's it.
7      MR. SNIDOW:  That is my
8  objection.
9  BY MS. BROWN:
10      Q.   We'll look at Baker, but do
11  you know that Baker did not find a
12  relationship between brain connectivity
13  and diagnosis of ADHD?  Do you know that
14  to be true?
15      A.   Can you please -- whoops --
16  show me the part of the report that you
17  are referring to?
18      Q.   Let's take a look at a
19  couple of things in Baker.
20      Do you know how many of the
21  individuals in Baker actually underwent
22  the MRI?
23      MR. SNIDOW:  Okay.
24      Objection to form.

Page 204

1      Ali, I don't know what
2  we're trying to prove here.  You
3  know this isn't about --
4      MS. BROWN:  No.  Counsel,
5  please.  She just said this is
6  the best study for --
7      MR. SNIDOW:  She doesn't
8  have it memorized.
9      MS. BROWN:  She doesn't
10  have to have it memorized, but I
11  get to ask about whether the
12  study really is the best study.
13      MR. SNIDOW:  Yeah, well,
14  you --
15      MS. BROWN:  Counsel, it's
16  just form.
17      MR. SNIDOW:  Yeah, I just
18  want to clarify the record,
19  though.
20      What you actually asked her
21  was to give you the precise
22  number of people who underwent
23  MRIs, and I think --
24      MS. BROWN:  No, I didn't.

Page 205

1  I said do you know, because the
2  study talks about it.  So you
3  would know.
4  BY MS. BROWN:
5      Q.   Okay.  Let's take a look at
6  these --
7      A.   On the bottom of page -- can
8  I answer your question?
9      Q.   Mm-hmm.
10      A.   On the bottom of page, as
11  you have it marked, E-2, it says, "At the
12  time of this report, 76 children had
13  undergone functional MRIs."
14      Q.   And do you know what the
15  authors said about whether or not that
16  was a sufficient size?
17      MR. SNIDOW:  Objection.
18  Objection to form.
19      I just -- I'll leave it
20  objection to form, but I've got a
21  standing objection on do you know
22  what the author said without
23  showing it to her.  She's
24  obviously not --

52 (Pages 202 - 205)

Page 206

1      MS. BROWN:  She has it in
2  front of her, Counsel.
3      MR. SNIDOW:  Why don't you
4  show her, then, where it says
5  this, instead of just asking her
6  if she remembers --
7      MS. BROWN:  Because it's my
8  deposition.
9      MR. SNIDOW:  Okay.  I'll
10  object to form.
11      THE WITNESS:  Give me
12  several minutes to look at this,
13  and I will read it.
14 BY MS. BROWN:
15      Q.   Let's take a look at E-7,
16 Dr. Ness.
17      A.   Okay.  Where on E-7?
18      Q.   Let's start in the left-hand
19 column, the paragraph on the bottom that
20 begins, "This is the first study."
21      Do you see that?
22      A.   Yes, ma'am.
23      Q.   It says, "This is the first
24 study, to our knowledge, to examine

Page 207

1  associations of prenatal acetaminophen
2  exposure with functional connectivity in
3  childhood."
4      Do you believe that to be
5  true?
6      A.   In my reading of the
7  literature, I believe that's true, yes.
8      Q.   Okay.  So this is actually
9  the first study to ever even look at
10  functional connectivity and its
11  association with prenatal acetaminophen
12  exposure, correct?
13      A.   Yes.
14      Q.   All right.  And what they
15  say halfway through that paragraph, which
16  begins with the sentence, "Causal
17  mediation analysis."
18      Do you see that?
19      A.   Yes, ma'am.
20      Q.   "Causal mediation analysis
21  revealed that altered frontoparietal
22  connectivity may link prenatal
23  acetaminophen exposure with increased
24  child hyperactivity at ages 9 to

Page 208

1  11 years."
2      Do you see that?
3      A.   It's frontoparietal.
4      Q.   Thank you.
5      "Although this result
6  suggests that brain connectivity may also
7  mediate an indirect effect on ADHD, we
8  were unable to explore this possibility
9  because ADHD diagnosis information was
10  obtained when children were ages 6 to
11  7 years old."
12      Do you see that?
13      A.   Yes, I do see that.
14      Q.   This study was unable to
15  explore the potential connection between
16  connectivity and ADHD, correct?
17      A.   Their --
18      MR. SNIDOW:  Objection to
19  form.
20      THE WITNESS:  Their results
21  were for hyperactivity.
22 BY MS. BROWN:
23      Q.   That's not ADHD, correct?
24      A.   That is certainly a subset

Page 209

1  of ADHD.
2      Q.   Hyperactivity is not
3  diagnosed ADHD, correct?
4      A.   If you go back to my notes,
5  please, on Page 16 of your Exhibit 5,
6  there -- actually -- I'm sorry.
7  Unfortunately, you've typed over it, so
8  it's hard to see my notes.
9      But it says ADHD, three
10  kinds, primary inattentive.  The second
11  one should say, but it's typed over,
12  primary hyperactive, and then both
13  combined.
14      So, yes, hyperactivity is a
15  subset -- is a subset of ADHD.  It is
16  part of the ADHD diagnosis, according to
17  the DSM-5 criteria.
18      Q.   Do you disagree with the
19  authors of Baker when they state that
20  they were unable to explore the possible
21  association between brain connectivity
22  and ADHD?
23      A.   They did not report that
24  particular overall connection, but they

53 (Pages 206 - 209)

1 did report hyperactivity as an outcome,
2 as we've just established.
3    Q.   The last sentence in the
4 paragraph we were just reading from says,
5 "Taken with the wide confidence interval
6 of the mediation analysis, indirect
7 effect, and the small MRI sample size,
8 studies in larger and more diverse
9 cohorts are needed to replicate these
10 novel findings."
11        Do you see that?
12    A.   Yes, I do.
13    Q.   Do you agree with the
14 authors that these findings are novel?
15    A.   I believe we've established
16 this was the first study, to our
17 knowledge, to examine associations of
18 prenatal acetaminophen exposure with
19 functional connectivity in childhood.
20 We've established that.  Yes, I agreed to
21 that.
22        MR. SNIDOW:  And I am just
23    going to renew my objection and
24    illustrate why I want a standing

1 objection to this.
2        What you asked her was, did
3    you know that Baker found no
4    relationship between brain
5    connectivity and diagnosis of
6    ADHD.
7        And when I asked you to
8    show the part of --
9        MS. BROWN:  It's right
10    here -- okay.  Let's go off --
11        MR. SNIDOW:  This is why I
12    want studies shown, because that
13    was a highly misleading -- I
14    don't know -- I don't think you
15    intended it as a gotcha, but this
16    is why I like the studies -- this
17    is why I like the studies in
18    front of her.
19        MS. BROWN:  So, Counsel,
20    the reason they didn't find that
21    is because they couldn't examine
22    it, and we just went over --
23        MR. SNIDOW:  That's right.
24        MS. BROWN:  -- the

1    information.
2        MR. SNIDOW:  I know.  But
3    you -- you know how you asked it,
4    Ali.  That's why I'm --
5        MS. BROWN:  Your objection
6    is to form, but redirect on it.
7        MR. SNIDOW:  Okay.  But I'm
8    not --
9        MS. BROWN:  That's enough.
10        MR. SNIDOW:  Yeah, I agree.
11    That's all I wanted.
12 BY MS. BROWN:
13    Q.   What -- Dr. Ness, other than
14 Baker, which we have discussed, and the
15 citations you gave us on Page 179 of your
16 report, do you have any other scientific
17 support for your opinion that ADHD
18 develops in the human fetal brain in the
19 second and third trimester?
20    A.   Yes, definitely.  I --
21 actually, there are one, two, three,
22 four -- four pages prior to that that
23 cite a multitude of studies that relate
24 to this question.  I was reading to you,

1 but I didn't read the references.  But
2 I'd be happy to read it to you with the
3 references.  There are a multitude of
4 references here.
5    Q.   What is the biological
6 mechanism by which acetaminophen causes
7 ADHD?
8    A.   I think there are a number
9 of plausible mechanisms.
10        I would like to more fully
11 answer your question, though, about
12 Baker, what you asked me --
13    Q.   Counsel will have an
14 opportunity to let you --
15    A.   Okay.  All right.
16        MR. SNIDOW:  Actually, if
17    you want to --
18        MS. BROWN:  There's no
19    pending question.
20        THE WITNESS:  Okay.
21        MR. SNIDOW:  Unless there's
22    something you need to correct,
23    Dr. Ness, I agree with Ali on
24    this.

54 (Pages 210 - 213)

1        THE WITNESS:  Okay.  Fair
2    enough.  My apologies.
3        MR. SNIDOW:  If there's
4    something you want to correct,
5    I'm sure she'd let you.
6        Otherwise, we'll let her move on.
7 BY MS. BROWN:
8    Q.   What is the biological
9    mechanism by which APAP causes ADHD?
10   A.   So, again, there are --
11   there are a number of plausible
12   mechanisms.  I discuss in some detail the
13   mechanisms related to oxidative stress
14   and inflammation.
15       And I would point out that
16   as per Hill, Bradford Hill, and as per
17   Ken Rothman, who I think most
18   epidemiologists would agree is one of the
19   more eminent epidemiologists of our day
20   and has interpreted Hill at some length,
21   I think both of them would tell you that
22   the criteria of biologic plausibility is
23   one in which there needs to be an
24   hypothesis that makes biologic sense.

1        It does not need to be
2    proven.  It does not need to be a single
3    hypothesis.
4        But if there are supportable
5    hypotheses based upon all the evidence
6    that we have in all the literature that
7    we have, those become part of biologic
8    plausibility.
9        So two of them that I
10   discussed in some detail are inflammation
11   and oxidative stress, and there are
12   others, but those are the two that I
13   discussed in more detail.
14   Q.   And did you discuss those
15   two, Dr. Ness, because you believe those
16   two are the most plausible mechanisms by
17   which acetaminophen causes ADHD?
18   A.   I think those are two.  I
19   would not say they are the most.  I would
20   say they are two of them that I think
21   there's very good data for.
22   Q.   Okay.  Are there more
23   plausible mechanisms that you did not
24   discuss in your report?

1    A.   There are other plausible
2    mechanisms that I did not discuss.
3    Q.   Okay.  Are they more
4    plausible than the two they did discuss?
5    A.   I think I just answered the
6    question that I am not opining about what
7    is more or less plausible.
8        Plausibility only requires
9    that one have at least one or more
10   plausible mechanisms.  I discuss two.
11   Q.   Okay.  How many plausible
12   mechanisms are you aware of?
13       MR. SNIDOW:  Objection to
14   form.  Asked and answered.
15       THE WITNESS:  That's -- I
16   can't answer that question.  I
17   don't have an opinion.
18 BY MS. BROWN:
19   Q.   Is it more than ten?
20   A.   I don't have an opinion.
21   Q.   Okay.  Let's take a look
22   back at the e-mail document, Dr. Ness,
23   which was marked as Ness 2.
24       One of the things we've

1 discussed throughout today is that you
2 were in charge of ensuring scientific
3 accuracy on the Autism Justice website,
4 correct?
5    A.   Incorrect.  I was not in
6 charge of.  I was offering expert opinion
7 in the area of science.
8    Q.   You were paid as a
9 consultant for Autism Justice to review,
10 in part, their website, correct?
11       MR. SNIDOW:  Objection to
12   form.  Asked and answered many,
13   many, many times.
14       THE WITNESS:  I was
15   offering them expert scientific
16   consultation.  That is correct.
17 BY MS. BROWN:
18   Q.   Okay.  And one of the things
19 you were tasked to do that we looked at
20 earlier was write talking points for Erin
21 Brockovich and Bernie Harlow, correct --
22 correct?
23   A.   I think what we've
24 established is that I gave them my best

1 scientific advice in concise form.
2     Q.    And if we look back,
3 Dr. Ness, to where we left off on this
4 document, we left off at Page 31, where
5 you were replying to an e-mail from
6 Ashley Thompson, the PR specialist,
7 correct?
8     A.    That's correct.
9     Q.    Okay.  And as we reviewed
10 earlier, she had -- the e-mail chain
11 begins with a list of questions or edits
12 to the website, correct?
13     A.    I'm sorry.  Where are you
14 reading, please?
15     Q.    When we reviewed this e-mail
16 earlier, you'll recall that this e-mail
17 string begins, for example, on Page 32,
18 with some specific parts of the website
19 that Ms. Thompson has questions about,
20 correct?
21     A.    I see -- oh, I see.  All
22 right.  I see -- now I am guessing that
23 you're referring to the e-mail on Page 32
24 that is from Ashley Thompson to Douglas

1 Boxer but I'm not cc'd on.
2         I don't understand what
3 you're asking me.
4     Q.    So we reviewed this e-mail
5 before.
6         Do you recall that?
7     A.    Yes.
8     Q.    And will you recall that the
9 e-mail chain begins from Ms. Thompson to
10 Mr. Boxer, correct?
11     A.    That's correct.
12     Q.    And ultimately you're looped
13 into this chain and you provide some
14 answers to Ms. Thompson's questions,
15 correct?
16     A.    On Page 33, is that what
17 you're asking me?
18     Q.    Page 31 is where you provide
19 your response.  Remember we looked at
20 that earlier?
21     A.    Yes.
22     Q.    Okay.  So I want to direct
23 your attention to the end of
24 Ms. Thompson's original e-mail, and that

1 would be at Page 34 and 35.
2         This is where she has
3 frequently asked questions.  Do you see
4 those?
5     A.    Oh, FAQs, is that what
6 you're saying?
7     Q.    Yes.
8     A.    Okay.  Mm-hmm.
9     Q.    And if you turn to Page 35,
10 one of the FAQ is how does acetaminophen
11 impact autism in pregnant women and their
12 children.
13         Do you see that?
14     A.    Yes.
15     Q.    Okay.  And the statement
16 here is, "While we don't yet fully
17 understand how acetaminophen impacts
18 autism, Dr. Harlow has reviewed evidence
19 of acetaminophen's negative impact on
20 critical functions of brain development
21 in fetuses."
22         Do you see that?
23     A.    Yes.
24     Q.    Okay.  It says, "The most

1 convincing of the biological rationale is
2 acetaminophen's impact on brain-derived
3 neurotropic factor, a protein that
4 stimulates the linking of neurons in the
5 brain during development."
6         Do you see that?
7     A.    Yes.
8     Q.    "Acetaminophen leads to an
9 over production of BDNF and limits the
10 natural process used to eliminate some of
11 these linked neurons, leading to babies
12 potentially being born with too many, a
13 characteristic shared with many autistic
14 children."
15         Do you see that?
16     A.    Yes.
17     Q.    Do you agree with that?
18         MR. SNIDOW:  Objection to
19 form.
20         THE WITNESS:  I have not --
21 I did not review that in my
22 report.  But as I said, there are
23 a number of plausible mechanisms.
24 Here she cites BDNF.  She cites

56 (Pages 218 - 221)

1  prostaglandin E2.  She cites
2  blocking the synthesis of
3  vanilloid -- I'm going to spell
4  it, V-A-N-I-L-L-O-I-D --
5  receptors.
6       And then also the oxidative
7  radical pathway, which is the one
8  that I discussed in more detail
9  in my report.
10      So there are a number, as
11 I've said previously.
12 BY MS. BROWN:
13   Q.   And what the information
14 that was forwarded to you, that was going
15 to be put on the Autism Justice website
16 and fact sheet, contained information
17 that the most convincing of the
18 biological rationales was the BDNF.
19      Do you agree with that?
20   A.   That was --
21      MR. SNIDOW:  Objection to
22 form.
23      THE WITNESS:  That was
24 Dr. Harlow's assessment.

1  cite specifically the mechanism of action
2  of a pathway that I did not cite in my
3  report.  I can tell you specifically
4  about the pathways that I did cite in my
5  report.
6       Q.   We'll get to that.
7            Does the BDNF plausible
8  biological mechanism cause both, or
9  potentially cause both, ADHD and autism?
10      MR. SNIDOW:  Objection to
11 form.
12      THE WITNESS:  As I say, I
13 am not opining about that
14 particular pathway today, as it
15 is not really fully articulated
16 in my report.
17      I am very happy to discuss
18 in detail anything that is fully
19 articulated in my report.
20 BY MS. BROWN:
21   Q.   So that --
22   A.   This is someone else's -- I
23 don't -- I don't even see a response on
24 my behalf to this.

1  BY MS. BROWN:
2    Q.   Do you agree?
3    A.   That was not cited as my
4  assessment.
5    Q.   Do you agree with that?
6       MR. SNIDOW:  Objection to
7  form.
8       THE WITNESS:  I told you
9  previously, and I would repeat, I
10 am not opining about what is the
11 most convincing evidence, period.
12      Biologic plausibility does
13 not require a hierarchy of the
14 most to the least convincing
15 evidence.
16 BY MS. BROWN:
17   Q.   Do you believe that
18 brain-derived neurotropic factor is a
19 plausible biologic mechanism by which
20 acetaminophen can cause ADHD?
21   A.   It is a plausible mechanism
22 as well.
23   Q.   Okay.  How does it work?
24   A.   I cannot tell you -- I can't

1    Q.   Right.  So the whole thing
2  was e-mailed to you, and you didn't
3  comment on that section.
4       Did you review it?
5       MR. SNIDOW:  Objection to
6  form.
7       THE WITNESS:  I just don't
8  recall the specifics of that at
9  this time.
10 BY MS. BROWN:
11   Q.   In your research for your
12 work in this litigation, did you review
13 any scientific studies regarding BDNF as
14 a biological plausible mechanism for
15 ADHD?
16   A.   I read -- I read studies,
17 yes.
18   Q.   Is there a reason you didn't
19 include those in your report?
20   A.   I told you I included two
21 that I discussed at length.
22      If I had included every
23 single biologic mechanism in the degree
24 of length that I did oxidative stress and

57 (Pages 222 - 225)

Page 226

1 inflammation, the report would have gone
2 on many, many, many, many, many more
3 pages. Because there's quite a bit of
4 data out there.
5         That was not my purpose. My
6 purpose was to review biologic
7 plausibility as one of the several Hill's
8 tenets, only to be able to say yes or no,
9 are there -- is there at least one, and
10 likely more, biologically plausible
11 tenets that would allow Hill's factors to
12 be met. That was my purpose.
13     Q.    Number 1 on the -- on
14 Ness 35 involves prostaglandin E2.
15         Do you see that?
16     A.    Yes, I do.
17     Q.    Did you review any studies
18 regarding prostaglandin E2 in connection
19 with your report in this case?
20     A.    I read some of those studies
21 as well.
22     Q.    Do you believe prostaglandin
23 E2 is a biologically plausible mechanism
24 by which acetaminophen causes ADHD?

Page 227

1     A.    I actually do not have an
2 opinion with regard to that, because I
3 have not reviewed that literature in
4 total. And I would have to do that as a
5 good professional scientist to answer
6 that question.
7     Q.    Number 2 involves vanilloid
8 receptors. Do you know what that is?
9     A.    I do.
10     Q.    What is it?
11     A.    "These critical pieces of
12 brain function help us to detect sharp
13 pain or hot food and without them,
14 reactions to certain forms of stimuli are
15 slowed."
16     Q.    And that's what it says in
17 the e-mail, correct?
18     A.    That is correct.
19     Q.    Where are the vanilloid
20 receptors located?
21     A.    I'm sorry. Did you ask
22 me -- I'm getting confused now with --
23         Did you ask me whether I
24 reviewed all that data, all those data on

Page 228

1 vanilloid receptors?
2     Q.    I don't know.
3     A.    You didn't ask that
4 question?
5     Q.    I don't know. What I'm
6 asking you is if you know where vanilloid
7 receptors are located?
8     A.    I have not reviewed that
9 literature.
10     Q.    Okay. Based on your review
11 of the literature, is the blocking the
12 synthesis of vanilloid receptors a
13 biological plausible mechanism by which
14 acetaminophen can cause ADHD?
15     A.    I have not reviewed those
16 data.
17     Q.    Okay. The last one involves
18 oxidative radicals.
19         Do you see that?
20     A.    That's correct.
21     Q.    Have you reviewed this
22 literature?
23     A.    Yes, it's in my report.
24     Q.    Okay.

Page 229

1     A.    With respect to glutathione,
2 yes.
3     Q.    Mm-hmm.
4         This talks about
5 acetaminophen being degraded by the
6 liver, correct?
7     A.    That's correct.
8     Q.    Okay. Without reading from
9 your report, Dr. Ness, can you give me a
10 high-level overview of what you discussed
11 in your report about how this particular
12 mechanism works?
13         MR. SNIDOW: Objection to
14     form.
15         Dr. Ness, if you can answer
16     without reading your report,
17     please do.
18 BY MS. BROWN:
19     Q.    That's a fine answer too.
20 If you can't do it without your report,
21 that's fine.
22         MR. SNIDOW: But to give a
23     complete answer, I'm sure
24     Ms. Brown will agree, if you want

58 (Pages 226 - 229)

Page 230

1  to look at your report, you can
2  also do that.
3      THE WITNESS:  To give a
4  complete answer to any of your
5  questions, any of your questions,
6  I prefer to be accurate and
7  precise.  Therefore, I prefer to
8  actually look at what is written
9  in my report, that, as I
10  understand it, you received and,
11  I believe, must have read.
12 BY MS. BROWN:
13     Q.   Could you explain, without
14 looking at your report, how the oxidative
15 stress biological mechanism works?  Can
16 you do that?
17     MR. SNIDOW:  Objection to
18     form.
19     THE WITNESS:  I'm not
20     prepared to answer a memory test
21     today.  This is not a test.
22 BY MS. BROWN:
23     Q.   That's fine.
24     Do you know the

Page 231

1  concentration --
2      MR. SNIDOW:  Do you want
3  her to explain the mechanism?
4      MS. BROWN:  No.  If she
5  can't do it without the report --
6  not the report --
7      MR. SNIDOW:  Well, I know.
8  I just -- you know what I'm
9  trying --
10     MS. BROWN:  Yeah, I'm good.
11     MR. SNIDOW:  What I don't
12 want to see is a brief that says
13 she didn't know the mechanism
14 when you didn't give her the
15 opportunity --
16     MS. BROWN:  You'll have
17 plenty of time to ask your
18 questions.
19     THE WITNESS:  I want to
20 answer your question.
21 BY MS. BROWN:
22     Q.   Ma'am, I don't need you to
23 read from your report.  I appreciate it.
24     A.   No, because you

Page 232

1  mischaracterized what I said, and,
2  therefore, I would like to, on the
3  record, reply to your
4  mischaracterization.
5      Q.   Sorry, ma'am.  You can't --
6      A.   I did not say --
7      MR. SNIDOW:  Yes, she can.
8  She can --
9  BY MS. BROWN:
10     Q.   I'm sorry, ma'am.  You
11 can't -- there's no question -- I'm
12 sorry --
13     MR. SNIDOW:  She can -- yes,
14 there is --
15 BY MS. BROWN:
16     Q.   I'm sorry.  There's just no
17 question pending, so I'm sorry.  You
18 can't do that.
19     MR. SNIDOW:  There
20     absolutely is.
21 BY MS. BROWN:
22     Q.   There's just no question
23 pending, so I'm sorry.  You can't do
24 that.  If you have something to add --

Page 233

1      A.   I did not say I cannot
2  recall --
3      Q.   -- your counsel will let
4  you --
5      A.   -- I said I would prefer to
6  be precise --
7      Q.   Of course.
8      A.   -- in my recollection.
9      Q.   Okay.
10     A.   I am a scientist.
11     Q.   Do you --
12     A.   I am not a memory expert.  I
13 am not an attorney.  I am a scientist.
14 Scientists prefer to be precise.
15     Q.   Do you know the
16 concentration of CYP2E1 in the fetal
17 brain?
18     A.   I do not know the
19 concentration of CYP2E1 in the brain.
20     Q.   Do you know the
21 concentration of CYP2E1 in the liver?
22     A.   I do not.
23     Q.   Do you have a general
24 understanding of whether or not there is

59 (Pages 230 - 233)

Page 234

1  more CYP2E1 in the fetal brain or in an
2  adult liver?
3      A.   I do not -- I do not believe
4  that was in my report.  And that
5  comparison, I think, does not make sense.
6  But I --
7          Can -- again, I need to go
8  off the record for a second.  Logistics.
9          MS. BROWN:  Sure.
10         THE WITNESS:  So I asked
11     the question --
12         MS. BROWN:  We're not off
13     yet.
14         THE WITNESS:  Oh, I'm
15     sorry.
16         THE VIDEOGRAPHER:  The time
17     right now is 12:47 p.m.  We are
18     off the record.
19             - - -
20     (Whereupon a luncheon
21     recess was taken.)
22             - - -
23     A F T E R N O O N   S E S S I O N
24             - - -

Page 235

1          THE VIDEOGRAPHER:  The time
2      right now is 1:30 p.m.  We're
3      back on the record.
4              - - -
5          CONTINUED EXAMINATION
6              - - -
7  BY MS. BROWN:
8      Q.   Welcome back, Dr. Ness.
9      A.   Thank you.
10     Q.   On Page 166 of your expert
11  report that we had marked as Exhibit 7,
12  you state, "The strong link between
13  inflammation/oxidative stress and ADHD,
14  reviewed above, argues for the hypothesis
15  that APAP, particularly in that when used
16  by a pregnant woman over a longer
17  duration, APAP depletes glutathione and
18  produces NAPQI in the fetal brain.  This,
19  in turn, among susceptible individuals,
20  triggers ADHD."
21         Do you see that?
22     A.   Mm-hmm.
23     Q.   Okay.  And you would agree
24  that this inflammation/oxidative stress

Page 236

1  theory is a hypothesis?
2      A.   Yes.
3      Q.   You talk about APAP
4  depleting glutathione, correct?
5      A.   Yes.
6      Q.   How -- what amount of
7  glutathione is needed to detoxify
8  acetaminophen in the liver?
9      A.   I mean, I can't tell you the
10  exact concentration.  My guess is it
11  depends on when in neurodevelopment, when
12  in fetal development.  I mean, it's not
13  -- you know, you can't say it's two, not
14  one.  I mean, what -- I'm not sure what
15  question you're asking.
16     Q.   My question is if you have
17  an opinion, outside of pregnancy, what
18  amount of glutathione is needed to
19  detoxify acetaminophen in the liver.
20     A.   I don't have a specific
21  number that I can cite for you.
22     Q.   Do you know whether the
23  concentration of glutathione is higher in
24  the brain than in the liver?

Page 237

1          MR. SNIDOW:  Objection to
2      form.  Asked and answered.
3          THE WITNESS:  We -- we
4      talked about that before.
5  BY MS. BROWN:
6      Q.   And you don't know?
7      A.   I didn't say I don't know.
8          Ask the question again,
9  would you, please.
10     Q.   Do you have an opinion about
11  whether the concentration of glutathione
12  is higher in the brain than the liver?
13     A.   And I said it depends on
14  whose brain, whose liver, when we are
15  talking about.  Depends.
16     Q.   You don't have an opinion
17  about, generally, whether glutathione
18  levels are greater or less in the liver
19  than in the brain?
20         MR. SNIDOW:  Objection to
21     form.
22         THE WITNESS:  I mean, in a
23     developing fetus, it's changing.
24  BY MS. BROWN:

60 (Pages 234 - 237)

1    Q.   Have you reviewed scientific
2 literature that quantifies the levels of
3 glutathione in a fetal brain?
4    A.   I'm sure that in animal
5 models it has been quantified in stuff
6 that I've read. I can't cite the
7 specific numbers for you at this moment.
8    Q.   And my question was specific
9 to the human fetal brain --
10    MS. BROWN:  Bless you.
11 BY MS. BROWN:
12    Q.   -- have you reviewed any
13 scientific literature that quantifies the
14 amount of glutathione in a human fetal
15 brain?
16    A.   And as I said, it's
17 changing. It changes during development
18 quite a bit.
19    Q.   And what direction does it
20 change?
21    MR. SNIDOW:  Objection to
22    form.
23    THE WITNESS:  Glutathione
24    levels increase -- wait. Let me

1    think about this for one second.
2 BY MS. BROWN:
3    Q.   Are you looking at a
4 particular page of your report, Dr. Ness?
5    A.   I'm thinking. Can I think?
6    Q.   Absolutely, ma'am. I saw
7 you looking down at your report --
8    MS. BROWN:  Just for the
9    record.
10    MR. SNIDOW:  Give her a
11    second.
12 BY MS. BROWN:
13    Q.   I saw you looking down at
14 your report, and if you were referring to
15 a particular page, I just want to get
16 that for the record.
17    A.   I was looking down to think.
18    Q.   Okay.
19    A.   I put my finger -- we can
20 also -- I put my finger on my lips. And
21 I'm thinking.
22    Q.   Okay.
23    A.   Glutathione levels increase
24 with fetal development, as the fetus

1 develops.
2    Q.   And why is that?
3    A.   I'm sorry. Why?
4    Q.   Yes, ma'am.
5    A.   That's just -- that's what
6 happens. There's -- I mean, I don't know
7 that I've ever been asked why does
8 something. It's like, am I God? I
9 don't -- I mean, what -- I'm not -- what
10 are you asking?
11    Q.   What happens in fetal
12 development that would cause glutathione
13 levels to increase?
14    A.   Are you asking why there is
15 more enzyme produced?
16    Q.   Yes, ma'am.
17    A.   I -- is that a teleologic
18 question?
19    Q.   Do you understand the
20 question?
21    MR. SNIDOW:  Objection to
22    form.
23    THE WITNESS:  No.
24 BY MS. BROWN:

1    Q.   So as I understand your
2 testimony, Dr. Ness, as the fetal brain
3 develops, glutathione increases.
4    Is that your opinion?
5    A.   Yes.
6    Q.   Okay. And by what amount
7 does glutathione increase as the fetal
8 brain develops?
9    A.   Again, I can't answer that
10 question because that's a changing
11 phenomenon. And it's been studied in
12 animal models. I don't know how well
13 it's been studied in human -- actual
14 human fetuses, so I can't really answer
15 the question.
16    Q.   And what is it -- what stage
17 of fetal development does glutathione
18 begin to increase?
19    A.   It's a dynamic process.
20    Q.   And what causes glutathione
21 to increase as the fetus develops?
22    A.   I don't know how to answer
23 that question.
24    Q.   Why is that?

61 (Pages 238 - 241)

Page 242

1    A.   I don't really understand
2  quite what you're asking.
3    Q.   Well, I guess what I'm
4  trying to understand is, what is it in
5  the development of a fetus that causes
6  the glutathione levels to increase?
7  Like, what's happening scientifically
8  that makes that happen?
9    A.   The liver is developing.
10   Q.   So --
11   A.   And the brain is developing.
12   Q.   Glutathione levels in the
13 liver affect glutathione levels in the
14 brain?
15       MR. SNIDOW:  Objection to
16     form.  That's not what he said.
17       THE WITNESS:  I said
18     everything is dynamically
19     changing during development.
20 BY MS. BROWN:
21   Q.   Yeah.  I don't think that
22 quite answers my question, though.
23       What I'm trying to
24 understand, and you may not have an

Page 243

1  opinion on it, is why would glutathione
2  levels increase in the fetal brain as the
3  fetus develops?
4    A.   I can't -- I'll just say I
5  don't have an opinion.  How about that?
6    Q.   Okay.  Do fetal brains in
7  the third trimester have the same level
8  of glutathione as adult brains?
9    A.   I don't know the answer to
10 that.
11   Q.   You say in your report at
12 Page 66, is that when APAP is used by a
13 pregnant woman over a longer duration,
14 APAP depletes glutathione.
15       Do you see that?
16   A.   Yes.
17   Q.   How long does APAP have to
18 be used to deplete glutathione?
19   A.   There's not a specific
20 number.  They --
21   Q.   Does --
22   A.   The number that has been
23 used in the epidemiologic literature most
24 commonly is a cut-off -- well, it's not a

Page 244

1  cut-off.
2        Actually, there have been
3  different categories used, but -- but in
4  the category of duration of 28 days and
5  longer, it has been found that those
6  risks tend to be higher.
7    Q.   There is no epidemiological
8  literature that measures glutathione,
9  though, right?
10   A.   Not to my knowledge.
11   Q.   Okay.
12   A.   Not in humans.
13   Q.   Okay.  So you say over -- so
14 your opinion is that after 28 days, APAP
15 begins depleting glutathione?
16   A.   No.  That's not what I said
17 at all.  Not at all.
18   Q.   Okay.  What -- explain that
19 to me.
20   A.   I said that the literature,
21 the epidemiologic literature, seems to
22 show that in the longest duration of use
23 category, which is sometimes categorized
24 as 28 days or longer, that seems to be

Page 245

1  the highest risk.
2    Q.   But what does that have to
3  do with glutathione?
4    A.   Can you repeat your
5  question?
6    Q.   Yeah.
7        My question was, at what
8  length of use of acetaminophen during
9  pregnancy does APAP begin to deplete
10 glutathione?
11   A.   And as I said, I can only
12 answer that on the basis of the
13 epidemiologic literature.
14   Q.   Okay.  But that literature
15 has nothing to do with glutathione --
16 doesn't talk about glutathione?
17   A.   Well, indirectly it has -- I
18 mean, it does, because it has to do with
19 acetaminophen toxicity.
20   Q.   You say APAP depletes
21 glutathione and produces NAPQI in the
22 fetal brain?
23   A.   Correct.
24   Q.   And then you say, "This, in

62 (Pages 242 - 245)

Page 246

1  turn, among susceptible individuals,
2  triggers ADHD."
3       Do you see that?
4    A.  Yes.
5    Q.  Okay.  What do you mean by
6  "susceptible individuals"?
7    A.  Well, as I said previously,
8  I'm not opining that APAP alone
9  singularly causes ADHD.
10      I am opining that it is a
11  cause.  And it's quite possible that it
12  is an interaction between other factors
13  and APAP that is most -- causes the
14  highest risk.
15      So just as one example,
16  although I'm not -- I'm not saying that
17  this is necessarily something that
18  happens, because it has not really been
19  well replicated.
20      But as an example, I believe
21  it's in the Ystrom study, there is an
22  interaction between fever and APAP use as
23  it relates to ADHD.  And what that
24  interaction shows is an almost sixfold --

Page 247

1  actually, sixfold or higher level of risk
2  associated in those individuals who both
3  have fever and used acetaminophen.
4    So what I'm just trying to give
5  you what an interaction looks like.
6    Q.  How is an interaction
7  different than a confounder?
8    A.  Oh.  Well, a confounder is a
9  third factor that is responsible for the
10  observed association.  So it's kind of a
11  spurious association based upon the fact
12  that one is not identifying that third
13  factor, whereas an interaction is
14  literally -- it can be what we call
15  additive or multiplicative.  But it's
16  literally two things come together, and
17  the combination of the two of them is
18  greater than equal either one of them
19  would have been singly.
20    Q.  Is it your opinion,
21  Dr. Ness, that APAP alone cannot cause
22  ADHD?
23    A.  That is not even slightly
24  what I said.

Page 248

1    Q.  Okay.  You said --
2    A.  That is a complete
3  mischaracterization.
4    Q.  But, see, I asked the
5  question "is it," so I wasn't
6  characterizing it.
7       MR. SNIDOW:  Objection to
8  form, Ali.
9  BY MS. BROWN:
10    Q.  So your testimony was that
11  APAP is a cause --
12    A.  Correct.
13    Q.  -- of ADHD, correct?
14    A.  Correct.
15    Q.  And you went on then to
16  explain that you believe there is an
17  interaction between APAP and other
18  factors, correct?
19    A.  I said that's quite
20  possible.  I didn't say I believe.  I
21  said that's quite possible.
22    Q.  Do you believe that APAP
23  without an interaction with other factors
24  is capable of causing ADHD?

Page 249

1    A.  My belief, my opinion here
2  today, is that APAP is a cause of ADHD.
3    Q.  Yeah, but I'm not
4  understanding that.  What -- why don't
5  you say APAP is the cause of ADHD?
6       MR. SNIDOW:  Objection.
7       Asked and answered at the
8       beginning of the dep.
9       You can answer again.
10       THE WITNESS:  Because as I
11       said, this is a multi -- it's
12       quite likely -- I mean, there --
13       it's quite likely that APAP is --
14       ADHD is quite likely a
15       multifactorial -- in other words,
16       it is quite likely that there
17       is -- there are several different
18       causes of which APAP, I believe,
19       is one.
20  BY MS. BROWN:
21    Q.  Do those causes have to work
22  together to cause ADHD?
23       MR. SNIDOW:  Objection to
24       form.

63 (Pages 246 - 249)

1       THE WITNESS:  Not -- not
2    necessarily.  They may.  They
3    certainly may.
4  BY MS. BROWN:
5       Q.   I'm a little stuck on your
6  distinction about APAP being a cause, and
7  I just want to make sure I understand
8  your opinion.
9          As I understand it, you
10  think it is possible that APAP works
11  together with other factors to cause
12  ADHD, correct?
13      A.   It is possible.
14      Q.   Okay.  And the reason you
15  don't say APAP is the cause of ADHD is
16  because you think it's likely that APAP
17  is working with other factors?
18      MR. SNIDOW:  Objection to
19      form.  That's not what she
20      testified to.
21      THE WITNESS:  I didn't say
22      that.  I said that is also
23      possible.
24  BY MS. BROWN:

1       Q.   You referenced an additive
2  or a multiplicative effect.
3       A.   Right.
4       Q.   Is it your opinion that APAP
5  has an additive effect in increasing an
6  individual's risk of having a child with
7  ADHD?
8       A.   Again, there's just not
9  enough data to be able to opine about
10  that.
11      Q.   Is it your opinion that APAP
12  has a multiplicative effect in the
13  context of in utero exposure?
14      A.   I would repeat the same
15  answer, that it is -- there's not enough
16  data.
17      Q.   Do you believe genetics is
18  the cause of ADHD?
19      MR. SNIDOW:  Objection to
20      form.
21      THE WITNESS:  No.
22  BY MS. BROWN:
23      Q.   You believe genetics is a
24  cause of ADHD?

1       A.   I do.
2       Q.   When you -- when you opine
3  that something is the cause of a
4  particular disease or disorder, does that
5  mean you believe it doesn't interact with
6  other factors?
7       A.   No.  I'm -- it -- what I'm
8  saying is I don't believe it is the
9  singular, sole cause of ADHD.
10      Q.   But in your opinion, APAP
11  alone can cause ADHD?
12      A.   There may be situations
13  where that is the case.
14      Q.   Do you think that's likely?
15      A.   I can't opine about that.  I
16  don't have an opinion.
17      Q.   Do any of the studies on
18  which you rely for your opinion that APAP
19  is a cause of ADHD support your opinion
20  that APAP works in connection with other
21  factors?
22      MR. SNIDOW:  Objection.
23      Objection to form.
24      THE WITNESS:  I don't

1    understand the question.
2  BY MS. BROWN:
3       Q.   Your opinion is that APAP
4  likely works with other factors to cause
5  ADHD, correct?
6       A.   Actually, I did not say
7  that.  I said there are a multitude of
8  factors.  ADHD is a multifactorial
9  disease.  There are a multitude of
10  factors.  Those factors may interact with
11  each other.
12      Q.   What are some of the factors
13  that you believe may interact with ADHD
14  to -- excuse me.
15         What are some of the factors
16  you believe APAP may interact with to
17  cause ADHD?
18      A.   Genetics.
19      Q.   Any others?
20      A.   As I said, Ystrom has
21  actually demonstrated the potential for
22  fever to interact with -- with APAP.  But
23  as I also said, that finding has not been
24  strongly replicated.

64 (Pages 250 - 253)

Page 254

1    Q.   You say, back to the
2 paragraph we were looking at, and then
3 you say, "This, in turn, among
4 susceptible individuals, triggers ADHD."
5         What do you mean by
6 triggers?
7    A.   It's involved.
8    Q.   You say, "The Anand study,
9 demonstrating oxidative stress markers in
10 the relationship between APAP and ADHD,
11 provides direct evidence for this
12 hypothesis"; is that right?
13    A.   Can you please show me where
14 you're reading from?
15    Q.   Yeah.  It's the last
16 sentence of Page 166 --
17    A.   Oh, I see.
18    Q.   -- the paragraph we've been
19 talking about.
20    A.   Mm-hmm.
21    Q.   Okay.  And did you review
22 the Anand study in connection with your
23 report and opinions in this case?
24    A.   I did.  I must have read it,

Page 255

1 yeah.
2    Q.   Okay.  And why do you say
3 that the Anand study provides direct
4 evidence of this hypothesis?
5    A.   I'm trying to see whether I
6 referenced it previously with respect
7 to -- I think I did.
8         Yeah, it starts on Page 164.
9         It says, "A compelling study
10 has shown directly that oxidative stress
11 biomarkers mediate an association between
12 APAP and ADHD.  Anand" -- "Anand,"
13 A-N-A-N-D -- "(2021) investigated whether
14 the relationship between APAP exposure
15 and ADHD is mediated by markers of
16 oxidative stress using umbilical cord
17 plasma."
18         So they actually use data
19 from the same study that Ji took his data
20 from, and it actually goes on to describe
21 that study in quite a bit of detail.
22    Q.   And you're talking about
23 your report, Dr. Ness?
24    A.   Yeah.  I'm on Pages 164, 165

Page 256

1 and then also 166 of the report.
2         So I discuss it at some
3 length.  Do you want me to read the whole
4 thing?
5    Q.   No, I have more questions.
6         So the hypothesis that
7 you're discussing at the end of 166, the
8 paragraph we were just looking at, is
9 that APAP depletes glutathione which, in
10 turn, produces NAPQI in the fetal brain
11 which, in turn, triggers oxidative stress
12 and ADHD; is that correct?
13    A.   In the fetal brain and/or
14 liver, yes.  Mm-hmm.
15    Q.   Okay.  So it's a decrease in
16 glutathione and an increase in NAPQI.
17 That's the hypothesis, correct?
18    A.   The hypothesis is that APAP
19 actually depletes glutathione, so that
20 the two pathways by which APAP can be
21 metabolized, the tendency then, without
22 enough glutathione around, is for the
23 APAP to go down the -- the alternative
24 toxic NAPQI pathway.

Page 257

1    Q.   Does a decrease of
2 glutathione lead to more NAPQI in the
3 fetal brain?
4    A.   The depletion of glutathione
5 leads to more NAPQI -- more of the
6 metabolism going down the NAPQI pathway.
7    Q.   And so what you should see
8 in studies looking to validate this
9 hypothesis are decreased levels of
10 glutathione and increased levels of NAPQI
11 in individuals who were exposed to APAP,
12 correct?
13         MR. SNIDOW:  Objection to
14    form.
15         THE WITNESS:  You'd see --
16    you would -- if there was more
17    APAP around, you would see it
18    interfering with glutathione and
19    so that the metabolism goes down
20    the NAPQI pathway.
21 BY MS. BROWN:
22    Q.   And of course that was
23 actually the hypothesis in the Anand
24 study, that you should see less evidence

65 (Pages 254 - 257)

Page 258

1 of glutathione and more evidence of NAPQI
2 in -- you should less evidence of
3 glutathione in individuals exposed to
4 APAP, correct?
5     A.   Right.
6     Q.   And you know, because you
7 read it and relied on it, that the Anand
8 study authors found just the opposite,
9 right?
10         MR. SNIDOW:  Objection to
11     form.  Standing -- for my
12     standing objection, Ali.  If you
13     want her to talk about Anand,
14     show her Anand.
15         THE WITNESS:  Let's look at
16     the study --
17 BY MS. BROWN:
18     Q.   Do you recall that about the
19 study?
20     A.   Let's look at the study --
21         MR. SNIDOW:  Objection.
22 BY MS. BROWN:
23     Q.   I'm going to give you the
24 study.

Page 259

1         MS. BROWN:  And I hear your
2     objection.
3 BY MS. BROWN:
4     Q.   My question is, do you
5 recall that finding of the study?
6     A.   I would much prefer to look
7 at it as we speak.
8         MR. SNIDOW:  There's no
9     reason to do this, and last
10     time --
11         MS. BROWN:  Counsel, this
12     is really --
13         MR. SNIDOW:  -- you said
14     something that wasn't true, so...
15         MS. BROWN:  Okay.  First of
16     all, Baker did not look at
17     ADHD --
18         MR. SNIDOW:  That's not
19     what you said.
20         MS. BROWN:  If you would
21     like to redirect on that, we'll
22     have plenty of time for it.
23         MR. SNIDOW:  Okay.
24         MS. BROWN:  Second, I'm

Page 260

1     entitled to ask the questions in
2     a way that I see fit.
3         Third, consistent with the
4     court's order, your objection is
5     only to form.  And when I
6     defended many of these
7     depositions the first time
8     around, your colleagues were very
9     strict in enforcing that order,
10     and I would expect the same when
11     the shoe is on the other foot.
12         MR. SNIDOW:  I guess I'll
13     just say my understanding is that
14     you and I probably had similar
15     approaches to the -- the order.
16         THE WITNESS:  Okay.
17 BY MS. BROWN:
18     Q.   So to reorient us, Dr. Ness,
19 this is the Anand study that we're going
20 to mark as Exhibit 8 that you've cited in
21 the paragraph we just discussed involving
22 the depletion of glutathione producing
23 NAPQI in the fetal brain.
24         (Document marked for

Page 261

1     identification as Ness
2     Exhibit 8.)
3 BY MS. BROWN:
4     Q.   Dr. Ness, this is the Anand
5 study that you read and relied on and
6 cited in your report.
7         And I want to direct your
8 attention to Page 2 of 16.
9     A.   Mm-hmm.  Yes.
10     Q.   And in the final paragraph,
11 the middle sentence begins, "We
12 hypothesized."
13         Do you see that?
14     A.   Yes.
15     Q.   And first of all, you
16 understand that because this study
17 couldn't measure glutathione --
18 glutathione, they were looking at
19 biomarkers of glutathione, correct?
20     A.   I understand.
21     Q.   Okay.  And so what they say
22 is, "We hypothesized that cord plasma
23 methionine, serine, glycine, and
24 glutamate" -- those are the cord plasma

1  amino acids necessary for glutathione
2  synthesis, correct?
3      A.  Yes.
4      Q.  All right.  They
5  hypothesized that they would be depleted
6  for children with higher acetaminophen
7  exposure, correct?
8      A.  It says, "We hypothesized
9  that cord plasma methionine, serine,
10  glycine, and glutamate would be depleted
11  for children with higher cord plasma
12  acetaminophen exposure due to greater
13  demand and need for glutathione to
14  detoxify acetaminophen," which is what I
15  was just saying.
16      "We further hypothesized the
17  depletion of cord amino acids may explain
18  the association" -- may explain, so
19  mediate -- "the association between
20  acetaminophen exposure and childhood risk
21  of ADHD, as these amino acids have roles
22  in other pathways that may be affected.
23      "Secondly, we aimed to
24  analyze whether cord plasma

1  8-hydroxy-deoyguanosine, a known
2  biomarker of oxidative damage to DNA, was
3  associated with acetaminophen exposure
4  and ADHD risk."
5      Q.  And what actually happened,
6  though, in the study, Dr. Ness, that you
7  cited, is found on Page 10.
8      A.  Can I just finish the
9  paragraph?
10      Q.  You don't need to read the
11  whole paragraph.  I just asked you a
12  question, if that was the hypothesis.
13  And it was --
14      A.  I think I just read to you
15  what their hypothesis was.
16      Q.  Right.  And it's consistent
17  with what we've been discussing, that
18  according to this biologically plausible
19  mechanism, you should see a depletion of
20  these glutathione biomarkers, correct?
21      A.  And then they go on, then,
22  to say, "8-hydroxy-deoyguanosine is a
23  product of cellular oxidative stress" --
24  is a product of cellular oxidative

1  stress -- "which can occur when NAPQI
2  causes mitochondrial damage that
3  subsequently leads to the release of
4  reactive oxygen species.  We hypothesized
5  that for children with higher cord
6  acetaminophen levels, higher
7  8-hydroxy-deoyguanosine levels would be
8  associated with ADHD risk."
9      Do you understand the
10  distinction?
11      Q.  Yes, ma'am, but that wasn't
12  my question.  And I appreciate you
13  reading from the article.
14      My question was, their
15  hypothesis was they should see a decrease
16  in the acids -- amino acids associated
17  with glutathione, correct?
18      A.  "We further hypothesize the
19  depletion of cord amino acids may explain
20  the association between acetaminophen
21  exposure and childhood risk of ADHD,"
22  which is what they found.
23      Q.  And what they found, though,
24  Dr. Ness, is that there was not a

1  depletion in these precursors of
2  glutathione.  There was actually
3  increased levels of these --
4      A.  Second --
5      Q.  Ma'am, please let me ask the
6  question.
7      -- of these precursors of
8  glutathione, correct?
9      A.  "Second" -- "Second, we aim
10  to analyze whether cord plasma
11  8-hydroxy-deoyguanosine, a known
12  biomarker of oxidative damage to DNA, was
13  associated" -- positively associated --
14  "with acetaminophen exposure and ADHD
15  risk," which is what they found.
16      Q.  Ma'am, did you understand my
17  question?
18      A.  I am fully articulating
19  their set of hypotheses.  If you take one
20  hypothesis out of context and don't
21  understand the nature of oxidative
22  stress, then it sounds like they found
23  the opposite of what they were looking
24  for.  In fact, they found just what they

Page 266

1 were looking for --
2    Q.   Let's go --
3    A.   -- and they say specifically
4 in the abstract, "Cord methionine
5 statistically mediated 22.1 percent and
6 glycine mediated 22 percent of the
7 association between cord acetaminophen
8 and ADHD. Our findings provide clues."
9    Q.   Keep reading.
10    A.   "But additional
11 investigation into oxidative stress
12 pathways and the association of
13 acetaminophen exposure and childhood ADHD
14 is warranted," which is what every study
15 by any reasonable professional scientist
16 will say at the end of a study.
17        Because as I think I
18 actually described in my report, our
19 professional standard is never to say
20 that a single study proves a causal
21 association. We require replication in
22 good studies, in well-done,
23 methodological studies. And that is
24 exactly what they are saying.

Page 267

1    Q.   Turn to page --
2    A.   They proved their
3 hypothesis.
4    Q.   Turn to Page 10, please,
5 ma'am. Final paragraph. This is the
6 discussion of the increased levels of the
7 glutathione precursors.
8        What the authors say is
9 that, "These findings are in opposition
10 to our original hypothesis that lower
11 levels of amino acids involved in the
12 synthesis of glutathione may explain the
13 association between cord acetaminophen
14 and ADHD risk."
15        Do you see that?
16    A.   I don't. Where exactly are
17 you reading from?
18    Q.   The first sentence of the
19 last paragraph.
20    A.   Of page?
21        MR. SNIDOW: Yeah.
22 BY MS. BROWN:
23    Q.   10 out of 16.
24    A.   Oh, I see.

Page 268

1    Q.   Do you see that, ma'am?
2    A.   Mm-hmm.
3    Q.   And so what the authors
4 found is that while there was an
5 association between markers -- ma'am --
6    A.   I'm sorry --
7    Q.   -- ma'am. I'm asking the
8 questions. We're going to move through
9 this quickly.
10    A.   You asked me a question, but
11 I never answered it.
12    Q.   I did not. I did not. I
13 have no question for you right now.
14 I'm -- I'm in the middle of asking it.
15        MR. SNIDOW: Wait. Hold
16    on. I actually thought you did
17    have a question.
18        I'm sorry. Do you want to
19    ask it again as a --
20        MS. BROWN: Let me ask it.
21        MR. SNIDOW: Okay. Thanks.
22 BY MS. BROWN:
23    Q.   What these authors actually
24 found is that while there was an

Page 269

1 association with markers of oxidative
2 stress, they found no association with
3 markers of glutathione, correct?
4    A.   They say, "This may suggest
5 that potential disruption of the
6 homeostasis of glutathione synthesis by
7 acetaminophen is associated with
8 increased oxidative stress."
9    Q.   That wasn't my question.
10    A.   That's correct.
11    Q.   What these authors, in the
12 study you cited in a paragraph where you
13 discuss glutathione depletion, found is
14 no association with the precursors of
15 glutathione and acetaminophen, correct?
16    A.   The authors themselves say,
17 "In a study of rats, subtoxic and toxic
18 doses of acetaminophen led to a
19 significant increase in
20 8-hydroxy-deoyguanosine and a decrease in
21 glutathione. Indeed, the significant
22 association of higher levels of
23 8-hydroxy-deoyguanosine with higher odds
24 of ADHD in this study is consistent with

68 (Pages 266 - 269)

Page 270

1  our original hypothesis of the oxidative
2  stress biomarker being associated with
3  childhood ADHD risk."
4      Q.   Yes, ma'am.  Oxidative
5  stress was found to be associated with
6  APAP use in this study.  We agree on
7  that, correct?
8      A.   That's correct.
9      Q.   What the authors
10  hypothesized is that there should also be
11  a decrease in the precursors to
12  glutathione, correct?
13      A.   There is a pathway that they
14  are hypothesizing that explains their
15  findings --
16      Q.   Ma'am, you do understand --
17      A.   -- by virtue of mediation.
18      Q.   Do you understand that they
19  hypothesized that there should be a
20  decrease in the precursors to
21  glutathione?
22      A.   I think we just went over
23  that, didn't we?
24      Q.   And so we can agree that was

Page 271

1  their hypothesis and their findings as it
2  related --
3      A.   I don't believe that we
4  agreed.  I read to you that they had
5  several hypotheses.
6      Q.   Ma'am, one of the
7  hypotheses --
8      A.   One of which was a mediation
9  hypothesis.
10      Q.   Page 2 --
11      A.   Which they found.
12      Q.   Page 2 of 16.  Last
13  paragraph, middle sentence.
14          "We hypothesized that cord
15  plasma methionine, serine, glycine, and
16  glutamate would be depleted for children
17  with higher cord plasma acetaminophen
18  exposure due to greater demand and the
19  need for glutathione to detoxify
20  acetaminophen."
21      A.   Correct.
22      Q.   Do you see that?
23      A.   Right.
24      Q.   That was one of their

Page 272

1  hypotheses, correct?
2      A.   They had -- they had
3  several.
4      Q.   And the findings as it
5  related to that hypothesis were in
6  opposite to the original hypothesis,
7  correct?
8      A.   They had several hypotheses.
9  They were able to demonstrate most but
10  not necessarily all of the hypotheses.
11      Q.   That was not my question.
12          As it related to their
13  hypothesis that we just looked at
14  regarding the precursors to glutathione,
15  their findings were in opposition to
16  their original hypothesis, correct?
17      A.   Well, I -- I did not conduct
18  this study, and I'm not opining today
19  about each separate hypothesis.
20          I am saying that, overall,
21  their studies showed what they set out to
22  find, and they characterized their study
23  as being a -- as being a positive study
24  in supporting this pathway.

Page 273

1      Q.   How could oxidative stress
2  occur if glutathione is not depleted?
3      A.   I don't -- I'm not here to
4  opine about toxicology.  I think we've
5  established that I'm not a toxicologist.
6      Q.   Because on Page 166 of your
7  report, your hypothesis of the biological
8  mechanism states that APAP depletes
9  glutathione, produces NAPQI in the fetal
10  brain, and then oxidative stress results,
11  correct?
12      A.   You know, I'd like to step
13  back for one second and say we're talking
14  about one study.  It had several
15  hypotheses.  Some of those hypotheses
16  were, in fact, verified by their results.
17          I am saying not all of their
18  hypotheses were entirely verified, and I
19  do not base, in any way, my opinion on a
20  single study of one subset hypothesis of
21  that study.
22          I base my opinion with
23  regard to biologic plausibility on the
24  totality of the biologic evidence and the

69 (Pages 270 - 273)

Page 274

1  question of whether that totality
2  creates -- that totality is data that
3  overall, supports the notion that there
4  is a biologically plausible hypothesis.
5          That is what I'm opining
6  today as an epidemiologist.  That is my
7  opinion.
8      Q.   Please turn to Page 3 of
9  your expert report that we've marked as
10  Exhibit 7.
11     A.   Page 3?
12     Q.   Correct.
13     A.   Okay.
14     Q.   You have a section titled
15  "Bradford Hill Criteria"?
16     A.   Correct.
17     Q.   And you list Hill's nine
18  tenets, correct?
19     A.   Correct.
20     Q.   And then you state,
21  "Consistency and temporality are often
22  considered to carry particular weight by
23  epidemiologists with whom I have
24  collaborated (notably I have been

Page 275

1  present" -- "I have been the president of
2  two of the three major societies of
3  epidemiology and so have had many and
4  ample opportunities to discuss this)."
5          Do you see that?
6      A.   Yes, I do.
7          MR. SNIDOW:  Are we done
8      with Anand?
9          MS. BROWN:  Yes.
10         MR. SNIDOW:  Thank you.
11 BY MS. BROWN:
12     Q.   And that is true for any
13 Bradford Hill causal analysis you
14 conduct, correct?
15         MR. SNIDOW:  What is that?
16         MS. BROWN:  The sentence we
17     just read.  "Consistency and
18     temporality are considered to
19     carry particular weight by
20     epidemiologists."
21 BY MS. BROWN:
22     Q.   Correct?
23         MR. SNIDOW:  Sorry.  I
24     thought you were talking about

Page 276

1      her being president of the
2      epidemiological societies.
3          THE WITNESS:  Yes.
4  BY MS. BROWN:
5      Q.   You don't change the
6  particular weight you give to a
7  consideration based on how much evidence
8  supports that particular consideration,
9  correct?
10     A.   That's an a priori -- that's
11 an a priori consideration.  Consistency
12 and temporality are often considered to
13 carry a particular weight.  That's a
14 priori.
15     Q.   Sure.
16         And so what that means to
17 regular people is that before you even
18 look at the evidence, this is the
19 framework that you are evaluating it
20 under, correct?
21     A.   That is my -- that is the
22 framework under which I work, and many
23 other epidemiologists do as well.  There
24 are many different ways to conduct --

Page 277

1  Hill's tenets is not like a quadratic
2  equation.  You know, it's not like you
3  can say X percent goes here and
4  X percent...
5          It's an aggregation of the
6  totality of the literature, and then in
7  the hands of an expert epidemiologist, an
8  estimation, an opinion about whether
9  those tenets are met.
10     Q.   Right.  And here in your
11 report in the acetaminophen litigation,
12 you write that "consistency and
13 temporality are often considered to carry
14 particular weight by epidemiologists,"
15 including yourself, correct?
16     A.   That's right, yes.
17     Q.   And one thing that would be
18 wrong, we can agree, is for an expert to
19 change the way she weights these
20 considerations, based on the evidence in
21 a litigation, correct?
22         MR. SNIDOW:  Objection to
23     form.
24         THE WITNESS:  I'm not --

70 (Pages 274 - 277)

Page 278

1    the -- the document speaks for
2    itself. I don't understand the
3    parsing of language here. I --
4    the document speaks for itself.
5   BY MS. BROWN:
6        Q.   It does.
7            And what the document states
8   is that consistency and temporality are
9   considered by you and other
10  epidemiologists to carry the most weight,
11  correct?
12       A.   I didn't say the most
13  weight. I said they are weighty.
14       Q.   Well, what you said is
15  "often considered to carry particular
16  weight," correct?
17       A.   Those two are weighty. In
18  other words, if -- in other words, my
19  opinion that both consistency and
20  temporality are met are important in my
21  coming to a final causal conclusion.
22       Q.   And those are the two
23  criteria that you called out specifically
24  here, correct?

Page 279

1        A.   That is what the report
2   reads, yes.
3        Q.   And it reads that because
4   that's your opinion, correct?
5        A.   My opinion, as I just said,
6   and I think I at least apply in other
7   parts of the report, are that the
8   totality of the literature, the totality
9   of meeting or not meeting Hill's tenets,
10  is the -- is the criteria on which I base
11  my causal opinion.
12       Q.   And one of the things, in
13  terms of your report, consistency and
14  temporality are the only two criteria
15  that you assign particular weight to in
16  your evaluation of the Bradford Hill?
17           MR. SNIDOW: Objection to
18      form.
19           THE WITNESS: That is
20      absolutely a mischaracterization.
21           All I said, and I'll read
22      it -- we can read it for a sixth
23      time. "Consistency and
24      temporality are often considered

Page 280

1    to carry particular weight by
2    epidemiologists with whom I have
3    collaborated."
4        (Document marked for
5        identification as Ness
6        Exhibit 9.)
7   BY MS. BROWN:
8        Q.   I'm handing you what we've
9   marked as Ness Exhibit 9.
10           This is a report that you
11  authored in February of 2018 --
12       A.   Correct.
13       Q.   -- in the talcum powder
14  litigation, correct?
15       A.   Yes, ma'am.
16       Q.   You have also served as an
17  expert witness in the talcum powder
18  litigation against Johnson & Johnson,
19  correct?
20       A.   I believe we've even met in
21  that context.
22       Q.   We sure have. Pretty
23  recently, too, right?
24       A.   That is correct.

Page 281

1        Q.   And of course in the talcum
2   powder litigation, you also opined on and
3   applied a Bradford Hill analysis,
4   correct?
5        A.   Yes, I did.
6        Q.   Okay. And, in fact, you use
7   some of the very same language that you
8   have in your Tylenol report, correct?
9        A.   I don't recall specifically,
10  but that certainly may be the case.
11       Q.   Do you have a template
12  report that you cut and paste into later
13  reports?
14       A.   No.
15       Q.   Okay. Let's take a look in
16  this talc report at Page 3. It's
17  actually the bottom of Page 2. And here,
18  too, like the Tylenol report, you list
19  Hill's tenets, correct?
20       A.   Yes.
21       Q.   Okay. And what you say
22  after that is, "Strength of association
23  and consistency are considered to be
24  particularly important by most

71 (Pages 278 - 281)

Page 282

1  epidemiologists with whom I have
2  consulted (notably I have been president
3  of two of the three major societies of
4  epidemiology and so have had many and
5  ample opportunities to discuss this)."
6          Do you see that?
7      A.  I do see that.
8      Q.  Okay.  And part of that
9  sentence is, in fact, identical to the
10 sentence that we saw in your Tylenol
11 report, correct?
12     A.  I would like to clarify.
13     Q.  Well, the question was
14 just -- ma'am, the question was just
15 part --
16     A.  There are records here that
17 are the same.
18     Q.  Okay.  What is the same in
19 the Tylenol report at Page 3 and the talc
20 report at Page 3 is, "notably I have been
21 president of two of the three major
22 societies of epidemiology and so have had
23 many and ample opportunities to discuss
24 this," correct?

Page 283

1      A.  That's correct.
2      Q.  Okay.  What is the same is a
3  reference to epidemiologists with whom
4  you have consulted or collaborated,
5  correct?
6      A.  That's correct.
7      Q.  What is different are the
8  two Bradford Hill criteria that you call
9  out in these reports, correct?
10     A.  This is where I'd like to
11 answer your question, please.
12     Q.  Well, just -- you have to
13 answer --
14         MR. SNIDOW:  Hold on.  Let
15     her answer.
16         MS. BROWN:  Hold on.
17 BY MS. BROWN:
18     Q.  You have to answer the
19 question that I ask.
20         MR. SNIDOW:  Okay.
21 BY MS. BROWN:
22     Q.  What is different is the two
23 Bradford Hill criteria that you call out
24 in these two different reports.

Page 284

1      A.  One is the same and one is
2  not the same.  Consistency is noted in
3  both places.
4          In the APAP report, I talk
5  about temporality.  And in the ovarian
6  cancer report, I talk about strength of
7  association.
8          And I would point out that
9  these reports are different in their
10 temporal relationship, insofar as the
11 APAP report was presented in -- what is
12 the date on this?
13         MR. SNIDOW:  I think you'll
14     find it's March.
15         THE WITNESS:  2024 -- 2024.
16     And the talc was dated six
17 years prior.  Six years is quite
18 a long time for a scientist to
19 better inform themselves.
20     In the meantime, I had the
21 opportunity, actually, to read
22 Hill's address several more
23 times, as well as reading the
24 commentary, by, as I noted

Page 285

1  previously, Ken Rothman and a
2  number of others who have
3  commented on this.
4      You might even call this
5  talmudic in its -- the degree to
6  which I have gone back and looked
7  at the language and looked at
8  exactly what Hill and Rothman and
9  others have said about this.
10     In the case of talc, I'm
11 sure you will recall that
12 strength of association is not
13 terribly different than it is in
14 the situation of APAP, right.
15     It was a 30 to 60 percent
16 increased risk.  For APAP, it's
17 somewhere within that range,
18 within that general range.  So
19 they are actually quite similar.
20     In -- when fully reviewing
21 Hill's own words, I realized that
22 actually -- and I think I quote
23 it, in fact.  I believe it was
24 Rothman -- it may have been Hill,

72 (Pages 282 - 285)

Page 286

1    but I can find the reference for
2    you -- specifically said that
3    kind of without temporality, you
4    really can't have causality.
5        So in the six years in
6    which I was becoming more learned
7    on this topic -- and I was
8    reading extensively, and I was
9    educating myself -- I have come
10   to the conclusion that, indeed,
11   it is consistency, as I thought
12   previously; but, in fact,
13   temporality is the other criteria
14   that Hill and Rothman have
15   pointed out is absolutely
16   necessary.
17   BY MS. BROWN:
18       Q.   So you got it wrong in the
19   talc report?
20       MR. SNIDOW:  Objection to
21   form.
22       THE WITNESS:  I didn't say
23   I got it wrong.  I said strength
24   of association is important as

Page 287

1    well.
2        I previously answered your
3    question, when you said are these
4    the only one -- I can't recall --
5    I mean, we can read it back.
6        But you asked, is it just
7    those two, you know, how are
8    those weighted differently than
9    everything else.  And I said
10   those are two, and you have to
11   basically look at all of them.
12       That is what I said.  And
13   that is what I still believe.
14   And that is what I believed when
15   I wrote the talc report.
16       What I say in the talc
17   report, at some length, you have
18   to take the entirety of the body
19   of literature.  I believe you'll
20   remember when I was on the stand,
21   I said that to you as well.
22   BY MS. BROWN:
23       Q.   Ma'am, how long have you
24   been a practicing epidemiologist?

Page 288

1        A.   30-plus years.
2        Q.   And when was Hill's tenets
3    published?
4        A.   1964.
5        Q.   We asked you some questions
6    under oath about your identification of
7    strength of association and consistency
8    as factors, you said, were considered to
9    "be particularly important by most
10   epidemiologists with whom I have
11   consulted," back in your 2018 report.
12       Do you recall that?
13       MR. SNIDOW:  You did --
14       THE WITNESS:  My report
15       speaks for itself.  I just
16       explained it.
17   BY MS. BROWN:
18       Q.   And do you recall testifying
19   under oath that your identification of
20   strength of association and consistency
21   as particularly important Bradford Hill
22   factors, do you recall testifying that
23   that was not specific to talc and ovarian
24   cancer?

Page 289

1        MR. SNIDOW:  Sorry, Ali.
2    Are you referring to a deposition
3    from six years ago?  Because I --
4        MS. BROWN:  We can get it.
5        MR. SNIDOW:  Yeah.
6        MS. BROWN:  But your
7    objection is form.
8        MR. SNIDOW:  Okay.
9        THE WITNESS:  If you're
10       asking me about something I said
11       under oath, I would have to see
12       exactly what I said and the
13       context of what I said.  So if
14       you did produce that document --
15   BY MS. BROWN:
16       Q.   Do you believe that your
17   opinion in the talc report about strength
18   of association and consistency being
19   particularly important factors, do you
20   believe that you said that specific to
21   talc and ovarian cancer?
22       A.   I did not specifically say
23   that to talc and ovarian cancer.  My
24   opinion in 2018 was based upon my reading

73 (Pages 286 - 289)

1  of Hill, Rothman, et cetera, in 2018.
2          As I said, when I further
3  educated myself and further read those
4  primary documents in much greater detail,
5  I have now appreciated that although
6  strength of association is important --
7  and I believe I say that in this report
8  on APAP, acetaminophen -- although
9  strength of association is important, I
10 have now come to appreciate that in his
11 own words or their own words, temporality
12 is actually considered to be a sine qua
13 non.
14         That is to say, if the
15 exposure is subsequent to the outcome,
16 one cannot -- one cannot -- I think I
17 actually used the terminology -- put the
18 cart before the horse.
19    Q.   When did you come to this
20 change of opinion that the two important
21 factors are now no longer strength and
22 consistency but consistency and
23 temporality?
24         MR. SNIDOW:  Objection to

1      the characterization.
2          THE WITNESS:  You are
3      completely mischaracterizing.
4      You are completely
5      mischaracterizing.
6  BY MS. BROWN:
7      Q.   When did your opinion
8  change?
9          MR. SNIDOW:  Objection to
10     the characterization.
11         THE WITNESS:  I told you my
12     opinion has not changed.  My
13     opinion has not changed.
14 BY MS. BROWN:
15     Q.   Okay.  You told me you went
16 back and you reread Hill and Rothman, and
17 now you've come to believe that
18 temporality is one of the key factors,
19 correct?
20     A.   It is one.  And I also
21 believe that strength of association is
22 important, as I said previously.
23         I had not appreciated the
24 emphasis that Hill and Rothman put on

1  temporality until I went back and further
2  read those documents, those primary
3  documents, and came to that appreciation.
4          And that happened sometime
5  between 2018 and 2024.  And I cannot give
6  you an exact timeline of when I woke up
7  one morning and said a-ha.
8      Q.   Okay.  But this wasn't the
9  only -- 2018 was not the only talc case
10 in which you testified, correct?
11     A.   Can you produce those other
12 reports and the exact language?
13     Q.   Wasn't my question.
14         2018 was not the only talc
15 case in which you testified, correct?
16     A.   2018 was not the only talc
17 case in which I've testified, and I would
18 have to look at those reports and see
19 exactly what I wrote.
20     Q.   And your testimony is that
21 sometime between 2018 and your Tylenol
22 report in 2024, you came to appreciate an
23 increased importance of temporality,
24 correct?

1      A.   That is correct.
2      Q.   And do you --
3      A.   I would also add that in
4  preparation for this particular case, for
5  the APAP case -- do you mind if I just
6  call it -- acetaminophen is, like, many
7  syllables.
8      Q.   Sure.  Sure.
9      A.   It was in preparation
10 specifically for the APAP case that I
11 specifically went back and reread those
12 primary documents several more times.
13     Q.   Did you specifically reread
14 the primary documents after you had been
15 retained as a testifying expert?
16     A.   I don't recall the answer to
17 that.
18         I do recall that having
19 been -- you know -- one gets into a kind
20 of way of thinking when one is doing
21 cases on a particular topic; talc and
22 ovarian cancer being a good example.
23         And I appreciated that in
24 order to review an entirely new

1 literature, I needed to go back and
2 reeducated myself about the foundational
3 aspects of this analytic process, which I
4 did.
5    Q.   Did you do that at the same
6 time that you made your notes in 2022?
7    A.   I can't -- I can't tell you.
8 Timelines are not something I'm terribly
9 good at. I just can't tell you the
10 answer to that.
11    Q.   Did you take any notes about
12 your re-review of Hill and Rothman?
13    A.   Not that I recall.
14    Q.   Did you type the expert
15 report in APAP that we marked as
16 Exhibit 4?
17    A.   Yes, I did.
18    Q.   Sorry. Exhibit 7.
19    A.   Yes. It's on my computer.
20 That's why I have it on my computer.
21    Q.   Is it still your opinion
22 here, in April of 2024, that consistency
23 and temporality are often considered to
24 carry particular weight by

1 epidemiologists?
2    A.   That is what I write, and
3 that is my opinion today.
4    Q.   Today is it your opinion
5 that strength of association is
6 considered to be particularly important
7 by most epidemiologists with whom you
8 have consulted?
9    A.   Today I would say that
10 strength of association is important.
11    Q.   Okay. That wasn't my
12 question.
13        Today, would you say that
14 strength of association is considered to
15 be particularly important by most
16 epidemiologists with whom you have
17 consulted?
18    A.   Actually, Hill and Rothman
19 -- I think it's very important to get
20 this precise.
21    Q.   Well, ma'am, respectfully,
22 could you answer the question?
23        MR. SNIDOW: She's going --
24    she's going to.

1        THE WITNESS: Respectfully,
2    I'm going to answer your
3    question, yes.
4 BY MS. BROWN:
5    Q.   You just opened your
6 computer --
7    A.   Yes, I did.
8    Q.   What are you looking for?
9    A.   That's correct.
10        I'm looking for the specific
11 language that Hill and Rothman used when
12 talking about strength of association.
13 If you just give me one second, please.
14    Q.   But my question had to do
15 with whether, today, you consider
16 strength of association to be
17 particularly important by most
18 epidemiologists.
19    A.   I do not call it out in my
20 report, and I can tell you the reason
21 why. Because Bradford Hill --
22    Q.   Ma'am, you are on your
23 computer. Can you please tell us what
24 you're doing?

1        MR. SNIDOW: Ali, do you
2    want me to speed it up?
3        MS. BROWN: Huh?
4        MR. SNIDOW: I've got the
5    page. Do you want to speed it
6    up?
7        MS. BROWN: I don't know
8    what she's looking at.
9 BY MS. BROWN:
10    Q.   Can you just say for the
11 record what you're looking at, Dr. Ness?
12    A.   Strength of association and
13 what Bradford Hill --
14        MR. SNIDOW: She's looking
15    at her report and --
16        THE WITNESS: Sorry.
17 BY MS. BROWN:
18    Q.   Are you looking at your
19 report, Doctor?
20    A.   Yes.
21    Q.   Okay. What page of the
22 report are you looking at?
23    A.   If I'm -- I can spend quite
24 a bit of time trying to find it, but it

1 sounds like --
2       MR. SNIDOW:  That's why I
3    asked.  142.
4       THE WITNESS:  -- Mr. Snidow
5    has the specific area.
6       So 142.
7       He is younger and faster
8    than I am.
9       MR. SNIDOW:  I just know
10    where it is.
11 BY MS. BROWN:
12    Q.   Ma'am, are you answering my
13 question about whether today you consider
14 strength of association to be
15 particularly important by most
16 epidemiologists with whom you have
17 consulted?
18    A.   As even Bradford Hill
19 pointed out, there are many real causal
20 associations that are not particularly
21 strong.  As he puts it, "We must not be
22 too ready to dismiss a cause-and-effect
23 hypothesis merely on the grounds that the
24 observed association appears to be

1 slight.  There are many occasions in
2 medicine when this truth" -- "when this
3 is in truth so."
4       Examples.  And then I go
5 through a number of examples, for
6 instance, occupational exposure to
7 benzine, hormone therapy,
8 estrogen/progesterone therapy, and breast
9 cancer risk.  Talc and ovarian cancer.
10 Trichloroethylene and risk of kidney
11 cancer.  Air pollution.
12       And I would add that in the
13 last trial I was involved in, I also
14 talked about, but did not in this report,
15 secondhand smoke.
16       But all of those are causal
17 associations that we accept as causal and
18 are in the same order of magnitude as
19 either talc or APAP.
20       Both of them fall into this
21 exact same range of, as Hill said,
22 cause-and-effect hypotheses, observed
23 associations that are slight.
24       Or I would say, as I said

1 previously, characterized as mild to
2 moderate.
3    Q.   What was my question?
4    A.   Can you repeat the question.
5    Q.   Wait, no.  Do you remember
6 my question?
7    A.   Yeah.  Your question was
8 whether I had changed my opinion, and the
9 answer is I have not changed my opinion.
10       I have simply gone back and
11 reeducated myself about exactly, and I
12 quote, what Hill said.
13       I think you will agree with
14 me, ma'am, that in the talc report, I did
15 not quote Hill from his original
16 publication at length.  In this report I
17 do quote, at length, Hill and what he
18 specifically wrote.
19       So you can see that over
20 that period of time, I have more fully
21 educated myself.
22    Q.   Okay.  What he specifically
23 wrote was written in the 1960s, correct?
24    A.   He -- 1964.

1    Q.   1964.
2    A.   That's correct.
3    Q.   And you had read what he had
4 specifically wrote many, many, many times
5 before the 2018 talc report, correct?
6    A.   That's not correct.  I had
7 read it.  I had read it, for sure.  For
8 absolute sure, I had read it.  And I was
9 familiar with it.
10       However, in this talmudic
11 way, I had not parsed the language and
12 thought very, very carefully about
13 exactly, and quoting, what he said.
14    Q.   So this talc report from
15 2018 is about 70 pages, right, ma'am?
16    A.   And this new report is about
17 202 pages, plus references plus exhibits.
18 Correct.
19    Q.   Are you pointing that out to
20 say you did a better job on the Tylenol
21 report than you did on the talc report?
22    A.   I'm telling you that I went
23 back and re-reviewed the foundational
24 concepts and quoted them in more detail

76 (Pages 298 - 301)

1 in this report, as a result of looking at
2 a new literature and, thereby, feeling
3 the need to further -- become further
4 acquainted with his language.
5      Q.   You just said you did this
6 as a result of looking at new literature;
7 is that right, ma'am?
8      A.   No.
9      Q.   You literally just said --
10      A.   Well, if I said that, what I
11 meant -- what I said previously, and what
12 I mean here, just to characterize what I
13 mean here, is when approached with a new
14 topic, I went back and more fully
15 educated myself on exactly his words.
16      Q.   What you said is, "I'm
17 telling you that I went back and
18 re-reviewed the foundational concepts and
19 quoted them in more detail in this
20 report, as a result of looking at a new
21 literature and, thereby, feeling the need
22 to further become acquainted with his
23 language."
24      A.   I want to be very -- I think

1 that you are interpreting my words
2 differently than I meant or am
3 interpreting my words.
4      My interpretation of my
5 words and what I meant, to make sure I'm
6 not being mischaracterized, is, this was
7 a new topic. I, therefore, felt the need
8 to go back and reread Hill, Rothman,
9 et cetera, with regard to the very
10 foundations of what I have been talking
11 about for many, many years.
12      Having re-reviewed the
13 language and quoting it here, I came to
14 the appreciation that, in fact, strength
15 of association, albeit important -- and I
16 would point out, in the talc report, I
17 also point out that a mild to moderate
18 association can be causal, even if it's
19 relatively modest. And, in fact, I give
20 some of the same examples.
21      So my opinion certainly has
22 not changed. My opinion certainly has
23 not changed. My opinion is certainly not
24 related to a particular litigation. Not.

1      Q.   Do you still believe today,
2 in April of 2024, that strength of
3 association and consistency are
4 considered to be particularly important
5 by most epidemiologists with whom you
6 have consulted?
7      A.   This report speaks for
8 itself.
9      Q.   Ma'am, we've been through
10 this question multiple times.
11      Could you please listen to
12 the question I'm answering -- asking you
13 and answer it.
14      MR. SNIDOW:  I think she
15      has.
16      MS. BROWN:  But she hasn't.
17      And we can go off the record and
18      look at the last six times I've
19      tried to get an answer to this
20      question.
21      MR. SNIDOW:  I think --
22      MS. BROWN:  And if we need
23      to, we can take this wherever we
24      need to take it.

1      But this is a question I'm
2      entitled to an answer to.
3 BY MS. BROWN:
4      Q.   We just reviewed two
5 different reports.
6      I want to know, if today,
7 you believe strength of association and
8 consistency are considered to be
9 particularly important by most
10 epidemiologists with whom you have
11 consulted.
12      A.   I'm telling you I consider
13 strength of association to be one of
14 Hill's tenets. I consider the totality
15 of Hill's tenets to be important in terms
16 of my causal opinion.
17      Having further reviewed
18 Hill's language, et cetera, I appreciated
19 that temporality is a sine qua non of
20 meeting the necessary factors. I also
21 said, and quoted to you, his specific
22 words with respect to strength of
23 association.
24      And I also said that in my

77 (Pages 302 - 305)

Page 306

1 talc report, I indicated that talc is not
2 a strong association and, very similarly
3 to here, said, and yet I come to a causal
4 conclusion.
5        I actually used some of the
6 exact same counterexamples, including
7 benzine, hormone therapy, and others that
8 I just enumerated to you.
9        I believe that's as full an
10 answer as I could conceivably give.
11       You can ask the question a
12 dozen more times and we can spend all of
13 our time on this question, but,
14 personally, I would prefer to talk about
15 the literature.
16     Q.   Is that your best answer to
17 the question I asked you?
18     A.   I just answered your
19 question.
20     Q.   Okay.  Did you review Judge
21 Cote's Daubert opinion?
22     A.   Yes, I did.
23     Q.   Did you read Judge Cote's
24 statements regarding Dr. Baccarelli?

Page 307

1     A.   Yes, I did.
2     Q.   Did you read her statements
3 regarding Dr. Baccarelli repeatedly
4 aiding defense counsel's inquiries?
5        MR. SNIDOW:  Did she what?
6 BY MS. BROWN:
7     Q.   Did you read the part of her
8 opinion about Dr. Baccarelli repeatedly
9 evading defense counsel's inquiries?
10        MR. SNIDOW:  Oh.  Objection
11     to the form.
12        THE WITNESS:  Could I see
13     the Daubert report, please.
14 BY MS. BROWN:
15     Q.   Absolutely.  Please answer
16 my question.
17     A.   I can't answer it without
18 seeing the report.  You keep asking me to
19 opine on things that I -- that you tell
20 me something is true, but I need to be
21 able to answer your question based upon
22 my own reading, correct?
23     Q.   When did you receive Judge
24 Cote's Daubert opinion?

Page 308

1     A.   I don't recall exact
2 timelines.  I definitely read it.
3     Q.   Who sent it to you?
4     A.   It was sent to me by -- by
5 plaintiffs' counsel.
6     Q.   Okay.  Do you have a general
7 recollection whether you received it
8 before you began drafting your report?
9     A.   Actually, I don't know the
10 answer to that.  I truly don't know the
11 answer to that.
12     Q.   When were you retained to
13 serve as a testifying expert in this
14 litigation?
15     A.   I believe it was somewhere
16 around either the end of 2023 or
17 beginning of 2024.  It was sometime in
18 that period.  Sometime in the holiday
19 period.
20        (Document marked for
21     identification as Ness
22     Exhibit 10.)
23 BY MS. BROWN:
24     Q.   Dr. Ness, I'm handing you

Page 309

1 what we've marked as Ness 10.  These are
2 the invoices we received for your work as
3 a testifying expert.
4        Do you prepare these
5 invoices?
6     A.   I do.
7     Q.   Okay.  And the date of the
8 first invoice is December 22nd of 2023.
9 Do you see that?
10     A.   Those are the first hours I
11 clocked, yes.  Mm-hmm.
12     Q.   Okay.  And you billed five
13 hours that day at a rate of $600 an hour?
14     A.   As I said previously, $600
15 an hour is what I'm charging for this
16 case, yes.  Mm-hmm.
17     Q.   Okay.  And this is an
18 invoice from you to J.J. Snidow?
19        MS. BROWN:  Am I
20     pronouncing that right?  Snidow.
21 BY MS. BROWN:
22     Q.   Is that correct?
23     A.   The gentleman who sits to my
24 left, that's correct.

78 (Pages 306 - 309)

Page 310

1    Q.   Okay.  And there's a bunch
2  of stuff that's blacked out on these
3  invoices.
4         What -- do you recall
5  generally what's contained in the areas
6  that are blacked out?  By that I don't
7  mean tell me what was there, in case we
8  need to have a discussion about what it
9  contains.
10        But what information do you
11  include there?
12    A.   I mean, just --
13        MR. SNIDOW:  Sorry, Ali.
14  Just reserve privilege.
15        What are you trying to get
16  that's not privileged here?
17        MS. BROWN:  I want to
18  understand what got blanked out.
19  Is it a bank account number or is
20  it details of conversations with
21  counsel or is it a description of
22  work?
23        MR. SNIDOW:  Okay.  You can
24  answer if you remember.

Page 311

1         And I'm instructing you, to
2   the extent it's -- I'll phrase
3   this attorney-work product,
4   related to exactly what you are
5   doing, then say you can't answer.
6         THE WITNESS:  Yeah, I
7   didn't black it out.  I have no
8   idea what it -- why it's blacked
9   out.  But I imagine that there's
10  a reason.  So I cannot answer
11  that question.
12  BY MS. BROWN:
13    Q.   When you send your invoices
14  to counsel, do you include a description
15  of what you did?
16    A.   I'm not going to answer that
17  question.
18    Q.   That's not privileged.
19        MR. SNIDOW:  Yeah.  She's
20  asking --
21        THE WITNESS:  Generally, in
22  very general terms, I say what I
23  did, yes.
24  BY MS. BROWN:

Page 312

1    Q.   Okay.  So generally your
2  practice on invoices is to include, at a
3  high level, the nature of the work you
4  did for the invoice you're billing,
5  correct?
6    A.   That's correct.
7    Q.   Okay.  What was the nature
8  of the work that you were doing from
9  December 22nd to January 15th?
10    A.   I was working on this
11  report.
12    Q.   Did you begin that on
13  December 22nd?
14    A.   I believe I -- that was
15  about the point that I started working on
16  the report, yes.
17    Q.   Okay.  Prior -- if we go
18  back to the consulting invoices we have
19  for you, which we marked earlier in the
20  deposition, it looks like this letter
21  here, a little chart on it.
22        The last entry we have --
23    A.   I'm sorry.  What -- what
24  exhibit number --

Page 313

1    Q.   4.
2        MR. SNIDOW:  4.
3        THE WITNESS:  I'm just
4   going to get my readers here.
5        Okay.  I have it.  Yes.
6   Mm-hmm.
7  BY MS. BROWN:
8    Q.   The last entry we have for
9  you in your consulting capacity was from
10  July of 2023.
11        Do you see that?
12    A.   Yes, I do.
13    Q.   Okay.  And then the first
14  entry we have for you in your testifying
15  capacity is December 22nd of 2023.
16        Do you see that?
17    A.   Yes, I do.
18    Q.   Okay.  Did you do any work
19  on the acetaminophen litigation between
20  July 2023 and December 22, 2023?
21    A.   Certainly I didn't do any
22  billable work, or I would have billed it.
23    Q.   All of the work that you
24  have done on the acetaminophen litigation

Page 314

1 has been billed to plaintiffs' counsel,
2 correct?
3      A.   I think we previously -- I'm
4 sorry. I'm getting confused. Sorry.
5           Are we talking about the
6 previous work? Are we talking about this
7 current report? What are we talking
8 about?
9      Q.   Generally, any work that you
10 have done on the acetaminophen
11 litigation, you have submitted an invoice
12 to a plaintiffs' lawyer, correct?
13      A.   I think I previously
14 testified under oath that my initial work
15 looking at the literature on
16 acetaminophen and neurodevelopmental
17 disorders, some of that I did on my own
18 because I felt so strongly about the
19 situation and about the need to inform
20 women that I did some of it on my own
21 that was not billed.
22      Q.   Did you ask the plaintiffs'
23 lawyers to increase the cap on the hours
24 they placed when you were doing that

Page 315

1 review?
2      A.   I did -- on -- I'm sorry.
3 Which review now?
4      Q.   The initial review you were
5 just referring to.
6      A.   I think we already went over
7 this. I did not ask for a higher rate
8 than what I received.
9      Q.   And I didn't mean rate. As
10 I understood your testimony, they had set
11 a cap on the number of hours that can be
12 billed.
13      A.   Oh, I see.
14      Q.   And my question is did you
15 go back to them and say, I need to spend
16 more time, will you pay for it?
17      A.   I indicated to them that I
18 was spending more time and left it to
19 them to decide what to do about it.
20           But I, in fact, spent quite
21 a number of hours on my own reviewing,
22 analyzing the situation. Because before
23 I went to talk to the public, I needed to
24 feel that I was absolutely and completely

Page 316

1 informed about the literature that is
2 noted in my notes, now marked Exhibit 5.
3      Q.   And when you say you let
4 them know and you left it to them, did
5 you submit invoices for payment for the
6 totality of the time?
7      A.   I did not.
8      Q.   How did you leave it to
9 them?
10      A.   I simply -- as I recall, had
11 a conversation with Douglas Boxer over
12 the phone in which I said, you know, I'm
13 spending a whole lot more time than the
14 cap. I feel that that's absolutely
15 necessary and requisite. I'm willing to
16 do that because I feel so strongly about
17 bringing this accurately to public
18 attention.
19      Q.   How is that leaving that to
20 him?
21      A.   I just said I gave him the
22 information. I left it in his hands. I
23 simply stated the fact.
24      Q.   So who approached you to

Page 317

1 serve in the testifying role in this
2 case?
3      A.   J.J. Snidow.
4      Q.   Okay. And when did that
5 happen?
6      A.   Again, it happened fairly
7 shortly before I started writing the
8 report, during -- very close to the
9 holiday period.
10      Q.   Okay.
11      A.   Well, I just remember
12 working over the holidays, which I
13 document here.
14      Q.   Okay. And what did
15 Mr. Snidow ask you to do?
16      A.   Asked -- he asked me to
17 write a full -- to consider and write a
18 full report on Hill's tenets with regard
19 to the question of APAP use and ADHD.
20      Q.   Did he ask you to write a
21 report on APAP and ASD?
22           MR. SNIDOW: Objection.
23      I'm going to reassert our --
24           MS. BROWN: This is

Page 318

1  testifying.
2       MR. SNIDOW: Huh?
3       MS. BROWN: But this is
4  testifying. I'm not asking about
5  the other one.
6       MR. SNIDOW: I'll let this
7  one go, but careful. In
8  addition, obviously, to the
9  consulting, in expert privilege
10 rules we have the preexisting --
11      MS. BROWN: Of course.
12      MR. SNIDOW: Well, hold on.
13 Let me just do it.
14      We have the preexisting
15 depo protocol which says no
16 getting into this. You can ask
17 her that.
18      MS. BROWN: And I certainly
19 don't want to run afoul of that.
20      MR. SNIDOW: Yeah.
21      MS. BROWN: What I'm really
22 after is what were the
23 instructions --
24      MR. SNIDOW: That's fine.

Page 319

1       MS. BROWN: -- which I
2  understand to be not privileged,
3  no matter what.
4       MR. SNIDOW: This question
5  is fine.
6  BY MS. BROWN:
7       Q. Okay. So I understand that
8  you were instructed to write a full
9  report on APAP and ADHD.
10      Did you receive any
11 additional instructions?
12      A. That was my instruction.
13      Q. Okay. Was there any
14 instruction regarding writing a report
15 about APAP and ASD?
16      A. My instruction was literally
17 to please write a report as full and
18 careful and considered as I could
19 conceivably write, on the question -- the
20 specific question of APAP use and ADHD.
21      That was the request that
22 was made to me, and that's what I did.
23      Q. Okay. Were you instructed
24 to review and consider Judge Cote's

Page 320

1  Daubert opinion?
2       A. As I said, I'm really not
3  remembering when I looked at Judge Cote's
4  opinion with respect to this question. I
5  know I was asked to look at the question,
6  and I know that at some point I read
7  Judge Cote's report. But I do not recall
8  the exact temporality of those two
9  things.
10      Q. And my question was slightly
11 different.
12      My question was were you
13 instructed to review Judge Cote's opinion
14 in connection with your task of writing a
15 report regarding ADHD?
16      A. I remember that -- are
17 you -- as I just said, I don't recall the
18 temporality of those two events. I'm not
19 sure what question in addition you're
20 asking me.
21      Q. It's a little different.
22      The temporality has to do
23 with when you got the opinion, right, and
24 I understand you don't remember that.

Page 321

1       A. That's correct.
2       Q. My question is different.
3       Were the initial
4  instructions, in terms of your role, was
5  there an instruction, we want you to
6  write this ADHD report, and we are
7  instructing you to review and consider
8  Judge Cote's opinion?
9       A. My instruction was to review
10 and consider absolutely everything that I
11 had in my hands, of which Judge Cote's
12 decision, at some point, I had in my
13 hands. I have reviewed every single
14 thing that has been put into my hands or
15 that I found.
16      Q. Well, are there any other
17 legal opinions that you have reviewed in
18 connection with your Tylenol report?
19      A. Legal opinions?
20      Q. Right.
21      A. No.
22      Q. Okay. Have you ever before,
23 in your work as an epidemiologist,
24 reviewed and referenced a legal opinion?

81 (Pages 318 - 321)

Page 322

1    A.   That's a very good question.
2 I have certainly reviewed depositions by
3 plaintiffs, depositions by experts.
4        And I'm trying to recall if
5 in the Fox case I actually saw the
6 judicial report.  I do believe I did.
7 Yeah, now I am -- yeah, it was quite a
8 while ago.  But yes, I did review the
9 judge's decision.  Yes.
10    Q.   About what?
11    A.   Talc.  And in the talc case
12 that I testified in.
13    Q.   Was it a Daubert decision?
14    A.   I don't think there was a
15 Daubert hearing, as I recall.
16    Q.   So what decision would you
17 have been reviewing?
18    A.   It would have been the --
19 well, you know, I reviewed the jury
20 outcome.  But there was -- there was some
21 judicial report at that time on talc.
22        And, again, I'm not
23 recalling exactly, but I -- I really
24 think I reviewed the judicial decision

Page 323

1 about talc at some point along the way.
2        Maybe it was around the
3 bankruptcy?  I just don't recall.
4    MR. SNIDOW:  This one is
5    between you guys to sort out.
6 BY MS. BROWN:
7    Q.   Did you review, in
8 connection with your report -- and I'm
9 sorry.  Let's just close this out.
10        So you don't remember when
11 Mr. Snidow called you, correct?
12    A.   Mr. Snider.
13    Q.   Snidow.
14    A.   Snidow.  I'm sorry.
15    MR. SNIDOW:  Right here.
16    THE WITNESS:  I don't
17    recall the exact date.
18 BY MS. BROWN:
19    Q.   All right.  But you do know
20 that you started billing by
21 December 22nd.
22        How long did it take you to
23 write the report that we marked as
24 Exhibit 7?

Page 324

1    A.   Is this my full set of
2 invoices?
3    Q.   It's all we received.
4    A.   Then I assume I must have
5 delivered it by January 31st, the day
6 after my son's birthday.  I do recall
7 something like that, yes.
8    Q.   Did you receive any
9 additional instructions about your task,
10 other than what you've already described?
11    A.   No.
12    Q.   Did you review -- you
13 understand from reviewing Judge Cote's
14 order that a number of prior experts were
15 excluded, correct?
16    A.   I was aware that she was not
17 in agreement -- I shouldn't say that.
18        I understand that she said
19 several times in her report that
20 Dr. Baccarelli -- and I think others as
21 well, but I was particularly focusing on
22 Dr. Baccarelli as the epidemiologist --
23 she believed that he was biased.
24        I don't understand all of

Page 325

1 the legalese of who gets included or
2 excluded and why.  I am not a legal
3 scholar.  I'm not an attorney.  I'm not a
4 judge.  I'm an epidemiologist.
5    Q.   Did you read any of the
6 deposition transcripts from any of the
7 experts who were the subject of Judge
8 Cote's order, including Dr. Baccarelli?
9    A.   I did read Dr. Baccarelli's
10 expert report, yes.
11    Q.   Who gave it to you?
12    A.   Plaintiffs' counsel.
13    Q.   And when did you receive
14 that?
15    A.   I don't have a clue.
16    Q.   Did you ask for it?
17    A.   I don't recall.
18    Q.   Okay.  It doesn't appear on
19 your reliance materials.  Do you know why
20 that is?
21    A.   I apologize.  It was an
22 oversight.
23    Q.   Okay.  Did you review any
24 other expert reports other than

82 (Pages 322 - 325)

Page 326

1 Dr. Baccarelli?
2     A.   Not that I recall.
3     Q.   Did you review
4 Dr. Baccarelli's deposition testimony?
5     A.   I don't recall doing that.
6     Q.   Were you provided with any
7 of the deposition testimony from the
8 experts who were the subject of the
9 Daubert hearing?
10     A.   I don't recall having those
11 in my hands.
12     Q.   Okay.  Why did you review
13 Dr. Baccarelli's expert report?
14         MR. SNIDOW:  And, Dr. Ness,
15     she's asking you in the context
16     of your report as a testifying
17     expert.
18         I'm instructing you not to
19     discuss anything you did while
20     serving as a consulting expert.
21         THE WITNESS:  Understand.
22         MR. SNIDOW:  So just for
23     timeline purposes, you know,
24     from -- I think our letter

Page 327

1     suggests September of 2022 to --
2         MS. BROWN:  August 2022,
3     yep.
4         MR. SNIDOW:  Sorry.  Thank
5     you.
6         Until December 2023.
7         To the extent that you
8     reviewed anything or she's asking
9     you questions that implicate
10     anything in that period, I
11     instruct you not to answer.
12         To the extent that it's
13     after December 2022, when you
14     were writing this report, then
15     you can answer.
16         Good with that?
17         MS. BROWN:  Mm-hmm.
18         THE WITNESS:  I recall that
19     at some point while -- I mean, I
20     recall that at some point I read
21     that.
22         And, again, I am just going
23     to say that I'm just not good
24     about timelines.  I don't recall

Page 328

1     when it was put in my hands.  I
2     don't recall when I reviewed it.
3         In the context of writing
4     this report, I do know for sure
5     that I reviewed it.  I do know
6     for sure that I reviewed Dr.
7     Cote's order -- I mean not -- I'm
8     sorry -- Judge Cote's order.
9     Apologies.
10 BY MS. BROWN:
11     Q.   Do you agree with
12 Dr. Baccarelli's conclusions in the
13 report you reviewed?
14     A.   Do I agree with his
15 conclusions?
16         I don't believe -- can I see
17 that document, please.
18     Q.   I don't even know if I have
19 it.
20         MR. SNIDOW:  And I'm going
21     to object.  This is beyond the
22     scope of her opinions.
23         MS. BROWN:  She just said
24     she reviewed it.

Page 329

1         MR. SNIDOW:  I know she
2     said she reviewed it.  She
3     doesn't remember when.
4         MS. BROWN:  That's fine.  I
5     just want to know if you agreed
6     with it.
7 BY MS. BROWN:
8     Q.   You read it.  Do you agree
9 with it?
10         MR. SNIDOW:  She's asked to
11     see it.
12         THE WITNESS:  It's not a
13     memory test.  I don't remember by
14     memory.
15 BY MS. BROWN:
16     Q.   Do you remember generally
17 what Dr. Baccarelli's methodology was,
18 and he --
19     A.   He used -- he used Hill's
20 tenets, in part.
21     Q.   Okay.  And did you generally
22 find his application of Hill's tenets to
23 be reliable?
24         MR. SNIDOW:  Object to the

83 (Pages 326 - 329)

Page 330

1    form. I mean, it's, what, it's
2    100-some pages?
3        MS. BROWN: It's not a
4    memory test. I'm not trying to
5    be tricky.
6  BY MS. BROWN:
7        Q.  I'm asking you general
8    questions.
9        A.  I don't generally legally
10   agree or disagree with anyone else's
11   opinions. I read them. I take from them
12   whatever information I was perhaps even
13   unaware of or references that I can add
14   and apply. And that's what I did with
15   Dr. -- Dr. Baccarelli's report.
16       Q.  Did you speak to
17   Dr. Baccarelli in connection with your
18   testifying witness role?
19       A.  I did not.
20       Q.  Did you speak with any of
21   the experts who previously submitted
22   reports prior to authoring your report?
23       A.  I did not.
24       Q.  Okay. You note in your

Page 331

1  report that you relied on studies
2  employing diagnostic endpoints when
3  evaluating Bradford Hill's criteria; is
4  that right?
5        A.  I'm sorry. Can you please
6  repeat.
7        Q.  Yeah.
8            You state in your report at
9  Page 154 that you relied on studies
10   employing diagnostic endpoints when
11   evaluating the Bradford Hill criteria; is
12   that correct?
13       A.  My primary reliance in
14   assessing the Bradford Hill criteria as
15   directed by Judge Cote was to rely on the
16   diagnostic endpoints primarily with the
17   continuous endpoints being contextual. I
18   think I say that in my report a number of
19   times.
20       Q.  You said in your answer, in
21   assessing the Bradford Hill criteria, as
22   directed by Judge Cote?
23       A.  That's correct.
24       Q.  What do you mean by that?

Page 332

1        A.  I mean that there are many
2  different ways of doing a Bradford Hill
3  analysis.
4            I was aware of the fact that
5  Judge Cote felt that the diagnostic
6  endpoints should be those that dominated
7  the specific Bradford Hill assessments,
8  and, thereby, that is what I did.
9            But I relied on all of the
10   data, the entirety of the data in
11   context, in the context of supporting or
12   not supporting those diagnostic
13   endpoints.
14           And I would point out that
15   had I written the report with all of that
16   data thrown in there, I would have come
17   to an even stronger causal conclusion
18   than I did.
19           I came to a very strong
20   causal conclusion, just -- I mean, not
21   just, but dominated by the diagnostics.
22   But I also include all of it for purposes
23   of completeness.
24       Q.  Were there any other

Page 333

1  decisions that you made, in terms of
2  drafting your report, that were informed
3  by Judge Cote's decision?
4        A.  I actually think that at
5  some point I say -- let me just see here
6  for a second.
7            I actually quote at some
8  length various components of the court's
9  decision, and I then address those
10   quotes.
11           So what's the question?
12       Q.  So my question was were
13   there other decisions that you made in
14   connection with drafting your report,
15   similar to employing diagnostic studies,
16   that were done in response to Judge
17   Cote's order?
18       A.  She did not direct the
19   entirety of my Hill's tenet report.
20           I was aware of what she had
21   said, and I felt the need to respond to
22   her concerns. So throughout the report
23   you will see responses to her language.
24       Q.  And why did you feel the

84 (Pages 330 - 333)

Page 334

1  need to respond to her concerns?
2      A.   Because she had indicated,
3  from a legal, scholarly perspective, that
4  that was, I guess, how she interpreted
5  the law.
6          I am not an attorney.  I
7  can't interpret the law.  All I can do is
8  I can do my scientific best to do what is
9  absolutely appropriate within the Hill's
10 tenets.
11         I would point out you had
12 referenced my talc report.  When
13 Langseth, in the talc literature, goes
14 through the Hill's tenets, he
15 specifically focuses on those eight
16 studies that he considers to be the most
17 methodologically precise, most
18 methodologically -- yeah, precise is a
19 good word.
20         And I felt that the judge
21 requesting that the dominant features of
22 Hill's tenets be measured by diagnostic
23 endpoints were absolutely consistent with
24 the way that epidemiologists, as I say in

Page 335

1  the past and in the present, do this.
2          So I was fully -- I was just
3  fully doing it the way that some
4  epidemiologists do it.
5      Q.   Well, how about the way that
6  you thought was appropriate?
7          MR. SNIDOW:  Objection to
8      form.
9          THE WITNESS:  I thought it
10     was completely reasonable.
11 BY MS. BROWN:
12     Q.   Well, did you have an
13 independent view of whether or not you
14 should include nondiagnostic studies in
15 your Bradford Hill analysis?
16     A.   I --
17         MR. SNIDOW:  Sorry.
18     Objection to form.
19         She's, at this point,
20     explained in pretty -- pretty
21     great detail of why she did that.
22         MS. BROWN:  Okay, counsel.
23     She didn't answer that question,
24     so it's objection to form if you

Page 336

1      don't like the question.
2          MR. SNIDOW:  I didn't mind
3      the question, I just thought she
4      answered it.
5          MS. BROWN:  Let's see what
6      it was.
7  BY MS. BROWN:
8      Q.   Did you have an independent
9  view of whether or not you should include
10 nondiagnostic studies in your Bradford
11 Hill analysis?
12     A.   I believe I said I thought
13 it was completely reasonable.
14     Q.   Yeah.  I understand you're
15 saying you read the judge's order, you
16 thought it was reasonable, and so you
17 limited your Bradford Hill to diagnostic
18 studies, correct?
19     A.   I -- the diagnostics are the
20 primary data on which I based my Bradford
21 Hill analysis in the context of -- and
22 you will see in the report I detail all
23 the other data as well, contextually.
24 And so in the context of all of those

Page 337

1  data, that is what I did.  I thought it
2  was very reasonable.
3          But I am not a legal
4  scholar, so I cannot comment on the legal
5  aspects of this.
6      Q.   And Alemany 2021 is one of
7  the nondiagnostic studies that you're
8  aware of and you have on your reliance
9  list, correct?
10     A.   And I discuss --
11         MR. SNIDOW:  Objection.
12     Objection to the characterization
13     of Alemany as a study.
14         THE WITNESS:  I discussed
15     that in my report at some length.
16 BY MS. BROWN:
17     Q.   And, in fact, though, if we
18 turn to Page 176 of your report.
19     A.   Yes.
20     Q.   You discuss -- you cite the
21 Alemany 2021 meta-analysis study in a
22 section regarding dose-response and
23 temporality, correct?
24     A.   That's correct.

85 (Pages 334 - 337)

Page 338

Q. And so temporality -- or what is the Bradford Hill section that you are discussing here? Biological gradient, correct?
A. Correct.
Q. And that means dose-response, correct?
A. Correct.
Q. Okay. And you cite for -- in the Bradford Hill section regarding biological gradient, you cite a number of studies regarding evidence of a dose-response relationship, correct?
A. That's correct.
Q. And one of the studies you cite is Alemany 2021, correct?
A. Which I use contextually, yes.
As I said, I reviewed everything. You'll actually see that back -- I can't find the page number immediately. But there is a full and complete review of the Alemany study. I'm very transparent about that.

Page 339

Q. Okay. But it's cited here in your Bradford Hill section, correct?
A. I see that it was cited as one of -- one, two, three, four, five, six -- yeah, one of the six was contextual. Yes.
Q. Did you weight it the same as a diagnostic study?
A. There's no weighting in a Bradford Hill analysis. That's just not a concept that exists.
Q. Did you consider it the same as you considered the diagnostic studies?
A. I think I've already answered that question. I considered the diagnostic studies to be primary.
I cited in this one line, this one study as contextual, along with five other studies that were diagnostic.
Q. All right. Let's take a look at 137 -- sorry -- 173, just a few pages before.
And this is still, Dr. Ness, the portion of your report that is

Page 340

discussing the Hill tenet of biological gradient or dose-response, correct?
A. That's correct.
Q. Okay. And here, too, in the last full paragraph on the page, you cite the Inoue 2021 nondiagnostic study, correct?
A. I do cite that, yes. Mm-hmm.
Q. Okay.
MR. SNIDOW: Where are you, Ali?
MS. BROWN: The last full paragraph on Page 173. Is everyone there?
MR. SNIDOW: No.
MS. BROWN: The last full paragraph that begins Ystrom 2017.
MR. SNIDOW: Yeah.
BY MS. BROWN:
Q. In the middle of that paragraph you cite the Inoue 2021 study, correct?

Page 341

MR. SNIDOW: Oh, okay.
THE WITNESS: Yes.
BY MS. BROWN:
Q. And that too is a nondiagnostic study, correct?
A. Please give me one moment.
Q. You talk about it on Page 135, if that helps you.
A. I'm sorry. On page -- yes, but I'm -- I'm actually looking for other references within the Hill's analysis. Just give me one second, please.
So I say on Page 143, 142 and 143, strength of association, and I would say this is true for, also, consistency, temporality -- dose-response. So for the criteria in general, of which strength of association is the one that I'm pointing out here.
"Between APAP use and ADHD can be summarized as follows. I've identified nine studies, seven observational cohort studies (Liew 2014, Ystrom 2014, Ji 2018, Liew 2019, Ji 2020,

Page 342

1 Baker 2020, Gustavson 2021), one nested
2 case-control study (Chen 2019), and one
3 metaanalysis (Ricci) that examined
4 pregnancy and diagnosed ADHD."
5        And then I go on to say,
6 "Additional studies and meta-analyses
7 examining behavioral methods correlated
8 with," and I use these contextually,
9 "with ADHD diagnosis were also reviewed
10 for context - but were not included in my
11 strength" association [sic] "and were not
12 relied upon dominantly in my others."
13        And two of those studies,
14 which I cite here, were in a way -- and
15 the other one -- oh, and Alemany, which
16 we just discussed both of those.
17        So I think I'm quite clear
18 in that regard.
19    Q.   Okay.  I've got some
20 follow-ups to that, but that wasn't at
21 all my question.
22        My question was Inoue 2021
23 is a nondiagnostic study.
24    A.   That's correct.

Page 343

1    Q.   Okay.  Now, you pointed me
2 to a totally different page of your
3 report.  Where were you?
4    A.   I was on page --
5        MR. SNIDOW:  142 and 143.
6        THE WITNESS:  142 and 143.
7 BY MS. BROWN:
8    Q.   So this is a section on
9 strength of association, correct?
10    A.   Yes.
11    Q.   Okay.  And we weren't
12 talking about strength of association.
13    A.   I -- I'm sorry.  Go ahead.
14    Q.   Correct?
15    A.   I just indicated that I
16 was -- in talking about strength of
17 association, I was talking about each of
18 the tenets.  I simply had strength of
19 association as the first, and so that was
20 the first example.
21    Q.   Okay.
22    A.   But each of the tenets are
23 the same.  There is an internal
24 consistency to the report.

Page 344

1    Q.   Okay.  That was on a totally
2 different section about biological
3 gradient, and I was asking you if you
4 cited a nondiagnostic study.
5        And you did, right?
6    A.   The citation was there for
7 you to see, yes.
8    Q.   And so any time in your
9 discussion of the Hill's tenets in your
10 report -- strike that.
11        You would agree with me that
12 throughout your report in the sections
13 discussing Hill's tenets, you frequently
14 cite nondiagnostic studies.
15        Do you know that?
16    A.   I don't frequently cite
17 them, but there are some citations that I
18 thought were important because they added
19 context.
20        But for sure, the great
21 majority of the citations are to
22 diagnostic studies.  We can count them,
23 but I think you'll find that that is
24 true.

Page 345

1    Q.   So as another example, if
2 you'll turn to Page 180, we're now in the
3 temporality section of your Bradford
4 Hill analysis.
5        And if you look at the
6 second-to-last full paragraph?
7    A.   Yes.
8    Q.   You talk about APAP use in
9 the first trimester and the second
10 trimester, and then you say Ystrom, Chen,
11 Inoue, and Stergiakouli.
12        Do you see that?
13    A.   I do.
14    Q.   And both Inoue 2021 and
15 Stergiakouli 2016, I believe it is, those
16 are nondiagnostic studies, correct?
17    A.   Yeah.  As I say, I use them
18 contextually to round out and -- yeah, to
19 round out the full discussion.  Yes.
20    Q.   So is it your testimony that
21 anytime a nondiagnostic study appears in
22 one of the Bradford Hill sections of your
23 report, it was not considered in your
24 Bradford Hill analysis?

Page 346

1    A.   I'm saying it was considered
2  contextually.
3        I considered all the
4  literature.  I also considered the
5  biologic literature, the animal
6  literature, et cetera, et cetera.  But I
7  don't cite the animal literature as part
8  of, you know, this paragraph.
9    Q.   But you cite it in other
10 spots, though?
11   A.   Right.  But my point is I
12 also cited Inoue and Stergiakouli in some
13 detail in prior sections and describe
14 exactly what they did, and I used them
15 contextually here.
16   Q.   Okay.  What does it mean
17 when you say you used nondiagnostic
18 studies contextually in your Bradford
19 Hill analysis?
20   A.   What that means is that
21 had -- if those studies were absent, I
22 would have -- no, no, no.
23       The presence of those
24 studies adds richness to the report.  The

Page 347

1  presence of those studies simply adds
2  richness to the report.
3    Q.   What does it mean to add
4  richness to a report?
5    A.   Context.
6    Q.   Is that context further
7  supportive of your opinion?
8    A.   If -- as I said previously,
9  if I had cited all of this as primary in
10 my Hill's opinion, my opinion would have
11 been even stronger, but I did not.
12       I used an exceptionally
13 conservative approach.  I used an
14 exceptionally conservative approach by
15 relying dominantly on the diagnostic
16 endpoints, and I came to a very clear
17 causal conclusion.
18   Q.   Did you also consider, for
19 richness, nondiagnostic studies that do
20 not support your opinion?
21   A.   Yes.  I mean, in fact, I
22 also show studies that do not show my
23 opinion in the diagnostic component.
24       So if you will turn to

Page 348

1  Page 107 as an example, I have here a
2  forest plot and a summary of a number of
3  different studies.
4        And you will note that for
5  Gustavson 2021, this is a study in which
6  the relative risk for ADHD diagnosis
7  greater than or equal to 29 days of APAP
8  exposure within the family, so that was
9  within sibling pairs, was 1.06 with a
10 confidence interval of 0.51 to 2.05.
11       So, clearly, that is not a
12 study that -- I mean, that is a study
13 that did not show -- it did show an
14 increased risk, notably.  There is no
15 study that didn't show an increased risk.
16 It did show an increased risk, but that
17 increased risk was not significant.
18       Moreover, I cite Ystrom,
19 which had the lowest of the risk
20 estimates of the prospective
21 observational ever never use studies from
22 Model 3 that's on the second line, 1.12.
23       So that is at the lower
24 limit.

Page 349

1        And I cite Chen, which is
2  1.2, at the very lowest limit of
3  statistical significance.
4        So I do.  I cite the ones
5  that had lower relative risks and the
6  ones that had higher relative risks.  I
7  was not cherry-picking.
8    Q.   My question was about
9  nondiagnostic studies.  Was your answer
10 in response?
11   A.   Yes.
12       MR. SNIDOW:  And she said
13 she did.
14       THE WITNESS:  I considered
15 everything.  Everything that I
16 had in my hands or could get my
17 hands on.
18 BY MS. BROWN:
19   Q.   If you considered
20 everything, Dr. Ness, how are we to
21 understand what consideration the
22 nondiagnostic studies had on a Bradford
23 Hill analysis that was only aimed at
24 diagnostic studies?

Page 350

1     A.   Can you repeat that.  I
2 don't understand the question.
3     Q.   Sure.
4          I understand your testimony
5 to be I considered and I cited
6 nondiagnostic studies as well as
7 diagnostic studies; is that fair?
8     A.   Yes.  They are all in the
9 report, discussed in the report.  That's
10 correct.
11     Q.   Okay.  How are we to
12 understand the different ways in which
13 you considered the diagnostic studies
14 versus the nondiagnostic studies?
15     A.   I just said if you look at
16 the references in the Hill's tenet
17 component of the report, you will see
18 that it is strongly dominated by the
19 diagnostic studies, and those were the
20 primary ones on which I based my
21 conclusion.
22          The others were considered
23 for context.
24          MR. SNIDOW:  If you're

Page 351

1     switching gears, we've been going
2 another two hours.
3          MS. BROWN:  Yeah, let's
4 take a break.  That'd be great.
5 Thank you.
6          THE VIDEOGRAPHER:  The time
7 is now 3:25 p.m.  We are off the
8 record.
9          (Short break.)
10          THE VIDEOGRAPHER:  The time
11 right now is 3:45 p.m.  We're
12 back on the record.
13 BY MS. BROWN:
14     Q.   Dr. Ness, when we left off,
15 we were discussing your review and
16 consideration of nondiagnostic studies in
17 your report.
18     A.   Yes.
19     Q.   One of the nondiagnostic
20 studies that you reviewed in your notes
21 is a study called Tronnes 2020.  Are you
22 familiar with that study?
23     A.   Tronnes, yes.
24     Q.   In fact, if we look at

Page 352

1 Exhibit 5, which is your notes, you
2 reviewed the Tronnes ADHD study as part
3 of your review of the literature,
4 correct?
5     A.   That's correct.
6          MS. BROWN:  And I'm going
7     to mark Tronnes 2020 as
8     Exhibit 11 to your deposition.
9          THE WITNESS:  Thank you.
10          (Document marked for
11     identification as Ness
12     Exhibit 11.)
13 BY MS. BROWN:
14     Q.   And if you turn to Page 255,
15 under Conclusions -- first of all, before
16 we get there, this study is a follow-up
17 to Brandlistuen 2013, correct?
18     A.   Where are you reading?
19     Q.   Well, do you know that to be
20 true?
21     A.   I -- can you show me where
22 you're reading, please.
23     Q.   Sure.
24          If you look at Section 4.4,

Page 353

1 Interpretation, it says, "This study is a
2 follow-up of the MoBa."
3          And that was the
4 Brandlistuen study, correct?
5     A.   There are a number of MoBa
6 studies.
7     Q.   Okay.  Let's look -- let me
8 find you another.
9          So if you look at earlier
10 publications -- if you turn the page,
11 254, earlier publications from MoBa found
12 an association between prenatal
13 paracetamol exposure for 28 days or more
14 and communication problems externalizing
15 and internalizing behavior problems and
16 higher activity levels in three-year-old
17 children.
18          Do you see that?
19     A.   Yes, I do.
20     Q.   Okay.  And if you go to the
21 study that they cite for us, it's
22 Brandlistuen 2013.
23          Do you see that?
24     A.   Yes, I do.

89 (Pages 350 - 353)

Page 354

1    Q.   Okay.  And what they say
2  is -- what they say in the -- and this
3  study was a follow-up in part to that
4  Brandlistuen study, correct?
5         MR. SNIDOW: Object to
6    form.  I think she's having
7    trouble with follow-up.
8  BY MS. BROWN:
9    Q.   Well, do you see -- going
10  back to where we were.  "This study is a
11  follow-up of the MoBa."
12        MR. SNIDOW:  That's just
13    the cohort, I think, is what
14    she's struggling with.  Do you
15    see what I mean?  It's just --
16        THE WITNESS:  Yeah, I mean,
17    as I said, there are a number of
18    MoBa studies.  They reference
19    Brandlistuen too, and I agree.
20  BY MS. BROWN:
21    Q.   Okay.  Well, Brandlistuen
22  was one of the MoBa studies referenced
23  here, correct?
24        MR. SNIDOW:  I think, and I

Page 355

1    really am trying to be helpful,
2    Ms. Brown, maybe you can clarify
3    what you mean by follow-up.
4    I think she'll agree they
5    are from the same cohort.  Maybe
6    ask that?
7        THE WITNESS:  Yeah.  I
8    mean, they also reference
9    Vlenterie as being from that same
10    cohort.
11        But, yeah, as I said, there
12    are a number of MoBa -- MoBa
13    cohort studies.  They analyzed it
14    several times for -- you know,
15    for different outcomes and such.
16    Ystrom is also an author on
17    this report, and of course Ystrom
18    was first author in another
19    report.
20        So, yeah, there have been a
21    number of MoBa studies.
22  BY MS. BROWN:
23    Q.   And what this Tronnes study
24  found was a follow-up to the MoBa -- a

Page 356

1  number of these MoBa cohort studies,
2  right?
3    A.   There have been, yes, a
4  number of MoBa studies.  Mm-hmm.
5    Q.   Okay.  And what this study
6  found is that -- if you go to Page 254.
7  Earlier publications from MoBa where we
8  were reading earlier.
9        Do you see that paragraph?
10    A.   I'm sorry.  2 -- what page
11  are you on now?
12    Q.   254.
13    A.   254, yes.
14    Q.   Left-hand column.
15    A.   Mm-hmm.
16    Q.   Paragraph that begins,
17  "Earlier publications from MoBa found an
18  association"?
19    A.   Right.
20    Q.   Okay.  And what they say in
21  the middle of this paragraph is, "We
22  could not replicate the association
23  between long-term prenatal exposure to
24  paracetamol and communication or activity

Page 357

1  problems observed in younger children."
2        Do you see that?
3    A.   Yes, I do.  Mm-hmm.
4    Q.   And in fact, if you go just
5  a page earlier, 253, in the
6  Interpretation paragraph, it starts by
7  saying, "This study is a follow-up of the
8  MoBa and adds to the current literature
9  on long-term neurodevelopment of children
10  prenatally exposed to paracetamol by more
11  closely exploring the role of unmeasured
12  confounding."
13        Do you see that?
14    A.   I see where they say that,
15  yeah.
16    Q.   Yeah.  And what these
17  authors find is that "It's reassuring
18  that the use of paracetamol in one
19  trimester was not associated with
20  communication, behavioral, or
21  temperamental problems in children five
22  years of age and also the timing of
23  paracetamol use during pregnancy does not
24  seem to increase the risk of outcomes

Page 358

1 examined. Furthermore, paracetamol
2 exposure during pregnancy did not seem to
3 have a negative impact on communication
4 skills among preschool-aged children."
5         Do you see that?
6     A.  I can only imagine that
7 their interpretation of their data
8 conflated the question of statistical
9 significance and the question of relative
10 risk.
11         Because, actually, when you
12 look at their data, for instance in
13 Table 4 is one example, in the second and
14 third trimester, which I think we're
15 agreeing is the more sensitive period for
16 APAP in causing ADHD and its behavioral
17 components, they actually find, and they
18 are adjusted relative risks a 1.09, so an
19 increased risk for externalizing
20 behavior, and they find a 1.05, so an
21 increased risk for internalizing
22 behaviors.
23         And if I'm recalling
24 correctly -- let me just actually look at

Page 359

1 my notes, please. Brandlistuen, which
2 you -- which you cited more than once.
3 Let me just look at what Brandlistuen
4 said --
5     Q.  And, for the record,
6 Dr. Ness, are you accessing your report?
7     A.  Yes, I'm looking at my
8 report. Yeah, that's correct.
9     Q.  And, Dr. Ness, you are still
10 looking at your report. Just for the
11 record, can you tell us what page you are
12 on and what you're reviewing?
13     A.  I'm actually trying to find
14 the full assessment that I did of
15 Brandlistuen.
16         THE WITNESS: Can you find
17     that, J.J.? Do you know what
18     page that starts on?
19 BY MS. BROWN:
20     Q.  Dr. Ness, my question was,
21 do you see that. I read you a paragraph
22 and I asked you if you saw that.
23     A.  I'm sorry. What is it that
24 you're asking me?

Page 360

1     Q.  So we're sort of off on a
2 crazy tangent. What we were doing was we
3 were reviewing the findings under 4.4,
4 Interpretation. And I read you that
5 paragraph, and I asked you if you saw it.
6     A.  I see. I see the paragraph,
7 yes.
8         MR. SNIDOW: Brandlistuen
9     is on 110.
10         THE WITNESS: Thank you.
11 BY MS. BROWN:
12     Q.  And we're totally off the
13 rails here.
14         My question is did you see
15 the paragraph on Page 253, Section 4.4,
16 and your answer was yes. Okay.
17         And you're still on your
18 computer, Dr. Ness. What's going on?
19     A.  Ah. I found it.
20     Q.  But what are you doing?
21         MR. SNIDOW: She told
22     you --
23         THE WITNESS: I'm finding
24     Brandlistuen because you asked

Page 361

1     about that.
2 BY MS. BROWN:
3     Q.  There -- we're totally
4 untethered to Brandlistuen right now.
5         MR. SNIDOW: It's just --
6     it's because you mentioned it
7     as -- by follow-up.
8         MS. BROWN: But by 45
9     questions later. Let's try to
10     power through here.
11         THE WITNESS: You -- you
12     asked me about the context of
13     this, and so I thought it was
14     only fair to tell you what the
15     results of the Brandlistuen study
16     were.
17 BY MS. BROWN:
18     Q.  And I want to --
19     A.  And so Brandlistuen actually
20 used same-sex sibling pairs, so like
21 Gustavson, this was within a pair
22 analysis of 2019 same-sex sibling pairs,
23 and found that they had poor -- so in
24 utero, longer term, greater than 28 days,

91 (Pages 358 - 361)

Page 362

1  of APAP use, they had poor behaviors in
2  the areas of gross motor communication,
3  externalizing, and internalizing.
4      And I was pointing out that
5  in this, in Tronnes, they also found
6  increased risk for externalizing and
7  internalizing behaviors.
8  BY MS. BROWN:
9      Q.   Let me stop you there,
10  because I have a follow-up question to
11  the information you're providing.
12      Do you consider a relative
13  risk that is not statistically
14  significant to evidence increased risk?
15      A.   I -- as I say in my report,
16  in quite a lot of detail, I do not use
17  statistical significance, neither did
18  Hill nor did Rothman, as excluding a --
19  an increased risk, because it is not
20  statistically significant. Statistical
21  significance is not the same as
22  association.
23      Q.   What you just said, though,
24  is that you were pointing out relative

Page 363

1  risks in Table 4 that were not
2  statistically significant and concluding
3  that they evidenced an increased risk.
4      A.   I'm saying --
5      Q.   Do you -- let me ask the
6  question.
7      A.   I'm sorry.
8      Q.   Do you interpret a relative
9  risk with a confidence interval that is
10  not statistically significant to show an
11  increased risk?
12      MR. SNIDOW:  Objection to
13  form.
14      THE WITNESS:  Let me -- let
15  me be incredibly specific and
16  precise.
17      Let's look at Table 4 under
18  externalizing problems, and let's
19  look specifically at exactly the
20  number that I referenced
21  period -- previously, which was
22  an adjusted relative risk of
23  1.09.
24      That relative risk of 1.09

Page 364

1  has a confidence interval that
2  goes from 0.98 to 1.20.  What
3  that means is -- excuse me --
4  that any of the numbers in the
5  range of 0.98, all the way up to
6  1.20, are possible risk estimates
7  that may have been obtained were
8  this exact same study to have
9  been reported 100 times.
10      95 of those times is
11  95 percent confidence interval.
12  95 percent of those times, that
13  would have been in the range of
14  0.98 to 1.20, meaning it could
15  have been as small as a 2 percent
16  decrement.  It could have been as
17  large as a 20 percent increased
18  risk.  That is what a confidence
19  interval means.
20      And the midpoint, the most
21  likely relative risk to come from
22  that study in 100 replications,
23  would have been a 9 percent,
24  1.09, a 9 percent increased risk.

Page 365

1  BY MS. BROWN:
2      Q.   Respectfully, please listen
3  to my question, because that wasn't
4  responsive.
5      MR. SNIDOW:  It was.
6  BY MS. BROWN:
7      Q.   My question was do you
8  interpret a relative risk of 1.09, with a
9  confidence interval of .98 to 1.2, as
10  evidencing an increased risk?
11      MR. SNIDOW:  Objection to
12  form.  Asked and answered.
13      She's given you a very
14  technical, full explanation.
15  BY MS. BROWN:
16      Q.   I understand what a
17  confidence interval is.  I understand
18  that it means if you repeat the
19  experiment 95 times, you will fall
20  within a confidence interval --
21      A.   Actually 100 times.
22      Q.   -- but that wasn't at all my
23  question.
24      A.   That's --

Page 366

1    Q.   So the question that I'm
2  asking you is whether you interpret the
3  confidence interval and the relative risk
4  that you're pointing me to on Table 4 as
5  evidence saying an increased risk?
6    A.   You just misquoted
7  epidemiology.  If you repeat it 100
8  times, 95 of those times, it would be in
9  the interval of 0.98 to 1.20.
10   Q.   I appreciate that.
11       Can you answer my question?
12       Do you interpret the
13  relative risk of 1.09 with a confidence
14  interval of 0.98 to 1.20 as evidencing an
15  increased risk?
16   A.   There is a 9 percent -- the
17  median of that is a 9 percent increased
18  risk.
19       What I said is that -- I
20  think I was very specific.  I said there
21  is a 9 percent increased risk shown in
22  the study in the adjusted relative risk,
23  with a confidence interval which
24  indicates that it may have been as low as

Page 367

1  0.98 and it may have been as high as
2  1.20.
3       So as low as a 2 percent
4  reduction or as high as a 20 percent
5  increase.
6    Q.   You did not include the
7  Tronnes study in your report.
8       Did you know that?
9    A.   I noticed that I did not
10  include it in my report, yes.
11       I -- as I recall, I may have
12  misbelieved at the time -- and this may
13  have been my error, and I apologize if it
14  was an oversight -- but the dominant
15  outcomes from their perspective, the
16  strongest, were on issues such as shyness
17  and internalizing behavior and, to some
18  degree, externalizing behavior.
19       And I was more focused at
20  that point on the question of whether it
21  had also looked at temperament including
22  activity.  And I now see that they did
23  look at temperament including activity.
24       But I think I may have

Page 368

1  missed that in my initial -- in my
2  initial review.  So apologies about one
3  oversight in, whatever, 29 different
4  articles that I reviewed.
5    Q.   Tovo-Rodrigues 2020 is
6  another article that appears in your
7  notes and does not appear in your report.
8       Do you know why that is?
9    A.   Can we see that study,
10  please.
11   Q.   Oh.  Can you answer the
12  question first?
13   A.   I cannot without seeing the
14  report, no.
15   Q.   Without seeing the report?
16   A.   I'd like to see their --
17       MR. SNIDOW:  She meant
18  Tovo-Rodrigues.
19       THE WITNESS:  I'd like to
20  see their publication, please.
21  BY MS. BROWN:
22   Q.   Okay.  I'm going to show you
23  the publication.
24       Do you know, off the top of

Page 369

1  your head, why it's not in your report?
2    A.   I'm sorry.  I believe I do
3  reference it on page -- no, this is
4  Page 33 of my report.  I'm not sure what
5  it is --
6       MR. SNIDOW:  Yeah, you're
7  wrong, Ali.
8       MS. BROWN:  Okay.  What
9  page is that?
10      MR. SNIDOW:  It's a few.
11  93, 189.
12      THE WITNESS:  Yeah, I have
13  a number of references to the
14  Tovo-Rodrigues.  I'm counting
15  four references to
16  Tovo-Rodrigues.
17  BY MS. BROWN:
18   Q.   Ah, yeah.  Okay.  And I'm
19  asking you about Tovo-Rodrigues 2020,
20  which is in your notes, not
21  Tovo-Rodrigues 2018.
22      MR. SNIDOW:  Got it.
23      (Document marked for
24       identification as Ness

93 (Pages 366 - 369)

1    Exhibit 12.)
2  BY MS. BROWN:
3      Q.    Here is Ness 12, which is
4  Tovo-Rodrigues 2020.
5      A.    Can you show me -- I'm
6  sorry -- what page in my notes this is
7  on?
8      Q.    Yeah.
9      A.    Oh, I see.  Mm-hmm.
10     Q.    So if you look, Dr. Ness,
11  at Ness 27, which is Exhibit 5, which
12  includes a summary of the literature,
13  Tovo-Rodrigues 2020 appears in your
14  summary list.
15     A.    I see that.  Mm-hmm.
16     I see that 2018 is also
17  included based upon the STQ, and the
18  Tovo-Rodrigues 2020 is based upon the
19  CBCL and Developmental Inventory.
20     Q.    What's the difference
21  between those two screening tools?
22     A.    Well -- and I would also
23  say, by the way, Tovo-Rodrigues 2018,
24  which, as I said, was cited four times in

1  my report, was based on 6 and
2  11-year-olds, and the Tovo-Rodrigues 2020
3  only went up to 48 months.  So those
4  are -- those are very young children.
5      I think I also -- I mean,
6  just for context, again, I say in my
7  report that Ystrom, it was based on
8  three-year-olds.  So these are two and
9  three-year-olds.  Ystrom was
10  three-year-olds.  Ystrom was a diagnostic
11  outcome study, which is why I included
12  it.
13     But these studies of very
14  young children are missing, the great
15  majority, of ADHD.  I mean, as I'm sure
16  you know, ADHD is rarely diagnosed before
17  the age of four.
18     Q.    Okay.  That wasn't at all my
19  question, which was Tovo-Rodrigues 2020
20  was not cited in your report.
21     Do you know why?
22     A.    As I said, these are young
23  children.  Again, Ystrom, I included
24  because -- for completeness, because it

1  was a -- and this is -- this is not.
2  This is a behavioral outcomes study.
3      So it's a behavioral
4  outcomes study of very young children,
5  and the outcomes did not include
6  attention.  They didn't include
7  hyperactivity.  They included what I
8  consider to be not direct -- not -- how
9  can I say this -- categories of ADHD.
10     I think we talked previously
11  about the categories, the three
12  categories in the DSM.
13     And as I said, you know,
14  Tronnes, I grant you, I think I would now
15  consider to be a bit of an oversight,
16  insofar as they did look at activity.
17     But this one didn't even
18  look at activity.  The outcomes that they
19  looked at were internalizing,
20  externalizing, withdrawn, somatic,
21  social, anxious, thought, attention, rule
22  breaking, and aggression -- actually,
23  they did look at attention.
24     Q.    Ma'am, you say one of the

1  reasons you did not include this study is
2  because they looked at outcomes at
3  24 months and 48 months, which you
4  consider to be young; is that correct?
5      A.    Those are young for the ADHD
6  diagnosis, yes.
7      Q.    And you did consider and
8  include in your analysis Brandlistuen
9  2013 that used one of the same screening
10  tools to look at outcomes at 34 months,
11  correct?
12     A.    Only -- only contextually.
13     I said the one study, as I
14  recall, that relied on young children was
15  Ystrom at three years.  That was the only
16  one that I used in actually making my
17  Hill's tenets decision.
18     I -- you know, I'm going to
19  say again what I said previously, which
20  is, these other studies, I only used
21  contextually.  They were not used -- none
22  of these studies with the continuous
23  behavioral outcomes were used in coming
24  to my Hill's tenets conclusion of

1 causality.
2    Q.    Your summary chart on
3 Page 27, which evidences your analysis
4 prior to being hired as a testifying
5 expert, includes a number of
6 nondiagnostic studies, including
7 Tovo-Rodrigues 2020, correct?
8        MR. SNIDOW:  Object to the
9    preamble.
10       THE WITNESS:  All -- all of
11    these studies are in my notes, my
12    original notes.  I only used the
13    ones that had the diagnostic
14    outcomes to my best -- what can I
15    say?  As well as I could capture
16    everything that I was aware of.
17       It is certainly possible
18    that there may be an oversight
19    here and there with respect to
20    the contextual studies.
21 BY MS. BROWN:
22    Q.    You mentioned Brandlistuen
23 2013 and the sibling analysis that was
24 performed, correct?

1    A.    Yes.  Brandlistuen is -- I
2 did include.  Mm-hmm.
3    Q.    Mm-hmm.  And you mentioned
4 that there were 2,919 same-sex sibling
5 pairs in that analysis, correct?
6    A.    Yes.
7    Q.    Do you consider that to be a
8 large number of sibling pairs for this
9 type of sibling control analysis?
10    A.    One has to look at -- for
11 power in a sibling analysis, one has to
12 look at discordant pairs.  Discordant
13 pairs.
14    Q.    Okay.  Do you know how many
15 discordant pairs, if any, were analyzed
16 by Brandlistuen?
17    A.    I'd like to see the paper.
18 You know, off the top of my head -- I'd
19 be very happy to take a look at the
20 tables in the paper, if it even reports
21 it.
22    Q.    Would you -- would it be
23 fair to say that a true sibling control
24 analysis, to be proper and effective, has

1 to look at discordant siblings, correct?
2    A.    That's correct.
3    Q.    And the more discordant
4 siblings study authors look at, the
5 greater the power of the analysis,
6 correct?
7    A.    That's correct.
8    Q.    So if, for example, you had
9 a study -- well, we know Brandlistuen
10 didn't look at 2,000 discordant pairs,
11 correct?
12    A.    I don't know anything.  If
13 you'll show me the study, we can actually
14 look at the data.
15    Q.    We can, but I've got
16 questions I've got to ask before my time
17 runs out.  So bear with me.
18       If authors looked,
19 hypothetically, at 2900 discordant
20 sibling pairs, would that be a
21 sufficiently powered study, in your mind,
22 to pick up a risk of acetaminophen
23 exposure in utero and ADHD?
24    A.    It depends on how many ADHD

1 outcomes there were.  It depends on the
2 prevalence of ADHD.
3    Q.    What is the prevalence of
4 ADHD in the general population?
5    A.    Which country are we talking
6 about?
7    Q.    The United States of
8 America.
9       What are you looking at?
10    A.    My notes that you were
11 referencing previously.
12       So the prevalence -- this is
13 on Page 16.  As per CDC data that I was
14 able to find, let's see, the prevalence
15 in 3 to 5-year-olds is 2 percent; in 6 to
16 11-year-olds, it's 10 percent; in 12 to
17 17-year-olds, is 13 percent.  Somewhat
18 different for boys -- it is different for
19 boys and girls.  It's 13 percent in boys
20 and 6 percent in girls.  It's different
21 by racial group.
22       What -- what are you exactly
23 asking me?
24    Q.    Let's try to focus on the

95 (Pages 374 - 377)

Page 378

1 question that I asked and see if we can
2 go from there.
3     A.   Excuse me.
4     Q.   So the question that I asked
5 is what is the prevalence of ADHD in the
6 general population?
7     A.   2 percent -- according to
8 the CDC, the prevalence is 2 percent in 3
9 to 5-year-olds; 10 percent in 6 to
10 11-year-olds; 13 percent in 12 to
11 17-year-olds.
12         Depends on whether you're
13 talking about a boy or a girl, and it
14 depends on whether you're talking about a
15 Black, a White, a Hispanic or an Asian.
16     Q.   Okay.  So let's look at
17 Brandlistuen, the study that you cited in
18 your report.
19         MS. BROWN:  What number is
20     Brandlistuen?  It must be towards
21     the end.
22         (Document marked for
23     identification as Ness
24     Exhibit 13.)

Page 379

1 BY MS. BROWN:
2     Q.   We're marking as Ness 13,
3 Brandlistuen 2013.
4         MR. SNIDOW:  Do you have a
5     question on something?
6 BY MS. BROWN:
7     Q.   Yeah.
8         Can you tell me, from the
9 Brandlistuen article, the number of
10 discordant pairs that Brandlistuen used
11 in the sibling control analysis?
12     A.   So in Figure 1, if you look
13 at that last box, it says there were 805
14 discordant pairs, where one was exposed
15 to one to 27 days, and 134 for the
16 greater than or equal to 28 days.
17         So adding those two, it
18 would be 939.
19     Q.   Okay.  Do you believe
20 approximately 935 is a sufficient number
21 of discordant pairs to detect a risk of
22 ADHD from in utero exposure to ADHD --
23 strike that.
24         Do you believe that 900-plus

Page 380

1 discordant pairs is sufficient to detect
2 a risk from in utero exposure to
3 acetaminophen?
4     A.   I would be very clear about
5 the fact that they did not look at ADHD
6 as a diagnostic outcome.  So that's not
7 really a question that's germane to this
8 study.
9     Q.   So if you were to design a
10 study with a sibling control analysis
11 that was intended to look at that
12 question, you would want it to be focused
13 on the diagnosis of ADHD, correct?
14     A.   That's correct.
15     Q.   And you would want it to
16 have a sufficient number of discordant
17 sibling pairs to analyze that question,
18 correct?
19     A.   That's correct.
20     Q.   And one of the reasons you'd
21 want to do that is to attempt to control
22 for genetic issues that could be
23 confounding the potential association,
24 correct?

Page 381

1     A.   The reason why I would want
2 to do that would be to have enough power
3 to look at those outcomes.
4     Q.   And certainly if --
5 certainly, the more discordant sibling
6 pairs you have, the more power you have
7 to look at your outcome, correct?
8     A.   Given the -- if you have an
9 outcome that's sufficiently prevalent to
10 be able to do that calculation, you have
11 to do a power calculation to know
12 exactly.
13         But part of the power
14 calculation is the number of discordant
15 pairs.  Part of the power calculation is
16 the prevalence of exposure.  And part of
17 the power calculation is the prevalence
18 of outcome.
19         So the more common the
20 exposure, the more power.  And the more
21 common the outcome, the more power.  And
22 the number of discordant pairs, the
23 power.
24         So, yes, all of those

96 (Pages 378 - 381)

Page 382

1 parameters would go into a power
2 calculation.
3    Q.   Have you done -- in
4 connection with your report that we
5 marked as Exhibit 7, have you done a
6 power calculation for any of those
7 studies?
8    A.   I -- that is well beyond the
9 scope of the study -- of the analysis.
10 Nobody does that for a Hill's tenet
11 analysis.  I've never seen it done.
12    Q.   Have you -- do you have the
13 opinion that any of the studies you
14 reviewed were not sufficiently powered to
15 pick up a risk of ADHD?
16    A.   I am of the opinion that my
17 Hill's tenet analysis was based on a
18 totality of literature.
19       And as I said, it is not a
20 quantitative analysis.  It is more of a
21 qualitative analysis, based upon my years
22 of expert experience.
23       So that's in part why
24 people -- you know, experts -- you

Page 383

1 don't -- you won't see a power
2 calculation within a Hill's tenet
3 causality analysis, not that I've seen.
4       If you can bring one to me,
5 I may stand corrected, but I have never
6 seen that.
7    Q.   Wasn't my question.
8       Do you have the opinion that
9 any of the studies you reviewed were not
10 sufficiently powered to pick up a risk of
11 ADHD?
12    A.   I -- when a study was very
13 small -- let me give you the example of
14 Gustavson.
15       Gustavson had only
16 34 discordant sibling pairs.  Gustavson
17 says several times, I think maybe three
18 or four times, in their report that it
19 was not sufficiently powered.  And I did
20 not go back and redo their power
21 calculation, but I take them at their
22 word.
23    Q.   Would 10,000 discordant
24 sibling pairs be sufficient to analyze a

Page 384

1 potential risk of in utero exposure to
2 acetaminophen and the outcome of ADHD?
3    A.   Depends on the prevalence of
4 the exposure and the prevalence of the
5 outcome.
6    Q.   But you know both of those
7 things?
8    A.   What population are we
9 talking about?
10    Q.   United States.
11    A.   In the United States?  I'd
12 have to do the power calculation, but off
13 the top of my head, my guess would be --
14 well, actually, I'd have to do the
15 calculation.
16    Q.   Is it your belief that you
17 would need more discordant sibling pairs
18 if the population you're looking at is
19 outside of the United States, or would
20 you need less?
21    A.   It depends on what the
22 specific national prevalence of
23 acetaminophen use and ADHD are.  It
24 differs country by country.

Page 385

1    Q.   Did you rely on any
2 analysis -- any sibling control analysis
3 in your actual Bradford Hill analysis for
4 your report?
5    A.   I referenced Gustavson,
6 yeah.
7    Q.   Okay.  Is it part of your
8 Bradford Hill?
9    A.   Yes.
10    Q.   And do you believe it is
11 underpowered?
12    A.   I believe that the authors
13 indicated more than once it was
14 underpowered.
15    Q.   But what do you think?
16    A.   I said I take them at their
17 word.
18    Q.   I'm handing you, Dr. Ness,
19 what we've marked as Ness 14A and
20 Ness 14B.
21       (Document marked for
22       identification as Ness
23       Exhibit 14A.)
24       (Document marked for

97 (Pages 382 - 385)

Page 386

1    identification as Ness
2    Exhibit 14B.)
3  BY MS. BROWN:
4    Q.   And I'll represent to you
5  that this is an article that just became
6  available today, perhaps within -- within
7  hours, titled "Acetaminophen Use During
8  Pregnancy and Children's Risk of Autism,
9  ADHD, and Intellectual Disability."
10         Let me ask you first,
11  Dr. Ness. Were you aware of the
12  publication of this JAMA article?
13    A.   As you said, it was just
14  available a few hours ago. I was not
15  aware that this was published on JAMA a
16  few hours ago.
17    Q.   Okay. Sometimes folks are
18  aware of prepublication, and I was
19  wondering if you had any indication from
20  any source that this study that we've
21  marked as 14A had been published.
22    A.   I was not aware that this
23  was published.
24    Q.   Okay. And I'm not going to

Page 387

1  ask you too much about it, because,
2  certainly, you haven't had a chance to
3  review it. But just a couple of
4  questions.
5         You see that this is a
6  study, if we look at Design, Setting, and
7  Participants. "This nationwide cohort
8  study with sibling control analysis
9  included a population-based sample of
10  2.4 million children born in 1995 to 2019
11  in Sweden, with follow-up through
12  December 31, 2021."
13         Do you see that?
14    A.   I do.
15    Q.   And if you look in the
16  Exhibit Ness-14B, turn with me, if you
17  would to E Table 4.
18    A.   I'm sorry. What page are
19  you on?
20    Q.   You know, it's not
21  paginated. I apologize. But it looks
22  maybe about ten pages in or so. There's
23  an E Table 4 --
24    A.   I see that.

Page 388

1    Q.   -- which has sample sizes
2  for sibling analyses of acetaminophen.
3    A.   I see that.
4    Q.   And if you look at the
5  number of participants who were
6  discordant for outcome and exposure for
7  ADHD, do you see that number had over
8  31,000?
9    A.   Yes, I do.
10    Q.   Okay. And you would agree
11  that 31,000 discordant sibling pairs is
12  a -- is the largest discordant sibling
13  analysis that you are aware of to date?
14    A.   That would be correct.
15    Q.   Okay. And if you look at --
16  and this article was published in JAMA,
17  which, of course, is a well-respected
18  medical journal, correct?
19    A.   That's correct.
20    Q.   Okay. And the conclusion of
21  this article is that "acetaminophen use
22  during pregnancy was not associated with
23  children's risk of autism, ADHD, or
24  intellectual disability in sibling

Page 389

1  control analysis. This suggests that
2  associations observed in other models may
3  have been attributable to familial
4  confounding."
5         Do you see that?
6    A.   Can you just give me one
7  minute. I think it's not entirely
8  reasonable to ask me to opine about an
9  article that just came out today and that
10  I'm seeing.
11    Q.   I'm entirely in agreement
12  with you, and I'm not meaning to put you
13  in that situation. I want to ask --
14         MR. SNIDOW: So hold on --
15         MS. BROWN: Hold on.
16  BY MS. BROWN:
17    Q.   I want to ask you a
18  follow-up about that statement, and
19  that's all I'm going to ask you about.
20  Because I agree it's not fair to ask you
21  about an article that I just handed you.
22         But what the authors here
23  conclude is that associations observed in
24  other models may have been attributable

1 to familial confounding, and that's what
2 I want to ask you about, okay, Dr. Ness?
3          MR. SNIDOW:  Well, I mean,
4 no.  You've got to let her read
5 it.  She can testify about it if
6 she wants, or not.  I mean, you
7 can't do it halfway.
8          MS. BROWN:  I'm not -- I'm
9 not -- hold on.  Hold on.  I'm
10 not asking about substance --
11          MR. SNIDOW:  Hold on.
12          MS. BROWN:  -- of an
13 article I just gave you.
14 BY MS. BROWN:
15     Q.   What I want to ask you about
16 is these authors' statements about
17 familial confounding.
18          MR. SNIDOW:  Objection.
19 BY MS. BROWN:
20     Q.   And if you need a minute to
21 look at the article, by all means, take
22 it.
23     A.   Thank you.
24     Q.   But I'm not asking detailed

1 questions about an article you have not
2 read.
3     A.   Yeah, let me just -- let me
4 just read this.
5          MR. SNIDOW:  Just for the
6 record, she obviously can't
7 interpret the authors'
8 statement --
9          MS. BROWN:  That's
10 certainly not what I'm asking.
11          MR. SNIDOW:  But you are.
12          But anyway, have her -- let
13 her take a look.
14          THE WITNESS:  Does someone
15 have a pen?
16          MR. SNIDOW:  Mm-hmm.
17          THE WITNESS:  Thank you.
18 BY MS. BROWN:
19     Q.   Dr. Ness, you ready to
20 continue?
21     A.   Just give me one more
22 minute.
23          Okay.  Here is what I see in
24 this study that I just asked you to look

1 at.
2     Q.   But, ma'am, I didn't.  And I
3 don't have a pending question.  So if
4 there's something you want to add on at
5 the end, counsel can ask you.
6          What I want to ask you about
7 is, I want to direct your attention to
8 the conclusion, and I have a question for
9 you about the authors' statement about
10 prior studies showing results that could
11 have been attributable to familial
12 confounding.
13          Do you, Dr. Ness, agree that
14 genetic confounding should be controlled
15 for when trying to investigate a
16 potential association between in utero
17 exposure to acetaminophen and ADHD?
18     A.   My opinion is that there
19 have been a plethora of studies that have
20 looked at the question of the potential
21 of genetic confounding in studies of
22 acetaminophen and ADHD and have used
23 sibling pair analyses.  They have used
24 before and after pregnancy analyses.

1 They have used alternative analgesic use
2 analogies.  They have adjusted for
3 various genetic surrogate measures.
4 Many, many studies which I outline in my
5 report.
6          And I -- I can see that in
7 this particular report, there was a
8 very -- this is a report from Sweden in
9 which the prevalence of -- we were just
10 talking about this -- the prevalence of
11 ADHD was 5.9 percent.  So it's very low
12 as compared to other countries.  It's the
13 lowest I've seen.
14          And the prevalence of
15 acetaminophen use was 7.49 percent,
16 which, again, is the lowest I've ever
17 seen.  It's a very unusual population.  I
18 have no idea what was going on in Sweden,
19 but it's an interesting country.
20          But their overall odds ratio
21 was 1.07, so a 7 percent increase in the
22 general population.  And then 0.98.  So
23 it's not -- it's right around one, in
24 sibling.  So I do see that.

99 (Pages 390 - 393)

1     I also see that for the dose
2 data, which they did look at, or the
3 duration data -- no, it's actually
4 dose -- that they did look at, which is
5 where we see the greatest effect, they
6 actually didn't have over-the-counter
7 dose data -- I mean they didn't have
8 over-the-counter use of APAP.  They only
9 had dispensary use, which is a very, very
10 poor marker of APAP use.
11     So I see all of those
12 things.
13         Now, what's your question?
14     Q.   Do you remember what it was?
15     A.   If you could repeat it, it
16 would be helpful.  Thank you.
17     Q.   My question was none of what
18 you answered.
19         My question was, do you
20 agree, Dr. Ness, that genetic confounding
21 should be controlled for when trying to
22 investigate a potential association
23 between in utero exposure to
24 acetaminophen and ADHD?

1     A.   My belief is that one of the
2 strongest ways to adjust for genetic
3 confounding is to look at the woman
4 herself and look at what she was doing
5 before and after the pregnancy and then
6 during the pregnancy.  And if in all
7 three of those periods she has an
8 elevated risk, that would raise some
9 eyebrows.
10         However, if -- I mean,
11 because she is her best -- she is her
12 best control.  Siblings are -- only share
13 50 percent of their genetics.  There are
14 epigenetic effects that they don't adjust
15 for.  There are changes in environment
16 that are not adjusted for.
17         I think a number of authors
18 which I cite in my report do not consider
19 sibling pairs to be a good adjustment for
20 genetic confounding.
21         But in the really good
22 adjustment for genetic confounding, I do
23 believe that's an important thing to do,
24 and we've not found it to be a

1 confounder.  We've not found genetics to
2 be a confounder.
3     Q.   Let me follow up on a couple
4 of things you said.
5         Would you agree that a
6 sibling control analysis is, in fact, a
7 good way to attempt to control for
8 genetic confounding?
9     A.   I think it's not the best
10 way at all.
11     Q.   Okay.  You believe maternal
12 negative controls are superior to sibling
13 controls?
14     A.   I think a woman is her best
15 control.
16     Q.   Okay.  Have you evaluated
17 the literature that look into whether or
18 not there is something different about a
19 woman who takes acetaminophen during
20 pregnancy than women who take
21 acetaminophen outside of pregnancy?
22         MR. SNIDOW:  Objection to
23     the form.
24         THE WITNESS:  I didn't

1     understand the question.
2 BY MS. BROWN:
3     Q.   Do you believe that
4 maternal -- the maternal controls in this
5 body of literature are properly comparing
6 the same groups of women?
7     A.   Again, if you rephrase that,
8 would be helpful.  Thank you.
9     Q.   I'll just strike it.  We'll
10 come back.
11         Let's talk a little bit
12 about Baker 2020, which you cite in your
13 report, Dr. Ness.
14     A.   Yes, ma'am.
15         MR. SNIDOW:  Do you have
16     that one marked?
17         MS. BROWN:  Not yet.
18         MR. SNIDOW:  I think we
19     did.
20         MS. BROWN:  Oh, Baker.
21     Yeah, we did.
22         MR. SNIDOW:  Yeah.
23         THE WITNESS:  We have that
24     already as an exhibit.

1      MR. SNIDOW:  I think it's
2  8.
3      MS. BROWN:  You are
4  correct.
5  BY MS. BROWN:
6      Q.   And in your discussion --
7      A.   I'm sorry.  Can I just have
8  a second to find it?  I see it.  Okay.
9  No, wait.  8 is Anand.  We're talking
10  Baker, right?
11      MR. SNIDOW:  Yeah, I think
12  Anand is 9.
13      THE WITNESS:  Mine says 8,
14  unless I'm misreading the
15  writing.
16  BY MS. BROWN:
17      Q.   We could -- and when we're
18  done, we can go through and just clean it
19  up if I have two 8s, which I may.  Which
20  I might.
21      A.   No, I don't -- I don't
22  believe that I have -- I don't believe
23  you gave me the Baker.  Not that I can
24  find.

1      (Whereupon a discussion was
2  held off the record.)
3      THE WITNESS:  Oh, I'm
4  sorry.  Actually, there's no
5  exhibit number on this.  So
6  I'm --
7      MS. BROWN:  This makes it
8  all clear.
9      (Document marked for
10  identification as Ness
11  Exhibit 15.)
12  BY MS. BROWN:
13      Q.   We're going to make Baker
14  Exhibit 15.  Sorry.
15      So, Dr. Ness, you discuss
16  this Baker article in part on Page 79 of
17  your report, and you acknowledge the
18  authors' admitted limitation that they
19  did not explicitly correlate maternal
20  acetaminophen use with acetaminophen
21  concentrations in the meconium, correct?
22      A.   I say that here.  I'm sorry.
23  And it would really be helpful -- I'm not
24  trying to be difficult.  It would be

1  helpful if you'd just show me exactly
2  where you're looking.
3      Q.   So we're on Page 79 of your
4  report.
5      A.   I see that.
6      Q.   The end of the only full
7  paragraph on that page --
8      A.   Yes.
9      Q.   -- you're discussing Baker.
10  And you say, towards the end of the
11  paragraph, "They also point out:
12  'Although meconium is known to accumulate
13  drugs and drug metabolites throughout the
14  last two-thirds of pregnancy, we did not
15  explicitly correlate maternal
16  acetaminophen use with acetaminophen
17  concentrations in meconium, a potential
18  limitation that should be the subject of
19  future work,'" correct?
20      A.   They -- that is what they
21  state, and then they did that future
22  work.  The first author on that future
23  work was Laue, L-A-U-E, I believe.
24      Q.   Okay.  And on --

1      A.   And I think I cite that as
2  well.
3      Q.   I want to talk about that,
4  but let's go one step at a time.
5      That is a potential
6  limitation in Baker that you recognize in
7  your report, correct?
8      A.   At that time it was, but
9  then, subsequently, they did the work,
10  and so I can opine about that additional
11  work that was published.
12      I mean, you know, this is a
13  snapshot at one point in time.  They then
14  subsequently went ahead and did the
15  analysis, and so that needs to be
16  considered with this snapshot.  Both
17  snapshots together complete a full
18  picture.
19      Q.   And what you say in your
20  report is "They subsequently completed
21  that work and directly showed that APAP
22  in meconium was a stronger indicator of
23  ADHD risk than maternal recall," correct?
24      A.   That's correct.

1    Q.    And you cite Laue 2018 for
2    that proposition, correct?
3    A.    That's correct.
4    Q.    Would you agree with me that
5    if Laue did not exist, Baker would have a
6    serious limitation?
7         MR. SNIDOW:  Objection --
8    objection to the form.
9    Incomplete hypothetical, I guess.
10        MS. BROWN:  I don't know
11   why everyone is laughing.
12        THE WITNESS:  As a
13   scientist, I can't answer that.
14   It does exist.
15        MR. SNIDOW:  Well, because
16   Laue does exist --
17        MS. BROWN:  Hold on.  We're
18   going to talk about it.
19   Everybody.  We're going to talk
20   about it.
21        MR. SNIDOW:  Yeah.  All
22   right.
23   BY MS. BROWN:
24   Q.    What I want to understand is

1    that without Laue, do you agree that the
2    findings of Baker are limited based on
3    the limitation we just discussed?
4    A.    I see that that is what they
5    said.  I can read it.  And that is what
6    they said.
7    Q.    And you thought it was
8    significant enough to put in your report,
9    correct?
10   A.    I quote it in my report.
11   That's correct.
12        I -- again, being
13   exceptionally conservative in my report
14   and very complete, I quote extensively
15   from each of the authors in the
16   diagnostic studies, both with regard to
17   their strengths and their weaknesses.
18        I was not cherry-picking.  I
19   was showing the strengths and the
20   weaknesses.  Every study has strengths
21   and every study has weaknesses.  This is
22   one of the weaknesses that they write
23   about, and I wanted to be complete and
24   conservative in showing everything.

1    Q.    Now, you say in your report
2    they, being the authors, subsequently
3    completed that work.
4    A.    Yeah.
5    Q.    And you're -- you're
6    referring to work attempting to correlate
7    maternal acetaminophen use with
8    acetaminophen concentration in the
9    meconium, correct?
10   A.    I think "subsequently" was
11   not a correct word, because I now note
12   that Laue was in 2018.  But I'd also note
13   that Laue 2018 was an abstract, not a
14   full publication.  So I think I was -- I
15   think the word "subsequently" was -- was
16   not a good word choice.
17   Q.    Well, it's wrong, right?
18   A.    I'm sorry?
19   Q.    It's wrong, right?
20   A.    It was in abstract form in
21   2018.  Baker was published in 2020.  But
22   I have no idea -- actually, let's look at
23   Baker.  Just give me one minute.
24   Q.    Well, we don't have a

1    question pending.
2    A.    No, but -- no, you do have a
3    question, because we were talking about
4    the word "subsequently."  So that's a
5    question, and I need to be able to answer
6    it, please.  Thank you.
7    Q.    Okay.  What are you looking
8    at to answer --
9    A.    I'm looking --
10   Q.    Wait.  Let me ask the
11   question.
12        What are you looking at to
13   answer the question that 2018 cannot be
14   subsequent to 2020?
15        MR. SNIDOW:  She's looking
16   at when Baker was written.
17        THE WITNESS:  I'm looking
18   at the report to see when the
19   Baker study was actually done.
20        So Baker is reporting about
21   work that was done from 2007 to
22   2009.
23        I do not know exactly when
24   they completed the writing of

Page 406

1 this report, so I cannot -- I
2 cannot say whether it was prior
3 to or after Laue.
4      But since abstracts take a
5 much shorter time to be published
6 than full publications, I don't
7 have the information to opine
8 about the word "subsequently."
9 BY MS. BROWN:
10     Q.   Okay.  Do you think it's
11 possibly a mistake in your report, the
12 word "subsequent"?
13     A.   I cannot opine.
14     Q.   Okay.
15          (Document marked for
16     identification as Ness
17     Exhibit 16.)
18 BY MS. BROWN:
19     Q.   I'm handing you what we've
20 marked as Exhibit 16, which is the
21 Laue 2018 publication that you cite for
22 the work that you believe directly showed
23 that APAP and meconium was a strong
24 indicator of ADHD risk, correct?

Page 407

1     A.   Actually, I said -- yes.
2     Q.   And one of the co-authors of
3 this abstract is Dr. Baccarelli.
4          Do you see that?
5     A.   Oh.  I do see that.
6     Q.   And in the results section,
7 the authors report that acetaminophen
8 used during labor was significantly
9 associated with acetaminophen in the
10 meconium.
11          Do you see that?
12     A.   Yes.
13     Q.   They have administration
14 during labor and then a statistically
15 significant finding, correct?
16     A.   Yes.
17     Q.   And then they have -- in
18 contrast, they report no statistically
19 significant association between
20 acetaminophen used during pregnancy and
21 acetaminophen found in the meconium.
22          Do you see that?
23     A.   What they report on is that
24 maternal recall, using maternal recall,

Page 408

1 yes/no, which my point is that it's a
2 very, very misclassified -- that a yes/no
3 exposure is quite misclassified, and the
4 misclassification is towards the null.
5     Q.   Do you remember my question?
6     A.   Can you repeat it, please.
7     Q.   Sure.
8          What these authors found is
9 no statistically significant association
10 between acetaminophen intake during
11 pregnancy and meconium concentrations,
12 correct?
13     A.   Based upon maternal recall,
14 they do not find an association between
15 maternal recall and acetaminophen
16 concentration and meconium, but they do
17 find an association with clinical files
18 from the hospital and medical database at
19 the point of labor and delivery.
20     Q.   Well, I mean, there's no
21 mystery to think that if you take
22 acetaminophen during labor, it might be
23 associated with finding it in meconium,
24 correct?

Page 409

1     A.   Meconium is -- accumulates
2 in the entirety of the last two-thirds of
3 pregnancy.
4     Q.   And in terms of your
5 investigation into the risk of taking
6 acetaminophen during pregnancy, you would
7 agree that there is a limited value to
8 information about taking acetaminophen
9 while you are delivering a baby, correct?
10     A.   I -- please -- please --
11 please misstate that -- I mean restate
12 that.
13     Q.   Let me restate it.
14          In terms of the exposure
15 period that is important to consider when
16 evaluating whether or not taking
17 acetaminophen during pregnancy increases
18 a woman's risk for having a child with
19 ADHD, you would agree there is limited
20 value to an exposure period that consists
21 only of labor and delivery?
22          MR. SNIDOW:  Objection to
23     form.
24          THE WITNESS:  I think what

103 (Pages 406 - 409)

Page 410

1     I would say is that if I had
2     documentation that the only time
3     that a woman was exposed to APAP
4     was a single peripartum exposure,
5     and there was no other exposure
6     during pregnancy, I would say
7     that that was not a good
8     indicator of exposure.
9  BY MS. BROWN:
10     Q.   Are you aware that this
11  abstract was never submitted for
12  publication?
13     A.   I can't say anything about
14  that. I'm not an author on this.
15     Q.   Well, you cited the
16  abstract, though, right?
17     A.   Well, I don't know if it was
18  submitted or not submitted. I could not
19  find it -- I could not find the full
20  publication.
21     Q.   You looked for it?
22     A.   Yes.
23     Q.   Okay. Do you know that
24  Dr. Baccarelli was questioned and

Page 411

1  testified about this abstract?
2     A.   I have no idea. As I said,
3  I did not read his deposition. I read
4  his report.
5     Q.   Would you be surprised to
6  learn that Dr. Baccarelli testified that
7  the reasons they didn't publish this
8  abstract was because they didn't believe
9  the findings were valid?
10     MR. SNIDOW: Objection to
11  form.
12     Ali, no way. If you're
13  going to question her about what
14  Dr. Baccarelli said, you've got
15  to show her the transcript.
16     THE WITNESS: I can't -- I
17  mean, how could I possibly --
18  I've not read it. I said I've
19  not read it.
20     I'm a scientist. I don't
21  guess. I don't imagine. I don't
22  have, you know, dreams about it.
23     I don't know what you're
24  asking me.

Page 412

1  BY MS. BROWN:
2     Q.   I want you to assume --
3     MR. SNIDOW: No.
4  BY MS. BROWN:
5     Q.   -- that this abstract
6  involved five women.
7     Would that be a reliable
8  sample size for you in making the
9  statement that this abstract subsequently
10  directly showed that APAP in meconium was
11  a stronger indicator of ADHD risk?
12     MR. SNIDOW: Objection to
13  form.
14     THE WITNESS: All I can
15  say, based upon my reading of the
16  abstract, is, "We recruited
17  pregnant women, N equals 238,
18  during the first trimester and
19  assessed maternal intake of
20  acetaminophen during pregnancy by
21  a questionnaire."
22     And then they had clinical
23  files. They don't say what their
24  N was. So I cannot opine about

Page 413

1     something that I do not see in
2     front of me.
3  BY MS. BROWN:
4     Q.   Well, it's a hypothetical,
5  and experts can and, in fact, are
6  required to answer questions
7  hypothetically.
8     And so my question is,
9  hypothetically, I want you to assume that
10  the number of women involved in this
11  abstract was five.
12     Do you believe that that is
13  a reliable sample size to draw the
14  conclusion that you did in your report?
15     MR. SNIDOW: Objection to
16  form. Incomplete hypothetical.
17     And, Ms. Brown, since you
18  and I both know what's going on
19  here, if you want to show her the
20  deposition, let's do that.
21     MS. BROWN: It doesn't
22  matter what Dr. Baccarelli said.
23  It's a hypothetical.
24     THE WITNESS: I mean, I

104 (Pages 410 - 413)

Page 414

1  have no idea whether he said it
2  or not.
3  BY MS. BROWN:
4     Q.   It doesn't matter.  I want
5  you to assume that that's the truth.
6        Does that impact your view
7  of the reliability of this abstract?
8     A.   I don't make assumptions.
9     Q.   It's -- I'm not asking you
10  to assume anything.
11       You were critical of
12  Gustavson's 34 discordant sibling pairs,
13  correct?
14    A.   That is correct.
15    Q.   And one of the reasons you
16  were critical of that, you told me, is
17  because, in your view, that did not
18  confer sufficient power, correct?
19    A.   That is correct.
20    Q.   And so my question for you
21  is, if you assume that this abstract
22  involved five women, does that confer
23  sufficient power to make the statement
24  that you did in your report regarding

Page 415

1  Laue 2018?
2        MR. SNIDOW:  Objection to
3     the form.  Incomplete
4     hypothetical.
5        Dr. Ness, if you feel like
6     you have the information
7     necessary to answer that, you can
8     go for it.
9        THE WITNESS:  I cannot
10    answer the question.
11       MS. BROWN:  Okay.  Let's
12    take -- let's go off the record,
13    please, so we can finalize what
14    we're going to do in our final
15    amount of time.
16       THE WITNESS:  I'm sorry.
17    What is the time on the record,
18    please?
19       THE VIDEOGRAPHER:  The time
20    is 4:57 p.m.  We're off the
21    record.
22       (Short break.)
23       THE VIDEOGRAPHER:  The time
24    right now is 5:13 p.m.  We're

Page 416

1  back on the record.
2  BY MS. BROWN:
3     Q.   Dr. Ness, I want to ask you
4  some questions about Page 91 of your
5  report.
6     A.   Yes.
7     Q.   I want to direct your
8  attention to the meta-analysis section in
9  the middle of 91.
10       Do you see that?
11    A.   Yes, I do.
12    Q.   Okay.  And you talk about
13  two Masarwa papers.
14       Do you see that?
15    A.   Yes.
16    Q.   And those are nondiagnostic
17  meta-analyses, correct?
18    A.   That's correct.
19    Q.   All right.  And you say
20  both -- down at the bottom, "Both Masarwa
21  meta-analyses relied on some studies that
22  assessed behavioral, nondiagnostic
23  endpoints, rather than diagnostic
24  endpoints."

Page 417

1        And then you say you include
2  it in your Bradford Hill "only because
3  the Court's Order discussed the Masarwa
4  2020 study, suggesting that the Court's
5  Order relied in part on this study."
6        Do you see that?
7     A.   I do see that.
8     Q.   So Masarwa 2020 was included
9  in your Bradford Hill analysis?
10    A.   Masarwa 2020, which I
11  discuss in quite a lot of detail, was
12  used in the context of understanding the
13  degree to which exposure
14  misclassification and confounding may
15  have impacted the results -- may have
16  impacted the association between APAP use
17  and acetaminophen.
18    Q.   Was Masarwa 2020 included in
19  your Bradford Hill analysis?
20    A.   In being very, very
21  conservative, I included -- I included
22  that assessment, which I think I discuss
23  in detail under the Bradford Hill
24  analysis.

105 (Pages 414 - 417)

1    Q.   And the reason you included
2 it was because of the court's order?
3    A.   I included it because it
4 gave somewhat -- well, it was not unique,
5 actually, because there were other
6 studies.
7         But as I said, it gave a
8 richness to the literature, and to be
9 very conservative, and to be fair, it
10 was -- it indicated that confounding may
11 have been an issue.  And on the other
12 hand, exposure misclassification went the
13 opposite way.
14         But I wanted to be
15 completely complete and totally
16 transparent.
17    Q.   But that's not what you say
18 in your report.
19         MR. SNIDOW:  Objection to
20    form.
21         THE WITNESS:  I'm sorry.
22    What's the question?
23 BY MS. BROWN:
24    Q.   You say in your report that

1 you included Masarwa 2020 in your
2 Bradford Hill assessment only because the
3 court's order discussed it.
4         Is that true?
5    A.   I used, dominantly, the
6 Ricci analysis, which was about ADHD
7 diagnosis.  I used Masarwa with respect
8 to the question of confounding and
9 misclassification.
10    Q.   But that wasn't my question.
11    My question was, is it true,
12 as you state in your report, that the
13 only reason you included Masarwa 2020 in
14 your Bradford Hill analysis was because
15 of the court's order?
16    A.   I relied, in my report,
17 under the Bradford Hill, I -- I believe,
18 I'd have to reread that component of
19 it -- but dominantly in the section on
20 misclassification -- on -- what do I call
21 it?
22    Q.   Ma'am, you're flipping
23 through your report, and my question is
24 on Page 91.

1    A.   I understand that.  But this
2 question -- oh, systematic error.  I'm
3 sorry.  I was just blocking on the
4 terminology.  Systematic error.
5    Q.   I'm going to try one last
6 time, and you give me the best answer you
7 are capable of giving as an expert
8 witness in this litigation.
9         MR. SNIDOW:  Objection to
10    the preamble.
11 BY MS. BROWN:
12    Q.   Is it true, as you state on
13 Page 91 of your expert report, that the
14 only reason you included Masarwa 2020 in
15 your Bradford Hill analysis is the
16 court's order?
17    A.   I indicated that the court
18 seemed to have a particular interest in
19 this study and, therefore,
20 conservatively, I -- and, as I said, I
21 had read the Daubert report.
22         As I said, I wanted to
23 adhere to, for whatever legal reasons,
24 and be respectful of the judge's

1 opinions; and, therefore, I relied on
2 diagnostic outcomes and included Masarwa
3 in the context of systematic error.
4    Q.   Do you believe that
5 Dr. Baccarelli's transdiagnostic Bradford
6 Hill analysis is a reliable way to answer
7 the question of whether in utero exposure
8 to acetaminophen causes ADHD?
9         MR. SNIDOW:  Objection --
10    hold on.  Objection to form.
11    Incomplete hypothetical.
12         And I'll renew my objection
13    I made before.  If you're going
14    to ask her about something
15    specific in Dr. Baccarelli's
16    report, that you at least -- at
17    least show her the report, which
18    is 160 pages.
19         MS. BROWN:  Counsel --
20    Counsel.  Objection to form.  I
21    get it.  This is the only thing
22    you got.
23         MR. SNIDOW:  Yeah, but -- I
24    know, but come on --

106 (Pages 418 - 421)

Page 422

1          MS. BROWN:  Here's my
2      question.  It is not detailed.
3      It's not in the abstract.
4   BY MS. BROWN:
5          Q.   You reviewed
6   Dr. Baccarelli's report.  My question is
7   do you believe a Bradford Hill analysis
8   that includes ADHD, ASD, and other
9   neurodevelopmental disorders is proper,
10  from an epidemiological point of view?
11         A.   I don't have an opinion.
12         Q.   You retired in 2020,
13  correct?
14         A.   At the very, very end of
15  2019, going into 2020.  That's correct.
16         Q.   Okay.  And you've told us in
17  the past that in the year 2023,
18  100 percent of your time earning
19  compensation was doing expert witness
20  work for plaintiffs; is that accurate?
21         A.   My compensated work.  I also
22  indicated that I have done quite a lot of
23  uncompensated work in the area of public
24  health.

Page 423

1          Q.   Okay.  Let's break that up.
2              In 2023, is it correct that
3   100 percent of your compensated work was
4   expert witness work for plaintiffs?
5          A.   That's correct.
6          Q.   And that -- in 2022, was
7   100 percent of your compensated work
8   expert witness work for plaintiffs?
9          A.   Compensated work, yes.
10         Q.   And that's true for 2021 and
11  2020 as well, correct?
12         A.   That is correct.
13         Q.   And you just indicated you
14  did some uncompensated work, correct?
15         A.   I did.
16         Q.   Please tell me what that
17  was.
18         A.   I've -- I've written several
19  papers -- oh, goodness me.
20              I've written quite -- quite
21  a number of papers as co-author and a few
22  papers as primary author, first author,
23  during that time, that was uncompensated.
24         Q.   And what were the subject of

Page 424

1   those papers?
2          A.   Some of them were ovarian
3   cancer.
4              More recently there have
5   been publications around issues related
6   to end of life.
7          Q.   Has any of your
8   unpublished -- strike that.
9              Has any of your
10  uncompensated published work since your
11  retirement in 2020 dealt with ADHD or
12  ASD?
13         A.   No, it has not.
14         Q.   Has any of your
15  uncompensated published work since 2020
16  dealt with acetaminophen?
17         A.   Not to my knowledge, no.
18         Q.   Other than ovarian cancer
19  and end-of-life publications, have you
20  done any other uncompensated professional
21  work since your retirement?
22         A.   Well, again, I told you
23  several times that some of my work in
24  this case was uncompensated.

Page 425

1          Q.   And you estimated that
2   earlier to be about half of the time you
3   spent prior to the USA Today article in
4   the fall of 2022; is that correct?
5          A.   Not prior to the USA Today,
6   but as a result of my very initial review
7   of the literature.
8          Q.   Wouldn't that have been
9   prior to the USA Today statements on
10  causation?
11         A.   Well, I -- I'm not sure
12  exactly how you meant that, but yes.
13              I mean, yes, that -- that
14  came as part of my Hill's tenet analysis.
15  And I then was interviewed by USA Today,
16  based upon that opinion that I'd come to.
17  Yes.
18         Q.   Okay.  The request to do the
19  USA Today interview came from Ashley
20  Thompson, as we discussed earlier,
21  correct?
22         A.   As I recall, yes.
23         Q.   Did you understand -- have
24  lawyers ever requested particular press

107 (Pages 422 - 425)

1 appearances?
2     A.   I don't recall.  No, I don't
3 recall that to be the case.
4     Q.   Okay.  Lawyers were on the
5 e-mails with Ashley Thompson regarding
6 the appearances, correct?
7     A.   I saw the cc's, yeah.
8     Q.   Are you currently affiliated
9 with Autism Justice at all?
10    A.   No.
11    Q.   When is the last time you
12 were affiliated with Autism Justice?
13    A.   I can't -- I don't know the
14 answer to that question.
15    Q.   Okay.  While you were
16 working for -- or while you were
17 consulting for Autism Justice, why did
18 you not do an autism-specific Bradford
19 Hill analysis?
20    A.   I was not asked to do that.
21    Q.   Today, in April of 2024, is
22 100 percent of your professional time
23 spent doing expert witness work?
24    A.   No.

1     Q.   What percentage of your time
2 do you currently spend on expert witness
3 work?
4     A.   I have -- I don't know the
5 answer to that.
6          As I said, I'm doing other
7 academic work that is uncompensated.  I
8 think we've established that.
9     Q.   Right.
10         Can you estimate what
11 percentage of your time is nonexpert
12 witness work today?
13    A.   I cannot.
14    Q.   Is it more than half?
15    A.   I just told you I can't -- I
16 can't estimate.
17    Q.   Okay.  When is the most
18 recent uncompensated publication that you
19 have?
20    A.   That's actually been
21 published?
22         I think you need to
23 understand that there's a fairly long
24 timeline between collecting data,

1 analyzing the data, writing up the paper,
2 submitting for publication, and then
3 actual publication.
4     Q.   Okay.  When is the most
5 recent one?
6     A.   My most recent publication,
7 is that what you're asking?
8     Q.   Yes, ma'am.  We've been
9 discussing --
10    A.   What is the date of my most
11 recent publication, is that your
12 question?
13    Q.   No, let me -- let me
14 reorient you.
15         We've been discussing
16 uncompensated publications that you've
17 had since your retirement.
18    A.   Correct.
19    Q.   And you told me they were in
20 the area of ovarian cancer and end of
21 life.
22    A.   Correct.
23    Q.   And my question was, when
24 was the most recent one of those

1 publications?
2     A.   If you'll let me look at my
3 CV, I can tell you what the publication
4 date is.
5     Q.   We can do that, if you don't
6 know off the top of your head.
7          That's where we would find
8 that information?
9     A.   That is where we would find
10 that information.
11    Q.   Okay.  Let me show you --
12         MS. BROWN:  I think we're
13 up to 17.
14         (Document marked for
15 identification as Ness
16 Exhibit 17.)
17 BY MS. BROWN:
18    Q.   Okay.  This is a December 7,
19 2022, article entitled, "Is Taking
20 Tylenol During Pregnancy Safe?  Experts
21 Weigh In on Research, Pending Lawsuits."
22         This is another interview
23 you gave in connection with your
24 consulting for Autism Justice, correct?

1    A.    Yes.
2    Q.    And you were paid by Douglas
3 Boxer to give this interview, correct?
4    A.    I was paid to give this
5 interview, yes.
6    Q.    Okay.  And you describe
7 yourself here as an Autism Justice
8 scientific consultant.
9        Do you see that?
10    A.    I'm sorry.  Where are you
11 reading, please -- oh.
12        No, I'm sorry.  Where?
13    Q.    At the bottom of the first
14 page --
15        MR. SNIDOW:  Do you mind?
16        MS. BROWN:  Thank you, J.J.
17        MR. SNIDOW:  Yeah.
18 BY MS. BROWN:
19    Q.    "'I am absolutely convinced
20 it's not only a link, but it's a cause,'
21 said Roberta Ness, Autism Justice
22 scientific consultant and former Dean of
23 the University of Texas School of Public
24 Health."

1        Do you see that?
2    A.    Yeah.  I didn't say I was an
3 Autism Justice scientific consultant.
4 That was their characterization.  But
5 yes, I see that.
6    Q.    When you gave your -- did
7 you disclose to this news outfit that you
8 had been engaged by plaintiffs' lawyers
9 in the acetaminophen litigation and were
10 being paid by them at the time of this
11 article?
12    A.    I don't understand the
13 question.
14    Q.    Sure.
15        At the time of this article,
16 December 7, 2022, you were consulting for
17 at least two different groups of
18 plaintiffs' lawyers filing lawsuits
19 against JJCI, amongst others, correct?
20    A.    I don't know what you mean
21 by two.  What two are you referring to?
22    Q.    So earlier we looked at your
23 declaration, and there was an engagement
24 by one group of plaintiffs' lawyers, and

1 then another that has a confidentiality
2 agreement that you can't talk about.
3        Remember that?
4    A.    I -- as I said when we
5 reviewed that document, I really don't
6 recall two separate groups.
7    Q.    Okay.
8    A.    I -- I said that.
9    Q.    Right --
10    A.    I believe it was on the
11 record.
12    Q.    Yeah.  But you signed a
13 declaration in July of 2023 that
14 identified two different plaintiffs'
15 lawyers, right?
16    A.    I just cannot recall exactly
17 one, two, whatever.
18        I was consulting for Autism
19 Justice, which I believe we have
20 affirmed --
21    Q.    Right.
22    A.    -- and I agree.
23    Q.    Right.  And you listed
24 Autism Justice as a third retention.

1 Remember your declaration said, I was
2 also retained by Autism Justice?
3    A.    I'm sorry.  Ask again,
4 please.
5    Q.    Sure.
6        Let's just real quick look
7 at your declaration so that we can get
8 this moving.
9        We marked it as Ness 3.  If
10 you want to go back to where we were.
11        What you said and signed in
12 July of 2023, in Paragraph 3, was that
13 you "were first contacted by plaintiffs'
14 counsel regarding acetaminophen and
15 neurodevelopment disorders in August 2022
16 and ultimately retained to serve as a
17 consulting-only expert."
18        Do you see that?
19    A.    Yes.
20    Q.    But then you say you were
21 also retained as a consulting expert by
22 an individual law firm.  You're not going
23 to disclose that.
24        Do you see that?

Page 434

1    A.   I see that.
2    Q.   Right.  And then in
3 Paragraph 4 you say, "I was separately
4 retained by Autism Justice."
5        Do you see that?
6    A.   I think that there's an
7 overlap here.  There were not three -- I
8 mean I -- gosh only knows at this point.
9 This was a year and a half ago.
10    Q.   Ma'am, it was less than a
11 year.
12    A.   I'm sorry?
13    Q.   Yeah, less than a year.
14 July 2023?
15        MR. SNIDOW:  I think she's
16    talking about a different date,
17    but it's all right.
18        THE WITNESS:  Oh, I'm
19    sorry.  What -- I'm getting quite
20    confused by your questioning.
21    Can we clarify the line of
22    questioning, please.
23 BY MS. BROWN:
24    Q.   This declaration that you

Page 435

1 signed was less than a year ago, correct?
2    A.   This was signed in July of
3 2023.  That is less than a year ago.
4 That's correct.
5    Q.   It identifies a retention by
6 two different plaintiffs' lawyers and
7 Autism Justice, correct?
8    A.   So as I'm reading this, it
9 says, "I was first contacted by
10 plaintiffs' counsel regarding
11 acetaminophen and neurodevelopment
12 disorders in August 2022 and ultimately
13 retained to serve as a consulting-only
14 expert in the above-referenced
15 litigation."
16        And then in Bullet 4 I say,
17 "I was separately retained by Autism
18 Justice to provide limited editorial
19 assistance regarding the content of its
20 website."
21        I do not recall exactly,
22 again, as I said previously, who, what,
23 when, where, da-da, but I do believe I
24 was referring to Bullet Point 3.

Page 436

1        So I was a consulting-only
2 expert, and I was giving editorial
3 assistance.  As I said, I was consulting
4 with respect to editorial assistance on
5 the website and in the language that was
6 used to convey information to the public.
7    Q.   Okay.  I'm not sure I
8 followed that.
9        But my question is, you
10 didn't disclose in this article that you
11 had been -- that you were consulting for
12 plaintiffs in the Tylenol litigation,
13 correct?
14    A.   Oh, I told everyone that I
15 was working with Autism Justice, and I
16 told everyone that I was being
17 compensated.
18    Q.   I'm not talking about Autism
19 Justice.  I'm talking about the
20 plaintiffs' lawyers filing lawsuits.
21        Did you disclose that to
22 anybody in this article?
23    A.   As I under -- I mean, I
24 thought that you characterized previously

Page 437

1 that Autism Justice was linked to these
2 lawsuits; did you not?
3    Q.   Is that what you understood?
4    A.   That was what I believe you
5 said.
6    Q.   What was your understanding?
7    A.   My understanding was that I
8 was consulting for Autism Justice.
9    Q.   And did you understand
10 Autism Justice to be linked to
11 plaintiffs' lawyers?
12    A.   My understanding was that
13 autism -- well, I mean, Douglas Boxer is
14 an attorney.
15    Q.   Do you think that disclosing
16 that you were a scientific consultant for
17 an organization called Autism Justice
18 completely and accurately disclosed that
19 you were working as an expert for
20 plaintiffs in litigation?
21    A.   I was not working for
22 plaintiffs in litigation.  I think we've
23 established that.  I was consulting for
24 Autism Justice on the very discrete

110 (Pages 434 - 437)

1  issues of their website and their
2  information.
3        And Douglas Boxer was the
4  individual who initially, and
5  subsequently, I was interacting with.
6    Q.   The first sentence of your
7  declaration says, "I was contacted by
8  plaintiffs' counsel regarding
9  acetaminophen and neurodevelopment
10  disorders in August 2022 and ultimately
11  retained to serve as a consulting-only
12  expert in the above-referenced
13  litigation."
14        Did I read that correctly?
15    A.   So what we've established is
16  that I was first contacted by Russ Abney.
17  He asked me to look at the literature on
18  acetaminophen and neurodevelopmental
19  disorders.
20        And I was then, after having
21  reviewed that information and come to my
22  own independent conclusion, I was
23  retained to serve as a consulting-only
24  expert for Autism Justice.  And I knew

1  that Douglas Boxer was an attorney and
2  somehow involved in litigation.  But it
3  was not my job to figure out all of these
4  interrelationships, and if I recall
5  correctly, they were quite complicated.
6        My job was to assess the
7  scientific literature and ensure that the
8  way that it was conveyed to the public
9  was accurate.  That was my job.
10    Q.   On the second page of the
11  article, you're quoted as saying, "I was
12  thinking, 'Oh, this is going to be
13  another vaccine and autism scare, and
14  then I started reviewing the literature,'
15  Ness said.  'There have been 29 really
16  huge, longitudinal studies, 26 of which
17  have shown a connection.'"
18        Do you see that?
19    A.   I do see that.
20    Q.   Okay.  Do you believe there
21  have been 29 really huge, longitudinal
22  studies?
23    A.   I -- as I counted at that
24  time, there were 29 studies that looked

1  at either ADHD or ASD, or a combination
2  thereof, or behaviors related to --
3  thereto.
4        I think if you count the
5  number of studies in my notes, it will be
6  something on that order of magnitude.
7    Q.   The next sentence says,
8  "Ness said, 'This is not a warning for
9  every pregnant woman who pops Tylenol.'
10  But instead, she refers to one specific
11  group of patients."
12        And then you're quoted as
13  saying, "Only 10 percent of women take
14  acetaminophen for a long duration during
15  pregnancy, and it's those women that are
16  of concern.  Have the information and use
17  it for the shortest duration of time that
18  you can.  That's all I'm saying."
19        Do you see that?
20    A.   I do.
21    Q.   Do you believe -- what is
22  the long duration that you're referring
23  to in this quote?
24    A.   I specifically did not give

1  a number that was -- because, as I said,
2  the different studies have characterized
3  that longest duration in different ways.
4        That's actually the reason
5  why Ricci, or Ricci, when doing the
6  meta-analysis of diagnostic endpoints,
7  did not specifically give a number.  Just
8  says the longest duration of use, because
9  that was categorized differently in
10  different studies.
11        So I'm looking at that
12  longest duration of use across studies.
13    Q.   But to come up with the
14  figure that only 10 percent of women take
15  acetaminophen for a long duration during
16  pregnancy, you must have had in your mind
17  a quantification of what a long duration
18  during pregnancy is, correct?
19    A.   I believe I referred you
20  previously to the Vlenterie -- Vlenterie
21  study, and there was one additional
22  study, I think it was Bandolini -- yes.
23  I referred you to those studies, and you
24  can look at exactly how they quantified

1 that.
2    Q.   But how did you come up with
3 this 10 percent number?
4    A.   I -- and I see that this
5 10 percent -- I had said previously
6 20 percent, and so I apologize for any
7 internal inconsistency.
8       But it was on the order of
9 magnitude of 10 to 20 percent. The point
10 being it is a modest percentage. It is
11 not the majority of women. It is the
12 minority of women take it for long
13 duration.
14    Q.   Is there a minimum duration
15 of exposure that you believe is necessary
16 for in utero exposure to APAP to cause
17 ADHD?
18    A.   I do not have an opinion.
19    Q.   Do you have an opinion on a
20 minimum exposure of APAP during pregnancy
21 to increase the risk of having a child
22 with ADHD?
23    A.   Can you please repeat that.
24    Q.   Sure.

1       Do you have an opinion on
2 the minimum exposure required for a woman
3 to take acetaminophen during pregnancy to
4 increase the risk that she has a child
5 with ADHD?
6    A.   I -- can you define for me
7 your terms? What do you mean by
8 exposure? What do you mean by risk?
9       I -- you have to be clear.
10    Q.   Sure.
11       So by exposure I mean
12 ingestion of the medicine acetaminophen.
13       Does that answer your
14 question on exposure?
15    A.   Again, one more time. Let's
16 go through it and clarify our terms.
17       Go ahead.
18    Q.   Do you have an opinion as to
19 how much exposure to acetaminophen during
20 pregnancy is required to increase the
21 risk that a woman has a child with ADHD?
22    A.   Again, exposure meaning
23 dose, exposure meaning ever never? What
24 are you asking me?

1    Q.   Well, when you reviewed
2 these studies and you had a column about
3 exposure, what information was important
4 to you to put down?
5    A.   I'm asking for you to
6 clarify your question. I'm just not --
7 I'm not trying to be difficult. I'm just
8 trying to understand what you're asking
9 me.
10    Q.   Do you really legitimately,
11 Dr. Ness, not understand the question --
12       MR. SNIDOW: Objection to
13    form. Come on.
14 BY MS. BROWN:
15    Q.   -- on how much exposure --
16    A.   I really legitimately --
17    Q.   -- during -- let me -- let
18 me just get the question out.
19       Is it correct that you
20 cannot answer the question, because you
21 don't understand it, how much exposure to
22 acetaminophen during pregnancy is
23 required to increase a woman's risk of
24 having a child with ADHD?

1    A.   Are you asking me about
2 dose?
3    Q.   I'm asking you about any
4 quantification of exposure that you
5 believe is appropriate.
6       Pills, days, trimesters,
7 however you, in your mind, quantify
8 exposure is what I want to know.
9       What is your opinion?
10    A.   This is not a black-or-white
11 question, so I really -- I cannot opine,
12 because I -- I -- it's -- the question is
13 posed in a way that an epidemiologist
14 would not pose it. And I am a scientist
15 and an epidemiologist. I need it to be
16 posed in language that I understand.
17    Q.   What -- pose that question
18 in a way that you can answer it.
19    A.   I can't pose your question.
20 I don't know what's in your mind.
21    Q.   Okay. If someone --
22       MR. SNIDOW: Form objection
23    to that one.
24 BY MS. BROWN:

112 (Pages 442 - 445)

Page 446

1    Q.   If someone wanted to know
2 your opinion on how much use of
3 acetaminophen puts a woman at risk for
4 ADHD, what would the answer be?
5    A.   How do you define use?
6    Q.   So you can't answer that
7 question?
8    A.   I just told you I'm unclear
9 about how exactly you're defining your
10 terms.
11    Q.   Do you have an opinion --
12    A.   I cannot answer a question
13 where I don't understand the terminology
14 and what it's reflecting in your mind.
15    Q.   Do you have an opinion about
16 how many days during pregnancy a woman
17 needs to take acetaminophen to be at an
18 increased risk of having a child with
19 ADHD?
20    A.   I believe I just answered
21 that question.
22    Q.   I don't understand your
23 answer.  I apologize.
24    A.   My -- my answer was

Page 447

1 different authors have defined duration,
2 number of days, differently.
3       My opinion is, as I said,
4 that long duration of use, as it is
5 defined in the studies, is associated
6 with a higher risk.
7    Q.   How is it defined in the
8 studies?
9    A.   We can go through every
10 study and which dose-response was looked
11 at.
12       Would you like to do that?
13    Q.   No, no.  I want to know what
14 you -- your opinion is.  You made these
15 statements to the world.
16    A.   Yes.
17    Q.   What was in your mind when
18 you went on NBC and USA Today and told
19 women throughout this country that using
20 acetaminophen for a long duration put
21 them at risk of having a child with ADHD?
22       MR. SNIDOW:  Objection to
23       form.
24       THE WITNESS:  What was --

Page 448

1       what was in my mind was what I
2       said, which was long duration of
3       use increases the risk more so
4       than, for an example, ever use
5       versus never use.
6 BY MS. BROWN:
7    Q.   If a woman takes APAP for
8 30 days in the first trimester, do you
9 believe that increases her risk of having
10 a child with ADHD?
11    A.   I do not have an opinion in
12 that regard.
13    Q.   Do you believe taking
14 acetaminophen for seven days or less
15 leads to an increased risk of ADHD?
16    A.   I cannot quantify that in
17 the absence of looking at the specific
18 studies.
19    Q.   If a woman takes
20 acetaminophen for 29 days, all within the
21 first trimester, does that increase her
22 risk of having a child with ADHD?
23       MR. SNIDOW:  Objection to
24       the form of the question.

Page 449

1       THE WITNESS:  I do not have
2       an opinion.
3       MR. SNIDOW:  I think you're
4       out of time.
5       MS. BROWN:  Is it --
6       THE VIDEOGRAPHER:  Eight
7       minutes.
8       MS. BROWN:  Eight minutes.
9       THE WITNESS:  I'm sorry.
10 How many more minutes?
11       THE VIDEOGRAPHER:  We've
12 been on the record for seven
13 hours.
14       MS. BROWN:  Okay.  Well --
15       MR. SNIDOW:  Nice try.
16       MS. BROWN:  Well, thank you
17 very much for your time,
18 Dr. Ness.  I appreciate it.
19       THE WITNESS:  Thank you,
20 Ms. Brown.
21       MS. BROWN:  I'll have
22 questions if Mr. Snidow has
23 follow-up.
24       MR. SNIDOW:  I will have a

113 (Pages 446 - 449)

Page 450

1  brief follow-up.
2      Can we take a two-minute
3  break, you guys. Just stay
4  seated.
5      THE VIDEOGRAPHER: The time
6  is 5:46 p.m. We're off the
7  record.
8      (Short break.)
9      THE VIDEOGRAPHER: The time
10  right now is 5:48 p.m. We're
11  back on the record.
12      - - -
13      EXAMINATION
14      - - -
15  BY MR. SNIDOW:
16      Q.  Dr. Ness, during Ms. Brown's
17  questioning, she asked you about other
18  causes of autism and ADHD -- excuse me --
19  other causes of ADHD, and you said
20  genetics; is that right?
21      A.  Yes.
22      Q.  And then later I believe you
23  referenced valproic acid; is that right?
24      A.  Yes, I did.

Page 451

1      MS. BROWN: Objection.
2      Misstates testimony.
3  BY MR. SNIDOW:
4      Q.  Is valproic acid a
5  modifiable risk factor for ADHD,
6  according to its label?
7      A.  Yes, it is.
8      Q.  Okay. When you were working
9  with Autism Justice, you said that you --
10  your primary responsibility was to review
11  the scientific information to see if it
12  was accurate?
13      A.  That's correct.
14      Q.  Why did you think that was
15  something that's important to do?
16      A.  I think correct information
17  needs to be related to the public.
18      Q.  And I believe Ms. Brown
19  showed you a document in which you said
20  that you were going to be an advocate.
21      What did you -- what did you
22  mean by advocate in that context?
23      A.  I believe we discussed this,
24  but I -- I did not think of myself as

Page 452

1  being political or anything like that. I
2  thought of myself as, basically,
3  informing the public on the facts, based
4  upon research.
5      Q.  You and Ms. Brown talked
6  about the difference between a cause and
7  the cause.
8      Do you remember that?
9      A.  Yes, I do.
10      Q.  And you agree with me that
11  went on for maybe 20 or 30 minutes?
12      A.  I don't know, but...
13      Q.  Okay. Now, when you talk
14  about something being the cause, does
15  that mean the only cause, in your mind?
16      A.  That is what I'm trying to
17  convey, yes.
18      Q.  And are there other causes
19  for ADHD?
20      A.  Yes, sir.
21      Q.  And does -- can someone get
22  ADHD even if they've never been exposed
23  to APAP?
24      A.  That is correct.

Page 453

1      Q.  Besides that, did you mean
2  anything more about the difference
3  between a cause and the cause?
4      A.  I did not.
5      Q.  You talked to Ms. Brown
6  about biologic plausibility, and I
7  believe you both spoke about glutathione
8  for some time?
9      A.  Yes.
10      Q.  And, again, that went on for
11  a good bit of time, right?
12      A.  Yes.
13      Q.  Okay. Biologic
14  plausibility, do you need to identify for
15  sure what the chemical pathway is for
16  exposure?
17      A.  You only need to have
18  something that's plausible.
19      Q.  And you reviewed the -- the
20  epidemiology in your report; is that
21  right?
22      A.  Yes, I did.
23      Q.  And in the biologic
24  plausibility section of your report, you

Page 454

1 actually detail a number of studies that
2 say that the relationship is biologically
3 plausible?
4      A.   That's correct.
5           MS. BROWN:  Objection to
6 the form.
7           MR. SNIDOW:  Well, let me
8 ask -- yeah.  I'll fix it.
9           MS. BROWN:  Because you're
10 relating.
11           MR. SNIDOW:  Yes, I was.
12 BY MR. SNIDOW:
13      Q.   Do you review studies in
14 that report in which the authors actually
15 say that it's biologically plausible?
16      A.   There are many, many, many
17 reports that have -- where the authors
18 have said it is biologically plausible.
19      Q.   And here's -- here's my real
20 question.  In your review of the
21 literature, have you ever seen any author
22 suggest that this relationship is not at
23 least a biologically plausible one?
24           MS. BROWN:  Objection to

Page 455

1 the form.
2           THE WITNESS:  I have not
3 seen that.
4 BY MR. SNIDOW:
5      Q.   You and Ms. Brown talked
6 about the difference between your talc
7 report and your APAP report.
8           Do you remember this?
9      A.   Yes, I remember.
10      Q.   And your talc report is
11 marked as Exhibit 7, and your -- I said
12 it wrong.
13           Your talc report is marked
14 as Exhibit 10, and your APAP report is
15 marked as Exhibit 7.
16           Do you mind just pulling
17 those out?
18      A.   Thank you.  Yes.  Yes.
19      Q.   Okay.  And -- and
20 Exhibit 10, this is your talc report from
21 2018.  If you could please turn to
22 Page 3.
23      A.   Yes.
24      Q.   And the sentence that you

Page 456

1 and Ms. Brown were sparring over for a
2 while, it said -- do you see where it
3 says, "Strength of association and
4 consistency are considered to be
5 particularly important by most
6 epidemiologists with whom I have
7 consulted," right?
8      A.   That is correct.
9      Q.   And what section of your
10 report is that statement in?  What --
11      A.   Of the talc report?
12      Q.   -- what section is it?
13           Is it in the Bradford Hill
14 analysis, is it in the literature
15 reviews, is it in the introduction?
16      A.   I mean, it was in
17 introduction.
18      Q.   And in this report, do you
19 say that strength and consistency are the
20 only important factors for Bradford Hill?
21      A.   I do not.
22      Q.   Did you suggest that
23 temporality is not an important factor
24 for Bradford Hill?

Page 457

1      A.   I did not.
2      Q.   Did you suggest that any of
3 the Bradford Hill factors aren't
4 important?
5      A.   I did not.
6      Q.   Now, I think you and
7 Ms. Brown got into this a little bit, but
8 for strength of association for talc, how
9 did the risk ratios in talc compare to
10 the risk ratios in APAP?
11      A.   They are similar.
12      Q.   And that's true for ever --
13 ever never use.
14           How do they compare when
15 you -- excuse me -- when you look at the
16 biologic markers in APAP -- when you look
17 at the studies using biologic markers in
18 APAP?
19           MS. BROWN:  Objection to
20 the form.
21 BY MR. SNIDOW:
22      Q.   Like Baker or Ji?
23           MS. BROWN:  Objection.
24           THE WITNESS:  I'm -- oh, I

115 (Pages 454 - 457)

Page 458

1    see, in APAP. Yeah.
2        Yeah, those studies have
3    quite a bit stronger
4    associations.
5 BY MR. SNIDOW:
6    Q.   So is there any reason that
7 you'd say -- you would say that strength
8 is important in a talc report but not in
9 an APAP report? Does that make sense?
10    A.   It makes absolutely no sense
11 whatsoever.
12    Q.   Okay. And consistency is
13 one that you actually did flag in the
14 talc report here in this sentence, right?
15    A.   Yes, I did.
16    Q.   Did you say the same thing
17 in your APAP report?
18    A.   Yes, I did.
19    Q.   All right. If you look at
20 Exhibit 7 and turn to Page 3.
21    A.   Yes.
22    Q.   It says, "Consistency and
23 temporality are often considered to carry
24 particular weight by epidemiologists,"

Page 459

1 right?
2    A.   Yes.
3    Q.   And temporality, have you
4 ever heard an epidemiologist say that
5 temporality is not important?
6    A.   No.
7    Q.   And why is that?
8    A.   Because if you put the cart
9 before the horse, the cart doesn't pull
10 the horse.
11    Q.   Right. I mean, am I correct
12 that it's logically impossible to have an
13 effect before a cause?
14    A.   Makes no sense.
15    Q.   So when you said that
16 consistency and temporality are often
17 considered to carry particular weight, is
18 that -- is that anything groundbreaking?
19    A.   No.
20    Q.   You and Ms. Brown talked
21 about the set of studies that you use in
22 your Bradford Hill analysis. And I'd
23 like you to turn to Page 107 of Exhibit 7
24 in your report.

Page 460

1    A.   Yes.
2        MS. BROWN: What page,
3 J.J.?
4        MR. SNIDOW: 107.
5        MS. BROWN: Thanks.
6        MR. SNIDOW: Yep.
7        THE WITNESS: Yes.
8 BY MR. SNIDOW:
9    Q.   And do you see the forest
10 plot there?
11    A.   Yes, I do.
12    Q.   Are there any studies with
13 nondiagnostic endpoints in the forest
14 plot?
15    A.   No, there are not.
16    Q.   If you had included
17 nondiagnostic studies, would the
18 relationship strengthen or weaken?
19    A.   Strengthen.
20    Q.   Why did you choose to
21 include only the diagnostic studies in
22 the forest plot?
23    A.   As I said repeatedly, I was
24 being highly conservative.

Page 461

1    Q.   And what do you mean by
2 conservative?
3    A.   I was trying to, if
4 anything, underestimate. I was trying,
5 if anything, to shoot myself in the foot.
6    Q.   Fair enough.
7        Now, you gave Ms. Brown a
8 citation for a talc paper that had looked
9 at just diagnostic endpoint studies.
10        Do you remember that?
11    A.   Say again.
12    Q.   I think you gave her --
13    A.   In talc?
14    Q.   In talc, I believe.
15        MS. BROWN: Diagnostic in
16 talc?
17        THE WITNESS: Diagnostic
18    endpoints in talc? Diagnostic
19    for ovarian cancer?
20 BY MR. SNIDOW:
21    Q.   Well, I'll strike the
22 question.
23        Real question is this: Have
24 you seen study authors doing Bradford

116 (Pages 458 - 461)

Page 462

1 Hill focused only on diagnostic endpoint
2 studies?
3     A.   Yes, I have.
4     Q.   Have you seen study authors
5 look at all of the studies available in
6 the literature, regardless of whether
7 they have a hard endpoint or not?
8     A.   Yes.
9     Q.   Let's look at a couple other
10 sections of your report.
11        If you can turn to Page 153.
12     A.   Yes.
13     Q.   Do you see above "Biologic
14 Plausibility" you say, "I place heavy
15 weight on the criterion of consistency as
16 did Rothman and Hill"?
17     A.   Yes.
18     Q.   And is anything about that
19 inconsistent with what you said in your
20 talc report?
21     A.   No.
22     Q.   All right.  Let's look at
23 the temporality section on 180.
24     A.   Yes.

Page 463

1     Q.   You see at the bottom you
2 say, "I place great weight on the tenet
3 of temporality"?
4     A.   Yes.
5     Q.   Anything about that
6 inconsistent with what you did in your
7 talc report?
8     A.   No.
9     Q.   Okay.  And for strength,
10 your opinion, am I correct, that strength
11 is only partially satisfied?
12     A.   That's correct.
13     Q.   Okay.
14        All right.  Now, Ms. Brown
15 asked you a lot about what you meant by
16 looking at other studies for context.
17        Do you remember that?
18     A.   Yes.
19     Q.   Are there any of the
20 Bradford Hill criteria you reviewed where
21 you couldn't have gotten there if you had
22 just looked at the diagnostic endpoint
23 studies alone?
24     A.   That's a double negative.

Page 464

1 Are there -- can you --
2     Q.   Yeah.  So we can do it in
3 order.
4        For strength, you showed
5 this forest plot --
6     A.   Correct.
7     Q.   -- and you say that it's
8 partially satisfied, right?
9     A.   That's correct.
10     Q.   Is that your opinion if you
11 looked only, only, only at the diagnostic
12 endpoint studies?
13     A.   That's my opinion if you
14 looked at the diagnostic endpoint studies
15 only and it strengthened if you took into
16 consideration everything.
17     Q.   And is that true for all the
18 other Bradford Hill factors as well?
19     A.   That would be correct.
20     Q.   Okay.
21     A.   I mean, the assessment that
22 I came to, that's correct.
23     Q.   And when you looked at the
24 other studies for context, did that

Page 465

1 strengthen or weaken the case for
2 causality?
3     A.   It would have strengthened
4 it, but I was being conservative and
5 trying to -- as I say, I was -- in a
6 sense, I was trying to disprove my own
7 case.  I was being as conservative as
8 humanly possible.
9        MR. SNIDOW:  Thank you,
10 Dr. Ness.  No further questions.
11        - - -
12        EXAMINATION
13        - - -
14 BY MS. BROWN:
15     Q.   Dr. Ness, the -- you have
16 never attempted to inform the public
17 about your view of the risk of
18 acetaminophen during pregnancy when you
19 were not being paid by plaintiffs'
20 lawyers to do so, correct?
21     A.   That's correct.
22     Q.   You opine on your report,
23 Exhibit 7, Page 149, that in your APAP
24 report, you placed moderate weight on the

117 (Pages 462 - 465)

1 tenet of strength of association,
2 correct?
3      A.   I see that.
4      Q.   Okay.  And that's -- when
5 you conducted your Bradford Hill analysis
6 in the Tylenol case, concluding, as you
7 did, that strength was only partially
8 met, you had placed moderate weight on
9 the tenet of strength of association,
10 correct?
11      A.   I see that.
12      Q.   And that's what you did,
13 right?
14      A.   I said there are many
15 instances when associations are weak or
16 moderate, even though they are causal,
17 and that was my reasoning.  Again, I was
18 being very conservative.
19      Q.   Yes, ma'am.  And counsel
20 asked you, there was nothing
21 groundbreaking about your identification
22 of consistency and temporality in your
23 APAP report, when it didn't exist in the
24 same form in your talc report.

1          Do you remember that?
2      A.   I have no idea what you just
3 asked me.
4      Q.   Counsel just asked you the
5 question about how consistency and
6 temporality are called out in your APAP
7 report, while strength and consistency
8 are called out in your talc report.
9          Do you remember that?
10      A.   We -- we discussed that in
11 great detail previously.  I believe we've
12 covered that ground, yes.
13      Q.   Okay.  And counsel just
14 asked you about that.
15          Do you remember that?
16      A.   Yes.
17      Q.   All right.  And counsel said
18 to you, well, there was nothing
19 groundbreaking about your identification
20 of consistency and temporality in the
21 Tylenol report.
22          Do you remember that?
23      A.   Yes.
24      Q.   Okay.  But, in fact, you

1 described to us today a somewhat
2 enlightened view that you had of Hill's
3 document when you went back and reviewed
4 it in connection with this case, correct?
5      A.   I wouldn't say enlightened.
6 I think that's a mischaracterization.
7 But, yes, I now quote extensively from
8 Hill himself with regard to how he viewed
9 the various criterion.  And I cite those
10 in my report.
11      Q.   And your view of how Hill
12 viewed the criteria of temporality is new
13 in this litigation, correct?
14      A.   It's not new.  I indicated
15 previously that temporality was an
16 important contributor to Hill's tenets.
17 I say here it's an important contributor
18 to Hill's tenets.
19          What is added in this report
20 is the quotation that we read previously
21 that indicated that -- I think it's
22 something like a sine qua non.
23      Q.   On Page 107 of your
24 acetaminophen report, you have a forest

1 plot that counsel asked you about?
2      A.   Yes.
3      Q.   Why did you not include
4 three findings from Gustavson 2021 -- do
5 you see that?
6      A.   Yes, I do.
7      Q.   And why did you not include
8 any of the findings for less than 28 --
9 29 days of APAP exposure?
10      A.   These were the ones that
11 were most relevant.
12          I have to say, if I included
13 every subset analysis from every study,
14 it would have gone on for pages and
15 pages.  I -- it could not have been read.
16 It would have been just way too
17 complicated.
18          So I was including these
19 data that I thought were representative,
20 and I included the data that both
21 supported and did not as strongly support
22 the causal connection.  So I included
23 both to be conservative.
24      Q.   Why did you choose to

Page 470

1 include the ever never finding from
2 Ystrom 2017?
3     A.   I could have easily included
4 the dose-response, but as I think I just
5 answered for you -- and they would have
6 actually strengthened my argument,
7 frankly, quite a bit.
8         But as I said, I was being
9 very conservative, and I couldn't include
10 absolutely everything in a forest plot.
11     Q.   Why did you take an
12 ultraconservative approach to your report
13 in this case?
14     A.   I was trying to -- as I
15 said, I was actually trying to shoot
16 myself in the foot.  I was trying to not
17 overestimate.  I was trying not to be
18 biased.
19     Q.   What do you mean you were
20 trying not to be biased?
21     A.   I was trying not to
22 cherry-pick.
23     Q.   Why was that important?
24     A.   As I said, you have to take

Page 471

1 into consideration all the data.
2     Q.   One final question,
3 Dr. Ness.
4         Your invoices go through the
5 end of July 2024.  Can you approximate
6 how much time you've spent in this
7 litigation since the -- I'm sorry --
8 since the end of January 2024?
9     A.   You're asking me how much
10 time I've spent since January 2024?  I
11 cannot estimate.
12     Q.   Do you have --
13     A.   I've not put it together.
14     Q.   Okay.  Do you have an
15 invoice you're planning to submit soon?
16     A.   I have not.  I haven't put
17 my hours together.  I haven't prepared an
18 invoice.  I don't have that, no.
19         MS. BROWN:  Okay.  We'll
20     just request production of it as
21     soon as you get it.
22         MR. SNIDOW:  Take it under
23     advisement.
24         MS. BROWN:  And I'll also

Page 472

1 request production, some of the
2 e-mails you produced to us
3 reference attachments.  And since
4 you produced the e-mail, we'll
5 request the attachments as well.
6 And we talked about some of those
7 today, but we'll follow up with
8 you offline.
9         Otherwise, I have no
10 further questions.  Thank you for
11 your time, Dr. Ness.
12         THE WITNESS:  Thank you.
13         MR. SNIDOW:  Thank you.
14         Dr. Ness, we're done.
15         Just on the record, I
16 want -- we're going to reserve
17 our rights with this new study,
18 Exhibit 14 and 14A.
19         MS. BROWN:  We'll reserve
20 as well.
21         MR. SNIDOW:  Yeah.
22         THE VIDEOGRAPHER:  The time
23 right now is 6:06 p.m.  We are
24 off the record.

Page 473

1         *************
2         (Excused.)
3         (Deposition concluded at
4 approximately 6:06 p.m.)

Page 474

```
 1
 2              CERTIFICATE
 3
 4
 5       I HEREBY CERTIFY that the
         witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.
 7
              It was requested before
 8   completion of the deposition that the
     witness, ROBERTA B. NESS, M.D., M.P.H.,
 9   have the opportunity to read and sign the
     deposition transcript.
10
11       Michelle L Gray
12   _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  April 10, 2024
16
17
18       (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

Page 476

```
 1     - - - - -
             E R R A T A
 2     - - - - -
 3
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6       REASON: _____
 7   ____  ____  _____
 8       REASON: _____
 9   ____  ____  _____
10       REASON: _____
11   ____  ____  _____
12       REASON: _____
13   ____  ____  _____
14       REASON: _____
15   ____  ____  _____
16       REASON: _____
17   ____  ____  _____
18       REASON: _____
19   ____  ____  _____
20       REASON: _____
21   ____  ____  _____
22       REASON: _____
23   ____  ____  _____
24       REASON: _____
```

Page 475

```
 1      INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition
 4   over carefully and make any necessary
 5   corrections.  You should state the reason
 6   in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8          After doing so, please sign
 9   the errata sheet and date it.
10          You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14          It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 477

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4       I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 1 - 478, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   ROBERTA B. NESS, M.D., M.P.H.    DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
     _____
23   Notary Public
24
```

Page 478

```
1          LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
```

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

| **&** | **1.20.** 364:2 | 377:16 378:10 | **15th** 312:9 |
|---|---|---|---|
| **&** 1:9 3:14,19 | 366:9 367:2 | **12/16/22** 6:21 | **16** 9:20 125:6 |
| 4:3,8,10,14,16 | **10** 8:10 82:18 | **1200** 5:4 | 173:16,17 |
| 4:20 5:2,8 | 263:7 267:4,23 | **12:10** 192:22 | 209:5 261:8 |
| 280:18 | 308:22 309:1 | **12:11** 193:2 | 267:23 271:12 |
| | 377:16 378:9 | **12:47** 234:17 | 377:13 406:17 |
| **0** | 440:13 441:14 | **12th** 2:20 4:18 | 406:20 |
| **0.51** 348:10 | 442:3,5,9 | 5:4 | **160** 421:18 |
| **0.98** 364:2,5,14 | 455:14,20 | **13** 6:6,16 8:21 | **164** 255:8,24 |
| 366:9,14 367:1 | 474:15 | 91:20 123:11 | **165** 255:24 |
| **0.98.** 393:22 | **10,000** 383:23 | 377:17,19 | **166** 235:10 |
| **0001-03** 8:11 | **100** 330:2 364:9 | 378:10,24 | 254:16 256:1,7 |
| **0004-28** 7:13 | 364:22 365:21 | 379:2 | 273:6 |
| **0029-57** 6:23 | 366:7 422:18 | **134** 379:15 | **17** 10:6 377:17 |
| **03043** 1:4 | 423:3,7 426:22 | **135** 341:8 | 378:11 429:13 |
| **07960** 4:12 | **1000** 4:12 | **137** 339:21 | 429:16 |
| | 200:19 | **13th** 91:22 | **1700** 5:9 |
| **1** | **10001** 4:6 | **14** 472:18 | **173** 339:21 |
| **1** 3:10 6:16 13:8 | **10017** 4:18 | **142** 298:3,6 | 340:14 |
| 13:11,17 26:17 | **10022** 2:21 | 341:13 343:5,6 | **176** 192:12 |
| 60:7 116:21 | **107** 348:1 | **143** 341:13,14 | 200:6 337:18 |
| 117:24 201:3 | 459:23 460:4 | 343:5,6 | **177** 196:4 |
| 226:13 379:12 | 468:23 | **149** 465:23 | **178** 193:6 |
| 477:6 | **10:47** 120:7 | **14a** 9:6 385:19 | 194:14 |
| **1.05** 358:20 | **11** 8:12 45:16 | 385:23 386:21 | **179** 194:18,19 |
| **1.06** 348:9 | 208:1 352:8,12 | 472:18 | 194:23 195:4 |
| **1.07** 393:21 | 371:2 377:16 | **14b** 9:11 385:20 | 195:10 196:18 |
| **1.09** 358:18 | 378:10 | 386:2 387:16 | 212:15 |
| 363:24 364:24 | **110** 360:9 | **15** 9:16 399:11 | **180** 345:2 |
| 365:8 366:13 | **1100** 2:4 | 399:14 | 462:23 |
| **1.09.** 363:23 | **1101** 2:4 | **150** 2:12 | **189** 369:11 |
| **1.12.** 348:22 | **11074** 1:8 | **1523** 3:21 | **194** 7:17 |
| **1.2** 349:2 365:9 | **113** 7:15 | **153** 462:11 | **1960s** 300:23 |
| **1.20** 364:6,14 | **11:01** 120:11 | **154** 331:9 | **1964** 288:4 |
| 366:14 | **12** 8:17 168:12 | **155** 187:9 | 300:24 301:1 |
| | 177:8 370:1,3 | | |

**[1990s - 26]**

**1990s** 158:17 160:16 161:12 161:17 163:15
**1995** 387:10
**1:22** 1:4
**1:23** 1:8
**1:30** 235:2

**2**

**2** 6:20 26:16 33:3,7,11 108:11 115:18 120:15 136:3 136:16 201:4 205:11 216:23 227:7 261:8 271:10,12 281:17 356:10 364:15 367:3 377:15 378:7,8
**2,000** 376:10
**2,919** 375:4
**2.05.** 348:10
**2.4** 387:10
**2/2018** 8:6
**20** 27:14 120:22 120:23 123:8 123:21 364:17 367:4 442:6,9 452:11 477:20
**20004** 5:5
**20006** 5:10
**2000s** 161:20 163:15
**20036** 2:5 3:21

**2007** 405:21
**2008** 161:19
**2009** 405:22
**2013** 352:17 353:22 373:9 374:23 379:3
**2014** 341:23,24
**2016** 122:22 345:15
**2017** 340:19 470:2
**2018** 280:11 288:11 289:24 290:1 292:5,9 292:14,16,21 301:5,15 341:24 369:21 370:16,23 402:1 404:12 404:13,21 405:13 406:21 415:1 455:21
**2019** 341:24 342:2 361:22 387:10 422:15
**202** 301:17
**202.220.9600** 3:22
**202.289.1313** 5:5
**202.737.0500** 5:11
**202.918.1123** 2:5
**2020** 341:24 342:1 351:21

352:7 368:5 369:19 370:4 370:13,18 371:2,19 374:7 397:12 404:21 405:14 417:4,8 417:10,18 419:1,13 420:14 422:12 422:15 423:11 424:11,15
**2021** 255:13 337:6,21 338:16 340:6 340:23 342:1 342:22 345:14 348:5 387:12 423:10 469:4
**2022** 13:14 14:18 33:18 37:22 45:16 63:10,24 64:12 65:14,16 66:15 66:22 67:18 68:14 70:8 71:11 72:3,12 77:11 81:16 91:20 108:21 123:6 125:6 140:24 145:15 150:21 195:17 294:6 327:1,2 327:13 423:6 425:4 429:19 431:16 433:15 435:12 438:10

**2023** 71:3 73:15 308:16 309:8 313:10,15,20 313:20 327:6 422:17 423:2 432:13 433:12 434:14 435:3
**2024** 1:13 12:7 284:15,15 292:5,22 294:22 304:2 308:17 426:21 471:5,8,10 474:15
**212** 2:21
**212.735.3000** 4:6
**22** 266:6 313:20
**22.1** 266:5
**220,000** 132:6
**22nd** 309:8 312:9,13 313:15 323:21
**238** 412:17
**24** 98:2 100:5 373:3
**24.9** 123:4
**25** 158:20
**253** 357:5 360:15
**254** 353:11 356:6,12,13
**255** 352:14
**26** 7:18 132:5 137:1 190:14 439:16

[26-27 - 600]                                                    Page 3

**26-27**  118:16
**260**  7:20
**27**  33:17 118:16
123:10 149:1
157:8 370:11
374:3 379:15
**28**  82:18 99:8
99:11,20
122:23 143:2
157:8 244:4,14
244:24 353:13
361:24 379:16
469:8
**280**  8:6
**29**  132:4,24
133:7 134:6
135:9 136:11
136:19,24
348:7 368:3
439:15,21,24
448:20 469:9
**2900**  376:19

**3**

**3**  7:6 70:21 71:1
71:7,24 73:9,20
74:5 75:18
118:14 137:5
195:2 274:8,11
281:16 282:19
282:20 348:22
377:15 378:8
433:9,12
435:24 455:22
458:20

**3/27/24**  7:16
**30**  120:16
124:12,24
125:5 136:8
285:15 288:1
448:8 452:11
475:16
**300**  3:16
**3043**  1:3
**308**  8:10
**31**  120:17
129:18 131:8
142:10 218:4
219:18 387:12
**31,000**  388:8,11
**312.741.5220**
2:14
**31569**  474:11
**31st**  324:5
**32**  128:2,19
130:3 136:3,7
136:16 218:17
218:23
**322**  82:15
**33**  6:20 122:1,6
122:14,15
137:10 219:16
369:4
**34**  220:1 373:10
383:16 414:12
**35**  220:1,9
226:14
**352**  8:12
**369**  8:17
**37**  45:15

**378**  8:21
**38**  45:13 115:17
**385**  9:6,11
**390**  4:17
**399**  9:16
**3:25**  351:7
**3:45**  351:11

**4**

**4**  7:9 79:14 81:1
81:4 123:11
294:16 313:1,2
358:13 363:1
363:17 366:4
387:17,23
434:3 435:16
**4.4**  352:24
360:3,15
**4/5/24**  7:9
**40**  91:15
**401**  3:10
**406**  9:20
**4100**  2:13
**421-2800**  2:21
**429**  10:6
**45**  361:8
**450**  6:7
**465**  6:6
**4740**  3:15
**478**  477:6
**48**  371:3 373:3
**49.9**  123:3
**4:57**  415:20

**5**

**5**  7:12 97:4,7
147:1 154:17
156:9 173:15
175:1,8,14,21
176:7,17 177:2
177:23 178:6
178:17 209:5
209:17 316:2
352:1 370:11
377:15 378:9
**5.9**  393:11
**50**  395:13
**500**  47:10 82:21
83:2
**51**  33:10,12,16
44:9,10
**52**  33:10,12
123:9
**535**  1:17 2:20
12:9
**55**  82:17 108:9
**555**  5:4
**5:13**  415:24
**5:46**  450:6
**5:48**  450:10

**6**

**6**  7:15 113:11
113:14 208:10
371:1 377:15
377:20 378:9
**60**  285:15
**600**  82:24
309:13,14

[60606 - accurate]                                    Page 4

| | | | |
|---|---|---|---|
| **60606** 2:13 | **80.2** 123:1 | **9:13** 1:18 12:7 | 321:10 334:9 |
| **64112** 3:16 | **805** 379:13 | **a** | 334:23 430:19 |
| **646.746.2000** | **811** 3:4 | | 458:10 470:10 |
| 4:19 | **816.701.1112** | **a.m.** 1:18 12:7 | **abstract** 177:18 |
| **66** 123:3 243:12 | 3:17 | 120:7,11 | 266:4 404:13 |
| **67** 4:11 | **855.969.2887** | **ability** 184:24 | 404:20 407:3 |
| **6:06** 472:23 | 3:6 | 185:21 | 410:11,16 |
| 473:4 | **877.370.3377** | **able** 18:17 | 411:1,8 412:5,9 |
| **7** | 1:22 | 28:10 30:3 50:3 | 412:16 413:11 |
| **7** 7:17 194:8,13 | **8s** 398:19 | 72:2 120:21 | 414:7,21 422:3 |
| 195:11 206:15 | **9** | 165:10 181:7 | **abstracts** 406:4 |
| 206:17 208:11 | **9** 1:13 8:6 12:6 | 226:8 251:9 | **academic** 427:7 |
| 235:11 274:10 | 207:24 280:6,9 | 272:9 307:21 | **accept** 299:17 |
| 294:18 323:24 | 364:23,24 | 377:14 381:10 | **access** 104:9 |
| 382:5 393:21 | 366:16,17,21 | 405:5 | 175:12 |
| 429:18 431:16 | 398:12 | **abney** 3:3 36:18 | **accessing** 359:6 |
| 455:11,15 | **90** 120:3 | 37:9,23 39:6,23 | **account** 310:19 |
| 458:20 459:23 | **900** 5:10 379:24 | 45:20 46:10,18 | **accruing** |
| 465:23 | **91** 416:4,9 | 47:17 48:6 | 143:10,12 |
| **7.49** 393:15 | 419:24 420:13 | 71:15 125:21 | 144:13 |
| **7/28/23** 7:7 | **916.520.6639** | 126:1,15,21 | **accumulate** |
| **70** 7:6 301:15 | 3:11 | 147:24 438:16 | 400:12 |
| **725** 3:5 | **917.591.5672** | **abney's** 69:3 | **accumulates** |
| **73** 81:15 | 1:22 | **above** 1:18 27:9 | 409:1 |
| **76** 205:12 | **93** 369:11 | 44:8 101:8 | **accuracy** 51:7 |
| **78704** 3:5 | **935** 379:20 | 108:4 187:21 | 79:5 113:19 |
| **79** 399:16 400:3 | **939** 379:18 | 235:14 435:14 | 139:4 217:3 |
| **8** | **95** 364:10,11,12 | 438:12 462:13 | **accurate** 45:9 |
| **8** 7:20 260:20 | 365:19 366:8 | **absence** 448:17 | 58:24 73:10 |
| 261:2 263:1,22 | **95864** 3:11 | **absent** 346:21 | 79:19 109:12 |
| 264:7 265:11 | **97** 7:12 | **absolute** 301:8 | 109:13,15,19 |
| 269:20,23 | **973.775.6101** | **absolutely** 56:2 | 110:12 114:11 |
| 398:2,9,13 | 4:13 | 87:8 232:20 | 117:12 118:5 |
| **80** 7:9 | **98** 365:9 | 239:6 279:20 | 160:4 230:6 |
| | | 286:15 307:15 | 422:20 439:9 |
| | | 315:24 316:14 | 451:12 475:20 |

| | | | |
|---|---|---|---|
| **accurately** | 154:22 155:6 | 412:20 417:17 | **action** 87:3 |
| 316:17 437:18 | 156:14 157:5,6 | 421:8 424:16 | 224:1 |
| **acetaminophen** | 172:1,3,4 173:5 | 431:9 433:14 | **activity** 353:16 |
| 1:2 7:9,20 9:6 | 179:20 180:13 | 435:11 438:9 | 356:24 367:22 |
| 9:12,16,21 | 180:18 181:20 | 438:18 440:14 | 367:23 372:16 |
| 12:11 13:23 | 181:24 187:9 | 441:15 443:3 | 372:18 |
| 14:3,12 15:16 | 200:5,13 207:1 | 443:12,19 | **actual** 241:13 |
| 17:1,13,23 | 207:11,23 | 444:22 446:3 | 385:3 428:3 |
| 18:12 19:8,12 | 210:18 213:6 | 446:17 447:20 | **actually** 14:10 |
| 20:9 21:6,15,20 | 215:17 220:10 | 448:14,20 | 18:3 25:16 |
| 21:21 22:5,17 | 220:17 221:8 | 465:18 468:24 | 32:20 37:11 |
| 24:12,15 25:4 | 223:20 226:24 | **acetaminoph...** | 42:21 45:14 |
| 26:7 28:15 | 228:14 229:5 | 220:19 221:2 | 80:18 82:23 |
| 29:12,16 30:5 | 236:8,19 245:8 | **acid** 35:10,16 | 86:9 87:5 |
| 30:18 31:4 | 245:19 247:3 | 35:18 450:23 | 100:19 104:19 |
| 32:17 34:24 | 262:6,12,14,20 | 451:4 | 109:24 112:24 |
| 36:5,20 39:16 | 263:3 264:6,20 | **acids** 262:1,17 | 115:13 118:24 |
| 39:21 63:12,24 | 265:14 266:7 | 262:21 264:16 | 120:18 126:6 |
| 64:19 65:2,4,18 | 266:13 267:13 | 264:16,19 | 161:2 180:4 |
| 66:17,20 67:6 | 269:7,15,18 | 267:11 | 187:17 194:18 |
| 67:20 68:16 | 271:17,20 | **ack** 2:14 | 195:7 203:21 |
| 71:9 73:22 74:1 | 277:11 290:8 | **acknowledge** | 204:20 207:8 |
| 80:9 93:13,18 | 293:6 313:19 | 399:17 | 209:6 212:21 |
| 93:23 94:2 | 313:24 314:10 | **acknowledg...** | 213:16 227:1 |
| 101:11 103:12 | 314:16 376:22 | 477:2 | 230:8 244:2 |
| 103:16 107:19 | 380:3 384:2,23 | **acquainted** | 247:1 253:6,21 |
| 111:12,18 | 386:7 388:2,21 | 302:4,22 | 255:18,20 |
| 112:7,16 117:2 | 392:17,22 | **acquire** 45:1 | 256:19 257:23 |
| 118:2 119:24 | 393:15 394:24 | 50:15 54:17 | 263:5 265:2 |
| 123:5 127:11 | 396:19,21 | 55:13 56:15 | 266:18 268:16 |
| 127:13 134:15 | 399:20,20 | 59:16 | 268:23 281:17 |
| 137:16 139:6 | 400:16,16 | **acquisition** | 284:21 285:19 |
| 141:3,4,10 | 404:7,8 407:7,9 | 50:8,24 51:19 | 285:22 290:12 |
| 142:23 145:6 | 407:20,21 | 56:14 58:20 | 290:17 295:18 |
| 147:10 151:3 | 408:10,15,22 | 59:14 115:23 | 306:5 308:9 |
| 151:20 152:7 | 409:6,8,17 | | 322:5 333:4,7 |

| | | | |
|---|---|---|---|
| 338:20 341:10 | 16:5,5,9,12 | 158:2 159:15 | 228:14 235:13 |
| 358:11,17,24 | 17:2,3,8,16,21 | 159:18,22 | 235:20 246:2,9 |
| 359:13 361:19 | 17:24 18:1,13 | 160:3,7,22 | 246:23 247:22 |
| 365:21 372:22 | 18:14 19:5,14 | 161:2,6,15 | 248:13,24 |
| 373:16 376:13 | 19:18,18 20:2,5 | 162:12,17,24 | 249:2,5,14,22 |
| 384:14 394:3,6 | 21:7 22:10,21 | 162:24 163:4,7 | 250:12,15 |
| 399:4 404:22 | 22:24 23:3,6 | 163:11,18,20 | 251:7,18,24 |
| 405:19 407:1 | 24:1,10,12,20 | 164:2,17,20 | 252:9,11,19 |
| 418:5 427:20 | 25:3 27:15 | 166:8,16 167:7 | 253:5,8,13,17 |
| 441:4 454:1,14 | 29:14,17 30:6 | 170:8 171:17 | 254:4,10 |
| 458:13 470:6 | 30:10,11,19,21 | 171:21 172:8 | 255:12,15 |
| 470:15 | 32:17 34:16,19 | 172:24 173:6 | 256:12 259:17 |
| **add** 232:24 | 39:16 64:12 | 173:21 174:5 | 262:21 263:4 |
| 293:3 299:12 | 65:2,4 66:17,21 | 174:14,16,19 | 264:8,21 |
| 330:13 347:3 | 67:1,1,6,20 | 176:18 177:3 | 265:14 266:8 |
| 392:4 | 68:16,20 93:14 | 177:24 178:17 | 266:13 267:14 |
| **added** 111:4 | 93:18,23 94:2 | 182:9,10 | 269:24 270:3 |
| 128:6 344:18 | 94:15 101:11 | 186:19 187:2 | 317:19 319:9 |
| 468:19 | 103:12,17 | 187:16 188:12 | 319:20 320:15 |
| **adding** 379:17 | 118:7 123:22 | 188:17,19 | 321:6 341:20 |
| **addition** 73:20 | 132:9,19 | 189:3 190:9 | 342:4,9 348:6 |
| 318:8 320:19 | 133:23 135:18 | 191:17,21 | 352:2 358:16 |
| **additional** | 137:1,6,24 | 192:1 194:17 | 371:15,16 |
| 266:10 319:11 | 138:2,12,14,18 | 195:22 196:14 | 372:9 373:5 |
| 324:9 342:6 | 139:5,17 140:4 | 196:24 197:12 | 376:23,24 |
| 401:10 441:21 | 141:4,22 142:1 | 198:14,18 | 377:2,4 378:5 |
| **additive** 247:15 | 142:3,5 147:11 | 199:18 201:8 | 379:22,22 |
| 251:1,5 | 147:15 149:8 | 201:23 202:6 | 380:5,13 |
| **address** 284:22 | 149:20 150:1,6 | 202:10 203:13 | 382:15 383:11 |
| 333:9 | 150:16,21 | 208:7,9,16,23 | 384:2,23 386:9 |
| **adds** 346:24 | 151:3,10,11,20 | 209:1,3,9,15,16 | 388:7,23 |
| 347:1 357:8 | 152:5,7 153:8 | 209:22 211:6 | 392:17,22 |
| **adhd** 1:3 6:18 | 153:18 154:23 | 212:17 213:7 | 393:11 394:24 |
| 7:10,22 9:8,13 | 155:7,10,22 | 214:9 215:17 | 401:23 406:24 |
| 12:12 14:4,13 | 156:13,24 | 223:20 224:9 | 409:19 412:11 |
| 15:17,21,22 | 157:3,4,12 | 225:15 226:24 | 419:6 421:8 |

422:8 424:11
440:1 442:17
442:22 443:5
443:21 444:24
446:4,19
447:21 448:10
448:15,22
450:18,19
451:5 452:19
452:22
**adhere** 420:23
**adjust** 395:2,14
**adjusted**
358:18 363:22
366:22 393:2
395:16
**adjustment**
395:19,22
**administration**
407:13
**admitted**
399:18
**adult** 234:2
243:8
**advance** 97:9
**adverse** 161:9
172:11,16
180:10 182:2,6
182:8
**advice** 110:10
110:14,15
131:20 146:9
146:16,17,21
218:1
**advise** 179:19
179:22

**advisement**
471:23
**advising** 141:21
144:11 145:4,7
145:8
**advocate** 60:14
61:7,11,14,22
62:20 451:20
451:22
**advocating**
60:18 107:15
**affect** 242:13
**affected** 262:22
**affiliated** 77:16
426:8,12
**affirmed**
432:20
**afoul** 318:19
**afraid** 152:21
**age** 177:8
357:22 371:17
**aged** 8:14 358:4
**ages** 207:24
208:10
**aggregation**
277:5
**aggression**
372:22
**ago** 72:6 73:16
110:3 113:16
289:3 322:8
386:14,16
434:9 435:1,3
**agree** 116:14
149:7,13
210:13 212:10

213:23 214:18
221:17 222:19
223:2,5 229:24
235:23 270:6
270:24 277:18
300:13 328:11
328:14 329:8
330:10 344:11
354:19 355:4
388:10 389:20
392:13 394:20
396:5 402:4
403:1 409:7,19
432:22 452:10
**agreed** 36:21
37:4 210:20
271:4 329:5
**agreeing** 78:17
358:15
**agreement** 76:6
76:9,12 105:7
324:17 389:11
432:2
**ah** 360:19
369:18
**ahead** 343:13
401:14 443:17
**ahlqvist** 9:9,14
**aiding** 307:4
**aim** 265:9
**aimed** 262:23
349:23
**air** 299:11
**al** 1:8 154:3
**alarm** 6:17

**albeit** 303:15
**alemany** 337:6
337:13,21
338:16,23
342:15
**ali** 16:7 52:19
54:3 55:4 59:4
66:13 75:6 77:6
120:4 167:19
170:24 177:15
202:13 204:1
212:4 213:23
248:8 258:12
289:1 297:1
310:13 340:12
369:7 411:12
**alicia** 127:2
**allison** 4:3
124:22
**allison.brown**
4:7
**allow** 85:12
226:11
**allowed** 73:8
147:9 154:21
156:22
**alterations**
187:13
**altered** 207:21
**alternative**
256:23 393:1
**amanda** 2:10
**amanda.hunt**
2:15
**america** 377:8

| | | | |
|---|---|---|---|
| **american** 159:6 | 141:1 148:16 | **analytic** 294:3 | 164:14 166:10 |
| **amino** 262:1,17 | 148:21 149:18 | **analyze** 262:24 | 168:17,24 |
| 262:21 264:16 | 150:5,7,22 | 265:10 380:17 | 169:3,11,13,16 |
| 264:19 267:11 | 151:14,19 | 383:24 | 169:18,19,20 |
| **amount** 236:6 | 152:4 153:7 | **analyzed** | 170:11 171:2 |
| 236:18 238:14 | 154:9,14,20 | 355:13 375:15 | 178:23 191:10 |
| 241:6 415:15 | 155:4,11,23 | **analyzing** | 205:8 213:11 |
| **ample** 275:4 | 156:8,22 | 147:19 315:22 | 216:16 227:5 |
| 282:5,23 | 157:12,24 | 428:1 | 229:15,19,23 |
| **analgesic** 393:1 | 200:11 207:17 | **anand** 7:23 | 230:4,20 |
| **analgesics** | 207:20 210:6 | 254:8,22 255:3 | 231:20 241:9 |
| 107:6 180:3 | 275:13 281:3 | 255:12,12 | 241:14,22 |
| **analogies** 393:2 | 332:3 335:15 | 257:23 258:7 | 243:9 245:12 |
| **analyses** 19:22 | 336:11,21 | 258:13,14 | 249:9 251:15 |
| 98:8 103:15 | 337:21 339:10 | 260:19 261:4 | 283:11,13,15 |
| 150:14 162:6 | 341:11 345:4 | 275:8 398:9,12 | 283:18 293:16 |
| 342:6 388:2 | 345:24 346:19 | **anatomy** | 294:10 295:22 |
| 392:23,24 | 349:23 361:22 | 188:11 | 296:2 300:9 |
| 416:17,21 | 373:8 374:3,23 | **andrea** 2:19 | 304:13,19 |
| **analysis** 15:5 | 375:5,9,11,24 | **andrea.johnst...** | 305:2 306:10 |
| 15:11,18 17:12 | 376:5 379:11 | 2:22 | 306:16 307:15 |
| 17:13,16,17,19 | 380:10 382:9 | **animal** 180:23 | 307:17,21 |
| 17:21 18:1,5,14 | 382:11,17,20 | 181:5 185:14 | 308:10,11 |
| 18:21 19:5,8,12 | 382:21 383:3 | 187:8,14 238:4 | 310:24 311:5 |
| 19:16 22:13,21 | 385:2,2,3 387:8 | 241:12 346:5,7 | 311:10,16 |
| 23:3,6,11 25:21 | 388:13 389:1 | **annoying** | 327:11,15 |
| 41:22,23 63:11 | 396:6 401:15 | 102:24 | 331:20 335:23 |
| 63:23 64:11,16 | 416:8 417:9,19 | **answer** 11:5 | 349:9 360:16 |
| 64:19 65:17 | 417:24 419:6 | 26:10 53:5,14 | 366:11 368:11 |
| 66:16,20,24 | 419:14 420:15 | 53:19 54:2 | 402:13 405:5,8 |
| 67:5,7,19 68:15 | 421:6 422:7 | 55:24 56:5 57:7 | 405:13 413:6 |
| 68:19,22 82:1 | 425:14 426:19 | 58:5,7,11 59:1 | 415:7,10 420:6 |
| 84:16,21 104:3 | 441:6 456:14 | 59:7,9,19 65:24 | 421:6 426:14 |
| 104:5 109:20 | 459:22 466:5 | 66:7 88:21 91:2 | 427:5 443:13 |
| 134:14 138:11 | 469:13 | 106:10 120:21 | 444:20 445:18 |
| 140:2,3,5,12,23 | | 127:1 153:4 | 446:4,6,12,23 |

[answer - argument]                                                          Page 9

446:24
**answered** 18:22
  23:14,16 30:15
  31:10 51:24
  52:2,18 53:3,7
  53:12 54:5 55:3
  55:7,23 56:3,7
  56:18 57:2,8
  58:1,18 59:8,18
  62:2 64:4,6
  66:2,5 67:24
  68:24 85:8,20
  94:6 96:9
  111:22 152:11
  152:14,15
  153:11 156:1
  173:9 178:21
  190:12 198:17
  216:5,14
  217:12 237:2
  249:7 268:11
  287:2 306:18
  336:4 339:15
  365:12 394:18
  446:20 470:5
**answering**
  53:21 191:19
  194:16 298:12
  304:12
**answers** 121:9
  130:1 131:1
  219:14 242:22
  477:8
**anxious** 372:21
**anybody** 90:12
  115:7 436:22

**anytime** 345:21
**anyway** 391:12
**apap** 122:11,19
  123:7 187:20
  200:21 201:2
  201:10,11
  214:9 235:15
  235:17 236:3
  243:12,14,17
  244:14 245:9
  245:20 246:8
  246:13,22
  247:21 248:11
  248:17,22
  249:2,5,13,18
  250:6,10,15,16
  251:4,11
  252:10,18,20
  253:3,16,22
  254:10 255:12
  255:14 256:9
  256:18,20,23
  257:11,17
  258:4 270:6
  273:8 284:4,11
  285:14,16
  290:8 293:5,10
  294:15 299:19
  317:19,21
  319:9,15,20
  341:20 345:8
  348:7 358:16
  362:1 394:8,10
  401:21 406:23
  410:3 412:10
  417:16 442:16

442:20 448:7
  452:23 455:7
  455:14 457:10
  457:16,18
  458:1,9,17
  465:23 466:23
  467:6 469:9
**apologetic**
  74:16
**apologies** 214:2
  328:9 368:2
**apologize** 16:17
  121:22 325:21
  367:13 387:21
  442:6 446:23
**appear** 129:8
  325:18 368:7
**appearances**
  2:1 3:1 4:1 5:1
  69:22 426:1,6
**appears** 187:23
  298:24 345:21
  368:6 370:13
**application**
  329:22
**applied** 281:3
**apply** 279:6
  330:14 474:19
**appreciate**
  16:21 231:23
  264:12 290:10
  292:22 366:10
  449:18
**appreciated**
  290:5 291:23
  293:23 305:18

**appreciation**
  292:3 303:14
**approach**
  200:17 347:13
  347:14 470:12
**approached**
  37:21,23 38:2
  40:13 126:1
  302:13 316:24
**approaches**
  260:15
**appropriate**
  139:4 334:9
  335:6 445:5
  475:6
**approximate**
  471:5
**approximately**
  70:8 99:19
  158:20 379:20
  473:4
**april** 1:13 12:6
  82:17 294:22
  304:2 426:21
  474:15
**archer** 48:20
**area** 162:11,16
  185:24 198:15
  217:7 298:5
  422:23 428:20
**areas** 188:14
  310:5 362:2
**argues** 235:14
**argument**
  470:6

arps  4:2
article  13:18
  15:15 20:6
  26:15 28:14
  32:12 60:3,18
  61:6,17,23
  64:18 82:8 86:3
  87:1,19 88:14
  264:13 368:6
  379:9 386:5,12
  388:16,21
  389:9,21
  390:13,21
  391:1 399:16
  425:3 429:19
  431:11,15
  436:10,22
  439:11
articles  368:4
articulated
  224:15,19
articulating
  265:18
asd  1:3 7:10
  12:12 137:6
  138:13 149:8
  150:1 157:13
  174:19 317:21
  319:15 422:8
  424:12 440:1
asher  4:4
asher.trangle
  4:7
ashley  2:8,9
  33:21 34:22
  35:22 43:22

44:3 48:18
49:11 50:1
77:18,22 92:1
92:16 108:16
116:7 119:20
124:14 125:6
127:22,24
128:7,22
129:21 130:11
131:8 143:12
144:1 218:6,24
425:19 426:5
ashley.barriere
  2:15
asian  378:15
aside  164:2,5,6
asked  23:14
  30:17 32:16
  36:15,17 37:14
  47:21 51:23
  52:17 53:3 54:5
  55:3 56:18 57:2
  58:19 59:18
  62:2 63:16 64:4
  64:6 66:3 67:23
  68:24 79:3 85:8
  85:20 86:9 87:5
  94:6 96:8 97:22
  111:2,22
  120:20 123:20
  152:11,13
  153:11 156:1
  165:14 168:22
  169:4 173:8
  178:21 190:12
  197:24 198:17

204:20 211:2,7
212:3 213:12
216:14 217:12
220:3 234:10
237:2 240:7
248:4 249:7
263:11 268:10
287:6 288:5
298:3 306:17
317:16,16
320:5 329:10
359:22 360:5
360:24 361:12
365:12 378:1,4
391:24 426:20
438:17 450:17
463:15 466:20
467:3,4,14
469:1
asking  20:22
  21:24 22:3
  25:12,15,17,19
  25:20 40:5 48:3
  52:14 67:12
  94:12 96:14
  97:24 106:18
  116:12 121:8
  133:6 134:21
  176:21 177:15
  177:18,22,24
  183:22 185:3,8
  185:13 186:1,6
  206:5 219:3,17
  228:6 236:15
  240:10,14
  242:2 268:7,14

289:10 304:12
307:18 311:20
318:4 320:20
326:15 327:8
330:7 344:3
359:24 366:2
369:19 377:23
390:10,24
391:10 411:24
414:9 428:7
443:24 444:5,8
445:1,3 471:9
aspect  50:10
  52:8,24 101:19
aspects  37:6
  42:7 74:20
  294:3 337:5
aspirin  180:3
  180:10,12
assert  75:7
assess  36:22
  439:6
assessed  412:19
  416:22
assessing
  183:19 331:14
  331:21
assessment
  34:3,24 41:18
  62:6 85:4 98:7
  222:24 223:4
  359:14 417:22
  419:2 464:21
assessments
  332:7

**assign** 279:15
**assistance**
79:17 435:19
436:3,4
**associated**
103:17 171:17
171:21 172:24
173:6 247:2
263:3 264:8,16
265:13,13
269:7 270:2,5
357:19 388:22
407:9 408:23
447:5
**association**
9:16 40:18
41:19,20
103:11 117:2
118:2 132:5
137:1 159:6
200:12,20
207:11 209:21
247:10,11
255:11 262:18
262:19 264:20
266:7,12,21
267:13 268:5
269:1,2,14,22
281:22 284:7
285:12 286:24
288:7,20
289:18 290:6,9
291:21 295:5
295:10,14
296:12,16
297:12 298:14

298:24 303:15
303:18 304:3
305:7,13,23
306:2 341:14
341:18 342:11
343:9,12,17,19
353:12 356:18
356:22 362:22
380:23 392:16
394:22 407:19
408:9,14,17
417:16 456:3
457:8 466:1,9
**associations**
207:1 210:17
298:20 299:17
299:23 389:2
389:23 458:4
466:15
**assume** 324:4
412:2 413:9
414:5,10,21
**assuming**
189:16
**assumptions**
414:8
**attached**
101:23 130:6
475:12 477:11
**attachments**
472:3,5
**attempt** 380:21
396:7
**attempted**
465:16

**attempting**
404:6
**attention** 7:21
20:10 31:18
80:16,19 93:17
173:16 219:23
261:8 316:18
372:6,21,23
392:7 416:8
**attorney** 36:17
233:13 311:3
325:3 334:6
437:14 439:1
475:16
**attributable**
25:18 389:3,24
392:11
**august** 37:22
70:8 71:10 72:3
72:12 327:2
433:15 435:12
438:10
**austin** 3:5
**author** 205:22
355:16,18
400:22 410:14
423:21,22,22
454:21
**authored** 161:5
161:7,14
280:11
**authoring**
330:22
**authority** 84:20
85:3 174:18

**authors** 200:10
202:8 205:15
209:19 210:14
258:8 267:8
268:3,23
269:11,16
270:9 357:17
376:4,18
385:12 389:22
390:16 391:7
392:9 395:17
399:18 403:15
404:2 407:2,7
408:8 447:1
454:14,17
461:24 462:4
**autism** 6:18,22
7:15 9:8,13
14:3,13 15:17
15:20,21 16:4,4
16:5,8,8,11,14
17:2,3,8,20,24
18:13 19:9,14
20:3,5,10 21:6
21:18,22 22:5
22:11,18 24:4,5
24:23,24 27:15
29:14,18 30:6
30:10,11,19
34:16,19 35:10
35:16 37:10
40:10 63:24
64:11 67:1
69:18 77:16
78:7,11,17
79:10,16,24

80:5,7,15 84:7
85:17 94:4,16
94:21 95:2,9,12
95:13,17,24
96:4,15,19
101:11 103:17
109:4,11,19
110:18,19
111:19 112:16
112:23 113:14
113:19 117:3
118:3 123:22
127:17 128:1
132:9,18
133:14,23
134:10 135:18
137:2,19 138:3
138:15 139:7
139:16,21
140:4 141:3,10
142:5 146:8
147:11,14
149:24 152:5
154:23 155:7
156:13 157:5
157:19 173:21
217:3,9 220:11
220:18 222:15
224:9 386:8
388:23 426:9
426:12,17,18
429:24 430:7
430:21 431:3
432:18,24
433:2 434:4
435:7,17

436:15,18
437:1,8,10,13
437:17,24
438:24 439:13
450:18 451:9
**autistic**  138:17
221:13
**available**
118:15 119:11
119:19,20
132:17 386:6
386:14 462:5
**ave**  2:4
**avenue**  1:17
2:20 3:10,15,21
4:17 5:9 12:9
**average**  200:22
200:23
**avoid**  193:19
**aware**  35:19
36:9 37:7 40:17
40:22 63:2 78:4
80:4,14 83:20
84:23 87:12
127:8,8 216:12
324:16 332:4
333:20 337:8
374:16 386:11
386:15,18,22
388:13 410:10
**awareness**
39:18

**b**

**b**  1:16 6:5,12
7:2 8:2,7 9:2

10:2 12:15,22
116:22 117:7
474:8 477:16
**babies**  221:11
**baby**  199:5
409:9
**baccarelli**
306:24 307:3,8
324:20,22
325:8 326:1
330:17 407:3
410:24 411:6
411:14 413:22
**baccarelli's**
325:9 326:4,13
328:12 329:17
330:15 421:5
421:15 422:6
**back**  13:13
26:15 27:24
36:16 58:8 60:7
102:11 108:6
120:12,15,19
123:2,15
170:19 173:13
193:3,23 209:4
216:22 218:2
235:3,8 254:1
273:13 285:6
287:5 288:11
291:16 292:1
293:11 294:1
300:10 301:23
302:14,17
303:8 312:18
315:15 338:21

351:12 354:10
383:20 397:10
416:1 433:10
450:11 468:3
**background**
153:20 174:16
**bad**  135:5
145:23 153:3
183:23
**baker**  9:18
199:20 200:3
202:8 203:10
203:11,19,21
209:19 211:3
212:14 213:12
259:16 342:1
397:12,20
398:10,23
399:13,16
400:9 401:6
402:5 403:2
404:21,23
405:16,19,20
457:22
**baker's**  201:21
**bandolini**  123:6
123:17 124:2
441:22
**bank**  310:19
**bankruptcy**
323:3
**barlow**  3:8
**barnes**  4:10,16
5:2
**barrier**  183:20
184:2,16,20

185:1,16
**barriere** 2:9
**barton** 3:4
**basal** 190:17
**base** 273:19,22
279:10
**based** 27:20
117:13 123:5
132:5 137:15
169:22 178:5
215:5 228:10
247:11 276:7
277:20 289:24
307:21 336:20
350:20 370:17
370:18 371:1,7
382:17,21
387:9 403:2
408:13 412:15
425:16 452:3
**basically** 112:5
287:11 452:2
**basis** 42:3 69:2
245:12
**bates** 99:8
**bayesian**
200:18
**bdnf** 221:9,24
222:18 224:7
225:13
**bear** 376:17
**becoming**
286:6
**began** 308:8
**beginning** 1:17
36:16 249:8

308:17
**begins** 128:18
189:9 206:20
207:16 218:11
218:17 219:9
244:15 261:11
340:18 356:16
**behalf** 224:24
**behavior**
353:15 358:20
367:17,18
**behavioral** 8:18
24:6 187:12
357:20 358:16
372:2,3 373:23
416:22
**behaviors**
358:22 362:1,7
440:2
**behavorial**
342:7
**belief** 22:15
24:12 249:1
384:16 395:1
**believe** 14:2,12
16:4,14 17:1
18:12 21:15,21
25:4,23 26:6
30:15,19 35:9
62:12 78:9 83:8
85:11 86:21
112:8 145:22
154:22 160:18
162:2 173:6,8
189:2 193:6
196:24 207:4,7

210:15 215:15
223:17 226:22
230:11 234:3
246:20 248:16
248:20,22
249:18 251:17
251:23 252:5,8
253:13,16
271:3 280:20
285:23 287:13
287:19 289:16
289:20 290:7
291:17,21
304:1 305:7
306:9 308:15
312:14 322:6
328:16 336:12
345:15 369:2
379:19,24
385:10,12
395:23 396:11
397:3 398:22
398:22 400:23
406:22 411:8
413:12 419:17
421:4 422:7
432:10,19
435:23 437:4
439:20 440:21
441:19 442:15
445:5 446:20
448:9,13
450:22 451:18
451:23 453:7
461:14 467:11

**believed** 15:16
17:23 109:17
139:4 155:5
287:14 324:23
**benzine** 299:7
306:7
**bernie** 116:22
217:21
**best** 114:20
146:16,17,21
204:6,12
217:24 306:16
334:8 374:14
395:11,12
396:9,14 420:6
**better** 177:10
199:19 284:19
301:20
**beyond** 190:15
328:21 382:8
**biased** 324:23
470:18,20
**big** 14:21
144:19
**billable** 313:22
**billed** 81:14
82:11,15
309:12 313:22
314:1,21
315:12
**billing** 312:4
323:20
**biologic** 214:22
214:24 215:7
223:12,19
225:23 226:6

273:23,24
346:5 453:6,13
453:23 457:16
457:17 462:13
**biological** 213:5
214:8 221:1
222:18 224:8
225:14 228:13
230:15 273:7
338:3,11 340:1
344:2
**biologically**
226:10,23
263:18 274:4
454:2,15,18,23
**biomarker** 9:20
182:13 263:2
265:12 270:2
**biomarkers**
255:11 261:19
263:20
**birth** 189:21
**birthday** 324:6
**bit** 138:18,20
158:5 193:11
201:7 226:3
238:18 255:21
297:24 372:15
397:11 453:11
457:7 458:3
470:7
**black** 101:10
102:6,18 311:7
378:15 445:10
**blacked** 310:2,6
311:8

**blanked** 310:18
**bless** 238:10
**blocking** 222:2
228:11 420:3
**blood** 183:19
184:2,16,20
185:1,16
**board** 181:15
**body** 147:19
287:18 397:5
**bone** 161:13,22
163:13,17,23
164:8
**bookshelf**
175:15
**born** 221:12
387:10
**bosso** 5:8
**bottom** 33:16
45:15 175:21
205:7,10
206:19 281:17
416:20 430:13
463:1
**box** 101:10
102:6,18
379:13
**boxer** 37:16,17
44:4 45:16 46:8
47:1,5,14,23
48:6,17 49:10
49:19,22 55:11
56:12 68:22
69:18,20 74:24
76:4,7,10 77:4
77:11,14,16

78:24 79:1,12
80:2 83:9 84:3
86:16 87:6,17
88:9,17 91:19
96:22,22,23
116:3 126:12
148:1 219:1,10
316:11 430:3
437:13 438:3
439:1
**boxer's** 59:12
**boy** 378:13
**boys** 377:18,19
377:19
**bradford** 15:5
15:10,18 17:12
17:19,20,24
18:13,21 19:4,7
19:11,15,22
20:2 22:4,21
23:3,6,11 35:18
36:24 63:7,11
63:23 64:11,16
64:18 65:17
66:16,19,23
67:5,19 68:15
68:18 82:1 98:7
134:14 150:13
151:19 152:4
153:7 154:14
154:20 155:4
155:10,22
156:8,21
157:24 214:16
274:15 275:13
279:16 281:3

283:8,23
288:21 296:21
297:13 298:18
331:3,11,14,21
332:2,7 335:15
336:10,17,20
338:2,10 339:2
339:10 345:3
345:22,24
346:18 349:22
385:3,8 417:2,9
417:19,23
419:2,14,17
420:15 421:5
422:7 426:18
456:13,20,24
457:3 459:22
461:24 463:20
464:18 466:5
**brain** 172:2,5
183:19 184:2
184:16,20
185:1,16,23
186:3,20
188:12,14,17
188:24 190:10
190:16 191:18
194:17 197:4
197:13 198:15
198:20 199:3,7
199:14,17
200:14 201:24
202:9 203:12
208:6 209:21
211:4 212:18
220:20 221:2,5

| | | | |
|---|---|---|---|
| 223:18 227:12 | **bring** 50:16 | 71:21 72:10,20 | 165:24 166:5 |
| 233:17,19 | 62:14 63:4 | 73:2,18 74:4,8 | 166:18 167:1 |
| 234:1 235:18 | 93:17,21 94:1 | 75:10,13 76:19 | 167:22 168:5,8 |
| 236:24 237:12 | 94:14 383:4 | 77:7,8 81:2 | 169:24 170:13 |
| 237:14,19 | **bringing** 39:17 | 85:15 86:1,14 | 171:8,14,15 |
| 238:3,9,15 | 59:23 61:9,13 | 86:23 88:3,15 | 173:12 174:24 |
| 241:2,8 242:11 | 62:8 78:14 | 89:5,13,18 90:4 | 176:11,23 |
| 242:14 243:2 | 134:1 316:17 | 90:10,23 91:11 | 177:1,21 |
| 245:22 256:10 | **broadly** 158:9 | 91:14 92:19 | 178:15,22 |
| 256:13 257:3 | **brockovich** | 94:13,24 95:10 | 179:2 182:7 |
| 260:23 273:10 | 117:8,10 | 95:21 96:10,17 | 183:7,11,12 |
| **brains** 186:11 | 217:21 | 97:5 101:6 | 191:7 192:18 |
| 243:6,8 | **brought** 45:9 | 102:15,20 | 193:4,24 194:5 |
| **brand** 20:9 | 51:8 129:20 | 103:1,3 104:7 | 194:10 198:3,5 |
| **brandlistuen** | **brown** 4:3 6:6 | 105:1,4,9,13 | 198:8,22 |
| 8:23 352:17 | 13:4,9 14:7,14 | 106:12 108:2 | 202:18,24 |
| 353:4,22 354:4 | 16:11,16,20,23 | 108:12,14 | 203:5,9 204:4,9 |
| 354:19,21 | 22:19 23:17 | 110:16 111:1 | 204:15,24 |
| 359:1,3,15 | 24:2 25:8 26:8 | 111:14 112:13 | 205:4 206:1,7 |
| 360:8,24 361:4 | 30:2 31:11 | 113:12 114:14 | 206:14 208:22 |
| 361:15,19 | 32:10 33:4 | 115:16 116:13 | 211:9,19,24 |
| 373:8 374:22 | 36:12 42:17 | 118:13 119:13 | 212:5,9,12 |
| 375:1,16 376:9 | 43:7 45:12 | 120:5,13 | 213:18 214:7 |
| 378:17,20 | 46:19,22 49:7 | 121:21 122:2 | 216:18 217:17 |
| 379:3,9,10 | 51:9,16 52:5,21 | 134:3,20 135:2 | 222:12 223:1 |
| **break** 28:10 | 53:8 54:7,9,23 | 135:7 139:13 | 223:16 224:20 |
| 120:4,9 192:24 | 55:9,19,22 | 140:7,11,15,19 | 225:10 229:18 |
| 351:4,9 415:22 | 56:10 57:10,12 | 140:22 142:2 | 229:24 230:12 |
| 423:1 450:3,8 | 57:19,24 59:6 | 143:9,21 144:2 | 230:22 231:4 |
| **breaking** | 59:10 60:1,8,10 | 144:10 145:14 | 231:10,16,21 |
| 372:22 | 60:11 61:3 | 146:7,23 | 232:9,15,21 |
| **breast** 299:8 | 62:17 63:21 | 147:17 149:12 | 234:9,12 235:7 |
| **brennan** 4:10 | 64:9 66:6,14 | 150:17 151:15 | 237:5,24 |
| **brief** 231:12 | 67:15,17 68:1,4 | 152:17 154:7 | 238:10,11 |
| 450:1 | 68:12 69:10 | 155:20 156:5 | 239:2,8,12 |
| | 70:14,16,22 | 165:7,9,18,20 | 240:24 242:20 |

248:9 249:20
250:4,24
251:22 253:2
257:21 258:17
258:22 259:1,3
259:11,15,20
259:24 260:17
261:3 267:22
268:20,22
275:9,11,16,21
276:4 278:5
280:7 283:16
283:17,21
286:17 287:22
288:17 289:4,6
289:15 291:6
291:14 296:4
297:3,7,9,17
298:11 304:16
304:22 305:3
307:6,14
308:23 309:19
309:21 310:17
311:12,24
313:7 317:24
318:3,11,18,21
319:1,6 323:6
323:18 327:2
327:17 328:10
328:23 329:4,7
329:15 330:3,6
335:11,22
336:5,7 337:16
340:13,17,21
341:3 343:7
349:18 351:3

351:13 352:6
352:13 354:8
354:20 355:2
355:22 359:19
360:11 361:2,8
361:17 362:8
365:1,6,15
368:21 369:8
369:17 370:2
374:21 378:19
379:1,6 386:3
389:15,16
390:8,12,14,19
391:9,18 397:2
397:17,20
398:3,5,16
399:7,12
402:10,17,23
406:9,18 410:9
412:1,4 413:3
413:17,21
414:3 415:11
416:2 418:23
420:11 421:19
422:1,4 429:12
429:17 430:16
430:18 434:23
444:14 445:24
448:6 449:5,8
449:14,16,20
449:21 451:1
451:18 452:5
453:5 454:5,9
454:24 455:5
456:1 457:7,19
457:23 459:20

460:2,5 461:7
461:15 463:14
465:14 471:19
471:24 472:19
**brown's** 450:16
**btlaw.com** 4:13
4:19 5:6
**bulk** 159:24
160:6 162:22
**bullet** 117:11
117:18 435:16
435:24
**bullets** 176:2
**bunch** 124:14
125:10 310:1
**burden** 200:5
**burning** 167:5

**c**

**caffeine** 9:21
**calculation**
381:10,11,14
381:15,17
382:2,6 383:2
383:21 384:12
384:15
**california** 3:11
**call** 86:22
100:22 247:14
283:8,23 285:4
293:6 296:19
419:20
**called** 41:21
42:1 43:9,14
44:15 94:3
125:17 129:3

278:23 323:11
351:21 437:17
467:6,8
**calls** 86:20
**cancer** 8:8
180:13 284:6
288:24 289:21
289:23 293:22
299:9,9,11
424:3,18
428:20 461:19
**cap** 38:24 47:15
314:23 315:11
316:14
**capable** 248:24
420:7
**capacity** 37:22
313:9,15
**capture** 374:15
**care** 160:2
**careful** 318:7
319:18
**carefully** 18:4,6
18:17 28:4 38:4
43:18 144:21
146:2 301:12
475:4
**carlo** 200:18
**carry** 274:22
275:19 276:13
277:13 278:10
278:15 280:1
294:24 458:23
459:17
**cart** 188:20
290:18 459:8,9

cartmell 3:14
case 1:4,8 30:20
  63:2 99:14
  100:1 126:5
  143:16 145:19
  150:9 153:9
  158:16 188:5
  190:3 200:9
  226:19 252:13
  254:23 281:10
  285:10 292:9
  292:15,17
  293:4,5,10
  309:16 310:7
  317:2 322:5,11
  342:2 424:24
  426:3 465:1,7
  466:6 468:4
  470:13
cases 42:16
  109:3 126:8,10
  126:13 138:23
  293:21
categories
  244:3 372:9,11
  372:12
categorized
  244:23 441:9
category 17:6
  20:1 34:20
  244:4,23
catherine 2:18
catherine.hea...
  2:22
causal 20:5
  22:18 25:21

63:6,7 65:5
83:16 93:17
200:10,23
207:16,20
266:20 275:13
278:21 279:11
298:19 299:16
299:17 303:18
305:16 306:3
332:17,20
347:17 466:16
469:22
causality 286:4
374:1 383:3
465:2
causation 65:13
65:15 425:10
cause 14:3,13
15:9,16,17 16:4
16:8,15 17:1,23
18:12 21:6,7
30:19 34:12
35:6,10 83:17
154:23 155:6
188:2,19
223:20 224:8,9
228:14 240:12
246:11 247:21
248:11 249:2,5
249:22 250:6
250:11,15
251:18,24
252:3,9,11,19
253:4,17
298:22 299:22
430:20 442:16

452:6,7,14,15
453:3,3 459:13
caused 24:21
25:4 156:14
causes 8:8
21:13,16,17,22
24:4,5,11,12
35:1,16 138:1
138:24 139:6
147:11 162:24
189:3 213:6
214:9 215:17
226:24 241:20
242:5 246:9,13
249:18,21
264:2 421:8
450:18,19
452:18
causing 248:24
358:16
cautious 107:22
145:9
cbcl 370:19
cc'd 125:11
219:1
cc'ing 48:19
124:14
cc's 426:7
cdc 174:1,8,9
174:11,17
175:3,6 377:13
378:8
cdc's 174:13
cell 189:11
cellular 263:23
263:24

central 189:8
certain 38:17
72:11 227:14
certainly 167:3
176:13 184:3
208:24 250:3
281:10 303:21
303:22,23
313:21 318:18
322:2 374:17
381:4,5 387:2
391:10
certificate
474:2
certification
181:16 474:18
certified 1:18
1:19,20 181:11
181:13 474:13
474:14
certify 474:5
477:5
certifying
474:22
cetera 123:15
290:1 303:9
305:18 346:6,6
chain 128:6
129:21 131:9
131:19 218:10
219:9,13
chains 128:12
chance 387:2
change 238:20
276:5 277:19
290:20 291:8

476:4

**changed** 291:12
291:13 300:8,9
303:22,23

**changes** 238:17
395:15 475:11
477:10

**changing**
237:23 238:17
241:10 242:19

**characteristic**
221:13

**characterizati...**
291:1,10
337:12 431:4

**characterize**
302:12

**characterized**
272:22 300:1
436:24 441:2

**characterizing**
133:2 248:6

**charchalis** 4:16

**charge** 38:11
38:15 217:2,6

**charging** 83:2
309:15

**chart** 81:9
312:21 374:2

**check** 96:22,24
114:15

**chemical**
453:15

**chen** 342:2
345:10 349:1

**cherry** 349:7
403:18 470:22

**chicago** 2:13

**child** 8:21
20:11 29:13,17
30:6,10,11
131:3 207:24
251:6 409:18
442:21 443:4
443:21 444:24
446:18 447:21
448:10,22

**childhood** 7:21
24:7 207:3
210:19 262:20
264:21 266:13
270:3

**children** 8:15
27:15 123:21
137:14 201:9
201:11 205:12
208:10 220:12
221:14 262:6
262:11 264:5
271:16 353:17
357:1,9,21
358:4 371:4,14
371:23 372:4
373:14 387:10

**children's** 9:7
9:13 386:8
388:23

**choice** 85:13
404:16

**choose** 460:20
469:24

**christian** 48:20

**circle** 33:22
34:22 35:23
36:3,10 44:24
116:5 125:8

**citation** 123:20
344:6 461:8

**citations**
212:15 344:17
344:21

**cite** 122:3,5
171:22 195:4
212:23 224:1,2
224:4 236:21
238:6 337:20
338:9,11,16
340:5,8,23
342:14 344:14
344:16 346:7,9
348:18 349:1,4
353:21 395:18
397:12 401:1
402:1 406:21
468:9

**cited** 133:21
139:15 195:17
223:3 260:20
261:6 263:7
269:12 339:1,3
339:17 344:4
346:12 347:9
350:5 359:2
370:24 371:20
378:17 410:15

**cites** 124:5
221:24,24

222:1

**citing** 174:23

**city** 3:16

**claims** 43:10
44:15 125:12
125:17,19

**clarify** 21:24
25:16 77:6
135:4 184:21
185:8 197:24
204:18 282:12
355:2 434:21
443:16 444:6

**clarifying**
177:16

**clean** 16:9,19
398:18

**clear** 23:7
39:15 41:16
107:17 130:16
152:24 342:17
347:16 380:4
399:8 443:9

**clearly** 38:1
146:17 348:11

**clinical** 179:11
408:17 412:22

**clocked** 309:11

**close** 317:8
323:9

**closely** 357:11

**clue** 325:15

**clues** 266:8

**clusters** 201:15

**cognitive**
187:12

**cohort** 8:23
341:23 354:13
355:5,10,13
356:1 387:7
**cohorts** 210:9
**cold** 123:10
**collaborated**
274:24 280:3
283:4
**colleagues**
159:10 260:8
**collect** 97:11,18
174:22
**collecting**
427:24
**column** 206:19
356:14 444:2
**combination**
34:19 66:24
68:20 153:17
154:9,13,20
155:4 156:8,21
247:17 440:1
**combine**
132:11 135:21
138:8
**combined**
138:12 141:2
152:5 209:13
**come** 27:24
44:13,21 58:8
60:13 61:21
62:20 79:3
86:17 91:5
170:19 175:3
247:16 286:9

290:10,19
291:17 306:3
332:16 364:21
397:10 421:24
425:16 438:21
441:13 442:2
444:13
**comes** 27:23
127:24 199:5
**comfortable**
155:3
**coming** 278:21
373:23
**comment** 225:3
337:4
**commentary**
284:24
**commented**
285:3
**commission**
477:21
**commissioned**
148:1
**common** 19:18
23:1 381:19,21
**commonly**
243:24
**communication**
353:14 356:24
357:20 358:3
362:2
**communicati...**
35:23 36:3
**companies**
50:15

**company** 1:22
43:14
**compare** 457:9
457:14
**compared**
112:11 185:18
393:12
**comparing**
110:18 111:3,8
397:5
**comparison**
234:5
**compelling**
255:9
**compensate**
38:18
**compensated**
38:5,7 69:7,12
69:15,17 70:2
422:21 423:3,7
423:9 436:17
**compensation**
47:24 83:4
422:19
**compilation**
7:12 8:10
**complete**
109:20 171:5
178:5 229:23
230:4 248:2
338:23 401:17
403:14,23
418:15
**completed**
401:20 404:3
405:24

**completely**
291:3,4 315:24
335:10 336:13
418:15 437:18
**completeness**
113:20 332:23
371:24
**completion**
474:8
**complex** 21:13
**complicated**
26:10 197:5
439:5 469:17
**component**
151:10 347:23
350:17 419:18
**components**
36:24 333:8
358:17
**comport** 99:9
99:18
**computed**
200:24
**computer**
26:20 187:5
193:13 294:19
294:20 296:6
296:23 360:18
**conceivably**
306:10 319:19
**concentration**
143:15 146:11
231:1 233:16
233:19,21
236:10,23
237:11 404:8

**[concentration - considered]**

408:16

**concentrations**

201:7 399:21

400:17 408:11

**concept** 339:11

**concepts**

301:24 302:18

**concern** 87:18

440:16

**concerned**

31:15

**concerns**

333:22 334:1

**concise** 50:9

51:1,3 52:3,8

52:23 54:12

56:8 59:22

117:23 218:1

**conclude**

147:10 389:23

**concluded**

473:3

**concluding**

363:2 466:6

**conclusion** 15:4

79:3 91:5

278:21 286:10

306:4 332:17

332:20 347:17

350:21 373:24

388:20 392:8

413:14 438:22

**conclusions**

328:12,15

352:15

**concomitant**

138:22

**conduct** 19:21

155:10,22

160:13,13,15

161:20,21

163:9,21

272:17 275:14

276:24

**conducted**

151:19 153:6

182:12 183:14

183:18 186:2

186:13 466:5

**confer** 414:18

414:22

**conference**

100:22

**confidence**

210:5 348:10

363:9 364:1,11

364:18 365:9

365:17,20

366:3,13,23

**confident** 155:3

**confidential**

1:11

**confidentiality**

74:12 432:1

**conflated** 358:8

**conflict** 87:20

87:24

**confounder**

123:12 247:7,8

396:1,2

**confounding**

122:10 357:12

380:23 389:4

390:1,17

392:12,14,21

394:20 395:3

395:20,22

396:8 417:14

418:10 419:8

**confuse** 110:6

**confused** 23:18

227:22 314:4

434:20

**confusion**

193:19

**connecticut** 2:4

**connection**

39:7 40:3,4

78:6 126:13

208:15 209:24

226:18 252:20

254:22 320:14

321:18 323:8

330:17 333:14

382:4 429:23

439:17 468:4

469:22

**connections**

189:18 190:22

198:21

**connectivity**

200:15,20

201:1,4,13

202:3,9 203:12

207:2,10,22

208:6,16

209:21 210:19

211:5

**consensus**

31:16 137:15

**conservative**

41:17 43:6

347:13,14

403:13,24

417:21 418:9

460:24 461:2

465:4,7 466:18

469:23 470:9

**conservatively**

420:20

**consider** 62:8

76:13 174:17

180:22 296:15

298:13 305:12

305:14 317:17

319:24 321:7

321:10 339:12

347:18 362:12

372:8,15 373:4

373:7 375:7

395:18 409:15

**consideration**

93:15 276:7,8

276:11 349:21

351:16 464:16

471:1

**considerations**

277:20

**considered**

16:5 19:2,24

274:22 275:18

276:12 277:13

278:9,15
279:24 281:23
288:8 290:12
294:23 295:6
295:14 304:4
305:8 319:18
339:13,15
345:23 346:1,3
346:4 349:14
349:19 350:5
350:13,22
401:16 456:4
458:23 459:17
**considering**
17:2
**considers**
334:16
**consistency**
37:3 40:18,24
274:21 275:17
276:11 277:12
278:8,19
279:13,23
281:23 284:2
286:11 288:7
288:20 289:18
290:22,22
294:22 304:3
305:8 341:16
343:24 456:4
456:19 458:12
458:22 459:16
462:15 466:22
467:5,7,20
**consistent**
39:14 103:11

110:4 116:23
260:3 263:16
269:24 334:23
**consists** 409:20
**constant**
143:24
**consultant**
143:12 144:1
217:9 430:8,22
431:3 437:16
**consultation**
217:16
**consulted** 282:2
283:4 288:11
295:8,17
298:17 304:6
305:11 456:7
**consulting**
37:22 70:7 76:1
81:6 96:2
110:10 148:10
312:18 313:9
318:9 326:20
426:17 429:24
431:16 432:18
433:17,21
435:13 436:1,3
436:11 437:8
437:23 438:11
438:23
**consumer** 1:9
4:8,14,20
**cont'd** 3:1 4:1
5:1 7:2 8:2 9:2
10:2

**contact** 46:24
71:15 74:24
77:14 78:23
79:11 80:2
88:10
**contacted**
46:24 47:3 70:6
71:8 72:3,4,12
73:21 74:23
433:13 435:9
438:7,16
**contacts** 190:23
**contain** 149:18
150:4
**contained** 81:9
109:18 222:16
310:5
**contains** 310:9
**content** 9:11
114:3 435:19
**contents** 79:18
**context** 251:13
265:20 280:21
289:13 326:15
328:3 332:11
332:11 336:21
336:24 342:10
344:19 347:5,6
350:23 361:12
371:6 417:12
421:3 451:22
463:16 464:24
**contextual**
331:17 339:6
339:18 374:20

**contextually**
336:23 338:17
342:8 345:18
346:2,15,18
373:12,21
**continue** 58:13
190:16 391:20
**continued**
235:5
**continuous**
331:17 373:22
**contrast** 407:18
**contributor**
137:18 468:16
468:17
**control** 342:2
375:9,23
379:11 380:10
380:21 385:2
387:8 389:1
395:12 396:6,7
396:15 474:21
**controlled** 8:22
392:14 394:21
**controls** 396:12
396:13 397:4
**conversation**
316:11
**conversations**
310:20
**convey** 436:6
452:17
**conveyed** 112:3
439:8
**convince** 38:21

| | | | |
|---|---|---|---|
| **convinced**   63:6 | 61:24 63:13 | 154:17,18,23 | 253:5 256:12 |
| 430:19 | 64:1,20 65:19 | 154:24 155:7,8 | 256:17 257:12 |
| **convincing** | 66:18 67:9,21 | 155:11,23 | 258:4 261:19 |
| 221:1 222:17 | 68:17,22 69:14 | 156:9,14,15,18 | 262:2,7 263:20 |
| 223:11,14 | 71:16 79:21,22 | 156:19,23 | 264:17 265:8 |
| **cooper**   3:19 | 81:22,23 82:2,3 | 157:1,6,10,13 | 269:3,10,15 |
| **cooperkirk.c...** | 82:8,9,11,15,16 | 157:19,20 | 270:7,8,12 |
| 3:22 | 82:18 84:1,12 | 158:2,10,11,14 | 271:21 272:1,7 |
| **coordinated** | 84:13 85:18 | 158:15,18,21 | 272:16 273:11 |
| 196:15 197:15 | 86:5 87:4 92:5 | 158:22,24 | 274:12,16,18 |
| **copied**   43:16,19 | 92:9,24 93:1 | 159:1,3,4,7,12 | 274:19 275:14 |
| **copy**   13:17 | 96:4 97:10 | 160:17,22 | 275:22 276:9 |
| 122:15 137:6 | 100:10 109:21 | 163:15 178:18 | 276:20 277:15 |
| 194:1,13 200:8 | 110:19 112:17 | 178:19 179:4,8 | 277:21 278:11 |
| **cord**   255:16 | 125:8,21 | 179:9,11,12,15 | 278:16,24 |
| 261:22,24 | 127:22 131:8 | 179:16 180:5,5 | 279:4 280:12 |
| 262:9,11,17,24 | 131:13,21,22 | 180:14,15,19 | 280:14,19,24 |
| 264:5,19 | 132:1,2,6,7,9 | 180:23 181:2 | 281:4,8,19 |
| 265:10 266:4,7 | 132:20 133:11 | 181:10,20 | 282:11,24 |
| 267:13 271:14 | 133:15 134:11 | 182:9,11 187:7 | 283:1,5,6,9 |
| 271:17 | 134:12,16 | 192:15 193:8 | 291:19 292:10 |
| **correct**   13:14 | 135:15,16,18 | 195:14,15,22 | 292:15,24 |
| 13:18,23,24 | 135:19 137:3,7 | 197:17,20,21 | 293:1 296:9 |
| 14:15,16,18,19 | 139:19 140:8 | 198:3,12,13 | 300:23 301:2,5 |
| 14:22,23 15:19 | 141:5,11 142:6 | 207:12 208:16 | 301:6,18 |
| 17:10 22:24 | 142:20 143:4,6 | 208:23 209:3 | 307:22 309:22 |
| 32:4,14,21,22 | 143:7 144:14 | 213:22 214:4 | 309:24 312:5,6 |
| 35:3,7,8,14,24 | 145:19 147:5,6 | 217:4,10,16,21 | 314:2,12 321:1 |
| 36:1,5 37:18,19 | 147:11,20 | 217:22 218:7,8 | 323:11 324:15 |
| 39:23,24 40:3 | 148:2,3,6,7,13 | 218:12,20 | 331:12,23 |
| 40:11 41:1 | 148:14,18,19 | 219:10,11,15 | 336:18 337:9 |
| 43:24 44:1,4 | 148:23,24 | 227:17,18 | 337:23,24 |
| 45:2,22 51:19 | 149:5,9,10,15 | 228:20 229:6,7 | 338:4,5,7,8,13 |
| 53:1,11 54:13 | 149:16,20 | 236:4 245:23 | 338:14,16 |
| 54:18 55:1,14 | 150:9,23,24 | 248:12,13,14 | 339:2 340:2,3,7 |
| 60:20 61:7,19 | 151:6,22 152:9 | 248:18 250:12 | 340:24 341:5 |

| | | | |
|---|---|---|---|
| 342:24 343:9 | 465:20,21 | 90:10 96:18 | 393:19 447:19 |
| 343:14 345:16 | 466:2,10 468:4 | 97:8,12,16 | **couple** 100:13 |
| 350:10 352:4,5 | 468:13 477:7 | 98:18 105:8 | 203:19 387:3 |
| 352:17 353:4 | **corrected** 383:5 | 121:19 134:21 | 396:3 462:9 |
| 354:4,23 359:8 | **corrections** | 140:15 167:22 | **course** 41:5 |
| 373:4,11 374:7 | 475:5,7 477:10 | 171:8 203:5 | 172:8,9,17 |
| 374:24 375:5 | **correctly** 22:23 | 204:4,15 206:2 | 173:3 202:5 |
| 376:1,2,6,7,11 | 358:24 438:14 | 211:19 213:13 | 233:7 257:22 |
| 380:13,14,18 | 439:5 | 233:3 259:11 | 281:1 318:11 |
| 380:19,24 | **correlate** | 308:5 310:21 | 355:17 388:17 |
| 381:7 388:14 | 399:19 400:15 | 311:14 314:1 | **court** 1:1,19 |
| 388:18,19 | 404:6 | 325:12 335:22 | 12:18 57:15 |
| 398:4 399:21 | **correlated** | 392:5 421:19 | 90:12 420:17 |
| 400:19 401:7 | 342:7 | 421:20 433:14 | 475:20 |
| 401:23,24 | **correspondence** | 435:10 438:8 | **court's** 166:23 |
| 402:2,3 403:9 | 75:9 | 466:19 467:4 | 260:4 333:8 |
| 403:11 404:9 | **corresponding** | 467:13,17 | 417:3,4 418:2 |
| 404:11 406:24 | 34:21 | 469:1 | 419:3,15 |
| 407:15 408:12 | **cortex** 196:16 | **counsel's** 307:4 | 420:16 |
| 408:24 409:9 | 197:1,3,7,16 | 307:9 | **covered** 467:12 |
| 414:13,14,18 | 198:2 199:4,6 | **counselors** | **crafting** 92:2 |
| 414:19 416:17 | **cortical** 190:1 | 154:3 | 92:22 144:21 |
| 416:18 422:13 | **cortices** 201:16 | **count** 139:21 | **cranial** 189:13 |
| 422:15 423:2,5 | **cote** 1:6 331:15 | 344:22 440:4 | **crazy** 360:2 |
| 423:11,12,14 | 331:22 332:5 | **counted** 439:23 | **created** 148:9 |
| 425:4,21 426:6 | **cote's** 148:22 | **counter** 394:6,8 | 148:11 |
| 428:18,22 | 151:21 306:21 | **counterexam...** | **creates** 274:2 |
| 429:24 430:3 | 306:23 307:24 | 306:6 | **criteria** 18:18 |
| 431:19 435:1,4 | 319:24 320:3,7 | **countersigned** | 175:2,9,22 |
| 435:7 436:13 | 320:13 321:8 | 77:13 | 176:8,18 177:3 |
| 441:18 444:19 | 321:11 324:13 | **counting** | 177:12,17,24 |
| 451:13,16 | 325:8 328:7,8 | 369:14 | 178:1,2,7,17 |
| 452:24 454:4 | 333:3,17 | **countries** | 202:6 209:17 |
| 456:8 459:11 | **counsel** 12:16 | 393:12 | 214:22 274:15 |
| 463:10,12 | 71:8,23 72:20 | **country** 377:5 | 278:23 279:10 |
| 464:6,9,19,22 | 73:21 90:4,5,5 | 384:24,24 | 279:14 283:8 |

283:23 286:13
331:3,11,14,21
341:17 463:20
468:12
**criterion** 15:6
462:15 468:9
**critical** 194:21
220:20 227:11
414:11,16
**critique** 110:17
**cross** 184:20,24
185:16
**crossed** 101:9
101:14
**crosses** 186:3
**crude** 189:12
**current** 314:7
357:8
**currently**
158:13 426:8
427:2
**cut** 243:24
244:1 281:12
**cute** 106:17
**cv** 1:8 429:3
**cyp2e1** 233:16
233:19,21
234:1

**d**

**d** 6:2 222:4
255:13
**d.c.** 2:5 5:5,10
**da** 435:23,23
**damage** 263:2
264:2 265:12

**danny** 5:16
12:3
**data** 27:9 37:3
39:19 101:23
109:21 111:12
111:13 112:7
112:11 117:22
123:17 152:1
155:15,16
157:12,18,19
174:23,23
215:21 226:4
227:24,24
228:16 251:9
251:16 255:18
255:19 274:2
332:10,10,16
336:20,23
337:1 358:7,12
376:14 377:13
394:2,3,7
427:24 428:1
469:19,20
471:1
**database**
408:18
**date** 1:18 12:6
284:12 309:7
323:17 388:13
428:10 429:4
434:16 475:9
477:16
**dated** 284:16
474:15
**daubert** 148:23
151:21 306:21

307:13,24
320:1 322:13
322:15 326:9
420:21
**day** 37:12
214:19 309:13
324:5 477:20
**days** 122:23
123:8 143:2
244:4,14,24
348:7 353:13
361:24 379:15
379:16 445:6
446:16 447:2
448:8,14,20
469:9 475:16
**dc** 3:21
**deal** 180:1,8
184:4,5
**dealings** 46:12
**dealt** 424:11,16
**dean** 430:22
**deanna** 5:3
**deanna.lee** 5:6
**december**
82:10 91:20,22
108:21 125:6
309:8 312:9,13
313:15,20
323:21 327:6
327:13 387:12
429:18 431:16
**decide** 58:6
60:5,13 61:21
62:19,21
315:19

**decision** 63:4
321:12 322:9
322:13,16,24
333:3,9 373:17
**decisions** 333:1
333:13
**declaration** 7:6
37:20 70:4,13
70:15 71:2 73:7
79:14 431:23
432:13 433:1,7
434:24 438:7
**decrease**
256:15 257:1
264:15 269:20
270:11,20
**decreased**
257:9
**decrement**
364:16
**deemed** 42:4
475:19
**default** 201:14
**defendant** 5:6
5:12
**defended** 260:6
**defense** 307:4,9
**deficit** 7:21
20:10
**define** 61:10,12
61:14 443:6
446:5
**defined** 56:9
447:1,5,7
**defining** 446:9

**[definitely - developmental]** Page 25

**definitely** 26:5 107:8,9 182:21 212:20 308:2
**definitively** 169:22
**degraded** 229:5
**degree** 38:8 186:4 225:23 285:5 367:18 417:13
**degrees** 145:3
**delete** 48:15
**delighted** 43:23
**delineated** 51:5
**delineation** 74:19
**delinquency** 161:23
**delivered** 324:5
**delivering** 409:9
**delivery** 408:19 409:21
**demand** 262:13 271:18
**demonstrate** 272:9
**demonstrated** 253:21
**demonstrating** 254:9
**dendritic** 189:23 190:17
**denise** 1:6
**deoyguanosine** 263:1,22 264:7

265:11 269:20 269:23
**dep** 59:5 249:8
**depends** 236:11 237:13,15 376:24 377:1 378:12,14 384:3,21
**deplete** 243:18 245:9
**depleted** 262:5 262:10 271:16 273:2
**depletes** 235:17 243:14 245:20 256:9,19 273:8
**depleting** 236:4 244:15
**depletion** 257:4 260:22 262:17 263:19 264:19 265:1 269:13
**depo** 318:15
**deponent** 12:14 477:2
**deposing** 475:16
**deposition** 1:15 11:2 12:8 187:6 206:8 289:2 312:20 325:6 326:4,7 352:8 411:3 413:20 473:3 474:6,8,9 475:3,13,17,19

**depositions** 260:7 322:2,3
**derived** 221:2 223:18
**describe** 188:23 255:20 346:13 430:6
**described** 71:15 81:21 131:24 266:18 324:10 468:1
**describes** 54:12
**describing** 71:24
**description** 6:15 7:5 8:5 9:5 10:5 310:21 311:14
**design** 380:9 387:6
**designation** 35:12
**designed** 181:18 182:1
**despite** 56:12 59:12
**detail** 101:21 191:20 214:12 215:10,13 222:8 224:18 255:21 290:4 301:24 302:19 335:21 336:22 346:13 362:16 417:11,23 454:1 467:11

**detailed** 133:10 390:24 422:2
**details** 48:2 136:10 310:20
**detect** 227:12 379:21 380:1
**detected** 201:11
**detection** 201:10
**determined** 185:17
**detoxify** 236:7 236:19 262:14 271:19
**develop** 29:13 186:19 189:24 190:17 197:12 198:14
**developed** 29:17 199:3
**developing** 114:2 188:15 199:8 237:23 242:9,11
**development** 26:1 114:13 137:18 138:2 139:1 188:24 191:1 196:20 220:20 221:5 236:12 238:17 239:24 240:12 241:17 242:5 242:19
**developmental** 188:7 370:19

**[develops - discuss]**                                    Page 26

**develops** 187:2
190:9 191:17
191:22 194:17
196:24 198:24
199:18 201:24
212:18 240:1
241:3,8,21
243:3
**devoted** 98:4,10
**diagnosed**
27:15 123:21
138:18 159:14
209:3 342:4
371:16
**diagnoses** 163:7
163:18 164:3
176:18
**diagnosis** 137:2
138:21 149:19
201:9 202:10
203:13 208:9
209:16 211:5
342:9 348:6
373:6 380:13
419:7
**diagnostic**
138:19 149:14
175:2,8,21
177:2,23 178:7
178:17 331:2
331:10,16
332:5,12
333:15 334:22
336:17 339:8
339:13,16,19
344:22 347:15

347:23 349:24
350:7,13,19
371:10 374:13
380:6 403:16
416:23 421:2
441:6 460:21
461:9,15,17,18
462:1 463:22
464:11,14
**diagnostics**
332:21 336:19
**diaries** 123:6
**difference**
370:20 452:6
453:2 455:6
**differences**
28:17 29:5
**different** 25:12
66:4 69:24 70:1
75:19 76:12
93:4 193:13
244:3 247:7
249:17 276:24
283:7,22,24
284:9 285:13
305:5 320:11
320:21 321:2
332:2 343:2
344:2 348:3
350:12 355:15
368:3 377:18
377:18,20
396:18 431:17
432:14 434:16
435:6 441:2,3
441:10 447:1

**differentiate**
189:17,23
190:19
**differentiating**
191:5 192:7
196:23 199:10
**differently**
27:10 287:8
303:2 441:9
447:2
**differs** 384:24
**difficult** 128:12
185:9 399:24
444:7
**difficulties**
161:1
**dilute** 110:7
**direct** 33:10
108:8 173:16
200:22,24
219:22 254:11
255:3 261:7
333:18 372:8
392:7 416:7
474:21
**directed** 331:15
331:22
**direction** 11:5
238:19
**directly** 255:10
401:21 406:22
412:10
**disability** 9:8
9:14 386:9
388:24

**disagree** 209:18
330:10
**disclose** 86:4
431:7 433:23
436:10,21
**disclosed** 74:10
86:10,13 87:3,9
87:13 437:18
**disclosing**
437:15
**disclosure** 7:18
**discordant**
375:12,12,15
376:1,3,10,19
379:10,14,21
380:1,16 381:5
381:14,22
383:16,23
384:17 388:6
388:11,12
414:12
**discovered** 35:7
**discrete** 119:5
119:10 437:24
**discuss** 20:14
39:9 47:4 65:3
148:18 186:22
214:12 215:14
215:24 216:2,4
216:10 224:17
256:2 269:13
275:4 282:5,23
326:19 337:10
337:20 399:15
417:11,22

**discussed** 50:2
147:3,24
172:17 184:12
212:14 215:10
215:13 217:1
222:8 225:21
229:10 260:21
337:14 342:16
350:9 403:3
417:3 419:3
425:20 451:23
467:10
**discussing**
140:13,24
256:7 263:17
338:3 340:1
344:13 351:15
400:9 428:9,15
**discussion**
184:14 267:6
310:8 344:9
345:19 398:6
399:1
**discussions**
184:9,11,13
**disease** 15:9
16:6 17:3 23:1
26:1 252:4
253:9
**dismiss** 298:22
**disorder** 7:22
17:4 20:11
160:16 177:11
252:4
**disorders** 17:5
17:7,10,14,18

19:13,17 20:1
21:14 23:10
34:20 35:1,6
39:22 63:13
64:20 65:19
67:8 71:10
73:23 120:1
132:20,22
134:2,16
138:22 152:6
160:13,14
161:20,21
163:9,21
172:18 180:19
183:16 185:2
314:17 422:9
433:15 435:12
438:10,19
**dispensary**
394:9
**disprove** 465:6
**disrupted** 202:4
**disruption**
188:18 189:3
192:1 197:2
198:19 269:5
**distinct** 17:9
**distinction**
76:18 250:6
264:10
**distinguishing**
15:24
**distressed**
39:12
**district** 1:1,1

**disturbed** 40:19
**diverse** 210:8
**dlc** 1:5
**dna** 263:2
265:12
**doctor** 297:19
**document** 13:6
33:1 52:19
70:19 73:14
77:3 80:23 97:2
113:9 144:16
147:8 194:6
216:22 218:4
260:24 278:1,4
278:7 280:4
289:14 308:20
317:13 328:17
352:10 369:23
378:22 385:21
385:24 399:9
406:15 429:14
432:5 451:19
468:3
**documentation**
410:2
**documented**
154:16 157:17
**documents**
11:8 73:8 90:14
99:23 104:10
112:21 290:4
292:2,3 293:12
293:14
**doing** 36:11,14
37:1 45:11
76:22 92:9

105:5 114:1
293:20 296:24
311:5 312:8
314:24 326:5
332:2 335:3
360:2,20 395:4
422:19 426:23
427:6 441:5
461:24 475:8
**dominance**
153:17
**dominant**
334:21 367:14
**dominantly**
19:17 342:12
347:15 419:5
419:19
**dominate** 23:8
**dominated**
19:17 22:10,21
23:3,21 67:1
68:20 156:24
157:2 332:6,21
350:18
**dose** 42:9
337:22 338:7
338:13 340:2
341:17 394:1,4
394:7 443:23
445:2 447:10
470:4
**doses** 269:18
**double** 30:7
463:24
**doubt** 160:6

**doug** 37:16,17
**douglas** 44:4
  45:16 46:8 47:1
  47:5,23 48:17
  49:10,19,21
  55:11 56:12
  59:12 68:21
  69:18,20 74:24
  76:4 78:24 79:1
  79:12 80:2 83:9
  84:3 86:16 87:6
  87:17 88:9
  96:21,22,23
  128:23 218:24
  316:11 430:2
  437:13 438:3
  439:1
**dozen** 20:7,20
  306:12
**dr** 7:13 8:10
  12:14 13:5,12
  15:8 26:17
  31:13 33:5 40:8
  43:2 45:14 49:3
  49:12 52:16
  53:18 54:1,11
  55:1 56:4,22
  57:7,24 58:18
  59:11,19 61:18
  64:5 65:23 70:5
  70:23 71:17
  72:15 75:15
  81:8 90:15
  91:16 93:24
  97:7 98:4
  105:14 106:23

112:15 116:10
116:14 120:14
128:3 129:23
130:24 131:7
132:14,24
139:2 140:2,23
142:11,22
144:12 146:24
149:2 152:22
155:2 158:4
165:1,19 166:6
167:3 173:13
179:3 181:15
182:18 187:3
190:5 193:5
194:12 206:16
212:13 213:23
215:15 216:22
218:3 220:18
222:24 229:9
229:15 235:8
239:4 241:2
247:21 255:23
260:18 261:4
263:6 264:24
297:11 306:24
307:3,8 308:24
324:20,22
325:8,9 326:1,4
326:13,14
328:6,12
329:17 330:15
330:15,17
339:23 349:20
351:14 359:6,9
359:20 360:18

370:10 385:18
386:11 390:2
391:19 392:13
394:20 397:13
399:15 407:3
410:24 411:6
411:14 413:22
415:5 416:3
421:5,15 422:6
444:11 449:18
450:16 465:10
465:15 471:3
472:11,14
**drafting** 308:8
  333:2,14
**draw** 413:13
**dreams** 411:22
**drug** 185:15
  186:3 400:13
**drugs** 400:13
**dsm** 175:1,8,10
  175:14,21
  176:7,17,22
  177:2,20,23
  178:6,11,17
  209:17 372:12
**due** 262:12
  271:18
**duly** 12:23
  474:5
**duration** 29:11
  42:9 107:11,23
  142:16 145:2
  145:10,17
  235:17 243:13
  244:4,22 394:3

440:14,17,22
441:3,8,12,15
441:17 442:13
442:14 447:1,4
447:20 448:2
**dynamic**
  241:19
**dynamically**
  242:18

**e**

**e** 4:11 6:2,12,20
  7:2 8:2 9:2 10:2
  33:6,17 35:24
  37:18 43:9,17
  43:19 44:7,8
  45:15 48:14,17
  49:14,17,18
  51:10,17 54:11
  54:14,16 58:14
  59:13 86:18
  88:18,20,22
  89:7,17,24
  90:13,17 91:1,3
  91:19 108:7,15
  110:1 114:21
  115:18,22
  116:3 117:15
  120:15 122:22
  122:22 124:13
  124:13 125:4,5
  125:20 127:17
  127:24 128:6
  128:12,18,21
  129:8 133:3
  138:8 140:12

140:24 142:11
143:11 147:4
205:11 206:15
206:17 216:22
218:5,10,15,16
218:23 219:4,9
219:24 225:2
227:17 234:23
234:23 387:17
387:23 400:23
426:5 472:2,4
476:1
**e.g.** 93:2
**e2** 222:1 226:14
226:18,23
**earlier** 110:1
115:22 147:24
217:20 218:10
218:16 219:20
312:19 353:9
353:11 356:7,8
356:17 357:5
425:2,20
431:22
**early** 163:15
189:15
**earning** 422:18
**easily** 470:3
**easy** 60:5,12
61:20 62:19,21
**editorial** 79:17
435:18 436:2,4
**edits** 6:21
127:17 128:1
129:11,15
218:11

**educated** 290:3
300:21 302:15
**educating**
286:9
**effect** 172:1,4
188:1 200:22
200:23 208:7
210:7 251:2,5
251:12 298:22
299:22 394:5
459:13
**effective**
375:24
**effects** 181:20
201:1 395:14
**eight** 57:6
334:15 449:6,8
**either** 49:4
123:16 174:10
247:18 299:19
308:16 440:1
**elegantly** 189:4
**elevated** 25:11
395:8
**elevation** 26:6
**elevations**
143:3
**eliminate**
221:10
**else's** 224:22
330:10
**embryonic**
189:12
**eminent** 214:19
**emotional** 8:18

**emphasis**
291:24
**emphasize**
143:14
**emphasized**
145:16
**emphasizing**
142:15 146:10
**employed**
200:10
**employee** 43:22
**employer** 116:8
**employing**
331:2,10
333:15
**empty** 99:12,17
**endeavored**
146:9
**endpoint** 163:7
163:19 164:3
461:9 462:1,7
463:22 464:12
464:14
**endpoints**
147:14,15
331:2,10,16,17
332:6,13
334:23 347:16
416:23,24
441:6 460:13
461:18
**enforcing** 260:9
**engaged** 431:8
**engagement**
48:5,9 76:13
77:10 79:10

431:23
**enlightened**
468:2,5
**ensure** 45:6
51:6 79:18
109:11 439:7
**ensuring**
110:11 217:2
**entire** 104:1
**entirely** 273:18
293:24 389:7
389:11
**entirety** 98:9
287:18 332:10
333:19 409:2
**entities** 17:9
**entitled** 54:2
260:1 305:2
429:19
**entry** 312:22
313:8,14
**enumerated**
306:8
**environment**
395:15
**environmental**
34:11 35:5
**enzyme** 240:15
**epi** 173:21
**epidemiologic**
243:23 244:21
245:13
**epidemiologi...**
244:7 276:2
422:10

**epidemiologi...** 25:12
**epidemiologist** 14:22 15:3,7 155:2 274:6 277:7 287:24 321:23 324:22 325:4 445:13 445:15 459:4
**epidemiologi...** 214:18,19 274:23 275:20 276:23 277:14 278:10 280:2 282:1 283:3 288:10 295:1,7 295:16 296:18 298:16 304:5 305:10 334:24 335:4 456:6 458:24
**epidemiology** 158:9 180:1 181:3 187:22 275:3 282:4,22 366:7 453:20
**epigenetic** 395:14
**equal** 176:4 177:5,7 247:18 348:7 379:16
**equals** 412:17
**equation** 277:2
**equivalent** 187:10

**erin** 116:22 117:7,8,10 217:20
**errata** 475:6,9 475:12,15 477:12
**error** 367:13 420:2,4 421:3
**esq** 2:3,8,9,10 2:11,18,19 3:3 3:8,9,14,14,20 4:3,4,10,16 5:3 5:8
**essentially** 123:13
**established** 142:7 179:21 210:2,15,20 217:24 273:5 427:8 437:23 438:15
**estimate** 39:4 427:10,16 471:11
**estimated** 425:1
**estimates** 42:14 348:20 364:6
**estimation** 277:8
**estrogen** 299:8
**et** 1:8 123:15 154:3 290:1 303:9 305:18 346:6,6

**evading** 307:9
**evaluated** 137:23 396:16
**evaluating** 141:10 185:21 276:19 331:3 331:11 409:16
**evaluation** 279:16
**events** 320:18
**everybody** 109:14 166:19 402:19
**evidence** 83:15 83:16 99:24 123:14 150:21 215:5 220:18 223:11,15 254:11 255:4 257:24 258:1,2 273:24 276:7 276:18 277:20 338:12 362:14 366:5
**evidenced** 156:9 363:3
**evidences** 374:3
**evidencing** 365:10 366:14
**evolves** 92:23
**exact** 37:12 70:11 72:24 73:4 152:12 153:15 169:7 236:10 292:6 292:12 299:21

306:6 308:1 320:8 323:17 364:8
**exactly** 48:4 57:3 74:17 98:1 120:24 126:9 182:24 266:24 267:16 285:8 289:12 292:19 300:11 301:13 302:15 311:4 322:23 346:14 363:19 377:22 381:12 400:1 405:23 425:12 432:16 435:21 441:24 446:9
**examination** 13:2 235:5 450:13 465:12
**examine** 206:24 210:17 211:21
**examined** 12:24 342:3 358:1
**examining** 342:7
**example** 100:15 135:14 158:24 196:5 218:17 246:15,20 293:22 343:20 345:1 348:1 358:13 376:8 383:13 448:4
**examples** 41:3 299:4,5 303:20

except 477:9
exceptionally
    347:12,14
    403:13
excitatory
    190:4
excluded
    324:15 325:2
excludes 157:19
excluding
    362:18
exclusively
    112:16 133:14
    150:6
excuse 100:5
    150:4 173:14
    173:19 253:14
    364:3 378:3
    450:18 457:15
excused 473:2
executive 189:1
    196:15 197:15
exercise 167:4
    168:11
exhibit 6:16,20
    7:6,9,12,15,17
    7:20 8:6,10,12
    8:17,21 9:6,11
    9:16,20 10:6
    13:8,11 33:3,11
    60:7 70:18,21
    70:24 71:1 81:1
    81:4 97:3,7
    108:7,11
    113:11,14
    115:18 120:15

147:1 154:17
156:9 173:15
194:8,13
195:11 209:5
235:11 260:20
261:2 274:10
280:6,9 294:16
294:18 308:22
312:24 316:2
323:24 352:1,8
352:12 370:1
370:11 378:24
382:5 385:23
386:2 387:16
397:24 399:5
399:11,14
406:17,20
429:16 455:11
455:14,15,20
458:20 459:23
465:23 472:18
exhibits 301:17
exist 402:5,14
    402:16 466:23
exists 339:11
expansion
    189:10
expect 260:10
experience
    181:4 382:22
experiment
    365:19
expert 6:17
    7:18 40:16,20
    61:15 62:11,13
    148:13 150:8

151:4 152:8
153:9 157:23
180:23 217:6
217:15 233:12
235:10 274:9
277:7,18
280:17 293:15
294:14 308:13
309:3 318:9
325:10,24
326:13,17,20
374:5 382:22
420:7,13
422:19 423:4,8
426:23 427:2
433:17,21
435:14 436:2
437:19 438:12
438:24
expertise 158:5
    158:9 181:6
experts 10:7
    76:20 322:3
    324:14 325:7
    326:8 330:21
    382:24 413:5
    429:20
expires 477:21
explain 230:13
    231:3 244:18
    248:16 262:17
    262:18 264:19
    267:12
explained 55:17
    57:3 58:21 88:1
    111:23 177:10

288:16 335:20
explains 270:14
explanation
    20:4 22:16
    365:14
explicitly
    399:19 400:15
explore 208:8
    208:15 209:20
exploring
    357:11
exposed 27:16
    123:22 257:11
    258:3 357:10
    379:14 410:3
    452:22
exposure 7:21
    8:13,21 9:17,21
    142:16 145:17
    146:12 173:5
    180:10,17
    187:9 188:6
    200:13,21
    201:2 207:2,12
    207:23 210:18
    251:13 255:14
    262:7,12,20
    263:3 264:21
    265:14 266:13
    271:18 290:15
    299:6 348:8
    353:13 356:23
    358:2 376:23
    379:22 380:2
    381:16,20
    384:1,4 388:6

392:17 394:23
408:3 409:14
409:20 410:4,5
410:8 417:13
418:12 421:7
442:15,16,20
443:2,8,11,14
443:19,22,23
444:3,15,21
445:4,8 453:16
469:9
**exposures**
161:9 162:19
172:10,22
180:2,8 182:24
**extensively**
181:4 286:8
403:14 468:7
**extent** 76:5
311:2 327:7,12
**externalizing**
353:14 358:19
362:3,6 363:18
367:18 372:20
**eyebrows** 395:9

**f**

**f** 234:23
**fact** 6:22 39:11
39:12 41:16
56:12 127:18
129:4 138:17
156:16 157:3
188:5 222:16
247:11 265:24
273:16 281:6

282:9 285:23
286:12 303:14
303:19 315:20
316:23 332:4
337:17 347:21
351:24 357:4
380:5 396:6
413:5 467:24
**factor** 25:24
28:15 30:13,24
41:7,11 122:9
221:3 223:18
247:9,13 451:5
456:23
**factors** 24:6,14
24:17 25:21
30:18 137:13
160:9,10
226:11 246:12
248:18,23
250:11,17
252:6,21 253:4
253:8,10,10,12
253:15 288:8
288:22 289:19
290:21 291:18
305:20 456:20
457:3 464:18
**facts** 452:3
**fail** 475:18
**fair** 15:11 68:7
138:18,20
159:24 160:5
162:9 214:1
350:7 361:14
375:23 389:20

418:9 461:6
**fairly** 28:4
317:6 427:23
**fall** 13:13 14:18
63:9,23 64:12
65:14,16 66:15
66:22 67:18
68:14 77:11
299:20 365:19
425:4
**familial** 389:3
390:1,17
392:11
**familiar** 164:19
164:23 166:7
167:6,10
169:14 170:7
170:12,15
171:3,19 301:9
351:22
**family** 348:8
**faq** 220:10
**faqs** 220:5
**far** 19:18 75:22
**faster** 298:7
**fault** 150:19
153:2
**fda** 84:16 93:3
93:12,21 100:7
101:24 102:2,5
102:19 103:7
103:10 104:10
104:21 105:18
105:21
**fda's** 102:2
103:15 104:17

**feature** 80:15
**features** 334:21
**february** 82:14
280:11
**feel** 20:3 315:24
316:14,16
333:24 415:5
**feeling** 302:2
302:21
**felt** 20:4 38:20
40:19 155:2
303:7 314:18
332:5 333:21
334:20
**female** 187:13
**fetal** 179:10,14
183:19 184:2
186:20 190:10
197:13 212:18
233:16 234:1
235:18 236:12
238:3,9,14
239:24 240:11
241:2,7,17
243:2,6 245:22
256:10,13
257:3 260:23
273:9
**fetus** 237:23
239:24 241:21
242:5 243:3
**fetus's** 185:22
**fetuses** 220:21
241:14
**fever** 122:21
123:4,11

246:22 247:3
253:22
**figure** 112:4
379:12 439:3
441:14
**figures** 111:2,8
**files** 408:17
412:23
**filing** 36:4
431:18 436:20
**fill** 80:8
**final** 114:6,18
122:8,16
189:16 261:10
267:5 278:21
415:14 471:2
**finalize** 415:13
**finally** 50:3
**find** 28:5 41:6
91:24 103:11
111:9 121:2
202:8 203:11
211:20 272:22
284:14 286:1
297:24 329:22
338:21 344:23
353:8 357:17
358:17,20
359:13,16
377:14 398:8
398:24 408:14
408:17 410:19
410:19 429:7,9
**finding** 253:23
259:5 360:23
407:15 408:23

470:1
**findings** 116:24
187:14 210:10
210:14 266:8
267:9 270:15
271:1 272:4,15
360:3 403:2
411:9 469:4,8
**finds** 42:11
**fine** 91:13
105:12 121:7
121:15 164:12
165:8 167:16
169:10 229:19
229:21 230:23
318:24 319:5
329:4
**finger** 239:19
239:20
**finish** 263:8
**firm** 1:17 2:18
3:3 32:21 73:24
74:11,15 78:2,3
78:7 92:1,7
125:7 126:19
126:22 127:3
433:22
**first** 12:23
15:10 19:20
37:21 39:20
40:1,13 49:14
71:7 151:1,18
152:3 153:6
165:9 175:22
188:4,11
206:20,23

207:9 210:16
259:15 260:7
261:15 267:18
309:8,10
313:13 343:19
343:20 345:9
352:15 355:18
368:12 386:10
400:22 412:18
423:22 430:13
433:13 435:9
438:6,16 448:8
448:21
**fit** 260:2
**five** 309:12
339:4,19
357:21 412:6
413:11 414:22
**fix** 454:8
**flag** 458:13
**flipping** 419:22
**flom** 4:3
**floor** 2:20 4:18
**flu** 123:10
**fluid** 185:18
**focus** 92:24
95:17 135:8
162:10,13,15
162:18,22
377:24
**focused** 93:3
95:2,12 150:5
157:24 160:7,8
167:14 182:10
367:19 380:12
462:1

**focuses** 334:15
**focusing** 324:21
**fold** 188:10
**folks** 43:8,17
44:19 81:13
85:17 124:15
124:20,21
125:11 386:17
**follow** 56:1
58:12 128:12
152:24 342:20
352:16 353:2
354:3,7,11
355:3,24 357:7
361:7 362:10
387:11 389:18
396:3 449:23
450:1 472:7
**followed** 436:8
**following** 23:19
176:5 182:4
**follows** 12:24
341:21
**food** 227:13
**foot** 260:11
461:5 470:16
**foregoing**
474:18 477:6
**forest** 112:6,9
112:10,15
348:2 460:9,13
460:22 464:5
468:24 470:10
**form** 22:8
23:14,23 25:6
26:3 29:21 31:7

| | | | |
|---|---|---|---|
| 32:6 36:8 41:13 | 197:23 198:17 | **format** 122:16 | 339:4 369:15 |
| 43:1,3 45:4 | 202:12,21 | 128:16 130:10 | 370:24 371:17 |
| 50:18 51:13,23 | 203:3,6,24 | **formation** | 383:18 |
| 52:12,17 53:3 | 204:16 205:18 | 189:9,11 | **fox** 322:5 |
| 53:17 54:20 | 205:20 206:10 | **formed** 14:2 | **framework** |
| 55:3,16 56:18 | 208:19 212:6 | 24:19,24 25:2 | 276:19,22 |
| 57:2,16 60:22 | 216:14 217:12 | **former** 430:22 | **frankly** 114:4 |
| 62:2 63:15 64:4 | 218:1 221:19 | **forming** 135:12 | 114:19 470:7 |
| 65:21 66:10 | 222:22 223:7 | **forms** 227:14 | **frequent** 20:8 |
| 67:23 68:6,24 | 224:11 225:6 | **forwarded** | **frequently** |
| 72:14 73:12 | 229:14 230:18 | 222:14 | 220:3 344:13 |
| 75:5 76:16 85:6 | 237:2,21 | **found** 34:12 | 344:16 |
| 85:20 86:7,20 | 238:22 240:22 | 92:6,21 112:10 | **friday** 125:6 |
| 87:22 88:4,6 | 242:16 248:8 | 123:7 137:24 | **front** 168:14 |
| 89:9 90:19 | 249:24 250:19 | 138:14 145:2 | 192:13 206:2 |
| 92:11 94:6,19 | 251:20 252:23 | 201:7 211:3 | 211:18 413:2 |
| 95:4,19 96:7,8 | 257:14 258:11 | 244:5 258:8 | **frontal** 201:20 |
| 96:11 100:24 | 260:5 277:23 | 263:7 264:22 | **frontoparietal** |
| 103:19 104:12 | 279:18 286:21 | 264:23 265:15 | 207:21 208:3 |
| 106:9 109:23 | 289:7 307:11 | 265:22,24 | **full** 14:11 15:4 |
| 110:21 118:9 | 330:1 335:8,18 | 268:4,24 269:2 | 15:18 17:12,15 |
| 133:17 134:22 | 335:24 354:6 | 269:13 270:5 | 17:20 18:5 |
| 135:1 139:10 | 363:13 365:12 | 271:11 321:15 | 22:12 23:6 |
| 140:16,18 | 396:23 402:8 | 353:11 355:24 | 35:17 54:2 67:5 |
| 141:13 144:16 | 404:20 409:23 | 356:6,17 | 150:13 196:13 |
| 145:21 146:14 | 411:11 412:13 | 360:19 361:23 | 306:9 317:17 |
| 150:11 151:8 | 413:16 415:3 | 362:5 395:24 | 317:18 319:8 |
| 152:11 153:11 | 418:20 421:10 | 396:1 407:21 | 319:17 324:1 |
| 155:13 156:1 | 421:20 444:13 | 408:8 | 338:22 340:5 |
| 167:18,23 | 445:22 447:23 | **foundational** | 340:13,17 |
| 168:7 170:10 | 448:24 454:6 | 294:2 301:23 | 345:6,19 |
| 173:8 174:21 | 455:1 457:20 | 302:18 | 359:14 365:14 |
| 176:10,20 | 466:24 477:10 | **foundations** | 400:6 401:17 |
| 177:14 178:9 | **formally** | 303:10 | 404:14 406:6 |
| 178:21 181:22 | 159:16 | **four** 53:4 195:1 | 410:19 |
| 189:17 190:12 | | 212:22,22 | |

**fully** 19:2 36:22
37:1 38:21,22
110:15 115:5
151:11 213:10
220:16 224:15
224:18 265:18
285:20 300:20
302:14 335:2,3
**function** 227:12
**functional**
191:5 192:8
196:23 205:13
207:2,10
210:19
**functions**
188:14 189:1
196:15 197:15
220:20
**funding** 107:3
**further** 262:16
264:18 290:2,3
292:1 302:3,3
302:22 305:17
347:6 465:10
472:10
**furthermore**
358:1
**future** 400:19
400:21,22

**g**

**gears** 351:1
**general** 17:17
174:15 233:23
285:18 308:6
311:22 330:7

341:18 377:4
378:6 393:22
**generally** 40:22
48:23 237:17
310:5 311:21
312:1 314:9
329:16,21
330:9
**genes** 171:17,20
171:23
**genetic** 28:14
30:13 380:22
392:14,21
393:3 394:20
395:2,20,22
396:8
**genetics** 24:5
24:18,21 30:23
31:2,4 251:17
251:23 253:18
395:13 396:1
450:20
**genital** 8:8
**genre** 141:6
**gentleman**
309:23
**germane** 380:7
**gestation** 188:1
188:13
**getting** 198:5
199:8 227:22
314:4 318:16
434:19
**girdle** 123:2
**girl** 378:13

**girls** 377:19,20
**give** 34:2 46:16
54:1 58:16 64:4
95:8 97:19
104:9,21
117:19 121:14
122:7 146:20
164:24 171:1,5
182:20 193:19
204:21 206:11
229:9,22 230:3
231:14 239:10
247:4 258:23
276:6 292:5
296:13 303:19
306:10 341:6
341:12 383:13
389:6 391:21
404:23 420:6
430:3,4 440:24
441:7
**given** 59:1
114:19 188:15
365:13 381:8
474:6 477:8
**giving** 121:9
420:7 436:2
**glad** 50:3
**glutamate**
261:24 262:10
271:16
**glutathione**
229:1 235:17
236:4,7,18,23
237:11,17
238:3,14,23

239:23 240:12
241:3,7,17,20
242:6,12,13
243:1,8,14,18
244:8,15 245:3
245:10,15,16
245:21 256:9
256:16,19,22
257:2,4,10,18
258:1,3 260:22
261:17,18,19
262:1,13
263:20 264:17
265:2,8 267:7
267:12 269:3,6
269:13,15,21
270:12,21
271:19 272:14
273:2,9 453:7
**glycine** 261:23
262:10 266:6
271:15
**go** 26:15 31:12
36:16 54:4 56:5
59:5 68:9 88:19
99:8 102:11
105:1 108:6
115:17 120:14
120:19 121:24
131:6,21
134:10 136:2,3
136:6 137:10
173:13 187:19
188:9,22
192:18 194:14
209:4 211:10

234:7 256:23
263:21 266:2
294:1 299:4
303:8 304:17
312:17 315:15
318:7 342:5
343:13 353:20
356:6 357:4
378:2 382:1
383:20 398:18
401:4 415:8,12
433:10 443:16
443:17 447:9
471:4
**god** 240:8
**goes** 255:20
257:19 277:3
334:13 364:2
**going** 40:9
65:12 66:11
75:6 89:22 90:2
90:2,7 91:10,12
93:14 97:6
105:5,10 116:4
116:16,21
118:7 120:3,14
121:4,8,18
124:11 131:9
131:21 134:10
153:5 165:16
187:3 202:15
210:23 222:3
222:14 257:6
258:23 260:19
268:8 295:23
295:24 296:2

311:16 313:4
317:23 327:22
328:20 351:1
352:6 354:9
360:18 368:22
373:18 386:24
389:19 393:18
399:13 402:18
402:19 411:13
413:18 415:14
420:5 421:13
422:15 433:22
439:12 451:20
472:16
**golkow** 1:22
5:16 12:5
**good** 13:5 16:19
49:1 177:17
201:22 215:21
227:5 231:10
266:22 293:22
294:9 322:1
327:16,23
334:19 395:19
395:21 396:7
404:16 410:7
453:11
**goodness**
423:19
**gosh** 434:8
**gotcha** 211:15
**gotten** 463:21
**gradient** 338:4
338:11 340:2
344:3

**grand** 3:15
**grant** 372:14
**graphics** 114:9
**gray** 1:18 12:19
474:12
**great** 28:11
101:21 179:24
180:7 184:3,5
193:17 335:21
344:20 351:4
371:14 463:2
467:11
**greater** 122:23
142:24 176:4
177:5,6 237:18
247:18 262:12
271:18 290:4
348:7 361:24
376:5 379:16
**greatest** 142:17
187:21 394:5
**grey** 189:22
**gross** 362:2
**ground** 467:12
**groundbreaki...**
459:18 466:21
467:19
**grounds** 298:23
**group** 37:5
377:21 431:24
440:11
**groups** 397:6
431:17 432:6
**growing** 191:4
192:7 196:22
199:10

**guerra** 126:16
**guess** 23:7
48:13 49:2
71:18 72:18,19
88:10 183:3
236:10 242:3
260:12 334:4
384:13 402:9
411:21
**guessing**
218:22
**gustavson**
342:1 348:5
361:21 383:14
383:15,16
385:5 469:4
**gustavson's**
414:12
**guys** 323:5
450:3
**gynecologist**
179:8
**gyrus** 201:20

**h**

**h** 6:12 7:2 8:2
9:2 10:2
**ha** 124:24 292:7
**half** 38:12,14
38:15 113:15
138:17 425:2
427:14 434:9
**halfway** 207:15
390:7
**hampshire** 3:21

**[hand - hill]**

**hand** 206:18 356:14 418:12
**handed** 389:21
**handing** 13:10 33:5 70:23 280:8 308:24 385:18 406:19
**hands** 277:7 316:22 321:11 321:13,14 326:11 328:1 349:16,17
**handwritten** 7:12
**happen** 242:8 317:5
**happened** 263:5 292:4 317:6
**happening** 189:2 199:15 242:7
**happens** 240:6 240:11 246:18
**happy** 91:3 121:2 186:22 213:2 224:17 375:19
**hard** 209:8 462:7
**hardcopy** 175:16
**harlow** 116:23 217:21 220:18
**harlow's** 222:24

**heacox** 2:18
**head** 63:10 67:5 82:2 121:12 151:24 153:16 164:12 165:5 167:6,15 168:10 169:11 170:7,16 182:23 189:13 369:1 375:18 384:13 429:6
**headache** 123:1 123:9,15
**health** 40:17 61:15 62:11,13 83:19 84:20 85:3,11 107:4 156:17 422:24 430:24
**hear** 259:1
**heard** 459:4
**hearing** 322:15 326:9
**heavy** 462:14
**held** 1:16 12:9 14:18 107:1 399:2
**help** 37:5,7 45:1 50:8,14,23 51:18 54:17 55:12 56:13,15 59:14 227:12
**helped** 58:20 92:16,17
**helpful** 144:13 355:1 394:16

397:8 399:23 400:1
**helping** 45:5 59:15
**helps** 341:8
**herbert** 160:19 161:17
**hierarchy** 223:13
**high** 27:16 45:8 123:22 229:10 312:3 367:1,4
**higher** 42:9 83:11 143:3,14 145:3 146:11 201:7,8 236:23 237:12 244:6 247:1 262:6,11 264:5,6 269:22 269:23 271:17 315:7 349:6 353:16 447:6
**highest** 245:1 246:14
**highly** 138:2 211:13 460:24
**hill** 15:5,10,18 17:12,19,21 18:1,14,21 19:4 19:8,11,15,22 20:2 22:4,21 23:3,6,11 35:18 36:24 63:11,23 64:11,16,19 65:17 66:16,20 66:24 67:5,19

68:15,19 82:1 98:8 134:14 150:14 151:19 152:4 153:7 154:14,20 155:4,10,22 156:8,22 157:24 214:16 214:16,20 274:15 275:13 279:16 281:3 283:8,23 285:8 285:24 286:14 288:21 290:1 291:16,24 294:12 295:18 296:11,21 297:13 298:18 299:21 300:12 300:15,17 303:8 331:11 331:14,21 332:2,7 335:15 336:11,17,21 338:2,10 339:2 339:10 340:1 345:3,22,24 346:19 349:23 362:18 385:3,8 417:2,9,19,23 419:2,14,17 420:15 421:6 422:7 426:19 456:13,20,24 457:3 459:22 462:1,16

463:20 464:18
466:5 468:8,11
**hill's** 41:4,24
63:7 104:3,5
151:13 226:7
226:11 274:17
277:1 279:9
281:19 284:22
285:21 288:2
305:14,15,18
317:18 329:19
329:22 331:3
333:19 334:9
334:14,22
341:11 344:9
344:13 347:10
350:16 373:17
373:24 382:10
382:17 383:2
425:14 468:2
468:16,18
**hired** 55:1,12
148:16 150:8
151:4 152:8
153:8 374:4
**hispanic** 378:15
**hit** 44:12
**hmm** 15:23
49:20 60:8
91:23 103:14
122:13 125:23
133:8 136:5
156:10 183:2
205:9 220:8
229:3 235:22
254:20 256:14

261:9 268:2
309:11,16
313:6 327:17
340:9 356:4,15
357:3 370:9,15
375:2,3 391:16
**hold** 43:1,1
51:22 52:15,15
52:16 53:22,22
53:23 56:21
57:19,20 58:15
96:7 159:9
165:24,24
166:1,17,19
168:1 171:10
176:19 268:15
283:14,16
318:12 389:14
389:15 390:9,9
390:11 402:17
421:10
**holiday** 308:18
317:9
**holidays** 317:12
**homeostasis**
269:6
**hormone** 299:7
306:7
**horse** 188:21
290:18 459:9
459:10
**hospital** 408:18
**hot** 227:13
**hour** 47:10
82:21,24 83:2
309:13,15

**hours** 38:17,21
39:1,3 47:15
68:5 81:15
82:11,15 117:1
153:3 309:10
309:13 314:23
315:11,21
351:2 386:7,14
386:16 449:13
471:17
**house** 175:17
**huge** 439:16,21
**huh** 297:3
318:2
**human** 185:14
190:10 191:18
197:12 212:18
238:9,14
241:13,14
**humanly** 465:8
**humans** 187:11
244:12
**hunt** 2:10
**husband**
175:13
**hydroxy** 263:1
263:22 264:7
265:11 269:20
269:23
**hyperactive**
201:17 209:12
**hyperactivity**
7:22 20:11
177:6 200:14
200:22 201:2,5
202:2,5 207:24

208:21 209:2
209:14 210:1
372:7
**hypotheses**
215:5 265:19
271:5,7 272:1,8
272:10 273:15
273:15,18
299:22
**hypothesis**
83:16 214:24
215:3 235:14
236:1 254:12
255:4 256:6,17
256:18 257:9
257:23 263:12
263:15 264:15
265:20 267:3
267:10 270:1
271:1,9 272:5,6
272:13,16,19
273:7,20 274:4
298:23
**hypothesize**
264:18
**hypothesized**
261:12,22
262:5,8,16
264:4 270:10
270:19 271:14
**hypothesizing**
270:14
**hypothetical**
169:5 402:9
413:4,16,23
415:4 421:11

[hypothetically - incorrect]                                          Page 39

**hypothetically**
  376:19 413:7,9

**i**

**idea**  43:16
  113:2 155:9,21
  311:8 393:18
  404:22 411:2
  414:1 467:2
**identical**  282:9
**identification**
  13:7 33:2 70:20
  80:24 97:3
  113:10 194:7
  261:1 280:5
  288:6,19
  308:21 352:11
  369:24 378:23
  385:22 386:1
  399:10 406:16
  429:15 466:21
  467:19
**identified**  21:18
  24:4,11 25:22
  75:19 173:4
  194:16 341:22
  432:14
**identifies**  435:5
**identify**  106:22
  172:23 453:14
**identifying**
  247:12
**illinois**  2:13
**illustrate**
  210:24

**imagine**  311:9
  358:6 411:21
**imaging**  186:10
  200:16 201:22
**immediately**
  338:22
**impact**  137:14
  220:11,19
  221:2 358:3
  414:6
**impacted**
  417:15,16
**impacts**  184:5
  185:1 220:17
**impairments**
  188:12
**imperative**
  475:14
**implantation**
  189:10
**implicate**  327:9
**importance**
  292:23
**important**
  143:13 156:17
  278:20 281:24
  286:24 288:9
  288:21 289:19
  290:6,9,20
  291:22 295:6
  295:10,15,19
  296:17 298:15
  303:15 304:4
  305:9,15
  344:18 395:23
  409:15 444:3

451:15 456:5
  456:20,23
  457:4 458:8
  459:5 468:16
  468:17 470:23
**impossible**
  459:12
**impressed**  37:2
  39:19 41:9
  83:15,17 84:11
  84:14,18 85:1,7
  85:10
**impressive**
  160:6
**improper**  57:14
**impulsivity**
  177:6
**inattention**
  175:23 176:2,3
  176:7 177:4
**inattentive**
  209:10
**include**  87:14
  87:20 135:18
  141:22 142:1
  158:23 160:24
  161:3 225:19
  310:11 311:14
  312:2 332:22
  335:14 336:9
  367:6,10 372:5
  372:6 373:1,8
  375:2 417:1
  460:21 469:3,7
  470:1,9

**included**  23:11
  69:22 81:20,24
  132:17 140:2
  160:23 172:12
  225:20,22
  325:1 342:10
  370:17 371:11
  371:23 372:7
  387:9 417:8,18
  417:21,21
  418:1,3 419:1
  419:13 420:14
  421:2 460:16
  469:12,20,22
  470:3
**includes**  125:20
  132:8 149:8,14
  149:21 370:12
  374:5 422:8
**including**  148:6
  160:10 180:2
  277:15 306:6
  325:8 367:21
  367:23 374:6
  469:18
**incomplete**
  402:9 413:16
  415:3 421:11
**inconsistency**
  141:19 442:7
**inconsistent**
  139:21 141:9
  141:17 462:19
  463:6
**incorrect**  217:5

| | | | |
|---|---|---|---|
| **increase**  189:14 | **index**  11:2 | **induced**  187:12 | 148:5 316:1 |
| 238:24 239:23 | **indicated**  38:16 | **inflammation** | 333:2 |
| 240:13 241:7 | 61:8 93:9 306:1 | 214:14 215:10 | **informing** |
| 241:18,21 | 315:17 334:2 | 226:1 235:13 | 452:3 |
| 242:6 243:2 | 343:15 385:13 | 235:24 | **ingestion** |
| 256:16 269:19 | 418:10 420:17 | **inform**  37:8 | 443:12 |
| 314:23 357:24 | 422:22 423:13 | 284:19 314:19 | **inhibitory** |
| 367:5 393:21 | 468:14,21 | 465:16 | 190:4 |
| 442:21 443:4 | **indicates** | **information** | **initial**  40:9 |
| 443:20 444:23 | 366:24 | 20:20 45:10 | 314:14 315:4 |
| 448:21 | **indication** | 51:7 61:9,13 | 321:3 368:1,2 |
| **increased**  31:3 | 386:19 | 62:9,14,15,22 | 425:6 |
| 201:12 207:23 | **indications** | 63:5 78:14,22 | **initially**  47:20 |
| 257:10 265:3 | 122:23 | 80:8 83:21 | 438:4 |
| 267:6 269:8 | **indicator** | 88:13 93:22 | **injury**  123:10 |
| 285:16 292:23 | 401:22 406:24 | 94:1,15 103:23 | **inoue**  340:6,23 |
| 348:14,15,16 | 410:8 412:11 | 109:13,16,18 | 342:22 345:11 |
| 348:17 358:19 | **indirect**  200:24 | 110:11 112:2 | 345:14 346:12 |
| 358:21 362:6 | 208:7 210:6 | 114:11 117:13 | **inquiries**  307:4 |
| 362:14,19 | **indirectly** | 117:23 124:8 | 307:9 |
| 363:3,11 | 245:17 | 131:20 132:16 | **inside**  108:22 |
| 364:17,24 | **individual** | 153:21 174:13 | **insofar**  193:12 |
| 365:10 366:5 | 73:24 433:22 | 174:18 175:3 | 284:10 372:16 |
| 366:15,17,21 | 438:4 | 198:10 201:3 | **instance**  42:8 |
| 446:18 448:15 | **individual's** | 208:9 212:1 | 196:5 299:6 |
| **increases** | 251:6 | 222:13,16 | 358:12 |
| 123:15 189:24 | **individually** | 310:10 316:22 | **instances** |
| 190:18 241:3 | 16:1 | 330:12 362:11 | 129:10,14 |
| 409:17 448:3,9 | **individuals** | 406:7 409:8 | 466:15 |
| **increasing** | 43:13 44:14 | 415:6 429:8,10 | **instruct**  327:11 |
| 251:5 | 125:16 160:3 | 436:6 438:2,21 | **instructed** |
| **incredibly** | 160:24 203:21 | 440:16 444:3 | 74:11 319:8,23 |
| 39:15 363:15 | 235:19 246:1,6 | 451:11,16 | 320:13 |
| **independent** | 247:2 254:4 | **informed**  64:17 | **instructing** |
| 170:5 335:13 | 257:11 258:3 | 65:17 67:10,10 | 311:1 321:7 |
| 336:8 438:22 | | 82:5 85:13 | 326:18 |

**instruction**
46:14 319:12
319:14,16
321:5,9
**instructions**
46:16 318:23
319:11 321:4
324:9 475:1
**intake** 408:10
412:19
**intellectual** 9:8
9:13 386:9
388:24
**intended**
211:15 380:11
**interact** 252:5
253:10,13,16
253:22
**interacted**
127:6
**interacting**
438:5
**interaction**
47:23 126:7,10
246:12,22,24
247:5,6,13
248:17,23
**interest** 93:9
188:7 420:18
**interested**
75:14 93:20
**interesting**
187:15 393:19
**interference**
177:9

**interfering**
257:18
**internal** 141:18
181:17 343:23
442:7
**internalizing**
353:15 358:21
362:3,7 367:17
372:19
**internally**
139:20
**interneurons**
189:22 190:19
**interpret** 181:7
334:7 363:8
365:8 366:2,12
391:7
**interpretation**
303:4 353:1
357:6 358:7
360:4
**interpreted**
214:20 334:4
**interpreting**
303:1,3
**interrelations...**
439:4
**interrupt** 166:3
**interrupting**
57:21,22
**interval** 210:5
348:10 363:9
364:1,11,19
365:9,17,20
366:3,9,14,23

**interview** 13:13
13:17,21 14:21
20:15,20 32:4
32:18,19 34:3
43:24 69:13
86:5 88:11
92:23 425:19
429:22 430:3,5
**interviewed**
425:15
**interviewer**
21:1 87:7
**interviewing**
34:10
**interviews**
69:13 92:8
107:17 154:22
**introduced**
77:17
**introduction**
46:1 50:4
456:15,17
**invaluable** 92:2
92:8,21
**inventory**
370:19
**investigate**
183:15 392:15
394:22
**investigated**
132:18 255:13
**investigating**
162:23 184:23
**investigation**
266:11 409:5

**invoice** 70:1
309:8,18 312:4
314:11 471:15
471:18
**invoiced** 96:21
**invoices** 8:10
46:6 69:19 70:2
75:16 76:1,3
81:6 309:2,5
310:3 311:13
312:2,18 316:5
324:2 471:4
**involve** 160:2
160:22 197:4
**involved** 59:15
59:21 67:7
74:20 80:11,13
84:7,8 94:22
127:9,10 254:7
267:11 299:13
412:6 413:10
414:22 439:2
**involves** 190:21
196:14 198:19
226:14 227:7
228:17
**involving** 80:9
172:8,10
260:21
**issue** 152:23
156:17 418:11
**issues** 65:9
111:11 180:7
367:16 380:22
424:5 438:1

**j**

**j** 3:9
**j.j.** 2:3 154:3
 193:24 309:18
 317:3 359:17
 430:16 460:3
**jama** 9:9
 386:12,15
 388:16
**january** 312:9
 324:5 471:8,10
**jersey** 4:12
**jessica** 4:10
**jessica.brennan**
 4:13
**ji** 255:19
 341:24,24
 457:22
**jj.snidow** 2:6
**jjci** 4:8,14,20
 431:19
**jmasterman**
 3:22
**job** 114:7,8,10
 301:20 439:3,6
 439:9
**jog** 106:19
**johnson** 1:9,9
 4:8,8,14,14,20
 4:20 280:18,18
**johnstone** 2:19
**join** 80:8
**joined** 50:7,22
 51:18 54:17
 56:13 59:13

**joseph** 3:20
**journal** 388:18
**journalists**
 92:24
**judge** 1:6
 148:22 151:21
 306:20,23
 307:23 319:24
 320:3,7,13
 321:8,11
 324:13 325:4,7
 328:8 331:15
 331:22 332:5
 333:3,16
 334:20
**judge's** 322:9
 336:15 420:24
**judgment** 43:6
**judicial** 322:6
 322:21,24
**july** 71:3 73:15
 82:18 313:10
 313:20 432:13
 433:12 434:14
 435:2 471:5
**june** 82:18
**jury** 322:19
**justice** 6:22
 7:15 37:10
 69:18 77:16
 78:7,11,18
 79:10,16,24
 80:5,7,15 84:7
 85:18 94:4,22
 95:12,17,24
 96:4,15,19

 109:4,11,19
 112:23 113:14
 113:19 127:18
 128:1 134:10
 146:9 217:3,9
 222:15 426:9
 426:12,17
 429:24 430:7
 430:21 431:3
 432:19,24
 433:2 434:4
 435:7,18
 436:15,19
 437:1,8,10,17
 437:24 438:24
 451:9
**justice's** 95:9

**k**

**kansas** 3:16
**keep** 48:12
 98:12 105:10
 121:8,18
 122:18 124:10
 266:9 307:18
**keller** 2:2,8,8
 81:13,14
**kellerpostma...**
 2:6,14,15,15,16
**ken** 214:17
 285:1
**kept** 48:13
**kershaw** 3:8
**key** 291:18
**kidney** 299:10

**kind** 34:18 41:3
 77:3,10 130:13
 163:10 185:20
 196:9 247:10
 286:3 293:19
**kinds** 161:1
 209:10
**king** 2:11 5:8
**kirk** 3:19
**knew** 87:8
 438:24
**know** 26:18,20
 36:2,23 37:11
 37:14 38:22
 43:11,20 44:12
 44:17,18 48:21
 49:4 57:5,14
 58:17 61:16
 64:21 69:6
 70:14 71:22
 72:4,16 77:14
 80:6 83:1 84:8
 87:6,14 88:12
 95:16 96:15,24
 103:2,9,22
 104:1 112:22
 112:24 113:4,5
 115:5,9 117:22
 119:1,3 121:6
 122:15 124:16
 124:21 125:15
 125:19 126:19
 126:24 127:3
 128:14 132:23
 144:4,5 146:8
 153:24 164:11

164:13,14
165:12 167:2
167:21 168:2,9
176:12 182:3
182:21 184:14
196:6 198:23
199:5 200:4
202:7,19 203:1
203:11,13,20
204:1,3 205:1,3
205:14,21
211:3,14 212:2
212:3 227:8
228:2,5,6
230:24 231:7,8
231:13 233:15
233:18,20
236:13,22
237:6,7 240:6
241:12,22
243:9 258:6
273:12 277:2
287:7 293:19
297:7 298:9
305:6 308:9,10
316:4,12 320:5
320:6 322:19
323:19 325:19
326:23 328:4,5
328:18 329:1,5
344:15 346:8
352:19 355:14
359:17 367:8
368:8,24
371:16,21
372:13 373:18

375:14,18
376:9,12
381:11 382:24
384:6 387:20
401:12 402:10
405:23 410:17
410:23 411:22
411:23 413:18
421:24 426:13
427:4 429:6
431:20 445:8
445:20 446:1
447:13 452:12
**knowledge**
206:24 210:17
244:10 424:17
**known** 36:18
126:4,23 263:1
265:11 400:12
**knows** 434:8
**kolk** 195:17
**kslaw.com** 5:11
**ktblegal.com**
3:12

**l**

**l** 1:18 4:10
122:22 222:4,4
400:23 474:12
**label** 101:10
102:18 451:6
**labeled** 35:19
99:8
**labor** 407:8,14
408:19,22
409:21

**lack** 107:3
**laid** 152:1
**langseth** 334:13
**language** 92:18
101:8 102:12
102:14,16
144:22 145:24
146:1,4,5 278:3
281:7 285:7
292:12 296:11
301:11 302:4
302:23 303:13
305:18 333:23
436:5 445:16
**lanier** 1:17 2:18
**lanierlawfirm...**
2:22,22
**large** 364:17
375:8
**larger** 131:2
210:8
**largest** 388:12
**late** 158:17
160:16 163:14
191:22
**laue** 9:22
400:23 402:1,5
402:16 403:1
404:12,13
406:3,21 415:1
**laughing**
402:11
**launch** 118:17
118:21
**launching**
119:15,15

**law** 1:17 3:3
73:24 74:11,15
78:2,7 126:19
126:22 334:5,7
433:22
**lawsuit** 45:2
80:8
**lawsuits** 10:8
36:4 50:16
429:21 431:18
436:20 437:2
**lawyer** 37:9
44:3 45:20
46:24 49:11,22
60:19 84:4
314:12
**lawyer's** 478:1
**lawyers** 36:4
38:11 49:8
50:14 55:13
56:15 59:15
75:1,20 84:1
87:2 97:16,20
104:8 314:23
425:24 426:4
431:8,18,24
432:15 435:6
436:20 437:11
465:20
**layers** 189:11
190:15
**lbosso** 5:11
**le** 3:8
**lead** 28:16 29:4
160:13,15
161:13,20,22

161:22 163:13
163:17,23
164:8 257:2
**leading** 221:11
**leads** 221:8
257:5 264:3
448:15
**learn** 44:13,21
411:6
**learned** 37:8
83:22 286:6
**leave** 205:19
316:8
**leaving** 316:19
**lecturing**
172:20
**led** 269:18
**lee** 3:9 5:3
**left** 161:18
206:18 218:3,4
309:24 315:18
316:4,22
351:14 356:14
**legal** 12:4
321:17,19,24
325:2 334:3
337:3,4 420:23
**legalese** 325:1
**legally** 330:9
**legitimately**
444:10,16
**length** 189:24
190:18 214:20
225:21,24
245:8 256:3
287:17 300:16

300:17 333:8
337:15
**letter** 7:9 48:6,9
76:13 77:10
81:4 100:15
102:6,17
312:20 326:24
**level** 161:13
163:17,24
164:8 229:10
243:7 247:1
312:3
**levels** 27:16
123:23 161:22
163:13 237:18
238:2,24
239:23 240:13
242:6,12,13
243:2 257:9,10
264:6,7 265:3
267:6,11
269:22 353:16
**liability** 1:3
7:10 12:12
**licensed** 158:13
**liew** 341:23,24
**life** 424:6,19
428:21
**likely** 20:4
22:16 226:10
249:12,13,14
249:16 250:16
252:14 253:4
364:21
**limit** 348:24
349:2

**limitation**
399:18 400:18
401:6 402:6
403:3
**limited** 50:9
51:1,3 52:3,7
52:23 54:12
56:8 58:23
59:22 67:20
79:16 336:17
403:2 409:7,19
435:18
**limits** 221:9
**lindsey** 3:14
**line** 11:6,6,6,9,9
11:9,12,12,12
11:15,15,15
339:17 348:22
434:21 476:4
478:2
**link** 6:18 22:17
39:13,15 40:22
93:17 207:22
235:12 430:20
**linked** 20:8
221:11 437:1
437:10
**linking** 221:4
**lips** 239:20
**list** 136:19
171:6 218:11
274:17 281:18
337:9 370:14
**listed** 37:18
113:21 119:4
432:23

**listen** 304:11
365:2
**literally** 29:11
247:14,16
302:9 319:16
**literate** 38:23
**literature** 18:16
36:20,22 38:3,6
38:19 39:5,9,21
40:2 46:7,11,15
47:16,20,22
60:20 69:9,23
79:2 80:21,22
81:21 84:12,15
84:19 85:2,4
99:24 111:10
141:2 147:19
148:21 149:5
150:22 151:2
207:7 215:6
227:3 228:9,11
228:22 238:2
238:13 243:23
244:8,20,21
245:13,14
277:6 279:8
287:19 294:1
302:2,6,21
306:15 314:15
316:1 334:13
346:4,5,6,7
352:3 357:8
370:12 382:18
396:17 397:5
418:8 425:7
438:17 439:7

| | | | |
|---|---|---|---|
| 439:14 454:21 | **lobe**  189:6,7 | 89:12 100:4 | 381:7 387:6,15 |
| 456:14 462:6 | **located**  227:20 | 104:20 106:21 | 388:4,15 |
| **litigation**  1:3 | 228:7 | 111:10 112:15 | 390:21 391:13 |
| 7:10 12:5,13 | **logically**  459:12 | 112:20 113:7 | 391:24 394:2,4 |
| 39:8 40:3 50:10 | **logistical** | 114:8,16 115:6 | 395:3,4 396:17 |
| 52:9 53:1 54:18 | 192:17 | 115:14 121:5 | 404:22 429:2 |
| 55:13 56:16 | **logistics**  234:8 | 133:14 141:9 | 433:6 438:17 |
| 59:16 70:7 74:1 | **long**  29:11 | 146:18 149:1 | 441:24 457:15 |
| 98:5,11,17 | 107:2,11 | 157:18 164:10 | 457:16 458:19 |
| 99:11 105:20 | 122:11 123:18 | 165:15,16 | 462:5,9,22 |
| 108:4 126:2 | 124:9 148:12 | 169:8 170:4 | **looked**  18:3,5 |
| 127:14 150:15 | 243:17 284:18 | 182:17 183:5 | 18:16 20:3 26:5 |
| 152:2 225:12 | 287:23 323:22 | 183:10 187:4 | 40:2 43:18 47:9 |
| 277:11,21 | 356:23 357:9 | 200:7 203:10 | 68:16,19 80:20 |
| 280:14,18 | 427:23 440:14 | 203:18 205:5 | 80:21 82:7 |
| 281:2 303:24 | 440:22 441:15 | 206:12,15 | 88:24 103:20 |
| 308:14 313:19 | 441:17 442:12 | 207:9 216:21 | 103:24 114:18 |
| 313:24 314:11 | 447:4,20 448:2 | 218:2 230:1,8 | 114:22 115:1 |
| 420:8 431:9 | **longer**  42:8 | 258:15,20 | 115:22 141:6 |
| 435:15 436:12 | 142:16 145:2,9 | 259:6,16 | 142:4 143:2 |
| 437:20,22 | 145:17 146:12 | 276:18 281:15 | 145:1 151:2 |
| 438:13 439:2 | 235:16 243:13 | 287:11 292:18 | 153:16 158:1 |
| 468:13 471:7 | 244:5,24 | 304:18 320:5 | 180:9 184:1 |
| **little**  158:5 | 290:21 361:24 | 339:21 345:5 | 217:19 219:19 |
| 250:5 312:21 | **longest**  244:22 | 350:15 351:24 | 272:13 285:6,7 |
| 320:21 397:11 | 441:3,8,12 | 352:24 353:7,9 | 320:3 367:21 |
| 457:7 | **longitudinal** | 358:12,24 | 372:19 373:2 |
| **liver**  229:6 | 439:16,21 | 359:3 363:17 | 376:18 392:20 |
| 233:21 234:2 | **look**  28:3 32:23 | 363:19 367:23 | 410:21 431:22 |
| 236:8,19,24 | 33:15 36:19,21 | 370:10 372:16 | 439:24 447:10 |
| 237:12,14,18 | 37:15 38:3 40:5 | 372:18,23 | 461:8 463:22 |
| 242:9,13 | 42:7 45:13 | 373:10 375:10 | 464:11,14,23 |
| 256:14 | 46:10,15 47:8 | 375:12,19 | **looking**  14:6 |
| **llc**  2:2,8 | 47:20,21 48:16 | 376:1,4,10,14 | 22:14 26:15 |
| **llp**  3:3 4:3,10 | 49:23 60:20 | 378:16 379:12 | 36:23 38:6,19 |
| 4:16 5:2,8 | 70:12 79:4,13 | 380:5,11 381:3 | 44:6,8,10 47:16 |

**[looking - make]**

49:15,19 60:4
66:16,20,24
69:9 88:22
105:16 114:5
115:18 125:3
139:5 140:3,4
141:2,4 147:4
149:19 151:20
152:4,6 153:7
158:1 161:20
165:2 166:6
167:13 170:6
180:8,12,17
182:2,4,5
186:24 230:14
239:3,7,13,17
254:2 256:8
257:8 261:18
265:23 266:1
296:8,10 297:8
297:11,14,18
297:22 302:1,6
302:20 314:15
341:10 359:7
359:10 377:9
384:18 400:2
405:7,9,12,15
405:17 441:11
448:17 463:16
**looks**  99:7
101:13 108:16
247:5 312:20
387:21
**looped**  131:19
219:12

**lost**  77:6
**lot**  31:17
316:13 362:16
417:11 422:22
463:15
**low**  8:17 366:24
367:3 393:11
**lower**  267:10
348:23 349:5
**lowest**  348:19
349:2 393:13
393:16
**lscarcello**  3:17
**luke**  5:8
**lunch**  91:7,10
**luncheon**
234:20

**m**

**m**  4:3
**m.d.**  1:16 6:5
12:22 474:8
477:16
**m.p.h.**  1:16 6:5
12:22 474:8
477:16
**ma'am**  53:14
91:17 120:22
123:19 124:18
149:3 158:7
166:14 168:15
169:14 170:1
186:5,7 191:11
206:22 207:19
231:22 232:5
232:10 239:6

240:4,16
264:11 265:5
265:16 267:5
268:1,5,7 270:4
270:16 271:6
280:15 282:14
287:23 295:21
296:22 298:12
300:14 301:15
302:7 304:9
372:24 392:2
397:14 419:22
428:8 434:10
466:19
**made**  35:12
46:10 63:9
64:17 65:9,13
65:16 81:13
82:6 112:4,8
132:17 171:9
294:6 319:22
333:1,13
421:13 447:14
475:7
**madison**  1:17
2:20 4:17 12:9
**magnitude**
299:18 440:6
442:9
**mail**  6:20 33:17
35:24 37:18
43:9,17,19 44:7
44:8 45:15
48:17 49:14,17
49:18 51:10,17
54:11,14,16

59:13 86:18
88:18 90:13,17
91:19 108:7,15
110:1 114:21
115:22 116:3
117:15 124:13
125:4,5,20
127:17,24
128:6,12,18,21
129:8 133:3
138:8 140:12
140:24 142:11
143:11 147:4
216:22 218:5
218:10,15,16
218:23 219:4,9
219:24 227:17
472:4
**mailed**  225:2
**mailing**  89:7,24
91:1
**mails**  33:6
48:14 58:14
88:20,22 89:17
91:3 115:18
120:15 124:13
426:5 472:2
**maintain**  74:12
**major**  141:23
142:3 168:6
275:2 282:3,21
**majority**
344:21 371:15
442:11
**make**  37:7 50:3
58:23 62:22

**[make - means]**                                                    Page 47

63:4 83:20
85:13 87:8 90:7
90:11 109:14
114:10 141:24
156:22 234:5
250:7 303:5
399:13 414:8
414:23 458:9
475:4
**makes**   214:24
242:8 399:7
458:10 459:14
**making**   18:6
74:19 117:12
373:16 412:8
**male**   187:13
**manhattan**   4:5
**manifest**   189:5
**march**   82:14
284:14
**mark**   97:6
113:13 193:15
194:12 260:20
352:7
**marked**   11:14
13:6,11,16 33:1
33:7,11 70:19
70:24 80:23
97:2 108:7
113:9 146:24
147:1 173:15
193:20 194:6
195:11 205:11
216:23 235:11
260:24 274:9
280:4,9 294:15

308:20 309:1
312:19 316:2
323:23 352:10
369:23 378:22
382:5 385:19
385:21,24
386:21 397:16
399:9 406:15
406:20 429:14
433:9 455:11
455:13,15
**marker**   394:10
**markers**   254:9
255:15 268:5
269:1,3 457:16
457:17
**marking**   81:3
379:2
**mart**   5:12
**masarwa**
416:13,20
417:3,8,10,18
419:1,7,13
420:14 421:2
**masterman**
3:20
**match**   131:16
**materials**
325:19
**maternal**
179:10,14
396:11 397:4,4
399:19 400:15
401:23 404:7
407:24,24
408:13,15

412:19
**math**   82:21
**matter**   12:10
189:22 199:2
319:3 413:22
414:4
**mature**   189:23
190:16
**mcharchalis**
4:19
**md**   1:4
**mdl**   1:3
**meadows**   48:20
124:22
**meagher**   4:2
**mean**   14:24
15:2 18:20
21:10,12,19
23:4,5,15,20
26:11 29:8
30:14,20 40:16
48:2,13 55:5
62:18 70:1
78:13,23 88:20
93:7 96:16
98:13,16 99:5
99:12,16
101:16,20
103:8,22
104:15 105:23
106:13,17,20
117:21 124:7
127:4,7 128:11
130:12 133:18
144:5 149:23
154:11 176:13

176:15 184:8
184:10 201:19
236:9,12,14
237:22 240:6,9
245:18 246:5
249:12 252:5
254:5 287:5
302:12,13
310:7,12 315:9
327:19 328:7
330:1 331:24
332:1,20
346:16 347:3
347:21 348:12
354:15,16
355:3,8 371:5
371:15 390:3,6
394:7 395:10
401:12 408:20
409:11 411:17
413:24 425:13
431:20 434:8
436:23 437:13
443:7,8,11
451:22 452:15
453:1 456:16
459:11 461:1
464:21 470:19
**meaning**
364:14 389:12
443:22,23
**meaningful**
137:17
**means**   15:5
106:7 276:16
338:6 346:20

364:3,19
365:18 390:21
474:20
**meant** 23:8
29:10 58:22
302:11 303:2,5
368:17 425:12
463:15
**measure** 200:4
261:17
**measured** 9:17
334:22
**measures**
137:23 244:8
393:3
**mechanism**
213:6 214:9
223:19,21
224:1,8 225:14
225:23 226:23
228:13 229:12
230:15 231:3
231:13 263:19
273:8
**mechanisms**
213:9 214:12
214:13 215:16
215:23 216:2
216:10,12
221:23
**meconium** 9:17
9:20 182:13,14
182:15,22
183:14 200:4
201:10,12
399:21 400:12

400:17 401:22
404:9 406:23
407:10,21
408:11,16,23
409:1 412:10
**media** 40:8
69:22 85:24
86:3 118:16,21
119:21 135:14
**median** 366:17
**mediate** 208:7
255:11 262:19
**mediated**
200:20 201:1
255:15 266:5,6
**mediation**
200:11,12,23
207:17,20
210:6 270:17
271:8
**medical** 178:18
388:18 408:18
**medicine**
158:13 159:22
179:15 181:17
184:24 185:21
299:2 443:12
**medicines**
184:19
**meet** 49:12
**meeting** 41:10
279:9,9 305:20
**member** 159:5
179:13
**memorized**
204:8,10

**memory** 72:16
106:6,19 168:4
170:10 176:22
203:4 230:20
233:12 329:13
329:14 330:4
**mentioned** 27:8
361:6 374:22
375:3
**merely** 298:23
**message** 110:8
**messages** 92:3
92:22
**met** 18:18,19
41:7,8 42:5,19
42:22 43:5
45:24 63:6
126:11,12
226:12 277:9
278:20 280:20
466:8
**meta** 41:22,23
337:21 342:6
416:8,17,21
441:6
**metaanalysis**
342:3
**metabolism**
257:6,19
**metabolites**
400:13
**metabolized**
256:21
**methionine**
261:23 262:9
266:4 271:15

**method** 200:18
**methodological**
266:23
**methodologic...**
334:17,18
**methodology**
329:17
**methods** 342:7
**mice** 187:13
**michael** 48:19
124:22
**michelle** 1:18
12:19 474:12
**microphone**
121:20
**mid** 189:19
191:2 192:5
193:7 195:13
196:21
**middle** 27:1
261:11 268:14
271:13 340:22
356:21 416:9
**midpoint**
364:20
**migraine** 123:1
**mild** 42:2 300:1
303:17
**million** 387:10
**mind** 19:2,5,16
20:2 23:8
177:16 293:5
336:2 376:21
430:15 441:16
445:7,20
446:14 447:17

**[mind - n]**                                                     Page 49

448:1 452:15
455:16
**mine** 398:13
**minimum**
442:14,20
443:2
**minority**
442:12
**minute** 121:15
121:17,18
164:24 182:20
389:7 390:20
391:22 404:23
450:2
**minutes** 120:3
167:5 168:12
206:12 449:7,8
449:10 452:11
**misbelieved**
367:12
**mischaracteri...**
144:19 232:4
248:3 279:20
468:6
**mischaracteri...**
232:1 303:6
**mischaracteri...**
29:22 146:4,5
**mischaracteri...**
291:3,5
**misclassificat...**
408:4 417:14
418:12 419:9
419:20
**misclassified**
408:2,3

**misleading**
211:13
**misquoted**
366:6
**misreading**
398:14
**missed** 368:1
**missing** 371:14
**mission** 13:22
**missouri** 3:16
**misstate** 409:11
**misstates**
144:16 151:8
451:2
**mistake** 406:11
**misunderstan...**
47:19
**misunderstood**
153:1
**mitchell** 4:16
**mitochondrial**
264:2
**mm** 15:23
49:20 60:8
91:23 103:14
122:13 125:23
133:8 136:5
156:10 205:9
220:8 229:3
235:22 254:20
256:14 261:9
268:2 309:11
309:16 313:6
327:17 340:9
356:4,15 357:3
370:9,15 375:2

375:3 391:16
**moba** 122:24
353:2,5,11
354:11,18,22
355:12,12,21
355:24 356:1,4
356:7,17 357:8
**mode** 201:15
**model** 348:22
**models** 201:3
238:5 241:12
389:2,24
**moderate** 42:2
42:12 300:2
303:17 465:24
466:8,16
**modest** 303:19
442:10
**modifiable**
24:13,17 451:5
**moment** 33:9
141:16 238:7
341:6
**money** 76:21
**monte** 200:18
**month** 142:17
142:23
**months** 371:3
373:3,3,10
**mood** 177:11
**morning** 13:5
292:7
**morristown**
4:12
**mota** 1:8

**mother** 131:3
**mother's** 29:16
**motor** 362:2
**move** 55:6
100:12 116:2
214:6 268:8
**moving** 58:13
102:4 121:18
122:18 168:10
433:8
**mri** 186:10
200:16 201:21
203:22 210:7
**mris** 204:23
205:13
**multi** 249:11
**multifactorial**
249:15 253:8
**multiple** 21:12
154:21 155:17
198:19,20
199:7,14
304:10
**multiplicative**
247:15 251:2
251:12
**multitude**
101:22 212:23
213:3 253:7,9
**mystery** 408:21

**n**

**n** 6:2 122:22
222:4 234:23
234:23,23
255:13,13

**[n - ness]**

Page 50

| | | | |
|---|---|---|---|
| 412:17,24 | 215:1,2 231:22 | 9:19 10:6 12:15 | 194:7,12 |
| **n.w.** 2:4 3:21 | 234:7 262:13 | 12:22 13:5,7,11 | 206:16 212:13 |
| 5:4 | 263:10 271:19 | 13:12,17 15:8 | 213:23 215:15 |
| **name** 12:3 20:9 | 302:3,21 303:7 | 26:17,17 27:9 | 216:22,23 |
| 95:9 | 304:22,24 | 31:13,15 33:2,5 | 218:3 226:14 |
| **named** 36:18 | 307:20 310:8 | 33:7,10,16 40:8 | 229:9,15 235:8 |
| 94:21 | 314:19 315:15 | 43:2 44:9 45:14 | 239:4 241:2 |
| **naming** 94:23 | 333:21 334:1 | 49:3,12 52:16 | 247:21 255:23 |
| **napqi** 235:18 | 384:17,20 | 53:18 54:1,11 | 260:18 261:1,4 |
| 245:21 256:10 | 390:20 405:5 | 55:1 56:4,22 | 263:6 264:24 |
| 256:16,24 | 427:22 445:15 | 57:7,24 58:18 | 280:5,9 297:11 |
| 257:2,5,6,10,20 | 453:14,17 | 59:11,19 61:18 | 308:21,24 |
| 258:1 260:23 | **needed** 63:5 | 64:5 65:23 70:5 | 309:1 326:14 |
| 264:1 273:9 | 210:9 236:7,18 | 70:20,23,24 | 339:23 349:20 |
| **national** 118:16 | 294:1 315:23 | 71:17 72:15 | 351:14 352:11 |
| 118:20 384:22 | **needleman** | 75:15 80:24 | 359:6,9,20 |
| **nationwide** | 160:19 161:17 | 81:8 90:15 | 360:18 369:24 |
| 387:7 | **needs** 84:23 | 91:16 93:24 | 370:3,10,11 |
| **natural** 221:10 | 165:15 214:23 | 97:3,7 98:2,4 | 378:23 379:2 |
| **nature** 265:21 | 401:15 446:17 | 105:14 106:23 | 385:18,19,20 |
| 312:3,7 | 451:17 | 112:15 113:10 | 385:22 386:1 |
| **nbc** 447:18 | **negative** 30:7 | 116:10,14 | 386:11 387:16 |
| **necessarily** | 201:12 220:19 | 120:14 128:3 | 390:2 391:19 |
| 246:17 250:2 | 358:3 396:12 | 129:23 130:24 | 392:13 394:20 |
| 272:10 | 463:24 | 131:7 132:14 | 397:13 399:10 |
| **necessary** | **negotiate** 83:7 | 132:24 139:2 | 399:15 406:16 |
| 38:20 262:1 | **negotiated** | 140:2,23 | 415:5 416:3 |
| 286:16 305:20 | 76:10 83:5,6,9 | 142:11,22 | 429:15 430:21 |
| 316:15 415:7 | **neither** 362:17 | 144:12 146:24 | 433:9 439:15 |
| 442:15 475:4 | **nervous** 189:8 | 149:2 152:22 | 440:8 444:11 |
| **need** 28:3 53:14 | **ness** 1:16 6:5,16 | 155:2 158:4 | 449:18 450:16 |
| 54:1 55:23 | 6:20,23 7:6,7,8 | 165:1,19 166:6 | 465:10,15 |
| 58:10 107:4 | 7:11,13,13,14 | 167:3 173:13 | 471:3 472:11 |
| 152:24 165:10 | 7:17,19 8:6,7,9 | 179:3 181:15 | 472:14 474:8 |
| 170:20 182:17 | 8:10,11,12,16 | 182:18 187:3 | 477:16 |
| 194:1 213:22 | 8:20 9:6,10,15 | 190:5 193:5 | |

**nested** 342:1
**network** 201:15
**networks** 190:4
**neurodevelop...**
  8:22 17:7,14
  19:13 35:1,6
  39:22 63:12
  64:20 65:18
  67:8 71:10
  73:23 132:19
  134:15 137:14
  152:6 172:18
  180:19 183:15
  185:2 188:3,16
  192:2,4 195:13
  196:20 197:20
  198:11 236:11
  357:9 433:15
  435:11 438:9
**neurodevelop...**
  8:14,17 17:5,10
  17:18 19:16,24
  21:14 23:10
  34:20 119:24
  132:22 134:2
  172:12,13
  194:22 314:16
  422:9 438:18
**neuroimaging**
  189:5
**neurologic** 29:5
**neurological**
  28:16
**neurons** 189:14
  189:17,21
  191:3 192:6

196:22 221:4
221:11
**neurotropic**
  221:3 223:18
**never** 15:8 22:4
  34:11 35:5
  129:24 131:1
  181:18 182:9
  266:19 268:11
  348:21 382:11
  383:5 410:11
  443:23 448:5
  452:22 457:13
  465:16 470:1
**new** 1:1,17,17
  2:21,21 3:21
  4:6,6,12,18,18
  12:10,10 60:3
  93:8 137:6
  293:24 301:16
  302:2,6,13,20
  303:7 468:12
  468:14 472:17
**newfound**
  83:20
**news** 431:7
**nice** 115:11
  449:15
**nine** 274:17
  341:22
**non** 24:17
  290:13 305:19
  468:22
**nondiagnostic**
  149:15 335:14
  336:10 337:7

340:6 341:5
342:23 344:4
344:14 345:16
345:21 346:17
347:19 349:9
349:22 350:6
350:14 351:16
351:19 374:6
416:16,22
460:13,17
**nonexpert**
  427:11
**nope** 186:18
**normal** 82:22
  82:23 177:10
**north** 2:12
**norwegian**
  122:24
**notably** 274:24
  282:2,20
  348:14
**notary** 1:20
  474:14 477:23
**note** 62:3 150:3
  330:24 348:4
  404:11,12
**notebook** 97:19
  97:21,23 98:3
  98:10,12,14,16
  98:20,23 99:3,6
  99:10,13
  149:18
**noted** 12:16
  187:21 284:2
  284:24 316:2
  475:11 477:11

**notes** 7:12 97:7
  97:12,15 99:23
  100:21 130:13
  130:18 133:11
  134:19 147:2,8
  147:18 148:8
  148:11,15,20
  149:2 150:20
  153:21 154:16
  157:8,21
  173:14 177:19
  178:13 209:4,8
  294:6,11 316:2
  351:20 352:1
  359:1 368:7
  369:20 370:6
  374:11,12
  377:10 440:5
  478:1
**notice** 1:16
**noticed** 100:12
  367:9
**noting** 174:13
**notion** 274:3
**notochord**
  189:12
**novel** 9:20
  210:10,14
**null** 408:4
**number** 38:17
  38:21 47:15
  70:15 116:21
  117:24 118:14
  131:2 136:3
  137:5 138:23
  143:1 162:5

**[number - occur]**                                          Page 52

| | | | |
|---|---|---|---|
| 189:13,14 | **oath**  288:6,19 | 139:8,9,10 | 286:20 289:7 |
| 204:22 213:8 | 289:11 314:14 | 140:17 141:12 | 290:24 291:9 |
| 214:11 221:23 | **object**  43:2 | 143:8,19 144:8 | 307:10 317:22 |
| 222:10 226:13 | 65:21 73:11 | 144:15 145:20 | 335:7,18,24 |
| 227:7 236:21 | 85:6 165:6 | 146:13 147:12 | 337:11,12 |
| 243:20,22 | 166:3 206:10 | 149:11 150:10 | 363:12 365:11 |
| 285:2 299:5 | 328:21 329:24 | 151:7 152:10 | 390:18 396:22 |
| 310:19 312:24 | 354:5 374:8 | 153:10 155:12 | 402:7,8 409:22 |
| 315:11,21 | **objection**  22:7 | 155:24 167:17 | 411:10 412:12 |
| 324:14 331:18 | 23:13,22 25:5 | 167:23 168:7 | 413:15 415:2 |
| 338:11,21 | 26:2 29:21 31:6 | 170:9 173:7 | 418:19 420:9 |
| 348:2 353:5 | 32:5 36:7 41:12 | 174:20 176:9 | 421:9,10,12,20 |
| 354:17 355:12 | 42:24 43:3 45:3 | 176:20 177:14 | 444:12 445:22 |
| 355:21 356:1,4 | 50:17,18 51:12 | 178:8,20 179:1 | 447:22 448:23 |
| 363:20 369:13 | 51:21,23 52:11 | 181:21 190:11 | 451:1 454:5,24 |
| 374:5 375:8 | 52:17 53:2,16 | 197:22 198:16 | 457:19,23 |
| 378:19 379:9 | 54:19 55:2,15 | 202:11,14,20 | **objections** |
| 379:20 380:16 | 56:17,23 57:1 | 203:2,6,8,24 | 57:13 |
| 381:14,22 | 57:15 59:17 | 205:17,18,20 | **observational** |
| 388:5,7 395:17 | 60:21 62:1 | 205:21 208:18 | 341:23 348:21 |
| 399:5 413:10 | 63:14 64:3 | 210:23 211:1 | **observed** |
| 423:21 440:5 | 65:20 66:9 | 212:5 216:13 | 247:10 298:24 |
| 441:1,7 442:3 | 67:13,22 68:23 | 217:11 221:18 | 299:22 357:1 |
| 447:2 454:1 | 72:13 75:4,7 | 222:21 223:6 | 389:2,23 |
| **numbers**  99:8 | 76:15 85:5,19 | 224:10 225:5 | **obstetrician** |
| 131:13 238:7 | 86:6,19 87:21 | 229:13 230:17 | 179:4,6 |
| 364:4 | 88:4,6 89:3,8 | 237:1,20 | **obtained** |
| **nw**  5:9 | 90:19,22 92:10 | 238:21 240:21 | 208:10 364:7 |
| **nyt**  93:2 | 94:5,18 95:3,18 | 242:15 248:7 | **obviously**  72:17 |
| **o** | 96:6,8 100:23 | 249:6,23 | 171:3 205:24 |
| **o**  3:20 222:4 | 103:18 104:11 | 250:18 251:19 | 318:8 391:6 |
| 234:23,23,23 | 106:8 109:22 | 252:22,23 | **occasions**  299:1 |
| **o'boyle**  124:22 | 110:20 111:21 | 257:13 258:10 | **occupational** |
| **o'neill**  127:2 | 113:22 118:8 | 258:12,21 | 299:6 |
| | 133:16 134:22 | 259:2 260:4 | **occur**  264:1 |
| | 134:23 135:1 | 277:22 279:17 | 273:2 |

| | | | |
|---|---|---|---|
| **occurs** 188:4 | 26:9,14,23 28:6 | 126:21 127:16 | 216:3,11,21 |
| **october** 33:17 | 29:1,8 31:12 | 127:21 128:5 | 217:18 218:9 |
| 45:16 81:15 | 32:2,23 35:9,22 | 128:20 129:7 | 219:22 220:8 |
| 118:16 | 37:17 38:9 39:3 | 129:17 130:5 | 220:15,24 |
| **odds** 269:23 | 40:1 41:9 43:21 | 130:15 131:18 | 223:23 228:10 |
| 393:20 | 44:2 46:5,9,23 | 132:14 133:7 | 228:17,24 |
| **offer** 30:3 | 47:7 48:8,11 | 133:13 134:5 | 229:8 233:9 |
| **offered** 32:16 | 49:10,16 50:1 | 134:20 135:2,8 | 235:23 239:18 |
| 110:10 | 57:11 59:7 | 135:9,11,17 | 239:22 241:6 |
| **offering** 31:9 | 60:17 67:11 | 136:1,4,4,24 | 243:6 244:11 |
| 217:6,15 | 69:21 70:12 | 137:5 138:6,11 | 244:13,18 |
| **offline** 472:8 | 71:22 73:3 74:6 | 140:1 147:7 | 245:14 246:5 |
| **oh** 16:16 28:23 | 74:9 75:24 76:5 | 148:8 151:1 | 248:1 250:14 |
| 29:3 44:11 | 76:11 77:2,15 | 154:13,19 | 254:21 255:2 |
| 49:16,20 75:10 | 77:20 78:5 79:6 | 157:16 158:6 | 256:15 259:15 |
| 76:23 107:6,7 | 79:13,22 80:6 | 158:19 159:9 | 259:23 260:16 |
| 116:17 124:23 | 81:19 82:4,17 | 160:5 162:4,7 | 261:21 268:21 |
| 124:24 125:22 | 82:20 86:24 | 163:2,16 165:4 | 274:13 281:6 |
| 126:6 131:12 | 88:3,5,16,23 | 166:12 167:13 | 281:15,21 |
| 136:4,8 173:17 | 91:6 92:6 95:16 | 168:18 169:2,4 | 282:8,18 283:2 |
| 175:7 183:2 | 95:22 96:3 97:1 | 170:14,19 | 283:20 289:8 |
| 195:6 200:1 | 98:24 99:7,16 | 171:19 173:17 | 291:15 292:8 |
| 218:21 220:5 | 99:22 100:4,11 | 174:12 175:1 | 295:11 297:21 |
| 234:14 247:8 | 100:17 101:7 | 175:11,16,20 | 300:22 306:20 |
| 254:17 267:24 | 102:4 103:6 | 176:1,24 179:7 | 308:6 309:7,12 |
| 307:10 315:13 | 105:9,11 106:2 | 180:16 181:1 | 309:17 310:1 |
| 341:1 342:15 | 106:5 108:3,6 | 185:10 186:15 | 310:23 312:1,7 |
| 368:11 370:9 | 108:15 109:8 | 192:20 194:2,5 | 312:17 313:5 |
| 397:20 399:3 | 112:20 113:7 | 195:3,9,20 | 313:13,18 |
| 407:5 420:2 | 113:13 115:21 | 196:8 198:7,14 | 317:4,10,14 |
| 423:19 430:11 | 116:9,20 117:7 | 200:3 202:7 | 319:7,13,23 |
| 434:18 436:14 | 117:9 121:10 | 203:23 205:5 | 321:22 325:18 |
| 439:12 457:24 | 121:23 122:10 | 206:9,17 207:8 | 325:23 326:12 |
| **okay** 14:9 16:3 | 122:17,19 | 211:10 212:7 | 329:21 330:24 |
| 21:4 22:2 23:2 | 124:4,10 | 213:15,20 | 335:22 338:9 |
| 24:3,10,16 25:9 | 125:24 126:15 | 214:1 215:22 | 339:1 340:4,10 |

**[okay - original]**                                         Page 54

341:1 342:19
343:1,11,21
344:1 346:16
350:11 353:7
353:20 354:1
354:21 356:5
356:20 360:16
368:22 369:8
369:18 371:18
375:14 378:16
379:19 385:7
386:17,24
388:10,15,20
390:2 391:23
396:11,16
398:8 400:24
405:7 406:10
406:14 410:23
415:11 416:12
422:16 423:1
425:18 426:4
426:15 427:17
428:4 429:11
429:18 430:6
432:7 436:7
439:20 445:21
449:14 451:8
452:13 453:13
455:19 458:12
463:9,13
464:20 466:4
467:13,24
471:14,19
**old**   208:11
353:16

**olds**   371:2,8,9
371:10 377:15
377:16,17
378:9,10,11
**once**   359:2
385:13
**ones**   147:15
164:22 167:9
170:14 176:15
349:4,6 350:20
374:13 469:10
**online**   9:11
**ooh**   121:21
**open**   187:5
**opened**   296:5
**operations**
196:14
**opine**   32:17
73:14 251:9
252:2,15 273:4
307:19 389:8
401:10 406:7
406:13 412:24
445:11 465:22
**opined**   281:2
**opining**   35:20
216:6 223:10
224:13 246:8
246:10 272:18
274:5
**opinion**   14:2,17
24:19,24 25:2
30:4 31:2,5,9
95:6,11,14
107:1 114:20
142:21 143:5

144:23 148:23
190:9 191:17
191:21,24
201:23 212:17
216:17,20
217:6 227:2
236:17 237:10
237:16 241:4
243:1,5 244:14
247:20 249:1
250:8 251:4,11
252:10,16,18
252:19 253:3
273:19,22
274:7 277:8
278:19 279:4,5
279:11 289:17
289:24 290:20
291:7,12,13
294:21 295:3,4
300:8,9 303:21
303:22,23
305:16 306:21
307:8,24 320:1
320:4,13,23
321:8,24 347:7
347:10,10,20
347:23 382:13
382:16 383:8
392:18 422:11
425:16 442:18
442:19 443:1
443:18 445:9
446:2,11,15
447:3,14
448:11 449:2

463:10 464:10
464:13
**opinions**   25:10
135:13 254:23
321:17,19
328:22 330:11
421:1
**opportunities**
275:4 282:5,23
**opportunity**
32:15 34:2
122:8 213:14
231:15 284:21
474:9
**opposite**   258:8
265:23 272:6
418:13
**opposition**
267:9 272:15
**order**   1:11
57:15 260:4,9
260:15 293:24
299:18 324:14
325:8 328:7,8
333:17 336:15
417:3,5 418:2
419:3,15
420:16 440:6
442:8 464:3
**organ**   191:6
192:8 196:23
**organization**
94:3,17 437:17
**orient**   127:23
**original**   71:14
127:24 219:24

[original - page]                                                                 Page 55

267:10 270:1
272:6,16
300:15 374:12
475:15
**originally** 70:6
**ortega** 5:16
12:3
**outcome** 163:1
163:8,19,20
164:3 182:3,8
201:4,5 210:1
290:15 322:20
371:11 380:6
381:7,9,18,21
384:2,5 388:6
**outcomes** 8:14
160:9,11
161:10 172:11
172:13,16
182:6 183:1
355:15 357:24
367:15 372:2,4
372:5,18 373:2
373:10,23
374:14 377:1
381:3 421:2
**outfit** 431:7
**outline** 393:4
**outrageous**
101:12
**outs** 88:17
**outside** 236:17
384:19 396:21
**ovarian** 8:8
180:13 284:5
288:23 289:21

289:23 293:22
299:9 424:2,18
428:20 461:19
**overall** 25:24
209:24 272:20
274:3 393:20
**overestimate**
470:17
**overlap** 138:19
138:21 434:7
**overlaps** 163:10
**oversight**
325:22 367:14
368:3 372:15
374:18
**overview**
131:15 139:22
229:10
**own** 38:8,10,13
38:15 79:3
184:5 285:21
290:11,11
307:22 314:17
314:20 315:21
438:22 465:6
**oxidative**
214:13 215:11
222:6 225:24
228:18 230:14
235:13,24
254:9 255:10
255:16 256:11
263:2,23,24
265:12,21
266:11 269:1,8
270:1,4 273:1

273:10
**oxygen** 264:4

**p**

**p.m.** 192:22
193:2 234:17
235:2 351:7,11
415:20,24
450:6,10
472:23 473:4
**packet** 33:11
**page** 6:15 7:5
8:5 9:5 10:5
11:6,6,6,9,9,9
11:12,12,12,15
11:15,15 26:16
27:1 31:13 34:8
44:10 45:13
49:15 58:4 60:4
60:10 81:8
91:15 100:5,7
100:12,20
101:24 102:5
102:11,16
106:3,6,19
108:9 109:15
113:14 115:17
121:24 122:6
122:14 124:24
127:22 128:2
128:19 129:18
130:3 131:8
136:3,7 142:10
149:1 173:16
173:17,20
187:9 192:9,12

193:6,16
194:14,15,18
194:23 195:4
195:10 196:4
196:18 200:6
205:7,10 209:5
212:15 218:4
218:17,23
219:16,18
220:1,9 235:10
239:4,15
243:12 254:16
255:8 261:8
263:7 267:1,4
267:20 271:10
271:12 273:6
274:8,11
281:16,17
282:19,20
297:5,21 331:9
337:18 338:21
340:5,14 341:8
341:9,13 343:2
343:4 345:2
348:1 352:14
353:10 356:6
356:10 357:5
359:11,18
360:15 369:3,4
369:9 370:6
374:3 377:13
387:18 399:16
400:3,7 416:4
419:24 420:13
430:14 439:10
455:22 458:20

459:23 460:2
462:11 465:23
468:23 476:4
478:2
**pages** 33:12
97:18 98:6,17
98:20 99:11,13
99:17,17,20
120:16 129:9
155:17 157:8
212:22 226:3
255:24 301:15
301:17 330:2
339:22 387:22
421:18 469:14
469:15 477:6
**paginated**
387:21
**pagination**
193:14
**paid** 68:21 86:4
96:3,15,19
217:8 430:2,4
431:10 465:19
**pain** 107:16
122:20 123:2,3
123:9,12,14,15
227:13
**painkiller**
27:17
**pair** 361:21
392:23
**pairs** 131:3
132:6 348:9
361:20,22
375:5,8,12,13

375:15 376:10
376:20 379:10
379:14,21
380:1,17 381:6
381:15,22
383:16,24
384:17 388:11
395:19 414:12
**pandemic**
31:17
**paper** 153:22
160:16 161:6
161:13,14,23
171:16 375:17
375:20 428:1
461:8
**papers** 164:4,8
181:7 184:14
416:13 423:19
423:21,22
424:1
**para** 31:14
**paracetamol**
8:13,21 353:13
356:24 357:10
357:18,23
358:1
**paragraph** 14:8
14:11 21:5 27:3
31:15 71:7,24
73:9,20 74:5
75:18 79:14
109:3 111:6
142:9 193:9
194:20 195:2,8
195:9,21 196:8

196:9,13
206:19 207:15
210:4 254:2,18
256:8 260:21
261:10 263:9
263:11 267:5
267:19 269:12
271:13 340:5
340:14,18,23
345:6 346:8
356:9,16,21
357:6 359:21
360:5,6,15
400:7,11
433:12 434:3
**paragraphs**
195:1 196:11
196:12
**parameters**
382:1
**park** 4:11
**parsed** 301:11
**parsing** 146:1
278:3
**part** 49:24
50:13 54:24
55:11 56:14
62:12 69:8
95:23 107:14
111:17 131:24
141:23 142:3
147:22 159:19
163:10,22
179:23 181:3
192:12 196:7
202:6 203:16

209:16 211:8
215:7 217:10
282:8,15 307:7
329:20 346:7
352:2 354:3
381:13,15,16
382:23 385:7
399:16 417:5
425:14
**partial** 41:10
196:9
**partially** 41:7,8
42:5,19 43:5
197:2 463:11
464:8 466:7
**participants**
387:7 388:5
**particular**
35:20 63:2
100:20 101:18
163:1 171:20
192:12 209:24
224:14 229:11
239:4,15 252:4
274:22 275:19
276:6,8,13
277:14 278:15
279:15 280:1
293:4,21
294:24 303:24
393:7 420:18
425:24 458:24
459:17
**particularly**
142:15 187:15
188:24 235:15

281:24 288:9
288:21 289:19
295:6,15
296:17 298:15
298:20 304:4
305:9 324:21
456:5
**parts** 188:16
197:4 198:20
218:18 279:7
**past** 126:7
335:1 422:17
**paste** 281:12
**pathway** 222:7
224:2,14
256:24 257:6
257:20 270:13
272:24 453:15
**pathways** 224:4
256:20 262:22
266:12
**patient** 58:2
158:21 159:15
159:18 163:3
**patients** 160:2
161:1 179:18
181:15 440:11
**pay** 315:16
**paying** 47:19
49:22 60:19
80:16,19
**payment** 87:2
316:5
**peaks** 189:15
**pelvic** 123:2

**pen** 391:15
**pending** 10:8
165:13 170:3
213:19 232:17
232:23 392:3
405:1 429:21
**pennsylvania**
5:9
**people** 13:22
31:23 32:14
43:20 48:21
61:10 80:7
125:12 138:17
204:22 276:17
382:24
**percent** 27:14
120:23 123:2,3
123:3,4,9,10,11
123:11,21
266:5,6 277:3,4
285:15 364:11
364:12,15,17
364:23,24
366:16,17,21
367:3,4 377:15
377:16,17,19
377:20 378:7,8
378:9,10
393:11,15,21
395:13 422:18
423:3,7 426:22
440:13 441:14
442:3,5,6,9
**percentage**
24:20 25:3 31:3
185:17 427:1

427:11 442:10
**percentages**
25:23
**perfect** 140:19
**perfected** 43:10
44:15 125:12
125:17,19
**perfectedclai...**
43:15 124:20
**perform** 150:7
**performance**
8:18
**performed**
152:3 157:17
374:24
**perinatal** 7:20
**period** 36:19
75:3 76:2 80:2
179:18 187:1,1
188:3 191:1,16
192:3 195:12
196:19 197:19
223:11 300:20
308:18,19
317:9 327:10
358:15 363:21
409:15,20
**periods** 187:10
395:7
**peripartum**
410:4
**person** 2:3,19
2:20 4:4,5,17
5:3,17 34:9
35:24 83:19

**person's** 20:8
**personality**
177:11
**personally**
61:12,14 62:7
173:10 180:21
306:14
**perspective**
185:4 334:3
367:15
**ph** 1:22
**phase** 190:20
**phases** 114:2
**phenomenon**
241:11
**phone** 86:22
316:12
**phrase** 15:21
62:23 144:7
311:2
**physiology**
188:11
**pick** 376:22
382:15 383:10
470:22
**picking** 349:7
403:18
**picture** 112:22
113:16,21
115:7,12
401:18
**pieces** 117:23
227:11
**pill** 107:19
145:5

**pills** 445:6

**pittsburgh**
160:19 161:19
172:15

**place** 4:11
88:17 188:8
199:13 462:14
463:2

**placed** 314:24
465:24 466:8

**placenta**
185:19

**places** 284:3

**plaintiff's** 71:8
71:23

**plaintiffs** 2:16
2:23 3:6,12,18
3:23 7:17 36:4
45:1 50:15
54:18 55:13
56:16 59:16
60:19 70:6
73:21 75:19
83:24 84:4 87:2
97:17 143:13
144:14 308:5
314:1,12,22
322:3 325:12
422:20 423:4,8
431:8,18,24
432:14 433:13
435:6,10
436:12,20
437:11,20,22
438:8 465:19

**planning**
471:15

**plasma** 255:17
261:22,24
262:9,11,24
265:10 271:15
271:17

**plausibility**
214:22 215:8
216:8 223:12
226:7 273:23
453:6,14,24
462:14

**plausible**
188:20 213:9
214:11 215:16
215:23 216:1,4
216:7,10,11
221:23 223:19
223:21 224:7
225:14 226:10
226:23 228:13
263:18 274:4
453:18 454:3
454:15,18,23

**plaza** 2:12

**please** 22:1,1
44:6 45:14
49:11 57:20
68:1,2,11 72:18
72:21 87:6,7
91:16 96:11
104:22 121:14
122:7 128:10
128:13 136:13
136:18 167:23

168:17 169:1
171:9 173:16
175:5 184:21
202:23 203:15
204:5 209:5
218:14 229:17
237:9 254:13
265:5 267:4
274:8 283:11
296:13,23
304:11 307:13
307:15 319:17
328:17 331:5
341:6,12
352:22 359:1
365:2 368:10
368:20 405:6
408:6 409:10
409:10,11
415:13,18
423:16 430:11
433:4 434:22
442:23 455:21
475:3,8

**plenty** 231:17
259:22

**plethora**
392:19

**pllc** 3:19

**plot** 112:6,9,10
112:15 348:2
460:10,14,22
464:5 469:1
470:10

**plus** 288:1
301:17,17

379:24

**point** 34:10
35:4 48:7 55:5
63:8 68:7
101:20 114:20
115:1 154:5
214:15 284:8
303:16,17
312:15 320:6
321:12 323:1
327:19,20
332:14 333:5
334:11 335:19
346:11 367:20
400:11 401:13
408:1,19
422:10 434:8
435:24 442:9

**pointed** 124:1
193:6 197:13
286:15 298:19
343:1

**pointing** 194:23
301:19 341:19
362:4,24 366:4

**points** 116:22
117:10,11,18
217:20

**political** 452:1

**pollution**
299:11

**poor** 361:23
362:1 394:10

**pops** 440:9

**population**
377:4 378:6

384:8,18 387:9 393:17,22

**portion** 38:9,11 339:24

**portions** 190:6 191:9,15

**pose** 445:14,17 445:19

**posed** 445:13 445:16

**posit** 188:2

**position** 189:16

**positive** 132:5 137:1 272:23

**positively** 265:13

**possibility** 188:18 208:8

**possible** 6:18 209:20 246:11 248:20,21 250:10,13,23 364:6 374:17 465:8

**possibly** 187:24 406:11 411:17

**posted** 115:5 146:19

**posting** 80:22 114:11

**postman** 2:2,8 81:14

**potential** 122:9 180:18 181:19 183:15 208:15 253:21 269:5

380:23 384:1 392:16,20 394:22 400:17 401:5

**potentially** 24:6 221:12 224:9

**powder** 280:13 280:17 281:2

**power** 361:10 375:11 376:5 381:2,6,11,13 381:15,17,20 381:21,23 382:1,6 383:1 383:20 384:12 414:18,23

**powered** 376:21 382:14 383:10,19

**pr** 43:17,22 92:1 125:7 143:11 144:1 218:6

**practice** 158:13 160:1 178:18 312:2

**practicing** 159:11 287:24

**preamble** 65:22 67:14 85:6 113:23 139:9 143:20,22 144:9 374:9 420:10

**precede** 188:1

**precentral** 201:20

**precise** 204:21 230:7 233:6,14 295:20 334:17 334:18 363:16

**precursors** 265:1,7 267:7 269:14 270:11 270:20 272:14

**preexisting** 318:10,14

**prefer** 230:6,7 233:5,14 259:6 306:14

**prefrontal** 189:6,7 191:1 192:1,2,4 195:12 196:16 196:19 197:1,3 197:7,16,19 198:2,11,15 199:4,6 201:13 201:14,19

**pregnancy** 6:17 9:7,12 10:7 30:5 100:8 107:20 123:14 137:17 145:6 172:10,23 179:20 180:2,9 182:5 185:22 187:11 192:3 236:17 245:9 342:4 357:23 358:2 386:8

388:22 392:24 395:5,6 396:20 396:21 400:14 407:20 408:11 409:3,6,17 410:6 412:20 429:20 440:15 441:16,18 442:20 443:3 443:20 444:22 446:16 465:18

**pregnant** 13:22 20:8 158:24 179:19,22 220:11 235:16 243:13 412:17 440:9

**prenatal** 8:12 8:21 9:16 200:13,21 201:2 207:1,11 207:22 210:18 353:12 356:23

**prenatally** 357:10

**preparation** 115:4 293:4,9

**preparatory** 114:1

**prepare** 111:7 116:21 309:4

**prepared** 65:3 130:18 230:20 471:17

**prepublication** 386:18

**preschool** 8:14
  358:4
**prescription**
  159:22
**presence**
  346:23 347:1
**present** 5:14
  188:6 275:1
  335:1
**presented**
  284:11
**president** 275:1
  276:1 282:2,21
**press** 148:6
  425:24
**presume**
  176:14
**pretty** 107:16
  280:22 335:20
  335:20
**prevalence**
  123:18 124:8
  377:2,3,12,14
  378:5,8 381:16
  381:17 384:3,4
  384:22 393:9
  393:10,14
**prevalent** 381:9
**previous** 93:12
  195:24 314:6
**previously**
  125:18 222:11
  223:9 246:7
  255:6 285:1
  286:12 287:2
  291:22 300:1

302:11 309:14
  314:3,13
  330:21 347:8
  363:21 372:10
  373:19 377:11
  435:22 436:24
  441:20 442:5
  467:11 468:15
  468:20
**primarily**
  331:16
**primary** 209:10
  209:12 290:4
  292:2 293:12
  293:14 331:13
  336:20 339:16
  347:9 350:20
  423:22 451:10
**printed** 200:8
**prior** 18:6 46:1
  79:8 113:15
  120:20 188:18
  212:22 284:17
  312:17 324:14
  330:22 346:13
  374:4 392:10
  406:2 425:3,5,9
**priori** 276:10
  276:11,14
**privilege** 75:7
  310:14 318:9
**privileged**
  310:16 311:18
  319:2
**probably** 38:12
  183:23 260:14

**problem**
  193:12
**problems** 8:19
  353:14,15
  357:1,21
  363:18
**process** 94:23
  114:12 188:7
  188:23 221:10
  241:19 294:3
**produce** 98:19
  98:20 289:14
  292:11
**produced** 33:6
  90:14 97:8,8,15
  98:16 104:10
  128:15 240:15
  472:2,4
**produces**
  235:18 245:21
  256:10 273:9
**producing**
  260:22
**product** 263:23
  263:24 311:3
**production**
  11:8 221:9
  471:20 472:1
**products** 1:3
  7:10 12:12
**professional**
  1:19 159:20
  162:10 166:20
  179:23 227:5
  266:15,19
  424:20 426:22

474:13
**professionals**
  159:11
**progesterone**
  299:8
**promise** 65:11
**pronouncing**
  309:20
**proper** 375:24
  422:9
**properly** 397:5
**proportions**
  201:8
**propose** 83:11
**proposed**
  129:10,15
**proposition**
  402:2
**propounded**
  477:9
**prospective**
  348:20
**prostaglandin**
  222:1 226:14
  226:18,22
**protective** 1:11
**protein** 221:3
**protocol** 318:15
**protofontal**
  201:14
**prove** 204:2
**proved** 267:2
**proven** 215:2
**proves** 266:20
**provide** 20:19
  20:22 79:16

**[provide - question]**

97:12 136:19
219:13,18
266:8 435:18
**provided**
198:10 326:6
**provides**
254:11 255:3
**providing**
131:20 362:11
**pruned** 199:11
**psychiatric**
159:6
**psychiatrist**
159:2,12
175:14
**public** 1:20
13:21 31:18
32:20 45:10
51:8 59:24
61:10,13,15
62:9,11,13,16
63:3,5 65:8
78:2,2,6 82:6
83:19 84:20,22
84:23 85:3,11
92:7,16 93:17
93:22 94:1,15
103:21,23
104:17 119:12
155:5 156:17
156:23 157:22
315:23 316:17
422:23 430:23
436:6 439:8
451:17 452:3
465:16 474:14

477:23
**publication**
161:5 164:1
300:16 368:20
368:23 386:12
404:14 406:21
410:12,20
427:18 428:2,3
428:6,11 429:3
**publications**
132:4,24 134:6
161:8,8 162:8
162:11 174:11
353:10,11
356:7,17 406:6
424:5,19
428:16 429:1
**publicly** 92:18
103:10 156:13
**publish** 411:7
**published**
87:19 162:3
163:6,18 164:2
164:7,15
171:16,24
184:6,7 185:5
186:10,12,16
288:3 386:15
386:21,23
388:16 401:11
404:21 406:5
424:10,15
427:21
**pull** 27:21
104:22 459:9

**pulling** 455:16
**purpose** 226:5
226:6,12
**purposely**
166:22
**purposes**
326:23 332:22
**pursuant** 1:11
1:16
**push** 105:21
**put** 26:21 45:20
73:6 74:24
92:17 121:6
153:22 222:15
239:19,20
290:17 291:24
321:14 328:1
389:12 403:8
444:4 447:20
459:8 471:13
471:16
**puts** 298:21
446:3
**putting** 101:10
164:1,5
**pyramidal**
189:21

**q**

**qua** 290:12
305:19 468:22
**quadratic**
277:1
**qualifications**
158:6

**qualitative**
382:21
**quality** 45:7
**quantification**
441:17 445:4
**quantified**
238:5 441:24
**quantifies**
238:2,13
**quantify** 445:7
448:16
**quantitative**
42:13 382:20
**quasi** 200:18
**query** 69:3
**question** 8:7
18:10,23 20:17
22:1 23:16
25:13,16 28:1
30:16 31:10
32:9 44:20 49:1
51:15 53:7,13
55:8 57:9 58:1
58:7,11,19 59:9
61:2 64:14
65:10,24 66:2,3
84:24 88:21
89:4,24 90:9,16
90:18 93:13
94:10 97:14
102:18 106:15
120:19,20
127:12 133:6
143:22 144:6
151:16 152:13
152:15,16

**[question - quoting]**                                                Page 62

| | | | |
|---|---|---|---|
| 153:1,12 | 292:13 295:12 | 422:2,6 426:14 | 472:10 477:8 |
| 155:19 161:11 | 295:22 296:3 | 428:12,23 | **quick** 433:6 |
| 162:21 165:11 | 296:14 298:13 | 431:13 436:9 | **quickly** 268:9 |
| 165:13,21,23 | 300:3,4,6,7 | 443:14 444:6 | **quite** 18:9 |
| 166:9,11,15 | 304:10,12,20 | 444:11,18,20 | 36:19 38:20 |
| 167:14 168:6 | 305:1 306:11 | 445:11,12,17 | 201:7 226:3 |
| 168:17,18,23 | 306:13,17,19 | 445:19 446:7 | 238:18 242:2 |
| 168:24 169:3 | 307:16,21 | 446:12,21 | 242:22 246:11 |
| 170:2,3,5 | 311:11,17 | 448:24 454:20 | 248:19,21 |
| 171:12 172:21 | 315:14 317:19 | 461:22,23 | 249:12,13,14 |
| 181:9 183:24 | 319:4,19,20 | 467:5 471:2 | 249:16 255:21 |
| 185:12 190:8 | 320:4,5,10,12 | **questioned** | 284:17 285:19 |
| 191:12,16,20 | 320:19 321:2 | 163:3 410:24 | 297:23 315:20 |
| 192:16,17 | 322:1 333:11 | **questioning** | 322:7 342:17 |
| 194:16 197:8 | 333:12 335:23 | 153:15 434:20 | 362:16 408:3 |
| 197:11 198:9 | 336:1,3 339:15 | 434:22 450:17 | 417:11 422:22 |
| 205:8 212:24 | 342:21,22 | **questionnaire** | 423:20,20 |
| 213:11,19 | 349:8 350:2 | 412:21 | 434:19 439:5 |
| 216:6,16 227:6 | 358:8,9 359:20 | **questionnaires** | 458:3 470:7 |
| 228:4 231:20 | 360:14 362:10 | 164:17 | **quotation** |
| 232:11,17,22 | 363:6 365:3,7 | **questions** 6:21 | 468:20 |
| 234:11 236:15 | 365:23 366:1 | 11:14 32:16 | **quote** 62:4 |
| 236:16 237:8 | 366:11 367:20 | 65:7,8 121:9 | 285:22 300:12 |
| 238:8 240:18 | 368:12 371:19 | 127:17 128:1 | 300:15,17 |
| 240:20 241:10 | 378:1,4 379:5 | 129:2,24 131:1 | 333:7 403:10 |
| 241:15,23 | 380:7,12,17 | 134:21 188:10 | 403:14 440:23 |
| 242:22 245:5,7 | 383:7 392:3,8 | 218:11,19 | 468:7 |
| 248:5 253:1 | 392:20 394:13 | 219:14 220:3 | **quoted** 101:8 |
| 259:4 263:12 | 394:17,19 | 230:5,5 231:18 | 102:12,14,15 |
| 264:12,14 | 397:1 405:1,3,5 | 256:5 260:1 | 301:24 302:19 |
| 265:6,17 | 405:11,13 | 268:8 288:5 | 305:21 439:11 |
| 268:10,13,17 | 408:5 411:13 | 327:9 330:8 | 440:12 |
| 269:9 272:11 | 413:8 414:20 | 361:9 376:16 | **quotes** 100:14 |
| 274:1 282:13 | 415:10 418:22 | 387:4 391:1 | 101:4 333:10 |
| 282:14 283:11 | 419:8,10,11,23 | 413:6 416:4 | **quoting** 100:18 |
| 283:19 287:3 | 420:2 421:7 | 449:22 465:10 | 301:13 303:13 |

Case 1:22-md-03043-DLC    Document 1471-1    Filed 05/10/24    Page 184 of 212

**r**

**r**  122:22 234:23
  476:1,1
**racial**  377:21
**radical**  222:7
**radicals**  228:18
**rails**  360:13
**raise**  102:19
  395:8
**raises**  6:17
**range**  42:15
  285:17,18
  299:21 364:5
  364:13
**rapid**  189:10
  190:20
**rapidly**  189:14
**rarely**  371:16
**rate**  47:5 82:22
  82:23 83:12
  309:13 315:7,9
**rather**  416:23
**ratio**  393:20
**rationale**  221:1
**rationales**
  222:18
**ratios**  457:9,10
**rats**  269:17
**reach**  15:3
  84:15,19 85:2
  87:17 88:17
  185:22
**reached**  39:6
  84:22 88:8

**reaching**  87:16
  190:1
**reactions**
  227:14
**reactive**  264:4
**read**  89:15,16
  91:4 116:17
  122:18 128:10
  136:13 148:22
  178:3 181:7
  184:3 186:23
  191:9,14
  194:21 195:23
  196:1,6 206:13
  213:1,2 225:16
  225:16 226:20
  230:11 231:23
  238:6 254:24
  256:3 258:7
  261:5 263:10
  263:14 271:4
  275:17 279:21
  279:22 284:21
  287:5 290:3
  292:2 301:3,7,7
  301:8 306:23
  307:2,7 308:2
  320:6 325:5,9
  327:20 329:8
  330:11 336:15
  359:21 360:4
  390:4 391:2,4
  403:5 411:3,3
  411:18,19
  420:21 438:14
  468:20 469:15

474:9 475:3
  477:5
**readers**  313:4
**reading**  130:19
  175:5 190:6
  193:10 207:6
  210:4 212:24
  218:14 229:8
  229:16 254:14
  264:13 266:9
  267:17 284:23
  286:8 289:24
  307:22 352:18
  352:22 356:8
  412:15 430:11
  435:8
**reads**  27:9
  107:3 279:2,3
**ready**  298:22
  391:19
**real**  144:18
  298:19 433:6
  454:19 461:23
**realized**  40:21
  285:21
**really**  39:17,18
  41:22 47:2 48:1
  49:6 83:3,13
  84:8 95:7
  101:17 102:1
  106:10 126:24
  127:4 141:23
  151:17 173:1
  186:22 204:12
  224:15 241:14
  242:1 246:18

259:12 286:4
  318:21 320:2
  322:23 355:1
  380:7 395:21
  399:23 432:5
  439:15,21
  444:10,16
  445:11
**realtime**  1:20
  474:14
**reason**  22:2
  150:3,20
  211:20 225:18
  250:14 259:9
  296:20 311:10
  381:1 418:1
  419:13 420:14
  441:4 458:6
  475:5 476:6,8
  476:10,12,14
  476:16,18,20
  476:22,24
**reasonable**
  266:15 335:10
  336:13,16
  337:2 389:8
**reasonably**
  172:11
**reasoning**
  466:17
**reasons**  132:12
  135:21 136:2
  138:9 373:1
  380:20 411:7
  414:15 420:23

**reassert** 317:23
**reassuring**
  357:17
**rebecca** 2:11
**rebecca.king**
  2:16
**recall** 38:24
  46:21 47:2,12
  48:1,4 49:9
  69:4 70:9,11
  71:20,20 72:9
  73:17 74:20,23
  75:2 76:8 77:2
  77:9,13 80:17
  80:18 83:3,4,13
  83:14 93:11,19
  98:13,15 99:4,5
  100:19 101:2,3
  101:5 102:1,7
  103:9,13 106:1
  106:24 111:11
  111:16,20
  112:18 114:5
  114:17 115:24
  118:11,22,23
  119:1,16 126:8
  130:9,12,13,22
  141:18,20
  162:2 176:17
  178:12 182:20
  183:5 218:16
  219:6,8 225:8
  233:2 258:18
  259:5 281:9
  285:11 287:4
  288:12,18,22

293:16,18
294:13 308:1
310:4 316:10
320:7,17 322:4
322:15 323:3
323:17 324:6
325:17 326:2,5
326:10 327:18
327:20,24
328:2 367:11
373:14 401:23
407:24,24
408:13,15
425:22 426:2,3
432:6,16
435:21 439:4
**recalling**
  182:23 322:23
  358:23
**receipt** 475:17
**receive** 31:17
  307:23 319:10
  324:8 325:13
**received** 81:4
  130:1 131:1
  230:10 308:7
  309:2 315:8
  324:3
**recent** 27:4,13
  427:18 428:5,6
  428:11,24
**recently** 113:3
  150:23 280:23
  424:4
**receptors** 222:5
  227:8,20 228:1

228:7,12
**recess** 234:21
**recognize** 401:6
**recollection**
  89:7,23 90:17
  90:24 99:10,18
  233:8 308:7
**record** 12:2,17
  53:24 105:2
  108:11 120:8
  120:12 121:5
  135:4,6 167:20
  170:23 171:9
  177:17 192:19
  192:23 193:3
  204:18 232:3
  234:8,18 235:3
  239:9,16
  297:11 304:17
  351:8,12 359:5
  359:11 391:6
  399:2 415:12
  415:17,21
  416:1 432:11
  449:12 450:7
  450:11 472:15
  472:24 474:6
**recorded**
  176:14,16
**records** 282:16
**recruited**
  412:16
**redirect** 212:6
  259:21
**redo** 383:20

**reduced** 199:10
**reduction**
  367:4
**reeducated**
  294:2 300:11
**refer** 73:7
**reference** 27:22
  27:23 28:5,8
  41:24 89:1
  139:5 283:3
  286:1 354:18
  355:8 369:3
  472:3
**referenced**
  40:24 184:15
  251:1 255:6
  321:24 334:12
  354:22 363:20
  385:5 435:14
  438:12 450:23
**references**
  20:23 117:13
  130:5 213:1,3,4
  301:17 330:13
  341:11 350:16
  369:13,15
**referencing**
  130:17 154:15
  377:11
**referred** 37:16
  109:4 157:7
  441:19,23
**referring** 26:19
  27:7 34:23
  116:16 132:15
  136:14 138:7

**[referring - repeat]**

157:3 161:13
161:24 187:22
203:17 218:23
239:14 289:2
315:5 404:6
431:21 435:24
440:22
**refers**  118:1
440:10
**refinement**
190:21
**reflect**  58:4
147:18 148:15
148:20
**reflected**
109:20 110:13
110:15
**reflecting**
200:24 446:14
**reflection**  150:5
**regard**  25:11
37:3 80:22
102:3 104:20
138:24 162:6
199:20 227:2
273:23 303:9
317:18 342:18
403:16 448:12
468:8
**regarding**
39:21 63:11,24
71:9 73:22
79:17 81:5
87:18 115:22
129:3 137:6
151:3 161:6,15

193:7 225:13
226:18 272:14
306:24 307:3
319:14 320:15
337:22 338:10
338:12 414:24
426:5 433:14
435:10,19
438:8
**regardless**
462:6
**regions**  199:7
199:15,18
202:4
**registered**  1:19
474:13
**regular**  276:17
**relate**  212:23
**related**  93:20
98:17 103:15
103:16 126:7
126:10 146:10
161:9 172:17
201:18 214:13
271:2 272:5,12
303:24 311:4
424:5 440:2
451:17
**relates**  201:23
246:23
**relating**  100:20
454:10
**relations**  32:20
78:2,3,6 92:7
**relationship**
37:12 202:9

203:12 211:4
254:10 255:14
284:10 338:13
454:2,22
460:18
**relative**  169:7
348:6 349:5,6
358:9,18
362:12,24
363:8,22,24
364:21 365:8
366:3,13,22
**relatively**
303:19
**release**  264:3
**released**  31:16
**releases**  103:23
**relevant**  187:18
188:17 469:11
**reliability**
414:7
**reliable**  174:18
329:23 412:7
413:13 421:6
**reliance**  325:19
331:13 337:8
**relied**  258:7
261:5 331:1,9
332:9 342:12
373:14 416:21
417:5 419:16
421:1
**rely**  252:18
331:15 385:1
**relying**  21:2
347:15

**remember**
72:17,24 73:4
74:17,18 75:21
101:17,18
104:23 107:8
107:10,14,24
108:3 119:9
219:19 287:20
300:5 310:24
317:11 320:16
320:24 323:10
329:3,13,16
394:14 408:5
432:3 433:1
452:8 455:8,9
461:10 463:17
467:1,9,15,22
**remembering**
320:3
**remembers**
206:6
**reminding**
35:13
**removal**  190:22
**removed**  113:3
113:6
**renew**  210:23
421:12
**reorient**  260:18
428:14
**repeat**  56:5
223:9 245:4
251:14 300:4
331:6 350:1
365:18 366:7
394:15 408:6

Golkow Technologies,
A Veritext Division

| | | | |
|---|---|---|---|
| 442:23 | 193:7,12,16 | 307:13,18 | 404:1 405:18 |
| **repeatedly** | 194:13 195:10 | 308:8 312:11 | 406:1,11 407:7 |
| 307:3,8 460:23 | 197:14 200:6,7 | 312:16 314:7 | 407:18,23 |
| **repeating** 144:6 | 203:16 205:12 | 317:8,18,21 | 411:4 413:14 |
| **rephrase** 67:16 | 209:23 210:1 | 319:9,14,17 | 414:24 416:5 |
| 75:11 397:7 | 212:16 215:24 | 320:7,15 321:6 | 418:18,24 |
| **replete** 111:13 | 221:22 222:9 | 321:18 322:6 | 419:12,16,23 |
| **replicate** 210:9 | 224:3,5,16,19 | 322:21 323:8 | 420:13,21 |
| 356:22 | 225:19 226:1 | 323:23 324:19 | 421:16,17 |
| **replicated** | 226:19 228:23 | 325:10 326:13 | 422:6 453:20 |
| 246:19 253:24 | 229:9,11,16,20 | 326:16 327:14 | 453:24 454:14 |
| **replication** | 230:1,9,14 | 328:4,13 | 455:7,7,10,13 |
| 266:21 | 231:5,6,23 | 330:15,22 | 455:14,20 |
| **replications** | 234:4 235:11 | 331:1,8,18 | 456:10,11,18 |
| 364:22 | 239:4,7,14 | 332:15 333:2 | 458:8,9,14,17 |
| **reply** 232:3 | 243:11 254:23 | 333:14,19,22 | 459:24 462:10 |
| **replying** 218:5 | 255:23 256:1 | 334:12 336:22 | 462:20 463:7 |
| **report** 8:6,7 | 261:6 266:18 | 337:15,18 | 465:22,24 |
| 26:12,22,24 | 273:7 274:9 | 339:24 343:3 | 466:23,24 |
| 28:4 41:6,15 | 277:11 279:1,7 | 343:24 344:10 | 467:7,8,21 |
| 42:18 64:21,23 | 279:13 280:10 | 344:12 345:23 | 468:10,19,24 |
| 64:24 65:11 | 281:8,12,16,18 | 346:24 347:2,4 | 470:12 |
| 100:2 104:14 | 282:11,19,20 | 350:9,9,17 | **reported** 86:11 |
| 104:18,20 | 284:4,6,11 | 351:17 355:17 | 87:10 123:8 |
| 121:24 122:6 | 286:19 287:15 | 355:19 359:6,8 | 364:9 |
| 122:12 134:18 | 287:17 288:11 | 359:10 362:15 | **reporter** 1:19 |
| 140:10 148:17 | 288:14 289:17 | 367:7,10 368:7 | 1:19,19,20 |
| 150:13 151:5 | 290:7 292:22 | 368:14,15 | 12:18 474:13 |
| 154:4,6 157:18 | 294:15 296:20 | 369:1,4 371:1,7 | 474:14,14,22 |
| 165:3,15,17 | 297:15,19,22 | 371:20 378:18 | **reporter's** 62:5 |
| 166:7 167:4,14 | 299:14 300:14 | 382:4 383:18 | **reporters** 110:7 |
| 168:3,13,16 | 300:16 301:5 | 385:4 393:5,7,8 | **reporting** |
| 170:4,6,18,21 | 301:14,16,21 | 395:18 397:13 | 405:20 |
| 171:4 187:4,14 | 301:21 302:1 | 399:17 400:4 | **reports** 281:13 |
| 190:7 191:9,15 | 302:20 303:16 | 401:7,20 403:8 | 283:9,24 284:9 |
| 192:10,12 | 304:7 306:1 | 403:10,13 | 292:12,18 |

305:5 325:24
330:22 375:20
454:17
**represent** 88:23
386:4
**representation**
90:11
**representations**
81:12 90:8
**representative**
85:12 469:19
**representing**
2:16,23 3:6,12
3:18,23 4:8,14
4:20 5:6,12
97:16
**reproduction**
474:20
**reproductive**
182:3
**request** 11:8
46:10 319:21
425:18 471:20
472:1,5
**requested**
39:23 425:24
474:7
**requesting**
334:21
**require** 76:20
223:13 266:21
**required** 413:6
443:2,20
444:23
**requires** 93:3
105:7 170:3

216:8
**requisite**
316:15
**reread** 291:16
293:11,13
303:8 419:18
**rereading**
152:20
**research** 10:8
34:4,23 107:5
109:12 111:3
145:11 160:7,8
162:16,19,23
163:17,24
164:9 180:12
180:17,21
181:5,6 184:13
184:19,23
185:5,6,20,23
186:2,10,13
225:11 429:21
452:4
**researchers**
137:24 138:13
**reserve** 310:14
472:16,19
**resonate** 34:9
**respect** 36:23
151:12,13
189:1 229:1
255:6 305:22
320:4 374:19
419:7 436:4
**respected**
388:17

**respectful**
420:24
**respectfully**
168:20,21,23
168:24 169:15
295:21 296:1
365:2
**respectively**
123:4
**respond** 44:12
118:6 333:21
334:1
**responded**
43:21 44:2
118:11
**responding**
44:14 128:7
131:7
**responds**
108:17
**response** 44:9
103:7 105:19
131:10 219:19
224:23 333:16
337:22 338:7
338:13 340:2
341:17 349:10
447:10 470:4
**responses**
333:23
**responsibility**
451:10
**responsible**
25:24 78:21
86:11 247:9

**responsive**
365:4
**rest** 52:6,22
53:10
**restate** 22:1
66:12 409:11
409:13
**resting** 200:14
**result** 26:7
122:9 145:10
150:14 208:5
302:1,6,20
425:6
**results** 208:20
273:10,16
361:15 392:10
407:6 417:15
**retained** 73:24
79:15 148:9,12
153:23 293:15
308:12 433:2
433:16,21
434:4 435:13
435:17 438:11
438:23
**retainer** 76:6,9
76:12,21
**retention** 79:23
157:23 432:24
435:5
**retired** 422:12
**retirement**
424:11,21
428:17
**return** 475:15

**revealed**
207:21
**review** 69:23
78:16 99:24
103:14 110:2
114:22 117:9
117:14 137:23
147:2,8 148:1
149:5 217:9
221:21 225:4
225:12 226:6
226:17 228:10
254:21 293:24
294:12 306:20
315:1,3,4
319:24 320:13
321:7,9 322:8
323:7 324:12
325:23 326:3
326:12 338:23
351:15 352:3
368:2 387:3
425:6 451:10
454:13,20
**reviewed** 39:8
39:20 79:2
101:21 104:16
117:11,22
133:9 134:14
135:12 136:20
137:16 151:11
155:15 181:4
218:9,15 219:4
220:18 227:3
227:24 228:8
228:15,21

235:14 238:1
238:12 301:23
302:18 303:12
305:4,17
321:13,17,24
322:2,19,24
327:8 328:2,5,6
328:13,24
329:2 338:19
342:9 351:20
352:2 368:4
382:14 383:9
422:5 432:5
438:21 444:1
453:19 463:20
468:3
**reviewing** 39:4
46:7 81:21
83:14 113:18
117:1 130:9
139:3 167:4
168:16 174:15
285:20 315:21
322:17 324:13
359:12 360:3
439:14
**reviews** 456:15
**ricci** 41:21
342:3 419:6
441:5,5
**richness** 346:24
347:2,4,19
418:8
**right** 14:4 16:6
27:4,14 29:18
33:15 35:2

37:20 41:5 44:7
44:20 45:19,21
45:23 47:11
49:19,20,21,23
50:16 61:18
64:15 65:6 66:7
78:8 84:5 91:18
101:7 103:6
108:20 115:2,8
116:2,10 118:3
120:7,11
124:19 127:5
131:14 132:3
132:24 133:10
136:2,21 139:7
141:16 150:18
151:16 158:8
158:12 173:19
173:24 175:23
179:1 192:22
193:2 195:16
201:18 207:14
211:9,23
213:15 218:22
225:1 234:17
235:2 244:9
251:3 254:12
258:5,9 262:4
263:16 268:13
271:23 277:10
277:16 280:23
285:14 301:15
302:7 309:20
320:23 321:20
323:15,19
331:4 339:20

344:5 346:11
351:11 356:2
356:19 361:4
393:23 398:10
402:22 404:17
404:19 410:16
415:24 416:19
427:9 432:9,15
432:21,23
434:2,17
450:10,20,23
453:11,21
456:7 458:14
458:19 459:1
459:11 462:22
463:14 464:8
466:13 467:17
472:23
**rights** 472:17
**risk** 9:7,13
24:13,17 25:11
25:18 26:6 31:3
122:9 123:16
142:17,24
143:3 145:3
160:9,10 169:7
180:14 187:21
245:1 246:14
247:1 251:6
262:20 263:4
264:8,21
265:15 267:14
270:3 285:16
299:9,10 348:6
348:14,15,16
348:17,19

**[risk - scarcello]**

357:24 358:10
358:19,21
362:6,13,14,19
363:3,9,11,22
363:24 364:6
364:18,21,24
365:8,10 366:3
366:5,13,15,18
366:21,22
376:22 379:21
380:2 382:15
383:10 384:1
386:8 388:23
395:8 401:23
406:24 409:5
409:18 412:11
442:21 443:4,8
443:21 444:23
446:3,18 447:6
447:21 448:3,9
448:15,22
451:5 457:9,10
465:17
**risks** 244:6
349:5,6 358:18
363:1
**riverside** 2:12
**road** 3:4
**robert** 8:7
**roberta** 1:16
6:5 7:7 12:15
12:22 49:12
50:2,7,22 51:22
430:21 474:8
477:16

**rodrigues** 8:19
368:5,18
369:14,16,19
369:21 370:4
370:13,18,23
371:2,19 374:7
**role** 50:14
55:18 56:15
57:4 58:23
62:10,13 70:7
85:10 109:10
131:24 317:1
321:4 330:18
357:11
**roles** 262:21
**rothman**
214:17 285:1,8
285:24 286:14
290:1 291:16
291:24 294:12
295:18 296:11
303:8 362:18
462:16
**roughly** 27:14
123:20
**round** 345:18
345:19
**rule** 7:18
372:21
**rules** 318:10
**ruling** 151:21
166:23
**run** 318:19
**running** 85:17
**runs** 376:17

**russ** 3:3 36:18
37:9 40:5 45:20
46:18 47:19
69:2 74:23
125:21 126:1,4
126:15 438:16
**russ's** 37:12
46:1

**s**

**s** 4:4 6:12 7:2
8:2 9:2 10:2
234:23,23,23
**sacramento**
3:11
**safe** 6:16 10:7
429:20
**sample** 210:7
387:9 388:1
412:8 413:13
**satisfied** 463:11
464:8
**save** 194:3
**saw** 77:18 87:1
114:6 239:6,13
282:10 322:5
359:22 360:5
426:7
**saying** 21:5,7
29:24 42:23
43:4 107:18,21
110:5 130:17
139:12 145:12
220:6 246:16
252:8 262:15
266:24 272:20

273:17 336:15
346:1 357:7
363:4 366:5
439:11 440:13
440:18
**says** 28:14
31:15,21 34:8
42:18 49:11
51:17 52:7,23
54:15,16,20,22
61:24 79:15
100:14 101:9
102:5 103:7
105:20 107:10
109:3 110:23
111:17 116:9
116:15,20
118:14 122:8
129:23 130:23
133:20 136:18
137:6,13 174:1
175:8 176:3
177:4 195:11
196:14 205:11
206:4,23 209:9
210:4 220:24
227:16 231:12
255:9 262:8
318:15 353:1
379:13 383:17
398:13 435:9
438:7 440:7
441:8 456:3
458:22
**scarcello** 3:14

scare 439:13
scholar 325:3
337:4
scholarly 334:3
school 430:23
science 58:24
59:23 80:17,19
217:7
scientific 37:6
45:7,9 51:6
79:4 109:13,15
113:20 129:3
132:16 137:15
139:3 141:1
147:3,9 148:16
148:21 212:16
217:2,15 218:1
225:13 238:1
238:13 334:8
430:8,22 431:3
437:16 439:7
451:11
scientifically
62:15 79:19
156:12 242:7
scientist 40:6
60:13 61:21
62:19,24 155:1
227:5 233:10
233:13 266:15
284:18 402:13
411:20 445:14
scientists 63:1
92:14 233:14
scope 50:9 51:1
51:4 52:3,8,23

54:12 56:8
59:22 84:9
328:22 382:9
scott 33:22
34:22 35:23
36:2,10 44:23
116:5 125:8
screening 163:3
164:16,20
166:8 167:7
168:1,2 170:8
171:2 370:21
373:9
scroll 129:7
seated 450:4
second 14:7,11
64:5 70:17 81:8
104:21 105:2
187:24 188:4
188:13 189:15
189:19 191:2
191:22 192:5
193:7 195:7,9
195:13 196:21
198:24 209:10
212:19 234:8
239:1,11
259:24 265:4,9
265:9 273:13
296:13 333:6
341:12 345:6,9
348:22 358:13
398:8 439:10
secondhand
299:15

secondly
262:23
section 101:7
136:16 173:24
184:15 186:21
192:14 197:14
225:3 274:14
337:22 338:2
338:10 339:2
343:8 344:2
345:3 352:24
360:15 407:6
416:8 419:19
453:24 456:9
456:12 462:23
sections 344:12
345:22 346:13
462:10
see 14:11 20:12
21:8 27:5,11,18
27:21 28:18,20
28:23 29:3
31:19,24 33:16
33:19,23 34:5
34:13 45:17
49:13 50:5,11
52:10,13 60:15
62:23 71:4,12
74:2,7,13 79:20
81:17,18 82:12
82:19 91:4,21
92:4,23 93:5
97:22 100:9,14
102:12,21
103:4,5 106:22
108:18,24

109:6 110:24
113:20 116:6
116:17,19
117:4,5 118:18
118:19 119:6
124:20 125:1
125:11,13,22
126:17 127:19
128:3,9,24
129:5,12 130:2
130:7 131:4,5
131:11,12
132:21 134:7
135:23 136:4
136:12,22
137:8,10,20
138:4 139:18
139:23 142:19
143:17 154:12
154:15 155:16
173:22 174:2,6
175:7 195:18
200:10 201:6
206:21 207:18
208:2,12,13
209:8 210:11
218:21,21,22
220:3,13,22
221:6,15
224:23 226:15
228:19 231:12
235:21 243:15
246:3 248:4
254:17 255:5
257:7,15,17,24
260:2 261:13

**[see - short]**

263:19 264:15
267:15,24
268:1 271:22
275:5 282:6,7
289:11 292:18
300:19 307:12
309:9 313:11
313:16 315:13
328:16 329:11
333:5,23 336:5
336:22 338:20
339:3 344:7
345:12 350:17
353:18,23
354:9,15 356:9
357:2,13,14
358:5 359:21
360:6,6,14
367:22 368:9
368:16,20
370:9,15,16
375:17 377:14
378:1 383:1
387:5,13,24
388:3,7 389:5
391:23 393:6
393:24 394:1,5
394:11 398:8
400:5 403:4
405:18 407:4,5
407:11,22
413:1 416:10
416:14 417:6,7
430:9 431:1,5
433:18,24
434:1,5 439:18

439:19 440:19
442:4 451:11
456:2 458:1
460:9 462:13
463:1 466:3,11
469:5
**seeing** 307:18
368:13,15
389:10
**seem** 357:24
358:2
**seemed** 420:18
**seems** 244:21
244:24
**seen** 47:8 79:7
88:20 188:12
382:11 383:3,6
393:13,17
454:21 455:3
461:24 462:4
**send** 311:13
**sense** 214:24
234:5 458:9,10
459:14 465:6
**sensitive** 188:3
190:24 191:15
192:3 195:12
196:19 197:18
358:15
**sensorimotor**
201:16
**sent** 308:3,4
**sentence** 27:8
28:13,21 30:12
49:14 52:7,22
53:11 74:5

101:9 102:10
105:18 107:2
123:19 207:16
210:3 254:16
261:11 267:18
271:13 275:16
282:9,10 438:6
440:7 455:24
458:14
**sentences**
100:13 102:22
106:20
**separate** 19:21
76:1 79:10,23
180:7 272:19
432:6
**separately**
19:10 22:11
64:8 79:15
434:3 435:17
**september**
81:15 327:1
**serine** 261:23
262:9 271:15
**serious** 402:6
**serve** 308:13
317:1 433:16
435:13 438:11
438:23
**served** 280:16
**services** 12:5
**serving** 326:20
**set** 32:3,20
88:11 265:19
272:21 315:10
324:1 459:21

**setting** 177:9
387:6
**seven** 57:5 68:4
82:11 153:3
167:5 341:22
448:14 449:12
**several** 51:5
72:8 94:8
206:12 226:7
249:17 271:5
272:3,8 273:14
284:22 293:12
324:19 355:14
383:17 423:18
424:23
**sex** 361:20,22
375:4
**share** 84:16,20
85:3 395:12
**shared** 221:13
**sharp** 227:12
**she'd** 214:5
**she'll** 118:15
355:4
**sheet** 6:22
127:18 129:4
222:16 475:7,9
475:12,15
477:12
**shoe** 260:11
**shoot** 461:5
470:15
**short** 120:9
192:24 351:9
415:22 450:8

**[shorter - small]**                                          Page 72

**shorter** 406:5
**shortest** 440:17
**shorthand** 1:18
  474:13
**shortly** 189:9
  317:7
**show** 132:5,12
  135:21 138:9
  157:9,11
  170:17 202:16
  202:22 203:16
  206:4 211:8
  244:22 254:13
  258:14 347:22
  347:22 348:13
  348:13,15,16
  352:21 363:10
  368:22 370:5
  376:13 400:1
  411:15 413:19
  421:17 429:11
**showed** 112:5,7
  112:9,10
  122:22 137:1
  201:12 272:21
  401:21 406:22
  412:10 451:19
  464:4
**showing** 186:2
  202:2 205:23
  392:10 403:19
  403:24
**shown** 143:3
  211:12 255:10
  366:21 439:17

**shows** 246:24
**shyness** 367:16
**sibling** 8:22
  348:9 361:20
  361:22 374:23
  375:4,8,9,11,23
  376:20 379:11
  380:10,17
  381:5 383:16
  383:24 384:17
  385:2 387:8
  388:2,11,12,24
  392:23 393:24
  395:19 396:6
  396:12 414:12
**siblings** 376:1,4
  395:12
**sic** 123:6,6
  342:11
**side** 42:12
**sign** 48:5 474:9
  475:8
**signature**
  474:11
**signed** 71:3
  73:15 76:8
  77:12 432:12
  433:11 435:1,2
**significance**
  349:3 358:9
  362:17,21
**significant**
  269:19,21
  348:17 362:14
  362:20 363:2
  363:10 403:8

  407:15,19
  408:9
**significantly**
  407:8
**signing** 77:3,9
  475:10
**similar** 47:14
  138:2,14
  260:14 285:19
  333:15 457:11
**similarities**
  138:24
**similarly** 306:2
**simple** 58:10
**simply** 37:14
  40:21 300:10
  316:10,23
  343:18 347:1
**simulations**
  200:19
**sinclair** 108:22
**sine** 290:12
  305:19 468:22
**single** 107:19
  145:5 215:2
  225:23 266:20
  273:20 321:13
  410:4
**singly** 247:19
**singular** 252:9
**singularly**
  246:9
**sir** 452:20
**sit** 144:24
**sits** 309:23

**situation** 62:6
  110:6 202:4
  285:14 314:19
  315:22 389:13
**situations**
  252:12
**six** 55:4 176:4
  177:5,7 284:16
  284:17 286:5
  289:3 304:18
  339:5,5
**sixfold** 246:24
  247:1
**sixth** 279:22
**size** 205:16
  210:7 412:8
  413:13
**sizes** 388:1
**skadden** 4:2
**skadden.com**
  4:7,7
**skeptical** 40:12
  40:14
**skills** 358:4
**skipping** 111:5
**slate** 4:2
**slight** 299:1,23
**slightly** 193:13
  247:23 320:10
**slow** 103:7
  105:18
**slowed** 227:15
**small** 101:18
  210:7 364:15
  383:13

**[smfm - snidow]**

| | | | |
|---|---|---|---|
| **smfm** 179:14 | 102:23 103:18 | 202:11,20 | 307:5,10 |
| **smoke** 299:15 | 104:11 105:3,6 | 203:2,7,23 | 309:18,20 |
| **snapshot** | 105:11 106:8 | 204:7,13,17 | 310:13,23 |
| 401:13,16 | 106:21 108:10 | 205:17 206:3,9 | 311:19 313:2 |
| **snapshots** | 109:22 110:20 | 208:18 210:22 | 317:3,15,22 |
| 401:17 | 111:5,21 | 211:11,23 | 318:2,6,12,20 |
| **snider** 323:12 | 113:22 115:11 | 212:2,7,10 | 318:24 319:4 |
| **snidow** 2:3 6:7 | 116:11 118:8 | 213:16,21 | 323:4,11,13,14 |
| 14:5,9 16:7,13 | 119:8 120:2 | 214:3 216:13 | 323:15 326:14 |
| 16:18,22 22:7 | 133:16 134:17 | 217:11 221:18 | 326:22 327:4 |
| 23:13,22 25:5 | 134:24 135:3 | 222:21 223:6 | 328:20 329:1 |
| 26:2 29:20 31:6 | 139:8 140:5,9 | 224:10 225:5 | 329:10,24 |
| 32:5 36:7 41:12 | 140:14,17,20 | 229:13,22 | 335:7,17 336:2 |
| 42:24 45:3 | 141:12 143:8 | 230:17 231:2,7 | 337:11 340:11 |
| 46:17 49:2 | 143:19,23 | 231:11 232:7 | 340:16,20 |
| 50:17 51:12,21 | 144:4,15 | 232:13,19 | 341:1 343:5 |
| 52:11,15 53:2 | 145:20 146:13 | 237:1,20 | 349:12 350:24 |
| 53:16,22 54:19 | 147:12 149:11 | 238:21 239:10 | 354:5,12,24 |
| 55:2,15,21 56:2 | 150:10 151:7 | 240:21 242:15 | 360:8,21 361:5 |
| 56:17,21 57:1 | 152:10 153:10 | 248:7 249:6,23 | 363:12 365:5 |
| 57:17,23 58:15 | 154:3 155:12 | 250:18 251:19 | 365:11 368:17 |
| 59:17 60:6,9,21 | 155:24 165:6 | 252:22 257:13 | 369:6,10,22 |
| 62:1 63:14 64:3 | 165:12,22 | 258:10,21 | 374:8 379:4 |
| 65:20 66:9 | 166:4,17,24 | 259:8,13,18,23 | 389:14 390:3 |
| 67:13,22 68:3,7 | 167:17,24 | 260:12 267:21 | 390:11,18 |
| 68:23 71:17 | 169:17 170:9 | 268:15,21 | 391:5,11,16 |
| 72:5,13 73:11 | 170:22 171:10 | 275:7,10,15,23 | 396:22 397:15 |
| 74:3,6 75:4,12 | 173:7 174:20 | 277:22 279:17 | 397:18,22 |
| 76:15 77:5 85:5 | 176:9,19,24 | 283:14,20 | 398:1,11 402:7 |
| 85:19 86:6,19 | 177:13 178:8 | 284:13 286:20 | 402:15,21 |
| 87:21 88:5 89:3 | 178:20,24 | 288:13 289:1,5 | 405:15 409:22 |
| 89:8 90:1,6,21 | 181:21 182:16 | 289:8 290:24 | 411:10 412:3 |
| 91:9,13 92:10 | 183:9 190:11 | 291:9 295:23 | 412:12 413:15 |
| 94:5,18 95:3,7 | 193:18,22 | 297:1,4,14 | 415:2 418:19 |
| 95:18 96:6,13 | 194:2 197:22 | 298:2,4,9 | 420:9 421:9,23 |
| 100:23 102:13 | 198:4,7,16 | 304:14,21 | 430:15,17 |

434:15 444:12
445:22 447:22
448:23 449:3
449:15,22,24
450:15 451:3
454:7,11,12
455:4 457:21
458:5 460:4,6,8
461:20 465:9
471:22 472:13
472:21
**social**  177:10
372:21
**societies**  275:2
276:2 282:3,22
**society**  179:14
**sole**  252:9
**somatic**  372:20
**somewhat**
377:17 418:4
468:1
**son's**  324:6
**soon**  471:15,21
**sophisticated**
199:9
**sorry**  14:5
28:19 29:20
32:8 44:5 49:16
56:24 60:6 61:1
97:13 102:23
121:22 122:4
124:23 125:2
129:13 134:24
136:8 140:21
143:23 152:19
155:18 175:4

177:13 182:14
191:13 195:6,6
199:23 201:19
209:6 218:13
227:21 232:5
232:10,12,16
232:17,23
234:15 240:3
268:6,18
275:23 289:1
294:18 297:16
310:13 312:23
314:4,4 315:2
323:9,14 327:4
328:8 331:5
335:17 339:21
341:9 343:13
356:10 359:23
363:7 369:2
370:6 387:18
398:7 399:4,14
399:22 404:18
415:16 418:21
420:3 430:10
430:12 433:3
434:12,19
449:9 471:7
**sort**  323:5
360:1
**sound**  47:11
62:15
**sounds**  265:22
298:1
**source**  99:23
101:2,3 386:20

**sources**  108:23
**southern**  1:1
**space**  475:6
**spalding**  5:8
**sparring**  456:1
**speak**  85:23
119:11,20
156:13,18
259:7 330:16
330:20
**speaking**
135:13
**speaks**  52:19
278:1,4 288:15
304:7
**specialist**
179:11 218:6
**species**  264:4
**specific**  17:19
17:21 30:20
48:3 98:7
150:21 155:10
163:20 171:23
202:15 218:18
236:20 238:7,8
243:19 288:23
289:20 296:10
298:5 305:21
319:20 332:7
363:15 366:20
384:22 421:15
426:18 440:10
448:17
**specifically**
59:21 66:17
86:9 98:4

104:19 118:24
119:1 126:20
131:2 151:2
181:24 202:1
224:1,3 266:3
278:23 281:9
286:2 289:22
293:10,11,13
300:18,22
301:4 334:15
363:19 440:24
441:7
**specifics**  112:19
173:2 225:8
**spectrum**  137:2
**speculation**
86:20
**speech**  58:16
**speed**  297:2,5
**spell**  222:3
**spend**  38:20
47:16 68:8
89:20 105:15
297:23 306:12
315:15 427:2
**spending**
315:18 316:13
**spent**  39:4
81:20 116:24
315:20 425:3
426:23 471:6
471:10
**spinal**  185:18
**spines**  189:24
190:17

[spoke - strict]

spoke  86:2
    453:7
spoken  108:22
sponsored
    174:11
spots  346:10
spreadsheet
    130:6,10,14,18
springs  3:4
spurious
    247:11
stage  241:16
stand  287:20
    383:5
standard  15:13
    266:19
standing
    202:14 205:21
    210:24 258:11
    258:12
start  76:22
    197:6,7 198:1
    206:18
started  69:1
    83:14 131:7
    312:15 317:7
    323:20 439:14
starting  134:5
    197:9 199:3
starts  27:4
    45:14 125:5
    198:24 199:13
    255:8 357:6
    359:18
state  15:8 20:6
    154:21 200:14

209:19 235:12
274:20 331:8
400:21 419:12
420:12 475:5
stated  15:14
    16:3,24 18:11
    19:14 103:10
    316:23
statement  18:7
    29:9 31:16
    108:4 124:5,7
    220:15 389:18
    391:8 392:9
    412:9 414:23
    456:10
statements  63:9
    64:17 65:8,13
    65:15 82:6
    103:21 104:17
    148:5 155:6
    156:23 157:22
    306:24 307:2
    390:16 425:9
    447:15
states  1:1 20:7
    37:21 273:8
    278:7 377:7
    384:10,11,19
statistic  122:5
statistical  349:3
    358:8 362:17
    362:20
statistically
    266:5 362:13
    362:20 363:2
    363:10 407:14

407:18 408:9
statistics  174:5
stay  450:3
stenographic
    12:17
step  273:12
    401:4
stergiakouli
    345:11,15
    346:12
stick  64:23
stimulates
    221:4
stimuli  227:14
stipulations
    11:11
stop  68:1,2
    89:14 96:11,14
    362:9
stores  5:12
stories  93:12
story  86:12
    93:10
stq  370:17
strategy  50:8
    50:24 51:19
    56:14 58:21
    59:14 93:4
    115:23 144:12
street  5:4
strength  37:2
    40:17,24 41:6
    41:10,18,20
    42:8,18,22
    281:22 284:6
    285:12 286:23

288:7,20
289:17 290:6,9
290:21 291:21
295:5,10,14
296:12,16
297:12 298:14
303:14 304:2
305:7,13,22
341:14,18
342:11 343:9
343:12,16,18
456:3,19 457:8
458:7 463:9,10
464:4 466:1,7,9
467:7
strengthen
    143:15 145:18
    460:18,19
    465:1
strengthened
    464:15 465:3
    470:6
strengths
    403:17,19,20
stress  214:13
    215:11 225:24
    230:15 235:13
    235:24 254:9
    255:10,16
    256:11 263:23
    264:1 265:22
    266:11 269:2,8
    270:2,5 273:1
    273:10
strict  260:9

| | | | |
|---|---|---|---|
| **strike** 39:5 | 139:5,15,22 | 351:20 353:6 | 258:24 259:5 |
| 67:15 148:10 | 140:3,4 141:2,3 | 354:18,22 | 260:19 261:5 |
| 344:10 379:23 | 141:9 142:1,5 | 355:13,21 | 261:16 263:6 |
| 397:9 424:8 | 143:1 144:24 | 356:1,4 371:13 | 266:14,16,20 |
| 461:21 | 147:3,9,14 | 373:20,22 | 269:12,17,24 |
| **string** 218:17 | 149:9,15,19 | 374:6,11,20 | 270:6 272:18 |
| **strong** 235:12 | 157:4 158:1 | 382:7,13 383:9 | 272:22,23 |
| 298:21 306:2 | 164:16 180:23 | 392:10,19,21 | 273:14,20,21 |
| 332:19 406:23 | 182:2 183:19 | 393:4 403:16 | 337:13,21 |
| **stronger** 42:12 | 185:14,15 | 416:21 418:6 | 338:23 339:8 |
| 332:17 347:11 | 186:11 187:8 | 439:16,22,24 | 339:18 340:6 |
| 401:22 412:11 | 187:14,23 | 440:5 441:2,10 | 340:23 341:5 |
| 458:3 | 195:4 199:20 | 441:12,23 | 342:2,23 344:4 |
| **strongest** | 202:16 210:8 | 444:2 447:5,8 | 345:21 348:5 |
| 367:16 395:2 | 211:12,16,17 | 448:18 454:1 | 348:12,12,15 |
| **strongly** 253:24 | 212:23 225:13 | 454:13 457:17 | 351:21,22 |
| 314:18 316:16 | 225:16 226:17 | 458:2 459:21 | 352:2,16 353:1 |
| 350:18 469:21 | 226:20 252:17 | 460:12,17,21 | 353:4,21 354:3 |
| **struggling** | 257:8 266:22 | 461:9 462:2,5 | 354:4,10 |
| 354:14 | 266:23 272:21 | 463:16,23 | 355:23 356:5 |
| **stuck** 250:5 | 331:1,9 333:15 | 464:12,14,24 | 357:7 361:15 |
| **studied** 83:22 | 334:16 335:14 | **study** 8:23 | 364:8,22 |
| 241:11,13 | 336:10,18 | 123:1 163:8 | 366:22 367:7 |
| **studies** 20:7,15 | 337:7 338:12 | 181:19 182:13 | 368:9 371:11 |
| 20:21 21:1 | 338:15 339:13 | 183:14 189:5 | 372:2,4 373:1 |
| 22:17 24:1 27:4 | 339:16,19 | 195:17 199:21 | 373:13 376:4,9 |
| 27:13 49:23 | 341:22,23 | 201:22 204:6 | 376:13,21 |
| 67:2 101:22 | 342:6,13 | 204:12,12 | 378:17 380:8 |
| 117:1 118:1 | 344:14,22 | 205:2 206:20 | 380:10 382:9 |
| 130:10 132:18 | 345:16 346:18 | 206:24 207:9 | 383:12 386:20 |
| 133:7,13,21 | 346:21,24 | 208:14 210:16 | 387:6,8 391:24 |
| 134:9,13 135:9 | 347:1,19,22 | 246:21 254:8 | 403:20,21 |
| 135:11,17 | 348:3,21 349:9 | 254:22 255:3,9 | 405:19 417:4,5 |
| 136:11,19,24 | 349:22,24 | 255:19,21 | 420:19 441:21 |
| 137:16,22 | 350:6,7,13,14 | 257:24 258:8 | 441:22 447:10 |
| 138:12,12 | 350:19 351:16 | 258:16,19,20 | 461:24 462:4 |

469:13 472:17

**stuff**  99:2 238:5
310:2

**sub**  176:2

**subcortical**
190:2

**subject**  6:21
127:16 325:7
326:8 400:18
423:24 475:10

**submit**  46:5
75:24 316:5
471:15

**submitted**
314:11 330:21
410:11,18,18

**submitting**
75:16 428:2

**subscribed**
477:19

**subsequent**
290:15 405:14
406:12

**subsequently**
18:4,18 264:3
401:9,14,20
404:2,10,15
405:4 406:8
412:9 438:5

**subset**  208:24
209:15,15
273:20 469:13

**substance**
390:10 477:11

**substantive**
99:17

**subtoxic**  269:17

**sufficient**
156:12,21
205:16 379:20
380:1,16
383:24 414:18
414:23

**sufficiently**
376:21 381:9
382:14 383:10
383:19

**suggest**  269:4
454:22 456:22
457:2

**suggesting**
111:16 417:4

**suggests**  208:6
327:1 389:1

**suing**  50:14

**suite**  2:4,13
3:10,16 4:12
5:4,10

**summaries**
47:8

**summarized**
117:21 341:21

**summary**  81:5
149:4,8,14
157:8 348:2
370:12,14
374:2

**summer**  77:11

**superior**
396:12

**supervision**
474:22

**supplemental**
9:11

**support**  11:2
201:22 212:17
252:19 347:20
469:21

**supportable**
215:4

**supported**
155:5 469:21

**supporting**
272:24 332:11
332:12

**supportive**
347:7

**supports**  274:3
276:8

**sure**  18:8 20:18
32:11 58:23
61:4 77:7 87:8
104:6 109:14
114:10 117:12
120:5 136:15
141:24 150:18
156:3,6 172:12
172:20 175:18
178:3 183:21
184:17 185:19
193:21 197:5
200:4 214:5
229:23 234:9
236:14 238:4
250:7 276:15
280:22 285:11
293:8,8 301:7,8
303:5 320:19

328:4,6 344:20
350:3 352:23
369:4 371:15
408:7 425:11
431:14 433:5
436:7 442:24
443:10 453:15

**surprise**  48:14

**surprised**  411:5

**surrogate**
393:3

**susceptible**
235:19 246:1,6
254:4

**swear**  12:19
72:2 73:9

**sweden**  387:11
393:8,18

**switching**  351:1

**sworn**  12:23
474:5 477:19

**syllables**  293:7

**symptoms**
137:3 176:5,7
177:5,7,8,8

**synapses**  191:4
192:6 196:22

**synaptic**  189:18
190:22

**synaptogenesis**
190:20

**syndicate**
108:22

**synthesis**  222:2
228:12 262:2
267:12 269:6

**system**  189:8
**systematic**
  420:2,4 421:3

**t**

**t**  6:12 7:2 8:2
  9:2 10:2 122:22
  234:23 476:1
**tab**  115:17
**table**  358:13
  363:1,17 366:4
  387:17,23
**tables**  375:20
**take**  32:2,23
  37:15 40:5 47:7
  48:16 87:3
  88:17 93:15
  106:21 107:18
  113:7 115:7
  120:4 145:5
  146:9 179:20
  187:4 193:22
  203:18 205:5
  206:15 216:21
  265:19 281:15
  287:18 294:11
  304:23,24
  323:22 330:11
  339:20 351:4
  375:19 383:21
  385:16 390:21
  391:13 396:20
  406:4 408:21
  415:12 440:13
  441:14 442:12
  443:3 446:17

  450:2 470:11
  470:24 471:22
**taken**  1:16
  185:22 210:5
  234:21
**takes**  29:11
  396:19 448:7
  448:19
**talc**  8:8 126:8
  126:10,13
  281:16 282:19
  284:16 285:10
  286:19 287:15
  287:16 288:23
  289:17,21,23
  292:9,14,16
  293:21 299:9
  299:19 300:14
  301:5,14,21
  303:16 306:1,1
  322:11,11,21
  323:1 334:12
  334:13 455:6
  455:10,13,20
  456:11 457:8,9
  458:8,14 461:8
  461:13,14,16
  461:18 462:20
  463:7 466:24
  467:8
**talcum**  280:13
  280:17 281:1
**talk**  30:20,22
  63:1 81:8
  120:16 143:24
  151:5 158:4

  195:22 236:3
  245:16 258:13
  284:4,6 306:14
  315:23 341:7
  345:8 397:11
  401:3 402:18
  402:19 416:12
  432:2 452:13
**talked**  156:7,11
  237:4 299:14
  372:10 452:5
  453:5 455:5
  459:20 472:6
**talking**  28:22
  34:15,17,18
  46:18 54:11
  63:3 64:22,23
  65:1 92:14,15
  102:8 116:3,22
  117:10 118:7
  133:18 134:17
  134:18 137:11
  140:10,11
  162:7 196:17
  217:20 237:15
  254:19 255:22
  273:13 275:24
  296:12 303:10
  314:5,6,7
  343:12,16,17
  377:5 378:13
  378:14 384:9
  393:10 398:9
  405:3 434:16
  436:18,19

**talks**  197:14
  205:2 229:4
**talley**  3:8
**talmudic**  285:5
  301:10
**tangent**  360:2
**targets**  190:2
**task**  117:24
  119:11 320:14
  324:9
**tasked**  217:19
**tasks**  116:15
  119:5
**taught**  172:7,9
  173:2
**team**  7:15 50:7
  50:23 51:18
  54:17 56:13
  59:13 113:17
  113:21
**technical**
  365:14
**technician**  5:15
**teleologic**
  240:17
**tell**  70:5 72:17
  84:9 105:24
  167:11 169:21
  173:1 200:1
  214:21 223:24
  224:3 236:9
  294:7,9 296:20
  296:23 307:19
  310:7 359:11
  361:14 379:8
  423:16 429:3

**telling** 79:11
80:1 119:19
131:16 301:22
302:17 305:12
**temperament**
367:21,23
**temperamental**
357:21
**template**
281:11
**temporal**
284:10
**temporality**
187:20 192:14
274:21 275:18
276:12 277:13
278:8,20
279:14,24
284:5 286:3,13
290:11,23
291:18 292:1
292:23 294:23
305:19 320:8
320:18,22
337:23 338:1
341:16 345:3
456:23 458:23
459:3,5,16
462:23 463:3
466:22 467:6
467:20 468:12
468:15
**ten** 216:19
387:22
**tend** 244:6

**tendency**
256:21
**tenet** 333:19
340:1 350:16
382:10,17
383:2 425:14
463:2 466:1,9
**tenets** 19:3
22:15 37:4 41:4
42:1 63:7 226:8
226:11 274:18
277:1,9 279:9
281:19 288:2
305:14,15
317:18 329:20
329:22 334:10
334:14,22
343:18,22
344:9,13
373:17,24
468:16,18
**teratogens**
188:5
**term** 122:11
123:18 124:9
154:8 356:23
357:9 361:24
**termed** 196:14
**terminology**
61:16 154:1
197:9 290:17
420:4 446:13
**terms** 24:13
92:2,22 180:13
279:13 305:15
311:22 321:4

333:1 409:4,14
443:7,16
446:10
**terribly** 146:2
285:13 294:8
**test** 72:16 168:4
170:10 200:11
200:19 203:4
230:20,21
329:13 330:4
**testified** 12:24
41:14 50:20
60:24 90:15
141:14 250:20
292:10,15,17
314:14 322:12
411:1,6
**testify** 390:5
**testifying** 74:10
89:2 148:13
150:8 151:4
152:8 153:9
157:23 288:18
288:22 293:15
308:13 309:3
313:14 317:1
318:1,4 326:16
330:18 374:4
**testimony** 6:4
18:9 29:22
56:11 58:3
59:12 95:8
151:8 241:2
248:10 292:20
315:10 326:4,7
345:20 350:4

451:2 474:6
**texas** 3:5
172:15 430:23
**text** 14:11
**thank** 16:17
28:23 35:13
88:4 140:20
179:1 194:3,9
194:11 208:4
235:9 275:10
327:4 351:5
352:9 360:10
390:23 391:17
394:16 397:8
405:6 430:16
449:16,19
455:18 465:9
472:10,12,13
**thanks** 14:9
16:20 124:10
268:21 460:5
**that'd** 351:4
**theory** 236:1
**therapy** 299:7
299:8 306:7
**thereof** 440:2
**thereto** 440:3
**thing** 14:21
119:2,3,18
153:15 175:22
225:1 256:4
277:17 321:14
395:23 421:21
458:16
**things** 13:20
40:7 48:3 70:3

91:24 100:11
130:23 141:7
203:19 216:24
217:18 247:16
279:12 307:19
320:9 384:7
394:12 396:4
**think** 18:22,24
19:14 24:14
27:22 31:9 34:8
35:15 42:21
47:18 53:9 93:8
93:19 95:1
112:6 114:5
135:5 142:7
143:13 144:18
144:20 146:3
161:18 179:21
183:4 194:24
199:12,19
201:21 204:23
211:14 213:8
214:17,21
215:18,20
216:5 217:23
234:5 239:1,5
239:17 242:21
250:10,16
252:14 255:7
263:14 266:17
270:22 273:4
279:6 284:13
285:22 290:16
295:19 300:13
302:24 304:14
304:21 314:3

314:13 315:6
322:14,24
324:20 326:24
331:18 333:4
339:14 342:17
344:23 354:6
354:13,24
355:4 358:14
366:20 367:24
371:5 372:10
372:14 383:17
385:15 389:7
395:17 396:9
396:14 397:18
398:1,11 401:1
404:10,14,15
406:10 408:21
409:24 417:22
427:8,22
429:12 434:6
434:15 437:15
437:22 440:4
441:22 449:3
451:14,16,24
457:6 461:12
468:6,21 470:4
**thinking** 102:2
141:23 142:4
146:6 195:24
239:5,21
293:20 439:12
**third** 31:14
187:10,23
188:15,19
189:20 190:14
191:2,22 192:5

193:8 195:14
196:13,21
199:1 212:19
243:7 247:9,12
260:3 358:14
432:24
**thirds** 400:14
409:2
**thirty** 475:16
**thomas** 77:18
77:21
**thompson**
33:22 34:22
35:22 43:22
48:18 49:11
77:18,19,21,23
77:24 108:17
124:14 125:7
129:21 130:11
143:12 144:1
218:6,19,24
219:9 425:20
426:5
**thompson's**
116:7 219:14
219:24
**thornburg** 4:10
4:16 5:2
**thought** 40:9
144:13 153:19
156:16,20
184:4 268:16
275:24 286:11
301:12 335:6,9
336:3,12,16
337:1 344:18

361:13 372:21
403:7 436:24
452:2 469:19
**thread** 6:20
**three** 116:15
188:10 196:10
196:11 209:9
212:21 275:2
282:3,21 339:4
353:16 371:8,9
371:10 372:11
373:15 383:17
395:7 434:7
469:4
**thrown** 332:16
**thursday** 33:17
**time** 12:7 17:22
18:2,11 36:19
37:23 38:3,6
39:20 40:1
46:21 47:13
68:8 69:8,12,16
73:1,5 75:2,17
81:20 84:10
87:13 89:21
96:16 105:5,15
105:15 107:2
110:13 119:19
120:6,10 126:4
126:22 127:7,9
144:7,19 146:6
151:1,18 152:3
153:6 157:15
157:16,21
160:20 166:22
170:20,24

178:14 179:17
186:24 187:1
188:6 191:16
191:24 192:21
193:1 199:9,16
205:12 225:9
231:17 234:16
235:1 259:10
259:22 260:7
279:23 284:18
294:6 297:24
300:20 306:13
315:16,18
316:6,13
322:21 344:8
351:6,10
367:12 376:16
401:4,8,13
406:5 410:2
415:15,17,19
415:23 420:6
422:18 423:23
425:2 426:11
426:22 427:1
427:11 431:10
431:15 439:24
440:17 443:15
449:4,17 450:5
450:9 453:8,11
471:6,10
472:11,22
**timeline**  69:5
72:24 73:5
292:6 326:23
427:24

**timelines**  294:8
308:2 327:24
**times**  50:2 51:5
52:18 53:4 54:6
55:4 57:6 59:2
67:24 72:8
85:21 93:8 94:8
96:9 217:13
284:23 293:12
301:4 304:10
304:18 306:12
324:19 331:19
355:14 364:9
364:10,12
365:19,21
366:8,8 370:24
383:17,18
424:23
**timing**  70:11
151:17 188:15
357:22
**title**  173:20
**titled**  100:7
274:14 386:7
**today**  12:14,18
13:13 30:22
34:2 35:21
39:10 43:23
60:3 64:18,22
64:24 65:1,3,7
69:13 82:7 86:3
87:18 88:10
91:1 97:9
135:14 144:24
145:13 148:6
148:18 173:4

217:1 224:14
230:21 249:2
272:18 274:6
295:3,4,9,13
296:15 298:13
304:1 305:6
386:6 389:9
425:3,5,9,15,19
426:21 427:12
447:18 468:1
472:7
**today's**  12:6
**together**  44:24
73:6 126:5
128:17 134:5
142:5 247:16
249:22 250:11
401:17 471:13
471:17
**told**  13:20 40:8
55:16 70:10
74:22 87:24
88:7 89:10 94:7
96:23 112:1
119:8 125:18
154:2 223:8
225:20 291:11
291:15 360:21
414:16 422:16
424:22 427:15
428:19 436:14
436:16 446:8
447:18
**took**  38:2
255:19 464:15

**tool**  163:4
**tools**  164:16,20
166:8 167:7
168:1,3 170:8
171:2 370:21
373:10
**top**  49:15
121:12 130:3
164:12 165:4
167:5,15
168:10 169:11
170:6,15
182:23 196:10
368:24 375:18
384:13 429:6
**topic**  35:20
36:21 38:23
119:22,23
286:7 293:21
302:14 303:7
**total**  227:4
**totality**  176:6
273:24 274:1,2
277:6 279:8,8
305:14 316:6
382:18
**totally**  343:2
344:1 360:12
361:3 418:15
**touch**  45:20
87:7
**tovo**  8:19 368:5
368:18 369:14
369:16,19,21
370:4,13,18,23
371:2,19 374:7

**towards** 378:20
400:10 408:4
**toxic** 256:24
269:17
**toxicants**
162:20
**toxicity** 245:19
**toxicologic**
160:10 181:5
185:4
**toxicological**
181:19
**toxicologist**
181:2,10,12,13
273:5
**toxicology**
273:4
**trained** 179:5,8
**traits** 138:1,14
**trangle** 4:4
**transcript**
152:20 411:15
474:9,19
475:17,19
**transcription**
477:7
**transcripts**
325:6
**transdiagnostic**
421:5
**transparent**
338:24 418:16
**treated** 158:21
159:17
**treating** 160:1
179:18 181:14

**trees** 194:4
**trial** 299:13
**trichloroethyl...**
299:10
**tricky** 330:5
**tried** 304:19
**triggers** 235:20
246:2 254:4,6
256:11
**trimester**
187:11,24
188:4,19
189:15 190:14
191:23 193:8
199:1 212:19
243:7 345:9,10
357:19 358:14
412:18 448:8
448:21
**trimesters**
42:10 189:20
191:3 192:6
195:14 196:21
445:6
**tronnes** 8:15
351:21,23
352:2,7 355:23
362:5 367:7
372:14
**trouble** 354:7
**true** 22:6 55:17
55:20 78:10
96:20 203:1,14
207:5,7 259:14
275:12 307:20
341:15 344:24

352:20 375:23
419:4,11
420:12 423:10
457:12 464:17
474:6
**truly** 308:10
**truth** 299:2,3
414:5
**truthfully**
57:13
**try** 361:9
377:24 420:5
449:15
**trying** 27:22
99:1 102:24
104:23 107:12
133:4 135:4
166:10 167:11
171:1 182:19
185:9 204:2
231:9 242:4,23
247:4 255:5
297:24 310:15
322:4 330:4
355:1 359:13
392:15 394:21
399:24 444:7,8
452:16 461:3,4
465:5,6 470:14
470:15,16,17
470:20,21
**turn** 26:16 34:7
81:7 91:8,15
98:2 127:21
220:9 235:19
246:1 254:3

256:10,11
267:1,4 274:8
337:18 345:2
347:24 352:14
353:10 387:16
455:21 458:20
459:23 462:11
**twice** 40:23
**two** 19:14,19,21
20:7 23:1 24:9
42:15 43:13
67:3 68:20
75:19 102:21
112:12 124:4,6
132:11 135:21
138:8,21 180:6
195:1 196:10
201:3 212:21
215:9,12,15,16
215:18,20
216:4,10
225:20 236:13
247:16,17
256:20 275:2
278:17,22
279:14 282:3
282:21 283:8
283:22,24
287:7,10
290:20 305:4
320:8,18 339:4
342:13 351:2
370:21 371:8
379:17 398:19
400:14 409:2
416:13 431:17

431:21,21
432:6,14,17
435:6 450:2
**tylenol**   6:16
   10:6 12:11 20:9
   110:18 111:3,8
   123:23 147:10
   281:8,18
   282:10,19
   292:21 301:20
   321:18 429:20
   436:12 440:9
   466:6 467:21
**type**   294:14
   375:9
**typed**   209:7,11
**typically**   62:24

**u**

**u** 400:23
**ultimately**   69:4
   69:7 79:1 128:5
   131:18 146:18
   189:3 219:12
   433:16 435:12
   438:10
**ultraconserva...**
   470:12
**umbilical**
   255:16
**unable**   208:8
   208:14 209:20
**unaware**   39:13
   40:15,20
   330:13

**unclear**   130:19
   130:20 446:8
**uncompensated**
   422:23 423:14
   423:23 424:10
   424:15,20,24
   427:7,18
   428:16
**under**   41:24
   105:18 113:16
   113:21 152:18
   175:6 176:2
   187:20 276:20
   276:22 288:6
   288:19 289:11
   314:14 352:15
   360:3 363:17
   417:23 419:17
   436:23 471:22
   474:21
**underestimate**
   461:4
**undergone**
   205:13
**underline**
   50:22
**underlying**
   152:1
**underneath**
   103:6
**underpowered**
   385:11,14
**underscored**
   110:4
**understand**
   18:8 20:16

22:22 51:15
64:13 65:23
67:11 75:20
76:18 77:22
78:12 80:12
94:10,11 99:1
111:15 133:1,5
133:24 153:4
156:4 163:23
170:1 171:13
183:21 185:11
190:5 191:8,14
219:2 220:17
230:10 240:19
241:1 242:1,4
242:24 250:7,9
253:1 261:16
261:20 264:9
265:16,21
270:16,18
278:2 310:18
319:2,7 320:24
324:13,18,24
326:21 336:14
349:21 350:2,4
350:12 365:16
365:17 397:1
402:24 420:1
425:23 427:23
431:12 437:9
444:8,11,21
445:16 446:13
446:22
**understandable**
92:18

**understanding**
   35:11 36:13
   75:15 78:20
   84:6 104:4
   177:23 178:6
   233:24 249:4
   260:13 417:12
   437:6,7,12
**understood**
   22:3 50:13
   78:13 150:19
   315:10 437:3
**underwent**
   203:21 204:22
**unequivocally**
   29:13 30:9
**unfortunately**
   209:7
**unique**   418:4
**united**   1:1
   377:7 384:10
   384:11,19
**university**
   430:23
**unmeasured**
   357:11
**unpublished**
   424:8
**untethered**
   361:4
**unusual**   393:17
**upfront**   76:21
**ups**   342:20
**usa**   13:13 34:2
   43:23 60:3
   64:18 69:13

82:7 86:3,24
87:18 88:10
91:1 135:14
148:6 425:3,5,9
425:15,19
447:18
**use** 8:8 9:6,12
13:23 20:9
28:16 29:16
30:4,8 42:9,9
42:10 61:16
107:23 122:11
122:19,24
123:18 124:9
137:16 142:18
142:22 145:2
145:10,23,24
146:3,4 197:10
244:22 245:8
246:22 255:18
270:6 281:6
317:19 319:20
338:17 341:20
342:8 345:8,17
348:21 357:18
357:23 362:1
362:16 384:23
386:7 388:21
393:1,15 394:8
394:9,10
399:20 400:16
404:7 417:16
440:16 441:8
441:12 446:2,5
447:4 448:3,4,5
457:13 459:21

**used** 92:12,13
92:15 122:20
123:8 137:23
154:8 178:16
182:21 183:13
200:4,16
221:10 235:15
243:12,18,23
244:3 247:3
290:17 296:11
306:5 329:19
329:19 346:14
346:17 347:12
347:13 361:20
373:9,16,20,21
373:23 374:12
379:10 392:22
392:23 393:1
407:8,20
417:12 419:5,7
436:6 475:20
**uses** 200:17
**using** 41:3
42:13 43:5
123:7 154:1
163:3 182:13
183:14 255:16
407:24 447:19
457:17
**usually** 48:15
**utero** 9:20
27:17 29:16
123:23 161:9
162:19 180:17
251:13 361:24
376:23 379:22

380:2 384:1
392:16 394:23
421:7 442:16

| **v** |
|---|

**v** 122:22 222:4
**vaccine** 111:13
112:11 439:13
**vaccines** 40:10
110:19 111:4,9
111:18
**valid** 411:9
**validate** 257:8
**validating**
164:16
**valproic** 35:10
35:16,18
450:23 451:4
**value** 409:7,20
**vanilloid** 222:3
227:7,19 228:1
228:6,12
**various** 36:24
129:9 160:9,11
190:15 202:3
333:8 393:3
468:9
**verbally** 117:17
**verified** 273:16
273:18
**veritext** 1:22
**versa** 49:12
**versus** 31:4
38:10 111:3
350:14 448:5

**vice** 49:12
**video** 12:8
**videographer**
12:1,4 120:6,10
121:19 192:21
193:1 234:16
235:1 351:6,10
415:19,23
449:6,11 450:5
450:9 472:22
**videotape** 5:15
**videotaped**
1:15
**view** 138:13
144:23 335:13
336:9 414:6,17
422:10 465:17
468:2,11
**viewed** 468:8
468:12
**vinh** 3:8,12
**violating**
166:22
**virtue** 270:17
**vlenterie**
122:21 123:16
124:2,3 355:9
441:20,20
**vs** 1:8
**vulnerability**
28:14 30:13

| **w** |
|---|

**wagstaff** 3:14
**wait** 238:24
268:15 300:5

**[wait - weigh]**

398:9 405:10
**wal** 5:12
**walgreens** 5:6
**walk** 134:4
**walking** 107:15
**walmart** 5:12
**want** 16:9,19
25:16 26:16
39:14 49:3 54:3
58:8 66:12 68:8
72:19 77:5 81:8
89:16 95:8
105:14,17
106:10 108:8
120:4,16,19
121:16 135:5
136:6 158:4
167:2,20 171:7
171:11 173:15
178:10 183:3,9
185:7,11 196:1
204:18 210:24
211:12 213:17
214:4 219:22
229:24 231:2
231:12,19
239:15 250:7
256:3 258:13
261:7 268:18
297:2,5 302:24
305:6 310:17
318:19 321:5
329:5 361:18
380:12,15,21
381:1 389:13
389:17 390:2

390:15 392:4,6
392:7 401:3
402:24 412:2
413:9,19 414:4
416:3,7 433:10
445:8 447:13
472:16
**wanted** 93:16
93:21,24 94:14
109:14 212:11
403:23 418:14
420:22 446:1
**wanting** 83:19
**wants** 171:5
390:6
**warn** 13:22
31:22 32:14
107:11
**warning** 100:15
102:5,17 440:8
**warnings** 100:8
101:24
**warranted**
266:14
**washington** 2:5
3:21 5:5,10
**waste** 105:5,15
121:16 170:20
**wasting** 166:22
168:12 170:24
**watched** 185:15
**watt** 3:10
**watts** 3:3
126:16
**way** 80:7 83:23
85:16 105:8,21

106:14 166:20
166:21 260:2
273:19 277:19
293:20 301:11
323:1 334:24
335:3,5 342:14
364:5 370:23
396:7,10
411:12 418:13
421:6 439:8
445:13,18
469:16
**ways** 66:4
276:24 332:2
350:12 395:2
441:3
**wcllp.com** 3:17
**we've** 13:10,16
33:7,11 47:8
50:1 70:24
120:2 142:7
173:15 179:21
195:10 210:2
210:15,20
216:24 217:23
254:18 263:17
273:4 274:9
280:8,20 304:9
309:1 351:1
385:19 386:20
395:24 396:1
406:19 427:8
428:8,15
437:22 438:15
449:11 467:11

**weak** 466:15
**weaken** 460:18
465:1
**weaknesses**
403:17,20,21
403:22
**website** 6:22
37:5,6 45:8
59:24 78:14,16
78:22 79:4,5,18
80:15 109:5,12
109:19 110:2
110:14 111:17
112:23 113:15
113:19 114:3,6
114:9,13,16,18
114:23 115:2
127:18 128:2
129:9 131:16
131:21 132:17
133:22 134:11
139:3,16
142:12 143:14
146:10 174:9
174:10,14
217:3,10
218:12,18
222:15 435:20
436:5 438:1
**week** 110:3
113:15
**weeks** 189:20
190:14
**weigh** 10:7
429:21

| | | | |
|---|---|---|---|
| **weight** 274:22 | **white** 189:22 | 88:7 89:11,15 | 258:15 260:16 |
| 275:19 276:6 | 378:15 445:10 | 92:12 94:9,20 | 276:3 277:24 |
| 276:13 277:14 | **whoops** 203:15 | 95:5,20 101:1 | 279:19 280:17 |
| 278:10,13,16 | **wide** 210:5 | 103:20 104:15 | 284:15 286:22 |
| 279:15 280:1 | **william** 3:9 | 106:24 108:13 | 288:14 289:9 |
| 294:24 339:7 | **willing** 38:18 | 109:24 110:22 | 291:2,11 296:1 |
| 458:24 459:17 | 316:15 | 111:7 112:1 | 297:16 298:4 |
| 462:15 463:2 | **willingness** | 113:24 115:13 | 307:12 311:6 |
| 465:24 466:8 | 85:23 | 118:10 119:10 | 311:21 313:3 |
| **weighted** 25:22 | **window** 194:22 | 121:23 133:20 | 323:16 326:21 |
| 287:8 | **wished** 87:12 | 139:11 141:15 | 327:18 329:12 |
| **weighting** | **withdraw** | 144:17 145:22 | 330:18 335:9 |
| 339:9 | 165:23 171:7 | 146:15 147:13 | 337:14 341:2 |
| **weights** 277:19 | 171:12 | 150:12 151:9 | 343:6 349:14 |
| **weighty** 278:13 | **withdrawing** | 152:14 153:13 | 352:9 354:16 |
| 278:17 | 166:14 | 155:14 156:2 | 355:7 359:16 |
| **weintraub** 6:19 | **withdrawn** | 169:20 170:11 | 360:10,23 |
| **weird** 128:16 | 170:2 372:20 | 173:10 174:22 | 361:11 363:14 |
| **welcome** | **witness** 7:18 | 178:12 181:23 | 368:19 369:12 |
| 140:21 235:8 | 11:5 12:20 | 182:19 190:13 | 374:10 391:14 |
| **went** 21:23 | 14:10 22:9 | 192:20 193:21 | 391:17 396:24 |
| 69:19 76:3 | 23:15,24 25:7 | 194:9 198:18 | 397:23 398:13 |
| 211:22 248:15 | 26:4 29:23 31:8 | 202:22 206:11 | 399:3 402:12 |
| 270:22 291:15 | 32:7 36:9 41:15 | 208:20 213:20 | 405:17 409:24 |
| 292:1 293:11 | 43:4 45:5 46:20 | 214:1 216:15 | 411:16 412:14 |
| 301:22 302:14 | 49:5 50:21 | 217:14 221:20 | 413:24 415:9 |
| 302:17 315:6 | 51:14 52:1,13 | 222:23 223:8 | 415:16 418:21 |
| 315:23 371:3 | 53:6,20 54:21 | 224:12 225:7 | 420:8 422:19 |
| 401:14 418:12 | 55:7 56:6,20,24 | 230:3,19 | 423:4,8 426:23 |
| 447:18 452:11 | 57:8 58:6 59:20 | 231:19 234:10 | 427:2,12 |
| 453:10 468:3 | 61:1 62:3 63:19 | 234:14 237:3 | 434:18 447:24 |
| **west** 4:5 | 64:7 66:1 68:10 | 237:22 238:23 | 449:1,9,19 |
| **whatsoever** | 69:1 71:19 72:7 | 240:23 242:17 | 455:2 457:24 |
| 458:11 | 72:22 73:13 | 249:10 250:1 | 460:7 461:17 |
| **whip** 178:11 | 74:7,10 76:17 | 250:21 251:21 | 472:12 474:5,6 |
| | 85:9,22 86:8,21 | 252:24 257:15 | 474:8 475:1 |

**[woke - x]**                                                                Page 87

| | | | |
|---|---|---|---|
| **woke** 292:6 | **wording** 118:4 | 401:9,11,21 | 321:6 323:23 |
| **woman** 30:4 | **words** 58:3 | 404:3,6 405:21 | 403:22 |
| 145:4 158:24 | 92:17 110:9 | 406:22 422:20 | **writes** 34:1 |
| 179:19 235:16 | 249:15 278:18 | 422:21,23 | **writing** 106:3 |
| 243:13 395:3 | 278:18 285:21 | 423:3,4,7,8,9 | 151:12 317:7 |
| 396:14,19 | 290:11,11 | 423:14 424:10 | 319:14 320:14 |
| 410:3 440:9 | 302:15 303:1,3 | 424:15,21,23 | 327:14 328:3 |
| 443:2,21 446:3 | 303:5 305:22 | 426:23 427:3,7 | 398:15 405:24 |
| 446:16 448:7 | **work** 46:6 47:9 | 427:12 | 428:1 |
| 448:19 | 50:10 51:2,4 | **worked** 94:8 | **written** 18:4 |
| **woman's** | 52:4,8,24 54:13 | 125:24 126:3,5 | 19:1 147:22 |
| 409:18 444:23 | 56:9 59:22 | 126:21 | 153:20 159:21 |
| **women** 37:7,8 | 69:22 76:22 | **working** 36:3 | 230:8 300:23 |
| 40:21 78:15 | 78:17 82:5 83:2 | 37:10 44:24 | 332:15 405:16 |
| 85:12 107:10 | 83:24 84:2 92:6 | 74:1 75:2 78:1 | 423:18,20 |
| 107:11,21 | 94:16 98:5,10 | 78:7 80:5 85:17 | **wrong** 124:24 |
| 123:7 142:16 | 99:11,14 | 91:24 94:3 | 277:18 286:18 |
| 142:22 145:16 | 101:19 114:15 | 104:9 150:15 | 286:23 369:7 |
| 145:18 146:11 | 114:19 116:4 | 250:17 312:10 | 404:17,19 |
| 179:22 182:4 | 125:16 128:16 | 312:15 317:12 | 455:12 |
| 220:11 314:20 | 147:19,22,23 | 426:16 436:15 | **wrote** 18:19 |
| 396:20 397:6 | 147:23 148:4 | 437:19,21 | 49:17 61:5 |
| 412:6,17 | 159:20 160:12 | 451:8 | 87:13 104:24 |
| 413:10 414:22 | 160:19,21 | **works** 58:17 | 108:21 151:9 |
| 440:13,15 | 161:16 162:1 | 82:21 125:7 | 152:2 154:5 |
| 441:14 442:11 | 163:12 164:6 | 229:12 230:15 | 158:3 169:23 |
| 442:12 447:19 | 177:10 179:23 | 250:10 252:20 | 178:2,13 |
| **women's** 40:16 | 180:8 184:5 | 253:4 | 186:21 287:15 |
| 107:4 | 223:23 225:12 | **world** 65:14,16 | 292:19 300:18 |
| **wondering** | 249:21 276:22 | 447:15 | 300:23 301:4 |
| 386:19 | 309:2 310:22 | **write** 148:17 | **x** |
| **word** 23:21 | 311:3 312:3,8 | 151:5 154:4 | **x** 6:2,12 7:2 8:2 |
| 101:14 334:19 | 313:18,22,23 | 200:5 217:20 | 9:2 10:2 277:3 |
| 383:22 385:17 | 314:6,9,14 | 277:12 295:2 | 277:4 |
| 404:11,15,16 | 321:23 400:19 | 317:17,17,20 | |
| 405:4 406:8,12 | 400:22,23 | 319:8,17,19 | |

| y | | |
|---|---|---|
| **yeah**  16:13,18 | 397:22 398:11 | 348:18 355:16 |
| 16:18,22 20:24 | 402:21 404:4 | 355:17 371:7,9 |
| 23:15 28:12 | 421:23 426:7 | 371:10,23 |
| 29:23 44:11 | 430:17 431:2 | 373:15 470:2 |
| 49:5 70:1 75:12 | 432:12 434:13 | **z** |
| 80:12 83:8 98:1 | 454:8 458:1,2 | **zoom**  2:9,10,11 |
| 99:13 106:16 | 464:2 472:21 | 2:12 3:4,9,10 |
| 107:7,7,7 | **year**  72:6 73:16 | 3:15,20 4:11 |
| 108:12 115:15 | 353:16 371:2,8 | 5:9 |
| 123:24 127:7 | 371:9,10 | |
| 131:17 138:20 | 377:15,16,17 | |
| 165:22 176:16 | 378:9,10,11 | |
| 176:23,23 | 422:17 434:9 | |
| 183:4 184:9 | 434:11,13 | |
| 193:11,15,17 | 435:1,3 | |
| 204:13,17 | **years**  158:20 | |
| 212:10 231:10 | 208:1,11 | |
| 242:21 245:6 | 284:17,17 | |
| 249:3 254:15 | 286:5 288:1 | |
| 255:1,8,24 | 289:3 303:11 | |
| 267:21 289:5 | 357:22 373:15 | |
| 300:7 311:6,19 | 382:21 | |
| 318:20 322:7,7 | **yep**  28:2 121:1 | |
| 331:7 334:18 | 327:3 460:6 | |
| 336:14 339:5 | **york**  1:1,17,17 | |
| 340:20 345:17 | 2:21,21 4:6,6 | |
| 345:18 351:3 | 4:18,18 12:10 | |
| 354:16 355:7 | 12:10 60:3 93:8 | |
| 355:11,20 | **young**  371:4,14 | |
| 357:15,16 | 371:22 372:4 | |
| 359:8 369:6,12 | 373:4,5,14 | |
| 369:18 370:8 | **younger**  115:14 | |
| 379:7 385:6 | 298:7 357:1 | |
| 391:3 397:21 | **ystrom**  246:21 | |
| | 253:20 340:18 | |
| | 341:24 345:10 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.