UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: Acetaminophen – ASD-ADHD Products Liability Litigation<br><br>This Document Relates To: All Actions | Docket No.: 22-md-3043 (DLC) |

## DEFENDANT'S MOTION FOR SANCTIONS AGAINST ASHLEY KELLER

**INTRODUCTION**

On January 18, 2023, this Court entered a Protective Order ("MDL Protective Order" or "Order") to safeguard confidential information and facilitate discovery in this MDL proceeding. ECF 351. The MDL Protective Order clearly states that Confidential and/or Highly Confidential Information received during discovery in this action "shall not be used in any other proceeding or action." *Id*. ¶ 17. Nonetheless, Plaintiffs' Lead Counsel, Ashley Keller, just did precisely that in two different lawsuits in Florida and Texas state court. In opposing Defendants' motion to dismiss the Florida case, Mr. Keller cited, quoted, described, and ultimately attached to his client's responsive pleading a dozen documents designated Confidential and Highly Confidential in this MDL. And days later, *after* Mr. Keller was advised of the violation of the MDL Protective Order in the Florida case, Mr. Keller attached the same dozen documents (albeit fully redacted) to his client's responsive pleading in the Texas matter and simultaneously moved to file those "confidential" materials under seal in that case. Plaintiffs' counsel's conduct disobeyed this Court's order and threatened the integrity of this proceeding. Accordingly, sanctions are warranted under both Rule 37 and the Court's inherent authority.

**First**, Rule 37 mandates the imposition of monetary sanctions where a lawyer knowingly violates a discovery order absent substantial justification. It is beyond dispute that Mr. Keller, an experienced attorney and Plaintiffs' Lead Counsel, knew that these materials were protected under this Court's Order. Indeed, counsel expressly titled those documents "Confidential" in his Florida state court filing and filed a Notice alerting the state court of the protected status of those materials. Counsel similarly redacted the materials in Texas and moved to file them under seal in that proceeding. But neither justifies violation of this Court's protective order by using protected matter in cases outside this Court. This conduct warrants an award of the attorneys' fees Kenvue has incurred as a result of Mr. Keller's sanctionable conduct.

1

***Second***, the Court should also impose non-monetary sanctions under its inherent authority and formally reprimand Mr. Keller and his firm for this clear-cut violation of the MDL Protective Order. As this Court has previously recognized, while the exercise of inherent authority generally requires bad faith, an "exception" applies where "the attorney's misconduct falls within his or her role as an 'officer of the court,'" which includes "'violations of court orders or other conduct which interferes with the court's power to manage its calendar and the courtroom . . . .'" *In re Plumeri*, 434 B.R. 315, 328 (S.D.N.Y. 2010) (quoting *United States v. Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000)). Even if Mr. Keller's knowing and repeated violations of the MDL Protective Order do not rise to the level of bad faith, they are a direct affront to this Court's authority and the orderly management of the MDL. In order to ensure that such misconduct does not happen again, this Court should reprimand counsel and his law firm pursuant to its inherent authority.[1]

## BACKGROUND

### The Protective Order

In order to facilitate discovery in this matter, this Court entered the MDL Protective Order on January 18, 2023. ECF 351. Counsel for all parties, including Mr. Keller, stipulated to that Order. In no uncertain terms, the Order prohibits recipients of "Confidential and/or Highly Confidential Information" from using that Information in a separate action. Paragraph 17 of the Order states:

> Confidential Information and/or Highly Confidential Information May Be Used Only in this Matter. ***Except as noted above in paragraphs 12(a) and (g) and paragraphs 13(a) and (f)***, or further order of this Court, the documents, the information contained therein, and all other information produced or disclosed during this matter shall be used solely for the purposes of discovery, hearings, trial, appeal, and/or settlement of the above-captioned matter, and ***shall not be used in any other proceeding or action***, unless the same discovery has been produced in a

---

[1]   Defendants reserve the right to seek more severe sanctions in the event that Mr. Keller commits any further violations of the MDL Protective Order or any of the Court's other orders, including, but not limited to, revocation of his *pro hac vice* privileges in this proceeding or holding him in contempt.

"***Related Action***" as defined in the forthcoming Order on the coordination of state and federal litigation.

ECF 351 ¶ 17 (emphasis added).

As emphasized above, Paragraph 17 carves out only limited exceptions, delineated in Paragraph 12, which specifies to whom Confidential Information may be disclosed, and Paragraph 13, which specifies to whom Highly Confidential Information may be disclosed. The relevant provisions of these paragraphs are narrow in scope. They merely provide that information may be disclosed to certain counsel, legal staff, and witnesses necessary for the prosecution or defense of *this action*, ECF 351 ¶¶ 12(a), 13(a), as well as to this Court and members of its staff, *id.* ¶¶ 12(g), 13(f). There is no accommodation for the use of confidential documents across all actions, or even related actions.

Nor is the Florida or Texas state case at issue a "Related Action" as defined in this Court's January 27, 2023 Coordination Order. ECF 382. Per the Coordination Order, a "Related Action" is one in which the court has adopted this Court's Coordination and Protective Orders. *Id.* ¶ 4. While counsel for Defendants have repeatedly urged Mr. Keller to submit this Court's Orders for adoption in state court proceedings filed by his firm after this Court's Rule 702 decision in December 2023, he has repeatedly refused to do so.

### **Mr. Keller's Violation Of The MDL Protective Order**

In addition to representing numerous plaintiffs in this MDL, Mr. Keller also serves as counsel for other plaintiffs in state court lawsuits throughout the country that raise substantially similar claims to the ones dismissed by this Court in 2024. The underlying motion pertains to two such lawsuits. The first lawsuit was filed by Mr. Keller on behalf of Melissa Guist in Florida state court in late 2024. *See* Compl., *Guist v. Johnson & Johnson*, No. CA25-1750 (Fla. Cir. Ct. St.

Johns Cnty.) (Ex. A to the Declaration of Jessica L. Brennan, Esq. ("Brennan Decl.")). [2] On January 13, 2026, Defendants filed a motion to dismiss the *Guist* lawsuit, and Mr. Keller served his client's opposition brief two weeks later, on January 27. *See* Pl.'s Opp'n to Mot. to Dismiss (Ex. B to the Brennan Decl.). As part of that filing, Mr. Keller attached nearly 600 pages of exhibits, as well as an 11-page declaration acknowledging that he "serve[s] as co-lead counsel for plaintiffs in the federal multidistrict litigation," and that "[i]n this capacity, [he] ha[s] gained personal knowledge of the matters set forth herein." Decl. of Ashley Keller ("*Guist* Keller Decl.") ¶ 4, *Guist v. Johnson & Johnson* (Ex. C to the Brennan Decl.).

In a "Notice of Confidential Information" filed simultaneously with the Florida state court, Mr. Keller specifically acknowledged that his client's opposition brief, his affidavit and twelve (or nearly half) of the accompanying exhibits contain "confidential" information. *See* Notice of Confidential Information (Ex. D to the Brennan Decl.).[3]

Beyond attaching these confidential documents, Mr. Keller also extensively quotes from them in the brief opposing Defendants' motion to dismiss and in Mr. Keller's own declaration. For example, significant portions of pages 5-6 of the opposition brief quote from internal communications reflecting that Johnson & Johnson kept abreast of scientific developments regarding the safety of Tylenol. *See* ████████████████

███████████████████

---

[2]    Notably, although Plaintiffs' Leadership is required to periodically advise this Court of ongoing related state court litigation (ECF 200), the last update provided to this Court was on November 4, 2024 (ECF 1525). Plaintiffs have not yet advised this Court of the pendency of the *Guist* action.

[3]    *See, e.g.*, *Guist* Keller Decl. at Exhibit 4, APAP-JJCI-0001717789; Exhibit 5, APAP-JJCI-0001722365-69; Exhibit 6, APAP-JJCI-000015607-08; Exhibit 7, APAP-JJCI-0001722804-07; Exhibit 9, APAP-JJCI-0000034407-09; Exhibit 10, APAP-JJCI-0000035030-32; Exhibit 13, BBC0000313-26; Exhibit 16, APAP-JJCI-0001831517; Exhibit 17, APAP-JJCI-0001831515; Exhibit 18, APAP-JJCI-0001778097-507; Exhibit 20, APAP-JJCI-0000016835-37; Exhibit 24, APAP-JJCI-0001763435. Two additional exhibits contain documents currently unsealed in another state court matter but subject to redactions. *See, e.g.*, *Guist* Keller Decl. at Exhibit 8, APAP-JJCI-0000014388; Exhibit 11, APAP-JJCl-0000013368.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████    Similarly, a large chunk of page 7 of the opposition quotes from internal Kenvue documents addressing the safety of Tylenol. *See id.* at 7 (quoting from *Guist* Keller Decl. at Ex. 16, APAP-JJCI-0001831517, Ex. 17, APAP-JJCI-0001831515, and Ex. 18, APAP-JJCI-0001778097). And 10 of the paragraphs of Mr. Keller's declaration quote from documents designated as "confidential" in the MDL. *See* Notice of Confidential Information ¶ 2 (noting that paragraphs 12-15, 17, 23-24, and 29-31 quote from confidential documents). In total, Mr. Keller references or *quotes directly from* protected documents no fewer than 17 times.

Upon realizing that Mr. Keller had improperly used confidential MDL materials in his state-court filing, defense counsel promptly sent Mr. Keller and his colleagues a letter demanding that they immediately take all steps necessary to ensure that no unauthorized individuals are able to access the January 27th filings, including plaintiff's opposition brief, supporting exhibits and Mr. Keller's declaration, including, but not limited to, obtaining an order from the Florida court sealing the confidential documents. *See* Jan. 30, 2026 Letter from A. Kruppa to A. Keller (Ex. E to the Brennan Decl.). Defense counsel also demanded that plaintiff withdraw the improper filings and refile an amended opposition that does not use confidential information in contravention of the MDL Protective Order. *Id.* Counsel met and conferred on February 2, and on February 4, Mr. Keller ultimately withdraw the improper pleadings and served an amended opposition brief and an amended declaration, along with a motion to strike the prior improper filings.

The other case at issue was brought by Mr. Keller on behalf of the State of Texas. On

February 5, *after* being advised of the violation in Florida state court and *after* withdrawing the improper pleadings there, Mr. Keller filed a redacted opposition to Defendant's motion to dismiss that case, attaching the same twelve confidential documents discussed above in redacted form. Mr. Keller also filed a redacted affidavit, touting his "serv[ice] as co-lead counsel for plaintiffs in the federal multidistrict litigation[.]" Decl. of Ashley Keller ("*Texas* Keller Decl.") ¶ 4, *Texas v. Johnson & Johnson* (Ex. G to the Brennan Decl.) filed in support of Plaintiff's Opposition (Ex. F to the Brennan Decl.). Mr. Keller simultaneously moved for leave to file the "confidential" materials under seal in the Texas court. *See* Pl.'s Mot. for Leave to Seal, *Texas v. Johnson & Johnson* (Ex. H to the Brennan Decl.).

## ARGUMENT

Mr. Keller's use of documents designated confidential in this MDL in two pending state court proceedings is sanctionable under both Rule 37 and the Court's inherent authority. As explained below, the Court should: (1) award attorneys' fees to Kenvue incurred in responding to counsel's misconduct; and (2) issue a formal reprimand.

### I.    THE COURT SHOULD AWARD ATTORNEYS' FEES UNDER RULE 37.

Rule 37 authorizes the imposition of sanctions on a party or her attorney who "fails to obey an order to provide or permit discovery[.]" Fed. R. Civ. P. 37(b)(2)(A). "By logical extension," courts within the Second Circuit have "consistently held that a protective order issued under Rule 26(c) can be enforced through Rule 37(b)." *Jay v. Spectrum Brands Holdings, Inc.*, No. 13 Civ. 8137, 2015 WL 6437581, at * 5 (S.D.N.Y. Oct. 20, 2015); *see also Minskoff v. Mendoza*, 797 F. Supp. 3d 238, 265 (E.D.N.Y. 2025) (similar) (citations omitted).

The "'mildest' sanction specifically enumerated under Rule 37(b) is an order that the "party who violated the discovery order at issue, or the attorney advising that party, be required to reimburse the opposing party for expenses caused by the violation." *Jay*, 2015 WL 6437581, at

6

*12. Indeed, under Rule 37(b)(2)(C), a court "*must*" so order unless the violation was "substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added); *see also Minskoff*, 797 F. Supp. 3d at 265, 267 ("Rule 37(b) generally requires that this sanction be imposed . . . unless" the two exceptions apply) (quoting *Jay*, 2015 WL 6437581, at *5). "Rule 37 places the burden of proof on the disobedient party to show 'that his failure is justified or that special circumstances make an award of expenses unjust.'" *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 145, 148 (S.D.N.Y. 2014) (quoting *Novak v. Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008)).

Accordingly, courts within the Second Circuit have repeatedly awarded attorneys' fees incurred as a result of a party or her attorney using information designated confidential in one proceeding in an unrelated action. *See, e.g.*, *Minskoff*, 797 F. Supp. 3d at 267 (imposing attorneys' fees and a significant monetary fine on a party for disclosing confidential information to "signal [to the] public . . . that insubstantial attempts to circumvent Court authority will not be tolerated"); *Hunt v. Enzo Biochem, Inc.*, No. 06 CIV. 170 (SAS), 2011 WL 4840713, at *1, *6-7 (S.D.N.Y. Oct. 12, 2011) (finding plaintiff's attorney in contempt and imposing monetary sanctions for "improperly giving" confidential documents to a man he knew was pursuing a separate case against the same defendants); *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, No. 18-CV-5427 (JSR), 2020 WL 7231095, at *2-3 (S.D.N.Y. Dec. 7, 2020) ("Given [plaintiff's] clear violation of the Protective Order" in sharing confidential documents with an outside law firm to support the filing of similar litigation, "the Court will therefore impose a sanction of $40,000 (i.e., $10,000 for each of the four documents wrongly disclosed) . . . ."); *see also Abdou v. Mahany & Ertl, LLC*, No. 19-cv-1824 (JHR) (RWL), 2024 WL 3503046, at *43 (S.D.N.Y. June 11, 2024) (imposing reasonable attorneys' fees for filing confidential material on the public docket).

7

For example, *Minskoff* involved a motion for sanctions based on a defendant's disclosure of confidential information (i.e., the results of a paternity test) in a separate state court action. The protective order provided that "'Discovery Material designated as 'CONFIDENTIAL,' as the paternity test was designated,' 'shall be held in confidence . . . shall be used *only for purposes of this action*, and shall not be disclosed to any person who is not a Qualified Recipient.'" 797 F. Supp. 3d at 263-64 (emphasis added). The defendant nevertheless stated in a state court filing that "a paternity test authorized by judicial order has proven" that he was the father. *Id.* at 264. As Judge Brian Cogan of the Eastern District explained in imposing sanctions, the defendant's "violation of the protective order was a willful, direct violation of this Court's orders." *Id.* at 266. Moreover, "[t]hat [the defendant] did not come to this Court first and preview what he was going to do in [the state case] so that this Court could grant or withhold permission [was] another indication of how brazen his violation was." *Id.* In imposing attorneys' fees and a substantial monetary fine, the court emphasized that it "must [e]nsure that defendant adheres to its rulings in this case, and . . . also must signal [to] the public as well that insubstantial attempts to circumvent Court authority will not be tolerated." *Id.* at 267.

Here, just as in *Minskoff*, parties to this MDL and their counsel agreed to be bound by a protective order clearly stating that "Confidential Information and/or Highly Confidential Information May Be Used Only in this Matter." Protective Order § IV, ¶ 17. However, Mr. Keller flouted that clear directive in the pending *Guist* and *Texas* lawsuits. In an attempt to avoid the dismissal of those lawsuits, Mr. Keller attached to his clients' briefs multiple documents designated as confidential in the MDL as well as other state court proceedings. In the *Guist* case, Mr. Keller also extensively cited to and quoted from those confidential documents throughout the brief and in his own declaration supporting that pleading. There is no debate that this conduct

8

constitutes a "willful, direct violation of this Court's orders," *Minskoff*, 797 F. Supp. 3d at 266; rather, Mr. Keller simultaneously filed a "Notice of Confidential Information" in *Guist* and a motion to seal in the Texas case, effectively conceding that his filings contain confidential information.

Sanctions under Rule 37(b)(2)(C) are therefore mandatory unless Mr. Keller can show that his violations were "substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).[4] He cannot show either. Mr. Keller is an experienced attorney. And he plainly knew that he was disclosing or using information protected by the MDL Protective Order by notifying the Florida and Texas state courts of the protected status of the documents in question. Moreover, counsel specifically stated in his declarations that he has "gained personal knowledge of the matters set forth herein" by virtue of "serv[ing] as co-lead counsel for plaintiffs in the federal multidistrict litigation[.]" *Guist* Keller Decl. ¶ 4; *Texas* Keller Decl. ¶ 4. Needless to say, such knowledge does not give him license to "thumb his nose at a clearly stated court order" that was entered in that litigation. *See Minskoff*, 797 F. Supp. 3d at 267. Rather, at a minimum, counsel was required to "come to *this Court* first . . . so that this Court could grant or withhold permission," and his failure to do so reinforces just "how brazen his violation was." *Id.* at 266 (emphasis added). Similarly, the fact that Mr. Keller ultimately agreed to withdraw his improper filings in the *Guist* case and completely redacted the protected materials in his filings in the *Texas*

---

[4]    Although the MDL Protective Order permits such use where "the same discovery has been produced in a 'Related Action' as defined" in the Court's Coordination Order, *id.*; *see also* ECF 351 ¶ 17, that narrow exception does not apply here, as noted above. To be a "Related Action," the court overseeing the other action must adopt this Court's Coordination Order and, in turn, this Court's Protective Order. ECF 382 ¶ 4. Neither has occurred here; to the contrary, Mr. Keller has repeatedly objected to defense counsel's requests for adopting this Court's orders in other actions. Although Mr. Keller's colleagues in the Texas case recently suggested pursuing such a procedure in that action, Defendants indicated that they are not amenable to that proposal at this time in light of Mr. Keller's violations of the Protective Order in connection with the Florida lawsuit. Indeed, that proposal was not even raised until **after** counsel's improper actions in *Guist*—demonstrating that this proposal's only purpose was to attempt to circumvent the protections afforded by the MDL Protective Order.

action does not undo his sanctionable conduct, much less make up for the amount of time and resources that defense counsel have spent in enforcing this Court's Order. Accordingly, to protect this Court's authority and ensure that counsel "adheres to its rulings" going forward, *id.* at 267, the Court should award Kenvue the attorneys' fees it has incurred in having to respond to this misconduct—namely, the filing of the underlying motion.

## II.    SANCTIONS ARE ALSO WARRANTED UNDER THE COURT'S INHERENT AUTHORITY.

The Court should also formally reprimand Mr. Keller pursuant to its inherent authority. "It has long been understood that 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citation omitted). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.* (citation omitted).

As this Court has made clear, although the exercise of inherent authority is generally reserved for misconduct involving bad faith, an "exception" occurs when an attorney engages in "misconduct unrelated to 'legitimate efforts at zealous advocacy for the client.'" *In re Plumeri*, 434 B.R. at 329 (quoting *Seltzer*, 227 F.3d at 40-42). This includes "'violations of court orders or other conduct which interferes with the court's power to manage its calendar and the courtroom[.]'" *Id.* (quoting *Seltzer*, 227 F.3d at 42); *see also, e.g.*, *Palmer v. Simon's Agency, Inc.*, 833 F. App'x 838, 839 (2d Cir. 2020) ("we have made clear that the source of sanctions authority . . . can also cover certain non-bad-faith conduct" such as "violations of court orders") (citation omitted); *George v. Prof'l Disposables Int'l, Inc.*, No. 15-CV-3385 (RA), 2018 U.S. Dist. LEXIS 74103, at *6 (S.D.N.Y. May 1, 2018) (counsel's "repeated failures to comply with Court orders .

. . is unacceptable from an officer of the court" and warrants monetary sanctions under the court's inherent authority).

Where an attorney engages in such misconduct, district courts have wide discretion to award not only attorneys' fees incurred as a result of the misconduct but also non-monetary sanctions. *See, e.g.*, *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 272, 282 n.18 (2d Cir. 2021) (attorney's violation of pretrial orders "is sanctionable" under "the district court's inherent authority" and supported a variety of non-monetary sanctions, including, *inter alia*, requiring counsel to serve a copy of the district court's ruling on "every one of the firm's clients" and to "file a copy of the Order on the docket of any case brought by" the attorney for one year after the ruling); *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, No. 20-CV-7269 (VEC), 2022 WL 524737, at *3 (S.D.N.Y. Feb. 22, 2022) (requiring counsel, "for the next two years, to notify all other Courts in which he litigates and all other parties against whom or with whom he litigates that a Court has determined that he willfully violated a Protective Order during litigation"), *aff'd sub nom., Nat'l Acad. of Television Arts & Scis., Inc. v. Goodman*, No. 22-592, 2023 WL 3989876 (2d Cir. June 14, 2023).

Mr. Keller's actions warrant the imposition of inherent-power sanctions under these principles. As outlined above, Mr. Keller knowingly violated the MDL Protective Order by repeatedly using Confidential and Highly Confidential Information in unrelated state court cases. Even if such conduct does not amount to bad faith, it has necessarily undermined the enforcement of the MDL Protective Order and, by extension, this Court's authority. As an "officer of the court," Mr. Keller has an obligation to follow this Court's orders rather than disregard them in unrelated state cases. *In re Plumeri*, 434 B.R. at 328 (quoting *Seltzer*, 227 F.3d at 42). Accordingly, Kenvue respectfully requests that the Court admonish counsel under its inherent authority. *Cf. Kensington*

11

*Int'l, Ltd. v. Republic of Congo*, No. 03 Civ. 4578 (LAP), 2007 U.S. Dist. LEXIS 63115, at *34 (S.D.N.Y. Aug. 23, 2007) ("This sanction is imposed [under court's inherent authority] as a formal reprimand [for obstruction of discovery] and should be circulated to all attorneys at" counsel's law firm), *aff'd sub nom.*, *Cleary Gottlieb Steen & Hamilton LLP v. Kensington Int'l Ltd.*, No. 07-4075-cv, 284 F. App'x 826 (2d Cir. July 1, 2008).

## CONCLUSION

For the foregoing reasons, the Court should: (1) award attorneys' fees in the amount incurred by Defendant in filing the underlying motion; and (2) reprimand Mr. Keller for his misconduct.

Dated: February 6, 2026                    Respectfully submitted,


                                           /s/ Jessica L. Brennan
                                           Jessica L. Brennan
                                           Barnes & Thornburg LLP
                                           67 East Park Place, Suite 1000
                                           Morristown, NJ 07960-7105
                                           Tel: 973.775.6120
                                           Fax: 973.775.6102
                                           Email: Jessica.Brennan@btlaw.com

                                           *Attorneys for Johnson & Johnson Consumer Inc.*
                                           *now known as Kenvue Brands LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: Acetaminophen – ASD-ADHD
Products Liability Litigation

Docket No.: 22-md-3043 (DLC)

This Document Relates To: All Actions

**DECLARATION OF JESSICA L. BRENNAN, ESQ.**

I, Jessica L. Brennan, Esq., an attorney duly admitted to practice law in this Court, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a Partner with the law firm of Barnes & Thornburg LLP, attorneys for Defendant Johnson & Johnson Consumer Inc. (now known as Kenvue Brands LLC) ("Kenvue") in the above referenced matter.

2.     I submit this Declaration in support of Kenvue's Motion for Sanctions Against Ashley Keller. I have personal knowledge of the following facts set forth in this Declaration and, if called as a witness, I could and would competently testify as to the matters stated herein.

3.     Annexed hereto as **Exhibit A** is a true and correct copy of the Complaint filed in the action styled *Guist v. Johnson & Johnson*, No. CA25-1750 (Fla. Cir. Ct. St. Johns Cnty.) on December 15, 2025.

4.     Annexed hereto as **Exhibit B** is a true and correct copy of Plaintiff's Opposition to Kenvue's Motion to Dismiss filed in the action styled *Guist v. Johnson & Johnson*, No. CA25-1750 (Fla. Cir. Ct. St. Johns Cnty.) on January 27, 2026.

5.     Annexed hereto as **Exhibit C** is a true and correct copy of the Declaration of Ashley Keller filed in support of Plaintiff's Opposition to Kenvue's Motion to Dismiss in the action styled

1

*Guist v. Johnson & Johnson*, No. CA25-1750 (Fla. Cir. Ct. St. Johns Cnty.) and as filed on January 27, 2026.

6.      Annexed hereto as **Exhibit D** is a true and correct copy of Plaintiff's Notice of Confidential Information filed in connection with Plaintiff's Opposition to Kenvue's Motion to Dismiss filed in the action styled *Guist v. Johnson & Johnson*, No. CA25-1750 (Fla. Cir. Ct. St. Johns Cnty.).

7.      Annexed hereto as **Exhibit E** is a true and correct copy of the January 30, 2026 Letter from A. Kruppa to A. Keller, advising Mr. Keller of his violations of this Court's MDL Protective Order.

8.      Annexed hereto as **Exhibit F** is a true and correct copy of Plaintiff's February 5, 2026 Combined Response in Opposition to Kenvue's Motion to Dismiss filed in the action styled *State of Texas v. Johnson & Johnson, et al.*, No. 2025-348 (Tex. Dist. Ct. Panola Cnty.).

9.      Annexed hereto as **Exhibit G** is a true and correct copy of the Affidavit of Ashley Keller filed in support of Plaintiff's Combined Response in Opposition to Kenvue's Motion to Dismiss in the action styled *State of Texas v. Johnson & Johnson, et al.*, No. 2025-348 (Tex. Dist. Ct. Panola Cnty.).

10.      Annexed hereto as **Exhibit H** is a true and correct copy of Plaintiff's Motion for Leave to File Unredacted Documents Under Seal filed in support of Plaintiff's Combined Response in Opposition to Kenvue's Motion to Dismiss in the action styled *State of Texas v. Johnson & Johnson, et al.*, No. 2025-348 (Tex. Dist. Ct. Panola Cnty.).

Dated: February 6, 2026                                    Respectfully submitted,


                                                          /s/ *Jessica L. Brennan*
                                                          Jessica L. Brennan
                                                          Barnes & Thornburg LLP
                                                          67 East Park Place, Suite 1000
                                                          Morristown, NJ 07960-7105
                                                          Tel: 973.775.6120
                                                          Fax: 973.775.6102
                                                          Email: Jessica.Brennan@btlaw.com

                                                          *Attorneys for Johnson & Johnson Consumer*
                                                          *Inc. now known as Kenvue Brands LLC*

# EXHIBIT A

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
12/17/2025
CT Log Number 550907211

## Service of Process Transmittal Summary

**TO:**    Dasia Abram
Johnson & Johnson
1 JOHNSON AND JOHNSON PLZ
NEW BRUNSWICK, NJ 08933-0001

**RE:**    **Process Served in New Jersey**

**FOR:**    Johnson & Johnson  (Domestic State: NJ)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: MELISSA GUIST as Parent and Natural Guardian of Minor Child, H.G. // To: Johnson & Johnson |
| **CASE #:** | 552025CA001750A000MX |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation |
| **PROCESS SERVED ON:** | C T Corporation System, West Trenton, NJ |
| **DATE/METHOD OF SERVICE:** | By Process Server on 12/17/2025 at 15:12 |
| **JURISDICTION SERVED:** | New Jersey |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 12/18/2025, Expected Purge Date: 12/28/2025 |
| | Image SOP |
| | Email Notification,  Ra-Jjcus Ldsop  ra-jjcus-ldsop@its.jnj.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 820 Bear Tavern Road |
| | West Trenton, NJ 08628 |
| | 855-844-0739 |
| | ServiceSolutionsTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:**                                    Wed, Dec 17, 2025
**Server Name:**                             Drop Service

| Entity Served | JOHNSON & JOHNSON |
|---|---|
| Case Number | CA251750 |
| Jurisdiction | NJ |

| Inserts |
|---|
|  |



Filing # 237783427 E-Filed 12/15/2025 07:12:32 PM

IN THE CIRCUIT COURT, SEVENTH
JUDICIAL CIRCUIT, IN AND FOR ST.
JOHNS COUNTY, FLORIDA

552025CA001750A000MX
CASE NO: CA25-1750
DIVISION: 59

MELISSA GUIST as Parent and Natural
Guardian of Minor Child, H.G.,

Plaintiff,

v.

JOHNSON & JOHNSON, KENVUE INC.,
KENVUE BRANDS LLC, and PUBLIX
SUPER MARKETS, INC.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## COMPLAINT AND DEMAND FOR JURY TRIAL

For well over a decade, Defendants JOHNSON & JOHNSON, KENVUE INC., KENVUE

BRANDS LLC, and PUBLIX SUPER MARKETS, INC., have known that acetaminophen—

Tylenol's active ingredient—is dangerous to unborn children. Recently, the federal government

confirmed what Defendants have known for years: prenatal exposure to acetaminophen likely

causes conditions like **Autism Spectrum Disorder ("ASD")** and **Attention-Deficit Hyperactivity**

**Disorder ("ADHD")**. Defendants have ignored this evidence because the market for

acetaminophen is highly lucrative. Acetaminophen is the most commonly used drug in the United

States,[1] and approximately 65% of pregnant women take acetaminophen over the course of their

pregnancy. Even as Defendants have reaped the profits from acetaminophen sales, Defendants

---

[1] *Patterns of Medication Use in the United States*, Slone Epidemiology Ctr. at Boston Univ. at 11,
Tbl. 1 (2006), *available at* https://www.bu.edu/slone/files/2012/11/SloneSurveyReport2006.pdf.

**Accepted 12/17/2025 08:42 AM by the Clerk of the Circuit Court, St. Johns County, Florida, DIN: 5**

owed a duty to adequately warn of risks associated with the drug. Yet, Defendants have taken no steps to warn about the risk of ASD and ADHD and, in fact, have sought to minimize the risk and create doubt concerning the science to protect their bottom line, nor have they fulfilled their responsibility to study, investigate, and independently assess these risks.

**Defendants' failure to warn of acetaminophen's risks has caused** life-altering consequences for families across the country. Defendants have consistently represented acetaminophen as safe to use during pregnancy, despite evidence showing that acetaminophen increases the risk that their children will develop ASD and/or ADHD. **Pregnant women have relied on Defendants'** representations and unknowingly placed their children at risk of incurable, lifelong neurodevelopmental disorders. The law requires that Defendants provide accurate and complete information about their acetaminophen products to reduce or avoid the risk that children will develop ASD and/or ADHD.

Like many mothers, Melissa Guist **took Defendants' acetaminophen during her pregnancy** with Plaintiff H.G. As a result of being exposed to acetaminophen in utero, Plaintiff developed ASD. If Defendants had properly warned about the risks associated with their acetaminophen, Plaintiff would not have been exposed to acetaminophen in utero or such exposure would have been significantly reduced, and he would not have developed ASD. Plaintiff will now require lifelong care and support as a result of **Defendants'** failure to warn about the risks of prenatal acetaminophen use.

## **INTRODUCTION**

1.      For years, Defendants have willfully ignored and attempted to influence and minimize the science showing that prenatal exposure to their acetaminophen products can cause ASD and ADHD in children. The labels on these products contain no warning that there is any sort

of risk of ASD or ADHD if a child is exposed to the drug in utero. Instead, Defendants have marketed the drug as a completely safe pain medication for pregnant women and their babies. This campaign has been effective, as approximately 65% of pregnant women take acetaminophen while pregnant, and most do so electively for minor aches and pains.

2.      For years, Defendants have sold their respective acetaminophen products and reaped the benefits of these sales. Pregnant women rely on Defendants and their safety assurances when they purchase Defendants' acetaminophen. Defendants owed a duty to warn about the risks of prenatal ingestion of acetaminophen.

3.      Defendants, however, have shunned this duty and willfully ignored the science that prenatal exposure to acetaminophen can cause ASD and ADHD in children. In particular, Johnson & Johnson, Kenvue Inc., and Kenvue Brands LLC have attempted to manufacture evidence disclaiming a link between acetaminophen and ASD and ADHD by publishing their pro-Tylenol position under the guise of legitimate scientific research.

4.      The labels for Defendants' acetaminophen contain no warning that there is any risk that children may develop ASD or ADHD as a result of being exposed to acetaminophen in utero. Pregnant women have purchased and taken the Defendants' acetaminophen products based on the understanding that they posed no risk to their unborn children.

5.      But prenatal exposure to acetaminophen, the sole active ingredient of the acetaminophen products at issue in this case, can cause ASD and ADHD in children. To date, at least 26 epidemiological studies have shown positive associations between prenatal use of acetaminophen and ASD and/or ADHD in children. Six studies have investigated whether there is a dose-response relationship between prenatal APAP exposure and ADHD. Two focused on ASD. *All eight* showed a dose-response relationship, a key indicator of a causal relationship.

6. Scientists designed several of the studies to address certain limitations associated with observational studies. For instance, a common limitation of observational studies is that they rely on mothers to self-report their exposure to the drug or toxin in question, which creates a risk of recall bias. To control for this, one peer-reviewed study published in a prominent scientific journal examined umbilical cord blood samples to assess acetaminophen levels.[2] The results showed that children with cord blood acetaminophen concentrations in the top one-third suffered a 3.62 times increased risk of ASD and a 2.86 times increased risk of ADHD compared to those in the lowest tertile.

7. On the strength of this evidence, in September 2021, over 90 scientists signed a consensus statement, which concluded: "the combined weight of animal and human scientific evidence is strong enough for pregnant women to be cautioned by health professionals against [acetaminophen's] indiscriminate use, both as a single ingredient and in combination with other medications."[3] Other researchers have subsequently reviewed the medical and scientific literature, finding that "prenatal exposure to paracetamol causes statistically significant risks of developmental delays, attention deficit hyperactivity disorder, and a subtype of autism spectrum disorder (ASD) associated with hyperkinetic behavior."[4]

8. Defendants have paid no heed to the scientific facts. They continue to promote their acetaminophen as safe for use in pregnancy. They have taken no steps to update their labels to warn of the risks of ASD and ADHD. Despite the recommendations of federal public-health

---

[2] Yuelong Ji et al., *Association of Cord Plasma Biomarkers of In Utero Acetaminophen Exposure With Risk of Attention-Deficit/Hyperactivity Disorder and Autism Spectrum Disorder in Childhood*, 77 JAMA Psychiatry 180 (2020).

[3] Ann Z. Bauer et al., *Paracetamol Use During Pregnancy—A Call for Precautionary Action*, 17 Nature Revs. Endocrinology 757, 764 (2021).

[4] Esha Patel et al., *The Safety of Pediatric Use of Paracetamol (Acetaminophen): A Narrative Review of Direct and Indirect Evidence*, 74 Minerva Pediatrics 774, 774 (2022).

officials to warn about the link between prenatal acetaminophen use and neurodevelopmental disorders, Defendants continue to represent their acetaminophen as safe for use in pregnancy.

9.     There are many examples of drugs regulated by the Food and Drug Administration ("FDA") that include complete information regarding potential health risks on their labels even when the underlying science—unlike here—is not fully settled. These labels reflect the aims of the regulatory system to apprise consumers of certain risks. The regulatory system also recognizes states' authority to require appropriate warnings, and pregnant women should be provided with complete information so that they can make informed decisions regarding the risks to which they expose their unborn children.

10.    But Defendants deprived pregnant women of the right to make that choice. These women relied on the Defendants' acetaminophen labels when deciding to consume the drugs while pregnant. Had these labels contained *any* warning of acetaminophen's ASD/ADHD risk, mothers would have reduced or avoided acetaminophen use while pregnant, preventing their children from being exposed to the drug and developing incurable neurodevelopmental disorders.

11.    Defendants had the authority and the duty to warn about the risks that acetaminophen poses to unborn children based on the significant scientific evidence. They chose (and continue to choose) not to.

12.    Mrs. Guist is the mother and natural guardian of Minor Plaintiff H.G. Mrs. Guist consumed Defendants' acetaminophen products during her pregnancy with H.G. As a result, H.G. developed ASD.

13.    Defendants breached their duty to adequately warn consumers of the risks of developing ASD and/or ADHD when exposed to their acetaminophen products in utero. Defendants continue to breach it every day with every acetaminophen product sold without

5

warning about the increased ASD and ADHD risks associated with taking acetaminophen during pregnancy, ensuring that future children will face the same sorts of devastating diagnoses as Minor Plaintiff H.G. To compensate him for his present and future losses and to deter future misconduct, Plaintiff brings strict liability failure to warn, negligence, breach of implied warranty, and Uniform Fraudulent Transfer Act claims against Defendants.

## PARTIES

### PLAINTIFF

14.    **Minor Plaintiff H.G.** is a citizen and resident of the State of Florida and St. Johns County.

15.    H.G. has suffered personal injuries in the form of ASD because he was exposed in utero to Defendants' acetaminophen products, specifically TYLENOL® and Publix brand acetaminophen, which were developed, manufactured, formulated, marketed, tested, promoted, licensed, sold and/or distributed by Defendants.

16.    H.G. was born in 2017 and is 8 years old as of the filing of this Complaint.

### DEFENDANTS

17.    **Johnson & Johnson ("J&J")** Johnson & Johnson is a New Jersey corporation with its principal place of business in New Jersey. At all relevant times, Johnson & Johnson was engaged in the business of researching, developing, manufacturing, formulating, marketing, testing, promoting, licensing, selling, and/or distributing Tylenol® brand acetaminophen. At all relevant times, Johnson & Johnson regularly transacted, solicited, and conducted business in Florida.

18.    **Kenvue Inc.** is a Delaware corporation with its principal place of business in New Jersey. Since its formation, Kenvue Inc. has engaged in the business of manufacturing,

6

formulating, marketing, testing, promoting, licensing, selling, and/or distributing Tylenol® brand acetaminophen. Since its formation, Kenvue Inc. regularly transacted, solicited, and conducted business in Florida.

19.     **Kenvue Brands LLC ("Kenvue Brands")** is a Delaware corporation with its principal place of business in New Jersey. It is a wholly owned subsidiary of Kenvue Inc. Since its formation, Kenvue Brands LLC has engaged in the business of manufacturing, formulating, marketing, testing, promoting, licensing, selling, and/or distributing Tylenol® brand acetaminophen. Since its formation, Kenvue Brands LLC has regularly transacted, solicited, and conducted business in Florida.

20.     Kenvue Inc. was incorporated on February 23, 2022, as a wholly owned subsidiary of J&J in connection with a restructuring of J&J's consumer health business. Kenvue Inc. and J&J entered into a separation agreement on May 3, 2023, and Kenvue Inc. completed its initial public offering as a standalone public company that same month. J&J continued to be the majority shareholder of Kenvue Inc. until at least August 2023, and Johnson & Johnson did not fully divest from Kenvue Inc. until mid-2024.

21.     From approximately 2018 until October 28, 2024, Kenvue Brands was known as Johnson & Johnson Consumer Inc. ("JJCI"). JJCI was a wholly owned subsidiary of J&J. Prior to 2018, JJCI was known as McNeil Consumer Healthcare ("McNeil").

22.     Upon information and belief, Kenvue Inc. and/or Kenvue Brands LLC assumed all liabilities relating to the operation or conduct of Kenvue Inc.'s business, including Tylenol, during all relevant times. Together, J&J, Kenvue Inc., and Kenvue Brands LLC are referred to herein as the "Tylenol Defendants."

23.     **Publix Super Markets, Inc. ("Publix")** is a Florida profit corporation with its principal place of business in Florida. Publix has engaged in the business of manufacturing, formulating, marketing, testing, promoting, licensing, selling, and/or distributing store brand acetaminophen, known as "Publix" brand. Publix has also engaged in the business of marketing, promoting, selling, and/or distributing Tylenol® brand acetaminophen. Publix has regularly transacted, solicited, and conducted business in Florida.

## JURISDICTION & VENUE

24.     This Court has jurisdiction in this matter pursuant to F.S.A. § 26.012(2) because Plaintiff seeks damages in excess of $50,000, exclusive of costs, interest, and attorneys' fees. Each of the Defendants conducts business in the State of Florida. Publix also maintains its principal place of business in Florida. Defendants have sufficient minimum contacts with and purposefully avail themselves of the markets of this State. This suit arises out of Defendants' forum-related activities, such that the Court's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

25.     The Defendants caused injury by acts and omissions in Florida and caused injury in Florida while regularly doing and soliciting business, engaging in a persistent course of conduct, and receiving financial benefit and profits from goods used or consumed in Florida.

26.     At all relevant times, Defendants were present and doing business in Florida and should have expected that their acts would have consequences within the state of Florida.

27.     Additionally, this Court has personal jurisdiction over Publix because Publix is a Florida citizen.

8

28.     During Ms. Guist's pregnancy with Minor Plaintiff, she purchased and consumed Defendants' acetaminophen products in Florida, including but not limited to: Tylenol® and Publix Acetaminophen.

29.     Venue is proper pursuant to F.S.A. § 47.001 because Ms. Guist purchased the acetaminophen products to which Plaintiff was exposed in St. Johns County and Plaintiff's injuries occurred in St. Johns County.

## FACTUAL ALLEGATIONS

## I.     A BRIEF HISTORY OF ACETAMINOPHEN

30.     Acetaminophen was first discovered in the latter half of the 19th century. In the early 1950s, Robert McNeil led the research department at his family's small drug company. At a drug-industry conference, he learned about acetaminophen, which had been sold as a headache remedy in other countries.[5]

31.     McNeil Laboratories capitalized on the bubbling concern over aspirin's side effects—upset stomachs, ulcers, and impairment of normal blood clotting—to launch acetaminophen as a safe and effective alternative for treating pain and fever.

32.     In 1955, McNeil Laboratories obtained FDA approval for a prescription single-ingredient product called Tylenol Elixir for Children, an aspirin-free pain reliever and fever reducer. Its active ingredient was acetaminophen.[6]

---

[5] Stephen Miller, *Creator of Tylenol "For Little Hotheads"*, Wall St. J. (May 26, 2010), https://www.wsj.com/articles/SB10001424052748704026204575266780552207418.
[6] Natasha Singer, *Robert L. McNeil Jr., Chemist Who Introduced Tylenol, Dies at 94*, N.Y. Times (June 3, 2010), https://www.nytimes.com/2010/06/04/business/04mcneil.html.

33.    The brand name "Tylenol" was a derivative of a combination of letters found in the chemical name for acetaminophen: N-aceTYL-p-aminophENOL.[7]

34.    Tylenol was marketed directly to physicians and pharmacists and, at the time, was available by prescription only.  McNeil Laboratories' initial strategy was to offer Tylenol as a remedy for children, and it sold the drug in a package modeled after a fire engine along with a slogan pitching the product "for little hotheads."[8]

35.    In 1959, J&J acquired McNeil Laboratories.[9] By 1960, the Tylenol was available without a prescription, or "over-the-counter," and was marketed for use by children and adults alike.[10]

36.    Since that time, acetaminophen has become one of the most widely used drugs in the world and dozens of retailers sell their own name-brand version of the drug. A 2006 survey found that acetaminophen was the most commonly used drug among adults in the United States, with 19% of adults reporting that they used the drug during a particular week.[11]

37.    J&J's July 2013 earnings call reported that over-the-counter ("OTC") drug revenue had skyrocketed by 26%, identifying Children's Tylenol as one of the top two brands in OTC children's pain relief.[12] The same call reported that Extra Strength Tylenol had doubled its market share during the first half of 2013, cementing its status as America's No. 1 OTC adult pain reliever.[13]

---

[7]    McNeil    Consumer    Healthcare    Company,    *History    of    TYLENOL*, http://www.nancywest.net/pdfs/McNeilConsumerHealthcareCompany.pdf.

[8] Miller, *supra* note 5.

[9] McNeil Consumer Healthcare Company, *supra* note 7.

[10] Singer, *supra* note 6.

[11] *Patterns of Medication Use in the United States*, *supra* note 1, at 1.

[12] *Use Only As Directed*, ProPublica (Sept. 20, 2013), https://www.propublica.org/article/tylenol-mcneil-fda-use-only-as-directed.

[13] *Id.*

38.    By 2015, McNeil had dubbed Tylenol a "Megabrand" and marketed it as vital for all stages of life, including in pregnancy and early infancy.

39.    Acetaminophen has long been marketed as the safest over-the-counter pain-reliever available for pregnant women.[14] In the United States, acetaminophen is estimated to be used by up to 65% of women during pregnancy.[15]

## II.    FEDERAL REGULATION OF ACETAMINOPHEN

40.    Acetaminophen is regulated by the FDA under the OTC Drug Review process, also known as the Monograph System. The Monograph System was developed in 1972 to regularize the marketing and sale of drugs that were already being marketed. Drugs covered under the Monograph System, like acetaminophen, were "grandfathered in" and not required to obtain FDA approval prior to marketing.

41.    As a result, FDA never reviews the drug label for drugs covered under the Monograph System.[16] There is also no requirement that FDA approve changes to the label for a monograph drug once it is on the market.

42.    Instead, under the Monograph System, FDA issues a comprehensive regulation—a monograph—for each therapeutic class of OTC drugs, setting out each drug's FDA-approved active ingredients and then identifying the conditions under which the drugs are generally recognized as safe and effective. Under the Monograph System, there are no "generic" drugs

---

[14] *See ACOG Response to Consensus Statement on Paracetamol Use During Pregnancy*, Am. Coll. of Obstetricians & Gynecologists (Sept. 29, 2021), https://www.acog.org/news/news-articles/2021/09/response-to-consensus-statement-on-paracetamol-use-during-pregnancy ("ACOG and obstetricians-gynecologists across the country have always identified acetaminophen as one of the only safe pain relievers for pregnant individuals during pregnancy.").

[15] *See* Bauer et al., *supra* note 3, at 758.

[16] *See* Over-The-Counter Human Drugs; Labeling Requirements, 64 Fed. Reg. 13,254, 13,271 (Mar. 17, 1999) ("Products that are marketed under an OTC drug monograph are not required to submit labeling to the agency for preapproval.").

11

operating under a modified regulatory framework. Different brand names, such as Tylenol or Publix brand, are governed by the same rules.

43.    As a consequence, all OTC drug marketers have the ability to unilaterally change their labels. There is no distinction under the regulatory regime between, for instance, the marketers of Tylenol and retailers marketing store brand acetaminophen. Both sets of marketers have the duty to update the drug's label to account for risks under the regulatory regime and state law.

44.    In addition, because a drug's monograph does not specify the exact label that must be used with respect to a particular drug, marketers must use their professional judgment to create packaging that complies with FDA's regulations. In other words, marketers of monograph drugs can unilaterally make changes to the warning label as long as those changes do not conflict with the warnings required by applicable regulations that carry the force of law.

45.    The acetaminophen monograph, which was deemed "final" in 2021,[17] outlines the applicable conditions that drugs containing acetaminophen is required to satisfy. Some of these conditions are stated in terms of a floor—minimal requirements with no limitations on what can be added. Others are stated in terms of a ceiling—requirements that cannot be supplemented.

46.    However, nothing in the monograph's warnings section suggests that the required warnings are *exclusive*. Accordingly, marketers retain the regulatory freedom to provide *additional*, truthful warnings that do not contradict the warnings required by federal law.

---

[17] Prior to being deemed "final," the acetaminophen monograph was considered a "tentative final monograph" and had the "legal status . . . of a proposed rule." Internal Analgesic, Antipyretic, and Antirheumatic Drug Products for Over-the-Counter Human Use; Tentative Final Monograph, 53 Fed. Reg. 46204, 46204 (Nov. 16, 1988).

47.    So, although nothing prevented Defendants from doing so, they have not included any warnings on their acetaminophen product labels regarding the risk that prenatal use of acetaminophen may cause ASD or ADHD.

## III.    DEFENDANTS MANUFACTURE, CONTROL, AND SELL ACETAMINOPHEN.

### A.    The Tylenol Defendants

48.    J&J has sold and marketed Tylenol since 1959, when it acquired McNeil Laboratories.

49.    Until 2023, J&J and its wholly owned subsidiaries designed, manufactured, packaged, labeled, marketed, sold and/or distributed Tylenol.[18]

50.    In May 2023, J&J separated its consumer health business, including Tylenol, into a standalone public company called Kenvue Inc. Since that date, Kenvue Inc. and its wholly owned subsidiary Kenvue Brands have designed, manufactured, packaged, labeled, marketed, sold and/or distributed Tylenol.

51.    Based on information and belief, J&J maintained and exercised ultimate control over Tylenol, including over the labeling and marketing of Tylenol at all relevant times hereto.

### B.    Publix Super Markets Inc.

52.    Defendant Publix sells pure acetaminophen products under its own store brand and is responsible for the labels on its store brand acetaminophen. As a marketer under the Monograph System, Publix had the authority—and the duty—to change its acetaminophen warning labels to warn of the risks associated with prenatal use of acetaminophen.

---

[18] The Tylenol products that are the subject of this lawsuit include only those products with acetaminophen as the sole active ingredient.

13

53.     Publix sells a variety of pure acetaminophen products under its own label/brand, the Publix brand or "badge."

54.     Publix also markets, promotes, distributes, and sells Tylenol brand acetaminophen products alongside its Publix brand acetaminophen products.

55.     Publix sold the Publix brand and Tylenol brand acetaminophen at its stores throughout each of the States and Territories of the United States where Publix has stores, including Florida.

56.     Publix prominently affixed its brand labeling on the Publix brand acetaminophen packaging, bottles, and pills. The Publix brand acetaminophen label is intended to capture the attention of consumers who shop at Publix, like Plaintiff's mother.

57.     The Publix brand packaging and label do not identify (or do not prominently identify) the manufacturer of the Publix brand acetaminophen or otherwise state that Publix is *not* the manufacturer of the Publix brand acetaminophen.

58.     Consumers who ingested Publix brand acetaminophen products—including Plaintiff's mother—associated the brand name and prominently featured Publix brand with Publix and reasonably believed they were ingesting a product manufactured by Publix.

59.     At all relevant times, Publix had substantial control over Publix brand acetaminophen products, including ultimate control and authority over the manufacturing and labeling of Publix brand acetaminophen.

60.     Upon information and belief, Publix contracted with a third-party to manufacture Publix brand acetaminophen. Publix was required to approve any modifications to the Publix brand acetaminophen label. Publix also directed the third-party manufacturer to apply Publix's logo and other intellectual property on the Publix brand acetaminophen label.

14

61.     Upon information and belief, Publix failed to adequately supervise the third-party manufacturer(s) that it hired and directed to manufacture and label Publix brand acetaminophen for Publix.

62.     Moreover, upon information and belief, Publix instructed the third-party manufacturer(s) to add an adequate warning about the risk of ASD and ADHD, the manufacturer would have added the warning. But because Publix's specification did not include any warning about ASD or ADHD, the third-party manufacturer(s) did not add one.

## IV.     A BRIEF OVERVIEW OF ASD.

63.     ASD is a serious neurological disorder that typically manifests its symptoms early in childhood and can require lifelong care.[19]

64.     Although the symptoms of ASD are wide-ranging, they generally include atypical behavior and difficulty with social interaction and communication.[20] Many children with ASD also suffer from intellectual disability, with an IQ score below 70, and/or ADHD.[21]

65.     The American Psychiatric Association previously provided five possible diagnoses for autistic conditions, ranging from Asperger's syndrome on the milder end to autistic disorder on the severe end.[22] The fifth and current edition of the Association's *Diagnostic and Statistical*

---

[19] *See Autism*, World Health Org. (Sept. 17, 2025), https://www.who.int/news-room/fact-sheets/detail/autism-spectrum-disorders.

[20] *Id.*

[21] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 58–59 (5th ed. 2013) ("DSM-V"); *see also* Autism & Developmental Disabilities Monitoring (ADDM) Network, *Community Report on Autism* 10, 48 (2021), https://www.cdc.gov/ncbddd/autism/addm-community-report/documents/ADDM-Community-Autism-Report-12-2-021_Final-H.pdf ("2021 Autism Report").

[22] DSM-V, *supra* note 21, at 50-51.

*Manual of Mental Disorders* ("DSM-5") now provides for a single diagnosis, Autism Spectrum Disorder, with three levels of severity.[23]

66.    Children with Level 1 autism, the mildest form, require some support in daily life.[24] These children can often speak in full sentences but still have trouble initiating social interactions, reading nonverbal cues, and engaging in back-and-forth conversation.[25] Making friends might not come easily, and an inflexibility of behavior can make it difficult to switch between activities.[26] These children might also experience problems with organization and planning that limit their independence.[27]

67.    Children with Level 2 autism require substantial support in daily life.[28] These children have more obvious problems with communication, often speaking in simple sentences and struggling with nonverbal communication.[29] They also tend to have narrow interests and to engage in restricted, repetitive behaviors, which further limits their social interactions and their ability to function in various contexts.[30]

68.    Children with Level 3 autism, the severest form, require very substantial support in daily life.[31] These children have significant difficulty expressing themselves and will often be entirely nonverbal.[32] They might interact with others only in response to direct approaches.[33] And

---

[23] *Id.* at 52.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

16

they will exhibit extreme inflexibility, engaging in repetitive behaviors and feeling great distress when changing focus, which impedes their ability to function in everyday situations.[34]

69.    ASD can be reliably diagnosed by age 2 and is sometimes detectable earlier.[35] But diagnosis is based on observation; there is no medical test for ASD.[36] Many children are diagnosed after age 4.[37]

70.    Treatments for ASD include varying degrees of behavioral management therapy, cognitive behavior therapy, joint attention therapies, physical therapy, speech-language therapy, occupational therapy, social skills training, and medication.[38] But there is no cure for ASD. Treatment to manage ASD symptoms lasts a lifetime.[39]

71.    According to one report, as of 2018, an estimated 2.3% of 8-year-old American children, or 1 in 44, have been identified with ASD.[40]

72.    **By comparison, the World Health Organization ("WHO") estimates that** approximately 1 in 127 children had ASD worldwide in 2021, making childhood autism over two times more prevalent in the United States than the global average.[41]

73.    Since 2013, ASD has appeared alongside ADHD and other neurodevelopmental disorders in the DSM-5 in a new chapter titled "Neurodevelopmental Disorders." There is overlap between the symptoms of ASD and ADHD, and the DSM-5 categorizes the symptom patterns that emerge as either ASD, ADHD, or comorbid ADHD and ASD.

---

[34] *Id.*
[35] *Id.* at 55; 2021 Autism Report, *supra* note 21, at 36.
[36] 2021 Autism Report, *supra* note 21, at 19.
[37] *Id.* at 9-10.
[38] Laura C. Politte et al., *Evidence-Based Treatments for Autism Spectrum Disorder*, 2 Current Treatment Options in Psychiatry 38 (2015).
[39] *Autism*, World Health Org., *supra* note 19.
[40] *See* 2021 Autism Report, *supra* note 21, at 9.
[41] *See Autism*, World Health Org., *supra* note 19.

74.    Like ASD, ADHD is a neurological disorder that typically begins in childhood, persists through adulthood and has become more prevalent among American children over time.[42]

75.    It is accepted within the scientific community that these neurodevelopmental disorders share a pathophysiology in the biological pathways that dysregulate neurodevelopment and create brain variations leading to disorder onset. As a result, studying both disorders and symptoms thereof is instructive as to the underlying causes of ASD.

## V.    SCIENTIFIC EVIDENCE LINKS PRENATAL ACETAMINOPHEN USE AND NEURODEVELOPMENTAL DISORDERS.

76.    For years, the scientific evidence has shown that acetaminophen can cause ASD and ADHD in children whose mothers ingested the drug while pregnant and that the more acetaminophen ingested, the greater the risk.

77.    Parental awareness and changes in diagnoses do not account for the rapid rise in ASD and ADHD diagnoses or the prevalence in the United States as compared to the rest of the world.[43]

78.    One scientific article found that "[a] country's average prenatal [acetaminophen] consumption was found to be correlated with its autism/ASD prevalence" with an R of 0.80, which suggests a strong correlation.[44]

---

[42]See About ADHD, Ctrs. for Disease Control & Prevention (Nov. 25, 2025), https://www.cdc.gov/adhd/about/?CDC_AA.

[43] Irva Hertz-Picciotto & Lora Delwiche, *The Rise in Autism and Role of Age at Diagnosis*, 20 Epidemiology 84, 84 (2009).

[44] Ann Z. Bauer & David Kriebel, *Prenatal and Perinatal Analgesic Exposure and Autism: An Ecological Link*, 12 Env't Health 1, 4 (2013).

18

79.    Another study noted that "the marked increase in the rate of autism [and] attention deficit disorder with hyperactivity . . . may be largely caused by the marked increase in . . . the use of acetaminophen by pregnant women."[45]

80.    As early as 2008, scientists identified "a possible association of acetaminophen use with [ASD]."[46] That study also identified plausible biological mechanisms that describe how acetaminophen disturbs neurodevelopment.[47]

81.    In 2009, another scientist concluded that "[c]onsiderable evidence support th[e] contention" that "autism is triggered . . . by acetaminophen (Tylenol®)."[48] He noted that "[t]he synchronicity" that earlier scientists had "detected between the onset of the autism epidemic and the surge in acetaminophen use after the CDC's 1980 warning against aspirin seems unlikely to be artifact or coincidence."[49]

82.    In 2010, another paper "present[ed] evidence of a link to autism from acetaminophen use, evidence to show that acetaminophen produces analgesia by activating cannabinoid receptors, and evidence that activation of the cannabinoid receptors may interfere with normal development to trigger autism."[50]

83.    Scientists have also conducted well-designed epidemiological studies to examine the association between prenatal use of acetaminophen and ASD and ADHD. Since 2013, studies

---

[45] William Shaw, *Evidence That Increased Acetaminophen Use in Genetically Vulnerable Children Appears to Be a Major Cause of the Epidemics of Autism, Attention Deficit with Hyperactivity, and Asthma*, 2 J. Restorative Med. 14, 14 (2013).

[46] Stephen T. Schultz et al., *Acetaminophen (Paracetamol) Use, Measles-Mumps-Rubella Vaccination, and Autistic Disorder*, 12 Autism 293, 305 (2008).

[47] *Id.* at 303-04.

[48] Peter Good, *Did Acetaminophen Provoke the Autism Epidemic?*, 14 Alternative Med. Rev. 364, 364 (2009).

[49] *Id.* at 370.

[50] Stephen T. Schultz, *Can Autism Be Triggered by Acetaminophen Activation of the Endocannabinoid System?*, 70 Acta Neurobiologiae Experimentals 227, 227 (2010).

of over 70,000 mother-child pairs from six European birth cohort studies[51] have shown an association between prenatal use of acetaminophen and ASD and ADHD.

84.    In a 2013 study, scientists undertook an expansive sibling-controlled analysis of 48,631 children from the Norwegian Mother and Child Cohort Study whose mothers had returned a three-year follow up questionnaire.[52] Between 1999 and 2008, all pregnant Norwegian women were eligible to participate in the study, and 38.7% of pregnant women participated.[53] The study population included 2,919 same-sex sibling pairs who were used to adjust for familiar and genetic factors.[54] During the study, the mothers submitted two questionnaires around gestational weeks 17 and 30 reporting their medication use during the pregnancy and a follow-up questionnaire three years post-birth.[55] The study cohort was also linked to the Medical Birth Registry of Norway, which contained detailed medical information regarding the child.[56]

85.    The study authors concluded that acetaminophen "use for more than 28 days during pregnancy was associated with adverse outcomes for gross motor and communication development, behavior and activity at 3 years of age. In contrast, [they] found no association between ibuprofen on the same neurodevelopmental outcomes, which suggests a specific effect of [acetaminophen] less likely to be confounded by indication."[57] "In clinical terms, the[ ] results suggest that exposure to [acetaminophen] for more than 28 days during foetal life increases the

---

[51] Birth cohort studies follow a group of people that were born at a similar date or period of time. By following a group over time and collecting information at regular intervals, birth cohort studies provide insight into how variables, including prenatal exposures to chemicals, affect babies and children as they age.
[52] Ragnhild Eek Brandlistuen et al., *Prenatal Paracetamol Exposure and Child Neurodevelopment: A Sibling-Controlled Cohort Study*, 42 Int'l J. Epidemiology 1702 (2013).
[53] *Id.* at 1703.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.* at 1710.

risk of adverse psychomotor and behavioral outcomes by almost 70% and doubles the risk of language problems in 3-year-old children."[58] Ultimately, the authors concluded that "[c]hildren exposed to long-term use of [acetaminophen] during pregnancy had substantially adverse developmental outcomes at 3 years of age."[59]

86.     In 2014, a peer-reviewed, prospective study found that acetaminophen use during pregnancy was associated with a higher risk for all three neurodevelopmental outcomes.[60] The authors conducted three telephone interviews with the mothers (two during pregnancy and one six months after birth) and administered a standardized behavioral questionnaire to the caregiver when the child was seven years old.[61] Notably, the study detected a statistically significant dose-response relationship, a critical feature of a causal relationship: "[s]tronger associations were observed with use in more than 1 trimester during pregnancy, and exposure response trends were found with increasing frequency of acetaminophen use during gestation for all outcomes."[62]

87.     The authors concluded, "[u]sing prospective data from a well-designed large cohort of pregnant women with a long duration of follow-up and registry-based outcome assessment, we found that prenatal exposures to acetaminophen may increase the risk in children of receiving a hospital diagnosis of HKD or [taking] ADHD medication and of exhibiting ADHD-like behaviors, with higher use frequency increasing risk in an exposure-response manner."[63]

---

[58] *Id.* at 1711.

[59] *Id.* at 1702.

[60] Zeyan Liew et al., *Acetaminophen Use During Pregnancy, Behavioral Problems, and Hyperkinetic Disorders*, 168 *JAMA Pediatrics* 313, 316-17 (2014).

[61] *Id.* at 314

[62] *Id.* at 313.

[63] *Id.* at 319.

88.     Another observational birth cohort study—this one from New Zealand—further solidified the causal relationship between acetaminophen and ADHD in 2014.[64] The prospective study examined use during pregnancy of acetaminophen, aspirin, antacids, and antibiotics in relation to behavioral difficulties and ADHD symptoms at ages 7 and 11 by parent reporting and "found that the children of mothers who used acetaminophen during pregnancy were at increased risk of having symptoms of ADHD" and that their "findings strengthen the contention that acetaminophen exposure in pregnancy increases the risk of ADHD-like behaviours."[65] Notably, the study found that there was "no association" between ADHD and the numerous other examined drugs used during pregnancy, including aspirin, antacids, and antibiotics.[66]

89.     In 2016, another peer-reviewed study focused on 1,491 mothers/children enrolled in the Danish National Birth Cohort and prospectively recorded prenatal use of acetaminophen and then assessed executive function when the children reached five years old.[67] The study concluded that "[t]he risks for subnormal overall attention or executive function were elevated with longer duration of [acetaminophen] use in pregnancy."[68]

90.     Later in 2016, scientists published a second peer-reviewed study focused on the Danish National Birth Cohort, which followed 64,322 children and mothers for an average of 12.7 years and obtained data regarding prenatal acetaminophen use during phone interviews at 12 and

---

[64] John M.D. Thompson et al., *Associations Between Acetaminophen Use During Pregnancy and ADHD Symptoms Measured at Ages 7 and 11 Years*, 9 PLOS One 1 (2014).
[65] *Id* at 4.
[66] *Id.*
[67] Zeyan Liew et al., *Paracetamol Use During Pregnancy and Attention and Executive Function In Offspring at Age 5 Years*, 45 Int'l J. Epidemiology 2009 (2016).
[68] *Id.* at 2009.

30 weeks of pregnancy and 6 months after birth.[69] That study "found prenatal exposures to acetaminophen to be associated with elevated risk for ASD with hyperkinetic features."[70]

91.    That same year, scientists published a prospective, confounder adjusted study of a Spanish birth cohort consisting of 2,644 mother-child pregnancy pairs to examine the causal association between acetaminophen and ASD and ADHD.[71] The scientists collected information regarding prenatal use of acetaminophen prospectively by interviewing the pregnant mothers at 12 and 32 gestational weeks.[72] All children were evaluated in-person by trained psychologists, computer-based measures, teacher-rated scales and specific symptom diagnostic tools for ADHD and ASD symptoms.[73] The results showed prenatal use of acetaminophen was associated with greater risk of ASD in males and showed a greater risk of ADHD in both sexes.[74] The authors noted that "[t]hese associations seem to be dependent on the frequency of exposure [to acetaminophen]."[75]

92.    Yet another study published the same year attempted to assess the association between acetaminophen and neurodevelopmental disorders while addressing confounding factors such as genetics.[76] This study consisted of 14,541 pregnant women from the Avon Longitudinal

---

[69] Zeyan Liew et al., *Maternal Use of Acetaminophen During Pregnancy and Risk of Autism Spectrum Disorders in Childhood: A Danish National Birth Cohort Study*, 9 Autism Res. 951 (2016).

[70] *Id.* at 956.

[71] Claudia B. Avella-Garcia et al., *Acetaminophen Use in Pregnancy and Neurodevelopment: Attention Function and Autism Spectrum Symptoms*, 45 Int'l J. Epidemiology 1987 (2016).

[72] *Id.* at 1989.

[73] *Id.* at 1988-94.

[74] *Id.* at 1993-94.

[75] *Id.* at 1988.

[76] *See* Evie Stergiakouli et al., *Association of Acetaminophen Use During Pregnancy With Behavioral Problems in Childhood: Evidence Against Confounding*, 170 JAMA Pediatrics 964 (2016).

23

Study of Parents and Children cohort in Bristol, England.[77] Maternal acetaminophen use was measured at 18 and 32 weeks of pregnancy.[78] Behavioral symptoms were collected by the mother's completing the Strengths and Difficulties Questionnaire, a child behavior screening questionnaire, when the child was 7 years old.[79] "In this study [the authors] [ ] demonstrated that children exposed prenatally to acetaminophen in second and third trimesters are at increased risk of multiple behavioral difficulties, including hyperactivity and conduct problems."[80]

93.    In 2017, a study using the Norwegian Birth Cohort also attempted to assess the association between prenatal use of acetaminophen and ADHD while accounting for genetic factors.[81] The final sample included 112,973 children and their parents.[82] The study sent questionnaires at 18 weeks of gestation, later months of pregnancy, and after delivery.[83] The study then followed up with the children at 6 months old, 1.5 years, and 3 years old.[84] Even adjusting for confounders, the study found that "[l]ong-term maternal use of [APAP] during pregnancy is associated with ADHD in offspring."[85]

94.    Notably, the results from that study yielded a hazard ratio of 2.20 (95% CI 1.50–3.24) for developing ADHD when the mother ingested acetaminophen for 29 or more days while pregnant.[86] A 95% CI of 1.5 to 3.24 means that there is a 95% probability that the true association between acetaminophen exposure and risk of ADHD is between a 1.5-fold to 3.3-fold increased

---

[77] *Id.* at 965.
[78] *Id.*
[79] *Id.* at 965–66.
[80] *Id.* at 967.
[81] *See* Eivind Ystrom et al., *Prenatal Exposure to Acetaminophen and Risk of ADHD*, 140 Pediatrics 1 (2017).
[82] *Id.* at 1.
[83] *Id.* at 2.
[84] *Id.*
[85] *Id.* at 7.
[86] *Id.* at 4.

relative risk. Thus, the 2.20 hazard ratio in this study means that "[a]fter adjusting for familial risk for ADHD, indications of use, and acetaminophen use before pregnancy, long-term acetaminophen use during pregnancy is related to more than a twofold increase in risk for offspring ADHD."[87]

95.    In 2018, a Swedish pregnancy cohort study was published that assessed prenatal acetaminophen exposure and language development in children at 30 months.[88] The study focused on delayed language development because it "is an early marker of impaired cognitive development."[89] Acetaminophen exposure was measured by maternal self-reporting and acetaminophen concentration in a urine sample taken at study enrollment.[90] The study showed a statically significant language delay in girls whose mothers reported taking more than six tablets.[91] There was also a statically significant difference between females whose mothers' acetaminophen use was in the highest versus lowest quartile.[92] The authors concluded that "[g]iven the prevalence of prenatal APAP use and the importance of language development, these findings, if replicated, would suggest that pregnant women should limit their use of this analgesic during pregnancy."[93]

96.    In 2020, scientists published a peer-reviewed study using data from the Boston Birth Cohort.[94] To avoid any potential limitations of relying on self-reporting, the study measured acetaminophen in maternal cord plasma samples obtained within 1 to 3 days postpartum.[95] The authors divided the cord groups into three groups or "tertiles" based on "acetaminophen burden."[96]

---

[87] *Id.* at 1.
[88] C.G. Bornehag et al., *Prenatal Exposure to Acetaminophen and Children's Language Development at 30 Months*, 51 Eur. Psychiatry 98 (2018).
[89] *Id.* at 99.
[90] *Id.* at 98–99.
[91] *Id.* at 100.
[92] *Id.*
[93] *Id.* at 98.
[94] Yuelong Ji, *supra* note 2.
[95] *Id.* at 181.
[96] *Id.* at 182.

"[C]ompared with being in the first tertile, being in the second and third tertiles of cord acetaminophen burden was associated with higher odds of ADHD diagnosis . . . and ASD diagnosis."[97] Study participants with the top third levels of acetaminophen in cord plasma suffered a 3.62 times increased risk of giving birth to a child later diagnosed with ASD and a 2.86 times increased risk of giving birth to a child later diagnosed with ADHD.[98]

97.    The study's authors further noted that "[s]ensitivity analyses and subgroup analyses found consistent associations between acetaminophen and ADHD and acetaminophen and ASD across strata of potential confounders, including maternal indication, substance use, preterm birth, and child age and sex."[99] Finally, the authors concluded that their "findings support previous studies regarding the association between prenatal and perinatal acetaminophen exposure and childhood neurodevelopmental risk and warrant additional investigations."[100]

98.    Another peer-reviewed study published in 2020 avoided maternal self-reporting or incomplete information regarding the quantity of acetaminophen ingested by analyzing the child's meconium.[101] This approach allowed the study's authors to reliably know the baby's exposure to acetaminophen prior to birth because the exposure level can be measured in the first feces of a newborn infant.[102] Besides the meconium analysis, this study tracked the children participants to assess whether there was a physician diagnosis of ADHD and undertook an MRI analysis of each study participant at 9 to 11 years.[103] Compared with no acetaminophen, detection of

---

[97] *Id.* at 180.
[98] *Id.* at 186.
[99] *Id.* at 183.
[100] *Id.* at 188.
[101] Brennan H. Baker et al., *Association of Prenatal Acetaminophen Exposure Measured in Meconium With Risk of Attention-Deficit/Hyperactivity Disorder Mediated by Frontoparietal Network Brain Connectivity*, 174 JAMA Pediatrics 1073 (2020).
[102] *Id.* at 1074.
[103] *Id.* at 1075.

acetaminophen in meconium was associated with a statically-significant increased risk of ADHD.[104] Notably, a dose-response association was detected; each doubling of exposure increased the odds of ADHD by 10%.[105] Children with acetaminophen detected in meconium also showed brain development problems.[106]

99.    These "results suggest that prior studies may have been biased toward the null by inaccurate maternal recall."[107] In other words, past studies may have had a bias toward there not being an association when in fact there may be an association, meaning that those prior studies may have understated the association between acetaminophen and ADHD.[108]

100.    The epidemiologic evidence is fortified by consistent animal studies, neuroscience studies, and empirical evidence that demonstrate viable biologic mechanisms by which acetaminophen causes ASD and ADHD and impactful real-world effects.[109] This consistent epidemiologic, animal, neuroscience and empirical evidence that has led independent physicians and scientists to demand that women be warned about the dangerous effects acetaminophen can have on their unborn children.

101.    In particular, as early as 2010, experiments in rats showed that acetaminophen "has direct neurotoxic effects on rat brain neurons both *in vitro* and *in vivo*."[110] A 2014 study in mice

---

[104] *Id.* at 1073.
[105] *Id.*
[106] *Id.*
[107] *Id.* at 1079.
[108] *Id.*
[109] Stephen Schultz et al., *Endocannabinoid System Dysregulation from Acetaminophen Use May Lead to Autism Spectrum Disorder: Could Cannabinoid Treatment Be Efficacious?*, 26 Molecules 1845 (2021).
[110] Inmaculada Posadas et al., *Acetaminophen Induces Apoptosis in Rat Cortical Neurons*, 5 PLoS One 1, 6 (2010).

27

reached a similar conclusion, noting that acetaminophen "can act as a developmental neurotoxic agent."[111]

102.    In 2017, another study found that mice treated with acetaminophen during critical periods of neurodevelopment showed signs of "adverse effects on adult behavior and cognitive function."[112] The authors concluded: "Although rodent models cannot fully recapitulate complex human neuropsychiatric disorders, our results support findings from the previously mentioned epidemiological studies, where [acetaminophen] exposure during the third trimester had the strongest association with adverse neurodevelopmental outcomes."[113]

103.    Based on the overwhelming scientific evidence, in September 2021 over 90 respected scientists signed a peer-reviewed consensus statement calling for precautionary action over the use of acetaminophen during pregnancy.[114]

104.    The scientists issued this "call to action" because of the serious safety concerns of continued acetaminophen use by pregnant women given the overwhelming evidence that acetaminophen use during pregnancy causes ASD and ADHD.[115] The authors concluded that "the combined weight of animal and human scientific evidence is strong enough for pregnant women to be cautioned by health professionals against its indiscriminate use, both as a single ingredient and in combination with other medications."[116]

---

[111] Henrik Viberg et al., *Paracetamol (Acetaminophen) Administration During Neonatal Brain Development Affects Cognitive Function and Alters Its Analgesic and Anxiolytic Response in Adult Male Mice*, 138 Toxicological Scis. 139, 146 (2014).

[112] Gaëtan Philippot et al., *Adult Neurobehavioral Alterations in Male and Female Mice Following Developmental Exposure to Paracetamol (Acetaminophen): Characterization of a Critical Period*, 37 J. Applied Toxicology 1174, 1174 (2017).

[113] *Id.* at 1180.

[114] *See* Bauer et al., *supra* note 3, at 763.

[115] *Id.* at 762–63.

[116] *Id.* at 764.

105.    Since 2021, scientists have continued studying the association between prenatal acetaminophen and neurodevelopmental disorders. For example, in 2024, scientists again reviewed the epidemiological literature and concluded that there was "abundant and robust" evidence that "demonstrate[s] the critical role of acetaminophen in the etiology of ASD."[117]

106.    In 2025, researchers used the Navigation Guide Systematic Review methodology—a gold-standard framework for synthesizing and evaluating environmental health data—to conduct a comprehensive analysis of the forty-six human observational studies that had been performed on this topic to date.[118] Their analysis found that higher-quality studies were more likely to show positive associations between acetaminophen use and neurodevelopmental disorders, further supporting a causal relationship between acetaminophen exposure during pregnancy and increased incidence of neurodevelopmental disorders.[119]

## VI. DEFENDANTS HAVE NEVER WARNED PREGNANT MOTHERS OF THE DANGERS ASSOCIATED WITH TAKING ACETAMINOPHEN WHILE PREGNANT.

107.    Despite this overwhelming evidence, the Defendants have taken no steps to warn pregnant women of the dangers associated with taking acetaminophen while pregnant.

108.    Defendants have represented to consumers that they take affirmative steps to ensure the safety of their over-the-counter products, and consumers rely on those safety representations.

---

[117] John P. Jones III et al., *Evaluating the Role of Susceptibility Inducing Cofactors and of Acetaminophen in the Etiology of Autism Spectrum Disorder*, 14 Life 1, 1 (2024).

[118] Diddier Prada et al., *Evaluation of the Evidence on Acetaminophen Use and Neurodevelopmental Disorders Using the Navigation Guide Methodology*, 24 Environ. Health No. 56 (2025).

[119] *Id.*

A.      The Tylenol Defendants Repeatedly Downplayed the Scientific Evidence
        Linking Tylenol to ASD.

109.    As the scientific evidence of a causal link between acetaminophen and neurodevelopment disorders grew, the Tylenol Defendants internally reviewed the studies and mounted efforts to undermine that evidence.

110.    As early as 2008, physicians reached out the Tylenol Defendants to raise the possibility of a causal link between Tylenol and Autism. Internally, the Tylenol Defendants characterized the risk of "Tylenol as a trigger for Autism" as a "safety signal that needs to be evaluated."

111.    Following the publication of the 2013 Norwegian Mother and Child Cohort Study,[120] a J&J spokesperson told the media that Tylenol "has an exceptional safety profile."[121] J&J deflected from the study's findings, noting "there are no prospective, randomized controlled studies demonstrating a causal link between acetaminophen use during pregnancy and adverse effects on child development."[122] But it is exceedingly rare, if not impossible, to conduct a randomized control study in a pregnant study population because of the ethical implications of exposing pregnant women to a potentially dangerous drug. The scientific evidence J&J demanded will likely never exist.

112.    In 2014, the Tylenol Defendants raised concerns about the link between acetaminophen and neurodevelopmental disorders to J&J's chief executive officer.

---

[120] Brandlistuen et al., *supra* note 52.
[121] Kathryn Doyle, *Too Much Tylenol in Pregnancy Could Affect Development*, REUTERS HEALTH (Nov. 22, 2013), https://www.reuters.com/article/us-too-much-tylenol-in-pregnancy-could-a/too-much-tylenol-in-pregnancy-could-affect-development-idUSBRE9AL15920131122.
[122] *Id.*

113.    Later that year, the Tylenol Defendants approached one of the co-authors of the Liew 2014 study[123] about ways to "better understand[] the specificity of the relationship between acetaminophen use during pregnancy and [ADHD] in children." The Tylenol Defendants' epidemiologists commented that the 2014 study had "substantial strengths" and the "analyses were very informative and lend support to the findings" of an association.

114.    The Tylenol Defendants considered funding "additional research" by the Liew 2014 authors. J&J's global head of epidemiology noted that the Liew 2014 study "would be difficult to improve on." Internally, other scientists worried that further research "could end up confirming the [Liew 2014] findings," which showed a statistically significant association between prenatal acetaminophen exposure and ADHD. Ultimately, the Tylenol Defendants decided it was not worth it to "stick our neck out and make this offer" to fund additional research that might replicate Liew's findings.

115.    In 2016, the Tylenol Defendants' executives, including J&J's global head of epidemiology and the Chief Medical Officer for consumer health products reviewed a study provided "evidence against confounding," i.e., suggesting the association is causal.[124] The study found "that the association between [APAP] use during pregnancy and offspring behavioral problems in childhood may be due to an intrauterine mechanism."[125]

116.    In 2018, one of the Tylenol Defendants' epidemiologists remarked that the "weight of the evidence is starting to feel heavy to me," meaning that the scientific evidence linking prenatal acetaminophen exposure to neurodevelopmental disorders suggested a causal relationship. This followed review of a systematic review and meta-analysis—the strongest and

---

[123] Zeyan Liew et al., *supra* note 60.
[124] Evie Stergiakouli et al., *supra* note 76.
[125] *Id.* at 969.

highest quality scientific evidence, which concluded that "[APAP] use during pregnancy is associated with an increased risk for ADHD, ASD, and hyperactivity symptoms."[126]

117.    Meanwhile, in 2017, the Tylenol Defendants had updated their internal company labeling information for acetaminophen products to account for the risks of neurodevelopmental disorders. The revised label—which has never appeared on Tylenol products sold in the United States or was publicized in any way—stated: "This product should not be used during pregnancy or lactation unless the potential benefit of treatment to the mother outweighs the possible risks to the developing fetus."

118.    Rather than communicating this message to consumers and healthcare providers, the Tylenol Defendants stood up an "advisory board" of paid experts to "discuss the weight of the evidence around [acetaminophen] and fetal outcomes." The stated goal of this project was "to protect acetaminophen."

119.    The Tylenol Defendants also undertook a communications strategy to advocate for "the company position" in sham scientific articles and literature reviews. This strategy was intended to undermine studies supporting a causal link between acetaminophen and ASD and ADHD, while at the same time explaining why Tylenol "do[esn't] need a label change."

120.    The Tylenol Defendants also represented Tylenol as a safe for use in pregnancy by claiming on the Tylenol website and in communications to consumer and healthcare providers that FDA had classified the drug as Pregnancy Category B, suggesting no risk to the fetus. But the only acetaminophen product that FDA ever assigned to a pregnancy category—a prescription IV acetaminophen—was assigned to the more dangerous Pregnancy Category C.

---

[126] Reem Masarwa et al., *Prenatal Exposure to Acetaminophen and Risk for Attention Deficit Hyperactivity Disorder and Autistic Spectrum Disorder: A Systematic Review, Meta-Analysis, and Meta-Regression Analysis of Cohort Studies*, 187 Am. J. Epidemiology 1817, 1817 (2018).

121. J&J also controlled the messaging to pregnant women through a popular and widely trusted parenting site, BabyCenter.com, which it owned from 2001 to 2019.[127]

122. During a 2018 J&J earnings call, the Tylenol Defendants described BabyCenter.com as "an incredible asset" featuring "the largest online parenting community in the world." According to J&J, "We have 7 out of 10 moms in 14 countries around the world that sign up for BabyCenter at 5 weeks of pregnancy." This control of the pregnant and new mom demographic allowed J&J to "leverag[e] the data of BabyCenter to really make it an engine behind how we connect and give mom what she wants when she wants it."

123. Upon information and belief, J&J used BabyCenter.com to promote Tylenol as safe to use during pregnancy under the guise that it was coming from a neutral third party and not the maker of Tylenol. For example, the website included information from a "genetic counselor" that acetaminophen was safe to take during pregnancy despite the studies above linking prenatal use of acetaminophen to neurodevelopmental disorders.

124. Upon information and belief, the Tylenol Defendants' highest executives were engaged in the misconduct and cover-up regarding prenatal use of Tylenol and neurodevelopmental disorders, including ASD. That pattern of deflection and silence has continued to the present day. None of them have taken any steps to warn pregnant women of the dangers associated with taking Tylenol while pregnant.

---

[127] *Company News: Johnson & Johnson Buys BabyCenter From eToys*, N.Y. Times (Mar. 3, 2001), https://www.nytimes.com/2001/03/03/business/company-news-johnson-johnson-buys-babycenter-from-etoys.html; *Everyday Health Group Acquires BabyCenter, the Leading Global Digital Parenting Resource*, Nasdaq (Aug. 27, 2019), https://www.nasdaq.com/press-release/everyday-health-group-acquires-babycenter-the-leading-global-digital-parenting.

125.    For instance, the Tylenol Defendants used advertisements like this one, "Mother's Day: Celebrating the Moms Who Care Without Limits," to reinforce its message that Tylenol is safe for pregnant women:



**B.    Defendants' Acetaminophen Labels Do Not Warn About ASD.**

126.    Defendants have taken no steps to warn consumers of the risks associated with prenatal ingestion of Tylenol and Publix brand acetaminophen products.

127.    The Tylenol Defendants have the ability and the duty to ensure that the Tylenol label provides adequate warnings to consumers and makes apparent the potential harmful consequences of using the drug during pregnancy.

128.    Although the Tylenol labels warn of various risks, nothing on the Tylenol label warns pregnant women that ingestion of acetaminophen while pregnant can cause ASD and/or ADHD.

129.    Similarly, Publix has the ability and the duty to warn about risks associated with the acetaminophen products it sells, including their respective store brand and Tylenol brand, to ensure consumers have sufficient information to weigh the risks associated with such products.

130.    Although the Publix brand acetaminophen label warns of various risks, nothing on the label warns that taking acetaminophen while pregnant can cause ASD in the child. Publix thus

accepts the benefits of selling private label (store brand) drugs without fulfilling their responsible to warn consumers of associated health risks.

131.    Drug marketers, like Defendants, have voluntarily added warnings of other risks on numerous occasions based on much less conclusive evidence than pleaded above.

132.    **Marketers have a duty to warn the public about a drug's potential dangers, even if** the underlying science is not conclusive. Consumers ingesting a drug designed to treat minor aches, pains, and fever have a right to make an informed choice about possible risks they are willing to bear, even if those risks have not been established with scientific certainty.

133.    The body of scientific evidence showing a causal relationship between ASD/ADHD and prenatal ingestion of acetaminophen is overwhelming, consisting of at least 26 observational studies with over 170,000 people, and further corroborated with animal studies. Given this compelling scientific evidence, it is incumbent on manufacturers and retailers of acetaminophen products to provide warnings that prenatal use of the drug can cause ASD and ADHD in children.  At a minimum, Defendants should warn that many studies have found such an association. Yet Defendants have taken no steps to warn of the dangers associated with prenatal ingestion of their acetaminophen products. Instead, Defendants have continued marketing and selling these products as completely safe for use during pregnancy.

**C.    The Federal Government Rejects Defendants' Scientific Spin.**

134.    On September 22, 2025, the United States Department of Health and Human Services "initiate[d] a safety label change" about chronic acetaminophen use in pregnant women.[128]

---

[128] Press Release, U.S. Dep't of Health & Human Servs., President Trump, Secretary Kennedy Announce Bold Actions to Tackle Autism Epidemic (Sept. 22, 2025), https://www.hhs.gov/press-room/hhs-trump-kennedy-autism-initiatives-leucovorin-tylenol-research-2025.html.

135.    This action was in response "to prior clinical and laboratory studies that suggest a potential association between acetaminophen use during pregnancy and adverse neurodevelopmental outcomes."[129]

136.    As HHS recognized, "[l]arge-scale cohort studies, including the Nurses' Health Study II and the Boston Birth Cohort, report associations between in utero exposure [to acetaminophen] and later diagnoses of autism spectrum disorder (ASD) and attention-deficit/hyperactivity disorder (ADHD)."[130]

137.    Moreover, "[s]cientists have proposed biological mechanisms linking prenatal acetaminophen exposure to altered brain development."[131]

138.    "Because acetaminophen is one of the most common medications taken during pregnancy, even a modest increase in risk could have a significant public health impact."[132]

139.    HHS thus sent a letter to doctors nationwide warning them that "evidence has accumulated suggesting that the use of acetaminophen by pregnant women may be associated with an increased risk of neurological conditions such as autism and ADHD in children."[133]

140.    HHS acted because Defendants failed to properly warn physicians and consumers about the risks associated with pregnant women using acetaminophen. The evidence cited by HHS was in Defendants' possession for years and they refused to warn consumers.

---

[129] Id.

[130] Press Release, U.S. Dep't of Health & Human Servs., Autism Announcement Fact Sheet, https://www.hhs.gov/press-room/autism-announcement-fact-sheet.html.

[131] Id.

[132] Id.

[133] Martin A. Makary, M.D., M.P.H., Commissioner of Food and Drugs, Notice to Physicians on the Use of Acetaminophen During Pregnancy (Sept. 22, 2025), https://www.fda.gov/media/188843/download.

141.    Commissioner of Food and Drugs Martin Makary stated that "we now have data we cannot ignore," highlighting the very studies discussed above. He acknowledged that "you'll be able to find a study to the contrary," but emphasized that this was simply "how science works." He quoted with approval Andrea Baccarelli, Dean of the Harvard School of Public Health, for the proposition that "there is a causal relationship between prenatal acetaminophen use and neurodevelopmental disorders of ADHD and autism spectrum disorder." Again, Defendants had never previously disclosed this information to pregnant women, like Plaintiff's mother.

## VII.    J&J PROFITS FROM ASD RESEARCH AND MEDICATIONS WHILE HIDING THAT TYLENOL CAUSES ASD.

142.    J&J's conduct suggests that it prioritizes profits over the interests of consumers and the health of children.

143.    Based on information and belief, J&J has directed its subsidiary, Janssen Research & Development, LLC ("Janssen"), to track ASD behaviors and other events.

144.    Janssen operates the Janssen Autism Knowledge Engine, also known as JAKE® ("JAKE"), which is a "system of tools and technologies to optimize clinical trials for [ ] ASD."[134] The JAKE system was developed to facilitate the testing of medications that may treat the symptoms of ASD.

145.    According to a publication written by Janssen researchers, "JAKE is a dynamically updated clinical research system developed to provide quantifiable and reproducible measures for use in assessing treatment outcomes, potentially including detection of change in ASD symptoms and ASD subgroup identification. JAKE is a three-part investigational system consisting of: My JAKE (a web and mobile application for use by caregivers and clinicians to log symptoms, record

[134] Gahan Pandina, *47.4 Development of a System of Tools and Technologies to Optimize Clinical Trials for Autism Spectrum Disorders*, 55 J. Am. Acad. Child & Adolescent Psychiatry S334 (2016).

37

treatments, track progress, and gather comprehensive medical information); JAKE Sense (research biosensors and tasks designed to detect and monitor changes in experimental, proof-of-concept ASD biomarkers); and JAKE Stream (a system designed to collect, time-synchronize, and process data from both My JAKE [My JAKE Data Pipeline] and JAKE Sense [JAKE Sense Data Pipeline])."[135]

146.    Through the My JAKE web-and-mobile application, a user can "log symptoms, demarcate events of interest, record treatments and medical information, and track overall study progress" for someone with ASD.[136] This data is collected and stored in the "Janssen Research Data Warehouse," where Janssen can analyze that data along with data collected from JAKE Sense biosensors.[137]

147.    Based on information and belief, for many years, dating back to at least 2015 and continuing through the present date, Janssen, at the direction of J&J, has been tracking ASD patients throughout the United States and perhaps globally via My JAKE. Janssen collects data about ASD symptoms, medical history, and treatment and therapy appointments.

---

[135] Seth L. Ness et al., *An Observational Study with the Janssen Autism Knowledge Engine (JAKE®) in Individuals with Autism Spectrum Disorder*, 13 Frontiers in Neuroscience 4 (2019).
[136] *Id.* at 5.
[137] Seth L. Ness et al., *JAKE® Multimodal Data Capture System: Insights from an Observational Study of Autism Spectrum Disorder*, 11 Frontiers Neurosci. 2 (2017).

148.   Janssen also tracks data from a mother's pregnancy:



**My JAKE**

**Medical & Developmental History**

A single caregiver-controlled repository of all relevant medical information and treatment history. Entries are grouped into categories, such as Pregnancy, Labor & Delivery, Early Developmental Milestones, and Conditions/Diagnoses.

**Details**

• Enter and manage a dependent's medical and developmental history

• Keep relevant information about conditions, medications and providers in one place

149.   Upon information and belief, at the direction of J&J, Janssen does *not* track whether mothers of children with ASD took Tylenol—or other acetaminophen products—while pregnant.

150.   The My JAKE application has been touted as a tool to "test[] pharmaceutical compounds [in the near future] for the treatment of [ASD]."[138] J&J seeks to use JAKE to profit off the very ASD epidemic the Tylenol Defendants helped create by marketing pharmaceutical treatments while willfully continuing to turn a blind eye to the fact that its signature product, Tylenol, can cause ASD in children.

151.   Indeed, upon information and belief, J&J already profits from sales of Risperdal, a prescription drug that treats certain ASD symptoms and is sold by Janssen.

152.   Upon information and belief, the Tylenol Defendants opted to bury their heads in the sand rather than take advantage of a ready-made study population to assess acetaminophen as

---

[138]   Nanette Varian, *Meet the Man Who's Helping to Advance Autism Research*, https://www.jnj.com/innovation/janssen-autism-spectrum-disorder-research (last visited Dec. 12, 2025).

a risk factor for ASD. This is yet another example of the Tylenol Defendants' deliberate efforts to rebuke and downplay the science linking prenatal Tylenol exposure to ASD and/or ADHD.

## VIII.    DEFENDANTS CAUSED PLAINTIFF'S INJURIES

### A.    Plaintiff's Mother Took Defendants' Acetaminophen While Pregnant.

153.    Defendants' concerted efforts to represent their respective brands of acetaminophen as safe for prenatal ingestion has worked all too well. Millions of consumers like Plaintiff's mother relied on these representations and took Tylenol and Publix brand acetaminophen while they were pregnant.

154.    Defendants' persistent messaging that their acetaminophen products are safe during pregnancy has been so effective it is widely considered common knowledge. For example, MotherToBaby, a suggested resource by the Centers for Disease Control and Prevention and FDA's Office of Women's Health, notes that acetaminophen is "the pain reliever of choice during pregnancy."[139] Similarly, Motherly, a popular motherhood blog, notes acetaminophen is "the drug of choice for pain during pregnancy" and it is "widely used."[140]

155.    Defendants knew that, thanks to their efforts, acetaminophen was regarded as the only safe pain reliever for pregnant women.

156.    Plaintiff's mother ingested acetaminophen products that were designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants during her pregnancy with H.G.

157.    During her pregnancy with Minor Plaintiff H.G., from approximately December 2016 to August 2017, Mrs. Guist suffered from common colds and headaches.

---

[139] *Acetaminophen (Pararcetamol)*, MotherToBaby (Nov. 1, 2023), https://mothertobaby.org/fact-sheets/acetaminophen-pregnancy/.
[140] *What Medication Can I Take While Pregnant?*, Motherly (Jan. 7, 2019), https://www.mother.ly/life/what-medications-can-i-take-when-pregnant/.

40

158. To treat these conditions, Mrs. Guist took Tylenol and Publix brand acetaminophen. She typically took regular strength formulations of these acetaminophen products.

159. Mrs. Guist ingested Defendants' acetaminophen products approximately once or twice a week primarily during the second and third trimesters of her pregnancy with Minor Plaintiff H.G.

160. Mrs. Guist purchased Defendants' acetaminophen products at Publix stores in Florida.

161. Mrs. Guist's OB/GYN told her that acetaminophen was safe to take during her pregnancy and recommended that she treat her colds and headaches with acetaminophen.

162. None of the Defendants provide any public information for physicians that discloses the safety of, or risks associated with, ingesting acetaminophen while pregnant.

163. In fact, the Tylenol Defendants affirmatively tell healthcare providers that there are no risks to the unborn child associated with prenatal use of acetaminophen.

**B.      Minor Plaintiff H.G. Developed ASD.**

164. As a result of Mrs. Guist's prenatal use of Defendants' acetaminophen products, Minor Plaintiff H.G. developed ASD.

165. H.G. was diagnosed with ASD in March 2021, when he was three years old. At the time of his diagnosis, H.G. was not hitting developmental milestones and was behind socially and developmentally. H.G. struggles with socializing with other children and suffers from extended tantrums and elopement.

166. H.G. has undergone genetic testing through the Simons Powering Autism Research ("SPARK") study. The testing revealed no known genes that have been linked to ASD.

167. As a result of his autism, H.G. receives in-home ABA therapy for 15 to 20 hours per week. H.G. is also home-schooled as a result of difficulties adjusting to a typical school environment due to his ASD. H.G. will likely require care and treatment for the rest of his life.

**C.    Plaintiff Suffered Injuries as a Result of Defendants' Failure to Warn About the Risk of ASD.**

168. At all relevant times, Defendants knew or should have known that there was a significant risk of ASD in children, such as Minor Plaintiff H.G., who were exposed to acetaminophen while in utero.

169. Despite this, Defendants failed to include *any* warning regarding the risks of a child developing ASD when exposed to acetaminophen in utero or to otherwise communicate these risks to consumers to protect children like H.G.

170. Defendants thus failed to adequately warn about the increased risk that H.G. would develop ASD due to prenatal exposure to Defendants' acetaminophen.

171. Had Defendants disclosed the risks associated with prenatal use of acetaminophen, and that it could cause H.G. to develop ASD, Mrs. Guist would not have ingested acetaminophen while pregnant with H.G. or would have dramatically limited her consumption of acetaminophen to brief periods of use.

172. **As a direct and proximate cause of Defendants' conduct, Minor Plaintiff H.G.** suffered serious and permanent injuries in the form of ASD. H.G. has suffered damages and harm, including but not limited to, emotional distress, medical expenses, and other economic harm associated with loss of earnings and lifelong care and support.

173. As a direct and proximate result of the acts and omissions of Defendants, Mrs. Guist's took acetaminophen while pregnant with H.G., and H.G. has been prevented from pursuing normal activities, has experienced suffering and mental anguish, has been deprived of his ordinary

pursuits and enjoyments of life, and will suffer the costs of lifelong care and diminution of earnings as a result.

## IX.    THE TYLENOL DEFENDANTS UNDERTOOK FRAUDULENT TRANSFER TO AVOID POTENTIAL LIABILITY.

174.    Upon information and belief, J&J knew that claims arising from the scientific evidence linking Tylenol to ASD and ADHD could potentially subject it to billions of dollars in liability.

175.    On November 12, 2021, J&J began the process of "peeling off" its consumer health business, including Tylenol.[141] As one analyst noted, "if the consumer division 'no longer holds the deep pockets of the combined company, the risk of future consumer product litigation . . . may decrease.'"[142]

176.    In 2022, dozens of lawsuits were filed against APAP sellers around the country regarding the neurodevelopmental harms caused by prenatal use of APAP, and these claims were consolidated into a multidistrict litigation on October 5, 2022.

177.    On April 24, 2023, J&J announced that it planned to take Kenvue Inc. public.[143] When the initial public offering ("IPO") closed on May 8, 2023, J&J held "approximately 89.6% of the total outstanding shares of Kenvue common stock[,]" with the "intention to dispose of its majority stake in Kenvue" later that year.[144] The IPO was "partial consideration for the consumer

---

[141] Michelle Chapman & Tom Murphy, *Johnson & Johnson to split into 2, aim for faster growth*, Associated Press (Nov. 12, 2021), https://apnews.com/article/business-johnson-and-johnson-health-prescription-drugs-be49e5beca59dfcb3457be62f4cfa2e9.

[142] *Id.*

[143] Press Release, Johnson & Johnson, *Johnson & Johnson Announces Launch of Kenvue Inc. IPO Roadshow* (Apr. 24, 2023), https://www.jnj.com/media-center/press-releases/johnson-johnson-announces-launch-of-kenvue-inc-ipo-roadshow.

[144] Press Release, Kenvue Inc., *Kenvue Announces Closing of Initial Public Offering* (May 8, 2023), https://investors.kenvue.com/financial-news/news-details/2023/Kenvue-Announces-Closing-of-Initial-Public-Offering/default.aspx.

43

health business that Johnson & Johnson transferred to Kenvue."[145]   Tylenol was part of that transfer.

178.    On August 23, 2023, Kenvue Inc. "announced its separation from Johnson & Johnson, marking its first day as a fully independent company."[146] By the time Kenvue announced it was separating, J&J had divested down to "9.5% of the outstanding shares of Kenvue common stock."[147] On May 13, 2024, Kenvue announced that J&J would sell off its remaining stake.[148]

179.    On November 3, 2025, Kenvue Inc. announced that Kimberly-Clark Corporation "will acquire all of the outstanding shares of Kenvue common stock in a cash and stock transaction."[149]

180.    The merger agreement between Kenvue Inc. and Kimberly-Clark Corporation excludes from "Material Adverse Effect" "any effect . . . relating to any Products of Kenvue or any Kenvue Subsidiary containing acetaminophen . . . to the extent [it is] related to allegations of [ASD] or [ADHD\] from the use of such Products by pregnant women or children."[150]

---

[145] *Id.*

[146] Press Release, Kenvue Inc., *Kenvue Becomes a Fully Independent Company Following Final Separation from Johnson & Johnson* (Aug. 23.2023), https://www.kenvue.com/media/kenvue-becomes-a-fully-independent-company.

[147] *Id.*

[148] *J&J to Exit Spinoff Kenvue with Latest Stake Sale, Reuters* (May 13, 2024), https://www.reuters.com/markets/deals/jj-sell-all-shares-spun-off-unit-kenvue-2024-05-13/.

[149] Press Release, Kenvue Inc., *Kimberly-Clark to Acquire Kenvue, Creating a $32 Billion Global Health and Wellness Leader* (Nov. 3, 2025), https://investors.kenvue.com/financial-news/news-details/2025/Kimberly-Clark-to-Acquire-Kenvue-Creating-a-32-Billion-Global-Health-and-Wellness-Leader/default.aspx.

[150] Kenvue Inc., Exhibit 2.1 – Agreement & Plan of Merger (Nov. 2, 2025), https://www.sec.gov/Archives/edgar/data/1944048/000110465925105216/tm2529895d1_ex2-1.htm.

## TOLLING/FRAUDULENT CONCEALMENT

181. Plaintiff asserts all applicable statutory and common law rights and theories related to the tolling, extension, or delayed accrual of any applicable statutes of limitations, including minor tolling, equitable tolling, delayed discovery, discovery rule and/or fraudulent concealment.

182. The discovery rule applies such that the causes of action for statute of limitations purposes did not accrue until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of their injuries, the cause of their injuries, and the tortious nature of the wrongdoing that caused their injuries.

183. The nature of Plaintiff's injuries, damages, or their causal relationship to Defendants' conduct was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

184. The running of the limitations period is also equitably tolled. Defendants are estopped from relying on Florida statutes of limitation or repose by virtue of their fraudulent concealment, through affirmative misrepresentations, and omissions to Plaintiff regarding the safety of acetaminophen. Based on information and belief, Defendants affirmatively withheld and/or misrepresented facts concerning acetaminophen's safety. As a result of the Defendants' misrepresentations and concealment, Plaintiff's mother was unaware, and could not have known or have learned through reasonable diligence, of facts related to Defendants' misrepresentations or omissions, that Plaintiff had been exposed to the risks alleged herein, or that those risks were the direct and proximate result of the wrongful acts and/or omissions of the Defendants.

185. Given the Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the defects—information over which the Defendants had

45

exclusive control—and because Plaintiff could not reasonably have known that acetaminophen could cause ASD and/or ADHD in children when exposed in utero, the Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## EXEMPLARY PUNITIVE DAMAGES ALLEGATIONS

186. Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice. Defendants were fully aware of acetaminophen's safety risks, including that injuries from their respective acetaminophen products' inadequate labels could cause ASD or ADHD in children when exposed in utero. Nonetheless, Defendants deliberately crafted their label and marketing to mislead consumers and profit from the lucrative sales to pregnant women.

187. The Tylenol Defendants also not only minimized and downplayed the risks to unborn children of exposure to Tylenol in utero but also paid experts the field to manipulate the science and publish studies designed to call into question the legitimate risks of prenatal exposure to Tylenol.

188. Defendants' conduct was carried out with a willful and conscious disregard for Plaintiff's safety and subjected Plaintiff to cruel and unjust hardship. Defendants' conduct and callous disregard for the safety of Plaintiff was so mean, vile, base, and contemptible that it would be looked down on and despised by reasonable people. On information and belief, Plaintiff alleges that Defendants' wrongful conduct was known, adopted, and approved by Defendants' employees that exercised substantial independent authority and judgment such that the employees' decisions ultimately determine corporate policy.

189.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew they could profit by convincing consumers that acetaminophen was the safe form of pain reliever for pregnant women. Plaintiff's **mother was** denied the right to make an informed decision about whether to use acetaminophen while pregnant. Defendants' conduct was done with conscious disregard of Plaintiff's rights.

190.    Even now, the Defendants continue to sell their acetaminophen to pregnant women without any warning about the risk of ASD and/or ADHD in children.

191.    In addition, and as stated above, the Tylenol Defendants have and continue to affirmatively conceal the risks associated with prenatal ingestion of acetaminophen. J&J in particular is seeking to profit off of the very injuries that result from prenatal ingestion of acetaminophen. J&J created the JAKE database to profit from the development of therapies to treat Plaintiff's and others' neurodevelopmental disorders, rather than addressing Tylenol's safety concerns through warnings or other actions.

192.    Defendants' conduct, as described above, was committed with knowing, conscious, careless, reckless, willful, wanton, malicious, and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future. Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

193.    Accordingly, Plaintiff request punitive damages against Defendants for the harms caused to Plaintiff.

### COUNT I:  STRICT PRODUCTS LIABILITY—FAILURE TO WARN
**(Against All Defendants)**

194.    Plaintiff incorporates the preceding paragraphs as if fully stated herein.

195.    Under Florida law, a manufacturer has a duty to adequately warn of the potential risks or hazards associated with a product where there is unequal knowledge, actual or constructive of a dangerous condition, and the defendant, possessed of such knowledge, knows or should know that harm could be reduced or avoided if a warning is not given.

196.    At all relevant times, Tylenol was under the exclusive control of the Tylenol Defendants. The Tylenol Defendants designed, developed, manufactured, tested, labeled, packaged, distributed, marketed and/or sold Tylenol, including the Tylenol ingested by Mrs. Guist while she was pregnant with Minor Plaintiff H.G.

197.    At all relevant times, Publix had control over the acetaminophen sold under its store brand. Publix designed, labeled, packaged, tested, distributed, and/or sold its store brand pure-acetaminophen products, including those that Mrs. Guist took while pregnant with Minor Plaintiff H.G.

198.    Defendants had an ongoing duty to the consuming public to provide adequate warnings or instructions about the risks and latent dangers associated with the use of acetaminophen during pregnancy.

199.    The Tylenol Defendants, as manufacturers of drugs, are held to the level of knowledge of an expert in the field and, in fact, had knowledge of the dangerous risks and side effects of Tylenol.

200.    At all relevant times, Publix affixed its own brand labeling on its acetaminophen products, and consumers reasonably believed Publix brand acetaminophen products were manufactured by Publix.

201.    Publix was therefore an "apparent manufacturer" of its store brand acetaminophen or otherwise exerted control over the design or manufacture of the product.

48

202. Publix was in the "stream of commerce" that produces, markets, and distributes its store brand acetaminophen.

203. In addition, Publix was in the "stream of commerce" that markets, promotes, distributes, and sells Tylenol® brand acetaminophen.

204. Acetaminophen, the sole active ingredient in Tylenol and Publix brand acetaminophen, can cause ASD in children. Defendants knew or should have known about these reasonably foreseeable risks in light of the scientific community's knowledge and had a duty to warn about them.

205. Nonetheless, Defendants never warned pregnant women that ingestion of acetaminophen while pregnant can cause ASD. The warnings that accompanied Defendants' acetaminophen products failed to provide the level of information that an ordinary consumer would expect when using the product in a manner reasonably foreseeable to Defendants.

206. Defendants knew or should have known that prenatal ingestion of acetaminophen could cause ASD in children and that the minimal warnings disseminated with their acetaminophen products were inadequate, failed to communicate adequate information on the dangers and risks of acetaminophen, and failed to communicate warnings and instructions that were appropriate and adequate to render acetaminophen safe for its ordinary, intended and reasonably foreseeable uses.

207. Defendants' promotional activities further diluted or minimized the warnings given with their acetaminophen products by misrepresenting the safety, risks, and benefits of acetaminophen in order to advance their own financial interests.

208. Specifically, Defendants marketed their acetaminophen products as pain relievers that are safe for pregnant women to use.

49

209. Defendants therefore breached their duty to warn of the risks associated with prenatal ingestion of acetaminophen.

210. Minor Plaintiff's mother was a foreseeable user of Defendants' acetaminophen products.

211. At all relevant times, Mrs. Guist used Defendants' acetaminophen products in the manner in which the drugs were intended to be used.

212. Defendants' acetaminophen products, when ingested by Mrs. Guist, were in the same condition as when the products were designed, developed, manufactured, tested, labeled, packaged, distributed, marketed, and/or sold by Defendants.

213. Mrs. Guist ingested Defendants' acetaminophen products while pregnant with Minor Plaintiff H.G., and H.G.'s in utero exposure to this acetaminophen caused him to develop ASD. Mrs. Guist did not know and could not have reasonably been expected to know of the risks associated with prenatal ingestion of acetaminophen.

214. At the time Mrs. Guist used Defendants' acetaminophen products, the drugs were unreasonably dangerous to Minor Plaintiff H.G., because of these products' inadequate warnings.

215. If Defendants had provided proper or adequate warnings and/or instructions of the risks of using acetaminophen while pregnant, she would have read and heeded those warnings and/or instructions and could have obtained or used alternative medication. As a result, Mrs. Guist would not have ingested Defendants' acetaminophen products while pregnant and Minor Plaintiff H.G. would not have been injured.

216. Defendants' lack of adequate warnings and instructions accompanying their acetaminophen products was a substantial factor in causing H.G.'s injuries.

217.    As a direct and proximate result of Defendants' failure to provide adequate warnings of the risks of their acetaminophen products, Minor Plaintiff H.G. has been injured, suffered severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, and economic damages, including but not limited to past and future medical expenses, lost income, and other damages.  Minor Plaintiff H.G. may also require additional medical and/or hospital care, attention, and services in the future.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**COUNT II: NEGLIGENCE**
**(Against All Defendants)**

218.    Plaintiff incorporates the preceding paragraphs as if fully stated herein.

219.    At all relevant times, Tylenol was under the exclusive control of the Tylenol Defendants and the Tylenol Defendants designed, developed, manufactured, tested, labeled, packaged, distributed, marketed and/or sold Tylenol.

220.    At all relevant times, Publix had control over acetaminophen sold under its store brand. Publix designed, labeled, packaged, tested, distributed, and/or sold its store brand pure-acetaminophen products, including those Minor Plaintiff H.G. was exposed to in utero.

221.    At all relevant times, Publix affixed its own brand labeling on its acetaminophen products, and consumers reasonably believed Publix brand acetaminophen was manufactured by Publix.

222.    At all relevant times, Defendants had a duty to design, label, package, manufacture, test, distribute, and sell their acetaminophen products with reasonable and due care for the safety

and well-being of the consuming public in general, and Plaintiff in particular, who was exposed to the product.

223.    Acetaminophen or APAP, the sole active ingredient in Defendants' products at issue, can cause ASD and/or ADHD in offspring when a woman ingests the drug while pregnant. Defendants knew or should have known about each of these risks and warned consumers about same, specifically warning pregnant women.

224.    Defendants' acetaminophen product labels warn of various risks, including at least one warning that is not required by federal law, but nothing on these labels warns pregnant women that ingestion of acetaminophen while pregnant can cause ASD and/or ADHD.  The warnings that accompanied Defendants' acetaminophen products thus failed to provide the level of information that an ordinary consumer would expect when using the product in a manner reasonably foreseeable to Defendants.

225.    Defendants therefore breached their duty to consumers, including Plaintiff, to communicate the risks associated with prenatal ingestion of acetaminophen with reasonable care.

226.    It was foreseeable that Minor Plaintiff H.G. would be exposed to Defendants' acetaminophen products while in utero.

227.    At all relevant times, Mrs. Guist used Defendants' acetaminophen products in the manner in which the drugs were intended to be used and in the same condition as when they were designed, developed, manufactured, tested, labeled, packaged, distributed, marketed, and/or sold by Defendants.

228.    Plaintiff did not know and could not have reasonably been expected to know of the risks associated with prenatal ingestion of acetaminophen.

229.   Mrs. Guist ingested Defendants' acetaminophen products while pregnant with Minor Plaintiff H.G., and this in utero exposure to acetaminophen caused him to develop ASD.

230.   Plaintiff's injuries were reasonably foreseeable to Defendants because they knew or should have known that prenatal ingestion of acetaminophen could cause ASD and/or ADHD in children and that the minimal warnings disseminated with their acetaminophen products failed to communicate warnings and instructions that were appropriate and adequate to render these products safe for ordinary, intended and reasonably foreseeable uses.

231.   Had Defendants used reasonable care in communicating adequate warnings and/or instructions of the risks of using their acetaminophen products while pregnant, Minor Plaintiff H.G. would not have been exposed to Defendants' acetaminophen products in utero and he would not have been injured.

232.   Defendants' lack of adequate warnings and instructions accompanying their acetaminophen products was a substantial factor in causing Plaintiff's injuries.

233.   As a direct and proximate result of Defendants' failure to provide adequate warnings of the risks of their acetaminophen products, Plaintiff has been injured, suffered severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, and economic damages, including but not limited to past and future medical expenses, lost income, and other damages. Minor Plaintiff H.G. may also require additional medical and/or hospital care, attention, and services in the future.

**WHEREFORE,** Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III: NEGLIGENT MISREPRESENTATION BY OMISSION
### (Against All Defendants)

234. Plaintiff incorporates the preceding paragraphs as if fully stated herein.

235. At all relevant times, the Tylenol Defendants designed, developed, manufactured, tested, labeled, packaged, distributed, marketed, sold and/or otherwise released into the stream of commerce Tylenol and exercised control over Tylenol.

236. At the time the Tylenol left the Tylenol Defendants' possession, it was in the same condition as when it was ingested by Plaintiff mother.

237. At all relevant times, Publix had control over acetaminophen sold under its store brand. Publix designed, labeled, packaged, tested, distributed, and/or sold its store brand pure-acetaminophen products and also distributed and/or sold Tylenol brand acetaminophen products, including those that Minor Plaintiff H.G. was exposed to in utero.

238. At all relevant times, Publix affixed its own brand labeling on its acetaminophen products, and consumers reasonably believed Publix brand acetaminophen was manufactured by Publix.

239. At the time the Publix acetaminophen and Tylenol brand acetaminophen left Publix's possession, it was in the same condition as when Ms. Guist ingested it, leading to Minor Plaintiff H.G. being exposed to it.

240. Defendants, as manufacturers and distributors of their acetaminophen products, owed a duty to the consuming public in general to provide accurate, truthful, and complete information about the risks and benefits of using acetaminophen when used in the intended manner and for the intended purpose.

241. Acetaminophen or APAP, the sole active ingredient in Tylenol, can cause ASD and/or ADHD in children when a woman ingests the drug while pregnant.

54

242.    Defendants knew or should have known about each of these risks to warn consumers, specifically pregnant women.

243.    Defendants' acetaminophen labels mispresent its safety because the label omits the risk of a child developing ASD and/or ADHD from in utero exposure to acetaminophen.

244.    Defendants breached their duty of care to Plaintiff in the labeling, packaging, distribution, marketing, and/or sale of the acetaminophen products.

245.    Defendants knew or should have known their statements regarding the safety of acetaminophen constituted misrepresentations for failing to disclose the risk of a child developing ASD and/or ADHD from in utero exposure to acetaminophen.

246.    Defendants intended for Mrs. Guist and other consumers to rely on these misrepresentations, and it was foreseeable that Mrs. Guist would ingest acetaminophen while pregnant as a result of Defendants' misrepresentations.

247.    Defendants knew that pregnant women would rely on their misrepresentations regarding the safety of acetaminophen, which omitted the risk of a child developing ASD and/or ADHD from in utero exposure to acetaminophen.

248.    Because of Defendants' representations to Mrs. Guist regarding the safety of Tylenol failed to disclose the risk of a child developing ASD and/or ADHD from in utero exposure to acetaminophen, Mrs. Guist relied on the Tylenol Defendants' misrepresentations when she purchased and consumed acetaminophen and Minor Plaintiff H.G. was exposed to acetaminophen in utero.

249.    At all relevant times, Mrs. Guist used Defendants' acetaminophen products in the manner in which the drugs were intended to be used.

250.    As a result, Minor Plaintiff H.G. was injured in that he developed ASD due to his in-utero exposure to acetaminophen.

251.    It was foreseeable that Defendants' misrepresentations, actions, and omissions would cause severe, permanent, and debilitating injuries to Plaintiff.

252.    Defendants' conduct was a substantial factor in causing Plaintiff's injuries.

253.    As a direct and proximate result of Defendants' negligence, Plaintiff has been injured, suffered severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, and economic damages, including but not limited to past and future medical expenses, lost income, and other damages. Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

## COUNT IV: BREACH OF IMPLIED WARRANTY
### (Against All Defendants)

254.    Plaintiff incorporates the preceding paragraphs as if fully stated herein.

255.    At all relevant times, the Tylenol Defendants were in the business of selling Tylenol. Tylenol was under the exclusive control of the Tylenol Defendants. The Tylenol Defendants designed, developed, manufactured, tested, labeled, packaged, distributed, marketed and/or sold Tylenol, including that Minor Plaintiff H.G. was exposed to in utero.

256.    At all relevant times, Publix was in the business of selling its store brand acetaminophen products. Publix controlled, designed, developed, tested, labeled, packaged, distributed, marketed and/or sold its acetaminophen, including its store brand acetaminophen that Minor Plaintiff H.G. was exposed to in utero.

257.    At all relevant times, Defendants intended that pregnant women purchase and ingest their acetaminophen products, thus exposing their child in utero to acetaminophen, and Defendants impliedly warranted these products to be of merchantable quality and fit for such use.

56

258.    It was foreseeable that Minor Plaintiff H.G. would be exposed to Defendants' acetaminophen products.

259.    Defendants knew or had reason to know that, while pregnant with H.G., Mrs. Guist would rely on Defendants' judgments and representations regarding the safety of their acetaminophen products for pregnant women.

260.    Defendants' acetaminophen products were expected to reach and did reach consumers without substantial change in the condition in which the products were manufactured and sold by Defendants.

261.    Defendants breached various implied warranties with respect to their acetaminophen products in that these products were not fit for their intended purpose or ordinary use, and specifically, that Defendants represented that these products were safe for pregnant women and would not cause ASD and/or ADHD in children when exposed in utero.

262.    In reliance upon Defendants' implied warranties, Mrs. Guist ingested Defendants' acetaminophen products while pregnant with Minor Plaintiff H.G., in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

263.    Defendants' breach of their implied warranties regarding their acetaminophen products was a substantial factor in causing Plaintiff's injuries.

264.    As a direct and proximate result of Defendants' breach of implied warranties regarding their acetaminophen products, Plaintiff has been injured, suffered severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, and economic damages, including but not limited to past and future medical expenses, lost income, and other damages. Minor Plaintiff H.G. may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT V – FRAUDULENT TRANSFER OF ASSETS
#### (Against the Tylenol Defendants)

265.    Plaintiff incorporates the preceding paragraphs as if fully stated herein.

266.    At all times relevant herein, there was a statute in Florida called the Florida Uniform Fraudulent Transfer Act ("UFTA"). F.S.A. § 726.105.

267.    The UFTA prohibits a debtor from transferring assets to prevent creditors from recovering the value of their claim without receiving appropriate compensation for the assets.

268.    The UFTA prohibits a debtor from incurring a debt with the intent to hinder, delay, or defraud any creditor.

269.    The UFTA prohibits a debtor from incurring a debt without receiving reasonably equivalent value if the debtor knows, or reasonably should know, that it would incur debts beyond the debtor's ability to pay as the debts become due.

270.    Plaintiff is a "creditor" as defined in the UFTA.

271.    The Tylenol Defendants are "debtors" as defined in the UFTA.

272.    Plaintiff has a "claim" as defined in the UFTA.

273.    J&J has known for many years that its acetaminophen products could cause ASD and ADHD in children when their mothers consume the drug while pregnant.

274.    The Kenvue Defendants have known since they were formed that its Tylenol products could cause ASD and ADHD in children when their mothers consume the drug while pregnant.

275.    Further, possessed with this knowledge, the Tylenol Defendants knew that individuals like Plaintiff would have legal claims against them for their actions surrounding the marketing, sale and advertising of these products to people like Plaintiff.

276.    Upon information and belief, J&J knew that claims of this nature could potentially subject them to billions of dollars in liability.

277.    J&J incorporated JNTL, Inc., the company that would eventually be known as Kenvue Inc. on February 23, 2022, as a Delaware corporation.

278.    When the initial public offering for Kenvue closed on May 8, 2023, J&J held the vast majority of Kenvue common stock. By August 2023, J&J had divested its majority stake down to 9.5% of Kenvue common stock. In May 2024, J&J intended to divest this remaining stake as well.

279.    Upon information and belief, to protect itself from liability for claims like those at issue here, J&J transferred its assets and liability to the Kenvue Defendants.

280.    This maneuver was a direct attempt by J&J to insulate itself from liabilities arising from consumer health products such as Tylenol by transferring its assets and liabilities to the Kenvue Defendants.

281.    The Kenvue Defendants incurred a debt intending to hinder, delay, or defraud creditors.

282.    The Kenvue Defendants incurred a debt while it knew, or should have known, that it would incur debts beyond its ability to pay the debts as they become due.

283.    This conduct is prohibited by the UFTA, regardless of whether the Tylenol Defendants intended this result and regardless of whether the Tylenol Defendants knew of Plaintiff's specific claims prior to the transfer.

59

284.    As a direct and proximate result of the actions of the Tylenol Defendants, the Plaintiff has been harmed in that they may be unable to recover full value for his claims.

**WHEREFORE,** Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for avoidance of the transfer, an attachment of assets of the Tylenol Defendants equivalent of the value of the transfer, an injunction against the Tylenol Defendants for the disposition of other corporate assets and all such other and further relief as this Court deems just and proper

## JURY TRIAL DEMAND

285.    Plaintiff hereby demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the Court to enter judgment in Plaintiff's favor and against Defendants for:

    a.    actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

    b.    pre-judgment and post-judgment interest;

    c.    **reasonable attorneys' fees as provided by law;**

    d.    costs and expenses of these actions;

    e.    statutory damages, treble damages and other relief permitted by the laws of Florida;

    f.    punitive damages to the maximum extent permitted by the laws of Florida, and

    g.    any other relief the Court may deem just and proper.

60

Dated: December 15, 2025

Respectfully submitted,

*/s/ Ashley Keller*

KELLER POSTMAN LLC
Ashley Keller (Florida Bar No. 1029118)
ack@kellerpostman.com
Ashley Barriere (*pro hac vice forthcoming*)
Ashley.barriere@kellerpostman.com
Amanda Hunt (*pro hac vice forthcoming*)
Amanda.Hunt@kellerpostman.com
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Roseann Romano (*pro hac vice forthcoming*)
Roseann.Romano@kellerpostman.com
1101 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Telephone: (202) 983-5484
Facsimile: (312) 971-3502

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing will be served on the Defendants by process server.

Date: December 15, 2025

*/s/ Ashley Keller*

61

Filing # 237783427 E-Filed 12/15/2025 07:12:32 PM

| | |
|---|---|
| **MELISSA GUIST as Parent and Natural Guardian of Minor Child, H.G.,** | **IN THE CIRCUIT COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR ST. JOHNS COUNTY, FLORIDA** |
| **Plaintiff,** | |
| **v.** | 552025CA001750A000MX |
| | **CASE NO.:** CA25-1750 |
| **JOHNSON & JOHNSON, KENVUE INC., KENVUE BRANDS LLC, and PUBLIX SUPER MARKETS, INC.,** | **DIVISION:** 59 |
| **Defendants.** | |

---

**SUMMONS:**

**THE STATE OF FLORIDA:**

To All and Singular the Sheriffs of said State:

      **YOU ARE COMMANDED** to serve this Summons, a copy of the Complaint in this action on defendant:

**JOHNSON & JOHNSON**
**C T Corporation System**
**820 Bear Tavern Road**
**West Trenton, NJ 08628**

**WITNESS** my hand and the seal of this Court on _12/17/2025_

Brandon J. Patty
**CLERK OF THE CIRCUIT COURT**

By:_____
As Deputy Clerk

**Persons with disabilities requesting reasonable accommodations to participate in this preceding should contact (352) 374-3639 (voice & TDD) or via Florida Relay Service at (800) 955-8771.**

**Accepted 12/17/2025 08:42 AM by the Clerk of the Circuit Court, St. Johns County, Florida, DIN: 7**

## IMPORTANT

A lawsuit has been filed against you. You have twenty (20) calendar days after this Summons is served on you to file a written response to the attached Complaint with the Clerk of this Circuit Court. A telephone call will not protect you; your written response, including the above case number given above and the names of the parties, must be filed if you want the Court to hear your case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book.)

If you choose to file a written response yourself, at the same time you file your written response to the Court, you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiffs Attorney" named below.

**KELLER POSTMAN LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
(312) 741-5220

## IMPORTANT

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Localizado en: 501 West Adams Street, Jacksonville, FL 32202 Una llamada telefonica no lo protegera; si usted desea que el tribunal consideres su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales, si lo desea, puede usted consultar a un abogado immediataments. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparencen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denomminada abajo como "Plaintiff's Attorney". (Demandate o Abogado del Demandante).

**KELLER POSTMAN LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
(312) 741-5220

## IMPORTANT

Des poursuites juriciaries ont ete entreprises contre vous. Yous avez 20 jours consecutifs a partir

de la date de 1 'assignation de cette citation pour deposer une response ecrite a la plainte ci-j ointe aupres de ce tribunal. Qui se trouve a: 501 West Adams Street, Jacksonville, FL 32202. Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige do deposer votre response ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal entende votre cause. Si vous ne deposez pas votre response ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du Tribunal. 11 ya d'autres obligtions juridiques et vous pouvez requeir les services immediate d'un avocat. Si vous ne connaissez pas d' avocat, vous pourriez telephoner a un service de renference d' avocats ou a un bureau d' assistance juridique (figuarant a l'annuaire de telephones).

Si vous choisissez de eposer vous-meme une response recrite il vous faudra egalement, en meme temps que cette formalite, faire parenvir ou expendier une copie au carbone ou one photocopies de votre response ecrite au "Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**KELLER POSTMAN LLC**
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
(312) 741-5220

## IN THE CIRCUIT/COUNTY COURT OF FLORIDA, SEVENTH JUDICIAL CIRCUIT, IN AND FOR FLAGLER, PUTNAM, ST. JOHNS AND VOLUSIA COUNTIES

### UNIFORM CASE MANAGEMENT ORDER

**NOTICE:  The deadlines referenced in this Order will be strictly enforced.**

This Case Management Order is issued in accordance with Fla. R. Civ. P. 1.200 and Administrative Order(s) of the Seventh Judicial Circuit Court. The deadlines referenced herein apply in conjunction with the trial date specified in the Order Setting Trial.

### A.     CASE DESIGNATION

All civil cases will be assigned a designation as follows: Civil cases in which trials by jury are demanded are designated as "General," except those cases in which all defendants have been defaulted. Civil cases designated as "Complex" pursuant to Rule 1.201, Fla. R. Civ. P., are exempted from the requirements of this Order and will follow the procedures outlined in the Rule. All other civil cases are designated as "Streamlined." Parties may move for redesignation in accordance with Fla. R. Civ. P. 1.200 (c)(1). Civil actions specified in Fla. R. Civ. P. 1.200(a)(1-18) are likewise exempted from the requirements of this order.

### B.     PROJECTED TRIAL PERIOD

The projected trial period for "General" cases will be no later than eighteen (18) months from case filing. The projected trial period for "Streamlined" cases will be no later than twelve (12) months from case filing. The parties may move the Court to fix a trial period on or before the projected trial period. For cases in which no trial order has been issued, the parties seeking affirmative relief must notify the Court no later than seventy-five (75) days before the expiration of the projected trial period that no trial order has been issued.

### C.     SERVICE OF PROCESS

Plaintiff(s) are required to serve each defendant with initial process and pleading no later than one hundred twenty (120) days from case filing as provided in Fla. R. Civ. P. 1.070(j). Proof of service of process is to be promptly filed with the Clerk of Court. Motions for extension of time to complete service of process must be filed no later than ten (10) days prior to the expiration of the initial time allotted for service. The motions must specify the reasons why service could not be performed within 120 days and what attempts had been made at service during that period. In its discretion, the presiding judge may grant the plaintiff(s) an additional ninety (90) days to serve any remaining defendant(s). After the expiration of the time for service, including any extensions, any unserved defendant(s) may be dismissed from the action without further notice.

### D.     ADDING NEW PARTIES

The deadline for adding new parties to an action is 120 days after the completion of service of process on the initial defendants in cases designated as "General" and 90 days after the completion of service of process on the initial defendants in cases designated as "Streamlined." Parties may not be added to actions after these deadlines absent a showing of good cause.

1

## E.    OBJECTIONS TO PLEADINGS

Motions objecting to pleadings must be called up for hearing no later than 120 days after the filing of the motion. Motions objecting to pleadings not called up for hearing within the time specified herein, absent a showing of good cause, may be deemed waived or abandoned.

## F.    DISCOVERY/DISCLOSURE DEADLINES

All discovery is to be completed according to the following schedule:

| Action or Event | General | Streamlined |
| --- | --- | --- |
| Mandatory Initial Disclosures | As provided in Fla. R. Civ. P. 1.280(a) | As provided in Fla. R. Civ. P. 1.280(a) |
| Disclosure of expert witnesses | 120 days before docket sounding for parties seeking affirmative relief; 90 days before docket sounding for parties not seeking affirmative relief | 90 days before docket sounding for parties seeking affirmative relief; 60 days before docket sounding for parties not seeking affirmative relief |
| Disclosure of fact witnesses | 60 days before docket sounding | 60 days before docket sounding |
| Service of written discovery requests | 45 days before docket sounding | 45 days before docket sounding |
| Completion of all discovery | 10 days before docket sounding | 10 days before docket sounding |

## G.    DISPOSITIVE MOTIONS

Dispositive motions must be filed and served no later than 120 days prior to the scheduled or projected trial period for "General" cases and 90 days prior to the scheduled or projected trial period for "Streamlined." cases. Motions for summary judgment and responses in opposition must comply with the deadlines set forth in Fla. R. Civ. P. 1.510. Movants must promptly call up dispositive motions for hearing, but no sooner than the time specified in Rule 1.510. Replies to responses in opposition to dispositive motions are only permitted upon leave of Court.

2

## H.    EXPERT WITNESS MOTIONS

Expert witness-related motions or objections (e.g., *Daubert* motions) must be filed no later than 60 days prior to the start of the scheduled or projected trial period for "General" cases and forty-five (45) days prior to the start of the specified or projected trial period for "Streamlined" cases.

## I.    PRETRIAL MOTIONS

All pretrial motions, other than dispositive motions and motions directed at expert witnesses, must be filed no later than thirty (30) days prior to the trial date. Pretrial motions filed within 30 days of trial will not be considered if predicated on matters the movant knew or should have known with the exercise of reasonable diligence at least 30 days prior to the trial date. Compliance by counsel (not staff) with the conferral requirements in Fla. R. Civ. P. 1.202 is required. Failure to comply with conferral requirements may result in summary denial of motions. Because of busy court calendars, hearing time may not be available to consider motions filed close to the deadline. The inability of a party to obtain hearing time will generally not constitute grounds for a continuance of the trial.

## J.    MEDIATION

Unless excused by the Court or excluded pursuant to Fla. R. Civ. P. 1.710(b), mediation is to be conducted in all cases. Mediation must be concluded, and a report filed prior to docket sounding.

## K.    EXTENSIONS/MODIFICATIONS OF DEADLINES

The deadlines specified herein will be strictly enforced unless modified by Court order. The parties may submit an agreed order to extend disclosure and/or discovery deadlines; however, all remaining deadlines will remain in place absent a Court order. Continuances of deadlines are strongly discouraged.

## L.    SERVICE OF THIS ORDER

Plaintiff is required to serve a copy of this Order on all other parties and file a notice of service with the Clerk within 30 days of the date of its issuance.

**DONE AND ORDERED** in Flagler, Putnam, St. Johns, and Volusia counties.

Leah R. Case
**Chief Judge**

Effective: January 1, 2025
Adopted: December 2024

3

Filing # 237783427 E-Filed 12/15/2025 07:12:32 PM

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

## I.    CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>SEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>ST. JOHNS</u>   COUNTY, FLORIDA

<u>Melissa Guist as Parent and Natural Guardian of Minor Child, H.G.</u>    552025CA001750A000MX
Plaintiff                                                                            Case # <u>CA25-1750</u>

                                                                                    Judge <u>59</u>

vs.

<u>Johnson & Johnson, Kenvue Brands LLC, Kenvue Inc., Publix Super Markets Inc.</u>
Defendant

## II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

**III.    TYPE OF CASE**     (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**Accepted 12/17/2025 08:42 AM by the Clerk of the Circuit Court, St. Johns County, Florida, DIN: 4**

- 2 -

## CIRCUIT CIVIL

☐ Condominium
❑ Contracts and indebtedness
❑ Eminent domain
☐ Auto negligence
☐ Negligence—other
       ☐ Business governance
       ☐ Business torts
       ☐ Environmental/Toxic tort
       ☐ Third party indemnification
       ☐ Construction defect
       ☐ Mass tort
       ☐ Negligent security
       ☐ Nursing home negligence
       ☐ Premises liability—commercial
       ☐ Premises liability—residential
☒ Products liability
☐ Real Property/Mortgage foreclosure
       ☐ Commercial foreclosure
       ☐ Homestead residential foreclosure
       ☐ Non-homestead residential foreclosure
       ☐ Other real property actions

☐ Professional malpractice
       ☐ Malpractice—business
       ☐ Malpractice—medical
       ☐ Malpractice—other professional
❑ Other
       ☐ Antitrust/Trade regulation
       ☐ Business transactions
       ☐ Constitutional challenge—statute or ordinance
       ☐ Constitutional challenge—proposed amendment
       ☐ Corporate trusts
       ☐ Discrimination—employment or other
       ☐ Insurance claims
       ☐ Intellectual property
       ☐ Libel/Slander
       ☐ Shareholder derivative action
       ☐ Securities litigation
       ☐ Trade secrets
       ☐ Trust litigation

## COUNTY CIVIL

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

- 2 -

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☐ No ☒

**IV.    REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☒ Punitive

**V.    NUMBER OF CAUSES OF ACTION:** [    ]
(Specify)

    5    1) strict products liability; (2) negligence; (3) negligent misrepresentation by omission; (4) breach of implied warranty; and (5) fraudulent transfer of assets

**VI.    IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.    IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.    DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Ashley C Keller        Fla. Bar # 1029118
        Attorney or party           (Bar # if attorney)

Ashley C Keller           12/15/2025

- 3 -

- 4 -

(type or print name)                    Date

CA25-1750

## IN THE CIRCUIT COURT, SEVENTH JUDICIAL
## CIRCUIT, IN AND FOR ST. JOHNS COUNTY, FLORIDA

## PRACTICES AND PROCEDURES STANDING ORDER FOR CIVIL
## CASES IN DIVISION 59

The following practices and procedures apply to all civil cases pending in Division 59. These procedures are designed to assist the parties in having their cases handled as efficiently as possible. If you have questions regarding the requirements set forth herein, please contact the judicial assistant for the division at mlapinski@circuit7.org or (904) 827-5654.

1.     **Orders on Unopposed Matters**: Orders on consented matters which do not need a hearing may be forwarded to the Judge. The motion and proposed order must specify that the relief sought has been agreed to by all parties. The order must be submitted electronically utilizing the procedures set forth below in paragraph 5.

2.     **Orders on Ex Parte Motions**: The Court will consider the following *ex parte* motions:

A.     *Motions to Cancel Foreclosure Sales:* The Court will consider motions to cancel or reschedule foreclosure sales on an *ex parte* basis, only if the following requirements are met: (a) the written motion is received by the Court no less than five (5) business days before the scheduled sale date and served on all parties; (b) the motion must contain specific facts setting forth the reasons for the postponement; and (c) the motion must have supporting documentation attached (e.g. sale contract, loan modification information, etc.). Motions will not be granted as a matter of right and will only be granted on a limited basis upon a determination of good cause.

B.     *Motions to Withdraw by Counsel:* Counsel may seek withdrawal from representation upon filing of an appropriate motion. Notice must be provided to all parties and their client. The motion must set forth the reasons for withdrawal and the client's last known address. ***If the client does not consent to the withdrawal in writing, a hearing will need to be scheduled.***

C.     *Motions to Substitute Counsel:* Motions to substitute counsel must comply with Fla. R. Gen. Prac. & Jud. Adm. 2.505 and contain the client's written consent.

3.     **Motions to Compel Discovery**:

A.     Unless there has been a complete failure to respond or object to written discovery requests, motions to compel discovery must include in the body of the motion in quotation, each interrogatory, deposition question, request for admission, or request for production to which the motion is addressed, followed by quotation, in full, of the answer or response which is asserted to be insufficient, or the objection and grounds stated by the opposing party. Merely attaching the request and alleged deficient response to the motion will not suffice.

B.     If there has been a complete failure to respond to discovery requirements, a party may utilize the procedures in Seventh Judicial Circuit Administrative Order CV-22-004-SC to obtain an order compelling discovery.

*C.*     Discovery disputes called up for a hearing and determined to not be meritorious, failure to respond to discovery, or objections to discovery that have no legitimate basis will result in sanctions, in accordance with Fla. R. Civ. P. 1.380.

**4.     Hearings:**

*A.*     **Scheduling Hearings**

i.     All hearings need to be coordinated among all counsel and scheduled through the Benchmark internet scheduling system. Instructions for using Benchmark can be found on the Judge's webpage at www.circuit7.org. **Hearings may not be scheduled on the Court's calendar less than 10 days before the scheduled hearing date without the Court's consent.**

ii.     No hearing shall be scheduled on motions that have not yet been filed. Hearings scheduled on unfiled motions will be stricken. A Notice of Hearing must be filed *immediately* upon securing hearing time.

iii.     *No hearing may be scheduled for longer than one hour on Benchmark.* Any hearing requiring more than one hour may only be scheduled through the judicial assistant. If a hearing is scheduled for more than one hour without prior authorization from the Court, the hearing will be stricken.

iv.     Multiple motions in the same case may not be scheduled at non-sequential times throughout the same day.

v.     Counsel must assure that enough time is reserved to allow for arguments by all parties. All parties will receive equal time during hearings. Hearings scheduled with insufficient time to hear all parties' arguments will be stricken and continued until sufficient time is available.

vi.     Other parties in a case are not permitted to notice a hearing on a different motion at the same time as the scheduled hearing without the consent of the party that reserved the time. Hearings set in such a manner will be stricken.

*B.*     **Chambers Copies of Motions:** If the motion(s) scheduled for hearing exceed(s) 15 pages, including attachments, the movant shall submit a chambers copy, in hard copy, of the motion(s) and attachments to the Court, which must be received by the Court *no later than ten (10) business days prior to the hearing.* Failure to timely submit a chambers copy of the motion as directed herein may result in canceling of the hearing, or the Court's inability to review the motion prior to the hearing due to the Court's busy hearing schedule.

*C.*     **Legal Memoranda:** If parties desire to submit legal memoranda, or responses in oppositions to motions upcoming for hearing, in addition to filing the memoranda or response, *regardless of length a chambers copy must be delivered to the judge no later than ten (10) business days prior to the hearing.* Responses or memoranda in opposition to motions are not required unless mandated by the Florida Rules of Civil Procedure. Responses or memoranda in opposition to motions shall not exceed twenty (20) typewritten pages without leave of Court.

Replies to responses in opposition to motions are not permitted absent leave of Court. Untimely submissions or submissions not delivered to the Court will not be considered.

*D.* **Conferral Certification:** All motions shall conform to the conferral requirements of Fla. R. Civ. P. 1.202. Motions that fail to comply with Rule 1.202 may be summarily denied. A non-movant's purposeful failure to respond to conferral attempts may be considered consent to the relief sought.

*E.* **Hearing Cancellations:** If a hearing is cancelled, a Notice of Cancellation must be filed ***and*** the judicial assistant must be ***immediately*** notified of the cancellation so the time may be made available for litigants in other cases. Only the party that scheduled a hearing may cancel that hearing.

*F.* **Court Reporters:** Parties arranging a court reporter for attendance at a hearing must assure the court reporter meets the requirements set forth in Seventh Judicial Circuit Administrative Order G-23-041-SC. Court reporters not satisfying these requirements will not be permitted to report the proceedings but the hearing will proceed as scheduled. Court reporters must appear in person if counsel for the parties appear in person, in order to assure the court reporter can hear all the participants.

*G.* **Emergency Motions:** Emergency hearings must be requested in writing, setting forth in the introductory or first paragraph the reasons why the matter is considered an "emergency." The request must be delivered to the Judge's chambers. Generally, emergencies exist where persons or property face the threat of imminent harm without court intervention. Hearings scheduled on emergency motions must be attended in-person by all counsel and necessary witnesses, unless the Court permits otherwise. The unwarranted designation of a motion as an emergency will result in summary denial of the motion and may result in additional sanctions.

*H.* **In-Person and Remote Appearances:** All hearings regardless of the number of matters to be heard, scheduled for one hour or longer or that are evidentiary must be attended in-person. Non-evidentiary hearings scheduled for less than one hour may be attended in person or through audio-video communication technology, as defined in Rule 2.530(a)(2), Fla. R. Gen. Prac. & Jud. Admin. Parties and/or counsel planning to attend a hearing via audio-video communication technology must file at least 24-hours prior to the hearing a notice of their intention to do so.

*I.* **Remote Appearance Zoom Procedures:** Audio-video communication technology is conducted using the Zoom platform. Zoom is accessible via the Court's Zoom meeting number 386 329 0263; no password is required. The following shall be strictly adhered to during authorized appearances made over Zoom:

i. Hearings conducted on Zoom are official court proceedings, and proper courtroom decorum must be followed, ***including appropriate courtroom attire.***

ii. Unauthorized recording of Zoom proceedings is not permitted.

iii. If a court reporter is present they must meet the requirements in Seventh Judicial Circuit Administrative Order G-23-041-SC.

iv. Participants shall not move their device around during the Zoom proceedings.

v.  Participants shall limit distractions during the hearing.  Find a quiet place to participate in the hearing.

vi.  All participants shall assure, that they are ***properly identified by name.*** Zoom identifiers such as "iPhone" are insufficient.

vii.  Participants who interrupt the proceedings, or create a distraction, will be disconnected.

*J.*  **Hearing Notices:**  All notices of hearing must identify the specific hearing room or courtroom where the hearing will take place and shall not indicate the hearing is a remote hearing.  For non-evidentiary hearings scheduled for less than one hour, the notice shall additionally specify "parties and/or counsel may appear by Zoom in lieu of in-person appearance and must strictly adhere to the Zoom attendance guidelines."  An example of a proper notice of hearing can be found on the Court's website.

5.  **Submission of Proposed Orders:**

*A.*  All proposed orders must be sent to the Court electronically by email at division59@circuit7.org.  The subject line of the email must state "Proposed Order," and include the case style and case number.  The proposed order must be an attachment to the email in MS Word format.  Proposed orders shall not be filed thru the e-filing portal.  Do not send proposed orders in pdf format.

*B.*  Executed orders will be served upon counsel of record in the case at their designated email addresses; thus, it is imperative all counsel keep their email addresses up to date.  Unrepresented parties who have designated an email address will receive the executed orders at their email address.  Unrepresented parties who have been excused from designating an email address will receive orders through the mail.

*C.*  Proposed orders following a hearing at which the judge announced a ruling and directed a party to submit a proposed order reflecting that ruling must be presented to opposing counsel prior to submission to the Court.  The email to the Court with the attached proposed order must indicate whether the proposed order had been shown to opposing counsel for review and whether opposing counsel agrees to its content.

*D.*  Proposed orders following a hearing at which the judge did not announce a ruling shall only be submitted if the Court requested the parties to do so.

6.  **Setting Cases for Trial**:  Parties seeking to set a case for trial do not need to schedule a hearing with the Court but should file a Notice of Trial that complies with Fla. R. Civ. P. 1.440.  A copy of the Notice must be sent to the Judge's chambers.  If a specific trial term is agreed to by the parties, the Notice should so specify.  The Notice of Trial must specify whether the trial is by jury or non-jury, and the expected length of the trial.  Parties shall carefully read the Court's Order Setting Case for Trial and the Uniform Case Management Order to comply with the requirements and deadlines therein.

7.  **Motions for Summary Judgment:** Motions for summary judgment, and responses thereto, shall strictly adhere to the time requirements in Fla. R. Civ. P. 1.510 and the Uniform Case Management Order.  Motions and/or responses that do not adhere to the time

specifications will not be considered. Replies by movants to a non-movant's response in opposition to a motion for summary judgment are not permitted absent an order from the Court. Replies filed without Court authorization will not be considered.

**8.**     **Motions to Continue Trials**: A motion to continue must comply with the requirements in Rule 1.460, Fla. R. Civ. P. and Rule 2.545(e), Fla. R. Gen. Prac. & Jud. Adm. No continuance is granted as a matter of right and the parties should not assume that a continuance will be granted, even if all parties consent. Motions to continue trials are disfavored and rarely granted. Lack of due diligence in preparing for trial is not good cause to continue a trial.

**9.**     **Settlements:**  If a case set for trial settles, counsel must notify the judicial assistant.

**10.**     **Witness Testimony by Audio-Video Communication Technology:** All witness testimony at hearings or trial shall be in-person unless otherwise authorized by Court order. If a party seeks to have a witness testify via audio-video communication technology, a motion must be filed that complies with Rule 2.530, Fla. R. Gen. Prac. & Jud. Admin. Parties calling a witness to testify via audio-video communications technology shall assure the witness is provided a copy of the Court's procedures governing Zoom appearances.

**11.**     **Trials:**  The following procedures are for jury trials before the Court. These procedures supplement the requirements set forth in the order setting the case for trial.

*A.*     Counsel shall stand when court is opened, recessed, or adjourned, the jury enters or retires from the courtroom, addressing or being addressed by the Court, examining witnesses, or making objections.

*B.*     All objections and remarks shall be directed to the Court, and not to opposing counsel. Disparaging personal remarks or acrimony toward opposing counsel will not be tolerated. Refer to all persons (including witnesses, other counsel, and parties) by their surnames, not by their first names. Exceptions may be made in the case of children.

*C.*     Counsel making objections shall state only the legal grounds for the objections, withholding further comment or argument unless requested by the Court. Speaking objections (other than legal basis) are not permitted. The proponent of the question should not make argument regarding the objection unless the Court requests a response.

*D.*     Any paper or other tangible object not yet received into evidence shall be marked for identification by the clerk and shown to opposing counsel before tendered to a witness.

*E.*     All exhibits must be pre-marked for identification by the clerk ***before trial***. Exhibits marked for identification shall be identified by letter. Exhibits will be assigned a number upon admission into evidence.

*F.*     One attorney for each party shall examine or cross-examine any one witness. The attorney who examines or cross-examines shall make any objections.

*G.*    Offers or requests for stipulations must be made outside the presence of the jury. Suggestions of counsel relating to the comfort or convenience of jurors must be made outside the presence of the jury.

*H.*    Do not ask the Court to declare a witness to be an expert, or "tender" a witness as an expert.

*I.*    Motions in limine shall be limited to case specific anticipated evidentiary issues. Boilerplate motions in limine not addressing case specific anticipated evidentiary issues will not be considered. *See State Farm Mut. Auto. Ins. Co. v. Davis,* 336 So.3d 392, 397 n.5 (Fla. 5th DCA 2022).

*J.*    Counsel for the Plaintiff shall bring one ream of letter size (8x11) paper on the first day of trial and hand it to the clerk. This paper will be used to prepare jury instructions and verdict forms.

*K.*    Counsel for the Defendant shall bring enough standard letter size (8x11) pads, envelopes to hold the pads, and pens, for each of the jurors, including alternate juror(s), to be used for juror note taking.

*L.*    Prior to jury selection, counsel for all parties shall confer and generate **one joint set** of jury instructions for use at the charge conference. Instructions that are agreed to shall be so designated; instructions not agreed to should be labeled as the Plaintiff's or Defendant's requested instructions within the **joint** set. Citations to the source of the instructions should be noted therein. Plaintiff's counsel (unless Plaintiff is unrepresented, in which case defense counsel) is responsible for creating the **joint** set of proposed instructions. The **joint** set of instructions should be given to the Court on paper and electronically (e.g. flash drive, email, etc.) in Microsoft Word format. Proposed verdict forms should be submitted the same way.

*M.*    Counsel and parties shall be prepared to try their cases anytime during the scheduled trial term.

*N.*    Please refer to the trial order and Uniform Case Management Order for additional requirements and deadlines.

DONE AND ORDERED in St. Augustine, St. Johns County, Florida.

_____
Kenneth J. Janesk, II Circuit Judge

*Revised January 2025*

# EXHIBIT B

# FILED UNDER SEAL

# EXHIBIT C

# FILED UNDER SEAL

# EXHIBIT D

Filing # 240419809 E-Filed 01/27/2026 10:35:34 PM

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT, IN
AND FOR ST. JOHNS COUNTY, FLORIDA

MELISSA GUIST as Parent and Natural
Guardian of Minor Child, H.G., Plaintiff

v.

Johnson & Johnson et al.
        Defendant.

CASE NO.: CA25-1750

NOTICE OF CONFIDENTIAL INFORMATION WITHIN COURT FILING

Pursuant to Florida Rule of General Practice and Judicial Administration 2.420(d)(2), I hereby certify that:

☒ 1. I am filing herewith a document containing confidential information as described in Rule 2.420(d)(1)(B) and:

    a. The title/type of document is: See attachment                                    ; **and**

    b. ☐ The entire document is confidential, **OR**

    ☒ the confidential information within the document is precisely located at: See attachment

_____

_____

**OR**

☐ 2. A document was previously filed in this case that contains confidential information as described in Rule 2.420(d)(1)(B), but a Notice of Confidential Information within Court Filing was not filed with the document and the confidential information was not maintained as confidential by the clerk of the court. I hereby notify the clerk that this confidential information is located as follows:

    a. Title/type of document: _____

    b. Date of filing (if known): _____

    c. Date of document: _____

    d. Docket entry number: _____

    e. ☐ Entire document is confidential, **OR** ☐ Precise location of confidential information in document:

_____

_____

I HEREBY CERTIFY that a copy of the foregoing was furnished by ☒ (email) ☐ (delivery) ☐ (mail) ☐ (fax) to andrew.kruppa@squirepb.com; amanda.preston@squirepb.com; jmcloone@shb.com; drogers@shb.com on, January 27                                    , 20 26    .

Signature: Ashley Keller    _Digitally signed by Ashley Keller Date: 2026.01.27 18:41:43 -06'00'_

Printed Name: Ashley Keller

Address: 2333 Ponce De Leon Blvd Ste R240 Coral Gables, FL

Telephone Number: 312-741-5520

Florida Bar No. (if applicable): 1029118

E-mail address: ack@kellerpostman.com

Note: The clerk of court shall review filings identified as containing confidential information to determine whether the information is facially subject to confidentiality under subdivision (d)(1)(B). The clerk shall notify the filer in writing within five (5) days if the clerk determines the information is NOT subject to confidentiality, and the records shall not be held as confidential for more than 10 days, unless a motion is filed pursuant to subdivision (d)(3) of Rule 2.420.

Form Revised July 2023

**Notice of Confidential Information Within Court Filing**

**Attachment A**

1.      The following portions of Plaintiff's Opposition to Defendants Johnson & Johnson, Kenvue Inc., and Kenvue Brands LLC's Motion to Dismiss quote purportedly confidential information:

      a.  Page 5, first full paragraph from "reviewed" to end.

      b.  Page 6, first full paragraph from "In" to "like ASD."

      c.  Page 6, second full paragraph from "J&J also" to "bottles of Tylenol."

      d.  Page 7, carryover paragraph from "when in" to "not warranted."

2.      The following portions of Declaration of Ashley Keller in Support of Plaintiff's Opposition to Defendants Johnson & Johnson, Kenvue Inc., and Kenvue Brands LLC's Motion to Dismiss quote purportedly confidential information: ¶¶ 12-15, 17, 23-24, 29-31.

3.      Exhibit 4, APAP-JJCI-0001717789: Internal email correspondence dated March 29, 2014.

4.      Exhibit 5, APAP-JJCI-0001722365-69: Internal email correspondence dated April 7, 2014.

5.      Exhibit 6, APAP-JJCI-000015607-08: Internal email correspondence dated April 14, 2014.

6.      Exhibit 7, APAP-JJCI-0001722804-07: Internal email correspondence dated May 27, 2014.

7.      Exhibit 9, APAP-JJCI-0000034407-09: Internal email correspondence dated September 22, 2021.

8. Exhibit 10, APAP-JJCI-0000035030-32: Internal email correspondence dated January 10, 2018.

9. Exhibit 13, BBC0000313-26: Internal Powerpoint Presentation.

10. Exhibit 16, APAP-JJCI-0001831517: Kenvue Inc. Letter to Dr. Munez.

11. Exhibit 17, APAP-JJCI-0001831515: Kenvue Inc. Letter to Dr. Deora.

12. Exhibit 18, APAP-JJCI-0001778097-507: Kenvue Inc. Medical Safety Periodic Benefit Risk Evaluation Report.

13. Exhibit 20, APAP-JJCI-0000016835-37: Internal email correspondence dated February 24, 2014.

14. Exhibit 24, APAP-JJCI-0001763435: Transcript of Johnson & Johnson Presentation dated February 22, 2018.


Date: January 27, 2026                                    /s/ *Ashley Keller*

# EXHIBIT E



Squire Patton Boggs (US) LLP
200 South Biscayne Boulevard, Suite 3400
Miami, Florida 33131

O   +1 305 577 7000
F   +1 305 577 7001
squirepattonboggs.com

Andrew R. Kruppa
T   +1 305 577 7712
andrew.kruppa@squirepb.com

January 30, 2026

**VIA ELECTRONIC MAIL**

Roseann Romano
Ashley Keller
Amanda Hunt
Keller Postman
1101 Connecticut Ave., N.W., Suite 1100
Washington, D.C.  20036

James Edgar
Canan Law
1030 N Ponce de Leon Blvd
St. Augustine, FL 32084

> **RE:**    **Guist v. Kenvue Inc., et al.**

Dear Counsel:

As you know, our firm represents Johnson & Johnson, Kenvue Inc., and Kenvue Brands LLC (the "Defendants") in this matter. The purpose of this letter is to raise serious, time-sensitive concerns regarding plaintiff's brief in opposition to the Defendants' motion to dismiss, which improperly discloses confidential documents in contravention of existing protective orders.

Plaintiff's brief in opposition attaches 582 pages of exhibits and is also accompanied by an 11-page declaration from plaintiff's counsel, Ashley Keller. Inexplicably, plaintiffs primarily submit and rely on "Confidential Information" and "Highly Confidential Information" that is protected by the January 18, 2023, Protective Order (the "MDL Protective Order") entered in *In re: Acetaminophen – ASD–ADHD Prods. Liab. Litig.*, MDL No. 3043 (E.D.N.Y.) (the "MDL Protective Order"), as well as the Protective Orders in the *Davey* (CA) and *Bellmon* (IL) matters. Defendants object to plaintiff's use or filing of these materials in this case without their consent, as required under the terms of the MDL Protective Order.

Pursuant to Paragraph 17 of the MDL Protective Order[1], "Confidential Information" and "Highly Confidential Information" may only be used in the MDL, except under limited circumstances that are not applicable here.

---

[1] The Protective Orders in *Davey* (CA) and *Bellmon* (IL) were adapted from and track the MDL Protective Order.

Over 40 Offices across 4 Continents

Squire Patton Boggs (US) LLP is part of the international legal practice Squire Patton Boggs, which operates worldwide through a number of separate legal entities.

Please visit squirepattonboggs.com for more information.

Squire Patton Boggs (US) LLP

January 30, 2026

Additionally, Paragraph 20 of the MDL Protective Order requires counsel to take all reasonable and necessary steps to assure the security of any "Confidential Information" or "Highly Confidential Information," including ensuring that any Internet site—such as this Court's electronic docket—is secure, and that the information cannot be accessed by any individuals who are not specifically authorized to review such information, or who have not executed the Acknowledgements for Certain Recipients.

Given the above restrictions, Defendants demand that plaintiff immediately take all steps necessary to ensure that no unauthorized individuals are able to access plaintiff's January 27th filings—including plaintiff's opposition brief, supporting exhibits, and the Declaration of Ashley Keller. This may include, but not be limited to, obtaining an Order from the Court formally and permanently sealing these documents.

Additionally, because the "Confidential Information" and "Highly Confidential Information" is not authorized for use in this case, Defendants further demand that plaintiff file an amended opposition brief that removes all use of, and references to, "Confidential Information" and "Highly Confidential Information." This demand is without prejudice to the Defendants' intent to seek expedited relief from the MDL, CA, and IL courts—including fees, costs, and other sanctions—due to plaintiff's use of such "Confidential Information" and "Highly Confidential Information," in blatant violation of the applicable Protective Orders.

Defendants also take this opportunity to point out that Plaintiff's use of "Confidential Information" and "Highly Confidential Information" in their opposition brief is improper not only under the terms of the MDL Protective Order, but also under well-established Florida law governing Rule 1.140(b)(6) motions, which are limited to the four corners of the complaint and may not consider extraneous matters.

Finally, given the length of the brief in opposition with exhibits, Defendants will seek leave of court to file a concise reply. Please confirm whether plaintiff will oppose that application.

Please confirm by Monday, February 2, whether plaintiff agrees to take the above actions. We will make ourselves available to meet and confer at your first availability, if necessary.

Very truly yours,

Squire Patton Boggs (US) LLP

Andrew R. Kruppa

# EXHIBIT F

# FILED UNDER SEAL

# EXHIBIT G

# FILED UNDER SEAL

# EXHIBIT H
## FILED UNDER SEAL